IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

|   |   |   |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 10-cr-219-WMS-HKS |
| | : | |
| TONAWANDA COKE CORPORATION | : | |
| | : | |

_____

**DEFENDANTS' JOINT RESPONSE TO THE GOVERNMENT'S SUPPLEMENTAL
SENTENCING MEMORANDUM AND MOTION FOR DESIGNATION OF
VICTIM STATUS UNDER THE CRIME VICTIMS' RIGHTS ACT**

Defendant Tonawanda Coke Corporation ("Tonawanda Coke" or the "Company"),

through undersigned counsel, and on behalf of co-defendant Mark L. Kamholz (collectively, the

"Defendants"), hereby submits this Response to the Government's Supplemental Sentencing

Memorandum and Motion for Designation of Victim Status Under the Crime Victims' Rights

Act (the "Supplemental Sentencing Memorandum"), filed November 5, 2013 [Docket No. 261].

**INTRODUCTION**

The government's Supplemental Sentencing Memorandum, filed in response to the

Court's inquiries at a status hearing for the parties held on October 22, 2013, reflects a marked

shift in the government's position.  Whereas the government previously acknowledged that

Defendants' offenses of conviction resulted in no "identifiable victims" and, instead, cited to a

group of 128 impact statements appended to its initial Sentencing Memorandum in support of the

nebulous proposition that the entirety of the community surrounding Tonawanda Coke

constituted the primary "victim" of Tonawanda Coke's offenses, it now moves the Court to

designate the authors of the impact statements as individual "crime victims" under the Crime

Victims' Rights Act of 2004 (the "CVRA").

Tonawanda Coke explained in earlier submissions to the Court that the government's characterization of the entire community as a victim of the Company's offenses of conviction in the instant case was not supported by case authority or the U.S. Sentencing Guidelines. Nonetheless, while the government's decision to seek the Court's designation of individual community members as "crime victims" under the CVRA resolves the defects in the government's earlier position, as discussed in detail herein, the government's newfound arguments in favor of conferring victim status on individual community members under the CVRA are without merit.  Most significantly, the government mischaracterizes the legal standard for designation of a "crime victim" under the CVRA and fails to make even a threshold showing that any of the categories of harm suffered by individual community members were "directly and proximately" caused by the offenses of conviction.  Without satisfying the threshold requirement of causation under the CVRA, a sentencing hearing, requested by the government to enable the Court to determine which specific community members qualify for victim status, is unwarranted. Accordingly, Defendants urge the Court to deny the government's motion to designate individual community members as "crime victims" under the CVRA.

In addition to moving for the designation of community members as "crime victims" under the CVRA, the government responds in its Supplemental Sentencing Memorandum to the Court's request for case authority purporting to support the government's assertion that a hearing, requested by Tonawanda Coke to present expert testimony, is not warranted to provide some context for the Court in assessing the seriousness of Tonawanda Coke's offenses in accordance with 18 U.S.C. § 3553(a).  As discussed in detail herein, the cases cited to by the government are inapplicable and do not obviate the need for the Court to convene a hearing to

receive testimony and evidence relevant to the facts of this case that would assist the Court in assessing the seriousness of the offenses of conviction under § 3553(a).

## ARGUMENT

## I.   THE GOVERNMENT MISCHARACTERIZES THE LEGAL STANDARD APPLIED TO THE CVRA

The CVRA affords certain enumerated rights to individuals who qualify as "crime victims."  According to the CVRA, a "crime victim" is a "person directly and proximately harmed as a result of the commission of a Federal offense."  18 U.S.C. § 3771(e).

### A.   The Government's Assertion that the Term "Victim" Under the CVRA is to be Construed Broadly is Misplaced

The government asserts that the CVRA construes the term "victim" broadly.  *See* Supplemental Sentencing Memorandum at p. 6.  This assertion however is not consistent with case authority in the Second Circuit.  In support of its argument that the term "victim" should be construed broadly under the CVRA, the government cites to *United States v. Battista*, 575 F.3d 226, 231 (2d Cir. 2009).  *See id.  Battista*, however, is inapplicable to the CVRA as it concerns the definition of "victim" under two previously enacted, but distinguishable, acts, the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. § 3663A, and the Victim and Witness Protection Act of 1982 ("VWPA"), 18 U.S.C. § 3663.  *See Battista*, 575 F.3d at 229-232.  Contrary to the outcome of *Battista*, and to the government's position, where the Second Circuit has addressed the CVRA directly, it has narrowly construed the term "victim" even when urged to define it broadly.  *See, e.g., In re Rendon Galvis*, 564 F.3d 170 (2d Cir. 2009).

In *Galvis*, a woman sought to enforce her rights as a crime victim under the CVRA after a defendant who was responsible for murdering her son was convicted on charges of drug trafficking and money laundering.  She argued that a broad interpretation of the definition of

"crime victim" under the CVRA is consistent with its underlying legislative intent, as reflected specifically in a statement made by Senator Jon Kyl on the Congressional Record.[1]  *See Galvis*, 564 F.3d at 173.  The United States District Court for the Southern District of New York denied the woman's motion.  *See id.*  In upholding the district court's ruling, the Second Circuit found that the woman did not qualify as a "victim" under the CVRA because she was not a person "directly and proximately harmed by the federal crime committed by the defendant."  *Id.* at 173-74.  The Second Circuit agreed with the district court's reasoning that the harm was "too attenuated" from the defendant's offense of conviction and there were "too many questions left unanswered concerning the link between" the defendant's federal offense and the alleged harm.  *Id.* at 175.

Similarly, in *In re Local # 46 Metallic Lathers Union*, 568 F.3d 81 (2d Cir. 2009), the Second Circuit denied a petition for a writ of mandamus prepared by a union seeking entitlement to restitution rights afforded by the CVRA.  In that case, the defendant had pleaded guilty to a conspiracy to launder money after admitting that he had forged checks from his company to fictitious vendors, then cashed those checks and used the cash to pay union employees off the books, which further allowed him to avoid contributing to union benefit funds.  *See Lathers Union*, 568 F. 3d at 82.  The Second Circuit concluded that the union did not constitute a victim under the CVRA on the ground that the conspiracy to launder money ended when the defendant cashed the checks and, therefore, the harm suffered by the union from the defendant's failure to

---

[1] This is precisely the statement that the government cites to in support of its argument that the term "victim" be construed broadly under the CVRA.  *See* Supplemental Sentencing Memorandum at p. 6.  In fact, Senator Kyl's statement is not supported by any other legislative history concerning the reach of the term "victim" articulated in the statute.  As the court in *United States v. Sharp*, 463 F. Supp. 2d 556, 561 (E.D. Va. 2006), noted, despite Senator Kyl's statement, the actual language of the statute constrains the meaning of the term "victim" to individuals "directly and proximately harmed" as a result of the commission of the defendant's federal offense.

make payments to the union's benefit funds was not directly connected to the offense of conviction. *See id.* at 86-87. In making this determination, the Second Circuit noted its reluctance to "engage in an expansive redefining of the term 'victim.'" *Id.* at 87.

Case authority in the Second Circuit and elsewhere has moreover declined to adopt the broad meaning of "victim" under the MVRA and the VWPA for the purposes of the CVRA. In *Lathers Union*, the Second Circuit expressly declined to determine "whether the CVRA's definition of crime victim as 'a person directly and proximately harmed as a result of the commission of a Federal offense' is the same as the MVRA definition." *Lathers Union*, 568 F.3d at 85, n.2. Similarly, in *In re McNulty*, 597 F.3d 344 (6th Cir. 2010), the Sixth Circuit noted that while it found its "case law interpreting the VWPA and the MVRA to be persuasive, it is not binding on our interpretation of the CVRA for the purposes of determining whether an individual is a 'crime victim' as the definition differs under the statutes." *McNulty*, 597 F.3d at 350, n.6.

Defendants respectfully urge the Court to refrain from departing with precedent by adopting the broad construction of the CVRA espoused by the government in its submission and to, instead, apply the Second Circuit's more narrow interpretation of the definition of "crime victim" under the CVRA to its consideration of the government's Supplemental Sentencing Memorandum.

