VOL. I

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

        -vs-                 10-CR-219S

TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
               Defendants.
-------------------------------------


         Proceedings held before the

     Honorable William M. Skretny, U.S.

     Courthouse, 2 Niagara Circle, Buffalo,

     New York on February 27, 2013.


     APPEARANCES:

     AARON J. MANGO,
     Assistant United States Attorney,
     ROCKY PAIGGIONE, Senior Counsel,
     U.S. Department of Justice,
     Appearing for the United States.

     GREGORY F. LINSIN, ESQ.,
     JEANNE M. GRASSO, ESQ.,
     ARIEL S. GLASNER, ESQ.,
     Appearing for Tonawanda Coke Corporation.

     RODNEY PERSONIUS, ESQ.,
     Appearing for Mark L. Kamholz.

     Also Present:  Lauren DiFillipo, Paralegal
                   Sheila Henderson, Paralegal



     Michelle L. McLaughlin, RPR,
     Official Reporter,
     U.S.D.C. W.D.N.Y.
     (716)332-3560

1                          I N D E X

2        OPENING STATEMENTS                    PAGE

3    Mr. Mango                                 33
     Mr. Linsin                                50
4    Mr. Personius                             79

5        ALFRED CARLACCI

6    Direct Examination by Mr. Mango           104

7

8

9        GOVERNMENT EXHIBITS                    EVD.

10                   105.07                     164
                     305.07                     165
11                   105.42                     166
                     305.42                     166
12                   128                        176
                      19.01                     186
13                    19.02                     189
                      19.03                     191
14                    19.04                     193
                     129                        195
15                   110                        199
                      19.17                     201
16                    19.21                     203
                      19.05                     204
17                    19.06                     206

18

19

20

21

22

23

24

25

1              (Jury not present in the courtroom.)

2          THE CLERK:  Criminal case 10-219S, United

3    States of America versus Tonawanda Coke Corporation

4    and Mark L. Kamholz.

5          THE COURT:  Good morning, everybody.

6          MR. MANGO:  Good morning, your Honor.

7          MR. LINSIN:  Good morning, your Honor.

8          THE COURT:  We start out by giving

9    Mr. Glasner a gold star for an early arrival.  All

10   right.  And then we post those as we go through the

11   trial weeks.

12         MR. GLASNER:  Thank you, your Honor.

13         THE COURT:  You're welcome.  From the

14   government's standpoint, if you let me know who the

15   paralegal bodies will be, or the tech bodies will

16   be so we can introduce those to the Court - to the

17   jury.  I'll probably have you do that.

18      But I know Mr. Bauman is here and Miss Turton,

19   and Miss DiFillipo, whom the jury heard about

20   yesterday, but she was visibly absent.

21         MR. MANGO:  Yes.

22         THE COURT:  Okay.  So we'll make that all

23   straight.

24         MR. MANGO:  Yes, your Honor.  Special

25   Agent Conway will also be with us, who you met

4

1    yesterday.

2            THE COURT:  He's there.  He's working, and

3    then we still have somebody else there hiding.

4    Good morning.

5            MS. DUBRELL:  Good morning.  Laurie

6    Dubrell, attorney from EPA.

7            THE COURT:  Are you going to be seated

8    somewhere in here?  Or back in the gallery?

9            MS. DUBRELL:  Yes, your Honor.

10           THE COURT:  Okay.  No unfamiliar faces

11   here for the defense today.  But we have some good

12   news and some bad news.  I guess if there's

13   anything you want to talk about first, we can do

14   that.

15           MR. LINSIN:  Nothing on behalf of

16   Tonawanda Coke, your Honor.

17           THE COURT:  Okay.  All right.  There is an

18   article in today's paper relative to Tonawanda's

19   meeting last night.  You know, frankly, I don't

20   think there's anything in there that we need to

21   address.  It's consistent with all the admonitions

22   to exercise the caveat to stay away, but it doesn't

23   reference anything here.  So I think we're okay

24   with that.

25       We did get a call this morning from juror

1   number seven, Mrs. Nicole Fuller.  And if your

2   sense is the same as mine, that's no big surprise.

3   I mean, in my view, she was not particularly happy

4   to be included on the jury yesterday.  I listened

5   to her audio message on the chamber's telephone

6   this morning.  She claims that she has the flu,

7   which appeared over the evening.  I don't know what

8   we can do about it.  She is the only juror that's

9   missing.  I'm going to suggest that we move up

10  alternate number one, Mr. Bauman, to take over her

11  position.

12      I am going to have her come in.  I'm not going

13  to let up on it until she recovers and hopefully

14  that won't occasion another set back.  But, I will

15  tell the jury that she claims to be ill.  And, you

16  know, I'm going to appreciate the fact and note

17  that -- that Mrs. Palistrant has made it.  And I

18  hope they get the connection, because I'm trying to

19  be subtle but not so subtle, unless anybody

20  disagrees with that approach.  I want everybody to

21  know it's going to take a little bit of sacrifice

22  here to continue on.  Are we okay with that?

23          MR. PIAGGIONE:  Yes, your Honor.

24          MR. LINSIN:  Your Honor, I believe I'm

25  okay.  I just want to make sure what the Court's --

1    your intention would be eventually to release

2    Miss Fuller when she does come in, but to proceed

3    this morning by moving up alternate number one to

4    the number seven spot?

5              THE COURT:  Right, I am.  And then when

6    she does come in -- I'm not going to give up on it.

7    There must be a recovery point in time.  Then I'm

8    going to let her know that she must appear at the

9    next jury selection.  Has nothing to do with this

10   case, but that her service has not been concluded.

11   You know, I'm hoping that, you know, there's

12   nothing seriously amiss as far as her health is

13   concerned.  But, you know, I think from a morale

14   standpoint, you know, it's important that we

15   continue to press on.

16        And, you know, again, I think everybody is

17   aware in the jury that Miss Palistrant is not the

18   happiest of jurors, but that we do appreciate her

19   service.  So, I think we'll go from there, and

20   we'll let the issue drop, and we'll continue to

21   move forward day by day.

22              MR. LINSIN:  That is certainly acceptable

23   to Tonawanda, your Honor.

24              THE COURT:  Okay.  How about you,

25   Mr. Personius?

1          MR. PERSONIUS:  It is, Judge.  Thank you

2     for asking.

3          THE COURT:  Okay.

4          MR. MANGO:  Acceptable, your Honor.

5          THE COURT:  Mr. Mango?

6          MR. MANGO:  Yes, of course.

7          THE COURT:  Okay.  All right.  I guess

8     we're all ready then to go forward.  You want to

9     bring the jury in at 9:45, okay?  It's about four

10    minutes so we can kind of shuffle around and get

11    everything together.  I have a preliminary charge,

12    very brief.  We'll address the juror issue, and

13    then we should be ready for opening statements,

14    okay?

15         MR. MANGO:  Yes, your Honor.  We do

16    have -- I informed Miss Labuzzetta we do have a

17    stipulation to enter following openings before the

18    first witness.  Would it be the Court's

19    intention -- or maybe the government would ask to

20    take a brief recess after opening just to make sure

21    we're ready to proceed smoothly into the next

22    witness?

23         THE COURT:  Yeah.  Who is I going to give

24    the opening?

25         MR. MANGO:  I am.

1           THE COURT:  Approximately how long?

2           MR. MANGO:  Approximately maybe 25, 30

3     minutes.

4           THE COURT:  Mr. Linsin?

5           MR. LINSIN:  Same range, your Honor.

6           THE COURT:  On behalf of Tonawanda.

7     Mr. Personius?

8           MR. PERSONIUS:  About the same, Judge.

9     When I tried it it was about 20.

10          THE COURT:  Okay.  So it would be

11    appropriate I think to take a break before we get

12    started.  Okay.  Sounds good.  Three or four

13    minutes we should be ready.  Thank you.

14          (Short recess was taken.)

15          (Jury seated.)

16          THE COURT:  Good morning, ladies and

17    gentlemen.  Please have a seat.

18       Okay.  Miss Labuzzetta, if you would call the

19    case, please.  We have a few matters of business to

20    address and we'll get started with the trial.

21          THE CLERK:  Criminal case 10-219S, United

22    States of America versus Tonawanda Coke Corporation

23    and Mark L. Kamholz.

24          THE COURT:  Okay.  We're probably going to

25    do some introductions in just a minute or two,

1    ladies and gentlemen, but it's good to see you all

2    here except for one missing juror I see.  And just

3    for your information, I did get a call early this

4    morning -- and we've been discussing this and we've

5    been assembled here for a while, so I apologize for

6    the little bit of delay in getting you started.

7    But thank you for being here promptly.  We

8    appreciate that.  That will help us all.

9        My chambers and I, we did receive a call from

10   Nicole Fuller, and she advised us that she

11   contracted the flu overnight, and so she'll be

12   unavailable.  We are going to start the trial

13   promptly.  And I've talked to the attorneys, and we

14   talked about that utility role, so we're going

15   promote one of our alternates.

16       And Mr. Steven Bauman, you graduate from

17   alternate number one to our regular juror number

18   seven.  So if you wouldn't mind moving up, we'll

19   put you there.

20       Okay.  And when Miss Fuller does recover, I'm

21   going to have her brought in, and I will talk with

22   her.  She'll not be a part of this jury, but she'll

23   be assigned to the next jury selection pool, which

24   will involve one of the judges in this particular

25   building.  And then that will be the start of the

1    fulfillment of her continued jury service.  Okay.

2        Mr. Bauman, you're okay sitting as a regular

3    juror?

4                A JUROR:  Yes.

5                THE COURT:  Okay.  And then our alternates

6    get promoted as well.  And, Miss Malyszka, you

7    become alternate number one; and, Mr. Carlson, you

8    become alternate number two; and Mr. Demmer, you

9    become alternate number three.  And you can play

10   with those seats up there if you want to get more

11   comfortable one way or another and occupy that last

12   seat, that's okay.  It's probably better that you

13   stay where you are, and we can use that as a

14   utility, or we'll have a phantom alternate number

15   four, a person that we'll invite into the courtroom

16   from time to time.

17       Okay.  All right.  We've got serious business

18   to conduct.  And I think, as you can see, all the

19   attorneys and parties, they're ready.  You are

20   ready, I can see that.  And we have to technically

21   start the case.  And even though we selected you

22   yesterday, the official start of the trial doesn't

23   happen until you are sworn in as jurors.  Once you

24   are sworn in, the trial is officially started, so

25   I'm going to ask you, now that you look so darn

1    comfortable, to stand up, please, and we're going

2    to have you sworn in this morning.

3              (Jury oath administered.)

4              THE COURT:  Okay, well done.  And we're

5    going to step number two.  You might see a few

6    extra bodies here in the well area of the

7    courtroom.  You're going to get familiar, I think,

8    with the faces and the names, and I don't know

9    everybody yet.  So I kind of do this to help me.  I

10   think you should know -- even though I have

11   instructed you that the personalities have no role

12   in what the ultimate outcome of this case will be.

13   Whether you like everybody or not, or some or not

14   doesn't matter.  What they say, what I say, none of

15   that is evidence.  What they do, not evidence.  You

16   have to decide this case on the basis of competent

17   evidence or lack thereof.

18       Government has the burden beyond a reasonable

19   doubt on each essential element of each crime

20   separately considered.  Nineteen counts in the

21   indictment involving the two defendants in this

22   case.

23       I'm going to do some introductions.  If I

24   falter a little bit, please bear with me.  I only

25   get worse as the trial goes on.  I'll try as

1    strongly as I possibly can to go forward this

2    morning.  And, you know, the new faces -- I mean, I

3    know the names, but I may have Mr. Mango introduce

4    them.  But let me make sure that you're comfortable

5    with who's sitting at counsel table for the

6    government, that's Aaron Mango in the dazzling

7    striped pink tie.  And followed by Rocky Piaggione.

8    And let's see.  We also have Robert Conway, and

9    he's the special agent from EPA.  And I think I get

10   this right -- you can correct me, Mr. Mango.  We

11   have in the center of that triumvirate at the far

12   table is Kathleen Turton.

13               THE PARALEGAL:  Morning.

14               THE COURT:  She's a tech specialist.  I

15   don't think she's going to be here for the whole

16   trial, but in and out probably.  You heard the

17   person at the far right is Lauren DiFillipo.  And

18   also Craig Bauman.  They're all the tech people

19   that will be assisting the government in its

20   presentation of the evidence as I understand it.

21       And then we'll go from there.  I think they're

22   all familiar faces on the defense side.  And we

23   have Mr. Gregory Linsin and Jean Grasso, okay, and

24   they both represent the defendant corporation

25   Tonawanda Coke, along with Arial Glasner who is at

1    the far table.  You met the defense paralegal, and

2    that's Sheila Henderson.  And representing the

3    corporation -- and remember we said that the

4    corporation -- can't bring a corporation in, so its

5    president Paul Saffrin is present.

6        At the far table representing Mark L.

7    Kamholz -- you may identify yourself I guess.  He's

8    the individual defendant in the indictment.  And

9    he's represented by Rodney Personius.

10       Okay.  And you know Michelle and Mary, my

11   courtroom deputy, and the distinguished hairless

12   gentleman over there is Andrew Moeller.  He's my

13   law clerk and he works with me.  He'll be in and

14   out during the course of trial.  I think that's

15   everybody.  And, you know, we'll be seeing a lot of

16   each other in the next four weeks or so.

17       And, you know, you've been terrific so far.  We

18   had a long day yesterday.  Everyday I hope will be

19   a long day, but I hope it will go speedily.  And I

20   hope we accomplish a lot each day so that we do get

21   this trial done in a way that's absolutely

22   ultimately fair to both sides.

23       And I'm going to repeat a little bit of what I

24   discussed with you yesterday, because I think they

25   just -- it just establishes the groundwork, the

 1  fundamentals for going forward.  And I hope this

 2  helps you a little bit, because it's osmosis by

 3  repetition I think.

 4      I'm going to be using terms that really mean

 5  the same during the course of the trial, but

 6  they're not exactly identical.  For example, you

 7  know, you might hear me refer to the gentlemen,

 8  lady here that are the legal people as attorneys or

 9  lawyers, means the same thing, or counsel

10  sometimes.  And, you know, no real distinction

11  amongst those three terms.

12      I'm sometimes referred to as the judge, the

13  Court, no real difference.

14      The prosecution, prosecutors, the government,

15  the United States, that all means the same

16  basically.

17      The defendants, you know, that relates to

18  Tonawanda Coke Corporation and Mr. Kamholz, so no

19  distinction there except you have to consider each

20  separately and distinctly on the elements and the

21  charges, and each has separate representation.

22  Collectively I think the two are defendants or

23  individually a defendant.

24      You'll hear objections -- that's a part of the

25  job of the attorneys -- in all likelihood.  I've

1   yet to have an objection-free trial.  And, you

2   know, I will resolve the objections.  If I sustain

3   an objection, that means that the party making the

4   objection is correct in my view.  If the objection

5   is overruled, that means that that person is not so

6   correct, if you will.  And then I'll try to explain

7   to give you some direction after a ruling, where

8   it's appropriate.  Otherwise we'll just move on.

9   The attorneys are comfortable with being sustained

10  or being overruled.  That's part of what they're

11  acclimated with.

12      Whether I make an objection -- I mean, don't

13  keep score.  None of that is important.  I mean,

14  attorneys will make those objections in good faith.

15  If they don't, I'll let them know.  And I'll let

16  you know at times.  But the bottom line is, you

17  know, we -- the rules are strict.  The evidence

18  that should be considered should be the competent

19  evidence.

20      And it -- you know, it's what we tell everybody

21  that comes into this courthouse, we play by the

22  rules.  And the rules get a little complicated, but

23  they are very, very helpful.  And so I will apply

24  them as best as I can.  The competent evidence

25  comes when it's what we call received into evidence

1    by me.  Okay.  And you're going get that at the end

2    of the case.  When you go into your deliberations,

3    you get all of the exhibits in some fashion that

4    have been received into evidence.

5        Now, you may hear testimony about exhibits that

6    don't wind up being admitted into evidence, and

7    that's okay.  That's proper.  But you are to

8    consider the testimony, not the exhibit.  You won't

9    get the exhibit necessarily.  And, you know, if

10   that becomes in any way confusing, I'll try to

11   clear it up as we go through the course of the

12   trial.

13       To get to a unanimous verdict, and recall --

14   I'm going to emphasize this many times.  Everything

15   comes to you in the four walls -- within the four

16   walls of this particular courtroom.  What do you

17   apply from the outside?  Only your common sense,

18   experience, and intelligence.  You work with that.

19   You'll get to a unanimous verdict.  Your verdict

20   must be unanimous.  You're going to be in the best

21   position of anybody ever to be able to decide the

22   disputes here in this particular case.

23       You have to be respectful of each other, listen

24   to each other.  And we're going to give you

25   notebooks, stenographer books, so you can take

1   notes if you choose to do that.  And, you know, the

2   one caveat on that, you know, train yourself to

3   absorb as much as you possibly can.  Don't be

4   distracted by note taking if you can possibly avoid

5   that.  But sometimes note taking helps.  We're not

6   going to let you take the notebooks home with you.

7   We confiscate them before you leave.  You get them

8   back the following day.

9        You are the deciders of the facts, all right?

10  You are the judges of the facts.  You are the

11  determiners of credibility, the believability of

12  the witnesses.  All of the witnesses start as

13  equals at the bar of justice.  And those aren't

14  just idle words.  That's what makes the system

15  work.  So you take a look at these witnesses, look

16  at what their interest in the case may be.  How do

17  they communicate to you?  What can they recall?

18       This case goes back, I guess, back to 2005 in

19  terms of references in the indictment.  So that's a

20  long time.  And you take that into account in terms

21  of recollections.  That's your choice to make.  You

22  have to determine what the facts are.  And there

23  will be disputes in terms of what those facts are

24  in this particular case.  You decide the fact

25  issues.  You are the judges of the facts.

1        Okay.  I'll take care of the law, all right?

2    That's my job.  I'm the judge of the law.  I

3    resolve the objections.  I give you that final

4    instruction at the end of the case just when, you

5    know, and it's going to wrap things up.  You're

6    going to get closing arguments from the attorneys.

7    They will be different from the opening statements.

8    But the similarity is that neither one of those are

9    evidence, because the only evidence comes from the

10   testimony of the witnesses, their answers.  Not the

11   questions, because sometimes the questions assume

12   facts that are not in evidence.

13        So, the rule is, the law is, that the answers,

14   against the backdrop of the question, that's the

15   evidence that you can consider.  Okay.  Only that.

16   The answers of the witnesses, the exhibits received

17   into evidence, any stipulations -- and the case

18   will be opened after opening statements by a

19   stipulation, an agreement amongst the parties as to

20   what the evidence is that is competent for you to

21   consider, and anything that I might judicially

22   notice.  What does that mean?  It means I tell you

23   that something is indisputable.  It's usually

24   relating to sometimes noting legal matters or the

25   law or certain matters in terms of, for example,

1     locations of things, can be almost anything that is

2     undisputed at least from the judicial and parties'

3     perspective.  So I'll tell you that.  I'll tell you

4     when I'm judicially noting it, but it does amount

5     to what you can consider to be competent evidence.

6          The indictment in this case, 19 counts.  Two

7     defendants in each of the 19 counts.  Both

8     defendants presumed innocent.  Government, burden

9     of proof beyond a reasonable doubt on all of those

10    counts.  The defense, each defendant separately to

11    each count has entered a plea of not guilty.  Okay.

12    All right.

13         At the end of the case that's when you should

14    examine whether the government has proven its case

15    beyond a reasonable doubt on each essential element

16    of the crime charged.  And I say it that way

17    because you're not to make up your mind until all

18    of the evidence is in.  Until that point in time

19    comes, if it does, each defendant, the corporation

20    and Mr. Kamholz, are presumed innocent, and that

21    never changes until you are satisfied unanimously

22    that a defendant or both defendants are proven

23    guilty by the government's proof beyond a

24    reasonable doubt.

25         The opening statements -- the way it works is

1   because, you know, the attorneys for the

2   government -- they get that table closest to you.

3   That's the way the process has evolved.  All right.

4   That's not because their case is entitled to

5   anything more or less than the defense case.

6   That's the protocol that we follow.

7        Because the government, though, is bringing the

8   case, it gets the opportunity to open first.  And

9   the closing arguments, it gets the opportunity to

10  close first.  Okay.  So, that's tied into the fact

11  that it's bringing this action against the two

12  defendants.

13       What is said, what you will hear today, that's

14  just to give you a roadmap about what this case is

15  about.  You've heard a little bit about it.  But

16  the attorney's job is to embellish that a little

17  bit, so that you will be in a position to know what

18  to expect in this case from the evidence or the

19  lack of evidence.

20       We proceed in two stages.  There's the

21  prosecutors' case, there is the defense case if

22  they choose to put one on.  But there will be

23  questioning by all of the attorneys irregardless of

24  whose case we're talking about, the defense case or

25  the prosecutors' case.

1         All right.  If it's appropriate, you know, I'm

2    going to tell you from time to time how you are to

3    consider certain evidence.  It may be for a

4    specific purpose as opposed to the ultimate issue

5    in the case, and I may tell you that certain things

6    that you can consider in whole or in part or not at

7    all, depending on what's before you.  So we'll get

8    into that a little bit.  But I'll try to make it as

9    easy for you as I can.

10        Remember, all these terms, maybe you are more

11   familiar with them than I am, I don't know.  But

12   we're learning about this case together, because I

13   don't know what the evidence is in this case.  What

14   I know is what we had to go through to get it trial

15   ready.  But in terms of the evidence, I will be

16   hearing it for the first time, as you will be, and

17   we'll have to get our familiarity with most of the

18   terminology together.

19        Then, you know, we'll have certain breaks.  You

20   go back to your deliberation room.  That's your new

21   home for the next month or so.  And then that's

22   where you will make the final deliberation that

23   leads to your unanimous verdict in this case.  And

24   again, we ask you to keep your minds open, and be

25   respectful.  And I ask the attorneys to do that as

1    well.

2        If I ask questions during the course of trial,

3    which I usually do, it's because either I think it

4    will help you or maybe in my own mind I'm a little

5    bit confused, so I want to make sure I put myself

6    in a position and you in a position to do the best

7    job possible.  But it's not evidence.  It's not an

8    indicator of how I feel about the case, who's right

9    or wrong or whatever.  I have no role in that.  You

10   have to decide that.  Okay.  And please keep in

11   mind what I'm trying to do is clarify and simplify,

12   and nothing more than that.

13       In this case, there will be a number of what we

14   call expert witnesses, what I anticipate from the

15   information I've been given from the attorneys for

16   both sides.  You will know who the expert witnesses

17   are so to speak.  By the way, you view them like

18   any other witness.  There's no witness gets special

19   treatment.

20       An expert witness does by way of training,

21   expertise, education, or whatever, in all

22   likelihood have information tied into his or her

23   expertise that can be of assistance to you to get

24   to the resolve of the issues.  That's why we bring

25   experts in.  But their credibility, you determine

1    it the same way using the same criteria that you do

2    with all the other witnesses.  That's what makes

3    the system so fair.

4        It's not a usual practice to ask questions by

5    jurors.  I'm going to allow it in this case with

6    respect to expert witnesses.  But there's a

7    procedure that has to be followed.  The question

8    right will be only as to expert witnesses, because

9    some of the stuff is pretty technical.  At the back

10   of your notebooks will be a question form.  And the

11   way it works is you write out your question.  I'll

12   take the question.  I'll see if it's proper under

13   the rules that apply, and I'll discuss it with the

14   lawyers.  And then if it's copacetic, if it's okay,

15   then I'll have the question asked on your behalf.

16   I'll do the questioning of the witness based on

17   what you've given to me.

18       My suggestion is be discerning in the questions

19   if you choose to ask a question in that fashion

20   through a written communication that I get.  You

21   know, if it's something that's really troubling,

22   and you think, gee, if somebody just asked this,

23   everything would come together for me, then you're

24   perfectly free.

25       I may not be able, because of the rules, to ask

1   the question you asked me to ask.  But I'll give it

2   the best effort that we can to make it more

3   understandable for you, again, as best we can.  So

4   that will be the process that we're going to use as

5   far as questions are concerned.  And then I will

6   try to remember and ask everybody here to remind me

7   that before the witness concludes to give you that

8   opportunity to write your question if you're not

9   satisfied from the examination.  And usually

10  examinations are pretty thorough.  But they may

11  just miss a question or two that would be helpful

12  to you.

13      Again, I'm going to try to limit the number of

14  side bars that we have.  And that's where the

15  attorneys come up here to the bench, and we talk on

16  this microphone.  You listen to white noise, no

17  longer Chopin, but we will I work on that somewhere

18  down the line a little bit.  And I'll get the

19  administrative matters resolved as best I can, so

20  we don't encumber and burden you.

21      And remember that the attorneys are not --

22  they're instructed not to discuss matters with you.

23  If they bump into you on the elevators or whatever,

24  good morning, good afternoon is about all you're

25  going to get.  That's by my direction, just so that

1    we don't run into complications or problems and

2    appearances and the like, okay?

3        Everybody with me so far?  All right.  Let me

4    tell you a little bit though very, very briefly.

5    You're going to hear more about this from the

6    lawyers.  And, you know, I want tell you about the

7    indictment.  You already know that there are 19

8    counts.  And I want to just tell you a little bit

9    about the elements, because I want you to focus on

10   those.  This is elementally driven.  The government

11   has to prove each element beyond a reasonable

12   doubt.

13       And Counts 1 through 15 in the indictment have

14   essentially the same essential elements.  And for

15   those counts there are four essential elements.

16   And I'll just give you a couple of points of

17   reference as we talk about these in the aggregate.

18   But here are the four elements.  First, that the

19   defendant was an owner or operator of a stationary

20   source of air pollutants, and the indictment, which

21   you will see at the end of the case, refers to that

22   stationary source as Tonawanda Coke Corporation.

23       The second element, that the stationary source

24   of air pollutants, Tonawanda Coke, was subject to

25   the Title V operating permits program.  Okay.

1   You'll learn what that means.

2       Third, that during the time periods alleged in

3   the indictment -- and we're covering a span roughly

4   from 2005 through 2009 in that aggregate of 15

5   counts -- the defendant, Tonawanda Coke -- this is

6   the third element that has to be proven beyond a

7   reasonable doubt -- operated or caused to be

8   operated an emission source in violation of a

9   Title V operating permit requirement.  Now, what

10  does that mean?

11      Okay.  Counts 1 through 5 talk about a

12  pressure-relief valve in the by-products department

13  of TCC, Tonawanda Coke Corporation, that's the

14  emission source.  Counts 6 through 10 talk about a

15  western quench tower without a baffle system.

16  Okay.  So, I mean, terminology that we made

17  reference to very briefly yesterday.  But that's

18  the difference in Counts 6 through 10.  Government

19  has to prove that that caused an emission, all

20  right, that violated the permit requirement.

21      And Counts 11 through 15 reference an eastern

22  quench tower without baffle system, that the

23  emission violates the operating permit requirement.

24  So that's where we're at as far as those four

25  elements -- or those are the first three.  The

1    fourth element is that the defendant named in those

2    counts acted knowingly.  The government has to

3    prove that beyond a reasonable doubt.  Defendants

4    both are presumed innocent until you find the proof

5    satisfies you, if it does, beyond a reasonable

6    doubt.

