VOL. II

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

        -vs-               10-CR-219S

TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
               Defendants.
-------------------------------------


           Proceedings held before the

      Honorable William M. Skretny, U.S.

      Courthouse, 2 Niagara Circle, Buffalo,

      New York on February 28, 2013.


      APPEARANCES:

      AARON J. MANGO,
      Assistant United States Attorney,
      ROCKY PAIGGIONE, Senior Counsel,
      U.S. Department of Justice,
      Appearing for the United States.

      GREGORY F. LINSIN, ESQ.,
      JEANNE M. GRASSO, ESQ.,
      ARIEL S. GLASNER, ESQ.,
      Appearing for Tonawanda Coke Corporation.

      RODNEY PERSONIUS, ESQ.,
      Appearing for Mark L. Kamholz.

      Also Present:  Lauren DiFillipo, Paralegal
                      Sheila Henderson, Paralegal



      Michelle L. McLaughlin, RPR,
      Official Reporter,
      U.S.D.C. W.D.N.Y.
      (716)332-3560

1                      I N D E X

2              WITNESS                           PAGE

3          ALFRED CARLACCI

4     Continued Direct Examination by Mr. Mango     220
      Cross-Examination by Mr. Linsin               397
5

6          GOVERNMENT EXHIBITS                    EVD.

7                    19.07                         223
                     19.08                         225
8                    19.09                         227
                     102                           229
9                    107                           238
                     19.10                         245
10                   19.11.1                       251
                     19.12                         254
11                   19.13                         258
                     19.14                         268
12        18.09.01 through 18.09.20                272
                     18.01                         299
13                   18.17                         304
                     18.02                         305
14                   18.03                         308
                     18.18                         310
15                   131                           323
                     18.04                         334
16                   18.06                         336
                     18.07                         342
17                   19.15                         346
                     19.16                         349
18                   31                            351
                     32                            355
19                   33                            357
                     34                            358
20                   35                            359
                     36                            360
21                   37                            361
                     38                            362
22                   105.23                        376
                     105.48                        377
23                   305.48                        378
                     15.020.097                    389
24

25

1                          I N D E X

2      DEFENDANTS' EXHIBITS                          EVD.

3              QQQ.01                                 413

1                    (Jury not present in the courtroom.)

2                    THE COURT:  Good morning.  There's nobody

3          that I would better like to see than this group at

4          this point.

5              All right.  Anything that we have to take up

6          preliminarily?

7                    MR. LINSIN:  Your Honor, I have one very

8          brief matter I've already discussed with government

9          counsel.  I wanted to alert the Court to as well.

10         Out of the abundance of caution, I wanted to bring

11         to the Court's attention that Mr. Carlacci,

12         subsequent to the events related to the indictment,

13         and after the return of the indictment, has been

14         very directly involved, I understand, in the civil

15         negotiations with the company.

16                   THE CLERK:  Judge, excuse me.  He's in the

17         courtroom.  I don't know if that matters.

18                   MR. LINSIN:  I do understand that, yes.

19                   THE CLERK:  Okay.

20                   MR. LINSIN:  -- in the civil negotiations

21         with the company, and has been directly involved in

22         discussing the resolution of the issues on the

23         civil side of the case.  What piqued it for me when

24         I heard his testimony yesterday was in relation

25         specifically is those pushing controls on the

1    battery, that remains an issue of very intense

2    discussions between the two sides on the civil

3    side.  I certainly do not intend to get into any

4    questions post-indictment with this witness per our

5    discussions and the Court's direction.  I just

6    wanted to make clear, and government counsel has

7    assured me they instructed the witness, that in

8    response to questions on cross-examination, he

9    should not voluntarily get into those topics or

10   respond in a way that would reveal those

11   discussions.  And I just wanted to raise that as a

12   preliminary matter.

13            THE COURT:  It's a point well taken.

14   Mr. Carlacci has heard that.  He's here.  And I

15   take it, Mr. Mango, the government's on board.

16            MR. MANGO:  Yes, your Honor.  We've

17   actually already instructed him on that.  As we've

18   said, we've dialogued on this prior to the start

19   here.  So yes, that's fine.

20            THE COURT:  Okay.  I think with that, the

21   record will so reflect.  My understanding -- we're

22   ready to go.  I do have a request, though, from

23   juror number 8, Mrs. Palistrant --

24            THE CLERK:  No, it's not.  Sorry, Judge.

25   It's Mrs. Finn.

1          THE COURT:  No, it's not her?

2          THE CLERK:  No, it's Mrs. Finn.

3          MR. PERSONIUS:  Judge, at the end of the

4    day yesterday, when the jurors were leaving, juror

5    number 8 was actually smiling.  Now, maybe it's

6    because the day was over, but she was smiling.

7          THE COURT:  I think that's probably it,

8    and I'll judicially notice that if it's okay with

9    you, Mr. Personius.

10          THE CLERK:  It's my fault, Judge.  It was

11   Mrs. Finn.

12          THE COURT:  All right.  I have a request

13   from juror number 11 to approach the bench on the

14   matter, so I will hear that first if it's okay with

15   everyone.

16          MR. PIAGGIONE:  Yes, your Honor.

17          THE COURT:  And after that, then I will

18   call Mr. Carlacci back to the stand.  And if

19   there's any issue, I'll let everybody know.  Okay.

20          MR. MANGO:  Thank you, your Honor.

21          THE COURT:  Okay.  Please have a seat.

22   Please bring the jury in, Chris.  Good to see you

23   this morning.

24          (Jury seated.)

25          THE COURT:  Good morning, everybody.

1            THE JURY:  Good morning.

2            THE COURT:  Good to see you again.  Just

3     so you know, I had asked Chris to take care of the

4     weather conditions for today.  That's what

5     happened.

6            COURT SECURITY OFFICER:  I guess I crossed

7     my fingers the wrong way.

8            THE COURT:  All right.  Please have a

9     seat.  Good to see everybody.

10       Mrs. Finn, can I see you just for a second,

11    please.  You haven't been bad or good or anything

12    like that.  Be careful.

13           (Discussion off the record.)

14           THE COURT:  Okay.  Mrs. Finn, thank you

15    very much.

16       And -- okay.  Ladies and gentlemen, we're ready

17    to resume.  I'm going to call Mr. Alfred Carlacci

18    back to the witness stand.  He remains under oath.

19    He's the government's first witness.  And we'll

20    resume direct examination shortly.

21       Mr. Mango, I guess you're going to continue the

22    examination?

23           MR. MANGO:  Yes, your Honor.

24           THE COURT:  Or you're not done yet?

25           MR. MANGO:  No, not done yet.

1          THE COURT:  Okay.  All right.  If you want

2     to get set up, and -- you know, we're back on, as

3     everybody knows now, in the case of United States

4     versus Tonawanda Coke Corporation and Mark L.

5     Kamholz, the two defendants in this case.

6          All of the attorneys and parties and paralegals

7     and support, and they're all here as you know, as

8     you can see, and maybe towards the end of tomorrow

9     or maybe on Monday we'll introduce or reintroduce

10     everybody so you don't forget names and faces.  I'm

11     sure the faces you probably will not forget for a

12     long time to come.  But we'll try to keep names

13     associated with that.

14          And, you know, I reiterate, and you know, just

15     from what you've heard so far, that this is an

16     important case.  All right?  It's important to both

17     sides.  It will be entrusted to you for your

18     unanimous verdict down the road a little bit.  We

19     will continue to urge everybody to do what you've

20     done, and we really appreciate it.  I know today is

21     kind of a hard day to get in.  You made it on time.

22     We're getting started on time.  And we need to do

23     that in order to move the case along.  Keep your

24     minds open until all of the evidence is in.  Please

25     approach all of this ultimately as fair as you can.

1      And the case needs to be decided, you know, without

2      bias and prejudice, sympathy, all of that that we

3      talked about so far.

4          We will redistribute the notebooks.  Try to

5      keep your notations limited to this case.  That's

6      always helpful to us.  And we will get those

7      distributed to you right way.

8          But I think we can start with examination.  So

9      again, thank you all.  We appreciate it.

10         Mr. Mango, you're on once again.

11             MR. MANGO:  Thank you, your Honor.

12             THE COURT:  Okay.  And Mr. Carlacci, good

13     morning, and you remain under oath.

14             THE WITNESS:  Good morning.

15     A L F R E D   C A R L A C CI, having previously been

16     duly sworn as a witness, testified further as

17     follows:

18     CONTINUED DIRECT EXAMINATION BY MR. MANGO:

19     Q.  Good morning, Mr. Carlacci.

20     A.  Good morning.

21     Q.  All right.  Let's proceed.

22             MR. MANGO:  If we could, please, Lauren,

23     pull up Exhibit 19.06.  I think that's where we

24     left off, Mr. Carlacci.

25             THE COURT:  How would anybody know that,

1    Mr. Mango?  19.06.  Okay.

2    BY MR. MANGO:

3    Q.  If we could go to the second page, this is the

4    flow diagram.  And I believe there was -- we may

5    have figured out this liquor storage.  Why don't

6    you tell -- tell us what some of these important

7    items are on here.  You understand what this

8    by-products flow diagram means?

9    A.  Yes.  Identifying most of the vessels in the

10   by-products area.  And this weak liquor storage --

11   weak liquor is the water that's used to flush the

12   mains, the coke oven gas mains, of tar.  It's a

13   storage tank for the -- for that water.

14   Q.  Okay.  And you see there's a primary CGA and

15   secondary CGA cooler.  What is the purpose of those

16   items?

17   A.  Those are coke oven gas coolers.  Prior to the

18   exhauster coming off the battery, the coke oven gas

19   is cooled so that it becomes -- you know, you can

20   pass that through the exhauster without causing

21   much damage, and, therefore, continue to remove tar

22   and other items from the gas.

23   Q.  Okay.  And down here I'll just put a little

24   point there.  You see the light oil removal box

25   that's highlighted?

1    A.   Yes.

2    Q.   A little -- a little arrow.  What is -- what is

3    a light -- light oil removal?  If you can explain

4    for the jury what -- what light -- light oil is and

5    how you get it out.

6    A.   I believe this to be the light oil scrubber and

7    storage tank where oil -- metal oil is used to

8    remove benzene, toluene, and xylene.

9    Q.   Okay.  So --

10            THE COURT:  And those are all three

11   chemicals, is that right?

12            THE WITNESS:  Yes, it is.

13   BY MR. MANGO:

14   Q.   Okay.  Now, during the light oil removal

15   system, you're familiar in general terms with that

16   system and how it works?

17   A.   I don't have the details of that -- insides of

18   that system, but the idea is to just to scrub those

19   contaminants out of the coke oven gas.

20   Q.   Is it a hundred percent effective?

21   A.   No, it's not.

22   Q.   All right.  So the gas that -- after it leaves

23   the light oil removal system or the scrubber you

24   mentioned, there's still some amount of benzene,

25   some amount of xylene, some amount of toluene, I

1    think you said?

2    A.   Toluene, correct.

3    Q.   Okay.   Okay.   I'd like to show you what's

4    identified or marked for identification purposes,

5    Government Exhibit 19.07.

6              MR. MANGO:   And, your Honor, absent an

7    objection, the government would move this into

8    evidence as a business record of the DEC.

9              MR. LINSIN:   No objection, your Honor.

10             MR. PERSONIUS:   No objection, your Honor.

11             THE COURT:   Okay.   19.07 received into

12   evidence.   No objection.

13             (Government's Exhibit 19.07 was received

14             into evidence.)

15   BY MR. MANGO:

16   Q.   Okay.   Mr. Carlacci, can you tell the jury what

17   we're looking at here?   The date, who it's from,

18   who it's too.

19   A.   This is a letter from the department of Gary

20   Foersch, the employee, to Tonawanda Coke, Mark

21   Kamholz.

22   Q.   Okay.   And if we can focus in on that area,

23   please.

24        Okay.   So what is -- what is Gary Foersch

25   telling Defendant Kamholz here?

1   A.   He's requesting air applications for 15

2   emission points.

3   Q.   Okay.  And these emission points all relate to

4   what -- what part of the coke oven production

5   facility at Tonawanda Coke Corporation?

6   A.   All 15 items appear to be part of the

7   by-product side of the plant.

8   Q.   All right.  And -- and it mentions that there

9   was an inspection by Mr. Foersch on February 5th of

10  1985?  In the top line.

11  A.   Yes, it does.

12  Q.   Okay.  And then as a result of that, he

13  believed these 15 additional items needed -- needed

14  to have certificates to operate?

15  A.   Correct.

16  Q.   Those are the Air 100s?

17  A.   Correct.

18  Q.   That we've already talked about?

19  A.   Yes.

20  Q.   All right.  He also mentions that he's enclosed

21  a modified process diagram.

22       If we can go to the second page of this

23  document.

24       Okay.  Is that -- that's what we just looked at

25  in Exhibit 19.06, right?

1    A.  Yes, it is.

2    Q.  All right.  Okay.  If we can move on to

3    Exhibit 19.08.  Show you that for identification

4    purposes.  Government exhibit.

5           MR. MANGO:  And absent an objection, your

6    Honor, I would ask that this be offered into

7    evidence as a record coming from Defendant Kamholz.

8           MR. LINSIN:  No objection, your Honor.

9           MR. PERSONIUS:  No objection, your Honor.

10           THE COURT:  Okay.  There being no

11   objection, 19.08 received.

12           (Government's Exhibit 19.08 was received

13           into evidence.)

14           MR. MANGO:  Okay.  If we can publish that,

15   please.

16   BY MR. MANGO:

17   Q.  Mr. Carlacci, if you can tell us what the date

18   is, who this is from and who it's too, and then the

19   subject of what this letter is getting at.

20   A.  This is a cover letter from Mark Kamholz from

21   Tonawanda Coke to the department Gary Foersch

22   stating, "Enclosed are seven applications for

23   permit to operate."

24   Q.  Okay.  So, if I refer back to -- we can leave

25   this up -- but 19.07 we just looked at, that said

1    "Please submit additional Air 100s."  This is a

2    letter now less than a month later with seven of

3    those, is that right?

4    A.   Correct.

5    Q.   Okay.  Now, there's a -- there's a little part

6    at the bottom here.  Can you read that out?

7    A.   It states, "We protest the use of the data

8    contained in these and subsequent application forms

9    (identified as 76-16-3) for any theoretical

10   numerical manipulation to determine a similarly

11   theoretical impact."

12   Q.   Does that have any meaning to you or to your

13   inspectors in the department?

14   A.   It has no meaning to me.

15   Q.   Okay.  Do you have any idea what Mr. Kamholz

16   was trying to convey here?

17   A.   I'm going to guess he --

18           MR. PERSONIUS:  Your Honor, I object to a

19   guess.

20           MR. LINSIN:  I object.

21           THE COURT:  All right.  Sustained.

22           MR. PERSONIUS:  He already said he doesn't

23   know.

24           THE COURT:  Yes, sustained.

25           MR. MANGO:  All right.  We'll move on.

1    Let's -- I'd like to show you Government Exhibit

2    19.80 for identification purposes.

3        And absent an objection, move that into

4    evidence.  I'm sorry.  That's what we're looking

5    at, 19.09.  Absent an objection, move 19.09 into

6    evidence.

7                    MR. LINSIN:  No objection, your Honor.

8                    MR. PERSONIUS:  No objection, your Honor.

9                    THE COURT:  Okay.  19.09 received.  No

10   objection.

11                   (Government's Exhibit 19.09 was received

12                   into evidence.)

13                   THE COURT:  Just so you know, ladies and

14   gentlemen, to the extent that we've been able to do

15   this, the exhibits have been exchanged and turned

16   over to the attorneys and they, in all likelihood,

17   reviewed everything, but, it does require that we

18   specifically admit the documents on offer.  But it

19   takes the lawyers a little time to just kind of

20   scan the documents to make sure that it's the

21   document that they understand it to be.

22       So, with that, Mr. Mango, continue, please.

23                   MR. MANGO:  Thank you, your Honor.  I'd

24   ask that this be published to the jury.

25

1   BY MR. MANGO:

2   Q.   What is letter that we're looking at,

3   Mr. Carlacci?

4   A.   This appears to be another cover letter from

5   Mark Kamholz to Gary Foersch with DEC stating that

6   there's six more applications for certificate to

7   operate as requested.

8   Q.   Okay.  I'd like to move on to -- and show you

9   Government Exhibit 102 for identification purposes.

10      Okay.  Do you see Exhibit 102 on your screen?

11  A.   Yes, I do.

12  Q.   Just in general terms --

13          MR. MANGO:  Well, I guess, your Honor, I'd

14  move this into evidence subject to an objection.

15  If there is an objection, I can cover some

16  foundational grounds, if need be.

17          MR. LINSIN:  Could we -- is there an

18  additional page to this document?

19          MR. MANGO:  Yes.  There's four additional

20  pages.

21          MR. LINSIN:  Could we see the final page,

22  please?

23          MR. MANGO:  Yes.

24          MR. LINSIN:  And the first page again,

25  please.  Tonawanda has no objection, your Honor.

1        MR. PERSONIUS:  Your Honor, the only

2    concern we have is there's -- there's a handwriting

3    on it and we don't -- we can't identify the

4    handwriting.  But subject to that, we have no

5    objection to the exhibit.  Maybe this witness can

6    explain that handwriting.

7        THE COURT:  Okay.  I'll receive 102,

8    noting the comment relative to the handwriting.  It

9    will be received without objection otherwise.

10       (Government's Exhibit 102 was received

11       into evidence.)

12       THE COURT:  Let me just ask this one

13   question before you proceed.

14      The request for -- is it permission to operate?

15   Is that a Clean Air Act requirement or RCRA

16   requirement, or what that is that you just

17   testified about?

18       THE WITNESS:  It's under the Clean Air

19   Act -- excuse me -- under the Clean Air Act it

20   requires permits for each emission point or source

21   of air pollution.  It's a Clean Air Act

22   requirement.  It's a state requirement.  Part of

23   that SIP plan that's approved by the federal

24   government.

25       THE COURT:  Okay.  So that's what we're

1    talking about, the Title V application process?

2              THE WITNESS:  This is prior to Title V

3    when it was the state's form of air application and

4    permit.

5              THE COURT:  Okay.  So that relates

6    specifically to Counts 1 through 15, I guess,

7    right?

8              MR. MANGO:  Yes, your Honor.  It's the

9    predecessor to Title V, and it does.

10             THE COURT:  Okay.  Okay.  So that's where

11   we're at, ladies and gentlemen, in that kind of

12   scope of the indictment.  Okay.  And as you know,

13   you heard testimony yesterday about what was the

14   precursor to, you know, the Clean Air Act and its

15   requirements under Title V.  So that's -- that was

16   what that testimony was about.

17        Now we're going where, Mr. Mango?

18             MR. MANGO:  We're on 102, your Honor.  I

19   believe the witness is going to discuss this

20   letter, which has been I think admitted into

21   evidence.

22        And I ask that it be published for the jury.

23             THE COURT:  Okay.  And today is, what,

24   February 28th, right?  So we're saying goodbye

25   today to February, and we'll do that in March with

1    Exhibit 102.  Received.  No objection.

2            MR. MANGO:  If we can -- maybe we can

3    focus on that part just to make it just a tad bit

4    bigger, please.

5    BY MR. MANGO:

6    Q.  Okay.  Mr. Carlacci, let's just get the basics

7    out of this -- for this letter.  Who is this letter

8    from, who is it to, and when is it dated?

9    A.  This is a letter from Tonawanda Coke, dated

10   October 29th, 1993, to the deputy administrator of

11   the United States Environmental Protection Agency.

12   Q.  Okay.  And you've already seen this letter, is

13   that correct?  So without seeing the last page, do

14   you know who this letter came from?

15           MR. PERSONIUS:  Your Honor, pardon me.

16   This -- there's been a number of compound

17   questions.  If we could just have one question at a

18   time, please.

19           THE COURT:  Yeah.

20           MR. MANGO:  Yes, your Honor, I'll --

21           THE COURT:  It does help.  I mean, some of

22   it will move things along, even if it's compound.

23   I think that's a point well taken.  So just

24   discipline yourself in that regard.  Thanks.

25           MR. MANGO:  Yes, your Honor.

1    BY MR. MANGO:

2    Q.   Who is this letter from?

3    A.   I missed who signed it.

4    Q.   If we could go to the last page, please.

5    A.   It's from Mark Kamholz of Tonawanda Coke.

6    Q.   Okay.  If we can go back to the first page,

7    please.

8         Okay.  While we're doing that, why don't you

9    tell the jury what the essence of this letter is?

10   Is there a -- let me start again.

11        Is there a request being made in this letter?

12   A.   Yes.

13   Q.   Okay.  Why don't you tell the jury what the

14   request is in this letter.

15   A.   The request is for an alternative method of

16   controlling emissions from the coke oven battery as

17   required by the NESHAP regulation.

18   Q.   Okay.  Now, you talked about that yesterday.

19   Let's again talk -- what is the NESHAP regulation?

20   There is a reference here to the hazardous --

21   National Emissions Standard for Hazardous Air

22   Pollutants for coke ovens -- for coke ovens

23   promulgated by the U.S. EPA in 1993.

24        Can you tell the -- the jury what that is?

25   A.   This is a NESHAP for the control of hazardous

1    air pollutants such as benzene from coke oven

2    operations, and this request -- in this section of

3    that reg, it requires a flare for emergency

4    purposes when the exhauster goes down.

5    Q.   Okay.  So it requires a flare on what?

6    A.   To destroy the coke oven gas emissions

7    generated by the battery.

8    Q.   Okay.  So if -- let me ask you this question:

9    If there's coke oven gas to be vented out of the

10   battery, this regulation says it has to be flared?

11   A.   Correct.

12   Q.   All right.  Now, did this NESHAP for coke ovens

13   promulgated in 1993 come as a result of this 1990

14   amendment to the Clean Air Act?

15   A.   If this is the 1993 NESHAP they're referring

16   to, yes.

17   Q.   Okay.  So this was a product of that which you

18   discussed yesterday, the 1990 Clean Air Act?

19   A.   Correct.

20   Q.   All right.  And it says, "We -- we are required

21   to install" -- I'm reading from here -- "a bypass

22   bleeder stack flare system on the battery by

23   March 31st of '94," is that right?

24   A.   Correct.

25   Q.   Okay.  So, again, what is the letter

1    requesting?

2    A.   It's requesting an alternative method of

3    controlling those emissions.

4    Q.   Okay.  And are you familiar with the -- the

5    alternative method that is being proposed by

6    Defendant Kamholz in this letter?

7    A.   In -- this letter describes a system of

8    standpipes that would maintain the coke oven gas in

9    the battery until they had an opportunity to ignite

10   that gas.

11   Q.   Okay.  Is -- so can you read that, starting

12   with "This procedure"?

13   A.   It states in the letter, "This procedure would

14   be fully implemented within approximately three to

15   five minutes, and as the battery would have no

16   other relief events, would ensure that no unburned

17   gas is vented to the atmosphere.  All applicable

18   opacity standards would be met."

19   Q.   Okay.  I want you to keep that -- that

20   statement in mind.  Let's go to the second page,

21   please.

22       Now, terms of this request for approval, if we

23   can focus in on that section.  What different

24   grounds are being given by Defendant Kamholz to

25   justify why this should be allowed?

1          Actually, zoom in, please.

2     A.   The justification for an alternative system is

3     low rate of generating coke oven gas, over

4     abundance of exhauster capacity, contact plant

5     layout/plant design, minimum likelihood of venting

6     incidences.

7     Q.   Okay.  If we can come back out, I'd like to

8     show you a different part on that page.

9          If you can read this part.  Maybe we can zoom

10    it in.

11    A.   "Because we generate such small volumes of coke

12    oven gas, gas availability for steam production is

13    a chronic problem.  Inevitably, we are forced to

14    supplement coke oven gas with natural gas,

15    particularly in wintertime.  Consequently, venting

16    is very expensive for use, and we avoid it at all

17    costs."

18    Q.   Okay.  What is -- is that statement important

19    to you in your role at DEC?

20              MR. LINSIN:  Your Honor, excuse me.  Until

21    we have a foundation that this witness had anything

22    to do with the response to this letter, I'm not

23    quite sure how we can evaluate what is important to

24    him or why that is relevant here.

25              THE COURT:  Yeah.  You've got to look at

1    it.  I'll open that up to you, Mr. Mango.  I think

2    we need more to get testimony from this witness.

3    And keep in mind that we're talking about 1993, I

4    think as well.

5              MR. MANGO:  Yes, your Honor.

6    BY MR. MANGO:

7    Q.  Did you have any role in writing this or

8    receiving this letter from the EPA?

9    A.  No, I did not.

10   Q.  Or from Defendant Kamholz?

11   A.  No, I did not.

12   Q.  Okay.  So let's not go into the particulars yet

13   on that.

14       If we can back out.  If we can go to the next

15   page, please.  If we can go to the last page,

16   please.

17       Is there someone in New York State Department

18   of Environmental Conservation listed there?

19   A.  Yes, sir.  Henry Sandonato.

20   Q.  Okay.  So the DEC received a copy of this

21   letter?

22   A.  Correct.

23   Q.  All right.  If we can move to -- I'll show you

24   Government Exhibit 107.

25              THE COURT:  Well, let me just ask you this

1    before we leave.  Can you identify any of the

2    writing, the handwriting that's on this letter?

3              THE WITNESS:  Some of it.

4              THE COURT:  Whose is it, do you know?

5              THE WITNESS:  On the first page?

6              THE COURT:  Let's go to the first page,

7    please, Ms. DiFillipo.

8              THE WITNESS:  The "let's discuss SG" is

9    Stan Gubner, the regional air pollution control

10   engineer at that time.  On the top right corner,

11   GF, is initials for Gary Foersch.  I can't make out

12   the first name on the top.  And the other two names

13   here, Roy or Amanda I'm not familiar with.

14             THE COURT:  Okay.  We'll move on then.

15   Thank you.

16   BY MR. MANGO:

17   Q.  Okay.  Now do you know if that request for an

18   alternative flare system by Defendant Kamholz was

19   allowed or not allowed?

20   A.  It was denied.

21   Q.  Okay.  If we can move to Government

22   Exhibit 107, I'd like to show you that for

23   identification purposes.

24             MR. MANGO:  And absent an objection, your

25   Honor, move this into evidence.

1          MR. LINSIN:  No objection, your Honor.

2          MR. PERSONIUS:  Your Honor, I just would

3     like to see the rest of the exhibit, if I could,

4     please.

5          MR. MANGO:  Yes.

6          THE COURT:  Sure.  Take it through page by

7     page, please, Ms. DiFillipo.

8          MR. PERSONIUS:  No objection, your Honor.

9     Thank you.

10         THE COURT:  Okay.  You're welcome.  107

11    received.  No objection.

12              (Government's Exhibit 107 was received

13              into evidence.)

14         MR. MANGO:  Okay.  If -- if we can just --

15    if we can publish this for the jury, please.  And

16    if we can maybe just focus actually on that

17    portion, make it just a tad larger, please.

18    BY MR. MANGO:

19    Q.  Okay.  Who's this letter from and who is it to

20    and when is it dated?

21    A.  This is from the director of the United States

22    EPA to Mark Kamholz, Tonawanda Coke Corporation.

23    Q.  And what is the purpose of this letter?

24    A.  This letter is a response to the request for an

25    alternative control system.

1    Q.   Okay.  And -- and this -- you mentioned before

2    that that request was denied.

3    A.   Correct.

4    Q.   Does this letter deny that request?

5    A.   This is the letter that denies the request.

6    Q.   Okay.  If you could just read this paragraph,

7    please.

8    A.   "After extensive review of your request by my

9    staff and the regions, we have concluded that your

10   proposal does not represent an adequate alternative

11   that would achieve at least 98 percent control or

12   destruction efficiency."

13   Q.   All right.  If we can move to the second page

14   at the bottom.  If you can, read that regarding

15   minimal likelihood of venting incidents.

16   A.   "Minimum likelihood of venting incidents.  Some

17   of the factors you cite indicate that you may have

18   a lower potential for venting raw coke oven gas

19   than some other batteries, and your records show

20   that, historically, it has not."

21   Q.   If we can go -- continue there.

22   A.   "It has not been a problem.  However, other

23   plants have already argued this point during the

24   negotiations, and it was not accepted as a reason

25   for not installing the flare system."

1    Q.  And if you can keep reading, then.

2    A.  "In conclusion, we feel a very rapid response

3    is needed when there is a venting episode, as a

4    large amount of coke oven gas can be generated in a

5    short period of time."

6    Q.  Next sentence, please.

7    A.  "Also we have discovered that some companies,

8    after closer examination, found they were venting

9    more often than they thought.  Some of these

10   venting episodes were brief, but occurred several

11   times per day at one plant.  A manually operated

12   system would not be as reliable as a flare system

13   for these brief venting episodes.  An automatic

14   system is much faster than using battery workers to

15   vent the battery.  And"--

16   Q.  That's -- that's sufficient.  Thank you.

17            THE COURT:  All right.  Just for

18   clarification purposes, maybe more mine than

19   anybody's, you keep on referring to a battery.

20   Tell us what a battery is.  I think that consists

21   of a number of ovens, right?

22            THE WITNESS:  Correct.  It's a series of

23   ovens.  In this case, approximately 60 ovens with

24   flues in between that comprise a battery where

25   you're cooking this coal to make coke and

1    extracting the coke oven gas.

