VOL. III

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

        -vs-               10-CR-219S

TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
               Defendants.
-------------------------------------


          Proceedings held before the

     Honorable William M. Skretny, U.S.

     Courthouse, 2 Niagara Circle, Buffalo,

     New York on March 1, 2013.


     APPEARANCES:

     AARON J. MANGO,
     Assistant United States Attorney,
     ROCKY PAIGGIONE, Senior Counsel,
     U.S. Department of Justice,
     Appearing for the United States.

     GREGORY F. LINSIN, ESQ.,
     JEANNE M. GRASSO, ESQ.,
     ARIEL S. GLASNER, ESQ.,
     Appearing for Tonawanda Coke Corporation.

     RODNEY PERSONIUS, ESQ.,
     Appearing for Mark L. Kamholz.

     Also Present:  Lauren DiFillipo, Paralegal
                    Sheila Henderson, Paralegal


     Michelle L. McLaughlin, RPR,
     Official Reporter,
     U.S.D.C. W.D.N.Y.
     (716)332-3560

1                      I N D E X

2              WITNESS                          PAGE

3        ALFRED CARLACCI

4   Continued Cross-Examination by Mr. Linsin    480
    Cross-Examination by Mr. Personius           513
5   Redirect Examination by Mr. Mango            650
    Recross-Examination by Mr. Linsin            690

6

7

8        DEFENDANTS' EXHIBITS                    EVD.

9              FFFF                              483
               OOO.07                            509
10             RRR.02                            566

11

12       GOVERNMENT EXHIBITS                     EVD.

13             3506.08-0008                      639
               49.19                             663
14             49.20                             667
               49.15                             685

15

16

17

18

19

20

21

22

23

24

25

1                    (Jury not present in the courtroom.)

2              THE COURT:  Morning.  Please have a seat.

3       Morning, Chris.

4              COURT SECURITY OFFICER:  Morning, sir.

5              THE COURT:  Okay.  Ms. Labuzzetta.  If you

6       would call the case, please.

7              THE CLERK:  Criminal case 10-219S, United

8       States of America versus Tonawanda Coke Corporation

9       and Mark Kamholz.

10             THE COURT:  Okay.  The attorneys and

11      parties are back present.  The jury is here.  We'll

12      call them out shortly, but I understand there is a

13      preliminary nature matter we need to address.

14             MR. LINSIN:  There is, your Honor.  I

15      thought it might be easier to do it out of the

16      presence of the jury.  As the Court may recall,

17      during Mr. Carlacci's direct testimony, the

18      government introduced two exhibits, Government

19      Exhibit 15 point -- I'm sorry -- 19.15 and 19.16,

20      which were two letters regarding the -- letters

21      from Tonawanda Coke to DEC informing the agency of

22      the installation.  The first letter relating to

23      baffles -- to the baffles in quench tower number 2;

24      the second letter relating to the installation of

25      baffles in quench tower number 1.

1          During that -- the introduction of that

2     evidence, I raised the issue of the notices of

3     violation, or NOVs, that had been issued by --

4     first by DEC and then by EPA.  The initial letter

5     issued by DEC requiring installation of the baffles

6     just in quench tower number 2 was sent by DEC in

7     October of 2009.

8               THE COURT:  Those letters were November,

9     right?

10              MR. LINSIN:  The first letter was November

11    informing DEC that the baffles in quench tower

12    number 2 had been installed.  The second letter was

13    actually sent in January of 2010, but that was

14    advising -- because the EPA's NOV, which was issued

15    in December of 2009, still during our -- the time

16    period of the indictment, that letter required

17    installation of baffles in both quench towers,

18    quench tower number 1 and quench tower number 2.

19         And, thereafter, the company sent a -- a letter

20    confirming that the baffles had now been also

21    installed in quench tower number 1.

22         I advised counsel for the government that I

23    intended to introduce -- seek to introduce through

24    Mr. Carlacci those two NOVs that are related to the

25    two letters that the government has already

1   introduced into evidence.  And I understand from

2   Mr. Mango that the government would object.  I

3   thought it would be easier to raise this with the

4   Court before the issue arose during the testimony.

5           THE COURT:  Yeah, I think you asked me to

6   permit that, right?

7           MR. LINSIN:  I did, your Honor.

8           THE COURT:  And then I declined it.  But

9   you said you would like to maybe do it on your

10  examination.

11      Okay.  Mr. Mango?

12          MR. MANGO:  Good morning, your Honor.

13  Yes.

14          THE COURT:  Good morning.

15          MR. MANGO:  These -- these notices of

16  violation bring directly into play the civil

17  litigation in this case.  The civil litigation

18  that -- that there's already been reference to that

19  is trying to keep this whole idea of pushing

20  controls out of this case, this -- this sticking

21  issue for the corporation.  These letters that were

22  sent to the government, DEC, by the Tonawanda Coke

23  Corporation don't reference the NOVs.  So by

24  allowing these NOVs into evidence there's going to

25  be inference that Tonawanda Coke Corporation put

1    these baffles in because of the NOVs.  That -- that

2    is definitely not going to be able to be

3    established through this witness.  He's not going

4    to be able to say why the Tonawanda Coke

5    Corporation put these baffles in, and it would give

6    the improper inference that it's the NOVs that are

7    driving this, rather that they violate -- that they

8    know they were engaging in illegal conduct and

9    violated the law.  Now the -- the -- the other --

10            THE COURT:  Now, isn't there a position

11    here that, at least as far as I think it was the --

12    which one was shortened?  Was it the western?

13            MR. MANGO:  Number 2, your Honor.

14            THE COURT:  Number 2.  So that's eastern.

15            MR. MANGO:  That's eastern.

16            THE COURT:  All right.  And it was the

17    position of Mr. Kamholz that that didn't require a

18    baffle and that changed, right?

19            MR. MANGO:  That was his position.  But as

20    the letters show, it's the Government's position

21    DEC was very clear in telling him what quench tower

22    needs to have baffles.

23            THE COURT:  Okay.  So you're saying this

24    interjects an unnecessary issue that's going to

25    wind up being confusing, but --

1          MR. MANGO:  It does.

2          THE COURT:  -- the defense could offer

3     that through another witness, couldn't it?

4          MR. MANGO:  Potentially.  Definitely not

5     this witness.  I don't think it's appropriate to

6     even question this witness about these NOVs.

7          THE COURT:  He knows about them.

8          MR. MANGO:  Possibly.  Your Honor,

9     I haven't -- I haven't briefed this with him

10    because this whole issue of civil litigation has

11    not been involved.  I do note that the DEC letter,

12    the DEC NOV --

13         MR. PERSONIUS:  Pardon me.  I'm sorry to

14    interrupt.  The witness is in the courtroom.  I

15    don't know if that's appropriate that he be here if

16    we're going to be talking about his testimony.

17         THE COURT:  All right.  Mr. Carlacci, if

18    you wouldn't mind stepping out, please.  But don't

19    go too far.  Right.  Thank you.

20         (Witness exited the courtroom.)

21         MR. PERSONIUS:  Sorry, Judge.

22         THE COURT:  No, that's okay.  Thank you.

23         MR. MANGO:  Your Honor, the -- the DEC --

24    I'm sorry, I should wait till he -- okay, he's

25    gone.

1          The DEC NOV, which is Defendant's Exhibit

2     OOO.07, that's signed by Larry Sitzman.  He's going

3     to be a witness later in this trial.  He would be

4     the more appropriate witness to -- if this is

5     really going to come into evidence, to get it in

6     through him.

7          The EPA NOV is -- is totally not relevant

8     because it talks about -- it talks about issues

9     that are not issues in this case about charging as

10    the operation that introduces coal into coke ovens

11    beginning when the coal enters the oven, continuing

12    until that -- the charging does not include the

13    period when lids are reopened.  It just --

14    there's -- there's too much information here that

15    it's -- it's going to inject issues and it's dated

16    December 7th of 2009.  We already know the baffles

17    in the west -- or the east quench tower were

18    already put in place by that point.  So what --

19    what -- what relevance does that have?

20              THE COURT:  All right.  Well, let's talk

21    about relevancy --

22              MR. LINSIN:  Sure.

23              THE COURT:  -- because, I mean, we have

24    the letters.  They obviously -- they talk about

25    the -- really the reinstallation of the baffles,

1    right?

2              MR. LINSIN:  They do, your Honor.  They

3    do.  And the relevancy here -- and -- and we

4    believe this is a very important issue -- is that

5    these two NOVs issued by separate agencies, a state

6    and a federal agency, within two months of each

7    other, reflect a very different enforcement

8    perspective regarding the requirement for baffles

9    in these two quench towers.

10         As -- as the Court may recall, we expect the

11   evidence will show -- and I think we've already

12   heard some of this testimony -- that for many years

13   there was an exemption that it -- granted by DEC,

14   an explicit exemption for requiring baffles in

15   quench tower number 1, the west quench tower.  And

16   so when DEC gets around to issuing its NOV in

17   October of '09, the only quench tower they address

18   in their NOV is quench tower number 2.  Less than

19   two months later, without any intervening

20   discussion with the company or anything else, EPA

21   issues an NOV requiring baffles in both quench

22   towers.

23              THE COURT:  Yeah, but Carlacci had nothing

24   to do with either of those, right?

25              MR. LINSIN:  Well, your Honor, if -- if

1    this witness expresses a lack of knowledge that

2    the -- the parties in the case, your Honor, as to

3    the underlying foundational testimony for documents

4    of this nature, business records essentially, have

5    agreed to stipulate to foundational issues.  If

6    Mr. Carlacci testifies that he has no knowledge

7    about either of these NOVs, then I will move on.  I

8    will not go any further.  But if he indicates that

9    he was aware that DEC had issued an NOV for the

10   installation of baffles in quench tower number 2, I

11   think it is perfectly appropriate for the jury to

12   hear what that NOV required.  If he professes a

13   lack of knowledge about EPA's NOV, then I will move

14   on.  We'll deal with it with another witness.

15            THE COURT:  All right.  Why isn't that

16   fair?  How are you unfairly prejudiced?  Because at

17   issue is the extent of Carlacci's knowledge.

18            MR. MANGO:  Well, your Honor, at this

19   point, it was a subject of our pretrial discussions

20   before your Honor to keep the civil litigation out

21   of this case.  I did not prep this witness on civil

22   litigation, on NOVs.  I did not show him those.  So

23   at this point now he's on cross-examination, he's

24   going to get on the stand, and Mr. Linsin is going

25   to say are you familiar with this.  And he's going

1    to say no because I told him not to look at it.  So

2    it's almost -- it is unfair now because we have our

3    proffered expert up there who is going to profess a

4    lack of knowledge about a very important point that

5    I told him not to look at because civil litigation

6    was not supposed to be coming into this case.

7             THE COURT:  Okay.  But he -- do you know

8    that's what he's going to say, that he's not

9    familiar with them?

10            MR. MANGO:  I expect him to.  I mean, if

11   I'm permitted to at least talk to him for a minute,

12   then I could at least bring this to his attention.

13   I -- I just -- it's -- it would be unfortunate to

14   have him blind-sided in front of the jury being --

15   being in the position that he is in.

16            THE COURT:  Well, he's not going to be

17   because he heard some of this discussion already,

18   you know.  But you can ask him, you know, why are

19   you not familiar with those NOVs.  And he's going

20   to say because you told me, Mr. Mango, not to get

21   involved with the civil litigation aspect of this

22   case.

23            MR. MANGO:  Well, your Honor, there is

24   also an interesting point here that defense is

25   trying to pick up -- to try to make this two

 1    divergent EPA position and DEC position.  The

 2    government has adopted the DEC position in this --

 3    in this trial.

 4        And the -- and the issue is in this -- in this

 5    notice of violation that goes out from DEC talking

 6    only about quench tower number 2, it's because they

 7    didn't know that quench tower number 1 was being

 8    used more than 10 percent of the time.  There was

 9    still this exemption in their mind on the books

10    that was valid.  Now that EPA comes in, the

11    evidence is going to show that EPA, the civil EPA

12    in New York City, had no involvement in -- in

13    referring this to a criminal case.

14            THE COURT:  Okay.  Let me -- let me --

15            MR. MANGO:  Our evidence will show that.

16    So -- so this -- this attempt, which was trying to

17    make this big bad EPA coming in from the New York

18    City to, in a New York second, to turn this around

19    and spin this up criminally, that's not -- that's

20    not going to be the evidence in this case.  So the

21    point he's trying to make is going to be

22    irrelevant.

23            THE COURT:  All right.  I'll get to you

24    just in a second, Mr. Linsin.  But the fact is that

25    as I understand the proof, or at least the

1   information that accompanied the trial brief, was

2   that the EPA was told that the quench tower

3   operation was only with respect to a maximum of

4   10 percent, is that right?

5           MR. MANGO:  EPA -- EPA was -- I'd like

6   to -- if I can have one moment, your Honor.

7           THE COURT:  And then the percentages,

8   you -- were later determined to be in excess of

9   that.  Yeah, check -- and I don't know how that's

10  relevant, because are we interjecting other issues

11  in here that we shouldn't be?

12          MR. MANGO:  Your Honor --

13          MR. LINSIN:  I want to be --

14          MR. MANGO:  I can answer that question

15  quickly, your Honor.  There is an email that is

16  referenced in Defendant's Exhibit N.  It's an email

17  from Ken Eng, the head of the air department in --

18  in -- in New York City EPA, dated December 30th

19  where he says --

20          THE COURT:  Of 2009?

21          MR. MANGO:  2009.

22      Their notice of violation is issued

23  December 7th or 9th of 2009.  So this is after that

24  notice goes out where he says, oh, I spoke to Larry

25  Sitzman, he said the state and TCC had an agreement

1    memorialized in some letter that talked about

2    10 percent of the time.  So the only evidence that

3    shows when EPA finally learned about that is after

4    the NOV, and that's not going to come in through

5    this witness, so it's really going to confuse the

6    matter.

7             THE COURT:  All right.  Well, let's hold

8    it there.  Why do we need this?  Why is this

9    relevant?  And -- and we were trying to keep the

10   civil --

11            MR. LINSIN:  This is -- this is the point

12   I was hoping to make before.  We do not view this

13   as in any way opening the door to civil litigation

14   or in any way trying to circumvent what we've --

15   remain in full agreement about, that the civil

16   litigation aspect, the compliance orders that

17   cascaded down on this company in 2010, we do not

18   intend to get into these issues.  These are

19   notices -- this witness testified about notices of

20   violation yesterday, decisions by an agency that

21   have -- they have identified a violation and

22   telling the permittee to correct that violation.

23   These are notices that reflect a decision, a

24   judgment by the agency that there is a violation of

25   a permit that needs to be corrected.  And -- and

1    that's all these are.

2        And the government has already -- what -- what

3    seems so unfair about the argument now from the

4    government is they have already introduced into

5    evidence the letters confirming the company's

6    actions that are in response to these NOVs, and now

7    they are wanting to suggest that the admission of

8    the NOVs that prompted the action are irrelevant.

9    And --

10            THE COURT:  So you're saying that the EPA

11   already made a determination that something was in

12   violation and had to be addressed.

13            MR. LINSIN:  I'm saying, first, DEC made a

14   determination based on the April '09 inspection,

15   and their determination, as reflected in their NOV

16   in October of '09, was that baffles needed to be

17   installed or re-installed in quench tower number 2.

18   Less than two months later, EPA issues a separate

19   NOV concerning both quench towers.

20       And, your Honor, we do agree -- I completely

21   agree that the e-mail that Mr. Mango just

22   referenced is a very revealing e-mail.  And the

23   Court may recall I referenced it during our opening

24   statement, that it reflects a recognition on the

25   part of EPA that there was an exemption and should

460

1   have been -- should have been included in this

2   facilities permit --

3           THE COURT:  Okay.

4           MR. LINSIN:  -- but DEC missed it.

5           THE COURT:  Let me ask you this, let's say

6   Carlacci says I have no knowledge, all right?  But

7   he probably will not say that because he at least

8   know that -- knows that they exist.  All right.

9   Where do you go?  You're going leave it alone, if

10  he says I have -- I knew that they were issued, if

11  that's the proper terminology, but -- but I don't

12  know anything specific about it.  Then you leave it

13  alone, and you go your way.  Is that what you're

14  saying?

15          MR. LINSIN:  Your Honor, my -- my

16  intention would be to ask the witness are you aware

17  that DEC issued an NOV to Tonawanda Coke in October

18  of 2009 regarding baffles.

19          THE COURT:  Okay.

20          MR. LINSIN:  If he says I'm not aware of

21  it, fine, I move on.

22          THE COURT:  But if he says yes, I know --

23          MR. LINSIN:  If he says yes, then I would

24  move the document into evidence.  Does this

25  document -- is this document the NOV that was sent

1    to Tonawanda Coke regarding baffles?

2              THE COURT:  And where do you go from

3    there?

4              MR. LINSIN:  And then I go are you aware

5    that a separate NOV was issued to Tonawanda Coke

6    regarding baffles in December of 2009.  If he says

7    no, I leave it there.

8              THE COURT:  Okay.  If he says yes, you

9    move it in?

10             MR. LINSIN:  Exactly.

11             THE COURT:  Then what?

12             MR. LINSIN:  I leave it.

13             MR. MANGO:  Your Honor, again, the

14   government thinks it's inappropriate that --

15   another reason is in the EPA's NOV, they cite to a

16   response letter submitted by Defendant Kamholz in

17   response to a request for information.  That

18   information will come out later in the government's

19   case where Defendant Kamholz specifically says both

20   towers in the facility do not have baffles.  They

21   didn't --

22             THE COURT:  Well, what I don't -- I don't

23   see how you're unfairly prejudiced by this

24   necessarily.  I mean, there's got to be some

25   connecting up that you're going to be doing, other

1   than this being a reflection of Carlacci's

2   knowledge or lack of knowledge.

3           MR. LINSIN:  Your Honor --

4           THE COURT:  And maybe some -- are you

5   going to argue pre-disposition or something?

6           MR. LINSIN:  Your Honor, we have -- first

7   of all, these -- the exhibits we're referencing

8   that we're proposing to introduce were premarked in

9   the defendants' exhibit list.  We intend in our

10  case, and we've already noticed him in our witness

11  list, to -- to call to testify the individual who

12  oversaw the installation of these baffles in both

13  quench towers at Tonawanda.

14          THE COURT:  So we're not interjecting what

15  Mr. Mango's concerned with, and that is the breadth

16  and the extent of the civil litigation aspect of

17  this case.  All we're doing is establishing the

18  fact of the issuance of the violations, and the

19  knowledge of this particular witness and we're

20  moving on.

21          MR. LINSIN:  That's exactly correct.

22          MR. MANGO:  Your Honor, there's one more

23  point I'd like to make.  In the EPA notice of

24  violation there is an enforcement provision at the

25  end.  This is -- this is a problem in this case

1   because it specifically references that under a

2   section, EPA has authority to take this following

3   action.  And it's in bullet -- three bullet points.

4   It's only civil -- civil -- civil enforcement

5   actions that they're allowed to take.  This is a

6   civil wing of the EPA.  So it's going to confuse

7   the issue of whether criminal enforcement is now

8   appropriate.  Because then it says, "In addition

9   for any person who knowingly violates any

10  requirement or prohibition of the SIP, State

11  Implementation Plan, for more than 30 days after

12  date of the issuance of a notice of violation,

13  Section 113 of the Act provides for criminal

14  penalty or imprisonment or both.  Under Section 306

15  of the Act, the regulations" -- it's all these

16  different laws that have no bearing on this case.

17  So the jury is going to see this and think wait a

18  second, they put the baffles in, they did it within

19  30 days, why is there criminal enforcement?

20  Because criminal enforcement is under a different

21  provision of the Clean Air Act.

22          THE COURT:  Well, if I gave a limiting

23  instruction that these documents were admitted for

24  purposes of the knowledge of Carlacci in terms of

25  his activities with respect to Tonawanda Coke and,

1       you know, his official role with DEC, is that

2       sufficient?

3                MR. MANGO:  I think if we peel away the

4       defendants' argument, the heart at what they're

5       trying to do with this EPA NOV is that exact point.

6       It was clear in opening, and it's clear in this

7       NOV.  Civil enforcement is the way to go.  Criminal

8       enforcement is not appropriate.  And this is the

9       problem.  Because this document will then put in

10      the jury's hand something that says to them

11      criminal -- you can't take criminal enforcement if

12      they complied within 30 days.  And that's not the

13      law, that's not the criminal provision of the Clean

14      Air Act.  And it's going to tell them -- it's going

15      to make an argument that's improper.

16         We have no problem with the DEC NOV.  If we

17      want -- if we want -- that one -- that one is okay,

18      if we really want to get into that.  But --

19                MR. LINSIN:  Your Honor, may I -- may I

20      propose a -- a solution?  As I -- as I hear

21      Mr. Mango, the inferences that he is now expressing

22      concern about are -- are not anything we in any way

23      seek through the introduction of this document.

24      And I would be happy -- if it would satisfy the

25      government and -- and help move things along, I

1   would be happy to limit my inquiry with this

2   witness to whether he was aware that an -- that an

3   EPA NOV was introduced, whether he knows what that

4   NOV required with respect to baffles, and through a

5   later witness we would be happy before then to

6   redact from this document the portions that

7   Mr. Mango is expressing concern about.

8       Because as I said a few moments ago, our

9   interest in this document relates to the fact that

10  it requires installation in two towers, not just

11  one.  We are not seeking, will not argue, and do

12  not seek to somehow infer to the jury that they

13  should take their enforcement cues from an NOV

14  issued by EPA in 2009.

15      So if that would help move us along, we're

16  happy to do it that way, but the concern Mr. Mango

17  is expressing is not where -- in any respect where

18  we intend to go with this document.

19          THE COURT:  Well, it's not a bad idea

20  but --

21          MR. MANGO:  Your Honor, I would actually

22  ask that -- now that I'm reading the DEC document,

23  it also says the same thing.  "In addition, failure

24  to comply with this notice could subject you to

25  criminal charges.  Environmental conservation

1    law -- gives the cite -- provides that any person

2    who willingly violates -- at this point, until we

3    all have an ability to really digest this, I don't

4    think these should come into evidence through this

5    witness.  Asking -- if that's the way the Court

6    wants to go, that's fine.  But until we really all

7    can -- can -- can focus in on this language which

8    the government strongly urges is -- is -- is

9    improper to -- you know, deals with civil, criminal

10   enforcement, they shouldn't come in, and they

11   should be redacted.

12              THE COURT:  Well, you have an offer that I

13   think addresses what your principle concerns are

14   from Mr. Linsin.  And what I'm going to do is I'm

15   going to allow the limited questioning and the

16   moving into admission.  But you're talking both the

17   DEC and the EPA notices?

18              MR. LINSIN:  For -- if -- what I would

19   propose, your Honor, is if the witness expresses an

20   understanding about the DEC action, to move that

21   document, to not move EPA's document until that

22   language that Mr. Mango referred to could be

23   redacted.

24              MR. MANGO:  The same language, though,

25   your Honor, is in the DEC document.  So I'd

1    actually want that redacted as well if this really

2    is coming into evidence.  Again -- and so I don't

3    think -- I don't think there is an ability to make

4    this redaction right now with this witness.  So I

5    don't think that the DEC NOV should come into

6    evidence at this point either.

7                THE COURT:  Well --

8                MR. MANGO:  So --

9                THE COURT:  -- I'm going to leave it open

10   before the document -- I'm going to allow the

11   documents to be introduced.  It -- and I'm looking

12   at it from the standpoint of it is reflective of

13   what the knowledge of the witness is, and that's

14   Mr. Carlacci at the time that he was involved with

15   his visit and involvement with Tonawanda Coke.

16   From that standpoint, I'm going to allow it.  It

17   looks like both can be worked out as far as

18   appropriate redactions.

19       If there is going to be a change in positions

20   after all of the witnesses have had the opportunity

21   to address, or not, those NOVs in later testimony,

22   if there's a change in position on what can be

23   argued, we will have to get that resolved before

24   the actual argument itself at the end of the case.

25   Okay?

1          MR. MANGO:  Yes, your Honor.  And the

2     government would ask for -- if these -- when and if

3     these redacted versions do get into evidence, some

4     sort of limiting instructions that these are to be

5     considered solely as to the witness's knowledge,

6     but not have any bearing on whether criminal

7     enforcement is appropriate.

8          THE COURT:  We'll see -- yeah, because

9     you're not planning to make that argument.

10          MR. LINSIN:  Your Honor --

11          THE COURT:  But -- I'm sorry.  Go ahead.

12          MR. LINSIN:  We have already made that

13     representation to the Court.  I will reiterate it.

14          THE COURT:  Yeah.  And -- and I mean, if

15     there is another witness that the admission of

16     these documents is appropriate in connection with

17     that witness, then, you know, we'll see where it

18     goes at that point in time.  But I think we have a

19     meeting of the minds in terms of what our

20     understanding is now.

21          MR. LINSIN:  And so I am clear, your

22     Honor -- I apologize -- but it's the Court's

23     intention to permit the admission of the documents

24     today?

25          THE COURT:  Yes.

1          MR. LINSIN:  Okay.

2          THE COURT:  All right.  Yes.  But Carlacci

3    has to know about --

4          MR. LINSIN:  Of course.  Of course.

5          MR. MANGO:  And in redacted form or in

6    unredacted form?  I thought in redacted form.

7          THE COURT:  Well, you're going to work out

8    the redaction.  They're not going to get to see the

9    NOVs, right?  I mean, I --

10         MR. LINSIN:  I was not intending to

11   display them before they would be -- before they

12   would be formally provided to the jury for time of

13   deliberation, we are happy to redact the language

14   that Mr. Mango has referenced.

15         THE COURT:  In both, DEC's and EPA's?

16         MR. LINSIN:  In both of them, of course.

17         THE COURT:  Okay.

18         MR. MANGO:  So they won't put up on the

19   screen when they are put into evidence?

20         MR. LINSIN:  My -- my inquiry will simply

21   be, and limited to, whether he's aware that these

22   NOVs required installation from DEC of baffles in

23   one tower and from EPA baffles in two towers.

24   That's what we want from these documents and

25   nothing more.

1          THE COURT:  Okay.  How -- how many pages

2     this is this notice?

3          MR. MANGO:  The DEC document, your Honor,

4     is five pages.  There's four of the actual notice

5     and one cover letter.  The EPA document is actually

6     a little lengthier.  It looks likes it's ten pages

7     in length, and it does get into issues that aren't

8     relevant in this case about total dissolved solids

9     in the quench water, about this charging on the

10    leaks and the doors, which, you know, I'm just

11    letting the Court know that --

12         THE COURT:  Well, we know upon

13    representation what the defense's position with

14    how -- with respect to these documents, how they're

15    going to be utilized.  I don't have any problem

16    with publication for the jury just to see the face

17    of the notice of violation document.  That's not

18    going to get into the language you're concerned

19    about.  But before it goes to the jury, if, in

20    fact, it does that, the redactions will have to be

21    made.

22         MR. MANGO:  Well, your Honor, the face of

23    the -- the physical NOV has that language in it.

24    So I'm concerned if they see this NOV on the

25    screen --

1          THE COURT:  Where is it on the --

2          MR. MANGO:  At the bottom here.  But if

3     this cover letter -- that's fine, that's the first

4     page.  If they want to show the cover letter,

5     that's fine.

6          MR. LINSIN:  I'm happy to limit the

7     present -- the production of these documents -- the

8     publication of these documents to the jury today to

9     be limited to the cover letters for both of the

10    NOVs we are discussing.

11         MR. MANGO:  Okay.

12         THE COURT:  And we will redact before the

13    documents will be admitted and before we -- they

14    are further published to the jury, the language

15    Mr. Mango's referenced will be redacted regarding

16    enforcement.

17         MR. MANGO:  Okay.

18         THE COURT:  And I will allow you, Mr.

19    Mango, if you need to, to inquire as to why these

20    NOV documents weren't reviewed or gone into in any

21    great depth by Mr. Carlacci --

22         MR. MANGO:  If it becomes an issue.

23         THE COURT:  -- if it comes out that way.

24         MR. MANGO:  Yeah.

25         THE COURT:  And I assume he's on notice

1    now.  I mean --

2         MR. MANGO:  Yeah.  And I expect he knows

3    about it.  I just told him not to -- to -- to

4    really go over them and review them.  I mean, he's

5    been very involved in the civil litigation, so --

6         THE COURT:  Okay.  All right.  Thank you

7    very much.

8         MR. PERSONIUS:  Your Honor, I briefly want

9    to raise one other -- just because we don't have

10   the jury here now and --

11        THE COURT:  Sure.

12        MR. PERSONIUS:  -- given -- not wanting

13   any surprises.  When I'm examining Mr. -- and I'm

14   going to screw -- I keep saying -- is it Carlacci

15   or Carluchi?  It's Carlacci.

16        THE COURT:  Carlacci.

17        MR. PERSONIUS:  I'm sure I'm going to

18   screw it up.

19      Mr. Carlacci.  One thing that I intend to do,

20   Judge, is to explore his familiarity with the DEC

21   file for Tonawanda Coke that he's already testified

22   on direct that he's reviewed.  And to attempt

23   through him to introduce the vast majority of the

24   inspection reports at Tonawanda Coke going back to

25   1981.  We need to get those into evidence.  We need

1   to have a live witness at least identify those and

2   generally describe what they relate to.  And I

3   think Mr. Carlacci is as good a witness as anyone

4   to do that with.  There's nothing nefarious about

5   what I intend to do with it, other than to

6   establish to the jury through a live witness that

7   there were these repeated inspections out at

8   Tonawanda Coke.

9        THE COURT:  The government went into the

10  1980 era so to speak on its direct examination.

11       MR. PERSONIUS:  I just want to make sure

12  the government -- if we're going to have an issue,

13  let's talk about it now.

14       MR. MANGO:  Your Honor, we believe Cheryl

15  Webster and Larry Sitzman, who were some of these

16  inspectors, they are going to testify.  We have no

17  problem with the foundation.  If there -- if

18  there's a question that this witness needs to

19  identify them as business records, I think we have

20  already all agreed we're going -- we're going to

21  agree on the DEC records.

22       But just the wholesale admission of these

23  inspection reports before we get the witness who

24  actually wrote the inspection report and/or why

25  it's relevant -- I mean, typically reports of

1   police officers don't come into -- into evidence

2   just because we want them to come into evidence.

3            MR. PERSONIUS:  I'm sorry.  Go ahead.

4            MR. MANGO:  They're technically hearsay.

5            THE COURT:  Well, I don't know.  Are you

6   intending to move them into evidence?

7            MR. PERSONIUS:  Yeah.  We want to get them

8   in, Judge.  And the reason they're relevant here is

9   evident from -- from both of our opening

10  statements, that it all has to do with this issue

11  of presence at the premises and what the inspectors

12  knew.  And it isn't possible, I don't believe, that

13  Mr. Sitzman and Ms. Webster can testify about the

14  majority of these reports.  The government had on

15  its witness list Henry Sandonato and Gary Foersch.

16  They removed them from their list, Judge.  And

17  Mr. Foersch, without question, is the principle air

18  inspector from DEC who was out at Tonawanda Coke

19  over a period of some 20 years.  He's not going to

20  be a witness for the government.  So it seems to me

21  that if you've got a witness up there who's holding

22  himself out as having familiarity with the DEC

23  file, that he would be the person to get all these

24  reports introduced through.

25           MR. MANGO:  Your Honor, there is --

1              THE COURT:  All right.  What exhibit

2    numbers are we talking about?

