VOL. IV

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

             -vs-                    10-CR-219S
TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
                 Defendants.
-------------------------------------


          Proceedings held before the

     Honorable William M. Skretny, U.S.

     Courthouse, 2 Niagara Circle, Buffalo,

     New York, on March 4, 2013.


     APPEARANCES:

     AARON J. MANGO,
     Assistant United States Attorney,
     ROCKY PAIGGIONE, Senior Counsel,
     U.S. Department of Justice,
     Appearing for the United States.

     GREGORY F. LINSIN, ESQ.,
     JEANNE M. GRASSO, ESQ.,
     ARIEL S. GLASNER, ESQ.,
     Appearing for Tonawanda Coke Corporation.

     RODNEY PERSONIUS, ESQ.,
     Appearing for Mark L. Kamholz.

     Also Present:  Lauren DiFillipo, Paralegal
                      Sheila Henderson, Paralegal


     Michelle L. McLaughlin, RPR,
     Official Reporter,
     U.S.D.C. W.D.N.Y.
     (716)332-3560

1                     I N D E X

2              WITNESS                          PAGE

3       ANTHONY BROSSACK
     Direct Examination by Mr. Mango              707
4    Cross-Examination by Mr. Personius           807
     Cross-Examination by Mr. Linsin              836
5    Redirect Examination by Mr. Mango            857
     Recross-Examination by Mr. Linsin            861
6
        MARTHA ELIZABETH HAMRE
7    Direct Examination by Mr. Mango              877
     Cross-Examination by Mr. Linsin              953
8

9          GOVERNMENT EXHIBITS                   EVD.

10              49.17                            715
                115.13                           718
11              115.47                           719
                115.42                           720
12              130.15                           723
                130.01                           726
13              130.03                           727
                 49.16                           729
14              130.10                           736
                130.11                           737
15              130.12                           737
                130.05                           739
16              130.06                           740
                130.08                           741
17               49.14                           743
                115.11                           744
18              115.24                           745
                130.09                           747
19              115.23                           748
                115.42                           750
20              115.43                           752
                 3.11                            761
21               3.01                            768
                125.02                           784
22              125.03                           785
                125.04                           839
23              125.06                           841
                125.01                           842
24       117.12 and 117.13                       891
                15.03                            899
25              15.02.003                        903

1                    I N D E X

2          GOVERNMENT EXHIBITS                    EVD.

3                15.02.008                        904
                 15.02.12                         905
4                15.02.014                        906
                 15.02.015                        907
5                15.02.060                        908
                 15.02.018                        909
6                15.02.019                        910
                 15.02.020                        917
7                15.02.064                        918
                 15.02.007                        920
8                15.02.022                        921
                 15.02.026                        922
9                15.02.027                        923
                 15.02.028                        925
10               15.02.066                        928
                 15.02.101                        929
11               15.02.103                        933
                 20.01                            939
12               20.02                            941
                 20.03                            942
13        20.04 through 20.08                     943
                 70                               951

14

15         DEFENDANTS' EXHIBITS                   EVD.

16               KKKK                             845

17

18

19

20

21

22

23

24

25

1              (Jury not present in the courtroom.)

2              THE COURT:  It looks like we're relatively

3      assembled and ready to go.

4              THE CLERK:  Criminal Case 10-219S, United

5      States of America versus Tonawanda Coke and Mark

6      Kamholz.

7              THE COURT:  Okay.  Welcome back,

8      everybody.  Good morning.

9              MR. MANGO:  Morning, your Honor.

10             MR. LINSIN:  Morning, your Honor.

11             MR. PERSONIUS:  Morning, your Honor.

12             THE COURT:  Is there anything that we have

13     to take up preliminarily before I bring the jury

14     in?

15             MR. MANGO:  No, I don't think so, your

16     Honor.

17             THE COURT:  All right.  What I'd like to

18     do for tomorrow, I'd like to start -- have you come

19     in here, if you can, about 8:45 and get set up.  I

20     only have one minor calendar matter, and then we

21     can start right after that.  So it should be five

22     or ten minutes after nine.

23         We'll need, I think, to break tomorrow at 3:45.

24     So where we pick up on the front end, we're going

25     to lose on the back end tomorrow.  And I'll let the

1    jury know that that's our schedule, if that works

2    with everybody.  Okay.  That would be helpful.

3        Okay.  Good to see everybody.

4        Chris, the jury's back so --

5            COURT SECURITY OFFICER:  Yes, sir.

6            THE COURT:  -- let's get them in, and

7    let's get started.

8            (Jury seated.)

9            THE COURT:  Good morning.  Hope you had a

10   good weekend.  We couldn't wait to get you back

11   here.  So please have a seat.

12       Although, Mrs. Lambert, I understand you took a

13   little slide today as you entered the building.

14   Are you doing okay?

15           A JUROR:  Yeah, I'm okay.  Thank you.

16           THE COURT:  Okay, good.  We've got to get

17   you those high traction shoes for the rest of the

18   trial so it doesn't happen again.

19           A JUROR:  I'll call my husband at lunch

20   and tell him to bring me my flat shoes.

21           THE COURT:  Whatever it takes.  Whatever

22   it takes.

23       Okay.  As everybody knows, I think by now, the

24   attorneys and parties are back, present.  And we're

25   about ready to start the case of Tonawanda Coke

1     Corporation and Mark Kamholz, both defendants.  The

2     jury is here, roll call waived.

3         And this is actually week number 2.  And just

4     for purposes of reintroduction, we'll maybe try

5     that for two weeks or so in a row so you get to put

6     names to faces if you don't already know.  Unless

7     the individuals change their names for purpose of

8     the trial, I don't know.

9         But we have Aaron Mango and Rocky Piaggione at

10    the government's table.  And in that second table

11    we have Robert Conway, who is basically our summary

12    witness and case agent.  And Lauren DiFillipo,

13    who's been working all of the technology so far.

14    So you know those faces and those individuals.

15        And on the other side, so to speak, we have

16    Greg Linsin and Jeanne Grasso and Paul Saffrin at

17    the first table.  And Mr. Saffrin is president of

18    Tonawanda Coke Corp.  At the far table we have

19    Rodney Personius, and Mark Kamholz, the

20    defendant -- individual defendant in the case.  And

21    then at the far table, always quiet, but Ariel

22    Glasner and Sheila Henderson.  So that's, I think,

23    our full complement of individuals.  And you know,

24    of course, Michelle and Mary.  And that's our crew

25    starting out the week.  So it's good to have you

1   back.

2        And I know I speak for everybody.  And you know

3   what we're talking about, we're talking about a

4   case that's important to both sides.  And you are

5   the ones that decide those fact issues using your

6   common sense, experience, and intelligence applied

7   to what you hear and are presented with here in

8   this particular courtroom, not outside the four

9   walls.  And your job is to return a unanimous

10  verdict.

11       We have 19 counts in the indictment, and

12  they're broken down into counts that involve the

13  Clean Air Act, 15 or so of the counts, and then the

14  others relate to RCRA, that's the other

15  environmental act, and an obstruction of justice

16  count.  So that's the indictment.

17       You'll get a copy of that, but keep in mind

18  that the indictment is not evidence, nor what the

19  attorneys say or what we argue or discuss, that's

20  not evidence.  What you hear from the witnesses,

21  the documents, and the stipulations, that's the

22  evidence from which you decide, or the lack

23  thereof.  Keeping in mind that the government in

24  this case has the burden of proof beyond a

25  reasonable doubt as to each essential element of

1    the crime charged.  And both defendants are

2    presumed innocent until and if they, to your

3    satisfaction, are proven guilty beyond a reasonable

4    doubt.  So that's where we're at.

5        I think we're ready.  We all appreciate the

6    fact that you were here timely.  Tomorrow, a little

7    different schedule.  We'd like to start as close to

8    9:00 o'clock as we can.  I only have one matter at

9    9:00 o'clock, so it should be over in five minutes

10   or so.  So we should start -- if you can get here

11   by nine, that would be great.  If you can't, we'll

12   wait.  The attorneys are able to be assembled.  But

13   we will break at 3:45 tomorrow, all right?  So we

14   pick up a little time on the one end, we lose it on

15   the other end, but we should have a productive day.

16   So that's the schedule for tomorrow.  Is that okay

17   with everybody?

18       Okay.  You've been terrific so far.  Let's see

19   if we can start the case on a Monday on the right

20   foot.

21       Mr. Mango, let's see what you can do.

22            MR. MANGO:  We're ready, your Honor.

23            THE COURT:  Do you have a witness ready?

24            MR. MANGO:  Yes, your Honor.  The

25   government would call Anthony Brossack.

1          THE COURT:  Okay.  Mr. Witness, if you

2     would approach the witness stand.  Don't enter it,

3     but -- I'll tell you when to stop.  Right about

4     there.  You're going to be asked to face the jury,

5     please, so we can administer an oath to you.

6  A N T H O N Y   B R O S S A C K, having been duly

7     sworn as a witness, testified as follows:

8          THE COURT:  Okay.  Good morning.  Be

9     careful when you get in there.  Okay.  Just some

10     preliminary instructions.  The microphone is pretty

11     friendly, but don't get right on top of it like

12     that.  Speak in a conversational tone at the

13     microphone.  You're here to testify for the benefit

14     of the ladies and gentlemen of the jury.  If you

15     keep your voice up at a conversational tone,

16     everybody will hear you just fine.

17          Couple of rules that help, if you comply with

18     them.  If you don't understand a question, don't

19     answer it.  Ask the attorneys or me or whoever's

20     asking the question to repeat it.  Try to be as

21     succinct with your answer as you can.  If you can

22     answer it yes or no, try to do that.  When you

23     volunteer information, that's when things become

24     complicated.

25          If there is an objection, wait until I rule on

1    the objection, and then I'll tell you either answer

2    the question, wait for another one, or whatever

3    similar instruction might be appropriate.

4        Do you understand?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  State your full name,

7    but at the microphone, and spell your last name,

8    and then we'll know if you're going to be picked up

9    reasonably well.  You might get up a little closer

10   than that.

11             THE WITNESS:  Anthony Brossack,

12   B-R-O-S-S-A-C-K.

13             THE COURT:  Okay, Mr. Brossack.

14       Your witness, Mr. Mango.

15             MR. MANGO:  Thank you, your Honor.

16   DIRECT EXAMINATION BY MR. MANGO:

17   Q.  Good morning, Mr. Brossack.

18   A.  Good morning.

19   Q.  Are you currently employed?

20   A.  Yes, I am.

21   Q.  How -- why don't you tell the jury how you're

22   currently employed?

23   A.  At Tonawanda Coke.

24   Q.  And what position are you in at this point?

25   A.  At this point I'm helping out down front at

1    Vanocur.

2    Q.   Okay.  Can you tell the jury what Vanocur is?

3    A.   It's a refractory manufacturer.

4    Q.   Is it associated with the Tonawanda Coke

5    Corporation?

6    A.   Yes, it is.

7    Q.   Have you worked before at the Tonawanda Coke --

8    A.   Yes, I have.

9    Q.   -- facility?

10   A.   Yes.  I'm sorry.

11   Q.   What position -- what was your most recent

12   position at the Tonawanda Coke Corporation?

13   A.   Battery foreman.

14   Q.   All right.  Can you tell the jury what -- what

15   it means -- first, just what a battery is and then

16   what a battery foreman does.

17   A.   Battery is a bank of ovens.  We have 60 in our

18   battery.  A battery foreman more or less supervises

19   people, the operation of the battery, making sure

20   the ovens get pushed on time, they're charged

21   correctly, everything there is -- that your

22   settings are right, everything is going the way

23   it's supposed to go.  You're there to supervise.

24   Q.   How long have you worked for the Tonawanda Coke

25   Corporation?

1    A.   Thirty-two years.

2    Q.   And in your 32 years there, have you held any

3    other positions other than battery foreman?

4    A.   Yes, I have.

5    Q.   Okay.  If you could briefly tell the jury what

6    other types of positions you've held and the

7    approximate time periods.

8    A.   In 19 -- February of 1981 I started as a

9    security officer, and I believe it was February of

10   '88, someplace around there, I got promoted out as

11   the yard foreman, which is the railroad foreman.

12        In 1990 I went to coal handling.  I believe it

13   was a year or two after that I went to coke

14   handling.  Then in '94 I went on the battery and in

15   charge of the door environmental program for the

16   303.  And then after that, just -- I believe it

17   was 2000 -- I'm sorry.  I'm sorry.  1997 one of the

18   general foremen had a serious injury, an accident,

19   and I took over his crew as what we call a shift

20   foreman, which is general foreman.  I worked a

21   rotating shift, had my own crew, and, again, made

22   sure that the operations, the ovens pushed on time,

23   right -- right into production of it.

24             THE COURT:  If you just you move up just a

25   little bit.

1           THE WITNESS:  I'm sorry.

2           THE COURT:  What you're doing is you're

3    swirling in your chair --

4           THE WITNESS:  I'm sorry.

5           THE COURT:  -- and it detracts from the

6    microphone catching you.

7           THE WITNESS:  And then in 2003 I came off

8    the battery and went back to coal handling.  I was

9    supposed to go out at -- at the -- our Bethlehem

10   plant or our Bethlehem site to supervise dumping

11   the coal that was brought into our plant.  That

12   never came about, so I was kind of just floating.

13   So I just floated -- I went back to battery and

14   became what we call just a battery foreman.  I went

15   back helping out anything I can:  The general

16   foreman, the head heater, again, the door program.

17   Anything I can possibly do to just give them a

18   hand.

19   BY MR. MANGO:

20   Q.  Okay.

21   A.  I'm just trying to get my order here.  Yeah.

22   In 2004, I had a slight sickness and I had to take

23   some time off from work and then came back at the

24   position of just battery foreman, a day battery

25   foreman.

1    Q.   Okay.  You briefly mentioned the door and

2    environmental program.  You mentioned the numbers

3    303.

4    A.   303.

5    Q.   Just real briefly, if you could tell the jury

6    what you mean by that.

7    A.   They come in daily.  It's an -- it's a

8    third-party contractor, and they come in daily and

9    they monitor the door emissions, any door

10   emissions, any top side emissions, and in five

11   consecutive charges how many emissions are off of

12   those.

13   Q.   Top side emissions.  What do you mean when you

14   say "top side" --

15   A.   Lids and off-takes.  The off-takes are what

16   draw the gas off the battery.  The lids are where

17   you charge the battery from.  And you have to make

18   sure that's all sealed up after the battery -- or

19   after the oven is charged.

20   Q.   Okay.  So you've held a number of positions.

21   And in all of those positions, have you now come to

22   be familiar with the process of turning coal into

23   coke?

24   A.   Yes.

25   Q.   All right.  I'm going to ask you to explain

1    that process for the jury.  And if we could start

2    with -- if we could pull up Government

3    Exhibit 105.42, which is in evidence.

4        Do you see that on the screen --

5    A.  Yes, I do.

6    Q.  -- Mr. Brossack?

7    A.  Yes, I do.

8    Q.  If we could focus in there.  With that on your

9    screen -- actually, if we can focus in the whole

10   thing.

11       With that on your screen, Mr. Brossack, why

12   don't you start -- why don't you tell the jurors

13   just what's the first step in -- obviously it takes

14   coal, right?

15   A.  Right.

16   Q.  So why don't you tell the jurors how the coal

17   gets to the facility and where it's stored.

18   A.  Well, your low vol coal would be over here.

19   Q.  Would do you mean "low vol"?

20   A.  It's low volatility.  There's not just one coal

21   used to make coke.  There's a mixture of coal.

22   Q.  Okay.

23   A.  It's -- it's -- I don't really understand who

24   makes the mixes and, you know, everything involved

25   in it, but you have a certain way that you have

1    to -- to -- there's certain percentages of

2    different coals that go into the mix.  So your --

3    your -- your low vol would be on one side, your

4    high vol would be over on this side.

5    Q.   Okay.

6    A.   And every once in a while we get a mid vol,

7    which if I remember right, to my knowledge, it

8    hasn't been there in a while.  It also went on the

9    north side of seven belt, which is over here.

10   Q.   So where I've drawn a line, just above that, is

11   that what you're calling seven belt?

12   A.   That's seven belt.

13   Q.   Why don't you tell the jurors what the purpose

14   of seven belt is and --

15   A.   Right now all we use seven belt for is if we

16   get coal in the dump -- right here is the stacker.

17   And I'm trying to find the dumper here.  I'm sorry.

18        The dumper is right there.  And the coal is

19   dumped, runs through a series out through the loop,

20   and then stacked in the field.  Most of the coal

21   now comes in by truck, and that's put down here

22   farther.

23   Q.   Okay.  So the coal comes in by truck and is

24   deposited here where I drew the circle?

25   A.   Yes.

1    Q.   All right.  And at some point that coal is then

2    brought out to the field?

3    A.   That is the field.

4    Q.   Well, it's dumped.  The trucks dump it --

5    A.   Dump it -- right.

6    Q.   Okay.

7    A.   And then from there it would be -- I believe

8    that's the new system, Baby 10, where they start

9    sending the coal up to the building.

10   Q.   Okay.  Can you describe -- again, a lot of

11   these terms the jury is not familiar with.  So Baby

12   10 --

13   A.   Baby 10 is a small hopper with a belt.  It runs

14   the coal onto ten belt.  Ten belt, believe it or

15   not, runs all the way underground to about here.

16   That runs to 14.  14 runs it up onto 15.  15 runs

17   it up to the building.  Then an elevator, and then

18   it brings it up to one stationary shuttle.  And you

19   have a series of bins upstairs that you move

20   another shuttle to put the different coals in.

21   There's seven bins up there that -- you move the

22   shuttle.  Depending on what coal goes in what bin

23   is where you put that shuttle.

24   Q.   Okay.  So I think you mentioned belts 14 and

25   15.  Are those also underground?

1    A.   At the 14 -- 14, no.  15, the tail, which would

2    be the bottom of the belt, is underground, and then

3    goes up this incline right here.

4    Q.   And we'll look at another picture in a minute.

5    So, at some point the coal comes in, separated, and

6    then is brought by way of conveyors and belts to --

7    A.   To the building.

8    Q.   What's that building called?

9    A.   Coal handling.

10   Q.   Okay.  I'd like to pull up Government

11   Exhibit 049.17 for identification purposes, and

12   absent an objection, your Honor, I would move this

13   into evidence.

14            MR. LINSIN:  No objection, your Honor.

15            MR. PERSONIUS:  No objection, your Honor.

16            THE COURT:  Okay.  049.17 received.  No

17   objection.  It may be published.

18            (Government's Exhibit 49.17 was received

19            into evidence.)

20   BY MR. MANGO:

21   Q.   Mr. Brossack, do you see that picture on your

22   screen?

23   A.   Yes, I do you.

24   Q.   Okay.  So you just mentioned there is this

25   building called the coal handling building.

1   A.   Yes.

2   Q.   Where is the coal handling building on this

3   screen?

4   A.   Right here.   This is your coal handling

5   building.

6   Q.   And if you can, describe what happens in the

7   coal handling building for the jury, please.

8   A.   Your raw coal bins are up here.   They -- they

9   have hopper -- I'm sorry.   They have small feed

10   belts down on the mix table, and those are adjusted

11   to how much of that particular coal goes into the

12   mix.   Just about all of them run all at the same

13   time with different percentages.   They run off the

14   east and west feed belt into what we call the

15   pulverizer.

16       The pulverizer pulverizers the coal so it -- it

17   is still raw coal, but it's more workable.   It can

18   be mixed better.   Then it's run up number 2

19   elevator to -- I'm -- I'm trying to remember the

20   belts here.   Number 2 to 17, 17 to 18, which is --

21   this is 18 incline right here.   And these are the

22   coal bunkers, up on top of the battery where the

23   finished product goes, and the charge car comes in,

24   gets the coal, the mixed coal to charge ovens.

25   Q.   Okay.   So in the coal handling building here,

1    that is where the coal is -- is it blended together

2    there?

3    A.   Yes.

4    Q.   So different coals are mixed together?

5    A.   Yes.

6    Q.   And you mentioned a pulverizer.  The pulverizer

7    machine, is it in that building?

8    A.   Yes.

9    Q.   Is any other material added to the coal in that

10   building?

11   A.   Yes.  Bulk density oil.

12   Q.   Bulk density oil.  At some point, once the

13   mixture is ready, it goes along -- was that 18

14   belt?

15   A.   Where are you pointing?

16   Q.   This incline here?

17   A.   Yeah, that's 18.

18   Q.   Okay.  It goes on 18 belt and goes into this

19   building here.  What would you call that building?

20   A.   This one here?

21   Q.   Yes.

22   A.   That's the battery.  That's part of the

23   battery.  Right here where -- where the coal

24   bunkers are and where we get the coal, we call the

25   scale floor.

1   Q.   The scale floor.

2   A.   That's where the charge car runs in to get the

3   coal to charge the oven.

4          MR. MANGO:  If we can, your Honor, pull up

5   Government Exhibit 115.13 for identification

6   purposes, and absent an objection, move that into

7   evidence.

8          THE COURT:  It's another photo?

9          MR. MANGO:  Yes.

10         MR. LINSIN:  No objection, your Honor.

11         MR. PERSONIUS:  No objection, your Honor.

12         THE COURT:  Okay.  115.13 received.  No

13   objection.  And may be published.

14         (Government's Exhibit 115.13 was received

15         into evidence.)

16  BY MR. MANGO:

17   Q.   Mr. Brossack, can you tell the jury what we're

18   looking at now from this photograph?

19   A.   Over to the left here would be coal handling.

20   It's hard to see, but coke handling is in the

21   middle, and then the battery or the ovens are right

22   here.

23   Q.   Okay.  What is this building there?

24   A.   That's our boiler house.

25   Q.   What is this structure there?

1    A.   Hit that again.  I'm sorry.  This right here?

2    Q.   Yes.

3    A.   That's the quench station, number 2 quench

4    station.

5    Q.   Okay.

6              MR. MANGO:  Your Honor, if we can pull up

7    Government Exhibit 115.47 for identification

8    purposes, and absent an objection, move this into

9    evidence.

10             THE COURT:  Okay.  That's another photo?

11             MR. MANGO:  Yes, your Honor.

12             MR. LINSIN:  No objection, your Honor.

13             MR. PERSONIUS:  No objection, your Honor.

14             THE COURT:  Okay.  No objection.  115.47

15   received and will be published.

16             (Government's Exhibit 115.47 was received

17             into evidence.)

18             MR. MANGO:  Thank you, your Honor.

19   BY MR. MANGO:

20   Q.   Mr. Brossack, do you see that picture on your

21   screen?

22   A.   Yes, I do.

23   Q.   Okay.  Can you tell the jury what -- what this

24   exhibit depicts?

25   A.   That's the -- the tank car that holds the

1    bulk -- bulk density oil --

2    Q.  Okay.

3    A.  -- for the -- for the coal handling building.

4    Q.  So as you mentioned, the coal gets mixed,

5    pulverized, and then oil is added to it?

6    A.  Oil is added while it's mixed, before it hits

7    the pulverizer.

8    Q.  Okay.  And the oil is stored where?

9    A.  In this car right here.

10            MR. MANGO:  Your Honor, the government

11   would ask to pull up Government Exhibit 115.52 for

12   identification purposes, and absent an objection,

13   move this into evidence.

14            THE COURT:  Okay.  That's another photo?

15            MR. MANGO:  Yes.

16            MR. LINSIN:  No objection, your Honor.

17            MR. PERSONIUS:  No objection.

18            THE COURT:  Okay.  No objection.  115.52

19   received and may be published.

20            (Government's Exhibit 115.52 was received

21            into evidence.)

22            MR. MANGO:  Thank you.

23   BY MR. MANGO:

24   Q.  Mr. Brossack, what are we looking at here in

25   this photograph?

1    A.   That -- excuse me.   There is your bulk density

2    car, and there is the line that runs up to the

3    table, that mix table with the bulk density oil.

4    Q.   Okay.   When you use the term "mix table",

5    again, describe that.

6    A.   That is the table I was telling you had the

7    feed belts, the two feed belts, that run down into

8    the pulverizer.   We call that the mix table.

9    Q.   How big -- I'm thinking of a kitchen table.

10   A.   No.   Probably a little better than the length

11   of this room.

12   Q.   Okay.   And who operates that mixing table?

13   A.   One of the hourlies.   I'm not sure who operates

14   it now.

15   Q.   One person?

16   A.   One person.

17   Q.   All right.   And up in this picture here, what

18   is this thing that I just put the arrow on?

19   A.   That's 18 incline again.

20   Q.   Okay.   That's a view from the bottom of that?

21   A.   Yes.

22   Q.   Once the finished product goes over to the

23   battery?

24   A.   Yes.

25   Q.   Okay.   Describe the process by which coal, the

1    mixed and finished coal, gets actually loaded into

2    the battery or into the ovens.

3    A.   It's put into the charge car.  The charge car

4    runs out on rails.  There's boots that are dropped,

5    and there's turntables on the three hoppers.  And

6    the turntables feed the coal into the oven.

7    Q.   Okay.  So the hoppers -- let's just break that

8    down.  The hoppers are on the charge car?

9    A.   On the charge car.

10   Q.   Okay.  And there's the boots.  What are these

11   boots?

12   A.   The boots drop over the charging holes.

13   Q.   How many charging holes are there --

14   A.   Three.

15   Q.   -- for each oven?

16   A.   Three.

17   Q.   Okay.  So there's three then boots that come

18   off this charging car?

19   A.   There's three -- there's three boots that drop

20   down on -- from the -- from the charge car, and

21   then you have your jumper holes.

22   Q.   How long does it take to charge one oven?

23   A.   It would be -- it would depend on how wet or

24   dry the coal is.  We -- we've had them as low as

25   maybe six or seven minutes, and if the coal is very

1    wet and gets hung up in the charge car, it can take

2    you up to 15.

3    Q.   All right.  Does the charge car -- it holds the

4    coal that is going into the oven, is that right?

5    A.   Right.

6    Q.   Does it hold enough coal to charge multiple

7    ovens or just --

8    A.   No, just the one.  Just one oven at a time.

9           MR. MANGO:  Your Honor, the government

10   would ask to put up Government Exhibit 130.13 for

11   identification purposes, and absent an objection,

12   move that into evidence.

13          MR. LINSIN:  No objection, your Honor.

14          MR. PERSONIUS:  No objection, your Honor.

15          THE COURT:  Okay.  130.13 you said?

16          MR. MANGO:  Yes, your Honor.

17          THE COURT:  Okay.  Received.  No

18   objection.  And may be published.

19          (Government's Exhibit 130.13 was received

20          into evidence.)

21   BY MR. MANGO:

22   Q.   Mr. Brossack, can you tell the jury what we're

23   looking at here.

24   A.   That's -- this is the south side of the charge

25   car.  This is the south hopper.  And these two

1   gentlemen here appear to be putting down the jumper

2   pipe.

3   Q.   Okay.   Describe for the jury what the jumper

4   pipe is.

5   A.   The jumper pipe runs from the charging oven to

6   the sister oven in front of it, and use aspiration

7   from both ovens to draw the gas down to keep the

8   emissions down.

9   Q.   Okay.   What do you mean "aspiration"?

10  A.   Aspiration -- we put steam into the oven.   On

11  the off-takes, there's what you call a steam jet.

12  And when you -- when you turn that on, it actually

13  makes a suction to pull the gases off the oven

14  while you're charging it.

15  Q.   Okay.   Can you point to, and just put a little

16  note on the actual jumper here, if you can see it?

17  A.   That's the jumper pipe.

18  Q.   Okay.   Is it -- does it curve around there?

19  A.   It's -- yeah, it's a 180-degree L.

20  Q.   And does it -- is it fair to say it connects

21  one oven --

22  A.   To the other oven.

23  Q.   -- to the adjoining oven?

24  A.   To the one in front of it, yes.

25  Q.   Okay.   And what is this machine over there?

1    A.   That's the -- the boot I was telling you went

2    down on the charge hole.  And this is the hopper

3    here that feeds the coal through the oven.

4    Q.   Okay.  So, from looking at this photo, could

5    you tell if an oven is being charged at this point?

6    A.   It appears to me, yes, it is being charged or

7    in process of beginning charge.

8    Q.   All right.  So one of the holes here that

9    directly accesses the oven is right there?

10   A.   Down underneath there, yes.

11   Q.   Now, you've mentioned what a battery is, and it

12   consists of the ovens.  Do you have different terms

13   for the different sides of the battery?

14   A.   The different?

15   Q.   The different sides, one side versus the other.

16   A.   One side is the pusher side.  The other side is

17   the coke side.

18   Q.   Okay.  One side is the pusher side?

19   A.   Pusher side.

20         MR. MANGO:  Your Honor, the government

21   would ask to bring up Government 130.01 for

22   identification purposes, and absent an objection,

23   move that into evidence.

24         THE COURT:  Okay.  130.01.

25         MR. LINSIN:  No objection, your Honor.

1              MR. PERSONIUS:  No objection, your Honor.

2              THE COURT:  Okay.  Received.  No

3      objection.  May be published.

4              (Government's Exhibit 130.01 was received

5              into evidence.)

6      BY MR. MANGO:

7      Q.  All right.  Can you, please, tell the jury what

8      we are looking at here?

9      A.  You're looking at the pusher side of the

10     battery, and that's the pusher, that large machine

11     right here.

12     Q.  Okay.  And what -- again, tell the -- tell the

13     jury what -- what the pusher is designed to do.

14     A.  The pusher's designed to -- it takes the pusher

15     side doors off of the oven, swings them out of the

16     way.  There is a big ram on the -- on the machine

17     that actually pushes the hot coke out of the oven

18     all the way through.

19     Q.  So are the doors taken off on the other side?

20     A.  Yes.

21     Q.  We'll get to that side in a minute.  If we can

22     just -- if you could, point out some other features

23     on this photograph.  For example, what is this long

24     pipe going there?

25     A.  That's number 2 crossover.  That's what draws

1     the -- or once the gas is drawn off the battery,

2     that's what takes it over to the by-products.

3     Q.   Okay.  So that is one of the pipes that pulls

4     coke oven gas off the battery?

5     A.   Yes.

6     Q.   Look at a different picture of this.  But what

7     is that structure right there?

8     A.   That's our flare stack.

9     Q.   All right.  You mentioned on the pusher side

10    the doors get taken off?

11    A.   The one door of the oven you're going push,

12    yes.

13          MR. MANGO:  Your Honor, the government

14    would ask to pull up Government Exhibit 130.03 for

15    identification purposes, and absent any objection,

16    move that into evidence.

17          THE COURT:  130.03.

18          MR. LINSIN:  No objection, your Honor.

19          MR. PERSONIUS:  No objection, your Honor.

20          THE COURT:  Okay.  Received and may be

21    published.

22          (Government's Exhibit 130.03 was received

23          into evidence.)

24          MR. MANGO:  Thank you, your Honor.

25    BY MR. MANGO:

1    Q.   Mr. Brossack, what are we looking at here, if

2    you can tell the jury?

3    A.   These are the pusher side doors.

4    Q.   All right.  And how do these actually come off?

5    A.   There is a hydraulic jack, I suppose you'd call

6    it, on the machine that -- the extractor goes

7    around, goes in to -- there's hooks that go up

8    underneath here and here, and right here and here

9    are the door latches and they're spring loaded.

10   And the -- the hydraulics of the machine -- I'm

11   sorry.  The hydraulics of the machine push those --

12   those buttons on the latches in to take the

13   pressure off of them.  And then there's what we

14   call latch lifters that lift the latches of the

15   door up.  And then you can pull it back and move it

16   out of the way and push the oven.

17            MR. MANGO:  Your Honor, the government

18   would ask to pull up Government Exhibit 49.16 for

19   identification purposes, and absent an objection,

20   move that into evidence.

21            THE COURT:  49.16?

22            MR. MANGO:  Yes, your Honor.

23            MR. LINSIN:  No objection.

24            MR. PERSONIUS:  No objection, your Honor.

25            THE COURT:  Okay.  Received.  No

 1    objection.  It may be published.

 2              (Government's Exhibit 49.16 was received

 3              into evidence.)

 4    BY MR. MANGO:

 5    Q.  Mr. Brossack, can you tell the jury now what

 6    this photograph depicts?

 7    A.  I'm trying to see which -- this one here would

 8    probably be number 2 crossover right here.  This is

 9    the main.  Again, this is the pusher side doors.

10    There is a flare stack.  It's not a very good

11    picture.  The pusher is right here.  The coal

12    bunkers are up here.  This is the escania

13    (phonetic) house.

14              COURT REPORTER:  Do you know how do you

15    spell "escania"?

16              THE WITNESS:  I don't know, ma'am.  I have

17    to be honest with you.  I'm sorry.

18    BY MR. MANGO:

19    Q.  So, let's just focus -- that was -- what you

20    mentioned was the escania house?

21    A.  Yes.

22    Q.  Okay.  It's spelled as it sounds, I guess.  And

23    what is the escania house designed to do?

24    A.  That regulates the back pressure on the

25    battery.

1    Q.   Okay.

2    A.   There's two of them up there.   One for number 1

3    and one for number 2 crossover.

4    Q.   And -- all right.   You put a dot on the flare

5    stack here?

6    A.   Yes.

7    Q.   This item?

8    A.   Yes.

9    Q.   Okay.   Let's talk about that for a minute.

10   What is the purpose of the battery flare stack, if

11   you can tell the jury?

12   A.   If you lose the exhausters, withdraw the gas

13   off the battery, you -- the gas has no place to go.

14   So what you do is go up and open this up and the

15   gases are expelled through there, so it takes the

16   pressure off the battery so you don't have any

17   problems with -- with any lids popping or anything

18   like that.   You don't want excessive bad pressure

19   on the battery.   It's not good.   So, when you open

20   this up, it's a manual valve, right here, when you

21   open that up, it lights off the gas so you can take

22   pressure off.   It's kind of like the exhaust pipe

23   on your car, I guess would be the best way to

24   describe it.

25   Q.   How is -- how is that battery flare stack lit?

1    A.   There is a pilot light on it.

2    Q.   Okay.  How many times have you seen -- in your

3    career at Tonawanda Coke Corporation, approximately

4    how many times have you seen that battery flare

5    stack lit?

6    A.   I'd say eight or nine times, maybe more.  I'd

7    say probably eight or nine.

8    Q.   Okay.  And during those eight or nine times

9    what -- what happened to cause the battery flare

10   stack to have to be used?

11   A.   We'd lose the exhauster.

12   Q.   And how long would you lose exhausters for?

13   A.   Depending on what the problem was, it could be

14   anyplace from -- if you had a good BP operator, he

15   could probably switch you over to the other

16   exhauster within eight or nine minutes.  If you

17   lost power and couldn't get the exhausters back,

18   could be until you got power back.  I mean, an

19   hour, two hours.  It all depended.

