VOL. V

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

        -vs-                10-CR-219S

TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
               Defendants.
-------------------------------------


          Proceedings held before the

     Honorable William M. Skretny, U.S.

     Courthouse, 2 Niagara Circle, Buffalo,

     New York on March 5, 2013.


     APPEARANCES:

     AARON J. MANGO,
     Assistant United States Attorney,
     ROCKY PIAGGIONE, Senior Counsel,
     U.S. Department of Justice,
     Appearing for the United States.

     GREGORY F. LINSIN, ESQ.,
     JEANNE M. GRASSO, ESQ.,
     ARIEL S. GLASNER, ESQ.,
     Appearing for Tonawanda Coke Corporation.

     RODNEY PERSONIUS, ESQ.,
     Appearing for Mark L. Kamholz.

     Also Present:  Lauren DiFillipo, Paralegal
                    Sheila Henderson, Paralegal


     Michelle L. McLaughlin, RPR,
     Official Reporter,
     U.S.D.C. W.D.N.Y.
     (716)332-3560

1                           I N D E X

2                  WITNESS                        PAGE

3        MARTHA ELIZABETH HAMRE
         Continued Cross-Examinatin by Mr. Linsin    985
4        Cross-Examination by Mr. Personius         1016
         Redirect Examination by Mr. Mango          1060
5        Recross-Examination by Mr. Linsin          1082

6        MARK KIBLER
         Direct Examination by Mr. Piaggione        1097
7        Cross-Examination by Mr. Linsin            1107
         Cross-Examination by Mr. Personius         1114
8        Redirect Examination by Mr. Piaggione      1116

9        PATRICK WILLIAM JOHN CAHILL
         Direct Examination by Mr. Mango            1121

10

11

12          GOVERNMENT EXHIBITS                    EVD.

13               15.02.061                         1061
                 82 through 89                     1129
14               14                                1132
                 14.1                              1136
15               50                                1154

16

17          DEFENDANTS' EXHIBITS                   EVD.

18               HHHH                              989

19

20

21

22

23

24

25

1          (Jury not present in the courtroom.)

2          THE COURT:  Okay.  We have got a couple of

3     preliminary matters.  I mean, if you're ready --

4     we've got a few minutes.  So, are you all set?  And

5     if anybody needs more time, that's okay.

6          MR. LINSIN:  We're prepared, your Honor.

7          THE COURT:  Okay.

8          MR. MANGO:  Your Honor, do you want the

9     witness outside?  She is sitting -- I don't know

10    what issues we may discuss.

11         THE COURT:  No, I don't think so.  I don't

12    think that's necessary.  If you think, as we is

13    discuss these things, that it's uncomfortable for

14    her, whatever, we'll move on.  But some of it is

15    administrative.  Part of it is a continuation of

16    one of the discussions we had yesterday.

17      But I think for record purposes, in United

18    States versus Tonawanda Coke and Mark Kamholz, all

19    of the attorneys and parties are present.

20      We were supposed to start as close to 9:00 as

21    we could, and we'll get pretty close to that, I

22    think.  But I guess the first issue to address is

23    the juror issue.  It looks as if we're going to

24    have to move with Ms. Malyszka, who is alternate

25    number 1, to replace Mrs. Linda Finn.  She's the

1    one that had the medical problem.  This morning,

2    just a short time before 9:00 o'clock, she called

3    from her doctor's office, and she's getting a

4    doctor's note saying she cannot continue because of

5    the medical condition.  If you recall, that had to

6    do with the medication issue and her driving.

7        I mean, she appeared to be trying, I think,

8    sincerely, but she was running the risk of

9    lightheadedness and blacking out and all that kind

10   of stuff because of her inability to take

11   medications early in the morning, and she couldn't

12   take them and drive the distance that she had to

13   drive.  So I think we're going to have to move

14   Heather Malyszka up to become juror number 11.  And

15   then Andrew Carlson and James Demmer will move up

16   to alternates, respectively, 1 and 2.  Okay?

17            MR. PIAGGIONE:  Yes, your Honor.

18            THE COURT:  Okay.  The other -- the other

19   matter is -- it won't take much time, but I did do

20   a little bit of work on our hypothetical question

21   issue.  I don't know if anybody else did, but --

22            MR. LINSIN:  We looked at it as well, your

23   Honor.

24            THE COURT:  All right.  Well, what did you

25   come up with?  Because I've got a First Circuit

1    case and some Seventh Circuit cases, and basically,

2    you know, at least the way I've looked at it, you

3    know, the traditional hypothetical doctrine is

4    really limited to expert witnesses, but the

5    exception is you can do it with lay witnesses if

6    the hypothetical is geared to the specific personal

7    knowledge of the lay witness.

8        And they've used it in mail fraud cases,

9    financial fraud cases, and there was always that

10   one missing step that related to, you know, for

11   example, would you have engaged in the financial

12   reliance that you did with your adviser had you

13   known he or she was not forthcoming with certain

14   information.  And because it was premised and based

15   in personal knowledge, the hypothetical was allowed

16   for the lay witness.  And you have to weigh that

17   against -- as I read these cases, you have to weigh

18   that against speculation, unfair prejudice, I mean,

19   the kind of things we talked about yesterday.

20       So that's where I come out on this thing.  So

21   it's not an outright prohibition, but it does fly

22   in the face a little bit of the traditional

23   doctrine as to hypothetical questions.

24              MR. LINSIN:  Your Honor, that -- your

25   Honor's summary is consistent with what we looked

1    at as well, that there are occasional exceptions to

2    the general rule when the response to the

3    hypothetical would be based on personal knowledge

4    of the witness, as distinct from technical or

5    specialized training.  That is what our research

6    suggested.  So we did not brief the issue, but we

7    believe your Honor's summary is consistent with

8    where we saw the case law.

9            THE COURT:  Okay.  I think, and then most

10   expert witnesses, as we all know, I mean, it's a

11   specialized training and expertise and the like,

12   but in the majority of the cases I think the expert

13   witnesses don't have personal knowledge of most of

14   the facts that are presented for the rendering of

15   an expert opinion.  So, I mean, that's a major

16   distinction, so --

17           MR. PIAGGIONE:  Your Honor, I just point

18   out that yesterday we were talking about that,

19   that -- was saying if it was part of his personal

20   investigation and personal knowledge -- even though

21   they may have a specialized background, if it's

22   part of their personal investigation, that they're

23   allowed to testify, and I do --

24           THE COURT:  Who's that?

25           MR. PIAGGIONE:  There is a case involving

1    a police officer who did some accounting

2    evaluations, and he was allowed to give his opinion

3    based upon his specialized -- his personal

4    investigation of the documents, even though he may

5    have had specialized information.  I can retrieve

6    that if --

7              THE COURT:  Oh, you mean sort of it's a

8    hybrid.  He's got personal knowledge, plus he's got

9    some expertise, so he kind of fits both molds?

10             MR. PIAGGIONE:  Right.  And they're

11   allowed to do that.

12             THE COURT:  Yeah.  I mean, it makes sense.

13   I don't want to give you too much credit,

14   Mr. Piaggione, but it does make some sense.

15             MR. PIAGGIONE:  Sometimes I get carried

16   away.

17             THE COURT:  Mr. Mango, you agree with

18   that?

19             MR. MANGO:  Absolutely, your Honor.

20             THE COURT:  All right.  So you were on the

21   right track, Mr. Personius, after yesterday's

22   discussion, so --

23             MR. PERSONIUS:  Is this on the record

24   again or not?

25             THE COURT:  No.  No.  I would never do

1   that.  You know that.

2       Okay.  Anything preliminary that we have to

3   discuss?

4           MR. LINSIN:  Your Honor, may I just have

5   one moment to consult with government counsel about

6   an issue I noticed in the notes?  It will not

7   detain the Court.  We can proceed to carry out.  I

8   just want to --

9           THE COURT:  Sure.  No, absolutely.

10          MR. LINSIN:  Thank you.

11          THE COURT:  Miss Hamre, you want to come

12   back up and get ready?

13          (Discussion off the record.)

14          MR. LINSIN:  We're ready.

15          THE COURT:  Okay.  Are you going to resume

16   cross-examination?

17          MR. LINSIN:  Yes, please.

18          THE COURT:  You want to stay there until

19   we get the jurors reseated?

20      And, Chris, you want to bring the jury in,

21   please.

22      And we will break by 3:45 this afternoon.

23          (Jury seated.)

24          THE COURT:  All right.  Good to see some

25   smiles on those faces this morning.  Please have a

1    seat.

2         Okay.  As you can tell -- and good morning,

3    everybody.

4              THE JURY:  Good morning.

5              THE COURT:  We got a little bit of

6    sunshine and brought that in.  Unfortunately, it

7    wasn't enough to have Mrs. Finn come in.  We're

8    going to excuse her, and as you know, she's juror

9    number 11.  So a promotion is in order, and,

10   Miss Heather Malyszka, you become juror number 11.

11   And, gentlemen, you get elevated to alternate

12   number 1 and alternate number 2 respectively.  So

13   we're going to probably have to negotiate your

14   contract with your agents and make sure that we

15   make the proper adjustment.

16        But, you know, it's unfortunate that that has

17   to happen, but that's why we have our alternates,

18   and that's why we talked to you about the

19   importance of your role.  So we ask the alternates

20   to continue to focus, please.  We don't want to

21   lose any other jurors, but we need to have backup

22   just in case the inevitable sometimes takes place,

23   so --

24        Okay.  Everybody doing okay?  All right.

25   You're ready for another day?  All right.  Okay.

1   We -- as you know, we're convened in the case of

2   United States versus Tonawanda Coke Corporation and

3   Mark Kamholz, the individual defendant.

4       And to repeat again, now that we have our new

5   juror for this -- substituting for our former

6   juror, you know, you will participate in the

7   deliberations.  And I know you've been paying

8   attention, because I've been watching throughout

9   the course of the trial.  And, you know, it takes

10  effort every day to stay with testimony, regardless

11  of the type of case it is, and in this case in

12  particular, as you know, it's pretty technical,

13  and, you know, it's in an area I guess for most of

14  us that we don't have a lot of familiarity with.

15      So, you know, we urge you to keep on working to

16  take this all in.  I know you're engaged.  I mean,

17  I -- if I don't look in your direction, I'm

18  watching you through the corner of my eye, so I

19  know that you're all, you know, taking note of the

20  testimony and watching your monitors, and that's

21  all very important, because this case is so

22  important to both sides.

23      And we're asking you to keep your minds open.

24  Wait until all of the evidence is in.  I mean,

25  we've had a healthy start.  We're not making a lot

1   of progress in terms of absolute numbers of

2   witnesses, but the essentials are to get the

3   evidence before you that's needed so that you can

4   make that unanimous decision in this case, you can

5   resolve those fact issues.

6       And you know how the case is broken down.

7   Those first 15 counts are clean air counts, and

8   violations are charged of the Clean Air Act are

9   criminal, and you have the obstruction of justice,

10  and then the last three counts are the

11  environmental RCRA statute.  And so you have to

12  resolve fact issues that may relate to all of those

13  counts.

14      There may be some that, you know, really are

15  different than others, but you have to do the

16  analysis for each individual defendant on each

17  count, and you have to take a look at it in terms

18  of the essential elements that have to be proven by

19  the government beyond a reasonable doubt, and

20  always keeping in mind that the presumption of

21  innocence remains with the defendant -- defendants

22  at all times until proven guilty, if you so find.

23  And, you know, you get to that point when you do

24  your deliberating.

25      And again I stress to you the importance of

1    respecting each other and respecting each other's

2    views, and it really is very, very helpful to be in

3    a situation where you, as an individual juror, have

4    no reservations about expressing your views,

5    because, you know, sometimes it's a difficult thing

6    to do if individuals don't respect each other's

7    points of view.  So, you know, work on that.  Keep

8    that in mind.  It's very important that you work

9    together.  And, as you know, I mean, you represent

10   various sections of our community, and that's the

11   whole -- that's what our whole process is about.

12       So rather than go on too much longer, please

13   keep your minds open, restrict your consideration

14   to what you hear and see, observe, or are presented

15   with in this courtroom, the four walls of this

16   courtroom, and then work to apply common sense,

17   experience, and intelligence to the decision-making

18   process without bias, prejudice, sympathy.  That's

19   basically the principles here.  And it will all

20   come together.  Just stay with us.  And thank you

21   for your effort to date.  We appreciate it.

22       Okay.  We are actually getting an early start.

23   As you can see, we have Martha Hamre from the EPA

24   back on the stand.  She remains under oath.  She is

25   called as a government witness, but we're in

1    cross-examination by Mr. Gregory Linsin.

2         So, Mr. Linsin, if you want to continue,

3    please.

4              MR. LINSIN:   Thank you, Your Honor.

5    M A R T H A   E L I Z A B E T H   H A M R E, having

6    previously been duly sworn as a witness, testified

7    further as follows:

8    CONTINUED CROSS-EXAMINATION BY MR. LINSIN:

9    Q.   Good morning, Miss Hamre.

10   A.   Good morning.

11   Q.   Miss Hamre, you testified yesterday that you

12   were the project manager from NEIC for this

13   inspection at the Tonawanda Coke facility in April

14   of 2009, correct?

15   A.   Correct.

16   Q.   Does that mean that you were in charge of that

17   on-site inspection on behalf of NEIC?

18   A.   Yes.

19   Q.   And was this the first time you had ever served

20   as a project manager for a site inspection?

21   A.   No.

22   Q.   How many times before April of 2009 had you

23   been the project manager for the inspection?

24   A.   I don't have that number right now.

25   Q.   More than ten?

1    A.    A number of times.  But I don't -- I would want

2    to look through my files to give a number.

3    Q.    So you've had experience in doing this as the

4    project manager before, correct?

5    A.    Yes.

6    Q.    Now, when you traveled to Buffalo to begin this

7    inspection in April of '09, did you bring with you

8    copies of documents from the facility's air

9    inspection file?

10   A.    I brought a copy of the permit and maybe some

11   of the background initial notifications pertaining

12   to the sections of -- of the inspection we were

13   looking at.

14   Q.    Now, you testified yesterday that the -- this

15   was not a multimedia inspection, this was an air

16   inspection of this facility, correct?

17   A.    Correct.

18   Q.    And if I heard you correctly, you testified

19   that it was an inspection that was intended to

20   focus on NESHAPS, N-E-S-H-A-P-S, operations and

21   also potential benzene sources from the by-products

22   area, is that correct?

23   A.    Yes, that was the focus.

24   Q.    All right.  So you also testified yesterday

25   that before beginning the inspection you had

1    reviewed the air emissions summary, the HAPS air

2    emissions summary that the facility had prepared

3    in 2003, do you recall that?

4    A.   Yeah, I recall that -- the name of that

5    document.

6    Q.   All right.  Did you have a copy of that

7    document with you as you began your inspection on

8    April 14th, 2009?

9    A.   I don't recall.

10   Q.   All right.  You knew from that document,

11   though, didn't you, that in that document, when it

12   summarized the vents and components in the

13   by-products area, that the -- the facility had

14   reported that there was a pressure-relief valve in

15   the by-products area, didn't you?

16   A.   No.

17   Q.   You had not noticed that in your review of the

18   document?

19   A.   No.

20   Q.   Did you review that document in more than a

21   cursory manner?

22   A.   No.

23   Q.   This was an inspection focused on potential

24   benzene releases and NESHAP waste operations, and

25   your testimony is that you only reviewed that HAPS

1    air emissions study in a cursory fashion before you

2    began the inspection, is that correct?

3    A.   Yes.

4    Q.   You arrived at Tonawanda Coke's facility on

5    April 14th, in the morning, of 2009, is that

6    correct?

7    A.   Yes.

8    Q.   And you and your colleagues were on-site at the

9    facility -- the 14th, I believe you testified, was

10   a Tuesday, correct?

11   A.   Correct.

12   Q.   And so you were on-site that Tuesday, that

13   Wednesday, that Thursday, and that Friday, four

14   days that week, correct?

15   A.   Correct.

16   Q.   And then the first two days of the following

17   week, the 20th and the 21st of April, correct?

18   A.   Yes.

19   Q.   All right.  So six days altogether at the site,

20   correct?

21   A.   Correct.

22   Q.   Now, you were shown quite a number of

23   photographs yesterday, during your direct

24   examination, of components that you had taken

25   pictures of in the by-products area, correct?

1    A.   Correct.

2    Q.   And out of the six days that you were there

3    on-site, how many days were you actually in the

4    by-products area?

5    A.   Probably pieces of all six.  I'd have to check

6    my notes to be sure.

7    Q.   All right.

8              MR. LINSIN:  Your Honor, if I may call up

9    a document that has been marked for identification,

10   Defendant's Exhibit quadruple H, and absent

11   objection, would move this document into evidence.

12             MR. MANGO:  No objection, your Honor.

13             THE COURT:  Okay.

14             MR. PERSONIUS:  No objection, Judge.

15             THE COURT:  All right.  Quadruple H

16   received, no objection.  And do you want it

17   published?

18             MR. LINSIN:  Yes, I would like it

19   published, please, your Honor.

20             THE COURT:  All right.  And it may be

21   published, Miss Henderson.

22             (Defendant's Exhibit HHHH was received

23             into evidence.)

24             THE COURT:  You've got the exhibit ready

25   to go?  Okay.

1          MR. LINSIN:  It's up?

2          THE COURT:  It's up.

3    BY MR. LINSIN:

4    Q.  All right.  Can we please enlarge the -- this

5    area.

6        Now, I don't believe you -- well, have you seen

7    this drawing before, Miss Hamre?

8    A.  No, I don't believe so.

9    Q.  All right.  I just ask you to take a minute and

10   orient yourself if you can.  Do you -- and ask

11   whether you recognize this as a diagram depicting

12   the location of the coke oven battery, the

13   coal-handling building, and the by-products area at

14   the Tonawanda Coke facility.

15   A.  It appears to be the Tonawanda Coke facility.

16   Q.  All right.  And if you would take note of the

17   colored lines on this drawing, the blue lines

18   coming from the coke oven battery into the

19   by-products area and then the green line moving

20   from the by-products area to the right-hand -- in

21   the right-hand direction to the boiler house and

22   back to the coke ovens, do you recognize that as a

23   depiction of the location of the coke oven gas line

24   at the facility?

25   A.  As best I can tell.  I mean, things may have

1    changed.

2    Q.   Let me ask it this way.  Is this depiction of

3    those colored lines consistent at least with your

4    memory of the location of the coke oven gas line at

5    the Tonawanda Coke facility?

6    A.   I believe so.

7    Q.   All right.  And the components that are

8    identified -- I'm going to -- components that are

9    identified in this general location in the

10   drawing -- the light oil scrubber, the ammonia

11   scrubbers, the tar precipitator, the exhausters,

12   and the two cooler stacks -- were all of those

13   components ones you identified pictures of

14   yesterday and inspected during the course of your

15   inspection at the facility?

16   A.   Can you go through the list again?

17   Q.   The light oil scrubber, the ammonia scrubber,

18   the tar precipitator, the exhausters, and the two

19   cooling stacks.

20   A.   Those were things we looked at, although there

21   weren't three exhausters while we were there.

22   Q.   How many exhausters were there?

23   A.   Two.

24   Q.   All right.  Now, what was the first day -- of

25   the six days, what was the first day you went to

1    the by-products area?

2    A.   Which day did we go the first time?

3    Q.   The first time.

4    A.   On the 14th.

5    Q.   Okay.  What did you do there on the 14th in the

6    by-products area?

7    A.   It was more of a plant tour just to give us a

8    lay of the land, try to see what equipment was --

9    what the physical equipment looked like.

10   Q.   And you were back to the by-products area the

11   next day on the 15th, correct?

12   A.   Yes.

13   Q.   All right.  And as a matter of fact, during the

14   course of your six days there you and your

15   colleagues took not only photographs in the

16   by-products area, but you took quite a number of

17   samples from the containment areas you described

18   and other locations in the by-products area,

19   correct?

20   A.   Yes.

21   Q.   Now, on the 15th, so this would be Wednesday,

22   do you recall having a conversation with Patrick

23   Cahill, the by-products foreman?

24   A.   I recall him assisting in our sampling.

25   Q.   Would it assist you to make reference to your

1    notes from that day?

2    A.   Yes.

3         MR. LINSIN:  Your Honor, may we please

4    have exhibit -- Government's Exhibit 3527.21 marked

5    for identification.  And ask if we could turn to --

6    well, turn to what is 010, page 010.

7         THE COURT:  Okay.  We will mark for

8    identification 3527.21.

9    BY MR. LINSIN:

10   Q.   Now, what I'm going to ask, Miss Hamre, if you

11   can just read to yourself or review the notes on

12   the left-hand side of this page, and once you've

13   finished reviewing it, I'm going to ask you the

14   same question:  Whether you have a recollection of

15   having spoken to Mr. Cahill on the 15th.

16        All right.  Having reviewed these notes, do you

17   now have a recollection of having spoken to Patrick

18   Cahill, the by-products foreman, on April 15th of

19   2009?

20   A.   Yes.

21   Q.   All right.  And you were speaking to Mr. Cahill

22   about certain components in the by-products area,

23   correct?

24   A.   Yes.  The ammonia stripper.

25   Q.   All right.  And how long did you stay in the

1    by-products area that day?

2    A.   I don't have an exact time.

3    Q.   Was it most of the day?

4    A.   I'd say at least half the day.

5    Q.   All right.  And if we could remove this now,

6    and recall Defendant's Exhibit quadruple H now in

7    evidence, please.  And if we could highlight that

8    same upper right quadrant.

9         Do you recall where else you went on the 15th

10   other than the by-products area?

11   A.   No.

12   Q.   Did you go back to the by-products on the 16th?

13   A.   I believe so.

14   Q.   All right.  And do you recall whether you spoke

15   to Mr. Cahill on the 16th?

16   A.   I don't recall.

17   Q.   Are how long did you spend in the by-products

18   area on April 16th, 2009?

19   A.   Offhand, I'm not sure.  Possibly half a day.

20   Q.   All right.  And then you went back to the

21   by-products area on the 17th, that Friday, correct?

22   A.   Yes.

23   Q.   And your testimony yesterday was that the first

24   time you noticed a release of the pressure-relief

25   valve on the coke oven gas line was that Friday,

1    the 17th, correct?

2    A.   Yes.

3    Q.   And your testimony was that you asked

4    Mr. Kamholz a question about the line and he said

5    you should speak to Pat Cahill, correct?  I'm

6    sorry.  A question about the pressure-relief valve.

7              THE COURT:  Okay.  Put the question again.

8              MR. LINSIN:  I'm sorry.  My apology, your

9    Honor.

10   BY MR. LINSIN:

11   Q.   You testified yesterday that when you saw this

12   pressure-relief valve release on the 17th, that you

13   asked Mr. Kamholz about the valve, correct?

14   A.   No.

15   Q.   All right.  What did you do when you saw the

16   valve release?

17   A.   I spoke to my colleague, Ken Garing.

18   Q.   Why didn't you just ask Mr. Kamholz?

19   A.   I wanted to show it to the other -- my other

20   colleague at the time.  Mr. Kamholz was up in front

21   of us.

22   Q.   All right.  Did you speak to Mr. Sitzman about

23   it, from DEC?

24   A.   I don't recall.

25   Q.   Did you speak to Cheryl Webster about it, from

1    DEC?

2    A.   I don't recall.   I don't even know if they were

3    there on Friday.

4    Q.   After talking to Mr. Garing about it, what did

5    you do?

6    A.   We were doing monitoring that day.   I don't

7    recall when exactly Mr. Garing asked Mr. Kamholz

8    about the PRV, but some time that morning.

9    Q.   I see.   So you didn't ask Mr. Kamholz a

10   question.   It was Mr. Garing that asked Mr. Kamholz

11   a question, is that correct?

12   A.   Correct.

13   Q.   All right.   And it wasn't right away, it was

14   later in the morning after you had seen it release?

15   A.   I don't remember when it was.

16   Q.   Did you make any record of that discussion

17   about the PRV on April 17th in your notes?

18   A.   No.

19   Q.   You've been trained to record important events

20   in the notes during the course of an inspection in

21   a facility, haven't you?

22   A.   Yes.

23   Q.   As a matter of fact, you took quite voluminous

24   notes of this weeklong inspection at Tonawanda

25   Coke, didn't you?

1    A.   Yes.

2    Q.   Do you know what the standard operating

3    pressure is for the coke oven gas line at Tonawanda

4    Coke facility?

5    A.   I know what range I was given.

6    Q.   And what range was that?

7    A.   100 to 150 centimeters of oil.

8    Q.   And who gave you that range?

9    A.   Mr. Cahill.

10   Q.   And is your recollection clear about that?

11   A.   Yes.

12   Q.   Are you aware that there are a number of

13   factors that influence the changes in the coke oven

14   gas line pressure at a facility -- at this

15   facility?

16   A.   Yes.

17   Q.   Are you aware that those factors can include

18   production levels, requests from the battery,

19   whether or not the facility is in cogeneration

20   status?  Are you aware of all those factors?

21   A.   Not all of them, but some.

22   Q.   Were you aware that this facility at the time

23   of the inspection was in cogen status; that is,

24   generating its own electricity through the burning

25   of coke oven gas?

1   A.   No, I don't recall that.

2   Q.   Did you inquire about that while you were

3   there?

4   A.   I don't remember.

5   Q.   Do you think it might have been an important

6   factor, in assessing the facility's consumption of

7   coke oven gas, for you to know that this facility

8   at the time of this inspection was burning coke

9   oven gas to generate the electricity for the entire

10  facility?

11          MR. MANGO:  Objection, your Honor.  It

12  seems like he's testifying in that question.

13          THE COURT:  Overruled.

14          THE WITNESS:  Can you say that again,

15  please?

16          MR. LINSIN:  Yeah.  Can you agree that it

17  would have been an important thing for you to

18  understand that at the time of your inspection of

19  April 2009 that Tonawanda Coke was in cogeneration

20  status; that is, burning coke oven gas to generate

21  the electricity for the entire facility?

22          MR. MANGO:  Objection, your Honor.

23  Assuming facts not in evidence.  There's no

24  evidence that this facility was in cogeneration

25  status.  The way the question is being asked

1    indicates that it was.  There is no evidence to

2    that effect.  I bring that to the Court's

3    attention.

