VOL. VI

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

              -vs-                         10-CR-219S
TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
                    Defendants.
-------------------------------------


           Proceedings held before the

      Honorable William M. Skretny, U.S.

      Courthouse, 2 Niagara Circle, Buffalo,

      New York on March 6, 2013.


      APPEARANCES:

      AARON J. MANGO,
      Assistant United States Attorney,
      ROCKY PAIGGIONE, Senior Counsel,
      U.S. Department of Justice,
      Appearing for the United States.

      GREGORY F. LINSIN, ESQ.,
      JEANNE M. GRASSO, ESQ.,
      ARIEL S. GLASNER, ESQ.,
      Appearing for Tonawanda Coke Corporation.

      RODNEY PERSONIUS, ESQ.,
      Appearing for Mark L. Kamholz.

      Also Present:  Lauren DiFillipo, Paralegal
                     Sheila Henderson, Paralegal



      Michelle L. McLaughlin, RPR,
      Official Reporter,
      U.S.D.C. W.D.N.Y.
      (716)332-3560

1189

1          I N D E X

2          WITNESS                                    PAGE

3     PATRICK WILLIAM JOHN CAHILL
      Continued Direct Examination by Mr. Mango      1195
4     Cross-Examination by Mr. Personius             1206
      Cross-Examination by Mr. Linsin                1265
5     Redirect Examination by Mr. Mango              1283

6     PETER MATTHEW DOLAN
      Direct Examination by Mr. Piaggione            1288
7     Cross-Examination by Ms. Grasso                1299
      Cross-Examination by Mr. Personius             1308
8     Redirect Examination by Mr. Piaggione          1323

9     GERALD ANTHONY PRIAMO
      Direct Examination by Mr. Mango                1345
10    Cross-Examination by Mr. Linsin                1392
      Redirect Examination by Mr. Mango              1404

11

12

13        GOVERNMENT EXHIBITS                         EVD.

14               132                                  1352
                 133                                  1355
15               134                                  1357

16

17

18

19

20

21

22

23

24

25

1        THE COURT:  Miss Labuzzetta, would you

2    mind calling the case, please?  I know you mind,

3    but would you?

4        THE CLERK:  Criminal case 10-219S, United

5    States of America versus Tonawanda Coke and Mark

6    Kamholz.

7        THE COURT:  Good morning.  I am just so

8    anxious to get going.  Good morning.

9        MR. LINSIN:  Morning.

10        MR. MANGO:  Morning, your Honor.

11        THE COURT:  We probably won't start for

12    another ten minutes or so.  I thought I should

13    bring to your attention a letter from Linda J.

14    Finn, who was juror number 11.  I won't read the

15    entire letter, but it's -- I mean, it's actually a

16    wonderful letter, and it's obvious that she took

17    considerable time to articulate her sentiments

18    about jury service and her civic duty and this

19    case.  And if you can just bear with me, I thought

20    I'd just read a couple of portions of it.  It's

21    roughly a five-paragraph letter.

22        But the letter reads, in the first paragraph,

23    "It is with a heavy heart that I write this letter

24    informing you of my inability to continue serving

25    as juror participant", and then she lists her

1   number.  "As I mentioned to you last Thursday, I

2   suffer from an autoimmune disease called Crest",

3   and she goes on to explain that a little bit.

4   "When I originally was sworn in as a juror, I did

5   not anticipate that this would cause any problems.

6   After five days of sitting on the jury, I've become

7   painfully aware, in paren, literally, close paren,

8   that I'm unable to fulfill this duty in a way that

9   is fair to both parties involved."  And then she

10  explains her sentiments and her condition a little

11  bit in a couple of subsequent paragraphs.

12      And then she concludes by saying, "Please know

13  that I take my civic duty to serve as a juror very

14  seriously, and I am disappointed that I am unable

15  to do this."  And she expresses her gratitude for

16  the sensitivity that's been afforded to her in the

17  process, as far as all of the parties and -- are

18  concerned and the Court.  And she concludes by

19  saying, "I will continue to maintain silence in

20  this case as I have been directed."

21      So I think -- I mean, it's a good letter.  It

22  substantiates her mindset in terms of the

23  importance of her civic duties, and I think it does

24  highlight what I'm sure you are interested in, is

25  that the jurors take the matter seriously and are

1    committed to following the directives that we have

2    given to them to ensure confidentiality and

3    compliance with the specific instructions that will

4    make this a fair case for both sides.

5        So, I am making that a part of the record, at

6    least our juror record, in this particular case.

7        Okay.  I thought I'd start on a high note and

8    then find out if there's anything that we have to

9    address before we bring the jury in.

10           MR. LINSIN:  Your Honor, I just have a

11   question.  The Court filed a document under seal

12   yesterday.  Was it this letter that was filed under

13   seal or --

14           THE CLERK:  I knew you were going to ask.

15   What it was was the jury usage sheet from the jury

16   selection, because I'm not allowed to put their

17   names on the docket.  So what it does, it lists the

18   jurors that were selected, the cause challenges,

19   peremptory challenges, and who was not called.

20           MR. LINSIN:  I was just speculating that

21   it might have been this letter.  And when I heard

22   your Honor reference it, I was -- I just wanted to

23   clarify.  Thank you, your Honor.

24           THE COURT:  Okay.  You're welcome.  Okay.

25   Mr. Personius, anything this morning?

1     MR. PERSONIUS:  No, your Honor.  Thank you

2   for asking.

3           THE COURT:  Mr. Mango, anything?

4           MR. MANGO:  Nothing from me, your Honor.

5           THE COURT:  Okay.  All right.  We'll

6   take --

7           MR. PIAGGIONE:  Your Honor, can I alert

8   you to one thing?  There is a witness who, for

9   medical reasons, has some difficulty going to

10   attend, and defense counsel and the government are

11   going to stipulate to what he would testify to.  We

12   haven't drawn up that stipulation yet, but we're in

13   the process of doing that.

14           THE COURT:  All right.  We'll get to that,

15   I take it?

16           MR. PIAGGIONE:  Yes.

17           THE COURT:  Okay.  Chris, if you would

18   have the jury in at exactly 9:45, please, I would

19   appreciate it.

20       Okay.  Give us about eight minutes.

21           MR. MANGO:  Your Honor, we may also have

22   another stipulation in the afternoon, just a very

23   brief factual stipulation.

24           THE COURT:  Okay.  We now have about seven

25   minutes.  All right.  We'll see you then.

```
 1              (Short recess was taken.)

 2              (Jury seated.)

 3              THE COURT:  Good to see everyone this

 4    morning.  We've been busy.  We're glad you're here.

 5    We want you to know the reason why the storm front

 6    that's hit the East Coast has missed Buffalo, it's

 7    to accommodate you.  We've made those arrangements.

 8    In any event, that's a positive first step.  I hope

 9    you're ready for the trial day.

10        You know this is an important and serious

11    matter, and we urge you please to keep your minds

12    open until all of the evidence is in.  This is

13    important to both sides.  The government, of

14    course, has the burden of proof beyond a reasonable

15    doubt on each essential element of each crime

16    charged.  The defendants are afforded and carry

17    with them the presumption of innocence at this

18    trial.  And you have to resolve the fact issues in

19    this case.  That's really your job.  You are the

20    judges of the facts.  So, you've got a job to do,

21    and I know you've been very engaged and very

22    attentive on behalf of all of us.  We appreciate

23    that.  Please remember the resolve comes from

24    respecting each other's views when you get to

25    deliberation and the application of your common
```

1    sense, experience, and intelligence.  We're happy

2    to have you here again this morning.

3        As you can tell, all the attorneys and parties

4    are back, present.  They're, I think, prepared and

5    ready to go.  This is the case of United States

6    versus Tonawanda Coke Corporation and Mark Kamholz,

7    the defendant in this case.  We have two

8    defendants.

9        This is the government's case, and Mr. Mango

10   was questioning Mr. Cahill, Patrick Cahill

11   yesterday.  And Mr. Cahill's back.

12       Want to come on up, Mr. Cahill.  You remain

13   under oath.  And we'll resume with what I think is

14   the wrap-up of the direct examination and we'll get

15   into cross.  Good morning, sir.  How are you?

16              THE WITNESS:  Good morning.  Good, thank

17   you.

18              THE COURT:  Good seeing you.  Okay.  When

19   Mr. Cahill's ready and you're ready, Mr. Mango, you

20   may proceed.

21              MR. MANGO:  Thank you, your Honor.

22   P A T R I C K   W I L L I A M   J O H N   C A H I L L,

23   having previously been duly sworn as a witness,

24   testified further as follows:

25   CONTINUED DIRECT EXAMINATION BY MR. MANGO:

1   Q.   Good morning, Mr. Cahill.

2   A.   Good morning.

3   Q.   At the time we broke yesterday I believe you

4   had just described a conversation that took place

5   about the bleeder valve in the presence of

6   Defendant Kamholz and the inspectors?

7   A.   Yes.

8   Q.   Is that right?

9   A.   Yes.

10  Q.   To the best of your recollection, when did this

11  conversation occur?

12  A.   It was Friday, a Friday afternoon.

13  Q.   Friday afternoon?

14  A.   Yes.

15  Q.   Okay.  Where did this conversation occur?

16  A.   In front of the bleeder shack, the green shack.

17  Q.   All right.  Do you recall what inspectors were

18  present at the time of this conversation?

19  A.   No, I don't.

20  Q.   During the conversation do you recall showing

21  anybody this green shack where the circular chart

22  is kept?

23  A.   Yes.  Two inspectors.

24  Q.   Okay.  Do you recall which of those inspectors

25  you showed the shack to?

1   A.  No, I don't.

2   Q.  All right.

3            MR. MANGO:  Your Honor, if we could please

4   pull up FFFF, Defendants' FFFF, please.

5            THE COURT:  Okay.  It is published.

6   BY MR. MANGO:

7   Q.  If we can focus on that, Ms. Henderson.  Thank

8   you.

9       Mr. Cahill, do you see what's on your screen

10  there?

11  A.  Yes, I do.

12  Q.  What do you recognize this document as that's

13  on your screen?

14  A.  The gas flow in the by-products area.

15  Q.  Okay.  Can you indicate by touching the screen

16  the location of the bleeder valve?

17  A.  Yes, I can.

18  Q.  Okay.  Can you indicate by touching the screen

19  the location of the green shack?

20  A.  Yes.

21            THE COURT:  All right.  I'll tell you what

22  we're going to do, we're going to clear it.  Go

23  back to the first relief valve, I think is what you

24  questioned about.  Tap the screen with authority.

25  You should get an arrow instead of drawing on it.

1    BY MR. MANGO:

2    Q.   That's okay.  That's the location of the

3    bleeder?

4    A.   Yes.

5    Q.   That you've been calling the bleeder.

6         Can you tap with authority the location where

7    this green shack is?

8    A.   Sure.

9    Q.   Which is that shaded box before that arrow?

10   A.   Yes.

11   Q.   Now, you've mentioned this green shack.  Tell

12   the jury, please, what's inside the green shack.

13   A.   The chart recorder.

14   Q.   Okay.  Is that where the circular charts we've

15   been discussing are created?

16   A.   Yes.

17   Q.   Is that where the release point for the bleeder

18   is set?

19   A.   Yes, it is.

20   Q.   Okay.  For the jury's benefit, for the line

21   pressure that gets recorded on that circular chart,

22   can you tap the screen at what point in the line is

23   that measurement is taken.

24   A.   Yes.  The green line coming off the pipe and

25   going right to the green shack.

1    Q.   Okay.  So for the lines that get recorded on

2    that circular chart --

3    A.   Yes.

4    Q.   -- those lines correspond to the pressure at

5    this point where you drew the circle?

6    A.   Yes.

7    Q.   Okay.  Who is permitted to adjust the release

8    point for the bleeder?

9    A.   The BP supervisor and the operators.

10   Q.   If an adjustment is made, is that noted

11   anywhere?

12   A.   Yes.

13   Q.   Okay.  Where is the adjustment noted?

14   A.   It would be in the BP log book.

15   Q.   Thank you, you can take that down.

16        I'd like to pull up Government Exhibit 87 now

17   in evidence, your Honor, which is the by-products

18   operator log book for December 31st, 2008, to

19   May 9th of 2009.

20        Mr. Cahill, do you see that on your screen?

21   A.   Yes, I do.

22   Q.   I'd like to go to page 1 of this document.  If

23   we can just -- if we can just focus in on the text

24   area of this page.  Okay.

25        Do you see that on your screen?

1    A.   Yes, I do.

2    Q.   Okay.  This page, page 100, what entry -- what

3    date is this entry?

4    A.   3/3/09.

5    Q.   On March 3rd of 2009 there was an entry?

6    A.   Yes.

7    Q.   Now, on the bottom half of this page, is there

8    a shift in the left margin that is noted?

9    A.   Yes.  Four to midnights, 4 to 12s.

10   Q.   Is there an entry at the bottom of this page

11   for the four-to-midnight shift on March 3rd of 2009

12   relating to the bleeder?

13   A.   Yes, at the bottom.

14   Q.   Okay.  Can you read for the jury what it says?

15   A.   Sure.  "Raised bleeder to 100.  Looking good."

16   Q.   Okay.  And there is a number there, 605?

17   A.   Yes.

18   Q.   Do you know who wrote this?

19   A.   605 I believe was Mike Rathman.

20   Q.   How is Mike Rathman employed at the Tonawanda

21   Coke Corporation?

22   A.   Now?

23   Q.   Yes.

24   A.   He's not.  He passed away.

25   Q.   Okay.

1    A.   At that time he was at Tonawanda Coke.

2    Q.   At that time, what position was he in?

3    A.   BP operator.

4    Q.   All right.  Okay.  You testified yesterday that

5    every morning of the EPA inspection you raised the

6    set point on the bleeder.  You recall testifying

7    about that?

8    A.   Yes.

9    Q.   Okay.  I'd like to -- keeping with Government

10   Exhibit 87, that same log book, I'd like to show

11   you an entry for April 14th of 2009 on page 164.

12   If we could focus in on the -- can you please read

13   that, Mr. Cahill?

14   A.   Yes.  4/14/09.

15   Q.   Okay.  Take a moment and read that page,

16   please.  And when you're done with that page, look

17   up.  I want to go to the next page.

18   A.   Okay.

19   Q.   If we could go to the next page.

20   A.   Okay.

21   Q.   All right.  You've reviewed the pages for

22   April 14th, 2009?

23   A.   Yes.

24   Q.   Is there any notation for this day that you

25   changed the release set point for the bleeder?

1    A.   No.

2    Q.   Can you tell the jury why not?

3    A.   Because I didn't want anybody finding out that

4    I was making the adjustment.

5    Q.   Okay.  If we can go -- if you can continue

6    reading at the bottom of this page, April 15th of

7    2009, do you see that?

8    A.   Yes.

9    Q.   Okay.  Read that, and when you're ready we'll

10   go to the next page.

11   A.   Okay.

12   Q.   Okay.  Page 166, please.

13   A.   Okay.

14   Q.   And page 167.  The top portion relates to

15   April 15th.

16   A.   Okay.

17   Q.   All right.  For the pages relating to April 15,

18   is there any notation on any of these pages that

19   you made an adjustment to the release point for the

20   bleeder?

21   A.   No.

22   Q.   Why?

23   A.   Again, I didn't want anybody knowing.

24   Q.   Okay.  If you can keep reading on this page for

25   April 16th.

1    A.   Okay.

2    Q.   If we can go to page 168.  Could you read this

3    page, please?

4    A.   Okay.

5    Q.   All right.  For April 16th, you've now read the

6    entries.  Is there any entry by you that you raised

7    the bleeder set point?

8    A.   No.

9    Q.   Okay.  Tell the jury why.

10   A.   Again, I didn't want to get -- I didn't want

11   anybody to know.

12   Q.   Okay.  Now, I'm just going to ask you to review

13   the next page, 169, please.

14          THE COURT:  Is there a date that this

15   refers to?

16          THE WITNESS:  Pardon me?

17          THE COURT:  Is there a date that this

18   refers to?

19          THE WITNESS:  No.  I don't see a date.

20   BY MR. MANGO:

21   Q.   If we can -- if we go to the page before, do

22   you see a date on this page?

23   A.   Yes.  4/16/09.

24   Q.   If we go to the next page --

25   A.   This is still -- sorry.

1204

1    Q.   If we go to this page now, you don't see a date

2    here?

3    A.   No.

4    Q.   Okay.  If we can go to the next page, please,

5    171, you see a date there?

6    A.   Yes.

7    Q.   For what?

8    A.   4/18/09.

9    Q.   So if we can now go back to page 169.  What do

10   you believe this page -- the date of this page is?

11   A.   4/17/09.

12   Q.   Okay.  There's just no date on it?

13   A.   Yes.

14   Q.   All right.  So now if you can review 4/17/09.

15   A.   Okay.

16   Q.   All right.  I'd like to go now to page 172,

17   which is dated 4/20/09 at the bottom.  Do you see

18   that?

19   A.   Yes.

20   Q.   Review that, please.

21   A.   Okay.

22   Q.   Please let's go to 173, which is the next page

23   for 4/20 of '09.

24   A.   Okay.

25   Q.   If we can go to page 174, which relates to

1    4/21/09.

2    A.   Okay.

3    Q.   And the final page 175, please, which is the

4    end of 4/21/09.

5    A.   Okay.

6    Q.   Now I just had you review 4/17, 4/20 and

7    4/21 of 2009.

8    A.   Yes.

9    Q.   Did you see any notations on those pages that

10   you changed the release set point for the bleeder?

11   A.   No.

12   Q.   Tell the jury why.

13   A.   Again, because I didn't want anybody knowing.

14   Q.   Now, you testified that each morning of the EPA

15   inspection you raised the release point --

16   A.   Yes.

17   Q.   -- right?

18        What were you trying to prevent from happening?

19   A.   The valve from opening up.

20   Q.   And what from coming out?

21   A.   Coke oven gas.

22   Q.   And I believe you testified that it did blow

23   off, right?

24   A.   Yes.

25   Q.   Can you explain that, explain why?

1    A.   No, I can't.  I just -- I don't know.  I don't

2    know why it went off.

3              MR. MANGO:  Your Honor, may I have one

4    moment, please?

5              THE COURT:  Certainly.

6              MR. MANGO:  Thank you.  Thank you, your

7    Honor.  Nothing further.

8              THE COURT:  Okay, Mr. Mango, thank you.

9              MR. PERSONIUS:  Your Honor, this would be

10   another witness, with your permission, that I would

11   like to question first.

12             THE COURT:  Certainly.

13             MR. PERSONIUS:  Thank you, Judge.

14             THE COURT:  Okay. Mr. Personius.

15   CROSS-EXAMINATION BY MR. PERSONIUS:

16   Q.   Good morning, Mr. Cahill.

17   A.   Good morning.

18   Q.   Would you agree that whenever you consider

19   somebody's words, you should also take into

20   consideration their actions?

21             MR. MANGO:  Objection, your Honor.  I

22   don't know what context this is being made in.  It

23   seems somewhat ambiguous.

24             THE COURT:  I think it is.  Sustained.

25             MR. PERSONIUS:  Okay.

1      (Court reporter equipment malfunction.)

2            THE COURT:  Okay.  Do you recall where you

3      want to start, Mr. Personius?

4            MR. PERSONIUS:  Do you want me to go back

5      to the beginning or go from that last -- and then

6      you sustained the objection.

7            THE COURT:  Yes.

8            MR. PERSONIUS:  I can start from there, if

9      you'd like.

10            THE COURT:  Please.

11   BY MR. PERSONIUS:

12   Q.   It won't be exactly as before.

13   A.   Okay.

14   Q.   You've heard the expression "actions speak

15   louder than words?"

16   A.   Yes.

17   Q.   And that has a meaning to you?

18   A.   Yes.

19   Q.   And what that means is that when you're trying

20   to determine what a person's words mean, you also

21   have to take into consideration what their

22   surrounding actions are, correct?

23   A.   Yes.

24   Q.   All right.  Now, you have been in the

25   by-products -- or you were in the by-products

1    before becoming general foreman for about how long,

2    how many years?

3    A.  I wasn't a general foreman.  I was a

4    by-products foreman.

5    Q.  I'm sorry.

6    A.  Okay.

7    Q.  You're currently plant manager?

8    A.  Yes.

9    Q.  Before becoming plant manager you were in

10   by-products?

11   A.  Yes.

12   Q.  You were in by-products for how many years?

13   A.  Again, I want to say 13 years.

14   Q.  And about eight or so of those years you were

15   the operator?

16   A.  Yes.

17   Q.  And so, therefore, about five or so of those

18   years you were the foreman?

19   A.  Yes.

20   Q.  And as of April of 2009, you were the -- the

21   foreman?

22   A.  Yes.

23   Q.  All right.  And your responsibilities, when you

24   went from being an operator to becoming the

25   foreman, increased?

```
 1    A.   Yes, it did.

 2    Q.   Is that true?

 3         And I -- without getting into the details, I

 4    assume that by -- by becoming a foreman, the amount

 5    that you got paid increased too?

 6    A.   Yes, it did.

 7    Q.   And as of April of 2009, would there have been

 8    anybody at Tonawanda Coke who would have known more

 9    about the operation of the by-products unit than

10    you?

11    A.   No.

12    Q.   You'd been there -- by that time you'd been

13    there 13 straight years?

14    A.   Yes.

15    Q.   And the pressure relief valve is located in the

16    by-products area?

17    A.   Yes, it is.

18    Q.   Now, since you became the plant manager, one of

19    your responsibilities is to sign certain forms?

20    A.   Yes.

21    Q.   Okay.  And some of those forms that you sign

22    are completed by Mr. Kamholz?

23    A.   Yes, they are.

24    Q.   Okay.  And since April of 2009 you continued to

25    work continuously at Tonawanda Coke, correct?
```

1   A.   Yes.

2   Q.   And so has Mr. Kamholz --

3   A.   Yes.

4   Q.   -- is that true?

5   A.   Yes.

6   Q.   Okay.   And since April of 2009 Mr. Kamholz has

7   been arrested?

8   A.   Yes.

9   Q.   All right.   That was in December of 2009?

10  A.   Yes, sir.

11  Q.   I'm sure you remember that.

12  A.   Yes.

13  Q.   And then he was indicted, which is why he's on

14  trial now in July of 2010.

15       Do you recall that?

16  A.   Yeah, 2010.   Yes.   What month -- yes.

17  Q.   Fair enough.

18  A.   Yes, sir.

19  Q.   But in any event, you two have continued to

20  work together?

21  A.   Yes.

22  Q.   And since you became plant foreman, your

23  occasions to have contact with him are greater now

24  than when you were still in by-products?

25  A.   Yes, they are.   Yes.

1211

1   Q.  And has Mr. Kamholz -- well, before the

2   inspection in April of 2009, could you describe

3   your relationship with Mr. Kamholz?

4   A.  Good.  It was -- we were -- it was fine.  We

5   had a good relationship.

6   Q.  Okay.  And did you have any reason at all to

7   doubt or question Mr. Kamholz in terms of his bona

8   fides?

9   A.  No, none.

10  Q.  And since April of 2009, what has your

11  relationship been with Mr. Kamholz?

12  A.  The same.

13  Q.  It hasn't changed at all, has it?

14  A.  No.

15  Q.  And he still treats you the same now as he did

16  before April of 2009, is that correct?

17  A.  That's true, yeah.

18  Q.  Okay.  And you're called upon in your current

19  position, as I mentioned before, from time to time

20  to sign forms that are presented to you by him?

21  A.  Yes.

22  Q.  And do you have any reservations about signing

23  those forms in terms of the accuracy or reliability

24  of the information?

25  A.  No, I don't.

1    Q.   You don't hesitate to sign those forms?

2    A.   No, I don't.

3    Q.   Even though Mark Kamholz is the one preparing

4    those forms for you to sign?

5    A.   Yes.

6    Q.   Okay.  Now, as part of -- so that we can

7    understand that, as part of this investigation,

8    when was the first time that you were contacted by

9    what I would call law enforcement?  Do you

10   remember?

11   A.   I don't know.  I really don't.

12   Q.   You remember that there was a search that was

13   executed at the plant in December of 2009?

14   A.   Yes.

15   Q.   And that meant that a number of agents came to

16   the plant?

17   A.   Yes.

18   Q.   Do you remember how many agents came?

19   A.   No.

20   Q.   Okay.  A lot?

21   A.   I don't know.

22   Q.   All right.  And did any of the agents talk to

23   you on that date?

24   A.   No.

25   Q.   Did the agents take records from the plant?

1213

1    A.   To my knowledge, yes.

2    Q.   All right.  And was it sometime after that that

3    you were contacted by the agents?

4    A.   No.

5    Q.   You don't -- do you remember when you were

6    first contacted?

7    A.   No, I don't.

8    Q.   If you don't remember when it was, can you tell

9    us how that first contact occurred?

10   A.   I think it was by the district attorney here.

11   Q.   Mr. Mango?

12   A.   Yeah.

13   Q.   That's who you're pointing to?

14   A.   Yes.

15   Q.   All right.  And he didn't come out to the

16   plant, did he?

17   A.   No.

18   Q.   How is it that it was drawn to your attention

19   that Mr. Mango wanted to talk to you?

20   A.   Sent me a letter, my lawyer.

21   Q.   Okay.  Did you go in and talk with Mr. Mango?

22   A.   Yes.

23   Q.   And there were other people there, not just

24   him --

25   A.   Yes.

1   Q.   -- right, when you spoke to him?

2   A.   Yes.

3   Q.   And that led to you testifying in front of the

4   grand jury?

5   A.   Yes.

6   Q.   And that testimony that you provided to the

7   grand jury, if I'm recalling it correctly, was in

8   April of 2010, is that right?

9   A.   Yes.

10  Q.   And when you go into the grand jury, that's a

11  room that has a number of individuals in it who

12  have been selected to serve on the grand jury?

13  A.   Yes.

14  Q.   And it could be somewhere between 16 and 23

15  people that were in that room to listen to you

16  testify?

17  A.   Yes, that is true.

18  Q.   And when you went into the grand jury room,

19  Mr. Mango was present with you?

20  A.   Yes, he was.

21  Q.   And there was a person, such as Michelle, who

22  was there who was taking down with one of those

23  machines everything that was said in the grand

24  jury?

25  A.   Yeah.

1   Q.   And you were sworn in before you provided

2   answers to Mr. Mango's questions, just like you

3   were here today?

4   A.   Yes.

5   Q.   So the information you gave in the grand jury

6   was under oath?

7   A.   Yes, it was.

8   Q.   And then Mr. Mango proceeded to ask you a

9   series of questions, some of which were on the same

10   topics that you testified about here yesterday and

11   this morning, correct?

12   A.   Yes.

13   Q.   Can -- was there anybody else in the room other

14   than the grand jurors, Mr. Mango, and the court

15   reporter, that you recall?

16   A.   Judge or -- no.

17   Q.   You don't recall anybody else being there?   In

18   other words, there was nobody -- there was nobody

19   there representing either the company or

20   Mr. Kamholz, right?

21   A.   No.

22   Q.   And you weren't questioned by anybody other

23   than Mr. Mango, correct?

24   A.   Correct.

25   Q.   All right.   Now, as a result of that appearance

1    by you, you're aware that a transcript was created

2    of your testimony?

3    A.   Yes.

4    Q.   Okay.  And in preparing to testify here in this

5    trial, you've had a chance to review that

6    transcript?

