VOL. VII

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

        -vs-               10-CR-219S

TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
              Defendants.
-------------------------------------


        Proceedings held before the Honorable William M.

Skretny, U.S. Courthouse, 2 Niagara Circle,

Buffalo, New York on March 7, 2013.


        APPEARANCES:

        AARON J. MANGO,
        Assistant United States Attorney,
        ROCKY PIAGGIONE, Senior Counsel,
        U.S. Department of Justice,
        Appearing for the United States.

        GREGORY F. LINSIN, ESQ.,
        JEANNE M. GRASSO, ESQ.,
        ARIEL S. GLASNER, ESQ.,
        Appearing for Tonawanda Coke Corporation.

        RODNEY PERSONIUS, ESQ.,
        Appearing for Mark L. Kamholz.

        Also Present:  Lauren DiFillipo, Paralegal
                    Sheila Henderson, Paralegal


        Michelle L. McLaughlin, RPR,
        Official Reporter,
        U.S.D.C. W.D.N.Y.
        (716)332-3560

1          I N D E X

2          WITNESS                                          PAGE

3      FRANK DAVID GONZALEZ
       Direct Examination by Mr. Piaggione            1420
4      Cross-Examination by Mr. Linsin                1443
       Cross-Examination by Mr. Personius             1458
5      Redirect Examination by Mr. Piaggnione         1478
       Recross-Examination by Mr. Linsin              1479
6      Recross-Examination by Mr. Personius           1479

7      JAMES CRATSLEY
       Direct Examination by Mr. Mango                1484
8      Cross-Examination by Mr. Linsin                1494
       Cross-Examination by Mr. Personius             1497
9      Redirect Examination by Mr. Mango              1507

10     SEAN HOFFMANN
       Direct Examination by Mr. Piaggione            1510
11     Cross-Examination by Mr. Personius             1547
       Cross-Examination by Mr. Linsin                1594
12
       KEITH HUTCHINSON
13     Direct Examination by Mr. Mango                1606
       Cross-Examination by Mr. Linsin                1621
14     Cross-Examination by Mr. Personius             1628
       Redirect Examination by Mr. Mango              1635

15

16

17     GOVERNMENT EXHBITS                              EVD.

18        29                                          1421
          21.61                                       1492
19        49.12                                       1513
          3.02                                        1521
20        3.03                                        1638
          3.04                                        1526
21        3.05                                        1527
          3.07                                        1528
22        3.08                                        1531
          3.09                                        1532
23        119.01                                      1543
          105.40                                      1560

24

25

1412

1                    I N D E X

2      DEFENDANTS' EXHIBITS                  EVD.

3          UUU                          1556

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1413

1        (Jury not present in the courtroom.)

2            MR. PIAGGIONE:  Morning, your Honor.

3            THE COURT:  Good morning, Mr. Piaggione.

4      Okay.  Miss Labuzzetta, I don't mind if

5    everybody keeps on doing what you're doing, but

6    we'll just call the case, please.

7            THE CLERK:  Criminal case 10-219S, United

8    States of America versus Tonawanda Coke and Mark

9    Kamholz.

10           THE COURT:  Okay.  I just would like to

11   know if there are any issues that we have to

12   address before we get started.  I'll need a few

13   minutes just to get organized and get ready.

14           MR. LINSIN:  None on behalf of Tonawanda

15   Coke, your Honor.

16           MR. PERSONIUS:  No, your Honor.

17           MR. PIAGGIONE:  Just a point of

18   clarification, a little change in the schedule.

19   We're calling Frank Gonzalez first.

20           THE COURT:  What?

21           MR. PIAGGIONE:  Frank Gonzalez.

22   Originally, I indicated Sean Hoffmann would be

23   first.  We're going to call Frank Gonzalez first.

24           THE COURT:  How do you spell his last

25   name?

1    MR. PIAGGIONE:  G-O-N.

2    THE COURT:  V-O-N.  Okay.

3    MR. PIAGGIONE:  G as in George.

4    THE COURT:  Oh, G.  Okay.

5    MR. PIAGGIONE:  Sorry, your Honor.  Must

6    be my New York City upbringing.

7    THE COURT:  I don't think so.  I'm

8    developing more impediments than I'd like to think

9    about these days.

10    MR. PIAGGIONE:  Just a point of

11    clarification, your Honor.  I will not ask him

12    about showing Hoffmann's photographs either.

13    THE COURT:  Okay.  Okay.  All right.  By

14    the way, I don't know, those of you that were here

15    for that last status report on that April 9th trial

16    date, I'm not trying to afford you a cushion, I

17    still want to move this case along.  All right.

18    And, you know, we have promised the jury what we

19    did in terms of 30 days.

20    MR. LINSIN:  And your Honor, as I was

21    listening to counsel in that last meeting -- we, of

22    course, because we also have out-of-town experts,

23    have a strong scheduling interest in understanding

24    where things are.  My one request in that regard --

25    I know this sometimes happens in a trial where this

1    many witnesses have been noticed -- if the

2    government perceives that it feels comfortable in

3    jettisoning some of these witnesses and reducing

4    its schedule, we would greatly appreciate knowing

5    that as well so we can plan and schedule

6    accordingly.

7            THE COURT:  Okay.  If it means plugging in

8    witnesses in each other's cases or whatever, you

9    know, I'd be open to that if you are agreeable to

10   that because we do have to move this on.  But

11   again, it's important so I want to make sure that

12   everybody gets the full opportunity for your entire

13   cases.

14           MR. PIAGGIONE:  Your Honor, we're actually

15   attempting to do that.  We're in the process of

16   trying to do that, trying to cull things down.  And

17   as soon as we can see maybe light at the end of the

18   tunnel, we'll let defense counsel know.  I don't

19   anticipate -- although it depends on what's coming

20   here.  I don't anticipate our case going beyond

21   next Friday.

22           MR. LINSIN:  That's actually very helpful

23   information to know, your Honor.  And if that

24   includes an evaluation and a decision then to

25   remove certain witnesses from your order of proof,

1    if you could obviously notify us and the Court as

2    quickly as possible, so we would then target our

3    defense case for the beginning of the following

4    week, that's very helpful information to know.

5    Thank you.

6              THE COURT:  Yeah.  That would be the 18th,

7    then.

8              MR. LINSIN:  Exactly.

9              THE COURT:  Yes.  Okay.  Well, let's --

10   we'll work with that.  If there's changes on that,

11   please let all of us know so that we can make

12   whatever arrangements we need to.  Okay.  All

13   right.  Thank you.

14      Okay.  So, Mr. Gonzalez will be first.  I need

15   probably about five minutes, and then we should be

16   able to get started.

17             (Short recess was taken.)

18             THE COURT:  Chris, you might want to bring

19   in the jury.  The gallery can sit down.  The

20   attorneys probably want to stand until we get the

21   jury in.

22             (Jury seated.)

23             THE COURT:  It's been a long time, but

24   we're back together again.  Good morning.  Please

25   have a seat.

1        All right.  Good to see everybody again.  Hope

2   you had a good trip in and we're about ready to

3   start, I think.  And as you know, we're back on in

4   the case of United States versus Tonawanda Coke

5   Corporation and Mark Kamholz, the defendants.

6        Please keep your minds open.  Don't lose sight

7   of the fact that this is important to both sides,

8   and what it's going to take for you to resolve

9   those fact issues in this case so that you can

10   determine whether or not the government has proven

11   each of the charges that are pending against the

12   defendants.  Has to be an individual analysis of

13   each defendant as to each count.  And the

14   government has that exclusive burden of proving the

15   case beyond a reasonable doubt on each essential

16   element of the crime charged.

17        So, you are, as you know, upcoming in your

18   deliberations the judges of the facts, and we will

19   continue with that hoping your minds remain open.

20   Remember, you're going to get everything you need

21   in the courtroom here.  So we're about ready to

22   start with a next and new witness, and I think

23   maybe your witness, is that right, Mr. Piaggione?

24           MR. PIAGGIONE:  Yes, your Honor.  You're a

25   clairvoyant.

1    THE COURT:  Okay.  I don't know how to

2    take that exactly, but we'll assume it's a

3    complement.

4         MR. PIAGGIONE:  It was meant in all the --

5    as positive a way as possible.

6         THE COURT:  All right.  Good.  All the

7    attorneys and parities are back present.  You, of

8    course, are here, ladies and gentlemen, roll call

9    waived.

10     You want to call your next witness, please.

11        MR. PIAGGIONE:  Yes, your Honor.  The

12   government would call Frank Gonzalez.

13        THE COURT:  All right.  Mr. Witness, if

14   you just sort of make your way, I'll tell you when

15   to stop.  We'll have you stop right there, and

16   you're going to turn around towards the jury.

17   We're going to have you sworn in.

18   F R A N K   G O N Z A L E Z, having been duly sworn

19   as a witness, testified as follows:

20        THE COURT:  Be careful when you come into

21   the box there.  Good.  Couple of preliminary

22   instructions while you're pouring your water there.

23   And I guarantee that was fresh as of this morning,

24   so that will help you out a little bit.  Keep in

25   mind a couple of things.  And you should -- if

1  you're about where you're at, if you speak at the

2  microphone, it's going to pick you up.  It's a

3  pretty friendly device.  And we ask that you sort

4  of make sure your answers go towards the jury

5  because you're here to testify for their benefit.

6      If you don't understand a question, let me

7  know, let the attorneys know, all right, until we

8  get it straightened out.  Don't answer a question

9  that you don't understand.  Be as responsive as you

10  can.  Don't volunteer information.  That usually

11  complicates matters.  If you can answer a question

12  yes or no, do your best to do that.

13      If there's an objection -- and attorneys

14  usually do object, on, you know, a couple of

15  occasions every once in a while -- let me rule on

16  the objection first, then I will tell you either

17  answer the question or wait for another question,

18  or I'll give you some other directive.  Okay?

19              THE WITNESS:  Yes.

20              THE COURT:  All right.  And just keep your

21  voice up.  You know, it will come out clearly on

22  the microphone.

23      State your full name, please.  Spell your last

24  name.

25              THE WITNESS:  My name is Frank David

1    Gonzalez, G-O-N-Z-A-L-E-Z.

2              THE COURT:  Good.  Sounds great.

3        Your witness, Mr. Piaggione.

4              MR. PIAGGIONE:  Thank you, your Honor.

5    DIRECT EXAMINATION BY MR. PIAGGIONE:

6    Q.   Mr. Gonzalez, where are you employed?

7    A.   Tonawanda Coke.

8    Q.   And how long have you been employed there?

9    A.   Nineteen years now.

10   Q.   Okay.  And what is your current position?

11   A.   Oven supervisor.

12   Q.   Okay.  And what are some of the other positions

13   you've held prior to becoming oven supervisor?

14   A.   I was a general foreman.  Before I became a

15   salary, I worked just about all the jobs there

16   starting from the wharf to the charge car,

17   backdoor, by-products operator.

18   Q.   Okay.  And so you worked at by-products, you

19   worked on the wharf, you said?

20   A.   Worked on the wharf.

21   Q.   What's the wharf?

22   A.   It's where they take the coke and coke is

23   placed on this platform.  From there, it goes into

24   the building -- goes into a building where it's

25   separated.

1    Q.   Okay.  And you're familiar with the

2    organizational structure of Tonawanda Coke?

3    A.   Yes, I am.

4    Q.   Okay.

5            MR. PIAGGIONE:  Your Honor, I'm going to

6    mark for identification Government's Exhibit Number

7    29, and absent any objections from the defense, I'd

8    ask that it be introduced into evidence.

9            THE COURT:  That something we don't have

10   on our list or --

11           MR. PIAGGIONE:  It's not been introduced

12   before.

13           THE COURT:  Okay.

14           MR. LINSIN:  No objection, your honor.

15           THE COURT:  Okay.

16           MR. PERSONIUS:  No objection, your Honor.

17           THE COURT:  Okay.  29 received into

18   evidence.  No objection.

19       Do you want it published?

20           MR. MANGO:  Yes, your Honor.  Thank you,

21   your Honor.

22           THE COURT:  You're welcome.

23           (Government Exhibit 29 was received into

24           evidence.)

25   BY MR. PIAGGIONE:

1422

1    Q.   Let the record reflect that the exhibit has the

2    date of 3/24/09.

3         Now Mr. Gonzalez, I'd ask you, where is your

4    position on that chart?

5    A.   As of now?

6    Q.   Yeah.

7    A.   Battery supervisor.

8    Q.   So if you touch the screen -- we forgot to tell

9    you about this.   There you go.   Hey, you did that

10   great the first time out.   That's wonderful.

11        Okay.   Just prior to that, where were you?   You

12   were the general foreman, you said?

13   A.   General foreman.

14   Q.   And your -- your supervisors would be, then,

15   the assistant plant superintendent?

16   A.   People that I answer to?

17   Q.   Yes.

18   A.   Yeah.   Assistant superintendent and plant

19   superintendent.

20   Q.   All right.   And just for clarification, where

21   would -- are you familiar with Mr. Kamholz?

22   A.   Yes.

23   Q.   Okay.   Where is his position on that chart?

24   A.   Environmental manager.

25   Q.   Yes.   Want to touch it?   Okay.

1    And do you recall -- have you worked with an

2    individual named Pat Cahill?

3    A.   Yes.

4    Q.   At one time he was the by-products foreman.

5    Where would that be on the chart?

6         Okay.  If I can summarize this for the record.

7    In the middle of the chart, the bottom of the --

8    the tree of arrows is the general foreman's box,

9    which is clicked and the battery supervisor box

10   which is clicked.  For the environmental QA

11   manager, as it's called, Mr. Kamholz's position, it

12   would be immediately to the right of the box above

13   it, which is called president and that's the box

14   immediately to the right of that.  Below it.  And

15   by-products foreman is indicated to be the third

16   box from the center on the second line of the

17   organizational chart from the bottom.

18              THE COURT:  Let me ask you this:  Are you

19   going to move this -- well, there's no objection to

20   this.  So it's self-explanatory on that basis.

21              MR. PIAGGIONE:  I just wanted to clarify

22   for the record, your Honor, so it would be clean.

23        Miss DiFillipo.

24   BY MR. PIAGGIONE:

25   Q.   Now, with respect to your position as general

1424

1    foreman of the battery, how long were you in that

2    position?

3    A.   Six years maybe.   If I can remember.

4    Q.   Okay.   Going back from where -- from when to

5    when?

6    A.   From '99 to 2000.

7    Q.   Okay.   And after 2000 did you continue to work

8    on the battery?

9    A.   Yes.

10   Q.   Okay.   In what position?

11   A.   I was general foreman from 2000 on and then --

12   then I was -- I was asked to be battery supervisor.

13   Q.   Okay.   So when you said "from 2000 on," do you

14   mean 2000 going 2001, 2002?

15   A.   Going up.   Yeah.

16   Q.   For how many years were you in that position?

17   A.   I'd have to look.   I'd say at least six, seven

18   years, maybe.

19   Q.   Okay.

20   A.   Maybe longer.

21   Q.   Okay.   So, between 2000 to 2008 then you were a

22   foreman, you would say?

23   A.   Yes.

24   Q.   Okay.   On the battery?

25   A.   On battery.

1  Q.  So you know what the term "back pressure" is?

2  A.  Yes, I do.

3  Q.  Okay.  What is it?

4  A.  The amount of gas being held back on ovens.

5  Q.  Okay.  And when you started working on the

6  battery, what was the back pressure set at?  Do you

7  know?

8  A.  When I first started, it was anywhere from five

9  to six.

10  Q.  All right.  And did there come a time that you

11  were advised that the back pressure was going to be

12  raised?

13  A.  Yes.

14  Q.  Do you know approximately when that was?

15  A.  I don't recall the exact year when it was.  I

16  know how it came about.

17  Q.  Okay.  How did it come about?

18  A.  They had a consultant come in by the name of

19  Tom Bermingham, and at that time we were having

20  stack issues where the stack was -- kept on going

21  off.  So Mr. Bermingham's idea was the higher your

22  back pressure, the more carbon you build, the less

23  the stack would smoke.

24  Q.  Okay.  And do you know what a 303 inspection

25  is?

1    A.   Yes, I do.

2    Q.   Okay.  And what is that?

3    A.   We have an inspector come in each day.  Every

4    day he comes in he does -- he comes in and he

5    inspects our doors.  He'll walk and if he sees any

6    visible emissions, he will mark them down.  Also,

7    he will walk the top of the ovens and look for lids

8    and offtakes.  If he sees anything leaking, he will

9    write it down.

10   Q.   And what effect did the raising of the back

11   pressure have on the compliance with 303

12   inspections, if any?

13   A.   The higher the back pressure, the harder it is

14   to seal the ovens.  The more emissions you would

15   have on the doors and the top.

16   Q.   All right.  Did you start getting any

17   instructions from your supervisors regarding the

18   number of emissions that were coming from the

19   doors?

20   A.   Our supervisor -- meaning plant superintendent?

21   Q.   Yes.

22   A.   If our door numbers started to come up, they

23   would tell us we have to do better.  You guys got

24   to do better sealing the doors.

25   Q.   Okay.  And who were your plant supervisors at

1    the time?

2    A.   I had, I'm pretty sure, Gerry Priamo and Dan

3    Heukrath.   I know Gerry was there for a little

4    while and Danny took over there for a while, also.

5    Danny took over the plant superintendent there for

6    a while.

7    Q.   All right.   So did you start having higher

8    numbers?

9    A.   Yes.   As soon as the back pressure came up to

10   eight, it definitely brought our numbers up.   We

11   had more problems sealing the doors.

12   Q.   So did you attempt to seal the doors?

13   A.   Oh, yeah.   Yes, there was no -- I mean, we --

14   we tried everything we could.

15          MR. PERSONIUS:   Forgive me for

16   interrupting, Rocky.   Your Honor, could we have a

17   time frame, please, when this is happening.

18          THE COURT:   Sure.   Give us a time frame.

19          MR. PIAGGIONE:   He said, your Honor, that

20   he couldn't give us the exact year --

21          THE COURT:   No, no, no.   Ask the witness.

22          MR. PIAGGIONE:   Okay.

23   BY MR. PIAGGIONE:

24   Q.   Do you remember the time frame we're talking

25   about?   Was it 2004, 2005, 2006?

1428

1    A.  I would say 2000 -- I think 2006 is when

2    Bermingham was there.  Maybe 2005.  2005, 2006.

3    Q.  Okay.

4            MR. PIAGGIONE:  Is that okay, Rod?

5            MR. PERSONIUS:  Yes, thank you.

6            MR. LINSIN:  Well, your Honor, as -- as I

7    understood the testimony, the witness had said the

8    back pressure had begun at five or six.  He was

9    then testifying about a time when the back pressure

10   had gotten to eight.

11           THE COURT:  Yes.

12           MR. LINSIN:  That would be my -- not

13   necessarily when Mr. Bermingham started, but when

14   it was that the back pressure had been raised to

15   eight.

16           THE COURT:  Well, I think that took place

17   when Mr. Bermingham was there, correct?

18           THE WITNESS:  Yes.

19           THE COURT:  Okay.  Lets -- lets -- when it

20   was raised to eight, was that the result of the

21   directives that were received from Mr. Bermingham?

22           THE WITNESS:  Yes.

23           THE COURT:  Okay.  And as best as you can

24   tell us, that was approximately when?

25           THE WITNESS:  2005, 2006.

1    THE COURT:  Okay.  And before that it was

2    set at five, is that correct?

3    THE WITNESS:  Yes.  It was set at five

4    before he came.

5    THE COURT:  Okay.  Thank you.

6    MR. PIAGGIONE:  Thank you, your Honor.

7  BY MR. PIAGGIONE:

8  Q.  Who were the -- I think -- who were the plant

9    supervisors at that time?  Do you remember?

10  A.  The plant supervisors or the plant

11    superintendent?

12  Q.  Superintendent, excuse me.

13  A.  Gerry Priamo and Danny Heukrath.  I think Danny

14    was the assistant superintendent.

15  Q.  Okay.  And when you got these notes from them

16    saying it was too high, what did you do, if

17    anything, to the back pressure to prevent too many

18    leaks from the doors?

19  A.  After a while --

20    MR. PERSONIUS:  Whoa, whoa.  I'm sorry.

21    I'm sorry.

22    Your Honor, I object.  I think the question is

23    based on facts that I don't recall being in

24    evidence.

25    THE COURT:  I think that's right.  I'll

1    sustain the objection.

2              MR. PIAGGIONE:  Okay.  I'm sorry.  I

3    thought he had testified that --

4              THE COURT:  No.  Whatever you thought, you

5    didn't think right, so start again.

6    BY MR. PIAGGIONE:

7    Q.  Did you get any notes that your numbers were

8    high from the superintendents?

9    A.  It was -- yeah.  They would come -- or they

10   would say, "Yeah, leave a note and tell the guys

11   that the doors are too high."

12   Q.  So you got instructions from them that the

13   doors were too high?

14   A.  Yes.

15   Q.  What did you do, if anything, to prevent the

16   leaks from the doors?

17   A.  After -- after a while trying so hard to keep

18   the doors, we knew as foremen when we were up there

19   with the other foremen, we knew that we couldn't

20   keep it at eight.  There was no way to keep it at

21   eight and keep our door numbers down.  So one day

22   we decided we were going to bring it down.

23   Q.  When you say "we," is it --

24   A.  I did.  I brought it down.

25   Q.  Did you have a conversation with the other

1    general foremen about that?

2    A.   Yeah.   They were like, "Hey, what did you guys

3    do to pass today?"   And it was like, "Well, we just

4    lowered the back pressure."   And they were like,

5    "Oh, okay."   And all of a sudden everybody just

6    caught on -- the other general foremen caught on

7    and it started -- became a routine for them.

8    Q.   Okay.   And who were the names of the other

9    general foremen at that time?

10   A.   You had John Bowman.   I believe Tony Brossack

11   was one.   I believe Dave -- Dave Dahl.   I can't

12   remember the other one now.   There was one other.

13   Q.   Was there a Pete Dolan?

14   A.   Yeah, Pete Dolan.

15   Q.   As a result with the other general foremen, did

16   the lowering of the 303 inspections become a common

17   practice on the battery?

18              MR. LINSIN:   Objection, your Honor.

19              THE COURT:   Grounds?

20              MR. LINSIN:   That -- there has been no

21   testimony from this witness as to when these

22   adjustments were made or for what purpose.

23              THE COURT:   All right.   Reput a question.

24   BY MR. PIAGGIONE:

25   Q.   Okay.   When you had this conversation,

1   approximately when was that in time?  Do you

2   remember what year it was?

3   A.  2000, 2005, 2006.

4   Q.  And as a result of them -- excuse me.  As a

5   result of your conversations with the general

6   foremen, was the lowering of the back pressure

7   during 303 inspections the common practice on the

8   battery during the period that the back pressure

9   was eight or higher?

10  A.  Yes.

11  Q.  Okay.  Now, did you do that to avoid the work

12  of sealing the doors?

13  A.  No.

14  Q.  Okay.  Was it to reduce visible leaks?

15  A.  Yes.

16          MR. LINSIN:  Objection.  Leading, your

17  Honor.

18          THE COURT:  Sustained.

19  BY MR. PIAGGIONE:

20  Q.  What was the purpose of lowering the back

21  pressure?

22  A.  So that it would give us less leaks.

23  Q.  Okay.  Now, did you have a conversation with

24  any of the plant superintendents about -- or

25  assistant plant superintendents about the lowering

1433

1    of the back pressure?

2    A.   Yes.

3    Q.   Who did you have that conversation with?

4    A.   Dan Heukrath.

5    Q.   Okay.  Now, were you ever disciplined -- did

6    you tell him that you were lowering the back

7    pressure?

8    A.   He asked if we were lowering -- somebody had

9    told him.

10            THE COURT:  Give us a time frame, again,

11   on this conversation.

12            THE WITNESS:  2006.

13            THE COURT:  Thank you.

14   BY MR. PIAGGIONE:

15   Q.   Okay.

16   A.   He asked.

17   Q.   And you told him?

18   A.   We told him that we had lowered the back

19   pressure.

20   Q.   Okay.

21            MR. PERSONIUS:  Forgive me.  Could we have

22   identification who the "we" is, please?

23            THE COURT:  Sure.

24   BY MR. PIAGGIONE:

25   Q.   Is it you?

1   A.   Me.  Yes.

2   Q.   Were you ever disciplined for reducing the back

3   pressure?

4   A.   No.

5   Q.   Did you continue to reduce the back pressure?

6   A.   If the number was set to eight, yes.  Only at

7   times.  It wasn't all the time.  It depended on --

8   it depended on the inspector.

9   Q.   Okay.  How about when Inspector Kibler came?

10  A.   Mr. Kibler, he's definitely there to do his

11  job.

12  Q.   Which means what?

13  A.   Which means he will -- if you have a leak,

14  you're going to get a leak.

15  Q.   So does that mean -- does that mean you lowered

16  the back pressure or raised the back pressure?

17  A.   If we knew Mr. Kibler was going to come in,

18  we'd lower it.

19         MR. PERSONIUS:  And again, Judge, forgive

20  me, could we find out to the "we" is?

21         THE WITNESS:  I'm sorry.  The GFs.

22  BY MR. PIAGGIONE:

23  Q.   Who's the GFs?

24  A.   Tony Brossack, Pete Dolan, myself.

25  Q.   Okay.  And to your knowledge, was anyone ever

1435

1   disciplined for this practice?

2   A.   No.

3   Q.   Okay.  As a general foreman, are you familiar

4   with the two quench towers at Tonawanda Coke

5   Corporation?

6   A.   Yes.

7   Q.   Incidentally -- I'll come back.  I forgot to

8   ask you this.

9        Did there come a time that the back pressure

10  was reduced back to five to six as the routine

11  setting?

12  A.   Yes.

13  Q.   When was that approximately?

14  A.   After Tom Bermingham was gone.

15  Q.   Do you know what year that might have been?

16  A.   2008, maybe.

17  Q.   Okay.

18          MR. LINSIN:  Your Honor, if the witness is

19  guessing, I would object.  If it is a maybe, I

20  don't believe that's competent testimony.

21          THE COURT:  Well, I think it goes to the

22  weight and you can explore that, but let's see if

23  you can make it more definite.  If not, the witness

24  will give us his best approximation or if he can be

25  specific what year we're talking about.

1        Ask the question, please, Mr. Piaggione.

2          MR. PIAGGIONE:  Yes, your Honor.

3   BY MR. PIAGGIONE:

4   Q.  Can you say which year you think the

5   pressure -- back pressure was returned to five or

6   six as a routine setting?

7   A.  I can't say the year.

8   Q.  Is there an event?

9   A.  That's what I'm trying to remember, if there

10  was an event.  I know who brought the back pressure

11  down back to five to six.

12  Q.  Okay.  The question is, though --

13  A.  Yes.  My best would be 2008.  That's what --

14         THE COURT:  Okay.  We'll let it stand at

15  that.  Move forward, please.

16         MR. PIAGGIONE:  Thank you, your Honor.

17  BY MR. PIAGGIONE:

18  Q.  Who was responsible for getting the back

19  pressure back down to five or six?

20  A.  I believe Gerry was.  Gerry was.

21  Q.  Who is Gerry?

22  A.  Gerry Priamo.

23  Q.  Okay.  Now, going back to the quench towers at

24  Tonawanda Coke, how many are there?

25  A.  There's two.

1    Q.   And what are they called?

2    A.   They're called quench stations.

3    Q.   Okay.  And is there a west one and east one?

4    One, numbered one?

5    A.   There is a number one and a number two.

6    Q.   Okay.

7    A.   Number two is the west, I think.  Number one

8    and number two.

9    Q.   Okay.  Which is the one closest to the river?

10   A.   Number one.

11   Q.   Okay.  And do you remember how often the two

12   quench towers were used when you first began

13   working on the battery -- and approximately what

14   year did you begin working on the battery?

15   A.   When I first began working on the battery, '95.

16   Q.   Okay.  At that time do you recall how often the

17   number one tower and the number two tower were

18   being used?

19   A.   Number two was used most, but number one was

20   also -- we would -- there was times that we did

21   alternate towers, meaning go from one to the other

22   and you go -- catch one, go into the number one

23   quench station, catch another, go to number two

24   quench station.  This would happen throughout the

25   shift.

1  Q.  And how long did that last, as far as you can

2  recall?

3  A.  It's hard to say, because there was times when

4  the quench station was down.

