VOL. VIII

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

             -vs-                          10-CR-219S
TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
                    Defendants.
-------------------------------------


          Proceedings held before the

     Honorable William M. Skretny, U.S.

     Courthouse, 2 Niagara Circle, Buffalo,

     New York on March 8, 2013.


     APPEARANCES:

     AARON J. MANGO,
     Assistant United States Attorney,
     ROCKY PIAGGIONE, Senior Counsel,
     U.S. Department of Justice,
     Appearing for the United States.

     GREGORY F. LINSIN, ESQ.,
     ARIEL S. GLASNER, ESQ.,
     Appearing for Tonawanda Coke Corporation.

     RODNEY PERSONIUS, ESQ.,
     Appearing for Mark L. Kamholz.

     Also Present:  Lauren DiFillipo, Paralegal
                    Sheila Henderson, Paralegal



     Michelle L. McLaughlin, RPR,
     Official Reporter,
     U.S.D.C. W.D.N.Y.
     (716)332-3560

1639

1    I N D E X

2    WITNESS                                      PAGE

3       KEVIN E. NEELY
Direct Examination by Mr. Mango                1644
4    Cross-Examination by Mr. Linsin               1649
     Cross-Examination by Mr. Personius            1652

5       HARISH PATEL
6    Direct Examination by Mr. Mango               1663
     Cross-Examination by Mr. Linsin               1711
7    Cross-Examination by Mr. Personius            1767
     Redirect Examination by Mr. Mango             1811
8    Recross-Examination by Mr. Linsin             1817
     Redirect Examination by Mr. Mango             1824

9

10

11
     GOVERNMENT EXHIBITS                           EVD.
12
                    126                            1679
13                  127                            1690

14
     DEFENDANTS' EXHIBITS                          EVD.
15
                    OOO.08                         1733
16

17

18

19

20

21

22

23

24

25

1       (Jury not present in the courtroom.)

2           THE COURT:  Miss Demma, would you call the

3       case, please.

4           THE CLERK:  Criminal case 2010-CR-219S,

5       United States versus Tonawanda Coke and Mark

6       Kamholz.

7           THE COURT:  Okay.  And the attorneys and

8       parties are back present.  I know the jury's all

9       assembled and ready to go.  Is there anything that

10      we have to discuss?  I think there are no real

11      issues but there's, Mr. Piaggione, something to

12      call to my attention.

13          MR. PIAGGIONE:  Yes, your Honor.

14      Yesterday you asked us -- we had this discussion

15      about eliminating some of the witnesses from the

16      witness list, and I just -- we've given that list

17      to the defense.  I thought perhaps you wanted to

18      make a note of it as well.  I have the names if you

19      want to eliminate them or how would you --

20          THE COURT:  All right.  Do me a favor.  If

21      you have them, would you give whatever that sheet

22      is that you have the names on, and I'll take that

23      and I'll add it to my records and we'll go from

24      there.  Okay?

25          MR. PIAGGIONE:  Very good.

1    THE COURT:  That way we can get right

2 started with the jury.

3    Is there anything else?

4    MR. LINSIN:  No, nothing from Tonawanda.

5 Thank you, your Honor.

6    MR. PERSONIUS:  No, your Honor.

7    THE COURT:  Okay.  Who is your witness

8 today?

9    MR. MANGO:  Your Honor, we do have a very

10 quick witness, Kevin Neely, who I figured, before

11 we get into the long witness, we might as well do

12 Mr. Neely and let him enjoy the rest of the day.

13    THE COURT:  Okay.  All right.

14    MR. MANGO:  Defense is aware of that.

15    THE COURT:  Okay.  Okay.  We'll do that.

16    Chris, if you get the jury, please.

17    Does anybody object to the fact that it's

18 Friday?

19    (Jury seated.)

20    THE COURT:  You are a little more colorful

21 this morning.  Good morning.  Good to see

22 everybody.  Please have a seat, please.

23    Okay.  Good to have our jury back.  And it's

24 also good to have a Friday in this week.  So, we're

25 about ready to start as you can tell.  The

1    attorneys and parties are back ready, and again, I

2    reemphasize for you -- and I know you know because

3    you've been very cooperative, and we really do

4    appreciate that.  This is an important case to both

5    sides.  So, the government has that burden of

6    proof, and it's ready with its next witness.

7        Please keep your minds open.  Again, everything

8    that you're going to need to decide this case

9    unanimously you will be getting from the witnesses,

10   or the lack thereof, and the other evidence that's

11   received.  And, you know, we ask you please don't

12   do anything to in any way negatively impact on your

13   objectivity in this case.  Keep your minds open.

14   You know it's going to depend on resolving those

15   fact issues on the application of your common

16   sense, your experience, and your intelligence to

17   getting the job done unanimously.  So, again, thank

18   you.

19       I think, Mr. Mango, is the first witness yours?

20           MR. MANGO:  Yes, your Honor.

21           THE COURT:  Okay.  If you call your

22   witness, please.

23           MR. MANGO:  Yes, your Honor.  I did

24   mention we'd have a long witness.  I would like to

25   do a short witness before that, Mr. Kevin Neely.

1          THE COURT:  We're going to hold you to

2     your word, Mr. Mango, on this one.  Okay.  All

3     right.

4          All right.  Mr. Neely, if you'd just move up a

5     little bit, stop right there, and Miss Demma is

6     going to administer the oath.  If you would just

7     sort of turn around a little bit and face the jury.

8     K E V I N   E.   N E E L Y, having been duly sworn as

9     a witness, testified as follows:

10         THE COURT:  Okay.  Good norming.

11         THE WITNESS:  Morning.

12         THE COURT:  All right.  You do have the

13    distinction before I give you the preliminary

14    instructions of being the only one introduced as a

15    short witness in this case so far.  So we hope that

16    plays out.  But, keep in mind that you are here in

17    this important case to testify for the benefit of

18    the ladies and gentlemen of the jury.

19         And that requires that you do a couple of

20    things, because my court reporter has to take down

21    everything you say, and the jury has to hear you so

22    please speak at the microphone.  It's friendly, but

23    you have to speak in a conversational tone.  You

24    don't have to get right on top of it.  You have to

25    stay back a little bit, but you have to keep your

1    voice up.

2        If you don't understand a question, let

3    whoever's asking the question know.  Don't answer a

4    question you don't understand.  Be as concise as

5    you can.  If you can answer a question yes or no,

6    please do that.  If there's an objection, wait

7    until I rule on the objection, and I'll tell you

8    whether to complete an answer, or wait for another

9    question.

10       Do you understand those instructions?

11             THE WITNESS:  Yes, I do.

12             THE COURT:  Okay.  I think you'll carry

13   okay.  Would you state your full name and spell

14   your last name, please?

15             THE WITNESS:  Kevin E. Neely, N-E-E-L-Y.

16             THE COURT:  Okay.  Your witness,

17   Mr. Mango.

18             MR. MANGO:  Thank you, your Honor.

19   DIRECT EXAMINATION BY MR. MANGO:

20   Q.  Good morning, Mr. Neely.

21   A.  Good morning.

22   Q.  Are you currently employed?

23   A.  No, I'm not.

24   Q.  All right.  Have you ever been employed at the

25   Tonawanda Coke Corporation?

1    A.   Yes.

2    Q.   What period of time, if you can tell the jury,

3    were you employed at Tonawanda Coke Corporation?

4    A.   August 28th 1995 to February 28th, 2013.

5    Q.   Okay.  Can you tell the jury what positions

6    you've held at the Tonawanda Coke Corporation?

7    A.   Pusher operator, door machine, quench car

8    operator, by-products operator.

9    Q.   Okay.  Let's talk about by-products.

10        Do you recall the year or the years you worked

11   in the by-products department?

12   A.   Between 2004 to '06.

13   Q.   Okay.  2004 to 2006?

14   A.   Yes.

15   Q.   So at some point did you leave the by-products

16   area?

17   A.   Yes, I did.

18   Q.   For a different position?

19   A.   Yes.

20   Q.   Why did you leave by-products?

21   A.   The smell.  Couldn't deal with the smell.

22   Q.   Okay.  You mentioned you were employed up until

23   February 28th of 2013.

24   A.   Yes.

25   Q.   About a week ago?

1   A.   Yes.

2   Q.   Under what terms did you leave the Tonawanda

3   Coke Corporation?

4   A.   I got into an argument with one of the

5   supervisors and was suspended and then terminated.

6   Q.   Okay.  Let me show you exhibit -- already in

7   evidence, your Honor -- 15.02.097.

8        Mr. Neely, I'm going to ask you to take a look

9   at your screen.  Do you see that on your screen?

10  A.   Yes, I do.

11  Q.   Okay.  What is this that we're looking at?

12  A.   The bleeder.

13  Q.   Are you familiar with the operation of this

14  bleeder?

15  A.   Yes.

16  Q.   As part of your employment as a by-products

17  operator, did you have -- you were an operator when

18  you were in by-products?

19  A.   Yes.

20  Q.   All right.  I'm sorry.  As part of your

21  employment as a by-products operator, did you have

22  any responsibilities regarding the operation of

23  this bleeder?

24  A.   Yes.

25  Q.   Okay.  Tell the jury, please, what -- what you

1    had to do.

2    A.   As operator you supposed to check it every two

3    hour round.

4    Q.   Okay.   And you would check it during your

5    two-hour rounds?

6    A.   Yes.

7    Q.   During the time period you were in the

8    by-products department, was this operational?

9    A.   Yes, it was.

10   Q.   And when it was operational, what, if anything,

11   would come out of this bleeder?

12   A.   Gas.

13   Q.   When would gas come out of this bleeder?

14   A.   During reversal.

15   Q.   Have you seen it happen?

16   A.   Yes.

17   Q.   When it would release gas, would you smell

18   anything?

19   A.   Yes.

20   Q.   Okay.   Tell the jury what you would smell.

21   A.   Gas.

22   Q.   All right.   When it will release, would you

23   feel anything?

24   A.   Yes.

25   Q.   All right.   Tell the jury what you would feel.

1648

1   A.   A mist.  You feel a mist on you when you walk

2   by.

3   Q.   Okay.  For the releases, how long would they

4   last?

5   A.   Up to a minute.

6   Q.   Do you know what the typical set point for this

7   bleeder was?

8   A.   Between 80 to 100.

9   Q.   Who decided where the bleeder would be set at?

10  A.   Supervisor.

11  Q.   Did you ever make any changes to the set point

12  of this bleeder?

13  A.   No.

14  Q.   If a change was made, was it recorded anywhere?

15  A.   Yes.

16  Q.   Okay.  Were you trained to put any adjustments

17  you would make as a by-products operator in any

18  type of book?

19  A.   Yes.

20  Q.   Okay.  Do you know what drip legs are,

21  Mr. Neely?

22  A.   Yes, I do.

23  Q.   While you were in by-products, did you ever

24  find any of those drip legs cracked open?

25  A.   Yes.

1649

1    Q.   Can you tell the jury what -- when you found

2    those cracked open, what would be coming out of

3    them?

4    A.   Liquid.   A liquid.

5    Q.   Okay.   Anything else?

6    A.   And gas.

7            MR. MANGO:   Thank you, your Honor.   No

8    further questions.

9        Thank you, Mr. Neely.

10            THE WITNESS:   Thank you.

11            THE COURT:   Okay, Mr. Neely.   Thank you.

12        Mr. Linsin.

13            MR. LINSIN:   Thank you, your Honor.   May I

14    proceed?

15            THE COURT:   Yes.

16   CROSS-EXAMINATION BY MR. LINSIN:

17   Q.   Good morning, Mr. Neely.

18   A.   Good morning.

19   Q.   My name is Greg Linsin.   I represent Tonawanda

20   Coke Corporation.

21        You were asked about the drip legs that are in

22   the by-products area, and you testified that

23   sometimes you found them cracked open, correct?

24   A.   Yes.

25   Q.   All right.   Now, were the drip legs another one

1    of the items that you routinely inspected during

2    these two-hour rounds you did in by-products?

3    A.   Yes.

4    Q.   All right.   And the standard procedure for

5    those drip legs was that they were to be kept

6    closed, correct?

7    A.   Yes.

8    Q.   And so when in the exceptional circumstance you

9    might find one of them open, you were trained to

10   close it, correct?

11   A.   Correct.

12   Q.   Because you knew they were supposed to be

13   closed?

14   A.   Yes.

15   Q.   Did you ever operate a front-end loader

16   operator out at the plant, sir?

17   A.   No.

18   Q.   And you testified that you operated a quench

19   car, I believe.

20   A.   Yes.

21   Q.   What period of time did you do that?

22   A.   Can't recall.

23   Q.   You don't remember?

24   A.   Don't remember.

25   Q.   Do you know if it was during the 2005, 2009

1    period, or would it have been some other time?

2    A.   Some other time.

3    Q.   Let me ask you this:   Do you remember -- there

4    are two quench towers at the plant, correct?

5    A.   Correct.

6    Q.   And one of them is a shorter tower over on the

7    east side of the property, closer to the ovens,

8    correct?

9    A.   Yes.

10   Q.   And there's another taller tower over closer to

11   the river that's further away from the ovens,

12   correct?

13   A.   Yes.

14   Q.   Do you remember a time when that taller

15   tower -- the one that's further away, the one

16   that's closer to the river, do you remember a time

17   when that tower was actually shut down and the

18   quench cars couldn't go to that tower?

19   A.   No.

20   Q.   Do you remember a time when they actually put

21   rail guards on the rails so the quench cars

22   couldn't move down there?

23   A.   No.

24   Q.   You don't remember that?

25   A.   Don't remember.

1    Q.  Okay.

2          MR. LINSIN:  I have nothing further, your

3   Honor.

4          THE COURT:  All right.  Mr. Linsin, thank

5   you.

6     Mr. Personius.

7  CROSS-EXAMINATION BY MR. PERSONIUS:

8    Q.  Morning, Mr. Neely.

9    A.  Good morning.

10   Q.  My name a Rod Personius.  I represent Mark

11  Kamholz.

12     Mark, would you stand up, please?

13     Do you recognize Mr. Kamholz?

14   A.  Yes.

15         MR. PERSONIUS:  Your Honor, if the record

16  could reflect, please, that --

17         THE COURT:  Yeah.  The record will show

18  that the defendant Mark Kamholz has been identified

19  by Mr. Neely.

20  BY MR. PERSONIUS:

21    Q.  Mr. Neely, how tall are you?

22    A.  About five-eight.

23    Q.  Would you consider that short?  I'm just trying

24  to figure out if you're a short witness, that's why

25  I asked.

1      THE COURT:  All right.

2          MR. PERSONIUS:  I'll continue, Judge.

3          THE COURT:  Is there a motion to strike?

4  No.

5          MR. MANGO:  I think he's taken that a

6  little out of context but that's -- we can proceed,

7  your Honor.

8          THE COURT:  Okay.

9  BY MR. PERSONIUS:

10  Q.  You understand, right?

11  A.  Yeah.

12  Q.  Don't take it personally.

13          MR. MANGO:  I'll choose my words carefully

14  next time.

15  BY MR. PERSONIUS:

16  Q.  I just have a couple of questions, Mr. Neely.

17  You identified for Mr. Mango this pressure -- we

18  call it -- we've been calling it both a bleeder and

19  pressure relief valve.

20      Are you familiar with that term "pressure

21  relief valve"?

22  A.  We always called it a bleeder.

23  Q.  Okay.  Did you ever hear it referred to as a

24  pressure relief valve?

25  A.  No.

1    Q.   We'll call it a bleeder.  That instrument, can

2    you tell the jury where within the by-products area

3    that was located, please?

4    A.   In the by-products.

5    Q.   Okay.  Maybe go at it this way.  There is a

6    road that goes down through the -- the middle of

7    the -- of the property that's referred to as

8    Broadway?

9    A.   Yes.

10   Q.   Are you familiar with that -- that road?

11   A.   Yes.

12   Q.   And on one side of that road as you're -- if

13   you were heading away from the river -- in other

14   words going to the east, on one side to your left

15   would be by-products --

16   A.   Yes.

17   Q.   -- is that right?  And then on your right-hand

18   side as you went down Broadway, you would have the

19   coal handling building and then the battery?

20   A.   Yeah.

21   Q.   Is that fair?

22   A.   That's correct.

23   Q.   Okay.  Now, the -- did the by-products area

24   border on Broadway?

25   A.   Yes.

1    Q.   Okay.  And if my directions are correct, then

2    by-products would be on the north side of Broadway?

3    A.   Right.

4    Q.   Okay.  And this bleeder valve, where in

5    relation to Broadway was the -- was that valve?

6    A.   On the north side.

7    Q.   All right.  It's on the north side of Broadway

8    but within the by-products area.  Was it closer to

9    Broadway or was the --

10   A.   It was closer to Broadway.  Right at the

11   driveway there, right at the road.

12   Q.   Right at the side of Broadway?

13   A.   Yes.

14   Q.   Okay.  Do you remember about how high up in the

15   air the valve was?

16   A.   No.  Can't recall.

17   Q.   And if you were -- the valve runs off of a big

18   pipe that's called the coke oven gas line?

19   A.   Yes.

20   Q.   Okay.  And that coke oven gas line is -- is

21   that painted a certain color?

22   A.   No.

23   Q.   It doesn't have any color to it?

24   A.   No.

25   Q.   Okay.  If you're looking up -- up in the air at

1    that coke oven gas line and you're standing on

2    Broadway, do you see the pressure relief valve?

3    A.   No.

4    Q.   At what point do you see the pressure relief

5    valve?  Is there any perspective you can have where

6    you can actually see it?

7    A.   You have to walk up on it.

8    Q.   Pardon me?

9    A.   You have to walk up on it, behind a little

10   shed.  It's a little shack.

11   Q.   There is a green shack that's down on the

12   ground, right?

13   A.   Yes.

14   Q.   And the pressure relief valve is above that?

15   A.   Up above it, that's correct.

16   Q.   And you mentioned when you talked to the

17   investigators that from time to time that valve

18   would get clogged up?

19   A.   Don't remember.

20   Q.   Do you remember telling the investigators that

21   there were times when you had to steam out the

22   valve?

23   A.   Don't remember.

24   Q.   That every couple of months you had to use

25   steam to clean out the valve?  You don't remember

1    that?

2    A.  No, I don't.

3           MR. PERSONIUS:  Can I have just a minute,

4    Judge?

5           THE COURT:  Yes.

6    BY MR. PERSONIUS:

7    Q.  Mr. Neely, do you remember that you were

8    interviewed by an agent from the Environmental

9    Protection Agency and an agent from the Department

10   of Environmental Conservation in August of 2010?

11   A.  Yes.

12   Q.  Okay.  And you were asked certain questions

13   about your work experience at Tonawanda Coke?

14   A.  Yes.

15   Q.  And you're telling us that you don't recall

16   telling those investigators about the need to steam

17   out the -- this what you refer to as the bleeder

18   valve every couple of months?

19   A.  No.

20   Q.  All right.  Could we please, for

21   identification, Lauren, have Government

22   Exhibit 3550 put up on the screen.

23      Mr. Neely, there is a screen there that you're

24   looking at.  Do you see in the upper right corner,

25   it's got a yellow sticker?  Yes?

1    A.   Yes.

2    Q.   On that sticker it says 3550.01?

3    A.   Yes.

4    Q.   Right below that, it says Government Exhibit?

5    A.   Yes.

6    Q.   And what I'd like you to do, sir -- we're going

7    to take part of this so you can read it better and

8    we're going to make it bigger, so bear with us.

9         Now, there's a paragraph that we've made bigger.

10   bigger.  My request is please read that to

11   yourself.

12        Have you read that?

13   A.   Yes.

14   Q.   Could you take it down, please, Lauren.

15        Now, Mr. Neely, having read that paragraph,

16   does that refresh your recollection?

17   A.   Yes.

18   Q.   Okay.  And does it refresh your recollection

19   that you told the agents about having -- maybe I'm

20   not using the right words -- but steam out that

21   valve from time to time?

22   A.   Yes.

23   Q.   Okay.  Would you tell the jury what you

24   remember about that process, please?

25   A.   Normally, if you don't -- you don't see the

1    bleeder bleeding, it will be plugged, you know, be

2    clogged and you have to run the steam hose to it

3    and clear the line out.

4    Q.  And when you -- when you -- well, would you do

5    this or did someone else at Tonawanda Coke do the

6    steaming?

7    A.  Usually during the winter months --

8    Q.  Okay.

9    A.  -- we would have a problem with it.

10   Q.  I see.  And was that something that you as a

11   by-products operator would do; that is, would you

12   do the steaming or did some other unit at Tonawanda

13   Coke do the steaming?

14   A.  Well, all the employees did -- the by-products

15   operators will have to.

16   Q.  Would have to do it?

17   A.  Yes.

18   Q.  And you would somehow enter steam into the line

19   to clean out the valve?

20   A.  Right.  That's correct.

21   Q.  All right.  And when you did that, would that

22   cause whatever was clogged in the line to come out

23   of the valve?

24   A.  Yes.

25   Q.  And whatever was in the line, would it create

1660

1    some type of a spray?

2    A.   Yes.

3    Q.   Okay.  And do you know what it was that would

4    clog up the line?

5    A.   Tar.

6    Q.   Tar?

7    A.   Tar most of the time.

8    Q.   Okay.  Would you actually then, if you saw --

9    if you think it was tar, would you actually see the

10   tar come out of the valve?

11   A.   No.

12   Q.   Okay.  Have you ever heard of a substance

13   called naphthalene?

14   A.   Yes.

15   Q.   Do you know whether or not naphthalene would

16   sometimes clog up that valve?

17   A.   Sometimes, yes.

18   Q.   And then when you would steam it out, the clog

19   would come out of the valve?

20   A.   Yes.

21   Q.   And that would include the naphthalene?

22   A.   Yes.

23   Q.   And this was done mostly in the winter months?

24   A.   Yes.

25            MR. PERSONIUS:  May I have a minute,

1    please, Judge?

2              THE COURT:  Certainly.

3              MR. PERSONIUS:  Your Honor, we have

4    nothing further at this time.

5         Thank you, Mr. Neely.

6              THE WITNESS:  Thank you.

7              MR. MANGO:  Nothing further, your Honor.

8    Thank you.

9              THE COURT:  Okay.  Mr. Mango.  Okay.

10   Mr. Neely, you're excused.  Thank you very much.

11             THE WITNESS:  Thank you.

12             THE COURT:  Okay.  Have a good day.

13             MR. MANGO:  Your Honor, the government

14   would call Harish Patel.

15             THE COURT:  Good morning.  If you approach

16   the witness stand, please.  Don't go in it.  I'll

17   tell you when to stop.  If you stop right there,

18   we're going ask you to face the jury, and we'll

19   have you sworn as a witness.

20   H A R I S H   P A T E L, having been duly sworn as a

21   witness, testified as follows:

22             THE COURT:  You'll have to speak at the

23   microphone in a conversational tone.  It's

24   friendly, so it should pick you up.  You don't have

25   to be right on top of it.  Keep in mind that you're

1    here to testify for the benefit of the ladies and

2    gentlemen of the jury.  If you don't understand a

3    question, make sure you ask the questioner to

4    repeat the question.  Don't answer something you

5    don't understand, okay?

6              THE WITNESS:  I understood.

7              THE COURT:  Okay.  If you can, answer a

8    question as succinctly as you are able.  If you can

9    do it with a yes or no, please do it that way.  The

10   attorneys should follow up with questions where

11   they want you to go.

