VOL. IX

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

        -vs-                10-CR-219S

TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
               Defendants.
-------------------------------------


          Proceedings held before the

    Honorable William M. Skretny, U.S.

    Courthouse, 2 Niagara Circle, Buffalo,

    New York on March 11, 2013.


    APPEARANCES:

    AARON J. MANGO,
    Assistant United States Attorney,
    ROCKY PIAGGIONE, Senior Counsel,
    U.S. Department of Justice,
    Appearing for the United States.

    GREGORY F. LINSIN, ESQ.,
    JEANNE M. GRASSO, ESQ.,
    ARIEL S. GLASNER, ESQ.,
    Appearing for Tonawanda Coke Corporation.

    RODNEY PERSONIUS, ESQ.,
    Appearing for Mark L. Kamholz.

    Also Present:  Lauren DiFillipo, Paralegal
                  Sheila Henderson, Paralegal


    Michelle L. McLaughlin, RPR,
    Official Reporter,
    U.S.D.C. W.D.N.Y.
    (716)332-3560

1829

1        I N D E X

2        WITNESS                                    PAGE

3        LARRY SITZMAN
         Direct Examination by Mr. Mango              1833
4        Cross-Examination by Mr. Linsin             1953

5

6        GOVERNMENT EXHIBITS                        EVD.

7              113                                  1925
               3521.20                              1958
8              92                                   1967
               3560.45                              2010
9              3560.13                              2035

10

11       DEFENDANTS' EXHIBITS                       EVD.

12              F                                   1981
             III and G                              1990
13              I                                   2001

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury seated.)

2      THE COURT:  Good morning, ladies and

3  gentlemen.

4      THE JURY:  Good morning.

5      THE COURT:  Good to see you again.  Ready

6  for another week?  Okay.  Please have a seat.

7      Okay, Miss Labuzzetta, if you would call the

8  case.

9      THE CLERK:  Criminal case 10-219, United

10  States of America versus Tonawanda Coke and Mark

11  Kamholz.

12      THE COURT:  Okay.  And, ladies and

13  gentlemen, as you can see, the attorneys and

14  parties are back present this morning.  We have

15  Mr. Mango and Mr. Piaggione, and we have the

16  paralegal, Miss DiFillipo, and, of course, Robert

17  Conway back there on the government's side.

18      And if you remember, the government has the

19  continuing burden of proof beyond a reasonable

20  doubt on each of the essential elements of the

21  crime charged.

22      And we have two defendants in this case, and

23  you know that Mark Kamholz is here.  He's at the

24  far table, along with his attorney Mr. Personius.

25  And we have Mr. Linsin for the defendant

1   corporation Tonawanda Coke; and back with us, I

2   think, chipper and ready to go forward is Jeanne

3   Grasso, and she's back here.  And at the same table

4   is Paul Saffrin, who is the president of Tonawanda

5   Coke, and off to the right is Miss Henderson, who's

6   the paralegal for the defense, and Ariel Glassner,

7   who gave up his seat from last week to go back to

8   where he started from.  And I think with everybody

9   here we're ready to proceed.  And -- yes,

10  Mr. Linsin?

11          MR. LINSIN:  Your Honor, I believe -- I

12  don't know if the jurors have their notebooks yet,

13  and I was hoping --

14          THE COURT:  Okay.  Thank you.  I'm not

15  sure the door opens from the -- oh, yeah, it does.

16  I thought maybe you had locked yourself in there,

17  but no such luck, right?

18     Okay.  Now that we've accomplished that --

19  thank you, Mr. Linsin -- I think government's ready

20  with its 14th witness, by my account, so --

21          MR. MANGO:  Yes, your Honor, the 14th

22  witness, the government calls Larry Sitzman.

23          THE COURT:  All right, Mr. Witness, if you

24  would approach the witness box, and I'll tell you

25  when to stop, and it's probably right about now.

1   Don't enter yet.  If you'd face the jury, please,

2   that would be helpful.  Thank you.

3   L A R R Y   S I T Z M A N, having been duly sworn as

4   a witness, testified as follows:

5            THE COURT:  Thank you.  Okay.  You just

6   KO'd the microphone, and we'll see how we go from

7   there.

8       A couple of preliminary instructions, please.

9   Please keep in mind that you're here to testify for

10  the benefit of the ladies and gentlemen of the

11  jury.  What works best, I think, is if you speak in

12  a conversational tone.  Speak at the microphone.

13  It's friendly.  It should pick you up with no

14  difficulty.  If you look in the direction of the

15  ladies and gentlemen of the jury, that's helpful.

16      Please don't answer a question that you don't

17  understand.  Simply ask the attorneys, or me if I'm

18  questioning you, to repeat the question.

19      Try not to volunteer information.  That's what

20  usually complicates things.  If you can do a yes or

21  a no answer to a question, that enables us to go

22  forward more expeditiously.

23      If there's an objection, wait until I rule on

24  the objection, and then I will give you further

25  instructions, either complete your answer, wait for

1    the next question, or something similar to that.

2        Do you understand?

3            THE WITNESS:  Yes, your Honor.

4            THE COURT:  Okay.  I think you're going to

5    carry pretty well.  Speak at the microphone, state

6    your full name, spell your last name, please.

7            THE WITNESS:  My full name is Larry

8    Sitzman.  Last name is S-I-T-Z-M-A-N.

9            THE COURT:  Okay.  Your witness,

10   Mr. Mango.  Thank you.

11           MR. MANGO:  Thank you, your Honor.

12   DIRECT EXAMINATION BY MR. MANGO:

13   Q.  Good morning, Mr. Sitzman.

14   A.  Good morning.

15   Q.  Are you currently employed, Mr. Sitzman?

16   A.  Yes, I am.

17   Q.  How are you employed?

18   A.  I'm employed by the New York State Department

19   of Environmental Conservation.

20   Q.  And how long have you been employed with the --

21   can we call that the DEC?

22   A.  Yes.

23   Q.  How long have you employed with the DEC?

24   A.  25 1/2 years, approximately.

25   Q.  What is your current position that you're in?

1834

1    A.   My current position, I work in the Albany

2    office of the DEC.  I'm the director of the Bureau

3    of Air Quality Surveillance for the Division of Air

4    Resources.

5    Q.   So you work out of Albany?

6    A.   Yes.

7    Q.   How long have you been in that position?

8    A.   I've been in that position approximately two

9    and a half years.

10   Q.   And if you can tell the jury, please, what are

11   your duties in that position?

12   A.   My duties -- my duties now are to manage the

13   operation of New York State's ambient air quality

14   monitoring network.  It's required by federal

15   regulations, and I manage a staff who runs all

16   those monitors and repairs them throughout the

17   state.

18   Q.   Okay.  Is that what the Bureau of Air Quality

19   Surveillance does?

20   A.   Yes.

21   Q.   And how many staff members do you oversee?

22   A.   About 44 throughout the state.

23   Q.   All right.  Have you held any other positions

24   with the New York State DEC?

25   A.   Yes, I have.

1   Q.   All right.   If you can describe for the jury

2   what other positions and how long, approximately,

3   you've held those.

4   A.   Okay.   I started with DEC in 1987 in the Albany

5   office as an assistant environmental engineer.   I

6   worked for the Division of Air Resources in the

7   Bureau of Stationary Source Control.   That's the

8   bureau that basically does all the permitting

9   activities, assists the regions in doing permitting

10   of air pollution sources throughout the state.   I

11   was there for about two and a half years.

12       Had an opportunity to transfer back to the

13   Buffalo office, and I took that.   In 1990 I came to

14   the Buffalo office in the Division of Water as an

15   assistant engineer.   I did wastewater -- inspected

16   and permitted wastewater treatment plants for about

17   a year and a half.

18       Then in the summer of 1991 I took my

19   professional engineer's exam and passed and had an

20   opportunity to go to the Division of Air Resources,

21   which was my first love, so I went back to that.

22   And I spent the next 18 1/2 years in various

23   capacities in the Division of Air in the Buffalo

24   office from senior -- from -- well, I was still

25   assistant engineer until I got my license, for a

1836

1    short time.  Then senior engineer doing permitting,

2    compliance inspections, and enforcement responding

3    to complaints.  And in 2000 I was named -- got a

4    promotion.  I was named regional air pollution

5    control engineer, where I was in charge of the

6    entire operation of the region for the air program.

7        And in October of 2010 I left and got a

8    promotion and went back to Albany.

9    Q.  Okay.  So in total how long were you in the

10   Buffalo office?

11   A.  Twenty years.

12   Q.  And you mentioned from -- a period of time of

13   from 1991 to 2000 you were in what position?

14   Senior engineer?

15   A.  I was -- yeah, for the brunt of the time I was

16   a senior engineer.

17   Q.  Have you heard the term "Environmental Engineer

18   II"?

19   A.  Yes.  That was my title.  My civil service

20   title was Environmental Engineer II.  It had

21   changed over time.  When I started, it was

22   assistant and senior engineer, and so I never got

23   used to the new -- now we're called Environmental

24   Engineers I, II, III, IV, whatever, but --

25   Q.  Okay.  So between 1991 and 2000 you were an

1    Environmental Engineer II?

2    A.   Correct.

3    Q.   Okay.  Can you describe for the jury what your

4    job duties were as an Environmental Engineer II

5    during that time period?

6    A.   I was assigned air pollution facilities,

7    industries.  I wrote permits for those facilities.

8    I inspected them for my assigned facilities.  I

9    took enforcement actions as necessary.  I responded

10   to general air pollution complaints.

11       Throughout that time in -- in the -- in 1990

12   the Clean Air Act was amended, and that brought on

13   for my type of work the Title V permitting program.

14   I was the lead in the region on doing outreach.

15   The department and our region in particular was

16   very proactive in giving presentations on the new

17   requirements of the Clean Air Act.  We were

18   learning along the way too, so we wanted to do a

19   lot of outreach with industry to talk about the new

20   requirements so we could implement -- implement

21   things as they came along.  And I did many talks

22   throughout that time period while I was a senior

23   engineer.

24   Q.   Okay.  So you mentioned some of your duties

25   were inspection related --

1    A.   Yes.

2    Q.   -- is that right?   How frequently -- if you can

3    tell the jury, how frequently did you conduct

4    inspections in that role?

5    A.   In those days it was probably weekly I was

6    going to some facility on an inspection.

7    Q.   Okay.   What types of facilities would you

8    inspect?

9    A.   Oh, boy, a lot of different types, from auto

10   body shops, to medical waste incinerators, to

11   chemical plants, to coke ovens.   Some of the names

12   Buffalonians may remember is Buffalo Color

13   Corporation, Bethlehem Steel.   Those were my type

14   of facilities.

15   Q.   Okay.   So you did conduct inspections at

16   Bethlehem Steel?

17   A.   Yes.   I had two responsibilities there, the bar

18   mill -- Bethlehem Steel still operated -- three

19   responsibilities, actually -- the bar mill; they

20   operated the galvanizing mill they operated still;

21   and the coke plant that was still in operation in

22   those days.

23   Q.   Okay.   During your inspections of the coke

24   plant -- did you do inspections of that part, the

25   coke plant?

1   A.   Yes.

2   Q.   Okay.  During your inspections what was the

3   focus of your inspections of the coke plant at

4   Bethlehem Steel?

5   A.   My focus was in those days the -- the battery.

6   The coke battery was in great disrepair.  I guess

7   I'll put it that way.  And there was a new Clean

8   Air Act requirement that dealt with emissions from

9   the coke battery.  In 1994, I believe, that came

10  out, so I started at that plant in 1993.  So that

11  was generally my big focus, although there was a

12  by-products part of the plant that had

13  requirements, but I spent much more time at the

14  battery.

15  Q.   Okay.  If you can tell the jury, just typically

16  how long did your inspections last in this position

17  as Environmental Engineer II, or if it varied, if

18  you can tell the jury, you know, why it varied.

19  A.   It really varies.  If you go to a plant in

20  response to a complaint, it could be as little as

21  15 minutes.  You could be there all day, too,

22  depending on what you were there to inspect, and if

23  it was just one item at the plant or an entire

24  plant inspection.

25  Q.   Okay.  Did your inspections involve viewing

1840

1  every emission source at a particular facility?

2  A.  Not typically.

3  Q.  Okay.  If you can tell the jury, during your

4  inspections if you noticed a violation, what would

5  you -- what would you do?

6  A.  If I noticed -- if I noticed a violation, I

7  knew it was a violation, my standard procedure was

8  to inform the facility that there was a violation

9  that I saw during the inspection.  We'd have to

10  deal with that one way or another.

11  Q.  Okay.

12  A.  If I -- go ahead.

13  Q.  If you're on-site -- we just can't overlap too

14  much.

15  A.  Yes.

16  Q.  If you're on-site and you notice a violation,

17  what would you do?

18  A.  I would typically tell the plant that they had

19  a violation.  I think it's very important to let

20  facilities know what you're seeing during an

21  inspection and if there's a violation you find or

22  not.

23  Q.  Okay.  Were there times when you thought maybe

24  something was a violation, but you wanted to go

25  back and research it more?

1    A.   Oh, absolutely.  You know, there's times you

2    might have to really look into a regulation or go

3    back through the file and find out if there was a

4    violation.

5    Q.   All right.  Now, in your job duties, you

6    discussed duties relating to permit writing and

7    review, is that right?

8    A.   Yes.

9    Q.   Can you tell the jury what duties you had

10   relating to permit writing and review as an

11   Environmental Engineer II?

12   A.   As an Environmental Engineer II, I reviewed

13   permit applications submitted by facilities and

14   wrote a permit based on that.  In the -- when I was

15   first in that title, we had our old permitting

16   system, which was each emission point at a

17   facility, any place the emissions came out,

18   required a permit, and an application would be

19   submitted, and we -- on that application we would

20   write the requirements for the permit and have the

21   permit issued and sent back to the facility.

22        The Clean Air Act changed all that from an

23   emission-point permit to a facility basis, so we

24   would get an application in, again, that would

25   include all of the information for the facility,

1    and write the permit based on that.

2    Q.  All right.  So you would review permit

3    applications as part of your duties?

4    A.  Yes.

5    Q.  Okay.  In the course of your work as an

6    Environmental Engineer II, how many permit --

7    permit -- how many permit applications would you

8    review or do you recall reviewing in your time?

9    A.  Oh, I reviewed hundreds of applications.

10   Q.  And as an Environmental Engineer II, were you

11   involved in writing permits?

12   A.  Yes.

13   Q.  Okay.  How many permits were you involved in

14   writing?

15   A.  As in the old permit system, where it was

16   emission point by emission point, it would be

17   hundreds.  One of my facility had 500 emission

18   points.  There was a lot of permits.  As Title V

19   came on, I -- when I was still an Environmental

20   Engineer II, I wrote -- I wrote just a handful of

21   permits myself.

22   Q.  Title V permits?

23   A.  Title V permits.

24   Q.  So you started to discuss the regulatory scheme

25   in New York that addresses air permits, is that

1    right?

2    A.   Yes.

3    Q.   All right.   You're familiar with the regulatory

4    scheme in New York?

5    A.   Yes.

6    Q.   Okay.   Let's talk a little bit about your job

7    duties as Regional Air Pollution Control Engineer.

8    Okay.   Is that also called a RAPCE?

9    A.   Yes.

10   Q.   If you use that term, so the jury knows.   If

11   you could tell the jury, what you were your duties

12   as Regional Air Pollution Control Engineer?

13   A.   As Regional Air Pollution Control Engineer, I

14   was in charge of the environmental staff for the

15   Division of Air Resources in the regional office.

16   I would make sure we met all the requirements for

17   the Clean Air Act in our region.   I had, as an

18   Environmental Engineer II, supervised some staff.

19   I continued -- our staff was shrinking at the time.

20   I continued providing that service, so as part of

21   those duties I reviewed the permits they wrote,

22   because I had been doing that for quite some time.

23       And then part of my duties also were -- for all

24   large facilities, once a year we had to assure that

25   every one of them, that every item that was

1    required throughout the year was completed.  And so

2    every one of those facilities, there was a form

3    turned in by the staff in charge of that facility I

4    had to review and make sure everything was done,

5    sign it, and enter it into our computer system.

6    Q.  How were you selected to become Regional Air

7    Pollution Control --

8    A.  Through civil service test and interviews.

9    Q.  And how many staff -- or if it changed, tell

10   the jury how many staff at one point you supervised

11   and how that may have changed.

12   A.  When I became RAPCE, we had 18 staff in

13   Region 9.  When I left in 2010, it took it down to

14   10 staff.

15   Q.  And what positions did these individuals hold

16   that you supervised?

17   A.  The -- the main titles were Environmental

18   Engineering Technician, Environmental Program

19   Specialist, and Environmental Engineer, through

20   various categories and various levels of detail in

21   those titles, I, II, III, just the same as the

22   engineers I described earlier.

23   Q.  Okay.  And what were the principal differences

24   between a technician, a specialist, and an

25   engineer?

1    A.   Typically the facilities vary in complexity

2    throughout the state, so -- or throughout the

3    region.  So, typically, environmental engineering

4    technicians would assist engineers in inspections

5    of large facilities and may -- maybe actually have

6    their own very small facilities that they're

7    responsible for all compliance.

8        Program specialists and lower-level engineers,

9    as they -- as they got more knowledge in the

10   system, they would get more complex facility --

11   assigned more complex facilities.  And typically

12   the most seasoned staff, most knowledgeable staff,

13   did the most complex facilities in the region.

14   Q.   Did you have any public outreach

15   responsibilities as Regional Air Pollution Control

16   Engineer?

17   A.   Yes.  I continued those responsibilities as

18   RAPCE, from being a senior engi -- or Environmental

19   Engineer II.

20   Q.   Okay.  And as a Regional Air Pollution Control

21   Engineer, did you have any role in the oversight of

22   a company known as the Tonawanda Coke Corporation?

23   A.   I was in charge of the whole region, and yes, I

24   had responsibility for every facility.

25   Q.   Are you familiar with that company?

1846

1    A.   Yes, I am.

2    Q.   All right.  Was there a time when your focus on

3    the Tonawanda Coke Corporation increased?

4    A.   Yes.

5    Q.   When was that?

6    A.   I would say around -- well, it was after --

7    late 2007, early 2008, we conducted a project in

8    our region in the Tonawanda area.  From -- it

9    really started -- we really started learning about

10   the issue in 2005.  Samples were taken, by a

11   community group, of air.  We started investigating

12   the results of those samples when they presented

13   them to us.  We went out and took our own samples

14   after that and confirmed some of the short-term

15   sampling with longer sampling.

16        That led to us applying for a grant through

17   EPA, and we received -- I think it was $365,000, to

18   do an air quality study around Tonawanda.  And we

19   spent about that much ourself as New York State.

20   Worked hand in hand with our Albany office, where

21   the real technical experts on air monitoring were

22   located.

23        Completed that study.  One of the big issues

24   was benzene.  There's several facilities that emit

25   benzene in the Tonawanda area, the Tonawanda

1847

1    industrial area on River Road, and we started

2    investigating those facilities to see where there

3    may be possible sources of benzene.

4    Q.   Okay.  And one of those facilities you began to

5    focus more on was Tonawanda Coke, is that right?

6    A.   Yes.

7    Q.   Was there a contact person at Tonawanda Coke

8    that you dealt with?

9    A.   Yes.

10   Q.   All right.  Who was that?

11   A.   Mark Kamholz.

12   Q.   And, Mr. Sitzman, do you see Mr. Kamholz here

13   in court?

14   A.   Yes, I do.

15          MR. MANGO:  Your Honor, may the record

16   reflect Defendant Kamholz has stood up and the

17   witness has identified him?

18          THE COURT:  Yes.  The record will reflect

19   the identification of Defendant Mark Kamholz.

20          MR. MANGO:  Thank you, your Honor.

21   BY MR. MANGO:

22   Q.   Mr. Sitzman, do you have any type of particular

23   educational background that qualified you for the

24   position of Regional Air Pollution Control

25   Engineer?

1    A.   I have a Bachelor's of Science degree in civil

2    engineering from the University of Buffalo, I

3    received in 1980, and I've taken many air pollution

4    training courses throughout the years.

5    Q.   And what types of air pollution training

6    courses, if you can tell the jury, would you -- did

7    you take?

8    A.   One of the typical ones we take quite often is

9    training to read the opacity of smoke or the

10   darkness of smoke coming out of a stack.

11   Inspectors have to be certified every six months in

12   the EPA methods to be able to read that smoke.  So

13   we -- most staff went through that.  As I became

14   RAPCE, I did that less and less, because I had

15   other duties and didn't maintain my certification.

16       But throughout my career I took courses in

17   various industrial activities, in permitting

18   strategies, in enforcement strategies, in air

19   pollution control equipment design and inspection,

20   in hazardous waste incineration, in medical waste

21   incineration.  Continued taking courses throughout

22   my career.

23   Q.   Do you hold any type of professional license,

24   Mr. Sitzman?

25   A.   Yes.  I'm a licensed New York State

1849

1    professional engineer.

2    Q.  Are you a member of any professional

3    associations?

4    A.  Yes.  I'm a member of the Air and Waste

5    Management Association.

6    Q.  All right.  Let's talk -- you've mentioned the

7    term "the Clean Air Act."  Are you familiar with

8    the Clean Air Act?

9    A.  Yes, I am.

10   Q.  How are you familiar with the Clean Air Act?

11   A.  I have familiarity with the act itself, which

12   is the federal law, and familiarity with the

13   implementing regulations that EPA developed to

14   implement the Clean Air Act.

15   Q.  Okay.  Can you tell the jury, briefly, what is

16   the Clean Air Act?

17   A.  The Clean Air Act is a federal law that was

18   first established, I think, in 1970.  I don't

19   remember the exact date.  Was amended a couple

20   times.  The most recent amendment was 1990, the big

21   amendment that really changed the way we looked at

22   air pollution.  There's many sections of it, many

23   titles of the Clean Air Act.  There's some titles

24   I'm not very familiar with.  There's titles on

25   cars, for instance, mobile sources.  I don't deal

1    with that.  We have other people that deal with

2    that.

3        I'm more familiar with the parts of the Clean

4    Air Act that deal with industrial permitting and

5    compliance issues and regulation development.

6    Q.  Is there something in the Clean Air Act known

7    as Title V?

8    A.  Yes, there is.

9    Q.  Are you familiar with Title V of the Clean Air

10   Act?

11   A.  Very familiar.

12   Q.  How have you gained this familiarity with

13   Title V?

14   A.  Reading it and working with it.

15   Q.  Okay.  How long have you been working with the

16   Clean Air Act or Title V?

17   A.  Title V, you know, the amendments came out in

18   1990.  We started working on our implementation of

19   the Clean Air Act at that point.  We had to

20   write -- we had to completely rewrite our

21   permitting regulation at the time, to put in the

22   requirements for Title V.

23   Q.  So, Mr. Sitzman, are you familiar with the

24   permitting scheme under Title V?

25   A.  Yes.

1    Q.   And can you describe in general terms what that

2    permitting scheme is?

3    A.   In -- in general terms, Title V required that

4    every facility that was covered under Title V,

5    which in our case was large facilities -- if I can

6    use the term, "major facility" is what we use.   It

7    depends on your -- the level your emissions are.

8    If your -- if you have enough emissions, you're

9    considered a major facility and you get a Title V

10   permit.

11        To be complete, I should tell you that we have

12   two other schemes for smaller facilities, one with

13   lower emissions.   They're issued a state facility

14   permit, which is similar in look to a Title V

15   permit, but it's facilities that aren't major.   For

16   very small facilities we issue a one-page

17   registration that -- for instance, a dry cleaner

18   may get a registration that just says:   I'm a dry

19   cleaner and I'm covered under this law.   A very

20   general certificate.

21        Title V is for major facilities.   What it

22   required is that all sources covered under that had

23   to submit an application.   The application had to

24   include all of the information of the plant for

25   every regulated unit at the plant.   Had to include

1    all of the regulations.  They had to identify all

2    of the regulations that governed those operations

3    in the application, and they had to identify any

4    recordkeeping or monitoring requirements that may

5    have not been precisely in a regulation, but the

6    monitoring methods they would use to show they were

7    in compliance at the facility.

8        And that application was then signed and

9    submitted by the responsible official at the

10   facility, and it comes in -- at DEC we have a unit

11   called the Environmental Permits Unit.  They

12   basically issue all the permits for DEC, no matter

13   what program.  So any permit application is

14   submitted through them.  They receive it, send it

15   off to a key punch contractor who key punches the

16   application into digital format, sends a disc back

17   to us.  It gets entered in our computer system, and

18   we go from there to draft a permit from the

19   application.

20   Q.   Okay.  So from 1990 all the way up through your

21   position as Regional Air Pollution Control

22   Engineer, have you dealt with Title V?

23   A.   Yes.

24            THE COURT:  Now, you testified, I believe,

25   earlier, though, that you only wrote a handful of

1   Title V permits, correct?

2              THE WITNESS:  I only wrote a handful, yes.

3   BY MR. MANGO:

4   Q.  Have you heard of the -- you started to

5   discuss, Mr. Sitzman, the -- the state

6   requirements, two additional non-Title V permits.

7   A.  Yes.

8   Q.  Before we get there, do you know if New York

9   State is delegated to implement the Title V?

10  A.  Yes, New York State -- every state had to

11  receive -- I don't think it's really called

12  delegation, but I'm going to forget the exact term.

13  But every state had to be approved by EPA to write

14  Title V permits.  And it was a whole program, not

15  just a permitting part, but legal requirements that

16  the State had to meet legal obligations too, so

17  some state laws had to be changed, for instance.

18  So it was a whole package, and I think it was 1996

19  New York received interim approval of our Title V

20  program and could start writing permits, and I

21  think it was 2000 or 2002 that we got final

22  approval of our complete program.

23  Q.  All right.  Now, prior to Title V, can you

24  describe -- and you've already touched on it

25  briefly -- can you describe the permitting scheme

1    in place prior to Title V in New York State?

2    A.   Sure.  It was -- as I said earlier, it was

3    emission point permits, and each emission point at

4    a facility needed a permit.  What I mean by that is

5    anything generally that emitted air contaminants --

6    air pollutants, that's a better term -- would need

7    to apply for a permit with us.

8        Our permitting regulation contained exemptions,

9    so people may apply for a permit and be exempt, and

10   we would never have to issue one.  But generally,

11   since I've been doing this work, any air pollution

12   source, emission point that emitted air pollutants

13   or air contaminants, needs a permit.

14   Q.   Okay.  Have you heard the term Air 100?

15   A.   Yes.

16   Q.   Okay.  What is that?

17   A.   Air 100 is the form we used to issue those

18   emission point permits.  It was an application that

19   a facility would complete, submit to us, we would

20   review that application along with any other

21   associated documents submitted with that form,

22   include the regulatory requirements then on the

23   application, and there was places for the permit to

24   be issued.

25   Q.   In your career at DEC in the various positions

1    that you've held, have you reviewed Air 100s?

2    A.   Many times.

3    Q.   How many would you say?

4    A.   That's where it's hundreds.

5    Q.   Are you familiar with Title 6 of the New York

6    Code Rules and Regulations, which we may call

7    NYCRR?

8    A.   Yes.

9    Q.   And Subparts 200, 201 and 214?

10   A.   Yes.

11   Q.   How familiar are you with these subparts?

12   A.   Very familiar.

13   Q.   Okay.  What does Subpart 200 deal with?

14   A.   200 is our -- Part 200 is our general

15   definitions, general provisions for the air

16   pollution program.  It also contains references to

17   all of the federal regulations that we have

18   delegation to enforce in New York State.

19   Q.   Okay.  Part 201, what does that deal with?

20   A.   Part 201 is our permitting regulation that

21   contains all the requirements for required permits

22   applications, and all the requirements for who

23   needs to apply for a permit.

