VOL. X

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

           -vs-                    10-CR-219S
TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
               Defendants.
-------------------------------------

Proceedings held before the

Honorable William M. Skretny, U.S.

Courthouse, 2 Niagara Circle, Buffalo,

New York on March 12, 2013.


APPEARANCES:

AARON J. MANGO,
Assistant United States Attorney,
ROCKY PAIGGIONE, Senior Counsel,
U.S. Department of Justice,
Appearing for the United States.

GREGORY F. LINSIN, ESQ.,
JEANNE M. GRASSO, ESQ.,
ARIEL S. GLASNER, ESQ.,
Appearing for Tonawanda Coke Corporation.

RODNEY PERSONIUS, ESQ.,
Appearing for Mark L. Kamholz.

Also Present:  Lauren DiFillipo, Paralegal
                  Sheila Henderson, Paralegal


Michelle L. McLaughlin, RPR,
Official Reporter,
U.S.D.C. W.D.N.Y.
(716)332-3560

2055

1                        I N D E X

2              WITNESS                           PAGE

3       LARRY STITZMAN
        Cross-Examination by Mr. Personius        2058
4       Redirect Examination by Mr. Mango         2066
        Recross-Examination by Mr. Linsin         2090
5       Further Redirect Examination by Mr. Mango  2098
        Further Recross-Examination by Mr. Linsin  2099
6       Further Redirect Examination by Mr. Manto  2104

7       JON ROGERS
        Direct Examination by Mr. Piaggione       2116
8       Cross-Examination by Mr. Linsin           2147
        Cross-Examination by Mr. Personius        2154
9       Redirect Examination by Mr. Piaggione     2159

10      JASON JOHN KAMBAT
        Direct Examination by Mr. Piaggione       2164
11      Cross-Examination by Mr. Linsin           2197
        Redirect Examination by Mr. Piaggione     2211
12      Recross-Examination by Mr. Linsin         2212
        Recross-Examination by Mr. Personius      2213
13      Further Redirect Examination by Mr. Piaggione 2215

14      THOMAS CORBETT
        Direct Examination by Mr. Corbett         2221

15


16
        GOVERNMENT EXHIBITS                        EVD.
17
                    3560.12                        2067
18                    97                           2070
                    136.01                         2140
19                  136.02                         2141
                    136.10                         2143
20                  136.11                         2145
                     3.06                          2242
21                  119.07                         2253

22

        DEFENDANTS' EXHIBITS                       EVD.
23
                    LLLL                           2200
24

25

1                    (Jury not present in the courtroom.)

2             THE COURT:  All right.  Can I just take a

3     minute with everybody on the Tonawanda Coke case

4     and the Mark Kamholz case.  We had an early on

5     issue with alternate juror number, Andrew Carlson.

6     He did phone in.  We just received the information

7     just a very short time ago.  And his -- he had car

8     trouble.  His car wouldn't start, and he said he

9     had no way to get here.  So we had to try to make

10    arrangements to get a cab out there.  And then we

11    got a call back saying that he was successful in

12    waking up his girlfriend, and she's going to bring

13    him in rather than have to take the cab in.

14         So, it looks like about 10:15 is a realistic

15    starting time.  He should be here within a half

16    hour, is our understanding.  So, you know, whatever

17    you have to do, you've got a little extra time to

18    do it, and we'll try to get started promptly at

19    10:15.  Okay?

20             MR. LINSIN:  May we work here, your Honor?

21             THE COURT:  Yeah, sure.  Anywhere.  That's

22    fine.

23             MR. LINSIN:  Thank you.

24             THE COURT:  Okay.  Thank you.

25             (Short recess was taken.)

1          (Jury seated.)

2          THE COURT:  Good morning, ladies and

3     gentlemen.

4          THE JURY:  Good morning.

5          THE COURT:  Good to see you this morning.

6     I was a little worried there.  Please have a seat.

7        All right.  You didn't get that automobile

8     started, I guess, right?  No.  Okay.  Mr. Carlson,

9     we're glad to have you here, though.

10       Okay.  We're back on in the case of United

11    States versus Tonawanda Coke Corporation and Mark

12    Kamholz, defendants.  The attorneys and parties are

13    back present.  And a welcome sight for us all, our

14    jury is here.  Roll call waived.  We're glad to see

15    everybody.  Good morning.  You probably see a

16    familiar face in the witness stand.  That's Larry

17    Sitzman.  He is here.  He remains under oath.  And

18    we're going to start this morning with

19    cross-examination by Mr. Personius on behalf of

20    Defendant Kamholz.

21       Keep in mind, ladies and gentlemen, that we ask

22    you to keep your minds open until all of the

23    evidence is in.  Don't prejudge the case.  Keep in

24    mind that this is an important case to both sides,

25    as you well know.

1          And we still are in the government's case.  The

2     government has the burden of proof beyond a

3     reasonable doubt on each essential element of the

4     crime charged.  And as you know, there are 19

5     counts that comprise the indictment in this case,

6     and the government has that same burden on each one

7     of those counts, and you have to separately

8     consider them -- each count, that is, and each

9     defendant with respect to each count in the

10    indictment.

11         The defendants are presumed innocent.  That

12    never -- that presumption never leaves them until

13    you unanimously conclude, if you reach that point,

14    that the proof satisfies you beyond a reasonable

15    doubt as to the guilt of either or both of the

16    defendants in this case.

17         So, I think with that we're ready to proceed.

18    And, Mr. Personius, if you would start, please.

19              MR. PERSONIUS:   Thank you, your Honor.

20    L A R R Y   S I T Z M A N, having previously been

21    duly sworn as a witness, testified further as

22    follows:

23    CROSS-EXAMINATION BY MR. PERSONIUS:

24    Q.   Good morning, Mr. Sitzman.

25    A.   Good morning.

2059

1    Q.   I did introduce myself a few minutes ago while

2    we were waiting, but to formally introduce myself,

3    I'm Rod Personius, and I represent Mark Kamholz.

4         Mr. Sitzman, do you recall that during the

5    course of the investigation by the government that

6    you met with individuals involved in that

7    investigation on three different occasions?

8    A.   Which investigation are you referring to?

9    Q.   The criminal investigation.

10   A.   Yes, I believe it was three.

11   Q.   Okay.  I just want to briefly go through those.

12   Do you remember that the -- the first time that you

13   were involved in a meeting related to this case was

14   on October 19th of 2009?

15   A.   Yes.

16   Q.   That was at the DEC office here in Buffalo?

17   A.   Correct.

18   Q.   And Mr. Mango was present?

19   A.   Correct.

20   Q.   And an agent or investigator from the

21   Department of Environmental Conservation named

22   O'Connor?

23   A.   Yes.

24   Q.   And there was also an agent there from the EPA,

25   whose last name, if I recall, was Kelly.  Do you

1  remember that?

2  A.  Yes.

3  Q.  And you went to this interview with Cheryl

4  Webster?

5  A.  Yes.

6  Q.  And then as I understand it, the next time that

7  you met with -- if I could call it government

8  investigators, would have been a few months later

9  in February of 2010?

10  A.  I believe that's the date, yes.

11  Q.  All right.  And then more recently, to prepare

12  for your testimony, as I understand it, you met

13  again with the investigators in February of this

14  year, February of 2013.  Is that true?

15  A.  Correct.

16  Q.  All right.  And is it safe for us to conclude

17  that on each of these occasions when you met with

18  representatives of the government you did your very

19  best to be accurate and complete in the information

20  that you shared regarding Tonawanda Coke?

21  A.  Yes.

22  Q.  And regarding Mr. Kamholz?

23  A.  Yes.

24  Q.  All right.  Now, yesterday during your

25  testimony you referenced this inspection, the joint

1    inspection by the EPA and the DEC, that took place

2    at Tonawanda Coke in April of 2009, do you recall

3    that?

4    A.   Yes.

5    Q.   You were asked a lot of questions about that,

6    correct?

7    A.   Yes.

8    Q.   And if I recall your testimony correctly, is it

9    true that you told us that at the conclusion of the

10   investigation you made a recommendation to Pat

11   Cahill, the foreman of the by-products area, and

12   Mr. Kamholz that some action be taken regarding

13   this pressure-relief valve, do you recall that?

14   A.   Yes.

15   Q.   And if I recall your testimony correctly, your

16   recommendation was to do one of two things, either

17   raise the set point for the pressure when it would

18   release for the valve, or somehow reduce the

19   pressure in the coke oven gas line --

20   A.   Correct.

21   Q.   -- is that correct?  And what you told us, if I

22   recall, is that your understanding is that within

23   days of you making that recommendation, action was

24   taken to raise the set point for the pressure

25   relief valve, is that true?

1     A.   Yes.

2     Q.   Okay.  And in the months that followed, is it

3     also true that you determined that by virtue of

4     this action having been taken and due to a

5     reduction in the production level at Tonawanda

6     Coke, that the pressure-relief valve, in fact,

7     stopped releasing?

8     A.   I believe that to be true, yes.

9     Q.   And, in fact, when you met with Mr. Mango and

10    these two agents on October 19th of 2009, that's

11    one of the pieces of information that you and

12    Miss Webster shared with the government, true?

13    A.   I would have to read the notes again, but, yes,

14    that --

15    Q.   Would it help you to see them to refresh your

16    recall?

17    A.   It may.  It may, yes.

18    Q.   Let's do that.  Could -- for identification,

19    Lauren, could we please put Government

20    Exhibit 3560.05 on the screen.

21         Just so we've identified it for the written

22    record, Mr. Sitzman, do you see on the screen a

23    document -- it's the first page of a document that

24    has a yellow sticker in the upper right?

25    A.   Yes.

1    Q.   Okay.  And it says Government Exhibit 3560.05?

2    A.   Correct.

3    Q.   All right.  Could we go to the next page,

4    please, Lauren.

5         Okay.  We're on the second page of this

6    exhibit, is that correct?

7    A.   Yes.

8    Q.   Okay.  Lauren, could you make that last

9    paragraph bigger, please?

10        We have taken the last paragraph at the bottom

11   of page 2 of this exhibit and we've made it bigger.

12   Do you see that, Mr. Sitzman?

13   A.   Yes.

14   Q.   Would you please just read that paragraph to

15   yourself.

16   A.   Okay.

17   Q.   Have you read it?

18   A.   Yes.

19   Q.   Could you take it down, please, Lauren.

20        We have to take it off the screen because the

21   question is going to be if that refreshes your

22   recall.

23   A.   Okay.

24   Q.   So my question is:  Having reviewed that

25   paragraph from Government Exhibit 3560.05,

1    Mr. Sitzman, does that refresh your recollection

2    about what you told Mr. Mango and the investigators

3    on October 19, 2009, regarding the pressure-relief

4    valve?

5    A.   That reflects that -- that they didn't

6    accurately describe what I would have told them, in

7    the notes.

8    Q.   So there's an error in the report?

9    A.   Yes.

10   Q.   Okay.  And have you had a chance to review this

11   report before you took the stand?

12   A.   Just in the last -- while I was preparing for

13   trial.

14   Q.   You did review this report?

15   A.   Yes.

16   Q.   Okay.  And did you bring it to the attention of

17   anyone that there was an error in this report?

18   A.   I believe I did, yes.

19   Q.   Who did you tell about that?

20   A.   I think I told our attorney, our DEC

21   representative, and --

22   Q.   Did you tell anyone other than the DEC

23   attorney?

24   A.   I don't believe so.

25   Q.   All right.  And what is the error, Mr. Sitzman,

2065

1    that you've identified in the report?

2    A.   The error, it said that -- there was two

3    errors.  The one that really stuck out to me was

4    that it wasn't releasing anymore because the plant

5    was only operating at 50 percent capacity.

6    Q.   Okay.  And what was the error in that?

7    A.   Well, it wasn't releasing anymore because it

8    had been adjusted to not release.

9    Q.   So, whatever the reason, it wasn't releasing as

10   of October of 2009.

11   A.   Correct.

12   Q.   Okay.

13           MR. PERSONIUS:  May I have a minute,

14   Judge?

15           THE COURT:  Sure.

16           MR. PERSONIUS:  Your Honor, that's all I

17   have.

18       Thank you, Mr. Sitzman.

19           THE COURT:  Okay, Mr. Personius.  Thank

20   you.

21       Mr. Mango, is there anything else?

22           MR. MANGO:  Yes, your Honor.

23       Your Honor, may I proceed?

24           THE COURT:  Yes, you may.

25

1    REDIRECT EXAMINATION BY MR. MANGO:

2      Q.   Good morning, Mr. Sitzman.

3      A.   Good morning.

4      Q.   On August 21st, 2008, when you found that the

5    pilot light was out in the battery flare stack,

6    what did Mark Kamholz tell you was the cause for

7    the pilot light being out?

8      A.   I believe he told us that during some work at

9    the battery the -- the gas line feeding the pilot

10   had been ripped off and therefore was disconnected.

11     Q.   Okay.  Did he tell you how long that the pilot

12   light was out?

13     A.   No.

14           MR. MANGO:  Your Honor, I'd like to pull

15   up for identification purposes Government

16   Exhibit 3560.12.  For identification purposes.  And

17   it's a two-page document.  I'm going to start with

18   the first page, your Honor, if that's --

19           THE COURT:  Certainly.

20           MR. MANGO:  Thank you.

21   BY MR. MANGO:

22     Q.   If we can zoom in on that, please.

23       Mr. Sitzman, I want you to review this document

24   and then look up when you're ready.

25     A.   Okay.

1    Q.   Okay.  If we can go to the second page, please.

2    A.   Okay.

3    Q.   Mr. Sitzman, what is this document, if you

4    could just identify it.  What is it?

5    A.   It's an inspection detail report for the

6    inspection on August 21st.

7    Q.   Okay.  Is that one of those AFS entries --

8    A.   Yes.

9    Q.   -- that you talked about on cross-examination?

10   A.   Yes.

11   Q.   Is this something that you were involved in

12   preparing?

13   A.   I was involved in reviewing, yes.

14   Q.   And this summarizes what you did on August 21st

15   of 2008, is that right?

16   A.   Yes.

17             MR. MANGO:  Your Honor, at this point,

18   absent an objection, I would offer Government

19   Exhibit 3560.12 into evidence.

20             MR. LINSIN:  No objection, Judge.

21             MR. PERSONIUS:  No objection, your Honor.

22             THE COURT:  All right.  There being no

23   objection, 3560.12 received, no objection.  And it

24   may be published.

25             (Government's Exhibit No. 3560.12 was

1           received into evidence.)

2    BY MR. MANGO:

3     Q.   Thank you, your Honor.  If we could go to

4     page 1.  Let's just take a look at this.

5           So, Mr. Sitzman, just so the jury is aware,

6     this is -- the achieved date there, this relates to

7     your August 21st, 2008, inspection?

8     A.   Correct.

9     Q.   Okay.  And in the commentary period do you

10    discuss your identification that there was no pilot

11    light on the battery flare?

12    A.   Yes.

13    Q.   Okay.  All right.  Thank you.

14          MR. MANGO:  We can take that down for now,

15    your Honor.

16    BY MR. MANGO:

17    Q.   Mr. Sitzman, do you recall whether you

18    conducted a follow-up inspection at the Tonawanda

19    Coke facility on September 9th of 2008?

20    A.   Yes.

21    Q.   Okay.  During that inspection, now two weeks --

22    over two weeks after this August 21st inspection,

23    was the pilot light back in operation?

24    A.   No.

25          MR. MANGO:  Your Honor, I'd like to pull

1    up for identification purposes Government

2    Exhibit 97, also a two-page document.

3    BY MR. MANGO:

4    Q.  Mr. Sitzman, I'd like you to review this

5    portion here.  Just look up when you're ready.

6    A.  Okay.

7    Q.  If we could go to the second page.

8             THE COURT:  Does your monitor have the

9    full section?

10            MR. MANGO:  It does, your Honor.  Thank

11   you.

12            THE COURT:  Okay.

13            THE WITNESS:  Okay.

14   BY MR. MANGO:

15   Q.  All right.  Now, you've reviewed both pages of

16   Government Exhibit 97 for identification purposes,

17   is that right?

18   A.  Yes.

19   Q.  All right.  What is Government Exhibit 97?

20   A.  It's a -- again, an inspection detail report

21   from our AFS computer system and on an inspection I

22   conducted in September at Tonawanda Coke.

23   Q.  Okay.  And were you involved in the creation of

24   this AFS inspection detail?

25            MR. LINSIN:  Your Honor, excuse me.

1     Tonawanda Coke has no objection to the introduction

2     of the document, if that's where we're going.

3              THE COURT:  Okay.  Maybe that will enable

4     us to move forward.  Mr. Personius, same?

5              MR. PERSONIUS:  No objection.

6              THE COURT:  All right.  97 received.

7              MR. MANGO:  Thank you, your Honor.

8              THE COURT:  And it may be published.

9              (Government's Exhibit No. 97 was received

10              into evidence.)

11    BY MR. MANGO:

12    Q.   I would ask that if we can go to page 1,

13    please.  Mr. Sitzman, if we can just zoom in for

14    the jury's benefit now.  So this shows your

15    inspection there on September 9th of '08?

16    A.   Correct.

17    Q.   Okay.  And again you inspected some flare --

18    some records relating to the battery flare, and you

19    learned that the pilot light was not operating at

20    that point?

21    A.   Correct.

22    Q.   Okay.  And is it fair to say that this says

23    that you learned that there was actually no fuel

24    hooked up to the pilot light?

25    A.   Correct.

```
1    Q.   Thank you, Lauren.   We can take that down.
2         Mr. Sitzman, when you conducted your night
3    inspection -- do you recall testifying about that
4    on cross-examination?
5    A.   Yes.
6    Q.   How much advance notice did you give Defendant
7    Kamholz?
8    A.   A day or two.
9    Q.   All right.   I'd like to go to a defense exhibit
10   now, your Honor, Defense Exhibit III, please.
11   Okay.   And this is in evidence.
12        Mr. Sitzman, do you recall seeing this
13   inspection detail from your AFS computer system
14   during cross-examination?
15   A.   Yes.
16   Q.   An inspection by Mr. Foersch on, looks like
17   March 12th, 2003, is that right?
18   A.   Yes.
19   Q.   And then there's a second page of this
20   document.   Miss Henderson, if we could please go to
21   that.
22        Mr. Sitzman, do you recall being asked
23   questions about whether this was a compliance
24   inspection that was conducted in March of 2003?
25   A.   Yes.
```

1    Q.  All right.  From your reading of what happened

2    on this day, is there any indication that

3    Mr. Foersch looked inside the quench towers or went

4    to the by-products area?

5    A.  No.

6    Q.  And does a compliance inspection -- if you can

7    tell the jury, does a compliance inspection mean

8    you must physically view each and every emission

9    source at the facility?

10   A.  No, it does not.

11   Q.  Okay.  Thank you, Miss Henderson.  We can take

12   that down.

13       Have you talked to Defendant Kamholz during

14   your interactions with the Tonawanda Coke

15   Corporation?

16   A.  Many times.

17   Q.  Yes.  Based on what you know of the DEC air

18   permit file for Tonawanda Coke, do you know if it

19   was Mark Kamholz who applied for the air permits on

20   behalf of Tonawanda Coke?

21   A.  His signature was on the application.

22   Q.  Okay.  And how far back do those applications

23   go?  Well, let me ask you this:  Do you remember

24   seeing any Air 100s in the 1980s with his signature

25   on it?

1    A.   Yes, I do.

2    Q.   Was he the one whose signature appeared on any

3    permit modification requests?

4    A.   Yes.

5    Q.   Was his signature the one that appeared on any

6    request for waivers or exemptions?

7    A.   Yes.

8    Q.   Okay.  Based upon these filings and your

9    discussions with Defendant Kamholz, do you know if

10   Defendant Kamholz knew the Clean Air Act

11   regulations?

12           MR. LINSIN:  Objection, your Honor; what

13   this witness knows Mr. Kamholz knew.

14           THE COURT:  Well, it calls for a yes or a

15   no.  I'm going to allow it to go that far.  So,

16   overruled.

17           THE WITNESS:  I'm sorry.  Could you repeat

18   the question?

19   BY MR. MANGO:

20   Q.   Yes.  Sure.  Based on the filings that you've

21   reviewed with Defendant Kamholz's signature on it

22   that we just talked about, and your discussions

23   with him either on the telephone or at the plant,

24   do you believe that he knew the Clean Air Act

25   regulations?

```
 1   A.   Yes.

 2              MR. PERSONIUS:   And I have an objection to

 3   foundation, also, Judge.

 4              THE COURT:   Yeah.   We'll leave it -- it's

 5   going to stand where it is right now, and then

 6   you're going to move on.

 7              MR. MANGO:   Yes, your Honor, I am.

 8              THE COURT:   All right.

 9              MR. MANGO:   Do you know whether Mark

10   Kamholz knew the process by which to -- to seek a

11   permit for an emission source?

12              MR. PERSONIUS:   Same objection, Judge.

13              MR. LINSIN:   I join in the objection, your

14   Honor.

15              THE COURT:   Sustained.

16   BY MR. MANGO:

17   Q.   I'd like to move on to another defense exhibit

18   in evidence, Defense Exhibit I, please,

19   Miss Henderson.

20        Mr. Sitzman, do you remember seeing this

21   inspection detail, which included Mr. Foersch,

22   yourself, and Miss Webster included on it?

23   A.   Yes.

24   Q.   All right.

25              THE COURT:   This is received, right?
```

1          MR. MANGO:  Yes, this is in evidence,

2     according to my notes.

3    BY MR. MANGO:

4     Q.  If we can go to the next page, please,

5     Miss Henderson.

6          Mr. Sitzman, please take a look at that.  On

7     this visit, can you tell the jury, did you inspect

8     the quench towers?

9     A.  No.

10     Q.  All right.  And this computer form, again --

11     sorry.  If we could go back to the first page.

12          This computer form calls this an inspection up

13     here, routine inspection, is that right?

14     A.  Yes.

15     Q.  And you testified on cross-examination this was

16     actually part of you going out to all of the

17     facilities in the Tonawanda area to tell them about

18     this air monitoring study that was now ongoing, is

19     that right?

20     A.  Correct.

21     Q.  When you told Defendant Kamholz that you were

22     doing air monitoring study and there was a benzene

23     issue, did he indicate there might be a source of

24     benzene coming from a bleeder valve in the coke

25     oven gas --

1          MR. LINSIN:  Objection, leading, your

2     Honor.

3          THE COURT:  Sustained.

4          MR. MANGO:  -- line.  I'll rephrase.

5     BY MR. MANGO:

6     Q.  During this inspection did you tell Mr. Kamholz

7     that you were concerned about benzene in the air?

8     A.  Yes.

9     Q.  Based on that conversation you had, did

10     Mr. Kamholz bring to your attention --

11          MR. LINSIN:  Objection, your Honor.

12          THE COURT:  Leading?

13          MR. LINSIN:  Exactly.

14          THE COURT:  Sustained.

15     BY MR. MANGO:

16     Q.  Was there any sources of benzene brought to

17     your attention by Defendant Kamholz after you told

18     him you were concerned about benzene in the air?

19     A.  No.

20          MR. MANGO:  All right.  I'd like to go for

21     identification purposes, your Honor, to Defendants'

22     Exhibit NNN for identification.

23     BY MR. MANGO:

24     Q.  Mr. Sitzman, do you recall seeing these and

25     identifying Defendants' Exhibit NNN as notes of

1    Cheryl Webster from a May 28th, 2008, inspection?

2    A.  Yes.

3    Q.  All right.  And during that visit, now after

4    having the air monitoring study be ongoing for some

5    period of time, did you -- were you told at all as

6    to potential sources of benzene in the air from a

7    bleeder valve?

8              MR. LINSIN:  Objection, leading, your

9    Honor.

10             MR. PERSONIUS:  And, your Honor, forgive

11   me, but this is not in evidence.  I don't think it

12   should be on the screen while he's testifying about

13   events on this day.

14             THE COURT:  Well, I'm going to sustain the

15   objection to leading.  You have to have a proper

16   purpose for showing this exhibit to this witness.

17             MR. MANGO:  Yes, your Honor.  We can take

18   it down.  I just wanted to call to his attention

19   these notes that he was asked about.

20   BY MR. MANGO:

21   Q.  And I'm going to ask you some follow-up on

22   that, Mr. Sitzman.  Do you recall that May 28th,

23   2008, visit?

24   A.  Yes.

25   Q.  Okay.  Do you recall telling Defendant Kamholz

1    that you believed Tonawanda Coke was the source of

2    benzene in the air?

3    A.   Was one of the major sources of benzene in the

4    area, yeah, I think is how I phrased it.

5    Q.   Okay.  And upon being told that, did Defendant

6    Kamholz on that day identify any possible sources

7    of benzene at the plant that you were not aware

8    about -- of?

9    A.   The only ones we would have talked about were

10   the ones that were regulated already.

11   Q.   Okay.  So did he bring up any unregulated

12   sources of benzene?

13   A.   No.

14   Q.   Okay.  During cross-examination you were asked

15   how many times DEC had been to the Tonawanda Coke

16   plant in the past 13 years.  Mr. Linsin asked you

17   that question.  Do you remember that?

18   A.   Yes.

19           MR. LINSIN:  Your Honor, time frame is

20   important here, and past 13 years from today's date

21   is not the question that was posed to the witness

22   yesterday.

23           THE COURT:  Okay.  Let's get to a date,

24   please.

25

1    BY MR. MANGO:

2    Q.   I believe prior to April of '09 were you asked

3    approximately how many times the DEC was at the

4    Tonawanda Coke facility in the -- 13 years from

5    April of '09.  Do you remember that question?

6    A.   Yes.

7    Q.   Okay.  Sitting here today, do you know the

8    answer to that question?

9    A.   No.

10    Q.   Okay.  But during those 13 years, do you know

11    if some of the times you or other individuals were

12    at Tonawanda Coke was in response to complaints?

13    A.   Yes.

14    Q.   And if you were responding as part of a

15    complaint, can you tell the jury how short -- if

16    you did end up visiting the plant, how short that

17    interaction could have been?

18            MR. PERSONIUS:   Object to what could have

19    been, your Honor.

20            THE COURT:   To the form, sustained.

21    BY MR. MANGO:

22    Q.   Okay.  Do you remember the shortest period of

23    time -- when responding to complaints at the

24    Tonawanda Coke facility, the shortest period of

25    time you spent there?