B. The Government Confuses the Meaning of "Harm" Under the CVRA

The CVRA only applies to a person directly and proximately "harmed" as a result of the commission of a Federal offense. 18 U.S.C. § 3771(e). While "harm" is not expressly defined under the statute, the government improperly seeks to borrow the meaning of the term under the Victims' Rights and Restitution Act ("VRRA") of 1990 in support of its argument that the Court should construe the meaning of "harm" broadly. *See* Supplemental Sentencing

Memorandum at p. 5.  Specifically, the government states that "it can be inferred [from the VRRA] that the three types of harm cognizable under the CVRA are physical, emotional, or pecuniary harm."  *See id.*  The government's reliance upon *United States v. Turner*, 367 F. Supp. 2d 319, 322 (E.D.N.Y. 2005), for making this inference is unfounded.  *See* Supplemental Sentencing Memorandum at pp. 5-6.  *Turner* only notes that some of the rights in the CVRA were also included in the VRRA.  *See Turner*, 367 F. Supp. 2d at 322.  The decision in that case does not—implicitly or expressly—link the meaning of "harm" under the VRRA to the meaning of harm under the CVRA.

The government's misplaced inference also ignores contrary guidance from the United States Department of Justice, which has expressly acknowledged that Congress intended to construe the CVRA more narrowly than the VRRA.  Specifically, a Memorandum Opinion for the Acting Deputy Attorney General prepared by the Deputy Assistant Attorney General for the U.S. Department of Justice explained that the definition of "victim" under the VRRA and the CVRA are not coterminous, noting that the VRRA defined "victim" broadly "as a person that has suffered physical, emotional, or pecuniary harm," but that Congress adopted a more limited definition of "victim" under the CVRA that applies only when the person was "directly and proximately harmed" by an offense.  *See* Memorandum Opinion for the Acting Deputy Attorney General, from John E. Bies, Deputy Assistant Attorney General, Office of Legal Counsel, Re: *The Availability of Crime Victims' Rights Under the Crime Victims' Rights Act of 2004*, at *n.5 (December 17, 2010) (citations omitted). [2]  The Executive Office for United States Attorneys

---

[2] Consistent with the principle that the definition of "harm" under the VRRA is distinguishable from the definition of harm under the CVRA, the CVRA was drafted to repeal and replace section 502 of the VRRA.  Moreover, the acts have different purposes.  The purpose of the VRRA is to enumerate mandatory services available to crime victims, such as victim protection

("EOUSA") has similarly indicated that the meaning of a "crime victim" under the CVRA is distinguishable from the VRRA.  *See* Katharine L. Manning, Executive Office for U.S. Attorneys, U.S. Department of Justice, *Understanding Victim Rights in Mass Violence Cases*, unnumbered p. 4, available at

https://www.ncjtc.org/CONF/Ovcconf/AttMat/Understanding%20Victim%20Family%20Survivor%20Rights_Manning.pdf (last accessed November 14, 2013).  Specifically, the EOUSA states that the definition of a "victim" under the VRRA is a "person that has suffered direct physical, emotional or pecuniary harm as a result of the commission of a crime" whereas the definition of a "victim" under the CVRA is a "person that has suffered direct and proximate harm as a result of the commission of a Federal offense."  *Id.*[3]

The principle that the meaning of "harm" under the CVRA is distinguishable from the VRRA is further vindicated in *McNulty*.  In that case, the court held that "[b]ecause the CVRA does not include the specific language included in the others statutes, which predate the CVRA, we cannot assume that Congress intended the definitions [of a "crime victim"] to be identical." *McNulty*, 597 F.3d at 350 n. 6 (6th Cir. 2010); *cf. United States v. Monzel*, 641 F.3d 528, 542

---

and information services available to victims, whereas the purpose of the CVRA is to afford certain enumerated rights to victims of crimes, including the right to confer with prosecutors and to seek restitution.  In fact, while several of the specific rights enumerated in the CVRA were part of federal law under the VRRA, the legislation marked a departure from the VRRA and other previously enacted victims' rights statutes by giving putative victims direct standing to vindicate their procedural and substantive rights in criminal cases independently of prosecutors. *See* 18 U.S.C. §§ 3771(b), (d); *see also Turner*, 367 F. Supp. 2d at 322.  The different purposes of the CVRA and the VRRA, and the fact that the CVRA is unique in providing putative victims denied restitution with a private remedy, support the notion that the CVRA applies a more narrow definition of crime victims than the VRRA.

[3] Notably, in describing who qualifies as a victim under the CVRA at least as to crimes of mass violence, the EOUSA included family members of the deceased, those who suffered physical injuries at the scene, those who lost property and first responders.  *Id*. unnumbered at p. 7.  The EOUSA did not include individuals who suffered emotional trauma.

(D.C. Cir. 2011) (where "Congress includes particular language in one section of a statute but

omits it in another section . . . it is generally presumed that Congress acts intentionally and

purposely in the disparate inclusion or exclusion.") (citations omitted).

C. The Government Fails to Consider Case Authority Pertaining to the CVRA in which Courts Concluded that the Harm Alleged Was Too Attenuated From the Offense of Conviction

In the absence of a statutory definition of "harm" under the CVRA, and taking into

consideration that courts focus on whether a petitioner has made a sufficient showing of

causation to be conferred victim status under the CVRA statute, it is clear that the controlling

analysis under the CVRA is not whether a particular harm is "per se" cognizable under the

CVRA, but whether the injuries, losses or illnesses attested to by a putative victim are the "direct

and proximate cause" of a defendant's commission of a Federal offense.  Though the

government fails to reference directly applicable case authority from the Second Circuit,

Tonawanda Coke does not dispute that the legal authority cited by the government in its

Supplemental Sentencing Memorandum accurately reflects the causation standard applied in this

jurisdiction under the CVRA.[4]  *See* Supplemental Sentencing Memorandum at pp. 7-9.  Indeed,

in *Galvis*, the Second Circuit stated with respect to the CVRA that "[t]he requirement that the

victim be 'directly and proximately harmed' encompasses the traditional 'but for' and proximate

cause analyses."  *Galvis*, 564 F.3d at 175.

Nevertheless, the government omits entirely from its discussion of the applicable

causation standard any consideration of case authority in which the court found the harm alleged

to be too remote from the defendant's commission of a Federal offense.  Given the clear

---

[4] The sole case that the government cites from the Second Circuit pertaining to the standard for determining "direct and proximate" harm, *United States v. Marino*, 654 F.3d 310 (2d Cir. 2011), applies to the MVRA and the VWPA, not the CVRA.  *See* **S**upplemental Sentencing Memorandum at p. 7.

implication of the government's Supplemental Sentencing Memorandum—that the Court must construe the CVRA broadly or else the putative victims will not qualify under the CVRA—a review of such case authority is directly relevant to the Court's determination with respect to the government's Supplemental Sentencing Memorandum and accompanying motion to designate community members as victims under the CVRA.

In *United States v. Sharp*, 463 F.Supp.2d 556 (E.D. Va. 2006), the court declined to grant the petitioner crime victim status. In that case, the defendant was convicted of conspiring to possess with intent to distribute marijuana. The petitioner sought crime victim status on the grounds that she was physically, mentally and emotionally harmed by one of the defendant's marijuana customers, whose treatment of her was attributable to the drugs illegally sold to him by the defendant. *Id.* at 558-59. The petitioner supported her argument by citing to academic articles demonstrating a causal link between chronic marijuana usage and violent and aggressive behavior. *Id.* at 559. Nevertheless, the court refused to designate her as a crime victim under the CVRA on the grounds that she had not been "directly and proximately harmed" by the defendant's criminal actions. *Id.* at 568. The court reasoned that the abuse suffered by the petitioner did not "assist the Defendant in the commission of his federal offense, nor was it an essential element necessary for the accomplishment of his criminal acts. Therefore, [petitioner's] alleged injuries were not caused by the Defendant's offense of conviction." *Id.* at 564.