7        Count 16 doesn't have four elements.  It has

8    three.  You have to separately consider it.  That's

9    the obstruction of justice charge in the

10   indictment.  The government has to prove each

11   element, though, beyond a reasonable doubt.  And

12   the first element is that on or about the date set

13   forth in the indictment.  And this -- for Count 16

14   it's roughly the month of April, 2009, a proceeding

15   was pending before an agency of the United States.

16   Okay.  You'll find out on that.

17       Second, that the defendant knew that a

18   proceeding was pending before an agency of the

19   United States; and third, that the defendant

20   corruptly endeavored to influence, obstruct, or

21   impede the due and proper administration of the law

22   under which the proceeding was being conducted.

23   Those are the three essential elements.

24   Obstruction of justice.  Did something to interfere

25   with the proper administration of justice under the

1       facts and circumstances of this case.

2           Then we have the final Counts 17, 18, and 19.

3       Count 17 relates to a period of May of 1998 through

4       December of '09 -- is that 2008, or is that --

5               MR. MANGO:  2009, your Honor.

6               THE COURT:  It's 2009.  But is it 1998

7       or 2008?  I copied it down --

8               MR. MANGO:  It's 1998, your Honor.

9               THE COURT:  Okay.  Thank you.  Count 17,

10      May of 1998 through the period December of 2009.

11      And Count 18 covers the period June through

12      September of 2009.  And Count 19 covers the period

13      June of 2007 through October of 2009.

14          I know this is a lot, but you've got to look at

15      it.  Those are the things you focus on, the time

16      periods, the elements.  And you will have a paper

17      framework to work for.  But I just want you to know

18      that that's the way these counts are broken down.

19          The first element that relates to the

20      government's burden of proof beyond a reasonable

21      doubt on Counts 17 through 19 are that the

22      defendant knowingly stored or disposed of, or

23      caused others to store or dispose of a waste

24      product -- in this case benzene is referred to --

25      on or about the dates set forth in the indictment.

1    I gave you those dates.

2        Second of the four essential elements for these

3    counts are as follows:  That the waste was

4    hazardous as defined by a particular federal

5    environmental law referred to commonly as RCRA,

6    which means Resource Conservation and Recovery Act,

7    RCRA;

8        Third, that the defendant knew the hazardous

9    waste -- we're talking about benzene here -- had

10   the potential to harm others or the environment.

11   In other words, knew that the waste was not

12   harmless substance like uncontaminated water; and

13   fourth, that the defendant did not have a permit to

14   store or dispose of that hazardous waste.

15       Okay.  So we have for each cluster of counts

16   essential elements.  They're all relatively

17   different.  But you have to consider the proper

18   counts with the proper elements.  And the

19   government has to prove each, because they're all

20   essential on your separate consideration beyond a

21   reasonable doubt.

22       Okay.  I mentioned to you the case will start

23   after the opening statements with a stipulation.

24   And that's an agreement with respect to the fact

25   that something is competent evidence that you may

1    choose to consider in reaching your what?

2    Unanimous verdict in this case.

3        What do you apply in this regard?  Common

4    sense, experience, intelligence.  Just work with

5    that.  Just let it resonate, because that's what's

6    going to be make all of that happen in terms of you

7    getting to this final disposition in this case.

8        Okay.  And I want to just repeat one last time.

9    No outside contact, all right.  Don't go to

10   dictionaries, reference materials, Web sites,

11   blogs.  Don't use electronic tools of any kind to

12   obtain information about this case that you feel is

13   not being presented to you or just out of

14   curiosity.  Only what you get here is what you are

15   to use in arriving at your unanimous verdict.

16       All right.  No investigation on your own.

17   Don't go visiting the site.  Don't do anything like

18   that.  Don't discuss this case with anybody.  We

19   talked about that pretty extensively yesterday.

20   You really shouldn't talk about this amongst

21   yourselves until you get to that deliberation.

22   You've got to absorb it, keep it flowing.  It's

23   going to be hard technically not to say something,

24   because you're here all day.  But to really try to

25   resolve issues, that's what you shouldn't do.  You

1    should resolve those in your jury deliberations

2    with your fellow jurors.

3        You know, all of you probably use either cell

4    phones, iPhones, Blackberries, the internet, but

5    don't communicate with each other through that

6    usage.  Don't communicate with your family and

7    friends about the case.  Not proper.  Just --

8    because you -- you should be uninfluenced by

9    anything or anybody other than all of you working

10   together to get this case unanimously decided, and

11   that's what's ultimately fair to both sides.

12       Okay.  This really doesn't happen very much,

13   but, you know, if there is any juror violation of

14   any of this stuff and you think it should be

15   brought to my attention, don't hesitate to do that.

16   But I'm confident you all took an oath.  You know

17   what's expected of you.  You want to get on with

18   this, just as I do.  And I know the parties do.

19       Just remember we are a nation of laws.  We

20   follow the laws.  We follow the rules.  We follow

21   the regulations.  That's really what we're

22   committed to, and that's what makes us, in many

23   respects, the society that we are.  That's why this

24   trial process is so significant, so important.  And

25   your role is absolutely critical to making this

1    justice system work.

2        So thank you for your attention.  I know that's

3    a lot of talking out of the gate for me, but for

4    the most part after that I'm silent until I give

5    you these periodic instructions or resolve some

6    disputes, or finally get you to that final charge

7    and instruction in the law in this case.  You are

8    the judges of the facts from the competent

9    evidence.

10       The opening statements, you are going to hear

11   three today.  And, you know, after the opening

12   statements, we'll probably take a break.  If

13   anybody has a problem in the process of, let me

14   know, and I'll try to accommodate that.  But we'll

15   get through the openings, then we'll break, and

16   start with the proof.  Only the evidence or lack of

17   evidence you should consider in resolving the fact

18   issues in this case.  You are the judges of the

19   facts.  Thank you very much.

20       Okay.  Anything from anybody before we start

21   with opening statements?

22               MR. MANGO:  No, your Honor.

23               MR. LINSIN:  Nothing from Tonawanda Coke,

24   your Honor.

25               MR. PERSONIUS:  No, your Honor.  Thank

1   you.

2          THE COURT:  Okay.  Okay.  Something tells

3   me, Mr. Mango, you're going make the opening

4   statement for the government?

5          MR. MANGO:  Yes, your Honor.

6          THE COURT:  Okay.  Let's get started.

7          MR. MANGO:  Thank you, your Honor.

8      Good morning, we all know that a business

9   operates to make money.  The bottom line for a

10  business is to turn a profit.  And there is nothing

11  wrong with that.  In fact, part of the American way

12  is to allow anybody to start a business and to try

13  to strike it rich.

14      However, in our society we don't believe in

15  profit at all costs.  We balance that with the

16  greater good of our citizens.  And such things as

17  child labor laws, consumer protection laws, and

18  environmental laws are designed to protect our

19  society from unchecked business development.  And

20  so it is in the coke business.

21      Coke, a black, rocky, almost pure carbon

22  substance, formed by the burning of coal for days

23  on end is made.  And in the process of making that

24  coke, a gas is formed, coke oven gas.  And that

25  coke oven gas contains a number of pollutants

1    including naphthalene, ammonia, sulfur, tar, and

2    benzene, a known human carcinogen.

3         Environmental regulations have been put in

4    place so that those pollutants don't end up in the

5    air we breathe and on the ground we walk on.

6    Businesses are expected to comply.  But compliance

7    means money.

8         This case, ladies and gentlemen, is about a

9    business, the Tonawanda Coke Corporation, and its

10   manager of environmental control, Mark L. Kamholz,

11   who made a choice, a business decision to increase

12   profits rather than protect the environment.

13        Now you just heard me refer to Defendant

14   Kamholz as manager of environmental control.  That

15   was his job title, and in that position you'll

16   learn that he controlled all aspects of

17   environmental compliance at the Tonawanda Coke

18   Corporation since at least 1981.  He was in

19   control.  He was the one who interacted with the

20   United States Environmental Protection Agency.

21   You'll hear them called EPA.  He was the one that

22   interacted with the New York State Department of

23   Environmental Conservation.  You may hear them

24   called DEC.  He was the one who corresponded with

25   them about environmental compliance, and he was the

1   one who applied for the applicable permits.

2       On the surface, Defendant Kamholz appeared to

3   be keeping Tonawanda Coke in its environmental

4   compliance.  But beneath the surface you will learn

5   he was just a man concerned with the bottom line, a

6   man who chose to present the false front of

7   environmental compliance, while using every trick

8   to escape true compliance.  The evidence will show

9   that he accomplished this front by knowing what to

10  say, what not to say, knowing the habits of the

11  inspectors, and importantly, using his position of

12  control.

13      Defendant Kamholz routinely escorted inspectors

14  around the plant and, in fact, before the

15  inspectors could even enter the production

16  facilities, they had to wait and be escorted by the

17  defendant.  That allowed a delay which allowed the

18  defendants to engage in deception.

19      You've heard the Court talk to you about the

20  two environmental laws in play in this case.  Those

21  are the Clean Air Act and the Resource Conservation

22  and Recovery Act.  Both of these environmental laws

23  at their heart are self-reporting statutes.  That

24  means the burden is on the business to maintain

25  compliance with the laws, and if not, promptly

 1    report to EPA and DEC.

 2         Under the Clean Air Act you're going to learn

 3    than industrial sites that release a certain amount

 4    of pollutants into the air, such as Tonawanda Coke,

 5    must apply and operate pursuant to an air permit.

 6    You'll also hear that called a Title V air permit.

 7    Title V is the title in the Clean Air Act.

 8         That permit is designed to regulate all

 9    emissions going into the air.  Everything.  The

10    company must periodically certify that they are in

11    compliance with that permit, and it must notify the

12    authorities if new emissions are identified.

13         Likewise, the Resource Conservation and

14    Recovery Act you've heard known as RCRA, R-C-R-A,

15    requires businesses to apply for a permit if

16    they're going to treat, store, or dispose of

17    hazardous waste, and then they must manage that

18    hazardous waste in compliance with the permit.

19         EPA and DEC cannot be everywhere, and they

20    certainly cannot inspect -- I'm sorry, do

21    inspections 24 hours a day, seven days a week at

22    every industrial facility in the country or in New

23    York State.  That is impossible.

24         Therefore, some of the responsibility falls on

25    the shoulders of industry and individuals like

1    Defendant Kamholz.  However, instead of being

2    forthright and honest about the compliance issues

3    at Tonawanda Coke, you will hear evidence that

4    Defendant Kamholz used that position of control to

5    manipulate and deceive inspectors from finding

6    areas of noncompliance.

7         Defendant Tonawanda Coke Corporation and

8    Defendant Kamholz are charged in all of the 19

9    counts of the indictment.  Counts 1 through 15

10   allege the defendants violated the Clean Air Act by

11   operating their coke facility in violation of their

12   Title V permit.  Specifically Counts 1 through 5

13   charge that from 2005 to 2009 the defendants

14   violated their permit by releasing coke oven gas

15   from a pressure release valve in the by-products

16   department.

17        You'll hear more about that during the trial.

18   You're going to learn that the pressure release

19   valve wasn't listed on their Title V permit, and as

20   such that was an unpermitted emission source, a

21   violation of the permit, a criminal offense.

22        Witnesses who actually worked at Tonawanda Coke

23   will describe this emission source as something

24   they called the bleeder valve.  You will hear that

25   every 20 minutes or so this would pop open, and it

1   would bleed, using their terms, benzene containing

2   coke oven gas into the atmosphere.  Now sometimes

3   the releases were short, 15, 30 seconds, but every

4   half hour, every 20 minutes approximately.

5        But you're also going to hear sometimes those

6   emissions were continuous.  The valve was open all

7   the time.  In fact, you're going to hear testimony

8   from a couple witnesses that while that bleeder

9   valve or pressure release valve, you may hear it

10  called the PRV, the pressure release valve.  While

11  that was releasing, lightening struck it, and sent

12  a 10-foot tall flame into the air.  Obviously

13  corrective measures needed to be taken by the plant

14  personnel to get that blow torch out.

15       Counts 6 through 15 deal with pollution control

16  devices known as baffles.  We've heard this term

17  now a couple times, baffles.  During the trial

18  you're going hear that during the coke production

19  process, after the hot incandescent coke is pushed

20  out of the coke oven, it's brought by a railcar to

21  a location known as a quench tower.

22       I think you've heard that term already too.  At

23  that location, the hot coke is doused with water.

24  And if you think about that, when something that's

25  2,000 degrees Fahrenheit is doused with water,

1    you're going to get a giant plume of gas, steam and

2    other matters in that gas.

3        Baffles are the items in those quench towers

4    that are designed to disrupt the air flow so that

5    particulate matter that's in that plume of gas

6    going into the air falls out, or at least slows

7    down so it doesn't make it as far off the property.

8    Baffles, sometimes they're as simple as wooden

9    beams.  And the idea also is that particulate

10   matter, also called soot, will hit the baffles,

11   drop out of the gas plume.

12       You're going to hear about the two quench

13   towers at the Tonawanda Coke facility, one on the

14   east side of the property, known as quench 1, or

15   quench tower number 1, one on the west side of the

16   property known as quench 2, or quench tower number

17   2.  Conditions 96 and 97 of the Title V permit

18   explicitly and unambiguously say quench towers must

19   have baffles.  Clear as day.

20       But the evidence will show that at Tonawanda

21   Coke neither of those quench towers have baffles.

22   In fact, you're going learn about letters Defendant

23   Kamholz wrote to the DEC regarding the quench

24   towers.  How in 1983 Defendant Kamholz requested an

25   exemption from the baffle requirement for tower

number 1, the east tower.  I think I got them

backwards.  The west tower, tower number 1, on the

west side of the property.  He asked for an

exemption from the baffle requirement, because he

said you know what, we only use this on an

emergency basis, less than 10 percent of the time.

You're going to hear in 1996 Defendant Kamholz

again wrote to DEC.  This time about the east

quench tower, tower number 2, about how he was

going to lower the tower.  You're going to hear in

response, DEC sent a letter back saying, okay, you

can lower the tower.  But I remind you, all quench

towers must have baffles.  Pretty simple.  Pretty

clear.  Pretty unambiguous.  However, those towers

never had baffles.

Tonawanda Coke and Defendant Kamholz never went

back to the DEC and said, you know what, we're

using quench tower number 1 more than 10 percent of

the time, just to let you know.  That never

happened.  He never went back to the DEC and said,

you know what, when we lowered the tower, we didn't

reinstall the baffles.

The evidence will show that the defendants

operated as business as usual, knowing full well

that DEC would never actually look in the towers.

1   They're dangerous places.

2       Counts 17 and 18 involve violations of RCRA.

3   For Count 17 you'll hear about two large abandoned

4   tanks in the coal field area at Tonawanda Coke.

5   These tanks were in disrepair.  The witnesses will

6   discuss about how 15 years ago it was brought to

7   Defendant Kamholz's attention that there was a

8   gooey, sticky coal tar all around these tanks.

9       In response you'll hear that Defendant Kamholz

10  managed that tar by taking what's known as coke

11  breeze -- it's made in the process.  It's small

12  fine little pieces of coke -- and spread it over

13  the surface of that coal tar to harden it up, to

14  make it so it wasn't as dangerous back there.

15      Additionally, you're going to hear about a

16  fire, a big fire, that occurred in the summer

17  of 2008.  And during that fire additional coal tar

18  ran from those tanks out onto the ground.  Now, the

19  coal tar in and around these tanks was tested on

20  two occasions by the Environmental Protection

21  Agency.  And you're going to hear that the sampling

22  confirmed that that coal tar was a hazardous waste

23  because of the amount of benzene it contained.

24      Count 17 therefore relates to the storage of

25  that hazardous benzene containing waste on the

1    ground around these tanks from 1998 up until 2009.

2        Count 18 also involves these abandoned tanks.

3    And the company witnesses will discuss how after

4    the fire, Defendant Kamholz authorized a limited

5    clean up of that area.  And he authorized the

6    scooping up of this coal tar sludge and the coal

7    tar, the hazardous waste, to be dumped on the coal

8    field on the ground.  You'll learn that at no time

9    did the defendant have a permit under RCRA to

10   dispose of such hazardous waste in this manner.

11   And that is the essence of Count 18.

12       Now as I discussed earlier, in the process of

13   making coke there's this coke oven gas.  That coke

14   oven gas is sent to the by-products unit at

15   Tonawanda Coke.  It's separate from the group of

16   ovens known as the battery, where you make the

17   physical coke, where you heat the coke -- the coal

18   to turn it into coke.  That coke oven gas is sent

19   to the by-products unit.

20       The by-products unit then processes that gas

21   and takes whatever recoverable material can come

22   out of the gas.  One of those materials is tar.

23   Tar is similar to the tar that's used to seal your

24   driveway.  But in pulling that tar out of the

25   by-products -- or in the by-products system, a tar

1    sludge is created, part of the tar that you just

2    can't use, that's too gloppy and big, and just it's

3    not smooth, falls into a box in the by-products

4    unit called the tar box.

5         That tar is also known as decanter tank tar

6    sludge from coking operations which is identified

7    and listed under RCRA as a hazardous waste.  Some

8    of the material -- some of the items under RCRA you

9    test it, you see if it's got too much benzene in

10   it, and it's a hazardous waste.

11        Other items under RCRA, RCRA just says this

12   material, this is hazardous.  That's how it is with

13   this decanter tank tar sludge from coking

14   operation.  You're also going to hear the term

15   K087.  That's the number that RCRA gives this

16   waste.

17        Count 19 involves the defendants' practice of

18   taking that K087 waste and dumping it on coal piles

19   on the ground.  I expect you're going hear about an

20   exclusion under RCRA regarding this K087 waste,

21   that so long as when it's properly recycled to the

22   coke ovens, you don't need a RCRA permit.  I expect

23   you're going to hear that.

24        And ultimately some of this K087 waste that was

25   dumped on the coal field on the ground did make it

1    back into the coke ovens.  However, it's the

2    government's position that the intervening

3    placement of that hazardous waste on the ground

4    voided that exclusion, and that is Count 19, and a

5    crime under RCRA.

6        Those are the environmental charges we've

7    talked about.  But there's another count in the

8    indictment.  Count 16, which circles back to what

9    I've already been talking about, Defendant

10   Kamholz's position of control.

11       In that count you're going to -- the defendants

12   are charged with obstruction of justice in April

13   of 2009.  And as part of that charge you're going

14   hear evidence that prior to 2009 local citizens

15   learned that there were elevated levels of benzene

16   in the air.  They brought it to DEC's attention.

17   DEC in turn commissioned an air study.  And that

18   air study, in DEC's mind, concluded that Tonawanda

19   Coke was responsible for the elevated levels of

20   benzene in the air.

21       The defendants new this as DEC had shared their

22   preliminary finding with them.  EPA then got

23   involved.  They scheduled a week-long inspection,

24   from April 14th to April 21st of 2009.  People flew

25   in from Denver, Colorado, New York City,

1    Washington, D.C., all with EPA.  They went to this

2    Tonawanda Coke plant.  DEC was there as well.  The

3    defendants knew they were coming.  You're going

4    hear they got notice about a week ahead of time

5    that EPA was coming.

6         And so what you're going to hear is you're

7    going to hear testimony from the person who was the

8    by-products foreman at the time, Pat Cahill; that

9    just prior to this EPA inspection he went on a walk

10   with Defendant Kamholz, and as they were touring

11   the by-products area, Defendant Kamholz saw the

12   pressure relief valve go off, the bleeder.  And he

13   turned to Pat Cahill and said, "We can't let that

14   go off when they're here."  And in response, Cahill

15   told the defendant he would take care of it.  He

16   would interfere with EPA's ability to do their job.

17        So, everyday prior to EPA arriving on site, Pat

18   Cahill would dial up the set point on that pressure

19   relief valve away from its typical setting of 80 to

20   100 centimeters of oil.  You're going to hear all

21   these terms.  It was raised.  The idea it was

22   raised so it won't blow off as much.  Yet, you're

23   going to hear evidence that it did blow off.  EPA

24   noticed it.  EPA at one point asked the defendant

25   about it, Defendant Kamholz.  When he was asked

1    about it, he said, "I don't know what that is.

2    You're going to have to talk to the by-products

3    foreman."  Interfering with their ability to do

4    their job.  Obstructing justice.  The evidence is

5    going to show he did know what that was.

6        Following the inspection you're going hear that

7    EPA sent Defendant Kamholz a letter.  It's typical

8    in their process to ask for information.  Again,

9    remember I told you, environmental laws are, at

10   their heart, self-reporting statutes.

11       So if EPA or DEC says, hey, business, we want

12   some information, the business has to respond and

13   give it.  After this inspection, EPA sent a letter

14   to Defendant Kamholz asking for additional details

15   about this PRV, in response, about how it operates

16   and how long it's been there.  Part of what

17   Defendant Kamholz wrote -- you're going to see the

18   letter.  You're also going to see handwritten notes

19   that were seized from his office when EPA, criminal

20   EPA went in in December of 2009 and took those

21   records.

22       So you're going to see his handwritten notes,

23   and you're going to see the letter where he

24   responds back and says, the PRV opened very rarely.

25   The emissions have not been reported because they

1    are believed to be de minimus.

2         After hearing witness after witness describe

3    the frequency of the releases from this PRV, you'll

4    have no doubt that Defendant Kamholz lied to the

5    EPA.

6         So the essence of Count 16 captures the

7    deceptive conduct by the defendants prior to the

8    EPA inspection, hey, we can't let that blow off;

9    during the EPA inspection, I don't know what that

10   is; and after the EPA inspection, the PRV opens

11   very rarely.  And that is keeping with a course of

12   conduct by the defendants whenever they knew they

13   were subject to scrutiny.

14        That course of conduct will be apparent after

15   you hear the witnesses discuss the charges in the

16   indictment.  But it will also be apparent after you

17   hear the witnesses testify regarding other steps

18   taken by the defendants to enhance their bottom

19   line.

20        That includes removal of something you'll learn

21   about, an automatic igniter on the flare stack.

22   Where you cook the coke -- the coal to make the

23   coke, these group of ovens called a battery, that's

24   where all the coke oven gas is generated.  There is

25   a flare on them.  That flare is supposed to have an

1    automatic igniter.

2         You'll hear witnesses talk about the defendant

3    removed that automatic igniter, Defendant Kamholz,

4    because natural gas was too expensive to keep that

5    automatically lit.  So that in an emergency, you

6    know, massive pieces of equipment are down, you

7    can't suck that coke oven gas out of the oven so

8    the oven doesn't blow up.  In an emergency you know

9    what witnesses are going to tell you how they had

10   to light that?  Defendant Kamholz said get a straw

11   broom, light it on fire, throw it on top of the

12   battery.

13        You're going to hear also about steps taken

14   during what you'll hear about Method 303

15   inspections.  There is a lot of information in this

16   case.  That is simply a private inspector came to

17   Tonawanda Coke every day.  Every day Tonawanda Coke

18   had to have a private inspector come to the plant,

19   and they had to walk around the battery, this group

20   of ovens where the coal is cooked, and they had to

21   inspect it.  They had to look for leaks coming out

22   of holes, on the top, out of the doors, out of

23   cracks in the walls, they had to look for all that.

24        And part of that inspection, you have to keep

25   what's called the back pressure on the oven

1    consistent.  You can't change it.  Well, you're

2    going to hear it was a regular practice at

3    Tonawanda Coke that when the Method 303 inspector

4    came in, who had to wait, who had to be escorted,

5    causing delay, that witnesses at Tonawanda Coke

6    will say it was a routine practice that we lowered

7    the back pressure so there wasn't as much pressure

8    in the oven, so it's not forcing as much gas out of

9    these cracks and holes and lids so they could try

10   to be in compliance.  You'll hear other activity

11   too that circumvented the environmental compliance

12   laws.

13       Now during the course of the trial you'll hear

14   from several witnesses, DEC witnesses, who, on

15   occasion, went to the site and conducted

16   inspections at Tonawanda Coke.  You may hear the

17   defendants claim that their violations were open

18   and obvious.  In fact, they were authorized by DEC.

19       However, the evidence you hear will show that

20   no one, no one from DEC, no one from EPA, got the

21   full story as to what was happening at the

22   facility.  And no one authorized the defendants to

23   engage in these illegal acts.

24       The notion of a good corporate citizen means

25   not just focusing on the bottom line, but valuing

1    the community in making business decisions.  At the

2    end of the trial I will ask you to consider what it

3    means to be a good corporate citizen, and that

4    based on the evidence presented to you during this

5    trial, defendant Tonawanda Coke Corporation was not

6    a good corporate citizen, but rather, a company

7    that disregarded environmental compliance laws to

8    enhance its bottom line.  And likewise, Defendant

9    Kamholz, manager of environmental control, was an

10   enthusiastic leader in devising ways to skirt the

11   laws and regulations designed to protect the

12   environment and society, all for a profit.  And,

13   ladies and gentlemen, when I conclude at the end of

14   the trial, I will urge you to find the defendants

15   guilty as charged.  Thank you.

16              THE COURT:  Okay, Mr. Mango, thank you

17   very much.  Everybody okay, ladies and gentlemen?

18       Mr. Linsin, are you going to open for the

19   defendant Tonawanda Coke Corporation?

20              MR. LINSIN:  Yes, thank you, your Honor.

21              THE COURT:  You're welcome.

22              MR. LINSIN:  Good morning.

23              THE JURY:  Good morning.

24              MR. LINSIN:  We appreciate your being

25   here.  On behalf of Tonawanda Coke I want to thank

1    you for your attention so far and request your

2    indulgence and careful attention throughout this

3    very important trial.

4        As you might expect, the defendant expects the

5    evidence in this case to show something

6    dramatically different than what Mr. Mango just

7    outlined.  But I am pleased to hear, from what

8    Mr. Mango just said, that there is one thing about

9    which we can agree.  You may remember that

10   Mr. Mango, when talking about the quench tower,

11   said, wait a minute, I think I got it backwards.

12   And he did.

13       And the government's case in this criminal

14   prosecution is backwards.  Because we believe,

15   ladies and gentlemen, that the evidence will

16   actually show in this case that the EPA

17   investigation, the week-long investigation that

18   Mr. Mango referenced in April of 2009, was an

19   investigation that was conducted with a stacked

20   regulatory deck.  It was an investigation that was

21   premised on misconceptions, a lack of information,

22   and a complete reversal of the way in which the

23   regulators had interacted with this company for

24   decades.

25       The evidence will show that for more than 30

1    years, from 1978 up through April of 2009, the

2    entire period where our nation's environmental laws

3    were enacted, amended, regulations enacted and

4    changed and amended, this company worked hard to

5    understand those regulations, to comply with those

6    regulations.  The evidence will show that the DEC

7    regulators, the Department of Environmental

8    Conservation from New York State, worked with this

9    company on a regular basis.  They were out at this

10   plant on a regular basis.  Worked directly with

11   Mark Kamholz on a regular basis.

12       And one point that I think will become obvious

13   as soon as you begin seeing the evidence in this

14   case, the photographs, the aerial photographs, this

15   is an industrial site 180 acres out in Tonawanda.

16   And most of the operations in this plant, by nature

17   of what they do there, are out in the open.  Very,

18   very few of the workers work inside.  All of the

19   activities that are being discussed that are the

20   subject of this indictment are out in the open, are

21   out in the environment.