2            THE COURT:  Okay.  How many ovens?

3            THE WITNESS:  Approximately 60.

4            THE COURT:  And is that the battery at

5    Tonawanda Coke, or is that --

6            THE WITNESS:  It's the battery at

7    Tonawanda Coke I'm describing.

8            THE COURT:  All right.  And this is back

9    in the mid-1990s?

10           THE WITNESS:  Correct.

11           THE COURT:  Okay.  And we're working up to

12   the indictment period, which is 2005 through 2009

13   essentially, right?

14           MR. MANGO:  Yes.

15           THE COURT:  Okay.  So that's where we're

16   at.  This is moving in that direction, ladies and

17   gentlemen.  Yes?

18           MR. LINSIN:  Your Honor, while we are on

19   this page, could we just clarify with the witness

20   who actually authored this letter?  I believe his

21   testimony was the director of EPA.  And could we

22   just clarify that now that we're on the signature

23   page?

24           THE COURT:  Absolutely.

25           THE WITNESS:  It's John Seitz, Director,

1      Office of Air Quality Planning and Standards with

2      the United States EPA.

3              MR. LINSIN:  Thank you, your Honor.

4              THE COURT:  You're welcome.

5    BY MR. MANGO:

6    Q.  Okay.  There was a couple of questions from --

7    from Chief Judge Skretny.  I'd like to just follow

8    up on that.  You mentioned there was the -- the

9    battery is a series of coke ovens?

10   A.  Series of ovens.

11   Q.  Do you know approximately when that -- that

12   battery began operation?

13   A.  The battery I believe was built in the '20s and

14   '30s.  Application's listed as 1962.

15   Q.  Okay.  And then taking now this -- from this

16   letter, even up to the -- to the 2005 to 2009

17   period, was the battery operating in the same

18   manner as it was back in 1962?

19   A.  Yes.

20   Q.  Okay.  There were no additional ovens added on

21   to it, were there?

22   A.  No.

23   Q.  Okay.  All right.  Thank you.  If we can go to

24   Exhibit 19.10, I'd like to show you for

25   identification.

1          MR. MANGO:  And absent an objection, your

2     Honor, move this into evidence as a letter coming

3     from Defendant Kamholz.

4          MR. LINSIN:  Your Honor, we do not object

5     on foundation grounds in term of business records.

6     I'm struggling with the relevancy of many of these

7     documents, however.

8          THE COURT:  Okay.  You know, the offer's

9     going to be made subject to connecting up.  I mean,

10    if you want to note an objection, that's okay.  I

11    know you've been busy getting up and going down.

12    If you want to object or discuss just remaining

13    seated, that's okay.  Otherwise -- but if you want

14    the exercise, that's even better.  So you chose

15    either way.  Okay?

16         MR. LINSIN:  Old habits are hard to break.

17    Thank you.

18         THE COURT:  No, I know.  I mean, it's

19    preferable, and the way we traditionally do it,

20    ladies and gentlemen, we ask the attorneys to -- to

21    stand and articulate the objection.  Makes it

22    easier for me to handle, you get to understand, you

23    know, what we're talking about a little better.

24    But, you know, there's so many documents in this

25    case, I'll leave it up to you, how you want to do

1   it.  If you need a workout, standing up is fine.

2           MR. LINSIN:  Okay.

3           THE COURT:  If there comes a point where

4   you really want to establish the -- the objection

5   as to relevancy, let me know.  I mean, I know

6   there's almost a general concern about relevancy

7   from your standpoint.  But I can't entertain just a

8   general objection on relevancy grounds.  So when

9   you want it to be specific, hit me with it, and

10  then we'll put Mr. Mango to the task of, you know,

11  responding.  But, you know, so far subjecting this

12  to connecting up would probably mean I'd overrule

13  the objections, although legitimately there's a

14  concern and I'll entertain a motion to strike if

15  necessary at the appropriate time.  Okay?

16          MR. LINSIN:  Thank you, your Honor.

17          THE COURT:  I don't know, if you have a

18  better way of handling it, let me know, and I'll

19  work with you on that.

20          MR. LINSIN:  All right.

21          THE COURT:  Mr. Personius, anything

22  that -- I'm sorry, Mr. Kamholz -- that we should

23  know before we move forward?

24          MR. PERSONIUS:  No, your Honor.

25          THE COURT:  All right.  And so I'll admit

1    19.10 subject -- without objection at this point.

2    And then if there are any relevancy issues

3    afterwards, we'll talk about it.

4             (Government's Exhibit 19.10 was received

5             into evidence.)

6             MR. MANGO:  Excellent.  I'd ask that this

7    be offered then for the jury.

8    BY MR. MANGO:

9    Q.  And Mr. Carlacci, can you please tell the jury

10   who this letter is from, who it is to, and when it

11   is dated?

12   A.  This is a letter from Tonawanda Coke signed by

13   Mark Kamholz, dated October 21st, 1994, to the

14   department, Gary Foersch.

15   Q.  If we can focus in on this section here.  If

16   you could read starting there, starting at the

17   "The."

18   A.  "The only emission source adversely affected

19   during this incident."

20   Q.  And then "The by-product."

21   A.  "The by-product and boiler areas operated

22   normally, and, thus, there were no venting."

23   Q.  Okay.  So what is -- what is the purpose of

24   this letter?  What is the purpose of this letter?

25   A.  This letter describes a malfunction at the

1    plant, identifies emissions out of the waste heat

2    stack.

3    Q.  Okay.  And discusses how something was manually

4    opened right there?

5    A.  Right.  It addresses there how they addressed

6    that malfunction to prevent additional emissions.

7    Q.  All right.  Does this have anything to do with

8    the -- the automatic flare system that we

9    previously discussed?

10   A.  No, it does not.

11   Q.  All right.  But this -- this part that talks

12   about the by-product and boiler areas operated

13   normally, and thus there was no venting, is that an

14   important statement to the Department of

15   Environmental Conservation?

16   A.  Yes, it is, as to my knowledge as to what

17   Tonawanda Coke was -- was familiar with on how to

18   handle emission sources and emissions.

19   Q.  Okay.  Is that something -- whether there would

20   be venting from the by-products department, is that

21   something the DEC would want to know about?

22              MR. PERSONIUS:  Your Honor, he already

23   asked if it was important, and the witness said it

24   was.

25              THE COURT:  Yeah.  I think that that will

1    suffice.  Let's move on.

2        Let me ask you this:  Give me your theory of

3    relevancy here.  I want to follow up on --

4            MR. MANGO:  Yes, your Honor.  This

5    directly shows that Defendant Kamholz is making a

6    comment to the DEC by saying that there was no

7    venting in the by-products unit.  So, in essence,

8    as the government is arguing, the Defendant Kamholz

9    knew that venting from by-products -- anything from

10   by-products is a very serious and important matter

11   and needs to be raised with the department.  He

12   specifically put a sentence in here which says the

13   by-products -- the by-product area operated

14   normally and thus there was no venting.  That

15   relates directly to this pressure release valve,

16   which vents in the by-products units, and I think

17   is relevant, your Honor.

18           THE COURT:  All right.  Going to the

19   indictment period?

20           MR. MANGO:  Yes.

21           THE COURT:  So this is background

22   knowledge information with regard to the process

23   that relates to the -- to the permitting

24   requirements?

25           MR. MANGO:  Yes, your Honor.

1          THE COURT:  Okay.  All right.  What the

2     attorney says, though, ladies and gentlemen, is not

3     evidence.  Remember that.  It's going to be for

4     admissibility purposes only.  And, you know, I kind

5     of need that information to make a ruling with

6     respect to whether it's competent evidence for you

7     to consider.  But once the document's in, it's up

8     to the attorneys at the end of the case, if you

9     will, to argue from those documents whether it

10    does, in fact, support the essential elements of

11    each of the counts or the particular count for

12    which it is being offered.  Okay?

13       So you have to kind of keep in mind that this

14    case is about individual counts consisting of

15    individual elements, and these particular exhibits

16    have to relate to a particular count, at least.

17    And if pressed, to a particular element before

18    they're properly competent evidence.  And this is

19    pretty far removed stuff, so we've got to be

20    cautious on the continued presentation of this

21    evidence.  And if there's anything else --

22          MR. LINSIN:  Nothing further, your Honor.

23          THE COURT:  All right, Mr. Linsin.  So

24    I'll allow it.  I'll allow it.  But, you know, I'm

25    going to challenge you from time to time on the

1    relevancy.

2           MR. MANGO:  Absolutely, your Honor.  Thank

3    you.

4        All right.  If we can move on to show you for

5    identification purposes Exhibit 19.11.1.

6        And absent an objection, your Honor, I would

7    ask to enter this into evidence, not only as a

8    letter coming from Defendant Kamholz regarding

9    quench station number 2, but as a business report

10   of the DEC as it has notations by DEC on here.

11          MR. LINSIN:  Your Honor, as to the

12   document -- excuse me.

13          THE COURT:  No, either way.  It doesn't

14   matter.  You know, just whatever you -- you know, I

15   thought you were hesitating:  Should I get up,

16   should I sit down, should I get up.  And I'm

17   wondering if I should have said what I said, but

18   okay.

19          MR. LINSIN:  I will -- as to a document --

20   business record from Tonawanda Coke, we have

21   absolutely no objection.

22       As to the identification of whose handwriting

23   this is and who made it, counsel's statement about

24   whose handwriting can't provide a basis for a

25   business record foundation for DEC.  If this

1    witness can identify something, so be it, but not

2    counsel.

3              THE COURT:  All right.  It very well may

4    not be a business record for DEC, but it doesn't

5    have to be to be properly relevant --

6              MR. LINSIN:  Exactly.

7              THE COURT:  -- and admissible.  All right.

8    But the point's made.  So you've heard the

9    objection -- I don't know if it's an objection --

10             MR. LINSIN:  It is.

11             THE COURT:  -- but it's a clarification.

12             MR. LINSIN:  And request, I guess, your

13   Honor, if this -- if this witness can identify

14   whose handwriting is interlineated here in the

15   middle of the document.

16             THE COURT:  Okay.  Fair enough.  And I

17   think we have to do that.

18        Go ahead, Mr. Mango.

19             MR. MANGO:  Yes, your Honor.

20        Lauren, if you could, please, zoom in on that

21    portion for the witness to review.

22   BY MR. MANGO:

23   Q.  Mr. Carlacci, do you see that -- that

24    handwritten portion there?

25   A.  Yes.  It's handwriting that's initialed by Gary

1    Foersch stating that he discussed this document

2    with Henry Sandonato.

3    Q.   Okay.  So without -- and, again, without going

4    into the details, so Gary Foersch, you already

5    mentioned, is a -- was a technician working at DEC.

6    A.   Correct.

7    Q.   And Henry Sandonato was an engineer who was

8    Gary's supervisor?

9    A.   Correct.

10          MR. MANGO:  All right.  Your Honor, we

11   would move this document into evidence at this

12   point.

13          THE COURT:  Okay.

14          MR. LINSIN:  No objection.

15          MR. PERSONIUS:  No objection.

16          THE COURT:  Okay.  19.11.1?

17          MR. MANGO:  Yes, 19.11.1.

18          THE COURT:  Okay.  Received.  No

19   objection.

20          (Government's Exhibit 19.11.1 was received

21          into evidence.)

22          MR. MANGO:  I'd ask that it be published

23   for the jury.

24   BY MR. MANGO:

25   Q.   And if you could tell the jury, Mr. Carlacci,

1    the date, who it's from, and who it's to.

2    A.   Date on the letter is December 29th, 1996, from

3    Tonawanda Coke, signed by Mark Kamholz to the

4    Department of Gary Foersch.

5    Q.   Okay.  If we can zoom in on just this portion,

6    and then we'll -- I'd like to go through this whole

7    letter, actually, with you, but let's focus on this

8    top half.

9         So what is Defendant Kamholz notifying the

10   department of in this letter?

11   A.   It's in regards to the deterioration of number

12   2 quench tower.

13   Q.   And is Defendant Kamholz in this letter telling

14   the department that he plans to take any

15   activities?

16   A.   Yes.  He plans to remove a portion of the

17   tower.

18   Q.   Okay.  And in there -- I ask you to start

19   reading at that sentence.

20   A.   "As such, it offers certain qualities that

21   reduce the entrainment of any particulates.  The

22   quench station's height is a fraction of typical

23   quench towers (100 to 200 feet) and has no taper or

24   chimney-like structure to act as a duct; thus,

25   inducing velocity to propel any particulates into

1     the atmosphere."

2     Q.  Okay.  Let's read the bottom half of this

3     letter.

4                THE COURT:  Okay.  Before you move on, if

5     you know, what does "entrainment" mean?

6                THE WITNESS:  Entrainment is to

7     reintroduce the particulates into the ambient air.

8                THE COURT:  When you say "ambient air,"

9     what does that mean?

10                THE WITNESS:  The air we breathe.

11                THE COURT:  Okay.  Thank you.

12    BY MR. MANGO:

13    Q.  Let's start there.  Okay.  Just, really, if you

14    can read this with the handwriting, please.

15    A.  "We anticipate operating number 2 quench

16    station in its modified form and request your

17    concurrence to this modification."

18         And this handwriting states "Discussed with

19    HS," who is Henry Sandonato, with a date

20    January 6th, 1997.  Says "Okay with the condition

21    if unforeseen problems occur.  Stack height have to

22    be -- might have to be raised."  Initialed GWF.

23                MR. MANGO:  Okay.  Now, if we can go --

24    I'd like to show you Exhibit 19.12 for

25    identification purposes.

1          And absent an objection, your Honor, move this

2     in as a DEC business record.

3               MR. LINSIN:  No objection, your Honor.

4               MR. PERSONIUS:  No objection, your Honor.

5               THE COURT:  Okay.  Received.  No

6     objection.

7               (Government's Exhibit 19.12 was received

8               into evidence.)

9               THE COURT:  And that's 19.12.

10              MR. MANGO:  Yes, your Honor.  And I'd ask

11     that it be published for the jury.

12    BY MR. MANGO:

13    Q.  And Mr. Carlacci, if you can, please, tell the

14     jury the date, who it's from, and who it's to.

15    A.  It's a letter dated January 6th, 1990, signed

16     by Gary Foersch with the New York State DEC, to

17     Tonawanda Coke, Mark Kamholz.

18    Q.  Okay.  And if you can actually start reading

19     here, and read that -- those two paragraphs,

20     please.

21    A.  "The department has no problem at this time

22     with the removal of the upper portion of the quench

23     tower.  However, if unforeseen problems occur, such

24     as, but not limited to, fallout or odor complaints

25     resulting from the removal of the tower, we may

1    require that the tower be rebuilt back to the

2    original height.  It should also be noted that Part

3    214.5(a) requires that all wet quench towers be

4    equipped with a baffle system."

5    Q.   Okay.  That Part 214.5 we've discussed already,

6    correct?

7    A.   Correct.

8    Q.   And is there any notations made in Part 214.5

9    regarding whether baffles are required in the

10   quench towers depends on how high the quench tower

11   is?

12   A.   No.

13   Q.   Okay.  If you're using a wet quench tower, you

14   have to have baffles.  That's what part 214.5 says?

15   A.   Correct.

16   Q.   Okay.  And, again, a wet quench tower, if you

17   could tell the jury what that is.

18   A.   It's a structure that allows you to deluge

19   water onto this railcar containing coke allowing

20   for the steam to -- to rise away from the railcar.

21   Q.   Okay.  Now, we're going to get to some

22   questions down the line regarding whether you

23   believe Tonawanda Coke Corporation was in

24   compliance or not in compliance with their permit.

25   We're going to talk about that.

1        Are you aware of conditions in their Title V

2    permit relating to baffles in the quench tower?

3    A.   I believe 214.5(a) is in the Title V permit.

4    Q.   Okay.

5             MR. PERSONIUS:  Your Honor, if we could

6    just have a clarification.  The witness says he

7    believes.  That may mean he knows, it may mean

8    something else.  And if --

9             THE COURT:  Okay.  We can do it now or

10   when you examine.  But let's do it now.

11            MR. MANGO:  I -- your Honor, we -- we

12   can -- we will get there at some point.  I do

13   anticipate offering the Title V permit through

14   Mr. Carlacci, and we can go through it at that

15   point.

16            THE COURT:  Yeah, because the permit has

17   to itemize specific conditions that are approved

18   and are contained.  So we'll let you defer until

19   then.

20       And if it doesn't get handled to your

21   satisfaction, Mr. Personius, on your examination,

22   you can explore it.

23       Okay.  Go ahead.

24            MR. MANGO:  Thank you.  Mr. Carlacci, I'd

25   like to now show you what's identified as

1      Government Exhibit 19.13.  I show you that for

2      identification purposes.

3          And subject to an objection, I would offer this

4      into evidence, your Honor.

5                MR. PERSONIUS:  Your Honor, we -- we have

6      a relevancy objection.

7                MR. LINSIN:  I would share in that

8      objection, your Honor.

9                THE COURT:  Okay.  Without identifying the

10     portion that you say is relevant, how does this

11     relate?

12               MR. MANGO:  Yes, your Honor.  This relates

13     to Mark Kamholz interacting with the department

14     regarding permitting under Title V and whether

15     certain things need to be in the Title V permit or

16     not -- do not need to be in the Title V permit.

17               THE COURT:  So familiarity with the

18     process?  Is that what we're talking about?

19               MR. MANGO:  Yes, your Honor.

20               MR. PERSONIUS:  Your Honor, there's going

21     to be evidence.  He puts -- he completes the permit

22     application.  This has to do with a whole different

23     part of the system that has nothing to do, that I

24     can see, with the issues in this case.

25               MR. MANGO:  Your Honor, the Title V permit

1    encompasses all emission sources.  This is one of

2    them.  And the government's simply offering it to

3    show that Mr. Kamholz is aware of the requirements

4    to interact with the DEC about Title V and notify

5    whether something needs to be in the Title V permit

6    or not be in the Title V permit.

7              THE COURT:  All right.  I'll -- I'll admit

8    it over objection.  I'll determine it to be

9    relevant if the jury chooses to consider it in

10   reaching its unanimous verdict in this case.

11       But, ladies and gentlemen, it is being offered

12   for the limited purpose of establishing Defendant

13   Kamholz's knowledge of the permitting process with

14   respect to Title V.

15             THE CLERK:  You admitted?

16             THE COURT:  Yeah, I am admitting it.  It's

17   19.13 received over relevancy objection.

18             (Government's Exhibit 19.13 was received

19             into evidence.)

20             MR. MANGO:  Okay.  If we can -- if you can

21   tell the jury now in particular what this is, who

22   it's from, who it's to, the date, and what

23   particularly is being discussed in the letter.

24       I think that's a little compound.  If you want

25   me to break that up, I can, your Honor.

1          THE COURT:  It was a lot compound,

2      Mr. Mango, so yeah, break it down.

3      BY MR. MANGO:

4      Q.  It's generally background.  I thought maybe to

5      get the background, but let's start:  What -- what

6      is the date of this document?

7      A.  This letter is dated June 5th, 1990 from

8      Tonawanda Coke signed by Mark Kamholz to the

9      department, Mr. Gary Foersch.

10     Q.  Okay.  Let's focus on this.  And just if you

11     could tell the jury, please, what Mr. Kamholz is

12     trying to tell the department in this letter.

13     A.  Mr. Kamholz is notifying the department of the

14     removal or not -- no longer use of boilers number 8

15     and 9.

16     Q.  Okay.  That they're coming out of service?

17     A.  Correct.

18     Q.  And that -- at the bottom here, if you can read

19     that -- that paragraph.

20     A.  "In taking these actions, we will not be

21     applying for permitting under Title V for boilers

22     number 8 and number 9, nor emission point number

23     2."

24     Q.  Okay.  If we can move on now to Government

25     Exhibit 19.14, I'd like to show you for

1    identification purposes.  This next exhibit ties

2    in.

3              THE COURT:  All right.  Let me -- let me

4    just ask you this:  Where -- where do boilers come

5    in with ovens and batteries, as far as this case is

6    concerned?  Is there any relationship?

7              THE WITNESS:  The boilers there are used

8    to generate steam that are used throughout the

9    process to heat gases, heat, for example, the

10   ammonia still.

11             THE COURT:  Well, the ovens are what are

12   being utilized for purposes of the battery

13   activity, right?

14             THE WITNESS:  Correct.

15             THE COURT:  So where are the boilers?

16             THE WITNESS:  The boilers are in another

17   building and -- and they supply steam or heat to

18   other activities at -- at the plant.

19             THE COURT:  Yeah, I mean if that's the

20   case --

21             MR. MANGO:  I have a follow-up question,

22   your Honor.

23             THE COURT:  Okay.

24   BY MR. MANGO:

25   Q.  At Tonawanda Coke -- I think we -- we heard

1    some reference to this.  We may have lost it.  How

2    are -- what runs the boilers at Tonawanda Coke?

3    What kind of gas?

4    A.  Coke oven gas.

5    Q.  Okay.

6               THE COURT:  That's the COG stuff?

7               MR. MANGO:  That's the COG.  Coke oven

8    gas.

9    BY MR. MANGO:

10   Q.  So would it be fair to say that if -- if two

11   boilers are being taken out of service, would that

12   mean there's more coke oven gas or less coke oven

13   gas in the -- in the -- in the system?

14   A.  There's more than two boilers at the facility.

15   I'm not familiar with the size of these two without

16   looking at the application or permit, but it should

17   be enough boiler to run the facility without these

18   two.

19              THE COURT:  All right.  I'm going to

20   reverse myself.  I'm not going to admit 19.13.  I

21   sustained the objection to relevancy.

22              MR. MANGO:  Your Honor, if we could --

23   I -- after we go through Exhibit 19.14, I may ask

24   to revisit that.

25              THE COURT:  Okay.  But as of this point,

1      it's simply an identified exhibit.  The relevancy

2      objection is sustained.

3  BY MR. MANGO:

4      Q.  All right.  I'd like to show you Exhibit 19.14

5      for identification purposes, and ask that you tell

6      us the date that this document has on it.

7      A.  This document is from the department, dated

8      August 25th, 1997, to Tonawanda Coke, Mark Kamholz.

9      Q.  And it's -- and it's signed by who?

10     A.  It's signed by Richard Sweeney, environmental

11     analyst with the department, division of

12     environmental permits.

13     Q.  Okay.  And if we can just focus in on this

14     section here.  What -- what is this letter -- is

15     this letter in response to something else?

16     A.  Yes.  It responds to the --

17             MR. PERSONIUS:  Your Honor -- your Honor,

18     I'm concerned where we're going with this.  You

19     have not admitted the earlier letter to which this

20     is a response.  I cannot fathom how this can

21     possibly be offered at this point if you've

22     rejected the prior exhibit.  This is simply the --

23     the response to that prior request, and any

24     testimony we get on it is defeating the fact that

25     you didn't admit the -- the other letter.

1           THE COURT:  This is a little different

2     because of the language relating to an application

3     for a new --

4           MR. MANGO:  Absolutely, your Honor.

5           THE COURT:  -- air emission permit.  So

6     that -- that goes -- but, you know, I'm not sure

7     that there's enough there necessarily.  But what

8     are you going -- I'll defer ruling on that

9     objection.  Where are you going with this?

10          MR. MANGO:  Your Honor, I've -- I've put a

11    little bracket next to this paragraph here.

12    This -- this paragraph specifically tells

13    Mr. Kamholz certain requirements that he has to do

14    and certain things that needs to be done if

15    emissions are identified.  That's directly relevant

16    to this case, as we're going to argue that the

17    pressure release valve is an unpermitted emission

18    source.  In this letter he's specifically being

19    told that he would have to -- well, I don't know

20    how much you want me to go into the details.

21          THE COURT:  I just -- that's far enough.

22    But this is specific as to a situation where you

23    have boilers that are -- are retired.  I mean it

24    has nothing -- does it have anything to do with the

25    general requirements with respect to a Title V like

1    application?

2         MR. MANGO:  Well, your Honor, this -- this

3    letter -- the next exhibits I'm going to show this

4    witness are the actual Title V applications which

5    come some four months after this letter.  Four

6    months after this letter.  And there's a -- there's

7    a line here which starts right there, which says

8    "Specifically any emission points that you operate,

9    you have to have a permit for."

10        MR. PERSONIUS:  But that's not a fair --

11   that's taking it out of context.  That's the

12   concern.  This is -- this is specific to the prior

13   letter.  This isn't some general advice that's

14   being given.  It's if you put the boilers back

15   in -- in operation, then you're going to have an

16   obligation.  That's all the letter's saying.

17        MR. MANGO:  Yeah, that's what the first

18   sentence says, your Honor.

19        THE COURT:  No, I'm going to agree with

20   that.  I'm going to sustain the objection.  You can

21   come back to it.  But, you know, if you're going to

22   the Title V permit applications, go there.  But, I

23   think -- I think this is right, this is specific to

24   the dual boiler situation.  Unless you -- I mean,

25   unless there's something else here that I don't

1    see.

2              MR. MANGO:  Well, your Honor, even if it

3    is specific to the dual boilers, I think the point

4    that he is being told that operation of emission

5    points without a permit is a violation of the law,

6    and it's subject to enforcement action.  That is --

7    that is relevant --

8         If I can finish, please.

9         That is -- that is relevant to his state of

10   mind when he submits this Title V application.

11   When he -- when he -- in the government's view,

12   when he fails to submit any type of application to

13   utilize this pressure release valve.

14             MR. PERSONIUS:  Judge, and I apologize for

15   interrupting.  I don't want to get into that.  But

16   this letter is important because -- and I'm reading

17   from an exhibit not in evidence, but it says,

18   "Operation of the emission points; i.e., the boiler

19   emission points."  Not operation of an emission

20   point which would be the general advice he's trying

21   to get.  This is specific to the boiler.  It talks

22   about the, not A or an or any.  That's the

23   distinction, Judge.  We're overreading the letter.

24             MR. LINSIN:  The regulations -- in

25   addition, the regulations that relate to particular

1    emission sources or emission points -- and there is

2    a distinction -- vary throughout a plant like this.

3    And those things that may relate to a boiler do not

4    necessarily relate to a vent.

5              THE COURT:  Yeah, but we're still talking

6    emissions, though, right?

7              MR. LINSIN:  Well, but the -- but the

8    requirements, your Honor, are different.  And that

9    is what -- yes, the Title V relates to emissions,

10   but what is required and how it is required to be

11   recorded and noted vary depending on the type of

12   unit that is being discussed.  And boilers are

13   unique.

14             THE COURT:  All right.  Let me ask you

15   that, Mr. Carlacci.  Does the unit make a

16   difference with respect to the application of the

17   requirements?

18             THE WITNESS:  Your Honor, 201 states what

19   requires a permit.  And this -- this -- these terms

20   are right out of 201 or very similar to what's

21   required in 201.

22             THE COURT:  Yeah, but we're talking

23   different types of units, boilers versus ovens.

24             THE WITNESS:  Emission points.  Doesn't

25   matter if it's a boiler or bleeder valve or any

1    other kind of stack.  An emission point is a source

2    of emissions.

3              THE COURT:  So they're the same?

4              THE WITNESS:  I'm going to say it's the

5    same.  Emission unit is different, but emission

6    source and emission point are interchangeable at

7    times.

8              THE COURT:  All right.  I'm going to leave

9    it at that.  And then if there wants to be

10   cross-examination on that, I'll permit it.  I will

11   receive the exhibit over objection.

12             MR. PERSONIUS:  Your Honor, if you're

13   going to admit this exhibit, then I request you

14   admit the prior exhibit.  Because without the prior

15   exhibit, this exhibit I think can be overread.  I

16   think you need to have the prior exhibit too.  So

17   if you're going to admit this, I'd ask that you

18   admit 19.13 also.

19             THE COURT:  All right.  I'm going to

20   receive 14.  I don't think there's a risk of

21   overreading it.  I -- without 13 -- .13.  So I'm

22   not going to admit that.  If you want to move it as

23   part of your case, so be it.  But at this point, I

24   will not do it.

25             MR. PERSONIUS:  Just to -- to clarify

1    that, Judge, when you say as part of our case,

2    during the cross-examination of this witness may

3    I --

4              THE COURT:  Yeah, you can use it then too.

5    Sure.

6              (Government's Exhibit 19.14 was received

7              into evidence.)

8              MR. MANGO:  Mr. Carlacci, I'd like to show

9    you what's marked Government Exhibit 18.09.01 for

10   identification purposes.

11      And absent an objection, I would offer this

12   into evidence as part of the Title V application.

13   It's a multi-page document, your Honor.  I would

14   note that it is actually very -- rather lengthy.

15             THE COURT:  Give us the number of pages.

16   Do you have Bates stamp numbers on those?

17             MR. MANGO:  Yes, your Honor.  Forty pages

18   in this document.  And there is another of other

19   exhibits that relate to different emission units in

20   the Title V application, with different tabs on it

21   that we'll go through.  But this -- this is the

22   first one and it's 40 pages.

23             THE COURT:  All right.  Is that 18 or 19?

24             MR. MANGO:  18.09.01.

25             THE COURT:  Okay.  So this is the entire

1    application?

2            MR. MANGO:  No, your Honor.  There's --

3    there's additional applications for each different

4    emission unit, which have been labeled 18.09.02,

5    .03, .04.  So all of the 18.09 exhibits are the

6    Title V application.  They're broken out because

7    that's -- that's how they were sent to the DEC, is

8    separate documents, so --

9            THE COURT:  And how many applications are

10   there in this exhibit?