3              MR. PERSONIUS:  There are a number of the

4    defense exhibits, your Honor.

5              THE COURT:  And it's not just business

6    records.  These are reports, right?

7              MR. PERSONIUS:  Yes, Judge.

8              THE COURT:  All right.  So it comes under

9    another admission rule really.

10              MR. PERSONIUS:  Would you like all the --

11              THE COURT:  Well, I mean, are they in a

12    block, like from something to something?  Some

13    number --

14              MR. PERSONIUS:  I wish we were organized

15    that way, Judge.  And when we were doing this, we

16    weren't.  So I can't -- they're a number -- no,

17    they are not.  I could identify them for you, but

18    they're not just a block of exhibits.

19              THE COURT:  Well, these are probably

20    803(8) records, right?

21              MR. PERSONIUS:  Well --

22              THE COURT:  Is that what you're -- is that

23    how you're moving them in?

24              MR. PERSONIUS:  I think they're special --

25    yeah, I'm sorry.  Yes.  And I think there's special

1    relevance here because of the nature of our defense

2    and they demonstrate the number of times that these

3    inspectors were present at the facility.

4         THE COURT:  Well, I guess we're going to

5    see how it goes.  I'm on notice of that.  I'll take

6    a look at it.  I mean, I'll be viewing them under

7    that exception to the hearsay rule, and then if you

8    have to make --

9         MR. MANGO:  Yes, your Honor.  I will take

10   a look at that.  I -- I -- and it's just that there

11   is -- there is, under my understanding, nothing to

12   preclude the defense from calling these witnesses,

13   Mr. Sandonato or Mr. Foersch, you know, to testify

14   and to simply say, okay, did you go out on a -- did

15   you go on a site visit in 1981.  I think so.  Are

16   you not sure?  Is there a document that would

17   refresh your recollection?  Here, let me show you

18   this.

19        MR. PERSONIUS:  I don't think that should

20   be a consideration in this ruling, Judge, because

21   we have no burden.  And if the government has put a

22   witness on who has knowledge, and we can get it in

23   through that witness, we shouldn't have to --

24   because the government chooses to take witnesses

25   off its list, we shouldn't be prevented from

1   getting admissible evidence in through a qualified

2   witness.

3           THE COURT:  Well, if it's properly

4   foundationed [sic], and if it is -- if it does

5   qualify under the rule, I will take a look at it.

6   But, you know, if it's laden with hearsay, we've

7   got some problems, as you know.  Okay?  Okay.

8           MR. MANGO:  Thank you, your Honor.

9           MR. PERSONIUS:  Thank you, Judge.

10          THE COURT:  Well, Chris, you think we are

11  ready yet or what?

12          COURT SECURITY OFFICER:  Just about

13  getting there.

14          THE COURT:  Okay.  Let's bring the jury

15  in, okay?

16          (Jury seated.)

17          THE COURT:  Good morning, everybody.  How

18  are you doing?

19          THE JURY:  Good morning.

20          THE COURT:  Please have a seat.

21      Okay.  You know, we are back on in the case of

22  United States versus Tonawanda Coke Corporation and

23  Mark Kamholz -- Kamholz, the defendant.  The

24  attorneys and parties are back present.  All of the

25  jurors -- are you raising your hand or are you just

1        getting dressed?

2                A JUROR:  I'm just --

3                THE COURT:  The jury is here.  Roll call

4        waived.  Thank you for being here on time.  All the

5        attorneys were here, and parties, early, and we've

6        been working through some issues that I think will

7        move things along.  Because had we had to discuss

8        it in front of you, it would have taken twice as

9        long.  We would be sending you out and bringing you

10       in and all that kind of stuff.  So that's the

11       reason for the delay.  Everybody was ready, and I'm

12       glad you were here, because that helped us get

13       started as well.  So thank you for that.

14           Just so you know, there's another newspaper

15       article, at least in one of the local papers, and,

16       you know, there's some -- so I just urge you to

17       please stay away from any news accounts that relate

18       to this trial in any of the local papers.  The

19       Buffalo News has one today.  There's -- you know,

20       some of the other smaller newspapers have been

21       running news articles that can be related or at

22       least the subject matter is aligned with the

23       prosecution in this case.

24           So, you know, keep in mind that you're not

25       supposed to do anything that runs the risk of

1    giving you information that you haven't learned

2    about here within the four walls of our courtroom.

3    Okay.  Very, very important.  Because once you

4    start contaminating that, then, we have some issues

5    and some problems, so please stay focused in that

6    regard.  Keep your minds open.  Remember, you know,

7    as you start absorbing all of this, it's -- you

8    know, you all represent, you know, a pretty good

9    cross section of, you know, what is our district

10   composition in terms of the individuals that live

11   in our Western District of New York.  And, you

12   know, as you absorb and learn, and we get the

13   evidence admitted, or not, then you apply your

14   common sense, your experience, your intelligence.

15   You just work through it intelligently, and it

16   won't overwhelm you.  It will -- it will all come

17   together for you so you can -- you'll probably

18   surprise yourself, have some really intelligent

19   discussions.  But not now, when you get in your

20   deliberation room.  And, again, nobody but you will

21   have all of that information necessary to come back

22   with a unanimous verdict in this case.  Okay?

23       Thank you again for being here on time.  We

24   appreciate it.  I know you hate the thought of

25   thinking that today is Friday.  But you're going to

1    have to live with that for the entire day, and

2    we'll try to stay on schedule and get you out of

3    here on schedule today.  Thank you very much.  We

4    appreciate it.

5        I think we have to recall Mr. Carlacci.  Is he

6    somewhere to be found?  Okay.  Come on up.

7        Good morning.  How are you?

8            THE WITNESS:  Good.

9            THE COURT:  Good.

10   A L F R E D   C A R L A C C I, having been duly

11   sworn as a witness, testified as follows:

12           THE COURT:  All right. Ladies and

13   gentlemen, you remember Mr. Carlacci, right?  And

14   he still is the government's first witness.  He's

15   on cross-examination.  He remembers -- I'm sorry.

16   He is now under oath, and the cross-examination

17   will be resumed by Mr. Linsin who represents

18   Tonawanda Coke Corporation.

19       Mr. Linsin.

20           MR. LINSIN:  Thank you, your Honor.  May I

21   proceed?

22           THE COURT:  Yes, certainly.  Thank you.

23   CONTINUED CROSS-EXAMINATION BY MR. LINSIN:

24           MR. LINSIN:  Could I, please, have

25   Government's Exhibit QQQ.01 already in evidence?

481

1              THE CLERK:  Defendants' exhibit?

2              MR. LINSIN:  I'm sorry.  Defendants'

3       Exhibit QQQ.01.

4              THE COURT:  Okay.  And Ms. Henderson,

5       that's you?  You got it done for us?  Okay.

6    BY MR. LINSIN:

7    Q.  Mr. Carlacci, you testified yesterday that this

8       photograph depicted the area, the by-products area

9       of the Tonawanda Coke plant substantially similar

10      to what you observed when you visited the plant in

11      May of 2008.

12          Do you recall this photograph, sir?

13   A.  I recall this photograph.  My visit, you know,

14      was not a full-blown inspection, and I was there

15      really to talk to Tonawanda Coke about the study.

16   Q.  All right.  Either before this visit or since

17      this visit have you become familiar with the coke

18      oven gas system at the Tonawanda Coke plant?

19   A.  You know, I tried to understand it each time I

20      have a chance to look at it in -- on paper or if I

21      went there, but never really did a full-blown

22      walk-through and looked at every piece of equipment

23      and understood -- you know, to understand it

24      completely.

25   Q.  Okay.

1          MR. LINSIN:  Your Honor, I can represent

2     to the Court that the parties have agreed to

3     stipulate that the next exhibit that I would

4     request be displayed to the jury constitutes a fair

5     and accurate depiction of the coke oven gas system

6     at the Tonawanda Coke facility as it existed during

7     the period relevant to the indictment.

8          THE COURT:  2005 to 2009?

9          MR. LINSIN:  2005 through 2009, through

10    the end of 2009.

11        With that representation to the Court, and

12    hearing no objection from the government, I would

13    ask that Defendant's Exhibit FFFF, first of all,

14    be -- well, be displayed and be published to the

15    jury.

16         THE COURT:  Okay.  Okay.  FFFF any

17    objection?

18         MR. MANGO:  Your Honor, the only issue is

19    that this still represents that a light oil system

20    was in place.  I believe the evidence is going to

21    show that that came out in November of '08.  It's

22    on the diagram.  You know, it was in play for some

23    period.  So I just want to make sure that that is

24    on the record and it will be discussed with some of

25    the witnesses.

1           THE COURT:  Okay.  That will be noted.

2      I'm sure we'll tie that up for the jury.  I see a

3      few puzzled looks right now.  But, you know, we'll

4      get that straightened out.

5          I'll admit FFFF.  No objection.  But qualified

6      as indicated by you, Mr. Mango.  And we're hoping

7      that with a little bit of luck, Ms. Henderson is

8      going to be able to get us up and running here.

9                (Defendants' Exhibit FFFF was received

10               into evidence.)

11               MR. LINSIN:  I apologize for the delay,

12      your Honor.  I was -- perhaps while that is

13      occurring --

14               THE COURT:  Okay.  I'm sorry.  Yes.  Go

15      ahead.

16               MR. LINSIN:  -- I will move on to another

17      area.  Once this becomes available, I will come

18      back to it.

19               THE COURT:  Well, I think we're making

20      some progress.  I just saw the --

21               MR. LINSIN:  Are we there?

22               THE COURT:  -- the ready stick.  Okay.

23               MR. LINSIN:  And can we, please, enlarge

24      this to the bordered area.  Enlarge the bordered

25      area of the exhibit.  All right.

1           THE COURT:  Can you move it up a little

2     bit, I think.

3     BY MR. LINSIN:

4     Q.  Now, taking a moment to -- to orient yourself,

5     Mr. Carlacci.  I ask whether you recognize this

6     diagram as depicting the coke oven gas system as it

7     existed at the time of your visit to the facility

8     in May of 2008.

9     A.  I've never seen this diagram before.  It looks

10    like a conceptual drawing of that by-products area.

11    I don't -- am not familiar with every pipe or valve

12    or relief vent that may be depicted in this drawing

13    or if there's any missing tanks or processes here.

14    Q.  Do -- do you see -- let's begin here on the

15    right-hand side of the drawing -- the shadow of

16    a -- of a structure labeled "battery"?

17    A.  Yes, I do.

18    Q.  Okay.  And is that shadowed image roughly in

19    the location that you understood the battery at

20    Tonawanda Coke to be located?

21    A.  Yes.

22    Q.  All right.  And in this area --

23           THE COURT:  Where is the shadow that

24    you're talking about?

25           MR. LINSIN:  It is not as clear in this --

1      it is more clear, your Honor -- the shadowed image

2      is more clear in the next building that is

3      depicted, the coke handling building.  Those

4      buildings are drawn in shadow just so they do not

5      obstruct the view of the roadway.

6              THE COURT:  If I may interrupt, I'm sorry.

7      I don't see any shadow around the word "battery".

8      That's what I'm --

9              MR. LINSIN:  Is it possible to get a

10     better resolution of this document?

11             THE COURT:  No.

12        Mr. Carlacci, do you see a shadow around the

13     word "battery"?

14             THE WITNESS:  No, I don't see a shadow.

15             MR. LINSIN:  Let me leave it at that then.

16     BY MR. LINSIN:

17     Q.  Is that the location of the battery, as you

18     recall it?

19     A.  That would be where the battery would be.

20     Q.  And where the words "coke handling building"

21     appear, is there -- is that the location of -- as

22     best you recall, of the coke handling building at

23     Tonawanda Coke?

24     A.  That would be where the general -- that would

25     be where it would be located, the general area.

1    Q.  And looking up in this area of the diagram, do

2    you see two blue lines with arrows heading in

3    toward the top of the diagram?

4    A.  Yes, I do.

5    Q.  And do you recall those two blue lines as being

6    the take-off lines for the coke oven gas off of the

7    battery?

8    A.  Recall when?  What do -- when you're saying

9    "recall"?

10   Q.  From your time in May of 2008 when you visited

11   the plant, or what you have learned since, where

12   the take-off lines are located for the coke oven

13   gas from the battery.

14   A.  Yes, that's approximately what they would look

15   like in that general area.

16   Q.  All right.  And roughly, then, in overall

17   terms, if you follow the arrows on those blue lines

18   and through the structures on the left-hand side of

19   the diagram, which we'll talk about in a minute, do

20   those blue lines represent generally the flow of

21   the coke oven gas through the by-products area?

22   A.  Yes.

23   Q.  All right.

24              THE COURT:  Are they leading from the

25   battery?  Is that what you're saying, Mr. Carlacci?

1            THE WITNESS:  Yes.  This is the raw coke

2      oven gas coming off the battery.

3            THE COURT:  All right.  And the battery

4      has those 60 --

5            THE WITNESS:  Sixty ovens --

6            THE COURT:  -- ovens?

7            THE WITNESS:  -- make up a battery.

8            THE COURT:  Okay.  So they're somewhere

9      out there.  And those blue lines, you're saying --

10            THE WITNESS:  Is the raw gas, you know,

11      the --

12            THE COURT:  Running through them --

13            THE WITNESS:  Being removed from the coal,

14      right.  Being distilled from the coal.  The raw gas

15      being collected in the mains going to the

16      by-products side of the plant.

17            THE COURT:  Okay.  And in the direction of

18      the flap house there?

19            THE WITNESS:  Correct.

20            THE COURT:  Okay.  Okay.  Thank you.

21      BY MR. LINSIN:

22      Q.  And then if you follow the arrows on these blue

23      lines, the first structure you come to is labeled

24      "tar decanter", is that correct?

25      A.  Correct.

1    Q.  All right.  And is that the structure that you

2    understand that the coal tar is actually decanted

3    out of, at this point, the hot coke oven gas?

4    A.  Yes.

5    Q.  Okay.  And the -- the coal tar is decanted out,

6    and then the coal tar sludge also drops out of the

7    gas at that location in the by-products area, is

8    that correct?

9    A.  That's the purpose of the equipment in good

10   operating condition.

11   Q.  All right.  And moving again, then, to the left

12   and in the direction of the arrows, do you see a

13   structure labeled the "primary cooler"?

14   A.  Yes, I do.

15   Q.  All right.  And is it your understanding, and

16   as you observed it in operation, is that primary

17   cooler the vessel at the Tonawanda Coke by-products

18   department that is designed to initially cool down

19   the coke oven gas as it has come off of the -- the

20   battery?

21   A.  I didn't observe its operation, but that's the

22   purpose of that cooler.

23   Q.  All right.  And after going through the primary

24   cooler, there is actually -- I believe you

25   testified about this yesterday -- the secondary

1   cooler that further cools the coke oven gas.

2       And do you see that vessel depicted in the

3   center left portion of the -- of the diagram?

4   A.  I see the secondary cooler in this diagram.

5   Q.  Okay.  Now, are you familiar with the

6   exhausters that existed in this coke oven gas

7   system?

8   A.  I'm familiar with them.

9   Q.  And are you familiar with the function of those

10  exhausters?

11  A.  Yes.

12  Q.  All right.  And is it accurate, then, to say

13  that the exhausters actually are the components

14  that suck or pull the coke oven gas off of the

15  battery and through this system?

16  A.  Yes.

17  Q.  All right.  And do you see the term

18  "exhausters" referenced in the left-hand portion of

19  the diagram and -- with a parenthesis and three

20  included in there?

21  A.  Yes.

22  Q.  And is it your recollection that there were

23  actually three in-line exhausters at the Tonawanda

24  Coke by-products plant?

25  A.  I believe I did see them at one time in 2011,

1    yes.

2    Q.  All right.  And is that the -- the last arrow I

3    just marked, is that the location where the

4    exhausters are aligned in line there, those three

5    exhausters?

6    A.  Generally.

7    Q.  Okay.  After being sucked through the

8    exhausters, the coke oven gas line is then under a

9    positive pressure, is that correct?

10   A.  Correct.

11   Q.  A positive pressure created by the exhausters,

12   correct?

13   A.  Correct.

14   Q.  Up until that point, from the batteries that

15   we've -- you've testified about, up to the

16   exhausters, the line is actually in suction,

17   correct?

18   A.  Correct.

19   Q.  All right.  But now after the gas has gone

20   through the exhausters and pressure has been

21   created in the line, the -- the coke oven gas is

22   moved to a vessel here identified as the tar

23   precipitator, correct?

24   A.  Correct.

25   Q.  All right.  And that is a vessel designed to

1    further remove tar from the coke oven gas, correct?

2    A.  Correct.

3    Q.  After the tar precipitator, the coke oven gas

4    is routed through a series of three vessels here

5    that are labeled the ammonia scrubbers, correct?

6    A.  Correct.

7    Q.  And those vessels are designed to remove the

8    ammonia from the coke oven gas, correct?

9    A.  Correct.

10   Q.  And there is a parenthetical beneath that

11   component, that group of components, LGA.  Do you

12   see that, sir?

13   A.  Yes.

14   Q.  All right.  Now, have you sometimes heard these

15   ammonia scrubbers referred to as LGA?

16   A.  Yes.

17   Q.  All right.  Do you understand those letters

18   actually reference the original manufacturer of

19   this equipment?

20   A.  Yes.

21   Q.  All right.  Not an American manufacturer, but

22   the original manufacturer.  We'll leave it at that.

23   Is that correct?

24   A.  I don't know the name.  I couldn't recall it.

25   Do you?

1          THE COURT:  You can answer.  If you know.

2          MR. LINSIN:  I'm not under oath, and no, I

3    don't, your Honor.  I don't.

4          THE COURT:  All right.

5    BY MR. LINSIN:

6    Q.  Okay.  So, after going through the ammonia

7    scrubbers, again following the arrows in this

8    diagram, the coke oven gas is brought to the --

9    along this blue line to the light oil scrubber,

10   again, to the -- with the parenthetical --

11   parenthetical LB, as in boy, A, correct?

12   A.  Correct.

13   Q.  And, again, the LBA referencing the initials of

14   the original manufacturer, correct?

15   A.  Correct.

16   Q.  And do you see the light oil scrubber depicted

17   on the left-hand side, this tall vessel?

18   A.  Yes.

19   Q.  All right.  And is that roughly in the location

20   where you recall seeing that light oil scrubber

21   when you visited the plant back in May of 2008?

22   A.  Yes.

23   Q.  All right.  Now, following through with the

24   flow then, after the light oil scrubber, after the

25   gas comes out of the light oil scrubber, if you

1    look to the top of that light oil scrubber vessel,

2    you see an arrow pointed downward and the line

3    has -- at this point is green.  Do you see that,

4    sir?

5    A.   Yes, I do.

6    Q.   And so after coming through the light oil

7    scrubber, the coke oven gas has been stripped of

8    each of the components that we have referenced and

9    chemicals we have referenced up to this point, is

10   that correct?

11   A.   That's correct.

12   Q.   And from that point, the coke oven gas, if you

13   again follow that route, is moved through the

14   line -- moved through the line toward the location

15   where it says "underground fuel line to battery".

16        Do you see that location on the diagram, sir?

17   A.   Yes, I do.

18   Q.   All right.  And the coke oven gas line in that

19   location is the overhead line that we saw depicted

20   in Photograph QQQ.01, correct?

21   A.   It appears to be so.

22   Q.   All right.  And from that overhead line in this

23   diagram, you see a line dropping down to the text

24   we just referenced, the underground fuel line, to

25   the battery.  And do you understand that at that

494

1   point there is a take-off line that is then routed

2   back to the battery?

3   A.   Yes.

4   Q.   All right.  And that take-off line, the arrows

5   goes underneath Broadway there, and then all the

6   way back to what -- the battery area in this

7   diagram, to the right-hand side, is that correct?

8   A.   That's correct.

9   Q.   And that fuel coke oven gas is then used back

10  into the battery to reheat the battery for

11  continued coke production, correct?

12  A.   That's correct.

13  Q.   All right.

14           THE COURT:   Want to clear?

15  BY MR. LINSIN:

16  Q.   Looking past the off-take there, the off-take

17  for the underground line back to the battery, do

18  you see the drawing -- the indication in there of

19  pressure relief valve?

20  A.   Yes.

21  Q.   And do you see that pressure relief valve

22  depicted at just prior to the 90-degree turn in the

23  coke oven gas line?

24  A.   Yes.

25  Q.   All right.  Do you know the diameter of the

1    coke oven gas line at that point of the by-products

2    plant?

3    A.   I believe it to be 24 inches.

4    Q.   Do you know the diameter of the vent from the

5    pressure relief valve at that location?

6    A.   I believe it to be four or six inches.

7    Q.   All right.  Would four inches fit with your

8    recollection?

9    A.   It would.

10   Q.   And your testimony yesterday, if I recall it,

11   was that you specifically talked to Mr. Kamholz

12   while you visited the plant in May of 2008.  You

13   specifically spoke to him about the operation of

14   the light oil scrubber and questioned him about

15   whether or not he actually tested the valves on the

16   light oil scrubber for leak detection, correct?

17   A.   Yeah.  I asked -- you know, since this is the

18   positive side of the battery, that it would be a

19   good idea to see if there are leaks on this side of

20   the battery.

21   Q.   And when you had that conversation -- I'm

22   sorry.  Go ahead.

23   A.   Go ahead.  Not battery, but by-products plant.

24   Q.   When you had that conversation with

25   Mr. Kamholz, were you standing over here by the

1    light oil scrubber, or were you still out on the

2    roadway?

3    A.   We were right on the roadway.

4    Q.   Okay.  And that roadway we're discussing here

5    is the yellow line drawn diagonally through the

6    diagram labeled Broadway, correct?

7    A.   Correct.

8    Q.   And were you looking at the light oil scrubber

9    as you were out there on Broadway?

10   A.   We did look at the light oil scrubber.

11   Q.   And is it your current recollection that during

12   that May 2008 visit you do not recall seeing that

13   pressure relief valve that's labeled here on this

14   diagram?

15   A.   Yes.

16           MR. LINSIN:  All right.  We can take off

17   FFFF.

18   BY MR. LINSIN:

19   Q.   You testified yesterday about the distinction

20   between an emission point and an emission source.

21   And as I recall, you testified that an emission

22   point is actually the vent or pipe through which

23   emissions are released, and that the requirements

24   are in the permitting process that the height and

25   location of those emission points be identified in

1   the permit.  Is that correct?

2   A.  Correct.

3   Q.  And an emission source, does it fit with your

4   understanding of the term "source" for the purposes

5   of the New York State permitting -- air permitting

6   requirements, that an emission source is a -- an

7   apparatus or a machine that is capable of causing

8   emission of any air contaminant to the outdoor

9   atmosphere?

10  A.  Sounds like the definition right out of the

11  instructions.

12  Q.  You also testified, both on direct and

13  cross-examination, regarding this term "emergency

14  relief vent".  I want to ask you a couple of quick

15  questions about the use of that term in the New

16  York State regs, but then a follow-up question

17  about its current status.

18      Back in 1984 -- and you were with DEC back in

19  '84, correct?

20  A.  Correct.

21  Q.  Back in 1984, is it your recollection, sir,

22  that emergency relief vents were covered -- and

23  stacks were covered under a part of the regulations

24  that exempted emergency relief events from

25  permitting requirements?

1    A.   Typically we exempted anything that dealt with

2    emergency situations.  An emergency relief vent

3    would fit into that category.  In '84 I can't quote

4    you exactly where in 201 it said that, but odds are

5    it was there.

6    Q.   Okay.  And that portion of the New York State

7    regulations regarding air permitting requirements

8    was substantially revised and changed in 1996.  Is

9    that your recollection?

10   A.   Yes, that's correct.

11   Q.   And at that point the regulations divided

12   exempted activities from trivial activities, is

13   that correct?

14   A.   Correct.

15   Q.   And the issue of emergency relief vents or the

16   handling of emergency relief vents under the

17   regulations was actually moved under the trivial

18   activities definition in Section 201 of the

19   regulations, correct?

20   A.   Correct.

21   Q.   All right.  And that portion of the New York

22   regulations now regarding emergency relief vents

23   lists out approximately 94 separate activities that

24   are determined to be trivial activities under the

25   regulations, correct?

1    A.   Correct.

2    Q.   And it was your recollection, I believe in your

3    testimony on direct, that those definitions have

4    stayed substantially the same since 1996?

5    A.   Yes.

6    Q.   Those definitions -- I'm sorry -- regarding

7    emergency relief vents, correct?

8    A.   Yes.

9    Q.   Now, when an agency recognizes there is some

10   uncertainty or a lack of clarity in a regulation,

11   it will revise regulations or change them, as we've

12   just discussed in the 1996 amendments, correct?

13   A.   Correct.

14   Q.   Are you aware of an amendment to the definition

15   for trivial activities that New York State proposed

16   and published just last year, 2012, an amendment

17   regarding the definition of emergency relief vents?

18   A.   No, I can't say I recall.  They changed 201

19   quite frequently.  You know, minor changes.

20           MR. MANGO:  I'll wait for the next

21   question, your Honor.

22           MR. LINSIN:  All right.  Are you aware --

23   let's see if this helps your recollection.  Are you

24   aware that there is a pending amendment?

25           MR. MANGO:  Objection, your Honor.  This

1      has nothing to do with the time period of

2      indictment between 2005 to 2009; therefore, it's

3      not relevant.

4              THE COURT:  Yeah.  It's, what, 2012 or '13

5      depending.  Unless there's an argument to be made,

6      I'm going to sustain the objection.  It's out of

7      the time period, and, therefore, not relevant.

8              MR. LINSIN:  The proffer I would make,

9      your Honor, is that the pending amendment that --

10      that I am referencing -- I'd be happy to provide it

11      to the Court if it wishes to review it -- relates

12      to this very issue of how the agency views

13      emergency relief vents and whether there is a need

14      for clarification in that definition on -- on the

15      very point in issue in this trial.  And so I -- I

16      recognize this --

17              THE COURT:  Well, I'll -- I'll take it

18      under advisement.  You can give me whatever you

19      want me to look at, but I will sustain the

20      objection.

21              MR. LINSIN:  All right.  All right.  Thank

22      you, your Honor.

23              THE COURT:  You're welcome.

24      BY MR. LINSIN:

25      Q.  Now, Mr. Carlacci, were you aware of the

1    planning for a joint EPA, DEC inspection at the

2    Tonawanda Coke facility in April of 2009?

3    A.   Not of the planning, but I knew that it was

4    going to happen around or relatively close to the

5    time it did.

6    Q.   All right.  Did you participate in that

7    inspection of the facility?

8    A.   No.

9    Q.   Are you aware that it was a week-long

10   inspection of the facility?

11   A.   Yes.

12   Q.   Did you talk to your DEC colleagues regarding

13   their findings after that April 2009 inspection?

14   A.   Yes.

15   Q.   And did you learn that during that April 2009

16   inspection they had had a conversation with the

17   personnel at the plant regarding a pressure relief

18   valve that was located in the by-products area?

19            MR. MANGO:  Objection, your Honor.

20   This -- did you learn that there was a

21   conversation, that's classic hearsay.

22            THE COURT:  No, it's not.

23      Overruled.

24            THE WITNESS:  I can't say I recall that --

25   that piece of information.

1   BY MR. LINSIN:

2   Q.  You don't recall being advised of that?

3   A.  Not -- not -- not right after the inspection.

4   I'm not quite sure when I learned of the valve.  It

5   wasn't right then.

6   Q.  Well, we established yesterday that you learned

7   of the valve from the HAPs emission report back

8   before your visit in 2008.

9              MR. MANGO:  Objection, your Honor.

10             THE WITNESS:  The valve wasn't identified.

11             THE COURT:  There is an objection.  Hold

12   on.

13             MR. MANGO:  Objection.  That

14   mischaracterizes the testimony.

15             THE COURT:  Well, the witness can say that

16   but this is cross-examination.  We've heard the

17   testimony.  So if he says that's not what he said,

18   so be it.

19       Okay.  Your answer, then, Mr. Carlacci?

20             THE WITNESS:  The valve in that report

21   doesn't identify the valve you're showing me in the

22   drawings.

23   BY MR. LINSIN:

24   Q.  Mr. Carlacci, do I recall your testimony from

25   yesterday correctly, that prior to your visit to

1   the plant in 2008, you were -- you reviewed the

2   HAPs emission report from 2003, is that correct?

3   A.   Yes.

4   Q.   And that you understood from your review of

5   that emission report that the plant was reporting

6   the existence of a pressure relief valve in the

7   by-products area?

8   A.   I think it was plural, pressure relief valves,

9   and -- and it estimated a low emission from those.

10  Q.   Do you recall the number in the column adjacent

11  to that as being one?

12  A.   Now that you mention it, yes.

13  Q.   Now, my question, going back to the post 2009

14  time period, my question is:  After the week-long

15  inspection with NEIC and EPA and DEC, did this

16  facility that you had expressed concern about back

17  in May of 2008, did you talk to them about their

18  findings?

19  A.   Yes, I did.  You know, I mean not directly,

20  but -- because I wasn't involved in the case.

21  Q.   And did any of them advise you about

22  discussions they had concerning the pressure relief

23  valve in the by-products area?

24  A.   At some point I learned of this pressure relief

25  valve.

1    Q.  Did DEC issue any NOV or communicate any

2    requirement to Tonawanda Coke during 2009 from the

3    April 2009 inspection to the end of 2009?  Any NOV

4    to the facility respecting this PRV?

5    A.  I'd have to look at the file, but I don't

6    believe so.

7              THE COURT:  All right.  Just tell us what

8    an NOV is, please.

9              THE WITNESS:  It's a notice of violation.

10              THE COURT:  Okay.  And just to refresh us,

11   what's a PRV?

12              THE WITNESS:  Pressure relief valve.

13              THE COURT:  Thank you.

14   BY MR. LINSIN:

15   Q.  And to your knowledge, Mr. Carlacci, did DEC

16   issue a notice of violation regarding this pressure

17   relief valve to Tonawanda Coke at any time

18   during 2010?

19   A.  I can't recall if and when the NOV was issued.

20   I'd have to review the file.

21   Q.  Is it your recollection that an NOV was issued,

22   a notice of violation was issued, to Tonawanda Coke

23   regarding the pressure relief valve?

24              MR. MANGO:  Objection, your Honor.  I

25   don't know where we're going with this.  The -- the

1      aspect of any civil litigation that -- that may

2      have occurred is -- is separate and apart from this

3      criminal action, and really has no bearing on this

4      criminal trial.

5              THE COURT:  Okay.  Well, we've discussed

6      this, so --

7              MR. MANGO:  This -- this relates to a

8      pressure release valve.  Our discussions were

9      relating to baffles.  This is something different

10      that was not discussed.

11              MR. LINSIN:  My question, your Honor, to

12      the witness --

13              THE COURT:  Yeah.

14              MR. LINSIN:  -- related to a notice of

15      violation regarding a pressure relief valve, and

16      whether or not the witness has any knowledge of a

17      notice of violation regarding that pressure relief

18      valve being issued to the company.  He's already

19      said he didn't recall one, as I understand it,

20      during 2009.

21      BY MR. LINSIN:

22      Q.  And do you recall one being issued in 2010?

23      A.  You know, it was addressed in the civil side,

24      so I'm not sure exactly of all the documentation

25      that was done to get to the point where we resolved

1     that issue.  I'd have to look at the file to see

2     when that NOV, or if an NOV, was issued.

3     Q.  Does it fit with your recollection -- does it

4     help refresh your recollection to learn that

5     Tonawanda Coke --

6              MR. MANGO:  I'm going to object, your

7     Honor.  He's testified and this question is trying

8     to really add -- add testimony that's not in

9     evidence.