20   Q.   Okay.  So how does the -- you mentioned a pilot

21   light.  There is a pilot light on this?

22   A.   Yes, sir.

23   Q.   How does the pilot light work?

24   A.   It runs off of natural gas.

25   Q.   Has this structure always had a pilot light?

1    A.  No, sir.

2    Q.  When was the period of time that it did not

3    have a pilot light?

4    A.  I believe it was from around '94,

5    '95 until 2009, I want to say.  2008 or '9,

6    someplace in there.

7    Q.  All right.  What happened to the pilot light?

8    A.  The -- the gas was shut off.

9    Q.  Did you have a conversation with anyone

10   regarding the gas to that pilot light?

11   A.  Yes, I did.

12   Q.  Who did you have a conversation with?

13   A.  Mark Kamholz.

14   Q.  Okay.  Do you see Mr. Kamholz here in the

15   courtroom today?

16   A.  Yes, I do, sir.

17   Q.  Okay.  Can you just point to him, identify an

18   article of clothing he's wearing?

19   A.  He's right there, sir.

20          MR. MANGO:  All right.  I note, your

21   Honor, for the record, the defendant stood up

22   during that identification.  I'd ask the defendant

23   be identified.

24          THE COURT:  Yes.  The record will reflect

25   the identification of the Defendant Mark Kamholz.

1    BY MR. MANGO:

2    Q.   Okay.  So you had a conversation with Defendant

3    Kamholz about the pilot light?

4    A.   Yes, I did.

5    Q.   Okay.  What year, approximately, do you

6    remember this conversation happening?

7    A.   Probably around '94.  Someplace around there.

8    Q.   What did -- did Defendant Kamholz tell you

9    about the pilot light during this conversation?

10   A.   That it was shut off.

11   Q.   Okay.  Did you ask him anything?

12   A.   I asked him why it was shut down.

13   Q.   And did he respond?

14   A.   Yes, he did.

15   Q.   And what did he say?

16   A.   Natural gas was too expensive.

17   Q.   In response to that, did you ask him how you

18   were supposed to light this structure?

19   A.   Yes, I did.

20   Q.   And what did he say?

21   A.   Light a broom and throw it up there.

22   Q.   Between 1994 and 2008 or '9 you mentioned --

23   A.   Yes.

24   Q.   -- did you have to light a broom and throw it

25   up there?

1   A.   Yes, we did.

2   Q.   Is the pilot light back in?

3   A.   Yes, it is.

4   Q.   And why was the pilot light put back in?

5   A.   We got an NOV from the state because it wasn't

6   hooked up.

7   Q.   NOV is what?

8   A.   Notice of violation.

9   Q.   Okay.  When did that notice of violation

10   happen?

11   A.   I want to say 2008, 2009.  Someplace around

12   there.

13   Q.   Okay.  Were you working when that notice of

14   violation occurred?

15   A.   Yes, I -- Mark and I were both in the plant at

16   that time.

17   Q.   Okay.  And how did the notice of -- how did

18   this get detected, if you can tell the jury?

19   A.   Mr. Sitzman from the -- from the DEC came in

20   that evening -- or that night, it was a midnight

21   shift -- to monitor the pushing.  And when he went

22   upstairs, he noticed that the pilot light wasn't --

23   wasn't there.  And then he went down and talked to

24   Mark about it, and I went about my business.

25       When Mr. Sitzman left, Mark was nice enough to

1    give me a ride out to -- to the locker room that --

2    that morning, and he mentioned that we got a NOV

3    for no pilot light.

4    Q.   Okay.  All right.  So, what happens to the

5    contents of the oven after the coal has cooked the

6    amount of time it's supposed to cook?

7    A.   It's pushed out.

8    Q.   And in this photograph you see the pusher

9    machine there?

10   A.   Yes.  It's tough to see, but I can see it.

11   Q.   Okay.  So what happens now on the other side of

12   the battery?

13   A.   The backdoor machine will pull the door in the

14   same manner as -- as the pusher side.  And then he

15   goes down with what we call a rack, and he racks it

16   in the oven, which aligns the -- or aligns the oven

17   over to the bench, so the coke can hit the hot car.

18           MR. MANGO:  Your Honor, at this point the

19   government would ask to pull up Government

20   Exhibit 130.01, and absent an objection, move that

21   into evidence.

22           THE COURT:  130.01?

23           MR. MANGO:  Yes, your Honor.

24           MR. LINSIN:  No objection, your Honor.

25           MR. PERSONIUS:  No objection, your Honor.

1           THE COURT:  Okay.  Received.  No

2     objection.  May be published.

3           (Government's Exhibit 130.10 was received

4           into evidence.)

5           MR. MANGO:  Thank you, your Honor.

6     BY MR. MANGO:

7     Q.  Mr. Brossack, can you tell the jury what we're

8     looking at in this photograph?

9     A.  That's the -- the coke running through the coke

10    guide going into the hot car.

11    Q.  What is this structure there -- or the vehicle?

12    A.  That's the quench loco.

13    Q.  And what is -- what do you see happening in

14    this photograph?

15    A.  Right now the -- the operator's catching a load

16    of coke to take to the quench station.

17    Q.  And how long -- how long does it take for this

18    process to -- to finish?

19    A.  Three or four minutes.  Not more than that.

20          MR. MANGO:  Your Honor, if we could pull

21    up Government Exhibit 130.11 for identification

22    purposes, and absent an objection, move that into

23    evidence.

24          THE COURT:  130.11?

25          MR. MANGO:  Yes, your Honor.

1           MR. LINSIN:  No objection, your Honor.

2           MR. PERSONIUS:  No objection, Judge.

3           THE COURT:  No objection.  Received.  May

4     be published.

5                (Government's Exhibit 130.11 was received

6                into evidence.)

7     BY MR. MANGO:

8     Q.  Mr. Brossack, what -- what is this that we're

9     looking at here?  If you can tell the jury.

10    A.  That's the -- that's the coke falling out of

11    the coke guide, and this is the -- this is the hot

12    car catching the -- the hot coke.

13           THE COURT:  All right.  Excuse me one

14    second.  Okay.  Thank you.

15           MR. MANGO:  And if we can also just pull

16    up Exhibit 130.12 for identification purposes, and

17    absent an objection, move that into evidence.

18           MR. LINSIN:  No objection, your Honor.

19           MR. PERSONIUS:  No objection, Judge.

20           THE COURT:  Okay.  130.12 received.  No

21    objection.  May be published.

22                (Government's Exhibit 130.12 was received

23                into evidence.)

24    BY MR. MANGO:

25    Q.  Mr. Brossack, do you see this photograph on

1    your screen?

2    A.   Yes, I do.

3    Q.   What is this structure here?

4    A.   That's the coke guide.

5    Q.   Okay.  So that's the coke guide.  Is there a

6    machine that puts that on?

7    A.   The backdoor machine.

8    Q.   All right.

9    A.   It's hooked right to the backdoor machine.

10   Q.   All right.  So the backdoor machines comes on,

11   takes the door off?

12   A.   Yes, sir.

13   Q.   And then puts that guide on.

14   A.   Moves down -- moves down so he can, what we

15   call rack into the oven.  The rack locks into the

16   buckstays, and then the oven can be pushed.

17   Q.   What happens -- what happens to the oven after

18   all of the coke is pushed out of it?

19   A.   It's taken down to the quench station.

20   Q.   The coke is?

21   A.   Yeah.

22   Q.   What happens to the oven?

23   A.   The oven -- then the operators on each side

24   clean up the drag.  The doors are put back on the

25   oven and the oven is charged.

1    Q.   Okay.  So you mentioned some worker cleans up

2    the drag?

3    A.   Yes.

4            MR. MANGO:  Your Honor, if the government

5    could pull up please Government Exhibit 130.05 for

6    identification purposes.

7            THE COURT:  130.05?

8            MR. MANGO:  Yes.  And absent an objection,

9    move that into evidence.

10           MR. LINSIN:  No objection, your Honor.

11           MR. PERSONIUS:  No objection, your Honor.

12           THE COURT:  Okay.  Received.  No

13   objection.  May be published.

14           (Government's Exhibit 130.05 was received

15           into evidence.)

16   BY MR. MANGO:

17   Q.   Mr. Brossack, can you tell the jury what we're

18   looking at here?

19   A.   That's the backdoor operator.  He's pulling the

20   drag down off the sill.  When he gets it down on

21   the bench, he'll clean that up and then put the

22   door back on the oven.

23   Q.   Okay.  And that's the inside of the oven we're

24   looking at?

25   A.   Yes, it is.

1    Q.   And it's empty now?

2    A.   Yes, it is.

3    Q.   Do you know what the temperature is, the

4    operating temperature inside of a coke oven?

5    A.   It depends on what you're production and coking

6    time is.

7    Q.   Okay.  Can you give the jury a range of what

8    temperatures you've seen at the Tonawanda Coke --

9    A.   I've seen from about 1850 up to 2070, 2090.

10   Q.   Is that degrees Fahrenheit?

11   A.   Yes.

12           MR. MANGO:  Your Honor, if the government

13   could pull up, please, Government Exhibit 130.06

14   for identification purposes, and absent an

15   objection, move that into evidence.

16           THE COURT:  130.06.

17           MR. LINSIN:  No objection, your Honor.

18           MR. PERSONIUS:  No objection, Judge.  I'm

19   sorry.

20           THE COURT:  Okay.  Received.  No

21   objection.  May be published.

22           (Government's Exhibit 130.06 was received

23           into evidence.)

24   BY MR. MANGO:

25   Q.   All right.  Mr. Brossack, can you tell the jury

1     what -- what this picture depicts?

2     A.   That's a -- excuse me.   That's a hot load in a

3     hot car heading toward the quench station.

4     Q.   Okay.   How many -- how many ovens fit in this

5     one car?

6     A.   Just one.

7     Q.   Okay.   So this -- what we're seeing, the

8     glowing -- glowing material here, that's the coke?

9     A.   That's the coke.

10    Q.   And it's the contents from one oven?

11    A.   From one oven.

12          MR. MANGO:   Your Honor, the government

13    would ask to pull up Government Exhibit 130.08 for

14    identification purposes, and absent an objection,

15    move that into evidence.

16          THE COURT:   Okay.   130.08.

17          MR. LINSIN:   No objection, your Honor.

18          MR. PERSONIUS:   No objection, Judge.

19          THE COURT:   Received.   No objection.   May

20    be published.

21          (Government's Exhibit 130.08 was received

22          into evidence.)

23    BY MR. MANGO:

24    Q.   Okay.   Can you tell the jury what we're looking

25    at here?

742

1    A.   That, again, is a full load of -- of hot coke

2    after the ovens have been pushed.

3    Q.   Okay.  Looking more towards the top?

4    A.   Looking -- I'm sorry?

5    Q.   Looking more towards the top compared to the

6    photo we just saw?

7    A.   Yeah.  This would be the other side of the car.

8    Q.   So where is this, the hot coke, taken after it

9    comes out of the oven?

10   A.   Down to the quench station.

11          MR. MANGO:  Your Honor, the government

12   would ask to pull up already admitted Exhibit 49.15

13   into evidence, and ask that be published.

14   BY MR. MANGO:

15   Q.   You mentioned the coke goes to a quench?

16   A.   Quench station.

17   Q.   Quench station?

18   A.   Yes.

19   Q.   Okay.  What is this here?

20   A.   That's number 2 quench.

21   Q.   Okay.  Number 2 quench would be on which

22   side --

23   A.   The east.

24   Q.   The east?

25   A.   The east.

1    Q.   And is this a quench happening?

2    A.   Yes, it is.

3    Q.   And during the quenching process, can you tell

4    the jury how -- how long that takes?

5    A.   You have a quenching cycle of right now one

6    minute, and then a drainage cycle of, I believe, 45

7    seconds and then another quench of 45 seconds.  And

8    then it sits in there and drains for about three

9    minutes before you take it out and put it on the

10   wharf.

11           MR. MANGO:  The government would ask to

12   pull up Government Exhibit 49.14 for identification

13   purposes, and absent an objection, move that into

14   evidence.

15           THE COURT:  49.14.

16           MR. LINSIN:  No objection, your Honor.

17           MR. PERSONIUS:  No objection, Judge.

18           THE COURT:  Okay.  Received.  No

19   objection.  May be published.

20           (Government's Exhibit 49.14 was received

21           into evidence.)

22   BY MR. MANGO:

23   Q.   Mr. Brossack, what does this picture depict

24   here?

25   A.   That's number 2 quench station from a different

1    angle.

2    Q.   Okay.  Quench is happening?

3    A.   Yes, it is.

4    Q.   Now, how many quench towers are there at the

5    Tonawanda Coke facility?

6    A.   There is a number 1 and number 2 quench

7    stations.  There is two of them.

8    Q.   There is two?

9    A.   Yes.

10   Q.   Okay.  Are they in -- connected by the same

11   rail?

12   A.   Yes, they are.

13            MR. MANGO:  Your Honor, the government

14   would ask to pull up Government Exhibit 115.11 for

15   identification purposes, and absent an objection,

16   move this into evidence.

17            THE COURT:  115.11?

18            MR. MANGO:  Yes, your Honor.

19            MR. LINSIN:  No objection, your Honor.

20            MR. PERSONIUS:  No objection, Judge.

21            THE COURT:  All right.  Received.  No

22   objection.  May be published.

23            (Government's Exhibit 115.11 was received

24            into evidence.)

25   BY MR. MANGO:

1    Q.   Mr. Brossack, what -- can you tell the jury

2    what we're looking at here?

3    A.   That looks like the inside of number 2 quench

4    station.   The hot car is right here, and then

5    number 1 quench station is down here at the other

6    end of the tracks.

7    Q.   Okay.   And what is -- what are some of these

8    structures?

9    A.   That would be coke handling, what you circled.

10   On the right-hand side here -- I'm sorry -- would

11   be the battery.

12   Q.   Okay.   Quenches at number 1 quench, do they

13   take the same amount of time as you just went

14   through for the jury at number 2 quench?

15   A.   Yes, they do.

16            MR. MANGO:   If we could pull up for

17   identification purposes, please, your Honor,

18   Government Exhibit 115.24 for identification, and

19   absent an objection, move that into evidence.

20            THE COURT:   115.24.

21            MR. LINSIN:   No objection, your Honor.

22            MR. PERSONIUS:   No objection, Judge.

23            THE COURT:   Okay.   Received.   No

24   objection.   May be published.

25            (Government's Exhibit 115.24 was received

1            into evidence.)

2            MR. MANGO:  Thank you, your Honor.

3   BY MR. MANGO:

4   Q.  Mr. Brossack, could you tell the jury what

5   we're looking at here?

6   A.  That's number one quench station.

7   Q.  And what's -- what location -- where is this

8   located?

9   A.  That's west.  That's the west station.

10  Q.  On the west.  So where is the coke then taken

11  after it's quenched?

12  A.  It's taken down and dumped on the wharf.

13  Q.  The wharf.  What do you mean -- can you tell

14  the jury what you mean by the wharf?  What happens

15  at the wharf?

16  A.  The coke is dumped on the wharf.  It's a

17  sloping structure, and there's gates down there

18  that are manually pulled.  The coke slides down on

19  to a belt and then is run up into the coke handling

20  building for sizing.

21            MR. MANGO:  If we could pull up Government

22  Exhibit 130.09, your Honor, for identification

23  purposes, and absent an objection, move that into

24  evidence.

25            MR. LINSIN:  No objection, your Honor.

1           MR. PERSONIUS:  No objection, your Honor.

2           THE COURT:  Okay.  One second, please.

3       130.09?

4           MR. MANGO:  Yes, your Honor.

5           THE COURT:  Yes.  No objection.  Received.

6    May be published.

7               (Government's Exhibit 130.09 was received

8               into evidence.)

9    BY MR. MANGO:

10   Q.  Mr. Brossack, can you tell the jury what this

11   picture is?

12   A.  That's C boom in coke handling.

13   Q.  Excuse me?

14   A.  C boom in coke handling.  That's where -- this

15   is -- this is where the coke comes out after being

16   sized.

17   Q.  Okay.

18   A.  There is a series of belts that it runs through

19   and a series of booms it comes off depending on

20   what the size is.

21   Q.  All right.  So what -- what happens then to the

22   finished product?

23   A.  It's either shipped out by truck or sometimes

24   by rail, depending what the customer wants.

25           MR. MANGO:  Okay.  Your Honor, if we could

1        pull up Government Exhibit 115.23 for

2        identification purposes, and absent an objection,

3        move that into evidence.

4                THE COURT:  115.23.

5                MR. LINSIN:  No objection, your Honor.

6                MR. PERSONIUS:  No objection, Judge.

7                THE COURT:  Okay.  Received.  No

8        objection.  May be publish.

9                (Government's Exhibit 115.23 was received

10               into evidence.)

11               MR. MANGO:  Thank you, your Honor.

12       BY MR. MANGO:

13       Q.   Mr. Brossack, what are we looking at here in

14       115.23?

15       A.   That's the front of coke handling.

16       Q.   Okay.  Is this where -- I see a truck there.

17       Is that where -- what would happen at that

18       location?

19       A.   Right here?

20       Q.   Yes.

21       A.   That would be -- those trucks would be in the

22       process of being loaded.

23       Q.   With what?

24       A.   With coke.

25       Q.   Okay.  And then that's how the coke -- in one

1    instance you mentioned that's how the coke leaves

2    the facility?

3    A.   Yes.

4    Q.   This structure here going up, what is that?

5    A.   A incline.

6    Q.   Okay.  Does stuff go up or does stuff come down

7    that?

8    A.   The stuff goes up.

9    Q.   All right.  What goes up that incline?

10   A.   The coke.  Sorry.  The coke.

11   Q.   All right.

12   A.   Off the wharf.  That comes off the -- this --

13   this -- this incline runs off of A wharf.

14   Q.   And what happens up here then?

15   A.   It runs down on to B belt, and then there is a

16   series of belts.  It drops on to -- on to shakers.

17   We call them double deckers.  And there's screens

18   on there that screen out the coke to various sizes.

19   And then they're run off of these booms -- well,

20   you can't really see them all that well, but

21   they're run off the booms from their perspective

22   size.  Depending on what track is depending on what

23   size comes off of -- of that belt.

24   Q.   Is there another incline on this side over

25   there?

1    A.   Yeah, that's -- that's D incline.

2    Q.   All right.  Another way to get coke up to the

3    coke handling?

4    A.   That runs off of D Wharf, yeah.

5    Q.   Are you familiar with the term "breeze"?

6    A.   Yes.

7    Q.   Why don't you tell the jury what "breeze" is?

8    A.   It's -- it's the coke fines.  It's oh, maybe

9    the consistency of sand.  It's the fines that

10   are -- that are off the coke that either is

11   screened out or when we dig the sumps, which are on

12   the -- on the quench stations -- and, you know,

13   wash off the coke in the quench process, and we --

14   we clean them out and put over in the coal field in

15   the raw breeze pile.

16           MR. MANGO:  Your Honor, if we could pull

17   up Government Exhibit 115.42 for identification

18   purposes, and absent an objection, move that into

19   evidence.

20           THE COURT:  115.42.

21           MR. LINSIN:  No objection, your Honor.

22           MR. PERSONIUS:  No objection, Judge.

23           THE COURT:  Okay.  Received.  No

24   objection.  May be published.

25           (Government's Exhibit 115.42 was received

 1              into evidence.)

 2              MR. MANGO:  Thank you, your Honor.

 3    BY MR. MANGO:

 4    Q.  Mr. Brossack, can you tell the jury what we're

 5    looking at here?

 6    A.  That's a pile of raw breeze.

 7    Q.  Raw breeze, all right.  And you mentioned where

 8    the breeze comes from.  What -- what is raw breeze

 9    used for?

10    A.  As it stands right there, nothing.  It's --

11    it's -- before we use it in our process, we have to

12    crush it.

13    Q.  Okay.  So is there a machine that you use to

14    crush it?

15    A.  Yes.

16    Q.  Is that all that happens, it just gets crushed?

17    A.  Yes.

18    Q.  And is it called something else after you crush

19    it?

20    A.  Finished breeze.

21    Q.  All right.  Is there a separate pile it's taken

22    to?

23    A.  Yes, there is.

24              MR. MANGO:  Let me show you Government

25    Exhibit 115.43 for identification purposes, and

1    absent an objection, move that into evidence.

2              THE COURT:  Okay.  115.43.

3              MR. LINSIN:  No objection, your Honor.

4              MR. PERSONIUS:  No objection, Judge.

5              THE COURT:  Okay.  Received.  No

6    objection.  May be published.

7              (Government's Exhibit 115.43 was received

8              into evidence.)

9    BY MR. MANGO:

10   Q.  Mr. Brossack, can you tell the jury what --

11   what this depicts?

12   A.  That would be the finished breeze pile.

13   Q.  And then how do you -- can you tell the jury in

14   what process or how do you use the finished breeze

15   product?

16   A.  It's part of the mix that goes up to the coal

17   handling building.

18   Q.  So that's that big table --

19   A.  Yes.

20   Q.  -- that you mentioned?

21   A.  Yes.

22   Q.  Okay.  Have you ever heard the expression

23   "beehive"?

24   A.  Yes, I have.

25   Q.  Can you tell the jury what does -- what does it

1   mean when you use the term "beehive"?

2   A.   When we have to open the flare stack when we

3   lose the exhausters, we call it beehiving.

4   Q.   Okay.   So the circumstances by which you would

5   go into a beehive that would be -- you mentioned if

6   the exhausters went down?

7   A.   Yes.

8   Q.   Any other circumstances that would cause a

9   beehive to occur?

10  A.   If you had a power failure, which,

11  consequently, after you lose your steam, would --

12  would shut the exhauster down.

13  Q.   So if the exhauster itself breaks down or if

14  you lose your power?

15  A.   If you lose power, yes.

16  Q.   Okay.   What happens to the coke oven gas when

17  you're in a beehive situation?

18  A.   It runs out the flare stack.

19  Q.   Did you ever have a conversation with Defendant

20  Kamholz regarding beehiving?

21  A.   A while ago, yes, I did.

22  Q.   Okay.   Can you tell the jury when that

23  happened?

24  A.   I think it was around '98, 1998.

25  Q.   And what were the circumstances that gave rise

1   to your conversation about beehiving with Defendant

2   Kamholz?

3   A.   I had to beehive the battery.  We lost the

4   exhauster.

5   Q.   How long did the beehive last on that occasion?

6   A.   I think before we got it back was probably

7   maybe 45 minutes or an hour.  They had a problem

8   over there.

9   Q.   Okay.  Forty-five minutes or an hour?

10  A.   Something like that, if I remember right, yes.

11  Q.   And how did you come about having a

12  conversation with Defendant Kamholz?

13  A.   Mark came up to the battery after it was over.

14  Q.   And what did he ask you?

15  A.   He said how long was the -- was the beehive.

16  Or how long did you lose the exhauster.  And I told

17  him, I don't know, about 45 minutes to an hour.

18  Q.   Did he say anything at that point?

19  A.   He said he never had an exhauster failure or

20  have to beehive the oven for more than ten minutes.

21  Q.   Okay.  I'm sorry.  Explain that again for the

22  jury.  What -- what did he tell you?

23  A.   He told us we never had -- or told me, I'm

24  sorry, not us.  He told me that you never have an

25  exhauster failure for over ten minutes.

1    Q.   Okay.  After hearing that, did you say anything

2    to him?

3    A.   I asked him what's the big deal, you know, but

4    apparently something about some report.  I -- I

5    don't know.

6          MR. PERSONIUS:  Your Honor, the question

7    was what did Mr. Kamholz say, not apparently

8    something.  Could we have what Mr. Kamholz said?

9          THE COURT:  All right.  I mean, he said

10    what he said.  That answer will stand.  But

11    follow-up on it, so we can see if there's any more

12    specificity to it.

13          MR. MANGO:  Yes, your Honor.

14  BY MR. MANGO:

15    Q.   Defendant Kamholz mentioned to you it never

16    happens longer than ten minutes?

17    A.   Yes, sir.

18    Q.   And what did you say in response to that?

19    A.   That -- I just -- if I remember right, I just

20    asked him what was the big deal.  I didn't know why

21    it was no longer than ten minutes.

22    Q.   Okay.  Did he tell you why to report it for

23    only ten minutes?

24          MR. PERSONIUS:  Your honor, object to the

25    leading.  He didn't -- the witness didn't testify

1    that Mr. Kamholz told him to report it as --

2    there's been no evidence of that.  I ask that that

3    question be stricken.

4              THE COURT:  No.  But reput the question.

5              MR. MANGO:  Yes, your Honor.

6    BY MR. MANGO:

7    Q.  During your conversation with Defendant

8    Kamholz, did he tell you how to report this beehive

9    situation?

10   A.  Yes.  That a beehive was no longer than ten

11   minutes.

12   Q.  Okay.  So did he tell you to report it -- how

13   long did he tell you to report it for?

14   A.  To be honest with you, I don't think I put it

15   in my report.  It was just -- he just mentioned to

16   me that a beehive was no longer than ten minutes.

17   Q.  Did you tell him -- how -- again, how long did

18   you tell him the beehive actually happened?

19   A.  I believe I told him it was 45 minutes or an

20   hour that the exhauster was down.

21             MR. PERSONIUS:  Your honor, I renew my

22   request in light of that testimony.

23             THE COURT:  To do what?

24             MR. PERSONIUS:  To strike Mr. Mango

25   characterizing the conversation that Mr. Kamholz

1    said anything about how long to report this

2    incident for.  The witness has said that the only

3    thing Mr. Kamholz said was that beehives don't last

4    more than ten minutes.

5              THE COURT:  All right.  The jury's heard

6    the testimony, the answers given by Mr. Brossack,

7    and you can cross-examine.  The answers will stand.

8    BY MR. MANGO:

9    Q.  Did Defendant Kamholz tell you why beehives

10   only last ten minutes?

11   A.  That he didn't have to put a report in.

12   Q.  He told you that?

13   A.  Yes.

14   Q.  Okay.  What's your understanding of the

15   requirements if a beehive lasts longer than ten

16   minutes?

17             MR. PERSONIUS:  Well, your Honor, if the

18   witness has an understanding, could we have a

19   foundation for the witness's understanding so it's

20   not just a guess or speculation.

21             MR. MANGO:  Your Honor, he's the battery

22   foreman.  I think his position itself -- I can

23   rephrase those questions.

24             THE COURT:  Go ahead, please.

25   BY MR. MANGO:

1    Q.  In your position as battery foreman, do you

2    have responsibilities over the battery during times

3    of a beehive?

4    A.  Yes.

5    Q.  Okay.  During times of a beehive, are you

6    instructed to do anything during a beehive?

7    A.  I don't quite understand your question.  I'm

8    sorry.

9    Q.  Do you have to make note of a beehive anywhere

10   in any of your --

11   A.  In the general foreman's report, yes.

12   Q.  Okay.  So describe for the jury what the

13   general foreman's report is.

14   A.  It's just a shift-by-shift log of what happened

15   on that particular shift, your -- your readings,

16   any breakdowns, people calling off and using --

17   using replacement people.  Just -- just so that the

18   superintendent knew what happened on your shift.

19   Q.  Okay.  And as part of your duties, you're

20   required to -- to list in that report whether a

21   beehive happened?

22   A.  I don't know if I'm required, but I -- when I

23   did have a beehive I did -- I did put it -- put it

24   on my GF report, yes.

25   Q.  Okay.  So when Defendant Kamholz tells you

1    beehives never last longer than ten minutes, what's

2    your understanding of what he's telling you?

3    A.   I really don't -- I got -- I got to be honest

4    with you, I don't know.  I never really thought it.

5    The man made a statement, and I --

6    Q.   Well, was the statement accurate?

7    A.   To my knowledge, no.

8    Q.   And, now, based on your position as battery

9    foreman, your experience, your -- your use of

10   filling out this -- this report, what is your

11   understanding if a beehive lasts longer than ten

12   minutes?  What has to be done?

13           MR. PERSONIUS:  Your Honor, again --

14           MR. LINSIN:  Objection.  Asked and

15   answered.

16           THE COURT:  Yeah, well, it's a lot of

17   things, but to the form of the question I'll

18   sustain the objection.

19   BY MR. MANGO:

20   Q.   That general foreman report, have you ever seen

21   it made available to inspectors if they ever show

22   up at the Tonawanda Coke facility?

23   A.   No, I haven't really.

24   Q.   What is your understanding as to why Defendant

25   Kamholz would tell you beehives last only ten

1    minutes?

2          MR. PERSONIUS:  He's already testified he

3    doesn't know.

4          THE COURT:  Yeah, asked and answered.

5       Sustained.

6  BY MR. MANGO:

7    Q.  Let's talk about the coke oven gas.  When it's

8    pulled off of the ovens by the -- by the

9    exhausters, what happens to it at that point?

10   A.  It's sent to the by-products.

11   Q.  And are you -- how familiar, if you can tell

12   the jury, are you with the by-products department?

13   A.  Not really all that much.  I didn't spend a lot

14   of time over there.  Didn't really care for the

15   department.

16   Q.  Okay.  And do you have a limited knowledge of

17   the by-products?

18   A.  Yes, sir.

19   Q.  In your limited knowledge, what are some of the

20   by-products that are taken out of the coke oven

21   gas?

22   A.  Well, you -- you draw off tar, ammonia.  We

23   used to process light oil, benzene, naphthalene.

24   Q.  Okay.  You mentioned tar.

25   A.  Yes, I did.

1    Q.   In the process of taking the tar out, is

2    something else created?

3    A.   You get -- I suppose you call it a sludge in

4    the tar box, yes.

5    Q.   Okay.  You mentioned tar box.

6    A.   Yes.

7    Q.   What is -- if you can tell the jury what the

8    tar box is.

9    A.   That's where -- where the -- after the tar goes

10   through a process of being refined, I guess you

11   call it, that's really not used, it's dropped down

12   into what we call the tar box.

13            MR. MANGO:  Your Honor, the government

14   would ask to pull up Government Exhibit 3.11 for

15   identification purposes, and absent an objection,

16   move that into evidence.

17            MR. LINSIN:  No objection, your Honor.

18            MR. PERSONIUS:  No objection, Judge.

19            THE COURT:  Okay.  3.11 received.  No

20   objection.  May be published.

21            (Government's Exhibit 3.11 was received

22            into evidence.)

23            MR. MANGO:  Thank you, your Honor.

24   BY MR. MANGO:

25   Q.   Mr. Brossack, can you tell the jury what this

1    picture depicts here?

2    A.   That's the tar box I was speaking of.

3    Q.   Okay.  And this is where this sludge you

4    mentioned --

5    A.   Drops in, yes.

6    Q.   -- drops in.  How often does this tar box have

7    to get cleaned out?

8    A.   Depends on production.  At a higher production,

9    maybe once a day.  Medium production, two, three

10   times a week.  And at a very low production, one,

11   maybe twice a week.

12   Q.   Okay.  How does the -- the tar box actually get

13   cleaned out?  You mentioned it needs to get cleaned

14   out.

15   A.   An end loader puts his bucket right in there

16   and scoops the tar out of there, or the sludge.

17   Q.   Okay.  An end loader is -- is what?  If you can

18   just --

19   A.   It's -- it's a bucket tractor, a large bucket

20   tractor is the best way I can describe it to you.

21   Q.   Okay.  And the -- and the piece that's on the

22   front of this end loader --

23   A.   Is the bucket.

24   Q.   -- you're calling it the bucket?

25   A.   Yes.

1    Q.   Okay.  So the end loader comes over, puts the

2    bucket in this box?

3    A.   Yeah.

4    Q.   And scoops the material up?

5    A.   Yes.

6    Q.   Okay.  Do you recall the criminal search

7    warrant that was executed at the Tonawanda Coke

8    Corporation?

9    A.   Yes, I do.

10   Q.   All right.  Can you tell the jury when that --

11   when that happened?

12   A.   It was December 2009, I believe.

13   Q.   And prior to the search warrant, where was the

14   sludge taken, if anywhere, after being scooped out

15   of this tar box?

16   A.   Out to the coal field.

17   Q.   Out to the coal field?

18   A.   Yes.

19   Q.   And did you see this happen?

20   A.   When I was in coal handling, I saw it -- I saw

21   it come out to the field, yes.

22   Q.   And what happened once it went out to the

23   field?

24   A.   If there was room on the -- on the concrete

25   pad, it went there.  If there wasn't, it was mixed

1    into one of the coal piles so I could take it up to

2    the building and regenerate it.

3    Q.   All right.  So you mentioned a concrete pad.

4    A.   Yes.

5    Q.   Can you tell the jury where this concrete pad

6    is located?

7    A.   It's down at the end of where I pointed out

8    seven belt, and it's a -- kind of almost looks like

9    a foundation of a house.  Excuse me.  That's where

10   the tar is -- is stored.  It's just a storage pad.

11            THE COURT:  All right.  This is relevant

12   to Counts 17 through 19?

13            MR. MANGO:  Yes, your Honor.

14            THE COURT:  All right.  Remember, ladies

15   and gentlemen, the counts are broken down 1 through

16   15, and then there's the obstruction of justice

17   charge, and then 17 through 19 are the RCRA counts,

18   and that's what this line of questioning is

19   relating to.

20        Yes, Mr. Linsin?

21            MR. LINSIN:  Your Honor, just a point of

22   clarification.  I believe the testimony regarding

23   the coal tar sludge from the decanter tank relates

24   to Count 19.  And 17 and 18, actually, as I recall,

25   relate to the -- the Barrett tanks or the storage

1    tanks and not this material.

2              THE COURT:  Okay.  But we're talking about

3    placement of sludge, so that's more refined and

4    it's specific.  Okay.

5         So this is Count 19 and I take it there's no

6    objection to that instruction?

7              MR. MANGO:  No, your Honor.

8              THE COURT:  Okay.  Thank you.  And then we

9    still have to deal with the tanks and the condition

10   of the tanks at another point.  Thank you.

11        Mr. Personius, we're okay in that regard?

12             MR. PERSONIUS:  Yeah, your Honor.

13             THE COURT:  Okay.  Why don't we do this.

14   Let's take 15 minutes, all right?

15             MR. MANGO:  Thank you, your Honor.

16             (Jury excused from the courtroom.)

17             THE COURT:  Okay.  Mr. Brossack, you can

18   step down.  Thank you.

19             (Short recess was taken.)

20             (Jury seated.)

21             THE COURT:  Where's the spring in your

22   step?  This is Monday, ladies and gentlemen.