4            THE COURT:  Mr. Linsin?

5            MR. LINSIN:  We will be -- I believe the

6    government is aware that this evidence will clearly

7    be linked up with subsequent witnesses.  I don't

8    believe there is any genuine dispute about the

9    premise of the question that's been posed to this

10   witness.

11           THE COURT:  Mr. Mango, is there?

12           MR. MANGO:  We don't believe that's the

13   case, your Honor.  We haven't been proffered any

14   evidence by the defense that they were in

15   cogeneration.

16           THE COURT:  I'll sustain your objection.

17           MR. PERSONIUS:  Your Honor, may I just

18   point something out to Mr. Linsin, or is that not

19   permissible?

20           THE COURT:  No, sure.  Go ahead.

21           MR. PERSONIUS:  Thank you, Judge.

22           MR. LINSIN:  Could I please ask that

23   Government Exhibit 3527.21 marked for

24   identification be called back up, and go to

25   page 018.

1    BY MR. LINSIN:

2    Q.   Now, Miss Hamre, I'm going to ask you again to

3    read silently to yourself the notes that appear on

4    the bottom right-hand portion of this page, and I'm

5    going to pose the same question to you that I asked

6    a moment ago, and that is whether you were aware

7    that at the time of your inspection this facility

8    was in cogeneration status.

9        Having read those notes, Miss Hamre -- and

10   these are your notes, correct?

11   A.   Correct.

12   Q.   Having read those notes, does that refresh your

13   recollection as to whether you knew that at the

14   time of your inspection of the Tonawanda Coke

15   facility in April 2009 it was in cogen status?

16   A.   No.

17            THE COURT:   Is it your answer that it

18   doesn't refresh your recollection?  Is that what

19   you're saying?

20            THE WITNESS:   It does refresh my

21   recollection, but the -- what I read doesn't answer

22   whether or not they were in cogen at the time.

23            THE COURT:   Okay.

24   BY MR. LINSIN:

25   Q.   Does it refresh your recollection that you had

1   a conversation with the personnel at Tonawanda Coke

2   about cogeneration and the maximum megawattage that

3   the facility produced while it was in cogeneration?

4   A.   Yes.

5   Q.   Now, you testified yesterday regarding the -- a

6   number of the circular charts that were -- copies

7   of which were provided to you at the end of your

8   inspection, correct?

9   A.   Correct.

10  Q.   Now, before this inspection had you had

11  experience in reviewing, reading, or interpreting

12  circular charts similar to the ones you received

13  from Tonawanda Coke?

14  A.   I have seen circular charts before.  I don't

15  recall what they were recording.

16  Q.   All right.  May I please have Government's

17  Exhibit 20.05 that is in evidence, please.  Now,

18  and if we could, is it possible to enlarge just the

19  chart itself?  Okay.

20      You testified a moment ago that you were

21  informed that -- by Mr. Cahill that the operating

22  line pressure at Tonawanda Coke for the coke oven

23  gas line was between 100 and 150.  Do I recall that

24  testimony correctly?

25  A.   Correct.

1  Q.  All right.  Now, as you look at this, the

2  readings on this circular chart -- and you have

3  looked at these readings, correct?

4  A.  Yes.

5  Q.  All right.  You see readings -- do you see

6  readings on the right-hand side of this, this

7  particular chart, in a range down to 70 centimeters

8  of oil?

9  A.  Somewhere in that area, yes.

10  Q.  And just so that we're talking about the same

11  direction, do you see this -- the recording just

12  above the point of the arrow that I've just made

13  there, indicating a reading in the 70s at about

14  some time, what would be after 11:00 a.m. that day?

15  A.  I see about 70.

16  Q.  All right.  And do you also see peaks in that

17  same general vicinity on this drawing that go up to

18  approximately 130 in that location?

19  A.  Yeah, it looks like 120 to 140 peaks kind of in

20  that side of the chart.

21  Q.  All right.  Varying peaks, correct?

22  A.  Correct.

23  Q.  Do you see any peaks on this drawing that get

24  up to 150?

25  A.  Part of the drawing is cut off on the right

1    there, so I can't tell for about a quarter of the

2    time.  But the time I can see, I don't see anything

3    above 150.

4    Q.  And you see quite a number of readings below

5    100, correct?

6    A.  Right at 100 or below.  Looks like this whole

7    half is 100 or a little above.

8    Q.  The left-hand side is in -- in the hundred

9    range.  The right-hand side has quite a number of

10   readings below 100 down into the 80-and-below

11   range, correct?

12   A.  It has some, yes.

13   Q.  Well, Miss Hamre -- I'm going to draw this line

14   there.  That arc of this graph reflects pressure

15   readings below 100 on a consistent basis, doesn't

16   it?

17   A.  It's fluctuating.  Some are above and some are

18   below, so --

19   Q.  Maybe my question wasn't clear.  Yes, it is

20   fluctuating along that arc.  But the fluctuations

21   include many readings below 100, correct?

22   A.  Yes.

23   Q.  All right.  So is it fair to say, at least from

24   this one example, that the operating range for this

25   day for the coke oven gas line -- the operating

1    pressure range was between 80 and 130 or

2    thereabouts?

3    A.   That's what it looks like.

4    Q.   All right.  So you knew, just based on your

5    review of even this one chart, that the estimate of

6    100 to 150 centimeters of pressure was not an

7    accurate estimate, correct?

8    A.   No.

9    Q.   And why is that?

10   A.   It was a range.  I -- this is one day out of a

11   year, so it could be or it couldn't be.

12   Q.   Did you ask for any other data other than the

13   charts you were brought -- that you were given at

14   the end of the week?

15   A.   No.

16   Q.   And, by the way, did you ask about the

17   background of this valve when you were there during

18   your inspection?

19   A.   I don't recall.

20   Q.   Did you ask when it was installed?

21   A.   I don't recall.

22   Q.   Now, I'm not sure I heard your testimony

23   yesterday correctly, but I thought I heard you

24   testify that the readings on this chart, the spikes

25   on this chart, if -- if the spikes went above the

1    set point for the pressure-relief valve, that that

2    spike would indicate a release of coke oven gas.

3    Did I hear your testimony correctly?

4    A.   Yes.

5    Q.   All right.  Now, are you aware, Miss Hamre,

6    that it is physically impossible for the pressure

7    gauge that generates this circular chart for this

8    pressure gauge to record a pressure that exceeds

9    the setting on the pressure-relief valve?

10              MR. MANGO:  Objection, your Honor.  Are

11    you aware that it's physically impossible.

12    That's -- that's not a proper question, your Honor,

13    in that it assumes evidence that's not -- or facts

14    not in evidence, your Honor.

15              THE COURT:  It may well be, unless there

16    is a foundation for it.  Objection sustained.

17    BY MR. LINSIN:

18    Q.   Do you know where the pressure recorder was

19    that generated this circular chart?  Where on the

20    coke oven gas line?

21    A.   No.

22    Q.   Did you ask?

23    A.   Not that I recall.

24    Q.   Do you know how close it was to the

25    pressure-relief valve itself?

1    A.   No.

2    Q.   If a pressure-relief valve -- or your

3    understanding was the pressure-relief valve on this

4    line opened at a certain pressure, correct?

5    A.   Correct.

6    Q.   And it wouldn't close until the pressure fell

7    below that set point, correct?

8    A.   I believe so.

9    Q.   And so given that operation that you've just

10   described, the pressure in the line couldn't exceed

11   the set point for the valve, correct?

12   A.   No.

13   Q.   Can you explain that answer?

14   A.   It may -- there may be a delay time for the

15   valve to open.  I don't have all the particulars.

16   Q.   You said there may be.  And so you're guessing?

17   A.   Yes.

18            MR. MANGO:  Objection, your Honor, to

19   characterizing this as guessing.

20            THE COURT:  It's been asked and answered.

21   BY MR. LINSIN:

22   Q.   And you testified that you didn't inquire where

23   the pressure gauge was that generated these

24   circular charts, correct?

25   A.   Not the exact location, no.

1  Q.  Now, you testified yesterday, Miss Hamre, that

2  after speaking to Mr. -- after Mr. Garing spoke to

3  Mr. Kamholz on the 17th, that you then spoke to

4  Mr. Cahill about the pressure-relief valve on the

5  21st, is that correct?

6  A.  Yes.

7  Q.  Now, is your memory clear about that?

8  A.  Yes.

9  Q.  And so between the time you saw this valve

10  release on the 17th and the time you talked to

11  Mr. Cahill on the 21st, the last day of your

12  inspection, you didn't receive any additional

13  information about this valve, correct?

14  A.  No.

15  Q.  You did receive additional information?

16  A.  Yes.

17  Q.  All right.  From where did you receive this

18  additional Information?

19  A.  There's a notation in my logbook.  I don't

20  recall who gave me the information.

21  Q.  All right.  In fact -- and when you say your

22  logbook, you mean the notes that you took during

23  this inspection, correct?

24  A.  Yes.

25  Q.  And, in fact, your notes reflect that on

1  April 20th, that Monday, you received from someone

2  specific information about the operation of this

3  valve.  You even drew a diagram of the valve in

4  your notes on the 20th, correct?

5  A.  Correct.

6  Q.  And your testimony is that you don't remember

7  who gave you that information?

8  A.  Correct.

9  Q.  It would have been someone from Tonawanda Coke,

10  correct?

11  A.  Yes.

12  Q.  In the course of your inspection at Tonawanda

13  Coke in April of '09, did you come to learn who was

14  responsible for setting the set point for the PRV

15  in the by-products area at that facility?

16  A.  No.

17  Q.  Did you ask?

18  A.  No.

19  Q.  There is a -- there was a by-products logbook

20  in the by-products area at the time of your

21  inspection.  Did you examine that logbook?

22  A.  I did not see a logbook.

23  Q.  Were you aware that there was a logbook in the

24  by-products area that recorded changes in the set

25  point for the pressure-relief valve?

1    A.   No.

2    Q.   Now, if we could just pull this exhibit down,

3    please.

4         You were shown yesterday Government Exhibit

5    number 70, which you may recall, Miss Hamre, was

6    your process flow diagram that you created after

7    the conclusion of the inspection.

8         Well, actually, could we please call that back

9    up, Government Exhibit 70, which is in evidence.

10   And if we could enlarge the -- just that portion.

11   Thank you.

12        Now, this is a drawing you created after your

13   inspection, correct?

14   A.   Yes.

15   Q.   And the pressure-relief valve that we've been

16   discussing is up in this right-hand corner,

17   correct?

18   A.   Yes.

19   Q.   And it's depicted by two triangles in that

20   portion of the line, correct?

21   A.   Yes.

22   Q.   And that's a traditional symbol for a valve in

23   a line such as that, is that correct?

24   A.   I believe so.

25   Q.   All right.  Now, the other vessels that are in

1    this, especially this top part of this drawing

2    where -- with the dotted lines, which you testified

3    was where the coke oven gas flowed, correct?

4    A.   Which vessels?

5    Q.   I'm sorry.  I was referencing all the vessels

6    of the top portion of this drawing through which

7    the dotted line travels as you move from left to

8    right.

9    A.   Yes.

10   Q.   Those are all components in the -- say, for the

11   coke oven battery at the far left, those are all

12   components in the by-products area, correct?

13   A.   Yes.

14   Q.   Now, those components have -- a number of these

15   components that are on your drawing have vents and

16   valves that are not depicted in your drawing,

17   correct?

18   A.   Yes.

19   Q.   Vents and valves that if you were going to be

20   doing a more detailed drawing, you would need to

21   include those, correct?

22   A.   Correct.

23   Q.   So this is a -- a more general drawing to

24   convey what you believe to be the important

25   elements for your focus in the by-products area,

1    correct?

2    A.   Yes.

3    Q.   But those vents and valves that are not on your

4    drawing were also the subject of your inspection,

5    were they not?

6    A.   Correct.

7    Q.   Those being vents and valves that are required

8    periodically to be monitored for possible leaks,

9    correct?

10   A.   Yes.

11   Q.   But you didn't include those in your drawing?

12   A.   No.

13   Q.   If we can pull this down, please.

14        During the course of your inspection at the

15   Tonawanda Coke facility in April of 2009, did you

16   talk to the personnel at the facility about their

17   handling of coal tar sludge?

18   A.   What do you mean by handling?

19   Q.   Whether it was recycled or not.

20   A.   It was discussed.

21   Q.   All right.  And did you learn through your

22   inspection that the facility was recycling the coal

23   tar sludge from the decanter tank in the

24   by-products area?

25   A.   Yes.

1   Q.   Now I'd like to go back -- oh, before we leave

2   the by-products area, you testified yesterday that

3   you learned, I believe, that at the time of your

4   inspection of April 2009 that the light oil system

5   at the plant was not in operation, correct?

6   A.   Yes.  All but the light oil column where gas

7   was still flowing through.

8   Q.   But -- but that column wasn't at that time

9   removing the light oil from the gas stream,

10  correct?

11  A.   That was how it was explained to us, yes.

12  Q.   And did you ask why the light oil scrubber had

13  been shut down at that point?

14  A.   No.

15  Q.   I'd like to turn your attention, please, to the

16  closeout meeting that you and your colleagues had

17  with the -- with Mr. Kamholz and, I believe you

18  testified, Mr. Trembowicz from Tonawanda Coke on

19  April the 21st.  You testified yesterday that -- on

20  direct examination, that at that closeout meeting

21  on the 21st that you did not make any comment to

22  Mr. Kamholz or anyone else as to whether this

23  pressure-relief valve was a violation of the

24  facility's Title V permit, correct?

25  A.   Correct.

1   Q.  All right.  There were two DEC personnel

2   present at that closeout meeting as well, correct?

3   A.  Correct.

4   Q.  And their names again, please?

5   A.  Larry Sitzman and Cheryl Webster.

6   Q.  And Mr. Sitzman at the time was the regional

7   air pollution engineer for DEC for Region 9,

8   correct?

9   A.  I don't know.

10  Q.  You understood him -- you testified yesterday

11  you understood him to be one of the people who had

12  been directly involved at inspections -- in

13  inspections at this facility, correct?

14  A.  Yeah.

15  Q.  And Miss Webster, as well, had been involved in

16  inspections of this facility on behalf -- air

17  inspections on behalf of DEC, correct?

18  A.  I believe she was just starting to inspect the

19  facility.

20  Q.  Now, my question is:  During this closeout

21  meeting, when the pressure-relief valve was

22  discussed, did either Mr. Sitzman or Miss Webster

23  give any instructions to Mr. Kamholz or anyone else

24  at the plant that this pressure relief needed to be

25  blanked off or that they needed to do something to

1    amend their Title V permit with respect to this

2    pressure-relief valve?

3    A.   No.

4    Q.   As a matter of fact, the only thing that was

5    discussed at this closeout meeting, after a

6    weeklong inspection, was a request on the part of

7    your team for the facility to explore whether they

8    could raise the set point for the pressure-relief

9    valve, isn't that true?

10   A.   One item.

11   Q.   Was there anything else discussed about the

12   pressure-relief valve at the closeout meeting other

13   than what I just said?

14   A.   Not that I recall.

15   Q.   And if there was anything else significant

16   discussed, you would have recorded it -- regarding

17   the pressure-relief valve, you would have recorded

18   it in your notes, correct?

19   A.   Not necessarily.

20   Q.   You drafted a report of your inspection in

21   September of 2009, five months after the inspection

22   itself, correct?

23   A.   It was being drafted prior to September.

24   Q.   Fair enough.  Your report on this inspection

25   was finalized and signed in September of 2009,

1    correct?

2    A.   No.

3    Q.   When was it finalized and signed?

4    A.   October of 2009.

5    Q.   Thank you for that correction.  Now, in this

6    report -- and it -- it goes on for about 14 pages.

7    Is that a fair statement?

8    A.   Yes.

9    Q.   You summarized your findings, correct?

10   A.   Correct.

11   Q.   You identify certain areas that you term to be

12   areas of noncompliance, correct?

13   A.   Correct.

14   Q.   And then after that, at the very end of your

15   report you also identify a few additional areas

16   which you identify as areas of concern, correct?

17   A.   Yes.

18   Q.   And as a matter of fact, the pressure-relief

19   valve that we've been discussing this morning is

20   the very last item listed in your inspection

21   report, correct?

22   A.   Correct.

23   Q.   And it is in the section of your report

24   regarding areas of concern, correct?

25   A.   Yes.

1    Q.   Not areas of noncompliance, correct?

2    A.   Correct.

3              MR. LINSIN:   I have nothing further, your

4    Honor.

5              THE COURT:   Okay, Mr. Linsin.   Thank you.

6         Mr. Personius?

7    CROSS-EXAMINATION BY MR. PERSONIUS:

8    Q.   Good morning, Miss Hamre.

9    A.   Morning.

10   Q.   I don't think we've met.   We've seen one

11   another.   But I'm Rod Personius, and I represent

12   Mark Kamholz.   It's nice to meet you.

13   A.   Nice to meet you.

14   Q.   Could you tell us, please, what steps you took

15   to prepare to testify during this trial?

16   A.   I reviewed my notes, I spoke with my attorneys,

17   I looked at other documents that we had gotten

18   while on-site, and I looked at photographs.

19   Q.   When you say you reviewed your notes, that's

20   the -- the notes that Mr. Linsin referred to?

21   A.   Correct.   My -- what I call my logbook.

22   Q.   Sure.   Okay.   And -- and when you describe this

23   document as a logbook, what does it -- what does it

24   look like?

25   A.   It's black.   It's a bound book.   It's smaller

1  than a regular sheet of paper.  I don't know the

2  exact measurements.

3  Q.  I from time to time date myself because I hate

4  to admit how old I'm getting, but back in -- when I

5  was in high school, you would from time to time get

6  these books that were black, and you'd open it up,

7  they had lined paper in them, and they had like a

8  string or something that was kind of the binder for

9  it so it was hard to rip pages out.  Is that the

10  kind of book you're referring to?

11  A.  Yes.

12  Q.  And is that the type of book that you always

13  use when you do these types of inspections?

14  A.  Yes.

15  Q.  Is there a reason you use that type of a -- a

16  document?

17  A.  To keep all our notes in one location.

18  Q.  Okay.  So that you don't -- if you lose -- if

19  you lose -- if you use something like I'm holding

20  up, a yellow pad, there is a risk that pages could

21  get torn off, and the advantage of the type of book

22  that you use is everything stays in one place?

23  A.  Yes.  Unless you lose the whole book, I guess.

24  Q.  Sure.  And the reason that you do that is

25  because what you put in to this book is what during

1   that inspection was important to you, right?

2   A.   Yes.

3   Q.   All right.   And I notice that you testified in

4   response to questions by Mr. Linsin that there were

5   certain events that occurred that didn't find their

6   way into this bound logbook that you maintained

7   during that weeklong inspection in April of 2009,

8   true?

9   A.   Yes.

10  Q.   All right.   And I think one -- probably the

11  most salient or the example that stands out the

12  most is your initial discovery or observation of

13  that pressure-relief valve in the by-products area.

14  Would that be true?

15  A.   What was the question again?

16  Q.   Let me repeat.   I apologize for not being

17  clear.   One example that stands out of an event

18  that didn't find its way into your logbook was your

19  discovery of this pressure-relief valve in the

20  by-products area on April 17th, 2009.

21  A.   Yes.

22  Q.   And was the reason that that didn't find its

23  way into your logbook, because you overlooked

24  putting it in your logbook or because you made a

25  decision that that didn't need to be put in your

1    logbook?

2    A.   Because there was no discussion regarding the

3    pressure-relief valve at that time.

4    Q.   By "at that time," you mean when you discovered

5    the pressure-relief valve on Friday, April 17th,

6    2009, true?

7    A.   Yes.   Mr. Kamholz couldn't answer our

8    questions, and we were doing other pieces of the

9    inspection at that time.

10   Q.   All right.   So there was a conversation at that

11   time with Mr. Kamholz, true?

12   A.   Yes.

13   Q.   And you've testified here in court about that

14   conversation with Mr. Kamholz, true?

15   A.   Yes.

16   Q.   And certainly you'd agree, would you not, that

17   as your testimony has gone along that's been a

18   point of emphasis, that Mr. Kamholz did not provide

19   information immediately about that pressure-relief

20   valve, true?

21   A.   Yes.

22   Q.   But it's not in your logbook?

23   A.   No.

24   Q.   And you say the reason it's not in your logbook

25   is because it wasn't discussed at that point, is

1    that correct?

2    A.   Yes.

3    Q.   Now, when you had that -- I guess as long as

4    we're talking about that, why don't we go to that

5    right now.  You're in the by-products area on

6    April 17th, and you observe this pressure-relief

7    valve go off or release?

8    A.   Yes.

9    Q.   All right.  At the time that that happens, do

10   you remember if it's morning or afternoon?

11   A.   My recollection is morning.

12   Q.   Do you remember what time in the morning?

13   A.   No.

14   Q.   Was there anybody present with you when the --

15   the pressure-relief valve released?

16   A.   Yes.

17   Q.   Would you tell the jury, please, who else was

18   with you?

19   A.   Mr. Kamholz was escorting us out into the

20   facility.  Mr. Garing from my office, and the

21   Region 2 inspectors, Harish Patel, Mozey Ghaffari

22   and Richard Kan, and there could have been others.

23   Those are who I recall.

24   Q.   And am I correct in understanding that at the

25   time the PRV released, this group that you've

1    identified were all together?

2    A.   Not -- we were walking maybe in rows, but sort

3    of as a group going out there.

4    Q.   So it was as you were walking to the

5    by-products area?

6    A.   As I recall, yes.

7    Q.   And do you remember where you were when you

8    observed the PRV release?

9    A.   Somewhere on the -- what I think you guys

10   called Broadway or whatever the road is between the

11   coke battery itself and the by-products area.

12   Q.   Okay.  And do you remember specifically where

13   you were on that roadway?

14   A.   Not specifically.

15   Q.   All right.  And did you see the valve release

16   one time or more than one time?

17   A.   At that time?

18   Q.   Yes.

19   A.   Once.

20   Q.   Okay.  And so you observed the pressure-relief

21   valve release one time, correct?

22   A.   Yes.

23   Q.   And your testimony, as I understand it, is, up

24   to that point in time you did not know that this

25   device existed in the by-products area, correct?

1    A.   Correct.

2    Q.   All right.  And once you observed that -- that

3    release, I think your testimony is you conferred

4    with Mr. Garing?

5    A.   Yes.

6    Q.   And again Mr. Garing is your associate who came

7    from Denver with you for this inspection?

8    A.   Yes.

9    Q.   And is Mr. Garing in some sense your

10   supervisor?

11   A.   No.

12   Q.   Are you coequals in terms of your position with

13   your office in Denver?

14   A.   Yes.

15   Q.   All right.

16   A.   He's more senior than I.

17   Q.   Okay.  But not your supervisor?

18   A.   No.

19   Q.   Now, did you -- did you talk to anybody else at

20   that point other than Mr. Garing?

21   A.   Not that I recall.

22   Q.   You recall your conversation was just with

23   Mr. Garing?

24   A.   Yes.

25   Q.   All right.  And did you step aside to have this

1    discussion?

2    A.  It was as we were walking along, as I recall.

3    Q.  All right.  And do you know from that

4    conversation if Mr. Garing also observed this PRV

5    release?

6    A.  I believe he did.

7    Q.  Okay.  What's your basis for saying that you

8    think he did?

9    A.  Because he turned, and we were looking up, and

10   I saw it, so I think he did, but --

11   Q.  And can you share with the jury, please, what

12   you remember about what you said to Mr. Garing and

13   what he said to you after you both had seen the

14   this PRV release?

15   A.  I don't recall exactly the conversation.

16   Q.  Well, you certainly would have a recollection

17   of the substance of that conversation, true?

18   A.  Yeah.

19   Q.  Okay.  Could you share what you remember --

20   A.  I think --

21   Q.  Pardon me.  Let me finish so we have a -- just

22   so we have a clean record.  I don't mean to cut you

23   off.

24        Could you share with the jury, please, what you

25   do recall about that conversation you had with

1    Mr. Garing?

2    A.   Something to the effect, "Ken, look at the pipe

3    on the coke oven gas line.  It's -- there's a --

4    it's relieving emissions.  What do -- do we know

5    what that is?"

6    Q.   All right.  And did Mr. Garing respond?

7    A.   I'm sure he did.  I don't remember what his

8    response was.

9    Q.   Okay.  You may not remember every word that he

10   used, but you certainly have some recollection

11   about the substance of what Mr. Garing said in

12   response, don't you?

13            MR. MANGO:  Objection, your Honor.  She

14   said she didn't remember.  If we get into the

15   substance, I think that is hearsay.

16            THE COURT:  No.  I'll permit it.

17            THE WITNESS:  I think he said something

18   like, "We'll have to check into that."

19   BY MR. PERSONIUS:

20   Q.   All right.  And was there any further

21   discussion at that point with Mr. Garing?

22   A.   No.  Because we were heading out to monitor.

23   We -- Mr. Garing had monitoring equipment.  We were

24   trying to stick to our schedule.

25   Q.   Okay.  So at that point in time it was more

1    important that you stick to your schedule than that

2    you discuss with Mr. Kamholz this pressure-relief

3    valve that you testify you had just discovered, is

4    that true?

5    A.   No.

6    Q.   You made a decision to go ahead with your

7    schedule at that point rather than talk immediately

8    to Mr. Kamholz, true?

9    A.   Yes.

10   Q.   And you did that because it was more important

11   to you at the time to maintain your schedule, true?

12   A.   No.

13   Q.   All right.  Was there anybody else that was

14   part of this group other than Mr. Kamholz,

15   Mr. Garing, these other gentlemen from EPA, and

16   you?

17   A.   Mike Trembowicz from Tonawanda Coke was with us

18   most of the time.  I don't recall if he was there

19   or not during that phase of the inspection.

20   Q.   Okay.  I don't know if that's come up before,

21   and if I'm being repetitive I apologize, but could

22   you tell the jury who Mike Trembowicz is, please,

23   to the extent you know who he is?

24   A.   As explained to us, he was a special assistant

25   to the owner of the company and had recently

1    started employment there, as I recall.

2    Q.   And was Mr. Trembowicz -- and by "the company"

3    you mean Tonawanda Coke?

4    A.   Tonawanda Coke, yes.

5    Q.   And was Mr. Trembowicz generally present during

6    the inspection with Mr. Kamholz?