7    A.   Yes, I did.

8    Q.   And you've had a chance to -- to make comment

9    on anything in that transcript that you felt was

10   not accurate?

11   A.   Yes.

12   Q.   Okay.  And you've provided some comments on

13   entries that were in that transcript that you

14   didn't feel were accurate --

15   A.   Yes, I did.

16   Q.   -- right?

17        And those changes were made to the transcript?

18   A.   Yes.

19   Q.   Okay.  And after the changes were made, did you

20   then get a chance to review this revised

21   transcript?

22   A.   Yes.

23   Q.   Okay.  And are you satisfied then that the

24   contents of that revised transcript of your grand

25   jury testimony from April of 2010, that that

1    transcript is accurate?

2    A.   Yes.  To my knowledge, yes.

3    Q.   Okay.  Because you went through this whole

4    process of reviewing it, suggesting changes, the

5    changes were made, and you reviewed it again, true?

6    A.   Yes.

7    Q.   Now, you also mentioned in your testimony

8    yesterday that this pressure relief device, or as

9    it's called the bleeder --

10   A.   Yes.

11   Q.   We can call it either way, right?  It's the

12   same thing?

13   A.   Yes.

14   Q.   -- that that was deactivated or shut down in

15   March of 2010?

16   A.   Yes.

17   Q.   All right.  And are you aware that the plan to

18   shut down that device had been -- been in

19   existence -- there had been a plan to shut it down

20   for some period of time prior to that?

21   A.   That's what I've heard, yes.

22   Q.   That's what you've heard.  Who have you heard

23   that from?

24   A.   Guys in the plant say that they were going to

25   shut it down and build a new one, make a new one.

1218

1   Q.   Okay.  Do you -- do you have a recollection of

2   when you first heard that there were plans in place

3   to shut down the PRV?

4          MR. MANGO:  Objection, your Honor.

5          THE COURT:  Grounds?

6          MR. MANGO:  This seems to be based on

7   hearsay.  He's saying he heard this from other

8   people in the plant.

9          THE COURT:  It's okay.  Overruled.

10          THE WITNESS:  Could you repeat --

11  BY MR. PERSONIUS:

12  Q.   Of course.  Don't be bashful --

13  A.   No.

14  Q.   -- about asking for that.

15      Do you remember when it was that you first

16  heard that there were plans to shut down or

17  deactivate the pressure relief valve?

18  A.   No, no.

19  Q.   Do you remember if you heard that before this

20  inspection in April of '09?

21          MR. MANGO:  Objection, your Honor.  That's

22  asked and answered.  He doesn't remember.

23          THE COURT:  I'll let him answer.

24  Overruled.

25          THE WITNESS:  No.

1219

1    BY MR. PERSONIUS:

2    Q.   You don't remember when it was?

3    A.   No.

4    Q.   All right.  Now, I saw in your grand jury

5    testimony, and you can correct me if I'm wrong,

6    that you were asked if -- if you had spoken to

7    Mr. Kamholz at any time prior to April of 2009

8    about the pressure relief valve in the by-products

9    area.

10        Do you remember being asked that in the grand

11   jury?

12   A.   I think so.

13   Q.   If you don't remember, just say "I don't

14   remember."

15   A.   Okay.  Sorry.

16   Q.   Let me ask you the question.  If we have to, we

17   can go to the transcript.

18        Had you ever spoken to Mr. Kamholz about the

19   pressure relief valve in the by-products area prior

20   to April of 2009, the conversation you've testified

21   about here yesterday?

22             THE COURT:  Do you understand that

23   question?

24             THE WITNESS:  No, I don't.

25             MR. PERSONIUS:  You didn't understand it

1    either?

2              MR. PERSONIUS:  Before April -- I'll start

3    again.

4              THE COURT:  No.

5              MR. PERSONIUS:  It's a good idea, right,

6    Judge?

7              THE COURT:  It was.  Thank you.

8    BY MR. PERSONIUS:

9    Q.  Before April of 2009, had you ever spoken to

10   Mark Kamholz about the pressure relief valve?

11   A.  No.

12   Q.  Not about anything?

13   A.  No.

14   Q.  And is it your testimony that Mr. Kamholz had

15   never mentioned to you that some steps should be

16   taken to control the releases of the pressure

17   relief valve?

18   A.  No.

19   Q.  And when you say "no" are you saying it didn't

20   happen, or are you saying you don't remember that

21   that happened?

22             MR. MANGO:  Objection, your Honor.  He

23   answered the question.

24             THE COURT:  But it -- I guess the backdrop

25   of the question, it was confusing, so try to clear

1   it up a little bit, please.

2   BY MR. PERSONIUS:

3   Q.   When you say you never had any prior

4   conversations, were you certain that you never had

5   any prior conversations?

6   A.   No, I'm not certain.

7   Q.   Okay.  And the conversation that you testified

8   about that you had with Mr. Kamholz in the

9   by-products area, the first one in April of 2009,

10  you told us yesterday that that happened on -- on a

11  Friday.

12       Do you remember that?

13  A.   Yes.

14  Q.   Okay.  Now, you also testified that you thought

15  the inspection started the following Monday.

16  A.   Yes, I did.

17  Q.   All right.  Now, do you remember when you

18  testified in the grand jury that you could not

19  specifically recall when you had the conversation

20  with Mr. Kamholz?

21  A.   I thought I said it was that Friday.

22  Q.   You thought you said it was that Friday?

23  A.   Yes.

24  Q.   This is for identification.  Would you please

25  put on the screen Government Exhibit 3505.08.

1      Mr. Cahill, what should be on your screen is

2   the first page of a document marked 3505.08.  Do

3   you see that?

4   A.  Yes, I do.

5   Q.  And do you recognize that to be the first page

6   of your grand jury transcript?

7   A.  Yes.

8   Q.  And it's dated April 22nd, 2010?

9   A.  Yes, it is.

10  Q.  All right.  Could we please go to page 13.  All

11  right.

12      And if you go to line 5, do you remember you

13  were asked, "Okay.  Couple days, maybe a week ahead

14  of time?"  And your answer was, "Yes, right,

15  because I do believe they came in on a Monday."

16  Then the question was, "Okay.  So maybe a couple

17  days to a week ahead of time?"  And your answer was

18  "Yes."

19      Is that -- is that true?

20  A.  Yes.

21  Q.  That's what you testified to back in April

22  of 2010?

23  A.  Yes.

24  Q.  That would have been three years ago, right?

25  A.  Yes.

1    Q.   Because it's now March of 2013.

2    A.   Yes.

3    Q.   And what has caused you to remember now that

4    the conversation that you had with Mr. Kamholz in

5    by-products was on a Friday?

6    A.   I don't know.  I don't know what caused me to

7    remember it was a Friday.

8    Q.   And as you sit here now, is it your testimony

9    that it was a Friday as opposed to being earlier

10   that week?

11   A.   Well, I still think it was a Friday.

12   Q.   Okay.  All right.  And you told us yesterday

13   about the -- the conversation as it related to the

14   pressure relief valve and some things that are

15   called drip legs.

16        Do you remember that?

17   A.   Yes.

18   Q.   And it's true, is it not, that that was not the

19   entirety of the discussion that you had with

20   Mr. Kamholz?  There was more to the conversation,

21   correct?

22   A.   That day, yes.

23   Q.   Right.  You were -- you were in the by-products

24   area with Mr. Kamholz, and as you've told us, there

25   was some brief discussion about the pressure relief

1  valve, correct?

2  A.  Yes.

3  Q.  And there was a brief conversation about the

4  drip legs, right?

5  A.  Yes.

6  Q.  Now, in addition to that, do you remember that

7  you talked to Mr. Kamholz about the exhauster and

8  that a different exhauster was being used?  Do you

9  recall that?

10  A.  No, I don't.

11  Q.  Do you remember that Mr. Kamholz was pointing

12  out to you some concerns that he had about the

13  condition of the by-products area?

14  A.  Yes.  Well, that was part of our walk-through.

15  Q.  That's right.

16  A.  Yes.

17  Q.  And he would point out things to you in the

18  by-products area -- not that he would, but that he

19  did.  He pointed out to you parts of the by-product

20  area that he thought should be cleaned up for the

21  inspection, is that true?

22  A.  Yes.

23  Q.  And do you remember some of the -- some of the

24  areas that he pointed to and said Pat -- or words

25  to this affect, Pat, you got to clean this up?

1        Do you remember what he referred to?

2    A.   Yes.  I think it was over by the LGAs.

3    Q.   And the LGAs are, again, what, please?

4    A.   The three big tanks on that diagram if you want

5    to --

6    Q.   All right.  LGAs, though -- this is more for --

7    are they for ammonia?

8    A.   Yes, for ammonia.

9    Q.   Is it ammonia?

10   A.   Yeah.

11   Q.   Okay.  And do you remember if he referred to

12   the condition of what's called the moat?

13   A.   Yes.  I would say that was the tar moat, yes.

14   Q.   Okay.  And it had -- I don't know what to call

15   it.  What did the moat have in it that shouldn't

16   have been there?

17   A.   A lot of pallets, buckets, rags.

18   Q.   Okay.  And did he point to that too and say you

19   should clean up the moat?

20   A.   Yes.

21   Q.   Okay.  And did -- there is a building called

22   the AC building?

23   A.   Yes.

24   Q.   Again, what's the AC building?

25   A.   That's where the still was to strip the

1226

1    ammonia.

2    Q.   Did you walk through the AC building?

3    A.   Yes, we did.

4    Q.   Did he comment about the condition of the AC

5    building, too?

6    A.   Yes, he did.

7    Q.   And told you you got to clean this up --

8    A.   Yeah.

9    Q.   -- right?

10   A.   Yes.

11   Q.   And can you remember any other parts of the --

12   the BP area that you talked about with Mr. Kamholz?

13   A.   Back behind the BP area too, there were a lot

14   of tar pumps, a lot of pumps just laying around.

15   He said you got to clean that up.  We did.  That's

16   why I know it was a Friday, because we worked the

17   weekend to get everything ready for Monday morning.

18   Q.   Now, you've told us that you had this -- this

19   conversation about the pressure relief valve with

20   Mr. Kamholz while you were in the BP area.

21   A.   Yes.

22   Q.   And not that it's important, but if you can it

23   would help us.

24        Do you remember specifically where you were

25   when the subject of the pressure relief valve came

1    up?

2    A.   On Broadway right across from the green shack.

3    Q.   So if you're across from the green shack, are

4    you then also near where that pressure relief valve

5    is?

6    A.   Yes.

7    Q.   Okay.  And in that area where you were standing

8    when you had that PRV discussion with Mr. Kamholz,

9    is that a noisy area?

10   A.   Not really, no.

11   Q.   It's not noisy?

12   A.   No.

13   Q.   You don't have noise coming from steam vents?

14   A.   No, sir.

15   Q.   Okay.  So your testimony is that you don't find

16   the BP area to be noisy?

17           MR. MANGO:  Objection, your Honor.  He

18   didn't say that.

19           MR. PERSONIUS:  I can restate it, Judge.

20           THE COURT:  Please.

21   BY MR. PERSONIUS:

22   Q.   The area you were standing on on Broadway,

23   across from this valve and where the green shack

24   is, it's your testimony that that's not a noisy

25   area?

1   A.   Yes.

2   Q.   And you don't hear steam coming from the vents

3   in that area?

4   A.   No.

5   Q.   Okay.  And that's where you had the

6   conversation about the PRV with Mark?

7   A.   Yes.

8   Q.   Okay.  And your testimony, if I understood it

9   correctly yesterday, is that what Mr. Kamholz said

10  was, "We can't have that going off when they're

11  here."  Did I get that right?

12  A.   Yes, you did.

13  Q.   Okay.  And that's what you testified to

14  yesterday, right?

15  A.   Yeah.

16  Q.   All right.  Now, I don't know if you noticed

17  this when you reviewed your grand jury testimony,

18  but do you realize that during your grand jury

19  testimony you had that -- that statement by

20  Mr. Kamholz three -- three other different ways.

21  This is only one of the four ways you testified to

22  it in the grand jury.

23       Would you like to go through those?  I would,

24  so why don't we.  That was not the right question.

25       This is, again, just -- just for

1    identification, but we're -- if we could back up

2    the transcript again, which is Government Exhibit

3    3505.08.  And if we could please go to page 14.

4         And I want to draw your attention, Mr. Cahill,

5    to line 8.  And do you see in quotes, "We can't

6    have that going off when they're here," unquote.

7         Do you see that?

8    A.   Yes, I do.

9    Q.   That's how you have indicated you testified

10   yesterday.  That's what you recall Mr. Kamholz

11   saying, right?

12   A.   Yes.

13   Q.   If you go down to line 20 -- and this is again

14   in quotes -- this is Mr. Mango indicating, and Mark

15   Kamholz said, quote, "We can't let that happen when

16   the inspectors are here," unquote.

17        Do you see that?

18   A.   Yes, I do.

19   Q.   And you agree with that, that that's what was

20   said?

21   A.   Yes, I do.

22   Q.   And let's go to -- in this exhibit, please, to

23   page 22.  And if you can, go down to line 24.  This

24   is you testifying:  "Yes.  Yes.  And he said,

25   quote, We can't have that going off, unquote,

1   period."

2        Do you see that?

3   A.   Yes, I do.

4   Q.   Nothing about inspectors, nothing about when

5   they're here, and part of your same grand jury

6   testimony, true?

7   A.   Yes.

8   Q.   Okay.  And then let's go to page 20.  And

9   please go to line 10.  And you were asked a

10  question by Mr. Mango:  "So, that inspection

11  happened, and he told you dial it up before they

12  come in and at the end of the day, you dial it

13  down."  And your answer was:  "Yes."

14       Do you see that?

15  A.   Yes, I do.

16  Q.   Okay.  Mr. Kamholz never said that, did he?

17  A.   No.

18  Q.   And you, nonetheless, agreed with Mr. Mango

19  when that's how he stated what Mr. Kamholz had said

20  to you in the grand jury, right?

21  A.   Yes, I did.

22  Q.   Okay.  So, you agree that in the grand jury

23  four different ways that you described what

24  Mr. Kamholz told you?

25            MR. MANGO:  Your Honor, objection.  At

1231

1    least two of those ways I described it.  So he may

2    have acknowledged that, I just --

3                MR. PERSONIUS:  I can restate it, Judge.

4                THE COURT:  No, the jury's heard

5    everything.  I think we are clear.

6         Move on, please.

7                MR. PERSONIUS:  Thank you, Judge.

8                THE COURT:  Objection overruled.

9    BY MR. PERSONIUS:

10   Q.  You agree?

11   A.  Yeah.

12   Q.  Okay.  Thank you.

13        And you also testified yesterday about a

14   conversation involving the drip legs.

15   A.  Yes, I did.

16   Q.  And you mentioned to us that these are -- we

17   saw picture of these earlier, but it's a device

18   that drops down in a vertical way, and it's a way

19   to get moisture out of the gas line, and apparently

20   there is a valve at the bottom you can open to

21   drain off the liquid.

22        But then what you should do is close it?

23   A.  Yes.

24   Q.  If you keep it open, there's at least some

25   amount of coke oven gas that could escape?

1   A.   Yeah.

2   Q.   Okay.  Now, you testified yesterday, and you

3   tell me if I have this wrong, but the way I got it

4   in my notes is that what you recall Mr. Kamholz

5   saying is, "We can't have those valves open while

6   they're here," unquote.

7       And that's what your current recall is, is that

8   fair?

9   A.   Yes.

10  Q.   Okay.  Now, with the same exhibit for

11  identification, Government Exhibit 3505.08, which

12  is your transcript, could we please go to page 14.

13      All right.  Now, on -- on page 14, line 8, your

14  testimony in quotes was, "We can't have that going

15  off when they're here," unquote.

16      Do you see that?

17  A.   Yes, I do.

18  Q.   And we both agree that's the substance or

19  that's really what you testified to yesterday,

20  right?

21          MR. MANGO:   Your Honor, this relates to

22  the pressure release valve.

23          MR. PERSONIUS:   Okay.  I apologize.

24  That's my error.

25          MR. MANGO:   Just to clarify where we are.

1      THE COURT:  No, sustained.

2      MR. PERSONIUS:  It is a complete mistake

3   on my part.

4      THE COURT:  We'll strike the question.

5   BY MR. PERSONIUS:

6   Q.  Okay.  I'm not -- I made a mistake.

7      If you go to line 12 on page 14, your testimony

8   in the grand jury at that point about the drip legs

9   was, quote, "We can't have gas coming out of them

10  either," unquote.

11     Right?

12  A.  Yes.

13  Q.  And that's different than what you just agreed

14  you testified to yesterday.  You agree to that?

15  A.  Yes.

16  Q.  It's different?

17  A.  Yes.

18  Q.  And it's -- what's -- and in the transcript

19  it's in quotes, right?  It's got quotations marks

20  around it?

21  A.  Yes.

22  Q.  And could we go to page 26, please.

23     And down on line 24, what you testified to

24  again in quotes about the drip legs is, quote, "We

25  can't have these valves open either," unquote.

1    Do you see that?

2    A.   Yes.

3    Q.   All right.  So, with the testimony you gave us

4    yesterday, and these two other quoted references in

5    the grand jury transcript, you've put that second

6    conversation three different questions, agreed?

7    A.   Yes.

8    Q.   Okay.  And with both the -- the PRV

9    conversation, if I can call it that, and with the

10   drip leg conversation, one of the versions that

11   you've given us does not make reference to the

12   inspection, correct?  Do you understand my

13   question?

14   A.   Yes.  Yes.

15   Q.   Do you understand what I'm saying?

16   A.   Yes.

17   Q.   All right.  So as you sit here now, can you

18   tell the jury or jurors with certainty that as to

19   either subject, the PRV or the drip legs, that

20   Mr. Kamholz made reference to the inspectors or the

21   inspection?

22   A.   Yes.  I would say the PRV, yes.

23   Q.   You would say that?

24   A.   Yes.

25   Q.   When you say you would say that --

1    A.   Yes.

2    Q.   -- are you saying that with confidence?

3              MR. MANGO:  Objection.  That was his

4    answer.

5              THE COURT:  He's bound by the witness, but

6    he can, in this instance, I think pursue it.

7         Go ahead.  Overruled.

8    BY MR. PERSONIUS:

9    Q.   Your language was "I would say that?"

10   A.   Yes.

11   Q.   Okay.  And you have confidence that

12   Mr. Kamholz, when he talked about the PRV, referred

13   in some fashion to the inspection?

14   A.   Yes.

15   Q.   Even though you've got these other versions

16   sworn to in your grand jury testimony?

17   A.   Yes.

18   Q.   And, again, can we agree that this is an

19   example of why you don't want to just focus on what

20   you recall the words were, but we need to explore

21   also what Mr. Kamholz's actions were?

22             MR. MANGO:  Objection, your Honor.

23             THE COURT:  Sustained.

24   BY MR. PERSONIUS:

25   Q.   You have provided testimony, Mr. Cahill, as to

1   steps you took after you had this conversation with

2   Mr. Kamholz, right?

3   A.   Yeah.

4   Q.   You've told us about how you would go in in the

5   morning and you'd raise the pressure up for the

6   pressure relief valve, right?

7   A.   Yeah.

8   Q.   And you'd go back at night and you -- you'd

9   drop it back down, right?

10  A.   Yes.

11  Q.   And we can agree, can we not, that Mr. Kamholz

12  never told you to do that, did he?

13  A.   No, he didn't.

14  Q.   And did Mr. Kamholz -- to your knowledge, did

15  Mr. Kamholz know that you did that?  Let me put

16  that a different way.

17          MR. MANGO:  Whoa, whoa, whoa.  Your Honor,

18  I object.  Let him answer the question.

19          THE COURT:  He can -- well, you want to

20  withdraw the question?

21          MR. MANGO:  He was working on an answer,

22  your Honor.

23          THE COURT:  Do you remember the question?

24          THE WITNESS:  No, I don't.

25          MR. PERSONIUS:  Let me just ask it again,

1      Judge.

2                  THE COURT:  All right.  Let's take our

3      time here.  Okay.  Ask the question.

4      BY MR. PERSONIUS:

5      Q.  Did you ever tell Mark Kamholz, either before

6      or during or after, that you were going to raise

7      the pressure up in the morning and drop it down at

8      night?

9      A.  No.

10     Q.  You never told him, did you?

11     A.  No.

12     Q.  And do you otherwise know if Mr. Kamholz knew

13     what you were doing?

14     A.  No.

15     Q.  All right.  Now, you spent some time this

16     morning with Mr. Mango talking about the -- the

17     by-products log?

18     A.  Yes.

19     Q.  He selected one page from the log and said --

20     back in March of '09, and said, "Do you see there's

21     a mention here of changing the pressure on the

22     valve?"

23     A.  Yes.

24     Q.  And then he walked you through all the days of

25     the inspection in April of '09 and said, "Do you

1    see any changes here regarding the pressure?"  And

2    you said, "No."

3    A.   Right.

4    Q.   Is that right?

5    A.   Yes.

6    Q.   Now, have you taken any time at all to look at

7    this log to see how many references in this entire

8    exhibit there are to changes in the pressure?

9    A.   The whole log book, no.

10   Q.   Have you ever had a chance to look at it as

11   part of preparing for your testimony?

12   A.   The pages we went through, yes.

13   Q.   Just those pages.  But the rest of this log,

14   they didn't have you go through that, did they, as

15   part of your preparation?

16   A.   No.

17            MR. PERSONIUS:  Just a minute, please,

18   Judge.

19   BY MR. PERSONIUS:

20   Q.   Government Exhibit 87 starts on December 31

21   of -- okay.  We have got it up on the screen.  This

22   is in evidence, too.  Thank you, Lauren.

23        Would you go please to page 3.  I'm sorry.  It

24   is.  On page 3, the starting date for this log is

25   December 31 of 2008, is that true?

1239

1    A.   Yes.

2    Q.   And, Lauren, would you please go to page 194.

3         The ending date is May 9 of 2009?

4    A.   Yes, it is.

5    Q.   Right.  So it covers about four months --

6    A.   Yes.

7    Q.   -- or so?

8         And the one date that Mr. Mango showed to you

9    was March 3 of 2009, is that correct?  Do you

10   remember that?

11   A.   Yes.

12   Q.   Okay.  I don't want you to spend hours doing

13   this, but with the Court's permission I would like

14   you to just take a quick look through this entire

15   exhibit and let us know if you can find one more

16   reference to a change in the pressure for that

17   recorder than the one Mr. Mango showed you.  One

18   other one.

19            MR. PERSONIUS:  May I have him do that,

20   Judge?

21            THE COURT:  Not at this time.  We can do

22   it over the break and we can question after.

23            MR. PERSONIUS:  Okay.  Very good, Judge.

24   Thank you, Judge.

25   BY MR. PERSONIUS:

1240

1    Q.  Do you agree, Mr. Cahill, that while it might

2    have been the desired practice to put changes in

3    the pressure for that PRV recorder in the -- in the

4    by-products log book, that that didn't happen on a

5    regular basis?

6    A.  No, it didn't happen on a regular basis.

7    Q.  It was rare that entries were made in this log

8    book, wasn't it?

9    A.  No.  Whenever the operators would make an

10   adjustment, they would definitely put it in the log

11   book.

12   Q.  They would?

13   A.  Yes.

14   Q.  So that if you go through this book, and you

15   find, as I've represented to you, that the only

16   reference to a change was this one on March 9th

17   of 2009, that would be an indication -- other than

18   when you say you changed it in April of 2009, that

19   would be an indication that pressure never changed?

20   A.  In my testimony I thought I said once you set

21   it, that's it.

22   Q.  Right.  But you're saying most of the time it

23   gets changed, the majority of times that pressure

24   got changed, it should be in the log book and will

25   be.

1    A.   Yeah.

2    Q.   All right.  Now, you've referred to the little

3    green shack which is where this recording device

4    is.

5    A.   Yes, it is.

6    Q.   You've shown us on a diagram where that is,

7    right?

8    A.   Yes.

9    Q.   The by-products log books, where are they kept?

10   A.   In the by-products office, the BP office.

11   Q.   Okay.  And you make the change to the pressure

12   at the green shack?

13   A.   Yes.

14   Q.   And so whoever makes the change to the recorder

15   is then expected to go from the green shack to the

16   by-products office to record the entry in this log

17   book --

18   A.   Yes.

19   Q.   -- right?

20        That would be the procedure?

21   A.   Yeah, it would.

22   Q.   And how far is the -- the by-products office

23   from there, from the green shack?

24   A.   Seventy-five feet.  It's not far at all.

25   Q.   But they're not next to each other?

1242

1    A.   No.

2    Q.   All right.   Now, the fact that you didn't put

3    entries in the by-products log book for this week

4    or so of the inspections that you testified about,

5    Mr. Kamholz didn't tell you to not make those

6    entries, did he?

7    A.   No, sir.

8    Q.   And did you ever tell Mr. Kamholz that you had

9    made those entries in the by-products log book?

10   A.   No, sir.

11   Q.   And as far as you know, Mr. Kamholz had no idea

12   that you had done that, correct?   Is that fair?

13   A.   Yes, sir.

14            THE COURT:   What was your question, that

15   he had or had not made entrees in the products

16   [sic] log book?

17            MR. PERSONIUS:   I should have said had

18   not.   Did I mix it up?

19            THE COURT:   I think you did.

20            MR. PERSONIUS:   I'll ask it again, and

21   thank you for correcting me.

22   BY MR. PERSONIUS:

23   Q.   Mr. Kamholz, to your knowledge, would not have

24   known that you failed to make entries for that week

25   of the inspection in April of '09 in this log book,

1    true?

2    A.   True.

3    Q.   Thank you.

4         Thank you, Judge.

5         Now, in fact, other than the conversation that

6    you've told us about that you had with Mr. Kamholz

7    in the by-products area -- and you recall it being

8    on a Friday?

9    A.   Yes.

10   Q.   -- regarding the PRV releasing, did you ever

11   after that have a conversation with Mr. Kamholz

12   about that?

13   A.   About it releasing?  No.

14   Q.   Did Mr. Kamholz ever come back to you after

15   that conversation and say, "Pat, have you made sure

16   that that valve is not going to go off?"

17             MR. MANGO:  Objection, your Honor.  He

18   said he didn't have a conversation afterwards.  Now

19   we're -- Mr. Personius is, in essence, testifying

20   and assuming facts not in evidence.

21             THE COURT:  Okay.  Anything else?

22             MR. MANGO:  No, your Honor.

23             THE COURT:  All right.  I'll permit the

24   question.  Overruled.

25   BY MR. PERSONIUS:

1244

1    Q.   You probably need it again?

2    A.   Yes, please.

3    Q.   Okay.  Understandable.  And I'll try to make

4    this quick.  But let me ask it this way.

5         Between the time of the -- what you say was the

6    Friday conversation with Mr. Kamholz, and the start

7    of the inspection, Mr. Kamholz didn't come to you

8    to make sure you had done something about the

9    pressure relief valve, true?

10   A.   True.

11   Q.   And during the entire period of the inspection,

12   Mr. Kamholz never came to you to say, "Now you've

13   taken care of this, Pat," right?

14   A.   True.

15   Q.   And you told us that during the inspection that

16   the PRV actually went off, right?

17   A.   Yes, it did.

18   Q.   And after that happened, you agree, Mr. Kamholz

19   never came to you and said, "Pat, what did you do?"

20   Is that true?

21   A.   Yes.

22   Q.   And after that, up to the present, Mr. Kamholz

23   has never discussed with you anything further about

24   that pressure relief valve, true?