5  Q.  Right.  Before the quench tower was down, how

6  long did the frequency of using one tower as

7  opposed to the other last?  Was it a year, a month

8  after you started?  Was it a day after you started?

9  A.  Can you repeat the question?

10  Q.  Sure.  How long after you started working on

11  the battery did that practice continue?  Did it

12  last a day, a week, a month, a year?

13  A.  A year.

14  Q.  Okay.  Did it last two years?

15        MR. LINSIN:  Objection.  Asked and

16  answered.

17        THE COURT:  Yes.  It's leading as well.

18  Sustained.  Please move on.

19  BY MR. PIAGGIONE:

20  Q.  And subsequently did that change -- that

21  frequency change?

22  A.  Yes, it did.

23  Q.  Approximately when did that happen?

24  A.  If I were to guess --

25        MR. PERSONIUS:  Your Honor --

1    MR. LINSIN:  Objection.

2    BY MR. PIAGGIONE:

3    Q.  You can't guess.

4    A.  I know I can't guess.  I'm trying to remember

5    these things.  It's kind of hard.  Years -- a lot

6    of years --

7         THE COURT:  Stay right there.  And then

8    we're going to have another question put to you so

9    that you -- it will make it a little bit easier for

10   you to know what you're answering.

11        Go ahead, Mr. Piaggione.

12        MR. PIAGGIONE:  Thank you, your honor.

13   BY MR. PIAGGIONE:

14   Q.  Do you remember the frequency of how the quench

15   towers were used between the years 2005 and 2009?

16   A.  Yes.  I believe it was -- you were supposed to

17   only go to the west -- or you were supposed to go

18   to number one only one or two times per shift, and

19   number two was the rest of the shift.

20   Q.  Okay.  And was that practice always followed?

21   A.  Whether it was followed, I couldn't -- I

22   couldn't -- I couldn't say whether it was followed.

23   I know when I was there or if I told the guys

24   that's what I wanted them to do, that's what my

25   guys did.  On the off shift, if they did anything

1    different --

2    Q.   No.   I'm asking about when you were there.

3    A.   When I was there, that's what it was.   Yeah.

4    Q.   Did that ever change at all while you were

5    working between 2005 and 2009?

6    A.   Yes.   For a while there, they actually put some

7    rail stops in to the tower.

8    Q.   Which tower was that?

9    A.   Number one.

10   Q.   Okay.   And when was that?

11   A.   2006.

12   Q.   Okay.   For how long did that last?

13   A.   That was there for a couple years, two years.

14   Q.   Okay.   Now, did the frequency of use change in

15   the wintertime, prior to the closing of that one

16   rail?

17   A.   Yes.   I think they would go in there a little

18   more frequent to keep it from freezing up.

19   Q.   When you say "a little more frequent," what do

20   you mean?

21   A.   Instead of one or two times a shift, it would

22   be maybe --

23          MR. LINSIN:   Objection to maybe.

24          THE WITNESS:   Sorry.   Instead of one to

25   two times, five times out of the shift.

1    BY MR. PIAGGIONE:

2    Q.   Okay.  And after the rail was removed --

3    A.   The rail stop?

4    Q.   Yes.  How often was it used?

5    A.   I don't recall.

6    Q.   In the wintertime?

7    A.   Oh, in the wintertime.  Five times out of the

8    shift.

9    Q.   So, if you had -- well, okay.

10        How long is a shift?

11   A.   Eight hours.

12   Q.   Okay.  And how many shifts were there in a day?

13   A.   Three shifts.

14   Q.   Okay.  Other than when the east tower was

15   shortened -- do you remember when the east tower

16   was shortened?  The number two tower, when it was

17   shortened?  Was the east number two tower

18   shortened?

19   A.   What do you mean shortened, Rock?

20   Q.   In height.

21   A.   Oh, in height.  I don't recall them doing that.

22   Q.   Okay.  Was the number two tower out of

23   commission at any time?

24   A.   There was a time that it was out of commission

25   and we used just number one.  There was times where

1442

1    the -- I believe there was a time where we lost the

2    pumps in number two tower and there was no pump in

3    the tower so we had to use number one.

4    Q.  All right.  Now, was there a time that you also

5    worked in the by-products area?

6    A.  Yes.

7    Q.  Okay.  And when was that?  Without guessing.

8    A.  '97.

9    Q.  Okay.  And at that time were you aware of

10   something called a bleeder valve?

11   A.  Yes.

12   Q.  All right.  Could you tell us what that was?

13   A.  It was a bleeder valve on the top of the gas

14   line.  Purpose of the bleeder valve was to --

15            MR. PERSONIUS:  Your Honor, he wasn't

16   asked the purpose.

17   BY MR. PIAGGIONE:

18   Q.  What was its function?

19   A.  The function of the valve was to relieve the

20   pressure as the pressure got too high.

21   Q.  Okay.  Did you know -- what pressure?

22   A.  The pressure in the line -- the pressure in the

23   lines.

24   Q.  Okay.  What lines?

25   A.  The gas lines.

1   Q.   Okay.  Would that -- what kind of gas lines?

2   A.   Coke oven gas.

3   Q.   Okay.  Now, when you were there, did you

4   observe the pressure relief -- the bleeder valves

5   release coke oven gas?

6   A.   Yes.

7   Q.   Okay.  How often did you observe it -- how

8   frequent did that occur?

9   A.   Every 20 minutes.

10          MR. PIAGGIONE:  I have no further

11   questions, your Honor.

12          THE COURT:  Okay, Mr. Piaggione.  Thank

13   you.

14       Mr. Linsin.

15          MR. LINSIN:  Thank you, your Honor.

16   CROSS-EXAMINATION BY MR. LINSIN:

17   Q.   Good morning, Mr. Gonzalez.

18   A.   Good morning.

19   Q.   Let me ask you before I begin, sir.  Just

20   because I ask you a question doesn't mean you have

21   to answer it.  If a truthful answer to my question

22   is, I don't remember, please tell us that.  Okay?

23   A.   Okay.

24   Q.   My first question is:  How long did Mr. Tom

25   Bermingham serve as a consultant for the Tonawanda

1    Coke Corporation?

2    A.   How long?

3    Q.   That was my question, yes.

4    A.   I don't have that answer.

5    Q.   So you don't remember?

6    A.   No.

7    Q.   My next question is:  You testified that when

8    Mr. Bermingham first began working there as a

9    consultant, your recollection was that the back

10   pressure on the ovens was in the range of five to

11   six, correct?

12   A.   Yes.

13   Q.   And then you provided some testimony about

14   encountering problems once the back pressure got to

15   eight and higher, correct?

16   A.   Yes.

17   Q.   Now, isn't it true, Mr. Gonzalez, that the

18   raising of this back pressure during the time

19   Mr. Bermingham was there was a slow and gradual

20   process?

21   A.   Yes, it was slow.

22   Q.   Incremental increases, correct?

23   A.   Yes.  I think -- up by one I think they kept on

24   coming up.

25   Q.   Sometimes even by a half a point, correct?

1    MR. PIAGGIONE:  Objection, your Honor.

2  He's now testifying about a half.

3    THE COURT:  No.  I'll permit that.

4  Overruled.

5  You may answer.

6    THE WITNESS:  I don't remember -- I don't

7  remember.  I know by one.  I remember ones.

8  BY MR. LINSIN:

9  Q.  I'm sorry.

10  A.  I remember one.

11  Q.  All right.  But the idea was to elevate the

12  back pressure a certain amount, let the system

13  operate for a period of time, sometimes a number of

14  months, and evaluate what that pressure change has

15  done, correct?

16  A.  Correct.

17  Q.  And those changes would be discussed in the

18  stack meetings, correct?

19  A.  Yes.

20  Q.  The effects of the raising would be debated and

21  potential additional steps discussed as to how to

22  handle any problems that developed, correct?

23  A.  Yes.

24  Q.  And your testimony was that once the back

25  pressure got to eight or higher, you and the other

1446

1    general foremen out on the batteries realized that

2    you were having trouble -- that it was harder --

3    I'm sorry -- harder to seal the ovens for these

4    daily air inspections, correct?

5    A.   Yes.

6    Q.   And you raised this with the plant supervisor,

7    and if I heard your testimony correctly, his

8    response to you was you -- he told you you needed

9    to do a better job of sealing the oven doors and

10   the oven lids, correct?

11   A.   Yes.

12   Q.   He didn't tell you, "Well, just lower the back

13   pressure for the test and then raise it back up

14   again once the inspector leaves," correct?

15   A.   Correct.

16   Q.   Were you aware that one of the other general

17   foremen on the battery was chastised by Mr. Priamo

18   because of his practice of lowering the back

19   pressure --

20   A.   No.

21   Q.   I'm sorry.  Could I finish the question,

22   please.

23   A.   I'm sorry.

24   Q.   Were you aware that one of the other general

25   foremen on the battery was chastised by Mr. Priamo

1    because he was caught lowering the back pressure

2    for a 303 inspection?

3    A.   No.

4    Q.   You talked to Mr. Dolan a lot.  You testified

5    about that, correct?

6    A.   I talked to him.

7    Q.   You talked to him a lot about this issue of

8    lowering the back pressure, correct?

9    A.   We talked about lowering back pressure.

10   Q.   And your testimony is that Mr. Dolan never told

11   you that Mr. Priamo had chastised him for failing

12   to do his job?

13   A.   No.  Mr. Dolan never told me.

14   Q.   Mr. Dolan ever told you that Mr. Priamo even

15   took his chess set away because he didn't think he

16   was doing his job correctly?

17   A.   No.

18   Q.   Now, you testified as you began your testimony

19   that Mr. Bermingham had been brought in by the

20   company because the company was having stack

21   issues, correct?

22   A.   Yes.

23   Q.   And when you say "stack issues," are you

24   talking about the waste heat stack?

25   A.   Yes.

1    Q.   That's a very tall chimney that's just down to

2    the east of the batteries there, correct?

3    A.   Yes.

4    Q.   And do you know what those stack issues were?

5    A.   They would smoke.  Stack would smoke.

6    Q.   And isn't it true, Mr. Gonzalez, that the

7    issues, the problems that the company was having

8    with the waste heat stack were emissions that

9    didn't raise to the level of any violations of a

10   Clean Air Act regulation, but emissions that the

11   company was concerned about and wanted to control

12   before it got to that point?

13           MR. PIAGGIONE:  Objection, your Honor.

14   It's a pretty complex -- compound question.

15           THE COURT:  Do you understand it?

16           THE WITNESS:  Repeat it.  Just repeat it

17   one more time.

18           MR. LINSIN:  Sure.  Sure.  I'm happy to.

19   BY MR. LINSIN:

20   Q.   Isn't it true that the stack issues, which is

21   what prompted Mr. Bermingham to be brought in, were

22   emissions issues out of the waste heat stack that

23   hadn't gotten to the level of a regulatory

24   violation, but the company knew it wanted to get

25   control of this problem, correct?

1   A.   Correct.

2   Q.   The decision by Mr. Priamo to lower the back

3   pressure after Mr. Bermingham no longer worked

4   there as a consultant, was that a decision he

5   made -- that was made -- I'm sorry -- after

6   Mr. Bermingham departed?

7   A.   Yes.

8   Q.   Do you know what year that was?

9   A.   You said don't guess.

10  Q.   If the answer is, "I don't know," please just

11  tell us that.

12  A.   I don't know.  I don't know.

13  Q.   All right.  But the lowering occurred after

14  Mr. Bermingham left, am I correct?

15  A.   Yes.

16  Q.   Is that your recollection?  Thank you.

17       Are you familiar with the use of jumper pipes

18  on the battery?

19  A.   Yes.

20  Q.   Would you describe, please, to the members of

21  the jury what a jumper pipe is?

22  A.   A jumper pipe is used when the oven is being

23  charged.  It's called -- it's called an assist, and

24  what it does, it helps draw the gas to the next

25  oven over so that you don't get emissions from the

1    charging -- through the charging holes.  As the

2    leveling bar travels through the oven, there's a

3    restrict -- it becomes a restriction for the gas to

4    flow, so you have to have somewhere else for the

5    gas to go.  This jumper pipe would be put from one

6    oven -- from the oven you were charging to the next

7    oven over so it would help draw -- instead of just

8    having draw up the stand pipe and into the

9    gooseneck, you would have draw to your next oven

10   and up.  It was an assist.  It would help.

11   Q.  What it would help would be to reduce the

12   release of gas from the ovens, correct?

13   A.  Yes.

14   Q.  And to place it into the next oven that would

15   be charged in the sequence, correct?

16   A.  Right.  The next oven that it would be put into

17   was charged hours ago.

18   Q.  And those -- those -- would you describe just

19   physically, these jumper pipes, what do they look

20   like?

21   A.  Just think of a big 12-inch pipe -- 12, 18-inch

22   pipe in an U shape.  You got a big U-shape pipe.

23   Q.  And they have to be physically manipulated --

24   A.  No.  There is a rail.  There is a rail.

25   Q.  Back off the mike a little bit, please.

1451

1    A.   I'm sorry.   There is a rail and the pipes are

2    pushed up and down by hand.

3    Q.   All right.   And this is one of the duties of

4    the workers on the battery, correct?

5    A.   Yes; of the charge car operator.

6    Q.   And as a matter of fact, there's a specific

7    procedure that the company has put out for charging

8    ovens and all the steps that need to be done to

9    properly charge an oven, correct?

10   A.   Yes, there is.

11   Q.   And the use of these jumper pipes is

12   specifically discussed in there, correct?

13   A.   Yes, it is.

14   Q.   And you're aware, aren't you, that there were

15   several occasions where some of these battery

16   workers were found not using those jumper pipes?

17   A.   Yes.

18   Q.   Correct?

19        And they were disciplined for that, correct?

20   A.   Yes, they were.

21   Q.   And in a couple of instances, were even

22   released, correct?

23   A.   Yes.

24   Q.   Now, you testified that you worked in the

25   by-products area as an operator, correct?

1    A.   Yes.

2    Q.   And how long did you work in by-products as an

3    operator?

4    A.   A year.

5    Q.   And how many -- what shift were you on when you

6    were there?

7    A.   I worked the swing shift.

8    Q.   Meaning what?

9    A.   One week we work first, another week we work

10   second, another week we work third; a rotating

11   shift.

12   Q.   Rotating through each of the three shifts in a

13   24-hour day, correct?

14   A.   Yes.

15   Q.   And I believe you responded to one question

16   about the frequency of the release of this pressure

17   relief valve and your testimony was that that valve

18   released every 20 minutes, correct?

19   A.   Yes.

20   Q.   There were a number of things that influenced

21   the operation of that valve, weren't there?

22   A.   Yes.

23   Q.   And things that caused that valve to release

24   sometimes more frequently, sometimes less

25   frequently, correct?

1   A.   Yes.

2   Q.   The -- the season had an influence, whether it

3   was real hot or real cold had an influence on the

4   frequency of operation of that valve?

5   A.   No.

6   Q.   That's not true?

7   A.   I don't think so.

8   Q.   Okay.  The type of coke that was being produced

9   had an influence on the level of coke oven gas

10  produced and the operation of that valve, didn't

11  it?

12  A.   Yes.

13  Q.   The setting, the release point setting for the

14  valve itself had an influence on how often the

15  valve would release, correct?

16  A.   Yes.

17  Q.   And the other demands throughout the coke oven

18  gas system for coke oven gas would also have an

19  influence on how often that valve would release,

20  correct?

21  A.   Yes.

22  Q.   So it's not really true that that valve

23  released every 20 minutes, is it?

24  A.   Yes, it is true.

25  Q.   Maybe I misunderstood your testimony.  I

1    thought you just testified that there were a number

2    of things that influenced the frequency?

3    A.   Yes.   There's different things that will make

4    it -- a charge -- charging an oven will make it

5    open because the pressure in the line builds past

6    the set point.   And if you're charging an oven and

7    that -- that pressure builds above the set point,

8    the valve will open.

9    Q.   Yes?

10   A.   There's one.

11   Q.   The reversal in the ovens --

12   A.   Reversals --

13   Q.   -- sometimes causes an -- it does an

14   increase --

15   A.   The reversals in the ovens as the -- as the

16   battery reverses, it stops taking gas, causing

17   pressure to build into the line.   As that pressure

18   builds into the line, the bleeder opens because it

19   goes over the set point.

20   Q.   And is it your testimony that the set point was

21   always below that pressure?

22          MR. PIAGGIONE:   Objection, your Honor.   I

23   don't know what reference to "that pressure" is.

24          MR. LINSIN:   The built-up pressure from a

25   reversal.   I'm sorry if my question wasn't clear.

1455

1      Is it your testimony, Mr. Gonzalez, that the

2    set point for the pressure relief valve was always

3    below the peak pressure during a reversal?

4              THE WITNESS:  The set point was set at

5    different levels.

6    BY MR. LINSIN:

7    Q.  Okay.

8    A.  I'm -- just set at different levels.

9    Q.  It was?

10   A.  Yes.  Whether it was set higher so that it

11   wouldn't open, is that possible?  Sure, it was

12   possible.

13   Q.  My question wasn't -- not whether it was

14   possible.

15   A.  Okay.

16   Q.  My question is:  Is it your testimony that that

17   set point was never set that high?

18   A.  It may have been set that high.

19   Q.  All right.  Did you ever change the set point

20   for the pressure relief valve?

21   A.  I knew how.

22   Q.  I'll ask my question again.  Did you ever set

23   or change the set point for the pressure relief

24   valve?

25   A.  Yes.

1456

1    Q.   Why?

2    A.   I was told to.

3    Q.   By whom?

4    A.   By the -- by the -- the by-products supervisor.

5    Q.   And do you know why he told you to change it?

6    A.   Production.

7    Q.   What does that mean?

8    A.   The higher the production.

9    Q.   Let me see if I understand.  Is it correct that

10   higher production resulted in higher gas pressure

11   within the line, is that correct?

12   A.   Yes.

13   Q.   And is it also then your testimony that you

14   were instructed by the by-products foreman that

15   when production was higher, you raised the set

16   point of the PRV, is that correct?

17   A.   No.

18   Q.   That's not correct?

19   A.   No.

20   Q.   Did the BP foreman tell you to lower the back

21   pressure -- I'm sorry -- lower the set point to the

22   PRV?

23   A.   I was told -- I know I've been told to lower it

24   or raise it.  I just did whatever I was told to do.

25   Q.   Okay.

1  A.  And the circumstance why they did it for that

2  one particular day, I don't know.

3  Q.  All right.  But you testified a moment ago that

4  you were told to change it because of high

5  production.

6  A.  High production.

7  Q.  Is that correct?  Do you have a memory of that?

8  A.  No.

9  Q.  You offered some testimony, Mr. Gonzalez, about

10  the quench towers.  And you testified that it was

11  your recollection that quench tower number two, the

12  east quench tower further away from the river, was

13  used most often, correct?

14  A.  Yes.

15  Q.  And you also testified that you had received

16  instructions -- you and the other battery foremen

17  had received instructions that quench tower number

18  one, the quench tower closer to the river, the west

19  quench tower, was only to be used one or two times

20  per shift, is that correct?

21  A.  Yes.

22  Q.  And as a matter of fact, quench tower number

23  one itself was down and out of commission for a

24  couple of years during the 2005, 2009 time period,

25  correct?

1458

1    A.   Yes.

2    Q.   And they had put rail stops on the rail tracks

3    to prevent any of the hot cars from going into that

4    tower, correct?

5    A.   Yes.

6    Q.   And you testified that during the winter months

7    there was a need to use quench tower number one in

8    order to prevent the pipes from freezing, correct?

9    A.   Yes.

10   Q.   But there was also an automatic quench system

11   in quench tower number one so that they could flush

12   those lines without the need for a hot car to go in

13   there, correct?

14   A.   Yes.

15   Q.   And that was used with some regularity,

16   correct?

17   A.   Yes.

18          MR. LINSIN:   I have no further questions.

19   Thank you, your Honor.

20          THE COURT:   Okay, Mr. Linsin.   Thank you.

21      Mr. Personius.

22   CROSS-EXAMINATION BY MR. PERSONIUS:

23   Q.   Good morning, Mr. Gonzales.

24   A.   Good morning.

25   Q.   Could -- Lauren, could we please have -- this

1    is in evidence -- Government Exhibit 29 put on the

2    screen.

3        Mr. Gonzalez, at the start of your testimony,

4    you were asked about this exhibit.  Do you recall

5    that?

6    A.   Yes.

7    Q.   Okay.  And this is the organizational chart for

8    Tonawanda Coke as of March of 2009, is that

9    correct?

10   A.   Yes.

11   Q.   Okay.  And up at the top -- at the very top

12   below the heading, it says "president" with a box

13   around it, right?

14   A.   Yes.

15   Q.   Okay.  And then there's a line with an arrow

16   that drops down from there to plant superintendent?

17   A.   Yes.

18   Q.   And then there is another line below that with

19   an arrow that goes to assistant plant

20   superintendent?

21   A.   Yes.

22   Q.   And then there's another line with an arrow

23   after that where it spreads -- there is a line that

24   spreads in either direction with a number of

25   different supervisors, true?

1    A.   Yes.

2    Q.   And in one of those that you were asked to

3    identify on your direct examination was the box for

4    the by-products foremen.

5    A.   Yes.

6    Q.   And would you do your finger with an arrow,

7    please, for where that box is?  Okay.  Thank you.

8         Now, am I correct in understanding that the way

9    this organizational chart works is that the plant

10   superintendent would report to the president?

11   A.   The plant superintendent -- yes.

12   Q.   And that the assistant plant superintendent

13   would report to the plant superintendent?

14   A.   Yes.

15   Q.   And those supervisors below that, such as the

16   by-products foremen, would be reporting to the

17   assistant plant superintendent?

18   A.   Yes.

19   Q.   That's the way the chain of command is at

20   Tonawanda Coke?

21   A.   Yes.

22   Q.   Now, you were also asked about the box for the

23   environmental manager.

24   A.   Yes.

25   Q.   And for the jury's benefit, please, would you

1461

1   put an arrow there?  Have you done this before?

2   A.   No.

3   Q.   You're good at it.  You're very good.

4       And if I'm understanding this chart correctly,

5   the environmental manager then reports to the

6   president?

7   A.   Yes.

8   Q.   And these who report to the environmental

9   manager, if I'm reading this correctly, would be

10  the laboratory supervisor?

11  A.   Yes.

12  Q.   And then the laboratory technician?

13  A.   Yes.

14  Q.   Have I read this correctly?

15  A.   Yes, you have.

16  Q.   Okay.  You can take that down, Lauren.  Thank

17  you.

18      You were asked on your direct testimony,

19  Mr. Gonzalez, about -- I think about quench

20  stations and quench towers.  Do you remember that?

21  A.   Yes.

22  Q.   All right.  And is it true that, at least in

23  your mind, that at Tonawanda Coke quench station

24  and quench tower were used interchangeably?

25  A.   Yes.

1462

1    Q.   Okay.  It's like some say potato, some say

2    potato?

3    A.   Yes.

4    Q.   Okay.  Thank you.

5         I noticed -- do you remember you testified in

6    the grand jury in this case?

7    A.   Yes.

8    Q.   Okay.  And do you remember that -- you may not

9    remember the exact date, but it was back in

10   early 2010?

11   A.   Yes.

12   Q.   All right.  And did you have a chance to review

13   that grand jury testimony before you came in here

14   to testify?

15   A.   Yes.

16   Q.   When did you review that testimony?

17   A.   Just outside the door.

18   Q.   So just before you came in here?

19   A.   Right.

20   Q.   Okay.  And did you have a chance to get through

21   all the testimony?

22   A.   Not all of it.

23   Q.   No?  How much time were you given to review

24   your testimony?

25   A.   Twenty minutes, half hour.

1463

1    Q.   Okay.  And when did you first find out you were

2    going to be a witness in this case?

3    A.   My lawyer was subpoenaed.

4              MR. PIAGGIONE:  Objection, your Honor.

5    This is now getting irrelevant.

6              THE COURT:  No, absolutely not.  This can

7    be considered for purposes of the jury's viewing

8    the credibility of this witness and his knowledge.

9    Overruled.

10             MR. PIAGGIONE:  Okay.  Thank you, your

11   Honor.

12             THE WITNESS:  In -- last month we met with

13   the -- it is the government here?

14   BY MR. PERSONIUS:

15   Q.   Okay.

16   A.   And that's when they told me we were -- that

17   they were subpoenaing me for trial.

18   Q.   Sometime in February?

19   A.   Sometime in February.

20   Q.   Would it be fair to say it was about a month

21   ago?

22   A.   Yes.

23   Q.   Did you have a chance to review your grand jury

24   testimony at that time?

25   A.   Yes.

1464

1    Q.   And did you review it then?

2    A.   Yes, I did.

3    Q.   Did you review it all?

4    A.   Yes.  I read through it all.

5    Q.   So you've had two opportunities to review your

6    grand jury testimony?

7    A.   Yes.

8    Q.   The occasion back in February.

9    A.   Yes.

10   Q.   And you reviewed it completely?

11   A.   There, I did.

12   Q.   All right.  And then today you had a chance to

13   get through part of it?

14   A.   Just part of it.

15   Q.   Based on those two reviews, one complete and

16   one not complete, did you satisfy yourself that

17   what appeared in that transcript was an accurate

18   reflection of what you testified to in the grand

19   jury?

20   A.   I think things start coming back to you later

21   as you start reading them.

22   Q.   Okay.  But that has to do -- it did help

23   refresh your recollection?

24   A.   Right.

25   Q.   Or your memory?

1465

1    A.   Right.

2    Q.   You're talking here about events that --

3    A.   Happened years ago.

4    Q.   -- years ago.  You've been asked questions

5    about things that go back 15 years, right?

6    A.   Which is tough to remember.

7    Q.   Sure it is.  And you don't mean to suggest to

8    the jury that you've got a perfect memory of what

9    happened 15 years ago, right?

10   A.   Right.

11   Q.   Okay.  And reviewing your testimony at least

12   gave you the benefit of seeing what you had

13   testified about under oath about three years ago on

14   some of these subjects, right?

15   A.   Right.

16   Q.   And in reviewing that transcript, did you

17   detect anything in the transcript that did not

18   accurately reflect what you had testified to back

19   in early 2010?

20   A.   There was only one thing that I wasn't sure

21   what I had said in the grand jury testimony was

22   about the quench stations.

23   Q.   About the quench stations?

24   A.   Yes.

25   Q.   What was that --

1    A.   I wasn't sure -- I wasn't sure -- and back then

2    when they asked the question in the grand jury

3    about the quench stations, and of course it was --

4    it was very nervous -- very nervous going into the

5    grand jury.  In fact, I couldn't even remember

6    names.

7       They asked about the quench stations and the

8    only thing I could recall about the quench stations

9    were -- were we used the number two and then one to

10   two times per shift, I think is what I had said.  I

11   think I also had said on there that when I first

12   started and I was a quench car operator that we had

13   used -- we used it regularly.  I think it says --

14   said it in there.

15   Q.   And we'll get to that in just a minute.  But

16   you were asked a number of questions about the use

17   of quench tower number one and quench tower number

18   two, correct?

19   A.   Yes.

20   Q.   And I'm not -- and I'd like to be clear.  What

21   was it about your testimony in the grand jury from

22   about three years ago that after you reviewed it

23   you didn't think was entirely accurate?

24   A.   Well, I think it was fairly accurate --

25   Q.   Okay.

1    A.   -- testimony that I gave to the grand jury.

2    Q.   Okay.  Well, you've told us here today that

3    there was some point in time where -- if I use the

4    term "quench tower number one or the west tower,"

5    you know which one I'm referring to?

6    A.   Yes.

7    Q.   The one by the river?

8    A.   By the river.

9    Q.   That that was used up to five times a shift?

10   A.   That was in the cold months.

11   Q.   All right.  Did you testify to that in the

12   grand jury?

13   A.   I testified in the grand jury -- I think if you

14   look back on it, it says when I first became an

15   operator that we alternated; meaning one in one

16   tower, one in another tower.

17   Q.   Why don't we do this.  If we can, could we --

18   maybe this will assist you and assist the jury in

19   understanding your testimony.  Could -- Lauren,

20   could we please -- this is for identification.