12      If there's an objection, wait until I rule on

13   the objection, and then I'll give you instructions

14   on whether to continue with your answer, wait for

15   another question, or something along those lines.

16   Don't volunteer information, because that

17   complicates matters.  Do you understand my

18   instructions?

19             THE WITNESS:  Yes, I do.

20             THE COURT:  All right.  I think you're

21   going to carry okay.  State your full name, spell

22   your last name, please.

23             THE WITNESS:  My name is Harish Patel.

24   Last name is P-A-T-E-L.

25             THE COURT:  Okay.  Spell your first name

1663

1     too, because it's a little unusual.

2               THE WITNESS:  Harish, H-A-R-I-S-H.

3               THE COURT:  All right.  Thank you,

4     Mr. Patel.

5          Your witness, Mr. Mango.

6               MR. MANGO:  Thank you, your Honor.

7     DIRECT EXAMINATION BY MR. MANGO:

8     Q.  Good morning, Mr. Patel.

9     A.  Good morning, Aaron.

10    Q.  Can you tell the jury, are you currently

11    employed?

12    A.  Yes, I am.

13    Q.  Okay.  Who are you employed by?

14    A.  I'm employed by the U.S. Environmental

15    Protection Agency Region 2 office.

16    Q.  Okay.  Where is the Region 2 office?

17    A.  It's in New York City.

18    Q.  All right.  So you work out of New York City?

19    A.  Yes, sir.

20    Q.  What is your position with EPA Region 2?

21    A.  I'm an environmental engineer in the air

22    compliance branch.

23    Q.  The air compliance branch.  Can you tell the

24    jury what the air compliance branch is?

25    A.  Yes.  The air compliance branch, we enforce the

1   Clean Air Act requirements, and we only do air

2   inspections, not any other media.

3   Q.   All right.   How long have you been employed

4   with EPA in the air compliance branch?

5   A.   Over 25 years.

6   Q.   And if you can tell the jury what your job

7   duties are in that position you hold.

8   A.   Yes.   As environmental engineer in the air

9   branch, one of my job functions is to do compliance

10  inspections for the Clean Air Act.   We go and

11  inspect for stationary sources for compliance with

12  the federal and state regulations.

13       One of the other things I do is also do

14  oversight of state programs where we periodically

15  go and review state programs, assure that they are

16  implementing them properly.

17  Q.   Okay.   How many states does Region 2 oversee?

18  A.   Region 2 oversees New York, New Jersey, Puerto

19  Rico, and the Virgin Islands.

20  Q.   All right.   Can you explain what your

21  educational background is for the jury, please?

22  A.   Yes.   I have a bachelor's and master's in

23  chemical engineering from City College of New York.

24  Q.   As part of your job duties have you received

25  any type of specialized training by the EPA?

1665

1    A.   Yes, I do.

2    Q.   Okay.  Can you describe some of that for the

3    jury, please?

4    A.   Sure.  Over the years I've taken some

5    specialized training classes on the job.  I've

6    taken classes in how to do inspections at

7    stationary sources.  I've taken classes on how to

8    evaluate hazardous waste incinerators.  I've taken

9    classes on how to do inspections for fugitive

10   emissions from sources.  I've taken classes in how

11   to review and write new source review permits.

12   Just a number of other sources -- courses that I've

13   taken over the years.

14   Q.   All right.  How many -- can you tell the jury

15   how many Clean Air Act compliance inspections

16   you've done?

17   A.   Yes, I've done over 200 inspections.

18   Q.   Have you ever inspected a coke facility before?

19   A.   No.

20   Q.   All right.  At some point you did come to be

21   involved in an inspection at the Tonawanda Coke

22   facility?

23   A.   Yes.

24   Q.   Explain how -- if you can, explain for the jury

25   how you became involved with the Tonawanda Coke

1    Corporation.

2    A.   Yes.   Back in 2008 we, you know, we meaning the

3    EPA Region 2 office, received information from

4    headquarters.   You know, they had evaluated air

5    emissions, TRI information.   This is -- TRI is

6    toxic release inventory information.   They had

7    evaluated this information from facilities all over

8    the country.   And they did some risk analysis and

9    came up with a list of sources that they felt that,

10   you know, the region should go out and inspect.

11       The Region 2 office got a list of sources.

12   There were about a dozen sources on that list, of

13   which Tonawanda Coke was one of the sources on

14   there.

15   Q.   Okay.   Again, who puts out this TRI, the

16   toxic -- what is it called?

17   A.   Yes, it's the toxic release inventory program.

18   It's a program under the EPA where facilities are

19   required to report on an annual basis their

20   emissions to the air, to the water, to the ground.

21   This is reported by the facility to the EPA, and

22   that information is then publicly available.

23   Q.   Okay.   So these facilities report this to the

24   EPA?

25   A.   Yes, sir.

1    Q.   Who compiles this, Region 2, or is there a

2    headquarters that compiles this?

3    A.   I don't understand.

4    Q.   Who puts out this TRI list?

5    A.   The information is sent to EPA so the

6    headquarters would compile it.

7    Q.   Okay.  Where is headquarters for EPA?

8    A.   Oh, the headquarters for EPA is in Washington,

9    D.C.

10   Q.   All right.  So this TRI list comes out.

11   Tonawanda Coke is on it?

12   A.   Yes.

13   Q.   All the other regions get their own TRI list?

14   A.   When we say TRI list, I mean, you know, was

15   using TRI information to generate, you know, the

16   list of sources that were on that list.

17   Q.   Oh, okay.

18   A.   So there could have been other factors that

19   were used, but TRI was the major factor that was

20   used to generate that information.

21   Q.   Okay.  So Region 2 -- if I've got this

22   correctly, Region 2 gets a list from Washington

23   with about a dozen or so sources on it asking you

24   to inspect?

25   A.   Yes, asking the regions to look into it and

1668

1    possibly go and inspect.

2    Q.  Okay.  Why was -- was an inspection then

3    decided for the Tonawanda Coke Corporation?

4    A.  Yes.  After we got the list, we went and looked

5    at some other information that we had including,

6    you know, inspection history for this facility, and

7    we found out that the EPA had not inspected this

8    facility in over ten years.  So that became another

9    factor in deciding whether we should go and inspect

10   Tonawanda Coke.

11             MR. PERSONIUS:  Your Honor, the witness

12   referred to "we" looked at inspection reports.

13   Could we find out who the "we" is please?

14             THE COURT:  Okay.

15             MR. MANGO:  I'll ask.

16             THE COURT:  Please.

17   BY MR. MANGO:

18   Q.  Mr. Patel, are there other environmental

19   engineers that you work with in the air compliance

20   branch?

21   A.  Yes, I do.

22   Q.  So when you use the term "we" are you referring

23   to those people?

24   A.  Yes, I am.

25   Q.  Okay.  Can you just tell the jury who those

1669

1    other people are?

2    A.   Yes.   There is about 18 other environmental

3    engineers in the branch.   Some of them I may have

4    consulted.   Then we have my manager who is also

5    consulted on these before we -- before any decision

6    is made to inspect a facility.

7    Q.   Okay.   So when was the decision made that an

8    inspection was going to happen at the Tonawanda

9    Coke Corporation?

10   A.   It was probably made --

11            MR. LINSIN:   Objection, probably, your

12   Honor.

13            THE COURT:   All right.   Start again,

14   please.

15   BY MR. MANGO:

16   Q.   Do you know when EPA Region 2 made a decision

17   to move forward with an inspection of the Tonawanda

18   Coke Corporation?

19   A.   Yes, I do.

20   Q.   Okay.   Tell the jury when that was.

21   A.   It was in October of 2008.

22   Q.   Okay.   Now, prior to that had you made any type

23   of request to any other divisions of EPA to assist

24   you in that inspection?

25   A.   Yes, we did.

1    Q.   Okay.  Can you tell the jury what other

2    divisions of EPA you requested assistance from?

3    A.   Yes, I can.  Every year we get a request from

4    the NEIC, the National Enforcement Investigation

5    Center, out of Denver.  They send a request out to

6    the regions asking if the region needs any

7    assistance with any inspections that they may help

8    us with.  So we received a request from NEIC

9    earlier in 2008 or in June of 2008.  And so that

10   request was out there, and when we decided to go

11   and inspect Tonawanda Coke, we solicited NEIC's

12   assistance on that inspection.

13   Q.   Okay.  What kind of inspection were you

14   planning then for the Tonawanda Coke Corporation?

15   A.   We were planning to do a full compliance

16   evaluation.

17   Q.   Was this a criminal or civil inspection?

18   A.   This was a civil inspection.

19   Q.   Does the air compliance branch have any

20   criminal enforcement powers?

21   A.   No, it does not.

22   Q.   Okay.  Describe what you mean for the jury what

23   a full compliance inspection is.

24   A.   Yes.  A full compliance inspection for the air

25   program is to evaluate compliance with all the

1    applicable air requirements to that facility.  It

2    could be the federal requirements as well as the

3    state requirements, so that is that full compliance

4    evaluation.

5    Q.   Okay.  What are some of the federal regulations

6    that were involved in the Tonawanda Coke

7    Corporation inspection?

8    A.   There were a number of federal regulations that

9    applied to coke ovens.  We have NESHAP regulations.

10   These are the National Emission Standards for

11   Hazardous Air Pollutants, and these are mainly

12   focused on benzene emissions from coke ovens,

13   various process units at this coke oven.  We also

14   have what we call MACT regulations.  These are

15   Maximum Achievable Control Technology regulations.

16   And these apply to other portions at the coke oven,

17   at the process units at the coke oven, and they

18   regulate hazardous air pollutants.

19        So we have one that mainly focuses on benzene

20   and one that focuses on hazardous air pollutants.

21   These are the federal regulations we were planning

22   to inspect for at the Tonawanda Coke facility.

23             THE COURT:  Excuse me.  The second one

24   focuses on what?

25             THE WITNESS:  Hazardous air pollutants,

1    sir.

2              THE COURT:  That's the MACT?

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Thank you.

5    BY MR. MANGO:

6    Q.   Are there state requirements or regulations

7    that are considered when doing a full compliance --

8    full compliance inspection?

9    A.   Yes, there are.

10   Q.   Can you tell the jury what those are -- I mean

11   what those were in this case?

12   A.   Yes.  You know, each state also has what we

13   call a State Implementation Plan, a SIP, and these

14   regulations have been promulgated by the state

15   which the EPA have reviewed.  And so when we do a

16   full compliance evaluation, we also go and enforce

17   these regulations because they're federally

18   enforceable.

19   Q.   Okay.  Did you participate in an inspection at

20   the Tonawanda Coke Corporation?

21   A.   Yes, I did.

22   Q.   Okay.  When was that inspection?

23   A.   Inspection was in April 2009.

24   Q.   Do you know how many days that inspection was?

25   A.   Yes.  It was for six days.

1   Q.   Were you there all six days?

2   A.   No, sir.

3   Q.   Okay.  Tell the jury why you were not there for

4   all six days.

5   A.   I was at the inspection for the first week for

6   four days, from Tuesday through Friday.  At the end

7   of the week I had to go back to New York office.

8   Q.   Okay.

9   A.   I did not have permission from my management to

10   stay over for the remaining of the inspection.

11   Q.   Okay.  Did NEIC have permission to stay?

12   A.   Yes, sir.

13   Q.   What was that permission?  Why did you not have

14   permission?

15   A.   Basically as a matter of cost, you know, there

16   was -- we had three inspectors from the New York

17   City office that were at the inspection, so, it was

18   just getting too much to keep all three of us here

19   for another week.

20   Q.   You didn't have the budget to stay?

21   A.   That's correct.

22   Q.   NEIC had the budget to stay?

23   A.   Yes.  They operate on a separate budget.

24   Q.   So what different agencies or subagencies of

25   EPA or other agencies were involved in the

1    inspection?

2    A.   At the inspection other than the EPA, we also

3    had inspectors from the New York State DEC.

4    Q.   Okay.  So it was EPA --

5    A.   Yes.  It was EPA, NEIC.  We had inspectors from

6    EPA New York office, and then we had inspectors

7    from the DEC office here in Buffalo.

8    Q.   All right.  Was there one person from EPA in

9    Washington that came up as well that you're aware

10   of?

11   A.   Yes, there was a person, but he did not come on

12   site.  He was in the area.

13   Q.   He took measurements off site?

14   A.   That's correct, sir.

15   Q.   All right.  Why did DEC participate in the

16   inspection?

17   A.   It's our practice to make sure that we involve

18   the state programs on our inspections.  Even though

19   this was an EPA-lead inspection, we normally invite

20   the states to accompany us during the inspection,

21   and then it's up to them to come with us or not.

22   Q.   Do you know who participated in the inspection

23   from DEC?

24   A.   Yes, I do.

25   Q.   Okay.  Who?

1   A.   There were two inspectors.   One was Cheryl

2   Webster and the other person was Larry Sitzman.

3   Q.   All right.   Following the inspection, what if

4   anything did you do to follow up on the April

5   inspection?

6   A.   After the inspection I had several discussions

7   with the other inspectors from NEIC because they

8   were here for another couple of days after I left.

9   So we had discussions on what they found during the

10  inspection.   And we had discussions with my

11  management of what our preliminary findings were

12  during the inspection.   And after we analyzed that,

13  we decided to send an information request letter to

14  Tonawanda Coke.

15  Q.   Okay.   Can you tell the jury what an

16  information request letter is?

17  A.   Yes.   Under the Clean Air Act we have the

18  authority to send these request letters to seek

19  more information to determine a proper compliance

20  evaluation.   You know, under the information

21  request letters we can require the sources to

22  conduct stack tests.   We can require the sources to

23  submit data or records that they were required to

24  keep which we were not able to obtain during the

25  inspection.   So basically it's to obtain more

1    information from the facility.

2    Q.   Okay.   So why would EPA send out an information

3    request?

4    A.   Like I said, after we discussed the preliminary

5    findings after the inspection we felt that we did

6    not have all the information to make a complete

7    compliance determination at that point, so we

8    needed additional information.

9    Q.   Okay.   Does EPA rely on responses to those

10   requests for information that are sent?

11   A.   Yes.   We depend on these very much because the

12   information that is submitted is supposed to be

13   certified by the company and has to be complete,

14   and that information is very critical to make the

15   final determination on compliance.

16   Q.   Okay.   So do you know if an information request

17   or information requests were sent to the Tonawanda

18   Coke Corporation?

19   A.   Yes, I do.

20   Q.   Were you involved in sending those information

21   requests out?

22   A.   Yes, I helped drafting those request letters.

23   Q.   Okay.   How many requests for information -- if

24   we may call that RFI, is that a term you use,

25   request for information?

1    A.   You could use that.  We just usually call it

2    the 114 letter.

3    Q.   Okay.  Why -- what's 114 relate to?

4    A.   That's the portion of the Clean Air Act that

5    authorizes the EPA to issue these letters.

6    Q.   Okay.  So we'll call it that.  How many 114

7    letters were sent to the Tonawanda Coke Corporation

8    in 2009?

9    A.   We sent two 114 letters.

10   Q.   When did you send the first 114 letter?

11   A.   The first one was sent in early July, a couple

12   of months after the inspection.

13   Q.   Okay.  When did you send the second 114 letter?

14   A.   The second one was sent in early September

15   2009.

16   Q.   Okay.  Why was the second 114 letter sent?

17   A.   The first one that we sent we were trying to

18   obtain some general process information from the

19   facility, you know, like operating data from

20   various processes at the facility.  And we also

21   wanted the company to submit some testing

22   protocols, because like I explained earlier, under

23   114 we have the authority to have a facility

24   conduct performance test or stack tests, so that

25   was the purpose of this 114 was to solicit a

1   protocol for them to do some testing.

2       The second 114 letter that we sent, we sent

3   that because we -- during the inspection we felt

4   that we did not get all the records and

5   documentation that would help us make a complete

6   evaluation.  So the second 114 was geared towards

7   the specific requirements of the regulations and to

8   try to obtain that information.

9   Q.  Okay.  So this second 114, were you involved in

10  sending that one out?

11  A.  Yes, I was involved.

12  Q.  Do you know who signed this 114 that you said

13  was sent in early September?

14  A.  The 114s are signed by my division director,

15  Dore LaPosta.

16  Q.  All right.  What is her role, if any, in

17  sending the 114 letter out?

18  A.  She is part of management.  She has the

19  authority, as it's delegated down, to sign these

20  letters, so she is the person that signs off on

21  these.

22  Q.  Okay.  Is it fair to say that you and the

23  people in your branch drafted this?

24  A.  Yes.  It's drafted at the branch.

25  Q.  Okay.  Have you reviewed this September 114

1    letter prior to you coming here to testify today?

2    A.  Yes, I have.

3    Q.  All right.

4         MR. MANGO:  Your Honor, I'd like to pull

5    up for identification purposes Government

6    Exhibit 126, and absent an objection, I would move

7    this document into evidence.  It is multiple pages,

8    your Honor.  126.

9         MR. LINSIN:  Your Honor, may we see the

10   signature page of this document, please?

11      No objection, your Honor.

12        MR. PERSONIUS:  Your Honor, if we could,

13   please, could we see the last page?

14        MR. MANGO:  Yes.

15        THE COURT:  Coming up.

16        MR. PERSONIUS:  Thank you, Judge.  No

17   objection.

18        THE COURT:  Okay.  126 received, no

19   objection.  Do you want it published?

20        MR. MANGO:  Yes, please, your Honor.

21        THE COURT:  Okay.  It can be published,

22   please.

23        MR. MANGO:  Thank you.

24        (Government's Exhibit 126 was received

25         into evidence.)

1    BY MR. MANGO:

2    Q.   Mr. Patel, do you see what's on your screen

3    now?

4    A.   Yes.

5    Q.   Okay.  Let's just focus in on this area,

6    please.  What is this document that is on your

7    screen, Exhibit 126?

8    A.   This is the 114 letter that we sent in

9    September of 2009.

10   Q.   And do you recognize this document?

11   A.   Yes.

12   Q.   Do you know if you received a response to this?

13   It's dated September 1st of 2009, this

14   September 1st, 2009, 114?

15   A.   Yes, we did.

16   Q.   Okay.  We'll talk about that response in a

17   moment.  From what's on your screen, who was this

18   114 sent to?

19   A.   The 114 is addressed to Mark L. Kamholz, the

20   environmental manager at Tonawanda Coke.

21   Q.   All right.  If we could go to the second page,

22   please.  If you could focus on this first

23   paragraph.

24        If you could start reading right there at the

25   beginning of that sentence, "in accordance".

1    A.   Yes.   "In accordance with Section 113(c)(2)(A)

2    of the Act, criminal penalties may be imposed on

3    any person who knowingly makes any false material

4    statement, representation, or certification in his

5    or her response, our knowingly alters, conceals, or

6    omits any material information."

7    Q.   Okay.   If we could go to -- so, again, you've

8    testified EPA relies on responses to these

9    documents?

10   A.   That's correct.

11   Q.   All right.   If we could go to the third page,

12   please, Lauren.

13       There's some CCs at the bottom.   Was this sent

14   to anybody in the New York State Department of

15   Environmental Conservation as well?

16   A.   Yes, we did.

17   Q.   Why would you also include a CC to the DEC?

18   A.   That's our normal practice is just to let the

19   state partners know that, you know, we have this

20   information request out.   And, you know, it's just

21   normal standard operating procedure to CC the

22   state.

23   Q.   Okay.   If we can go to page 4, please.   There's

24   a person here listed as Carey Secrest.   Is he that

25   person you mentioned from Washington who --

1682

1    A.   Yes, that's the person.

2    Q.   Okay.  If we can go to the fifth page, please.

3    Now pages 5, 6 and 7, if we just want to scroll

4    through those.  Can you tell what those relate to?

5    A.   Yes, that's just boilerplate information that

6    we attach to the 114 which allows the company to

7    submit anything, if it's confidential business

8    information, that they feel that should not be

9    released to the public, then they can assert that

10   on their response.

11   Q.   Okay.  Page 8, if we can go there.  What is

12   this page?

13   A.   This is the -- this is just general information

14   on how to respond to the 114.

15   Q.   Like instructions?

16   A.   Instructions, that's correct.

17   Q.   Okay.  If we can go to page 9 now.  All right.

18   Now what is this information here?  And what is --

19   what is the jury looking at?

20   A.   Okay.  This is the first page of all the

21   questions that we asked in that 114.

22   Q.   Okay.  So this is the meat of the 114?

23   A.   That's correct, yes, sir.

24   Q.   Okay.  Let's look at number three.  If we can

25   just focus on number three here.  A and B, if you

1   can read those for the jury.

2   A.   A and B?

3   Q.   Yes.

4   A.   Okay.  This question has to do with the bypass

5   bleeder flare at the facility.  A reads, "Provide a

6   detailed description of how the bypass bleeder

7   flare operates and how compliance with all Title V

8   permit conditions applicable to such flare is

9   demonstrated."

10       And B reads, "Describe in detail the frequency

11   that coke oven gas is vented to the bypass stack."

12   Q.   Okay.  Have you had heard the term "battery

13   flare stack"?

14   A.   Yes, I have.

15   Q.   Are those one in the same?

16   A.   Yes, sir.

17   Q.   The bypass bleeder flare at the facility is the

18   same as what you know as a battery flare stack?

19   A.   That's correct.

20   Q.   Okay.  Why would you request information about

21   the battery flare stack?

22   A.   There is -- earlier I mentioned the MACT

23   regulation that applies to coke oven, and one of

24   the regulations that applies has specific

25   requirements for the bypass bleeder flare.

1    Q.   Okay.

2    A.   And that's why we had the question here.

3    Q.   Okay.  If we can come out of this, Lauren, and

4    please go to the next page.  All right.  If we can

5    focus in on number eight, please.

6         This is request number eight.  If you can read

7    the whole thing for the jury, please?

8    A.   Yes.  This question deals with the quench

9    towers.  It's for the quench towers at the

10   facility.  A, "State whether the quench towers have

11   any baffles.  If your answer is no, explain why

12   not."

13        And B, "Explain in detail TCC's maintenance

14   program for the quench towers.  Provide copies of

15   records of all maintenance and repair activities

16   conducted at the quench towers during the past five

17   years."

18   Q.   All right.  For this request, number eight, why

19   would you ask for information about the quench

20   towers and whether they have baffles?

21   A.   As I said earlier, you know, we were doing a

22   full compliance evaluation, so one of the portions

23   of the full compliance evaluation is to determine

24   compliance with the Title V permit.  And in the

25   Title V permit there is a condition regarding the

1    quench towers, and that the quench towers need to

2    have baffles.

3    Q.   Okay.  If we can come out of that, Lauren, and

4    please go to the next page.  And then the next

5    page.  If we could focus in on 20, request number

6    20.  If you can read that whole item there for the

7    jury, please.

8    A.   A through F?

9    Q.   Yes, please.  Starting at "for".  Right there.

10   A.   Okay.  This question had to do with the

11   pressure relief valve or the PRV.  So for the

12   pressure relief valve on the coke oven gas return

13   line at the facility, A, "Provide a detailed

14   description of the function of the PRV and how this

15   PRV operates.

16       "B, Provide the date of installation for the

17   PRV bleeder valve.

18       "C, Provide a detailed description of TCC's

19   operating procedures for the PRV, including all

20   documentation of such procedures.