24   Q.   And Subpart 214, what does that deal with?

25   A.   Subpart 214 regulates coke-making operations.

1  Q.  All right.  Now, in your position as regional

2  air pollution control engineer, did your -- did

3  your -- when I last asked you the question, I was

4  focused solely when you were an Environmental

5  Engineer II regarding permit writing and review.

6  When you became RAPCE, did those duties increase?

7  A.  The review part increased, yes.  My writing of

8  permits, I no longer wrote permits myself, but I

9  assisted staff in writing permits, and for several

10  staff I reviewed their permits before they were

11  sent out as a draft permit for public notice.

12  Q.  Okay.  Did you ever work with staff members to

13  interpret conditions of a permit?

14  A.  Constantly.

15          MR. MANGO:  Your Honor, at this point,

16  based on Mr. Sitzman's experience with DEC,

17  educational background, familiarity with the Clean

18  Air Act, Title V, and the New York Codes, Rules and

19  Regulations, the government would offer Mr. Sitzman

20  as an expert in those areas of the Clean Air Act,

21  Title V, permitting scheme, and the implementation

22  of New York Codes, Rules and Regulations.

23          THE COURT:  Okay.  Any objection?

24          MR. LINSIN:  No objection, your Honor.

25          MR. PERSONIUS:  No, your Honor.

1          THE COURT:  Okay.  Ladies and gentlemen,

2     you may consider the testimony of Mr. Sitzman with

3     respect to areas that will call upon his expertise

4     as an expert witness in the defined areas that

5     Mr. Mango has mentioned.  You are to judge the

6     credibility, the believability of the witness just

7     like you do everybody else who testifies.

8     Mr. Sitzman's being called because of the special

9     knowledge that he has that might be of assistance

10    to you in working through his testimony relative to

11    areas that he may be called upon to give an expert

12    opinion.

13        Because he is an expert, if you do have any

14    questions after his testimony is concluded, you may

15    fill out the question form at the back of your

16    notebooks, and then we'll process it and see if

17    those questions or the question will be answered.

18    Okay?

19        You may proceed, Mr. Mango, except that you

20    have to wait for Mr. Personius to add his comments.

21          MR. PERSONIUS:  Thank you, Judge.  Judge,

22    just in light of the instruction you gave to the

23    jury, which certainly was very appropriate, my

24    understanding is Mr. Sitzman is not just here as an

25    expert witness.  He's also here as a fact witness.

1858

1    So I just think the jury should know that they're

2    going to hear expert and fact testimony from him.

3             THE COURT:  Okay.  And, you know, it will

4    be -- it should be made clear to you, ladies and

5    gentlemen, where in those areas Mr. Sitzman is

6    being called to give testimony that would be

7    considered expert testimony relative to the Clean

8    Air Act and various interpretations, and again,

9    that would be based on his expertise.  But as noted

10   by Mr. Personius -- and you've heard Mr. Sitzman's

11   name mentioned throughout this case -- he will be

12   called and is being called, once we get through all

13   of the allergies and the sneezes and everything

14   else, as a fact witness in this case as well.

15       All right.  I think that happens after a while.

16   The jurors and juries usually develop allergies

17   either to attorneys or witnesses.  We never know

18   which.  But in any event, bless you.  You may

19   continue with that.

20             MR. MANGO:  Thank you, your Honor.

21   BY MR. MANGO:

22   Q.  Mr. Sitzman, have you reviewed DEC's Division

23   of Air file dealing with the Tonawanda Coke

24   Corporation before testifying here today?

25   A.  Yes, I have.

1859

1    Q.   And do you know if the Tonawanda Coke

2    Corporation is required to operate pursuant to a

3    Title V permit?

4    A.   Yes, they are.

5    Q.   Okay.  Do they have a Title V permit?

6    A.   Yes, they do.

7    Q.   And do you know when that Title V permit was

8    issued?

9    A.   The permit was issued in May of 2002.  It

10   expired in May of 2007.  However, it remains in

11   effect.  They applied for a permit renewal in a

12   timely fashion, and because of all the issues going

13   on with the plant, we haven't issued a renewal

14   permit until we get everything straightened out and

15   can issue an accurate permit for what requirements

16   will be at the facility when we conclude all the

17   actions.

18   Q.   Okay.  Prior to the issuance of Tonawanda

19   Coke's Title V permit, was the company regulated at

20   all by the DEC?

21   A.   Yes.  They had emission point permits.

22   Q.   Okay.  So these are these Air 100s?

23   A.   Correct.

24   Q.   And when did the regulation of the Tonawanda

25   Coke facility begin?

1860

1     A.   When they purchased the facility in 1978.

2     Q.   All right.  I'd like to talk about an area

3     now -- are you familiar with the term "pushing

4     controls"?

5     A.   Yes.

6     Q.   And what does that term mean to you?

7     A.   A coke plant -- part of the operation is, once

8     the coke has been produced in the oven, it's pushed

9     out.  Pushing it out of the oven can release lots

10    of contaminants.  And there is a requirement for

11    certain coke facilities to have pushing controls on

12    their push side of the oven, the coke side, so that

13    when the coke comes out of the oven and all those

14    contaminants come off, they're all collected and

15    treated and just don't go into the atmosphere.

16              MR. MANGO:  Okay.  At this point I'd like

17    to pull up, your Honor, Government Exhibit 128

18    already in evidence.

19    BY MR. MANGO:

20    Q.   If we can just take a look at this document,

21    Mr. Sitzman.  It's a multiple-page document.  Have

22    you reviewed this document in the past?

23    A.   Yes, I have.

24    Q.   And what's the date up at the top?

25    A.   Date is November 27th, 1979.

1  Q.  Let's focus in, actually.  November what?

2  A.  17th, 1979.

3  Q.  Thank you.  And if you could tell the jury,

4  Mr. Sitzman, what -- what is -- what -- what is

5  this document requesting of the DEC?

6  A.  This was a letter to -- or is a copy of a

7  letter to our commissioner of DEC at the time,

8  discussing Part 214 and how it related to Tonawanda

9  Coke.  This was a relatively -- Tonawanda Coke had

10  just purchased the facility, and there was much

11  discussion, in my looking at the -- through the

12  file back at that time, over the regulatory

13  requirements for this facility in the whole scheme

14  of Part 214.

15  Q.  Okay.  Mr. Sitzman, do you know, as a result of

16  this letter -- do you know if DEC granted Tonawanda

17  Coke any type of exemption relating to pushing

18  controls?

19  A.  The -- after -- after -- after this letter

20  worked its way all through the process and with

21  much discussion with DEC, Tonawanda Coke was issued

22  an exemption.  A consent order was issued that

23  exempted Tonawanda Coke from pushing controls in

24  exchange for tighter controls at the facility on

25  another requirement.  Another requirement of

1862

```
 1      Part 214 is to control leaks from doors of the
 2      ovens, lids of the ovens, and offtakes, and
 3      Tonawanda Coke accepted stricter limits on those
 4      provisions in exchange for not installing pushing
 5      controls.
 6      Q.   Okay.  So as a result of those stricter limits,
 7      do you know what was the focus of the DEC
 8      inspections at the Tonawanda Coke Corporation?
 9      A.   We were focused at the time on making sure they
10      met those stricter limits at the battery.
11      Q.   And that related to the battery?
12      A.   Uh-huh.  To the battery.
13               THE COURT:  Yes?
14               THE WITNESS:  Yes.  Yes.  I'm sorry.
15      BY MR. MANGO:
16      Q.   So, were the DEC inspections similar to Method
17      303 inspections?
18      A.   Yes, similar.
19               MR. LINSIN:  Your Honor, I just request a
20      clarification on that question and the response.
21      The question was were DEC inspections, and then
22      asked for the witness to characterize them.  There
23      are a variety of different types of inspections,
24      and I would ask that we be clear about what we're
25      talking about over the years.
```

1         THE COURT:  Yeah, I think it was were they

2    similar to 303 inspections.  So you want a

3    clarification on that?

4         MR. LINSIN:  Well, clarification as to,

5    first of all, which DEC inspections we're talking

6    about, and then whether they're similar or not to

7    303 inspections.  Yes.

8         MR. PERSONIUS:  And forgive me, your

9    Honor.  Before we even go down that road, the

10    witness said the focus at the time.  If we could

11    have a clarification of what "at the time" is.

12    This may not be relevant.

13         THE COURT:  Okay.  Well, let's see what

14    you have to say here by way of your redirected

15    questions, Mr. Mango.

16         MR. MANGO:  Yes, your Honor.

17    BY MR. MANGO:

18    Q.  Mr. Sitzman, you mentioned about similarity

19    with Method 303 inspections?

20    A.  Yes.

21    Q.  Okay.  Were some of the DEC inspections similar

22    to a Method 303 inspection?

23    A.  Yes, they were.

24         THE COURT:  Let us know a time frame now.

25    BY MR. MANGO:

1    Q.   That was the next question, your Honor.

2         Mr. Sitzman, do you know what time period we

3    would be talking about here?

4    A.   Well, in the in -- the requirement for a Method

5    303 inspection came out in the federal regulation

6    in 1994 time frame, is where that requirement is

7    included.  Prior to that, New York State did those

8    inspections to see if the battery -- the battery,

9    the coke battery, was in compliance with the leak

10   limits of the battery.

11   Q.   Okay.  So is it fair to say some of the

12   inspections prior to 1993 were focused on the

13   battery?

14   A.   Yes.

15   Q.   Okay.  And how about after 1994 up through,

16   let's say, 2009?  Were some of your inspections or

17   some of the DEC inspections focused on the battery?

18   A.   Yes.

19   Q.   Because of these pushing -- this exemption for

20   pushing controls?

21   A.   The -- you know, the rules in 1994, the federal

22   rules, required a third-party inspector daily at

23   the plant.

24            THE COURT:  I thought you said that the

25   federal rules were as of 1994, not prior to.  What

1    is --

2              THE WITNESS:  Sorry if I wasn't clear,

3    your Honor.  The regulation of 1994 required that

4    coke facilities hire a third-party inspector.

5              THE COURT:  Now, that was a federal

6    regulation?

7              THE WITNESS:  Federal, yes.

8              THE COURT:  Now, were there federal

9    regulations before 1994?

10             THE WITNESS:  No, there was no federal

11   regulations before 1994.  It was just Part 214.

12   BY MR. MANGO:

13   Q.  Okay.

14   A.  Part 214 still exists.

15   Q.  Okay.  And because of this exemption on pushing

16   controls prior to 1994, were some of your

17   inspections focused on the battery?

18   A.  Yes.

19   Q.  And even after 1994 when the 303 inspection

20   scheme came into place, was DEC still at a time

21   focused on the battery?

22             MR. PERSONIUS:  Your Honor, this has been

23   asked and answered.  It's being overemphasized.

24             THE COURT:  Well, I'll overrule that

25   objection.  You may answer.

1    THE WITNESS:  There was focus on the

2    battery, yes, in addition to Part 303 inspections.

3    BY MR. MANGO:

4    Q.  Okay.  Based on your knowledge of the DEC file,

5    do you know if Tonawanda Coke had any other type of

6    exemption relating to the -- let's say, the quench

7    towers?

8    A.  Yes.

9    Q.  All right.  And you know what quench towers

10   are?

11   A.  Yes.

12   Q.  All right.  Can you tell the jury what your

13   understanding of that exemption relating to the

14   quench tower was?

15   A.  Tonawanda Coke has two quench towers.  I never

16   remember the numbers, but there's an east tower and

17   a west tower.  The west tower, there was an

18   exemption for -- to operate that unit in a standby

19   capacity.  The exemption allowed them not to have

20   required baffles in the tower as long as it was

21   used less than 10 percent of the time throughout

22   the year.

23   Q.  Okay.  Do you know when, Mr. Sitzman, that

24   exemption for the west quench tower was

25   established?

1    A.   I think it was in the 1980s.

2              MR. MANGO:  All right.  Let's take a

3    look -- your Honor, if we could pull up Government

4    Exhibit 19.02 in evidence.  And if we can focus on

5    this portion, please.

6    BY MR. MANGO:

7    Q.   Mr. Sitzman, do you see this document on your

8    screen?

9    A.   Yes.

10   Q.   And what is the date of this document?

11   A.   September 19th, 1983.

12   Q.   All right.  It's a -- let's focus starting --

13   well, really, at these two paragraphs.  Do you see

14   any discussion regarding quench tower number 1?

15   A.   Yes.

16   Q.   And --

17   A.   That is -- this is a letter, copy of a letter

18   to the RAPCE at the time at DEC in Buffalo, and

19   submitting applications that we talked about, Air

20   100s for certificates to operate, and also asking

21   that baffles -- that we approve an exemption -- an

22   exception to allow them not to install baffles in

23   quench tower 1 due to it being very old and that

24   the -- there would be a significant sum of capital

25   would have to be spent to provide the required

1868

1    baffles.

2    Q.   Okay.  So, now, does looking at this letter

3    refresh your recollection as to -- you mentioned

4    the west quench tower had an exemption.  And this

5    letter talks about quench tower number 1.

6    A.   That would be the west quench tower.

7    Q.   Okay.  And the reason provided by the Tonawanda

8    Coke Corporation is significant sums of capital?

9    A.   That's one of the reasons, yes.

10   Q.   Do you know, Mr. Sitzman, if this request was

11   approved?

12   A.   Yes, it was.

13            MR. MANGO:  All right.  Your Honor, if we

14   could pull up, please, Government Exhibit 19.17

15   that is in evidence.

16   BY MR. MANGO:

17   Q.   Mr. Sitzman, do you see this document on your

18   screen?

19   A.   Yes, I do.

20   Q.   Okay.  And what is the date of this document?

21   A.   March 14th, 1984.

22   Q.   And what is your understanding of this letter?

23   A.   This letter grants -- this is a letter -- copy

24   of a letter to Mark Kamholz at Tonawanda Coke from

25   the RAPCE, approving an exemption for having

1869

1    baffles in quench tower 1 and limiting the use to

2    less than 10 percent of the time.  And saying that

3    if things change in the future, we may revisit this

4    exemption, the appropriateness of the exemption.

5    Q.  Okay.  Based on your -- we've been talking

6    about quench tower number 1, the west quench tower,

7    right?

8    A.  Correct.

9            THE COURT:  Hold on.  I think there's an

10   objection.

11           MR. PERSONIUS:  It's not an objection.

12   I'm sorry.  I'm trying to figure out the exhibit

13   number, Judge.  I'm very sorry.

14           THE COURT:  We were at 19.17.

15           MR. PERSONIUS:  Right.  That's all I need.

16   Thank you.  You can't see it on the screen.  Thank

17   you.

18           THE COURT:  Thank you.

19   BY MR. MANGO:

20   Q.  Mr. Sitzman, we have now been talking about

21   quench tower number 1, correct?

22   A.  Correct.

23   Q.  All right.  Based on your knowledge of the DEC

24   file, do you know if Tonawanda Coke had any type of

25   exemption relating to the other quench tower, this

1870

1    east quench tower that you talked about?

2    A.  No, they did not.

3    Q.  All right.  Do you recall receiving a letter in

4    1996 from Tonawanda Coke regarding the east quench

5    tower?

6    A.  Yes.

7         MR. MANGO:  All right.  I'd like to, your

8    Honor, pull up government Exhibit 19.11.1 already

9    in evidence.

10   BY MR. MANGO:

11   Q.  Is this -- do you see this on your screen here,

12   Mr. Sitzman?

13   A.  Yes, I do.

14   Q.  Okay.  There's some handwriting in the middle

15   starting with "discussed" there.  Do you know whose

16   handwriting that is?

17   A.  Well, the initials at the end say GWF, which is

18   Gary Foersch, who was a technician that worked for

19   me at the time.  I supervised him.

20   Q.  What is being requested in this letter?

21   A.  This is a letter to Gary at the department,

22   requesting that -- or informing us that quench

23   tower number 2 had significant deterioration, and

24   asking for removal -- asking to remove the tower

25   portion of the quench station, and providing some

1    information about what the quench tower would look

2    like after the quench station was -- quench tower

3    was modified.

4    Q.  Upon receiving this letter, were you involved,

5    Mr. Sitzman, in sending a response letter to

6    Tonawanda Coke?

7    A.  Yes.  I reviewed Gary's letter in response

8    to -- we talked about it, and I reviewed his letter

9    in response to Tonawanda Coke.

10           MR. MANGO:  All right.  Your Honor, I'd

11   like to pull up Government Exhibit 19.12 in

12   evidence.

13   BY MR. MANGO:

14   Q.  Do you see this document on your screen,

15   Mr. Sitzman?

16   A.  Yes, I do.

17   Q.  Was there a paragraph included in this letter

18   regarding baffles?

19   A.  Yes.  It's the third paragraph in the letter.

20   It says, "It should also be noted that Part 214.5A

21   requires that all wet quench towers be equipped

22   with a baffle system."

23   Q.  Okay.  Why was this paragraph -- did you have

24   any role in including this paragraph --

25   A.  I -- I at the time --

1    THE COURT:  Yeah, hold on, please.

2    THE WITNESS:  I'm sorry.

3    BY MR. MANGO:

4    Q.  You got to let me finish, Mr. Sitzman.

5    Otherwise the record is impossible.

6    Did you have any role in including this

7    paragraph in the letter?

8    A.  Yes, I did.

9    Q.  Okay.  Why was this paragraph about baffles

10   included?

11   A.  I talked to Gary at the time and asked that he

12   put that sentence in just to be clear with the

13   company that baffles were required.

14   Q.  Okay.  Under Part 214.5A?

15   A.  Correct.

16   Q.  What did that require?

17   A.  Required baffles for any wet quench tower.

18   Q.  All right.  Now, based on your review of the

19   Tonawanda Coke file, is there any correspondence or

20   documents, Mr. Sitzman, after this letter,

21   indicating that Tonawanda Coke was using quench

22   tower number 2 without baffles?

23   A.  Not until inspection reports in 2009.

24   Q.  Okay.  We're talking about an April of 2009

25   inspection?

1    A.   Correct.

2    Q.   Prior to April of 2009, up to the point of this

3    letter in 1997, in that time period, is it fair to

4    say that there's no correspondence or documents in

5    the file indicating that Tonawanda Coke was using

6    quench tower number 2 without baffles?

7              MR. PERSONIUS:   Your Honor, I object.

8    It's been asked and answered.

9              MR. MANGO:   Your Honor, I think it needed

10   clarification, because there was no time period --

11             THE COURT:   I'll permit it.

12             MR. MANGO:   -- given.

13             THE WITNESS:   Could you restate the

14   question?

15   BY MR. MANGO:

16   Q.   Yes.

17   A.   Sorry.

18   Q.   Now, based on your review of the Tonawanda Coke

19   file, after the date of this letter -- you see it,

20   January 6th, 1997 -- up until April of 2009, is

21   there any correspondence or documents in the DEC

22   file that indicates that Tonawanda Coke is

23   operating quench tower number 2, this quench tower,

24   without baffles?

25   A.   No, there isn't.

1874

1    Q.   Okay.  Based on your review of the Tonawanda

2    Coke file, is there any correspondence or documents

3    indicating that Tonawanda Coke was using quench

4    tower number 1 more than 10 percent of the time?

5    A.   No, there isn't.

6    Q.   Based on your review of the Tonawanda Coke

7    file, Mr. Sitzman, did Tonawanda Coke ever apply

8    for an approval of an alternative method for using

9    quench tower number 2?

10   A.   No, they didn't.

11   Q.   What is the procedure to obtain approval for an

12   alternative method of using a quench tower?

13   A.   It requires -- Part 214 requires a written

14   application to the department.

15   Q.   Is that 214.510?  Or 214-510?

16   A.   I believe it's 214.10.

17   Q.   .10.  Okay.  Is that the section?

18   A.   Yes.

19             THE COURT:  And what does that require?

20             THE WITNESS:  Requires the submission of a

21   written application for exceptions to the rule.

22             THE COURT:  With respect to baffles?

23             THE WITNESS:  With respect to any

24   provision of the regulation.

25             MR. MANGO:  Okay.  And that needs --

1        MR. LINSIN:  Your Honor, I apologize for

2    interrupting, but could I just get that regulatory

3    citation again?  214 point --

4        THE WITNESS:  10.

5        MR. LINSIN:  Thank you.

6   BY MR. MANGO:

7    Q.  And that needs to be in writing?

8    A.  Correct.

9    Q.  Are you familiar, Mr. Sitzman, with the process

10   by which Tonawanda Coke applied for a Title V

11   permit?

12   A.  Yes.

13   Q.  What was the first step in the process of

14   applying?

15   A.  Completing -- the facility had to complete an

16   application.

17   Q.  Okay.  What is supposed to be included in the

18   Title V application?

19   A.  The Title V application includes all

20   information about the operations at the facility

21   that are regulated under the Clean Air Act,

22   includes -- including citations of the regulations

23   that govern those operations, and then any

24   monitoring to show -- any proposed monitoring by

25   the company to show compliance with the

1876

1    requirements, and any recordkeeping necessary.

2    Q.   Do you know if the term "emission unit" is used

3    in Title V applications?

4    A.   Yes.

5    Q.   Can you tell the jury what is an emission unit?

6    A.   An emission unit is a collection of emission

7    sources, processes, emission points, used to

8    identify operations at a facility.

9    Q.   Do you know if the term "emission source" is

10   used in Title V applications?

11   A.   Yes, it is.

12   Q.   Tell the jury, please, what an emission source

13   is.

14   A.   An emission source is an industrial operation

15   that can create air pollutant emissions.

16   Q.   And is the term "emission point" used in

17   Title V applications?

18   A.   Yes, it is.

19   Q.   And tell the jury what the term "emission

20   point" means.

21   A.   An emission point is any opening in a building

22   or duct or flue or stack where air pollutants enter

23   the atmosphere.

24   Q.   All right.  Is there a difference between an

25   emission source and an emission point?

1   A.   There could be, and they could be pretty much

2   describing the same piece of equipment.

3   Q.   Okay.  Can you explain that a little further

4   for the jury, please?

5   A.   In some cases an emission point may be a

6   combination of several emission sources, and it all

7   goes out one common stack.  So in order to write a

8   permit for regulatory purposes, we would have to

9   regulate what source created the emissions, not --

10  not at the stack, because it would be a combination

11  of several different sources.  An emission point,

12  there's some that the emission source is right next

13  to the emission point.  You can regulate it either

14  way.  There's some where the emission point is

15  regulated for a specific reason, as to the amount

16  of, for instance, dust that comes out of that

17  emission point.  So it varies depending on the

18  regulation.

19  Q.   Do you know, is there flexibility in Title V

20  given to the facility as to how to classify an

21  emission source versus an emission point?

22  A.   Absolutely.  And that was -- that was a lot of

23  focus of our outreach when we were doing Title V

24  outreach, was that Title V was structured in a way

25  that a company -- since all companies are different

1    to some extent, that a company could structure

2    their information about their company in their

3    application in a way that made sense for that

4    facility.  Under emission units, some companies had

5    one emission unit for the entire plant.  Some had

6    multiple.  Some really large companies had multiple

7    Title V permits.

8        So it was designed to be flexible to regulate a

9    company in a proper way.  We're talking, my last

10   count, over 250 air regulations.  So it's a wide

11   variety of the way companies are regulated.

12           THE COURT:  All right.  You just mentioned

13   emission units.  How does that differ from sources

14   or points?

15           THE WITNESS:  Well, an emission unit is a

16   way to characterize your facility operations in

17   putting different sources and points together.

18           THE COURT:  So it's -- it's -- it's the

19   large picture, so to speak --

20           THE WITNESS:  It's more of a larger

21   picture, your Honor, to try to characterize how a

22   facility is regulated.  If you were in a -- I'm

23   trying think of an example.  If you're at a -- if

24   you're at this facility, and it was Title V, and it

25   has a heating plant down there, it might have

1879

1    several boilers that all burn natural gas.  The

2    emission unit might be the combination of all those

3    boilers, and they call that the emission unit.

4    Then inside that the sources are each boiler.  So

5    this would allow us then to write one permit

6    condition that said -- at the emission unit level,

7    that said all boilers must meet this regulatory

8    requirement, rather than writing a permit that is

9    unnecessarily long because we have to repeat the

10   same thing multiple times for similar operations.

11   So it was just a way to consolidate permit writing.

12             THE COURT:  All right.  Thank you.

13   BY MR. MANGO:

14   Q.  Mr. Sitzman, under Title V who has the

15   obligation to identify the emission sources in the

16   Title V application?

17   A.  The facility has the obligation.

18   Q.  Okay.  And does DEC rely on the facility to

19   identify all emission sources that must be

20   permitted?

21   A.  Yes.

22   Q.  Okay.  Based on your personal experience and

23   knowledge of the Title V process, once a facility

24   applies for a Title V permit, does the DEC go to

25   that facility and identify which parts of the

1    facility need permits?

2    A.   Not necessarily.

3    Q.   You rely on the facility?

4    A.   Yes.   And our knowledge of the facility.

5              THE COURT:   Well, what does that mean, you

6    rely on the facility?

7              THE WITNESS:   The facility is responsible

8    to complete an application that lists everything

9    that's regulated at the facility.

10             THE COURT:   So what the facility submits

11   to you in its application is what you rely on?

12             THE WITNESS:   Correct.

13             THE COURT:   Thank you.

14             MR. MANGO:   I'd like to pull up, your

15   Honor, Exhibit 18.09.01 already in evidence.

16   BY MR. MANGO:

17   Q.   Mr. Sitzman, do you see this document on your

18   screen?

19   A.   Yes, I do.

20   Q.   Okay.   If you want to just -- just take a

21   moment, take a look at it, and then tell the jury

22   what this document is.

23   A.   This is a copy of the Title V permit

24   application from Tonawanda Coke received by the

25   department.   I see it's stamped in December 4th,

1    1997.

2    Q.  Do you know if that Title V application

3    included additional sections relating to other

4    emission units?

5    A.  Yes, it did.

6           MR. MANGO:  Okay.  Let me -- your Honor,

7    if we could pull up Government Exhibit 18.09.02

8    already in evidence.

9           THE COURT:  All right.  You just said

10   different emission units.

11          MR. MANGO:  Yes.

12          THE COURT:  Is that what you meant?

13          MR. MANGO:  Yes.  I will make sure we

14   focus on that, your Honor.  Yes, I did.

15          THE COURT:  Okay.

16   BY MR. MANGO:

17   Q.  Okay.  Do you see Government Exhibit 18.09.02

18   on your screen?

19   A.  Yes, I do.

20   Q.  All right.  If we can focus on this top part,

21   please.  Do you see this up at the top, "emission

22   unit"?

23   A.  Yes.

24   Q.  Okay.  Tell the jury what this document you're

25   looking at relates to.

1    A.   This describes Emission Unit U-COKEB, Coke B,

2    and the description written in there is this unit

3    is the coke oven battery consisting of 60 coke

4    ovens, charging, pushing, quenching, leaks, and

5    waste heat stack are all associated with this unit.

6    Q.   Okay.

7    A.   Then it goes on to describe the physical

8    characteristics within that emission unit, and the

9    stacks, and their emission points, and the battery

10   size.

11   Q.   Okay.  So this U-COKEB is one of those

12   bigger-picture items that the Judge has referenced

13   in terms of the emission unit?

14   A.   Correct.

15   Q.   Okay.  And all the emission sources and points

16   relating to the coke battery are grouped into this

17   emission unit, is that right?

18   A.   Yes.

19   Q.   All right.  I'd like to go to page 6 of this

20   document please, Lauren.

21        Do you see this document on your screen, this

22   page of Government Exhibit 18.09.02?

23   A.   Yes.

24   Q.   Do you see the reference to QUEN1 there and

25   QUEN2?

1    A.   Yes, I do.

2    Q.   Okay.  Let's start with QUEN1.  Is that -- is

3    that quench tower number 1?

4    A.   Yes, it is.

5    Q.   Do you see the reference to 214.10A in the

6    written permit conditions over there?

7    A.   Yes, I do.

8    Q.   Okay.  What information is being provided in

9    this section?