2080

1    A.   Fifteen to thirty minutes.

2    Q.   Okay.  Does the AFS computer system allow you

3    to distinguish this as a 15-minute inspection?

4    A.   No.

5    Q.   Okay.  On cross-examination you discussed

6    issuing a notice of violation for the operation of

7    the east quench tower, quench tower number 2 --

8    A.   Correct.

9    Q.   -- without baffles.  You recall that?

10   A.   Yes.

11   Q.   And you said that you did not check with Gary

12   Foersch before issuing a notice of violation for

13   baffles in the east quench tower.  Is that right?

14   A.   Correct.

15   Q.   Did the Title V permit require baffles in this

16   tower?

17   A.   Yes, it did.

18   Q.   Okay.  Did you confirm that the east quench

19   tower did not have baffles?

20   A.   Yes, I did.

21   Q.   Did you need any other information than that?

22   A.   No.

23   Q.   Did Mr. Foersch ever tell you that he had

24   waived the requirements for baffles in the east

25   quench tower?

1    A.   No, he did not.

2    Q.   Did he even have authority to orally waive

3    conditions of the Title V permit?

4              MR. LINSIN:  Objection.

5              THE COURT:  Grounds?

6              MR. LINSIN:  Requesting a legal conclusion

7    from this witness.

8              MR. MANGO:  Your Honor, this witness is

9    the RAPCE at this point.  He knows what his staff

10   is authorized to do and not authorized to do.  I

11   can rephrase the question to focus on his duties.

12             THE COURT:  Go ahead.

13   BY MR. MANGO:

14   Q.   Mr. Sitzman, in your position as RAPCE and your

15   understanding of what responsibilities Mr. Foersch

16   had and authority he had, did Mr. Foersch have the

17   authority to orally waive conditions of the Title V

18   permit?

19             MR. PERSONIUS:  I object, your Honor.

20             THE COURT:  Grounds?

21             MR. PERSONIUS:  It misstates the legal

22   standard.

23             MR. LINSIN:  And I renew my objection,

24   your Honor, that it is seeking a legal opinion from

25   this witness.

1          THE COURT:  No, I don't think it is.  And

2     you may examine on it.  Overruled.

3          MR. MANGO:  You can answer it.

4          THE COURT:  In the context of the

5     question --

6          MR. MANGO:  Yes.

7          THE COURT:  -- I'm overruling the

8     objection.

9          THE WITNESS:  No.

10    BY MR. MANGO:

11    Q.  No, he did not have, in your mind, authority to

12    orally waive conditions of the Title V permit?

13    A.  Correct.

14    Q.  Do you know if Defendant Kamholz knew that?

15          MR. PERSONIUS:  Object, your Honor.

16          THE COURT:  Sustained.

17    BY MR. MANGO:

18    Q.  All right.  On cross-examination you testified

19    that you -- when you found the mistake regarding

20    the west quench tower in the Title V permit, quench

21    tower number 1, with the exemption relating to

22    usage less than 10 percent of the time, is that

23    right?

24    A.  Correct.

25    Q.  At the time you found that mistake, the Title V

2083

1   permit had already expired, is that right?

2   A.   Correct.

3   Q.   So at the time you noticed the mistake, was

4   there any point in modifying the permit, if you

5   know?

6   A.   No.   The permit was suspended at that time.

7   Q.   So if Tonawanda Coke used the west quench tower

8   less than 10 percent of the time, DEC considered

9   them in compliance with their Title V permit?

10  A.   Yes.

11  Q.   And if they used the west quench tower

12  10 percent or more of the time, would DEC consider

13  Tonawanda Coke out of compliance with their Title V

14  permit?

15  A.   Yes.

16  Q.   And at the time you issued your notice of

17  violation for just the east tower, going back to

18  tower number 2, did you know whether or not

19  Tonawanda Coke was using the west tower, number 1,

20  10 percent or more of the time?

21  A.   No, I did not.

22  Q.   Okay.   Had you interviewed any of the Tonawanda

23  Coke employees to make that determination?

24  A.   No.

25  Q.   So you had no idea, at the time you issued your

1    notice of violation, whether or not Tonawanda Coke

2    was using the west tower, number 1, 10 percent or

3    more of the time.

4              THE COURT:  Objection?  Asked and

5    answered?

6              MR. PERSONIUS:  And leading.

7              THE COURT:  All right.  Sustained.

8    BY MR. MANGO:

9    Q.  Okay.  I'd like to go, your Honor, to

10   Defendants' Exhibit QQQ.01, Miss Henderson, please,

11   which is in evidence.

12        Mr. Sitzman, do you remember seeing this

13   photograph?

14   A.  Yes.

15   Q.  Okay.  Is this photograph taken from the ground

16   or an elevated position?

17   A.  It appears to be from an elevated position.

18   Q.  Okay.  In fact, do you see -- this red, does

19   that appear to be a roof of a structure, some type

20   of structure?

21   A.  Yes.

22   Q.  So is this -- if you could tell the jury, is

23   this photo representative of the view you would

24   have standing on Broadway with the rest of the

25   pipes, the light oil scrubber, the actifier, the

1    other by-products components in the background?

2    A.   No.

3    Q.   So would it be fair to say that this is an open

4    and obvious depiction of the bleeder valve if

5    you're elevated off the ground and not standing on

6    Broadway?

7    A.   Could you restate that again, please?

8              THE COURT:   Be interesting to see how you

9    do on this one, Mr. Mango.

10             MR. MANGO:   Yeah, I know.   I think the

11   question -- the earlier question is all I want to

12   really get on this, your Honor.   I'm going to move

13   on.

14        Thank you.   We can take that down,

15   Miss Henderson.

16        Lauren, if we could please pull up Government

17   Exhibit 131.   Your Honor, I'd like to pull up

18   Government Exhibit 131 and go to page 4-2.

19   BY MR. MANGO:

20   Q.   Mr. Sitzman, do you recall seeing this table in

21   the hazardous air pollution emission inventory

22   report from 2003?

23   A.   Yes.

24   Q.   All right.   Does this provide notice that the

25   pressure-release valve in the coke oven gas system

2086

1    was releasing gas to the atmosphere every 30

2    minutes?

3    A.   No.

4    Q.   Does this provide notice that the

5    pressure-release valve in the coke oven gas system

6    was releasing, say, 173 tons of coke oven gas into

7    the atmosphere on any given year?

8    A.   No.

9    Q.   Did this hazardous air pollutant report provide

10   you notice of the pressure-release valve in the

11   coke oven gas system -- that it was subject to

12   Tonawanda Coke's Title V permit?

13   A.   No.

14   Q.   Thank you, Lauren.  We can take that down.

15        All right.  You testified, Mr. Sitzman, that

16   the DEC did not issue a notice of violation for the

17   bleeder/pressure-release valve, is that right?

18   A.   Correct.

19   Q.   In 2009 were you advised that there was a

20   criminal investigation ongoing?

21   A.   Yes, I was.

22   Q.   Did that delay at all or affect your civil

23   enforcement?

24   A.   It did delay our civil enforcement.

25   Q.   And, in fact, during cross-examination you were

1    asked about a meeting a long time ago between --

2    where I attended and you provided some information

3    to the government --

4    A.   Correct.

5    Q.   -- do you remember that?  October of 2009?

6    A.   Yes.

7    Q.   Did you know any of the details of the criminal

8    investigation at that point?

9    A.   None.

10   Q.   Did you learn any of the details of the

11   criminal investigation after that point?

12   A.   None.

13   Q.   Were you privy to that information?

14   A.   Not at all.

15   Q.   Were you involved in any way in referring the

16   case for criminal prosecution?

17   A.   No, I wasn't.

18   Q.   You testified that you were told in the April

19   inspection that the -- the bleeder/pressure-release

20   valve was set at 130 centimeters of oil?  Do you

21   recall that?

22   A.   Yes.

23   Q.   Okay.  Did you know at the time of your closing

24   conference that the bleeder was actually normally

25   set at 100 centimeters of oil?

1    A.   No.

2    Q.   Did anybody tell you that?

3    A.   No.

4    Q.   Or how about, did you know at the time of your

5    closing conference or afterwards that someone was

6    instructed to not let the bleeder release during

7    the April inspection?

8    A.   No.

9    Q.   Were you told that?

10   A.   No.

11   Q.   You were asked during cross-examination about

12   during that October meeting that me and you had,

13   whether you advised the government whether you

14   believed or not the pressure-release valve was

15   still releasing --

16   A.   Correct.

17   Q.   -- right?  And that was based on information

18   provided to you by the Tonawanda Coke Corporation?

19            MR. PERSONIUS:  Your Honor, I object to

20   the leading.

21            THE COURT:  Yeah, this is leading.

22   Sustained.

23            MR. MANGO:  Okay.  Was that -- was that

24   information that was provided to you by the

25   Tonawanda Coke Corporation?

1           MR. PERSONIUS:  Your Honor, that's

2      leading.

3           THE COURT:  What's your question?

4      BY MR. MANGO:

5      Q.  Do you recall today how you learned that the

6      pressure-release valve was not operating in October

7      of '09?

8      A.  I -- I remember hearing about it, and I

9      don't -- can't recollect where that came from.

10     Q.  You remembered hearing about it.  That's what

11     your memory is?

12     A.  Yes.

13     Q.  Okay.  Mr. Sitzman, how long has Part 201 --

14     that's the New York Code, Rules, and Regulations,

15     Part 201 -- how long has that part imposed

16     permitting requirements for emission sources?

17     A.  Since at least the early 1970s.

18     Q.  Okay.  So let's say, for example, if the

19     bleeder/pressure-release valve was installed, let's

20     say ten years back from 2009, that would be 1999,

21     would it have to have been permitted under Part

22     201?

23     A.  Yes.

24     Q.  Okay.  How about, let's go back ten years

25     before that.  If it was installed in 1989, would it

1    have needed a permit pursuant to Part 201?

2    A.  Yes.

3            MR. MANGO:  Thank you, your Honor.  I have

4    nothing further subject to any questions the jury

5    may have for this witness.

6            THE COURT:  Okay, Mr. Mango.  Thank you.

7        Mr. Linsin, any recross?

8            MR. LINSIN:  Thank you.  Very briefly,

9    your Honor.

10       Pardon me, your Honor.  May I proceed?

11           THE COURT:  Certainly.

12   RECROSS EXAMINATION BY MR. LINSIN:

13    Q.  Good morning, Mr. Sitzman.

14    A.  Good morning.

15           THE COURT:  Do you remember Mr. Linsin

16   from yesterday?

17           THE WITNESS:  Yes, I do.

18   BY MR. LINSIN:

19    Q.  You just testified on redirect examination, if

20   I heard you correctly, sir, that when you learned

21   about this exemption that DEC had granted for the

22   baffles in quench tower number 1 -- when you

23   learned that information, the facility's Title V

24   permit had already expired.  Did I hear your

25   testimony correctly?

1    A.   Yes.

2    Q.   All right.   But the truth is, Tonawanda Coke's

3    Title V permit has never expired, isn't that

4    correct?

5    A.   That's a more accurate portrayal, yes.

6    Q.   The truth is that the facility applied for a

7    renewal of that permit in a timely fashion,

8    correct?

9    A.   Correct.

10   Q.   And your agency notified Tonawanda Coke that it

11   was going to renew -- was going to administratively

12   extend the permit until it could make a decision --

13   A.   Correct.

14   Q.   -- correct?

15   A.   Correct.

16   Q.   So, from the time that permit was issued

17   in 2002 until today, that permit has remained in

18   effect, correct?

19   A.   Correct.

20   Q.   And the obligations of that permit with respect

21   to Tonawanda Coke and the obligations with respect

22   to the Department of Environmental Conservation

23   have remained in effect throughout that time

24   period, correct?

25   A.   Correct.

1                THE COURT:  It's the Title V permit?

2                MR. LINSIN:  Yes, sir.

3      BY MR. LINSIN:

4      Q.  Is that what you're responding to, sir?

5      A.  Yes.

6      Q.  You were asked at the end of your redirect

7      examination that whether -- when the DEC's Part 201

8      regulations were first implemented or first

9      implemented or first enacted.  And if I heard you

10     correctly, you said they have been in effect since

11     the 1970s, is that correct?

12     A.  Yes.

13     Q.  Do you know what year?

14     A.  Not off the top of my head, no.

15     Q.  And do you know what form those regulations

16     existed in the 1970s?  How they compared to the 201

17     regulations that are in effect today?

18     A.  They were different than the regulations today.

19     Q.  And as a matter of fact, between 1970 and 2009,

20     those regulations have changed fundamentally at a

21     number of different points as the law has evolved

22     and developed, correct?

23     A.  I don't think I would characterize it as

24     fundamentally changed.  Certainly, administratively

25     permit issues have changed.

1    Q.   Was the enactment of the Clean Air Act in

2    1990 -- or the amendments to the Clean Air Act in

3    1990, was that a fundamental change in the way the

4    Clean Air Act was administered and its

5    requirements?

6    A.   Not in New York.

7    Q.   It didn't change the way you did things in New

8    York?

9    A.   We always had permits.

10   Q.   It changed the way the permits were written,

11   didn't it?

12   A.   Yes.

13   Q.   It changed the way the reporting requirements

14   for each facility were organized and structured,

15   correct?

16   A.   Correct.

17   Q.   And the definitions of certain terms were

18   changed, key terms were changed in New York State

19   in 1996, correct?

20   A.   Correct.

21   Q.   And as a matter of fact, that -- those changes

22   in definitions continue even until today, correct?

23   A.   Correct.

24   Q.   Now, you were asked if, in your opinion, this

25   bleeder valve had been installed in 1999 would it

1    have needed a permit.  And I heard you testifying

2    it was your opinion that it would have, correct?

3    A.  Correct.

4    Q.  And even in 1989 it would have needed a permit,

5    correct?

6    A.  Correct.

7    Q.  But if this facility had a bleeder valve back

8    even into the 1940s, that would clearly have

9    predated the New York State air emissions

10   regulations, wouldn't it?

11   A.  Yes.

12   Q.  And therefore would not have required a permit,

13   correct?

14   A.  I disagree.

15          MR. LINSIN:  One moment, please, your

16   Honor.

17          THE COURT:  Certainly.

18          MR. LINSIN:  May I please have Government

19   Exhibit 18.18, please.  The second Condition 4 in

20   the document, please.

21          THE COURT:  Okay.  This is received.

22          MR. LINSIN:  Yes.  I'm sorry, your Honor.

23   It is in evidence.

24   BY MR. LINSIN:

25   Q.  All right.  Thank you.  If we can enlarge the

1    top half of the page, please.  Including the

2    heading on the page, please.

3         Now, Mr. Sitzman, do you recognize this as

4    condition number 4 from Tonawanda Coke's Title V

5    permit that we you testified about yesterday?

6    A.  Yes.

7    Q.  Now, I'd like to ask you to focus your

8    attention again on the first clause of Item 4.1.

9    And ask if this clause doesn't say that "If an

10   existing emission source was subject to permitting

11   requirements of 6 New York Code, Rules, and

12   Regulations Part 201 at the time of construction or

13   modification" -- am I reading that accurately?

14   A.  Yes.

15            MR. MANGO:  Your Honor, I'm going to

16   object.  This is beyond the scope of redirect at

17   this point.

18            THE COURT:  No.  Overruled.

19   BY MR. LINSIN:

20   Q.  So, Mr. Sitzman, the question I asked you a

21   moment ago was that if a pressure-relief valve was

22   installed or existed on the coke oven gas line at

23   the Tonawanda Coke facility -- let's say it was

24   constructed in the 1940s, the Part 201 requirements

25   wouldn't have applied to that pressure-relief valve

1    at the time it was constructed, would it, because

2    they didn't exist then?

3    A.   Correct.

4    Q.   And unless you knew something about the

5    modification or operation of that valve

6    subsequently, you couldn't apply this condition,

7    could you?

8    A.   I think, regardless what that says, that we

9    have many sources built in the 1940s or before, and

10   at some point they must have required in our

11   department, before my time, to have permits,

12   because they have permits now.

13   Q.   Well, what I'd like to ask you to do -- instead

14   of offering your opinion about what you think must

15   have happened, what I'd like to ask you to do is to

16   focus on the actual language of this permit that

17   controls this facility and that is the subject of

18   five counts in this criminal indictment.  And what

19   I'm asking you is -- would you like me to repeat

20   the question?

21   A.   Please.

22   Q.   My question is, sir:  If this pressure-relief

23   valve was constructed in the '40s when the New York

24   rules and regulations regarding air emissions --

25   before they had even been enacted, those rules

1    wouldn't have applied to it at the time of

2    construction, correct, because they didn't exist?

3    A.   Correct.

4    Q.   And unless you knew something about -- because

5    the only other condition in this first clause is

6    construction or modification.  Unless you knew

7    something about how that valve had been modified,

8    according to the definition of the term

9    "modification," because that term is defined, isn't

10   it?

11   A.   Correct.

12   Q.   So unless you knew something about how that

13   valve was modified, you couldn't apply this

14   condition, could you?

15   A.   You're correct, but I think there's other

16   conditions that would apply.

17   Q.   What other conditions, sir?

18   A.   The Title V provisions that would require that

19   all emission units, sources, points at a facility

20   be identified and placed in the Title V permit at

21   time of application.

22   Q.   Counts 1 through 5 of this criminal indictment

23   that is the subject of this criminal prosecution

24   cites this -- it cites a Condition 4, so we'll

25   presume on the permit.  Since there are two, we'll

1      presume right now this is one of the options.

2          So with respect to this condition in the

3      permit, do I understand your answer to be to my

4      last question that unless you knew something about

5      the modification, what had happened, when it

6      happened, and whether it fit within the definition

7      of that term, you couldn't apply this condition,

8      could you?

9      A.   Correct.

10             MR. LINSIN:  I have nothing further, your

11     Honor.

12             THE COURT:  Okay, Mr. Linsin.  Thank you.

13     Mr. Personius, anything?

14             MR. PERSONIUS:  I do not, your Honor.

15     Thank you.

16             MR. MANGO:  Brief redirect, your Honor.

17     FURTHER REDIRECT EXAMINATION BY MR. MANGO:

18     Q.   Mr. Sitzman, you're familiar with the term

19     "modification"?

20     A.   Yes.

21     Q.   Okay.  If the pressure-release valve was set to

22     release at a certain setting, but the dial was then

23     turned down so it would release more frequently,

24     would that be considered a modification?

25     A.   Yes.

1    Q.   And how about Title V?  Did Title V grandfather

2    in emission sources from 1940?

3    A.   No.

4    Q.   What did Title V require?

5    A.   Title V required that all emission sources at a

6    facility that are regulated be included in a

7    permit.

8            MR. MANGO:  Your Honor, if I may just have

9    a moment.

10           THE COURT:  Sure.

11   BY MR. MANGO:

12   Q.   Okay.  So if I understand your testimony right,

13   every time a pressure-release valve is set at a

14   different setting, that would be considered a

15   modification?

16   A.   If it was, in fact, releasing, yes.

17   Q.   More frequently?

18   A.   More frequently.

19           MR. MANGO:  Thank you.  Nothing further,

20   your Honor.

21           THE COURT:  Okay.

22   FURTHER RECROSS EXAMINATION BY MR. LINSIN:

23   Q.   Mr. Sitzman, you were just asked some questions

24   about modification and what your understanding of

25   that term is.  You just testified on recross a

1    moment ago that you understand that that term is

2    defined in the regulations, correct?

3    A.   Correct.

4    Q.   And let me ask you if the following fits with

5    your understanding of what that term -- how that

6    term "modification" is defined.

7    A.   Okay.

8    Q.   "Any physical change or change in the method of

9    operation of an incinerator, a stationary

10   combustion installation, or process."  Now, that's

11   the introductory clause -- do you recognize that as

12   the introductory clause to the definition of

13   "modification"?

14   A.   Yes.

15   Q.   Now, the pressure-relief valve is not an

16   incinerator, is it?

17   A.   Correct.

18   Q.   It's not a stationary combustion installation,

19   is it?

20   A.   Correct.

21   Q.   And it's not a process, is it?

22   A.   Yes, it is.

23   Q.   Your opinion is that a pressure-relief valve is

24   a process?

25   A.   Yes.

1    Q.  And the Title V permit lists out the processes

2    in the by-products area and other units within this

3    facility, doesn't it?

4    A.  Yes.

5    Q.  And isn't it true, sir, that every one of those

6    processes are things that actually do what you

7    would expect a process to do:  To change things, to

8    physically affect the chemical composition of

9    things, and to adjust activities within the flow of

10   the operation of the plant.  Isn't that how

11   "processes" are used within the context of the

12   Title V permit?

13          MR. MANGO:  Objection, your Honor.  It

14   seems argumentative at this point.

15          THE COURT:  No, overruled.  You may

16   answer.  Can you answer that question?

17          THE WITNESS:  Let me think back through it

18   a second.

19   BY MR. LINSIN:

20   Q.  All right.

21   A.  I would say this is part of a process.  It's

22   controlling the whole process of the by-products

23   plant.  It's one of the -- one of the components of

24   the by-products plant.

25   Q.  It is a vent, isn't it, sir?

1           MR. MANGO:  Objection, your Honor.  This

2      is -- he's bound by the answer.  He says it's a

3      process.  He's now trying to argue with this

4      witness to say it's not a process.

5           THE COURT:  No, it's a question.  I'll

6      permit it.  Overruled.

7           THE WITNESS:  Yes, it's a vent, too.

8  BY MR. LINSIN:

9  Q.  May I have Government Exhibit 18.18 again,

10     please.  I'm sorry.  In evidence.  And may we go to

11     page 34 of this exhibit, please.

12          I'm going ask you, sir -- can we enlarge the

13     bottom portion of this page?  Yeah.  Item 34.4,

14     please.

15          Now, first of all, do you recognize this as

16     another part of Tonawanda Coke's Title V permit?

17 A.  Yes.

18 Q.  All right.  And in Item 34.4 does it indicate

19     that it is discussing the by-products unit at that

20     facility?

21 A.  Yes, it is.

22 Q.  And if we can move to -- well, and at the very

23     bottom of this first entry in 34.4, it talks about

24     the process description for process A16, correct?

25 A.  Yes.

1    Q.   And moving on to the next page.  And if we

2    could highlight, say, the top half of the page.

3         So from the preceding page, process description

4    for process A16 was, "Surges in available aqueous

5    cooling media are held in this tank" -- that is

6    tank A16 -- "for impending pumping through the

7    system," correct?

8    A.   Correct.

9    Q.   That's a process, right?

10   A.   Correct.

11   Q.   And process for -- I'm sorry -- Item 34.5

12   discusses process A17, correct?

13   A.   Correct.

14   Q.   "Combined flushing liquor and tar are conveyed

15   to the BH decanter, where the insoluble and heavier

16   tar settle into the bottom, the lighter aqueous

17   liquid is decanted from the top."  That's a

18   process, isn't it?

19   A.   Correct.

20   Q.   And moving down, 34.6, please.  The latter --

21   the lower -- all right.

22        34.6 describes the process for A18:  "When

23   transportation is unavailable, truck or rail

24   tanker, tar is held in tanks until suitable

25   transport arrives."  Again describing a tank that

1    is a part of a process, correct?

2    A.  Correct.

3    Q.  And the next one, please.  All these are in

4    by-products, right?

5    A.  Yes.

6    Q.  And Item 34.7, process description for A21:

7    "Multistage centrifugal fans draw suction on the

8    coke ovens and pressurize coke oven gas to the

9    discharge side of the exhauster.  Only one of the

10   three units is operated at any given time."  That's

11   a process, correct?

12   A.  Correct.

13   Q.  Are you aware, sir -- we can take this down.

14   Thank you very much.

15       Are you aware of any place in Tonawanda Coke's

16   Title V permit where a vent is described as a

17   process?

18   A.  No.

19             MR. LINSIN:  I have nothing further, your

20   Honor.

21             MR. MANGO:  Your Honor, so that the record

22   is not unclear.  Can we please go back, Lauren, to

23   18.18, page 37.

24   FURTHER REDIRECT EXAMINATION BY MR. MANGO:

25   Q.  You were just talking about the processes.

1    Just first, are you familiar that the definition of

2    process -- does this sound accurate:  "Any activity

3    involving one or more emission sources that emits

4    or has the potential to emit any regulated air

5    pollutant."

6    A.   Correct.

7    Q.   That's your understanding of what a process is?

8    A.   Yes.

9    Q.   And you believe the bleeder/pressure-relief

10   valve is a process?

11   A.   Yeah.

12   Q.   Okay.  Let's focus on Item 34.12.  Talks about

13   the light oil.  Do you see this?  "All of the light

14   oil pumping, flanges, valves, line ends, and pumps

15   from the light oil condenser to the light oil

16   storage tank" -- sorry.  Is that describing a

17   process of the flow of gas in the light oil system?

18   A.   Yes.

19            MR. MANGO:  Nothing further, your Honor.

20            MR. LINSIN:  I have nothing further, your

21   Honor.  Thank you.

22            THE COURT:  Okay, Mr. Linsin.  Thank you.

23      Mr. Personius?

24            MR. PERSONIUS:  I'm not getting near it,

25   Judge.  I have nothing.

1            THE COURT:  Okay.  Mr. Mango, anything

2    further?

3            MR. MANGO:  No, your Honor.

4            THE COURT:  All right.  Ladies and

5    gentlemen, does anybody have a written question

6    that you want considered for Mr. Sitzman?

7        Okay.  Chris, would you do me a favor, please?

8        I think juror number three, Mr. Collins, has a

9    question, please.

10        Okay.  May I see the attorneys, please, and may

11    we have some white noise, please.

12            (Side bar discussion held on the record.)

13            THE COURT:  Okay.  There are two questions

14    listed on the sheet.  The first question is this:

15    "While looking at the chart with the PRV listed,

16    did you say the emissions listed referenced leaks

17    or releases?"  That's the question.  Leaks or

18    releases.

19            MR. LINSIN:  Well, could I ask you to

20    reread it, your Honor.  While looking at the

21    chart --

22            THE COURT:  With the PRV listed --

23            MR. PIAGGIONE:  He's talking about the

24    table in the HAP report, is what he's referring to.

25            MR. MANGO:  Yes.  We talked about the

1     footnote.

2             MR. LINSIN:  Okay.

3             MR. MANGO:  4-2.

4             THE COURT:  "Did you say the emissions

5     listed referenced leaks or releases?"  I think that

6     question works.