The court in *Sharp* further distinguished petitioner's circumstances from cases in which a causal link was established between the commission of the federal offense and the harm suffered by the putative victim despite multiple acts occurring in between the commission of the offense and the incurring of the harm. *See id.* In drawing such a distinction, the court emphasized that the guiding principle in determining whether harm is the "direct and proximate cause" of the

commission of a federal offense is whether it was a *foreseeable* consequence of the offense.  *Id.*

at 565 (emphasis added).  In this regard, the court found that it was readily foreseeable that a

defendant, convicted of a conspiracy to commit simple assault, would cause the victim's death

when he enlisted a co-defendant to "scare" the victim but then gave his co-conspirator a loaded

pistol.  *Id*.  By contrast, the court found that the petitioner in *Sharp* was unable to demonstrate

that her alleged injuries were a foreseeable consequence of the defendant's drug conspiracy.  *Id.*

The court's lengthy explanation for its rationale is instructive to the instant case:

> Foreseeability is at the heart of proximate harm; the closer the relationship
> between the actions of the defendant and the harm sustained, the more likely that
> proximate harm exists. Whether one seeking to be heard at a defendant's
> sentencing hearing is a "victim" under the CVRA is, therefore, a fact-specific
> question.
>
> Here, Nowicki [the petitioner] is not a "victim" as that term is used in the CVRA
> because she is not a person "directly and proximately harmed" by the federal
> crime committed by the Defendant. The Defendant has pled guilty to conspiring
> to distribute marijuana. But linking this fact to Nowicki's abuse is *too attenuated,*
> *either temporally or factually,* to confer "victim" status on Nowicki as that term is
> used in the statute. Nowicki is no doubt an alleged victim of her boyfriend's
> violent ways. But Nowicki cannot demonstrate the nexus between the
> Defendant's act of selling drugs and her former boyfriend's subsequent act of
> abusing her. *No consistent, well-accepted scientific evidence has been proffered to*
> *demonstrate that marijuana necessarily causes a person to become violent, and*
> *the Court certainly cannot take judicial notice of the same.* Indeed, the authority
> is conflicting at best.  Likewise, there is no evidence showing that Nowicki's
> significant other was not simply a "jerk," suffered from an anger management
> problem, or was otherwise predisposed to violence in one form or another,
> regardless of whether he was under the influence of marijuana at the time any
> alleged abuse occurred. Indeed, Nowicki even admits to the possibility that the
> Defendant's marijuana "had nothing to do with [her former boyfriend's] abusing
> [her]—perhaps [the former boyfriend] was just an evil person."
>
> In essence, to qualify as a victim, Nowicki would need to show a more direct
> link—or more specifically, a "direct and proximate" causal link—between the
> Defendant's act of selling marijuana to her boyfriend, and her boyfriend's
> subsequent abusive behavior against her. She would need to demonstrate not only
> that the Defendant conspired to sell marijuana, but also that the Defendant sold
> marijuana to her former boyfriend, that the boyfriend smoked the Defendant's

> marijuana, and that this drug usage caused her boyfriend to react such that he was compelled to violently attack Nowicki.

*Id.* at 566-67 (emphasis added, internal citations omitted).  Notably, the court in *Sharp* then added that even if it were to accept the petitioner's allegations as conclusively true, she would still lack a remedy under the CVRA, "for *there are too many questions left unanswered concerning the link between the Defendant's federal offense and Nowicki's suffered abuse.*" *Id.* at 567 (emphasis added).   In other words, the petitioner had failed to submit evidence that would help to prove the ultimate issue before the Court—whether the Defendant's distribution of marijuana was the "direct and proximate cause" of her physical and emotional abuse.  *Id.*

Citing to *Sharp*, the court in *Galvis* likewise concluded that the putative victim had failed to establish that the defendant's offense was the direct and proximate cause of the harm she suffered.  *See Galvis*, 564 F.3d at 175.  The court reasoned that, though there was no dispute that the putative victim's son was murdered and that the defendant was, to some extent, responsible, there were multiple possible motivations for the son's murder and not all were related to the defendant's conviction for conspiring to import cocaine into the United States.  *Id.*  Accordingly, the court concluded that there were "too many questions left unanswered concerning the link between the Defendant's federal offense and the petitioner's harm." *Id.*

*Sharp* and *Galvis* make clear that the controlling analysis under the CVRA is whether or not the defendant's commission of a specific Federal offense is the "direct and proximate cause" of the harm asserted to have been suffered by a putative victim.  As discussed in detail in this submission, the government has entirely failed to make even a *prima facie* showing that the categories of harm it sets forth in its Supplemental Sentencing Memorandum satisfy this causation threshold.  Accordingly, the government's motion to designate individuals as "crime victims" under the CVRA must be denied.

II.    **THE GOVERNMENT DOES NOT SATISFY THE THRESHOLD REQUIREMENT OF CAUSATION BETWEEN THE OFFENSES OF CONVICTION AND THE HARM SUFFERED BY INDIVIDUAL COMMUNITY MEMBERS**

The government offers a number of theories as to the nature of the harm that community members have suffered purportedly as a result of Defendants' commission of federal offenses. Specifically, the government argues that: (1) community members have had to endure the emotional trauma of living in a polluted environment and being subjected to uncontrolled noxious emissions; (2) community members are at increased risk of contracting future illnesses relating to the defendants' pollution; and, (3) physical injuries and property loss are linked to the Company's conduct underlying the offenses of conviction.  *See* Supplemental Sentencing Memorandum at pp. 13-14.  The government has offered these theories of harm despite the fact that it has not identified a single case that concluded individuals qualified as victims under the CVRA based on "emotional trauma" or an "increased risk of contracting future illnesses." Moreover, the impact statements that reference physical injuries or property damage fall far short of demonstrating or even alleging direct and proximate causation.  The theories of harm put forth by the government fail to satisfy the legal and factual threshold required for this Court to designate any of the community members whose impact statements were appended to the government's Sentencing Memorandum as "crime victims" under the CVRA.

A.    The Victim Designation in *United States v. CITGO Petroleum Corp.* Does Not Support the Government's Attempt in the Instant Case to Have Individual Community Members Designated as "Crime Victims" Under the CVRA

In support of its motion to designate community members as victims under the CVRA, the government cites at length to the district court's determination in *United States v. CITGO Petroleum Corp.*, Case No. C-06-563 (S.D. Tex.).  In that case, the district court initially granted

defendant CITGO Petroleum Corporation and CITGO Refining and Chemicals Company, L.P.'s

(collectively, "CITGO") Motion to Exclude the Government's Purported "Victim" Witnesses.

*See CITGO*, C-06-563 (S.D. Tex. April 5, 2011).  Subsequently, 14 community members filed a

motion with the district court seeking to be declared victims under the CVRA.  *See CITGO*, C-

06-563 (S.D. Tex. July 6, 2012).  After the United States Court of Appeals for the Fifth Circuit

directed the district court to consider the merits of the community members' motion pursuant to

a writ of mandamus, the district court granted the community members' victim status under the

CVRA.  *See* Memorandum Opinion & Order in *CITGO Petroleum Corp.* (the "Memorandum

Opinion & Order"), C-06-563 (S.D. Tex. Sept. 14, 2012).  A copy of the district court's

September 14, 2012 Memorandum Opinion & Order is attached hereto as **<u>Exhibit A</u>**.

     In *CITGO*, the community members argued that they were entitled to crime victim status

under the CRVA because (1) they had to breathe in noxious fumes; (2) they suffered other

harms, including mental harm, devaluation to property, and the destruction of vegetation; and (3)

chemical emissions from oil water separator tanks ("Tanks 116 and 117") at the CITGO facility

that lacked emission controls exposed community members to a future risk of health harms,

including cancer, and forced community members to undergo medical monitoring.  *See*

Memorandum Opinion & Order at p. 5.  In its Memorandum Opinion & Order, the district court

only addressed the merits of the community members' first argument.  The court stated that "[i]n

order to determine whether CITGO's federal offenses caused the Community Members' harm,

the Court must consider whether the harms that the Community Members suffered 'would

probably still have occurred' had CITGO maintained roofs on Tanks 116 and 117."  *Id.* at p. 5.