22       Now, Tonawanda's track record before

23   April '09 I don't want to suggest was a perfect

24   record.  There were problems.  There were sometimes

25   compliance issues.  And DEC regulators came to the

1    company, talked to them about these issues, and

2    Tonawanda time and time again, responded, corrected

3    situations that needed to be corrected, and went

4    forward.

5        And the truth is, if you look across this

6    country with regard to big companies or small

7    companies, no company has a perfect environmental

8    compliance record.  It is just not in the nature of

9    the regulations and the ability to comply a hundred

10   percent of the time.

11       But in April of '09, EPA decided that they were

12   going to apply literally a different set of rules

13   to the environmental compliance issues at Tonawanda

14   Coke.  The conditions and operations that had

15   existed at that plant and had been approved and

16   allowed by the Department of Environmental

17   Conservation for decades, were all of a sudden

18   decided to be violations of the law, criminal

19   violations.  And that is that stacked regulatory

20   deck that has led directly to the charges in this

21   indictment before you.

22       Let me give you a little bit of what I think

23   the evidence will show about the background of this

24   company.  This is a facility, the facility itself,

25   that was opened in 1917 as a coke production

1    facility.  It has been -- it was owned originally

2    by a number of other companies.  Allied Chemical

3    was one and other companies earlier on.  Tonawanda

4    Coke Corporation bought this company in 1978.

5    Continued the coking operations that had gone on in

6    that site since 1917.  The ovens, this battery of

7    ovens that you'll come to learn about and see

8    pictures of, was built in 1962.

9        And in order for coke to be made, in order for

10   this process to work, these ovens and the people

11   that work at this facility have to work 24 hours a

12   day, seven days a week, 365 days a year.  There are

13   no on-off switches at a coke oven.  It has to

14   continue in operation in order to function.  And

15   you will learn about what is a pretty extraordinary

16   process that goes on in these ovens.

17       As Mr. Mango said, the evidence will talk about

18   and witnesses will describe how this coke is

19   created.  You will actually see a piece of coke

20   that is manufactured here.  And coke is a product

21   that is created by baking coal and a number of

22   other components in these ovens at very high

23   temperature, but in an airless environment in these

24   ovens.  Baking it for quite a number of hours, and

25   then pushing this coke, this hot coke, into the

1    rail cars, and the coke is then used by other

2    facilities to manufacture steel and iron.  And it

3    is an essential component in those blast furnace

4    operations.  And it has been produced at this

5    facility for nearly a hundred years.

6        But one of the other fascinating things about

7    this company and the operations you'll hear is not

8    just that it makes this valuable, essential product

9    for blast furnaces and foundries.  As this coke

10   oven gas is brought out of the battery and brought

11   over to the by-products area, there are systems in

12   place to strip out of that coke oven gas the very

13   pollutants that Mr. Mango has discussed.

14       Coal tar is removed from that coke oven gas and

15   then coal tar itself is a salable product.  It is

16   sold commercially.  And it is sold for use on

17   parking lot sealants, in paints, and dyes, and even

18   some medicated shampoos and soaps.

19       The ammonia is knocked out of the coke oven gas

20   and other components of the coke oven gas are

21   removed, including a light oil that is removed and

22   itself, is a salable product.  It is used to

23   enhance -- as a gasoline additive and for other

24   chemical products.

25       So these products are taken out of the coke

1    oven gas in this by-products unit that you will see

2    pictures of, and then what is referred to as clean

3    coke oven gas or fuel gas is then recycled right

4    back into the furnace.  There is a major gas line

5    that goes under the roadway and right back to the

6    battery to be used again in the heating process and

7    to recapture the BTUs that are in that coke oven

8    gas.

9        You'll also hear -- because this coke oven gas

10   has value, not just for BTU value in the furnace,

11   but it is also used in the boilers in the facility.

12   For five years, most of the five years that are

13   involved in the years of this indictment, this

14   facility was on what was called cogeneration.  And

15   this coke oven gas was used in the boilers to

16   actually generate electricity for the entire

17   facility.  The facility, for most of the period of

18   this indictment, was off the electric grid, and it

19   was using every ounce of this coke oven gas that it

20   could get, to generate electricity for the

21   facility, because it was literally unplugged.

22       There are other recycling activities that

23   you'll hear about.  Coke breeze, which are the fine

24   particles from the coke manufacturing are also

25   recycled back into the production process.

1            And you heard Mr. Mango talk about this -- the

2    coal tar sludge that is -- that drops out of the --

3    in the tar decanter in this by-products area.  That

4    too is recycled back into the coke ovens precisely

5    pursuant to the very EPA regulation, the RCRA

6    regulation that Mr. Mango talked about.

7            The government understood, EPA understood, wait

8    a minute, it does not make sense to take this K087,

9    this coal tar sludge, what would otherwise be a

10   hazardous waste, and then have to go put it in a

11   landfill someplace or store it someplace in

12   perpetuity.

13           We are going to permit coke ovens, this type of

14   facility, to recycle it back into the coke mixture,

15   as long as you don't dispose of it on the land.

16   And that's what the regulation says.

17           And what you'll hear from witness after witness

18   who will come to this stand and talk about the

19   people that actually did this mixing, they took it

20   out to the coal fields with front end loader

21   operators.  They put it up on top of the coal

22   piles.  They mixed it into the coal pile, and then

23   put it on the conveyors that was charged into the

24   oven.

25           And you'll hear each of them say to you, every

1    one of them say, their intention was to recycle

2    that material back into the coke mix.  That's why

3    they were doing it.  Not a single one of those

4    witnesses will say they had any intent to dispose

5    of this material.  That wasn't what they were

6    doing.

7        Now I talked a bit about Tonawanda's

8    relationship with DEC and the years of interaction.

9    You will hear evidence of that interaction.  You'll

10   see records and documents regarding that

11   interaction.  And what I ask you to do as you hear

12   that evidence is to recognize how important that

13   evidence is as background and context for the

14   charges the government now wants you to focus on in

15   this reshaped environmental world that they have

16   created post-April 2009.

17       That background and context will show you why

18   this indictment is a product of a stacked

19   regulatory deck.  And let me begin by talking about

20   first these Clean Air Act charges.  15 of the 19

21   counts of the indictment are Clean Air Act charges,

22   and 10 of those 15 counts relate to these baffles

23   that you've already heard about.  You will see what

24   these baffles were.  You will understand why they

25   were used.  But let me, as we begin, you will also

1   hear that, despite the fact that Mr. Mango is

2   saying that these violations were so egregious

3   because the company was just trying to save money,

4   you'll hear evidence that the cost -- the cost for

5   installation of these baffles in these quench

6   towers, when the government finally got to the

7   point of saying well, you really have to install

8   these in 2009, the cost for doing that was about

9   $125,000.

10      Now, that's a lot of money for any one of us,

11   of course.  But for an ongoing company in terms of

12   compliance costs, that is not a significant factor.

13   That is not a significant factor that would drive a

14   company to avoid compliance responsibilities at the

15   risk of some sort of enforcement action.

16      What you will hear instead in the evidence is,

17   as Mr. Mango referenced, there was -- quench tower

18   number 1 by the way is the west quench tower.  If

19   you look at it on a map, it's on the left-hand

20   side, quench tower number 1.  There was an explicit

21   exemption granted by DEC.  And you'll see the

22   letter granting this from 1984 telling the company

23   you do not need to have baffles in quench tower

24   number 1.  It's an emergency quench tower.

25      And these towers, by the way, are not elaborate

1    facilities.  These are corrugated steel sheds.

2    That's really all they are.  And the baffles -- and

3    you will see the baffles brought in -- the baffles

4    are nothing more than one-by-six or two-by-six

5    pieces of lumber that are stretched at an angle at

6    the top of these towers in order to knock down

7    particulate matter when the coal -- the coke is

8    quenched.

9         So we're not talking elaborate systems here.

10   We're not talking systems that prevent the emission

11   of any dangerous gases into the environment.

12   They're meant as a fairly basic and rudimentary

13   system to knock down particulates.

14        And so the years will show that there were not

15   baffles in quench tower number 1 because there was

16   an exemption, and everybody knew the exemption was

17   there.

18        There was this exchange of letters, and you'll

19   see the letters in 1996, about quench tower number

20   2 being lowered, this shed being lowered, and the

21   baffles were removed.

22        Now baffles were not reinstalled in that quench

23   tower.  But what you will also hear, and the

24   evidence that you'll hear from another witness on

25   this stand is that the DEC inspector who was

1    charged and goes out to this facility every single

2    year from 1996 to 2009, he's out there every year,

3    and he'll tell you I knew there weren't baffles in

4    quench tower number 2.  I understood that.  And I

5    made a judgment call.  This DEC inspector will say

6    I made a judgment call.  I didn't think they were

7    that significant.  So I never wrote the company up.

8    I never told them they had to install baffles, even

9    though I knew they weren't there.

10        But then in April of '09 all of a sudden EPA

11   discovers there are no baffles in these towers.

12   And that discovery has led to more than half of the

13   charges in this indictment.  That's not even

14   dealing.  That is not the way regulators are

15   intended to regulate a company.

16        What you'll also see, and this I think is a

17   very telling piece of evidence, an email that

18   relates directly to these baffles, an email from

19   December of 2009.  So this is eight months after

20   this April '09 inspection by EPA.  You'll see an

21   email from a fellow named Ken Eng, E-N-G.  And he

22   was the chief of EPA's Region 2 -- that encompasses

23   the New York area -- Region 2 air compliance

24   branch.

25        And after this discovery of no baffles in the

1    quench towers Mr. Eng writes to a number of his EPA

2    colleagues, we have finally become aware that DEC

3    had granted Tonawanda an exemption for these

4    baffles in quench tower number 1.  It finally

5    dawned on us, and he says in the same email that

6    DEC -- DEC, the regulatory agency, accidently left

7    that exemption out of this Title V air permit that

8    governs the facility.  They missed it.  They

9    accidently failed to put it in.  And then Mr. Eng

10   goes on to say, and TCC never caught -- didn't

11   catch this mistake by DEC.

12        Now that very same permit requires the

13   regulatory agencies, not surprisingly, if they

14   realize they made a mistake, that permit requires

15   them to correct that mistake.  But what was done

16   here instead was that EPA just goes forward and

17   orders the company to install baffles in quench

18   tower number 1, and the company does it.

19        But you will find in this indictment five of

20   those ten baffles counts relates to the baffles in

21   quench tower number 1, the tower for which DEC had

22   granted an exemption, and DEC had just failed to

23   put it in the permit, and Tonawanda never caught

24   it.  That is not straight dealing.

25        Now the PRV counts, the first five counts, let

1    me tell you a little bit about what I think the

2    evidence is going to show about the regulatory

3    history of that particular valve in the by-products

4    area.

5         You will hear, I anticipate, the evidence will

6    be that when that valve was installed on the coke

7    oven gas line, those types of valves were exempt

8    from regulation under New York State air emissions

9    regulations.  There was an exemption in the New

10   York regulations.

11        And you'll also see -- and you be the judge of

12   this, ladies and gentlemen, you'll see photographs

13   of this -- of this valve in the by-products area.

14   And this valve is about as open and as obvious as

15   something could be for anybody that was intending

16   to look for it.  It's right there on the coke oven

17   gas line.  The coke oven gas line at that point in

18   the plant is about as high as the ceiling in this

19   courtroom, and the valve sticks straight up from

20   it, and you'll see photographs.  Right next to the

21   by-products area, right downstream, by the way, of

22   where this clean gas goes back to the ovens on the

23   way to the boiler house.

24        So you'll see that the company did not put this

25   PRV literally in its permit because there was this

1   exemption.  The permit by itself does speak to and

2   talks about requirements generally for PRVs at the

3   facility.  Those provisions are in the permit.

4       You'll also see -- now permit, you'll see, was

5   issued in May of 2002.  The very next year the

6   company, as required by regulations, they hired an

7   outside consultant to do a study of what are called

8   hazardous air pollutants, HAPs H-A-P-S, at the

9   facility.  And they're required to do an estimate

10  of what the leakage of these hazardous air

11  pollutants might be at the plant.  And they

12  literally go around and identify every valve and

13  every source that might be emitting hazardous air

14  pollutants.

15      The company retains this consultant, prepares a

16  report, and in 2003 files this HAPs emission study

17  with DEC.  In that study, the very PRV that EPA

18  says they discovered for the first time in April of

19  '09, that PRV is specifically listed in this

20  emission study that was sent to DEC in 2003, was

21  studied by EPA and reviewed by EPA that very same

22  year.

23      So the company didn't believe, because of the

24  regulation, that it was required to be in the

25  permit.  But the very next year they notified the

1    agencies, yes, there is this PRV in the facility in

2    the by-products area, and open and obvious to

3    anybody that walks through the plant; open and

4    obvious, we suggest the evidence will show, to any

5    of the DEC inspectors that walk through that plant.

6        At the April '09 inspection there is, in fact,

7    an explicit discussion about this PRV.  The

8    inspectors see the valve release.  There is a

9    discussion.  I expect -- I do not expect the

10    evidence will show what Mr. Mango suggested in

11    terms of the dialogue.  But this week-long

12    inspection progresses.  The inspectors are out

13    there every day.

14        At the close-out meeting of this week-long

15    inspection, the DEC and EPA inspectors sit down

16    with the folks at Tonawanda, talk about their

17    findings, and, say, listen, about that PRV -- and

18    there had been information exchanged back and forth

19    during the week about what happens to the PRV.

20    They showed the inspectors where the gauges were

21    recorded, where the pressure readings were made.

22    And the only request, only request that the

23    regulators make at the end of this week-long

24    inspection is, by the way, will you please set

25    that -- elevate that set point a little bit so it

1   doesn't go off as much?

2       They did not cite the company for a violation.

3   They did not direct the company to do anything

4   about this PRV that has been sitting there since

5   1987 approximately.  And as a matter of fact, from

6   April of '09 all the way until the end of December

7   of 2009, neither EPA nor DEC says anything to this

8   company about blanking it off, or adding it to its

9   permit.

10       And the company decides early the following

11   year, February of 2010, to blank it off itself

12   voluntarily.  And another flare is constructed in

13   the by-products area.  And then six months after

14   this flare is voluntarily blanked off by the

15   company, without any direction from the agencies,

16   an indictment is filed charging the company with

17   five felony counts, one per year, for having this

18   unpermitted valve in the by-products area from 19

19   -- I'm sorry, from 2005 through the end of 2009.

20       So despite the fact it was exempted when it was

21   installed, that there were yearly inspections by

22   DEC inspectors throughout the period of the

23   indictment, despite the fact that the company had

24   explicitly notified DEC and EPA, we've got a PRV in

25   the by-products area -- you will see this

1    document -- and despite the fact that after this

2    April '09 inspection no regulators said anything to

3    the company about having to change the valve or

4    remove the valve, six months after the company

5    blanks it off, five felony counts, Counts 1 through

6    5 in this indictment.  That is not straight

7    dealing.

8         There will be discussion and evidence about

9    this coal tar sludge.  You will hear quite a bit

10   about the regulation that governs this coal tar

11   sludge.  It is, as we've said, a product that EPA

12   has listed as a hazardous waste unless it is

13   recycled.  And the fact is from 1978 all the way

14   through until April of 2009 the company was

15   recycling this coal tar sludge in exactly the same

16   way, openly and obviously out in this coal field --

17   and you'll see the pictures of it -- by doing

18   exactly what I said.  Taking these front end

19   loaders putting it on the coal piles, mixing it up

20   and charging it into the ovens.

21        And you'll also see a different set of DEC

22   regulators -- now these are RCRA DEC regulators --

23   out at the facility in 1989, 1997, 2001, and 2007.

24   And they file reports saying, hey, this coke oven

25   facility isn't generating hazardous waste, because

1    this sludge, this coal tar sludge is being

2    recycled.  They approve the very process that is

3    the basis for this Count 19 in this indictment.

4    The very process that was done on a weekly basis at

5    this facility out in the open for all to see.

6         Now the one exception you will hear evidence

7    about, and I expect -- well, the exception is that

8    in 2004 there was a decision made because a couple

9    of other facilities in this area were shutting

10   down -- the Allied Chemical plant and Bethlehem

11   Steel -- they had some excess coal tar sludge at

12   their facilities.  And there was a decision made to

13   move some of that coal tar sludge that was

14   generated at other facilities to the Tonawanda

15   facility so that it could slowly be worked into the

16   coke production process at that plant.

17        And because the company knew that it could not

18   handle all of this outside coal tar sludge at once,

19   they made a decision to construct a concrete pad

20   out in the coal field.  And you'll see pictures of

21   this pad.  And when this outside coal tar sludge

22   was brought in, it was stored on this concrete pad,

23   and then slowly mixed in to the coal over time as

24   the process could take it.

25        Even though it had never been raised before,

1    even though none of the DEC RCRA regulators had

2    ever said anything about the process that was

3    routinely used to recycle Tonawanda's coal tar

4    sludge, as of April 2009, EPA says, you know what,

5    you should have been mixing this coal tar sludge on

6    this concrete pad the whole time.  And your failure

7    to have done that is a crime.  That's not straight

8    dealing.  When Tonawanda was told in -- toward the

9    end of 2009, listen, you need to mix it on the pad,

10   they complied.  That's what they started doing and

11   that's what they've done.

12       You're also going to hear evidence about these

13   old storage tanks.  And I don't want to impose on

14   your patience, but let me go quickly to those two

15   counts, 17 and 18.  These are old tanks that had

16   existed at this facility since before Tonawanda

17   purchased the facility.  The evidence you'll hear

18   is that Tonawanda itself never put in any material

19   into these tanks, and never put any material --

20   there was material in the tanks and this coal tar

21   residue on the ground in between the tanks when

22   Tonawanda bought this plant.  They never added any

23   waste to those -- to that site at all.

24       There was a point in time, as Mr. Mango

25   referenced, when some breeze, some of this

1    crushed-up coke, was spread out on the area to

2    cover it up.  But there was never any intention --

3    and you'll hear this testimony -- never any

4    intention to actively manage this material or to do

5    something to manage it in a way that would kick in

6    the regulation.

7        Because what you'll hear the law is about

8    material like this -- the Judge will instruct you

9    eventually about the law, but some of the witnesses

10   will talk about the regulations that govern

11   material like this.  Because this was material that

12   was in place before RCRA was even enacted and

13   before the regulations defined some waste as

14   hazardous or not, because it was there beforehand

15   and abandoned by the prior owner, it was not

16   covered by RCRA.  It was not -- it did not come

17   within the RCRA regulations, unless or until the

18   new owner of that site decided to actively manage

19   that waste.  If you did that, then you had to do it

20   according to RCRA.

21       And the evidence will show that the first time

22   Tonawanda did anything that would come close to an

23   active management of this material was in 2009 when

24   they made a decision to recycle again, recycle some

25   of this coal tar residue from one of the tanks, and

1      they took an excavator, scooped some of it out, and

2      again went out and mixed it with the coal, just as

3      they had done with this coal tar sludge, and as

4      they had been doing since 1978.  But now, now the

5      government wants to say no, no, that's not proper

6      recycling, that's disposal.  And that's Count 18.

7          The government will produce expert witnesses

8      regarding the Clean Air Act, regarding RCRA.  The

9      defense will also offer expert witnesses on these

10     RCRA issues.

11         And you will hear the testimony of Marcia

12     Williams, who was with EPA headquarters for 18

13     years, who was for the last three years of that

14     agency was the head of that office's -- the Office

15     of Solid Waste at EPA headquarters, and was the

16     manager for the national program for RCRA

17     development in the early '80s.  She was

18     responsible, the person responsible for overseeing

19     implementation of RCRA during this formative period

20     when all these RCRA regulations were written.  She

21     has since served on the board and in consulting

22     roles with industry regarding management of waste

23     material and compliance with the environmental

24     laws.

25         And another individual, a fellow named Steve

1    Williams will come in and testify as an expert for

2    the defense.  He used to head Arizona's office of

3    waste programs, and then was chief for EPA Region 9

4    out on the West Coast.  Chief of their RCRA

5    enforcement office.

6        Both of those individuals will come in and tell

7    you about the RCRA regulations that apply to the

8    management of this waste.  They will both explain

9    to you that what this company did was -- with

10   regard to the coal tar sludge on a regular basis

11   throughout the years was entirely compliant with

12   the RCRA regulations.  They will tell you that this

13   material, this coal tar residue that existed in

14   these tanks before Tonawanda even bought the

15   property, that was not under the regulations

16   governed by RCRA until Tonawanda decided to take

17   some of it out and to recycle it into the coke

18   ovens.  That will be their testimony about how

19   these operations complied with the RCRA laws.

20       The evidence, ladies and gentlemen, will show

21   you, I believe, that the allegations in this

22   indictment are riddled with inconsistencies.  They

23   are contrary to years of practice and procedure

24   that were known to and approved by either expressly

25   or implicitly by DEC.  And the charges are also

1    contrary to the very regulations that are cited in

2    the charges.

3        The evidence will show that from April

4    '09 forward EPA made a decision to ignore the

5    regulatory history of this facility, to ignore the

6    prior interpretations that apply to this company's

7    operations, and to apply an entirely different

8    standard.  And it is that different standard that

9    has produced the indictment that is before you, the

10   product of a stacked deck approach to regulatory

11   enforcement.  And that is a flaw, the evidence will

12   show you, a flaw that pervades every single count

13   of this indictment.

14       On behalf of Tonawanda Coke, as we get started

15   on what we do expect will be a several-week trial,

16   I want to thank you in advance for your patience,

17   for your service.  I know it's not easy for any of

18   you.  But it is for a number of reasons, as the

19   Judge mentioned yesterday, and also to Tonawanda

20   Coke it is very important.  And so we appreciate

21   your attention, and your patience, and your time.

22       But before I sit down I have three requests

23   that I would like to make on behalf of my client.

24   We ask you throughout this trial to try your best

25   to be fair to both sides, to all parties in this

1   case.  Listen to the government's evidence and

2   weigh it fairly.  Listen to the cross-examination

3   of the government's witnesses that we may make, the

4   answers the witnesses give in response to

5   cross-examination, and the evidence the defense may

6   choose to introduce at the end of the government's

7   case.  Weigh it all fairly.  Use your common sense

8   and wait, as the Judge said yesterday, to reach

9   conclusions until you've heard all the evidence.

10  Because the reality is in a trial like this,

11  especially a trial of this length, you may hear

12  something next week or two weeks from now, a piece

13  of evidence, a piece of testimony that ties

14  directly into a witness you may hear today and

15  either contradicts that witness or supplements that

16  testimony or makes something clearer.  So please

17  resist the temptation to reach decisions and

18  conclusions before you've heard it all, and see how

19  it all fits together, and whether it all fits

20  together as the government suggests.

21      The second request I have is, even though it

22  will be a lengthy trial, we ask you to listen

23  carefully to this evidence.  I suspect, I guess I

24  know, that none of you has worked in a coke plant

25  before.  Some of these terms will be unfamiliar.

1    The lawyers in the case and the witnesses I believe

2    will do our best to try and explain these issues so

3    that you can understand them through the testimony.

4    But it's just not natural for anybody over a period

5    of weeks like this for your attention to wander,

6    for some testimony to be determined to be less

7    interesting than others.  But we implore you to pay

8    attention throughout.  This is, we know, a very

9    unnatural process in some ways.  You will be the

10   judges of the facts, as Judge Skretny has already

11   told you.

12       But you will be sitting there for the most part

13   silent throughout the trial.  That's not the way we

14   normally figure things out in life.  But listen

15   carefully to the evidence.  As the Judge has said,

16   you'll have the opportunity at least with the

17   experts, if necessary, to ask your own questions,

18   and use that time to try and absorb this evidence

19   that we believe is very, very important despite the

20   duration of this trial.

21       Now the third request I have, and it's one I

22   will make at the conclusion of the trial, I will

23   come again at the conclusion to provide what is

24   called a closing argument.  And at that time I will

25   ask you after all the evidence is in to return

1   verdicts -- unanimous verdicts of not guilty as to

2   each and every count in this indictment.  Because

3   that is what straight dealing requires.  Thank you.

4            THE COURT:  Okay, Mr. Linsin, thank you.

5   Ladies and gentlemen, we're going to take a

6   15-minute break, and then we'll wrap up with the

7   final opening statement this morning.  So we'll

8   start again at ten of 12.

9            (Jury excused from the courtroom.)

10           THE COURT:  Okay.  Thank you.  We'll see

11  you in 15.

12           (Short recess was taken.)

13           THE COURT:  Sorry for the delay.  I had an

14  unanticipated phone call.

15           MR. MANGO:  Judge, before the jury comes

16  out, I don't know if we're going to proceed into

17  the next witness following Mr. Personius's opening.

18  We do have some enlarged aerial photographs.  I

19  apologize I meant to bring this up before now.  We

20  have an easel.  It's hidden back there.  I was

21  wondering if it would be permissible to put it up

22  just in front of the flag over there, so that the

23  aerial photo could be viewed by yourself, the jury,

24  and the witness.

25           THE COURT:  Has defense counsel seen it?

1           MR. MANGO:  Yes.

2           THE COURT:  Anything demonstrative there

3    has to be a pre-exchange on it.

4           MR. LINSIN:  Can I just inquire through

5    the Court when -- when you will be displaying the

6    enlargements, will they simultaneously be

7    broadcasting the exhibit itself on our screen?  It

8    would just be very difficult --

9           MR. MANGO:  Yes, we will.

10          THE COURT:  All right.  I hope you do

11   that.  I mean, it kind of works in a double whammy

12   positive fashion if you do that.  We don't have to

13   struggle to move around, that whole kind of thing.

14   So that will work.

15       I think what we're going to do is, we're going

16   to hear Mr. Personius, if he's a man of his words

17   and it goes roughly 20 minutes --

18          MR. PERSONIUS:  It will probably be

19   shorter.

20          THE COURT:  I'm sorry?

21          MR. PERSONIUS:  It will actually I think

22   be shorter than 20.

23          THE COURT:  Oh, okay.

24          MR. PERSONIUS:  Just because Mr. Linsin

25   covered a fair amount of what I was going to say,

1    and I'm not going to repeat it.

2              THE COURT:  I don't know if it's fair to

3    blame Mr. Linsin for that.

4              MR. PERSONIUS:  I tried to give him

5    credit, but here I go again.

6              THE COURT:  Okay.  You do what you have to

7    do.  I think what we'll do we will at least start

8    with the stipulation, that would be the

9    commencement of proof.  My feeling is that maybe we

10   should break at that point, and then start with

11   live witness testimony no later than 2:00 o'clock.

12             MR. MANGO:  Great.

13             THE COURT:  Okay.

14             MR. MANGO:  Thank you, your Honor.

15             THE COURT:  Please have a seat.

16      Chris, if you will.  And thank you.

17             (Jury seated.)

18             THE COURT:  Please have a seat.  Thank

19   you.  Okay.  Welcome back.  I take part of the

20   blame for giving you a little extra time, and I

21   apologize.  We did a very little bit of work with

22   the attorneys to clear up some exhibits.  But I

23   have to be reminded to give Michelle a little bit

24   of a break, taking all the stuff down.  And then I

25   had an unanticipated business phone call from

1       another judge that I had to wrap up.  So I

2       apologize for that.  It shouldn't happen too often.

3            We are resumed in the case of United States

4       versus Tonawanda Coke Corporation and Mark L.