11           MR. MANGO:  21, your Honor.  And if you

12   like I can move them all in mass into evidence as

13   18.09.01 all the way up to .20.  I'm sorry, there's

14   20, your Honor.  .20.

15           THE COURT:  Mr. Linsin?

16           MR. LINSIN:  Could I just see the

17   additional 21 documents counsel is referring to?

18   See if we can expedite this.

19           THE COURT:  Yes, let's do that.

20      How is our jury doing?  Okay.

21      Ms. DiFillipo, you're doing a nice job on the

22   technical part of this so far.  I don't want you to

23   get too overconfident, but it's been working pretty

24   well.

25      Ms. Henderson, you'll have to meet a high bar

1    here.

2               MS. HENDERSON:  I will try, your Honor.

3               THE COURT:  Would you like a break now?

4    Because we have to take one at sometime relatively

5    soon or -- okay.

6        All right.  I withdraw that offer of a break.

7    You get none for the next week.  All right.

8               MR. LINSIN:  May I confer with co-counsel?

9               THE COURT:  Sure.

10       You know, if you want to stand up and, you

11   know, kind of stretch or anything like that, you're

12   welcome to do that too until we get everything

13   ready, but don't leave.

14       Chris, could I see you for a minute, please?

15              MR. LINSIN:  Your Honor, we have no

16   objection to any of these exhibits.  We -- we

17   would, through the Court, suggest it may be

18   simplest to just mark it all as one exhibit and --

19   and move it in in unison.

20              MR. MANGO:  Well, your Honor, they're

21   already all marked differently, but I would still

22   move them all separately in unison.

23              THE COURT:  Why -- why would you do that,

24   Mr. Mango?

25              MR. MANGO:  Well, your Honor, I guess

1    I'm -- the details are -- the devil is in the

2    details.  They were sent in separately.  I -- you

3    know, they were -- they were paper clipped

4    separately.

5              THE COURT:  All right.  So give me --

6    we'll move them all in without objection.

7         You're on board with that, Mr. Personius?

8              MR. PERSONIUS:  Thank you for thinking of

9    me, Judge.

10             THE COURT:  It's an afterthought, so don't

11   get carried away with it, all right?

12             MR. PERSONIUS:  No, it's perfectly fine.

13   Just the concern is that -- like -- seems like they

14   should have a clip on them or something.  That's

15   all.

16             THE COURT:  All right.  Any colored clip?

17   I mean --

18             MR. PERSONIUS:  What does Ms. Labuzzetta

19   have, your Honor?

20             THE COURT:  All right.  Okay.  All right.

21   It does take organizing.  You know, we're trying to

22   do this so it becomes more comprehensible to you.

23   Okay?  And so we can move through this.  You know,

24   we make light of it, but it's important stuff, so

25   we keep a track -- keep on track -- keep track of

1      all of these exhibits in the way that it will be

2      manageable for you and for the attorneys when they

3      get to examinations and arguments.  And that's why

4      it takes a little bit of time.  So, please, bear

5      with us just a little bit.

6          Give me the number range that we are --

7      included in this -- this offer now.

8                  MR. MANGO:  Yes, your Honor.  18.09.01 --

9                  THE COURT:  Okay.

10                 MR. MANGO:  -- all the way through

11     18.09.20.

12                 THE COURT:  .20.

13                 MR. MANGO:  Okay.

14                 THE COURT:  Through and including .20?

15                 MR. MANGO:  Yes, your Honor.

16                 THE COURT:  Okay.  And for that entire

17     range of exhibits, for today, they're received

18     without objection.

19         And then you can move at your heart's content

20     and pace, Mr. Mango.

21                 MR. MANGO:  Thank you, your Honor.

22                 (Government's Exhibit 18.09.01 through

23                 18.09.20 were received into evidence.)

24                 THE CLERK:  Judge, just for record, that's

25     20 exhibits, correct?

1              MR. MANGO:  Correct.

2              THE COURT:  Okay.  Good.  Thank you very

3    much.  That should help.  And we'll move on,

4    please.

5              MR. MANGO:  Great.  Your Honor, I'd ask to

6    actually show the paper exhibit of this one to the

7    witness.  It may help him move through these and

8    point out different pages.

9              THE COURT:  Okay.  But Ms. DiFillipo can

10   work the tech part of it so it's published to the

11   jury?

12             MR. MANGO:  Yes.

13             THE COURT:  All right.  Let's do that.

14   Okay.

15             MR. MANGO:  Great.  May I approach, your

16   Honor.

17             THE COURT:  Absolutely.

18             MR. MANGO:  Thank you.  I'm going to

19   show -- show you, Mr. Carlacci, what's now in

20   evidence as 18.09.01 to .20.  And if you do make

21   reference to a page, I'd ask you to just note which

22   exhibit you're looking at, and then after that dash

23   there, just note that number.

24             THE COURT:  That's your Bates stump

25   number?

1          MR. MANGO:  Yes.

2          THE COURT:  All right.  And I think you

3   all know what's Bates stamp is.  It's further

4   identification numbers so that we don't lose track

5   of the documents within the numbered exhibits.  So

6   if it's, for example, 18.09.01, there's a number of

7   pages in there and they're all separately stamped.

8   And so that when we go back to the record, or if

9   you need a point of reference, that identification

10  Bates stamp number will be related to the 09.01

11  exhibit.

12  BY MR. MANGO:

13  Q.  Okay.  So let's start here, Mr. Carlacci, with

14  a 18.09.01.  If we can focus on that top portion,

15  please.  Okay.  And if you could read, is there

16  something called a Title V certification there?

17  A.  Yes.  This is the cover sheet to the Title V

18  application.

19  Q.  Okay.  And what does that say?

20  A.  Says, "I certify under penalty of law that the

21  document and all attachments were prepared under my

22  direction or supervision in accordance with a

23  system designed to assure that qualified personnel

24  properly gather and evaluate the information

25  submitted.  Based on my inquiry of the person or

1    persons directly responsible for gathering this

2    information, (required pursuant to 6NYCRR

3    201-6.3(d) I believe the information is true,

4    accurate and complete.  I am aware that there are

5    significant penalties for submitting false

6    information, including the possibility of fines and

7    imprisonment for knowing violations."

8    Q.  And that's signed by?

9    A.  Signed by Mark Kamholz.

10   Q.  And the date -- can you make the date out

11   there?

12   A.  November 28th, 1997.

13   Q.  All right.  And there's a description under

14   "Project -- Project Description" at the bottom.

15   Can you read that?

16   A.  "Tonawanda Coke Corp. is a merchant by-product

17   coke facility producing metallurgical foundry

18   coke."

19   Q.  Okay.  There's a section at the bottom.  If we

20   can please go to the bottom.  If we can zoom in on

21   the owner contact mailing address.  What is that?

22   A.  This is information on -- on the owner, firm

23   contact and facility contact.  Both list Mark

24   Kamholz.

25   Q.  Okay.  So if you could just tell the jury, now

1      just looking at your -- your copy of 18.09.01,

2      what -- what the rest of this document contains,

3      please?

4      A.  This documents is the Title V application.

5      Should contain all of the emission sources, all of

6      the summary of the emissions, and the applicable

7      requirements.

8      Q.  That's -- that's for .01 to .20, correct?  I

9      want to focus just on .21 -- .01.

10             THE COURT:  But what is -- because that

11      doesn't help.  I mean, I'm trying to figure out

12      what you're saying.

13     BY MR. MANGO:

14      Q.  All right.  Let's look just solely at 18 --

15      Exhibit 18.09.01.

16             THE COURT:  Okay.  So what is that

17      exhibit?  That's a Title V application?

18             MR. MANGO:  That's a Title V application.

19     BY MR. MANGO:

20      Q.  And if you could go to the third page of that

21      document.  Okay.  There is a listing of facility

22      emission summary.  And what is listed there?

23      A.  This is the facility emission summary

24      identifying every pollutant emitted into the

25      atmosphere.

1   Q.   From this facility?

2   A.   From Tonawanda Coke.

3   Q.   Okay.  If we could go to the next page, please.

4           THE COURT:  Who makes those entries?

5           THE WITNESS:  This is done by the

6   applicant.

7           THE COURT:  Okay.

8   BY MR. MANGO:

9   Q.   So there's one more contaminant listed there?

10  A.   One more contaminant listed as a continuation

11  sheet listing hydrogen sulfide.

12  Q.   Okay.  Now, if we can go to the next page,

13  page 4, there is a specific emission unit listed

14  there, is that right?

15  A.   Page 5?

16  Q.   Yes, page 5.  I'm sorry.

17  A.   Correct.  It is emission unit 1 identifying the

18  steam generation.

19  Q.   Okay.  So explain to the -- to the jurors,

20  please, what emission -- what an emission unit is

21  for Title V purposes, and what this classification

22  is, U00001.

23  A.   An emission unit is just a description of

24  similar emission sources.  It can describe, in this

25  case, a boiler house that has three or four boilers

1    in it.  So it's describing all of steam generation

2    by boilers that most likely have very similar

3    conditions.

4    BY MR. MANGO:

5    Q.  Okay.  If we can back out of that, please,

6    Lauren.

7         Now, if we can focus on -- so that's the

8    emission unit.  Now, are there emission points

9    described that relate to that emission unit?

10   A.  Correct.  The emission point then would be the

11   actual vent, the stack, describing the stack

12   height, diameter information in this -- in this --

13   in this section.

14   Q.  Okay.  So is it fair to say that this -- this

15   unit and then point, emission unit and then

16   emission point is a way to organize and categorize

17   emissions coming from a facility?

18   A.  Correct.  It's a way to describe the -- the --

19   that operation, the process, the emission point,

20   and the sources of emission.

21   Q.  Okay.  If you could tell the -- the jury what

22   the -- the next couple of pages in this document

23   discuss.  We don't need to get into detail, but

24   just in general terms so they understand what this

25   document contains.

1          THE COURT:  The next couple of pages being

2    from what?  Six through something or another?

3          MR. MANGO:  Yes, your Honor, six through

4    ten.

5          THE COURT:  Thank you.  Why don't you work

6    through those.  Start with six, seven --

7          THE WITNESS:  Six here is the emission

8    source identifying a Cleaver Brooks boiler with a

9    design capacity which is a heat -- heat input rate

10   in BTUs per hour.  So it gives you an indication of

11   the size of the boiler.

12   BY MR. MANGO:

13   Q.  Okay.  And it gives a date of construction

14   there?

15   A.  Correct.

16   Q.  All right.  Let's go to the next page.

17   What's -- what information is contained on this

18   page?

19   A.  That's page 7.  This is another emission,

20   emission unit 1.  This emission and the process.

21   What's key here is the process.  This emission unit

22   is for the boiler operation burning coke oven gas.

23   So it's describing, you know, the process of

24   burning coke oven gas in the three emission

25   sources -- one, two, and three -- three boilers.

1    Q.   Okay.  So there's a process described, and then

2    underneath when you get to the emission unit,

3    there's a description, another description given?

4    A.   Right.  This is for the process of burning

5    natural gas in the same three boilers.

6    Q.   Okay.  All right.  If we can go to the next

7    page, please.  What is -- what is captured on this

8    page?  If you could start at the top and work your

9    way down.

10   A.   This is the emission unit compliance

11   certification identifying the applicable rule,

12   identifying how they will read smoke to determine

13   compliance with the opacity standard in that rule.

14   Q.   Okay.  And so you talked about opacity and

15   opacity readings.  Those were relevant for boiler

16   operations?

17   A.   Correct.

18   Q.   Okay.  I'd like to now have you move to Exhibit

19   18.09.02.  Now this is -- this is the application

20   for a different emission unit as part of the

21   Tonawanda Coke's application, is that right?

22   A.   It would have been one application all together

23   identifying another emission unit.

24   Q.   Let's focus on this emission unit that's

25   contained in 18.09.02.  Which emission unit is

1   this?

2   A.   This is emission unit U coke B.   The

3   description is this unit is a coke oven battery

4   consisting of 60 coke ovens charging, pushing,

5   quenching.   Leaks and waste heat stack are

6   associated with this unit.

7   Q.   Okay.  So if we can then back out of this and

8   go down.

9        So then the emission points that are

10  identified --

11  A.   Correct.   It identifies emission points and

12  there is a continuation sheet listed so there's

13  more.   And -- and it's a description of charging.

14  It's the -- you know, go on further to describe the

15  process of charging and the emissions that are

16  associated with that.

17            THE COURT:   All right.   Keep in mind,

18  ladies and gentlemen, this is a November 1997

19  Title V application.   Okay?

20  BY MR. MANGO:

21  Q.   Okay.  If we can back out of that, please, and

22  go to the bottom part where it gives some emission

23  source.

24       Is there a date of construction given there?

25  A.   Correct.   Date of construction, 1962.

1    Q.  All right.  So that would have been the date

2    this coke oven battery would have been constructed?

3    A.  Could be associated with when this particular

4    Willputte charging system was used.

5    Q.  All right.  If we can go to the next page,

6    please.  You said there is a continuation of

7    emission points?

8    A.  Correct.  Lists additional emission points

9    associated with this emission unit.

10   Q.  Okay.  Now, let's -- let's take a look at --

11   the first one says, in the upper right, push 2?

12   A.  Push 2, correct.  Emission point push 2.

13   Q.  All right.  Do you know what that relates to?

14   A.  Pushing.

15   Q.  All right.  And beneath that is Quen 1.  What

16   is that relation?

17   A.  Emission point 2 referring to quench tower 1.

18   Q.  All right.  And then beneath that is Quen 2.

19   A.  Quen 2 referring to quench or station 2 or

20   tower 2.

21           THE COURT:  Okay.  You say push 2 related

22   to pushing.  What's pushing?

23           THE WITNESS:  Pushing, you know, is the

24   process of pushing the coke out of the oven.  As it

25   falls into the railcar, it generates opacity and

1    there's a standard in 214 that the opacity be below

2    a certain level.

3                THE COURT:  Thank you.

4                MR. MANGO:  If we can go to the next page,

5    please.

6                MR. PERSONIUS:  Your Honor, forgive me.

7    I'm -- I'm trying to use the paper copies and "next

8    page", I'm not sure what page we're on.

9                THE COURT:  Okay.  It should be Bates

10   stamped at the bottom 18.09.02-0003.

11               MR. MANGO:  Yes.

12               MR. PERSONIUS:  Thank you, Judge.

13   BY MR. MANGO:

14   Q.   Okay.  Now, each emission source that we've

15   discussed already is given an ID, a further ID.

16   I'd like to focus on emission ID9 and emission

17   ID10.  What do those relate to?

18   A.   Emission ID9 and 10 refer to the two quench

19   towers.

20   Q.   All right.  So quench 1 is given emission

21   source ID9?

22   A.   Correct.  And quench 2 is emission source 10.

23   Q.   Okay.  If we could go to page 5, please.  Let's

24   focus on this top part.  What does this part of the

25   Title V application discuss?

1   A.   This -- in the application it's required that

2   they list the applicable state or federal

3   regulations.

4   Q.   Okay.  So --

5   A.   So for charging, you can see CFR Part 63

6   Subpart L applies, as well as New York State Code

7   Rules and Regulations Part 214 Subpart 3, Section

8   A.   And in -- in handwriting it says consent order

9   81-27.

10  Q.   Okay. Do you know what that consent order

11  relates to?

12  A.   It had to do with a variance of -- of Part 214

13  for pushing controls.

14  Q.   Okay.  That relates to a letter that you

15  discussed yesterday that I believe went back to

16  1979, is that right?

17  A.   Yes.

18  Q.   All right.  So if we can go -- there's --

19  there's a check mark there for continuation sheet.

20  Do you see that?

21  A.   That's correct.

22  Q.   So let's go to page 6, please.  All right.  If

23  we can focus on this.  Okay.  So you see Quen 1 and

24  Quen 2 there?

25  A.   Yes, I do.

1    Q.   Okay.  For Quen 1 -- it's listed twice -- it

2    says, "Permit conditions."  And for Quen 2 it talks

3    about letters 12/29/96 and 1/6/97.

4    A.   That's correct.

5    Q.   All right.  So what is being referenced here in

6    the permit conditions for Quen 1?  And does that --

7    well, let's just talk about that.  What is that

8    referring to?

9    A.   It's referring to the Air 100s.  The old --

10   older permits, state permits that had special

11   conditions at the bottom of them.

12   Q.   Okay.

13   A.   And it had to do with use of the tower.

14   Q.   Okay.  I showed you that Air 100 from quench

15   tower 1 yesterday, correct?

16   A.   Correct.

17   Q.   And it had that 10 percent condition on it?

18   A.   That's the condition, right.

19   Q.   All right.  Now the quench tower number 2 --

20   today we actually just went through those letters

21   from December 29th of 1996 and January 6th of 1997

22   and there's a reference being made there, is that

23   right?

24   A.   Correct.

25   Q.   There's no other discussion, though -- if you

1      could just flip through the rest of the pages,

2      there's no other discussion in here giving more

3      details than that in terms of those letters, is

4      there?

5                 MR. PERSONIUS:  Your Honor, as the witness

6      is doing that, it occurs to me that when you look

7      at the record of this -- these questions and these

8      answers, it's going to refer to next page.  I think

9      it would be helpful, if it's not too cumbersome for

10     Mr. Mango, to refer to something about the page

11     number.  Because, frankly, I'm getting lost.  If

12     you're watching the screen, it's fine, because you

13     can see on the screen what it is.  But trying to

14     follow it in the hard copy is difficult, and I'm

15     thinking that the cold record is not going to show

16     the page number.  You see what I'm saying?

17                THE COURT:  Why are you looking at the

18     hard copy instead of --

19                MR. PERSONIUS:  Because then I can put a

20     sticker on something I think is important that I

21     may want to go back to rather than have it there.

22                THE COURT:  Okay.  All right.  Just give

23     us the range of pages.  But I'm having Ms.

24     DiFillipo go from page to page on the screen so

25     that the jury gets a general idea of what the

1    document looks like that is being reviewed by

2    Mr. Carlacci at this time.  So give us the range of

3    document numbers, from what number to what number

4    are you asking Mr. Carlacci to review.  Just do it

5    by Bates stamp digital.

6          MR. MANGO:  Yes, your Honor.  In fact

7    actually, if we can go to page 9, please.

8    Actually, I'm sorry.  We need page 10.  I'm working

9    off a non-Bates stamped copy, your Honor, so -- but

10   I can follow along here.

11         THE COURT:  It's probably too much

12   information for me to know that.  All right.

13   Let's -- let's take a break.  Okay?  And we'll take

14   about 20 minutes with the jury out, and then we'll

15   go from 11:35 until about 12:45.  That will be our

16   next period and we'll break for lunch.  Okay?

17              (Jury excused from the courtroom.)

18         THE COURT:  Before you leave, just one --

19   and Mr. Carlacci, you can step down, if you'd like.

20      I had that earlier conversation with juror

21   number 11, and that's Mrs. Linda Finn, just so you

22   know what that involved.  She has some medical

23   condition that's causing her some discomfort.  It's

24   called scleroderma, and it's -- she is under

25   treatment from a rheumatologist.  She is trying to

1    work through it.  The problem becomes a little bit

2    more aggravated because she can't take her

3    medication and drive, so she's here without

4    medication.  So she's doing her best to try to work

5    through this to see if she's going to be okay

6    absent the medication, because when she takes it,

7    then she really shouldn't drive.

8        And I alerted the court security officer to

9    watch her because part of the issue becomes you

10   become lightheaded and you have a risk of -- I

11   don't know if it's losing consciousness, but at

12   least, you know, having some difficulties.  And so

13   we're watching all of that at this point in time.

14   But she wants to continue.  She just has this

15   problem.  So that -- that was what that discussion

16   was.  Okay?

17           MR. MANGO:  Thank you, your Honor.

18           MR. LINSIN:  Thank you, your Honor.

19           (Short recess was taken.)

20           (Jury seated.)

21           THE COURT:  Welcome back.  Please have a

22   seat.

23       Okay.  We're resumed in the case of United

24   States versus Tonawanda Coke Corporation and Mark

25   Kamholz, defendants.  The attorneys and parties are

1    back, present.  Our jury is here once again.  Roll

2    call waived.

3         Mr. Mango, you may resume questioning of

4    Mr. Carlacci, who remains under oath, the

5    Government's first witness.

6              MR. MANGO:  Thank you, your Honor.

7         We were on 189.09.02.  If we could pull that

8    up, please.

9    BY MR. MANGO:

10   Q.  Mr. Carlacci, I'd like to reference you

11   specifically to page 10 of this document.  Okay.

12   Is there a reference on -- let's focus in on the

13   bottom half of page 10 here.  Is there a reference

14   to emission point quench 1?

15   A.  Yes.  This is identifying the applicable rule.

16   There's citing of monitoring information relative

17   to -- to quench 1.

18   Q.  All right.  And there's a mention here about

19   using this as a standby unit?

20   A.  Correct.  In the description it states, "This

21   unit is maintained as a standby unit."

22   Q.  That's consistent with the documents we've gone

23   through for quench tower 1?

24   A.  Correct.

25   Q.  All right.  If we could go to the next page,

1    page 11.  More information about quench tower

2    number 1.  If we could go, then, to page 13.  I'm

3    sorry, page -- we can stay on page 12.

4        There is a notation up at the top.  Let's focus

5    on this -- that portion.  This -- this -- this page

6    refers to quench tower number 2, is that correct?

7    A.  Correct.

8    Q.  Okay.  Is there any reference on this page

9    regarding that no baffles are installed in these

10   tower -- in this tower or that there is any mention

11   of baffles in here?

12   A.  There is no reference to baffle, only to two

13   letters that describe modifications of the quench

14   station.

15   Q.  Okay.  I'd like to show you -- have you look at

16   18.09.06, that exhibit, please.  Pull up the first

17   page.  This relates to emission unit U-ACTIF.  What

18   is that?

19   A.  This unit regenerates the sodium carbonate

20   solution in the desulfurizer by removing hydrogen

21   sulfide.

22   Q.  Okay.  Is this in the by-products department at

23   Tonawanda Coke?

24   A.  This was in the by-products area.

25   Q.  Okay.  We've been talking about this bleeder

1    valve.  Is the bleeder valve listed as any type of

2    unit -- I'm sorry, emission point or emission

3    source in this document?

4    A.  No, it's not.

5    Q.  All right.  If we can move to Exhibit 18.09.08,

6    which relates to emission unit U-BHBEC.  If we can

7    focus on this -- that part.  What does this

8    emission unit relate to?

9    A.   It describes the process of separating tar from

10   aqueous flushing liquor.

11   Q.  Is that located in the by-products unit?

12   A.  Yeah, it is.

13   Q.  Is there any mention of the bleeder in here?

14   A.  No, there's not.

15   Q.  Let's go to 18.09.09.  Focus in on that part.

16   What does this relate to?

17   A.  This is an emission unit for 30,000 gallon tar

18   storage tank.

19   Q.  Is that in the by-products department?

20   A.  Yes, it is.

21   Q.  Is there any mention of the bleeder in this?

22   A.  No.

23   Q.  Let's go to 18.09.10, please.  If we can focus

24   on that part.  What does this emission unit relate

25   to?

292

1    A.   Removes moisture from tar.

2    Q.   Is that in the by-products unit?

3    A.   Yes.

4    Q.   Is there any mention of the bleeder in this

5    application for this emission unit?

6    A.   No.

7    Q.   Let's go to 18.09.11.  Let's look at that

8    portion.  What does this exhibit relate to?

9    A.   Describes a tank for storage of excess aqueous

10   liquor.

11   Q.   Is this in the by-products unit?

12   A.   Yes.

13   Q.   Does this mention the bleeder?

14   A.   No.

15   Q.   Let's go to Exhibit 18.09.12.  What does this

16   exhibit relate to?

17   A.   This is the exhauster that draws coke oven gas

18   from the battery.

19   Q.   Is there any mention of the bleeder in this

20   emission unit?

21   A.   No.

22   Q.   Let's go to 18.09.13.  What does this relate

23   to?

24   A.   This is a tank for storing unrefined or crude

25   light oil.

1    Q.   We talked about the light oil already, right?

2    A.   Correct.

3    Q.   This relates to that process.  Is that in the

4    by-products unit?

5    A.   In that general area.

6    Q.   Does this have the bleeder in it?

7    A.   No, it does not.

8    Q.   Let's go to 18.09.14.  What does this emission

9    unit relate to?

10   A.   Describes a storage tank for storage of virgin

11   wash oil.

12   Q.   Is this in the by-products unit of Tonawanda

13   Coke?

14   A.   It's in that area.

15   Q.   Is the bleeder listed in here?

16   A.   No.

17            MR. PERSONIUS:  Your Honor, forgive me.

18   The end of Mr. Carlacci's testimony yesterday he

19   was asked about the PRV, pressure relief valve, and

20   about something called a bleeder.  Mr. Mango is

21   consistently referring to references to the

22   bleeder.  I understood Mr. Carlacci to say

23   yesterday that he -- that there was a difference

24   between a pressure relief valve and a bleeder, and

25   I think what we're talking about here is a pressure

1    relief valve.  Maybe I'm mistaken, but --

2              THE COURT:  Well, let's find out.

3    Clarification questions, please.

4              MR. MANGO:  Yes, your Honor.

5    BY MR. MANGO:

6    Q.  I've been referring to what you have become

7    familiar with as a bleeder at the Tonawanda Coke

8    facility.

9    A.  Correct.  I've -- I've seen description of it

10   described as a bleeder valve.

11             THE COURT:  Okay.  Give us a time frame

12   for your questions.

13   BY MR. MANGO:

14   Q.  Yes.  When -- at some point did you see this

15   emission source -- emission point known as the

16   bleeder physically at Tonawanda Coke?

17   A.  Yes, I have.

18   Q.  When did you see it?

19   A.  In follow-up inspections around 2011.

20   Q.  Okay.  Have you -- that's what you know as the

21   bleeder?

22             MR. PERSONIUS:  Your Honor, I object to

23   the leading.  That's the whole point of this, is

24   trying to see what the distinction is.

25             THE COURT:  Well, the last question I

1    think maybe, but I'm going to allow, so we get

2    through this for an identification purpose, some

3    leading questions under 611(a), so we get this

4    thing wrapped up.  Okay?

5              MR. MANGO:  Yes, your Honor.

6              MR. PERSONIUS:  And I think yesterday I

7    believe he talked about the interchangeability of

8    the pressure release valve with the bleeder, that

9    they were one in the same.  So --

10             THE COURT:  Well, I want to find that out.

11   I mean, there is a distinction, right, between the

12   PRV and the bleeder valve?

13             THE WITNESS:  They're both a pressure

14   relief valve, right.  You know, you can use a

15   pressure relief valve in the -- it allows pressure

16   to build up in a system designed typically not to

17   release the gas that's contained in there.  And

18   when you start saying "bleeder valve," you still

19   have pressure relief valve, but you designed it

20   such that it bleeds off gas.

21             MR. PERSONIUS:  All right.

22             THE WITNESS:  So that you use it as a

23   process.  It's an emission point.

24             THE COURT:   Mr. Personius, what's --

25   what's your difficulty here?

1          MR. PERSONIUS:  Because I think that there

2     is a difference between a pressure relief valve and

3     a bleeder based on what he just said.  And --

4          THE COURT:  Well, they're both release

5     valves.

6          MR. PERSONIUS:  Right.  But the one that

7     we're talking about here, I think is -- the proper

8     term for it is "pressure relief valve," I think, as

9     opposed to a bleeder valve.  Maybe I am mistaken.

10    That's what I'm trying to understand.

11         THE COURT:  All right.  For all practical

12    purposes, they're both release valves.  You want to

13    know which one we're talking about specifically.

14         MR. PERSONIUS:  And if the witness is

15    saying they're the same, Judge, then -- then I

16    don't -- that's what I don't understand.  If the

17    witness is saying a bleeder valve and a pressure

18    relief valve are the same, then I don't object to

19    using the word "bleeder."  But if there's a

20    difference, I think we ought to refer to it the

21    proper way.  If it is the same thing, then we

22    should understand that.

23         THE COURT:  Is there a difference in the

24    manner of release?

25         THE WITNESS:  In this case we're saying

1    they're the same.

2              THE COURT:  Okay.

3              MR. PERSONIUS:  Okay.  Thank you, Judge.

4              THE COURT:  All right.  Please move on.

5    BY MR. MANGO:

6    Q.  I believe we were -- we did 18.01.14.  Let's go

7    to Exhibit 18.09.15, please.  And what does this

8    emission unit relate to?

9    A.  It's a reservoir for wash oil.

10   Q.  Is this in the by-products department at

11   Tonawanda Coke?

12   A.  Yes.

13   Q.  Is the bleeder or pressure release valve listed

14   in here?

15   A.  No.

16   Q.  How about Exhibit 18.09.16?  What does this

17   emission unit relate to?

18   A.  A unit that separates water from the wash oil.

19   Q.  Is this wash oil decanter in the by-products

20   department?

21   A.  Yes.

22   Q.  Is the bleeder pressure/relief valve listed in

23   here?

24   A.  No.

25   Q.  Let's go to Exhibit 18.09.17.  What does this

1    emission unit relate to?

2    A.  A second decanter system for wash oil.

3    Q.  Is the bleeder pressure release valve listed in

4    here?

5    A.  No.

6    Q.  18.09.18, please.  How about this emission

7    unit?

8    A.  This is the number 1 weak liquor storage tank.

9    Q.  Is that located in the by-products department

10   at Tonawanda Coke?

11   A.  You would have to look at the plan.  It might

12   be located at the other side of the plant.