10             THE COURT:  Yeah.  You know, generally the

11    rule is you're bound by the answer of the witness

12    on cross-examination.  I'm going to apply that.

13        And the answer is -- to your -- you don't have

14    a recollection of one at this time absent doing

15    something further.  Is that a fair statement?

16             THE WITNESS:  That's correct.

17             THE COURT:  Okay.  You're bound by that.

18             MR. LINSIN:  Fine.

19    BY MR. LINSIN:

20    Q.  You testified yesterday about two letters that

21    had been sent from Tonawanda Coke to DEC.  And if

22    we could -- these are documents that have been

23    moved into evidence, Government's Exhibit 19-15, if

24    I may have that, please.

25        I'm sorry.  19.15.

1        Do you recall seeing this letter during your

2    direct testimony yesterday, sir?

3    A.   Yes, I do.

4    Q.   All right.  And it's a letter from Mr. Kamholz

5    to Larry Sitzman, the person that held your

6    position formerly, advising of the installation of

7    baffles in quench tower number 2, is that correct?

8    A.   Correct.

9    Q.   All right.  And just to refresh the perspective

10   here, quench tower number 2 is the tower on the

11   eastern side of the property, is that correct?

12   A.   No.  I get -- get those confused all the time.

13   But if we look at a plan, and it says it's on the

14   east side, I'm with you, yeah.

15   Q.   With a map, it's on the right-hand side.

16   A.   It's on the right, so it's east.

17   Q.   Okay.

18   A.   Number 2 is east.

19   Q.   All right.  As long as the map is oriented with

20   north to the top --

21   A.   Yeah.

22   Q.   -- correct?

23       And that was the tower -- do you recall that

24   that was the tower that had been lowered somewhat

25   years before?

1    A.   Correct.

2    Q.   All right.   Now, do you recall that DEC --

3    before this letter was sent, before this

4    November 24th letter, do you recall DEC having

5    issued a notice of violation to Tonawanda Coke

6    regarding the baffles in quench tower number 2?

7    A.   You know, I wasn't involved in the case, so I

8    don't recall when that NOV was issued.

9    Q.   Do you know that one was?

10   A.   I believe there was.   I would prefer to look

11   through the file to verify it.

12   Q.   Let me request that we call up Defendant's

13   Exhibit OOO.07 for identification purposes.   Ask

14   you to look at this letter, first of all, sir, the

15   document displayed on the screen.   And ask if this

16   refreshes -- helps to refresh your recollection as

17   to when an NOV was issued with respect to the

18   baffles at Tonawanda Coke.

19   A.   It's the cover letter for an NOV, and I'd

20   have --

21   Q.   Right.   But --

22   A.   -- to look at the NOV to see what it was for.

23   Q.   Right.   Again, for identification purposes,

24   could you display the second page of this document

25   for the witness?

1    A.   This is the NOV for quench tower number 2.

2    Q.   All right.  And go back to the first page of

3    this document.  So does it now fit with your

4    recollection that on October 28th, 2009, DEC sent a

5    NOV to Tonawanda Coke, a notice of violation to

6    Tonawanda Coke, regarding the need to install

7    baffles in quench tower number 2?

8    A.   I don't know what you mean by "recollection".

9    I mean, this is what's in the file, it's a record,

10   and that's what I can attest to that's in the file.

11   Q.   All right.

12          MR. LINSIN:  Your Honor, at this time I

13   would move Defendant's Exhibit OOO.07 into

14   evidence.

15          MR. MANGO:  Your Honor, subject to our

16   earlier discussion, no objection.

17          THE COURT:  Okay.  OOO.07 received, with

18   your comment noted, Mr. Mango.  Thank you.

19          (Defendants' Exhibit OOO.07 was received

20          into evidence.)

21          MR. LINSIN:  Now --

22          THE COURT:  Do you want it published, the

23   cover letter?

24          MR. LINSIN:  The cover letter, please,

25   yes.  Just the first page of this exhibit.

1          THE COURT:  Yes.

2    BY MR. LINSIN:

3    Q.  And this is a letter from Mr. Sitzman who is

4    then the regional air control engineer for Region

5    9, is that correct?

6    A.  Correct.

7    Q.  Directed to Mark Kamholz with Tonawanda Coke,

8    the date of October 28th, 2009, correct?

9    A.  Correct.

10   Q.  And based upon your review of that first page

11   of the NOV, this required the company to install

12   baffles in quench tower number 2, correct?

13   A.  This is the cover letter.  It's a notice.  The

14   NOV, if we read it --

15   Q.  The NOV was attached to this letter made that

16   requirement, correct?

17   A.  I didn't read it all, but -- I didn't read the

18   whole NOV to see if it required the installation of

19   baffles or if it was just a notice that you are in

20   violation.

21   Q.  For not having baffles in quench tower number

22   2?

23   A.  Correct.

24   Q.  All right.

25            THE COURT:  Let me just ask you this --

1    I'm sorry -- but the designation for Mr. Sitzman,

2    it's regional air control engineer.  Is that the

3    same as RAPCE?  Because I --

4         THE WITNESS:  Yes, they're missing the

5    word "pollution" in there.

6         THE COURT:  Yeah.  But there -- is there a

7    distinction?

8         THE WITNESS:  Whoever was typing missed

9    one word.

10         THE COURT:  Okay.  All right.  Thank you.

11         MR. LINSIN:  Could we move on then to --

12    could we have the exhibit marked Defendant's

13    Identification -- Defendant's Exhibit DOOO.08

14    marked for identification?

15   BY MR. LINSIN:

16   Q.  Now, did you understand that in December

17   of 2009, EPA issued a separate NOV concerning the

18   baffles for the quench towers at Tonawanda Coke?

19   A.  All I can do is testify what's in the file.  I

20   mean, I didn't understand or follow at this time

21   how they were doing an NOV here or EPA was doing

22   something there.

23   Q.  Based upon your review of the file then, are

24   you familiar with an NOV issued by EPA in December

25   of 2009 regarding the baffles in the quench towers

1    at Tonawanda Coke?

2    A.  No.  I paged through the file.  This would not

3    have been one I focused on if this came from the

4    file.  I'll agree that in the -- you know, that's

5    in EPA.

6    Q.  All right.  Let me ask the question a different

7    way.  Separate and apart from this document -- if

8    we can take this document down -- do you recall

9    that EPA issued a separate NOV for the quench

10   towers at Tonawanda Coke?

11   A.  I don't recall it without looking at this --

12   this letter you just showed me and saying, yeah,

13   that's from our file.

14   Q.  Okay.  I'm sorry.  Can we call that Defendant's

15   Exhibit, for identification, DOOO.08 back up.  And

16   could you move to the second page of this document.

17   Third page.  And fourth page.  And fifth page.

18   Please, continue.  All right.  Go back one page,

19   please.

20       We will scroll -- scroll through this as -- as

21   much as you would like, but does this refresh your

22   recollection -- does it demonstrate to you what the

23   substance of this NOV was?

24            MR. MANGO:  Objection, your Honor.  I

25   don't know if maybe -- may we approach on this?

1           MR. LINSIN:  If the answer is no, your

2      Honor, I'm moving on.

3           MR. MANGO:  He already said it was no, and

4      we're still talking about this.

5           THE COURT:  Yeah.  Your answer still

6      stands?

7           THE WITNESS:  Yes, the same.

8           THE COURT:  Okay.  It's sustained.

9           MR. MANGO:  Thank you, your Honor.

10          MR. LINSIN:  I have nothing further, your

11     Honor.

12        Thank you very much, Mr. Carlacci.

13          THE WITNESS:  Have a good day.

14          THE COURT:  Okay.  Everybody doing okay?

15        How about you, Mr. Personius?  Ready to take

16     over?

17          MR. PERSONIUS:  Raring to go, Judge.

18          THE COURT:  All right.  Please.

19          THE WITNESS:  Good morning.

20   CROSS-EXAMINATION BY MR. PERSONIUS:

21   Q.  I don't think we've ever met.  My name is Rod

22     Personius.  You've probably figured that out.  I

23     represent Mark Kamholz.

24   A.  Please to meet you.

25   Q.  Nice to meet you too.

1           During your direct examination with Mr. Mango,

2     and at some points in your examination with

3     Mr. Linsin, you've referred to a file that you

4     reviewed, a Tonawanda Coke file at DEC.

5     A.   Yes.

6     Q.   I'd like to get, if I could, just a little bit

7     better understanding of -- of what that file

8     consists of.  First of all, when I think of a file,

9     I think of like a folder or a box or something that

10    contains papers.  Could you describe for us what

11    this file is for DEC on Tonawanda Coke that you've

12    referred to over the past several days, please?

13    A.   It's exactly that, a folder that contains

14    all -- all of the paperwork that may be

15    exchanged -- exchanged between the companies and

16    DEC.

17    Q.   How far back does -- does that -- that file go?

18    A.   I think it went at least -- the stuff that I

19    looked at was at least maybe back to the early

20    '70s -- late '70s.

21    Q.   Late '70s?

22    A.   Yes.

23    Q.   Do you know -- I don't know that this has come

24    out in the evidence -- when it was that Tonawanda

25    Coke became Tonawanda Coke as opposed to being

1    Allied, which was what it was before then?

2    A.   I think it was right around the late '70s,

3    1980.   Somewhere in there.

4    Q.   And this -- this file that you're referring to

5    then, is it one folder?  Is it multiple folders?

6    Is it a box?

7    A.   It's multiple folders.

8    Q.   And when I think of folders, then I think of

9    the -- the kind lawyers use which are these

10   expandable folders and they have a flap over the

11   top and something that holds it together.  Is that

12   the type of folder you are referring to?

13   A.   It's the green Pendex folders that would fit in

14   a metal file cabinet.

15   Q.   And would hang -- hang down from a piece of

16   metal on either side --

17   A.   Correct.

18   Q.   -- those types of folders?

19   A.   Yes.

20   Q.   And about how large is this -- this folder or

21   file for Tonawanda Coke?

22   A.   The file's probably enough to fill three or

23   four boxes.

24   Q.   So -- and is a box about the size of a file

25   drawer, then?

516

1    A.   About -- you know, about -- you know, the boxes

2    that you would move files in.  You know, this wide.

3    Q.   So maybe we're talking -- I don't want to

4    exaggerate -- is that about a foot and a half by a

5    foot?

6    A.   By the width of the folder.  Yeah, about a foot

7    and a half.

8    Q.   And about four of those -- those size boxes?

9    A.   Correct.

10   Q.   And that's because it has information in it

11   that goes all the way back to around 1980, is that

12   true?

13   A.   Correct.

14   Q.   The -- the -- and you reviewed all of those

15   papers?

16   A.   I paged through them.  It's not, you know, my

17   facility.  I didn't write the permit.  You know,

18   my -- it wasn't my focus.  As an engineer, you

19   know, the study was my focus at the time and my

20   initial involvement with Tonawanda Coke.

21   Q.   And when you're referring to "the study" this

22   is the benzene study you testified about yesterday

23   afternoon?

24   A.   The air Tonawanda study, yes.

25   Q.   The -- the reason that you went through this

1   file, was that to prepare to be a witness in this

2   case?

3   A.   No.  I've -- I've looked at this file as I was

4   doing the Tonawanda study because I was also

5   reviewing other facilities in the area and -- and

6   doing inspections at those facilities as well.  I

7   mean, I did inspections at other facilities looking

8   for some reductions in pollution.  I never did a

9   real inspection at Tonawanda Coke.

10  Q.   So the -- the file review, then, has been

11  something that's been ongoing for a number of

12  years?

13  A.   As I needed to, you know, look for some

14  information, I would look in there.  You know, it

15  wasn't a lot.

16  Q.   Could you give us an idea, Mr. Carlacci, of the

17  types of documents that are contained in the file?

18  Do they fit in different categories?

19  A.   No.  They just go by year.  As material comes

20  in, you just put it in a folder by year.  You know,

21  so if it was a permit -- permit -- you know, an Air

22  100 submitted in the '80s, it would be in the '80s

23  file.  The Title V submitted in 1996, it would be

24  in the '96 file.  The permit issued in 2002, it

25  would be in the 2002 file.

518

1   Q.   Is -- are the papers in this file arranged then

2   chronologically?

3   A.   Not always.

4   Q.   In a perfect world they would be?

5   A.   In a perfect world they would be.

6   Q.   And after you got done with it, they weren't?

7   A.   You got it.

8   Q.   But the point being, is an effort made to keep

9   the papers in the file more by when they come in as

10  opposed to the type of document that they are?

11  A.   Yes.

12  Q.   And something we may get into a little later in

13  your testimony is what's called an inspection

14  report.

15  A.   Okay.

16  Q.   You're familiar with what that is, correct?

17  A.   Yes.

18  Q.   And does the file contain inspection reports

19  regarding Tonawanda Coke?

20  A.   There's documentation of inspections in there.

21  Q.   When a -- an employee of -- of the Department

22  of Environmental Conservation goes and visits a

23  company such as Tonawanda Coke, are there instances

24  when an inspection report should be prepared?

25  A.   Yes.

1    Q.   Now, just -- just by way of example, you went

2    to Tonawanda Coke on May 28th of 2008?

3    A.   Correct.

4    Q.   You went with three other then employees of

5    Tonawanda Coke, correct?

6    A.   Three other employees of DEC.

7    Q.   I'm sorry, of DEC.  Meaning Cheryl Webster,

8    Larry Sitzman and Gary Foersch?

9    A.   Correct.

10    Q.   And currently Mr. Sandonato is retired?

11    A.   Correct.

12    Q.   Mr. Foersch is retired also?

13    A.   Correct.

14    Q.   Was a report, an inspection report, prepared of

15    that visit?

16    A.   It wasn't an inspection.  We went to share

17    information with Mark.  You know, the intent was

18    not to do -- not for an inspection, but to talk

19    about the study, you know, to raise our concerns.

20    That was the purpose.

21    Q.   Okay.  And I'm sorry, my question wasn't clear.

22        Was a report prepared of that visit?

23    A.   No.

24    Q.   Thank you.  And -- and I think you've given us

25    the reason.  It's because it wasn't viewed as an

1  inspection?

2  A.  That wasn't our purpose.

3  Q.  That's why a report wasn't prepared?

4  A.  You could say that.

5  Q.  All right.  Does DEC have a practice that every

6  time there's a contact with a regulated company

7  that some -- some type of document be prepared to

8  memorialize that contact?

9  A.  No.

10  Q.  What -- what is the guidance that's used by

11  DEC -- DEC personnel to decide when there will and

12  when there will not be documentation of an -- of a

13  contact prepared?

14  A.  You know, there's no specific guidance.  You

15  know, typically if you -- if you have exchange of

16  information with a company, you should document it.

17  If it's a formal inspection, you know, you document

18  it in our -- in our system one way or another.  It

19  depends on -- on what the -- you know, what the

20  goal was.

21  Q.  Okay.  Is it true, then, that the -- the person

22  who has the contact with a company, a person from

23  DEC who has contact with a company, has discretion

24  as to whether or not some type of record of that

25  contact is prepared?

1      A.   Has some discretion, yes.

2      Q.   All right.   The -- the individuals who go out

3      and actually inspect a company from DEC, go out and

4      inspect Tonawanda Coke, is it correct to refer to

5      those individuals as inspectors?

6      A.   Yes.

7      Q.   And -- and would that be true whether the

8      person is or is not also an engineer?

9      A.   Yeah.

10     Q.   They're still called an inspector?

11     A.   Yes.

12     Q.   You told us, I think on the first day of your

13     testimony, and maybe it mirrors your -- your

14     progress through DEC, that inspectors can have

15     different qualifications.

16     A.   Yeah.

17     Q.   All right.   Is the -- the lowest, if you will,

18     lowest level of inspector called a technician?

19     A.   Yes.

20     Q.   And if you go from a technician, is the next

21     highest level the first level of engineer?

22     A.   Yes.

23     Q.   An Engineer 1?

24     A.   Correct.

25     Q.   And then the next highest level after that

1    would be an Engineer 2?

2    A.   Correct.

3    Q.   Is that -- does that cover the category of --

4    of inspectors at DEC?

5    A.   Yes, it does.

6    Q.   All right.  When you go out and do an

7    inspection, is it your practice to take notes of

8    what you observed and what you learned?

9    A.   That's my practice.

10   Q.   Do you know if that's the practice of all the

11   inspectors at DEC, to do that?

12   A.   Some do it in different degrees.  Some can

13   write pages and others a sentence.

14   Q.   Okay.  And so, again, it's a matter of

15   discretion with the inspector?

16   A.   Style usually dictates how they write, document

17   things.

18   Q.   There's no set rule on -- on -- on whether you

19   have to create, then, a contemporaneous record of

20   what you observe when you're at a facility?

21   A.   You know, in the beginning, in the early '70s,

22   when I started in 1979, we did have a form that we

23   would fill out.  That slowly, you know, stopped

24   being used.  We have, you know, for Title V

25   facilities a requirement to do at least an annual

523

1    inspection and document that in our computer system

2    of your observations.  The amount of detail in

3    there depends on, you know, the facility you're

4    looking at and the writer.

5    Q.  Okay.  If -- if you go out to a facility to

6    perform an inspection, is it expected, then, that

7    either when you're at the facility or when you get

8    back to the office that you will prepare some type

9    of report of that inspection?

10   A.  Yes.

11   Q.  And -- and I've looked at a number of documents

12   over the course of some period of time regarding

13   this case, and I've seen documents that I don't

14   know how to describe them, but, to me, they don't

15   look like an official report.  They almost look

16   like a teletype entry or something.  Do you know

17   what I am talking about?

18   A.  Something that was entered in -- in our

19   computer system, you know, to satisfy the

20   requirement of doing an inspection.

21   Q.  Okay.  And does that -- that type of entry

22   qualify as an inspection report?

23   A.  It satisfied the requirements of -- of a visit.

24   You know, it was -- it's a requirement by EPA that

25   we visit a Title V facility, at least annually, and

1    that entry satisfies that requirement.  Is it a

2    good report, a complete report?  Some are not.

3    Q.  And as far as the level of detail that's put

4    into that -- should I call it a report?

5    A.  I -- you know, I don't -- I don't know if I

6    would call it a report.  Because there's -- you

7    know, there's -- it's an entry that says you were

8    there.  If you had a lot of detail, you would write

9    a separate report, have a separate document.  You

10   know, if you can summarize it in a paragraph, you

11   would key it in there.

12   Q.  So those entries that we're talking -- let's

13   call them entries.  Those entries that we're

14   talking about, those are made directly by the

15   inspector that's been at the facility?

16   A.  That's correct.

17   Q.  And -- and that serves to be a record in the

18   file that you've referred to of -- of that contact

19   with the facility?

20   A.  Correct.

21   Q.  Now, if, as part of that contact with the

22   facility, the inspector also takes down handwritten

23   notes, is there a requirement that those notes be

24   retained in the file?

25   A.  Keep them in the file.

1    Q.   So if the inspector, when the inspector goes

2    out to do an inspection, takes notes, they should

3    be in the file also?

4    A.   Typically that's -- that's what we do, keep

5    them in the file.

6    Q.   When you went through the file for Tonawanda

7    Coke, can we agree that you saw a number of these

8    entries that you and I have been referring to,

9    these written entries that were typed in?

10   A.   The entries, you know, were -- were printed.

11   You know, they weren't always in there.  They may

12   have never been printed from the computer system,

13   and then we did print them to complete the file

14   once, you know, everybody was FOIL-ing it.  But I

15   have seen them, yes.

16   Q.   So are you telling us that there will be times

17   or in -- specifically with Tonawanda Coke, that

18   there were times when even these written entries

19   weren't contemporaneously made?

20   A.   They might not have been in the -- in the

21   file -- in the folder.

22   Q.   I see.  And then those would be created later

23   on?

24   A.   You can just print it out and have that -- that

25   inspection entry.

526

1    Q.   So what you're saying, the entry was in the

2    system, it just wasn't in the file?

3    A.   It may not have been in the file, but, you

4    know, if -- if someone was FOIL-ing it, you'd print

5    it out and have that out, if they are looking for

6    those inspection comments.

7    Q.   I want to be clear I understand and the jury

8    understands your response.  You're not saying --

9    tell the jury what a FOIL is.  We're not talking

10   about aluminum foil.

11   A.   It's a Freedom of Information request.  Someone

12   wants to look at records, they have to make a

13   request to the department.

14   Q.   Okay.  And FOIL stands for Freedom of

15   Information Law?

16   A.   Correct.

17   Q.   We call it a FOIL?

18   A.   Right.

19   Q.   So when the FOIL request is -- is received and

20   it's being processed, you're not saying that a new

21   document is created at that time.  It might be

22   transferred from the system into the file?

23   A.   Correct.

24   Q.   Now, getting back to this -- this question of

25   the notes.  When you went through the Tonawanda

527

1    Coke file, you would see these typed in entries

2    for -- for inspections?

3    A.   You know, when I went through it, I just paged

4    through the system, the computer system, and went

5    through the inspections that way.

6    Q.   You didn't go through the file?

7    A.   And I went through the file, but when I was

8    looking at those AFS sheets -- Air Facility System

9    is the system -- the computer system that we use to

10   enter our applications, print out a permit, enter

11   our tracking for enforcement, inspections, et

12   cetera, I just paged through that system on the

13   computer.

14   Q.   I see.  You remember if for the -- when you

15   went through the file, if you saw handwritten notes

16   that related to these I think you called them AFS

17   entries?

18   A.   Handwritten notes?  I've seen handwritten notes

19   of inspections that probably correlated with some

20   of these AFS inspect -- AFS comments.

21   Q.   Okay.  And did you see -- and those handwritten

22   notes would have been prepared by the inspector who

23   went to the facility?

24   A.   Correct.

25   Q.   Okay.  Do you remember whether it was more

1    often or less often that you saw handwritten notes

2    that accompanied these -- these typed AFS entries

3    for Tonawanda Coke?

4    A.   Were there more handwritten notes than AFS

5    entries?

6    Q.   No, no, no.  In most instances were there

7    handwritten notes that supported the AFS entries in

8    the Tonawanda Coke file?

9    A.   I would say, yes.

10    Q.   And that would include notes that were made,

11    for example, by Mr. Sandonato?

12    A.   No, I don't recall seeing too many notes from

13    Mr. Henry Sandonato.

14    Q.   Okay.  Would it include Gary Foersch?

15    A.   Not many notes from Mr. Gary Foersch.

16    Q.   All right.  So the handwritten notes you saw,

17    are we down to one?  Is that Cheryl Webster?

18    A.   Cheryl Webster.

19    Q.   For her you would see handwritten notes?

20    A.   She was a note taker.  She likes to take notes.

21    I do too.

22    Q.   Okay.  So in the case of Mr. Sandonato, it

23    sounded like you're telling us really no notes for

24    his contacts with Tonawanda Coke?

25    A.   You know, he would have been the supervising

1   engineer, so, yeah, maybe from his visits there

2   would not be too many notes.

3   Q.   In the case of Mr. Foersch, I understand you to

4   be saying it would be the exception rather than the

5   rule that there would be these contemporaneous

6   notes supporting these typed entries?

7   A.   Not as many notes from Gary.  I think there are

8   a few in there.  You know, I would say they're less

9   than what you would see from Cheryl.

10  Q.   Sure.  But from Mr. Foersch, to be clear, would

11  it be fair to say that there were very few?

12  A.   He -- I wouldn't say that without taking a good

13  look again, but less than Cheryl's.

14  Q.   Okay.  But -- and with Cheryl, you mean Cheryl

15  Webster?

16  A.   Cheryl Webster.  Excuse me.

17  Q.   In the case of Cheryl Webster, it sounds like

18  you're saying in most instances where there was an

19  inspection that she participated in, there also

20  would be notes?

21  A.   Correct.

22  Q.   And were there inspections that you went on

23  where you accompanied Cheryl Webster --

24  A.   Yes.

25  Q.   -- from time to time?

1         You got to know her style?

2    A.   Somewhat.

3    Q.   Okay.  And she's a note taker you said?

4    A.   Keeps records.

5    Q.   Yes.  Okay.  And have you had occasion where

6    you've been present for a contact where you've then

7    reviewed her notes of that contact?

8    A.   Yes.

9    Q.   And have you found that she's an accurate

10   recorder of those contacts?

11   A.   Yes, I would say that.

12   Q.   And that she is thorough in terms of noting

13   what is covered during the contact?

14   A.   Yeah.  Yes, I would say that.

15   Q.   Okay.  And -- and have you found that --

16   therefore, that she doesn't leave out events that

17   occurred during the contact as a rule?

18   A.   She writes down what -- you know, what she

19   understands or -- or is privy to hear.  You know,

20   where she has an opportunity to hear.

21   Q.   And to the extent she's been in a position to

22   observe, whether it's by -- by visualizing it or

23   hearing it or seeing it, however she sees it,

24   you'll see that in her notes?

25   A.   Correct.

1    Q.   Now, let's talk for a couple minutes, if -- if

2    we can, about -- I'm going to call it the statutory

3    and regulatory framework for this environmental

4    enforcement in New York State.   Okay?

5    A.   Okay.

6    Q.   You talked about this a little bit with

7    Mr. Mango on the first day of your testimony, if

8    you recall that.

9    A.   Yes.

10   Q.   You told us about the -- and we're talking

11   about the air side.   And just so it's clear to

12   the -- to the -- to the jury, we talked about the

13   air side, correct?

14   A.   Correct.

15   Q.   And then there's a separate side that deals

16   with hazardous waste or -- or ground issues?

17   A.   It's another division of the department.

18   Q.   All right.   And what's the name of that

19   division?

20   A.   It's a new name:   Hazardous Materials

21   Management.

22   Q.   When -- when did it change?

23   A.   I think within the last 12 months.

24   Q.   What was it called before then?

25   A.   There was Hazardous Waste and Solid Waste

1    Management.

2    Q.   They were two separate --

3    A.   Correct.

4    Q.   -- distinctions?

5    A.   Correct.

6    Q.   They are combined?

7    A.   Now they're combined.

8    Q.   What we're talking about here is just the air

9    side?

10   A.   Correct.

11   Q.   Air side deals with emissions into -- into the

12   sky or --

13   A.   Into the ambient air.

14   Q.   Ambient air is the term we use for that.  Good.

15        So on the federal side, as far as the statute,

16   there is what's called the Clean Air Act, is that

17   true?

18   A.   Correct.

19   Q.   Now, is there a state statutory counterpart to

20   the -- the Clean Air Act?

21   A.   There is a conservation law, New York State

22   conservation law that gives us the legal authority

23   to -- to enter a facility above regulations.  If

24   you're citing regulations, it's the law that allows

25   us to get the regulations on the state side.  Is

1   that what you're referring to?

2   Q.  What I'm interested in is I know on the federal

3   side you have the Clean Air Act, which is a fairly

4   complete body of law --

5   A.  Right.

6   Q.  -- regarding fair -- federal enforcement of air

7   laws.  And I'm wondering, on the state side -- and

8   when you say "conservation law," you're talking

9   about the environmental --

10  A.  Environmental Conservation Law, correct.

11  Q.  Sometime called the ECL?

12  A.  ECL, right.

13  Q.  Does the ECL or Environmental Conservation Law

14  have a similar body of statutes to what we have in

15  the Clean Air Act regarding air enforcement?

16  A.  You know, I don't get into reading the law that

17  much.  I -- you know, I cite my violations relative

18  to the regulations and usually don't reach out to

19  the law part.  I leave that to the attorneys.

20  Q.  I see.  So you're not sure about that?

21  A.  Pardon?

22  Q.  You're not sure about that?

23  A.  Oh, I'm sure there is.  You know, I'm just not

24  familiar or versed enough to have a conversation

25  with you.

1    Q.   Okay.  Then in addition to the laws, we've had

2    a lot of discussion here about regulations, right?

3    A.   Correct.

4    Q.   And -- and in -- in this area of environmental

5    enforcement generally, as you've indicated, these

6    regulations are very, very important --

7    A.   Yes.

8    Q.   -- correct?

9         And it's really the regulations that get down

10   into the detail of -- of what you can and cannot

11   do --

12   A.   Correct.

13   Q.   -- true?

14   A.   Correct.

15   Q.   And Mr. Linsin has -- has covered with you in

16   more detail than I'm going to that over the course

17   of time, those regulations can change --

18   A.   Correct.

19   Q.   -- correct?

20        Do you know -- on the federal side we refer to

21   the Code of Federal Regulations, right?

22   A.   CFR, Code of Federal Regulation.

23   Q.   And on the state side, we've had -- you've

24   testified about this -- we have the New York Code

25   Rules and Regulations.

1   A.   Correct.

2   Q.   And it's sometimes called the NYCRR?

3   A.   6 NYCRR.

4   Q.   Would be the particular one for --

5   A.   Right.

6   Q.   -- for you?

7   A.   Right.

8   Q.   Okay.  Who -- let's talk about the state side

9   for a minute with 6 NYCRR.  All those regulations

10  that appear in that part, who writes those?  Do you

11  know?

12  A.   I mean, the law is -- is written by the

13  legislatures of the state of New York.

14  Q.   Okay.  But that -- that's statutes.  But when

15  you're talking about the --

16  A.   Regulations.

17  Q.   -- what's in the NYCRR, do you know who --

18  who --

19  A.   That's written by staff in Albany.

20  Q.   Staff of the?

21  A.   Division of Air?

22  Q.   For the Department of Environmental

23  Conservation?

24  A.   Department of Environmental Conservation,

25  correct.

1    Q.   And on the -- on the federal side, would the

2    CFR, do you know who prepares those provisions

3    regarding enforcement of environmental laws?

4    A.   The regulations?

5    Q.   Yes.

6    A.   Those are written by the federal government.  I

7    would assume it's the same division of air.

8    Q.   But you don't know?

9    A.   Some of it -- some of it is contracted out, so

10   I'm not quite sure how they interact in writing

11   that -- that rule, those rules.

12   Q.   Okay.  Do you ever find, in your experience

13   dealing with air enforcement, that there are

14   conflicts between the provisions of the NYCRR and

15   the provisions of the CFR?

16   A.   I don't know if I would call them conflicts.

17   Overlap or differences.

18   Q.   Okay.  Differences?

19   A.   Correct.

20   Q.   You do find that occurs, correct?

21   A.   That occurs.

22   Q.   Okay.  Let's -- let's also talk about, if we

23   can, the fact that we have the EPA or Environmental

24   Protection Agency which is a federal agency, right?

25   And then we have the Department of Environmental

1     Conservation which is a state agency --

2     A.   Correct.

3     Q.   -- right?

4          And -- and when we get into the area of air

5     enforcement, is it true that most of that

6     enforcement most of the time is done by the DEC

7     rather than the EPA?

8     A.   Correct.  The DEC's delegated authority, you

9     know, to implement and enforce on these regulations

10    on the federal and, of course, we could do our own

11    state regs.  But the federal government, you know,

12    has overwriting abilities.

13    Q.   That's part of what I want to try to -- I want

14    to try to understand and help the jury understand

15    how that works.  Because the impression I have

16    from -- from getting familiar with this case and

17    from your testimony is that the -- the day-to-day

18    contact with a company, such as Tonawanda Coke, was

19    by DEC personnel.

20    A.   Correct.

21    Q.   And how is it determined when there will be

22    contact with a company like Tonawanda Coke by

23    federal or EPA personnel?  How does that work?

24    A.   The federal government, you know, reviews their

25    files, our records, the Title V permits, and they

1    make decisions as to when they want to make an

2    inspection at a facility whatever way they choose.