23   Welcome back.  Please have a seat.

24        Okay.  The attorneys and parties are back,

25   present.  Mr. Anthony Brossack is back on the

1    stand.  He remains under oath.  Looks like

2    Mr. Mango still has a few questions.

3         If you want to start, Mr. Mango, we're ready.

4             MR. MANGO:  Yes, your Honor.  Thank you.

5    BY MR. MANGO:

6    Q.  Mr. Brossack, you mentioned -- I asked you what

7    happened to the sludge, if it was taken anywhere

8    prior to the search warrant after being scooped out

9    of that tar box, right?

10   A.  Yes.

11   Q.  Okay.  And, again, can you tell the jury where

12   it would go?

13   A.  When it was taken out of the tar box, it was

14   taken out to the coal field.

15   Q.  Okay.  And what would happen to the material

16   once it was brought out to the coal field?

17   A.  It was either put into the tar storage pen or

18   if there was no room, it was put in a coal pile and

19   mixed up and tried to be used in a mix that day.

20   Q.  And the tar storage bin, is that also called

21   the concrete pad?

22   A.  Yes.

23   Q.  All right.  That's where we left off.

24   A.  Yes.

25   Q.  I was trying to reorient us here.  Let me show

1    you what's in evidence as Government's Exhibit

2    105.42.  And if we can focus on that section,

3    please?

4         Okay.  Could you put a -- do you see this

5    concrete pad?

6    A.   Right here.

7    Q.   Okay.  So, again, now with reference to this

8    photograph, can you tell the jury what would happen

9    to the material after it left the tar storage box?

10   A.   Like I said before, if there was room, it went

11   in there.  If not, it usually went on the -- on the

12   low vol side down on the south here --

13   Q.   Okay.

14   A.   -- one of the coal piles.

15   Q.   So are you familiar with the -- this concrete

16   pad in the coal field?

17   A.   Yes.

18   Q.   Can you describe it for the jury?

19   A.   Like a big foundation to a home, except there

20   was one cutout I believe at the east side of it

21   that you can go in with an end loader and either

22   dump something or pick it up or take it up.

23            THE COURT:  Let's enlarge the pad, please.

24   BY MR. MANGO:

25   Q.   Okay.  So that's the pad.  I'd actually like to

1      also show you Government Exhibit 3.01 for

2      identification purposes, and absent an objection,

3      offer that into evidence, your Honor.

4               THE COURT:  Okay.  3.01.

5               MR. LINSIN:  No objection, your Honor.

6               MR. PERSONIUS:  No objection, Judge.

7               THE COURT:  Okay.  Received and may be

8      published.

9               (Government's Exhibit 3.01 was received

10              into evidence.)

11     BY MR. MANGO:

12     Q.   Okay.  Could you tell the jury what we're

13     looking at here, Mr. Brossack?

14     A.   That would be the -- the concrete pad.

15     Q.   Okay.  And if you can tell the jury, based on

16     your work in the coal handling department, what was

17     this pad used for?

18     A.   Tar storage and sometimes they would -- we'd

19     take coal in and mix it up on -- in the pad to take

20     it up to the building for regeneration.

21     Q.   Okay.  Can you tell the jury and describe how

22     the coal and the sludge were mixed on this pad?

23     A.   Usually an end loader took the coal in and put

24     it in there, and then picked up some tar to put it

25     in.  And then they back drag it, what we call back

1    drag it, to try and mix it up.  Pick it up again,

2    back drag it -- I don't know -- four, five, ten

3    times.  However many it took to get where it would

4    go down to the point where we could take it up to

5    the buildings without too much problems.

6    Q.  Okay.  Where would that mixture -- that would

7    happen on the pad?

8    A.  Yes.

9    Q.  Where would that mixture go after that?

10   A.  When I was up there, it would go back out to a

11   coal pile and be put in the coal pile.

12   Q.  And those coal piles are out in the coal field?

13   A.  Yes.

14   Q.  How long would the mixture stay on the ground

15   before it was used?

16   A.  Depending on how much of it I took up that day,

17   it could be any place from a couple hours to

18   overnight until I started the building the next

19   day.

20   Q.  Okay.  In fact, did there ever come a time when

21   you were informed that something had been on the

22   ground overnight?

23   A.  Yes.

24           MR. PERSONIUS:  Your Honor, this term

25   "ground" I object to the use of that term "ground."

1      The witness testified it was on the coal pile.  And

2      this gets into an important part of this case,

3      without me saying more.

4              THE COURT:  Well, Mr. Linsin, you want to

5      add to that?

6              MR. LINSIN:  The concern I had about the

7      witness being informed about something, your Honor,

8      I have no idea where that information comes from.

9      If he had observations, I would share in

10     Mr. Personius's objection.

11             THE COURT:  Well, okay.  If he was

12     informed, the answer is yes or no.  And then the

13     follow-up should be who did the informing or where

14     did it come from.

15        As far as the ground is concerned, the ground

16     is the ground, and that's the question.  The pad

17     might be the ground, is that what you're going to

18     tell me?  No?

19             MR. LINSIN:  No, your Honor.  The -- the

20     issue in the coal pile is -- the roadways in the

21     coal field are not ground.  They consist of coal.

22             MR. MANGO:  Objection, your Honor.  This

23     is argument.  I don't know if we want to enter into

24     this argument now.  I'd ask that we reserve this

25     for another time.

1          THE COURT:  Well, it has been an issue in

2     terms of what is the ground, what is the pad, what

3     is the area.

4        Better identify it.  Describe, as best you can,

5     in the witness's description, what the area of

6     location is actually to him, and then we'll go from

7     there.

8          MR. PERSONIUS:  Thank you, your Honor.

9          THE COURT:  So you have to be a little bit

10    careful in terms of your questioning here, I think,

11    Mr. Mango.  Because we know that from -- well, I

12    think the openings as well as the discussions that

13    the attorneys have had that this is a term of art

14    that we have to work on.

15       So, I guess the objections are sustained to

16    more specifics in your questioning, please.

17         MR. MANGO:  Yes, your Honor.

18       If we could please go back to Exhibit 105.42 in

19    evidence.  And if we can focus on this area here,

20    please.

21    BY MR. MANGO:

22    Q.   Okay.  Mr. Brossack, you see the area

23    highlighted on the screen or pulled up on the

24    screen?

25    A.   Yes, I do.

772

1    Q.   Okay.  Could you point to where the coal piles

2    are in this photograph?

3    A.   Right here, here, looks to be here.  This looks

4    like a little one here.

5    Q.   Okay.  Are the coal piles on top of anything?

6    A.   Probably more coal.

7    Q.   Okay.

8              MR. MANGO:  Your Honor, if I may have a

9    moment.

10             THE COURT:  Yes.

11   BY MR. MANGO:

12   Q.   Mr. Brossack, you mentioned that there's

13   probably coal underneath the coal piles?

14   A.   Yes.

15   Q.   Okay.  Why do you say that?

16   A.   The coal -- the coal field has been there for

17   years.  I'm sure they haven't scraped up all of it.

18   So there's probably a pretty good base of coal

19   there.

20   Q.   Okay.  Do you know if there is any type of

21   structures underneath the coal piles?

22   A.   Structures?

23   Q.   Yes.

24   A.   No, I don't.

25   Q.   Okay.  And any type of concrete lining

1   underneath the coal field?

2   A.   To my knowledge, no.

3   Q.   Okay.  So we were talking about the -- the

4   mixture that would be made on the concrete pad.

5   A.   Yes.

6   Q.   Okay.  And again, where would that mixture go

7   after being made on the concrete pad?

8   A.   I don't want to say to the ground.

9   Q.   Well, no, say -- I want you to say what you

10   want to say.

11   A.   It usually was put in -- in a coal pile on the

12   ground, you know.

13   Q.   Okay.  All right.  How did you know that?  Did

14   you see it happen?

15   A.   At -- sometimes, no.  Sometimes I would see it,

16   but other times, no, I wouldn't.  It was mixed up

17   prior, like the -- the afternoon and night before I

18   came back in.

19   Q.   Okay.  So then you would come in, what, the

20   next morning?

21   A.   The next morning.

22   Q.   And would you make some observations when you

23   came in that next morning?

24   A.   Just to how the building was running.  And then

25   I was alerted that there was -- there was a mixture

1    out there for me to use that day.

2    Q.  A mixture in the piles on the ground?

3    A.  Yes.

4         MR. PERSONIUS:  Your Honor, again, I

5    object to that.

6         MR. MANGO:  Your Honor, that's his

7    testimony.

8         THE COURT:  I'm going to allow it.  But,

9    you know, ladies and gentlemen, the testimony of

10   the witness is the evidence, and that's why the

11   instruction to you is the questions are not the

12   evidence.  All right.  It's what the witness has

13   responded to the question.  And you heard what

14   Mr. Brossack said, and you are to consider that as

15   the evidence.

16       I don't -- I don't think there was any

17   difficulty in -- that will result in my sustaining

18   the objection, but you can cross-examine with

19   respect to your concern about the ground, which is

20   I think encompassed in your objection, right?

21        MR. PERSONIUS:  I will do that, Judge.

22        THE COURT:  All right.  If there's more to

23   it, let me know.  Is there more?

24        MR. PERSONIUS:  I don't want to do a

25   speaking objection, but the concern is this is a

1    very sensitive issue.  We just had a discussion of

2    this no more than five minutes ago.  The witness

3    gives a response, and then it is -- in my judgment,

4    was not properly characterized when it was repeated

5    by Mr. Mango.  And this is a sensitive area and --

6              THE COURT:  Well --

7              MR. PERSONIUS:  That's the problem, Judge.

8    But I can cover it on cross.

9              THE COURT:  You can cover it on

10   cross-examination.  You know you have to be

11   sensitive to that.  Like I said, I don't think

12   there was anything improper in what I heard.

13        So we'll move forward, please.

14             MR. MANGO:  Thank you, your Honor.

15        If we could pull back up Government

16   Exhibit 3.01, which is now in evidence, please,

17   your Honor.

18   BY MR. MANGO:

19   Q.  Okay.  And Mr. Brossack, you testified this was

20   the concrete pad, right?

21   A.  Yes.

22   Q.  All right.  And would you consider this

23   concrete pad full or empty?

24   A.  It appears to be -- it appears to be fairly

25   full to me.

1    Q.   Okay.  So you mentioned before if there was

2    room on the pad, we would mix it on the pad.

3    A.   Yes.

4    Q.   Okay.  If there was not room on the pad, where

5    would you take this tar sludge?

6    A.   I wouldn't take it.

7         MR. PERSONIUS:  Your Honor, I object.

8    This witness hasn't testified he ever took the coal

9    tar sludge anywhere.  That has not been the

10   evidence.

11        THE COURT:  Well, ask him if he did.

12   BY MR. MANGO:

13   Q.   Did you see the tar sludge being taken out of

14   the tar box that we already talked about?

15   A.   Yes.

16   Q.   Okay.  If it was not mixed -- where was it

17   taken?

18   A.   To the coal field.

19   Q.   Okay.  And what happened at the coal field when

20   you saw it taken there?

21   A.   If the -- if the concrete pad was full, it was

22   usually taken over to -- predominantly one of the

23   low -- low vol piles and put in a pile and mixed

24   up.

25   Q.   Okay.  How would that mixing happen?  Describe

1    for the jury.

2    A.   Again, the end loader would -- would pour it

3    into the pile, grab a bucket of coal, and then mix

4    it in by back dragging it, and keep picking it up,

5    dropping it, and back dragging it.

6    Q.   In your -- in your employment in coal handling,

7    how long would that material then stay in the coal

8    piles?

9    A.   It would depend on how much I used that day.

10   Q.   Okay.

11   A.   Like I said --

12   Q.   Could you give the jury a range of how long it

13   could -- could stay in the pile?

14   A.   It could be from a couple hours to the next run

15   the next day.

16   Q.   Did anyone ever tell you that the coal tar

17   sludge should not be mixed on to the coal piles?

18   A.   No, not that I can remember.

19   Q.   Did anyone ever give you any type of training

20   regarding hazardous wastes?

21   A.   No.

22   Q.   When it rained, did the runoff from the coal

23   pile flow anywhere?

24   A.   Into the coal field.

25   Q.   Did you see where it went from the coal field?

778

1    A.   No.  I never took a particular notice to which

2    way it went.

3    Q.   Okay.  Did the -- now you just described this

4    process, you gave -- we talked about the criminal

5    search warrant.

6    A.   Yes.

7    Q.   After the criminal search warrant, did this

8    handling of the tar sludge, how it happened,

9    change?

10   A.   Everything went on the pad and it was mixed on

11   the pad and taken from the pad directly to the

12   building.

13   Q.   Okay.  Okay.  When you -- when you testified

14   earlier you stated that there was -- when you first

15   started on the battery, there was a pilot light --

16   A.   Yes.

17   Q.   -- for this flare stack?

18   A.   Yes.

19   Q.   And so then from 1994 to 2008 or '9 there was

20   no pilot light?

21   A.   No, there wasn't.

22   Q.   All right.  And what is the purpose of the

23   pilot light, if you could tell the jury?

24   A.   When you open the --

25              MR. LINSIN:  Your Honor, these questions

1    have been asked and answered.  Unless this is a new

2    subject, I do not see the need to repeat the same

3    testimony.

4              THE COURT:  Yeah, this was gone into.  So,

5    where are you going?  Are you going somewhere else?

6              MR. MANGO:  No, it's just I want to

7    clarify the purpose of the pilot light.  I don't

8    think there was exact testimony on what the pilot

9    light itself actually does, and I think I just want

10   to clarify that briefly.

11             THE COURT:  All right.  I'll limit your

12   questions to just the purpose of the pilot light.

13             MR. MANGO:  Yes, sir, thank you.

14   BY MR. MANGO:

15   Q.  What is the purpose of the pilot light?

16   A.  To light the gas that's being taken off the

17   oven -- or the battery, sorry.

18   Q.  Okay.  So the gas would then burn?

19   A.  Yes.  It would automatically light off as you

20   open the valve.

21   Q.  All right.  Thank you.

22        Are you familiar with two abandoned tar tanks

23   that were located in the coal field?

24   A.  Yes, I am.

25             THE COURT:  Okay.  This is where we get to

 1   Count 17 and 18.  Mr. Linsin?

 2              MR. LINSIN:  Yes, your Honor.

 3              THE COURT:  Right?

 4              MR. LINSIN:  Yes, thank you, your Honor.

 5              THE COURT:  Mr. Mango?

 6              MR. MANGO:  That's correct.

 7              THE COURT:  Okay. Mr. Personius?

 8              MR. PERSONIUS:  Yes, Judge.

 9              THE COURT:  And again, remember the first

10   15 counts are the Clean Air Act.  Counts 17, 18, 19

11   have to do with the RCRA statute, which is the

12   Resource Conservation and Recovery Act, RCRA.

13       Okay.  And then that 16th count, if you

14   remember, is the obstruction of justice.  So just

15   keep the focus there.  This is what we're talking

16   about now, the RCRA portion of the indictment.

17   Count 17, 18, 19.

18       Go ahead, please.

19              MR. MANGO:  Thank you, your Honor.

20   BY MR. MANGO:

21   Q.  Mr. Brossack, at some point did you make an

22   observation about the area around these two tar

23   tanks in the coal field?

24   A.  Yes, I did.

25   Q.  Okay.  Can you tell the jury when you made this

1    observation?

2    A.   I think it was around '94, '95.

3    Q.   Okay.  And what was your observation that you

4    made of the area around these two tanks?

5    A.   There was quite a large pool of tar between the

6    two tanks.

7    Q.   Okay.  You say "a large pool of tar."  Can

8    you -- based on your observations, can you give the

9    jury an approximate size of this pool of tar?

10   A.   Maybe about the size of a 24-foot above-ground

11   pool.  About that size.

12   Q.   Did you make an observation as to approximately

13   what the depth of this pool of tar was?

14   A.   Maybe a foot, foot and a half.

15           MR. LINSIN:  Objection.  "Maybe", your

16   Honor.

17           THE COURT:  It goes to weight.  You can

18   cross-examine.

19       And by weight I mean what you choose in

20   considering all of the evidence, ladies and

21   gentlemen, to give consideration to that answer.

22       But you can ask that question again if you

23   choose to, Mr. Mango.

24           MR. MANGO:  No, I'm going to let it stand,

25   your Honor.

1              THE COURT:  Okay.

2    BY MR. MANGO:

3    Q.  Subsequently, did you observe a change in the

4    area around these tanks?

5    A.  It was not too long after that it was covered

6    with raw breeze.

7    Q.  Okay.  It was covered with raw breeze?

8    A.  Raw breeze, yes.

9    Q.  Did there come a time when you became aware of

10   a fire in the vicinity of these two tanks?

11   A.  Yes, I did.

12   Q.  Okay.  Approximately when was that fire?

13   A.  Late summer, early fall of 2008, I believe it

14   was.

15   Q.  Okay.  Please tell the jury what you observed

16   at that time.

17   A.  By the time I got out to the fire, after I

18   heard on the radio that there was a fire out at the

19   old tanks, the -- the grass was burning pretty well

20   around the tar and then the tar itself consequently

21   started on fire.

22   Q.  Okay.  Did you try or assist in trying to put

23   this fire out?

24   A.  Yes, there was a few of us out there with some

25   fire extinguishers, but that wasn't adequate.

1    BY MR. MANGO:

2    Q.   So what exactly did you observe on fire?

3    A.   The grass and the tar.

4    Q.   Did any fire companies respond to assist in

5    putting this fire out?

6    A.   Yes, they did.

7    Q.   How long did it take the fire companies to put

8    this fire out?

9    A.   I'd say around three hours.

10   Q.   All right.  Who else from the Tonawanda Coke

11   Corporation was present in the area at this time?

12   A.   There was myself, Dan Heukrath, Gene Wolkowski

13   was out there.  There was Dave Dahl, the

14   gentlemen -- the people from coal handling, a few

15   more hourlies that come out to give us a hand,

16   mostly maintenance people.

17   Q.   Okay.  Did you see Defendant Kamholz at all

18   during this time?

19   A.   After the fire, yes.

20   Q.   In the area?

21   A.   In the area, yes.

22          MR. MANGO:  Your Honor, I'd like to pull

23   up Government Exhibit 125.02 for identification

24   purposes, and absent an objection, offer this into

25   evidence.

1          THE COURT:  125.02.  Any objection?

2          MR. LINSIN:  No objection, your Honor.

3          MR. PERSONIUS:  No objection, Judge.

4          THE COURT:  Okay.  Received.  No

5      objection.  May be published.

6          (Government's Exhibit 125.02 was received

7          into evidence.)

8   BY MR. MANGO:

9   Q.  Mr. Brossack, you see that photograph on your

10  screen?

11  A.  Yes, I do.

12  Q.  Okay.  Can you tell the jury what -- what

13  your -- what they're looking at in this photograph?

14  A.  This was -- this was the tank involved in the

15  fire.  This was where -- at the base of this is

16  where the tar spills were.

17  Q.  Okay.  We don't have an approximate height

18  here.  For the jury, can you tell them

19  approximately how high is this tank we're looking

20  at?

21  A.  Maybe 25, 30-foot, maybe.  Something like that.

22          MR. MANGO:  Your Honor, the government

23  would ask to pull up Government Exhibit 125.03 for

24  identification purposes, and absent an objection,

25  offer this into evidence.

1          THE COURT:  Okay.  We're talking 125.03.

2          MR. LINSIN:  No objection, your Honor.

3          MR. PERSONIUS:  One minute please, Judge.

4     No objection, Judge.

5          THE COURT:  Okay.  Received.  No

6     objection.  May be published.

7          MR. MANGO:  Thank you, your Honor.

8          (Government's Exhibit 125.03 was received

9          into evidence.)

10    BY MR. MANGO:

11    Q.  Mr. Brossack, can you tell the jury what we're

12    looking at here?

13    A.  That's west of where the tank is that we just

14    looked at.

15    Q.  All right.  And so was this -- we see some

16    ground in this photograph?

17    A.  Yes.

18    Q.  Was this part of the ground that was on fire?

19    A.  Yes, it was.

20    Q.  And the tank we just looked at, was that on

21    fire?

22    A.  I don't believe the tank itself was burning,

23    no.  I think it was the -- the material around it

24    that was burning.

25    Q.  Okay.  I'd like to talk to you now about the

1    quench areas.  I remember you testifying you

2    used --

3                THE COURT:  Well, ask the question, okay?

4                MR. MANGO:  Yes.

5    BY MR. MANGO:

6    Q.  When you testified did you use the term "quench

7    station"?

8    A.  Yes.

9    Q.  Did there ever come a time when you had a

10   conversation with Defendant Kamholz about the

11   quench towers at the Tonawanda Coke facility?

12   A.  Yes.

13   Q.  All right.  Can you tell the jury when this

14   conversation took place?

15   A.  I believe it was around 1998.  It was after I

16   made general foreman.

17   Q.  Okay.  What caused you to have this

18   conversation with Defendant Kamholz?

19   A.  I called somebody on the radio -- I can't

20   remember who it was -- to go down to number 1

21   quench tour.  And later on Mark had come up to me

22   and said that they're not quench towers, they're

23   quench stations.  I figured he was just, you know,

24   correcting terminology.  And I asked him why.  He

25   said that quench towers need baffles, quench

1    stations don't.  And I said okay.  Ever since then,

2    I've called them quench stations.

3    Q.  Okay.  And when he said this to you, he was

4    using the word "towers" and the word "stations" in

5    plural?

6    A.  Yes.

7    Q.  So he was referring to them as quench towers,

8    or quench stations?

9    A.  Yeah.

10           MR. MANGO:  Your Honor, if I may have a

11   moment.

12           THE COURT:  Sure.

13           MR. MANGO:  I just want to check an

14   exhibit.

15       Yes, your Honor, I'd like to pull up Government

16   Exhibit 15.02.097 already in evidence.

17           THE COURT:  Fifteen or 115?

18           MR. MANGO:  15.02.097.

19           THE COURT:  Yes, received.  Okay.

20   BY MR. MANGO:

21   Q.  I'd like to focus in on this, Mr. Brossack.  Do

22   you see this?

23   A.  Yes, I do.

24   Q.  What is this item that we're looking at on the

25   photograph?

1   A.   That's the -- the old pressure release valve.

2            THE COURT:  Tap it where it is, please.

3            THE WITNESS:  I'm sorry?

4            THE COURT:  Tap the screen where it is.

5   Thank you.

6   BY MR. MANGO:

7   Q.   All right.  You said "the old pressure release

8   valve."

9   A.   Yes.

10   Q.   Did you have another term that you called this?

11   A.   Bleeder stack.

12   Q.   Bleeder stack?

13   A.   Yes.

14   Q.   How did this -- how did this operate?

15   A.   If the plant pressure went up past a certain --

16            MR. LINSIN:  Objection.  Objection to

17   foundation.

18            THE COURT:  Okay.  You need a preliminary

19   question or two.  Sustained.

20   BY MR. MANGO:

21   Q.   Are you familiar with this pressure release

22   valve/bleeder stack?

23   A.   Yes.

24   Q.   Are you familiar with how it operated?

25   A.   Yes.

1    Q.  Did you see it operate during your time at

2    Tonawanda Coke?

3    A.  Yes.

4    Q.  Did you come to learn what the purpose of this

5    bleeder stack was?

6    A.  Yes, I did.

7    Q.  All right.

8              MR. PERSONIUS:  Your Honor, how did he

9    come to learn?

10             THE COURT:  I'm sorry?

11             MR. PERSONIUS:  The question would be how

12   did he come to learn.  Because you still have to

13   have a proper foundation.

14             THE COURT:  You may follow-up.

15             MR. MANGO:  Yes, your Honor.

16   BY MR. MANGO:

17   Q.  How do you know this is the bleeder stack?

18   A.  I was told that's what it was.

19   Q.  Okay.  And you've seen it in operation?

20   A.  Yes.

21   Q.  Okay.  How did this bleeder stack operate?

22             MR. PERSONIUS:  Object, your Honor,

23   especially based on those responses.  I think there

24   is a foundation issue.

25             THE COURT:  No, at this point, I'll deem

1    it sufficient for further questioning and then you

2    may cross-examine.

3       Ladies and gentlemen, it's up to you to

4    determine whether the witness has sufficient

5    knowledge based on his testimony to give the

6    answers that will be asked of him by Mr. Mango at

7    this point.  That's what we call -- it's a matter

8    of weight for the jury, not W-A-I-T, but weight,

9    like how heavy is it, how much do you give it,

10   all -- full consideration, something less than

11   that, no consideration at all or no value at all.

12   That's up to you.  Okay.

13  BY MR. MANGO:

14   Q.  Mr. Brossack, how did this bleeder stack

15   operate, if you can tell the jury, please?

16   A.  There's a certain set point on it for the plant

17   pressure.  If the plant pressure for some reason

18   goes beyond that set point, the valve will open and

19   release that pressure.

20   Q.  Okay.  I'd like to show you another photograph

21   already in evidence Government Exhibit 49.19.

22      Okay.  Do you see that photograph on your

23   screen?

24   A.  Yes, I do.

25   Q.  Okay.  If I focus on this area here, do you see

1    the item that you referred to as the bleeder stack

2    or pressure release valve?

3    A.   It's right here.

4    Q.   Okay.  Is the bleeder still in operation today?

5    A.   No.

6    Q.   During the time the bleeder was in service,

7    what was the purpose of the bleeder?

8    A.   To relieve excess gas pressure.

9    Q.   Okay.  And you mentioned if it -- if the

10   pressure setting got above a certain point, the

11   valve would open?

12   A.   Yes.

13   Q.   When the valve would open, what would come out

14   of the bleeder?

15   A.   Coke oven gas.

16   Q.   And what was the frequency with which the

17   bleeder would release coke oven gas to the

18   atmosphere?

19         MR. LINSIN:  Your Honor, I renew my

20   objection on foundation both -- actually to the

21   last question, and to the one that has now been

22   posed.

23         THE COURT:  Yeah, I -- I'm going to

24   sustain the objection with respect to foundation as

25   well as time frame.

1           MR. MANGO:  Yes, your Honor.

2   BY MR. MANGO:

3   Q.  During your employment at the Tonawanda Coke

4   facility, did you see this bleeder operate?

5   A.  Yes.

6   Q.  Do you know when this bleeder or -- how long

7   has this bleeder been there?

8   A.  As long as I can remember.  I can't tell you

9   when it was installed.

10          THE COURT:  And the period of time you've

11  been there is what again?

12          THE WITNESS:  Thirty-two years.

13          THE COURT:  Okay.

14  BY MR. LINSIN:

15  Q.  Starting in what year?

16  A.  1981.

17  Q.  Up to the present?

18  A.  Up to the present.

19  Q.  All right.  Now, you mentioned it's -- this

20  bleeder is not operational today.

21  A.  No.

22  Q.  Now, between the time that you were aware of

23  its operations, that it was in service --

24  A.  Yes.

25  Q.  -- did the purpose of this bleeder, was it the

1    same?

2              MR. PERSONIUS:  Your Honor, again.

3              THE COURT:  To the form of the question,

4    sustained.

5    BY MR. MANGO:

6    Q.  Okay.  During -- during your time at Tonawanda

7    Coke, from the time you first became aware of it to

8    the time it came out of service, did you make

9    observations of this bleeder as to the frequency

10   with which it would release?

11   A.  Yes, I did.

12   Q.  Okay.  What was the frequency with which the

13   bleeder would release coke oven gas to the

14   atmosphere?

15             MR. PERSONIUS:  Your Honor, he hasn't -- I

16   still think the foundation is inadequate because we

17   don't have any testimony when he became aware of

18   this valve.

19             THE COURT:  Well, on that basis, that's

20   the time frame that we were talking about earlier.

21   So unless it's more specific, I'll sustain the

22   objection.  But I'll give you the opportunity to

23   pursue the foundation.

24             MR. MANGO:  Yes, your Honor.

25   BY MR. MANGO:

1    Q.  Mr. Brossack, let's assume for the time period

2    from 2005 -- starting in 2005, up until the time it

3    was taken out of service -- okay.  You've got that

4    time period in your head?

5    A.  Yes.

6    Q.  Okay.

7        -- did you see this bleeder stack/pressure

8    release valve operate?

9    A.  Yes.

10   Q.  Okay.  Did you make observations as to how

11   frequent this bleeder released gas?

12   A.  It would --

13   Q.  Yes or no?

14   A.  Yes.  I'm sorry.

15   Q.  Okay.

16           THE COURT:  When was it taken out of

17   service again, please?

18           THE WITNESS:  I believe it was 2010 it was

19   taken out of service.

20           THE COURT:  Thank you.

21   BY MR. MANGO:

22   Q.  Okay.  So during that time period you made

23   observations as to --

24   A.  I have a cramp.  I'm sorry.

25   Q.  If you need to stand, I'm sure the Judge will

1   let you take a -- stand if -- he's got a cramp.

2              THE COURT:  Are you speaking for me now,

3   Mr. Mango?

4              MR. MANGO:  I'm sorry, your Honor.

5              THE COURT:  I mean, you're assuming I'm

6   easy, right?

7        All right.  No, if you need to stretch, that's

8   fine.

9              THE WITNESS:  No, no, that's fine.  Let's

10  just go.

11             MR. MANGO:  Okay.

12             THE WITNESS:  I'm sorry.

13  BY MR. MANGO:

14  Q.  All right.  So you made observations -- did you

15  make observations as to how frequently this would

16  release from '05 to the time it was taken out of

17  service?

18  A.  Yes, I did.

19  Q.  Tell the jury, please, what was the frequency

20  with which the bleeder would release coke oven gas

21  to the atmosphere?

22  A.  When the battery would reverse, which now is

23  every 20 minutes, because the battery's -- when the

24  battery is halfway through reversal, it takes no

25  gas.  So obviously the plant pressure goes up

1    because we're not taking gas, and the valve would

2    open up to relieve that pressure.  And then when

3    we're charging ovens, because it would get quite a

4    bit of plant pressure when you charge an oven.

5    Q.   How often do reversals happen?

6    A.   Right now every 20 minutes.

7    Q.   Okay.  So how often would this bleeder flare

8    stack open up?

9    A.   If the plant pressure went up at that time past

10   the set point, during the reversal, every 20

11   minutes.

12   Q.   Okay.  If you can describe, in really simple

13   terms for the jury, what a reversal is.

14   A.   You're reversing flues.

15   Q.   Okay.

16   A.   You burn on different flues to keep an even

17   heat on the battery.  So every 20 minutes the

18   battery will reverse in an even/odd situation to

19   keep an even heat different -- like at one time

20   your even will be burning on one side, your odd on

21   the other and it reverses to heat up where it

22   wasn't heated before to keep a constant heat on the

23   battery.

24   Q.   Okay.  Let's jump for a minute to Government

25   Exhibit 130.05 which is in evidence.

1          This is a picture of the oven, correct?

2     A.   Yes.

3     Q.   All right.  You used the term "flues."

4     A.   Yes.

5     Q.   The reversal of the flues?

6     A.   Yes.

7     Q.   Again, in simple terms, describe for the jury

8     with reference to this photograph, what -- what are

9     these flues and where are they located?

10    A.   You can't see them in there.

11    Q.   Try to tell the jury.

12    A.   See this right here?

13    Q.   Yes.

14    A.   That's -- that's one wall.  The flues are in

15    between this oven and this oven.

16    Q.   So --

17    A.   This oven and this oven.  I'm sorry.

18    Q.   -- would they be where I just put the dot at

19    the bottom?

20    A.   Yes.  Yes.

21    Q.   Okay.  And which direction do the flues run in

22    the oven?  Is there one flue?

23    A.   No, there's -- there's 28 across.

24    Q.   Twenty-eight across going in which direction?

25    A.   One to 28 north to south.  North being number

1    one.

2    Q.   From one end of the oven to the other end of

3    the oven?

4    A.   From north to south, yeah.

5    Q.   So in that wall there --

6    A.   There's 28 flues.

7    Q.   -- there is a line of 28 flues?

8    A.   Yes.

9    Q.   Are they all on the bottom, or are there any on

10   the top?

11   A.   No, they're all on the bottom.

12   Q.   Okay.  And what comes out of these flues?

13   A.   Coke oven gas.

14   Q.   What's the purpose for the coke oven gas that

15   comes out of these flues that are on the bottom of

16   the wall?

17   A.   To heat the ovens.

18   Q.   All right.  Now, you mentioned there's a

19   reversal.  Again, there's another wall on this

20   side?

21   A.   Yes.

22   Q.   Is there another series of flues going down

23   that wall?

24   A.   Yes.

25   Q.   During a reversal, what happens to the gas in

1    these flues?  If you can tell the jury now with

2    that description.

3    A.   Okay.  Let's say when the battery reverses,

4    this wall, which I just marked, might be burning on

5    the even flue.  This wall next to it might be

6    burning on the odd flue.  When it reverses, it will

7    be just the opposite.

8    Q.   Okay.  So in this oven here, where we've got

9    the circle, you've got flues one through 28?

10   A.   Yes.

11   Q.   And if you say it's burning on the odd flue,

12   that would be one, three, five --

13   A.   Right.

14   Q.   -- seven, down the line?

15   A.   Yes.

16   Q.   Okay.  And then during -- why would you reverse

17   flues?

18   A.   To keep a constant heat on the battery.  While

19   your -- while your even flues are burning on that

20   oven wall, your odd flues aren't.  So once it

21   reverses, the even flues shut off and the odd flues

22   light.

23   Q.   Is there any damage that could happen to the

24   oven if you just burn from one set of flues?

25   A.   You could get cold spots in the walls, yes.

800

1   Q.  All right.  So every 20 minutes this reversal

2   happens?

3   A.  Every 20 minutes.

4   Q.  Okay.  Physically, how does the reversal

5   happen?

6   A.  There's mechanisms downstairs that take care of

7   that.  There's large arms and -- it's quite

8   involved on how it works.

9   Q.  That's beneath the oven down in that area?

10  A.  Even farther down.

11  Q.  Okay.  How long from start to finish does the

12  reversal process take from getting the even flues

13  that are firing shut off and the odd flues firing?

14  How long does that take?

15  A.  Maybe three or four minutes at the most.

16  Q.  Three or four minutes?

17  A.  Yes.

18  Q.  Okay.  Is there a period of time where there's

19  no gas flowing to all of the flues?

20  A.  Yes.

21  Q.  So none of the flues, even or odd, have any

22  gas?

23  A.  Right.

24  Q.  How long is that period of time?

25  A.  Maybe a minute or minute and a half.  Not much

1  more.

2  Q.  What happens to the -- to the line pressure

3  when there's no gas going to any of those flues?

4  A.  Your plant pressure goes up.

5  Q.  And does that correspond to the releases in the

6  bleeder that you've observed?

7  A.  Yes.

8  Q.  During periods of high production would

9  releases from that bleeder be affected?