7    A.   For the most part, yes.

8    Q.   All right.  Now, at the time you first observed

9    this -- this PRV release, do you remember if

10   Patrick Cahill was part of the group?

11   A.   He was not.

12   Q.   He was not there.  Okay.  Now, after you have

13   this brief discussion with Mr. Garing and you

14   decide to go on with your scheduled activities,

15   tell us what happened next.  Where did you go, or

16   what did you do immediately after that

17   conversation?

18   A.   We were going out into the by-products plant to

19   do some monitoring that's part of Subpart L, and

20   the region also had a unit, and there were a number

21   of items we were having Mr. Kamholz walk us through

22   what he typically does in his monthly monitoring.

23   Q.   All right.  So at that point in time you don't

24   make any mention to Mr. Kamholz about this

25   pressure-relief valve, true?

1    A.   At some point that morning Mr. Garing asked

2    Mr. Kamholz what it was.  I don't recall exactly

3    when during the morning.

4    Q.   I understand.  But immediately after you

5    observe it, you go on with your scheduled

6    activities.  We agree?

7    A.   It could have been that we asked him then.  I

8    just -- I don't remember the order of, if we asked

9    him right then or at a break between different

10   units.

11   Q.   And, of course, if in this logbook that you

12   maintain you had decided this was important enough

13   to make an entry, we would know when this happened,

14   true?

15   A.   Not necessarily.

16   Q.   If you put an entry -- had put an entry in your

17   logbook, "Observed PRV released, talked to Ken,

18   then talked to Mark" or Mr. Kamholz, we would know

19   what the chronology was, right?

20   A.   If I had written down the time, yes.

21   Q.   Okay.  But you didn't write anything down,

22   right?

23   A.   Correct.

24   Q.   And anybody that was to look at that logbook

25   would have no idea that you had observed this PRV

1    releasing on the morning of April 17, 2009,

2    correct?

3    A.   Correct.

4    Q.   All right.  So you're telling us that you think

5    it was later that morning that Mr. Garing made an

6    inquiry to Mr. Kamholz?

7    A.   At some point that morning.

8    Q.   All right.  Do you remember what -- how much

9    later it was after this conversation you had

10   with --

11            MR. MANGO:  Objection, your Honor.  We're

12   covering ground that was asked and answered, now

13   for a third time here.  I'd let that last question

14   go.  That was asked and answered.  This is similar

15   format of the same questions.

16            THE COURT:  Yeah.  I'll permit the

17   question, but move on.

18            MR. PERSONIUS:  Okay.

19   BY MR. PERSONIUS:

20   Q.   Between when you spoke to Mr. Garing and when

21   you recall Mr. Garing spoke to Mr. Kamholz about

22   the PRV, do you remember how much time passed?

23   A.   No.

24   Q.   And do you have a recollection of what the

25   circumstances were when Mr. Garing spoke to

1    Mr. Kamholz about the PRV?

2    A.   Other than that we were out in the plant, I

3    don't recall specifics.

4    Q.   Could you -- could you tell us where you were

5    in the plant?

6    A.   In the by-products recovery area somewhere

7    where we could see the PRV and point to it so that

8    Mr. Kamholz knew what we were referring to.

9    Q.   All right.  And who else was present other than

10   you and Mr. Garing and Mr. Kamholz when this

11   conversation took place?

12   A.   I don't recall if anyone else was present.

13   Q.   Do you remember if Mr. Cahill was there?

14   A.   No.  From Tonawanda Coke it was Mr. Kamholz,

15   and like I said, potentially Mike Trembowicz was

16   with the group, but Mr. Cahill was not with us at

17   that time.

18   Q.   All right.  And so that the topic was raised by

19   Mr. Garing with Mr. Kamholz?

20           MR. MANGO:  Again, your Honor, asked and

21   answered.

22           THE COURT:  Yeah.  Sustained.

23           MR. PERSONIUS:  I'd like to get into that

24   conversation.

25           THE COURT:  Well, you can get into it,

1030

1    but, you know, you have mentioned that about three

2    times, so --

3            MR. PERSONIUS:  I can ask it this way.  I

4    apologize.

5            THE COURT:  No, that's okay.  It's all

6    right.

7            MR. PERSONIUS:  I'm not trying to drag

8    this out.

9            THE COURT:  No.  I'm not saying you are.

10    But it's a legitimate objection, so --

11   BY MR. PERSONIUS:

12   Q.   Would you tell the jury what you remember about

13   what Mr. Garing said and what, if anything,

14   Mr. Kamholz said, and what you may have said during

15   this conversation?  Tell us about the conversation.

16   A.   I remember Ken asking, "Hey, what is that pipe

17   coming out of the coke oven gas line with the valve

18   on it," and Mark saying that we would have to ask

19   someone else, the by-products foreman.  He didn't

20   use a name, just that title, I believe.

21   Q.   Oh, Mr. Kamholz's response was -- didn't

22   mention Mr. Cahill's name?

23   A.   Not to my recollection, no.

24   Q.   And Mr. Cahill was not present when this

25   conversation occurred?

1    A.   No.

2    Q.   Was there -- do you remember anything else

3    about the -- the conversation other than what

4    you've told us?

5    A.   That was about it, as far as I recall.

6    Q.   All right.  And were steps taken -- if you

7    know, were steps taken at that point to go talk

8    Mr. Cahill, the by-products foreman, about the

9    pressure-relief valve?

10   A.   I don't know.

11   Q.   You didn't take any steps to do that?

12   A.   No.

13   Q.   All right.

14   A.   I didn't know it was Pat at the time.

15   Q.   You didn't know that Pat Cahill was the

16   by-products foreman?

17   A.   No.  I didn't know his title.

18   Q.   So on April 17th you were not aware that Pat

19   Cahill was the by-products foreman?

20   A.   No.  I knew he worked for Tonawanda Coke.

21           MR. PERSONIUS:  I just need a minute,

22   Judge, please.

23           THE COURT:  Sure.

24           MR. PERSONIUS:  Thank you.

25   BY MR. PERSONIUS:

1   Q.   Could we have -- this is for identification,

2   Exhibit -- Government Exhibit 3527.21.   Just for

3   identification.   And could we go, please, to

4   page 10.

5        Now, what you're looking at, Miss Hamre, is two

6   of the pages from this logbook you've described, is

7   that correct?

8   A.   Yes.

9   Q.   And in the upper left the date is

10  April 15th, 2009, is that true?

11  A.   Yes.

12  Q.   And that would have been two days before this

13  conversation with Mr. Kamholz that you've testified

14  about, true?

15  A.   True.

16  Q.   All right.   And do you see that the first entry

17  on April 15th, 2009, is "Pat Cahill, dash,

18  foreman"?

19  A.   Yes.

20  Q.   Okay.   And is it your testimony that you didn't

21  know that Mr. Cahill was the foreman in the

22  by-products area?

23  A.   I didn't know that he was the specific person

24  to talk to, no.

25  Q.   Okay.   My question again -- I'm sorry I didn't

1    make it clear -- when you learned that Mr. Cahill

2    was a foreman at Tonawanda Coke, is it your

3    testimony that you didn't realize from the context

4    of his name being mentioned that he was the

5    by-products foreman?

6    A.   I knew he worked for Tonawanda Coke.  I didn't

7    know --

8    Q.   And you knew he was a foreman?

9    A.   Yes.

10   Q.   And you didn't bother -- at the time you

11   learned his identity, you didn't bother to find out

12   what department he was the foreman of?

13   A.   Not at the time, no.

14   Q.   And during the course of your inspection did

15   you confer with Mr. Cahill on a number of occasions

16   with questions that you had that related to the

17   by-products department?

18   A.   Yes.

19   Q.   And it still didn't occur to you that he was

20   the foreman of the by-products area?

21   A.   No.

22   Q.   Did you ever make inquiry as to who the foreman

23   of the by-products area was?

24   A.   Later on I knew that he was.

25   Q.   All right.  When did you find out that this

1    person you'd been talking about by-products issues

2    that you knew was a foreman was the foreman of the

3    by-products area?

4    A.  On the Tuesday, the 21st.

5    Q.  So you didn't find that out until Tuesday, the

6    21st, which was the closing conference?

7    A.  Not at the closing conference.  Earlier in the

8    day.

9    Q.  Okay.  But the last day you were there?

10   A.  Yes.

11   Q.  Okay.  Now, just to finish this thought, you do

12   agree that during the course of your inspection on

13   a number of different occasions you spoke to

14   Mr. Cahill about questions regarding the operation

15   of the by-products area, true?

16   A.  Yes.

17   Q.  All right.  And, in fact, you were -- you were

18   told at different points talk to Pat Cahill about

19   this, right?

20   A.  Correct.

21   Q.  All right.  And when the question came up about

22   the PRV that operates in the by-products area,

23   Mr. Kamholz said talk to the -- he may not have

24   used Mr. Cahill's name at that point, but he said,

25   "Talk to the foreman of the by-products area."

1    True?

2    A.   Not quite in those words, but --

3    Q.   Well, okay.  Tell us again what he said.

4    A.   He said we'd have to talk to the by-products

5    recovery plant foreman.

6    Q.   All right.  And your recollection is you took

7    the time to do that on April 21st?

8    A.   Yes.

9    Q.   So that it's clear to the jury, this

10   conversation that you had with Mr. Kamholz on

11   April 17th where he referred you to the person you

12   found out later was Mr. Cahill, that's not in your

13   logbook either, is it?

14   A.   Which?

15   Q.   The conversation you had, you and Mr. Garing

16   had with Mr. Kamholz on April 17th regarding the

17   PRV, you didn't put that in your logbook?

18   A.   No.

19            MR. MANGO:  Objection, your Honor.  We've

20   covered this ground already.

21            THE COURT:  No.  We're going to move on,

22   but overruled.

23   BY MR. PERSONIUS:

24   Q.   Now, you final -- you do talk to Mr. Cahill, as

25   you've told us, on the morning of April 21st,

1    right?

2    A.   Yes.

3    Q.   How does that get set up with him?  How do you

4    end up talking to Mr. Cahill?

5    A.   We were out in the by-products recovery area

6    finishing up some -- a vari -- sorry about that --

7    a variety of questions that we were still following

8    up on, and we told Mr. Kamholz that we still had

9    the question about the pressure-relief valve, and

10   about that time Mr. Cahill was walking through the

11   area, and he was waved over to come talk to us.

12   Q.   By whom?  Who waved him over?

13   A.   I believe by Mr. Kamholz.

14   Q.   Mr. Kamholz.  Okay.  And did you then have a

15   discussion with Mr. Cahill at that point about the

16   PRV?

17   A.   Yes.

18   Q.   Who else was present when Mr. Kamholz waved

19   over Mr. Cahill?  Do you remember?

20   A.   I believe it was -- well, Mr. Garing, myself,

21   Mr. Cahill; and Mr. Kamholz was still in the --

22   still with us.

23   Q.   All right.  Did the conversation with

24   Mr. Cahill take place right in the by-products

25   area?

1  A.  Yes.

2  Q.  Right where you were standing?

3  A.  Yes.

4  Q.  Okay.  And do you recall what -- what -- who

5  asked the questions?  You or Mr. Garing or both of

6  you?

7  A.  Probably a combination of the two of us.  I

8  don't recall specifically.

9  Q.  Did you have your logbook with you at that

10  time?

11  A.  Yes.

12  Q.  You carried that logbook with you at all times?

13  A.  I tried to.

14  Q.  All right.  And you would make contemporaneous

15  entries in that as you went through the inspection?

16  A.  Yes.

17  Q.  And you made some entries in your logbook at

18  that time -- this is on April 21st -- of the

19  conversation that you had with Mr. Cahill?

20  A.  Yes.

21  Q.  Do you have a recollection of the -- what

22  questions were asked and what Mr. Cahill told you

23  about the pressure-relief valve at that time?

24  A.  Yes.

25  Q.  Could you share that with the jury, please?

1   A.   We were standing out in the by-products area.

2   There's kind of an open area where the

3   pressure-relief valve is up above, and there was a

4   little shack that held the circular chart where the

5   pressure was recorded.  We were standing in that

6   area, and we asked Pat what did he know about

7   the -- the pressure-relief valve, what was the

8   typical pressure in the line.  He showed us the

9   chart inside the shed.  He said that it was set at

10  between 120 and 130 centimeters of oil, but that

11  it -- it could vary because the process varied

12  some.

13      And then I asked him how long he kept these

14  pressure charts, and he said about 30 days, but

15  that those were in his -- you know, we didn't see

16  any others in the shed.

17  Q.   You didn't see any others.  I don't mean to

18  interrupt you.

19  A.   Any other circular charts.  The one was on the

20  wall that was -- had the ink pen recording, but I

21  don't recall others in the shed.  He said those

22  were kept in his office that was not too far from

23  there.

24  Q.   Okay.  Did you then still remain at the shed?

25  A.   I had taken a picture, and then we -- we --

1    he -- he escorted us over to his office.

2    Q.   Okay.   And what happened when you got to

3    Mr. Cahill's office?

4    A.   He was searching through some of his drawers,

5    trying to find some of the historical charts, and

6    he kind of was fumbling around.   He seemed nervous.

7    And, you know, we said, well, we'd like to get the

8    previous week's charts, and if he could just bring

9    us to the -- those to us at the main conference

10   room, which was kind of on the other side of the

11   facility, before we left.

12   Q.   Okay.   Did he do that?

13   A.   He did.   Or we got the charts somehow.   I don't

14   remember if he's the one that brought them or not.

15   Q.   And when you describe Mr. Cahill as being

16   nervous as he was looking for these charts, did you

17   form a belief as to why he was acting nervously?

18   A.   No.

19   Q.   You don't mean to suggest that there was

20   anything improper about the fact he was nervous, do

21   you?

22          MR. MANGO:   Objection, your Honor.   She

23   said she didn't know.

24          THE COURT:   No.   I'll allow the answer.

25   Overruled.

1           THE WITNESS:  No.

2    BY MR. PERSONIUS:

3    Q.  In your interaction with Mr. Cahill were you

4    satisfied that he was being truthful with you in

5    what he was telling you?

6    A.  We took him to be truthful.  Other people have

7    gotten nervous when we're asking them questions on

8    inspections.

9    Q.  Right.  Right.  But -- but as far as you were

10   concerned at that time, he was being cooperative

11   with you, correct?

12   A.  Yes.

13   Q.  And as you look back at it now, do you agree he

14   was being cooperative with you?

15   A.  Yes.

16   Q.  All right.  Now, was there ever a time when you

17   were in the by-products area within sight or

18   hearing of this pressure-relief valve, when

19   Mr. Cahill was with you and the pressure-relief

20   valve released?

21   A.  Can you say that again?

22   Q.  Sure.  I don't always ask the best questions.

23       Was there a time during your inspection when

24   you were within sight or hearing of the

25   pressure-relief valve, it released, and Mr. Cahill

1    was present with you?

2    A.   I don't remember if he was there or not.

3    Q.   Now, what you've just described to us, at least

4    some of that is in your logbook, this conversation

5    you had with Mr. Cahill on April 21st, correct?

6    A.   Yes.

7    Q.   All right.   Now, Mr. Linsin referred to some

8    entries that you made on April the 20th, the day

9    before, in your logbook.   Correct?

10   A.   Yes.

11   Q.   And that includes like a diagram of the

12   pressure-relief valve and some more detail about

13   how it operates, true?

14   A.   Yes.

15   Q.   Okay.   And you told Mr. Linsin that you don't

16   recall who provided you with that information?

17   A.   No, I do not.

18   Q.   And your notes don't tell us that either,

19   correct?

20   A.   Correct.

21   Q.   Now, let me ask you this if I can:   Do you know

22   whether or not it was Mr. Kamholz that gave you

23   that information?

24   A.   I don't.

25   Q.   So it may have been him that gave you that

1    information on the 20th?

2    A.   I don't know who it was.

3    Q.   All right.  And the information you got on the

4    20th, was that consistent with what Mr. Cahill told

5    you on the 21st?

6    A.   I believe some of it was.  Without reading

7    through it, I --

8    Q.   Would it be helpful for you to take a look at

9    it before you answer that question?

10   A.   Yes.

11   Q.   Okay.  We have the -- the exhibit on the screen

12   for identification only.  I believe if we could go

13   to page 32, Lauren.

14              THE COURT:  And this is 3527.21?

15              MR. PERSONIUS:  Yes, Judge.

16   BY MR. PERSONIUS:

17   Q.   I don't want to limit you to what I think are

18   your references to the PRV on that -- on the 21st,

19   but on this page, page 32 of this exhibit, on the

20   left-hand side I see a reference to the -- to the

21   PRV.  Do you see that?

22   A.   The bleeder?

23   Q.   Yes.

24   A.   Uh-huh.

25              MR. MANGO:  Your Honor, just for

1    clarification purposes, my reading of this is

2    actually this entry was made on the 21st.

3           MR. PERSONIUS:  Yes, that's right.

4           MR. MANGO:  We were asking about the 20th.

5           MR. PERSONIUS:  Well, we've got to compare

6    both of them, and since my book was open to -- I

7    don't mean to confuse anybody.  My book was open to

8    the 21st.  And if I didn't make that clear, I'll

9    make that clear.  We're looking at entries for your

10   conversation with Mr. Cahill on the 21st.  Okay?

11       And if you look on the left-hand side on

12   page 32 and read those entries, and let us know if

13   that refreshes your recall of the discussion you

14   had with Mr. Cahill on the 21st.

15       Are you done?

16   A.  Uh-huh.

17   Q.  Yes?

18   A.  Yes.

19   Q.  Okay.  And am I picking out the right part of

20   your logbook that reflects your notations as to

21   your conversation with Mr. Cahill on the 21st?

22   A.  I believe so, yes.

23   Q.  Okay.  Now could we go to page 28, please,

24   Lauren?

25       Now, we have page 28 on the screen, and up at

1   the top the date is 4/20/09, correct?

2   A.   Correct.

3   Q.   Do you see entries there that also relate to

4   the pressure-relief valve?

5   A.   Yes.

6   Q.   Would you review those to yourself and let us

7   know if those are your entries from the 20th

8   regarding the PRV?

9   A.   Okay.

10   Q.   And are we looking at the right portion of your

11   logbook for your entries, your notations regarding

12   the April 20th conversation you had with respect to

13   the PRV?

14   A.   Yes.

15   Q.   All right.  And now that you've looked at both

16   entries, do you agree that they're consistent in

17   terms of the information they provide?

18   A.   Some is the same, and some is different.

19   Q.   Okay.  Do you want to highlight for us what's

20   different?

21   A.   The main thing I see is the relief valve set at

22   approximately 80 centimeters.

23   Q.   And that's -- what date says that?

24   A.   The 20th.

25   Q.   Okay.  And then on the 21st does it have a

1045

1    different setting noted?

2    A.   I didn't -- that was something Mr. Cahill

3    discussed with us.  I didn't have an -- I didn't

4    have the specifics, I guess, so --

5    Q.   So in your notes -- to be clear, your notes of

6    your conversation with Mr. Cahill do not show what

7    he said the setting was for the PRV, is that true?

8    A.   No -- yes.

9    Q.   Okay.  I don't mean to confuse you.  Are there

10   any other differences that you see in the two

11   entries that you want to note for us?

12   A.   No.

13   Q.   Okay.  Thank you very much.

14            THE COURT:  Okay.  Why don't we take 15.

15            (Jury excused from the courtroom.)

16            THE COURT:  Okay.  You may step down.  See

17   you in about 15.

18            MR. PERSONIUS:  Okay.  Thank you, Judge.

19            (Short recess was taken.)

20            (Jury seated.)

21            THE COURT:  Welcome back.  Please have a

22   seat.  All right.  You look revivified.  All right.

23   All right.  We're back on in the case of United

24   States versus Tonawanda Coke and Mark Kamholz, and

25   Martha Hamre is back on the stand.  She remains

1    under oath.  I think we're still in

2    cross-examination by Mr. Personius.

3              MR. PERSONIUS:  Just a few more questions,

4    Judge.

5              THE COURT:  Okay.

6              MR. PERSONIUS:  Thank you.

7         Lauren, could we please have for identification

8    Government Exhibit 3527.21?

9              THE COURT:  Okay.  We can do that.  And

10   let's move on.  Thank you.  All the attorneys and

11   parties are back present.  Thank you.

12   BY MR. PERSONIUS:

13   Q.  Miss Hamre, what I've asked to be put back on

14   your screen is your logbook once again.  Do you see

15   that?

16   A.  Yes.

17   Q.  Thank you.  Would you please go, Lauren, to

18   page 28?

19        Miss Hamre, we now have back up the notations

20   you made from a discussion you had with someone on

21   April 20th, 2009, regarding the pressure-relief

22   valve, is that correct?

23   A.  Correct.

24   Q.  And one of the items you had mentioned about

25   the -- the entries on April 20 is that there was

1047

1    mention of a -- a pressure of 80 centimeters?

2    A.   Yes.

3    Q.   And after you put 80 centimeters, you put a

4    question mark after that?

5    A.   Correct.

6    Q.   And was the question mark intended to indicate

7    that whatever your source of information was wasn't

8    sure about that?

9    A.   Correct.

10   Q.   All right.  Now, the -- the entries that you

11   have in your logbook for April 20th of 2009 include

12   a diagram of this pressure-relief valve?

13   A.   Yes.

14   Q.   Correct?  And something that says COG, which

15   could be the coke oven gas line?

16   A.   Yes.

17   Q.   And then after that you made a number of

18   entries that cover about seven lines?

19   A.   Yes.

20   Q.   All right.  And could we go to page 32, please?

21        Now, on page 32 of Government Exhibit 3527.21

22   we have your entries in the logbook from your

23   conversation on April 21st with Mr. Cahill?

24   A.   Yes.

25   Q.   And am I correct that the -- the number of

1    entries -- lines of entries you have regarding the

2    discussion you had with Mr. Cahill is maybe -- it's

3    either two or four lines, if I'm reading it

4    correctly?

5    A.   That -- all but the first line were discussion

6    with Mr. Cahill.

7    Q.   Okay.  But as far as dealing with the PRV, I

8    see two lines near the top, and then down at the

9    bottom I see two more lines that relate to the PRV.

10   A.   I'd say six, that there's four at the top.

11   Q.   I see.  Okay.  I understand.  I understand

12   exactly what you're saying.  Thank you.

13        You had mentioned to Mr. Linsin, when he asked

14   you some questions about a cogeneration system at

15   the plant, that you didn't recall that having been

16   referred to during your inspection, correct?

17   A.   Restate the question.

18   Q.   When you were being asked questions by

19   Mr. Linsin, he asked you about a cogeneration

20   system at Tonawanda Coke, correct?

21   A.   Correct.

22   Q.   And your testimony was that you didn't recall

23   that there was a cogeneration system in operation

24   at Tonawanda Coke, correct?

25   A.   No.

1    Q.   Okay.  Do you recall that there was a

2    cogeneration system in operation at Tonawanda Coke

3    in April of 2009?

4    A.   No.  I recall talking about a cogen system.  I

5    don't recall whether it was in operation or not at

6    the time.

7    Q.   Okay.  So you at least recall cogeneration was

8    discussed?

9    A.   Yes.

10   Q.   And that -- do you understand that if there was

11   a cogeneration system in operation at Tonawanda

12   Coke at that time, that that would have been a use

13   for the coke oven gas that the -- the coking

14   process generated?

15   A.   Yes.

16   Q.   All right.  Can we go stay on Exhibit 3527.21.

17   And go to page 30, please, Lauren.  And we can even

18   just do the right side, Lauren, if you can.  Thank

19   you.

20        This page of Exhibit 3527.21 contains entries

21   you made on April 21, 2009, in your logbook?

22   A.   Yes.

23   Q.   Okay.  And would you look down at the bottom of

24   the -- the page that's enlarged, which would be the

25   right side of your logbook for that date.  Do you

1   see where I'm focusing?

2   A.   Yes.

3   Q.   And do you see there's a paragraph that starts

4   out in March 2009?

5   A.   Yes.

6   Q.   And that pertains to a cogen system?

7   A.   Partially.

8   Q.   Okay.  Why don't you, if you would, read that

9   bottom paragraph to yourself, and then I think

10   we'll have to move on to the top of page 31 of this

11   exhibit.

12   A.   Okay.

13   Q.   Can we go to page 31, please, Lauren?  And

14   we're concerned here on the left side of the page.

15   Thank you.

16       The entry that you were reading to yourself

17   continues on the top left-hand side of page 31 of

18   this exhibit, is that true?

19   A.   Yes.

20   Q.   Okay.  Would you read that to yourself, too,

21   please?

22   A.   Okay.

23   Q.   Are you done reading it?

24   A.   Uh-huh.

25   Q.   And what -- what is reflected on these entries

1    in your logbook that I've just had you read to

2    yourself relates to a problem with a cogeneration

3    system at Tonawanda Coke in March of 2009?

4    A.   Yes.

5    Q.   Okay.  And that would have been a month before

6    your inspection?

7    A.   Yes.

8    Q.   And does that help refresh your recollection

9    that Tonawanda Coke was operating with a

10   cogeneration system in place?

11   A.   On that date, yes.

12   Q.   On what date?

13   A.   On the March 17th, or if I could go back to the

14   previous page, I think it was March 17th.

15   Q.   Of 2009?

16   A.   2009.

17   Q.   So that would have been a month before you were

18   there?

19   A.   Correct.

20   Q.   Are you suggesting by your testimony that as of

21   the time you were there that cogeneration system

22   was no longer in operation?

23   A.   I don't know.

24   Q.   You didn't ask?

25   A.   I don't recall.

1   Q.   All right.  We know from your note that you

2   got -- did you get this information, by the way,

3   from Mr. Kamholz?  Do you remember?

4   A.   I believe so, yes.

5   Q.   Okay.  So we know that on April 21st of 2009

6   you received information from Mr. Kamholz that a

7   month earlier Tonawanda Coke had a cogeneration

8   system operating, true?

9   A.   Yes.

10   Q.   And for how long it had operated before that,

11   do you know?  Before March of 2009?

12   A.   I don't.

13   Q.   And that's because you didn't ask?

14   A.   Correct.

15   Q.   Now, during your interaction with -- with

16   Mr. Kamholz in April of 2009, would you agree that

17   when you requested information from him that he

18   provided it to you?

19   A.   Except for in two areas, yes.

20   Q.   Okay.  And in one of those areas dealing with

21   the PRV, you don't know whether he did or did not

22   supply you with the information from April 20th,

23   correct?