25   A.   True.

1    Q.   I now want to talk about what happened in the

2    by-products area during the inspection.

3    A.   Okay.

4    Q.   And I think your testimony is that your best

5    recollection is that this incident where the valve

6    goes off when the inspectors are there, that that

7    happened, it would be, I guess, the next Friday?

8    A.   Yes.

9    Q.   It was a week later?

10   A.   Right.  Yes.

11   Q.   All right.  Do you remember where you were with

12   these inspectors and Mr. Kamholz within by-products

13   when that pressure relief valve went off?

14   A.   Yes.

15   Q.   Okay.  Could you tell the jury, please?

16   A.   Yes.  We were over by the green shack, the

17   green building.

18   Q.   And in relation to the pressure relief valve,

19   if you're in the area of the green building, am I

20   correct that that pressure relief valve would be up

21   to your left?

22   A.   Yes, sir.

23   Q.   Is that correct?

24   A.   If you're looking at the green shack, yes.

25   Q.   Right.  That's where this group was?

1    A.   Yes.

2    Q.   Okay.   And you were present?

3    A.   Yes, sir.

4    Q.   Okay.   What was your -- what was your reason,

5    if you recall, for being there?

6    A.   Walking around with the inspectors as

7    supervisor of the by-products.

8    Q.   The reason you were there was because this was

9    your unit?

10   A.   Yeah.

11   Q.   If questions came up about the by-products

12   area, it was expected you would answer those

13   questions, right?

14   A.   Yes, sir.

15   Q.   Right?

16   A.   Yes.

17   Q.   Because it's your area, right?

18   A.   Yes.

19   Q.   And indeed, during the course of that

20   inspection, there were a number of instances when

21   you were asked questions about by-products because

22   you were the supervisor, right?

23   A.   Yes, sir.

24   Q.   The ones that I want to -- do you remember what

25   some of the questions were that you were asked

1    during the course of that inspection?

2    A.   I want to say maybe the water in the tar moat,

3    when you pump it out, where does it go.  A couple

4    other different ones.

5    Q.   About water flow through the BH liquor, do you

6    remember being asked about that?

7    A.   No.

8    Q.   That doesn't ring a bell?

9    A.   No.

10   Q.   The tar precipitator sump, do you remember

11   being asked about that?

12   A.   Yes.

13   Q.   And the drip legs, you were asked about those?

14   A.   Yeah.

15   Q.   You identified where they were and how many

16   there were and how they worked, right?

17   A.   Yes, sir.

18   Q.   Okay.  And the light oil system, how that

19   operated, you were asked questions about that?

20   A.   Yes, sir.

21   Q.   Okay.  And the reason for all of this is

22   because this is the by-products area, right?

23   A.   Yeah.

24   Q.   Okay.  And by the way -- one other question

25   about those drip legs.  What Mr. Kamholz had told

1   you was that those drip legs should be closed,

2   right?

3   A.   Yes.

4   Q.   And those drip legs should be closed, right?

5   A.   Yes.

6   Q.   That's the correct thing to do with them,

7   right?

8   A.   Yes.

9   Q.   Okay.  Now, as far as the conversation, the way

10  you've recounted it to us is the way you recounted

11  it in your grand jury testimony.  And I want to go

12  through that with you, if I can, step by step.

13       The pressure valve -- pressure relief valve

14  releases -- and Mr. Kamholz made a remark that was

15  only steam, is that right?

16  A.   Yes.

17  Q.   Okay.  And someone, one of the inspectors, said

18  "Well, what is it?" right?

19  A.   Yes.

20  Q.   And you don't remember which inspector said

21  that, but Mr. Kamholz's response was, "That's the

22  pressure relief valve," right?

23  A.   Yes, it was.  Yes.

24  Q.   Which was accurate, right?

25  A.   Yes.

1    Q.   That's what it was?

2    A.   Yes.

3    Q.   And then the next question was one of the

4    inspectors said, "How long has that been there?",

5    right?

6    A.   Yes.

7    Q.   And Mr. Kamholz responded, "I don't know,"

8    right?

9    A.   Yes, he did.

10   Q.   And he then referred to you and said, "Pat, how

11   long has that been there?", right?

12   A.   Yes, he did.

13   Q.   Okay.  And you responded, "As long as I've been

14   here," right?

15   A.   Yes.

16   Q.   Okay.  And now, you've testified -- you

17   testified yesterday that this interaction you

18   found -- in your words, you found to be shocking

19   and it made you angry, correct?

20   A.   Yes.  I said that yesterday, yes.

21   Q.   Those were the words you used?

22   A.   Yes, they were.

23   Q.   And when you were asked specifically what it

24   was about it that you found so shocking and made

25   you so mad, it was because Mr. Kamholz should have

1    known when that device went off that it was coke

2    oven gas, right?

3    A.   Yes.

4    Q.   That's what you testified to?

5    A.   Yes.

6    Q.   Now, when you testified in the grand jury,

7    that's not what you said, is it?

8    A.   I thought I said, yes.  I thought I said he

9    said it was steam.

10   Q.   Okay.  No, no, no.  In terms of what

11   Mr. Kamholz should have known.

12   A.   Oh.

13   Q.   Okay.  If we could, please, for identification,

14   Lauren, bring up Government Exhibit 3505.08, which

15   is Mr. Cahill's grand jury testimony.  And if we

16   could, please, go to page 21.

17       Okay.  And we're going -- we're going to start

18   reading on line 20.  You were asked:  "Mr. Kamholz,

19   says, quote, it's just steam, unquote."  And

20   Mr. Mango says, "Right".  Or you say "right."  I

21   apologize.  You say "right".  And Mr. Mango says,

22   "It's not just steam?"  And your answer was, "At

23   that point, I don't know if it was that, just

24   steam.  Steam.  That might have been a reversal or

25   charge.  We were still walking and a reversal

1    happened and it looked the same."

2        Do you remember that was your testimony?

3    A.  Yes.

4    Q.  So is it still your recollection that part of

5    your anger had to do with the fact that you thought

6    Mr. Kamholz should have known that was coke oven

7    gas?

8    A.  Yes.

9    Q.  You testified in the grand jury that you

10   couldn't tell whether it was coke oven gas or

11   steam, right?

12   A.  Right.

13   Q.  Okay.  And just in fairness to you, you felt

14   put upon because of what you felt Mr. Kamholz was

15   doing to you, that he was putting you on the spot,

16   right?

17   A.  Yes, sir.

18   Q.  And can we agree that, in terms of your

19   recollection of these events, that how you

20   interpreted what Mr. Kamholz was doing to you has

21   affected your recollection?

22           MR. MANGO:  Objection, your Honor.

23           THE COURT:  Grounds?

24           MR. MANGO:  There's no basis or foundation

25   for this question, your Honor.

1252

 1          THE COURT:  Let's -- do you remember the

 2     question?

 3             THE WITNESS:  No.

 4             THE COURT:  Okay.  So why don't you --

 5             MR. PERSONIUS:  Want me to restate the

 6     question?

 7     BY MR. PERSONIUS:

 8     Q.  Can we agree -- well, let's take one step back.

 9     You've told us that you were upset because you

10     felt -- is it fair to say you felt upset that -- in

11     your view, Mr. Kamholz was putting you on the spot,

12     right?

13     A.  Yes.  Yes.

14     Q.  And can we agree that -- and does that continue

15     to be your view up to the present time?

16     A.  Yes.  Putting me on the spot for the valve,

17     yes.

18     Q.  Yes.  And can we agree that -- that your -- the

19     fact that you're upset about what was done has

20     affected your recollection of the events?

21             MR. MANGO:  That's the objection, your

22     Honor.

23             THE COURT:  All right.  I'll sustain the

24     objection.  Whether he agrees or not is not

25     necessarily a proper inclusion in the question,

1253

1    among other things.  So as to the form, I will

2    sustain the objection.

3              MR. PERSONIUS:  All right.

4              THE COURT:  Because, remember, ladies and

5    gentlemen, it's the witness's answer that's the

6    evidence, not anything having to do with what the

7    attorney believes or not.

8    BY MR. PERSONIUS:

9    Q.  Now, the other point that you raised yesterday

10   in your testimony was that the source of your anger

11   is that you felt that Mr. Kamholz should have known

12   how long that pressure relief valve had been there,

13   right?

14   A.  Yes.

15   Q.  And you're not open to the fact that

16   Mr. Kamholz may not have known how long it had been

17   there?

18              MR. MANGO:  Objection, your Honor.

19              THE COURT:  Sustained.

20   BY MR. PERSONIUS:

21   Q.  Do you know when the pressure relief valve was

22   installed?

23   A.  No, sir.

24   Q.  Okay.  And when Mr. Kamholz said "I don't

25   know", he simply said, "Pat, how long has that been

1   there," right?

2   A.   Yes, he did.

3   Q.   And then it was after that that -- and you were

4   called upon to answer different questions related

5   to the pressure relief valve, right?

6   A.   Yes, sir.   Yes.

7   Q.   Would it be fair to say you weren't happy about

8   being put in that position?

9   A.   Yes.

10   Q.   Again, you felt like you had been put on the

11   spot?

12   A.   Right.

13   Q.   And you had to go to the -- the green shack and

14   provide some explanation to these inspectors,

15   right?

16   A.   Yes.

17   Q.   And at some point the inspectors also asked you

18   for charts?

19   A.   Yes, they did.

20   Q.   Was that that same day, or was that at a later

21   time?

22   A.   It was the same day.

23   Q.   The same day?

24   A.   Yes.

25   Q.   So did you, then, have to go to your office,

1    the by-products office, to look for those charts?

2    A.   Yes.  It wasn't my office.  It was a

3    by-products office.  And we went in and looked for

4    them, and we couldn't find them.

5    Q.   Was that stressful for you, that you couldn't

6    find them?

7    A.   A little, yeah.

8    Q.   And did you feel nervous?

9    A.   Yes.

10   Q.   You were uncomfortable?

11   A.   Right.

12   Q.   And all of this made you unhappy, right?

13   A.   Yes.

14   Q.   And the person you blame for that is Mark

15   Kamholz?

16   A.   I blame Mark for not knowing the valve.  That's

17   what I blame Mark for.  How long it should have

18   been there.

19   Q.   But he put you through all this having to

20   explain it and then looking for records you

21   couldn't find, right?

22   A.   Yes.

23   Q.   All right.  And then further than that, you had

24   to go back the following week and provide further

25   information about the pressure relief valve to the

1    inspectors, right?

2    A.   The charts, yes.

3    Q.   Well, something dealing with the pressure

4    relief valve, right?

5    A.   Yes.  Yes.

6    Q.   And did you do that on one day or more than one

7    day?

8    A.   It was the one day, Monday, the Monday we came

9    come back into work.

10   Q.   On Monday?

11   A.   Yes.

12   Q.   Do you remember who you met with then and

13   provided that information to?

14   A.   I ended up -- I gave them to Mark.

15   Q.   Pardon?

16   A.   I gave them to Mark Kamholz.

17   Q.   Right.

18       But did you talk to the inspectors again on

19   Monday about the pressure relief valve or the

20   charts?

21   A.   Honestly, I don't know.

22   Q.   Okay.  And do you remember if you did on that

23   following Tuesday talked to the inspector about the

24   pressure relief valve or the charts?

25   A.   Well, if they were still there, yes, I'm sure I

1257

1    did.  Yes.

2    Q.  All right.  Now, let's go back to when this

3    valve goes off during the inspection.  You recall

4    it going on a Friday.  And Mr. Kamholz turns to you

5    about how long the valve has been there.  And then

6    you have to answer these questions.

7    A.  Yes.

8    Q.  You were at the time the supervisor of the

9    by-products area?

10   A.  Yes.

11   Q.  The pressure relief valve was in the

12   by-products area?

13   A.  Yes.

14   Q.  And it is one of your responsibilities to know

15   about the operation of the different components

16   that are in your area?

17   A.  Yes, sir.

18   Q.  And that includes the pressure relief valve --

19   A.  Yes, sir.

20   Q.  -- right?

21        Have you ever heard the -- I want to know if

22   you agree with their expression, "With great power

23   comes great responsibility."

24            MR. MANGO:  Objection to the Spiderman

25   quote, your Honor.

1    MR. PERSONIUS:  I don't know if it's

2    Spiderman.

3    MR. MANGO:  Well, I know it is Spiderman,

4    your Honor.

5    THE COURT:  I think others do as well.

6    MR. PERSONIUS:  I think it's a little

7    older than that.

8    THE COURT:  Well, you know --

9    MR. MANGO:  Relevance, your Honor.

10   THE COURT:  You mean the age of Spiderman,

11   is that relevant or not?  You know, on that

12   grounds, I'll sustain the objection.

13   MR. PERSONIUS:  Spiderman grounds?

14   THE COURT:  Spiderman grounds.

15   MR. PERSONIUS:  All right.

16   But you agree that, given your position as the

17   head of by-products, it would not be unreasonable

18   to expect that you would, as part of those

19   responsibilities, be required to tell inspectors

20   about the operation of a component within the unit

21   that you're in charge of, right?

22   MR. MANGO:  Objection, your Honor.  Calls

23   for speculation.

24   THE COURT:  Can you answer that question?

25   Do you remember it well enough to do that?

1        THE WITNESS:  Could you repeat it?

2        MR. PERSONIUS:  I'll try to.

3        THE COURT:  Yeah, I mean, it's a little

4    bit lengthy.  So --

5        MR. PERSONIUS:  Sure it is.

6        THE COURT:  Reput the question.

7        MR. PERSONIUS:  I'm trying to do it a

8    right way, but you're right, it is.

9    BY MR. PERSONIUS:

10   Q.  You were the head of by-products, right?

11   A.  Yes.

12   Q.  PRV is within by-products?

13   A.  Yes.

14   Q.  Something you knew as much about as anybody in

15   the plant, right?

16   A.  Yes.

17   Q.  And, therefore, to ask you to explain it to

18   these inspectors, you have an objection to that?

19   A.  No.

20   Q.  Okay.  And the information that you gave to the

21   inspectors, was it accurate?  Did you answer all

22   their questions?

23   A.  Yes.

24   Q.  And did you answer them accurately?

25   A.  To my knowledge, yes.

1    Q.   Okay.  And how you answered those questions was

2    entirely left up to you, right?

3    A.   Yes.

4    Q.   Mr. Kamholz had not told you ahead of time what

5    to tell these inspectors, right?

6    A.   No.

7    Q.   And as you're talking to the inspectors, he's

8    not giving you signals about what you should say?

9    A.   No.

10   Q.   Everything you told the inspectors was left

11   totally up to you?

12   A.   Yes.

13   Q.   Okay.  Now, Mr. Mango asked you if at some time

14   later that day you talked to two other employees,

15   Mr. Brossack, who's testified here, and a gentleman

16   named Mr. Priamo, about this series of events.

17        Do you remember that?

18   A.   Yes.

19   Q.   You told him that you did, right?

20   A.   Yes.

21   Q.   How much later in the day was that

22   conversation?

23   A.   I want to say 3:30, 4:00.  Late evening.

24   Q.   Okay.  How many hours passed from this

25   discussion you had with the inspectors until you

1261

1    talked about it with Mr. Brossack and Mr.  Priamo?

2    A.   Half hour, hour.

3    Q.   Half an hour to an hour later?

4    A.   Yes.

5    Q.   Okay.  All right.  And what you were feeling at

6    that point in time was anger?

7    A.   Yes.

8    Q.   Okay.

9         MR. PERSONIUS:  Your Honor, during a

10   recess I would like to ask for permission for

11   Mr. Cahill to go through this book.  And I'd like a

12   minute to talk to Mr. Kamholz to see if I have

13   anything more to ask.

14        THE COURT:  Okay.  Certainly.

15        MR. PERSONIUS:  We can take this off the

16   screen too.

17        THE COURT:  Done.

18        MR. PERSONIUS:  Thank you, Judge.

19        THE COURT:  All right.  Everybody doing

20   okay?

21        MR. PERSONIUS:  Thank you, Mr. Cahill.

22   Those are my questions for now, subject to the log

23   book.

24        THE COURT:  Okay.  Give you time to take a

25   break and go through the transcript.  We'll resume

1    again at 11:30.  Okay?

2        All right.  Ladies and gentlemen, you're on

3    your own, but in the care, custody, and control of

4    Chris.

5             (Jury excused from the courtroom.)

6             THE COURT:  Okay.  You may step down.

7    Okay.  We'll see you here about 11:30.

8             MR. MANGO:  Judge, one point.  I know you

9    looked to me for this type of information.  I think

10   the source of that quote is Voltaire.  I'm not

11   positive, but I think it's Voltaire.

12            MR. PERSONIUS:  I like Spiderman.

13            THE COURT:  It's not to say Spiderman

14   wasn't conversant with Voltaire.

15            MR. PIAGGIONE:  Or that Spiderman was

16   Voltaire.

17            THE COURT:  Okay.  I guess we'll leave it

18   at that.  Thank you.

19            (Short recess was taken.)

20            (Jury seated.)

21            THE COURT:  Welcome back, ladies and

22   gentlemen.  Please have a seat.  Okay.  The

23   attorneys and parties are back, present.  The

24   ladies and gentlemen of the jury are here.  Roll

25   call waived.  And Mr. Robert Cahill remains under

1263

1    cross-examination by Mr. Personius.  And you are

2    under oath, Mr. Cahill.

3   BY MR. PERSONIUS:

4    Q.  During the break, Mr. Cahill, did you have a

5    chance to go through the by-products log book

6    that's marked as Government Exhibit 87?

7    A.  Yes, I did.

8    Q.  Did you find any other references to a change

9    in the pressure for the --

10   A.  One.

11   Q.  You found one?

12   A.  Yes.

13   Q.  Okay.  What page -- do you remember what date

14   that was?

15   A.  No, I don't.

16   Q.  If I give it to you, would you be able to find

17   it?

18   A.  Yes, I think so.

19            MR. PERSONIUS:  May I give it --

20            THE COURT:  Let's put it up on the screen

21   though.

22            MR. PERSONIUS:  Also.

23            THE WITNESS:  I think it was --

24            THE COURT:  I'm sorry?

25            THE WITNESS:  I think it was before that

1264

1    one when they raised it to 100.  I think it was the

2    day before or two days before that.  So whatever

3    date that was.

4              MR. PERSONIUS:  That date was 3/3/09.

5              THE COURT:  Okay.  March 3rd of '09.

6              MR. PERSONIUS:  May I give it to him to

7    look at?

8              THE COURT:  Certainly.  Give us the page

9    number where you find that and we can put it up on

10   the screen.

11             MR. PERSONIUS:  Ninety-nine.  That's the

12   page number down here.

13             THE WITNESS:  Yes, there it is.

14   BY MR. PERSONIUS:

15   Q.  Okay.  We have on the screen page 99 of

16   Government Exhibit 87.

17       Can you show us where the entry is, please?

18   A.  Yes.  It's at the top, a note lower -- lowered

19   bleeder to 94.

20   Q.  Okay.  All right.  And that was the only other

21   entry then?

22   A.  That I seen.  I looked through it pretty

23   quickly.

24             THE COURT:  Is that your writing or

25   somebody else's?

1265

1    THE WITNESS:  That's not mine, no.

2    THE COURT:  Thank you.

3  BY MR. PERSONIUS:

4  Q.  Okay.  So for the period that's covered by this

5  log book, which would be January through April

6  of 2009, you found a total of two entries?

7  A.  Yes.

8  Q.  Related to changing the pressure?

9  A.  Yes.

10  Q.  And I think you told us on direct that, when

11  you would change the pressure, you did not make an

12  entry in the log book, is that true?

13  A.  That's true, yes.

14  Q.  Okay.  Thank you.

15    THE COURT:  Okay.  Mr. Personius, thank

16  you.

17    Mr. Linsin.

18    MR. LINSIN:  Thank you, your Honor.

19    THE COURT:  You're welcome.

20    MR. LINSIN:  Morning, Mr. Cahill.

21    May I proceed, your Honor?

22    THE COURT:  You may.

23  CROSS-EXAMINATION BY MR. LINSIN:

24  Q.  Mr. Cahill, I believe, if I heard your

25  testimony correctly, it's your recollection that

1    the EPA inspection that you've been testifying

2    about began on a Monday, is that correct?

3    A.   Yes.  Yes.

4    Q.   All right.  Is it fair to say that your memory

5    may not be precise about that?

6    A.   About the day?

7    Q.   About the day of the week that the inspection

8    began.

9    A.   Yes.

10   Q.   Could have been a Tuesday?

11   A.   Yes.

12   Q.   All right.  You also testified about the

13   frequency with which this pressure relief valve or

14   bleeder valve released, correct?

15   A.   Yes, I did.

16   Q.   Is it accurate to say, Mr. Cahill, that the

17   frequency of the time that that valve released

18   varied depending on a number of different

19   conditions in the plant?

20   A.   Yes, that's true.

21   Q.   And depending on the time of year?

22   A.   Yes.

23   Q.   And depending on the type of coke that was

24   actually being produced in any given charge,

25   correct?

1267

1    A.   Yes.

2    Q.   Production levels at the plant had an influence

3    as well, correct?

4    A.   Yes, it did.

5    Q.   And the production levels at the plant varied

6    significantly over time, correct?

7    A.   Yes.

8    Q.   Okay.  And so it's fair to say, isn't it, that

9    the frequency with which this valve released varied

10   significantly based on all the factors we've just

11   discussed, correct?

12   A.   Yeah.

13   Q.   Okay.  Now, the inspection that you testified

14   about, the EPA inspection of April of 2009, do you

15   recall, you yourself recall, interacting with those

16   inspectors pretty much every day they were there?

17   A.   Not every day, no.  I had other things to do

18   too, so --

19   Q.   But in the -- in the first week they were

20   there, do you recall interacting with them several

21   days during that week?

22   A.   Yes.

23   Q.   All right.  And is it -- in your interaction

24   with them, you were in and around the by-products

25   area answering questions about the equipment in

1268

1    that area, the operations, and providing what

2    information they might need, correct?

3    A.   Yes, sir.

4    Q.   And they were -- do you recall they were taking

5    samples and testing equipment and inspecting

6    equipment, correct?

7    A.   Yes, they were.

8    Q.   Now, you've testified that on the Friday of

9    that week, Friday of the inspection, you recall

10   being present there and you saw -- you and the

11   others saw the pressure relief valve release at

12   that point, correct?

13   A.   Yes.

14   Q.   Now, as best you recall, Mr. Cahill, was that

15   the first time that week that you were with the

16   inspectors in the by-products area that that valve

17   released?

18   A.   Yes, I would say so.   Yes.

19   Q.   Could I -- may I please have Defendant's

20   Exhibit FFFF, please.

21            THE COURT:   It may be published.   It's

22   received.

23            MR. LINSIN:   Yes, thank you, your Honor.

24   BY MR. LINSIN:

25   Q.   You were asked some questions about this this

1269

1    morning, this exhibit.  Mr. Cahill, do you

2    recognize this exhibit as depicting the coke oven

3    gas line at Tonawanda Coke and the components that

4    are in the by-products area that are connected to

5    the line?

6    A.   Yes.

7    Q.   Now, we've talked -- you've testified a fair

8    amount about the pressure in the coke oven gas

9    line, correct?

10   A.   Yes, sir.

11   Q.   And is it accurate to say -- I want to hold

12   that thought for a moment about the pressure in the

13   coke oven gas line.

14        There are actually at least three different

15   pressure components in this entire system.  There

16   is a back pressure on the ovens in the battery

17   itself, which is to the right on this exhibit,

18   correct?

19   A.   Yes, sir.

20   Q.   And then where the blue lines begin coming off

21   of the battery there, from that point traveling in

22   the direction of the arrows until you get to the

23   exhausters in this location, the coke oven gas line

24   is in suction, correct?

25   A.   Yes, sir.

1    Q.   And those exhausters suck the gas off of the

2    battery, and -- and then on the other side push the

3    gas through the remainder of this system, correct?

4    A.   Yes, sir.

5    Q.   And the pressure created by those exhausters

6    pushes the gas through the remaining components in

7    the by-products area, correct?

8    A.   Yes.

9    Q.   And then at least on this schematic, to the

10   what is labeled the LBA or the light oil scrubber?

11   A.   Yes.

12   Q.   And then as it comes out of the light oil

13   scrubber, the gas is headed back towards the

14   battery, correct?

15   A.   Yes.

16   Q.   All right.  Now, while we're on this point, the

17   light oil scrubber at the time of the inspection in

18   April of '09 had been deactivated, correct?

19   A.   Yes, sir.

20   Q.   Do you know why it was deactivated?

21   A.   No.  No, I don't.

22   Q.   You were foreman of the by-products area during

23   that time, and you're not sure why?

24   A.   Yes.  No.

25   Q.   Do you recall it being --

1          MR. MANGO:  Objection, your Honor.  He

2    doesn't know.  Any question asked now is just

3    putting words in the witness's mouth.

4          THE COURT:  Yes.  Unless it's refreshing

5    his recollection --

6          MR. LINSIN:  Just one question to see if

7    it helps his recollection, your Honor.

8          THE COURT:  Well, Mr. Mango?

9          MR. MANGO:  I'm concerned about the

10   question, your Honor.  There's a different way to

11   try to refresh his recollection.

12         THE COURT:  I'm going to sustain the

13   objection.

14   BY MR. LINSIN:

15   Q.  The gas, after it goes through the light oil

16   scrubber, travels again in the direction of the

17   arrows.

18   A.  Not so easy.

19   Q.  No, and I've practiced.

20       Well, just to the right of the arrow I managed

21   to create here, do you see a line that drops down

22   from the overhead coke oven gas line?

23   A.  Yes, I do.

24   Q.  All right.  In the vicinity of the green shed

25   you've testified about, correct?

1    A.   Yes.

2    Q.   What is that line that drops down and travels

3    back toward the battery?

4    A.   That's the gas line going to the ovens to heat

5    the ovens.

6    Q.   Okay.  And so the coke oven gas, after it goes

7    through by-products, a main line is taken off, the

8    off-take then for the batteries.  And is that the

9    primary source of fuel to heat the batteries to

10   continue to make coke in the next charges?

11   A.   Yes, it is.

12   Q.   And you see the pressure relief valve where it

13   is indicated on this diagram, correct?

14   A.   Yes.

15   Q.   And downstream of that pressure relief valve to

16   the right along the way, does it -- does the coke

17   oven gas line then travel to the boiler which is

18   off of this diagram?

19   A.   Yes.

20   Q.   All right.  And is the coke oven gas also used

21   in the boiler?

22   A.   Yes, it is.

23   Q.   It's used to create steam for the entire plant,

24   correct?

25   A.   Yes.

1273

1    Q.   Do you recall it also being used to create

2    electricity?

3    A.   Yes.

4    Q.   For the entire plant?

5    A.   Yes.

6    Q.   Did you -- are you familiar with the term

7    "cogen" or "cogeneration"?

8    A.   Yes, I am.

9    Q.   All right.  It's accurate to say, isn't it,

10   that the coke oven gas that comes off of this

11   battery during the coke production process is an

12   extremely valuable and necessary component for this

13   plant to remain in operation?

14   A.   Yes, it is.

15   Q.   And with regard to those three pressure areas

16   that we talked about, the back pressure on the

17   ovens, the suction in the early part of the line,

18   and the positive pressure that you testified about

19   in this latter portion of the coke oven gas line

20   downstream of the exhausters, there is a need to

21   coordinate with the people up on the battery and

22   make adjustments in the set point for the pressure

23   relief valve in order to maintain the safety and

24   stability of this system, isn't there?