21   Could we please have Government Exhibit 3524.01 put

22   on the screen for Mr. Gonzalez and counsel and the

23   Court.

24        Do you see the -- the first page of this

25   exhibit, it has a yellow sticker that says 3524.01

1468

1    Government Exhibit?

2    A.   Yes.

3    Q.   And do you recognize this to be the first page

4    of your grand jury testimony provided on February 4

5    of 2010?

6    A.   Yes.

7    Q.   And you were asked during that grand jury

8    appearance, as I think you've acknowledged, a

9    number of questions about the use of these two

10   quench towers, correct?

11   A.   Yes.

12   Q.   Before you gave any testimony, you were sworn

13   in to tell the truth, correct?

14   A.   Yes.

15   Q.   All right.  And if we could, please, Lauren, go

16   to page 41.  This isn't working because of how it's

17   set up.  I need the page that has page 41 of the

18   grand jury transcript, Lauren.  I apologize.  Thank

19   you.  Go to the next page, please, Lauren.

20       All right.  Now, the page that's now on the

21   screen, so that we've got this identified for the

22   record, is page 33 of this exhibit.

23       Do you see that down in the lower right?

24   A.   0033.

25   Q.   Yes.  You see that?

1    A.   Yes.

2    Q.   That's just so we have it noted for the record.

3    Now, let's go to line 17 if we can, please.

4        And you were asked:  "How did the quenches

5    rotate between those two towers?  How did you

6    decide which quench tower to take it to?"

7        Do you see that question?

8    A.   Yes.

9    Q.   And your answer was:  "Usually, for the most

10   part, number two quench station is the quench

11   station.  They use it the most."

12       And then the question on line 21 was:  "What

13   is?"

14       And then on line 22 you said:  "The east one,

15   we said."

16       Do you see that?

17   A.   Yes.

18   Q.   And so your initial testimony on this in the

19   grand jury was that the one that was used most

20   would have been number two or the east tower,

21   right?

22   A.   Yes.

23   Q.   That would be the one away from the river?

24   A.   Yes.

25   Q.   Okay.  And Lauren, would you go to the next

1470

1    page, please.  And highlight that part there,

2    please, Lauren.

3         All right.  Now, we're on the next page of this

4    exhibit, and on line 15 you were asked:  "How often

5    are you using the west side quench tower?"

6         And then your answer was:  "In an eight-hour

7    period?"

8         And then the next question was:  "Right."

9         And then on line 18, your answer was:  "Two

10   times.  One or twice, maybe."

11        Is that correct?

12   A.   Yes.

13   Q.   All right.  And again, we're talking about the

14   west or number one quench tower, right?

15   A.   Yes.

16   Q.   Would you go to the next page, please, Lauren.

17   Go back to the other page.  I apologize.

18        We're on page 0034 of this exhibit,

19   Mr. Gonzalez?

20   A.   Yes.

21   Q.   And Lauren, that bottom part there.

22        Now, on this page on line 13, the question was:

23   "Okay.  When it was operational, let's talk about

24   the east quench tower.  How often is that being

25   used?"

1       And your answer was:  "Most of the shift."

2       Right?

3   A.   Yes.

4   Q.   "Most of the operators used that" -- and I

5   think we may have to go to the next page, Lauren.

6       -- "tower," right?  You say at the top of page

7   35?

8   A.   Yes.

9   Q.   Okay.  And then Lauren, could we, please -- I

10  think we probably need to go two more pages

11  forward.  Okay.  We're on page 0037 of this

12  exhibit.

13  A.   Yes.

14  Q.   And Lauren, that part, please.

15      Now, on line 2, you were asked:  "Just so I've

16  got your testimony clear on the quench tower,

17  during the time you were a general foreman working

18  out there, your testimony is you would be using the

19  east quench tower about six times a shift the

20  majority of the time, but you'd also be using the

21  quench tower one or two times per shift."

22      And your answer was:  "Yes."

23  A.   Yes.

24  Q.   You can take that down, Lauren.

25      Can we agree, Mr. Gonzalez, that when you

1    testified in the grand jury, the most that you said

2    that quench tower number one, the west tower, was

3    used was once or twice a shift?

4    A.   Yes.

5    Q.   Not five times a shift, right?

6    A.   Yes.

7    Q.   And when was it that you came up with the

8    number five for the frequency of the use of that

9    tower during a shift?

10   A.   As I go back and start remembering things.

11   Q.   Okay.  So your memory is better today --

12   A.   Then from that day, yes.

13   Q.   -- then it was three years ago.

14   A.   Well, that -- as you get -- sit back and start

15   thinking, you start recalling.

16   Q.   You were asked questions about this in the

17   grand jury in February of 2010 that went on for

18   three or four pages of your testimony, weren't you?

19   A.   Yes.

20   Q.   And the most times you ever said that the west

21   tower was used in a shift was once or twice,

22   correct?

23          MR. PIAGGIONE:  I'm going to object, your

24   Honor.  Actually, that's not what it says in the

25   transcript.  It's only part of it.

 1          THE COURT:  The witness can answer what he

 2     said and then if you need to clarify it, you may.

 3   BY MR. PERSONIUS:

 4     Q.  Do you agree?

 5     A.  Can you ask the question again?

 6     Q.  Sure.  The most times you testified back

 7     in February of 2010 that the west tower or number

 8     one was used in a shift was once or twice, true?

 9     A.  No.

10     Q.  Oh, you didn't?

11     A.  I believe in -- from when I read this, it says

12     somewhere in there when I first became an operator

13     about using it more than one time a shift.  Or one

14     or two times a shift.

15     Q.  And if you found the -- if you have the -- the

16     testimony, that would help you find that?

17     A.  Yes.

18          MR. PERSONIUS:  Your Honor, I don't know

19     if you want to do this on a break or how.  I'm

20     happy to have Mr. Gonzalez review his --

21          MR. PIAGGIONE:  I can provide the

22     reference, your Honor, if that would speed things

23     up.

24          MR. PERSONIUS:  Sure.

25          MR. PIAGGIONE:  Just go to page 41, point

1   0041.  If you look at -- starting at line 15.

2            MR. PERSONIUS:  Which line, Rocky, would

3   you like to go to?

4            MR. PIAGGIONE:  Starting at line 15.

5            MR. PERSONIUS:  Line 15?

6       Okay.  Let's -- in the interest of

7   completeness, we're on what page, Rocky?

8            MR. PIAGGIONE:  041.

9            MR. PERSONIUS:  041?

10  BY MR. PERSONIUS:

11  Q.  Can we start, Lauren, please, on line 6 where

12  the question starts.  Thank you.  Okay.

13       Starting on line 6, the question was:  "How

14  long?  You mentioned you used the west quench tower

15  one or two times per shift.  If you could think

16  back and specifically with your different positions

17  you had -- you were a quench car operator as well.

18  How far back did that go?  I mean, since you've

19  been there for, what, 17 years.  Ever been there?"

20  That's the question?

21  A.  Yes.

22  Q.  Okay.  "I can remember way back when I was a

23  quench tower operator using that quench station,

24  because something was wrong with the other quench

25  station because the one was broken down, and I also

1475

1      remember when I was a quench car operator, we'd

2      alternate.  Two would go down and then come back

3      the other way and did a couple more on the west

4      end.  It's hard to remember exactly when."

5          Is that what your testimony was?

6      A.   Yes.

7      Q.   Then the next question was:  "Did you say you

8      had a distinct memory of not using -- it's always

9      been used in the back in some way or another?"

10         And your answer was:  "We use it -- I remember

11     a while back, we were told, 'Don't use this.  Can't

12     use it again,' and they put rail stops inside

13     there."

14         Is that right?

15     A.   Yes.

16     Q.   Okay.  Now, this period of time when the quench

17     towers were alternated, when was that?

18     A.   When I was a hot car operator.

19     Q.   What was that?

20     A.   '96.  '96.

21     Q.   1996?  And how long did that last?

22     A.   I don't recall.

23     Q.   Did it end before 2000?

24     A.   I don't recall.

25     Q.   You don't remember how long you worked in that

1    position?

2    A.   Oh, in the position itself?

3    Q.   Yes.

4    A.   As a quench car operator, couple months.

5    Q.   A couple of months.  So a couple of months back

6    in the 1990s, you remember that the -- these towers

7    were alternated?

8    A.   Yes.

9    Q.   And otherwise your testimony was that it was no

10   more than twice a shift that, in your experience,

11   that quench tower number one was used, right?

12   A.   Yes.

13   Q.   Okay.  Now, you worked in the -- or you do work

14   in the battery area, correct?

15   A.   Yes, I do.

16   Q.   And do you remember testifying in the grand

17   jury that in the battery area there's a respirator

18   that you have to use?

19   A.   Yes.

20   Q.   And could you describe the type of respirator

21   that you use in the battery area?

22   A.   Cartridge.

23   Q.   Okay.  Is it like a half face mask?

24   A.   Half face cartridge.

25   Q.   Okay.  What kind of cartridges are in there?

1477

1    A.   They're just cartridges.

2    Q.   Do you know what the purpose of the cartridges

3    is?

4    A.   Filter the particulates out.

5    Q.   Particulate matter, right?

6    A.   Right.

7    Q.   Okay.  And is there a rule that when you're in

8    the battery area, you have to wear one of those

9    respirators?

10   A.   Yes.

11   Q.   And have you ever seen Mr. Kamholz in the

12   battery area?

13   A.   Yes, I have.

14   Q.   And when he's in the battery area, is he too

15   required to wear this respirator?

16   A.   Yes, he is.

17   Q.   And you've seen him wear it?

18   A.   Yes, I have.

19   Q.   Have you seen him, when he's not actually

20   wearing it, have it hanging around his neck hanging

21   down?

22   A.   I don't recall.

23   Q.   Okay.

24            MR. PERSONIUS:  Can I have a minute,

25   please, Judge?

1          THE COURT:  Sure.

2          MR. PERSONIUS:  Your Honor, I'm finished

3     with our cross.

4        Thank you, Mr. Gonzalez.

5          THE WITNESS:  Thank you.

6          MR. PIAGGIONE:  I only have a couple of

7     questions, your Honor.  I don't know if you want to

8     take a break first.

9          THE COURT:  No.

10         MR. PIAGGIONE:  Okay.

11         THE COURT:  Thank you.

12   REDIRECT EXAMINATION BY MR. PIAGGIONE:

13   Q.  Mr. Gonzalez, when you said two cars would go

14   to the west quench tower per shift, how many

15   ovens -- was it eight ovens you said in that

16   testimony?

17   A.  In that testimony if I said eight ovens, it's

18   probably we were at eight ovens during the shift.

19   Yes.

20   Q.  All right.  So two of those -- one to two of

21   those would go to the west tower?

22   A.  Yes.

23   Q.  How many shifts were there in a day?

24   A.  Three shifts.

25   Q.  So that would be a total of 24 ovens?

1  A.  Yes.

2  Q.  And that means how many cars would go to the

3  west tower?

4  A.  Six in a 24-hour period.

5          MR. PIAGGIONE:  No further questions, your

6  Honor.

7          THE COURT:  Mr. Linsin.

8  RECROSS-EXAMINATION BY MR. LINSIN:

9  Q.  Mr. Gonzalez, the number of ovens pushed in any

10  one shift changed over time, didn't it?

11  A.  Yes.

12  Q.  If it was low production, it would be fewer;

13  high production, more ovens pushed, correct?

14  A.  Yes.

15  Q.  And yet your testimony is that the number of

16  times this hot car went down to the west -- the

17  west quench tower was one to two times per shift,

18  correct?

19  A.  Yes.

20          MR. LINSIN:  No further questions.

21          MR. PERSONIUS:  Just one question, Judge.

22  RECROSS-EXAMINATION BY MR. PERSONIUS:

23  Q.  When Mr. Piaggione asked you about the total

24  number of times that the west tower would be used

25  over the three shifts -- in other words, in a

1  day -- what was the reason you said it would be six

2  rather than three to six?

3  A.  He asked how many ovens we were pushing in a

4  day.  And you're talking eight ovens a day, 24

5  ovens -- or I mean, you're talking eight ovens a

6  shift, 24 ovens.

7  Q.  But your testimony has been that it was one or

8  two times a shift, right?

9  A.  One shift -- one shift is an eight-hour period,

10  pushing eight ovens.

11  Q.  So there are three shifts in a day.  Three

12  times eight is 24.

13  A.  Right.

14  Q.  Right?

15  A.  Right.  24.

16  Q.  Your testimony was that the west tower would be

17  used one or two times a shift.

18  A.  Per shift.

19  Q.  Right?

20  A.  Right.

21  Q.  You multiply one or two times three, it's three

22  to six.  It's not six.

23  A.  You're right.  Three to six.

24  Q.  Three to six to be accurate.

25  A.  Three to six.  One to two would be three to

1    six.

2              MR. PERSONIUS:  Nothing further, Judge.

3    Thank you.

4              MR. PIAGGIONE:  I have nothing further.

5              THE COURT:  All right.  Mr. Gonzalez,

6    that's it.  You're excused.  Thank you.

7              THE WITNESS:  Thank you.

8              THE COURT:  You're welcome.

9         All right.  Let's take 15.  We'll start again

10   at 11:30.  The government will have its next

11   witness ready, please.

12        Ladies and gentlemen, we want you all to come

13   back.  So -- but take your break now, okay.

14              (Jury excused from the courtroom.)

15              THE COURT:  Before you break, we're going

16   to be down on March 22nd.  That would be a Friday.

17   Okay.  So just make sure that that works with

18   everybody.

19              MR. MANGO:  Yes, your Honor.

20              MR. LINSIN:  Thank you, your Honor.

21              THE COURT:  Okay.  We will let the jury

22   know.

23              (Short recess was taken.)

24              (Jury seated.)

25              THE COURT:  Well, it looks like you're

1    almost over those morning blahs so we're going to

2    start.  All right?  Thanks for coming back.  Have a

3    seat.  We're back on in the case of United States

4    versus Tonawanda Coke Corporation and Mark Kamholz,

5    the defendants.  The jury's back.  Roll call

6    waived.  The attorneys and parties are present.

7        Mr. Mango, it looks like you're ready for some

8    reason.

9            MR. MANGO:  I'm on the edge of my seat,

10   your Honor.  Yes.  The government would call James

11   Cratsley.

12           THE COURT:  Okay.  Is there a James

13   Cratsley here?

14           MR. MANGO:  There is.

15           THE COURT:  Come on up, please.  If you

16   would approach the witness box and I'll tell you

17   when to stop.  All right.  Right there.  Okay.  And

18   then turn around towards the jury, please.

19   J A M E S   C R A T S L E Y, having been duly sworn

20   as a witness, testified as follows:

21           THE COURT:  Okay.  Good morning, sir.  I

22   have a couple of instructions for you, the same

23   ones I give to all the witnesses.  And it's

24   important that you realize that you're here to

25   testify for the benefit of the ladies and gentlemen

1    of the jury.  Okay.  So I'll ask you to direct your

2    responses to them, look in that direction if you

3    can.  I know there will be some going back and

4    forth with the lawyers, but if you don't understand

5    a question, don't answer the question.  Just ask

6    the lawyer or if I'm asking you questions, by

7    chance, just say, "Judge, I don't understand it.

8    Repeat it."  We'll do that for you.  Be as succinct

9    with your answers as you can.  Don't volunteer

10   information.  That's what complicates matters.  If

11   you can answer a question with a yes or no, please

12   try to do that.

13        And sometimes there may be an objection to a

14   question.  Wait until I rule on the objection, and

15   then I will give you instructions; complete an

16   answer, or I'll tell you -- the attorneys to ask

17   another question or some instruction like that.

18   Okay?

19                THE WITNESS:  Okay.

20                THE COURT:  And we need to know how you're

21   going to sound on the microphone system.  You don't

22   have to be right on top of it but you have to speak

23   in a conversational tone right at the microphone.

24   So state your full name, spell your last name for

25   us.  Okay.

1    THE WITNESS:  James Cratsley.

2    C-R-A-T-S-L-E-Y.

3    THE COURT:  All right.  Sounds good.

4    Thank you.

5    Mr. Mango, you're on.

6    MR. MANGO:  Thank you, your Honor.

7    DIRECT EXAMINATION BY MR. MANGO:

8    Q.  Mr. Cratsley, how are you doing this morning?

9    A.  I'm nervous.

10   Q.  All right.  Nervous.  Do you want to be here?

11   A.  Not really.

12   Q.  All right.  How you do you feel about being

13   here?

14   A.  Not good.

15   Q.  All right.  Why don't you tell the jury -- I

16   appreciate you being here, though.

17   Why don't you tell the jury how or if you're

18   currently employed?

19   A.  No, I'm retired.

20   Q.  And have you ever been employed at the

21   Tonawanda Coke Corporation?

22   A.  Yes.

23   Q.  What period of time were you employed at that

24   location?

25   A.  From 1990 to 2012.

1485

1    Q.   What positions -- if you can tell the jury,

2    what positions did you work at the Tonawanda Coke

3    Corporation?

4    A.   I worked on the ovens.  I ran all the machinery

5    up there.  I worked in the coke handling, loading

6    trucks, and then I worked in the by-products

7    department.

8    Q.   Okay.  Do you recall the time periods that you

9    worked in the by-products department?

10   A.   I actually worked there twice.  Once from

11   '94 to '98 and then from 2005 until 2009.

12   Q.   Okay.  And then --

13   A.   Excuse me.

14   Q.   Yes.

15   A.   I stand corrected.  Till 2012.

16   Q.   2012?

17   A.   2012.

18   Q.   And were you an operator during that time

19   period in by-products?

20   A.   Yes.

21   Q.   Okay.  Why did you leave the Tonawanda Coke

22   Corporation?

23   A.   I quit to retire.

24        MR. MANGO:  Your Honor, if we could pull

25   up Government Exhibit 15.02.097 which is in

1    evidence.

2              THE COURT:  Okay.

3    BY MR. MANGO:

4    Q.  Mr. Cratsley, do you see what we have on our

5    screen here?

6    A.  Yes.

7    Q.  Okay.  Can you tell the jury what -- what this

8    is?

9    A.  That's the bleeder.

10   Q.  Is that what you called it?

11   A.  It's a bleeder or pressure relief valve.

12   Q.  All right.  What did you call it?

13   A.  I called it the bleeder.

14   Q.  All right.  Are you familiar with the operation

15   of this bleeder?

16   A.  Yes.

17   Q.  As part of your employment as a by-products

18   operator, did you have any responsibilities

19   regarding the operation of this bleeder?

20   A.  To monitor it and set -- set the set point as

21   directed by a foreman.

22   Q.  All right.  We'll talk about that in a minute.

23       During the period of 2005 to 2009, was the

24   bleeder that you see on the screen operational in

25   this location?

1  A.  Yes.

2  Q.  And did you -- that time period I just gave

3  you, 2005 to 2009, did you work in the by-products

4  department that whole time period?

5  A.  Yes.

6  Q.  And were you an operator that whole time

7  period?

8  A.  Yes.

9  Q.  During that time period, what was the purpose

10  of this bleeder?

11  A.  To release gas pressure in the line when it

12  became too much.

13  Q.  All right.  How would it -- can you explain for

14  the jury just how it would do that?

15  A.  I don't understand what you're --

16  Q.  Okay.  You meant it was designed to relieve

17  pressure in the line?

18  A.  Correct.

19  Q.  Okay.  How would it relieve pressure in the

20  line?  How would it work?

21  A.  It would work on charges and reversals.

22  Q.  Okay.  We'll get there.  So at some point of --

23  this would release, you're saying?

24  A.  It would release only on charges and reversals.

25  Q.  When it would release, what would come out of

1488

1    the bleeder?

2    A.   Coke oven gas.

3    Q.   Now, you've mentioned charges and reversals.

4    That's when it would release?

5    A.   Correct.

6    Q.   Do you know in 2009 what the -- how often

7    reversals happened?

8    A.   Roughly every 30 minutes.

9    Q.   Okay.  So in your experience, every 30 minutes

10   this bleeder would open up?

11   A.   That's correct.

12   Q.   How long were the releases from the bleeder

13   every 30 minutes?

14   A.   Ten to 15 seconds.

15   Q.   During the period -- are you familiar with the

16   term "cogeneration," Mr. Cratsley?

17   A.   Yes.

18   Q.   During the periods of cogeneration, would the

19   bleeder still release during reversals?

20   A.   Yes.

21   Q.   Can you tell the jury what the typical set

22   point for the bleeder was?

23   A.   Between 80 and 100.

24   Q.   Who decided where the bleeder would be set at?

25   A.   The foreman.

1489

1    Q.  Which foreman?

2    A.  Normally, the by-products foreman.  He would

3    get directions and then we would raise it.

4    Q.  Okay.  So there is a by-products foreman.  Is

5    that the boss of all the by-products operators?

6    A.  Yes.  Correct.

7    Q.  Are you familiar with the process of how the

8    set point for this bleeder was either raised or

9    lowered?

10   A.  Yes.

11   Q.  How often would the -- the adjustment to this

12   bleeder, how often did an adjustment get made?

13   A.  Just -- it's very rare.  Only when they needed

14   it.

15   Q.  If the change was made, was it recorded

16   anywhere?

17   A.  Yes; in our log book.

18   Q.  Is that called the by-products operators' log

19   book?

20   A.  That's correct.

21   Q.  How would -- if you can tell the jury.  We

22   talked about it.  Just physically, how would you

23   actually change the release point for this bleeder?

24   A.  There's a -- a chart recorder and there's a

25   little button up there that you have to turn to set

1    and there is a red bar that comes down.  When you

2    turn it, it goes to the set point that you were

3    told to set it at.

4    Q.  Okay.  Does that -- where you set the set

5    point, does that actually get recorded on the

6    circular chart?

7    A.  No.

8    Q.  Okay.  Is there anything else that's happening

9    that does get recorded on the circular chart?

10   A.  The pressure that's in the line.

11   Q.  Okay.  And can you tell the jury what would

12   happen if the pressure in the line, as being

13   recorded on that chart, gets above the set point?

14   A.  It would bleed.

15   Q.  And what would happen, if you can tell the

16   jury, if the -- if the pressure in the line went

17   below that set point?

18   A.  Nothing.

19   Q.  It wouldn't bleed?

20   A.  It wouldn't bleed, no.

21           MR. MANGO:  All right.  Your Honor, I'd

22   like to show -- which is in evidence -- Government

23   Exhibit 87.  If we can pull that up, please.

24       Okay.  I'm showing you Government Exhibit 87,

25   Mr. Cratsley, which is a by-products log book which

1491

1    contains -- includes the period of March 3rd and

2    March 4th of 2009.  Okay?

3        If we can go to page 100 of this document,

4    please, Lauren.  If we can just zoom in on the

5    whole day.

6        Mr. Cratsley, can you tell the jury what

7    entry -- what day this entry is for?

8    A.   The 3rd of March, '09.

9    Q.   Okay.  And on the four-to-midnight shift, the

10   bottom half of this page, at the bottom do you see

11   any reference to the bleeder?

12   A.   "Raise bleeder to 100, looking good."

13   Q.   Okay.  Now, if we can go to the next page,

14   please.  This is an entry for 3/4/09.  I'd like you

15   to review the whole entry and then just look at me

16   when you're ready.  Okay.  And I'd like to go to

17   the next page.  And if we can just focus in on --

18   okay.  Please, again, review just the top half and

19   then look at me when you're ready.

20       All right.  Mr. Cratsley, is there any entry

21   for March 4th of 2009 relating to the bleeder?

22   A.   No.

23   Q.   Based on your review of this log book, what

24   does the log book indicate the bleeder was set at

25   for March 3rd of 2009?

1    A.   One hundred.

2    Q.   And based on your experience, what do you

3    believe the bleeder was set at on March 4th

4    of 2009?

5    A.   One hundred.

6            MR. MANGO:  Your Honor, if I can have a

7    moment.

8            THE COURT:  Sure.

9            MR. MANGO:  Confirm that this is not in

10   evidence.  No, it is not.  Your Honor, I'd like to

11   show the witness Government Exhibit 21.61 for

12   identification purposes.

13           THE COURT:  Is there any objection to its

14   being received?

15           MR. LINSIN:  No, your Honor.

16           THE COURT:  Mr. Personius?

17           MR. PERSONIUS:  No objection, Judge.

18   Thank you.  Sorry.

19           THE COURT:  21.61 received.  No objection.

20   Do you want it published?

21           MR. MANGO:  Yes, please, your Honor.

22           (Government Exhibit 21.61 was received

23            into evidence.)

24   BY MR. MANGO:

25   Q.   If we can focus in on this section, please,

1    just the circular chart portion.

2        Mr. Cratsley, do you see this on your screen

3    here?

4    A.   Yes.

5    Q.   Okay.  Let's wait till it zooms in.

6        Can you tell the jury what this item is we see

7    on our screen?

8    A.   That's a recording chart of the bleeder.

9    Q.   All right.  And do you see a date for this

10   bleeder chart?

11   A.   March 4th, '09.

12   Q.   Okay.  So this would be the chart for

13   March 4th?

14   A.   Yes.

15   Q.   And you just testified that you believe the

16   bleeder was set to 100 on March 4th?

17   A.   Yes.

18   Q.   All right.  I'd like to zoom in, if we could,

19   on the 2:00 a.m. to 3:00 a.m.

20       All right.  Between 2:00 a.m. and 3:00 a.m.,

21   can you explain for the jury what your

22   understanding of this chart is?

23   A.   Yes.

24   Q.   Please do so.

25   A.   At 2:00 a.m. there was a reversal.  You can

1494

1    show by the spike.  There is a straight line going

2    up at 2:00 a.m. right here.

3    Q.  Okay.

4    A.  And then 2:30 the same thing, there is another

5    spike right here.  And at 3:00 o'clock, there's the

6    same thing right there.  And that's a reversal.

7    Q.  Okay.  Are those spikes above 100?

8    A.  Yes.

9    Q.  Okay.  What do you believe was happening to the

10   bleeder during those spikes?

11   A.  To my knowledge, it was bleeding gas.  Coke

12   oven gas.

13          MR. MANGO:  Thank you, Mr. Cratsley.

14   Nothing further, your Honor.

15          THE COURT:  Okay.  Mr. Linsin.  Thank you.

16          MR. LINSIN:  Thank you.  May I proceed,

17   your Honor?

18          THE COURT:  Certainly.

19   CROSS-EXAMINATION BY MR. LINSIN:

20   Q.  Good morning, Mr. Cratsley.

21   A.  I'm fine.  Thank you.

22   Q.  I don't believe we've met before.  My name is

23   Greg Linsin.  I represent Tonawanda Coke.

24   A.  Okay.

25   Q.  I just have a couple of questions for you, sir.

1    The -- the pressure relief valve that you've been

2    testifying about, do you understand mechanically

3    how that valve operates?

4    A.   Not really.

5    Q.   Do you know whether when the valve operates, it

6    is instantly opened full bore, or do you know

7    whether it opens slightly and then to a greater

8    extent as the pressure increases?

9    A.   I don't know.

10   Q.   All right.  Do you know if it's a butterfly

11   valve?

12   A.   I don't understand the question.

13   Q.   All right.  Fair enough.  As a by-products

14   operator, you had a number of jobs that you were

15   responsible for every couple of hours as you toured

16   the by-products department, correct?

17   A.   Correct.

18   Q.   And one of those jobs was to go around and to

19   check the drip legs that came down off of the coke

20   oven gas line, correct?

21   A.   That's correct.

22   Q.   And you would go around and open the valves on

23   the bottom of those drip legs and drain any

24   condensate that had collected in that drip leg,

25   correct?

1    A.   Yes.

2    Q.   And after you drained the condensate out of the

3    line, you would close that valve, correct?

4    A.   Yes.

5    Q.   And in your experience -- in both tours of your

6    experience in the by-products department, this is

7    something when you were on duty you did every

8    couple of hours, correct?

9    A.   Yes.

10   Q.   And then would you record that activity in the

11   by-products log book that you had done that

12   walk-through and done those functions?

13   A.   Not -- not the drip legs, no.

14   Q.   Not the drip legs.  But in your time in the

15   by-products department, it was standard operating

16   procedure for those drip legs to be kept closed

17   unless they were being drained, correct?

18   A.   Correct.

19   Q.   And as a matter of fact, there was one time

20   that you happened to notice that someone had left

21   them open and you went around and closed it because

22   you knew that's what they were supposed to be,

23   correct?

24   A.   Correct.

25   Q.   The pressure relief valve that you talked about

1    and the vent that goes up above that coke oven gas

2    line, do you have an estimate as to how high that

3    vent is?