21       "D, Describe each operating parameter that is

22   monitored for the PRV and provide copies of all

23   monitoring records for the PRV for the past five

24   years.

25       "E, Provide an estimate of the quantity of coke

1  oven gas emitted from the PRV on a daily and

2  monthly basis in pounds per hour and an estimate of

3  the hours per day that emissions from the PRV

4  occur.

5      "And F, State whether any coke oven gas

6  emissions from the PRV are reported to EPA or New

7  York State DEC as deviations from TCC's Title V

8  permit requirements.  If your answer is yes,

9  provide scope of all such --"

10  Q.  If we could go to the next page, please,

11  Lauren.  Do you want to keep reading there.

12  A.  "Provide copies of all such reports for the

13  past five years.  If your answer is no, explain why

14  such information are not reported.

15  Q.  Why did you request information about the PRV,

16  the pressure relief valve?

17  A.  At the April 2009 inspection during the second

18  week when I was not there the inspectors from the

19  NEIC, the Denver office, they were given

20  information on the PRV, and they were given some

21  explanation on how the gases get released from the

22  PRV.  So the purpose of asking that question here

23  was to try to obtain more information on how the

24  PRV operates, and also to obtain records of any

25  monitoring data that they kept for the PRV.

1    Q.   Okay.  All right.  Thank you.  If we can come

2    out of that.  Lauren, if we could go to page 15 of

3    this document.  Let's focus in on request number 32

4    and 33.

5         Do you see those requests?

6    A.   Yes.

7    Q.   Okay.  Can you read 32, please?

8    A.   Yes.  Thirty-two, "For the pilot light

9    installed on the bypass bleeder flare at the

10   facility, A, provide the date when the pilot light

11   was installed on the bypass bleeder flare.

12        "B, Explain in detail how the pilot light on

13   the bypass bleeder flare is monitored continuously

14   consistent with 40 CFR Sections 63.307(b)(4) and

15   63309(h)(2).

16        "C, Provide all documentation indicating when

17   the thermocouple or equivalent device is in service

18   and when it is not in service for the past five

19   years.

20        "And D, Provide all documentation for

21   maintenance and repair of the pilot light for the

22   past five years."

23   Q.   Okay.  Please read 33 as well.

24   A.   Yes.  Thirty-three, "Provide detailed

25   information and documentation regarding all periods

1    during the past five years in which the facility's

2    bypass bleeder flare was not operating with a pilot

3    flame present.  The information must include the

4    dates and the duration of each such period.  For

5    each period, explain in detail the reasons why the

6    flare was not operating with a pilot flame

7    present."

8    Q.   Thank you, Mr. Patel.  Why did you request

9    information about the pilot light on the battery

10   flare stack?

11   A.   One of the MACT regulations that applies to

12   coke ovens is specific requirement for the bypass

13   bleeder flare and the pilot light that goes with

14   it.

15   Q.   Now -- thank you, Lauren.  We can take that

16   down.

17        We talked about -- you mentioned before you did

18   receive a response from this 114 letter?

19   A.   Yes, we did.

20   Q.   Okay.  Do you -- did you review that response

21   prior to coming here to testify today?

22   A.   Yes, I did.

23             MR. MANGO:  Okay.  And, your Honor, at

24   this point, I'd like to pull up Government

25   Exhibit 127, and absent an objection, offer this

1    into evidence.

2              MR. LINSIN:  No particular objection to

3    the document, but could we establish when this

4    witness actually reviewed -- when this witness

5    first reviewed this document?  It's not clear to me

6    from his testimony.

7              THE COURT:  Okay.  Let's take care of the

8    document first, and then you'll set that up --

9              MR. MANGO:  I will, your Honor.

10             THE COURT:  -- foundationally.

11             MR. LINSIN:  No objection to the document,

12   your Honor.

13             MR. PERSONIUS:  Your Honor, could we

14   please see the last page?  It's page 8.

15             MR. MANGO:  Page 10 at the bottom.  Page 8

16   at the top and then down there there is page 10.

17             THE WITNESS:  The Bates 10.

18             MR. PERSONIUS:  Your Honor, with the

19   understanding that this letter was accompanied by

20   any number of attachments that are not part of the

21   exhibit, we have no objection.  But as it is, it's

22   not the complete response.  It doesn't have any of

23   the attachments.

24             THE COURT:  Okay.

25             MR. MANGO:  Yes, your Honor.

1        THE COURT:  Letter with partial

2    attachments will be received as 127.  No objection.

3            (Government's Exhibit 127 was received

4            into evidence.)

5            THE COURT:  And may be published.

6            MR. MANGO:  Thank you, your Honor.  I

7    would ask that it be published.

8    BY MR. MANGO:

9    Q.  Mr. Patel, can you tell the jury when you first

10   reviewed this response?

11   A.  The response was received in October 2009, and

12   I reviewed it sometime thereafter.  Because it was

13   a huge response, it was like two boxes of

14   information, the review just took several weeks to

15   go through.

16   Q.  You heard about attachments.  There was, is it

17   true, a number of attachments to this letter?  Is

18   that right?

19   A.  Yes, there was.

20   Q.  And it filled up how many boxes?

21   A.  Almost two boxes of information.

22   Q.  All right.  So let's look at this front page.

23   Who was the response sent from?

24   A.  The response was signed by Mark L. Kamholz, the

25   environmental manager at Tonawanda Coke.

1   Q.   Okay.  You said you received this in October?

2   A.   Yes, sir.

3   Q.   Even though it's dated September 7th.  Is that

4   accurate?

5   A.   Yes, I believe that's a typo.

6   Q.   Okay.  Okay.  If we can go to the next page

7   please, Lauren.

8        Okay.  What is this?

9            THE COURT:  Excuse me.  Back that up,

10  please, Lauren.

11       What's the typo, Mr. Patel?

12           THE WITNESS:  The September should be

13  October 7, 2009.

14           THE COURT:  But it was received October

15  5th, right?

16           THE WITNESS:  That's when we received it,

17  yes.

18           THE COURT:  And you say it should be dated

19  October 7th before you received it?

20           THE WITNESS:  Well, that's the date that

21  was put by the company, your Honor.

22           THE COURT:  It's September 7th, right?

23           THE WITNESS:  That's correct.

24           THE COURT:  You say that should be

25  October 7th?

1    THE WITNESS:  Well, it should be sometime

2    in October.  It could be October 5th or 7th.

3    MR. MANGO:  Okay.

4    BY MR. MANGO:

5    Q.  Now, I'll ask some questions, your Honor.  This

6    document came out of the EPA files, is that right?

7    A.  That's correct.

8    Q.  Okay.  And somebody at EPA -- do you see this

9    handwriting here that says received 10/5/09?

10   A.  Yes, I do.

11   Q.  Is that your handwriting?

12   A.  No.

13   Q.  Okay.  Is it somebody in EPA's handwriting?

14   A.  Yes.

15   Q.  Okay.  Because this document came out of the

16   EPA file?

17   A.  That's correct.

18   Q.  Okay.  So that date -- that date just -- do you

19   believe the September 7, 2009, date is accurate or

20   not accurate?

21   A.  It's not accurate.

22   Q.  Okay.  Do you know when the Tonawanda Coke

23   Corporation actually sent, put in the mail the

24   response?

25   A.  I don't know when it was actually put in the --

1    in the mail, but there's a certification on the

2    next page.

3    Q.   Okay.  Let's go to that certification, if we

4    could.

5         Okay.  This certification is dated what date?

6    A.   It's dated October 6th, 2009.

7    Q.   All right.  And I'd like to focus in on this

8    portion now.  Can you read the certification for

9    the jury, please?

10   A.   Yes.  The entire certification?

11   Q.   Yes, please.

12   A.   Yes.  "I certify, under penalty of law, that I

13   have personally examined and am familiar with the

14   information submitted in response to the

15   information request and all documents submitted in

16   this response, and that based on my inquiry of

17   these individuals immediately responsible for

18   obtaining the information, I believe that the -- I

19   believe that the submitted information is true,

20   accurate, and complete, and that all documents

21   submitted within this response are complete and

22   authentic, unless otherwise indicated.

23       "I am aware that there are significant

24   penalties for submitting false information,

25   including the possibility of fine and imprisonment.

1    "I am also aware that for one year from the

2    date of the information request I am under an

3    obligation to supplement my response to the

4    information request if any additional information

5    relevant to the matters should become known or

6    available to me."

7    Q.  Okay.

8         MR. LINSIN:  Your Honor, may I just

9    interject a request at this point?  I remain

10   confused, given the testimony concerning the dates

11   on these two pages.  And the question I would ask,

12   if we could, the witness to address is, what his

13   knowledge is about who actually initialed or

14   hand-wrote the date that appears on the first page

15   of the letter.  I believe he said it was some EPA

16   official.  If he has any better insight into that,

17   it may be helpful for everyone.

18        THE COURT:  I think that was contained in

19   Mr. Mango's question.

20      You want to follow up on that, please, so we

21   get some clarification?

22        MR. MANGO:  Yes, your Honor.

23   BY MR. MANGO:

24   Q.  I believe I asked this.  The handwriting that

25   we saw on the first page --

1    A.   Yes.

2    Q.   -- do you know whose handwriting that is?

3    A.   I don't know whose handwriting it is.  If I had

4    to guess, it's probably one of the three inspectors

5    that were at the inspection from the EPA Region 2

6    office.

7              THE COURT:  Point out the handwriting that

8    we're talking about.

9         Highlight that, please, Ms. DiFillipo.  In

10   yellow, please.  Thank you.

11   BY MR. MANGO:

12   Q.   That's the handwriting.  You don't know whose

13   handwriting that is?

14   A.   No, sir.

15   Q.   Do you know whether that date is accurate or

16   not?

17   A.   No, sir.

18   Q.   Okay.  But if we go to the next page on the

19   certification, it's signed on October 6th, is that

20   right?

21   A.   That's correct, sir.

22   Q.   Okay.  All right.  If we can go to page 3 now.

23   If we can focus in on 3A and B.

24        Can you read there what Mr. Kamholz told the

25   EPA about 3A and B?

1    A.   Yes.   This is the response to Question 3.   3A

2    reads:   "The bypass bleeder flare is operated by

3    manually opening the valve that connects collector

4    main to the flare.   The flare is equipped with a

5    natural gas pilot light that provides automatic

6    ignition of any flared raw coke oven gas.   The

7    pilot light has a terminal couple -- thermocouple

8    that sets off -- that sets off a strobe light

9    should temperatures fall below 600F, at the

10   thermocouple.   The New York State DEC inspects our

11   facility for Title V flare compliance.

12       And 3B reads:   The frequency of venting to the

13   bypass stack is historically very infrequent.   Our

14   records do not indicate any incidents except for

15   several in 2009, March 17, June 23, and

16   August 21st.

17   Q.   Thank you.

18       Lauren, if we could come out of that and go to

19   the next page, please.   And then the next page.

20   I'm sorry, page 4 is what I mean.

21       Down here at the bottom there was a response

22   regarding the quench towers, the request that was

23   made.

24   A.   Yes.

25   Q.   Can you read number 8 for the jury, please?

1   A.   Yes.   "Number 8:   Quench towers.   A, quench

2   towers are not baffled.   The quench towers at

3   Tonawanda Coke are not traditional quench towers.

4   They are short, about 40 feet high, and have very

5   large openings, about 14 feet by 51 feet.   This

6   greatly reduces the upward velocity of the quench.

7   In addition, foundry coke offers at least 3.38

8   times less surface area for any particulate

9   degeneration.

10      "B, maintenance is done on an as-needed basis.

11   Records are not maintained."

12   Q.   Okay.   So you've read this.   You also went

13   through the attachments that were included to this

14   response?

15   A.   Yes.

16   Q.   Okay.   In this letter or in any of the

17   attachments, is there any mention that DEC had

18   granted a formal exemption for either of the quench

19   towers?

20   A.   No.

21   Q.   How about is there any mention regarding an

22   informal exemption for any of the quench towers?

23   A.   There was no mention.

24   Q.   Okay.   If we could go to page 6, please,

25   Lauren.

1        If you could start at the bottom here and then

2   we will have to move to the next page.  This is in

3   response to number 20.  Can you read this, please,

4   for the jury?

5   A.   Yes.  "Number 20:  Coke oven gas pressure

6   relief valve.  Consulted P. Cahill.

7        "A, the purpose of the PRV is -- is relieve

8   excessive pressure in the gas system.  Should that

9   pressure exceed a pre-set level, the valve opens

10  automatically.

11       "B, about ten years ago --

12  Q.   Now, before you read, what may make sense if --

13  for number 20 if we continue for C, if you remember

14  in your 114 letter, is this -- for C, was it

15  provide a detailed description of TCC's operating

16  procedures for the PRV including all documentation

17  of such procedures?

18  A.   That's -- C is a response to that question.

19  Q.   Yes.  Okay.

20  A.   Yes.

21  Q.   Okay.  So now can you read C, the response?

22  A.   Yes.  "C, there are no written operating

23  instructions for the PRV.  The objective is to

24  maintain consistent operating gas pressure and not

25  exceeding the set point, thus, conserving coke oven

1   gas for boiler and coke battery use."

2   Q.   Okay.  Let's go to D, which -- go ahead.

3   A.   "D, the only operating parameter that is

4   monitored for the PRV is the coke oven gas

5   pressure.  Charts are maintained for 30 days plus

6   to date.  Charts that exist are in Attachment 20D."

7

8   Q.   E?

9   A.   "E, the PRV opens very rarely.  Again, the

10  objective is to conserve coke oven gas for boiler

11  and battery use.  Should the valve open, it would

12  only be for five to ten seconds.  In the open

13  position, the PRV could emit coke oven gas at the

14  rate of 7,135 pounds per hour."  In parenthesis it

15  says consulted C. Luricilla.  "And the PRV has not

16  opened in months."

17  Q.   Okay.  F?

18  A.   "F, coke oven gas emissions have not been

19  estimated, nor have the been [sic] reported as

20  deviations from the TCC's Title V permit.  The

21  emissions have not been reported because they are

22  believed to be de minimus."

23  Q.   All right.  And why don't you read the note to

24  Response 20, please?

25  A.   The note, "The current PRV is to be replaced

1   with a new PRV located at the end of the coke oven

2   gas system.  The new PRV is equipped with a

3   shielded automatic flare of similar design to the

4   one on the collector main.  However, the new PRV is

5   equipped with an electronic igniter."

6   Q.  I'd like to go to page 9 now, please, Lauren.

7       Do you see the part at the bottom there, 32,

8   relating to the pilot light?

9   A.  Yes, I do.

10  Q.  Okay.  If you could read that and then we'll --

11  actually, before we go on, there was a mention to

12  some attachments in 20, in the response to 20 --

13  A.  Yes.

14  Q.  -- regarding some circular charts.

15  A.  Yes.

16  Q.  Is that what that attachment related to?  You

17  were provided with some circular charts?

18  A.  Yes, we were provided about 30 days of circular

19  charts.

20  Q.  Okay.  All right.  Now, if you could read 32,

21  please.

22  A.  "32.  Pilot light.  A, the bypass bleeder flare

23  was installed by March 31st, 1994.  See attachment

24  32A.  The pilot light was part of that

25  installation.  While I could not find any

1    definitive document as to date of installation,

2    however, a copy of the pilot light construction

3    approval is also in attachment 32A."

4    Q.   Okay.  If we could go to the next page, please.

5         If you can continue reading B then.

6    A.   "B, the pilot light has a thermocouple in the

7    flame that sends a signal to a switch that operates

8    a strobe on top of the selector main.  Should the

9    thermocouple signal drop below 600-degree F, output

10   to the switch closes to activated the strobe light,

11   indicating the pilot light is out.

12        "C, documentation indicating when the

13   thermocouple was in or out of service during the

14   last five years does not exist.  However, we do

15   know that on August 21st, 2008, the pilot light was

16   found to be not operating.  It was relit, but the

17   thermocouple was faulty.  A new thermocouple was

18   installed on September 9, 2008.  Subsequently the

19   natural gas regulator was not operating to

20   adjustment and was replaced on November 17, 2008.

21   This did not cause any pilot light outage.  On

22   June 19, 2009, the charge car hit an electrical

23   conduit that supplied power, the pilot light

24   indicator system, and caused some relays to burn.

25   New relays were ordered and installed by

1     February 12, 2009, returning the strobe light

2     indicator to service.  The pilot light was checked

3     visually during this time and was in continuous

4     service.

5          "D, see 32C.

6     Q.  And just 33, if we could finish with that,

7     please.

8     A.  Yes.  "Documentation as to when the pilot light

9     on the bypass bleeder flare was not operating does

10    not exist.

11    Q.  Okay.  Thank you.

12         Lauren, we can take that down.

13         So you've reviewed as part of your duties the

14    response sent by the Tonawanda Coke Corporation?

15    A.  I did.

16    Q.  Do you know what -- do you know what is the

17    difference between a quench tower and a quench

18    station?

19    A.  Yes, I do.

20    Q.  Okay.  Can you explain that for the jury,

21    please?

22    A.  In one of the MACT regulations there is a

23    distinction made between quench towers and a quench

24    station.  Basically the distinction being that a

25    quench station cannot be operated for more than

1     5 percent of the total number of quenches.

2     Q.   Okay.

3     A.   The quench station does not have to have

4     baffles.   So it has to be operated for less than

5     5 percent of the time and it cannot have baffles.

6     Q.   Okay.   Does that distinction turn on how high

7     or low the tower is?

8     A.   No.   There is no mention of how high or low the

9     tower can be in the regulations.   The only

10    distinction is operating time.

11    Q.   Did you review the response made regarding the

12    pressure release valve that you went through,

13    Response 20?

14    A.   Yes, I did.

15    Q.   And did you have a chance to review the

16    circular charts that were included as attachments?

17    A.   Yes, I did look through them.

18    Q.   And based on that information submitted by the

19    Tonawanda Coke Corporation, did you make a

20    determination regarding the amount of coke oven gas

21    that was emitted from the PRV?

22    A.   Yes, I did.

23    Q.   Okay.   Explain for the jury what your

24    determination was.

25    A.   Yes.   In the response to our 114 letter, the

1704

1    company stated that the valve opens for five to ten

2    seconds.  And the company also stated that the

3    pressure relief valve could emit about 7,000 pounds

4    per hour if it was open.  During the inspection

5    that we did in April 2009, the inspectors from NEIC

6    from the Denver office, they were told that the

7    pressure relief valve opens every half hour, at

8    least once every half hour.

9        And using that information, so assuming that it

10   opens for ten seconds every half hour, if I do the

11   math, and assuming that the pressure relief valve

12   releases 7,000 pounds per hour of gas, I came up

13   with an estimate of about 173 tons per year of coke

14   oven gas that could potentially be released from

15   that pressure relief valve.

16   Q.  Okay.  173 tons per year?

17   A.  That's correct.  Each ton is 2,000 pounds.

18   Q.  Okay.  Would you consider 173 tons of coke oven

19   gas emissions to be de minimus, as the words were

20   used in the response?

21   A.  I would not consider that to be de minimus.

22   Q.  Based on your review of the information

23   request, the response, that information you just

24   presented to the jury, what did you do in response

25   to -- after receiving this response letter?

1  A.  Well, after I -- after the EPA received this

2  response, I reviewed it.  We discussed the

3  information with my management.  And it was then

4  decided that we should issue a notice of violation

5  for any noncompliance issues.

6  Q.  Okay.  Just explain just in general terms what

7  a notice of violation is for the jury, please.

8  A.  Sure.  A notice of violation is an enforcement

9  document that the EPA issues.  It's basically

10 putting the source and the state on notice that

11 there is violation that we have documented.

12 Q.  Okay.  And EPA apparently has authority to

13 issue NOVs?

14 A.  Yes, the EPA has the authority.

15 Q.  Okay.  NOV, I'm using, notice of violation?

16 A.  That's correct.

17 Q.  Okay.  What determinations go into being made

18 as to whether EPA is going to issue an NOV?  How do

19 you make that determination?

20 A.  Well, we have, you know, information that we

21 obtain during the inspection.  We have information

22 that we obtain from our review of the 114 letter.

23 And based on that information and -- you know, we

24 have the regulations that are -- that are

25 applicable to the facility, and that's where the

1    determination is made, whether there is a violation

2    or not.

3    Q.  All right.  So in this case you determined that

4    an NOV would be issued to the Tonawanda Coke

5    Corporation?

6    A.  Yes, for violations of the New York State SIP

7    and for violations of the Title V permit.

8    Q.  Okay.  So was an NOV issued to the Tonawanda

9    Coke Corporation relating to the quench towers?

10   A.  Yes, because this was a requirement of the

11   permit, the Title V permit.  It was a requirement

12   that the quench towers had to have baffles.  The

13   information that was submitted by the company

14   stated that they did not have baffles.  So we

15   determined that to be a violation, and, therefore,

16   we issued a notice of violation for that.

17   Q.  When did that notice of violation get issued?

18   A.  That notice of violation was issued in

19   December 2009.

20   Q.  Okay.  Did EPA decide that a notice of

21   violation should be issued for the pressure release

22   valve?

23   A.  Yes.

24   Q.  Okay.  And when did -- was an NOV, notice of

25   violation, issued for the pressure release valve?

1    A.   Yes, there was a second notice of violation for

2    the pressure relief valve.

3    Q.   And when was that issued?

4    A.   That was issued in April of 2010.

5    Q.   April of '10?

6    A.   That's correct.

7    Q.   Okay.  Does the fact that a notice of violation

8    is issued by the civil air compliance branch have

9    any effect on whether criminal enforcement could

10   occur?

11            MR. LINSIN:  Objection, your Honor.

12            THE COURT:  Grounds?

13            MR. LINSIN:  Competency of this witness to

14   respond to that kind of legal question.

15            THE COURT:  Yeah, without more, I'll

16   sustain the objection.

17            MR. MANGO:  Okay.

18   BY MR. MANGO:

19   Q.   The notice of violation, is that a civil or

20   criminal document?

21   A.   It's a civil document, as I recall.

22   Q.   Okay.  Have you been involved in any cases in

23   your career where a civil notice of violation has

24   been issued and then -- let me rephrase that, your

25   Honor.

1        Are you aware in your training and experience,

2    are you aware of whether a civil notice of

3    violation has any bearing on whether criminal

4    enforcement can occur?

5              MR. LINSIN:  Objection, relevance.

6              THE COURT:  Sustained.

7    BY MR. MANGO:

8    Q.  Was the civil air compliance branch involved in

9    any way in making a criminal referral in this case?

10   A.  My branch in New York?

11   Q.  Your branch.

12   A.  No, sir.

13             MR. MANGO:  Your Honor, can I have one

14   moment, please?

15             THE COURT:  Yes.

16   BY MR. MANGO:

17   Q.  Mr. Patel, do you know the procedure for the

18   enforcement of violations of a Title V permit by

19   the EPA?

20   A.  Any violation of the title --

21             THE COURT:  It calls for a yes or no.

22             THE WITNESS:  Yes.

23   BY MR. MANGO:

24   Q.  Okay.  You're familiar with that?

25   A.  Yes.

1    Q.   Okay.  How do -- how does enforcement of the

2    Title V permit in violations of the Title V permit

3    occur by the civil air compliance branch?