10   A.   It looks like they're -- looks like we're being

11   provided the regulatory requirement for this

12   operation at the facility.  It says it's subject to

13   6NYCRR Part 214.10(a), which is the exceptions

14   section, and it references, then, permit

15   conditions.

16   Q.   Okay.  So does that have any meaning to you for

17   quench tower number 1, this reference to 214.10(a)

18   and permit conditions?

19   A.   Yes.

20   Q.   Tell the jury what -- what meaning it has to

21   you.

22   A.   This -- the permit conditions were related to

23   permit conditions on the old emission point

24   permits, where we allowed the operation of quench 1

25   as a standby unit as long as it was operated less

1884

1    than 10 percent of the time.

2    Q.   Okay.  So in Tonawanda Coke's application are

3    they requesting to continue that exception?

4    A.   Yes.

5    Q.   Let's focus on quen -- quench 2, which is below

6    the blue line.  Do you see that?

7    A.   Yes.

8    Q.   All right.  Do you see the reference to

9    214.10(a) there and letters of 1996 and '97?

10   A.   Yes, I do.

11   Q.   And what information is DEC being -- well, let

12   me ask you this.  Do those references have any

13   meaning to you relating to quench tower number 2?

14   A.   The -- the letters of '96 and '97 were what we

15   talked about earlier, the letters where Tonawanda

16   Coke requested to tear down the tower at quench

17   tower 2, and we approved that.

18   Q.   Okay.  Does this information here, 214.10(a)

19   and letters of '96 and '97, tell you that quench

20   tower number 2 is being operated without baffles?

21   A.   No.

22   Q.   You recall those two letters, right?

23   A.   Yes.

24   Q.   Do those letters state whether baffles are

25   required -- or let me -- let me start with the 1997

1    letter back to Tonawanda Coke.  Does that letter

2    state whether baffles are required?

3          MR. LINSIN:  Your Honor, I object.  This

4    is precisely the question counsel posed to this

5    witness ten minutes ago.

6          THE COURT:  Yes, but it didn't have this

7    as a point of reference, so, overruled.  Go ahead.

8    BY MR. MANGO:

9    Q.  Mr. Sitzman, did the 1997 letter --

10   A.  That's January 6th?

11   Q.  January 6th, 1997, letter from DEC back to

12   Tonawanda Coke have any reference to baffles in it?

13   A.  Yes.

14   Q.  And what did it say?

15   A.  It said baffles needed to be present in quench

16   station 2.

17   Q.  Okay.  And this reference to 214.10(a) here

18   you've mentioned is an alternative method or

19   exception that you can apply for --

20   A.  Yes.

21   Q.  -- for anything under 214?

22   A.  Correct.

23   Q.  Based on your review of the file, did TCC ever

24   apply for an alternative method for quenching

25   pursuant to New York regulations at number 2?

1886

1    A.   No.

2    Q.   And what must have been done by the Tonawanda

3    Coke Corporation if they wanted to use an

4    alternative method for quenching at tower number 2

5    without baffles?

6    A.   They would have had to have made a written

7    application to the department.

8    Q.   And, in fact, do you know if Tonawanda Coke had

9    done that in the past for the other quench tower?

10   A.   Yes, they had.

11   Q.   Do you know if Tonawanda Coke could just use an

12   alternative method of quenching without baffles

13   without applying in writing and providing details

14   to the DEC to review and approve?

15   A.   No, they couldn't.

16   Q.   Do you know if TTC could use an alternative

17   method of quenching without baffles without

18   specific approval of the DEC in writing?

19   A.   No, they couldn't.

20           MR. MANGO:   All right.   We can take that

21   down.

22           THE COURT:   No.   Hold it one second.

23           MR. MANGO:   Yes.

24           THE COURT:   Miss DiFillipo, enlarge this

25   so that we find out -- what was at the top of the

1887

1     page above the DEC ID?  What does it say up there?

2         Okay.  Thank you.

3    BY MR. MANGO:

4     Q.  Okay.  Mr. Sitzman, do you know if a map or

5     plot plan is generally submitted with a Title V

6     application?

7     A.  Generally.

8     Q.  Okay.  Let me show you Government Exhibit 18.01

9     already in evidence.  Do you see this document on

10    your screen?

11    A.  Yes, I do.

12    Q.  All right.  Can you tell the jury what this is?

13    A.  We may have to zoom in, but this is -- appears

14    to be a plot plan of Tonawanda Coke.  I can't quite

15    read the date, but I remember this drawing, of

16    seeing it before, and it's actually a plot plan

17    from, I believe, before they owned the facility.

18    And written in hand on the plot plan are the

19    emission points, emission unit, all the

20    identification numbers that Tonawanda Coke used in

21    preparing their permit application.

22    Q.  And this was submitted as part of the Title V

23    application?

24    A.  Yes.

25    Q.  Mr. Sitzman, upon receipt of the Title V

1    application by Tonawanda Coke Corporation, what, if

2    anything, happened at the DEC?

3    A.   The application was received by our

4    Environmental Permits Bureau.  As I described

5    earlier, they logged it in, sent it to key punch.

6    When it came back, they sent it to the air program

7    for review and drafting of a permit.

8    Q.   Okay.  And that's what you've previously

9    described, your office -- when you were RAPCE, your

10   office would review these permits -- or

11   applications, and then draft permits?

12   A.   Yes, even before I was a RAPCE.

13   Q.   Okay.  So that's what happened upon receipt of

14   Tonawanda Coke's application?

15   A.   Correct.

16   Q.   After the review, what happened then?

17   A.   Once a permit is reviewed, a Title V permit,

18   when the air program is satisfied with it, we --

19   and ready to issue it as a draft permit, we send it

20   back to the Division of Environmental Permits, and

21   they prepare the documents to send the permit out

22   to public notice, and it goes through a 30-day

23   public notice comment period, where comments can be

24   submitted to the department either asking questions

25   or asking for changes to the permit.

1889

1    Q.   Okay.  So there is a draft permit?

2    A.   There is a draft permit first.

3    Q.   Okay.  Are you familiar with that draft

4    permit --

5    A.   Yes.

6    Q.   -- in the Tonawanda Coke case?

7    A.   Yes.

8    Q.   All right.  Did the draft permit allow for the

9    use of a pressure-release or bleeder valve in the

10   by-products department on the coke oven gas line?

11   A.   No.

12   Q.   Did the draft permit include any requirement

13   relating to baffles in the quench towers?

14   A.   Yes, it did.

15   Q.   Okay.  What were those requirements?

16   A.   The requirement in the draft permit required

17   that each quench tower, both quench 1 and quench 2,

18   have baffles installed.

19   Q.   Okay.  Now, you just told us, though, that in

20   the application Tonawanda Coke was asking to

21   continue that exception.

22   A.   Correct.

23   Q.   Did the draft permit miss that?

24   A.   Yes, it did.

25   Q.   Did Tonawanda Coke have an opportunity to

1    comment on the draft permit?

2    A.   Yes, they did.

3    Q.   Do you know if they commented?

4    A.   Yes, they did.

5            MR. MANGO:  I'd like to pull up Government

6    Exhibit 18.02, your Honor, which is in evidence.

7    BY MR. MANGO:

8    Q.   Mr. Sitzman, do you see Government

9    Exhibit 18.02 on your screen?

10   A.   Yes.

11   Q.   Okay.  Can you tell the jury what this is?

12   A.   It's a copy of a letter from Tonawanda Coke,

13   September 28th, 2001, commenting on the draft

14   Title V permit.

15   Q.   Okay.  So these are the comments submitted by

16   Tonawanda Coke?

17   A.   Correct.

18   Q.   Do you see the reference here under Item 34.2

19   to 6NYCRR 201-3.3(c)(33)?

20   A.   Yes, I do.

21   Q.   What does that regulation, Subpart

22   201-3.3(c)(33), relate to?

23   A.   It was a note in the comments that noted the

24   existence of a pressure-relief vent on the roof of

25   Emission Unit UACBLD, which is the AC building --

1891

1    called the AC building at the facility.  And they

2    notified us that it's considered a trivial activity

3    under Part 201.

4    Q.  Okay.  So you mentioned trivial activity.  What

5    is Subpart 201-3.3(c)(33)?

6    A.  Well, (c)(33) is the trivial activity that

7    describes emergency pressure-relief vents.

8    Q.  Okay.  Emergency pressure-relief vents.  In

9    your experience, have you seen emergency relief

10   vents or stacks during your inspections?

11   A.  Yes.

12   Q.  Under what conditions does an emergency relief

13   vent or stack operate?

14   A.  Under emergency conditions.

15   Q.  Okay.  If the emission source released as part

16   of a regular operation, could that qualify as an

17   emergency relief vent or stack?

18   A.  No.  The -- the definition of that trivial

19   activity includes specific language that says

20   regular release from an emergency release vent

21   would not be considered a trivial activity.

22   Q.  Okay.  If the emission did release as part of a

23   regular operation, would it need a permit?

24   A.  Absolutely.

25   Q.  And are you familiar with the definition of

1    "emergency" under Part 201?

2    A.   Yes, I am.

3    Q.   What is your understanding of the definition of

4    "emergency"?

5    A.   An emergency is any sudden, unforeseen

6    catastrophic event or act of God.

7    Q.   Now, if we could just zoom back out of this,

8    please, Lauren.  If we could go to the next page.

9    And then the next page.

10        Okay.  Mr. Sitzman, did you see the three pages

11   of comments by Mr. Kamholz here?

12   A.   Yes.

13   Q.   Did TCC -- or Tonawanda Coke's comments

14   identify that a pressure-relief bleeder valve was

15   operating in the by-products document on the coke

16   oven gas line?

17   A.   No.

18   Q.   Did Tonawanda Coke's comments address Condition

19   96 or 97 of the draft permit relating to operation

20   of the quench towers?

21   A.   Could you refresh my memory on conditions 96

22   and 97?

23   Q.   Yes.  Are you aware of whether the requirements

24   for quench tower number 1, the west quench tower,

25   were included as Condition 96 in the draft permit?

1    A.   Yes.

2    Q.   All right.   And for quench tower number 2, the

3    east quench tower, do you know if those -- the

4    requirements for the operation of that quench tower

5    were included as Condition 97 of the draft permit?

6    A.   Yes.

7    Q.   In the comments you just looked at that are on

8    your screen, did Tonawanda Coke's comments address

9    Condition 96 or 97 of operation of their quench

10   towers?

11   A.   No, they did not.

12   Q.   All right.   And you just testified that in the

13   draft permit for both quench towers it said it had

14   to have baffles?

15   A.   Yes.

16   Q.   And there was no comment on that?

17   A.   Correct.

18   Q.   Okay.   Following the comment period, do you

19   know if Tonawanda Coke was issued a Title V permit?

20   A.   Yes, they were.

21           MR. MANGO:   All right.   Your Honor, I'd

22   like to pull up Government Exhibit 18.18 which is

23   in evidence.

24   BY MR. MANGO:

25   Q.   Mr. Sitzman, do you see this document on your

1    screen?

2    A.   Yes, I do.

3    Q.   Okay.   What is this document on your screen?

4    A.   It's a copy of the permit transmittal letter to

5    Tonawanda Coke for the Title V permit,

6    May 2nd, 2002.

7    Q.   Okay.   So is that the day the permit was

8    transmitted to the Tonawanda Coke Corporation?

9    A.   Yes.

10   Q.   Let's take a look, please, Lauren, at page 7 of

11   this document.   We can zoom in here.

12        Page 7 talks about DEC general conditions.   Can

13   you tell the jury what DEC general conditions are?

14   A.   The beginning of a Title V permit has a listing

15   put in -- that part of the permit is done by our

16   Environmental Permits Group that issues all our

17   permits, and these are the administrative

18   requirements for permit holders in New York State.

19   Q.   Okay.   So these are more just administrative

20   requirements?

21   A.   Correct.

22   Q.   Okay.   If we could go to page 11, please,

23   Lauren.   If we could zoom in.

24        Do you see this page on your screen,

25   Mr. Sitzman?

1   A.   Yes.

2   Q.   Okay.  What is page 11 of this exhibit?

3   A.   This is the title page of the actual air

4   Title V permit.

5   Q.   And at the bottom it gives an effective date

6   and an expiration date, is that right?

7   A.   Correct.

8   Q.   If we could go to page 16 now, please, Lauren.

9   Let's focus in on Condition number 4.

10       Do you see Condition number 4 on your screen?

11  A.   Yes, I do.

12  Q.   What is Condition 4 of the Title V permit?

13  A.   Condition 4 lists -- are the applicable

14  requirement which is applicable to all Title V

15  facilities under 6NYCRR Part 201-1.2.  And it

16  requires that any existing emission source that was

17  subject to permitting requirements must submit an

18  application to have that emission source included

19  in the permit.

20            THE COURT:  Say that again.

21            THE WITNESS:  I didn't say that very well,

22  did I?

23       It requires any existing -- if there was an

24  existing emission source at a facility that never

25  had a permit, it's a requirement that re -- that

1    says that the source owner must apply for a permit

2    for that source.

3              THE COURT:   Thank you.

4    BY MR. MANGO:

5    Q.   Okay.  Do you know when Part 201 first imposed

6    permitting requirements for emission sources?

7    A.   Early 1970s, late 1960s.

8    Q.   In fact, based on your review of the DEC file,

9    what is the earliest Air 100 you recall seeing for

10   the Tonawanda Coke facility?

11   A.   Mid-1980s.

12   Q.   And those Air 100s, were they issued pursuant

13   to Part 201?

14   A.   Yes, they were.

15   Q.   All right.  I'd like to go to page 90, please,

16   Lauren.  If we could focus in on Condition 96 here.

17   Actually, just -- focus just on that portion.

18   Great.

19        Mr. Sitzman, do you see Condition 96 on your

20   screen?

21   A.   Yes, I do.

22   Q.   Okay.  With respect to 96A, is there a

23   requirement for baffles?

24   A.   Yes, there is.

25   Q.   Okay.  Now, recalling that Title V application

1    I showed you with QUEN1 and QUEN2 and Emission

2    Source ID 9 and 10, do you see emission source

3    there?

4    A.   Yes.

5    Q.   So Condition 96 relates to which quench tower?

6    A.   Quench tower 1.

7    Q.   All right.  And it says it must have baffles?

8    A.   Correct.

9    Q.   Is there any reference to a 10 percent usage

10   restriction?

11   A.   No, there isn't.

12   Q.   All right.  Based on your earlier exemption,

13   what was your understanding of Condition 97

14   relating to baffles?  I'm sorry.  Condition 96

15   relating to baffles.

16   A.   Based on what I know now, that this should have

17   had a condition limiting operation to less than 10

18   percent of the time and allowing an exception for

19   the installation of baffles.

20   Q.   All right.  If we can go to the next page,

21   please, Lauren.  Let's focus on Condition 97.

22       Do you see Condition 97 on your screen,

23   Mr. Sitzman?

24   A.   Yes.

25   Q.   And you see Emission Source 19 there?

1898

1    A.   Yes, I do.

2    Q.   So what -- what quench tower does Condition 97

3    now relate to?

4    A.   Quench tower 2.

5    Q.   Is there a requirement for baffles in this

6    condition?

7    A.   Yes.  Down in A.

8    Q.   So this paragraph here?

9    A.   Yes.

10   Q.   Was there any previous exemption granted to

11   Tonawanda Coke for this quench tower to not have

12   baffles?

13   A.   No.

14   Q.   So was this quench tower required to have

15   baffles?

16   A.   Yes.

17   Q.   All the time?

18   A.   All the time.

19           THE COURT:  Did you say there was an

20   exemption for Emission Source 9 with respect to

21   baffles?

22           THE WITNESS:  Yes.

23           THE COURT:  Okay.

24   BY MR. MANGO:

25   Q.   That's the -- I can clarify, your Honor.

1         That exemption related to the 1983 and then
2    response letter from 1984 that DEC sent to
3    Tonawanda Coke?
4    A.  Correct.
5    Q.  All right.  And that related solely to quench
6    tower number 1, the west quench tower?
7    A.  Yes.
8    Q.  And it related to this usage requirement of
9    10 percent or less, if that is the case then you
10   don't need baffles?
11   A.  Correct.
12   Q.  Now, one year after Tonawanda Coke's Title V
13   permit was issued that we've been looking at here,
14   do you know whether or not a new federal Clean Air
15   Act law was enacted that added additional
16   requirements to certain coke plants?
17   A.  Yes.
18   Q.  And as part of that new law, did Tonawanda Coke
19   have to submit data to the Department of
20   Environmental Conservation to determine if it was
21   subject to that new law in 2003 in addition to the
22   existing Title V permit?
23   A.  Yes.  They submitted data.
24   Q.  And do you know if Tonawanda Coke submitted
25   data to determine if it was subject to this new law

1    in addition to its existing Title V permit?

2    A.  Yes, they did.

3              MR. MANGO:  All right.  I'd like to, your

4    Honor, pull up Government Exhibit 131 in evidence.

5    BY MR. MANGO:

6    Q.  Mr. Sitzman, take a look at this.  Let's focus

7    on this page.  Do you recognize this document?

8    A.  Yes, I do.

9    Q.  Okay.  What is this document, if you can tell

10   the jury.

11   A.  This is a letter from Tonawanda Coke -- copy of

12   a letter July 11, 2003, to myself as RAPCE,

13   submitting to us an inventory of hazardous air

14   pollutant emissions at Tonawanda Coke, to describe

15   if the regulation -- to determine if the

16   regulation -- the new regulation was applicable to

17   Tonawanda Coke or not.

18             THE COURT:  Is that a federal regulation

19   or a New York State regulation?

20             THE WITNESS:  It's a federal regulation.

21   Federal NESHAP regulation.

22   BY MR. MANGO:

23   Q.  And that came into effect in 2003?

24   A.  It was proposed in 2003.  It was proposed

25   around that time frame.  I'm not exactly sure the

1    exact date it went final.

2    Q.   Okay.   The hazardous air pollutants, that's

3    commonly called HAPS?

4    A.   Correct.

5    Q.   So if we use the term HAPS, that's what it

6    refers to.   So was there any data included with

7    that cover letter relating to the HAPS emissions

8    from Tonawanda Coke?

9    A.   Yes.   There was a report prepared by a

10   consultant documenting the total emissions from the

11   facility.

12   Q.   Okay.   Based on the total emissions Tonawanda

13   Coke claimed it released in the HAPS report, was

14   Tonawanda Coke subject to the requirements of this

15   new federal law?

16   A.   No, they would not be.

17   Q.   Was Tonawanda Coke still subject to its

18   existing Title V permit?

19   A.   Yes.

20   Q.   So was the HAPS report ever part of Tonawanda

21   Coke's existing Title V permit, if you know?

22   A.   No.

23   Q.   If Tonawanda Coke wanted to change or modify

24   its existing Title V permit, what process, if any,

25   was it required to follow?

1902

1    A.   It would have to apply for a permit

2    modification.

3    Q.   And if someone wanted to review or look at

4    Tonawanda Coke's existing Title V permit, would

5    this HAPS report of 2003 be part of it?

6    A.   No, it would not.

7    Q.   Okay.  What was -- we can take this down.

8    Thank you, Lauren.

9         What was the expiration of the permit, the

10   Title V permit?

11   A.   The permit is still in effect.  It was

12   scheduled to expire in May 2007.

13   Q.   Do you know if Tonawanda Coke submitted a

14   renewal application?

15   A.   Yes, they did.

16   Q.   And have you reviewed that renewal application

17   prior to testifying here today?

18   A.   Yes, I have.

19             MR. MANGO:  Your Honor, I'd like to pull

20   up Government Exhibit 18.06 in evidence.

21   BY MR. MANGO:

22   Q.   Mr. Sitzman, do you see this document on your

23   screen?

24   A.   Yes.

25   Q.   And what is this document, if you can tell the

1    jury?

2    A.   It's a letter from Tonawanda Coke to the

3    department, October 20th, 2006, submitting the air

4    permit renewal application.

5    Q.   All right.  If we could go to page 31, please,

6    Lauren, of this document.  Let's focus just on the

7    table part, please.

8        Do you see where I put arrows -- one arrow for

9    Emission Source 9 and Emission Source 10?

10   A.   Yes, I do.

11   Q.   Do you see any reference in these sections to

12   Part 214.10?

13   A.   No, I do not.

14   Q.   So as part of the renewal application submitted

15   by Tonawanda Coke, is there any discussion

16   regarding an exemption for the requirement to have

17   baffles in the west quench tower, number 1?

18   A.   Not in this section.

19   Q.   And in the renewal application is there any

20   discussion that quench tower number 2, the east

21   quench tower, is being used without baffles?

22   A.   No.

23   Q.   All right.  We can take that down.  Thank you,

24   Lauren.

25       Now, Mr. Sitzman, we've looked at the Title V

1    permit application, the map that was included with

2    that application, comments that were submitted as

3    part of the draft permit that was made, and then

4    now this renewal application.  Do you recall going

5    through all those documents?

6    A.   Yes.

7    Q.   All right.  Based on your review of those

8    documents, is there any mention in those documents

9    that Tonawanda Coke is using quench tower number 2

10   without baffles?

11   A.   No.

12   Q.   How about in the rest of the DEC file?  Before

13   April of '09 is there any reference that Tonawanda

14   Coke is using quench tower number 2 without

15   baffles?

16   A.   No.

17   Q.   Okay.  Those same documents we just went

18   through -- the Title V permit application, the map,

19   the comments submitted, the renewal application --

20   based on those documents, is there any mention that

21   Tonawanda Coke is using quench tower number 1 more

22   than 10 percent of the time?

23   A.   No.

24   Q.   How about in the rest of the DEC file?  Is

25   there any reference that Tonawanda Coke is using

1    quench tower number 1 more than 10 percent of the

2    time?

3    A.   Not in my review.

4    Q.   All right.   Now, those same documents -- again,

5    keep that in your mind.   Based on a review of those

6    same documents, is there any mention that Tonawanda

7    Coke was emitting coke oven gas from a

8    bleeder/pressure-release valve off of the coke oven

9    gas line in the by-products area?

10   A.   No.

11   Q.   Mr. Sitzman, are you familiar with by-product

12   flow diagrams that were submitted by Defendant

13   Kamholz to the DEC?

14   A.   Yes.

15   Q.   You've seen those documents in the DEC file?

16   A.   Yes.

17   Q.   Were there any by-product flow diagrams

18   submitted to DEC prior to April of 2009 that

19   identified a bleeder/pressure-release valve on the

20   coke oven gas line in the by-products area?

21   A.   No.

22   Q.   All right.   Now, you've mentioned you've done

23   some inspections at Tonawanda Coke.   I'd like to

24   talk about your inspections now for a time.

25                THE COURT:   Okay.   Let's take a break at

1    this point in time, then we can hear all about the

2    inspections.

3              MR. MANGO:  Yes, your Honor.

4              THE COURT:  Okay.  All right.  Is that

5    okay with you, ladies and gentlemen, if we take a

6    break?  All right.  We'll see you back here about

7    20 after or so.  Okay.  Actually quarter of, Chris.

8              COURT SECURITY OFFICER:  Yes.

9              (Jury excused from the courtroom.)

10             THE COURT:  Okay, Mr. Sitzman.  You can

11   step down, sir.  Thank you.

12             THE WITNESS:  Thank you.

13             MR. LINSIN:  May we be released?

14             THE COURT:  We'll see you in 20 minutes.

15             MR. PIAGGIONE:  Thank you, your Honor.

16             (Short recess was taken.)

17             (Jury seated.)

18             THE COURT:  Welcome back, ladies and

19   gentlemen.  Please have a seat.  Larry Sitzman is

20   back on the stand.  He remains under oath.  This is

21   direct examination by Mr. Mango, and I think he's

22   ready to get into some questions about the

23   investigation.  And the attorneys and parties are

24   back present.  You are here.

25        Remember the government has the burden of proof

1    beyond a reasonable doubt, and the defendants are

2    entitled to the presumption of innocence.

3         And, Mr. Mango, I think you're on.

4             MR. MANGO:   Thank you, your Honor.

5    BY MR. MANGO:

6    Q.   Mr. Sitzman, in the course of your duties how

7    many inspections had you completed at the Tonawanda

8    Coke Corporation prior to April of 2009?

9    A.   Maybe ten.

10   Q.   Okay.  If you can recall, when was your first

11   inspection?

12   A.   I believe my first inspection was in the mid to

13   late 1990s.

14   Q.   During your inspections, did you focus on any

15   particular area at Tonawanda Coke during your

16   inspections?

17   A.   My first inspection was a walk-through with the

18   inspector, the DEC inspector at the facility, to

19   familiarize myself with the plant.  Mostly when I

20   go I look at the coke battery.

21   Q.   Okay.  Why do you focus on the coke battery?

22   A.   That's where the most regulations are from the

23   state and federal level and where the most

24   complaints come from the public that sees the

25   facility.

1   Q.   Okay.  So prior to April of 2009, how

2   frequently did you conduct inspections at Tonawanda

3   Coke?

4           MR. PERSONIUS:  Your Honor, I think that's

5   been asked and answered, hasn't it?

6           MR. LINSIN:  He just asked it.

7           THE WITNESS:  Yes.  Sustained.

8   BY MR. MANGO:

9   Q.   Well, your Honor, I'm trying to ask -- did you

10  go every year or a particular --

11  A.   No, I did not.

12  Q.   Okay.  So, how did your inspections come up

13  that you decided to go to Tonawanda Coke?

14  A.   I began supervising the inspector at the

15  facility.  I was the engineer -- engineering

16  supervisor then, after 1993, and then we hired

17  another engineer who took over, who was in charge

18  of that facility and supervised the technician that

19  did the inspections.  And I was the one in the

20  region that had coke plant experience with my years

21  inspecting and permitting Bethlehem Steel, so I was

22  training her in coke plant operations and how the

23  regulations apply to facilities.

24  Q.   Okay.  Let's get the jury some names.  Who was

25  the technician who you mentioned during your first

1909

1    inspection you went with --

2    A.   The technician's name was Gary Foersch.

3    Q.   Okay.  And now you've begun talking about

4    another engineer?

5    A.   Then we hired an engineer in 1998.  She moved

6    from a different division into air.  Her name is

7    Cheryl Webster.

8    Q.   Okay.  And you recall at some point when

9    Miss Webster started in the Air Division, you went

10   out there with her?

11   A.   Yes.

12   Q.   Okay.  Now, you've talked about the Title V

13   permit being issued in 2002, is that right?

14   A.   Correct.

15   Q.   For inspections that you conducted after 2002,

16   did you review the Title V permit before all of

17   those inspections?

18   A.   No.

19   Q.   Mr. Sitzman, do you recall a joint EPA-DEC

20   inspection in April of 2009?

21   A.   Yes, I do.

22   Q.   And prior to that inspection, what did your

23   inspections consist of at the Tonawanda Coke

24   Corporation?

25   A.   I was involved mainly to -- as part of the

1    training of Cheryl in how to regulate the facility

2    and write the Title V permit.  I helped her with

3    that.  And at later times prior -- within a year or

4    two prior to the April 2009 inspection, we were

5    visiting the facility more frequently.  By then we

6    had determined that benzene emissions were high in

7    the area, and it looked like at the time throughout

8    our process that it looked like Tonawanda Coke was

9    probably the main source of that benzene, so we

10    started making more frequent visits to the

11    facility.  We were looking for sources of benzene

12    emissions, to try to get them controlled and reduce

13    those emissions.

14    Q.  Okay.  Your inspections prior to April of 2009,

15    did they last -- when you went to the site, did

16    they last a particular set amount of time, or did

17    they vary?

18    A.  They varied.

19    Q.  Can you describe how long/how short they were

20    for the jury?

21    A.  It could have been a half an hour if I was

22    there in response to a complaint, I needed to see

23    something that happened at the facility or just

24    talk to Mr. Kamholz.  It could be a couple hours if

25    we spent more time in the facility, or four hours

1   walking throughout the facility looking at the

2   various units at the plant.