7             MR. MANGO:  Yes, I think that's fair.

8             THE COURT:  That's a good question.  Okay.

9         The second question is this:  "Do you know if

10    the PRV listed in the chart" and there's a

11    bracket -- eight days, one...

12            MR. MANGO:  It says 1 PRV.

13            THE COURT:  It says one PRV, but I don't

14    know if it's eight days.

15            MR. LINSIN:  Says 1 PRV.

16            THE COURT:  Yeah, but eight what?

17            MR. MANGO:  I don't see an eight.

18            MR. LINSIN:  I think it says, "says 1

19    PRV," not an eight.

20            THE COURT:  Well, what's this?

21            MR. LINSIN:  That's paren --

22            MR. MANGO:  Parentheses.

23            THE COURT:  Yeah, a parentheses, and what

24    are the letters and number?

25            MR. MANGO:  I think that's his S.

1           MR. LINSIN:  That's an S-A-Y -- I read

2     that as S-A-Y-S.  "Says 1 PRV."

3           THE COURT:  Oh.  Okay.  "Says 1 PRV."

4     Thank you.  "Is the one on the COG gas line or

5     light oil scrub?"

6           MR. MANGO:  Okay.

7           MR. LINSIN:  Okay.

8           MR. MANGO:  It sounds like the questions

9     are related to that Exhibit 131.  Would you like me

10    to have Lauren pull that up?

11          THE COURT:  Yes.

12          MR. MANGO:  And that page?

13          THE COURT:  Mr. Linsin?

14          MR. LINSIN:  That is fine.  I agree.  I

15    think it would be helpful.

16          THE COURT:  All right.  And Mr. Personius?

17          MR. PERSONIUS:  Yes.

18          THE COURT:  Okay.

19          MR. MANGO:  If -- your Honor, if there's

20    some interpretation, you know, because they may not

21    be a perfectly worded question, is that something

22    you would -- if there's some additional follow-up,

23    is that something your Honor could do with the

24    witness, just to kind of clarify?

25          THE COURT:  I will ask the witness if that

1    satisfies his request for the questions asked.

2              MR. LINSIN:  You will ask the juror?

3              THE COURT:  I will ask the juror.  Okay?

4              MR. LINSIN:  Okay.

5              MR. MANGO:  Great.

6              THE COURT:  And then if he says not, then

7    we'll have to have him write out another question

8    and proceed on that basis.

9              MR. MANGO:  Great.

10             THE COURT:  Okay.  Okay.

11             MR. MANGO:  Thank you.

12             (End of side bar.)

13             THE COURT:  Okay.  There are two

14   questions, Mr. Sitzman, and I'm going to ask both.

15   And you have on the screen the exhibit to which it

16   is believed that the questions apply, as a point of

17   reference.

18        And what's the exhibit number on that,

19   Mr. Mango?

20             MR. MANGO:  131, your Honor, page 4-2.

21             THE COURT:  Okay.  I'm going to ask you

22   the two questions.  I'm going to ask you to answer

23   each.  And then once that's done, I will ask the

24   juror if the questions asked are in fact what the

25   juror -- what you, Mr. Collins, wanted asked.  And

1    then if there are any follow-up questions of the

2    witness after he answers the questions, I'll allow

3    the attorneys to follow up with additional

4    examination.  Okay?

5        All right.  Question number 1, Mr. Sitzman:

6    While looking at the chart with the PRV listed, did

7    you say the emissions listed referenced leaks or

8    releases, question mark.

9             THE WITNESS:  This chart represents leaks

10   from the valve.

11            THE COURT:  Okay.  And the second question

12   is:  Do you know if the PRV that's listed in the

13   chart, and that's 1 PRV, is the one on the COG gas

14   line or the light oil scrubber, question mark.

15            THE WITNESS:  I don't know, according to

16   the chart.

17            THE COURT:  Okay.

18            MR. MANGO:  No follow-up on the government

19   side, your Honor.

20            THE COURT:  All right.  Let me ask

21   Mr. Collins.

22       Mr. Collins, those are your two questions,

23   correct?

24            A JUROR:  Yes.

25            THE COURT:  And those are the questions

1    you intended to be asked?

2              A JUROR:  Yes.

3              THE COURT:  Okay.  All right.  Mr. Linsin?

4    FURTHER CROSS-EXAMINATION BY MR. LINSIN:

5    Q.  Could we please just enlarge the lower half of

6    the page.

7         Now, you're familiar with the light oil

8    scrubber at the Tonawanda Coke facility, are you?

9    A.  Yes.

10   Q.  And is it accurate, sir, that the light oil

11   scrubber is part of the light oil system at the

12   plant?

13   A.  Yes.

14   Q.  All right.  So, at the top of what's been

15   enlarged here you see a block for the light oil

16   system, correct?

17   A.  Correct.

18   Q.  And the PRV that is referenced in the lower

19   section relates to a pressure-relief valve on the

20   coke oven gas system, correct?

21   A.  Correct.

22   Q.  Now, with that background, does that alter the

23   response that you just gave to the second question

24   that the Judge posed to you?

25             MR. MANGO:  Your Honor, I'm going to

1    object.  He answered the question the juror asked.

2              THE COURT:  It's a fair question.  That's

3    actually cross-examination on the answer.  Yes.

4              THE WITNESS:  Could you ask me the

5    question again, your Honor?

6              THE COURT:  Certainly.  All right.  Do you

7    know if the PRV listed in the chart -- and it says

8    1 PRV -- is the one on the COG gas line or light

9    oil scrubber?

10             THE WITNESS:  Light oil scrubber --

11       Okay.  If I could, I remember seeing an

12   application in our file for a pressure-relief valve

13   on the light oil scrubber.  And that is a different

14   part of the system, and it's not -- in fact, not

15   listed on here, even though that -- that exists on

16   it.  So the pressure-relief valve on the coke oven

17   gas system that's listed in that table would be

18   that one or another one, if it existed in the

19   system.

20             MR. LINSIN:  On the coke oven gas line,

21   correct?

22             THE WITNESS:  On the coke oven gas line.

23             MR. LINSIN:  Nothing further.  Thank you,

24   your Honor.

25             THE COURT:  Okay.

1           MR. MANGO:  Just one follow-up question,

2    your Honor.

3           THE COURT:  Thank you.

4           MR. MANGO:  Mr. Sitzman, are you aware

5    that the light oil scrubber, as used, that term,

6    that's connected -- is that connected to the coke

7    oven gas system?

8           THE WITNESS:  Yes.  It's all part of the

9    by-products plant.

10          MR. MANGO:  Thank you.  Nothing else, your

11   Honor.

12          THE COURT:  Mr. Linsin?

13          MR. LINSIN:  I have nothing further.

14          THE COURT:  Okay.  Mr. Personius?

15          MR. PERSONIUS:  No, your Honor.  Thank

16   you.

17          THE COURT:  Okay.  All right.

18   Mr. Collins, thank you for those questions.

19       All right.  Mr. Sitzman, you're excused.  Thank

20   you very much.  Appreciate it.

21       Okay.  Next witness, please.

22          MR. PIAGGIONE:  Your Honor, the government

23   would call Jon Rogers.

24          THE COURT:  Everybody okay, ladies and

25   gentlemen?  Do you need a break or -- you do need a

 1    break.  Okay.  Let's take ten minutes or so, and

 2    then we'll be back.

 3              (Jury excused from the courtroom.)

 4              THE COURT:  Okay.  It will be about ten

 5    minutes.  Five of twelve we'll get started.

 6              (Short recess was taken.)

 7              (Jury seated.)

 8              THE COURT:  Welcome back, ladies and

 9    gentlemen.  Please have a seat.

10       Okay, Mr. Rogers, you want to come on up?  The

11    attorneys and parties are back present.  Our jury

12    is back, ready to go, roll call waived.  And we're

13    still on the government's case.

14       If you stay right there.  Ms. Labuzzetta, if

15    you would administer the oath.

16    J O N   R O G E R S, having been duly sworn as a

17    witness, testified as follows:

18              THE COURT:  Morning, sir.

19              THE WITNESS:  Morning.

20              THE COURT:  Okay.  Have a seat, make

21    yourself comfortable.  A couple of very preliminary

22    instructions.  You seem to know the routine.  I'm

23    going to ask you to speak towards the jury, because

24    you are here to testify for their benefit.  It's

25    important that you answer the questions as best you

1   can.  Make sure you understand the question.  If

2   you don't, if I ask the question or any of the

3   attorneys, just let me know.  I'll have the

4   attorneys or I will rephrase the question until you

5   understand it.

6        Try to be as succinct with your answers as you

7   can.  Don't volunteer information.  That seems to

8   always complicate things.  If you can answer a

9   question yes or no, please try to do that.  That's

10  somewhat helpful.

11       If there's an objection, wait until I rule on

12  the objection, then I will tell you by instruction

13  whether to complete your answer, restate your

14  answer, or wait for another question.  Do you

15  understand?

16            THE WITNESS:  Yes.

17            THE COURT:  We need you to speak in a

18  conversational tone at the microphone.  The

19  microphone is friendly, but it needs to pick you

20  up.  So state your full name so we can hear how

21  you're going to do, and spell your last name.

22  Okay?

23            THE WITNESS:  Jon Rogers, R-O-G-E-R-S.

24            THE COURT:  You'll have to get a little

25  closer than that, and I think that will help.

1        All right.  Mr. Piaggione, your witness.

2               MR. PIAGGIONE:  Thank you, your Honor.

3    DIRECT EXAMINATION BY MR. PIAGGIONE:

4    Q.  Mr. Rogers, we've met several times before, is

5    that correct?

6    A.  Yes.

7    Q.  And you've expressed a great deal of

8    nervousness about being here?

9    A.  Yes.

10   Q.  In fact, you've broken out in hives, is that

11   correct?

12   A.  Yes, I have.

13   Q.  Okay.  Just try and take your time, take deep

14   breaths, and just respond to the questions if you

15   could.  Okay?

16   A.  Yes.

17   Q.  Where are you employed?

18   A.  Tonawanda Coke.

19   Q.  When did you start?

20   A.  March of 1978.

21   Q.  All right.  So you've been working at Tonawanda

22   Coke since?

23   A.  Yes.

24   Q.  Okay.  And what positions have you held with

25   Tonawanda Coke?

1    A.   I started as a maintenance man, became a

2    maintenance supervisor, special projects, on to the

3    railroad, coke handling, coal handling, and a good

4    share of other jobs throughout the plant.

5    Q.   So as a maintenance worker, did you -- have you

6    worked in virtually all the yard grounds of the

7    Tonawanda Coke?

8    A.   Yes, I have.

9    Q.   Okay.  And did that include the period between

10   2005 and 2009?

11   A.   Yes, it did.

12   Q.   All right.  Did you ever work with a bleeder

13   valve in the by-products area?

14   A.   Yes, I did.

15   Q.   All right.  What work did you do there?

16   A.   Repaired steam lines on it, did some crane work

17   with it.

18   Q.   Okay.  So you weren't the operator of the

19   valve?

20   A.   No, I was not.

21   Q.   Did you install it?

22   A.   No, I did not.

23   Q.   Okay.  Did you work on the installment?

24   A.   I think I was a crane operator.

25   Q.   Okay.  So that was during your employment

2118

1    between 1978 and 2009, is that correct?

2    A.   Yes.

3    Q.   Do you know approximately when that was?

4    A.   No, I don't.

5    Q.   Okay.  Did you ever see that bleeder valve

6    release?

7    A.   Yes, I did.

8    Q.   All right.  Have you ever been near the bleeder

9    in the wintertime?

10   A.   Yes, I have.

11   Q.   Describe what, if anything, you would observe

12   when you were near the bleeder in the winter.

13   A.   Moisture on the ground and naphthalene

14   crystals.

15   Q.   Okay.  And you said you saw it release.  How

16   often did you see it release?

17   A.   Frequently.

18   Q.   Okay.  Can you tell us if it was related to the

19   reversals at the battery or not?

20   A.   Yes, it was.

21   Q.   Do you recall ever working at Tonawanda Coke

22   when the bleeder was hit by lightening?

23   A.   Yes.

24   Q.   Do you know approximately when that happened?

25   A.   No, I don't.

2119

1    Q.   Did you respond to it?

2    A.   Yes, I did.

3    Q.   What did you see?

4    A.   About a 10- to 12-foot flame.

5    Q.   Okay.  And did you work on extinguishing it?

6    A.   Yes, I did.

7    Q.   What did you do?

8    A.   Introduced steam and increased the set point or

9    the -- to close the valve.

10   Q.   How long did it take to get that under control?

11   A.   Thirty minutes.

12   Q.   All right.  To your knowledge was that bleeder

13   valve hit by lightening again?

14   A.   One other time that I remember.

15   Q.   Okay.  Did you see the bleeder valve release

16   between 2005 and 2009?

17   A.   Yes, I did.

18   Q.   And how often did that happen?

19   A.   Frequently.

20   Q.   Do you know Mark Kamholz?

21   A.   Yes, I do.

22   Q.   How long have you known him?

23   A.   Since I started there.

24   Q.   All right.  Is he in the courtroom today?

25   A.   Yes, he is.

2120

1    Q.   Can you point him out?

2    A.   Right there.

3            MR. PIAGGIONE:   Okay.  Let the record

4    reflect that the witness has identified

5    Mr. Kamholz.

6            THE COURT:   Yeah, the record will so

7    reflect, and Mark Kamholz the defendant has been

8    identified by Mr. Rogers.

9    BY MR. PIAGGIONE:

10   Q.   Okay.  Who is the environmental control manager

11   at Tonawanda Coke Corporation?

12   A.   Mark Kamholz.

13   Q.   Okay.  If -- did Mark Kamholz, as environmental

14   control manager, have the authority to give you

15   directions?

16   A.   Yes, he did.

17   Q.   And if Mark Kamholz, as the environmental

18   control manager, gave you an order to perform some

19   work at Tonawanda Coke, did you have to do it?

20   A.   Yes.

21   Q.   Can you recall an example of when Mark Kamholz,

22   as the environmental control manager, gave you an

23   order to do some work at Tonawanda Coke?

24   A.   I dug a settling pond for him.

25   Q.   Okay.  In the course of your duties working at

1   the -- in the by-products area, did you ever see

2   Mr. Kamholz in that area?

3   A.   Yes.

4   Q.   How often did you see him there?

5   A.   Frequently.

6   Q.   Okay.  Did you see him in the by-products area

7   between 2005 and 2009?

8   A.   Yes.

9   Q.   All right.  And how often did you see Mark

10  Kamholz in the by-products area during the period

11  between 2005 and 2009?

12  A.   Sorry, repeat that.

13  Q.   Okay.  How often did you see Mr. Kamholz in the

14  by-products area during the period between 2005

15  and 2009?

16  A.   Frequently.

17  Q.   Okay.  Did you bother to count how many times

18  you saw Mr. Kamholz in the by-products area?

19  A.   No, I didn't.

20  Q.   In the course of your employment at Tonawanda

21  Coke since 1978 through 2009, who, if any one, in

22  Tonawanda Coke had the responsibility to determine

23  if the bleeder valve in the by-products area needed

24  a permit to comply with the Clean Air Act?

25              MR. PERSONIUS:  Objection, your Honor.

1          THE COURT:  Sustained.

2          MR. PIAGGIONE:  Do you know who in

3   Tonawanda Coke had the responsibility to determine

4   if the bleeder valve in the by-products area needed

5   a permit to comply with the Clean Air Act?

6          MR. LINSIN:  Objection, your Honor, same

7   question.

8          THE COURT:  It is.  Sustained.

9          MR. PIAGGIONE:  If the -- if the bleeder

10  valve in the by-products area needed a flare to

11  comply with the Clean Air Act, who would determine

12  that?

13         MR. LINSIN:  Objection, your Honor.  First

14  of all, it's a hypothetical question, and there's

15  no foundation at all with this witness for this

16  kind of -- line of questioning.

17         THE COURT:  I mean, it's -- I mean, it's

18  certainly compound in terms of what you're asking

19  for, so I'll sustain the objection.

20  BY MR. PIAGGIONE:

21  Q.  In the course of your employment at Tonawanda

22  Coke, who has the responsibility to determine

23  compliance with the environmental regulations at

24  the facility?

25  A.  Mark Kamholz.

2123

1    Q.  Okay.  And would that include whether or not a

2    bleeder valve in the by-products area needed a

3    permit or not?

4              MR. PERSONIUS:  Objection.

5              THE COURT:  Foundation?  Grounds.

6    Sustained.

7              MR. PIAGGIONE:  If a valve needed a permit

8    pursuant -- who determined whether or not a valve

9    at Tonawanda Coke needed a valve -- needed a permit

10   for a valve in the by-products area?

11             MR. PERSONIUS:  Objection, foundation.

12             THE COURT:  And form.  Sustained.

13             MR. PIAGGIONE:  Yes.  Okay.  I'm sorry.

14   Withdrawn.

15       Who determined at Tonawanda Coke if something

16   was subject to environmental regulations at

17   Tonawanda Coke?

18             MR. PERSONIUS:  Objection, asked and

19   answered.

20             THE COURT:  No, I'll permit that.

21             THE WITNESS:  Mark Kamholz.

22   BY MR. PIAGGIONE:

23   Q.  Okay.  So if you -- that's good enough.  In the

24   course of your duties, did you work in the area

25   between the ovens and the quench towers?

1    A.   Yes, I did.

2    Q.   What was the work you did in that area?

3    A.   Railroad work.

4    Q.   What is the time frame you're talking about?

5    A.   From 1991 until present.

6    Q.   Okay.  In the course of your duties did you

7    ever look inside the quench towers?

8    A.   Yes, I did.

9    Q.   When you started were there baffles in those

10   towers?

11   A.   Yes, there were.

12   Q.   Okay.  In the east tower?

13   A.   Yes.

14   Q.   How about the west tower?

15   A.   No.

16   Q.   Okay.  Did there come a time that the east

17   tower no longer had baffles?

18   A.   When it was shortened.

19   Q.   Okay.  And do you recall when that happened?

20   A.   I don't.

21   Q.   Okay.  So when it was shortened, was the

22   baffles replaced, or was it just never put in?

23   A.   Not that I know of.

24   Q.   Okay.  Were you in the east quench tower after

25   the tower was shortened?

1    A.   Yes.

2    Q.   Okay.   And did it have baffles?

3    A.   No.

4    Q.   Okay.   Were you ever in the east quench tower

5    between the period of 2005 and October 2009?

6    A.   Yes.

7    Q.   Did the east quench tower have baffles then?

8    A.   No.

9    Q.   Did there come a time when you had discussion

10   with Mark Kamholz about no baffles in the tower?

11   A.   Yes.

12   Q.   Okay.   Can you please describe the

13   circumstances leading up to that discussion?

14   A.   There was an article in the Tonawanda News that

15   stated there was baffles in that tower.   I went to

16   Mr. Crane and told him there weren't.   And --

17            MR. LINSIN:   Objection, nonresponsive.

18   Question related to a conversation with

19   Mr. Kamholz.

20            THE COURT:   Yeah.   Do you want me to

21   strike that answer?

22            MR. LINSIN:   Yes, please.

23            THE COURT:   Okay.   I'll grant the motion

24   to strike.

25       You may have heard that, ladies and gentlemen,

1     but it's not proper for you to consider it in

2     connection with the question that was asked, so

3     disregard it, please.

4   BY MR. PIAGGIONE:

5     Q.  Did you have a discussion with Mr. Kamholz

6     about the lack of baffles in the east quench tower?

7     A.  I asked him why he didn't tell Mr. Crane about

8     it.

9     Q.  Okay.  What was his response?

10    A.  He said he did.

11    Q.  Okay.

12            MR. PERSONIUS:  Could we have, while we're

13    on the subject, a time frame please, Judge?

14            THE COURT:  Yes.

15  BY MR. PIAGGIONE:

16    Q.  Sure.  Do you recall when this was

17    approximately?

18    A.  No, I don't.

19    Q.  Was it in 2009?

20            MR. LINSIN:  Objection.

21            THE WITNESS:  I'm sorry, I don't.

22            THE COURT:  Leading?

23            MR. LINSIN:  The witness has just

24    testified he doesn't remember.

25            MR. PIAGGIONE:  Your Honor, if I can, I

1    believe he can recall the dates based upon events,

2    so I can ask him about an event --

3              THE COURT:  Based upon events?

4              MR. PIAGGIONE:  Yes.

5              MR. LINSIN:  Then --

6              THE COURT:  Okay.

7    BY MR. PIAGGIONE:

8    Q.  All right.  Do you recall when the baffles were

9    installed in the east quench tower?

10   A.  No, I don't, I'm sorry.

11   Q.  Do you recall the baffles being installed in

12   the east quench tower?

13   A.  Yes, I do.

14   Q.  Okay.  What was the time period preceding that

15   that you had the conversation with Mr. Kamholz?

16   A.  Short -- short time.  Less than a month.

17             MR. PIAGGIONE:  Okay.  And then subject to

18   connection as to when the baffles were placed in

19   the tower, your Honor, with subsequent evidence we

20   can identify that time frame.

21             THE COURT:  I'm not sure what you're

22   asking for, Mr. Piaggione.

23             MR. PIAGGIONE:  I'm just saying, your

24   Honor, that he relates it to that, and subsequent

25   evidence will indicate what date that was.

1      Approximately.

2               THE COURT:  Okay.  You may continue.  Keep

3      your voice up too when the ask the questions,

4      because you're trailing I think, unless it's my

5      hearing again.  No, not this time?

6               MR. PIAGGIONE:  Okay.  I'll speak up, your

7      Honor.  I think I've been sitting too long.

8          Based upon your experience at Tonawanda Coke

9      regarding environmental issues -- excuse me.

10     Withdrawn.  During the course of your duties at

11     Tonawanda Coke, if there was a question about

12     environmental compliance, who did you ask?

13              MR. LINSIN:  Your Honor, I'm going to

14     object.  I think this is the third time this

15     question has been asked.  And answered.

16              THE COURT:  You know, I'm not sure.  I

17     think it is different.  I'll permit it.  I'm not

18     sure it's necessarily relevant.  But, you know, I

19     guess subject to connecting up, overruled.

20              MR. PERSONIUS:  If it speeds it along,

21     I'll stipulate that Mr. Kamholz was the

22     environmental control manager at Tonawanda Coke.

23     And he handled environmental issues.  If that's

24     helpful.  We don't dispute, Judge.

25              THE COURT:  Okay.  Lets --

2129

1          MR. PERSONIUS:  So we can move along.

2          THE COURT:  Let's go from there,

3    Mr. Piaggione.

4    BY MR. PIAGGIONE:

5    Q.   Okay.  In the course of your duties have you

6    had to deal with the coal tar bin?

7    A.   Yes, I have.

8    Q.   And where is that located?

9    A.   Broadway in the by-products department.

10   Q.   I'm asking for Exhibit 3.11, which I believe is

11   already in evidence.

12        Can you identify that, sir?

13   A.   That's the tar bin.

14   Q.   Okay.  And what, if anything, did your duties

15   have to do with the tar box?

16   A.   If I saw it needed cleaning, I would call an

17   end loader to clean it.

18   Q.   How was it emptied?

19   A.   The end loader would line himself up, put the

20   bucket in there, get the bucket full, let it drip

21   off, and take it to the coal field.

22   Q.   And where was it taken?

23   A.   To the coal field.

24   Q.   Would you give the operator of the front end

25   loader which coal pile to take it to?

1    A.   No, I wouldn't.

2    Q.   Did you ever empty the tar box?

3    A.   Yes.

4    Q.   Okay.  Did you ever observe the coal being

5    mixed with the coal tar sludge?

6    A.   Yes.

7    Q.   All right.  And describe what you observed.

8    A.   The end loader would drive up to the pile, put

9    the bucket up high.  In the process of dumping the

10   bucket into the pile, the tar would be up on the

11   pile.  He would back drag it, and then put more

12   coal over it.  Back drag it, put more coal over it

13   to mix it in.

14   Q.   Did you observe it hit the ground at any time

15   during the process?

16   A.   Once in a while.

17   Q.   Okay.  Was there anyone telling you not to have

18   the coal tar reach the ground while mixing?

19   A.   No.

20   Q.   Was there any precautions made to prevent it

21   from being hit by the rain or the snow?

22   A.   No.

23   Q.   Was there any lateral walls around it to

24   prevent it from spreading out?

25   A.   No.

1   Q.  Did you observe that when you first started at

2   Tonawanda Coke Corporation?

3   A.  Yes.

4   Q.  Have you seen this mix of coal pile taken for

5   use in the coke ovens?

6   A.  Yes.

7   Q.  Did there come a time when you -- when a wall,

8   concrete pad was installed near the coal field?

9   A.  Yes.

10  Q.  Do you recall when that was?

11  A.  No.

12  Q.  Did the installation of the pad change when the

13  tar box was emptied?

14  A.  No.

15  Q.  Did you observe others empty the tar box after

16  the pad was installed?

17  A.  Yes.

18  Q.  Where did you observe them put the coal tar

19  sludge?

20  A.  Coal piles.

21  Q.  How often did you observe that?

22  A.  Sometimes daily, sometimes not as frequently.

23  Q.  All right.  Did there come a time when bringing

24  the tar box sludge directly to the coal fields

25  stopped?

1    A.   Yes.

2    Q.   When was that if you can recall?

3    A.   After the search warrant.

4    Q.   Okay.  And prior to that event, did you ever

5    observe coal tar sludge on the concrete pad?

6    A.   Yes.

7    Q.   Okay.  Ms. DiFillipo, can you put up

8    Exhibit 303, which is also in evidence?

9         And can you tell us what that is?

10   A.   It's coal tar sludge.

11   Q.   Okay.  And can we have -- is that the -- coal

12   tar sludge where?

13   A.   On the concrete pad.

14   Q.   All right.  So that's the pad with coal tar

15   sludge on it?

16   A.   Yes.

17             THE COURT:  Speak into the microphone,

18   please.

19             THE WITNESS:  Yes.

20             THE COURT:  Thank you.

21  BY MR. PIAGGIONE:

22   Q.   I'd ask you if you can identify what I'm going

23   to point out in that lower left-hand corner.

24   A.   That's the ramp for the pug mill.

25   Q.   Can I have Exhibit 3.02 please?

2133

1           Can you identify that picture?

2      A.   That's the pug mill.

3      Q.   That's already in evidence.

4              THE CLERK:  You need to say that.

5              MR. PIAGGIONE:  Okay, I'm sorry.

6      BY MR. PIAGGIONE:

7      Q.   And can you identify that object?

8      A.   That's the pug mill.

9      Q.   Okay.  What was the purpose of the pug mill?

10     A.   It's a mixing device to mix product.

11     Q.   Was it supposed to mix the coal tar sludge on

12     the pad with coal?