Examining the evidentiary record, the district court noted that, in response to complaints about

noxious odors on November 7, 1996, an investigator for the Texas Commission on

Environmental Quality ("TCEQ") traced the source of the odors to Tanks 116 and 117.  *Id.* at pp. 5-6.  The TCEQ investigator also drove to another refinery in the area in order to confirm that the odor was not emanating from another source.  *Id.* at p. 6.  She then issued CITGO a notice of violation because the odors were determined to be a "nuisance."  *Id.*  The Texas Natural Resource Conservation Commission later confirmed that the odors were coming from Tanks 116 and 117, and that these odors amounted to nuisance conditions and were "confirmed at several residents [*sic*]."  *Id.*  Similarly, in response to ten complaints about noxious odors causing a "stuffy nose, headaches and bronchitis" on January 15, 1997, a TCEQ investigator traced the source of the odor specifically to Tank 117.  *Id.* at pp. 6-7.  Finally, the court noted that CITGO had acknowledged that the nuisance level odor complaints were traced to Tanks 116 and 117.  *Id.* at p. 7.

Applying the standard for proximate causation set forth in *In re Fisher*, 649 F.3d 401, 403 (5th Cir. 2011), the court in *CITGO* concluded that, based on the evidentiary record connecting the noxious odors directly to Tanks 116 and 117, "had CITGO had proper emission controls on Tanks 116 and 117, the Community Members would not have suffered the aforementioned symptoms on November 7, 1996 and January 15, 1997.  Thus, CITGO's 'commission of a Federal offense' directly and proximately harmed the Community Members on those specific days."  *Id.*  Accordingly, the district court held that "Community Members are crime victims based on the immediate negative health effects they suffered from breathing noxious fumes from Tanks 116 and 117."  *Id.* at pp. 7-8.  The district court then declined to consider the merits of the community members' arguments that emotional distress, increased risk of future disease, and property-related harms would independently confer crime victim status on them under the CVRA.  *Id.* at p. 8.

Contrary to what the government appears to suggest, the court's decision to grant community members victim status under the CVRA in *CITGO* has no bearing on the government's motion in the instant case.[5]   The district court's determination in *CITGO* was premised upon the "immediate negative health effects" suffered by community members from breathing noxious fumes emanating from the two specific tanks at the center of CITGO's criminal conduct.   The court did not weigh in on whether emotional trauma or the future risk of health harms is included in the meaning of "harm" under the CVRA.[6]   Moreover, in *CITGO*, the district court relied upon the specific and direct causal connection that had been established in the record between the commission of the offense and the noxious fumes that community members had breathed, and upon the fact that other potential sources for the noxious odor had been excluded by TCEQ investigators, to determine that community members qualified as victims under the CVRA.   In the instant case, there is no such evidence on the record of a specific and direct connection between the underlying conduct related to the offenses of conviction and "noxious emissions" to which the government claims community members were subjected.

---

[5] Notably, though the government includes a lengthy description of the procedural history in *CITGO*, its Supplemental Sentencing Memorandum fails to explain how the court's reasoning in *CITGO* is persuasive to the government's arguments in the instant case.   The government mentions in passing that, like the residents around CITGO in Corpus Christi, Texas, individual community members in the present case "have been subjected to emotional harm due to the defendants' criminal acts."   *See* Supplemental Sentencing Memorandum at p. 19.   However, as noted, *supra*, the district court in *CITGO* declined to address the question of whether emotional harm constitutes a basis for designation as a "crime victim" under the CVRA.

[6] The district court noted that "harm" is defined as "physical or mental damage: injury" by Merriam-Webster and as "physical or psychological injury or damage" by the American Heritage Dictionary, but did not state whether those definitions were applicable to the CVRA.

B.  <u>The Impact Statements Appended to the Government's Sentencing Memorandum Do Not Establish a Direct and Proximate Connection Between the Offenses of Conviction and the Illnesses and Injuries Suffered by Individual Community Members</u>

   *1.   On Their Face, The Impact Statements are Insufficient for the Court to Confer "Crime Victim" Status on Individual Community Members*

The government previously appended 128 impact statements as an exhibit to its initial Sentencing Memorandum, filed September 16, 2013 [Docket No. 216].  In its Supplemental Sentencing Memorandum, the government now states that "[a] review of the 128 impact statements from the community members is replete with examples of the harms discussed above."  *See* Supplemental Sentencing Memorandum at p. 14.  For the purposes of this submission, Tonawanda Coke does not question or seek to minimize the medical illnesses, ailments, loss of life and other hardships reflected in the impact statements submitted by the government.  Nevertheless, those impact statements submitted by the government fail to offer any grounds for the Court to designate individuals as "victims" under the CVRA because of the statements' failure to demonstrate the necessary causal link between the illnesses and injuries suffered by the putative victims and the offenses of conviction. [7]

_____

[7] The government's Supplemental Sentencing Memorandum remains confusing because it has not provided any meaningful guidance to the Court beyond its request for a hearing.  In this regard, the government does not explain whether it seeks to have all of the authors of the 128 impact statements that it has submitted to be designated as "victims" under the CVRA or only a portion of them.  The government also does not address, nor do any of the impact statements appear to relate to, harm allegedly caused by the conduct underlying Defendants' convictions for offenses relating to violations of the Resource Conservation and Recovery Act ("RCRA").  That is, the government's Supplemental Sentencing Memorandum appears to seek the Court's designation of community members as victims under the CVRA for harms suffered solely as a result of violations of the Clean Air Act.

Lastly, the government does not explain how designation of community members as crime victims affects the sentencing recommendation it has made to the Court.  The government's sentencing recommendation to the Court includes a request for the Court to order Tonawanda Coke to fund certain community service projects.  *See* Gov't's Sentencing Memorandum at p. 6.  Until the filing of its Supplemental Sentencing Memorandum, the

Many of the impact statements submitted by the government do not provide the Court

with any purported basis for finding a link, direct or otherwise, between Defendants' commission

of the offenses of conviction and the illnesses or injuries suffered by the statement's author.  For

instance, Jennifer Bruggeman writes that she has a thyroid condition "due to the chemicals

released over the years" without indicating the precise nature of these "chemicals", any

knowledge or belief as to who released the "chemicals," or the time period that they were

released.  [Docket No. 228, p. 21].  Janet Chilelli lists cancers that she and family members have

been diagnosed with, but, except for noting that her family members are "longtime residents of

the Town of Tonawanda," does not explain the basis for her belief that Tonawanda Coke's

conduct impacted her family members' illnesses.  [Docket No. 228, p. 34].  As the government

noted in its Supplemental Sentencing Memorandum, former Tonawanda Police Chief John

Ivancic states that his "house is constantly being covered in black soot" and that he is also

"subjected to noxious odors throughout the year."  [Docket No. 330, p. 32].  Yet, he does not

provide any explanation in support of his belief that his cancer is related to the black soot or

government has relied upon the impact statements and its assertion that the "community as a
whole" is the purported victim of Tonawanda Coke's criminal conduct to justify its request for
the Court to order Tonawanda Coke to fund community service projects.  *See id.* at pp. 32, 38.
Tonawanda Coke has objected to the purported basis for the government's request.  *See*
Tonawanda Coke's Response to Gov't's Sentencing Memorandum, filed Sept. 30, 2013 [Docket
No. 241], at pp. 15-19.
     Following its re-evaluation of the individual community members' impact statements and
after conducting further research, the government now appears to have reversed course and
dropped its contention that the "community as a whole" is a victim of Tonawanda Coke's
commission of federal offenses.  Nevertheless, the government does not explain how this change
in position affects its sentencing recommendation to the Court, particularly with respect to its
request for community service payments.  Tonawanda Coke further notes that if the
government's motion to designate individual community members as "victims" under the CVRA
is successful, those individuals will be able to seek restitution against the Company.  *See* 18
U.S.C. § 3771(a).  The government does not explain how a request for restitution by the
individual community members would affect its overall sentencing recommendation to the
Court.