5       Kamholz, defendants.  And as you know, you have

6       heard from two of the three attorneys that are

7       prominent with respect to the defense of the --

8       that represent the parties in this particular case.

9       You heard from Mr. Mango and Mr. Linsin.  And now

10      you're going to hear from attorney Rod Personius,

11      who represents Mark Kamholz, the defendant.

12           So Mr. Personius, if you will, please.

13           Keep in mind, ladies and gentlemen, that what

14      the attorneys say is not evidence.  Okay.  It's

15      intended to give you what you've been getting, a

16      bird's-eye view essentially or roadmap with respect

17      to the case and what it's about, and the

18      amplification of some specifics.  We'll find out

19      what Mr. Personius has to add.

20           Mr. Personius.

21           MR. PERSONIUS:  Thank you, Judge.  If it

22      may please the Court, Mr. Mango, Mr. Piaggione,

23      Mr. Linsin, Miss Grasso, Mr. Glasner, members of

24      the jury, don't let the facts get in the way of a

25      good story.  You may have heard that expression

1    before.  And having heard Mr. Linsin's opening

2    juxtaposed against the opening given by the

3    government, you may get a sense of what the defense

4    is in this case.

5        I'm sure that after you heard the excellent

6    presentation by Mr. Mango, even though you're not

7    supposed to do it, because you're supposed to

8    presume the defendants innocent, you were probably

9    thinking in your head why are we here?  Wow, this

10   is a good case for the government.

11       But through the presentation that Mr. Linsin

12   gave, you hopefully have some appreciation that

13   there is another side to this story.  That there

14   are viable defenses to each and every one of these

15   charges.

16       There was a commentator, and I'll show my age

17   by mentioning it.  Probably none of you will

18   remember this.  But he had a deep voice and he was

19   a gifted story teller, and his name was Paul

20   Harvey.  And he would start out giving a little bit

21   of background on something, and then -- I won't do

22   it the way he does it -- now the rest of the story.

23   And he'd go on to explain something that was

24   entirely different than what you thought it was

25   going to be, and it was very compelling theater the

1    way that he did it.  He was outstanding at what he

2    did.

3        And in a certain sense, it's our hope, both

4    mine on behalf of Mr. Kamholz and Greg and Jeanne

5    and Ariel on behalf of Tonawanda Coke, that you'll

6    allow us during the course of this trial, not in

7    the compelling fashion that Paul Harvey would do

8    it, and certainly not in five minutes, but to give

9    you the rest of this story.

10       I'm going to be brief, and that should bring a

11   smile to everybody's face, I hope.  Because I'm not

12   going to repeat what Mr. Linsin said.

13       But what I do want to say is this:  And just to

14   summarize and maybe embody in one word what

15   Mr. Linsin has told you about what our defenses

16   are, and that is that ultimately what this case is

17   is about fairness.  What's right?  What's fair?

18       Is it fair for one regulatory agency over the

19   years, the DEC, the New York State agency, to lead

20   you to believe, the company and Mr. Kamholz, that

21   activities can take place in a certain way, that

22   everything is okay, and then to turn around and

23   have the EPA come in and change all that in a New

24   York second and say no, no, no, it's not going to

25   be that way.  It's going to be entirely different.

1    Not only is it going to be entirely different, but

2    we're going to make this criminal charges out of

3    conduct that, in the past you were engaging in,

4    that the New York State DEC -- as you heard from

5    Mr. Linsin -- said this is okay to do it this way.

6         And maybe to capture that concept in what we

7    expect will be the testimony you'll hear from one

8    of the witnesses, there's a former DEC inspector

9    whose name is Gary Foersch, and he was out at the

10   Tonawanda facility a lot during the important time

11   period going back to the 1990s.  He was an air

12   inspector with the DEC.  And he had a good

13   relationship, as really most of these regulators

14   did.  Not all of them, but most of these regulators

15   had a very good relationship with Mr. Kamholz and

16   viewed him as a square dealer.

17        But Mr. Foersch was interviewed by our

18   investigator within weeks after Mr. Kamholz was

19   arrested out at the Tonawanda Coke facility on

20   December 17th of 2009 and taken in handcuffs out of

21   his office, a week before Christmas.  And

22   Mr. Foersch was interviewed, and at the conclusion

23   of the interview after he had described how he had

24   handled matters -- how he had handled matters with

25   Mr. Kamholz and Tonawanda Coke, he said, "I guess

1    the DEC is going to get a bloody lip and a black

2    eye out of how this was handled."

3        We are not here to bloody up the DEC.  We're

4    not here, frankly, to bloody up the EPA either.

5    But we are here to defend our clients, and if in

6    doing so we have to call certain behavior on to the

7    carpet, that's what we're going to have to do.

8        Now, Mr. Mango talked to you about the

9    different counts in the indictment.  He talked

10   about these permits -- or the permit requirements

11   that were violated with respect to this pressure

12   relief valve, with respect to the baffles, and with

13   respect to the disposal of both the coal tar around

14   these abandoned tanks and the coal tar sludge from

15   Tonawanda coking operation.

16       What you heard from Mr. Linsin in a nutshell is

17   that's all well and good to say you didn't have a

18   permit for this, you didn't have a permit for that.

19   What you should take away from what Mr. Linsin told

20   you is that the evidence will show that there were

21   exemptions, there were exceptions that applied to

22   this activity.  And as of -- not even as of April

23   of 2009 at this inspection, which was a watershed

24   event, but it really occurred over a course of time

25   after that.

1    But what happened after that is that everything

2    changed.  There was world change and in the

3    enforcement.  And again the over-arcing question

4    is, is that fair?  Should we really be here

5    charging the company and Mr. Kamholz with criminal

6    conduct based on this activity?

7    Now, Tonawanda Coke was not run perfectly.  It

8    was a large company.  It is a large company.  It

9    employs a lot of people, over a hundred people.

10   And just the nature of the business is very

11   challenging.  So it's not run perfectly.  And

12   there's no question that during the course of this

13   trial you're going hear certain evidence about the

14   imperfect operation of that company.

15   But when it comes to the counts that are

16   charged in the indictment, when it comes to the

17   PRV, when it comes to the baffles, when it comes to

18   the coal tar residue around the abandoned tanks,

19   and when it comes to the coal tar sludge from

20   Tonawanda's operation, that's a different matter.

21   The other thing that Mr. Mango mentioned in his

22   opening that I want to speak to is he mentioned

23   that this is a self-reporting situation because

24   these regulators can't be everywhere all of the

25   time.  They can't be at every company 24 hours a

1       day, seven days a week, 365 days a year.  And what

2       he suggested in his opening is who are we going to

3       hold accountable for that?  Who is supposed to be

4       there 24 hours a day, seven days a week and 365

5       days a year?  And the implication from his comment

6       is Mark Kamholz.

7            We're going to hold Mr. Kamholz responsible for

8       every single activity that occurs at Tonawanda Coke

9       over the five-year period that's covered in the

10      indictment and even before that, because one of the

11      charges goes back to 1998.  And why?  Because he

12      was the environmental manager going back some 30

13      years at Tonawanda Coke.

14           And just so it's clear, what you're going to

15      find out from the evidence is that if there is --

16      and I don't really think there is -- but if there's

17      this financial motive in this case, Mark Kamholz

18      doesn't have that financial motive.  He was the

19      environmental manager.  By that don't think that

20      means he was an officer of the company, that he was

21      a director, that he was an owner.  He was a

22      salaried employee of Tonawanda coke, who would go

23      to work, do his eight hours, do it well, and then

24      go home.  And obviously do it well, because he's

25      been doing it there for decades.

1        You'll find from the evidence that Mark is now

2    65 years old.  His wife Sandra, who is here in the

3    front row with the reddish, chartreuse, whatever

4    color that is top on.  They've been married for

5    about 30 years.  He has two sons.  I won't get them

6    in the right order.  One is Jeremy and one is

7    Jordan.  They're here today to support their

8    father.  They run a landscaping business.  He lives

9    in West Seneca.

10       He's a military veteran.  He served six years

11   in the Army National Guard.  You'll find this out

12   from the evidence, because it turns out one of

13   these DEC inspectors, whom we expect will testify,

14   served in the Army National Guard with Mark

15   Kamholz, so he's known him for a long period of

16   time.

17       Now, the other thing that we want to point out

18   to you is that Tonawanda Coke is, in a certain

19   sense, it's a community.  And what I mean by that

20   is you've got over a hundred people working there.

21   And like any community, when you got a

22   conglomeration of people, you're going to get all

23   shapes and sizes in that community.  A lot of those

24   members of that community are going to come in here

25   and testify.  I assure you that their manner of

1    presentation, their recollection, the reliability

2    of their testimony, whether there's a motive for

3    the way that they testify, whether they're

4    susceptible to testifying as to, what I would call,

5    anecdotal evidence.

6        Anecdotal evidence is the type of thing like my

7    dear wife Louise, if she hears one bad thing about

8    a restaurant, we are never going there again,

9    because one person told her I had a bad meal there.

10   That's it.  We don't go there anymore.  It's --

11   it's one of the chains that she won't go to,

12   because that happened.  That's anecdotal evidence.

13   You hear something one time, you generalize it, and

14   you make it true for all of time.  That's not good

15   evidence.

16       Evidence that's based on anecdotes is not good

17   evidence.  Evidence that comes from someone who has

18   a motive to spin things in a certain way is not

19   good evidence.  Evidence that comes from someone

20   who has a poor recollection, or whom you can see is

21   guessing or speculating, that's not good evidence.

22       Chief Judge Skretny told you during his

23   instructions that all you need to do is to come

24   into this courtroom with the same tools that you

25   use in your own affairs, the most important of your

1   own affairs to decide what you're going to do and

2   to assess whether or not somebody's telling the

3   truth.  If you use those same tools in this

4   courtroom, you'll do just fine.  And we know all of

5   you will because you told the Judge and you've told

6   us that you will do that.

7       This trial -- and I know this doesn't make all

8   of you happy, but it's going to be a marathon.

9   It's not going to be a sprint.  It's going to take

10  a lot of time to get this evidence in.  It's going

11  to take weeks, not days, and that's regrettable,

12  but it's just the nature of the charges and the

13  nature of the evidence that we have to deal with.

14      Mr. Linsin has talked to you about the need to

15  not make judgments early, listen to all the

16  evidence as it comes in, consider not just the

17  direct and the cross, and all of that is very, very

18  true.

19      The other thing that's true in a case like this

20  is that it's vitally important that you follow the

21  rules, that you follow the presumption of

22  innocence, and you presume both these defendants to

23  be innocent through the entire trial.  Through the

24  summations they are still presumed innocent, and

25  that when that time comes for the 12 of you who are

1    going to deliberating to go off to deliberate, that

2    you hold the government to its burden of proof, to

3    proof beyond a reasonable doubt.  And I know the

4    government embraces that burden.  They come to this

5    courtroom knowing that that's what they have to

6    show you.

7        Now, the only count in the indictment that has

8    really not been talked about much is that

9    obstruction count where it's alleged that

10   Mr. Kamholz within several days to a week before

11   this big inspection in April of 2009 talked to a

12   gentleman named Patrick Cahill, who was the foreman

13   of the by-products area where this pressure relief

14   valve is located.  Talked to him about the valve

15   which it's indicated went off when Mr. Kamholz was

16   talking to Mr. Cahill.

17       And the allegation of the government is that

18   when Mr. Kamholz responds to that valve going off

19   by saying "that can't be going off while they're

20   here", that that becomes obstruction of justice.

21   If you consider the entire body of evidence that

22   surrounds that conversation and what occurred over

23   the following week, if you consider the rest of the

24   story, if you allow the facts to get in the way of

25   a good story, you're going to come to an entirely

1    different conclusion on what Mr. Kamholz's purpose

2    was when he said that.  And when later, during the

3    inspection, in fact, that valve still went off,

4    even though he had told Mr. Cahill we don't want

5    that going off, it went off, and when it went off,

6    you'll find from the evidence that what Mr. Kamholz

7    said was, was that steam, because he actually

8    thought it was steam.  And then he was asked by one

9    of the regulators what is that.  And he was

10   truthful.  In his response he said that's a

11   pressure relief valve.  And then they wanted to

12   know more detail about it.  He did exactly the

13   right thing.  He referred them to the head of the

14   by-products area, Patrick Cahill.

15       It's his area.  He works there eight hours a

16   day, five days a week, 52 weeks a year.  So who

17   should he have referred the regulators to when they

18   wanted to know how a piece of equipment in the

19   by-products area, how it worked?  And what you'll

20   hear from Mr. Cahill is -- we understand his

21   testimony will come in, is that Mr. Cahill was then

22   completely truthful with these regulators,

23   completely truthful with these regulators on how

24   that valve worked.  He took them down where the

25   pressure setting was, showed them how that worked.

1    He answered all of their questions.

2        During that inspection you'll find there were

3    other times when there were questions in the

4    by-products area and who did the regulators go to?

5    Did they go to Mr. Kamholz all the time?  No.  They

6    went to Patrick Cahill.  So there's nothing

7    sinister, nothing sinister about this interaction,

8    certainly nothing that justifies this very, very

9    serious charge that has been brought against

10   Mr. Kamholz.

11       But that's what the evidence will be.  You'll

12   have to decide ultimately where the truth lies, but

13   it's a great example of how the government will

14   tell you one thing, but when you hear, again, the

15   rest of the story, we're very, very confident that

16   you're going to come to a different conclusion.

17       I was told when I started out as a lawyer

18   sometime ago that sometimes it's a good idea to be

19   short and be seated.  That's what I'm going to do

20   right now.  Thank you very much.

21           THE COURT:  Okay, Mr. Personius, thank

22   you.

23       And, you know, please, ladies and gentlemen,

24   keep in mind that what the attorneys say to you,

25   that's not evidence.  But it can help you with your

1    consideration of the evidence, and that should be

2    controlling in your minds.

3        So we're about to start, I think, the trial

4    with a stipulation as to certain evidence, and then

5    that will be followed by live witness testimony.

6    So I think you've been oriented now to what this

7    case is about.  And, you know, you've been

8    confronted with the technicalities and the

9    regulatory aspects, and you've heard about RCRA and

10   Clean Air Act.  And you've heard different

11   perspectives on what the evidence will show and

12   what the differences are.

13       And that's what we talked about when we talk

14   about the fact issues that have to be resolved in

15   this particular case.  That's what makes you the

16   judges of the facts.  And to reiterate, the way

17   that you properly do that is to keep your minds

18   open and wait until all of the evidence is in and

19   until you get into that deliberation room and start

20   working through everything to make sure you get it

21   right.  And, you know, I'm confident from certainly

22   what I've heard that you can do that by the

23   application of your common sense, your experience,

24   and your intelligence to the information which the

25   attorneys say you will be presented with through

1    witnesses and exhibits and the like during the

2    course of this trial.

3         So, you know, that's all to be looked forward

4    to.  And that process will begin in short order.

5    So, again, you know, I thank the attorneys for

6    their opening statements, which pretty much went

7    according to timing estimates that we had.  And it

8    should give you a little better idea than you had

9    coming into the courthouse this morning based on

10   what we discussed yesterday in summary fashion, and

11   the little additional information that I gave you

12   this morning, and then obviously you're now

13   starting to get the roadmap or the bird's-eye view,

14   so to speak, of this case and how things interact

15   and come into play.  And so there's a lot more to

16   be heard, seen, observed, and presented.

17        Part of what we're doing is trying to establish

18   a rhythm, so to speak, because that will facilitate

19   moving through this case.  I think what's probably

20   best is that we give Mr. Mango the opportunity to

21   start with the stipulation.  Give us a chance to

22   regroup and make sure that everybody's ready for

23   that first witness.  So I think what we're going to

24   to do is break right after the stipulation.  And we

25   will give you an opportunity to kind of get

1    comfortable with the building and where you want to

2    go, if you want to go somewhere for lunch, get back

3    here, and we'll start at 2:00 o'clock.  And then we

4    will develop the rhythm this afternoon and tomorrow

5    as we go through this, so that we don't impinge on

6    your time to any substantial extent more than we

7    have to.

8         So, okay.  Mr. Mango, are you ready?

9              MR. MANGO:  Yes, your Honor.

10             THE COURT:  Let's see what you have there.

11             MR. MANGO:  Thank you, your Honor.  May I

12   approach?

13             THE COURT:  You may.

14             MR. MANGO:  I'd like to pass up an

15   original and a copy of a stipulation, ask that it

16   be marked as a Court Exhibit.

17             THE COURT:  Okay.  And a stipulation,

18   ladies and gentlemen, is an agreement as to the

19   facts and the information that's contained in the

20   document, which is actually designated a Court

21   Exhibit.  And you will not get that because -- in

22   the jury room in all likelihood.  You will get the

23   information from the document that will be, I

24   believe, read to you by Mr. Mango.  That is the

25   evidence; it's what is contained in that document.

1    But the indicators are that all the parties and

2    attorneys agree that the contents of this

3    stipulation is properly competent evidence for you

4    to consider, should you choose to do that.

5        So, Mr. Mango.

6            MR. MANGO:  Thank you, your Honor.  I'm

7    reading from Court Exhibit 1 that is now marked.

8    Stipulation.  Government Exhibit 74 to 80, 105.01

9    to 105.53, 305.04, 305.07, 305.09, 305.23, 305.37,

10   305.42, and 305.48.  The United States of America,

11   by and through its attorney, William J. Hochul,

12   Jr., for the Western District of New York, and

13   Ignacia S. Moreno, Assistant Attorney General for

14   the United States Department of Justice,

15   Environment and Natural Resources Division, and the

16   undersigned Assistant United States Attorney and

17   Senior Trial Counsel, and the undersigned counsel

18   for defendants Tonawanda Coke Corporation,

19   Tonawanda Coke, and Mark L. Kamholz do hereby

20   stipulate and agree as follows:  One, that if

21   called to testify, David Finger, Vice President for

22   Customer Technical Services at Pictometry

23   International, Pictometry, located in Rochester,

24   New York, would testify that Government Exhibit 74

25   to 80, 105.01 --

1            THE COURT:   Mr. Mango, do me a favor.

2    Position yourself in the direction you did for

3    opening statements.   Thank you.

4            MR. MANGO:   Will do.  105.01 to 105.53,

5    305.04, 305.07, 305.09, 305.23, 305.37, 305.42, and

6    305.48 are true and accurate copies of digital

7    aerial photographs taken by Pictometry, that those

8    exhibits contain information kept in the ordinary

9    course of the regulary conducted business

10   activities of Pictometry, and it was the regular

11   practice of Pictometry to make and keep the

12   information reflected in those exhibits.

13     Two, that if called to testify, David Finger

14   would testify that Government's Exhibits -- your

15   Honor, would you like me to read all those exhibits

16   again?  It's the same exhibits I've been reading.

17   I can go through or just paraphrase the exhibits

18   previously mentioned.

19           THE COURT:   No.  If there is an agreement

20   of counsel, we'll dispense with that.

21           MR. LINSIN:   No objection.

22           THE COURT:   But the record will be

23   augmented with those numbers after the Court takes

24   that particular exhibit, with the understanding the

25   jury knows we're just not repeating the same

1      numbers that you've heard.

2          Mr. Personius, any problem with that?

3              MR. PERSONIUS:  No, your Honor.  Thank

4      you.

5              THE COURT:  Okay.  Thank you.

6              MR. MANGO:  Those exhibits previously

7      mentioned were taken by Pictometry personnel in the

8      regular and routine course of the business, and

9      that the exhibits were taken on the following

10     dates:  Exhibits 105.01, 105.02, 105.03, 105.04,

11     105.05, and 305.04 were taken on May 11th of 2002.

12         Exhibits 77, 78, 105.14, 105.15, 105.17, and

13     105. 18 were taken on November 13 of 2004.

14         Exhibit 105.16 was taken on November 15th of

15     2004.

16         Exhibits 105.19, 105.20, 105.21, 105.22,

17     105.23, 105.24, 105.26, 105.29, 105.30, 105.31,

18     105.40, 105.41, 105.44, 105.45, 105.47, 105.48,

19     105.49, 105.50, 305.23, and 305.48 were tall taken

20     on April 21st, 2007.

21             THE COURT:  Check that date again.  I'm

22     sorry.  Okay.  Thank you.

23             MR. MANGO:  Exhibits 105.08, 105.10,

24     105.11, 105.12, and 105.13, those were taken on

25     April 23rd of 2007.

1          Next set of exhibits, 105.06, 105.07, 105.32,

2     105.33, 105.34, 105.35, 105.36, 105.37, 105.38,

3     105.39, 105.42, 105.43, 105.52, 105.53, 305.07,

4     305.37, and 305.42 were all taken on April 10th

5     of 2009.

6          Exhibits 75, 79, 80, 105.09, 105.27, 105.28,

7     105.46, 105.51, 305.09 were all taken on

8     November 12 of 2010.

9          And Exhibits 74 and 76 were taken on

10    November 13th of 2010.

11         Paragraph 3.  That Government Exhibits

12    previously referenced meet the requirements of

13    records of a regularly conducted activity pursuant

14    to Federal Rule of Evidence 803(6), and subject to

15    objection on any other ground, should be admitted

16    into evidence.

17         It's dated Buffalo, New York, February 27th,

18    2013, signed by myself, Mr. Piaggione, Mr. Linsin,

19    Miss Grasso, and Mr. Personius and Mr. Kamholz.

20         Thank you, your Honor.

21              THE COURT:  Okay.  So stipulated, counsel?

22              MR. LINSIN:  Yes, your Honor.

23              MR. PERSONIUS:  Yes, your Honor.

24              THE COURT:  Okay.  And the record will

25    reflect as accurate the stipulation that has been

1        executed for purposes of the record.

2            Okay.  You've already gone through, with this

3        stipulation, probably two days' worth of trial,

4        ladies and gentlemen.  That's the purpose of a

5        stipulation is to expedite as best as possible what

6        otherwise would take considerable time to move

7        exhibits to the point where they can be used in a

8        fashion that would relate to possible

9        admissibility.  So this is a start to the trial.

10           You heard a reference to a Rule 803(6).  Just

11       so you know, that's a business records rule, and

12       it's part of the evidence.  If the records qualify

13       under a certain particular rule, then it becomes

14       competent evidence for you to consider, since you

15       choose to do that.  So that's the start.

16           We're going to let you go to lunch, and we will

17       start again at 2:00 o'clock.  Chris will give you

18       some directions.  I don't think he picks up the

19       lunch bill the first day, but he will be there to

20       assist you and get you started.

21           You've been terrific.  I know, it's all

22       necessary, and we look forward to the afternoon,

23       getting you back here.  We appreciate that, all of

24       your efforts.

25           Miss Palistrant, it's good to see you back

1      again.  So we'll see everybody here at what time?

2                THE JURY:  2:00 o'clock.

3                THE COURT:  2:00 o'clock.  Thank you very

4      much.

5                (Jury excused from the courtroom.)

6                THE COURT:  Okay.  Yes, Mr. Linsin?

7                MR. LINSIN:  Just very briefly before we

8      break for lunch, I wanted to put on the record -- I

9      didn't want to interrupt the flow this morning.

10     But we were listening to the Court's summary of the

11     elements of the RCRA counts this morning.  We

12     understand it's summary.  We understand the charge

13     conference is down the line.  But with respect to

14     Counts 18 and 19, we do just want to make note that

15     our submission regarding the elements contains an

16     intent element, which we believe is very important.

17     And just given that the Court had run through this,

18     I wanted to put that on the record, so that we

19     could be clear to address it when we get there.

20               THE COURT:  And the record will so

21     reflect.  My purpose is to focus the jury in terms

22     of the elemental analysis that I think everybody is

23     asking them to do.  I know there's been some issues

24     with respect to the proper elements for the

25     respective counts.  That will be noted.  And,

1    again, we'll have the finality of the charge

2    conference to make sure that everything is

3    copacetic and in order.

4        I will try to get you, you know, as quickly as

5    I can, a draft proposal with respect to the charge.

6    You know, it's a work in progress.  I can't tell

7    you exactly when I'm going to have it ready.  But

8    it -- once you get it, it's a living instrument.

9    It's a living document for you to fine tune as we

10   go through the case, so that when we get to the

11   charge conference time, it won't be your first

12   review.  I mean, it will be a conference where we

13   can, I think, move through blocks of proposed

14   charges that you will not have issues with, and

15   then we can focus on just those that seem to be

16   stumbling blocks to a finality of the charge, okay?

17             MR. LINSIN:  Thank you, your Honor.

18             THE COURT:  Okay.  We'll see you here at

19   what time?

20             MR. MANGO:  2:00 o'clock.

21             THE COURT:  All right.  See you then.

22             (Lunch recess was taken.)

23             (Jury not present in the courtroom.)

24             THE COURT:  Do we have anything

25   preliminary?

1          MR. LINSIN:  Nothing, your Honor.

2          MR. MANGO:  No.

3          MR. PERSONIUS:  No, your Honor.  Thank

4     you.

5          THE COURT:  Jury, please.

6          (Jury seated.)

7          THE COURT:  Sorry for the slight delay.

8     I'll get it right yet.  Thank you very much.  Have

9     a seat, and we're about ready to get started.

10        This is the case of United States versus

11    Tonawanda Coke Corporation, defendant, and Mark L.

12    Kamholz, defendant.  The attorneys and parties are

13    back, present.  Our jury is here.  Roll call

14    waived.

15        This is the government's case against the

16    defendants.  The government has the burden of proof

17    beyond a reasonable doubt.  You have heard some

18    evidence with respect to the exhibits, the litany

19    of numbers that will enable the government to

20    proceed forward.

21        I guess you have a live witness now, Mr. Mango?

22         MR. MANGO:  Yes.

23         THE COURT:  Okay.

24         MR. MANGO:  Your Honor, the government

25    would call Alfred Carlacci.

1          THE COURT:  If you would approach the

2     witness stand, please.  Don't enter it, just stop

3     before you get in, and I'll have the oath

4     administered to you.

5  A L F R E D   C A R L A C C I, having been duly

6  sworn as a witness, testified as follows:

7          THE COURT:  Okay, thank you.  Get

8     comfortable.  Just a couple of preliminary

9     instructions, Mr. Witness.  You are here to testify

10    for the benefit of the ladies and gentlemen of the

11    jury.  What helps is if you talk at the microphone,

12    look in their direction, and talk in a

13    conversational tone.  The microphone is relatively

14    friendly if you talk in that fashion.

15        When it comes to questioning, don't answer a

16    question that you don't understand, okay?  Double

17    negative, but I think relatively clear.  If the

18    answer can be a yes or no to a question, please try

19    to apply that.  Don't volunteer information.  That,

20    generally speaking, causes problems that are

21    unnecessary.

22        If there's an objection, wait until I rule on

23    the objection, then I will give you instructions,

24    continue with your answer, wait for the same

25    question to be asked again, or wait for a new

1    question.  Do you understand those instructions?

2              THE WITNESS:  Yes, I do.

3              THE COURT:  Okay.  Let's, by speaking at

4    the microphone -- you don't have to be be right on

5    top of it.  Probably right about there.  Why don't

6    you state your full name, spell your last name,

7    please.

8              THE WITNESS:  My name is Alfred Carlacci,

9    C-A-R-L-A-C-C-I.

10             THE COURT:  Okay.  You carry well.  Your

11   witness, Mr. Mango.