13   Q.  Okay.  Actually, that's a good time.  Let's

14   talk about that.  Let me show you, for

15   identification purposes, Exhibit 18.01.

16           MR. MANGO:  Your Honor, I'd ask to -- this

17   exhibit is actually a much smaller scale of the

18   real exhibit, which is larger in size.  I'd ask to

19   be able to approach the witness to give him this

20   exhibit.

21           THE COURT:  Okay.  Do we have anything

22   on -- yeah, there it is.  Okay.  You can approach.

23      Is there any objection to 18.01?

24           MR. LINSIN:  No objection, your Honor.

25           MR. PERSONIUS:  No objection.

1          THE COURT:  All right.  We'll received it

2     into evidence.

3          (Government's Exhibit 18.01 was received

4          into evidence.)

5          MR. MANGO:  Great.

6          THE COURT:  It can be published and we'll

7     have Mr. Carlacci work off of the main document, if

8     he needs to.  Otherwise, he can stay with the one

9     that's on the monitor.

10    BY MR. MANGO:

11    Q.  So now with reference to 18.01, can you tell

12    the jury -- first, just give the jury an idea of

13    what 18.01 is that -- that you're looking at.

14    A.  18.01 is a plot plan of the facility

15    identifying the emission points at Tonawanda Coke.

16    Q.  Okay.  And how -- how is this -- what relation

17    does this have to the Title V application that

18    we've been going through?

19    A.  This is included in the Title V application.

20    Q.  Okay.  So this was submitted as part of

21    Tonawanda Coke's application?

22    A.  Correct.

23    Q.  Received by the department?

24    A.  Received by the department.

25    Q.  And does this plot plan have the emission

1    points and emission source ID numbers listed on

2    here?

3    A.   Yes.  It lists emission points and emission

4    sources.

5              MR. MANGO:  Your Honor, at this point, I'd

6    like to -- if I could clip that up to the board, so

7    the jury can just see the -- it's tough to publish

8    that by holding it up.  I would like to just clip

9    it up.

10             THE COURT:  I mean, they have it on the

11   monitor.

12             MR. MANGO:  Okay.

13             THE COURT:  I think that's probably

14   enough.  If -- if anybody has trouble working off

15   the monitor, just raise your hand, and then I'll

16   have it put up for demonstration purposes.  But

17   it's a pretty clear exhibit on the -- on the

18   monitor, so let's try it that way.

19   BY MR. MANGO:

20   Q.   Okay.  So let's go back.  Now, with reference

21   to 18.01, we can go back to 18 -- Exhibit 18.09.18.

22   This was the exhibit I believe you wanted to

23   reference the plot plan.

24        Is this weak liquor storage tank number 1 in

25   the by-products department?

301

1    A.   It's not in the by-products area.   It's located

2    behind the ammonia still.

3    Q.   Is the bleeder/pressure release valve listed in

4    this --

5    A.   No, it's not.

6    Q.   -- application for this emission unit?

7    A.   No, it is not.

8    Q.   Okay.   Let's move to Exhibit 18.09.19.   What

9    does this emission unit relate to?

10   A.   It's the second weak storage tank.

11   Q.   Is the --

12   A.   Weak liquor storage tank.

13   Q.   Is the bleeder/pressure release valve listed in

14   that application?

15   A.   No, it is not.

16   Q.   All right.   And the last one.

17   Exhibit 18.09.20.   What does this relate to?

18   A.   It identifies the number 3 weak liquor storage

19   tank.

20   Q.   Is the bleeder/pressure release valve listed in

21   here?

22   A.   No, it is not.

23   Q.   In fact, if you can look at 18.01, do you see

24   the bleeder/pressure release valve notated anywhere

25   on that exhibit?

1    A.   I see no notation of any pressure release

2    valve.

3    Q.   Okay.  So following -- following the Title V

4    application being submitted to the DEC, does the

5    facility get notified that you received the

6    application?

7    A.   Yes, they do.

8    Q.   All right.  What's -- if you can describe for

9    the jury the next step or the steps in the process

10   that DEC engages in in evaluating Title V

11   applications?

12   A.   There was a requirement to submit the

13   application by a specified date.  They meet that

14   date.  We notify them of that.  We go through the

15   process of building this permit that will

16   eventually be public notice.  We take comments from

17   both the company and the public before the permit

18   is given to EPA for a 45-day period.

19   Q.   All right.  And you take -- you take comments

20   from the public?

21   A.   From the public as well as the company.

22   Q.   Now, if the department needs additional time to

23   review the permit, how do you go about -- or review

24   the permit application, I'm sorry.  How does the

25   department go about getting additional time to

1    review the permit application?

2    A.   There's time periods that we -- we are required

3    to review a permit by.  They're codified in the

4    Uniform Procedures Act.  And in there also we can

5    ask for an extension.  We ask the company for that

6    extension.

7    Q.   Okay.  And that's something -- you tell the

8    company you need more time to go through this

9    application?

10   A.   Correct.

11   Q.   And then they either agree or disagree?

12   A.   Correct.

13   Q.   Did the company agree in this case?

14   A.   Yes, they did.

15   Q.   Okay.  Now, for this comment period -- I'm

16   sorry, I may have missed it -- is there a

17   requirement that the -- the application or any type

18   of public notice be made?

19   A.   Correct.  There is a requirement to publish the

20   draft permit in the -- in the local newspaper, and

21   Tonawanda Coke would have to do that.

22   Q.   Okay.

23   A.   They draft a notice that they would publish.

24   Q.   Did they do that in this case?

25   A.   Yes, they did.

1    Q.  And in that -- in that public notice, does it

2    list the date in which comments must be received to

3    the department by?

4    A.  Yes, it will.

5    Q.  Let me show you for identification purposes

6    Government 18.17.

7            MR. MANGO:  And absent an objection, your

8    Honor, the government would move this into

9    evidence.

10           MR. LINSIN:  No objection, your Honor.

11           MR. PERSONIUS:  No objection, your Honor.

12           THE COURT:  Okay.  18.17 received.  No

13   objection.

14           (Government's Exhibit 18.17 was received

15           into evidence.)

16           MR. MANGO:  I'd ask it be published for

17   the jury.

18   BY MR. MANGO:

19   Q.  Now, Mr. Carlacci, what -- what are we looking

20   at here?  If we can focus on that.

21   A.  This is a letter from Mark Kamholz with

22   Tonawanda Coke, dated September 1st, 2001, to the

23   permit administrator of DEC confirming a

24   conversation for an extension on the comment

25   period.

1    Q.   Okay.  So this -- this is Tonawanda Coke asking

2    for an additional period of time to comment?

3    A.   This is confirming that request that was

4    approved by Richard Sweeney.

5    Q.   Okay.  Did you -- do you know if the department

6    received from Tonawanda Coke any comments that they

7    made to the draft permit?

8    A.   I don't recall.  I'd have to look through the

9    file.

10   Q.   Let me show you what's identified as Government

11   Exhibit 18.02.

12           MR. MANGO:  And, your Honor, absent an

13   objection, the government would move this into

14   evidence.

15           MR. LINSIN:  Can we see the second page of

16   this document, please.  Or the final page.  And the

17   first page again, please.

18      No objection.

19           MR. PERSONIUS:  No objection, Judge.

20           THE COURT:  Okay.  18.02 received.  No

21   objection.

22           (Government's Exhibit 18.02 was received

23           into evidence.)

24           THE COURT:  It may be published.  It is.

25   BY MR. MANGO:

1    Q.   Mr. Carlacci, can you tell the jury the date of

2    this document?

3    A.   This is dated September 28th, 2001.

4    Q.   And who is it -- who is it to?

5    A.   It's from Mark Kamholz of Tonawanda Coke to the

6    Department -- New York State Department of

7    Environmental Conservation, Penny Dempsey.

8    Q.   And what does this letter relate to?

9    A.   It contains Tonawanda Coke's comments on the

10   draft permit.

11   Q.   Okay.  I'd like you in particular to focus on

12   that, item 34.2.  Can you read this, please?

13   A.   "Item 34.2 includes (one emission point)

14   emission point ACBLD, for emission unit U-ACBLD.

15   Currently there are two stacks for the redundant

16   process systems with only one operating at a time.

17   The change to the draft Title V permit should be as

18   follows:  Change emission point ACBLD to ACBLD1,

19   and add emission point ACBLD2.  The --"

20   Q.   Okay.  Keep reading.

21   A.   "The pressure relief vent located on the roof

22   of the emission unit U-ACBLD is considered a

23   trivial activity under 6 NYCRR subpart

24   201-3.3(c)(33). This is a notification, not a

25   requested permit change."

1    Q.   Okay.  Now, you've previously discussed 6NYCRR,

2    in particular, subpart 201-3 as it relates to

3    exempt and trivial activities, correct?

4    A.   Correct.

5    Q.   Okay.  Now, this is listing -- and you talked

6    about a trivial -- an example of a trivial activity

7    as a pressure relief vent stacks or stack, is that

8    right?

9    A.   An emergency pressure release vent.

10   Q.   Okay.  This is what your -- you were talking

11   about, that that is the citation to the subpart

12   that deals with an emergency pressure relief vent

13   or stack?

14   A.   Right.

15   Q.   Is there any comment -- let's back out of this,

16   please.

17       Is there any comments that -- if you can review

18   this -- page 1.  If we can go to page 2.  And if we

19   could go to page 3.

20       Is there any comment in here saying that we

21   have a bleeder/pressure relief valve in the

22   by-products unit that is a trivial activity?

23   A.   Show me page 2, again, please.

24       There's no mention of a pressure relief valve

25   in the by-products area.

1    Q.   Okay.  If we can go to exhibit -- show you

2    Government Exhibit 18.03.

3              MR. MANGO:  And absent an objection, your

4    Honor, I would move this into evidence.  This is

5    two pages.

6         If we can -- I'm sorry, this is three pages.

7    If we can go to the second and the third page.

8              MR. LINSIN:  Can I see the first page,

9    please?

10             THE COURT:  Sure.

11             MR. LINSIN:  No objection.

12             MR. PERSONIUS:  No objection, Judge.

13             THE COURT:  Okay.  No objection.  18.03

14   received.

15             (Government's Exhibit 18.03 was received

16             into evidence.)

17             THE COURT:  It may be published, please.

18   BY MR. MANGO:

19   Q.   All right.  Mr. Carlacci, can you please tell

20   the jury -- if we can just focus on that part --

21   what -- what this letter is, who it's from, who

22   it's to.

23   A.   This is a letter from the department to Mark

24   Kamholz, Tonawanda Coke, documenting the changes

25   that he requested to the permit.

1    Q.   Okay.  And so the department is responding to

2    his comments that we just looked at?

3    A.   Correct.

4    Q.   And there's reference, again, to the pressure

5    relief -- if I put that little mark there -- the

6    pressure relief vent stack is -- is included there,

7    is that right?

8    A.   Correct.

9    Q.   If you go -- if we can go to the second page,

10   please.  And the third page.

11       And this is -- this is included to Larry

12   Sitzman and Cheryl Webster.  They're -- they were

13   in the -- Larry was in your air division, is that

14   right?

15   A.   Yes.

16   Q.   Okay.  So now at some point we've gone through

17   the application, we've gone through the publishing

18   in a newspaper, we've gone through the comment

19   period.  Do you know if Tonawanda Coke Corporation

20   was granted a Title V permit?

21   A.   At that point, the permit is proposed.

22   Q.   I've moving on to this.  I'm sorry.

23   A.   Okay.

24   Q.   At some point after this comment back and

25   forth --

1    A.   Then the permit is issued.

2    Q.   Are you aware whether Tonawanda Coke

3    Corporation was issued a Title V permit?

4    A.   Yes.

5              THE COURT:  Okay.  Were they?

6              THE WITNESS:  Yes, they were.

7              MR. MANGO:  Your Honor, I'd ask to pull up

8    Government Exhibit 18.18, for identification

9    purposes.

10       And absent an objection, introduce this into

11   evidence.

12             MR. LINSIN:  Your Honor, we have no

13   objection to this exhibit.

14             THE COURT:  Mr. Personius?

15             MR. PERSONIUS:  No objection.

16             THE COURT:  Okay.  Then 18.18 received.

17    No objection.

18             (Government's Exhibit 18.18 was received

19             into evidence.)

20   BY MR. MANGO:

21   Q.   As we publish this to the jury, what is this,

22   Mr. Carlacci, that we're looking at?

23   A.   This is a permit transfer -- transmittal

24   letter.  It's the cover letter to the permit.  From

25   the department, regional permit administrator for

1    DEC, Steven Doleski signed it, addressed to Mark

2    Kamholz at Tonawanda Coke.

3    Q.   Okay.  And it's dated when?

4    A.   It's dated May 2nd of 2002.

5    Q.   Let's focus in on these two paragraphs, please.

6    Can you please start reading at "The permit is

7    valid."

8    A.   "The permit is valid only -- for only that

9    project, activity, or operation expressly

10   authorized.  If modifications are desired after

11   permit issuance, you must submit the proposed

12   revisions and receive written approval from the

13   permit administrator prior to initiating any

14   change.  If the department determines that the

15   modification represents a material change in the

16   scope of the authorized project, activity,

17   operation, or permit conditions, you will be

18   required to submit a new application for permit."

19   Q.   And if you can start reading at this portion of

20   the capitalized paragraph.

21   A.   "Since failure to comply precisely with permit

22   conditions may be treated as a violation of the

23   environmental conservation law, you are requested

24   to provide a copy of the permit to the project

25   contractor, facility operator, and other persons

1    directly responsible for permit implementation, if

2    any."

3    Q.   Okay.  Now, there's some -- there's a number of

4    conditions listed in this Title V permit.  Is that

5    fair to say?

6    A.   Correct.

7    Q.   There's a couple of conditions that I'd like to

8    focus on with you right now, okay?  So I'd like to

9    direct the attention to page 16 of this document

10   and condition number 4.  If we can focus in on

11   condition 4.

12        Okay.  What is condition 4 of Tonawanda Coke

13   Corporation's Title V permit?

14   A.   This is a citation right out of 6NYCRR 201-1.2.

15   Q.   Okay.  And what does it relate to?

16   A.   It describes how you would handle a source that

17   wasn't -- wasn't identified or permitted properly.

18   Q.   What is --

19   A.   What steps you would take to initiate

20   permitting.

21   Q.   Okay.  And what is your understanding that

22   condition 4 requires a facility to do if there's

23   additional air sources of pollution that are not in

24   the permit?

25   A.   States that the owner or operator must apply

313

1    for a permit and must meet the applicable

2    regulations of that source at that -- during

3    that -- at the time of construction or

4    modification.

5    Q.   Okay.  Now, with respect to your knowledge of

6    this pressure relief valve/bleeder valve, you've

7    come to learn about that in your review of the

8    Tonawanda Coke file, is that correct?

9    A.   Correct.

10   Q.   You also mentioned you've -- you've seen it.

11   A.   I've seen it.

12   Q.   Was it in operation at the time you saw it?

13   A.   I didn't check that.

14   Q.   Okay.  This pressure release valve -- did

15   you -- did you get to look at any type of

16   documentation for this bleeder/pressure release

17   valve?

18   A.   Yes, I did.  I checked the strip charts that

19   record the settings for the pressure relief valve.

20   You can see on the strip charts when the valve was

21   releasing gas.

22        MR. LINSIN:  Your Honor, can we have a

23   time frame, please?

24        THE COURT:  Sure.

25        THE WITNESS:  It would be during my

1    inspections in 2011.

2              MR. LINSIN:  Time frame for the circular

3    charts that the witness is discussing that he

4    reviewed.

5              THE WITNESS:  I seen the chart that was on

6    the monitor that records the pressure at the site

7    at Tonawanda Coke.

8              MR. LINSIN:  In 2011?  Thank you.

9              MR. MANGO:  Well, have you since learned

10   that this pressure release valve/bleeder was taken

11   out of service in a --

12             MR. PERSONIUS:  Your Honor, I object to

13   the leading.

14             THE COURT:  Yes.  Sustained.

15   BY MR. MANGO:

16   Q.  Did you see any emissions coming out of this

17   pressure release valve/bleeder valve?

18   A.  It's a gas, so you can't see it.

19   Q.  Okay.  Did you hear any emissions coming out?

20   A.  I did not hear them.

21   Q.  Okay.  Do you know whether or not that pressure

22   release valve or bleeder valve was actually still

23   in service at the time you saw it?

24             MR. LINSIN:  Objection.  Asked and

25   answered.

1          MR. MANGO:  It's a different --

2          THE COURT:  I think it is the same

3     question.  I'll sustain the objection.

4          MR. LINSIN:  Thank you.

5          MR. MANGO:  Let me ask you a question.  If

6     there is an emission unit that is being used to

7     bleed coke oven gas into the atmosphere on

8     intervals roughly every 20 or 30 minutes, that

9     is -- that that emission unit releases coke oven

10    gas in the atmosphere --

11         MR. PERSONIUS:  Your Honor, I understand

12    what Mr. Mango is trying to do.  We don't have any

13    evidence of that right now.  I understand we may

14    later on, but I think it needs to be clear that

15    this is subject to --

16         MR. MANGO:  This is a hypothetical.  I'm

17    asking the question.

18         MR. PERSONIUS:  We don't have the -- the

19    basis yet for it.  I understand there's going to be

20    later testimony.  But I just want it clear on the

21    record we don't have that yet.

22         THE COURT:  Okay.  But we do have the

23    hypothetical, but we're going to have to start it

24    all over again.  So -- which is okay.  I mean,

25    whatever -- I mean, you don't disagree necessarily

 1    with what Mr. Personius is saying, but your point

 2    is this is a hypothetical at this point?

 3              MR. MANGO:  Yes, your Honor.

 4              THE COURT:  Okay.  Start again.

 5              MR. MANGO:  All right.

 6  BY MR. MANGO:

 7    Q.   Let's talk about a hypothetical scenario.   If

 8    you have a bleeder valve or pressure release valve

 9    being used to emit coke oven gas into the

10    atmosphere as frequently as every 20 minutes or, if

11    you want to consider every 30 minutes, and the

12    releases last anywhere between five and 30 seconds

13    at a time, would you consider that a violation --

14    if it was not in the Title V permit, would you

15    consider that a violation of condition 4?

16    A.   Yes, I would.

17    Q.   Why?

18    A.   It requires a permit and needs to be identified

19    in a Title V permit.  And this condition says that

20    they should do that.

21    Q.   Okay.  Would -- would it be considered an

22    emergency pressure release vent or stack under 6

23    NYCRR 201-3?

24    A.   No.

25    Q.   Why not?

1    A.   It's not used in an -- in a fashion as defined

2    in emergency.  Emergency is defined in Part 201,

3    and that -- that is an event that's unforeseen,

4    that infrequently occurs.  And in this case you're

5    describing a situation that occurs quite

6    frequently.

7    Q.   If we can go to page 90, please, of this

8    exhibit.  If we can focus in on condition 96.

9    Okay.

10        Now, condition 96 of the Title V permit, you

11   see emission source there, 00009, is that right?

12   A.   Correct.

13   Q.   And that's related to -- do you remember what

14   that's related to?

15   A.   It relates to one of the quench towers.

16   Q.   All right.  Can you read A there, please?

17   A.   A states, "A person may not operate a wet

18   quench tower of a coke oven battery unless it is

19   equipped with a baffle system designed to

20   effectively reduce particulate emissions during

21   quenching."

22   Q.   If we can go to page 91, the next page, please.

23   If we can focus in on condition 97.  Can you read

24   condition 97(a)?

25   A.   Condition 97(a) states the same thing for

1    emission source 10.  "A person may not operate a

2    wet quench tower of a coke oven battery unless it

3    is equipped with a baffle system designed to

4    effectively reduce particulate emissions during

5    quenching."

6    Q.  Okay.  Emission source 10, was that another one

7    of the quench towers?

8    A.  It's the other quench tower.  There's two at

9    the site.

10   Q.  I'd ask you to refer to Exhibit 18.01 if you

11   need to.  But can you tell us which emission source

12   10 is?  Is it the west quench tower or the east

13   quench tower?

14          THE COURT:  Okay. Let's get that exhibit

15   on the monitor, please at that point.

16          THE WITNESS:  This is the east quench

17   tower, emission source 10.

18   BY MR. MANGO:

19   Q.  Okay.  So that would be quench tower number 2?

20   A.  Quench 2, correct.

21   Q.  Okay.  We can back out.  Focus in there,

22   please.  There do you see --

23   A.  This identifies emission point quench 1.

24   Emission source 9.

25   Q.  So nine is the west tower?

1    A.   The west tower, correct.

2    Q.   That's the one with this 10 percent exclusion?

3    A.   Correct.

4    Q.   Prior to the Title V permit?

5    A.   Correct.

6    Q.   Does the Title V permit capture that 10 percent

7    exclusion?

8    A.   It does not.

9    Q.   Okay.  Let me ask you a hypothetical relating

10   to -- if a Title V permit does not capture a

11   previous exclusion in an Air 100, what controls?

12   A.   You know, you try to apply some common sense.

13   If we granted it before and we have no reason to

14   doubt that we would grant it again, we would give

15   them that exclusion.

16   Q.   Okay.  So let's assume, then, that the

17   exclusion would carry over into the Title V permit

18   even though it's not explicitly listed there.  Is

19   that what you're saying?

20   A.   Correct.

21   Q.   Okay.  Let me ask you a hypothetical, then.  If

22   the exclusion is to use the quench tower less than

23   10 percent of the time -- but I'm going to give you

24   a hypothetical that if the quench tower is being

25   used more than 10 percent of the time, in fact, it

1    is being used every other push from the coke oven.

2    You know what I'm talking about, right?

3    A.   Yes.

4    Q.   Every other push.  It's being used on that

5    frequency.

6    A.   50 percent of the time.

7    Q.   Would that be a violation of the Title V

8    permit?

9    A.   Yes.

10   Q.   Okay.  Let's talk about quench tower number 2.

11   For that quench tower at Tonawanda Coke, there was

12   no exemption that you're aware of, correct?

13   A.   Correct.

14   Q.   In terms of 10 percent usage or how -- how much

15   it was being used?

16   A.   Correct.

17   Q.   So condition 97 which relates to quench tower

18   number 2, is that right?

19   A.   Correct.

20   Q.   That mandates that baffles must be installed in

21   quench tower number 2?

22   A.   Correct.

23   Q.   So hypothetically speaking, if that quench

24   tower is being used without baffles inside of it,

25   would that be a violation of the condition?

1    A.  Yes, it would be.

2              THE COURT:  Let me ask you this question,

3    because I -- I'm getting a little confused on

4    quench tower number 2, emission source number 9.

5              MR. MANGO:  Ten.

6              THE COURT:  Nine and ten?

7              MR. MANGO:  Right.

8              THE COURT:  Okay.  No, go ahead.  Tell me

9    what I'm going to say.

10             MR. MANGO:  I think quench tower -- I

11   think the evidence I heard is quench tower number 2

12   is emission source 10, quench tower number 1 is

13   emission source 9 as referenced.

14             THE COURT:  Okay.  If it's quench --

15   Mr. Carlacci, if it's quench tower number 1, which

16   is emission source number 9 and quench tower

17   number -- leave it at that.  Is that the west

18   quench tower?

19             THE WITNESS:  The west one would be quench

20   1 --

21             THE COURT:  All right.

22             THE WITNESS:  -- emission source 9.  The

23   east would be quench 2, emission source 10.

24             THE COURT:  Okay.  Thank you.

25             MR. MANGO:  Your Honor, I'd like to, at

1    this point, show Mr. Carlacci Government

2    Exhibit 131 for identification purposes.

3       And absent an objection, admit this into

4    evidence.

5              THE COURT:  131?

6              MR. MANGO:  Yes, your Honor.  This is a

7    multiple-page document.

8              THE COURT:  I'm sorry.  Bear with me.

9              MR. MANGO:  Yes, sir.

10             THE COURT:  I can't locate it on here.

11             (Discussion held off the record.)

12             THE COURT:  Okay.  What do have on the

13   screen now, before it's published?  It doesn't look

14   like 131.

15             MR. MANGO:  We zoomed in, your Honor.  It

16   is.  It's just a little -- not too sharp.

17             MR. LINSIN:  Okay.  I'm satisfied, your

18   Honor.

19             THE COURT:  All right.  Well, then we're

20   all happy then.

21             MR. MANGO:  Subject to an objection, I

22   would move this document into evidence, your Honor.

23             THE COURT:  How could there possibly be an

24   objection now, Mr. Mango?  There's no objection,

25   right?

1          MR. LINSIN:  No, your Honor.

2          THE COURT:  All right.  Mr. Personius?

3          MR. PERSONIUS:  I want to clarify:  It's

4     not just the letter, Judge, there's more to it?

5          MR. MANGO:  Yes.

6          MR. PERSONIUS:  Does this have the

7     emission study with it?  Is that what this is?

8          MR. MANGO:  Your Honor, I expect the

9     evidence will show if we move through this, this is

10    an inventory of hazardous air pollutants that are

11    included with this.  It's a two-page cover letter

12    followed by a hazardous air pollutant emission

13    inventory prepared for Tonawanda Coke Corporation.

14         MR. PERSONIUS:  Yes, Judge, understanding

15    that, no objection.

16         THE COURT:  Okay.  And that's the way it's

17    described on the exhibit list as well.  So, okay.

18    So we got actually two parts, okay, the letter and

19    the addendum, so to speak.

20       Okay.  131 received, no objection.

21              (Government's Exhibit 131 was received

22              into evidence.)

23    BY MR. MANGO:

24    Q.  Okay.  If we can move on, let's just focus on

25    this.  And why don't you tell the jury, please,

324

1    Mr. Carlacci, what -- what they are looking at.

2    A.   This letter is focusing on a new NESHAP that

3    regulates quench towers pushing and heat waste

4    stacks.   It's applicable if the facility emits, as

5    a major source of hazardous air pollutants, over

6    ten tons of an individual HAP or 25 tons total

7    HAPs.   And this document documents the emissions

8    from the facility as a whole showing that it's

9    below those thresholds and this NESHAP does not

10   apply.

11   Q.   Okay.   So this is a letter from Tonawanda Coke

12   to the DEC.   And if you can, just read this last

13   sentence here.

14   A.   "The proposed rule only -- a proposed rule is

15   applicable only to major sources" --

16   Q.   I think -- I'm sorry.   You're reading this

17   where the green dot is on the screen.   "That

18   document --"

19   A.   "That document demonstrates that TCC's

20   Tonawanda New York facility is not a major source

21   of HAPs."

22   Q.   All right.   And this letter is signed by who?

23   Let's go to the second page, please.

24   A.   Mark Kamholz with Tonawanda Coke.

25   Q.   If we go to the third page, this begins the

1    hazardous air pollutant emission inventory, is that

2    correct?

3    A.  Correct.

4          MR. MANGO:  Your Honor, if I could have

5    just one moment, please.

6          THE COURT:  Certainly.

7    BY MR. MANGO:

8    Q.  I'd like to direct your attention to page 18 of

9    this document.  And there's a discussion about

10   quenching in here, is that correct?

11   A.  Correct.

12   Q.  Ask you to read starting at "particulate

13   emissions."

14   A.  "Particulate emissions from quenching are

15   typically large carbon particulate created by the

16   break up of hot coke upon contact with water.  PM

17   emissions are a function of quench tower controls;

18   i.e., use of baffles, and the quench water total

19   dissolved solids level.  The Tonawanda Coke quench

20   tower has baffles for control of PM emissions."

21   Q.  Okay.  So the Tonawanda Coke Corporation is

22   sending this document to DEC saying we have

23   baffles?

24   A.  Correct.

25          THE COURT:  Okay.  Enlarge the entire page

1    for me, please, Ms. DiFillipo.  The full page,

2    please.  Okay.  Just checking a number for a

3    second.  You referenced page 18.  And where does

4    that come in?  Because this is 2-10. I don't see 18

5    anywhere on there.

6            MR. MANGO:  Yes, your Honor.  This copy

7    was not Bates marked.  It is -- it's page 18 in the

8    document.  So that was more of a code to get us on

9    the right page.

10           MR. PERSONIUS:  For the record --

11           MR. MANGO:  I'll refer to page 2-10 at the

12   bottom.

13           THE COURT:  Please.

14   BY MR. MANGO:

15   Q.  Okay.  If we could then go to 4-1, which would

16   be page 23.  4-1, if we can go there.  So now

17   there's a section dealing with emissions from

18   by-product plant equipment components, is that

19   right?

20   A.  Correct.

21   Q.  And if we can go to the next page, 4-2, this

22   has a table with a summary of the different types

23   of -- let's focus on that section, please -- of the

24   different components at the Tonawanda Coke

25   Corporation, is that right?

1    A.   Correct.

2    Q.   Okay.  And you do see listed here -- let's -- I

3    want to direct your attention directly to this

4    pressure release valve, number of components, it

5    says one.  What are the emissions that relate to

6    that pressure release valve?

7    A.   This is identifying one pressure relief valve

8    in the coke oven system using -- using a published

9    emission factor with a reference of total organic

10   compound emissions in tons per year of .003.

11   Q.   Can you tell the jury -- give the jury an

12   example?  How much are we talking about would be

13   .0030 in terms of emissions?  Is that a lot?  A

14   little?

15   A.   It's a little, very little.

16   Q.   Okay.  So if -- I want to get back to what

17   we've been talking about.  Under 201-3, trivial and

18   exempt activities, been talking about a trivial

19   activity known as an emergency pressure release

20   valve, right?