3    Q.  Okay.  And if the -- the personnel from the EPA

4    decide that they want to go to a facility and

5    inspect it, do they go to the DEC to ask for

6    permission?

7    A.  They don't ask for permission.  They usually

8    notify us that they're going to do that.

9    Q.  Okay.  Have you ever had instances where the

10   interpretation given to -- to certain behavior by

11   the EPA is different than the interpretation that's

12   given to that same behavior by the DEC?  Have you

13   ever run into that in your experience?

14   A.  What do you mean "behavior"?

15   Q.  Well, a certain -- for lack of a better term, a

16   certain course of conduct.  Have you ever had the

17   experience where the DEC inspector, you, for

18   example, are dealing with a particular company,

19   you -- you have a relationship with that company,

20   and there's certain activities that are taking

21   place and you develop a view on whether those are

22   or are not in compliance with environmental laws

23   and regulations.  Are you with me?

24          MR. MANGO:  Your Honor, I object.  Seems

25   like a speculative nature of the question.  Maybe

1   it can be rephrased in a better format.  I'm not

2   sure.

3          THE COURT:  Well, on that ground, I'm

4   going to overrule the objection.

5       You may continue with the question.

6       Do you have the question in mind so far?

7          THE WITNESS:  No, you're going to have to

8   give it to me again.

9          THE COURT:  All right.  Do you have the

10  question in mind?

11         MR. PERSONIUS:  He's going to get his

12  wish.  I'm going to have to rephrase it, Judge,

13  because I don't want you to speculate.

14         THE COURT:  Well, I'll tell you what,

15  think about rephrasing it while we take a break.

16  Okay?

17         MR. PERSONIUS:  I will do that, Judge.

18         THE COURT:  All right.  We'll resume again

19  at 11:45.  Okay?

20      See you shortly, ladies and gentlemen.

21          (Jury excused from the courtroom.)

22         THE COURT:  You can step down.

23      Is there anything we have to discuss?

24         MR. MANGO:  No, your Honor.

25         THE COURT:  All right.

1              MR. MANGO:  Thank you, Judge.

2              MR. PERSONIUS:  Thank you, Judge.

3              (Short recess was taken.)

4              (Jury seated.)

5              THE COURT:  Let's get the audio started,

6     please.

7         The attorneys and parties are back, present.

8     We're resumed in the case of Tonawanda Coke

9     Corporation and Mark Kamholz defendants.  Case

10    brought by the United States, and they have the

11    burden of proof beyond a reasonable doubt and the

12    presumption of innocence remains and always is with

13    the defense and the defendants until, and if,

14    proven guilty by that proof standard on each

15    essential element of each crime charged in this

16    particular case.  Remember, common sense,

17    experience, intelligence.  Apply it to what you

18    hear in this case.

19        We gave you enough time.  This question better

20    be good, Mr. Personius.

21  BY MR. PERSONIUS:

22  Q.  I feel this enormous pressure.

23        In your experience, Mr. Carlacci, have you ever

24    had oversight at a company of a particular activity

25    where your interpretation of the propriety or

1    impropriety of that activity was different than a

2    counterpart from the Environmental Protection

3    Agency?

4    A.  I've had -- been on inspections with EPA and

5    have had things that we had to figure out and

6    always come to a resolution on it.  You know, were

7    there differences of opinion?  Yes.

8    Q.  Okay.

9    A.  But we usually come to resolution.

10   Q.  Usually?

11   A.  I have.  I have personally resolved --

12   Q.  I understand.  But in -- in viewing the same --

13   call it activity.  In viewing the same activity,

14   you and this other inspector, including inspectors

15   from the EPA, have come to a different conclusion?

16   A.  No.  We have different opinions, but at the end

17   we resolve it together so it ends --

18   Q.  Right.

19   A.  -- to be the same conclusion.

20   Q.  Right.  If you're working together.

21   A.  That's what it takes.

22   Q.  That's the trick, right?

23   A.  That's what it takes.

24   Q.  Okay.  Communication between the DEC on the one

25   hand and the EPA on the other?

1    A.   Correct.

2    Q.   And, ideally, that communication should

3    continue from year to year to year, right?

4    A.   You're doing this -- you know, you're doing

5    this job, you get to know your counterparts and,

6    yeah, you hope so.

7    Q.   You hope so.  And it's true, is it not, that

8    you don't always have that regular communication

9    about a particular company and the regulation of

10   that company with your counterpart from the EPA?

11   A.   The EPA is not -- you know, is not -- they're

12   more of a, you know, a spot check.  They're not

13   looking at every facility.  They come in and, you

14   know, do an inspection and then not -- you know,

15   not come back to that company again.  They're done.

16        Or they'll do a certain sector.  If they're

17   looking at, let's say, a leak detection or repair,

18   they'll look at those types of facilities.  Excuse

19   me, leak detection and repair.  They will look at

20   those facilities that are subject to that reg, but

21   they're -- they're not there, you know, to come

22   back annually.  That's not what they typically do.

23   Q.   All right.  And how much time -- in your

24   experience, how much time can pass from when the

25   EPA might do an inspection of a facility that

543

1    you're overseeing and then come back again?  How

2    much -- how many years later would it be before

3    they come back?

4    A.   It could be many years.

5    Q.   And many --

6    A.   Many could be never.

7    Q.   -- five or ten?

8    A.   Could be maybe never or --

9    Q.   Never?

10   A.   -- or it could be five years.

11   Q.   It could be ten or 20 years?

12   A.   Or it could be a year.  It depends on, you

13   know, the regs that are in play, you know, the

14   significance of the facility, and if -- if there's

15   another category they feel they need to look at or,

16   you know, something new came on at that facility.

17   You know, circumstances.

18   Q.   And in the absence of the EPA coming to the

19   site, it's expected that the company will listen to

20   what you, as the inspector from the DEC, tell them?

21           MR. MANGO:  Objection, your Honor.  That

22   calls for speculation.  That's -- it's expected the

23   company is going to listen to what you have to say.

24           MR. PERSONIUS:  I'll rephrase it, Judge.

25   Rephrase it.

1          THE COURT:  Okay.  Please do that.

2     BY MR. PERSONIUS:

3     Q.  In your experience, when the EPA is not around

4     and you're the inspector assigned -- you told us

5     some of the companies that you're assigned to --

6     A.  Correct.

7     Q.  -- is it your expectation that that company and

8     the personnel at that company will listen to you

9     regarding what is and is not appropriate from an

10    air environmental perspective?

11    A.  I think they would listen to the department,

12    not an individual.  You know, we don't stand alone

13    and have sole authority at a facility.  You know, I

14    have support, you know, with attorneys and staff in

15    Albany that do different components of -- you know,

16    of analysis of things.  I'm not an individual sole

17    ruler of this facility.

18    Q.  So -- so put it a different way -- and thank

19    you for clarifying it -- whoever is representing

20    the DEC is who that company should listen to if the

21    EPA is not around?

22    A.  The department as a whole.

23    Q.  Okay.  Thank you.

24         When you go to a company -- you've told us

25    about the discretion that exists with inspectors

1    regarding recordkeeping, correct?

2    A.   Correct.

3    Q.   All right.  When you go to the company as an

4    inspector, whether you're a technician or whether

5    you're an Engineer 1 or whether, as with you,

6    you're an Engineer 2, and you observe a particular

7    activity taking place within your jurisdiction, do

8    you have discretion as to whether or not you cite

9    that company for a violation of a particular

10   regulation?

11   A.   If you find a violation, you know, typically --

12   the way it should be done is that you discuss it

13   with your supervisor.  Your supervisor decides or

14   gets advice from counsel, and then the department

15   decides what to do with that violation.

16   Q.   Okay.  But when you're at the site and you see

17   a particular activity taking place, and it, in your

18   judgment, doesn't specifically conform with how you

19   interpret the applicable regulation, do you have

20   the discretion to overlook that?

21   A.   No.

22   Q.   Or to --

23   A.   If it's a violation of the reg --

24   Q.   Yeah.

25   A.   -- you cannot overlook that.

1    Q.  And do you have the discretion, without going

2    to your supervisor, to inform the representative of

3    the company that that activity or that behavior

4    should be corrected or you're going to do

5    something, or else?  Do you have the ability to do

6    that?

7    A.  You have the ability to do that.  If it's black

8    and white, if it's clear, you know, that there is

9    an issue here, it doesn't conform with the reg, you

10   know, it's easy then to have that conversation with

11   the -- the person that represents the plant, you

12   know.  If it's a gray area, sometimes you got to

13   figure it out.

14   Q.  Right.  Right.  And I think Mr. Linsin touched

15   on this yesterday, and it gets into the idea of --

16   of compliance.  Is it fair to say that the DEC's

17   overall goal is to get companies into compliance

18   with the environmental rules?

19   A.  Yes, it is.

20   Q.  And -- and that the goal is to work together to

21   try to get environmental compliance from the

22   companies in this area?

23   A.  It's always more comfortable to do it that way.

24   Q.  And usually more effective?

25   A.  Yes.

1    Q.   A more effective use of time and money.

2    A.   True.

3    Q.   All right.  You've reviewed the -- this

4    Tonawanda Coke file, and I was wondering if -- if

5    maybe you could help us.  Do you see these -- these

6    carts here with the wheels on them?

7    A.   Yes.

8    Q.   There's two of them.  There is a top and a

9    bottom.  The records that you reviewed for

10   Tonawanda Coke, would they fill -- how much -- how

11   much of those two carts would they have filled?

12   A.   Probably --

13            MR. MANGO:  Objection, your Honor.  The

14   question was asked and answered.  It was about four

15   our five banker's boxes.  I don't know why we need

16   to now reference a cart.

17            THE COURT:  I think that's true.  Move on,

18   please.

19        Sustained.

20            MR. PERSONIUS:  All right.

21   BY MR. PERSONIUS:

22   Q.   These records that you reviewed for Tonawanda

23   Coke, did you review them for substance as to what

24   the interaction was between the assigned inspectors

25   from the DEC and Tonawanda Coke and Mr. Kamholz in

1    particular from a particular point in time to a

2    particular point in time?

3    A.   You mean, did I specifically look to see how

4    the interaction was between the inspector and

5    Mr. Kamholz in the file?

6    Q.   Yes, and how -- how environmental issues, as

7    they arose, how they were handled.

8    A.   Not specifically.

9              THE COURT:   All right.   To the form of the

10   question.   Reput it.

11   BY MR. PERSONIUS:

12   Q.   Okay.   All right.   When you did your file

13   review, tell us what the purpose, then, of the

14   review was.   In what detail were you reviewing the

15   file?

16   A.   You know, for the May 2008 meeting that I had

17   with Mr. Kamholz previous to that, you know,

18   considering my involvement in the air Tonawanda

19   study where we were looking for toxic emissions and

20   setting up an ambient air monitoring network, my

21   focus was on reviewing the file, in particular the

22   NESHAP summary, to see the status of that facility

23   and -- and the amount of emissions.

24        Again, it wasn't a detailed review because I

25   had Albany staff, toxicologists and modelers, doing

1    a detailed review of the emissions to determine

2    impacts downwind at the stations.

3    Q.   I see.

4          THE COURT:  All right.  What's NESHAP

5    again?

6          THE WITNESS:  NESHAP stand for National

7    Emissions Standards for Hazardous Air Pollutants.

8          THE COURT:  Okay.

9          MR. PERSONIUS:  Thank you, Judge.

10   BY MR. PERSONIUS:

11   Q.   If I understand your testimony, you then

12   reviewed the Tonawanda Coke file again to prepare

13   for your testimony, or am I incorrect?

14   A.   I -- I've looked through different records at

15   different times, you know, as I felt I needed to,

16   you know, garner -- garner more information.  I

17   didn't do much preparedness for this.  I'm not -- I

18   am not the key inspector or key engineer.

19   Q.   Okay.  In your review of the file, did you go

20   through and read in detail all the inspection

21   reports, for example?

22   A.   In detail, no, but I scanned them.

23   Q.   By scanning, you read each one but --

24   A.   Like I --

25   Q.   -- didn't try to digest it?

1    A.   Like I explained earlier, I went through the

2    AFS system for the data that was inputted there.

3    Q.   Okay.  So you -- so you did read all those --

4    what we called those -- those typed entries from

5    the inspections?

6    A.   Yes.

7    Q.   You read all those.  And it would be fair to

8    say you read those in detail?

9    A.   Yeah.

10   Q.   Okay.  And -- and did your -- your review of

11   those inspection reports cause you to conclude that

12   any of the inspections that were conducted at

13   Tonawanda Coke had been handled improperly?

14   A.   No.  I couldn't make that conclusion.

15   Q.   Could we please -- it's going to be a

16   government exhibit.  This is in evidence.  It's

17   Government Exhibit 19.01.  Could we have that on

18   the screen, please?

19       We have on the screen, Mr. Carlacci, Government

20   Exhibit 19.01, which is a letter from March 13,

21   1982.  Do you see that?

22   A.   Yes, I do.

23   Q.   And is there a second page to this?  A third

24   page.

25       Remember this is a flow diagram?

1    A.   Block diagram.

2    Q.   Right.

3    A.   There's no flow noted here, I believe.

4    Q.   Okay.  And do you remember that Mr. Mango asked

5    you if a -- if a pressure relief valve was shown in

6    this diagram?  Do you recall that?

7    A.   Yes.

8    Q.   Okay.  And if we could go back to the date of

9    the letter, please.

10        And again this was in 1982, the letter was

11   written, right?

12   A.   Correct.

13   Q.   1981.

14   A.   Yes, 1981.

15   Q.   I misread it.  It's my error.  I apologize.

16   You told Mr. Linsin that this pressure relief valve

17   that we've been referring to, you don't know when

18   that was installed?

19   A.   I do not know.

20   Q.   Okay.  And -- and if it was installed at some

21   point after 1981, you obviously wouldn't see the

22   PRV shown on a diagram from 1981, right?

23   A.   That's correct.

24   Q.   And that would be true with the other diagram

25   that was shown to you by Mr. Mango, that if the PRV

1    was not yet installed, you wouldn't expect to see

2    it on a diagram, is that true?

3    A.   That's correct.

4    Q.   Thank you.  You can take that down, please.

5         Now, I saw on one of the government exhibits --

6    I can have it pulled up if you need it -- but it

7    described Tonawanda Coke as a merchant coke

8    producer.  Do you know Tonawanda Coke to be a

9    merchant coke producer?

10   A.   Yes, I do.

11   Q.   Okay.  Do you know what that term means?

12   A.   Yes.

13   Q.   Would you please tell the jury what that means?

14   A.   A merchant coke producer is a stand alone coke

15   facility.  An integrated coke facility is one

16   that's integrated into a steel-making facility.

17   Q.   Maybe compare it, if you would, to Bethlehem

18   Steel when it had a coking operation?

19   A.   Right.  Bethlehem Steel was making steel.  The

20   coke is -- is different in that it's furnace coke

21   that's used as a reducing agent in blast furnaces

22   to make pig iron, which is a lower grade of -- of

23   iron that's further refined in the steel-making

24   process in that integrated steel industry.

25        A foundry coke producer has more of a cleaner

1   coke used in cupolas, for example, to make cast

2   iron.  An example of cast iron would be the cover

3   on a sewer on the road, sewer cover.

4   Q.  Like a manhole cover?

5   A.  Manhole cover.  Excuse me.

6   Q.  It could be covering a sewer.  Now, if you're a

7   merchant coke producer, are you, then, dependent

8   upon what the -- what the demand is from the

9   companies on the outside as to how busy you are?

10  A.  Yes, I would say.

11  Q.  So in your experience, if you're a merchant

12  coke producer, would you have periods of high

13  production and periods of low production?

14  A.  I would say that would be true.

15  Q.  Okay.  Do those terms, "high production" and

16  "low production," in the context of a coking

17  company, do those terms have meaning to you?

18  A.  Yes, they do.

19  Q.  Would you explain to the jury what the

20  difference is between high production and low

21  production, please?

22  A.  There is a -- a rate of coking.  You can slow

23  the battery down, you know, if production -- if you

24  don't have demand for the coke, you can leave the

25  coke in the battery, the coal that's cooking into

1    coke, for a longer period of time; therefore,

2    slowing down your output.

3    Q.   Okay.  And -- and does the level of

4    production -- is there a correlation between the

5    level of production at a facility like Tonawanda

6    Coke and the amount of coke oven gas that's

7    generated by the company?

8    A.   Yes, there is.

9    Q.   Would you please explain that to the jury?

10   A.   All right.  The -- you know, the faster you

11   process coal into coke, the more gas -- coke oven

12   gas you will generate.

13   Q.   So that there'll be -- if you're in high

14   production, just using that generally, you would

15   expect that you would be generating more coke oven

16   gas that you would have to deal with?

17   A.   Correct.

18   Q.   Is that fair?

19   A.   Fair.

20   Q.   Okay.  And you went through with Mr. Linsin --

21   at Tonawanda Coke what happens to this coke oven

22   gas after it leaves the -- the battery, it gets --

23   in effect it gets sucked out of the battery through

24   the collector main and then moves across this road

25   called Broadway to the exhauster, is that right?

1    A.   That's correct.

2    Q.   It's being pulled that way by the -- by the

3    exhauster?

4    A.   Correct.

5    Q.   Kind of like a vacuum cleaner?

6    A.   Slight suction.

7    Q.   Right.  And then once it hits the exhauster,

8    then it's being pushed forward?

9    A.   Correct.

10   Q.   Okay.  Now, after the coke oven gas goes

11   through this processing that you reviewed with

12   Mr. Linsin, I think you testified some of that coke

13   oven gas will go back to the battery and some of it

14   goes to the boiler?

15   A.   Correct.

16   Q.   Is that fair?

17   A.   Correct.

18   Q.   The coke oven gas that goes to the battery,

19   what purpose does it serve there?  Do you know?

20   A.   To heat the battery.

21   Q.   So it gets reused?

22   A.   It gets burned in burners that generates the

23   heat for the battery.

24   Q.   Is it fair to say that the world is never

25   perfect, but -- but to the extent it is a perfect

556

1    world, if you have a -- an efficient coking

2    operation, you're going to be -- you're going to

3    have a cycle where you're making coke, you're

4    getting by-products out of it, and then what you

5    have left you're reusing?

6    A.   That's -- that's the process that you just

7    described, yes.

8    Q.   That's -- that's -- that would be your goal,

9    true?

10   A.   That's how it's designed.

11   Q.   Okay.  Now, the coke oven gas that goes to the

12   boiler house, do you know what that's used for?

13   A.   They burn it in boilers that generates steam

14   for use throughout the facility where steam is

15   needed.

16   Q.   And do you know whether or not at any point in

17   time Tonawanda Coke also was operating a

18   cogeneration system?

19   A.   I know they have a generator on site, and I do

20   recall at times someone saying that they used that

21   to generate power.

22   Q.   Okay.  And to the extent that Tonawanda Coke

23   was using a cogeneration system, would that also

24   use some of this coke oven gas that would be --

25   would be left over after by-products?  Could you

1   use it for that?

2   A.   That would be an opportunity if you had extra

3   gas.

4   Q.   Okay.

5        THE COURT:   In a coking operation, is that

6   dependent on the type of coal you use?

7        THE WITNESS:   Yes, it is.   I mean, furnace

8   coke typically you're not too concerned about how

9   clean the coal is in regards to sulfur.   One of the

10  other key items with foundry coke is volatility.

11       THE COURT:   Is foundry coke the product of

12  coal burning?

13       THE WITNESS:   Yes.

14       THE COURT:   Okay.   Thank you.

15  BY MR. PERSONIUS:

16  Q.   And -- and I don't know if you know this, but

17  there are different kinds of coal?

18  A.   Yes.

19  Q.   And there's high volatile and low volatile

20  coal?

21  A.   Correct.

22  Q.   And do you know what those are used for, what

23  different purposes they have?

24  A.   Well, I know Tonawanda Coke uses a lower

25  volatile coal.   It was -- it's in the permit as a

1    condition.  It's related to part of the definition

2    for foundry, I believe, coke.

3    Q.  Okay.  And just very briefly, and then we'll

4    move on to -- to something that's more specific to

5    your testimony.  But in terms of how Tonawanda Coke

6    operates, you start with coal?

7    A.  Start with coal.

8    Q.  And maybe you've described for the jury, you've

9    got -- let's say you start with a pile of coal.

10   Where does that go and -- and what's that process?

11   A.  Well, you -- you got different types of coal.

12   They -- they blend the coal to get whatever mix

13   they -- they -- they feel is the formula for their

14   coke.  And it's --

15   Q.  They have different recipes?

16   A.  They have different recipes.  And once you get

17   that blend, it's fed into the oven.

18   Q.  How does it get fed in -- so the jury knows,

19   how does it get fed into the oven?  Do you know how

20   that works at Tonawanda?

21   A.  There is a larry car they call it, where --

22   where there's bins that hold this coal that travels

23   along the top of the battery.  It goes where the

24   charging holes are.  The slotted oven has lids on

25   the top.  You pull the lids off, and you feed the

1    oven, the empty oven, full of coal.

2    Q.  How much -- do you know how much coal you put

3    in an oven?

4    A.  No, I don't know an exact number, but, you

5    know, for example, it's probably equivalent to a

6    single-axle dump truck load, you know, to give a

7    comparison of size.

8    Q.  A fairly large quantity?

9    A.  A fair amount.

10   Q.  You -- you -- and when you talk about charging,

11   is the charging the filling of that particular oven

12   with the coal?

13   A.  Correct.

14   Q.  That's called charging?

15   A.  Correct.

16   Q.  All right.  Do you do just one oven at a time?

17   A.  You do one oven at a time.

18   Q.  Okay.  And -- and so you put the -- you've got

19   the coal in.  And then what happens next?

20   A.  Lids go back on.  You know, the oven is hot,

21   and it's in the process of destructive distillation

22   into coke.

23   Q.  And I think you may have mentioned this, and

24   I -- I don't know how this works, but when it's

25   burning in the oven, there's no -- there's supposed

1    to be no air in there?

2    A.   No air.  So it's not burning.

3    Q.   So what I don't understand -- and you're a lot

4    smarter at this then I'll ever be -- how can

5    something burn if there's no air?

6    A.   It's not burning.  It's -- it's going through a

7    distillation.  And you're driving off the

8    impurities from this coke.

9    Q.   Okay.  And those impurities, is that what

10   becomes the -- the coke oven gas?

11   A.   That's right, the coke oven gas.

12   Q.   Let's hold that for a minute.  The -- the coal

13   will then -- they call it coking?

14   A.   Coking, correct.

15   Q.   The coal will coke for a period of time that's

16   a lot -- could be a day or two days?

17   A.   Between 28 and 48 hours.

18   Q.   And -- and when it's done coking, what happens

19   to that -- that then coke that's in that -- that

20   particular oven?

21   A.   That coke is pushed out of the oven.

22   Q.   When you say it's "pushed out," how is that

23   done?

24   A.   There is a ram -- a ram, you know, the same

25   size as the oven.  Let's say the oven is two-foot

1    wide by 13 feet high with doors on either side.

2    The doors are taken off.

3    Q.  Off both sides?

4    A.  Taken off of both sides.  You have red hot coke

5    inside.  There is some emissions at this point

6    because it's getting exposed to air.  And another

7    piece of rail equipment comes down that has a

8    long -- has -- has this piece that fits right in

9    this oven, you know, like a ram, and it pushes the

10   coke out, goes through the whole length of the oven

11   and pushes the coke out the other side into the

12   pushing cart.

13   Q.  And this pushing cart, is that like an

14   open-ended railroad car?

15   A.  Yes.

16   Q.  And that's on a railroad track?

17   A.  On a -- on a railroad track.  And that's

18   what -- after -- after you have all the coke out of

19   the oven, this car rolls down to, you know, the

20   quench tower.

21   Q.  Okay.  And as far as -- at that point it's

22   literally, like when you look at it, it's red hot?

23   A.  It's red hot.

24   Q.  How -- how -- do you know how hot it is?

25   A.  The ovens I think run around 1400 degrees

1  Centigrade.

2  Q.  Okay.  When it gets to the -- the quench tower,

3  what happens?

4  A.  Water is sprayed on to it to cool this coke

5  off.

6  Q.  And the purpose of the -- the quench tower is

7  what?  What purpose does that serve?

8  A.  The water's -- the purpose is to cool this coke

9  off so that you can stockpile it.  And the tower

10  now has water that is turning into steam as it hits

11  this coke, and you have ash associated with this

12  coke that's now cracking and -- and changing

13  temperature.  The ash is driven off and the

14  structure or tower, you know, has -- allows the

15  steam to rise in a -- in a confined -- in a

16  confined space, so up it -- up it goes.  Steam

17  rises.  In it are baffles to help knock down the

18  particulates that are captured in the steam.

19  Q.  You may have described this before and the

20  judge may have asked about it, but you talk about

21  particulates and particulate matter.  Let's start

22  with that.  Particulate matter, again, is what,

23  please?

24  A.  Particulate are -- are particles of -- you

25  know, it can be anything, any organic material.

1   It's a particle that's inhalable.

2   Q.  All right.  And as the steam rises, it takes

3   some of this particulate matter with it?

4   A.  Correct.

5   Q.  And -- and if you have baffles in place, is the

6   point that some of that particulate matter hits

7   the -- will hit the boards that are the baffle and

8   then come back down?

9   A.  Right.  Allow the steam and particulars to

10   agglomerate a little bit, hit the baffles, and

11   knock it down.

12   Q.  Okay.  And if you know, do some of the

13   particulate matter still escape into the -- into

14   the atmosphere?

15   A.  I believe it does, yes.

16   Q.  Okay.  I guess the smaller it is, the less

17   likely it's going to get caught by the baffles, is

18   that true?

19   A.  Well, it's hard to say.  I mean, the small ones

20   would turn into bigger ones.  You know, as long as

21   they get wet, they should get heavier and the same

22   thing should happen.

23   Q.  Okay.

24   A.  So how effective it is is the issue.

25   Q.  Could we -- and this is just for

```
 1    identification.  Could we, please, have Defense
 2    Exhibit RRR.02.
 3        Do you see on -- on hopefully just your screen,
 4    Mr. Carlacci, a picture?
 5    A.  Yes, I do.
 6    Q.  And do you see at the lower right it says it's
 7    Defendant's Exhibit RRR.02?
 8    A.  Yes.
 9    Q.  Do you recognize what's shown in that picture?
10    A.  I can't place it, but it looks like a quench
11    tower.
12    Q.  Okay.  And do you know if that's one of the
13    quench towers at Tonawanda Coke?
14    A.  I couldn't --
15            MR. MANGO:  Objection, your Honor.  He
16    just said he couldn't place it.
17            THE COURT:  I'll permit this question.
18    Overruled.
19        You may answer.
20            THE WITNESS:  You know, I don't know
21    exactly.  I -- I didn't walk by.
22  BY MR. PERSONIUS:
23    Q.  But is -- is it a picture of a -- of a quench
24    tower?
25    A.  It appears to be.
```

1    Q.   Okay.

2              MR. PERSONIUS:   Your Honor, I offer it.   I

3    just want to display a quench tower to the jury.

4    That's my design.

5              THE COURT:   Mr. Mango?

6              MR. MANGO:   Your Honor, I do expect other

7    pictures to come into evidence.   If there's really

8    no foundation for this one, I would ask that it not

9    be admitted.

10             THE COURT:   Okay.

11             MR. MANGO:   Well, we'll stipulate this is

12   a quench tower.   But the testimony is what it is in

13   terms of where this one is located.   So we'll -- we

14   agree to admission.

15             THE COURT:   I guess the end result is that

16   it helps us --

17             MR. MANGO:   Yes, you're right, exactly.

18             THE COURT:   -- at least to get it in for

19   purposes of continuing on.

20        And you have no objection with this,

21   Mr. Linsin?

22             MR. LINSIN:   We concur with the Court,

23   your Honor.

24             THE COURT:   Okay.   I think that works.

25   I'll admit it.   And you've heard the testimony,

1    right?  I mean, the witness said he's not sure

2    essentially if it's, you know, the quench tower at

3    Tonawanda Coke, but it is identified as apparently

4    a quench tower.  I'll allow it in on that basis --

5              MR. PERSONIUS:  Thank you, Judge.

6              THE COURT:  -- four demonstrative purposes

7    particularly.  Okay.  So RRR.02 received

8    demonstratively.

9              (Defendants' Exhibit RRR.02 was received

10             into evidence.)

11             MR. PERSONIUS:  Is it -- Judge, is it

12   published now to everybody?

13             THE COURT:  Yeah, we can publish it.  Yes.

14             MR. PERSONIUS:  Thank you, Judge.

15             THE COURT:  And it is.

16             MR. PERSONIUS:  Thank you very much.

17   BY MR. PERSONIUS:

18   Q.  The -- we're going to look at this picture,

19   Mr. Carlacci.  You've testified that this -- is it

20   the rectangular, the large rectangular object, is

21   that the quench tower?

22   A.  You're telling me that's a quench tower?

23   Q.  Well, no.  Do you know if that's a quench

24   tower?

25   A.  It appears that it can be a quench tower.  It's

1    your picture.  You tell me.

2             THE COURT:  No.

3             MR. PERSONIUS:  I can't do that.

4             THE WITNESS:  I can't tell you either.

5             THE COURT:  Well, you have to answer the

6    question.  Ask the question.  Let's get it answered

7    to the best of your ability, and then it's for the

8    ladies and gentlemen to consider.

9    BY MR. PERSONIUS:

10   Q.  Okay.  I want to be clear.  I'm not committing

11   that this is a quench tower at Tonawanda Coke.

12   Okay?

13   A.  Okay.

14   Q.  But does this structure appear to you in your

15   experience to be a picture of what's known as a

16   quench tower?

17   A.  Yeah, it has the shape.  It looks like it could

18   be a quench tower at a facility similar to

19   Tonawanda Coke.  It has that look.

20   Q.  Okay.  And you mentioned that this -- this hot

21   coke goes on a rail into the quench tower?

22   A.  Correct.

23   Q.  Looking at this picture, are you able to put an

24   arrow that shows where the railcar would enter?

25   A.  You know, it's hard to see, because, you know,

1    everything is coal or black and dark.  You know,

2    but this -- but this should be an entrance here, I

3    would guess.  And a railcar should enter either --

4    you know, depending on where the oven is, the

5    railcar will enter from that side.

6    Q.   And once the railcar gets inside this -- this

7    building, then you say water is put on the coke?

8    A.   Correct.

9    Q.   Where does the water come from?

10   A.   You know, there should be a sump.  And, again,

11   I haven't -- I haven't been in this one.  Or it's

12   using well water or public water in some fashion

13   that you can spray through nozzles or flood it

14   through open pipe onto the coal -- the coke.

15   Q.   You don't have people in there with hoses --

16   A.   No --

17   Q.   -- spraying it?

18   A.   -- no, there's -- nobody's in there --

19   Q.   Okay.

20   A.   -- when this happens.

21   Q.   But are the -- the -- the nozzles that spray

22   the water inside the quench tower and designed to

23   spray the water down onto the coke?

24   A.   Yes, they are.

25   Q.   Is that how it works?

1    A.  Yes.

2    Q.  All right.  And -- and can you show the jury on

3    this picture -- you talked about that some

4    particulate matter will escape, correct?

5    A.  Correct.

6    Q.  Even if you have baffles?

7    A.  Correct.

8    Q.  Where -- where does that particulate matter

9    come out?

10   A.  This top here is open.  And it would come out

11   the top.