10  A.  At times, yes.

11  Q.  Okay.  Can you explain that for the jury,

12  please?

13  A.  If -- if the set point on the -- on the bleeder

14  was too low, and we're at a higher production,

15  obviously producing more gas, it's going to bleed

16  off.

17  Q.  Have you heard the term "cogeneration"?

18  A.  Yes.

19  Q.  Okay.  Can you describe that for the jury?

20  A.  It was -- it ran off the boilers and we made

21  our own power.  It was a big generating unit that

22  made our own power.

23  Q.  Did you -- if we can go back to

24  Exhibit 15.02.097 in evidence, please.  Okay.

25  Again, that's the bleeder stack pressure release

1    valve --

2    A.   Yes.

3    Q.   -- that you've seen operate?

4    A.   Yes.

5    Q.   Okay.  During the times when you were in

6    cogeneration, making your own power, did you still

7    see this go off?

8    A.   When it would reverse and when we charged, yes.

9    Q.   And that was every 20 minutes?

10   A.   Yes.

11   Q.   Was the bleeder, though, known to other

12   Tonawanda Coke employees?

13   A.   Yes.

14   Q.   Did Defendant Kamholz know about this bleeder?

15          MR. PERSONIUS:  Objection, your Honor, to

16   what Mr. Kamholz knew.

17          THE COURT:  Calls for a yes or no.

18   Overruled.

19      You may answer.

20          THE WITNESS:  Yes, he did.

21   BY MR. MANGO:

22   Q.   Okay.  How do you know that?

23   A.   In the colder weather you get a condensate on

24   Broadway from the -- or you used to, I should say,

25   from that.

1    Q.   Okay.

2    A.   And I was coming back down Broadway one day and

3    there happened to be quite a bit of condensate on

4    the road.  And Mark was coming the other way toward

5    me, and I just asked him about it, you know, is

6    this thing all right?  He said, yeah, that's fine.

7    Everything's doing what it's supposed to be doing.

8    I said okay and left it at that.

9    Q.   Okay.  So, again, where did this conversation

10   take place?

11   A.   On Broadway.  Right -- right underneath the

12   bleeder where the -- where the condensate was.

13   Q.   Okay.  Was the condensate coming out of this

14   bleeder pressure release valve?

15   A.   It -- it -- it would of had to have been

16   where -- where it was.  It was like a V right

17   underneath there across the road.

18   Q.   Okay.  And this condensate, would it -- during

19   winter would it freeze at all?

20   A.   Yeah, it would.

21   Q.   Okay.  Was there anything in this condensate

22   that froze in a certain type of pattern?

23   A.   I never really looked for a pattern in it.  I'm

24   sorry.

25   Q.   Let me come at it a different way.

1        Have you ever seen naphthalene crystals?

2    A.   Oh, yeah.

3             MR. PERSONIUS:  Your Honor, object to the

4    leading.

5             THE COURT:  No.  Overruled.

6        You may answer.

7             THE WITNESS:  Yes, I have seen

8    naphthalene.

9    BY MR. MANGO:

10   Q.   Can you describe for the jury what -- when I

11   say the term "naphthalene crystal" what that means?

12   A.   Small snow flakes, best way I can describe it.

13   Q.   Okay.  And did you ever see those small snow

14   flakes in the area of this bleeder/pressure release

15   valve?

16   A.   Yes.

17   Q.   Okay.  Would there have been these naphthalene

18   crystals when you had this conversation with

19   Defendant Kamholz?

20   A.   Down on the ground in the -- in the -- yes,

21   they would be in there.

22   Q.   When did this conversation take place with

23   Defendant Kamholz, if you can recall?

24   A.   I really can't recall really when it was.

25   Q.   Okay.  And, again, what -- what did he say to

1    you?

2              MR. PERSONIUS:  Your Honor, I object.

3    It's been asked and answered.

4              THE COURT:  Yeah, it was.  Sustained.

5    BY MR. MANGO:

6    Q.  Okay.  Do you know a person by the name of Pat

7    Cahill?

8    A.  Yes, I do.

9    Q.  How do you know him?

10   A.  Pat's worked there, I believe, now over 20

11   years, so him and I know each other.

12   Q.  Okay.  And you say he worked there, you're

13   saying Tonawanda --

14   A.  Tonawanda Coke, yes.  I'm sorry.

15   Q.  Did you have times to -- so you worked with

16   him.  Did there come occasions where you -- I'm

17   sorry.  Let me just ask you:  How would you

18   describe his personality?

19   A.  Pat's kind of a laid-back, likes-to-joke-around

20   sort of guy.

21   Q.  Do you recall an extended inspection by the EPA

22   in April of 2009?

23   A.  Yes.

24   Q.  Did there come a time during that inspection

25   that you observed Pat Cahill speaking to the

1   inspectors?

2   A.   They were all over there.  Yes, he was speaking

3   with them.

4   Q.   Okay.  Who else did you observe from the

5   Tonawanda Coke Corporation speaking with the

6   inspectors with Pat Cahill at this time?

7   A.   Mark was there.  I believe -- I believe the BP

8   operator was there.  And to be honest with you, I

9   didn't notice much -- anybody else.  There was

10  quite a few people, but some of them I didn't know.

11  I didn't know who they were.

12  Q.   Okay.  Subsequently that day did you see Pat

13  Cahill again?

14  A.   Yes, I did.

15  Q.   Did you have a conversation with him?

16  A.   Yes, I did.

17  Q.   Can you describe what Pat Cahill's demeanor was

18  like during this subsequent conversation?

19  A.   He was upset and mad.

20  Q.   Was that consistent or not consistent with his

21  personality, his general personality?

22  A.   His general personality?  He wasn't like that,

23  or he isn't like that, I should say.

24          MR. MANGO:  Your Honor, may I have a

25  moment, please?

1           THE COURT:  Certainly.

2           MR. MANGO:  Your Honor, I have no further

3      questions fro Mr. Brossack.

4           THE COURT:  Okay.

5           MR. PERSONIUS:  Your Honor, we mentioned

6      before we started trial there might be witnesses,

7      where, with your permission, I would go first.

8      With your permission, may I go first?

9           THE COURT:  Absolutely.

10          MR. PERSONIUS:  Thank you, Judge.

11          THE COURT:  Everybody okay, Ladies and

12     Gentlemen?

13       Okay.  Mr. Personius, you're on.  Thank you.

14       Mr. Brossack, you're doing okay?

15          THE WITNESS:  Yes, I'm fine.  Thank you.

16     Just getting a drink of water.

17          THE COURT:  Okay.

18     CROSS-EXAMINATION BY MR. PERSONIUS:

19     Q.  I had to look.  Good afternoon.

20     A.  Yeah, so did I.  Good afternoon.

21     Q.  Okay.  How often do you wear the -- the suit

22     and the tie, or the sport coat and the tie?

23     A.  Not very often.

24          MR. PERSONIUS:  Judge, I mentioned to

25     Mr. Brossack as we came up in the elevator that I

808

1     didn't recognize him, and I thought he was one of

2     the blue coats.  And turned out it was him.

3                 THE COURT:  Okay.  He probably was lent --

4                 MR. PERSONIUS:  Pardon me?

5                 THE COURT:  -- the blazer by one of the

6     blue coats.  They have a side business,

7     Mr. Personius, just so you know.

8                 MR. PERSONIUS:  Maybe he got Chris's used

9     one, I don't know.

10                THE COURT:  Okay.

11    BY MR. PERSONIUS:

12    Q.   It's nice to see you again, Mr. Brossack.

13    A.   Nice seeing you.

14    Q.   Mark Kamholz has been at Tonawanda Coke, do you

15    remember how long?

16    A.   He was there when I got there, sir.

17    Q.   All right.  And you got there, I think you

18    said, in 1981?

19    A.   February of '81, yes.

20    Q.   And you described the personality of

21    Mr. Cahill.  You're familiar with Mark's

22    personality and demeanor also, is that true?

23    A.   Yes.

24    Q.   And would you agree that Mark's personality

25    would be reserved?

1    A.   I don't know if I would call it reserved.

2    Q.   Why don't you describe his personality.

3    A.   Mark will joke around with the best of us.  You

4    know, I don't -- I don't say he's -- he's nasty

5    or -- he's just a normal, you know, sort of guy.

6    I've known him for years.

7    Q.   Okay.  Do you socialize with him?

8    A.   No.  Not outside the plant, no.

9    Q.   Do you socialize with other employees at

10   Tonawanda Coke?

11   A.   Not --

12   Q.   By that I mean see him -- see him outside the

13   plant.

14   A.   Every once in a while one of our general

15   foremen, Justin Smith, he just bought a house in my

16   neighborhood, and I'll go over to see how he's

17   doing because he has a lot of work to do on it.

18   But other than that, as far as the current

19   employees at Tonawanda Coke, no, I don't socialize

20   outside the plant.

21   Q.   Are there any former employees that you

22   socialize with --

23   A.   Yes.

24   Q.   -- from Tonawanda Coke?

25   A.   Yes.

1    Q.  Could you tell us who they are, please?

2              MR. MANGO:  Objection, your Honor.  I

3    don't know the relevance of this --

4              THE COURT:  All right.

5              MR. MANGO:  -- round of questioning.

6              THE COURT:  What is the relevance?

7              MR. PERSONIUS:  It may go to bias, your

8    Honor.

9              THE COURT:  Okay.  We'll see.

10       I'll entertain a motion to strike if it

11   doesn't, Mr. Mango.

12       You may proceed.

13             THE WITNESS:  I can answer?

14       Oh, okay.  Gerry Priamo I still -- still see

15    each other outside the plant.

16   BY MR. PERSONIUS:

17    Q.  And based on your experience, you've observed

18    the interaction between Mr. Kamholz and Mr. Priamo?

19    A.  Yes.

20    Q.  And do you have some knowledge based on those

21    observations as to what the relationship is between

22    Mr. Priamo and Mr. Kamholz?

23             MR. MANGO:  Objection, your Honor.  Again,

24    relevance.

25             THE COURT:  Yeah, sustained.

1          MR. PERSONIUS:  Has Mr. Priamo ever made

2     comments to you about what his thoughts are on

3     Mr. Kamholz?

4          MR. MANGO:  Objection, your Honor.

5          THE COURT:  Sustained.

6        No answer.  You don't have to answer that

7     question.  I'm sorry.

8          THE WITNESS:  That's all right.

9     BY MR. PERSONIUS:

10    Q.  How many people work at Tonawanda Coke?

11    A.  I think right now there would be 95 or 100.

12    Q.  Is that -- over the years that you've worked

13    there, has it been around that number that have

14    been worked there?

15    A.  It all depended on production.  We -- at one

16    time we were up to about 150, 160.  That was years

17    ago.

18    Q.  And Mark Kamholz, do you know what his position

19    is at the company currently?

20    A.  Environmental manager, yes.

21    Q.  And has that been his position for some period

22    of time?

23    A.  I believe so, yes.

24    Q.  And going back as long as you've been at the

25    company, has that been Mr. Kamholz's position?

1   A.   When I first got there, I really didn't know

2   his position.  I knew he worked in the lab but I

3   didn't know his position.

4   Q.  Do you know if anybody at Tonawanda Coke

5   reports to Mr. Kamholz?

6   A.   I would believe Bruce Schlager -- oh, God, I

7   forgot their names -- Deborah Nolland and Jeff

8   Baker.

9   Q.   Okay.  The three individuals that you've

10  identified, did they all work in the lab?

11  A.   They work in the lab, yes.

12  Q.   And those are the people that would -- would

13  report to Mr. Kamholz?

14  A.   I would believe so, yes.

15  Q.   And as environmental manager at Tonawanda Coke,

16  do you know what Mr. Kamholz's duties are?

17  A.   Some of them.  Some of the great things he's

18  told me.  I'm sure there are more than what he's

19  told me.

20  Q.   Okay.  Well, based on your observations, you

21  see what he does at the plant?

22  A.   Yes.

23  Q.   And -- and, generally, does his job involve

24  trying to ensure that environmental rules are

25  followed at the plant?

1    A.   Yes.

2    Q.   Okay.  And would it be fair to say that at

3    times his attempt to enforce those rules is not

4    always well received?

5    A.   I'm not sure I understand your question.

6    Q.   Well, have you ever seen occasions where

7    Mr. Kamholz has attempted to enforce a particular

8    environmental rule and the employee or employees

9    that he's dealing with have not responded well to

10   that?

11   A.   No, not that I can remember.  No.

12   Q.   You had mentioned about the conversation that

13   you had with Mr. Kamholz regarding a flare that's

14   on the top of the battery.

15   A.   Yes, sir.

16   Q.   And when did you say that happened?

17   A.   I believe it was '94, '95.  Someplace up around

18   there.

19   Q.   All right.  And Mr. Kamholz was asked a

20   question about the -- the fact that the -- the

21   pilot light was not on --

22   A.   Yes.

23   Q.   -- for the flare.  And you testified that his

24   response was that natural gas was expensive?

25   A.   Yes.

1    Q.   And is that all he said?

2    A.   That's all he said to me at that time, yes.

3    Q.   And in terms of who made that decision to not

4    have that natural gas run to the pilot, you don't

5    know who made that decision, do you?

6    A.   No, I don't.

7              MR. MANGO:  Objection, your Honor.

8              THE COURT:  I'll let it stand.  It's asked

9    and answered.  Go ahead.

10             MR. PERSONIUS:  And you don't mean to

11   suggest by your testimony that it was Mr. Kamholz

12   that made that decision, do you?

13             MR. MANGO:  Objection to that, your Honor.

14             THE COURT:  Overruled.

15             MR. PERSONIUS:  That means you can answer.

16             THE WITNESS:  Oh, okay.

17             THE COURT:  I'm sorry.

18             THE WITNESS:  Could you repeat it, please?

19   BY MR. PERSONIUS:

20   Q.   Sure.

21   A.   Thank you.

22   Q.   You don't mean to suggest by your testimony

23   that it was Mr. Kamholz who decided that natural

24   gas would not be run to that pilot?

25   A.   No.

1    Q.   Thank you.  You provided testimony about your

2    observations of coal tar sludge from Tonawanda

3    Coke's coking operation being placed on the coal

4    fields.

5    A.   Yes.

6    Q.   All right.  And the period of time that you

7    made those observations would have been when?

8    A.   Would have been 1990 to '92, and then I went

9    back to coal handling in 2003.  From probably just

10   about the beginning of 2003, till maybe the fall of

11   the same year.  Someplace in there.

12   Q.   Okay.  So the early '90s and then again in --

13   A.   Yes, 2003.

14   Q.   Okay.  For some part of 2003 --

15   A.   Yeah.

16   Q.   -- true?

17        And do you know what the purpose is for putting

18   the -- mixing the coal tar sludge with the coal --

19   A.   Yes.

20   Q.   -- before it goes into the coking process?

21   A.   Yes.

22   Q.   You do know what that is?

23   A.   Yes.

24   Q.   Okay.  Would you please tell the jury why

25   that's done?

1   A.   It's to regenerate it back through the system

2   and draw anything that was left in there out.

3   There's probably still some good tar left in there

4   so we regenerate it.

5   Q.   Is that process consistent with how a coking

6   operation ideally should run?  I can ask that a

7   different way.

8   A.   If you would, please.  I'm not sure what

9   you're --

10  Q.   We've heard some testimony already about how --

11  and you've given us some about how a coking

12  operation runs.

13  A.   Okay.

14  Q.   And -- and one of the purposes of a coking

15  operation is to make coke.

16  A.   Yes.

17  Q.   All right.  And then there's been testimony

18  about the coke oven gas that's created that goes

19  over to an area that's called the by-products.

20  A.   Uh-huh.  I'm sorry, yes.

21  Q.   You testified a little bit about by-products.

22  A.   Yes.

23  Q.   And in that by-products area we've heard

24  testimony, I think a little bit from you, about

25  what gets drawn out of the coke oven gas.

1    A.   Yes.

2    Q.   All right.  And then the -- the -- what's left

3    of that coke oven gas gets sent back to either the

4    battery or down to the boiler?

5    A.   Yes.

6    Q.   And -- and it gets reused there, whether it be

7    in the -- in the ovens again, the coke oven gas

8    gets reused or --

9    A.   Or the boiler house.

10   Q.   -- or it gets used down at the boiler, true?

11   A.   Yes.

12   Q.   And -- and my question was designed to ask you

13   if, with this coal tar sludge, that's another

14   by-product of the coking operation, if that isn't

15   just put back into the operation?

16           THE COURT:  Do you understand the

17   question?

18           THE WITNESS:  No, I really don't.  I'm

19   sorry, sir.  I don't understand what you want here.

20   BY MR. PERSONIUS:

21   Q.   The coal tar sludge, you've testified, gets

22   picked up by a front end loader?

23   A.   Yes.

24   Q.   And it gets taken over to the coal fields?

25   A.   Yes.

1    Q.   And it gets mixed with the coal --

2    A.   Yes.

3    Q.   -- right?  And then that coal is put back

4    through the process?

5    A.   Yes.

6    Q.   So the coal tar sludge is recycled.

7    A.   It's regenerated, yes.

8    Q.   Okay.  All right.  So you're taking what you

9    have left from the coking process and you're

10   putting it back on top of the coal to send it

11   through again and reuse it, correct?

12   A.   Yes.

13   Q.   Okay.  That's -- that's my point.

14          THE COURT:  No, you're doing the right

15   thing.  If you don't understand it, please --

16          THE WITNESS:  Okay.

17          THE COURT:  It's the attorney's job to

18   make it clear to you, so you can answer if you can,

19   okay?

20          THE WITNESS:  Thank you.

21          THE COURT:  Thank you.

22   BY MR. PERSONIUS:

23   Q.   Okay.  The -- it's helpful to be clear about

24   what you observed in terms of what was done with

25   this coal tar sludge.  Okay?

1    A.   Okay.

2    Q.   And you've testified that you observed it being

3    picked up by the front end loader and there were

4    times when it would be taken to what you described

5    as the pad, right?

6    A.   Yes.

7    Q.   And there are times when it was taken right

8    directly to the coal fields, true?

9    A.   Yes.

10   Q.   When the coal tar sludge was taken to the -- to

11   the coal fields, it was put directly into the coal

12   piles?

13   A.   Yes.

14   Q.   All right.  And then you described this mixing

15   process that took place.

16   A.   When they back drag it, yes.

17   Q.   Beneath the coal piles you referred to,

18   what's -- at the base of the coal piles is the coal

19   fields?

20   A.   Yes.

21   Q.   And as long as you've worked at Tonawanda Coke,

22   has that been the case, that the coal piles sit on

23   what you described as the coal fields?

24   A.   Yes.  Yes.

25   Q.   The coal fields are the -- the result of the

820

1  coal that may at one point have been part of a coal

2  pile that has -- has come down and become part of

3  the base for the old coal field?

4      MR. MANGO:  Objection, your Honor.  It

5  seems like Mr. Personius is testifying here.

6      THE COURT:  Yeah, it's more than leading,

7  and I think I'll sustain the objection.

8    You have to do better on your questions.

9      MR. PERSONIUS:  Okay.

10      THE COURT:  You can't tell him what you

11  think.  Ask him the questions.

12      MR. PERSONIUS:  On cross-examination, your

13  Honor, I'm not permitted to lead?

14      THE COURT:  I'm saying it's more than

15  leading.  It gives the appearance that you're

16  testifying, so you have to fine tune that a little

17  bit.  Okay?

18      MR. PERSONIUS:  All right.  I understand.

19      THE COURT:  But, otherwise, you can lead

20  under 611(c), as you know, Mr. Personius.

21  BY MR. PERSONIUS:

22  Q.  Let me ask it this way then:  The -- the base

23  of the -- of the coal piles which you've described

24  as the coal fields --

25  A.  Yes.

1    Q.   -- what -- where does -- where does that base

2    come from?

3    A.   Years of accumulated coal.

4    Q.   Okay.  And it just keeps building up and up and

5    up?

6    A.   Yes.

7    Q.   Thank you.  And as far as the depth of the --

8    what we described as the coal fields, do you know

9    what that depth is?

10   A.   No, I'm sorry, I don't.

11   Q.   Do you know whether it's -- it's feet as

12   opposed to inches?

13   A.   That would only be an assumption.

14   Q.   Okay.  We don't want you to do that.  You've

15   referred to a -- a conversation you had with

16   Mr. Kamholz about the concept of a quench station.

17   A.   Yes.

18   Q.   Okay.  And did you tell us when that

19   conversation occurred?

20   A.   I believe it was around '98 --'97, '98 after I

21   made general foreman.

22   Q.   And you had made a call on the radio?

23   A.   Yes.

24   Q.   And I think you told us that when you made that

25   call, you specifically referred to quench tower

1   number 1?

2   A.   Yes.

3   Q.   And quench tower number 1 would be the -- the

4   tower to the west?

5   A.   To the west.

6   Q.   All right.  And it was at that point that

7   Mr. Kamholz contacted you and drew this distinction

8   between a quench station and a quench tower?

9   A.   Yes, sir.

10  Q.   At the time you had the conversation with

11  Mr. Kamholz about this, was there anything more to

12  it other than what you've told us?

13  A.   Not that I can recall, no.

14  Q.   Would it be fair to describe it as a friendly

15  conversation?

16  A.   Oh, yes.  He wasn't upset.

17  Q.   As far as the pressure relief valve is

18  concerned, you've indicated to us that you have

19  some knowledge about how that operates?

20  A.   Yes.

21  Q.   And it -- it's based in part upon -- upon what

22  you've observed?

23  A.   Yes.

24  Q.   It's also based upon what you've been told?

25  A.   Yes.

823

1    Q.   Okay.  And -- and do you remember who it is

2    that you have spoken to about the operation of the

3    pressure relief valve?

4    A.   That would be obviously the by-products

5    foreman.  When I was on shift, the by-products

6    operator.  Sometimes the heater would know where it

7    was -- where it was set.  In general conversation,

8    just the people that it applied to.  Myself, the BP

9    operator, the BP foreman, the head heater, the

10   other general foreman, in case it was changed, so

11   you could tell them about it when they came in to

12   relieve you.

13   Q.   You said if "it was changed"?

14   A.   Yeah.  Like if the production went up and they

15   had to change the set point, you wanted to let the

16   other general foreman know where the set point was.

17   Q.   I see.  And if we can get into this just a

18   little bit more deeply.

19       When you refer to a "set point", could you tell

20   the jury what you mean by that?

21   A.   There's a certain point of pressure that you

22   set.  Once the plant pressure goes over that, the

23   pressure relief valve, or bleeder or whatever, will

24   release the pressure -- excuse me -- release the

25   pressure on the system.

1    Q.   Okay.  And if I understand your testimony

2    correctly, that if -- if production is higher, that

3    set point would be -- would be set higher, is that

4    your understanding?

5    A.   Yes.  I'm sorry.  I had to sit and think about

6    it for a minute.

7    Q.   All right.

8    A.   Because you're producing more gas.

9    Q.   Right.  When production is higher, the gas

10   pressure is higher?

11   A.   Yes.

12   Q.   And, therefore, that set point would be placed

13   higher?

14   A.   That would be up to the BP foreman, but, yes.

15   Q.   Okay.  And -- and that was going to be my next

16   question.  As far as who sets the -- who sets the

17   set point is a terrible question.

18        But who -- who establishes the -- if you know,

19   who establishes the set point for the -- for the

20   pressure relief valve?

21   A.   That would be the by-products foreman.

22   Q.   As far as your -- your observations of the

23   pressure relief valve in instances when it would

24   release, how frequently would -- would you notice

25   that or would you be paying attention to the

1    pressure relief valve?

2    A.   When I happen to be looking over to the BP.

3    Usually when you're on top of the battery.

4    Q.   Okay.  And -- and so your perspective when

5    you're observing this would be over at the battery?

6    A.   Yes.

7    Q.   About how far is the battery from the pressure

8    relief valve?

9    A.   I don't know.  I'm not good at distance.  I'm

10   sorry.

11   Q.   All right.  Just as one example, is it further

12   than from where you're sitting to the entrance to

13   the courtroom?

14   A.   Oh, yes.

15   Q.   Okay.  But beyond that, you can't give us an

16   idea of how far away it is?

17   A.   No, I can't.  I'm sorry.

18   Q.   The -- the battery that you're describing is on

19   one side of this road that -- that's called

20   Broadway?

21   A.   Yes.

22   Q.   All right.  And the pressure relief valve, as

23   we've seen from photographs, is on the other side

24   of -- of --

25   A.   Yeah.

1    Q.   -- Broadway?

2    A.   Yes.

3    Q.   And the battery is not directly across Broadway

4    from the pressure relief valve, true?

5    A.   No.

6    Q.   And the battery is in an easterly direction.

7    If I've got my directions right, it's east -- to

8    the east of where the pressure relief valve is.

9    A.   Yes.

10   Q.   So it's at a diagonal from one another?

11   A.   Yeah, I'd say.

12   Q.   All right.  And so when -- when you testified

13   that the pressure relief valve would go off every

14   20 minutes when there was a reversal -- that's been

15   your testimony, right?

16   A.   Uh-huh.  Oh, I'm sorry.  Yes.

17   Q.   Okay.  So the jury understands, you're not

18   suggesting that -- that every 20 minutes you would

19   be looking up to see if that pressure relief valve

20   went off?

21   A.   No.

22   Q.   And as far as whether the valve would go off,

23   it would depend, would it not, on what the pressure

24   set point was for the pressure relief valve?

25   A.   Yes.

1    Q.  And that -- that set point could be at a

2    certain level where there could be a reversal and

3    the pressure relief valve would still not go off?

4              MR. MANGO:  Objection, your Honor.  Again,

5    this is Mr. Personius testifying for the witness.

6              THE COURT:  Do you understand that

7    question?

8              THE WITNESS:  Yes.

9              THE COURT:  All right.  I'll permit it

10   over objection.

11       You may answer, please.

12             THE WITNESS:  Okay.  Yes, if they raise

13   the set point.

14   BY MR. PERSONIUS:

15   Q.  Okay.  It would all depend on what that set

16   point was set at, and that would be determined by

17   the by-products foreman?

18   A.  By the by-products foreman.

19   Q.  Now, you've also testified about a conversation

20   that you had with Mr. Kamholz when you were on

21   Broadway and you noticed some accumulation of frost

22   on this road that -- that we call Broadway.

23   A.  Yes.

24   Q.  And if I recall correctly, you don't remember

25   when that conversation occurred?

1   A.  Not really, no.

2   Q.  Do you know, for example, if that was within

3   the last ten years?

4   A.  It may have been, yes.

5   Q.  Okay.  You've been pretty good about

6   remembering conversations from the 1990s, and I

7   commend you for that.

8       But this one you don't remember the date of it?

9   A.  Not really, no.  I'm sorry.

10  Q.  All right.  And were you alone or was -- was

11  someone with you when you had this conversation?

12  A.  I was alone.

13  Q.  You were alone?

14  A.  Yes.

15  Q.  Okay.  And if -- as I wrote down your testimony

16  as to what you asked Mr. Kamholz, you said "Is this

17  thing all right?"  Is that correctly recalling what

18  you remember asking Mr. Kamholz?

19  A.  I don't think I said "thing".  I think it was

20  just "is this all right", meaning the condensate on

21  the road.

22  Q.  Oh, okay.  That's -- that's what you were

23  referring to?

24  A.  Yes.

25  Q.  But what you asked him was, "Is this all

1   right"?

2   A.   Yes.

3   Q.   And his answer was yes?

4   A.   Yes.

5   Q.   All right.  And was there anything more to

6   that -- that conversation other than that?

7   A.   Just that he said it's -- it's doing what it's

8   supposed to do.

9   Q.   Okay.  And by that he was referring to the

10  pressure relief valve?

11  A.   Yes.

12  Q.   Now, from time to time, do the -- does the coke

13  oven gas line and -- and the different valves -- if

14  you know -- in the by-products area, do they need

15  to be cleaned out?

16  A.   We do get blockages and have to steam them,

17  yes.

18  Q.   All right.  And have you ever been involved in

19  that -- that process of -- of cleaning out the --

20  the gas line or the valves?

21  A.   The -- the one coming to the battery, yes.

22  Q.   Okay.  The coke oven gas line, that goes to the

23  battery?

24  A.   Yes.

25  Q.   So could you explain to the jury how that's

1   done?

2   A.  As far as our end of it, I could.

3   Q.  Okay.  Well, let's try that --

4   A.  Okay.

5   Q.  -- please.

6   A.  Okay.  It's a -- sometimes -- we have an

7   underground line, and sometimes it will get -- I'm

8   sorry.

9       Sometimes it will get -- start getting or

10   sometimes fully plugged with naphthalene, tar,

11   whatever, and we have to steam that line, and then

12   open up the top of it and put a big pump in it, and

13   then pump out whatever's in there, once it's been

14   softened by the steam, into in an end loader bucket

15   so we can clear that line out and get gas back to

16   the battery.

17   Q.  Is it your understanding that same process

18   takes place over in the by-products area, the

19   steaming out of the lines?

20   A.  I've heard them steaming, yes.

21   Q.  Okay.  And when you do that, one of the

22   substances that you -- you could be trying to clean

23   out of the line could be naphthalene?

24   A.  Yes.

25   Q.  All right.  And in the by-products area on

1    Broadway, is there -- if you know, is there a sump

2    that's associated with steaming out the lines?  Do

3    you know about that sump that's on -- on Broadway?

4    A.   We have a sump for the battery that we pump

5    every day.

6    Q.   All right.  But where -- where is that located?

7    A.   That's on Broadway.  I don't know if that's the

8    one you're referring to.

9    Q.   Okay.  Does -- does -- to your knowledge -- if

10   we're talking about the same sump, and I'm not sure

11   we are.

12   A.   Okay.

13   Q.   But if we are, do you know if during the

14   steaming process is -- is anything released out of

15   that sump?

16          MR. MANGO:  Objection, your Honor.  I

17   don't know what sump we're talking about.

18          THE COURT:  Yeah.  Sustained.

19   BY MR. PERSONIUS:

20   Q.   Well, you're describing a sump that you know

21   about that's located on Broadway?

22   A.   Yes.

23   Q.   Okay.  Tell us where on Broadway it's located,

24   please.

25   A.   Right -- right across almost from the operating

1   booth for the -- for the by-products operator.

2   Q.  Okay.  All right.  So it's -- it's -- it's

3   across from by-products?

4   A.  Yes, it's across -- it's on our side of the

5   road.

6   Q.  And the purpose of the sump is what again?

7   A.  To -- you can pump out the moisture.  It's like

8   a -- like a drip.  When that -- that -- instead of

9   sending the water and the moisture and everything

10  through the coke oven gas to the battery, it drops

11  out there and we can pump it out.

12  Q.  You pump it out into -- into what?

13  A.  There's a little receptacle there that runs

14  over into 6 sump back to the BP.

15  Q.  Okay.  You say "a little receptacle."

16  A.  Yes.

17  Q.  I'm not sure what you mean by that.

18  A.  It's -- it's -- we use a steam siphon and it

19  looks like -- almost like a little funnel.  It runs

20  down to a line going to the by-products, to six up

21  in the by-products.

22  Q.  Okay.  When you're steaming out -- to your --

23  in your experience, when you're steaming out the

24  lines or the valves to get rid of the naphthalene,

25  does any of that naphthalene ever spray out -- out

1    of the valve that's being cleaned or out of the

2    sump that you've referred to?

3    A.   If you're getting gas pressure through, yes, a

4    little will spray out at you.

5    Q.   And you've told us that you've worked in the

6    battery for quite some while, correct?

7    A.   Yeah.

8    Q.   When you're working in the -- the battery, is

9    there any requirement regarding the use of a

10   respirator?

11   A.   Yes.

12   Q.   Okay.  Would you tell the jury what that is,

13   please?

14   A.   Any time you're in a regulated area, which

15   would be the benches, top side, you are required to

16   wear a respirator by OSHA.

17   Q.   What -- are there different kinds of

18   respirators?

19   A.   There are.  Most of us use a particulate up

20   there.

21   Q.   Would you explain to the jury what that is?

22   A.   It takes the particles.  It's not more -- it's

23   not so much for gas or anything.  It's more for the

24   particulate that's in the air.

25   Q.   Okay.  And does Mark Kamholz from time to time

834

1    come down to the battery area?

2    A.   Yes, he does.

3    Q.   And when he comes down to the battery area, is

4    he required to wear a respirator?

5    A.   He's required to -- everybody who comes up in a

6    restricted area.

7    Q.   Have you seen Mark around the plant with one of

8    these respirators around his neck before?

9    A.   Before, yes.  Yes, I have.

10   Q.   All right.

11           MR. PERSONIUS:  Your Honor, can I have a

12   minute, please.

13           THE COURT:  Sure.

14           MR. PERSONIUS:  One other area, Judge --

15           THE COURT:  Sure.

16           MR. PERSONIUS:  -- I'll probably have some

17   questions.

18   BY MR. PERSONIUS:

19   Q.   Mr. Brossack, you've referred to the fire that

20   took place in the location of the two abandoned

21   tanks?

22   A.   Yes.

23   Q.   When did that fire happen again, if you

24   remember?

25   A.   2008.

1    Q.   During the summer?

2    A.   It was -- it was nice weather.  I'd say late

3    summer, maybe early fall.

4    Q.   Okay.  And -- and you've told the jury that it

5    took three hours to -- to put the fire out?

6    A.   That's my estimate, yeah.

7    Q.   Okay.  And was that three hours of active

8    fire-fighting, or is that three hours what it took

9    to get the -- the equipment there, to get a source

10   of water?  In other words, was the whole three

11   hours the active fire-fighting or was there -- were

12   there other things going on?

13   A.   I believe that was the active fire-fighting,

14   yes.

15   Q.   So your recollection is it took a full three

16   hours of active fire-fighting to put out the fire?

17   A.   For the fire department to put it out, yes.

18   Q.   Okay.  Do you remember if there were problems

19   with the -- the fire companies getting a source for

20   water?

21   A.   They had to -- my understanding was they had to

22   run the hoses up our plant road and use various

23   pumpers to get the pressure up.

24   Q.   Okay.  But your recollection is that that would

25   not have been part of -- that effort would not have

1    been part of this three hours you're referring to?

2    A.  I don't believe so, no.

3    Q.  Okay. all right.

4         MR. PERSONIUS:  Thank you, Judge.

5         Thank you, Mr. Brossack.

6         THE COURT:  Okay, Mr. Personius, thank

7    you.

8         MR. PERSONIUS:  You're welcome.

9         THE COURT:  How are you holding up?  Okay?

10        THE WITNESS:  I'm fine, sir.

11        THE COURT:  All right.  Good.

12        Mr. Linsin.

13        MR. LINSIN:  Thank you, your Honor.  May I

14   proceed?