24   A.   No.

25   Q.   What's -- that's not correct?

1    A.   Yes.

2    Q.   All right.

3              THE COURT:  Wait.

4              MR. PERSONIUS:  I'll clear it up.

5              THE COURT:  Clear it up.

6              MR. PERSONIUS:  Double, triple negatives.

7              THE COURT:  Or something.

8    BY MR. PERSONIUS:

9    Q.   The entries that you have from April 20th of

10   2009 regarding the PRV, you told us you don't know

11   who provided you with that information, right?

12   A.   Yeah.

13   Q.   And you can't exclude Mr. Kamholz as the source

14   of that information, true?

15   A.   No.

16   Q.   That's not true?

17   A.   That's not true.  I distinctly remember

18   Mr. Kamholz did not give -- provide any information

19   regarding the PRV during the inspection.

20   Q.   All right.  So now your testimony is that on

21   April 20th whatever information you got about the

22   PRV did not come from Mark Kamholz?

23   A.   Correct.

24   Q.   And you say that even though we don't have any

25   source identified for that information from

1   April 20th?

2   A.   Correct.

3   Q.   So getting back to my question.   Other than the

4   PRV and then there was some question about

5   production of coke?

6   A.   Yes.

7   Q.   Other than those two -- those two questions,

8   Mr. Kamholz was completely cooperative with you

9   during the --

10   A.   He provided us information.   He answered the

11   questions, yes.

12   Q.   All right.   And when you asked for documents,

13   he provided those to you, correct?

14   A.   Yes, if he had them.

15   Q.   And in the case of the PRV, at minimum we know

16   he referred you to the foreman of the by-products

17   area, correct?

18   A.   Yes.

19   Q.   And the foreman of the by-products area was Pat

20   Cahill, correct?

21   A.   Yes, at least one of them.   There may be other

22   foremen.   I don't know.

23   Q.   All right.   And you were satisfied with the

24   information you got from Mr. Cahill about the PRV,

25   correct?

1     A.    Yes.

2     Q.    All right.  And in the case of the other area

3     where he referred you to someone else dealing with

4     production, do you remember who he had you talk to

5     about that?

6     A.    I believe his name was Mike Durkin, a financial

7     representative from Tonawanda Coke.

8     Q.    All right.  And the last topic that I want to

9     cover with you is that when you prepared a final

10    report, that was in October of 2009?

11    A.    That was when it was finalized, yes.

12    Q.    And before that report became final, did it go

13    through a review process with EPA at Region 2?

14    A.    Yes.

15    Q.    All right.  So that that report, by the time

16    it's final, was a report that had gone -- not only

17    been prepared by you and been reviewed in your

18    office, it had also gone to -- is it New York City

19    where it would go?

20    A.    Yes.

21    Q.    And New York City provided its input for the

22    report?

23    A.    Yes.

24    Q.    And you refer in that report to this emissions

25    study that was done in July of 2003.  Do you recall

1    that?

2    A.   Yes.

3    Q.   And you specifically reference that study and

4    indicate that that study provides that there is a

5    pressure-relief valve in the by-products area,

6    right?

7    A.   I didn't indicate that in the report, no.

8    Q.   You don't have a reference in your final report

9    to that emissions study indicating --

10   A.   I do have a reference to the emissions study.

11   Q.   And that indicates -- that reference that you

12   have indicates that the emissions study discloses

13   that there was a pressure-relief valve at Tonawanda

14   Coke, doesn't it?

15        MR. MANGO:   Objection, your Honor.   She

16   answered the question, no, it does not.

17        MR. PERSONIUS:   Then I can go to the

18   exhibit if I need to, Judge.   Do you want me to do

19   that?

20        THE COURT:   I didn't rule on the

21   objection.   I'm going to overrule it.   So if you

22   can answer that question, please.

23        THE WITNESS:   Can you say it one more

24   time, please?

25   BY MR. PERSONIUS:

1    Q.   Well, why don't we do it this way.  I don't

2    want to seem at all to be unfair with you.

3         Could we have -- this is for identification --

4    Government Exhibit 15 put on the screen.

5         Now, Government Exhibit 15 for identification,

6    you see the first page of that document?

7    A.   Yes.

8    Q.   This is the -- the final report that you

9    prepared in October of 2009?

10   A.   Yes.

11   Q.   Lauren, would you please go to page 8?

12        All right.  On page 8 you include a -- this is

13   a continuation of your summary of findings and

14   observations, correct?

15   A.   Correct.

16   Q.   And this would be the -- as far as your -- it's

17   the eighth page of the document, and it's the --

18   the third page of your findings, correct?

19   A.   I believe so.  It's the eighth page of the

20   document.  I'm not sure what page of the findings

21   without having the previous pages.

22   Q.   All right.  If you go to item number 6 on page

23   8 of Government Exhibit 15 for identification, do

24   you see that in the column for observation finding,

25   that you reference this emissions study?

1  A.  Yes.

2  Q.  And do you see that you specifically make

3  reference to the presence of a pressure-relief

4  valve?

5  A.  Yes.

6  Q.  And you're getting that information from this

7  emissions study, correct?

8  A.  And from observations on-site.  There was a

9  pressure-relief valve on the light oil tank.

10  Q.  Well, the valve that you're referring -- your

11  testimony is that when you refer to the TCC

12  document Hazardous Air Pollutant Emissions

13  Inventory -- do you see that reference?

14  A.  Yes.

15  Q.  Okay.  And then you go on right after that to

16  talk about a pressure-relief valve.

17  A.  Yes.  There was one listed in the -- in the --

18  what I have as Appendix G, which is the HAP.

19  Q.  Right.  It's the -- the emissions study, right?

20  A.  Yes.

21  Q.  All right.  And is it your testimony that that

22  pressure-relief valve that's referred to in that

23  emissions study is not the pressure-relief valve

24  that you've been testifying about over the past two

25  days?

1   A.   I don't believe it was.

2   Q.   What pressure-relief valve do you think it was?

3   A.   There was a pressure-relief valve on the light

4   oil storage tank that during our inspection we saw,

5   and this study was regarding fugitives, and you

6   wouldn't typically record a pipe coming off of a --

7   the coke oven gas line would be a point source.

8   Q.   Did you make any inquiry to determine which

9   pressure-relief valve was being referred to in this

10  in this study?

11  A.   No.

12  Q.   And did you know about the reference to this

13  pressure-relief valve in this study before you went

14  to Tonawanda Coke in April?

15  A.   No.

16  Q.   You had the document?

17  A.   I did have the document.

18  Q.   But you hadn't reviewed it that carefully?

19  A.   No.

20          MR. PERSONIUS:  All right.  May I have a

21  minute, Judge?

22          THE COURT:  Yes.

23          MR. PERSONIUS:  Your Honor, I have no

24  further questions at this point.

25      Thank you, Miss Hamre.

1      THE COURT:  Okay, Mr. Personius.  Thank

2   you.

3      Any redirect, Mr. Mango?

4      MR. MANGO:  Yes, your Honor.

5   REDIRECT EXAMINATION BY MR. MANGO:

6   Q.  Good morning, Miss Hamre.  How are you doing

7   today?

8   A.  Good.

9   Q.  All right.  You were just asked about this

10   hazardous air pollutant inventory that was done

11   in 2003.

12   A.  Correct.

13   Q.  Okay.  And again, for the jury, prior to going

14   to the Tonawanda Coke Corporation for your April

15   of 2009 inspection, do you recall seeing a

16   reference to a pressure-release valve in that

17   document?

18   A.  No.

19   Q.  Now, during your inspection did you find a

20   pressure-release valve in the by-products area?

21   A.  Yes.

22   Q.  Okay.  We've been talking about one that you

23   also refer to as the bleeder valve?

24   A.  Yes.  Also referred -- or referred by Tonawanda

25   as a bleeder valve, so --

1   Q.   If I understand your testimony, there was

2   another pressure-release valve you found in the

3   light oil area?

4   A.   Yes.  On the light oil storage tank.

5           MR. MANGO:  Okay.  If I could pull up,

6   your Honor, for identification purposes Government

7   Exhibit 15.02.061 for identification purposes.  And

8   absent an objection, your Honor, move this document

9   into evidence.

10           MR. LINSIN:  No objection.

11           MR. PERSONIUS:  No objection, Judge.

12           THE COURT:  Okay.  15.02.061 received, no

13   objection.  May be published.

14           (Government's Exhibit No. 15.02.061 was

15           received into evidence.)

16   BY MR. MANGO:

17   Q.   Miss Hamre, can you tell the jury what we're

18   looking at on our screen here?

19   A.   This was taken from the top of the light oil

20   storage tanks, and this is a pump right here, and

21   then right here is a pressure-relief valve.

22   Q.   And the light oil storage tank is located in

23   the by-products area at the Tonawanda Coke

24   Corporation?

25   A.   Yes.

1    Q.  All right.  Now, on cross you were questioned

2    about your review of the DEC file.  Do you remember

3    those questions?

4    A.  Yes.

5    Q.  And is it customary that you review the whole

6    file at DEC, or when you go out on these

7    inspections, the appropriate state agency, or just

8    the portion of that file that relates to your

9    upcoming inspection?

10   A.  We try to do as thorough a review as we can,

11   but we focus on those sections pertinent to what

12   we'll be looking at during our -- our on-site

13   inspection.

14   Q.  Okay.  Why did you conduct only a cursory

15   review of the DEC file and in particular this

16   hazardous air pollutant inventory emission.  Why

17   only a cursory review?

18   A.  We had a -- I got a number of documents while I

19   was at the DEC, and you -- other places have had

20   HAP emissions studies, and sometimes there's

21   inaccuracies in them, so, I mean, you -- you look

22   through them, but you also want to confirm while

23   you're on-site.

24   Q.  Okay.  So in your experience as a chemical

25   engineer, have you seen other hazardous air

1    pollutant inventories similar to the one you saw

2    for the Tonawanda Coke Corporation?

3    A.   Similar items, yes.

4    Q.   Okay.  Have you formed an opinion as to the

5    general accuracy of these documents?

6    A.   It can vary.  They can be good, or they can

7    have inconsistencies.  Once we're on-site we find

8    differences in what was listed.  I mean, typically

9    they're done by a consultant who has sometimes very

10   minimal time at the facility also, and they give a

11   representation of what they did while they were

12   there.  And we may find differences once we go

13   on-site.  And that's why, you know, we like -- we

14   go through a discussion of what the operations are,

15   and then we go out into the plant, and we confirm,

16   or we try to confirm what we can while we're there.

17   Q.   So you also testified on cross-examination that

18   at the time you prepared your report -- the report

19   that was finalized in October of 2009, is that

20   right?

21   A.   Yes.

22   Q.   Okay.  At the time you prepared that, you --

23   you made reference to this hazardous air pollutant

24   inventory study, is that right?

25   A.   Yes.

1    Q.   So -- and in fact you made reference to a

2    notation that there was one pressure-release valve

3    in the by-products area, is that right?

4    A.   Yes.

5    Q.   Okay.  So after your inspection you went back

6    and looked at that HAP study?

7    A.   Yes.

8    Q.   Okay.

9    A.   And I was trying to get a component count for

10   how many components are in their system, because

11   typically a company will provide us a more detailed

12   list than what was provided to us by Tonawanda

13   Coke.  They gave -- their inventory just gave basic

14   units, like the tar decanter.  Typically we'd see,

15   you know, tar decanter, and then it would list

16   specific valves and usually a specific ID of some

17   sort on the list.  So I was trying to give a feel

18   for how many components we thought were in the

19   system.

20   Q.   Do the regulations discuss identifying the

21   number of components that are in benzene service?

22            MR. LINSIN:  Objection, your Honor.

23            THE COURT:  Grounds?

24            MR. LINSIN:  This gets into the issue,

25   your Honor, that we discussed at the bench

1    yesterday.  We're dealing with a different set of

2    regulations now.

3                MR. MANGO:  Your Honor, this has now

4    become relevant in terms of the cross-examination,

5    particularly when asked in terms of specific areas

6    of concern versus areas of noncompliance.  I'm

7    going to be very limited in this, but I think this

8    is appropriate, because there was a reference made

9    in -- in item number 6, which is a noncompliance

10   citation of a pressure-release valve, and I think

11   it's appropriate for the jury to know why

12   Miss Hamre was making a notation in there about a

13   pressure-release valve, what was relevant to her in

14   making that.

15               THE COURT:  Okay.  What's your question?

16   BY MR. MANGO:

17   Q.  With respect to area number 6 you included on

18   your report, your summary of findings, your table,

19   you made note to this hazardous air pollutant

20   emission inventory, is that correct?

21   A.  Yes.

22   Q.  Why did you make note to this hazardous air

23   pollutant emission inventory with respect to item

24   number 6 in your table of findings?

25               THE COURT:  All right.  Same objection?

1    MR. LINSIN:  Same objection, your Honor.

2    THE COURT:  Yeah.  I'm going sustain the

3    objection.

4    MR. MANGO:  All right.  What do the

5    regulations require for -- for components or

6    equipments that are in benzene service?

7    MR. LINSIN:  Objection, your Honor.

8    THE COURT:  Grounds?

9    MR. LINSIN:  Same grounds.

10   THE COURT:  Sustained.

11   BY MR. MANGO:

12   Q.  Why did you make reference to a

13   pressure-release valve in your report?

14   A.  Because there was one listed in the HAP

15   emission study, and I was trying to give an

16   approximation of how many components were in the

17   area.

18   Q.  Okay.  Now, so you reviewed that hazardous air

19   pollutant inventory in preparation for your

20   report -- or in -- in preparing your report.  I'm

21   sorry, your Honor.

22   THE COURT:  Try it again.

23   BY MR. MANGO:

24   Q.  Is it fair to say you reviewed that HAP study

25   again in preparing your report?

1    A.   Yes.

2    Q.   In your review of that HAP study, did that HAP

3    study say where that pressure release valve that

4    was notated in the HAP study -- where it was?

5    A.   Not specifically, no.

6    Q.   Did it say it was this one on the light oil

7    storage tank?

8    A.   No.

9    Q.   Did it say it was the one you saw releasing

10   from the coke oven gas line?

11   A.   No.

12   Q.   Okay.  If we could please pull up quadruple H,

13   please, which is in evidence now, your Honor,

14   Defendant's quadruple H.

15       Do you recall seeing this document, Miss Hamre?

16   A.   Yeah, when I was cross-examined.

17   Q.   Okay.  Let's -- if we could just for this

18   second focus on the legend portion of this, please.

19       Okay.  If you could, for the jury, please tell

20   the jury what the blue lines on this exhibit

21   reflect.

22   A.   The coke oven gas line.

23           MR. MANGO:  Your Honor, if I may just have

24   a moment.

25   BY MR. MANGO:

1068

1    Q.   And what does the green on this diagram

2    indicate?

3    A.   It says gas line after LBA.

4    Q.   Do you know what that reference to the LBA is

5    without having to go back to this?

6    A.   I believe it's the light oil absorber.

7    Q.   Okay.  And that piece of equipment was not in

8    service during your inspection, is that right?

9    A.   The gas flowed through it, but they weren't

10   using it to remove the light oils.

11   Q.   Does this -- if we can take that off, please.

12   If we could focus on this area here, please.  Thank

13   you.

14        If you could tell the jury, does this document

15   reflect -- depict all of the components in the

16   by-products area?

17   A.   No.

18   Q.   Okay.  Are there any liquid lines that you

19   observed that are not depicted on this diagram?

20   A.   This diagram -- no, it doesn't show the liquid

21   lines at all.

22   Q.   Okay.  The BH decanter that you testified about

23   on direct, do you see that listed on this diagram?

24   A.   Yeah, it's -- but it's labeled as the tar

25   decanter on this.

1  Q.  The moat that you observed --

2         THE COURT:  Why don't you point out where

3  are you referring to?  Tap the screen, please.

4         THE WITNESS:  Oops.

5         THE COURT:  That's okay.

6         THE WITNESS:  Right there is the tar

7  decanter.  Sorry.  I drew around.

8         THE COURT:  That's all right.

9  BY MR. MANGO:

10  Q.  Okay.  And that's what you referred to as the

11  BH decanter?

12  A.  Yeah.

13  Q.  Just so the jury's clear, is there something

14  else called the tar decanter that you saw, or are

15  those one and the same?

16  A.  Those are one and the same.

17  Q.  How about the moat that you observed and there

18  was pictures on, do you see that depicted on this

19  diagram?

20  A.  No.

21  Q.  Okay.  With your finger can you draw the

22  approximate location of where that moat was?

23      Okay.  How about the drip legs we talked about

24  on direct examination?

25         MR. LINSIN:  Your Honor, if it could save

1    some time, we are prepared to stipulate this

2    diagram does not represent all the components that

3    Mr. Mango is referencing.  It was not its

4    intention.

5         MR. MANGO:  Okay.  I can move on then.

6    Thank you.

7         THE COURT:  All right.  So stipulated.  So

8    what you're saying is that certain components are

9    not included in this diagram?

10        MR. LINSIN:  That is correct, your Honor.

11   The legend at the bottom right-hand corner of this

12   diagram indicates that it is the operating

13   components --

14        THE COURT:  Okay.

15        MR. LINSIN:  -- for the by-products area.

16        THE COURT:  So stipulated, Mr. Mango?

17        MR. MANGO:  Your Honor, we've agreed to

18   the admission of the document into evidence.  I

19   think I'm going to leave it at that.

20        THE COURT:  Okay.  But this does say

21   operating components versus -- I assume the

22   opposite of that is nonoperating components.  So

23   you don't disagree with that?

24        MR. MANGO:  No, your Honor.  That is what

25   it says, and we agree.

1    BY MR. MANGO:

2    Q.   Okay.  We can take that down.  Thank you.

3         Let's -- let's talk about -- Miss Hamre, you

4    were asked about your interactions with Defendant

5    Kamholz.  Do you remember those questions?

6    A.   Yes.

7    Q.   Okay.  And I heard you say, "He answered the

8    questions that we asked," is that right?

9    A.   Yes.

10   Q.   Can you explain what you meant by that for the

11   jury?

12   A.   He -- he answered the question asked.  He

13   didn't offer any information.  That's what I meant

14   by -- by that.

15   Q.   Okay.  So if you were walking along, did he

16   voluntarily provide you with information about

17   different components you were seeing?

18   A.   No.

19   Q.   Did you attempt to ask Mr. Kamholz any

20   questions during your inspection?

21   A.   Yes.

22   Q.   Okay.  What responses did you receive or what

23   types of responses did you receive to those

24   questions?

25   A.   He was short with his answers.

1   Q.   Okay.  As a result of being short with his

2   answers to you, did you decide on how to go about

3   asking Defendant Kamholz other questions during

4   your inspection?

5           MR. PERSONIUS:  Object to the leading,

6   Judge.

7           THE COURT:  I'm sorry.  What was the

8   objection?

9           MR. PERSONIUS:  Leading, your Honor.

10          THE COURT:  No, I don't think so.

11   Overruled.  You may answer that question.

12          THE WITNESS:  Yes.

13   BY MR. MANGO:

14   Q.   Okay.  Can you tell the jury what that practice

15   that you came up with was?

16   A.   He seemed to be short with me and more willing

17   to converse with Mr. Garing, so for the most part

18   Mr. Garing asked Mr. Kamholz the questions and I --

19   I took the primary notes.  I did ask some

20   questions, just not as many.

21   Q.   Okay.  You recall your inspection in April

22   of 2009?

23   A.   Yes.

24   Q.   Okay.  And on the -- during the first week of

25   the inspection I believe you testified that the

1    Region 2 EPA inspectors were there?

2    A.   Correct.

3    Q.   Okay.  So, is it fair to say that during the

4    first week -- were they there the second week?

5    A.   No.

6    Q.   Okay.  They weren't there during your closing

7    conference?

8    A.   No.

9    Q.   Okay.  So during the first week there were more

10   inspectors present than in the second week, is that

11   right?

12   A.   Correct.

13   Q.   Can you describe for the jury how all of you as

14   inspectors would line up and walk when you're

15   walking down Broadway, for example?

16           MR. LINSIN:  Objection, your Honor.

17           THE COURT:  Yeah.  Grounds?

18           MR. LINSIN:  Well, time frame,

19   consistency.  I don't know that we had a marching

20   order here.

21           THE COURT:  Yeah.  What's your specific

22   question?  We had testimony about this before,

23   multiple times, so get the question out that you

24   want to ask.

25   BY MR. MANGO:

1    Q.  All right.  When you were all walking in the

2    by-products area, did all of you stay together,

3    clumped up as one group, or did you spread out?

4    A.  We all were in one group, but, I mean, there

5    were enough of us we were not huddled right

6    together.  There was some distance between

7    different people walking, yes.

8    Q.  Okay.  During that first week, in particular

9    let's focus on April 17th, 2009.  That was Friday?

10   A.  Correct.

11   Q.  You've testified that's when you first became

12   aware of the bleeder, pressure-release valve?

13   A.  Correct.

14   Q.  All right.  Do you know if any of the other

15   inspectors had a conversation with Pat Cahill on

16   that day?

17   A.  I don't.

18   Q.  Do you know if any of the other inspectors were

19   present with Pat Cahill when a release may have

20   happened from that bleeder?

21   A.  I don't.

22   Q.  When you first observed the bleeder release on

23   April 17th, 2009, did you know what that was at

24   that point?

25   A.  No.

1    Q.   At that time did you identify this as an area

2    of concern?

3    A.   No.

4    Q.   When did you -- if you can tell the jury, when

5    did you form an opinion that this was an area of

6    concern that needed to be brought up at the closing

7    conference and included in your report?

8    A.   I would say Monday or Tuesday of the second

9    week.  Tuesday was when I'd gotten the most

10   information, so we usually gather our thoughts

11   prior to the closeout, and -- and that would be

12   when we would come up with the items that we're

13   going to discuss at the closeout.

14   Q.   Okay.  On cross-examination you were shown

15   Government Exhibit 20.06, which was the bleeder

16   chart for April 17th.  Do you remember that?

17   A.   Yes.

18   Q.   I'd like to show you what's in evidence as

19   20.08.  If we can pull that up.  That is in

20   evidence.

21       Do you see this document here?

22   A.   Yes.

23   Q.   If you could -- looking at this document, can

24   you tell the jury what the ranges of the pressure

25   being recorded on this chart were for that day?

1    A.   Looks like 70 centimeters of oil to about 150

2    centimeters of oil.

3    Q.   Okay.  And would that be consistent with what

4    you were told on April 21st of 2009?

5    A.   Some would be in the range of, yes, the 100 to

6    150.

7    Q.   Okay.  At the time you held your closing

8    conference, did you feel you knew everything you

9    needed to know about this bleeder valve to make an

10   accurate assessment as to its impact on your

11   inspection?

12   A.   No.

13   Q.   Okay.  And so during that closing conference

14   you went over a number of concerns with Defendant

15   Kamholz?

16   A.   Yes.

17   Q.   Do you recall those concerns that you went over

18   with Defendant Kamholz?

19   A.   Generally.

20   Q.   Okay.  Can you tell the jury generally what

21   those concerns were?

22            MR. LINSIN:  Objection, your Honor.

23            MR. MANGO:  Your Honor, I think this puts

24   it into perspective.  She's been asked a number of

25   times from both counsel and different mechanisms

1    why this apparently was not emphasized enough

2    during closing conference.  And I think it is

3    relevant, for the limited conversation we're going

4    to get into, to discuss the other concerns that she

5    had.  Not citing what her opinions were, but just

6    concerns.

7              THE COURT:  All right.  I'll permit the

8    question.

9    BY MR. MANGO:

10   Q.   Okay.  Why don't you tell the jury.

11   A.   We went through the two main areas that was the

12   focus of the inspection, Subpart L and then Subpart

13   FF, regarding monitoring, recordkeeping, the --

14   some reports that -- one of the regs, depending on

15   what level of benzene you have in your waste,

16   requires you to do additional things, and we went

17   through where we thought they fit into the -- fit

18   into the regulation, and then we also brought up

19   other issues, just the general housekeeping of the

20   moat area, and the PRV.

21       And it's our practice to bring up other issues

22   we see.  Even though it was an air inspection, if

23   we saw oil dripping into a drain that --

24              MR. LINSIN:  Objection to the

25   hypothetical.

1    THE COURT:  Yeah.  Sustained.  All right.

2    End your answer there.  Next question, please.

3    BY MR. MANGO:

4    Q.  Did you have any concern with what's known as

5    leak detection and repair?

6    A.  Yes.

7    Q.  Okay.  In very brief general terms --

8          MR. LINSIN:  Your Honor, I renew my

9    objection.

10         MR. MANGO:  Your Honor, again, this is

11   a -- the government believes in very general brief

12   terms this is relevant to putting the rest of the

13   closing conference into perspective.

14         THE COURT:  No, I don't think so.

15   Overruled -- sustain the objection.  Move on,

16   please.

17   BY MR. MANGO:

18   Q.  If we could pull up, Lauren, Government

19   Exhibit 3527.21 for identification purposes.  And

20   move to page 28.

21      Miss Hamre, do you see this entry here for

22   April 20th of 2009 from your notebook?

23   A.  Yes.

24   Q.  Okay.  How certain are you that this

25   information that you recorded here did not come

1  from Defendant Kamholz?

2  A.   I'm positive it didn't.

3  Q.   Let's go to your opening conference.  I'd like

4  to talk about that briefly.  Do you remember, is

5  there -- was there a discussion regarding whether

6  the coke oven gas flow at Tonawanda Coke was

7  deficient?

8  A.   Yes.

9  Q.   Tell the jury what you recall about that

10  conversation.

11  A.   I recall that Mr. Kamholz said that they -- the

12  plant was operating in a coke oven gas deficiency

13  and that they supplemented their fuel with natural

14  gas.

15  Q.   Okay.  Does that have any bearing on the

16  notation in your notes about "pressure-relief

17  valves, no"?

18  A.   Yes.

19  Q.   Okay.  Tell the jury how it relates.

20  A.   Mr. Kamholz was asked a question, "Do you have

21  any pressure-relief valves," and he said "No."

22  Q.   Okay.  If we could actually keep that exhibit

23  up, please, and go to page 4 of that document.  If

24  we could zoom in on this, just for identification

25  purposes here, that side of the -- the document.