25   A.   Yes, sir.

1    Q.   And as a matter of fact, failure to do that

2    could result in catastrophic injury or catastrophic

3    damage to the plant, correct?

4    A.   Yes.

5    Q.   And let's talk for a moment about the oven

6    reversals that you've testified about.  The ovens,

7    again, are over in the battery on the right-hand

8    side of this diagram, correct?

9    A.   Yes, sir.

10   Q.   When the ovens reverse, is it accurate that the

11   pressure -- I'm sorry -- the flow of gas in this

12   portion of the coke oven gas line that is

13   underground, that flow of gas is actually stopped

14   for a short period of time, is that correct?

15   A.   Yes.

16   Q.   All right.  And so for that intervening short

17   period of time, that pressure backs up into the

18   line back into the by-products area, correct?

19   A.   Yes.

20   Q.   And then as soon as the reversal, or as the

21   reversal proceeds and flow continues, that

22   momentary peak in pressure is relieved, correct?

23   A.   Yes, sir.

24   Q.   Okay.  So when we're talking about a reversal

25   having an effect on the pressure back in the line

1    on by-products, that's how it happens mechanically,

2    correct?

3    A.   Yes.

4    Q.   Now, you testified on cross-examination that

5    you understood that there were plans in place to

6    deactivate this pressure relief valve, correct?

7    A.   Yes, sir.

8    Q.   And to make other adjustments so that this

9    pressure relief valve would not have to be used any

10   further, correct?

11   A.   Yes.

12   Q.   As the EPA inspection in April of 2009 was --

13   as you learned about it, that this inspection was

14   going to occur, did you understand that this

15   inspection was going to be something that focused

16   pretty directly on the operation of your department

17   at this plant?

18   A.   Yes.

19   Q.   Is it fair to say that you kind of felt put on

20   the spotlight, in the spotlight because this number

21   of inspectors were coming from various parts of the

22   country to come and see how you were doing your

23   job?

24   A.   Yes.

25   Q.   Okay.  And you -- and I believe you testified

1    on direct others in your department spent some time

2    after you had talked to Mr. Kamholz during this

3    walk-through, you spent some time working in the

4    by-products area to help prepare the department for

5    this inspection, correct?

6    A.   Yes, sir.

7    Q.   And you were following the guidance you had

8    received from Mr. Kamholz about doing things to

9    clean things up prior to the inspection, correct?

10   A.   Yes.

11   Q.   Now, there's been a lot of testimony about the

12   pressure relief valve and the interactions about

13   this valve during and just before this inspection.

14   But you're aware, aren't you, that Tonawanda Coke

15   and Mr. Kamholz are required to file reports to

16   regulatory agencies on a fairly regular basis,

17   correct?

18   A.   I'm aware of that now, yes.

19   Q.   Were you aware of it back prior to being plant

20   manager?

21   A.   No.

22   Q.   If you can put yourself back in that position

23   for just a moment, April of '09.  My question for

24   you, Mr. Cahill, is, were you aware in April of

25   '09 that Tonawanda Coke and Mr. Kamholz had

1    prepared and submitted a report to the Department

2    of Environmental Conservation for the State of New

3    York and to EPA, a report that specifically

4    notified those agencies that there was a pressure

5    relief valve on the coke oven gas line at the

6    Tonawanda plant?  Were you aware that that

7    notification had been sent?

8              MR. MANGO:  Objection, your Honor.  That's

9    assuming facts not in evidence.  That's not how the

10   testimony has been.

11             THE COURT:  No, but you can examine if you

12   need to.  I'll permit it.

13        Do you remember the question, right,

14   Mr. Cahill?

15             THE WITNESS:  No.

16             THE COURT:  No, you don't?

17             MR. LINSIN:  I will say it again.

18             THE COURT:  We'll have to break it down a

19    little bit.

20   BY MR. LINSIN:

21   Q.  Back in April of 2009, before this EPA

22    inspection, did you know that Tonawanda Coke and

23   Mr. Kamholz had filed a document with the DEC, the

24   Department of Environmental Conservation for New

25   York, and EPA, notifying them that there was a

1    pressure relief valve on the coke oven gas system

2    at the Tonawanda Coke plant?  Were you aware of

3    that?

4    A.  To my knowledge, no.  I can't remember that.

5    Q.  All right.  Because you weren't involved in

6    preparing those reports at that time, and you were

7    not aware that that report had been filed, correct?

8    A.  Right.

9    Q.  This pressure relief valve, you've seen some

10   pictures up to now.

11       Could I please have Defendant's Exhibit QQQ.01

12   in evidence, please.

13       Do you recognize this as a photograph of the --

14   or a part of the by-products plant at Tonawanda

15   Coke?

16   A.  Yes, I do.

17   Q.  And you see the pressure relief valve that

18   you've testified about?

19   A.  Yes.

20   Q.  That pressure relief valve was in that -- that

21   location during the April 2009 inspection, correct?

22   A.  Yes, sir.

23   Q.  And if I followed your testimony correctly

24   yesterday, you recall -- having worked in

25   by-products, you recall that sometime earlier there

1    had been a -- a different pressure relief valve on

2    the same system in approximately the location --

3    did I get that correct -- in approximately the

4    location where this arrow is placed?

5    A.   Yes, pretty close to it.   Next to that big

6    black mark on the gas line.   Right there.   Yeah.

7    Q.   And do you recall when that change was made?

8    Do you know when the pressure relief valve was

9    moved?

10   A.   No.   Again, like I stated earlier, no, I don't.

11   Q.   You don't know that even though you were

12   working in the by-products area?

13   A.   Yeah.   No.

14            THE COURT:   All right.   Mr. Linsin, let me

15   ask you this.   In light of that line of

16   questioning, we now have reference to two pressure

17   relief valves, right?

18            MR. LINSIN:   One at a time, I believe is

19   the testimony, yes.   There was testimony -- yes,

20   that's correct.

21            THE COURT:   All right.   And earlier there

22   was the objection by Mr. Mango to the fact that

23   your question contained facts not in evidence,

24   right?   Do you remember that objection?

25            MR. LINSIN:   I do remember the objection,

1    your Honor.

2              THE COURT:  Okay.  Was there evidence with

3    respect to reports being filed with either EPA or

4    DEC with respect to either one or both of those

5    different valves that existed at different times?

6    So far.  Or were you connecting up?  That's my --

7              MR. LINSIN:  No, your Honor.  We have had

8    significant testimony about a HAP submission study

9    that was filed by the company and Mr. Kamholz

10   in 2003.  It was referenced in the testimony of the

11   last witness, Ms. Hamre.  She was asked

12   specifically about the very page on which this

13   information was provided in that HAPs study.  That

14   was 2003, six years before the April 2009

15   inspection.

16             THE COURT:  Okay.  Mr. Mango?

17             MR. MANGO:  Yes, your Honor.  My objection

18   is the characterization of that as a notification.

19   Mr. Carlacci testified that's not notification.

20   Ms. Hamre didn't testify that was a notification.

21   It was just simply a reference in a report

22   regarding whether the company releases, you know,

23   sufficient amounts of hazardous air pollutants.

24             THE COURT:  So your objection related to

25   the notification portion of the question, not with

1281

1    respect to whether a report was, in fact, filed?

2              MR. MANGO:  Right, your Honor.  Yes, your

3    Honor.

4              THE COURT:  Okay.  Then, my ruling will

5    remain the same, and you may proceed.

6              MR. LINSIN:  Thank you.

7    BY MR. LINSIN:

8    Q.  Let me ask you this, and see if you can recall

9    this.  Do you know, based on your work in

10   by-products, whether the PRV that is shown in this

11   photograph right in this location, was that PRV in

12   that location during 2003?

13   A.  I want to say yes.  Yes, it was in that

14   location.

15   Q.  Is it fair to say that's your best recollection

16   as you sit here today?

17   A.  Yes, it is.

18   Q.  And is it also your best recollection that

19   while there may have been a PRV at this second

20   location you testified about, there were never two

21   PRVs on this system, is that correct?

22   A.  Right.

23   Q.  It was in this place a few feet to the north on

24   this line in years earlier, and then it was

25   subsequently moved to its present location?

1   A.   Yes.

2   Q.   All right.   Okay.   Now, my question to you

3   about this PRV, which you best -- you recall has

4   been there at least since 2003 and for many years

5   before, the entire time you've been in the

6   by-products area, correct?

7   A.   Yes.

8   Q.   And when did you first start in the by-products

9   area?   '91?

10  A.   Something like that, yes.

11  Q.   Okay.   Early '90s?

12  A.   Yes.

13  Q.   Fair enough?

14  A.   Yeah.

15  Q.   Is this valve and the vent that -- that extends

16  up above the valve, is that valve and vent entirely

17  visible as you walk down Broadway there?

18  A.   Yes, it is.

19  Q.   Is it open and obvious to anybody that might be

20  walking through the by-products area?

21          MR. MANGO:   Objection, your Honor.

22          THE COURT:   Grounds?

23          MR. MANGO:   Is it open and obvious to

24  anyone else?   That's calling for speculation.   This

25  witness said he could see it.   I think that's the

1283

1    substance of the --

2            THE COURT:  Yeah, I'll allow it to stand,

3    though.

4    BY MR. LINSIN:

5    Q.  Is it open and obvious to anybody that would be

6    walking through the by-products area?

7    A.  Yes.

8    Q.  You don't ever recall going up there and

9    putting a shroud over that valve, do you?

10   A.  No, sir.

11           MR. LINSIN:  I have nothing further, your

12   Honor.

13           THE COURT:  Thank you.  Okay, Mr. Linsin,

14   thank you.

15       Any redirect?

16           MR. MANGO:  Yes, your Honor.  Thank you,

17   your Honor.  May I proceed?

18           THE COURT:  You may.

19   REDIRECT EXAMINATION BY MR. MANGO:

20   Q.  Good afternoon, Mr. Cahill.

21       Can you tell the jury, how do you feel about

22   testifying here today?

23   A.  Nervous, scared.  I don't want to testify,

24   but --

25   Q.  Okay.  So is this something you want to be

1284

1    doing right now?

2    A.  No.

3    Q.  Okay.  I want you to look at the ladies and

4    gentlemen of the jury and I want you to tell them

5    whether what you testified to on the direct

6    examination is your truthful recollection of what

7    happened.

8         MR. PERSONIUS:  Your Honor, I object to

9    that question.  He's under oath.

10        THE COURT:  Yeah.  Sustained.

11   BY MR. MANGO:

12   Q.  Prior to this April of 2009 conversation, the

13   pre-inspection conversation you had, had Defendant

14   Kamholz ever told you to adjust the bleeder before?

15   A.  No.

16   Q.  Had you not had the conversation with Defendant

17   Kamholz before this inspection, would you have on

18   your own raised the release set point for the

19   bleeder?

20   A.  No.

21   Q.  When you did the walk-around with Defendant

22   Kamholz, the pre-inspection walk-around, did he

23   indicate to you any lack of knowledge of the

24   by-products area?

25   A.  No.

1285

1    Q.  And when Defendant Kamholz made reference to

2    the bleeder and said, "We can't have that going off

3    when they're here," did he indicate any lack of

4    knowledge of the bleeder?

5    A.  No.

6              MR. PERSONIUS:  Your Honor, the question's

7    unfair because -- I'm trying to think how I -- it

8    assumes that there was some obligation to show

9    knowledge, which there wouldn't have been, if that

10   makes sense.

11             THE COURT:  I'll sustain the objection to

12   the form of the question.

13             MR. MANGO:  When you did the walk-around

14   with Defendant Kamholz, the pre-inspection

15   walk-around, did he indicate any lack of knowledge

16   of the bleeder?

17             MR. PERSONIUS:  Same question.  Same

18   objection.

19             THE COURT:  Sustained.

20   BY MR. MANGO:

21   Q.  Do you have any doubts, Mr. Cahill, that

22   Defendant Kamholz was telling you the bleeder had

23   to be adjusted and not released during the

24   inspection?

25   A.  No.

1286

1    Q.   You have no doubts?

2    A.   Right.

3              MR. MANGO:  Your Honor, if I can have one

4    moment.

5              THE COURT:  Yes.

6              MR. MANGO:  I'm all set, your Honor.

7    Thank you.  Nothing further.

8              THE COURT:  Okay.  Would you like to go?

9              THE WITNESS:  Yes.

10             THE COURT:  All right.  Be gone.

11             THE WITNESS:  Thank you.

12             THE COURT:  All right.  Thank you very

13   much.

14        All right.  Next government witness, please.

15             MR. PIAGGIONE:  Your Honor, if the Court

16   allows, I would put on the next witness.  We would

17   ask for Peter Dolan as our next witness, your

18   Honor.  D-O-L-A-N.

19             THE COURT:  Ladies and gentlemen, I stand

20   corrected.

21        You can come up, and we'll have you sworn as a

22   witness.

23        I've been referencing Mr. Cahill as Robert.  It

24   is Patrick Cahill, it's my understanding now.  All

25   right.  So it's my correction, please.  All right.

1     Okay.

2     P E T E R   M A T T H E W   D O L A N, having been

3     duly sworn as a witness, testified as follows:

4                    THE COURT:  Good afternoon.

5                    THE WITNESS:  Good afternoon, your Honor.

6                    THE COURT:  Okay.  I have a couple of just

7     preliminary instructions for you.  I'm going to ask

8     you to speak in a conversational tone at the

9     microphone.  You have to get a little bit closer

10    than that, but you don't have to be right on top of

11    it, okay, because then it distorts.

12        And what I'd like you to do as far as the

13    questions are concerned, if you don't understand

14    the question, let whoever's asking the question

15    know, so that he or she can rephrase it.

16        Be as directly responsive to the questions as

17    you can.  Don't volunteer information, because that

18    usually complicates things.

19                    THE WITNESS:  Okay.

20                    THE COURT:  If you can answer a question

21    yes or no, keep that in mind, try to do that.

22                    THE WITNESS:  Okay.

23                    THE COURT:  If there's an objection -- and

24    attorneys on occasion will object.  If there's an

25    objection, wait until I rule on the objection.

1    Don't continue on.  Then I'll tell you what to do,

2    either continue with the answer, wait for another

3    question, or I'll give you some other instructions.

4    Is all of that clear?

5              THE WITNESS:  Yes.

6              THE COURT:  Okay.  And remember you're

7    here to testify for the benefit of the ladies and

8    gentlemen of the jury, so if you could direct your

9    answers to them, that would be helpful whenever you

10   can.  Okay?

11             THE WITNESS:  Yes, sir.

12             THE COURT:  All right.  State your full

13   name; spell your last name.  Move up a little bit

14   towards the microphone and spell that last name,

15   please.

16             THE WITNESS:  Peter Matthew Dolan.

17   D-O-L-A-N.

18             THE COURT:  Okay, Mr. Dolan, thank you.

19        Your witness, Mr. Piaggione.

20             MR. PIAGGIONE:  Thank you, your Honor.

21   DIRECT EXAMINATION BY MR. PIAGGIONE:

22   Q.  Mr. Dolan, where are you employed?

23   A.  Self-employed.

24   Q.  Okay.  How long have you -- was there a time

25   that you were employed at Tonawanda Coke --

1    A.   Yes.

2    Q.   -- Corporation?

3         All right.   Just wait until I ask the question

4    before you answer.   Just slow down.

5         And when were you employed there?

6    A.   Roughly 2005 till around 2008.

7    Q.   Okay.   In what capacity?

8    A.   I started out in brick shop, and was then

9    promoted up to general foreman on the battery.

10   Q.   Okay.   And when did you start working on the

11   battery?

12   A.   I believe, the end of 2005, maybe beginning

13   of 2006.

14   Q.   Okay.   And what were your duties as a general

15   foreman?

16   A.   Keep the body -- or keep the battery

17   operational, on schedule.

18   Q.   And does the back pressure have any relevance

19   to the operation of the battery?

20   A.   Yeah.

21   Q.   Okay.   What -- what impact does it have?

22   A.   It keeps an amount of gas on the battery.

23   Q.   Okay.   And do you recall what the setting was

24   of the back pressure when you started working on

25   the battery?

1    A.   Not a hundred percent sure, but roughly around

2    5 or 6.

3    Q.   Okay.  And do you know what a stack meeting is?

4    A.   Yeah.

5    Q.   What is that?

6    A.   It's basically we're supposed to have a monthly

7    general foreman and any foreman associated with the

8    battery and our -- our immediate supervisors, the

9    owner, and I believe that was it.  So just -- just

10   small meetings.

11   Q.   Okay.  And did there come a time while working

12   on the battery that you had a stack meeting where

13   the issue of setting of the back pressure was

14   discussed?

15   A.   Yes.

16   Q.   Okay.  And approximately when was that?

17   A.   I believe, about a year before I left, so 2007,

18   2008, somewhere in there.

19   Q.   All right.  And was it proposed in that meeting

20   that the back pressure be raised in the battery?

21   A.   Yes.

22   Q.   And what was the purpose of raising the back

23   pressure in the battery?

24   A.   To supposedly build carbon in the ovens to

25   seal -- seal the inside of the oven better.

  
1    Q.   Okay.  And as a result of the stack meeting,

2    did you begin to raise the back pressure on the

3    battery?

4    A.   Yes.

5    Q.   And was that raised over time or all at once?

6    A.   Was it raised over time?

7    Q.   Yes.

8    A.   Yes.

9    Q.   Okay.  And over time how high did it get?

10   A.   9 or 10.

11   Q.   Okay.  And do you know what a 303 inspection

12   is?

13   A.   Yes.

14   Q.   Okay.  Did 303 inspections occur while you were

15   working at Tonawanda Coke Corporation?

16   A.   Yes.

17   Q.   And once the back pressure started to be

18   raised, what practice, if any, would you follow

19   before a 303 inspection?

20   A.   We'd lower the back pressure.

21            THE COURT:  All right.  Let me ask you

22   this.  What did you understand a Section 303

23   inspection to be?

24            THE WITNESS:  Do you want me to tell you

25   exactly what the inspection was?

1292

1    THE COURT:  What you understood it to be,

2    yes.

3    THE WITNESS:  The 303 inspector would show

4    up.  He would do a visual inspection of the

5    battery, basically counting the leaks and

6    everything like that.  He would also inspect five

7    charges and count leaks during that, and then he

8    would also -- as far as the battery was concerned,

9    I think he would also just walk the main afterwards

10   and everything like that and check for any leaks on

11   the battery, basically, so --

12   THE COURT:  All right.  You wouldn't do

13   that.  That's an inspector's function?

14   THE WITNESS:  Yes.  Yes.

15   THE COURT:  Thank you.

16   THE WITNESS:  Well, I mean, I would pick

17   him up.  When he -- when he got to the battery, he

18   had to change out of his civilian clothes, put, you

19   know, greens on.  I would pick him up, bring him up

20   to the battery, and then he would, you know,

21   commence with the inspection.

22   THE COURT:  Okay.  Thank you.

23   MR. PIAGGIONE:  Your Honor, you just

24   eliminated half my direct.

25   THE COURT:  Okay.  I'm sorry.  I didn't

1293

1    realize you were getting to that.

2              MR. PIAGGIONE:  It's okay.

3    BY MR. PIAGGIONE:

4    Q.  Lets see.  How would you know when a 303

5    inspection was going to occur?

6    A.  The security at the front would give us a call

7    and tell us the inspector is here.

8    Q.  Okay.  And what would that mean in terms of

9    time?

10   A.  Probably give us 20 minutes or so to have our

11   final touches and everything ready for the

12   inspection.

13   Q.  Okay.  And those final touches, what would that

14   include?

15   A.  If the back pressure wasn't already lowered by

16   that point, it would be lowered, and the battery

17   would be sealed up.

18   Q.  And how many times did you personally adjust

19   the back pressure when you were there?

20   A.  I couldn't recall how many times, but I've done

21   it.

22   Q.  All right.  How many times did you tell others

23   to do it?

24   A.  Pretty much every -- any time I was on nights.

25   Q.  Okay.  And do you recall what the pressure

1    setting was set at during the 303 inspections?

2    A.   Like I told you before, I don't remember the

3    exact setting on the manometer, what it is, but

4    roughly two whatever units it is less than what it

5    was at.

6    Q.   So if it was at an 8?

7    A.   It would be set down to roughly around 6.

8    Q.   Okay.  And what would happen to the back

9    pressure settings when the 303 inspector left?

10   A.   Then you raise it back up, put it back to where

11   it was supposed to be.

12   Q.   So the only purpose of lowering the back

13   pressure was for the 303 inspection?

14   A.   Yes.

15   Q.   To prevent the detection of leaks?

16          MR. PERSONIUS:  Your Honor, it's leading.

17          THE COURT:  I'm sorry?

18          MR. PERSONIUS:  Object to it.  It's

19   leading.  Leading question.

20          THE COURT:  It is.  Sustained.

21   BY MR. PIAGGIONE:

22   Q.   So, what was the purpose of raising and

23   lowering the back pressure for a 303 inspection?

24   A.   To seal the battery.

25   Q.   And what effect would that have on the

1    inspection by the 303 inspector?

2    A.   It would pass.

3    Q.   By "pass," you mean what?

4    A.   We're only allowed a certainl rolling average

5    of leaks on the battery.  From what I recall, it

6    was a 30-day rolling average or whatever.  So, you

7    know, your amount of doors or your amount of leaks

8    on the lids or offtakes or anything like that, they

9    would all have to be within a certain amount of

10   leaks daily.

11   Q.   So lower the number -- by lowering the back

12   pressure, you would lower the number of leaks to be

13   detected?

14   A.   Yes.

15   Q.   Incidentally, what were the circumstances under

16   which -- am I going too fast?  I'll slow down

17   again.

18       What were the circumstances under which you

19   left Tonawanda Coke Corporation?

20   A.   I was laid off when they -- when I was there,

21   most of the time it was during a large oven

22   schedule, up to 50 ovens a day, and then during the

23   cutback they went down to, I don't know, like 20 or

24   something like that, so --

25   Q.   Okay.  Incidentally, do you know the difference

1    between foundry and furnace coke?

2    A.  Not really.

3    Q.  Do you know what the impact of foundry or

4    furnace coke has on the battery operation?

5            MS. GRASSO:  Objection, your Honor.  He

6    said he didn't know.

7            MR. PIAGGIONE:  Your Honor, first of

8    all --

9            THE COURT:  There was a voice I didn't

10   recognize.  Where did that come from?

11           MS. GRASSO:  I'm debuting today.  Thank

12   you.

13           THE COURT:  I mean, all I recognize from

14   you are sneezes and coughs.

15      Okay.  Is this going to be your witness?

16           MS. GRASSO:  Yes.  Yes, your Honor.

17           THE COURT:  Okay.  All right.  Sustained.

18           MR. PIAGGIONE:  Then I'll rephrase the

19   question, your Honor.

20   BY MR. PIAGGIONE:

21   Q.  What was the impact of making foundry or

22   furnace coke, if any, upon the battery?

23   A.  I just know it was two different types of coke.

24   We had to keep it separate.

25   Q.  Does the foundry or furnace coke have any

1    impact on the smoke that's produced?

2             MS. GRASSO:  Objection, your Honor.  He

3    just said he didn't know.

4             MR. PIAGGIONE:  Different question, your

5    Honor.

6             THE COURT:  All right.  Let the question

7    be complete, and then you wait, please, Mr. Dolan,

8    and I'll rule on the objection if there is one.

9    Okay.

10   BY MR. PIAGGIONE:

11   Q.  What does the impact -- withdrawn.

12       With respect to smoke that is -- is smoke

13   produced as part of coke production?

14   A.  Yes.

15   Q.  Okay.  Does the production of foundry or

16   furnace coke have an impact upon the amount of

17   smoke that's produced during coke production?

18            THE COURT:  If you know.

19            MR. PIAGGIONE:  If you know.  Thank you.

20            THE COURT:  Do you know?

21            THE WITNESS:  I understand what you're

22   asking.  Generally, what we call in the furnace --

23   or furnace coke would produce more gas.

24   BY MR. PIAGGIONE:

25   Q.  And which one would produce more smoke?

1    A.  Gas, smoke, same thing.

2    Q.  Okay.  I just want to make sure I understand

3    your answer.  Okay.

4        And in general, when was furnace coke produced

5    at the battery?

6    A.  When was it charged?

7    Q.  Yes.  Either -- was it day or night?

8    A.  No, it was charged --

9            THE COURT:  Okay.  Put a question in

10   there, because it's -- you're missing connection

11   here.

12           MR. PIAGGIONE:  Okay.  I'm sorry, your

13   Honor.

14   BY MR. PIAGGIONE:

15   Q.  In general, was furnace coke produced during

16   the day?

17   A.  No.

18   Q.  When was it produced?

19   A.  Well --

20   Q.  Usually.

21   A.  -- I -- I mean, I -- I don't want to ask you

22   how to tell -- ask the question, because it was --

23   coke goes into the oven, it gets cooked for 30

24   hours.  It's being produced all the time.  Did it

25   come out?  Was it pushed during the day?  Yes.  Was

1    it -- it was charged at night, roughly.

2    Q.  Was charging when the smoke was produced?  Is

3    that the procedure in which the smoke was produced?

4    A.  The procedure during the charging, yes.

5    Q.  Okay.  And so was the charging for furnace coke

6    done at night?

7    A.  Yes.

8    Q.  Was that the usual practice?

9    A.  I didn't make the schedule, but yes.

10   Q.  Okay.  You don't know why that was done,

11   however?

12   A.  Like I said, I didn't make the schedule.

13           MR. PIAGGIONE:  Okay.  No further

14   questions, your Honor.

15           THE COURT:  Okay.  Miss Grasso,

16   cross-examination?

17           MS. GRASSO:  Yes.

18   CROSS-EXAMINATION BY MS. GRASSO:

19   Q.  Good afternoon, Mr. Dolan.

20   A.  Good afternoon.

21   Q.  My name is Jeanne Grasso, and I am counsel for

22   Tonawanda Coke.  On direct you testified that your

23   responsibilities as general foreman were to make

24   sure the battery was operational, is that right?

25   A.  Yes.

1   Q.   And did those responsibilities include sealing

2   the battery before charges?

3   A.   Before charges?

4   Q.   After charges.   I'm sorry.

5   A.   After charges, yes.

6   Q.   Yes.   And can you describe what that involved?

7   A.   There is a mud bin in the back of the battery

8   on the top of the scale floor, that you'd have to

9   make sure mud was pumped up in there, and it was --

10  tell you the truth, I don't know what it was for,

11  but it was used for sealing the lids and offtakes

12  and the whole top of the battery.

13  Q.   Okay.   So the lids were sealed?

14  A.   Yes.

15  Q.   The offtakes were sealed?

16  A.   Yes.

17  Q.   Were the goosenecks sealed as well?

18  A.   Yes.   Anything leaking on top of the battery

19  needed to be sealed.

20  Q.   So sealing the battery was important, is that

21  right?

22  A.   Yes.

23  Q.   And the purpose of sealing was to reduce

24  visible emissions, is that right?

25  A.   Yes.

1    Q.   And there were independent inspectors that were

2    there on a daily basis to monitor those emissions,

3    right?

4    A.   Yes.

5    Q.   Okay.  You testified on direct that a -- at a

6    stack meeting there was a company directive to

7    increase the back pressure, correct?

8    A.   Yes.

9    Q.   And that this --

10   A.   Well, I don't know about a company directive,

11   but it was brought to our attention that they were

12   raising the back pressure.