4    A.   Not really.

5    Q.   All right.  But that place where the coke oven

6    gas line turns 90 degrees and heads down towards

7    the boiler house, that's right adjacent to

8    Broadway, correct?

9    A.   Correct.

10        MR. LINSIN:  I have nothing further.

11   Thank you, your Honor.

12        THE COURT:  Okay.  Mr. Linsin, thank you.

13   Mr. Personius.  You may begin.

14   CROSS-EXAMINATION BY MR. PERSONIUS:

15   Q.   Good morning, Mr. Cratsley.

16   A.   Morning.

17   Q.   My name is Rod Personius and I represent Mark

18   Kamholz.

19        You began working at Tonawanda Coke in 1990?

20   A.   That's correct.

21   Q.   Okay.  And in 1990 was that pressure relief

22   valve that you identified in the photograph, was

23   that in existence in 1990?

24   A.   To my knowledge, yes.

25   Q.   Okay.  And was it in the location in 1990 that

1    it was when you retired in 2012?

2    A.  To my knowledge, yes.

3    Q.  Okay.  Thank you.  In the times when you were

4    in by-products, your position was to be an

5    operator?

6    A.  Yes.

7    Q.  And you would report to the by-products

8    foreman?

9    A.  Yes.

10   Q.  And the by-products foreman was in charge of

11   the entire by-products department?

12   A.  Yes.

13   Q.  Okay.  And did -- did you ever talk to -- well,

14   first of all, do you know who Mark Kamholz is?

15   A.  Yes, I do.

16   Q.  You see -- Mark, he'll stand up.  Do you see

17   him in the courtroom?

18   A.  Yes.

19   Q.  Okay.

20            THE COURT:  Well, the record will reflect

21   that the identification of Defendant Kamholz was

22   made.

23            MR. PERSONIUS:  Thank you, Judge.

24   BY MR. PERSONIUS:

25   Q.  Did you ever talk to Mr. Kamholz at any time

1    about this pressure relief valve?

2    A.   No.

3    Q.   I think you -- you've testified to this, but so

4    it's clear.  By looking -- you were referred to one

5    of these circular charts?

6    A.   Yes.

7    Q.   And that circular chart is created on this

8    recorder that is located in a green building below

9    the pressure relief valve?

10   A.   Yes.

11   Q.   And it -- it shows ink marks on it.  From time

12   to time there will be -- for lack of a better

13   term -- what might be a spike?

14   A.   A spike, yes.

15   Q.   Okay.  And just by looking at that -- that

16   circular chart alone, that won't tell you what the

17   pressure was set at at that time, right?

18   A.   No.

19   Q.   And Mr. Mango showed you a chart and he had you

20   look at the by-products log book, and remember, you

21   looked at the chart between two and three in the

22   morning?

23   A.   Yes.

24   Q.   And you saw three -- again, for lack of a

25   better term -- three spikes?

1   A.   Yes.

2   Q.   And based on what you saw in the log book, you

3   concluded that that would show three times that

4   there would have been, for some period of time, a

5   release of this valve?

6   A.   Yes.

7   Q.   Is that true?

8   A.   Yes.

9   Q.   Okay.  In your experience, do you know if every

10  time that set point for the pressure relief valve

11  was changed, if that was recorded in that log book?

12  A.   Yes.

13  Q.   Your experience was every single one was?

14  A.   Yes.

15  Q.   Okay.  Do you know of any times when a -- well,

16  let me put it to you this way.  The rule was that

17  operators were supposed to note changes in the set

18  point in the log book --

19  A.   Yes.

20  Q.   -- right?  That's what you were supposed to do?

21  A.   I did it.

22  Q.   Okay.  You did.

23  A.   Yes.

24  Q.   Do you know whether or not all the other

25  operators that worked in by-products would always

1   note those changes in the log book?

2   A.   I don't know that.

3   Q.   Okay.  And the -- the foremen for by-products

4   had the authority to change that set point?

5   A.   Yes.

6   Q.   And do you know whether or not the -- well,

7   let's go at it this way.  The foremen who worked in

8   by-products when you were there as an operator, one

9   of them would have been a gentleman whose name was

10  Hutchinson?

11  A.   Yes.

12  Q.   Okay.  And the other would have been

13  Mr. Cahill?

14  A.   Yes.

15  Q.   Were there any other foremen when you worked in

16  by-products?

17  A.   Kenny Bermel.

18  Q.   Kenny Bermel, too?  Okay.  Do you know how to

19  spell his last name?

20  A.   B-E-R-M-E-L.

21  Q.   Thank you very much.  When those foremen would

22  change the set point on this recorder, do you know

23  if they were supposed to make notation of that in

24  this log book?

25  A.   They usually told us and then we logged it in

1    the book.

2    Q.   Okay.  Do you know if there are instances when

3    the foremen would make changes and it would not get

4    recorded in a log book?

5    A.   There may have been.

6    Q.   You don't know?

7    A.   I don't know.

8    Q.   Okay.  Now, do you remember that a number of

9    agents -- law enforcement officers came to

10   Tonawanda Coke in December of 2009?

11   A.   That must be in the evening, wasn't it?

12   Q.   I'm sorry?

13   A.   Was that in the evening?

14   Q.   Well, that's not my understanding.  But I can't

15   give you information.  Let me ask it a different

16   way.

17       Do you remember there was a point in time when

18   a search warrant was executed at Tonawanda Coke?

19   A.   Yes.

20   Q.   Okay.  Do you remember what date that was when

21   that happened?

22   A.   Not offhand.

23   Q.   Do you remember the month?

24   A.   No.

25   Q.   Okay.  Or the year?

1    A.   No.

2    Q.   Okay.  All right.  You're not expected to

3    remember those things, right?  It's not part of

4    your job.

5         In any event, do you recall what the -- the set

6    point was on that recorder for the pressure relief

7    valve at the time the search warrant was executed?

8    A.   Not offhand, I don't.

9    Q.   Okay.  Do you remember that you were

10   interviewed by some of these agents -- some of the

11   government's agents?

12   A.   Yes.

13   Q.   Okay.  Bear with me just a minute, please.  I'm

14   disorganized.  I'm sorry.  That's because I'm in

15   the wrong part of my notebook.  I'm sorry.

16        Sorry, Judge.

17             THE COURT:  It's okay.

18             MR. LINSIN:  Your Honor, may I offer

19   assistance?

20             MR. PERSONIUS:  I have it.  I got it.

21   Thank you, Greg.

22        For identification, Lauren, could we, please,

23   have Government Exhibit 3511.01 put on the screen.

24        Now --

25             MR. MANGO:  Your Honor, I don't know if

1    there's been any need yet to refresh this witness's

2    recollection with this document.  I think that's

3    technically required before it's shown to the

4    witness.  I don't know if we need to show him at

5    this point, but --

6           MR. PERSONIUS:  You want me to ask a

7    couple more questions?

8           THE COURT:  Well, that is the proper

9    procedure under 612, so, yes, and I'll note that

10   for the record.  It's sort of an objection a little

11   bit in advance, but we'll allow it at this point.

12          MR. PERSONIUS:  I think he was

13   anticipating correctly.

14          THE COURT:  Okay.

15   BY MR. PERSONIUS:

16   Q.  Do you remember, Mr. Cratsley, that you were

17   interviewed by federal agents on July 21 of 2010?

18   A.  Yes.

19   Q.  Okay.  And you were asked certain questions at

20   that time about your work at Tonawanda Coke, right?

21   A.  Yes.

22   Q.  And there were a number of people from the

23   government who were present when you were

24   questioned?

25   A.  Yes.

1    Q.  All right.  And this included individuals who

2    worked with the Environmental Protection Agency?

3    A.  Yes.

4    Q.  Okay.  And do you remember you were asked about

5    the pressure relief valve during this interview?

6    A.  Yes.

7    Q.  Do you remember that you were specifically

8    asked about the settings on the pressure relief

9    valve?

10   A.  Yes.

11   Q.  Okay.  And do you remember that you told the

12   investigators during this interview that at the

13   time of the warrant that the pressure relief valve

14   was set at 160 centimeters?

15   A.  I don't remember.

16   Q.  Okay.  Could we please put Government

17   Exhibit 3511.01 on the screen, just for the

18   witness?

19            THE COURT:  Yes.

20   BY MR. PERSONIUS:

21   Q.  And do you see that you have in front of you,

22   Mr. Cratsley, a document?  It has a yellow sticker

23   in the upper right.  It says 3511.01.  You see

24   that?

25   A.  Yes.

1   Q.   Okay.  And, Lauren, if we could, please, make

2   the bottom part of that first page bigger.

3        Okay.  I'm going to -- you have to read this to

4   yourself.  Okay, Mr. Cratsley?  But I'd like you to

5   read the part that I just put the blue bracket

6   around, that part of that paragraph.  Read it to

7   yourself, please.  Let me know when you're done.

8        Are you done reading it?

9   A.   Yes.

10  Q.   Would you take that off the screen, please,

11  Lauren?

12       All right.  Now, Mr. Cratsley, having read that

13  excerpt from Government Exhibit 3511.01, does that

14  refresh your recollection about what you told the

15  investigators regarding the setting of the pressure

16  relief valve at the time the warrant was executed?

17  A.   Yes.

18  Q.   And what did you tell the investigators the

19  pressure relief valve was set at?

20  A.   160.

21  Q.   Okay.

22           MR. PERSONIUS:  May I have a minute,

23  Judge?

24           THE COURT:  Yes.

25           MR. PERSONIUS:  Your Honor, those are all

1    the questions we have.

2        Thank you, Mr. Cratsley.

3            THE COURT:  Anything, Mr. Mango?

4            MR. MANGO:  Yes, your Honor, just a couple

5    areas, very brief.

6    REDIRECT EXAMINATION BY MR. MANGO:

7    Q.  Mr. Cratsley, Mr. Bermel was one of your

8    supervisors?

9    A.  Yes.

10   Q.  Is he alive?

11   A.  No, he's deceased.

12   Q.  Are you aware of whether other operators would

13   leave drip legs in the open position during the

14   wintertime?

15   A.  Not to my knowledge.

16   Q.  During your interview with the government, was

17   your attorney present?

18   A.  When I was at your office?

19   Q.  Yes.

20   A.  Yes.

21   Q.  And do you know if -- you mentioned you were

22   just refreshed that at the time you were

23   interviewed you said the pressure sitting was 160

24   centimeters of oil at the time of the search

25   warrant.

1   A.   Yes.

2   Q.   Right?  Do you recall a longer, week-long EPA

3   inspection happening before the search warrant?

4   A.   No.

5   Q.   Okay.  And, in fact, in your time period

6   between 2005 and 2009, what was the standard set

7   pressure for the bleeder?

8   A.   80 to 100.

9   Q.   Okay.  Thank you.

10          MR. MANGO:  Nothing else, your Honor.

11          THE COURT:  Okay.  Mr. Mango, thank you.

12   Mr. Linsin, anything?

13          MR. LINSIN:  Nothing further, your Honor.

14   Thank you.

15          THE COURT:  Mr. Personius?

16          MR. PERSONIUS:  Thank you.  No, Judge.

17          THE COURT:  Okay.  Mr. Cratsley, that

18   nervousness should be over.  You're excused.  Thank

19   you.

20          THE WITNESS:  Thank you very much.

21          THE COURT:  Okay.  Mr. Piaggone.

22          MR. PIAGGIONE:  Yes, your Honor.  The

23   government would call Sean Hoffman.

24          THE COURT:  Okay.  Mr. Witness, if you

25   come up this way.  Make your way towards the

1    witness stand here.  The traffic guard will direct

2     you.  If you stop right there, please.

3    S E A N   H O F F M A N N, having been duly sworn as

4    a witness, testified as follows:

5              THE COURT:  Okay.  Good afternoon.

6              THE COURT:  All right.  I have a couple of

7    preliminary instructions for you.  You're here to

8    testify for the benefit of the ladies and gentlemen

9    of the jury, so couple things are important, that

10   you speak at the microphone.  It's friendly, so you

11   just have a to speak in a conversational tone,

12   okay?

13             THE WITNESS:  Okay.

14             THE COURT:  Sounds like you're going to

15   carry okay.  But if you don't understand a

16   question, ask that it be repeated.  Whether I ask

17   you or the attorneys ask you, if you just don't

18   understand it, don't answer it.

19             THE WITNESS:  Okay.

20             THE COURT:  Try to be as succinct, as

21   concise as you can.  Don't volunteer information,

22   that's usually complicating things.  If you can

23   answer a question yes or no, please try to do that

24   and just drop it.  It's up to the attorneys to pick

25   up on what other information they may want from

1    you.

2          If there's an objection, wait until I rule on

3    the objection, and then I will tell you either

4    complete your answer, wait for another question, or

5    I'll give you some other instruction.  Do you

6    understand?

7                THE WITNESS:  Yes, sir.

8                THE COURT:  Okay.  I think you're going to

9    be okay.  State your full name into the microphone,

10   look in the direction of the jury, and spell your

11   last name please.

12               THE WITNESS:  Sean Hoffmann.  Last name

13   H-O-F-F-M-A-N-N.

14               THE COURT:  Okay, Mr. Hoffmann, thank you

15   your witness, Mr. Piaggone.

16               MR. PIAGGIONE:  Thank you, your Honor.

17   DIRECT EXAMINATION BY MR. PIAGGIONE:

18   Q.   Mr. Hoffmann, where are you currently employed?

19   A.   I'm employed at Spartech in Lockport.

20   Q.   Okay.  And was there a time when you were

21   employed by Tonawanda Coke Corporation?

22   A.   Yes.

23   Q.   When were you employed by Tonawanda Coke

24   Corporation?

25   A.   From January of 2002 till mid-December of 2009.

1    Q.   And what positions did you hold at Tonawanda

2    Coke Corporation?

3    A.   I started there as a laborer.  I went -- I

4    became the leadman on the track crew, and

5    eventually the coke handling foreman in February

6    of 2009.

7    Q.   Okay.  Is there a chance you can guess as to --

8    not guess, excuse me.  Is there a chance that you

9    would know when you were employed as a laborer?

10   A.   I was employed as a laborer from beginning

11   January of 2002 until approximately October

12   of 2002, when I became the leadman on the track

13   crew.

14   Q.   Okay.  And how long were you on the track crew?

15   A.   From October of 2002 until I became a foreman

16   in February of 2009.

17   Q.   And in February of 2009 what position did you

18   hold then?

19   A.   Coke handling foreman.

20   Q.   Okay.  And you stayed there until when?

21   A.   December of 2009.

22   Q.   Okay.  Now, with respect to, I guess, the

23   charge car --

24   A.   Yes.

25   Q.   -- and the -- all right.  Can you tell us what

1  your duties were in that area?

2  A.  What I did on -- that would have been on what

3  was referred to as the battery or the ovens.  I

4  would load what was called a charge car with coal,

5  operate it, drive it out onto the coke ovens, and

6  refill a coke oven with coal.

7  Q.  Okay.  Did you ever operate what is called a

8  hot car?

9  A.  Yes.

10  Q.  What did you do when you drove the hot car?

11  A.  The hot car would catch an oven [sic] that had

12  been cooked in the ovens.  It would catch the oven.

13  It would go down to either one of the quench

14  towers, where it was quenched off with water.  And

15  then it would take it to A Wharf or D Wharf and

16  empty on to one of the wharfs.

17       MS. GRASSO:  Your Honor, can we get a time

18  frame please?

19       MR. PIAGGIONE:  I think he already

20  indicated what years he was working on the charge

21  car.  Would you have a year for the hot car?

22       THE WITNESS:  I operated that at different

23  times, depending on when I was needed to operate

24  it.  I wasn't a regular employee on the hot car.  I

25  was filling in when needed.  Not only when I was on

1    the battery, but when I was also on the track crew.

2    BY MR. PIAGGIONE:

3    Q.  Excuse me.  What period of time did you

4    actually work then on the hot car?

5    A.  Usually that was done when I was a leadman on

6    the track crew, which would have been from October

7    of '02 until approximately January of '09,

8    depending on when they needed me to do the job.

9    Q.  Okay.  I'd like to at this point introduce

10   Exhibit 49.12 for identification, Government's

11   Exhibit 49.12.

12             MS. GRASSO:  No objection.

13             MR. PERSONIUS:  No objection, your Honor.

14             THE COURT:  Okay.  49.12 received, no

15   objection.

16             MR. PIAGGIONE:  Can we publish that?

17             THE COURT:  Yes.

18             (Government's Exhibit 49.12 was received

19             into evidence.)

20   BY MR. PIAGGIONE:

21   Q.  Okay.  Can you see the picture, the photograph

22   on the screen in front of you?

23   A.  Yes.

24   Q.  What is that?

25   A.  That was commonly referred to as the backdoor

1    machine.

2    Q.   Okay.   That means I have the wrong photo.

3              THE COURT:  Touch the screen with your

4    finger with authority so we know what -- you'll get

5    an arrow, and that will point to the machine.

6    Backdoor machine?

7              THE WITNESS:  Yes.

8              MR. PIAGGIONE:  What does a backdoor

9    machine do?

10             THE WITNESS:  That would remove the door

11   off of an oven.  The guide on the backdoor machine

12   would then be inserted into the oven, the opening

13   of where the door was.  It would guide the coke out

14   of the oven into the hot car.

15             MR. PIAGGIONE:  Okay.  Just one moment,

16   your Honor.

17             THE COURT:  I'm glad you have this one

18   here, Mr. Piaggione.  We haven't seen this before.

19             MR. PIAGGIONE:  Thank you, your Honor.

20   We'll move on, your Honor.

21             THE COURT:  Okay.

22   BY MR. PIAGGIONE:

23   Q.   During the time you were working on the -- in

24   the track area, do you recall if Tonawanda Coke had

25   quench towers?

1  A.  Yes, we had two quench towers.

2  Q.  And do you recall the names of the quench

3  towers?

4  A.  I know one was -- would be at the east end of

5  the tracks.  The other was at the west end of the

6  tracks.  I believe they referred to them as towers

7  one and two, but I'm not sure.

8  Q.  Okay.  Do you recall how frequently they used

9  each tower in 2002 when you were on the tracks?

10  A.  When -- in that time frame I was on the wharfs

11  they were using each one about 50 percent of the

12  time, depending on the need, or if one was out of

13  operation.  But usually about 50 percent of the

14  time they used them.  Each one.

15  Q.  And between 2005 and 2009, could you recall the

16  frequency in which those towers were used?

17  A.  It changed a little little.  There was a --

18  they had closed the west tower for a short time.

19  They had done some work on them.  But most of the

20  time they were used 50 percent of the time one was

21  used, then the other one would be used except for

22  when they were out of use.  There was a time frame

23  when the west tower was out of use for a short

24  time.  I don't know the reason for that.  It was

25  other than -- for other than repairs.  I don't know

1    the reason for that.

2    Q.  When you say "a short time", you mean about a

3    year or two?

4    A.  About a year.

5    Q.  Okay.  And was there a time when the east tower

6    was closed?

7    A.  Yes.

8    Q.  During that period between 2005 and 2009?

9    A.  Yes.

10   Q.  Do you know approximately when that was?

11   A.  Yes.  That was down for repairs.  We were

12   changing the railroad ties, the railroad tracks,

13   the concrete work inside the east tower.  It was

14   down from about -- excuse me a minute, I'm trying

15   to remember exactly the time frame.  That would

16   have been January of 2008 till about May of 2008.

17   Q.  And when that tower was down, what -- what

18   tower was used?

19   A.  They used the west tower.

20   Q.  All right.  Now, you were interviewed at one

21   time by an EPA agent?

22   A.  Yes.

23   Q.  Okay.  Do you recall telling him the frequency

24   that the towers were used at that time when you

25   were interviewed?

1  A.  Yeah, I believe at that time I told him that

2  they were only using the west end tower during

3  February for about 10 percent of the time, being

4  there were some repairs being done to it.

5  Q.  And so they were using the east quench tower

6  90 percent of the time?

7  A.  Yeah.

8  Q.  Okay.  Now, I wonder if I can have

9  Exhibit 3.11, which is already in evidence.  Do you

10  know what that is?

11  A.  Yes.  That was -- is what's commonly referred

12  to as the tar box.

13  Q.  Okay.  And where is that located, do you know?

14  A.  That would have been located just east in the

15  by-products area on the road between the battery

16  and the by-products area.

17  Q.  Okay.  Did your work at Tonawanda Coke

18  Corporation ever entail working with the tar box?

19  A.  Yes.

20  Q.  When was this approximately?

21  A.  While I was a leadman on the track crew -- I've

22  done several jobs while I was on the track crew.

23  One of them was operating an end loader.  When I

24  was operating end loader, I would empty the tar

25  box.

1  Q.  Is it possible that you can give us a time or

2  date or year?

3  A.  Oh, I probably emptied it once a month myself

4  while I was on the track crew from approximately

5  2003 until about 2008.

6  Q.  And where did you bring the tar from the tar

7  box?

8  A.  The tar from the tar box was taken to the coal

9  field and mixed in with the coal.

10  Q.  Okay.  Did anyone tell you -- give you

11  instructions not to have the tar sludge in the tar

12  box hit the ground?

13  A.  No.  Never.  The instruction I was given was to

14  empty it.  We actually emptied it with an end

15  loader, took it out to the coal field, poured it

16  into one of the existing piles, and you would scoop

17  up some of the coal and mix it in with the pile of

18  coal that you were mixing it into at the time.

19  Q.  And by mixing it, would you mean that you'd

20  have to put the scoop in, pick it up, throw the

21  coal down?

22  A.  Yeah.  Just with the bucket of the end loader

23  mixing it into the coal.  You would pick it up,

24  empty it.  Pick it up, empty it.  That was the only

25  process ever shown to me to do.

1    Q.  Was there anything to prevent the coal being

2    mixed from hitting the ground below it?

3    A.  No.

4    Q.  And how would you know when to pick it up,

5    incidentally?

6    A.  You would be asked to by a foreman.  And this

7    happened on on a daily basis.

8    Q.  All right.  Now, did you do this when it was

9    raining out?

10   A.  In the rain, snow, whatever the weather was.

11   We were open 24/7 every day of the year.  Holidays,

12   everything.

13   Q.  Now, when you mixed the tar and the coal in the

14   pile, how long would it stay there before it was

15   taken to the battery?

16   A.  It varied depending on when they needed to use

17   the -- when they had a need for that particular

18   coal.  It could sit there a day.  It could sit

19   there for weeks.  You know, it was whatever they

20   decided.

21   Q.  Okay.  Was there tar residue left on the end

22   loader when you after you mixed it?

23   A.  Yes.

24   Q.  And how would you remove the tar sludge that

25   was left on the end loader?

1    A.   There was no procedure for removing any tar

2    that was left on the -- you know, what you could

3    get off in the coal pile is what you could get off.

4    Nobody worried about it.   Nobody cared about it.

5    Q.   Did you observe others empty the tar box?

6    A.   Oh, yes.

7    Q.   Okay.   Where did you observe them put the coal

8    tar sludge?

9    A.   In the same, in the coal field, mixing it in

10   with the coal.

11   Q.   Okay.   Did they take any precautions to prevent

12   it from hitting the ground?

13   A.   No.

14   Q.   How often did you observe that?

15   A.   As I said, the tar box would have been emptied

16   on a daily basis.   There were some times they might

17   empty it on to what was called a pad in the coal

18   field.   But if the pad was full and there was no

19   room, you know, or if they just wanted to mix it

20   in, you just mixed it in.

21   Q.   Do you know if the tar and coal mix was taken

22   to the battery the same day?

23   A.   I seldom saw that happening.   I don't remember

24   it happening ever.   Usually it sat there for a

25   couple of days or longer, depending on how much tar

1    they had on hand.

2    Q.  And how often did you bring the contents of the

3    tar box to the concrete pad that was out in the

4    coal field?

5    A.  Less than 50 percent of the time.

6    Q.  All right.

7              MR. PIAGGIONE:  Your Honor, I'd like to

8    bring up for identification Exhibit 3.02 and

9    hopefully it's the right photograph.

10       Is there any objection?  Minus any objection,

11   your Honor, I would introduce this into evidence.

12             MS. GRASSO:  No objection.

13             MR. PERSONIUS:  No objection, your Honor.

14             THE COURT:  All right.  3.02 received into

15   evidence, no objection, and may be published.

16             (Government's Exhibit 3.02 was received

17             into evidence.)

18   BY MR. PIAGGIONE:

19   Q.  Mr. Hoffmann, do you recognize the photograph?

20   A.  Yes.

21   Q.  Can you tell us what that is?

22   A.  Okay.  What you have here is the tar pad.

23   Q.  Okay.  If you actually touch the screen, an

24   arrow will show up.  Or a dot will show up.

25   A.  Okay.

1522

1    Q.  Can you tell us what you just --

2    A.  That would have been the area of the tar pad.

3    That would have been the entrance to it that you

4    could dump tar on to if there was room available.

5              MR. PIAGGIONE:  Okay.  Let the record

6    reflect he touched the area about 2 inches to the

7    right of the center of the photograph.

8              THE COURT:  Record will so reflect.

9    BY MR. PIAGGIONE:

10   Q.  All right.  And what is the material that's on

11   the pad?

12   A.  It appears to be coal tar.

13   Q.  Okay.  And I notice there's a ramp going up to

14   the left.  Can you tell us what that is?

15   A.  That is a piece of equipment of some type.  I'm

16   not exactly sure what it does, because it's never

17   run.  I've never seen it in operation.  I know it

18   was something to do with the mixing or processing

19   of the tar, but I've never seen it operate in the

20   time that I was there.

21   Q.  Was there a name for that?

22   A.  I believe so.  I do not recall the name for

23   that piece of equipment.

24   Q.  Okay.

25   A.  We never used it.  Nobody ever used it that I

1    know of.  It's really an unfamiliar piece of

2    equipment as far as the operation is concerned.

3              MR. PIAGGIONE:  Okay.  Can we bring up

4    what has been marked for identification as

5    Government's Exhibit number 3.03?

6              THE COURT:  Yeah.  Leave it for just a

7    moment, the one we have, 3.02.  If you drag your

8    finger, you can make a box where the concrete pad

9    is that you're talking about.  I think you said

10   this --

11             THE WITNESS:  I'm not really good, but it

12   follows that short concrete wall that you see

13   around that area.

14             THE COURT:  Okay.  Okay.  Thank you.

15             MR. PIAGGIONE:  Thank you for that

16   clarification, your Honor.

17      May we have 003.03?  Thank you.

18      Okay.  Now, can you tell me -- excuse me.

19   Absent any objection I would introduce this into

20   evidence as 003.03.

21             MS. GRASSO:  No objection.

22             MR. PERSONIUS:  No objection, your Honor.

23             THE COURT:  Okay.  3.03 received, no

24   objection, and may be published.

25             (Government's Exhibit 3.03 was received

1         into evidence.)

2              MR. PIAGGIONE:   Thank you, your Honor.

3    BY MR. PIAGGIONE:

4    Q.  Can you tell us what we're looking at here?

5    A.  From this picture, no.  It looks like anyplace

6    in the plant to be honest.  I can see coal handling

7    behind in the back view.  I'm not exactly sure of

8    this picture.

9    Q.  Okay.  I would point out the piece of metal in

10   the left-hand corner of the --

11   A.  Yes.

12   Q.  Does that correspond with the ramp in the

13   previous picture?

14              MS. GRASSO:  Objection, your Honor.

15              THE COURT:  Yeah, move on.  The witness

16   has said he cannot identify what is depicted in

17   this photograph.

18              MR. PIAGGIONE:  Okay.

19   BY MR. PIAGGIONE:

20   Q.  All right.  Did you ever remove tar sludge from

21   the pad?

22   A.  Yes.

23   Q.  What did you do with it?

24   A.  Mixed it in with the coal in the coal field.

25   Q.  Okay.  Did anyone give you any instructions to

1    keep that mixture from hitting the ground when you

2    were doing it?

3    A.   No.

4    Q.   Okay.  Did you do that in the rain?

5    A.   In the rain, the snow, the sleet.

6    Q.   Okay.  How physically would you do that?

7    A.   You would pick the tar up from the coal -- the

8    tar pad.  You picked the tar up in the pad in the

9    field, and you would take it to the coal pile that

10   was to be mixed in.

11   Q.   Did you ever bring the coal from the piles and

12   mix it with the sludge on the pad?