4    A.   I don't understand your question.

5              MR. MANGO:  Okay.  Your Honor, may have

6    just one moment?  Thank you, your Honor.

7              THE COURT:  Sure.

8    BY MR. MANGO:

9    Q.   Mr. Patel, what procedures do you follow for

10   the enforcement of violations of a facility's

11   Title V permit?

12   A.   If we document violations of a Title V permit,

13   we issue a notice of violation for that -- for

14   those violations.

15   Q.   Is that a civil or criminal document?

16             MR. LINSIN:  Objection.  Asked and

17   answered.

18             THE COURT:  Yeah, but I'll allow it.

19        Go ahead.  You may answer.

20             THE WITNESS:  That is a civil procedure.

21   BY MR. MANGO:

22   Q.   Do you know -- in your experience, your

23   understanding of the Clean Air Act, do you know

24   whether criminal enforcement has -- is -- I'm

25   sorry.

1710

1        -- whether civil enforcement through the use of

2     notices of violation has any effect on criminal

3     enforcement --

4              MR. LINSIN:  Objection --

5              MR. MANGO:  -- ability?

6              MR. LINSIN:  -- relevance.

7              THE COURT:  Relevance and other grounds,

8     sustained.

9              MR. MANGO:  Your Honor, if I could have

10    one moment.  Thank you, your Honor.

11   BY MR. MANGO:

12   Q.  Let me ask you this, Mr. Patel.  Does the civil

13   air compliance branch have the authority to

14   commence criminal enforcement of the Title V

15   permit?

16   A.  No.

17              MR. MANGO:  Thank you, your Honor.  I have

18   nothing further.

19              THE COURT:  Okay.  Let's take 15 minutes,

20   please.  It will be about 11:45.

21              (Jury excused from the courtroom.)

22              THE COURT:  You can step down.  Thank you.

23   All right.  We'll resume again at 11:45.

24              MR. MANGO:  Yes, your Honor.

25              MR. LINSIN:  Thank you.

```
 1              (Short recess was taken.)

 2              (Jury seated.)

 3              THE COURT:  Welcome back, ladies and

 4     gentlemen.  Please have a seat.

 5         Okay.  Chris, everything in order?

 6              COURT SECURITY OFFICER:  Yes, sir.

 7              THE COURT:  Okay.  The attorneys and

 8     parties are back, present.  Of course our jury is

 9     here now.  Roll call waived.

10         We're resumed.  Harish Patel is on the stand.

11     Direct examination has been completed.  You remain

12     under oath, Mr. Patel.

13         Mr. Linsin, are you going to start the

14     cross-examination?

15              MR. LINSIN:  Yes.  Thank you, your Honor.

16              THE COURT:  Okay.  You may begin.

17     CROSS-EXAMINATION BY MR. LINSIN:

18     Q.  Morning, Mr. Patel.

19     A.  Good morning.

20     Q.  My name is Greg Linsin.  I represent Tonawanda

21     Coke Corporation.  You testified on direct

22     examination that you have worked for the EPA for

23     over 25 years, is that correct?

24     A.  Yes.

25     Q.  And that you have conducted, I believe I heard
```

1    you correctly, over 200 air -- Clean Air Act

2    compliance inspections at various facilities, is

3    that correct?

4    A.   That's correct.

5    Q.   Have all of those inspections been in EPA

6    Region 2?

7    A.   Yes.

8    Q.   So have you been in Region 2 your entire career

9    with EPA?

10   A.   That's correct.

11   Q.   And you testified this was your first -- the

12   first coke facility you had inspected.  But what

13   other types of facilities, generically, had you

14   inspected prior to this April 2009 inspection at

15   Tonawanda Coke?

16   A.   Facilities that are regulated under Clean Air

17   Act.  You know, could be small facilities, like gas

18   stations or fuel terminals.  Could go all the way

19   up to refineries and chemical plants,

20   pharmaceutical plants.

21   Q.   And New York and New Jersey as well, is that

22   correct?

23   A.   Yes.  New York, New Jersey, Puerto Rico and the

24   Virgin Islands.

25   Q.   And you testified that you had received a

1    number of special training classes from EPA in

2    order to help prepare you for this work, correct?

3    A.   That's correct.

4    Q.   And one of those classes, if I heard you

5    testify correctly, was a specialized training

6    course in just how to do these types of air

7    compliance inspections, correct?

8    A.   It's a class, that's correct, for basic

9    inspections at station resources.

10   Q.   All right.  And how long was that class?

11   A.   I believe it was a three-day class.

12   Q.   All right.  And was it a class provided

13   internally within EPA, or did you -- were you

14   trained outside?

15   A.   It's a -- you know, EPA has a training

16   contractor.  In fact, when I took it, there was a

17   training contractor, and so we had to go and take

18   the class outside the EPA offices to -- at this

19   place.

20   Q.   As part of that training, did you receive

21   guidance on the importance of documenting things

22   you've seen and important findings during the

23   course of an inspection?

24   A.   Yes.

25   Q.   And were you also trained to take notes as you

1714

1    were going through facilities?  Perhaps draw

2    diagrams or other things that would help you

3    capture the information you're observing, is that

4    correct?

5    A.   That's correct.

6    Q.   And you did that during your April -- during

7    your participation in the April 2009 inspection at

8    Tonawanda, didn't you?

9    A.   Take notes, sir?

10   Q.   Yes.

11   A.   Yes.

12   Q.   All right.  Now -- so I can get the dynamics

13   correctly, your role as a representative of Region

14   2 in the April 2009 inspection, was that in support

15   of NEIC's inspection, or who was in charge of that

16   inspection team?

17   A.   It was led by the NEIC, and we were supporting

18   them.

19   Q.   All right.  Now, when was the last time you

20   reviewed the notes that you took during the

21   April 2009 inspection at Tonawanda Coke?

22   A.   About a week ago, sir.

23   Q.   And would you agree with me that during the

24   course of the four days that you were there for the

25   inspection, you took about 14 pages of notes?

1    A.   That's correct, sir.

2    Q.   And those notes included data that you had

3    received about certain of the components that you

4    were inspecting, is that correct?

5    A.   That's correct.

6    Q.   Diagrams of some of the vessels and components

7    that you were inspecting, correct?

8    A.   I had drawn diagrams in my notebook, yes.

9    Q.   Yes.  And you broke your notes out by days in

10   the course of your note-taking so that each day

11   begins with a date and then the information

12   recorded on the date you received it, correct?

13   A.   That's correct.

14   Q.   Now, during the time, during the four days you

15   spent at Tonawanda in April of 2009, how many of

16   those four days did you spend time in the

17   by-products department?

18   A.   About a day and a half.

19   Q.   About a day and a half?

20   A.   Yes, sir.

21   Q.   So there would be two and a half days you

22   weren't in by-products at all.  Is that -- do I

23   understand you correctly?

24   A.   That's correct.

25   Q.   So you visited other parts of the plant during

1    that time?

2    A.   Yes.   For a lot -- for almost a day and a half

3    we were in the conference room, you know, trying to

4    get an understanding of how the facility operates

5    and trying to get an understanding of all the

6    process units at the facility.   We also spent some

7    time around the coke oven battery.

8    Q.   Now, you testified on direct that before, as

9    part of your planning to prepare for this

10   inspection, that you reviewed the inspection

11   background of this facility, correct?

12   A.   Yes.   What we have in the EPA database.

13   Q.   Did you review any of the DEC files regarding

14   its history of inspection and interaction with this

15   facility?

16   A.   No, sir.   I just reviewed the Title V permit.

17   Q.   You reviewed the Title V permit which had been

18   issued to the facility in 2002, correct?

19   A.   That is correct.

20   Q.   But you didn't review any of the DEC's

21   inspection records at the facility?

22   A.   I don't remember that, sir.

23   Q.   Do you remember that there were DEC air

24   inspection records for this facility that date back

25   to 1978?   Does that refresh your recollection?

1717

1    A.   No, sir.

2    Q.   Were you aware that this facility had been

3    inspected at least on an annual basis by DEC air

4    inspectors from '78 forward?  Were you aware of

5    that?

6    A.   Yes, sir.

7    Q.   All right.

8    A.   That information is in the EPA database.

9    Q.   But were the results of any of those

10   inspections in the EPA database?

11   A.   There is very minimal information in the

12   database.

13   Q.   Let me repeat my question, please.

14       Were the results of any of those DEC air

15   inspections of the Tonawanda Coke facility in the

16   EPA database that you reviewed?

17   A.   Yes, there is.

18   Q.   All right.  What results of those DEC air

19   inspections are in the EPA database?

20   A.   Basically just says in compliance or in

21   violation.

22   Q.   So a conclusion, is that correct?

23   A.   That's correct.

24   Q.   And do you recall that virtually all of the

25   those DEC air inspections for the Tonawanda Coke

1    facility found the facility was in full compliance

2    with its -- with the air regulations for the state

3    of New York?

4              MR. MANGO:  Objection, your Honor.

5    Assuming facts not in evidence.

6              THE COURT:  If he knows, I'll permit it.

7         Do you know?

8              THE WITNESS:  No, sir.

9    BY MR. LINSIN:

10   Q.  Do you recall that?

11   A.  No, sir.

12   Q.  If you had seen -- in your review of the EPA

13   database, if you had seen significant findings of

14   noncompliance, would that have stood out to you?

15             MR. MANGO:  Objection, your Honor.  Calls

16   for speculation, "if you had seen."

17             THE COURT:  This goes back to an earlier

18   discussion that we have had on this issue.  This is

19   based on the factual processes of this witness.

20   I'm going to permit it over objection.

21        You may answer.

22             THE WITNESS:  Can you repeat the question,

23   sir?

24   BY MR. LINSIN:

25   Q.  Of course.  I will try.

1       In your review of the EPA database, if you had

2   seen significant findings of noncompliance in the

3   prior DEC air inspections for this facility, would

4   that have stood out to you?

5   A.  Yes, sir.

6   Q.  Would it have prompted you to inquire further

7   about what these noncompliance events were?

8   A.  Yes.

9   Q.  But your testimony is that you did not go to

10  the DEC files and review those inspection records

11  before you went to the facility in April 2009,

12  correct?

13  A.  That's correct, sir.

14  Q.  Now, I know you said it's been about a week

15  since you've reviewed your notes from this

16  inspection.  If you would like to see them to

17  review yourself to respond to my next question, I'd

18  be happy to ask that they be called up.

19       But, is it accurate, Mr. Patel, that no where

20  in your notes of the four days that you spent in

21  this facility, the 14 pages of notes that you took,

22  no where is there any mention of this pressure

23  relief valve in the by-products area?  Is that

24  correct?

25  A.  Yes.

1    Q.   Is it also accurate that no where in your

2    notes, these 14 pages of notes, is there any

3    mention of quench towers or the absence of baffles

4    in the quench towers?  Is that accurate?

5    A.   That's correct.

6    Q.   But the fact is, while you were there -- excuse

7    me.  Withdraw that question.

8         You testified on direct examination that you

9    learned later, after you left the Tonawanda Coke

10   facility, that some of your colleagues had had a

11   conversation with Mr. Kamholz and others at the

12   facility about the PRV the second week when you

13   were not there, correct?

14   A.   That's correct.

15   Q.   But isn't it true, Mr. Patel, that you had a

16   conversation with Mr. Kamholz about the PRV the

17   Friday, the last day you were there at that

18   facility?  Isn't that true?

19   A.   I don't remember.

20   Q.   All right.  Last month, February 13th of 2013,

21   you were interviewed by Mr. Piaggione, Mr. Mango,

22   Special Agent Conway, a Mr. Briel, another attorney

23   whose last name is Quinton, and you discussed your

24   recollections about this inspection and about the

25   Tonawanda Coke facility, correct?

1    A.   That's correct.

2    Q.   How long did that interview last?

3    A.   I believe it was an hour.  Maybe less than

4    that.

5    Q.   And if I understand correctly, your present

6    testimony is that you don't recall telling those

7    attorneys and those special agents that you had a

8    conversation with Mark Kamholz that you observed

9    the pressure relief valve release on Friday while

10   you were there, which would be the 17th, I believe.

11   You don't recall telling the agents that, is that

12   correct?

13   A.   I recall observing the pressure relief valve

14   during our walk-through through the plant.  I don't

15   recall who we talked to on that day about the

16   pressure release valve.

17   Q.   All right.  Let's go there first then.

18        What day do you recall observing a release of

19   the pressure relief valve during the inspection?

20   A.   On Friday.

21   Q.   All right.  And who was with you when you saw

22   this?

23   A.   Inspectors from the New York regional office,

24   the Denver inspectors, the folks from the DEC

25   office, and representatives from the company

1   were -- the entire group was at -- was around that

2   same area.

3   Q.   Can you give us those names, please?   Who was

4   there?

5   A.   Of who, sir?

6   Q.   Yes, can you give us the names?

7   A.   Of the inspectors?

8   Q.   All the people you just referenced.

9   A.   From the New York Region 2 office was myself,

10  Mozey Ghaffari, and Richard Khan.   From the Denver

11  office we had Martha Hamre and Ken Garing.   From

12  the New York City State DEC office we had Cheryl

13  Webster and Larry Sitzman.   And from the plant, I

14  believe -- I know Mark Kamholz was there.   There

15  were a couple other folks that I just don't

16  remember who they were.

17  Q.   So this whole group was in the by-products area

18  on Friday, April 17th, 2009, correct?

19  A.   That's correct, sir.

20  Q.   Do you remember what time of day this was?

21  A.   It was about mid morning.

22  Q.   And is it your testimony that you recall this

23  pressure relief valve releasing at that time?

24  A.   Yes.

25  Q.   All right.   And what happened then?

1    A.   I remember I took at least one photograph of

2    that.   I remember that somebody opened the shed to

3    show us a strip chart, a circular strip chart that

4    was used to monitor the pressure for that pressure

5    relief valve.   And I remember that there was some

6    discussion going on about it.   But I -- I'm not

7    sure who asked what.

8    Q.   All right.   Could we, please, have for

9    identification Government's Exhibit 3554.34.

10           MR. MANGO:   Your Honor, one, this is the

11   notes of the special agent.   This is not the notes

12   of the witness.   And two, I haven't heard the

13   witness say there's any type of lack of memory

14   regarding anything right now.   In fact, he just

15   gave his memory.   I don't know if this is

16   appropriate to pull up on the screen at this point.

17           THE COURT:   Well, he did testify about not

18   recalling whether or not there was certain entries

19   in his notes, but I don't know where this is going

20   at this point in time.   So, it will not be

21   published, but it can be brought up.

22       So 3554.24?

23           MR. LINSIN:   3554.34.

24           MR. MANGO:   I do note, this is not his

25   notes for the Court.

1       THE COURT:  Okay.  We will identify it, if

2    he can, and we will go from there.

3    BY MR. LINSIN:

4    Q.  Do you see the exhibit sticker at the top

5    right-hand corner of this page Mr. Patel, 3554.34?

6    A.  Yes, I do.

7    Q.  Government's Exhibit, correct?

8    A.  That's correct.

9    Q.  All right.  Now, if we may please enlarge that

10   portion.

11       MR. MANGO:  Your Honor, again, I'm going

12   to object.  There is no identification on what

13   these notes are, who they are.  There's really no

14   purpose to show the witness these notes at this

15   point.

16       THE COURT:  Well --

17       MR. MANGO:  No basis.  I'm sorry.

18       THE COURT:  -- I don't know.  It can be

19   refreshing memory if it's foundationally proper.

20   It can be an impeachment under 613, if these are

21   substantially established as the statement of this

22   particular witness.  I don't know yet.  Okay.

23   Let's find out where we're going.

24   BY MR. LINSIN:

25   Q.  Here's what I'm going to ask you to do, sir.

1    I'm going ask you to review the portion of this

2    document that's been enlarged right now, and then a

3    small portion of the next page.  I'd just like you

4    to read this to yourself and then I'm going to ask

5    you a couple of questions about your recollection

6    of the inspection itself.

7         May I have the next page, please.  And just at

8    that top portion.

9              THE COURT:  Ms. DiFillipo, highlight,

10   please.

11   BY MR. LINSIN:

12   Q.  And just the first line on this page, actually,

13   Mr. Patel.  Did you read the first line here?

14   A.  Yes, sir.

15   Q.  All right.  If we can take this down now,

16   please.

17        Now, reviewing those notes, does that help

18   refresh your memory about who showed you the

19   circular chart in the shack beneath the pressure

20   relief valve on Friday, April 17th, 2009?

21   A.  It was somebody from the facility.  I just

22   don't remember exactly who it was.  I remember

23   seeing the chart.  I'm not sure who opened the door

24   for us.

25              THE COURT:  Okay.  Listen to the question.

1        All right.  You want to reput it.

2               MR. LINSIN:  I'll reput it.

3               THE COURT:  The question calls for a yes

4    or no.  Does it refresh your memory?

5               THE WITNESS:  I'm sorry, sir.

6               THE COURT:  That's okay.  Just listen now.

7    BY MR. LINSIN:

8    Q.  Having read through those notes, does it now

9    refresh your memory, as you sit here right now, do

10   you remember who showed you the circular chart

11   regarding the pressure relief valve on Friday,

12   April 17th, 2009?

13   A.  No.

14   Q.  All right.  Do you remember less than a month

15   ago telling the people I've just named --

16               MR. MANGO:  I'm going to object, your

17   Honor.  If we can approach.

18               THE COURT:  Is this the same --

19               MR. MANGO:  He's going to read --

20               THE COURT:  -- the area?  You are bound by

21   the witness's answer.  If you're going back into

22   that, that would not necessarily be proper.  I

23   don't know what you're going to do here, though.

24               MR. LINSIN:  Your Honor, I'm trying to

25   explore what this witness told the agents three

1   weeks ago about the events that he's now expressed

2   a lack of recollection about.

3          THE COURT:  Okay.  So, we go, Mr. Mango,

4   from his answer that no, his memory is not

5   refreshed by reading that statement, but that's not

6   all-exhaustive, so it depends on the particular

7   question that follows.  So we've limited it to

8   those notes.

9       You may ask the next question.

10          MR. LINSIN:  Thank you.

11      Mr. Patel, my question now is, do you remember

12   telling the attorneys for the government and the

13   special agents that I just named less than three

14   weeks ago that it was Mark Kamholz that showed you

15   this circular chart regarding the PRV at Tonawanda

16   Coke on April the 17th, 2009?  Do you remember

17   that?  Do you remember telling the agents that?

18          THE WITNESS:  I don't remember that, sir.

19          THE COURT:  Okay.  And remember, ladies

20   and gentlemen, the question of the attorneys,

21   that's not evidence, okay?  It's the answer of the

22   witness that you are to consider.  You may consider

23   this exchange with respect to the witness's ability

24   to recall the events that took place several years

25   ago.  So, this is a credibility determination that

1   you can make from this exchange, but not evidence

2   contained in the question itself.

3   BY MR. LINSIN:

4   Q.  Now, you testified that there was no mention of

5   the pressure relief valve in the notes you

6   maintained regarding your inspection at this

7   facility, correct?

8   A.  That's correct.

9   Q.  And you also testified on direct that after you

10  got back to New York you consulted with the other

11  colleagues of yours that had completed the

12  inspection at the facility, correct?

13  A.  That's correct.

14  Q.  And did you learn from them what had occurred

15  on the last two days of the inspection after you

16  had departed?

17  A.  Yes.

18          THE COURT:  Let me ask you to keep your

19  voice up, please, Mr. Patel.

20  BY MR. LINSIN:

21  Q.  Did you learn that there had been a discussion

22  regarding this pressure relief valve at the

23  closeout meeting of that inspection on Tuesday,

24  April the 21st, 2009?

25  A.  Yes, I did.

1   Q.  And were you told, Mr. Patel, that at that

2   closeout meeting, the company and Mr. Kamholz had

3   been requested to raise the set points on the

4   pressure relief valve, did you learn that?

5   A.  I don't remember that, sir.

6   Q.  Did you make any notes regarding your

7   conversations with these colleagues that had

8   completed the inspection?

9   A.  I don't believe so.

10  Q.  Do you recall hearing from any of them that

11  they had asked the facility to raise the set point

12  on this pressure relief valve so that it would not

13  release as often?

14          MR. MANGO:  Objection, your Honor.  Asked

15  and answered.

16          THE COURT:  Grounds?

17          MR. MANGO:  He just asked that question.

18  He said he did not know.

19          THE COURT:  Yeah, I think he did.

20  Sustained.

21  BY MR. LINSIN:

22  Q.  Now, you testified on direct about a couple of

23  requests for information that had been sent out and

24  that you had a hand in drafting, correct?

25  A.  That's correct, sir.

1730

1    Q.   And I believe you said that you have decided

2    to -- you and your colleagues decided to send out

3    these 114 letters, if you will, because you hadn't

4    gotten all of the records that you needed during

5    the course of the inspection.  Did I hear you

6    correctly?

7    A.   That's correct.

8    Q.   Now, at any time you were at the Tonawanda Coke

9    facility during the inspection did you ever make a

10   request for documents that was not fulfilled by the

11   company?

12             MR. MANGO:  Objection, your Honor.

13   Relevance.

14             THE COURT:  Overruled.

15             THE WITNESS:  I just don't remember if

16   there were any specific incidents when documents

17   were not provided.

18   BY MR. LINSIN:

19   Q.   Do you remember anybody saying no when you

20   asked for certain records?

21   A.   Yes, I do recall that.

22   Q.   And what was that in relation to?

23   A.   There was engineering drawings that we had

24   requested copies of and we were told they were not

25   available.  You know, these were required by the

1    regulation.  And we asked for some operating data

2    information.  We were told it's not available.

3        So there were instances when we asked for

4    information and we were told it's not available or

5    can't be found.

6    Q.  All right.  Maybe I misunderstood.

7        So you received some responses when you asked

8    for certain data or information and you were told

9    it wasn't available, correct?

10   A.  That's correct.

11   Q.  He -- or they couldn't locate it, correct?

12   A.  That's correct.

13   Q.  Do you ever remember a time when the company

14   said to you no, we have these records that you're

15   requesting, but we're not going to give them to

16   you?

17   A.  I don't remember that.

18   Q.  Now, you testified about these NOVs that EPA

19   issued in 2009 and I want to ask you about the NOV

20   that EPA issued in December of 2009 regarding

21   baffles.

22       Do you recall the date of that NOV?

23   A.  I don't remember the exact.  I know it was

24   early December 2009.

25   Q.  And do you recall there being some discussion

1    within Region 2 about what was going to be in that

2    notice of violation regarding the baffles?

3    A.   You are talking about internal discussion?

4    Q.   Yes.

5    A.   Yes.   Usually the inspector would discuss his

6    findings with the manager and with counsel, and

7    together would decide whether we want to issue the

8    NOV or not.

9    Q.   All right.   May I, please, have Defendant's

10   Exhibit OOO.08 for identification.

11      Ask you to take a look at this document,

12   Mr. Patel, and state, first of all, just from the

13   first page, whether this is a document you can

14   identify.

15   A.   Yes, I can.

16   Q.   And is this the NOV you were just -- I'm

17   sorry -- the notice of violation you were just

18   testifying about?

19   A.   Yes, sir.

20   Q.   Dated December 7th, 2009?

21   A.   That's correct, sir.

22           MR. LINSIN:   And -- well, your Honor, at

23   this point I would move Defendant's Exhibit OOO.08

24   into evidence.