3   Q.   Okay.

4   A.   Sometimes it was just meetings and I didn't go

5   back to the plant.

6   Q.   During your inspections were you escorted?

7   A.   Typically, all plants escort you on

8   inspections, yes.

9   Q.   Okay.  So you were escorted, though, during --

10  A.   Yes.

11  Q.   -- your inspections at Tonawanda Coke

12  Corporation?

13  A.   Yes.

14  Q.   All the time?

15  A.   Yes.

16  Q.   Did you keep any notes during these

17  inspections?

18  A.   Occasionally.

19  Q.   And were there other inspectors with you that

20  would take notes?

21  A.   From time to time, yes.

22  Q.   And after the inspections were your inspection

23  findings documented anywhere?

24  A.   Typically, our inspections are documented in

25  our Air Facility System or in notes to the file or

1    both places.

2    Q.   Okay.  Air Facility System, is that sometimes

3    called the AFS?

4    A.   Yes, that's our computer system that is created

5    to write permits in, document inspections,

6    enforcement activities, things like that.  It's

7    where we keep all our information related to

8    regulated facilities.

9    Q.   And when you were responding to a complaint at

10   Tonawanda Coke, what was the procedure you would

11   follow?

12   A.   It varied according to the complaint.  It may

13   result -- it may require a follow-up inspection,

14   that I would call the plant to set up an

15   inspection.  Sometimes it was just a call to the

16   plant to see if anything was going on.  And

17   sometimes I would just stop in when I either saw

18   something around the plant -- we did a lot of

19   surveillance in those days when the study was going

20   on.  So if we saw something, we could occasionally

21   just stop in the plant and ask what was going on.

22   Q.   Okay.  Are you familiar with a document known

23   as a full compliance evaluation checklist?

24   A.   Yes, I am.

25   Q.   Can you tell the jury what that document is?

1  A.  It's -- every Title V facility has to have one

2  of those completed every year.  It's part of our

3  administrative process at DEC.  Basically requires

4  the RAPCE, me in this case, the engineer in charge

5  of a Title V facility fills out the application --

6  or fills out the checklist that goes through

7  everything required throughout the year.  The -- is

8  the Title V permit current?  Did the facility

9  submit their semiannual monitoring reports?  Did

10  they submit their annual compliance certification?

11  Was there any source testing done at the facility?

12  Were there any complaints, was on there.  And then

13  that engineer had to make a determination at the

14  bottom of the form, is the facility in compliance

15  and is the facility in compliance continuously, or

16  were there some problems identified.

17  So that form was completed by the staff,

18  submitted to me.  I would check through the form.

19  I would get on our AFS computer system and make

20  sure everything for a facility was complete, and

21  when it was complete, I signed the form and entered

22  that information into our AFS system.

23  Q.  All right.  During your inspections prior to

24  April of 2009, did you ever spend any time in the

25  by-products area?

1    A.   Yes.

2    Q.   Why would you spend time in the by-products

3    area, if you could tell the jury?

4    A.   There's many regulated units in the by-products

5    area.

6    Q.   When you were there, did you smell anything

7    while you were in by-products?

8    A.   There's odors all over coke plants.

9    Q.   Okay.  What type of odors?

10   A.   Coke odors.  When -- I don't mean to -- I

11   didn't mean that to be funny.  Sorry.  Coke oven

12   gas is a complex composition of many different

13   chemicals.

14   Q.   All right.  Are you familiar with a roadway

15   known as Broadway at the Tonawanda Coke

16   Corporation?

17   A.   Yes, I am.

18   Q.   And did you ever walk along that road?

19   A.   Yes.

20   Q.   What was your purpose for walking on the road,

21   this Broadway?

22   A.   Broadway is the central road through the coke

23   plant.

24   Q.   Now, during your inspections, how long would

25   you spend on walking on Broadway prior to April

1    of 2009?

2    A.  Depends what I was there -- the reason for my

3    inspection.

4    Q.  Okay.  Let me ask you, have you come to -- come

5    to know something known as a

6    bleeder/pressure-release valve that was on the coke

7    oven gas line --

8    A.  Yes, I have.

9    Q.  -- in the by-products area?

10   A.  Yes, I have.

11   Q.  And that knowledge came about -- when did you

12   learn about that?

13   A.  I learned about that during the April 2009

14   inspection with EPA.

15   Q.  Okay.  Are you familiar -- so I still want to

16   talk about the time prior to April of 2009.  Do you

17   know, though, when you discovered it, whether that

18   bleeder/pressure-release valve was associated with

19   any type of small building or shack?

20   A.  At the time I didn't.

21   Q.  No.  But now do you know that?

22   A.  Yes.

23   Q.  Okay.  So you know what I'm -- do you know what

24   I'm talking about?  The shack near the bleeder?

25   A.  Yes.

1  Q.  Okay.  Prior to April of '09, now knowing you

2  have a familiarity with this -- current familiarity

3  with this shack, is it green in color?

4  A.  I believe it is.

5  Q.  All right.  This green shack, prior to April

6  of 2009 did you spend any time in the immediate

7  area right around that green shack?

8  A.  I spent time in the general area around there.

9  Q.  Okay.  Not -- I'm talking about right at the

10  green shack.  Did you spend time right at the green

11  shack?

12  A.  I never looked at anything in that green shack.

13  Q.  Okay.  When you were in the by-products area,

14  would you generally spend a long time in one

15  location?

16  A.  No.  We moved through, looking at the different

17  units.  We'd stop for a question, but that was

18  about it.

19  Q.  Okay.  During inspections prior to April

20  of 2009, did you ever look inside either of the two

21  quench towers at Tonawanda Coke?

22  A.  No, I did not.

23  Q.  Okay.  Why not?

24  A.  They weren't a focus of my inspection.

25        MR. MANGO:  Your Honor, if I just may have

1    a moment here?

2              THE COURT:  Yes.

3    BY MR. MANGO:

4    Q.  Mr. Sitzman, are you familiar with the term

5    "annual and semiannual compliance certifications"

6    under Title V?

7    A.  Yes, I am.

8    Q.  Can you tell the jury what annual and

9    semiannual compliance certifications under Title V

10   are?

11   A.  The Title V program required facilities with a

12   Title V permit -- or requires facilities with a

13   Title V permit to semiannually submit a report of

14   all the monitoring they do at the facility required

15   in their permit.  Annually it requires a facility

16   to look through the whole past year and determine

17   if they were in compliance continuously with their

18   Title V permit or intermittently, and submit a

19   report to the department for each condition,

20   indicating their compliance status.

21   Q.  Okay.  For the time periods of -- I just asked

22   you a question of why you did not look into the

23   quench towers prior to April of 2009.  Do you

24   remember that?

25   A.  Yes.

1918

1    Q.   Okay.  For the period prior to April of 2009,

2    either before, during, or after your inspections

3    did you review semiannual and annual compliance

4    certifications submitted by the Tonawanda Coke

5    Corporation?

6    A.   I reviewed the -- I never did.  I reviewed the

7    compliance -- the full compliance evaluation

8    checklist for the facility.

9              MR. MANGO:  All right.  Well, let me pull

10   up Government Exhibit 31 which is in evidence, your

11   Honor.  Let's take a look at this.

12   BY MR. MANGO:

13   Q.   Do you see this document on your screen,

14   Mr. Sitzman, Certification of Truth, Accuracy and

15   Completeness?

16   A.   Yes.

17   Q.   Report type, annual, for the period of January

18   of 2005 to December of 2005.

19   A.   Yes.

20   Q.   Okay.  If we could go to the next page.

21        Do you see page number 2 of Government

22   Exhibit 31?

23   A.   Yes, I do.

24   Q.   Okay.  Are you familiar with this page?

25   A.   Yes, I am.

1    Q.   Would these be documents -- the annual

2    monitoring reports that you would have reviewed

3    prior to inspections?

4         MR. PERSONIUS:   Your Honor, he just

5    testified he didn't review them.

6         MR. MANGO:   Your Honor, I think there may

7    be a confusion with the name.

8         MR. PERSONIUS:   Well, then, why is he

9    leading him through it?   The witness said he didn't

10   review it.

11        THE COURT:   Well, I'm going to allow it.

12   Overruled.

13   BY MR. MANGO:

14   Q.   Do you recognize this document?

15   A.   Yes.

16   Q.   Did you review this?   Did you see this document

17   prior to your inspections?

18   A.   I did not.

19   Q.   You did not.   Okay.   Now, prior to April

20   of 2009 did Defendant Kamholz ever mention the east

21   quench tower, number 2, had no baffles?

22   A.   No, he did not.

23   Q.   Did he ever tell you that there was an

24   exemption relating to the east quench tower,

25   number 2, that allowed quenching without baffles?

1    A.   No.

2    Q.   Did he ever tell you that other DEC inspectors

3    had authorized the use of the east quench tower,

4    number 2, without baffles?

5    A.   No.

6    Q.   And did he ever tell you that the west tower,

7    number 1, was being used 10 percent or more of the

8    time?

9    A.   No.

10   Q.   Okay.  Now, during inspections prior to April

11   of 2009, did you ever notice a pressure-release

12   valve in the by-products area at Tonawanda Coke?

13           MR. LINSIN:  Objection.  Asked and

14   answered.

15           MR. MANGO:  This is more general, your

16   Honor.

17           THE COURT:  Sustained.

18   BY MR. MANGO:

19   Q.   You remember me asking you a question about a

20   pressure-relief/bleeder valve on the coke oven gas

21   line in the by-products area?

22   A.   Yes.

23   Q.   Okay.  And you now have familiarity with that

24   based on an April of 2009 inspection?

25   A.   Yes.

1    Q.   Prior to April of 2009 did you ever notice any

2    other type of pressure-release valves in the

3    by-products area?

4    A.   Yes.

5    Q.   All right.  How many?

6    A.   I remember one.

7    Q.   Okay.  Can you tell the jury where that was?

8    A.   That was on the light oil storage tank.

9    Q.   Okay.  And describe for the jury what you

10   observed and how you became aware of this

11   pressure-release valve on the light oil storage

12   tank.

13   A.   Like I explained earlier, we were looking

14   for -- back at that time we were looking for

15   benzene sources at Tonawanda Coke to see if we

16   could get any reductions, and that was one of the

17   sources, that light oil storage at larger

18   facilities are required to control emissions from

19   light oil storage tanks and loading.  So we spent

20   some time with the facility, looking at that tank.

21   As I was in that area looking at that tank and how

22   it operated, and we finally got controls put on

23   that to lower the benzene emission part of the

24   emissions.

25   Q.   Okay.  Now, you -- let's go back to the

1    pressure-release valve on the coke oven gas line,

2    the bleeder, that you say you became aware of in

3    April of 2009.

4    A.  Okay.

5    Q.  And before April of 2009 you were not aware of

6    that, that's what you said?

7    A.  Correct.

8    Q.  Okay.  Tell the jury why you were not aware of

9    the bleeder/pressure-release valve on the coke oven

10   gas line.

11   A.  I never saw it.  It wasn't in the permit

12   application.  We never talked about it being

13   required in the permit application.  We were never

14   notified of it.  The by-products area is -- I don't

15   know if it's miles of pipe, but there's a lot of

16   pipe in different instruments and units there.

17   Some of the units, we would go in and focus on a

18   certain unit that was required by federal

19   regulation to be, for instance, under vacuum so

20   there was no emissions.  So, typically, when I went

21   in the by-products area, we would focus on specific

22   units to make sure they were in compliance and had

23   the right components to meet federal regs or our

24   state regs.

25   Q.  Okay.  Now, in your role as RAPCE, did any DEC

1    inspector ever report to you that there was a

2    bleeder/pressure-release valve on the coke oven gas

3    line in the by-products area?

4    A.  No.

5    Q.  Prior to April of 2009, did Defendant Kamholz

6    ever mention to you that there was a bleeder valve

7    in operation on the coke oven gas line in the

8    by-products area?

9    A.  No.

10   Q.  Based upon your review of documents submitted

11   to the DEC by Tonawanda Coke, did you have any

12   reason to believe that there was excess coke oven

13   gas being vented to the atmosphere at Tonawanda

14   Coke prior to April of 2009?

15   A.  No.

16   Q.  Okay.  Why is that?

17   A.  Since I started learning about Tonawanda Coke

18   and going to the facility, they had always said

19   they were deficient in coke oven gas, that they

20   didn't produce enough to have any excess.  So I

21   would have never thought that there would be coke

22   oven gas leaking out there.  They needed all they

23   could get to operate the facility.

24        And in the -- the earlier report we talked

25   about, the hazardous air pollution emission

1    inventory report, they actually made a statement in

2    that that they didn't have any extra coke oven gas,

3    that they used all they had.  They were actually

4    coke oven gas deficient at the plant.

5    Q.  Okay.  So -- so, based on those comments --

6    well, let me withdraw that.  Do you remember --

7    let's move on.  Do you remember an inspection in

8    August 21st of 2008?

9    A.  Yes.

10   Q.  All right.  During that inspection, do you know

11   if you were provided any documents?

12   A.  Yes, we were.

13          MR. MANGO:  Okay.  I'd like to show you --

14   for identification purposes, your Honor --

15   Government Exhibit 113, and absent an objection,

16   your Honor, the government would move this into

17   evidence.

18          THE COURT:  Okay.  113.

19          MR. LINSIN:  Your Honor, if we could just

20   see if we could scroll through the pages of this

21   exhibit.

22          THE COURT:  Certainly.

23          MR. LINSIN:  No objection, your Honor.

24          MR. PERSONIUS:  No objection, your Honor.

25          THE COURT:  All right.  113, no objection,

1    received.  And do you choose to have it published?

2              MR. MANGO:  Yes, please, your Honor.

3              THE COURT:  Please.

4              (Government's Exhibit 113 was received

5              into evidence.)

6    BY MR. MANGO:

7    Q.  So if we could focus on this section.

8        Mr. Sitzman, do you see what's on your screen?

9    A.  Yes, I do.

10   Q.  Okay.  What -- what is this document that is on

11   your screen, and when did you receive it?

12   A.  Well, it's notes written on top that we

13   received it August 21st, 2008, during a site

14   inspection.

15   Q.  Okay.  And do you recall who was with you

16   during that site inspection?

17   A.  I believe Cheryl Webster was with me.

18   Q.  And this is a document you then obtained during

19   that site inspection?

20   A.  Yes.

21   Q.  What generally is the information -- who gave

22   you this document?

23   A.  Mr. Kamholz.

24   Q.  Okay.  And what generally is -- information is

25   being provided to the DEC in this document?

1    A.   This is a required -- the federal regulation

2    required a plan -- every facility subject to

3    federal regulations of this sort was required to

4    submit a plan for what they would do if there was a

5    startup, shutdown, or malfunction at their

6    facility.  And this is Tonawanda Coke's startup,

7    shutdown, and malfunction plan.

8    Q.   All right.  Is there any mention regarding

9    whether unburned coke oven gas is released to the

10   atmosphere in this document?

11            MR. PERSONIUS:  Well, your Honor, I -- I'm

12   trying to think how I'd frame my objection.  No

13   foundation would be my objection.

14            THE COURT:  Well, the document's in

15   evidence.  The question is, does it contain any

16   information with respect to startup, shutdown,

17   right?

18            MR. PERSONIUS:  No.  It was does it have

19   anything in it about coke oven gas being emitted

20   into the atmosphere.  And my objection is

21   foundation.  I think that's the proper objection.

22   I could give you an example of what I mean, but --

23            THE COURT:  I'll overrule.

24            MR. PERSONIUS:  A generic one.

25            THE COURT:  Pardon me?

1       MR. PERSONIUS:  I could give you a generic

2   example, but --

3           THE COURT:  All right.

4           MR. PERSONIUS:  Does it talk about

5   elephants?  I mean, that's what I mean by

6   foundation.

7           MR. MANGO:  Well, your Honor, I'm asking

8   this witness's knowledge of the document.  That's

9   establishing the foundation.

10          THE COURT:  So what -- whether it

11  contains?  I'm not -- I'm not sure, with respect to

12  that objection, whether it applies here,

13  Mr. Personius.  I'll overrule the objection.

14          MR. PERSONIUS:  Okay.

15          THE COURT:  Does this contain a reference

16  to coke oven gas?  Is that what you're saying?

17          MR. MANGO:  Unburned coke oven gas being

18  released to the atmosphere.  That was the question.

19  BY MR. MANGO:

20  Q.  Mr. Sitzman, does it contain a reference --

21  A.  Yes, it does.

22  Q.  Okay.  Can you just put a little dot or --

23  where that reference is and describe what your

24  understanding of the reference relates to.

25  A.  In -- in the third paragraph of the document

1    here -- I guess I can draw it.  That's the third

2    paragraph.  That starts, "Malfunction of coke oven

3    gas processing equipment."  The last sentence, it

4    says, "Unburned coke oven gas is not flared or

5    vented."

6    Q.  Okay.  So that -- this information contained in

7    this document, is there any requirement that you're

8    aware of in times of operation failure whether coke

9    oven gas needs to be flared if it's going to be

10   released in the atmosphere?

11   A.  There is a requirement in the federal

12   regulation that the coke battery have installed on

13   it an emergency bypass flare for such situations

14   when there would be a failure in operation.

15   Q.  Okay.  And do you know if that emergency bypass

16   flare has to have a pilot light associated with it?

17   A.  Yes, it does.

18   Q.  Okay.  On August 21st, 2008, did you notice any

19   violations relating to that pilot light?

20   A.  Yes, we did.

21   Q.  Okay.  Tell the jury what -- what you learned.

22   A.  We learned during that inspection that the

23   pilot light was not operating.

24   Q.  Okay.  During that inspection were you told

25   that the pilot light had not been operating for a

1    period of approximately 15 years?

2    A.   No.

3    Q.   What, if anything, did you do as a result of

4    the violation you noticed?

5    A.   We notified the company verbally that a pilot

6    was required by regulation, and followed that up

7    with a notice of violation.

8    Q.   Okay.  I'd like to -- we can take that down.

9    Thank you, Lauren.

10       I'd like to go back to Government Exhibit 131,

11   which is that HAP study that you discussed.  Do you

12   remember that?

13   A.   Yes.

14   Q.   Okay.  Let's pull that up on the screen.  Did

15   you review this document prior to testifying here

16   today?

17   A.   Yes, I did.

18   Q.   All right.  And I'd like to show you Section 4

19   of this document.

20       It's page 23, Lauren, for your purposes.

21       This is Section 4, and it says 4-1 at the

22   bottom, is that correct?

23   A.   Correct.

24   Q.   And the title is Emissions From By-Product

25   Plant Equipment Components, is that right?

1    A.   Correct.

2    Q.   All right.  If we could go to the next page,

3    4-2.

4         Do you see this page here, Mr. Sitzman?

5    A.   Yes, I do.

6    Q.   Okay.  If we could just focus on that, please.

7         Okay.  In this table do you see the by-products

8    plant area and a section for coke oven gas system?

9    A.   Yes, I do.

10   Q.   And do you see the reference in the coke oven

11   gas system to a pressure-release valve?

12   A.   Yes.

13   Q.   All right.  If we could go to the next page,

14   please, page 4-3.

15        Do you see that same by-products plant area,

16   the coke oven gas system listed?

17   A.   Yes.

18   Q.   How much benzene, toluene, or xylene is listed

19   as coming out of the coke oven -- the whole coke

20   oven gas system in a year, based on this table?

21   A.   Zero.

22   Q.   Mr. Sitzman, can you tell the jury when the

23   first time you recall seeing this document?

24   A.   In 2003 when it was submitted.

25   Q.   All right.  What was the purpose of your review

1    in 2003 of this document?

2    A.   At that time it was submitted to totalize the

3    emissions of hazardous air pollutants for the

4    facility, to determine the status of the facility,

5    whether it was major or minor for hazardous air

6    pollutants.  Major and minor is -- major hazardous

7    air pollutant facility is defined as emitting per

8    year more than 10 tons of one hazardous air

9    pollutant or 25 tons of total hazardous air

10   pollutants.  And at the time, that was submitted to

11   determine if the facility was subject to the new

12   coke oven federal regulation.

13   Q.   Okay.  And did you attempt to determine, based

14   on the numbers in this report, that the calculation

15   for the total HAPS was correct?

16   A.   We looked at the report, looked at the totals.

17   At the time then it didn't -- I had questions

18   whether they would be minor for hazardous air

19   pollutants, being a coke plant itself.  So we sent

20   it off to the experts at EPA that wrote the

21   regulations, and they confirmed back to us that, in

22   fact, the emissions were accurate for this facility

23   and it was minor for hazardous air pollutants.

24   Q.   Okay.  Did you have any independent

25   information, meaning aside from the information

1    contained in this HAP study, to check these numbers

2    against?

3    A.  We would check them against the -- the

4    references that they were created by.

5    Q.  So is it fair to say, at the time you're

6    reviewing this document you're trying to determine

7    whether it was major or minor for HAPS?

8    A.  Yes.  The entire facility.

9    Q.  Okay.  Now, after we just went through this

10   table here listing zero for benzene, toluene, or

11   xylene, did this table factor into your

12   calculations or not?

13   A.  Well, no.  Zero.

14   Q.  So was there a need to focus on this table or

15   the previous table, which had that reference to

16   pressure-release valve -- was there a need to focus

17   on those two tables in the HAP report?

18   A.  The emissions were very minor from these

19   operations.  So the answer is, no, we didn't focus

20   on it.

21   Q.  Did -- did your review of this document have

22   anything to do with determining whether there were

23   additional emission sources that needed a permit?

24   A.  No.

25   Q.  Would you consider this document proper notice

1    of an emission source not listed in the Title V

2    permit?

3    A.   No.

4    Q.   Okay.   Why not?

5    A.   You would have to submit an application for an

6    emission source not listed, and it would include

7    all of the descriptive mat -- descriptive

8    information for that emission source as part of a

9    permit application.

10   Q.   All right.   Lauren, if we can go to the

11   previous, the prior page here, 4-2.   All right.

12       So, in this table does -- does this report give

13   you any information as to the location of the

14   pressure-release valve on the coke oven gas line --

15   or in the coke oven gas system?   I'm sorry.

16   A.   No.

17   Q.   Does this report describe with any detail what

18   the pressure-release valve on the coke oven gas

19   system looked like?

20   A.   No.

21   Q.   So you mentioned you recall seeing this

22   in 2003?

23   A.   Uh-huh.

24   Q.   This document?

25   A.   Correct.

1934

1   Q.  Do you recall in 2003 seeing the reference to

2   the pressure-release valve on the coke oven gas

3   system?

4           MR. LINSIN:  Objection.  Asked and

5   answered.

6           THE COURT:  Sustained.

7           MR. MANGO:  Your Honor, I believe I asked

8   whether he focused on the tables.  I don't recall a

9   specific explicit question asking him if he saw

10  this pressure release valve in 2003.  And it's just

11  that one --

12          THE COURT:  I'm sorry?

13          MR. LINSIN:  Your Honor, I guess we could

14  have it read back.  You know, the answer, I assume,

15  will be the same, but the question, according to my

16  notes, was already asked and answered.

17          THE COURT:  A while ago.

18          MR. LINSIN:  Exactly.

19          THE COURT:  That's where I think you did

20  ask it.  But ask the question again, and we'll see

21  where we are.

22  BY MR. MANGO:

23  Q.  All right.  Mr. Sitzman, in 2003 do you

24  recall -- with specific reference to where I put

25  the arrow, pressure-release valve, do you recall

1   seeing that reference during your 2003 review?

2   A.   No.

3   Q.   Okay.   This table on the screen here, do you

4   see this?

5   A.   Yes.

6   Q.   Okay.   Do you see -- is there a footnote listed

7   for the pressure-release valve in this column?

8   A.   Yes, there is.

9   Q.   Are you familiar with the reference in that

10   footnote?

11   A.   Yes, I am.

12   Q.   Can you explain for the jury what your

13   understanding of what this reference in the

14   footnote is?

15   A.   The reference is for the coke oven gas system

16   for all the components listed in this table, and it

17   says, "Emission factors for the coke oven gas

18   system are based on the refinery correlation

19   equations at a screening concentration of 200 parts

20   per million."

21       That, to determine what those emissions are, we

22   go back to the federal guidance documents for

23   emission inventory development.   EPA creates for

24   both industry and government use a compilation of

25   emission information from many different

1    industries.  And there happens to be one for the

2    coke oven industry.  The document is called, in

3    general, AP 42.  The section here is coke plants.

4        AP 42 contains a lot of these emission factors

5    so you can determine what your emissions are from

6    the facility if you don't have testing at your

7    facility.  And a lot of components you can't really

8    test, or you would probably go out of business

9    spending the money to test it all.

10       In this case, in AP 42 it refers to another

11   document called the Protocol For Determining

12   Emission Leak Rates, and that was used in this case

13   to come up with this value for this pressure-relief

14   valve.  Indicated that it was leaks from the valve

15   as opposed to process emissions.

16   Q.  Okay.  So your understanding of this footnote

17   indicates that the reference to pressure-release

18   valve was for a leaking valve?

19   A.  Correct.

20   Q.  All right.  Let's focus on -- we can take that

21   down.  Thank you, Lauren.

22       Did there come a time in April of 2009 that you

23   participated in a joint EPA-DEC inspection at the

24   Tonawanda Coke Corporation?

25   A.  Yes, I did.

1   Q.  All right.  Tell the jury when that inspection

2   was.

3   A.  The inspection occurred from April 14th to

4   April 21st.

5   Q.  And how did that inspection come about?

6   A.  EPA scheduled an inspection, and we

7   participated with them in the inspection.

8   Q.  Can you describe what you did during that

9   inspection?

10  A.  During -- well, we arrived at the facility.  We

11  had an opening conference with plant personnel in

12  the office, proceeded to the inspection.  Over

13  several days, split into various groups to inspect

14  the facility.  And EPA took many samples throughout

15  the facility during the inspection.  And when we

16  completed the inspection, we reconvened with

17  facility representatives for a final meeting to go

18  over our inspection findings before we left.

19  Q.  Okay.  Were you there all -- all of the days of

20  the inspection?

21  A.  No, I don't believe I was.

22  Q.  Okay.  Why not?

23  A.  I was the regional air engineer, and I had

24  other duties to attend to.  I was only there part

25  of the time.

1  Q.  Was DEC represented during the inspection?

2  A.  Yes.  There was always a DEC person there.

3  Q.  Okay.  It was either you or who?

4  A.  It was either Cheryl Webster and I or Cheryl

5  Webster by herself.

6  Q.  All right.  Now, we've been talking about the

7  east quench tower, this quench tower number 2.

8  During the April of 2009 inspection, did you learn

9  anything relating to this quench tower number 2,

10  the east quench tower?

11  A.  Yes.  During the inspection Cheryl informed me

12  that they had found that there was no baffles in

13  quench tower number 2.

14  Q.  Okay.  Did you raise that issue with anyone?

15  A.  I remember asking Mr. Kamholz about it and

16  mentioning that, you know, we had sent him a letter

17  specifically saying they needed baffles.  And he

18  agreed that he had the letter, but that was the end

19  of our conversation.

20  Q.  Did he provide any type of response beyond

21  that?

22  A.  Not that I remember.

23  Q.  Did he give you any explanation for why there

24  were no baffles in quench tower number 2?

25            MR. PERSONIUS:  Your Honor, object.  It's

1    already been asked and answered.

2              THE COURT:  I'll permit it.  Overruled.

3              THE WITNESS:  No, he did not.

4    BY MR. MANGO:

5    Q.  Was there any discussion regarding that the

6    tower was exempt from the baffle condition?

7    A.  No.

8    Q.  Was there any discussion that your DEC

9    inspectors had authorized the use of this tower

10   without baffles?

11             MR. PERSONIUS:  Your Honor, I object.

12   This has been covered.

13             THE COURT:  Yeah.  I mean, there was no

14   response, no discussion.  Sustained.