13     A.   It was supposed to mix or -- mix the coal tar

14     up and either put it on the coal or mix it with

15     coal, yes.

16     Q.   Okay.  Where would the material be placed after

17     it was mixed from the pad through the machine?

18     A.   On to a conveyor belt and up through the

19     system.

20     Q.   So with this process, would the coal tar sludge

21     touch the ground in any way?

22     A.   No.

23     Q.   Do you know how long that machine was in

24     operation?

25     A.   It was attempted to be used, but it was a short

1    period of time.

2    Q.   And do you know if there was any problems with

3    running that particular --

4    A.   Yes.  It was very difficult to use.

5    Q.   Okay.  I'm going to go to Exhibit 125.03, which

6    is already in evidence.

7         Ask you if you can recognize that.

8    A.   Yes.  It's the area around the tanks that

9    burned.

10   Q.   Okay.  When did you first observe that area, do

11   you know?

12   A.   Early 1980s.

13   Q.   Okay.  And can you describe what it was like to

14   try and walk in that area at that time?

15   A.   There was spots of tar.

16   Q.   Okay.  When you say "spots of tar", what do you

17   mean?

18   A.   It wasn't the whole surface that was covered.

19   There was just spots of tar here and there.

20   Q.   And how big of an area are we talking about?

21   A.   250 feet square.

22   Q.   All right.  And on the spots of tar, what was

23   it like to try and walk in those spots?

24   A.   You'd try not to step in the tar.

25   Q.   Okay.  Without mentioning the event that causes

2135

1    you to remember this, did there come a time in 1998

2    when the surface of that area was modified in any

3    way?

4    A.   Yes.  A share of the area approximately 150

5    feet square was filled in.

6    Q.   And what was it filled in with?

7    A.   Coke breeze.

8    Q.   And what, if anything, did you observe happen

9    to that tar sludge over time as a result of that

10   filling in?

11   A.   The tar sludge was compacted or forced into a

12   smaller area around the tanks themselves.

13   Q.   Okay.  So it moved, the tar sludge moved?

14   A.   Yes.  Depressed.  The process of filling the

15   area in would cause the tar to move to a -- to the

16   low area.

17   Q.   Would that include equipment running over

18   the --

19   A.   Yes.

20   Q.   Okay.  Now, how long of an area was the tar

21   sludge then?

22   A.   It was into an area approximately a hundred --

23   a hundred feet square, but the tanks were also in

24   that area.

25   Q.   Okay.  How deep was it, if you know?

1   A.   After the fire it was 2 to 3 feet between the

2   tanks.

3   Q.   Okay.  And you mentioned a fire.  Now, was that

4   fire involving near the storage tanks?

5   A.   Yes, it was.

6   Q.   Okay.  I'd like to have -- do you know what

7   date that was?

8   A.   July of 2008.

9   Q.   Okay.  Now, did you respond to the fire?

10  A.   Yes, I did.

11  Q.   All right.  Can you tell us what the fire --

12  how big the fire was?

13  A.   It incorporated a good share of the area.

14  Q.   Okay.  Now, what was in the tanks that --

15  before the fire occurred?

16  A.   Tar sludge.

17  Q.   Okay.  How do you know that?

18  A.   There were holes.  The tanks were starting to

19  rust.  There were holes in them.  You could see

20  into them.

21  Q.   And when the fire occurred, what was on fire?

22  A.   The actual tar around the tanks.

23  Q.   Okay.  So this was the tar that had been moved

24  over towards the tanks?

25  A.   Yes.

1    Q.   Okay.  Now, in the course of your duties, did

2    there come a time that you informed that there

3    was going -- they were going to scrap those tanks?

4    A.   Yes.

5    Q.   Okay.  And what, if anything, did you do?

6    A.   I filled right around the tanks themselves with

7    more coke breeze to allow access of machinery to

8    take the tanks down.

9    Q.   And how much coal breeze did you put down?

10   A.   Approximately 10 buckets, 50 tons.

11   Q.   Okay.  And what happened to the coal tar

12   sludge?

13   A.   It was combined into an even smaller area.

14   Q.   Okay.  Now, this was before the fire or after

15   the fire that you did that?

16   A.   This was before the fire.

17   Q.   Okay.  Did you observe the fire -- I'm sorry.

18   Withdrawn.

19       After this fire, did you speak to Mr. Kamholz

20   about the tanks?

21   A.   Yes.

22   Q.   What did you want to do, if anything?

23   A.   Clean up the remaining scrap metal and process

24   the tar sludge.

25   Q.   Okay.  And you asked Mr. Kamholz's permission

2138

1    to do that?

2    A.   Yes.

3    Q.   Okay.  And how long after the fire did you

4    speak to Mr. Kamholz about the tanks?

5    A.   It was approximately nine months.

6    Q.   And what was his response?

7    A.   The first time no.

8    Q.   Did he explain why?

9    A.   No.

10   Q.   Did you ask him more than once?

11   A.   Yes.

12   Q.   Okay.  Did there come a time he gave you

13   approval to remove the remnants of the tanks?

14   A.   Yes.

15   Q.   Approximately how long after the fire was that?

16   A.   It was approximately a year.

17   Q.   Okay.  And what, if anything, did you do?

18   A.   Removed the scrap metal, and then started

19   removing the tar sludge from the tanks.

20   Q.   Okay.  I'm going to go to what's already in

21   evidence as Exhibit 3.05 please.

22        Okay.  Now do you recognize that photograph?

23   A.   Yes.

24   Q.   Okay.  Can you tell us what we are looking at?

25   A.   Yes.  That's one of the tanks that was

2139

1    disassembled, and that's the tar sludge in the

2    tank.

3    Q.  Okay.  And show this area I'm going mark.

4        What is that?

5    A.  That was the area we filled in around the tanks

6    for access.

7    Q.  Okay.  And what is in the -- in this area?

8    A.  That's the tar sludge.

9    Q.  Okay.  So was there a difference between the

10   material outside the tank and inside the tanks?

11   A.  The stuff outside the tank had coke breeze in

12   it.  The stuff inside the tank didn't.

13   Q.  Okay.  So what did you do, if anything, with

14   the contents of the tank?

15   A.  Removed it with an excavator, put it in an end

16   loader bucket, and mixed in the coal piles.

17   Q.  Did anyone tell you not to prevent the stuff

18   from being mixed on the ground?

19   A.  No.

20   Q.  Was there any attempt to prevent the material

21   from hitting the ground?

22   A.  No.

23   Q.  I'm going to go to Exhibit 136.01.  It's not in

24   evidence, for identification only.

25       Now I'm going ask you if you recognize that

1    photograph?

2    A.   That's the tar tank.

3    Q.   Okay.  And does that depict what the -- what

4    the tanks looked like when you were working on

5    them?

6    A.   Yes.

7    Q.   Okay.  Is it a fair and accurate representation

8    of what you observed?

9    A.   Yes.

10           MR. PIAGGIONE:  Your Honor, I would move

11   to have this introduced into evidence as 136.01.

12           MR. LINSIN:  No objection, your Honor.

13           MR. PERSONIUS:  No objection, your Honor.

14           THE COURT:  Okay.  136.01 received, no

15   objection.

16           (Government's Exhibit 136.01 was received

17           into evidence.)

18   BY MR. PIAGGIONE:

19   Q.   Now, in the background -- what's in the

20   background of that photograph?

21   A.   Coal pile.

22   Q.   Is that where you brought the coal tar sludge?

23   A.   Yes.

24   Q.   Okay.  We'll go to marked for Government's --

25   for identification 136.02 please.

1      Okay.  I ask you if you can recognize that

2   photograph?

3   A.  Yes.  Again, the same tanks.

4   Q.  And is that a fair and accurate depiction of

5   the area that you worked on to remove the coal tar

6   sludge?

7   A.  Yes.

8            THE COURT:  Speak into that microphone,

9   please.

10            MR. PIAGGIONE:  Yes, your Honor.  I'm

11   having a little trouble with my throat, and I

12   apologize.

13      Is that a fair and accurate representation of

14   what you observed at the time?

15            THE WITNESS:  Yes.

16            MR. PIAGGIONE:  Okay.  At this time the

17   government would introduce this into evidence as

18   Government Exhibit 136.02.

19            MR. LINSIN:  No objection, Judge.

20            MR. PERSONIUS:  No objection.

21            THE COURT:  All right.  136.02 received,

22   no objection.  May be published.

23            (Government's Exhibit 136.02 was received

24            into evidence.)

25   BY MR. PIAGGIONE:

1    Q.   Can you describe to the jury what we're looking

2    at here?

3    A.   That's the disassembled tank with the tar

4    sludge inside of it, and you can see the marks from

5    the excavator removing some of the tar sludge.

6             THE COURT:  All right.  Point to that area

7    please.  Tap the screen good.  Thank you.

8    BY MR. PIAGGIONE:

9    Q.   Okay.  And is that the metal you scrapped

10   around it?

11   A.   Yes.

12   Q.   Okay.  And the road in front of it, is that

13   what you put in to get access to the coal tar

14   sludge?

15   A.   Yes.

16   Q.   Okay.  Okay.  We will move on to 136.10 for

17   identification please.

18        Do you recognize that?

19   A.   Yes.

20   Q.   What is that?

21   A.   Different picture of the same thing.

22   Q.   Okay.  Is that a fair and accurate depiction --

23             MR. LINSIN:  Your Honor, we have no

24   objection to the admission of the photograph if

25   that's where we're going.

1           THE COURT:  Okay.  136.10, Mr. Personius?

2           MR. PERSONIUS:  No objection, Judge.

3           THE COURT:  That will be received, no

4     objection.

5                (Government's Exhibit 136.10 was received

6                into evidence.)

7     BY MR. PIAGGIONE:

8     Q.   Mr. Rogers, I'd ask you if you can explain to

9     the jury what we're looking at.

10    A.   We're looking at the tank where the tar sludge

11    was removed.

12    Q.   Okay.  And I'll ask you, is this the wall of

13    the tank?

14    A.   Yes, it is.

15    Q.   All right.  And this is the insides of the

16    tank?

17    A.   Yes.

18    Q.   And I notice that it goes down.  Is that the

19    marks of the excavator?

20    A.   Yes.

21    Q.   Okay.  How deep did that go down?

22    A.   Approximately 5 feet.

23    Q.   Okay.  So it was about 5 feet below the

24    surface --

25    A.   Yes.

2144

1    Q.   -- of coal tar sludge?

2    A.   Right.

3    Q.   You brought that where?

4    A.   To the coal piles.

5    Q.   Okay.  And you mixed it on the ground there?

6    A.   In the coal piles.

7    Q.   And was there anything to prevent it from

8    hitting the ground?

9    A.   No.

10   Q.   Was the coal piles on the ground?

11   A.   Yes.

12   Q.   We'll go on to Government Exhibit 136.12 for

13   identification only.

14           THE COURT:  What's the number again?

15           MR. PIAGGIONE:  136.12.

16           THE COURT:  I don't think you have that

17   listed.

18           MR. PIAGGIONE:  Eleven, I'm sorry.

19           THE COURT:  Okay.  Do we have any

20   objection?

21           MR. LINSIN:  No objection, your Honor.

22           MR. PERSONIUS:  None, your Honor.  Thank

23   you.

24           THE COURT:  Okay.  136.11, no objection,

25   received.  And may be published.

2145

1              (Government's Exhibit 136.11 was received

2              into evidence.)

3              MR. PIAGGIONE:   Thank you, your Honor.

4    BY MR. PIAGGIONE:

5    Q.   Could you explain what we're looking at here?

6    A.   That's the other tank.

7    Q.   Okay.  So that was -- there was two tanks

8    involved, and this was the second one?

9    A.   Yes.

10   Q.   Okay.  And is that the walls of the tank?

11   A.   Yes.

12   Q.   And what is this material in front of it?

13   A.   That's the coke breeze that was put in there as

14   fill.

15   Q.   Okay.  And what's inside here?

16   A.   That's tar sludge.

17   Q.   And where did that tar sludge go?

18   A.   To the coal field.

19   Q.   And did you mix it with the coal there?

20   A.   Yes.

21   Q.   Was the coal piles on the ground?

22   A.   Yes.

23   Q.   Was there anything to prevent the material from

24   hitting the ground?

25   A.   No.

1    Q.  Was there anything to prevent it -- from the

2    rain falling on it?

3    A.  No.

4    Q.  Did anyone tell you not to put it on the

5    ground?

6    A.  No.

7    Q.  Incidentally, were you -- did there come a time

8    that you observed samplers taking samples in this

9    location?

10   A.  Yes.

11   Q.  Can you tell us what happened to one of the

12   samplers, if anything?

13   A.  He took a step into one of the areas that was

14   relatively deep, got his boot stuck.

15   Q.  What happened?  Did he need help to get out?

16   A.  Yes, he did.

17           MR. PIAGGIONE:  At this point I have no

18   further questions of this witness.

19           THE COURT:  Okay.  Put that back up,

20   please.

21       All right.  This is 136.11.  The top portion of

22   that, Mr. Rogers, is that what you said was the

23   coal tar sludge?

24           THE WITNESS:  Yes.

25           THE COURT:  Is that in the tank?

2147

1              THE WITNESS:  Yes.

2              THE COURT:  Okay.  And the walls of the

3     tank are how deep?

4              THE WITNESS:  From the surface you're

5     looking at, they probably go down another 3 feet.

6              THE COURT:  Okay.  And the tank itself, is

7     it entirely metal?

8              THE WITNESS:  Yes.

9              THE COURT:  Is there a floor to that tank?

10             THE WITNESS:  Yes, there was.

11             THE COURT:  Okay.  And was that metal as

12    well?

13             THE WITNESS:  I'm sorry?

14             THE COURT:  Was that metal as well?

15             THE WITNESS:  Yes, sir.

16             THE COURT:  Thank you.

17        Mr. Linsin, any cross-examination?

18    CROSS-EXAMINATION BY MR. LINSIN:

19    Q.  Good afternoon, Mr. Rogers.

20    A.  Good afternoon.

21    Q.  I will introduce myself formally, though we met

22    before.  My name is Greg Linsin.  I represent

23    Tonawanda Coke.

24        You were asked a number of questions by

25    Mr. Piaggione regarding the -- I'm sorry, regarding

2148

1     the mixing of the decanter tank coal tar sludge and

2     the material from these tanks with the coal on the

3     coal piles, correct?

4     A.   Yes.

5     Q.   And you were repeatedly asked by Mr. Piaggione

6     whether this process of mixing occurred on the

7     ground, do you recall that?

8     A.   Yes.

9     Q.   Are you familiar with the coal field itself?

10    A.   Yes.

11    Q.   And the roadways on which trucks and front end

12    loader operators drive in the coal fields, what

13    does -- what do those roadway consist of?

14    A.   Coal.

15    Q.   And that's the same throughout the coal field,

16    is that correct?

17    A.   Yes.

18    Q.   And do you know, based on your years of

19    experience there, how deep that coal is in the coal

20    fields at the Tonawanda Coke facility?

21    A.   Anywhere between 3 and 6 feet.

22    Q.   And do you know what is beneath that 3 to

23    6 feet of coal upon which the coal piles sit?

24    A.   Clay.

25    Q.   And do you have any reason to know how deep

1    that clay is?

2    A.   I've been down in that clay approximately

3    15 feet below the surface and saw solid clay.

4    Q.   All right.   Now, all of the mixing that you

5    testified about from the decanter coal tar sludge

6    and the material that was excavated from the tanks,

7    you testified that it was mixed with the coal,

8    correct?

9    A.   Yes.

10   Q.   And after it was mixed with the coal, that

11   material was charged into the ovens, correct?

12   A.   Yes.

13   Q.   That was the purpose of mixing it with the coal

14   before it could be charged back into the ovens,

15   correct?

16   A.   Yes.

17   Q.   When you took or you directed people to take

18   the material from the tanks and mix with the coal,

19   were you telling them to dispose of this material

20   out on the coal field?

21            MR. PIAGGIONE:   Objection, your Honor.

22            MR. LINSIN:   Or were you telling them to

23   mix the material?

24            THE COURT:   All right.   What's your

25   ground?

1          MR. PIAGGIONE:  The issue of calling for a

2     conclusion from this witness.

3          THE COURT:  No, not on those grounds.

4     Overruled.

5       Do you understand the question, Mr. Rogers?

6          THE WITNESS:  Yes.

7          THE COURT:  All right.  You may answer it,

8     please.

9          THE WITNESS:  I was asking them to mix it.

10         MR. LINSIN:  And when you talked to the

11    front end loader operators -- when you see the tar

12    tank filled up in the by-products area, and you

13    talked to the front end loader operators and asked

14    them to take a load out to the coal fields, were

15    you asking them to dispose of that coal tar sludge,

16    or to mix it on the coal piles?

17         MR. PIAGGIONE:  Again, your Honor, the

18    issue of RCRA disposal is a legal conclusion.  I

19    object.

20         THE COURT:  Overruled.  You may answer

21    that question.

22         THE WITNESS:  Mix it.

23   BY MR. LINSIN:

24   Q.  All right.  When -- based on your time at

25    Tonawanda Coke, the mixing of the decanter tank

2151

1   coal tar sludge, was that done in the same way as

2   you've just described from the time you first

3   started at the plant until the search warrant

4   in 2009?

5   A.  Yes.

6   Q.  Now, you were asked some questions as well

7   about the concrete pad, correct?

8   A.  Yes.

9   Q.  And I believe you recall that -- you testified

10  that you don't recall exactly when that was

11  installed, correct?

12  A.  No.

13  Q.  Do you recall though that the concrete pad was

14  constructed there at a time when certain coal tar

15  sludge was actually brought to the Tonawanda Coke

16  facility from off site?

17  A.  Yes.

18  Q.  And is it accurate that the concrete pad was

19  then -- then served as a staging area or a storage

20  area for this off-site coal tar sludge when it was

21  brought in it by truck?

22  A.  Yes.

23  Q.  Now, you testified that you've had a

24  recollection of serving as the crane operator when

25  the pressure relief valve was installed on the coke

1    oven gas line.  Do you recall that testimony?

2    A.  Yes.

3    Q.  Now, do you recall a time when the pressure

4    relief valve on that line was actually moved from

5    one location to another on the coke oven gas line?

6    A.  I don't know what you're asking.

7    Q.  Okay.  Do you recall that there was a pressure

8    relief valve on the line that was deactivated, and

9    then a second pressure relief valve was installed a

10    little further downstream on the coke oven gas

11    line?

12    A.  Yes.

13    Q.  All right.  And is that the installation you

14    have a recollection of participating in?

15    A.  Yes.

16    Q.  All right.  So there was a pressure relief

17    valve on that line before, but you assisted in the

18    installation of the new location for that valve, is

19    that correct?

20    A.  Yes.

21          THE COURT:  And your answer is yes?

22          THE WITNESS:  Yes.

23          THE COURT:  Thank you.

24          THE WITNESS:  Sorry, your Honor.

25          THE COURT:  That's okay.

1           MR. LINSIN:  The Court's indulgence.  Just

2       one moment, please.

3           THE COURT:  Certainly.

4   BY MR. LINSIN:

5   Q.  So does it fit with your memory, Mr. Rogers,

6       that the scrapping of these old tanks and then the

7       excavation that you talked about occurred in late

8       summer, early fall of 2009, does that fit with your

9       memory?

10  A.  Yes.

11  Q.  And when you were authorized to do this work,

12      were you told not to do it at a certain time, or

13      were you told to do it at nighttime so people

14      couldn't see it?

15  A.  No.

16  Q.  Was your objective in excavating this tar to

17      reuse and recycle that tar in the coke ovens?

18  A.  Yes.

19          MR. PIAGGIONE:  Objection, your Honor.

20      Again recycling is an issue -- is a legal issue for

21      this.

22          THE COURT:  No.  It was for reuse is the

23      testimony.  Overruled.  The answer will stand.

24  BY MR. LINSIN:

25  Q.  During the time that you were working with

1    Tonawanda Coke, do you recall seeing regulators out

2    at the facility from time to time?

3    A.   Yes.

4    Q.   Do you recall seeing regulators from the air

5    division of DEC there?

6    A.   Yes.

7    Q.   Do you recall seeing regulators from the

8    hazardous waste division of DEC from time to time?

9    A.   Yes.

10   Q.   And did the operations that you've testified

11   about continue in the same manner you've described

12   them when the regulators were there or not there?

13   A.   Yes.

14           MR. LINSIN:   I have nothing further, your

15   Honor.   Thank you.

16           THE COURT:   Okay, Mr. Linsin, thank you.

17      Mr. Personius.

18           MR. PERSONIUS:   Just a couple, your Honor,

19   please.

20           THE COURT:   Okay.

21           MR. PERSONIUS:   I just need one quick

22   second please.

23   CROSS-EXAMINATION BY MR. PERSONIUS:

24   Q.   Good afternoon, Mr. Rogers.

25   A.   Good afternoon.

1    Q.   We've met before.

2    A.   Yes, we have.

3    Q.   And I represent Mark Kamholz.  Rod Personius.

4    As your dentist will sometimes say, we're almost

5    done.

6    A.   Thank you.

7    Q.   Would you put Government Exhibit 3.11 up,

8    Lauren?  That's in evidence.

9         Do you remember that Mr. Piaggione asked you

10   about this photograph of the -- it's called the tar

11   box or tar bin?

12   A.   Yes.

13   Q.   Okay.  This is in the by-products area?

14   A.   Yes.

15   Q.   And this contains the -- the coal tar sludge

16   that's generated as part of Tonawanda Coke's

17   operation?

18   A.   Yes.

19   Q.   Based on the many, many years you were at

20   Tonawanda Coke, Mr. Rogers, could you explain to

21   the jury how frequently this box would have to be

22   emptied and what factors might affect that, please?

23   A.   Depending on production spells out how often

24   this has to be done.  There's times when you may go

25   three, four, five days that it doesn't get cleaned.

1    And the wintertime also plays in it, because the

2    tar is thicker.  It's not a liquid.  It becomes

3    more of a putty, so it would pile up and not need

4    to be cleaned as quickly.  So it all depends on

5    different factors.

6    Q.  So in addition to the time of year, would the

7    production level --

8    A.  Absolutely.

9    Q.  -- at the plant, that would affect it?

10   A.  Yes, sir.

11   Q.  Higher production you're going to have to empty

12   it more often, lower production less often?

13   A.  Yes, sir.

14   Q.  The production rate at Tonawanda Coke from 2005

15   to 2009 varied?

16   A.  Yes.

17   Q.  You may take that down, Lauren.  Thank you.

18       You were asked about the pressure relief valve

19   in the by-products area?

20   A.  Yes.

21   Q.  You told the jury that your experience was that

22   would release?

23   A.  Yes.

24   Q.  Okay.  You said it would release with some

25   frequency, correct?

1    A.   Yes.

2    Q.   All right.   Now, in your many years' experience

3    at Tonawanda Coke, did you find that the frequency

4    of those releases by that valve was effected by

5    certain factors?

6    A.   Yes.

7    Q.   Would you explain to the jury what those

8    factors are, please?

9    A.   The adjustment of the set point could change,

10   and production -- again, when production is

11   relatively low, the gas pressure is not as high in

12   the plant, thus the frequency would be less.

13   Q.   Did you notice any difference in the frequency

14   of release between summer and winter?

15   A.   Not so much.

16   Q.   Okay.   Lauren, would you please put up

17   Government Exhibit 136.10, which is in evidence?

18        This is the one of the photographs you were

19   shown by Mr. Piaggione on his examination.

20        Do you recall that, Mr. Rogers?

21   A.   Yes.

22   Q.   And I don't know which tank is which, but this

23   is one of the two tanks you testified about, right?

24   A.   Yes.

25   Q.   Or actually what's left of it.   And I'm going

2158

1    to try this.  Do you see where I put the red arrow?

2    A.   Yes.

3    Q.   Is that inside the tank?

4    A.   Yes, it is.

5    Q.   And is that -- where that arrow is pointing to,

6    is that this coal tar substance that you're

7    referring to?

8    A.   Yes.

9    Q.   Did it have a -- it would appear from what we

10   see here it would have a thickness to it?

11   A.   Yes.

12   Q.   Was it a thick material?

13   A.   Very thick.

14   Q.   Close to a solid?

15   A.   Very.

16   Q.   Okay.  Would you please, Lauren, put up

17   Government Exhibit 136.11, which is also in

18   evidence.

19       If I recall correctly, this is the other

20   tank --

21   A.   Yes.

22   Q.   -- that you were asked about.  And the arrow

23   happens to still be in the middle of what's left of

24   that tank?

25   A.   Yes.

1    Q.   And is that the coal tar substance you're

2    referring to?

3    A.   Yes.

4    Q.   At least the same thickness as you described

5    for the other tank?

6    A.   Yes.

7    Q.   Okay.  You may take that down, Lauren.

8            MR. PERSONIUS:  Judge, may I have a

9    minute?

10            THE COURT:  Certainly.

11            MR. PERSONIUS:  Your Honor, we have no

12    more questions for Mr. Rogers.  Thank you, sir.

13            THE COURT:  Okay, Mr. Personius, thank

14    you.  Mr. Piaggione.

15            MR. PIAGGIONE:  Yes, your Honor, just a

16    few questions to -- on redirect to clarify.

17    REDIRECT EXAMINATION BY MR. PIAGGIONE:

18    Q.   May we have 136.10 again, please?

19        Mr. Rogers, how many buckets of material from

20    inside that tank did you remove?

21    A.   Five to six end loader buckets each time I did

22    it, and I did it approximately ten times all

23    together.

24    Q.   Ten times spread out over a period of time?

25    A.   A month and a half or so.

2160

1    Q.   Okay.  And how much is in a bucket?

2    A.   It would depend on the thickness of the

3    material.  There would be a lot of air space on

4    stuff that was this thick.  Half bucket, four to

5    five 55-gallon drums approximately.

6    Q.   How much is that in tons?

7    A.   Three to five.

8    Q.   Three to five tons, so how many buckets did you

9    say you took out?