noxious odors, nor does he link the black soot and noxious odors to the Company's unpermitted operation of the pressure relief valve or its failure to install baffle systems in its quench towers.[8]

Certain of the statements submitted by the government in fact expressly indicate that the author is unable to attribute his or her illness to the conduct underlying the offenses of conviction. For instance, Susan Mazur writes that "[a]s of yet, I can't be positive about what my medical condition can be attributed to." [Docket No. 230, p. 55]. Jessica Castner also writes that she realizes that "these health issues can be caused by an array of factors." [Docket No. 228, p. 31]. Diane Evans noted that she did "not know of any health effects the pollution coming from Tonawanda Coke has had on me directly." [Docket No. 228, p. 59]. In another impact statement, Diane Evert questions whether her health problems are "from Tonawanda Coke Plant polluting air and land?" but does not actually attribute her illnesses to the commission of the offenses at issue. Theresa Giambra writes in relation to her daughter's esophageal cancer that, "[t]here is probably no way to prove that the Coke plant was directly responsible." [Docket No. 230, p. 12].[9]

_____

[8] Former New York State Department of Environmental Conservation ("NYS DEC") Regional Air Engineer and Regional Solid and Hazardous Materials Engineer Henry Sandonato has stated that "there will always be odors associated with coke ovens because of the process and that sulfur has a low odor threshold [but] that doesn't mean it's harmful." *See* Exhibit 1 to Tonawanda Coke's Sentencing Memorandum, filed September 16, 2013 [Docket No. 229], at p. 1.

[9] Several representatives of the community who have not themselves suffered illnesses or injuries further note that the medical conditions described in the impact statements cannot be attributed specifically to the conduct underlying Tonawanda Coke's offenses of conviction. For instance, Jackie James Creedon writes as follows:

> Since I became a community activist, about ten years ago, I have heard endless stories of sickness in my community: cancer, tumors, breathing problems, household pets (dogs) that die of unexplained growths, the list goes on and on. Many of these illnesses cannot be directly linked to Tonawanda Coke Corp.'s emissions.

Other statements submitted by the government blame Tonawanda Coke for the illnesses

or injuries suffered by the author, but point to specific causes different from the conduct

underlying the offenses of conviction.  For instance, the statement submitted on behalf of Robin,

Charles and Peter Aronica appears to blame the illnesses described in the statement to "a large

black cloud" that comes out of Tonawanda Coke's "stacks" at night.  [Docket No 228, p. 3].

David Bentley writes that he, his son and his deceased wife seek restitution as a result of the

"intentional dumping of poisons by the Tonawanda Coke Plant on River Road in the Town of

Tonawanda."  [Docket No. 228, p. 10].  Jay Farquharson cites Tonawanda Coke's purported

practice of "burn[ing] dirty coke at night" as the cause of his exposure to benzene and other

"toxics" that will manifest themselves as illnesses in the future.  [Docket No. 230, p. 3].

Certain statements claim benzene exposure as the root cause of the author's illnesses, but

fail to link that exposure to the Company's Clean Air Act violations. [10]  For instance, John

Bartolomeo writes that he suffers from leukemia and that "[t]he benzene that was emitted from

Tonawanda Coke Plant has been identified as a major cause of leukemia."  [Docket No. 228, p.

9].  He also writes that another cancerous growth "is believed to have been associated with

benzene and other toxins that were emitted by the Tonawanda Coke Plant."  *Id.*  As to Mr.

Bartolomeo's leukemia, it was diagnosed in 1994, well before the time period of the Company's

_____

[Docket No. 228, p. 49].  Similarly, the Hon. Kevin Hardwick writes that "it is difficult to
attribute causality and say which deaths and serious medical conditions were the result of the
company's actions and which were due to other factors."  [Docket No. 230, p. 16].

[10] The Indictment charges that the unpermitted operation of the pressure relief valve resulted in
emissions of coke oven gas, which are known to contain benzene.  *See* Indictment at ¶ 13.  As to
the remaining counts related to the Clean Air Act—the failure to install baffles in the quench
towers—the Indictment only states that a baffle system is designed to effectively reduce
"particulate emissions during quenching" and that particulate matter is "an air pollutant."  *See*
Indictment at ¶¶15-16.

conduct specified in the Indictment.  Mr. Bartolomeo also does not explain whether the benzene exposure that he believes led to his cancers was caused by the Company's operation of the pressure relief valve or the basis for such a belief.  David Brown notes that, after his daughter was diagnosed with Leukemia, he researched how "Benzene from coke ovens is known to cause Leukemia in extremely low concentrations."  [Docket No. 228, p. 20].  However, Mr. Brown's daughter was first diagnosed with the disease in 1988, well before the time period specified in the Indictment, and he does not offer any evidence that his daughter's purported exposure to benzene was the result of Tonawanda Coke's operation of an unpermitted pressure relief valve. Donna Hennessy also writes that she has been diagnosed with a bone marrow cancer caused by exposure to benzene but does not offer any indication as to the basis for her belief or the cause of her benzene exposure.[11]  [Docket No. 230, p. 19].

A number of impact statements, some of which are cited by the government in its Supplemental Sentencing Memorandum, directly attribute certain injuries to the absence of baffles in the quench towers.  For instance, Alphonse Esposito writes that he has had to wash his car "almost every day to wash off the oil and tar that is left in the morning.  I believe this has happened because I have learned that they [Tonawanda Coke] were operating with no baffles in the quench towers."  [Docket No. 228, p. 56].  Similarly, Joyce Hoffman Hogenkamp wrote that "[b]ecause of no baffles in the quench tower, it made it impossible to enjoy our back yard, with

---

[11] In its review of the 128 impact statements, counsel for Tonawanda Coke located only one statement, authored by Alphonse Esposito, that attributed illness to the Company's unpermitted operation of the pressure relief valve.  Specifically, Mr. Esposito wrote that he suffered from "chronic eye, ear, nose and throat irritations and infections" and that "the burning [is] because of the illegal bleeder valve releasing toxic emissions in the air."  [Docket No. 228, p. 56]. Nonetheless, Mr. Esposito did not explain the basis for his belief that the pressure relief valve caused his symptoms, the date of the onset of his symptoms or their duration.  William Meagher felt that his lung cancer (diagnosed in November 2012) was caused by "Tonawanda Coke's illegal emissions", but like Mr. Esposito did not explain the basis for this belief.

pool and hot tub.  There was always a horrible smell followed by a burn.  There was a black oily film on the pool and tar balls floating around.  I had to wash white siding almost every day with Dawn soap to remove the oil clinging to it."  [Docket No. 230, p. 26].  Ronald McEldowney also wrote that "because of no baffles in the quench towers and other violations, I've had to power wash my home excessively, I do not have a garage and the amount of tar and oil left on my car has led me to wash it daily or suffer from paint damage and a shortened life span of the vehicle." [Docket No. 230, p. 49].  Despite attributing the damage to their property to Tonawanda Coke's failure to install baffles in its quench towers, none of these statements offer any evidence or indication, besides the author's supposition, that the cited property damage was in fact directly and proximately caused by the failure to install baffles in the quench towers.

Moreover, while Defendants do not, for the purposes of this submission, question the veracity of the statements' accounts, the causal link between the property damage and the Company's failure to install baffles in violation of the Clean Air Act is undermined by the absence of any information in the evidentiary record indicating that the particulate matter that was emitted through the quench tower dispersed beyond the boundaries of the Tonawanda Coke facility.  It is also undermined by the trial testimony indicating that quench towers are used to spray incandescent coke with water at the conclusion of its heating cycle.  As such, any particulate matter emitted through the quench towers would not have involved oily or tar like substances of a nature similar to those described in the impact statements.