12             MR. MANGO:  Thank you, your Honor.

13   DIRECT EXAMINATION BY MR. MANGO:

14   Q.  Mr. Carlacci, how are you currently employed?

15   A.  I'm employed with the New York State Department

16   of Environmental Conversation.  I'm the regional

17   air pollution control engineer there.

18   Q.  Regional air pollution control engineer.  Is

19   there an acronym sometimes we may hear?

20   A.  RAPCE, R-A-P-C-E.

21   Q.  How long have you been employed at New York

22   State Department of Environmental Conservation?

23   A.  Since September 1979, about 34 years.

24   Q.  All right.  And we can call that DEC.  Is that

25   an acronym you use sometimes?

1    A.   Yes.

2    Q.   Okay.  How long have you been a regional air

3    pollution control engineer?

4    A.   Since November 2010.

5    Q.   And what does that mean?  What are your duties?

6    A.   My duties, I supervise a staff of nine

7    engineers and technicians that administer the air

8    pollution program in Western New York.  That

9    includes Allegany, Cattaraugus, Chautauqua County,

10   Wyoming County, Erie and Niagara County.  That

11   includes air permitting of the facilities that

12   require permits to pollute the air, inspection of

13   these facilities, enforcement, as well as managing

14   the office, making sure the staff have proper tools

15   to do their jobs.

16   Q.   Okay.  You mentioned Western New York.  Is DEC

17   broken up into regions at all?

18   A.   Yes, there's nine regions in New York State,

19   each with a regional office that is governed by the

20   central office in Albany.

21   Q.   Okay.  Does each region have an equivalent

22   RAPCE?

23   A.   Yes.  Each region has a RAPCE.

24   Q.   And what region technically are you in here?

25   A.   This is Region 9.

1    Q.   Now you mentioned you oversee permitting,

2    inspection, and enforcement programs?

3    A.   Correct.

4    Q.   Why don't you tell the jury, please, just a

5    little bit about what you mean by overseeing

6    permitting?

7    A.   Permitting entails writing a permit for -- for

8    a source, an industry, that allows them to pollute

9    the air that meet the regulations written by the

10   state of New York and the federal government.  Many

11   regs are developed through acts of Congress, like

12   the first Clean Air Act of 1970 which established

13   national ambient air quality standards.  It

14   established new source performance standards for

15   new facilities being constructed.  It established

16   national emission standards for hazardous

17   pollutants.

18       It also allowed the EPA to work with state

19   agencies and the states and require them to monitor

20   the ambient air to determine compliance with these

21   national ambient air quality standards, to develop

22   plans to bring the ambient air into attainment with

23   those standards if they were out of attainment.

24   That was done through a state implementation plan,

25   in that the states would have a plan that would

1    include writing additional regs, if necessary, to

2    bring specific industries in that state into

3    compliance that will lower the emissions below

4    those standards.  And that state implementation

5    plan would have to be approved by the federal

6    government.

7         So that's kind of the framework how the

8    regulations are developed, how we monitor the

9    ambient air to determine if the regulations are

10   being effective.  The permitting is similar to

11   establishing an inventory, also communicates the

12   regulations to the industry.  You know, they have

13   a -- they submit an application.  You know, as new

14   ones come along, they get an opportunity to apply

15   the regulations to determine compliance, and we

16   review those reg permits for them.  So that's the

17   permitting part of that.

18   Q.   Okay.  How about -- you mentioned the

19   inspection program.  You oversee inspection.  Why

20   don't you tell the jury what that means?

21   A.   To go along with the inspection, and this is

22   also part of the Clean Air Acts and requirements of

23   the federal government, that along with writing a

24   permit you have to inspect the facility to ensure

25   they're meeting those requirements.  Permits today

1     are quite complicated and have, depending on the

2     size of the facility, have quite a bit of

3     compliance assurance monitoring requirements to

4     assure that they meet the emission limits as

5     accurately as possible.

6         So you would do inspections to ensure

7     compliance with those permits, and if they were out

8     of compliance, it would lead to enforcement.  And

9     that enforcement you would document the issue,

10    bring it back to your attorneys in the office, and

11    with their guidance determine how to handle the

12    enforcement.

13    Q.  Okay.  And there are attorneys in New York

14    State DEC that you work with?

15    A.  Yes.  In each regional office there is a

16    regional attorney as well as a regional director,

17    and both would be involved.

18    Q.  Okay.  Do you have any community duties as part

19    of being the RAPCE?

20    A.  As part of being the RAPCE we represent the

21    public in these situations.  We deal with the

22    community with complaints, with dealing with small

23    companies, with doing outreach, explaining

24    regulations and how we interact with companies.  We

25    do some training sessions on the part of the Air

1    and Waste Management Association.  It's a trade

2    group of engineers, attorneys that get together

3    like a trade group to learn about the latest in our

4    environmental expertise.  And we also get involved

5    in that kind of thing.

6             MR. PERSONIUS:  Pardon me, your Honor.

7    I'm having trouble with the narrative responses.  I

8    don't think the witness is answering the question

9    that's asked.

10             THE COURT:  Well, I'll let it stand.

11    We'll monitor that.  Make a more timely objection

12    so that I can gear it before --

13             MR. PERSONIUS:  I thought I'd wait until

14    he finished.  I apologize.

15             THE COURT:  Okay.  Thank you.

16    BY MR. MANGO:

17    Q.  In particular, what type of activities do you

18    engage in with the community?

19    A.  I do public meetings, depending on whatever

20    topic the public needs a discussion on.

21    Q.  Okay.  You mentioned you answer questions and

22    respond to complaints as well?

23    A.  Answer questions, respond to complaints.  For

24    example, we're doing a study around the Peace

25    Bridge.  I've done community meetings around the

1    Peace Bridge sampling that we're doing right now.

2    Q.   Okay.  And where is your office physically

3    located?

4    A.   Our office is located right in Buffalo on 270

5    Michigan Ave.

6    Q.   Is there -- your staff of nine you mentioned,

7    are they out of that office?

8    A.   Correct.

9    Q.   What type of positions does your staff hold?

10   A.   I have technicians and engineers.

11   Q.   And what do the technicians and engineers do

12   under you?

13   A.   Technicians are involved with more smaller,

14   less complicated permitting and inspection, as well

15   as enforcement.  The engineers get into more

16   complicated facilities.  All do basically the same

17   type of work.  Some do a little bit more ambient

18   air monitoring and maintaining that equipment on

19   smaller projects such as the Tonawanda study and

20   the Peace Bridge study.

21   Q.   We'll talk about that Tonawanda study in a

22   minute, okay?  Are there other individuals who work

23   in Region 9 that deal with air resources but aren't

24   supervised by you?

25   A.   Yes, there are.  As I mentioned earlier, the

1    state is required by the Clean Air Act to monitor

2    the ambient air to determine compliance with the

3    national air quality standards.  We have ambient

4    air monitoring stations throughout the state, and

5    there are state employees that work out of Albany

6    supervised by Larry Sitzman that maintain those

7    facilities.

8    Q.   Okay.  You mentioned that name Larry Sitzman,

9    so he worked out of Albany now?

10   A.   Correct.

11   Q.   Was he formerly in the Region 9?

12   A.   Larry Sitzman was the RAPCE before me.

13   Q.   All right.  So prior to becoming RAPCE in

14   November of 2010, what were your duties and your

15   position at the DEC?

16   A.   Prior to RAPCE, I was Environmental Engineer 2

17   doing the inspections, enforcement, and permitting

18   of major facilities in Erie County.

19            THE COURT:  Mr. Carlacci, move the

20   microphone just a little bit away from you.

21            THE WITNESS:  It's too loud?

22            THE COURT:  It's not that it's too loud.

23   I think it's the consonants that you hit kind of

24   distort.

25            THE WITNESS:  You tell me when I'm right

1      on.

2    BY MR. MANGO:

3      Q.   Okay.  So in terms of the -- the time frame,

4      what's the time frame you worked as a -- I think

5      you said Environmental Engineer 2.

6      A.   Environmental Engineer 2.  I was promoted to

7      EE2 around 1989 until 2010 when I was promoted to

8      RAPCE.

9      Q.   Okay.  And did you have any supervisory role in

10     that time period?

11     A.   Yes.  I supervised a variety of staff.  I was

12     also coordinator of many of the programs that are

13     coming along, such as new source performance

14     standards that were --

15              THE COURT:  Slow down a little bit.

16              THE WITNESS:  Such as new source

17     performance standards that were coming out of the

18     federal government relatively quickly.  I was like

19     the keeper of the NSPS standards so that, you know,

20     I could give them like a bulletized version of each

21     NSPS.  I also was --

22              THE COURT:  Slow.  Slow.  Slow.

23              THE WITNESS:  I also was responsible

24     for --

25              THE COURT:  Take a breath.  Take a breath.

1    Okay.  Hold on.

2      Okay.  Ask a question, Mr. Mango.

3  BY MR. MANGO:

4    Q.  Yes, your Honor.  Did you have any other type

5    of office coordination duties?

6    A.  Yes.  I was in charge of the nitrogen oxide

7    regulations that were being written to control acid

8    rain as well as smog, lower atmospheric smog.

9    Those regs were being updated relatively quickly

10    during that period.  I was the disseminator of

11    information in the office.

12    Q.  Okay.  Now you may make some comments I need to

13    come back to.  You said regs now a couple times.

14    A.  Regulations.

15       THE COURT:  Okay.  And RAPCE, one more

16    time, is regional air pollution control engineer,

17    is that correct?

18       MR. MANGO:  Yes.

19       THE WITNESS:  That's correct.

20       THE COURT:  Okay.

21  BY MR. MANGO:

22    Q.  And essentially in that position you are the

23    top personnel in the air department in Region 9?

24    A.  In the Division of Air in Region 9, correct.

25    Q.  Who is above you?  Who do you report to?

1    A.   There is a regional engineer in the region that

2    supervises all the divisions, and I report to him.

3    And then above him is the regional director.

4    Q.   Okay.  Let's talk about the other divisions.

5    So there's one regional engineer you said who

6    oversees different divisions.  Why don't you tell

7    the jury -- you're in charge of one of the

8    divisions.

9    A.   I'm in charge of Division of Air.  There is a

10   Division of Water.  There is a Division of

11   Hazardous Waste and Materials Management.  There is

12   a Division of Fish and Wildlife.  There is a

13   Division of Environmental Permits.

14              THE COURT:  Back up a little bit, okay, on

15   your microphone.  The decibel level is good, but it

16   gets distorted, especially when you approach the

17   Ps.  Go ahead.

18              MR. MANGO:  Yes.

19   BY MR. MANGO:

20   Q.   So Division of Water, Division of Fish and

21   Wildlife, Division of Hazardous Waste --

22   A.   Hazardous Waste and Materials Management.

23   Q.   Okay.  And --

24   A.   Where was I?  The Division of Environmental

25   Permits.

1    Q.   Okay.

2    A.   I think we got them all there.

3    Q.   Okay.  And then there is a regional engineer

4    who supervises you and all the other heads of the

5    divisions.  And there is a regional director?

6    A.   Regional director, correct.

7    Q.   Each region has its own regional director?

8    A.   Correct.

9    Q.   Okay.  There is a number of items you've

10   discussed that we'll come back to when we start

11   talking in detail about the Clean Air Act.  You've

12   already mentioned a couple items that I think we

13   need to -- we'll need to focus in on.

14       But you talked about the nitrogen oxide and

15   acid rain.  Why don't you tell the jury a little

16   bit more in detail about what your role in that

17   program was.

18   A.   As we were updating regulations, we do see the

19   limit from nitrogen oxide from stationary

20   combustion sources there were -- you know, guidance

21   out on how you measure it, what emission factors to

22   use, you know, how to write appropriate conditions.

23   You know, gathering the list of the sources that it

24   would apply to.  That's the information I was

25   dealing with in that program.

1    Q.   Is there something called a Division of Air

2    Resources Technical Support Workgroup?

3    A.   There is a division -- yes, technical support

4    workgroup was established probably 15 years ago.

5    And it was basically to bring the nine regions

6    together.  There was issues in each of the nine

7    regions had similar issues and some that were not

8    so similar.  There was a lack of communication, so

9    this technical support workgroup --

10          MR. PERSONIUS:  Your Honor, pardon me.

11   I'm sorry to interrupt.  This is what I'm concerned

12   about, Judge.  I object.

13          THE COURT:  Yes.  You're going to have to

14   tailor the questions.  I'll sustain the objection.

15   I mean, I'll give you some leeway in latitude,

16   because as I view this, this is the qualification

17   of the witness.

18      I'll permit a lot of this under 104(a).  But,

19   you know, make it -- if you break it down, it's

20   going to be easier for the jury to get started.

21   And maybe as we go along things will change.  But

22   do it more deliberately.

23          MR. MANGO:  Yes, your Honor.

24   BY MR. MANGO:

25   Q.   This Division of Air Resources Technical

1    Support Workgroup, were you involved in that?

2    A.   Yes.

3    Q.   What was your role?

4    A.   I represented the Region 9 office.

5    Q.   And how long did you do that?

6    A.   For several years.

7    Q.   And this is while you were working as an

8    environmental engineer 2?

9    A.   Correct.

10   Q.   And what were some of the things you discussed

11   with the members from the other regions?

12   A.   Discussed with members of the other region as

13   well as Albany central office was the regulations,

14   interpretation of the regulations, permitting

15   issues with writing permits, the mechanism of

16   delivering a permit from our computer system,

17   things of that nature.  Developing guidance for

18   staff so that they can could their jobs

19   appropriately.

20   Q.   Okay.  So that guidance, would you then pass it

21   on anywhere?

22   A.   Exactly.  We shared with all the staff.

23   Q.   As an environmental engineer 2, did you engage

24   in any type of permit review, inspection, or

25   enforcement?

1    A.   Yes.   I was responsible for several Title V

2    facilities in Erie County.   I was involved with at

3    least 50 or so state facility permit applications.

4    I did quite a few registrations, which is the

5    simplest of permitting we do.   And I handled

6    complaints.

7    Q.   Okay.

8    A.   Roughly did three or so inspections a week.

9    Fifty to a hundred a year.

10   Q.   All right.   Can you tell the jury -- you

11   mentioned this Title V facility.   Might as well

12   just briefly tell the jury, if you could, what do

13   you mean by Title V?

14   A.   In the Clean Air Act of 1990 it established --

15   it was 11 titles, and one of the titles was Title V

16   that established a permitting program that would be

17   applied through all the states in the United

18   States.   Kind of leveled the playing field as to

19   what should be included in a permit.   Up until then

20   each state had their own way of doing a permit and

21   what was required in the permit.

22        The Title V title also defined what was a major

23   facility, one that required to have a Title V

24   permit.   Those facilities that emitted a nitrogen

25   oxide, a sulfur dioxide, a particulate, or carbon

1    monoxide, any one of those pollutants at a rate

2    over a hundred tons per year would be considered a

3    Title V facility.  One that emitted over 50 tons

4    per year of a volatile organic compound would be

5    considered a major facility, one that required a

6    Title V permit.

7         It's a significant permit that requires a

8    certification by the facility that they're in

9    compliance with all the requirements that are

10   codified in this -- this permit that they would do

11   semi and annual reports.

12             THE COURT:  Okay.  Hold on.  I'm going to

13   stop you right there.  Just for the jury's

14   enlightenment, if you will, the first 15 counts of

15   the indictment relate to alleged violations of

16   Title V permit requirements.

17             MR. MANGO:  Yes.

18             THE COURT:  All right.  Go from there.

19   BY MR. MANGO:

20   Q.  Yes, your Honor.  We'll come back to Title V.

21   How many Title V facilities were you in charge of

22   as an environmental engineer 2?

23   A.  Directly responsible was seven.

24   Q.  Seven.  Okay.  Now, were you responsible for

25   any non-Title V facilities?

1    A.   Yes.   Approximately 30 to 45.

2    Q.   And at all of those facilities you would do

3    inspections approximately two to three per week?

4    A.   I was out in the field two or three times a

5    week.   We would to Title V inspections at least

6    once a year.   Depending what was going on at that

7    facility may go there more often.

8    Q.   Can you describe the types of facilities, like

9    in -- just describe for them like what facilities

10   are you talking about?

11   A.   The facilities I was responsible for was the

12   Huntly Power Plant.   It's a steam-generating

13   facility that burns coal to generate electricity.

14   The Dunlop Tire facility located here in Tonawanda

15   that makes approximately 15,000 tires a day, very

16   large facility.   The 3M Sponge plant.   One of the

17   larger sponge plants probably in the world.   DuPont

18   Yerkes facility, right in that same area.   General

19   Motors, Tonawanda, the engine plant that's located

20   on that River Road strip also are some of those.

21   Q.   Okay.   And how about -- those are the Title V

22   facilities?

23   A.   Correct.

24   Q.   Why don't you give the jury an example of the

25   non-Title V facilities that you would inspect?

1  A.   The Ford plant was a state facility permit I

2  believe that I've been to.  The Thermal Foams makes

3  the foam for styrofoam cups, make the large boards,

4  that's a state facility permit.  There's so many of

5  them they just don't come to mind right now.

6  Q.  Okay.

7           MR. PERSONIUS:  Your Honor, forgive me,

8  could we have a time frame that the witness is

9  referring to?

10          THE COURT:  Sure.  Set the time frame with

11  your next question, please.

12          MR. MANGO:  Sure, your Honor.

13 BY MR. MANGO:

14 Q.  You were discussing inspections that you

15 conducted as an environmental engineer 2?

16 A.   Correct.

17 Q.  You were, again, you served in that roll from

18 when to when?

19 A.   From 1989 till November 2010.

20 Q.  Prior to that, so prior to 1989, did you hold

21 any other positions with DEC?

22 A.   I was an environmental engineer 1.

23 Q.  And what were some of your duties as an

24 environmental engineer 1?

25 A.   Very similar to environmental engineer 2.  More

122

1    supervision, not to that degree of capability as an

2    EE2.

3                    THE COURT:  Say that again, please.

4                    THE WITNESS:  I didn't have the same

5    expertise as an EE2.  I had more supervision, less

6    significant sized companies or issues to deal with.

7                    THE COURT:  Okay.  So 1 and 2, the

8    difference is you had had more supervision duties

9    and responsibility in 1, but the basic job duty

10   requirements were similar?

11                   THE WITNESS:  Very similar.

12   BY MR. MANGO:

13   Q.   And how long did you serve as an environmental

14   engineer 1?

15   A.   From when I started in September 1979.

16   Q.   Up to 1989?

17   A.   Till 1989.

18   Q.   What caused you to be promoted from

19   environmental engineer 1 to environmental engineer

20   2?

21   A.   You're required to have a professional

22   engineers license to be an EE2.

23   Q.   So you did obtain a professional engineer

24   license?

25   A.   Correct.  I did in 1988.

1    Q.   All right.  In what state?

2    A.   New York State.

3    Q.   In terms of the promotion from environmental

4    engineer 2 to the regional air pollution control

5    engineer, is that known by another -- environmental

6    engineer 3 for example?

7    A.   Environmental engineer 3, yes.

8    Q.   What went into your promotion from

9    environmental engineer 2 to environmental engineer

10   3?

11   A.   You had to take an exam.  You were ranked, and

12   you went through an interview process as well as a

13   written submission of your abilities.

14   Q.   Okay.  That exam -- who puts that exam on?

15   A.   New York State.

16   Q.   You took that exam?

17   A.   Yes, I did.

18   Q.   When did you take that exam?  I took it

19   numerous times.  I think three, four times.

20   A.   Once every couple years during 2000, 2005 in

21   that era.

22   Q.   Okay.  And then what's the next step of the

23   process?  You mentioned you have to interview?

24   A.   Right.  They interviewed the top three

25   candidates and then choose one.

1    Q.   Is this when Larry Sitzman left, this position

2    opened up?

3    A.   Correct.

4    Q.   Okay.  So you interviewed for that?

5    A.   Yes, I did.

6    Q.   Who did you interview with?

7    A.   With Abby Snyder and James Strickland.  Abby

8    Snyder is the regional director.  Excuse me, Abby

9    Snyder and Mark Hans.

10   Q.   And Mark Hans, what's his role?

11   A.   He's the regional engineer for the hazardous

12   materials division.

13   Q.   And after taking that exam and then after going

14   through that interview process, did you say there

15   was a written component?

16   A.   It was part of the grading along with the exam.

17   Q.   And then you obviously were given that

18   promotion?

19   A.   Yes, I was.

20   Q.   Can you tell the jury about your education?  Do

21   you have any undergraduate degrees?

22   A.   I have a B.S. degree in civil engineering from

23   the University of Buffalo.  I have my professional

24   engineers license.  I took additional courses -- in

25   air pollution there's no -- back in 1979 there was

1    no degree for air pollution.  So most of it is

2    on-the-job training as well as taking courses that

3    are put on by organizations in air pollution.  So I

4    took a lot of courses during my career at DEC such

5    as those for controlling particulate emissions, or

6    controlling gaseous emissions, or design of boilers

7    and control of nitrogen oxide emissions.

8    Q.  We will talk about some of those pollutants you

9    just mentioned in a little bit.  As in your -- what

10   year did you graduate from UB?

11   A.  1979.

12   Q.  All right.  And obviously you had to take

13   courses in engineering to get that degree?

14   A.  Correct.

15   Q.  And I think you were just talking about some

16   continuing education you were involved in?

17   A.  Yes.

18   Q.  All right.  Did you hold any certifications or

19   seek any certifications to help you do your job as

20   an inspector?

21   A.  Only through the education I got at the state

22   through these training courses, as well as opacity

23   training, which you get certified to read opacity

24   from a stack.  That's a form of certification.

25   Q.  Tell the jury what you mean opacity stack.

1   This is all foreign to them, please, so just break

2   it down for them.

3   A.   Out of a stack if you have air pollution, it

4   usually comes out of a stack.  It could be smoke

5   associated with that.  And opacity -- opacity is

6   the measure of light that transmits through that

7   smoke.  Zero percent opacity means that there is no

8   smoke in it.  A hundred percent opacity would be

9   totally dark obscuring the light coming through

10  that smoke.  There is a method of reading that

11  opacity as to how -- the sunlight is behind your

12  back so that it doesn't cast a shadow.

13      And there is a procedure of getting certified

14  that you do once every six months.  And that

15  certification allows you to read opacity, document

16  a violation.  There's standards.  For example,

17  20 percent opacity is a standard over a six-minute

18  period.  Below that would be acceptable, above

19  would not.  And that would hold up in a court of

20  law if you were certified to read opacity.

21  Q.   Okay.  A lot there.  We'll get back to that as

22  well.  In terms of -- do you know a person by the

23  name of Mark Kamholz?

24  A.   Yes, I do.

25  Q.   How do you know that person?

1    A.  Mark occasionally would be one of the

2    individuals that I'd see at opacity school to get

3    certified.  He also works at Tonawanda Coke.

4    Q.  Do you see Mark Kamholz here in the courtroom?

5    A.  Yes, I do.  Mark is sitting right there.

6              MR. MANGO:  Your Honor, may the record

7    reflect identification of the defendant?

8              THE COURT:  Okay.  Describe something he's

9    wearing, please?

10             THE WITNESS:  Red tie.  Blue shirt.

11             THE COURT:  Okay --

12             THE WITNESS:  Back row before the --

13             MR. PERSONIUS:  We will stipulate to it,

14   Judge, if it helps.

15             THE COURT:  All right.  I won't accept the

16   stipulation.  The identification has been made.  It

17   will be noted for the record.  I take it there's no

18   objection?

19             MR. PERSONIUS:  No, your Honor.

20             THE COURT:  Go forward, please.

21             MR. MANGO:  Thank you, your Honor.

22   BY MR. MANGO:

23   Q.  And you've subsequently learned that he works

24   at Tonawanda Coke Corporation?

25   A.  Right.

1    Q.  And was there a time period when you met him at

2    the facility?

3    A.  I met -- you know, I don't know exactly the

4    first time I met Mark.  I've seen him at smoke

5    school and knew him there that he worked at

6    Tonawanda Coke.  But I did meet him at the plant in

7    May of 2008.

8    Q.  We'll get to that interaction at the plant.

9    Now, smoke school you mean is it this opacity

10   training?

11   A.  This is this opacity training.  It's put on by

12   a separate organization where anybody can register

13   to take the class.  So there would be state

14   individuals, as well as those from industry.

15   Q.  Now, you previously -- I think in your earlier

16   answers you mentioned an Air and Waste Management

17   Association?

18   A.  Correct.

19   Q.  Okay.  Are you a member of that?

20   A.  Yes, I am.

21   Q.  Can you describe for the jury what that

22   association is and who it's composed of?

23   A.  The association is a nonprofit organization

24   just to enhance our learning in the field of

25   environment and air and waste management.  And it's

1    comprised of state employees, as well as industry

2    consultants, attorneys.  And, you know, we do a

3    seminar that I was a major part of to raise funds.

4    The seminar was -- we would certify PE credits, PEH

5    credits for engineers, and it was a training

6    seminar.  So the organization would get together,

7    have monthly meetings that usually were

8    educational.

9    Q.  What do you mean by PE credits?

10   A.  PEH credits.  It's a certification that some

11   PEs have to take a certain amount of training per

12   year to maintain their PE license.

13   Q.  I guess PE is what I'm getting at.  What do you

14   mean by PE?

15   A.  PE stands for professional engineer.

16   Q.  Okay.  Now, have you in the past ever testified

17   as an expert?

18   A.  Yes, I have twice.

19   Q.  All right.  Why don't you talk about the first

20   proceeding if you can?

21   A.  Back in the '80s I was doing inspections at

22   Bethlehem Steel, and I had documentation of waste

23   heat stack violations, and we took action against

24   Bethlehem Steel.  It was in front of an

25   administrative law judge in the office.

1        The second time had to do with Wilson Great

2    Batch, a facility in Clarence that processed

3    hazardous waste, and it was -- involved a permit

4    action.  And I testified on the -- on the permit.

5    Q.  The Bethlehem Steel, you mentioned a waste heat

6    stack.  Can you describe what you mean by the term

7    "waste heat stack"?

8    A.  A waste heat stack is a stack that vents the

9    pollution from a battery, a coke oven battery.

10   Coke oven battery is a piece of equipment that --

11   that makes -- that processes coal into carbon.

12   Carbon is a fuel or an oxidizer in refining iron

13   ore used in smelters or blast furnaces.

14   Q.  Okay.  So the waste heat stack is a component

15   at a coke oven battery?

16   A.  Correct.  The waste heat stack -- after the

17   fuel is burned in the oven, it's exhausted out the

18   waste heat.

19   Q.  Now, you mentioned obviously coke ovens.  Have

20   you in your prior duties as EE1, EE2, and even as

21   your experience now as the regional air pollution

22   control engineer, putting Tonawanda Coke aside for

23   a minute, have you done any inspections at other

24   coke plants in the region?

25   A.  Yes.  When I first started in 1979 there was

1    quite a bit of steel industry in South Buffalo, and

2    I did inspections at Donner Hanna Coke.  I think

3    two or three.  The facility shut down relatively --

4    shortly after I started.  And then at Bethlehem

5    Steel I may have gone there 20 or so times to do

6    inspections on coke ovens, and mainly was to

7    document opacity or door leaks or pushing emissions

8    from the operation of the battery.