21   A.   Correct.

22   Q.   Okay.  If an emergency pressure release valve

23   is being used and emits .003 tons per year of

24   emissions, would that be used as a trivial

25   activity?

1    A.   If it was an emergency relief valve, I don't

2    believe you'd have an estimated emission for it.

3    You wouldn't have a planned excursion where this

4    valve went on in an emergency.  You would have a

5    emission of zero because you don't plan

6    emergencies.

7    Q.   Okay.  But if we can focus on it, the .003, is

8    that a significant amount of emissions or not a

9    significant amount of emissions?

10   A.   It's not a significant amount of emissions, but

11   it's identifying a source, an emission point.

12   Something that, to me, would require a permit.

13           THE COURT:  Okay.  Hold on one second.

14        Ms. DiFillipo, can you highlight the column

15   names?  Yeah, that dark portion up there.  Okay.

16   Thank you.

17   BY MR. MANGO:

18   Q.   Is there any discussion -- if you'd like, I can

19   give you the hard copy of this to flip through.

20   But is there any discussion in this document where

21   this pressure release valve is located?

22   A.   Let me flip through the document.  I don't

23   recall it being located.

24           MR. MANGO:  Your Honor, may I approach the

25   witness?

1          THE COURT:  What is the exhibit?

2          MR. MANGO:  Exhibit 131 in paper format.

3          THE COURT:  Thank you.

4          THE WITNESS:  This document is a summary

5     of emissions.  It contains some of -- references to

6     where the emission factors were obtained, but

7     doesn't identify where any of the emission points

8     or emission sources are at the plant.

9     BY MR. MANGO

10    Q.  Okay.

11    A.  No plan included.

12    Q.  So let's look -- look back at your screen here,

13    which is page 4-2.  There's no reference to where

14    this pressure release valve is located at Tonawanda

15    Coke, this one component in that document?

16    A.  It states this whole table is by-product plant

17    area, and somewhere in the coke oven gas system.

18    Q.  Okay.  Now, let me ask you a hypothetical

19    similar to the earlier hypothetical I asked you.

20         If you have a pressure release valve/bleeder

21    valve that releases coke oven gas to the atmosphere

22    as frequently as every 20 minutes or every 30

23    minutes, if you want to use that, and the emissions

24    from that, when it opens up, are somewhere between

25    five and 30 seconds.  You've got that?

1    A.   Got it.

2    Q.   Would emissions from that hypothetical be

3    consistent with what is listed and highlighted here

4    on page 4-2?

5    A.   It could be.

6    Q.   What if the emissions -- let's now go to a

7    different hypothetical.  If the emissions from the

8    pressure release valve/bleeder valve are going off

9    continuously for a long period of time, let's say

10   an hour, okay, would that be consistent with the

11   highlighted portion that is here?

12   A.   I think it would result with more emissions

13   than that as listed in this chart.

14   Q.   Okay.

15             MR. PERSONIUS:  Forgive me, Judge.  I -- I

16   missed the hypothetical.  It had to do with an

17   hour?

18             THE COURT:  It was an hour's period of

19   time.

20             MR. PERSONIUS:  With what -- pardon me.

21   With what frequency, your Honor?  I mean, how often

22   does it go for an hour?  I don't know if that's --

23             THE COURT:  Consistently, I think.

24             MR. PERSONIUS:  Oh, so it's going all the

25   time?

1          THE COURT:  Yeah, during that hour period

2     of time.

3          MR. PERSONIUS:  Right.  But then how

4     many -- how many hours in a day?  I mean --

5          THE COURT:  How would I now that?

6          MR. PERSONIUS:  Well --

7          THE COURT:  Yeah, I know.  Let's -- let's

8     get it refined a little bit, right?  Okay.  Please.

9          MR. PERSONIUS:  Sorry I wasn't clear.

10          THE COURT:  No, you were clear.  I only

11     know what I heard.  So we'll get him to amplify

12     Mr. -- you're the "him," Mr. Mango.

13          MR. MANGO:  I will, your Honor.

14          THE COURT:  All right.

15     BY MR. MANGO:

16     Q.  Let's -- let's expand that hypothetical.  The

17     pressure release valve/bleeder valve releases

18     continuously for one hour.  Let's assume that

19     happens once per day.  Would that be consistent

20     with the emissions that are highlighted here on

21     page 4.2?

22     A.  I mean, you could do the math.  It has the

23     emission factor in kilograms per hour.  It doesn't

24     have the hours that were used here to calculate

25     this .003.  So to really give you an accurate

1   answer, I've got to have a calculator.

2       But, in general, the more it goes off, the more

3   the emissions are.  If this is based on seconds,

4   then obviously minutes or hours would be a lot

5   more.

6               THE COURT:  Where do you see kilograms per

7   hour?

8               THE WITNESS:  In -- in the third column at

9   the top, "Emission Factor."  So there's -- there's

10  conversions that were done to get to tons per --

11  per year.  There was some assumption here that this

12  goes off once a year or for one second a year,

13  or -- you know, there's -- there was assumptions

14  made that are not in this chart.  You know, all the

15  information to calculate that number is not

16  presented here.

17              THE COURT:  Okay.

18  BY MR. MANGO:

19  Q.  Okay.  So to -- to accurately understand this

20  pressure release valve that's highlighted here, you

21  need to engage in some type of calculations to --

22  to figure that out?

23  A.  Correct.  This would require an application,

24  you know, with data.  We would do a permit review

25  and determine what the requirements would be.

1    Q.   Okay.  So -- so even sitting here today,

2    though, without your calculator -- you mentioned I

3    would need a calculator -- you -- you can't say

4    with certainty this pressure release valve -- with

5    the kilograms per hour source there, and the total

6    tons per year there, is it fair to say you can't

7    tell this jury how frequently this pressure release

8    valve is releasing?

9    A.   No, I cannot.

10   Q.   Okay.  I'd like to show you what's been marked

11   for identification purposes Government's Exhibit

12   18.04.

13             THE COURT:  Okay.  Before you go there --

14   I mean, in follow-up to that question, is your

15   answer that you can't tell if it was continuous for

16   an hour or if it was every ten seconds and stopped

17   at that?

18             THE WITNESS:  In this chart, no, I can't

19   tell that.

20             THE COURT:  Okay.  All right.  Thank you.

21             MR. MANGO:  Well, before -- I'd like to go

22   back.

23             THE WITNESS:  If I had my calculator, I

24   could do it for you, but --

25             THE COURT:  No, no, I'm not asking you to

334

1    do it, but I think when you say you can't determine

2    the time of emissions, I mean, you don't know if

3    it's an hour -- you don't know based on this.  I

4    mean, you could figure it out, I suppose.  But at

5    least in viewing it right now, you cannot tell if

6    it is a ten-second emission or if it's an hour

7    emission?

8              THE WITNESS:  Correct.

9              THE COURT:  Okay.  In duration.

10             MR. MANGO:  That's what I was going to get

11   at.  Thank you, your Honor.  We can move off -- if

12   we can go to Exhibit 18.04 for identification

13   purposes.

14       And absent an objection, I would move this into

15   evidence.

16             MR. LINSIN:  No objection, your Honor.

17             MR. PERSONIUS:  No objection.  Thank you,

18   Judge.

19             THE COURT:  Okay.  18.04 received.  No

20   objection.

21             (Government's Exhibit 18.04 was received

22             into evidence.)

23             MR. MANGO:  Okay.  If we can publish that

24    and then focus on this part.

25   BY MR. MANGO:

1    Q.  This is -- who is this letter sent from and who

2    is it to?

3    A.  This is a letter from Mark Kamholz with

4    Tonawanda Coke, dated April 23rd, 2004, to Larry

5    Sitzman, a regional air pollution control engineer.

6    Q.  And what does this letter discuss?

7    A.  It's relative to this minor -- minor source

8    status of a HAP.

9    Q.  Okay.  And it relates to this exhibit we just

10   looked at, is that correct, Exhibit 131?

11   A.  Yes, it does.

12   Q.  If we can go to the bottom paragraph here, off

13   the screen.

14       So it's starting with, "We propose that minor

15   source status be monitored."  What does that mean?

16   A.  They're offering conditions to maintain a minor

17   source status in their Title V permit.

18           THE COURT:  Who's making that offer?

19           THE WITNESS:  This is Tonawanda Coke.

20           THE COURT:  Thank you.

21   BY MR. MANGO:

22   Q.  Okay.  If we can -- now, at some point, there

23   is an expiration date on a Title V application, is

24   that right?

25   A.  Correct.

1    Q.   I mean, on a Title V permit.

2    A.   Correct.  They're good for five years.

3    Q.   So if Tonawanda Coke's Title V permit was

4    issued in 2002, five years from then would be 2007?

5    A.   Correct.

6    Q.   I'd like to show you what's been identified

7    Government Exhibit 18.06 for identification

8    purposes.

9         MR. MANGO:  And absent an objection, I'd

10   move this into evidence, your Honor, as the renewal

11   that was submitted.

12        THE COURT:  Okay.  It might be an

13   appropriate time to break.  All right?  Well, let's

14   find out, is there an objection?  Can you tell me

15   that?

16        MR. LINSIN:  I can tell you that.  No

17   objection, your Honor.

18        MR. PERSONIUS:  No objection, your Honor.

19        THE COURT:  Okay.  Then we will receive

20   18.06.  No objection.

21        (Government's Exhibit 18.06 was received

22        into evidence.)

23        THE COURT:  And, ladies and gentlemen, you

24   look hungry, and you persuaded me to let you go now

25   for lunch.  We'll start again at 2:00 o'clock.  Get

1    here right about 2:00, and we will go until -- we

2    have to break by 4:45 tonight, okay, so right

3    around in that vicinity.  I have a -- a meeting I

4    can't reschedule here.  But so -- and that's

5    basically the time we're going to try to break

6    anyway.  So 4:45 will be the target time just so

7    everybody knows.  Okay?

8         Have a great lunch.  Don't talk about the case.

9    Keep in mind it's very important to both sides.

10   Don't discuss it.  And we'll see you here at what

11   time?

12             THE JURY:  2:00 o'clock.

13             THE COURT:  Thank you.

14             (Jury excused from the courtroom.)

15             THE COURT:  Any matters we have to discuss

16   before we break?

17             MR. PERSONIUS:  Thank you, your Honor.

18             MR. MANGO:  No, your Honor.

19             MR. LINSIN:  Thank you, your Honor.

20             THE COURT:  Thank you very much.

21             (Lunch recess was taken.)

22             (Jury seated.)

23             THE COURT:  Good afternoon, ladies and

24   gentlemen.  Please have a seat.  Hope you had a

25   good lunch.

1          All right.  Okay.  Mr. Carlacci, if you would

2     resume the stand.  You remain under oath for -- we

3     are resumed in the case of United States versus

4     Tonawanda Coke Corporation and Mark Kamholz.  The

5     attorneys and parties are back present.  Our jury

6     is here ready, willing, and able to forge ahead.

7     Roll call waived, and I guess we're ready to go.

8          Counsel.

9               MR. MANGO:  Yes, your Honor.  Thank you.

10    BY MR. MANGO:

11    Q.  I think we left off Government Exhibit 18.06,

12    Mr. Carlacci, had been admitted into evidence.

13         Can you just tell the jury, if we can focus on

14    this section here, what this document is.

15              THE COURT:  Let's publish, I think,

16    please.

17              MR. MANGO:  Oh, yes, please.

18              THE COURT:  All right.  Mr. Mango, give me

19    the number on that again, please.

20              MR. MANGO:  Yes.  Exhibit 18.06.

21              THE COURT:  Okay.  And that was received

22    into evidence just before we broke?

23              MR. MANGO:  Yes.

24              THE COURT:  Okay.  Thank you.

25    BY MR. MANGO:

1   Q.  Can you tell the jury, please, Mr. Carlacci,

2   what Exhibit 18.06 is?

3   A.  This is a letter from Tonawanda Coke dated

4   October 20th, 2006, to the DEC permit

5   administrator.  A cover letter describing a renewal

6   application for a Title V permit.

7   Q.  All right.  So as you mentioned before, the

8   original Title V permit had an expiration date.

9   A.  The expiration date was sometime in 2007.

10  Q.  Okay.  And so at this point this is the renewal

11  submitted to get another Title V permit?

12  A.  Correct.  Within -- 201 states that no -- no --

13  within 18 months and no later than six months of

14  the expiration date you're required to submit a

15  permit application for renewal.

16  Q.  Have you looked through this renewal

17  application?

18  A.  Yes, I have.

19  Q.  Okay.  I'm going to ask you a couple questions

20  about that.  Is there any mention in this renewal

21  application that quench tower number 2 is being

22  used without baffles?

23  A.  No, there's not.

24  Q.  Is there any indication in this renewal

25  application that quench tower number 1 is being

1    used more than 10 percent of the time?

2    A.   No, there's not.

3    Q.   And, finally, is there any indication in this

4    renewal application that there is a bleeder or

5    pressure release valve being used in the

6    by-products department?

7    A.   No, there is not.

8    Q.   I'd like to show you for identification

9    purposes exhibit -- actually, I'd like to stay on

10   18.06 for a moment.  If we can go to page number 4,

11   and then -- actually, to the fifth page, please.

12        Do renewal applications contain a

13   certification?

14   A.   Yes, they do.  Same as the certification we

15   read earlier --

16   Q.   Okay.

17   A.   -- for the initial application.

18   Q.   Okay.  Let's focus on that.  And who signed

19   the -- as responsible officer in this top box?

20   A.   Mark Kamholz.

21   Q.   That's for Title V certification?

22   A.   Correct.

23   Q.   And he signed on October 20th of 2006?

24   A.   Correct.

25   Q.   Is it fair to say this last line says, "I

1    believe the information is true, accurate, and

2    complete.  I'm aware that there is significant

3    penalties for submitting false information,

4    including the possibility of fines and imprisonment

5    for knowing violations"?

6    A.   That's exactly what it says.

7    Q.   All right.  If I can show you for

8    identification purpose Exhibit 18.07.

9              MR. MANGO:  And if there's no objection,

10   your Honor, I would move to admit this into

11   evidence as being part of the renewal application.

12             MR. PERSONIUS:  I just need a minute,

13   Judge.  I apologize.

14             THE COURT:  Certainly.

15             MR. LINSIN:  How many pages is this

16   document, please?

17             MR. MANGO:  It's four pages, your Honor.

18             MR. LINSIN:  Can we just -- could I

19   request that we scroll through them?

20             THE COURT:  Sure.

21             MR. LINSIN:  Okay. No objection.

22             THE COURT:  You can't afford to blink,

23   Mr. Piaggione, or Ms. DiFillipo has them already

24   scrolled.

25             MR. PIAGGIONE:  Story of my life.  Always

1    blinking at the wrong time.

2              THE COURT:  It's the story of many of us.

3        All right.  And then over the weekend we're

4    going to get Mr. Personius a tutorial on managing

5    papers in a binder.  I hope you don't mind.

6              MR. PERSONIUS:  I'm only supposed to be

7    treated this way at home, Judge.  I apologize.  I

8    just got to quickly look at it, Judge.  I'm sorry.

9        Your Honor, with the understanding that this

10   was just part of the renewal application that was

11   all submitted at the same time, we have no

12   objection.  Again, I'm not sure why there's a

13   separate marking, but maybe they were submitted

14   stapled separately.  I don't know.

15             THE COURT:  Okay.  So 18.07 is a part of

16   18.06?

17             MR. MANGO:  Yes, Your Honor.

18             THE COURT:  All right.  And that -- that

19   helps clarification-wise --

20             MR. PERSONIUS:  Thank you, Judge.

21             THE COURT:  -- so I'll receive it.

22   There's no objection.  18.07 in.

23             (Government's Exhibit 18.07 was received

24             into evidence.)

25             MR. MANGO:  Okay.  And I ask that it be

1    published for the jury.

2  BY MR. MANGO:

3    Q.   And Mr. Carlacci, if you can, tell the jury

4    what is Exhibit 18.07.

5    A.   This exhibit is a list of exempt activities at

6    the facility, and it's required to be submitted

7    with every Title V application.

8    Q.   Okay.  Or renewal application?

9    A.   Or renewal application, correct.

10   Q.   Okay.  So any of the exempt activities need to

11   be submitted to the department?

12   A.   Correct.

13   Q.   Okay.  Now, we've been talking about trivial

14   activities as well, an emergency pressure relief

15   event or stack.  Trivial activities don't need to

16   be reported, is that correct?

17   A.   That's correct.

18             THE COURT:  All right.  Mr. Mango, you

19   sometimes refer to exempt and exclusion.  Is that

20   -- is there any distinction?

21             MR. MANGO:  I'll ask the witness that

22   question, your Honor.

23             THE COURT:  Fair enough.

24  BY MR. MANGO:

25   Q.   Mr. Carlacci, this -- this form here says

1   exempt -- exempt activities.  Is that the language

2   that's used in the regulation?

3   A.   Exempt activities would be those sources that

4   do not require a permit, but still must meet the

5   applicable reg for -- for maintenance of equipment,

6   maintenance of any emissions that come out of that

7   source, or if it has control, maintenance of that

8   control equipment.  But it doesn't need a

9   particular permit.  If -- or say a silo is an

10  exempt activity that has a bag house storing, let's

11  say, salt.  If the bag house was not there, it

12  wouldn't be exempt.  If the bag house is improperly

13  maintained, it would not be exempt.  The exempt

14  activities, the total of emissions from those, are

15  still required to be included in determining if

16  you're Title V applicable.  The emissions from them

17  exempt activities, plus those that are required to

18  have a permit as a total exceed that source

19  threshold in Title V requires a Title V permit.  So

20  that's why we ask for the list, and the

21  calculations of emissions should be included in the

22  application.  Trivial activities are those that

23  emissions are -- are not of concern.

24  Q.   Okay.  So if -- if there's been any reference

25  on my part, I apologize.  Excluded activities,

1    that's not a term you used in the -- in the

2    regulations?

3    A.   Trivial is -- is the other section that defines

4    those things that are not exempt, that do not

5    require a permit.

6    Q.   Okay.  So the real distinction is between

7    exempt and trivial activities?

8    A.   Correct.

9    Q.   Okay.

10              THE COURT:   Thank you.

11   BY MR. MANGO:

12   Q.   And in this document there's no mention of a

13   bleeder or pressure release valve in the

14   by-products unit, is there?

15   A.   Not on this page.

16   Q.   If we can go to the next page.

17   A.   Not on this page either.

18   Q.   Okay.  Give us a number.  Is that 02 and 03?

19   Yes?

20   A.   It's 02.

21   Q.   Now 03?

22   A.   03, no mention on this page also.

23   Q.   And then 04?

24   A.   No mention on that page also.

25   Q.   Okay.  I'd like to show you now for

1    identification purposes Exhibit 19-15.

2            MR. MANGO:  And I would offer that into

3    evidence, your Honor, if there is no objection.

4        There is handwriting and I believe the witness

5    would be able to identify this handwriting, if

6    necessary.

7            MR. LINSIN:  No objection, your Honor.

8            MR. PERSONIUS:  No objection, Judge.

9            THE COURT:  Okay.  19.15 received.  No

10   objection.

11           (Government's Exhibit 19.15 was received

12           into evidence.)

13           MR. MANGO:  I'd ask that that be published

14    for the jury.

15   BY MR. MANGO:

16    Q.  And if we can -- if you can first just tell the

17    jury what we're looking at here, the date of the

18    letter.

19    A.  The date of this letter is November 24th, 2009,

20    from Mark Kamholz from Tonawanda Coke to Larry

21    Sitzman the RAPCE.

22   BY MR. MANGO:

23    Q.  Okay.  At -- the RAPCE at the time, okay.  If

24    we can focus in on that.  What is this letter

25    telling the department?

1   A.   It's telling the department that Tonawanda Coke

2   has reinstalled baffles on its number 2 quench

3   tower.

4   Q.   And that note in the upper right corner, whose

5   handwriting is that?

6   A.   Cheryl Webster.

7   Q.   She is an engineer in your department?

8   A.   Yes, she is.

9            THE COURT:   All right.   You made mention

10  of the RAPCE again.   That's the regional air

11  pollution --

12           THE WITNESS:   Regional air pollution

13  control engineer.

14           THE COURT:   Control engineer, okay.

15           MR. MANGO:   Great.   I'd like to show you

16  now what's identified as Government Exhibit 19.16.

17      And I would offer this into evidence subject to

18  any objection.

19           MR. LINSIN:   Your Honor, I -- I have just

20  an inquiry.   Fundamentally I don't object to the

21  authenticity of the document.   This document and

22  the last document are correspondence that are

23  responsive to certain NOVs, notices of violations,

24  that were issued.   And my question is simply

25  whether the government intends to simultaneously

1    introduce the NOVs that prompted these

2    notifications.  I believe for purposes of

3    completeness and clarity, those would be very

4    important.

5              MR. MANGO:  No, your Honor, we were not,

6    as that relates to other matters subject of civil

7    issues that I don't think are -- are necessary

8    to -- to -- to come in in this case or -- or

9    relevant to civil issues.  But the government is

10   simply offering this to show that an admission,

11   in -- in sense by the Tonawanda Coke Corporation

12   that there were no baffles in the quench tower

13   number 1, similar to that letter we just looked at

14   that there were no baffles in quench tower number

15   2.

16             MR. LINSIN:  And, your Honor, the NOV to

17   which this letter is responsive, as I recall, was

18   issued during the period of the indictment.  And

19   the government is offering these, I think, for -- I

20   mean, we'll do it ourselves, if need be, but we

21   think for fairness purposes they should be offered

22   simultaneously.

23             THE COURT:  Well, I don't know if it's

24   necessary for completeness.  That's what you're

25   arguing.  Your proffer on this is with respect to

1    the installation of the baffles on number 1?

2                MR. MANGO:  Yes, your Honor.

3                THE COURT:  Yeah, I'll allow it for that

4    purpose.  Objection overruled.

5        You may proceed, and it is received into

6    evidence over objection.  So that's 19.16?

7                (Government's Exhibit 19.16 was received

8                into evidence.)

9                MR. MANGO:  Yes, your Honor.  And I'd ask

10   that it be published, and if we could just focus in

11   on that section.

12   BY MR. MANGO:

13   Q.  If you could, tell the jury what this is,

14   Mr. Carlacci.

15   A.  This is a letter from Robert Kolvek, the

16   Tonawanda Coke Corporation dated January 25th, 2010

17   to Mr. Larry Sitzman of DEC.

18   Q.  Okay.  And it's stating that -- what with

19   respect to baffles?

20   A.  Stating that Tonawanda -- Tonawanda Coke

21   Corporation has installed baffles on its number 1

22   quench tower.

23   Q.  All right.  Let's talk about monitoring and

24   compliance that needs to be done under Title V.

25   You had discussed that, is that right, yesterday?

1          All right.  Are there forms that must be

2     submitted to the department by Title V facilities

3     that indicate whether they're in compliance with

4     their Title V permit?

5     A.  Yes, there are.  Every six months and annually

6     a deviation report must be submitted that lists

7     compliance with all the conditions in the permit.

8     Annually a certification is submitted that does the

9     same thing along with the deviation report, and

10    also describes any violations and how they

11    addressed them --

12              MR. MANGO:  Okay.  If we could pull up

13    Government Exhibit 31 for identification purposes.

14         And I would move this into evidence, your

15    Honor, absent an objection.

16              THE COURT:  Who prepares the deviation

17    report?

18              THE WITNESS:  The burden is on the company

19    to prepare these reports.  It was part of the

20    Title V requirements.

21              THE COURT:  Okay.  What -- what exhibit do

22    we have now?

23              MR. MANGO:  Thirty-one.  If we could pull

24    up Exhibit 31.

25              MR. LINSIN:  No objection, your Honor.

1          MR. PERSONIUS:  No objection, Judge.

2          THE COURT:  Okay.  Thirty-one received.

3    No objection.

4          (Government's Exhibit 31 was received into

5          evidence.)

6          MR. MANGO:  Thank you, your Honor.  And

7    I'd ask that this be published to the jury.

8          THE COURT:  Okay.

9    BY MR. MANGO:

10   Q.  And, Mr. Carlacci, can you tell the jury what

11   Exhibit 31 is?

12   A.  This is the cover sheet of an annual report for

13   the year 2005 documenting certification of truth,

14   accuracy, and completeness from Tonawanda Coke to

15   the department.

16   Q.  Okay.  And if -- the facility contact here is

17   listed as who?

18   A.  Mark Kamholz.

19   Q.  His title?

20   A.  Manager, environmental control.

21   Q.  All right.  And the responsible officer or the

22   title of that is who?

23   A.  Gerald A. Priamo, P-R-A-M-O[sic].

24   Q.  And what's his title?

25   A.  Plant manager.

1    Q.   Okay.  And if we can focus in on that part.

2    That -- that certification essentially is saying

3    that this is certified under penalty of law to be

4    true?

5    A.   Correct.

6    Q.   Okay.  Now, if we can go to the next page.

7              THE COURT:  Whose signature is that?

8              MR. MANGO:  Do you know whose signature

9    that is, Mr. Carlacci?

10             THE WITNESS:  I'm going to guess that's

11   Priamo, if we can go back and see the initial As in

12   this.  Gerald A. Priamo.  It looks like a Gerald A.

13   Priamo signed it.

14             MR. PERSONIUS:  Judge, rather than have a

15   record where he's guessing, I'm at least prepared

16   to stipulate that that's Mr. Priamo's signature.

17             MR. MANGO:  Okay.  So stipulated.

18             MR. LINSIN:  No objection, your Honor.

19             THE COURT:  All right.

20   BY MR. MANGO:

21   Q.   If we could go to the second page of this

22   exhibit.  Page 2.  Okay.  So why don't you tell the

23   jury, is this one of these deviation reports?

24   A.   Correct.  This is a deviation report listing

25   all the applicable requirements, a short

1    description, the compliance status, whether it was

2    continuous or intermittent, a method used to

3    determine compliance, and whether or not that was

4    deviation.

5    Q.   Okay.  And with respect to condition 4 listed,

6    is there any deviation noted?

7    A.   No deviation noted.

8    Q.   If we could go to page 6, please.  Okay.  With

9    respect to conditions 96 and 97, do you remember

10   those conditions we just talked about in the

11   Title V permit?

12   A.   Those were the two relative to the quench

13   tower.

14   Q.   Yes.  With respect to conditions 96 and 97,

15   does it list any deviation?

16   A.   Correct.  It lists a description compliance

17   certification for quench tower.  Status,

18   continuous.  No deviation.

19            THE COURT:  How do we know a deviation

20   report and monitoring report is the same thing?

21            THE WITNESS:  The monitoring -- the

22   devises report is this right here.  If there was a

23   deviation, you would detail that in a separate

24   report and then annually would summarize all those

25   deviations to determine what you did.  You know, if

1    it's still occurring, if there was compliance

2    issues, et cetera.

3              THE COURT:  And then you get this

4    monitoring report from the facility?

5              THE WITNESS:  Correct.  The facility fills

6    this out, does their monitoring based upon what we

7    agreed on is in the Title V permit.

8              THE COURT:  But they self-monitor?

9              THE WITNESS:  Basically.

10             THE COURT:  Okay.

11   BY MR. MANGO:

12   Q.  So to follow up with another question, this

13   page that we're physically looking at, this is

14   created by the facility?

15   A.  Yes.

16   Q.  And sent to DEC in this manner?

17   A.  Yes.

18   Q.  DEC doesn't fill this -- these items out?

19   A.  No.

20             MR. MANGO:  Okay.  If we can move to

21   Exhibit 32, please, for identification purposes.

22   And absent an objection, I would ask that this be

23   admitted into evidence.

24             THE COURT:  Okay.  Exhibit 32.

25             MR. LINSIN:  No objection, your Honor.

1          MR. PERSONIUS:  No objection, Judge.

2          THE COURT:  Okay.  Received into evidence.

3    No objection.

4          (Government's Exhibit 32 was received into

5          evidence.)

6    BY MR. MANGO:

7    Q.  So what we just looked at, Exhibit 31, was an

8    annual for reporting period 1/1/05 to 12/31/05.

9    Now, with respect to Exhibit 32, what is the report

10   type listed at the top?

11   A.  This report type is a semi-annual report.

12   Q.  All right.  And the period of time?

13   A.  For the first six months in 2005.

14   Q.  All right.  If we can go to the second page of

15   this document.  Now, the second page here, this is

16   the start of the semi-annual monitoring report, is

17   that right?

18   A.  Correct.

19   Q.  The actual spreadsheet version, there's -- it

20   starts at condition 24.  Why is that?

21   A.  In the beginning of the permit, usually it has

22   conditions that are codified in the reg exactly

23   verbatim.  Like 201, that says "You must submit a

24   semi-annual report."  There's nothing different

25   about that condition.  It's in the rule.  These

1    conditions, you know, may -- may have been altered

2    slightly that you develop your own monitoring

3    specification, and the department added to the

4    monitoring that was required.

5    Q.   Okay.  So let's say condition 4 is not there.

6    Was that not necessary in a semi-annual report?

7    A.   Not necessary in a semi-annual report.

8    Required in the annual monitoring report.

9    Q.   Okay.  If we could go to page -- the page 3 of

10   this document, the next page.

11       So condition 96 at the bottom there -- is there

12   though.  So condition 96 had to be certified on a

13   semi-annual basis?

14   A.   Correct.

15   Q.   In addition to an annual basis?

16   A.   Correct.

17   Q.   And here it says, "No deviation," is that

18   right?