12   Q.  All right.  So -- excuse me -- the way the

13   quench tower is set up is it would have an opening

14   on at least one end so you can get the railcar in

15   there with the coke on it?

16   A.  Correct.

17   Q.  And then it will be open on the top.

18   A.  Correct.

19   Q.  All right.  And where are the -- if you have

20   baffles, where -- where are the baffles situated?

21   A.  The baffles should be on the inside of the

22   structure.

23   Q.  I don't know that we've talked about this, but

24   specifically, what is -- what are baffles made out

25   of?

1   A.   Baffles are typically made out of wood so that

2   you don't have to deal with corrosion.

3   Q.   Is there anything special about the wood that's

4   used?

5   A.   You know, I don't know wood that well, but you

6   would want to get a wood that could withstand

7   moisture.

8   Q.   All right.  And once the quenching process is

9   completed, what happens to that now cooled-down

10  coke product?

11  A.   The coke is then moved out of there and dumped

12  into a chute that would move it to the coke field.

13  Q.   What's the reason for taking the -- the

14  finished coke to the coke field, if you know?

15  A.   I mean, that's -- that's where it -- it may

16  be -- it may be processed before it gets there if

17  they have to size it, crush it, to a specific size,

18  but it's stored there before it's sold.

19  Q.   And then it's sold?

20  A.   Right.

21  Q.   Okay.  And so I guess you can take this picture

22  down, Sheila.

23       Let's get back to the -- the -- you finished

24  talking about one charge of the oven, and what

25  happens to the coal becoming coke and getting

1    quenched and then going out on the -- to the coal

2    pile.  This process you indicated creates this coke

3    oven gas?

4    A.  Yes.

5    Q.  All right.  And that coke oven gas from the

6    battery, where does that go?

7    A.  Into the coke oven mains that those -- the

8    drawing that Greg -- I know your first name -- you

9    know, that sucks the gas over pulled by the

10   exhausters.

11   Q.  And we have been through that process?

12   A.  Yeah.

13   Q.  We don't need to go through that again.  Thank

14   you.

15       Could we, please, have Government Exhibit 19.10

16   which is in evidence on the screen?

17       Okay.  Government Exhibit 19.10 is a letter

18   from Mr. Kamholz to Mr. Foersch dated October 21,

19   1994, is that true?

20   A.  Yes.

21   Q.  Okay.  Could you -- The first time I've ever

22   done this.  Could you make that part bigger,

23   please?  Thank you.

24       Do you remember what this letter was about?  Or

25   would you like to take a quick look at it so it

1   refreshes your recall?

2   A.   I think we've seen this earlier, right --

3   Q.   Yeah, right.

4   A.   -- and it had to do with a malfunction at the

5   facility, and they're documenting the -- the issue.

6   Q.   Right.  Do you remember what the -- what the

7   malfunction was?

8   A.   It was a -- I think something to do with

9   reversing the flow on the battery.  It might have

10  been in the top there in the subject matter.

11  Repair to the broken rod -- let's see.  Was there a

12  particular phrase we're looking for?  Reversing

13  system failure.

14  Q.   Is this a common or uncommon occurrence, if you

15  know, in your experience?

16  A.   I'm going to guess this is probably the only

17  one that's in the file.

18  Q.   Okay.  So it's an uncommon occurrence?

19  A.   Right.

20  Q.   And that would be a file that existed for over

21  30 years?

22  A.   Yep.

23  Q.   Or 40 years maybe?

24  A.   Since the -- since the '70s.

25  Q.   Thirty years.  I don't want to overstate it.

1   Now, in this situation that's described in this

2   letter, was there a release of coke oven gas into

3   the atmosphere?

4   A.   In the middle paragraph it says here it should

5   be noted that the stack emissions was the only

6   emission source adversely affected during this

7   incident.

8   Q.   Okay.  And can you -- do you know what the --

9   that's referring to, the stack emission source?

10  A.   I believe it would be referring to the waste

11  heat stack.

12  Q.   All right.  Can you tell the jury where that's

13  located?

14  A.   The waste heat stack is at the far end of the

15  battery after the coke oven gas is burnt in the

16  flues.  This gas is the -- is the exhaust flue that

17  goes out to the waste heat stack.

18  Q.   Okay.  I was being a bad listener, and I

19  apologize.  Could you explain it one more time,

20  please?

21  A.   So you have burners in the flues that are in

22  between each oven to heat up the oven.  You burn

23  the gas, and the emissions that may be escaping

24  this oven that holds the coal through cracks in the

25  walls enter the flue.  And the flues are connected

1    to the stack that allow those emissions to vent to

2    the ambient air.

3    Q.   So is the waste heat stack in the -- the area

4    of the battery?

5    A.   It's at the far end of the battery.

6    Q.   And it's -- it's -- it's excess gas that

7    escapes as part of the coking process that -- that

8    goes up this waste heat stack?

9    A.   It leaks from the -- from the oven and the

10   products of combustion from burning the gas -- the

11   coke oven gas in the burner.

12   Q.   Is it your understanding -- correct me if I'm

13   wrong -- that the entire purpose of this letter was

14   to describe this unusual event, and then indicate

15   what emissions had taken place from it?

16   A.   Yes.

17   Q.   And -- and is this what you would expect a

18   company to do when something like this happens?

19   A.   Yes.

20   Q.   Thank you.  You could take that down.  We

21   should put this up if we could.  This is in

22   evidence also.  This is Government Exhibit 19.11.

23   All right.

24        Government Exhibit 19.11, which is in evidence,

25   is a letter from Mr. Kamholz to Gary Foersch at the

1    DEC, dated December 29, 1996.

2              THE COURT:  Hold on.  This is not received

3    into evidence.

4              MR. PERSONIUS:  Oh, it isn't?

5              THE COURT:  No.

6              MR. PERSONIUS:  Oh, my heavens.

7              MR. MANGO:  19.11.1 was received into

8    evidence.

9              THE COURT:  Yes, that was, but not 19.11.

10             MR. PERSONIUS:  I didn't know they were

11   different.  I'm sorry.  Okay.  I want 19.11.1.  I

12   apologize, Judge.

13             THE COURT:  Okay.  Please Ms. DiFillipo,

14   19.11.1.  Thank you for catching that.

15   BY MR. PERSONIUS:

16   Q.  Okay.  Government Exhibit 19.11.1 is a letter

17   dated December 26th, 1996, from Mr. Kamholz to

18   Mr. Foersch?  Is that true?

19   A.  Yes, it is.

20   Q.  Okay.  And could you make that part bigger,

21   please?

22        This is the -- what I've made bigger is the

23   first paragraph of this letter, correct?

24   A.  Correct.

25   Q.  And do you see that in the letter -- and this

1    is from Mr. Kamholz -- he's referring to both a

2    quench -- number 2 quench tower and then he's

3    referring to a quench station?

4    A.   Yes.

5    Q.   And I think your testimony has been that you're

6    not familiar with the difference between a quench

7    tower and a quench station?

8    A.   I'm saying that they're the same.

9    Q.   Okay.  The same under New York law?

10   A.   There's no definition in New York law.  It's

11   a -- it's a piece of equipment at the facility.

12   The station is the location where the quench

13   occurs --

14   Q.   Okay.

15   A.   -- that has a tower.

16   Q.   Are you familiar with the use of the term

17   "quench station" as a term of art under federal

18   law?

19   A.   No.

20   Q.   Do you deal with Title 40 of the CFR Part 63?

21   A.   Yes.

22   Q.   Okay.  And -- and you're not familiar with

23   the -- those regulations drawing a distinction

24   between a quench tower and quench station?

25   A.   I don't -- I don't recall a distinction.

1    Q.   Okay.  You may take that down.  Thank you.

2         You've provided testimony about the term

3    "trivial activity" that was enacted apparently in

4    1990?

5    A.   Correct.

6    Q.   Okay.  And -- and before that time, I think you

7    agree that there was a -- an exemption from the

8    state permitting requirements for an emergency

9    relief vent?

10   A.   Yes.

11   Q.   Okay.  That -- that emergency relief vent, was

12   there a definition for that under whether it be

13   statute or regulation?

14   A.   Typically there wouldn't be a -- there would be

15   a definition for emergency in -- in 201 dash -- or

16   in 201 or in 200, what's considered an emergency,

17   and then itemized under exemption or trivial would

18   just be the item.

19   Q.   But I know you testified that emergency --

20   there is a definition for emergency --

21   A.   Correct.

22   Q.   -- under state law --

23   A.   Right.

24   Q.   -- in this context.  But isn't it true that

25   that definition was not promulgated until 1996?

1    A.   I'd have to go through the records.  We write

2    so many rules and change them so often it would

3    hard to just make that quote like you just did

4    without looking at it.

5    Q.   All right.  You can probably guess what I've

6    done, right?

7    A.   You looked at it.  You know best.

8    Q.   But I'm asking you what you know.

9              MR. MANGO:  Objection, your Honor.  I ask

10   to strike that portion of the testimony.

11             MR. PERSONIUS:  Sorry, Judge.

12             THE COURT:  All right.  Any exchanges and

13   the colloquies that are not questions and answers,

14   ladies and gentlemen, remember, that's not

15   evidence.  And it's only the answers of the witness

16   to the questions that you can consider.  So I will

17   strike that.  Please don't consider it even if you

18   remember it.

19   BY MR. PERSONIUS:

20   Q.   And just to clarify, as you sit here now, and

21   you're not expected to know everything, you don't

22   know whether or not prior to 1996 state law or

23   regulation defined emergency in this context, is

24   that true?

25   A.   Yeah, I can't say for sure.

1   Q.   Thank you.  Would you, please, put up

2   Government Exhibit 18.02?  Now I'm nervous, but

3   I've got that in evidence.

4        We have on the screen, Mr. Carlacci, Government

5   Exhibit 18.02, correct?

6   A.   Correct.

7   Q.   It's a letter dated September 28th, 2001 to the

8   DEC, right?

9   A.   Correct.

10  Q.   With the -- second page, please.  Third page,

11  please.

12       From Mr. Kamholz, right?

13  A.   Correct.

14  Q.   Go back to the first page, please.

15       Now, you testified about this -- this letter on

16  direct, and I'm going to have part of it made

17  bigger.

18       Could you please make that part bigger?

19       The part that we've made larger is a paragraph

20  that starts Item 34.2 in bold, is that correct?

21  A.   Correct.

22  Q.   Now, there's a reference in the last paragraph

23  of what's been made larger.  It says, "The pressure

24  release vent is located on the roof of the emission

25  unit," and then some letters.  And it says, "is

1    considered a trivial activity under a certain

2    subpart of the NYCRR," correct?

3    A.   Correct.

4    Q.   All right.  And do you recall that you were

5    then shown another exhibit -- and if we need to get

6    that up we can -- but there was a response by the

7    DEC to this letter?

8    A.   Yes.

9    Q.   And -- and can we agree that in that response,

10   the DEC agreed with Mr. Kamholz's position that

11   this particular vent was a trivial activity?

12   A.   I believe for this particular vent, that's what

13   it stated.

14   Q.   Yes, right.  And so it's clear, this is not the

15   PRV that we've been talking about in your

16   testimony?

17   A.   Okay.

18   Q.   Is that -- we agree?

19   A.   That's clear, yeah.

20   Q.   But as far as Mr. Kamholz, for this particular

21   vent, taking the position it was a trivial

22   activity, the DEC in response agreed?

23   A.   I believe that's stated on the second page.

24   Q.   Okay.  I think this -- I think this is the

25   letter by Mr. Kamholz.  I think there is another

1    exhibit where the DEC --

2    A.   Oh, the response.

3    Q.   Right.

4    A.   Okay.   Then it would be in there.

5    Q.   And that's Government Exhibit 18.03.   Do you

6    need to see that?

7    A.   Yeah.

8    Q.   Okay.   Could we have Government Exhibit 18.03

9    in evidence?

10       All right.   Government Exhibit 18.03 is dated

11   April 23, 2002.   It's from DEC to Mr. Kamholz,

12   correct?

13   A.   Correct.

14   Q.   Just from looking at the first page, can we

15   agree this was the DEC response?

16   A.   Yes.

17   Q.   Would you go to the second page, please?   And

18   the third, please.   And maybe we have to -- and I'm

19   sorry that I'm not being more efficient.   Could we

20   go back to the first page?   I think we have to go

21   to the second page.   Okay.   There it is.   Could you

22   make that larger, please?

23       There's a -- the part I highlighted includes --

24   it starts with a line response to comments, and

25   then it identifies certain numbers.

1    A.   Yes.

2    Q.   And it says, "The items have been changed as

3    requested."

4    A.   Correct.

5    Q.   And seeing that, does that satisfy you that

6    this characterization of that vent as a trivial

7    activity was agreed to by the DEC?

8    A.   Yes.

9    Q.   And because it was a -- that vent was a

10   trivial -- trivial activity, the DEC was agreeing

11   that you didn't need to have it permitted, right?

12   A.   Correct.

13   Q.   And to be clear, under the -- under the

14   requirements, if something is a trivial activity,

15   if it qualifies as a trivial activity, you don't

16   need to disclose it, right?

17   A.   Correct.

18   Q.   Okay.  Thank you.  You could take that down.

19   Would you please put up Government Exhibit 18.07.

20   I have that in evidence.

21       We have on the screen now the first page of

22   Government Exhibit 18.07 in evidence, correct?

23   A.   Correct.

24   Q.   This is -- if you recall, was this part of the

25   original application or the renewal?

1    A.  You have a date with it?

2    Q.  Could we go to the next page, please.  Maybe

3    the next page.  Is that the last page, or is there

4    more?  That's the end of it?

5        This is part of the renewal.

6    A.  Okay.

7    Q.  Okay.  But my -- my question, it wouldn't

8    matter what it was.  But it talks about list of

9    exempt activities, and it's showing exempt

10    activities on here, but this isn't to be confused

11    with a trivial activity?

12    A.  Correct.

13    Q.  There's certain exempt activities you have to

14    disclose and other ones you don't have to disclose,

15    right?

16    A.  Exempt activities you disclose; trivial

17    activities, you don't have to disclose.

18    Q.  All right.  That's the distinction?

19    A.  Right.

20    Q.  And a -- to be clear, one more time, a pressure

21    relief valve can be a trivial activity, correct?

22    A.  Used in emergency situations, yes.

23    Q.  Thank you.  You may take that down.  Thank you.

24        I want to get back to baffles, if I can.  And

25    what I've -- I've seen from the paperwork is that

584

1    there's a particular part of 6 NYCRR that you go to

2    for baffles, correct?

3    A.   Correct.

4    Q.   And what I've seen are references to -- it's

5    Section 214, right?

6    A.   214 is the part.

7    Q.   Part, okay.  And I've seen references to

8    214.5(a), right?  That would be subdivision (a) of

9    Section 214.5, right?

10   A.   Correct.

11   Q.   That's the provision that says you have to have

12   baffles, right?

13   A.   I believe so.

14   Q.   You're not certain of that?

15   A.   It's in the Rule 214.5(a).  If that's the

16   title, that's what it says.

17   Q.   I've also seen references in the paperwork to

18   section 214.5(b).  And are you familiar with

19   214.5(b)?

20   A.   I'm sure I've read it, but I can't quote it to

21   you.

22   Q.   And it has to do with tower make up water,

23   dissolved solid tower make up water?

24   A.   Yep.

25   Q.   Okay.  Can -- now, are you familiar with the

1    subdivision I'm talking about now?

2    A.   Yeah, it's -- yeah, it's coming to me.

3    Q.   Could you -- and this isn't a quiz.  But could

4    you describe for the jury, please, what the purpose

5    of that subdivision is?

6    A.   If I recall, it has to do with the amount of

7    solids that are left in the water so that you're

8    not --

9    Q.   Which water?

10   A.   In this water that's used to quench the coke.

11   Right?  You know, you can reuse this water.  Well,

12   eventually it will be loaded with solids or

13   particulate matter contained in the water.  So if

14   you reuse it -- and you will actually bring more

15   particulate matter back into the steam plume and

16   actually add to the problem.  So there is a limit

17   in concentration that says if the water gets this

18   dirty basically, you need to add make up water or

19   start with fresh water.

20   Q.   And -- and the other section that I just want

21   to draw your attention to, if I could, is 6 NYCRR

22   Section 214.10.

23   A.   What's the title say?

24   Q.   Exceptions.

25   A.   Exceptions.  There you go.

1  Q.  And -- and are you familiar with that section?

2  A.  Yes.

3  Q.  Would you please -- to the extent you recall

4  it, explain the purpose of that section to the

5  jury?

6  A.  I believe that section allows you to propose an

7  alternate type of control for the requirements in

8  the previous parts of the reg.

9  Q.  Including the requirement in 214.5(a) for

10  baffles, right?

11  A.  I believe it says that, yeah.  I believe it's

12  worded that way.  You have to look at the words --

13  at the details there.

14  Q.  Okay.  Now, you were shown a number of

15  documents by -- by Mr. Mango that were completed by

16  Mr. Kamholz in -- in reference to the quenching

17  towers.  Do you remember that?

18  A.  Yes.

19  Q.  And the first one we started with was the --

20  the application for the Title V permit, which was

21  completed back in the mid-1990s?

22  A.  Right.

23  Q.  Maybe 1996?

24  A.  Right.

25  Q.  Okay.  That's Government Exhibit 18.09.02.  And

1    I have that in evidence.  What we have on the

2    screen now, do you recognize this as -- it's

3    Government Exhibit 18.09.02.  Do you recognize this

4    as being part of the application --

5    A.   Yes.

6    Q.   -- for Tonawanda Coke?

7         THE COURT:  Do you want it published?

8         MR. PERSONIUS:  I'm sorry.  Yes.  I'm

9    sorry, Judge.

10       Could we go to 0006, please?

11   BY MR. PERSONIUS:

12   Q.   Okay.  Now, let's see.  Let's do this next.

13   We're on 18.09.020-0006, correct?

14   A.   Yes.

15   Q.   Okay.  If you could make that bigger.

16       All right.  Now, some of these entries that now

17   have been made larger relate to the -- the quench

18   towers, correct?

19   A.   Correct.

20   Q.   Can you push the screen and show us where the

21   first entry is that relates to the quench tower?

22   A.   Right here where it says quench 1.

23   Q.   And if we look to the far right, the words

24   "permit conditions" are there, right?

25   A.   Correct.

1    Q.   And there is a reference to a 6 NYCRR section,

2    right?

3    A.   Yes.

4    Q.   It's 214.10(a).

5    A.   Correct.

6    Q.   And 214.10(a) you just told us is the section

7    that allows for quench towers to not have baffles,

8    right?

9    A.   I don't think it says directly do not have

10   baffles.

11   Q.   You can have exceptions from, among other

12   things, the baffles requirement?

13   A.   You can propose an alternative.

14   Q.   Yes.  Right.  Right.  And -- and so it's --

15   it's clear from this, that with respect to quench

16   tower 1, that Mr. Kamholz specifically referred to

17   that section of 6 NYCRR, Part 214, right?

18   A.   That's what listed in the application.

19   Q.   All right.  And if you go down -- oh, boy.

20          MR. PERSONIUS:  Well, sorry, Judge.

21   BY MR. PERSONIUS:

22   Q.   Okay.  See where I put the arrow?

23   A.   Yes.

24   Q.   And to the right of it, do you see where it

25   says QUEN2?

1   A.   Yes.

2   Q.   That would be the other quench tower, right?

3   A.   Yes.

4   Q.   And if we go to the right on that, it refers to

5   letters of 12/29/96 and 1/6/97, correct?

6   A.   Correct.

7   Q.   We've seen those letters?

8   A.   Yes.

9   Q.   One is from Mr. Kamholz to Mr. Foersch, and one

10  from Mr. Foersch to Mr. Kamholz, right?  Correct?

11  A.   Correct.

12  Q.   And, again, the section that's cited here is

13  214.10(a), which is the exception part of the

14  statute, right?

15  A.   Correct.

16  Q.   In other words, he's suggesting that for both

17  of the -- in his application, he's suggesting that

18  it's his understanding that for both quench towers,

19  that Tonawanda Coke fits -- fits under the

20  exception.

21  A.   At least appears to be proposing to operate the

22  same way that he did when he had his Air 100s.

23  Q.   Yeah.  Okay, good.  Thank you.

24          THE COURT:  Okay. Mr. Personius, almost

25  finished with this exhibit?

1        MR. PERSONIUS:  I'm done with this, Judge.

2   Thank you.

3        THE COURT:  It's an appropriate time.  I

4   think, just so you know, every Friday we're going

5   to break for lunch.  Okay?  So we're probably going

6   to do that right now, and we'll resume again at --

7   what time?

8        THE JURY:  2:00 o'clock.

9        THE COURT:  All right.  Thank you.

10   Keep your minds open.  Please keep in mind this

11   is an important case to both sides.  And what it's

12   going to take to resolve is the application of your

13   common sense, experience and intelligence just to

14   work through the evidence or lack of evidence in

15   this case.  Okay?

16   Thank you very much.  Enjoy lunch.  We look

17   forward to seeing you back here again at

18   2:00 o'clock.

19        (Jury excused from the courtroom.)

20        THE COURT:  Thank you.  Mr. Carlacci, you

21   may step down.

22   Anything we have to discuss?

23        MR. MANGO:  No, your Honor.

24        MR. PERSONIUS:  No, your Honor.

25        MR. LINSIN:  No, your Honor.  Thank you.

1              THE COURT:  See you at 2:00.

2              (Lunch recess was taken.)

3              MR. MANGO:  Your Honor, I don't know if is

4    this -- or we can discuss this now this relates

5    back to the hearsay exception that we were

6    discussing this morning in relation to certain

7    inspection records Defendant Kamholz is going to

8    seek to introduce.

9         There is a number of additional documents that

10   really completes the full picture that the

11   government has included in its 3500 material.  And

12   I don't know -- we still object to the introduction

13   of the -- of the inspection reports, but I was

14   generating a list of equivalent items that I think

15   should be admitted in the event the Court allows

16   all this really extraneous evidence in.  Because

17   we're going to have the witnesses on the stand, for

18   the most part, who created these reports and

19   they're going to be subject to -- to examination.

20   I don't know how the Court wants to deal with this

21   issue.

22             THE COURT:  Where are you going right out

23   of the gate?

24             MR. PERSONIUS:  That's pretty soon, Judge.

25   I've got to finish the baffles, and probably --

1    certainly within ten minutes of starting again, I

2    would hit those inspection reports.

3              THE COURT:  Okay.  Well, let -- let's get

4    started.

5              MR. PERSONIUS:  Okay.

6              THE COURT:  And if we need to break after

7    ten or 15 minutes.  In the meantime you can --

8              MR. MANGO:  Keep going, yes.

9              THE COURT:  Yeah, we'll keep going.  You

10   can multitask.

11             MR. MANGO:  Of course.

12             THE COURT:  Make progress.  My wife keeps

13   on telling me that males aren't very good at

14   multitasking.  I want to prove her wrong with you,

15   Mr. Mango.

16             MR. MANGO:  I'll try.

17             THE COURT:  Now, don't let me down.

18             MR. MANGO:  I'll try.

19             MR. PERSONIUS:  And I don't -- I don't

20   want you to -- to be thinking, Judge, and I don't

21   want Aaron to think, until we see what he's

22   suggesting, I -- I don't know how we're going to

23   respond to it.  But he's proposing that also go in.

24   I don't know what that is.

25             THE COURT:  Well, he probably doesn't

1    really know what you're proposing either.  So we

2    probably need to get a little handle on that too.

3    I mean, I know you're going to try to move them in,

4    but, you know, I want to see how you do that.  And

5    then if we need to take a break -- I'd rather get

6    started as he we've already held them --

7                MR. PERSONIUS:  Absolutely.

8                THE COURT:  Okay?

9                MR. PERSONIUS:  Sure.

10               THE COURT:  And then we'll go from there.

11   All right.  Thank you.

12        All right.  Chris, if you wouldn't mind.  Thank

13   you.

14               (Jury seated.)

15               THE COURT:  All right.  How was lunch?

16               THE JURY:  Good.

17               THE COURT:  Good.  Please have a seat.

18   We'll get started.  I think the attorneys and

19   parties are ready.  We are resumed in the case of

20   U.S. versus Tonawanda Coke Corporation and Mark

21   Kamholz, both defendants.

22        Government's case, cross-examination.

23        Please keep your minds open.  Very important to

24   both sides.  No burden on the defense because the

25   defendants are presumed innocent until otherwise

```
 1    proven guilty.
 2         I think you were doing the cross-examining and
 3    if you're not finished, you may start.
 4              MR. PERSONIUS:  Thank you, Judge.
 5              THE COURT:  Okay.  I almost forgot about
 6    you, Mr. Carlacci.  We kind of need you up there.
 7    Okay.  You remain under oath.
 8              MR. PERSONIUS:  I could just talk to
 9    myself.
10              THE COURT:  Probably in another week you
11    will be.
12              MR. PERSONIUS:  I think you will be.
13              THE COURT:  All right.  And then we'll try
14    putting you under oath, Mr. Personius.  Okay?
15    BY MR. PERSONIUS:
16    Q.  Good afternoon, Mr. Carlacci.
17    A.  Good afternoon.
18    Q.  With the baffles -- well, let's start with
19    this.  I think we've talked about this before, but
20    so -- so we explain it one more time.  There's
21    something -- there's another acronym that gets
22    used, which is H-A-P-S, HAPs --
23    A.  HAPs.
24    Q.  -- Hazardous Air Pollutants.  Would you,
25    please, tell the jury what they are again, or what
```

1    that is?

2    A.   In the Title 3 of the 1990 Clean Air Act they

3    established 189 HAPs, identified them, and that --

4    that was the list that EPA was charged with

5    reducing the emissions of from certain sector

6    industries.

7    Q.   Okay.  So -- so they are specifically

8    identified pollutants?

9    A.   Yes.

10   Q.   Thank you.  And is it correct that baffles

11   don't restrict the emission of HAPs?

12   A.   I mean, that 214 rule written quite a long time

13   ago was designed to reduce particulate emissions.

14   Those particulates may have some HAPs associated

15   with it.

16   Q.   How would that be?

17   A.   If there was any benzene soluble organics in --

18   in the particles.

19   Q.   If there were any benzene?

20   A.   Soluble organics.

21   Q.   Okay.  And for there to be a benzene soluble

22   organic in a particulate, would the particulate

23   have to be of a certain size?

24   A.   No.  It wouldn't be of size.  It just would be

25   whether or not that coke was fully cooked and

```
1    whether or not it was still driving off impurities
2    as it went into the quench tower.
3    Q.   Let's, if we could, please, put up Government
4    Exhibit 18.18, which is in evidence.   That's the
5    permit.
6         Do you see on the screen Government
7    Exhibit 18.18?
8    A.   Yes.
9    Q.   Which is a cover letter to Mr. Kamholz from
10   Steven Doleski, Regional Permit Administrator?
11   A.   Correct.
12   Q.   Okay.   It's dated May 2 of 2002?
13   A.   Yes.
14   Q.   All right.   Before we get in -- into the permit
15   and maybe -- maybe we don't need to, but is there a
16   provision in each permit including the permit for
17   Tonawanda Coke that allows for a change to be made
18   to the permit and the conditions in the permit if
19   it realized that a mistake has been made?
20   A.   Yes.
21   Q.   Okay.   And -- and do you remember what
22   condition that is?
23   A.   I believe that would be condition 4.
24   Q.   Condition 4 provides for that?
25   A.   I believe that's the one --
```

1    Q.   Okay.

2    A.   -- that says if you missed an emission point or

3    constructed something after you got your Title V,

4    you -- you can apply for that permit.  Also, I

5    think in parts of it, if there was a error, you

6    know, there's -- there's -- there's insignificant,

7    what do you call -- Title V, there's three

8    different ways to modify a permit.  There's those

9    that are major modification, minor modifications,

10   and those that are called -- I want to say

11   insignificant, but there's another term for it.

12   Q.   Trivial?

13   A.   Not trivial.  It's almost like, you know,

14   you're making a grammar correction.  There is

15   another word for it.  It slipped my mind here.

16   It's going to come to me sooner or later.

17   Q.   We get the point.

18   A.   Yeah.

19   Q.   I have the page with condition 20.  Are you

20   able to scroll through it?

21            MR. MANGO:  Page 21.  It starts at 21,

22   Your Honor.

23            MR. PERSONIUS:  Thank you, Aaron.

24   BY MR. PERSONIUS:

25   Q.   Okay.  Down at the bottom of -- of

1    page 018.18-0021 of this exhibit, do you see -- are

2    you able to see where it says condition 20?

3    A.   Yes.

4    Q.   If you can bring that up, reopening for cause.

5    Could we go to the next -- next page, please.

6    Could you make that larger, please?

7         All right.  We've gone to the next page of this

8    exhibit.  It starts out Item 20.1, correct?

9    A.   Correct.

10   Q.   And it talks about being able to reopen and

11   revise the permit for a series of listed

12   circumstances?

13   A.   Correct.

14   Q.   And -- and the second -- second provision, I

15   think you'd call it Romanette ii, would you read

16   that, please?

17   A.   "The department or the administrator determines

18   that the permit contains a material mistake or that

19   inaccurate statements were made in establishing the

20   emissions standards or other terms or conditions of

21   the permit."

22   Q.   And am I reading that correctly that that gives

23   the DEC the authority, if they realize that they've

24   made a mistake in the permit, that they can correct

25   that?

1    A.   Yes.

2    Q.   Okay.  Thank you.  We're done with that.  Thank

3    you.  Could we, please, have Government Exhibit 31,

4    which is in evidence.

5         We have on the screen Government Exhibit 31, is

6    that correct, Mr. Carlacci?

7    A.   Correct.

8    Q.   And do you recall you testified in response to

9    questions by Mr. Mango on direct, I think it was

10   yesterday, about a series of these certifications?

11   A.   Yes.

12   Q.   Now, the exhibit that we have up, Government

13   Exhibit 31, has a date -- well, the time period

14   that's covered would be 2005, is that right?

15   A.   Correct.

16   Q.   So this would be an annual certification?

17   A.   Correct.

18   Q.   On the -- the sheet that we have on the -- the

19   screen right now, it provides for a -- both a

20   facility contact and a responsible official.  Do

21   you see the --

22   A.   Yes.

23   Q.   -- two different entries?

24        For the facility contact, it identifies

25   Mr. Kamholz --

1   A.   Yes.

2   Q.   -- right?

3        And for the responsible official, it identifies

4   an individual named Gerald Priamo --

5   A.   Correct.

6   Q.   -- right?

7        It identifies him as the plant manager, right?

8   A.   Correct.

9   Q.   Now, do you know why it is that the form makes

10  the provision for a facility contact and a

11  responsible official?

12  A.   The responsible official is responsible for

13  signing the permit and responsible for the content

14  of this annual compliance report.

15  Q.   Okay.  And -- and what's the responsibility,

16  then, of the -- if you know, of the facility

17  contact?

18  A.   The facility contact is -- is -- was one

19  that's -- if you need to make contact with the

20  plant, you know, someone physically at the facility

21  that you -- let's say I need to do an inspection,

22  this would be the individual you would call.

23  Q.   In this case Mr. Kamholz?

24  A.   Correct.

25  Q.   And do you know whether or not there's any --

1    any rules on -- on who completes a certification,

2    such as this?  In other words, who fills it out as

3    opposed to -- to who signs it?

4    A.   I don't think there's a specific rule, but I'm

5    not sure.  I think it's, you know, whoever you want

6    to designate as the responsible official.  I don't

7    think there's a rule as to who -- who you can and

8    cannot pick.  I think it can be the -- an

9    environmental manager.  You know, it might -- I

10   think it has to be the plant -- plant -- plant

11   manager.