15        THE COURT:  Certainly.

16   CROSS-EXAMINATION BY MR. LINSIN:

17   Q.  Good afternoon, Mr. Brossack.

18   A.  Good afternoon.  How are you?

19   Q.  I'm well, thanks.

20        The fire that you were just testifying about,

21   fire in the summer of 2008 --

22   A.  Yes.

23   Q.  -- were you involved in the fire-fighting

24   efforts yourself?

25   A.  We tried.  I tried, yes.

1    Q.   All right.  Before the fire department arrived,

2    is that correct?

3    A.   Yes.

4    Q.   So you were up in the vicinity of the tanks --

5    A.   Yes.

6    Q.   -- and the tar that was on the ground --

7    A.   Yeah.

8    Q.   -- is that correct?

9         And were you using equipment yourself,

10   fire-fighting equipment?

11   A.   Just a fire extinguisher.  That's all I had.

12   Q.   And you and your -- your co-workers were not

13   successful in containing the fire?

14   A.   No, we weren't.

15   Q.   How long did you stay up in the vicinity of the

16   tanks to try and fight the fire?

17   A.   I really couldn't tell you.  I really don't

18   know how long I was standing there.

19   Q.   Is it fair to say that over the course of the

20   three hours that you were just testifying about,

21   that you, perhaps not continuously, but made

22   observations periodically as this fire-fighting

23   effort was going on?

24   A.   Yes.

25   Q.   All right.  And you were shown two pictures on

1    your direct examination, I believe Government's

2    Exhibit 125.02 and 125.03.

3        May I please have Government Exhibit 125.04

4    marked for identification called up?

5        I ask you to take a look at this exhibit,

6    Mr. Brossack, and just state whether you can

7    identify it.

8    A.  Yes, sir, I can.

9    Q.  And does this photograph fairly and accurately

10   represent part of the scene that you observed in?

11   A.  The vicinity of the Barrett tanks during the

12   fire-fighting effort --

13           MR. MANGO:  Judge, we have no objection to

14   the -- if counsel is going to move this into

15   evidence, we have no objection.

16           THE COURT:  You want it received?

17           MR. LINSIN:  Yes.  I would request that

18   Government's Exhibit 125.04 then be moved into

19   evidence.

20           THE COURT:  All right.  Any objection, Mr.

21   Personius.

22           MR. PERSONIUS:  No, your Honor.

23           THE COURT:  Okay.  No objection.  125.04

24   received.

25           MR. LINSIN:  And --

1          THE COURT:  And may be published.

2          MR. LINSIN:  Thank you.

3          (Government's Exhibit 125.04 was received

4          into evidence.)

5    BY MR. LINSIN:

6    Q.  Would you describe, please, for the jury what

7    is depicted in this photograph?  And first of all,

8    before I ask you that, do you see the date stamp on

9    the bottom right-hand corner of the photograph?

10   A.  Yes, I do.

11   Q.  And I understand you just testified that this

12   fire may have been in late summer of 2008.  But

13   would July 8th of 2008 fit with your recollection

14   of the date of the fire?

15   A.  It would fit with the time of year.  It was --

16   I remember it was nice and it was hot.

17   Q.  All right.  Would you describe, please -- first

18   of all, the structure that is on the left-hand side

19   of this photograph, what is that structure?

20   A.  This here you're talking?

21   Q.  Yes, sir.

22   A.  That would be the old pump house.  There was a

23   series of pumps in there years ago.

24   Q.  All right.  And behind the pump house there,

25   the larger structure?

1   A.   Is the tank.

2   Q.   All right.  And there are two larger Barrett

3   tanks, is that correct?

4   A.   Yes.

5   Q.   And would this be the Barrett tank that was to

6   the western side of the -- the western more tank of

7   the two tanks?

8   A.   These aren't the Barrett tanks.

9   Q.   Okay.  Which tank is that?

10  A.   As far as I know, it's just the tar tanks.

11  Q.   All right.  The tar tanks?

12  A.   Yes.

13  Q.   This was the tank around which the fire

14  occurred, is that correct?

15  A.   Yes.

16  Q.   And so is -- of the two tanks, is this the tank

17  to the west or to the east?

18  A.   To the west.

19  Q.   All right.  And the tank that is torn here in

20  the -- in the right-hand side of the photograph, do

21  you -- or the structure that is torn, do you know

22  what that is?

23  A.   That's an old tank car, an old tank railcar.

24  Q.   And the area around the tank, is this in the

25  aftermath of the fire, as best you recall?

1    A.   Yes.

2              MR. LINSIN:  Could I have then

3    Government's Exhibit 125.06 that has been marked

4    for identification.  My questions would be the same

5    and --

6              MR. MANGO:  We -- we will not object --

7              MR. LINSIN:  All right.

8              MR. MANGO:  -- your Honor.

9              THE COURT:  Okay.  125.06 received.  No

10   objection.

11             (Government's Exhibit 125.06 was received

12             into evidence.)

13             THE COURT:  And may be published.

14   Mr. Personius?

15             MR. PERSONIUS:  No objection, judge.  No

16   objection.  Thank you.

17             MR. LINSIN:  And is it accurate to say

18   that this is a more zoomed in photograph capturing

19   components that were also depicted in the last

20   photograph?

21             THE WITNESS:  Yes.

22             MR. LINSIN:  All right.  And next, your

23   Honor, may I have Government's Exhibit 125.01

24   marked for identification?

25        Again, my questions would be the same.  And

```
 1      barring objection --

 2              MR. MANGO:  No objection, your Honor.

 3              MR. LINSIN:  All right.

 4              THE CLERK:  125.01, I have it in.

 5              THE COURT:  I don't.

 6              MR. LINSIN:  I did not have that as in,

 7      your Honor.

 8              THE COURT:  Okay.  I think we're -- well,

 9      it is now.  No objection.

10              MR. PERSONIUS:  No objection.

11              MR. LINSIN:  All right.

12              THE COURT:  All right.

13              (Government's Exhibit 125.01 was received

14              into evidence.)

15      BY MR. LINSIN:

16      Q.  And would you describe, please, what's depicted

17      in this photograph?

18      A.  Again, the old pump house and -- and the tank.

19      Q.  All right.  The -- the tank to the west of the

20      two large tanks, correct?

21      A.  Yes.

22      Q.  Now, you've been at the plant, you testified,

23      since '81, correct?

24      A.  Yes.

25      Q.  During the time you were at the plant, between
```

1    1981 and the end of 2009, did Tonawanda Coke ever

2    have anything to do with putting material into any

3    of these tanks?

4    A.   No.  To my knowledge, no.

5    Q.   And from your earliest observations of these

6    tanks, is it fair to say that the tanks were in

7    general disrepair, in poor condition?

8    A.   Yes.

9    Q.   And did you, again, from your earliest

10   observations, note that there were, in fact, holes

11   near the base of particularly this tank?

12   A.   Yes.

13   Q.   All right.  And is it also accurate to say that

14   from your earliest years of working at the plant,

15   you had seen that some of the contents that had

16   been in the tank, this storage tank, had actually

17   leaked on to the ground in the area around the

18   tank?

19   A.   Yes.

20   Q.   All right.  You testified on direct that in, I

21   believe it was approximately 1994, that you had

22   seen that some raw coke breeze that actually had

23   been spread onto the area in the vicinity of these

24   tanks, is that correct?

25   A.   Yes, I did.

1           MR. LINSIN:  Your Honor, may I retrieve an

2    exhibit?

3           THE COURT:  Certainly.

4           MR. LINSIN:  May I approach the witness,

5    your Honor?

6           THE COURT:  Yes.

7    BY MR. LINSIN:

8    Q.  Mr. Brossack, I have placed before you a jar

9    that has been marked as Defendant's Exhibit KKKK.

10   I ask you to take a look at the contents of that

11   jar and tell us whether you can identify what's

12   inside of it.

13   A.  It appears to be raw breeze.

14   Q.  And is that similar to the material that you

15   had seen spread in this area around the tank back

16   in the mid '90s as you testified?

17   A.  Yes.

18          MR. LINSIN:  Your Honor, may I briefly

19   publish this to the jury?

20          THE COURT:  Yes.  Is there any objection?

21          MR. MANGO:  No, your Honor.

22          THE COURT:  Triple -- KKKK, is that what

23   you said?

24          MR. LINSIN:  Yes, sir.

25          THE COURT:  Okay.

1          MR. LINSIN:  It is -- it was a new exhibit

2      just marked today, your Honor.  And if there was no

3      objection from the government, we will supplement

4      our exhibit list.

5          MR. PIAGGIONE:  We have no objection to

6      that --

7          THE COURT:  Okay.

8          MR. PIAGGIONE:  -- your Honor.

9          MR. LINSIN:  Your Honor, if this is --

10         THE COURT:  It's received into evidence,

11     yes.  No objection?

12         MR. MANGO:  No, your Honor, none.

13         THE COURT:  Okay.

14         (Defendants' Exhibit KKKK was received

15         into evidence.)

16     BY MR. LINSIN:

17     Q.  Now, during the entire time that you were

18     attempting to fight the fire in this area and

19     around observing the efforts of the fire department

20     personnel to extinguish the fire, is it accurate to

21     say that you at no time saw any of the contents of

22     this tank or the other tank actually seep out

23     outside of the tank?

24     A.  No, I didn't see that.

25     Q.  All right.  The material that you see depicted

1    in these photographs, water, of course, has been

2    added in the process, but the material otherwise

3    that you see depicted here, as best you understood,

4    was there before this fire even started, is that

5    correct?

6    A.   Yes.

7              MR. LINSIN:  Your Honor, if this is,

8    perhaps, a convenient time to break for lunch.  I

9    do have a couple of other areas, but -- I'm happy

10   to go forward if the Court wishes.

11             THE COURT:  About how long?

12             MR. LINSIN:  Ten minutes.  15 max.

13             THE COURT:  Let's finish up --

14             MR. LINSIN:  All right.

15             THE COURT:  -- Mr. Brossack, unless you

16   prefer to come back.

17             THE WITNESS:  No.

18             THE COURT:  No?  Why does that not

19   surprise me, Mr. Brossack?

20             THE WITNESS:  I'm sorry.

21             THE COURT:  Ladies and gentlemen, are you

22   okay?  Can you hang in there for ten more minutes

23   or so?  Okay.

24   BY MR. LINSIN:

25   Q.   Now, you were asked some questions on direct

1    examination regarding the baffles -- I'm sorry --

2    the quench towers and quench stations.

3    A.   Yes, sir.

4    Q.   Now, in the time that you worked in coal

5    handling, in the time that you worked up on the

6    batteries, you saw the -- quite a number of

7    quenching operations over the years, is that a fair

8    statement?

9    A.   Yes, I have.

10   Q.   All right.  And you never actually operated

11   that -- the locomotive that moves the car, did you?

12   A.   Yes, I have.

13   Q.   Oh, you have?

14   A.   Yes, I have.

15   Q.   How long did you do that?

16   A.   Every once in a while you fill in for one of

17   the hourlies.  Maybe he had something he had to do,

18   and you'd catch the oven for him or go down.  Or

19   maybe if the operator didn't -- didn't quench the

20   load quite correctly, you would take it down and --

21   or I would take it down and requench it to make

22   sure it didn't burn the car up.

23   Q.   All right.

24   A.   But it wasn't an everyday sort of thing.  I

25   mean, I was qualified to operate it, but I didn't

848

1    operate it every day.

2    Q.   Okay.  And is it fair to say, Mr. Brossack,

3    that in -- in your experience, based on all the

4    time that you spent on the battery, operating

5    the -- that locomotive yourself, and observing

6    others do it, that it was quench tower number 2,

7    that quench tower to the east side of the property

8    that was used predominantly to quench the coke

9    after it came out of the oven, correct?

10   A.   Yes.

11   Q.   And quench tower number 1, the taller quench

12   tower that's on the west side, was used from time

13   to time especially during the winter to prevent the

14   pipes from freezing, correct?

15   A.   Correct.

16   Q.   And even in times of high production when you

17   had more quenching operations, quench tower number

18   1 was not used that frequently, as best you recall,

19   is that correct?

20   A.   No, not that frequently, no.

21   Q.   All right.  Now, you've testified about

22   pressure in the system in connection with your

23   testimony about the PRV.

24   A.   Yes.

25   Q.   Plant pressure, you called it, I believe?

1    A.   Yes.

2    Q.   Now, the pressure you're talking about when you

3    discuss that pressure, is the pressure that is in

4    the coke oven gas line downstream of the

5    exhausters, correct?

6    A.   Yes.

7    Q.   There is -- from the collector main on the

8    battery over to the exhausters and by-products,

9    there is actually suction on the line, correct?

10   A.   Yes, there is.

11   Q.   But now there is a separate measurement of

12   pressure, gas pressure for the ovens themselves,

13   correct?

14   A.   The back pressure, yes.

15   Q.   And would you describe, please, what the back

16   pressure is on the -- on the ovens?

17   A.   How much -- excuse me -- how much battery

18   pressure -- I'm sorry, back pressure that you --

19   how much gas pressure you hold on the battery

20   itself, on the ovens themselves.

21   Q.   And how is that back pressure on the ovens

22   controlled?

23   A.   By the escania-s on number 1 and number 2

24   crossover.

25   Q.   There are two crossovers -- coke oven gas line

1    crossovers that lead from the battery to

2    by-products, correct?

3    A.  Yes.

4    Q.  Is it your understanding that each of those

5    crossovers has a separate control device, escania,

6    if you will --

7    A.  Yeah.

8    Q.  -- that controls back pressure for a certain

9    number of ovens, is that correct?

10   A.  Yes.

11   Q.  All right.  And how is that back pressure

12   adjusted?

13   A.  Depending on your production.

14   Q.  All right.

15   A.  How much -- depending on production would be --

16   at a low -- at a low production level you would

17   want a higher back pressure.  You don't want to be

18   dry -- sucking the gas, not only the gas, but you

19   will actually start sucking air into the ovens and

20   you don't want that.

21   Q.  You don't want air in the ovens?

22   A.  No.

23   Q.  My question was a poor one.  Mechanically, how

24   do you adjust the back pressure on the ovens?

25   A.  I'm sorry.  There's -- there's set points.  You

1    can set -- with the new controllers you can set --

2    electronically set them --

3    Q.   All right.

4    A.   -- to where you want the back pressure.

5    Q.   Well, before the new controllers were in place,

6    were there control devices that you could also set?

7    A.   Yes.

8    Q.   And they were -- those pressure settings were

9    recorded on another one of these circular charts,

10   is that correct?

11   A.   Yes.  Yes.

12   Q.   Now, do you remember from a time, from, say,

13   2005 through 2009, do you remember a gentleman by

14   the name of Tom Bermingham that worked as a

15   consultant for Tonawanda Coke?

16   A.   Yes, I did.

17   Q.   And do you know why he was asked to come in and

18   serve as a consultant for the company?

19   A.   No, I don't.

20   Q.   Did you come to learn that Mr. Bermingham and

21   other company managers had -- had decided that it

22   was important from an operational standpoint that

23   high back pressure be maintained on the ovens?

24   A.   He told us that, yes.

25   Q.   All right.  And did you understand why it was

1   that Mr. Bermingham told you that he wanted high

2   back pressure on the ovens?

3   A.   He said it was to build roof carbon.

4   Q.   I'm sorry?

5   A.   Build roof carbon.

6   Q.   All right.

7   A.   To build up the carbon to try to seal the oven.

8   Q.   All right.  And when you say "build up roof

9   carbon" or "carbon inside the ovens", the concept

10  was that, at least in Mr. Bermingham's

11  understanding, with a higher back pressure you

12  would build up carbon on the interior walls of the

13  oven, is that correct?

14  A.   Up at the roofs, yes.

15  Q.   That would help seal cracks in those ovens that

16  might otherwise permit coke oven gas to escape,

17  correct?

18  A.   Yes.

19  Q.   And might permit coke oven gas to escape into

20  the waste heat vents, correct?

21  A.   Yes.

22  Q.   All right.  Now, do you recall that from the

23  time period I just described, from 2005 to 2009,

24  that there was a program in place to slowly raise

25  the back pressure on the ovens over time from --

1    from 6 millimeters to 6.5 to 7.5?  Do you recall

2    that?

3    A.  Yes, I do.

4    Q.  All right.  And so we're clear, when we say

5    "millimeters", can you describe what that

6    measurement references?  Do you know?

7    A.  It just -- we use it as an -- as an indication

8    of the pressure on the battery.

9    Q.  And is -- would that be millimeters of water in

10   a -- in a column?

11   A.  I'm not sure if we use water or kerosene up

12   there.

13   Q.  All right.  But it's -- it's pressure

14   created -- static pressure created --

15   A.  Yes.

16   Q.  -- by a column of fluid of some sort?

17   A.  Yes.

18   Q.  All right.  And -- and you measure this back

19   pressure in millimeters, correct?

20   A.  Yes.

21   Q.  And so you recall that over this time period

22   we're talking about, that Mr. Bermingham and other

23   managers of the company were talking to the battery

24   workers to ensure that this back pressure was

25   elevated periodically, correct?

1   A.   Yes.

2   Q.   And that process of elevating back pressure

3   created certain challenges for the battery crew

4   members, correct?

5   A.   Yes.

6   Q.   And some of those challenges is that an

7   increased back pressure put a much higher priority

8   on the need to carefully seal the ovens, correct?

9   A.   Yes.

10  Q.   And to seal the oven doors, correct?

11  A.   Yes.

12  Q.   And it's accurate to say, isn't it, that, in

13  your experience, some of those battery foremen,

14  some of those workers whose jobs it was to ensure

15  that these ovens were sealed, actually resisted

16  these efforts to increase the back pressure and

17  would actually go out and lower the back pressure

18  from time to time?

19          MR. MANGO:  Objection, your Honor, to

20  asking about what other people would do.

21          THE COURT:  Yeah, I think there was some

22  flaws in the question.  I'll sustain the objection.

23  BY MR. LINSIN:

24  Q.   Mr. Brossack, did you ever adjust the back

25  pressure down?

1    A.   Yes.

2    Q.   Why did you do that?

3    A.   To help out the 303 numbers.

4    Q.   And when you say "to help out the 303 numbers",

5    are you referring to the daily air act inspections

6    that were required by regulations --

7    A.   Yes.

8    Q.   -- to monitor emissions from the ovens?

9    A.   Yes.

10   Q.   And when you adjusted the back pressure

11   downward, you understood that you were doing

12   something that was contrary to the directions that

13   had been given you by Mr. Bermingham and other

14   managers of the company, correct?

15   A.   Yes.

16   Q.   Based on your personal observations, did you

17   see other battery personnel sometimes lower the

18   back pressure?

19   A.   I never physically saw it, no.

20   Q.   Now, sometimes you and Mr. Priamo -- you

21   mentioned Mr. Priamo's name earlier --

22   A.   Yes.

23   Q.   What position did he have?

24   A.   He was head heater.

25   Q.   All right.  On the battery?

1    A.   Heater.

2    Q.   I'm sorry.  He was the head heater on the

3    battery?

4    A.   Yes.

5    Q.   Sometimes you and Mr. Priamo would actually

6    lower the back pressure for necessary operational

7    reasons, but then you would notify the 303

8    inspector, correct?

9            MR. MANGO:   Objection, your Honor.

10           THE COURT:   Grounds?

11           MR. MANGO:   Ambiguous as to referring to

12   both him and Mr. Priamo.  The question was earlier

13   asked whether he changed the back pressure and he

14   said yes.  Now Mr. Priamo is added to the mix.

15           THE COURT:   All right.  It's compound, I

16   guess is what you're saying.  I sustain it.

17       Reput it, please.

18   BY MR. LINSIN:

19   Q.   Were there times, Mr. Brossack, that you

20   reduced the back pressure, but for legitimate

21   reasons, and then notified the 303 inspector you

22   had done so?

23   A.   Yes.

24   Q.   All right.  Were there times you observed

25   Mr. Priamo do exactly the same thing?

1    A.   Yes.

2              MR. LINSIN:  I have nothing further, your

3    Honor.   Thank you.

4              THE COURT:  Okay.  Mr. Linsin, thank you.

5    Any redirect?

6              MR. MANGO:  Yes, your Honor.  I will try

7    to do this in five minutes or less.

8              THE COURT:  Sure.

9              MR. LINSIN:  May I retrieve my exhibit?

10             THE COURT:  You sure you want it?  Okay.

11   Where did you have that?  Was that in your

12   briefcase?

13             MR. LINSIN:  It was, your Honor.

14             THE COURT:  Thank you.  I don't think

15   we've seen it before.

16             MR. LINSIN:  It being my first physical

17   exhibit, your Honor, where shall we -- where shall

18   this live?

19             THE CLERK:  In your possession.

20             THE COURT:  Okay.  Please, Mr. Mango.

21   Thank you.

22             MR. MANGO:  Thank you, your Honor.

23   REDIRECT EXAMINATION BY MR. MANGO:

24   Q.   In your opinion, Mr. Brossack, could the ovens

25    at Tonawanda Coke handle the higher back pressure

1    recommended by Mr. Bermingham?

2    A.   In my opinion?

3    Q.   Yes.

4    A.   No.

5    Q.   Okay.  Why not?

6    A.   Because our 303 numbers were just going up way

7    too much.

8    Q.   How many times did you lower the back pressure

9    in an attempt to help your 303 numbers?

10   A.   I did it once, but I didn't do it right, so I

11   didn't bother with it again.

12   Q.   Okay.  Are you required by OSHA, if you know,

13   to wear a respirator on Broadway near the

14   by-products area?

15   A.   No.

16   Q.   When you were attempting to extinguish the fire

17   around these two abandoned tar tanks, as you

18   mentioned --

19   A.   Yes.

20   Q.   -- was there a lot of smoke produced?

21   A.   Yes, there was.

22   Q.   Okay.  Were there times when the number 2

23   quench tower was down for an extended period of

24   time?

25   A.   Number 2 quench station, yes.

1    Q.   Okay.  And when the number 2 quench station was

2    down, where -- where did the quenches happen?

3    A.   We had to use number 1.

4    Q.   Okay.  In -- in Defendant Kamholz's position, I

5    think as you testified as environmental manager --

6    A.   Yes.

7    Q.   -- would you believe that Defendant Kamholz

8    would have knowledge of whether a pilot light on

9    the battery flare was required under the

10   regulation?

11           MR. LINSIN:  Objection, your Honor.

12           MR. PERSONIUS:  Objection to what this

13   witness's understanding of Mr. Kamholz's

14   understanding of a regulation.

15           MR. MANGO:  Your Honor, he was asked on

16   cross-examination about his knowledge of

17   Mr. Kamholz's job.

18           THE COURT:  So whether or not the pilot

19   light on the battery was required under the regs?

20           MR. MANGO:  Yes.

21           THE COURT:  Do you understand?

22           THE WITNESS:  Do I know if it was

23   required?

24           THE COURT:  Yes or no.

25           THE WITNESS:  Yes.

 1           THE COURT:  All right.  Overruled.

 2    I'll -- yeah, go ahead.

 3           MR. LINSIN:  Your Honor, if this witness

 4    is testifying about his knowledge of the

 5    requirements, that is one thing.  Asking this

 6    witness to testify about someone else's knowledge

 7    is problematic.

 8           THE COURT:  Yeah, I think -- it was his

 9    knowledge, right, whether he knows?

10           MR. LINSIN:  No.

11           MR. PERSONIUS:  No.  He was asking about

12    Mr. Kamholz's.

13           THE COURT:  Okay.  Then I'm sorry.  All

14    right.

15           MR. MANGO:  I'll rephrase.

16           THE COURT:  Reput the question, please.

17           MR. MANGO:  Yeah.

18           THE COURT:  Thank you.  Objection

19    sustained, then.

20    BY MR. MANGO:

21    Q.  Mr. Brossack, did you have knowledge as to

22    whether a pilot light was required under the

23    regulations for the battery flare stack?

24    A.  Yes.

25    Q.  Okay.  And what was your knowledge of the

1    requirement?

2    A.   That it had to be operational all the time.

3    Q.   Okay.

4    A.   So if you did have to beehive the battery, it

5    was burned off.

6    Q.   Now, in -- in Defendant Kamholz's position,

7    based on what you've seen him do and his job

8    duties, do you believe that he would have known

9    about that regulation?

10             MR. PERSONIUS:  Your Honor, I object.

11             MR. LINSIN:  Objection, your Honor.

12             THE COURT:  Yeah, sustained.

13             MR. MANGO:  Nothing further, your Honor.

14             THE COURT:  Okay.  Any additional

15   questions?

16             MR. PERSONIUS:  No, Judge.

17             MR. LINSIN:  Just one.

18   RECROSS-EXAMINATION BY MR. LINSIN:

19   Q.   Mr. Brossack, you said -- you testified, I

20   believe, that in the entire time you have or had

21   been at Tonawanda you recall this bee-hiving

22   occurring eight or nine times, is that correct?

23   A.   Yes.

24             MR. MANGO:  Objection, your Honor.  This

25   goes beyond the scope of redirect.

1          THE COURT:  Well --

2          MR. MANGO:  We didn't talk about

3     bee-hiving.

4          THE COURT:  I don't know.  No, you didn't,

5     but is this relating to redirect?

6          MR. LINSIN:  It does, your Honor.

7          THE COURT:  All right.  I'll let you try

8     it.

9     BY MR. LINSIN:

10    Q.  When the flare -- when a bee-hiving occurred,

11    was gas released through this battery flare

12    automatically, or did something have to happen

13    mechanically before gas was released through the

14    battery flare?

15    A.  No, we've got a big manual valve we have to

16    open up.

17    Q.  All right.  And so no gas is released until

18    that manual valve is opened, is that correct?

19    A.  Correct.

20         MR. LINSIN:  Nothing further, your Honor.

21         THE COURT:  Thank you.

22    Anything, Mr. Mango?

23         MR. MANGO:  No, thank you, your Honor.

24         THE COURT:  Mr. Personius?

25         MR. PERSONIUS:  Thank you, no, Judge.

1           THE COURT:  Okay.  Mr. Brossack, you're

2     excused, sir.

3           THE WITNESS:  Thank you, sir.

4           THE COURT:  Appreciate it.

5        All right.  How's the jury doing?  Getting a

6     little hungry?  Okay.  Would any of you like to go

7     to lunch?  Would all of you like to go to lunch?

8     Okay.  Get back here about 2:15, okay?  Not before

9     then.

10        All right.  Thank you for your attention.

11    Please don't discuss the case.  Don't make up your

12    minds.  Keep your minds open.  And we'll continue

13    at approximately 2:15.  Thank you.  Have a good

14    lunch.

15              (Jury excused from the courtroom.)

16           THE COURT:  Okay.  Anything we have to

17    discuss?  We're good?

18           MR. MANGO:  No, your Honor.

19           THE COURT:  Do you know who your next

20    witness is?

21           MR. MANGO:  Martha Hamre from Denver,

22    Colorado, from the EPA.

23           THE COURT:  Okay.  All right.  We will see

24    you at 2:15.  All right.

25           MR. MANGO:  Thank you very much.

1                    (Lunch recess was taken.)

2                    (Jury not present in the courtroom.)

3                    MR. MANGO:  Judge, before the jury comes

4      out can I raise an issue?

5                    THE COURT:  Sure.

6                    MR. MANGO:  I was walking in -- I had to

7      run to my office to get something.  As I was coming

8      in -- and I've already informed defense counsel of

9      this.

10                   THE COURT:  Please have a seat.

11                   MR. MANGO:  -- my head was down, and Juror

12     No. 7 held the door for me.  And as I was walking

13     into the courthouse, he asked me, "Is the person in

14     the gallery Adam Buchbinder?"

15         Adam, if you would just raise your hand.

16         Adam is a new EPA agent who recently

17     transferred in from Chicago.  He's been here in

18     Buffalo maybe about a month.  And I simply said,

19     "Yes, it is him, and I'm going to make sure I bring

20     this to the judge's attention."

21         I've asked Adam separately how they knew each

22     other.  Apparently about ten years ago they were

23     friends in high school, but haven't had really any

24     contact after that.

25                   THE COURT:  Okay.  Is Agent Buchbinder

1        going to testify?

2                MR. MANGO:  No.  He's not a witness.

3                THE COURT:  Okay.

4                MR. MANGO:  All right.

5                THE COURT:  Is there anything that the

6        defense wants me to do?

7                MR. LINSIN:  I don't think any further

8        inquiry is necessary, your Honor.  Can I just ask

9        through the Court again what the -- what the

10       question itself was from the juror?

11               THE COURT:  I think it was, "Is that Adam

12       Buchbinder?"  Right?

13               MR. MANGO:  He said his name.  "Is that

14       Adam Buchbinder?"  And I responded, "Yes.  And I'm

15       going to need to raise this to the judge's

16       attention."

17               MR. LINSIN:  But no indication that he

18       knew he was working for the EPA or anything like

19       that.

20               MR. MANGO:  No.

21               MR. LINSIN:  All right.  I have nothing,

22       your Honor.  Okay.

23               MR. PERSONIUS:  Your Honor.  Forgive me,

24       your Honor.  I thought that -- that it was

25       connected with EPA.  It wasn't?  The question from

1    the juror.

2         MR. MANGO:  He asked me specifically, "Is

3    that Adam Buchbinder?"  He did not say, "Is that

4    Adam Buchbinder with EPA?"  He just asked me if

5    that was Adam Buchbinder.

6         THE COURT:  And he said to you that they

7    were friends ten years ago.

8         MR. MANGO:  That's what I got from Adam.

9    I didn't want to inquire of the juror.  So when I

10   got back up to the office I asked Adam, and that's

11   what he told me.

12        THE COURT:  Okay.  Okay.  I think

13   that's -- I'm sorry.  Go ahead.

14        MR. LINSIN:  The only -- I'm sorry to

15   interrupt, your Honor.  The only question I would

16   ask, given this, I can understand why Special Agent

17   Buchbinder might have an interest in observing the

18   case.  Unfortunately, I guess my request would be,

19   given this development, I don't think -- I would

20   request that the government speak to Mr. Buchbinder

21   about perhaps not continuing to attend the trial,

22   just because now that we've established there's

23   some relationship.  The only concern I would have

24   is if Mr. Buchbinder continued to show up at trial

25   for some reason, that, I guess, as I think about

1    it, would potentially be somewhat problematic.

2              MR. MANGO:  Your Honor, I defer to the

3    Court.  He was planning to be here during trial.

4    He's -- he helps us with logistics and witnesses.

5    But we'll defer to the Court on this one.

6              THE COURT:  Why don't I call up Bauman,

7    all right?  And I can talk to him here at side bar.

8              MR. LINSIN:  Okay.

9              THE COURT:  All right.  And then -- I

10   don't think that will present a problem from his

11   standpoint, and I'll find out if there's anything

12   about his continued presence that would cause him

13   concern.  If he even knows where he's employed,

14   that kind of thing.  Okay?

15             MR. LINSIN:  That would be fine, your

16   Honor.  And just so that we're not -- the only

17   other point I would raise before the jury comes

18   back out is there are two additional stipulations

19   that I had hoped to read into evidence during the

20   last witness's testimony.  They were not executed

21   until over lunch, and I would request the Court's

22   indulgence to read them before the first witness is

23   brought to the stand.  They will be very brief.

24             THE COURT:  Okay.  All right.  I take it,

25   Mr. Personius, no problem with that?

1          MR. PERSONIUS:  None, your Honor.  Thank

2    you.

3          THE COURT:  Okay.  And --

4          MR. MANGO:  None, your Honor.

5          THE COURT:  Mr. Mango?

6          MR. MANGO:  Nope.  We signed them.

7    They're ready to go.

8          THE COURT:  Okay.  Chris, please.

9          (Jury seated.)

10          THE COURT:  Mr. Bauman, can I see you for

11    a second, please?

12       Okay.  Please have a seat.  Good to see

13    everybody.

14          (Side bar discussion held on the record

15          between the Court and Juror number 7.)

16          THE COURT:  Adam Buchbinder.

17          A JUROR:  Yes.

18          THE COURT:  That is him.

19          A JUROR:  I thought I recognized him.

20          THE COURT:  You recognize the individual,

21    right?

22          A JUROR:  Yes.

23          THE COURT:  Is it a friend of yours from

24    awhile back?

25          A JUROR:  From high school, yeah.

869

1       THE COURT:  And where was that?  What high

2   school?

3           A JUROR:  Saint Francis.

4       THE COURT:  And have you had any

5   relationship with him over the last ten years or

6   so?

7           A JUROR:  Yeah.  We've played hockey after

8   high school.

9       THE COURT:  Do you know what he does?

10          A JUROR:  Last I heard he was in South

11  Carolina.

12      THE COURT:  Doing what?

13          A JUROR:  Some government agency.

14      THE COURT:  You don't know which one or

15  anything?

16          A JUROR:  No.  I'm assuming EPA since he's

17  here, but --

18      THE COURT:  Okay.  The fact that he's with

19  EPA, does that make a difference to you, if he's

20  not a witness?

21          A JUROR:  No.

22      THE COURT:  Would you be more comfortable

23  if he weren't here?

24          A JUROR:  No.  I didn't know if he was a

25  witness or if he's an investigator with the case.

1          THE COURT:  Okay.  All right.  Do you know

2     where he lives or --

3          A JUROR:  No.

4          THE COURT:  You haven't seen him for ten

5     years or so or since you played hockey together?

6          A JUROR:  I seen him when he came home to

7     visit.  I mean, I would run into him at Sabre

8     games.

9          THE COURT:  And would you consider him to

10    be a continuing good friend?

11         A JUROR:  A friend.  I mean, obviously we

12    haven't stayed in contact.

13         THE COURT:  Okay.  Because it really comes

14    down to a question of whether I keep him and allow

15    him to watch the trial or not.  But if there's any

16    risk whatsoever that you would be distracted or

17    feeling a little less comfortable, then probably

18    the answer is I should ask him not to spend the

19    day.  So you have to tell me if it makes you at

20    least in any way uncomfortable.

21         A JUROR:  No.

22         THE COURT:  Okay.  And you know he is an

23    employee of EPA?

24         A JUROR:  Uh-huh.

25         THE COURT:  Yes?

1          A JUROR:  Yeah.

2          THE COURT:  Okay.  That's because it has

3    to get recorded that way.

4          A JUROR:  Okay.

5          THE COURT:  And you feel you can still be

6    fair and impartial to both sides?

7          A JUROR:  I would try my best.

8          THE COURT:  Okay.  Any doubt about that?

9          A JUROR:  Uh -- no.

10          THE COURT:  Okay.  And things haven't

11   changed in your mind since you saw him in the

12   courtroom?