1    Is this the page during the opening conference

2    where you made a note "pressure relieve valves,

3    no"?

4    A.  Yes.

5    Q.  Okay.  What -- what comment do you have in your

6    notebook directly after that notation?

7    A.  "By-products plant flow diagram."

8    Q.  And we've talked about that by-products plant

9    flow diagram, right?

10   A.  Correct.

11   Q.  Did that have the bleeder pressure-release

12   valve listed on it?

13   A.  No.

14   Q.  Okay.  Now if we go -- let's go up.  You have

15   "pressure-relief valves no."  What's the entry

16   immediately before that notation?

17   A.  "Always in a coke oven gas deficient."

18   Q.  Okay.

19        MR. MANGO:  Your Honor, if I may have a

20   moment.

21        THE COURT:  Yes.

22        MR. MANGO:  Thank you, your Honor.

23   BY MR. MANGO:

24   Q.  Now, in relation to those entries in your

25   notebook, does that indicate that there's no need

1    for a pressure-release valve because they're always

2    in a coke oven gas deficiency?

3    A.   Yes.

4    Q.   And that's what you were told?

5    A.   Yes.

6    Q.   And that's what you wrote?

7    A.   Yes.

8    Q.   Now, at some point during your inspection did

9    it ever come to your attention that there was a

10   by-products logbook?

11   A.   No.

12   Q.   Did Defendant Kamholz ever offer to show you

13   the by-products logbook that was maintained in the

14   by-products department?

15   A.   No.

16   Q.   Is that something that you would have been

17   interested in looking at?

18   A.   Yes.

19           MR. MANGO:   Your Honor, if I can just have

20   one moment, please.

21           THE COURT:   Sure.

22           MR. MANGO:   Your Honor, nothing further.

23   Thank you.

24           THE COURT:   Okay.   Thank you.   Any

25   recross, Mr. Linsin?

1    　　　　MR. LINSIN:  Very briefly, your Honor.

2    RECROSS EXAMINATION BY MR. LINSIN:

3    Q.  You were at this Tonawanda Coke facility for

4    six days, correct?

5    A.  Correct.

6    Q.  You had the opportunity to ask for any

7    documentation you wished, correct?

8    A.  Correct.

9    Q.  And your testimony in response to

10   Mr. Personius's questions were -- was that when you

11   asked for documents you were given them, correct?

12   A.  Yes, if he had them.

13   Q.  And you're there to study the by-products

14   department, correct?

15   A.  Correct.

16   Q.  And yet you never -- your testimony is that you

17   never bothered to ask if there was a by-products

18   logbook, correct?

19   A.  Correct.

20   Q.  You were again shown your notes from the

21   opening meeting by Mr. Mango and asked about this

22   notation regarding the PRV in the discussion in the

23   opening meeting with Mr. Kamholz.  You testified

24   yesterday that all of the notes that immediately

25   preceded the reference to the PRV related to the

1    battery, didn't you?

2    A.   No.

3              MR. MANGO:   Objection, your Honor.   That

4    was not her testimony, and I do want to just

5    clarify the reference, "you were again shown these

6    notes."   During Mr. Linsin's cross-examination she

7    was not shown these notes.

8              THE COURT:   Well, she answered the

9    question as no.   So you may go from there.

10   BY MR. LINSIN:

11   Q.   We talked yesterday about your notes in the

12   opening meeting, correct?

13   A.   Yes.

14   Q.   And we talked about several notes that related

15   to a discussion of the battery at this facility,

16   correct?

17   A.   No.

18   Q.   By the way, you are an engineer?

19   A.   Yes.

20   Q.   And is it your testimony, as I believe I heard

21   you say on redirect, that a pressure range of

22   70 centimeters to 150 centimeters is consistent

23   with a range of 100 centimeters to 150 centimeters?

24   Is that your testimony?

25   A.   I believe I said some of it was.

1    Q.   The truth is that's a significant difference,

2    isn't it?

3              MR. MANGO:   Objection, your Honor.   Form

4    of the question.

5              THE COURT:   No.   Overruled.   You may

6    answer that question.

7              THE WITNESS:   Repeat it, please.

8    BY MR. LINSIN:

9    Q.   There's a significant difference between a

10   range of 150 centimeters to 100 centimeters and a

11   range of 150 centimeters to 70 centimeters, isn't

12   there?

13   A.   There is a difference.   I don't know I'd say

14   significant.   It's relative to the entire range.

15   Q.   It's adding 30 centimeters to the range, isn't

16   it?

17   A.   Yes.

18   Q.   And the original range of 100 to 150 is only a

19   range of 50, correct?

20   A.   Yes.

21   Q.   And your testimony is you don't know if that's

22   a significant difference?

23   A.   It could be.

24             MR. LINSIN:   May I just get my notebook,

25   your Honor?

1    THE COURT:  Sure.

2  BY MR. LINSIN:

3    Q.  May I please have Government's Exhibit 3527.21

4    that's been marked for identification.  And if we

5    could go to page 4.  And highlight the right side

6    of this document, please.

7      Are those your notes or a part of your notes

8    from the opening meeting at the Tonawanda Coke

9    facility on April the 14th, 2009?

10   A.  Yes.

11   Q.  Now, with reference to the top half of the

12   page, I ask you to look at the first three lines of

13   your notes.  Do those lines relate to the battery

14   at that facility?

15   A.  Those lines relate to an overall discussion

16   Mr. Kamholz had during the opening meeting of

17   facility background.  It was -- we were talking

18   about the entire facility at that time -- at that

19   time, and then we broke into more specifics on the

20   by-products plant flow diagram.

21   Q.  Let me reask my question.  The first three

22   lines of these notes on this page, do they say --

23   am I reading them accurately? -- "Flare on coke

24   oven battery.  Emergency flare.  Pilot light on all

25   the time.  No steam assist."  Am I reading that

1    accurately?

2    A.   Yes.

3            MR. MANGO:   Your Honor, if I may assist,

4    the government would not be opposed to the

5    introduction into in evidence of this page of the

6    notes.

7            THE COURT:   No, I don't -- well,

8    Mr. Linsin?

9            MR. LINSIN:   Your Honor, I don't see it as

10   necessary.   I thought we were clear on this before.

11   I hope we can clear it up quickly.

12           THE COURT:   Yeah.   Let's get the witness

13   to answer the question, please.   I think you'll

14   have to reput a question, though, at this point.

15   BY MR. LINSIN:

16   Q.   Do those first three lines relate to a flare on

17   the battery at the facility?

18   A.   Yes.

19   Q.   And do the next two lines relate to how that

20   coke oven gas is routed from the battery if the

21   exhausters are not working?

22   A.   Yes.

23   Q.   And then you have a line about the plant always

24   being in coke oven gas deficiency, correct?

25   A.   Correct.

1   Q.  And the very next line after those three lines

2   regarding the battery and the reference to coke

3   oven gas deficiency is "pressure-relief valve, no,"

4   correct?

5   A.  Yes.

6   Q.  And it is after that, after that in your notes,

7   that you turn to the topic of the by-products flow

8   diagram, correct?

9   A.  Correct.

10  Q.  And that entry in your notes is underscored,

11  correct?

12  A.  Yes.

13  Q.  And then you proceed to talk in -- at least

14  your notes reflect that the conversation then

15  proceeded to talk about the by-products area,

16  correct?

17  A.  Correct.

18          MR. LINSIN:  I have nothing further, your

19  Honor.

20          THE COURT:  Okay.  Thank you, Mr. Linsin.

21      Yes, Mr. Personius.

22          MR. PERSONIUS:  One subject, Judge.

23          THE COURT:  Sure.

24          MR. PERSONIUS:  Thank you.

25  RECROSS EXAMINATION BY MR. PERSONIUS:

1    Q.   Mr. Mango asked you a number of questions when

2    he started his redirect about the July 2003

3    emissions study.  Do you remember that?

4    A.   Yes.

5    Q.   And that had come up because in your final

6    report you make a reference to that emissions

7    study, correct?

8    A.   Yes.

9    Q.   And you testified, at the conclusion of my

10   examination and then in response to Mr. Mango's

11   questions, that the reference to a PRV in that

12   emissions study was interpreted by you to relate to

13   a vent on the light oil system, is that fair?

14   A.   Yes.

15   Q.   All right.

16   A.   Or another vent in the plant.

17   Q.   Well, you told us it was a vent in the light

18   oil system.

19   A.   Well, there was one on the light oil -- on the

20   light oil tank, yes.

21   Q.   Let me ask a question.  Did you testify

22   consistently, at the end of my questions and when

23   asked by Mr. Mango, that you understood that the

24   reference to a PRV in this emissions study was to a

25   vent on the light oil system?

 1          MR. MANGO:  Objection, your Honor.  That

 2     was not her testimony.  I think that's --

 3          THE COURT:  Well, let's hear from the

 4     witness, though, Mr. Mango.

 5          THE WITNESS:  I'm sorry.  Will you ask it

 6     one more time?

 7     BY MR. PERSONIUS:

 8     Q.  Am I correct in my recollection that you

 9     described the PRV reference in the July 2003

10     emissions study as referring to a vent on the light

11     oil system?

12     A.  That -- "system" is a broad term.  Light oil

13     tank, yes.

14     Q.  Okay.  On the light oil tank.  That was your

15     testimony, right?

16     A.  Yes.

17     Q.  All right.  Could we please -- this is for

18     identification.  Could we please have Defendant's

19     Exhibit PPP put on the screen?

20          You now have the first page of Defendant's

21     Exhibit PPP in front of you on the screen,

22     Miss Hamre?

23     A.  Yes.

24     Q.  This is the first page of this July 2003

25     emissions study?

1    A.   This is the first page of my report.

2    Q.   All right.   Forgive me.   First page of your

3    report?

4    A.   Yes.

5    Q.   Right?   I'm sorry.

6           MR. MANGO:   Your Honor, just so there's no

7    confusion, it was also referenced as Government

8    Exhibit 15 for identification purposes during

9    Mr. Linsin's cross-examination.

10          MR. PERSONIUS:   Just so the record is

11   clear as to why I'm doing this, Judge, the

12   government's exhibit is not complete.   It doesn't

13   include this emissions study.   That's why I'm using

14   the defense exhibit, because it does include the

15   emissions study.

16          THE COURT:   Okay.   All right.   So, that

17   will be noted for the record.

18          MR. PERSONIUS:   And I'm sorry for the

19   confusion, Judge.

20   BY MR. PERSONIUS:

21   Q.   Please, Sheila, if you could, go to page 105 of

22   this exhibit.

23      Now, do you recognize page 105 of the

24   Defendant's Exhibit PPP as Table 4-1 of this

25   July 2003 emissions study?

1    A.   I believe so, yes.

2    Q.   All right.  And what you have up at the top, if

3    you can maybe try to -- thank you.  It's shaded,

4    but the caption up at the top says "By-Products

5    Plant Area."  Do you see that?

6    A.   I see that.

7    Q.   Okay.

8         THE COURT:  All right.  Can you highlight

9    that in yellow?  Thank you.

10        MR. PERSONIUS:  Thank you, Judge.

11   BY MR. PERSONIUS:

12   Q.   And if you go down that column, it lists

13   different parts of the by-products plant, is that

14   true?

15   A.   Yes.

16   Q.   Okay.  And down at the bottom it says "coke

17   oven gas system," correct?

18   A.   Yes.

19   Q.   And that's where you see the reference to the

20   pressure-relief valves, is -- is what the second

21   column provides, correct?

22   A.   Yes.

23   Q.   You go over one more column, and it says

24   "number of components," and it says "1," correct?

25   A.   Yes.

1    Q.   Now, a vent on a -- in the light -- the light

2    oil system, is it your testimony that would be part

3    of the coke oven gas system?

4    A.   I don't know.

5    Q.   Well, let's go right above that.  What's the

6    category right above that?  Does it say "light oil

7    system"?

8    A.   Yes.

9    Q.   And if we go over in the categories listed

10   there, it says valves, flanges, and pumps, right?

11   A.   Right.

12   Q.   And it doesn't say anything about a

13   pressure-relief valve, does it?

14   A.   No.

15   Q.   If you go over one more category for valves, it

16   says there's 36.

17   A.   Yeah.

18   Q.   So it's clear from this table, is it not, that

19   the reference to a pressure-relief valve is in the

20   coke oven gas system?

21   A.   Yes.

22           MR. PERSONIUS:  Thank you.  Nothing

23   further, Judge.

24           THE COURT:  Okay.  Nothing further,

25   Mr. Mango.

1    Okay.  You're wondering what I'm going to say,

2  right?  Okay.  How would you like to do this?  How

3  would you like to go to lunch before we start

4  another witness?  Okay.  And I'm going to keep

5  Miss Hamre here, so you don't have to worry about

6  that.  No.  We're going to let her go too.  She's

7  finished with her testimony.  And then we'll start

8  at 1:45.  Okay.  And we'll go for two hours, until

9  3:45.  Okay?

10    Please don't discuss the case.  I mean -- and I

11  know it's tedious, but, you know, just stay with

12  it.  We'll work through this, and, you know, we'll

13  get some momentum here.  Thank you for your

14  attention.  Thank you for your work.  Please know

15  you have to be fair to both sides.  Have a great

16  lunch.  The sun's out there.  You're going to enjoy

17  the day if you go out there.  You'll come back

18  here, you'll be in a great mood, and we'll finish

19  up with two hours, okay?  All right.  Thank you.

20          (Jury excused from the courtroom.)

21          THE COURT:  You may step down.  Thank you.

22    Anything that we need to discuss before we

23  break?  Your next witness is who?

24          MR. PIAGGIONE:  Your Honor, since we've

25  been keeping me quiet through this procedure, I've

1  decided that I would put on the next witness, and

2  that would be Mark Kibler.

3           THE COURT:  You better get it straight,

4  though, if you're going to put that witness on,

5  Mr. Piaggione.

6           MR. PIAGGIONE:  Yeah.  Mark Kibler,

7  K-I-B-L-E-R.

8           THE COURT:  Mark Kibler.  Got it.  All

9  right.  Thank you very much.  We'll see everybody

10 here at 1:45.

11           (Lunch recess was taken.)

12           (Jury seated.)

13           THE COURT:  Miss Russ is exhausted.  She

14 wanted to sit down right away.  She wasn't going to

15 wait for all of you to remain standing.  But

16 welcome back from lunch.  You look well fed.  You

17 look ready for the afternoon.  Please have a seat.

18     Miss Majerowski, did you buy that over the

19 lunch hour, or did you come equipped with your

20 shawl today?

21           A JUROR:  Oh, I came up with it.

22           THE COURT:  All right.  We're ready.

23 We're back on in the case that you have come to

24 know as United States versus Tonawanda Coke

25 Corporation and Mark Kamholz, both defendants.  And

1   you know that we're in the government's case, and

2   it is the only one with a burden in a criminal

3   case, and it must prove each essential element

4   beyond a reasonable doubt.  And you have to get

5   through everything and decide those fact issues on

6   the 19 counts that you will get once the proof is

7   in.

8        I think we are now at, I think, already witness

9   number four, and I think we probably have a new

10  prosecutor.  Mr. Piaggione is going to take the

11  next witness, is that correct?

12            MR. PIAGGIONE:  With your permission, your

13  Honor.

14            THE COURT:  You have it, sir, and you may

15  proceed and call your next witness, please.

16            MR. PIAGGIONE:  Thank you, your Honor.

17  The United States would call Mr. Mark Kibler.

18            THE COURT:  Okay.

19            MR. PIAGGIONE:  K-I-B-L-E-R.

20            THE COURT:  Okay.  Mr. Kibler, if you

21  would make your way up to the witness stand.  And

22  the record should reflect that all the attorneys

23  and parties are back present.

24       Don't enter the box.  Stand right about there.

25  Turn towards the jury.

1  M A R K   K I B L E R, having been duly sworn as a

2  witness, testified as follows:

3            THE COURT:  Okay.  Be careful when you

4   enter the box.  It's a little bit tricky.

5       Okay.  If you're going to get water, that's a

6   used cup, so you want to put that aside somewhere.

7            THE WITNESS:  Okay.

8            THE COURT:  Okay.  Just a couple of

9   preliminary instructions.  That microphone is

10  friendly.  All you have to do is speak at it in the

11  direction of the jury.  You're here to testify for

12  their benefit.  Keep it at a conversational tone,

13  and then we'll be okay.

14      One, if you don't understand a question, please

15  don't answer it.  Just ask the attorneys or me to

16  repeat the question.

17      Try to be as succinct with your answers as you

18  can.  If you can answer something yes or no, it

19  will save you a world of problems if you do that.

20  When you volunteer information, that usually

21  complicates things.

22      If there's an objection, wait until I rule on

23  the objection, and then I'll give you instructions

24  on whether to complete an answer, stop your answer,

25  wait for another question, and the like.  Do you

1    understand?

2           THE WITNESS:  Yes.

3           THE COURT:  All right.  So that we know

4    how you're going to come across on the system,

5    state your full name, spell your last name, and

6    speak towards the jury.

7           THE WITNESS:  Okay.  My name is Mark

8    Kibler, K-I-B-L-E-R.

9           THE COURT:  Okay.  It looks like we're at

10   a go.  Thank you.

11   DIRECT EXAMINATION BY MR. PIAGGIONE:

12   Q.  All right.  Mr. Kibler, if you could, maybe

13   face the jury when you're talking.  It will be

14   helpful to them.

15       Where are you employed?

16   A.  With Guardian Environmental Associates.

17   Q.  And in what capacity?

18   A.  I'm the president of the company.

19   Q.  And how long have you been employed there?

20   A.  Since 2007.

21   Q.  Okay.  And prior to Guardian Environmental

22   Services, where were you employed?

23   A.  Gateway Environmental Services.

24   Q.  And in what capacity?

25   A.  I was also president of that company.

1    Q.   And what years were they?

2    A.   From 1992 to 2007.

3    Q.   Okay.  And what, if any, services did your

4    first company, Gateway Environmental Services,

5    provide?

6    A.   We did environmental work for Tonawanda Coke,

7    doing EPA Method 303 inspections and Method 9

8    inspections under stack.  We did the same work for

9    Erie Coke in Pennsylvania, and we also did

10   environmental work for Bethlehem Steel Corporation,

11   doing 303 emissions monitoring their stack, and we

12   also operated the wastewater treatment plant and

13   did field sampling.

14   Q.   Okay.  If you could just slow down a little bit

15   so this young lady to your right can record it

16   without getting a cramp.  I know you're a little

17   nervous, so just try and relax.

18        Now, we'll talk about what those -- those

19   services in some detail, but in your present

20   company, do they also supply the same type of

21   services?

22   A.   We no longer do wastewater treatment.  We do

23   the EPA Method 303 and EPA Method 9 on the stack.

24   Q.   And do you still provide those services to

25   Tonawanda Coke Corporation?

1    A.   Yes, we do.

2    Q.   Okay.  And how often are 303 inspections

3    required at a coke-producing plant?

4    A.   Every day of the year.

5    Q.   And do you -- can you describe what a 303

6    inspection consists of?

7    A.   It's an inspection for visible emissions from

8    the coke oven battery, smoke, basically.  It

9    consists of a door inspection, where we traverse

10   the outside perimeter of the battery looking for

11   smoke emissions in the door area.  There is then

12   a -- two top-side inspections which consist of the

13   offtakes, where we traverse the battery in one

14   direction, and on the return traverse we look for

15   lid leaks.  At the end of those we then do five

16   consecutive charging inspections, again looking for

17   smoke emissions.

18   Q.   Okay.  So we'll go through that a little

19   slower.  When you say you're looking to traverse

20   the doors, what exactly are you doing?

21   A.   We start at one end of the battery and walk at

22   a slow pace, observing the doors.  We look around

23   the perimeter of the door and the defined door area

24   for leaks.

25   Q.   When you say you look for leaks, what exactly

1    are you looking for?

2    A.   We're looking for smoke, visible emissions.

3    Q.   Okay.  So you're looking for smoke coming out

4    of the doors.  That would indicate a leak, is that

5    correct?

6    A.   Yes.

7    Q.   Okay.  And besides -- now, you mentioned

8    something else.  Lids?

9    A.   The top side of the battery, they have holes in

10   the top of the ovens where they charge the oven.

11   They put the coal in to fill it, and they have

12   steel lids that look like manhole covers that go on

13   those holes, and they have to be sealed.  And we

14   look for leaks in that area.

15   Q.   Okay.  And so, in other words, when you say

16   charging, you mean that they're putting coal into

17   the oven through the hole on top, is that it?

18   A.   Yes.

19   Q.   Okay.  And the lid over it is the lid you're

20   looking to see if it's secure to prevent smoke

21   coming out?

22   A.   Yes.

23   Q.   Okay.  And what was the third, the off --

24   A.   Offtakes.

25   Q.   Okay.  And what is that?

1    A.   That's the -- there's a set of pipes on each

2    oven that take the gases produced in coking off the

3    ovens to the by-products area.  And on this area

4    we're looking for any visible smoke leaks that

5    could be at the cap or base, or there's a defined

6    list that we have to look at.

7    Q.   Okay.  And the five charging events.  Exactly

8    what are you talking about?  When they put the coal

9    into the -- into the oven?

10   A.   Yes.  After they push the coke out of the oven,

11   they seal the doors back up and then open the top

12   lids, and there's a machine that carries the coal

13   out onto the battery and drops it through the

14   holes.  And during that process we time the

15   emissions.

16   Q.   Now, how many -- do you conduct these

17   inspections personally?

18   A.   Yes.

19   Q.   Okay.  And how many times have you conducted

20   these inspections at Tonawanda Coke Corporation?

21   A.   Over a thousand times.

22   Q.   Okay.  And did you conduct those inspections

23   during the period of 2005 to 2009?

24   A.   Yes.

25   Q.   And can you describe the procedure that you

1    follow to gain access to Tonawanda Coke

2    Corporation?

3    A.   We drive in through the gate and stop at the

4    guardhouse.   They have a log inside the guardhouse

5    we have to sign in on.   The guard then notifies the

6    battery foreman that we have arrived.   We then

7    drive back to the locker room and change into our

8    fireproof equipment, hard hat, et cetera, and a

9    foreman comes up with a pickup truck and takes us

10   to the battery.

11   Q.   Okay.  Now, I'll ask you this:  How much time

12   does it take from the time the security guard makes

13   the phone call to the time you actually reach the

14   battery?

15   A.   Generally 10 to 15 minutes.

16   Q.   Okay.  10 to 15 minutes.  Thank you.  Now, do

17   you understand the phrase "back pressure"?

18   A.   Yes.

19   Q.   What does that refer to?

20   A.   When the coking process is going on, they seal

21   the oven up, and they restrict the flow of gas from

22   the battery so that there's a positive pressure in

23   the oven so that they don't get oxygen in there

24   that would damage the oven or burn the coal.

25   Q.   So, would a higher back pressure result in more

1    visible leaks than if it was at a lower pressure --

2    back pressure?

3    A.  I'd say yes.

4    Q.  Okay.  And how long does a 303 inspection take?

5    A.  Normally, between three and five hours.

6    Q.  Okay.  And do you need to walk around the

7    battery to conduct all four observations for a 303

8    inspection?

9    A.  Yes.

10   Q.  And have you ever walked through the east

11   quench tower to get from one side of the battery to

12   another?

13   A.  Yes.

14   Q.  Why would you do that?

15   A.  In the winter it's a shortcut.  You don't have

16   to walk through the snow.  The quench area is

17   clear.

18   Q.  And did you do that between 2005 and 2009?

19   A.  Yes.

20   Q.  Did you ever notice if there were baffles in

21   the east quench tower or not?

22   A.  No, I did not.

23   Q.  Why not?

24   A.  Well, when you walk through the quench tower,

25   there's railroad tracks and ties, and the quench

1   water washes the material between the ties away, so

2   you've got to look down so you don't step between

3   the ties and fall.

4   Q.   Would you describe that area as one that you

5   try to avoid normally?

6   A.   Yes.

7   Q.   Why -- why is that?

8   A.   Well, the -- there's water dripping, for one

9   thing, and the quenching process, in the winter

10  they don't want the water to freeze, so they have a

11  timer on it so it can randomly cycle, and I don't

12  want to get quenched.

13  Q.   Did you ever pass the by-products area while

14  conducting a 303 inspection?

15  A.   I'm sorry.  I didn't understand the question.

16  Q.   Did you ever pass the by-products area while

17  conducting the 303 inspection?

18  A.   Yes.

19  Q.   Okay.  And in the course of your inspection

20  between January 2005 and December of 2009, how

21  close have you come to the -- I'm sorry.  I'll slow

22  down.

23       In the course of your inspections between

24  January of 2005 and December of 2009, how close did

25  you come to the by-products area?

1    A.   10 to 20 feet.

2    Q.   Now, after Tonawanda Coke Corporation was

3    indicted, did employees point out the bleeder valve

4    that was the subject of that indictment to you?

5    A.   Yes.

6             MR. LINSIN:  Objection, your Honor.

7    Relevance.

8             THE COURT:  I'm sorry?

9             MR. LINSIN:  Relevance.

10            THE COURT:  Relevance?

11            MR. LINSIN:  Postindictment.

12            THE COURT:  What is the relevance here?

13            MR. PIAGGIONE:  I'm going to ask him --

14   the question is, during the period of time -- now

15   that he knows where it is, did he ever notice it

16   during the period between 2005 and 2009.  And that

17   is relevant, your Honor.  And I can go into why the

18   government feels it's relevant.

19            THE COURT:  Well, is that the relevance

20   issue, or was it who had pointed out?

21            MR. LINSIN:  If the question relates to

22   the witness's observations during the period of the

23   indictment, I have no objection.  It was the

24   postindictment conversations with Tonawanda

25   Corporation employees that I raised an objection

1    to.

2              THE COURT:  Let's see where you're going

3    on the basis of that objection.

4              MR. PIAGGIONE:  Sure, your Honor.  Thank

5    you, your Honor.

6    BY MR. PIAGGIONE:

7    Q.  All right.  In the times that you were at

8    Tonawanda Coke between 2005 and 2009, did you ever

9    notice that valve?

10   A.  No, I did not.

11   Q.  Okay.  And in the thousand times you've been

12   there, prior to this being brought to your

13   attention did you ever notice that valve there?

14   A.  No, I did not.

15   Q.  Okay.  And when you observed the valve, can you

16   describe what the by-products area appeared like

17   between 2005 and 2009?