13   Q.   Okay.  And that was done on an incremental

14   basis, right?

15   A.   Yes.

16   Q.   Over a fairly long period of time?

17   A.   Yes, I -- I guess.

18   Q.   That it was a slow increase.  It wasn't from 5

19   or 6, that you testified was normal, to 10?

20   A.   They changed it all the time.  A lot of times

21   we would come in, and in our office it would just

22   be written on a pad of paper, and that was it.

23   Back pressure is now at -- dut -- and that was it.

24   Leave it.

25   Q.   Okay.  And when the back pressure was

1  increased, it created challenges, didn't it, for

2  the workers on the battery?

3  A.  It's impossible to seal.  I mean, it got to a

4  point --

5  Q.  It made more work for you, then, correct?

6  A.  Whether it's work or not, it was impossible.

7  I'll just say yes.  Yes.  It made more work.

8  Q.  And that personnel resisted these efforts,

9  correct?

10  A.  No.

11  Q.  No?

12  A.  No.  No.  I don't think there was any

13  resistance.

14  Q.  Okay.  You testified that you lowered the back

15  pressure yourself, correct?

16  A.  Yes.

17  Q.  And roughly how many times did you do that?

18  A.  I don't know.  It was -- it was done every

19  single night, whether I did it or not.

20  Q.  And whose -- who made the determination to do

21  that?  Was it you as the foreman?

22  A.  That's what we were taught to do.

23  Q.  By who?

24  A.  When I -- I probably worked with a numerous

25  different amount of foremen in training, and the

1303

1    head heater was training me.  Plant manager had to

2    do with my training.  Extra foremen on the battery

3    had to do with my training.

4    Q.   So you said it made more work for you on the

5    battery.  And did this cause you to cut corners?

6    A.   To?

7    Q.   To not seal like you should have sealed the

8    battery?

9    A.   We always sealed the battery for inspection.

10   Q.   Excuse me one second.

11        Is it true, Mr. Dolan, that there were

12   occasions when you did not seal the battery in the

13   evenings?

14   A.   Pardon?

15   Q.   Are there occasions when you did not do proper

16   sealing of the battery in the evenings?

17   A.   We always sealed the battery.  I mean, it was

18   only done to a point unless it was an inspection

19   time, and then that's when everything was sealed.

20   But, no, we didn't let just smoke fly all over the

21   place, because that's -- you can't see.

22   Q.   One moment, please.

23        Mr. Dolan, can you please describe how you

24   would typically seal or maintain the lids or the

25   doors prior -- after a charge?  I'm sorry.

1    A.   After a charge, the charge car operators would

2    put the lids back on the oven and seal them all

3    with buckets that are hanging from the charge car.

4    Q.   And were you required to do any maintenance on

5    those to make sure that the leaks were sealed?

6    A.   Maintenance on what?

7    Q.   Cleaning the doors, cleaning the gaskets,

8    ensuring that they were working properly so there

9    wouldn't be visible emissions.

10   A.   Yeah.  Any doors that were -- you schedule as

11   many doors as you can to get gasketed, and when

12   they're bad they get put on a schedule and they get

13   gasketed.  They go down to the door room prior to

14   the oven being charged, and they change the gasket

15   on the door.

16   Q.   Okay.  So, Mr. Dolan, it's clear to you that in

17   these stack meetings the company requested,

18   recommended, directed, however you put it, that the

19   back pressure be raised to seal leaks, is that

20   correct?

21   A.   Yes.

22   Q.   And you did not do that, did you?  You did not

23   maintain the back pressure as it was supposed to be

24   maintained, did you?

25   A.   No.

1    Q.   You lowered it on your own, is that correct?

2    A.   It's been -- like I said, it didn't matter who

3    did it.  It was done every day.

4    Q.   Did you lower the back pressure on your own,

5    knowing that the inspectors were coming?

6    A.   Yes.

7    Q.   Thank you.  In your experience on the battery,

8    Mr. Dolan, did you come to be familiar with the

9    quench cars?

10   A.   Yes.

11   Q.   And what was the purpose of the quench towers?

12   A.   To cool down the coke.

13   Q.   How many were there?

14   A.   Two different towers.

15   Q.   Was one used more often than the other?

16   A.   At times there was only one working.

17   Q.   And do you know which tower that was?

18   A.   You know what, I forget the names, which one's

19   which.  Yeah.

20   Q.   If I were to say there was an east and west

21   quench tower, would that refresh your memory?

22   A.   It would refresh my memory, but honestly, to

23   tell you the truth, it's been so long, I don't

24   remember which one was the east and which one was

25   the west.  I could picture myself standing on the

1    battery, and I could point to you which tower we

2    used more, but I don't remember what that was

3    called.

4    Q.  Do you remember them being called Tower 1 and

5    Tower 2?

6    A.  Yes.

7    Q.  Do you remember which one was used more, if

8    they were called Tower 1 and Tower 2?

9    A.  Whatever you call it, I don't -- like I said, I

10   know which tower was used.  I don't know -- I don't

11   remember what it was called.  It's been a while.

12   Q.  Was there a tower near the river?

13   A.  The river.  No.  I think it was the one further

14   from the river.

15   Q.  Okay.  Which tower -- do you remember, when you

16   were being interviewed by the government, that you

17   noted that one of the towers did not work half the

18   time you were employed by TCC?

19   A.  I just remember doing that with you now.

20   Q.  I'm sorry?  I'm asking you about your interview

21   with the government last month.

22   A.  Oh, okay.

23   Q.  Do you remember stating that one of the towers

24   did not work half the time during your employment

25   at TCC?

1  A.  Whether I said half the time or what, yes.

2  There was times that only one tower was

3  operational.

4  Q.  Okay.  And then when the -- when both towers

5  were operational, is it true that you stated that

6  it was used -- Quench Tower 1 was rarely used?

7  A.  Wintertime it needed -- wintertime you had to

8  use them both, because you had to keep the tracks

9  clear.  I mean, yes, we used one tower more often

10 than the other, yes.  And at times when the other

11 tower was shut down, we used the other -- the

12 opposite tower more frequently.

13 Q.  Okay.  Are you able to put a percentage of

14 time, roughly, that you used those towers or no?

15 A.  No.

16 Q.  Okay.  But one was clearly used more than the

17 other?

18 A.  Yes.

19 Q.  And you do not -- do you know -- one was

20 clearly used more than the other.  Does it ring a

21 bell for you --

22            MR. PIAGGIONE:  Your Honor, I'm going to

23 object.  We've listened to this.  This is beyond

24 anything -- beyond the scope of direct.  He was

25 just talking about raising and lowering the back

1    pressure.  Now we are talking about quench towers.

2    I let it go for a while, but it's continuing on

3    this way.  It's way beyond direct, your Honor.

4              THE COURT:  Yeah.  Why isn't it beyond the

5    scope?

6              MS. GRASSO:  Yes, I understand, your

7    Honor.  We're -- the government knew the witness

8    had information on this topic, and we were trying

9    for the sake of efficiency not to have to call him

10   back to testify on quench towers.  I'm done.

11             THE COURT:  Okay.

12             THE WITNESS:  Well, if it's for the sake

13   of efficiency, I don't really want to come back.

14   I'm telling you right now.

15             THE COURT:  Well, if we don't bring you

16   back, it is more efficient.  I mean, just so you

17   know.

18             THE WITNESS:  All right.

19             THE COURT:  All right.  But I think you

20   have to be cross-examined by Mr. Personius if -- if

21    you'd like to do that, Mr. Personius.

22   CROSS-EXAMINATION BY MR. PERSONIUS:

23   Q.  Good afternoon.

24   A.  Good afternoon.

25   Q.  My name is Rod Personius, and I represent Mark

1   Kamholz.

2        Your testimony on cross was that something was

3   done all the time.  Do you remember testifying to

4   that?

5   A.  Yes.  Something regarding what?

6   Q.  That's what I'm wondering.  You said several

7   times it was done all the time, and is it your

8   testimony that the -- the back pressure was lowered

9   all the time?  Is that what you were saying?

10  A.  Prior to 303 inspection, yes.

11  Q.  Okay.  And did you work at Tonawanda Coke every

12  day --

13  A.  No.

14  Q.  -- of every month of every year?

15  A.  No.

16  Q.  Okay.  And so I think the jury needs to know

17  what the basis is for you testifying that the back

18  pressure was lowered all the time.

19       MR. PIAGGIONE:  Your Honor, he's already

20  testifying that when he was working there, when he

21  was the battery operator.

22       THE COURT:  No.  The witness can answer

23  the question.  Thank you.  Overruled.

24       THE WITNESS:  I think I know what you're

25  looking for, so I'll just come out and say it.  It

1   doesn't matter whether I was working nights.  If I

2   was working nights, it would probably be lowered

3   right before daylight, because that's roughly when

4   the 303 inspection would occur.  After daylight,

5   okay.  Now, if I was coming in on day shift, the

6   back pressure would already be lowered for me if

7   the sun was up.  So, obviously, I did not lower it,

8   no, but it was already lowered prior to my coming

9   to work.

10   BY MR. PERSONIUS:

11   Q.  Okay.  And so you're telling us that -- that

12   there were occasions when you would lower the back

13   pressure.

14   A.  If I was working nights prior to sunrise, yes.

15   Q.  Okay.

16   A.  Only when I was working nights would I ever

17   lower the back pressure.

18   Q.  Okay.  And you were doing this even after this

19   meeting took place that said to raise the back

20   pressure?

21   A.  Yes.

22   Q.  Okay.  And your -- what is -- what was your

23   reason for lowering the back pressure if you

24   attended a meeting where you were told to gradually

25   raise the back pressure?

1    A.   Because we were still told to lower it for

2    inspection.

3    Q.   Okay.

4    A.   Not during the meeting, but we were still told.

5    Q.   So, now what we need to find out is -- you say

6    "we were told."   Now, when you say "we were told,"

7    who in addition to yourself was told this?

8    A.   All the foremen.

9    Q.   Could you identify them?

10   A.   Any general foreman on the battery.   There's

11   been numerous ones.   I was only there for a couple

12   of years, but they changed them all the time.

13   Q.   Okay.   Can you remember -- when you say "we,"

14   it would be helpful for us to know who you're

15   referring to.   Do you remember their names?

16   A.   Yes.

17   Q.   Okay.

18   A.   Some of them.

19   Q.   And why don't you tell us who they are, please.

20   A.   I might not even know full names, but, I mean,

21   we're talking -- Joe was a foreman when I was

22   there; Frank was a foreman when I was there; Justin

23   was a foreman when I was there.   I don't remember

24   his first name, but Bowen was a foreman when I was

25   there.

1    Q.   Bowen?

2    A.   Bowen, yeah.  I'm probably missing others.

3    Q.   Okay.  And were you present when these people

4    that you've identified were told to lower the back

5    pressure?

6    A.   When they were told, no, but we would talk.

7    Q.   Okay.  So the testimony you're giving to the

8    jury is based on what you were told -- or telling

9    us you were told by these other foremen?

10        MR. PIAGGIONE:  Objection, your Honor.

11   Again, he already testified that when he was not

12   working nights he would come in and the back

13   pressure had been lowered.

14        THE COURT:  We heard the testimony.

15   What's your objection?

16        MR. PIAGGIONE:  Well, he's indicating

17   something that's not in evidence.

18        THE COURT:  Okay.

19        MR. PIAGGIONE:  It's not the testimony of

20   the witness.

21        THE COURT:  Okay.  Overruled.  You may

22   continue, please.

23   BY MR. PERSONIUS:

24   Q.   Do you need the question repeated?

25   A.   Yes.

1  Q.  So that the jury understands, when you say that

2  these other foremen were told this, that's based on

3  you recollecting what you say these other foremen

4  told you, right?

5  A.  Yes.

6  Q.  Okay.  So why --

7  A.  Plus, I was told myself, by my superiors.

8  Q.  Well, that's what I want to get to.  I'd like

9  to explore a little bit what you recall you were

10  told and by whom.  Okay?

11  A.  Uh-huh.

12  Q.  Now, your testimony is you were told -- after

13  this meeting about raising the back pressure, you

14  were still being told to lower the back pressure,

15  correct?

16  A.  Uh-huh.

17  Q.  Yes?

18  A.  Yes.

19  Q.  Okay.  And the reason you need to do that --

20  A.  Only for 303 inspection purposes.  Other than

21  that, the battery stayed at the same back pressure.

22  Q.  Okay.  You need to say yes.

23  A.  I did say yes.

24  Q.  I don't want you to get aggravated.  I want you

25  to understand why.

1    THE COURT:  No, here's the thing,

2  Mr. Dolan.  When you say uh-huh, it's difficult for

3  my court reporter to take that down.  Uh-huh is

4  sometimes tough to spell, depending.  All right.

5  So if you say yes, it makes it much clearer, much

6  easier.  Okay?

7              THE WITNESS:  Okay.

8              THE COURT:  Thank you.

9  BY MR. PERSONIUS:

10  Q.  I'm not trying to give you a hard time.

11      Now, your testimony is that someone at

12  Tonawanda Coke was giving you this instruction for

13  303 inspections to lower the back pressure,

14  correct?

15  A.  Yeah.

16  Q.  And do you remember the first time when you

17  were told that?

18  A.  No.

19  Q.  Okay.  And do you remember who told you?

20  A.  Been told by numerous people, because every

21  time they would raise it we would ask, "Are we

22  still lowering it for inspection?"  We would ask

23  whoever our, you know, in charge of the battery at

24  the time if we were still lowering it.  So --

25  Q.  Are you done?

1    A.   Yes.

2    Q.   Okay.

3             MR. PERSONIUS:  Am I doing it again?

4    Okay.

5             (Court reporter equipment malfunction.)

6             THE COURT:  Will you try some tests,

7    please?

8        Okay.  Thank you.

9        Mr. Personius, you may continue, please.

10   BY MR. PERSONIUS:

11   Q.   Mr. Dolan, what I want to find out is your

12   recollection of who it was at Tonawanda Coke who

13   told you to lower the back pressure, okay.  So

14   that's the focal point of this.

15   A.   Okay.

16   Q.   And I asked you if you remember when the first

17   time was that you were told, and you don't recall

18   that, correct?

19   A.   No.

20   Q.   Okay.  Let's go at it this way.  Do you

21   remember how many times you were told to lower the

22   back pressure?

23   A.   Pretty much it was any time they raised it,

24   just to make sure we were still doing our normal

25   procedure.

1316

1    Q.   Okay.  How many times -- let's go at it this

2    away then.  You say almost every time that you were

3    told to raise it you were told to lower it.  Now,

4    how many times were you told to raise it?

5    A.   Well, like I said, any time -- we would just

6    come in and it would be on our pad.  Just -- I

7    mean, it wasn't always just at a meeting.  We only

8    had meetings once in a while, and any time we came

9    in to work they would tell us what the back

10   pressure was at.

11   Q.   Well, let's -- let's try to go at it this way.

12   The meetings that you're referring to, are these

13   the stack meetings?

14   A.   Yes.

15   Q.   Okay.  How many stack meetings did you attend?

16   A.   I'm not sure.  For a while they weren't having

17   them, and when they did start having them again, we

18   had them -- we had them monthly.

19   Q.   Okay.  I understand when you had them.  My

20   question is, how many did you attend?

21   A.   Any one that I had to.

22   Q.   How many did you have to attend, sir?

23   A.   I don't know.

24   Q.   Did you attend more than one?

25   A.   Oh, yes.

1    Q.   How many?

2    A.   As many as -- I don't recall.

3    Q.   Okay.  All right.  One, but you don't know how

4    many more than one?

5    A.   Definitely more than one, probably less than

6    ten.  I don't know.  Maybe.  Maybe more.

7    Q.   Go at it this way.  How many meetings did you

8    miss?

9    A.   I didn't miss any.  If I was required to be

10   there, I went.

11   Q.   So you didn't miss a single stack meeting?

12   A.   While I was required to be there, I did not

13   miss a meeting.

14   Q.   Lets get back if we can, again, to who told you

15   that you were supposed to lower the back pressure.

16   Can you tell us who that was, please?

17   A.   It was whoever -- whoever I was working for at

18   the time.  It could have been Frank; it could have

19   been Tony; it could have been Gerry.  Anyone.

20   Q.   Okay.  So you told us Frank, Tony, and Gerry.

21   A.   Yeah.  And also we were also told by word of

22   mouth -- that's how we were required to report when

23   we came on shift, you know, what's going on.  You

24   know, I have to relieve my other foreman.  There's

25   always a foreman on the battery at all times.  So

1    when I got to work, I would show up, I would ask

2    the other foreman what's going on, and if that was

3    brought up -- it was always a question if you're

4    getting there in the morning, what's the back

5    pressure at and what's it at now.  It was always a

6    question brought up.

7    Q.  Are you done?

8    A.  Yes.

9    Q.  Okay.  Frank.  What's Frank's last name?

10   A.  Not sure.  I think -- I think -- I think it's

11   Gonzalez.

12   Q.  Frank Gonzalez.  So your testimony is that

13   Frank Gonzalez told you to lower the back pressure?

14   A.  Has told me, yes.

15   Q.  How many times did Mr. Gonzalez tell you to

16   lower the back pressure?

17   A.  I'm not sure.  I don't remember.

18   Q.  More than once?

19   A.  Yes.

20   Q.  More than five times?

21   A.  I'm not sure.

22            MR. PIAGGIONE:  Objection, your Honor.

23   He's already asked and answered the question.  Now

24   we're just repeating it three times now.

25            THE COURT:  Well, this has become more

1319

1    specific.  I'll allow it, and we'll move on.

2    Overruled.

3  BY MR. PERSONIUS:

4    Q.  More than five times?

5    A.  I'm not sure.  I know more than once, but I

6    don't know any more than that.

7    Q.  All right.  And then you mentioned Tony.

8    What's Tony's last name?

9    A.  Brossack.

10   Q.  So Tony Brossack told you to lower the back

11   pressure?

12   A.  Yes.

13   Q.  How many times did he tell you to do it?

14   A.  Same thing.  More than once.  I'm not sure.  I

15   don't have definitive answers for you.  I can't

16   tell you he told me this many times.  It was

17   standard practice when I was working there, and it

18   didn't matter who told me.  It never really

19   changed, and that was basically it.

20   Q.  You mentioned Gerry.

21   A.  Yes.

22   Q.  What is Gerry's last name?

23   A.  Priamo.

24   Q.  Okay.  And how many times did Mr. Priamo tell

25   you to lower the back pressure?

1   A.  I don't know.  More than once.

2   Q.  More than once?

3   A.  Yes.

4   Q.  But beyond that, you can't tell us how many

5   times?

6   A.  No.

7   Q.  And did Mr. Priamo ever tell you not to lower

8   the back pressure?

9   A.  There was times they tried it, yes.

10  Q.  All right.  And did Mr. Priamo ever lecture you

11  on the fact that you were lowering the back

12  pressure and he didn't want you to do that?  Did he

13  ever do that?

14  A.  No.

15  Q.  That never happened?

16  A.  No.

17  Q.  All right.  Let's talk just a little bit about

18  when you worked on the night shift, because you're

19  suggesting on the night shift that the back

20  pressure would be lowered and that it had something

21  to do with these 303 inspections, correct?

22  A.  Yes.

23  Q.  All right.  Now, when you have a lower back

24  pressure, does that make the process of sealing

25  these different openings -- and I can't even

1    identify what all of them are, but does it make

2    that processes easier?

3    A.   It makes it doable, yes.

4    Q.   It makes it easier, doesn't it?

5    A.   Yes.

6    Q.   It's a lot easier to do the sealing if the back

7    pressure is lower.

8    A.   Yes.

9    Q.   True?

10   A.   Yes.

11   Q.   Okay.  And if the back pressure is higher, it

12   makes that sealing job more difficult?

13   A.   Yes.

14   Q.   And I think you testified that in your opinion

15   that if you have the back pressure too high, it

16   makes it impossible?

17   A.   Yes.

18   Q.   Right?

19   A.   Yes.

20   Q.   Okay.  So, something that would be accomplished

21   for those on a shift, a nighttime shift, if they

22   lower the back pressure, it makes their job easier.

23   True?

24   A.   True.

25   Q.   Okay.  And if your job is made easier, it gives

1    you more time to do things other than your job.

2    True?

3    A.   No.   I was always doing my job.

4    Q.   Well, you're there, right?

5    A.   Yeah.

6    Q.   But if it takes you less time to do the

7    sealing, it gives you more time to do things like

8    play cards, doesn't it?

9    A.   True.

10           MR. PERSONIUS:   I have no further

11   questions, Judge.

12           THE COURT:   Okay.   Just -- you mentioned

13   Tony Brossack as one of the individuals that told

14   you to lower the back pressure.

15           THE WITNESS:   Yes.

16           THE COURT:   All right.   Can you see the

17   board up there, the second photograph?   Is that

18   Tony Brossack, the gentleman you were talking

19   about?

20           THE WITNESS:   If it is, he's gained a lot

21   of weight since I've seen him.   It's hard to see

22   from here, but --

23           THE COURT:   You think so?

24           THE WITNESS:   Can I go over and look?

25           THE COURT:   Sure.

1    THE WITNESS:  Yes.

2    THE COURT:  That's the same gentleman?

3    THE WITNESS:  Yes.

4    THE COURT:  Okay.  Thank you.

5    Any redirect?

6    MR. PIAGGIONE:  Very briefly, your Honor.

7    THE COURT:  Okay.

8  REDIRECT EXAMINATION BY MR. PIAGGIONE:

9  Q.  I just want to clarify that on cross the

10  question was, so you lowered the back pressure on

11  your own.  Were you doing that because you were

12  doing it without any orders or directions from

13  anyone else to do it?

14  A.  No.

15  Q.  You were doing it because you were told to do

16  it, is that correct?

17  A.  Yes.

18  Q.  Okay.  And you didn't get any additional pay

19  for lowering the back pressure?

20  A.  No.

21  Q.  Okay.  And would you say that raising and

22  lowering the back pressure, when you were there,

23  was common knowledge on the battery?

24  A.  Yes.

25    MR. PERSONIUS:  Object, your Honor, to

1    common knowledge.

2              THE COURT:  Well, it's been asked and

3    answered.  I'll let it stand.

4              MR. PIAGGIONE:  Thank you, your Honor.

5         And the purpose of this, as your understanding,

6    was so you could have less leaks --

7              MR. PERSONIUS:  Your Honor, I object.

8    It's leading, and I object to it.

9              THE COURT:  It is leading.  Sustained.

10             MR. PIAGGIONE:  I'm going to -- no further

11   questions then, your Honor.

12             THE COURT:  Okay.  Miss Grasso.

13             MS. GRASSO:  Nothing further, your Honor.

14             THE COURT:  Mr. Personius?

15             MR. PERSONIUS:  Thank you, Judge.  No.

16             THE COURT:  Okay.  You get your wish.

17   That's it.

18             THE WITNESS:  Thank you.

19             THE COURT:  Thank you, Mr. Dolan.

20        Okay.  How would you like to take a break,

21   ladies and gentlemen, until 2 o'clock.  Okay.  Any

22   objections?  Okay.  Thank you very much.  Please

23   keep your minds open.  Don't discuss the case.

24   Enjoy a beautiful day if you're going out there,

25   and make sure you get back here at 2 o'clock.

1   Okay?  Thank you.

2              (Jury excused from the courtroom.)

3              THE COURT:  Is there anything additional?

4              MR. MANGO:  No, your Honor.

5              MR. PERSONIUS:  No, your Honor.

6              THE COURT:  Okay.  Thank you very much

7   we'll see you at 2 o'clock.

8              MR. LINSIN:  Thank you, your Honor.

9              (Lunch recess was taken.)

10             (Jury not present in the courtroom.)

11             THE COURT:  Good afternoon.  Please have a

12   seat.

13             MR. LINSIN:  Good afternoon, Judge.

14             THE COURT:  Okay.  We're back on in the

15   case of U.S.A. versus Tonawanda Coke Corporation

16   and Mark Kamholz, defendant.  I understand there

17   are a couple of preliminary matters.

18             MR. MANGO:  Yes, your Honor.  There is one

19   issue with Government Exhibit 33, which is already

20   in evidence.  This is one of the certification

21   forms.  If you want, we could try to bring it up on

22   the screen.  This is to be signed by the plant

23   manager.  The person whose signature is allegedly

24   on this is going to testify now, Gerry Priamo.  And

25   he's going to say that this document -- that he

1   didn't sign this document, and that he actually

2   recognizes these initials, MK, as Mark Kamholz's.

3   And I just want to make sure the Court knows that

4   I'm going to be sensitive of the Court's ruling,

5   because obviously we had a pretrial ruling about

6   Defendant Kamholz's practice of forging

7   individual's names.  We're not going to go into the

8   fact that this is a forgery, but I think the

9   witness is going to say that's not my signature.  I

10  wanted to make sure the Court is aware of that so

11  we don't have an issue when that comes out, and I

12  don't get the look from your Honor.

13          THE COURT:  What look are you talking

14  about?

15          MR. MANGO:  The look that I did something

16  wrong.

17          THE COURT:  All right.  Well, I'll focus

18  my attention on Mr. Piaggione.  All right.  But

19  you're not -- the witness is not going to testify

20  that he knows who signed that name.

21          MR. MANGO:  Well, he does recognize the

22  initials MK as Mark Kamholz's initials.  So I think

23  with that limited information, then we're going to

24  move on.

25          THE COURT:  Okay.

1    MR. PERSONIUS:  Judge, I don't know what

2    purpose do we serve by having the -- if we just

3    don't get into it -- we don't accomplish anything

4    by getting into it.  And you run the risk of going

5    contrary to your ruling.  So why don't we leave it

6    alone and not show the witness an exhibit and it

7    becomes a non-issue in the case.

8    THE COURT:  This is a certification

9    document though.

10   MR. MANGO:  Right.

11   MR. PERSONIUS:  Right.

12     But you've already ruled that anything that

13   gets close to a forgery is not going to come in

14   under 404(b) and I don't see -- the document's in

15   evidence, Judge, and I don't see what purpose we

16   serve by having this witness say that's not my

17   signature.

18   MR. MANGO:  Your Honor, your ruling was

19   with respect to the government's request to

20   introduce a practice of Defendant Kamholz forging a

21   signature.  This one document, which is already in

22   evidence, and the name Gerry Priamo has already

23   come up as being the signatory of this document, I

24   think it's relevant to briefly go into that, that

25   he didn't sign this form, and he can recognize Mark

1    Kamholz's initials.  We're not going to get into

2    that there's a practice of a forgery.  So we won't

3    be going in contravention of the Court's ruling.

4           MR. LINSIN:  Your Honor, I would just ask

5    what conceivable relevance, even that limited

6    testimony, would have to any issue that is

7    legitimately an issue in this trial?  I fail to see

8    how that's relevant, except the obviously improper

9    innuendo that Mark Kamholz somehow did something

10   wrong.

11          THE COURT:  Well, you know, my ruling I

12   think with respect to 404(b) is clear, and that was

13   category number 5.  And the specific wording of

14   that is Kamholz's practice of forging the plant

15   superintendent's name on certain records submitted

16   to EPA and NY -- New York State DEC --

17          MR. MANGO:  Yes, DEC.

18          THE COURT:  So, I think it falls within

19   the four corners of that exclusion, Mr. Mango.

20   Unless there's a proper purpose for it, other than

21   admissibility under 404, I wouldn't allow it.