13   A.   I don't remember ever doing that.  I don't

14   remember anybody instructing me to do it in that

15   order.

16        MR. PIAGGIONE:  I'd like to bring up

17   Exhibit 3.04, your Honor, for identification

18   purposes.  And absent any objection, I would

19   introduce it into evidence as 003.04.

20        MS. GRASSO:  Can the witness identify this

21   photo first?

22        THE WITNESS:  Yes.  This was one of the

23   tanks --

24        MS. GRASSO:  Okay.  Then no objection.

25        THE COURT:  Okay.  Mr. Personius?

1          MR. PERSONIUS:  No objection, your Honor.

2          THE COURT:  All right.  No objection to

3    3.04.  It will be received and may be published.

4          (Government's Exhibit 3.04 was received

5          into evidence.)

6          MR. PIAGGIONE:  Thank you, your Honor.

7    BY MR. PIAGGIONE:

8    Q.  Do you recognize what's depicted in that

9    photograph?

10   A.  Yes.  This is one of the tanks in the plant

11   that was cut down and removed from the premises.

12   Q.  Is that one of the tanks that was involved in

13   the fire at one time at the plant?

14   A.  Yes.  This was in the location of where the

15   fire was in the plant, one of the fires in the --

16   the only fire I know of in the plant.  This was in

17   the general area of that fire, yes.

18   Q.  Okay.  And do you know how that tank was

19   reduced to this condition?

20   A.  It was cut down with a torch.

21   Q.  Okay.

22   A.  Cutting torches, welding torches.

23          MR. PIAGGIONE:  Try Government Exhibit 3

24   for identification, 3.04.  003.05, excuse me.  Do

25   you recognize that photo?

1    THE WITNESS:  It appears to be --

2    THE COURT:  Well, yes or no?

3    THE WITNESS:  Yes.

4    THE COURT:  Okay.

5    MS. GRASSO:  No objection.

6    MR. PERSONIUS:  No objection, your Honor.

7    THE COURT:  Okay.  3.05 received, no

8    objection, and may be published.

9    (Government's Exhibit 3.05 was received

10    into evidence.)

11    MR. PIAGGIONE:  Do you recognize this

12    photograph?

13    THE WITNESS:  It appears to be, if not the

14    same tank, a similar tank in the same area of the

15    last one.  It's a tank that was cut down in the

16    Tonawanda Coke, in the plant.

17    THE COURT:  All right.  What kind of tank?

18    THE WITNESS:  I'm assuming it was a

19    holding tank.  I don't know what these tanks were

20    used for.  I wasn't a part of that process.

21    THE COURT:  Thank you.

22    MR. PIAGGIONE:  I want, is there more than

23    one tank in this area that was in this condition?

24    THE COURT:  Wait a minute.  Put the

25    question again, please.

1528

```
 1    BY MR. PIAGGIONE:

 2    Q.  Okay.  Was there more than one tank in this

 3    area?

 4    A.  I believe so, yes.

 5    Q.  We'll go to marked Exhibit 3.06.  Skip over

 6    that.  Let's go to 3.07.  Okay.  For identification

 7    purposes.  Can you recognize what this is?

 8    A.  Yes.

 9              MR. PIAGGIONE:  Any objection?

10              MS. GRASSO:  No objection.

11              MR. PERSONIUS:  Just a minute, Judge,

12    please.

13         No objection, Judge.

14              THE COURT:  Okay.  3.07, no objection.

15    Received.  May be published.

16              (Government's Exhibit 3.07 was received

17              into evidence.)

18    BY MR. PIAGGIONE:

19    Q.  Can you recognize this photograph?

20    A.  Yes.

21    Q.  And what is that?

22    A.  It's one of the tanks that was cut down.  By

23    the looks of it, there's tar leaking out of the

24    tank after it had been cut down.

25              MS. GRASSO:  Objection, your Honor.
```

1           THE COURT:  Grounds?

2           MS. GRASSO:  Narrative response.

3           THE COURT:  I'll allow, it since it's been

4    asked and answered.  So you may proceed.

5           MR. PIAGGIONE:  Thank you, your Honor.

6    Can you touch on the photograph where you see tar

7    leaking out?

8       Can we go to 003.08 for identification

9    purposes?  Can you recognize that photo?

10          THE WITNESS:  Yes.  It's another --

11          THE COURT:  Hold on.  Any objection?

12          MS. GRASSO:  No objection.

13          MR. PERSONIUS:  Your Honor, in light of

14   the testimony regarding the last photo, I do have

15   an objection.  And I don't think there is a proper

16   foundation.

17          THE COURT:  Okay.  I'll sustain the

18   objection at this point.

19          MR. PIAGGIONE:  Okay.

20   BY MR. PIAGGIONE:

21   Q.  May I establish foundation?  In looking at that

22   photograph, can you identify what it is?

23   A.  Yes.

24   Q.  Okay.  What is it?

25   A.  It's one of the tanks that was cut down on the

1   premises of Tonawanda Coke.

2   Q.  Can you recall approximately what date that was

3   that you observed this?

4            MR. PERSONIUS:  Again, your Honor, I

5   object to it.  That's leading.  I object to it.

6            THE COURT:  No, the question, can you

7   recall the date?

8            MR. PERSONIUS:  No, the date -- he said

9   the date that he observed it.  There's no testimony

10  from the witness that he observed it.  That's

11  leading.  It assumes, that's what -- that's my

12  point.

13           THE COURT:  Okay.  All right.  Sustained.

14  BY MR. PIAGGIONE:

15  Q.  Did you observe this -- this tank in this

16  condition at this site?

17  A.  Yes.

18  Q.  Okay.  On what date did you observe it

19  approximately in this condition?

20  A.  I would say that was the year of 2007,

21  maybe 2008.  I don't remember the exact date, but

22  it had been cut down and had been sitting for quite

23  a while.

24  Q.  Is that an accurate depiction of what you

25  observed around 2007, 2008 --

1    A.   Yes.

2    Q.   -- when you were at the location?

3    A.   Yes.

4              MR. PIAGGIONE:  Your Honor, I would ask

5    that this be introduced as Exhibit number 003.08.

6              MR. PERSONIUS:  No objection, Judge.

7              MS. GRASSO:  No objection.

8              THE COURT:  3.08 received, no objection.

9              (Government's Exhibit 3.08 was received

10             into evidence.)

11             MR. PIAGGIONE:  May it be published, your

12   Honor?

13             THE COURT:  Yes.

14   BY MR. PIAGGIONE:

15   Q.   Can you describe to the jury what they're

16   looking at?

17   A.   This was a tank, a holding tank, that was cut

18   down.  And what's left is a -- what's left of the

19   tank and the tar that was inside of the tank.

20   Q.   Okay.  Can you -- can you -- do you know what

21   that liquid -- what appears to be a black liquid

22   running around the bottom right quadrant of the

23   photograph is?

24   A.   Yeah.  That would have been tar running out of

25   the.

1    Q.  Thank you.  Can we have marked for

2    identification, Government's 003.09.  I ask you if

3    you can recognize that photograph?

4    A.  Yes.

5         MR. PIAGGIONE:  Absent an objection, I

6    would ask that this be moved into evidence as

7    Exhibit 003.09.

8         MS. GRASSO:  No objection.

9         MR. PERSONIUS:  If I can just ask this,

10   will the witness's testimony be the same about

11   having observed it?

12        MR. PIAGGIONE:  Yes.

13        MR. PERSONIUS:  No objection.

14        THE COURT:  Okay.  Then I guess that

15   establishes the foundation, so I'll receive 3.09,

16   no objection, and may be published

17        (Government's Exhibit 3.09 was received

18             into evidence.)

19        MR. PIAGGIONE:  I'm sorry, your Honor, did

20   I say something out of turn?  I apologize if I did.

21        THE COURT:  No.  No, but there was no

22   foundation -- I mean, not a proper foundation laid.

23   But there technically really wasn't an objection.

24   It was a point of information, so I think we're

25   okay.  And the jury will get this now as

1    Exhibit 3.09.

2              MR. PIAGGIONE:  Thank you, your Honor.

3    BY MR. PIAGGIONE:

4    Q.  Mr. Hoffmann, can you recognize what you're

5    looking at in this picture?

6    A.  Yes.  This appears to be one of the same tanks

7    cut down on the premises of Tonawanda Coke.

8    Q.  Okay.  And can you describe what that liquid is

9    that's displayed in that photograph?

10   A.  Yes.  That's tar.

11             THE COURT:  Is that the inside of the tank

12   or outside of the tank, do you know?

13             THE WITNESS:  It appears to be the outside

14   of the tank.  I can't be a hundred percent sure,

15   but by looking at it, that's what it appears to be.

16   I could be wrong.  It could be the inside of the

17   tank.

18   BY MR. PIAGGIONE:

19   Q.  Prior to the fire that you mentioned, do you

20   recall what this area was like?

21   A.  Oh, yes.  The tanks -- obviously the tanks were

22   complete and full.  It was a grassy, swampy area.

23   There was a -- there was a road that ran along side

24   of it, and it dropped off 3, 4 feet.  It was a

25   little bit of a wet area, very wet.

1    Q.   And was it surrounded by coal fields?

2    A.   There really wasn't much around it at all.

3    These tanks were by themselves, the building, et

4    cetera.   The coal field would have been on the

5    other side of the road.   There is the road, a

6    ditch, and then the coal fields.

7    Q.   Okay.   Can we call up Government Exhibit

8    already in evidence 125.02?   Do you recognize that?

9    A.   Yeah.   It looks like one of the tanks on the

10   premises of Tonawanda Coke.

11   Q.   Would that -- is that the tank that was just

12   dismantled?

13   A.   I would say, yes, looking at the buildings and

14   structures and grassy areas around it, and et

15   cetera.   Yeah, that looks like the tank that had

16   been dismantled, yes.

17          MR. PERSONIUS:   I object, Judge.

18          THE COURT:   Grounds?

19          MR. PERSONIUS:   Speculation.

20          THE COURT:   Well, I think it's okay as far

21   as it goes.   It will be a matter of weight for the

22   jury, meaning, ladies and gentlemen, you have to

23   take into account what the witness has testified

24   to, and the manner in which he has answered and

25   what he has said, and then you decide if it is

1    sufficient to satisfy you with respect to what this

2    photograph depicts, okay?  And then you may

3    consider it, if you choose to, as competent

4    evidence in arriving at your unanimous verdict in

5    this case.

6              MR. PIAGGIONE:  Thank you, your Honor.

7    BY MR. PIAGGIONE:

8    Q.  Mr. Hoffmann, you would note there was a date

9    in the lower right-hand quadrant?

10   A.  Yes.

11   Q.  Would that in any way change your testimony as

12   to the dates that you observed the previous

13   photographs?

14             MR. PERSONIUS:  I object to the leading,

15   Judge.

16             THE COURT:  Yeah, sustained.

17             MR. PIAGGIONE:  Having seen the date on

18   this, can you tell us the dates that you observed

19   the previous photographs of the dismantled tanks?

20             MR. PERSONIUS:  Leading, Judge, I object.

21             THE COURT:  Sustained.

22   BY MR. PIAGGIONE:

23   Q.  Okay.  Let's go back to Exhibit 3.09, please.

24   Now, what date do you recall seeing this -- what is

25   depicted in this photograph?

1536

1    A.   That would have been in about 2000 -- the year

2    of 2008.

3    Q.   Okay.

4    A.   This was a process that they did of cutting

5    these tanks down.  There were several of them.

6    Q.   I just asked for the date.

7    A.   Sorry.

8    Q.   All right.  Can we go back to Exhibit 3.08?

9    And what date would you say that was observed?

10   A.   Obviously the same year, 2008 by the looks of

11   it.

12   Q.   We'll go back to Exhibit number 3.07.  And what

13   was the date that you observed that?

14   A.   2008, same year.

15   Q.   Okay.  Go back to 3.05.  And what year would

16   that be?

17   A.   The same year, same time frame.  These were all

18   taken obviously in the same time frame of 2008.

19   Q.   And how about Exhibit 3.04?

20   A.   Once again, the same time frame.

21   Q.   Okay.  Can we have what's already in evidence

22   as Government Exhibit 125.03, please?

23       Do you recognize this area?

24   A.   Yes.

25   Q.   What is that?

1   A.   That would have been in the same area of one of

2   the building -- one of the buildings that was in

3   that area of the tank that was there.  It looks

4   like you can actually still see the tank there in

5   the background.

6   Q.   And is there a date there on the right lower --

7   A.   Yes, the date at the right lower, 7/8/2008.

8   Q.   Okay.  And what is the material, the darker

9   material around the water?  If you know?

10  A.   By the looks of it, there's coke, coal, dirt,

11  everything there.  Just a wet -- it looks like

12  they've put some coke down there.

13  Q.   Okay.  Now, prior to the fire that you've

14  referenced --

15          MR. PERSONIUS:  Could we have a time frame

16  for this fire the witness has been testifying about

17  please, Judge?

18          THE COURT:  Establish by questioning,

19  please --

20          MR. PIAGGIONE:  Yes, your Honor.

21          THE COURT:  -- a time frame.

22          MR. PIAGGIONE:  Do you recall at all when

23  the fire was?

24          THE WITNESS:  That would have been in the

25  same time frame in 2008 when that fire took place.

1        MR. PIAGGIONE:  Okay.  Is that sufficient,

2   your Honor?

3        THE COURT:  Go ahead and see if there's an

4   objection.

5   BY MR. PIAGGIONE:

6   Q.  Okay.  With regard to the material on the

7   ground around it, prior to that fire, 2008, could

8   you drive heavy equipment in this area?

9   A.  No.

10  Q.  Why not?

11  A.  You'd get stuck.  As a matter of fact, I

12  believe we did have an end loader getting stuck in

13  that area when it drove off the road.

14  Q.  Okay.  And after the fire in 2008, did you do

15  any work in that area?

16  A.  Yes.  I did some work in that area at one time

17  after the tanks were cut down.

18  Q.  What, if anything, did you do?

19  A.  There was still tar in the bottom of the tanks,

20  and we were removing the tar from the tanks.  I

21  operated the excavator, and I would -- on occasion

22  I would take the tar out of the holding tank area

23  and put it into an end loader, which then would be

24  driven out to the coal field.

25  Q.  And did you see what happened to the -- at any

1    time what happened to the sludge from the tank?

2    A.   Yes.   It was mixed into the coal field, the

3    same way as the tar from the tar box.   It would

4    just be dumped into the coal piles and mixed in.

5    Q.   Okay.   And did you see anyone give instructions

6    not to have that material hit the ground when

7    they're mixing it in the coal field?

8    A.   No, there was no -- same instructions, take it

9    out to the coal field and mix it in.

10   Q.   Were you given any hazardous waste training

11   while you were working at Tonawanda Coke?

12   A.   No.

13   Q.   Okay.   Now, who told you to work in that area?

14   A.   Jon Rogers.

15   Q.   And who is Jon Rogers, do you know?

16   A.   Jon Rogers was my foreman.

17   Q.   And how long did you do that?

18   A.   How long was I mixing this tar from those

19   tanks?

20   Q.   Yes.

21   A.   Only a couple of days.   Myself, I was pulled

22   off of that job.

23   Q.   Okay.   Did you observe it continuing after you

24   were pulled off the job?

25   A.   Yes.

1    Q.   So how long did that activity occur?

2    A.   I would estimate at a couple of weeks.

3    Q.   Okay.  Now, when you were working in that area

4    with the excavator, did you notice any differences

5    in the ground that you were working on?

6    A.   Yes.  They had broughten [sic] in coke to put

7    on the ground so that the heavy equipment wouldn't

8    sink into the ground.  You had to do something,

9    otherwise the heavy equipment would have just sank

10   into the ground.

11   Q.   When you say coke, do you mean coke?

12   A.   That would have been the coal that was

13   processed in the ovens, cooked, et cetera, and then

14   put on the ground.  It's -- once it's cooked, it's

15   a little solider [sic], giving you a better base to

16   put heavy equipment on.

17   Q.   Did you ever hear the expression "coke breeze"?

18   A.   Yes.

19   Q.   Okay.  Did the -- do you know if any coke

20   breeze was used in this area as well?

21   A.   Not a hundred percent sure.  But it wouldn't

22   have surprised me if it was.

23        MR. PERSONIUS:  Well, your Honor, whether

24   he's surprised or not is not relevant.

25        THE WITNESS:  Sorry.

1          MR. PERSONIUS:  I ask that that part of

2     his testimony be stricken.

3          THE COURT:  Yeah, I will do that.  The

4     testimony, ladies and gentlemen, is not to be

5     considered by you.  I mean, obviously you heard it,

6     but it's struck from the record, so it's not proper

7     evidence.  It's not competent evidence.  Okay.

8     Thank you.

9   BY MR. PIAGGIONE:

10   Q.  Do you know who put -- put the material down on

11   the ground around the tanks?

12   A.  I would have said it was Pervis Jones that

13   would do it.  He would have been ordered by Jon

14   Rogers to do so, so we could get in there to empty

15   these tanks.

16   Q.  I'm going to call up what's been -- for

17   identification purposes Exhibit 119.01.

18       Do you recognize that photograph?

19   A.  Yes.

20          MR. PIAGGIONE:  Absent any objection, I

21   would ask that it be introduced into evidence as

22   Government's Exhibit 119.01.

23          MS. GRASSO:  No objection.

24          MR. PERSONIUS:  I think, Judge, I prefer

25   we get more of a foundation first, please.

1542

1    THE COURT:  Certainly.

2    BY MR. PIAGGIONE:

3    Q.  Okay.  Mr. Hoffmann, do you recognize the

4    photograph?

5    A.  Yes.

6    Q.  Do you know -- what is being depicted there?

7    A.  One of the tanks that had been cut down, the

8    area of the ground around it, the tar in the tank

9    still.

10   Q.  And what time frame are we looking at here?

11   A.  I believe this is 2008 after it had been cut

12   down.

13   Q.  Is that a fair and accurate depiction of what

14   you observed around that time?

15   A.  Yes.

16        MR. PERSONIUS:  Object to the -- again, to

17   the leading, Judge.

18        THE COURT:  Well, I guess it presumes that

19   he observed it, so start with that.  Sustained.

20   BY MR. PIAGGIONE:

21   Q.  Sorry.  Did you observe this tank in this

22   condition when you were at Tonawanda Coke?

23   A.  Yes, several times.

24   Q.  And is that a fair and accurate depiction of

25   what you observed at that time?

1543

1    A.   Yes, it is.

2              MR. PERSONIUS:  No objection, Judge.

3              THE COURT:  Okay.  119.01 received, no

4    objection.

5              (Government's Exhibit 119.01 was received

6              into evidence.)

7              THE COURT:  You may publish if you choose

8    to do that.

9              MR. PIAGGIONE:  I do, your Honor.  Thank

10   you.

11       I would draw your attention to the marks in

12   the -- in the photograph.  I'm going to touch with

13   my finger and see if -- can you -- does that

14   indicate anything to you?

15             THE WITNESS:  Appears to be the tar --

16             MR. PERSONIUS:  Object to what it appears

17   to be, your Honor.

18             THE WITNESS:  That's a big picture.

19             THE COURT:  Well, no, I'll deny -- I'll

20   overrule that objection, and then you can

21   cross-examine.

22             MR. PERSONIUS:  Okay.

23   BY MR. PIAGGIONE:

24   Q.   Do you notice the steep -- what appears where

25   the arrows are sort of a steep drop in the -- in

1544

1    the tar sludge?

2    A.   Yes.   Yes.

3    Q.   Okay.   Would you know how those indentations in

4    the tar got there?

5    A.   It appears that a --

6                THE COURT:   Well, calls for a yes or no.

7    Do you know?

8                THE WITNESS:   No, not for sure.

9    BY MR. PIAGGIONE: --

10   Q.   Then we'll move on.

11   A.   --  how those got there.

12   Q.   All right.   Do you know what this material is?

13   A.   Yes, it's tar.

14   Q.   Okay.   And do you know where it went?

15   A.   Yes.

16   Q.   Where did it go?

17   A.   It was removed and taken to the coal field.

18   Q.   Okay.   Do you know how deep -- is that a -- how

19   deep that tar goes in that area?   Do you know?

20   A.   I would say no, the tank was much deeper than

21   that.   They had built up the ground around it in

22   order to remove the tar from the tank, so that the

23   heavy equipment could get in there.

24   Q.   So the tar went down below the surface of

25   what's being depicted in this photograph?

1   A.   Yes.   It went down approximately another

2   3 feet, because the road dropped off another 3 feet

3   when those tanks were there.

4   Q.   Okay.   And who worked on that -- that area with

5   you?

6   A.   Pervis Jones, Mr. Rogers, Kevin Townsend, and

7   I'm sure there were a few others.   I can't remember

8   all the names of everybody that helped on that

9   project.

10          MR. PIAGGIONE:   I have no further

11   questions for this witness, your Honor.

12          THE COURT:   Okay, Mr. Paggianoe.   I think

13   what we'll do, if it's okay with you, ladies and

14   gentlemen, we'll break for lunch.   Any objections?

15   All right.   None.   It will be received in evidence,

16   all right.   So you can all get up, leave your

17   notebooks behind, take off for lunch, enjoy it, and

18   we'll see you back here -- we'll start again at

19   2:15.

20          (Jury excused from the courtroom.)

21          THE COURT:   Okay.   You can step down,

22   Mr. Hoffmann.

23      Anything that we need to address?

24          MR. LINSIN:   No, thank you, your Honor.

25          MR. MANGO:   No, your Honor.

1       MR. PERSONIUS:  Thank you, Judge.

2       THE COURT:  Okay.  Thank you.

3       (Lunch recess was taken.)

4       (Jury seated.)

5       THE COURT:  How was lunch?

6       THE JURY:  Good.

7       THE COURT:  Good to have you back.  Please

8  have a seat.  Okay.  The attorneys and parties are

9  back, present.  You, of course, are here, roll call

10  waived.

11     Just one kind of preliminary administrative

12  matter.  If you have noticed, Ms. Grasso was one of

13  the attorneys, Jeanne Grasso, she was second chair

14  to Mr. Linsin.  She had to leave for a family

15  emergency, so whether she'll be back or not we're

16  not actually sure.

17     So, like in the case with Mr. Bauman and Ms.

18  Malyszka, we have an alternate that moves up to the

19  regular second chair, and that's Ariel Glasner.

20  So, he's going to be seated, but he's not going to

21  do the first cross-examination.  I think you're

22  going to do that, Mr. Linsin?

23     And I think with that, we're in order.  We're

24  ready to go.  We have to get Mr. Hoffmann back on

25  the witness stand.  I think direct is complete.

1547

1     And we go right into cross-examination.

2         Mr. Hoffmann, you remain under oath.

3             THE WITNESS:  Yes, sir.

4             THE COURT:  Please have a seat.

5             THE WITNESS:  Thank you.

6             THE COURT:  You're welcome.  Thank you.

7     Mr. Linsin.  No, you're going to do that first?

8             MR. PERSONIUS:  May I, Judge?

9             THE COURT:  You may.  You may,

10    Mr. Personius.

11    CROSS-EXAMINATION BY MR. PERSONIUS:

12    Q.   Good afternoon, sir.

13    A.   Good afternoon.

14    Q.   I think you probably know what I do, but you

15    probably don't know who I am.  My name is Rod

16    Personius, and I represent Mark Kamholz.

17    A.   Okay.

18    Q.   You've told us, Mr. Hoffmann, that you worked

19    at Tonawanda Coke --

20    A.   Yes.

21    Q.   -- from 2002 until December of 2009?

22    A.   Yes.  Yes.

23    Q.   Okay.  And you left employment with Tonawanda

24    Coke on December 17th of 2009?

25    A.   Yes.

1    Q.   Okay.  And would it be fair to say you were

2    fired?

3    A.   I'm not sure.  I was told my services were no

4    longer needed.  I don't know if I was fired or

5    downsized.  I assumed downsized.

6    Q.   Did you ask?

7    A.   I didn't ask if I was fired, downsized, or

8    anything.  They didn't inform me.  They didn't

9    refuse my unemployment.  I only collected for a

10   couple weeks.  I have no idea the reason.  I just

11   assumed a downsizing or something.

12   Q.   That's what you assumed?

13   A.   Yes.

14   Q.   But you don't know?

15   A.   I don't know.

16   Q.   You didn't ask?

17   A.   Didn't ask.

18   Q.   And whatever it was, it was the company's

19   decision to --

20   A.   Yes.

21   Q.   -- to terminate your employment, correct?

22   A.   Yes.

23   Q.   Now, when you worked for the -- for the

24   company, I think you told us starting in 2002 that

25   you were a laborer?

1    A.   Yes.

2    Q.   For what period of time did you work at

3    Tonawanda Coke as a laborer?

4    A.   I was hired through a temp service.  I worked

5    from January to approximately July of 2002 as a

6    laborer.

7    Q.   So it was a period of about six months?

8    A.   Yes.

9    Q.   Seven months maybe?

10   A.   Approximately.

11   Q.   All right.  And as a laborer did you work in a

12   particular department at the company?

13   A.   I started off working in -- making bricks for

14   the oven, oven bricks.  And then I worked on the

15   wharf, and after that I worked on the battery or

16   the ovens.

17   Q.   Okay.  And the wharf, I think you've told us,

18   is that part of the coke handling department?

19   A.   That would be part of coke handling, yes, I

20   believe so.

21   Q.   And then you went to the battery?

22   A.   Yes.

23   Q.   And how long did you work in the battery as a

24   laborer?

25   A.   From July of 2002 until about October of 2002.

1  Q.  Okay.  I guess I misunderstood.  I thought that

2  you were a laborer from January to July 2002.

3  A.  Oh, well, I -- from July to October I was on

4  the battery in a position of charge car operator.

5  I don't know if they consider that a labor job or a

6  specific operation.  Specifics of it I'm not sure.

7  Q.  So did you work then at the wharf as a laborer

8  until July --

9  A.  Yes.

10  Q.  -- of 2002?

11  A.  Yes.

12  Q.  And then from July of 2002 to October of 2002

13  you were in the battery as a charge car operator?

14  A.  Correct.

15  Q.  Now, the jury has heard -- we could do a quiz,

16  I guess, and ask them if they know what a charge

17  car operator is, but they may not remember it.

18      Can you tell the jury again what a charge car

19  operator did?

20  A.  What I did as a charge car operator, there was

21  a piece of equipment that ran on tracks, train

22  tracks.  It would be loaded with coal.  This piece

23  of equipment would be driven out on to the ovens,

24  and it would fill the oven with coal to be cooked.

25  Q.  The way it's been explained to us, you charge

1    or fill with coal one of these ovens at a time?

2    A.   Yes.

3    Q.   And that's what you did from July until

4    October?

5    A.   Yes.

6    Q.   Okay.  And then was it in October of 2002 that

7    you joined what I think is called the track crew?

8    A.   Yes.

9    Q.   Okay.  And I think you're going to have to, if

10   you don't mind, explain to the jury what the track

11   crew is, please.

12   A.   The track crew generally maintains the tracks,

13   the railroad tracks, inside the plant.  There is

14   approximately 10 miles worth of railroad track

15   inside the plant.  I was in charge of rerailing

16   cars, repairing track, fixing track, along with

17   several other duties that I was given from time to

18   time by Mr. Rogers.

19   Q.   And Mr. Rogers is Jon Rogers?

20   A.   Mr. Rogers is Jon Rogers.  He was my foreman.

21   Q.   So he was the foreman of the track crew?

22   A.   Yes.

23   Q.   I don't know if you said this in your testimony

24   or if I got it from one of the interview reports

25   when you spoke to the agents, but you were a

1    leadman?

2    A.   Yes, that's correct.

3    Q.   What does that mean, to be a leadman?

4    A.   What it meant was that I was in charge of the

5    laborers coming into the plant.  I was in charge of

6    taking care of any tracks that needed repair, any

7    railroad cars that derailed inside the plant,

8    including the equipment at the battery which ran on

9    railroad tracks.

10   Q.   The railroad tracks that are inside the plant,

11   you said there's 10 miles of tracks?

12   A.   Approximately.  I don't know the exact number.

13   Q.   Okay.  But it sounds like a lot.

14   A.   Yeah, I guess so.

15   Q.   What was the purpose or what is the purpose of

16   all these tracks that are inside Tonawanda Coke?

17   What are they used for?

18   A.   We would bring in coal sometimes on -- in rail

19   cars.  Sometimes coke would go out on rail cars.