25           MR. MANGO:   No objection, your Honor.

1        MR. PERSONIUS:  No objection, your Honor.

2        THE COURT:  Okay.  OOO.08 received.  No

3    objection.

4        (Defendants' Exhibit OOO.08 was received

5        into evidence.)

6        THE COURT:  And it may be published.

7    BY MR. LINSIN:

8    Q.  Now, just for everyone's ease, can we just

9    enlarge the text of the letter itself?  Can you

10   identify, first of all, who is Dore LaPosta?  Is

11   that how you pronounce it?

12   A.  Dore LaPosta.

13   Q.  Dore LaPosta, who is she?

14   A.  She is the division directer for the division

15   that I work for, the Division of Enforcement and

16   Compliance Assistance.

17   Q.  And she was the one you testified that has been

18   delegated the authority to issue these kinds of

19   notices, is that correct?

20   A.  That's correct.

21   Q.  And also the request for information, is that

22   correct?

23   A.  That's correct.

24   Q.  All right.  And based on the text in these two

25   paragraphs in the cover letter, do you know what

1     this notice of violation relates to?

2     A.   Yes.   This notice of violation relates to EPA's

3     findings of noncompliance at -- of the New York

4     State regulations.

5     Q.   Okay.   And is it correct that -- and we'll look

6     at the text of this in a moment.   But is it correct

7     that one of those violations that is contained in

8     this notification related to the baffles in the

9     quench towers at this facility?

10    A.   That's correct.

11    Q.   Now, were you involved in preparing this notice

12    of violation?

13    A.   Yes, I was working with my counsel on that.

14    Q.   All right.   And in the course of your preparing

15    this notice of violation, did you become aware that

16    New York State Department of Environmental

17    Conservation had issued -- agreed to -- I'm sorry,

18    agreed to an exemption for baffles in quench tower

19    number 1 at the Tonawanda Coke facility?   Were you

20    aware of that at the time this NOV was issued?

21    A.   I just don't remember that, sir.

22    Q.   Let's pull this down, please.   We'll come back

23    to it.   May I please have Government's

24    Exhibit 19.17, which is in evidence, I believe,

25    your Honor.   And if we could enlarge the text

1    again, please.

2        Take a moment, please, Mr. Patel, to review

3    this letter.

4    A.  Okay.

5    Q.  Have you ever seen this letter before?

6    A.  I don't remember.  I may have.  I don't

7    remember seeing this letter, sir.

8    Q.  Would you agree with me that this letter is

9    from the New York State Department of Environmental

10   Conservation signed by the principle air pollution

11   control engineer for Region 9 and is addressed to

12   Mr. Kamholz at Tonawanda Coke Corporation?  And it

13   informs him that there is an agreement for the

14   company's request for an exemption for the baffle

15   requirement in quench tower number 1.  Is that

16   what's communicated by this letter?

17   A.  Yes.

18   Q.  So whether you've seen this letter or not, were

19   you aware at the time you issued the NOV -- or I'm

20   sorry, Ms. LaPosta issued the notice of violation

21   in December of 2009, were you aware that New York

22   State Department of Environmental Conservation had

23   granted this facility an exemption --

24              MR. MANGO:  Objection, your Honor.

25              MR. LINSIN:  -- for baffles in quench

1    tower number 1?

2              MR. MANGO:  This is --

3              THE COURT:  There is an objection.  Yes?

4              MR. MANGO:  This is the same exact

5    question we asked a couple questions before putting

6    this on the screen.

7              THE COURT:  I'm going to permit it.

8    Overruled.

9         You may answer.

10   BY MR. LINSIN:

11   Q.  Would you like me to repeat it?

12   A.  Yes, please.

13   Q.  Sure.  You testified a moment ago you hadn't

14   seen this letter.  But my question now is, when you

15   issued -- when this notice of violation was issued

16   on December 9th of 2009 regarding the baffles in

17   the quench tower at Tonawanda Coke facility, were

18   you aware that DEC had previously granted the

19   company an exemption for baffles in quench tower

20   number 1?

21   A.  I was not aware of it.

22   Q.  Do you agree with me that you should have been

23   aware of it?

24             MR. MANGO:  Objection, your Honor.

25             THE COURT:  Overruled.

1           THE WITNESS:  If I had reviewed the files

2    at DEC, I may have come across this letter and then

3    I would have been aware.

4           MR. LINSIN:  Well, Mr. Patel -- can we

5    take this down?  I'm sorry, please.

6        Would you agree with me that before a federal

7    agency comes in and issues notices of violation to

8    a facility that it has not inspected for quite a

9    number of years that it has a responsibility to

10   understand what the prior regulatory history had

11   been by the delegated state agency?

12          MR. MANGO:  Objection, your Honor, to any

13   relevance to the charges in the indictment here,

14   which are criminal in nature.

15          THE COURT:  Overruled.

16      You may answer.

17          THE WITNESS:  You have to repeat your

18   question, sir.

19   BY MR. LINSIN:

20   Q.  I'll try it again.

21      Would you agree with me, Mr. Patel, that before

22   a federal agency, EPA, comes in and issues a notice

23   of violation to an industrial facility, they should

24   have an understanding of what that prior regulatory

25   history had been with the state?

1    A.   Yes.

2    Q.   Now, let's go back, please, to -- if I may, to

3    Defendant's Exhibit OOO.08.  All right.  Now, can

4    we have the next page, please?

5            THE COURT:  Give me the exhibit number

6    again.

7            MR. LINSIN:  I'm sorry, OOO.08.

8            THE COURT:  Thank you.

9    BY MR. LINSIN:

10   Q.   Now, this is a -- the second page of the cover

11   letter with several CCs, correct?

12   A.   That's correct.

13   Q.   And all of these individuals are the New York

14   State Department of Environmental Conservation

15   officials, correct?

16   A.   That's correct.

17   Q.   Next page, please.

18       And let's just set this in perspective.  A

19   notice of violation generally has structure to it

20   where the statutory authority is set out and then

21   you, as Mr. Mango said, get to the meat of the

22   notice, is that correct?

23   A.   That's correct.

24   Q.   Okay.  Let's go forward, then, to the next

25   page.

1    Everything on this page is headed statutory and

2    regulatory background, correct?

3    A.  Yes.

4    Q.  Next page, please.

5    Now, beginning with the lower portion of this

6    page -- can we enlarge that?  These are factual

7    findings that are summarized based upon your

8    inspection at the facility in April of 2009,

9    correct?

10   A.  Yes.

11   Q.  All right.  Next page, please.  Next page,

12   please.

13       MR. PERSONIUS:  Your Honor, could we get

14   this page number maybe noted for the record?

15       MR. LINSIN:  I apologize.  Thank you, Rod.

16   We are on page number 5999 of the Bates number at

17   the bottom right-hand corner -- I'm sorry.  The

18   page number of the exhibit is 0007, I believe.

19       THE COURT:  Let's try this again.  Because

20   there is --

21       MR. LINSIN:  Can we get this enlarged?

22   Yes.  So the page number here is DOOO-08.000007.

23       THE COURT:  You said our Bates number?

24   There is another number on there too.

25       MR. LINSIN:  This is the exhibit number,

1    your Honor.  I apologize.  The exhibit number is

2    here.  But I was trying to reference the exhibit --

3    this is the Bates number, but the exhibit number is

4    tied to the exhibit I had called up.  So I was

5    trying to give us a record that would be tied to

6    the exhibit we were working in.

7                  THE COURT:  This exhibit number is 000.08.

8    And this is another --

9                  MR. LINSIN:  This is a page in this

10   document, in this exhibit.

11                 THE COURT:  All right.  And then it has an

12   actual page number and it has a Bates number too?

13                 MR. LINSIN:  Yes, it does, your Honor.

14                 THE COURT:  Okay.  Who designed that

15   system, Mr. Linsin?

16                 MR. PERSONIUS:  Your Honor, I'm sorry for

17   my question.

18                 THE COURT:  Okay.  All right.  No, but we

19   need to clarify it for the record.  That's the

20   point.

21                 MR. LINSIN:  I should have done that, your

22   Honor.  I apologize.

23                 THE COURT:  Okay.  Please.

24   BY MR. LINSIN:

25   Q.   Now, do you see on this page, Mr. Patel, the

1    findings that relate to the baffles?

2    A.   Yes.

3    Q.   All right.  And if we can enlarge that portion

4    of the page, please.

5         And can you read item 17, please?

6    A.   "During the EPA inspection and in Tonawanda

7    Coke's response to Question 8A of the 114 letter,

8    Tonawanda Coke indicated that the quench towers at

9    the facility are not equipped with any baffles."

10   Q.   All right.  And so that was a finding upon

11   which this notice of violation was based, is that

12   correct?

13   A.   That's correct.

14   Q.   And just for -- to be clear, the reference here

15   is to quench towers, plural, correct?

16   A.   That's correct.

17   Q.   All right.  And if we can go back to the full

18   page, please.

19        Is it accurate that the substance of this

20   notice of violation required Tonawanda Coke to

21   install baffles in both of the quench towers at the

22   facility?

23   A.   That's correct.

24   Q.   All right.  Now, we can bring this down,

25   please.

1        Who is Ken Eng, E-N-G?

2    A.   Ken Eng is my manager.  He's the branch chief

3    for the air compliance branch.

4    Q.   The air compliance branch in Region 2?

5    A.   That's correct.

6    Q.   And was he involved with you in the development

7    of this NOV regarding the baffles?

8    A.   Yes.  He was informed that we were going to

9    issue this NOV or drafting this NOV to be issued.

10   Q.   Now, I want to direct your attention -- you

11   recall that NOV is issued on December 7th, 2009,

12   correct?

13   A.   Yes.

14   Q.   Do you recall having conversations with Mr. Eng

15   later that same month, possibly December 30th,

16   2009, regarding this NOV?

17   A.   I don't recall the exact conversation.

18   Q.   My question, first of all, was, do you recall

19   having any conversation with Mr. Eng late

20   December 2009 regarding this NOV?

21   A.   I don't remember.

22   Q.   Do you recall talking with Mr. Eng in late

23   December 2009 about the realization that New York

24   State Department of Environmental Conservation had

25   issued an exemption for baffles in quench tower

1    number 1?

2    A.   I don't remember that, sir.

3    Q.   May I please have Defendant's Exhibit N marked

4    for identification?  And if we may go to the second

5    page of this exhibit.

6        I'm going to ask you to read -- do you

7    recognize this as an email from the EPA's system?

8    A.   Yes, I do.

9    Q.   All right.  To yourself, if you would just read

10   the top portion of this page, and then I will ask

11   you a separate question about it.

12   A.   Okay.

13   Q.   Okay.  If we can pull this down, please.

14       Now, the question I want to ask you is whether

15   you remember learning in December of 2009 that

16   Tonawanda Coke had requested in its application for

17   Title V permit, requested an exemption for baffles

18   in quench tower number 1, but that somehow that

19   exemption had just been missed and had not been

20   placed in the facility's Title V permit?  Do you

21   recall learning that?

22   A.   Based on the email?

23   Q.   Do you have an independent memory of that now?

24   A.   No, sir.

25   Q.   Do you have a memory now of talking to Mr. Eng

1    about that exemption for baffles in quench tower

2    number 1 in December of 2009?

3            MR. MANGO:  Your Honor, objection.  This

4    has gone on a little bit.  The government intends

5    to show that the defendants used the west quench

6    tower more than 10 percent of the time.  What a

7    civil EPA administrator thinks is appropriate in

8    his civil case is a matter -- is something that the

9    defendants can oppose in civil litigation.

10           MR. LINSIN:  Your Honor --

11           MR. MANGO:  It has no bearing on the

12   bringing of this criminal case is irrelevant.

13           THE COURT:  Mr. Linsin?

14           MR. LINSIN:  Well, I don't intend to make

15   a speaking objection like that, your Honor.  I'm

16   simply asking if this witness was aware that --

17   whether he had had a conversation with Mr. Eng

18   about the absence of this exemption in the Title V

19   permit.  The government introduced this NOV.  We

20   have asked questions about the NOV.  And I'm trying

21   to explore what this witness knew about the

22   confusion regarding this Title V permit.  If his

23   answer's no, I'm going to move on, your Honor.

24           MR. MANGO:  Again, the government's

25   concern is the relevancy to the criminal

1    indictment.  This is getting far afield from

2    relevant to the criminal indictment.  We're talking

3    about civil NOVs.  That's the point, your Honor.

4              THE COURT:  But knowledge is an element,

5    is it not?

6              MR. MANGO:  What happens after the time --

7    the relevant time period in the indictment has no

8    bearing on knowledge.  Knowledge is before the

9    period.  Count 1 of the indictment goes back

10   to 2005.

11             THE COURT:  All right.  I'm going to allow

12   the question.

13       You may answer the question, and then

14   Mr. Linsin is going to go forward.

15       Do you have a recollection?

16   BY MR. LINSIN:

17   Q.  You're going to ask me to repeat it, aren't

18   you?

19   A.  No.  I don't recall any discussion with

20   Mr. Eng.

21   Q.  Now, you filed two -- I'm sorry.

22       In June of 2009 you filed a report and sent it

23   to Mr. Eng about your findings based on your

24   inspection at the Tonawanda Coke facility in April

25   of that year, correct?

1    A.   That's correct.

2    Q.   Does it fit with your recollection that this --

3    your report is about six and a half pages,

4    single-spaced typed?

5    A.   That's correct.

6    Q.   And it attached a number of photographs, is

7    that correct?

8    A.   Yes, sir.

9    Q.   And that first version of the report, as you

10   just said, was issued in June of 2009, correct?

11   A.   Yes.

12   Q.   And you signed it, right?

13   A.   Yes, sir.

14   Q.   And isn't it accurate, Mr. Patel, that in that

15   report of your findings you make no mention

16   whatsoever of this pressure relief valve?  Is that

17   correct?

18   A.   That's correct.

19   Q.   And no mention whatsoever of the absence of

20   baffles in either of the quench towers at the

21   facility.  Is that also correct?

22   A.   Yes, sir.

23   Q.   That report that we just -- you just testified

24   about was reissued back later that year in December

25   of 2009, wasn't it?

1747

1    A.   That's correct.

2    Q.   And at that time -- on December 7, 2009,

3    correct?

4    A.   Yes.

5    Q.   The very same date that the NOV was issued

6    regarding the baffles, correct?

7    A.   That's correct.

8    Q.   And at that point, you signed that reissuance

9    of this report, December 7th, and your superior Ken

10   Eng signed it December 7th, 2009, correct?

11   A.   Yes.

12   Q.   And no mention of the pressure relief valve in

13   this six-page report, correct?

14   A.   Yes.

15   Q.   And no mention of baffles in this report?

16   A.   Yes.

17            THE COURT:   Let me ask you, was the report

18   of June 9th that was reissued in December of '09,

19   were there differences in that report?

20            THE WITNESS:   Yes, your Honor.

21            THE COURT:   Okay.

22   BY MR. LINSIN:

23   Q.   So it had been revised to some extent, correct?

24   A.   Basically we had redacted any process type of

25   data from the facility, you know, in terms of

1748

1    production data or gas production information.

2    Q.  But the core findings remain the same, correct?

3    A.  That's correct.

4    Q.  And you reported -- in both versions of this

5    report, you reported that Tonawanda Coke was

6    recycling the coal tar sludge that was generated on

7    site, didn't you?

8    A.  Yes.

9    Q.  And you reported they were recycling it by

10   mixing it back into the coal, correct?

11   A.  That's correct.

12          MR. LINSIN:  Your Honor, if I may, I

13   believe I'm almost done.  It might make things a

14   little bit easier if we could break and I could

15   collect things.  It would be very brief upon

16   return.

17          THE COURT:  Okay.

18          MR. LINSIN:  Thank you.

19          THE COURT:  Excuse me.  Jury able to

20   handle a lunch break at this point?  Okay.  Keep

21   your minds open.  Please don't discuss the case.

22   One of the few places in the country to have a

23   gorgeous day today.  Go out there and enjoy it.

24   We'll see you back here -- be here at 2:00 o'clock.

25   We'll start between 2:00 and 2:15, just to make

1    sure.

2        All right.  Thank you very much.

3            (Jury excused from the courtroom.)

4            THE COURT:  You may step down.  Okay.

5    We'll see you back here 2:00ish.

6            MR. LINSIN:  Thank you, your Honor.

7            MR. MANGO:  Yes, your Honor.

8            MR. PERSONIUS:  Thank you, Judge.

9            (Lunch recess was taken.)

10           (Jury not present in the courtroom.)

11           THE COURT:  Mr. Patel, if you would,

12   please.

13       Is there a preliminarily issue?  Hold on one

14   second.

15           MR. LINSIN:  Just very briefly, your

16   Honor.  If the Court would recall with an earlier

17   witness we had introduced an exhibit,

18   Defendant's 000 -- I'm sorry, OOO.07.  And it was

19   the DEC notice of violation regarding baffles.  We

20   have now introduced and published OOO.08.

21       And if the Court may remember, those two

22   documents, by whim of the parties was redacted and

23   certain language regarding enforcement options was

24   redacted from both those documents.

25       My one request, your Honor, I intend very

1    briefly to make reference to that earlier Exhibit

2    OOO.07.  Both of those documents, which are now in

3    evidence, have the word "redacted" in them where

4    the -- that material was removed.  I request that

5    the Court just advise the jury that that should not

6    concern them in any way, that it just reflects the

7    removal of irrelevant Information.

8              THE COURT:  Okay.  Yeah, I see it here.

9         All right.  No objection to that, Mr. Mango?

10             MR. MANGO:  No, your Honor.

11             THE COURT:  Okay.

12             MR. LINSIN:  Thank you, your Honor.

13             THE COURT:  All right.  Sure, Mr. Linsin.

14        Mr. Personius, that works from your standpoint?

15             MR. PERSONIUS:  Thank you, Judge.

16             THE COURT:  Okay.  Okay.  Chris, if you

17   would please.

18                  (Jury seated.)

19             THE COURT:  Were you taking complaints

20   from the jurors, Chris, about the weather?

21             COURT SECURITY OFFICER:  Certainly no

22   complaints.

23             THE COURT:  All right.  Welcome back.

24   Please have a seat.

25        Okay.  Another good Friday afternoon.  We're

1    ready for business.  We're going to move forward.

2    The jury is here.  Roll call waived.  All of those

3    attorneys that you love to see day in and day out,

4    they're here.  The parties are here.  Roll call

5    waived.  And Mr. Harish Patel is back on the stand.

6    He remains under oath.

7        We're at the point of concluding

8    cross-examination by Mr. Linsin.  Mr. Linsin is

9    going to be referring, I think, at various points

10   to two documents that you will get to see that have

11   been received into evidence.  And they're marked as

12   Defendants' Exhibits 000.07 and 000.08.  In certain

13   parts of the exhibits respectively, there's a

14   reference to something being redacted.  What that

15   really means, for your information, is that there

16   was information there which I directed or -- which

17   was directed to be taken out.  It's not relevant or

18   material to what you have to decide.  So, the

19   exhibit, as you will see it, is the relevant

20   exhibit for your consideration.

21       Okay.  All right.  Mr. Linsin.

22           MR. LINSIN:  Thank you, your Honor.

23       May I proceed, Judge?

24           THE COURT:  Certainly.

25   BY MR. LINSIN:

1  Q.  Good afternoon, Mr. Patel.

2  A.  Good afternoon.

3  Q.  Ms. Henderson, may I please have Defendant's

4  Exhibit OOO.08, which has been admitted into

5  evidence?

6      Now, Mr. Patel, you remember this exhibit you

7  testified about earlier today, the cover letter for

8  EPA's NOV concerning the baffles, correct?

9  A.  Yes.

10  Q.  And if we could go to the second page of this

11  cover letter, please, Ms. Henderson.  And for the

12  record, it is OOO.08, page 2.

13      Now, what is the -- who is the first name

14  listed in this list of carbon copies at the top of

15  this page?

16  A.  Mr. Larry Sitzman.

17  Q.  And was he one of the people present in the

18  April 2009 inspection?

19  A.  Yes, he was.

20  Q.  Was he one of the people with whom you had

21  communicated regarding the results of that

22  inspection?

23  A.  We discussed our preliminary findings with him,

24  yes.

25  Q.  Okay.  All right.  If we could take this down,

1    please.  And if we could now call up OOO.07,

2    Defendant's OOO.07 in evidence.

3         And ask, Mr. Patel, if, first of all, you

4    recognize this document?  Do you know what this is?

5    A.  Yes.

6    Q.  All right.  Do you recognize it as a notice of

7    violation sent to Tonawanda Coke Corporation by

8    Mr. Sitzman on April 28th of 2009?  I'm sorry,

9    October 28th of 2009.

10   A.  Yes.

11   Q.  All right.  And if you would go to the second

12   page of this document, please, and enlarge that

13   portion, please.

14        Ask you to read what is contained in the

15   "comments" section of this notice of violation.

16   A.  Based on the results of a --

17   Q.  I'm sorry.  You don't need to read it out load.

18   Read it to yourself.  Just refresh your memory

19   about this, please.

20   A.  I'm sorry.

21        Okay.

22   Q.  All right.  Have you had a chance to read it?

23   A.  Yes.

24   Q.  All right.  Now, this notice of violation from

25   DEC was issued about five or six weeks before EPA's

1    notice of violation regarding the baffles, correct?

2    A.   That's correct.

3    Q.   And this notice of violation by DEC relates to

4    baffles in quench tower number 2, doesn't it?

5    A.   Yes, it does.

6    Q.   And do you know which of the two quench towers

7    number 2 is at the facility?

8    A.   Number 2 is the east quench tower.

9    Q.   All right.  The east quench tower, the lower

10   quench tower, correct?

11   A.   That's correct.

12   Q.   And my question -- this requires -- references

13   the absence of baffles in that quench tower, right?

14   A.   That's correct.

15   Q.   And says nothing about baffles in quench tower

16   number 1, correct?

17   A.   That's correct.

18   Q.   This notice of violation.  Sorry.

19   A.   That's correct.

20   Q.   Okay.  Now, if we can take this down, please.

21        My question, Mr. Patel, is, were you aware in

22   October or November of 2009 that the New York State

23   Department of Environmental Conservation had issued

24   a notice of violation to Tonawanda Coke regarding

25   the baffles in just quench tower number 2?

1    A.   I don't remember exactly when we got a copy of

2    this NOV.

3    Q.   All right.  Let me try it a different way.

4    When you were making a decision about whether EPA

5    was going to issue its notice of violation

6    concerning baffles, did you talk to Mr. Sitzman or

7    anyone else at DEC?

8    A.   I don't think we did.

9    Q.   So when you issued your notice of violation

10   regarding baffles, you didn't know that five or six

11   weeks earlier the state of New York had issued its

12   own separate notice of violation regarding baffles,

13   is that your testimony?

14             MR. MANGO:  Objection, your Honor.  Asked

15   and answered and irrelevant.  He said he didn't

16   know, and I don't see the relevance in this line of

17   questioning.

18             THE COURT:  Relevance?

19             MR. LINSIN:  Your Honor, the relevance

20   goes, your Honor, to knowledge of conditions

21   regarding these baffles that had been authorized by

22   the state of New York.  My initial question --

23             THE COURT:  Yeah, but you're referring --

24   I'm sorry.  You're referring to a violation notice,

25   but only as to the one quench tower as opposed to

1    the other.