15   BY MR. MANGO:

16   Q.  Based on your knowledge of Condition 97 of

17   Tonawanda Coke's Title V permit -- do you remember

18   that condition we went through?

19   A.  Yes.

20   Q.  All right.  Is the operation of the east quench

21   tower without baffles a violation of that condition

22   of the permit?

23             MR. PERSONIUS:  Your Honor, that's been

24   asked and answered many times.

25             THE COURT:  Yes.  Sustained.

1       MR. MANGO:  When did you first learn that

2   Condition 97 of the Title V permit was being

3   violated by the Tonawanda Coke Corporation?

4       MR. PERSONIUS:  That's also been asked and

5   answered, Judge.

6       THE COURT:  I'm not sure it is.

7   Overruled.  I'll let that question stand.

8       THE WITNESS:  During the April 2009

9   inspection with EPA.

10  BY MR. MANGO:

11  Q.  Okay.  Now, we've been talking about this

12  bleeder/pressure-release valve in the by-product

13  area in the coke oven gas line, right?

14  A.  Yes.

15  Q.  During this April of 2009 inspection, did you

16  learn of such bleeder valve in operation at

17  Tonawanda Coke?

18  A.  Yes, we did.

19  Q.  Okay.  How -- if you can tell the jury, how do

20  you recall learning about it?

21  A.  We were inspecting the by-products area, and

22  somebody in the group noticed that component and

23  wanted to go investigate it.

24  Q.  Okay.  When do you first remember seeing the

25  bleeder/pressure-release valve in question here?

1   A.   Reviewing my notes, on April 20th I drew a

2   picture of that valve in my notes.

3   Q.   Do you have any recollection today as to why

4   you drew that picture in your notes?

5   A.   I think it was -- no, I have no recollection.

6   I think it was something we had to revisit.

7   Q.   Okay.  Is there anything in your notes for

8   Friday, April 17th, relating to the

9   pressure-release valve/bleeder valve?

10   A.   No.

11   Q.   Is there anything in your notes for April 21st,

12   the Tuesday, for the pressure-release valve?

13   A.   Yes.

14   Q.   All right.  What do you -- what do you recall,

15   if anything, happening on April 21st?

16   A.   On the 21st we looked at the valve again and

17   looked inside the cabinet on the ground, that you

18   described as green, looked inside that cabinet

19   because that's where the -- the parameters of the

20   valve were monitored from.

21       And on that day Mr. Kamholz and Pat Cahill, the

22   maintenance manager, explained what those charts

23   meant, to me, what they were recording.  That there

24   was system pressure being recorded on one.  As I

25   looked at it, I asked Pat what the -- the valve was

1942

1   set at, and my notes said it was set at 130

2   centimeters.

3        In looking at the charts, it looked like every

4   half hour the valve was popping off, releasing.

5   And Mr. Kamholz mentioned that he thought that

6   those spikes were related to the battery reversing,

7   which is part of the operation of heating the

8   battery, and for momentarily the gas stops when

9   they go through a reversal of burning.

10  Q.   Okay.  Did Mr. Kamholz give you any other

11  information other than that, that you recall,

12  relating to reversing?  Or was -- did Pat Cahill

13  provide you information?

14  A.   After -- after they described it all, they

15  didn't provide more information.

16  Q.   Okay.  So you did review the circular charts

17  that you said --

18  A.   The circular chart that was inside, yes, I

19  reviewed that.

20  Q.   Did you discuss the possibility of raising the

21  set point?

22  A.   After we saw that and I realized it was going

23  off every half an hour, I spoke to Mr. Cahill and

24  Mr. Kamholz and asked them if they could either

25  adjust the valve to a higher set point so it didn't

1943

1    go off every half an hour, or I knew also they

2    control the pressure in the whole gas main system.

3    Asked if they could lower the pressure.  And they

4    told me at the time they would check into that.

5    They thought they probably could, so they would --

6    they were busy with the inspection, but after the

7    inspection they would see if they could adjust the

8    settings.

9    Q.  Were you present during the closing conference?

10   A.  Yes, I was.

11   Q.  Was this pressure-release valve/bleeder valve

12   discussed?

13   A.  My notes show that --

14          MR. LINSIN:  Objection, hearsay.

15          THE COURT:  At this point sustained.

16   BY MR. MANGO:

17   Q.  Mr. Sitzman, do you recall the

18   pressure-release/bleeder valve being discussed

19   during the closing conference?

20   A.  I have an entry in my notes that it was.

21          MR. LINSIN:  Objection, hearsay.

22          THE COURT:  Sustained.

23   BY MR. MANGO:

24   Q.  Do you have a recollection today, sitting on

25   the stand, whether the pressure-release

1    valve/bleeder valve was discussed at the closing

2    conference?

3    A.   No, I do not.

4    Q.   Okay.   Is there any document, Mr. Sitzman, that

5    would assist in your recollection of whether the

6    pressure-release valve/bleeder valve was discussed

7    during the closing conference?

8    A.   My notes.

9            MR. MANGO:   Your Honor, if I may have a

10   moment?

11           THE COURT:   Yes.

12           MR. MANGO:   Your Honor, I'd like to pull

13   up for identification purposes Government

14   Exhibit 3560.61.

15       If we could go, please, Lauren, to page 7 of

16   that document.

17           THE COURT:   3560.61?

18           MR. MANGO:   3560.61, yes, for

19   identification, and go to page 7.

20   BY MR. MANGO:

21   Q.   Now, Mr. Sitzman, I want you to review this

22   document.   If you need it zoomed, let me know, and

23   when you're ready, please look up.

24       Okay.   Did you have a chance to review that?

25   A.   Yes.

1    Q.   What is this document I'm showing you?

2    A.   These are my notes.

3              MR. LINSIN:  Your Honor, I would ask if

4    the question is going to be posed again, the

5    document would be removed from the screen, as we've

6    done with each witness, and the witness be asked if

7    he now has a present recollection of what was

8    discussed at the closeout meeting.

9              THE COURT:  Okay.  And that's fair enough.

10   And that's the proper protocol under 612.

11   BY MR. MANGO:

12   Q.   Yes, we can take that down.

13        Mr. Sitzman, did you review the document that

14   was up on your screen?

15   A.   Yes.

16   Q.   And did that document refresh your recollection

17   as to whether the pressure-release valve/bleeder

18   valve was discussed at the closing conference in

19   your April inspection?

20   A.   Yes, it was.

21   Q.   Okay.  And what was the document that I showed

22   you?

23   A.   That was my notes where I noted everything

24   discussed --

25              THE COURT:  Is there an objection?

1          MR. LINSIN:  Your Honor, I do object again

2     to the voiring of the testimony through the notes.

3     I would ask that we focus on the witness's present

4     recollection.

5          THE COURT:  After having been refreshed?

6          MR. LINSIN:  Exactly.  Yes.

7          THE COURT:  Thank you.

8          MR. MANGO:  Yes, your Honor.

9     BY MR. MANGO:

10    Q.   Mr. Sitzman, you mentioned that your

11    recollection has now been refreshed by reviewing

12    that document, is that correct?

13    A.   Correct.

14    Q.   Okay.  Can you tell the jury now with your

15    refreshed recollection whether the pressure-release

16    valve/bleeder valve was discussed during the

17    closing conference?

18    A.   Yes, it was.

19    Q.   Okay.  And what was discussed?

20    A.   It was discussed that we would have to look

21    into it further.  It was an issue for follow-up.

22    Q.   Now, you mentioned that you had previously

23    asked whether they could look into raising the set

24    point on this bleeder/pressure-release valve?

25    A.   Yes.

1   Q.   Okay.  Do you know if that ever happened?

2   A.   I recollect that I learned a couple of days

3   later that, yes, in fact, it had been adjusted.

4   Q.   Okay.  Do you remember how you learned that?

5   A.   No, I don't.

6   Q.   Did you go to the plant and inspect it?

7   A.   I don't remember.

8   Q.   Okay.  How certain of you -- how certain are

9   you that -- I'm sorry.  Can you say with certainty

10  here today that the pressure-release valve -- that

11  you know personally was -- the set point was

12  raised?

13          MR. LINSIN:  Your Honor, he just said he

14  doesn't know how he recalls it.  I would object to

15  the question being posed again in this fashion.

16          THE COURT:  Okay.  Yeah.  I'll sustain the

17  objection.

18          MR. MANGO:  Mr. Sitzman, do you know if

19  that recollection was based on conversations you

20  may have had with any Tonawanda Coke personnel?

21          MR. LINSIN:  Objection.

22          THE COURT:  Sustained.

23          MR. MANGO:  Your Honor, may I have a

24  moment?

25          THE COURT:  Yes.

1      MR. MANGO:  Thank you, your Honor.

2    BY MR. MANGO:

3    Q.  Did you have any conversations with any plant

4    personnel regarding the bleeder/pressure-release

5    valve after this closing conference?

6    A.  Yes.

7    Q.  Okay.  And based on those conversations, what

8    do you believe happened to the set point for the

9    bleeder/pressure-release valve?

10            MR. PERSONIUS:  Objection, your Honor.

11            THE COURT:  Grounds?

12            MR. PERSONIUS:  Foundation.

13            THE COURT:  No.  Overruled.

14   BY MR. MANGO:

15   Q.  You can answer.

16   A.  Could you repeat the question, please?

17   Q.  Sure.  Based on those conversations -- I'm

18   going to try to get this right here.  Based on

19   those conversations you had with plant personnel

20   regarding the setting on the pressure-release

21   valve, do you believe the set point for the

22   pressure-release valve was raised?

23   A.  I believe changes were made to stop the

24   releases from that valve, yes.

25   Q.  Okay.  Okay.  I'd like to pull up Government

1    Exhibit 131 back again, which is the HAP study.

2        Mr. Sitzman, do you recall this?

3    A.   Yes.

4    Q.   I'd like to go to page 2-1 of this exhibit,

5    please.  It's actually 2-10.  I'm sorry.  2-10.

6        I'd like to focus in -- is there a section that

7    relates to quenching?

8    A.   Yes.

9    Q.   If you could just read this paragraph, please,

10   and then I'll ask you the next question.

11   A.   "Particulate emissions from quenching" --

12   Q.   Well, I'm sorry.  I meant to yourself,

13   Mr. Sitzman.

14   A.   Oh.  Good.  Thank you.

15       Okay.

16   Q.   Okay.  Do you recall, is there a mention in

17   this section that the quench towers at Tonawanda

18   Coke actually do have baffles?

19   A.   Yes.  The sentence starting right there.  It

20   says directly, "The Tonawanda Coke quench tower has

21   baffles for control of PM emissions."

22   Q.   Okay.  All right.  Thank you.  We can pull that

23   down.

24       Now, let's go back quickly to the pilot light

25   that you discussed that you observed not being on.

1950

1    Who told you that the pilot light was not

2    operational?

3    A.   Mr. Kamholz.

4    Q.   All right.

5              THE COURT:  Put up 131 again, please.

6         No, that's not the right one.  I'm sorry.

7              MR. MANGO:  Do you want that page we just

8    read from, your Honor?

9              THE COURT:  Yes.  What page was that?

10             MR. MANGO:  That was 2-10.

11             THE COURT:  2-10.  And that had the

12   reference to the quenchers?

13             MR. MANGO:  Yes.  Right here, your Honor.

14             THE COURT:  Okay.  So the sentence you

15   pointed to with respect to baffles, Mr. Sitzman,

16   was the fourth line beginning with "the"?

17             THE WITNESS:  Correct.

18             THE COURT:  Okay.  And then it references

19   one quench tower, singular, doesn't it?

20             THE WITNESS:  Yes, it does.

21             THE COURT:  Thank you.

22   BY MR. MANGO:

23   Q.   Now, Mr. Sitzman I'd like to -- based upon the

24   information that you received regarding the use of

25   the bleeder/pressure-release valve on the coke oven

1    gas line in the by-products area that you learned

2    of in April of 2009, right?  Based on the

3    information you received regarding that and your

4    review of the circular charts, should that have

5    been included in the Title V permit?

6    A.  Yes, it should have.

7    Q.  Was it included in the Title V permit?

8    A.  No, it wasn't.

9    Q.  And can you tell this jury whether the failure

10   to include it is a violation of Condition 4 of the

11   Title V permit?

12   A.  Yes, it is.

13   Q.  Okay.  Tell the jury why you believe that.

14   A.  Any emission source at a facility, unless it's

15   exempt or trivial, requires to be permitted by New

16   York State, and it has for many years.

17   Q.  Based on your understanding of how this

18   pressure-release valve/bleeder valve operated, do

19   you believe it was a trivial or exempt activity?

20   A.  No, it was not.

21   Q.  In fact, if you learned that approximately

22   7,100 pounds per hour were released from that

23   bleeder every time it opened, would that affect

24   your consideration at all?

25   A.  The way it was operated affected my

1    consideration.  Process emissions were coming out

2    of the valve.  It required a permit.

3               MR. MANGO:  Your Honor, if I could have

4    one moment, please?

5               THE COURT:  Certainly.

6               MR. MANGO:  Thank you, your Honor.

7    Nothing further.

8               THE COURT:  Okay.  Okay.  Unless you

9    object, ladies and gentlemen -- no objections?

10   Lunch is okay?  All right.  You can have lunch.

11   You must come back, and we'll start at

12   approximately 2:00 o'clock.  Okay.

13      Don't discuss the case.  Please keep your minds

14   open, and remember this case is important to both

15   sides.  And I know you're working hard to stay with

16   this, so please continue to do that, and we'll see

17   you again after lunch.  I guess it's still a nice

18   day out there, so please enjoy the time.  Thank

19   you.

20               (Jury excused from the courtroom.)

21               THE COURT:  Okay.  Mr. Sitzman, you can

22   step down.  See everybody at about 2:00 o'clock or

23   so, okay.

24               MR. LINSIN:  Thanks, your Honor.

25               MR. MANGO:  Thank you, your Honor.

1        THE COURT:  You're welcome.  Thank you.

2             (Lunch recess was taken.)

3             (Jury seated.)

4        THE COURT:  Welcome back, ladies and

5    gentlemen.  Please have a seat.

6        Okay.  We're reassembled.  The attorneys and

7    parties are back present.  Ladies and gentlemen,

8    you are here, roll call waived.  And we have

9    Mr. Larry Sitzman on the stand, and he remains

10   under oath.  I think we're about ready to start

11   cross-examination.  Okay.

12       All right, Mr. Linsin, I think you're on.

13            MR. LINSIN:  Thank you, your Honor.

14   CROSS-EXAMINATION BY MR. LINSIN:

15   Q.  And good afternoon, Mr. Sitzman.

16   A.  Good afternoon.

17   Q.  I don't believe we've met before, sir.  My name

18   is Greg Linsin.  I represent Tonawanda Coke

19   Corporation.

20   A.  Nice to meet you.

21   Q.  Mr. Sitzman, you testified on direct

22   examination, I believe, that you began working in

23   DEC's Division of Air Resources in 1978, is that

24   correct?

25   A.  Correct.

1954

1    Q.  And you were with that division for two years,

2    and then you did a -- about a one-year stint in the

3    Water Division, is that correct?

4    A.  Roughly, yes.

5    Q.  Now, when you joined the Division of Air

6    Resources, you joined as an Environmental Engineer

7    I, is that correct?

8    A.  Correct.

9    Q.  And at that time was there a technician working

10   in that division by the name of Gary Foersch?

11   A.  At that time I worked in the Albany office.

12   Q.  You were in the Albany office.  I see.  You

13   didn't know Mr. Foersch at that time?

14   A.  Correct.

15   Q.  So the first time you worked in that division

16   in Buffalo was in 1991?  Is that your recollection?

17   A.  Yes.  Summer of 1991.

18   Q.  All right.  And you then joined the Buffalo

19   office as an Environmental Engineer II in that

20   year, in 1991, correct?

21   A.  I was still an Environmental Engineer I, but I

22   had passed the professional engineer's exam and was

23   working towards a promotion.

24   Q.  All right.  And was it at that time then that

25   you became acquainted with Mr. Foersch?

1  A.  Yes.

2  Q.  And he was then a technician in that Buffalo

3  office of the Division of Air Resources, correct?

4  A.  Correct.

5  Q.  And what was your relationship to him?  I mean,

6  you were an engineer in the office, he was a

7  technician, is that correct?

8  A.  Correct.

9  Q.  And did you supervise him with respect to the

10  work he conducted or inspections he conducted

11  concerning facilities?

12  A.  Not at that time.

13  Q.  When did you first take on supervisory

14  responsibilities for Mr. Foersch?

15  A.  It was sometime in 1993.

16  Q.  And what changed that you then became more of

17  his supervisor than just an associate?

18  A.  By then I was an Environmental Engineer II, and

19  I also -- a couple of staff left, moved on to other

20  jobs, and we shrunk a little bit and had to realign

21  facilities and duties.

22  Q.  So in 1993 then, when you assumed those

23  additional duties of supervising Mr. Foersch and

24  the work he was doing at the facilities he was

25  working with, was that your first at least

1    supervisory contact with the Tonawanda Coke

2    facility?

3    A.   I was his supervisor, yes, but I really didn't

4    go to the facility for several years after that.

5    Q.   I understand that your first on-site visit was

6    later in the '90s.

7    A.   Yes.

8    Q.   But my question is, in 1993 you knew that one

9    of the facilities that Gary Foersch was responsible

10   for inspecting was the Tonawanda Coke facility,

11   correct?

12   A.   Yes, I did.

13   Q.   And as his supervisor, did you oversee and

14   discuss with him the inspections he was conducting,

15   the plans for those inspections, and the results of

16   those inspections?

17   A.   Yes.

18   Q.   And in order to perform your duties as

19   Environmental Engineer II and now taking over

20   responsibilities involving the supervision of Gary

21   Foersch, did you review the Division of Air

22   Resources file regarding the Tonawanda Coke

23   Corporation?

24   A.   I don't believe I did.

25   Q.   Did you know, when you first started

1  supervising Gary Foersch, that he had been

2  inspecting the Tonawanda Coke Corporation back as

3  early as 1978?

4  A.  Yes.

5  Q.  All right.  And did you talk with Mr. Foersch

6  about the nature of those inspections, the results

7  of those inspections, the general compliance

8  history of this facility?

9  A.  Yes.

10  Q.  All right.  May I please have Government's

11  Exhibit 3521.10 for identification.

12      Now, do you see the exhibit sticker 3521.10 in

13  the upper right-hand corner, sir?

14  A.  Yes, I do.

15  Q.  Do you recognize this document?

16  A.  Yes.

17          MR. LINSIN:  Your Honor, absent objection,

18  I would move this document into evidence.

19          MR. MANGO:  No objection, your Honor.

20          MR. PERSONIUS:  No objection.

21          THE COURT:  Okay.  3521.10 received, no

22  objection.  Do you want it published?

23          MR. LINSIN:  Yes, please, your Honor.

24          THE COURT:  And it may be published

25  please.

1        (Government's Exhibit 3521.10 was received

2        into evidence.)

3        MR. LINSIN:  And if we could just enlarge

4    the top half of the document, please.  Thank you.

5    BY MR. LINSIN:

6    Q.  Now, you're copied on this document.  You're

7    not the author of this document, correct?

8    A.  Correct.

9    Q.  And in the -- it's an internal DEC memorandum,

10   correct?

11   A.  Correct.

12   Q.  And it is authored by Gary Foersch and

13   initialed by him, correct?

14   A.  Correct.

15   Q.  And directed to Mr. Michael Podd with the HWR,

16   is that correct?

17   A.  Correct.

18   Q.  And what was HWR?

19   A.  I believe it's Hazardous Waste Remediation.

20   Q.  All right.  And is it an accurate general

21   summary to say that this is a communication from

22   the Division of Air Resources to the Hazardous

23   Waste and Remediation Office regarding the

24   regulatory history for Tonawanda Coke with respect

25   to Clean Air Act compliance?

1  A.  Yes.

2  Q.  And do you know why this memorandum was

3  written?

4  A.  No, I don't recollect why.

5  Q.  I'm going to ask you to take a look at the --

6  well, the first paragraph indicates that it is

7  being written in response to a request from

8  Mr. Podd that you review your Division of Air

9  Resources files for this facility, correct?

10  A.  Correct.

11  Q.  And then the second paragraph talks about the

12  general regulatory status of the facility, correct?

13  A.  For all 23 air contamination source, yes.

14  Q.  And that those sources were operating in

15  compliance with your department's regulation,

16  correct?

17  A.  At that time, correct.

18  Q.  And that the permits were valid through

19  December 1, 1994, correct?

20  A.  Correct.

21  Q.  And would you read, please, the last paragraph

22  of this memorandum?

23  A.  "The firm historically has been in compliance

24  with our regulations, with only an occasional upset

25  or malfunction causing any problems."

1  Q.  And is it fair to say, Mr. Sitzman, that that

2  quick summary provided in this memorandum is

3  consistent with the information you had learned in

4  your discussions with Gary Foersch concerning his

5  oversight of the Tonawanda Coke facility on behalf

6  of the Division of the Air Resources?

7  A.  That was Mr. Foersch's opinion.

8       MR. MANGO:  Objection, your Honor, to

9  that.  I guess it's asked and answered.  I'll let

10  it stand.

11       THE COURT:  You don't have to guess.  It

12  was.

13       MR. MANGO:  Yeah, well, I was going to

14  object what Mr. Foersch's opinion was, but it was

15  asked and answered, so I'll withdraw.

16       THE COURT:  All right.

17  BY MR. LINSIN:

18  Q.  All right.  If we can pull this down, please.

19       Now, three years after that memorandum, if I

20  have the chronology correctly, Tonawanda Coke

21  submitted its initial Title V application, correct?

22  A.  Correct.

23  Q.  And you testified that you were involved in the

24  review of that application, is that right?

25  A.  I was involved in the review of that

1     application, correct.

2     Q.  After it was processed and punched in and you

3     got it back in digital form, is that correct?

4     A.  Correct.

5     Q.  And as a -- now, that application remained

6     under consideration by the Division of Air

7     Resources for approximately five years, correct?

8     A.  Correct.

9     Q.  All right.  If I may have Defendant's Exhibit

10    HHH, please, for identification.

11        Now, as Miss Henderson is calling that up, do

12    you recall, yourself, conducting an inspection of

13    the Tonawanda Coke facility in October of 1999?

14    A.  I don't recall that date offhand, but --

15            THE COURT:  HHH?

16            MR. LINSIN:  For identification.

17            THE COURT:  Okay.  For identification.

18    Thank you.

19    BY MR. LINSIN:

20    Q.  Ask you to take a look at this document and,

21    first of all, state whether you can identify it.

22    A.  It's a printout of the inspection detail report

23    from our AFS computer system for a completed

24    inspection at the facility.

25    Q.  And the facility is the Tonawanda Coke

1    facility?

2    A.   Correct.

3    Q.   All right.   Your Honor, I would move -- and the

4    date -- I'm sorry -- of the inspection?

5    A.   The date of the inspection was October 25th,

6    1999.

7         MR. LINSIN:   All right.   I would move

8    Defendant's Exhibit HHH into evidence, your Honor.

9         MR. MANGO:   Your Honor, subject to some

10   relevance to this witness, whose name does not

11   appear anywhere on this document, we would object.

12        THE COURT:   Okay.   I mean, this comes

13   within the ambit of his jurisdiction at the time,

14   but as far as this document is concerned?

15   BY MR. LINSIN:

16   Q.   Mr. Sitzman, this document -- the entry in the

17   computer system was made by Mr. Gary Foersch, is

18   that correct?

19   A.   Yes.

20   Q.   All right.   Now, do you recall that the

21   inspection that is referenced in this document on

22   October 25th, 1999, was conducted by yourself,

23   Miss Webster, and Mr. Foersch?

24   A.   No.

25   Q.   You didn't conduct an inspection of the

1963

1    facility on this date?

2    A.   Generally, looking at what you presented to me,

3    it only says Gary was there.  Our computer system

4    has -- can list as many staff as was there.

5    Q.   Let me ask my question again.  And let's just

6    take this document down, please.  My question,

7    Mr. Sitzman, is, do you remember -- not what the

8    document says -- do you remember being present at

9    an inspection for an inspection at the Tonawanda

10   Coke facility on October 25th, 1999?

11              MR. MANGO:  I'm going to object, your

12   Honor.  Asked and answered.  He said he didn't

13   remember.

14              THE COURT:  It's a little confusing right

15   now, so let's find out what you do remember,

16   please.  Overruled.

17              THE WITNESS:  I do not remember being at

18   that inspection.

19   BY MR. LINSIN:

20   Q.   You testified on direct examination that your

21   first visit to the Tonawanda Coke facility was in

22   the mid-'90s, I believe you testified, is that

23   correct?

24   A.   Correct.

25   Q.   When was that, sir?

1964

1    A.    In the mid-'90s sometime.

2    Q.    You testified on direct examination that you

3    reviewed the regulatory history of this facility

4    before testifying today, correct?

5    A.    Correct.

6    Q.    Did you identify through your review of those

7    records when was the first time you inspected this

8    facility?

9    A.    No.

10   Q.    Does it fit with your recollection,

11   Mr. Sitzman, that in 1999 a review of this facility

12   was conducted on behalf of the Division of Air

13   Resources?

14   A.    I don't know what you mean by a review.

15   Q.    An inspection.

16   A.    An inspection should have been conducted, yes.

17   Q.    Does it fit with your memory that it was

18   conducted?

19   A.    It fits.  I say that because every major

20   facility needed an annual inspection, and we always

21   did ours in Buffalo, so it would have been done.

22   Q.    And is your recollection about the inspection,

23   the '99 inspection -- is your recollection

24   refreshed by having reviewed the document that was

25   just on the screen, Defendant's Exhibit HHH for

1    identification?

2    A.   I still don't remember if I was there or not.

3    Q.   No, not whether you were there.  My question

4    now is, do you remember that one was done in

5    October of '99 as your memory is refreshed having

6    reviewed the document?

7    A.   According to that document, one was done.

8    Q.   Do you recall, Mr. Sitzman, that in October of

9    1999 that an inspection was conducted at the

10   facility to review that facility's Title V

11   application, to conduct a plant tour, to determine

12   how the facility's 303 inspections were being

13   performed, and to request that the facility supply

14   your office with copies of the 303 inspection

15   reports?

16   A.   I don't remember the exact date, but I know

17   that inspection was done.

18   Q.   All right.  So this would have been while the

19   application was pending and before the -- your

20   office had made a decision as to whether or not a

21   permit was going to be issued, correct?

22   A.   Correct.

23   Q.   Now, may I please have Government's Exhibit 92

24   for identification.

25        Do you see the exhibit sticker at the bottom

1    right-hand corner of the document Government's

2    Exhibit 92, sir?

3    A.   Yes.

4    Q.   All right.  And do you recognize what this is?

5    A.   This is a permit transmittal letter of an air

6    state facility permit for Tonawanda Coke,

7    December 8th, 2000.

8    Q.   Now, is it accurate -- this is still during the

9    period of time that DEC is reviewing the Title V

10   permit application, correct?

11   A.   Correct.

12   Q.   And is it accurate that this would be one of

13   the Air 100 permits that you testified about on

14   direct examination?

15   A.   It's -- it's possible.  I haven't seen the

16   permit, but --

17            MR. LINSIN:  All right.  Your Honor --

18   well, at this point I would move Government's

19   Exhibit 92 into evidence.

20            MR. MANGO:  Your Honor, if we could scroll

21   through the rest of the pages.

22      No objection, your Honor.

23            MR. PERSONIUS:  No objection, your Honor.

24            THE COURT:  Okay.  Government's Exhibit 92

25   received, no objection.

1    (Government's Exhibit 92 was received into

2    evidence.)

3    MR. LINSIN:  May it be published, your

4  Honor?

5    THE COURT:  Yes, it may.  First page?

6    MR. LINSIN:  First page initially.

7  BY MR. LINSIN:

8  Q.  Now, you are copied on this document as well,

9  sir, is that correct?