10   A.   Five to six.

11   Q.   Every time you did it?

12   A.   Yes.

13   Q.   So that's 25 tons?

14   A.   Around there, yes.

15   Q.   Ten times at least?

16   A.   Yes.

17   Q.   So that's 250 tons?

18   A.   Yes.

19   Q.   Okay.  And that was mixed in the coal fields?

20   A.   Yes.

21   Q.   Okay.  And during 2005-2009, how often was the

22   tar box emptied?

23   A.   Periodically.  Don't know exactly how many

24   times.  Depended on when it needed it.

25   Q.   Okay.  Did it happen once a day at times?

1    A.   At times.

2    Q.   All right.  Did it happen more than once a day

3    at times?

4    A.   Depending on how thick the material, they could

5    have gone into it twice.  The size of the machine

6    also.

7    Q.   And when they did that, did you know which coal

8    pile they took it to?

9    A.   No.

10           MR. PIAGGIONE:  Okay.  I have no further

11   questions, your Honor.

12           THE COURT:  Mr. Linsin, anything?

13           MR. LINSIN:  I have nothing further.

14           THE COURT:  Mr. Personius?

15           MR. PERSONIUS:  Nothing, your Honor.

16           THE COURT:  Okay, Mr. Rogers, you're

17   excused.  Thank you very much, sir.

18           THE WITNESS:  Thank you.

19           THE COURT:  Okay.  Okay.  I don't know,

20   have you worked up an appetite?  Why don't we break

21   for lunch, but we'll start at 2:00 o'clock, okay?

22   Thank you very much.  Don't discuss the case.  Keep

23   your minds open please.

24           (Jury excused from the courtroom.)

25           THE COURT:  Okay.  We'll see everybody at

1    two.

2              MR. LINSIN:  Thank you, your Honor.

3              MR. PERSONIUS:  Thank you.

4              THE COURT:  Thank you.

5              (Lunch recess was taken.)

6              (Jury seated.)

7              THE COURT:  All right.  Good afternoon.

8    Please have a seat.

9        All right.  Hope you had a good lunch.  Glad

10   you're back.  We're ready to begin.  The attorneys

11   and parties are back present.  You, of course,

12   ladies and gentlemen, are here, roll call waived.

13       We are in the government's case.  Let's see, by

14   my count we should be at witness number 16.  Whose

15   witness?  Mr. Piaggione?

16             MR. PIAGGIONE:  Yes, your Honor.

17             THE COURT:  Okay.  If you would call your

18   next witness, please.

19             MR. PIAGGIONE:  Yes, thank you, your

20   Honor.  We'll call Jason Kambat.  K-A-M-B-A-T-T.

21             THE COURT:  By whatever name they call

22   you, come on up.  If you stop right at the witness

23   area, right there.  Turn around and face the jury,

24   I'll have an oath administered to you.

25   J A S O N   J O H N   K A M B A T, having been duly

1    sworn as a witness, testified as follows:

2            THE COURT:  Okay.  Be careful when you

3    enter.  We're going to ask you to testify and look

4    in the direction of the jury.  It sort of helps

5    them watch you, and makes it a little bit easier to

6    follow your testimony.

7        I have a few preliminary instructions.

8    Basically, if you don't understand a question,

9    don't answer it.  Just ask the attorneys or me, if

10   I'm asking you the question, to repeat the

11   question.

12       I'm going to ask you to speak in a

13   conversational tone.  Speak at the microphone.  The

14   microphone is basically friendly.  You just have to

15   get maybe a little closer than you are right now

16   and speak at it.

17       Be as succinct with your answers as you can.

18   Don't volunteer information.  That's usually what

19   complicates things.  If you can answer a question

20   yes or no, assuming it calls for that kind of

21   answer, please try to do that.

22       If there's an objection, wait until I rule on

23   the objection, and then I'll let you know answer

24   the question, wait for another question, or I'll

25   give you some other related-type of instruction,

1    okay?

2              THE WITNESS:  Okay.

3              THE COURT:  I think you're going to carry

4    okay.  If you speak at the microphone, state your

5    full name, spell your last name, please.

6              THE WITNESS:  Jason John Kambat.  Spelling

7    my last name is K-A-M-B-A-T.

8              THE COURT:  You'll have to speak up higher

9    than that or move a little closer to the

10   microphone.

11      All right.  Let's try it, Mr. Piaggione.  And

12   we're going to ask you to speak into the

13   microphone, please.

14             MR. PIAGGIONE:  Yes, your Honor.  I think

15   I have my voice back now.  I don't think it will be

16   a problem now.

17             THE COURT:  Okay.  Thank you.

18   DIRECT EXAMINATION BY MR. PIAGGIONE:

19   Q.  Mr. Kambat, where are you employed?

20   A.  Tonawanda Coke.

21   Q.  And how long have you been employed there?

22   A.  A little over ten years.

23   Q.  So, what year did you start?

24   A.  January 7th, 2003.

25   Q.  Okay.  And what's your current position?

1    A.   Supervisor.

2    Q.   Okay.  And how long have you been -- well, what

3    was your position when you started?

4    A.   Laborer.

5    Q.   Okay.  And as part of your duties, did you work

6    at the wharf?

7    A.   Yes.

8    Q.   Okay.  And what happens on the wharves?

9    A.   You pull the series of gates to pull the

10   finished product up on to the belt so it can be

11   loaded in the trucks or railcars.

12   Q.   Okay.  If you could just slow down a little.

13   Is your work affected by the use of the quench

14   towers?

15   A.   Yes.

16   Q.   How many quench towers are at Tonawanda Coke?

17   A.   Two.

18   Q.   Okay.  How do you identify them?

19   A.   One and two tower.

20   Q.   Okay.  Is the one tower the western most tower?

21   A.   Yes.

22   Q.   And two is the east tower?

23   A.   Yes.

24   Q.   Okay.  And how do the quench towers relate to

25   the work on the wharves?

2166

```
1    A.   Could you repeat the question?

2    Q.   How are the quench towers, the use of the

3    quench towers, related to the work on the wharves?

4    A.   They cool the coke down.

5    Q.   Okay.  So how many wharves are there?

6    A.   Two.

7    Q.   Is one closer to the one tower?

8    A.   Yes.

9    Q.   And one is closer to the two tower?

10   A.   Yes.

11   Q.   Okay.  And so, depending on which wharf they're

12   using -- rather which tower they're using, they

13   would be using a corresponding wharf?

14           MR. LINSIN:  Objection leading, your

15   Honor.

16           THE COURT:  All right.  Yeah, it was a

17   disjointed question.  Sustained.

18   BY MR. PIAGGIONE:

19   Q.   Okay.  So the use of the towers has an effect

20   on the work on the wharf or not?

21   A.   Could you repeat that again?

22   Q.   The use of the tower, does that have an effect

23   on the work on the wharf or not?

24           MR. LINSIN:  Your Honor, I object again.

25           THE COURT:  Yeah, sustained.
```

2167

1    BY MR. PIAGGIONE:

2    Q.  All right.  While working on the wharves, did

3    you observe how often the quench towers were used?

4    A.  Yes.

5    Q.  How often?

6    A.  Every time they pushed an oven.

7    Q.  Okay.  Use of which tower -- how often did they

8    use one tower as opposed to the other?

9    A.  They alternated.

10   Q.  This was in 2003?

11   A.  Yes.

12   Q.  Okay.  Did that use change at all in 2004?

13   A.  I'm not sure.

14   Q.  Okay.  During your time working at Tonawanda

15   Coke, how frequently did they use -- did they use

16   each tower?

17           MR. LINSIN:  Objection, foundation.

18           THE COURT:  I'm sorry?

19           MR. LINSIN:  Lack of foundation, your

20   Honor.

21           THE COURT:  Okay.  Sustained.

22   BY MR. PIAGGIONE:

23   Q.  Okay.  During your time working at Tonawanda

24   Coke, have you observed the use of -- the frequency

25   of use of each quench tower?

1    A.   Yes.

2    Q.   And how often did they use -- while you were

3    working there at Tonawanda Coke, how often did

4    you -- tell us how often they used each tower.

5              THE COURT:   Start it begin, please.

6              MR. PIAGGIONE:   Sorry.

7              THE COURT:   Give us a time frame, if you

8    can.

9    BY MR. PIAGGIONE:

10   Q.   Let's go back to between 2005 and 2009, did you

11   observe the frequency of the use of each quench

12   tower?

13   A.   Yes.

14   Q.   And how frequently did they use each quench

15   tower?

16   A.   They alternated.

17   Q.   Okay.  And was there a time when the west tower

18   was down for repair?

19   A.   Yes.

20   Q.   Do you know approximately when that was?

21   A.   I can't recollect.

22   Q.   Okay.  Do you recall how long that was?

23   A.   I can't say with certainty.

24   Q.   Okay.  Was it longer than a year?

25   A.   I do not believe so.

1    Q.   Okay.  While working on the wharves, did you

2    observe -- excuse me.  After working on the wharfs,

3    what other job did you -- when you stopped working

4    on the wharfs, did you go to another job?

5    A.   Yes.

6    Q.   What job was that?

7    A.   The trestle.

8    Q.   Okay.  And from the trestle where did you go?

9    A.   The yard runner.

10   Q.   What is -- when you said working on the

11   trestle, you want to explain what that was?

12   A.   We load the finished product into a hopper, and

13   it goes through a screening station to load trucks.

14   Q.   Okay.  And when you were yard runner, what does

15   that mean?

16   A.   You were a truck driver.  You drove tractor

17   trailer and dump truck.  You would load trailers

18   for our trucking company, Ausmus.

19   Q.   Now, while you're driving trucks around

20   Tonawanda Coke, is there any need to note which

21   quench tower's being used?

22   A.   Could you repeat that?

23   Q.   Okay.  When you're driving a truck at Tonawanda

24   Coke on the facility, is there any need to note

25   which quench tower is being used?

1    A.   No.

2    Q.   Okay.  Is it -- have you been instructed when

3    you drive near a quench to --

4          MR. LINSIN:  Object, leading, your Honor.

5    The witness gave a very direct answer, and now

6    counsel is simply trying to --

7          THE COURT:  I mean, very honestly, the

8    questions haven't been too good, Mr. Piaggione.

9    They're difficult to follow, frankly.  Take your

10   time, get the right questions out.

11        But objection sustained.

12   BY MR. PIAGGIONE:

13   Q.   Have you ever been caught in the steam of a

14   quench tower while driving one of your vehicles?

15   A.   Yes.

16   Q.   Okay.  As a result of that what happens?

17   A.   You stop.

18   Q.   Why?

19   A.   Safety measures.

20   Q.   Okay.  So is there a need to note when a steam

21   from a quench is evident while you're driving?

22   A.   Yes.

23   Q.   Okay.  So do you have to note which tower is

24   being used while you're driving?

25        THE COURT:  Sustained.

1    BY MR. PIAGGIONE:

2    Q.   What happens when you get in -- when you are in

3    your truck and a quench steam hits the truck?

4    A.   The windshield gets vapor on it.

5    Q.   Okay.  What do you mean by vapor?  Can you

6    describe it, please?

7    A.   It's kind of like being in a steam bath.

8    Q.   Is there anything on the windshield at all

9    besides steam?

10   A.   Yes.

11   Q.   What?

12   A.   Little black specks.

13   Q.   Okay.  What do you do, if anything, to remove

14   the spots from the windshield?

15   A.   Turn the windshield wipers on.

16   Q.   Did there come a time that you operated an end

17   loader?

18   A.   Yes.

19   Q.   When was that?

20   A.   That was the job that I took -- I bid after I

21   was a yard runner.

22   Q.   Okay.  Can we get -- how long were you a yard

23   runner?

24   A.   Approximately a year and a half.

25   Q.   And so what year are we talking about when you

1    became an end loader?

2    A.   Roughly 2005.

3    Q.   Okay.  Was one of your duties to empty the coal

4    tar box?

5    A.   Yes.

6    Q.   And how often did you empty it?

7    A.   Was a regular practice.

8    Q.   Okay.  Was it daily?

9    A.   Yes.

10   Q.   Okay.  And where did you bring it?

11   A.   To the pad in the coal field.

12   Q.   Okay.  And was this -- which shift were you on

13   when you were doing this?

14   A.   I worked 4-to-12s and the midnight shift.

15   Q.   Okay.  So during the night shift did you ever

16   bring it to the coal piles?

17   A.   No.

18   Q.   So the only place you brought it was where?

19   A.   To the pad.

20   Q.   Okay.  In the course of your employment did you

21   observe the coal tar bin emptied in the daytime?

22   A.   Yes.

23   Q.   Can you tell us where it was -- where it went

24   then?

25   A.   Coal piles.

1    Q.   Okay.  Was there any instructions given to you

2    to -- did you ever do it?

3    A.   Yes.

4    Q.   Okay.  And was this after the day -- working

5    the night shift?

6    A.   Could you repeat the question?

7    Q.   Sorry.  After you became a coal -- an end

8    loader at night on the night shift, did your job

9    change?  Did your job change after that?

10        Did you take another job after that?

11   A.   Yes.

12   Q.   What was that?

13   A.   Supervisor.

14   Q.   Where?

15   A.   Coke handling.

16   Q.   Okay.  As part of that, did you empty the coal

17   tar box?

18   A.   No, not as a supervisor.

19   Q.   Okay.  Did you empty the coal tar box as -- in

20   what position?  Besides end loader at night.

21   A.   Breeze crusher.

22   Q.   As breeze crusher, okay.  When did you become

23   the breeze crusher?

24   A.   Around the middle of 2004 to 2005.

25   Q.   And during that time did you empty the coal tar

1    box in the daytime?

2    A.   Yes.

3    Q.   Okay.  And where did you bring it?

4    A.   To the closest coal pile to the pad.

5    Q.   Okay.  And was there any instructions given to

6    you to mix the coal with the coal tar sludge?

7    A.   Yes.

8    Q.   Okay.  What did you do?  Did you mix it with

9    the coal?

10   A.   Yes.

11          THE COURT:  All right.  Hold on.  I mean,

12   you gave him two questions.  Try to get one

13   question that he can understand, please.

14          MR. PIAGGIONE:  Okay.  Can you tell us

15   where did you bring the coal tar from the coal tar

16   sludge box?

17          MR. LINSIN:  Objection, asked and

18   answered.

19          THE COURT:  Sustained.

20   BY MR. PIAGGIONE:

21   Q.   When you got to the coal pile with the coal tar

22   sludge from the coal tar box, what did you do, if

23   anything?

24   A.   Are you talking about day shift?

25   Q.   Day shift, yes.

1    A.   We would mix the tar in the pile closest to the

2    pad.

3    Q.   Okay.  Did you have any instructions given to

4    you to prevent the sludge from being mixed with the

5    coal on the coal tar -- on the coal pile?

6              MR. LINSIN:  Objection, your Honor.  I

7    simply do not understand that question.

8              MR. PIAGGIONE:  Was there instructions

9    given to you --

10             THE COURT:  Sustained.  Okay.  Give us a

11   setting, and then --

12             MR. PIAGGIONE:  Okay.  All right.

13   BY MR. PIAGGIONE:

14   Q.   Mr. Kambat, you testified day shift

15   between 2004 and 2005 you were bringing the coal

16   tar sludge from the coal tar box to the coal piles,

17   is that correct?

18   A.   Yes.

19   Q.   Okay.  Were you given any instructions how to

20   mix the coal tar sludge with the coal?

21   A.   No.

22   Q.   Okay.  Were you given any instructions to

23   prevent it from hitting the ground?

24   A.   No.

25   Q.   Were you given any instructions to not mix it

2176

1    in the rain?

2    A.   No.

3    Q.   Did you mix it in the rain?

4    A.   Me personally, no.

5    Q.   Did you observe it being mixed in the rain?

6    A.   Yeah.

7    Q.   When did you observe it being mixed in the

8    rain?

9    A.   When I worked on the trestle.

10   Q.   Okay.  When was that?

11   A.   2003.

12   Q.   Okay.  Now, were there -- when you mixed it --

13   when you mixed it on the coal pile, were there any

14   walls around the piles to prevent the material or

15   the rain from spreading the material out?

16          MR. PERSONIUS:  Again, your Honor, I

17   object.  He testified he did not mix it in the

18   rain.

19          MR. PIAGGIONE:  Excuse me, you're correct.

20   I'll restate the question.

21   BY MR. PIAGGIONE:

22   Q.   When you mixed the materials on the coal pile,

23   the coal tar sludge on the coal pile, were there

24   any walls around the pile to prevent the material

25   from spreading out?

2177

1    A.   Yes, there was one wall.

2    Q.   Okay.   Other than that one wall, was there

3    anything else?

4    A.   No.

5    Q.   Okay.   Did there come a time when you request

6    -- the wall was located where?

7    A.   Was the wall to the pad on the left-hand side

8    of the pile closest to the pad.

9    Q.   Okay.   Did there come a time that you

10   requested -- you were requested to mix the tar

11   sludge on the pad with the coal piles?

12   A.   Could you repeat the question?

13   Q.   Did there come a time that you were requested

14   to mix the tar sludge on the pad with the coal

15   pile?

16            MR. LINSIN:   Your Honor, I object.   Again,

17   I apologize.   I do not understand the question.

18            THE COURT:   All right.   Sustained.

19   BY MR. PIAGGIONE:

20   Q.   Okay.   Was there tar sludge on the pad that you

21   had in the coal field?

22   A.   Yes.

23   Q.   Did there come a time that you were requested

24   to take the coal tar sludge from the pad and mix it

25   with the coal pile?

2178

1    A.   Yes.

2    Q.   Okay.  And approximately when was this?

3    A.   2005.

4    Q.   Okay.  Was there anything -- did you do that?

5    A.   Repeat.

6    Q.   Did you do that?

7    A.   Yes.

8    Q.   Can you describe what you did?

9    A.   Went into the pad with the end loader, front

10   end loader, pulled the product that was on the pad

11   out of the pad, brought it to the pile which was

12   designated to me by my supervisor, spread it out.

13   It was run over by the bulldozer, and then we

14   pushed it up into the pile that we had set it in

15   front of.

16   Q.   Okay.  When you said you spread it out, where

17   did you spread it out?

18   A.   In the coal field.

19   Q.   Where on the coal field, on the ground?

20   A.   Yes.

21   Q.   Okay.  In front of the coal pile?

22   A.   Yes.

23   Q.   And then you and your supervisor did what?

24   A.   Ran over it with the bulldozer.

25   Q.   And then what did you to, if anything?

1    A.   Pushed it up into the coal pile that it was

2    closest to.

3    Q.   When it was spread out on the ground, was there

4    anything underneath it other than the ground that

5    was in the coal field?

6    A.   No.

7    Q.   Okay.  Was there anything on the sides of the

8    walls to prevent it from spreading out?

9    A.   No.

10   Q.   Okay.  Did you ever get any hazardous waste

11   training?

12   A.   No.

13   Q.   Okay.  Now, when you did this, when you had

14   performed this mixture, was there anything about

15   that incident that stayed in your mind?

16   A.   Yes.

17   Q.   What was that?

18   A.   I broke out in a rash on my arms.

19   Q.   Okay.  And what did you do about that?

20   A.   I asked the human resource and safety personnel

21   director, Ryan King, for an MSDS book.

22   Q.   Did you get one?

23   A.   No.

24   Q.   Were you given any other further explanation?

25   A.   No.

1    Q.   Okay.  Can you say for certainty that rash was

2    caused by anything you had to do with the coal tar

3    sludge?

4    A.   No.

5    Q.   Okay.  Were you ordered to mix more coal tar

6    sludge from the pad with the coal piles?

7    A.   Repeat.

8    Q.   Were you ordered to mix more coal tar sludge

9    from the pad with the coal piles?

10   A.   Yes.

11   Q.   Okay.  When was that?

12   A.   The next day.

13   Q.   Okay.  And what did you do, if anything?

14   A.   Refused.

15   Q.   Okay.  You worked in the coal piles between --

16   coke field, excuse me, between 2005 and 2009?

17       Have you worked out in the coal fields

18   between 2005 and 2009?

19   A.   Yes.

20   Q.   Okay.  And have you had opportunity to observe

21   mixtures of coal tar sludge with coal on coal piles

22   in the coal field during that period of time?

23   A.   Yes.

24   Q.   Okay.  Can you tell us how long you have

25   observed coal tar sludge and coal mixed in together

2181

1    before it was put into the process for the battery?

2    A.  Could you repeat that?

3    Q.  Okay.  How long would a mixture of coal tar

4    sludge and coal be on the ground before it was put

5    into the process?

6              MR. PERSONIUS:  Form.  I'm sorry, Judge,

7    form.

8              THE COURT:  Objection, form?

9              MR. PERSONIUS:  I'm sorry, Judge.  I'm so

10   sorry.  I'm thinking of a deposition.  I object.

11             THE COURT:  I know you're trying to move

12   things along, so you cut out half of the statement.

13   But sustained.

14             MR. PIAGGIONE:  Sustained?

15             THE COURT:  Sustained.

16   BY MR. PIAGGIONE:

17   Q.  Okay.  Have you had an opportunity to observe

18   the coal tar sludge in the coal in the coal fields

19   between 2005 and 2009?

20   A.  Yes.

21   Q.  Okay.  And have you observed how often the coal

22   tar mix is put back on to belts to go to the

23   battery?  Or put on belts to go to the battery?

24             MR. LINSIN:  Compound question.

25             MR. PIAGGIONE:  Withdrawn.  Withdrawn.

2182

1  BY MR. PIAGGIONE:

2  Q.  Have you observed the coal tar sludge -- how

3  long -- in making your observations of mixtures of

4  coal tar sludge and coal, how long has -- have you

5  observed that material stay there before it's put

6  into the process?

7            THE COURT:  All right.  Do you understand

8  the question?

9            THE WITNESS:  No.

10           THE COURT:  Okay.

11           MR. PIAGGIONE:  How long -- how soon after

12  the mixture is placed in the coal pile, the coal

13  tar sludge and the coal, before it is taken and put

14  into the process?

15           THE COURT:  I don't really know what

16  you're asking for.  Because you mix up the mixture,

17  coal tar sludge.  It's confusing.  Try it again.

18           MR. PIAGGIONE:  Okay.  The coal tar and

19  the coal, when they're mixed together, how long

20  does it take before it gets removed and put back

21  into the ovens?

22           THE COURT:  Are you talking about now or

23  when?

24           MR. PIAGGIONE:  Originally we prefaced

25  this between 2005 and 2009, your Honor.

1          THE COURT:  Okay.  So, how long did it

2    take back then?

3          MR. PIAGGIONE:  Yes.

4          THE COURT:  Not how long does it take now,

5    so there's the distinction you're drawing, right?

6    Okay.  That's what was confusing, Mr. Piaggione,

7    because I didn't know --

8          MR. PIAGGIONE:  I apologize, your Honor.

9    That's my own fault.

10       Back in 2005-2009, did you -- how long did it

11   take for coal tar sludge and coal to be put back

12   through the process -- be brought to the ovens?

13         THE COURT:  What did you just say?  Again

14   you trail off.  You know, it's in part my hearing

15   probably, but I don't catch those little add-ons

16   that you --

17         MR. PIAGGIONE:  I apologize.

18         THE COURT:  Okay.  Give us a full

19   question, no add-ons.  No explanations during the

20   question, okay?  Please.

21         MR. PIAGGIONE:  Thank you, your Honor.

22   BY MR. PIAGGIONE:

23   Q.  With the mixture of coal and coal tar sludge,

24   you made observations of it after it was mixed?

25   A.  Yes.

1    Q.   Okay.  How long does it take to bring that coal

2    tar sludge mixture to the battery?

3              MR. LINSIN:  Objection, time frame.

4              THE COURT:  Yeah.  And you're using the

5    current, "how long does it take".  Is that what you

6    want to the witness to answer when you're

7    talking --

8              MR. PIAGGIONE:  You're right, your Honor.

9    I apologize --

10              THE COURT:  Wait.  Give me a chance

11    because, you know, we're not trying to cut you off

12    Mr. Piaggione, but the questions have to be clear

13    to the witness and the jury and everybody else in

14    order for it to work.  So just take your time.  I'd

15    rather have you take your time than go through all

16    of this back and forth.

17              MR. PIAGGIONE:  Thank you, your Honor.

18        In 2005-2009 how long did it take to bring the

19    coal tar sludge mixture to the battery?

20              THE COURT:  Can you answer that?

21              THE WITNESS:  I can't answer -- I can't

22    answer that.

23              MR. PIAGGIONE:  All right.  Did you make

24    observations as to how long the coal tar sludge

25    mixture stayed in the coal piles between 2005

1    and 2009?

2              MR. LINSIN:  Objection, asked and

3    answered.

4        Your Honor, if I understand the question, the

5    witness just said he can't answer that.

6              MR. PIAGGIONE:  Excuse me, your Honor.

7              THE COURT:  I don't know.  Can you answer

8    that question?  This is confusing, I understand.

9        Here's the problem, you did add an element

10   there.  You went from the pile to a place, so it

11   gave it some more definition.

12             THE WITNESS:  I can answer that.

13             THE COURT:  Well, we're not going to have

14   you answer it until he asks you another question,

15   okay?  All right.  So just hang in there.  It takes

16   a while to get a rhythm, so bear with us.

17             MR. PIAGGIONE:  How long did you see the

18   coal tar sludge and coal mixture stay on the coal

19   piles before being removed?

20             MR. LINSIN:  Objection.

21             THE COURT:  Sustained.

22             MR. PIAGGIONE:  How long have you seen the

23   coal tar coal pile -- how long have you seen the

24   coal tar sludge mixture with the coal stay in the

25   coal field?

1          MR. LINSIN:  Objection.

2          THE COURT:  Sustained.

3    BY MR. PIAGGIONE:

4    Q.   What happened to the coal tar sludge and coal

5    after you mixed it?

6    A.   It got put into the hopper and run up into coal

7    handling.

8    Q.   How long have you seen it stay on -- in the

9    coal field before it was put in the hopper?

10          MR. LINSIN:  Objection, time frame.

11          THE COURT:  Sustained.

12   BY MR. PIAGGIONE:

13   Q.   How long in 2005-2009 did you see it on the

14   ground before it was put in the hopper?

15   A.   Till the next day.

16   Q.   Okay.  Have you ever seen it stay longer?

17   A.   Yes.

18   Q.   How long have you seen it stay?

19   A.   Till the pile was gone.

20   Q.   And how long would that take?

21   A.   I'd be guessing.

22   Q.   Okay.  Have you ever seen it stay there for a

23   month?