> **2. Even Accepting the Impact Statements as True, The Connection Between the Offenses of Conviction and the Harms Asserted By the Government Remains Too Attenuated**

Even assuming, *arguendo*, that the impact statements in their entirety are conclusively true, too many questions remain unanswered regarding the link between the Company's offenses of conviction and the illnesses and injuries described by individual community members in the impact statements submitted by the government.[12]  In *Sharp*, the court noted that linking the defendant's conviction for conspiring to distribute marijuana to the abuse suffered by the petitioner was "too attenuated" to confer "victim" status on the petitioner under the CVRA.  *See Sharp*, 463 F. Supp. 2d at 566.  Moreover, the court noted that "[n]o consistent, well-accepted scientific evidence" had been proffered to demonstrate that marijuana "necessarily" causes a person to become violent.  *Id.*; *see also Galvis*, 564 F.3d at 175.

The instant case is analogous to the circumstances described in *Sharp* and *Galvis*.  That is, even accepting the truth of the impact statements, the Court does not have a basis to conclude, based on the state of the evidentiary record before it and the government's briefing on this issue, that the illnesses and injuries described in the impact statements were a foreseeable consequence of the emission of coke oven gas from the pressure relief valve or the lack of baffles in the quench towers.  Put another way, based on the information presently available to the Court, had the Company not engaged in the unpermitted operation of the pressure relief valve and/or properly installed baffles in the quench towers, the injuries and illnesses attested to in the impact statements may very well still have occurred.

The attenuated connection between the offenses of conviction, and the illnesses and injuries described in the impact statements, is underscored by the amount of information that remains unknown.  For instance, the trial record is wholly insufficient to permit the Court to

---

[12] The proper forum to litigate issues that are collateral to the offenses of criminal conviction, particularly where, as here, substantial causation questions remain, is in the civil arena.

make a reasonable inference as to the amount of benzene that was emitted solely as a result of the unpermitted operation of the pressure relief valve during the Indictment period.  The record is also inadequate for the Court to draw conclusions with respect to the dispersion area of particulate matter emitted from the quench towers.[13]  Further, no conclusive data has been offered to the Court concerning the sources of concentrated benzene levels in the air in and around Tonawanda which the NYS DEC recorded in an air quality study conducted in 2010 and that has been referenced in prior submissions to the Court by the parties.[14]  Notably, Tonawanda Coke is situated in an industrial corridor that includes, within a two mile radius, two petroleum distribution facilities, multiple chemical bulk storage terminals, a coal burning power plant, a tire manufacturing plant and two interstate highways.   All are potential sources of benzene emissions.  The placement of the air quality monitoring stations at toll plazas where there is a large volume of idling vehicular traffic may also constitute a source of concentrated benzene levels.

Similarly, the Court does not have sufficient information to evaluate the extent to which each individual community member has been exposed to benzene and the sources of such

---

[13] Tonawanda Coke notes for the Court that the United States Environmental Protection Agency ("US EPA") listed the Buffalo-Niagara Falls area as in "attainment" status for Particulate Matter exposure as of 2010.  *See* US EPA Summary Nonattainment Area Population Exposure Report, available at http://www.epa.gov/oar/oaqps/greenbk/popexp.html (last accessed November 13, 2013).  This means that the area meets the air quality standards under the National Ambient Air Quality Standard ("NAAQS") for particle pollution.  *See* US EPA Explanation of Particulate Matter, available at http://www.epa.gov/airquality/particlepollution/ (last accessed November 13, 2013); US EPA Explanation of Particulate Matter Designations, available at http://www.epa.gov/pmdesignations/ (last accessed November 13, 2013).

[14] As Tonawanda Coke has expressed in previous submissions to the Court, Defendants dispute the scientific reliability of the Tonawanda Community Air Quality Study.  Notwithstanding Defendants' objection to the methodology of the air quality study, which is not waived, the study's results alone do not provide a sufficient basis for the Court to draw any conclusions regarding the proximate cause of the offenses of conviction on the illnesses and injuries described in the impact statements submitted by the government.

benzene exposure.  Benzene exposure varies based upon a number of factors, including indoor benzene air levels at one's residence, indoor/outdoor levels at work, time spent driving a vehicle or refueling it, and lifestyle factors such as smoking.  Indeed, in comments recently reported in the *Tonawanda News* regarding a potential follow up study to the NYS DEC's 2010 air quality study, an official from the New York State Department of Health ("NYS DOH") noted the existence of an array of potential sources of benzene emissions beyond Tonawanda Coke's production activities that impact individuals' relative exposure to benzene.  These sources include one's diet intake, smoking, auto emissions, and wood fires.  A copy of the article dated November 7, 2013 reporting on the NYS DOH official's comments is attached hereto as **<u>Exhibit B</u>**.

Ultimately, the numerous questions pertaining to the connection between the Company's offenses of conviction, and the illnesses and injuries described in the impact statements, make it clear that the harms asserted by the government in its Supplemental Sentencing Memorandum are simply too attenuated from the offenses of conviction to establish the threshold showing of causation required under the CVRA.  Indeed, applying the court's reasoning in *Sharp*, the government is unable to demonstrate a nexus between Tonawanda Coke's act of operating an unpermitted pressure relief valve and failing to install baffles in quench towers at the facility, both in violation of the Clean Air Act, and the emotional trauma that community members have had to endure for "living in a polluted environment and being subjected to uncontrolled noxious emissions."  This is at least in part because no well-accepted scientific evidence has been proffered to demonstrate that the unpermitted emission of coke oven gas on an intermittent basis from a single pressure relief valve or the operation of a quench tower without baffles as required

by a facility's Title V operating permit *necessarily* causes individuals residing outside of the facility to be subjected to "noxious emissions" or to live in a polluted environment.

Likewise, the government's assertion that Defendants' conduct as to the offenses of conviction has increased community members' "risk of contracting future illnesses relating to the defendants' pollution" fails to satisfy the causation threshold of the CVRA. The government has not demonstrated, either through the impact statements it has submitted or through the evidentiary record before the Court, how Defendants' conduct with respect to the operation of an unpermitted pressure relief valve or its failure to install baffles in quench towers, has "directly and proximately" increased community members' risk of contracting future illnesses. The government has also not proffered any scientific evidence or medical records to support its position.

Because the government has entirely failed to demonstrate the causal connection between the offenses of conviction and the harms it has asserted in its Supplemental Sentencing Brief, the government's motion as to the designation of community members as "crime victims" under the CVRA must be denied.

   C.   Case Authority Cited to by the Government in Support of its Argument that "Emotional Trauma" and the "Increased Risk of Contracting Future Illnesses" Constitute Cognizable Harms Under the CVRA is Inapplicable

The controlling analysis for the purposes of determining whether a putative victim is entitled to the rights conferred by the CVRA is a fact-specific assessment of whether harm has been "directly and proximately" caused by a defendant's commission of a Federal offense. The government however claims that certain harms are cognizable under the CVRA because they have been expressly enumerated in other, previously enacted, statutes. Even if the Court were to allow for the government's position, no case authority has been identified by defense counsel

that recognizes emotional trauma or the risk of contracting future illnesses as cognizable harms under the CVRA, and the case authority cited to by the government in support of such an argument is inapposite.

The government cites to *United States v. Lundquist*, 731 F.3d 124 (2d Cir. 2013), in support of the proposition that a cognizable harm under the CVRA includes "emotional trauma." *See* Supplemental Sentencing Memorandum at pp. 17-18.  This case lends no support to the government's argument for a number of reasons.  First, *Lundquist* relates to restitution afforded under the Violence Against Women Act of 1994 ("VAWA"), 18 U.S.C. § 2559, not the CVRA.  Importantly, the provisions for restitution to victims under VAWA are enumerated in the statute, unlike in the CVRA.  Under VAWA, an individual convicted of receiving and possessing child pornography is required to make restitution for "the full amount of the victim's losses," 18 U.S.C. §2559(b)(1). VAWA then defines the "full amount of the victim's losses" as including, *inter alia*, "medical services relating to *physical, psychiatric, or psychological care*."  *See* 18 U.S.C. § 2259(b)(3) (emphasis added).  The CVRA, which provides a crime victim with the right to "full and timely restitution," includes no such provision.  Second, *Lundquist* is inapplicable to the government's argument that "emotional trauma" is a cognizable harm under the CVRA because the petitioner in *Lundquist* fell within the category of individuals (children depicted in child pornography) expressly conferred "victim" status under VAWA by the Second Circuit.  *See United States v. Aumais*, 656 F.3d 147 (2d Cir. 2011).  The same cannot be said of conferring "crime victim" status on individuals who have suffered emotional trauma under the CVRA.  Third, unlike the instant case, the evidentiary record in *Lundquist* contained substantial and specific evidence demonstrating a causal link between the commission of the defendant's offense and the petitioner's need for psychological care.