9    Q.  Okay.  Bethlehem Steel, was that -- did that

10   have an additional industrial component present on

11   site in addition to the coke oven battery?

12   A.  With every coke oven battery there's usually a

13   by-product plant.  By-product plant takes the gas

14   that's distilled from the coal and processes it,

15   recovers any product that's useful, and then uses

16   it to reheat the battery or run -- operate a boiler

17   or generator.

18   Q.  Okay.  You briefly described -- can you just in

19   a little bit more detail describe the process of

20   making coke?

21   A.  Coke -- a coke oven battery is comprised of a

22   series of batteries, and these are slots.  They're

23   roughly 2 feet wide by 13 feet high by 40 feet

24   long.  There's different sizes, but roughly that's

25   the general shape.  There will be 60 or so in a

1    row, and they have flues in between each one.  So

2    you're charging coal through lids into that slot

3    that have doors on either side.  You're going to a

4    process of destructive distillation with no air in

5    this oven that operates at about a thousand to

6    1500 degrees centigrade to remove the impurities

7    from this coal so you end up with pure coke.

8         And that is the material that's collected in

9    these lanes that goes to the by-products side of

10   the plant to recover things such as benzene,

11   toluene, or xylene, and to clean the gas of

12   ammonia, sulfur, so that you can use it as a fuel

13   back in the battery or in the boiler.

14   Q.   Okay.  So that there is a gas that comes off

15   the coal as it's --

16   A.   The gas is called coke oven gas.  It's a known

17   carcinogen.

18   Q.   Okay.  And is there any other type of

19   pollution?  You've mentioned the nitrogen oxides.

20   Is that involved at all in a coke oven facility?

21   A.   Whenever you burn a gas, you form nitrogen

22   oxides, but the coke oven gas itself has tars,

23   polycyclic aromatic hydrocarbons, benzene, toluene,

24   xylene, has components such as that that are

25   removed from the gas stream so that you have more

1    of a gas that's combustible in a burner that would

2    burn clean.

3    Q.   Okay.  During your inspections at Bethlehem

4    Steel or Donner Hanna Coke, what was the focus of

5    your inspection?

6    A.   My focus was on the battery itself and opacity

7    from pushing or leaks from charging holes and

8    doors.

9    Q.   Let's stop there.  Pushing, what do you mean

10   pushing?

11   A.   Once that battery that I described, that oven,

12   that slotted oven, cooks for a certain amount of

13   time, you have to push the coal -- the coke now

14   that it's turned into coke, out of the battery.

15   And the doors are taken off, and a machine comes

16   along with a ram and actually forces the coke out

17   of that battery into a -- like a railcar that's

18   shaped like a dump truck.  It has four sides, open

19   on the top.  Coke falls in this railcar, and it

20   travels down to the quench tower.

21       As you can imagine, this coke now is glowing

22   red hot sitting in an oven for anywhere from 20 to

23   30 to 40 hours, and it has to be quenched, cooled,

24   so you can store it and pile it until you sell it.

25   Q.   Okay.  You said it's got to be cooled.  How

1    does coke, red hot coke, get cooled?

2    A.   It goes under a quench tower where it' deluged

3    with water to cool it.   As it's going down you have

4    ash coming off.   If it's not totally cooked, you

5    have other emissions coming of this coke.   And the

6    cooling just knocks most of the particulate down in

7    a tower called a quench tower.

8        This tower is designed to take the steam away

9    from the railcar so the individual driving the

10   railcar is not, you know, swimming in steam.   It

11   makes steam, but it also knocks down the

12   particulates generated from hitting it with water.

13   It's like putting out your barbecue grill.   You get

14   ash coming off with that water once you hit that

15   coke.

16       In the quench tower there are baffles to help

17   minimize the emissions, to knock down the

18   particulates and give the particulates more time to

19   come in contact with water.

20   Q.   You keep saying this word particulates.   What

21   is that?

22   A.   Particulates is a contaminant.   It's a small

23   particle that in the air if you breathe in causes

24   health issues.

25   Q.   All right.   So --

1    A.   So there is a national ambient air quality

2    standard for particulates.

3    Q.   Also called particulate matter or P --

4    A.   Also called PM.  Particulate matter or PM.

5    Q.   You mentioned your focus was on the battery,

6    and than you mentioned a couple terms that we just

7    talked about.  Now why was your focus on the

8    battery at these coke plants?

9    A.   The regulation that we were -- we were

10   enforcing was Part 214.  It's a regulation for coke

11   ovens that requires -- you know, to minimize leaks

12   from a battery.  And it had, you know, requirements

13   for doors, charging holes, pushing, opacity limits

14   for pushing, as well as opacity limits for waste

15   heat, and required baffles in quench towers.

16   Q.   That's Part 214 of what?  What are we talking

17   about?

18   A.   That's part of the New York State Code of Rules

19   and Regulations.

20   Q.   So it's the New York regulations?

21   A.   Yes.

22   Q.   And there is a part that's Part 214?

23   A.   Correct.

24   Q.   And how long has Part 214 been around?

25   A.   I think it was initially written in the middle

1    '70s.

2    Q.  In terms of Bethlehem Steel, did they ever have

3    problems with their opacity or emissions from the

4    pushing and the leaks that you were focusing on?

5            MR. PERSONIUS:  Objection.

6            MR. LINSIN:  Objection, your Honor.

7    Relevance.

8            THE COURT:  I'm sorry?

9            MR. LINSIN:  Objection.  Relevance, your

10   Honor.

11           MR. MANGO:  Your Honor, this is relevant

12   because this -- this is going to be a theme we hear

13   during the trial that DEC air inspectors were very

14   focused on the battery.  And that's relevant to

15   this pressure release valve that's going to come

16   into play which is in the by-products unit.

17           THE COURT:  I'll allow you to connect it

18   up.

19           MR. MANGO:  Thank you.

20           THE COURT:  Overruled.

21   BY MR. MANGO:

22   Q.  Why was there an emphasis on the battery at

23   Bethlehem Steel?

24   A.  The Part 214 reg covered the battery.  It

25   didn't really focus on the by-product side of the

1    plant, because the by-product side of the plant

2    supposedly was a closed-loop system.  If the coke

3    oven gas that's generated within the pipe is

4    sealed, there's no leaks, goes through the process

5    of being clean.  Again in vessels and tanks that

6    are sealed, there will be no emission sources

7    there.  So actually our 214 did not cover the

8    by-product side of the plant.

9    Q.   Okay.  So you weren't focused on that when you

10   went to Bethlehem Steel because there was no New

11   York regulation on that?

12   A.   Correct.

13   Q.   But did Bethlehem Steel have problems with

14   their leaks and their door -- the leaks on doors

15   and lids and pushing and charging?

16   A.   Yes, it did.

17   Q.   Okay.  You've mentioned a couple times now this

18   Clean Air Act.  Why don't you explain -- you

19   mentioned at least one in the 1970s, and then there

20   was -- when you were talking about Title V you

21   mentioned the 1990s.  Why don't you tell the jury

22   just in very simple terms what the Clean Air Act is

23   and how many there are.

24            MR. LINSIN:  Your Honor, objection.  I did

25   not yet hear this witness proffered as an expert

1    for any purpose.  And before he begins this type of

2    testimony, I would, for one, request permission to

3    voir dire, and then an express proffer as to his

4    area of expertise.

5            THE COURT:  All right.  Well, you're on

6    notice in terms of the area of expertise designated

7    in the pretrial submissions by the government,

8    which includes the Clean Air Act Title V permit

9    procedures.  So, that's part of the qualification

10   you've already done, right?

11           MR. MANGO:  Right, your Honor.  I think I

12   need to at least get him to say that he understands

13   or knows what the Clean Air Act is before I call

14   him an expert in the Clean Air Act.

15           THE COURT:  Yeah.  I'm going to permit it,

16   so at this point overruled.  You may go ahead.

17   BY MR. MANGO:

18   Q.  Great.  Why don't you explain your

19   understanding of the Clean Air Act.

20   A.  Okay.  There were quite -- there was several

21   Clean Air Acts.  It started in 1955 as research to

22   develop the national ambient air quality standards.

23   In 1970 it enabled -- U.S. Congress enabled EPA to

24   write national ambient air -- to develop --

25           THE COURT:  Slow down.  Take a breath.

1   No.  No.  Hold on.  Question, Mr. Mango.

2   BY MR. MANGO:

3   Q.  Yes.  The 1990 -- or 1970 Clean Air Act that

4   you just mentioned, right?

5   A.  Right.

6   Q.  Okay.  What was that designed to do, and what

7   were some of the tools in the Clean Air -- that

8   were put into place in the Clean Air Act?

9         THE COURT:  I'm going to sustain the

10  objection.  Let's find out what the Clean Air Act

11  is, then we'll find out if he has the expertise, if

12  you offer and there's no objection, to testifying

13  about attendant ramifications of the applications

14  relating to the clean act.

15        MR. MANGO:  Yes.

16  BY MR. MANGO:

17  Q.  Can you describe what the 1970 Clean Air Act

18  is?

19  A.  The 1970 Clean Air Act empowered the EPA to

20  establish national ambient air quality standards,

21  new source performance standards, and national

22  emission standards for hazardous air pollutants.

23  Q.  Okay.  You mentioned three things there.

24  National ambient air quality standards?

25  A.  Correct.

1    Q.   What are those?

2    A.   Those are ambient air quality standards to

3    protect public health.

4    Q.   Okay.  The next item you mentioned was a new --

5    A.   New source performance standards.

6    Q.   What are those?

7    A.   Those are regulations that govern new

8    facilities.

9    Q.   And the last one you mentioned?

10   A.   National emission standards for hazardous air

11   pollutants.  There were eight identified hazardous

12   air pollutants under the 1970 Clean Air Act, and

13   they wrote regulations to govern industries that

14   emit those contaminants, benzene being one of them.

15   Q.   Benzene one was of the first eight?

16   A.   Yes.

17   Q.   Were there any additions to the Clean Air Act

18   or subsequent Clean Air Acts that you have

19   knowledge of?

20   A.   There was one in 1977 that had to do with

21   prevention of significant deterioration.  The

22   national ambient air quality standards were not

23   being met, so the U.S. Congress empowered EPA to

24   write additional regs, and they are codified in the

25   40 CFR Part 52, identified as prevention of

1    significant deterioration.

2        After that there was a Clean Air Act in 1990

3    that was even more empowering to the EPA that had

4    11 titles to it.

5    Q.   Okay.  One of which is that Title V you've

6    already mentioned?

7    A.   Correct.

8    Q.   Can you go through the different titles of the

9    1990 Clean Air Act?

10   A.   Title I had to do with new source review in

11   attainment and non-attainment area, very similar to

12   PSD.  It had requirements for those facilities that

13   went into areas that would hinder the compliance of

14   the national ambient air quality standards, regs to

15   that effect.

16       Title II had to do with mobile sources,

17   automobiles and trucks.  It allowed EPA to write

18   regs to limit emissions from automobiles, such as

19   the on-board diagnostics that you have on all cars

20   now.

21       Title III had to do with hazardous air

22   pollutants.  It identified 189 hazardous air

23   pollutants.  It allowed EPA to write regulations

24   regulating source categories that emitted any of

25   those hazardous air pollutants.

1       After the regs were written and the control

2   technology was implemented at theses facilities

3   that emitted hazardous air pollutants, they did

4   risk assessment and were allowed to come back and

5   write additional regs if the risk was still not

6   acceptable.

7       Title IV had to do with acid rain.  It

8   regulated major sources of sulfur and nitrogen

9   oxides, such as very large boilers and power

10  plants.

11      Title V was the permitting program that I

12  discussed earlier.

13      Title VI had to do with enforcement.  It

14  stipulated how enforcement would be handled at

15  Title V facilities.

16      Title 7 had to do with stratospheric ozone

17  depletion.  It's the ozone layer.  It eliminated

18  production of chlorofluorocarbons and

19  hydrochlorofluorocarbons.

20      Title VIII was a miscellaneous title.

21      And Title IX, X, and XI had to do with

22  disadvantaged business, employment, and there was

23  one other I can't recall.

24  Q.  Okay.  All right.  Before we go into Title V,

25  let's just quickly cover, is there any -- you've

1    mentioned Part 214 under the New York Code Rules

2    and Regulations.  Is there another part that also

3    assists you in doing your duties as a state air

4    inspector?

5    A.   There's several parts, but Part 201 is key in

6    defining our permitting process and exempt

7    activities.

8    Q.   Okay.  How long have you worked with the

9    various parts under the New York regulations?

10   A.   Since I started Part 201 was key.

11   Q.   Okay.

12          MR. PERSONIUS:  Pardon me, your Honor.

13   Could we have the title of the CFR that we're

14   referring to?  Or the New York Code.  I'm not sure

15   what title we're talking about.  We're talking

16   about parts, but --

17          THE WITNESS:  This is Chapter 6 of the New

18   York State Code and Rules and Regulations, Part

19   201.

20          MR. PERSONIUS:  Thank you.

21          MR. MANGO:  Your Honor, before we go into

22   a discussion of Title V, at this point based on

23   this witness's qualifications, his experience, his

24   education, his employment, the government would

25   proffer this witness as an expert in the area of

1    the Clean Air Act, and in particular to discuss

2    Title V of the Clean Air Act, requirements under

3    Title V, and requirements at coke oven batteries.

4              THE COURT:  Okay.  Yes, Mr. Linsin?

5              MR. LINSIN:  Your Honor, may I ask the

6    witness a couple of questions?

7              THE COURT:  You know, I'm not going to

8    permit that.  There were discussions relative to

9    this witness's testimony.

10       His testimony, ladies and gentlemen, I will

11   tender him -- or accept the tender of Mr. Carlacci

12   as an expert as defined by the prosecutor by virtue

13   of knowledge and experience and education, skill in

14   the field, training, and the like.

15       I'm going to allow cross-examination of the

16   qualifications of this witness.  When you have

17   both, okay, when you have the cross-examination and

18   the direct examination, then you can determine from

19   the testimony when it's complete what weight, if

20   any, to give to this particular witness's

21   testimony.

22       And remember, you determine credibility.  The

23   expertise of the witness as it relates to the Clean

24   Air Act, and specifically Title V, was discussed by

25   the attorneys for purposes of testimony here today

1    in advance of trial.  And that's the permit

2    procedures.  I'm going to allow that.

3         But you assess the credibility and the

4    believability of this witness just as you would any

5    other witness.  It's just that the technicalities

6    that have been referenced and may be necessary to a

7    complete understanding, which you may not have, you

8    may choose to rely on this witness's expertise.

9         So I'm going to permit it subject to

10    cross-examination for purposes of the weight that

11    this jury is to afford to his testimony.

12         You may proceed, Mr. Mango.

13              MR. MANGO:  Thank you, your Honor.

14              THE COURT:  And the proffer I think is

15    pursuant to 702, right?

16              MR. MANGO:  Yes, your Honor.

17              THE COURT:  Okay.

18    BY MR. MANGO:

19    Q.  Okay.  Let's dive into Title V of the Clean Air

20    Act.  Explain -- first let's explain in general

21    terms what Title V was designed to do.

22    A.  Again, each state had their own mechanism of

23    writing a permit and what was included in a permit.

24    So Title V required that all states have certain

25    elements in a permit so that it was uniform

1    throughout.

2         And the Title V permit -- you know, all the

3    conditions had to be in the permit.  You had to

4    have a good description of the facility, all the

5    required regulations specified in the permit, and

6    compliance assurance monitoring for any of the

7    parameters that were of significance.

8         Along with that it required that the facility

9    managers submit reports such as semi and annual

10   reports that documented compliance with the permit.

11   If there was a deviation, they would document that

12   in the annual compliance report.  Semi-annual

13   reports are submitted documenting compliance with

14   the permit, unless there was an issue that they

15   would identify in that annual report.

16   Q.  Okay.  So you just went through a couple items

17   there.  Let's break that down.  Compliance

18   assurance monitoring, what do you mean by that?

19   Tell the jury.

20   A.  Compliance assurance monitoring in a sense is a

21   term used for significant sources.  But each

22   operation or process, you know, for example would

23   have some method of demonstrating that it was

24   meeting that standard.  And you would require them

25   to check it.  For example, if it was a bag house

1    and there was a pressure gauge to determine there

2    was no leaks in the bag, you would require them to

3    do a weekly checks of that magnetic reading.

4    Q.   What do you mean bag house?

5    A.   A bag house is a piece of control equipment

6    that filters out particulates from the air.  From

7    actually the source.

8    Q.   Okay.  So it's --

9            THE COURT:  That's a bag house?

10           THE WITNESS:  I call it a bag house.

11           THE COURT:  Is that one word, two words?

12   Is it B-A-G?

13           THE WITNESS:  Yes, B-A-G.  Two words.

14           THE COURT:  Thank you.

15   BY MR. MANGO:

16   Q.   So the emissions are captured into this bag?

17   A.   It's ducted, you know, with hooding from a

18   process going into a bag house to filter out the

19   particulates before you exhaust clean air, just a

20   simple example.

21   Q.   That's an example of compliance assurance

22   monitoring.  Now you mentioned some annual

23   certifications and semi-annual certifications that

24   need to be made?

25   A.   Right.

1    Q.   What -- what are those?  Just in general terms.

2    A.   Those are a summary of the permit requirements,

3    and an identification of the monitoring that was

4    required for that condition, along with a statement

5    that you were either in compliance or out of

6    compliance.  That would be identified as a

7    deviation.

8         If it was out of compliance, you would have a

9    description as to what occurred and how you

10   corrected the problem.

11   Q.   Are these requirements that Title V imposed on

12   air emission sources?

13   A.   It was part of the permit, right.  That's what

14   Title V required you to also have in that permit

15   program.

16   Q.   Okay.  So was there an equivalent type of

17   annual or semi-annual compliance certification

18   requirement prior to Title V?

19   A.   No, there was not.

20              THE COURT:  What is the enactment date of

21   Title V?

22              THE WITNESS:  Title V -- I mean, it was

23   started in the 1990 Clean Air Act.  We put it into

24   our Part 201, into the SIP, and got interim

25   approval in 1996, final approval I believe in 2000,

1    2002.

2    BY MR. MANGO:

3    Q.   Okay.  You mentioned SIP.  Can you --

4    A.   State implementation plan.  It's the plan that

5    the state has to meet the requirements of the

6    federal government, and the federal government

7    approves that plan.

8    Q.   Okay.  How does Title V -- how does Title V

9    actually work?  You've mentioned a permit.  What

10   needs to go into this permit?

11   A.   You fill out an application.  A facility fills

12   out at application and describes their facilities,

13   identifies all of the emission points in certain

14   ways using emission units, emission sources, and

15   estimates the emissions.  Actually does an emission

16   estimate.  Submits -- lists all the requirements,

17   regs that apply, whether they be federal or state,

18   in an application with the mechanism of how they're

19   going to monitor compliance for each of the regs

20   that apply.  And that's an application.

21       Comes into the office.  We write a permit that

22   has that same information into a form that looks

23   like a permit.

24   Q.   Okay.  So, you're talking about in New York

25   State, you would get an application, right?

1    A.   Right.

2    Q.   What types of information would come with an

3    application for a Title V permit?

4    A.   It would be a plan of the facility, diagrams

5    that showed where equipment is located, and so on.

6    It would have emissions calculations supporting the

7    emissions listed in the application.

8    Q.   Okay.  And in New York State -- we'll get down

9    to that in a minute.  For some of these Title V

10   facilities, was there a history already with them?

11   A.   Yes.  Before the Title V program we had our own

12   form.  It was a form for each stack or emission

13   point.  Called an Air 100.

14   Q.   So you mentioned now -- so who actually

15   implements Title V in New York State?

16   A.   New York State does.  New York Department of

17   Environmental Conservation.

18             MR. LINSIN:  Objection, time frame,

19   please.

20   BY MR. MANGO:

21   Q.   After you received -- I think you mentioned

22   in 2001 or 2002 there was final approval.

23   A.   Right.

24   Q.   After that time period, once New York obtained

25   final approval, who implements Title V in New York

1    State?

2    A.   In the region the region does.

3    Q.   What division?

4    A.   The Division of Air Resources.

5    Q.   Your division?

6    A.   Correct.

7    Q.   Now, does New York State have in somewhere --

8    you've mentioned this 6NYCRR, the New York Code

9    Rules and Regulations, Title 6.  Is there anywhere

10   in there that discusses Title V?

11   A.   In Part 201 details the Title V requirements.

12   Q.   Okay.  So is that like your blueprint for how

13   to implement the Title V program?

14   A.   Yes, it is.  It describes -- initially when we

15   started the program in 1996, it detailed when an

16   application was due.  It details what's required to

17   be in an application.  It details how you submit a

18   for a permit modification.

19   Q.   All right.  And do you know if there's a

20   specific section in 201 -- 6 NYCRR 201 that deals

21   with Title V?

22   A.   201-6 that deals with Title V.

23   Q.   What does 201-6 set out?  Why don't you tell

24   the jury what's in there.

25   A.   The requirements for submitting a Title V

1    application.

2    Q.  I think you mentioned this.  There's certain

3    criteria or certain --

4    A.  Well, it defines what a Title V facility would

5    be --

6             THE COURT:  No, hold on.  Question.

7             MR. MANGO:  Yes, sorry, your Honor.

8    BY MR. MANGO:

9    Q.  Is there some type of mechanism in this 6 NYCRR

10   Subpart 201-6 that defines what is a Title V

11   facility?

12   A.  Yes, in the definition section it will define a

13   major facility that's subject to Title V

14   requirement.

15   Q.  What is that?  What makes a facility a Title V

16   facility?

17   A.  The amount of emissions that they put out into

18   the atmosphere.  In the examples I gave earlier of

19   the 100-ton threshold exceeded for any of the

20   pollutants such as particulates, nitrogen oxides,

21   sulfur dioxide, carbon monoxide, if any of those

22   are over 100 tons emissions into the atmosphere

23   from all of the sources at the facility, it's a

24   Title V facility, as well as either/or, either of

25   those contaminants as well as either 50 tons of a

1    volatile organic compound, or 25 tons per year of

2    total hazardous air pollutants as defined under

3    Title III of the Clean Air Act, or 10 tons of any

4    individual hazardous air pollutant.

5    Q.   What other sections are there in this Part 201?

6    A.   There's a section for state facility permits,

7    which is 201-5, and those that are not Title V that

8    wish to limit their emissions below that threshold

9    can obtain a state facility permit.

10        There is a Section 201-4 for those that are --

11   are minor sources can apply for registration.  And

12   then in 201-3 identifies those sources, those

13   emissions that are exempt or trivial.

14   Q.   Okay.  You used that, so let's talk about that,

15   exempt or trivial.  So there's a specific section

16   that deals with that?

17   A.   Right.  Identified particular processes or

18   operations that were -- were small that didn't

19   reach the threshold that you needed to identify

20   them their permit application.

21   Q.   Let me jump in here.  Can you give me an

22   example of some of the exempt activities that are

23   in this -- what section is it again?

24   A.   201-3.

25   Q.   Okay.  201-3, what are some of the exempt

1    activities, if you can give an example?

2    A.   Exempt activities that are listed in there are

3    small combustion sources burning natural gas below

4    10 million BTU per hour.  Handheld welding would be

5    exempt.  Emissions for those types of sources would

6    have to quantify in that Title V facility, but

7    would not be necessary for a state facility or a

8    registration.

9    Q.   Okay.  Now you mentioned this word trivial,

10   what are some examples of trivial activities?

11   A.   Trivial activities are like bathroom vents or

12   kitchen -- restaurant vents from cooking, as well

13   as another example is emergency relief vents.

14   Q.   Okay.  Let's talk about that, emergency relief

15   vent.  So there's a specific trivial activity

16   that's listed in that Part 201-3?

17   A.   Correct.

18             MR. LINSIN:  Your Honor, with respect to

19   this particular regulation, I would ask that we be

20   clear as to what year -- this is a regulation that

21   has gone through a number of changes in the time

22   period under this indictment.  What year are we

23   referencing with this testimony, please?

24             THE COURT:  Okay.  Your concern is the

25   exempt portion?

1          MR. LINSIN:  201-3, your Honor, yes.

2     BY MR. MANGO:

3     Q.  The trivial activities portion.  If you can

4     tell me what -- in terms of the trivial activities,

5     this emergency relief vent stack, what time period

6     are we talking about here?

7     A.  In the reg?

8     Q.  Yes.

9     A.  The exempt and trivial activity was implemented

10    in our 201 right in that 1996 period when we were

11    defining Title V state facility and registration.

12    It has gone through some changes, but the list of

13    exempt and trivial activities really didn't change

14    much.

15    Q.  Okay.  So this emergency relief vent stack has

16    been there as long as -- how long has it been

17    there?

18    A.  Since that rule was designed in that setup with

19    Title V state facility registration and exempt and

20    trivial, designed in that fashion in 1996.

21    Q.  Okay.  Now, you've mentioned your long history

22    of inspections.  In your inspections have you ever

23    seen an emergency relief vent or stack in your

24    inspections?

25    A.  Emergency relief vents are common in industry

1    where you're heating a medium, whether it be a gas

2    or a liquid, that's going to expand.  You try to

3    prevent the pressure to a point that would cause

4    significant damage to that equipment, you know, if

5    you couldn't control it.  An emergency, you know,

6    as it means, is used only for those that, you know,

7    are beyond design of the equipment.  It occurs

8    because of unforeseen circumstances, catastrophic

9    event that that valve would go off, like an act of

10   God.  It's not something that's common.

11       That type of vent, it's no different than on

12   your hot water heater.  You have a vent there.  If

13   you boil the water too hard, the burner doesn't

14   shut off you can have a catastrophic event on your

15   boiler.  The valve would go off and allow the steam

16   to come out.  That's an emergency relief vent.

17   It's not used frequently.

18   Q.  That's your experience with energy relief vents

19   and stacks as a trivial activity?

20   A.  Correct.

21   Q.  Now do you know if the term "emergency" is

22   defined in Part 201 anywhere?

23   A.  Yes.  There is a definition of emergency in

24   Part 201.

25   Q.  What's your understanding of the definition of

1    emergency?

2    A.   As I just explained, it's for a -- if the

3    equipment is properly maintained and was designed

4    properly, and it's not something that's used as a

5    process, it's there to prevent a catastrophic

6    failure of equipment that -- that would be

7    considered an emergency, something that occurs in

8    that fashion.

9    Q.   What about if you improperly use a device, or

10   if you improperly use a piece of equipment,

11   improper use, would that qualify as an emergency?

12   A.   No.

13   Q.   Operator error?

14   A.   Operator error wouldn't be considered

15   emergency.

16   Q.   Improperly designed equipment?

17   A.   No, that would not qualify as a -- as an

18   exemption as an emergency -- excusable as an

19   emergency release.

20   Q.   So in your position now as head of the air

21   division and in your time as an inspector, you've

22   seen emergency relieve vents and stacks that meet

23   this definition of an emergency and is a trivial

24   activity?

25   A.   Correct.

1    Q.   Okay.  We'll get back to that.  Now, you

2    mentioned state facility permits.  What --

3    what's -- what goes into getting a state

4    emergency -- I'm sorry, a state facility permit?

5    How much less demanding is it than a Title V

6    permit?