19   A.   That's what it says.

20   Q.   Okay.  If we could go to page 3 of -- I'm

21   sorry -- page 4 of this exhibit.  And condition 90

22   is there as well, is that right?

23   A.   That's correct.

24   Q.   No deviation?

25   A.   Correct.

1    Q.  Let me show you Exhibit 33, please, for

2    identification purposes.

3          MR. MANGO:  And absent an objection, your

4    Honor, I would move that into evidence.

5          MR. LINSIN:  No objection, your Honor.

6          MR. PERSONIUS:  No objection, Judge.

7          THE COURT:  Okay.  Thirty-three received

8    into evidence.  No objection.  It may be published.

9          (Government's Exhibit 33 was received into

10          evidence.)

11   BY MR. MANGO:

12   Q.  Now, for this exhibit that we have up, what

13   report type is it, and what reporting period is it

14   for?

15   A.  This is an annual report for the period -- for

16   the year 2006.

17   Q.  If we can look at page 2 of this exhibit.

18   Condition number 4 is listed there.  Do you see

19   that?

20   A.  Correct.

21   Q.  Is there any deviation reported?

22   A.  No deviations noted.

23   Q.  If we could go to page 6 of this exhibit.

24   Ninety-six and 97, any deviation reported?

25   A.  No deviations noted.

1    Q.   Move to Exhibit 34.   I'll show you that for

2    identification purposes.   Exhibit 34.

3              MR. MANGO:   Absent an objection, move that

4    into evidence, your Honor.

5              MR. LINSIN:   No objection.

6              MR. PERSONIUS:   No objection, Judge.

7              THE COURT:   Thirty-four received.   No

8    objection.

9              (Government's Exhibit 34 was received into

10             evidence.)

11             MR. MANGO:   I'd ask that that be published

12    for the jury.

13   BY MR. MANGO:

14    Q.   And if you could tell the jury, Mr. Carlacci,

15    what's the report type and the reporting period?

16    A.   Report type, semi-annual, for the first six

17    months of 2006.

18    Q.   Okay.   And if we can go to page 3 of that

19    document.   Condition 96, any deviation listed?

20    A.   No deviation listed.

21    Q.   Next page, please.   Page 4, condition 97, any

22    deviation listed?

23    A.   No deviation listed.

24    Q.   I'd like to show you Government Exhibit 35,

25    and -- for identification purposes.

1          MR. MANGO:  And I ask that that be

2     admitted into evidence, your Honor, subject to an

3     objection.

4          MR. LINSIN:  No objection, your Honor.

5          MR. PERSONIUS:  No objection, Judge.

6          MR. MANGO:  Thirty-five.

7          THE COURT:  Thirty-five received into

8     evidence.  No objection.  May be published.

9          (Government's Exhibit 35 was received into

10          evidence.)

11          MR. MANGO:  Thank you, your Honor.  I ask

12     that that be published.

13    BY MR. MANGO:

14    Q.  And if you could look at the report type and

15     the reporting period, Mr. Carlacci, and tell the

16     jury what that is.

17    A.  This is an annual report for the year 2007.

18    Q.  Okay.  If we could go to page 2.  Is there any

19     deviation listed for condition number 4?

20    A.  No deviations listed.

21    Q.  If we can go to page 6 of this document.

22     Conditions 96 and 97, any deviation listed?

23    A.  No deviation mentioned.

24    Q.  If we can take a look at Government Exhibit 36,

25     for identification purposes.

1          MR. MANGO:  And subject to an objection,

2     move that into evidence, your Honor.

3          MR. LINSIN:  No objection.

4          MR. PERSONIUS:  No objection, your Honor.

5          THE COURT:  All right.  Thirty-six

6     received.  No objection.

7          (Government's Exhibit 36 was received into

8          evidence.)

9          MR. MANGO:  I'd ask that that be published

10     for the jury.

11    BY MR. MANGO:

12    Q.  And if you could tell the jury, Mr. Carlacci,

13     the report type and the reporting period.

14    A.  This is a semi-annual report for the first six

15     months of 2007.

16    Q.  If we could go to page 3 of that document.

17     Condition 96 at the bottom, any deviation listed?

18    A.  No deviations.

19    Q.  Page 4, please.  Any deviations listed for

20     exhibit -- condition 90?

21    A.  No.

22    Q.  Take a look at Government Exhibit 37, for

23     identification purposes.

24          MR. MANGO:  And subject to an objection,

25     your Honor, the government would move that into

1    evidence.

2              MR. LINSIN:  No objection, your Honor.

3              MR. PERSONIUS:  No objection, Judge.

4              THE COURT:  Okay.  Thirty-seven received.

5    No objection.

6              (Government's Exhibit 37 was received into

7              evidence.)

8              MR. MANGO:  I'd ask that that be

9    published.

10   BY MR. MANGO:

11   Q.  And, Mr. Carlacci, can you tell the jury the

12   report type and the reporting period?

13   A.  This is an annual report for the year 2008.

14   Q.  Okay.  And if we can go to page 2, condition

15   number 4, any deviation listed?

16   A.  No.

17   Q.  If we could go to page 6, conditions 96 and 97,

18   any deviation listed?

19   A.  No.

20   Q.  Finally, I'd like to show you Government

21   Exhibit 38, for identification purposes.

22             MR. MANGO:  And subject to an objection,

23   move that into evidence, your Honor.

24             MR. LINSIN:  No objection, your Honor.

25             MR. PERSONIUS:  No objection, Judge.

362

1          THE COURT:  All right.  Exhibit 38

2      received.  No objection.

3              (Government's Exhibit 38 was received into

4              evidence.)

5              MR. MANGO:  Thank you, your Honor.  And

6      I'd ask that that be published.

7      BY MR. MANGO:

8      Q.  And, Mr. Carlacci, can you tell the jury the

9      report type and the reporting period?

10     A.  This is a semi-annual report for the first six

11     months of 2008.

12     Q.  If we could go to page 3 of that document.

13     Condition 96 at the bottom there, any deviation

14     reported?

15     A.  No.

16     Q.  And the next page, page 4, please.  Any

17     deviation listed for condition 97?

18     A.  No.

19     Q.  Okay.  I want to switch gears now.  You've --

20     we have gone through a lot of documents, and during

21     your testimony, when you were talking about your

22     duties and as an environmental engineer 2, I

23     believe you mentioned that you were involved in an

24     air study in the Tonawanda area.

25     A.  Correct.

1    Q.   Is that right?

2    A.   Yes.

3    Q.   Okay.  If you could, tell the jury how that air

4    study began.

5              THE COURT:  Time frame, please.

6    BY MR. MANGO:

7    Q.   When did -- when did the air study, the DEC air

8    study begin?

9    A.   We did two -- two rounds of sampling.  There --

10   there was canisters that we did as well as a

11   full-blown study.  The canisters we did was

12   in 2006, and the study started in July of 2007.

13   Q.   Okay.  So 2006 is when you took canister

14   samples?

15   A.   Correct.

16   Q.   Did anything happen before 2006 that prompted

17   the DEC to start taking canister samples?

18   A.   We took -- what prompted us to do that was the

19   Clean Air Coalition had taken some ambient air

20   samples in -- in that industrial area.  And that --

21             MR. PERSONIUS:  Objection, your Honor.  I

22   don't think we need more than that to answer the

23   question.  I'm concerned if the witness continues

24   to testify, he'll get into an area we've agreed

25   will not be part of the trial.  The question was --

1    I won't say --

2              THE COURT:  The question is what

3    occasioned the taking of the air sample.

4              MR. PERSONIUS:  And he answered.  He said

5    it was something from this group called the Clean

6    Air Coalition.

7              THE COURT:  Right.  And the one ruling

8    related to no testimony about the -- the results.

9              MR. PERSONIUS:  Exactly.  And that's where

10   I was concerned the witness was going.

11             MR. MANGO:  Right.  But my understanding,

12   your Honor, was we've got to have an understanding

13   of at least that there was some concern from those

14   results that prompted the DEC to do their own

15   canister studies.

16             THE COURT:  Okay.  Well, I think the

17   witness has testified that that's what occasioned

18   the DEC's activity.

19             MR. MANGO:  Yeah.

20             THE COURT:  So you can move from there.

21             MR. MANGO:  Yes.

22   BY MR. MANGO:

23   Q.  Okay.  Briefly, though, you mentioned the Clean

24   Air Coalition.  What is the Clean Air -- Clean Air

25   Coalition?

365

1    A.   It's residents of Tonawanda that had concern

2    with their environment --

3    Q.   Okay.

4    A.   -- and were organized and took some action.

5    Q.   Okay.  And they presented their results to you?

6    A.   Yes.

7    Q.   And that prompted you, then, as you're saying

8    now, to take canister samples?

9    A.   We took canister samples, to -- to -- to -- so

10   that we could see if there was concern.

11   Q.   What were some of the contaminants of concern

12   that you were looking at?

13   A.   We did a Method TO15, which measures for 42

14   different volatile organic compounds.  That's a lab

15   method.  Benzene is one of the contaminants that we

16   looked for in that -- in that method when we did

17   the canister samples.

18   Q.   Were you concerned with benzene?

19   A.   Yeah.

20   Q.   So you -- you took canister samples.  Describe

21   what canister samples are.

22   A.   It's a one-liter stainless steel glass-lined

23   canister that is evacuated on the negative

24   pressure.  You can open it, and it will suck in

25   ambient air through an orifice over a period of

1   time so that you can analyze it and get a

2   concentration in the ambient air.

3   Q.   Okay.  And ambient air you already mentioned.

4   That's just -- you just mean the air we breathe?

5   A.   Correct.

6   Q.   All right.  So you took these canister samples.

7   Did the results -- were there -- were there any

8   concern when you got the results from those

9   samples?

10   A.   Yes, there was concern.

11   Q.   Okay.  For what contaminants?

12   A.   Benzene.

13   Q.   All right.  And then you mentioned you prompted

14   a full-blown study?  Why don't you tell the jury

15   what you meant by a "full-blown study"?

16   A.   There was enough concern there to apply to the

17   EPA for a grant to do a study in the area, and the

18   EPA granted us funds based on a plan to do this

19   study.

20   Q.   Okay.  And what -- why don't you tell the jury

21   a little bit about the study.  How was it set up,

22   and what was the purpose of the study?

23   A.   Part of the study was, you know, to identify

24   this concern.  You know, we had inventory of the

25   facilities in this area.  The sources of benzene of

1    concern were NOCO, Sunoco, and Tonawanda Coke.  The

2    inventory showed that the emissions from Sunoco

3    were about 400 pounds a year of benzene.

4         MR. PERSONIUS:  Your Honor, I object to

5    getting into the results.  I mean, I think it's

6    clear we're not getting into the results.  The

7    witness knows it.

8         THE COURT:  I think you're right.  I don't

9    think we have to go there.

10         MR. MANGO:  Yeah, we can abstain.  We can

11    move on from the results.

12      And while we're doing this, your Honor, I would

13    actually ask that Exhibit 105.07 that's already in

14    evidence be brought up on the screen.

15  BY MR. MANGO:

16  Q.   Okay.  So why don't you -- why don't you start

17    again there.  You said you were concerned.  And if

18    you need to point things out -- well, let me just

19    start in.  Were monitoring stations put in place?

20  A.   Yes.  Part of the plan was to do some ambient

21    air sampling for a year.  We agreed to do a Method

22    TO15 sample at four different stations, as well as

23    sample for carbonyl compounds.  An example of a

24    carbonyl compound is formaldehyde and methyl ethyl

25    ketone.

1        We also did a PM 2.5 sample of particulate

2   matter less than 2.5 microns in size.  That's an

3   inhalable particle of concern.  Size of concern.

4        We did SO2 monitoring and carbon monoxide

5   monitoring at four stations in this area.  I can

6   identify the locations of the stations?

7             MR. MANGO:  Yes.

8             THE COURT:  What's SO2?  Is that sulfur

9   dioxide?

10             THE WITNESS:  Sulfur dioxide, correct.

11   BY MR. MANGO:

12   Q.  Yes.  If you can, please, point out with --

13   again, if you touch the screen it will add a little

14   arrow where your monitoring locations were.

15   A.  Okay.  The largest source of benzene is -- is

16   right here.  We had monitoring stations upwind on

17   Grand Island Boulevard, which, you know, was on --

18   on the other side here, on Grand Island, excuse me.

19   That was our upwind monitoring stations at the --

20   by the golf course where the -- they repair the

21   golf carts.

22   Q.  So across the river?

23   A.  Across the river, yeah.  Thirty percent of the

24   time the wind comes from the southwest in this

25   direction.  We had a monitoring station at Grand

1    Island Boulevard right there.

2        We had a monitoring station at the water tower

3    at the Two Mile Creek Road Golf Course, which is --

4    which is off this diagram here.

5    Q.  Can you put the arrow where it's off the

6    diagram, please?

7    A.  It would be in that direction -- it would be in

8    that direction there.

9        And then another one in a community on

10   Brookside terrace Drive.  Basically inline with

11   this -- with this station on Grand Island Boulevard

12   in that direction.

13   Q.  Okay.  And, again, what is the prevailing wind

14   direction in this area?

15   A.  Thirty percent of the time the wind is out of

16   the southwest in this direction.

17   Q.  Thirty percent of the time?

18   A.  Approximately.

19   Q.  Would that be the prevailing --

20   A.  Prevailing winds.

21   Q.  Okay.  So you took samples, then, of air on a

22   daily basis.  How often would samples be taken at

23   these different locations?

24   A.  The TO15 method was via canister.  The carbonyl

25   samples were through cartridges.  Those were done

1    once every six days.  The TO, the piece of

2    equipment that measured the PM 2.5 was continuous.

3    Q.  Did you get some preliminary results back in

4    six months in your study?

5    A.  Right.  We had some preliminary data, you know,

6    that -- that showed concern for benzene emissions.

7    We were able to -- we had weather stations at --

8    at -- at a couple of these monitoring stations so

9    we can identify when the wind was coming across

10   Tonawanda Coke.  And the data showed concern.  You

11   know, there was enough there to believe that on an

12   annual basis there may be more emissions than what

13   was reported in the emissions statements from this

14   facility.

15   Q.  Okay.  So this is sometime in -- when did your

16   full-blown study begin?

17   A.  It began in July of 2007 and ended in July

18   of 2008.

19   Q.  Okay.  So by May of 2008?

20   A.  In May we had some preliminary data that gave

21   us this indication.  We had a conversation with the

22   RAPCE, Larry Sitzman at the time, and felt it was a

23   good idea to present this data to Tonawanda Coke

24   and see if we can find -- you know, find -- find

25   some of the sources, find some reductions to

1    minimize the emissions.

2    Q.   Okay.  Now, so in May of 2008 is when your

3    preliminary results came in?

4    A.   Correct.

5    Q.   And they showed elevated levels of benzene?

6    A.   Correct.

7    Q.   And at that time, are you testifying that you

8    believed that elevated level of benzene was coming

9    from Tonawanda Coke Corporation?

10   A.   Yeah.

11   Q.   All right.  Now, had you been to the Tonawanda

12   Coke Corporation prior to this?

13   A.   No.

14   Q.   Before May of 2008?

15   A.   No.

16   Q.   Okay.  And you mentioned there was a discussion

17   between you and Larry Sitzman.

18   A.   Yes.

19   Q.   What did you guys decide to do?

20   A.   We decided to go visit Tonawanda Coke, Mark

21   Kamholz, and show him the data, and -- and discuss

22   it with him.

23   Q.   Okay.  And you did that?

24   A.   And we did that on May 28th, I believe, 2008.

25   Q.   So May 28th, 2008, you go --

1    A.   Myself, Larry Sitzman, Cheryl Webster, and Gary

2    Foersch met with Mark Kamholz.

3    Q.   Okay.  And when -- take us through the -- the

4    jury through the process.  When you first got to

5    the site, what did you have to do to get in and who

6    did you meet with?

7    A.   You go to a guard gate.  You announce that

8    you're there to visit Mark Kamholz, and they call

9    Mark and direct you to the -- where to meet him in

10   his -- in the offices.

11   Q.   Okay.

12   A.   So we met with Mark.  You know, I discussed

13   similar to what I just did here for you.  I showed

14   him a -- a graph that had particular days where the

15   winds were coming from the southwest across the

16   plant that indicated, you know, benzene levels of

17   concern.  And -- and I asked him for some input as

18   to, you know, what he thought may be contributing

19   to this.  You know, basically we wanted to have,

20   you know, an opportunity to discuss it with him, so

21   that he could help us find -- find -- find the

22   source of -- if there was one, that -- that was of

23   concern and get reductions.

24   Q.   Okay.

25             THE COURT:  Before you go on, tap the

1     exhibit in terms of where the gate is and where the

2     offices are.

3               MR. MANGO:  In fact, your Honor, if we

4     could zoom in to this portion, that may help us in

5     doing this, your Honor.

6               THE COURT:  Okay.

7               THE WITNESS:  This is the entrance to

8     Tonawanda Coke.  Gate house should be right here.

9     It's hard to see.

10              THE COURT:  That's the gate?

11              THE WITNESS:  There is a gate here and a

12    gate house with an officer who is at that box.

13              THE COURT:  Okay.  Where are the offices?

14              THE WITNESS:  This is the office here.

15              THE COURT:  So you went from the gate area

16    away from the Coke ovens and all that stuff to the

17    offices?

18              THE WITNESS:  Correct.

19              THE COURT:  Okay.

20              MR. MANGO:  So, again, tell the jury how

21    was your interaction with Defendant Kamholz during

22    this -- this meeting in his office?

23              MR. PERSONIUS:  Your Honor, I object to

24    that question.  How was his interaction?  Object to

25    it.

1          THE COURT:  To the form, I'll sustain it.

2     Rephrase it.

3   BY MR. MANGO:

4   Q.  Describe your interaction with Defendant

5   Kamholz during your meeting in his office.

6   A.  Well, I presented the data, like I said, and,

7   you know, basically we were there just to see if we

8   can work together to figure something out to kind

9   of take a look at the by-products plant, you know,

10  together.  Hopefully -- you know, hopefully with

11  our input and Mark's, we can see if we can learn

12  something about the facility, about that side of

13  the plant, or -- or the battery to find -- to find

14  reductions.  That's all we were after.

15       And, you know, I gave my little speal and Mark

16  was -- is relatively quiet, you know, when I asked

17  him, you know, can you think of anything that

18  contributes to these sources.  You know, he had

19  nothing to add.  So I asked that, you know, can we

20  take a quick tour of the by-products plant.  You

21  know, we couldn't stay very long.  We wanted to

22  be -- so we took a tour.  He gave us a -- we

23  walked -- I think we may have drove towards the

24  battery and parked in this area here and then

25  walked down the alley between the coke ovens and

1    the by-products area.  And I was just basically

2    asking questions about the different sources there

3    to see if we can, you know, identify some benzene

4    emissions.

5    Q.  Let's be very clear.  You were -- you were

6    telling him you were concerned about benzene?

7    A.  Yes.

8    Q.  And when you asked him what you just said, do

9    you have any ideas or any suggestions, how did he

10   answer that question?

11   A.  He did not have any -- any input.  You know,

12   there was no -- no information that I recall that

13   he gave back.  It was a shrug of a shoulder or

14   something like that.

15   Q.  Okay.  So at some point, then, you all leave.

16   Did you -- did you follow him, or did you ride

17   together, if you can recall?

18   A.  I don't recall if we drove in separate cars to

19   that spot or if we took a van.

20   Q.  Okay.  And so now you get into the production

21   facilities here?

22   A.  We basically started on the other side of this

23   where this steam plume is.  That's the alleyway

24   there that goes between the -- the battery and the

25   by-products plant.

1    Q.   All right.

2              MR. MANGO:   If you can -- actually, I'd

3    like to, your Honor, at this point pull up

4    Government Exhibit 105.23, which is part of the

5    stipulation that was received into evidence

6    yesterday as being taken on April 21st, 2007, an

7    aerial photograph.   If we can focus on this

8    portion.

9         And I ask that that be entered into evidence

10   now formally subject to an -- an objection.

11             THE COURT:   No objection?

12             MR. LINSIN:   No objection.

13             MR. PERSONIUS:   No objection, your Honor.

14             THE COURT:   All right.   105.23 received.

15   No objection.

16             (Government's Exhibit 105.23 was received

17             into evidence.)

18             MR. MANGO:   Your Honor, if I may have a

19   moment.

20             THE COURT:   Sure.

21             MR. MANGO:   I'd also like to offer into

22   evidence, your Honor, 105.48, and ask that that be

23   brought up on the screen, actually.   Which was

24   stipulated to --

25             MR. LINSIN:   No objection, your Honor.

1           MR. PERSONIUS:  No objection, your Honor.

2           THE COURT:  Okay.  105.48 received.

3           (Government's Exhibit 105.48 was received

4           into evidence.)

5           MR. MANGO:  Which was subject to

6    stipulation as being taken April 21, 2007.  I ask

7    that that be published to the jury, your Honor, and

8    be focused like that.

9           THE COURT:  Sure.  You may publish.

10          MR. MANGO:  Thank you, your Honor.

11      Okay.  And related to that is Government

12   Exhibit 305.48, which was subject to the

13   stipulation and is an enlarged aerial photograph of

14   what is on the screen.  I'd ask that that be put up

15   on the easel, your Honor, and be formally admitted

16   into evidence. 305.48.

17          THE COURT:  Thank you.  I'm just looking

18   for that exhibit list.

19          MR. PERSONIUS:  Your Honor, I apologize.

20   I'm losing track of exhibit numbers.  Could we have

21   the number for this exhibit and for the previous

22   exhibit?

23          THE COURT:  Yeah.  This is 305.48.

24          MR. PERSONIUS:  Okay.  And the one before

25   this, please?

1             THE CLERK:  On the screen is 105.48,

2       right?

3             MR. MANGO:  Yes, on the screen is 105.48.

4       This cropped version is identical, your Honor, to

5       305.48.

6             MR. PERSONIUS:  Thank you, your Honor.

7             THE COURT:  There's no objection?

8             MR. LINSIN:  No objection.

9             MR. PERSONIUS:  No objection.

10            THE COURT:  All right.  305.48 received as

11      well.  No objection.

12            (Government's Exhibit 305.48 was received

13            into evidence.)

14            MR. MANGO:  Thank you, your Honor.

15      BY MR. MANGO:

16      Q.  Okay.  Mr. Carlacci, can you now, looking at

17      the screen, point out where you started.  You

18      mentioned you went through a walk-through of the

19      by-products unit.

20      A.  Right.  We -- we parked not too far from this

21      location right here, and walked down this driveway

22      to the by-products plant.

23      Q.  Which driveway?  It's not coming up.  Okay.

24      A.  This is the driveway.  The arrows are basically

25      pointing to the north side of this plant that is

1    the by-products area of the plant.

2    Q.   Okay.  What's this item right there that I just

3    put a mark on?

4    A.   That's the battery.  The 60 ovens make up a

5    battery.

6    Q.   Okay.  So where your two arrows are, that's the

7    by-products unit?

8    A.   Right.  That area -- in that general area

9    there.

10   Q.   Okay.  Tell the jury what you did during your

11   walk-through.

12   A.   All right.  We started down here, and I had

13   concern with this -- this first building right here

14   because this is the ammonia still, where the liquor

15   that's used to flush out the mains, the coke oven

16   mains, the mains that collect the coke oven gas

17   collecting contaminants as well as the ammonia from

18   the ammonia scrubbers is sparked.  And basically

19   they boil it so all the contaminants evaporate into

20   the atmosphere.  Approximately 400 tons of ammonia

21   that comes out of that stack as well as

22   4,000 pounds of benzene.  Approximately 3- to 4,000

23   pounds of cyanide.

24        The ammonia I felt was causing the complaints

25   that we were getting, some of the complaints we

1    were getting relative to throat irritation and eye

2    irritation.  I expressed my opinion that that

3    should be controlled.

4        We talked a little bit about some of the tanks

5    that are in this area here.  Nothing significant

6    sticks to mind here other than, you know, there was

7    a lot of steam leaks.  Tanks are contained in

8    dykes, so that if there's a spill, the material's

9    contained in that dyked area.  There was a lot of

10   water, oily water in those dyked areas.

11   Q.  Before you go on, let me ask questions here.

12   The ammonia still area that you talked about, you

13   said you raised this concern with Defendant

14   Kamholz?

15   A.  Yes, I did.

16   Q.  How did he respond to you?

17   A.  No comment.

18   Q.  Okay.  Keep going, please.

19   A.  Most of the -- the structures here, you know,

20   are in pretty rough shape.  This is an old

21   facility.  Lot of corrosion, you know, in rough

22   shape.  You know, walking down the alley here then,

23   you know, we're kind of going through the

24   by-products plant backwards, right?  More starting

25   from the end of the process.

1        In this -- in this area I believe he identified

2    these -- these green tanks here as the light oil

3    storage tanks that -- the light oil used in the LBA

4    scrubber to remove BTX, benzene, toluene, xylene.

5    And there is a truck loading station right here,

6    right adjacent to that line, where the benzene is

7    loaded into a truck and sold.  If you were a major

8    source of HAPs, the NESHAP that we discussed in one

9    of the previous letters would require that you

10   control emissions from these tanks, as well as that

11   loading station.  They justified being minor in

12   that letter, I think, of 2003 or '4.

13       When you look at the -- there was no control on

14   the vent, therefore -- and the loading rack was a

15   splash fill system, in that a tanker truck would

16   pull up and there was a line, you know, three-,

17   four-inch pipe that just loaded this oil in -- into

18   this truck from the porthole on top.  Many of our

19   regs are volatile organic compounds, you know,

20   require submerged fill as a minimal method of -- of

21   reducing re-volatilizing of a solvent or a

22   volatile.  And I suggested that they put an

23   extension on this unit, so that it would be

24   submerged fill, less splashing of the liquid as you

25   load the truck, less volatilizing of -- of the

1   chemicals that are in this oil.

2       Some minor reductions are possible from that.

3   You know, we didn't talk about how much that would

4   be.  In the scheme of things that's not a large

5   source compared to the whole facility, but, you

6   know, we're just walking through the place trying

7   to find anything we could that may help reduce

8   emissions.

9   Q.  So did you mention this splash fill versus a

10  submerged fill to Defendant Kamholz?

11  A.  Yes, I did.  And Mark didn't feel that was a

12  big deal, that that was easily done.  It's not an

13  expensive thing to do.

14  Q.  Okay.

15  A.  I believe they did that.  And at the end, this

16  whole process was eliminated of washing BTX from

17  the coke oven gas.

18  Q.  The light oil system?

19  A.  The light oil system.

20  Q.  Okay.  You're saying it was taken out of

21  service sometime after your -- your inspection?

22  A.  Correct.

23  Q.  All right.  I'm going to take away some of

24  these.  If you can, just start again.  So how -- so

25  you ended up at the light oil storage tanks, that

1    was --

2    A.   Those were the light oil storage tanks.

3    Q.   Where did you go after that?

4    A.   We were in front of the LBA, the actual

5    scrubber where oil is put in to contact the coke

6    oven gas and remove the benzene, toluene, xylene

7    from the coke oven gas to be sold as a by-product.

8    Q.   Okay.  While you're walking in this area,

9    how -- how were you all walking?  In what sort of

10   pattern?

11   A.   Normally you would expect a plant manager to

12   walk ahead of you to give you, you know, the tour.

13   They know the plant better than anyone, and you're

14   hoping that they interact with you, give you a good

15   description of what you're looking at.  And, you

16   know, that wasn't quite the case here.  You know,

17   Mark was a little reluctant to -- to -- you know,

18   just -- just to take off and -- and describe

19   things.  I had to -- particularly ask what's that

20   tank, what's this here, what's that there.

21       So as -- you know, as we progressed, you know,

22   I mean, I'm walking in front of Mark, and we were

23   going down somewhere during this -- this part of

24   this walk, Mark has a half face mask.

25            MR. PERSONIUS:  Your Honor, this is the

1   area that I talked about that I think is

2   irrelevant.

3            THE COURT:  All right.  I'm going to

4   overrule the objection.

5            MR. MANGO:  Go ahead.

6            THE WITNESS:  So a half face mask filters

7   out the contaminants that you breathe in.  It

8   covers your nose, your mouth.  It has carbon

9   cartridges that -- you know, I'm assuming it had

10  carbon cartridges on there that filter out volatile

11  organic compounds.

12           MR. PERSONIUS:  Your Honor, I object to

13  the witness assuming anything.

14           THE COURT:  Yeah.  I'll sustain that

15  objection.  Let's move on.  We have got the

16  description what he was wearing.

17           MR. MANGO:  No, your Honor, I don't think

18  he said he was wearing it.

19  BY MR. MANGO:

20  Q.  If you can --

21  A.  He wasn't wearing it, but he had it around his

22  neck as we were walking, and I'm asking questions

23  and talking to Larry and Cheryl.  And, you know,

24  they know the facility more than I do.  They are

25  feeding me information as well.

1         I turned once and I saw Mark with a face mask

2    up on his -- on his face.  You know, it was hanging

3    here.  You know, it wasn't only tied with one

4    string.  He held it up and pulled it down.  It just

5    gave me concern.  Typically an environmental

6    engineer will let you know if there's a safety

7    issue that you need protective equipment in an

8    area.  Made me just extra concerned about where I'm

9    walking.  And in this area it smelled like coke

10   oven gas.  It was a strong -- a strong odor.