12   Q.   Plant manager has to fill it out?

13   A.   I believe the plant manager has to sign it.

14   Q.   Yes, I think you're right.  But in terms of

15   filling it out, is it permissible, for example, to

16   have the form filled out by the environmental

17   manager for the --

18   A.   It's up to the plant manager.

19   Q.   So the plant manager can allow that to happen?

20   A.   Yes.

21   Q.   Okay.  Let's, if we could, please, make bigger

22   what I just circled.

23        We've taken part of the first page of this

24   exhibit and there's a -- an attestation, for lack

25   of a better term, that is above where the signature

1    is.  Do you see that?

2    A.  Yes, I do.

3    Q.  And would you read that for the jury, please?

4    A.  "The responsible official must sign this

5    statement after the applicable report form is

6    completed.  I certify under penalty of law, that

7    based on information and belief formed after

8    reasonable inquiry, the statements and information

9    contained in these documents are true, accurate,

10   and complete."

11   Q.  Now, tell me if you agree or disagree with me.

12   When I read that, my interpretation is that it's

13   understood or contemplated that someone other than

14   the responsible official would be putting the

15   information on the form.  Do you read it that same

16   way?

17   A.  Yes.

18            MR. MANGO:  Objection, Your Honor.

19            THE COURT:  Well, the certification states

20   what it states.

21            MR. MANGO:  It's -- it would appear that

22   Mr. Personius is putting words in the witness's

23   mouth by --

24            MR. PERSONIUS:  I'll withdraw.

25            THE COURT:  As long as it's withdrawn, I

 1   won't overrule it.  Okay.

 2            MR. PERSONIUS:  Thank you, Judge.

 3   BY MR. PERSONIUS:

 4   Q.  Could -- could we go to the next page of this

 5   exhibit, please.  And then we need to go to the one

 6   after that, please.  And after that.  After that.

 7   One more.  Thank you very much.

 8        This is page 031-0006.  Is that correct, Mr.

 9   Carlacci?

10   A.  That's correct.

11   Q.  And I think you testified to the entries at

12   lines 96 and 97, and they deal with the quench

13   towers.  Is that true?

14   A.  Yes.

15   Q.  And we see in the second column from the left,

16   under "Application Requirement," that it cites

17   214.5, right?

18   A.  Yes.

19   Q.  And -- and we -- you and I -- I asked

20   questions, you provided some responses about that

21   section before we went to lunch.  Do you remember

22   that?

23   A.  Yes, I do.

24   Q.  And over under the column for "Method Used to

25   Determine Compliance", for both of those the

1    information that's put in is "Testing".  Do you see

2    that?

3    A.  Yes, I do.

4    Q.  Okay.  Am I correct in -- in -- in my

5    understanding that the fact that the responses

6    given is -- is testing, rather than baffles, is

7    meaningful?

8    A.  I'd have to read the condition.  The permit

9    condition would hopefully give you more detail as

10   to what that means.

11   Q.  Do you review these annual reports on any kind

12   of a regular basis?

13   A.  This -- not this particular facility.  Those

14   that I was responsible for when I was an EE2, I

15   did.

16   Q.  You did.  And -- and would those have been

17   reports that would have included this certification

18   for quench towers?

19   A.  I didn't review the ones for this facility.

20   Q.  I understand.  But did you review these reports

21   for any facility that had quench towers?

22   A.  No.

23   Q.  So you're -- you would not be familiar with

24   whether or not that response under "Method Used to

25   Determine Compliance," if baffles were in place

1    would say baffles?  You don't know that?

2    A.   No.

3    Q.   May we go to Government Exhibit 32 in evidence,

4    please.

5         Do you see on the screen now, Mr. Carlacci,

6    Government Exhibit 32?

7    A.   Yes, I do.

8    Q.   This is one sample of one of the semi --

9    semi-annual certification reports that Mr. Mango

10   went through with you, correct?

11   A.   Correct.

12   Q.   This particular one covers the period January

13   through June of 2005?

14   A.   Correct.

15   Q.   Again, we have as the facility contact on

16   Exhibit 32, Government Exhibit 32, Mr. Kamholz?

17   A.   Correct.

18   Q.   And then for the responsible official, it's a

19   different person this time.  It's Ronald Snyder,

20   right?

21   A.   Correct.

22   Q.   But, again, the plant manager?

23   A.   Yes.

24   Q.   Could we again find the page that has 96 and

25   97, please, as the conditions.  Okay.  Thank you.

1          We're on page 032-0003, Mr. Carlacci.

2     A.   I'm there.

3     Q.   Okay.  Down at the bottom we see a condition

4     96?

5     A.   See it.

6     Q.   All right.  And that -- again, the section

7     is the -- the 214.5 that's referred in the second

8     column?

9     A.   Yes.

10    Q.   And then we see that description of the

11    requirement is quench water make up?

12    A.   Yes.

13    Q.   And then for the description of the monitoring

14    data and analysis required by permit, it says

15    "Testing make up water, total dissolved solids."

16    A.   Correct.

17    Q.   Okay.  Let's -- if we could go to the next

18    page, please.

19         Up at the top, it's condition number 97?

20    A.   Correct.

21    Q.   All right.  This would be for the other quench

22    tower?

23    A.   Okay.

24    Q.   Contains the same entries?

25    A.   Yeah.

1   Q.  All right.  And, again, have you had experience

2   reviewing these semi-annual reports for a facility

3   that has quenching towers?

4   A.  No.

5   Q.  So, again, you could not tell us whether or not

6   the response testing make-up water, total dissolved

7   solids under the heading "Description of Monitoring

8   Data and Analysis Required by Permit," whether that

9   has any meaning in terms of whether or not there

10  are or are not baffles?

11  A.  Not related -- this is not related to baffles.

12  Q.  It's not related, right?

13  A.  No.

14  Q.  But if you had -- if you had baffles, would you

15  be expected to -- to answer this differently than

16  if you didn't have baffles?

17  A.  This is a different requirement in 214 to

18  maintain the water below that 1600 milligrams per

19  liter of dissolved solids.

20  Q.  Okay.

21  A.  It's a separate requirement under 214 --

22  Q.  I understand.

23  A.  -- in addition to baffles.

24  Q.  Okay.  So when you're doing this semi-annual

25  monitoring report and you are responding for a

1    quench tower, are you providing a response about

2    baffles or are you providing a response about how

3    you test the quench water?  What's the purpose

4    of -- of the references to condition 96 and 97 on

5    this semi-annual report?

6    A.   You got to read the details of the condition.

7    If it was relative up to a limit of dissolved

8    solids in water, then this is what it's addressing.

9    Q.   Okay.  So as -- as we are present in Court

10   today, you don't know whether or not this -- these

11   entries in 96 and 97 do or don't have any

12   significance in terms of whether or not the two

13   quenching towers at Tonawanda Coke had baffles?

14   A.   The description says it's quench water make up

15   and it's testing for dissolved solids.  I'm going

16   to say it has to do with meeting that 1600

17   milligram per liter --

18   Q.   So it has nothing to do with baffles?

19   A.   It appears not.

20   Q.   Okay.  Thank you.  You can take that off.

21       I asked you before we broke for lunch -- not

22   right before, but late in the morning -- about your

23   review of these records for Tonawanda Coke at the

24   Department of Environmental Conservation.

25   A.   Yes.

1    Q.  And you told us that you did a review at the

2    time you were doing your study, and then you did a

3    second review, as I understood it, in preparation

4    to testify here as a witness.

5    A.  I -- I -- I looked at some records.  Actually,

6    I didn't do much of a review at all.

7    Q.  Okay.  All right.  So before -- so -- so in

8    fairness to you, and so the jury understands this,

9    in -- in coming in here to testify as a witness,

10   you did not conduct -- certainly didn't conduct a

11   complete review of the Tonawanda Coke file at the

12   DEC, is that true?

13   A.  Correct.  I didn't analyze every sheet, every

14   calculation, every permit entry.

15   Q.  Okay.  You didn't --

16   A.  I familiarized myself with what's in it, in the

17   file, so that I could speak of it.

18   Q.  Okay.  And you understood in conducting that

19   review that you were going to be called upon to

20   testify here, not only as a fact witness, but also

21   as an expert, is that fair?

22   A.  Yes.

23   Q.  Thank you.

24        MR. PERSONIUS:  Your Honor, now I want to

25   get to the inspection reports.

1    BY MR. PERSONIUS:

2    Q.  You mentioned to us that part of the review you

3    did conduct included looking at -- let me restate

4    it.

5         You told us you reviewed some of the inspection

6    reports as part of your review to testify, is that

7    fair?

8    A.  Not for testifying.  I reviewed them in the --

9    in the past.

10   Q.  Okay.  So in the past?

11   A.  Yes.

12   Q.  Do you know whether or not you've reviewed all

13   of the inspection reports in -- in the Tonawanda

14   Coke file at the DEC?

15   A.  I read all the entries in AFS.

16   Q.  Those would be the electronic entries?

17   A.  Yes.

18   Q.  Okay.  There's some -- did you notice -- and

19   when you did look at the file, either for the study

20   or before you came in here to testify, did you

21   notice that there were also some -- some hard copy

22   reports in the file?

23   A.  I think the same AFS entries were in -- in the

24   file.

25   Q.  Okay.  And there also, though, were -- forgive

1    me.

2        Some other inspection documents, I noticed that

3    there is some documents that are called a full

4    compliance evaluation.  Do you remember seeing

5    those in the file?

6    A.   Yes.

7    Q.   So you saw some of those in the file also?

8    A.   Yes.

9    Q.   And are you familiar with what a full

10   compliance evaluation is?

11   A.   It's a -- the single sheet form I believe is

12   what you're speaking of.

13   Q.   Yes.

14   A.   It's a check box that -- that summarizes what

15   was done at the facility to determine a full

16   compliance evaluation, such as reviewing any

17   consent orders, reviewing the permit, witnessing

18   any stack tests, performing an on-site inspection.

19   Q.   Okay.  As part of -- am I correct that as part

20   of a -- when it's a full compliance evaluation,

21   part of that entails looking for all permitted and

22   any other emission points at the facility, is that

23   true?

24   A.   It's -- it involves evaluating compliance with

25   the permit and -- and the applicable regs.  If you

1    find new construction or new -- a new emission

2    point, yes, you should identify it and deal with

3    that.

4    Q.   But -- but in conducting what's called a full

5    compliance evaluation -- I think it's an FCE, full

6    compliance evaluation --

7    A.   Yeah.

8    Q.   -- isn't it true that you're not only supposed

9    to look for the permitted emission points, but also

10   for any unpermitted emission points?

11   A.   Yeah, if you could find them.  If there are

12   some.  If they are there.

13   Q.   You're supposed to look for them and see if you

14   can find them, right?

15   A.   If it -- if you -- if you feel that they are

16   there, that you haven't missed them in the past, if

17   there's something that you are focusing on, and you

18   think is, you know, you don't understand from

19   previous reviews, you would look for them.

20   Q.   Okay.  I -- I'm going to ask it again a

21   different way.  And it's not to make things

22   difficult for you, but I want to make sure we

23   understand one another.

24        Different from, if you will, the annual

25   inspection that normally would be conducted, when

1    you do a full compliance evaluation, it's not just

2    a question of finding an unpermitted emission

3    point, you're supposed to specifically look for any

4    unpermitted emission points, true?

5    A.  I mean, once you get to know a facility, you

6    would assume that if you did a -- you know, if the

7    applicant listed all the emission points on the

8    plot plan, and you became familiar with the

9    facility and looked at these emission points during

10   some point of evaluation, that after that you may

11   not exactly go through the whole system looking for

12   additional emission points.  You've done it once.

13   Q.  Okay.  But at least one time you should do it?

14   A.  One -- one time you should say I know all the

15   emission points at this facility.  And if there's

16   new stuff, you would look -- you know, you would

17   look there.

18   Q.  Okay.  And -- and the -- as part of that

19   process of doing a full compliance evaluation at

20   Tonawanda Coke, you've seen the PRV that we've been

21   talking about the last three days.  You've seen

22   that out there, right?

23   A.  I've never done a full compliance evaluation at

24   Tonawanda Coke.

25   Q.  But you've seen the PRV?

614

1       A.   It has been pointed out to me.

2       Q.   Right.   Sometime in I think 2011 you saw it?

3       A.   Correct.

4       Q.   And -- and would you agree with me that if you

5       were doing a full compliance evaluation, so that

6       you weren't just looking for permitted emission

7       points, but also unpermitted emission points, you

8       should have found that PRV?  Agree?

9              MR. MANGO:  Objection, Your Honor.  Calls

10      for a conclusion this witness is not able to make.

11      He was not doing these inspections.

12             THE COURT:  I'll sustain the objection.

13             MR. PERSONIUS:  Okay.  Your Honor, I'd

14      like to call up, if I could, please, it's going to

15      be defense -- this is for identification, Defense

16      Exhibit KK.  And this is just for identification.

17      BY MR. PERSONIUS:

18      Q.   What is up on the screen, Mr. Carlacci, is the

19      first page of a document that shows a date of

20      December 26th, 1979.

21      A.   Correct.

22      Q.   All right.  This is a multiple -- multiple-page

23      document.  Would you like to have the -- Sheila

24      scroll through the other pages so you can see if

25      you're familiar with it?  The question's going to

1   be:  Are you familiar with this document.

2   A.  Yes, please.  Could you scroll through?

3   Q.  Sure.  Tell us when you would like to go to the

4   next page.

5   A.  Go back to the first page, please.

6   Q.  Do you need it enlarged?

7   A.  I'm okay, thanks.  Next page, please.  Okay.

8   Q.  I was going to say I want you to know what my

9   purpose is so you don't think I'm going to quiz you

10   on the content of this.

11       My question is:  In either of your -- your

12   review of the Tonawanda Coke file, when you were

13   doing the study, or whatever later review you did

14   to prepare to testify here, do you remember coming

15   across this inspection report in the file?

16   A.  You know, I may have, but I didn't read it.

17   Q.  Okay.  So it's not familiar to you?

18   A.  No.

19   Q.  All right.

20           MR. PERSONIUS:  Try a couple more, Judge,

21   and then we'll take it from there.

22           THE COURT:  Okay.

23           MR. PERSONIUS:  Thank you, Judge.

24   BY MR. PERSONIUS:

25   Q.  This is for identification only, Defendant's

1    Exhibit MM, please.

2         Okay.  We have on the screen Defendant's

3    Exhibit MM, Mr. Carlacci.

4    A.   Yes.

5    Q.   And this -- this is a two-page document.

6    You're looking at the first page, right?

7    A.   Yes.

8    Q.   Okay.  Let me know when you'd like to see the

9    second page.  It's going to be the same question.

10   A.   Okay.  Next page.  Looks like an inspection

11   report.  Go ahead.

12   Q.   Okay.  The question is:  In reviewing the

13   Tonawanda Coke file, either when you did your study

14   or to prepare to testify, do you remember seeing

15   this report in the file?

16   A.   No.

17            MR. PERSONIUS:  Try one more, Judge.

18        Could we, please, put up -- this is going to be

19   for identification -- Government Exhibit 19.07.

20   And, actually, this is -- I think this is in

21   evidence, Your Honor.

22            THE COURT:  It is.

23   BY MR. PERSONIUS

24   Q.   Okay.  And -- and the point here is that this

25   talks about an inspection that was conducted on

1    February 5th of 1985, right?

2    A.   Correct.

3    Q.   And this one at least is familiar to you?

4    A.   Yes.

5    Q.   But it's already in evidence.  Could we try,

6    please, Defendant's Exhibit -- this is for

7    identification -- YY.  Thank you, Sheila.

8        Defendant's Exhibit YY is on the screen, Mr.

9    Carlacci?

10   A.   Yes.

11   Q.   All right.  If you would, please, look at

12   the -- the first page.  Excuse me.  That's a cover

13   letter?  The first page.  It's a letter.

14   A.   It's a letter.  It's not a cover letter.

15   Q.   Okay.  Is this -- does this relate to an

16   inspection?

17   A.   Yes.

18   Q.   Okay.  And in your -- your file review or

19   reviews, did that make this Exhibit YY familiar to

20   you?

21   A.   You know, I probably breezed through the early

22   files and focused on the middle-year files.

23   Q.   Okay.  All right.  So it would be fair to say

24   that in whatever review you did of the Tonawanda

25   Coke file, before coming in here to testify, you

618

1    did not go through every inspection report?

2    A.   No.

3    Q.   Thank you.  Mr. -- I think it was Mr. Linsin

4    yesterday asked you some questions about the

5    pressure in the coke -- coke oven gas line.  Do you

6    remember that?

7    A.   Yes, I do.

8    Q.   And it -- there was some discussion about it's

9    not measured in -- in pounds per square inch, like

10   a bicycle or a car tire, correct?

11   A.   Correct.

12   Q.   It's I think centimeters of oil is what it's

13   called?

14   A.   Correct.

15   Q.   And I think you'll agree that's a much lower

16   pressure than pounds per square inch?

17   A.   I had -- you have to go through the math to --

18   to see it.

19   Q.   But I think you agreed --

20   A.   Yeah.

21   Q.   -- it's considerably lower, right?

22   A.   Yes.

23   Q.   And the -- is it measured in -- in -- is the

24   abbreviation for it CM?

25   A.   Yes.

1    Q.   All right.  And the -- the pressure for the

2    pressure relief valve at Tonawanda Coke, do you

3    remember what the general range was that that

4    operated at?

5    A.   I didn't see any -- I seen a couple of strip

6    charts that had readings around the 80 mark.

7    Others had readings around the 120 mark.

8    Q.   And that's 80 or 120 CMs?

9    A.   Centimeters.

10   Q.   All right.  Centimeters of oil?

11   A.   Right.

12   Q.   And if -- if we were to just roughly equate

13   that out to what that is in pounds per square inch,

14   it would be somewhere between one and two pounds

15   per square inch?

16   A.   I believe that's the math that was presented.

17   Q.   But does that sound reasonable to you?

18   A.   I think it did -- does, yeah.

19   Q.   Okay.  The one thing we can look at is -- is a

20   car tire, and car tires I think run around 32

21   pounds per square inch?

22   A.   Right.

23   Q.   And I wonder if you'd would agree with this,

24   that to try to think of something that has between

25   one and two pounds per square inch, would you agree

1    with me that that would be the same as a -- like a

2    balloon?  Like the air coming out of a balloon

3    would be one or two pounds per square inch?

4    A.   That's a pressure, and you're trying to compare

5    it to a volume.  And ultimately, that's what you

6    want to get to, is how much was released.  And

7    that's the evaluation that needs to be done.  And

8    that requires time and -- and -- and a way to get

9    to volume to find out a quantity.

10   Q.   But if the -- if the pressure is lower, the

11   amount that's going to be released over whatever

12   period of time it is, is less, right?

13   A.   Right.  Higher pressure, more volume most

14   likely.

15   Q.   Sure.  Sure.  And I'm just trying to -- to --

16   to help the jury, if I can -- and maybe you can't

17   help us with this -- understand what would be

18   something they might be familiar with that would

19   have one or two -- a pressure of one or two pounds

20   per square inch.  And I gave the example of a

21   balloon.  Maybe that's a -- you don't know?

22   A.   Right.  Right.  I don't know what the pressure

23   is in a -- in a balloon, but you -- this is a

24   release and then -- and you have to consider the

25   area, which I believe we said was a four-inch pipe.

1    And you have -- you have to calculate this pressure

2    into flow to estimate the emissions.  So there's

3    some evaluation that needs to be done.  I can't do

4    it for you here.

5    Q.  And as far as coming up with an example for the

6    jury of something they might be familiar with that

7    has one or two pounds per square inch, as you sit

8    here now, you don't know what it would be?

9    A.  It's very low pressure.  That's very low

10   pressure.

11   Q.  All right.  But you can't give them an example

12   in everyday life?

13   A.  I can't think of anything that's measured at

14   one or two pounds per square inch.  That's very

15   low.

16   Q.  Okay.  Thank you.  Now, you provided testimony

17   yesterday, Mr. Carlacci, near the end of your

18   direct about going to Tonawanda Coke on

19   May 28th of 2008.  Do you recall that?

20   A.  Yes.

21   Q.  You indicated, I think in response to

22   Mr. Linsin's questions, that before you went out

23   there, one of the things you had looked at was this

24   July 2003 emissions study --

25   A.  Correct.

1    Q.   -- correct?

2         And had noticed in there that there was a

3    reference to a pressure relief valve, true?

4    A.   True.

5    Q.   Okay.  And do we agree that by the reference in

6    the emission study you at least knew this pressure

7    relief valve was in the by-products area?

8    A.   Yes.

9    Q.   All right.  And in going out there, the area

10   you were focusing on was the by-products area?

11   A.   I was focusing on sharing information with the

12   plant manager on the study that we had, and then

13   getting an idea and just a discussion as to what

14   major sources of emissions could be in the

15   by-products area.

16   Q.   Okay.  The area you wanted to look at when you

17   went out there was by-products?

18   A.   And -- and we didn't look at the whole

19   by-products area.

20   Q.   I'm not asking what you did.

21   A.   Okay. okay.

22   Q.   I'm asking what --

23   A.   Yes, that was where we wanted to go.

24   Q.   And before you went out there, did you -- well,

25   again, you went out there with Mr. Sitzman,

1    Mr. Foersch, and Ms. Webster?

2    A.   Correct.

3    Q.   And just so the jury understands, you've talked

4    about engineers and inspectors -- or engineers and

5    technicians, right?

6    A.   Correct.

7    Q.   And when you went out there -- Mr. Sitzman was

8    an engineer.  He would have been an Engineer 2?

9    A.   He was the RAPCE.

10   Q.   What you are now?

11   A.   Correct.

12   Q.   Okay.  And so he was an engineer?

13   A.   Engineer 3, yes.

14   Q.   Engineer 3.  Are you an Engineer 3 now?

15   A.   I'm an Engineer 3 now.

16   Q.   And -- and Ms. Webster, she's an Engineer 2?

17   A.   Engineer 2.

18   Q.   Was she that back in May of 2008?

19   A.   Yes.

20   Q.   All right.  And Mr. Foersch, would he -- was he

21   a technician?

22   A.   Technician.

23   Q.   Okay.  So you had three engineers and one

24   technician going out there --

25   A.   Yes.

1    Q.   -- right?

2         Before you went out, did you discuss with

3    either Mr. Sitzman, Mr. Foersch, or Ms. Webster,

4    the existence of this PRV that you had seen in the

5    emission study?

6    A.   You know, that -- that was a low emission on

7    that table.  As you could see, it was .008 tons.

8    Q.   I didn't ask you --

9    A.   So that wasn't my focus.

10   Q.   Okay.  I didn't ask you if it was a low

11   emission.  Did you talk to one or more of the three

12   of these people about that PRV before you went out

13   there?

14   A.   I can't recall.  I don't recall if I brought

15   that specific subject up.

16   Q.   All right.  So when you say you don't recall,

17   you may have, you're not sure?

18   A.   Right.

19   Q.   When you headed out there, can we agree it was

20   about 9:00 o'clock in the morning?  Do you remember

21   that?

22   A.   Yeah, it was in the morning.

23   Q.   Okay.  And can we agree that you left there at

24   about 11:30 in the morning?

25   A.   Yes.

625

1    Q.  So you were there about two and a half hours?

2    A.  Okay, yes.

3    Q.  Does that sound right?

4    A.  Yes.

5    Q.  All right.  And you started out by having a

6    meeting, I think you've indicated, with

7    Mr. Kamholz?

8    A.  Yes.

9    Q.  Where did that meeting take place?

10   A.  In the -- in his -- in the conference room in

11   the office building.

12   Q.  On the -- on the first floor?

13   A.  Yes.

14   Q.  Was it just the five of you?

15   A.  Yes.  And there was -- I think one of his

16   assistants may be -- may have come in to help with

17   records or at one time there was another individual

18   I seen, but I don't -- he wasn't part of the

19   meeting.

20   Q.  You don't remember that person's name?

21   A.  No.

22   Q.  All right.  Now, before May 28th of 2008, had

23   you met Mark Kamholz?

24   A.  Yes.

25   Q.  And in what context?

626

1    A.   I met him at smoke school.  And, you know, as I

2    sit here now for two and a half days, I think I

3    believe I may have seen him at some of the air and

4    waste management meetings in the early '80s.

5    Q.   So based on these -- these contacts you've had

6    with -- with Mr. Kamholz, from a -- from a

7    standpoint of his personality or disposition, going

8    into that meeting, did you have some -- some idea

9    of the kind of person he was from a personality

10   standpoint?

11   A.   You know, I didn't know him well, but I was --

12   I would -- you know, I always assume everybody's

13   got a -- you know, is a good person and has a

14   decent personality.

15   Q.   Okay.  I'm not -- I don't want to know, and

16   none of us want to know what you assume.  But let

17   me be a little more specific.  You'd agree that

18   there's those among us who are more outgoing and

19   there's those among us who are less outgoing,

20   right?

21   A.   Yes.

22   Q.   And would you agree that Mark Kamholz is -- is

23   more on the mellow side as opposed to being a

24   gregarious person?

25   A.   Yes.

1    Q.   That's his personality, right?

2    A.   That's his personality?

3    Q.   He's got a reserved personality?

4    A.   Yes.

5    Q.   Thank you.  And your purpose in going out there

6    was to -- was it to pursue the -- the benzene study

7    and the sources of -- potentially the sources of

8    the benzene emissions you were seeing on the study?

9    A.   It was to share that information to see if we

10   could brainstorm and see if we could find -- you

11   know, see if there's an issue there and -- and see

12   if we can resolve it.  But really to share the

13   information to show him that we're -- what we're --

14   what we're -- what we're monitoring, what the

15   levels are, and share that concern.

16   Q.   Sure.  Sure.  But it dealt with -- it dealt

17   with the benzene study --

18   A.   Yes.

19   Q.   -- right?

20        And before going out there, was it -- did you

21   know whether or not Mr. Kamholz knew about this

22   study?

23   A.   Yes, he did.

24   Q.   He already knew about it, right?

25   A.   Yeah.

1    Q.   And do you know how long he had known about it?

2    A.   I can't say how long he knew about it.

3    Q.   Was it brought to your attention before you

4    went out to this meeting on May 28th of 2008, that

5    there had been a prior meeting with Mr. Kamholz

6    about this study on August 23rd of 2007?

7    A.   Was it with me?

8    Q.   No.

9    A.   Okay.  I don't recall that meeting.

10   Q.   Did Mr. Sitzman or Ms. Webster or Mr. Foersch

11   bring to your attention that there had been a prior

12   meeting?

13   A.   No.

14   Q.   When you went to the meeting, was it your

15   impression this was the -- the first time there was

16   to be -- was to have been a meeting with

17   Mr. Kamholz then about this study?

18   A.   I didn't have -- I didn't form an impression to

19   say it was the first time.  I was just going to

20   share this information.  You know, that this is the

21   data we collected for seven months, and that --

22   that was my -- the scope.

23   Q.   Okay.  Now, do you remember that during the

24   course of the meeting that Mr. Sitzman informed

25   Mr. Kamholz that continuous monitoring of benzene

1    levels was already in place?

2    A.   In -- in the study, you're saying?

3    Q.   Yes.  Do you remember him being told that

4    during the meeting?

5    A.   No.

6    Q.   And do you remember Mr. Kamholz being told by

7    Mr. Sitzman that if there was -- was any kind of

8    a -- a spike in a reading, that Buffalo DEC would

9    find out and some action would be taken?  Do you

10   remember that being discussed?

11   A.   You know, I don't directly recall that.

12   Q.   You have testified that at some point during

13   your visit you smelled coke oven gas.

14   A.   Yes.

15   Q.   And would that have been when you got to the

16   by-products area?

17   A.   Yes.

18   Q.   And if -- if the jury recalls, we'd had an

19   overhead photograph up yesterday that showed that

20   you first went to the office and then you had to

21   drive in either a truck or van from the office over

22   to the area of by-products.

23   A.   Correct.

24   Q.   Do you recall that?

25        Now, that we agree that you spent two and a

1    half hours there, does that help you recall any

2    better than you were able to yesterday how long you

3    actually spent at the by-products area?

4    A.  You know, it wasn't very long at the

5    by-products area.  I'm still going to say a half

6    hour.

7    Q.  Okay.

8    A.  Somewhere in there.

9    Q.  Somewhere around a half an hour.  And this

10   probably goes without saying, but -- but can we

11   agree during the half hour that you were there on

12   May 28th, 2008, that that PRV did not release?

13   A.  I can't say that.

14   Q.  Did you hear -- hear anything release while you

15   were there?

16   A.  There is a lot of noises when you're there.

17   There is a lot of odors.  There is steam leaks.

18   There's -- there is a lot of activity going on.

19   And I can't say what was going on with the PRV

20   valve.

21   Q.  So you don't know whether it did or didn't go

22   off?

23   A.  Correct.

24   Q.  Okay.  And when you say that the by-products is

25   a -- a normal -- or normal -- a noisy area, are you

1    talking about when you're standing outside it's

2    noisy?

3    A.   The by-products plant is an outside facility.

4    Q.   Right.   Right.   But if you're standing, for

5    example, on Broadway --

6    A.   Yeah.

7    Q.   -- does the noise from -- from by-products

8    interfere, for example, with a conversation?

9    A.   You can have a conversation with an individual

10   standing right next to you, you know.   Maybe

11   three -- three or four people couldn't hear the

12   same thing unless you're speaking up.   It's is not

13   noisy, but it's -- it's an interesting place.   So

14   your -- your eyes are always moving.   And unless

15   you're paying attention, you might not hear -- you

16   know, hear everything in the conversation.   You got

17   to be in a group.

18   Q.   All right.   And -- and as far as what

19   contributes to that noise level, you talked about

20   steam?

21   A.   Steam.

22   Q.   And what about steam?

23   A.   Steam leaks from pipes making noises.   The

24   railcar has a bell to inform you that -- you know,

25   the pusher car or the larry car, or any one of

1    those things on rails makes a noise when it moves.

2    So you're kind of trying to pay attention to where

3    you are.

4    Q.  Okay.  We've got to separate that out because

5    the railcar or the larry car is not by-products.

6    A.  It's -- it's on one side of it but further down

7    from where we are.

8    Q.  So the -- so the jury can -- and we could put

9    the picture up if we need to.

10    Why don't we put up, if we could, please,

11    Government Exhibit 105.42.

12        MR. PERSONIUS:  I have that, Judge, in

13    evidence.

14    BY MR. PERSONIUS:

15    Q.  Do you remember at the start of your testimony,

16    I believe on Wednesday, that you were shown this --

17    A.  Yes.

18    Q.  -- photograph?

19    A.  Yes.

20    Q.  I'm sorry for pausing like that.  This is

21    Government Exhibit 105.42.

22        THE COURT:  Okay.  Hold on just for a

23    second.

24    Do you have it in?

25        THE CLERK:  Yes, it's in.

1        THE COURT:  Okay.  Thank you.  Proceed.

2        MR. PERSONIUS:  I don't want to do that

3    twice in a day, Judge.

4        THE COURT:  Okay.

5    BY MR. PERSONIUS:

6    Q.  I'm going to try to see if we can blow up that

7    part of it, please.  That's very good.  Thank you.

8    Thank you.

9        Can you -- using your finger, Mr. Carlacci, tap

10   your finger in the by-products area so the jury can

11   orient itself -- or themselves.

12       All right.  And -- and the area where you've

13   tapped, you see there's a lot of red.  Can you see

14   the color red?