13          A JUROR:  No.

14          THE COURT:  Okay.  You know, I appreciate

15   the fact that you let the prosecutor know, because

16   you just inadvertently bumped into him -- right? --

17   at the lunch hour?

18          A JUROR:  The prosecutor?

19          THE COURT:  Yes.  And you mentioned to

20   him --

21          A JUROR:  Yeah.  I was planning to mention

22   it to Chris.

23          THE COURT:  Okay.  All right.  Thank you.

24   If you have a change of heart, you let me know.

25          A JUROR:  Okay.

 1              THE COURT:  Change of mind, okay?

 2              A JUROR:  Okay.

 3              THE COURT:  You're comfortable continuing

 4    as a juror?

 5              A JUROR:  Yeah.

 6              THE COURT:  Okay.  Thank you.

 7              (End of side bar.)

 8              THE COURT:  Okay.  In case you're

 9    wondering, we did not fire Mr. Bauman.  And welcome

10    back.  I hope you had a good lunch, and I think

11    we're ready to go.

12         There is a little wrap-up that probably makes

13    sense to take care of right now, and I think there

14    are two very, very brief stipulations that

15    Mr. Linsin has that he's going to read at this

16    point in time.  And remember, the information that

17    you are given, that's the evidence, not the

18    document itself.

19         So, Mr. Linsin, if you will, please.

20              MR. LINSIN:  Thank you, your Honor.

21         I'm going to read a document that has been

22    marked Court Exhibit No. 2, with the case caption,

23    and it is entitled Stipulation.

24         The United States of America by and through its

25    attorney --

1          THE COURT:  Mr. Linsin, so you -- if you

2    will, please.  Thank you.

3          MR. LINSIN:  The United States of America,

4    by and through its Attorney, William J. Hochul Jr.,

5    United States Attorney for the Western District of

6    New York, and Ignacia S. Moreno, Assistant Attorney

7    General for the United States Department of

8    Justice, Environment and Natural Resources

9    Division, and the undersigned Assistant United

10   States Attorney and Senior Trial Attorney, and the

11   undersigned counsel for defendants Tonawanda Coke

12   Corporation and Mark L. Kamholz, collectively the

13   defendants, do hereby stipulate and agree to the

14   following fact:

15     "Prior to January 27th, 1978, when Tonawanda

16   Coke Corporation purchased the property and coke

17   production facility at 3875 River Road, Tonawanda,

18   New York, the materials in the two storage tanks

19   that are the subject of the allegations in

20   Counts 17 and 18 had been abandoned by a prior

21   owner of the property; and also prior to

22   January 27th, 1978, some of the material that had

23   been in the two tanks had spread onto the ground in

24   the vicinity of the two tanks."

25        And the stipulation is signed by Mr. Aaron

1    Mango, Assistant United States Attorney, United

2    States Attorney's Office; Rocky Piaggione, Senior

3    Trial Counsel, Department of Justice; by myself,

4    Gregory Linsin, on behalf of Tonawanda Coke, and my

5    partner, Jeanne Grasso, for Tonawanda; Mr. Rod

6    Personius for Defendant Mark Kamholz, and by

7    Mr. Kamholz himself.

8              THE COURT:  Okay.  So stipulated,

9    government attorneys?

10             MR. MANGO:  Yes, your Honor.

11             MR. PIAGGIONE:  Yes, your Honor.

12             THE COURT:  All right.  Mr. Personius?

13             MR. PERSONIUS:  Yes, your Honor.

14             THE COURT:  Okay.  That information, then,

15   ladies and gentlemen is competent evidence by

16   virtue of stipulation, which you may consider in

17   working towards your completed duty of returning a

18   unanimous verdict in this case.

19             MR. LINSIN:  The second document I will

20   read has been marked Court Exhibit No. 3.  Again

21   captioned with the caption for this case, and

22   entitled Stipulation.

23        "The United States of America, by and through

24   its Attorney, William J. Hochul Jr., United States

25   Attorney for the Western District of New York, and

1    Ignacia S. Moreno, Assistant Attorney General for

2    the United States Department of Justice,

3    Environment and Natural Resources Division, and the

4    undersigned Assistant United States Attorney and

5    Senior Trial Counsel, and the undersigned counsel

6    for defendants Tonawanda Coke Corporation and Mark

7    L. Kamholz, collectively the defendants, do hereby

8    stipulate and agree to the following fact:

9        "After taking possession of the property and

10   coke production facility at 3875 River Road,

11   Tonawanda, New York, on January 27th, 1978,

12   Tonawanda Coke Corporation did not place any of the

13   materials that are the subject of Counts 17 and 18

14   into the storage tanks that are described in those

15   two counts."

16       And this document is also, as with the first,

17   dated today, signed by Mr. Aaron Mango and Rocky

18   Piaggione on behalf of the United States; by myself

19   and Jeanne Grasso on behalf of Tonawanda Coke; and

20   by Mr. Rod Personius and Mark Kamholz.

21           THE COURT:  Okay.  Thank you, Mr. Linsin.

22       So stipulated, Mr. Mango?

23           MR. MANGO:  Yes, your Honor.

24           THE COURT:  Okay.  Mr. Piaggione?

25           MR. PIAGGIONE:  Yes, your Honor.

1          THE COURT:  Okay.  And Mr. Personius?

2          MR. PERSONIUS:  Yes, Judge.

3          THE COURT:  Okay.  The stipulation will be

4    received into evidence, ladies and gentlemen.  The

5    information that's the subject of the stipulation

6    is competent evidence should you choose to consider

7    it and factor it into your deliberations in

8    arriving at an unanimous verdict in this case.

9        Remember the government has the burden of proof

10   beyond a reasonable doubt, and both defendants are

11   presumed innocent until and if proven guilty.

12       Okay.  We are about to embark on witness number

13   three.  All right.  Mr. Mango.

14          MR. MANGO:  Yes, your Honor.  The

15   government will call Martha Hamre.

16          THE COURT:  Okay.  Good afternoon.  If you

17   would approach the witness stand and stand right

18   about there.  Don't enter it.  Stay right there.

19   We're going to have you sworn.

20   M A R T H A   E L I Z A B E T H   H A M R E, having

21   been duly sworn as a witness, testified as follows:

22          THE COURT:  Okay.  Good afternoon.  Get

23   yourself comfortable, please.  And arrange the

24   microphone so you speak at it in conversational

25   tone.  It's basically pretty friendly, so you just

1    have to not be intimidated by it.  Speak into the

2    microphone but not right on top of it.

3        Keep in mind a couple of basic rules.  One, if

4    you don't understand a question, ask that it be

5    repeated, whether it's the attorneys or me, and

6    that helps matters a lot.

7        Be as succinct with your answers as you can.

8    If you can answer a question yes or no, please try

9    to do that.  If -- if you volunteer information,

10   that becomes a problem, generally speaking.

11       If there's an objection, wait until I rule on

12   the objection.  Then I'll tell you whether to

13   answer the question, wait for another question, or

14   similar type instructions.  Do you understand?

15            THE WITNESS:  Yes.

16            THE COURT:  All right.  Let's see how

17   you're going to sound on that microphone.  State

18   your full name; spell your last name, please.

19            THE WITNESS:  Martha Elizabeth Hamre,

20   H-A-M-R-E.

21            THE COURT:  Okay, Miss Hamre, thank you.

22       Mr. Mango, your witness.

23            MR. MANGO:  Thank you, your Honor.

24   DIRECT EXAMINATION BY MR. MANGO:

25   Q.  Miss Hamre, are you currently employed?

1    A.   Yes.

2    Q.   Can you tell the jury where you are employed?

3    A.   I'm employed with the United States

4    Environmental Protection Agency, National

5    Enforcement Investigation Center.

6    Q.   Okay.  Does that sometimes go by the acronym

7    NEIC?

8    A.   Yes.

9    Q.   All right.  How long have you been employed

10   with NEIC?

11   A.   I've been employed for just over 14 years.

12   Q.   And what are your duties at NEIC?

13   A.   My primary duties are to coordinate and conduct

14   single-media and multimedia inspections at various

15   types of industrial facilities.

16   Q.   What -- all right.  First off, do you have a

17   job title?

18   A.   Yes.  I'm a chemical engineer.

19   Q.   All right.  You mentioned for the jury

20   single-media and multimedia.  Is this some type of

21   audiovisual presentation, or why don't you tell the

22   jury.

23   A.   Single -- in the EPA there's air, water,

24   hazardous waste.  Those would be three of the main

25   medias that you might inspect, and we might do a

1   Clean Air Act investigation, which was the case

2   here, or we might do an investigation that covered

3   multiple -- air, water, and waste or any

4   combination.

5   Q.   Okay.  Approximately how many on-site

6   inspections have you participated in during your

7   employment with NEIC?

8   A.   Eighty to a hundred.

9   Q.   And how many of those prior inspections

10  included a coke production facility?

11  A.   Three other ones prior to this.

12  Q.   Prior to -- we're going to talk about one at

13  the Tonawanda Coke Corporation.

14  A.   Yes.

15  Q.   So prior to that you had three?

16  A.   Yes.  Three.

17  Q.   Okay.  What other duties do you have as a

18  chemical engineer with NEIC?

19  A.   We provide technical consultation.  There's ten

20  EPA regions across the country.  We'll provide

21  consultation to them.  We also -- I also write

22  reports documenting the inspections that I conduct.

23  But my primary duty is to conduct inspections.

24  Q.   All right.  You mentioned there's ten different

25  regions.  What region does Western New York fall

1    into?

2    A.   That would be EPA Region 2.

3    Q.   Are they headquartered out of anywhere?

4    A.   New York City.

5    Q.   Now, during your 80 to 100 inspections, have

6    you developed a specialty in any particular area?

7    A.   My primary focus is Clean Air Act

8    investigations.

9    Q.   Do you have any particular educational

10   background that qualifies you for the position you

11   hold with NEIC?

12   A.   Yes.  I have a Bachelor of Science in chemical

13   engineering and petroleum refining from the

14   Colorado School of Mines.

15   Q.   What year did you obtain that Bachelor of

16   Science?

17   A.   1993.

18   Q.   Do you have any specific training by the EPA

19   for your current position?

20   A.   Yes.

21   Q.   Okay.  If you could tell the jury briefly.

22   A.   For example, I attended an air toxics workshop,

23   and I also have done a Method 9 emissions

24   evaluator, taken a course in that.

25   Q.   Just briefly, what is Method 9?

1    A.   Method 9 has to do with reading opacity out of

2    stacks at industrial facilities.

3    Q.   Okay.  Have you participated as a faculty

4    member for any EPA trainings?

5    A.   Yes.  I participated in a benzene waste NESHAP

6    training that was provided in EPA Region 4, which

7    is in Atlanta, in 2010.

8    Q.   Were you on the faculty of that training?

9    A.   Yes.

10   Q.   Okay.  Why don't you tell the jury what the

11   benzene waste NESHAP -- you mentioned NESHAP --

12   just tell them what you mean by that.

13   A.   Under the Clean Air Act there's a number of

14   regulations.  A section of them is NESHAP, which is

15   National Emission Standards for Hazardous Air

16   Pollutants.  And this particular training was

17   regarding a specific subpart in the regulations,

18   40 CFR Part 61, Subpart FF, which is the national

19   emissions standard for benzene waste operations.

20   Q.   Where -- where is the NEIC?

21   A.   The NEIC is located in Denver, Colorado.

22   Q.   And do you live in the Denver, Colorado, area?

23   A.   Yes.

24   Q.   What is the -- the function of the NEIC?

25   A.   The NEIC is a field office out of headquarters.

1    We have -- there's two primary functions at NEIC.

2    We have a laboratory that does analysis of various

3    materials, and then we also have a field branch,

4    which is the branch that I'm in, and we conduct

5    inspections for all ten -- the EPA has ten regions.

6    We conduct inspections for all ten EPA regions

7    and/or headquarters, if they ask.

8    Q.   How does NEIC determine where to conduct

9    inspections?

10   A.   There's -- the regions and headquarters request

11   our support in conducting an inspection.  There's

12   kind of an annual process that -- it might vary a

13   little, but typically happens about August of

14   whatever year, because the federal year, we're on a

15   fiscal calendar beginning October 1st through

16   September 30th.  So there's a request process that

17   happens prior to the next fiscal year, in which

18   we -- we receive requests to conduct inspections,

19   and then there's a process on how we -- we -- how

20   our management determines which inspections we can

21   do or not.

22   Q.   By way of background, in your role at NEIC have

23   you ever testified in a courtroom setting such as

24   this.

25   A.   No.

1    Q.   How do you feel about testifying here today?

2              MR. PERSONIUS:  Your Honor, object to how

3    she feels.

4              THE COURT:  I'd like to know, I think.

5    Overruled.

6              THE WITNESS:  I'm a little nervous.

7              THE COURT:  Okay.  We can move on then,

8    please.

9              MR. MANGO:  Yep.

10   BY MR. MANGO:

11   Q.   All right.  Prior to your role in NEIC, have

12   you held any positions in private industry?

13   A.   Yes.

14   Q.   Okay.  Can you tell the jury what -- what

15   position or positions you've held?

16   A.   I was employed by a company called Textron

17   Fastening Systems for about five years, and I was

18   the environmental health and safety coordinator

19   there.

20   Q.   Okay.  Let's switch gears now.  Did there come

21   a time when NEIC received a request to conduct an

22   inspection at the Tonawanda Coke Corporation?

23   A.   Yes.

24   Q.   Okay.  When did NEIC receive that request?

25   A.   In approximately August-September of 2008.

884

1    Q.   All right.  Where did that request come from?

2    A.   That request came from EPA Region 2.

3    Q.   Okay.  Was it a request for a civil inspection

4    or request for a criminal inspection?

5    A.   It was a request for a civil inspection.

6    Q.   And do you know if that request was approved or

7    denied?

8    A.   That request was approved.

9    Q.   And as a result of that approval, what happened

10   at that point?

11   A.   At that point I was assigned to work on that

12   inspection as the project manager, and other

13   colleagues of mine were assigned to the case also.

14   I was given a contact name in Region 2 that I

15   called, and from them I got who to contact at the

16   state office, the New York State Department of

17   Environmental Conservation.

18   Q.   Okay.  Did you then contact the DEC, we'll call

19   them?

20   A.   Yes.

21   Q.   All right.  Who did you contact at DEC?

22   A.   I contacted Larry Sitzman.

23   Q.   And why -- why would you contact Larry Sitzman?

24   A.   I contacted him to talk about the facility,

25   Tonawanda Coke, and to schedule a file review at

1    the DEC offices in Buffalo, to learn about -- about

2    the facility and also to tell them that we were

3    planning an inspection for April of 2009.

4    Q.   Okay.  And subsequently did you review the DEC

5    file?

6    A.   Yes.

7    Q.   You came to Buffalo before the inspection?

8    A.   Yes, I came to Buffalo in February of 2009.

9    Q.   Okay.  How thorough -- if you can explain for

10   the jury, how thorough was your review of the DEC

11   file?

12   A.   It was a cursory review.

13   Q.   Okay.  Following that review did you reach any

14   conclusions as to previous DEC inspections?

15   A.   It appeared, from looking at the file and with

16   discussions with Mr. Sitzman, that the primary

17   focus of the State had been on the coke oven

18   battery part of Tonawanda Coke.

19   Q.   Okay.  What was the focus of your inspection

20   that you were planning in April of 2009?

21   A.   The focus of our inspection was to look at the

22   coke by-products recovery part of the process.

23   That's what the request was from EPA Region 2.  And

24   we were primarily looking at two regulations.  The

25   NESHAPs that I mentioned before, there's -- there's

1    Subpart FF, the benzene waste operations, and then

2    there's also Subpart L, which is national emissions

3    standard for benzene emissions from coke by-product

4    recovery plants.

5    Q.   Okay.  So there's specific EPA regulations

6    dealing with emissions from a coke by-products

7    facility?

8    A.   Yes.

9    Q.   Okay.  Did you invite the DEC to participate in

10   your inspection?

11   A.   Yes.

12   Q.   Did the DEC participate in your inspection?

13   A.   Yes.

14   Q.   Okay.  When was the inspection scheduled to

15   begin?

16   A.   April 14th, 2009.

17   Q.   Okay.  Did there come a time prior to that that

18   you notified the Tonawanda Coke Corporation --

19   A.   Yes.

20   Q.   -- of your inspection?

21   A.   Yes.

22   Q.   Okay.  All right.  Who did you notify?

23   A.   I notified Mark Kamholz.

24   Q.   And do you recall when you notified him?

25   A.   It was the week prior to the inspection,

1    April 8th.

2    Q.  Okay.  I'd like to pull up on your screen, if

3    we could pull up Government Exhibit 117.113 for

4    identification purposes.  Ask you to take a look at

5    that.  If we need to zoom in, we can.  It is a

6    two-page document, so if you need to see the second

7    page as well, let me know.

8    A.  Okay.

9    Q.  Do you recognize this document?

10   A.  Yes.

11   Q.  Okay.  Generally speaking, what is this

12   document that you're looking at?

13   A.  This document is the notification letter that

14   after I called Mr. Kamholz and told him that we

15   would be coming to conduct an inspection, I sent

16   him an email that included this notification letter

17   that's on the screen, and I -- it also included a

18   document request list.

19           MR. MANGO:  Your Honor, absent an

20   objection, the government would move Government

21   Exhibit 117.13 into evidence.

22           MR. PERSONIUS:  Could we have a scroll of

23   what the rest of the exhibit is, please?

24           THE COURT:  Yes.

25           MR. MANGO:  There's the second page, your

1    Honor.

2              MR. LINSIN:  Your Honor, it's not

3    immediately apparent -- I don't necessarily have a

4    concern about the document, but it's not

5    immediately apparent what connection this witness

6    has to this document.  Perhaps if we could clarify

7    that.  And I believe the testimony was that this

8    document was also accompanied by a request for

9    information.  I don't know if that is going to be

10   offered simultaneously.

11             THE COURT:  Okay.  Let's follow up on

12   that, and then, Mr. Personius, if you have any

13   comments, I'll entertain those.  Okay?

14             MR. PERSONIUS:  Thank you, Judge.

15             THE COURT:  All right.  But I will not

16   admit it until you further inquire.

17             MR. MANGO:  Yes, your Honor.

18   BY MR. MANGO:

19   Q.  If we can go to the second page of this letter

20   please.  Who signed this letter?

21   A.  Gene Lubieniecki.

22   Q.  Okay.  Who is Gene Lubieniecki?

23   A.  He's the Civil Program Coordinator at NEIC.

24   Q.  And what relationship in your employment does

25   Gene Lubieniecki have to your position?

1    A.   He's not my direct supervisor.  He is in charge

2    of the civil program, so we work with him whenever

3    we're conducting a civil inspection.  He would be

4    the one that would sign any of those notification

5    letters, and we put in the letter who the contact

6    person is from NEIC, which in this case was myself.

7    Q.   Okay.  So were you aware that this letter was

8    sent out?

9    A.   Yes.

10   Q.   Did you request that this letter get sent out?

11   A.   I sent the letter in an email.

12   Q.   All right.  Now, we mentioned a document

13   request as well.  Let me -- if we could pull up

14   Government Exhibit 117.12 for identification

15   purposes.  This is also a two-page document.  And

16   let's scroll to the next page.

17        Okay.  Do you see that?

18   A.   Yes.

19   Q.   All right.  Now we can go back.  What is this

20   document?

21   A.   This is the NEIC document request list that was

22   sent in the email that I sent to Mr. Kamholz, prior

23   to the inspection, to let him know what records he

24   might want to pull together for the inspection so

25   that the inspection goes more smoothly.  We tried

1    to give him a heads-up of the types of things that

2    we'll be looking for, and, you know, things like a

3    site map, process flow diagrams, company

4    organizational chart, and then records -- specific

5    records pertaining to the two regulations that we

6    were inspecting.

7    Q.   Okay.  If we can go to the second page of

8    Government Exhibit 117.12, there's a handwritten

9    note on the bottom there.  Do you know whose

10   handwriting that is?

11   A.   No.

12   Q.   Okay.  But absent that handwriting, is this

13   document the information request that you sent?

14   A.   Yes.

15           MR. MANGO:  All right.  Your Honor,

16   limited with that explanation of not knowing whose

17   that handwriting is, which I think will become

18   clear later, but the government would move

19   Government Exhibit 117.13, the cover letter, and

20   117.12, the records request letter -- or

21   attachment, into evidence at this point.

22           THE COURT:  All right.  Ms. DiFilippo,

23   enlarge the handwriting on the second page of the

24   request for information, please.  Okay.  Thank you.

25       Mr. Linsin.

1          MR. LINSIN:  No objection, your Honor.

2          THE COURT:  Okay.  Mr. Personius?

3          MR. PERSONIUS:  We're trying to figure out

4    if that's Mr. Kamholz's writing, and if we were

5    certain it was, Judge, we would stipulate to it.

6    We think it is, but we're not positive.  But we

7    have no objection to the admission of the exhibits.

8          THE COURT:  Okay.  Then we will receive

9    without objection 117.13, 117.12.  And do you want

10   them --

11         MR. MANGO:  Yes, your Honor, I'd like to

12   briefly publish 117.13 just so the jury can -- this

13   is the cover letter -- so they can see what

14   Miss Hamre was looking at.

15         THE COURT:  All right.  First we'll

16   receive without objection 117.13, and it can be

17   published as well.  Thank you.

18             (Government's Exhibits 117.12 and 117.13

19             were received into evidence.)

20   BY MR. MANGO:

21   Q.  Okay.  So now, with this up on the screen here,

22   can you tell the jury again what this is?

23   A.  This is a notification letter that I sent to

24   Mr. Kamholz prior to our inspection, about a week

25   prior, in an email, and it's kind of -- it's our

1   standard notification letter, other than down where

2   it -- it shows the Section 14 -- 114 of the Clean

3   Air Act.  If we were looking at other medias,

4   water, whatever, there would be other things listed

5   there.

6   Q.  Okay.  And so you notate here that your

7   inspection is going to be beginning April 14th

8   of 2009.  Is that right?

9   A.  Yes.

10  Q.  All right.  And you e-mailed this to Defendant

11  Kamholz?

12  A.  Yes.

13  Q.  Okay.  Now, you -- let me clarify that.  Did

14  you later come to meet somebody by the name of Mark

15  Kamholz?

16  A.  Yes.

17  Q.  Had you met a person by the name of Mr. Kamholz

18  before you spoke to that person on April 8th?

19  A.  No, I had not.

20  Q.  Okay.  The person you later met to be Mark

21  Kamholz, do you see him here in court today?

22  A.  Yes.

23  Q.  All right.  Can you point to him?

24          MR. MANGO:  And again, your Honor, the

25  record would reflect Defendant Kamholz is standing

1    at this point.

2                THE COURT:  Yes.  Blue shirt, blue tie.

3    And the record will so reflect the identification

4    of Defendant Mark Kamholz has been made.

5                MR. MANGO:  Great.  Thank you, your Honor.

6    BY MR. MANGO:

7    Q.  So this was sent to Defendant Kamholz.  You

8    e-mailed it to him?

9    A.  Yes.

10   Q.  Okay.  Now if we can go -- I'd like to publish

11   Government Exhibit 117.12 at this point.

12               THE COURT:  Okay.  That's been received,

13   no objection, and it may be published.

14               MR. MANGO:  I'd like to zoom in on that

15   portion.  So, why don't you tell the jury --

16               THE COURT:  Hold on.  Question?  No?

17               MR. LINSIN:  None, your Honor.

18               THE COURT:  Okay.  Thank you.

19   BY MR. MANGO:

20   Q.  Why don't you tell the jury, please, what we're

21   looking at here, Miss Hamre.

22   A.  This is the document request list that was also

23   sent in the email to Mr. Kamholz on April 8th.  And

24   this goes through some documents that we would like

25   him to have -- have ready for the first day of our

1    inspection on April 14th, and then we also list

2    some other things that we might look at.  But, you

3    know, these are typical things that we would --

4    would request during an inspection.  A process flow

5    description, a site map of the facility.  We'd ask

6    for an organizational chart to understand how

7    environmental fits into the overall layout of the

8    company.  And then depending, like I said, on what

9    type of a facility it is, we would then list out

10   specific records that we would want to look at

11   pertaining to those regulations.

12   Q.  Okay.  And there is -- right there, 1A, you

13   mention this process flow diagram, is that correct?

14   A.  Yes.

15   Q.  Why -- why do you request a process flow

16   diagram?  What purpose does that serve you?

17   A.  When NEIC does an inspection, we try to do a

18   process-based inspection.  We like to understand

19   what the facility makes, what the raw materials are

20   coming in, and then what waste would be generated

21   as a result of processing the materials.  And then

22   that helps us to understand how the company fits

23   into the regulations and what's required of that

24   company.

25   Q.  Okay.  Typically when you go out on an

1    inspection, can you tell the jury whether --

2    whether you had -- you have had a previous contact

3    at that facility or previous inspection or whether

4    most of your inspections you have not had such

5    previous contact?

6    A.   Most inspections I have not met the facility

7    people until I call them and then meet them when we

8    go to do the inspection.

9    Q.   Okay.  Does a process flow diagram assist you

10   in learning about the location that you're going to

11   be inspecting?

12   A.   Yes.

13   Q.   All right.  Did you conduct -- we can take this

14   down.  Thank you.

15        Did you end up conducting an inspection at the

16   Tonawanda Coke Corporation?

17   A.   Yes.

18   Q.   Okay.  What -- when did that inspection begin?

19   A.   The inspection began on April 14th, 2009, and

20   that was a Tuesday.

21   Q.   Who was present as part of the inspection team

22   when you arrived on-site?

23   A.   It was myself and a colleague from NEIC, also,

24   Ken Garing.  There were three people from EPA

25   Region 2:  Harish Patel, Mozey Ghaffari and Richard

1    Kan.  And there were four from the State DEC

2    office, including Larry Sitzman and Cheryl Webster.

3    I don't recall the other two inspectors' names.

4    Q.  Okay.  Can you describe the process by which

5    you gained entrance to the Tonawanda Coke

6    Corporation on April 14th of 2009?

7    A.  We drove there.  There's -- we pulled up.

8    There's a guard shack, and we informed the guard

9    that we were with EPA and we were there to conduct

10   an inspection and our contact was Mark Kamholz.

11   Q.  Did you meet a person by the name of Mark

12   Kamholz at that point?

13   A.  Yes.  The guard called Mr. Kamholz, and he came

14   and met us at the guard shack.

15   Q.  All right.  And did you proceed to any

16   locations after that?

17   A.  We followed him in his vehicle, because there

18   was a distance between where the guard shack is and

19   his offices and a conference room that we were --

20   kind of our home base while we were at the

21   inspection.  So we followed him in our car over

22   to -- to that area of the plant.

23   Q.  Okay.  And you said at some point you made it

24   into a conference room?

25   A.  Yes.

1    Q.   What happened during this meeting in the

2    conference room?

3    A.   We had an opening conference where we went

4    through inspection logistics, tried to -- when I

5    had talked to Mr. Kamholz prior, we tried to find

6    out what typical operating hours are and tried to

7    work within what's his typical operating hours.

8    Then we had -- we presented our credentials.   We

9    have EPA credentials that we show at every

10   facility.

11       And then I asked Mr. Kamholz to go through a

12   facility background, and also then he went through

13   a process description of the by-products plant.

14   Q.   Okay.   So did he provide a facility overview at

15   that point?

16   A.   Yes.

17   Q.   Okay.   And then at some point, you said, he

18   transitioned into an overview of the by-products --

19   A.   Yes.

20   Q.   -- department?

21       Now, during your inspections do you take notes?

22   A.   Yes.

23   Q.   All right.   And you've maintained those notes,

24   is that right?

25   A.   Yes.

1    Q.   During the discussion that Defendant Kamholz

2    provided you about the by-products area of the

3    plant, did he provide you with any documents?

4    A.   Yes.

5    Q.   Okay.  What documents were provided?

6    A.   He gave us a site map, and he also gave us a

7    one-page process flow diagram of the by-products

8    area.

9    Q.   Okay.  I'd like to show you Government

10   Exhibit 15.03 for identification purposes.

11   Miss Hamre, do you see that on your screen?

12   A.   Yes.

13   Q.   Do you recognize this document?

14   A.   Yes.

15   Q.   What is this document you're looking at?

16   A.   This is the coke by-products process

17   description flow diagram that Mr. Kamholz provided.

18   Q.   How do you know this is the document that you

19   received from Defendant Kamholz?

20   A.   I know it's the document I received from

21   Mr. Kamholz because in the upper right corner of

22   the document there is a notation with my

23   handwriting with a unique number that I log into my

24   notebook.

25            MR. MANGO:   Okay.  Your Honor, at this

1    point the Government would offer Government's

2    Exhibit 15.03 into evidence.

3            MR. LINSIN:  No objection.

4            MR. PERSONIUS:  No objection, Judge.

5            THE COURT:  Okay.  Do you want it

6    published?

7            MR. MANGO:  Yes, please.

8            THE COURT:  It may be.  It's received, no

9    objection.

10           (Government's Exhibit 15.03 was received

11           into evidence.)

12   BY MR. MANGO:

13   Q.  All right.  If we could focus on this just top

14   half, please.

15       Okay.  So, why don't you explain for the jury

16   what -- what document they're looking at now.

17   A.  This is the coke by-products process flow

18   diagram that Mr. Kamholz walked through with myself

19   and the other inspectors on April 14th.

20   Q.  Okay.  Does this by-products -- actually, if we

21   can come back out and get the whole picture in --

22   does this flow diagram indicate that there was a

23   pressure-release valve in the by-products area?

24   A.  No.

25   Q.  During your discussion, did the issue of a

1    pressure-release valve in the by-products area come

2    up during Defendant Kamholz's presentation?

3    A.   Yes.

4    Q.   How did it come up?

5    A.   Mr. Kamholz was asked if there were any

6    pressure-relief valves, and he said no.

7    Q.   Was the light oil recovery system discussed

8    during Defendant Kamholz's presentation?

9    A.   Yes.

10   Q.   What did he indicate about the light oil

11   recovery system?

12   A.   He indicated that the light oil recovery system

13   had been out of service since November 20th of

14   2008.

15   Q.   November 20th, 2008.  And based on your

16   experience, would that indicate that after

17   November 20th of 2008 there would be more or less

18   benzene in the coke oven gas?

19   A.   There would be more.

20   Q.   Okay.  What happened next after this discussion

21   in the conference room?

22   A.   After we finished going through the process

23   flow, we then went out into the plant and did a

24   plant tour of the by-products area.

25   Q.   Did that tour include the by-products area?

1    A.   Yes.

2    Q.   Did Defendant Kamholz, while you were in the

3    by-products area, indicate that there was a

4    pressure-relief valve in the by-products area?

5    A.   No.

6    Q.   Okay.  Did you make some general observations

7    while you did this -- should we call it your

8    initial walk-through?

9    A.   Yes.

10   Q.   Did you make some observations while you did

11   your initial walk-through of the plant?

12   A.   Yes.

13   Q.   All right.  Please describe what you observed

14   during the walk-through with Defendant Kamholz.

15   A.   During our walk-through we went past weak

16   ammonia liquor storage tanks, and they had a large

17   hole in the top of one of them, multiple holes.

18   That's the first thing we saw.

19       The equipment was primarily rusty, appeared to

20   be older.  Generally poor housekeeping.  Grime and

21   dirt on the ground and around.  It didn't appear

22   that the equipment had been painted in quite some

23   time.

24       And then when we got further down the road,

25   there was a containment area, which is a curbing

1    around some of their process units, and the purpose

2    of containment is in case one of the vessels within

3    the curbing would rupture, it would contain

4    whatever was in the vessel instead of dumping onto

5    the ground, maybe get into the stream or whatever.

6    And this containment was halfway full of processed

7    liquids, storm water.  There was sludge in the

8    bottom.  Appeared to be tar floating in the water.

9    Q.  Did you smell anything while you were in the

10   by-products area?

11   A.  There was some strong odors, walking past the

12   weak ammonia liquor storage tanks, and still there

13   was a strong smell of ammonia over by the -- this

14   secondary containment that they referred to as the

15   moat.  Kind of smelled like tar and other

16   process -- process materials.

17   Q.  Okay.  I'd like to show you at this point for

18   identification purposes Government

19   Exhibit 150.02.033 -- I'm sorry, .003.  15.02.003.

20   Do you see that on your screen, Miss Hamre?

21   A.  Yes.

22   Q.  Just generally can you tell the -- tell the

23   jury what --

24   A.  That's one of the weak ammonia liquor storage

25   tanks.

1    Q.  And was this one of your concerns during your

2    initial walk-through?

3    A.  Yes.

4    Q.  All right.  Who took this photograph?

5    A.  I took the photograph.

6              MR. MANGO:  All right.  Your Honor, I'd

7    ask that Government Exhibit 15.02.003 be

8    published -- or admitted into evidence and

9    published for the jury.

10             MR. LINSIN:  No objection, your Honor.

11             MR. PERSONIUS:  No objection, Judge.

12             THE COURT:  Okay.  Received, no objection.

13   May be published.

14             (Government's Exhibit 15.02.003 was

15             received into evidence.)

16   BY MR. MANGO:

17   Q.  Okay.  If we could just focus in on that.

18        Again, tell the jury what they're seeing here

19   and what your concern was.

20   A.  This is one of the weak ammonia liquor storage

21   tanks.  And the large holes in the tank and their

22   rusty condition was a concern of the integrity of

23   the tank, and this tank was in service.

24   Q.  So this tank was used as part of the ammonia

25   removal system?

1    A.   As -- it's the tank that holds the weak ammonia

2    liquor prior to being fed into the ammonia still.

3            MR. MANGO:  All right.  I'd like to show

4    you for identification purposes Government

5    Exhibit 15.02.008.  And absent an objection, your

6    Honor, offer this into evidence.

7            MR. LINSIN:  No objection, your Honor.

8            MR. PERSONIUS:  No objection, your Honor.

9            THE COURT:  Okay.  15.02.008 received, no

10   objection.  May be published.

11           (Government's Exhibit 15.02.008 was

12            received into evidence.)

13           MR. MANGO:  Thank you, your Honor.

14   BY MR. MANGO:

15   Q.  Miss Hamre, what are we looking at here?  If

16   you could tell the jury, please.

17   A.  The vessel in the -- that I have the arrow on

18   there, that's the surge tank, which is upstream of

19   the previous photo you just looked at.  This would

20   feed those ammonia stripper tanks.  And this vessel

21   is inside what I talked about, the secondary

22   containment.  This is the -- the curb and, you

23   know, in here is the moat area, with the wood

24   pallets and process fluids and storm water inside.