18   A.  There's a myriad of pipes running through it.

19   There is water that flows from different areas.

20   There is steam coming out.  It's very noisy, and I

21   don't know what the process is in that area.

22   Q.  And in your thousand 303 inspections did you

23   ever suspect that the back pressure was lowered

24   before your inspection?

25   A.  No.

1    Q.   Or raised after your inspection?

2    A.   No.

3             MR. PIAGGIONE:   I have no further

4    questions of this witness, your Honor.

5             THE COURT:   Okay.   Mr. Piaggione is

6    finished.   Any cross-examination, Mr. Linsin?

7             MR. LINSIN:   Thank you, your Honor.

8    CROSS-EXAMINATION BY MR. LINSIN:

9    Q.   Good afternoon, Mr. Kibler.   Are you familiar,

10   Mr. Kibler, with the type of maintenance that is

11   required to be performed on a battery in order to

12   minimize the visible emissions from that battery

13   during a coking operation?

14   A.   Primarily it's luting with mud material.

15   Q.   I'm sorry.   What was the verb?

16   A.   They use a mud -- it's a slurry of clay -- to

17   seal the top side, and on the doors they have to do

18   gasket maintenance.

19   Q.   All right.   Let's stay on the top side.   Would

20   you be referring to work that needs to be done on

21   the lids?

22   A.   On the lids and the offtakes.

23             THE COURT:   Well, you used a term called

24   luting?   L-O-O-T-I-N-G?   Is that what you said?

25             THE WITNESS:   L-U-T-I-N-G.

1         THE COURT:  L-U-T-I-N-G.  Okay.

2   BY MR. LINSIN:

3   Q.  And what do you mean when you use the word

4   luting?

5   A.  That's when they take the mud slurry and pour

6   it around the lid to seal it.  It dries out and

7   seals the lid.

8   Q.  So, in essence, after this lid is placed back

9   down over the opening in the battery, in the oven,

10  in the top of the oven, workers have to go around

11  and pour a mud slurry around the circumference of

12  the lid in order to seal it, is that correct?

13  A.  Correct.

14  Q.  All right.  And is that mud slurry at times --

15  does it have to be scraped off when the lid is

16  removed in order to permit a -- a good seal when

17  it's put back on?

18  A.  Yes.

19  Q.  And the same applies, then, to all of the

20  offtake valves that might leak, is that correct?

21  A.  There is a cap on the offtake that would be

22  treated the same way.

23  Q.  All right.  And with regard to the maintenance

24  work on the -- now, this is the top side you were

25  just testifying about on the battery, correct?

1    A.   Yes.

2    Q.   The doors, you have a long row of doors on both

3    sides of the battery, correct?

4    A.   Correct.

5    Q.   And there are 60 ovens --

6    A.   Yes.

7    Q.   -- at this -- in this battery, correct?

8         So 120 doors, correct?

9    A.   Correct.

10   Q.   And in order to prepare those doors to be

11   resealed, there has to be work done both on the

12   frames and the gaskets for those doors in order to

13   make sure that when they are closed back up, that

14   the seal is a good one and it prevents emissions

15   from those doors, correct?

16   A.   Yes.

17   Q.   And at Tonawanda Coke do you know which workers

18   were assigned to perform that maintenance that

19   we've just been discussing?

20   A.   No, I do not.

21   Q.   All right.  Did you ever encounter an

22   individual by the name of Mr. Dolan, D-O-L-A-N?

23   A.   Yes.

24   Q.   Did you understand him to be one of the foremen

25   on the battery?

1    A.   Yes.

2    Q.   One of the shift foremen on the battery,

3    correct?

4    A.   They call him a general foreman, yes.

5    Q.   Do you know whether or not he was one of the

6    people charged with performing that kind of

7    maintenance on the battery?

8    A.   I know he supervised people doing it, but I

9    don't know if he personally did it.

10   Q.   All right.   In the time that you visited

11   Tonawanda Coke company, did you -- in -- in the

12   2005-to-2009 time period, did you ever encounter an

13   individual named Tom Bermingham?

14   A.   Yes.

15   Q.   Did you understand him to be a consultant who

16   was working for the company with respect to battery

17   operations?

18   A.   Yes.

19   Q.   And did you also understand that

20   Mr. Bermingham -- part of what Mr. Bermingham was

21   attempting to do during his work with Tonawanda

22   Coke was to ensure that the back pressure on these

23   ovens was elevated, was raised?

24   A.   I wasn't sure what his goal was, but I knew he

25   was changing the back pressures.

1    Q.   And when you say changing, you mean -- am I

2    correct that he was elevating --

3    A.   Yeah.

4    Q.   -- or requesting others to elevate the back

5    pressure?

6    A.   Yes.

7    Q.   And that that request or direction was being

8    made on behalf of the management of the company, is

9    that correct?

10   A.   I would assume so.

11   Q.   And as a matter of fact, in response to those

12   efforts to elevate the back pressure in the ovens,

13   you at times noticed that the results of these 303

14   inspections that you were conducting, or your

15   colleagues, were actually suffering somewhat, is

16   that correct?

17   A.   Yes.   Door leaks went up.

18   Q.   And do you recall having discussions with other

19   personnel at Tonawanda suggesting, hey, you might

20   want to lower the back pressure a little bit.

21   We're getting some bad numbers on these 303

22   inspections?

23   A.   I did talk to Mr. Bermingham and some other

24   people about that, yes.

25   Q.   All right.   And just so we're clear, we've said

1    303 inspections.  Just what is Method 303?  Can you

2    explain that to the members of the jury, please?

3    A.   It's -- EPA Method 303 is visible emission

4    inspections.  You're basically looking for smoke.

5    Q.   And is it correct to say, Mr. Kibler, it is an

6    inspection protocol that EPA has established for

7    inspecting ovens at coke batteries?

8    A.   Yes, it is.

9    Q.   And what is Method 9?

10   A.   That's a visual observation of emission sources

11   for the opacity of smoke.

12   Q.   And is that similarly a -- an inspection

13   protocol that has been developed and promulgated by

14   EPA?

15   A.   Yes, it is.

16   Q.   What do you mean when you say opacity of smoke?

17   A.   It's the amount of light that can pass through

18   the emission.  So there's a defined way you have to

19   read it, where you have to position yourself where

20   the sun is, et cetera.

21   Q.   And you've described the 303 inspections that

22   you and your colleagues performed at Tonawanda.

23   Did you also perform the Method 9 inspections for

24   that company?

25   A.   Yes.

1113

1    Q.   And what were you -- what sources of emissions

2    were you measuring when you did the Method 9

3    inspections?

4    A.   The waste heat stack, the coke -- the

5    coke-handling building, and the coal-handling

6    building.

7    Q.   So the coke-handling building and the

8    coal-handling building are buildings on the

9    facility, correct?

10   A.   Yes.

11   Q.   And the waste heat stack, are you referring to

12   one of the very tall, couple hundred feet tall,

13   chimneys that is --

14   A.   Yes.

15   Q.   -- on the plant?

16   A.   Yes.

17   Q.   And would that be the chimney that is

18   immediately to the east of the battery at that

19   location?

20   A.   Yes.

21   Q.   All right.

22           THE COURT:  Now, both the 303 and the 9

23   protocols are visible inspections?

24           THE WITNESS:  Yes, they are.

25           THE COURT:  Okay.  And what does that

1    mean?  You just look?

2              THE WITNESS:  Just visual observation.

3    You have no instrumentation used.

4              THE COURT:  Okay.

5    BY MR. LINSIN:

6    Q.  You were asked a question about what happened

7    when you got to Tonawanda, checking in at the

8    guard's desk, calling someone at the facility,

9    having them come and get you, and then going to a

10   changing area to change into your protective

11   clothing, correct?

12   A.  Correct.

13   Q.  In your experience, sir, in the facilities

14   you've worked at and your colleagues have worked

15   at, is that pretty much standard operating

16   procedure for any inspector that comes to conduct

17   an inspection at an industrial facility?

18   A.  Yes, it is.

19             MR. LINSIN:  I have nothing further, your

20   Honor.  Thank you.

21             THE COURT:  Okay, Mr. Linsin.  Thank you.

22        Mr. Personius?

23   CROSS-EXAMINATION BY MR. PERSONIUS:

24   Q.  Good afternoon, Mr. Kibler.  Just have a couple

25   of questions.

1       The reason for your presence at Tonawanda Coke

2   is to conduct these 303 and Method 9 inspections?

3   A.   Yes.

4   Q.   Do either of those inspections that you perform

5   involve the by-products area?

6   A.   No, they do not.

7   Q.   And when you pass by the by-products area, is

8   your purpose to perform any kind of inspection of

9   that area?

10  A.   No, it is not.

11  Q.   You mentioned that the by-products area is

12  noisy?

13  A.   Yes, it is.

14  Q.   And you mentioned that there's steam that comes

15  out in the by-products area?

16  A.   Yes.

17  Q.   The -- do you know what the sources of that

18  steam are?

19  A.   Well, they have a boiler house that generates

20  steam.   I don't know how it's used in the

21  by-products area, though.

22  Q.   Okay.   What sticks out in your mind when you

23  walk by by-products is that you will hear -- is it

24  you hear or see or both?

25  A.   Both.

1   Q.   Steam coming out of different pipes and that

2   type of thing?

3   A.   Yes.

4   Q.   All right.   Is that one of the sources of

5   the -- what makes that area noisy?

6   A.   Yes, it is.

7   Q.   Do you know what the other sources are that

8   make it noisy in the by-products area?

9   A.   There's flowing water also, but I don't know

10  the operation over there at all.

11  Q.   Can you attribute the noise to anything other

12  than the steam and this water that you've referred

13  to?

14  A.   No.

15  Q.   And when you go by by-products, are -- if I'm

16  correct, are you going down what's known as

17  Broadway when you pass by-products?

18  A.   Yes, I am.

19          MR. PERSONIUS:   Okay.   Thank you, Judge.

20          THE COURT:   Okay.   Thank you,

21  Mr. Personius.

22          MR. PIAGGIONE:   Just two questions, your

23  Honor, just to clarify something.

24  REDIRECT EXAMINATION BY MR. PIAGGIONE:

25  Q.   On cross you indicated that you discussed the

1    elevated back pressure with Mr. Bermingham.  Who

2    else did you discuss that with?

3    A.   Gerry Priamo and somebody else, but I --

4    they've changed the management over.  I don't know

5    right offhand.

6    Q.   And when you got these elevated numbers, what

7    do you do with the numbers at the end of the day?

8    A.   Well, they're recorded.  At the end of our

9    inspection we walk the collector main as the final

10   thing we do, and we check the back pressure and

11   record those numbers on our inspection sheets.

12   Q.   What do you do with the inspection sheets?

13   A.   At the end of the day the data is transmitted

14   to my office so we can enter it in the computer,

15   and the original sheets are given to Mr. Kamholz or

16   his designated spot to leave them.

17   Q.   And did you ever suggest that they should lower

18   the back pressure while you did your inspection and

19   then raise it back afterwards?

20   A.   No.

21   Q.   Okay.  Would that defeat the purpose of doing a

22   303 inspection if they did?

23   A.   It would change the results.

24   Q.   Would it give -- the purpose of a 303

25   inspection is to give an impression -- or rather a

1    snapshot, as it were, of how the ovens are

2    operating during the normal course of business,

3    isn't that true?

4    A.  Yes.

5    Q.  So if they were changing it, you would not be

6    getting a representation of what was going on when

7    they were actually conducting business?

8         MR. PERSONIUS:  Your Honor, it's leading,

9    and I object to it.

10         THE COURT:  It is leading.  Sustained.  I

11   mean, do you and I count to two differently?  I

12   think you said two questions.

13         MR. PIAGGIONE:  I'm sorry, your Honor.  I

14   lost my head.  May I ask one more, then, just

15   rephrase that question?

16         THE COURT:  Yeah.  As long as it's not a

17   leading question and relevant.

18   BY MR. PIAGGIONE:

19   Q.  Okay.  If the back pressure was -- was changed,

20   would that be reflective of the -- and then

21   reversed again after you left, if it was changed

22   just for the purpose of your inspection, would that

23   be an accurate reflection of how the coke oven

24   batteries were operating?

25   A.  No.

1    MR. PIAGGIONE:  Okay.  No further

2    questions.

3         THE COURT:  Okay.

4         MR. LINSIN:  Nothing further, your Honor.

5         THE COURT:  Okay.  Thank you.

6    Mr. Personius?

7         MR. PERSONIUS:  Thank you, no, Judge.

8         THE COURT:  Okay.  All right.  Mr. Kibler,

9    you're excused.  Thank you very much, sir.

10        MR. MANGO:  Your Honor, I believe our next

11   witness may be on a different floor.  I don't know

12   if we can take maybe a five-minute break, I'll

13   retrieve him.

14        THE COURT:  We'll wait for you.

15        MR. MANGO:  Okay.  Thank you.

16        THE COURT:  Thank you.  Well, why -- don't

17   you have somebody to send out there, or do you need

18   to go?

19        MR. MANGO:  Yes.

20        THE COURT:  All right.  Are you going to

21   make any stops on the way, Mr. Mango?

22        MR. MANGO:  No stops, your Honor.

23        THE COURT:  Okay.  Thank you.

24    I know you're in a state of disbelief on the

25   duration of that witness, ladies and gentlemen, but

1   there may be some to come that might be just that

2   long or short.  So we'll see.

3          MR. PIAGGIONE:  I don't get any credit for

4   that, your Honor?

5          THE COURT:  None whatsoever,

6   Mr. Piaggione.

7          MR. MANGO:  Your Honor, the government

8   would call Pat Cahill.

9          THE COURT:  Okay.  If you would approach

10   the witness stand.  It's off to your right here.

11   Don't enter it.  Stand right there, face the jury,

12   and we'll have you sworn in.

13   P A T R I C K   W I L L I A M   J O H N   C A H I L L,

14   having been duly sworn as a witness, testified as

15   follows:

16          THE COURT:  Okay.  Have a seat.  Make

17   yourself comfortable.  Just a few preliminary

18   instructions.  Basically, you should know, the

19   microphones are friendly.  If you speak at them at

20   a conversational tone, it should pick you up pretty

21   well.  You don't have to get right on top of it.

22   Just hold back just a little bit.

23      When you respond to a question, try to respond

24   to the jury so they can observe you.  Be as concise

25   with your answers as you can.  That's better for

1    everybody.  Because if you volunteer information,

2    that sometimes complicates matters.

3         If you can answer a question yes or no, try to

4    do that.

5         If there's an objection, wait until I rule on

6    the objection.  Then I'll give you instructions on

7    what to do, answer the question, wait, or instruct

8    the attorneys on how to approach the next matter.

9         Okay?

10              THE WITNESS:  Yep.

11              THE COURT:  All right.  Are you ready,

12   Mr. Mango?

13              MR. MANGO:  We are ready.

14              THE COURT:  Mr. Witness, so we know how

15   you're going to sound, state your full name, spell

16   your last name, please.

17              THE WITNESS:  Patrick William John Cahill,

18   C-A-H-I-L-L.

19              THE COURT:  Okay.  Sounds like you're

20   going to carry well.

21         Mr. Mango, welcome back.

22              MR. MANGO:  Thank you, your Honor.

23              THE COURT:  Your witness.

24              MR. MANGO:  Thank you, your Honor.

25   DIRECT EXAMINATION BY MR. MANGO:

1    Q.   Good afternoon --

2    A.   Good afternoon.

3    Q.   -- Mr. Cahill.  How are you?

4    A.   Good.

5    Q.   All right.  Are you currently employed?

6    A.   Yes, I am.

7    Q.   Can you tell the jury how you're currently

8    employed --

9    A.   I work at Tonawanda Coke.

10   Q.   How long -- what position are you currently

11   employed?

12   A.   Right now, I'm the plant manager.

13   Q.   How long have you been plant manager at the

14   Tonawanda Coke Corporation?

15   A.   Almost a year and a half now.

16   Q.   Can you describe for the jury what your job

17   duties are as plant manager?

18   A.   Yes.  I oversee every department, coal handing,

19   coke handling, battery, and by-products.

20   Q.   Okay.  How many different departments was that?

21   A.   Four.

22   Q.   Just try to go a little slower.

23        So what are they again?

24   A.   Coal handling, coke handling, battery, the

25   ovens, and by-products.

1    Q.   Okay.  And if you can tell the jury, just

2    briefly, how did you end up becoming plant manager?

3    A.   Well, when -- they asked me and they said, Pat,

4    you're going to be plant manager.

5    Q.   Okay.

6         THE COURT:  Everyone should be so lucky,

7    in my humble opinion.

8         MR. MANGO:  Exactly.

9    BY MR. MANGO:

10   Q.   All right.  Was there any type of application

11   process?

12   A.   No.

13   Q.   How did you receive the news that you were

14   going to become plant manager?

15   A.   I think it was Bob Kolvek who mentioned it to

16   me.  He said you're going to be plant manager.

17   Q.   How soon after that conversation did you become

18   plant manager?

19   A.   A month later.

20   Q.   All right.  And this was -- you gave -- you

21   gave the jury how long you've been in the position.

22        When did you start as plant manager?

23   A.   July of 2011.

24   Q.   Okay.  Can you tell the jury if you've worked

25   in any other positions at the Tonawanda Coke

1    Corporation?

2    A.   Yes.   I was the supervisor of the by-products.

3    I was a by-product operator.   I was -- I worked on

4    the battery, the ovens, which was the charge car,

5    backdoor machine, pusher, hot car, heater, and

6    laborer.   I started off as a laborer.

7    Q.   When did you start at the Tonawanda Coke

8    Corporation?

9    A.   It was '86.   It was -- it was 24, 25 years ago.

10   Q.   All right.   Now, in any of those positions that

11   you've served, even including your current

12   position, have you received any type of

13   environmental training?

14   A.   No, sir.

15   Q.   Any type of training regarding hazardous waste?

16   A.   No, sir.

17   Q.   And any type of training regarding benzene or

18   other chemicals found in coke oven gas?

19   A.   No, sir.

20   Q.   All right.   Let's talk about when you were a

21   by-products operator.

22       Why don't you tell the jury the time period

23   that you were a by-products operator.

24   A.   Okay.   The time period?

25   Q.   Yes, if you could.

1      Do you know how long you were a by-products

2  operator?  That's the question.

3  A.  Yes.  I was a BP operator for eight years --

4  six years.

5  Q.  All right.  What you were your job duties as a

6  BP -- you call it BP operator?

7  A.  Yes.

8  Q.  -- as a BP operator?

9  A.  We would have to make rounds every two hours.

10  We would make adjustments on plate coolers to cool

11  the gas, pump sumps.  Maintain levels in your LGAs,

12  and that's it.  Every two hours.

13  Q.  Okay.  So you would make rounds and check on

14  things?

15  A.  Yes.

16  Q.  Is that fair to say?

17  A.  Yes.

18  Q.  Okay.  Are there any records kept in the

19  by-products area in the normal course of business

20  as a by-products operator?

21  A.  Yes.  We have a log book.

22  Q.  All right.  Are you familiar with those log

23  books?

24  A.  Yes, I am.

25  Q.  And why don't you tell the jury what goes into

1126

1    those logs books?

2    A.   Well, you -- like I mentioned earlier, as

3    you're doing your rounds, you --

4              MR. LINSIN:  Your Honor, excuse me.

5              THE COURT:  Excuse me?

6              MR. LINSIN:  Pardon me for interrupting.

7    I apologize.

8        The question was posed in the plural, log

9    books.  And if we're referencing more than one log

10   book, I just ask it be specific as to which one.

11   If we could use a title or something, that would be

12   helpful.

13             THE COURT:  Different log books for

14   different functions versus one log book, but

15   multiple when they get filled in?

16             MR. LINSIN:  Yes.

17             THE COURT:  I guess is that what you had

18   in mind?

19             MR. LINSIN:  That is exactly correct.

20             THE COURT:  Can you keep that clear so we

21   all know, please?

22             MR. MANGO:  Yes, your Honor.

23             THE COURT:  Thank you.

24   BY MR. MANGO:

25   Q.   Is there a book known as the BP operator log

1     book?

2     A.   Yes.

3     Q.   Okay.   When that BP operator log book gets

4     filled up for a certain time period, does another

5     log book get started?

6     A.   Yes.

7     Q.   And what do you call that other log book?

8     A.   BP log book.

9     Q.   They're all called BP operator log books?

10    A.   Yes.

11    Q.   When I use the term "BP operator log books",

12    I'm talking about a longer period, so multiple

13    books?

14    A.   Right.

15    Q.   Is that fair to say?

16    A.   Yeah.

17    Q.   Okay.   The -- for those log books, the BP

18    operator log books that get created, can you tell

19    the jury what goes in those log books?

20    A.   Sure.

21         If -- if you are pumping down your sumps,

22    making adjustments on plate coolers, add packing

23    into a pump, you would put that all down in your

24    log book.   Oil, grease.

25    Q.   Okay.   Are there any pressure valves or

1    pressure settings that you would adjust or could be

2    adjusted in your operations as a by-products

3    operator?

4    A.   Yes.

5    Q.   Okay.   If an adjustment gets made to a pressure

6    valve or setting, would that generally get recorded

7    in your by-products operator log book?

8    A.   Yes, it would.

9    Q.   Are by-products operators instructed to log any

10   changes to pressure settings or valves in this log

11   book?

12   A.   Yes, they are.

13            MR. MANGO:   Your Honor, if I may have a

14   moment?

15            THE COURT:   Sure.

16            MR. MANGO:   Your Honor, at this point,

17   absent an objection, the government would move all

18   en mass Government's Exhibit 82, which is a

19   by-products log book from August 17th, 2006, to

20   January 31st, 2007;

21      Government Exhibit 83, which is a by-products

22   log book from January 31st, 2007, to July 10th

23   of 2007;

24      Government Exhibit 84, which is a by-products

25   operator log book from July of 2007 to December

1    of 2007;

2         Government Exhibit 85, which is a by-products

3    log book from December 17th, 2007, to

4    June 22, 2008;

5         Government Exhibit 86, which is a by-products

6    log book from June 22nd, 2008, to

7    December 30th, 2008;

8         Government Exhibit 87 which is a by-products

9    log book from December 31st, 2008, to May 9th

10   of 2009;

11        Government Exhibit 88, which is a by-products

12   log book from May 10th of 2009 to

13   September 26th of 2009;

14        And Government Exhibit 98, which is a

15   by-products log book from September 27th, 2009, to

16   December 17th, 2009.

17             MR. LINSIN:  No objection, Judge.

18             MR. PERSONIUS:  No objection, your Honor.

19             THE COURT:  Okay.  Exhibits 82 through 89,

20   inclusive, no objection, received, and we'll

21   proceed from there.

22             (Government's Exhibit 82 through 89 were

23             received into evidence.)

24             MR. MANGO:  Thank you, your Honor.  If we

25   could just publish so the jury can see what I'm

1130

 1    looking at, Government Exhibit 82 now for

 2    identification purposes [sic].

 3  BY MR. MANGO

 4    Q.   Mr. Cahill, do you see that log book on your

 5    screen?

 6    A.   Yes, I do.

 7    Q.   If we can go to the next page, please.   This

 8    would be just inside the cover; is that right?

 9    A.   Yes.

10    Q.   If we could go a couple pages in.

11         Now there's some entries listed here.   It

12    appears for August 17th of 2006 at the top, is that

13    right?

14    A.   Yes, it is.

15    Q.   And that's -- is there a particular shift

16    that's listed there?

17    A.   That looks like 8:00 a.m. to 8:00 p.m.

18    Q.   All right.   Is that the typical shift for a

19    by-products operator, 12-hour shift?

20    A.   Normally, it's eight to four, four to 12, and

21    12 to eight.   I know we had a time frame there

22    where they were working four on and four off and

23    they were doing 10-, 12-hour days, but normally

24    it's eight to four, four to 12, and 12 to eight.

25    Q.   All right.   So as I asked you before, it would

1    be standard to record any pressure settings that

2    get adjusted in these log books?

3    A.   Yes.

4    Q.   All right.  Let me ask you -- we can take that

5    off?  Thank you.

6         Let me ask you about -- are you familiar with

7    what's known as the tar box?

8    A.   Yes.

9    Q.   Okay.  Does the by-products operator have any

10   responsibility relating to the tar box?

11   A.   Yes.

12   Q.   Okay.  Why don't you tell the jury what

13   responsibilities the by-products operator has for

14   the tar box?

15   A.   The tar box, in a 24-hour period a week, it

16   will start filling up with tar.  The BP operator

17   would call an end loader operator over, have him

18   come over, take the tar out.  End loader would stay

19   there five, ten minutes, and then the end loader

20   would take off with the tar, leave with the tar.

21   Q.   How often would the tar box need to get

22   emptied?

23   A.   High production, three times a week.  Low

24   production, maybe once a week, once a -- once every

25   other week.

1    Q.   Okay.  Is there any record that is kept by the

2    by-products operator or in the by-products

3    department relating to when the tar box is emptied?

4    A.   Yes, there's a tar book.

5    Q.   Okay.  So we'll call that the tar book.  You're

6    familiar with the tar book?

7    A.   Yes, I am.

8    Q.   What goes in the tar book?

9    A.   The date, the time, and the operator who called

10   to have it cleaned, his initials.

11   Q.   Have you made entries in the tar book before?

12   A.   Yes, I have.

13            MR. MANGO:  Your Honor, if I can have a

14   moment?

15            THE COURT:  Certainly.

16            MR. MANGO:  Your Honor, at this point, the

17   government would move Government's Exhibit 14 into

18   evidence, absent an objection from the defendants.

19            MR. LINSIN:  Could I just see the volume,

20   please?  No objection, your Honor.

21            MR. PERSONIUS:  No objection, your Honor.

22            THE COURT:  Okay.  Government's Exhibit 14

23   received into evidence.  No objection.

24            (Government's Exhibit 14 was received into

25            evidence.)

1    MR. MANGO:  Your Honor, I'd ask that be

2    published for the jury.

3    THE COURT:  Certainly.

4    BY MR. MANGO:

5    Q.  Mr. Cahill --

6    A.  Yes.

7    Q.  -- can you tell the jury what we're looking at

8    here?  And if we can actually flip to the next

9    page, why don't you tell the jury what we have

10   here?

11   A.  Yes.  That's the operators jotted down when the

12   tar box was cleaned.