22          MR. MANGO:  Well, your Honor, in the

23   limited case then, I'd ask that at least the

24   witness be able to say this is not my signature.

25   There's two other documents that are in evidence

1   that bear his signature that are totally different

2   than this.  This is in evidence, and it relates

3   directly to the Title V counts.  We need to -- we

4   need to have some examination of this because this

5   witness is going to say I relied on Defendant

6   Kamholz in signing this.  So, it is relevant to

7   knowledge of the Title V permit.

8          THE COURT:  He's going to say he relied on

9   Defendant Kamholz in terms of submitting the

10  document?  I mean, did he --

11         MR. MANGO:  In signing the document, yes.

12         THE COURT:  But -- but he -- what else is

13  he going to say?  He's not going to say he objected

14  to it, right?

15         MR. MANGO:  No.  He's going to say he

16  relied on Defendant Kamholz, and that he had a

17  discussion with Defendant Kamholz about -- about

18  these documents before he would sign them.

19         THE COURT:  It seems to me that that

20  interjects the issue that everybody was trying to

21  keep out of here, or at least it runs the risk of

22  confusing the issue.  You have what you want with

23  respect to the certification.  That document was

24  submitted, right, and that's what you wanted --

25         MR. MANGO:  Right.  But left undiscussed,

1    there is now an inference with the jury that

2    this -- that this plant manager did it on his own

3    and signed this document.  He's going to say he has

4    no idea what a Title V permit is.

5            THE COURT:  I mean, how do you move that

6    admission in light of my ruling previously that

7    that smacks of 404(b)?

8            MR. MANGO:  Well --

9            MR. PIAGGIONE:  Can I be permitted to

10   speak at all on this?

11           THE COURT:  I hate to allow you to do

12   that.  Go ahead.

13           MR. PIAGGIONE:  Your Honor --

14           THE COURT:  I mean, are you finished, just

15   so I know?

16           MR. MANGO:  Your Honor, I don't think that

17   it's -- going back to the 404(b), in your ruling,

18   this is not a -- we're not showing a practice here.

19   This is one isolated incident.  But it -- it is so

20   relevant to what everybody relied on Defendant

21   Kamholz to do with respect to the Title V permit.

22   And this very document which says I'm in compliance

23   with the permit, the witness is going to say I

24   didn't even know what the permit was.  So --

25           THE COURT:  Well, is that what he's going

1    to say?

2              MR. MANGO:  Yeah.

3              THE COURT:  I thought you said he relied

4    on the permit submission.

5              MR. MANGO:  No.  He relied on Defendant

6    Kamholz.

7              THE COURT:  Saying what?  That that was

8    submitted?

9              MR. MANGO:  Everything in here is okay.

10   You can sign this.  And I think that's very

11   important testimony when we relate to the Title V

12   charges or in Counts 1 through 15.

13             MR. LINSIN:  And your Honor, that precise

14   testimony can be elicited from this witness without

15   any reference to the signature in this document.

16   I've been listening closely to try and discern why

17   it is that -- or how it is that this signature on

18   this document relates to the point Mr. Mango is

19   saying is the hook for relevance.  And he can

20   certainly elicit from Mr. Priamo did you rely on

21   Mr. Kamholz in signing these certifications.

22             THE COURT:  So there's no problem with the

23   signing if he relied on Kamholz, right?

24             MR. LINSIN:  Well, right.  Right.  And so

25   getting into this detour about, well, is this your

1   signature on this document injects an unnecessary

2   and sinister connotation.

3           THE COURT:  There's reliance.  There's no

4   issue with respect to the reliance.  There is a

5   sinister aspect that can be raised in connection

6   with this.  I'm going to find that this falls

7   within my ruling, that it really is or can be part

8   of the practice of forging documents as you were

9   arguing it.  So I'm going to exclude it.  I'll hear

10  from Mr. Piaggione only so he doesn't --

11          MR. PIAGGIONE:  Just one point, your

12  Honor.  Perhaps you don't recall, but defense

13  counsel introduced two previous documents which

14  they actually focused in on Mr. Priamo's name and

15  certification drawing a distinction between him and

16  Mr. Kamholz.  I think that, in fairness to the

17  individuals testifying, the inference is that he

18  signed all these documents.  At the very least he

19  should be permitted to say, at least in this

20  document, that he did not sign it.  We don't have

21  to get into who may have signed it, but he did not

22  sign that particular document.  I think that's --

23          THE COURT:  But Mr. Mango wanted to go one

24  step further and say, whose initials are they and

25  do you recognize those.

1       MR. PIAGGIONE:  I think we can withdraw

2   that and --

3       MR. MANGO:  Yes.

4       MR. PIAGGIONE:  -- we would just ask for

5   him to be able to say this is not his signature

6   since the inference is already that he's been

7   signing all these documents.

8       THE COURT:  He relied on it.  I don't know

9   if that cures the problem.

10      MR. MANGO:  Well, your Honor, the other

11  thing I would note is, the two other certifications

12  that bear Mr. Priamo's signature are totally --

13  these are all in evidence -- are totally different

14  than this document, which does not bear his

15  signature.

16      And, again, this was a focus during, I believe,

17  cross-examination of Mr. Carlacci, where this was

18  focused in on.  Okay, so who signed this.  I

19  remember they read the certification language.  So

20  this is Mr. Priamo who's certifying to this, right?

21      THE COURT:  So he is going to be

22  testifying about his reliance on information that

23  went into those --

24      MR. MANGO:  Yes, your Honor.

25      THE COURT:  -- particular documents.

1      MR. MANGO:  Yes, your Honor.

2      THE COURT:  Why is the signature that much

3  of an issue?  I think it's too confusing.  I think

4  it can be potentially unfairly prejudicial.  I

5  think it flies in the face of the pretrial ruling

6  of this case as it relates to 404(b).  So I'm going

7  to exclude it.

8      MR. MANGO:  All right.  I won't ask about

9  the signature.

10     The other issue I wanted to bring up is the

11  only witness we currently have here is Mr. Priamo.

12  We were expecting to go a little longer.  We may

13  have a witness available this afternoon.  We will

14  have a witness available this afternoon.  I just

15  wanted to alert the Court of that issue at this

16  point now in terms of scheduling.

17     MR. PIAGGIONE:  The issue is actually it's

18  a witness that we had identified only yesterday as

19  appearing tomorrow.  And it was only lately that

20  we've been able to do that.  The problem was the

21  witness that we had as a -- someone who could

22  testify, had -- his wife was ill in Pittsburgh and

23  he had to leave last night.  And I informed the

24  counsel that we had a change, that Mr. Garing was

25  not going to be available.  But in fairness we did

1    not identify this other witness as being here

2    today.  And --

3              MR. LINSIN:  Or tomorrow, your Honor.

4              MR. PIAGGIONE:  I indicated earlier today.

5              MR. LINSIN:  We were told -- we were given

6    three new names today that weren't on our list for

7    today or tomorrow.  We have had to scurry to try

8    and retrieve binders, but we did not even expect

9    this witness for tomorrow, let alone for today.

10   You know, if -- if -- depending on the length of

11   Mr. Priamo's testimony, if Mr. -- is it Mr.

12   Cratsley --

13             MR. PIAGGIONE:  Yes.

14             MR. LINSIN:  -- who they anticipate being

15   here?

16       If the government wishes to proceed with his

17   direct testimony, we would have no objection.  But

18   I have -- I do now have his witness binder.  I

19   don't believe my co-counsel has his, and I just

20   don't know -- we may not be there in a time issue,

21   but we would just ask for consideration.

22             THE COURT:  Okay.  I'll do that.

23             MR. PIAGGIONE:  Thank you, your Honor.

24             THE COURT:  And, you know, getting back to

25   that other issue with respect to the initials,

1    doesn't that indicate on its face that he signed

2    for?

3              MR. MANGO:  Yes.

4              THE COURT:  So, I mean, if you -- if you

5    try to do it in a way that relates to an adverse

6    inference from doing it that way, I think that's

7    unfairly prejudicial.  I'm going to let my ruling

8    stand, and you'll be precluded from inquiring on

9    that.

10             MR. MANGO:  Yes, your Honor.

11             MS. GRASSO:  Your Honor, we had one more

12   issue, a 404(b) issue.  Last week we had discussed

13   our concerns about 404 evidence that wasn't

14   notified by the government, and that came to our

15   attention through their description in their

16   witness list.  And we've been notified that Sean

17   Hoffman will be testifying probably tomorrow or

18   this week and his description states he will

19   testify about dirty coke pushes, which were not

20   included in the government's notification.

21       I discussed that with Mr. Piaggione, and he

22   said he would not be testifying to that, but the

23   government would be moving to admit photographs

24   depicting those dirty coke pushes.

25       We object to that, your Honor, as being

1    unfairly prejudicial and irrelevant to any of our

2    issues in this trial and just basically a back-door

3    way of getting 404(b) in through photographs, which

4    we believe is not warranted.

5              THE COURT:  Who is the witness?  Daniel --

6              MS. GRASSO:  Sean Hoffman.

7              THE COURT:  Sean Hoffman, okay.

8         All right.  What's your position,

9    Mr. Piaggione?

10             MR. PIAGGIONE:  Yes, your Honor.  We are

11   not introducing any evidence about 303 -- excuse

12   me -- dirty pushing.  That was decided earlier when

13   you indicated your 404(b) decision.  We -- we

14   simply left it out after that.  That was left over

15   from that particular -- it's remnants of a previous

16   description.  The purpose of the photographs -- and

17   I indicated to Ms. Grasso -- we're not going to ask

18   him what's depicted in there beyond the fact that

19   that's a depiction of the plant.  And the reason

20   why is because they're bringing out the fact that

21   there is policy by the -- the company to prohibit

22   photographs from being taken by employees.  And

23   this goes against this concept of open and obvious

24   type of conduct by the defendants.  And he would

25   say that he wanted to show his children where he

1    works so he took some photographs, but they are

2    photographs from his vehicle.  It's obviously taken

3    from his vehicle.  It's simply that that's how he

4    could show his kids where it was.  And it goes to

5    the policy -- contradicts the policy of open and

6    obvious.

7        We're not going to ask him to comment what he's

8    observing or anything along those lines.  If

9    defense is willing to allow us to bring out that

10   that is the policy, I can do it with photographs,

11   if that's an issue.

12            THE COURT:  All right.

13            MS. GRASSO:  Your Honor, it's -- first of

14   all, we're surmising the photographs we're talking

15   about because they weren't identified.  We are

16   surmising they're some of this group in

17   Government's Exhibit 81.  It's unclear when they

18   were taken.  It's unclear how there were relevant,

19   and we're happy to show them to you to show you how

20   they're going to be depicting the plant, which has

21   nothing to do with any of the issues of the case.

22            THE COURT:  Let's talk about relevancy

23   first.  What conceivably is the relevance other

24   than it might contradict the policy against taking

25   photographs?  Where does that fall into place?

 1            MR. PIAGGIONE:  It goes against the

 2    defense.  They're claiming all these violations

 3    were open and obvious when employees can't even

 4    bring in a camera to take a picture of where they

 5    work.

 6            MS. GRASSO:  Your Honor, having worked at

 7    many manufacturing plants, no cameras are across

 8    the board a standard policy.  And the government is

 9    trying to imply that that is some how sinister here

10    by introducing these photographs, which are clearly

11    prejudicial.

12            THE COURT:  Okay.  I haven't seen the

13    photographs.

14            MS. GRASSO:  May I --

15            THE COURT:  I have a problem with

16    relevancy.  And I don't think that that is, as I

17    view it, relevant to the argument with respect to

18    what was open and notorious.

19        So at least my preliminary ruling is -- and

20    I'll take those, I'll take a look at them, unless

21    you object.  I'm going to preclude those photos.

22            MR. PIAGGIONE:  It's not the photos I'm --

23    it's fine, your Honor.  I won't bring the photos

24    in, if that's the issue.

25        But the fact that -- he could testify about the

1    fact that there's a no camera policy.  If defense

2    wants to bring it out on cross, that other

3    manufacturers prohibit it, that's fine.  But he

4    should be at least allowed to testify to that

5    effect.

6           MS. GRASSO:  I think an employee taking

7    photographs has absolutely no relevance to any of

8    our issues in question here.  Any disclosures

9    relevant to DEC has nothing do with the employees

10   taking photographs for their family.

11          THE COURT:  I mean, there's no notice

12   whatsoever in your summary description of what

13   Hoffman was going to testify to.  I'll reconsider

14   it on relevance, if you have a better argument.

15   He's -- you're not calling him until tomorrow?

16          MR. PIAGGIONE:  Yes.

17          THE COURT:  I'll take a look at it again.

18   But preliminarily, I find that it doesn't comport

19   with the summary.  And, secondly, I don't find it

20   relevant to the issue of open and notorious at this

21   point.  I won't allow the questioning or the

22   photos.  I want to see the photos just so I have a

23   perspective on it.

24          MS. GRASSO:  And, your Honor, we're

25   guessing that these are the relevant photos.

1       THE COURT:  You mean the irrelevant

2   photos?

3       MS. GRASSO:  The irrelevant photos.

4   You'll see the ones with the black smoke.

5       THE COURT:  Okay.  I'll look at these

6   after we get through this afternoon, and I'll

7   revisit it tomorrow, if necessary.  But, right now

8   my ruling -- the ruling stands, unless I'm

9   otherwise persuaded.

10      MR. PIAGGIONE:  Okay.

11      THE COURT:  Anything else?

12      MR. MANGO:  Your Honor, we do have a court

13  stipulation to start with, and we can proceed right

14  to the witness.

15      THE COURT:  Okay.  Thank you.  Chris, if

16  you would please.

17      (Jury seated.)

18      THE COURT:  Good afternoon.

19      THE JURY:  Good afternoon.

20      THE COURT:  Please have a seat.  Okay.

21  Sorry for the slight delay.  We actually had to

22  work out some matters.  I think we're there.  But

23  we're ready to start in any event.  And we are

24  resumed in the case of United States versus

25  Tonawanda Coke Corporation and Defendant Mark

1   Kamholz.

2        The attorneys and parties are back, present.

3   The jury is here.  Roll call waived.  We are in the

4   government's case and they have -- the government

5   has the burden of proof beyond a reasonable doubt.

6   The government, I believe, chooses to open with a

7   stipulation.

8        Is that right, Mr. Mango?

9            MR. MANGO:  That's correct, your Honor.

10  May I proceed?

11           THE COURT:  Yes.

12           MR. MANGO:  Thank you.  Your Honor, I'm

13  reading from what's been marked Court Exhibit

14  Number 4.

15       Stipulation:  The United States of America, by

16  and through its attorney, William J. Hochul, Jr.,

17  United States Attorney for the Western District of

18  New York, and Ignacia S. Moreno, Assistant United

19  States -- I'm sorry, Assistant Attorney General for

20  the United States Department of Justice,

21  Environment and Natural Resources Division, and the

22  undersigned Assistant United States Attorney and

23  Senior Trial Attorney, and the undersigned counsel

24  for Defendants Tonawanda Coke Corporation and Mark

25  L. Kamholz, do hereby stipulate and agree to the

1    following fact:

2        The cost to install baffles in the two quench

3    towers at the Tonawanda Coke Corporation in 2009

4    and 2010 was $125,000.

5        And that's dated today, and it's signed by

6    myself, Mr. Piaggione, Mr. Linsin, Ms. Grasso,

7    Mr. Personius, and the defendant, Mr. Kamholz.

8        Thank you, your Honor.

9            THE COURT:  Okay.  And, ladies and

10   gentlemen, that information is yours to consider as

11   competent evidence, should you choose to do that in

12   arriving at your unanimous verdict in this case.

13       Okay.  What's next, Mr. Mango?

14           MR. MANGO:  Ready to proceed, your Honor.

15   The government would call Gerald Priamo.

16           THE COURT:  Okay.  If you'd approach the

17   witness stand, I'll tell you when to stop.  And

18   just keep on coming.  Stop right about there.  Turn

19   around and face the jury, please, and we'll have

20   the oath administered to you.

21   G E R A L D    A N T H O N Y    P R I A M O, having

22   been duly sworn as a witness, testified as follows:

23           THE COURT:  Okay.  Good afternoon.

24           THE WITNESS:  Good afternoon, your Honor.

25           THE COURT:  Be careful.  Get comfortable.

1    THE WITNESS:  Is this water safe to drink?

2    THE COURT:  Yeah, but you better get a

3    clean cup.  And if it helps anything, Mr. Priamo, I

4    can assure you I witnessed the filling of those

5    containers this morning.  All right.  So, the water

6    is fresh as well.

7    Okay.  A few preliminary instructions, and that

8    is that we want you to talk at the microphone.  The

9    microphone is friendly.  You have to speak in a

10   conversational tone.  And if you would direct your

11   attention to the jury, that would be helpful.

12   You're here to testify for their benefit.

13   Try to be as concise with your answers as you

14   can.  If you don't understand a question, just

15   challenge the attorney or me on it to say, look, I

16   don't understand it, ask it again, or ask another

17   question.  And then if you can answer the question

18   yes or no, once you understand it, please try to do

19   that.  Don't volunteer information, if you can help

20   it.  That's what really complicates matters.

21   And, finally, if there's an objection, give me

22   time to rule on the objection before you answer.

23   Then I will give you instructions on whether to

24   answer the question, whether to wait, or whether to

25   follow another path.

1    Do you understand?

2         THE WITNESS:  Yes, your Honor.

3         THE COURT:  Okay.  I think you're going to

4    carry okay.  State your full name and spell your

5    last name.

6         THE WITNESS:  Full name is Gerald Anthony

7    Priamo, P-R-I-A-M-O.

8         THE COURT:  That's the way it should be

9    done.

10        Mr. Mango, that's your witness.

11        MR. MANGO:  Thank you, your Honor.

12   DIRECT EXAMINATION BY MR. MANGO:

13   Q.  Good afternoon, Mr. Priamo.  How are you?

14   A.  Good afternoon, Mr. Mango.

15   Q.  Are you currently employed, Mr. Priamo?

16   A.  No, I'm not.

17   Q.  And what -- if you can tell the jury, what was

18   your most recent employment?

19   A.  Tonawanda Coke.

20   Q.  How long were you employed at the Tonawanda

21   Coke Corporation?

22   A.  Thirty-two years.

23   Q.  And if you could tell the jury, what your last

24   position was at the Tonawanda Coke Corporation?

25   A.  Battery supervisor.

1    Q.   And how long were you in that position?

2    A.   Well, I started as an hourly employee back in

3    1978 at Tonawanda Coke.  After about three years, I

4    became a general foreman.  After about three years

5    after that I became battery supervisor.  In

6    September of 2005 I became plant superintendent

7    until December of 2006.  2006, until sometime in

8    October of 2007, I was assigned to Vanocur.  And

9    after that period of time, I went back and I was

10   back as battery supervisor.

11   Q.   Okay.  So you went through a number of

12   different positions as battery supervisor.  Can you

13   tell the jury what your job duties were?

14   A.   My job duties were to instruct the general

15   foremans [sic] on their job duties.  And usually I

16   would work with the heating department.

17            THE COURT:  Let me just ask a question.

18   You mentioned Vanocur.  That's another company,

19   isn't it?

20            THE WITNESS:  Yes, it is.

21            THE COURT:  Okay.  And you said you were

22   assigned there?

23            THE WITNESS:  Yes, I was.

24            THE COURT:  Okay.

25   BY MR. MANGO:

1    Q.   Is the ownership of Vanocur the same as with

2    Tonawanda Coke Corporation?

3    A.   As far as I know.

4    Q.   Okay.  And have you been -- in your duties at

5    Tonawanda Coke Corporation, have you been

6    dispatched anywhere or traveled at all?

7    A.   Yes.  Starting in roughly 2000, the year 2000,

8    I was -- I went to Indianapolis Coke to do oven

9    repairs.  2002 I went back there.  2002 I went to

10   Erie.  2003 I spent the fall in Erie.  2000 --

11   September of 2004 I was plant superintendent of

12   Erie Coke until 2000 -- until February -- I'm

13   sorry.  It was February of 2004 to February of 2005

14   I was plant superintendent of Erie Coke.

15   Q.   Okay.  Have you -- for the Tonawanda Coke

16   Corporation, have you ever done any travel abroad?

17   A.   Yes.  I was in the Netherlands from June, July,

18   of 2008.  I was in South Africa in November and

19   December of 2006.  I was in Hamilton, Ontario in

20   August and part of September of 2008.

21   Q.   Okay.

22   A.   And I've also been at different coke plants.  I

23   was A.K. Steel in Middletown, Ohio four times.  And

24   I was at Sloss.  That's located in Birmingham,

25   Alabama.  I was there four times.

1   Q.   Okay.  Let's go to Erie Coke Corporation.  Do

2   you know who owns that?

3   A.   Don Crane.

4   Q.   Is he the same person who owns the Tonawanda

5   Coke Corporation?

6   A.   That's correct.

7   Q.   And this company, Vanocur, what is made at

8   Vanocur?

9   A.   It's a new procedure where they make modules to

10  install in the coke ovens to take the place of a

11  silica brick.  It lasts a lot longer.  It's more

12  durable.

13          THE COURT:  Mr. Priamo, you don't have to

14  lean into the microphone.  That will distort it.

15  Just sort of stay straight and talk at it, please.

16  BY MR. MANGO:

17  Q.   And, Mr. Priamo, your travels abroad, just

18  describe in general detail what you were dispatched

19  to do abroad.

20  A.   Supervise.

21  Q.   What you were supervising?

22  A.   The installation of modules.

23  Q.   All right.  And these are the ones that are

24  made at Vanocur?

25  A.   That's correct.

1    Q.   But for a time period you were plant

2    superintendent at the Erie Coke Corporation?

3    A.   That is correct.

4    Q.   Now, in any of these positions you've held in

5    the 32 years you were employed, did you ever

6    receive any type of environmental training by the

7    Tonawanda Coke Corporation?

8    A.   No, sir.

9    Q.   Did you happen to work at the site, the

10   Tonawanda Coke Corporation site, prior to 1978

11   before the Tonawanda Coke Corporation took

12   ownership?

13   A.   Yes.  I worked for Allied Chemical, which is

14   the same place, for three years.

15   Q.   And do you know a person by the name of Mark

16   Kamholz?

17   A.   Yes, I do.

18   Q.   And how do you know him?

19   A.   He's standing right over there.

20           MR. MANGO:  Your Honor, may the record

21   reflect the Defendant Kamholz stood up and the

22   witness indicated in that direction so --

23           THE COURT:  He identified him is what

24   you're trying to get to?

25           MR. MANGO:  Yes, your Honor.

1    THE COURT:  The record will so reflect.

2  BY MR. MANGO:

3  Q.  What position did Defendant Kamholz hold at

4  Tonawanda Coke corporation?

5  A.  Environmental manager.

6  Q.  During your time at the Erie Coke Corporation,

7  did he hold any positions at the Erie Coke

8  Corporation?

9  A.  Environmental manager.

10  Q.  He was environmental manager there as well?

11  A.  That's correct.

12  Q.  Do you know if Defendant Kamholz worked at the

13  Tonawanda Coke site before Tonawanda Coke actually

14  purchased the property?

15  A.  Yes.  He also worked at Allied Chemical.

16  Q.  Okay.  So you've mentioned now that you worked

17  on the battery for a time -- time being.  Quite a

18  long period of time, is that right?

19  A.  That's correct.

20  Q.  Are you familiar with the terms "low

21  production," "high production" -- "low production,"

22  "medium production" and "high production"?

23  A.  Yes, I am.

24  Q.  All right.  If you could tell the jury what do

25  those terms relate to.

1    A.   The amount of ovens that are scheduled to be

2    pushed every day.

3    Q.   And do you have an estimate based on your

4    experience and your work at the Tonawanda Coke

5    Corporation what --

6    A.   Low production would generally be from 24 to 33

7    ovens a day.  Starting at 34 to roughly 42 would

8    be -- or 41 would be medium production.  And from

9    42 on would be high production.

10   Q.   Okay.  Are there any records maintained by

11   battery personnel in the ordinary course of

12   business that would relate to the number of ovens

13   pushed in a day?

14   A.   Yes.  A sheet that the general foreman fills

15   out with the oven number and the scheduled -- what

16   time the oven is supposed to be pushed.  And it's

17   turned over to the pusher operator who fills in

18   what time it's actually pushed, charged, and the

19   amps that pushes the oven out.

20   Q.   All right.  I'd like to show you, Mr. Priamo,

21   for identification purposes on your screen,

22   Government Exhibit 132 for identification purposes.

23            MR. MANGO:  And absent an objection, your

24   Honor, I would move this into evidence.

25            THE WITNESS:  The --

1352

1    MR. MANGO:  Just wait one second,

2    Mr. Priamo.

3    MR. LINSIN:  No objection, your Honor.

4    MR. PERSONIUS:  No objection, Judge.

5    THE COURT:  Okay.  132, no objection.

6    Received.  May be published, if you choose.

7    MR. MANGO:  Yes, your Honor.  I would ask

8    that it be published.

9    (Government's Exhibit 132 was received

10   into evidence.)

11   BY MR. MANGO:

12   Q.  All right.  Mr. Priamo, can you tell the jury

13   now what we're all looking at on our screen?

14   A.  There is 29 ovens scheduled to be pushed.

15   Q.  Okay.  So this is called what?  What is this

16   document?

17   A.  This is a pushing report that's filled out.

18   Q.  That document you were just referring to?

19   A.  Right.

20   Q.  All right.  And what date is this pushing

21   report for?

22   A.  It's Friday, 4/17/09.

23   Q.  Okay.  And you said this would -- this would

24   constitute 29 ovens being pushed?

25   A.  That's correct.

1   Q.   All right.  Now, there is a -- a couple columns

2   I want to just go through so we can understand what

3   this form -- there is an oven number.

4        How are the ovens numbered at the Tonawanda

5   Coke Corporation?

6   A.   They are marked from 61 to 126 minus zero.

7   Q.   Okay.  So 61 -- let's say we got to 68, 69 --

8   A.   Seventy-one.

9   Q.   There would be no 70?

10  A.   Right.

11  Q.   It would go to 71, and then up, okay.

12       So then there's a column which says time

13  scheduled.  What would that indicate?

14  A.   That would be the time the oven is scheduled to

15  be pushed.

16  Q.   Okay.  And then a time, I believe, last

17  charged.

18  A.   That would be the time the oven was charged

19  previously.

20  Q.   Okay.  Who fills out at least the oven number

21  and the time scheduled?

22  A.   That would be the general foreman.

23  Q.   Okay.  And then these other columns -- maybe we

24  can focus on this section here.

25       Okay.  Then there is a time pushed column, a

1    coking time, a brake amps, time leveled, kind of

2    coal, kind of coke, is that correct?

3    A.   That's correct.

4    Q.   Okay.  So the time pushed would relate to --

5    what does that mean?

6    A.   The oven was scheduled at 12:00 o'clock.  It

7    pushed out at, looks like, 12:10.

8    Q.   12:10, all right.  And the coking time there,

9    is that --

10   A.   That's the actual coking time that it is baked

11   before it's pushed would be 49.45 hours that it was

12   in the oven before it was pushed out.

13   Q.   Okay.  And brake amps.  Why don't you tell the

14   jury what break amps means.

15   A.   That's the amount of amperage or amps that it

16   takes to have the ram push the coke through the

17   oven.

18   Q.   Okay.  And what would time leveled mean?

19   A.   That would be the time that the coal is all

20   dumped into the -- to the oven and leveled.