20   The locomotive that we had would move these rail

21   cars around.  We sold coke to different places, and

22   if it was sold in railroad cars, the equipment --

23   we had cars that moved around and pushed them out.

24   We also had what was called storage cars that we

25   would put coke into to keep it so that trucks could

1    be loaded at a later date at the truck station.

2    Q.   Okay.  And so these tracks then were used to

3    bring in coal --

4    A.   Yes.

5    Q.   -- in part.  Coal would also come in in trucks?

6    A.   Yes.

7    Q.   And then the finished coke product would be

8    shipped out sometimes on these rail cars?

9    A.   Correct.

10   Q.   And I think -- I think that you've mentioned

11   too that this -- there's a quench car or the hot

12   car?

13   A.   Yes.

14   Q.   That's on a track too?

15   A.   That's on the tracks.  The backdoor machine ran

16   on tracks.  What was called the pusher which pushed

17   the coke out of the oven ran on railroad tracks,

18   and even the charge car ran on railroad tracks.

19   Q.   Okay.

20   A.   Okay?

21   Q.   Thank you very much.  And you were with the

22   track crew then from October of 2002 until you

23   became foreman for the coke handling department

24   in -- was that January of 2009?

25   A.   I believe it was February.

1554

1    Q.   February of 2009?

2    A.   Approximately.

3    Q.   All right.  And then held that position until

4    you were discharged in January of 2009?

5    A.   December of 2009.

6    Q.   I'm sorry, December of 2009.  That's what I

7    meant to say.  And as the foreman of the coke

8    handling department, what were your

9    responsibilities?

10   A.   Making sure that trucks were loaded in a timely

11   fashion, and making sure that the coke process, the

12   car that the coke would end up on the wharfs, go

13   through the screens, making sure that the coke

14   building was being operated in a fashion so that it

15   was operated quickly and efficiently, making sure

16   it was kept clean, et cetera.

17   Q.   Okay.  You've told us that during this period

18   of time that you worked at Tonawanda Coke that

19   there were occasions where you would operate a

20   device that's called a front end loader?

21   A.   Yes.

22   Q.   Okay.  And during what period of time was it

23   that you operated that machine?

24   A.   From the time where I was a leadman on the

25   track crew in October of 2002 until the time I was

1   no longer working there in December of 2009.  I had

2   on several occasions operated them on a regular

3   basis.

4   Q.  And operated the front end loader?

5   A.  Operated the front end loader.

6   Q.  The operation of that front end loader, you

7   testified, included using it to clean out what I

8   think is sometimes called the tar box?

9   A.  Yes, that's correct.

10  Q.  And removing accumulated coal tar sludge from

11  that tar box, which you then carried out to the

12  coal field, is that true?

13  A.  Yes.  Yes.

14  Q.  Okay.  Could we please have, Sheila, this is

15  for identification, Defense Exhibit UUU put up on

16  the screen?

17       MR. PERSONIUS:  Your Honor, I'm happy to

18  go through a foundation, but if the government

19  agrees that I don't need to do so --

20       MR. PIAGGIONE:  No objection, your Honor.

21       THE COURT:  Okay.  Go ahead, please.

22  BY MR. PERSONIUS:

23  Q.  Mr. Hoffmann, you have a photograph in front of

24  you, sir?

25  A.  Yes.

1   Q.   And this is Defendant's Exhibit UUU.  Do you

2   see that down at the bottom?

3   A.   Yes.

4            MR. PERSONIUS:  Okay.  As I understand it,

5   your Honor, this is in evidence now?  Okay.  May we

6   publish it to the jury?

7            THE COURT:  Yes, there's no objection.

8            (Defendants' Exhibit UUU was received into

9            evidence.)

10           MR. PERSONIUS:  Can you recognize what's

11  shown in this picture?

12           THE WITNESS:  Yes.

13           THE COURT:  All right.  Just hold for one

14  second.

15           MR. PERSONIUS:  Okay, Judge.

16           MR. LINSIN:  Excuse me, with your Honor's

17  permission?

18           THE COURT:  Yeah.

19

20           MR. LINSIN:  Thank you, your Honor.  I

21  apologize for the interruption.

22           THE COURT:  Thank you.  I'm sorry for the

23  interruption, Mr. Personius.

24           MR. PERSONIUS:  Not at all, Judge.

25           THE COURT:  Okay.  We have triple U I

1    think.

2              MR. PERSONIUS:  Yes, Judge.  Triple U.

3              THE COURT:  Okay.  You may resume, please.

4    BY MR. PERSONIUS:

5    Q.  Thank you, Judge.  The photograph that's shown

6    on the screen, Defendants' Exhibit UUU, do you

7    recognize what's depicted in that picture?

8    A.  Appears to be an end loader.

9    Q.  Okay.  And there's a pile behind it?

10   A.  Yeah.

11   Q.  And do you know what that's a pile of?

12   A.  It appears to be coke -- coal.

13   Q.  Appears?

14   A.  Appears.  It could be coke as well.  They look

15   very similar sometimes.  The small fine coke, but

16   it appears to be coal.

17   Q.  All right.  Well, you've told us that you had

18   this experience at Tonawanda Coke of operating a

19   front end loader --

20   A.  Yes.

21   Q.  -- to take coal tar sludge out and mix it in

22   the different coal piles in the coal fields at

23   Tonawanda Coke, correct?

24   A.  Yes.

25   Q.  And can you agree with me that this is a

1  picture of a front end loader in front of one of

2  the coal piles at Tonawanda Coke?

3  A.   Yes.

4  Q.   And what you would be doing is when you were

5  carrying the coal tar sludge out to a coal pile

6  would be driving one of these front end loaders?

7  A.   Yes.

8  Q.   In this picture the front end of this machine

9  is in a rest position?

10  A.   Yes.

11  Q.   Now, when you were taking the coal tar sludge

12  out to mix it in the coal pile, would it be true

13  that that front end would be raised up in the air?

14  A.   It would be raised up a couple feet off the

15  ground and curled back.

16  Q.   And when you would get to the coal pile, would

17  you raise the front end up higher?

18  A.   Yes.

19  Q.   And then, if you will, dump the coal tar sludge

20  into the side of the coal pile?

21  A.   Yes.

22  Q.   And then engage in your mixing process?

23  A.   Correct.

24  Q.   It's been described to us that that involves

25  using that front end of the loader to do a

1    dragging, a back dragging and then throwing more

2    coal in to mix the coal tar sludge into the coal,

3    is that an accurate description?

4    A.   Yes.

5    Q.   Okay.  Now, how often was it that -- that you

6    would use the front end loader to take the coal tar

7    sludge from Tonawanda Coke's operation and mix it

8    into a coal pile in the coal field?

9    A.   I myself --

10   Q.   Yes, sir.

11   A.   -- have probably done this approximately once a

12   month for about four or five years.

13   Q.   And which years was it that you did that?

14   A.   Probably starting in about 2003, 2004 area

15   until I finished working for Tonawanda Coke.

16           MR. PERSONIUS:  All right.  Could we take

17   this picture down please, Shiela?

18       And then, Lauren, if you would, please, this is

19   I believe for identification, it's Government

20   Exhibit 105.40.

21       Your Honor, if the government is agreeable, I'd

22   like to offer this into evidence.

23           MR. PIAGGIONE:  No objection, your Honor.

24           THE COURT:  Okay.  105.40 -- Mr. Linsin,

25   no objection?

1          MR. LINSIN:  No objection, your Honor.

2     Thank you.

3          THE COURT:  Okay.  No objection.  It is

4     received.  And do you want it published?

5          MR. PERSONIUS:  Yes, please, Judge.

6          THE COURT:  And it may be published.

7          (Government's Exhibit 105.40 was received

8          into evidence.)

9     BY MR. PERSONIUS:

10    Q.  Mr. Hoffmann, you have in front of you a

11    photograph that you can see it's marked Government

12    Exhibit 105.40, correct?

13    A.  Yes.

14    Q.  And do you recognize what -- do you recognize

15    what is shown in the -- do you recognize what's

16    shown in the photograph?

17    A.  Yes.

18    Q.  Could you tell the jury what it is, please?

19    A.  It is an overhead view, an above view of

20    Tonawanda Coke.

21    Q.  All right.  And is it depicted -- these coal

22    fields that you've testified about, are they

23    depicted in this photograph?

24    A.  Yes.

25    Q.  Could you use your finger to point to where the

1    coal fields are, please?

2        All right.  That's -- that's -- that would be

3    on the eastern side of the coal fields?  Or is that

4    the middle?

5    A.  That would be approximately the middle on what

6    I would call the north side of the coal field.

7    Q.  Okay.  There's a line above where you put the

8    blue square.  Do you recognize what that line is?

9    A.  That appears to be the belt -- that's the belt

10   that ran through the coal field that coal would be

11   put on in order to be sent to the coal building.

12   Q.  Lauren, if -- if we could, please, make what I

13   just put in blue bigger.

14       We have now taken one part of this photograph

15   and expanded it in size.  Do you see that,

16   Mr. Hoffmann?

17   A.  Yes.

18   Q.  Would you agree what we are showing now would

19   be these -- the coal fields at Tonawanda Coke?

20   A.  Yes.

21   Q.  All right.  Now, you've told the jury that --

22   what you've now told us is for about a five-year

23   period, from 2004 to 2009, once a month you would

24   take Tonawanda Coke coal tar sludge out and mix it

25   in these coal fields, correct?

1    A.   Yes.

2    Q.   Now you've also told the jury that it was

3    your -- apparently your observation that this coal

4    tar sludge, once it was mixed in one of these

5    piles, could remain there for a period of time.  It

6    could be days or weeks, is that correct?

7    A.   Yes.

8    Q.   And the coal that's -- that's brought to

9    Tonawanda Coke is brought in by either railcar or

10   by truck?

11   A.   Yes.

12   Q.   And are there deliveries of coal that come to

13   Tonawanda Coke on a daily basis?

14   A.   Yes.

15   Q.   And are you familiar with the amount of coal

16   that's brought to Tonawanda Coke on a daily basis?

17   A.   I'm not familiar with the exact numbers, no.

18   But I know it's several trucks.

19   Q.   Several?

20   A.   Dump trucks, yes.

21   Q.   Would you agree that there are 20 to 30

22   shipments of coal brought into Tonawanda Coke each

23   day?

24   A.   Yes, that could be a possibility.  Could be a

25   little more, it could be a little less.

1563

1    Q.   And the size of these trucks that bring in that

2    coal, these are 22-ton trucks?

3    A.   Yes.

4    Q.   They're a large truck?

5    A.   Yes, they're a large dump truck, three axle.

6    Q.   Once those trucks get to Tonawanda Coke, there

7    are different piles for the different kind of coal

8    that Tonawanda Coke uses?

9    A.   Yes.

10   Q.   And the coal, when it's brought in, is dumped

11   in the appropriate pile?

12   A.   Correct.

13   Q.   Okay.  If you could explain to us how it is

14   that you're able to testify under oath that you

15   know that coal tar sludge from the Tonawanda

16   operation that would be mixed in these coal piles

17   would sit there for days or weeks?

18   A.   You'd like me to explain that?

19   Q.   Sure.

20   A.   Okay.  I had -- I had the unique position on

21   the track crew I was able to drive around the plant

22   in the truck.  The track crew had its own truck.  I

23   could drive by the same site, same spot three, four

24   times, depending on what I was doing.  I might

25   actually have to work out there in the coal field.

1    At one time we had what was called a bridge

2    crane and needed -- it ran on railroad tracks.  And

3    I'd be out there working on it for several days at

4    a time if need be.  If the tracks were bad and the

5    area had to be fixed, I was out their fixing it.  I

6    could see what went on.  I could drive past to see

7    what was going on in the plant, depending on where

8    it was without any trouble.

9        Nobody questioned where I was going or what I

10    was doing when I was on the truck, because I

11    usually had work to do or whatever.

12    Q.  Is it -- is it your testimony that this truck

13    that you're describing that you would use three or

14    four days a day --

15    A.  I used it the entire day when I was --

16    Q.  Is it your testimony that every day you were

17    going out to the coal fields?

18    A.  Everyday, no.

19    Q.  Okay.

20    A.  There was some days, week at a time, I would

21    be.

22    Q.  Okay.  And with what frequency did your

23    assignments take you out to the -- to the coal

24    fields?

25    A.  The exact number of times I went out to a coal

1    field in a week I can't say for sure.  I was

2    probably out in the coal field once, twice a week

3    like -- on average.  But that would be an average.

4    There was sometimes, like I said, we would be out

5    there for weeks on end if we needed to replace

6    railroad ties on the crane tracks.

7    Q.  But I think what you're telling us, and you

8    correct me if I'm wrong, is that from the time you

9    got on the track crew, which would have been in the

10   fall of 2002 --

11   A.  Correct.

12   Q.  -- until you took over as foreman for the coke

13   handling department in February of 2009, it was on

14   average that you would be out in the coal fields,

15   did you say, a couple times a week?

16   A.  Yes.

17   Q.  Okay.  And your purpose for going out there

18   would have something to do with repairing --

19   A.  Not always.  Sometimes I actually loaded coal

20   on to the conveyor belts in the coal field.

21   Q.  Okay.

22   A.  I went where -- I had various of jobs,

23   depending on where they needed me.  If they needed

24   someone to operate an end loader and they didn't

25   have anybody else available, they asked me to.  And

1   I never had a problem with doing it.

2   Q.  And you're telling us that when you would go

3   out to the coal field you would focus upon the coal

4   tar sludge that had been put on a pile of coal?

5   A.  No.  I would focus on the job that I was doing.

6   Q.  Okay.  And how is it then that -- even though

7   you may have been out there once or twice a week

8   over a period of seven years, how is it you're able

9   to testify under oath that this coal tar sludge

10  would sit in these piles for whether it be days or

11  weeks?

12  A.  Because there's -- sometimes I worked next to

13  them.

14  Q.  Worked next to what, sir?

15  A.  The coal piles with the tar in them.  When we

16  replaced railroad ties, they would bring the stuff

17  out there, dump it in there, and we were working

18  along there, and it just sat.

19  Q.  It just sat meaning the --

20  A.  The coal coal tar sat in the coal pile.

21  Q.  You'll have a chance.  We have to have a

22  question and an answer.  It's all right.

23      Your testimony is that you could be working in

24  the same place for a number of days, and it could

25  be near a coal pile?

1   A.   Yes.

2   Q.   Okay.  And that you would take note of the fact

3   that there was coal tar sludge that had been mixed

4   into a particular coal pile, and you would see it

5   there for days on end, is that your testimony?

6   A.   Yes.  There was certain piles that the coal tar

7   was put into.  They weren't just put into usually

8   any pile.  They usually kept it to a couple of

9   different piles.

10  Q.   All the coal tar sludge always got put in the

11  same piles?

12  A.   Generally speaking, it was a couple of piles

13  that they would put it into.  They wouldn't put it

14  into just any coal mix.

15  Q.   So would it be fair to say then that the times

16  that you're telling us you made these observations

17  would be when you were going to be at the same

18  place in the coal fields for a number of days in a

19  row?

20  A.   Yes.

21  Q.   All right.  How frequently did that happen?

22  A.   Probably once a year, maybe twice a year,

23  depending on how often the tracks needed repair.

24  Q.   So that we can better understand your testimony

25  then, are you telling us that you would make this

1568

1    observation where you would see the coal tar sludge

2    in a pile for whether it was days -- you've

3    actually said weeks -- would be once or twice a

4    year that you saw that?

5    A.   Yeah, along with driving past the same coal

6    piles every day I was out there.

7    Q.   But --

8    A.   There were roads going out there that I had to

9    go out there to --

10   Q.   But when you were just driving out there, is it

11   your testimony that you would pay attention to what

12   coal pile -- we see a picture here in this

13   exhibit -- what coal pile had coal tar sludge in

14   it?

15   A.   Yeah, there were only a couple of piles that

16   they put it in.

17   Q.   Where were the piles --

18   A.   They would be

19   Q.   Please, whoa, whoa, whoa.  Let me finish,

20   please.

21   A.   Sorry.

22   Q.   Then you'll have a chance.

23   A.   Okay, sorry.

24   Q.   What were the coal piles that you're telling us

25   were the ones that they always used?

1   A.   Okay.   The coal piles that I'm aware of that

2   they generally used were at the northeast end of

3   the coal field.

4   Q.   Can you use your finger to show the jury where

5   that is?

6   A.   Yes.   That would be coal piles here -- oops.

7   There.   There.   And maybe one of these other piles

8   sometimes.

9   Q.   When you say "one of these other" --

10  A.   Maybe.   That was a maybe.   But the ones closet

11  right there were the ones that were used the most

12  often, most frequently.

13  Q.   And these piles that -- you put a blue spot on

14  two of these piles on the left-hand side of the

15  photograph, correct?

16  A.   Yes.

17  Q.   When coal tar sludge was -- was put into these

18  piles, is it your testimony that a day or couple

19  days or a week later you could tell that there was

20  coal tar sludge in that coal?

21  A.   Sometimes they wouldn't even use the coal tar

22  for days.

23  Q.   Sir, was that my question?

24  A.   No, I'm sorry.

25  Q.   Wait, and let me ask you a question.   Listen to

1  my question, please, and answer it, okay?  Once you

2  put coal tar sludge into a coal pile and you mix it

3  up, you're telling us that you could tell that that

4  coal tar sludge had been placed in that coal pile?

5  A.  Yes, sir.

6  Q.  Can you explain to the jury what the difference

7  would be in appearance that would enable you to

8  make the observation you're telling them you would

9  make once or twice a year?

10  A.  Okay.  You could actually see the clumps of tar

11  sitting there.  Tar stuck together.  Just, you

12  know, didn't really mix in extremely well.  You

13  could actually see the tar in the pile.  It would

14  be clumps.  Coal that we used was pulverized coal

15  rather than clumped coal.  And it was like almost

16  like a powder.  And the tar would be in clumps.

17  Q.  Okay.  What what color is the coal?

18  A.  Black.  Black.

19  Q.  All right.  And the coal tar sludge, what color

20  is that?

21  A.  Black.

22  Q.  If you will, you've got black on black?

23  A.  Yes.

24  Q.  And now these piles that you pointed to here

25  where you say you would notice this, did these 20

1  to 30 shipments of coal that came in a day, did

2  they ever get dumped in these piles that you're

3  referring to?

4  A.  On occasion some coal would be dumped in this

5  area when the coal -- when that coal was used, new

6  coal would be put there.  But those aren't usually

7  the piles they added coal to.

8  Q.  Oh, so the piles you're telling us about would

9  be ones that they wouldn't be adding the coal to as

10  a general rule?

11  A.  Those -- they weren't added to as frequently as

12  the other piles, no.

13  Q.  All right.  I see.  You've told us that you

14  would make this observation, this twice-a-year --

15  once or twice a year apparently over about five

16  years, so what we're talking about at most that you

17  made this observation ten times, is that fair?

18  A.  No, I didn't say that.  That's when I was --

19  that's the time frame when I actually worked out in

20  the coal field on the tracks.  There were times

21  when I was out there in the end loader filling --

22  as a matter of fact, the October storm we had a few

23  years back, I was actually working out in the coal

24  field.  And I was one of the ones putting coal on

25  to the conveyor belts to feed the coal handling

1    building.  That particular day we didn't use any of

2    the coal that was mixed with the tar.

3    Q.  So one day you worked in coal handling?

4    A.  No.

5    Q.  How many days did you work in coal handling?

6    A.  More than I can remember.  I was put there on

7    several occasions, not just in the field, but in

8    the cold handling building as well.  I was

9    generally put anywhere where they needed me.  I was

10   given a range of jobs and taught several different

11   jobs.  And I filled in when people would go on

12   vacation, et cetera, when someone would call off.

13   Whatever was needed, what I was asked to do, that's

14   what I did.

15   Q.  You viewed yourself as a very valuable

16   employee, I take it?

17   A.  I don't know.  You'd have to ask somebody else

18   if I was a valuable employee.  I assumed that my

19   value was of something being that I could --

20   Q.  Do so many different things?

21   A.  -- do various -- various numbers of jobs.  I

22   operated several pieces of heavy equipment as well.

23   Q.  Tell us, if you could, over this period of time

24   that you worked at Tonawanda Coke how many times

25   you worked in the coal fields for coal handling.

1    A.   There was a -- there was a stretch I did it for

2    a couple of months at a time, because that's what

3    they needed.

4    Q.   You say there was a stretch where you did it a

5    couple of months at a time?

6    A.   Yes.

7    Q.   How many times did you work in coal handling a

8    couple of months at a time?

9    A.   Oh, probably -- that was probably one of the

10   few times, probably twice while I was there --

11   Q.   Twice?

12   A.   -- that I worked months at a time.

13   Q.   Who was your supervisor?

14   A.   The person I answered to was Jon Rogers.

15   Q.   Well, Jon Rogers wasn't in coal handling, was

16   he?

17   A.   Yes, he was.

18   Q.   He was?

19   A.   Yes.

20   Q.   Was he the foreman for coal handling?

21   A.   He was acting foreman from time to time in coal

22   handing when someone on vacation.

23   Q.   So Jon Rogers would know about you having

24   worked in coal handing?

25   A.   Yes.  He would have asked me to do it.  He

1    would be the person to ask me to go to coal handing

2    and do whatever operation is needed.

3    Q.   During this period of -- these two months

4    period where you worked in coal handling, would you

5    agree that in most instances that the coal tar

6    sludge that was mixed in the coal piles would then

7    be used within 24 hours?

8    A.   I wouldn't agree that it was used within 24

9    hours.  I would agree that was used probably within

10   72 hours.

11   Q.   Within three days?

12   A.   Yeah, usually.

13   Q.   Okay.  And these -- other than these instances

14   when you say you were able to notice the coal tar

15   sludge in the pile when you would go there several

16   days in a row and see that coal tar sludge in the

17   pile, these other instances would simply be you

18   passing through and seeing coal car sludge in a --

19   these piles of coal where it was always put, right?

20   A.   Either passing through or putting it there

21   myself, yes.

22   Q.   Okay.  And would you allow for the fact that

23   you may have passed through on a given day seeing

24   coal tar sludge in a pile, and by the time you pass

25   through again and see coal tar sludge in the same

1  spot, it could be different coal tar sludge that

2  was put there, true?

3  A.  Yes, it could be.

4  Q.  And beyond that, you told the jury that the

5  coal tar sludge would sit there for weeks, which

6  means more than -- to me it would mean at least 14

7  days to get to two weeks, right?

8  A.  Yes.

9  Q.  And how frequently, sir, did you observe that?

10  A.  A couple of times.  Let's say two --

11  Q.  Please.  Please.

12       THE COURT:  Let him finish the answer,

13  okay?

14       MR. PERSONIUS:  I'm sorry, Judge.  Okay.

15       THE WITNESS:  I'd say approximately two to

16  ten times.

17  BY MR. PERSONIUS:

18  Q.  To two to ten times?

19  A.  Yes.

20  Q.  That you saw the coal sitting there for weeks?

21  A.  Yes.

22  Q.  Now, you told us that the number of times that

23  you worked in the same area in the coal fields

24  where you would be there every day was maybe two

25  times a year for five years, right?

1    A.   Yeah.

2    Q.   So you're telling us that of the times you did

3    that, it could have been every time that you saw

4    the coal tar sludge sitting in the same spot for

5    weeks, is that what you're telling us?

6    A.   Not just when I was working on the track, but

7    when I was working on the end loaders as well.  I

8    worked on the end loader in the coal field.  I

9    believe I mentioned that.

10   Q.   Okay.  But what you told us -- let me know if I

11   don't recall your testimony correctly, but what you

12   told us is that the occasions that you would be out

13   there multiple days, consecutive days in a row, was

14   about two times a year for five years, right?

15   A.   Working on the tracks, yes.

16   Q.   Oh, so there were other times that you would be

17   next to a coal pile for days on end, is that what

18   your telling us?

19   A.   I believe I said that when I worked in there

20   for two months at a time in the coal field.

21   Q.   All right.

22   A.   I've done that on occasion too.  Sometimes it

23   was just a couple of weeks.  If Pervis Jones was in

24   the coal field and he went on vacation for two

25   weeks, I might have to cover for him.

1    Q.   Now, it was your testimony, Mr. Hoffmann, that

2    the -- what we call the tar box would be emptied

3    daily?

4    A.   I believe it would be emptied on a daily basis.

5    They tried to keep it clean.  There were times when

6    it wasn't, but --

7    Q.   So when you tell us that you believe this to be

8    the case, is that an indication that it's -- it's

9    something you think was true but you don't know it?

10            MR. PIAGGIONE:  Objection, your Honor.

11   Sort of getting argumentive here.

12            THE COURT:  I'm sorry, I didn't understand

13   what you just said at the end.

14            MR. PIAGGIONE:  It's being argumentive,

15   your Honor.  The question, he's arguing with the

16   witness at this point, 611(a).

17            THE COURT:  I think the question is really

18   what do you mean by that.  So I'll allow that.

19   There is a lot of repetition here, so keep that in

20   mind too.  I know there wasn't an objection.

21            MR. PERSONIUS:  We're moving on, Judge.

22   That's why I'm asking about the tar box.

23            THE WITNESS:  I'm sorry, could you repeat

24   the question again?

25   BY MR. PERSONIUS:

1   Q.   Sure.  When you told us about the tar box being

2   emptied daily, you said you believe that's what

3   happened.  And to use the Judge's words, when you

4   use the word "believe", what you do you mean by

5   "believe"?

6   A.   Okay.  I'm sorry.  I would see it being

7   emptied -- the frequency at which I saw it emptied

8   I was under the impression it was emptied on a

9   daily basis.  Or it was attempted to be emptied on

10  a daily basis.

11  Q.   You didn't observe the coal tar box being

12  emptied on a daily basis, did you?

13  A.   Every day for 365 days a year for nine days a

14  year [sic], no, I wasn't there that often.   I

15  worked there five days a week, eight hours a day,

16  eight to 12 hours a day, depending on the day.

17  Q.   Mr. Hoffmann, you know from having worked at

18  the company for about seven years that there are

19  differences in production levels?

20  A.   Yes.

21  Q.   There's low production, there is medium

22  production, there is high production?

23  A.   Yes.

24  Q.   If there's high production, you're going to

25  generate more coal tar sludge, true?

1579

1    A.   Yes.

2    Q.   If it's low production, you're going to

3    generate less?

4    A.   Yes.

5    Q.   And Tonawanda Coke, during the time you worked

6    there, had periods of high, medium, and low

7    production, didn't it?

8    A.   Yes.

9    Q.   And if it was a period of low production, you'd

10   expect that less coal tar sludge would be

11   generated?

12   A.   Yes.

13   Q.   And less of a need to empty the coal tar box?

14   A.   Yes.

15   Q.   The coal tar sludge that was taken out and put

16   into the coal piles, you agree that the purpose for

17   doing that was so that that coal tar sludge could

18   be reused, correct?

19   A.   That's what I believed, yes.

20   Q.   Okay.  You didn't think when you took it out

21   there that you were disposing of it, did you?

22   A.   No.

23   Q.   You knew it was going to be put back into the

24   operation?

25   A.   Yes.

1580

1    Q.  And you've testified that from time to time you

2    would operate the -- what I think could either be

3    called the quench or hot car?

4    A.  Yes.

5    Q.  Is that the same -- we're talking about the

6    same device?

7    A.  Quench car, hot car, it would be the same

8    thing, yes.

9    Q.  This would be this railroad car that's just had

10   the result of the push, the coke, the hot coke, put

11   into the railcar -- pardon me -- and then you take

12   it to a quenching station?

13   A.  Yes.

14   Q.  And you did that from time to time?

15   A.  Yes.

16   Q.  When was it that you operated the quench car?

17   A.  While I was on the track crew.

18   Q.  All right.

19   A.  If they needed someone to do that, they showed

20   me how to operate it in case there was a need for

21   me to operate it, and I did so.

22   Q.  Over what period of time did you do that,

23   Mr. Hoffmann?

24   A.  While I was part of the track crew, which would

25   have been October -- actually, I probably didn't do

1    anything like that in 2002.  It would have been

2    more like 2003 to 2009 when I left Tonawanda Coke.

3    Q.  And who was it that trained you to operate the

4    quench car?

5    A.  I can't remember at this time.  One of the

6    foremen would have assisted in teaching me how to

7    catch an oven and take it down to the quench tower

8    and quench the car.