2              MR. LINSIN:  That is exactly correct, yes,

3    sir.

4              MR. MANGO:  Your Honor, the only knowledge

5    element in this case is the knowledge of the

6    defendants in a condition -- in a violation of

7    their condition in the Title V permit.  That's

8    really all that's relevant, is -- when we look at

9    the charges, it's an element of the charge.

10   Knowledge of EPA is irrelevant.

11             MR. LINSIN:  Your Honor, there has been

12   abundant testimony from a number of witnesses about

13   the coordination between federal and state

14   authorities regarding this particular inspection,

15   regarding the overall enforcement effort at this

16   facility.  And this is but one facet of that

17   process of coordination that has been the substance

18   of much of the testimony in this trial.

19             THE COURT:  Okay.  While the scope is as

20   you describe it, the knowledge, though, of, for

21   example, Mr. Patel, how is that actually relevant

22   to the knowledge of either of the defendants in

23   this case?

24             MR. LINSIN:  Your Honor, I have not

25   contended that it was.  That was never my argument.

1    I understand the elements relate to the knowledge

2    of the defendants' charge.  But the process of

3    coordination between two law enforcement agencies,

4    between two regulatory agencies is an important

5    component.  What each of those knew about what the

6    other had done, what things had been authorized and

7    what had not been authorized, that is a very

8    critical element that does relate directly to

9    whether or not violations occurred or not.  And

10   this is part of that general fabric of

11   communication.

12          MR. MANGO:  Your Honor, the government

13   still contends it's irrelevant.  The civil air

14   compliance branch in New York City is not a law

15   enforcement agency, as just mentioned.  The New

16   York State Department of Environmental Conservation

17   is not -- in terms of the air division, is not a

18   law enforcement agency.  This has no bearing on the

19   criminal case.  Again --

20          THE COURT:  Let me talk to the attorneys

21   at the bench, please, for a second.

22          (Side bar discussion held on the record.)

23          THE COURT:  From the defense standpoint,

24   is it still part of the defense that certain

25   ongoing alleged violations were in a sense condoned

1758

1    by one of the two enforcement agencies, DEC and/or

2    EPA?

3              MR. LINSIN:  Yes, it is, your Honor.

4    Either expressly or implicitly that we have

5    certainly made that clear from all of our pretrial

6    submissions --

7              THE COURT:  It was my fault.  I thought

8    Mr. Linsin was finished.

9              MR. LINSIN:  Your Honor, we simply see

10   this as one element of that process of interaction,

11   whether one agency knows what the other agency has

12   authorized.  Regulatory agencies, because these

13   criminal charges flow from regulatory violations.

14   And so understanding what that coordination was,

15   what the understanding was, is relevant to the very

16   defense we have noticed in this case.

17             THE COURT:  All right.  I mean, that's

18   what I was getting at it.  It does appear to me to

19   be relevant.

20             MR. MANGO:  Here's my concern, your Honor.

21   I believe counts -- I believe it's Counts 10

22   through 15, I'd have to check, the counts relating

23   to the eastern quench tower, those stop in 2009.

24   The charging period is up to November.

25             THE COURT:  Of 2009?

1          MR. MANGO:  Of 2009.  All of this -- these

2    NOVs, the DEC one, is before the charging period.

3    But the period after, this EPA NOV, it's after the

4    time period of the indictment of the charges.

5          THE COURT:  Yeah, but what the EPA

6    agent -- that's not the right term.

7          MR. MANGO:  Right.

8          THE COURT:  The EPA person knew with

9    respect to what DEC had authorized or approved

10   prior to the relevant period of the indictment is

11   relevant, isn't it?

12         MR. MANGO:  I don't think so, because

13   that's all in the civil context.  It's civil.  It

14   has no bearing on the criminal.  The criminal

15   elements are that the defendants operate a

16   facility --

17         THE COURT:  Let me interrupt for a second.

18   But, I think, arguably is relevant to what the

19   defendants knew the purposes of the criminal case,

20   when it's linked to what they were led to believe

21   or not in the civil actions that were ongoing

22   between both the DEC and EPA.  So I mean, it does

23   relate to their knowledge, doesn't it?

24      It's not really making a distinction between

25   civil and criminal.  It's what information they had

1       that caused them to do what they did or not do as

2       far as what led to the criminal charge.

3                  MR. MANGO:  That's correct, your Honor.

4       The defense really hinges down to what DEC has

5       authorized, not what EPA has authorized.  In our

6       criminal case, we made it abundantly clear, we're

7       adopting the position of DEC, that there was an

8       exemption for the western quench tower to use it

9       less than 10 percent of the time without baffles.

10                 THE COURT:  Sure.  But you have to prove

11      that the quench tower was used more than 10 percent

12      of the time --

13                 MR. MANGO:  Right.

14                 THE COURT:  -- in order for you to prevail

15      on that argument.  But if you don't, then the

16      arguments of the defense with respect to knowledge

17      and whether they were misled or whether they were

18      acting in good faith is a --

19                 MR. MANGO:  But any correspondence with

20      the EPA comes well after the charges in the

21      indictment.  The indictment --

22                 MR. LINSIN:  If I may make a point on

23      that.  Counsel has indicated that count 10 of the

24      indictment --

25                 MR. MANGO:  I meant Counts 11 through 15.

1     Count 10 relates to the west quench tower which had

2     no baffles up until December 31st.  Count 15 stops

3     on November 15th of '09.  That's well before any

4     EPA NOV was issued, which we've already gone

5     through.

6              THE COURT:  So your argument is that

7     because we're talking a period of time after

8     November of 2009, this is irrelevant because it's

9     after the charging period.

10             MR. MANGO:  Exactly.  November 15 of 2009

11    is the end date for the eastern quench tower

12    charges.  Anything that happens after that date is

13    totally irrelevant.

14             THE COURT:  Yeah, but -- but the

15    indictment happened after that date.

16             MR. MANGO:  Well, your Honor, that's --

17    that -- it doesn't matter when the indictment

18    happens.  I mean, there's issues of presenting a

19    case to a grand jury.  That's what I'm trying to

20    get across in the witness.  If that's allowed to

21    come out, that there's been this delay in

22    indictment, then I've got to be able to get out,

23    which I was objected to and sustained, that

24    there's -- that the civil case has no bearing on

25    the criminal case.  Because then there's going to

1    be an improper inference that we acted criminally,

2    we acted improperly by bringing an indictment when

3    we did.  When the indictment only goes up to

4    November 15th of '09.

5              MR. LINSIN:  Your Honor, can I correct the

6    record so we're clear on this?  The exemption that

7    is in issue here relates to quench tower number 1,

8    the west quench tower.

9              THE COURT:  Right.  Which is the

10   infrequently used quench tower?

11             MR. LINSIN:  Exactly.  Count number 10 of

12   the indictment which addresses that quench tower

13   runs through December 31st, 2009.  That's through

14   the end of December.  Not mid November.  Through

15   the end of December.  All the questions I'm asking

16   this witness relate to communications in December

17   of 2009.  Not after.

18             MR. MANGO:  Your Honor, I'm talking --

19   we're talking about two different quench towers

20   here.  Count 15 relates to --

21             THE COURT:  Quench tower 1.

22             MR. MANGO:  Count 15 relates to quench

23   tower number 2, to the eastern quench tower.  That

24   ends on November 15th of '09.  That's in the

25   indictment.

1            We're getting into the area where we briefed

2     this in pretrial litigation to get this civil

3     litigation out of this case.  And it was agreed to,

4     and we are back here again talking about it.

5     That -- it's going to confuse the issue that

6     somehow we're precluded or acted improperly by

7     bringing an indictment when we're not bound at all

8     by what the civil partners do.

9            THE COURT:  I agree that you were

10    concerned about the mixing of the two, the civil

11    and the criminal litigation.  But, frankly, what

12    took place resulted in both.  Whatever happened in

13    the -- that led to the civil citing the notices,

14    that's the same period that resulted in the period

15    of time that's under indictment, right?  So you

16    can't really --

17            MR. MANGO:  But we can also get into the

18    fact that there was a criminal complaint issued in

19    December 23rd of 2009, which is when Defendant

20    Kamholz was arrested at the facility, which is well

21    before the time of the indictment.  I don't want to

22    bring that up, but if we have to, we're going to

23    have to.  Then it's going to confuse the issue of

24    why we waited until July of '10 to bring an

25    indictment.  It's going to get messy.

1    THE COURT:  Well, I don't think it has to

2  be, I don't think it is, and I don't think the

3  defense necessarily is arguing that the indictment

4  was brought as -- in a manner of the bad faith.

5  You're not saying that.  You are saying that

6  whatever bears on the knowledge of the defendants,

7  all right, with respect to the criminal charges, is

8  what's at issue here.

9    MR. MANGO:  I think in opening there was a

10  reference that -- and then months afterwards, eight

11  months, nine months, whatever it was, the

12  government then felt compelled to bring this

13  indictment.  There was that reference in opening.

14  And that's what -- that's what struck me as

15  concerning, and that's why I keep wanting to raise

16  this with the Court.

17    THE COURT:  But they're saying that the

18  defendants knew such and such by virtue of what DEC

19  led them to believe.  Is that what you're arguing?

20    MR. LINSIN:  Yes, your Honor.  Over many

21  years by action, inaction, you --

22    THE COURT:  Condoning?

23    MR. LINSIN:  Exactly.

24    MR. PERSONIUS:  Judge, if I only add this,

25  you keep referring to knowledge, and it ultimately

1    is knowledge.  But it goes, really, to state of

2    mind, the state of mind of these people who are

3    representing the corporation, and what that state

4    of mind was based upon their interaction with both

5    DEC and EPA.  And to say that what EPA civil is

6    doing doesn't matter, EPA civil is the only people

7    they had contact with.  They didn't have a contact

8    with criminal at that point.

9              MR. MANGO:  No, they did.  There was a

10   criminal search warrant in December of '09.

11             THE COURT:  No.  I think -- I think it's

12   unfair to preclude limited inquiry in this area.

13   I'm going to overrule your objection.  I'll allow

14   you to do it.  In my view, tangentially -- I don't

15   know if that's the right word.  In my view, it's

16   relevant with respect to the -- it can even be a

17   state of mind of both of the defendants with

18   respect to the conduct that they're charged with in

19   the criminal cases.  I don't think you can separate

20   them out to the extent and draw that blanket line,

21   Mr. Mango, that will require that nothing that

22   happened in the civil investigation is relevant to

23   the period of time that relates to the indictment

24   that was returned.  You can't do that.  It's too

25   intertwined, but it's not necessarily something

1    that has to be confusing.  We're talking about an

2    isolated situation of what those notices of

3    violation really consisted of at the administrative

4    level and in late December, I think, of 2009.  So

5    I'm going to allow it.

6              MR. MANGO:  Okay.

7              (End of side bar discussion.)

8              THE COURT:  Okay.  The government's

9    objection is overruled.

10        You may proceed, Mr. Linsin.

11             MR. LINSIN:  Thank you, your Honor.

12   BY MR. LINSIN:

13   Q.  Mr. Patel, we were talking about December

14   of 2009, and I had asked you whether you had had

15   any conversations with Mr. Sitzman before you and

16   EPA issued your NOV in 2009.

17        Concerning the notice of violation that DEC

18   issued, I believe you testified you had not spoken

19   to him, is that correct?

20   A.  That's correct.

21   Q.  Now, my only other question, Mr. Patel, is, had

22   you spoken to anybody in -- anyone in DEC or read

23   anything at all that led you to understand that

24   five weeks before EPA issues its notice of

25   violation regarding both quench towers, baffles in

1    both quench towers, that DEC had issued a notice of

2    violation regarding just the baffles in quench

3    tower number 2?

4    A.  I did not.

5              MR. LINSIN:  All right.  I have nothing

6    further, your Honor.  Thank you.

7              THE COURT:  All right, Mr. Linsin.  Thank

8    you.

9         Mr. Personius.

10             MR. PERSONIUS:  Thank you, Judge.

11   CROSS-EXAMINATION BY MR. PERSONIUS:

12   Q.  Good afternoon, Mr. Patel.

13   A.  Good afternoon.

14   Q.  I took the opportunity during the lunch break

15   to introduce myself.  Again, I'm Rod Personius and

16   I represent Mark Kamholz.

17        Mark, would you stand up, please?

18        Do you recognize Mr. Kamholz from your

19   inspection?

20   A.  Yes, I do.

21   Q.  Okay.

22             MR. PERSONIUS:  Your Honor, if the record

23   may reflect the witness identified Mr. Kamholz.

24             THE COURT:  Okay.  The record will reflect

25   the identification of Defendant Mark Kamholz by

1    Harish Patel, the witness.

2         MR. PERSONIUS:   Thank you, your Honor.

3    BY MR. PERSONIUS:

4    Q.   During your direct examination by Mr. Mango

5    this morning, Mr. Patel, do you remember that you

6    were asked about a Section 114 letter that was

7    issued by the EPA to Tonawanda Coke in September

8    of 2009?

9    A.   Yes, I do.

10   Q.   Okay.  I want to spend a little time, not a lot

11   of your time, but a little bit of time going over

12   that with you, if that's okay.

13   A.   That's fine.

14   Q.   Thank you.  You were involved in the drafting

15   of that letter?

16   A.   Yes, I was.

17   Q.   Can you remember who else participated in

18   drawing up that letter?

19   A.   It would have been the other inspectors from

20   the New York office that came along on the

21   inspection and regional counsel that worked with me

22   on the case.

23   Q.   Okay.  Help me if I leave anyone out.  But my

24   recollection is there was a Mr. Khan who was at the

25   inspection?

1    A.   Yes, Mr. Richard Khan was at the inspection.

2    Q.   And Mr. Eng?

3    A.   No.  Mr. Eng was not at the April 2009

4    inspection.

5    Q.   Okay.  Mr.  Khan.  And Mr. Ghaffari?

6    A.   That's correct, Mozey Ghaffari.

7    Q.   And by the way, did Mr. Khan and Mr. Ghaffari

8    stay over into that second week of the inspection?

9    A.   No, they did not.

10   Q.   I see.  And then the other person that helped

11   with the letter would have been some attorney from

12   EPA?

13   A.   That's correct.

14   Q.   And is that -- what's that person's name?

15   A.   Erick Ihlenburg.

16   Q.   Could you spell is that for the court reporter?

17   A.   Erick, E-R-I-C-K, Ihlenburg, I-H-L-E-N-B-U-R-G.

18   Q.   And that's a male?

19   A.   Yes.

20   Q.   And Mr. Ihlenburg had not been present at any

21   part of the inspection?

22   A.   That's correct.

23   Q.   Okay.  Did anybody from NEIC in Denver

24   participate in preparing the 114 letter?

25   A.   No.

1    Q.   Okay.  So when that letter is being prepared,

2    no one participated who had been involved in the

3    last two days of the April 2009 inspection, is that

4    correct?

5    A.   Yes.

6    Q.   Okay.  And in particular, there was an -- if

7    you know, on the last day of the inspection, there

8    was what was called a closing conference?

9    A.   That's correct.

10   Q.   All right.  And Mr. Ghaffari and Mr. Khan and

11   yourself were not there for that conference?

12   A.   That's correct.

13   Q.   Now, was there one of the three of you who took

14   it upon himself -- or one of the four of you,

15   because Mr. Ihlenburg was involved too -- to do the

16   initial draft of the letter?

17   A.   Yes, I was tasked to do that.

18   Q.   And in the meat of it was the request that

19   followed the letter, right?  The attachment to the

20   letter, that's really what you were working on?

21   A.   That's correct, yes.  The questions.

22   Q.   I'm sorry to confuse you.  It's my fault.  I

23   apologize.

24        The letter itself is essentially a form?

25   A.   The first half of that letter?

1    Q.   Yes.

2    A.   It's -- yes, it's basically form.

3    Q.   And you plug some names into it and some dates,

4    but the real meat of it is the attachment that has

5    the specific request for information?

6    A.   That's correct.

7    Q.   And after you drafted it, it was reviewed by

8    the other three gentlemen?

9    A.   Yes.

10   Q.   And in terms of the fashion in which that was

11   drafted, there was no limitation on the words you

12   used, right?

13   A.   That's correct.

14   Q.   Now, could we please have Government

15   Exhibit 126 -- it's in evidence -- put on the

16   screen.

17        This is the first page of Government

18   Exhibit 126 that's on the screen, correct?

19   A.   Yes.

20   Q.   And when I talked about the first part being a

21   form, that would be -- this page would be part of

22   the form part of the letter, right?

23   A.   Yes.  Usually the cover letter just quickly

24   summarizes why we're sending this.  And then

25   sections after that are basic form.

1    Q.   Could we go to the second page, please, Lauren.

2         This would be more, if it's a fair description,

3    the form part of the letter?

4    A.   Yes.

5    Q.   And to the third page, please, Lauren.

6         And this would be the last page of the form

7    part?

8    A.   That's correct.

9    Q.   Thank you.

10        Could we go back to the first page please,

11   Lauren.  Thank you.

12        Now, before you did your draft of the specific

13   request for information, did you consult with

14   anybody from NEIC?

15   A.   Yes, we did.

16   Q.   All right.  When you say "we" who is "we"?

17   A.   Me and the other two inspectors that came to

18   the inspection with me.

19   Q.   I see.  And how did that -- how was that

20   consultation accomplished?

21   A.   It was done over the phone.

22   Q.   It was -- was it one phone call?

23   A.   No, I believe there was several phone calls.

24   Q.   All right.  And who participated from NEIC?

25   A.   Could have been either Martha or Ken or both of

1  them.

2  Q.  You when you say "Martha," you mean Martha

3  Hamre?

4  A.  That's correct.  Martha Hamre or Ken Garing.

5  Q.  Or Mr. Garing?

6  A.  That's correct.

7  Q.  You don't remember who?

8  A.  We had several calls, so, you know, I just

9  don't recall exactly on which call who was on.

10  Q.  Okay.  And we don't expect you to remember all

11  the specifics of those conversations.  But,

12  generally, what was discussed during those

13  conversations with NEIC?

14  A.  Basically our preliminary observations from the

15  inspection, at least the first week, and then what

16  Ms. Martha and Mr. Garing observed during the

17  second week of the inspection.

18  Q.  Okay.  And was it -- was it, for example,

19  brought to your attention that there had been

20  further discussion, the -- on two different days,

21  the second week regarding the operation of this

22  pressure relief valve?

23  A.  Yes.

24  Q.  You were informed of that?

25  A.  Yes.

1  Q.  And was it brought to your attention that it

2  had been disclosed during those discussions that

3  that pressure relief valve was releasing roughly

4  every 30 minutes?

5  A.  That's correct.

6  Q.  So you knew that?

7  A.  Yes.

8  Q.  Okay.  And was more information given to you

9  about the fact that that pressure relief valve was

10  releasing, or was being said that it was releasing

11  each time there was a reversal in the ovens?

12  A.  That's correct.

13  Q.  You were aware of that information too?

14  A.  Yes.

15  Q.  All right.  And did you speak with -- you --

16  yourself or you and Mr. Khan and Mr. Ghaffari

17  before you prepared these information requests, did

18  you speak to anybody from the Department of

19  Environmental Conservation?

20  A.  I don't recall.

21  Q.  And specifically who I would be thinking --

22  A.  It's Mr. Sitzman or Ms. Webster.

23  Q.  Because they had been present at the

24  inspection?

25  A.  That's correct.

1    Q.   Did you talk to either of them before preparing

2    the information request in September?

3    A.   I don't remember.

4    Q.   All right.  And had you talked to Ms. Webster

5    or Mr. Sitzman at any time from the time of the

6    inspection until you prepared the information

7    request?

8    A.   I did.

9    Q.   Okay.  And do you remember when that was and

10   who you talked to?

11   A.   No, I don't.

12   Q.   Do you remember the substance of what was

13   discussed in that conversation?

14   A.   I don't recall.

15   Q.   All right.  And did you have -- in preparing

16   the information request, did you have access to the

17   DEC's, Department of Environmental Conservation's,

18   file on Tonawanda Coke?

19   A.   The access we had was only to the Title V.

20   Q.   To the Title V permit?

21   A.   That's correct.

22   Q.   And so even the application for the permit was

23   not available to you?

24   A.   No.

25   Q.   And the rest of the Tonawanda Coke file, that

1   was not available to you because you didn't ask to

2   see it?

3   A.   That's correct.

4   Q.   Okay.  So that's -- what I -- one thing I'm

5   trying to understand is, the decision to issue this

6   letter was based upon a desire to get more

7   information?

8   A.   That's correct.

9   Q.   Okay.  And we know from the testimony of

10  Ms. Hamre that she did not conduct a detailed

11  review of the DEC file.

12          MR. MANGO:  Objection, your Honor.  I

13  don't think it's proper to tell the witness.

14          MR. PERSONIUS:  I can put it a different

15  way.  He's right.

16          THE COURT:  Okay.

17  BY MR. PERSONIUS:

18  Q.   Do you know whether or not Mr. Hamre had

19  reviewed the DEC file?

20  A.   Yes, I know.

21  Q.   You're aware she did?  Do you know how detailed

22  her review was?

23  A.   No, I don't.

24  Q.   And do you know whether or not Mr. Garing had

25  reviewed the DEC file?

1    A.   Mr. Garing did not review the files.

2    Q.   Okay.  And do you know if either Mr. Ghaffari

3    or Mr. Khan or Mr. Ihlenburg had reviewed the DEC

4    file before this request for information was

5    prepared?

6    A.   No, they did not.

7    Q.   Okay.  And the purpose of the request, as I

8    think you put it, was to get more information?

9    A.   That's correct.

10   Q.   Okay.  And in the information that you were

11   looking for, then, you didn't know whether or not

12   that information already existed in the DEC file?

13   A.   That's correct.

14   Q.   Okay.  And from Mr. Kamholz's perspective --

15   he's the one that answered your request, right?

16   A.   Yes.

17   Q.   Do you know whether or not he knew that -- do

18   you know whether or not he knew that you, who are

19   preparing this request, had not reviewed the DEC

20   file?

21        MR. MANGO:  Objection, your Honor, in

22   terms of -- that's highly speculative in terms of

23   what he knew, what he knew.

24        THE COURT:  You don't think he can answer

25   yes or no?  We'll permit him to do that.

1778

```
 1            THE WITNESS:  No.
 2    BY MR. PERSONIUS:
 3     Q.  Okay.  Thank you.
 4        Do you remember that Mr. Linsin showed you a
 5    letter from March of 1984 by the DEC to Mr. Kamholz
 6    regarding what we referred to as quench tower
 7    number 1?  Do you remember that letter, or do you
 8    need to see it again?
 9     A.  I remember.
10     Q.  Okay.  And do you remember that letter provided
11    for a DEC exemption for baffles in tower number 1?
12     A.  That's correct.
13     Q.  Okay.  And do you know whether or not that
14    letter was in the DEC file?
15     A.  I did not do the file review at DEC, so I had
16    not seen that letter before.
17     Q.  There was a letter -- I don't want to make a
18    statement.  I'll make it a question.
19        Are you aware of a letter that Mr. Kamholz sent
20    to Gary Foersch at the DEC in December of 1996
21    regarding the other quench tower, quench tower
22    number 2?
23     A.  Yes, I was aware of that.
24     Q.  You know of that letter?
25     A.  Yes.
```

1    Q.   Okay.  And when you did this request for

2    information, did you know about that letter?