10  A.  Correct.

11  Q.  As is Miss Webster, correct?

12  A.  Correct.

13  Q.  And she at that point was a -- an engineer in

14  the Division of Air Resources, correct?

15  A.  Correct.

16  Q.  And the -- this is a cover letter signed by

17  whom?

18  A.  Richard Sweeney, Deputy Regional Permit

19  Administrator.

20  Q.  And if we can then move to the next page,

21  please.  And let's just enlarge the text on the

22  page and see if we can improve our -- the permit is

23  issued to Tonawanda Coke facility, correct?

24  A.  Correct.

25  Q.  And from this cover page can you tell the

1968

1    effective date of the permit is December 4th, the

2    year 2000?

3    A.  Yes.

4    Q.  All right.  Now, if we could move to the --

5    what is, I believe, page 14 in the exhibit, please.

6    And if we can enlarge that portion.

7        I'm sorry.  This is not the page.  It is

8    Condition 14 I'm looking for.  And I'll go to my

9    default, the page 7 of 13 of the document.  Let's

10   start here, the very bottom, to get the title of

11   Condition 14.

12       Do you see that, the reference to that

13   condition?

14   A.  Yes.

15   Q.  And what is a coke oven gas desulfurizer or

16   actifier?

17   A.  It was operated to remove sulfur from the coke

18   oven gas stream.

19   Q.  This is a condition that relates to the

20   deactivation or shutdown of that piece of

21   equipment?

22   A.  Correct.

23   Q.  All right.  And if we could go to the next page

24   and enlarge the -- yes.  Thank you.

25       Now, is it accurate to say that this Item 14.1

1    on this page discusses the management of coke oven

2    gas at the Tonawanda Coke facility and the

3    potential effects from the shutdown of this

4    actifier?

5    A.   Yes.

6    Q.   And would you read -- please read the first

7    paragraph, please?

8        I'm sorry.  Read it out loud.

9    A.   Okay.  "Coke oven gas is recovered from the

10   coke oven battery and purified for reuse as an

11   underfire fuel at the battery.  The current

12   purification process includes the actifier emission

13   unit, which regenerates a sodium carbonate solution

14   from the desulfurizer by removing hydrogen sulfide

15   and emitting it to the atmosphere."

16          THE COURT:  Slow down just a little bit,

17   please.

18          THE WITNESS:  Okay.  "Removing the

19   actifier from the coke oven gas purification

20   process would increase the sulfur content of the

21   coke oven gas sent back to the battery for reuse

22   above the 0.5 grain limit found in 6NYCRR Part 214.

23   The increased sulfur content of the underfire fuel

24   translates to increased sulfur dioxide emissions

25   from the battery's waste heat stack.  The maximum

1    increase in sulfur dioxide emissions from the waste

2    heat stack is 240 pounds per hour."

3    BY MR. LINSIN:

4    Q.   Is it accurate to say, Mr. Sitzman, that this

5    paragraph and the ones that follow summarize the

6    Division of Air Resources' understanding of how the

7    Tonawanda Coke facility was managing the coke oven

8    gas after it came through the by-products area?

9    A.   Does this describe the effect of the additional

10   sulfur --

11   Q.   We will get to that in a moment.  But it talks

12   about the purification process and then its reuse

13   as an underfire fuel, correct?

14            THE COURT:  As a what?  I'm sorry.

15            MR. LINSIN:  As an underfire fuel.  In the

16   first line.

17            THE WITNESS:  Correct.

18   BY MR. LINSIN:

19   Q.   Okay.  And is it -- is it accurate to say that

20   based on -- and you're welcome to read the entire

21   text, but the Division of Air Resources determined

22   that the shutdown of this actifier might slightly

23   increase the sulfur dioxide emissions, but it would

24   also achieve a significant reduction in the

25   hydrogen sulfide emissions from the heat stack of

1    the battery?

2    A.   It would increase the sulfur dioxide from the

3    heat stack and eliminate the hydrogen sulfide from

4    the actifier.   Correct.

5    Q.   Okay.   And so this proposal to deactivate that

6    piece of equipment was granted because your office

7    determined it was worth the tradeoff to achieve

8    that reduction in hydrogen sulfide emissions,

9    correct?

10   A.   Correct.

11   Q.   May I now please have Government's

12   Exhibit 18.18.

13             THE COURT:   All right.   That's already in

14   evidence?

15             MR. LINSIN:   Yes, I'm sorry.   Already in

16   evidence.   18.18.

17   BY MR. LINSIN:

18   Q.   You testified about this document on direct

19   examination.   Do you recognize this as the cover

20   page for the Tonawanda Coke facility's Title V

21   permit?

22   A.   Yes.

23   Q.   All right.   Now, you were asked some questions

24   about the conditions in this permit that related to

25   the quench towers, correct, on direct examination?

1    A.   Correct.

2    Q.   If we may go to page 22 of this exhibit?

3         THE COURT:   That's Bates stamp 22 as

4    opposed to document?

5         MR. LINSIN:   Yes, your Honor.  Large Bates

6    stamp.  The exhibit page number.

7         THE COURT:   Okay.  Thank you.

8    BY MR. LINSIN:

9    Q.   Now, I'm going to ask you to look to -- we can

10   go back to the title of this condition if you want,

11   but at Item 20.1, and see if you recognize this as

12   the first item in the condition regarding reopening

13   for cause.

14   A.   Yes.

15   Q.   All right.  And the first portion of the

16   sentence under this condition states that "This

17   Title V permit shall be reopened and revised under

18   any of the following circumstances."  Correct?

19   A.   Correct.

20   Q.   And when a permit like this uses the word

21   "shall," that is mandatory, correct?

22   A.   Correct.

23   Q.   And if you look, please, at romanette ii, that

24   provision states that the department -- so, the

25   permit shall be reopened and revised under any of

1    the following circumstances.  The second one here

2    being that "The department or the administrator

3    determines that a permit contains a material

4    mistake or that inaccurate statements were made in

5    establishing the emissions standards or other

6    conditions of the permit," correct?

7    A.   Correct.

8    Q.   Now, you testified on direct examination that

9    the Division of Air Resources, in issuing this

10   permit, made a mistake by not including the

11   exemption for baffles concerning quench tower

12   number 1, correct?

13   A.   Correct.

14   Q.   And isn't it also true that even though that

15   mistake was made and later recognized, that there

16   was no effort on the part of the Division of Air

17   Resources to reopen or revise this permit after

18   that mistake had been recognized?

19   A.   I don't remember the date when we found out

20   that the error had occurred, whether the permit was

21   at its expiration date or we had already extended

22   it because of all the activities we've been going

23   through for the last several years.  So I don't

24   know when we discovered, we were told, whatever,

25   that that condition was wrong in the permit.

1974

1    Q.   Who discovered that, Mr. Sitzman?

2    A.   I don't remember.

3    Q.   Did you?

4    A.   I don't remember.

5    Q.   If we may go to page 16, please.  And enlarge

6    the top portion of that page.

7         Now, you testified about this condition on

8    direct examination, correct?

9    A.   Correct.

10   Q.   And let me find my notes on that, if I might.

11        If I recall correctly, sir, you testified that

12   this condition requires -- that there is a

13   requirement for any existing source that was

14   subject to regulation be included in the permit, is

15   that correct?

16   A.   Correct.

17   Q.   And that if that occurs, the source owner must

18   apply for a permit, correct?

19   A.   Correct.

20   Q.   All right.  Now, the first portion of this

21   condition states -- is a conditional requirement

22   for permitting, isn't that accurate?  It begins

23   with the word "if," doesn't it?

24   A.   Correct.

25   Q.   And it says, "If an existing emission source

1    was subject to permitting requirements of 6NYCRR

2    Part 201 at the time of construction or

3    modification," correct?

4    A.   Correct.

5    Q.   So everything that follows in this condition of

6    Tonawanda Coke's Title V permit is premised on that

7    first conditional clause, correct?

8    A.   In addition to and the owner-operator failed to

9    apply for the permit.

10   Q.   Well, obviously.  If they had applied, then

11   this would be a moot point, correct?

12   A.   Correct.

13   Q.   But, everything else in this condition is

14   dependent on that opening conditional clause,

15   correct?

16   A.   Correct.

17   Q.   Now, when was the pressure-relief valve in --

18   on the coke oven gas line at the Tonawanda Coke

19   plant constructed?

20   A.   I do not know.

21   Q.   Did you ever ask the company when it was

22   constructed?

23   A.   No.

24   Q.   When was the pressure-relief valve on the coke

25   oven gas line at the Tonawanda Coke facility

1    modified?

2    A.  I don't know.

3    Q.  Did you ever ask Tonawanda Coke when it was

4    modified?

5    A.  No.

6    Q.  Isn't it true, then, Mr. Sitzman, if you don't

7    know those two basic facts, you can't really apply

8    this condition, can you?

9    A.  Yes, I think I can.

10   Q.  And how is that?

11   A.  As an air pollution control engineer for the

12   New York DEC, any emission source needs to be

13   permitted whether -- unless it's exempt or trivial.

14   Q.  Now, you've just restated pretty much what you

15   testified to on direct.

16   A.  Correct.

17   Q.  What I'm trying to get you to focus on is the

18   specific conditions, the specific terms of this

19   condition.  And my question to you is:  If you

20   don't know when the pressure-relief valve on that

21   coke oven gas line at the Tonawanda Coke facility

22   was constructed or modified, isn't it true, under

23   the terms of this condition, you're not sure

24   whether at the time it was constructed or modified

25   it was subject to any permitting requirements, are

1    you?

2    A.   I believe that if it was an existing emission

3    source that I identified that required permitting

4    and already existing, and the time of construction

5    issue is that we always at DEC required permits for

6    these.  So, it was at the time of construction

7    subject to permitting.  If it was built prior to

8    our regulations, when we started requiring permits

9    for facilities, it should have gotten a permit then

10   if it was in existence.  If it was after we

11   required permits, then certainly it was constructed

12   when it needed a permit.

13   Q.   So you just testified about practices that you

14   had for New York State permitting obligations

15   before Title V came into effect, correct?

16            MR. MANGO:  Objection, your Honor.  He's

17   trying to tell him what he just testified to.  We

18   heard the answer.

19            THE COURT:  No, I think for effective

20   management under 611(a) I'm going to permit it, and

21   we'll get back to the core issue.  So go ahead.

22       Do you remember the question?

23            THE WITNESS:  No.

24   BY MR. LINSIN:

25   Q.   You just testified about practices that you had

1   in permitting emission sources within the Division

2   of Air Resources before Title V came into effect,

3   correct?

4   A.  Correct.

5   Q.  All right.  The permit that was issued to

6   Tonawanda Coke Corporation in 2002 was a Title V

7   permit, correct?

8   A.  Correct.

9   Q.  And this is the controlling language for that

10  permit, correct?

11  A.  Correct.

12  Q.  It doesn't say anywhere in here, well, just

13  follow the practices you used to follow, does it?

14  A.  It doesn't say not to either.

15  Q.  It says explicitly, "If an existing emission

16  source was subject to permitting requirements under

17  Title VI of the state regulations Part 201 at the

18  time of construction or modification," that's what

19  it says, correct?

20  A.  Correct.

21  Q.  And isn't it true that without having that

22  information, you can't properly apply this

23  condition to any emission source?

24          MR. MANGO:  Objection, your Honor.  Asked

25  and answered.

1          THE COURT:  Yeah, but I'll permit it.

2     Overruled.

3          THE WITNESS:  I believe we always have

4     done it that way.  We've always asked for a permit

5     when necessary.

6   BY MR. LINSIN:

7     Q.  Isn't it true that it is required, in

8     evaluating the conditions of a permit, to look to

9     the literal terms of the condition that exists in

10    the permit?

11    A.  Yes, it is.

12    Q.  All right.  May we take this down, please.  And

13    if I may have Defendant's Exhibit F marked for

14    identification.

15        Ask you to take a look at this document,

16    Mr. Sitzman and, first of all, tell us whether you

17    can identify it.

18    A.  Yes.  It's a full compliance evaluation

19    checklist form.

20    Q.  And dated September 18th, 2002?

21    A.  Correct.

22    Q.  Who signed this form, sir?

23    A.  I did.

24    Q.  Did you conduct this full compliance evaluation

25    inspection?

1980

1    A.   No, I did not.

2    Q.   Do you know who did?

3    A.   I would have to review the records.

4    Q.   Didn't you testify on direct that you reviewed

5    those records before coming in here to testify?

6    A.   Yes.

7    Q.   But you don't remember who conducted this

8    inspection.

9    A.   Not this particular year.  Not off the top of

10   my head, sir.

11        MR. LINSIN:  Your Honor, I would move this

12   document -- well, let me -- let me ask a couple

13   more questions.

14   BY MR. LINSIN:

15   Q.   Why did you sign this document?

16   A.   I was required as part of my duties as Regional

17   Air Pollution Control Engineer.

18   Q.   But you had to make some evaluation before

19   signing this document, correct?

20   A.   Correct.

21   Q.   Okay.  And you had to determine that the

22   compliance requirements had been met, correct?

23   A.   I had to determine that -- this was my review

24   of -- the staff person responsible for the facility

25   was -- was -- filled out this checklist and sent it

1    to me for review.

2    Q.  And based upon your review, you determined it

3    was appropriate in your position as the Regional

4    Air Pollution Control Engineer for Region 9 to sign

5    this, correct?

6    A.  I determined that all the requirements had been

7    completed for the year at the --

8              MR. LINSIN:  Your Honor, I would move --

9              THE WITNESS:  -- facility.

10             MR. LINSIN:  I'm sorry.  I'm sorry.  Did

11   I --

12             THE WITNESS:  That's okay.

13             MR. LINSIN:  I would move Defendant's

14   Exhibit F into evidence.

15             MR. MANGO:  No objection, your Honor.

16             MR. PERSONIUS:  No objection, Judge.

17             THE COURT:  Okay.  Defendant's Exhibit F

18   received.  Do you want this published?

19             MR. LINSIN:  Yes, please, your Honor.

20             THE COURT:  Publish, please.

21             (Defendant's Exhibit F was received into

22             evidence.)

23   BY MR. LINSIN:

24   Q.  So this full compliance evaluation -- and if we

25   can, first of all, highlight -- well, enlarge that

1    portion of the exhibit.

2         Well, despite the cutoff on the margin, are you

3    able to read this portion of the form, sir?

4         I'm sorry.  Can you read it out loud?

5    A.   Oh.  Sorry.  I might miss a little at the

6    beginning.  "A full compliance evaluation" -- "A

7    full compliance evaluation is a comprehensive

8    evaluation of the compliance status of a facility.

9    For purposes of this policy, 'facility' is used in

10   the broadest sense of the term, incorporating all

11   regulated emission units within the facility.  It

12   addresses all regulated pollutants at all regulated

13   emission units.  Furthermore, it addresses the

14   current compliance status of each emission unit as

15   well as the facility's continuing ability to

16   maintain compliance at each emission unit."

17   Q.   Now, it doesn't say in here anywhere that this

18   full compliance review was focused only on the

19   battery at Tonawanda Coke, does it?

20   A.   No.

21   Q.   And as a matter of fact, that wouldn't satisfy

22   the requirements of a full compliance review,

23   correct?

24   A.   Correct.

25   Q.   All right.  May we have the entire document

1    again.  And just so it's a little easier to read,

2    that portion, please.

3        Now, the date of September 18th, 2002, was

4    about four months after Division of Air Resources

5    had issued the Title V permit to Tonawanda Coke,

6    correct?

7    A.  Correct.

8    Q.  And so this was the first full compliance

9    review of the facility with its new Title V

10   permit --

11   A.  Correct.

12   Q.  -- correct?

13       And you signed this form because you satisfied

14   yourself that one of the inspectors, whose identity

15   you don't recall at the moment, had conducted an

16   on-site inspection and determined that, as required

17   by the top portion of this form, that all emission

18   units had been inspected and that the facility was

19   in compliance with the permit requirements,

20   correct?

21   A.  I think it said all regulated emission units,

22   but yes.

23   Q.  All right.  And, in fact, at the -- at the very

24   bottom of this form -- I'm sorry -- these last

25   three -- last four, I'm sorry.  This portion here.

1        Is there any way to shift this so we can

2   actually get the text on the left-hand border?  No?

3   All right.  Let's go back to the -- just the full

4   document then.

5        The determination on this form is that a

6   current on-site inspection or visit was completed,

7   correct?

8   A.   Correct.

9   Q.   And that the full compliance evaluation was

10  completed, right?

11  A.   Correct.

12  Q.   And that the facility was currently in

13  compliance with its permit requirements?

14  A.   Correct.

15  Q.   And that it had been continuously in compliance

16  during the evaluation period, correct?

17  A.   Correct.

18  Q.   May I have Defendant's Exhibit III for

19  identification, please?

20       Ask you to take a look at the enlarged portion

21  of this, tell us whether you can identify it.

22  A.   This is an inspection detail report from our

23  AFS computer system for an inspection completed by

24  Gary Foersch on March 12th, 2003.

25  Q.   And is there a second page to this exhibit,

1    please?  Is that it?  Okay.

2        Does the -- does the computer entry indicate

3    that at the time of that inspection the facility

4    was in compliance?

5    A.   Yes.

6    Q.   May I have Defendant's Exhibit G.  Oh, I'm

7    sorry.  We now found page 2.  I'm sorry, your

8    Honor.  I apologize, Mr. Sitzman.

9        Going back for just a moment then to

10   Defendant's Exhibit III, and let's go to page 2,

11   please, and enlarge that portion of the text.

12           THE COURT:  Can you block out more towards

13   the end of the page?

14           MR. LINSIN:  Okay.  Thank you.

15           THE COURT:  Do you want this published or

16   received?

17           MR. LINSIN:  I would move Defendant's

18   Exhibit III into evidence, yes.

19           MR. MANGO:  Well, your Honor, I don't

20   think there's the foundation here.  The only

21   inspector listed, there's one, and it's not this

22   witness.  It's similar to that other form we looked

23   at that was not admitted.

24           THE COURT:  Okay.

25           MR. LINSIN:  Let me ask a couple more

1  questions in that regard.

2          THE COURT:  Certainly.

3  BY MR. LINSIN:

4  Q.  In March of 2003, Mr. Sitzman, what was your

5  position?

6  A.  I was the Regional Air Pollution Control

7  Engineer.

8  Q.  At that time did you supervise Gary Foersch?

9  A.  Not directly.

10  Q.  Who did?

11  A.  Cheryl Webster.

12  Q.  And did you supervise Cheryl Webster?

13  A.  Yes, I did.

14  Q.  In March 2003 did you understand that a Title V

15  permit had just been issued to the title -- to the

16  Tonawanda Coke facility within the last year?

17  A.  Yes.

18  Q.  Was it your practice as the Regional Air

19  Pollution Control Engineer to monitor the

20  compliance reviews for the facilities that had

21  Title V permits?

22  A.  It was my practice to do and my requirement to

23  do the FCE check sheets every year.

24  Q.  And in order to do that, were you -- was it

25  part of your responsibility to monitor the results

1    of the periodic on-site inspections and review?

2    A.  I would go into the computer system and make

3    sure every do item for that facility was complete

4    and that there were no outstanding compliance

5    issues.

6          MR. LINSIN:  Your Honor, on that basis I

7    move Defendant's III into evidence.

8          MR. MANGO:  Your Honor, again we'd object

9    on the foundation.  There's no relation to this

10   document that -- that this witness has reviewed

11   this document and knows what this document is.  He

12   wasn't here.  This is a different inspector, and

13   it's basically an accounting of what this other

14   inspector did.

15         THE COURT:  Well, if it's an issue of does

16   he know what it is and did he review it, you'll ask

17   those questions.

18         MR. LINSIN:  Your Honor, as I recall, the

19   witness just testified that these were the types of

20   entries that he would, in fact, periodically review

21   in order to execute the full compliance evaluation

22   checklist.

23         THE COURT:  He did, as a matter of, I

24   guess, habit and practice, and that puts us in

25   another position.

1          But specifically with respect to this document,

2     are you familiar with it as part of your review

3     that was conducted back in -- what -- 2003?

4              THE WITNESS:   In 2003 if I was doing an

5     FCE evaluation check sheet, reviewing that, I would

6     have looked in the system to see that an inspection

7     had been done and is completed.

8   BY MR. LINSIN:

9     Q.   Let's do it this way, if we may.   May I please

10    have Defendant's Exhibit G, marked for

11    identification.

12         Now, do you recognize this document, sir?

13    A.   Yes.

14    Q.   And is it a full compliance evaluation

15    checklist that you signed?

16    A.   Yes, it is.

17    Q.   Did you sign it on April 7th, 2003?

18    A.   Yes.

19    Q.   And before signing this document, would you

20    have reviewed the computer entries regarding the

21    on-site inspections at the Tonawanda Coke facility

22    for the preceding year?

23    A.   I would have looked to make sure an inspection

24    was completed, what the compliance status was, yes.

25    Q.   And therefore, if there had been a -- an

1    inspection at that facility on March the

2    12th, 2003, less than a month before you signed

3    this document, you would have reviewed that

4    document as well, correct?

5    A.   I would have reviewed that the entry existed,

6    correct.

7            MR. LINSIN:  Your Honor, at this time I

8    would move both Defendants' Exhibit III and

9    Defendants' Exhibit G into evidence.

10           THE COURT:  Okay.  Let's see III again,

11   please.

12           MR. LINSIN:  Can we enlarge the top half

13   starting further to the left?

14           THE COURT:  What is that, Mr. Sitzman?

15           THE WITNESS:  This is a printout of the

16   inspection detail of an inspection done

17   March 12th, 2003, at Tonawanda Coke --

18           THE COURT:  Okay.

19           THE WITNESS:  -- from our computer system.

20           THE COURT:  From your computer system.

21   That's the document you would have reviewed in

22   connection with the checklist?

23           THE WITNESS:  I would have pulled up this

24   sheet just like this and saw that that inspection

25   was completed.  I check the compliance status and I

1   look that the check box for the inspection was

2   complete.

3           THE COURT:  Mr. Mango?

4           MR. MANGO:  No objection, your Honor.

5           THE COURT:  Okay.  Then III and G both

6   received.  I think, Mr. Personius, that's right.

7   No objection?

8           MR. PERSONIUS:  Thank you, Judge, for

9   asking.  No objection.

10          THE COURT:  Okay.  Both received, and then

11  if you want either one published, we can do that.

12          (Defendants' Exhibits III and G were

13          received into evidence.)

14          MR. LINSIN:  Yes.  If we can do that

15  sequentially, please.  If we can first publish the

16  first page, which is on now on the screen, of

17  Defendants' Exhibit III.

18  BY MR. LINSIN:

19  Q.  And just to orient the jurors, and Mr. Sitzman,

20  let's start at the top of this, the DEC ID number,

21  what is that for?

22  A.  That's the identification number for the

23  facility.

24  Q.  All right.  And so each permitted facility has

25  a unique identification number?

1    A.   Unique, yes.

2    Q.   And this is Tonawanda Coke Corporation's ID

3    number, correct?

4    A.   Correct.

5    Q.   And then you have a couple of boxes.  The

6    scheduled date, what does that relate to?

7    A.   The Title V facilities were scheduled for when

8    they had to be completed.

9    Q.   When the annual inspections had to be

10   completed, correct?

11   A.   Correct.

12   Q.   All right.  And so the deadline for completing

13   the annual inspection at Tonawanda Coke was

14   March 31st, but the inspection was actually

15   achieved on March 12th, correct?

16   A.   Correct.

17   Q.   And then the time is indicated, 9:30 a.m., and

18   the check is that -- in the far right-hand box is

19   that that inspection was completed, correct?

20   A.   Correct.

21   Q.   And Mr. Foersch indicated that it was a routine

22   inspection, correct?

23   A.   Correct.

24   Q.   And what does the -- on that same line right

25   here, what does the AIRS relate to?

1   A.   All of our inspections, other compliance

2   status, a bunch of our information on permits has

3   to be submitted to the EPA Air System, and this is

4   a code -- and all our inspections are part of that,

5   and this is a code for a routine inspection.  And

6   that -- the information about this inspection when

7   it was conducted would be submitted to EPA.

8   Q.   All right.  So it's -- it's a method whereby

9   the results of these inspections are submitted to

10  EPA, is that correct?

11  A.   Correct.

12  Q.   Because the inspection and permitting program

13  that you've testified about -- I'm sorry -- the

14  inspection -- the permitting and inspection program

15  you're talking about is a program that both the

16  Department of Environmental Conservation and EPA

17  work with in order to ensure compliance with the

18  Clean Air Act, correct?

19  A.   Correct.

20  Q.   And there is one Clean Air Act, correct?

21  A.   Correct.

22  Q.   Now, there is a comment section down below.

23  Does it indicate with whom Mr. Foersch conducted

24  this inspection?

25  A.   Yes.

1    Q.   And who was that?

2    A.   Mark Kamholz.

3    Q.   And references the issuance of this facility's

4    Title V permit just under a year prior, correct?

5    A.   Correct.

6    Q.   And then at least on this page, the visible

7    portion of the form, a copy of which is kept by

8    Mark, and then if we can move to page 2, please.

9    And this is -- the first two lines are actually a

10   repetition of the fragment that we saw on the first

11   page, correct?

12   A.   Correct.

13   Q.   So a copy of which -- on the second line of

14   this comment, a copy of which is kept by Mark

15   Kamholz, correct?

16   A.   Correct.

17   Q.   All right.  And this form indicates that

18   Mr. Foersch and Mark -- now, Mr. Foersch is

19   referring to Mr. Kamholz in -- by his first name

20   correct?

21   A.   Correct.

22   Q.   As a matter of fact, based on your contact and

23   your engagement with this company over the years,

24   you yourself referred to Mr. Kamholz by his first

25   name, correct?

1    A.   Correct.

2    Q.   That "Mark and I went over the monitoring and

3    reporting requirements in this new permit on an

4    item-by-item basis," correct?

5    A.   Correct.

6    Q.   "He explained and showed me how compliance is

7    maintained and verified.  Everything appeared to be

8    okay," correct?

9    A.   Correct.

10   Q.   And then he had emission statements for the

11   past five years.  And then there's a discussion of

12   the third-party Method 303 inspections, correct?

13   A.   Correct.

14   Q.   And they -- as per your earlier request, the

15   results of those inspections were being provided to

16   your office on a monthly basis, correct?

17   A.   Correct.

18   Q.   And so the records for those 303 inspections --

19   and these are daily air emission inspections for

20   the most critical part of this coke plant, the

21   battery -- showed compliance over the past year,

22   correct?

23   A.   Correct.

24   Q.   And then Mr. Foersch verified this by doing a

25   walk-around himself and observing push, or at least

1    one push, correct?

2    A.   Correct.

3    Q.   And everything to him looked good, right?

4    A.   Yes.

5    Q.   And then an assessment of the opacity from

6    the -- for the emissions from the waste heat stack,

7    right?

8    A.   Correct.

9    Q.   And it was below 10 percent, is that right?

10   A.   Correct.

11   Q.   Then a reference to certain operating

12   procedures manuals that Mr. Foersch was shown to

13   ensure the ovens were being operated in compliance

14   with the permit, right?

15   A.   Correct.

16   Q.   And then the conclusion by Mr. Foersch is that

17   this facility appeared to be in compliance with all

18   items listed in their Title V permit, right?

19   A.   Right.

20   Q.   And it's based on this information that you

21   determined you would sign -- and now if we move to

22   Defendants' Exhibit G, which I believe has already

23   been admitted into evidence -- you determined --

24   and may this be published, please?  You determined

25   you would sign the following month this full

1   compliance evaluation checklist, right?

2   A.  I would have probably not read the inspection

3   detail.  I would have just, as I indicated earlier,

4   looked at the inspection was done, the compliance

5   status, and that the inspection was completed.