24          MR. LINSIN:  Objection, leading.

25          THE COURT:  Sustained.

1          MR. PERSONIUS:  And asked and answered.

2          MR. PIAGGIONE:  Before being placed in the

3     hopper, how -- what was the longest you've seen

4     that mixture stay on the ground between 2005

5     and 2009?

6          MR. LINSIN:  Objection.  The witness has

7     responded he would only be guessing, and the

8     question is now being posed again.

9          MR. PIAGGIONE:  I didn't ask that

10    question, your Honor.  I asked how long.  I didn't

11    ask --

12         THE COURT:  Well, I'm going to sustain the

13    objection, and I'll let you try again.

14         MR. PIAGGIONE:  All right.  How is this

15    material removed and placed in the hopper?

16         MR. LINSIN:  Your Honor, I'm not sure what

17    material we're talking about now.

18         MR. PIAGGIONE:  Okay.

19         THE COURT:  I'm not either, so that's an

20    objection.  Form of the question, sustained.

21    BY MR. PIAGGIONE:

22    Q.  The coal tar mixture back in 2005 and 2009,

23    between that period of time, how was that removed

24    and placed in the hopper?

25    A.  With an end loader.

1    Q.   Okay.  Did the end loader, when it did that,

2    take all the coal tar sludge that had been mixed

3    with the coal?

4              MR. LINSIN:  Objection, time frame.

5              THE COURT:  Form of the question.

6              MR. LINSIN:  And form of the question,

7    yes.

8              THE COURT:  Sustained.

9              MR. PIAGGIONE:  When you made that

10   observation back in 2005 -- between 2005 and 2009,

11   did the end loader remove all the coal tar sludge

12   and coal when it attempted to remove -- move that

13   pile to the hopper?

14             MR. LINSIN:  Objection, form of the

15   question.

16             THE COURT:  Sustained.

17             MR. PIAGGIONE:  When the material was

18   taken by the end loader --

19             THE COURT:  Well, you know you're going to

20   get an objection just the way you started.

21             MR. PIAGGIONE:  When the coal tar sludge

22   and coal, between 2005 and 2009, when it was

23   removed, how long -- when it was -- when the end

24   loader removed the coal tar and coal to the

25   hopper --

1           THE COURT:  Okay.  Hold on.  Let's take

2    five minutes.

3           MR. PIAGGIONE:  Okay.  Thank you.

4           THE COURT:  Okay.  Want to get up, go out

5    take five, come back.

6           (Jury excused from the courtroom.)

7           THE COURT:  If you want to step out and

8    we'll call you when we're ready.

9           (Witness left the courtroom.)

10          THE COURT:  Take time to get organized.

11   When you're ready, let us know.

12          MR. MANGO:  Absolutely.

13          THE COURT:  Thank you.

14          (Short recess was taken.)

15          (Jury not present in the courtroom.)

16          THE COURT:  Okay. Do we have any

17   preliminary matters?

18          MR. PERSONIUS:  I do, Judge.

19          THE COURT:  Yes.

20          MR. PERSONIUS:  The defense understands

21   how difficult this has been, but we have an

22   obligation to represent our client.

23          THE COURT:  One second.  Okay.

24          MR. PERSONIUS:  The request is this,

25   Judge.  This witness was asked a question which got

1    into the fact he had a rash.

2              THE COURT:  Yes.

3              MR. PERSONIUS:  The witness then testified

4    in further questioning that he couldn't say the

5    rash had anything to do with his work at Tonawanda

6    Coke.  Bringing out the fact this witness suffered

7    some type of rash, given the facts we're working

8    with here, our application is that the jury be

9    instructed that question and answer is stricken,

10   and they're not to consider it.  It just shouldn't

11   -- it shouldn't have been asked.

12             THE COURT:  Okay.  I'll consider that.  I

13   think that's appropriate.

14             MR. PERSONIUS:  Thank you, Judge.

15             THE COURT:  Okay.

16             MR. PIAGGIONE:  Could I be heard on that,

17   your Honor?

18             THE COURT:  I'm sorry?

19             MR. PIAGGIONE:  Could I be heard on that,

20   your Honor?

21             THE COURT:  No.  I think that's fair given

22   the questions and answers relating to that

23   condition, so --

24        Is there anything else, Mr. Piaggione?

25             MR. PIAGGIONE:  No, your Honor.  I

1    believe --

2              THE COURT:  Do me favor, take your hands

3    out of your pocket.

4              MR. PIAGGIONE:  Sorry.

5              THE COURT:  I only say that for your

6    benefit, because it doesn't look good in front of

7    the jury, and it's -- it's really a little bit

8    unprofessional, in my judgment.

9              MR. PIAGGIONE:  I ask for your -- I

10   apologize, your Honor.

11             THE COURT:  Okay.  Are you more

12   comfortable?  Because sometimes it just takes a

13   while.

14             MR. PIAGGIONE:  I believe I'm okay, your

15   Honor.

16             THE COURT:  Okay.  Well, you know what's

17   going on.  I was just going to say don't interrupt

18   yourself in the questioning.

19             MR. PIAGGIONE:  All right.

20             THE COURT:  That's a good part of the

21   problem, and just keep focused in the here and now

22   versus a time period, and I think we'll get through

23   it.

24             MR. PIAGGIONE:  Yes.  I see the witness

25   struggling, and I'm trying to help him.

1          THE COURT:  Well, what you do is you cut

2     yourself off.  You start a question and then you

3     interject and you backtrack and you change

4     terminology, and then it's no good, frankly.  And I

5     think your mind is working ahead of what you're

6     speaking, and you never give a chance to -- a train

7     of focus to complete, and that's problematic.

8          So, I will continue to entertain objections and

9     I will rule appropriately if the questions just

10    don't work out.  But take your time.  I'll give you

11    whatever time you need.

12          MR. PIAGGIONE:  Okay, your Honor.

13          THE COURT:  Anything else?

14          MR. PIAGGIONE:  No, and I appreciate it,

15    your Honor.

16          MR. PERSONIUS:  Thank you, Judge.

17          THE COURT:  Mr. Kambat, please, if

18    you want to come back up.

19          (Jury seated.)

20          THE COURT:  How is our jury doing, okay?

21    Welcome back.  Please have a seat.

22          Okay.  We're all resumed.  The attorneys and

23    parties are back, present.  Our jury is here, roll

24    call waived.

25          Our witness is Jason Kambat, and he identified

1    himself as a supervisor I think with Tonawanda Coke

2    Corporation when he started his testimony.  He's

3    being examined by Mr. Rocky Piaggione.

4        And, Mr. Piaggione, you can resume direct

5    examination, please.

6              MR. PIAGGIONE:  Thank you, your Honor.

7              THE COURT:  You're welcome.

8    BY MR. PIAGGIONE:

9    Q.  After having a break -- now I don't want you to

10   guess.  Between 2005 and 2009 what is the longest

11   that you have observed the coal tar sludge mixture

12   remain in the coal field?

13   A.  Thirty days.

14   Q.  Okay.  With respect to when you took the coal

15   tar sludge from the coal tar box while working on

16   the night shift in 2005, how would you unload that

17   material into the pad?

18             MR. LINSIN:  Objection, form of the

19   question.

20             THE COURT:  Sustained.

21   BY MR. PIAGGIONE:

22   Q.  You testified that you brought the coal tar

23   from the coal tar box to the pad.  How -- can you

24   describe how that was done?

25   A.  You'd use the end loader to -- use the end

1    loader bucket to go into the tar box, scoop the tar

2    out of the coal tar box, curl your bucket back,

3    back up out of the tar box, and take the coal tar

4    to the pad which is located in the coal field.

5    Q.  Okay.  And after you deposited the material

6    from the end loader on to the pad, would all the

7    material -- would there be any material left on the

8    end loader bucket?

9          MR. LINSIN:  Objection, form of the

10   question.

11         THE COURT:  Sustained.

12      All right.  You know what you did there, you

13   put "materials" in there, and that confused the

14   question, among other things.

15         MR. PIAGGIONE:  Okay.  Sorry, your Honor.

16   BY MR. PIAGGIONE:

17   Q.  When you took the coal tar sludge to the coal

18   tar pad, you indicated that you put it on the -- on

19   the pad, is that correct?

20   A.  Yes.

21   Q.  Okay.  When you did that, did that remove all

22   the material from your bucket?

23   A.  No.

24   Q.  Okay.  What did you do, if anything, to remove

25   the remains of that coal tar sludge?

 1    A.  You would push up into the coal pile to clean

 2    your bucket.

 3    Q.  Okay.  And the coal tar mixture would remain in

 4    the coal pile?  After you were --

 5              MR. LINSIN:  Objection, leading.

 6              MR. PIAGGIONE:  Would that remove -- by

 7    putting it into the coal --

 8              THE COURT:  Let me rule on it first.

 9              MR. PIAGGIONE:  I'm sorry.

10              THE COURT:  I'll sustain the objection.

11    Let me rule, and then take your time and

12    reformulate.

13    BY MR. PIAGGIONE:

14    Q.  It's only one more question.  When you put the

15    end loader into the coal pile after -- after

16    depositing the coal tar sludge on the pad, what

17    would happen to the coal tar sludge that was on

18    your end loader?

19    A.  Could you repeat the question?

20    Q.  After you -- you said you would clean your end

21    loader by putting the coal tar -- by putting --

22              THE COURT:  All right.  Let's start all

23    over again.  You're leading, and there's going to

24    be two objections very shortly.  That's okay.  Just

25    take your time.  Just get it done.

1           MR. PIAGGIONE:  How did you clean the

2      end -- the bucket from your end loader after you

3      deposited the coal tar sludge on the pad?

4           MR. LINSIN:  Objection, asked and

5      answered.

6           THE COURT:  Well, I'm going to allow it

7      and we'll move forward.  Can you answer that

8      question?

9           THE WITNESS:  When you got to the pad, you

10     would dip your bucket into the pad, let everything

11     drip out of your bucket.  What was remaining you

12     would take your end loader and take your bucket

13     into the pile that was closest to the pad to clean

14     your bucket.

15          MR. PIAGGIONE:  Okay.  And what would

16     happen to the remains that was on your bucket?  Did

17     it stay on the coal pile?

18          MR. LINSIN:  Objection, foundation.

19          THE COURT:  Do you know what he's

20     referring to?

21          THE WITNESS:  Yes.

22          THE COURT:  You do.  Can you answer that

23     question?  You want it repeated?

24          THE WITNESS:  Yes.

25          THE COURT:  Okay.  Let's try repeating the

1      question, please.

2    BY MR. PIAGGIONE:

3      Q.  When you put your bucket into the coal pile to

4      clean it, what happened to the remains of the coal

5      tar sludge?

6      A.  Was left in the pile.

7              MR. PIAGGIONE:  Okay.  No further

8      questions, your Honor.

9              THE COURT:  Okay, Mr. Piaggione, thank

10     you.  Mr. Linsin.

11             MR. LINSIN:  Thank you, your Honor.

12    CROSS-EXAMINATION BY MR. LINSIN:

13     Q.  Good afternoon, Mr. Kambat.

14     A.  Good afternoon.

15     Q.  My name is Greg Linsin.  I represent the

16     Tonawanda Coke Corporation.  Let's start out by

17     going back to when you first became employed at

18     Tonawanda Coke, okay?

19         When did you first say you became employed

20     there?

21     A.  January 7th, 2003.

22     Q.  And what was your first job as of January

23     of 2003?

24     A.  Laborer.

25     Q.  And as a laborer, what type of work did you do?

2198

1    A.   A lot of shoveling.

2    Q.   And in what departments of the company did you

3    do this work?

4    A.   Coal handling and coke handling.

5    Q.   And how long did you work as a laborer?

6    A.   Roughly six months.

7    Q.   So that about July 2003 you took a different

8    position?

9    A.   Was a little bit before that.

10   Q.   All right.  June 2003?

11   A.   I think it was -- I think it was in May.

12   Q.   All right.  May 2003.  What was your next

13   position?

14   A.   The trestle.

15   Q.   And would you describe please what that is?

16   What work you did and where you did it.

17   A.   It's running the locomotive and being the

18   conductor offloading the finished product of

19   railcars, transporting coal cars, moving product

20   around the plant.

21   Q.   All right.  So when you refer to a trestle,

22   what are you talking about?

23   A.   The trestle is where the old truck station is.

24   It would be on the east end of the coal handling

25   building.  And that's where the hopper is for

1   offloading the finished product, which is coke.

2   Q.   The coke, is that correct?

3   A.   Yes.

4           MR. LINSIN:  May I have just a moment to

5   retrieve an exhibit, your Honor?

6           THE COURT:  Certainly.

7           MR. LINSIN:  May I approach the witness,

8   your Honor?

9           THE COURT:  Yes.

10  BY MR. LINSIN:

11  Q.   Mr. Kambat, I'm going to show you a physical

12  exhibit that has been marked as Defendants' Exhibit

13  LLLL.

14  A.   Okay.

15  Q.   Can you identify what that is?

16  A.   Four-by-nine foundry coke.

17  Q.   And is that the primary product of the

18  Tonawanda Coke Corporation?

19  A.   Yes.

20          MR. LINSIN:  Your Honor, we move, as a

21  demonstrative exhibit, Defendant's Exhibit LLLL

22  into evidence.

23          MR. PIAGGIONE:  No objection, your Honor.

24          THE COURT:  Okay.  Mr. Personius, no

25  objection?

1          MR. PERSONIUS:  No objection.  Thank you,

2     Judge.

3          THE COURT:  Okay.  LLLL received, no

4     objection.

5               (Defendants' Exhibit LLLL was received

6               into evidence.)

7          MR. LINSIN:  May I publish it to the jury,

8     your Honor?

9          THE COURT:  Sure.

10    BY MR. LINSIN:

11    Q.  Now, in your work as -- when you said "running

12    the trestle", you would move and transport finished

13    coke product that had been produced from the ovens,

14    is that correct?

15    A.  Yes, sir.

16    Q.  And the locomotive you're referring to in this

17    work, that was not the hot car, correct?

18    A.  Correct.

19    Q.  So it's a different locomotive on the plant,

20    right?

21    A.  Correct.

22    Q.  Now, how long did you run the trestle?  You

23    said you started that in May of 2003.  How long did

24    you do that?

25    A.  Roughly 30 days.

2201

1    Q.  All right.  And after that did you have another

2    job?

3    A.  Yes, I became a yard runner.

4    Q.  I'm sorry?

5    A.  A yard runner.

6    Q.  A yard runner.  And is that the truck driving

7    operation you were describing?

8    A.  Correct.

9    Q.  All right.  This would be around June of

10   '03 you started driving the truck?

11   A.  Correct.

12   Q.  And what were you driving the truck for?

13   What -- what purpose were you driving a truck

14   around the plant?

15   A.  Either transporting product or loading the

16   trailers for Ausmus.

17   Q.  And Ausmus is a trucking concern, is that

18   right?

19   A.  It's a trucking company, yes.

20   Q.  And what type of truck were you driving?

21   A.  Tractor trailer.

22   Q.  And how long did you drive one of those tractor

23   trailers?

24   A.  About a year and a half.

25   Q.  All right.  So in to the end of 2004, is that

1    correct?

2    A.   Approximately.

3    Q.   All right.  And after that, did you have a

4    different job?

5    A.   Yes.

6    Q.   What was your next job after a truck driver?

7    A.   Four-to-12 end loader operator.

8    Q.   And now the jury's heard testimony that these

9    front end loaders moved the coal tar sludge, but

10   they had other functions at the plant, didn't they?

11   A.   Yes.

12   Q.   What other kinds of things did a front end

13   loader operator use that equipment for?

14   A.   Cutting roads, cleaning track, transporting

15   track, helping the track gang lay track, tearing

16   out track, rescreening the finished product that

17   was laid out for us to put back through the system.

18   Q.   Would they be involved in moving the coal

19   itself?

20   A.   Yes.

21   Q.   All right.  Moving the coal from the coal piles

22   to the hopper, right?

23   A.   Yes.

24   Q.   And then moving the finished product to the

25   loading area, is that correct?

1    A.   Yes.  Also pushing up what coal was brought in

2    or dumped.

3    Q.   All right.  And how long did you work as a

4    front end loader operator?

5    A.   Four-to-12 end loader operator roughly 30 days.

6    Q.   All right.  So we're into early 2005, is that

7    right?

8    A.   Yes.

9    Q.   What was your next job?

10   A.   Breeze crusher operator.

11   Q.   How long did you do that job?

12   A.   Until I became a supervisor.

13           THE COURT:  That's coke breeze, is that

14   what you're referring to?

15           THE WITNESS:  Yes.

16   BY MR. LINSIN:

17   Q.   Would you describe what a -- first of all,

18   describe what coke breeze itself is.

19   A.   When the coke is run up from the wharfs on to

20   the belting system, it goes through a series of

21   shakers.  From them shakers we get what they call

22   raw breeze.  The raw breeze is transported to the

23   other side of the trestle via K belt.

24   Q.   So the breeze is little particles of the coke

25   after -- after it comes out of the oven, is that

2204

1  correct?

2  A.  Correct.

3  Q.  And that -- those small particles, the breeze,

4  the raw breeze, is then taken and processed by the

5  company, right?

6  A.  Correct.

7  Q.  And it's processed through a crusher, correct?

8  A.  Correct.

9  Q.  And when you said you were breeze crusher

10  operator, that's what you were talking about,

11  right?

12  A.  Yes, as well as you have to run the end loader.

13  Q.  And the finished breeze, the processed breeze

14  is then mixed back in with the coal before it is

15  charged back into the ovens, correct?

16  A.  Correct.

17  Q.  All right.  And how long did you work as a

18  breeze crusher operator?

19  A.  Until --

20  Q.  Until you became a supervisor.  I'm sorry, I

21  asked that one.  You became a supervisor, I'm

22  sorry, in 2006, is that right?

23  A.  It was 2006, 2007.  I'm not a hundred percent.

24  Q.  And what are you a supervisor of?  What do you

25  supervise?

1    A.   Now?

2    Q.   Yes, sir.

3    A.   Coal handling.

4    Q.   Well, in -- is that where you started out as a

5    supervisor?

6    A.   No.

7    Q.   What did you start out as a supervisor?

8    A.   Coke handling.

9    Q.   All right.  And you oversaw the workers in the

10   coke handling department, is that correct?

11   A.   Correct.

12   Q.   All right.  And then you moved -- was it next

13   to coal handling, or was there some intervening job

14   as a supervisor?

15   A.   I went to coal handling from coke handling.

16   Q.   Okay.  All right.  Now, we've run through this

17   list and as I had it down, I don't recall your

18   testifying now about having worked on the wharf.

19   When did that occur?  When did you work on the

20   wharf?

21   A.   When I was a laborer within the first four

22   weeks of being at Tonawanda Coke.

23   Q.   So the observations you made and testified to

24   on direct examination during the time you were on

25   the wharf were from a period back in 2003, is that

1    correct?

2    A.   Yes.

3    Q.   I see.  All right.  Now, each of these jobs

4    you've described has its own responsibilities and

5    requirements for you to perform that job, right?

6    A.   Correct.

7    Q.   And many of these positions involve the

8    operation of heavy equipment, correct?

9    A.   Correct.

10   Q.   Navigating them throughout the industrial

11   plant, correct?

12   A.   Correct.

13   Q.   So it's accurate to say, isn't it, that in

14   order to do the jobs you've just described, your

15   attention had to be focused on the responsibilities

16   that you had in each of those jobs at each of those

17   steps in your career at Tonawanda Coke, right?

18   A.   Correct.

19   Q.   Nobody asked you as a condition of your

20   employment when you came in to calculate the

21   percentage of usage of the two quench towers at

22   this facility, did they?

23   A.   No.

24   Q.   And as a matter of fact, you'd been interviewed

25   several times by the government officials before

```
1    coming in here to testify, correct?
2    A.  Correct.
3    Q.  And nobody asked you before today what that
4    percentage was, isn't that correct?
5    A.  Correct.
6    Q.  Your testimony is that -- if I heard you
7    correctly, that you recall that there was work
8    being done on each of these quench towers during
9    the 2005 to 2009 time period, correct?
10   A.  Correct.
11   Q.  And some of that work involved the replacement
12   of tracks for the -- that the quench car ran on,
13   correct?
14   A.  Correct.
15   Q.  Some of it involved the replacement of nozzles
16   inside the quench towers, correct?
17   A.  Correct.
18   Q.  And some of it also involved the construction
19   of a moat for a sump in one of the quench towers,
20   correct?
21   A.  Correct.
22   Q.  Now, do you know, Mr. Kambat, what I -- what --
23            MR. LINSIN:  Excuse me, your Honor, may
24   have just one moment please?
25            THE COURT:  Sure.
```

1    BY MR. LINSIN:

2    Q.   Do you know what I mean when I refer to the

3    term "a passthrough system" for the quench water?

4    A.   No.

5    Q.   Do you know whether one of the two quench

6    towers at the facility was -- during the 2005-2009

7    time period was changed from a passthrough system,

8    where the quench water was used only once, to a

9    recycling system, does that refresh your memory at

10   all?

11   A.   No.

12   Q.   The purpose of mixing the coal tar sludge with

13   the coal on the coal piles was so that that mixture

14   could then be recharged back into the ovens,

15   correct?

16   A.   Correct.

17   Q.   And that's what you understood when you went

18   out there to perform that mixing process, correct?

19   A.   Correct.

20   Q.   You were asked a number of questions by

21   Mr. Piaggione about whether the coal piles were on

22   the ground, do you recall those questions?

23   A.   Yes, sir.

24   Q.   Now, you're familiar with the coal field out at

25   Tonawanda Coke, right?

1    A.   Yes, sir.

2    Q.   The roadways in that coal field that the front

3    end loaders drive on, that the coal trucks drive

4    on, those roadways are actually composed of coal,

5    correct?

6    A.   Correct.

7    Q.   And have you ever had the occasion to determine

8    how deep that coal is throughout the coal field at

9    the plant?

10   A.   No.

11   Q.   Have you ever seen anyone excavate any area or

12   grade the coal field itself?

13   A.   Yes.

14   Q.   So that you would agree that there is a buildup

15   of coal throughout that coal field, is that

16   correct?

17   A.   Correct.

18   Q.   Because coal has been placed on that coal field

19   since this facility first started in operation?

20            MR. PIAGGIONE:   Objection, your Honor.

21   It's already now interjecting testimony -- facts

22   into the question that have not been discussed at

23   all.

24            THE COURT:   Well, if you reput the

25   question, please.

1            MR. LINSIN:  I will repeat the question,

2      your Honor.

3      BY MR. LINSIN:

4      Q.   When coal is brought to the Tonawanda Coke

5      facility, where is it dumped?  Raw coal.

6      A.   In the coal field.

7      Q.   And has that raw coal been dumped in that coal

8      field on a daily basis since the time you started

9      working there?

10     A.   Yes.

11     Q.   You were asked a number of questions on direct

12     examination regarding the length of time that this

13     mixture of coal tar sludge and coal might remain on

14     one of the piles in the coal field.  Do you recall

15     that series of questions?

16     A.   Yes.

17     Q.   Is it accurate to say, Mr. Kambat, the vast

18     majority of time that you observed this process,

19     the mixture of coal tar sludge and coal was taken

20     to the hopper to be transported up to the coal

21     handling building within 24 hours of the mixing?

22     A.   Correct.

23            MR. LINSIN:  I have nothing further, your

24     Honor.  Thank you.

25            THE COURT:  Okay, Mr. Linsin, thank you.

2211

1      Mr. Personius, anything?

2              MR. PERSONIUS:  Thank you, no, your Honor.

3              THE COURT:  All right.  Any redirect?

4              MR. PIAGGIONE:  Yes, your Honor.

5    REDIRECT EXAMINATION BY MR. PIAGGIONE:

6    Q.  Mr. Kambat, is it fair to say that when you

7    worked as a supervisor in the coal field, you had

8    an opportunity to observe the quench towers?

9    A.  Could you repeat the question?

10   Q.  Is it fair to say that when you worked as a

11   supervisor in the coal fields, you had an

12   opportunity to observe the quench towers?

13   A.  Correct.

14   Q.  Okay.  And how can you tell when a quench tower

15   was in use?

16   A.  The steam coming out of the top.

17   Q.  Okay.  And how frequently did you observe the

18   use of each quench tower based upon those

19   observations?

20   A.  They would normally alternate.

21   Q.  Okay.  And is it fair to say that by

22   alternating, the use was 50 percent each?

23   A.  Correct.

24              MR. PIAGGIONE:  Okay.  No further

25   questions, your Honor.

1          THE COURT:  Anything?

2          MR. LINSIN:  Just quickly, your Honor.

3          THE COURT:  Okay, Mr. Linsin, go ahead,

4    please.

5    RECROSS-EXAMINATION BY MR. LINSIN:

6    Q.  Did you keep any record of how often which

7    tower was used?

8    A.  No.

9    Q.  Isn't it accurate that you recall that quench

10   tower number 1, the west quench tower, the taller

11   one, was out of service for a significant period of

12   time during the 2005-2009 time frame?

13   A.  Would you repeat the question?

14   Q.  Isn't it true that quench tower number 1, the

15   west quench tower, was out of service entirely for

16   a significant period of time during the 2005-2009

17   time period?

18   A.  That is correct.

19   Q.  And you testified on direct that it may have

20   been up to a year, is that correct?

21   A.  Correct.

22   Q.  And it may have been longer, correct?

23   A.  Correct.

24   Q.  Do you know what year it was out of service?

25   A.  No, sir.

1    Q.   It could have been 2005, correct?

2    A.   Correct.

3    Q.   It could have been 2006, correct?

4    A.   Correct.

5    Q.   It could have been 2007, correct?

6    A.   Correct.

7    Q.   It could have been 2008, correct?

8    A.   Correct.

9    Q.   And 2009, correct?

10   A.   I don't believe it was 2009.

11   Q.   All right.

12         MR. LINSIN:  I have nothing further, your

13   Honor.  Thank you.

14         THE COURT:  Thank you.

15      Mr. Personius?

16         MR. PERSONIUS:  Sorry, Judge.  May I?

17         THE COURT:  Mr. Personius, sure.  Go

18   ahead, please.

19   RECROSS-EXAMINATION BY MR. PERSONIUS:

20   Q.   Good afternoon, Mr. Kambat.

21   A.   Good afternoon.

22   Q.   We haven't met.  I'm Rod Personius, and I

23   represent Mark Kamholz.  What I was discussing with

24   Mark, the one question I wanted to ask you, was

25   there a period of time while still working for

1    Tonawanda Coke that you were assigned over at

2    Bethlehem Steel?

3    A.   Yes, sir.

4    Q.   When was that?

5    A.   I'm still currently in charge of that

6    operation.