The government also cites to a number of cases, including *United States v. Weintraub*, 273 F.3d 139 (2d Cir. 2001), *United States v. Yi*, 704 F.3d 800 (9th Cir. 2013), *United States v. Scardecchio*, 05-CR-472 (E.D. Pa.), and *United States v. Mauck*, 02-CR-57 (N.D. W. Va.), that it claims support its argument that an increased risk of contracting environmental cancers also constitute a cognizable harm under the CVRA.  *See* Supplemental Sentencing Memorandum at pp. 18-19.  The cases cited by the government are in fact inapplicable to its argument.  First, *Weintraub* and *Yi* are not analogous to the instant case.  In both *Weintraub* and *Yi*, the factual record is categorical in making clear that the individuals entitled to restitution had been exposed to asbestos contamination as a direct result of the defendants' crimes.  *See Yi*, 704 F.3d at 802-04; *Weintraub*, 273 F.3d at 141-43.  In the instant case, the evidentiary record is, at best, conflicted as to whether the individuals whose impact statements were submitted by the government were exposed to emissions from the unpermitted operation of the pressure relief valve at Tonawanda Coke or to particulate matter emitted due to the absence of baffles at the facility.  Second, the government's reference to *Scardecchio* is completely misplaced.  In that case, the government sought restitution for property owners to re-test their properties for the presence of asbestos.  *See* United States' Sentencing Memorandum filed in *United States v. Scardecchio*, Case No. 05-CR-472 (E.D. Pa. September 13, 2006).  Accordingly, the defendant's sentence had nothing to do with payments of restitution to employees of a company that were exposed to asbestos as the government claims.  As to *Mauck*, counsel for Tonawanda Coke has been unable to identify a case involving a defendant with the surname of "Mauck" with the case number provided by the government in its Supplemental Sentencing Memorandum.[15]

---

[15] Counsel for Tonawanda Coke located  a case captioned *United States v. Mauck*, Case No. 02-cr-0024 (N.D. W. Va.), in which the defendant was convicted for violation of the Clean Air Act and the sentence imposed involved restitution payments for medical monitoring due to asbestos

The government's argument that the Court should recognize the increased risk of community members contracting future illnesses relating to the Company's pollution as a cognizable harm under the CVRA is not supported by the applicable case authority described in detail above.

## III.   THERE IS NO NEED FOR THE COURT TO HOLD AN EVIDENTIARY HEARING TO DETERMINE WHICH COMMUNITY MEMBERS QUALIFY AS "VICTIMS" UNDER THE CVRA

The government moves this Court to order a sentencing hearing at which the government will offer the sworn testimony of Tonawanda and Grand Island community members.  *See* Supplemental Sentencing Memorandum at pp. 19-20.  According to the government, the purpose of convening such a hearing is to assist the Court's determination regarding which specific community members qualify as "crime victims" under the CVRA.  *See id.*  The government also asserts that a hearing is necessary because, even though it anticipates that Defendants will object to the designation of *any* community member as a "victim" under the CVRA, "serious factual questions" remain as to the which individual community members suffered "sufficient harm" for CVRA purposes.  S*ee* Supplemental Sentencing Memorandum at p. 20.  Defendants' hereby object to the government's motion and respectfully submit that the evidentiary hearing requested by the government is completely unwarranted.[16]

exposure.  This appears to be the case that the government references in its Supplemental Sentencing Memorandum.  However, counsel was unable to access any court records that would provide the factual basis for the defendant's conviction or the court ordered restitution payments, and the government did not append any such records to its Supplemental Sentencing Memorandum.  Given the government's failure to provide any information associated with the case to the Court, as well as confusion over the precise case to which the government is referring, the government's statement that *Mauck* supports the argument set forth by the government should be disregarded in its entirety by the Court.

[16] In the event that the Court determines that a hearing on this issue should go forward, Defendants will certainly seek the opportunity to present evidence, including through the cross

The principal grounds for Defendants' objection to a sentencing hearing is that the government has failed to make a threshold showing that community members may in fact qualify as "crime victims" under the CVRA.  Indeed, as discussed in comprehensive detail in this submission, there is no basis whatsoever, either under the statutory scheme of the CVRA, applicable case authority, or the factual record that has been submitted to the Court, for the Court to find any of the categories of harms the government asserts are reflected in the 128 impact statements appended to the government's Sentencing Memorandum were the "direct and proximate" result of the offenses of conviction.[17]  In light of these circumstances, a hearing will serve as an unnecessary and time consuming expenditure of judicial resources that may very well delay the Court's ability to render a final sentencing determination in this case.

## IV.   THE CASE LAW CITED BY THE GOVERNMENT IN SUPPORT OF ITS OPPOSITION TO A HEARING TO ASSIST THE COURT IN ITS ASSESSMENT OF THE SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A) IS INAPPLICABLE

At the status hearing on October 22, 2013, the Court requested the government to prepare a submission providing legal authority in support of its position that the Court should decline to

---

examination of the witnesses offered by the government, the introduction of expert testimony and the admission of medical and other documentary records.  Moreover, should the Court grant the government's motion for a sentencing hearing, Defendants respectfully request that the Court order the government to provide clarification sufficiently in advance of the hearing as to which community members it expects to call to testify, so that appropriate discovery materials can be produced and reviewed, and defense counsel may meaningfully prepare their examination of these witnesses.

[17] Defendants' opposition to the government's motion is not due to an objection to the designation of "any" victims as a result of the offense conduct, as the government has suggested, or even to an inability to appreciate the seriousness of the illnesses, injuries and property damage that is described in the impact statements.  Rather, the opposition to the government's request for a hearing is premised entirely on the government's failure to demonstrate that the individual community members on whose behalf the impact statements were submitted satisfy the legal and factual threshold requirements for designation as a "crime victim" under the CVRA.

hold a hearing, requested by Tonawanda Coke, at which expert testimony would be introduced to provide context regarding the offenses of conviction in this case and assist the court in assessing the seriousness of those offenses under 18 U.S.C. § 3553(a).  The government now cites to three cases, *United States v. Pelican Refining Co., Inc.*, 11-CR-227 (W.D. La. 2011), *United States v. Columbus Steel Casings*, 11-CR-180 (S.D. Ohio 2011) and *United States v. Atlantic States Cast Iron Pipe Co.*, 627 F. Supp. 2d 180 (D.N. J. 2009), that it asserts are analogous to the instant case and that the Court may rely upon in evaluating the seriousness of Defendants' conduct underlying the offenses of conviction.  *See* Supplemental Sentencing Memorandum at pp. 21-23. The government also cites to a number of cases pertaining to the unlawful handling of asbestos as an example of criminal conduct that it considers less egregious than the conduct at issue in the instant case.  *See* Supplemental Sentencing Memorandum at pp. 23-24.