7    A.   A state facility permit is the same

8    application, same type of permit, and it's for

9    those facilities that do not want to be Title V, so

10   they're going to take a limit on their operation, a

11   limit in the emissions that they put out to stay

12   below those thresholds I mentioned earlier that

13   define a major source.  And the conditions are more

14   stringent, depending how close you are to that

15   threshold.  It still goes through a public notice,

16   and it doesn't require the same type of semi-annual

17   reports that a Title V facility does.

18   Q.   Okay.  That was Part 201.  Now, there's Part

19   214 which you've already mentioned.  And that -- in

20   there there's a discussion of quench towers, is

21   that right?

22   A.   Yes, there is a standard there for quench

23   towers.

24              THE COURT:  Are you talking about 214 now?

25              MR. MANGO:  Now we're on Part 214, your

1    Honor.

2    BY MR. MANGO:

3    Q.   Are you familiar with Part 214?

4    A.   Yes.

5    Q.   Okay.  In your experience you've heard the term

6    a wet quench tower?

7    A.   Correct.

8    Q.   Okay.  Again, describe that for the jury.  What

9    is a wet quench tower?

10   A.   A wet quench tower is when this railcar of coke

11   enters this station, this tower, you know, railcar

12   is in the bottom, water is sprayed on it to cool

13   off this coke.  And the steam is carrying

14   particulates out with it.  There's baffles in there

15   to prevent the particulates, as much as possible --

16   they're about 50 to 90 percent effective in

17   knocking the particulate out of this plume as it

18   goes into the atmosphere.

19   Q.   Okay.  You mentioned this term baffles.  Part

20   214 says there has to be baffles?

21   A.   Part 214 requires baffles in every quench

22   tower.

23   Q.   You've been using this term "quench tower".  Is

24   there a difference in the regulations anywhere

25   between a quench tower versus a quench station?

1    A.   No.

2    Q.   As long as -- let me ask you a question.   As

3    long as incandescent hot coke is being deluged with

4    water in a structure, is it your understanding that

5    that structure has to have baffles?

6    A.   Yes, it is.

7    Q.   Okay.   Now prior to Title V I think you

8    mentioned something called an Air 100?

9    A.   Yes.

10   Q.   Why don't you explain for the jury that system

11   that was used prior to Title V by New York State.

12   A.   So Title V applications looked at the whole

13   facility and emissions coming from the whole

14   facility so you can evaluate those together.

15            THE COURT:   Hold on one second.   Are we

16   talking about 1996 now and before that, or 2002 and

17   before that?   Which time period are we in?

18   BY MR. MANGO:

19   Q.   Well, you obtained approval for your Title V

20   program 2001-2002?

21   A.   We started implementing it in 1996.   We had

22   interim approval in '96.   Final approval in 2000,

23   2001.   But we were doing Title V -- requesting

24   Title V applications right around the late 1990s.

25   Q.   So the late '90s you start requesting Title V

1    permit --

2    A.  Right.

3    Q.  -- applications from facilities, right?  But

4    those facilities, what -- what are they still

5    operating under?

6    A.  They're operating under the state permit system

7    was called an Air 100, and it was a permit for each

8    stack at the facility.  And that had the same type

9    of information that you would have in a Title V

10   permit.  It had the emissions that were coming out

11   of that stack and described the process that

12   created those emissions, and gave you an

13   opportunity to write conditions that that covered

14   the reg that limited the emissions for that stack

15   in that process.  And it was for each stack.  That

16   was the state system before Title V.

17   Q.  So, each emission --

18   A.  Each stack, each mission point, had this Air

19   100 form.

20   Q.  Okay.  And then when Title V comes into play in

21   the late '90s, you mentioned you started

22   implementing Title V, right?

23   A.  Right.  We started requesting applications be

24   submitted based on the information we had on hand,

25   those facilities by SIC code had to submit an

1    application over a period of time.  We staggered

2    the submission requirements based on SIC code, and

3    had to submit a Title V application.

4    Q.   What is SIC code again?

5    A.   Standard Industrial Classification code.

6    Q.   Okay.  So you had this information on file from

7    these Air 100s?

8    A.   Yes.

9    Q.   And then you notified the facilities that

10   needed to apply for a Title V permit?

11   A.   Correct.

12   Q.   Okay.  Are you familiar -- let's now move to

13   the Tonawanda Coke Corporation.  Are you familiar

14   with that facility?

15   A.   Yes, I am.

16   Q.   Do they have a Title V permit?

17   A.   Yes, they do.

18   Q.   Have you reviewed that Title V permit?

19   A.   Yes, I have.

20   Q.   Okay.

21          MR. MANGO:  Your Honor, may I have a

22   moment?

23          THE COURT:  Sure.

24          MR. MANGO:  Your Honor, may I approach the

25   witness?

1          THE COURT:  Yes.

2          MR. MANGO:  Thank you.

3  BY MR. MANGO:

4    Q.  Mr. Carlacci, I'm showing you what's been

5    identified as exhibit -- Government Exhibit 105.07.

6    What is that that you're looking at?

7    A.  It's a photograph of the Tonawanda Coke

8    facility.

9          THE COURT:  Before you go any further, why

10   wouldn't you use Elmo for everybody else's benefit?

11         MR. MANGO:  I want to get it into evidence

12   first, your Honor.  That stipulation that we had

13   entered into was just an -- I'm going to ask to

14   enter Exhibit 105.07 into evidence.

15         MR. LINSIN:  No objection.

16         THE COURT:  All right.  So you can display

17   now if you want.  You can publish.

18         MR. MANGO:  Yes.

19         THE COURT:  No objection?

20         MR. LINSIN:  No objection.

21         MR. PERSONIUS:  No objection.

22         THE COURT:  Give us the exhibit number

23   205-1?

24         MR. MANGO:  105.07.

25         THE COURT:  Must be listening to another

1    line --

2              (Government's Exhibit 105.07 was received

3              into evidence.)

4    BY MR. MANGO:

5    Q.   There was a stipulation, Mr. Carlacci, I'll

6    tell you that this photo was taken on April 10th

7    of 2009.  Okay.  What are we looking at there?

8    A.   This is right along -- here is River Road.  You

9    can see the Grand Island Bridge right here.

10             MR. LINSIN:  Your Honor --

11             THE COURT:  Yes?

12             MR. LINSIN:  If we could just ask the

13   witness to orient where he's pointing in the

14   photograph.

15             THE COURT:  Yeah, we're going to have him

16   tap the screen and it will develop an arrow.  Or

17   circle where you're testifying about.  Does

18   everybody have this on your monitor?  Okay.

19      Mr. Carlacci, circle the area or tap with

20   authority the screen, and you'll either get an

21   arrow, or if you need to circle something, you have

22   to do that with a full motion of the finger.

23             THE WITNESS:  Okay.  This is River Road,

24   Grand Island Bridge, the 190-290 interchange.  NOCO

25   terminal, Sunoco terminal, Niagara River.

1    Tonawanda Coke.

2              THE COURT:  All right.  Where is Tonawanda

3    Coke?  Circle that.

4         Not bad for the first try.  Go ahead.

5              THE WITNESS:  That's Tonawanda Coke.

6              MR. MANGO:  Thank you.  Your Honor, at

7    this point I'd also offer, which was part of the

8    stipulation, Government's Exhibit 305.07, which is

9    enlarged and cropped version of Exhibit 105.07.

10             THE COURT:  Okay.  I take it there's no

11   objection?

12             MR. LINSIN:  No objection.

13             MR. PERSONIUS:  No objection, Judge.

14             THE COURT:  Okay.  It will be received as

15   demonstrative evidence.  No objection.

16             MR. MANGO:  Thank you, your Honor.

17             (Government's Exhibit 305.07 was received

18             into evidence.)

19   BY MR. MANGO:

20   Q.  Mr. Carlacci, is Exhibit 305.07 essentially a

21   version of what you're looking at here on the

22   screen?

23   A.  Yes, it is.

24   Q.  Okay.

25             MR. MANGO:  Your Honor, at this point the

1    government would also offer Exhibit 105.42 into

2    evidence, which was subject to this stipulation.

3           THE COURT:  Okay.  Unless I hear an

4    objection, I will admit that.  There's no

5    objection.  Do you intend to publish?

6           MR. MANGO:  Yes.

7           (Government's Exhibit 105.42 was received

8           into evidence.)

9           MR. MANGO:  If we could please publish

10   that.  Okay.  So now what are we looking at on the

11   screen, Mr. Carlacci, Exhibit 105.42?

12          THE WITNESS:  This is a closer look of the

13   Tonawanda Coke facility.

14          MR. MANGO:  For demonstrative purposes I

15   would also offer Exhibit 305.42, which is part of

16   the stipulation as an enlarged version of 105.42.

17          THE COURT:  For demonstrative purposes,

18   hearing no objections, 305.42 admitted.

19          (Government's Exhibit 305.42 was received

20           into evidence.)

21   BY MR. MANGO:

22   Q.  Okay.  Mr. Carlacci, if you'd like to look at

23   this photo, and at least describe some of the key

24   components at the Tonawanda Coke facility here by

25   using your touch screen.  Or if you'd like, I have

1  a laser pointer if you'd rather do it on that

2  larger board.

3  A.  I'll try to do it here.  This area here I would

4  say is the coal fields.  This piece of equipment

5  here that goes to this white stack right there is

6  the battery.  And this is the by-product side of

7  the plant here, this area in the circle.  This is

8  the ammonia still.  The boiler house.

9  Q.  Okay.  All right.  Now, in your position as

10  head of the air division, have you had a chance to

11  look through the air division's file for the

12  Tonawanda Coke Corporation, the Title V permit, and

13  any other permitting that was in place prior to

14  Title V?

15  A.  Yes, I have.

16  Q.  Are you aware of when operations began at

17  Tonawanda Coke facility under the name Tonawanda

18  Coke Corporation?

19  A.  It was in the late '70s I believe.

20  Q.  And when would a New York Stat DEC's oversight

21  have begun of the Tonawanda Coke Corporation?

22  A.  We always had oversight at that facility.

23  Before it was Tonawanda Coke, once it became

24  Tonawanda Coke they -- they had to do their

25  permitting for that facility.

1      MR. MANGO:  Your Honor, if may have a

2  moment?

3          THE COURT:  Certainly.

4          MR. MANGO:  Your Honor, may I approach the

5  witness?

6          THE COURT:  Is there any objection to

7  publishing this?

8          MR. LINSIN:  There is, your Honor.

9  Relevance.  Relevance.

10         THE COURT:  Okay.

11         MR. MANGO:  Should I approach, your Honor,

12  and at least establish foundation?

13         THE COURT:  Sure.

14         MR. MANGO:  Thank you.

15    Mr. Carlacci, I'm going to show you Government

16  Exhibit 128 and ask you if you can just take a look

17  at that document.

18         THE COURT:  All right.  Why don't you pull

19  Elmo out, publish it on Elmo.  It won't be

20  published for the jury and everybody would see it

21  on the monitors.

22         THE CLERK:  Don't you have it on disk?

23         MR. MANGO:  We do.

24         THE CLERK:  That's the way it should be

25  done.

1          THE COURT:  Lets do that, and we'll block

2     the jury until we get it qualified for you, ladies

3     and gentlemen.

4          MR. MANGO:  Yes, your Honor.  If we could

5     pull up 128, please.

6  BY MR. MANGO:

7     Q.  Okay.  What -- in general, what are we looking

8     at here?

9     A.  This is a letter from Tonawanda Coke signed by

10    Mr. Crane.

11    Q.  Okay.

12    A.  The president at the time.

13    Q.  Okay.  I don't want to go into the details of

14    what this is yet until it's and if it gets admitted

15    into evidence.  What is the date on this?

16    A.  The date on it is November 17th, 1979.

17    Q.  Okay.  And where did this document that you're

18    holding come from?

19    A.  Came from Tonawanda Coke.

20    Q.  And where was it found?

21    A.  It was found in our files in Region 9.

22    Q.  Is this a document that is maintained in the

23    ordinary course of business by the New York State

24    DEC?

25    A.  Yes, it is.

1    Q.   Is it the regular practice of New York State

2    DEC to maintain this document?

3    A.   Yes.  We maintain all records submitted on an

4    air permit source.

5    Q.   Is it the regular course of New York State DEC

6    to rely on this document?

7    A.   Yes, it is.

8    Q.   Would this document have been placed in --

9    there's a file that this came out of it?

10   A.   Yes, there is.  It's a file maintained in our

11   office.

12          THE COURT:  Okay.  Hold on.  We're not

13   talking foundation, we're talking about relevancy

14   of the document itself?

15          MR. LINSIN:  Well, yes.  My earlier

16   comment went to relevancy.  On its face, your

17   Honor, this is not a business record of DEC.  This

18   is a business record of Tonawanda.  I have no

19   objection on that basis.  It's a relevancy issue.

20          THE COURT:  Right.  So, I mean, there's no

21   issue with respect to that it was a document kept

22   by DEC, so we're beyond that hurdle.  But what's

23   the relevance?  That's what we want to get to.

24   We're talking 1979 here by this document.  So we

25   use that as a starting point to see if it's at all

1    relevant for purposes of this prosecution.

2              MR. MANGO:  Yes, your Honor.

3    BY MR. MANGO:

4    Q.  Mr. Carlacci, what is -- what is the subject of

5    this letter?

6    A.  The subject of this letter is Part 214 and the

7    requirements.

8    Q.  And what is being -- is there a request being

9    made in this letter?

10              MR. LINSIN:  Objection, your Honor.

11              THE COURT:  Well, it calls for a yes or

12   no.  I can let that go.

13              MR. LINSIN:  All right.

14              THE COURT:  All right.  Your answer is yes

15   or no?

16              THE WITNESS:  Yes.

17   BY MR. MANGO:

18   Q.  Let me go at it this way.  Are you aware of

19   something called pushing controls?

20   A.  Yes, I am.

21   Q.  Okay.  At a coke plant what are pushing

22   controls?

23   A.  Pushing controls is control equipment that's

24   put on the pushing side of the battery.  When the

25   coal is cooked into coke and pushed out of the oven

1    falling into that railcar, control equipment

2    controls the emissions that are created at that

3    point.  Those are called pushing controls.

4    Q.  Those are pushing controls.  Did Bethlehem

5    Steel have pushing controls?

6              MR. LINSIN:  Objection.

7              THE COURT:  Relevancy?

8              MR. LINSIN:  Indeed, your Honor, yes.

9              THE COURT:  All right.

10             MR. MANGO:  Your Honor, if I may make a

11   limited proffer here.  I don't know if you want to

12   do this at side bar.

13             THE COURT:  Do it concisely.  What's

14   the -- what's the relevance whether or not

15   Bethlehem Steel has a pushing control?

16             MR. MANGO:  Your Honor, Tonawanda Coke

17   facility is a facility that does not have pushing

18   controls.  And to obtain that exemption to not have

19   pushing controls, they agreed to tighter standards

20   on their battery.  And this is relevant because

21   then it controls, similar to what we talked about

22   before why Mr. Carlacci's focus at Bethlehem Steel

23   was on the battery, it was even more so for the DEC

24   air inspectors' focus on the battery, because they

25   got this pushing exemption from the pushing

1   controls, and they had to focus on the battery more

2   because it was tighter regulations.

3          THE COURT:  But we're talking Bethlehem

4   Steel, and I think that's the problem here, right?

5          MR. LINSIN:  We're talking about Bethlehem

6   Steel, that was the question pending, your Honor.

7   But, events in 1979, unless they are tied to

8   allegations in this indictment -- and there's no

9   allegation in this indictment that relates at all

10  to pushing controls or emissions for the oven for

11  that matter.  And therefore we are objecting on the

12  grounds of relevance.

13         THE COURT:  I'm going to -- foundationally

14  and relevance I'm going to sustain that objection.

15  I'll give you an opportunity to try to develop it,

16  but if you can't do it quickly, we'll move on.

17         MR. MANGO:  Your Honor, thank you.  This

18  letter relates to Tonawanda Coke.

19         THE COURT:  Right.

20         MR. MANGO:  During the defense counsel

21  opening there was this discussion of the regulatory

22  history at Tonawanda Coke.  This is the start of

23  the regulatory history.  I think this is -- the

24  government believes this is relevant, because

25  this -- this drives what the inspectors would then

1    be doing at Tonawanda Coke.

2              THE COURT:  Well, I mean, that's your

3    argument, but you haven't established that through

4    the witness, so we'll see.

5              MR. MANGO:  Okay.  Mr. Carlacci, this

6    letter, what does -- is there a request being made

7    in this letter?

8              THE WITNESS:  There is a request here that

9    pushing --

10             MR. LINSIN:  Objection.

11             THE COURT:  It calls for a yes or no

12   answer.

13   BY MR. MANGO:

14   Q.  Is a request being made --

15   A.  Yes, there is.

16   Q.  -- in that letter.  Did New York -- it's a

17   request for some type of waiver or an exemption?

18             MR. PERSONIUS:  Object to the leading,

19   your Honor.

20             MR. MANGO:  What type of request is it?

21   I'll rephrase, your Honor.

22             THE COURT:  Okay.

23   BY MR. MANGO:

24   Q.  What type of request, in general terms -- not

25   the specific details, in general terms what kind of

1    request is being made here?

2    A.  It's a request for a variance of the

3    requirements in Part 214 for pushing controls.

4    Q.  All right.  Now, do you know if DEC granted

5    that request for a variance, yes or no?

6    A.  Yes.

7    Q.  Did they grant that request after receiving

8    this letter?

9    A.  Yes.

10          MR. MANGO:  Your Honor, the government

11   would offer again this letter as the foundation for

12   an exemption to Part 214 has been made by the

13   Tonawanda Coke facility.

14          THE COURT:  All right.  I take it there's

15   still an objection?

16          MR. LINSIN:  There is, your Honor.  I've

17   heard no testimony that relates this document in

18   any way to any of the allegations in this

19   indictment.  It's a fundamental relevancy issue.

20          THE COURT:  Well, yes and no.  I mean,

21   there is background similar to the qualification of

22   a witness.  This is background information I think

23   is what you're saying.

24          MR. MANGO:  Yes, your Honor.  This

25   establishes, starts the regulatory history at

1    Tonawanda Coke.  And then it is also relevant to

2    subsequent air inspectors' inspections at the

3    Tonawanda Coke facility and the why the focus was

4    on the battery versus not on the by-products unit.

5            THE COURT:  All right.  I'm going to allow

6    you to do it.  I'm going to overrule the objection.

7    However, if you don't connect it up, I will

8    entertain a motion to strike the testimony, and

9    also to, from the exhibit standpoint, withdraw the

10   exhibit from evidence.  So, I'll do that.

11     With that though I think we're going to take a

12   break for about 15 minutes, and then we'll be going

13   today until about 4:45.  So we'll take 15 right

14   now.

15           MR. MANGO:  Yes, your Honor.

16           THE COURT:  I'm entering it subject to the

17   further connecting up, and in the event of a motion

18   to strike the exhibit, I'll entertain that at a

19   later point.

20              (Government's Exhibit 128 was received

21              into evidence.)

22              (Jury excused from the courtroom.)

23           THE COURT:  Okay.  Mr. Carlacci you may

24   step down, and we'll resume again at 4:00 o'clock.

25           MR. MANGO:  Yes, your Honor.

1          MR. PIAGGIONE:  Thank you, your Honor.

2          (Short recess was taken.)

3          (Jury seated.)

4          THE COURT:  Okay, welcome back, ladies and

5     gentlemen.  Please have a seat.  The attorneys and

6     parties are back, present.  The jurors here, roll

7     call waived.  We're back on in the case of United

8     States of America versus Tonawanda Coke Corporation

9     and Mark Kamholz.  And on the witness stand is

10    first witness for the government, Alfred Carlacci.

11        Your witness, Mr. Mango.

12         MR. MANGO:  Thank you, your Honor.

13   BY MR. MANGO:

14   Q.  If we could please publish Exhibit 128.  Okay.

15   Mr. Carlacci, I was asking you some questions about

16   Exhibit 128.  In your role as the regional air

17   pollution control engineer for DEC, does DEC -- are

18   you responsible or oversee inspectors who do

19   inspections at Tonawanda Coke Corporation facility?

20   A.  Yes, I do.

21   Q.  Okay.  And between the periods of 2005 to 2009,

22   you were not the regional pollution -- the regional

23   air pollution control engineer at the time, is that

24   correct?

25   A.  Correct.

1    Q.   Okay.  But were you aware that inspectors did

2    inspections at the Tonawanda Coke facility

3    between 2005 and 2009?

4    A.   Yes, I was.

5    Q.   Okay.  And during those inspections, what was

6    the focus of the inspections?

7            MR. PERSONIUS:  Your Honor, I object

8    without a foundation as to how he would know that.

9            THE COURT:  Yeah, sustained.

10           MR. MANGO:  All right.

11   BY MR. MANGO:

12   Q.   We'll move on.  I'd like to show you

13   Exhibit 19.01 for identification purposes.

14       Okay.  If we can zoom in on this portion,

15   please.  Do you see this on the screen, Exhibit

16   19.01 for identification?

17   A.   Yes, I do.

18   Q.   What is this letter?

19   A.   It looks like a letter that came out of our

20   files.

21   Q.   And who did it come from?

22   A.   Tonawanda Coke.

23   Q.   Actually, if we can zoom out please, Lauren,

24   okay.  Let's try to get this.  And who signed it?

25   A.   Mark Kamholz.

1    Q.   And what is the date?

2    A.   March 13th, 1981.

3    Q.   What is the subject of this letter, or what's

4    the purpose of this letter?

5              MR. PERSONIUS:  Your Honor, I object to

6    the purpose.  I think subject matter might be more

7    appropriate than purpose.

8              THE COURT:  Yeah.  Sustained on that

9    basis.

10             MR. MANGO:  What is the subject matter of

11   this letter?

12             THE WITNESS:  The subject matter is the

13   flow diagram of the process after the exhauster.

14             MR. MANGO:  Your Honor, the government

15   would offer Exhibit 19.01 into evidence.

16             MR. PERSONIUS:  I object on relevancy

17   again, Judge, from 1981.

18             THE COURT:  All right.  Let's have that

19   argument again, or at least your position.  Are you

20   connecting this up to something?  Is this just part

21   of the history of the -- of the regulation

22   relationship with DEC?

23             MR. MANGO:  Your Honor, this is even more.

24   This is a letter signed by Defendant Kamholz

25   enclosing a flow diagram for the gas flow after the

1   exhausters, which I may need to ask one more

2   question to tie this in.  But that would be

3   essentially the by-products area.  So this shows

4   that Defendant Kamholz has knowledge of the

5   by-products area, and obviously that's important to

6   this -- Counts 1 through 5, which relate to the

7   unpermitted pressure release valve.

8           THE COURT:  Assuming you can connect that

9   into the period of time that's the subject of the

10  indictment, so -- any further comment?

11          MR. PERSONIUS:  No, Judge.

12          MR. LINSIN:  Your Honor, we do expect that

13  the evidence from the witnesses who will testify

14  relevant to the time period in this indictment will

15  say that the processes in by-products area and for

16  this coke oven gas line were adjusted and changed

17  over time.  I fail to see the relevance to

18  something that is 24 years before the dates that

19  are relevant to the counts in this indictment.

20          THE COURT:  I mean, it's certainly

21  attenuated is what you're saying, right?

22          MR. LINSIN:  And no foundation, your

23  Honor, that this schematic that is the subject of

24  the letter bears any relevance to what -- the

25  conditions that existed at the plant.

1           THE COURT:  Well, that's for step number

2      two.  But I'm not going to admit the record.  I'm

3      going to sustain the objection.  But I will allow

4      you to add whatever question you think is necessary

5      to make the connect for further consideration.

6           MR. MANGO:  Yes, your Honor, thank you.

7        Is there a discussion in this letter -- or let

8      me start again.  Is there a title used on this

9      letter for Defendant Kamholz?

10          THE WITNESS:  Yes, there is.

11          MR. MANGO:  Okay.  What title is used?

12     I'm sorry, let me -- that's not evidence yet.

13          MR. PERSONIUS:  Your Honor, if that's the

14     -- we'll stipulate.  We stipulated in our opening

15     that Mr. Kamholz was the environmental manager at

16     Tonawanda Coke.

17          THE COURT:  But I think we're going beyond

18     that, right?

19          MR. MANGO:  Yes, your Honor.

20          THE COURT:  All right.  So we'll take

21     the stipulation.  I mean, there's no dispute that

22     that title applied back in 1981, and it's manager

23     of environmental control.  Let's go from there.

24     The document is not in evidence.

25          MR. MANGO:  Not in evidence, your Honor.

1    Is there a discussion of gas flow?

2    Is Defendant Kamholz discussing gas flow in

3    this letter?

4         THE WITNESS:  Yes.

5         MR. MANGO:  And based on your

6    understanding of this letter, what does the gas

7    flow relate to?

8         MR. PERSONIUS:  Now he's asking him to

9    read from an exhibit not in evidence.  I object to

10   it.

11        MR. MANGO:  Your Honor, maybe I can start

12   again.

13        THE COURT:  Please.

14   BY MR. MANGO:

15   Q.  All right.  In part of your duties as the

16   regional air pollution control engineer, do some of

17   the inspectors that you oversee inspect Tonawanda

18   Coke Corporation?

19   A.  Yes.

20   Q.  Do those inspectors have -- are they expected

21   now to have a knowledge of the by-products

22   department?

23   A.  Yes.

24   Q.  Okay.  And again, explain what the by-products

25   department is for the jury, please.

1   A.   The by-products -- part of a coke oven facility

2   is the part that would prepare the gas for use in

3   the ovens or the boiler and recover any -- any

4   items such as benzene, toluene, xylene, that's of

5   value in that gas, as well as remove tar from the

6   gas that's also a by-product.

7   Q.   Okay.  Is it important for your inspectors to

8   know how the gas is flowing in the by-products

9   department at Tonawanda Coke?

10   A.   Yes.

11   Q.   Okay.  How do inspectors in your department get

12   that information for the gas flow?

13   A.   By asking the plant.

14   Q.   Okay.  This letter that you're looking at, is

15   this information that came from the plant regarding

16   gas flow?

17   A.   Yes.

18   Q.   Is this relied on by you and your inspectors in

19   determining how the by-products operation works at

20   Tonawanda Coke facility?

21           MR. PERSONIUS:  Objection.  I'm sorry,

22   your Honor.  I object, your Honor.

23           THE COURT:  Grounds?

24           MR. PERSONIUS:  No foundation.

25           THE COURT:  Well, it's compound, because

1    it involved the inspectors and this witness, so on

2    that basis, on the form of the question, I'm going

3    to sustain it.

4        But we are dealing I think with respect to the

5    knowledge element of Counts 1 through 15, at least

6    setting it up.  So, you tell me if there's further

7    objection on this.  So, objection sustained.  You

8    go forward at this point.

9              MR. MANGO:  Yes, your Honor.

10   BY MR. MANGO:

11   Q.  In a moment we're going to discuss -- have you

12   come to learn that there was something called the

13   pressure release valve at the Tonawanda Coke

14   Corporation?

15   A.  Yes.

16   Q.  Have you formed any opinions as to whether that

17   was compliant with the Title V permit or

18   noncompliant?

19   A.  My opinion it's noncompliant.

20   Q.  We'll, get there.  Now, you formed that

21   opinion.  In forming that opinion, did you need to

22   have an understanding of the gas flow at Tonawanda

23   Coke?

24   A.  Yes.

25   Q.  Okay.  Is this a letter we're looking at here,

1    Exhibit 19.01, that assisted you in determining the

2    gas flow at Tonawanda Coke?