11        And, again, as I mentioned, the equipment is

12   in -- you know, looks like it's in disrepair.  It's

13   old.  It's rusty.  You see, you know, stains in

14   areas that look rusty, you know, that -- indicating

15   there could be leaks in that area.  The overhead

16   piping here that's, you know, painted red, you

17   know, was not red during my inspection.  It was

18   rusty stained piping.  You know, at every joint,

19   flange, valve, elbow, you could see, you know,

20   staining that indicate possibly some kind of

21   leakage, right?

22        So I'm commenting on the condition of the -- of

23   this -- of the tanks.  It's difficult to identify,

24   you know, what tanks are in service and which ones

25   are not.

1        Next to the light oil scrubber there were two

2    other tall tanks --

3            MR. PERSONIUS:  Your Honor, this -- this

4    is going on and on and on.  The question -- I'd ask

5    that all the testimony be stricken.  Maybe it's too

6    late, but he's just going to keep going.

7            THE COURT:  Yeah.  It is too late.  I'm

8    going to stop it right there.  Let's -- the

9    narrative should be eliminated.  Let's see what you

10   want to do with questions.

11           MR. MANGO:  I'll refocus.  Yes, your

12   Honor.

13       So as you're -- as you're walking in that area,

14   you see him hold -- hold the mask up, he sees you,

15   he puts it down.

16           MR. PERSONIUS:  Your Honor, now we have

17   got Mr. Mango retestifying about the evidence we

18   have already heard.  I object to that.

19           THE COURT:  You don't have to do that.

20   Let's move on with the questions.

21           MR. MANGO:  Yes, your Honor.

22   BY MR. MANGO:

23   Q.  You mentioned -- you were talking about this

24   light oil scrubber.  Let's go there.  Did you --

25   did you observe the light oil scrubber?

1      A.   Yeah.  I asked -- I asked Mark -- Mark to

2      describe how this light oil scrubber works, you

3      know.  And I'm looking at it again.  It's, you

4      know, the same type of disrepair looking old piece

5      of equipment.

6                MR. PERSONIUS:  Again, your Honor, he's

7      not answering the question.

8                THE COURT:  Yeah, it's a more narrative

9      response.  Let's tailor it in, please.

10               MR. MANGO:  Okay.

11               THE COURT:  Sustained.

12     BY MR. MANGO:

13     Q.   Okay.  You saw the light oil scrubber.  Your --

14     the inspection party ended up at the light oil

15     scrubber?

16     A.   Right.

17     Q.   You saw it.  What was your concerns with the

18     light oil scrubber?

19     A.   My concerns were there were leaks there.  I

20     asked Mark, you know, on the -- on the exhauster,

21     you do monitoring with a piece of equipment to

22     determine if there is VOC leaks.  It's a

23     requirement of the one of the NESHAP regs.  I asked

24     if he ever used that piece of equipment on this

25     side of the plant, the positive side, the

1    by-products side of the plant to see if there was

2    any leaks to aid us in finding sources that maybe

3    we can eliminate.

4    Q.  And what --

5    A.  And his answer was no.

6    Q.  He said he had never done detection?

7    A.  Never done that.  I asked him if he -- you

8    know, the light oil scrubber, again, looking in --

9    in rough shape, I asked if he ever went to the top

10   of this unit to see if it was perforated up on top

11   of the tank.  He said, "No, and I'll never go up

12   there."  So that was pretty much the end of our

13   tour.  We left.

14   Q.  Okay.  When you were there in March -- or I'm

15   sorry -- May 28th of 2008, did you see what you now

16   know termed the bleeder valve or the pressure

17   release valve?

18   A.  I didn't see it on that day.

19   Q.  Okay.  During a later inspection did you see

20   it.

21   A.  Yes.  Sometime in, I believe, early 2011 I was

22   there when the light oil scrubber tank was being

23   decommissioned with an inspection with Tom Ferraro

24   to see how that procedure was going.

25            MR. MANGO:  Your Honor, at this point I'd

1    like to show the witness Government

2    Exhibit 15.02.097 for identification purposes.

3        And absent an objection, I would move this into

4    evidence.

5            THE COURT:  Okay.  15.020.097.  Any

6    objection?

7            MR. LINSIN:  No objection.

8            MR. PERSONIUS:  No objection, your Honor.

9            THE COURT:  Okay.  No objection.

10   Received.

11           (Government's Exhibit 15.020.097 was

12           received into evidence.)

13           MR. MANGO:  I ask that this be published

14    to the jury.  Thank you.

15   BY MR. MANGO:

16   Q.  Okay.  What are we looking at here, Mr.

17   Carlacci?

18   A.  From descriptions of others and that one visit

19   that I had there, that is the bleeder valve.  When

20   I was there, I can't recall if the stack was there,

21   but I remember Tom Ferraro with Conestoga-Rovers

22   Association telling me that there was a --

23           MR. PERSONIUS:  Your Honor, I object to

24   what this gentleman said.  That's hearsay.

25           THE COURT:  Yeah, sustained.

1      MR. LINSIN:  Your Honor, could we ask the

2   witness to identify which component in this

3   photograph he's referring to as the PRV?

4      THE COURT:  That's why I had it brought

5   down, so we could do that.

6      MR. LINSIN:  Thank you.

7      THE COURT:  Thank you.  All right.

8   Redirect your questions, please.

9   BY MR. MANGO:

10  Q.   Yes.  Mr. Carlacci, can you -- can you point

11  to -- put a dot on what we're looking at as the

12  pressure release valve, bleeder valve?

13  A.   That is the valve.

14  Q.   Okay.  And then there is the stack above it

15  there that relates to the valve?

16  A.   That is the stack installed to allow the

17  contaminants to rise away from the ground.

18  Q.   Okay.  Can you describe the circumstances by

19  which you physically saw this?

20  A.   At the 2011 inspection I asked Tom Ferraro with

21  Conestoga-Rovers Association to point it out to me,

22  and he pointed it out to me.

23  Q.   Okay.  Did you learn on that day in 2011

24  whether this was still operational?

25  A.   Yeah.  I recall now that he told me there was

1    a -- a blind -- a flange installed --

2        MR. PERSONIUS:  Your Honor, again, this is

3    hearsay, what he's being told.

4        MR. MANGO:  Your Honor, I'll ask it

5    different.

6        Did you learn whether this was in service --

7    not what somebody told you.  Did you learn whether

8    this was in service or not?

9        MR. LINSIN:  That -- your Honor, I would

10   join the objection.  That is precisely what someone

11   would have told him.

12       MR. MANGO:  Your Honor, I think the record

13   needs to be clear that in 2011 this was not

14   operating and he saw that.

15       MR. LINSIN:  Objection, your Honor.

16       THE COURT:  Well, I think that's a

17   different story.  But, start again.  I'll sustain

18   the objection at this point.

19       MR. MANGO:  Okay.  Did you learn in 2011

20   whether this was operating?

21       THE WITNESS:  Yes.

22       MR. LINSIN:  I renew my objection, your

23   Honor.

24       THE COURT:  All right.  The question is

25   whether or not he learned if this was

```
 1   operational --
 2              MR. MANGO:  Yes.
 3              THE COURT:  -- not what he observed?
 4              MR. MANGO:  Right.
 5              THE COURT:  But as a product of an
 6   investigation?
 7              MR. MANGO:  Just whether you learned --
 8   yes, on his inspection in 2011 whether this was
 9   operational.  If he learned that, yes or no?
10              THE COURT:  All right.  At what time?
11              MR. MANGO:  During his 2011 inspection.
12   Which is, again -- this is well after the
13   indictment, so --
14              THE COURT:  Well, I mean you have to put
15   it in a proper question.  As to the form of the
16   question, I'm going to sustain the objection.
17   BY MR. MANGO:
18   Q.  Were you there in 2011 at the Tonawanda Coke
19   Corporation?
20   A.  Yes.
21   Q.  And is that when you observed this bleeder
22   valve?
23   A.  Yes.
24   Q.  Did you hear it discharge while you were there?
25   A.  No.
```

1    Q.   Do you know if it was in operation at the time?

2              MR. LINSIN:  Objection.

3              THE COURT:  I'll allow that.  Overruled.

4              THE WITNESS:  I was told it was not.

5              MR. PERSONIUS:  Doesn't matter.  It's all

6    right.

7    BY MR. MANGO:

8    Q.   So after -- if we could -- after you discussed

9    with Mr. Kamholz in front of the light oil scrubber

10   whether he had gone up there -- now we're back in

11   May 28th of 2008.  Whether he had ever gone up

12   there to check -- you asked him whether he checked

13   the top of this structure?

14             MR. PERSONIUS:  Your Honor, he's already

15   testified to this.  Now he wants to go back over it

16   again.  He's already testified to this subject.

17             THE COURT:  Well, I mean, I think he's

18   setting the stage.  You're going somewhere else,

19   right?

20             MR. MANGO:  Yes.

21             THE COURT:  I'm going to allow it just to

22   set the stage.  And let's move on.

23             MR. MANGO:  Okay.

24   BY MR. MANGO:

25   Q.   You had discussed the light oil scrubber with

1    him?

2    A.   Yes.

3    Q.   Then you mentioned after that your inspection

4    ended?

5    A.   Correct.

6    Q.   Okay.  So you left the plant at that point?

7    A.   Yes.

8    Q.   Did you have any conversations with Mark

9    Kamholz before you left the plant?

10   A.   No.

11   Q.   Okay.  During that inspection when you raised

12   this benzene concern and showed -- you showed him

13   physical results?

14   A.   Yes.

15   Q.   And you showed him physical results.

16   A.   Yes.

17   Q.   Did he ever tell you that he had a pressure

18   release valve or bleeder valve operating in the

19   by-products unit?

20   A.   No.

21           MR. MANGO:  Your Honor, if I may have a

22   moment.

23       Just a few questions, your Honor.

24       Mr. Carlacci, the charges in the indictment

25   range from 2005 to 2009.  Did you conduct any

1    further inspections during that time period

2    yourself?

3              THE WITNESS:  No.

4              MR. MANGO:  Thank you, your Honor.

5    Nothing further for this witness.

6              THE COURT:  Okay.  Let's take a break

7    until about 3:30 or so, ladies and gentlemen.

8              (Jury excused from the courtroom.)

9              THE COURT:  Okay.  With respect to

10   objections, it gets a little difficult to handle if

11   I don't know what the theory of your objection is.

12   Because certain conversations can get -- can be

13   gotten into without being hearsay depending on how

14   they are offered.  If it's to establish the

15   functionality, the truth of the matter asserted,

16   okay, that's a different story.  But we have

17   issues -- since Mr. Kamholz is the defendant here,

18   it could be an admission against interest.  It can

19   be a statement that's an exception to the hearsay

20   rule with respect to the authority to make

21   statements on behalf of the corporate defendants.

22   So we've got -- you know, those are all the things,

23   you know, that I have to consider.  So unless we're

24   a little bit more specific, it's -- it's harder for

25   me to deal with it.  Give that some thought.

1      I know, Mr. Linsin, you wanted to say

2    something.

3          MR. LINSIN:  Your Honor, we will certainly

4    give it some thought.

5      As I understood the proffered testimony, it

6    related to a conversation this witness had with a

7    third-party consultant, not an employee of the

8    company.  This was not an admission of a party

9    opponent, as I understand the basis for the

10    witness's testimony.  That's why I objected on the

11    basis of hearsay.

12          THE COURT:  Okay.  All right.  I mean,

13    that's helpful.  I mean, if it's not an employee of

14    the corporation, that's another matter.  And, you

15    know, if I missed that, so that we don't go astray,

16    let me know.  Okay?

17          MR. LINSIN:  I apologize, your Honor, I

18    should have been more -- more complete in my

19    objection.

20          MR. MANGO:  Likewise, your Honor, because

21    that actually was a third-party consultant hired by

22    Tonawanda Coke Corporation.  So if I would have

23    articulated it properly, I would have argued that

24    it was an agent of the Tonawanda Coke Corporation.

25          THE COURT:  You probably would have lost

1   in that argument, though, Mr. Mango.  I don't know.

2   I don't know, but that would help me just a little

3   bit in that kind of a context.  Okay?

4           MR. MANGO:  Yes, your Honor.

5           THE COURT:  Thank you very much.

6           (Short recess was taken.)

7           (Jury seated.)

8           THE COURT:  Thank you.  Please have a

9   seat.  We're resumed in the case of Tonawanda Coke

10  versus Kamholz.  And the attorneys and parties are

11  back, present.  The ladies and gentlemen of the

12  jury are here.  Role call waived.

13      And cross-examination I think is next.

14      Mr. Carlacci, if you would take the stand

15  please.  And who's going to open the cross?

16          MR. LINSIN:  I will, your Honor.

17          THE COURT:  All right, Mr. Linsin.  Thank

18  you.

19          MR. LINSIN:  May I proceed, your Honor?

20          THE COURT:  You may.

21  CROSS-EXAMINATION BY MR. LINSIN:

22  Q.  Good afternoon, Mr. Carlacci.

23  A.  Good afternoon.

24  Q.  My name is Greg Linsin and I represent

25  Tonawanda Coke.  You testified on direct

1    examination about Government's Exhibit Number 131,

2    which has been admitted into evidence.

3        Could we call up, 131, please?  Do you recall

4    that testimony, sir?

5    A.  Yes.

6    Q.  All right.  And could we please move to the

7    third page of this document.  When was the first

8    time you saw this document, Mr. Carlacci?

9    A.  I've seen it in the files, I think, prior --

10   no.  Prior -- you know, 2007, '8.  I can't say

11   exactly when, but I have -- I've looked at it a

12   couple of times.

13   Q.  Did you see this document before you went out

14   to Tonawanda Coke plant in May of 2008?

15   A.  Yes.

16   Q.  All right.  So that was part of your document

17   review in order to prepare yourself for the site

18   visit in May of 2008, is that right?

19   A.  It wasn't in preparation for that site visit,

20   but I looked at it for other reasons.

21   Q.  What -- what reasons did you look at it?

22   A.  To determine applicability of the NESHAPs,

23   Subpart L.

24   Q.  And your testimony regarding this document --

25   if we can move to what is at the bottom marked 4.2

1    in this document, please.  I'm sorry, 4-2.  And if

2    we can enlarge the bottom third of the page,

3    please.

4        Now, you recall your testimony on direct about

5    this information concerning pressure relief valve

6    in the by-products area at Tonawanda Coke, is that

7    right?

8    A.   Yes.

9    Q.   And do you know what the calculation factor or

10   the emission factor that was used for this study

11   related to?

12       Go to the larger view of this page, please.  At

13   the top of the fourth column, it says "Emissions

14   Factor."

15   A.   Right.  There is an emission factor with the

16   units.

17   Q.   And my question, sir, is:  Do you know what

18   that emissions factor is?

19   A.   The emission factor is for a measurement of

20   HAPs per hour at this -- at this source in

21   question.

22   Q.   And is that measurement during normal

23   operations, or is it measurement for leakage from

24   the components that are listed here?  Do you know

25   what that is a measurement of?

1    A.   I'd have to look at the calculation, if there

2    was supporting calculations, to give you a precise

3    answer.

4    Q.   So am I understanding your testimony now to be

5    that you're not sure if this was a calculation of

6    potential leakage from these components for the

7    purposes of the NESHAPs emission report?

8    A.   The -- the report, yes, is based on an estimate

9    of emissions from the facility to determine

10   applicability of Subpart L.

11   Q.   Yes.  My question, though, goes to whether it

12   is measuring -- whether this emissions factor that

13   is used here to develop the calculations, whether

14   that emissions factor is an industry factor of

15   leakage from the components listed in this

16   document.

17   A.   Again, I have to read that reference to give

18   you a precise answer.

19   Q.   When you say "that reference," what reference

20   are you identifying, sir?

21   A.   In here it references where this emission

22   factor came from.

23   Q.   All right.  So as you sit here right now,

24   you're not sure, is that correct?

25   A.   Correct.

1   Q.  All right.  There is no debate, is there, that

2   in July -- on July 11th, 2003, Tonawanda and Mark

3   Kamholz notified DEC and, thereafter, EPA that

4   there was a pressure relief valve located in the

5   by-products plant at this facility on the coke oven

6   gas system, is there?

7   A.  This is not a notification; it's a summary of

8   emissions.

9   Q.  And in that summary of emissions, they have

10  told DEC -- the company and Mr. Kamholz have told

11  the DEC -- there is a pressure relief valve on that

12  coke oven gas line, right?

13  A.  This is not telling.  I think part 201 tells

14  you that you have to submit a permit for a new

15  source or a source that you didn't discover, and

16  that's not the same.

17  Q.  This document says there's a pressure relief

18  valve in the by-products area on the coke oven gas

19  line, doesn't it, sir?

20  A.  It references an emissions from a pressure

21  relief valve in the coke oven gas system.

22  Q.  In the by-products area, correct?

23  A.  In the by-products area.

24  Q.  And that communication was sent to DEC, wasn't

25  it?

1    A.   Yes.

2    Q.   All right.   And after that, this analysis that

3    was done by a third party was sent by DEC to EPA

4    down in North Carolina for evaluation, wasn't it?

5    A.   Correct.

6    Q.   All right.   So this information that we're

7    referring to on this page was provided to DEC on

8    July 11th of 2003 --

9    A.   Correct.

10   Q.   -- correct?

11        Okay.   Do you know what the standard operating

12   pressure is for the coke oven gas line at the

13   Tonawanda Coke facility?

14   A.   No, I do not.

15   Q.   All right.   You provided a number of answers to

16   hypothetical questions on direct examination

17   concerning rates of leakage from a -- a valve.

18        Do you recall those responses?

19   A.   Yes.

20   Q.   What -- in offering those responses and giving

21   those opinions, what pressure were you assuming to

22   be behind the valve in those hypotheticals?

23   A.   My concern was not the pressure.   If it's -- if

24   it's using to emit a contaminant, then my point is

25   it requires a permit and an evaluation.

1    Q.   You -- you provided responses to a number of

2    hypotheticals indicating that, as I recall your

3    testimony, sir, that if a valve released every 20

4    or 30 minutes over a year's period of time, even in

5    regard to this document, you testified that you

6    thought that the quantity estimated here would be

7    approximately consistent with the valve operating

8    on that basis.  Isn't that what you testified to?

9    A.   You just confused me with whatever you said

10   there.

11   Q.   All right.  In response to questions on direct

12   examination, do you remember being asked a

13   hypothetical regarding this particular calculation

14   here?

15   A.   Right.

16   Q.   About the estimated emissions from this

17   pressure relief valve, .0030?

18   A.   Yes.

19   Q.   And do you recall telling Mr. Mango that you

20   thought that that estimated annual emissions was

21   roughly consistent with a valve that released every

22   20 or 30 minutes for a duration of 15 or 30

23   seconds?

24   A.   I don't recall that.

25   Q.   You don't recall that testimony?  Is it

1   possible to estimate the quantity of gas released

2   from a line without knowing the pressure in that

3   line?

4   A.   No.   The more information you have, the more

5   exact you can come up with a number.

6   Q.   Do you know whether the gas line, the coke oven

7   gas line at Tonawanda, is a high-pressure line or

8   low-pressure line?

9   A.   Not off the top of my head.

10   Q.   Would it surprise you to know that the pressure

11   at the coke oven gas -- in the coke oven gas line

12   at Tonawanda, it's standard operating pressure, is

13   something roughly equivalent to one to one and a

14   half pounds per square inch?

15   A.   Wouldn't surprise me.

16   Q.   And would you agree with me that is a

17   relatively low pressure line?

18   A.   You could say that.

19   Q.   Compared, for example, to a -- a car tire that

20   typically has 36, 38 pounds per square inch.

21   A.   Yes.

22   Q.   Could we, please, have Government

23   Exhibits 19.01, which has been admitted into

24   evidence.   And could we look at the second page of

25   this exhibit, please.

1        Do you recall seeing this letter and flow

2    diagram during your testimony yesterday,

3    Mr. Carlacci?

4    A.   Yes, I do.

5    Q.   And do you recall it as being a flow diagram

6    submitted in 1981 to DEC?

7    A.   Correct.

8    Q.   And do you recall testifying yesterday that you

9    had reviewed the file in this case, the Clean Air

10   Act file in this case, and that you did not recall

11   any additional gas flow diagrams submitted by

12   Tonawanda in that file?

13   A.   I recall saying that.  I recall saying that I

14   didn't see any diagrams similar to this schematic.

15   There's not much detail in this diagram.

16   Q.   In fact, during your testimony today --

17   actually, one time yesterday and again today --

18   there were at least two additional gas flow

19   diagrams submitted by Tonawanda to DEC, weren't

20   there?

21   A.   Yes.

22   Q.   You testified yesterday that you had, prior to

23   assuming your current responsibilities, inspected a

24   number of coke oven gas facilities, is that

25   correct?

1    A.   Correct.

2    Q.   Can you tell us, please, how many times

3    approximately you had been out on a field

4    inspection for a coke oven gas facility?

5    A.   I believe it was maybe a total of ten to 15

6    times and it was a long time ago.  I don't recall

7    the exact number, but I recall going to Donner

8    Hanna Coke at least once, maybe twice, and

9    Bethlehem Steel several times.

10   Q.   And when did those inspections occur?

11   A.   Early '80s.

12   Q.   And when a department of air resources --

13   Division of Air Resources inspector goes out to a

14   facility for a compliance inspection, what is the

15   purpose of that inspection?

16   A.   To determine compliance with the permit and

17   applicable regulations.

18   Q.   That exist at that time, is that correct?

19   A.   Correct.

20   Q.   And would you agree with me, Mr. Carlacci, that

21   between -- from the time period we're talking

22   about, say, from the date of this letter, 1981, up

23   until 2009, 2010, there have been some very

24   significant changes in the laws and regulations

25   that govern air emissions from industrial

1    facilities, both in the state of New York and

2    federally?

3    A.   I agree.

4    Q.   It has been, hasn't it, the -- the time during

5    which our nation's Clean Air Act has developed from

6    a very rudimentary statute to a very -- a far more

7    complicated statute and -- and with higher

8    permitting requirements, is that correct?

9    A.   That's correct.

10   Q.   And, similarly, during that period, New York

11   State's regulations have changed over time and

12   adjusted requirements, exemptions, and the range of

13   obligations that apply to facilities that are

14   required to be permitted, isn't that correct?

15   A.   That's correct.

16   Q.   Now, when an inspector goes out to a facility

17   to determine compliance with a permit, if an

18   inspector identifies a violation of a permit while

19   he or she is on the facility, have inspectors been

20   trained in terms of what they should do to address

21   that concern with the operator or to notify the

22   operator that there is a violation?

23   A.   Yes, they have.

24   Q.   And isn't it true that the -- since the purpose

25   is to achieve compliance -- that the training

1    inspectors receive and the whole purpose of these

2    compliance inspections is to notify the facility if

3    there is a violation that is understood and to work

4    with the facility to get it corrected?

5    A.   Yes.

6    Q.   And part of the process of achieving that

7    objective, typically in an inspection, is a

8    close-out meeting with the personnel from the

9    facility that you're inspecting, to kind of review

10   your findings and discuss issues of significance or

11   concern to the inspector.  Isn't that a typical

12   component of a compliance inspection?

13   A.   Typically.

14   Q.   By the way, did you keep any notes of your

15   visit to Tonawanda Coke on May 28th, 2008?

16   A.   I -- I did have the -- the sheet and some notes

17   that I scratched on the back, yes.

18   Q.   Did you file a report of that visit?

19   A.   No.

20   Q.   And going back to the general protocol for a

21   compliance inspection, if an inspector, an air

22   inspector, determines there is a violation, and

23   it's of some significance to the overall compliance

24   for this facility, the agency has the authority to

25   file what's called a Notice of Violation or NOV,

1    isn't that correct?

2    A.   That's correct.

3    Q.   And would you describe what a NOV does, what

4    it's designed to accomplish?

5    A.   NOV alleges the violation.  It documents the

6    time and specific comments relative to the

7    violation, and it's sent to the owner of the

8    facility.

9    Q.   And does it -- doesn't it also tell the

10   facility these are the things you need to do to

11   remedy this violation?

12   A.   Not always.

13   Q.   Is there another mechanism -- enforcement

14   mechanism that's a little higher in scale called a

15   compliance order?

16   A.   Correct.  There is a compliance order.

17   Q.   And as the name implies, that is an order from

18   the agency requiring a facility to do certain

19   things in order to come into compliance, isn't that

20   correct?

21   A.   That's correct.

22   Q.   Now, if we could take down this exhibit,

23   please.

24       When you reviewed the HAPs air emissions study

25   that we were just discussing, the 2003

1    notification, did you notice in that study the

2    identification of a PRV in the by-products area?

3    A.   I noticed --

4         MR. PIAGGIONE:  Objection, your Honor.

5    The witness testified that it was not --

6         THE COURT:  First of all, it's not your

7    witness, so the objections are reserved to

8    Mr. Mango.

9         MR. PIAGGIONE:  Oh, I'm sorry.

10        THE COURT:  That's okay.

11        MR. MANGO:  If I may have a moment, your

12   Honor.

13     Your Honor, objection.  The -- Mr. Linsin is

14   mischaracterizing the evidence that -- the HAPs

15   study.  Mr. Linsin just said the notification that

16   was received.  This witness has said it wasn't a

17   notification.  He's referred to it as something

18   that the DEC received.  That's it.  To phrase it as

19   a notification, I think, goes against what the

20   witness actually said.

21        THE COURT:  Well, I mean, you can clarify

22   on redirect.  The jury has heard the evidence.

23   Maybe you have a comment --

24        MR. LINSIN:  I'm happy to rephrase the

25   question, your Honor.

1          THE COURT:  Okay.

2     BY MR. LINSIN:

3     Q.  Before your visit to the facility in May

4     of 2008, as I recall your testimony, you said you

5     reviewed that HAPs air emission study that had been

6     submitted in 2003, is that correct?

7     A.  That's correct.

8     Q.  And in your review of that HAPs air emission

9     study, did you see the information contained in

10    that study regarding a pressure relief valve in the

11    by-products area?

12          MR. MANGO:  Asked and answered, your

13    Honor.  Objection.  We went over this.

14          THE COURT:  I'll let it stand.

15       You may answer.

16          THE WITNESS:  Yes, I did.

17          MR. LINSIN:  All right.  Your Honor, I

18    would request an exhibit that's been marked for

19    identification as Defendant's Exhibit QQQ.01 for

20    identification.

21          THE COURT:  Your paralegal will bring that

22    up.

23    BY MR. LINSIN:

24    Q.  Now, Mr. Carlacci, is -- does this photograph

25    depict the by-products area at the Tonawanda Coke

1    facility?

2    A.  Yes, it does.

3    Q.  Is it substantially similar to the

4    configuration of that part of the plant that you

5    visited in May of 2008?

6    A.  Seems to be.

7            MR. LINSIN:  Your Honor, I move

8    Defendant's Exhibit QQQ.01 into evidence.

9            MR. MANGO:  I'd object, your Honor.  It

10   seems to be is not it is.  We have no idea when

11   this photograph was taken.  Obviously, I don't

12   think they're going to be able to establish this

13   through this witness.  I would object.  Seems to be

14   does not -- does not satisfy the government's view

15   of the foundation.

16           THE COURT:  Okay.  And I'll sustain that

17   objection.

18       You can continue your inquiry, though, and see

19   if you can establish more.

20           MR. LINSIN:  Does this photograph appear

21   to be substantially similar to the part of the

22   plant that you saw on May 28th 2008?

23           THE WITNESS:  It appears to be.

24           MR. LINSIN:  Your Honor, I move the

25   exhibit into evidence.

1           THE COURT:  Yeah.

2           MR. MANGO:  No objection at this point.

3           THE COURT:  Okay.  I'll permit it, and it

4    goes to weight in terms of the way it was?

5                (Defendants' Exhibit QQQ.01 was received

6                into evidence.)

7           MR. LINSIN:  May we publish this document

8    to the jury?

9           THE COURT:  Certainly.  Certainly.

10   BY MR. LINSIN:

11   Q.  Now, you -- in the lower right portion,

12   right-hand portion of the photograph, do you

13   observe a roadway, sir?

14   A.  Yeah, I do.

15   Q.  And is that the roadway that you testified

16   about walking down during your visit?

17   A.  Yes.

18   Q.  And do you -- do you -- do you recall what that

19   road happens to be called at the plant?  Do you

20   know if it has a name?

21   A.  Everybody's got a name for that roadway.

22   Q.  Have you ever heard it referred to as Broadway?

23   A.  I heard it referred to as Broadway.

24   Q.  All right.

25           THE COURT:  Tap the roadway, please.

1   BY MR. LINSIN:

2   Q.  And the larger structure in the right

3   background -- right-hand background of the

4   photograph, can you identify what that building is?

5   A.  Seems that's the coal handling building.

6   Q.  And is it correct, then -- just so we can

7   orient the jury -- that the battery at the

8   Tonawanda facility would be to the left, and -- as

9   you're moving away in this photograph to the left

10  of the coal handling building, and down the street,

11  if you will, down Broadway?

12  A.  Towards the stack.

13  Q.  All right.

14          THE COURT:  All right.  Where's the coal

15  handling building?  Tap it.

16      Okay.  And then as you move away from that,

17  give us a line.

18          THE WITNESS:  This is the battery.

19  BY MR. LINSIN:

20  Q.  Now, you testified on direct examination about

21  the -- your observations of the coke oven gas line

22  when you were there at the plant.  Do you see the

23  coke oven gas line in this photograph?