15   A.  Yes.

16   Q.  And -- and is that the -- the piping in the

17   by-products area?

18   A.  That's some of the piping in the by-products

19   area.

20   Q.  Now, you've -- you've mentioned that one of the

21   sounds you hear in that area is coming from -- from

22   steam that's being released?

23   A.  Steam leaks, right.

24   Q.  Okay.  And steam leaks -- are there also steam

25   vents in that area?

1    A.   Yeah, I believe there is.

2    Q.   And they go off from time to time --

3    A.   Yeah.

4    Q.   -- in the by-products area?

5    A.   Yeah.

6    Q.   And then in addition to that, what you

7    mentioned contributes to the noise level is the

8    larry car?

9    A.   Right.

10   Q.   Now, can you show the jury with your second tap

11   where that larry car would be located, please?

12   A.   Well, there's -- maybe I got the terms wrong,

13   but there's the car that collects the coal -- coke

14   on this side, and on -- on this side is the -- is

15   the -- the ram that pushes the coke out.

16   Q.   Okay.  So you're getting noise in by-products

17   not just from by-products, but the operation across

18   the roadway over the battery?

19   A.   You're paying attention to things that are at a

20   distance because they're large.  There's -- there's

21   some noise here.

22   Q.   Hold on.  Where -- where did you hit that time?

23   A.   Over by the --

24   Q.   Maybe do a --

25   A.   -- ammonia scrubber.  Right here.

1    Q.   There is noise that comes from over at that end

2    too?

3    A.   Yeah, some.  Not a lot of noise.  I mean,

4    it's -- it's activity and some noise that makes you

5    look.

6    Q.   Now, in addition to the steam that's being

7    released in the by-products area, is there -- are

8    there other activities going on there that -- that

9    contribute to the noise level?

10   A.   There's traffic.  On occasion there might be

11   someone going by in a golf cart, moving people

12   around in a truck.  On the other side could be

13   front end loaders.  On this side you have some

14   trucks.

15   Q.   Okay.  Where you just said "on this side" you

16   just put a line down -- down close to the bottom of

17   the photograph on the left?

18   A.   Right.

19   Q.   Is -- is there other activity going on in the

20   by-products area that makes noise also, other than

21   just steam?

22   A.   I can't think of anything right now.

23   There's -- you know, there's -- yeah, I can't think

24   of anything right now.

25   Q.   It was when you were in the by-products area

1    that you remember detecting the smell of coke oven

2    gas?

3    A.  Yes.

4    Q.  Was that noteworthy to you?

5    A.  I thought it was noteworthy.

6    Q.  And did you make a note of it?

7    A.  No.

8    Q.  So it wasn't that noteworthy.

9    A.  I didn't write it down.

10   Q.  Okay.  Was -- did you take some notes during

11   this period of time you were out there?

12   A.  Yeah.  The one chart that I showed him on the

13   back I wrote -- I asked information about the light

14   oil throughput, had that data down.  I think it was

15   the only notation.

16   Q.  Could we please -- we're going to have to take

17   this down.  This will be for identification only,

18   it's Government Exhibit 3506.08.  For

19   identification, please.  Thank you.

20       And this is just for identification,

21   Mr. Carlacci, so we have to be a little careful.

22   Do you recognize what this -- this is a

23   multiple-page exhibit, but you already recognize

24   what this is?

25   A.  Yes.

1    Q.   Okay.  Could we go to Government

2    Exhibit 3506.08-0008.

3         We have that page on the screen right now.  And

4    are you having trouble reading it, Mr. Carlacci?

5    A.   Nope.  I got it.

6    Q.   All right.  And -- and is what's on this page

7    familiar to you?

8    A.   Yes.

9    Q.   Okay.  And is what's on this page the sum

10   totals of the notes you took when you were out at

11   Tonawanda Coke on May 28th of 2008?

12   A.   Yes.

13             MR. PERSONIUS:  Your Honor, I offer it.

14             THE COURT:  Mr. Mango?

15             MR. MANGO:  Your Honor, if he's offering

16   this, I'd ask that the whole package be admitted.

17   This is not separately exhibited.  This is on the

18   back of the document he brought with him to the

19   Tonawanda Coke Corporation.

20             THE COURT:  No, I don't think that falls

21   into the completeness doctrine because this is the

22   complete note set, according to testimony.  So I'm

23   going to permit it on that basis.

24             MR. MANGO:  Your Honor, I wonder what

25   basis it's actually being admitted as though.  He's

1   not saying that this is inconsistent or there's

2   some inconsistent statement being made.  He's

3   testifying here.  I don't understand why the notes

4   are being admitted.

5           THE COURT:  Well, we can find out, but

6   it's a record that he prepared that day, or in

7   close proximity.

8           MR. PERSONIUS:  Right.  And did you -- did

9   you make these notes in the course of performing

10  your duties as an engineer with the DEC?

11          THE WITNESS:  Yes.

12          THE COURT:  I'll permit it.

13          MR. PERSONIUS:  I think that's enough,

14  Judge.

15          THE COURT:  Now, we've got to figure out

16  if we can see this.

17          MR. PERSONIUS:  Is it in it now, Judge?

18          THE COURT:  Yeah.  This will have to be

19  3506.0008.

20          MR. PERSONIUS:  Point?

21          THE COURT:  0008.  If we could -- so I

22  don't have to turn upside-down please.

23      If it wasn't Friday, I'd take all those

24  compliments that I gave you earlier in the week

25  away.  All right.  Okay.  You have it,

639

1     Ms. Labuzzetta?

2         Okay.  All right.  So that will be received.

3             THE CLERK:  Doesn't match what it's

4     identified as.

5             MR. PERSONIUS:  And I'm going to have to

6     ask you again what the new number is, because I

7     think I missed it, Judge.  Is it 3506.008.

8             THE COURT:  No.  It's 3506.08-0008.

9             MR. PERSONIUS:  That's what we'll call it

10    then?

11            THE COURT:  Yes.

12            MR. PERSONIUS:  Thank you.

13            (Government's Exhibit 3506.08-0008 was

14            received into evidence.)

15            THE COURT:  Thank you.

16        Proceed.

17            MR. PERSONIUS:  If -- when we're ready, if

18    we could have it published.

19            THE COURT:  Yes, and then --

20    BY MR. PERSONIUS

21    Q.  Okay.  And can we start with what's on the top,

22    please?  Make that as big as you can.  Get rid of

23    that.  Thank you.

24        Okay.  What we have on the screen now,

25    Mr. Carlacci, is the top half of your notes.

1    There's items -- it says the date at the top,

2    5/28/08, correct?

3    A.   Yes.

4    Q.   And then it has a one and below it has a two?

5    A.   Correct.

6    Q.   Would you please read your first entry to the

7    jury?

8    A.   "Ammonia stripper of liquor out 80-foot stack,

9    17 PPM benzene, NH3, 3.5 grams per liter going in.

10   750,000 pounds per year, looking at controls."

11   Q.   And without getting into the detail of what

12   this information means, does it all have to do with

13   the ammonia stripper?

14   A.   Yes.

15   Q.   All right.  And then your second entry, would

16   you read that for the jury, please.

17   A.   "Light oil still, wash oil, high boil,

18   petroleum paraffinic, sprayed coke oven gas tower,

19   absorbers.  Light oil, benzene to still, steam

20   strip to condensers, to storage, decanter, water

21   oil separation."

22   Q.   Am I correct in understanding that paragraph

23   number 2, the subject matter has to do with the

24   light oil still?

25   A.   Yes.

1    Q.  All right.  Now, the information that's in --

2    in -- let's start with paragraph number 2, the

3    light oil still, where did you get that information

4    from or how?

5    A.  I think this is stuff I wrote down before I

6    went to the inspection and --

7    Q.  So that's not even information from the -- you

8    just referred to as an inspection.  Was that a

9    slip?

10   A.  Yeah.  It's not an inspection.  It was

11   information I wrote down before I went to this

12   meeting.

13   Q.  Okay.  Is that true for one and two?

14   A.  Yes.

15   Q.  All right.  So that doesn't count as anything

16   you wrote down when you were out there?

17   A.  Right.

18   Q.  Can we go back to the first page, please.

19       And the sum total of what else we have for your

20   note would be that bottom portion, right?

21   A.  Correct.

22   Q.  And we're going to put that up there now.  And

23   maybe for an initial question:  Did you make these

24   notes while you were out there?

25   A.  I believe these were made there.

1    Q.   Okay.  Would you read those for the jury,

2    please?

3    A.   "Boiler stack, 230 feet.  Coke stack, 240 feet.

4    AC still 80-foot high.  4,000 gallons per week.

5    One truck per week.  Light oil benzene 30,000

6    gallon storage tanks.  Atmospheric."

7    Q.   What you've just read that's up on the screen

8    right now then is the sum total of the notes you

9    took during this meeting?

10   A.   Yes.

11   Q.   On May 28th, 2008?

12   A.   Correct.

13   Q.   The -- the source of the information in these

14   notes would have been Mr. Kamholz?

15   A.   On the bottom here, yes.

16   Q.   Okay.  What was above was not written down by

17   you at the meeting, so we understand, that was

18   before?

19   A.   Right.

20   Q.   Okay.  Now, you've told us about the smelling

21   of the coke oven gas and you made no notation of

22   that?

23   A.   No.

24   Q.   And you told us a number of other things about

25   this meeting, would you agree, that are not noted

1    in this exhibit?

2    A.   Correct.

3    Q.   And before we -- we -- well, something else

4    that -- let's -- let's go through it.  One of the

5    things I think you told us yesterday that you

6    remember from the meeting is that the condition of

7    the equipment was very, very poor?

8    A.   It appeared to me to be, yes.

9    Q.   And you told us about there were leaks in

10   flanges and valves, right?

11   A.   Staining in those areas.

12   Q.   Okay.  Rust?

13   A.   Rust-ish, brownish areas that could be leaks.

14   Q.   Okay.  Something that would be important for --

15   for an air inspector to -- to know about?

16   A.   Things that we would -- we should talk about.

17   Q.   Especially when you're out there because it's

18   part of doing a -- an emission study, right?

19   A.   Things that I wanted to talk about with Mark

20   Kamholz, right.

21   Q.   Well, you would want to talk to him about it,

22   right?

23   A.   Right.

24   Q.   But you didn't make a note of it --

25   A.   I didn't make a note of it.

1    Q.   -- true?

2         You told us that Mr. Kamholz had a mask of some

3    type, right?

4    A.   Yes.

5    Q.   All right.  And -- and when did you notice that

6    Mr. Kamholz had this mask?

7    A.   When we were walking down that path.

8    Q.   Just suddenly you noticed he had it?

9    A.   He may have had it when we got out of the

10   vehicle.

11   Q.   Okay.

12   A.   It was hanging around his neck.

13   Q.   Okay.  So hanging around his neck?

14   A.   Right.

15   Q.   And the mask that he had hanging around his --

16   his neck, would you describe it for us?

17   A.    It's a half-face protective mask breathing

18   apparatus so that -- with -- with cartridges on the

19   outside, so that when you breathe air, it filters

20   through the cartridges.  When you exhale it comes

21   out a valve.

22   Q.   All right.  And -- and the type of mask, what

23   the mask was designed for, just by what you saw,

24   were you able to determine what type of a -- you

25   call -- call those things a respirator?

1    A.   Respirator.

2    Q.   It was a respirator.  Were you able to tell

3    what kind of a respirator it was for?

4    A.   Yeah, I believe it had cartridges on it with

5    carbon in it.

6    Q.   Okay.  You're saying you believe?

7    A.   Yeah.

8    Q.   Now, let me ask -- ask it to you this way:

9    There is a certain type of respirator that protects

10   you from particulates, right?

11   A.   Correct.

12   Q.   Okay.  And -- and there's an agency called the

13   Occupation and Safety and Health Administration,

14   right?

15   A.   Right.

16   Q.   And do you know that if you go into the battery

17   area of a coking plant, that it doesn't matter who

18   you are, whether you're a general laborer or

19   whether you're Mark Kamholz, you've got to wear one

20   of these respirators, right?

21           MR. MANGO:  Objection, Your Honor.  Is

22   that testimony, or is that a question?

23           THE COURT:  That's a question.

24           THE WITNESS:  Yes.

25   BY MR. PERSONIUS:

646

1    Q.   You know that?

2    A.   Yeah.

3    Q.   All right.  So if Mark Kamholz was going in the

4    battery area, he would have to wear this

5    respirator?

6    A.   Right.

7    Q.   Do you remember you were interviewed by some of

8    the agents that are conducting this criminal

9    investigation?

10   A.   Yes.

11   Q.   And do you remember telling them that you

12   thought Mark Kamholz was wearing a gas mask?

13   A.   Face mask.

14   Q.   Gas mask?

15   A.   That might be what you read, but face mask.

16   Q.   So that the report was in error when it -- when

17   it said you told these investigators that Mr.

18   Kamholz had on a gas mask?  Is that what you're

19   saying, they misunderstood you?

20   A.   What I told you is face mask.

21   Q.   That's what you told me.  Did you tell the

22   agents face mask?

23   A.   Yes.

24   Q.   And they got it wrong?

25   A.   It appears that that -- is what you're reading

1      there says gas mask.

2      Q.  You also, when you testified yesterday, talked

3      about the fact that Mr. Kamholz did not lead you

4      through this area, correct?

5      A.  Correct.

6      Q.  All right.  And I think you referred to him --

7      I think you said normally when I deal with a plant

8      manager, he takes the lead and walks me through the

9      area.  Do you remember that being your testimony?

10     A.  Right.  Right.

11     Q.  Mr. Kamholz isn't a plant manager, is he?

12     A.  He was a plant manager.

13     Q.  He was?

14     A.  At -- at different signings of these sheets, he

15     was a plant manager.

16     Q.  When was Mr. Kamholz a plant manager?

17     A.  He's -- he's the man I was dealing with on that

18     day --

19     Q.  He's the --

20     A.  -- escorting me through the plant.

21     Q.  He's the manager of environmental compliance,

22     isn't he?

23     A.  Okay.  Manager of environmental compliance.

24     Q.  Do you see a difference between a manager of

25     environmental compliance and a plant manager?

1    A.   Yes.

2    Q.   The plant manager runs the whole plant, doesn't

3    he?

4    A.   Yes.  Yes, he does.

5    Q.   Environmental manager doesn't do that, does he?

6    A.   Correct.

7    Q.   Now, in your notes that -- that we've got on

8    the screen here, this mask that you told the jury

9    about, you didn't make any note of that in there,

10   did you?

11   A.   No, sir.

12   Q.   When you testified yesterday you talked about

13   how concerned you were because you saw Mr. Kamholz

14   put this device up to his mouth in the by-products

15   area, right?

16   A.   Yes.

17   Q.   It was very important to you?

18   A.   It made me concerned.

19   Q.   All right.  You didn't put it in your notes,

20   did you?

21   A.   No.

22   Q.   You've also testified to this jury that

23   Mr. Kamholz, during this meeting, was -- was quiet.

24   And -- and I think you were suggesting that he

25   wasn't prepared to share information with you.  Is

1    that what you were trying to tell the jury?

2    A.   That -- that there wasn't, you know,

3    communication going back and forth.

4    Q.   And -- and was it your impression that he was

5    withholding information?

6    A.   I wouldn't say that.

7    Q.   Okay.  So you don't mean to suggest that to the

8    jury?

9    A.   Right.

10   Q.   Do you agree that could be a product of the

11   kind of person he is?

12   A.   It could be.

13   Q.   All right.  And are you aware of the fact that

14   Cheryl Webster, as you refer to her earlier, the

15   note taker, took three pages of notes of this

16   meeting?

17   A.   Yes.

18   Q.   Have you reviewed those notes?

19   A.   Yes.

20   Q.   And can we agree that what you've testified

21   about here in terms of leaks, conditions of

22   equipment, the mask, Mr. Kamholz's demeanor, him

23   lagging behind, none of that is in her notes, is

24   it?

25   A.   Right.

1          MR. PERSONIUS:  Can I have a minute,

2    please?

3          THE COURT:  Sure.

4          MR. PERSONIUS:  You can take that off the

5    screen.

6       Thank you, Mr. Carlacci.  Nothing else.

7          THE COURT:  Okay, Mr. Personius.  Any

8    redirect?

9          MR. MANGO:  Yes, Your Honor.

10   REDIRECT EXAMINATION BY MR. MANGO:

11   Q.  Good afternoon, Mr. Carlacci.

12   A.  Good afternoon.

13   Q.  Did Cheryl Webster see Defendant Kamholz hold

14   this respirator up to his face?

15          MR. PERSONIUS:  Object to what Cheryl

16   Webster saw, Your Honor.

17          THE COURT:  Yeah, sustained.

18   BY MR. MANGO:

19   Q.  Where were you standing in the line?

20   A.  Front.

21   Q.  In the front?

22   A.  Right.

23   Q.  Who was behind you?

24   A.  I'm going to say Cheryl and Larry.

25   Q.  And then where was Mr. Foersch?

651

1    A.   Mark -- in that group with -- probably with

2    Mark.

3    Q.   Okay.  So you were in front, Defendant Kamholz

4    was all the way in the back?

5    A.   Right.

6    Q.   And it was your testimony you turned around and

7    he had it up to his face?

8    A.   Right.

9    Q.   Was anybody else that you could see looking

10   back in your direction towards Mr. Kamholz?

11   A.   No.

12   Q.   Now, during your walk through the by-products

13   area, tell the jury if you were more concerned with

14   taking notes or if you were more concerned with

15   trying to understand the processes that you were

16   seeing happening in the by-products area?

17          MR. PERSONIUS:  Object, Your Honor.  It

18   may not have been either of those concerns.

19          THE COURT:  Well, then the witness can

20   respond accordingly.

21      Overruled.

22      Well, reput the question.

23          MR. MANGO:  Yes.

24          THE COURT:  Please.

25          MR. MANGO:  I will, Your Honor.  Thank

1    you.

2    BY MR. MANGO:

3    Q.  Mr. Carlacci, during your walk through the

4    by-products area -- your, I believe you testified

5    20- to 30-minute walk -- what was your main concern

6    during your walk -- what were you trying to learn?

7    A.  Trying to learn to identify pieces of equipment

8    and -- and understand the components of the -- of

9    the plant there.

10   Q.  All right.  Do you recall if you took any notes

11   during that walk around?

12   A.  Only the notes when we were near the light oil

13   storage tank that are on the bottom corner of that

14   page.

15   Q.  Okay.  You weren't shown those, were you, in

16   focus to discuss?

17           MR. PERSONIUS:  I -- I object to that,

18   Your Honor.  I think he's mistaken.

19           THE COURT:  I'm sorry.  He didn't what?

20           MR. PERSONIUS:  He's mistaken.  He was

21   shown those -- he was shown those notes.

22           MR. MANGO:  Well, let's -- Your Honor, I'd

23   like to pull up Exhibit 3506.08-0008, if we could.

24   And if we can focus in on this bottom portion.

25           THE CLERK:  This is the one that's in?

1         MR. MANGO:  Yes.

2      Okay.  We didn't talk about this.  You weren't

3   asked on cross-examination to explain for the jury

4   what this portion was.  If you could read it and

5   tell the jury what this is, please.

6         THE COURT:  Yeah, that was done.

7         MR. LINSIN:  Your Honor --

8         THE COURT:  I'm sorry, Mr. Linsin.

9         MR. LINSIN:  I apologize, Your Honor.  My

10  recollection was that the witness read these

11  notes --

12        THE COURT:  He did.

13        MR. LINSIN:  -- during cross.

14        THE COURT:  He did.

15        MR. MANGO:  My apologies, then, Your

16  Honor.  I missed that.  I thought he only read in

17  focus from the top portion.

18        THE COURT:  No.  No, he read right away

19  the entire portion through atmospheric.

20        MR. MANGO:  Thank you, Your Honor.  I'll

21  withdraw that question then.

22        THE COURT:  Okay.

23        MR. MANGO:  I'll move on.

24  BY MR. MANGO:

25  Q.  You testified that there was not much

1    information going back and forth between yourself

2    and Defendant Kamholz during this walk around.

3    A.   Yes.

4    Q.   Okay.  You were asked specifically on

5    cross-examination did you try to talk to Defendant

6    Kamholz about your concerns at the plant that you

7    were seeing, especially this coke oven gas.

8    A.   Yes.

9    Q.   Okay.  And so you did try to talk to him about

10   these items?

11   A.   Yes, I did.

12   Q.   What was your [sic] response when you brought

13   this up with him?

14        MR. PERSONIUS:  Object, Your Honor, to

15   what this witness's response was.  I think maybe he

16   means what Mr. Kamholz's response was.

17        MR. MANGO:  That was the question, Your

18   Honor.

19   BY MR. MANGO:

20   Q.   What was Defendant Kamholz's response when you

21   brought this up?

22   A.   My main -- my main question was, you know,

23   would you consider or have you done some monitoring

24   for leaks on this positive side of the plant, and I

25   believe the answer was no.  And I didn't sense any

1    interest in doing so.

2    Q.  Now, on cross-examination you were asked about

3    OSHA standards and the use of a respirator for

4    particulate matter near the battery.

5    A.  Right.

6    Q.  Did you go near the battery --

7    A.  No.

8    Q.  -- during this walk-through?

9    A.  No.

10   Q.  Okay.  And Mr. Kamholz was with you in the

11   conference room prior to going to the by-products

12   area?

13   A.  Yes.

14   Q.  He didn't break off at any time and go over to

15   the battery?

16           MR. PERSONIUS:  Your Honor, I object to

17   the leading.

18           THE COURT:  Yeah, it is leading.

19   Sustained.

20   BY MR. MANGO:

21   Q.  During your -- during your walk-through, you

22   started -- you started in the conference room?  Let

23   me just start there.  Is that fair to say?

24   A.  Right.

25   Q.  Okay.  And where did you go after that?

1    A.   We drove over to the parking area at the foot

2    of the by-products area, foot of Broadway there.

3    Q.   Was Mr. Kamholz with you during that time?

4    A.   I believe we drove in one of the company vans.

5    Q.   Did mr. Kamholz leave your group at any time

6    during your presence there?

7    A.   I do not think he did.

8    Q.   Now, you've -- you've raised -- I'm sorry.  Let

9    me ask it this way.

10       Did you have a chance to review an

11   inspection -- an interview report that the EPA

12   prepared of you during -- during your preparation

13   session?

14   A.   Yes.

15   Q.   Okay.  Did you notice any errors in that

16   interview report that you raised to the special

17   agent?

18   A.   Yeah.  I did raise one -- one error.

19   Q.   Okay.  And what -- what other error?

20            MR. PERSONIUS:  Your Honor, I don't know

21   where this is going, but I object to it.

22            THE COURT:  Well, I don't know where it's

23   going either, but he said one error and you're

24   asking him about another error.  He said --

25            MR. MANGO:  There was on

1   cross-examination --

2          THE COURT:  No.

3          MR. MANGO:  I'll rephrase, your Honor.

4          THE COURT:  Okay.  And what does this

5   relate to in terms of the cross-examination because

6   that's what your redirect is limited to?

7          MR. MANGO:  The -- the inference that

8   somehow because Mr. Carlacci did not write in his

9   report that there was a respirator, and yet he told

10  the EPA there was a gas mask or what ended up in

11  the EPA report said gas mask, that somehow his

12  recollection is clouded on this.

13         THE COURT:  Okay.  I'll allow you to

14  continue, but if you can't do it the right way,

15  we'll discontinue.

16         MR. LINSIN:  Your Honor?

17         THE COURT:  Mr. Linsin, yes.

18         MR. LINSIN:  Excuse me, Your Honor.  Just

19  for the sake of clarity, could we have a date of

20  the interview report Mr. Mango is referencing with

21  this testimony?  There are different interview

22  reports.

23         THE COURT:  Okay.  Fair enough.

24         MR. MANGO:  Your Honor, if I could

25  actually just pull up for identification purposes

1    Government Exhibit 3506.07.

2    BY MR. MANGO:

3    Q.   Mr. Carlacci, do you see this report on the

4    screen?

5    A.   Yes, I do.

6    Q.   And it's activity date dated February 29th of

7    2012?

8    A.   Yes.

9    Q.   All right.  And down in this portion here that

10   I'm going to circle it says gas mask in the report,

11   is that right?

12   A.   Yes.

13   Q.   Is that an error?

14   A.   That's an error.

15   Q.   Did you use the term "gas mask"?

16   A.   No.

17   Q.   Okay.  Subsequently you've -- have you

18   identified another error in this report that I'm

19   showing you that you raised to the special agents'

20   attention?

21   A.   Yes.

22   Q.   Okay.  What was that other error?

23            MR. PERSONIUS:  Your Honor, I object to

24   getting into what the other error is.

25            THE COURT:  Well, if it relates to the

1      cross-examination, I'll permit it.

2          Does it?

3              MR. MANGO:  I think we've made the point,

4      Your Honor, actually.  I don't want to get bogged

5      down in this.  I'm going to move on.

6              THE COURT:  Okay.

7      BY MR. MANGO:

8      Q.  Now you testified about plant manager versus

9      manager of environmental control.

10     A.  Yes.

11     Q.  In this setting that you went out on

12     May 28th of 2008, did you have a distinction in

13     your mind between plant manager versus manager of

14     environmental control when you used those terms

15     when you testified?

16     A.  No.

17     Q.  You also testified that you were concerned when

18     you saw Defendant Kamholz hold this mask up to his

19     face.

20     A.  Yes.

21     Q.  Why were you concerned?

22     A.  That in the course of his workday, that there

23     must be enough concern for his health here in that

24     area, that maybe a face mask is warranted.

25              MR. MANGO:  I'd like to show you

1    Defendant's Exhibit QQQ.01, please.  If we can pull

2    that up.

3              THE CLERK:  That's in evidence?

4              MR. MANGO:  Yes.

5    BY MR. MANGO:

6    Q.  Do you remember seeing this picture,

7    Mr. Carlacci?

8    A.  Yes, I do.

9    Q.  Okay.  Now, I'm going to put dots on here.  Do

10   you remember seeing any of these pipes on that coke

11   oven flow diagram that you were shown, the

12   three-dimensional image I believe came in as

13   triple -- or quadruple FFFF, Defendant's FFFF?

14   A.  No.

15   Q.  In fact, if we could, please pull up quadruple

16   F?

17              THE CLERK:  Is that in evidence?

18              MR. MANGO:  Yes.  Yes.  I'll refer to it

19   as in evidence.  Yes.

20   BY MR. MANGO:

21   Q.  Okay.  You don't see all that additional piping

22   included on here, do you?

23   A.  No.

24   Q.  In fact, on this diagram, do you know if

25   there's something called a weak liquor system in

1   place at the Tonawanda Coke facility?

2   A.   Yes.

3   Q.   Do you see the weak liquor system included on

4   here?

5   A.   No.

6   Q.   How about the wash oil system?   Is there

7   something called the wash oil system in play?

8            MR. LINSIN:   Your Honor, I'm going to

9   object.   Because I expressly represented to the

10  Court that this document -- there was a stipulation

11  this document did and was intended to represent the

12  coke oven gas line at the facility.   That is how it

13  is labeled on the bottom right-hand corner.   And to

14  somehow now suggest that there are items missing

15  from this I think is an unfair distortion of what

16  the stipulation was and what this clearly indicates

17  it represents.

18            MR. MANGO:   Your Honor, if I can respond.

19            THE COURT:   Sure.

20            MR. MANGO:   It was my understanding during

21  counsel's cross-examination they were using this

22  FFFF almost as a way to -- to examine Mr. Carlacci

23  as to what he saw and why he didn't see the

24  pressure release valve.   And I think it's

25  appropriate to talk about the number of other

1    components.

2         I'm not saying this does not represent the coke

3    oven gas line.  I'm just saying that there's

4    additional -- and I think what Mr. Carlacci is

5    saying -- there is a number of additional

6    components that are not included on this diagram.

7    And I want to say --

8              THE COURT:  Yeah, but you brought those

9    out in your examination.  So this document

10   represents what it is described to represent, so

11   I'll sustain the objection.

12   BY MR. MANGO:

13   Q.  If we could move for identification purposes to

14   Government's Exhibit 49.19.

15        Mr. Carlacci, do you see that on your screen

16   there?

17   A.  Yes, I do.

18   Q.  Okay.  What -- in general terms, what -- what

19   are you looking at?

20   A.  This looks like the roadway between the

21   by-products side of the plant and the battery side

22   of the plant.

23   Q.  Okay.  And this is the Broadway that you

24   mentioned during your direct and your

25   cross-examination?

1    A.   Yes.

2    Q.   And is this a fair and accurate depiction of

3    the -- the area that you walked known as Broadway?

4    A.   Yes.

5              MR. MANGO:  Your Honor, the government

6    would offer Exhibit 49.19 into evidence.

7              MR. LINSIN:  No objection.

8              MR. PERSONIUS:  No objection, Your Honor.

9              THE COURT:  Okay.  49.19 received.  No

10    objection.

11              (Government's Exhibit 49.19 was received

12              into evidence.)

13              MR. MANGO:  And I'd ask that it be

14    published for the jury, please.

15              THE COURT:  All right.  It may.  Please,

16    Miss DiFillipo.

17    BY MR. MANGO:

18    Q.   Okay.  So can you tell the jury, now that this

19    is on their screens, what they are looking at?  And

20    if you need to point items out, please do so.

21    A.   This is the coal handling facility.  This is

22    the waste heat stack.  Down in this area here is

23    the by-products plant.

24    Q.   Okay.  When you were walking -- let me -- I'm

25    going to clear that out.  Do you see this item

664

1   right there?

2   A.   Yes, I do.

3   Q.   What -- what is that that I put the arrow

4   against?

5   A.   I have no clue.

6   Q.   All right.  Would you -- where I put the arrow,

7   do you know if that is --

8           MR. LINSIN:  Your Honor, just so that the

9   record on that could be clear, could counsel, just

10  for the record, describe where he has placed that

11  arrow where the witness has said he has no clue.

12  Just describe and orient the record.  Thank you.

13          THE COURT:  Yes, that's a good point.

14          MR. LINSIN:  Thank you.

15          THE COURT:  Let's do that because

16  otherwise the trial record would not be

17  decipherable.

18          MR. MANGO:  Yes, Your Honor.

19      I'm looking to about the middle of the page, a

20  third of the way in from the left.  There was a

21  vertical stack going into the air to the right of

22  the -- the building in the left of the photo.

23          THE COURT:  All right.  That's about as

24  good as we can do, I think.  Pretty good job there,

25  Mr. Mango.

1           MR. MANGO:  Thank you.

2    BY MR. MANGO:

3    Q.  So that -- this -- this area here that I've now

4    put a dot on, where that vertical stack is, you see

5    there is a red pipe underneath it?

6    A.  Right.

7    Q.  Is that elevated off of the ground from

8    Broadway?

9    A.  Yes, it is.

10   Q.  Do you know approximately how high off the

11   ground that is?

12   A.  Say, 20 feet.

13   Q.  All right.  If we could pull up for

14   identification purposes Government Exhibit 49.20.

15       Do you see that on your screen, Mr. Carlacci?

16   A.  Yes, I do.

17   Q.  Okay.  Do you know what that is?

18   A.  It's some of the components that are in that

19   area of the light oil scrubber.

20   Q.  Okay.  Do you know what the tall column --

21   without saying what it is -- what the tall column

22   in the middle is?

23   A.  This one here?

24   Q.  Yes.

25   A.  From the other side, it would probably be

1    easier for me to depict it as at light oil scrubber

2    because I can see the down pipe.