25           MR. MANGO:  Your Honor, I'd like to show

1      Government Exhibit 15.02.012, and absent an

2      objection, offer this into evidence.

3                MR. LINSIN:  No objection, Judge.

4                MR. PERSONIUS:  No objection, your Honor.

5                THE COURT:  Okay.  15.02.012 received.  No

6      objection, may be published.

7                MR. MANGO:  Thank you, your Honor.

8                (Government's Exhibit 15.02.012 was

9                received into evidence.)

10   BY MR. MANGO:

11    Q.  Miss Hamre, what are we looking at in this

12    photograph?

13    A.  This is another view of the moat area just down

14    from the previous photo.

15    Q.  All right.  And what is all of this area in the

16    background here, if you could tell us?

17    A.   That's -- that's part of the coke by-products

18    recovery plant.  You have two tar storage tanks,

19    the two I marked, and then the primary cooler, you

20    can see just the bottom of it in this photo, and

21    then a bunch of piping.

22    Q.  Okay.  What is the primary cooler designed to

23    do in a by-product -- coke by-product recovery

24    plant?

25    A.  To cool the gas coming off of the coke battery.

1    Q.   Okay.  Why do you want to cool the coke oven

2    gas?

3    A.   You need to cool it so that then you can

4    recover the tars and separate out, in some cases,

5    the light oils.  Not in their case.  And then that

6    gas is reused back in the coke ovens and boilers.

7                MR. MANGO:  I'd like to show you

8    Government Exhibit 15.02.014 for identification

9    purposes, and absent an objection, offer that into

10   evidence.

11               MR. LINSIN:  No objection, your Honor.

12               THIRD SPEAKER:  No objection, Judge.

13               THE COURT:  All right.  15.02.014

14   received, no objection.  May be published.

15               (Government's Exhibit 15.02.014 was

16               received into evidence.)

17   BY MR. MANGO:

18   Q.   Thank you.  Miss Hamre, can you tell the jury

19   what we're looking at here in this photograph?

20   A.   This is what was called the BH collection tank,

21   and it's also inside the same moat area.

22   Q.   And what is collected in the BH tank?

23   A.   It's liquor, the water that's sprayed in the

24   primary.  I mean, it's kind of a circular loop, but

25   water that's sprayed, used to cool the gas, makes

1    it back to the BH collection tank, and then it's

2    reused to spray again on the coke oven gas header

3    at the beginning of the process.

4              MR. MANGO:  I'd like to show you

5    Government Exhibit 15.02.015 for identification

6    purposes.  And absent an objection, offer this into

7    evidence.

8              MR. LINSIN:  No objection, your Honor.

9              MR. PERSONIUS:  No objection, Judge.

10             THE COURT:  Okay.  Received, no objection.

11   May be published.

12             (Government's Exhibit 15.02.015 was

13             received into evidence.)

14             MR. MANGO:  Thank you, your Honor.

15   BY MR. MANGO:

16   Q.  Miss Hamre, what is the jury looking at in this

17   photograph?

18   A.  This is a pump tied to one of the sumps inside

19   the secondary containment area, that's used to pump

20   the secondary containment area out.  I believe that

21   at the time we were there, my recollection is there

22   were eight sumps, but only a couple of the pumps

23   were working at the time.

24   Q.  Okay.  Is this a rag here?

25   A.  Yes.

908

1    Q.   Okay.  What was the purpose of that rag?

2    A.   There was material leaking out of the piping

3    there, and they placed the rag so it wasn't

4    spraying up as you walked by.

5              MR. MANGO:  I'd like to show you

6    Government Exhibit 15.02.060, and absent an

7    objection, offer that into evidence, your Honor.

8              MR. LINSIN:  No objection, Judge.

9              MR. PERSONIUS:  No objection, your Honor.

10             THE COURT:  Okay.  15.02.060 is received,

11   no objection.  May be published.

12             (Government's Exhibit 15.02.060 was

13             received into evidence.)

14             MR. MANGO:  Thank you, your Honor.

15   BY MR. MANGO:

16   Q.   Miss Hamre, can you tell the jury what we're

17   looking at here?

18   A.   This is another picture of the moat from the

19   back road toward the landfill side of the facility.

20   And on the far right you see the two tar storage

21   tanks.

22   Q.   Would you put arrows on them?

23       Okay.  Is there another pump in this area here?

24   A.   Yes.  I believe that's a pump.

25             MR. MANGO:  All right.  All right.  I'd

1    like to show you Government Exhibit 15.02.018.  And

2    absent an objection, your Honor, offer this into

3    evidence.

4              MR. LINSIN:  No objection, your Honor.

5              MR. PERSONIUS:  No objection, Judge.

6              THE COURT:  Okay.  15.02.018 received, no

7    objection.  May be published.

8              (Government's Exhibit 15.02.018 was

9              received into evidence.)

10   BY MR. MANGO:

11   Q.  All right, Miss Hamre, can you tell the jury

12   now what we're looking at?

13   A.  You're looking at two tar precipitator sumps.

14   Q.  Why don't you explain what a tar precipitator

15   sump is.  First, can you just put the dots where

16   those are on the screen?

17        Okay.  Why don't you tell the jury what a tar

18   precipitator sump is.

19   A.  The -- in the regulations it would be defined

20   as a tar intercepting sump, and it would receive

21   tar and liquor and be sent to the -- the tar

22   decanter.

23   Q.  Now, is there anything significant about this

24   photograph that you're looking at?

25   A.  Those two sumps should have been covered and

1    controlled, under Subpart L.

2    Q.   That's in the regulations?

3    A.   Yeah, that's in the regulations.

4           MR. MANGO:   All right.   If we can please

5    look at Government Exhibit 01 -- 15.02.019 for

6    identification purposes, and absent an objection,

7    offer this into evidence.

8           MR. LINSIN:   No objection, Judge.

9           MR. PERSONIUS:   No objection, your Honor.

10          THE COURT:   Okay.   15.02.019 received, no

11   objection.   May be published.

12          (Government's Exhibit 15.02.019 was

13          received into evidence.)

14   BY MR. MANGO:

15   Q.   All right.   Miss Hamre, can you tell the jury

16   now what we're looking at?   Does this relate to the

17   previous photograph?

18   A.   Yeah.   The two sumps we were looking at in the

19   prior photograph were at the bottom in the front,

20   but the vessel behind them is the tar precipitator.

21   Q.   What happens -- if you can tell the jury, if

22   you know, what happens in the tar precipitator at

23   the Tonawanda Coke facility?

24   A.   The tar precipitator charges any -- or

25   remaining tar particles in the coke oven gas, puts

1    a charge on them, and removes them out of the gas

2    stream from going further down the line.  That's

3    the intent of the tar precipitator.

4    Q.  Okay.  And what is this structure?  What are

5    these red pipes?

6    A.  Those are coke oven gas lines.

7    Q.  Okay.  Again, part of the piping for the

8    by-products system?

9    A.  Yes.

10            MR. MANGO:  All right.  I'd like to show

11   you Government Exhibit 15.02.020, and absent an

12   objection, your Honor, offer this into evidence.

13            MR. LINSIN:  Your Honor, may we approach

14   briefly?

15            THE COURT:  I'm sorry?

16            MR. LINSIN:  May we approach briefly?

17            THE COURT:  Sure.

18            (Side bar discussion held on the record.)

19            MR. LINSIN:  Your Honor, we have -- I

20   raised no objection to any photographs depicting

21   conditions.  The witness's response to the last

22   photograph cited a violation of a Subpart L of the

23   NESHAP regulations.

24            THE COURT:  You mean the covering?

25            MR. LINSIN:  Exactly.  As the Court may

1    recall, this is certainly not anything that has

2    been noticed under 404(b).  My asking to come

3    forward is simply to ensure that there are no

4    additional questions put to this witness or

5    responses from the witness itemizing additional

6    regulatory violations that she may have detected.

7              MR. MANGO:  Well, your Honor, the next

8    photo we brought up, actually there is.  It's

9    consistent with the other photographs.  And I think

10   the -- this witness's observations of what she saw

11   on the ground I think is very compelling here,

12   because the -- their defense argument is that DEC

13   should have been aware of this and missed it.  And

14   these photographs are what her observations of the

15   plant there.  And I think the jury really needs to

16   get that.

17       I mean, I don't have too many more photographs

18   that she took.  She did take a lot.  I've culled

19   them down significantly.  I do have a few others,

20   but I think it's -- it's important for the jury to

21   get a sense of what it was like on the ground at

22   the Tonawanda Coke facility.

23             THE COURT:  Why wasn't this proffered as

24   404(b)?

25             MR. MANGO:  Because, your Honor, the

1     government doesn't view this as 404(b) evidence,

2     because this is -- this is the case.  This is

3     the -- the -- the -- the inspector's observations

4     of the ground.  And once the defendants made this

5     issue that the DEC should have known and missed it,

6     this is -- this is just the very heart of the case.

7     So we didn't feel necessary to raise this as

8     404(b).  But regardless, these photographs have

9     been marked as government exhibits since the

10    beginning, and I say all the -- all the iterations

11    of the government exhibit list and --

12          THE COURT:  Well, the photographs are what

13    purportedly this witness observed.

14          MR. MANGO:  Yes, your Honor.

15          THE COURT:  But I think your objection or

16    concern is her testimony that these constitute

17    violations.

18          MR. LINSIN:  That is precisely my concern,

19    your Honor.

20          THE COURT:  I mean, are you -- are you

21    willing to proceed with the observations with

22    respect to her determination that these violate

23    certain regs?

24          MR. MANGO:  I'm sorry?  I missed that

25    request.

1          THE COURT:  If you continue the

2     examination, there's no objection to the

3     photographs.

4          MR. MANGO:  Okay.

5          THE COURT:  The concern is her further

6     testimony that what she observed are violations.

7     And my question is:  Are you willing to proceed

8     going forward with just her observations and not

9     her determination that that constitutes a violation

10    of a particular regulation?

11         MR. MANGO:  Yes, your Honor.  I can do

12    that.

13         THE COURT:  Okay.

14         MR. MANGO:  In the event -- in the event

15    some question comes up during cross-examination as

16    to why -- why the --

17         THE COURT:  See, I think you have to do

18    that, at least based on your summary, and I think

19    that's probably true with respect to not having

20    raised it as a 404(b) matter.  I'm not so sure I

21    necessarily agree with your argument, but you only

22    have her described as not rendering any opinion

23    with respect to whether something is a violation or

24    not.  But if it relates to a conversation she had

25    with Defendant Kamholz, that's a different story.

1          MR. MANGO:  Okay.

2          THE COURT:  So, does that satisfy you?  I

3    think the ground rules are you can proceed with

4    observations but not questions with respect to

5    whether that constitutes a violation of a

6    particular reg.

7          MR. MANGO:  I understood, your Honor.

8          MR. LINSIN:  And my only question --

9    additional question would be whether -- given the

10   preparation that's been done with this witness,

11   whether a cautionary instruction from counsel to

12   the witness might be appropriate.  I do not know

13   what the preparation has consisted of in terms of

14   what's going to be prompted by any given

15   photograph, and I'd rather not have something

16   blurted out and have to come stand up again to

17   object.

18         THE COURT:  If we do that, it's going to

19   accentuate that you don't want to get into, because

20   the cautionary instruction would be to the jury?

21         MR. LINSIN:  No, no.  I'm asking if it

22   might be necessary for Mr. Mango to provide an

23   instruction to his witness not to volunteer

24   information.

25         MR. MANGO:  Your Honor, I don't think

1    that's necessary.  If the Court wants me to do

2    that, I will.  I don't think it's necessary.  I'm

3    prepared to show her these photographs.  She was

4    prepared, upon being asked, you know, what were

5    your concerns about this photograph.  So I just

6    won't ask that question.

7              THE COURT:  Okay.  We'll leave it at that,

8    all right, because, I mean, just from observing her

9    responses, they're really deliberate as to the

10   question, so if you don't have a question before

11   her, I suspect she is not going to answer it.  She

12   is not going to try to read your mind, Mr. Mango.

13             MR. MANGO:  I don't think so.

14             THE COURT:  Okay.

15             MR. MANGO:  Thank you, your Honor.

16             THE COURT:  Mr. Personius, anything?

17             MR. PERSONIUS:  Thank you, Judge.  Thanks

18   for asking.

19             THE COURT:  You're welcome.

20             (End of side bar discussion.)

21             THE COURT:  You wouldn't believe the

22   progress we made in that discussion, so don't feel

23   left out.  Okay?

24             MR. MANGO:  Your Honor, I believe I had

25   marked for identi -- may I proceed?

1              THE COURT:  You may.

2              MR. MANGO:  Thank you.  I believe I had

3    marked for identification purposes Government

4    Exhibit 15.02.020 for identification purposes, and

5    absent an objection, I would offer this into

6    evidence.

7              THE COURT:  Yes.

8              MR. LINSIN:  No objection, Judge.

9              MR. PERSONIUS:  No objection, your Honor.

10             THE COURT:  Okay.  Thank you.  No

11   objection.  15.02.020 received.  May be published.

12             (Government's Exhibit 15.02.020 was

13             received into evidence.)

14             MR. MANGO:  Thank you, your Honor.

15   BY MR. MANGO:

16   Q.  Miss Hamre, can you tell the jury what they're

17   looking at here, just what is this?

18   A.  This is another sump.  It's the secondary

19   cooler sump.

20   Q.  Okay.  Is this located in the by-products area?

21   A.  Yes.

22             MR. MANGO:  Okay.  I'd like to show you

23   for identification purposes Government

24   Exhibit 15.02.064, and absent an objection, offer

25   that into evidence.

1          MR. LINSIN:  No objection, your Honor.

2          THE COURT:  Okay.  15.02.064 --

3          MR. PERSONIUS:  No objection either.

4          THE COURT:  -- no objection.  Received.

5     May be published.

6          (Government's Exhibit 15.02.064 was

7          received into evidence.)

8          MR. MANGO:  Thank you, your Honor.

9     BY MR. MANGO:

10    Q.  Miss Hamre, can you tell the jury what they're

11    looking at in this photograph?

12    A.  This is an overview of piping and valving.  In

13    front of the -- the bottom of the primary cooler is

14    this reddish-colored vessel behind the piping.

15    Q.  Okay.  Where was this photograph -- where were

16    you -- did you take this photograph?

17    A.  Yes.

18    Q.  Where were you standing when you took this

19    photograph?

20    A.  On the ground.

21    Q.  All right.  We can take that down.  Thank you.

22         So, now, how long did your inspection last, if

23    you could just tell the jury?

24    A.  Our inspection lasted until April 21st, 2009.

25    Q.  Okay.  And in general detail, can you tell the

1    jury what you did during your inspection?

2    A.   During the inspection we looked, we went

3    through the process, asked questions about the

4    process.  We went out into the plant a number of

5    times to look at different equipment.  We did some

6    monitoring.  And a portion of the inspection was

7    looking at the benzene waste that they had in the

8    facility.  And then a closeout at the end of the

9    inspection.

10   Q.  All right.  We'll talk a little bit about that.

11   Now, the photographs we just went through, during

12   your testimony you had said you had some concerns

13   about the facility, is that right?

14   A.  Yes.

15   Q.  All right.  Now, did you take other photographs

16   during the course of your inspection?

17   A.  Yes.

18           MR. MANGO:  All right.  I'd like to show

19   you Government Exhibit 15.02.007 for identification

20   purposes.

21       Absent an objection, your Honor, the government

22   would offer this into evidence.

23           MR. LINSIN:  No objection, your Honor.

24           MR. PERSONIUS:  No objection, Judge.

25           THE COURT:  Okay.  15.02.007 received, no

1    objection.  May be published.

2              (Government's Exhibit 15.02.007 was

3              received into evidence.)

4              MR. MANGO:  Thank you, your Honor.

5    BY MR. MANGO:

6    Q.  Miss Hamre, can you tell the jurors what --

7    what they're looking at in this photograph?

8    A.  You're looking at a -- this is the coke oven

9    gas return line, and there's a drip leg coming off

10   the coke oven gas line that's going inside of the

11   moat area.  And a drip leg -- even though it is a

12   gas line, there's still some moisture in the gas,

13   and as it has time to cool and move down the line,

14   some condensate will come out.  And there's a few

15   drip legs throughout the by-products area, and this

16   is an example of one of them.

17   Q.  Okay.  Did you take this photograph?

18   A.  Yes.

19   Q.  Were you standing on the ground during this

20   photograph?

21   A.  Yes.

22   Q.  Okay.  So this depicts one of those drip legs.

23   A.  Yes.

24   Q.  The drip legs you saw at the Tonawanda Coke

25   Corporation facility, were those in the open

1    position or in the closed position when you saw

2    them?

3    A.   As I recall, they were closed.

4           MR. MANGO:   I'd like to show you

5    Government Exhibit 15.02.022 for identification

6    purposes, and absent an objection, offer that into

7    evidence.

8           MR. LINSIN:   No objection, your Honor.

9           MR. PERSONIUS:   No objection, your Honor.

10          THE COURT:   Okay.   15.02.022 received, no

11   objection.   May be published.

12          (Government's Exhibit 15.02.022 was

13          received into evidence.)

14          MR. MANGO:   Thank you, your Honor.

15   BY MR. MANGO:

16   Q.   Miss Hamre, what is this photograph that the

17   jury is looking at?

18   A.   This is a photo I took of -- this is five drip

19   legs coming in from various locations in the

20   by-products plant.

21   Q.   Okay.   So a different location than the

22   photograph we just looked at?

23   A.   Yes.

24   Q.   But more of the same.   These are drip legs?

25   A.   Yes.

1    Q.   Were these also in the closed position?

2    A.   As I recall, yes.

3              MR. MANGO:  I'd like to show you

4    Government Exhibit 15.02.026 for identification

5    purposes.  And absent an objection, your Honor,

6    offer this into evidence.

7              MR. LINSIN:  No objection, your Honor.

8              MR. PERSONIUS:  No objection, Judge.

9              THE COURT:  Received, no objection.  May

10   be published.

11             (Government's Exhibit 15.02.026 was

12             received into evidence.)

13   BY MR. MANGO:

14   Q.   All right.  Miss Hamre, can you tell the jury

15   what we're looking at in this photograph?

16   A.   In this photograph in the background you've got

17   the primary cooler, the secondary cooler, some coke

18   oven gas lines, and then this plywood shed here is

19   where they have their exhausters, which the gas

20   comes off the oven, and that provides the mode of

21   force to get the gas back around back to be fed

22   into the ovens.  It pulls it on the one side and

23   then pushes it.  Once it gets past the exhausters,

24   it's pushing it.

25             THE COURT:  What's that structure with the

1      green door?

2                  THE WITNESS:  I'm not sure what that is.

3                  THE COURT:  Thank you.

4      BY MR. MANGO:

5      Q.  During your inspection did you have a chance to

6      go in the exhauster building?

7      A.  Yes.

8                  MR. MANGO:  Okay.  I'd like to show you

9      Government Exhibit 15.02.027 for identification

10     purposes.  And absent an objection, your Honor,

11     offer this into evidence.

12                 MR. LINSIN:  No objection, your Honor.

13                 MR. PERSONIUS:  No objection, Judge.

14                 THE COURT:  All right.  Received, no

15     objection.  May publish.

16                 (Government's Exhibit 15.02.027 was

17                 received into evidence.)

18     BY MR. MANGO:

19     Q.  Miss Hamre, what are we looking at in this

20     photograph?

21     A.  This is the light oil column.

22     Q.  What is the purpose of the light oil column?

23     A.  At the time of the inspection, this portion was

24     out of service, although the coke oven gas was just

25     flowing through it, but you would contact the gas

924

1    with a heavy wash oil so it could absorb some of

2    the light oils in the gas.

3              THE COURT:  All right.  Miss DiFillipo, I

4    think it's 15.02.027.  Okay.  Thank you.

5    BY MR. MANGO:

6    Q.  There's a -- the light oil, can you --

7    scrubber -- can you put a dot on it?

8    A.  For the -- the light oil column is this tall

9    column here.

10   Q.  Okay.  What is this white rusted structure to

11   the left of the column?

12   A.  I don't recall.

13   Q.  Okay.  Was it in service at the time of your

14   inspection?

15   A.  I do not believe so, no.

16   Q.  And we see a little bit of a building there.

17   Do you know what that building was?

18   A.  That building, from this angle I'm not certain.

19   I don't believe that is the ammonia still building.

20   I believe that's a maintenance building.

21             MR. LINSIN:  Your Honor, just an objection

22   to belief.  If the witness has a recollection --

23   I'm just trying to get oriented rather than

24   guessing.

25             THE COURT:  Yeah.  I think I'll sustain

1    that.  You want me to strike the response?

2              MR. LINSIN:  I just ask we move on.

3              THE COURT:  Okay.  Let's move on, please.

4              MR. MANGO:  Yes.

5              THE COURT:  Thank you.

6              MR. MANGO:  I'd like to show you

7    Government Exhibit 15.02.028 for identification

8    purposes.  And absent an objection, your Honor,

9    offer this into evidence.

10             MR. LINSIN:  No objection, Judge.

11             MR. PERSONIUS:  No objection, Judge.

12             THE COURT:  Okay.  Received, no objection.

13   May be published, please.

14             MR. MANGO:  Thank you.

15             (Government's Exhibit 15.02.028 was

16             received into evidence.)

17   BY MR. MANGO:

18   Q.  Miss Hamre, can you tell the jury what they're

19   looking at in this photograph?

20   A.  This is a picture of the ammonia removal

21   system.

22   Q.  And what is the -- again, what is this system

23   here designed to do?

24   A.  It's the gas goes through each of these three

25   tanks in the first one and the second one and third

1    one, in series, we call that, from the bottom up to

2    the top, and there's water that's sprayed in the

3    top, and its -- the purpose is to remove ammonia.

4    Q.   There is somebody looking at something in this

5    area.  Was there anything that you noted in that

6    area?

7    A.   There is a sump in that area.

8    Q.   Okay.  Is that the steam coming out of that or

9    some type of gas?

10   A.   Yes, there's steam coming out of the sump

11   there.

12   Q.   Is this -- where is this picture taken from, if

13   you can just orient the jury, if you could just

14   tell them where this structure is.

15   A.   This would be on the back side.  Not the main

16   road that divided the coke battery from the

17   by-products plant, but there was another road on

18   the back side toward the landfill, which is

19   somewhat north, I think.

20   Q.   Okay.  I'd like to show you Government

21   Exhibit --

22           THE COURT:  Before you -- is this an

23   appropriate time to take a break?

24           MR. MANGO:  Yes, your Honor.

25           THE COURT:  Are you finishing up with this

1    witness or --

2              MR. MANGO:  We still have a little bit to

3    go, so this may be a good time to break.

4              THE COURT:  Okay.  Let's break until 4:00.

5              (Jury excused from the courtroom.)

6              THE COURT:  Okay.  Thank you.

7              (Short recess was taken.)

8              (Jury seated.)

9              THE COURT:  All set?  Welcome back.  Have

10   a seat, please.  Okay.  The attorneys and parties

11   are back present.  The jury is here.  Roll call

12   waived.  Witness Martha Hamre is on the witness

13   stand.  She's on direct examination, government's

14   case.  Government has the burden beyond a

15   reasonable doubt, and the witness has -- remains

16   under oath.

17       You may resume questioning.

18              MR. MANGO:  Thank you, your Honor.

19       I'd like to pull up for identification purposes

20   Government Exhibit 15.02.066 for identification

21   purposes.  Absent an objection, your Honor, offer

22   this into evidence.

23              MR. LINSIN:  No objection.

24              THE COURT:  Give me the number again,

25   please.

1          MR. MANGO:  15.02.066.

2          THE COURT:  Okay.  No objection.

3          MR. PERSONIUS:  No objection, Judge.

4          THE COURT:  Received, and may be

5     published.

6          MR. MANGO:  Thank you, your Honor.

7          (Government's Exhibit 15.02.066 was

8          received into evidence.)

9    BY MR. MANGO:

10   Q.  Miss Hamre, can you tell the jury what we're

11   looking at in this photograph?

12   A.  This is a photograph of the primary cooler.

13   The red vessel here -- don't know what I just did

14   here.  And then the two tar storage tanks are on

15   the left in the bottom here, and just an over --

16   another overview shot of the by-products area.

17          MR. MANGO:  All right.  I'd like to show

18   you Government Exhibit 15.02.101 for identification

19   purposes.  And absent an objection, offer this into

20   evidence.

21          MR. LINSIN:  No objection, your Honor.

22          MR. PERSONIUS:  No objection, your Honor.

23          THE COURT:  Okay.  15.02.101, no

24   objection.  Received.  May be published.

25          (Government's Exhibit 15.02.101 was

1           received into evidence.)

2               MR. MANGO:  Thank you, your Honor.

3      BY MR. MANGO:

4      Q.  Miss Hamre, can you tell the jury what they're

5      looking at in this photograph?

6      A.  This is a line coming off of the primary cooler

7      routed to the tar decanter, and there was something

8      dripping from above, and I zoomed in to try to get

9      a shot of the pipe with the material on it.

10     Q.  That's this material on this line?

11     A.  Yes.

12     Q.  Okay.  Thank you.  All right.  Did there come a

13     time during your inspection that you came to notice

14     a pipe that was emitting gas periodically?

15     A.  Yes.

16     Q.  When did you first notice that pipe?

17     A.  I first noticed that pipe on Friday, which

18     would be the fourth day of the inspection,

19     April 17th.

20     Q.  What -- if you could tell the jury, what

21     exactly did you notice?

22     A.  While we were walking out on the main road

23     between the coke plant and the by-products area, I

24     noticed a cloud shadow on the ground, and I looked

25     up in the sky.  And it was a clear day, so I turned

930

1   around to look and see where the -- you know, where

2   the cloud was coming from, and I saw a pipe on the

3   coke oven gas line emitting gas into the air.

4   Q.   What have you come to call that pipe?

5   A.   The pressure-relief valve.  Bleeder valve was

6   also a term used by Tonawanda Coke.

7   Q.   Okay.  How far off the ground was this release

8   that you said of gas that you observed?

9   A.   40 to 50 feet off the ground.

10  Q.   How long did the release last that you

11  observed?

12  A.   Approximately 15 seconds.

13  Q.   Okay.  What did you do at that point that

14  you -- when you observed the release?

15  A.   I pointed it out to Ken Garing, who was also

16  part of the inspection team, while we were walking

17  out.

18  Q.   What time of day was this?

19  A.   This was in the morning.

20  Q.   Did you see the pressure-release valve, bleeder

21  valve, release again that morning?

22  A.   Yes.  A couple of times.

23  Q.   Okay.  After seeing it release a couple of

24  times, what happened then?

25  A.   We -- my colleague and I asked Mr. Kamholz what

1    that pipe was and the purpose of the -- the PRV.

2    Q.  Okay.  And this was still in the morning on the

3    17th?

4    A.  Yes.

5    Q.  Okay.

6          MR. PERSONIUS:  Pardon me, your Honor.

7    Could we have an identification of who the

8    colleague was that was involved in the questioning?

9          MR. MANGO:  Okay.

10          THE WITNESS:  Mr. Garing.

11          MR. PERSONIUS:  Thank you.

12   BY MR. MANGO:

13   Q.  Okay.  This was you and Ken Garing?

14   A.  Yes.

15   Q.  You brought it to -- you brought this to

16   Mr. Kamholz's attention?

17   A.  Yes.

18   Q.  What was Mr. Kamholz's response?

19   A.  His response was that we would have to ask

20   someone else about that, and he said the -- the

21   by-products recovery foreman would be the

22   appropriate person to talk to.

23   Q.  Okay.  Did there come a time when you got to

24   speak to the by-products foreman about this

25   pressure-release valve?

1    A.   Yeah.

2    Q.   Okay.  When did you speak to him?

3    A.   We spoke to him on the Tuesday, April 21st.

4    Q.   What day of the inspection was that?

5    A.   This was the last day of the inspection, the

6    sixth day that we were on-site.

7    Q.   On that day did you take any photographs of

8    this pressure-release valve or bleeder valve?

9    A.   Yes.

10   Q.   All right.  I'd like to show you Government

11   Exhibit 15.02.097 -- which is already in evidence,

12   your Honor.

13        Okay.  If you can tell the jury what we're

14   looking at here?

15   A.   This is the pipe coming off of the coke oven

16   gas return line, and the valve is right in here,

17   but this is what we refer to as the PRV bleeder.

18   Q.   Okay.  And you took this photograph?

19   A.   Yes.

20   Q.   What day did you take this photograph?

21   A.   On Tuesday, April 21st.

22   Q.   That's the last day of your inspection?

23   A.   Yes.

24   Q.   And you mentioned the release before.  That's

25   the top of the pressure-release valve?

1    A.   Yes.

2    Q.   How far off the ground is that, the top of that

3    pressure-release valve?

4    A.   About 40 feet.

5             MR. MANGO:   All right.  I'd like to show

6    you Government Exhibit 15.02.103 for identification

7    purposes.  And subject to an objection, your Honor,

8    offer that into evidence.

9             MR. LINSIN:  No objection, your Honor.

10            MR. PERSONIUS:  No objection, Judge.

11            THE COURT:  Okay.  15.02.103 received, no

12   objection.  May be published.

13            (Government's Exhibit 15.02.103 was

14            received into evidence.)

15   BY MR. MANGO:

16   Q.   All right.  If you could tell the jury what

17   we're looking at on this photograph.

18   A.   This is again a photo of the pressure-relief

19   valve.  It's taken from the other side from the

20   previous photo and zoomed in on the valve itself.

21   It doesn't show the top of the pipe.  It just has

22   the bottom part of the pipe here.

23   Q.   Okay.  So I'd ask you if there -- there came a

24   time when you got to speak to the by-products

25   foreman about this pressure-release valve.  Right?

1    A.   Yes.

2    Q.   And did you get to talk to the by-products

3    foreman?

4    A.   Yes.

5    Q.   All right.  And that was on this April 21st

6    day, day six of your inspection?

7    A.   Yes.  It was on April 21st.

8    Q.   What time of day do you remember talking to the

9    by-products foreman?

10   A.   It was in the morning.

11   Q.   If you can tell the jury why -- why did this

12   happen on the last day of the inspection?

13   A.   We had a number of follow-up questions that we

14   were trying to get answered, and we asked

15   Mr. Kamholz again, you know, that we needed to --

16   to have an explanation of this valve on the -- on

17   the piping, so we were out in the plant looking at

18   some other items related to the other two main

19   portions of our inspection, and then we asked

20   Mr. Kamholz -- or told him that we needed to talk

21   about the pressure-relief valve.

22            MR. PERSONIUS:  Your Honor, forgive me.

23   Just so we capture it now.  The witness has

24   repeatedly referred to "we."  Could we have an

25   identification of who that is, please?

1                THE COURT:  Yes.

2                THE WITNESS:  Mr. Garing.

3    BY MR. MANGO:

4    Q.  Let's go back for a second to the Friday, day

5    four, April 17th.  When you raised this to

6    Defendant Kamholz's attention, he told you that you

7    would need to speak to somebody else?

8    A.  Yes.

9    Q.  Okay.  Up until that point, whenever you asked

10   him questions, would he give you answers to those

11   questions?

12   A.  Yes.

13   Q.  Okay.  Were there other questions that you

14   asked during your inspection on whatever topic you

15   want to -- any other topics, that Mr. Kamholz

16   referred -- referred you to somebody else?

17   A.  There was one other area that he referred us to

18   someone else to answer.

19   Q.  Okay.  What was that?

20   A.  This was regarding their production of

21   different types of coke, furnace coke versus

22   foundry coke, and there's certain provisions in the

23   regulation depending on how much you make of each

24   requires --

25                MR. LINSIN:  Your Honor.

1          THE COURT:  Hold on, please.

2      Yes, Mr. Linsin.

3          MR. LINSIN:  I would object and request

4  that the response be stricken.

5          THE COURT:  All right.  I will.  I'll

6  strike the response as not responsive and run-on,

7  so tailor your questions, please.

8  BY MR. MANGO:

9  Q.  Just briefly, what was the other area that

10  Defendant Kamholz would not answer your questions?

11  A.  Furnace coke and foundry coke, how much they

12  made of each.

13  Q.  Okay.  All right.  So let's go back to the

14  21st.  That's Tuesday.  How was the meeting with

15  the by-products foreman -- first, what the name of

16  the by-products foreman you spoke with on that day?

17  A.  Pat Cahill.

18  Q.  And how did your meeting with Pat Cahill get

19  arranged or come about?

20  A.  While we were out in the plant, Mark waved him

21  to come over.  He happened to be walking by in the

22  area, so Mark flagged him down.

23  Q.  Did Pat Cahill come over?

24  A.  Yes.

25  Q.  What, if anything, was discussed at that point?

1   A.   We talked to Mr. Cahill about the purpose of

2   the pressure-relief valve, what the typical

3   pressure was in the coke oven gas line, and he

4   showed us a shed, not directly below the valve but

5   just a little bit to the right, a small shed that

6   contained instrumentation that had a circular chart

7   that recorded the pressure at that point in the

8   line at the -- right in front of the -- the valve.

9   Q.   Did Pat Cahill mention to you how frequently

10   the pressure-release valve released?

11   A.   Pat said that it released about every half

12   hour.

13   Q.   Okay.  And you mentioned he showed you

14   something on the ground in the area?

15   A.   Yeah.  He opened up a door to a small shed, and

16   in there was where the circular chart was for the

17   current day, and it was recording the pressure in

18   the line.

19   Q.   Okay.  When you were looking at that circular

20   chart, did he tell you what the pressure-release

21   valve was set to release at?

22   A.   He said that they could vary the setting, but

23   that it was set somewhere between 120 and 130

24   centimeters of oil.

25   Q.   Okay.  What happened after this discussion at

1    this -- I'll call it the shack.

2    A.   I asked him how long he kept these charts

3    historically, and he said about 30 days, but that

4    those would be located in his office.

5    Q.   And what happened at that point?

6    A.   We followed him over to his office.

7    Q.   What happened in his office, if anything?

8    A.   He -- we got to his office.  He was searching

9    through drawers in the office looking for circular

10   charts, and he was having trouble finding the

11   historical charts.

12   Q.   Okay.  When you saw him having trouble finding

13   those historical charts, did you -- did you tell

14   him anything?

15   A.   We told him that, you know, we -- we had other

16   things to look at, so we asked him to find the ones

17   for the time while we were conducting our

18   inspection, and we said we'd want copies of those,

19   and for him to just bring the copies to us in the

20   conference room.

21        MR. PERSONIUS:  And pardon me again, your

22   Honor.  The witness has referred to "we."  If we

23   could have that -- whoever that is identified,

24   please?