13   Q.  Okay.  So this tar book starts May 20th of

14   1994?

15   A.  Yes.

16   Q.  Okay.  Is that -- there's somebody with the

17   initial PC there.

18       Who is that?

19   A.  That's me.

20   Q.  All right.  If we could go to page 63, please.

21   MR. MANGO:  I'd like to go to page 63 of

22   this document, your Honor.  I think that's page 3.

23   THE COURT:  Okay.  I think there's a

24   little discrepancy in --

25   MR. MANGO:  Your Honor, I can proceed.

1    Excellent.  Thank you.

2   BY MR. MANGO:

3    Q.  So the last entry for this book, Mr. Cahill,

4    shows what on the screen?

5    A.  4/7/10.

6            THE COURT:  Okay.  This is 61, I think,

7    right?

8            MR. MANGO:  Yes, your Honor.  There's

9    different Bates number on here.  I was trying to

10   match them up.  They didn't match up perfectly.

11           THE COURT:  Just go with our Bates number

12   that we can see.

13           MR. MANGO:  We'll do that.

14  BY MR. MANGO:

15   Q.  And if we could go to the next image, please,

16   62.

17       All right.  Do see there's some type of

18   placeholder in there?

19   A.  Yeah.

20           MR. MANGO:  Your Honor, may I approach the

21   witness and show him the original copy for this?

22           THE COURT:  Okay.  Yeah, you can do that.

23   But I think -- okay.  Go ahead, please.

24           MR. MANGO:  Or we could use the Elmo.

25           THE COURT:  No, that's okay.

1    BY MR. MANGO:

2    Q.  Mr. Cahill, do you see that placeholder in the

3    book?

4    A.  Yes, I do.

5    Q.  Okay.  What color is it?

6    A.  Red.

7    Q.  Can you describe what it says for the jury,

8    please?

9    A.  Coal tar.  Caution.  May cause skin irritation,

10   and so on.

11            MR. MANGO:  Okay.  Your Honor, if I may

12   just publish this by holding this up to the jury?

13            THE COURT:  You may.

14            MR. MANGO:  Okay.  Mr. Cahill, can you

15   tell the jury what this red tag was used for?

16            THE WITNESS:  Yes, it was --

17            THE COURT:  Just one second, Mr. Cahill.

18   Why don't you publish it to the attorneys too, so

19   they know what you're doing.

20            MR. PERSONIUS:  Judge, it's looking like

21   that's paper clipped inside the exhibit.  I wonder

22   if for recordkeeping we should consider marking

23   that as a sub exhibit rather than just having it

24   paper clipped on a page.

25            MR. MANGO:  We could, your Honor.  The

1    government would move this as Exhibit 14.1.

2              THE COURT:  Okay.  No problem with that,

3    Mr. Linsin?

4              MR. LINSIN:  No objection, your Honor.

5              THE COURT:  Okay.

6              THE CLERK:  It's in evidence, then?

7              THE COURT:  It will be received into

8    evidence.  No objection?

9              MR. LINSIN:  No objection, your Honor.

10             MR. PERSONIUS:  No objection, Judge.

11             (Government's Exhibit 14.1 was received

12             into evidence.)

13             MR. MANGO:  Your Honor, may I approach the

14   witness again?

15             THE COURT:  Yes.

16   BY MR. MANGO:

17   Q.  Mr. Cahill, can you tell the jury what this red

18   tag was used in Government Exhibit 14.1 for the tar

19   book?

20   A.  Yes.  Just to keep the page.  So when you

21   flipped it open, all you have to do is write it

22   down.  That's what it was for.

23   Q.  Okay.  So it was your page holder?

24   A.  Yeah.

25   Q.  Okay.  Okay.  Based on -- we can take that

1    down.  Thank you, Lauren.

2        Based on your position that you've held --

3    well, let's actually talk for a minute.  After

4    being an operator, you became by-products foreman?

5    A.  Yes.

6    Q.  Tell the jury how long you served as

7    by-products foreman.

8    A.  Again, times, I want to say six years, seven

9    years.

10   Q.  All right.  What duties would you have as a --

11   what duties did you have as a by-products foreman

12   that were different than a by-products operator?

13   A.  I would oversee all the operators.  I would

14   make -- oversee the maintenance crew that was in

15   the by-products.  Made sure if a pump went down, we

16   would repair it that following day.  That's about

17   it.

18   Q.  Okay.  Now, based on the position you've held

19   as a by-products operator and foreman, are you

20   familiar with the operation of the by-products

21   department?

22   A.  Yes, I am.

23   Q.  All right.  Can you describe, in general terms

24   for the jury, the flow of the coke oven gas through

25   the by-products department as it comes off the

1    battery?

2    A.  Sure.  We have a big exhauster.  And just

3    imagine the exhauster being cut in half.  One half

4    is on suction, the other half is on pressure.  So

5    what we do is draw the gas from the battery on the

6    suction side.  Once it ends up going through the

7    exhauster, it's on the pressure side.  Then it goes

8    through our units, we clean it up, send it back to

9    the battery, and send it back to the boiler house.

10   Q.  Okay.  In general terms, can you tell the jury

11   what components the gas flows through in the

12   by-products department?

13   A.  Sure.  As it -- we are drawing it from the

14   battery, it would go through our primary and

15   secondary CGA which cools the gas.  Then it goes

16   through the exhauster.  Then it would come out of

17   the exhauster, go to our precipitator.  Then it

18   would go to our LGAs.  Then it would go to our LBA.

19   Used to go to our LBA.  And then it would go to the

20   battery and to the boiler house.

21   Q.  Prior to the coke oven gas coming to the

22   by-products department, in the event of an

23   emergency, what would happen to the coke oven gas?

24   A.  It would go off the collector mains flare.

25   Q.  Is that also called the battery flare stack?

1    A.   Yes, it is.

2    Q.   How is the battery -- first off, what is the

3    purpose of the battery flare stack?

4    A.   Well, again, if we lost an exhauster, the

5    pressure would back up on the battery, so they

6    would open that up.

7    Q.   How is the battery flare stack lit currently?

8    A.   Pilot light.

9    Q.   All right.  How many times -- in your

10   26-or-so-odd-year career at the Tonawanda Coke

11   Corporation, how many times have you seen that

12   battery flare stack light off?

13   A.   Twenty or 30.

14   Q.   Okay.  And can you describe for the jury how

15   the pilot light works?

16   A.   Sure.  The minute you start opening up the

17   valve, the rush of gas will come through and the

18   pilot would just light the gas as it's leaving the

19   pipe.

20   Q.   Has there always been a pilot light on the

21   battery flare stack?

22   A.   No.

23   Q.   How was the flare stack lit during the time

24   that it did not have a pilot light?

25   A.   A broom.  We would light a broom on fire and

1    throw it up there.

2    Q.  Were you trained that way?

3    A.  Yes.

4    Q.  And to your knowledge, during the time that

5    there was no pilot light, was this the standard

6    operating procedure for lighting the battery flare

7    stack?

8    A.  Yes.

9          MR. MANGO:  All right.  I'd like to pull

10   up Government Exhibit 15.02.097 that is in

11   evidence, your Honor, and ask that we can show this

12   to the jury and Mr. Cahill.

13   BY MR. MANGO:

14   Q.  Mr. Cahill, do you see this on the screen?

15   A.  Yes, I do.

16   Q.  Okay.  What are we -- what is this that's on

17   the screen?

18   A.  That's our bleeder, pop off, whatever.  I mean,

19   we call it bleeder.

20   Q.  All right.  Have you heard the term "pressure

21   relief valve"?

22   A.  Yes.

23   Q.  Is that a term that any Tonawanda Coke

24   employee's used for it?

25   A.  No.  Everybody that I know of used it as a

1141

1   bleeder -- called it a bleeder.

2   Q.  And where is the bleeder located?  This

3   picture, where was this picture taken?

4   A.  On top of the gas line going to the boiler

5   house.

6   Q.  Which direction goes to the boiler house?  You

7   can touch the screen and draw.

8       Okay.  So if you could draw with your finger

9   and make an arrow, which direction is it going?

10  A.  That way.

11  Q.  All right.  So that is -- should have given you

12  some practice on this.  Sorry.  I know you weren't

13  ready for this.

14      That's going towards the boiler house?

15  A.  Yes.

16  Q.  All right.  As part of your responsibilities as

17  by-products foreman, did you have any

18  responsibilities relating to the operation of this

19  bleeder valve?

20  A.  Yes.

21  Q.  What were your responsibilities?

22  A.  To maintain the pressure in the plant.

23  Q.  All right.  What were your responsibilities

24  with respect to this bleeder valve?

25  A.  Setting it.

1    Q.   Setting it?

2    A.   Yes.

3    Q.   Okay.  So there's a way to set it?

4    A.   Yes.

5    Q.   All right.  We'll get there in a second.

6         Is the bleeder, this, what we're looking at,

7    still operational today?

8    A.   No.

9    Q.   Okay.  Tell the jury, please, when the bleeder

10   was taken out of service.

11   A.   I want to say March of 2010.

12   Q.   Okay.  March of 2010.

13        Were you involved in having the bleeder taken

14   out of service?

15   A.   Yes.

16   Q.   Okay.  What was your role in that?

17   A.   Being the supervisor, I had to make sure

18   everything was going okay as it was being taken out

19   of service.

20   Q.   Did somebody give you instructions or notice

21   that this was going to be taken out of service?

22   A.   Yes.

23   Q.   Who was that?

24   A.   Bob Kolvek.

25   Q.   What was his position at the time?

1    A.   I think vice-president of operations.

2    Q.   Were you given a reason why the bleeder was to

3    be blanked off?

4    A.   No.

5    Q.   Okay.  Is that the term you use for it,

6    "blanked off"?

7    A.   Yes.

8    Q.   Tell the jury what blanking it off means, if

9    you could.

10   A.   You're putting a plate, a steel plate, in

11   between a valve and the gas line so no gas can come

12   out through that solid plate.

13   Q.   Okay.  So if you -- now, with a little practice

14   on the screen, if you could point -- if you touch

15   the screen, you'll add a point where the blanking

16   happened, where the plate was put.

17        Right there?

18   A.   Yes, right there.

19   Q.   Okay.  Is the structure itself still there?

20   A.   Yes.

21   Q.   The stack?

22   A.   Yes.

23   Q.   Okay.  During the time the bleeder was in

24   service, what was the purpose of the bleeder?

25   A.   To relieve pressure on the gas line.

1   Q.   Okay.  And how did it do that?

2   A.   There's a chart recorder in a green shack and

3   there is two pen arms.  One is a set point and the

4   other one is an ink pen.  Once you have that set

5   point set at, let's say, a hundred, the ink pen

6   would rise.  If it goes up beyond that set point,

7   it would open up the valve.

8   Q.   Okay.  Would that happen automatically --

9   A.   Yes.

10   Q.   -- or would somebody have to manually have to

11   do that?

12   A.   No, automatically.

13   Q.   The ink pen -- there's these two things --

14   A.   Yes.

15   Q.   -- that relate to this chart.  Let's go through

16   it for a second.

17        There is an ink pen?

18   A.   Right.

19   Q.   What is the ink pen monitoring, if anything?

20   A.   The plant's pressure.

21   Q.   Okay.  So somehow this -- there's some device

22   that records on this circular chart what the plant

23   pressure is?

24   A.   Yes.

25   Q.   At what point is the plant pressure recorded?

1    A.   What point?

2    Q.   Yeah.   What point in the line, if you can

3    point?

4    A.   It's not on this line here.   It would be down

5    further down by the green shack building.

6    Q.   The question is -- if I just put a point there,

7    for example --

8    A.   Right.

9    Q.   -- is the ink pen recording the pressure in the

10   line right there?

11   A.   No.

12   Q.   Okay.   Where is the -- where's the pressure

13   that the ink pen is recording?

14   A.   Closer to the green shack.   Then it sends a

15   signal up to this control valve to open.

16   Q.   Okay.   So that is on what line?

17   A.   The main gas line just before it goes to the

18   ovens, the battery.

19   Q.   Okay.   Is that above ground or underground?

20   A.   Above.

21   Q.   All right.   So it's recording the pressure in

22   the line at that point?

23   A.   Yes.

24   Q.   And you mentioned there's this second arm

25   that's the set point?

1    A.   Yes.

2    Q.   And how do you set that set point?

3    A.   With a dial.  You just raise or lower it --

4    Q.   All right.

5    A.   -- in the chart recorder.

6    Q.   In the chart recorder?

7    A.   Yeah.

8    Q.   Where is the set point?  How do you know where

9    you're setting the set point?

10   A.   Because that arm, as you're turning that dial,

11   would either go up or down on the chart recorder.

12   You will see that you have zero to, let's say, 200.

13   Q.   So, again, tell the jury how this bleeder would

14   then open up.

15   A.   Again, you have your set point.  If the pen

16   comes up above that set point, the bleeder then

17   will start opening up and get a signal from that

18   chart recorder, an impulse, and send it right back

19   to the valve and open it up.

20   Q.   Mr. Cahill, if you could, tell the jury, when

21   the valve would open, what would come out of the

22   stack?

23   A.   Coke oven gas.

24   Q.   Was there ever a period of time that this

25   bleeder was in a different location?

1    A.   Yes.

2    Q.   Okay.  Can you describe for the jury in what

3    other location this bleeder was at?

4    A.   It would have been back more towards the black

5    tank here.  Right there.  Right where I just put

6    that mark.

7         MR. MANGO:  Okay.  Your Honor, I'd like to

8    pull up Government Exhibit 50 for identification

9    purposes at this point, and absent an objection, I

10   would move this into evidence.

11        MR. LINSIN:  Your Honor, without a

12   foundation regarding this photograph, we do object.

13   There are details about how this photograph was

14   taken that we are not aware of, and I think would

15   be important for the jury's understanding the photo

16   before it is introduced.

17        THE COURT:  Okay.  I'll mark it for

18   identification only.

19   BY MR. MANGO:

20   Q.   Mr. Cahill, do you see the photograph up on

21   your screen?

22   A.   Yes.

23   Q.   Okay.  So do you see the bleeder --

24   A.   Yes.

25   Q.   -- on this -- on this photograph?

1   A.   Yes.

2   Q.   Okay.  Do you see any other type of structure

3   that would indicate to you where the bleeder was

4   previously located?

5   A.   Yes.

6   Q.   Okay.  Could you please circle -- you can use

7   your finger and circle where the bleeder would have

8   been located?  Let me zoom in, if I can.  It may

9   make it easier.

10  A.   Okay.

11  Q.   It would have been there?

12  A.   Yes.

13  Q.   Is that the structural support for the old

14  bleeder?

15  A.   Yes.

16  Q.   All right.  If we can actually back out for a

17  moment.

18       Where was this -- if you -- if you -- knowing

19  the angle this was taken, where was this

20  photograph -- do you believe this photograph would

21  have been taken from?

22            MR. LINSIN:  Your Honor, I just ask the

23  question be rephrased to see if this witness

24  actually knows.

25

1   BY MR. MANGO:

2   Q.  Okay.  Do you have any idea where this

3   photograph would have been taken from?

4   A.  It looks like maybe on top of the battery, the

5   ovens.

6   Q.  Okay.  Does this -- if you were on top of the

7   ovens --

8          MR. LINSIN:  Your Honor, maybes and ifs, I

9   don't think are sufficient.

10          THE COURT:  Well, is your objection that

11   the foundation has to include from where it was

12   taken?

13          MR. LINSIN:  It does, your Honor.  That is

14   one part of the foundation.  But the other part

15   actually goes to the equipment with which it was

16   taken.

17          THE COURT:  Well, anybody can testify to

18   what is reflected in the photograph, for

19   foundational purposes, given the time element and

20   what it purports to represent.  So, where is your

21   objection in that regard?

22          MR. LINSIN:  Initially as to foundation,

23   as to whether the witness can identify, beyond a

24   maybe or an if, where this photograph was taken

25   from.  And then it gets into a question of

1    perspective and whether this is a magnification or

2    not.

3              THE COURT:  All right.  But I'm not sure

4    that from where it was taken is necessarily a part

5    of the foundation.  So I'm going to deny your

6    objection -- or overrule your objection on that

7    foundational ground.  But you haven't established a

8    foundation for the use of this photograph in any

9    respect, so it will only remain identified.

10             MR. MANGO:  Okay.  Thank you, your Honor.

11   BY MR. MANGO:

12   Q.  I believe you testified that this might have

13   been taken from on top of the battery.

14   A.  Yes.

15   Q.  If you were on top of the battery, would this

16   fairly and accurately depict what it would look

17   like looking -- which direction is this photograph

18   taken?  Let me stop there.  Which direction is this

19   photograph taken?

20   A.  It looks like it's more north.

21   Q.  Okay.  What is generally identified in this

22   part of the photograph?

23   A.  The gas piping, your LBA, your LGAs.

24   Q.  What department is that?

25   A.  By-products.

1    MR. PERSONIUS:  And, your Honor, again, we

2    got to look ahead and what was just done was, so we

3    have it on the record, a circle was put right in

4    the middle of the photograph.  If we don't somehow

5    verbally put that on the record, later on you'll

6    look at the transcript and have no idea what the

7    witness is testifying about.

8         THE COURT:  That's true.  But you're

9    working on a foundation --

10        MR. MANGO:  Yes, your Honor.

11        THE COURT:  -- at this point in time.

12   We'll go through that again.  But we don't have a

13   date set.  We don't have what it purportedly

14   represents.  We don't know if it's accurate in

15   terms of time frame.  All of those things I think

16   we have to still explore.  If not, I'm going to

17   continue to sustain any objections to the use of

18   the photograph.

19        MR. MANGO:  Yes, your Honor.

20   BY MR. MANGO:

21   Q.  At this point, I'm just going to have --

22   Mr. Cahill, I'm circling the structure you

23   mentioned where the bleeder would have been

24   located.

25   A.  Yes.

1    Q.   Okay.  Just describe that --

2              THE COURT:  You can't do that.  We can't

3    do that.  Because right now this doesn't purport to

4    represent anything, as far as I know, all right,

5    based on this witness's testimony.  So we don't --

6    we cannot use this as an illustrative in the

7    fashion that you're trying to do it.

8              MR. MANGO:  Your Honor, I was not -- I do

9    plan to have a witness who actually took this

10   photograph testify, but what I do expect is just at

11   least to have this witness describe the structure

12   that he sees that he believes, so when the

13   photograph does come in, the jury can tie the two

14   together.  I'm not -- obviously this --

15             THE COURT:  If he doesn't know what it

16   represents at what point in time, if it's not an

17   accurate representation -- you're saying you can do

18   this by connecting this up with a later witness?

19             MR. MANGO:  Yes, your Honor.

20             MR. LINSIN:  Your Honor, this is testimony

21   now -- first of all, we have no idea and -- the

22   witness has testified that the bleeder valve was

23   located in a different position at some

24   unidentified point in time.  We don't know when

25   he's talking about.  We don't know if the

1    structures in this system have changed.  It is --

2    we're -- we're trying to tie ends together when

3    there are frays all over this line of testimony.

4    And I'm just concerned about trying to turn the

5    testimony into something that it is not.

6              THE COURT:  Yeah.  Well, at this point

7    without having this witness recognize what this is,

8    at what given time, I'm not going to allow you to

9    go any further on it, even subject to connecting

10   up.  Because then it may not get connected up.

11             MR. MANGO:  Yes, your Honor, I'll ask that

12   limited question.

13   BY MR. MANGO:

14   Q.  Mr. Cahill, do you recognize what this

15   photograph is depicting?

16   A.  Yes.

17   Q.  Okay.  Tell the jury what this photograph is

18   depicting.

19   A.  The by-products.

20   Q.  Okay.  Does this fairly and accurately

21   represent what the by-products area looked like

22   between 2005 and 2009?

23   A.  Yes.

24             MR. MANGO:  Your Honor, I think at that

25   point now the foundation has been laid, and I would

1    move this Government Exhibit 50 into evidence with

2    the limited -- obviously the weight of the evidence

3    can be taken at this point, and I do expect another

4    witness to talk about this photograph.

5              THE COURT:  I think that's right.  Unless

6    there's another objection on some aspect of the

7    foundation, I'm going to admit it.

8              MR. LINSIN:  We'll address it on

9    cross-examination, your Honor.  Thank you.

10             THE COURT:  Okay.  You're welcome.

11        All right.  Fifty received into evidence

12   subject to cross-examination, but foundationally,

13   it can stand.

14             (Government's Exhibit 50 was received into

15             evidence.)

16             MR. MANGO:  Thank you, your Honor.

17        Mr. Cahill, now what the jury -- I'd ask that

18   be published for the jury.

19             THE COURT:  Okay.  It's received into

20   evidence illustratively.  And you want it

21   published?  I will do that.

22             MR. MANGO:  Yes, thank you.

23   BY MR. MANGO:

24   Q.  All right.  Mr. Cahill, can you tell the jury

25   again now what we're looking at in this photograph?

1    A.   Yes.  The by-products department.

2    Q.   Okay.  And you had previously testified I

3    believe -- do you see the structure that would have

4    been used as part of the -- the previous location

5    where this the bleeder was located?

6    A.   Yes.

7    Q.   Okay.  Let's give it another --

8    A.   Okay.

9    Q.   -- try.  If you could try to circle that

10    location on the screen and I will describe it as it

11    appears to be a red triangular area in the left

12    about a third of the way in in the middle of the

13    photograph.

14    A.   Yes.

15    Q.   All right.  Do you see the bleeder pressure

16    release valve on this photograph?

17    A.   Yes, I do.

18    Q.   If you can just tap the screen where it is.

19    All right.  Adding even more, what you drew, the

20    circle for the structure, is about an inch and a

21    half to 2 inches to the right, the triangular

22    structure?

23    A.   Yes.

24    Q.   Okay.  This structure behind there, see the

25    white rusty structure?

1    A.   Yes.

2    Q.   Do you know what that structure was used for?

3    Is that structure in service today?

4    A.   No, it's not.

5    Q.   What is that structure?

6    A.   They were tanks for coal spray oil.

7    Q.   All right.   That tower, what is that tower?

8    A.   That was actifier.

9    Q.   Actifier.   Can you tell the jury what the

10   actifier was meant to do?

11   A.   Remove sulfur.

12   Q.   That tower?

13   A.   That would have been the new purifier.

14   Actifier, purifier work together.

15   Q.   Okay.   Was the actifier or purifier in

16   service -- are they in service currently?

17   A.   No.

18   Q.   The structures are still there, though?

19   A.   Yes, they are.

20   Q.   And this tower there?

21   A.   That was the LBA.

22   Q.   Okay.   Great.   This line we see here, the green

23   dark-ish line, what is that line?

24   A.   That's the gas line going to the boiler house.

25              THE COURT:   All right.   What was that

1157

1    third tower?

2              THE WITNESS:  LBA.

3              THE COURT:  Which is?

4              THE WITNESS:  I don't know.

5              THE COURT:  Just LBA?

6              THE WITNESS:  Yes.

7              THE COURT:  Does it do anything or --

8              THE WITNESS:  Well, right now, no.  It's

9    out of service.

10             THE COURT:  When it was in service, did it

11   do something --

12             THE WITNESS:  Yes.

13             THE COURT:  -- if you know?

14             THE WITNESS:  Yes.

15             THE COURT:  What was that?

16             THE WITNESS:  Remove light oil.

17             THE COURT:  Light oil, okay.

18   BY MR. MANGO:

19    Q.  That was the light oil tower?

20    A.  Yes.

21    Q.  You call it the LBA.  You don't know what those

22   initials stand for?

23    A.  No.

24    Q.  That's what you were saying you didn't know?

25    A.  Yes.

1   Q.   Okay.  So this line, again, that I drew, what

2   is that line?

3   A.   The gas line going to the boiler house.

4   Q.   And at some point is there a line that goes

5   back to the -- to the ovens?

6   A.   Yes.

7   Q.   Could you use this photograph and draw on here

8   how the line goes from the -- from wherever you

9   want to start back to the ovens?

10  A.   It's underground.  So from here, come all the

11  way over to the battery underground.

12  Q.   All right.  Now, do you see a release happening

13  from the bleeder?

14  A.   Yes.

15  Q.   Okay.  Is that a release of coke oven gas, if

16  you know?

17  A.   Honestly, I can't tell you.  I don't know.

18  Q.   Okay.

19  A.   It's definitely a release though.

20  Q.   Okay.  Would steam sometimes come out of that

21  bleeder?

22  A.   Yes.

23  Q.   Is that steam?

24  A.   Honestly, I don't know.

25  Q.   Okay.  So how long was the bleeder in its

1   current position there?

2   A.   Maybe 15 years.  Dates, again, I don't know.

3   Q.   At some point it was at this location.  Can you

4   tell the jury why it was moved to its current

5   location?

6   A.   Sure.  Just like the gas line going underneath

7   to the ovens, the gas line was going underground to

8   the boiler house too.  But that one plugged off, so

9   they put the new one up.

10  Q.   Draw where the new one is.  Okay.  So that line

11  wasn't there in the past?

12  A.   No.

13  Q.   Do you know approximately when that line was

14  put in?

15  A.   No, I don't.

16  Q.   Would that be at approximately the same time

17  the bleeder was in this location?

18  A.   Yes.

19  Q.   Okay.  What is the frequency with which the

20  bleeder, when it was operational, would release

21  coke oven gas into the atmosphere?

22         MR. PERSONIUS:  Your Honor, can we have a

23  time frame, please?

24         MR. LINSIN:  Time frame, please.

25         THE COURT:  Yes.  Objection sustained.

1    BY MR. MANGO:

2    Q.   Okay.   During the time period of -- let's start

3    with 2005 to 2009.   During that time period, what

4    was the frequency with which the bleeder would

5    release coke oven gas to the atmosphere?

6    A.   I would say during high production it would

7    release every 20 minutes.

8    Q.   All right.   Would the 20 minutes -- why would

9    it release every 20 minutes?

10   A.   Because then the -- the battery, the ovens,

11   they weren't taking the gas.   The gas would back up

12   through the whole system and the pressure would

13   increase and it would release.

14   Q.   All right.   So describe -- describe how long

15   during a reversal the batteries are not taking any

16   gas -- the ovens are not taking any gas.

17   A.   Thirty seconds.

18   Q.   Okay.   So if there's -- for this 30 seconds if

19   there's no gas going to the ovens, what happens to

20   the pressure in the line where the bleeder setting

21   measures?