21   Q.   All right.  And then the kind of coal and the

22   kind of coke, you see down in this part here, FDY?

23   A.   That would be foundry coke.

24   Q.   All right.  So this -- if we could just zoom

25   back out, please.

1    This, you mentioned, was 29 ovens.  Would you

2    consider this low, medium, or high?

3    A.   That's low production.

4         MR. MANGO:  Your Honor, I'd ask to show

5    the witness for identification purposes Government

6    Exhibit 133, and absent an objection, move this

7    into evidence.

8         MR. LINSIN:  No objection, your Honor.

9         MR. PERSONIUS:  No objection, Judge.

10        THE COURT:  Okay.  133 received, no

11   objection.  You may publish.

12        MR. MANGO:  Thank you, your Honor.  I

13   would ask that it be published.

14        (Government's Exhibit 133 was received

15        into evidence.)

16   BY MR. MANGO:

17   Q.   Mr. Priamo, what are we looking at on our

18   screen now?  Do you see this?

19   A.   Yes.  We're looking at the same report.

20   Q.   The pushing report?

21   A.   Pushing report.

22   Q.   Is it for a different day?

23   A.   It's for 11/30/08.

24   Q.   Okay.  Now, there's the one column that is

25   not -- there is a column that's not filled in here,

1    coking time.

2    A.   Yeah, I see that.

3    Q.   Okay.  Were there some instances that the

4    coking time was not included?

5    A.   Actually, the general foreman is -- besides

6    filling out the oven number and the time that it's

7    supposed to be pushed, he's also supposed to be

8    filling in the coking time.

9    Q.   Okay.  So looking at this document, we don't

10   know how long this coke had been sitting in the

11   oven, do we?

12   A.   No, we don't.

13   Q.   Okay.  Now, how many ovens indicate were pushed

14   on this day?

15   A.   Thirty-six.

16   Q.   All right.  Would you consider this low,

17   medium, or high production?

18   A.   Medium.

19   Q.   All right.  Let's look at one more pushing

20   report.  I'd like to -- well, I shouldn't have said

21   that, if it's not evidence.

22        Let's look at Government Exhibit 134 for

23   identification purposes.  And absent an objection,

24   move that into evidence.

25             MR. LINSIN:  No objection, Judge.

1    MR. PERSONIUS:  No objection, your Honor.

2    THE COURT:  Okay.  134 received, no

3    objection.  You may publish.

4    MR. MANGO:  I would ask that it be so,

5    thank you, your Honor.

6    (Government's Exhibit 134 was received

7    into evidence.)

8    BY MR. MANGO:

9    Q.  Mr. Priamo, we're looking at another pushing

10   report, is that right?

11   A.  That's correct.

12   Q.  What date is this pushing report for?

13   A.  5/12/07.

14   Q.  All right.  And how many ovens indicate were

15   pushed on 5/12/07?

16   A.  Fifty-two.

17   Q.  All right.  Would you consider that low,

18   medium, or high production?

19   A.  That's high.

20   Q.  Now, in terms of the kind of coke we see here,

21   there's two things listed.  What do you see?

22   A.  I see indy and foundry.

23   Q.  What's indy coke?

24   A.  Indy coke is furnace coke.

25   Q.  All right.  Thank you.  We can take that down.

1    Mr. Priamo, you mentioned that you were plant
2    manager for a period of time?
3    A.   That's correct.
4    Q.   Again, what was the period of time that you
5    were plant manager?
6    A.   September '05 to September of '06 -- or
7    December of '06.
8    Q.   What were your job duties, if you can tell the
9    jury, as plant manager?
10   A.   Basically to make sure the plant was running
11   smoothly.  I'd have discussions with the different
12   department heads on how the departments were
13   running.
14   Q.   What are the different department heads there?
15   A.   We have the coal handling department.  We have
16   a battery department.  We have the boiler house
17   department.  We have the maintenance department,
18   by-product department, electrical department, and
19   you have the railroad or yard department.
20   Q.   Okay.  And they all have different supervisors
21   in charge of those departments?
22   A.   That's correct.
23   Q.   And you would work with all those supervisors?
24   A.   Yes, I would.
25   Q.   As part of your job duties as plant manager,

1    were you ever asked to sign any documents by

2    Defendant Kamholz?

3    A.   Yes, I was.

4    Q.   What documents were you asked to sign?

5    A.   I really don't know.  They were just documents

6    given to me.

7    Q.   Okay.  What is -- what was inside of these

8    documents?

9    A.   Numbers.

10   Q.   Did you ever ask Defendant Kamholz any

11   questions regarding these documents?

12   A.   Yes, I did.  I asked Mark, first of all, if

13   this was legal.  He said, "Yes, it is, it's legal."

14   And I said, "I don't understand what all these

15   numbers are."  He said, "You don't have to worry

16   about that."  He said, "Because you are the plant

17   superintendent, it's your job to sign this form."

18   And I told him a couple times I was not comfortable

19   doing it, but I did it.

20   Q.   I'd like to show you one document that's

21   already in evidence, Government Exhibit 31, please.

22   If we could pull that up?

23       And do you see that document on your screen?

24   A.   Yes, I do.

25   Q.   Okay.  It's titled "Certification of Truth

1360

1    Accuracy and Completeness."

2        Do you see that?

3    A.   Yes, I do.

4    Q.   It has reporting type, annual, and reporting

5    period of January 1st, '05 to December 31st, '05,

6    right?

7    A.   Right.

8    Q.   Were you plant manager during a period in that

9    time period?

10   A.   No, I was -- yes.

11   Q.   You were.  You were plant manager at some

12   point --

13   A.   Some point, yes.

14   Q.   Okay.  Looking at the face of this, do you know

15   what this document is?

16   A.   I do not have a clue.

17   Q.   All right.  If we could go to the next page of

18   this document, document page 2, do you recognize

19   this?

20   A.   Yes, I do.

21   Q.   What do you recognize this as?

22   A.   I just -- when I was told to sign it, I would

23   just look briefly through it, but I don't really

24   know anything that's on there.

25   Q.   Okay.  Do you know, for example, condition

1    number, what condition number that relates to right

2    there?

3    A.   No, I don't.

4    Q.   How about application requirement?  Do you know

5    what that means?

6    A.   No, I don't.

7    Q.   Whether a deviation or not a deviation.  Do you

8    know what that means?

9    A.   No, I don't.

10   Q.   Ever heard of a Title V permit?

11   A.   No, I haven't.

12   Q.   Did you ever review a Title V permit for the

13   Tonawanda Coke Corporation?

14   A.   No, I never did.

15   Q.   Did Defendant Kamholz ever offer to show you a

16   Title V permit?

17   A.   No, he didn't.

18   Q.   Let's just -- if we can go through all of the

19   pages of this document, if you just want to look on

20   your screen briefly.

21        Do you have any personal knowledge -- if we

22   could go back to the first page, please?

23        Do you have any personal knowledge of the

24   contents or the items contained in this document?

25   A.   No, I don't.

1    Q.   Did you rely on anyone in executing this

2    document?

3    A.   I relied on Mark Kamholz.

4    Q.   Why did you rely on Mark Kamholz?

5    A.   As being the environmental manager, he would --

6    he would know that it's up to code.

7    Q.   I'd like to show you Government Exhibit 33.

8    Now up at the top this says annual reporting period

9    1/1/06 to 12/31/06.

10       Were you plant manager at some point during

11   that time period?

12   A.   Yes, I was.

13   Q.   All right.  And if we could scroll through

14   these pages, please?

15       All right.  Do you have any personal knowledge

16   of the contents of Government Exhibit 33?

17   A.   No, I don't.

18   Q.   Again, did you rely on Defendant Kamholz in

19   executing this?

20   A.   Yes, I did.

21             MR. MANGO:  Your Honor --

22             THE COURT:  Let's take a break.

23             MR. MANGO:  Yeah.

24             THE COURT:  All right.  Ladies and

25   gentlemen, we're going to have you step out for

1    just five minutes.

2              (Jury excused from the courtroom.)

3              THE COURT:  Okay.  Mr. Priamo, I'm going

4    to have you step down.  If you'd step out into the

5    corridor, we'll come back out for you.

6              MR. MANGO:  Just wait outside those doors.

7              (Witness left the courtroom.)

8              THE COURT:  Okay.  You have a matter you

9    want to discuss?

10             MR. MANGO:  Yes, your Honor.  I think in

11   light of now the documents that are being on the

12   screen, and -- I think it would be unfortunate if

13   the record has to reflect that this witness

14   executed this document, which he did not.

15             THE COURT:  But you asked him that

16   question, right?

17             MR. MANGO:  Yes.

18             THE COURT:  You said did you rely on --

19             MR. MANGO:  I'm aware of that, your Honor.

20   There's really no other question I could ask.  I

21   seem to be at a loss to be able to -- I was trying

22   to come up -- I had a whole different line of

23   questioning laid out.  And I did change in terms of

24   asking him -- I was just going to simply ask is

25   this your signature at the bottom on the first one.

1    He was going to say yes.  Is this your signature --

2    when we got to this one, is this your signature;

3    no, it's not.  And then just move on.  So instead I

4    then asked were you plant manager during this

5    reporting period.

6              THE COURT:  Okay.

7              MR. MANGO:  And I tried, your Honor.  I

8    just think it's unfortunate to really box him in

9    and have this in front of the jury.  If there was a

10   way we could just simply address this --

11             THE COURT:  All right.  Well --

12             MR. MANGO:  -- I think it would be

13   appropriate.

14             THE COURT:  Were you going to ask him if

15   Mr. Kamholz was authorized to sign his name?

16             MR. MANGO:  I was not going to ask him

17   that question.  I can, if you would like me to.

18   But I'm going to guess from having spent a little

19   bit of time with Mr. Priamo in the past three

20   years, he's going to say no.

21             THE COURT:  So then we have a problem.

22             MR. MANGO:  Yes.  But I could ask that

23   question and report, if you want me to go ask that

24   simple question.

25             THE COURT:  Because if he -- if

1    Mr. Kamholz was authorized to sign his name, that's

2    a different matter, I think --

3            MR. MANGO:  Yes.

4            THE COURT:  -- in terms of my ruling,

5    because then you don't have a forgery, which is an

6    unauthorized signature and it might not fall within

7    the ruling.

8            MR. MANGO:  Right.

9            THE COURT:  But your view is that he's

10   going to in all likelihood say that he did not

11   authorize Mr. Kamholz to sign his name.

12           MR. MANGO:  That would be my -- my --

13           THE COURT:  Educated --

14           MR. MANGO:  -- off-the-cuff educated guess

15   from my knowledge, but I could go ask him.  But --

16           THE COURT:  Okay.  So, what do we have

17   now?  I mean, you got into the signature on this

18   particular document in I think that one question

19   where at least his answer indicated that that was

20   something that he signed.  I don't know exactly how

21   you termed it.  I'm losing my voice, I think.  But

22   you -- so what do you want to do?

23           MR. MANGO:  Your Honor, the government

24   would ask for permission to, in this limited

25   circumstance, craft one question for this one

1366

1    document to ask him is this your signature at the

2    bottom and let it be.  And there's one more -- one

3    more of these certificates that he did sign.  And

4    then move on to the next one.  I think the point is

5    made.  I don't -- I think that's the simplest and

6    most fair way for -- for the testimony to come out.

7    But I'm willing to -- to defer to the Court if

8    there's an alternative here without binding him.

9              THE COURT:  Well, you don't address the

10   MK.

11             MR. MANGO:  I will not address --

12             THE COURT:  And that's -- it's right there

13   next to the signature, so somewhat problematic from

14   that standpoint, right?

15             MR. MANGO:  I could address the MK, if you

16   would like.

17             THE COURT:  Well, it's not what I like.

18   I'm just discussing this with you.

19             MR. MANGO:  Okay.

20             THE COURT:  Mr. Personius?

21             MR. PERSONIUS:  There was no need to get

22   into this document in the fashion Mr. Mango did.

23   He's got two other examples he can use that Mr.

24   Priamo signed, so I'm not even sure why we're going

25   down the road we are going down.

1        In terms of the -- it seems to me the simple

2    answer at this point is -- I don't know if it's

3    just the last question and answer that gets

4    stricken, but just strike from the record the

5    questions that get us into this problem.  That's

6    the equitable way to handle it based on your

7    ruling, Judge.

8             MR. LINSIN:  And, your Honor, if I may add

9    quickly, I was very surprised to see this document

10   called up and displayed in light of the Court's

11   ruling minutes before this witness took the stand.

12   I think to be -- the witness, as I had it, has

13   testified that he had relied on Mr. Kamholz in

14   executing this document.  And my request -- my --

15   what I believe would be an equitable way of

16   resolving this, given the government's decision to

17   call this document up after the Court's ruling, is

18   just to move on.  Move on to the next document.

19       The whole concern that we expressed in our

20   discussion was some indication of impropriety in

21   the way this document was signed, and now the

22   government is claiming they're disadvantaged

23   because they elected to put this up on the screen.

24   And I think they backed into this, and they're now

25   looking for relief.

1         THE COURT:  What if we put Mr. Priamo on

2    the stand out of the presence of the jury and asked

3    him if he authorized the signature as far as

4    Mr. Kamholz is concerned.  If he says no, then you

5    can't go through it at all because it falls within

6    my ruling with respect to 404.  If he says, "Yes, I

7    did", then I don't think there's any harm in asking

8    that.  So why don't we find out on the stand?

9         MR. MANGO:  Your Honor, there's one more

10   issue that's now readily apparent, which I should

11   have raised earlier in my argument.  Mr. Priamo

12   said very clearly I was plant manager from

13   September of '05 to December of '06.  This document

14   is signed January 9th of '07.  He was not plant

15   manager.  So there's another argument to be made as

16   to why this is relevant and not totally unfairly

17   prejudicial and outweighed because he wasn't plant

18   manager.  So someone else put his name down.

19      And, you know, I could just do this on a very

20   limited basis and say the date the signature is

21   there, January 9th of 2007, were you plant manager.

22   I don't have to go into the signature.  I could

23   just ask that question.

24         MR. PERSONIUS:  Judge, Mr. Mango and I had

25   a discussion about this before you came out, and it

1    troubles me that I have to say this.  But Mr. Mango

2    brought up with me before you came out the issue

3    he's now raising.  To suggest that he didn't know

4    about this before you came out to have this

5    discussion, he knew about it, and we discussed it.

6         MR. MANGO:  Your Honor, what I informed

7    Mr. Personius was Mr. Priamo is going to say this

8    is not his signature.  He recognizes the initials.

9    He's going to be able to say this is Mark Kamholz's

10   initials.  We have a problem because there was this

11   Court ruling about forgery, so I want to raise this

12   for the Court's attention.  That's my recollection

13   of the conversation.

14       But he wasn't plant manager.  This is -- this

15   is relevant to Defendant Kamholz's authority to

16   control environmental issues at the plant.

17        THE COURT:  Well, the record now reflects

18   that he relied on Mr. Kamholz, right, for the

19   information?

20       Secondly, his answer acknowledged that he was

21   responsible for that document, meaning Mr. Priamo.

22       You start getting into whether that's his

23   signature or not, whether there was authorization

24   or not, and whether it's in 2007 or not, I think

25   that's attenuated -- I think that's too extended.

1    I think that will unfairly confuse and unfairly

2    prejudice, and I'm going to stay with the original

3    ruling.  Leave the document alone as it is.  You

4    asked the question, he answered it, and we move

5    forward.

6                MR. MANGO:  We'll move on your Honor.

7                THE COURT:  Please, Cheryl.  Thank you.

8                (Witness entered the courtroom.)

9                (Jury not present in the courtroom.)

10                THE COURT:  Okay.  Ask Mr. Priamo the

11    question about whether he authorized the signing of

12    that document.

13                MR. MANGO:  Lauren, can we pull up

14    Government Exhibit 33?  Focus on this bottom half,

15    please.

16        Mr. Priamo, do you see what's on your screen?

17                THE WITNESS:  Yes, I do.

18                MR. MANGO:  Did you authorize anybody to

19    sign your name?

20                THE WITNESS:  No, I didn't.

21                THE COURT:  Okay.  The ruling will stand.

22        We'll bring the jury in, please.

23        Thank you, Mr. Priamo.

24                THE WITNESS:  You're welcome, your Honor.

25                (Jury seated.)

1    THE COURT:  Okay.  We thought we'd

2    introduce a little exercise into your routine

3    today.  Sorry for the delay.  We had to work out a

4    few things.  Please have a seat.  We are ready to

5    go.

6        Back on the stand, ladies and gentlemen, is

7    Gerald Priamo, and you're familiar with him from

8    his earlier testimony.  And he's going to continue

9    with testimony, I think, on questioning by

10   Mr. Mango.

11       Please.

12       MR. MANGO:  Thank you, your Honor.

13   BY MR. MANGO:

14   Q.  The government would like to pull up Government

15   Exhibit 34 already in evidence.

16       All right.  Mr. Priamo, do you see this

17   document on your screen?

18   A.  Yes, I do.

19   Q.  Okay.  And the report type at the top says

20   semi-annual reporting period 1/13/06 to June  30th

21   of '06.  Do you see that?

22   A.  Correct.

23   Q.  Okay.  Were you plant manager during that time

24   period?

25   A.  Yes, I was.

1372

1    Q.  All right.  I'd like to, at this point, scroll

2    through the document, have you look at the pages.

3    Okay.  Do you know what this document is?

4    A.  No, I don't.

5    Q.  Do you know what its purpose is?

6    A.  No, I don't.

7    Q.  Do you know where it gets sent?

8    A.  No, I don't.

9    Q.  Did you have personal knowledge of any of the

10   documents -- or any of the contents of this

11   document at the time you signed it?

12   A.  Could you repeat that, please?

13   Q.  Did you have personal knowledge of any of the

14   contents of this document --

15   A.  No, I didn't.

16   Q.  -- at the time you signed?

17   A.  No.

18   Q.  All right.  Did you rely on anyone in executing

19   this document?

20   A.  Yes.  I relied on Mark Kamholz.

21   Q.  All right.  I'd like to switch topics now and

22   talk -- we can take that down, Lauren.  Thank you.

23       Are you familiar with two abandoned tar tanks

24   that were located in the coal field at the

25   Tonawanda Coke Corporation?

1    A.   Yes, I am.

2    Q.   Can you describe the area around these tar

3    tanks?

4    A.   Tanks were relatively close, but, behind the

5    tanks on the sides, there was a great deal of tar

6    that was very visible from the road.

7    Q.   Okay.   When -- if you can tell the jury, when

8    did you make this observation of the tar on the

9    ground around the tanks?

10   A.   Oh, about 1998.

11   Q.   And how large was the pool of tar that you saw

12   or the tar on the ground?

13   A.   It's really hard to describe because it was so

14   irregular.   I couldn't give a good description.

15   Q.   Did you -- from your observations, were you

16   able to approximate the depth of this tar on the

17   ground?

18   A.   No, I was not.

19   Q.   Okay.   Based on what you observed -- let's

20   start in 1998 -- did you bring this to anyone's

21   attention?

22   A.   Yes.   I brought it to Mark Kamholz's attention.

23   Q.   Okay.   Why did you raise it with Defendant

24   Kamholz?

25   A.   Thought it might be a dangerous situation.

1   Q.  All right.  And following this conversation,

2   what, if anything, happened to the ground around

3   the tanks?

4   A.  Some time maybe a week later, small coke or

5   breeze was put on top of it to try to, I guess,

6   make a hard surface out of it.

7   Q.  All right.  At some point later did you learn

8   that there was a fire in the area around these

9   tanks?

10   A.  Yes.  I was in the Netherlands at the time, but

11   when I came home, I learned that there was a fire

12   there in 2008.

13   Q.  Okay.  So you were in the Netherlands in 2008?

14   A.  That's correct.

15   Q.  After the fire, did you observe anything

16   happening in the area of these tanks?

17   A.  Sometime in late summer or early fall after the

18   inspection of '09, Mr. Rogers was head excavator,

19   and he was actually taking tar out of that area.

20   Q.  So Mr. Rogers -- can you to tell the jury who

21   you mean by Mr. Rogers?

22   A.  Jon rogers.

23   Q.  All right.  So there's a person who worked at

24   Tonawanda Coke Corporation?

25   A.  Yes.  Jon Rogers would be -- he was the

1  supervisor.

2  Q.  All right.  And what -- do you know what he was

3  a supervisor of?

4  A.  I don't know.  You'd have to -- he had a lot of

5  job titles.

6  Q.  Okay.  Had he been there for a while?

7  A.  Yes.  He was there a very long time.

8  Q.  And what exactly did you observe Mr. Rogers

9  doing in the area around these tanks?

10  A.  Taking tar out of that area.

11  Q.  Was he using any type of equipment to do that?

12  A.  An excavator.

13  Q.  Did you see him using the excavator?

14  A.  He was on the machine when I saw him with a

15  bucket, if you will, of tar.

16  Q.  On how many occasions did you see this?

17  A.  Just the one.

18  Q.  All right.  Did you make any other observations

19  relating to the coal piles after you made this

20  observation?

21  A.  About a week later I was driving down a road,

22  and I had -- there was a coal pile pretty close to

23  that area, and it had -- it had some -- some of

24  that -- I don't know if that was mixed, but it was

25  definitely coal sludge.

1    Q.   You saw some type of sludge on a coal pile?

2    A.   That's correct.

3    Q.   Was the coal pile on the concrete pad or on the

4    ground?

5    A.   It was on the ground.

6    Q.   So you saw some what you describe as fresh

7    sludge on a coal pile?

8    A.   That's correct.

9    Q.   Do you know how long that sludge was sitting on

10   the coal pile?

11   A.   No idea.

12   Q.   Did it -- from when you saw it, did it look

13   like anybody was about to scoop it up?

14   A.   No.

15   Q.   Okay.  I'd like to show you Government

16   Exhibit 49.16, which is in evidence, your Honor.

17   Mr. Priamo, do you see this exhibit on your screen?

18   A.   Yes, I do.

19   Q.   All right.  Can you tell us what this structure

20   is here?

21   A.   It's called a flare stack.

22   Q.   If you can tell the jury, what is the purpose

23   of the flare stack?

24   A.   Purpose of the flare stack would be if you lost

25   the exhauster or if you lost power in the plant,

1    the exhauster would not be able to pull gas from

2    the coke ovens and all the gas would stay -- would

3    back up and build up in the battery.  And if you

4    don't open that valve, it actually could do damage

5    to the walls.  You'd have smoke all over the place,

6    and it would be unbreathable.  So, the purpose of

7    the flare stack is when this happens, is to open

8    that and have it lit off.

9    Q.  In your 32 years at the Tonawanda Coke

10   Corporation, how many times have you seen the

11   battery flare stack lit?

12   A.  Twelve to 15 times.

13   Q.  How does the -- how does the flare stack get

14   lit off?

15   A.  There's an automatic igniter at the base which

16   would be roughly down here someplace.

17   Q.  I don't think --

18   A.  It's supplied by natural gas.  There is a

19   natural gas line that comes over which supplies

20   that.  It's always -- it's like a pilot light in

21   your hot water heater.

22   Q.  Okay.  Has it always had a pilot light?

23   A.  No, it has not.

24   Q.  Okay.  What was the period that it did not have

25   a pilot light?

1  A.   I don't know.  It was for a long time.  I don't

2  know when it was removed.

3  Q.   So for a long time?

4  A.   Right.

5  Q.   All right.  Do you know what happened to the

6  pilot light?

7  A.   Just what I was told.  It was removed.

8         MR. LINSIN:  Objection.  Hearsay.

9         THE COURT:  As it stands now, yes,

10  sustained.

11  BY MR. MANGO:

12  Q.   Okay.  Let's switch gears.

13      Did you ever have a conversation with Defendant

14  Kamholz about how to light this battery flash

15  stack?

16  A.   Yes, I did.  When there was no pilot light

17  there, I asked him how do you want us to light

18  that -- that flare stack.  That's pretty tall.  He

19  said -- they used straw brooms to sweep the top of

20  the battery.  Get a straw broom, light it off, and

21  to toss it up there.

22  Q.   Okay.  At some point was the pilot light put

23  back in?

24  A.   Yes, it was.

25  Q.   Do you know why the pilot light was put back

1    in?

2    A.   Larry Sitzman is a DEC official and he gave

3    them a violation one day when he was in the plant

4    for not having it.

5    Q.   Do you know if this battery flare stack is

6    supposed to have a pilot light?

7    A.   Yes, it's supposed to have a pilot light.

8    Q.   Okay.  All right.  Let's talk about the

9    process -- we can take that down, Lauren.  Thank

10   you.

11        Let's talk about the process of quenching hot

12   coke that comes out of the battery.  Are you

13   familiar with that process?

14   A.   Yes, I am.

15   Q.   All right.  Can you tell the jury how many

16   quench towers are at the Tonawanda Coke

17   Corporation?

18   A.   We have two.  We have a number 1, which is on

19   the east side, and number 2, which is on the west

20   side of the coke battery.

21   Q.   Okay.  Did you ever have a conversation,

22   Mr. Priamo, with Defendant Kamholz regarding quench

23   tower number 2?

24   A.   Yes, I did.

25   Q.   This is the one on the east side, right?

1380

1   A.   Yes.

2   Q.   All right.  Why don't you tell the jury what

3   you remember about your conversation with Defendant

4   Kamholz.

5              MR. LINSIN:  Your Honor, I would just ask

6   a point of clarification, given the witness's

7   testimony.  We may have gotten this backwards.

8   Could we clarify east, west, one, two?

9              THE COURT:  Sure.

10             MR. PERSONIUS:  Before we go ahead, could

11   we have a clarification for the time frame for

12   this, please?

13             MR. MANGO:  We're getting to that, your

14   Honor.

15             THE COURT:  Let's start with the

16   locations:  One, two, east, west.

17             MR. MANGO:  Okay.

18             THE COURT:  The other way around.

19   BY MR. MANGO:

20   Q.   Number 2 quench tower, where is that located?

21   A.   East end of the battery.

22   Q.   East end of the battery?

23   A.   East end of the battery.

24   Q.   Number 1 is located where?

25   A.   West end of the battery.

1381

1    Q.  Do you recall a conversation with Defendant

2    Kamholz regarding the number 2 quench tower?

3    A.  Yes, I do.

4    Q.  Okay.  If you can tell the jury when that

5    conversation occurred.

6    A.  I believe it was in '95.  It was -- it used to

7    be called a quench tower, and they had -- it was

8    falling apart, so they remodified it and made --

9    and lowered it and called it a quench tower -- or

10   station, I'm sorry.  Called it a quench station.

11   The quench tower had baffles in it and -- which

12   would catch particles during the process of the

13   quench to eliminate any fugitive dust.

14       And I asked Mark, there's no baffles in number

15   2 quench tower since it's been lowered, and he

16   said, well, it's a law that once it becomes a tower

17   and not a station, it does not need baffles.

18   Q.  Okay.  You just said "once it becomes a tower

19   and not a station".  Do you mean that the other way

20   around?

21   A.  Yes.  I meant the other way around, sorry.

22   Q.  That's okay.

23       So at some point quench tower number 2 you

24   recall being lowered?

25   A.  Yes.

1382

1    Q.  How certain are you of that date, 1995?

2    A.  I'm not really positive.

3    Q.  All right.

4    A.  Just -- it was -- it was a while ago.

5    Q.  Okay.  So at the time the quench tower is

6    lowered, did you make an observation regarding

7    whether there were baffles in the lowered quench

8    tower or not?