9    Q.  Who would -- who would assign you -- when you

10   were working on the track crew, who was it that

11   would assign you to operate the hot car?

12   A.  My foreman, Jon Rogers.

13   Q.  Again, it would be in Mr. Rogers that would do

14   that?

15   A.  Yes.

16   Q.  How frequently did you do that from 2003

17   to 2009?

18   A.  Oh, maybe half a dozen times.  That wasn't my

19   main operation.  It wasn't something I was overly

20   doing.  Usually they could find somebody else to

21   operate the hot car.

22   Q.  So you did this six times?

23   A.  Half dozen times or so, yes, about.

24   Q.  I'm sorry to interrupt.  So about once a year?

25   A.  Yeah.

1    Q.   Okay.  And you've told us that it was your

2    experience that the quench towers at some period of

3    time were being used on a 50/50 basis, right?

4    A.   Approximately, yes.

5    Q.   Okay.  You say approximately.  You would drive

6    the hot car -- you would drive the hot car once a

7    year, right?

8    A.   Yes.

9    Q.   And so what is the basis for your testimony

10   that those two quench towers from -- bless you,

11   Judge.

12            THE COURT:  Thank you.

13   BY MR. PERSONIUS:

14   Q.   -- from 2003 to 2009 were used on a 50/50

15   basis?

16   A.   While I was working on the wharf in 2002 you

17   can actually watch the hot car to see which tower

18   it went to.

19   Q.   And you, while you were working, would be

20   watching what tower it was, and say, okay it's

21   that, now it's that one?

22   A.   Well, usually what would happen it would go to

23   the west tower for a couple of quenches, and then

24   drop the product off at A Wharf, being that A Wharf

25   was close to the west tower.  It would quench at

1    the west tower and then drop the product off at the

2    A Wharf.  It would catch an oven, A wharf would be

3    full, it would go to the east tower and drop an

4    oven off at what was referred to as D Wharf.

5    Q.  Your testimony was you were observing this when

6    you were working on the wharf in what year?

7    A.  In 2002.

8    Q.  So this would have been right after you

9    started?

10   A.  Yes.

11   Q.  All right.  So you saw that taking place

12   in 2002?

13   A.  Yes.

14   Q.  And after 2002 is it your testimony that you

15   continued to have occasion to observe enough of the

16   use of these quench towers to testify here under

17   oath that the practice was 50/50 on the quench

18   towers?

19   A.  Yes.  There's been other times I've had to work

20   the wharf during the years as well, along with

21   working on the railroad tracks that the hot car ran

22   on.

23   Q.  And your testimony is that when you worked at

24   the wharf, you would be able to see which quench --

25   which quench tower is being used on each time that

1    the oven was emptied and put into a quench car?

2    A.   You could see it from the coal field because of

3    the steam coming from the quench.   The cloud was

4    bigger than this room of steam.

5    Q.   So in between paying attention to the coal tar

6    sludge staying in a particular spot in a coal pile,

7    you were also watching which quench tower was being

8    used?

9    A.   There were times you watched which quench tower

10   was being used because of the air direction.

11   Because the steam would have a sulfur smell to it,

12   and I preferred not to stand in the steam cloud.

13   Q.   All right.   Let me ask my question again.

14   A.   I thought -- I'm sorry, I was just trying to

15   explain how I knew.

16   Q.   When you were -- is it your testimony when you

17   were working in the coal fields that in addition to

18   paying attention to where the coal tar sludge was,

19   you were watching which quench tower was being

20   used, sir?

21   A.   When I was working in the coal fields, the coke

22   area, coke handling, on the railroad tracks, you

23   could see the steam cloud from anywhere inside the

24   plant.

25   Q.   I'll ask it a third time.

1    A.   Yeah, I could see it.  You could see it.

2    Q.   I didn't ask if you could see it.  My question

3    is, sir, you were paying attention --

4              MR. PIAGGIONE:  Your Honor, I'm going to

5    object.  This has been asked and answered several

6    times.

7              THE COURT:  I'm going to allow it, but --

8              MR. PERSONIUS:  I'm almost done too,

9    Judge.  I am.

10              THE WITNESS:  Was I paying attention

11   strictly to the hot car?  No, not all the time.

12   Was I paying attention to the hot car at times?

13   Yes.  It was important to know where it might be,

14   depending on where you were working, if you had to

15   work on the tracks that the hot car was using.

16   BY MR. PERSONIUS:

17   Q.   When is the first time, Mr. Hoffmann, that you

18   told the government that these quench towers were

19   used on a 50/50 basis?

20   A.   I don't remember exactly.  I believe -- they

21   were used at different rates at different times.

22   Sometimes they would use strictly one quench tower

23   because of the work done on it.  I don't know

24   exactly when I told them it was on a 50/50 basis.

25   But generally speaking, that's what it was used.

1    There were times when one quench tower wasn't used.

2    I think I stated that in 2005, 2006 they had

3    actually closed the one quench tower, and it wasn't

4    used at all.

5              THE COURT:  Okay.  Do your best not to

6    volunteer information.  Try to answer the question,

7    and I think we'll make further and faster progress,

8    okay?

9              THE WITNESS:  Okay.

10   BY MR. PERSONIUS:

11   Q.  Mr. Hoffmann, when was the first time that you

12   told the government that these quench towers were

13   used on a 50/50 basis?

14   A.  I don't remember.

15   Q.  Do you remember you were interviewed by the

16   government on January 12th of 2010?

17   A.  January 12th.  That would be approximately

18   correct, yes.

19   Q.  And you were interviewed by a couple of agents

20   from the Environmental Protection Agency named Jeff

21   Dirks and Robert Conway?

22   A.  Yes.

23   Q.  And do you remember that you talked about

24   quench tower usage during that interview?

25   A.  Yes.

1    Q.  And that you told them at that time that as

2    coke handling foreman -- okay, so we're

3    talking 2009 -- that the east quench tower was used

4    90 percent of the time and the west quench tower

5    was used only 10 percent of the time?

6    A.  I believe they were talking about a particular

7    time frame in February when it was used when we

8    were doing some repairs to different tracks on the

9    west end tower along with changing pumps, et

10   cetera.

11   Q.  Mr. Hoffmann, did you tell the agents on

12   January 12th of 2010, that when you were the coke

13   handling foreman, which would have been

14   during 2009, that the east tower was used

15   90 percent of the time and the west tower was used

16   10 percent of the time?

17   A.  I don't remember at this time exactly what I

18   had told them or the time frame.  I thought I

19   answered that for you, and I guess I'm wrong.

20   Q.  Could we take down this exhibit, please?  And

21   for identification could we please put Government

22   Exhibit 3529.01 just for identification on the

23   screen, please?  Thank you, Lauren.

24       Mr. Hoffmann, do you see that we have on the

25   screen the first page of an exhibit that's marked

1588

1    Government Exhibit 3529.01?

2    A.   Yes.

3    Q.   Okay.  And I want to -- I want you to read this

4    to yourself, but I'm going highlight the portion,

5    so just wait a minute.  It will be easier to read

6    once we get it bigger.

7        I put a box around that, Lauren.  Could you

8    please make that bigger?

9        I ask you please, Mr. Hoffmann, read that --

10   that highlighted portion to yourself, just to

11   yourself.

12       Have you finished reading it, sir?

13   A.   No.

14   Q.   I'm sorry.

15   A.   Okay.

16   Q.   Okay.  Would you take that down please, Lauren?

17       Mr. Hoffmann, having had a chance to review

18   that excerpt from Government Exhibit 3529.01, does

19   that refresh your recollection on what you told

20   these two agents regarding usage of the quench

21   towers in 2009?

22   A.   Yes.

23   Q.   And did you tell the agents --

24   A.   That's about what I told the agents that we

25   used it 10 percent -- in the -- in February -- in

1    February we used it less often than we did in the

2    east quench tower, yes.

3    Q.   Just in February?

4    A.   Just in the January, February months we used it

5    less often.  I'm not sure what the reason was, but

6    there's oftentimes when we used one tower more than

7    another.

8    Q.   Okay.  So when the agents talked to you at this

9    interview about the quench towers, you're telling

10   us that your recall is the focus was on January and

11   February of 2009?

12   A.   I believe so, yes.

13   Q.   Okay.

14   A.   That was generally when I was a coke handling

15   foreman.  And part of it had to do with the winter

16   months.  They didn't use the one tower as often in

17   the winter months on occasion because of freeze up

18   problems.

19   Q.   During that interview, sir, were you asked

20   about a quench tower usage at Tonawanda Coke for

21   any other period of time aside from February

22   of 2009?

23   A.   I'm sure I was asked about it other times.  I

24   don't recall that information.

25   Q.   Now, the last area -- one more area, Judge, to

1    cover.  And that is the -- you were shown a series

2    of photographs on direct examination regarding the

3    storage -- some storage tanks after the -- after

4    they had been scrapped, do you remember that?

5    A.  Yes.

6    Q.  Now, you've told us that there was a fire in

7    the area of these storage tanks in 2008, is that

8    correct?

9    A.  Yes.

10   Q.  Okay.  And we looked at these photographs of

11   these -- where these tanks had been, and initially

12   your testimony was that it was showing -- the

13   pictures were from 2007 or 2008, do you remember

14   that?

15   A.  Yes.

16   Q.  Okay.  And then later in your direct

17   examination you were quite specific that these

18   pictures showed that area in 2008, do you remember

19   that?

20   A.  Yes.

21   Q.  You became specific as to the year, do you

22   recall that?

23   A.  Yes.

24   Q.  And what was it that happened during your

25   testimony that enabled you to focus in and have

1    confidence that these photographs were from 2008?

2    A.   Well, some of the pictures had been dated 2008.

3    Q.   Well, some of the pictures had.   But the ones

4    you said were 2007 and 2008 did not have a date on

5    them, do you remember that?

6    A.   Yes.

7    Q.   But then you said with specificity those were

8    from 2008, do you remember that?

9    A.   They were all taken approximately the same time

10   when the towers were taken down.

11   Q.   I see.   How is it you know when those

12   photographs were taken?

13   A.   The towers were taken down in 2008 by the looks

14   of the one photograph, and we had cleaned it up

15   right after we had taken it down.   We emptied the

16   tar out and cut the rest of the tower down to

17   ground level that same year.

18   Q.   All right.   So that we understand it,

19   Mr. Hoffmann, your recollection is that the fire

20   near the tanks was in 2008, correct?

21   A.   I believe that's when it was, yes.

22   Q.   And that the -- what we refer to as the

23   scrapping of these tanks, your testimony is that

24   was in 2008?

25   A.   I believe that's to be correct, yes.

1    Q.  And the excavation of those -- whether it was

2    the tanks or the area around them of tar, that that

3    too was in 2008 at the same time?

4    A.  Yes.  It would have all been done before I

5    became a coke handling foreman.

6    Q.  You're certain about that?

7    A.  Because I worked on the project to clean up the

8    tar.

9    Q.  You're certain about that, sir?

10   A.  That I worked on the --

11   Q.  That all this happened before you became the

12   foreman for coke handling?

13   A.  Yes.  After that I only worked on it for a

14   short period.  I was still working with Kevin

15   Townsend as coke handling foreman.  I would be

16   driving the track truck.  After that I no longer

17   had the track truck to drive.  I was given what

18   would be called -- sorry.  I'm going on a little

19   bit too much.

20   Q.  Thank you for noticing that.

21   A.  I'm sorry.

22   Q.  Are you as certain that all these activities

23   occurred in 2008 as you are that the coal tar

24   sludge would sit in these coal piles for weeks at a

25   time, sir?

1    A.   Yes.

2    Q.   Okay.  Now, the photographs that were shown to

3    you -- I'm not going to -- I will if you need to,

4    but the photographs that were marked Government

5    Exhibit 3.04, 3.05, 3.07, 3.08, and 3.09 were taken

6    by a DEC agent named Thomas Corbett in June

7    of 2009.  Does that change your testimony,

8    Mr. Hoffmann?

9    A.   About when we cleaned the tar out of them or --

10   no, I believe -- I believe we were -- there was

11   several tanks on the premises that we had cut down.

12   I'm under the impression these are still the same

13   tanks that were cut down in 2008 before I became a

14   coke handling foreman.

15   Q.   The photograph -- the other photograph that was

16   shown to you, which was Government Exhibit 119.01,

17   was taken by EPA Agent Leonard Grossman in

18   September of 2009.  Does that change your

19   testimony?

20   A.   As I said, I believe that this is when these

21   tanks were cut down.  We had several tanks on the

22   premises.  There were more cut down after I became

23   a coke handling foreman.  There were several cut

24   down before those tanks.

25        I'm doing my best to remember exactly when

1594

1    these particular tanks were cut down.  But there

2    was half a dozen that were cut down on the premises

3    at Tonawanda Coke.

4                MR. PERSONIUS:  May I have a minute,

5    Judge?

6                THE COURT:  Yes.

7                MR. PERSONIUS:  Your Honor, we have

8    nothing further for this witness.

9         Thank you, Mr. Hoffman.

10               THE COURT:  Okay, Mr. Personius.

11   Mr. Linsin.

12               MR. LINSIN:  Thank you, your Honor.

13   CROSS-EXAMINATION BY MR. LINSIN:

14   Q.  Good afternoon, Mr. Hoffmann.

15   A.  Good afternoon.

16   Q.  My name is Greg Linsin.  I represent Tonawanda

17   Coke Corporation.

18        Sheila, could I have Defendant's Exhibit HHHH,

19   which has been admitted into evidence, please?  And

20   could we enlarge at least the framed portion.

21   That's it.  Thank you.

22        Now, I don't know if you've seen this

23   particular diagram before, but if you can take a

24   minute to orient yourself.  My question

25   preliminarily is whether you recognize this as a

1    drawing that depicts the layout at the Tonawanda

2    Coke facility showing the coal fields, the tracks

3    the ovens, by-products, et cetera?

4    A.   Yes.  I would say, yes.

5    Q.   Okay.  And you were shown some photographs,

6    some aerial photographs of the coal fields earlier,

7    and you were asked about a line that went through

8    those -- the coal field at that location.  At the

9    lower portion of this photograph, do you see what

10   is a representation for a conveyor belt there?

11   A.   Yes.

12   Q.   And would that correspond to that same line you

13   were asked about from the aerial photographs?

14   A.   Yes, I believe so.

15   Q.   All right.  And can we agree that the

16   orientation, as indicated by the symbol at the top

17   right, north is to the top of this diagram, is that

18   correct?

19   A.   Yes.

20   Q.   All right.  Now, the coal fields, the coal

21   storage area is down at the bottom of this drawing,

22   correct?

23   A.   Yes.

24   Q.   And I'd like to draw your attention to the

25   bottom right-hand portion of this diagram, and ask

1    if in this location you see two larger tanks

2    depicted?

3    A.  Yes.

4    Q.  All right.  And is that consistent with your

5    recollection of where you observed a fire on the

6    facility?

7    A.  Yes.

8    Q.  And is it also consistent with the area where

9    those tanks were later dismantled?

10   A.  Yes.

11   Q.  And one step further, is that the location from

12   which you, at least for a couple of days, used an

13   excavator to remove some of the tar from one of

14   those tanks?

15   A.  Yes.

16   Q.  All right.  Now, we had a different orientation

17   in the aerial photograph, but I believe you

18   testified on cross-examination that the piles into

19   which the coal tar sludge was usually put, I

20   believe you said, were at the northeast portion of

21   the coal field, was that correct?

22   A.  Yes.  I believe so, yes.

23   Q.  And would you indicate yourself by touching

24   your screen with some force -- it will create an

25   arrow -- where in this diagram would those piles be

1    located?

2    A.   That area approximately.

3    Q.   All right.  And if you travel down to the right

4    on this -- on this drawing where that conveyor belt

5    comes to an end, there's a chute right there,

6    correct?

7    A.   Yes.

8    Q.   And that is the chute into which the coal from

9    the coal fields is placed so that it can be

10   transferred up to the coal handling building,

11   correct?

12   A.   Yes.

13   Q.   And it goes by way of an underground conveyor

14   belt, which is depicted in this photograph with a

15   dotted line, correct?

16   A.   Yes.

17   Q.   All right.  And so the coal tar sludge is put

18   in the coal piles that are adjacent to or very

19   close to the very location where those -- that

20   material is loaded into the chute to be transported

21   to the coal handling building, correct?

22   A.   It was close to that particular chute, yes.

23   Q.   All right.  Now, it appeared to me from your

24   testimony, both on direct and on cross with

25   Mr. Personius, that you performed quite a number of

1    different jobs during the time you were at

2    Tonawanda Coke, correct?

3    A.   Yes.

4    Q.   Would you agree with me, Mr. Hoffmann, that

5    someone who performed any one of those jobs on a

6    regular basis, someone who, for example, was a

7    front end loader operator on a regular basis and

8    moved the coal tar sludge from the by-products area

9    to the coal fields on a regular basis, would have a

10   better understanding of that operation than you

11   would?

12   A.   Yes.

13   Q.   They'd have a better understanding of the

14   frequency that the tar box was unloaded, correct?

15   A.   Yes.

16   Q.   They would have a better understanding of the

17   mixing process in the coal fields, correct?

18   A.   Yes.

19   Q.   And a better understanding, in fact, of how

20   often that mixed coal and coal tar sludge was then

21   charged into the oven, correct?

22   A.   Yes.

23   Q.   You were asked about an interview you had with

24   two criminal investigative agents with the EPA back

25   in January of 2010.  You were asked questions by

1     Mr. Personius about that interview, correct?

2     A.   Yes.

3     Q.   You were also interviewed just in January of

4     this year, January 8th, of this year, by Mr. Mango

5     and Mr. Piaggone and Special Agent Robert Conway,

6     correct?

7     A.   Yes.

8     Q.   And all of the topics that you testified about

9     were reviewed during both of those interviews, were

10    they not?

11    A.   Yes.

12    Q.   Now, when was the first time you told any

13    federal investigator that you had a memory that

14    this coal tar sludge stayed on these piles for days

15    or weeks on end?

16    A.   I don't remember the first time I told them of

17    this.

18    Q.   Is there any explanation you can offer,

19    Mr. Hoffmann, as to why the investigative reports

20    that were created about either of your two prior

21    interviews with federal law enforcement officials

22    don't say anything about this coal tar sludge

23    remaining on these piles for days or weeks on end?

24    A.   Maybe they didn't ask me.  I don't know the

25    reason why it isn't in the report.  You would

1600

1    probably have to ask them.

2    Q.   You were asked questions about the handling of

3    the coal tar sludge, weren't you?

4    A.   Yes, along with several other questions.

5    Q.   And you were asked how you mixed it in the coal

6    piles, correct?

7    A.   I believe I was asked these questions at that

8    time, yes.

9    Q.   And so do I understand your testimony to be

10   that they just didn't ask the right question?

11   A.   I didn't say that they didn't ask those

12   questions.  They might have asked those questions

13   and they didn't get put into a report.  I cannot

14   remember every question that I was asked in January

15   and in February of 2009.  I spent several hours

16   with these gentlemen being asked questions about

17   Tonawanda Coke.

18   Q.   Several hours, because they were talking about

19   issues that were of some -- you understood to be of

20   some importance?

21   A.   I guess so, yes.

22   Q.   You guess so?

23   A.   I'm not a lawyer.  I don't know the reasons

24   they would ask all the questions.  I'm not familiar

25   with the law.

1  Q.  You didn't tell them then in 2010 and you

2  didn't tell them two months ago just in January

3  that you made this observation about coal tar

4  sludge staying on these piles for weeks on end, did

5  you, sir?

6  A.  I may not have told them how long the coal tar

7  was there if they did not ask specifically how long

8  the coal tar was there.  If they didn't ask a

9  specific question, no, I may not have answered

10  that.

11  Q.  One last question.  I believe I heard your

12  testimony -- if we can take this down please,

13  Sheila.

14      I believe your testimony in response to some

15  questions from Mr. Personius was that you had made

16  some of these observations you testified about out

17  in the coal field because you were working on a

18  bridge crane out in that -- in the coal field, is

19  that correct?

20  A.  I was working on tracks that the bridge crane

21  operated on.  Eventually the bridge crane was

22  removed, and they put conveyor-type hoppers on

23  these tracks instead that they could dump coal

24  into.

25  Q.  That bridge crane was deactivated quite a long

1602

1    time along, wasn't it?

2    A.   Yes, it was.  And they put hoppers in their

3    place that could ride up and down the tracks.

4    Q.   So any work you might have done on that bridge

5    crane had to have occurred before it was

6    deactivated, correct?

7              MR. PIAGGIONE:  Objection, your Honor.

8    Now he's testifying for the witness.

9              THE COURT:  No, overruled.  You may

10   answer.

11             THE WITNESS:  I didn't work on the bridge

12   crane.  I worked on the tracks.  I didn't work on

13   the crane.  It was a piece of equipment.  It ran on

14   tracks.  I worked on the tracks that were there.

15   And then later they changed -- they -- the bridge

16   crane was eliminated, and they put hoppers on these

17   tracks that they pushed up and down the tracks.

18   They continued to use them, and they had to be

19   maintained.

20        These hoppers would derail, and I would have to

21   put them back on the tracks, along with the fact

22   that ties would rot out, and they would have to be

23   replaced, et cetera.

24             MR. LINSIN:  And when was that work on

25   those tracks, sir?

1       THE WITNESS:  At various times while I

2  worked on the track crew from October of 2002 to

3  February of 2009.

4       MR. LINSIN:  Thank you very much for your

5  testimony, Mr. Hoffmann.  Thank you, your Honor.

6       THE COURT:  Okay, Mr. Linsin.  Anything,

7  Mr. Piaggone?

8       MR. PIAGGIONE:  No, your Honor.

9       THE COURT:  Okay.  Mr. Hoffmann, thank

10  you.  You're excused.

11     Okay we're going to take 15.  We'll resume

12  again at 3:45.

13       (Jury excused from the courtroom.)

14       THE COURT:  Anything we need address?

15       MR. PERSONIUS:  No, Judge.

16       THE COURT:  Who is your next witness

17  please?

18       MR. MANGO:  Keith Hutchinson.

19       (Short recess was taken.)

20       THE COURT:  Welcome back, please have a

21  seat.  Good to see everybody again.  Seems like

22  forever ago that we were together.  But I heard a

23  shoo, a couple of those coming in.  Okay.  Again,

24  very important case to both sides, as you all know.

25  And we're still in the government's case and, as

1    you know, it has the burden of proof beyond a

2    reasonable doubt.  Your job is take all this in.  I

3    know you're getting familiar with a lot of what is

4    going on operationally, and heard a lot of

5    evidence, and it will require the application of

6    your common sense, experience, and intelligence to

7    work it out so you get that unanimous verdict in

8    this case, being fair to both sides and

9    understanding that the defendants are presumed

10   innocent and the government has the burden of proof

11   beyond a reasonable doubt.  And remember, nobody's

12   going to have as much information as you in the

13   totality.  Everything that you're going to need to

14   get this case resolved you will get from the four

15   walls -- or in the four walls of this courthouse.

16   Keep that in mind, please.  You've been great so

17   far.

18        We're going to start with the next government

19   witness and looks like Mr. Mango is ready again.

20             MR. MANGO:  Yes, your Honor.  Thank you.

21   The government would call Keith Hutchinson.

22             THE COURT:  Okay.  Mr. Hutchinson, come on

23   up.  Good afternoon.

24             THE WITNESS:  Good afternoon.

25             THE COURT:  We're going to have you stop

1    right before you get in the witness stand.  Stop

2    right there.  Good.  Then you're going to turn

3    around towards the jury.  Okay.

4    K E I T H   H U T C H I N S O N, having been duly

5    sworn as a witness, testified as follows:

6               THE COURT:  Okay.  Couple of preliminary

7    instructions.  I think you're going to do okay.

8    Just stay facing the jury because you're here to

9    testify for their benefit.  They have to work this

10   all out and decide the case.  You'll be asked some

11   questions; sometimes by me, sometimes by the

12   lawyers.  If you don't understand a question, don't

13   answer it.  Just say, "I don't understand.  Repeat

14   the question."  Be as concise as you can.  Don't

15   volunteer information.  I mean -- and you can

16   understand why.  Because if you volunteer stuff,

17   you can -- everything gets more complicated.  It's

18   up to the lawyers to draw out the information from

19   you that they want.  If you can answer a question

20   with a yes or no, please try to do that.

21       If there's an objection -- and the attorneys do

22   object from time to time -- it's up to me to

23   resolve the objection.  So let me decide the

24   objection first, and then I'll tell you whether to

25   complete an answer or wait for another question or

1606

1    I'll give you some other instruction.  Okay?

2              THE WITNESS:  Okay.

3              THE COURT:  All right.  I think -- if you

4    speak at the microphone, it's friendly.  So just

5    talk in a conversational tone.

6        Tell us your full name, spell your last name.

7              THE WITNESS:  Keith Hutchinson.

8    H-U-T-C-H-I-N-S-O-N.

9              THE COURT:  Okay.  Mr. Mango, I hope you

10   do as well on that microphone.

11             MR. MANGO:  I could only hope, your Honor.

12   Thank you.  I will try.

13             THE COURT:  You and Spiderman and

14   Mr. Rogers and everybody else, right?

15             MR. MANGO:  That's right.  We have quite a

16   cast of characters in this case.  Yes, your Honor.

17             THE COURT:  All right.  Well, let's get

18   down to serious business, please.

19             MR. MANGO:  Absolutely.  Thank you.

20   DIRECT EXAMINATION BY MR. MANGO:

21   Q.  Good afternoon, Mr. Hutchinson.  How are you?

22   A.  Good.

23   Q.  Are you currently employed, sir?

24   A.  Yes, I am.

25   Q.  Can you tell the jury where you're employed?

1    A.   I work for Covanta in Niagara.

2    Q.   And have you ever been employed for a company

3    called the Tonawanda Coke Corporation?

4    A.   Yes.

5    Q.   What period of time were you employed at the

6    Tonawanda Coke Corporation?

7    A.   From February of 1989 to April of 2004.

8            THE COURT:  All right.  Before you go on.

9        Mr. Hutchinson, what was the company that

10   you're now employed with?

11           THE WITNESS:  Covanta Energy.

12           THE COURT:  Ovanta Energy?

13           THE WITNESS:  Yes.

14           THE COURT:  Okay.  Good.

15           MR. MANGO:  Covanta, for the record, with

16   a C, I believe.

17           THE WITNESS:  C-O-V-A-N-T-A.

18           THE COURT:  Oh, okay.  Thank you very

19   much.

20   BY MR. MANGO:

21   Q.   From 1989 to 2004 at the Tonawanda Coke

22   Corporation?

23   A.   Correct.

24   Q.   What positions did you work in at the Tonawanda

25   Coke Corporation, if you can just tell the jury?

1    A.   I started off as a laborer, and I worked at --

2    through various jobs in the plant and worked up to

3    be a by-products foreman.

4    Q.   All right.  Before becoming a by-products

5    foreman, were you a by-products operator?

6    A.   Yes, I was.

7    Q.   Okay.  And what year did you start in the

8    by-products department?

9    A.   It was around 1994.

10   Q.   And how long did you work as an operator?

11   A.   For about one year.

12   Q.   So when you became a -- the by-products foreman

13   in about 1995?

14   A.   Yes.

15   Q.   Okay.  And you mentioned you were employed

16   until April of 2004?

17   A.   Correct.

18   Q.   Were you in that position the whole time?

19   A.   Yes, I was.

20   Q.   If you could tell the jury, what were your job

21   duties as by-products foreman?

22   A.   To maintain the operating procedure in the

23   by-products and do maintenance and make sure the

24   safety and well-being of my employees.

25   Q.   Are you familiar with the coking process at the

1    Tonawanda Coke Corporation?

2    A.   Yes, I am.

3    Q.   Do you know what the term "reversal" means?

4    A.   Yes, I do.

5    Q.   Okay.  What does it mean, if you could tell the

6    jury?

7    A.   The ovens -- the ovens operating on odd and

8    even flues.  When you have a reversal, you'd either

9    -- if it was in the odd position, it would reverse

10   to the -- to the even -- even flues to burn.

11   Q.   Okay.  During a reversal what, if anything, do

12   you know happens to the flow of coke oven gas to

13   the ovens?

14   A.   It stops during the reversal.

15   Q.   Does that cause any type of increase in the

16   line pressure?