3    A.   No, I did not.

4    Q.   So you found out about it after that?

5    A.   That's correct.

6    Q.   Now, are you aware that there was a response by

7    Mr. Foersch to that letter in January of 1997?

8    A.   Yes, I am.

9    Q.   You know that now?

10   A.   Yes.

11   Q.   Okay.  But you didn't know that when you

12   prepared the request?

13   A.   That's correct.

14   Q.   And maybe, more importantly, you didn't know

15   that when you got Mr. Kamholz's response?

16   A.   That's correct.

17   Q.   All right.  Now, I think you've told us also

18   that you did not see the application Mr. Kamholz

19   prepared for the permit before you prepared your

20   request, is that true?

21   A.   Yes.

22   Q.   And hadn't seen that -- have you ever seen the

23   application by Mr. Kamholz for the Title V permit?

24   A.   No, I have not.

25   Q.   All right.  And so you're not aware of what

1    information Mr. Kamholz put in that application

2    regarding the requirement to have or not have

3    baffles in either of those quench towers, correct?

4    A.  Yes.

5    Q.  What I say is correct, right?

6    A.  Yes, that I had not seen the application.

7    Q.  Okay.  Thank you very much.

8        And did you, at any time before preparing the

9    request or getting Mr. Kamholz's response, confer

10   with the DEC inspector named Gary Foersch regarding

11   his interaction with Mr. Kamholz at Tonawanda Coke

12   regarding these baffles?

13   A.  I don't know that person.  I've never met him.

14   Q.  All right.  Thank you.

15       You've told us that, with respect to the

16   pressure relief valve, you knew from your

17   conversations with one or both of the people from

18   NEIC, that information had been obtained regarding

19   the operation of the PRV after you left Buffalo to

20   go back to New York City.

21   A.  That's correct.

22   Q.  And you knew about the frequency of the

23   releases?

24   A.  Yes.

25   Q.  And you knew that it had been indicated that

1     these releases occurred on reversals of the ovens?

2     A.   That's correct.

3     Q.   And do you remember during his examination

4     Mr. Linsin asked you if you were aware of a

5     decision that had been made by DEC regarding what

6     the pressure setting was going to be on this

7     pressure relief valve as of April or May of 2009?

8              MR. MANGO:  Objection, your Honor.

9              THE COURT:  Yeah, sustained.

10             MR. PERSONIUS:  Are you aware of any

11    conversations that either Ms. Webster or

12    Mr. Sitzman had with Mr. Kamholz after the

13    April 2009 inspection regarding what the pressure

14    setting would be for the PRV?

15             MR. MANGO:  Objection.

16             THE COURT:  Grounds?

17             MR. MANGO:  Calls for speculation, your

18    Honor, and relevance.

19             THE COURT:  Not if he knows.  Overruled.

20       Do you know?

21             THE WITNESS:  No.

22    BY MR. PERSONIUS:

23    Q.   Have you, at any time, received information

24    regarding what the PRV, pressure relief valve, at

25    Tonawanda Coke was set at following the April 2009

1    inspection?

2    A.   No.

3    Q.   From what you know about that pressure relief

4    valve, do you agree that if the set point is

5    higher, it is less likely that the pressure relief

6    valve is going to release?

7              MR. MANGO:   Objection, your Honor.

8              THE COURT:   Grounds?

9              MR. MANGO:   Two grounds.  Speculation as

10   to this witness, and relevancy.  I don't see the

11   relevancy in this question.

12             THE COURT:   Let me ask you, where are you

13   going with this question?

14             MR. PERSONIUS:   There is evidence,

15   Judge -- I'm representing to you, there is evidence

16   that will come out later in this trial.  Without

17   being more specific, it will tie up the purpose of

18   this question.  This is the last question on the

19   subject, but I represent to you, Judge -- and the

20   Government knows it -- there will be evidence that

21   will tie this up.

22             MR. MANGO:   Your Honor, that's --

23             THE COURT:   Well --

24             MR. MANGO:   We're going to object to that.

25             THE COURT:   Well, I mean, we've had

1    testimony about the setting of the set point and --

2    by a number of witnesses and what that results in

3    or does not.  Are you trying to establish if this

4    witness knows simply that, and then you're moving

5    on?

6            MR. PERSONIUS:  That's it, Judge.  One

7    question.

8            THE COURT:  Go ahead.

9            MR. PERSONIUS:  You're going to need the

10   question again, right?

11           THE WITNESS:  Yes, please.

12           MR. PERSONIUS:  Let me start with this

13   question.  Do you have any knowledge what the

14   relationship is between the set point of the

15   pressure on the PRV and how frequently the PRV

16   releases?

17           MR. MANGO:  Objection, foundation.

18           THE COURT:  No, I'm not -- the foundation

19   is there in terms of the investigation.  I'll allow

20   that to stand.  Now it's simply a matter of

21   knowledge in terms of the general principal, right?

22           MR. PERSONIUS:  Generally how it operates.

23           THE COURT:  Go ahead.

24   BY MR. PERSONIUS:

25   Q.  Do you need it again?

1    A.   Generally speaking, the pressure is -- if the

2    set point is set higher, it will release less

3    frequently.

4    Q.   Okay.  Thank you.

5         Now with respect to the -- there is a separate

6    device called a flare on the battery.  Do you

7    remember you testified about that on direct?

8    A.   Yes.

9    Q.   And you put some questions about this flare on

10   the battery in your 114 letter.

11   A.   That's correct.

12   Q.   Okay.  Now, when you were preparing those

13   questions, were you aware that in August and

14   September of 2008 the operation of that flare had

15   been a topic of discussion between Tonawanda Coke

16   and the Department of Environmental Conservation?

17   A.   Yes, I recall that we had some discussion of

18   that flare during our inspection in April.

19   Q.   Okay.  And you had a discussion about that with

20   Mr. Sitzman?

21   A.   No, with Mr. Kamholz.

22   Q.   Oh, with Mr. Kamholz.  Okay.  Did you talk --

23   we'll get to that in a minute.

24        Did you talk to Mr. Sitzman or Ms. Webster

25   about the operation of that battery flare and what

1    had been addressed in August and September of 2009?

2    A.  I don't recall having any discussions with

3    them.

4    Q.  All right.  Were you aware that the DEC had

5    issued a notice of violation to Tonawanda Coke in

6    October of 2008 related to that flare on the

7    battery?

8    A.  I don't know.

9    Q.  Are you aware that there had been -- you've

10   referred to these full compliance -- I think it's

11   called a full compliance evaluation.  Do you know

12   what that means?

13   A.  That's correct.

14   Q.  That's kind of a ratcheted up inspection,

15   right, it's a more detailed inspection?

16   A.  Yes, more comprehensive.

17   Q.  That's a better way to put it.

18       That there had been a full compliance

19   evaluation in Tonawanda Coke in August --

20   August 21st of 2008 and that one of the topics

21   addressed was the operation or non-operation of

22   this flare.  Did you know that?

23   A.  No, I did not.

24   Q.  All right.  So all the information you had when

25   you prepared your request for information was a

1   conversation you had with Mr. Kamholz during the

2   inspection?

3   A.   That's correct.  It was based on our -- the

4   information we gathered during the inspection and

5   my follow-up conversations with the NEIC

6   inspectors.

7   Q.   All right.  Do you remember what Mr. Kamholz

8   told you about that flare on the battery during the

9   inspection?

10  A.   It's in my notes.  He did mention that they had

11  some operational problems with the pilot light and

12  with the thermocouple previously and that they had

13  addressed those issues in the past.

14  Q.   All right.  Thank you.  Let's see.  We'll go to

15  the screen now to Government Exhibit 126, which

16  starts with a letter.

17     Lauren, would you please go to page 2?  Thank

18  you.  Lauren, would you please make that circled

19  paragraph bigger?

20     I made one of the circled paragraphs on the

21  second page of the form letter bigger.  Do you see

22  that on the screen?

23  A.   Yes.

24  Q.   Okay.  Do you see in bold that what your letter

25  indicated is that you wanted a response within 30

1   days of receipt of your request?

2   A.   That's correct.

3   Q.   And is it true that you got your response

4   within those 30 days?

5   A.   Yes, we did.

6   Q.   No request for an extension?

7   A.   That's correct.

8   Q.   And when you got the response, you got -- how

9   many boxes of records was there?

10   A.   It was about two boxes.

11   Q.   Two boxes, okay.

12        You can take that down, Lauren.  I'd like

13   exhibit -- back up, please, Government Exhibit 126.

14   And could we go to page 8, please?

15        Now, let's try this.  Do you have page 8 in

16   front of you, Mr. Patel?

17   A.   Okay.

18   Q.   You see that?

19   A.   Yes.

20   Q.   It says "Enclosure 1" up at the top?

21   A.   Yes.

22   Q.   Could we make that part bigger, Lauren, please?

23        Can you see that now?

24   A.   Yes.

25   Q.   Easier to read?

1     A.   Yes.

2     Q.   Okay.  Do you see where I put a blue arrow?  Do

3     you see a blue arrow on the screen?

4     A.   Yes.

5     Q.   And there is a bullet point next to that.

6     A.   Is that the third one you're pointing at?

7     Q.   Yes, the third bullet.

8     A.   Yes.

9     Q.   And that indicates -- these are form

10    instructions that go with the request for

11    information?

12    A.   That's correct.

13    Q.   All right.  And it tells the person responding

14    to provide responses to the best of your ability,

15    even if the information sought was never documented

16    in writing or if the written documents are no

17    longer available, correct?

18    A.   Yes.

19    Q.   So EPA recognizes when it makes these requests

20    that the person responding may either no longer

21    have the requested documents or the documents may

22    have never existed, correct?

23    A.   Yes.

24    Q.   And what the person responding is told to do in

25    that case is do your best?

1    A.   Yes.

2    Q.   All right.  Now, the -- I put another blue

3    arrow, and that's for the last bullet.  Do you see

4    that?

5    A.   Yes.

6    Q.   And that says, "For all time periods specified

7    below" -- and then it says, "for example, quote,

8    for the past five years, unquote, the period

9    extends back from the date of receipt of this

10   information request."

11   A.   That's correct.

12   Q.   Right?  And that is telling the person who's

13   responding if we want you to be referring to

14   anything other than the points in time when you

15   provide the response, we'll let you know.

16   A.   I did not understand.

17   Q.   Okay.  What this part of the instructions is

18   saying is that if you want the information to cover

19   a time period other than the present, in other

20   words, what the situation is when you provide the

21   response, the request for information will let the

22   responding party know that.

23   A.   I'm sorry, I just don't understand where you're

24   going.

25   Q.   Let me put it a different way.  When you

1      prepared your request for information you were

2      looking for the status of Tonawanda Coke's

3      operation as of date Mr. Kamholz responded, right?

4      A.   And going back five years.

5      Q.   Did you tell him in your request that they went

6      back five years?

7      A.   Yes, it does say that in the other portions of

8      the 114.

9      Q.   Okay.  We'll get to it.

10     A.   Okay.

11     Q.   But you're saying -- you're telling the jury

12     that your intention when you made the request was

13     to cover a period of five years before the request

14     was provided?

15     A.   Typically what we -- we are limited by law

16     to -- for a five-year period.  That's basically as

17     far as back we can go.  So this is boilerplate

18     language.  And then in the rest of the letter it

19     will tell you starting from today going back five

20     years or this period.

21     Q.   Okay.  When we get to the request, we'll see

22     where you did that and where you didn't do that.

23          Nothing prevented you from including that

24     language in the request, correct?

25     A.   That's correct.

1    Q.  All right.  Can we go, Lauren, please, to --

2    I'd like to get to the first page of the actual

3    request.  Could you go to the next page, please,

4    Lauren?  And then the next one, please.  Okay.  Go

5    back to the one before that, please.  Okay.

6         We're on page -- of this exhibit -- Government

7    Exhibit 126, page 9.  Do you see that in the lower

8    right?

9    A.  Yes.

10   Q.  Okay.  And is this where you started your

11   specific request that you and Mr. Khan and

12   Mr. Ghaffari and Mr. Ihlenburg put together?

13   A.  That's correct.

14   Q.  All right.  And what it says at the top is

15   simply a heading that says "General Facility

16   Information," right?

17   A.  Yes.

18   Q.  And then there's certain numbered questions

19   that come after that?

20   A.  Yes.

21   Q.  True?

22        Could we go to the next, page, please, Lauren.

23        Now, on page 10, it's at question number 8 that

24   you make some inquiries regarding the quench

25   towers, right?

1    A.   Yes.

2    Q.   Okay.  Could you make that bigger, Lauren?

3         We've made bigger from your request items

4    number 8 and number 9, is that right?

5    A.   Yes.

6    Q.   Okay.  The first question is, "For the quench

7    towers at the facility, state whether the quench

8    towers have any baffles."

9    A.   Yes.

10   Q.   Right?

11        Now, is it your testimony that you were asking

12   for whether or not the facility had baffles for the

13   past five years, or are you asking if the facility

14   had baffles on the day that Mr. Kamholz provides

15   his response?

16   A.   It would be if the quench tower had baffles for

17   the past five years or even longer.

18   Q.   Okay.  Good.  Tell us where in your question

19   you make it clear to Mr. Kamholz that you're

20   looking for information for the past five years.

21   A.   For that portion of the question?

22   Q.   We're starting with that one.

23   A.   Well, the general instructions said go back

24   five years.

25   Q.   It did, okay.  Let's go back.  We'll go back.

1    Would you go back to the general instructions,

2    Lauren.  And I think that's on page 8.

3        Is this what you're talking about?

4    A.   Yes.

5    Q.   And where does that tell you to go back five

6    years?

7    A.   Okay.  I see your point.

8    Q.   You agree that it wasn't clear -- it's not

9    clear to the person reading this who is responding

10   that you expect to get information covering five

11   years prior to the response, right?

12   A.   That's correct.

13   Q.   All right.  So, if we go back to page 10,

14   please, Lauren, and back to the -- thank you,

15   Lauren.

16       We've made those two questions about the

17   baffles bigger again, correct?

18   A.   Yes.

19   Q.   All right.  And here's a great example.  In

20   question 9 you make it clear that you want records

21   going back five years, right?

22   A.   Because records -- there was a time limit for

23   how long you keep records.

24   Q.   I understand.

25   A.   There is no time limit for how long the

1    controls have to be installed from the time you

2    start operating that piece of equipment till

3    whenever you remove that piece of equipment.

4    Q.  I understand.  But my point is, in question 9

5    you specifically refer to the fact you want to get

6    records going back five years, right?

7    A.  That's correct.

8    Q.  All right.  And you got records going back five

9    years on the past from Mr. Kamholz, right?

10   A.  The response from the company said they had no

11   records of maintenance on the baffles.

12   Q.  Okay.  So you got nothing and that was okay

13   too.  If they had no records, they didn't have to

14   provide them, right?

15   A.  That's correct.

16   Q.  But on -- we can agree on the answers to

17   question 8, that what you -- what Mr. Kamholz could

18   have understood and probably should have understood

19   is you were looking for the information on the date

20   he prepared his response, right?

21           MR. MANGO:  Objection, your Honor.

22           THE COURT:  Yeah, sustained.

23   BY MR. PERSONIUS:

24   Q.  Put it a different way, question 8 doesn't

25   indicate you want the condition going back five

1   years, right?

2   A.   That's true.

3   Q.   All right.  And I think maybe what we should

4   do, if we can, Lauren, please, is go to Government

5   Exhibit 127.

6        And this is Mr. Kamholz's response, right?

7   A.   Yes.

8   Q.   And if we get past the issue of the date, which

9   was created by Mr. Kamholz -- but it is his

10   response, we agree, right?

11   A.   Yes.

12   Q.   Whatever the date was.  And can we go to page 4

13   of Government Exhibit 127?  Could you make that

14   bigger, please, Lauren?

15       This is what Mr. Kamholz responded on the

16   baffles, right?

17   A.   Yes.

18   Q.   Okay.  And he said the quench towers are not

19   baffled?

20   A.   That's correct.

21   Q.   And as far as you know, that was true?

22   A.   We learned that afterwards.

23   Q.   Okay.  But as you sit here now, do you have any

24   question as to the accuracy of that response?

25   A.   No.

1  Q.  All right.  And he goes on to describe that

2  they're not traditional quench towers, right?

3  A.  That's correct.

4  Q.  And then he provides an explanation about what

5  the height is and talks about it reducing the

6  upward velocity of the quench, right?

7  A.  That's correct.

8  Q.  When you read that, did you know what he was --

9  what his purpose was for putting that information

10  in?

11  A.  Yes, I did.

12  Q.  And what was his -- what was your understanding

13  of his purpose in putting that information in?

14  A.  What I understood from the response, he was

15  trying to explain that this is a wider quench tower

16  than would normally be at a coke oven.

17  Q.  Right.  And because it was wider, and because

18  it was shorter, that that would affect how -- how

19  many of these -- what would happen with these

20  particulates when they would come off the coke when

21  it was quenched, right?

22  A.  I don't know, sir.

23  Q.  All right.  Did you not understand his

24  response?

25  A.  I understood the response.  However, the

1    regulation does not have that distinction about

2    wide quench towers or tall quench towers.

3    Basically the New York State regulation states all

4    quench towers shall have baffles.

5    Q.   Which regulation says that?

6    A.   The New York State Rule 214.

7    Q.   Okay.  What section?

8    A.   I believe it's 214.6.

9    Q.   214.5(a).  Are you familiar with 214.10?

10             MR. MANGO:  Objection, your Honor.  He

11   tried to answer the question the best he can.  Now

12   this is getting a little argumentative.

13             THE COURT:  It does relate to his

14   knowledge.  I'll allow the question to continue.

15             MR. PERSONIUS:  Thank you, Judge.

16   BY MR. PERSONIUS:

17   Q.   Are you acquainted, sir, with 6 NYCRR 214.10?

18   A.   Yes.

19   Q.   And what does that provide for?

20   A.   Provides for an alternate plan, I believe.

21   Q.   Which could be not having baffles, right?

22             MR. MANGO:  Objection, your Honor.

23             THE COURT:  Grounds?

24             MR. MANGO:  Speculation.

25             THE COURT:  Not necessarily.

1798

1    You may answer, if you know.

2    THE WITNESS:  I don't know exactly what

3    the grounds would be in 214.10 to ask for anything

4    related to quench towers.

5    BY MR. PERSONIUS:

6    Q.  I see.  You know that back in 1984 the DEC

7    granted an exemption to Tonawanda Coke to have

8    baffles in quench tower number 1, right?

9    A.  Now I do, yes.

10   Q.  Do you know what the basis for that was?

11   A.  No, I did not.

12   Q.  I think you told us earlier, though, that every

13   quench tower has to have baffles, right?

14   A.  That's correct.

15   Q.  And do you agree that because of 6 NYCRR

16   214.10, that that may not be true?

17   A.  I don't know.

18   Q.  Okay.  Can we go back to Government Exhibit

19   126, Lauren?

20   This is your request, right?

21   A.  Yes.

22   Q.  And go to page 12, please, Lauren.  Could you

23   make the bottom half bigger, please?  Thank you.

24   This is question 20 which relates to the

25   pressure relief valve?

1    A.  Yes.

2    Q.  Okay.  What shows on this page, and I think it

3    continues on the next page, are the requests you

4    set out under paragraph 20 related to the pressure

5    relief valve, right?

6    A.  That's correct.

7    Q.  And I want you to -- just so you're satisfied

8    with the language that's on this page, and then

9    we're going to go to the next page.  But I want you

10   to look at it and let us know if there's anything

11   in this request that indicates that you wanted

12   information going back five years.  Take a look at

13   what's here and we'll show you the rest of the

14   request.

15   A.  Okay.

16   Q.  Have you seen enough of this?

17   A.  Yes.

18   Q.  Can we see the next page, please, Lauren?  Just

19   that part, please, Lauren.

20       Okay.  And without seeing the rest of it, it's

21   a little confusing, but it does talk here about

22   five years, right?

23   A.  That's correct.

24   Q.  But it's relating to reports, correct?

25   A.  That's correct.

1   Q.   So as far as the -- let's go back to the

2   previous page, please, Lauren.   And the bottom

3   half, please, make bigger.

4        As far as request A through E, the non-record

5   request, there's nothing to indicate you were

6   looking for information going back five years,

7   correct?

8   A.   D does.

9   Q.   It does, okay.   Tell us which one does.

10  A.   D.

11  Q.   Okay.   It's another records request?

12  A.   That's correct.

13  Q.   Okay.   You're right about that.   If we go like

14  this, A, B, C, and E are not looking for

15  information going back five years.

16  A.   That's correct.

17  Q.   Okay.   And can we now go back to Government

18  Exhibit 127, Lauren, and go to page, please, 6?

19       Go to page 6 of Government Exhibit 127,

20  Mr. Patel?

21  A.   Yes.

22  Q.   Lauren, could you make that bottom part bigger?

23       This is where Mr. Kamholz began his response

24  about the PRV, right?

25  A.   That's correct.

1    Q.  And he -- the first question had to do with

2    what the purpose of the PRV was, and he answered

3    that, right?

4    A.  That's right.

5    Q.  The second question had do with how long it had

6    been there?

7    A.  Yes, sir.

8    Q.  He gave you an estimate?

9    A.  That's correct.

10   Q.  Could we go to the next, page, please, Lauren?

11   Could you make the upper part bigger, please,

12   Lauren?

13       And then C had asked if there's written

14   operating instructions.  He said there were not,

15   right?

16   A.  Yes.

17   Q.  It asked what the objective was.  He answered

18   that, right?

19   A.  Yes.

20   Q.  Okay.  And then D was asking for some records,

21   and he indicated there were these circular charts

22   going back 30 days, right?

23   A.  Yes.  We asked for five years.  The response is

24   he only had 30 days.

25   Q.  He gave you -- what he had he gave you?

1    A.   That's correct.

2    Q.   And you got those charts?

3    A.   Yes, sir.

4    Q.   And they were for the -- the month of September

5    of 2009?

6    A.   I don't remember what the date was on them.

7    Q.   Believe me, that's understandable.  It says

8    here they were included as attachment 20D, right?

9    A.   That's correct.

10   Q.   And then we get to E.  And E asked about how

11   often this releases and so on, right?

12   A.   Yes.

13   Q.   And I think we've agreed that when you made

14   your request, that what you were looking for is

15   what the operations of the PRV was in October --

16   September or October of 2009, right?

17   A.   That's the reading of the --

18   Q.   It's a fair reading of your request?

19   A.   Yes.

20   Q.   And what he says is, the PRV opens very rarely,

21   right?

22   A.   Yes, that's what the response is.

23   Q.   And do you know what the operation of the PRV

24   at Tonawanda Coke was in September, October

25   of 2009?

1    A.   No.

2    Q.   You got information about what it was back in

3    April of 2009, right?

4    A.   Yes.

5    Q.   All right.  Now, it goes on to say in this

6    response that the objective is to conserve COG,

7    which is coke oven gas, right?

8    A.   Yes.

9    Q.   And for the boiler and the battery?

10   A.   Yes.

11   Q.   And then it says, if the valve opens it would

12   be only for five or ten seconds, right?

13   A.   Yes.

14   Q.   And, again, the information you'd received back

15   from what was known in September -- or April of '09

16   was that when the PRV opened, it was for a short

17   period of time?