6   Q.  And you relied on the experience and training

7   and judgment of Gary Foersch in order to make the

8   determination that you would sign this document,

9   correct?

10  A.  Correct.

11  Q.  Because you knew him to be a long-time

12  inspector with the Division of Air Resources,

13  correct?

14  A.  Correct.

15  Q.  Someone in whose judgment you had confidence,

16  correct?

17  A.  Correct.

18  Q.  May we have Defendants' Exhibit HH, please, for

19  identification.  Actually, I apologize.  Let's do

20  this.  Given what has -- may we have Government's

21  Exhibit 3571.36 for identification?  Can we enlarge

22  the top half of this?  I'm sorry.

23      Do you recognize this document, sir?

24  A.  It's another printout of an inspection detail

25  report.

1    Q.   And the inspector listed is Cheryl Webster,

2    correct?

3    A.   Correct.

4    Q.   Would you have supervised her -- her

5    performance of this inspection?

6    A.   Depending on what you mean by supervision, yes.

7    Q.   Well, what do you mean by supervision?

8    A.   I would have made sure the tasks were

9    completed.

10   Q.   Did you speak with Miss Webster before she went

11   out to the facility in September of 2004?

12   A.   Maybe, maybe not.

13   Q.   Did you participate in the on-site inspection

14   with Miss Webster on September 30, 2004?

15   A.   Not according to this.

16   Q.   Do you have a recollection of participating?

17   A.   I don't recollect that I did.

18   Q.   Did you speak with her afterward about the

19   results of that inspection?

20   A.   Not necessarily, unless she had an issue and

21   came to see me about it.

22   Q.   All right.  If we can pull this down, please.

23        Do you recall that in May of 2006 EPA -- I'm

24   sorry -- that DEC conducted a visible emission

25   study of the heat stack at the Tonawanda Coke

1    facility?

2    A.   Yes, I believe it was May.

3    Q.   And may I have Defendants' Exhibit S for

4    identification.   S as in Sam.

5        Now, do you recognize what has been marked for

6    identification as Defendants' Exhibit S?

7    A.   It's another printout of an inspection detail

8    entry.

9    Q.   Now, your name does not appear on this

10   printout, but you have a recollection of

11   participating, is that correct?

12   A.   I have a recollection of this happening.

13   Q.   All right.   And is that the -- what is a Method

14   9 -- we can pull this down.   What is a Method 9

15   inspection?

16   A.   Method 9 is -- when I spoke earlier about being

17   certified for opacity reading, Method 9 is the

18   entire method you use when you read the smoke from

19   the stack to determine compliance.   It's an EPA

20   reference method.

21   Q.   And do you recall what the results of that test

22   were?

23   A.   They showed violations.

24   Q.   All right.   And what was done in -- based upon

25   those findings?

1    A.   We issued a notice of violation and

2    subsequently a consent order.

3    Q.   All right.  And do you recall what steps the

4    company did to remedy that violation that was

5    detected?

6    A.   I don't recall right now.

7    Q.   Do you recall in 2007 that the company spoke --

8    that you spoke, actually, with Mark Kamholz about

9    plans the company had to actually raise the height

10   of their waste heat stack in order to increase the

11   draft?

12   A.   Yes, I do remember that part.

13   Q.   And was that -- as best you recall, was that

14   part of the company's reaction to this notice of

15   violation you just testified about?

16   A.   It probably was.

17   Q.   May I have Defendants' Exhibit H for

18   identification, please.

19       Now, with reference to this document, sir, do

20   you recognize what it is?

21   A.   Another inspection detail report for an

22   inspection conducted September 15th, 2006.

23   Q.   All right.  And do you recall whether or not

24   you were present for that inspection?

25   A.   Doesn't look like I was.

1    Q.   Gary Foersch conducted it, correct?

2    A.   That's what it says, yes.

3    Q.   May I have Defendants' Exhibit -- I'm sorry --

4    Government's Exhibit 3571.39, for identification.

5         Do you recognize this document, sir?

6    A.   Another inspection detail printout for an

7    inspection conducted September 29th, 2006, by

8    Cheryl Webster.

9    Q.   And the determination is that the facility is

10   in compliance, correct?

11   A.   Correct.

12   Q.   May I have, please, Defendants' Exhibit I,

13   marked for identification.

14        Do you recognize this document, sir?

15   A.   Yes.  Another inspection detail printout

16   indicating an August 23rd, 2007, inspection with

17   Gary Foersch, myself, and Cheryl Webster.

18             MR. LINSIN:  Your Honor, at this time I

19   would move Defendants' Exhibit I into evidence.

20             MR. MANGO:  No objection, your Honor.

21             THE COURT:  Just I?

22             MR. LINSIN:  Just I.

23             THE COURT:  All right.  Mr. Personius, no

24   objection?

25             MR. PERSONIUS:  No objection, Judge.

2001

```
 1              THE COURT:  Okay.  Then Defendants'
 2     Exhibit I received, no objection.
 3              (Defendants' Exhibit I was received into
 4              evidence.)
 5              MR. LINSIN:  And may it be published, your
 6     Honor?
 7              THE COURT:  Yes.  Please.
 8              MR. LINSIN:  Now --
 9              MR. MANGO:  Your Honor, so this is clear,
10     our copy is two pages.
11              MR. LINSIN:  We will get there.
12              THE COURT:  Is that what we are talking
13     about, two pages?
14              MR. LINSIN:  Yes.  I can only -- I am only
15     able to display one page at a time.
16     BY MR. LINSIN:
17     Q.  Does this reflect an inspection at the
18     Tonawanda Coke facility on August the 23rd, 2007?
19     A.  Yes.
20     Q.  And you testified, I believe, that it was
21     Mr. Foersch and yourself and Miss Webster who
22     conducted the inspection, correct?
23     A.  Correct.
24     Q.  And the results of this inspection in which you
25     personally participated, again at the top portion
```

1    of the form indicate that the facility was in

2    compliance, correct?

3    A.   I would like to see the second part of this,

4    please.

5    Q.   We will go there in a second.  But is that what

6    this form says, "in compliance"?

7    A.   It says "in compliance," yes.

8    Q.   All right.  May we go to page 2, please.  And

9    enlarge -- yes.  Thank you.

10        Now, take a moment if you need it, sir, and

11   just read through this, familiarize yourself.

12   A.   Okay.

13   Q.   All right.  Is it accurate or fair to say that

14   you and Miss Webster and Mr. Foersch went to the

15   Tonawanda facility -- Tonawanda Coke facility on

16   this date to talk about potential issues regarding

17   benzene emissions?

18   A.   Yes.

19   Q.   And that the -- your department had been

20   conducting some air monitoring and wanted to

21   evaluate potential sources or methods for reducing

22   benzene emission from the plant, correct?

23   A.   Yeah, that probably came up.  I mean, this was

24   when the study first kicked off, so we were just

25   visiting all the -- all the facilities at the time,

1     to tell them what was going on.

2     Q.  Well, this -- the first paragraph of this

3     comment says, "We discussed the ongoing Tonawanda

4     benzene study being conducted by the department via

5     continuous air sampling in the Tonawanda area,"

6     correct?

7     A.  Correct.

8     Q.  So it didn't just come up.  I mean, it's one of

9     the things you discussed, right?

10    A.  I didn't mean by -- I didn't mean by come up.

11    I mean, we had just started doing this study, so we

12    were informing the facilities in the area of what

13    and why we were doing it.

14    Q.  And you also then at this visit talked about

15    plans that the company had or was willing to

16    perform in order to reduce visible emissions from

17    the plant, correct?

18    A.  Yes.

19    Q.  All right.  One of those, as referenced in the

20    second paragraph, is the decision to raise the

21    height of the waste heat stack, correct?

22    A.  Correct.

23    Q.  And then they also talked about evaluating

24    adding potential additional water sprays to the

25    pushing side of the battery, which might also help

1    with particulate emission, correct?

2    A.  It might, yes.

3    Q.  Well, that's one of the things they talked

4    about, right?

5    A.  They were studying it, yes.  They talked about

6    they were studying it.

7    Q.  And then you and your colleagues toured the

8    facility, correct?

9    A.  Correct.

10   Q.  And then there is a listing here of the battery

11   top, the boiler house, and then the light oil

12   processing area, correct?

13   A.  Correct.

14   Q.  And the light oil processing unit is in the

15   by-products area, right?

16   A.  Correct.

17   Q.  And do you recall what was discussed about the

18   light oil processing unit during this visit?

19   A.  No, I do not.

20   Q.  It's accurate, though, that based on your

21   inspection you determined that the battery top

22   components were in good working order, and no

23   visible emissions were noted, correct?

24   A.  Correct.

25   Q.  All right.  May I have, please, Defendants'

1    Exhibit NNN, as in Nellie, for identification.

2        Now, did you, Mr. Sitzman, along with

3    Mr. Carlacci, Miss Webster, and Mr. Foersch visit

4    the Tonawanda Coke plant on May the 28th, 2008?

5    A.   Yes.

6    Q.   What was the -- if -- we'll come back to these.

7    I'm sorry. I should have waited to pull these up.

8        What was the purpose of that visit?

9    A.   At that point we were really looking at

10   facilities in the area to try to reduce benzene

11   emissions.

12   Q.   All right.  And do you recall in that meeting

13   talking about the -- some of the results of this

14   ongoing benzene study, correct?

15   A.   Correct.

16   Q.   And do you recall talking with the facility

17   about its light oil system and what modifications

18   they might be able to make to the loading

19   procedures for the trucks from that light oil

20   system?

21   A.   Yes.

22   Q.   And what were those?

23   A.   It was to install a system to put a vapor

24   balance system on the truck loading so any vapors

25   created during loading of the truck would be

1    recovered back in the facility.

2    Q.  And do you recall that in response Mr. Kamholz

3    said that he thought that there was technology

4    available to do that and they thought it would be

5    doable and they would work to make that happen?

6    A.  Yes.

7    Q.  How long were you in the by-products area that

8    day?

9    A.  I don't exactly remember.  Half an hour maybe.

10   Maybe an hour.

11   Q.  Just what you recall.  I'm not -- if I ask a

12   question you don't know the answer to, please, just

13   tell me you don't recall.

14   A.  I don't recall.

15   Q.  All right.

16            THE COURT:  All right.  This is May

17   of 2008?

18            MR. LINSIN:  That is correct, your Honor.

19   BY MR. LINSIN:

20   Q.  Is that when this meeting occurred, May the

21   28th, 2008?

22   A.  Yes.

23   Q.  All right.  And just so the -- the notes -- I'm

24   sorry -- the documents you've been reviewing, are

25   those your notes from that inspection?

1    A.   No.

2    Q.   Do you recognize whose they are?

3    A.   Looks like Cheryl Webster's handwriting.

4    Q.   All right.  We'll take this down, please.

5           THE COURT:  Is there only one page to that

6    exhibit?

7           MR. LINSIN:  No, your Honor.  There are

8    actually three separate pages to that exhibit.

9           THE COURT:  Thank you.

10   BY MR. LINSIN:

11   Q.   Now, you testified on direct about an

12   inspection in which you participated in August -- I

13   believe it was August 21st of 2008, where you --

14   you had a conversation with Mark Kamholz about the

15   battery flare stack, correct?

16   A.   Correct.

17   Q.   And you determined then that that flare did not

18   have an operable pilot, right?

19   A.   Right.

20   Q.   And if I recall your testimony correctly, you

21   at that point told Mark and the company that they

22   needed to have a pilot, correct?

23   A.   Correct.

24   Q.   And later on you issued a notice of violation

25   because they didn't have a pilot, correct?

1    A.   Correct.

2    Q.   And requiring them to make that change and get

3    the pilot operable again, correct?

4    A.   Correct.

5    Q.   Now, in September of 2008 do you recall making

6    a request to the Tonawanda Coke facility to make

7    arrangements for you to come and visit the facility

8    at night?

9    A.   Yes.

10   Q.   And why did you make that request?

11   A.   At the time we were receiving complaints or --

12   and information from the community group involved

13   in Tonawanda, and one of their allegations was that

14   things were happening different at night, that a

15   different kind of coke was being produced and the

16   operation was somehow changing at night.  So I

17   wanted to go and see what happened at night, so I

18   scheduled going there.

19   Q.   All right.  And in response to your request

20   that the company arrange a nighttime visit for you,

21   did they cooperate?

22   A.   Yes.

23   Q.   All right.  Did they make arrangements for

24   staff, including Mr. Kamholz, to be on-site to

25   accompany you in your visit?

1    A.   Yes.

2    Q.   And did that visit occur actually on

3    September 23rd, 2008?

4    A.   I believe that's the date.

5    Q.   May I please have Government's Exhibit 3560.45

6    for identification?

7         Now, is it -- excuse me.  Is it possible to try

8    and enlarge this again, but starting further to the

9    left of the margin, all the way to the edge of the

10   paper, that would be perfect.  Thanks.

11        Okay.  Do you recognize what this -- this

12   document is, sir?

13   A.   Yes.

14   Q.   What is it?

15   A.   It's another inspection detail report of an

16   inspection I completed September 23rd, 2008.

17   Q.   And does it relate to this nighttime inspection

18   you were just testifying about?

19   A.   Yes, it does.

20             MR. LINSIN:  Your Honor, I move

21   Government's Exhibit 3560.45 into evidence.

22             MR. MANGO:  No objection, your Honor.

23             MR. PERSONIUS:  No objection, your Honor.

24             THE COURT:  Okay.  3560.45 received into

25   evidence.  No objection.

```
 1              (Government's Exhibit 3560.45 was received

 2              into evidence.)

 3              THE COURT:  You want it published?

 4              MR. LINSIN:  Yes, please, your Honor.

 5              THE COURT:  Okay.

 6   BY MR. LINSIN:

 7   Q.  So did you conduct this inspection yourself?

 8   Were any colleagues with you?

 9   A.  I conducted it myself.

10   Q.  All right.  And this indicates you arrived at

11   the facility at about 11:00 p.m. on the night of

12   September 23rd, 2008, correct?

13   A.  Correct.

14   Q.  And here again the compliance status indicated

15   on this page -- and we'll get to the comment

16   section, but the compliance status that is entered

17   here is in compliance, correct?

18   A.  Correct.

19   Q.  If we can then go to the second page of the

20   exhibit, which should contain the entire comment

21   frame.  And would you just read this out loud to

22   the members of the jury, please?

23   A.  "I went to Tonawanda Coke at night to view

24   pushing emissions from the pushing of furnace coke

25   ovens, which is only done at night.  I witnessed
```

2011

1       two foundry coke oven pushes and four furnace coke

2       pushes.  Emissions looked the same from all pushes.

3       I also inspected battery top operations.  All

4       operations were in compliance at the time of my

5       inspection.  I could not, however, read opacity

6       from the pushing operation due to my inspection

7       being at night.  I left the facility at 2:00 a.m."

8       Q.  All right.  So you were there that night and

9       early morning for a total of three hours, correct?

10      A.  Yes.

11      Q.  And did you learn at that night -- during that

12      night why it was that the Tonawanda Coke facility

13      frequently pushes furnace coke production at

14      nighttime?

15      A.  They explained to me that they -- furnace coke

16      gets taken out in train cars, so it --

17      operationally it's easier to load the train cars at

18      night, because during the day truckers are coming

19      in with coke and getting loaded in their trucks,

20      and the facility is full of trucks.

21      Q.  And it's a little more difficult to arrange for

22      truckers to drive at night, correct?

23      A.  To come in at night.

24      Q.  All right.  Now, you were asked some

25      questions -- if we can take this down, please.

1        You were asked some questions earlier about

2    whether DEC's inspections of the Tonawanda Coke

3    facility focused on the battery operations.  Do you

4    recall those questions?

5    A.   Yes.

6    Q.   And you tied this initially in your testimony,

7    as I recall, to the fact that there had been this

8    request for a -- an exemption for pushing controls,

9    correct?

10   A.   Correct.

11   Q.   But the fact is -- and you then testified later

12   in your direct testimony that most federal and

13   state regulations for coke oven batteries relate to

14   the operation of the battery, correct?

15   A.   Correct.

16   Q.   And that is true because the battery is

17   understood to be the primary source of potential

18   emissions that are of interest to federal and state

19   regulators, right?

20   A.   Correct.

21   Q.   But when DEC inspectors go out to conduct a

22   full compliance inspection of the facility, they

23   cannot just be limited to the battery, correct?

24   A.   Correct.

25   Q.   They have to evaluate and inspect all of the

1   emission units, as that form that you've testified

2   about requires, correct?

3   A.   The form requires that an inspection be done.

4   Q.   Regarding the compliance of all the emissions

5   units at the facility, correct?

6   A.   The compliance is determined by other

7   information than just the inspection.

8   Q.   But compliance -- for the purposes of a full

9   compliance evaluation review, compliance requires a

10   determination that all the emission units at the

11   facility be in compliance, right?

12   A.   Yes.

13   Q.   And if one of the emissions units was

14   determined not to be in compliance, then there

15   would be some notation of that in an inspection

16   report, correct?

17   A.   If it was -- if it was assessed during the

18   inspection, yes.

19   Q.   Now, let me go back to a point that you

20   testified about on direct regarding the -- this

21   facility's permit, the Title V permit.  You

22   testified that this facility -- that the Tonawanda

23   Coke facility was required to have a Title 5 permit

24   because it had been determined that it was a -- I

25   believe you used the term "major facility."  Is

1    that correct?

2    A.   Yes.

3    Q.   And the term under the Clean Air Act it is a --

4    it is a major source, correct?

5    A.   Correct.

6    Q.   And isn't it true that the Tonawanda Coke

7    facility was determined to be a major source

8    facility because of the emissions from the plant's

9    waste heat stack?

10   A.   And the boilers, yes.

11   Q.   And those emissions are emissions of SOx,

12   sulfur dioxide, correct?

13   A.   Yeah.

14   Q.   And NOx, correct?

15   A.   Correct.

16   Q.   Nitrogen oxide, correct?

17   A.   Correct.

18   Q.   And it was the determination of the quantity of

19   the emission of those components that classified

20   this facility as a major source under the Clean Air

21   Act, correct?

22   A.   Correct.

23   Q.   All right.  Now, you also testified, as I

24   recall, about the -- some of the terms that are

25   used under the New York State regulations

1   concerning sources and points, correct?

2   A.   Correct.

3   Q.   Now, those two terms have separate and

4   different definitions under the New York State

5   regulations, don't they?

6   A.   Yes.

7   Q.   And the definition for a source doesn't tell

8   you to look to the definition of a point, does it?

9   A.   No.

10  Q.   And the definition of an emission point doesn't

11  say, see definition for emission source, correct?

12  A.   Correct.

13  Q.   They are different under the regulations,

14  right?

15  A.   They're different definitions, yes.

16  Q.   And they are regulated differently, correct?

17  A.   Possibly.

18  Q.   They are required to be identified separately

19  in the Title V application, correct?

20  A.   Correct.

21  Q.   They're given different identification numbers,

22  correct?

23  A.   Correct.

24  Q.   And that is based upon the different

25  definitions that are contained in the regulations,

1    correct?

2    A.   Correct.

3           THE COURT:  Okay.  Let's take 15.

4           MR. LINSIN:  All right.

5           THE COURT:  Are you -- does that work, or

6    are you just about done?

7           MR. LINSIN:  That's perfectly fine, Judge,

8    thank you.  No.

9           THE COURT:  You've got a little bit of

10   time?

11          MR. LINSIN:  Yes.

12          THE COURT:  Okay.  Everybody doing okay?

13   Okay.  Does anybody not want a break?

14          MR. PERSONIUS:  Judge, I'd be just as

15   happy to go on.

16          THE COURT:  All right.  We'll see you in

17   about 15 minutes.

18          (Jury excused from the courtroom.)

19          THE COURT:  Okay.  Mr. Sitzman, you can

20   take a break.  Thanks.  Okay.  We'll see you at

21   4:00 o'clock.

22          MR. MANGO:  Thank you.

23          MR. PERSONIUS:  Thank you, Judge.

24          (Short recess was taken.)

25          (Jury seated.)

                                                          2017

1              THE COURT:  Welcome back.  Please have a

2    seat.

3         Okay.  Mr. Larry Sitzman is back on the stand.

4    The attorneys and parties are back present.  We are

5    going to resume cross-examination.  Mr. Sitzman is

6    still under oath.

7         Just in case you were wondering, okay,

8    Mr. Linsin was not hallucinating when he was trying

9    to get his monitor screen adjusted that so the full

10   exhibit would show.  Some of our monitors are

11   tracking differently today.  I don't know what it

12   is.  Particles or something in the air.  I'm not

13   exactly sure.  But we're trying to straighten that

14   all out.  So I think we have most of it under

15   control or at least we know some of it's not quite

16   right.  So if you would just bear with us when we

17   try to adjust the exhibits, that would be helpful.

18        I think with that, Mr. Linsin, if you'd like to

19   start -- or resume cross-examination, please.

20              MR. LINSIN:  Thank you, your Honor.

21   BY MR. LINSIN:

22   Q.   Okay.  Now, may I please have Government

23   Exhibit 131 in evidence?

24        Now, Mr. Sitzman, you testified about this

25   exhibit on direct examination.

1          And could we see the second page of this

2     exhibit, please.  And now back to the first page.

3          This is the cover letter that transmitted that

4     HAPS emission study to the Department of

5     Environmental Conservation on July 11th of 2003,

6     correct?

7     A.   Correct.

8     Q.   And this was addressed directly to you,

9     correct?

10    A.   Yes.

11    Q.   And at that point you were the Regional Air

12    Pollution Control Engineer for Region 9, correct?

13    A.   Correct.

14    Q.   And you knew the study was done with regard to

15    new federal regulations regarding the monitoring

16    and regulation of hazardous air pollutants,

17    correct?

18    A.   Correct.

19    Q.   Now, if we can go to -- I believe it's document

20    page 4-2.  And just enlarge this portion.  All

21    right.

22         Now, this table was contained in the emission

23    study that was submitted by Tonawanda Coke,

24    correct?

25    A.   Correct.

1   Q.   And if we could please highlight the coke oven

2   gas system, colorize it, please.

3        No, I'm sorry.  All the way across.

4        Now, I believe you testified on the -- on

5   direct examination that this table didn't factor

6   into your calculations because the emissions were

7   determined to be minor.  Is that what I recall your

8   testimony to be?

9   A.   They would be -- you know, they're -- the

10  emission numbers are part of the total calculation,

11  but they are minor for that facility, the total.

12  Q.   In order -- I'm sorry.  Were you not finished?

13  A.   Go ahead.

14  Q.   In order for you to have determined that the

15  emissions reported in here for the coke oven gas

16  system were minor, you needed to look at this

17  section, didn't you?

18  A.   Correct.

19  Q.   So, you looked at this section; you determined

20  that because the reporting here for total organic

21  compound emissions from the coke oven gas system

22  were minor, that it wasn't going to factor into

23  your overall analysis of the conclusions of this

24  air emission study, is that correct?

25  A.   Correct.

1           MR. MANGO:  Your Honor, I'm going to

2    object.  I believe on direct his answer was he does

3    not remember seeing this section, and so there's a

4    mischaracterization in that question.

5           THE COURT:  Okay.  The jury heard the

6    evidence.  I mean, the answer was given to the

7    question.  I think we can move on.  Thank you.

8           MR. LINSIN:  All right.  Thank you.

9    BY MR. LINSIN:

10   Q.  Well, let me make sure.  The question I asked

11   you, sir, was:  In order to determine that the

12   emissions reported in this study from the coke oven

13   gas system were minor, you had to look at this

14   section, didn't you?

15   A.  Someone had to, yes.

16   Q.  So someone had to see that a pressure-relief

17   valve is reported in this emission study that was

18   submitted to DEC in 2003, correct?

19          MR. MANGO:  Objection, your Honor.  That

20   calls for speculation.

21          THE COURT:  Can you answer that question?

22          THE WITNESS:  Not directly.

23          THE COURT:  Okay.  You can reask it, if

24   you'd like, or something close to it.

25

1    BY MR. LINSIN:

2    Q.  All right.  Let me go back to the premise

3    question then.  In order for the -- I thought I

4    heard you testify on direct that you had not --

5    that this table didn't factor into your

6    calculations -- your calculations -- about the

7    overall results of this emission study, because the

8    reported emissions were minor.  Did I mishear you?

9    A.  I believe at the time we were talking the next

10   page from this, where it actually said zeros for

11   emissions --

12   Q.  Well --

13   A.  -- of benzene, toluene, and xylene.

14   Q.  This page also reports emissions, doesn't it?

15   A.  Yes.

16   Q.  All right.  And as a matter of fact, reports

17   leak emissions based on the indication in

18   footnote two, correct?

19   A.  Correct.

20   Q.  And that was the purpose of this study,

21   correct?

22   A.  The emissions reported here are total organic

23   compounds.

24   Q.  Right.

25   A.  Not hazardous air pollutants.

1    Q.   In order, though, for you or your colleagues to

2    determine that the emissions reported were

3    insignificant, somebody had to look at this table

4    and the next table, correct?

5                MR. MANGO:   Objection, your Honor.  I

6    think it's an appropriate question whether he

7    looked at it.  I don't think it's appropriate to

8    ask whether other people looked at it.

9                THE COURT:   No, I don't think that's

10   right, because he testified that somebody would

11   have to have looked at one or other or both of

12   these pages, previously.  So, on that basis,

13   objection overruled.

14   BY MR. LINSIN:

15   Q.   Would you like me to repeat the question?

16   A.   Please.  Sorry.

17   Q.   Let me see if I can try.  In order for you or

18   your colleagues to have determined that the

19   reported emissions in this study for the coke oven

20   gas system were minor, somebody had to look at this

21   table and the table on the subsequent page,

22   correct?

23   A.   Presumably, yes.

24   Q.   And your testimony was that -- if I recall

25   correctly, that this text in here where it says

1    pressure-relief valve on the coke oven gas system

2    one, number of components one, your testimony, if I

3    recall, was that this was not proper notice of an

4    emission source in the by-products department.  Is

5    that your testimony?

6    A.  I think the question was proper notice for

7    permitting.

8    Q.  All right.  But there's no doubt, is there,

9    Mr. Sitzman, that in 2003 Tonawanda Coke and Mark

10   Kamholz provided information to the Department of

11   Environmental Conservation that there was a

12   pressure-relief valve on the coke oven gas system

13   at the Tonawanda Coke facility, is there?

14   A.  Correct.  They've done it other times too.

15          THE COURT:  I'm sorry.  I didn't hear what

16   you said.

17          THE WITNESS:  I said, correct, and they've

18   done it at other times also.

19   BY MR. LINSIN:

20   Q.  I'm sorry.  They've done what at other times?

21   A.  Notified us of the existence of pressure-relief

22   valves.

23   Q.  All right.  The pressure relief valve I'm

24   asking about now is the pressure-relief valve on

25   the coke oven gas system at the Tonawanda Coke

2024

1    facility.  They provided information to DEC in 2003

2    that there was a pressure-relief valve on the coke

3    oven gas system at the facility, didn't they?

4    A.   Yes.

5    Q.   We can bring this down, please.

6         Now, you participated in the April 2009 joint

7    inspection of the Tonawanda Coke facility, is that

8    correct?

9    A.   Yes.

10   Q.   Before attending that inspection, did you speak

11   with Gary Foersch?

12   A.   I don't remember the exact date when Gary

13   retired, so --

14   Q.   Would November 10th, 2009, refresh your

15   recollection?

16   A.   It doesn't.  I don't know.  I don't remember.

17   Q.   All right.  Well, my question really was not

18   what date Mr. Foersch retired.  My question was:

19   Before the April 2009 inspection, did you talk to

20   Gary Foersch about his interaction with this

21   facility?

22   A.   I don't remember.

23   Q.   You were asked some questions about this

24   requirement in the Title V permit that there be

25   a -- that there be baffles in quench tower number

1    2, the east quench tower, correct?