7    Q.   Over at Bethlehem?

8    A.   Yes.

9    Q.   Okay.  Are you there on a full-time basis now?

10   A.   I'm the guy that answers for that, yes.  Plus

11   I'm running -- helping out in coal handling too.

12   I'm a supervisor there.

13   Q.   "There" meaning?

14   A.   At Tonawanda Coke in the coal handling.

15   Q.   You're at both places?

16   A.   Yes, sir.

17   Q.   For what period of time have you been assigned

18   at least in part over in -- at Bethlehem Steel?

19   A.   Roughly two years and a month.

20   Q.   So it would go back to 2011?

21   A.   Yes, sir.

22   Q.   Okay.  That's when that started?

23   A.   Yes, sir.  I think -- I believe it was

24   March 8th of 2011.

25   Q.   And when you provide this testimony about your

1    observation of the use of the quench towers when

2    you were out in the coal field as a supervisor --

3    you understand what I'm talking about?

4    A.   Yes.

5    Q.   Okay.  You don't mean to suggest to us that you

6    would keep absolute track of which quench tower's

7    being used, do you?

8    A.   No, I do not keep track.

9    Q.   You had a lot of other things to do, right?

10   A.   Yes.

11   Q.   And when you tell us that it was 50/50, or they

12   alternated, that's just your sense based on when

13   you would notice?

14   A.   Yes.

15   Q.   Okay.  And that would just be occasional,

16   because you had all these other jobs to do, is that

17   fair?

18   A.   Correct.

19            MR. PERSONIUS:  I have nothing further,

20   Judge.

21            THE COURT:  Thank you.  Mr. Piaggione.

22   FURTHER REDIRECT EXAMINATION BY MR. PIAGGIONE:

23   Q.   Thank you.  You just testified about the

24   out-of-service of one of the quench towers, your

25   observations.  Did you observe that the number 2

1    quench tower, or the east tower, was also out of

2    service between 2005 and 2009?

3    A.   Yes.

4    Q.   Okay.  And do you recall the dates when number

5    2 was out of service?

6    A.   No.

7    Q.   When number 2 was out of service, would they

8    use number 1, do you remember, exclusively?

9    A.   Yes.

10   Q.   Do you recall if it was out of service in 2005?

11   A.   No.

12   Q.   Do you recall if it was in 2006?

13   A.   No.

14   Q.   Do you recall if it was in 2007?

15   A.   Yes, in 2007 they replaced the tracks.

16   Q.   Okay.  And while they replaced the tracks,

17   quench tower number 1 was used exclusively?

18   A.   Correct.

19   Q.   And how long of a period was that?

20   A.   I can't answer that.

21   Q.   Was it longer than a week?

22   A.   No.

23   Q.   Okay.  Was -- was the number 2 quench tower out

24   in 2008?  Can you say when it was out in 2008?

25   A.   No.

2217

1    Q.   2009?

2    A.   No.

3    Q.   Okay.  And do you recall -- excuse me.  Do you

4    recall --

5    A.   Judge, excuse me one second.  I'm not sure on

6    the years.  They're asking me to back track years,

7    and I'm not a hundred percent if 2009 was -- if it

8    was or wasn't out of service.

9              THE COURT:  Okay.  Let's --

10             THE WITNESS:  The years are blending.

11             THE COURT:  Okay.  So the years are

12   blending as far as 2008, 2009 is concerned.  You're

13   not --

14             THE WITNESS:  It's kind of foggy.

15             THE COURT:  Okay.  With that as the

16   background, you may continue.  Thank you.

17   BY MR. PIAGGIONE:

18   Q.   With respect to -- you indicated, I believe,

19   your memory as to quench tower number 1 when it was

20   out of service, do you know -- did you indicate it

21   was over a year?

22   A.   Yes, it was a long period of time.  I believe

23   it was over a year.

24   Q.   Okay.  And do you recall when the baffles were

25   put back in the east quench tower?

1   A.   I don't know the exact date.

2   Q.   Okay.  Do you remember what month it was?

3   A.   I know it was cold.

4   Q.   It was cold.  And what year was it?

5   A.   2009, 2010.

6           MR. PIAGGIONE:  Okay.  No further

7   questions, your Honor.

8           THE COURT:  Okay, Mr. Piaggione, thank

9   you.

10      Anything, Mr. Linsin?

11          MR. LINSIN:  No, thank you, your Honor.

12          THE COURT:  Mr. Personius?

13          MR. PERSONIUS:  No, your Honor, not for

14   the witness.  Just the application we made.

15          THE COURT:  Oh, thank you.

16          MR. PERSONIUS:  Please.

17          THE COURT:  Yes.  There was, ladies and

18   gentlemen, some testimony by Mr. Kambat that he had

19   a rash that developed I think early on in his

20   employment.  That's struck from the record.  That's

21   not anything for you to consider.  You may have

22   heard that, but if you recall, the follow-up

23   testimony is he doesn't know what to attribute that

24   to.  So because of that, that testimony about the

25   rash is not to be considered by you.  It's not

1    relevant evidence.  So when you work towards your

2    unanimous verdict, you are not to consider that

3    testimony at all.  Okay.  Thank you.

4        Okay.  You made it.  You're free to go.  All

5    right.  Thank you, Mr. Kambat.

6        Do we have another witness?

7            MR. PIAGGIONE:  Yes, your Honor, the

8    government would call Tom Corbett, C-O-R-B-E-T-T.

9            THE COURT:  Mr. Mango, are these add-on

10   witnesses to your list or not?

11           MR. MANGO:  No, your Honor.  It's Thomas

12   Corbett.  He's on our list.

13           (Discussion off the record.)

14           THE COURT:  Mr. Linsin?

15           MR. LINSIN:  Yes, your Honor.

16           THE COURT:  Can you take ownership of that

17   exhibit, please.

18           MR. LINSIN:  I'd be happy to.  Thank you.

19   T H O M A S   C O R B E T T, having been duly sworn

20   as a witness, testified as follows:

21           THE COURT:  Okay.  The witness stand is

22   all yours.

23           THE WITNESS:  Thank you.

24           THE COURT:  You're welcome.  Get

25   comfortable.  I'm going to have you move up towards

1    the microphone a little bit.  I think the angle is

2    good.  You don't have to be right on top of it,

3    because then it gets distorted, but I think you're

4    good.

5              THE WITNESS:  Is this fine?

6              THE COURT:  We'll try that.  Okay.  But

7    angle towards the jury a little bit, because you're

8    here to testify for their benefit.

9        A couple of very preliminary instructions.

10   What I'd like you to do is this.  If you don't

11   understand a question, just let the questioner

12   know, whether it's an attorney or me, and the

13   question will be repeated for you.  Don't answer a

14   question you don't understand.  Try to be concise.

15   Don't volunteer information.  That's generally when

16   things get a little bit complicated.  If you can

17   answer a question yes or no, and the question calls

18   for that, please try to do it.

19       If there's an objection, give me time to rule

20   on the objection, and then I will give you

21   instructions on whether to complete the answer or

22   to answer the question in the first instance or to

23   wait for further instructions.  Okay?

24             THE WITNESS:  Okay.

25             THE COURT:  All right.  Speak in a

1    conversational tone into the microphone.  State

2    your full name and spell your last name, please.

3              THE WITNESS:  My full name is Thomas

4    Corbett.

5              THE COURT:  Spell your last name.

6              THE WITNESS:  C-O-R-B-E-T-T.

7              THE COURT:  Okay.  Thank you very much.  I

8    think you'll carry well.

9         Mr. Piaggione, into the microphone, please.

10             MR. PIAGGIONE:  Yes, your Honor.

11   DIRECT EXAMINATION BY MR. PIAGGIONE:

12   Q.  Mr. Corbett, are you employed?

13   A.  I'm currently retired.

14   Q.  Okay.  How long have you been retired?

15   A.  Almost two and a half years.

16   Q.  Was there a time when you were employed by the

17   Department of Environmental Conservation?

18   A.  Yes.

19   Q.  When were you employed by the Department of

20   Environmental Conservation?

21   A.  I was employed with New York State DEC from

22   1980 to around 2010.

23   Q.  Okay.  So you refer to the DEC as the

24   Department of Enviromental Conservation?

25   A.  Yes.

1    Q.   Okay.  And what positions did you hold with the

2    DEC?

3    A.   I was -- I was a hazardous waste facility

4    monitor in two different positions from 1980 to

5    1997, and then I was an environmental chemist for

6    the remaining number of years until 2010.

7    Q.   Okay.  And please describe what your duties

8    were as the environmental monitor?

9    A.   As an environmental monitor I was stationed at

10   facilities that stored, treated, and disposed of

11   hazardous wastes, and my duties were to make sure

12   that they were in compliance with environmental

13   regulations.

14   Q.   And what were your duties as an environmental

15   chemist?

16   A.   My duties were basically the same duties except

17   I was doing the same kinds of inspections at not

18   only the treatment, storage, and disposal

19   facilities, but also at generator facilities, like

20   small businesses and large businesses that

21   generated hazardous wastes.

22   Q.   So did your duties include conducting

23   inspections at all?

24   A.   Yes.

25   Q.   All right.  And what were the inspections

1    related to?

2    A.   The inspections were related to the generation,

3    storage, treatment, and disposal of hazardous

4    waste.

5    Q.   Is there a law that overseas those activities?

6    A.   Yes, there is.

7    Q.   What's that called?

8    A.   That's RCRA.  It's an acronym name for Resource

9    Conservation and Recovery Act.

10   Q.   So would it be fair to say you were a RCRA

11   inspector?

12   A.   Yes.

13   Q.   Okay.  Is there a way of becoming a certified

14   RCRA inspector?

15   A.   Yes, there is.  There's training involved.

16   There is a week-long training called HAZWOPER

17   training, which is hazardous waste operations

18   training.  And then there's additional training

19   to -- to become familiar with the regulations and

20   how they apply to the various generators, treaters,

21   and disposers.

22   Q.   And is there a certification that goes with

23   being a RCRA inspector?

24   A.   Yes, there is.

25   Q.   Okay.  And what is that?

2224

1    A.  Well, it's -- it's a certification from the

2    department that you completed all the training and

3    that -- and that your work has been looked at by

4    other inspectors and you've passed muster, that

5    you -- you can do inspections properly.

6    Q.  And did you become a certified RCRA inspector?

7    A.  I did.

8    Q.  Okay.  Approximately when was that?

9    A.  Approximately 1984, '85.  Somewhere in that

10   range.

11   Q.  Okay.  And in the course of your duties at DEC,

12   how many RCRA inspections did you conduct?

13   A.  Well over 500 in my career from 1985 to 2010.

14   Q.  Now, have you ever heard the expression "small

15   quantity generator" before?

16   A.  Yes, I have.

17   Q.  What is a small quantity generator?

18   A.  Small quantity generator is one that generates

19   small quantities of hazardous wastes, less than a

20   certain threshold of waste.

21   Q.  Okay.  And are small quantity generators

22   subject to RCRA inspection in New York?

23   A.  Yes, they are.

24   Q.  Okay.  And did you conduct inspections of small

25   quantity generators?

1    A.   I did.

2    Q.   Okay.  Now, what is the difference between a

3    RCRA -- excuse me.

4         What is a large quantity generator?

5    A.   Is one that generates quite a bit more waste

6    than a small quantity generator.  You know,

7    typically ten times the amount as a small quantity

8    generator or more.

9    Q.   All right.  Have you conducted inspections of

10   large quantity generators?

11   A.   Yes, I have.

12   Q.   All right.  What is the difference between a

13   RCRA inspection for a large quantity generator as

14   opposed to a small quantity generator, if any?

15   A.   There's quite a bit more involved in -- in a --

16   in the checklist of items that need to be looked at

17   at the different generator sizes.  There is

18   typically about ten times the amount of paperwork

19   involved in -- in -- ten times the number of

20   questions to be asked of a large quantity generator

21   as opposed to a small quantity generator.

22   Q.   All right.  Did there come a time that you did

23   an inspection or rather -- withdrawn.

24        Did there come a time in the course of your

25   duties that you went to Tonawanda Coke Corporation?

1    A.   Yes.

2    Q.   All right.   When was the first time?

3    A.   First time was September 6, 2007.

4    Q.   Okay.   And was Tonawanda Coke Corporation

5    identified as a large quantity generator or a small

6    quantity generator?

7    A.   They were identified from previous inspections

8    as a small quantity generator.

9    Q.   Okay.   Now, what were the circumstances under

10   which you went to Tonawanda Coke for the first

11   time?

12   A.   I was --

13           MR. PERSONIUS:   Excuse me, your Honor.   I

14   object and the -- the basis is part of it is

15   relevance, part of it is Rule 404(b).   I know it's

16   difficult to ferret that out, but --

17           THE COURT:   Well --

18           MR. LINSIN:   Your Honor, it may be

19   easier -- with apology, perhaps we shouldn't raise

20   this before the witness.   Didn't expect this to

21   arise.

22           THE COURT:   Let's do that.

23           (Side bar discussion held on the record.)

24           THE COURT:   Okay.   Mr. Personius.

25           MR. PERSONIUS:   Judge, the inspection that

1       Mr. Piaggione I think is getting into involved an

2       allegation with PCBs, and one of the government's

3       404(b) applications related to PCBs, and I don't

4       think PCBs have any place in this case.

5               THE COURT:  That is where you're going

6       with this?

7               MR. PIAGGIONE:  No.  Where I was going was

8       he also conducted an interview of the defendant at

9       that time.

10              THE COURT:  Mr. Kamholz?

11              MR. PIAGGIONE:  Mr. Kamholz, correct.

12        He was not going to testify about the details

13      of the PCB complaint.

14              THE COURT:  What -- what conversations

15      with Defendant Kamholz?

16              MR. PIAGGIONE:  He -- he went through the

17      information regarding what he did.  Basically went

18      through a -- a checklist as to the inspection --

19      what would normally be a small quantity generator

20      inspection, and he asked him questions about what

21      they did with their waste, et cetera.  He did not

22      get into -- we're -- I wasn't going to get into the

23      complaints.

24              THE COURT:  PCB.

25              MR. PERSONIUS:  Okay.

1            MR. PIAGGIONE:  What I could do is I could

2    modify the question to say, did you go there in

3    response to some complaint, as a result not talk --

4    did you have a conversation with Mr. Kamholz about

5    the process?

6            THE COURT:  Well, you're not going there

7    so --

8            MR. PIAGGIONE:  Right.  Did you --

9            THE COURT:  Okay.  So there won't be any

10   reference --

11           MR. PERSONIUS:  I just want to make sure.

12           THE COURT:  Mr. Linsin?

13           MR. LINSIN:  Your Honor, I don't doubt

14   counsel's representation.  My concern, as we've

15   said before about these issues, is that unless this

16   witness has been expressly cautioned not to use

17   that term, all he needs to do is make reference to

18   this one time, and the, you know, genie is out of

19   the bottle.

20           MR. PIAGGIONE:  He has been cautioned,

21   your Honor.  Whether or not, you know --

22           THE COURT:  All right.  I mean, you

23   represent that he's been cautioned.  We'll --

24           MR. PERSONIUS:  Okay.

25           THE COURT:  -- we'll proceed on that

1    basis.  You have to be very, very careful.

2              MR. PIAGGIONE:  Yes, your Honor.

3              MR. PERSONIUS:  Thank you, Judge.

4              THE COURT:  Okay.  Thank you.

5              (End of side bar discussion.)

6    BY MR. PIAGGIONE:

7    Q.  You indicated you went to Tonawanda Coke on

8    September 6, 2007?

9    A.  Yes.

10   Q.  Okay.  Can you describe what, if anything,

11   happened to gain access to the facility?

12   A.  Well, there's a gate at the facility that you

13   first have to drive up to and identify yourself,

14   which I did.  And they ask you why you're there,

15   and I said I was there to do a hazardous waste

16   inspection.  They admitted me through the gate, and

17   you drive up to what's a guard shack at the

18   facility, and you meet a facility representative

19   there.  And that's -- that's what I did.

20   Q.  And who was the person from the facility that

21   met you there?

22   A.  I met with Mark Kamholz.

23   Q.  Okay.  And what did the inspection consist of?

24   A.  Well, the -- the inspection consisted of an

25   interview with Mark Kamholz to determine where --

1    where and how hazardous wastes were managed at the

2    facility.

3    Q.   Okay.  And did -- did you at that time observe

4    the recycling process?

5    A.   Did I observe which recycling process?

6    Q.   Did he indicate there was a recycling occurring

7    at the site?

8    A.   Yes.

9    Q.   Did you observe that process?

10   A.   No, I did not.

11   Q.   Okay.  Is Mr. -- what was being recycled?

12   A.   Well, there were two recycling issues that I

13   was dealing with on that inspection.

14   Q.   I want you to talk about the K087 waste.

15   A.   All right.  K087 waste was being recycled at

16   the facility, and that's the only major waste

17   stream that Mr. Kamholz indicated was being

18   generated at the facility at the time.

19   Q.   Okay.  What is K087 waste?

20   A.   It is coal tar residue.

21   Q.   Okay.  And how did he describe the recycling

22   process?

23   A.   He -- he described it as -- as being where the

24   coal tar was reintroduced into the -- into the coke

25   ovens by putting it on coal that was going into the

1   ovens.

2   Q.  Okay.  Did he indicate where the coal tar was

3   being mixed with the coal at Tonawanda Coke

4   Corporation?

5   A.  No.  We didn't discuss that.

6   Q.  Okay.  Did you have an impression as to where

7   it was being --

8           MR. LINSIN:  Objection, your Honor.

9           THE WITNESS:  I --

10          THE COURT:  Wait.

11          MR. LINSIN:  Objection.

12          THE COURT:  There's an objection,

13   Mr. Corbett.

14          MR. LINSIN:  If there's a foundation as to

15   things he observed or things other people told him,

16   I will withdraw the objection.  But an impression

17   is just not a proper question.

18          THE COURT:  All right.  Against that

19   backdrop, start out again, please.

20   BY MR. PIAGGIONE:

21   Q.  Based upon your conversation with Mr. Kamholz,

22   where did you think the coal tar sludge was being

23   mixed with the coal?

24   A.  I thought it was being done in proximity to

25   wherever the coal tar was being generated, which

2232

1    was pretty much in the same proximity as the coke

2    ovens.

3    Q.   Okay.  And did you get the impression it was

4    being mixed on the ground?

5             MR. PERSONIUS:  Your Honor, object.

6    Object.  He has already described what he thought.

7    Now he's asking a leading question.

8             THE COURT:  It is a leading question.

9    I'll sustain the objection.

10       Move on, please.

11   BY MR. PIAGGIONE:

12   Q.   Based on your conversation, where was -- how

13   was the coal tar sludge and coal being mixed before

14   entering the battery?

15   A.   I -- I didn't have enough information to figure

16   that out.

17   Q.   As a result of your inspection with

18   Mr. Kamholz, did you find that Tonawanda Coke was

19   in compliance with RCRA regulations?

20             THE COURT:  Try that one again.

21   BY MR. PIAGGIONE:

22   Q.   RCRA regulations, okay.

23       After -- did you complete your inspection?

24   A.   I did complete the inspection.

25   Q.   And after your inspection, did you find that

1    Tonawanda Coke was in compliance with RCRA

2    regulations for its handling of K087 waste?

3    A.   Yes.

4    Q.   Okay.  Did there come a time that you returned

5    to Tonawanda Coke Corporation?

6    A.   Yes.  I returned in the following year.

7    July 31st in the following year, 2008.

8    Q.   Okay.  Was that an inspection?

9    A.   That was a follow-up inspection.

10   Q.   Okay.  We'll move on to when was the next time

11   you went to Tonawanda Coke Corporation.

12   A.   Next time I went to Tonawanda Coke was, let's

13   see, June 17th, 2009.

14   Q.   I want to go back to the July 31st, '08,

15   inspection.  Did you fill out an inspection form

16   for that visit as well?

17   A.   Yes, I did.

18   Q.   Okay.  Did you observe the recycling process

19   when you were there that time?

20   A.   No, I did not.

21   Q.   Did you follow the same entrance procedures to

22   get into Tonawanda Coke?

23   A.   Yes.  Although I met with a different

24   representative.

25   Q.   Okay.  And as a result of that particular visit

1    on July 31st of '08, did you find that Tonawanda

2    Coke was in compliance with the RCRA regulations

3    for its handling of its K087 waste?

4    A.   That inspection, as I said, being a follow-up,

5    I was not even concerned with that -- with that

6    recycling during that inspection.

7    Q.   Okay.  Now, going on to June 17th, '09.  You

8    indicated you -- you went back to Tonawanda Coke.

9    A.   Yes, I did.

10   Q.   Okay.  What were the circumstances under which

11   you went back to Tonawanda Coke in June of '09?

12   A.   There was some internal meetings at -- at New

13   York State DEC with other inspectors that had been

14   at that facility.  Namely, Cheryl Webster was in

15   the air division at the time.  I don't know if she

16   still is, but there was some question as to whether

17   or not the K087 was being properly handled, and I

18   was going to go out to find out more about it.

19   Q.   Okay.  So could you describe what happened when

20   you went to the -- excuse me.  Withdrawn.

21       Did you go there with anyone else?

22   A.   Yes, I did.  I went there with Lenny Grossman

23   of the EPA and Ellen Banner of the EPA.

24   Q.   Okay.  And can you describe what, if anything,

25   happened at that time?

1   A.   Well, again, we -- we all arrived at the gate

2   together, were admitted through the gate.  I met

3   with Mark Kamholz at the security shack and went to

4   his office to -- to talk about the K087 issue.

5   Q.   Okay.  And what did the inspection consist of

6   then?

7   A.   It was mostly an information-gathering session.

8   It was quite a bit of time just sitting in -- in

9   Mr. Kamholz's office discussing how wastes are

10  generated and managed at the facility.

11  Q.   Did you observe the recycling process at that

12  time?

13  A.   No, I did not observe it at that time.

14  Q.   Okay.  And I'd like to have for identification

15  Defendant's Exhibit K.

16       And I'd ask if you could take a look at that on

17  the screen, Mr. Corbett.

18       If we could scroll through that slowly.

19  A.   This is the first inspection report from 2007.

20  Q.   Okay.

21            MR. LINSIN:  This is for identification,

22  your Honor?

23            THE COURT:  The exhibit is for

24  identification?

25            MR. LINSIN:  Yes.

1          MR. PIAGGIONE:  Yes.

2          MR. LINSIN:  Thank you.

3          MR. PIAGGIONE:  Take a look at that.

4          MR. LINSIN:  Your Honor, we would have no

5    objection to the admission of this document if

6    Mr. Piaggione intends to move it.

7          MR. PIAGGIONE:  I do, your Honor.  So if

8    Mr. Personius agrees -- stipulates, I would ask

9    that this document be moved into evidence.

10          MR. PERSONIUS:  We would like just a

11   minute, please, to review a hard copy of it.

12          THE COURT:  Certainly.

13          MR. PERSONIUS:  Thank you.

14       We object, your Honor, based on the discussion

15   we had up at the side bar.

16          THE COURT:  Okay.  On that basis, at least

17   at this point, I'll sustain the objection.

18          MR. PIAGGIONE:  One moment, your Honor.

19          THE COURT:  Sure.

20   BY MR. PIAGGIONE:

21   Q.  Now, getting back to the inspection of June of

22   '09, can you describe if you went outside

23   Mr. Kamholz's office as part of that inspection?

24   A.  Yes, we did.  After -- after a long

25   conversation, then we went out and looked at the

1     areas on the site where waste was managed.

2     Q.  Did you tell Mr. Kamholz he was in violation of

3     the law at that inspection?

4             MR. LINSIN:  Objection, your Honor.  I'm

5     not sure what areas the witness is testifying he

6     observed.  I think we need a clarification.

7             THE COURT:  No, I agree.  Sustained.

8     BY MR. PIAGGIONE:

9     Q.  Could you tell us where you went as part of the

10    inspection?

11    A.   We -- we started at the -- I believe we started

12    at the coal tar decanter, which is where the coal

13    tar ends up coming out of the process to see -- to

14    physically see the coal tar and -- and to get a

15    further explanation as to how it was then moved

16    into the recycling process.

17    Q.  Okay.  Where else did you go?

18    A.   We went out to the coal fields, and we also

19    went to some tanks that are adjacent to the -- to

20    the coal fields.

21    Q.  Did you take photographs when you were on this

22    inspection?

23    A.   Yes, we did.

24    Q.  Okay.

25            MR. PIAGGIONE:  Your Honor, I would ask

1    that we call up Government Exhibit 3.01, which is

2    already in evidence.

3              THE COURT:  Okay.

4    BY MR. PIAGGIONE:

5    Q.  Do you recognize that?

6    A.  Yes.  This is a -- this is a concrete pad that

7    was adjacent to the coal field.

8    Q.  Okay.  And what was on that pad, if you know?

9    A.  Well, it's an -- it's a combination of coal

10   tar, coal fines.  It looked like there was some

11   earth mixed in.  It was a bunch of different

12   things.

13   Q.  And you took that photograph?

14   A.  Yes, I did.

15   Q.  Okay.  Go on to Government Exhibit Number 3.02,

16   which is already in evidence, please.

17       Okay.  Can you tell us what that is?

18   A.  This is another vantage point looking at that

19   same pad.

20              THE COURT:  It's already up.

21   BY MR. PIAGGIONE:

22   Q.  Okay.  Was there any explanation as to what the

23   machinery next to it was?

24   A.  No.

25   Q.  And was there any indication that this was

1    where the coal tar sludge and the coal were being

2    mixed for recycling?

3    A.  No.

4    Q.  Okay.  We'll go on to 3.03, which is already in

5    evidence.  And --

6              THE COURT:  It's published.

7              MR. PIAGGIONE:  Thank you, your Honor.

8    BY MR. PIAGGIONE

9    Q.  Do you recognize that?

10   A.  Yes, I do.

11   Q.  And what is that?

12   A.  It's yet another viewpoint of the same pad.

13   Q.  Okay.  And we'll go on to Government Exhibit

14   Number 3.04, which is also in evidence.

15        Is it published?  Yes.

16        Okay.  And what is that?

17   A.  Now, this is a different location probably 100

18   yards away from that pad to the -- to the north.