The case law cited by the government reflects the government's lack of understanding concerning the Court's responsibility to conduct a fair and impartial assessment of the sentencing factors enumerated in 18 U.S.C. § 3553 in making a sentencing determination with respect to the facts of this case.  As counsel for Tonawanda Coke stated to the Court at the October 22nd status hearing, the principal purpose of Tonawanda Coke's request for a sentencing hearing is to provide testimony that would assist the Court in making a judgment as to the seriousness of the offenses of conviction as required by 18 U.S.C. §3553(a).  Such an assessment varies widely depending on a number of factors, including the regulatory context of the offense, the nature of the conduct giving rise to the offense, the presence or absence of related culpable conduct, and the environmental harm, if any, that resulted from the conduct.  Accordingly, the Court's assessment of the seriousness of the offense is, by its very nature, a fact specific inquiry.  In this regard, it is not apparent how sentencing determinations in other cases, including those that

involved convictions for environmental crimes, can act as a substitute for a rigorous

examination, through the presentation of expert testimony, of the facts and consequences related

to the specific offenses of conviction for which the Court must impose punishment.  Consistent

with this general principle, the cases cited by the government offer no template or standard of

analysis for other courts to conduct an assessment of § 3553(a) factors in making their

sentencing determinations.  Instead, the courts in each of the cases cited to by the government

conducted their own inquiry specific to the particular circumstances of the respective offenses of

conviction in order to assess the seriousness of the offense under § 3553(a).

The case authority cited to by the government is not at all instructive to the Court's

assessment of the seriousness of the offenses in the instant case.  The government appears to

suggest that *Pelican Refining Co.* and *Columbus Steel* offer the Court a basis for finding that the

seriousness of the offense in the instant case is an aggravating factor because "*Pelican Refining*

*Co.* and *Columbus Steel* were resolved by way of plea agreements and did not involve the

extensive time period of violations that occurred in the present case."  *See* Supplemental

Sentencing Memorandum at p. 22.  The government's assertion sets forth a completely

superficial comparison between *Pelican Refining Co.* and *Columbus Steel* and the instant case.

The government also mischaracterizes the resolution of the two cases as a factor in assessing the

seriousness of the respective offenses involved in them.  Whether a case is resolved through a

plea agreement or through trial is not at all relevant to a court's assessment of the seriousness of

the underlying offense under §3553(a).

Except to note that it is the only case involving a conviction for Clean Air Act violations

after a trial, the government does not explain at all how the district court's sentencing

determination in *Atlantic States* is instructive to this Court in assessing the seriousness of the

offenses of conviction.  This is perhaps because, as with the courts' individualized sentencing

determinations in *Pelican Refining Co.* and *Columbus Steel*, the court's sentencing determination

in *Atlantic States* is in fact not applicable to the Court's assessment of the seriousness of the

offenses in the instant case.[18]  The offenses of conviction in *Atlantic States* stemmed from the

company's conduct in causing emissions of carbon dioxide by burning more than 55 gallons per

day of waste in an industrial furnace in violation of the company's Title V operating permit,

exposing its workers to dangerous conditions in violation of Occupational Safety and Health

Administration regulations, and impeding and obstructing federal regulatory and criminal

investigations through, among other things, making false statements.  *See Atlantic States*, No.

3:03-CR-00852 (D. N.J. 2009).  Comparing the seriousness of the offenses underlying the

prosecution of the defendants in *Atlantic States* with the offenses of conviction in the instant case

would represent a superficial undertaking that ignores the fact specific inquiry that a Court must

pursue in assessing this particular sentencing factor. [19]

---

[18] As the Court may recall, Tonawanda Coke has already addressed the sentences imposed in *Pelican Refining Co.* and in *Atlantic States Cast Iron Pipe Co.* in its sentencing memorandum. *See* Tonawanda Coke's Sentencing Memorandum at pp. 21-22.  While Tonawanda Coke's discussion of these cases centered on the need to avoid unwarranted sentencing disparities pursuant to 18 U.S.C. §3553(a)(6), the Company specifically noted that the offenses of conviction in both cases were entirely different than the offenses of conviction in the instant case and that the sentences imposed in each case "fairly reflected the relative egregiousness and magnitude of the crime."  *See id.*

[19] Finally, the government cites to a number of asbestos cases in support of its position.  *See* Supplemental Sentencing Memorandum at p. 23.  The government asserts specifically that "the difference between asbestos cases and the present case is the typical asbestos case is usually focused upon one incident, one area affected, and a finite number of exposed individuals such as abatement workers."  *See* Supplemental Sentencing Memorandum at p. 23.  As with its discussion of *Pelican Refining Co.*, *Columbus Steel*, and *Atlantic States*, the government's view of these cases as offering the Court a purported basis to evaluate the seriousness of the offenses of conviction is superficial and unhelpful.  The government's view of the relative egregiousness of asbestos crimes compared to the offenses of conviction in the instant case is also undermined by the court's discussion of asbestos crimes in a case cited earlier in the government's

In light of the government's failure to provide any case authority for the Court to apply to its assessment of the seriousness of the offenses of conviction, as a substitute for a sentencing hearing, and for the reasons provided in Tonawanda Coke's earlier submissions to the Court and as stated by counsel for the Company at the October 22, 2013 status hearing, Tonawanda Coke urges the Court to grant the Company's motion to hold a sentencing hearing to receive expert testimony on the subject of the seriousness of the offenses of conviction.

## CONCLUSION

For the foregoing reasons, Defendants submit that the government's arguments in favor of its motion to designate individual community members as "crime victims" under the CVRA are without merit and, accordingly, respectfully request this Court to DENY the government's motion without the need for a sentencing hearing.

Furthermore, for the foregoing reasons, and for the reasons expressed in Tonawanda Coke's earlier submissions to the Court and as stated by counsel for the Company at the October 22, 2013 status hearing, Tonawanda Coke urges the Court to GRANT the Company's motion to hold a sentencing hearing to assist the Court in assessing the seriousness of the offenses of conviction under 18 U.S.C. § 3553(a).

DATED:   Washington, D.C.
November 15, 2013

Respectfully submitted,

/s/ GREGORY F. LINSIN
Gregory F. Linsin, Esq.
BLANK ROME LLP

---

Supplemental Sentencing Memorandum, *United States v. Weintraub*, 273 F. 3d 139 (2d Cir. 2001).  In that case, the court compared the handling of asbestos to the possession of hand grenades because of the obvious danger associated with both items.  *See Weintraub*, 273 F.3d at 148.

Pro Hac Vice
Attorney for Defendant
TONAWANDA COKE CORPORATION
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 772-5813
Linsin@blankrome.com

Jeanne M. Grasso, Esq.
BLANK ROME LLP
Pro Hac Vice
Attorney for Defendant
TONAWANDA COKE CORPORATION
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 772-5927
grasso@blankrome.com

Ariel S. Glasner, Esq.
BLANK ROME LLP
Pro Hac Vice
Attorney for Defendant
TONAWANDA COKE CORPORATION
600 New Hampshire Avenue, N.W.
Washington, D.C. 20037
(202) 772-5963
aglasner@blankrome.com

Rodney O. Personius, Esq.
PERSONIUS MELBER LLP
Attorney for Defendant
MARK L. KAMHOLZ
2100 Main Place Tower
Buffalo, NY 14202
(716) 855-1050
rop@personiusmelber.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of November 2013, I electronically filed the

foregoing DEFENDANTS' JOINT RESPONSE TO THE GOVERNMENT'S

SUPPLEMENTAL SENTENCING MEMORANDUM AND MOTION FOR DESIGNATION

OF VICTIM STATUS UNDER THE CRIME VICTIMS' RIGHTS ACT with the Clerk of the

District Court using the CM/ECF system, which sent notification of such filing to the following

CM/ECF participants on this case:

Rocky Piaggione, Esq.
U.S. DEPARTMENT OF JUSTICE
Environmental Crimes Section
P.O. Box 23985
L'Enfant Plaza Station
Washington, DC  20026-3985
(202) 305-0321
Rocky.Piaggione@usdoj.gov
***Counsel for the United States***

Aaron J. Mango, Esq.
Assistant United States Attorney
UNITED STATES ATTORNEY'S OFFICE
Western District of New York
138 Delaware Avenue
Buffalo, NY  14202
716-843-5882
Aaron.Mango@usdoj.gov
***Counsel for the United States***

John J. Molloy, Esq.
4268 Seneca Street
West Seneca, NY 14224
(716) 675-5050
jmolloy@johnmolloylaw.com
***Counsel for Tonawanda Coke Corporation***

/s/ Gregory F. Linsin
Gregory F. Linsin, Esq.