3    A.   Really doesn't give you the information, a

4    complete picture.

5    Q.   Okay.  What does it give you?

6    A.   This is the cover letter.  That's all that's

7    here.

8    Q.   Oh, yes.  If I can show you for identification

9    purposes the second page of this exhibit.  I guess

10   the third page, yes.

11        Okay.  So this page, is this something you have

12   relied on in learning about the by-products

13   department at the Tonawanda Coke Corporation?

14   A.   Yes.  This is a simple diagram.

15   Q.   It was sent to the New York DEC by who?

16   A.   By Mark Kamholz.

17             MR. MANGO:  Your Honor, the government

18   would offer now this into evidence as 19.01.

19             THE COURT:  Well, I'm going to open it up

20   at the appropriate time, if counsel choose, to

21   cross-examination.  But I'm going to admit it,

22   unless there's further argument on it.  It's still

23   subject to relevancy.  We're talking a long time.

24   We don't know if the conditions have changed or the

25   air flow system has changed in the ten years or so.

1          MR. LINSIN:  And, your Honor, that is my

2     point.  Without that foundation, I don't know how

3     we or the jury can assess relevance, and that is my

4     struggle with this document.

5          THE COURT:  Well, I mean, there are --

6     there are some gaps, but there is that aspect of

7     how much weight you are going to choose to give to

8     this particular exhibit, ladies and gentlemen.  The

9     attorneys will be able to argue to you if there's

10    nothing more.

11      I am admitting it for your consideration.

12    There will be more evidence to come.  There's still

13    the opportunity to move to strike this particular

14    exhibit if there is no connecting between change of

15    circumstances between '81 and -- or not,

16    '81 and 2005, '6, wherever we want to go with it.

17          MR. MANGO:  Yes, your Honor, thank you.

18          (Government's Exhibit 19.01 was received

19          into evidence.)

20    BY MR. MANGO:

21    Q.  I'd ask this be published for the jury, and if

22    we can return to the first page.  If we can just

23    focus in on that area please, Mr. Carlacci.  Can

24    you read the second paragraph here, please?

25    A.  "As you would expect, flow rates are completely

1    dependent on production levels.  Any level of gas

2    flow currently being utilized will be modified in

3    the future as needed.  However, a flow rate

4    measuring device is in place prior to the sampling

5    point."

6    Q.  Okay.  Now, this mentions that the gas flow

7    currently being utilized will be modified in the

8    future.  So do you know, based on your review of

9    the file, if additional gas flow diagrams have been

10   submitted to the DEC?

11   A.  I do not recall seeing any additional diagrams

12   in the file.

13   Q.  Now, if we can go to the third page again,

14   please.  Now, we're going to talk about, as I said,

15   a pressure release valve that you've come to learn

16   about at the Tonawanda Coke facility, is that

17   right?

18   A.  Correct.

19   Q.  Is that listed on this flow diagram?

20   A.  No, it is not.

21   Q.  Okay.  I'd like to show you Government's

22   Exhibit 19.02 for identification purposes.

23       If we can focus in, please, Lauren, on this

24   area.

25       Okay.  What are we looking at here,

1   Mr. Carlacci, in general terms please?

2   A.   A letter out of our file.

3   Q.   Okay.  Dated when?

4   A.   September 19, 1983.

5   Q.   Okay.  And it's sent by who?  We need to zoom

6   out if we can.

7   A.   Yeah, zoom out.

8   Q.   If we could go to the next page.  Who sent this

9   letter?

10  A.   Submitted by Mark Kamholz.

11  Q.   If we can go back to the first page.  Is there

12  a discussion of quench tower number 1 in this

13  letter?

14  A.   Yes, there is.

15  Q.   And essentially is there a request being made

16  in this letter regarding quench tower number 1?

17  A.   Yes, there is.

18  Q.   Is there commentary being made as to how often

19  this quench tower number 1 is being used?

20  A.   Yes, there is.

21          MR. MANGO:  Your Honor, government would

22  offer 19.02 into evidence.

23          MR. LINSIN:  No objection.

24          MR. PERSONIUS:  No objection, your Honor.

25          THE COURT:  Okay.  19.02 received, no

1    objection.

2              (Government's Exhibit 19.02 was received

3              into evidence.)

4              MR. MANGO:   I ask that it be published for

5    the jury.

6              THE COURT:   Okay.

7    BY MR. MANGO:

8    Q.   Okay.  Why don't you just tell the jury what

9    this letter is -- what Tonawanda Coke is trying to

10   convey to the DEC in this letter.

11   A.   Written in 1983, it's a cover letter for the

12   submission of applications -- Air 100 applications

13   for the sources listed in the letter, the five

14   sources.

15   Q.   Okay.

16   A.   As well as a request on a change in operation

17   for the quench tower.

18   Q.   Okay.  If we can start -- so you mentioned

19   these applications for certificate to operate.  Are

20   those these Air 100s you're talking about?

21   A.   Yes.

22   Q.   Okay.  Number 4 and number 5 on the list here

23   is quench 1 and quench 2?

24   A.   Correct.

25   Q.   And then if we can start at the bottom, this

1    paragraph.  If you can read that without zooming,

2    let me know.  If you want it zoomed, let me know.

3    A.  It states "Number 1 quench tower is used as a

4    backup unit, and as such, in service

5    intermittently -- only intermittently, i.e. about

6    10 percent of the time."

7    Q.  Okay.  If we can go to the next page, please,

8    Lauren.  Lets zoom in here if we can.

9        Okay.  Keep reading, please.

10   A.  "The physical location of number 1 quench tower

11   within the plant is a great distance to plant

12   property lines, and hence, the dropping out of

13   almost all particulate occurs on plant property."

14   Q.  Keep going.

15   A.  "Number 1 quench as well as number 2 use once

16   through water only.  Possible particulate

17   generation from increased solids in recycled water

18   is eliminated."

19   Q.  Okay.  And the final paragraph, please.

20   A.  "The effect of number 1 quench tower not being

21   baffled is believed to be de minimus.  The town of

22   Tonawanda is meeting ambient air quality

23   standards."

24   Q.  So what -- now, if you can tell the jury, what

25   is this letter trying to convey to the DEC?

1    A.   That number 1 quench tower is infrequently

2    used.

3    Q.   Okay.  Does it have or does it not have

4    baffles?

5    A.   That it does not have baffles.

6    Q.   All right.  Now you mentioned there was some

7    Air 100s that were included with this letter?

8    A.   Yes.

9    Q.   I'd like to show you Exhibit 19.03 for

10   identification purposes.  And absent an objection,

11   your Honor, I would simultaneously move this into

12   evidence as it relates to an Air 100 for quench

13   one.

14          MR. LINSIN:  No objection.

15          MR. PERSONIUS:  No objection, your Honor.

16          THE COURT:  Okay.  19.03 received, no

17   objection.

18          (Government's Exhibit 19.03 was received

19          into evidence.)

20          THE COURT:  Publish, please.

21   BY MR. MANGO:

22   Q.   Okay.  Maybe we can focus on the top half of

23   this document, please, and then we can move down.

24       Okay.  So why don't you -- this is the first

25   Air 100 we're looking at.  Why don't you tell the

1    jury, please, what this document is, how it's laid

2    out, what's this information that's on here.

3    A.   This is the application form, also serves the

4    purpose of being the permit when it's completely

5    filled out, the form we used prior to Title V.  On

6    the top it lists the name of owner, information on

7    the source, a description of the process, and an

8    estimate of emissions.

9    Q.   Okay.  And if we can scroll down on this.

10   Okay.  Can you read the special conditions at the

11   bottom?

12   A.   Yes, I can.  "The emission point shall be

13   maintained as a standby unit.  Use is limited to

14   less than 10 percent of total quenches.  The

15   installation of baffles is not required due to

16   unreasonable cost and physical impairments.

17   Q.   Okay.  And this is signed by Mark Kamholz?

18   A.   Yes, it is.

19   Q.   So essentially what did this Air 100 put into

20   place for quench tower number 1 at Tonawanda Coke?

21   A.   A limitation of use.

22   Q.   If I can show you 19.04 for identification

23   purposes, but also simultaneously move it into

24   evidence, your Honor, as this relates to quench 2,

25   an Air 100.

1          THE COURT:  Any objection?

2          MR. LINSIN:  No objection.

3          MR. PERSONIUS:  No objection, Judge.

4          THE COURT:  Okay.  19.04 received, no

5     objection.

6          (Government's Exhibit 19.04 was received

7          into evidence.)

8          MR. MANGO:  I ask that it be published to

9     the jury, and we can just focus on the bottom half

10    of this.

11         THE COURT:  Okay.  Publish please.

12    BY MR. MANGO:

13    Q.  Okay.  Now under special conditions, if you

14    can -- if you can read that?

15    A.  "This emission point is regulated by Part --

16    appears to say 214.3, effective August 23rd, 1979.

17    This wet quench tower does have an approved baffle

18    system.  Quench tower makeup water standard shall

19    be determined by the commissioner.  The permissible

20    in box 62 is a proposed standard."

21    Q.  Is it fair to say, in essence, this exhibit

22    19.04 is saying that there is baffles and there

23    needs to be baffles in quench tower number 2?

24    A.  Yes.

25    Q.  If we could actually go back to the second page

1      of Exhibit 19.02, please.  Focus on this section.

2      Do you see the section that says number 1 quench?

3      A.  In the middle.  Number 1 quench as well as

4      number 2 use once through water only.

5      Q.  Why don't you tell the jury what that means.

6      A.  It means the water that's -- that's used to

7      deluge the coke to cool this coke off is a

8      once-through only water before it's discharged

9      through their SPDES permit.  As this water goes

10     through this coke, it collects particulates and

11     other organics.  It's dirty.  If you reuse it, you

12     re-entrain some of the contaminants collected by

13     that water.

14     Q.  Okay.  You said SPDES permit.  I don't think

15     we've covered that yet.  Why don't you tell the

16     jury what a SPDES permit is.

17     A.  SPDES permit is a division of water permit for

18     any outfall to a water body.

19     Q.  Okay.  If I could show you for identification

20     purposes Exhibit 129, but simultaneously, your

21     Honor, move this into evidence as an Air 100 which

22     has different contaminants listed on it that are

23     relevant to the Title V permit.

24              THE COURT:  Mr. Linsin?

25              MR. LINSIN:  Your Honor, what year are we

1    talking here?

2              THE COURT:  1983 I think.

3              MR. LINSIN:  This is a SPDES permit for

4    which unit, which source?

5              MR. MANGO:  Your Honor, this is an Air 100

6    for stack two dated 9/20/83.

7              MR. LINSIN:  For stack two?

8              MR. MANGO:  Well, this is -- your Honor,

9    I'm going to use this to establish that Tonawanda

10   Coke needed a Title V permit.  There's nothing --

11             MR. LINSIN:  No objection.

12             THE COURT:  Okay.  Mr. Personius?

13             MR. PERSONIUS:  No objection, Judge.

14             THE COURT:  Okay.  129 received.

15             MR. MANGO:  Thank you.

16             THE COURT:  And can be published.

17             MR. MANGO:  Thank you, your Honor.

18             (Government's Exhibit 129 was received

19             into evidence.)

20   BY MR. MANGO:

21   Q.  Okay.  Lets -- if we could just -- you've --

22   where did this document come from?

23   A.  The DEC files in Region 9.

24   Q.  Now, is there a section in here that talks

25   about contaminants?

1    A.   Yes, right in the middle.

2    Q.   Okay.  And if there's not enough room for the

3    contaminants that are listed, what happens?  How

4    does additional contaminants get added to the Air

5    100?

6    A.   We cut out a part of the application and staple

7    it on.

8    Q.   Okay.  If we can go to the second page of

9    Exhibit 129, please.  If we can focus in on that,

10   this whole thing.

11        Do you see for nitrogen oxide listed there?

12   A.   Yes.

13   Q.   Okay.  There is some contaminants listed.  Why

14   don't you tell just in terms of -- there is a

15   column at the end here, says "pounds per year", is

16   that right?

17   A.   Correct.

18   Q.   Okay.  Is this something that the DEC would use

19   in evaluating whether -- let's jump ahead now to

20   19 -- late '90s when you said you started

21   implementing Title V -- that DEC would use to

22   determine if Tonawanda Coke needed a Title V

23   permit?

24   A.   Yes.  This would be the data that's in our

25   inventory, and from here you can see that 4.599

1    times ten to the fifth pounds per year is somewhere

2    about 250 tons per year, which qualifies as a

3    Title V facility.

4    Q.   And that's what you had already testified if

5    there was 100 or more tons a year of pollutants?

6    A.   Correct.

7    Q.   So this is a document that, would it be fair to

8    say, is subsequently used later when you're

9    implementing Title V?

10   A.   Correct.   This would be part of the inventory.

11             THE COURT:   All right.   Tap that part of

12   the exhibit that references more than 100 pounds.

13   BY MR. MANGO:

14   Q.   If you could just tap.   Okay.   So that says

15   4.599.   Why don't you tell the Court what you're

16   looking at.

17   A.   The units are pounds per year.   You know, the

18   first set of numbers are 4.599 to the power of 10

19   to the fifth pounds per year.   So have to divide

20   that by 2,000 pounds per ton to get tons.

21   Q.   Okay.

22             THE COURT:   Frankly I didn't understand

23   one word you said.   Try it again.

24             THE WITNESS:   It's over 100 tons a year.

25   Qualified --

1          THE COURT:  I know the conclusion, but

2     explain how you got to that.  By doing what?  You

3     take the number 4.599 --

4          THE WITNESS:  It's the power of tenth to

5     the fifth, so actually take that decimal point and

6     move it over five numerals, and that's exactly how

7     many pounds per year it is.

8          THE COURT:  So you move it over five

9     numerals to the right, right?

10          THE WITNESS:  And divide that by 2,000.

11     There's 2,000 pounds in a ton, will give you tons

12     per year.

13          THE COURT:  Okay.

14          THE WITNESS:  Who's got their calculator

15     if you want an exact number.

16          THE COURT:  That probably made sense the

17     first time, but it makes more sense this time.

18     Thank you.

19          MR. MANGO:  Okay. I'd now like to show you

20     for identification purposes Government Exhibit 110

21     and absent an objection, your Honor, I'd offer this

22     into evidence as it discusses quench tower number

23     1.

24          THE COURT:  Okay.  What year are we

25     talking about?  You said 110?

1          MR. MANGO:  Yes, Government Exhibit 110.

2          THE COURT:  Okay.  Any objection?

3          MR. LINSIN:  No, your Honor.

4          THE COURT:  Okay.  110 received.

5          THE CLERK:  Mr. Personius, Judge?

6          THE COURT:  I'm sorry?

7          THE CLERK:  Mr. Personius didn't answer.

8          THE COURT:  Yeah, Mr. Personius, no

9    objection?

10         MR. PERSONIUS:  Forgive me, Judge, I'm

11   finishing reading it.

12       No objection, Judge.

13         THE COURT:  Okay.  110 received, and it

14   may be published.

15         (Government's Exhibit 110 was received

16          into evidence.)

17   BY MR. MANGO:

18   Q.  Great.  Mr. Carlacci, can you please just

19   explain what this document is and the date, who

20   it's from and to.

21   A.  It's an internal memo from Gary Foersch, an

22   employee of DEC in 1984, to his -- to Henry

23   Sandonato, an employee of DEC in 1984, discussing

24   emissions from the waste heat stack for sulfur

25   dioxide.

1   Q.   Okay.   Who was Henry Sandonato at the time this

2   would have been created in '84?

3   A.   Henry Sandonato was engineer 2 at the time.

4   Q.   And who was Gary Foersch at the time this was

5   created?

6   A.   Gary Foersch was a technician in Division of

7   Air.

8   Q.   So based on this, is it fair to say that Henry

9   Sandonato supervised Gary Foersch?

10  A.   Yes.

11  Q.   Let's focus in, if we can zoom on this last

12  paragraph.

13       What does that say?

14  A.   "The scheduled usage of the number 1 quench

15  tower (standby tower) was also discussed.   The only

16  scheduled usage is during the winter months and

17  only to prevent freeze ups.   They would amount to

18  approximately 5 percent of the time.   The only

19  other usage would be in an emergency when the

20  number 2 quench tower cannot be used.   This would

21  amount to approximately another 5 percent of the

22  time."

23  Q.   Okay.   We had previously looked at that Air 100

24  that talked about a 10 percent -- the tower could

25  not be used more than 10 percent of the time.

1    A.   Correct.

2    Q.   This is an internal memo documenting some

3    observations by Mr. Foersch?

4    A.   A conversation between -- it appears between

5    Mark and Gary.

6         MR. MANGO:   Your Honor, I would at this

7    point now move on to -- Mr. Carlacci, I'd like to

8    show you Government Exhibit 19.17 for

9    identification purposes, and absent an objection, I

10   would move this into evidence as it relates to

11   quench tower number 1.

12        MR. LINSIN:   No objection.

13        MR. PERSONIUS:   No objection, your Honor.

14        THE COURT:   Okay.   19.17 received, no

15   objection.

16        (Government's Exhibit 19.17 was received

17        into evidence.)

18        THE COURT:   It may be published.

19   BY MR. MANGO:

20   Q.   Okay.   Just, if we could focus on that section

21   please.   If you could just tell the jury, just in

22   general -- we don't need to read this whole

23   letter -- what -- what is the essence of this

24   letter?

25   A.   It allows for -- for the exemption of the

1    installation of the baffles in the number 1 quench

2    tower approved by the department.

3    Q.  And second to last paragraph it says, "If at a

4    future date any of the justifications in your

5    September 19th letter are no longer valid, then

6    compliance may be required", is that right?

7    A.  Correct.

8    Q.  Okay.  So, this is an official letter from DEC

9    to Defendant Kamholz saying you have an exemption

10   for no baffles or to not have baffles in quench

11   one?

12   A.  Correct.

13            THE COURT:  And that's for purposes of the

14   permit requirements for Air 100?

15            THE WITNESS:  Yes.  The ability of that

16   Part 214 requirement on that quench tower.

17            MR. MANGO:  Your Honor, I'd like to move

18   to Government's Exhibit 19.21.

19   BY MR. MANGO:

20   Q.  And, Mr. Carlacci, I'd like to show you that

21   for identification purposes.  If we can just focus

22   on this section here.  What is the date of this?

23   A.  Dated October 22nd, 1984.

24   Q.  And it's from who to who?

25   A.  A letter from Gary Foersch to Mr. Crane.

1    Q.   Okay.  And what --

2    A.   Informing them of an inspection by the

3    department and United States Environmental

4    Protection Agency.

5    Q.   Is this a document that was sent by DEC?

6    A.   Yes.

7    Q.   It's a document maintained in the DEC file in

8    the regular course of business?

9              THE COURT:  All right, no objection --

10             MR. LINSIN:  No objection.

11             THE COURT:  So we could probably

12   dispense --

13             MR. PERSONIUS:  No.

14             MR. MANGO:  We'll move this into evidence,

15   your Honor, 19.21.

16             THE COURT:  Okay.  Received.  It may be

17   published, and already done.

18             (Government's Exhibit 19.21 was received

19             into evidence.)

20   BY MR. MANGO:

21   Q.   Great.  So this -- in essence, if you could

22   read the middle sections there.

23   A.   "Sources to be inspected are the coke oven

24   battery, boiler house, and the by-products plant."

25   Q.   Okay.  So this is basically giving notice that

1    there's an inspection that is going to happen and

2    we want to learn about the by-products?

3    A.  Yes.

4           MR. MANGO:  Okay.  If we can move to --

5    I'd like to show you for identification purposes

6    Government Exhibit 19.05, and absent an objection

7    and move this into evidence, as it is a letter from

8    DEC to Defendant Kamholz.

9           MR. PERSONIUS:  No objection, Judge.

10           MR. LINSIN:  No objection, your Honor.

11           THE COURT:  Okay.  19.05 received, no

12    objection.  Publish please.

13           (Government's Exhibit 19.05 was received

14            into evidence.)

15    BY MR. MANGO:

16    Q.  If we can focus on that section please, Lauren.

17        Okay.  Now who is this a letter from and who is

18    it to and when is it dated?

19    A.  This is a letter from Gary Foersch to

20    Mr. Kamholz dated November 21st, 1984.

21    Q.  And in this letter is there a request being

22    made by Mr. Foersch?

23    A.  Yes.

24    Q.  What is the request for?

25    A.  For a flow diagram of the by-products plant.

1    Q.   Okay.  And the purpose of that -- what is --

2    what is the purpose that Mr. Foersch or the

3    department would be asking for a by-products flow

4    diagram?

5    A.   Looking for sources of emission.

6              MR. MANGO:  All right.  If we can move on,

7    I'd like to show you Government Exhibit 19.06, and

8    absent an objection -- for identification purposes,

9    and absent an objection, your Honor, I would move

10   this into evidence as it is a response from

11   Tonawanda Coke Corporation to what we just looked

12   at.

13             MR. PERSONIUS:  I don't object, Judge.

14   I'm wondering is there more to this exhibit than

15   just the one page?

16             MR. MANGO:  There is.  It's a two-page

17   exhibit, your Honor.

18             MR. PERSONIUS:  Okay.  No objection,

19   Judge.

20             MR. LINSIN:  Could we just see the second

21   page of the exhibit?

22             THE COURT:  Sure.  Sure.

23             MR. LINSIN:  No objection.

24             THE COURT:  Okay.  No objection, 19.06

25   received and may be published.

```
 1              (Government's Exhibit 19.06 was received

 2              into evidence.)

 3              MR. MANGO:  Thank you, your Honor.  If we

 4    can focus on this section, please.

 5   BY MR. MANGO:

 6   Q.  What is this letter -- what is the purpose of

 7   this letter?

 8   A.  This is a response to the previous letter from

 9   Mark Kamholz to Gary Foersch, including a process

10   diagram of the by-products area.

11   Q.  If we could go to the second page, please.  And

12   what is this -- is this an attached flow diagram

13   that was with this letter?

14   A.  It appears to be, yes.

15   Q.  If there is a way -- yes, thank you.

16       Again, we've been talking about this pressure

17   release valve.  Have you also heard this pressure

18   release valve known as a bleeder that we'll talk

19   about in a minute?

20   A.  I know of a bleeder valve.

21   Q.  Yes.  Do you see the bleeder valve on here?

22   A.  I do not see one labeled there.

23              THE COURT:  Is a pressure relief valve and

24   bleeder the same thing for purposes of what you do?

25              THE WITNESS:  Yes.
```

1          THE COURT:  And with respect to Tonawanda

2     Coke, same thing?

3          THE WITNESS:  There's slight differences.

4     A bleeder valve gives you the impression that it's

5     used regularly to bleed off gas versus a pressure

6     relief valve is something that's to maintain

7     pressure in a system that normally is not used to

8     bleed off gas.

9          THE COURT:  So are the terms

10    interchangeable?

11         THE WITNESS:  It can be.

12         THE COURT:  They cannot be as well?

13         THE WITNESS:  Correct.

14         THE COURT:  Okay.

15         MR. MANGO:  I'd like to follow-up with

16    that.  Have you ever heard of the term "bleeder

17    valve" absent what you've come to learn that is at

18    the -- was at the Tonawanda Coke Corporation?

19         THE WITNESS:  Probably in the refinery

20    industry when it was here back in the '80s.  I

21    can't say positively it was used at Ashland

22    Refinery or Mobile Refinery, but it's terms that

23    you would hear at that those types of facilities.

24         MR. MANGO:  Okay.

25         THE COURT:  All right.  Go ahead.  Are you

1    leaving this exhibit or staying with this one?

2                MR. MANGO:  I was going to leave, your

3    Honor.  I don't know if, your Honor --

4                THE COURT:  We're going to leave I think

5    for the day.  But I want to know, if you take a

6    look at that chart, at least from where I'm

7    stating, it says weak liquor storage.

8                MR. MANGO:  Yes.

9                THE COURT:  Okay.

10               MR. MANGO:  If we're going to end now,

11   your Honor, we can do it during the next --

12               THE COURT:  With weak liquor.  Okay.  Lets

13   end it there, okay?  I think we made some progress.

14   We're going to move through this.  Bear with us.

15   It takes a little bit of work, but we're going to

16   do it.

17       Thank you for your attention.  You've been

18   great.  I hope it was an okay day for you.  We'll

19   see you tomorrow.  We're going to try to start

20   again as close to what time?

21               THE JURY:  9:30.

22               THE COURT:  9:30.  Did somebody say 10:30?

23   We're going to try for 9:30.  Be safe on your

24   return home.  Leave in plenty of time to get here.

25   Be safe, and we'll see you tomorrow.  Don't discuss

1    the case, don't research it, don't stop anywhere,

2    and we'll resume again as close to 9:30 as we can.

3    Thank you very much.  Leave your books behind,

4    please.

5              (Jury excused from the courtroom.)

6              THE COURT:  Okay.  Mr. Carlacci, you may

7    step down.  We'll see you tomorrow morning.

8              THE WITNESS:  Thank you.

9              THE COURT:  All right.  Thank you very

10   much, everybody.  We'll see you just before 9:30.

11             MR. PERSONIUS:  Judge, can I raise one

12   point?

13             THE COURT:  Sure.

14             MR. PERSONIUS:  And I don't know if this

15   is a matter of concern or not, but we've now had

16   two different diagrams that this witness has

17   testified about, and each time the witness has been

18   asked if it shows a PRV.  And it's known the PRV

19   wasn't installed at the time that either of these

20   diagrams were prepared.  So I don't think it's

21   being done necessarily intentionally to mislead,

22   but I think to ask that question knowing that the

23   PRV wasn't in place at that time has a tendency to

24   mislead the jury.

25             THE COURT:  Go ahead.

1          MR. MANGO:  If I can respond, your Honor.

2     The government was never informed when this was

3     installed.  This is coming from defense exhibits

4     that are -- so there's nothing that the government

5     has that affirmatively says when it was installed,

6     but --

7          MR. PERSONIUS:  The government does have a

8     defense exhibit that indicates that it was -- there

9     is a folder for what's called an emergency flare

10    from 1987.  And that's our understanding of when

11    the valve was installed.

12         THE COURT:  All right.  I mean -- go

13    ahead.

14         MR. MANGO:  The other point, your Honor,

15    that obviously the government is making here is

16    that these were by-product flow diagrams that

17    Mr. Kamholz sent to the DEC, and that regardless,

18    I'm going to make the case on good faith here that

19    there's no by-products flow diagram that has the

20    pressure release valve after it was put in.  And

21    I've got to obviously go through that.

22         THE COURT:  I'm going to let you do it.  I

23    don't find that it's necessarily misleading, and

24    you can make of it what you want to make of it.

25         MR. PERSONIUS:  Okay.

211

1          THE COURT:  At this point.  All right.

2     Thank you.

3          MR. MANGO:  Thank you, your Honor.

4          MR. LINSIN:  Thank you, your Honor.

5          *      *      *      *      *      *

1                        CERTIFICATION

2

3            I certify that the foregoing is a

4      Correct transcription of the proceedings

5      Recorded by me in this matter.

6

7

8                          s/Michelle L. McLaughlin
                           Michelle L. McLaughlin, RPR
9                              Official Reporter
                             U.S.D.C., W.D.N.Y.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25