24  A.  This angle is not the same angle.  I stood on

25  the roadway.  It's a little different looking this

1    way.

2    Q.  Do you see the coke oven gas line in this

3    photograph?

4    A.  I'm going to say it's this orange line, is --

5    is the main going back to the boiler house.

6    Q.  All right.  Would you mark it, then, on the

7    photograph, please.

8        All right.  And do you see the -- both the

9    pressure relief valve and the stack from the

10   pressure relief valve in this photograph?

11       And --

12           THE REPORTER:  There was no answer.

13   BY MR. LINSIN:

14   Q.  Did you -- did you tap the screen in the last

15   instance where you saw the pressure relief valve?

16   A.  Yes, I did.

17   Q.  To the right-hand center of the photograph, is

18   that correct?

19   A.  Correct.

20   Q.  Now, you were in the by-products area of that

21   facility during your visit, is that correct?

22   A.  At what time?

23   Q.  On May 28th, 2008.

24   A.  I was on that roadway.

25   Q.  All right.  And the components that are in the

1    foreground in this photograph, and to the left-hand

2    side of the photograph, are those part of the

3    by-products area?

4    A.   Yes.

5    Q.   And you testified on direct examination that

6    you observed the flanges and couplings in the coke

7    oven gas line as having stains and potential

8    corrosion, is that correct?

9    A.   That's correct.

10   Q.   So you looked at that coke oven gas line when

11   you were there?

12   A.   There's many lines in this area here that are

13   not depicted in this picture.  I looked at -- I

14   looked at the whole -- at the whole area.

15   Q.   But it's your testimony here today that even

16   though you had seen the HAPs air emission study

17   before you went out to the plant in May of 2008,

18   and even though you stood on this roadway and

19   looked at the coke oven gas line, and even though

20   you were there to look for potential sources of

21   benzene emission, you didn't see this pressure

22   relief valve and the stack that is in the

23   right-hand center of this photograph?

24   A.   I didn't notice it.

25   Q.   Can we take this photograph down, please.

1          Could I have Government Exhibit 18.18, please.

2          Mr. Carlacci, do you recognize this exhibit

3     which is now in evidence as the permit that was

4     issued by DEC to Tonawanda on May the 2nd of 2002?

5     A.   This is part of the transmittal letter, yes.

6     Q.   And could we proceed to the second page of this

7     document, please?  And zoom in to the top third of

8     the page.  The effective date for this permit was

9     April 30th, 2002, correct?

10    A.   Correct.

11    Q.   And the expiration for -- just so we can orient

12    ourselves.  The actual application for this permit

13    had been filed by Tonawanda back in 1990, correct?

14    A.   Correct.

15    Q.   All right.  And the DEC reviewed the

16    application, considered the application for

17    approximately a five-year period before the permit

18    was issued, correct?

19    A.   We had it in our hands for that five-year

20    period.

21    Q.   And this permit, as with all Title V permits,

22    have or has a five-year expiration period, is that

23    correct?

24    A.   That's correct.

25    Q.   And so the expiration date for this permit

1    originally issued in April of 2002 was May the 1st

2    of 2007, correct?

3    A.   That's correct.

4    Q.   All right.  And the application --

5    reapplication for a permit has to be filed 180 days

6    before the expiration of the permit itself, is that

7    correct?

8    A.   Within 180 days.  No later than six months.

9    Q.   All right.

10   A.   How many days is that, right?

11          THE COURT:  Say that again.

12          THE WITNESS:  It's three months.  No later

13   than six months prior to the expiration date, the

14   permit is due.  There is another one in front of

15   it.  I'd have to quote the rule.  We don't want it

16   too soon, is the -- is the reason for the

17   earlier -- the larger number.

18   BY MR. LINSIN:

19   Q.   All right.  And so I'll use months instead of

20   days.  The -- the requirement is they have to

21   reapply for a new permit six months before the

22   original permit expires?

23   A.   Correct.

24   Q.   And could I, please, have Government

25   Exhibit 18.08.  First page.  I'm sorry.  18.06.  My

1    mistake.

2        And you recognize this as the document in

3    evidence, the renewal submittal, for the Title V

4    permit application?  For the Title V -- the renewal

5    of the Title V permit.

6    A.   Yes.

7    Q.   Submitted October 20th, 2006, correct?

8    A.   Correct.

9    Q.   And that's just over six months before this

10   permit would have expired, correct?

11   A.   Correct.

12   Q.   Now, could I have 18.18 again.  And if we could

13   go to 18-009, please.  And if we can enlarge the

14   top half of the page.

15       This is condition 4 of Tonawanda's Title V

16   permit condition, correct?  Permit, correct?

17           MR. MANGO:  Objection, your Honor.  This

18   is not the condition 4 that I showed Mr. Carlacci.

19           MR. LINSIN:  I'm well aware of that, your

20   Honor.

21           THE COURT:  This is 18.08, right?

22           MR. LINSIN:  This document is in evidence,

23   your Honor, yes.

24           THE CLERK:  18.18.

25           MR. LINSIN:  This is 18 -- 18.18.

1            THE COURT:  Oh, 18.  Okay.

2        Okay.  So the -- the objection is what?

3            MR. MANGO:  Your Honor, this is not the

4    condition 4 that I showed him, so the objection is

5    to -- Mr. Linsin's referencing condition 4 of the

6    Title V permit.  That's -- that's not condition 4

7    that I showed this witness.

8            THE COURT:  Okay.  All right.  You want to

9    proceed?

10           MR. LINSIN:  Thank you, your Honor.

11   BY MR. LINSIN:

12   Q.  This is -- as -- can you read the third line of

13   this document?

14   A.  The third line or the --

15   Q.  Third line from the top of this page.

16   A.  Department requires any renew, modification

17   or --

18           MR. LINSIN:  I'm sorry.

19           THE COURT:  You can tap the screen.

20   BY MR. LINSIN:

21   Q.  Can you read that line?

22   A.  Condition 4?

23   Q.  Yes.

24   A.  Applications.

25   Q.  What's the title, please, of condition 4?

1    A.   Applications for Permit Renewals and

2    Modifications.   Applicable State Requirement 6

3    NYCRR 621.13.

4    Q.   And what is item 4.1 under condition 4?

5    A.   Describes submission of an application.

6    Q.   And 4.2?

7    A.   Describes the submission for renewal

8    application.

9    Q.   Within 180 days before the expiration, correct?

10   A.   Correct.

11   Q.   And you just testified that Tonawanda and Mark

12   Kamholz submitted a renewal application for their

13   Title V permit within 100 days -- sorry --

14   before -- 180 days before the expiration, correct?

15   A.   Correct.

16   Q.   So Tonawanda and Mark Kamholz satisfied this

17   condition 4 in their permit, didn't they?

18   A.   Yes.

19   Q.   Now, can we move, please, to 0016 of this same

20   document.   And if you could enlarge the top half of

21   the page, please.

22        All right.   Now, you recognize there another

23   condition 4 that you testified about on direct

24   examination, correct?

25   A.   Correct.

1    Q.   And I believe your testimony was -- and tell me

2    if I have this inaccurately -- that, in your

3    opinion, the pressure relief valve that existed at

4    Tonawanda, the failure to seek a permit for that

5    valve was a violation of this condition in its

6    Title V permit, is that correct?

7    A.   That's correct.

8    Q.   All right.  If we could enlarge, please, the --

9    well, first of all, could you read the title of

10   this condition?

11   A.   Unpermitted emission sources.

12   Q.   Now, you have talked in your direct testimony

13   about emission sources and emission points,

14   correct?  Is that correct?

15   A.   Yes.

16   Q.   If I recall your testimony yesterday, you said

17   that those terms were essentially interchangeable,

18   is that correct?

19   A.   They're difficult to describe, but an emission

20   source would be the source of emissions.  The

21   emission point would stay in that, and the pressure

22   relief valve would be the stack.

23   Q.   Mr. Carlacci, an emission source is different

24   than an emission point, isn't it?

25   A.   If you only have one emission source and one

1    emission point, it would be one in the same

2    described.

3    Q.  I'll ask the question again.

4        Is an emission source different than an

5    emission point?

6    A.  Depends on the situation.

7    Q.  Are they listed separately?

8    A.  Yes.

9    Q.  Identified separately?

10   A.  Yes.

11   Q.  Differing identification numbers?

12   A.  Yes.

13   Q.  So they're different, correct?

14   A.  You could call them different.

15   Q.  And this condition relates to unpermitted

16   emission sources, correct?

17   A.  Correct.

18   Q.  Now, could I direct your attention, please, to

19   item 4.1?  And if you can read the first line of

20   4.1.  I don't believe you testified about this

21   portion of the condition on your direct, but could

22   you read -- could you highlight that first partial

23   paragraph.  Yes.  Go ahead.

24   A.  "If an existing emission source was subject to

25   the permitting requirements of 6 NYCRR Part 201 at

1    the time of construction or modification, and the

2    owner and/or operator failed to apply for a permit

3    for such emission source, then the following

4    provisions apply."

5    Q.  All right.  So this condition of the facility's

6    Title V permit is saying that if these conditions

7    that you've just read existed, then the owner or

8    operator has to do certain things.  And those are

9    listed in subpart (a) and subpart (b), correct?

10   A.  Correct.

11   Q.  So let's take a look at those individually.

12   And by the way, the reference to 6 NYCRR, Part 201,

13   that is Chapter 6 of the New York Code of

14   Regulations, is that correct?

15   A.  Code of Rules and Regulations, correct.

16   Q.  Part 201 relates to what?

17   A.  Operating permits.

18   Q.  All right.  And so the condition upon which

19   this condition is determined is whether the

20   emission source was subject to permitting

21   requirements under New York State rules at the time

22   of construction, number one, or at the time of

23   modification, correct?

24   A.  Correct.

25   Q.  All right.  So, in order to determine whether

1   this PRV valve out on the coke gas line was

2   required -- was subject to permitting requirements,

3   you have to know when it was constructed, don't

4   you?

5   A.   Correct.

6   Q.   Do you know when that PRV was constructed, sir?

7   A.   No, I do not.

8   Q.   The date it was constructed would determine

9   which regulations were applicable to determine

10  whether it was subject to permitting requirements

11  at that time, wouldn't it?

12  A.   Yes.

13  Q.   And as you've just testified, the regulations

14  that we're talking about here that define the

15  permitting requirements have changed over time,

16  correct?

17  A.   Yes.

18  Q.   Now, it's as either at the time of construction

19  or modification.  And do you know whether that term

20  "modification" is defined anywhere?

21  A.   Yes, it is.

22  Q.   It is where?

23  A.   In either Part 200 or 201.

24  Q.   Okay.  And do you recall what that definition

25  is?  What does "modification" mean?

1    A.  You know, we can read it right from the

2    definition, if you like.

3    Q.  Well, we may get there.  But before we do that,

4    I'm wondering if you know what it means.

5    A.  I do know it.  It has to do with a modification

6    of a process with an increase in emissions -- that

7    results in an increase in emissions, in short, is

8    what you're looking for.

9    Q.  A modification of a process?

10   A.  Process or source.

11   Q.  What's a process?

12   A.  The words were interchanged as the permits

13   change.  You know, because Air 100s looked at

14   emission points, and then as 201 changed, it looked

15   at the sources.  You know, it separated the sources

16   from emission points.

17   Q.  Let's use the term "process", sir.  What does

18   process mean?

19   A.  The source, the process that's making the

20   emissions.

21   Q.  All right.  Now, a process is -- if I recall

22   your testimony on direct, you described -- you

23   described the light oil scrubber as a process,

24   correct?

25   A.  Yes, I did.

1    Q.   Because it is a component in which something

2    happens, something is changed or altered, or there

3    is something going on in that -- in that vessel or

4    component to create a process, correct?

5    A.   Correct.

6    Q.   And a process is distinct from event, isn't it?

7    A.   Yes.

8    Q.   Now, let me ask you and -- let me ask you if

9    this is consistent, the definition -- the words I'm

10   about to read is consistent with your understanding

11   of the word "modification."  Okay?

12        Any physical change or change in the method of

13   operation of an incinerator, number one, a

14   stationary combustion installation, or a process,

15   which increases hourly emissions or involves

16   installation of air cleaning components.

17             MR. MANGO:  Your Honor, I'm going to

18   object and ask for clarification on what we're

19   reading from, so that the witness has a clue as to

20   where this definition is coming from.

21             MR. LINSIN:  I'm happy to identify it,

22   your Honor.  I was --

23   BY MR. LINSIN:

24   Q.   Is the language I just read consistent with

25   your understanding of the definition of the term

1    "modification" as it existed in 6 NYCRR 200.1 at

2    the time Title V became effective in New York

3    State?

4    A.  Yes.

5    Q.  So for condition 4 to apply, you either have to

6    know when a -- an emission source was

7    constructed -- and you've testified you don't know

8    when that happened with regard to this PRV -- or if

9    it was modified in terms that comply with that

10   definition, correct?

11   A.  Correct.

12   Q.  Do you know when this PRV was modified?

13   A.  I don't know when it was modified.  But if it

14   was used as an emission, if it emitted pollutants,

15   it needed a permit.

16   Q.  Now, you're repeating that opinion again.  But

17   what I'm trying to do right now is stay with the

18   wording in the condition of the facility's Title V

19   permit.

20       And you've testified you don't know when it was

21   constructed, and you don't know when it was

22   modified.

23   A.  Correct.

24   Q.  And so your opinion that you've expressed now

25   several times, that this was a violation of the

1    permit, is based upon an absence of knowledge

2    concerning these two factors in condition 4,

3    correct?

4    A.   It needed to be identified in the initial

5    permit.  This is for those that were missed.  This

6    applies to those that were not included in the

7    initial permit.  And you have now new construction

8    and modification, this would apply, right.

9    Q.   This would apply as -- if you've read the terms

10   correctly, this applies, am I not correct, for

11   permitting requirements that existed at the time

12   the source was constructed or modified, correct?

13   A.   Correct.

14   Q.   And without knowing when a source was

15   constructed or modified, you can't really properly

16   apply this condition, can you?

17   A.   I can.  Because 201 initially required a permit

18   for every emission point, then it would have

19   required a permit to begin with and would have been

20   included in Title V.  As you go down then, and you

21   find -- you build a new source, a new -- new --

22   construct a new source, or modify one that's in

23   your Title V, this is what applies.

24   Q.   The rules for what's required to be permitted,

25   as we've said, have changed over time, correct?

1    A.   Yes.

2    Q.   And they were different in the 1980s, were they

3    not?

4    A.   Yes.

5    Q.   I'm sorry.  And as a matter of fact, the

6    definition of exempt sources back in the '80s

7    included emergency relief vents, correct?

8    A.   Most likely.  You'd have to look at that rule

9    in the '80s.

10   Q.   Is that consistent with your memory?

11   A.   That is.

12   Q.   And isn't it true that it is possible -- well,

13   no, let me ask this a different way.

14        I would like to ask you this hypothetical.  If

15   a component is installed in a facility and it

16   complies with an exemption that exists at that

17   time, and the operation of that component then

18   changes over time, you have to know how it's

19   changed and when it's changed in order to evaluate

20   whether it's still exempt or not, correct?

21             MR. MANGO:  Objection to that question.

22   It seemed like a compound question to me.  There

23   was --

24             THE COURT:  Do you understand the

25   question?

1          THE WITNESS:  Repeat it, and we'll give it

2     another shot.

3          MR. LINSIN:  All right.

4     BY MR. LINSIN:

5     Q.  If a component is exempt under the rules when

6     it is installed, exempt from permitting

7     requirements, in order to know whether that -- and

8     the operation of that component changes over time,

9     you have to know when that change occurs and what

10    that change was in order to know whether the

11    component has lost the exemption or whether it

12    still retains the exemption, don't you?

13    A.  Yes.  I can agree with that.

14    Q.  All right.  And you don't know that about this

15    pressure relief valve in the by-products area in

16    Tonawanda, do you?

17    A.  Not needed because the 201 requirements

18    required it to be identified in the Title V

19    application.  And then this would apply for any new

20    construction thereafter.

21    Q.  Now, you're saying title -- you're saying it

22    was required -- it was required to be reported

23    under the Air 100 regulations, correct?

24    A.  If it was not exempt on the -- on the 201 when

25    Air 100s were applicable, you would have a permit

432

1    then, an Air 100.

2    Q.   Yes.   That's if it was not exempt.

3    A.   Correct.

4    Q.   All right.   But if it was exempt --

5    A.   -- it wouldn't need a permit.

6    Q.   -- it wouldn't need a permit, correct.

7         You testified on direct examination before

8    lunch that when you visited the Tonawanda plant

9    in 2011, that you saw the pressure relief valve in

10   the by-products area.   And you also testified that

11   you saw a strip chart, if I recall your term, a

12   strip chart -- strip chart that showed gas

13   releases.   Do you recall that testimony?

14   A.   I recall that testimony and, you know, it

15   was -- my recollection wasn't perfect, I guess, if

16   that's what we're going to get at here.

17   Q.   Well, did you see a strip chart when you were

18   at the plant in 2011?

19   A.   I was forwarded strip charts from that process

20   by the Department of Justice.   I recall seeing

21   strip charts for that bleeder valve.   And I recall

22   in 2011, when I -- when that was pointed out to me

23   going into the building where this circular

24   chart -- actually, it's a circular chart -- was

25   maintained.   I can't say that there was a circular

433

1    chart there that was used, or if it was just a

2    blank -- a clean chart there, now that my memory is

3    coming back to me on that particular piece.

4    Q.   Your memory was refreshed over lunch?

5    A.   No, as we talked -- as I talked about it here,

6    I'm thinking exactly what did I see, and that's

7    what came -- you know, that's what's coming to me

8    here.

9    Q.   So let's see what your current recollection is.

10   A.   Okay.

11   Q.   In 2011, did you review circular charts in the

12   by-products area at the coke facility?

13   A.   No, I did not.

14   Q.   So at some other time you've seen circular

15   charts from the by-products area?

16   A.   Yes.

17   Q.   That the Department of Justice has provided to

18   you?

19   A.   Yes.

20   Q.   And you testified that you reviewed these

21   charts and they showed gas releases, if I recall

22   your testimony, is that correct?

23   A.   They showed spikes in -- in -- in gas value, in

24   pressure.

25   Q.   Okay.  Can you describe -- do you know how

1    these charts are recorded?

2    A.   There is a device that measures the pressure on

3    the gas and records it on a circular chart.

4    Q.   And the chart itself turns over time, is that

5    correct?

6    A.   Correct.

7    Q.   And so over a 24-hour period you wind up with a

8    tracing that records pressure in the line that's

9    being monitored, correct?

10   A.   Correct.

11   Q.   Do you know, from looking at the charts that

12   you reviewed, whether those charts indicate there

13   was any release of gas from the coke oven gas line?

14   A.   There was no documentation on it as to what the

15   pressure setting was.

16   Q.   What the pressure setting of what was?

17   A.   Of the -- of the valve, that it would open.  So

18   I can't say.

19   Q.   Of the pressure relief valve?

20   A.   The pressure relief valve.

21   Q.   So the circular charts you reviewed recorded

22   line pressure --

23   A.   Line pressure.

24   Q.   -- but did not record the set point, the

25   release set point for the pressure relief valve,

1    correct?

2    A.   Correct.

3    Q.   And do you know what the range of pressure was?

4    Do you recall what it was in those charts you

5    measured -- you looked at?

6    A.   Some -- some of the ranges were around 80 and

7    some were around 120.  And I thought it was in --

8    in units of an oil.  I'm trying to recall.

9    Q.   Would -- would it fit with your recollection

10   that it -- that the measurements on those circular

11   charts are in centimeters of oil?

12   A.   It could be it.

13   Q.   About 80 -- between 80 centimeters of oil and

14   100, 120 centimeters of oil.  And do you know what

15   that means?

16   A.   It's a measure of -- of pressure.

17   Q.   And do you understand it to mean a measure of

18   pressure that would overcome the resistence of a

19   column of oil of a certain height?

20   A.   Right.  Of 80 centimeters of oil.

21   Q.   Eighty to 120?

22   A.   Right.

23   Q.   And do you know what the -- the conversion

24   value is -- would be for centimeters of oil to

25   pounds per square?

1    A.   I don't know it, but I had staff go through

2    that calculation, and I believe it was around the

3    value that you mentioned earlier.

4    Q.   All right.  Would it fit with your

5    understanding that approximately 85 centimeters of

6    oil equates to 1 pound per square inch?

7    A.   If you did the math, I'll agree with that.

8    Q.   Does that fit with your recollection, sir?

9    A.   I think around that area.

10   Q.   Mr. Carlacci, you testified on direct

11   examination that you, and I presume your colleagues

12   in DEC, had become concerned about potential

13   sources for benzene emission --

14        Can we take this exhibit down, please?

15        -- potential sources of benzene emissions in

16   the Tonawanda area around 2006 and had begun

17   sampling in 2006, is that correct?

18   A.   Correct.

19   Q.   And then you initiated a study in 2007,

20   correct?

21   A.   Correct.

22   Q.   And then you eventually went to visit the

23   facility in May of 2008?

24   A.   Correct.

25   Q.   All right.  And you've already testified that

1    before you went to the facility in May of 2008 that

2    you reviewed this HAPs emission study that had been

3    submitted by the facility before in 2003, correct?

4    A.   Correct.

5    Q.   Did you review any other documents in the file

6    that had existed in -- in DEC's file for this

7    facility before going out in May of 2008?

8    A.   There was quite a few of us that reviewed the

9    file.  I did page through the file looking at

10   different applicable regs.  Albany was involved in

11   calculating emissions and estimating them also to

12   check those -- that study.  They modeled the

13   emissions from the facility, so they can predict

14   the outcome downwind.

15   Q.   My question was what you reviewed.  What did

16   you review before you went to the site in May

17   of 2008?

18   A.   I reviewed the permit.  I reviewed the Air

19   100s.  I reviewed the applicable regulations.  I

20   looked at that study.

21   Q.   Did you review the records of the inspection

22   reports for this facility over the years?

23   A.   Yes, I looked through them.

24   Q.   You did, okay.  And your objective in going to

25   the facility in May of 2008 was to identify this

1    concern to the facility and see if there were any

2    things you could identify or they could help you

3    identify that might be potential sources for these

4    elevated benzene readings, correct?

5    A.   Correct.

6    Q.   Now, what time of day did you get there on

7    May 28th, 2008?

8    A.   9:30, 10 o'clock.

9    Q.   Do you have a -- any record of that?

10   A.   I don't recall if I wrote it down in my notes

11   or not.

12   Q.   And from start to finish, how long did you stay

13   at that facility on May 28th, 2008?

14   A.   Not -- not very long.  I think it was a short

15   meeting in the office and a relatively short walk

16   down through the plant.

17   Q.   Can you estimate the time you spent there?

18   A.   Maybe an hour, hour and a half.

19   Q.   All right.  You testified on direct, as I wrote

20   it down, that you couldn't stay very long.  Do you

21   recall that testimony?

22   A.   Yes.

23   Q.   Now, did anybody at Tonawanda tell you that the

24   time there was limited?

25   A.   No.

1    Q.   Did anybody tell you there was any particular

2    part of the plant you couldn't go to?

3    A.   No.

4    Q.   So the time limitation you're talking about

5    came from where?

6    A.   From us.  We had other commitments.

7    Q.   And so you deemed it important enough to stay

8    at this facility for an hour or an hour and a half,

9    correct?

10   A.   That's the amount of time we had to -- to meet

11   with Mark and present this data.

12   Q.   All right.  And you said you met with

13   Mr. Kamholz.  And did you meet with anybody else at

14   the plant?

15   A.   I think Mr. Kamholz was the only guy we met

16   with on that day.

17   Q.   All right.  And did he -- did you request or

18   did Mark suggest that you go to the by-products

19   area?  How did that idea come up?

20   A.   I asked that we take a walk by the by-products

21   area.

22   Q.   And why did you request to go to the

23   by-products area?

24   A.   You know, to learn more about the by-products

25   area, to see if there was anything that I can

1    identify that may help find sources of emissions.

2    Q.   Is it because you thought that the by-products

3    area, based on your knowledge of -- of coke oven

4    facilities, the by-products area was a potential

5    area where you might identify benzene sources?

6    A.   No.   It could have been the oven.   I asked for

7    pushing records as well while we were in that

8    meeting.   It was just to look at that facility as a

9    whole.

10   Q.   Other than the by-products area, did you visit

11   any other part of the plant?

12   A.   We looked at the ammonia still and the

13   by-products area.   We didn't go any further than

14   that.

15   Q.   So you didn't visit the oven?

16   A.   No.

17   Q.   You didn't visit the boiler?

18   A.   No.

19   Q.   You didn't visit the coal fields?

20   A.   Not on that day, no.

21   Q.   Didn't visit the boiler house?

22   A.   Correct.

23   Q.   This was the one area that you requested to

24   visit?

25   A.   Correct.

1    Q.  All right.  And how many representatives of DEC

2    were with you on that visit?

3    A.   Three others.

4    Q.  Three others.  So four DEC representatives.

5    And how long was the meeting in Mark's office that

6    morning?

7    A.   It was the majority of the time, I would say.

8    Q.  Do you recall, sir?

9    A.   I'm going to take a guess it was 45 minutes.

10   Q.  My question is, and I ask you not to guess --

11   A.   Okay.

12   Q.  -- because this is important --

13   A.   Okay.

14   Q.  -- do you recall how long you stayed in Mark's

15   office that day?

16   A.   No.  I don't recall exactly the minutes.

17   Q.  Could you recall approximately how long you

18   stayed in Mark's office?

19   A.   Forty-five minutes, I would say.

20   Q.  All right.  And so you spent another 45 minutes

21   in the by-products area before you left?

22   A.   We drove into the plant, met at the plant,

23   drove down to the by-products area.  All of that

24   I'm going to guess was around an hour and a half,

25   two hours.  Maybe less.

1    Q.   How long do you recall staying in the

2    by-products area?

3    A.   Probably was maybe 20 minutes.   That -- that

4    walk, you know, from start to finish, maybe 25.

5    Q.   So there are four DEC representatives in the

6    by-products area at the plant for at least 20

7    minutes, you're saying, is that correct?

8    A.   Yes.

9    Q.   And could I have Defendant's Exhibit Q --

10   QQQ0.01 already in evidence back up?

11        So your testimony, Mr. Carlacci, is that on May

12   the 28th -- do you recall what the weather was that

13   day, by the way?

14   A.   I had a jacket on, so it was a little cool.

15   Q.   All right.   Was it raining?

16   A.   No, it wasn't raining.   I think the sun was --

17   partly cloudy.

18   Q.   All right.   And your testimony is that four

19   representatives of DEC were in this by-products

20   area after having reviewed a HAPs emission study

21   that said there was a PRV in this by-products area.

22   And your testimony is that you didn't see this PRV

23   that is in the right center portion of this

24   photograph, is that correct?

25   A.   We were on the roadway, not in the by-products

1    area, and we did not identify that source.

2              MR. LINSIN:  Your Honor, I don't have much

3    more, but I don't want to -- it might be a lot more

4    efficient if -- if this would be a convenient time

5    to break and -- and permit -- permit me to finish

6    up in the morning.

7              THE COURT:  Absolutely.  It's great

8    timing.  Thank you.

9              MR. LINSIN:  Thank you.

10             THE COURT:  We'll do that.  We'll break.

11   Tomorrow, Ms. Labuzzetta, 9:30 again?

12      Okay.  We're going to do 9:30 again tomorrow.

13   Please keep your minds open.  Don't lose sight of

14   the fact that this is very important case for both

15   sides.  Don't do any independent investigation.

16   Don't read any articles.  I mean, there are

17   articles in the newspaper that relate to

18   contaminants and toxic matters and the like, so

19   stay away from anything that has any relationship

20   to the subject matter of this case, even though

21   it's not specifically about this case.  Don't talk

22   about it with anybody.  Don't go to the Internet or

23   any electronic facility to enhance your knowledge.

24   You'll get everything you need here.  I mean, you

25   got to amaze yourself in terms of what you have

1    already learned, right?  And it will be that way.

2    It will be a -- a work in process, but you'll get

3    it all here.  So remember the application of common

4    sense, experience, intelligence.  It won't

5    overwhelm you, you'll get it.  There is a lot to do

6    here yet.  I think we're making progress.

7    Everybody is trying.  It's great to have you

8    cooperating with us, and we'll see you next month

9    at approximately what time?

10            THE JURY:  9:30.

11            THE COURT:  Okay.  Thank you very much.

12            (Jury excused from the courtroom.)

13            THE COURT:  Okay.  Thank you.  You may

14    step down.  Anything that we need?

15            MR. PIAGGIONE:  Your Honor, I apologize

16    for standing up and objecting.  In my own defense,

17    I did ask Mr. Mango am I permitted to object with

18    his witness, he said yes.  So he set me up.

19            THE COURT:  Between you and me, he's done

20    that before.  He sets you up, okay, so there must

21    have been something you did in the past that he was

22    trying to get back at you for.  But, in any event,

23    that's not a problem, Mr. Piaggione.  We'll see

24    everybody tomorrow about 9:30.  Thank you very

25    much.

1                    *        *        *        *        *        *

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3              I certify that the foregoing is a

4         Correct transcription of the proceedings

5         Recorded by me in this matter.

6

7

8                          s/Michelle L. McLaughlin
                           Michelle L. McLaughlin, RPR
9                              Official Reporter
                               U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25