3    Q.   Okay.

4    A.   This most likely is the backside of that.

5    Q.   Okay.  Have you been in the back area here in

6    looking at the light oil scrubber from the backside

7    like this?

8    A.   After -- after -- yeah, in 2011.

9    Q.   Okay.  Do you believe this picture fairly and

10   accurately depicts the backside of the light oil

11   scrubber?

12   A.   Yes.

13            MR. MANGO:  Your Honor, the government

14   would move Government's Exhibit 49.20 into

15   evidence.

16            MR. LINSIN:  No objection.

17            MR. PERSONIUS:  My -- my question, Judge,

18   is I don't know what it has to do with redirect.  I

19   don't have an objection to this picture coming in,

20   but for using it on redirect, I -- I don't know

21   where we're going.

22            THE COURT:  Well, we're going to find out.

23   I'll admit the photograph for what it appears to

24   represent.  All right.  There's no objection to

25   that.  I think the door's been opened in terms of,

1    you know, the premises and the property and the

2    structures and what everything existed at the time

3    that was observed.  But I mean, you've got to make

4    a connection from the allowed use of this photo to

5    a specific of the cross-examination.

6            MR. MANGO:  Yes, Your Honor.  May I --

7    this is admitted?

8            THE COURT:  It's admitted and it can be

9    published if you want it.

10           MR. MANGO:  Yes, please.

11           (Government's Exhibit 49.20 was received

12           into evidence.)

13           MR. MANGO:  Thank you.

14   BY MR. MANGO:

15   Q.   Now, Mr. Carlacci, so where you put the arrow,

16   that is the light oil scrubber?

17   A.   Yes.

18   Q.   Okay.  Where I just put an arrow, what is that?

19   A.   That looks like the bleeder valve that we've

20   been talking about.

21   Q.   Okay.  Now, you were asked on cross-examination

22   whether you saw the bleeder valve or not during

23   your May 28th, 2008, walk-through, is that right?

24   A.   Correct.

25   Q.   Okay.  And I just want to ask -- there is

668

1    another -- a number of other large components in

2    this area.

3              MR. PERSONIUS:  Your Honor, it's leading.

4    I object to it.

5              THE COURT:  That's not a completed

6    question.  It's starting out being leading, so give

7    that some thought.  I'm not going to rule on the

8    objection.  It's premature.

9         Reput the question.

10             MR. MANGO:  Yes, Your Honor.

11   BY MR. MANGO:

12   Q.  Looking at this picture and knowing what the

13   by-products unit looks likes at the Tonawanda Coke

14   facility, can you tell the jury why you did not see

15   the pressure release/bleeder valve on

16   May 28th of 2008?

17   A.  Because I'm looking at this large structure.

18   The pipes that are related to this immediate thing,

19   such as this -- this large one here, the rust, the

20   valves associated with any pipe going into this

21   piece of equipment, as well as I believe these

22   pieces were out of commission.  But just trying to

23   understand what all these other pipes are.

24   Q.  Okay.  All right.  You previously testified on

25   cross-examination --

1      We can bring that down, Lauren.  Thank you.

2      -- on cross-examination that an emission source

3  and an emission point can be different and can be

4  the same.  In this case, can you explain why an

5  emission source and emission point are the same

6  thing?

7  A.   In -- in this case, on the pressure relief

8  valve?

9  Q.   Relating to the pressure release --

10          THE COURT:  All right.  If you have to ask

11  that question, the question wasn't clear.  So reput

12  the question, please.

13  BY MR. MANGO:

14  Q.   During your cross-examination you testified

15  that an emission source and an emission point

16  sometimes can be different or sometimes can be

17  considered the same thing.  Do you remember

18  testifying about that?

19  A.   Yes.

20  Q.   Okay.  Now, in the case of the pressure

21  release/bleeder valve that you came to learn about

22  at the Tonawanda Coke Corporation, can you explain

23  to the jury why you consider an emission source and

24  an emission point with respect to the bleeder valve

25  the same thing?

1   A.  It's an -- it's a habit that started from

2   working -- working at DEC using the Air 100s where

3   everything we identified was by the stack.  You

4   know, that permit was relative to describing that

5   stack and the emissions coming out of that stack.

6   Title V broke it down a little bit more to say --

7   to help identify groups of sources that may have

8   individual stacks, and most do, but have the same

9   requirements in order to group conditions together.

10          MR. MANGO:  Okay.  If we could go back to

11  Defendant's Exhibit FFFF in evidence, please, Your

12  Honor.

13  BY MR. MANGO:

14  Q.  Okay.  Now, you remember testifying on

15  cross-examination about this diagram, Mr. Carlacci?

16  A.  Yes.

17  Q.  And do you see this line here, the underground

18  fuel line to the battery?

19  A.  Yes, I do.

20  Q.  All right.  Are you familiar with what a

21  reversal is in a coke oven battery?

22  A.  I don't think I can really describe it well,

23  but it has to do with changing the pressure on the

24  battery.  And I'm not quite sure how it relates to

25  the -- to the oven and the flue.

1    Q.   Okay.  Would you know how the flow of gas would

2    be affected during a coke oven reversal?

3            MR. LINSIN:  Objection.  I believe the

4    witness has just said he could not explain it.

5            THE COURT:  This is more specific.  I'm

6    going to overrule it.

7        You can answer yes or no, if you know.

8    BY MR. MANGO:

9    Q.   If you know.

10   A.   What's the question?

11   Q.   Are -- are you familiar with the flow of coke

12   oven gas during a coke oven reversal?

13   A.   During a coke oven reversal --

14           THE COURT:  Yes or no?

15           THE WITNESS:  Yes.

16   BY MR. MANGO:

17   Q.   Okay.  Can you explain what happens to the flow

18   of gas during a coke oven reversal?

19   A.   I think the battery gets pressurized.

20   Q.   Okay.  What happens to the -- to the

21   pressure -- or what happens to the gas, if you

22   know, in this line here?

23   A.   I do not know.

24   Q.   During cross-examination, you were asked about

25   pounds per square inch, centimeters of oil.  Do you

1    remember that?

2    A.   Yes.

3    Q.   Okay.  And, in fact, you talked about how you

4    would actually want to have a little bit more

5    information about volume and time to determine a

6    flow rate, is that right?

7    A.   Correct.

8    Q.   Okay.  I want to give you a hypothetical, okay?

9    If you had 145 centimeters of oil pressure with a

10   calculated flow of 7,135 pounds per hour, or

11   calculated out to 222,000 cubic feet per hour, and

12   it released every 20 minutes, for a duration of 15

13   to 30 seconds during that release, and it was not

14   in the Title V permit, would you consider that an

15   unpermitted emission source?

16   A.   Yes.

17   Q.   Would you qualify that as a trivial source, a

18   trivial activity, under 6 NYCRR, Part 201-3, as you

19   testified to, as an emergency pressure release

20   valve?

21   A.   No.

22   Q.   Why would you not classify it as an emergency

23   pressure release vent or stack?

24   A.   The way you described it to be, it's being used

25   routinely.

1              MR. MANGO:  Okay.  I'd like to go to

2      Government Exhibit 131 in evidence, Your Honor.

3              THE COURT:  Okay.  131.

4      BY MR. MANGO:

5      Q.  Do you recall seeing the HAPs study that we've

6      talked about here?

7      A.  Yes.

8      Q.  All right.  If we could go to page 4-2.  Which,

9      Lauren, would also be 24, please.

10          Okay.  And you remember seeing in the

11      by-products area here the different -- the

12      different categories that were broken out, weak

13      liquor system, tar system, light oil system, coke

14      oven gas system?

15      A.  Correct.

16      Q.  And you -- you recall seeing that pressure

17      release valve there?

18      A.  Correct.

19      Q.  Now, this document -- is it fair to say, no

20      where else in this document does it identify where

21      that pressure release valve is located at the

22      Tonawanda Coke Corporation?

23      A.  Correct.

24              THE COURT:  What do we have up here, by

25      the way?

674

1          MR. MANGO:  This is Government's Exhibit

2     131, Your Honor.  It's the July 11, 2003, letter

3     from Defendant Kamholz to DEC which included the

4     hazardous air pollution inventory done in 2003.

5          THE COURT:  Okay.  So it's not the cover

6     letter.  This is actually the attachment to that

7     cover letter, is that right?

8          MR. MANGO:  Yes.

9          THE COURT:  Okay.

10         MR. MANGO:  Yes, Your Honor.

11     Okay.  And there's nothing in this document

12     that describes what you just said where the

13     location would be, right?

14         MR. PERSONIUS:  Your Honor, two problems.

15     One, it's leading.  Two, it's been asked and

16     answered.

17         THE COURT:  Yeah.

18         MR. MANGO:  I was just setting the stage.

19     I'll move on.

20     There's no -- there's --

21         THE COURT:  Sustained.

22         MR. MANGO:  Sorry.

23  BY MR. MANGO:

24  Q.  There's no where else in this document -- or is

25     there any other discussion in this document of what

1    this pressure release actually looks like?

2    A.   No.

3    Q.   If we could go to the next page, please.   Now,

4    remember, I want you to keep this coke oven gas

5    system category in your mind, okay?

6    A.   Yes.

7    Q.   If we can go to the immediate next page, 4-3.

8    You see that coke oven gas system?

9    A.   Yes.

10   Q.   Okay.   Do you see this column here which has

11   emissions TPY?

12   A.   Tons per year, yes.

13   Q.   Okay.   That's tons per year.   And for benzene,

14   what is listed in the corner under emissions tons

15   per year?

16   A.   Correct.

17   Q.   What is -- what is listed there?   That's the

18   question.

19   A.   Zero.

20   Q.   Okay.   And when you went to the facility in

21   May 28th of 2008, you've testified your concern was

22   benzene, right?

23   A.   Yes.

24   Q.   And you reviewed this document, you said,

25   before you went there?

1    A.  Yes.

2    Q.  Why did you review this document?  What were

3    you looking for in this document?

4           MR. PERSONIUS:  Your Honor, that's a

5    compound question.  I object to it.

6           THE COURT:  Straighten that out a little

7    bit, please.

8           MR. MANGO:  Yes, Your Honor.

9  BY MR. MANGO:

10    Q.  What were you looking for in this document

11    prior to your May 28th, 2008, inspection or

12    walk-through?

13    A.  Sources of coke oven gas emissions containing

14    benzene.

15    Q.  And this, as you've -- we have here on

16    page 4.3 -- says zero, correct?

17    A.  Correct.

18    Q.  Remember that hypothetical I gave you?

19    A.  Yes.

20    Q.  With the -- the volume, the flow, the

21    centimeters of oil?

22    A.  Yep.

23    Q.  Now, assume that that is coke oven gas that is

24    being emitted from that point at that volume over

25    that time period.  Let's first say if the light oil

1   system at this coke oven facility is down, is not

2   in service, do you think that that release would

3   contain benzene?

4   A.  It would contain -- coke oven gas contains some

5   trace of benzene, whether it's raw coke oven gas or

6   processed coke oven gas.  Odds are it would have

7   more if the light oil scrubber was not operational.

8   Q.  Even if the light oil scrubber was not

9   operational, you would still expect some benzene in

10  there?

11  A.  Yes.

12  Q.  When you were in the by-products area on

13  May 28th of 2008, did Defendant Kamholz point out

14  or gesture to you, hey, that's our pressure release

15  valve?

16  A.  No.

17  Q.  Did he do that to Gary Foersch?

18          MR. PERSONIUS:  Your Honor, object to what

19  he did to Gary Foersch.

20          THE COURT:  Yeah, without foundation,

21  sustained.

22          MR. MANGO:  To you, he didn't point it

23  out, did he?

24          MR. PERSONIUS:  Your Honor, object.  It's

25  been asked and answered.

1          THE COURT:  Sustained.

2     BY MR. MANGO:

3      Q.  Are you aware of whether Defendant Kamholz

4     pointed out the pressure release/bleeder valve to

5     anybody else in your group?

6      A.  No, he did not.

7      Q.  Did he even say that there was a bleeder

8     valve/pressure release valve in the by-products

9     area when you were on Broadway?

10          MR. PERSONIUS:  Your Honor, I object

11     because the question implies he had an obligation

12     to do that.

13          THE COURT:  No, you can bring that out,

14     which you've already done.

15         You may answer.

16          THE WITNESS:  No, he did not.

17     BY MR. MANGO:

18     Q.  When Tonawanda Coke Corporation and Defendant

19     Kamholz applied for their Title V permit, was the

20     pressure release/bleeder valve identified in there?

21     A.  No.

22     Q.  When Tonawanda Coke Corporation and Defendant

23     Mark Kamholz, before being issued their Title V

24     permit, reviewed it and made comments to it, did

25     they discuss the pressure release/bleeder valve?

1    A.  No, they did not.

2    Q.  In fact, you remember them making comments

3    about a different --

4              MR. PERSONIUS:  Your Honor, I object to

5    the leading.

6              THE COURT:  Yeah, it is.

7         Sustained.

8              MR. MANGO:  Do you remember the comments

9    regarding a separate trivial activity emergency

10   pressure release vent?

11             MR. PERSONIUS:  Objection.

12             THE COURT:  I'm sorry?

13             MR. PERSONIUS:  Objection.  I'm sorry,

14   Judge.  Object, it's leading.

15             THE COURT:  Well, I mean, I'm going to

16   allow that under 611(a).

17        You may answer.

18             THE WITNESS:  Yes, I recall reference to

19   another pressure relief valve.

20   BY MR. MANGO:

21   Q.  Is it your opinion that the failure to identify

22   the pressure release valve or bleeder valve is a

23   violation of the Tonawanda Coke's Title V permit?

24   A.  Yes.  The whole purpose of Title V was to put

25   the burden of identifying the sources and

1    monitoring emissions at the facility on the plant.

2    And that -- that was his responsibility.  That was

3    the plant's responsibility.

4            MR. MANGO:  Your Honor, if we could go,

5    please, to Government Exhibit 18.18-90 already in

6    evidence.

7            THE COURT:  Okay.  How much more do you

8    have?

9            MR. MANGO:  I hope five minutes, Your

10   Honor.

11           THE COURT:  Okay.  Okay.  Because we do

12   have to take at least a short break.

13           MR. MANGO:  If you'd like to do it --

14           THE COURT:  No, you can finish up.  Give

15   me the numbers again, please.

16   BY MR. MANGO:

17   Q.  This is 18.18-90.  Condition 96 of the permit.

18   If we can focus on this section, please.

19       Okay.  You see condition 96 on your screen,

20   Mr. Carlacci?

21   A.  Yes, I do.

22   Q.  Okay.  And under item 96.2 it says, "Compliance

23   certification shall include the following

24   monitoring," is that right?

25   A.  Yes.

1    Q.   And under A, "Monitoring Description," it says,

2    "A person may not operate a wet quench tower unless

3    it is equipped with a baffle system," is that

4    right?

5    A.   Correct.

6    Q.   And that says, "The compliance certification

7    has to include that monitoring."

8    A.   Correct.

9    Q.   Okay.  Now, you testified regarding --

10       I'm sorry.  If we could go to the next page of

11   this document.  Okay.  If we could zoom in this

12   section, condition 96 -- 97.

13       Is it fair to say that the same monitoring

14   requirement for the baffles in the quench tower is

15   included in condition 97?

16   A.   Yes.

17   Q.   Under Part 201 of the New York Code of Rules

18   and Regulations and Title V, who has the burden to

19   identify unpermitted emission sources?

20   A.   It's on -- the burden is on the facility.

21   Q.   If we can go to Government Exhibit 18.11.1,

22   which is I believe in evidence.  19 -- 19.11.1 in

23   evidence.  19.11.1.

24           THE COURT:  Yeah, it's in.

25   BY MR. MANGO:

1   Q.   Okay.  Do you recall this -- this -- being

2   shown this letter, Mr. Carlacci?

3   A.   Yes, I do.

4   Q.   Okay.  And this is a letter from Defendant

5   Kamholz to the department?

6   A.   Yes.

7   Q.   In this letter is Defendant Kamholz explicitly

8   making a request to not have baffles in quench

9   tower number 2?

10   A.   There is no request in here to not have baffles

11   in the quench tower.

12   Q.   That's not in this letter, is it?

13   A.   No.

14   Q.   Okay.  If we could go to 19.12, which I also

15   believe is in evidence.

16            THE COURT:  Yes.

17   BY MR. MANGO:

18   Q.   Thank you.  Mr. Carlacci, this is the response

19   letter back from the DEC to Defendant Kamholz, is

20   that right?

21   A.   Yes.

22   Q.   And in here, is there any notation in this

23   letter that tells Defendant Kamholz that he does

24   not need baffles in his quench tower?

25   A.   There's no note in here that says they should

1    not have baffles in their quench tower.  It

2    references 214.5(a) that requires baffles being

3    maintained in a quench tower.

4    Q.  Okay.  So it actually says you do have to have

5    baffles?

6    A.  Yes.

7    Q.  Now, can we go to, please, Government

8    Exhibit 18.09.02, which I believe is in evidence.

9         Do you remember seeing this -- the part of the

10   Title V application for the emission unit U-COKEB,

11   the number 2 coke oven battery?

12   A.  Yes.

13   Q.  Okay.  And if we can scroll through these

14   pages, please.  If we could keep going.  Another

15   page.  Another page.  One more page.  Okay.  If we

16   can zoom in here, please.

17        Do you remember being asked on

18   cross-examination about these notations in here?

19   A.  Yes.

20   Q.  Okay.  And let's -- let's talk with

21   particularity to quench number 2 here.  And if you

22   follow it over, it -- it -- it has this reference

23   to 214.10(a), is that right?

24   A.  Correct.

25   Q.  Okay.  And that was -- your testimony was

1    what -- what does 214.10(a) allow a permitted

2    facility to make a request for?

3    A.   For alternative control.

4    Q.   Okay.  For an alternative control.  And one of

5    those alternative controls, you were asked, was to

6    not have baffles in a tower, is that right?  That's

7    something that someone could ask?

8    A.   It's something that someone could ask for.

9    Q.   All right.  And there is a reference then to

10   these letters of 12/29/96 and 1/6 of '97 --

11   A.   Yes.

12   Q.   -- is that right?

13        Which I just showed you?

14   A.   Yes.

15   Q.   And you testified that there is no request

16   contained in those letter -- in the 12/29/96 letter

17   and there is no authorization in the January 6, '97

18   letter for this alternative to not have baffles, is

19   that right?

20   A.   That's correct.

21             MR. MANGO:  Okay.  I would like to, at

22   this point, your Honor, pull up Government

23   Exhibit 49.15 for identification purposes.

24   BY MR. MANGO:

25   Q.   Do you see that on your screen --

1    A.   Yes.

2    Q.   -- Mr. Carlacci?

3    A.   Yes, I do.

4    Q.   Do you recognize what that is?

5    A.   That's a quench tower.

6    Q.   Do you know where that quench tower is located?

7    A.   Can't -- can't positively identify it.

8    Q.   Okay.  But it is a quench tower?

9    A.   It's a quench tower.

10            MR. MANGO:  Your Honor, the government

11   would offer Government's Exhibit 49.15 into

12   evidence.

13            MR. LINSIN:  No objection.

14            MR. PERSONIUS:  No objection, Judge.

15            THE COURT:  49.15 received.

16            (Government's Exhibit 49.15 was received

17            into evidence.)

18            MR. MANGO:  I'd ask that be published for

19   the jury, please.

20            MR. PERSONIUS:  Judge, if it's helpful,

21   I'm prepared to stipulate this is a quench tower at

22   Tonawanda Coke, if that helps.

23            MR. MANGO:  That would help.

24            THE COURT:  Okay.

25            MR. LINSIN:  As is Defendant Tonawanda

686

1    Coke, your Honor.

2         MR. MANGO:  If we could stipulate that

3    this is actually the east quench tower, just to

4    make it clear.

5         MR. LINSIN:  East quench tower.  Quench

6    tower number 2 on the right-hand side of the map.

7         MR. PERSONIUS:  I'll agree.

8         THE COURT:  Anything to add to that,

9    Mr. Personius?

10         MR. PERSONIUS:  I'm sorry, Judge?

11         THE COURT:  Anything to add to that

12    description?

13         MR. PERSONIUS:  I was afraid you were

14    going to ask me to repeat it.  No.

15         THE COURT:  No.  So stipulated all right.

16         MR. MANGO:  All right.  So --

17         THE COURT:  You know, you're more than

18    five minutes so -- I mean, I'm not going to cut you

19    off, but I just need to know.  Is this the end part

20    or --

21         MR. MANGO:  This was going to be my last

22    line of questioning and then subject to --

23         MR. PIAGGIONE:  Take a break.

24         MR. MANGO:  My senior counsel is telling

25    me we need -- we should take a brake, Your Honor.

1          THE COURT:  Okay.  How about you, ladies

2     and gentlemen?  I know you hate to break right now.

3     I know it.  You're saying don't let us break,

4     right, you want to keep on going.  You want a

5     break?

6         We'll have you back in 15, okay?  Ten after.

7              (Jury excused from the courtroom.)

8          THE COURT:  Mr. Carlacci, I guess we asked

9     everybody else how they are doing.  How are you

10    doing?

11         THE WITNESS:  All right.

12         THE COURT:  All right.  You can -- all

13    right.  You can step down.

14         THE WITNESS:  Thanks.

15         (Short recess was taken.)

16         THE COURT:  The gallery may be seated.

17    Attorneys stay risen.

18        All right.  Do you want to make an objection?

19         MR. MANGO:  No, Your Honor.  I'm ready to

20    move on.  I apologize.

21         THE COURT:  Okay.  I'm going to give you a

22    ruling anyway.  All right.  Sit down.  All right.

23        Chris, bring everybody in, please.

24        You know, I blame Mr. Piaggone on this one.

25    Not you, Mr. Mango.  But I think he's the culprit.

1           MR. MANGO:  He actually put the clamps on

2      me.  So I apologize I got wound up.

3                THE COURT:  Okay.

4                MR. PIAGGIONE:  Your Honor, if you want to

5      blame me, you still can.

6                THE COURT:  No, I'm going to apologize to

7      you, because if you put the clamps on him, I've

8      been trying to do that for two days.  Okay.

9                (Jury seated.)

10               THE COURT:  Now, this is my opinion.

11     You're starting to wilt a little bit.  It's too

12     early for that.  You've got to hang in there,

13     right?  Everybody feeling pretty good?  All right.

14     Have a seat.  We're going to get started again.

15          The attorneys and parties are back present.

16     We're back on in United States versus Tonawanda

17     Coke and Defendant Kamholz.

18          Jury's here.  Roll call waived.  Ready,

19     willing, and able to go, and waiting for you to

20     wrap this up.  Let's go, Mr. Mango.  I don't

21     know -- you have a few more questions and that's

22     it?

23               MR. MANGO:  Three areas, Your Honor.

24               THE COURT:  Okay.

25     BY MR. MANGO:

1    Q.  I'd ask that Exhibit 49.15 be published for the

2    jury, if it is not already.

3         All right.  Mr. Carlacci, do you see that

4    that's now been stipulated as the eastern quench

5    tower, quench tower number two at the Tonawanda

6    Coke Corporation?

7    A.  Yes.

8    Q.  All right.  Would you consider that a quench

9    tower or a quench station?

10   A.  You could call it either/or, in my opinion.

11   Q.  Okay.  Is there a difference under the

12   regulations, Part 214, if you call it either/or?

13   A.  No, in my opinion.

14   Q.  Let me be more specific.  With respect to the

15   baffle requirements in a wet quench tower.

16   A.  No.

17   Q.  If you call it a station, still needs baffles?

18   A.  Correct.

19   Q.  On May 28th of 2008, the fact that you didn't

20   write that Defendant Kamholz put up a respirator to

21   his mouth, does that mean it didn't happen?

22   A.  No.

23   Q.  Okay.  And if we can pull up, again, Exhibit

24   18.09.02-6 already in evidence.

25        Okay.  And, again, with reference to the

1   notations here, quench 2, do you see the reference

2   again to the '96 and '97 letters?

3   A.  Yes, I do.

4   Q.  Okay.  Based on your experience, your review of

5   other permits, upon reviewing something such as

6   this, and knowing what those letters contain, would

7   this indicate to you notice that quench tower

8   number 2 was operating without baffles?

9   A.  No.

10          MR. MANGO:  Thank you, Your Honor.

11   Nothing else.

12          THE COURT:  Okay, Mr. Mango, thank you.

13      Any recross?

14          MR. LINSIN:  Very limited, Your Honor.

15          THE COURT:  Okay.

16          MR. LINSIN:  May I proceed, Your Honor.

17          THE COURT:  Certainly.

18   RECROSS-EXAMINATION BY MR. LINSIN:

19   Q.  Good afternoon, Mr. Carlacci.  I have just a

20   couple of questions in follow-up to the redirect.

21   You testified on redirect, sir, that after

22   reviewing the initial report of interview that had

23   been completed as a result of your discussion with

24   the investigative agents from February 29th of

25   2012, that you told the agents that there was a

1    correction that needed to be made, is that correct?

2    A.   Correct.

3    Q.   And when was the subsequent meeting when you

4    met with the agents to review that report from

5    February 2012?

6    A.   When I make that correction?

7    Q.   Yes.

8    A.   I think it was last week.

9    Q.   All right.  And with whom did you meet last

10   week and tell them that this term "gas mask" was

11   incorrect?

12   A.   With DOJ Aaron Mango.

13   Q.   Were there any investigative agents present?

14   A.   Yes.  Rocky, I believe was on the phone, and

15   Bob Conway was also.

16   Q.   Thank you.  You testified on redirect regarding

17   this issue of source -- emission source and

18   emission point.  And you testified, at least as I

19   heard you say, that an emission source and emission

20   point can be the same in your judgment, is that

21   correct?

22   A.   It's just how I was -- you know, I'm used to

23   using the Air 100s, which we identified that

24   complete piece of apparatus and one an emission

25   point.  So under the new instructions, it breaks

1    things out so that you can kind of group conditions

2    or group sources or group items a little bit.

3    Q.   Let me -- let me break this into littler --

4    littler pieces here.

5    A.   Okay.

6    Q.   The -- the terms "emission point" and "emission

7    source" are defined in the regulation, right?

8    A.   In the instructions, they are, yes.

9    Q.   Well, in -- in Part 201, that contains the

10   regulations?

11   A.   Yes.

12   Q.   And the definition for an emission source

13   doesn't say, well, it's the same as an emission

14   point, does it?

15   A.   No, it doesn't say that.

16   Q.   And the definition for emission point doesn't

17   say it's the same as emission source, right?

18   A.   You're right, yes.

19   Q.   All right.  And you also said that groups of

20   sources can have the same requirements and so

21   sometimes they're grouped together, is that

22   correct?

23   A.   Right.

24   Q.   Now, that's an emissions unit, isn't it?

25   A.   That would be a -- you could go down to the

1    process level, and then the emission unit level.

2    Q.  All right.  But different definition for

3    emission -- an emission source and a different

4    definition for emission point, correct?

5    A.  Yes.

6    Q.  You reviewed the letters on direct examination,

7    you were asked on cross, and then on redirect about

8    this -- the letter from Mark Kamholz to DEC about

9    an emergency relief valve or a pressure relief

10    valve.  Do you recall those questions?

11    A.  Yes.

12    Q.  And the letter in substance, at least with

13    regard to that topic, said, well, this is an

14    emergency relief valve, it doesn't need to be --

15    it's exempted and -- and doesn't need to be in the

16    permit, correct?

17    A.  Correct.

18    Q.  And DEC's response acknowledged that

19    distinction, correct?

20    A.  Correct.

21    Q.  Now, my question about that exchange of letters

22    is:  Do you know what prompted Mr. Kamholz's letter

23    in the first place?

24    A.  Comments on -- on his Title V renewal, or if it

25    was the original the application.

1    Q.  And do you know whether there was actually a

2    visit to the site in connection with that original

3    application?

4    A.  I don't recall.

5            MR. LINSIN:  I have nothing further, Your

6    Honor.  Thank you.

7            THE COURT:  Okay, Mr. Linsin, thank you.

8        Mr. Personius?

9            MR. PERSONIUS:  Nothing further, Judge.

10           THE COURT:  Okay.  Okay.  Ladies and

11   gentlemen, Mr. Carlacci was admitted as an expert

12   regarding the Clean Air Act and Title V permit and

13   the benzene emissions that were a part of the

14   discussion here.

15       Does -- do any of you have a question that

16   you've written out that you want me to review for

17   possible asking by this expert witness?

18       Okay.  If you don't, I'm probably going to have

19   to send you home.  So do you want more time to

20   write out a question?

21       All right.  Okay.  I think we're going to

22   break.  I mean, it's been -- if it's okay with

23   everybody, it's been a long week.

24       Is there any attorney that wishes to object?

25           MR. LINSIN:  No, not on your life, Your

1    Honor.

2            THE COURT:  Whatever that's worth, right

3    now, ladies and gentlemen, we have no idea.  But

4    okay.  I mean, you've absolutely been terrific this

5    week, and we appreciate it.

6        And so you have to look forward to Monday

7    without Mr. Carlacci, okay, to be begin with.  And

8    please don't read anything this weekend.  Don't go

9    doing any social media work.  Don't get into the

10   electronics.  Don't talk about it.  Don't call each

11   other.  Don't visit any site.  Don't do any of that

12   kind of stuff, please.

13       Keep your minds as open and as available as you

14   can until all of the evidence is in in this case.

15   I think you know how serious the matter is.  The

16   more you hear, you -- you know it's important to

17   both sides.  And a lot has gone into this to get it

18   to you so that with the application of your common

19   sense and experience and intelligence you can work

20   through the fact issues and return that unanimous

21   verdict, against the backdrop of remembering that

22   the government is the only party here that has the

23   burden of proof beyond a reasonable doubt on each

24   essential element of each crime charged in the

25   indictment and each defendant must be considered

1    separately.  Both defendants are presumed innocent.

2       Okay.  Look at these faces closely.  All right.

3    Don't forget them, because they don't want to be

4    strangers to you when you come back on Monday.

5    Okay?  See you when?

6            THE JURY:  Monday.

7            THE COURT:  What time do you think?

8            THE JURY:  9:30.

9            THE COURT:  You got it.  Okay.  Thank you

10   very much.  Have a safe trip back, safe trip back

11   on Monday.

12           (Jury excused from the courtroom.)

13           THE COURT:  Mr. Carlacci, you're good to

14   go.  Thank you.

15           THE WITNESS:  Have a good weekend.

16           THE COURT:  Thank you.  You too.

17      Okay.  Is there anything that we need to

18   discuss before you beat feet out of here?

19           MR. LINSIN:  Not from Tonawanda, Your

20   Honor.

21           MR. PERSONIUS:  Judge, if we like are we

22   still able to leave things here over the weekend?

23           THE COURT:  Yeah, you can.  The courtroom

24   will be secure.

25           MR. PERSONIUS:  Thank you.

697

1              THE COURT:  Okay.  Thank you for your all

2     effort and cooperation.  We appreciate that.  We'll

3     see you at approximately 9:30 on Monday.

4              MR. MANGO:  Have a nice weekend, Your

5     Honor.

6              MR. LINSIN:  Thank you, Your Honor.

7              MR. PERSONIUS:  Thank you, Your Honor.

8              *      *      *      *      *      *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2

3              I certify that the foregoing is a

4       Correct transcription of the proceedings

5       Recorded by me in this matter.

6

7

8                          s/Michelle L. McLaughlin
                           Michelle L. McLaughlin, RPR
9                               Official Reporter
                                U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25