25        THE COURT:  Yes.

1          THE WITNESS:  Mr. Garing.

2    BY MR. MANGO:

3    Q.   Okay.  During -- during your interaction with

4    Pat Cahill in his office, did you make any

5    observations as to whether Pat Cahill appeared

6    nervous or calm?

7    A.   Mr. Cahill appeared nervous and, you know, was

8    frantically trying to find the previous charts for

9    the week while we were there.

10   Q.   Okay.  Now, did you ultimately obtain copies of

11   those circular charts before you left?

12   A.   Yes.

13          MR. MANGO:  I'd like to show you a couple

14   of those.  I show you Government's Exhibit 20.01

15   for identification purposes.  And absent an

16   objection, your Honor, offer that into evidence.

17          MR. LINSIN:  No objection, your Honor.

18          MR. PERSONIUS:  No objection, Judge.

19          THE COURT:  Okay.  20.01 received, no

20   objection.  May be published.

21          (Government's Exhibit 20.01 was received

22          into evidence.)

23   BY MR. MANGO:

24   Q.   Miss Hamre, can you tell the jury what you're

25   looking at -- what they're looking at on the

1    screen?

2    A.   This is one of the circular charts that again

3    records the pressure in the coke oven gas line at

4    the bleeder valve.  And, you know, that's -- that's

5    what this -- this line that's going up and down is

6    showing is -- is the pressure at that time it's

7    recording, and it has the -- the times up here up

8    at the -- at the top.  Noon, 11:00, 1:00, for

9    the -- that 24-hour -- a 24-hour period would be

10   recorded on -- on one chart.

11   Q.   Okay.  So this chart you're looking is the

12   24-hour period for -- does that say 4/12/09 on it?

13   A.   Yes.

14   Q.   And again, at the top that's your initials?

15   A.   Yes.

16   Q.   Well, the TC stands for what?

17   A.   Tonawanda Coke.

18   Q.   Martha --

19   A.   Martha Hamre, and that was that particular

20   document number that I had received from Tonawanda

21   Coke.

22   Q.   Okay.  Did you -- would you have logged that

23   into your notebook where you were keeping notes?

24   A.   Yes.  I would have put that in the document log

25   in the back of my logbook.

1          MR. MANGO:  Okay.  Let me show you

2     Government Exhibit 20.02 for identification

3     purposes.  And absent an objection, your Honor,

4     offer that into evidence.

5          MR. LINSIN:  No objection, your Honor.

6          MR. PERSONIUS:  No objection, Judge.

7          THE COURT:  Okay.  20.02 received, no

8     objection.  May be published.

9          (Government's Exhibit 20.02 was received

10          into evidence.)

11    BY MR. MANGO:

12    Q.  Okay.  Now, Miss Hamre, is this the copy that

13    you received for April 13th of 2009?

14    A.  Yes.

15    Q.  All right.  And just to be clear, you -- when

16    you left the facility did you have copies or did

17    you have the originals?

18    A.  We had copies.

19          MR. MANGO:  I'd like to show you

20    Exhibit 20.03 for identification purposes.  And

21    absent an objection, offer this into evidence.

22          MR. LINSIN:  No objection, your Honor.

23          MR. PERSONIUS:  No objection, Judge.

24          THE COURT:  Okay.  20.03 received, no

25    objection.  May be published.

1              (Government's Exhibit 20.03 was received

2              into evidence.)

3              MR. MANGO:  Thank you, your Honor.

4    BY MR. MANGO:

5    Q.  Now, Miss Hamre, is this the circular chart for

6    4/15/09?

7    A.  Yes.

8    Q.  Okay.  So we jumped from 4/13 to 4/15.  Did you

9    ever receive the chart for 4/14/09?

10   A.  We did not receive the chart for 4/14/09.

11             MR. MANGO:  Okay.  Let's look at Exhibit

12   20.04 for identification purposes.  And absent an

13   objection, your Honor, the government would move

14   this into evidence.

15             MR. LINSIN:  Your Honor, we have no

16   objection to this series of exhibits, if that might

17   be easier.

18             MR. MANGO:  That would be.

19             THE COURT:  All right.  That would take us

20   through 21.0 --

21             MR. MANGO:  20.08 would be the end of that

22   series.

23             THE COURT:  Okay.  All right.  What I'll

24   do is I'll receive all of those, no objection, and

25   they can be published starting with 20.04.

1           MR. PERSONIUS:  And so it's clear, Judge,

2     we don't object either, and we agree with that

3     approach.

4           THE COURT:  Okay.  Thank you.

5           MR. MANGO:  Thank you, your Honor.

6           (Government's Exhibits 20.04, 20.05,

7           20.06, 20.07 and 20.08 were received into

8           evidence.)

9     BY MR. MANGO:

10    Q.  20.04, if we could take a look at that.  That

11    is the chart for April 16th of 2009, is that right?

12    A.  Yes.

13    Q.  All right.  Lets go to 20.05, now in evidence.

14    Now, this is for April 17th of 2009, is that right?

15    A.  Yes.

16    Q.  Okay.  If we could actually just focus in on

17    this part of the chart, please.  April 17th was the

18    day you said you first observed the

19    pressure-release valve releasing?

20    A.  Yes.

21    Q.  Okay.  And in fact, do you see any spikes on

22    this chart that are above 120?

23    A.  Yes.

24    Q.  Okay.  All right.  If we could take a look at

25    Government Exhibit 20.06, now in evidence.  Is that

1    the bleeder chart for April 18th of 2009?

2    A.   Yes.

3    Q.   Okay.  Let's take a look at 20.07, Government

4    Exhibit 20.07, now in evidence.  Is that the chart

5    for 4/19 of '09?

6    A.   Yes.

7    Q.   Now, that would have been a weekend day?  Is

8    that right?

9    A.   Yes.

10   Q.   Did you go to the site on Saturday or Sunday?

11   A.   No, we did -- I did not.

12   Q.   Okay.  Let's take a look at 20.08, the last

13   chart you received, now in evidence.  Okay.  If we

14   could focus in on this section of the chart,

15   please.

16       Okay.  So, you mentioned that you learned that

17   the pressure setting was set between 120 and 130

18   centimeters of oil.

19   A.   Yes.

20   Q.   For the spikes that are above 120 to 130, for

21   example there, there, there, could you tell the

22   jury what your interpretation of this chart is?

23   A.   That the pressure was --

24              MR. LINSIN:  Your Honor -- objection, your

25   Honor.  Your Honor, without a little bit more

1    foundation for this witness's capability to

2    interpret these charts, I would request that that

3    question be withdrawn.

4                THE COURT:  Okay.  Let's see if there's

5    the background to do that.  I'll give you some

6    leeway to question.  If not, move on, please,

7    without interpretation of the charts.

8                MR. MANGO:  Yes, your Honor.

9    BY MR. MANGO:

10   Q.  Miss Hamre, were you informed as to how these

11   charts relate to when releases of the

12   pressure-release valve occur?

13   A.  Yes.

14   Q.  Okay.  Can you tell the jury what you were --

15   were you told that by someone?

16   A.  We were told that by Mr. Cahill.

17   Q.  What did Mr. Cahill tell you with respect to

18   that question?

19   A.  He said that the set point was between 120 and

20   130, and so he pointed to some of the peaks, and

21   peaks over that pressure the valve would be open.

22   Q.  Okay.  So, now, for the jury's benefit, can you

23   tell the jury, for the peaks above 120 to 130, what

24   would that indicate that you were told would happen

25   from the pressure-release valve?

1    A.   That coke oven gas would be going out the

2    bleeder valve.

3    Q.   Now, if the pressure setting was between 80 and

4    100, would your interpretation of this chart

5    change?

6              MR. LINSIN:   Objection to the

7    hypothetical.

8              MR. MANGO:   I can rephrase, your Honor.

9              THE COURT:   Okay.  Do that, please.

10   BY MR. MANGO:

11   Q.   If the pressure setting was lower -- again,

12   you're saying you had learned that the pressure

13   setting was between 120 and 130?

14   A.   Correct.

15   Q.   So any time there was a spike above that, that

16   you were told that would indicate a release into

17   the atmosphere.

18             MR. PERSONIUS:   Your Honor, he's just

19   repeating all the testimony, and I object to this.

20   He can ask the question, I think, without repeating

21   the witness's testimony.  Object to it.

22             THE COURT:   Yeah, there's a little bit too

23   much of that.  Sustained.

24             MR. MANGO:   If the pressure setting was

25   between 80 and 100, would the frequency of

1      releases, based on what you're looking at here on

2      this chart, be increased or decreased?

3                  MR. LINSIN:  Objection to the

4      hypothetical.

5                  THE COURT:  Why can't he ask a

6      hypothetical?

7                  MR. LINSIN:  Well, your Honor, this is not

8      an expert witness.  There's no foundation testimony

9      that the setting at the time that this chart was

10     recorded was anything close to 80.  The testimony

11     now repeatedly is that the setting on the dates of

12     the inspection was between 120 and 130 centimeters.

13                 THE COURT:  All right.  I think the

14     absence of a factual basis is what you're really

15     arguing -- right? -- in terms of the -- what

16     becomes a hypothetical question without the

17     underlying facts.  Right?  No?

18                 MR. LINSIN:  Well, your Honor, I believe

19     both bases are appropriate.  There is no factual

20     basis for the hypothetical, and this witness has

21     not been proffered as an expert.

22                 THE COURT:  Does the witness have to be an

23     expert in order to respond to a hypothetical?

24                 MR. LINSIN:  Your Honor, in my experience

25     hypotheticals are typically not posed to fact

1    witnesses.

2              THE COURT:  Can I instruct the witness to

3    answer my question, please?  I don't know the

4    answer to that.  I'm just -- but I'm not sure.  I

5    don't think so.  I don't think the witness does.

6    But I don't know.  I'm not exactly sure.  And I'm

7    just sparring a little bit, because I didn't know

8    the answer to that question.  And Mr. Linsin

9    probably has more information about that than I do.

10   But I will sustain the objection with respect to

11   the hypothetical.

12             MR. MANGO:  Yes, your Honor.  I'll move

13   on.

14   BY MR. MANGO:

15   Q.  Was there a closing conference with Defendant

16   Kamholz now later this day on the 21st?

17   A.  Yes.

18   Q.  What did you discuss during your closing

19   conference with Defendant Kamholz?

20   A.  We discussed preliminary findings of our

21   inspection the prior six days.

22   Q.  Okay.  Did the -- did you raise the issue of

23   the pressure-release valve, bleeder valve, with

24   Defendant Kamholz during your closing conference?

25   A.  Yes.

1   Q.   Now, in your practice in the 80 to 100

2   inspections that you have been on, is it customary

3   during a closing conference to tell the facility

4   whether or not they're in violation of their

5   operating permit?

6   A.   No.

7   Q.   And why not?

8   A.   During our inspections we're gathering

9   information, gathering the facts.  We collect that

10  information, take it back, review it, draft a

11  report, provide that to the region that requested

12  our inspection, and the region is ultimately who

13  determines the violations or not.

14  Q.   Okay.  So is it your responsibility to tell the

15  facility whether they're in violation of their

16  permit or not?

17  A.   No.

18  Q.   What did you tell Defendant Kamholz with

19  respect to the pressure-release valve setting or

20  the pressure-release valve?

21  A.   We told Defendant Kamholz -- it was Mr. Garing

22  who gave the closeout.  I was taking the notes.

23  But it was discussed that we would have to check on

24  how the pressure-relief valve fit into their permit

25  and their regulations.  That was something that we

1    would be looking at -- into.

2    Q.  Following your inspection, did you return to

3    Colorado?

4    A.  Yes.

5    Q.  Did you prepare anything in Colorado?

6    A.  Yes.  I prepared an inspection report and a

7    process description of the coke by-products area at

8    Tonawanda Coke.

9    Q.  Okay.  So, in essence, you prepared your own

10   process flow diagram?

11   A.  Yes.

12            MR. MANGO:  All right.  I'd like to show

13   you Government Exhibit 70 for identification

14   purposes.  And absent an objection, your Honor, the

15   government would move this into evidence.

16            THE COURT:  This a part of your report

17   that you prepared?

18            THE WITNESS:  Yes.

19            MR. LINSIN:  Your Honor, we don't object

20   to the introduction of this.  I guess -- yeah, we

21   don't -- no objection, your Honor.

22            MR. PERSONIUS:  No objection, Judge.

23            THE COURT:  Okay.  Then I will receive

24   Exhibit 70 without objection.  And do you want it

25   published?

1              MR. MANGO:  Yes, please, your Honor.

2              THE COURT:  All right.  Miss DiFillipo, if

3      you'd publish it, please.

4              (Government's Exhibit 70 was received into

5              evidence.)

6      BY MR. MANGO:

7      Q.  If you could, Miss Hamre, tell the jury what

8      they're looking at with this document that's now on

9      their screen.

10     A.  This is the process -- coke by-products process

11     flow diagram that was generated back in the office

12     by myself and Mr. Garing, a combo of the two of us.

13     Q.  Okay.  And there's a number of dotted lines on

14     here.  What do the dotted lines represent?

15     A.  Gas or vapors.

16     Q.  Okay.  And then the solid lines, what do the

17     solid lines represent?

18     A.  Would be liquids or waters.

19     Q.  If we can focus -- if we can focus on this just

20     corner section, did you list the pressure-release

21     valve on your process flow diagram?

22     A.  Yes, we did.

23     Q.  Can you point to it?

24         All right.  Did you list the pressure-relief

25     valve, bleeder valve, in your report that you

1    generated?

2    A.  Yes, we did.  I did.

3    Q.  And then where does that report -- where did

4    you send your report for this case to?

5    A.  We sent the report to EPA Region 2.

6            THE COURT:  Okay.  You're saying "we."

7    Did Mr. Garing --

8            THE WITNESS:  Sorry.

9            THE COURT:  -- did he sign off on this as

10   well?  The report?

11           THE WITNESS:  I should correct myself.  I

12   sent the report, because I was the project manager

13   on this particular inspection.

14   BY MR. MANGO:

15   Q.  Okay.  After you sent your report to Region

16   2 -- that's in New York City?

17   A.  Yes.

18   Q.  That's the civil inspectors who had requested

19   you to perform an inspection?

20   A.  Correct.

21   Q.  Okay.  Did you have any responsibility for

22   determining whether any of the items you saw during

23   your inspection were violations or were not

24   violations of their Title V operating permit?

25   A.  No.

1      Q.   Okay.

2                MR. MANGO:   Your Honor, may I have a

3      moment?

4                THE COURT:   Yes.

5                MR. MANGO:   Thank you, your Honor.   No

6      further questions for Miss Hamre.

7                THE COURT:   Okay.   Thank you.

8         Mr. Linsin?

9                MR. LINSIN:   Thank you, your Honor.

10        Good afternoon, Miss Hamre.

11        May I proceed, your Honor?

12               THE COURT:   You may.   Thank you.

13     CROSS-EXAMINATION BY MR. LINSIN:

14     Q.   Miss Hamre, let's start at that exit meeting

15     you were just testifying about.   Who was present at

16     the exit meeting?

17     A.   At the exit meeting Mr. Kamholz was present;

18     another TCC employee, Mike Trembowicz; two air

19     inspectors from New York State, Cheryl Webster and

20     Larry Sitzman.

21     Q.   Those would be individuals with DEC, is that

22     correct?

23     A.   Yes, that's correct.   And myself and

24     Mr. Garing.

25     Q.   Was anyone from Region 2 present?

1    A.   No.

2    Q.   And how long did the exit meeting last?

3    A.   Approximately 30 minutes.

4    Q.   Okay.  And it -- were you aware that this

5    facility had been issued a Title V permit?

6    A.   Yes.

7    Q.   You were aware of that before you began your

8    inspection, is that correct?

9    A.   Yes.

10   Q.   Were you aware that it was DEC that had

11   actually issued that Title V permit to the

12   facility?

13   A.   Yes.

14   Q.   And the two representatives you just

15   identified, Mr. Sitzman and Miss Webster, were DEC

16   representatives, correct?

17   A.   Correct.

18   Q.   And were they in a position to hear this

19   discussion about the PRV that you just described?

20   A.   Yes.

21   Q.   During the course of the inspection, did you

22   have any conversations about the PRV with the

23   personnel from DEC?

24   A.   I don't recall.

25   Q.   Is that a typical practice, for inspectors who

1    go on a team site facility to compare notes at the

2    end of the day to make plans for the subsequent

3    day?

4    A.   The representatives from DEC were not present

5    during the entire inspection.  So sometimes they

6    were involved in discussions we had and sometimes

7    they weren't.  I don't recall exactly when they

8    were there and weren't there.

9    Q.   So am I understanding your testimony correctly

10    that there were kind of debrief meetings among the

11    inspectors after the time you spent at the facility

12    on a day-to-day basis during the course of this

13    weeklong inspection?

14    A.   I don't know that I'd call them debrief

15    meetings.  We had planning meetings, and

16    Mr. Kamholz was part of those.  At the end of each

17    day we would try to give Mr. Kamholz an idea of

18    what we were trying to look at the following day.

19    Q.   Okay.  I apologize.  I may not have been clear

20    in my question.  After you left the facility at the

21    end of each day, at the end of each inspection day,

22    did you and the other inspectors get together

23    outside of the facility and talk about the results

24    of the your -- your efforts that day, what you had

25    found, what your plans were for the next day?

1    A.   Sometimes.

2    Q.   All right.  And did you take notes during those

3    meetings?

4    A.   No.

5    Q.   Do you recall during any of those meetings,

6    the -- let's call them off-site meetings, do you

7    recall discussing the PRV?

8    A.   With my colleague, Mr. Garing.

9    Q.   Did you discuss the PRV with anyone else?

10   A.   Possibly with Region 2.

11   Q.   And who would it have been from Region 2 who

12   was present during this week for the -- for at

13   least a part of the inspection?

14   A.   It could have been Mr. Patel.

15   Q.   And was Mr. Eng present as well?

16   A.   No.  Mr. Eng was not present at the inspection.

17   Q.   Was Mr. Ghaffari a part of those discussions at

18   all?

19   A.   I don't recall.

20   Q.   So after the 21st, after the closeout meeting

21   on the 21st, did you get together with the other

22   inspectors, with the DEC inspectors, before you

23   flew back to Denver, to have any preliminary

24   discussions about your findings or what the

25   follow-up was going to be?

1    A.   No.

2    Q.   Let me go back, Miss Hamre, to your

3    preparations for this inspection.  I believe you

4    testified that you flew to Buffalo on -- in

5    February of 2009 to review the DEC file and prepare

6    for the inspection, is that correct?

7    A.   Yes.

8    Q.   How long were you in Buffalo during that visit?

9    A.   I flew in one day, went to the office one day,

10   and flew out the next.

11   Q.   What office did you go to?

12   A.   The Buffalo DEC office.

13   Q.   And did anyone else from NEIC come with you?

14   A.   No.

15   Q.   Before you came, did you have any idea how

16   large the DEC file for this facility was?

17   A.   No.

18   Q.   Is it your general practice -- in the other

19   inspections that you've testified about conducting,

20   is it your general practice to conduct only a

21   cursory review of the regulatory file of a facility

22   before you start your inspection?

23   A.   Depending on how large the file is.

24   Q.   Depending on how large the file is really

25   should dictate how much time you spend reviewing

1    it, isn't it?  Isn't that true?

2              MR. MANGO:  Objection, your Honor.

3              THE COURT:  No, I'll permit it.

4    Overruled.

5              THE WITNESS:  Can you repeat the question?

6              MR. LINSIN:  Shouldn't the size of the

7    file dictate how long you spend reviewing it?

8              MR. MANGO:  Object again, your Honor, to

9    the --

10             THE COURT:  Same ruling.

11             THE WITNESS:  Possibly.

12   BY MR. LINSIN:

13   Q.  All right.  Miss Hamre, you prepared a project

14   plan before beginning this inspection process, did

15   you not?

16   A.  Correct.  I did.

17   Q.  An eight-page plan setting out the steps that

18   you believe should be followed in order to prepare

19   for and conduct the investigation, correct?

20   A.  No.

21   Q.  In that project plan there is a section

22   entitled Investigative Methods, is there not?

23   A.  I believe so.  I don't have it in front of me.

24   Q.  Let me see if this refreshes your recollection.

25   Do you recall in the report you authored to prepare

1    for this inspection writing that "To accomplish the

2    investigative objectives, NEIC will take the

3    following actions."  Colon.  First bullet:  "Review

4    the EPA and State database and file information."

5        Do you recall that being step one in the plan

6    that -- for investigative methods that you

7    authored?

8    A.  I recall it being a step.  I don't recall what

9    order I had them listed.

10            MR. MANGO:  Your Honor, I have to object.

11   This is a bulleted list.  It doesn't say step one

12   step two, step three.  It's a bullet which says

13   NEIC will take the following actions.  It's the

14   first bullet.  I don't want to characterize this as

15   step one.  That's a mischaracterization.

16            THE COURT:  Is it listed as the first

17   item?  The first bullet?

18            MR. LINSIN:  I'm happy to describe it as

19   the first bullet, your Honor.

20            THE COURT:  Okay.

21   BY MR. LINSIN:

22   Q.  Do you recall that being the first bullet in

23   the plan that you developed?

24   A.  Yes.

25   Q.  And you said you flew into Buffalo, were here,

960

1     you went to the DEC office in Buffalo, and then

2     flew back the next day.  How long did you spend at

3     DEC's office on the day you reviewed the file?

4     A.  I don't recall.

5     Q.  Do you recall what time of day you got there?

6     A.  In the morning.

7     Q.  And do you recall what time you left?

8     A.  In the afternoon.

9     Q.  And did you meet with personnel while you were

10    there?

11    A.  Yes.

12    Q.  Who did you meet with?

13    A.  Larry Sitzman and Cheryl Webster.

14    Q.  And in the time that you spent there from

15    sometime in the morning till sometime in the

16    afternoon, do you have any recollection of how much

17    time it took you to perform the cursory review of

18    the file you testified to on direct?

19          MR. MANGO:  Objection, your Honor.  Asked

20    and answered.  She said she didn't remember.

21          THE COURT:  No.  Overruled.  You may

22    answer.

23          THE WITNESS:  Repeat the question, please.

24    BY MR. LINSIN:

25    Q.  How much time did it take you to perform the

1      cursory review of the file?

2      A.   The number of hours I was at the DEC office.

3      Q.   And your testimony is you don't recall how long

4      that was.

5      A.   No.

6      Q.   Did you review the facility's Title V permit?

7      A.   I looked through it.

8      Q.   Did you review the HAPS emission studies that

9      the facility had submitted in 2003?

10     A.   I recall seeing that document.

11     Q.   Did you see it before the inspection?

12     A.   Yes.

13     Q.   Do you recall reviewing the inspection reports

14     that the DEC air inspectors had filed concerning

15     their inspections of this facility?

16     A.   I recall looking at them and talking to the

17     inspectors.

18     Q.   And which inspectors did you talk to?

19     A.   Larry Sitzman and Cheryl Webster.

20     Q.   Did you talk to Gary Foersch?

21     A.   I don't recall talking to Gary Foersch.

22     Q.   Did you talk to Henry Sandonato?

23     A.   I don't recall talking to him.

24     Q.   Do you recall reviewing the inspection reports

25     that were identified as full-compliance

1    inspections?

2    A.   I don't remember how they were identified.

3    Q.   You testified on direct that it was your

4    impression, I believe, that the air inspectors for

5    DEC had focused on the battery at this facility.

6    Do you recall that testimony?

7    A.   Yes.

8    Q.   Do you recall seeing multiple reports in this

9    file concerning full-compliance inspection --

10   inspections with the facility's Title V permit?

11   A.   I don't recall.

12   Q.   You might have overlooked those, is that

13   correct?

14           MR. MANGO:  Objection, your Honor.

15           THE COURT:  No.  Overruled.  You may

16   answer.

17           THE WITNESS:  Restate the question,

18   please.

19   BY MR. LINSIN:

20   Q.   You might have overlooked those full-compliance

21   inspection reports.

22   A.   I looked at inspection reports.  I don't

23   remember what the title was on them.

24   Q.   Was it your recollection, Miss Hamre, that

25   Mr. Sitzman and Miss Webster were the DEC personnel

1    who actually performed the inspections at this

2    facility?

3    A.   At least some of them, yes.

4    Q.   Now, you testified on direct examination about

5    the initial meeting that you had with Mark Kamholz

6    and the other inspection personnel that you

7    referenced.  How long did that initial meeting

8    last?  On the first day.  I'm sorry.  On the first

9    day of the inspection, April 14th.

10   A.   The initial meeting was a half hour.

11   Q.   And was there anyone else from Tonawanda Coke

12   present at that meeting?

13   A.   No.  There was a sign-in sheet.

14   Q.   And was this in a large room, a small room?

15   What size room are we talking about?

16   A.   Probably a third of this room, maybe, or a

17   quarter of this room.

18   Q.   Fair to say a typical-size conference room?

19   A.   Yeah, a conference room.

20   Q.   Okay.  Now, did you review -- you took notes

21   during this meeting, correct?

22   A.   Correct.

23   Q.   And did you review those notes before

24   testifying today?

25   A.   Yes.

1    Q.  And do you recall that during this discussion

2    in the preliminary meeting you asked or someone

3    asked several questions concerning the flare on the

4    battery?

5    A.  I recall that.

6    Q.  And do you recall being told that there was an

7    emergency flare on the battery, that there was a

8    pilot light that was -- was lit all the time?  Do

9    you recall that?

10   A.  Yes.  On the battery itself.

11   Q.  On the battery itself.  And do you recall

12   the -- there being also a discussion, when you're

13   talking about the battery, about what would happen

14   with the coke oven gas if the exhausters went down?

15   A.  Yes.

16   Q.  And do you recall again in the discussion about

17   the battery and this -- these beehiving incidents

18   if the exhausters went down, that there was an

19   indication that the system at this plant was always

20   in a gas -- coke oven gas-deficient position?

21   A.  Yes, I recall Mr. Kamholz making that

22   statement.

23   Q.  Do you recall in your notes about this

24   conversation that occurred nearly four years ago

25   now -- do you recall in your notes that this

965

1    reference to a pressure-relief valve that you

2    testified to on direct is actually in this section

3    in your notes where you have been discussing the

4    battery?

5    A.   That section of the notes was discussing the

6    overall plant.

7    Q.   The discussion of the -- of the topics I just

8    summarized relate to the battery, do they not?

9    A.   Some of them do.  The coke oven gas deficiency

10   doesn't necessarily reflect just the coke battery

11   itself.  That's, to me, the entire plant.

12   Q.   Isn't it -- isn't it true, Miss Hamre, that

13   this reference to a pressure-relief valve may well

14   have been a statement regarding the management of

15   coke oven gas on the battery itself rather than

16   someplace else?

17   A.   Can you repeat that again?

18   Q.   Isn't it true that the discussion about a PRV

19   in this pre-meeting might well have been a

20   reference to the valving situation on the battery

21   rather than some other part in the plant?

22   A.   Might well have been.

23   Q.   Yes?

24   A.   Might have been?

25   Q.   Yes.

1    A.   Might have been.

2    Q.   And given its placement in your notes proximate

3    to the discussion of the battery, that might be a

4    reasonable inference, correct?

5    A.   It could be.

6              THE COURT:   Okay.   That might be an

7    appropriate place to stop for the evening.   Ladies

8    and gentlemen, thank you for your attention, and

9    please keep in mind that this is an important case

10   to both sides.   Please doesn't prejudge the case.

11   Keep your minds open.   And, you know, you've been

12   terrific.   I know you've been engaged and following

13   and committed to absorbing as much of this as you

14   possibly can.   I urge you to continue doing that.

15        But don't discuss the case.   And remember that

16   the way you get to the resolve of the fact issues

17   is through the application of what you're taking

18   in, your discussions that you have with each other

19   at the time that you're in deliberations, and your

20   discussing all of that in terms of the common

21   sense, experience, and intelligence that you all

22   have and share.

23        Please remember that your decision should be

24   fair to both sides, and acknowledge for purposes of

25   going forward, that the government has the burden

1    of proof, and until the case is complete and you

2    decide it and resolve those fact issues, the

3    presumption of innocence remains with the

4    defendants.

5        You've been great.  Tomorrow you have to be

6    here at what time?

7            THE JURY:  9:00 a.m.

8            THE COURT:  Okay.  We'll see you at

9    9:00 a.m.  Be safe on the way home, and get some

10   rest, get back here tomorrow, and we're going to

11   proceed forward.

12       Okay.  Let's see.  Excuse me just one second,

13   please.  I'm sorry.

14       Okay.  I'm sorry.  I was kind of misreading a

15   note that I was just given by Miss Labuzzetta.  So

16   I think we can all let you go.  All right.  And

17   we'll see you tomorrow.  Look forward to it.  Great

18   to see you.  Wouldn't be the same week without you.

19   So we'll see you tomorrow morning at 9:00 o'clock.

20   Okay.

21       And Miss Majerowski, it's okay.

22           A JUROR:  Thank you.

23           THE COURT:  In the cup.

24           A JUROR:  Yes, thank you.

25           THE COURT:  Thanks, Chris.

968

1          (Jury excused from the courtroom.)

2          THE COURT:  Okay.  Miss Hamre, you can

3    step down.  Thank you.

4       My comment in that to Miss Majerowski,

5    apparently she has asked if she could bring some

6    ginger ale in.  She has a stomach condition that

7    she needs to tend to, and I told her it was okay.

8          MR. LINSIN:  And, your Honor, while we are

9    on that topic, could you also share with us the

10   information you received from Mr. Bauman?

11         THE COURT:  Yes, I will.  Thank you.

12         MR. PERSONIUS:  Judge, may we be seated?

13         THE COURT:  Sure.  I'm sorry.  You haven't

14   sat enough this afternoon, Mr. Personius?

15         MR. PERSONIUS:  I thought you might feel

16   more comfortable.

17         THE COURT:  No, no.  I'm comfortable

18   wherever.  No.  Mr. Bauman was forthright I

19   believe.  He said that he was a high school friend

20   of -- the name escapes me right now.

21         MR. MANGO:  Adam Buchbinder.

22         THE COURT:  Yes, Adam Buchbinder.  And

23   that they've had some conversations since

24   graduation.  Occasionally they have gotten

25   together.  But, in Mr. Bauman's view, he was not

1   uncomfortable with Mr. Buchbinder being here.  He

2   did know -- he thought that the government agency

3   that Mr. Buchbinder was with was the EPA.  He said

4   it would not have a bearing on how he felt about

5   the case.  He said, you know, he was -- would try

6   to be objective and fair to both sides.

7        I did caution him that, you know, he had the

8   option of letting me know if it would be better for

9   him if Mr. Buchbinder was directed not to be in the

10  courtroom.  He said it wasn't necessary.  I told

11  him that if he felt as the case progressed that

12  there might be something that was causing him to be

13  of some discomfort, he should let me know, and we'd

14  make arrangements to have Mr. Buchbinder leave the

15  courtroom, not only just for that isolated matter,

16  but, you know, for long term.

17       I think he was reasonably comfortable in that

18  dialogue.  Very, very serious.  I think he was

19  taking the conversation seriously.  And I asked him

20  if he could be fair and impartial and continue to

21  be that way.  I think his response was "I believe

22  so."  And, you know, I asked him a few times, and

23  essentially my view is that he's committed to being

24  fair to both sides.  Okay?

25            MR. LINSIN:  Yes, your Honor, okay.  My

1    only residual suggestion, your Honor, just given

2    the duration of this trial and hopefully -- and to

3    perhaps to avoid similar types of incidents, not

4    tied to Mr. Bauman, but perhaps that in another day

5    or two to just make the suggestion to the jury that

6    if questions or issues come up, they should perhaps

7    raise it with Chris so that he could then raise it

8    with you, rather than approaching government

9    counsel or defense counsel in the halls or just --

10   just as a prophylactic to avoid these kinds of

11   issues.

12        THE COURT:  Yeah, I think that's a good

13   suggestion.  Thank you.

14        MR. LINSIN:  Thank you.

15        THE COURT:  Now, let me ask you about

16   hypothetical questions.  I mean, I don't think it's

17   limited -- I know, we'll go, Michelle, one minute.

18   I recall hypothetical questions to lay witnesses.

19   I mean, I think I don't remember it being

20   restricted to experts.  Is it?

21        MR. LINSIN:  Your Honor, my -- I cannot

22   say I have done fresh research on this, but my

23   recollection has always been that -- that

24   hypotheticals are reserved for experts who are --

25   because it is in the nature of an opinion.

1          THE COURT:  But you can have the -- I'm

2     sorry.

3          MR. LINSIN:  I stand prepared to be

4     corrected on this, your Honor, but I'm drawing more

5     from my experience than a precise citation to the

6     rule.

7          MR. PIAGGIONE:  Your Honor, as far as I

8     know, there's lay opinion is -- is -- can be given.

9          MR. LINSIN:  Well, yes.

10          MR. PIAGGIONE:  So if it's lay opinion can

11     be given as part of testimony, then hypotheticals

12     would be fair game.  As long as it's not asking

13     them for something -- something not based upon

14     their personal knowledge or investigation.  In

15     other words, if the jury asked them about something

16     that they have no frame of reference to, then --

17     then you get into expert witness.

18          THE COURT:  Well, you're talking about

19     specialized knowledge and training and expertise

20     and that kind of thing.

21          MR. LINSIN:  If it is the kind of lay

22     opinion that is based upon, you know, common

23     experience and a witness's common ability to

24     perceive the environment, that's one thing.  A

25     hypothetical to me, your Honor, seems quite

1    different.  You know, assuming facts that this

2    witness has not seen before or -- and so, it has

3    not been my habit that those types of hypotheticals

4    are typically posed to fact witnesses.  I mean, it

5    could mushroom very quickly into a, you know,

6    asking hypotheticals of every fact witness.

7                THE COURT:  No, I think you're right.

8    Typically -- Mr. Personius, I mean, do you have a

9    recollection to go back a ways?

10               MR. PERSONIUS:  I don't, Judge.  And what

11   struck me, and maybe this is not an appropriate

12   consideration, but if it is going to happen, my

13   understanding would be there would have to be

14   notice that you were going to elicit that testimony

15   from that witness.  Wouldn't you have to give prior

16   notice that you were going do it?  Not just do it

17   in the middle of a trial?

18               THE COURT:  I mean, this is an academic

19   discussion, that's all it is.  So, Michelle, you

20   can shut down if you want, because I know you're

21   exhausted.

22               *       *       *       *       *       *

23

24

25

CERTIFICATION


     I certify that the foregoing is a

Correct transcription of the proceedings

Recorded by me in this matter.



                    s/Michelle L. McLaughlin
                    Michelle L. McLaughlin, RPR
                        Official Reporter
                        U.S.D.C., W.D.N.Y.