22   A.   It would increase.

23   Q.   Okay.   Now, during these releases that occurred

24   during the reversals, how long did they last?

25   A.   Ten seconds, 20 seconds.

1   Q.   Are you familiar with the term "cogeneration"?

2   A.   Yes, I am.

3   Q.   All right.  Tell the jury what cogeneration is.

4   A.   Cogen -- we produced our own power.  We got off

5   the grid.  So during that time cogen was a big

6   turbine.  We were producing our own power.

7   Q.   Was the cogeneration system consistently always

8   running?

9   A.   Yes.

10  Q.   Were there ever times when the cogeneration

11  system were down -- was down?

12  A.   Yes.

13  Q.   Okay.  So there was times when it came down for

14  a period?

15  A.   For repairs, whatever, yes, and put back on.

16  Q.   Okay.  But even -- what I want to talk about is

17  even during the period of cogeneration, would the

18  bleeder release during the reversals?

19  A.   If we were at high production, yes.  Low

20  production, no.

21          MR. LINSIN:  I'm sorry.  I didn't hear the

22  end of that response, please.

23          THE WITNESS:  Low production, no.

24          MR. LINSIN:  Thank you, your Honor.

25  BY MR. MANGO:

1    Q.   Were there times -- let me ask this.   In your

2    experience, did you ever observe the bleeder

3    release for longer than 10 to 20 seconds?

4    A.   Yes.

5    Q.   What were the circumstances that you observed

6    these longer releases?   If you could, tell the

7    jury.

8    A.   If they were pushing out two or three ovens in

9    a row.   Again, you're getting a big volume of gas.

10   The gas would back up and release.

11   Q.   Okay.   Why?   During -- during a push of an

12   oven, is there any coke oven gas flow going to that

13   oven?

14   A.   As you're pushing it, no.   When you start

15   charging it, you create gas.

16   Q.   How long would these releases last?

17   A.   A minute, two minutes, sometimes longer.

18   Q.   Okay.   Sometimes longer.   So have you ever seen

19   it -- the bleeder release for longer than two

20   minutes?

21   A.   Yes.

22   Q.   Okay.   Do you know if anything -- or were you

23   ever advised that something happened to the bleeder

24   during operation that caused a phone call to be

25   made to you?

1          MR. PERSONIUS:  Your Honor, is that

2     leading?

3          THE COURT:  Is that an objection --

4          MR. PERSONIUS:  Yes.  As soon as I said

5     it, I realized --

6          THE COURT:  -- just out of curiosity?

7          MR. PERSONIUS:  I object on leading, your

8     Honor.

9          THE COURT:  You know, there is that rule

10    to where for efficient management I can allow it.

11    And secondly, it's imputed permission under 611(c),

12    if it's an employee of the defendant corporation.

13    So, it probably is leading, but we're going to have

14    to repeat the question anyway.

15       So go ahead.

16          MR. MANGO:  I'm going start from scratch,

17    your Honor.

18    BY MR. MANGO:

19    Q.  The operations here at Tonawanda Coke

20    Corporation are outside in the elements, is that

21    right?

22    A.  Yes, it is.

23    Q.  So in your work there and in all the other

24    employees' work, you work in rain --

25    A.  Yes.

1    Q.   -- is that right?

2         Snow?

3    A.   Yes.

4    Q.   Windy conditions?

5    A.   Yes.

6    Q.   Sleet?

7    A.   Um-hum.

8    Q.   Sunny days?

9    A.   Yes.

10   Q.   All right.  Did you ever work in a lightening

11   storm?

12   A.   Yes.

13   Q.   Do you know if the bleeder has been struck by

14   lightening?

15   A.   Yes.

16   Q.   Okay.  If you could tell the jury what you know

17   about the bleeder being struck by lightening.

18   A.   I was at home one day and I get a telephone

19   call.  I get it from the operator.  It had just

20   stormed.  Lightening hit the bleeder, and they

21   couldn't put out the fire, so they asked me what to

22   do at the time.  I was the BP supervisor, so I told

23   them turn on the steam.  And they said they turned

24   on the steam, it still won't put it out.  I said

25   raise that bleeder up to reduce the pressure.  As

1    they raised it up, they had enough steam pressure

2    going up there to put out the fire.

3    Q.   Were you on the phone --

4    A.   Yeah.

5    Q.   -- during this period of time?

6    A.   Yes.

7    Q.   How long did that phone call last, if you can

8    remember?

9    A.   Five, ten minutes, if that.

10   Q.   Okay.

11            THE COURT:  Approximately, when was that?

12   Do you recall?

13            THE WITNESS:  No, I don't.  Sorry.

14            THE COURT:  Within five years, ten years?

15   Can you do that?

16            THE WITNESS:  Maybe seven years back,

17   maybe.

18            THE COURT:  From today?

19            THE WITNESS:  Yes.

20            THE COURT:  Thank you.

21            THE WITNESS:  Okay.

22   BY MR. MANGO:

23   Q.   Mr. Cahill, you talked about the frequency with

24   which the bleeder would release.

25   A.   Um-hum.

1    Q.  You talked about every 20 minutes during high

2    production?

3    A.  Yes.

4    Q.  Okay.  Have you seen this go off during low

5    production?

6    A.  Honestly, I can't say.

7    Q.  All right.  Do you know if it's gone off during

8    low production?

9            MR. PERSONIUS:  Well, your Honor, I object

10   without a foundation.

11           THE COURT:  Well, he can answer yes or no,

12   and we can go from there with a follow-up question.

13       So do you know?  Ask the full question, please.

14           MR. MANGO:  Do you know if it ever

15   released during low production?

16           THE COURT:  Yes or no?

17           THE WITNESS:  Yes.

18   BY MR. MANGO:

19   Q.  Okay.  And how would you know if it released

20   during low production?  Are there things that you

21   could look at to determine that?

22   A.  No.

23   Q.  Okay.  Then how would you know it would release

24   during low production?

25   A.  If I'm driving by, I see stuff coming out the

1    stack.  But that's -- that's the only way you could

2    tell.

3    Q.  What was the typical set point for the bleeder

4    between 2005 and 2009?

5    A.  I want to say 100 centimeters.

6    Q.  Okay.  One hundred centimeters.  Is that

7    measurement in oil, centimeters of oil?

8    A.  Yes.  Kerosene, yes.

9    Q.  So who made that decision where the bleeder

10   would be set at this 100 centimeters of oil?

11   A.  I made the call on that one.

12   Q.  Okay.  You made the call because you were in

13   what position?

14   A.  The supervisor of the by-products.

15   Q.  All right.  So in your role as supervisor of

16   the by-products, you had some responsibility over

17   this bleeder?

18   A.  Yes.

19   Q.  All right.  Now, if -- would you ever give

20   instructions, as an operator of the -- I'm sorry --

21   the supervisor of the by-products, did you ever

22   give instructions to anyone to raise or lower the

23   bleeder?

24   A.  Yes.

25   Q.  Okay.  If you had given that instruction, and

1    if someone had, in fact, raised or lowered the

2    bleeder, would you expect to find the notation in

3    the log books, the by-products log books?

4    A.   Yes, I would.

5    Q.   Okay.  Those log books we already talked about?

6    A.   Yes.

7    Q.   Was the bleeder known to other Tonawanda Coke

8    employees?

9    A.   Yes.

10   Q.   How about employees not in the by-products

11   department?  Did they know about the bleeder?

12             MR. PERSONIUS:  Your Honor, again,

13   foundation.  Object.

14             THE COURT:  Yeah, sustained.

15   BY MR. MANGO:

16   Q.   Do you know if other employees knew about the

17   bleeder?

18   A.   Yes.

19   Q.   Okay.  Let's talk about the by-products

20   operators.

21   A.   Okay.

22   Q.   Do you know if the by-products operators knew

23   about the bleeder?

24   A.   Yes.

25   Q.   Okay.  Why would they know about the bleeder?

1        MR. PERSONIUS:  Again, your Honor, now

2    we've got to have the foundation.  He just said he

3    knew.  He didn't say -- that's the whole problem.

4    We are not getting a foundation of how he knows it.

5        THE COURT:  Well, I think why would they

6    know is the start of a foundational pursuit.  I'll

7    permit that.  All right.

8        MR. MANGO:  Thank you, your Honor.

9    BY MR. MANGO:

10   Q.  Why would the by-products operators know about

11   the bleeder?

12   A.  Because they would have to change the chart

13   recorder.  And myself, if I was wasn't available to

14   raise or lower the bleeder for some odd reason, I

15   would inform the BP operator to do that.

16   Q.  Okay.  So this chart recorder, how often did it

17   need to be changed?

18   A.  In a 24-hour period.  Every day.

19   Q.  Every day?

20   A.  Yes.

21   Q.  Every 24 hours a new chart goes on?

22   A.  Yes.

23   Q.  What happens to the chart that comes off?

24   A.  It would at the time go up in my office.

25   Q.  Okay.  And how long would you save these charts

1    for?

2    A.   Six months to a year.

3    Q.   Okay.  Was there a standard operating procedure

4    with respect to those charts?

5              MR. PERSONIUS:  Objection, your Honor.  I

6    don't know what that -- the question is unclear.

7              THE COURT:  Okay.  Rephrase the question,

8    please, or reput the question in any event.

9    BY MR. MANGO:

10   Q.   You said six months to a year?

11   A.   Yes.

12   Q.   Okay.  What would -- let me ask it this way.

13   How would the charts get disposed of after six

14   months or a year?

15   A.   Either in the dumpster or we'd burn them in the

16   ovens.

17   Q.   Okay.  How would they -- just for discussion

18   purposes, how would they make it into the ovens?

19   A.   There is a lid on top of the oven.  You just --

20   after you push out the oven you drop them in there?

21   Q.   Okay.  And would other items get burned in the

22   oven?

23   A.   No.

24             MR. LINSIN:  Objection, your Honor.

25   Relevance.

1    THE COURT:  Sustained.

2    MR. MANGO:  I'll move on, your Honor.

3  BY MR. MANGO:

4  Q.  So at some point, what would cause you to

5  decide the records could get disposed of either in

6  the dumpster or in the ovens?

7  A.  A new year.  New calendar year.  I would just

8  okay, it's been six months, been a year, time to

9  get rid of them.

10 Q.  Were you ever told by anyone how long you need

11 to keep these bleeder charts?

12 A.  No.

13 Q.  Okay.  So we were talking about, when we got

14 into this, the by-products operators, whether they

15 knew or didn't know of the bleeder.

16 A.  Right.

17 Q.  Okay.  How about other employees,

18 non-by-products employees at the Tonawanda Coke

19 Corporation.  Do you know, first off, do you know

20 if they knew about the bleeder?

21 A.  Yes.

22 Q.  All right.  How did you -- I'm sorry.

23     How do you know that other employees knew about

24 the bleeder?

25 A.  Couple maintenance guys would know about it

1    because you would have to do some maintenance on

2    that valve.

3    Q.   Why don't you describe for the jury what type

4    of maintenance you would need to do on the valve?

5    A.   Sure.  You would have to go up there, grease

6    it, lube it, make sure it's working properly.

7    Q.   Do you know a person by the name of Mark

8    Kamholz?

9    A.   Yes, I do.

10   Q.   Okay.  Do you see Mr. Kamholz here in the

11   courtroom today?

12   A.   Yes, I do.

13          MR. MANGO:  Your Honor, let the record

14   reflect Defendant Kamholz has stood up.

15       And is that who you know as Mark Kamholz?

16          THE WITNESS:  Yes.

17          MR. MANGO:  Your Honor, I ask for the

18   record to reflect identification of the defendant.

19          THE COURT:  Okay.  The record will so

20   reflect that the defendant, Mark Kamholz, has been

21   identified by witness Patrick Cahill.

22          MR. MANGO:  Thank you, your Honor.

23   BY MR. MANGO:

24   Q.   Mr. Cahill, do you know what Defendant

25   Kamholz's position is at the Tonawanda Coke

1   Corporation?

2   A.   Yes.   He's our environmental guy.

3   Q.   How about from 2005 to 2009?

4   A.   Still our environmental guy.

5   Q.   Do you know what his duties were in that

6   position?

7   A.   Making sure everything stayed right.   I mean...

8   Q.   Were there ever any occasions between 2005

9   and 2009 that Defendant Kamholz would come to be in

10  the by-products area at the Tonawanda Coke

11  Corporation?

12  A.   Yes, he would do regular testing.

13  Q.   Okay.   What kind of testing would he do?

14  A.   Gas testing, leakage in the by-products.

15  Q.   Okay.   So he would check for leakage?

16  A.   Yes.

17  Q.   How frequently would he do that?

18  A.   Every quarter.   Once a month.   I think every

19  quarter.

20  Q.   Okay.   Let's talk for a minute about an EPA

21  inspection.

22  A.   Sure.

23  Q.   At some point were you notified that there was

24  going to be an EPA inspection at the Tonawanda Coke

25  Corporation?

1   A.   Yes.

2   Q.   Okay.  Who notified you that there was going to

3   be an inspection?

4   A.   Mark Kamholz.

5   Q.   Did -- did anybody else tell you there was

6   going to be an inspection?

7   A.   No.

8   Q.   Okay.  Were you told when the EPA inspection

9   was going to actually occur, the date?

10   A.   Again, dates, I don't remember dates.  But it

11   was April, I think.

12   Q.   April, okay.  But the question is, when

13   Defendant Kamholz told you there was going to be an

14   inspection, did he tell you when it was going to

15   be, when EPA would be there?

16   A.   Seventeenth or 21st or --

17   Q.   Okay.  I'm not looking -- did he tell you the

18   start date of the inspection?

19   A.   Yes.  On Monday.

20   Q.   Okay.  Prior to the inspection, do you remember

21   if Defendant Kamholz came over to the by-products

22   area to see you?

23   A.   Yes.

24   Q.   Okay.  So this is prior to the inspection?

25   A.   Yes, it is.

1175

1    Q.  If you could tell the jury, please, how soon

2    prior to the inspection was this?

3    A.  It was the Friday before the inspection.

4    Q.  All right.  So the Friday before he comes over

5    to see you?

6    A.  Yes.

7    Q.  In the by-products department?

8    A.  Yes.

9    Q.  What was the purpose for that visit?

10   A.  We were going to do a walk-through in the

11   by-products to make sure everything was okay while

12   they were here.  Steam hoses, roll them up.

13   Q.  During that walk-through, did you have a

14   conversation about the bleeder?

15   A.  Yes.  As we were walking down Broadway -- you

16   know where Broadway is?  Okay.  As we were walking

17   down Broadway, the bleeder went off, and Mark

18   turned to me and said, "Pat, we can't have that

19   going off while they're here."  So I said, "Okay.

20   I'll take care of it."

21   Q.  What did you understand his statement to you to

22   mean?

23   A.  Meaning we can't have no gas coming out of that

24   valve.  That's my meaning.

25   Q.  So there was gas coming out?

1    A.   Yes.

2    Q.   What was the gas?

3    A.   Coke oven gas.

4    Q.   Now, if you can remember, it's quite a ways,

5    April of 2009, was that a period of high

6    production, low production, or medium production?

7    A.   I want to say medium.

8    Q.   Okay.

9         MR. PERSONIUS:  My only concern, Judge, is

10   "I want to say" just to make sure it's not a guess.

11   As long as it's not a guess, I don't object.  But

12   if it's a guess --

13        THE COURT:  Well, you can ask on

14   cross-examination.  I'll follow up with that.

15      Is that a guess, or do you have a basis for

16   saying that?

17        THE WITNESS:  It's a guess.  I really

18   don't know.

19        THE COURT:  Okay.  Okay.  So we'll leave

20   it at that.  Medium is a guess.

21   BY MR. MANGO:

22   Q.   As a result of the conversation that you had

23   with Defendant Kamholz, what did you do?  If you

24   can, explain for the jury.

25   A.   Sure.  The following week, prior to the

1    inspection, I would come in at 7:30 in the morning

2    and I would go over to that bleeder valve, to the

3    chart recorder, and I would raise it up.  And then

4    every evening when they would leave, I would lower

5    it back down.

6    Q.  Okay.  Why did you do that?

7    A.  To make sure it wouldn't go off.

8    Q.  Okay.  And you mentioned this.  How did you

9    physically raise it?

10   A.  Well, again, like I described earlier, in the

11   chart recorder I opened up the door.  There is a

12   little dial.  You would raise that dial up.  And

13   then in the evening time, I would go back in and

14   lower it back down.

15   Q.  Okay.  Let's go back now Friday before the

16   inspection.

17   A.  Um-hum.

18   Q.  During your pre-inspection walk-through --

19   A.  Yes.

20   Q.  -- with Defendant Kamholz, were there any other

21   items in the by-products area that Defendant

22   Kamholz indicated a concern to you about?

23   A.  Yes.

24   Q.  Can you tell the jury what that was?

25   A.  Yes.  Our coke oven gas drip legs.  There are

1    two-inch drip legs.  The valves were open a little

2    too much and gas was coming out.  So Mark said, "We

3    can't have the valves open here while they're

4    here."  I said, "I'll take care of it."

5    Q.  Can you please tell the jury what the drip legs

6    are designed to do, how they operate?

7    A.  Sure.  Coke oven gas, you have condensate in

8    it.  So off a 24-inch line, 18-inch line, whatever

9    you have, you have a two-inch pipe coming all the

10   way down to a valve.  Condensate being heavier

11   would fill up that pipe.  So in the wintertime we

12   would just leave it cracked enough where the

13   condensate would come out.  Obviously, a couple of

14   operators might have opened them up too much and

15   gas was coming out while we were doing our

16   inspection.

17   Q.  So after the condensate flows out, is there

18   anything else that would flow out of these drip

19   legs?

20   A.  Yes.  Coke oven gas.

21   Q.  So were the drip legs capable of being closed?

22   A.  Yes.

23   Q.  Okay.  What was your practice regarding the

24   opening and closing of the drip legs, your regular

25   practice at the Tonawanda Coke Corporation

1    regarding the opening and closing of the drip legs?

2    A.   Sure.   Summertime, late fall, the drip legs

3    would be closed at all times.   And you do it to --

4    every round you do it, every two hours, you would

5    open them up, let the condensate come out.   The

6    minute the condensate come out, you close it back

7    up.   Wintertime we would leave them cracked open a

8    little bit so they wouldn't freeze.

9    Q.   Wintertime to include into April?

10   A.   Yes.

11   Q.   Okay.   And cracked open so they wouldn't

12   freeze.   What -- what do you say freeze?   What

13   would freeze in the line?

14   A.   The condensate.

15   Q.   And you wouldn't want that to happen?

16   A.   No.

17   Q.   Had it happened in the past?

18   A.   Yes.

19   Q.   What is the process you need to go through if

20   the condensate freezes in the line?

21   A.   You would have to thaw out the line.   You would

22   have to put steam to it, thaw it out.

23   Q.   So the regular practice then became in the

24   wintertime to keep these cracked open?

25   A.   Yes.

1    Q.   Okay.  So in the cracked open position, after

2    the condensate would flow out, what would then flow

3    out?

4    A.   Coke oven gas.

5    Q.   So during your pre-inspection walk-through did

6    you have a conversation with Defendant Kamholz

7    about the drip legs?

8    A.   Yes.

9    Q.   Okay.  At the time you had this conversation

10   about the drip legs, was there anything coming out

11   of the drip legs?

12   A.   Yes.

13   Q.   Okay.  What?

14   A.   Coke oven gas.

15   Q.   What did Defendant Kamholz tell you about the

16   drip legs?

17            MR. PERSONIUS:  Objection.

18            MR. LINSIN:  Objection.  Asked and

19   answered.

20            THE COURT:  Is this another conversation,

21   or the one we heard before this?

22            MR. MANGO:  I think with the -- the -- now

23   the conversation -- the knowledge about the drip

24   legs, it may have a better understanding to the

25   jury.

1181

1      THE COURT:  Not your strongest argument,

2   right?

3      MR. MANGO:  Yes.

4      THE COURT:  You've already asked and it's

5   been answered, so move on, please.

6      MR. MANGO:  Yes, your Honor.

7      THE COURT:  Okay.

8   BY MR. MANGO:

9   Q.   Okay.  So as a result of the statement that

10   Defendant Kamholz made to you about the drip

11   legs --

12   A.   Yes.

13   Q.   -- what did you do?

14   A.   I would raise up the bleeder in the morning.  I

15   would go around and make sure all the drip legs

16   were closed.

17   Q.   Why would you do that?

18   A.   So no gas would come out.  No coke oven gas

19   would come out.

20   Q.   How did you physically do that, if you can tell

21   the jury, please.

22   A.   Sure.  It's an Apollo valve, two-inch Apollo

23   valve.  It has a long handle on it.  You would just

24   close it.

25   Q.   So in addition to raising the pressure release

1    valve during the EPA inspection, you would close

2    the drip legs in the morning?

3    A.   Yes.

4    Q.   Now, did there come a time during the course of

5    the inspection -- now I want to talk about the

6    actual EPA inspection.

7    A.   Okay.

8    Q.   Did the inspection happen?

9    A.   Yes, it did.

10   Q.   Okay.  Did there come a time during the course

11   of the inspection that you had a conversation with

12   Defendant Kamholz about the bleeder valve in the

13   presence of the inspectors?

14   A.   Yes, we did.

15   Q.   Okay.  Can you tell the jury where -- where

16   were you at the time of this conversation?

17   A.   Again, we were over by that green shack, that

18   green building.  And I don't know how it happened,

19   but something came out of the stack.  And one of

20   the inspectors seen it and said to Mark, "What was

21   that?"  Mark said, "Steam."  They said "Steam?

22   What else is it?"  And he said, "Pressure relief

23   valve."  "Well, how long has that pressure relief

24   valve been in service?"  Mark said, "I don't know.

25   Pat, how long has that pressure relief valve been

1    in service?"  I told him, "I don't know.  As long

2    as I've been in the by-products."  That's it.

3    Q.  Let's talk about that for a minute.

4    A.  Sure.

5    Q.  So you mentioned that you were in the vicinity

6    of Defendant Kamholz and the inspectors when

7    something released from the bleeder?

8    A.  Yes.

9    Q.  Okay.  And Defendant Kamholz was asked what it

10   was?

11   A.  Yes.

12   Q.  And he said steam?

13   A.  Yes.

14   Q.  What you saw releasing, was it steam?

15   A.  No.

16   Q.  What was it?

17   A.  Coke oven gas.

18   Q.  Who was present if you can recall during this

19   conversation?

20   A.  I don't know.  There was probably six or seven

21   people, maybe more.  Couple EPA agents and DEC,

22   Mark and myself.

23   Q.  When you say "agents," were they agents or

24   inspectors?

25   A.  Inspectors.

1184

1    Q.   There's a difference.

2    A.   Sorry.   Sorry.

3    Q.   What was your reaction after hearing Defendant

4    Kamholz's response about steam and -- his response?

5    What was your reaction to Defendant Kamholz's

6    response to the inspectors?

7    A.   Shocked.   Just shocked.

8    Q.   Okay.   Tell the jury why you were shocked.

9    A.   Because, personally, my opinion, I think Mark

10   should have realized or should have known that it

11   is coke oven gas and how long that bleeder was

12   there.   He should know how long that bleeder was

13   there.

14   Q.   Okay.   Did this upset you?

15   A.   Yes, it did.

16   Q.   Okay.   Did you express your anger with anyone

17   else?

18   A.   Yes.   Towards the end of the day I went back

19   over to the battery.   I talked to Gerry Priamo and

20   Tony Brossack.   I talked to them about what had

21   just happened.   And yeah, I was mad.

22   Q.   Okay.   Sometime later did you provide a copy of

23   the bleeder charts to the inspectors?

24   A.   Yes, I did.

25   Q.   Was it the same day?

1185

1    A.   No.

2    Q.   Okay.  The day of this conversation that you

3    had where Defendant Kamholz said it was steam and

4    that he didn't know how long it was there and

5    turned to you --

6    A.   Yes.

7    Q.   -- after that, do you recall showing anything

8    to any of the inspectors?

9    A.   Yes.  Again, I don't know which side, I don't

10   know if it was DEC, EPA, but they wanted to see

11   inside the green shack, the chart recorder.  So I

12   brought I think two of them in there.

13           MR. PERSONIUS:  Judge, I'm sorry to

14   interrupt.  Can we have a time frame for the

15   testimony, please?  We haven't had a date or

16   anything about when this is.

17           THE COURT:  Well --

18           MR. PERSONIUS:  Are we talking the same

19   day?  Different days?

20           THE COURT:  Okay.  I mean --

21           MR. MANGO:  I'll ask.

22           THE COURT:  Set a date.  And then you

23   still have other areas to cover?

24           MR. MANGO:  Briefly, your Honor, yes.

25           THE COURT:  How long?

1           MR. MANGO:  Actually not too much, your

2      Honor.  Another five minutes.  I don't know if now

3      would be a convenient time to break.

4           THE COURT:  Okay.  I think we need to do

5      that, and then we will set the stage in terms of

6      the time.

7           MR. MANGO:  Yes, your Honor.

8           THE COURT:  That is the subject of

9      Mr. Personius's concern.  And then we can expect

10     five or ten minutes in that vicinity to wrap up

11     with Mr. Cahill and then we'll start

12     cross-examination tomorrow morning.

13          MR. MANGO:  Yes, your Honor.

14          THE COURT:  Okay.  Okay.  Keep your minds

15     open.  Don't discuss the case.  Don't do any

16     research.  Remember, everything you need to decide

17     this case and resolve the fact issues will come

18     from the witnesses and the evidence.

19        You've been great today.  Thank you.  As a

20     reward, we're going to let you go right now.

21     Tomorrow, we'll start at 9:30.  Thank you.

22               (Jury excused from the courtroom.)

23          THE COURT:  Okay.  Thank you.  We'll see

24     you tomorrow about 9:30.

25          MR. PERSONIUS:  Thank you, Judge.

1      MR. LINSIN:  Thank you, your Honor.

2      MR. MANGO:  Thank you.

3          *        *        *        *        *        *

1                          CERTIFICATION

2

3            I certify that the foregoing is a

4      Correct transcription of the proceedings

5      Recorded by me in this matter.

6

7

8                         s/Michelle L. McLaughlin
                          Michelle L. McLaughlin, RPR
9                              Official Reporter
                             U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25