9    A.  Yes.  There was no baffles.  I looked in there.

10    Q.  Okay.  And you then brought this to Defendant

11    Kamholz's attention?

12    A.  Yes, I did.

13    Q.  And what did he tell you about whether baffles

14    were required in there or not?

15    A.  He said they didn't require them anymore.  It

16    was a law that once -- once it was made a station,

17    it was low enough where it didn't require them.

18    Q.  Okay.  From that --

19          MR. PERSONIUS:  Your Honor, is this the

20    same conversation twice, or is this another

21    conversation?

22          THE COURT:  Let's get the times set here.

23          MR. PERSONIUS:  If it's just repeating

24    what we already heard or if this is a new

25    conversation.  It's just not clear.

1       THE COURT:  I think it's a continuing

2   conversation.

3       MR. MANGO:  I was trying to clarify since

4   we had a switch up.

5   BY MR. MANGO:

6   Q.  This is the same conversation you had in

7   1995 --

8   A.  Yes.

9   Q.  -- approximately?

10  A.  Yes.

11  Q.  Okay.  So from that point on, the time you

12  bring this to Defendant Kamholz's attention, from

13  that point on, did number 2 tower operate without

14  baffles?

15  A.  Correct.

16  Q.  Okay.  All right.  I'd like to bring up

17  Government Exhibit 15.02.097 which is in evidence,

18  your Honor.  Ask that it be published for the jury.

19      Mr. Priamo, do you see this picture on your

20  screen?

21  A.  Yes, I do.

22  Q.  Okay.  Do you recognize this photograph?

23  A.  That's the bleeder stack from the boiler or

24  from the by-product area.

25  Q.  Okay.  Do you know if the -- so you called this

1384

1    the bleeder?

2    A.   It was always called a bleeder, until after the

3    inspection of '09.  Then it was called the pressure

4    relief valve.  Then it was blanked off completely.

5    Q.   All right.  Do you know if the bleeder was

6    operational between the period of 2005 and 2009?

7    A.   It would bleed during reversals.  Every 20

8    minutes there would be a reversal where all the gas

9    is off the battery.  Sometimes it might be burning

10   165,000 cubic feet of gas an hour.  The gas has to

11   go somewhere, so it would -- it would vent out of

12   that pipe for roughly 15 or 30 seconds.

13   Q.   Okay.  That would happen during when?

14   A.   A reversal on the battery, when the gas is shut

15   off and before the other gas comes back on.

16   Q.   Okay.  Do you know what would come out of this

17   bleeder during a reversal?

18   A.   Coke oven gas.

19   Q.   How would you know coke oven gas would come out

20   of this?

21   A.   Well -- well, the coke oven gas, even though

22   it's cleaned in the by-product area, still has a

23   lot of contaminants in it.  They are known to get

24   naphthalene and sulfur down in the gas pipe and in

25   the basement of the battery.  If it's really

1385

1    extremely cold out, sometimes you could see crystal

2    naphthalene in the air.

3    Q.   Okay.  So when naphthalene freezes --

4    A.   When it gets cold, it crystallizes.

5    Q.   Okay.  Would you see the naphthalene crystals

6    in the area of this bleeder?

7    A.   Yes.

8    Q.   Okay.  Did you ever see any other type of

9    material or frost?

10   A.   Well, sometimes the road that's there, it's

11   called Broadway, would be saturated, but I don't

12   know what it was saturated with.  It was saturated

13   just in the general area.

14          MR. PERSONIUS:  Your Honor, could we again

15   have a time frame for this testimony?

16          MR. MANGO:  Your Honor, I'd asked earlier,

17   is it fair to say that this is -- this would be for

18   the 2005 --

19          MR. PERSONIUS:  Rather than have Mr. Mango

20   suggest an answer to the witness, could we have the

21   witness identify the time frame?

22          THE COURT:  Yeah.  Try to do it that way.

23   Don't lead him into it.  Give us a time frame,

24   please.

25   BY MR. MANGO:

1   Q.   Could you give the jury, Mr. Priamo, a time

2   period that you would see these naphthalene

3   crystals and/or frost?

4   A.   Only -- only extremely cold weather in the

5   wintertime.

6   Q.   Okay.  How about in the -- well, do you know if

7   this bleeder was taken out of service at some

8   point?

9   A.   Yes.  It was after the inspection of '09.

10  Q.   Okay.  So at some point -- you say

11  "inspection." Do you mean the criminal search

12  warrant?

13  A.   Yes.

14  Q.   Okay.  Were you working during the criminal

15  search warrant?

16  A.   Yes, I was.

17  Q.   Do you remember when that was?

18  A.   I believe it was April.

19  Q.   April?

20  A.   I believe.

21  Q.   Okay.  Do you know if there were any other

22  inspections?

23  A.   Criminal inspections?

24  Q.   Yeah.

25  A.   I was out of town when --

1    MR. PERSONIUS:  Your Honor, if he's out of

2    town, this sounds like it's going to be hearsay.

3        THE COURT:  Yeah.

4        MR. PERSONIUS:  I'm concerned about it.

5        THE COURT:  Sustained.

6    There's no question before you right now,

7    Mr. Priamo.  And what year are you talking about

8    now as far as the naphthalene crystals are

9    concerned?

10       THE WITNESS:  There wasn't any certain

11   time frame.  It could be every winter.  It could be

12   whenever.

13       THE COURT:  All right.  Then the

14   inspection that you were talking about in April, do

15   you know what year that was?

16       THE WITNESS:  It was in '09.

17       THE COURT:  Okay.  Thank you.

18   BY MR. MANGO:

19   Q.  Okay.  In April of '09, do you know how long

20   that inspection lasted?

21   A.  A week.

22   Q.  A week, okay.  Let me ask you this.  I asked

23   you for the period of 2005 to 2009.  Prior to 2005

24   did you ever have a conversation with Defendant

25   Kamholz about this bleeder?

1   A.   Yes, I did.

2   Q.   Okay.  If you can tell the jury, when -- when

3   did this conversation take place?

4   A.   Roughly 15 or 20 years ago.  We were at very

5   high production, seemed like we were bleeding gas

6   more than usual.  And --

7   Q.   Why don't you tell -- tell the jury now, first,

8   where did the conversation take place?

9   A.   Took place at the bleeder itself.  I saw

10   Mr. Kamholz over there, and I walked up to him and

11   I asked him if it was legal to bleed gas there, and

12   he said yes, it was.  And I said, "Is this supposed

13   to be lit?"  And he said, "You -- you don't have to

14   worry about that."  So I left it at that.

15   Q.   Did you inquire any more after that?

16   A.   No, I didn't.

17   Q.   And at the time you had this conversation with

18   Defendant Kamholz, what position did he hold?

19   A.   Environmental manager.

20   Q.   Okay.  Let me ask you, do you know a person by

21   the name of Pat Cahill?

22   A.   Yes, I do.

23   Q.   Okay.  If you could, tell the jury how you know

24   Pat Cahill.

25   A.   He's worked there for numerous years.  He

1389

1    worked on the battery when I was battery

2    supervisor.

3    Q.   So at some point you two worked together?

4    A.   Yes.

5    Q.   How would you describe Mr. Cahill's

6    personality?

7    A.   Very easy-going.

8    Q.   Okay.  Now, you mentioned you recalled a

9    week-or-so long inspection in April of 2009?

10   A.   Right.

11   Q.   Did there come a time during that inspection

12   that you observed Pat Cahill speaking to inspectors

13   in the area of this bleeder?

14   A.   Yes.

15   Q.   Okay.  Who else did you see in the area at that

16   time?

17   A.   Mark Kamholz.

18   Q.   Okay.  Subsequently that day, did you see Pat

19   Cahill again?

20   A.   Sometime later that day Pat came up into my

21   office and he was very, very upset.

22   Q.   Okay.  So you had a conversation with him?

23   A.   Yes, I did.

24   Q.   And during that conversation you made a note

25   about his demeanor?

1    A.   Yes.

2    Q.   And it was that he was very upset?

3    A.   Right.

4    Q.   All right.  You testified that you are no

5    longer employed at the Tonawanda Coke Corporation.

6    A.   That's correct.

7    Q.   Okay.  When did you -- when did you leave the

8    Tonawanda Coke Corporation?

9    A.   November of 2010.

10   Q.   Can you tell the jury under what terms you left

11   the Tonawanda Coke Corporation?

12   A.   I was forced into retirement.

13   Q.   Are you testifying here today because you hold

14   any type of grudge or ill will against the

15   Tonawanda Coke Corporation?

16   A.   Not at all.  While I was employed, they treated

17   me well, with respect, and I was well paid.

18            MR. MANGO:  Your Honor, if I just may have

19   a moment.

20            THE COURT:  Sure.

21            MR. MANGO:  Nothing further, your Honor.

22            THE COURT:  Okay.  Mr. Mango, thank you.

23            MR. PERSONIUS:  Your Honor, this would be

24   another witness that I will ask your permission to

25   go first, please.

1    THE COURT:  Certainly, Mr. Personius.  I

2  think we're going to take a 15-minute break.  We'll

3  resume again at 3:45 and we'll go until 4:45 today.

4  Okay?

5       Chris, can you handle the jury?

6            COURT SECURITY OFFICER:  I'm giving it a

7  shot.  Good group.

8            (Jury excused from the courtroom.)

9            THE COURT:  Okay.  You can step down and

10  we'll call you back in 15 minutes.

11            (Short recess was taken.)

12            (Jury not present in the courtroom.)

13            MR. PERSONIUS:  I'm not going to have any

14  questions, just so you know.

15            THE COURT:  Let me sit down.  You guys

16  stay standing.

17       Okay.  Let's see, anything on redirect?

18            MR. PERSONIUS:  Mr. Linsin --

19            THE COURT:  Oh, okay.  All right.  Bring

20  the jury in.

21            MR. MANGO:  I'd love to keep redirecting

22  nothing.

23       Judge, before the jury comes out, we do not

24  have another witness today.

25            THE COURT:  Okay.

1    (Jury seated.)

2    THE COURT:  All right.  You help brighten

3    up our day.  It's always nice to have you come

4    back.  Please have a seat.

5    Okay.  We have Mr. Gerald Priamo back on the

6    stand.  It's time for cross-examination.

7    Your finished with your direct, Mr. Mango?

8    MR. MANGO:  Yes, your Honor.  Thank you.

9    THE COURT:  Okay.  Ladies and gentlemen --

10   the jury is here.  Roll call waived.  The attorneys

11   and parties are back, present.

12   And, Mr. Linsin, do you have any

13   cross-examination?

14   MR. LINSIN:  Thank you, your Honor.  May I

15   proceed, your Honor?

16   THE COURT:  Certainly, please.

17   CROSS-EXAMINATION BY MR. LINSIN:

18   Q.  Good afternoon, Mr. Priamo.

19   A.  Good afternoon.

20   Q.  My name is Greg Linsin and I represent

21   Tonawanda Coke Corporation.  I wanted to follow-up

22   on just a couple of areas with you, please, sir.

23   You testified on direct examination about a

24   time in 2009 when you saw Jon Rogers removing some

25   of the tar residue from the area of those storage

1393

1   tanks, correct?

2   A.   Correct.

3   Q.   In your time, the number of years you've spent

4   out at the plant, you've seen the coal tar sludge

5   from the by-products area also taken out to the

6   coal fields, correct?

7   A.   Correct.

8   Q.   I'm sorry?

9   A.   Correct.

10  Q.   And when you've observed that happening -- now

11  you've -- did you ever operate one of those front

12  end loaders that moved that stuff?

13  A.   I tried once or twice.  Not very good.

14  Q.   Other individuals --

15  A.   I never tried to move anything.  I just tried

16  to run the machine, but it wasn't my thing.

17  Q.   But you would see these front end loader

18  operators move the coal tar sludge from the

19  by-products area and take it out to the coal

20  fields, correct?

21  A.   Correct.

22  Q.   And you would see them put that material on top

23  of the coal pile and then mix it with the coal, is

24  that correct?

25  A.   When they -- the decanter on Broadway across

1    from the ovens, when they would scoop it out, I

2    wouldn't watch where they went.  I knew they took

3    it to the coal field, but I didn't watch them put

4    it in the coal.

5    Q.  All right.  You also saw at some point there

6    was a concrete pad that was built in the coal

7    field, correct?

8    A.  Correct.

9    Q.  And do you recall what time frame that pad was

10   constructed, or no?

11   A.  No, I don't.

12   Q.  All right.  But did you observe that that

13   concrete pad was sometimes used for the storage of

14   some of this coal tar sludge that had been brought

15   in from off-site?

16   A.  Correct.

17   Q.  All right.  May I please have Defendant's

18   Exhibit HHHH, which is in evidence, please.  And

19   enlarge that portion of the -- I'm sorry.  Could we

20   come back out.  Let's try that area.

21       Now, you may not have seen this drawing before,

22   but orient yourself, if you will.  Do you see the

23   coke ovens in the top center of the drawing?

24   A.  Yes.

25   Q.  And do you see the coal handling building just

1   to the left of that?

2   A.   Right.   Sorry.   Yes.

3   Q.   That's all right.

4        Now, when the coke is pushed out of the ovens,

5   it is pushed in the direction that would be down on

6   this diagram, is that correct?   It's pushed -- the

7   lower side of the coke ovens is --

8   A.   Correct.

9   Q.   -- is the push side, correct?

10   A.   Correct.

11   Q.   And --

12   A.   The coke side.

13   Q.   I'm sorry.   The coke side.   The push side would

14   be to the top, correct?

15   A.   Correct.

16   Q.   And I'm just going to draw a line quickly here

17   in the location of those two arrows.

18        Is that -- do you recognize the location of the

19   quench tower number 2 and --

20   A.   Right.   Correct.

21   Q.   -- and quench tower number 1 on the left, is

22   that correct?

23   A.   No, that's not correct.

24   Q.   All right.   The quench tower number 2 is marked

25   with a -- the indication here, quench tower 2,

1    correct?

2    A.   Correct.  Quench tower 1 is down a lot further

3    on your drawing.

4    Q.   We will come back out further then,

5    Ms. Henderson.  Could you bring this back out.

6         Now, my apologies, sir.  Do you see the quench

7    tower which would be quench tower number 1

8    appearing on the left side of this portion of the

9    drawing?

10   A.   Yes.

11   Q.   All right.  And the quench tower on the left or

12   to the west, closer to the river, is quench tower

13   number 1, correct?

14   A.   Correct.

15   Q.   And the quench tower on the right-hand side,

16   quench tower number 2, is to the east side, is that

17   correct?

18   A.   That's correct.

19   Q.   Now, in the time that you worked on the

20   battery, worked at Tonawanda Coke, it's true, isn't

21   it, that quench tower number 1, the tower on the

22   left, was only used periodically?

23   A.   Can you repeat that, and put some kind of a

24   time frame in there?

25   Q.   Sure.  Let me frame it this way.  Between 2005

1    and 2009, that time frame --

2    A.   Okay.

3    Q.   First of all, during that time period, quench

4    tower number 1 was actually out of commission for a

5    couple of years, correct?

6    A.   That's correct.

7    Q.   And at other times, when quench -- during that

8    time frame when quench tower number 1 was not in --

9    was not out of commission, it was only used

10   infrequently, correct?

11   A.   Correct.

12   Q.   And it was quench tower number 2 that was used

13   the vast majority of the time, correct?

14   A.   That's correct.

15   Q.   And that is -- quench tower number 2 is the

16   tower that at one point was lowered, correct?

17   A.   Correct.

18   Q.   And your testimony was that that did not have

19   baffles in it after it was lowered, correct?

20   A.   Correct.

21   Q.   After that tower -- quench tower number 2 was

22   lowered.  And your best recollection is that was in

23   the mid-'90s, '95, '96, correct?

24   A.   Correct.

25   Q.   Do you recall clean air inspectors from the

1    Department of Environmental Conservation coming out

2    to the plant and inspecting the plant?

3    A.   Yes, I do.

4    Q.   All right.   And do you recall that occurring

5    pretty much on an annual basis?

6    A.   Yes.

7    Q.   And perhaps some years even more frequently

8    correct?

9    A.   I'd see them there once a year.

10   Q.   Okay.   And to your knowledge, in that time

11   period, 2005 to 2006, did any of those inspectors

12   ever tell you, or did you hear any of them telling

13   anyone else that baffles needed to be installed in

14   quench tower number 2?

15   A.   No.

16   Q.   Now, you testified -- if we could take this

17   down, Ms. Henderson.   Thank you.

18        You testified about your work on the battery

19   and that part of your duties was to supervise the

20   battery foreman, is that correct?

21   A.   Correct.

22   Q.   And am I correct that each shift had its own

23   battery foreman?

24   A.   They rotated.

25   Q.   All right.   And yet your position was as

1    supervisor for each of those battery foremen,

2    correct?

3    A.   Correct.

4    Q.   Now, in your work on the battery, did you

5    become familiar with the term "back pressure"?

6    A.   Of course.

7    Q.   All right.  And would you describe, please, for

8    the members of the jury, what -- what back pressure

9    is and why it's important?

10   A.   Back pressure is how much coke oven gas is left

11   in the oven on the pressure side of the battery and

12   then on the suction side, what gas pressure is

13   going to the exhauster.

14   Q.   Is it fair to say for those of us who have not

15   worked in a coke plant, that back pressure has some

16   relationship to the amount of internal pressure

17   that is contained within each of the ovens, is that

18   correct?

19   A.   That's correct.

20   Q.   All right.  And is it also accurate that it was

21   the plant superintendent or one of the

22   vice-presidents of the company that decided what

23   that back pressure was supposed to be on the ovens?

24   A.   That's not right.  Usually it was up to the

25   person that was running the battery to set the back

1    pressure.  Only at the end, when Tom Bermingham

2    came aboard, was pressure increased.  He wanted it

3    increased.  We were always running five to six.

4    Q.  All right.  Tom Bermingham served as a

5    consultant for Tonawanda Coke, correct?

6    A.  Right.

7    Q.  And you recall that it was between 2006

8    and 2009 that he was there as a consultant?

9    A.  Someplace around there.

10   Q.  And it's accurate, isn't it, that

11   Mr. Bermingham's belief was that it would be

12   important to slowly increase the back pressure on

13   the ovens, correct?

14   A.  Correct.

15   Q.  And that plan to slowly increase the back

16   pressure was communicated to the people that worked

17   on the battery, correct?

18   A.  That's right.

19   Q.  And some of the people that worked on the

20   battery resisted that plan that had been developed

21   by the company, correct?

22   A.  I think we all did.  I don't think it was

23   developed by the company.  It was developed by Tom

24   Bermingham.  And we all had disagreements that at

25   that time he couldn't put that much pressure on the

1   battery because you were causing excessive stack

2   smoke, because more pressure inside the oven would

3   find any loose cracks in the brickwork and go into

4   the flue walls and come back out the waste heat

5   tunnel to the stack.  And we tried to put -- the

6   stack would continually smoke.

7       Now, everybody has different theories on back

8   pressure.  Until Mr. Bermingham came, we always ran

9   that battery at low back pressure between five and

10  six.

11  Q.  All right.  Let me come at this a slightly

12  different way.  Did you come to realize during your

13  time as the -- as the supervisor for the battery,

14  that there were certain general foremen on the

15  battery that sometimes would lower the back

16  pressure before one of these 303 inspections?

17  A.  Correct.

18  Q.  Do you have any understanding as to how often

19  that happened?

20  A.  No, I don't, to tell you the truth.  It wasn't

21  done on a frequent basis.  And I don't know how

22  long it took place for.

23  Q.  And was it your impression, based upon your

24  supervisory responsibilities on the battery and

25  your oversight of these general foremen, that the

1    people that were doing that, lowering the back

2    pressure before a 303 inspection, were doing it

3    because they just didn't want to do their jobs

4    required to maintain and seal the ovens?

5    A.   Correct.

6    Q.   As a matter of fact, in one of the times you

7    were away from Tonawanda Coke and were traveling on

8    other business, you came back and found that some

9    of those general foremen had been lowering the back

10   pressure in your absence, correct?

11   A.   Correct.

12   Q.   And you had direct words with those foremen

13   telling them that that's not something that they

14   should be doing, correct?

15   A.   Correct.

16   Q.   And one of those individuals was a Mr. Dolan,

17   wasn't it?

18   A.   Correct.

19   Q.   Was it ever your practice, Mr. Priamo, did you

20   ever instruct anyone or would you have authorized

21   anyone to lower the back pressure just to trick the

22   303 inspectors?

23   A.   No.

24   Q.   And if you had ever learned that someone was

25   doing that, as you just testified, you would tell

1    them that that's not permissible and that's not

2    something they should do, correct?

3    A.   It took a while before we finally got Mr. Dolan

4    to start doing his job.  I even put an extra person

5    on midnights to help seal doors so we could get by

6    these inspections without lowering the back

7    pressure.

8    Q.   In fairness to Mr. Dolan, that is a lot of work

9    to a lot of doors on these ovens, correct?

10   A.   Correct.

11   Q.   And a lot of work in order to properly maintain

12   the seals and the frames to get those doors sealed,

13   correct?

14   A.   His job wasn't to change the gaskets in the

15   door.  He had a person in the door room to do that.

16   If he didn't put doors in there for him to gasket,

17   the job's not being done.  I took his chess set

18   away from him one day because I knew he was playing

19   chess instead of doing his job.  So we had words

20   about that.

21        MR. LINSIN:  Your Honor, I have no further

22   questions.

23      Thank you, Mr. Priamo.

24        THE WITNESS:  You're welcome.

25        MR. MANGO:  I don't know if

1404

1    Mr. Personius --

2                THE COURT:  Mr. Personius?

3                MR. PERSONIUS:  Your Honor, I have no

4    cross-examination.  Thank you.

5                THE COURT:  Okay.  Okay.  Thank you.

6                MR. MANGO:  Brief redirect, your Honor.

7                THE COURT:  Okay.  Sure.

8    REDIRECT EXAMINATION BY MR. MANGO:

9    Q.  Mr. Priamo, how are you doing?

10   A.  Good.

11   Q.  All right.  You mentioned -- you talked a

12   little bit about the different quench towers at the

13   Tonawanda Coke Corporation during

14   cross-examination.

15   A.  Right.

16   Q.  All right.  Do you recall if the number 1

17   quench tower was ever brought back online at some

18   point?

19   A.  At the very -- yes, at the end.  Maybe 2009 or

20   '10 --

21   Q.  Okay.

22   A.  -- they started using it.

23   Q.  All right.  Before they brought it online,

24   during the winter months, was quench tower number 1

25   used at any time?

1    A.   I couldn't tell you that, but I could tell you

2    there was an automatic valve that would -- was on a

3    timer that would keep the -- would quench itself,

4    so the place would not freeze.

5    Q.   You talked a little bit about the DEC coming on

6    an annual basis?

7    A.   Right.

8    Q.   Do you remember that?

9         Did you ever yourself personally have

10   conversations with the DEC?

11   A.   Yes, I talked to them.

12   Q.   What did you talk to the DEC about?

13   A.   Nothing.   In general, just what's going on

14   today.   You know, small talk.

15   Q.   Did you ever discuss the baffles with the DEC?

16   A.   No.

17   Q.   Did you ever discuss the bleeder valve with the

18   DEC?

19   A.   No.

20   Q.   Do you know if the quench tower at Erie Coke

21   has baffles?

22             MR. LINSIN:   Objection.   Relevance.

23             THE COURT:   Sustained.

24   BY MR. MANGO:

25   Q.   During the period of time you were abroad,

1406

1    would it be fair to say that you would not know

2    everything that was happening on the battery?

3    A.   That's a fact.

4    Q.   Okay.

5            MR. MANGO:   Thank you, your Honor.

6    Nothing else.

7            MR. LINSIN:   Nothing further, your Honor.

8    Thank you.

9            THE COURT:   Okay.

10            MR. PERSONIUS:   Nothing, Judge.

11            THE COURT:   All right.   All right.

12    Mr. Priamo, you are excused.

13            THE WITNESS:   Thank you, your Honor.

14            THE COURT:   Appreciate it.   Thank you.

15        Okay.   I'm sorry, ladies and gentlemen,

16    scheduling-wise we are at a point where I think it

17    makes more sense to break and let you go home a

18    little bit early.   If you don't want to go, I've

19    got work to do, so you can stay here while I get it

20    done.   I mean, everybody's, I think, in agreement

21    that it would better if we started tomorrow.   And

22    we'll start at as close to 9:30 as we can tomorrow.

23    Okay.   And we'll have a -- should have a full day

24    tomorrow.   Thank you for working with us and

25    cooperating.

1    We ask you and urge -- are we okay?  Yeah?

2    Keep your minds open, not prejudge the case, work

3    to be fair to both sides.  Remember, the government

4    has the burden of proof.  The defendants are

5    presumed innocent.  And you have to decide the fact

6    issues that will be argued to you in connection

7    with the 19 counts in the indictment.  This still

8    is the government's case.  It will continue

9    tomorrow, and, you know, we ask you to please don't

10   do any media scouring, any research, any

11   Internetting, any social media, and don't discuss

12   this case amongst yourselves or anybody that you

13   have contact with.

14       Okay.  All right.  Hate to see you go, but I

15   look forward to seeing you tomorrow at -- what

16   time?

17              THE JURY:  9:30.

18              THE COURT:  See you then.  Thank you.

19              (Jury excused from the courtroom.)

20              THE COURT:  Okay.  Are we -- please have a

21   seat.  Yes.  I'm sorry.  Will your first witness be

22   Sean Hoffman?

23              MR. PIAGGIONE:  Yes, your Honor.

24              THE COURT:  Okay.  Then with respect to

25   the matter of precluding the testimony and the

1  pictures or the photos that we talked about

2  earlier, I've had a chance to look at them at the

3  break, and the testimony related, I think, to the

4  no camera policy, and I ruled, at least at the

5  point that we discussed it, that neither the

6  cameras -- neither the testimony nor the

7  photographs would be allowed.  And I reaffirm that

8  ruling.  You know, I don't find that the no camera

9  policy is really relevant to the open and obvious

10  argument that was made by the government.  I guess

11  the real issue is whether all of this was open to

12  the inspectors, really, and not the general public.

13  So I think we have to view it in that context.

14      Second, I think the photos are a little bit

15  troubling because a couple of them have this black

16  smoke fusing out, and I think that could be

17  possibly prejudicial without having to go into all

18  kinds of explanations and maybe unsatisfactory

19  discussion and that.  So, I mean, I think that's

20  problematic as well.

21      And, you know, I think the testimony about no

22  cameras, you know, if you don't have the context of

23  the industry as part of the consideration, it

24  sounds, at first blush, a little sinister.  And I'm

25  not sure that that really is fair under the

1    circumstances.

2        So for those reasons, you know, I am going to

3    reaffirm my decision and make it final with respect

4    to both testimony about the -- the no camera

5    policy, as well as precluding the admissibility of

6    the photographs.  So I think you have to work

7    around that as far as this witness is concerned.

8            MR. PIAGGIONE:  No problem, your Honor.

9            THE COURT:  Okay.  Okay.  We'll see

10   everybody tomorrow.

11           MR. LINSIN:  Thank you, your Honor.

12           MR. MANGO:  Thank you, your Honor.

13           THE COURT:  You're welcome.

14           *      *      *      *      *      *

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3            I certify that the foregoing is a

4       Correct transcription of the proceedings

5       Recorded by me in this matter.

6

7

8                           s/Michelle L. McLaughlin
                            Michelle L. McLaughlin, RPR
9                               Official Reporter
                                U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25