17   A.   Yes, it does.

18   Q.   During your time in the by-products department,

19   so 1994 to 2004, was anything used to relieve the

20   pressure in the line?

21   A.   Yes.

22   Q.   Okay.  Tell the jury what.

23   A.   It was the bleeder valve.

24   Q.   Okay.  You called it the bleeder?

25   A.   Yes.

1    Q.   That was located where?

2    A.   There was one in the by-products, one in the

3    boiler house.

4    Q.   Okay.  I want to focus on the by-products one.

5         As part of your responsibilities as by-product

6    foreman, did you have any responsibility regarding

7    the operation of the bleeder valve?

8    A.   To make sure it operated correctly.

9    Q.   Okay.  Did you have any responsibilities

10   regarding where it should be set?

11   A.   It was usually set at around 80 centimeters.

12   Q.   And you had responsibilities as foreman -- as

13   person in charge of by-products, did you have

14   responsibilities regarding where that should be

15   set?

16   A.   We maintained it at the 80 centimeters.

17   Q.   Mr. Hutchinson, I'm just going to move that up

18   a little bit.  Maybe it'll pick up a little bit if

19   it's higher.

20        MR. PERSONIUS:  Your Honor, I don't have

21   any problem with the response, but it wasn't

22   responsive to the question.

23        THE COURT:  Okay.  How do I -- okay.

24        MR. PERSONIUS:  I don't know, but it

25   wasn't.

1       THE COURT:  Okay.  Okay.  Well, let's work

2    with that.  Ask another question.  I think we will

3    be able to work through it.  Thank you.

4   BY MR. MANGO:

5    Q.  Yeah.  Mr. Hutchinson, during your employment

6    in the by-products area, what was the purpose of

7    the bleeder?

8    A.  To relieve the excess gas.

9    Q.  How did it do that?

10    A.  By opening up, letting the gas out to drop the

11    pressure in the line.

12       THE COURT:  All right.  Mr. Hutchinson, my

13    court reporter has to take everything down, and you

14    need to pick your voice up a little bit or get

15    closer to that microphone.  Okay?

16       THE WITNESS:  Okay.

17       THE COURT:  All right.  I know you can do

18    it.  It just takes a little while to get everything

19    together.

20       THE WITNESS:  Sorry.

21   BY MR. MANGO:

22    Q.  Okay.  So you said it would open up and it

23    would relieve the pressure?

24    A.  Correct.

25    Q.  When the valve would open, what would come out

1612

1    of the bleeder?

2    A.   Coke oven gas.

3    Q.   What was the frequency with which the bleeder

4    would release coke oven gas?

5    A.   It would release during reversals, that was

6    every 20 to 30 minutes.

7    Q.   Okay.  For the releases relating to reversals,

8    how long did they last?

9    A.   Five to ten seconds.

10   Q.   During periods of low production, would the

11   bleeder still release during reversals?

12   A.   If it exceeded the pressure, yes.

13   Q.   In your experience, did you ever observe the

14   bleeder release for longer than five to ten

15   seconds?

16   A.   Yes.

17   Q.   Okay.  Can you tell the jury what the

18   circumstances were that you observed -- in which

19   you observed these longer releases?

20   A.   If there was a planned outage on -- downtime on

21   the ovens, they -- normally, they would push ahead

22   in ovens and you'd have an excess amount of gas and

23   sometimes you just run the steady pressure and it

24   would release above your set point.

25   Q.   Okay.  Did you ever see the bleeder catch fire?

1   A.   Yes, I did.

2   Q.   Okay.  Can you explain for the jury how that

3   happened?

4   A.   When I was an operator on midnight shifts, we

5   had a thunderstorm and lightening struck the

6   bleeder.

7   Q.   Okay.

8   A.   When it was bleeding.

9   Q.   Okay.  Describe after the bleeder got struck by

10  lightening, what the bleeder looked like for the

11  jury.

12  A.   You had about an 8- to 10-foot flame coming off

13  the top of the pipe.

14  Q.   Okay.  How long did it take you to -- or were

15  you able to put that flame out?

16  A.   Yes, I was.

17  Q.   How long did it take you to put that flame out?

18  A.   Less than a minute.

19  Q.   I'll ask you this direct question.  It came out

20  before but I want to be very focused.

21       What was the typical set point for the

22  by-products bleeder?

23  A.   Typically, it was at 80 centimeters.

24            THE COURT:  It did get a little bit

25  muddled there.  Your answer -- I don't know how

1    many times.  All right.  You said, again,

2    80 centimeters.  All right.  That's enough.  So

3    we're going to move on.

4    BY MR. MANGO:

5    Q.  Yes.  Okay.  How often -- if you know,

6    Mr. Hutchinson, how often would the bleeder set

7    point change?

8    A.  It wouldn't change often.

9    Q.  If a change was made, was it recorded anywhere?

10   A.  Usually, we would record it in the operators'

11   log books so they knew that there was a change and

12   they wouldn't move it back.

13   Q.  Okay.  When you were there, did you expect all

14   of your operators to log any changes into the log

15   book?

16   A.  Yes.

17   Q.  Did you train them that way?

18   A.  Yes.

19   Q.  Was the bleeder known to other Tonawanda Coke

20   employees?

21   A.  Yes.

22   Q.  Okay.  Do you know a person by the name of Mark

23   Kamholz?

24   A.  Yes, I do.

25   Q.  Okay.  Was he employed at the Tonawanda Coke

1    Corporation?

2    A.   Yes, he was.

3    Q.   What position did he hold when you were there?

4    A.   Environmental manager.

5    Q.   Were there ever any occasions that Mr. Kamholz

6    would be present in the by-products department?

7    A.   I've seen Mark in the by-products, yes.

8    Q.   Okay.  In fact, were there ever any occasions

9    that you and Mr. Kamholz were in the by-products

10   department in the vicinity of the bleeder?

11   A.   Yes.

12   Q.   Okay.  Describe that for the jury, please.

13   A.   I was taking a titrate test where we were

14   testing for sulphur removal and Mark come over to

15   drop off some solutions while I was doing the test.

16   Q.   What -- what was it like to work at the

17   Tonawanda Coke Corporation?

18          MR. LINSIN:  Objection, your Honor.

19          THE COURT:  Grounds?

20          MR. LINSIN:  Relevance and form of the

21   question, quite honestly.

22          THE COURT:  Yeah.  It's certainly open to

23   many interpretations.  Sustained.

24   BY MR. MANGO:

25   Q.   Okay.  As a by-products foreman, did you ever

1616

1    receive any type of budget to make maintenance or

2    upgrades in the department?

3    A.   No.

4    Q.   Now, as a by-products foreman, who was your

5    direct supervisor?

6    A.   The plant manager.

7    Q.   Okay.  Plant manager?

8    A.   Correct.

9    Q.   Okay.  If there were any environmental issues

10   or concerns, where would those concerns come from?

11   Would they come from the plant manager?

12              THE COURT:  Do you understand the

13   question?

14              THE WITNESS:  I don't understand.

15   BY MR. MANGO:

16   Q.   Okay.  You mentioned before when I asked you if

17   you knew a person by the name of Mark Kamholz what

18   his position was and you said environmental.

19   A.   Right.

20   Q.   Okay.  Would he be the one to provide you any

21   type of environmental compliance advice or

22   suggestions?

23   A.   Yes.

24   Q.   Not the plant manager?

25   A.   It would be either him or the plant manager.

1    Q.  Can you describe -- during your period of time

2    in the by-products department, can you describe the

3    state of the equipment you had to maintain and

4    repair in the by-products department?

5    A.  It was very old -- very old equipment.

6    Q.  Okay.  Did you enjoy working at the Tonawanda

7    Coke Corporation?

8              MR. LINSIN:  Objection, your Honor.

9              MR. PERSONIUS:  Objection, your Honor.

10             THE COURT:  Yeah.  Sustained.

11             MR. MANGO:  Okay.  Can you describe the

12   corporate culture at Tonawanda Coke?

13             MR. PERSONIUS:  Object to that, too,

14   Judge.

15             THE COURT:  I'll give you a chance to tell

16   me how is this relevant?  Is that your objection?

17             MR. PERSONIUS:  Yes.

18             MR. MANGO:  Your honor, this is relevant

19   because it goes to -- clearly, we've got as part of

20   this case the obstruction of justice charge and

21   that includes a directive that was given allegedly

22   in Count XVI by Defendant Kamholz.  And I think

23   it's fair for the witness to describe what the

24   culture was like at the Tonawanda Coke Corporation

25   if an employee did not follow directives, and this

1    witness is prepared to discuss that.

2              THE COURT:  Well, I don't think the

3    question is proper, then, under that explanation.

4    I'll sustain the objection.  But, you know, if you

5    choose to do further examination, let's see how

6    those questions come out.

7              MR. MANGO:  Yes, your Honor.

8         While you were at the Tonawanda Coke

9    Corporation, did you follow the directives that

10   were given to you by superiors?

11             THE WITNESS:  Yes, I did.

12   BY MR. MANGO:

13   Q.   Okay.  What would have happened to you if you

14   did not follow those directives?

15   A.   I'd probably be fired.

16   Q.   Can you describe how those directives -- well,

17   let me ask you a different question.

18        Were you asked -- in your time as the

19   supervisor of by-products, were you ever asked

20   advice on what needed maintenance or needed

21   upgrades in the by-products area?

22   A.   Never -- I was never asked.  But I -- I told

23   them what needed to be done.

24   Q.   Okay.  Did it happen?

25   A.   It took persuading.

1619

1     Q.   Okay.  Can you explain what that means for the

2     jury, "it took persuading"?

3     A.   When I asked for --

4            MR. PERSONIUS:  Forgive me, Judge.

5     Could -- if we could be more specific about it and

6     identify the when and the who, so that this isn't

7     just some general statement.

8            THE COURT:  Well, I think you're going to

9     tie this up, right?

10           MR. MANGO:  Yes, your Honor.

11           THE COURT:  I'm going to allow it on that

12    basis.  Go ahead.  Overruled.

13           MR. MANGO:  Okay.

14    BY MR. MANGO:

15    Q.   The question was:  Can you describe for the

16    jury what you mean by "it took some persuading"?

17    A.   When I was having problems with certain

18    equipment and I wasn't getting help through

19    engineering or anything, I literally had to get in

20    contact with Don Crane to get him out there to tell

21    him that we're environmentally going to be in

22    problems if we didn't do some kind of action here.

23    Q.   Okay.  Who's Don Crane?

24    A.   The owner -- owner of Tonawanda Coke.

25    Q.   Okay.  Did Don Crane ever say anything to you

1    that affected whether or not you would comply with

2    directives given to you?

3           MR. LINSIN:  Your honor, I would object to

4    that question on the grounds of relevance.  We have

5    no idea what directives this question relates to.

6    We have no idea as to time frame.  I see no

7    relevance here.

8           THE COURT:  Well, I guess on all three

9    grounds at this point, I'll sustain that objection.

10          MR. MANGO:  Your Honor, may I have one

11   moment?

12          THE COURT:  Yes.

13          MR. PERSONIUS:  And, your Honor, what I

14   had objected to is supposed to be tied up.  I don't

15   think it ever got tied up, but I guess we can do it

16   on cross if we want to.

17          THE COURT:  Well, it was tied up to the

18   extent that it involved discussions relating to

19   environmental soundness of the equipment.  We

20   didn't get to time frame yet.  We do have an

21   individual to whom, apparently, that statement was

22   made or at least the discussion was had.  So we

23   were on the way, but Mr. Mango may not be going any

24   further.

25          MR. MANGO:  That's possible, your Honor.

1    If I could just have a moment.

2              THE COURT:  Okay.

3    BY MR. MANGO:

4    Q.  Mr. Hutchinson, can you identify the time

5    period that you had this conversation with

6    Mr. Crane?  Do you remember what year?

7    A.  It was a year or so before I left so it would

8    be 2002, 2003.

9    Q.  Okay.

10             MR. MANGO:  Okay.  Nothing further, your

11   Honor.  Thank you.

12             THE COURT:  Okay.  Okay.  Thank you,

13   Mr. Mango.

14        Mr. Linsin, cross-examination?

15             MR. LINSIN:  Thank you, your Honor.  May I

16   proceed?

17             THE COURT:  Certainly.  Thank you.

18   CROSS-EXAMINATION BY MR. LINSIN:

19   Q.  Good afternoon.

20   A.  Good afternoon.

21   Q.  I don't believe we've met.  My name is Greg

22   Linsin.  I represent Tonawanda Coke.  You

23   understood, am I correct, Mr. Hutchinson, that

24   while you worked in the by-products department,

25   both as an operator and then as a foreman of that

1    department, that the job and the goal of the

2    by-products department was to maximize the amount

3    of gas that would be available to the remainder of

4    the facility system without bleeding off gas to the

5    atmosphere, correct?

6    A.   I don't understand what you're saying.

7    Q.   Did you understand that one of the goals -- one

8    of the primary goals of the by-products department

9    was to, first of all, remove a number of the

10   contaminants from the coke oven gas as it came

11   through, correct?

12   A.   Correct.

13   Q.   And you also understood that after the coke

14   oven gas went through those coolers and scrubbers

15   and light oil system in the by-products, that it

16   was then returned to the ovens to be burned in the

17   ovens and also routed to the boiler house for use

18   there, correct?

19   A.   Correct.

20   Q.   And am I correct that you understood, then, if

21   you kind of look at the big picture, that one of

22   the main goals of the by-products was to -- of the

23   by-products department was to maximize the

24   availability of this gas that was going to be used

25   in these other two parts of the plant -- maximize

1  the availability of that gas without bleeding off

2  gas unnecessarily, correct?

3  A.  Correct.

4  Q.  All right.  And the set point for that -- that

5  valve you talked about, the pressure relief valve

6  or the bleeder valve, that set point was something

7  that you decided on, is that correct?  Or did

8  somebody else decide that?

9  A.  I never decided.  That was where it was set

10 from the time I went into the by-products, and I've

11 never made a decision to change it any other way.

12 Q.  Now, am I correct, Mr. Hutchinson, that there

13 were different levels of production at the plant at

14 different points in time?

15 A.  Correct.

16 Q.  And is it accurate to say that when there

17 was -- when production was lower, fewer numbers of

18 ovens being charged and pushed, that the amount of

19 coke oven gas in the system was reduced, is that

20 correct?

21 A.  Correct.

22 Q.  And so the amount of pressure in that system

23 was reduced, correct?

24 A.  Correct.

25 Q.  And is it also accurate that therefore the

1   number of times that this valve would release would

2   be affected by the level of production?

3   A.   I don't understand what you're driving at.

4   Q.   Well, did the level of production have any

5   affect on how often this valve released?

6   A.   If it was below the set point, it would not

7   release, but if it come up above your set point, it

8   would bleed.

9   Q.   Okay.  Let me ask it a different way.

10      Were there times in the time that you were at

11   the -- in the by-products department, were there

12   times when the ovens would reverse and you get a

13   spike in pressure, but that that spike wouldn't go

14   above the set point for the pressure relief valve?

15   A.   I've never seen that.

16   Q.   All right.  Let me ask you a question about the

17   decanter tank in the by-products area, correct?  Do

18   you remember that piece of equipment?

19   A.   Yes, sir.

20   Q.   And there was a coal tar sludge that was

21   generated from that box, correct?

22   A.   Correct.

23   Q.   Was there a period of time when you worked at

24   Tonawanda that you actually were involved in

25   handling some of that coal tar sludge?

1    A.   Yes, there was.

2    Q.   You operated a front-end loader, correct?

3    A.   Correct.

4    Q.   And you would take it to the coal fields and

5    mix it in the coal piles on the coal fields -- in

6    the coal fields, is that correct?

7    A.   Correct.  They had a designated coal pile that

8    you'd mix it.

9    Q.   All right.  And am I correct, Mr. Hutchinson,

10   that you understood that that coal tar sludge was

11   being added to the coal because it helped to

12   increase the BTU value of that coal that was going

13   to be charged in the ovens, correct?

14   A.   At the time I was putting the sludge out there,

15   I didn't know what they were doing.  I thought they

16   were just reusing it into the process.

17   Q.   Reusing it and charging it back into the ovens,

18   correct?

19   A.   Correct.

20   Q.   All right.  You understood that that coal tar

21   sludge was going to be reused in the coking

22   process, right?

23   A.   Yes.

24   Q.   When you took that coal tar sludge out to the

25   coal field, you weren't intending to dispose of

1   that coal tar sludge out there, were you?

2          MR. MANGO:  Objection, your Honor.

3          THE COURT:  Grounds?

4          MR. MANGO:  One, this is beyond the scope

5   of direct.  I've let it go a little bit but,

6   secondly, he's testified he just brought it out

7   there and dumped it on the coal field.  So I think

8   he was asked and answered that question already.

9          THE COURT:  No.  I think -- I think this

10  line of questioning in -- to a limited extent is

11  okay.  So I'll overrule the objection.

12     You may proceed.

13  BY MR. LINSIN:

14  Q.  Would you like me to repeat the question?

15  A.  Can you repeat it?

16  Q.  Sure.  When you took this coal tar sludge --

17  and for what period of time did you do this, sir?

18  I don't want to make this larger than it seems.

19  How long did you do this?

20  A.  Two years, two and a half years.

21  Q.  All right.  And when you took this coal tar

22  sludge out to the coal field and mixed it with the

23  coal, it wasn't your intention to dispose of that

24  coal tar sludge out in the coal field, was it?

25  A.  We disposed of it into the coal pile.

1627

1    Q.   You mixed it into the coal pile, correct?

2    A.   Correct.

3    Q.   And then you knew that that was then going to

4    be used back in the ovens, correct?

5              MR. MANGO:   Objection, your Honor.   He

6    answered it.   He said, "We disposed of it into the

7    coal pile."

8              THE COURT:   No.   He did say that, but this

9    is a follow-up question.   So --

10   BY MR. LINSIN:

11   Q.   When you mixed it in the coal pile, you knew

12   that what was going to happen to that was that it

13   was going to be charged back into the ovens,

14   correct?

15   A.   Well, they were going to -- the crane was going

16   to pick it up and it was going to go up into the

17   coal bunker, yes.

18   Q.   All right.   All right.

19             THE COURT:   And again, Mr. Hutchinson,

20   you're doing it the right way.   If you don't

21   understand the question, just ask that it be

22   repeated.   Okay?

23   BY MR. LINSIN:

24   Q.   And just one last question.   There was a

25   separate maintenance department at Tonawanda Coke,

1628

1    correct?

2    A.   We had maintenance and we had electricians.

3    Q.   Right.  And you were asked questions about

4    by-products itself didn't have a budget for

5    maintenance.  Do you recall that question?

6    A.   Yes, I do.

7    Q.   But there was a separate maintenance department

8    at Tonawanda Coke, wasn't there?

9    A.   There was a maintenance department.

10              MR. LINSIN:  I have nothing further, your

11   Honor.  Thank you.

12              THE COURT:  Okay.  Mr. Linsin.

13        Mr. Personius.

14              MR. PERSONIUS:  Thank you, Judge.

15   CROSS-EXAMINATION BY MR. PERSONIUS:

16   Q.   Good afternoon, Mr. Hutchinson.

17   A.   Good afternoon.

18   Q.   My name is Rod Personius, and I represent Mark

19   Kamholz.  Just so we've done this, you recognize

20   Mr. Kamholz?

21   A.   I recognize him.

22              MR. PERSONIUS:  Would you stand up,

23   please, Mark?

24        And, your Honor, we've had him identified for

25   the record.

1       THE COURT:  Okay.  And the identification

2   is made of defendant Mark Kamholz by

3   Mr. Hutchinson.

4   BY MR. PERSONIUS:

5   Q.  You've been interviewed by the agents in this

6   case, correct, Mr. Hutchinson?

7   A.  I was interviewed by the state and private

8   investigators, yes.

9   Q.  And they asked you about Mr. Kamholz?

10  A.  Yes, they did.

11  Q.  And is it correct that you told them that, in

12  your experience, Mark Kamholz is a straight

13  shooter?

14       MR. MANGO:  Objection, your Honor.  He's

15  testifying.  This witness is on the stand.  He's

16  referring to interviews from a private

17  investigator.  We don't have those.  It sounds like

18  Mr. Personius is referring to those.  We've never

19  been provided those reports.

20       MR. PERSONIUS:  Could we put on the

21  screen, please, for identification, Government

22  Exhibit 3532.01.

23       Mr. Hutchinson, do you see on the screen

24  Government Exhibit -- you got a different pair of

25  glasses?

1    THE WITNESS:  I see something.  I can't

2    read it.

3    MR. MANGO:  You don't have bifocals?

4    THE WITNESS:  No, I can't wear them.

5    BY MR. PERSONIUS:

6    Q.  You can't.  Okay.  Can you see it now, sir?

7    A.  Yes.

8    Q.  Good.  Do you see there's a big yellow sticker

9    in the upper right that says 3532.01?

10    A.  Yes.

11    Q.  Okay.

12    And Lauren, could we please go to the third

13    page?

14    MR. MANGO:  Your Honor, I'm going to

15    object here.  He hasn't been inconsistent yet.  My

16    concern was reference to a private investigator.

17    The government doesn't have private investigators.

18    So if there is a report from a private investigator

19    and the witness is on the stand and Mr. Personius

20    is going to use it, that was my concern.  But --

21    THE COURT:  Okay, and we're there.  You

22    made the record.  We're not talking about a private

23    investigator's report.  We're not talking yet about

24    refreshing recollection.  We're not talking about

25    impeachment, so, slightly premature.  Let's see

1631

1    what Mr. Personius is going to do with this.

2    BY MR. PERSONIUS:

3    Q.   Let's go at it this way.  Mr. Hutchinson, on

4    July 8 of --

5         We should take this down, Lauren, please.

6         On July 8 of 2010, were you interviewed by

7    individuals who worked for the government?

8    A.   Somewhere around the time sounds right, yes.

9    Q.   You remember sometime in the summer of 2010 you

10   were interviewed?

11   A.   Yes.

12   Q.   Had to do with Tonawanda Coke?

13   A.   Yeah.

14   Q.   And one of the -- do you remember that one of

15   the people who interviewed you is a DEC, Department

16   of Environmental Conservation, investigator whose

17   name is Robert O'Connor?

18   A.   I believe that was his name.

19   Q.   And then there was a gentleman -- there was an

20   EPA, Environmental Protection Agency, Special Agent

21   whose name is Robert Conway?

22   A.   Yes.

23   Q.   Okay.  And Mr. Conway, do you see him sitting

24   at the second table?

25   A.   Yes, I do.

1    Q.  And they asked you a series of questions about

2    Tonawanda Coke, right?

3    A.  Correct.

4    Q.  And do you remember one of the things they

5    asked you was about Mr. Kamholz?

6    A.  Yes.

7    Q.  Okay.  And do you remember that you told them,

8    these government investigators, that Mr. Kamholz

9    was a straight shooter?

10   A.  I'm not sure if them were my exact words, but I

11   could have said that, yes.

12   Q.  Okay.  Could we put Government Exhibit 3532.01

13   for identification back on the screen, Lauren.

14       And Mr. Hutchinson, do you see that the

15   document that's on this screen for you to look at

16   has a yellow sticker in the upper right that says

17   3532.01?

18   A.  Yes.

19   Q.  Could we please go to the third page, Lauren.

20       And do you see down at the lower right that

21   there's a number.  It says 3532.01-0003?

22   A.  Yes.

23   Q.  Okay.  We've made a part of this document

24   bigger so hopefully it's easier to read.

25   A.  Yes.

1   Q.   Okay.  I want you, please, to read to yourself

2   the -- the paragraph -- short paragraph that now

3   appears on the screen.  Let us know when you're

4   done, please.

5        Are you done reading it?

6   A.   Yes.

7   Q.   Would you take it down, please, Lauren.

8        Is your recollection refreshed, Mr. Hutchinson,

9   that on July 8, 2010, you told these government

10  investigators that Mark Kamholz is a straight

11  shooter?

12  A.   Correct.

13  Q.   All right.  And do you recall you also told

14  them that Mr. Kamholz didn't fail to jump on you

15  when there were compliance issues?

16  A.   Correct.

17  Q.   Now, as the -- the foreman of the by-products

18  area, Mr. Hutchinson -- by the way, you did that

19  for about ten years?

20  A.   Roughly, yes.

21  Q.   All right.  Was one of your responsibilities

22  the -- this pressure relief valve?

23  A.   Yes.

24  Q.   Okay.  And that included the setting of that

25  release valve, where it was set at?

1    A.   To maintain the setting, yes.

2    Q.   Okay.  And you've testified that the -- any

3    changes in that pressure setting were supposed to

4    be put in a by-products log book?

5    A.   Yes.

6    Q.   And is it true that the changes in the setting

7    didn't always find their way into the log book?

8    A.   If someone was to change the bleeder setting,

9    it was logged in the book.

10   Q.   Okay.  Was it your experience that every single

11   time the pressure changed, it was put in the log

12   book?

13   A.   It was rarely changed.

14   Q.   Okay.  But when it was, was it your experience

15   that the change always found its way into the log

16   book?

17   A.   If I changed the setting, I logged it in the

18   book that it was changed.

19   Q.   If you did.  Did the operators who worked under

20   you ever change it?

21   A.   Not to my knowledge, no.

22   Q.   So the only changes that were made to the

23   pressure setting were made by you?

24   A.   Yes.

25   Q.   And then you would make an entry in the log

1    book?

2    A.   Correct.

3              MR. PERSONIUS:  Your honor, I have no

4    further questions.

5              THE COURT:  All right, Mr. Personius.

6         Mr. Mango.

7              MR. MANGO:  Yes, your Honor.  Thank you.

8    REDIRECT EXAMINATION BY MR. MANGO:

9    Q.   Almost done, Mr. Hutchinson.  Okay.

10        You were asked on cross-examination about

11   conserving gas at the -- in the coking process.

12        Do you remember being asked about conserving

13   gas?

14   A.   Yes.

15   Q.   Have you ever seen gas coming out of the drip

16   legs?

17   A.   Yes.

18   Q.   The paragraph that you were shown by attorney

19   Personius, do you remember that on the screen?

20   A.   Yes, I do.

21   Q.   Okay.  Do you remember saying that Mr. Kamholz

22   knew of the PRV existence and the spikes in the

23   pressure on the oven reversals?

24   A.   Yes.

25              MR. MANGO:  Thank you, your Honor.

1636

1       Nothing else.

2                THE COURT:  All right, Mr. Mango.

3                MR. LINSIN:  Nothing further, your Honor.

4       Thank you.

5                THE COURT:  Okay.  Mr. Linsin, thank you.

6          Mr. Personius.

7                MR. PERSONIUS:  No, thank you.

8                THE COURT:  Okay.  You've got a choice,

9       Mr. Hutchinson, you can leave or you can stay for a

10      while.

11               THE WITNESS:  I'll leave.

12               THE COURT:  All right.  Thank you very

13      much.

14               THE WITNESS:  Thank you.

15               THE COURT:  Mr. Mango.

16               MR. MANGO:  Your Honor, our next witness

17      is going to be lengthy.  We can start him.  It is

18      Harish Patel.  I'm at the discretion of the Court,

19      though.

20               THE COURT:  Okay.  I think probably it

21      makes more sense to start tomorrow.  Okay.

22          Does that work for everybody in the jury?  All

23      right.

24          Miss Labuzzetta.

25          We'll try to start as close to 9:30 tomorrow as

1    we possibly can so we'd like to see you here about

2    what time?

3                THE JURY:  9:30.

4                THE COURT:  Okay.  Thank you.  Please keep

5    your minds open.  Be safe on your return home.  We

6    look forward to seeing you again tomorrow morning.

7    Thank you very much for everything you're doing.

8    We appreciate it.

9                (Jury excused from the courtroom.)

10                THE COURT:  Okay.  Do we need to address

11    anything before we break?

12                MR. MANGO:  No, your Honor.

13                MR. PERSONIUS:  No, Judge.

14                MR. LINSIN:  No, Judge.  Thank you.

15                THE COURT:  Okay.  Thank you very much.

16                MR. LINSIN:  Thank you, your Honor.

17                *      *      *      *      *      *

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3               I certify that the foregoing is a

4          Correct transcription of the proceedings

5          Recorded by me in this matter.

6

7

8                              s/Michelle L. McLaughlin
                               Michelle L. McLaughlin, RPR
9                                   Official Reporter
                                  U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25