18   A.   A short period of time, every half hour.

19   Q.   Right.  Back then?

20   A.   That's correct.

21   Q.   And then it says in the open position, it gives

22   an estimate about what it would emit coke oven gas

23   at a certain rate.

24   A.   Yes.

25   Q.   You told us you did a calculation based on

1   that, but you were basing that on information back

2   in -- related back to April of 2009?

3   A.   That's correct.

4   Q.   All right.  And then in F he provided a

5   response about the emissions.  And what he says in

6   F is that the emissions have not been reported

7   because they are believed to be de minimus, right?

8   A.   That's what the response is.

9   Q.   Okay.  And we can agree, again, that it would

10  have been fair for Mr. Kamholz to be basing that

11  response on what the emissions were in September

12  and October of 2009, correct?

13            MR. MANGO:  Objection, your Honor.  F

14  actually says five years, so we shouldn't be

15  putting words into this witness's mouth.  F says

16  calculate the emissions -- I'll just withdraw.  I

17  think I can make my point on redirect, your Honor.

18  I'm sorry.

19            MR. PERSONIUS:  Let's go back --

20            THE COURT:  Did you have a misstatement

21  there?

22            MR. MANGO:  No, I object on -- I object to

23  that question.

24            THE COURT:  On the grounds that the

25  question called for a five-year period of time?

1    MR. MANGO:  Yes, your Honor.

2    THE COURT:  All right.  Sustained.

3    MR. PERSONIUS:  All right.

4    BY MR. PERSONIUS:

5    Q.  Can we go back, Lauren, please, to Government

6    Exhibit 126?  Then go to -- I think it's page 12

7    Lauren, please.  Thank you.

8        And this is going to be a little tough because

9    it goes on to the next page.  We're on page 12.

10   This is the first part of the question.  It says,

11   "State whether any coke oven gas emissions from the

12   PRV are reported to the EPA or NYS DEC as

13   deviations from TCC's Title V permit requirements.

14   If your answer is yes, provide copies of all

15   such" -- and then we went to the next page.  Thank

16   you, Lauren -- "reports for the past five years.

17   If your answer is no, explain why such emissions

18   are not reported."  Right?

19   A.  Yes.

20   Q.  That's what the question says?

21   A.  That's what the question is.

22   Q.  And you can -- maybe now we should go back to

23   the response, if we could, and that's Government

24   Exhibit 127.  And go to page 6 for starters,

25   Lauren.  And go to seven, please.  And highlight

1    that, please.

2         And it says, "COG emissions have not been

3    estimated nor have they been reported as deviations

4    from TCC's Title V permit.  The emissions have not

5    been reported because they are believed to be de

6    minimus."  Right?

7    A.   That's what the response says.

8    Q.   Okay.  And, again, my -- I'll ask the question

9    again.  As that question was written, do you agree

10   it was fair for Mr. Kamholz to interpret that to be

11   asking the question as to what the emissions were

12   when he prepared the response?

13             MR. MANGO:  Objection, your Honor, as to

14   what was fair for Mr. Kamholz.

15             MR. PERSONIUS:  I can state it a different

16   way.

17        Do you agree -- given the entire format of your

18   request, do you agree it would have been reasonable

19   for Mr. Kamholz to interpret this question to be

20   looking for a response as conditions existed in

21   September and October of 2009?

22             MR. MANGO:  Objection, your Honor.

23             THE COURT:  No, I'll permit it.

24   Overruled.

25             THE WITNESS:  No, I don't.

1  BY MR. PERSONIUS:

2  Q.  You don't think that would be reasonable?

3  A.  That's correct.

4  Q.  And the reason you say that is because there's

5  that reference to records for five years?

6  A.  That's correct.

7  Q.  And you aren't open to the fact that, given how

8  all the other questions are written, that

9  Mr. Kamholz would have understood that he was to

10  provide a response as those conditions existed in

11  September and October of 2009?

12          MR. MANGO:  Objection, your Honor.  I

13  think he's bound by the earlier answer.

14          THE COURT:  Yeah.  And let's move on,

15  please.  Sustained.

16          MR. PERSONIUS:  Okay.

17  BY MR. PERSONIUS:

18  Q.  Now, let's just spend a minute, if we can, on

19  the request related to the -- to the flare.

20      Would you go back to Government Exhibit 126,

21  Lauren?

22      This would be your request?

23  A.  Yes, sir.

24  Q.  And go to page 15, Lauren.  I think that part,

25  Lauren, please.

1    We made question number 32 larger?

2  A.   Yes.

3  Q.   Okay.  And this relates to the flare on the

4  battery?

5  A.   That's correct.

6  Q.   Okay.  And the request here had to do with the

7  pilot light on that flare?

8  A.   That's correct.

9  Q.   And can we agree that this is a little

10  difficult because 32A is asking for the date it was

11  installed, so you have to go back in time to

12  provide that information, right?

13  A.   Yes.

14  Q.   For 32B, how it's monitored, you agree it would

15  be reasonable for Mr. Kamholz to interpret that to

16  have been as of September and October of 2009?

17  A.   It could be interpreted that way.

18  Q.   Okay.  And C and D asks for records, correct?

19  A.   That's correct.

20  Q.   All right.  And would you go to Government

21  Exhibit 127, please, Lauren?  And go to page 10,

22  please.  And I'm sorry, you've got to go back to

23  page 9.

24    Mr. Kamholz's response starts at the bottom of

25  page 9, right?

1    A.   That's right.

2    Q.   And the request for when it was installed, he

3    provided that information?

4    A.   Yes.

5    Q.   Okay.  Can we go to the next page, please,

6    Lauren.

7         And then as to question B, he provided a

8    response on how that operated --

9    A.   Yes, sir.

10   Q.   -- right?

11        And as to question C, he says the documents

12   regarding when it was and wasn't in service don't

13   exist, right?

14   A.   Yes.

15   Q.   Okay.  And for question D he says look to the

16   response to C, which you would understand to mean

17   he doesn't have documents.

18   A.   That's correct.

19   Q.   Is that fair?

20   A.   Yes.

21   Q.   And could we go back to Government Exhibit 127,

22   please?

23        This was the first page of Mr. Kamholz's

24   response, correct?

25   A.   Yes.

1   Q.   Okay.  And would you make that part bigger,

2   please, Lauren?

3        He included an expressed invitation to call him

4   if there were any questions, right?

5   A.   Yes.

6   Q.   And do you know if anybody contacted him with

7   questions?

8   A.   I understand we were instructed not to contact

9   him at that point.  When we got the response to the

10  114 response, we were told not to contact the

11  company directly.

12  Q.   Okay.  Who told you not to contact them?

13  A.   I believe it was word from counsel.

14  Q.   Okay.  All right.  Mr. Ihlenburg?

15  A.   It wasn't him.  It was other counsel.  I just

16  don't remember which counsel at EPA.

17  Q.   Okay.  All right.

18             MR. PERSONIUS:  Could I have a minute

19  please, Judge?

20             THE COURT:  Yes.

21             MR. PERSONIUS:  Your Honor, I have no

22  further questions.

23       Thank you, Mr. Patel.

24             THE WITNESS:  Thank you.

25             THE COURT:  Mr. Mango, yes.

1    How is our jury doing, ladies and gentlemen?

2    Pretty good for a Friday afternoon?  All right.

3    Good.

4         MR. MANGO:  Thank you, your Honor.  May I

5    proceed?

6         THE COURT:  Certainly.

7    REDIRECT EXAMINATION BY MR. MANGO:

8    Q.  Good afternoon, Mr. Patel.

9    A.  Good afternoon.

10   Q.  If we could pull up Government Exhibit 50 in

11   evidence, your Honor.

12        THE COURT:  5-0?

13        MR. MANGO:  5-0.

14   BY MR. MANGO:

15   Q.  Mr. Patel, you were asked about your inspection

16   that you conducted.  Do you recognize this

17   photograph on your screen?

18   A.  Yes, I do.

19   Q.  How do you recognize this?

20   A.  This was a photo that I took during the

21   inspection while we were on the top of the coke

22   oven battery.

23   Q.  Okay.  At the time you took this photograph,

24   did you intend to capture the bleeder in the

25   photograph?

1    A.  No, I did not.

2    Q.  Okay.  All right.

3         Thank you.  We can take that down, Lauren.

4         I'd like to -- first off, prior to issuing your

5    114 letter, is there any requirement that EPA has

6    to scour all available information that's already

7    out there before you issue your 114 letter?

8    A.  No, there is not.

9    Q.  Okay.  If we could actually try a split screen

10   here, your Honor.  Pull up 126 on the left, and 127

11   on the right.  This may speed up my --

12              THE COURT:  You're getting pretty fancy,

13   Mr. Mango.

14              MR. MANGO:  -- my redirect here.  Thank

15   you.

16        On 126, if we could go to page 12 of 126, focus

17   in on this section.  On 127, if we could go to

18   page 7, please, Lauren.  If we could focus in on

19   this section.

20   BY MR. MANGO:

21   Q.  Mr. Patel, you see that on your screen?

22   A.  Yes, I do.

23   Q.  Okay.  For D here, on 126, Exhibit 126, see

24   where 20 --

25   A.  20D.

1    Q.   Yes, 20D.

2         That talks about operating parameters and a

3    copy of all monitoring records for the past five

4    years, is that right?

5    A.   Yes.

6    Q.   Okay.  And 20D, in the response on Exhibit 127

7    is there any reference there to a by-products log

8    book?

9    A.   No, there is not.

10   Q.   Okay.  So is it fair to say in 20D you're

11   asking for how this valve operated for the past

12   five years?

13   A.   How the pressure relief valve operated, that's

14   correct.

15   Q.   Okay.  So if, for example, this pressure relief

16   valve was typically set to release at 80 to 100

17   centimeters of oil, but then was changed to a

18   higher setting, do you think you would want to know

19   that by asking that question in terms of how the

20   valve operated over the course of five years?

21             MR. LINSIN:  Your Honor --

22             THE COURT:  The question was kind of

23   simple until you added two other parts to it.

24        To the form of the question, sustained.

25             MR. LINSIN:  Thank you.

1   BY MR. MANGO:

2   Q.   In your attachments that you received in the

3   response to 127, Exhibit 127, did you receive any

4   type of by-products log books that showed where the

5   bleeder had been set at for the past five years?

6   A.   No, we did not.

7   Q.   All right.   Now, for question F on 126, your --

8   is the purpose of your question here to request an

9   emission --

10           MR. PERSONIUS:   Your Honor, I object to

11   the leading.   I'm sorry to interrupt.   You can tell

12   from "Was it your purpose."

13           THE COURT:   You kind of scared me there

14   for a second, Mr. Personius.   I didn't see that one

15   coming.   What's the objection?   Leading?

16           MR. PERSONIUS:   Leading.

17           THE COURT:   Kind of rearticulate that.

18           MR. PERSONIUS:   I apologize for

19   interrupting.

20           MR. MANGO:   Yeah.

21   BY MR. MANGO:

22   Q.   If -- Lauren, on page -- on Exhibit 126 on the

23   left, if we can actually go to page 13.

24       Okay.   Mr. Patel, you see that?   That's the

25   last part of your question 20F that goes on to the

1   next page in Exhibit 126 --

2   A.   Yes.

3   Q.   -- is that right?

4        Okay.   And what -- can you tell the jury what

5   the purpose of this question was and what you were

6   looking for in response?

7   A.   We were looking for emission estimates for the

8   past five years, if there were any reports that

9   were made to the New York State Department of

10  Environmental Conservation for the past five years

11  and what those emission numbers would have been

12  reported as exceedances to the state.

13  Q.   Okay.   And in Exhibit 127F, are you provided

14  with any type of emission information for the past

15  five years?

16  A.   No, we are not.

17  Q.   Lauren, if we can go on Exhibit 126 on the

18  left, to page 15, please.   Focus in on -- well,

19  before we focus in on the right, Exhibit 127, if we

20  can go to page 10, please.

21       Okay.   Mr. Patel, do you remember being asked

22  on cross-examination about your question 32 there,

23  and the response to 32, which is up there regarding

24  the pilot light?

25  A.   Yes.

1    Q.   Okay.  I want to focus on question 33, which

2    also focuses on the pilot light.  Okay.  Is it

3    accurate to say that 33 says "Provide detailed

4    information and documentation regarding all periods

5    during the last five years in which the facility's

6    bypass bleeder flare was not operating with a pilot

7    flame present", is that right?

8    A.   That's right.

9    Q.   You know what, Lauren, if we can -- I'll

10   just -- in 33 here, so you asked for detailed

11   information and documentation, right?

12   A.   Yes.

13   Q.   And Exhibit 127 Mr. Kamholz says,

14   "documentation as to when the pilot light is not

15   available", is that right?

16   A.   That's what the response said.

17   Q.   But you asked for information as well, right?

18   A.   We asked for information.

19   Q.   Is there any information in there?

20   A.   There is not.

21   Q.   Were you aware in preparing your 114

22   questionnaire that TCC had no pilot light on the

23   battery flare stack from '94 to 2008?

24   A.   I don't remember.

25   Q.   Were you aware in preparing the questionnaire

1    that TCC removed and never replaced the baffles in

2    the east quench tower, number 2?

3    A.  No, I was not.

4              THE COURT:  Sorry.  What was your answer?

5              THE WITNESS:  No.

6              THE COURT:  Thank you.

7    BY MR. MANGO:

8    Q.  Were you aware in preparing the questionnaire

9    that in 1997, even though DEC had, in a letter,

10   told TCC that baffles were required in the tower,

11   that they never put baffles in the tower?

12   A.  No, I was not.

13             MR. MANGO:  Thank you, your Honor.

14   Nothing Further.

15             THE COURT:  Okay, Mr. Mango.  Thank you.

16      Any recross, Mr. Linsin?

17             MR. LINSIN:  Yes, briefly.  Thank you,

18   your Honor.

19   RECROSS EXAMINATION BY MR. LINSIN:

20   Q.  You were asked on redirect, sir, whether there

21   is any requirement that EPA -- I believe the words

22   were -- scour all available sources for information

23   before it issues a 114 request for information.

24      Do you recall that question?

25   A.  Yes.

1   Q.   And your answer was no, there's no such

2   requirement, correct?

3   A.   That's correct.

4   Q.   Now, there's one Clean Air Act, right?

5   A.   Yes.

6   Q.   It's a federal statute, right?

7   A.   Yes.

8   Q.   And the states are authorized to implement that

9   federal statute, correct?

10  A.   That's correct.

11  Q.   And they're delegated the authority to conduct

12  inspections, correct?

13  A.   Yes.

14  Q.   Determine whether there are violations,

15  correct?

16  A.   Yes.

17  Q.   States issue their own regulations to enforce

18  the Clean Air Act requirements, correct?

19  A.   Yes.

20  Q.   And EPA and the state agencies, they're

21  delegated the authority to implement this federal

22  law, coordinate on a regular basis, don't they?

23  A.   Yes.

24  Q.   And it's reasonable, isn't it, for a regulated

25  facility to presume that the federal and state

1    regulators are going to coordinate and communicate

2    when they talk about enforcing the same statute,

3    isn't it?

4                MR. MANGO:  Objection, your Honor.

5                THE COURT:  Overruled.

6    BY MR. LINSIN:

7    Q.  Isn't that reasonable, sir?

8    A.  You're going to have to repeat your question,

9    sir.

10   Q.  Isn't it reasonable for a regulated facility to

11   presume that the federal and state agencies that

12   are charged with enforcing the same statute are

13   going to coordinate and communicate about that

14   process of enforcement?  Isn't that reasonable?

15   A.  It's reasonable.

16   Q.  Now, may I please have Government's Exhibit 127

17   back up?  And I don't have a precise page

18   reference, but it is the response to question 20.

19   Can we go -- is there any way to capture -- let's

20   go to the next page, please, and open the top half,

21   please.

22       Now, this is Tonawanda Coke's response to your

23   request for information, correct?

24   A.  Yes.

25   Q.  And you received this response -- I know

1    there's a little confusion on the date, but -- in

2    the precise date, but in October of 2009.  Is that

3    reasonable?

4    A.   That's reasonable.

5    Q.   All right.  Now, when you received this

6    response in October of 2009, did you review the

7    note here that is provided for response 20?

8         And could you highlight that note, please,

9    Lauren?

10             MR. MANGO:  Objection, your Honor.  This

11   goes beyond the scope of my redirect, to now have

12   recross on this issue.

13             THE COURT:  No, it opened the door.  I'm

14   going to allow it for cross-examination or recross.

15   BY MR. LINSIN:

16   Q.   Can we highlight the notes?  That's it.

17        Did you read that note?

18   A.   Yes, I did.

19   Q.   And so you understood that as of October of

20   2009 the company was planning to deactivate this

21   pressure relief valve in the by-products area,

22   correct?

23   A.   That's correct.

24   Q.   And I believe you testified earlier that you

25   actually -- or EPA issued an NOV, a notice of

1821

1    violation, regarding this pressure relief valve in

2    April of 2010, is that correct?

3              MR. MANGO:  Objection, your Honor, as

4    well, goes beyond the scope of redirect.

5              THE COURT:  We're going to wrap it up.

6    I'll permit it.

7   BY MR. LINSIN:

8    Q.  April 2010?

9    A.  Yes, we did.

10   Q.  Before you decided to issue a notice of

11   violation concerning this pressure relief valve,

12   did you call Tonawanda or Mark Kamholz and ask them

13   whether or not this pressure relief valve had been

14   deactivated?

15             MR. MANGO:  Objection, your Honor.

16   Relevance.

17             MR. LINSIN:  I'm sorry, I didn't hear your

18   response.

19             THE COURT:  The objection was relevance.

20   I haven't ruled on it yet.

21             MR. LINSIN:  I apologize, your Honor.

22             THE COURT:  The relevance here is?

23             MR. LINSIN:  The relevance here, your

24   Honor, is these are responses -- the integrity of

25   these responses has been challenged by the

1    government.  Understanding what these responses

2    intended to communicate and exploring how this

3    witness interpreted those responses is relevant to

4    understanding whether the responses are reasonable.

5              THE COURT:  But there's no obligation to

6    go beyond the response, right?  So it's not

7    relevant that the witness made calls or not in

8    connection with a completed response document.

9              MR. LINSIN:  Well, part of the response

10   we're talking about here, your Honor, and the

11   question went to was the agency's response six

12   months later to issue a notice of violation.

13   That -- and this was a subject of the witness's

14   earlier testimony.  I believe I have two questions

15   on the issue.

16             MR. MANGO:  Which, your Honor, relates

17   to -- the April notice of violation in 2010 relates

18   to information determined in April of '09.  So the

19   relevance to this note has no bearing on this --

20   this NOV, which isn't even in evidence at this

21   point.  It's -- we're beyond relevant here.

22             MR. LINSIN:  Your Honor, the witness

23   testified about that notice of violation in

24   response to questions from counsel from the

25   government.

1          MR. MANGO:  Your Honor, and it says that

2     the notice of violation is limited in a period of

3     time to 2009.  The fact that it was issued in 2010

4     is not relevant because the notice of violation is

5     addressing something from 2009.

6          THE COURT:  But something happened

7     in 2010.  I'm going to permit it over objection.

8          MR. LINSIN:  Thank you, your Honor.

9     BY MR. LINSIN:

10    Q.   Shall I repeat the question, sir?

11    A.   Yes, please.

12    Q.   Lets see if I can do that.

13         My question -- I think I just have two

14    questions.  Before EPA issued its notice of

15    violation regarding this pressure relief valve in

16    April of 2010, did you contact Tonawanda Coke or

17    Mr. Kamholz to even determine whether this pressure

18    relief valve was still operating?

19    A.   No, we did not.

20    Q.   When you issued the notice of violation in

21    April of 2010 regarding this pressure relief valve,

22    did you know that the pressure relief valve in the

23    by-products area of Tonawanda Coke had already been

24    deactivated?

25         MR. MANGO:  Objection, your Honor.

```
 1              MR. LINSIN:  I withdraw.

 2              THE WITNESS:  Yes, we did.  We, meaning

 3      EPA, did.

 4              MR. LINSIN:  And so even though you knew

 5      it was deactivated, you decided to issue a notice

 6      of violation?

 7              THE WITNESS:  Yes, for the past operation

 8      of the pressure release valve.

 9              MR. LINSIN:  All right.  No further

10      questions.  Thank you, your Honor.

11              THE COURT:  Thank you.

12         Mr. Personius, any recross?

13              MR. PERSONIUS:  I do not, your Honor.

14              MR. MANGO:  Your Honor, I have one

15      question that I think will clear something up.

16              THE COURT:  Okay.  Fair enough.

17              MR. MANGO:  Thank you.

18      REDIRECT EXAMINATION BY MR. MANGO:

19      Q.  Mr. Patel, were you informed to not contact the

20      corporation because the criminal process had

21      already started --

22      A.  That's correct.

23      Q.  -- at the time you wanted your information?

24      A.  That's correct.

25              MR. MANGO:  All right.  Thank you.
```

 1    Nothing else, your Honor.

 2            THE COURT:  Okay.  We're going to stare

 3    each other down here, Mr. Patel.  You're not trying

 4    to tell me you want to leave that witness stand,

 5    are you?

 6        You can step down.  You're excused.  Thank you.

 7    Have a good weekend.

 8            THE WITNESS:  Thank you.

 9            THE COURT:  Okay.  We either need to take

10    a break or recess for the weekend.

11            MR. MANGO:  We are ready with a witness,

12    your Honor.  We defer to the Court.

13            THE COURT:  Long?

14            MR. PIAGGIONE:  Yes, he will be long.

15            THE COURT:  Okay.  How would you like to

16    take a 15-minute break.  In that period of time,

17    head home.  All right?  Would that be fair?  All

18    right.  I know, Ms. Lambert, you don't want to

19    leave.

20            A JUROR:  Yes, I do.

21            THE COURT:  All right.  We'll see you

22    when?

23            THE JURY:  Monday.

24            THE COURT:  What time?

25            THE JURY:  9:30.

1            THE COURT:  Remember, this is important to

2       both sides.  Don't do anything with respect to the

3       media.  Don't do any investigation.  Don't discuss

4       the case.  Keep your minds open.  We're making

5       progress, as you can see.  There's a lot there, you

6       know that.  It will become focused in terms of what

7       those fact issues are that you have to resolve.

8       It's been terrific.  I know it's tedious and you're

9       tired of listening to me.  I'm going to send you

10      home.  Be safe and come back Monday happy and

11      healthy.

12           (Jury excused from the courtroom.)

13           THE COURT:  Okay.  Is there anything we

14      have to discuss in wrapping up?

15           MR. MANGO:  No, your Honor, not from the

16      Government.

17           MR. LINSIN:  No from Tonawanda Coke, your

18      Honor.

19           MR. PERSONIUS:  No, your Honor.  Thank

20      you.

21           THE COURT:  All right.  Thank you for your

22      cooperation.  Enjoy your weekend.  We'll see you on

23      Monday at what time?

24           MR. MANGO:  9:15.

25           MR. PERSONIUS:  Thank you, your Honor.

1827

1          *          *          *          *          *          *

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3              I certify that the foregoing is a

4       Correct transcription of the proceedings

5       Recorded by me in this matter.

6

7

8                          s/Michelle L. McLaughlin
                           Michelle L. McLaughlin, RPR
9                              Official Reporter
                             U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25