2    A.  Correct.

3    Q.  And you were shown a letter, I believe, from

4    1997, where you had requested that a paragraph be

5    included to make that clear in the letter, correct?

6    A.  Correct.

7    Q.  Now, do you know how many times between the

8    date of that letter in 1997 and the inspection that

9    we're just going to talk about in just a minute in

10   April of 2009 -- how many times DEC inspectors were

11   at the Tonawanda Coke facility?

12   A.  At least once per year.

13   Q.  Would it surprise you that it was at least 22

14   times between 1997 and 2009?

15   A.  No, it wouldn't.

16   Q.  And before attending the April 2009 inspection,

17   wouldn't it have been valuable to you to talk to

18   Mr. Foersch about his experiences and activities in

19   inspecting this facility over the years?

20   A.  Possibly.  May have done it earlier.

21   Q.  I'm sorry.  You had done what?

22   A.  We had talked.  I mean, we've talked about the

23   facility.  We had talked many times.

24   Q.  And before April of 2009, did Mr. Foersch ever

25   tell you that he understood that this quench tower

1    number 2 didn't have baffles in it?

2    A.   No.

3    Q.   Did he ever tell you that he had made a

4    judgment in his mind that he was simply not going

5    to bring it up and not going to insist that baffles

6    be installed?

7    A.   No.

8    Q.   Before the April 2009 inspection, DEC retained

9    authority over the Tonawanda Coke plant, correct,

10   for regulatory purposes for Clean Air Act

11   compliance?

12   A.   Yes.

13   Q.   And there hadn't been any change in that

14   immediate -- in the immediate preceding months, a

15   change in the regulatory authority that DEC had

16   with respect to that facility, had there?

17   A.   No.

18   Q.   And the decision to conduct a joint

19   investigation did not somehow suspend or terminate

20   DEC's authority, its regulatory authority, with

21   respect to this facility, did it?

22   A.   No.

23   Q.   Now, you testified on direct examination

24   regarding your notes from this April 2009

25   inspection.  When was the last time you reviewed

1    those notes before coming on the stand to testify

2    today?

3    A.   Within the last few days.

4    Q.   And you had ample time to review them?

5    A.   Yes.

6    Q.   Do you recall in those notes that under the

7    section relating to activities on April 20th, which

8    would have been a Monday, that you drew a diagram

9    of the pressure-relief valve and included some

10   additional information about the valve?

11   A.   Yes.

12   Q.   And where did you get the information to draw

13   that diagram of the pressure-relief valve?

14   A.   I was standing there looking at it.

15   Q.   So you did it just based on your own

16   observations?

17   A.   My own observation.

18   Q.   So, on the ground?

19   A.   On the ground, yes.

20   Q.   So this pressure-relief valve was visible to

21   you as you looked up to the coke oven gas line down

22   in the by-products, correct?

23   A.   Correct.

24   Q.   And I believe your notes had an indication that

25   there was a steam line that went into the vent at

1    one point, is that correct?

2    A.   Yes.

3    Q.   How did you determine it was a steam line?

4    A.   I believe Mr. Kamholz told me that there was a

5    steam tracer on that valve.  There's many

6    throughout the facility so things don't freeze up

7    in the wintertime.

8    Q.   And your notes at that point also indicate some

9    information about the set point for the valve, is

10   that right?

11   A.   I believe that was on the 21st.

12   Q.   All right.  Now, do you recall in your review

13   of those notes for the 20th, right next to the

14   diagram that you drew, that there is a section of

15   your notes that have been blacked out?

16   A.   No, I don't recall.

17   Q.   All right.  May I please have Government's

18   Exhibit 3560.61 for identification.  And let's

19   scroll through the pages, please.  All right.  Stop

20   here, please.

21       What I'm going to ask you, sir, is first of all

22   to just review the top half of the page yourself.

23   Review as much of the page as you wish, and I have

24   some questions I want to ask.

25   A.   Okay.

1    Q.   It's just been enlarged, if you were --

2    A.   Uh-huh.

3    Q.   Now, if we can take that down, please.

4         Having reviewed that document, do you now

5    recall that immediately below the diagram of the

6    pressure-relief valve that there was a -- an area

7    on the page where the text had been blocked out?

8    A.   Uh-huh.

9              THE COURT:  Yes?  Yes?

10             THE WITNESS:  Yes, sorry.

11   BY MR. LINSIN:

12   Q.   Did you block that out?

13   A.   I would think so.  I don't recall.

14   Q.   What was -- what did the text say before you

15   blocked it out?

16   A.   I have no recollection.

17   Q.   Is it a common practice for you, sir, to block

18   out investigative notes that you -- you create

19   during the course of a Title V compliance

20   inspection?

21   A.   It's common practice for me to cross out things

22   that I started writing wrong, that I might have

23   made a mistake on.

24   Q.   What you just observed in your notes wasn't

25   information that was lined through or crossed out,

1    was it?

2    A.   No.   It was blacked out very well.

3    Q.   All right.   And you have no present

4    recollection of what was in those notes?

5    A.   No, I don't remember what was there.

6    Q.   When did you black it out?

7    A.   I have no clue.   I don't ever remember blacking

8    it out after the inspection.

9    Q.   Now, you testified about the closeout meeting

10   on the 21st, correct?

11   A.   Correct.

12   Q.   And the subject of the pressure-relief valve

13   came up during the closeout meeting, is that

14   correct?

15   A.   Correct.

16   Q.   But you had also learned some information about

17   the pressure-relief valve on the 20th and then

18   earlier on the 21st, correct?

19   A.   Correct.

20   Q.   So at the time of the closeout meeting at the

21   Tonawanda Coke Corporation on April 21st, 2009, you

22   knew that there was a pressure-relief valve on the

23   coke oven gas line, correct?

24   A.   Correct.

25   Q.   And you knew at that time that the light oil

1    system in the by-products department had been shut

2    down, correct?

3    A.  Correct.

4    Q.  And you knew, or at least based on the

5    information you had been given it was your

6    understanding that this valve on the coke oven gas

7    line released every 20 or 30 minutes, correct?

8    A.  Correct.

9    Q.  And you knew on April 21st, 2009, that this

10   pressure-relief valve was not in the facility's

11   Title V permit, correct?

12   A.  Correct.

13   Q.  And you had examined the circular charts that

14   were in the shed immediately beneath the

15   pressure-relief valve in the by-products area, and

16   had observed spikes in the line pressure that were

17   recorded there, correct?

18   A.  Correct.

19   Q.  And you were given information by Mr. Kamholz

20   or Mr. Cahill that those spikes in pressure were

21   the result of oven reversals, correct?

22   A.  Correct.

23   Q.  And you understood that the -- the oven

24   reversals or flue reversals at that facility

25   occurred on a regular and routine basis, correct?

1    A.   Correct.

2    Q.   You knew all of this at the time of this

3    closeout meeting, correct?

4    A.   Correct.

5    Q.   And at that closeout meeting you asked Mark

6    Kamholz if the facility could figure out a way

7    either to increase or raise the set point for the

8    pressure-relief valve or lower the overall line

9    pressure in the coke oven gas line, correct?

10   A.   No.   I actually asked him in the morning when

11   we were out in the by-products area.

12   Q.   You asked him to what?

13   A.   Mark and Pat, I asked them if they could

14   increase the set point of the pressure-relief valve

15   or decrease the system pressure.

16   Q.   And at some point later you received

17   information indicating that they had done exactly

18   that, correct?

19   A.   Correct.

20   Q.   When did you receive that information?

21   A.   You know, I think it was a couple days later.

22   Q.   All right.   Now, at the closeout meeting or at

23   any time during this joint inspection, you did not

24   and no one from any of the agencies represented did

25   not tell this facility that they had to blank off

1    that valve, did you?

2    A.   No.

3    Q.   You didn't tell them that they had to file an

4    amended -- an amendment to their permit, did you?

5    A.   No.

6    Q.   After you left the facility, in the next eight

7    months all the way to the end of 2009, the

8    Department of Environmental Conservation did not

9    issue any notice of violation to this facility

10   concerning the pressure relief valve, did you?

11   A.   DEC did not.

12   Q.   Is it your understanding that EPA issued a

13   notice of violation regarding the pressure-relief

14   valve?

15   A.   Yes.

16   Q.   And do you recall that having been done

17   in 2010?

18   A.   Possible.  I don't recall.

19   Q.   Do you have any information that DEC or EPA

20   issued a notice of violation to the Tonawanda Coke

21   facility regarding the pressure-relief valve at any

22   point during 2009?

23   A.   I don't recall.  I'd have to review the file.

24   Q.   Which is what you did before you came on the

25   stand to testify.

1   A.   Which is what I did, and it's an extensive

2   file.

3   Q.   And based upon your review, you don't have any

4   recollection of an NOV being issued for that

5   pressure-relief valve by any agency in 2009, do

6   you?

7   A.   I don't recollect it being there or not being

8   there.

9   Q.   May I please have Government's Exhibit 3560.13.

10   If we can enlarge the top -- top half from the far

11   left-hand margin, please.

12       Can you identify this document, Mr. Sitzman?

13   A.   It's another inspection detail report, entered

14   after the April -- entered on April 21st, the joint

15   inspection with EPA, and says that myself and

16   Cheryl Webster performed the inspection.

17   Q.   And this inspection report states in terms of

18   compliance status that the facility is in

19   violation, correct?

20   A.   Correct.

21   Q.   Now, if we can go to the second page of this

22   document and enlarge the text at the top.

23       You wrote this, sir?

24   A.   No.

25   Q.   You participated in the inspection, correct?

1    A.  Correct.

2            MR. LINSIN:  Your Honor, I move

3    Government's Exhibit 3560.13 into evidence.

4            MR. MANGO:  No objection, your Honor.

5            MR. PERSONIUS:  No objection, your Honor.

6            THE COURT:  Okay.  3560.13 is received

7    into evidence, no objection.

8            (Government's Exhibit 3560.13 was received

9            into evidence.)

10           MR. LINSIN:  And if -- just for the sake

11   of completeness, if we could go back to the first

12   page, please, and enlarge the text of the top, and

13   if the document may be published to the jury, your

14   Honor.

15           THE COURT:  Yes, you may.  And is.

16   BY MR. LINSIN:

17   Q.  All right.  Now, so here again we show an

18   inspection concluding on April 21st, 2009, correct?

19   A.  Correct.

20   Q.  And the entry is that you were the primary

21   inspector, is that correct?

22   A.  Yes.

23   Q.  How many days of this inspection did you

24   participate in, Mr. Sitzman?

25   A.  At least three.

1    Q.   So that would be three out of six days?

2    A.   I think three out of seven.

3    Q.   What's your understanding as to the date the

4    inspection --

5    A.   The inspection started the 14th and concluded

6    the 21st.

7    Q.   So that would be 14th, 15th, 16th, 17th of the

8    first week, right?

9    A.   Yeah.

10   Q.   That's four days, right?

11   A.   Oh, there was a weekend in there.

12   Q.   Weekend in there, and then we've got two days

13   the next week, right?

14   A.   Okay.

15   Q.   So six days?

16   A.   Six days.

17   Q.   And your recollection is that you were there

18   for three days?

19   A.   When I reviewed my notes I noted entries on the

20   14th, 20th, and 21st.  I know I was there those

21   days.  Could I have been there others too and not

22   written any notes?  Certainly.  But I at least know

23   I was there three.

24   Q.   May we have the second page of this document,

25   please?

1          Now, the first paragraph indicates that you and

2     Miss Webster participated in this inspection --

3     well, it says here seven days.  We have just

4     determined it was six -- for a full air compliance

5     inspection, correct?

6     A.   Correct.

7     Q.   And then it says, "EPA has not issued an

8     inspection report and has requested more

9     information via two Section 114 letters."  Would

10    you remind the jury what a Section 114 letter is?

11    A.   A Section 114 letter is an EPA request for

12    information.

13    Q.   All right.  And as of April 21st, 2009, had any

14    Section 114 letters been issued to the Tonawanda

15    Coke facility?

16    A.   Any previous ones?

17    Q.   No.  With respect -- as a consequence of this

18    investigation.

19    A.   I don't remember when they were issued.

20    Q.   Okay.  Then there is a reference to source

21    testing being required, correct?

22    A.   Correct.

23    Q.   And then would you read the concluding second

24    sentence of that first paragraph?

25    A.   "EPA is taking the lead on enforcement and will

1   determine the number, nature, and extent of

2   violations."

3   Q.  Was that sentence meant to indicate that DEC

4   was surrendering its enforcement authority to EPA?

5   A.  Not at all.  That could have been written much

6   better.

7   Q.  Do you know who wrote this?

8   A.  I believe, Cheryl.

9   Q.  And then the text goes on to talk about

10  possible violations that were detected during

11  inspection, correct?

12  A.  Correct.

13  Q.  And I'd like you to look through this summary

14  and tell me and the jury if there is any reference

15  in this second paragraph to the pressure-relief

16  valve that was observed on the coke oven gas line

17  at the facility during the inspection.

18  A.  No, there isn't.

19  Q.  We can take this down, please.

20      Now, you just testified a moment ago that you

21  drew this diagram in your notes about the

22  pressure-relief valve based on looking up and

23  making an observation as you were standing in the

24  by-products area, correct?

25  A.  Correct.

```
 1     Q.  May I please have Defendants' Exhibit QQQ for
 2     identification -- I'm sorry.  In evidence.
 3             THE COURT:  Miss Henderson, you're
 4     searching it out right now?
 5             MR. LINSIN:  Let's -- are we able to find
 6     this, Sheila?  All right.
 7             THE COURT:  We have a straight QQQ or is
 8     it QQQ.01?
 9             MR. LINSIN:  It's QQQ.01, but I think
10     we're having larger problems than that.
11         My apology.  My apology.
12   BY MR. LINSIN:
13     Q.  All right.  Do you recognize this photograph
14     sir?
15     A.  Yes, I do.
16     Q.  And is this a photograph of the
17     pressure-relief -- I'm sorry -- of the by-products
18     department in the -- at the Tonawanda Coke
19     facility?
20     A.  Yes.
21     Q.  Or a portion of it anyhow, correct?
22     A.  A portion of it.
23     Q.  And it's the portion that's immediately next to
24     the roadway that you identified as Broadway, right?
25     A.  Correct.
```

1   Q.  And do you see the pressure-relief valve in

2   this photograph?

3   A.  Yes, I do.

4   Q.  Would you tap the screen and create an arrow

5   where that valve is located?

6       All right.  And where were you standing when

7   you drew this diagram of the pressure-relief valve

8   that appears in your notes?

9   A.  I don't remember exactly where I was standing.

10  I know previous to that we were over by the

11  exhauster building.

12  Q.  All right.

13  A.  Which would be up -- up farther.

14  Q.  Up farther to the left in the photograph?

15  A.  To the --

16  Q.  Toward the background?

17  A.  Up in that area where the arrow is.

18  Q.  All right.  So you were previously over by the

19  exhausters, and then you moved over closer to the

20  location of the pressure-relief valve?

21  A.  That's how I remember it, yes.

22  Q.  All right.  Would you agree with me,

23  Mr. Sitzman, that this pressure-relief valve

24  located here on this coke oven gas line at the

25  Tonawanda Coke facility is in an open and obvious

1    location on this coke oven gas line?

2    A.  From the perspective of this picture, yes.

3    Q.  Now, DEC did issue a notice of violation to the

4    Tonawanda Coke facility in 2009, correct?

5    A.  I believe so.

6    Q.  And, in fact, a notice of violation was issued

7    on October 28th of 2009 regarding the absence of

8    baffles in quench tower number 2, correct?

9    A.  Correct.

10   Q.  Now, were you involved in the decision whether

11   or not to issue that notice of violation?

12   A.  Yes.

13   Q.  And before making the decision to issue that

14   notice of violation, did you speak to Gary Foersch?

15   A.  I don't believe so.

16   Q.  Wouldn't it have been important to you to know

17   what Mr. Foersch's experience had been regarding

18   the presence or absence of baffles in that quench

19   tower between 2000 -- I'm sorry -- 1997 and 2009?

20   A.  No.  We found the violation and issued a notice

21   of violation.

22   Q.  You understood that Mr. Foersch was the primary

23   inspector for that facility during the period I

24   just mentioned, correct?

25   A.  Correct.

2042

1    Q.  And yet you didn't feel that it was important

2    to speak to him?

3    A.  It was a violation.

4    Q.  Cut-and-dry, correct?

5    A.  Correct.

6    Q.  Did you become aware, Mr. Sitzman, that later

7    in 2009 -- well, first of all, you received

8    notification from Tonawanda Coke that they

9    installed the baffles in quench tower number 2,

10   correct?

11   A.  Yes.

12   Q.  All right.  And did you become aware later

13   in 2009 that EPA was considering issuing a notice

14   of violation for baffles in both quench towers?

15   A.  I didn't know that till I saw it.

16   Q.  You didn't know that they were planning on

17   issuing this notice of violation?

18   A.  Right.

19   Q.  At the time -- do you recall when that was?

20   A.  I don't remember the date of EPA's notice of

21   violation.

22   Q.  All right.  May I please have OOO.08, in

23   evidence.

24       I'm going to ask you to take a look at this

25   document, Mr. Sitzman, and it is already in

1    evidence, but ask if -- and we are -- I would be

2    happy to scroll through to the additional pages,

3    but does this refresh your recollection that EPA's

4    notice of violation regarding quench towers in

5    two -- regarding baffles in both of the quench

6    towers, was issued on December 7th, 2009?

7    A.   Correct.  It doesn't say the baffles on this

8    page, but --

9    Q.   I understand.  But does it now refresh your

10   memory?

11   A.   I'll take your word for it that that's what it

12   refers to later in the document.

13   Q.   Now, is it your testimony that you -- until you

14   were notified that this had already been issued,

15   there had been no discussions between you and EPA

16   about the background on baffles in these quench

17   towers at Tonawanda Coke?

18   A.   You know, EPA and DEC were participating in

19   joint enforcement, and it had been, as far as I

20   know, one of the first times this was ever done.

21   So there were lots of discussions taking place

22   between the lawyers involved as to who should issue

23   notices of violation and who should take lead on

24   certain portions of the enforcement and how that

25   should all work.  And I do know that there was some

1       glitches throughout the process.

2       Q.  All right.  My question was:  Do you recall --

3       do you recall having any conversation with the

4       folks at EPA about the issuance of this notice of

5       violation concerning the baffles in the quench

6       towers?

7       A.  I recall at some point telling EPA that, you

8       know, we found out that there was an exemption for

9       the one quench tower and we would only -- we only

10      issued a notice of violation for the one because

11      that exemption existed.

12      Q.  And to whom in EPA did you tell this?

13      A.  Oh, there was a whole group of them that was --

14      you know, it was the whole air team.  It could have

15      been just at a meeting where we all discussed it.

16      Q.  Well, I thought I heard you testify that you

17      had told them.

18      A.  Yes.

19      Q.  All right.  And when did that occur?

20      A.  That's why I don't know if it was at a meeting

21      or not.  I don't remember.  At some point we told

22      them, look, there is an exemption we became aware

23      of for this quench tower, and to us it's not a

24      violation to not have baffles, because back in 1984

25      we issued that exemption.

1    Q.  And when had you -- is it accurate,

2    Mr. Sitzman, that you had decided to issue your

3    notice of violation regarding the baffles in just

4    one quench tower, quench tower number 2, because at

5    that point someone had reviewed the regulatory

6    file, had identified that there was this

7    preexisting exemption for baffles in quench tower

8    number 1, and determined that the notice would only

9    relate to quench tower number 2, is that correct?

10   A.  Correct.

11   Q.  When did that happen, that you reviewed this

12   file to determine or to refresh your memory that

13   there was this exemption from 1984?

14   A.  I don't -- it was sometime between the April

15   inspection and the date of the NOV, which was in

16   the fall.  We either found it in the files, one of

17   my staff, or -- or Mr. Kamholz brought it forward

18   to us and said, you know, we have this exemption

19   for the quench tower.

20        I don't remember how it happened.  We became

21   aware of it and agreed that it existed and only

22   sent a notice of violation out for one unit.

23   Q.  Now, once you realized or were reminded that

24   there -- that your agency had granted this

25   exemption, did you initiate a process to reopen

1    this facility's permit and to revise that condition

2    as required by Condition 20 in the permit?

3    A.  No.  Because the permit was on -- already

4    extended.  The permit had already been expired, and

5    it was extended, and we were waiting -- all these

6    issues were going on, this inspection occurred, and

7    the decision was made in our agency to wait until

8    all that concluded so we could write an accurate

9    permit of the current conditions at the facility

10   and the current requirements, and have a final

11   permit that we could move forward with in the

12   future.

13   Q.  So you then decided -- once you learned that

14   EPA was considering or had issued this notice of

15   violation regarding baffles in both quench towers,

16   you then spoke to EPA and told them, hey, wait a

17   minute, there is an exemption for this for the

18   baffles in quench tower number 1?

19   A.  At some point, you know, us and EPA had that

20   conversation, I recollect.  Yes.

21   Q.  And what did EPA say to you?

22   A.  See, I don't remember if that discussion was

23   before or after they issued the NOV.

24   Q.  All right.

25   A.  The permit did say both -- both towers needed

1    baffles.  If EPA just relied on that, then that's

2    what they did their NOV on.

3    Q.  But if I understand your testimony correctly --

4    and I don't want to get it wrong -- it's your best

5    recollection that some time after DEC had issued

6    its notice of violation for these baffles in quench

7    tower number 2 -- some time after that you had a

8    conversation with someone in EPA and told them,

9    hey, there's an exemption for baffles in quench

10   tower number 1.

11            MR. MANGO:  Objection, your Honor, asked

12   and answered.  We're recovering the same ground

13   here.

14            THE COURT:  No.  Overruled.  You may

15   answer.

16            THE WITNESS:  Yes.

17   BY MR. LINSIN:

18   Q.  All right.  But you don't remember who you had

19   the conversation with?

20   A.  We had many meetings about this facility.

21   Q.  You don't remember when this conversation about

22   the baffles occurred, is that your testimony?

23   A.  Correct.

24   Q.  On December 30th, 2009 -- we can take this

25   down, please -- you had a conversation with Mr. Ken

1    Eng, a telephone conversation, didn't you?

2    A.  Okay.  Yes.

3    Q.  Well, do you recall -- Mr. Sitzman, I don't

4    want to suggest an answer to you.  Let me put it

5    this way:  Do you remember having a conversation

6    with Ken Eng, who was then the chief of the Air

7    Branch for EPA's Region 2?  Do you recall that?

8    A.  I've had many conversations with Mr. Eng, yes.

9    Q.  But that wasn't what I asked you.  My question,

10   Mr. Sitzman, is:  Do you remember having a

11   conversation with Mr. Eng on December 30th, 2009,

12   regarding the Tonawanda Coke facility?

13   A.  Not on that specific date, no.

14   Q.  May I please have Government's Exhibit 3560.64?

15   For identification, I'm sorry.  Now, if we could

16   enlarge just the center of the exhibit.

17       Now, what I'm going ask you to do, sir, is --

18   let's enlarge that, please.  Go back, please, to

19   the -- yeah.

20       Take note, please, of the date that appears at

21   the top right-hand corner.  And then let's go to

22   the enlarged portion.  I want you to read this,

23   please, Mr. Sitzman, to yourself, and then I have a

24   couple of questions for you.

25   A.  Okay.

1    Q.   All right.   Can we take this down, please?

2         Now, do you now remember having a conversation

3    with Mr. Eng on December 30th, 2009, regarding the

4    baffles at the Tonawanda Coke facility?

5    A.   Yes.

6    Q.   And did you advise Mr. Eng then that there was

7    this exemption for the backup quench station,

8    number 1, at the Tonawanda Coke facility?

9    A.   I may have.   I didn't write it in my notes.   I

10   just noted in my phone log that we had a

11   conversation about the lack of baffles in the

12   backup quench station.

13   Q.   Quench tower number 1, right?

14   A.   Quench tower number 1, yes.

15   Q.   But your testimony is you're not sure whether

16   you said that to Mr. Eng then?

17   A.   I already testified I don't know when we had

18   the conversation about, you know, the difference

19   between 1 and 2 requiring baffles and the exemption

20   in 1984.

21   Q.   Do you recall what you discussed with Mr. Eng

22   on December 30th, 2009, regarding the Tonawanda

23   Coke facility?

24   A.   Only what I wrote down there, that we discussed

25   the lack of baffles in quench station number 1.

1    Q.   Did you ask him to rescind EPA's NOV for --

2    that required the installation of baffles in both

3    quench towers?

4    A.   That wouldn't be my call.

5    Q.   This was a cooperative enforcement effort,

6    correct?

7    A.   Correct.

8    Q.   Didn't you have a responsibility to advise

9    Mr. Eng that this exemption existed in DEC's

10   regulatory files?

11          MR. MANGO:   Objection, your Honor.

12          THE COURT:   Overruled.

13          THE WITNESS:   I think I already stated

14   that, yes, at some point we advised them that this

15   exemption existed.

16   BY MR. LINSIN:

17   Q.   But you didn't request that they revise their

18   notice of violation?

19   A.   That would be -- no.

20   Q.   Now, at the conclusion of your direct

21   testimony, Mr. Sitzman, you were asked a question

22   that I took down as follows:  Based upon the

23   information that you learned regarding the

24   pressure-relief valve at the Tonawanda Coke

25   facility during your April 2009 inspection -- that

1    was the premise of the question.  Then you were

2    asked a number of questions about whether it should

3    have been included in the Title V permit, whether

4    the failure to include it was a violation of the

5    permit, et cetera.  Do you recall those?

6    A.  Yes.

7    Q.  Isn't it true, Mr. Sitzman, that everything you

8    know about the existence of that pressure-relief

9    valve on the coke oven gas line at Tonawanda Coke

10   facility -- everything you know about that

11   pressure-relief valve now is precisely what you

12   knew during the closeout meeting of the April 2009

13   inspection?

14   A.  No.

15   Q.  You've learned additional information regarding

16   that valve since the --

17   A.  Yes.

18   Q.  What additional information have you learned?

19   A.  I learned that valve has been removed, new

20   installed, and a flare installed to combust the

21   emissions.

22   Q.  Let me rephrase the question then.  Everything

23   you know about the operation of that

24   pressure-relief valve prior to April 2009 --

25   everything you know about how that valve operated

1    before April 2009, everything you know now is what

2    you knew at the end of your April 2009 inspection,

3    isn't that correct?

4    A.  Yes.

5              MR. LINSIN:  I have no further questions,

6    your Honor.

7              THE COURT:  Okay, Mr. Linsin.  Thank you.

8       Okay.  Ladies and gentlemen, what we will do,

9    we're going to break for the day.  We're going to

10   send you home.  Ask you to please keep your minds

11   open.  Be safe going home, safe coming back

12   tomorrow.

13      Don't do any independent research.  Keep in

14   mind the importance of this case to both sides.  We

15   will resume tomorrow at approximately 9:30 and with

16   cross-examination starting by Mr. Personius with

17   Mr. Sitzman.  And we'll see you tomorrow, healthy

18   and happy and raring to go for a Tuesday, at what

19   time?

20             THE JURY:  9:30.

21             MR. LINSIN:  Okay.  Thank you.  Appreciate

22   it.

23             (Jury excused from the courtroom ).

24             THE COURT:  Okay.  Mr. Sitzman, you can

25   step down.  We'll see everybody here about

1    9:30 tomorrow.

2            MR. LINSIN:  Thank you, your Honor.

3            MR. MANGO:  Yes, your Honor.

4            THE COURT:  Okay.  Thank you very much.

5            *       *       *       *       *       *

1                        CERTIFICATION

2

3            I certify that the foregoing is a

4        Correct transcription of the proceedings

5        Recorded by me in this matter.

6

7

8                            s/Michelle L. McLaughlin
                             Michelle L. McLaughlin, RPR
9                                Official Reporter
                                 U.S.D.C., W.D.N.Y.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25