19   It's what are called the Barrett tanks.  We found

20   out to be that was their name, the Barrett tanks.

21   And it's tanks that formerly held coal tar and coal

22   tar products that -- that had been involved in a

23   fire.

24   Q.  And was there any observations that you made as

25   to whether or not the coal tar that was in the

2240

1    tanks had leaked out of the tanks?

2    A.   Yes.   This picture actually shows that.

3    Q.   Okay.   Can you point out where on this picture

4    it shows that?

5              THE COURT:   Just tap the screen with your

6    finger with authority and you'll get an area.

7    That's it.   Thank you.

8    BY MR. PIAGGIONE:

9    Q.   And did Mr. Kamholz indicate what was -- what,

10   if anything, was happening or being done to that

11   area?

12   A.   He said that there wasn't much going on there

13   right now, but that their plan was to -- to deal

14   with -- with the waste inside these cut-down tanks.

15   Q.   Okay.   Did he indicate how he was going to take

16   care of the waste inside the tanks?

17   A.   He said that the company planned on recycling

18   the material.

19   Q.   Did he indicate where they were going to

20   recycle the material?

21   A.   Back into the coke ovens.

22   Q.   Did he say where the mixing of that material

23   was going to occur?

24   A.   No.

25   Q.   Go on to Government Exhibit 3.05.

1        And what is that?

2    A.   This is -- this looks like a wider view of the

3    same tank.

4    Q.   Okay.  And was there -- is there evidence of a

5    material being leaked out in that picture?

6    A.   Yes.

7    Q.   Where would that be?

8            MR. LINSIN:  Your Honor, this is just

9    cumulative.  This is the exact same location of the

10   same tanks, just a wider frame.  And it's just a

11   waste of time.

12           THE COURT:  Okay.  Well, it is cumulative.

13   So, is there anything new?

14   BY MR. PIAGGIONE:

15   Q.   Is there anything different in this picture as

16   opposed to the other picture?

17   A.   No.

18   Q.   Okay.  Then we'll move on.

19       Can I have Government's 3.06?

20           THE COURT:  All right.  That's not

21   received, I don't think.

22           MR. PIAGGIONE:  For identification then.

23   BY MR. PIAGGIONE:

24   Q.   Can you identify that?

25   A.   Yes.

1    Q.   What is that?

2    A.   Again, these are what's collectively called the

3    Barrett tanks.   These are two tanks that haven't

4    been cut down, like the other one we saw was.   And

5    the material in the foreground is coal tar.

6    Q.   And is that a clear and accurate depiction of

7    what you observed in June of '09 during your

8    inspection?

9    A.   Yes.

10   Q.   Okay.

11          MR. PIAGGIONE:   We ask that this

12   photograph be introduced in evidence as Government

13   Exhibit 3.06.

14          MR. LINSIN:   No objection, your Honor.

15          MR. PERSONIUS:   No objection, your Honor.

16          THE COURT:   All right.   Did you take this

17   photo, Mr. Corbett?

18          THE WITNESS:   Yes, I did.

19          THE COURT:   Okay.   Exhibit 3.06 will be

20   received, no objection, and can be published.

21          (Government's Exhibit 3.06 was received

22          into evidence.)

23          MR. PIAGGIONE:   Has it been published,

24   your Honor?

25          THE COURT:   Yes, it has been.

1          MR. PIAGGIONE:  Thank you.

2    BY MR. PIAGGIONE:

3    Q.  Mr. Corbett, can you indicate where in this

4    photograph you said there was coal tar sludge?

5    A.  Yes.

6    Q.  Will you point on the screen?

7         Did -- did anyone attempt to step in that

8    material?

9    A.  Not on this particular visit.

10   Q.  Okay.  On a subsequent visit?

11   A.  On a subsequent visit.

12   Q.  What date would that be?

13   A.  Pardon me?

14   Q.  What date would that be?

15   A.  That would be September 10th, 2009.

16   Q.  Okay.  And what happened when someone attempted

17   to step in that material?

18   A.  One of the samplers --

19         THE COURT:  Hold on for a second.  I lost

20   you.  All right.  Give us the question again.

21   Don't answer it.

22         THE WITNESS:  All right.

23         MR. PIAGGIONE:  What, if anything,

24   happened when a person stepped in that material in

25   September of '09?

1          MR. LINSIN:  Your Honor, I just object on

2     the ground of relevance.  I do not understand the

3     relevance of the question.

4          THE COURT:  All right.  What is the

5     relevance?

6          MR. PIAGGIONE:  Your Honor, the photograph

7     depicts what appears to be almost a solid surface,

8     and witness will testify from his observations

9     based upon --

10          THE COURT:  Okay.  All right.  Overruled.

11     I'll allow the question.

12          MR. PIAGGIONE:  Thank you, your Honor.

13     BY MR. PIAGGIONE:

14     Q.  When you observed someone step into that

15     material, what did you observe happen?

16     A.  It -- it was -- it was just a crust on top and

17     underneath was liquid coal tar.  It was like, you

18     know, falling into quicksand.

19     Q.  Okay.  Did that person need assistance to get

20     out?

21     A.  Yeah.

22          MR. PIAGGIONE:  We'll go on to -- has 3.07

23     been introduced into evidence yet?

24          THE COURT:  It's published.

25          MR. PIAGGIONE:  Okay.  Thank you, your

1    Honor.

2    BY MR. PIAGGIONE:

3    Q.   Mr. Corbett, do you -- can you recognize this

4    photograph?

5    A.   Yes, I do.

6    Q.   All right.  You took that photograph as well?

7    A.   I did.

8    Q.   Okay.  Can you describe what we're looking at

9    here?

10   A.   We're looking at another one of the -- one of

11   the two tanks that were cut down with cutting

12   torches, and we're seeing coal tar leaking out on

13   the outside of the tank.

14   Q.   Okay.  We will go on to Government

15   Exhibit 3.09, which I believe has also been

16   introduced into evidence.

17            THE COURT:  It's published.  Go ahead.

18   BY MR. PIAGGIONE:

19   Q.   All right.  Can you tell us what you're

20   observing here?

21   A.   Again, the dark black substance is a coal tar,

22   and it's -- this is on the outside of the tank.

23   Q.   Okay.  Go to Government Exhibit 3.11, please.

24            THE COURT:  All right.  Okay.  It's

25   published.

1    BY MR. PIAGGIONE:

2      Q.   Can you tell us what that is?

3      A.   This is the coal tar decanter.

4      Q.   Okay.  And what is significant about the coal

5      tar decanter?

6      A.   This is where coal tar is generated at the

7      facility coming out of their process.

8      Q.   Is this what you refer to as K087 waste?

9      A.   Yes.

10            THE COURT:  What are we referring to?  Put

11     an arrow on it, please.

12   BY MR. PIAGGIONE:

13     Q.   I'd like to show you for identification

14     purposes only 3.13, please.  Let's try 3.15.  Take

15     that down.

16        Now, was there any indication as to what was

17     going on with the coal tar sludge in the outside of

18     the tanks -- did you observe the outside --

19     withdrawn.

20            MR. LINSIN:  Objection.  Can we get

21     clarification on what tanks we're talking about?

22            THE COURT:  I don't think we have a

23     question, do we?

24            MR. PIAGGIONE:  No, we don't.

25   BY MR. PIAGGIONE:

1    Q.  With respect to the tanks that you -- that had

2    been -- the remnants of the tanks that you observed

3    in June of '09, was there material outside the

4    tanks that you observed?

5    A.  Yes, there was.

6    Q.  All right.  Did you have a discussion with

7    Mr. Kamholz about that material?

8    A.  Yes.  We wanted to know how -- how they were

9    going to clean it up.

10   Q.  Okay.  And did Mr. Kamholz indicate how they

11   were going to clean that material up?

12   A.  Again, I think I stated earlier that the

13   company's plans were to recycle the material into

14   the coke oven batteries.

15   Q.  Okay.  All right.  After that inspection, did

16   you engage in conversations with DEC officials

17   about the recycling of this material?

18   A.  Yes.

19   Q.  Okay.  And as a result of that, did you return

20   to Tonawanda Coke Corporation?

21   A.  Yes.

22   Q.  And when was that?

23        MR. LINSIN:  Can we get a time frame with

24   the inspection being referenced and the return?  I

25   just don't have a time frame as to when these

2248

1    events occurred.

2           THE COURT:  All right.  Yeah, there was

3    one question that related to the -- after the

4    inspection and then the return.  So those are

5    apparently two separate dates.

6           MR. PIAGGIONE:  My apologies, your Honor.

7    BY MR. PIAGGIONE:

8    Q.  After the June '09 inspection, did you ever

9    have conversations with officials at DEC?

10   A.  Yes.

11   Q.  And what were those discussions about?

12          THE COURT:  Give us a when first.

13   BY MR. PIAGGIONE:

14   Q.  Approximately, when was that?

15   A.  Shortly after the inspection.  Probably within

16   weeks of the inspection.

17   Q.  And this was in June of '09 that you had the

18   inspection?

19   A.  Yes.

20   Q.  So these discussions occurred in June of '09?

21   A.  Yes, they did.

22   Q.  Okay.  And what were those discussions about?

23   A.  They were about -- mostly about the bigger

24   issue that we saw as being these Barrett tanks with

25   the material on the ground and -- and how that was

1    going to be addressed.

2    Q.  Okay.  And what was the issue that you were

3    concerned about?

4    A.  Well, it was -- it was uncontained releases of

5    what we know as hazardous waste.

6    Q.  Why did you know it was hazardous waste?

7    A.  Well, Mr. Kamholz indicated it was K087 while

8    we were there.

9    Q.  So what, if anything, did you do?

10        MR. PERSONIUS:  Forgive me, Judge.  Before

11   we go to that, could we find out if the witness

12   knows who else was involved in these discussions,

13   please?

14   BY MR. PIAGGIONE:

15   Q.  Sure.  Who did you have these discussions with?

16   A.  They were with my direct superiors.

17   Q.  Can you give us the names of your direct --

18   A.  Jim Strickland.  There were Albany -- Albany

19   contacts.  There were EPA officials on conference

20   calls.

21   Q.  Do you recall any names of these officials?

22   A.  Well, Lenny Grossman and -- and his boss.  I

23   forget who his boss was at the time.  And I can't

24   remember exactly who in Albany, but there were

25   Albany DEC personnel also.

2250

1    Q.   So did there come a time that you returned to

2    Tonawanda Coke Corporation?

3    A.   After the September --

4    Q.   After the June inspection and your

5    conversations with these --

6    A.   Yes.  Yes.  There was a time.

7    Q.   Okay.

8    A.   It was in September, September of the same

9    year.  September 10th.

10   Q.   Okay.  Can you tell us what you did at that

11   time?

12   A.   At that time, again, I was returning to the

13   site with EPA personnel with the express idea of

14   sampling the material that was on the ground around

15   these Barrett tanks.

16   Q.   And what was the purpose of sampling?

17   A.   Well, it was -- it was -- it was twofold

18   actually.  It was, one, to determine if it was

19   indeed K087 by -- by doing sort of a fingerprint

20   analysis.  And then also to -- to make sure that

21   there wasn't any inadvertent mixing of other

22   hazardous wastes in with the material.

23   Q.   Okay.  As part of that inspection, then, did

24   you go out to where these dismantled tanks were?

25   A.   Yes, we did.

1    Q.   Okay.  Can you describe the area -- can you

2    describe that area at that time?

3    A.   Well, the area had changed in complexion from

4    the previous visit that we had at the facility in

5    that there were coke piles piled up very close in

6    proximity to -- to these tanks.  And there was also

7    a roadway built in between the two major tanks that

8    had been cut down.  Roadway built out of what

9    looked like coal fines and coal.

10   Q.   Okay.  Can we go to Government Exhibit 136.10,

11   which is already in evidence.

12       And I'll ask you, can you identify that?

13   A.   Yes, I can.  That's one of the cut-down Barrett

14   tanks and it's -- coal tar sludge is what we see

15   inside of it.  Coal tar and coal tar sludge.

16   Q.   Can we go to Government Exhibit 136.10, please.

17            THE COURT:  That's what we have up there

18   now.

19            MR. PIAGGIONE:  01, please.  136.01

20   please.

21   BY MR. PIAGGIONE:

22   Q.   And can you tell us what we're looking at here?

23   A.   Yes.  We're looking at -- at -- at the

24   cut-down -- one of the cut-down Barrett tanks with

25   this coal -- coal roadway that I was describing in

2252

1    the foreground.

2    Q.   Okay.  And 136 -- 136.02, please.

3         And that is?

4    A.   This is the other tank and -- with -- with the

5    two intact tanks behind it.  This is another

6    cut-down tank and in the foreground on the right is

7    the -- this roadway that I was describing that was

8    built between them.

9    Q.   Okay.  And could you put -- just tap where the

10   road was that you said was put in.

11        Thank you.

12        Based upon your observations, was there any

13   evidence of excavation in this area?

14   A.   Yes.  If you go back a couple pictures, I could

15   point that out.

16   Q.   Well, what I'll do is we're going to go to

17   Government's Exhibit 119.07 for identification

18   purposes.

19        Do you recognize that photograph?

20   A.   Yes, I do.

21   Q.   Okay.  And what does it depict?

22   A.   It depicts the -- one of the Barrett tanks

23   that's been cut down and shows evidence where a

24   machine has been in digging some of the coal tar

25   residue out.

1    Q.  And this is what you observed on September

2    10th, 2009, at the -- the dismantled tank area at

3    Tonawanda Coke Corporation?

4    A.  Yes.  This looks very different from -- from

5    what it looked like on the previous inspection.

6    Q.  And is that a fair and accurate depiction of

7    what you observed at that time?

8    A.  Yes, it is.

9         MR. PIAGGIONE:  Your Honor, I would ask

10   that this be introduced into evidence as

11   Government's Exhibit 119.07.

12        MR. LINSIN:  No objection, your Honor.

13        MR. PERSONIUS:  Just to clarify, Judge,

14   the photograph was taken at the September

15   inspection?  With that clarification, no objection.

16        THE COURT:  Okay.  119.07 received.  No

17   objection.  And may be published.

18        (Government's Exhibit 119.07 was received

19        into evidence.)

20        MR. PIAGGIONE:  Has it be published, your

21   Honor?

22        THE COURT:  It's published, yes.

23        MR. PIAGGIONE:  Thank you.

24   BY MR. PIAGGIONE:

25   Q.  Could you, please, on the screen tap where

 1    you're talking about excavation marks.

 2         Okay.  Did you have a conversation with

 3    Mr. Kamholz as to the excavation of this tank at

 4    that time in the field?

 5    A.  Yes, we did.

 6    Q.  Okay.  And can you tell us what that

 7    conversation consisted of?

 8    A.  Well, we -- we asked him, you know, what was

 9    going on with the material and how it was being

10    managed.  And his response was that -- that they

11    wanted to get at it and try and get it recycled so

12    it won't be exposed to the environment.

13    Q.  Did they tell you where it was being recycled?

14              MR. PERSONIUS:  Your Honor, could we have

15    an identification of who the "we" is or "they" --

16    They talked about more than one person -- please.

17              THE COURT:  Yes.

18              MR. PIAGGIONE:  Did Mr. Kamholz -- I'm

19    sorry, your Honor.

20              THE COURT:  Go ahead, Mr. Piaggione.

21    BY MR. PIAGGIONE:

22    Q.  Did Mr. Kamholz tell you where it was being

23    recycled?

24    A.  He told us it was being --

25    Q.  You're saying "us".  Did he tell you?

2255

1    A.  He told myself, and Lenny Grossman, and I

2    believe that's -- that's all that was -- were in

3    the conversation.

4    Q.  Okay.  So it was the three of you in

5    conversation?

6    A.  Yes.

7    Q.  Okay.  If you could, please state when you

8    heard, as opposed to what we or us heard, if that's

9    possible.

10   A.  What I heard was that the material was being

11   recycled by placing the material in the coal fields

12   to be mixed in with coal to go into the coke oven

13   batteries.

14   Q.  Okay.  Was that the first time that you had

15   heard that the material was being mixed into the

16   coal fields?

17   A.  No, it wasn't.  It was on the previous visit

18   Mr. Kamholz also stated that the recycling was

19   physically done in the coal field.

20   Q.  When you had that conversation back in June,

21   was there a question -- did he indicate that this

22   material -- did Mr. Kamholz indicate that this

23   material was being recycled in the --

24        MR. LINSIN:  Objection, leading, your

25   Honor.  You could simply ask what Mr. Kamholz said.

1          THE COURT:  I don't know what you're

2     referring to.  The arrowed material?  Is that what

3     you're saying?

4          MR. PIAGGIONE:  Yes.

5          THE COURT:  Clear the screen and ask the

6     question again, please.

7          MR. PIAGGIONE:  Okay.  Can we take the

8     screen down, please.

9          THE COURT:  I meant the arrows from the

10    screen.

11         MR. PIAGGIONE:  Oh.

12         THE COURT:  I'm sorry.

13         MR. PIAGGIONE:  It's okay.

14    BY MR. PIAGGIONE:

15    Q.  In June you had a conversation with Mr. Kamholz

16    regarding the recycling of the material that was --

17    recycling of the K087 waste?

18    A.  Yes.

19    Q.  And -- and what did he say to you and what did

20    you say to him at that time?

21    A.  What did he say to me and what did I -- both

22    ways?

23    Q.  Yes.

24    A.  Mr. Kamholz indicated that the K087 was mixed

25    with coal in the coal fields to the west of -- of

1      the pad that's in the coal field.

2      Q.   Okay.  And what did you say to him?

3      A.   I said nothing.

4      Q.   Okay.  With respect to the conversations that

5      you had after that -- after that inspection with

6      your superiors that you previously testified about,

7      was this issue of recycling on the coal fields

8      discussed?

9      A.   Yes, it was at length.

10     Q.   Okay.  And subsequently was it --

11          MR. LINSIN:  Your Honor, time frame for

12     this discussion.  Was this the same discussion that

13     was already testified about?

14          THE COURT:  Give us --

15          MR. PIAGGIONE:  I believe I identified it,

16     your Honor, as the conversation that he testified

17     about after the June inspection.

18          THE COURT:  After the June inspection?

19          MR. PIAGGIONE:  Right.

20          THE COURT:  Which is September?

21          MR. PIAGGIONE:  No.  It was several weeks

22     after the inspection.

23          THE COURT:  The end of June?  By the end

24     of June?

25          MR. PIAGGIONE:  Correct.

1            THE COURT:  Set it again.  Let's get rid
2      of this photo, please.  Thank you.
3    BY MR. PIAGGIONE:
4    Q.   Okay.  After the June inspection you testified
5      you had conversations with your superiors regarding
6      the June inspection, the information that you found
7      in your June inspection, is that correct?
8    A.   Yes.
9    Q.   Okay.  Was part of that conversation -- and if
10     we have a time frame, how soon after that June
11     inspection did these conversations take place?
12   A.   Within two or three weeks of -- of the
13     inspection.
14   Q.   All right.
15           THE COURT:  Is this something new?
16   Because we did go into this before.
17           MR. PIAGGIONE:  Correct, your Honor.  When
18   I asked the question did you also discuss this
19   issue about recycling, Mr. Linsin objected that he
20   didn't have a time frame.  So I'm going to that --
21   bring out that point.
22           THE COURT:  I mean, I know we had a
23   conversation.  We set a time period, and I think
24   Mr. Corbett said about three weeks or so after the
25   inspection.  Okay.  Ask a next question.  Let's see

 1    where we go.

 2    BY MR. PIAGGIONE:

 3    Q.   Okay.  During -- at the time of -- that you had

 4    these conversations in later June of '09, did you

 5    discuss the issue of recycling of the K087 waste on

 6    the coal piles at Tonawanda Coke?

 7    A.   Yes.

 8    Q.   All right.  And as a result of that

 9    conversation, was that one of the reasons why you

10    returned in September of 2009?

11    A.   Yes.

12    Q.   Okay.  At the -- during the 2009 inspection,

13    did you have conversations with Mr. Kamholz

14    regarding the recycling of the tar sludge and

15    material outside the tanks in the coal field?

16              MR. LINSIN:  Objection, your Honor.  Which

17    inspection in 2009?

18              THE COURT:  Are you talking about

19    September?  Are you talking about June?  Or that

20    intermittent discussion?

21              MR. PIAGGIONE:  I'm sorry, your Honor.  I

22    thought I had indicated.

23    BY MR. PIAGGIONE:

24    Q.   During your September 2009 inspection, did you

25    have conversations with Mr. Kamholz regarding the

1  recycling of the coal tar sludge that was in the

2  tanks and outside the tanks?

3  A.   Yes.

4  Q.   Okay.  Did he indicate where that material was

5  being recycled?

6  A.   I think we already went over this.  I said yes.

7  Q.   Okay.

8  A.   Yes, we did.

9  Q.   As a result of that, did you say anything to

10 him regarding this recycling -- where this

11 recycling was taking place?

12 A.   Well, this was the second visit, and

13 Mr. Kamholz was a little apprehensive about why we

14 were there sampling the material.  He asked me

15 directly why we were there trying to figure out --

16 what they were doing, and I said that it was

17 related to how they were physically recycling the

18 material.

19 Q.   Okay.  Did you indicate to them that there was

20 an issue regarding it being recycled out in the

21 coal fields?

22 A.   I did not.  I did not answer.  I did not talk

23 about that issue.

24 Q.   And why not?

25 A.   Because it was -- I was -- I was there as a

1    part of a team, and Mr. Grossman from EPA was kind

2    of leading the team.  And he -- he indicated to me

3    that he did not want to bring this up because we

4    were still gathering information, and I agreed with

5    that.

6           MR. PERSONIUS:  I'm sorry, who was it that

7    was saying this?

8           THE COURT:  Mr. Grossman, I think.

9           THE WITNESS:  Mr. Grossman, Lenny

10   Grossman, EPA.

11          MR. PERSONIUS:  Oh, thank you.

12   BY MR. PIAGGIONE:

13   Q.  Subsequently, was there a determination made as

14   to whether or not this was proper recycling of coal

15   tar sludge?

16   A.  Yeah.  I think after the September inspection

17   everyone agreed on EPA's side and DEC's side

18   that -- that it was not proper recycling method by

19   placing this coal tar directly on the coal fields.

20   Q.  And based upon --

21          MR. PERSONIUS:  Pardon me.  I'm sorry to

22   interrupt.  Could we have an identification who

23   everyone was, who agreed to this, please?

24          THE COURT:  Well, he said EPA and DEC.

25   You want more than that?

1          MR. PERSONIUS:  I would be interested in

2     knowing who was involved.  I can ask it on cross.

3          THE COURT:  You can.  Do you want to go

4     through that now, or do you want to wait?

5   BY MR. PIAGGIONE:

6   Q.  Do you remember the names of --

7   A.  Well, I don't remember Lenny Grossman's boss's

8   name, but I know it was his boss.  Lenny Grossman,

9   my boss Jim Strickland, and I forget who from our

10  DEC Albany central office that was involved, but

11  there were personnel there too that were all privy

12  to the conversation.

13  Q.  And what exactly was the problem with the

14  recycling process?

15  A.  Well, the guidance for recycling this material

16  specifically states that it cannot be done on the

17  ground.

18          MR. PIAGGIONE:  I have no further

19  questions, your Honor.

20       Well, one moment, your Honor, if I could.

21          THE COURT:  Certainly.

22          MR. PIAGGIONE:  Should we continue, your

23  Honor?

24          THE COURT:  You have more questions.

25          MR. PIAGGIONE:  I did.

1            THE COURT:  Okay.  Sure.

2     BY MR. PIAGGIONE:

3     Q.  Just a matter of clarification, when you were

4     discussing in June the issue of the K087 waste

5     being mixed out in the coal field, were you

6     referring to the K087 that was found in the tar

7     box?

8     A.  Yes, right.  In the coal -- the actively

9     generated material that comes out of the coal

10    decanter, the everyday process that generates the

11    waste at the site, it was that material that we

12    were talking about at that time.

13    Q.  Okay.  And you were not talking about the

14    material that was in the tanks?

15    A.  No, we were not talking about that material.

16    Q.  Okay.

17            MR. PIAGGIONE:  No further questions, your

18    Honor.

19            THE COURT:  Okay.  You probably did hear

20    that conversation I had with Michelle.  So, what

21    we're going to do is we're going to invite

22    Mr. Corbett to come back tomorrow morning.  So, we

23    will start tomorrow at 9:30, and we'd ask you to be

24    here again, Mr. Corbett.

25            THE WITNESS:  What time was that, Judge?

1              THE COURT:  9:30.

2              THE WITNESS:  9:30.

3              THE COURT:  We are going to recess for the

4    day.  Thank you for your attention.  I know we were

5    a little bit disjointed today, ladies and

6    gentlemen, but we did make progress.

7          Please keep your minds open.  Don't prejudge

8    the case.  I mean, your job is obviously to resolve

9    the fact issues, and we will get there.  And

10   ultimately you are to be fair to both sides against

11   the backdrop of whether the government to your

12   satisfaction unanimously -- and that requires an

13   application of your common sense, your experience,

14   and your intelligence to resolving the issues of

15   whether the government has established those

16   essential elements of each crime charged beyond a

17   reasonable doubt.  At all times, the presumption of

18   innocence, as you know, is, and remains, with the

19   defendants in this case, both defendants.  Please

20   don't do anything by way of separate investigation,

21   or don't access the Internet or any social networks

22   or anything like that.  You've heard me say that,

23   but it's very, very important because you know why.

24   What you need in totality will be given to you in

25   this courtroom, the four walls of the courtroom.

2265

1        Avoid anything else.

2            You've been terrific once again.  We really

3        appreciate it.  Thank you very much, and we'll see

4        you tomorrow at what time?

5                    THE JURY:  9:30.

6                    THE COURT:  Thank you.  Have a safe trip

7        back and forth.

8                    (Jury excused from the courtroom.)

9                    THE COURT:  Okay.  Mr. Corbett, you can

10       step down.  Thank you very much.  We'll see you

11       tomorrow.

12                   MR. LINSIN:  Thank you.

13                   THE COURT:  Okay.

14                   *      *      *      *      *      *

1                           CERTIFICATION

2

3              I certify that the foregoing is a

4       Correct transcription of the proceedings

5       Recorded by me in this matter.

6

7

8                           s/Michelle L. McLaughlin
                            Michelle L. McLaughlin, RPR
9                                Official Reporter
                               U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25