VOL. XI

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

          -vs-                  10-CR-219S
TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
               Defendants.
-------------------------------------

          Proceedings held before the

     Honorable William M. Skretny, U.S.

     Courthouse, 2 Niagara Circle, Buffalo,

     New York on March 13, 2013.


     APPEARANCES:

     AARON J. MANGO,
     Assistant United States Attorney,
     ROCKY PAIGGIONE, Senior Counsel,
     U.S. Department of Justice,
     Appearing for the United States.

     GREGORY F. LINSIN, ESQ.,
     JEANNE M. GRASSO, ESQ.,
     ARIEL S. GLASNER, ESQ.,
     Appearing for Tonawanda Coke Corporation.

     RODNEY PERSONIUS, ESQ.,
     Appearing for Mark L. Kamholz.

     Also Present:  Lauren DiFillipo, Paralegal
                      Sheila Henderson, Paralegal


     Michelle L. McLaughlin, RPR,
     Official Reporter,
     U.S.D.C. W.D.N.Y.
     (716)332-3560

2267

1                         I N D E X

2              WITNESS                          PAGE

3        THOMAS CORBETT
      Cross-Examination by Mr. Linsin           2270
4

5        DAVID A. DAHL
      Direct Examination by Mr. Mango           2336
6     Cross-Examination by Mr. Linsin           2360
      Cross-Examination by Mr. Personius        2369
7     Redirect Examination by Mr. Mango         2393

8        THOMAS CORBETT
      Continued Cross-Examination by Mr. Linsin  2398
9     Cross-Examination by Mr. Personius        2423
      Redirect Examination by Mr. Piaggione     2449
10    Recross-Examination by Mr. Linsin         2457
      Redirect Examination by Mr. Piaggione     2461
11

12       JOHN OHAR
      Direct Examination by Mr. Mango           2463
      Cross-Examination by Mr. Linsin           2467
13

14

      DEFENDANTS' EXHIBITS                       EVD.
15

16                    B                          2282
                      C                          2298
                      D                          2301
17            GGGG                               2304

18

      GOVERNMENT EXHIBITS                        EVD.
19

20            125.05                             2383

21

22

23

24

25

1          (Jury not present in the courtroom.)

2          THE COURT:  Good morning.  Please have a

3    seat.

4          MR. LINSIN:  Good morning, your Honor.

5          THE COURT:  Okay.  Ms. Labuzzetta, if you

6    would call the case, please.

7          THE CLERK:  Criminal case 10-219S, United

8    States of America versus Tonawanda Coke and Mark

9    Kamholz.

10          THE COURT:  Okay.  Good morning,

11    everybody.  The attorneys and parties are back,

12    present.

13       Are there any preliminary matters that we need

14    to address before we begin?

15          MR. PIAGGIONE:  No, your Honor.

16          MR. LINSIN:  None, your Honor.

17          MR. MANGO:  Your Honor, after Mr. Corbett,

18    I will have two stipulations to read into the

19    record.

20          THE COURT:  Okay.

21          MR. MANGO:  And just so the Court's not

22    taken off, one of the stipulations involves at the

23    end the parties agree that certain photographs are

24    admissible and can come into evidence.  I may ask

25    you ahead of time to move those into evidence so

1    that as I read the stipulations, those photographs

2    can come up on the screen.

3              MR. LINSIN:  No objection to that.

4              THE COURT:  That makes sense, if we

5    proceed in that fashion.  All right.

6              MR. MANGO:  Thank you, your Honor.

7              THE COURT:  Okay.  I think our jury is

8    here.  So if you would bring them in, please,

9    Chris.  And good morning.

10             COURT SECURITY OFFICER:  Good morning.

11             (Jury seated.)

12             THE COURT:  Good morning, ladies and

13   gentlemen.

14             THE JURY:  Good morning.

15             THE COURT:  You look ready to go today.

16   Please have a seat.  Keeping in mind that today is

17   3/13/13.  Yeah, to me, that means absolutely

18   nothing, but that's going to get us started.  It's

19   good to have everybody back.  And as you probably

20   recognize, Mr. Thomas Corbett is back on the

21   witness stand.  He remains under oath.  You know

22   everybody in the well area.  They are all here.

23   And you are here.  Roll call waived.

24        Please keep your minds open.  Government has

25   the burden of proof, as you know.  You've heard me

2270

1  mention that time and again.  And that's the way we

2  have to proceed.  And keep in mind that you will be

3  asked to resolve all of the fact issues in this

4  case because you are, in point of fact, the judges

5  of the facts.  And I know you've been very

6  attentive and very engaged, and on behalf of all of

7  us, thank you.

8      I think everybody is ready to get a start.

9      So Mr. Linsin, I think you're ready for

10  cross-examination.

11          MR. LINSIN:  Yes, thank you, your Honor.

12          THE COURT:  You're welcome.  Thank you.

13  T H O M A S   C O R B E T T, having previously been

14  duly sworn as a witness, testified further as

15  follows:

16  CROSS-EXAMINATION BY MR. LINSIN:

17  Q.  Good morning, Mr. Corbett.

18  A.  Good morning.

19  Q.  I don't believe we've met before.  My name is

20  Greg Linsin.  I represent Tonawanda Coke

21  Corporation.

22      You testified yesterday, sir, about your

23  background and experience regarding RCRA

24  inspections for the Department of -- Department of

25  Environmental Conservation, correct?

1    A.   Yes.

2    Q.   Let me first, before we begin, identify exactly

3    what office you work with within DEC.  What -- what

4    office are you a part of, or were you, I'm sorry,

5    before you retired?

6    A.   I was part of the -- of the division of solid

7    waste, which also has a subdivision of hazardous

8    waste.  I was in that hazardous waste unit.

9    Q.   So it was the Division of Solid and Hazardous

10   Waste and the Bureau of Hazardous Waste Operations,

11   is that correct?

12   A.   Correct.

13   Q.   All right.  And the 25 years you were with DEC,

14   you were in that bureau, is that correct?

15   A.   That's correct.

16   Q.   Now, you testified that you began work with DEC

17   in 1980, correct?

18   A.   1980, yes.

19   Q.   And that was the same year that the RCRA

20   statute was enacted, correct?

21   A.   Yes, that's when RCRA started.

22   Q.   All right.  And so from 1980 up until 2009, is

23   it accurate that in those 29 years there were a

24   number of amendments, additional regulations, and

25   changes over that time as the law developed?  Is

1    that correct?

2    A.   That's correct.

3    Q.   And is it accurate, as a general proposition,

4    Mr. Corbett, to say that one of the principle goals

5    of the Resource Conservation and Recovery Act was

6    to do what could be done to conserve resources, to

7    reuse resources, and where possible, to recycle

8    industrial resources so as to minimize the

9    generation of waste products?

10   A.   Yes, that's correct.

11   Q.   And there are quite a number of regulations

12   in -- that have been enacted under RCRA that relate

13   to those recycling and reuse purposes of the

14   statute, correct?

15   A.   Yes.

16   Q.   Now, let's also talk about a couple of general

17   concepts under RCRA.  There is, under RCRA, a

18   threshold issue before you determine regulatory

19   status of a particular material.

20        You have to determine whether it is a solid

21   waste, correct?

22   A.   Correct.

23   Q.   And if -- if it is not, as defined by the

24   regulations, a solid waste, then the other

25   regulations concerning solid waste or hazardous

1    waste don't apply, correct?

2    A.   Correct.

3    Q.   All right.  But if you determine that that

4    material is a solid waste, then you have some other

5    tests to evaluate whether that solid waste fits

6    within one of the definitions of a hazardous waste,

7    is that correct?

8    A.   That's correct.

9    Q.   And, again, in general terms, just so we lay

10   some groundwork here, for the purposes of hazardous

11   waste, is it fair to say that there are two general

12   types of hazardous wastes, both characteristic

13   hazardous waste and then listed hazardous waste?

14   Is that a fair summary?

15   A.   That's a fair summary.

16   Q.   And the characteristic hazardous wastes are

17   wastes that are determined to be hazardous because

18   of certain tested components within the wastes,

19   certain chemicals or components that EPA have

20   determined are considered hazardous, correct?

21   A.   Yes, that's correct.

22   Q.   And so classification as a characteristic

23   hazardous waste depends upon laboratory analysis of

24   certain materials, correct?

25   A.   Yes.

1    Q.  All right.  But then there is another category

2    you just testified about there being listed

3    hazardous wastes, correct?

4    A.  Correct.

5    Q.  And there are literally in the regulations

6    dozens, if not hundreds, of particular types of

7    listed materials that are -- that have been

8    determined by EPA to be appropriate to consider as

9    hazardous waste just given their sources, is that

10   correct?

11   A.  That's correct.

12   Q.  And one of these -- those lists generally begin

13   with a letter and then there's a number, correct?

14   A.  Correct.

15   Q.  And one of those items of listed hazardous

16   wastes are the K-listed wastes, correct?

17   A.  Correct.

18   Q.  But there are D-listed wastes and other types

19   of listed wastes for a variety of industrial

20   settings, correct?

21   A.  Correct.

22   Q.  Now, you testified a little bit -- and we'll

23   get to this a little bit later.  But you testified

24   yesterday about K087, correct?

25   A.  Yes, I did.

2275

1    Q.   And K087, in one of these lists, that is -- in

2    the regulation is specifically identified as

3    decanter tank tar sludge from coke operations,

4    correct?

5    A.   That's correct.

6    Q.   So this is a particularized number that relates

7    to the type of tar sludge that was generated in the

8    tar box that you testified to out at the Tonawanda

9    Coke facility, correct?

10   A.   Yes.

11   Q.   And EPA developed this based upon its study and

12   review of coking operations throughout the country,

13   correct?

14   A.   That's correct.

15   Q.   So when we talk about K087, it's listed in one

16   of those lists in the regulations, right?

17   A.   It is a listed waste, yes.

18   Q.   Okay.  Now, you testified yesterday that

19   initially you began working at -- I believe you

20   said TSD facilities, correct?

21   A.   Treatment, storage, and disposal facilities,

22   yes.

23   Q.   Would you like some water by the way?

24   A.   Probably.

25           MR. LINSIN:  May we, please --

1           THE COURT:  While we're doing all of that,

2      ladies and gentlemen, keep in mind when we are

3      talking about RCRA and the Resource Conservation

4      and Recovery Act, that this is what relates to

5      Counts 17 through 19 in the indictment.  Those are

6      the RCRA-related counts.

7    BY MR. LINSIN:

8      Q.  All right.  Would you explain, please, sir,

9      what a TSD or treatment, storage, and disposal

10     facility is?

11     A.  It's a facility that does just what the words

12     say, they either treat, store, or dispose of

13     hazardous waste.

14     Q.  Okay.  Those are, if not the three, at least

15     three of the critical verbs with respect to

16     hazardous wastes, correct?  Treatment -- to treat,

17     store, or dispose of hazardous waste, correct?

18     A.  Correct.

19     Q.  And -- and the hazardous waste regulations

20     govern how hazardous waste and under what

21     circumstances they can be treated, stored, or

22     disposed of, correct?

23     A.  Correct.

24     Q.  So these TSD facilities where you worked were

25     facilities specifically designed for managing

1    hazardous wastes, correct?

2    A.   That's correct.

3    Q.   But then after, I believe you said six years,

4    you began work as an environmental chemist and

5    started inspecting generation facilities, correct?

6    A.   Yes.

7    Q.   And these are facilities that actually create

8    materials that would be -- that fit within one of

9    these hazardous waste definitions as a part of

10   their industrial process, correct?

11   A.   That's correct.

12   Q.   And I believe you said -- you testified

13   yesterday that you had, between '85 and 2010,

14   conducted over 500 inspections at generator

15   facilities, correct?

16   A.   That was my estimate.

17   Q.   Okay.  Can you give some idea, sir, of what

18   types of facilities, during that time period, what

19   types of operations did you inspect for purposes of

20   RCRA compliance?

21   A.   Quite a few of the major chemical manufacturers

22   in Niagara Falls.  For instance, smaller

23   manufacturing facilities that did painting

24   operations and degreasing operations as part of

25   their normal course of business.  Electroplating

1    facilities.  Those are a few.

2    Q.  A wide range?

3    A.  Yes, a wide range.

4    Q.  Would that include both large quantity

5    generators and conditionally exempt small quantity

6    generators?

7    A.  Yes, it would.

8    Q.  All right.  And when we talked about the term

9    "conditionally exempt small quantity generators"

10   you testified yesterday that there are certain

11   volumetric or weight limitations.  Do you recall

12   what those are to qualify as a small quantity

13   generators?

14   A.  Less than -- less than 200 -- I think it was

15   220 pounds a month.  If you were under that

16   threshold, you would be conditionally exempt from

17   the regulations.

18   Q.  All right.

19   A.  And then 220 pounds a month up to 2200 pounds a

20   month would be a small quantity generator.  And

21   above that number would be a large quantity

22   generator.

23   Q.  And even small quantity generators are required

24   to report the types of wastes, the hazardous wastes

25   they generate and to register with EPA and receive

1    a generator ID number, correct?

2    A.   For that middle category, yes.  The -- the

3    small quantity generator, somewhere between

4    220 pounds a month up to 2200 pounds per month.

5    Q.   All right.  And --

6    A.   The conditionally exempt does not need an ID

7    number.

8    Q.   Okay.  And just so we can have this, you

9    testified that an inspection for large quantity

10   generator is a more complicated process involving a

11   lot more questions, and presumably -- how often

12   were you required to inspect large quantity

13   generators for RCRA compliance?

14   A.   As I -- I think it's already on the record.  I

15   said it was about 10 percent of the inspections I

16   did.

17   Q.   Oh, no.  I'm sorry, I wasn't clear.  With

18   regard to that 10 percent, how often did you get

19   out and inspect each of those large quantity

20   generators?  Was it on an annual basis?

21   A.   No.  It was not on an annual basis.

22   Q.   Do you recall what the time --

23   A.   You mean for each individual facility --

24   Q.   Yes.

25   A.   -- that was a large quantity generator?

1   Q.   Yes.

2   A.   No.  No, it wasn't done on an annual basis.

3   Q.   Do you recall how often you did it?

4   A.   Personally?

5   Q.   Yes, sir.

6   A.   At an individual facility?

7   Q.   Let's move on from this.  How often were small

8   quantity generators required to be inspected by the

9   Bureau of Hazardous Waste operation?

10  A.   I'm not clear on what you're asking me.

11  Q.   All right.  I'll try again.  I apologize.

12  Let's start it this way.

13       Under your protocols as a RCRA inspector, were

14  you required to inspect, or was your office

15  required to inspect, a small quantity generator

16  within a certain number of years?

17  A.   No.  There was no set period of time between

18  inspections.  It was based on personnel that were

19  available, how many inspections were -- had to be

20  done to meet a quota, and then figuring out --

21  trying to -- trying to spread it out so that you

22  did -- at least returned to a facility on a regular

23  basis.

24  Q.   Every several years or such?

25  A.   It could be up to five, seven, ten years.  It

2281

1    depends on the facility.

2    Q.  All right.  But there wasn't an annual

3    requirement?  There wasn't a five-year requirement?

4    You got there as often as you could?

5    A.  No, there was no specific requirement.

6    Q.  Okay.  Now, you testified yesterday, I believe,

7    that the first time you visited the Tonawanda Coke

8    facility was on September 6th of 2007, is that

9    correct?

10   A.  That's correct.

11   Q.  Now, before you visited that facility for the

12   first time, did you review your office's regulatory

13   file concerning that facility?

14   A.  Yes, I did.

15   Q.  All right.  And did you determine, first of

16   all, that the facility had, as early as 1986,

17   reported that it generated K087 waste to your

18   office and received an EPA generator ID number?

19   A.  Yes.

20   Q.  All right.  And did you review the records of a

21   RCRA compliance inspection for this facility

22   conducted by one of the colleagues in your office,

23   that occurred on February 17th, 1989?

24   A.  I inspected all the records.

25   Q.  All right.  May I please have Defendant's

1    Exhibit B for identification?

2        Please take a look at this first page, if you

3    would, Mr. Corbett.  Then we'll move on to the

4    second page.  Let's move on to the second page,

5    please.  Can we capture the entire page?

6                MR. PIAGGIONE:  If -- your Honor, if it's

7    helpful, we will stipulate to this being admitted

8    as an exhibit.

9                MR. LINSIN:  That would be helpful, your

10   Honor.

11               THE COURT:  All right.  B, Mr. Personius?

12               MR. PERSONIUS:  No objection.

13               THE COURT:  No objection, received.  And

14   it may be published.

15               (Defendants' Exhibit B was received into

16               evidence.)

17               MR. LINSIN:  All right.  Thank you, your

18   Honor.

19               THE COURT:  You're welcome.

20   BY MR. LINSIN:

21   Q.  Let's start with this page, which is actually

22   the second page of the exhibit.  We will come back

23   to the cover page.

24       What does this page reflect from your -- the

25   files of the Bureau of Hazardous Waste Operation?

1    A.   Looks like this page indicates that the

2    facility is a conditionally exempt small quantity

3    generator.   Although it doesn't say that on the

4    page, but the numbers indicate that.

5    Q.   And you are basing that on the kilograms of

6    waste that is either generated or -- and less than

7    100 kilograms being stored?

8    A.   Correct.

9              THE COURT:   Where is that located on the

10   form?   You want to tap it?

11             THE WITNESS:   It's where the check mark

12   is.

13   BY MR. LINSIN:

14   Q.   First --

15   A.   I hit the wrong spot there.

16   Q.   First of all, can we enlarge this portion of

17   the text?

18        So at the top of the page is the EPA generator

19   ID number we were just referencing, correct?

20   A.   Correct.

21   Q.   All right.   And this is a letter signed by a

22   Richard Baker, correct?

23   A.   That's correct.

24   Q.   And do you recall who he was?

25   A.   Oh, yes.   I worked with him for many years.

1    Q.  And what was his position in the Bureau of

2    Hazardous Waste?

3    A.  Oh, he was -- he was an engineer in the

4    hazardous waste division assigned to review

5    inspection reports.

6    Q.  And is it fair to say that this is a letter

7    that Mr. Baker sent after the inspection was

8    concluded, sent to Mr. Kamholz?

9    A.  Yes.

10   Q.  And what does -- you were testifying a moment

11   ago about a check mark or an X.  Would you locate

12   that on this screen?

13       Okay.  And it says -- the text actually says

14   small quantity generator.  But based on the volumes

15   and weights reported here, you believe that that

16   would be -- qualify as a conditionally exempt small

17   quantity generator, correct?

18   A.  Right.  The forms weren't that explicit back

19   then.

20   Q.  I understand.

21       Let's go on to the next page of the exhibit,

22   please.

23       And would you tell, first, generally, is this

24   the first page of the inspection form --

25   A.  Yes, this is the first page.

1    Q.  And just so we have a sense, is it -- does it

2    fit with your memory that the entire inspection

3    form -- and we're not going to go through every

4    page, but that entire inspection form is about 24

5    pages?  Does that fit with your memory?

6    A.  Sounds -- sounds correct.

7    Q.  All right.  So tell us -- if we can large the

8    central portion of the form, please.

9        Tell us what this information reflects or what

10   this form reflects regarding when the inspection

11   occurred, the personnel with whom the inspector

12   interacted.

13   A.  Well, want me to point these out on the form?

14   Q.  Yes.  To the extent you're making reference to

15   the text, tap the screen as you're talking about

16   it, please.

17   A.  How many of these items do you want me to

18   comment on?

19   Q.  Let's talk about -- who conducted the

20   inspection on behalf of the Bureau of Hazardous

21   Waste Operation?

22   A.   It's the bottom line here.  Raymond Fisher.

23   That's report -- I'm sorry.  Report prepared by Ray

24   Fisher.

25   Q.  And the inspector's name for the inspection,

1    the RCRA compliance inspection is right above that,

2    correct?

3    A.   Yes, that's correct.

4    Q.   And who was the facility contact?

5    A.   Is handler's signature of -- handler's contact

6    is Mark Kamholz.

7    Q.   Okay.  All right.  And his title reflected two

8    lines down.  What was his title at the time?

9    A.   Manager, environmental control.

10   Q.   All right.  And on that very next line, the

11   inspection date of February 17th, 1989, correct?

12   A.   Correct.

13   Q.   And it indicates that the inspection ran from

14   10:00 a.m. till noon, correct?

15   A.   That's correct.

16   Q.   All right.  May we have the next page, please?

17        Now, we're not going to run through all these,

18   but fair to say -- is it fair to say, Mr. Corbett,

19   that this is a table of contents of the various

20   sections and then appendices that are contained in

21   this overall inspection form?  Is that correct?

22   A.   It -- it shows the -- the possible items that

23   could be included in the inspection report.  Not

24   all of them are necessarily in there.

25   Q.   All right.  Now, I believe we may have this a

2287

1    little bit out of sequence, but let's go to the

2    second page of this, please.

3         Now, is this part 1 of the inspection form?

4    A.  Yes, it is.

5    Q.  All right.  And if tweak -- again, enlarge the

6    text.

7              MR. PERSONIUS:  Pardon me, your Honor.  I

8    don't mean to be a pain about this.  Should we note

9    the number of this page for the record?

10             THE COURT:  We should.  It was designated

11   1-1.  I didn't see a Bates number on it.  I don't

12   know if it's Bates numbered.  Is it?

13             MR. LINSIN:  Your Honor, this is Bates

14   numbered.  I think for ease of reference, and the

15   record will certainly reflect this -- Ms.

16   Henderson, if you could enlarge it again.  If we

17   can highlight the actual page that appears on the

18   document.  Yeah.  And I believe it is Part I,

19   page 1 as indicated at the bottom center of the

20   page.

21             THE COURT:  That's an I.  All right.

22   We'll do that.  We'll continue to reference it that

23   way.  Thank you, Mr. Personius.

24             MR. LINSIN:  Thank you.

25   BY MR. LINSIN:

2288

1    Q.  All right.  Is this the first page of Part I of

2    the inspection form?

3    A.  Yes, it is.

4    Q.  All right.  And in the center of the page --

5    well, first of all, if you could indicate what the

6    numbered sections under 1(a)(1) indicate.  One,

7    two, three, et cetera.  There is a check mark next

8    to company recognizes that its waste is hazardous

9    during the inspection.

10       What does that mean?

11   A.  That means that the company has determined on

12   its own that it generates hazardous wastes.

13   Q.  And what does item 2 indicate?

14   A.  That the company has notified EPA that it

15   generates hazardous waste by getting an ID number

16   and basically declaring what types of wastes it

17   generates.

18   Q.  And go down to item 5, please.  There is some

19   typed text there indicating that the hazardous

20   waste in question is one of these listed hazardous

21   wastes, correct?

22   A.  Correct.

23   Q.  And then there's some handwritten wording

24   there.  Would you read what that says, please?

25   A.  It says "K087 decanter tank tar sludge in

1    coking operations."

2    Q.   All right.  And so that would be the specific K

3    listed waste that is identified with this facility,

4    is that correct?

5    A.   That's correct.

6    Q.   And if we could then go to the preceding page

7    in the exhibit.  It is, for the record, I-3 in the

8    document itself.  And if we can enlarge all the

9    text and the page number.  Thank you.

10        Now this is a continuation of Part I of the

11   inspection form, is that right?  I'm sorry.  Part I

12   of the inspection form.

13   A.   That's correct.

14   Q.   Roman 1.  All right.  And there is a section

15   here where the inspector is called upon to describe

16   the activities that result in the generation of

17   hazardous waste, correct?

18   A.   Yes.

19   Q.   That's subpart E?

20   A.   Yes.

21   Q.   And Mr. Fisher has written this text in.  Are

22   you able to read that, sir?

23   A.   If I put my glasses on.

24   Q.   Would you, please, do so.  And just so we can

25   orient ourselves again, this is an inspection that

1    occurred --

2            THE COURT:  Ms. Henderson, the first part,

3    please.

4         I'm sorry.  Go ahead.

5            THE WITNESS:  Do you want me to read this?

6    BY MR. LINSIN:

7    Q.  Yes, please.  If you are able to.  If you're

8    not, let me -- let's see if -- we have to go -- we

9    have to go further to the margin, Sheila.  Thank

10   you.  Enlarge that section.

11   A.  I think I can read it from here.

12   Q.  All right.

13   A.  It says, "Tonawanda Coke Corporation produces

14   various grades of coke from bituminous coal in

15   gas-fired coke oven batteries.  It has (coal

16   roasting ovens.) K087 decanter tank tar sludges are

17   generated when these decanter tanks are cleaned to

18   remove the K087 sludges. No, underlined, K087 waste

19   are shipped off site for disposal."  Further goes

20   on to say, "All K087 sludges are mixed with

21   pulverized coal and fed into coke oven battery as

22   new material.  Thus, all K087 decanter tank tar

23   sludges are recycled in the coke oven battery

24   process."

25   BY MR. LINSIN:

1    Q.  All right.  That's enough.  This is part of the

2    information you had before you first visited this

3    facility, correct?

4    A.  That is correct.

5    Q.  And I hate to impose on you, but I must.  If I

6    could ask you to read subpart F as well.

7    A.  "Subpart F.  No hazardous waste is stored on

8    site.  K087 decanter tank tar sludges are removed

9    from each of the three decanter tanks at a rate of

10   approximately 1 ton per tank per year, varying up

11   to 4 tons of sludge per tank per year.  The K087

12   sludge being removed from one decanter tank during

13   tank cleaning procedures is premixed with raw

14   material, pulverized coal, wetted with

15   approximately three to four quarts of used oil per

16   ton of coal/sludge mixture, and fed as new material

17   through the coke oven battery."

18   Q.  Okay.  And this is, again, to orient ourselves,

19   the inspection that occurred by Mr. Fisher in

20   February of 1989, correct?  This is his report?

21   A.  That's correct.

22   Q.  And lastly, sir, if I could ask you please to

23   read subpart G.

24   A.  This is under the handler notified EPA as a --

25   and it says -- has generator, meaning large

1    quantity generator.  All K087 decanter tank tar

2    sludges are mixed with pulverized coal, new

3    material wetted with approximately three to

4    four tons of used oil and fed into coke oven

5    battery.  All K087 sludge is recycled into

6    process."

7    Q.  Now, if we may go to page Roman I-5, please.

8    A.  I'm continuing my narrative here?

9    Q.  I won't impose much more.

10        And enlarge this portion of the text, please.

11        Now, do you see this section that discusses

12   exemptions, correct?

13   A.  Correct.  This is -- this is the section on

14   exemptions.

15   Q.  And under generator exemption, the first box is

16   checked, correct?

17   A.  Yes, it is.

18   Q.  All right.  And that box indicates that this is

19   not a regulated handler.  Handler is the term used,

20   at least at that time, to identify the facility

21   that was generating the waste, correct?  When it

22   uses the word "handler".

23   A.  Let me read it.

24   Q.  Okay.

25   A.  It's a poorly worded checklist, and it's

1   changed over the years.  So, it is generally

2   talking about exemptions for -- various types of

3   exemptions that exist.

4   Q.  All right.  My particular question,

5   Mr. Corbett, at least on this subpart, was, when it

6   says not a regulated handler, the term "handler"

7   was used to reference the company that was being

8   inspected, correct?

9   A.  Correct.

10  Q.  All right.  Now, can you just read the text,

11  then, that is -- the handwritten text that is to

12  the left of this exemption box that has been

13  checked?

14  A.  It says, "All K087 sludges are recycled into

15  the process."

16  Q.  And that would be the explanation as to why

17  this generator, with regard to the K087 waste, was

18  exempt, correct?

19  A.  Correct.

20          THE COURT:  Let me ask you a question,

21  though, if I may.  On the prior page there was a

22  reference to generator and you made a point of

23  saying "large quantity generator."

24          THE WITNESS:  Yeah.

25          THE COURT:  All right.  But earlier, when

1    we were talking about Exhibit B, you referenced

2    language that read "small quantity generator

3    exemption".  Why did you characterize on the prior

4    page here that generator as small -- as large

5    quantity generator?

6              THE WITNESS:  Because when you notify EPA

7    that you are a generator, when you make the

8    notification to get an ID number for a facility,

9    you are stating that you're generating more than a

10   threshold quantity.

11             THE COURT:  So this is an upgrade, so to

12   speak, from what was referenced as the small

13   generator initially to now an acknowledgment that

14   we're dealing with a small -- or a large generator

15   capacity?

16             THE WITNESS:  In the initial notification

17   to EPA, when you tell them that you're generating a

18   waste, they don't -- they don't take into

19   consideration whether or not the waste is being

20   recycled under an exemption.  They just want to

21   know is it generated.  And that's why when you

22   notify as a generator, you -- the only way you can

23   get an ID number is to say I'm generating enough of

24   this waste that I need to notify you.

25             THE COURT:  That makes it a large quantity

1    generator?

2              THE WITNESS:  That makes it above that

3    large quantity threshold.

4              THE COURT:  Thank you.

5    BY MR. LINSIN:

6    Q.  But if we could go back, please, to the second

7    page of the exhibit, which was the letter.  Yes.

8         And there is no page number at the bottom, but

9    it is a letter from Mr. Baker to Mr. Kamholz, that

10   was sent following this February 17th, 1989,

11   inspection, correct?

12   A.  Correct.

13   Q.  And it clearly indicates in -- in the checked

14   portion, the middle portion of the letter, that the

15   Bureau of Hazardous Waste Operation determined that

16   the facility was actually a conditionally exempt

17   small quantity generator, is that correct?

18   A.  That is correct.

19   Q.  Now, if we could go to the first page of

20   this -- of Defendant's Exhibit B and enlarge the

21   text.

22        Now, this is an internal memorandum, correct,

23   within the Bureau of Hazardous Waste Operations?

24   A.  That's correct.

25   Q.  What is the purpose of this internal

1    memorandum?

2    A.   Let's see.  It's to notify the central office

3    of the compliance status of the facility.

4    Q.   And is it accurate that this notification

5    confirms that a compliance inspection was performed

6    on February 17th, 1989, by Mr. Ray Fisher, that no

7    violations were noted during the course of that

8    inspection, no violations of the RCRA statute or

9    its regulations were noted, and that a copy of that

10   report that we've just been discussing had been

11   sent to the facility?  Is that correct?

12   A.   That's correct.

13   Q.   So this is one of the inspection forms that you

14   reviewed prior to your first visit to the Tonawanda

15   Coke facility, correct?

16   A.   Yes, it is.

17   Q.   Did you also review -- if we can take this

18   down, please, Ms. Henderson.

19        Did you also review the results of a compliance

20   inspection by another of your colleagues within the

21   Bureau of Hazardous Waste Operations that occurred

22   at the Tonawanda Coke facility on January 7th,

23   1997?

24   A.   I stated earlier, I looked at all of them.

25   Q.   Okay.  Does it recall -- do you recall that

1    that was a similar report to the one we've just

2    reviewed, a 33-page report indicating that a full

3    compliance inspection had been conducted, that the

4    facility generates K087, and it is used as a fuel

5    along with the coal, and that it was operated as a

6    small quantity generator without violations?  Is

7    that consistent with your memory?

8    A.   That the K087 is used as a fuel?

9    Q.   Used with coal as fuel in the ovens.

10   A.   No.  I don't -- I think you're -- you know, the

11   characterization that it's used as fuel is, I

12   think, absurd.

13   Q.   What's your recollection of the results of that

14   1997 inspection?

15   A.   The K087 is recycled into the coke oven

16   battery.

17   Q.   May we please have Defendant's Exhibit C marked

18   for identification.

19        MR. PIAGGIONE:  Your Honor, again, if it's

20   helpful, we will stipulate to the admission of this

21   as an exhibit.

22        THE COURT:  Yes, I will move it into

23   evidence.

24        MR. PERSONIUS:  No objection.

25        THE COURT:  No objection, Mr. Personius?

 1           MR. PERSONIUS:  No objection.

 2           THE COURT:  Okay.  Defense Exhibit C

 3    received no objection.

 4           (Defendants' Exhibit C was received into

 5           evidence.)

 6    BY MR. LINSIN:

 7    Q.  Now, we'll come back to this first page which

 8    is a letter from Mr. Baker to Mr. Kamholz.  Let's

 9    go to the second page of the exhibit, please.  And

10    we will have a page reference as soon as we get to

11    the lettered sections of the form.

12        This is the cover page for the 1997 inspection,

13    is that correct?

14    A.  Yes, it is.

15    Q.  All right.  Conducted by Robert Wozniak, is

16    that correct?

17    A.  That's correct.

18    Q.  And, again, Mark Kamholz is the environmental

19    manager, right?

20    A.  Yeah.

21    Q.  All right.  I'd ask that we go to Roman I-5 of

22    this exhibit.  Enlarge this portion, please.

23        Under this subpart that talks about hazardous

24    waste generation, first portion talks about

25    facility's wash stations at the plant, correct, and

1    a Safety-Kleen service that carries off those

2    materials on a monthly basis, correct?

3    A.   That's correct.

4    Q.   Now, subpart B of this section talks about the

5    hazardous waste treatment processes on the

6    facility, correct?

7    A.   Yes, it talks about K087.

8    Q.   All right.  And would you read, please, what

9    that text states, the handwritten --

10   A.   It says, "Facility uses K087 tar sludges for

11   fuel to heat coal for the production of coke."

12   Q.   That's what this report states, correct?

13   A.   That's what it states.

14   Q.   All right.  You understood that to be

15   consistent with what was found in the first report

16   you reviewed that --

17   A.   No, no, no.  I didn't say that.  This is the

18   part where you just talked about it being a fuel.

19   I don't believe it's a fuel.

20   Q.   Okay.  The report says it was used for fuel to

21   heat coal, correct?

22   A.   That's what it says.

23   Q.   All right.  I'm not asking, Mr. Corbett, to

24   agree with that characterization, all right?  But

25   we can agree that's what the report states?

1    A.   We can agree on that, yes.

2    Q.   All right.  And is it your understanding, at

3    least, that this report, whether you agree with the

4    characterization of its use as a fuel or not, you

5    understood this report to be confirming that the

6    K087 generated at the Tonawanda Coke facility was

7    being recycled back into the coke ovens?

8    A.   Yes.

9    Q.   All right.  Can we go to the first page of the

10   Defendant's Exhibit C.

11       Now, is it accurate that this is a confirmation

12   letter, again from Richard Baker to Mr. Kamholz,

13   January 27th, 1997, reporting on the results of the

14   RCRA compliance inspection at the Tonawanda Coke

15   facility on January 7th, 1997?

16   A.   Yes.

17   Q.   And is it -- would you read please the second

18   paragraph of the letter?

19   A.   "As a result of that inspection, we believe

20   that your facility is operating as a small quantity

21   generator of hazardous waste."

22   Q.   And the next paragraph too, please.

23   A.   "No violations of the New York State hazardous

24   waste regulations were observed by the inspector on

25   the inspection date referenced above.  A copy of

1    the inspection form is enclosed for your records."

2    Q.   If we can take this down, please.

3         Now, I know you said you reviewed all the prior

4    inspection reports.

5    A.   Yes.

6    Q.   There was another prior inspection, RCRA

7    compliance inspection at Tonawanda Coke on

8    February 29th of 2001, correct?

9    A.   Correct.

10   Q.   All right.  May I have, please, Defendants'

11   Exhibit D for identification.

12        Do you recognize this page of Defendants'

13   Exhibit D as the first page of that compliance

14   inspection report?

15   A.   Yes.

16             THE COURT:  Do you wish to move this in?

17             MR. LINSIN:  I would request that it be

18   moved.

19             MR. PIAGGIONE:  No objection.

20             MR. PERSONIUS:  No objection, Judge.

21             THE COURT:  Okay.  Letter D, defense

22   exhibit, received.  No objection.  And may be

23   published.

24             (Defendants' Exhibit D was received into

25             evidence.)

1    BY MR. LINSIN:

2    Q.   Now, based upon your review of this compliance

3    inspection report, did you also conclude that your

4    colleague, Mr. Raymond Fisher, conducted a

5    compliance inspection report at Tonawanda Coke on

6    February 29th, 2001, and found that the facility

7    was continuing to operate as a small quantity

8    generator --

9         And I'm happy to scroll through the report if

10   you would like, but I'm trying to simply move this

11   along if we can.

12        -- and that no violations were identified based

13   as a result of this compliance inspection report?

14   A.   That's correct.

15   Q.   All right.   We can take this down, please.

16        Now, prior to your first inspection at

17   Tonawanda Coke, did you talk to either Ray Fisher

18   or Mr. Wozniak, the two inspectors that had

19   conducted these earlier inspections?

20   A.   Yes.

21   Q.   Did they confirm for you what -- to you the

22   findings of these reports that we've just reviewed?

23   A.   Yes.

24   Q.   And before your first inspection at Tonawanda

25   Coke on September 6th of 2009, had you previously

1    conducted an inspection of a coke plant?

2    A.   Yes.

3    Q.   Which coke plant and how many times?

4    A.   Bethlehem Steel coke plant, one time.

5    Q.   Okay.  All right.  Now, you testified yesterday

6    that when you went to Tonawanda Coke on

7    September 6th, 2007, that you stopped at the guard

8    gate and were met there by Mr. Kamholz, and then

9    continued with Mr. Kamholz to his office, correct?

10   A.   Correct.

11   Q.   Now, is it fair to say, Mr. Corbett, that that

12   type of procedure, waiting at a guard shack or in a

13   waiting area, and then being met by a facility

14   representative and escorted to the location for

15   your interviews or your inspection, that that is

16   pretty much standard operating procedure for any

17   industrial facility?

18   A.   For a large industrial facility, yes.

19   Q.   All right.  You're -- it's not going happen in

20   a gas station, correct?

21   A.   No.

22   Q.   All right.  Okay.  Now, may we please have

23   Defendant's Exhibit GGGG for identification,

24   please?  And if we could enlarge this portion.

25        Take a look at this, if you will, Mr. Corbett,

1    and tell us whether you can recognize this as a

2    depiction of the layout of the Tonawanda Coke

3    facility up on River Road.

4    A.  Yes, I recognize it.

5    Q.  All right.

6           MR. LINSIN:  Your Honor, I would move

7    Defendants' Exhibit GGGG into evidence.

8           MR. PIAGGIONE:  No objection, your Honor.

9           MR. PERSONIUS:  No objection, Judge.

10          THE COURT:  Okay.  GGGG received, no

11   objection.

12          (Defendants' Exhibit GGGG was received

13           into evidence.)

14   BY MR. LINSIN:

15   Q.  All right.  Now, can we please, Ms. Henderson,

16   go back and let's enlarge this just a little bit

17   more, a little bit more of the original exhibit.

18   Okay.  Thank you.

19       Would you, just for orientation purposes, would

20   you mark -- just tap on the screen where River Road

21   is depicted in this diagram.

22       All right.  Is that the location of the

23   entrance to the Tonawanda Coke facility?  Actually,

24   right down in that area?

25   A.  Um-hum, yes.

1    Q.  All right.  And would you tap on the screen

2    where the guard shack is that you then went to.

3    A.  Close to that.  I think it's the small one.

4    Q.  Okay.  So it's in this general vicinity at the

5    top of this roadway that leads off of River Road,

6    is that correct?

7    A.  That's correct.

8    Q.  All right.  Now, so we can orient ourselves, do

9    you recall where the ovens, the coke ovens are

10   located at the facility?

11       Would you tap the screen there?  All right.

12       And the coal field itself, would you tap the

13   screen?

14       All right.  And while we're here -- we'll come

15   back to this -- but would you also identify

16   where -- you testified yesterday about various

17   tanks that you inspected.  Where are those tanks

18   depicted?

19   A.  Are we talking about my initial inspection?

20   Q.  Yes, and I'll get back to that in a moment.

21   A.  I was only in the area of the coke oven

22   battery.

23   Q.  I understand, sir.  I didn't mean to

24   misrepresent that at all.  We'll get to where you

25   went with Mr. Kamholz on your first visit.

2306

1    A.   Okay.

2    Q.   While we are here, I just want -- so the jurors

3    could orient themselves to your testimony, where

4    are these Barrett tanks depicted?

5         Okay.  All right.  So, your first visit with

6    Mr. Kamholz on September 6th, 2007, where did you

7    and Mr. Kamholz meet and talk about the operation

8    of the facility?  Can you locate that on this map?

9    A.   I believe it was in his office.  Somewhere in

10   this area.

11   Q.   All right.  And is it accurate -- does it fit

12   with your memory that, in order to get to that

13   office, you need to drive along that roadway?

14   A.   I can't remember the exact route to get there.

15   Q.   Okay.  All right.  How long did you talk to

16   Mr. Kamholz during this first compliance inspection

17   that you conducted at this facility on

18   September 6, 2007?

19   A.   In total you mean or --

20   Q.   Yes.

21   A.   For the entire inspection?

22   Q.   Right.

23   A.   Maybe an hour or two.

24   Q.   Okay.  And you testified yesterday that you --

25   you understood that K087 -- I'm sorry -- K087 was

1    being recycled at the facility, is that correct,

2    based on what Mr. Kamholz told you?

3    A.   That's correct.

4    Q.   And part of the information you had, obviously,

5    when you went out there, was the information you

6    had learned from your review of the file before you

7    went out there, correct?

8    A.   That's correct.

9    Q.   What Mr. Kamholz told you was confirming what

10   three prior compliance inspections had reported,

11   correct?

12   A.   That is correct.

13   Q.   All right.  And on this particular visit, on

14   September 6th, 2007, you did not actually view the

15   place where the recycling was occurring, but you

16   satisfied yourself that the facility remained in

17   compliance with the RCRA regulations regarding the

18   K087 waste, is that correct?

19            MR. PIAGGIONE:  Objection, your Honor.  I

20   believe that's a pretty compound question.

21            THE COURT:  Yeah, I think it can be broken

22   down a little bit.

23        Sustained.

24   BY MR. LINSIN:

25   Q.   During your inspection on September 6th, 2007,

1    you did not view the location where the recycling

2    occurred, correct, recycling of the K087 waste?

3    A.   The physical point where the recycling was

4    occurring?

5    Q.   Right.

6    A.   No, I did not.

7    Q.   But at the end of your inspection, you

8    concluded that you found that the Tonawanda Coke

9    facility was in compliance with the RCRA

10   regulations with regard to its management of K087

11   waste, correct?

12   A.   That's correct.

13   Q.   And as a matter of fact, following your RCRA

14   compliance inspection on that date, you completed a

15   30-page compliance inspection form similar to the

16   ones we've just been reviewing, and you concluded

17   that Tonawanda Coke was operating as a small

18   quantity generator and that it was in compliance

19   with the RCRA regulations regarding its management

20   of K087, correct?

21   A.   That's correct.

22   Q.   All right.  Now, you -- you testified yesterday

23   that you conducted a second follow-up inspection at

24   the facility in July, I believe July 31st of 2008,

25   correct?

1    A.   That's correct.

2    Q.   But at that time you did not focus on this

3    management of the K087 material, is that correct?

4    A.   Yes, that is correct.

5    Q.   So that was your second visit to the plant.

6    But then you went back to Tonawanda Coke for your

7    third inspection on June 17th, 2009, correct?

8    A.   That's correct.

9    Q.   Now, you testified yesterday, I believe, that,

10   before going back out to Tonawanda Coke on

11   June 17th, 2009, there had been some internal

12   meetings within the Department of Environmental

13   Conservation.  Did I hear you correctly?

14   A.   That's correct.

15   Q.   And is it accurate that your -- who was Mr. Jim

16   Strickland, by the way?

17   A.   Jim Strickland was my boss at the time.

18   Q.   All right.  And does it fit with your

19   recollection, Mr. Corbett, that Mr. Strickland had

20   actually received a call from Cheryl Webster from

21   the Division of Air Resources within DEC?

22   A.   It may not have been directly.  He probably

23   received a call from her boss who was, I believe,

24   Larry Sitzman at the time.

25   Q.   And did you come to learn the substance of that

1   call?

2   A.  Yes, I did.

3   Q.  And what was it?

4   A.  It was that Cheryl Webster had been at the

5   facility and was with Mr. Kamholz, and Mr. Kamholz

6   pointed out the exact area at the facility where

7   K087 was being mixed with coal.

8   Q.  And did you know where that was before you went

9   to the facility?

10  A.  No, I did not.

11  Q.  Well, why -- what had prompted Ms. Webster to

12  call your office?

13  A.  Well, Ms. Webster was a hazardous waste

14  inspector prior to working in the Division of Air.

15  And when she -- she heard or, you know, was -- was

16  told how the recycling was occurring, it jogged

17  her as being -- not being done appropriately.

18  Q.  All right.  But am I understanding you

19  correctly, Mr. Corbett, that when you went out

20  there, or before you went out there on

21  June 17th, 2009, you did not know where this

22  recycling was occurring?

23  A.  That is correct.  I did not know.

24  Q.  And who did you -- who -- with whom did you go

25  to the Tonawanda Coke facility on June 17th, 2009?

2311

1   A.   I went with Lenny Grossman of U.S. EPA and

2   Ellen Banner of U.S. EPA.

3   Q.   And who decided that this was going to be a

4   joint RCRA compliance inspection?

5   A.   It was decided, I think, between my boss Jim

6   Strickland and Phil Flax of U.S. EPA who's Lenny

7   Grossman's boss.

8   Q.   Had you ever worked with Mr. Grossman before?

9   A.   No, I hadn't.

10  Q.   Is he from Buffalo?

11  A.   No.  He's from New York City.

12  Q.   And is Ellen Banner, is she from Buffalo?

13  A.   No, she's not.

14  Q.   Where is she from?

15  A.   I believe New Jersey.

16  Q.   Did you and Mr. Grossman and Ms. Banner have a

17  meeting before going out to Tonawanda Coke in June

18  of 2009?

19  A.   Just shortly before we went out, because they

20  arrived by -- I believe they arrived by plane, and

21  then we had just a short period of time before we

22  went to the facility together.

23  Q.   Before going out to the facility, do you know

24  if Mr. Grossman and Ms. Banner reviewed the

25  regulatory file that had been maintained on this

1    facility by the Bureau of Hazardous Waste

2    Operations?

3    A.   I believe they had.

4    Q.   Do you know?

5    A.   I don't know for sure.

6    Q.   All right.  Did you talk with them about the

7    results of these prior RCRA compliance inspections

8    that had been conducted by colleagues in your

9    office?

10   A.   Yes.

11   Q.   Did you talk with them about the fact that

12   there had been repeated explanations in these forms

13   about the recycling process that went on at

14   Tonawanda Coke?

15   A.   No.  We talked more about the current

16   information that we had received.

17   Q.   Did they know -- did you tell them -- and

18   "them" being Mr. Grossman and Ms. Banner.  Did you

19   tell them that the Tonawanda Coke facility had been

20   inspected three times by other colleagues of yours

21   and once by yourself and found to be in compliance

22   with the RCRA recycling regulations for K087?

23   A.   The inspection forms that we create are sent to

24   the EPA, so they have -- they're privy to the same

25   information I'm privy to.

1    Q.   And, Mr. Corbett, I understand that makes very

2    good sense, that your agency and EPA coordinate.

3    But what I'm trying to talk about now is whether

4    prior to you going to this facility in June

5    of 2009, whether you yourself told Mr. Grossman and

6    Ms. Banner that this facility had been found to be

7    in compliance on at least four separate occasions

8    by yourself and your colleagues.

9              MR. PIAGGIONE:  Objection, your Honor.

10             THE WITNESS:  No, I did not.

11             MR. PIAGGIONE:  It was already asked and

12   answered.

13             THE COURT:  Overruled.  I'll permit it.

14       The answer is?

15             THE WITNESS:  No, I did not discuss those

16   inspection reports with them.

17   BY MR. LINSIN:

18   Q.   You understood that a copy -- do you know what

19   offices those two individuals work for or worked

20   for back in 2009, Mr. Grossman and Ms. Banner?

21   A.   Well, I know that Mr. Grossman worked in the

22   hazardous waste section, probably solid and

23   hazardous waste section of EPA. Ms. Banner, I

24   believe, was a geologist.

25   Q.   All right.

1    A.   And I'm not sure which office she worked out

2    of.

3    Q.   Now, when the three of you then went to the

4    plant on June 17th, 2009, you had a meeting again

5    with Mr. Kamholz, correct?

6    A.   That's correct.

7    Q.   And would you point to this screen again as to

8    where that preliminary meeting occurred?

9    A.   Somewhere in one of these buildings.  I don't

10   know exactly where his office is.

11   Q.   All right.  Fair enough.  And how long did that

12   initial meeting between yourself and Mr. Grossman

13   and Ms. Banner last with Mr. Kamholz?

14   A.   It was a long meeting.  It was three or four

15   hours.

16   Q.   It was three or four hours in Mr. Kamholz's

17   office?

18   A.   Possibly.

19   Q.   All right.

20   A.   I remember it being a long time.

21   Q.   Okay.  Fair enough.  And possibly as long as

22   three or four hours?

23   A.   I'm just estimating, but I know it was longer

24   than a normal interview.

25   Q.   All right.  And the substance of this

1    discussion, if I heard your testimony correctly

2    yesterday, was how this facility was -- what waste

3    they were generating and how they were handling

4    them, correct?

5    A.   That's correct.

6    Q.   All right.  And was it at this time that you

7    talked about the recycling process for the K087

8    waste?

9    A.   About where it was specifically being recycled?

10   Q.   Yes.

11   A.   No, it wasn't.  It wasn't until we were on the

12   site where -- where we learned that information.

13   Q.   Was there a particular reason you -- you didn't

14   inquire or Mr. Grossman or Ms. Banner didn't

15   inquire of Mr. Kamholz where this recycling was

16   occurring?

17   A.   Well, there's several ways to find out the

18   information.  We would rather put our eyes on the

19   location of where it was happening rather than get

20   a verbal description of it.

21   Q.   All right.  Okay.  So you talked about the

22   K087.  And I'd like to make a distinction, if we

23   could, so we're clear going forward.  The K087 that

24   we have been talking about up to now was the K087

25   that was generated on site in the by-products area,

1    correct?

2    A.   That's correct.

3    Q.   Can we agree that -- let's call that, if you

4    would, the tar tank K087.

5    A.   Let's call it the decanter.

6    Q.   The decanter tank?

7    A.   Yes.

8    Q.   Tar sludge?

9    A.   Yes.

10   Q.   Because we're also going to be talking about

11   some of this other material that was in the Barrett

12   tanks, that, if I heard you correctly yesterday,

13   Mr. Kamholz told you he believed was K087 as well,

14   correct?

15   A.   That's correct.

16   Q.   Let's call that the tank K087, the Barrett tank

17   K087.  Is that fair?

18   A.   Okay.

19   Q.   All right.  This initial lengthy meeting with

20   Mr. Kamholz, were you talking about the decanter

21   tank tar sludge, or were you talking about the

22   Barrett tank K087?

23   A.   We were talking about the decanter tar sludge

24   from the active process.

25   Q.   From the active process in the by-products

1    area, is that correct?

2    A.  Yes.

3    Q.  And were you -- what did you discuss with him

4    for that length of time about the decanter tank tar

5    sludge?

6    A.  Well, we -- Mr. Grossman was -- I think -- I

7    believe it was his first time at a coke facility,

8    so he wanted to understand the entire process as

9    well as he could, and the amounts being generated,

10   whereby they were generated.  You know, all of the

11   various particulars.

12   Q.  So --

13   A.  Kind of like the first inspection that Ray

14   Fisher conducted where he got into very -- a lot of

15   detail about how -- how materials were recycled.

16   He wanted to have the same understanding --

17   Q.  All right.

18   A.  -- of the process.  So that's why it took such

19   a long time to get all that information.  And --

20   and everyone was taking notes, and so he wanted to

21   really understand it.

22   Q.  And during that time -- this was kind of like

23   Coke Plant 101?

24   A.  Yes.

25   Q.  All right.  All right.  During that time

1    Mr. Kamholz was responding to the questions that

2    were being asked of him, is that correct?

3    A.   Yes.

4    Q.   Is it -- do I have it accurately, was it

5    Mr. Grossman that was leading the conversation from

6    your group?

7    A.   Yes.

8    Q.   All right.  And were documents requested in

9    that meeting?

10   A.   I am not sure about that.

11   Q.   All right.

12   A.   I think an information request came at some

13   point, but I don't know if it was at that time or

14   later.

15   Q.   All right.  Now, did you keep notes of that

16   meeting, Mr. Corbett?

17   A.   I did not take any notes.  I took mental notes

18   which I then wrote down in a memo to my boss after

19   the -- after the meeting.

20   Q.   You wrote a memo to your boss about this

21   meeting?

22   A.   I believe I did.  I had to give him something.

23   There had to be something written at some point.

24   Q.   Have you seen that memorandum recently?

25   A.   I don't believe so.

1    Q.   All right.

2              MR. LINSIN:  Your Honor, I don't believe

3    we have received a copy of this memorandum.  Can I

4    inquire through the Court whether or not the

5    government has a copy of this memorandum?

6              THE COURT:  Certainly.

7              MR. PIAGGIONE:  As far as we know there is

8    no memorandum.

9              THE WITNESS:  It was an inspection report

10   for that date.

11   BY MR. LINSIN:

12   Q.   I'm sorry.  Is that what you're referencing?

13   A.   That's what I'm referencing.

14   Q.   Okay.  Does it fit with your memory that this

15   was a memorandum that contained certain

16   photographs?

17   A.   Yes.

18   Q.   All right.  And, actually, it wasn't on your

19   standard inspection form, correct?

20   A.   Correct.

21   Q.   All right.  And just so we're on track here, so

22   you submitted that to your -- your superior shortly

23   after that -- shortly after the inspection,

24   correct?

25   A.   Yes.

1    Q.  All right.  Now, you testified yesterday

2    that -- I believe you started out -- after leaving

3    this lengthy meeting with Mr. Kamholz, that you

4    went to the decanter tank in the by-products area,

5    is that correct?

6    A.  That's correct.

7    Q.  All right.  Could we please enlarge this

8    portion of the diagram.

9        Now can you -- if you want to orient yourself,

10   please take your time?

11       Do you see it?

12   A.  Yes.

13   Q.  Would you just tap the screen where that

14   decanter tank is?

15       Is that the by-products area, as best you

16   recall?

17   A.  Yes.

18   Q.  And so do you recall how you got over to the

19   by-products area?  Were you driven?  Did you walk?

20   A.  I believe we -- we all went in one vehicle with

21   Mr. Kamholz.  I can't remember because there were

22   three.  I think we all went together in one

23   vehicle.

24   Q.  All right.  And do you recall how you drove

25   there?

1    A.   Which route we took?

2    Q.   Yeah.

3    A.   I don't recall.

4    Q.   Okay.  How long did you stay in the by-products

5    area?

6    A.   Quite a while because we took pictures and

7    we -- you know, we looked at the -- we probably

8    spent, I don't know, 15, 20 minutes.

9    Q.   All right.  And your purpose in going over

10   there was to see where this decanter tank tar

11   sludge was being generated, correct?

12   A.   That's correct.

13   Q.   Did you ask at that time where that decanter

14   tank tar sludge was being recycled?

15   A.   I think -- I think -- I think the questions

16   were more along the line of how much sludge is

17   generated per shift or per week, and how is it

18   actually physically moved from that location.

19   Q.   Did you -- were you told how it was physically

20   moved?

21   A.   Yes.  We were told it was put into a front end

22   loader.

23   Q.   Okay.  And did you ask where that front end

24   loader went once it emptied the decanter tank tar

25   box?

1    A.   Let's see.  I think we didn't ask that question

2    until we got over near the coal fields.

3    Q.   All right.  And so after this time, then, in

4    the by-products area, did all of you then travel in

5    a group to a different location at the plant?

6    A.   Yes.

7    Q.   Where was that?

8    A.   We went out to the Barrett tanks.

9    Q.   Okay.  And would you -- okay.  Do you recall

10   how you got there?

11   A.   Again, with Mr. Kamholz in one vehicle.

12   Q.   Do you remember the route you took?

13   A.   I don't remember exactly which route we took.

14   Q.   Now, once you got out to this location, did you

15   ask then how the decanter tank tar sludge was

16   recycled?

17   A.   At some point, while we were looking at the

18   Barrett tanks and the material in there, we asked

19   where the recycling was occurring --

20   Q.   All right.

21   A.   -- physically.

22   Q.   Who asked that question?

23   A.   It was either myself or Lenny Grossman.  I

24   can't remember.  I can't remember exactly who.

25   Q.   And did Mr. Kamholz tell you?

1    A.   Yes, he did.

2    Q.   And he told you, in fact, that this recycling

3    of the decanter tank tar sludge was being done on

4    the coal piles, correct?

5    A.   He pointed to an area and said it was being

6    done in this area on the coal fields.  I can point

7    that area out if you would like.

8    Q.   Do I recall --

9    A.   I'm trying to -- you know, this is quite a

10   while ago.  I'm trying to remember the exact

11   progression.  We also -- we also stopped at this --

12   at this containment pad.

13   Q.   All right.  What I'm trying to recall right

14   now, and I'm referencing my notes, but obviously

15   I'm interested in your testimony.  But I thought I

16   heard you testify yesterday that you asked Mark

17   Kamholz where the recycling was occurring and he

18   said that this decanter tank tar sludge was being

19   recycled by placing it on coal in the coal field.

20   A.   That's correct.

21   Q.   Okay.  So you knew it was --

22   A.   Can I point to that area?

23   Q.   Sure, of course.

24   A.   I believe we were out near the pad and he

25   pointed to this area over here.

1    Q.  All right.  And so he told you at that point

2    that the recycling of the decanter tank tar sludge

3    was occurring in that area where the box is, by

4    placing it on coal in the coal fields, correct?

5    A.  Not in the box.  In the coal field.

6    Q.  Right, okay.

7    A.  Right.

8    Q.  On coal in the coal fields?

9    A.  Correct.

10   Q.  Let's go back -- we'll come back to this in a

11   moment.  How long did you take at the Barrett tanks

12   that day?

13   A.  Quite a while.

14   Q.  All right.  Can you give us an estimate?

15   A.  Maybe an hour.

16   Q.  And what did you talk about at the Barrett

17   tanks?

18   A.  We talked about the fact that this material

19   being a listed hazardous waste was open to the

20   environment because the tanks were basically

21   nonexistent.  They had been cut down with -- in an

22   effort to recover steel, in the process uncovering

23   waste and leaving it exposed to the environment.

24   Q.  Okay.  Now, did you talk with Mr. Kamholz about

25   when that material had been placed in the Barrett

1   tanks?

2   A.   Yes, we did.

3   Q.   And based on your -- the information you

4   received from Mr. Kamholz on that date, was it your

5   understanding that this material in the tanks and

6   on the ground around the tanks had actually been

7   abandoned by a prior owner of this facility?

8   A.   No.

9   Q.   That was not your understanding?

10  A.   No.   It was my understanding that the material

11  inside the tanks, when they were intact, were

12  indeed maybe generated by an earlier tenant of the

13  facility, but not the material that was released

14  outside the tanks.   Because that occurred when --

15  when this dismantling process was attempted and the

16  fire occurred, and then the tanks were left to

17  release material.

18  Q.   Who told you that, sir?

19  A.   I didn't -- no one had to tell me.   I could see

20  it with my eyes.

21  Q.   Are you aware of a factual stipulation that has

22  been entered into evidence in this trial regarding

23  the material on the ground around the tanks, these

24  Barrett tanks, at the Tonawanda Coke?

25              MR. PIAGGIONE:   Objection, your Honor.

1    The stipulation says that some of the material --

2              MR. LINSIN:  Your Honor, I haven't ask

3    about substance.

4              MR. PIAGGIONE:  He's mischaracterizing the

5    stipulation.

6              THE COURT:  We didn't get to that yet.  He

7    just referenced a stipulation.  I don't know where

8    it's exactly going.

9       I'm going to ask you to reput the question,

10   please.

11             MR. LINSIN:  Sure.

12   BY MR. LINSIN:

13   Q.  Are you aware, Mr. Corbett, that there has been

14   a factual stipulation entered into evidence in this

15   trial regarding the material on the ground around

16   the Barrett tanks?

17   A.  I'm unaware of it.

18   Q.  I'm sorry?

19   A.  I said I'm unaware of that.

20   Q.  The prosecutors didn't tell you about that

21   stipulation?

22   A.  No.

23   Q.  All right.

24             MR. LINSIN:  May I have a moment, your

25   Honor.

1          THE COURT:  Should we take 15?

2          MR. LINSIN:  Thank you.  That would be

3     helpful, yes.

4          (Jury excused from the courtroom.)

5          THE COURT:  Okay.  Mr. Corbett, you can

6     step down.  Thank you.  We'll see you at about

7     11:25.

8          (Short recess was taken.)

9          (Jury not present in the courtroom.)

10          THE COURT:  All right.  I haven't seen Ms.

11     Grasso move that fast in three weeks.  Please have

12     a seat.

13          MR. LINSIN:  I can assure you, your Honor,

14     Ms. Grasso is quite an athlete.

15          THE COURT:  All right.  That doesn't

16     surprise me, Mr. Linsin.

17       My understanding is -- and the attorneys and

18     parties are back present for purposes of the

19     record -- that there is a matter that we have to

20     address before the jury's brought back in.

21          MR. LINSIN:  Your Honor, during my

22     cross-examination of the witness, he testified that

23     he had completed a report with respect to his

24     June 17th, 2009, inspection at the -- of the

25     facility.  When he testified in that regard, I

1    glanced at my notebook.  I saw a report from that

2    date.  If the Court may recall, I asked did it

3    contain pictures, et cetera.

4        Upon further examination, the report that I was

5    looking at when I asked him those questions was, in

6    fact, an EPA report that had been filed by

7    Mr. Grossman and drafted by Mr. Grossman.

8              THE COURT:  Not the DEC report?

9              MR. LINSIN:  That's correct, your Honor.

10   I've discussed this with the government during the

11   break.  My understanding is that they do not at

12   this point have a report from Mr. Corbett with

13   respect to that inspection or, for that matter,

14   with respect to his subsequent inspection at the

15   facility in September of the same year.  So they

16   have dispatched a DEC attorney, as I understand it,

17   to seek -- to review their files and see if we can

18   find these.

19             THE COURT:  Can I interrupt for a second?

20   I'm sorry to do that.  But should we discuss

21   this -- Mr. Corbett's here and he is not done yet.

22   Should he step out, or is that not an issue?

23             MR. LINSIN:  I'm not troubled.  I did

24   recognize he was in the courtroom, and I'm just

25   saying if there are reports, for obvious reasons,

1    we would like to be able to review them before we

2    resume our cross-examination of the witness.  And I

3    don't know what length of time we are talking

4    about, but we do not have them for these critical

5    inspections.  And it's just -- it's surprising

6    because I do believe, you know, the government has

7    been conscientious in producing the 3500 material,

8    but it is -- these are critical inspections for the

9    case, your Honor, and it would be difficult to

10   proceed without first having -- receiving them and

11   having a chance to review them.

12           THE COURT:  Okay.  If I can get the

13   government's position on that.

14       And I'd like to know, Mr. Corbett, are you

15   local?  Do you reside in this area, or were you

16   brought in from elsewhere?

17           THE WITNESS:  I'm local.

18           THE COURT:  Okay.  Thank you.  I'm sorry.

19   Mr. Piaggione.

20           MR. PIAGGIONE:  We looked in our files.

21   We talked to Mr. Corbett.  He indicates there might

22   be an email and not necessarily a report, something

23   that would memorialize his visit.  So we had a DEC

24   attorney in the courtroom and she is going back to

25   look -- review the file itself, see if they can

1    locate any of these emails, possibly, if they

2    existed, still exist in the files or in the report,

3    if there was one that existed.  She indicates it

4    might take an hour, an hour and a half.

5            THE COURT:  Do you have another witness

6    that's available?

7            MR. MANGO:  We do, your Honor.

8            THE COURT:  What if we simply broke as far

9    as Mr. Corbett's testimony is concerned.  I'll

10   instruct the jury that, you know, there may be a

11   delay in the completion of the examination, but in

12   the meantime, so we don't lose time, we'll call the

13   government's next witness.  And once we are able to

14   proceed, we will resume cross-examination by

15   Mr. Linsin and Mr. Personius, and then wrap up

16   Mr. Corbett's testimony.

17       Does that work from the government's

18   standpoint?

19           MR. PIAGGIONE:  Yes, your Honor.

20           MR. MANGO:  Absolutely.

21           MR. PIAGGIONE:  And we thank you for your

22   patience.

23           THE COURT:  But it's probably -- I don't

24   know if Mr. Corbett should stay in the courtroom.

25           MR. MANGO:  No.

1          THE COURT:  I'd ask that --

2          MR. LINSIN:  Your Honor, I did not hear

3   who the next witness is that the government would

4   call.

5          THE COURT:  Nor did I.

6          MR. MANGO:  David Dahl, your Honor.

7          THE COURT:  David who?

8          MR. MANGO:  Dahl, D-a-h-l.

9          THE COURT:  Okay.

10          MR. MANGO:  I'll go get Mr. Dahl.  He's

11   just standing in the hallway.

12          MR. PERSONIUS:  Your Honor, with this

13   review that's going to be taking place, we've asked

14   the government to make sure it just doesn't cover a

15   memo from the June 2009 inspection, but any other

16   documents that may relate to Mr. Corbett's

17   testimony.

18          MR. PIAGGIONE:  We indicated we were aware

19   of that in asking them to look for any other

20   documents.

21          THE COURT:  And, again, I appreciate

22   working together on this.  It makes a lot of sense.

23   I think Mr. Linsin's comment about the government

24   being cooperative throughout in making available

25   the notes and 3500 materials is -- is well taken.

1    So thank you.

2        And I think we can proceed this way with the

3    next witness.  We won't incur any real downtime.  I

4    think we'll still be, from the jury's standpoint,

5    able to accomplish a proper communication of the

6    evidence.

7        So, if there's nothing further, then we'll have

8    the jury brought in.

9            MR. LINSIN:  You will explain the

10   circumstances to the jury, your Honor?

11           THE COURT:  As best I can.

12           MR. LINSIN:  Thank you.

13           THE COURT:  As counsel probably knows, I

14   don't always get it right.  So we'll try to do

15   that, and if anybody wants to add on or correct or

16   just whatever, please do.

17           (Jury seated.)

18           THE COURT:  You probably thought you

19   weren't going to see us again, but we're back.

20   Please have a seat, ladies and gentlemen.

21       Miss Russ, are you a little cold?

22           A JUROR:  It's good in here.  It's cold in

23   there.

24           THE COURT:  We have difficulty with one of

25   the -- of the valves, the heater valves in there.

1    So we're still trying to work on that.  That's why

2    you have to be all weather prepared when you come

3    here.  It's a pretty substantial difference in

4    temperature sometimes.  Sometimes it gets stuck the

5    other way, and it gets a little uncomfortably warm

6    there.  Hopefully we'll get it straightened out.

7        But as we started the day, I made reference to

8    3/13/13, so with that in mind, we're going to have

9    a little variation in what we've been regularly

10   doing where a witness is called and then we

11   complete the witness's testimony on both direct and

12   cross-examination.

13       We're not going to do that with Mr. Corbett.

14   We're going to break, and I think it will be

15   effective in terms of our ability to maximize the

16   use of time.  We're going to break from

17   Mr. Corbett's testimony.  We will resume with him,

18   but not immediately.  So, if you would note for

19   yourself that we will resume at an appropriate time

20   when we have everything ready with the

21   cross-examination by Mr. Linsin and then followed

22   by Mr. Personius, and we'll try to wrap up with

23   redirect and re-cross if there is any of

24   Mr. Corbett maybe this afternoon.  We'll see how it

25   goes.  But in any event, in close proximity of the

1    testimony of yesterday and today.

2        In the meantime, so that we can continue on and

3    be as efficient as we possibly can, the government

4    has a next witness, and we're going to start with

5    Daniel Dahl, is that right?

6            MR. MANGO:  Yes, your Honor, it's David

7    Dahl.  The government would call David Dahl to the

8    witness stand.

9            THE COURT:  Okay.  All right.  And with

10   respect to the witness change here -- Mr. Dahl, if

11   you could stay right there.  Don't enter the

12   witness box yet.  I mean, don't -- there's nothing

13   for you to infer or imply.  We just need to work

14   through administratively some things, and then

15   we'll bring the witness back, okay?

16       Mr. Dahl, we're going to have you sworn as a

17    witness, and if you're ready for that, please.

18   D A V I D   A.   D A H L, having been duly sworn as

19   a witness, testified as follows:

20           THE COURT:  All right.  Good morning.

21           THE WITNESS:  Morning.

22           THE COURT:  How are you today?

23           THE WITNESS:  Oh, pretty good.

24           THE COURT:  Okay.  Well, you got to

25    convince us.  At least with that statement we're

1    not so sure.

2         In any event, let me give you some preliminary

3    instructions.  You're here to testify for the

4    benefit of the ladies and gentlemen of the jury.

5    And what I'm going to ask you to do is to move a

6    little closer to the microphone.  You don't have to

7    be right on top of it, because then it distorts if

8    you do that.  Speak in the direction of the ladies

9    and gentlemen of the jury, because you're here for

10   their benefit.

11        Keep your voice at a conversational tone.  And

12   aim it at the microphone.  It's friendly, and it

13   should pick you up without any difficulty.  If you

14   don't understand a question -- we're trying to move

15   through this -- ask the attorney or me if I'm

16   asking you the question, to repeat it.  Don't

17   answer a question that you don't understand.

18        Try to be as concise as you can.  That works

19   for your benefit and everybody else's.  When you

20   answer the questions, don't volunteer information.

21   That actually complicates things.  If you can

22   answer a question yes or no, please try to do it in

23   that fashion.  And then lastly, if there's an

24   objection, wait until I rule on the objection.

25   It's the attorneys jobs to object.  Then I'll tell

1      you, okay, complete your answer, wait before you

2      answer the question, wait for another question,

3      I'll give you some instructions on how to proceed.

4      Do you understand?

5                  THE WITNESS:  Yes, I do.

6                  THE COURT:  Okay.  I think the jury wants

7      to know who you are.  State your full name, spell

8      your last name, and speak into the microphone,

9      please.

10                 THE WITNESS:  My name David A. Dahl,

11     D-A-H-L.

12                 THE COURT:  Okay.  I think you're going to

13     carry very well.  Thank you.

14         Your witness, Mr. Mango.

15                 MR. MANGO:  Thank you, your Honor.

16     DIRECT EXAMINATION BY MR. MANGO:

17     Q.  Good morning, Mr. Dahl.  How are you?

18     A.  All right.

19     Q.  All right.  Mr. Dahl, can you tell the jury if

20     you're currently employed?

21     A.  Yes, I am.

22     Q.  And who are you employed with?

23     A.  Tonawanda Coke.

24     Q.  And when did you start working at the Tonawanda

25     Coke Corporation?

1    A.   April of '93.

2    Q.   And I'd like to have you go through your

3    positions you've held.  But why don't you start,

4    what position do you currently hold there?

5    A.   At the present I'm the coal handling

6    supervisor.

7    Q.   Okay.  And how long have you been in that

8    position?

9    A.   Five, maybe six years.

10   Q.   Okay.  So five years back, six years back from

11   today would be 2007?

12   A.   2007 somewhere in there, yes.

13   Q.   And if can you tell the jury what your job

14   duties are as a coal handling supervisor, please.

15   A.   My department handles all the coal that comes

16   into the plant.  We process the coal, blend it.

17   And send a mix over for the ovens that they put in

18   the ovens to make our product.

19   Q.   Is there something known as the coal handling

20   building?

21   A.   Yes, there is.

22   Q.   And it's a relatively large building, is that

23   right?

24   A.   Yes, it's pretty big, yes.

25   Q.   Okay.  And from -- from where you generally

1    work in coal handling, in that building, is it fair

2    to say that you have a decent view of the grounds

3    at Tonawanda Coke?

4    A.   Yes.  I can see reasonably well around the

5    plant.

6    Q.   Okay.  Mr. Dahl, let's start in April of -- did

7    you say April of '93?

8    A.   Right.

9    Q.   Why don't we start there in April of '93.  At

10   least give the jury a snapshot of the different

11   jobs you've worked.

12   A.   In '93 I was still hourly, learning all the

13   machines, breaking in on the ovens.  '95 I believe

14   it was I started breaking in for a shift foreman.

15   Went on my own approximately six months later, and

16   was a shift foreman for about ten, maybe 11 years.

17   Then I went to our transportation department for a

18   couple of years on the afternoon shift.  And then

19   in between coming to coal handling a couple of

20   times and other positions in the plant that we

21   needed filled, quote, temporarily.

22   Q.   Okay.  And that transportation, that's relating

23   to the finished coke product, is that right?

24   A.   Yes, it is.  That's the shipping alley and

25   loading of our products.

1    Q.   Okay.  You used the term "shift foreman".  Is

2    that also synonomous with the term "general

3    foreman?"

4    A.   Yes.  General foreman or a shift foreman, yes.

5    Q.   And that involves work on the battery?

6    A.   Yes, that's correct.

7    Q.   All right.  Let's talk, are you familiar with

8    the quench towers at Tonawanda Coke?

9    A.   Yes, I am.

10   Q.   How many quench towers are there?

11   A.   Two towers.

12   Q.   All right.  If you can tell the jury what --

13   how do you refer to the different quench towers at

14   Tonawanda Coke?

15   A.   We have either the east or the west, or number

16   1 tower, number 2 tower.

17   Q.   Okay.

18   A.   The east tower would be number 2.  The west

19   tower would be number 1.

20   Q.   Okay.  During your time as a general foreman,

21   lets focus on that.  Did you ever have an occasion

22   to go inside the quench towers?

23   A.   Yes.

24   Q.   All right.  Explain why you would go in the

25   quench towers, if you could, for the jury, please.

1    A.   The east tower we would check the quenching

2    time on.  We would have to do a little bit of

3    maintenance work on the nozzles that spray the

4    water on the coke.  They would get plugged up from

5    time to time.  So we would also check the quenching

6    times on the ovens.  We'd actually check it about

7    once a week.  The east tower would be only normally

8    in the tower if we had a derailment.  I'm sorry,

9    the west tower would be only if we had a

10   derailment, then we'd actually be in the tower.

11   Q.   The east tower, this number 2 tower?

12   A.   Yes.

13   Q.   Can you actually drive from one side on tracks

14   through to the other side?

15   A.   Yes, you can.

16   Q.   Okay.  So the tracks go all the way through?

17   A.   Right.  The car has to go through the tower in

18   order to reach the other side, where we actually

19   push the electronic buttons to start the quench.

20   Q.   So the driver of the -- was that called the

21   quench car?

22   A.   The quench car, hot car operator, yes.

23   Q.   The driver of that quench car, the positioning

24   of where the driver is is such that the driver has

25   to go all the way through the quench tower to -- to

1    bring the storage area of the car into the

2    quenching area?

3    A.  That's correct.  You have to drive through the

4    tower with the locomotive, and the wagon would be

5    behind you, under you behind the tower -- or

6    actually in the tower.

7    Q.  Have you ever driven the quench car through the

8    number 2 tower?

9    A.  Yes, I have.

10   Q.  Okay.  And how about the number 1 tower, does

11   that have tracks that go all the way through that

12   you can drive right through?

13   A.  No, it doesn't.  You can only come in so far

14   just with the wagon.  If you go any further, you'll

15   either hit a bumper and/or derail the car.

16   Q.  So for the tower on the west, the quench car

17   is, what, backed into the tower so the operator of

18   the quench car never goes into the tower, is that

19   right?

20   A.  That is correct.

21   Q.  Okay.  With respect to quench tower number 1,

22   did you ever observe baffles inside of that tower?

23   A.  No, I did not.

24   Q.  Again, this is your time as a general foreman,

25   which I think you mentioned between 1995 and 2005?

1   A.   Right.   That would be about the time frame,

2   yes.

3   Q.   Okay.   With respect to quench tower number 2,

4   did you ever observe baffles inside of that tower?

5   A.   No, I did not.

6   Q.   And during your time as general foreman, what

7   was the frequency for use of either tower number 1

8   or tower number 2?

9   A.   We would alternate the towers as much as

10   possible.

11   Q.   Now, how about after 2005 when you left to go

12   into the transportation department and then

13   ultimately into your current position, coal

14   handling.   Did you ever have the opportunity to

15   make observations as to what quench tower was being

16   used at a particular time?

17   A.   Well, you can see the towers if you're on the

18   right side of my building, yes.

19   Q.   Okay.   And that's the coal handling building

20   we're talking about?

21   A.   That is correct.

22   Q.   All right.   And were you able to see the quench

23   steam plumes from your building?

24   A.   Yes.

25   Q.   Okay.   So after 2005 did you ever make any

1    observations about the frequency of use of either 1

2    or 2?

3    A.  As far as I could recollect, they were used

4    approximately the same other than if we had a

5    maintenance issue where it might be down for a few

6    hours or part of a day shift usually when the

7    mechanics worked on it.

8    Q.  Okay.  So you physically saw steam plumes

9    coming from both quench towers?

10   A.  As best I can remember, yes, we used the towers

11   to the alternate policy.

12   Q.  And you mentioned if the towers were out of

13   service for a little period of time just now.  Do

14   you recall any periods of time that either number 1

15   or number 2 were down for an extended period of

16   time?

17   A.  No, I don't.

18   Q.  Okay.  I'd like to switch your attention now,

19   Mr. Dahl, to some abandoned tanks that are out in

20   the coal field area.  During your employment at

21   Tonawanda Coke, did you become familiar with two

22   abandoned tanks in the coal field?

23   A.  Yes.

24   Q.  All right.  In approximately 1998, do you

25   recall making any observations of these tanks?

1    A.   We took a ride out by that area, Mr. Gerry

2    Priamo and myself, yes.

3    Q.   And you and Gerry Priamo went out there?

4    A.   Yes, we did.

5    Q.   And you made some observations of these tanks?

6    A.   The tanks were there, and the only thing we

7    noticed was there was like a road built with breeze

8    going out towards the tanks.

9    Q.   Okay.  And at some point after you made those

10   observations, did you see anything else brought and

11   put on the surface around the tanks?

12   A.   Looked like breeze around the area, and there

13   was a lot of water.

14   Q.   Okay.  Let's now move ahead in time a little

15   bit.  Do you recall whether these tanks were

16   involved in a fire during your time at Tonawanda

17   Coke?

18   A.   Yes, they were.

19   Q.   Okay.  When was that fire if you can tell the

20   jury?

21   A.   I believe it was July of '08.

22   Q.   All right.  Can you describe for the jury what

23   you remember about that fire?

24   A.   One of my hourly operators was doing his normal

25   checks, and he saw the fire I believe start.  He

1    called me right away, and then we went and got

2    ahold of a few people and got everything in motion

3    to try and take care of the fire.

4    Q.   Okay.  Did you, so the term goes, spring into

5    action and try to put this fire out?

6    A.   Right.  We brought our fire trucks.  We have a

7    couple fires trucks in the plant.  We energized

8    those and brought them over as quickly as we could.

9    We tried to run some fire hoses from our

10   connections, the hydrants that were close, and we

11   started working on putting it out as quickly as we

12   could.

13   Q.   Okay.  Were you successful in putting it out

14   with the crew that you had?

15   A.   No, we were not.

16   Q.   During the fire, did you observe any material

17   running out of the tanks on to the ground?

18   A.   Yes, we did.

19   Q.   What -- can you tell the jury what was the

20   material that you observed?

21   A.   It looked like tar to me.

22   Q.   Okay.  So you saw tar coming out of the tanks

23   on to the ground?

24            MR. LINSIN:  Objection, asked and

25   answered.

1          THE COURT:  I'll let it stand.  Move on,

2     please.

3     BY MR. MANGO:

4     Q.  Yes.  How much tar did you see come out of the

5     tanks and go on to the ground?

6     A.  I'd say approximately two, maybe three end

7     loader buckets, which would equate to 10 tons,

8     maybe 15 tons.

9     Q.  Okay.  Let's now talk about after the fire.

10    And let me bring your attention to late summer

11    of 2009.  Do you remember making any observations

12    in the area of these tanks at that time?

13    A.  Someone had started to remove some of the tar

14    from one of the burned tanks.

15    Q.  Okay.  Let me ask you this.  Prior to you

16    making that observation, the tar that you had

17    observed come out of the tank, what happened to it

18    in between the fire and the time in late summer

19    of 2009 that you saw this -- made this observation?

20    A.  I believe that was still there.

21    Q.  Stayed on the ground?

22    A.  It was still in the containment area.  There

23    were berms around the area, but it was still there

24    right on the outside of the tanks left from the

25    fire.

1          THE COURT:  All right.  What do you refer

2     to as the containment area, please?

3          THE WITNESS:  The tanks in question were

4     surrounded by like a bermed area, or like a dammed

5     area to prevent anything, I assume, from going any

6     further.  Like a containment area.

7          THE COURT:  Thank you.

8          MR. MANGO:  Okay.  And I'll ask some

9     follow-up questions to that, your Honor.  Thank

10    you.

11    BY MR. MANGO:

12    Q.  That berm area, that was like an earthen berm,

13    is that correct?

14    A.  Yeah, I believe it was mostly earthen, and I

15    think the one side of it may have been like breeze

16    or coke that was basically contaminated.

17    Q.  Okay.

18    A.  Not contaminated chemically, but just

19    contaminated, in other words, size-wise.

20    Q.  Okay.  You couldn't use it size-wise, is that

21    what you mean contaminated?

22    A.  Well, we could, but we would have to screen it

23    back through and resize it to the individual sizes

24    that we need.

25    Q.  Okay.  So in late summer of 2009 you observed

1    some activity in and around these tanks, right?

2    A.   That is correct.

3    Q.   Okay.  Let me show you what's in evidence, your

4    Honor, as Government Exhibit 136.01, if we could.

5         Mr. Dahl, do you see that on your screen?

6    A.   Yes, I do.

7    Q.   Is that one of the tanks in question you recall

8    seeing in late summer of 2009?

9    A.   Yes, it is.

10   Q.   And is that approximately how it looked in late

11   summer of 2009?

12   A.   I would say so, yes.

13   Q.   All right.  If we can go to Exhibit 136.02,

14   please, your Honor, in evidence.

15        Mr. Dahl, do you see that photograph on your

16   screen?

17   A.   Yes.

18   Q.   Does this also depict one of the tanks that you

19   observed in late summer of 2009?

20   A.   Yes.

21   Q.   All right.  So who did you -- did you -- did

22   you know who was removing material from these

23   tanks?  Did you make that observation?

24   A.   Yes.

25   Q.   Who was that?

1    A.   Jon Rogers.

2    Q.   Okay.  Jon Rogers, you saw -- why don't you

3    tell the jury exactly what did you see Jon Rogers

4    doing?

5    A.   Mr. Rogers came over with one of our excavators

6    and started removing some of the product from the

7    tank, put it into an end loader, and then sent the

8    end loader over to our coal field.

9    Q.   Okay.

10   A.   Where he dumped it in a pile.

11   Q.   So a coal pile?

12   A.   A coal pile, yes.

13   Q.   Yes.  A coal pile on the ground?

14   A.   Yes.

15   Q.   Okay.  And you observed that?

16   A.   Yes, I did.

17   Q.   Okay.  How long did you see Mr. Rogers scooping

18   the material out?

19   A.   Approximately a week, maybe two weeks at the

20   most on and off.  It wasn't an everyday thing.

21   Q.   Now, you've got a pretty good knowledge of the

22   different coal piles being in coal handling, is

23   that fair to say?

24   A.   I would hope so, yes.

25   Q.   Okay.  Did you make -- do you know when you

1   made this observation of the material from these

2   tanks being excavated, brought in an end loader to

3   a coal pile, which coal pile that was?  Is there a

4   name for it?

5   A.   Yes.  It was the -- probably the closest pile

6   to the fire area or to those tanks and it was I

7   believe keene.

8   Q.   Okay.

9         MR. LINSIN:  Your Honor, I'm sorry, I did

10  not hear the witness's response.  May I ask it be

11  repeated?

12        THE COURT:  Yes, the name please, can you

13  repeat that?

14        THE WITNESS:  The name of the coal was

15  keene, K-E-E-N-E.

16        THE COURT:  Thank you.

17  BY MR. MANGO:

18  Q.   And, Mr. Dahl, the keene pile was one of these

19  piles of coal that you had, as you said, in the

20  vicinity of these tanks?

21  A.   Yes.  That would have been the closest pile to

22  where the fire actually had happened with the

23  tanks.

24  Q.   All right.  All right.  We can take that down,

25  Lauren.  Thank you.

2351

1          Mr. Dahl, I'd like to ask you, are you familiar

2     with the term "coal tar sludge"?

3     A.   Coal tar, yes.

4     Q.   Okay.  Coal tar or coal tar sludge, you use

5     those two terms synonymously?

6     A.   Normally we'll just call it tar, or coal tar or

7     the sludge is relative.  It's all the same to me.

8     Q.   Okay.  Do you know if that material, this tar

9     sludge, is produced during the coking operations at

10    Tonawanda Coke?

11    A.   Yes.

12    Q.   Is there a location in by-products where the

13    tar sludge is accumulated?

14    A.   Yes, there is.  There is a what we call the tar

15    box on Broadway.

16    Q.   Are you aware of whether that tar sludge is a

17    hazardous waste?

18    A.   No.

19    Q.   In your current position or in any past

20    positions were you ever given any type of hazardous

21    waste training?

22    A.   No.

23    Q.   All right.  Have you ever heard of the term

24    K087?

25    A.   No, I have not.

1   Q.   Okay.  Now during your time after becoming --

2   after leaving a general foreman and into your

3   transportation supervisor, and then into the coal

4   handling supervisor, I want to talk about that time

5   period.  So from 2007 to up to the present, okay?

6   A.   Okay.

7   Q.   During that time do you know, after leaving the

8   tar box, where, if anywhere, the tar sludge was

9   brought?

10  A.   Some of it was brought to the concrete pad.

11  Some of it was actually put out and mixed right in

12  the coal piles.

13  Q.   Okay.  And did you observe this mixing into the

14  coal piles?

15  A.   If it was done while I was there, yes.   In

16  other words, on the day shift most of the time,

17  yes.

18  Q.   But you've made -- you've seen it happen

19  though?

20  A.   Yes.

21  Q.   All right.  Tell the jury, if you could, when

22  it went to the coal piles, what you observed.

23  A.   The loader that picked it up would bring it

24  over to the pile, and then would dump it on the

25  side of the coal pile, back up, push it back up

1    into the pile to try to mix it up with the coal for

2    a few minutes, and then if necessary he would stay

3    there and try and clean his bucket a little bit

4    before he went elsewhere in the plant.

5    Q.   Okay.  And you also mentioned sometimes it

6    would go to the pad.  When it went to the pad, can

7    you tell the jury -- did you observe that happen

8    too?

9    A.   Yes.

10   Q.   Tell the jury, please, what you -- what you

11   observed when you saw that.

12   A.   When they dropped it on our containment area or

13   concrete pad, they would pull up most of the time

14   on the side and dump it over the three-and-a-half-

15   foot wall, give or take, off of the ground, so the

16   tar would actually be in the containment area on

17   the pad.  Then they would wait a few minutes to

18   drip their buckets, and if they had to go clean

19   again their bucket, they would pick up a bucket of

20   the coal that we were mixing with it at the time,

21   and then take that back also and dump that on the

22   pad as well, and we would mix it up from there with

23   an excavator and then run it at some point.

24   Q.   Okay.  When the tar sludge was mixed into the

25   coal piles -- into the coal piles, not in the

1    pad -- did you make any observations as to how long

2    it would sit on the coal piles or in the coal

3    piles?

4    A.   On average we would run it either the same day

5    it was put in if we were able to do that, or the

6    next day.  So within, I'll say, a 24-hour time

7    frame most of the time.

8    Q.   Most of the time.  Did you ever see it -- it

9    sit in the piles longer than 24 hours?

10    A.   Only if we had more than we could actually run

11    on that particular day.

12    Q.   Okay.  Mr. Dahl, can you explain for the jury

13    and give an approximate percentage number of how

14    many times you observed the material go to the coal

15    piles versus go to the -- to the pad?

16    A.   I would say approximately 60/40.

17    Q.   Okay.  60 percent to the coal piles?

18    A.   Right.

19    Q.   And 40 percent to the pad?

20    A.   Right.  That would be also based on the room

21    that we had on the concrete pad at any given time.

22    There were times when the pad was full or close to

23    full, and there were times where we had lots of

24    room where we could accommodate it.

25    Q.   Okay.  Your Honor, if we could pull up

1    Government Exhibit 3.01 which is in evidence.

2         I'd like to show you that, Mr. Dahl.  Do you

3    see that?

4    A.  Yes, I do.

5    Q.  Okay.  What is that photograph that you see?

6    A.  That's the concrete pad.

7    Q.  Okay.

8    A.  Containment area.

9    Q.  Would you consider this full, this concrete

10   pad?

11   A.  That end of the pad is full, yes.  I can't see

12   the other end.  But from the end that it was

13   photographed, yes, that end of the pad is fairly

14   full.

15   Q.  Okay.  So, thank you, Lauren.  Take that down.

16        Let's talk about -- so in 2007 did the mixing

17   of the tar sludge into the coal piles occur

18   in 2007?

19   A.  Yes.

20   Q.  Okay.  Just want to make sure it's clear.

21   In 2008 did it happen in the coal piles?

22   A.  Yes.

23   Q.  And 2009 did it happen in the coal piles?

24   A.  Yes.

25   Q.  Okay.  Did you know, Mr. Dahl, if anything

1    happened in 2009 to cause a change to the practice

2    of mixing the tar sludge into the coal piles?

3    A.   We had some visitors come in on -- late in the

4    fall that year I believe or December, which kind of

5    changed a few of our policies.

6    Q.   Okay.  I see.

7    A.   A federal raid.

8    Q.   I see you smiling when you mention visitors.

9    Now you just said it was a federal raid.  Is that

10   also -- have you heard the term "the search

11   warrant"?

12   A.   The search warrant, yes.

13   Q.   Okay.  So the search warrant happens, and then

14   was it after the search warrant that there was a

15   change in this policy?

16   A.   Yes.

17   Q.   Okay.  Tell the jury, please --

18              MR. LINSIN:  Your Honor, just for clarity,

19   I'm not sure what policy is being inquired about.

20              THE COURT:  I think there needs to be a

21   follow-up on that.  We're talking about

22   December 9th, right?

23              MR. MANGO:  December of 2009.  I don't

24   think we got an exact date from this witness, your

25   Honor.  I don't want to put words into the

1    witness's mouth.  He said December of 2009.

2              THE COURT:  Okay.

3              MR. MANGO:  And the earlier question was,

4    did anything happen in 2009 that caused a change to

5    the practice of mixing tar sludge into the coal

6    piles.  So I'll keep that consistent.

7              THE COURT:  Okay.

8    BY MR. MANGO:

9    Q.  What happened, Mr. Dahl, if you can recall

10   after the -- the search warrant to the practice of

11   mixing tar sludge into the coal piles?

12   A.  Mr. Jon Rogers and Mr. Kamholz, Mark Kamholz,

13   came over to us and explained that we were going to

14   have a change the way the end loaders would handle

15   the coal tar.  In other words, bringing it from our

16   Broadway tar box, everything that we did handle

17   would be processed on our concrete pad.

18   Q.  Okay.  So you mentioned Mark Kamholz.  He was

19   one of the people that communicated this policy to

20   you?

21   A.  Yes.

22   Q.  And do you see Mr. Kamholz here in court today?

23   A.  Yes, I do.

24             MR. MANGO:  Your Honor, may the record

25   reflect Defendant Kamholz has stood up, and there

1     was an acknowledgment that that was Mr. Kamholz.

2              THE COURT:  Okay.  The record will reflect

3     that Mr. Dahl has identified Defendant Mark

4     Kamholz.  You may proceed.

5              MR. MANGO:  Thank you, your Honor.

6              THE COURT:  Thank you.

7              MR. MANGO:  Your Honor, at this point I'd

8     like to pull up Defendant's Exhibit for

9     identification purposes BBB.  Triple B.  And absent

10    an objection, your Honor, I would move this into

11    evidence as a business record of the Tonawanda Coke

12    Corporation.

13             THE COURT:  That's the letter document,

14    yes.

15             MR. MANGO:  And in particular page 10 of

16    this document.

17             THE COURT:  Maybe you want to scroll the

18    pages.  Yes, Mr. Linsin?

19             MR. LINSIN:  That would be helpful, but

20    also is there a representation this witness knows

21    anything about this exhibit, that's my threshold

22    question.

23             THE COURT:  Is there a threshold question

24    you can ask so we can get into that, if, after

25    viewing it, he knows what it is, and then we can

2359

1    see if there's any objection to its being

2    published.

3              MR. MANGO:  Yes, your Honor.  We can take

4    that down.

5    BY MR. MANGO:

6    Q.  Mr. Dahl, have you ever seen any type of

7    memorandum relating to the recycling of K-listed

8    hazardous wastes at the Tonawanda Coke Corporation?

9    A.  No, I haven't.

10   Q.  Okay.  And if there had been such a memorandum

11   in existence, as --

12             MR. LINSIN:  Objection to a hypothetical

13   question, your Honor.  Witness says he never saw

14   such a memorandum.  I don't understand the

15   relevance.

16             THE COURT:  Yeah, it could be almost

17   anything content-wise, so I'll sustain that

18   objection.

19   BY MR. MANGO:

20   Q.  Well, I asked you regarding K-listed hazardous

21   waste.  Do you know if there's any memorandums

22   regarding the -- the mixing of coal tar sludge into

23   the coal piles at Tonawanda Coke?

24   A.  Are you talking now, or are you talking prior

25   to a certain time?

1    Q.   I'm talking from 2007 time period, when you

2    were -- would have first started working in the

3    coal handling area.

4    A.   At that time to my knowledge, no, there was

5    nothing in writing or that we were ever informed.

6    Q.   Okay.

7              MR. MANGO:  Your Honor, if I could just

8    have a moment?

9              THE COURT:  All right.  Did that cover the

10   period from December -- or from 2007 until the

11   present time, is that what you're saying?

12             THE WITNESS:  That was up until 2009 when

13   we had the federal raid or the federal search.

14             THE COURT:  Okay.  Thank you.

15             MR. MANGO:  If I could a moment, your

16   Honor?

17             THE COURT:  Yes.

18             MR. MANGO:  We're all set, your Honor.  No

19   further questions for Mr. Dahl.

20             THE COURT:  All right, Mr. Mango.

21   Mr. Linsin.

22   CROSS-EXAMINATION BY MR. LINSIN:

23   Q.   Afternoon, Mr. Dahl.  How are you?

24   A.   Just fine.

25             MR. LINSIN:  May I proceed, your Honor?

1           THE COURT:  You may.

2     BY MR. LINSIN:

3     Q.   Thank you.  In the positions you held,

4     Mr. Dahl, at Tonawanda Coke, were you ever involved

5     personally in the maintenance work on these quench

6     towers that you testified about?

7     A.   The only thing we would do would be to call our

8     shift repairmen and/or the normal maintenance

9     people if there was a big problem.

10    Q.   All right.  Do you -- do you understand what

11    I -- what I mean when I refer to a passthrough

12    system for the quench water?  Does that ring any

13    bells with you?

14    A.   You want to say that again?

15    Q.   Let me try that again.  Do you remember -- do

16    you have any recollection of one of the quench

17    towers originally having a quenching system where

18    the quench water just quenched the coke one time,

19    and then was discharged through the storm drains?

20    A.   No.  As far as I can recollect, it was always

21    recycled.

22    Q.   Do you recall that quench tower number 2 had a

23    recycling system in it to recycle the quench water?

24    A.   Right, yes.

25    Q.   And do you recall during this 2005-2009 time

1    period that quench tower number 1, the west quench

2    tower, the taller tower, actually had to have a

3    recirculation system installed in it?

4    A.   That is correct.

5    Q.   And is it correct that that required a

6    significant amount of piping at the base of the

7    tower in order to capture -- construction of a

8    concrete moat first of all, correct?

9    A.   Well, the moat was already there for the

10   containment for the water.  But it had to be piped

11   to recirculate the water back into the holding

12   tower.

13   Q.   All right.  And do you recall how long that

14   work took in order to accomplish that recirculation

15   of the water in quench tower number 1?

16   A.   I really don't remember how long the tower was,

17   quote, down or out of service.

18   Q.   All right.  But as a matter of fact, again

19   during this 2005-2009 time frame, you remember that

20   one or another of the towers were, at times, out of

21   service for possibly weeks or even more on end,

22   correct?

23   A.   Most of my recollection would be anywhere from

24   a day to maybe three or four days at the most on

25   one of the towers.

1    Q.   Okay.  But the work you just were testifying

2    about with regard to quench tower number 1 was not

3    accomplished in that time frame, correct?

4    A.   I don't remember how long it took or when they

5    actually initiated that.

6    Q.   All right.  Now, you also testified that based

7    on the observations you actually made of the

8    quenching operations in these two towers, you

9    recall at times that these quench towers were used

10   on an alternating basis, correct?

11   A.   Yes.

12   Q.   And isn't it true, Mr. Dahl, that you saw

13   quench tower number 1, the west quench tower, used

14   more frequently in the winter months, is that

15   correct?

16   A.   No.  To the best of my knowledge they were

17   still alternated practically every other oven.

18   Q.   No.  My question is, is it true --

19          MR. MANGO:  I'm going to object.  It's the

20   same question.  I think he's going to -- he

21   answered the question no, and then he explained it.

22          THE COURT:  All right.  Well, I mean, your

23   objection is noted, but I'll permit a next

24   question.

25   BY MR. LINSIN:

1    Q.  You've given a number of interviews over the

2    course of the last couple of years about the facts

3    you were just testifying about, correct?

4    A.  That's correct.

5    Q.  All right.  And do you recall giving an

6    interview to Mr. Piaggione and some of the agents

7    about this subject regarding quench tower use,

8    among other topics?

9    A.  Yes.

10   Q.  All right.  May I have for -- what's been

11   marked for identification as Government's Exhibit

12   3513.05?

13            MR. MANGO:  Your Honor, again, this is up

14   on the witness's screen.  I haven't heard him say

15   that he, you know, is unable to make a recollection

16   where he's going to need to be refreshed.  These

17   are not his notes, and I don't think they're proper

18   at this point to be up on the screen.

19            THE COURT:  Well, it depends on what

20   you're going to do with it.  If it's an impeachment

21   matter, it's another thing.

22   BY MR. LINSIN:

23   Q.  No.  Fair enough.  Let's take this down for

24   just a moment.  Hold that thought, if you would.

25       Do you recall when you spoke to Mr. Piaggione

1    and some of the agents what you told them about the

2    quench tower usage?

3    A.   I don't remember.  It's been so long.

4    Q.   Okay.  May I now have Government's Exhibit

5    3513.05 for identification?

6         THE COURT:  All right, and it is on the

7    monitor at this point, but limited.

8    BY MR. LINSIN:

9    Q.   Yes.  And I'm going to ask you, first of all,

10   do you see the exhibit sticker 3513.05 at the top

11   right-hand corner, correct, Government's Exhibit?

12   A.   Yes.

13   Q.   These are not your notes, correct?

14   A.   No, I can't even read the writing.

15   Q.   All right.  We'll give this a go.  Can you read

16   that name?

17   A.   No.

18   Q.   All right.  Let me go to the third page of this

19   exhibit, please.  If we could enlarge that section

20   of the notes.  And my request for you, Mr. Dahl, is

21   just this, to read through these notes as best you

22   can, and just tell me when you're done reading

23   through them, and I have a question for you.

24        MR. MANGO:  Your Honor, I've got to object

25   here.  He didn't recognize the notes.  We have no

2366

1    tie-in of these notes to this witness.  I think the

2    foundation is lacking here for the use of these

3    notes.

4              THE COURT:  It's not lacking if he can

5    read this document.  Because he can use anything to

6    refresh his recollection, as you know.  So, once

7    that's established, then we're okay.

8              THE WITNESS:  I'm not sure where you're

9    going, but I'll say that doesn't look familiar at

10   all to me.

11   BY MR. LINSIN:

12   Q.  If we can take this down.  Now here's my

13   question, setting those notes aside for a moment.

14       Do you now remember what you told Mr. Piaggione

15   and some of the agents in one of these earlier

16   interviews about the quench tower usage?

17   A.  No.

18   Q.  All right.  Do you recall that part of the

19   difficulty with regard to quench tower number 1 in

20   the winter was that the pipes would sometimes

21   freeze?

22   A.  Yes.

23   Q.  Because they weren't being used, do you recall

24   that?

25   A.  If you don't use it, yes, about every hour to

2367

1       two hours, you could have your pipes freeze, yes.

2       Q.  And do you recall that there was, in fact, a

3       computerized automatic quenching system put in to

4       quench tower number 1 so that the water would flow

5       through that quenching system without it having to

6       quench a load from the charge car, do you recall

7       that?

8       A.  Yes.

9       Q.  All right.  And do you recall when that was

10      done?

11      A.  I don't remember when it was put in, but it

12      would quench approximately once an hour or once

13      every two hours, depending on where they had it

14      set.

15      Q.  On an automatic basis, right?

16      A.  Yes.  Automatic, yes.

17      Q.  And to prevent the pipes from freezing.

18      A.  Right.  That's what we were told.

19      Q.  All right.  And you were asked some

20      questions -- general questions about the

21      intermittent observations of the usage of these

22      quench towers that you made over the years that you

23      testified about, correct?

24      A.  Yes.

25      Q.  All right.  But as you sit here today, you're

1    not able, are you, to tell us how -- what

2    percentage of time any one of those quench towers

3    was used in a given month, are you?

4    A.   No.

5    Q.   And you're certainly not able to tell us what

6    percentage of time those quench towers are used in

7    a given year, correct?

8    A.   No.  Based on normal day-to-day operations and

9    maintenance, I would say if you averaged it out, it

10   would be approximately 50/50.

11   Q.   My question is not for you to guess, sir.  My

12   question is you made certain observations at

13   certain intervals of time, correct?

14   A.   Yes.

15   Q.   And the testimony you just offered was a

16   generalization based on those occasional

17   operations, correct?

18   A.   Right.  We never actually kept track of which

19   tower we were using for every oven.  No, you

20   couldn't do that.

21   Q.   You didn't keep track of it either?

22   A.   I didn't, no.

23   Q.   And so if somebody were to ask you to tell us

24   with reliability what percentages of time either

25   one of these quench towers was used in any one of

2369

1    the years between 2005 and 2009, you couldn't tell

2    us that, correct?

3    A.  Dialed to an exact number, no.

4          MR. LINSIN:  I have nothing further.

5    Thank you, your Honor.

6          THE COURT:  Okay, Mr. Linsin, thank you.

7       Mr. Personius, it's been a long time, please

8    come on up.

9          MR. PERSONIUS:  Did you miss me, Judge?

10         THE COURT:  Do you want me to answer that?

11   CROSS-EXAMINATION BY MR. PERSONIUS:

12   Q.  Good afternoon, Mr. Dahl.

13   A.  Good afternoon.

14   Q.  We've met before, correct?

15   A.  Yeah, we have.

16   Q.  Okay.  Just so again you know who I am, I

17   represent Mark Kamholz.

18   A.  Yes.

19   Q.  Okay.  Just on your testimony regarding the

20   usage of these quench towers, what you're doing is

21   telling us that on those occasions when you paid

22   attention to the quench towers, it was your

23   impression that it was alternating, is that fair?

24   A.  You want to say that again, please?

25   Q.  Sure.  When you testify about the relative

1    usage of each quench tower -- let me start with

2    this.  You're not suggesting that it was your job

3    to keep track?

4    A.   Right, that's correct.

5    Q.   And you worked I think for the period of time

6    we're concerned with here primarily or exclusively

7    in the coal handling building, is that fair?

8    A.   Most of that time, yes, from after '05, '06,

9    yes.

10   Q.   During the course of the day as -- were you the

11   head of coal handling?

12   A.   Yes.

13   Q.   And what -- what would be your duties as the

14   head of coal handling?

15   A.   We processed the coal and make the blend for

16   the finished coal to go to the ovens.

17   Q.   All right.  And where is it that you -- within

18   the coal handling building, where is it you perform

19   these duties?

20   A.   I'm upstairs on what we call the operator's

21   floor, the main floor upstairs.

22   Q.   Okay.  Is that inside?

23   A.   Yes, it is.

24   Q.   All right.  And when you're inside doing that,

25   can you see the quench towers?

1    A.   Absolutely.

2    Q.   Where do you see them?

3    A.   If I walk over to -- 20 feet over to the other

4    side of my building at the top I can look right out

5    either window and see either tower.

6    Q.   How frequently when you're working do you do

7    that?

8    A.   Two, maybe three times on average, four times

9    maybe, depends on where I have to be in the

10   building on my floor based on what's happening.

11   Q.   And when you say two, three, four times, you're

12   talking about in the course of the day?

13   A.   No, probably in a four-hour, five-hour period

14   approximately, what it takes us to make the coal

15   run.

16   Q.   Why don't you tell us how many times you go

17   over and make this observation during the course of

18   a shift?

19   A.   I would be on that side -- you're talking the

20   coal handling now on the building.  I would be over

21   there anywhere from two to four times on that

22   particular side of the building in the four to five

23   hours.

24   Q.   When you say "four or five hours", you work a

25   four- or five-hour shift?

1    A.   That's what it takes approximately for our run

2    time.  We're still there eight hours doing other

3    things.  But the actual run would be on average

4    four, maybe five hours.

5    Q.   Are you telling us, whether it's two times or

6    four times during this five-hour period, you would

7    specifically go over to check which quench tower

8    was being used?

9    A.   No, not at all.  I'm saying that I was in the

10   area and quite able to see what's going on in other

11   areas of the plant.

12   Q.   Okay.

13   A.   At any given time.

14   Q.   When you would go over in this area where you

15   could see the quench towers, you're not telling us

16   you were always paying attention to which quench

17   tower was being used?

18   A.   No.  You could tell by the wind.  You can tell

19   by the sound of the quench wagon as to which tower

20   it's going to just by the travel alarms.

21   Q.   But as far as suggesting to this jury that you

22   kept track of which quench tower was used on which

23   occasion, that wasn't part of your job to do that,

24   was it?

25   A.   No, it was not.

1    Q.  Again, what you're telling us is your best

2    impression of what the usage of the towers was,

3    correct?

4            MR. MANGO:  Objection, your Honor.  Asked

5    and answered.  We've covered this.

6            THE COURT:  I'll allow this one and then

7    move on.

8            MR. PERSONIUS:  I will.

9            THE WITNESS:  No, it was not my job to

10   keep track of it.  No.

11           MR. PERSONIUS:  I'll move on.

12           THE COURT:  Okay.

13   BY MR. PERSONIUS:

14   Q.  Now, the coal fields where the coal piles

15   were --

16   A.  Yes.

17   Q.  The coal piles themselves are on a base of

18   coal, is that true?

19   A.  Yes.

20   Q.  And the depth of that coal that these coal

21   piles sit on is how deep?

22   A.  Anywhere from maybe 12 inches up to 2 feet,

23   sometimes even 3 feet thick from the clay.

24   Q.  You just mentioned clay.  Underneath the coal

25   is clay?

1    A.   Yes.

2    Q.   When -- did you ever, yourself, actually take

3    the coal tar sludge from the tar bin in a front end

4    loader and put it in the coal piles?  Was that part

5    of any job you ever had?

6    A.   Not for me, no.

7    Q.   And as far as the fire is concerned that you

8    testified about, you told us that it's your

9    recollection that there were tons, did you say, of

10   coal tar that ran out?

11   A.   Based on the amount that I could see, I'm going

12   to say there might have been anywhere from 10 tons,

13   15 tons on the ground, yes.

14   Q.   All right.  Are you telling the jury that you

15   observed that happen?

16   A.   After the fire, yes.  When all the smoke

17   cleared obviously you could get a much better view

18   of it.  I think if you look at some of the

19   pictures, you'll see it.

20   Q.   Okay.  So is your testimony based on what you

21   saw that day or based on seeing pictures?

22   A.   No, I was actually there.  I was there trying

23   to put the fire out during everything.  It was

24   quite hectic that day.

25   Q.   Do you remember you were -- that you testified

1    in the grand jury?

2    A.   Yes.

3    Q.   Okay.  Do you remember that that was on

4    February 4th of 2010?

5    A.   I don't remember the exact date, but that

6    sounds fairly close, yes.

7    Q.   Did you have a chance to review a transcript of

8    that testimony before you took the stand here?

9    A.   Yes.

10   Q.   Did you review it?

11   A.   Some of it, yes.

12   Q.   When you say "some of it", what part did you

13   not review?

14   A.   Well, it was a very long document.  I don't

15   think you'd sit down and read it in 20 minutes.

16   Q.   Were you only given 20 minutes to read it?

17   A.   No, I had plenty of time to read it.  But I

18   only read what I read.

19   Q.   And it was your own choice not to read the

20   whole transcript?

21   A.   Right.

22   Q.   What you did read, did you find it to be

23   accurate?

24   A.   Some of it was accurate, some of it was very

25   confusing for me.  There were a lot of questions.

1   It seemed to be very overwhelming at the time.

2   Q.  What was overwhelming?

3   A.  Just the scope of the entire investigation

4   along with the federal raid, and then all of the

5   questions and things that were happening around

6   that.

7   Q.  All right.  When you tell us that "it was

8   overwhelming", are you referring to the experience

9   of testifying in the grand jury?

10  A.  Yes.  I don't do real well in front of a lot of

11  people.  I'm quite shy actually, and just like to

12  keep to myself.

13  Q.  When you read the transcript of your testimony,

14  what parts of it you read, did you find, based on

15  your recollection, that what the transcript showed

16  of the questions asked and the answers you gave was

17  accurate?

18  A.  Some were and some weren't, yes.

19  Q.  Can you give us an example of something that

20  you saw in the transcript that was not accurate?

21  A.  The process of handling the tar sludge, coal

22  tar, and I'll say it again, some of it did go in

23  the pad, some did go in the piles.

24  Q.  But this was -- your testimony was inaccurately

25  recorded in this transcript?

1    A.   Right.

2    Q.   Did you bring that to the attention of anyone?

3    A.   No.

4    Q.   All right.   There were other errors in the

5    transcript?

6    A.   I'd have to go back and actually review

7    everything if we're talking specifics.

8    Q.   All right.   Let's, if we could please, put

9    Government Exhibit for identification 3513.02 on

10   the screen, please.

11       Do you see on the screen, Mr. Dahl, there's a

12   document, and it has a yellow sticker on it?

13   A.   Yes.

14   Q.   It has a number on the sticker 3513.02?

15   A.   Yes.

16   Q.   This is the first page of your grand jury

17   transcript, do you agree?

18   A.   Right.

19   Q.   If we could please, Lauren, I need to go to --

20   my copy of this, I apologize, does not have numbers

21   at the bottom, but I'd like to get to page 54 of

22   the transcript.

23       MR. LINSIN:  Your Honor, may I consult

24   with Mr. Personius for just a brief moment?

25       THE COURT:  Certainly.  Certainly.

1           MR. PERSONIUS:  The page we're on,

2     Mr. Dahl, you can't see it on your copy right now,

3     but this is page 43, your Honor, of the exhibit.

4           THE COURT:  All right.  But there is the

5     number 54 in mid page?

6     BY MR. PERSONIUS:

7     Q.  Yes, on the page.  This is actually page 54 of

8     the grand jury transcript.

9         Do you see the number 54?

10    A.  Yes.

11    Q.  Mr. Dahl?  Could you make that part larger,

12    please?  Grab that line above it please if you

13    could too, please, Lauren.  You're still missing

14    it.  Line 9.  It's my fault.

15        All right.  Now, while you were in the grand

16    jury you were asked, starting on line 9 on page 54,

17    and I guess -- this is a question, "And I guess

18    going to -- did you see the coal tar sludge sort of

19    spilling out of the tank during this fire?"

20        And your answer was, "Right.  It was in the

21    summertime, so the tar gets soft in the summer, and

22    then, of course, with the fire and the heat of the

23    fire, I'm sure a lot of it ran in that area.  That

24    area is all pretty much dammed off or dyked off.

25    It's a low spot to begin with.  It sits in between

1   roads.  There's roads on either side of it, and

2   that area is hollowed out in the middle where the

3   tanks are."

4      Question:  "But you did see some coal tar

5   sludge coming out of the tank?"

6      And your answer was, "Yes, there was a little

7   bit seeping out of the edge of the tank.  Obviously

8   you can see it right there."  And then it has in

9   parentheses, indicating.  And then you said, "yes",

10  correct?

11  A.  Yes, I believe the indicating was when they

12  showed a picture of the tanks if I recall right.

13  Q.  So what you're referring to here is, after you

14  said, "I'm sure a lot of it ran in that area", and

15  then you said "There was a little bit seeping", you

16  were shown some kind of a photograph of one of

17  these tanks?

18  A.  I believe so, yes.

19  Q.  All right.  And do you remember, do you know

20  when that photograph was taken that you looked at?

21  A.  Looked to me like it was shortly after the

22  fire.

23  Q.  All right.  You can take that down, Lauren.

24  Would you put up, please, Lauren -- this is in

25  evidence, Judge -- Government Exhibit 125.01.

1        Do you see the photograph in front of you --

2    A.   Yes.

3    Q.   -- Mr. Dahl?  Do you see this is Government

4    Exhibit 125.01?

5    A.   Right.

6    Q.   You see before it it says 7/08/2008.

7    A.   Yes.

8    Q.   Is this photograph familiar to you?

9    A.   Yes.

10   Q.   And is this the photograph you were shown in

11   the grand jury?

12   A.   I don't remember.

13   Q.   All right.  Well, is it your testimony that you

14   somewhere can see in this photograph tons of this

15   coal tar that you've testified here under oath came

16   out of this tank?

17   A.   I want to say that it was the other picture of

18   the tank with the tar on the outside.

19   Q.   Can we go, Lauren, please to -- in evidence,

20   your Honor, Government Exhibit 125.02?

21        Do you recognize what's shown in this

22   photograph, sir?

23   A.   Yes.

24   Q.   Was this shown to you in the grand jury?

25   A.   I believe so, yes.

1    Q.   And again it has a date of 7/8/2008?

2    A.   Correct.

3    Q.   By the way, that either was the day of or the

4    day after the fire occurred, if you recall?

5    A.   It was -- right.  It would had to have been the

6    day or the day after I would say, yes.  Somewhere

7    right close.

8    Q.   We can agree this photograph doesn't depict any

9    leakage of coal tar?

10   A.   No.

11   Q.   Okay.  Could we go to, Lauren, please to

12   Government Exhibit 125.03 in evidence?

13        Do you recognize this photograph, Mr. Dahl?

14   A.   I don't remember if I saw this one or not.

15   Q.   Again, just so we note it, it says 7/08/2008 at

16   the lower right?

17   A.   Yes.

18   Q.   And could we please go to Government

19   Exhibit 125.04 in evidence?

20        Do you recognize this photograph?

21   A.   Yes.

22   Q.   All right.  What does that depict?

23   A.   The tank and part of the moat, and also the

24   tanker car that was parked near the tanks.

25   Q.   Okay.  Just for the jury's benefit, please,

2382

1    where's the tanker car?

2    A.   What do you mean where is it?

3    Q.   You said you see the tanker car in this

4    photograph.  Point to it with your finger.  I think

5    you'll make a spot on the screen if you do.  Thank

6    you.

7        All right.  And tell the jury what that is,

8    please.

9    A.   It was just a car that was parked in front of

10   the tanks, and it had sat there for as long as I

11   can remember.

12   Q.   Do you see that part of this -- what you

13   described as this tanker car has been cut open?

14   A.   Yes.

15   Q.   And do you know whether or not that tanker car

16   was being worked on with torches at the time the

17   fire started?

18   A.   I don't know.

19   Q.   So as far as what caused the fire, you don't

20   know?

21   A.   They were in the process of removing either the

22   tanks or the tanker car at the time.  But I'm not

23   sure what they were doing when the fire started.

24   Q.   All right.  So the answer to my question is you

25   don't know?

1    A.   Right.

2    Q.   Was this photograph 125.04 shown to you in the

3    in the grand jury?

4    A.   I don't remember.

5          MR. PERSONIUS:   One minute please, Judge.

6    BY MR. PERSONIUS:

7    Q.   Lauren, this is for identification, Government

8    Exhibit 125.05, please.   All right.   This is

9    just -- this is just for identification.

10        Mr. Dahl, do you see this picture says 125.05?

11   A.   Yes.

12          MR. MANGO:   Your Honor, we would not

13   object to the introduction of this photograph.

14          MR. PERSONIUS:   Okay.

15          THE COURT:   Mr. Linsin, any objection?

16          MR. LINSIN:   No objection.   Thank you,

17   your Honor.

18          THE COURT:   Okay.   125.05 received, no

19   objection.   It may be published.

20          (Government's Exhibit 125.05 was received

21          into evidence.)

22   BY MR. PERSONIUS:

23   Q.   Mr. Dahl, do you see this photograph 125.05 on

24   the screen?

25   A.   Yes.

1    Q.  Do you recognize what's shown in this picture?

2    A.  Yes.

3    Q.  It's similar to 125.04?

4    A.  Looks like it, yes.

5    Q.  All right.  And again, it has the date

6    7/08/2008 in the lower right?

7    A.  Yes.

8    Q.  Is this photograph familiar to you?

9    A.  I don't recall seeing these pictures up until

10   just today.  The pictures I recollect were of the

11   tanks that were already burned or pretty much down

12   on the ground.

13   Q.  So they had been cut down?

14   A.  Partially, yes.

15        MR. PERSONIUS:  Okay.  Just a minute,

16   Judge.  I've got to figure out which ones those

17   are.

18        THE COURT:  Why don't we break for lunch

19   at this point.

20        MR. PERSONIUS:  Okay.

21        THE COURT:  And we'll resume again at

22   about 2:00 o'clock, ladies and gentlemen.  Might be

23   a just a couple of minutes after that.  Keep your

24   minds open.  Please don't discuss the case.  There

25   happens to be a news article today in the local

1    news section of the paper relating to this case.

2    So, I mean, don't buy a paper, don't read it, don't

3    do anything that would interfere with the

4    information you're gathering here in the courtroom.

5    Keep anything in the media aside.

6         Okay.  You've been great.  Enjoy the lunch.

7    Sun's out there.  Spring is almost sprung, so we'll

8    see you today a little after two.

9              (Jury excused from the courtroom.)

10             THE COURT:  Okay, Mr. Dahl, you can step

11   down.  Thank you.  You have to be back about

12   2:00 o'clock.

13        Thank you.  We'll see you around two.

14             MR. PERSONIUS:  Thank you.

15             MR. LINSIN:  Thank you.

16             THE COURT:  Thank you.

17             (Lunch recess was taken.)

18             (Jury not present in the courtroom.)

19             THE COURT:  Are there any preliminary

20   matters, or are we set to go?

21             MR. MANGO:  Judge, we did resolve the

22   issue with the document I believe.  If you'd like,

23   we can resume Mr. Corbett's cross-examination after

24   Mr. Dahl.

25             THE COURT:  Okay.

1          MR. LINSIN:  I can confirm, your Honor, we

2     received an email that was written by Mr. Corbett's

3     supervisor on the day of that June inspection.  It

4     recounts a discussion concerning Mr. Corbett.  That

5     may have been all that was produced.  It's not

6     quite consistent with what the witness testified,

7     but we're satisfied the government has searched the

8     files and provided what they are able to identify.

9          THE COURT:  Okay.

10          MR. PIAGGIONE:  If I can just add, your

11     Honor, we did speak to Mr. Corbett, and basically

12     he said it appeared that he gave an oral report to

13     his supervisor, who then issued this email to

14     someone else.  And that's why it didn't register

15     coming from Mr. Corbett.  And that's why it wasn't

16     produced before.

17       The second inspection, defense counsel had the

18     memo which he gave a report.  However, it was dated

19     much later than the actual inspection.  So there

20     wasn't a connection made on that until we pointed

21     that out.

22          THE COURT:  Okay.  The record will so

23     reflect.  I'll guess we'll recall David Dahl first,

24     and we'll complete the examination.

25          MR. PIAGGIONE:  Your Honor, if I could,

1      there was one other issue before Mr. Corbett comes

2      back to the stand.  Defense counsel indicated he

3      was going to attempt to read parts of a stipulation

4      that had been given to the jury -- already had been

5      read to the jury before, and this witness has

6      indicated he has no personal knowledge of that

7      stipulation.  We don't see how that's going to be

8      relevant.  It's already been placed before the

9      jury, and it appears to be repetitive or bolstering

10     of some sort.

11              THE COURT:  That's with respect to

12     Mr. Corbett?

13              MR. PIAGGIONE:  Yes, your Honor.

14              THE COURT:  Let's deal with it at that

15     time.  We'll take care of Mr. Dahl right now, and

16     we can move on.

17         Mr. Dahl, if you resume the stand, please, and,

18     Chris, if you bring the jury in, please.

19              (Jury seated.)

20              THE COURT:  Welcome back, ladies and

21     gentlemen.  Please have a seat.

22         Okay.  The attorneys and parties are back,

23     present.  You, of course, are all here, and you

24     know that roll call is waived.  Witness David Dahl

25     is on the witness stand.  He remains under oath.

1    He's on cross-examination.

2         Mr. Personius, I think you're ready to resume?

3              MR. PERSONIUS:  Yes, Judge.

4              THE COURT:  Thank you.  If you would,

5    please.

6    BY MR. PERSONIUS:

7    Q.  Good afternoon, Mr. Dahl.

8    A.  Good afternoon.

9    Q.  When we broke for lunch, do you remember that

10   you had been referred to a section of your grand

11   jury testimony from February 4th of 2010?

12   A.  Yes.

13   Q.  And you recall that that related to testimony

14   you provided regarding the amount of coal tar that

15   you recollected at the time of your grand jury

16   testimony had come out of the tank at the time of

17   the fire?

18   A.  Yes.

19   Q.  All right.  And I had shown you a number of

20   photographs?

21   A.  Right.

22   Q.  And I understood your testimony to be that it

23   was none of those photographs that was shown to you

24   at the time of your grand jury testimony, is that

25   correct?

2389

1    A.   That's correct.

2    Q.   All right.  Could we please, Lauren, have

3    Government Exhibit -- this is in evidence, 3.04 put

4    on the screen?

5              THE COURT:  And it is published.

6    BY MR. PERSONIUS:

7    Q.   Mr. Dahl, do you see this picture that's on the

8    screen?

9    A.   Yes.

10   Q.   Is this the photograph that was shown to you in

11   the grand jury?

12   A.   It looks like one of them, yes.

13   Q.   Okay.  And is this a photograph you were

14   referring to when you provided the testimony about

15   seepage --

16   A.   Yes.

17   Q.   -- out of the edge of the tank?

18   A.   Yes.  I believe there were two different

19   photographs.  That's one of them with the tar

20   running over the side, yes.

21   Q.   Okay.  Is this -- well, first of all, show us

22   where in this photograph you were referring to in

23   your grand jury testimony.

24   A.   You're talking for the tar coming out of the

25   tank?

1    Q.   Right.   What you had said in your testimony

2    was -- this is Government Exhibit 3513.02 on page

3    43 of the exhibit.   And I'm reading from lines 20

4    through 22 of your testimony on page 54 of the

5    transcript.   You said, "Yes, there was a little bit

6    seeping out of the edge of the tank.   Obviously you

7    can see it right there."   And then the transcript

8    says "indicating".   And you said, "Yes".

9         So where were you referring to?

10   A.   This area right here.

11   Q.   Okay.   Now is this how the tank appeared at the

12   time of the fire?

13   A.   Right after the fire, yes.

14   Q.   Okay.   This is how the tank looked?

15   A.   The best of my knowledge, yes.

16   Q.   All right.   Can we go to Government

17   Exhibit 3.05?

18             THE COURT:   That's what we have here.

19             MR. PERSONIUS:   That's in evidence.

20             THE COURT:   This is -- okay.

21             MR. PERSONIUS:   Yes, it is in evidence,

22   Judge.

23             THE COURT:   And it's published.

24   BY MR. PERSONIUS:

25   Q.   Mr. Dahl, is this another of the photographs

2391

1    that was shown to you in the grand jury?

2    A.   Yes.

3    Q.   All right.  And is this a photograph of the

4    same area that's shown in the last photograph, do

5    you know?

6    A.   I believe it's the other side of the same tank.

7    Q.   All right.  But when you testified in the grand

8    jury and pointed to the seepage, you were referring

9    to the last photograph, not this one?

10   A.   Right.

11   Q.   Okay.

12   A.   Yes.

13   Q.   And just to finish this out, would you go to

14   3.06?

15       Do you see this photograph?

16   A.   Yes.

17   Q.   Were you shown this in the grand jury?

18   A.   I don't remember seeing this one, no.

19   Q.   And Lauren, 3.07 in evidence, please.

20       Do you recognize this photograph?

21   A.   No.

22   Q.   All right.  And 3.08 in evidence please,

23   Lauren.

24       Were you shown this one in the grand jury, this

25   photograph?

1    A.  I don't think so, no.

2    Q.  And then the last one, Lauren, would be 3.09 in

3    evidence.

4        Were you shown this one in the grand jury?

5    A.  No.

6    Q.  All right.  So just for a minute, Lauren,

7    please go back to 3.04.

8        This is the photograph you were referring to in

9    the grand jury?

10   A.  To the best of my knowledge, yes.  I was shown

11   two photographs, and they both had the tar coming

12   over the sides.

13   Q.  Okay.  And your recollection is this is how the

14   tank appeared after the fire?

15   A.  Yes.

16   Q.  All right.  Are you aware of the fact that this

17   photograph and 3.05 were taken about a year after

18   the fire?

19   A.  No.

20   Q.  And does that change your testimony about how

21   the tanks appeared after the fire?

22   A.  No, not really.  As far as I can recollect

23   that's what everything looked like.

24   Q.  Okay.  And then my last question, you had told

25   us that you reviewed parts of your transcript

1    before you took the witness stand?

2    A.   Yes.

3    Q.   And that you found errors in certain parts of

4    your testimony?

5    A.   Correct.

6    Q.   This testimony that I read to you about

7    seepage, was that one of the areas you found that

8    was an error in your testimony?

9    A.   I don't believe so, no.

10   Q.   Okay.

11           MR. PERSONIUS:  May I have a minute

12   please, Judge?  Lauren, you can take that down.

13           THE COURT:  Certainly.

14           MR. PERSONIUS:  Your Honor, that's all we

15   have at this time.

16       Thank you, Mr. Dahl.

17           THE COURT:  Okay, Mr. Personius, thank

18   you.

19       Mr. Mango, any redirect?

20           MR. MANGO:  Yes, your Honor.

21   REDIRECT EXAMINATION BY MR. MANGO:

22   Q.   Good afternoon, again, Mr. Dahl.  How are you?

23   A.   All right.

24   Q.   It was about three years ago we met, is that

25   correct, in the grand jury?

1    A.   I believe so, yes.

2    Q.   And if you can tell the grand [sic] jurors, was

3    that a fun experience for you, or a not a fun

4    experience?

5    A.   No, it was not pleasant.

6    Q.   All right.  And you mentioned, Mr. Dahl, you

7    mentioned that you were -- you felt a little

8    overwhelmed in the grand jury?

9    A.   Yes.  There was a lot going on, and I also had

10   some things in my personal life which were not

11   going very well at the time.  So there was quite a

12   bit of stress, yes.

13   Q.   Would it be fair to say it's a lot easier for

14   us to talk now in this setting than it was in the

15   grand jury?

16   A.   Yes.

17   Q.   Okay.  Would you describe yourself as being

18   nervous when you testified in the grand jury?

19   A.   Absolutely, yes.

20   Q.   Is it your testimony here today that you

21   observed 10 to 15 tons of coal tar come out of the

22   tank during the fire?

23   A.   Yes.

24   Q.   I'd like to pull up, your Honor, if we could,

25   Government Exhibit 125.04 in evidence.

1          Mr. Dahl, you were shown some photographs

2     during cross-examination, do you remember that?

3     A.   Yes.

4     Q.   Okay.  And this is published.  There's one tank

5     standing here on the left.  Do you see that?

6     A.   Yes.

7     Q.   Do you see another tank anywhere else that has

8     been torn down on this photograph?

9               THE COURT:  Why don't you point to the

10    first tank that you were referring to.

11    BY MR. MANGO:

12    Q.   Yes.  Do you see this tank --

13    A.   Yes.

14    Q.   -- here standing?

15    A.   Correct.

16    Q.   Okay.  Do you see anything else on this screen

17    with any -- any other tanks?

18    A.   Well, this area right here.

19    Q.   Okay.  In the background there?

20    A.   Yes.

21    Q.   Okay.  Lauren, if we could just focus in on

22    this, please.

23          Is that -- this area in the back, this is --

24    seems to be a torn-down tank, is that correct?

25               MR. PERSONIUS:  Your Honor, I object to

1       the leading.

2              THE COURT:  Sustained.

3    BY MR. MANGO:

4    Q.  Okay.  Mr. Dahl, what is that that's in the

5    background?

6    A.  As far as I can tell it's either part of one of

7    the tanks that was torn down, or it was the scrap

8    that was torn away and just left there.

9    Q.  Okay.  During the fire where did you make your

10   observations of coal tar -- 10 to 15 tons of coal

11   tar coming off of the tanks?

12   A.  It would have been the first tank as the road

13   splits, closest to the road, yes.

14   Q.  Okay.  So as the road -- let me ask you this

15   way.  If you're standing on a road and you're

16   looking north --

17   A.  You'd actually -- in our plant with our

18   directions, you would be looking northeast.

19   Q.  Okay.  Northeast.  So it would be the tank

20   towards the right if you're standing and looking

21   north, northeast?

22   A.  You have two roads.  The tanks are split by

23   road.  There's two roads, one on each side of the

24   tanks.  It's kind of like a triangle, and the one

25   road comes on the thaw shed side of our plant.  The

1    other road comes down what we call Jamoke Road, and

2    we would be on Jamoke Road looking northeast.

3    Q.   And I believe you testified that the -- after

4    the fire, the tar on the ground stayed in that area

5    for a while until you saw Mr. Rogers excavating the

6    material?

7    A.   Right.  I don't recollect anything being moved

8    until they actually started with the excavator.

9              MR. MANGO:  If I could just have one

10   moment, please?

11             THE COURT:  Certainly, Mr. Mango.

12             MR. MANGO:  I think we're all set, your

13   Honor.  Thank you.

14             THE COURT:  Okay.  Is there any recross,

15   Mr. Linsin?

16             MR. LINSIN:  Nothing.  Thank you, your

17   Honor.

18             THE COURT:  Mr. Personius?

19             MR. PERSONIUS:  No, your Honor.

20             THE COURT:  Okay.  Mr. Dahl, you're

21   excused.  Thank you very much.  We appreciate it

22   have a good day.

23             THE WITNESS:  Thank you.

24             THE COURT:  Okay.  I think we're at the

25   point where Mr. Corbett is available for resumption

1    of cross-examination.

2              MR. PIAGGIONE:  Yes, your Honor.

3              THE COURT:  Okay.  If you could do that

4    and make him available, please.

5        Good afternoon, Mr. Corbett.  You ready to

6    assume your position?  You remain under oath, and

7    we are going to continue with cross-examination by

8    Attorney Greg Linsin.  Okay?

9              THE WITNESS:  Thank you.

10             MR. LINSIN:  Thank you, your Honor.  May I

11   proceed?

12             THE COURT:  Yes, you may.  Thank you.

13   CONTINUED CROSS-EXAMINATION BY MR. LINSIN:

14   Q.  Good afternoon, Mr. Corbett.

15   A.  Good afternoon.

16   Q.  When we broke with your testimony earlier

17   today, sir, I recall we were -- you were testifying

18   about these Barrett tanks that existed on the

19   Tonawanda Coke property.

20       Do you recall that?

21   A.  Yes.

22             THE COURT:  Can we just spell "Barrett"?

23   Because it sounds different at times, and I'm just

24   not sure what the exact spelling is.

25   BY MR. LINSIN:

```
 1    Q.  Do you know the spelling, sir?

 2    A.  I think it's B-A-R-R-R-E-T-T.

 3            MR. LINSIN:  I believe that to be correct,

 4    your Honor.

 5            THE COURT:  You defer to that, all right.

 6    Thank you, Mr. Corbett.

 7            THE WITNESS:  You're welcome.

 8    BY MR. LINSIN:

 9    Q.  And just for point of clarification, do you

10    know where that name came from?

11    A.  All I know is that's what Mr. Kamholz referred

12    to them as, that historical name.

13    Q.  Historical name for a prior user of one of

14    these tanks, is that what you recall?

15    A.  I don't recall that --

16    Q.  All right.

17    A.  -- detail.

18    Q.  All right.  But that actually gets us to the

19    point of departure in your earlier testimony.  I

20    believe I had asked you a question about the

21    material that was inside of these Barrett tanks.

22        Do you recall that?

23    A.  Yes.

24    Q.  And I think I had asked you -- first of all,

25    talking about the material that was inside of those
```

1    Barrett tanks, was it your understanding back at

2    the time of this inspection on June 17th, 2009, was

3    it your understanding that the material inside of

4    those Barrett tanks had been abandoned in those

5    tanks by a prior owner of the facility?

6    A.   That's what Mr. Kamholz told us.

7    Q.   All right.  And where we actually broke with

8    your testimony was that I think I had also asked

9    you if you understood that some of the material

10   that had been inside those tanks had actually

11   seeped out onto the ground in the area around the

12   tanks before Tonawanda Coke ever took over this

13   facility.

14        Did you know that?

15   A.   No, I did not.

16   Q.   All right.  Would that fact change your

17   understanding of the dynamics of this RCRA

18   inspection?

19   A.   No.

20   Q.   All right.  So you're comfortable understanding

21   and assuming for the rest of your testimony that

22   some of the material that had been in those tanks

23   had leaked out on to the ground around the tanks

24   before Tonawanda ever took over the plant, correct?

25        Are you comfortable assuming that as a fact?

1   A.   I'm comfortable with that.

2   Q.   All right.   Okay.   Now, may we please have,

3   Sheila, Defendant's Exhibit HHHH for -- I

4   apologize.   Is that already in?   Yes, I believe

5   this is already in evidence.   And I wish this was a

6   little darker, but, Sheila, could you enlarge the

7   bordered portion of this?   Thank you.

8        All right.   Now, take a minute, Mr. Corbett, if

9   you wish, and orient yourself to this.   But do you

10  recognize this as a portion of the diagram you made

11  reference to earlier in your testimony?

12  A.   Yes.

13  Q.   All right.   So I believe you had testified that

14  the group you were with, yourself and Mr. Grossman

15  and --

16  A.   Ellen Banner.

17  Q.   Thank you very much.

18       -- Ms. Banner had gone to the by-products area

19  at the plant initially, correct?

20  A.   Correct.

21  Q.   And you looked at the decanter tank tar bin

22  there?

23  A.   Yes.

24  Q.   And you talked about quantities of K087 that

25  was generated, is that correct?

1    A.   Yes.

2    Q.   And you moved, then, from that location as a

3    group over to the Barrett tanks, is that correct?

4    A.   That's correct.

5    Q.   And would you just tap the screen and indicate

6    where again those Barrett tanks are?

7         All right.  Now, why did you go to the Barrett

8    tanks?

9    A.   I think I stated earlier we had information

10   that there was a fire, and that there looked to be

11   releases from -- as a result of that fire and

12   cutting down of the structure of the tanks that we

13   wanted to look at.

14   Q.   All right.  In your mind, as an RCRA inspector,

15   an RCRA regulator, did you understand there would

16   be a difference in terms of the regulatory status

17   of this material if you were dealing with material

18   that had been abandoned in place before RCRA was

19   even enacted?

20   A.   I would have -- I would have known that

21   distinction had I known about these prior releases

22   you are talking about.

23   Q.   I'm sorry.  I'm not sure I understand your

24   answer.

25   A.   You prefaced the whole discussion with there

2403

1    were historical releases from the tanks.  I said I

2    was unaware of that.

3    Q.   All right.

4    A.   I said had I known that there were historical

5    releases, I probably would have known that there

6    would be some distinction between that and a

7    release that happened the same day.

8    Q.   Okay.  So, if I understand that answer

9    correctly, is it correct that under RCRA, materials

10   are covered differently, and there is a different

11   regulatory status for materials that had been

12   abandoned before RCRA was enacted as opposed to

13   wastes that are generated after RCRA was enacted,

14   is that correct?

15   A.   That's correct.

16   Q.   Okay.  But at the time you were out there, in

17   June of 2009, you were not aware that some of that

18   material had actually leaked out prior to

19   Tonawanda's taking over this plant, correct?

20   A.   Correct.

21   Q.   All right.  Now, I believe you testified -- I

22   may be mistaken -- that you were in this area

23   around the tanks about an hour or so, is that

24   correct?

25   A.   That's my estimation.

1    Q.   All right.  And did you ask Mr. Kamholz what

2    the plans were with regard to these tanks, what was

3    going to be done?

4    A.   I testified earlier that he stated that they

5    had planned to recycle the material --

6    Q.   All right.

7    A.   -- as K087.

8    Q.   All right.  To recycle it as K087, the material

9    that was inside the tanks, correct?

10   A.   Correct.

11   Q.   And was it from that -- after you left the area

12   of the Barrett tanks, is it then that you went up

13   to this area of the concrete pad?

14   A.   Yes.

15   Q.   All right.  Would you tap that portion of the

16   screen, please?

17        Did you have a discussion with Mr. Kamholz

18   about the use of that pad and what its purpose was?

19   A.   Yes.

20   Q.   And what did he explain to you?

21   A.   He explained that K087 had been recycled on

22   this pad in the past, but that they were now

23   recycling it in the coal field.

24   Q.   All right.  Did you talk with Mr. Kamholz about

25   when that pad had been installed at the plant?

1    A.   I believe there was -- it was -- there was a

2    question at least asked along that line.

3    Q.   And does it fit with your recollection that

4    this pad was installed here in the coal field at

5    Tonawanda Coke in 1994?

6    A.   That's the general time frame, I recall.

7    Q.   Does it also fit with your memory, Mr. Corbett,

8    that the pad was installed here because certain

9    other materials were going to be brought into the

10   plant from offsite?

11            MR. PIAGGIONE:   Objection, your Honor.

12   Defense is now testifying.  Defense counsel is now

13   testifying as to statements or evidence -- of

14   evidence that's not -- of facts that are not in

15   evidence, your Honor.

16            THE COURT:   All right.  Want to reput the

17   question?  I don't think it was complete.

18            MR. LINSIN:   All right.  Let me try it

19   this way.

20   BY MR. LINSIN:

21   Q.   Were you told what the purpose was for this pad

22   being constructed?

23   A.   Well, Mr. Kamholz said that K087 had been

24   recycled on this pad in the past.

25   Q.   And do you recall any discussion with

1    Mr. Kamholz at that inspection regarding offsite

2    material being brought to Tonawanda Coke?

3    A.  Yes, but it wasn't in reference to that pad.

4    Q.  Okay.  All right.  Now, was it at this time

5    that Mr. Kamholz talked to you about where the K087

6    recycling was occurring?

7    A.  Yes.

8    Q.  All right.  And if I recall, you testified

9    earlier that he pointed out a location just to the

10   west of this concrete pad where there was some coal

11   piles, correct?

12   A.  Correct.

13   Q.  And did he explain to you how the recycling --

14   how the mixing of the coal tar sludge was done in

15   that location?

16   A.  I don't recall if we talked about exactly how

17   it was done.  But I mean, he pointed out the area

18   where it was done.

19   Q.  Okay.  And that area included a coal pile,

20   correct?

21   A.  It was a flat surface.

22   Q.  The area of the coal field around here, what is

23   that surface?

24   A.  What is that surface?

25   Q.  Yes.  What is it made of?

1   A.   It's -- it's the ground.

2   Q.   Is that your recollection?

3   A.   Well, I mean, if I don't see a coal pile, I

4   assume that a flat surface is the surface of the

5   earth.

6   Q.   Did you happen to notice that the entire

7   surface of the coal field at Tonawanda Coke at the

8   time of this RCRA compliance inspection that you

9   conducted was actually coal?

10          MR. PIAGGIONE:  Objection.  Again, your

11   Honor, these are not facts in evidence.

12          THE COURT:  Overruled.

13      You may answer that question.

14          THE WITNESS:  Well, the fact is that every

15   place on the facility has a black sheen to it.

16   It -- there is some amount of coal dust everywhere

17   on the site.

18   BY MR. LINSIN:

19   Q.   My question, Mr. Corbett, is, whether or not

20   you noticed during your June 16th, 2009, RCRA

21   compliance inspection, whether you noticed during

22   that inspection that the entire surface of the coal

23   field was covered in coal.

24   A.   When you say "coal" -- a coal pile to me is a

25   pile of coal.  If I'm on a flat surface, if you

2408

1    walk me out on a flat surface, to me, I'm on the

2    ground.

3    Q.   Okay.  Let's try it this way.  Did you observe

4    coal piles in the coal field during this --

5    A.   Yes, I did.

6    Q.   I'm sorry.  Did you observe coal piles in the

7    coal fields at Tonawanda Coke during the June 2009

8    inspection?

9    A.   Yes, I did.

10   Q.   And you were actually driving in this area in a

11   vehicle with your colleagues and Mr. Kamholz,

12   correct?

13   A.   Correct.

14   Q.   Now, the area on which you were driving, did

15   you notice what that was composed of?  The roadway

16   on which the vehicle was moving, did you notice

17   what that was?

18   A.   Like I said, the entire surface area of the

19   entire site has a black dusty look to it.  It could

20   be a combination of gravel, coal, dirt, you name

21   it.

22   Q.   I'm asking what you determined it to be.  Do

23   you know?

24   A.   Again, I'm on a flat surface.  I'm assuming

25   it's the ground.

1   Q.  So you assumed it was the ground?

2   A.  Yes.

3   Q.  Would it surprise you to learn that the coal in

4   the coal field at Tonawanda Coke, the surface

5   throughout that coal field, consists of 1 to 3 or

6   4 feet of coal?

7            MR. PIAGGIONE:  Objection.  Again, your

8   Honor, this is not facts in evidence.

9            THE COURT:  Yeah, sustained.

10  BY MR. LINSIN:

11  Q.  Did you do anything to inspect that surface of

12  the coal field during your RCRA compliance

13  inspection?

14  A.  No.

15  Q.  But your recollection is clear, that during

16  this June 2009 RCRA compliance inspection,

17  Mr. Kamholz told you that they were recycling their

18  K087 waste in the coal field --

19  A.  Correct.

20  Q.  -- correct?

21  A.  Correct.

22  Q.  And isn't it true, Mr. Corbett, that what

23  Mr. Kamholz told you actually during that

24  inspection was that the coal tar was placed on the

25  coal piles?  Isn't that what he said to you?

1   A.   I don't recall that.

2   Q.   All right.  May I please have for

3   identification Government's Exhibit 3509.05?

4        Do you see a yellow sticker up here, sir,

5   Government Exhibit 3509.05?

6   A.   Yes, I do.

7   Q.   Okay.  And do you recall being interviewed on

8   October 21st, 2009, by Special Agent Brian Kelly,

9   regarding your inspection at the Tonawanda Coke

10  facility?

11  A.   Yes, I do.

12  Q.   All right.  May we please go to page 2 of this

13  exhibit.  And enlarge this paragraph, please?  I'm

14  sorry.  Could we have the prior paragraph?

15       I'm going to ask you to read this paragraph

16  first and then the second paragraph on this page,

17  Mr. Corbett.  Read it silently to yourself, please.

18       I apologize.  I apologize.  Is this 3509.05?

19  Yes.  All right.  Can we just enlarge those two

20  paragraphs, please, on the second page of this

21  exhibit.

22  A.   Would you like me to read both of these

23  paragraphs?

24  Q.   Just read them to yourself, and then I have a

25  question to ask you after you read them.  Just let

1   me know when you're finished reading them.

2   A.  Okay.

3   Q.  All right.  Can we take this down, please?

4      Do you now remember, Mr. Corbett, what you told

5   the investigators in October of 2009 concerning

6   what Mr. Kamholz told you about where this K087 was

7   being recycled?

8   A.  Yes.

9   Q.  What did you tell them?

10   A.  I told them it was being done on the ground in

11   the coal field area.

12   Q.  Isn't it true, Mr. Corbett, isn't it true that

13   on October 21st, 2009, you told the criminal

14   investigators that Mr. Kamholz had told you four

15   months previous that coal tar from the tanks was

16   being put on the coal piles prior to baking the

17   coal to make coke?

18         MR. PIAGGIONE:  Objection, your Honor.  We

19   need -- there is a clarification needed.  That

20   paragraph that was read referred to the September

21   inspection, not the June 1, and now he's asking

22   about the June 1, as if those statements were made

23   in June.

24         THE COURT:  All right.  Well, let's get a

25   time frame clarification.

1    BY MR. LINSIN:

2    Q.  Is that your recollection, Mr. Corbett, that in

3    June Mr. Kamholz told you just generally that the

4    recycling was occurring on the coal fields, and in

5    September, when you went back, he said it was being

6    recycled on the piles?

7    A.  Well, the clarification is it's being spread on

8    coal in the coal field.

9    Q.  All right.  But the question I was asking you,

10   and it's a narrow one, did Mr. Kamholz tell you

11   that the recycling was occurring on the coal piles?

12   A.  Coal pile located in the coal field.

13   Q.  Fair enough.  Coal piles in the coal field,

14   correct?

15   A.  Correct.

16   Q.  All right.  Now, this is information you had

17   during the June 17th, 2009, RCRA compliance

18   inspection, correct?  Where the recycling was

19   occurring, you knew that, correct?

20   A.  Yes.

21   Q.  Now, based on your years of experience, and at

22   least your views of this recycling operation that

23   was being described, did you at that time believe

24   that the recycling process that Mr. Kamholz

25   described was in compliance with the RCRA

1    regulation?

2    A.  No, I did not believe it was in compliance.

3              THE COURT:  I'm sorry.  What did you --

4              THE WITNESS:  No, I didn't believe it was

5    in compliance.

6    BY MR. LINSIN:

7    Q.  And it was your practice, over the many years

8    you've been working as a RCRA inspector, wasn't it,

9    if you detected a violation of the RCRA

10   regulations, it was your practice to inform the

11   regulated facility if you had observed what you

12   believe to be a violation, correct?

13             MR. PIAGGIONE:  Objection.  Again, your

14   Honor, no foundation for what his practice was.  He

15   hasn't testified as to what his practice was.

16             THE COURT:  There's nothing wrong with

17   that question.  I'll allow it.

18        Overruled.

19        You may answer, was it your practice?

20             THE WITNESS:  Yes, it was my practice to

21   inform the regulated entity if they were not in

22   compliance.

23   BY MR. LINSIN:

24   Q.  All right.  And on June 17th, 2009, did you

25   tell Mr. Kamholz that you believed that this

1   recycling process that he described to you was not

2   compliant with RCRA?

3   A.   No, I did not.

4   Q.   And was that because Mr. Grossman told you not

5   to?

6   A.   He asked me not to -- not to bring it up

7   because we needed to gather more -- more

8   information to be clear about the violations.

9   Q.   Well, you just testified that, in your view,

10  right then, you believed that the recycling process

11  Mr. Kamholz described was in violation of the RCRA

12  regulations, correct?

13  A.   I have more experience than Mr. Grossman on

14  those -- on this subject matter.

15  Q.   I know.   And based on that depth of experience,

16  it was at least your view on June 17th, 2009, that

17  the recycling operation Mr. Kamholz described was

18  not in compliance with the regulations, correct?

19  A.   That's correct.

20  Q.   And so you didn't need to gather any additional

21  information, did you?

22  A.   I was part of the team, and we collectively had

23  to come to an agreement on the facts.   If I were

24  operating on -- on my own, if I was a lone

25  inspector, I would have certainly told Mr. Kamholz

1    that he was not in compliance.

2    Q.  Mr. Corbett, did this situation you found

3    yourself in make you uncomfortable?

4    A.  No.  Because -- because, as I say, it was more

5    than just me that needed to feel comfortable that

6    we had enough information to go forward.

7    Q.  Did you feel like somebody was being set up?

8    A.  No, I did not.

9    Q.  But you decided to leave the facility that day

10   not advising Mr. Kamholz or anybody else at the

11   company that you thought there was a violation of

12   the RCRA regs, correct?

13   A.  Correct.

14   Q.  And as a matter of fact, while you were there

15   in June, Mr. Kamholz told you that they planned --

16   they planned to recycle some of that -- some of

17   that K087 from the tanks, they planned to recycle

18   that material into the battery, didn't he?

19   A.  Yes, he did.  He did say they had planned on

20   handling that material.

21   Q.  And -- not handling, recycling it into the

22   battery, correct?

23   A.  Correct, yes.

24   Q.  And he told you how they were doing the

25   recycling, correct?

2416

1   A.   Well, he told me how they were doing the

2   recycling of their normal K087.

3   Q.   And he didn't say they were going to handle the

4   material from inside the Barrett tanks any

5   differently, did he?

6   A.   No, he didn't.

7   Q.   Did you caution him that if they handled the

8   material from inside the Barrett tanks in the same

9   way he has just described the decanter tar sludge

10  was being handled, that he would be not compliant

11  with the RCRA regulations?

12  A.   Again, we -- we hadn't -- we didn't know for

13  sure if the material in the Barrett tanks was even

14  K087 at that point in time.

15  Q.   You testified yesterday that Mr. Kamholz told

16  you it was.

17  A.   Yes, he did.  But he -- but obviously we needed

18  to -- to verify it for ourselves.

19  Q.   Mr. Corbett, did you caution Mr. Kamholz or

20  anyone else --

21  A.   No, I did not.

22  Q.   Please let me finish the question.

23       Did you, on June the 17th, 2009, caution

24  Mr. Kamholz or anyone else at Tonawanda Coke that

25  if they recycled the material from inside the

1    Barrett tanks in the same way they were recycling

2    the decanter tank tar sludge, that it could be

3    considered a violation of RCRA?

4    A.   No, I did not.

5    Q.   Now, you went back to your office and had

6    further conversations with Mr. Strickland and

7    Mr. Grossman and a number of other individuals,

8    correct?

9    A.   Correct.

10   Q.   How long after June -- the June 17th inspection

11   did those discussions occur?

12   A.   I can't recall the exact time frame.

13   Q.   All right.  Do you recall talking to your boss,

14   Jim Strickland the same day of this inspection?

15   A.   Yes, I do.

16   Q.   And do you recall telling him, Mr. Strickland,

17   that based on your inspection that you conducted

18   that day, that there appear to be violations

19   related to the coal tar recycling and introduction

20   of spent solvents from the lab into the coking

21   process?  Did you tell him that?

22   A.   Yes, I did.

23   Q.   And that there was also tar -- coal tar around

24   these old tanks, correct?

25   A.   Around the outside of the tanks --

2418

1    Q.   Yes.

2    A.   -- yes.

3    Q.   Did Mr. Strickland instruct you to inform

4    Tonawanda Coke or Mark Kamholz that this conduct

5    was viewed as noncompliant with RCRA?

6    A.   No.  He said we needed to consult with EPA

7    to -- to figure out what the next step should be.

8    Q.   Did Mr. Strickland have a different view of

9    these regulations than you did?

10   A.   I don't know.  You'd have to ask him.

11   Q.   Did he tell you he disagreed with you, sir?

12   A.   No, he didn't.

13   Q.   There's one RCRA statute, right?

14   A.   Yes.

15   Q.   Who made the decision to go back to Tonawanda

16   Coke three months later to collect samples?

17   A.   The EPA made the decision.

18   Q.   And what was the purpose of that follow-up

19   visit, other than to collect samples?

20   A.   That was pretty much -- that was the main

21   purpose in going to the facility.

22   Q.   Did you tour the coal fields during this fourth

23   inspection you conducted at Tonawanda Coke on

24   September 10th, 2009?

25   A.   Yes.

1   Q.   Did you observe the recycling process on that

2   date?

3   A.   I did not physically see the recycling process

4   in operation in any of the inspections.

5   Q.   Did you inspect what the consistency of the

6   coal field was that you were driving on and walking

7   on?

8   A.   Again, it was identical to the previous time I

9   was there.

10   Q.   My question is, did you inspect it?

11   A.   For what?

12   Q.   To determine what it was made of.

13   A.   No.

14   Q.   All right.  You observed that some of the

15   material inside the tanks had actually been

16   removed, correct?

17   A.   Yes, I did observe that.

18   Q.   And just as with the June inspection, when

19   asked about it, Mr. Kamholz explained to you where

20   they had recycled that material from inside the

21   tank, correct?

22   A.   Correct.

23   Q.   On coal piles, correct?

24   A.   In the coal fields.

25   Q.   Yes, on coal piles?

1    A.   In the coal fields, yes.

2    Q.   How long was the inspection on September 10th

3    of 2009?

4    A.   I think it lasted all day because the samplers

5    have strict protocol they have to follow, and it

6    takes them quite a bit of time to do everything

7    properly.

8    Q.   And I believe you testified yesterday that when

9    you returned for this second visit and Mr. Kamholz

10   told you how they were recycling this K087, you

11   again said nothing, is that correct?

12   A.   Correct.  Mr. Kamholz asked me, you know,

13   what's this all about?  Why are you here?  And I

14   said it's -- it's related to how you are physically

15   recycling K087.

16   Q.   Did you tell Mr. Kamholz that you believed that

17   the recycling operation that you observed in --

18   that you were informed about in June, and then

19   informed about again in September was a violation

20   of the RCRA regulation?

21   A.   No.

22   Q.   Now, at the conclusion of your testimony

23   yesterday you made some reference to -- I believe

24   you said a guidance that states that the recycling

25   of K087 cannot be done on the ground, is that

1    correct?

2    A.   Correct.

3    Q.   Now, are you referring to the regulation, the

4    RCRA regulation that governs this activity?

5    A.   No.   It's a guidance document that explains how

6    the recycling exemption is applied for K087 wastes.

7    Q.   Do you have a citation for that guidance

8    document?

9    A.   I don't have it with me, no.

10   Q.   Is it an EPA guidance document?

11   A.   I'm sure there is.

12   Q.   I'm not asking whether there is an EPA guidance

13   document.   The guidance document you're testifying

14   about, is that guidance document an EPA guidance

15   document?

16   A.   Yes.

17   Q.   Do you know when it was published?

18   A.   Not sitting here with resources in front of me.

19   I couldn't tell you.

20   Q.   Are you familiar with the RCRA regulations that

21   governs the exemption for K087 coal tar sludge?

22   A.   Yes.

23   Q.   Do you know what it says?

24   A.   Not literally.

25   Q.   Not literally?

1    A.   No.

2    Q.   Are you aware -- are you aware that that

3    regulation exempts K087 wastes from the definition

4    of solid wastes as long as certain conditions are

5    followed?  Are you aware of that?

6    A.   Yes, I am.

7    Q.   And those conditions include -- I'm sorry, the

8    exclusion includes --

9              THE COURT:  Well, put that again, please.

10   BY MR. LINSIN:

11   Q.   All right.  Is it consistent with your

12   understanding of that RCRA regulation that the

13   exclusion for K087 waste is conditioned on there

14   being no land disposal of the wastes from the point

15   they are generated to the point they are recycled

16   to the coke ovens for recovery or refining process?

17   A.   I'm familiar with that.

18   Q.   All right.  And so the condition is that there

19   be no land disposal, correct?

20   A.   Correct.

21   Q.   And your judgment was that what you heard from

22   Mark Kamholz in this June RCRA compliance

23   inspection of 2009, you believe that to be land

24   disposal that voided this exclusion, is that

25   correct?

2423

1    A.   Correct.

2    Q.   And yet you made a decision, as a part of this

3    team, that you were not going to inform Mr. Kamholz

4    of your views about these regulations, correct?

5    A.   Correct.

6            MR. LINSIN:   I have nothing further, your

7    Honor.   Thank you.

8            THE COURT:   Mr. Linsin, thank you.

9        Mr. Personius any recross -- or cross?

10           MR. PERSONIUS:   First time, Judge.

11           THE COURT:   Okay.

12   CROSS-EXAMINATION BY MR. PERSONIUS:

13   Q.   Good afternoon, Mr. Corbett.

14   A.   Good afternoon.

15   Q.   We have met before.   You don't remember it?

16   A.   No, I don't.

17   Q.   We met earlier today.

18   A.   Oh, I recall that.

19   Q.   All right.   Again, I'm Rod Personius.   I

20   represent Mark Kamholz.   You indicated to

21   Mr. Linsin that there had been a disclosure by

22   Tonawanda Coke back in the late '80s regarding its

23   generation of hazardous waste.

24       Do you remember that?

25   A.   Are you talking about a notification to EPA --

1    Q.   Yes.

2    A.   -- that they generate hazardous waste?

3    Q.   Yes.

4    A.   I acknowledged that -- that -- the fact that

5    they have an EPA ID number, that they had to have

6    made that notification.

7    Q.   Okay.  If we could do this, this is for

8    identification.  Sheila, could we please have

9    Defense Exhibit DDDD.02.

10        What is on the screen -- did you need a glass

11   of water first?

12   A.   No, I'm fine.

13   Q.   What is on the screen is Defense Exhibit for

14   identification DDDD.02.

15        Do you recognize that document?

16   A.   Well, I don't think I've seen it before.

17   Q.   Okay.  Take a minute and look at it and then --

18   you've looked at the Tonawanda Coke hazardous waste

19   file at the DEC before?

20   A.   Yes, I have.  I don't know if this document is

21   in it or not.

22   Q.   I want to make sure you look at it and let us

23   know if it's familiar to you, if you've seen it

24   before.  If you haven't, fine.

25   A.   I don't believe I've seen it before.

2425

1    Q.  Okay.  Could we put on the screen, Sheila,

2    please, for identification Defense Exhibit DDDD.01?

3    And now we have on the screen this exhibit.

4        My question is the same, Mr. Corbett, if you've

5    seen this before.

6    A.  I don't believe I've seen this document before.

7    Q.  And that would mean also that you didn't see

8    this in the DEC hazardous waste file for Tonawanda

9    Coke?

10   A.  I don't recall seeing it.

11   Q.  Okay.  All right.  Could you take that down,

12   please?

13       Mr. Corbett, you have testified, if I recall

14   correctly, that you've been an inspector on the

15   hazardous waste side with DEC for, or you were, for

16   about 25 years?

17   A.  Yes.

18   Q.  Okay.

19   A.  Approximately.

20   Q.  And retired a couple of years ago?

21   A.  Yes, a couple years ago.

22   Q.  If I -- if I understand correctly from your

23   testimony, in your interactions with Tonawanda Coke

24   that you testified about, that seem to back

25   to 2007 -- do I have that right?

1    A.   That's correct.

2    Q.   All right.  You never took a single note?

3    Well, let me ask it a different way.  For your

4    interactions with Tonawanda coke going back

5    to 2007, that you've testified in this courtroom

6    about --

7    A.   Yes.

8    Q.   -- did you ever take notes?

9    A.   Yes.  I took -- you mean written notes while I

10   was at the facility?

11   Q.   Yes.

12   A.   No.

13   Q.   Never took a note?

14   A.   Never took a note.

15   Q.   Is that always your practice -- was that always

16   your practice, as an inspector, not to take notes?

17   A.   Well, I mean, if I needed -- if I needed to

18   hone in on a specific issue where it was numbers or

19   data, then I would -- then I would have to take

20   notes, yes.

21   Q.   Otherwise, you never took notes?

22   A.   Well, I can remember the pertinent facts that I

23   needed to remember.

24   Q.   All right.  And would you then make some

25   memorialization about what you learned during an

1   inspection with a facility after you left the

2   facility?

3   A.   Yes, usually.

4   Q.   Go ahead.

5   A.   Usually right afterward.

6   Q.   What would you do?

7   A.   Go back to the office and start writing the

8   inspection report.

9   Q.   Beyond what you put in the inspection report,

10   would there be any other written memorialization

11   about your contact with the facility?

12   A.   Only if I were asked to do so by my superiors.

13   Q.   All right.  And if you had a conversation at a

14   facility during the course of -- whether it's an

15   inspection or a visit that you had with a

16   representative of the facility, would you ever

17   memorialize those conversations?

18   A.   Only if I were asked to.

19   Q.   Was this the way you were trained, not to have

20   a lot of paper in the file?

21   A.   I don't know what you're getting at.

22   Q.   Let me ask you a different way, if I can.

23   There were other inspectors in the offices with

24   you?

25   A.   Yes, there were other inspectors.

1    Q.   Was it your experience they also didn't make

2    any notes of their daily activities?

3    A.   I don't know how they went about their

4    business.

5    Q.   When you became an inspector, you received some

6    training about recordkeeping?

7    A.   Yes.

8    Q.   And did any of that training you received about

9    recordkeeping address the importance of maintaining

10   a contemporaneous record of contacts with

11   facilities?

12            MR. PIAGGIONE:   Objection, your Honor.  I

13   don't see the relevance of this.  He's already

14   testified he did not take notes.

15            THE COURT:   Overruled.

16            THE WITNESS:   Would you restate the

17   question?

18   BY MR. PERSONIUS

19   Q.   I'll try to.  You were trained when you became

20   an inspector some 25 or so years ago, correct?

21   A.   Yes.

22   Q.   I caught you in the middle of a drink.  Did the

23   training you received include recordkeeping

24   practices?

25   A.   Yes, it did.  It included how to fill out the

2429

1    inspection forms.

2    Q.   Okay.  Did it go beyond how to fill out the

3    inspection forms?

4    A.   Well, it taught you how to be an observer.

5    Q.   Okay.  But I'm talking about recordkeeping as

6    opposed to observing.  Did your training include

7    recordkeeping that went beyond how to fill out an

8    inspection form?

9    A.   Yes.

10   Q.   Okay.  And did the training include suggestions

11   or recommendations about maintaining a

12   contemporaneous record of contacts with facilities

13   that you would deal with in fulfilling your duties

14   as an inspector?

15   A.   That the -- that the training involved that?

16   Q.   Yes.

17   A.   No, it didn't.

18   Q.   Okay.  Beyond filling out an inspection form,

19   what did your training -- what instruction did you

20   get about recordkeeping other than how to fill out

21   an inspection form?

22   A.   I don't recall.

23   Q.   And is it true that for these contacts you've

24   testified about that you had with Tonawanda Coke

25   and Mark Kamholz, in particular, that there are no

1    notes?  You have no notes of any of those contacts?

2    A.  I believe there's plenty of information in the

3    file about what occurred at those inspections.

4    Q.  Okay.  And I'm sorry, I'm not being clear in my

5    question.  I'm talking specifically about notes.

6        Is it correct that you prepared --

7    A.  I already said I did not take notes at these

8    inspections.

9    Q.  Okay.  So there's no notes?

10   A.  There's no notes.

11   Q.  Okay.  Now, you told, I think it was

12   Mr. Linsin, that before you went to Tonawanda Coke

13   on June 17th of 2009, that you had received some

14   information from your supervisor, Mr. Strickland,

15   regarding Tonawanda Coke?

16   A.  That's correct.

17   Q.  Is that correct?

18   A.  Yes.

19   Q.  And -- and the information you received from

20   Mr. Strickland, you understood came to him through

21   Cheryl Webster?

22   A.  And her boss, Larry Sitzman.

23   Q.  And Larry Sitzman.  All right.  And the

24   information had to do with -- well, you tell me

25   again.  What did -- what topic did that information

1   relate to?

2   A.   It related to the K087 waste.

3   Q.   All right.  And --

4   A.   And it's recycling.

5   Q.   And did you receive any information -- how

6   specific was the information?  Did it indicate how

7   the K087 was being recycled?

8   A.   No, it just -- it was that there was

9   uncertainty as to whether or not the K087 was being

10  recycled properly.

11  Q.   I see, okay.  So you at least knew that much?

12  A.   I knew that much.

13  Q.   That's what you were told by Mr. Strickland,

14  was that there was uncertainty?

15  A.   Yes.

16  Q.   The source of their information was a fellow

17  inspector on the airside, Cheryl Webster?

18  A.   Correct.

19  Q.   Okay.  Did you then contact Cheryl Webster to

20  get more detail from her about what this

21  uncertainty was?

22  A.   Yes.

23  Q.   All right.  And do you remember what she told

24  you?

25  A.   She -- she said that it was her understanding

2432

1    that the recycling was happening in the coal

2    fields.

3    Q.   Okay.  So before you even went out there, you

4    had that information already from Cheryl Webster?

5    A.   Well, yes.

6    Q.   Okay.  And was it your understanding that she

7    had obtained that information from Mr. Kamholz

8    during an inspection that took place at Tonawanda

9    Coke in April of 2009?

10   A.   Yes.

11   Q.   All right.  And did Ms. Webster tell you

12   anything more than what you've told us, that it

13   related to the coal tar sludge being put on -- on

14   the coal in the coal field, or was that all they

15   told you?

16   A.   That's right.

17   Q.   That's what she told you?

18   A.   Yes.

19   Q.   And did that immediately raise question with

20   you as to whether or not that was proper?

21   A.   Yes.

22   Q.   Did you discuss that information you received

23   from Ms. Webster with anyone at DEC before you went

24   out on June 17th of 2009?

25   A.   With Jim Strickland.

1   Q.  All right.  And did he concur that that in your

2   mind posed a problem?

3   A.  He said it could potentially be a problem, yes.

4   Q.  So he wasn't as convinced as you were that it

5   was a problem?

6   A.  Well, he just wanted me to go confirm that

7   information.

8   Q.  Okay.  So, he told you when you went out on

9   June 17th, 2009, get more detail about exactly what

10  Tonawanda Coke is doing with the coal tar sludge

11  and the coal, right?

12  A.  Yes.

13  Q.  All right.  Did you do that when you went out

14  on June 17th of 2009?  In other words, did you get

15  more detail about exactly how the recycling was

16  occurring?

17  A.  Yes.

18  Q.  All right.  I must have missed that.  I'm

19  sorry.  What detail did you get?  Did you get the

20  detail from Mr. Kamholz?

21  A.  Yes, we got the details from Mr. Kamholz

22  directly.

23  Q.  And what did he tell you again?  I'm sorry.  I

24  must have missed this.  What did he tell you on

25  June 17th, 2009, regarding the recycling?

1    A.  Well, he said that the recycling had been

2    occurring on the pad, and that it was now occurring

3    in the coal fields.

4    Q.  All right.  And then you followed up and said

5    well, you know, give me some more detail about what

6    you're doing, right, with the coal fields?

7    A.  Well, we asked how the material was physically

8    brought out there.  So we were at the decanter.  We

9    saw a front end loader.  He said it was put in a

10   front end loader.  Transported via front end loader

11   to the coal piles in the coal field.

12   Q.  I see.  He told you all of this on June 17th of

13   '09?

14   A.  Yes.

15   Q.  And that the front end loader would go to the

16   coal fields and would take the coal tar sludge and

17   dump it into the side of a coal pile?

18   A.  He said it was mixed with coal in the coal

19   field.

20   Q.  Did you ask him for more detail about how that

21   was done?

22   A.  No.

23   Q.  Did you ask to go out in the coal field and see

24   this being done?

25   A.  It wasn't being -- that operation wasn't

1    occurring the day we were there.  There was no tar

2    in the decanter when we were there.

3    Q.  I see.  All right.  Had it been -- when

4    Mr. Kamholz makes this disclosure, had it already

5    been decided with Mr. Grossman from the EPA and

6    Ms. Banner from the EPA, that you were not going to

7    let Mr. Kamholz know that you thought this was

8    improper?  Was that decided ahead of time?

9    A.  No, it wasn't.

10   Q.  Had you discussed ahead of time with the two

11   individuals from EPA, Grossman and Banner, what you

12   had found out from Cheryl Webster?

13   A.  Yes.

14   Q.  Okay.  And what was -- did Mr. Grossman respond

15   to that?

16   A.  Respond to what?

17   Q.  When you told him that Mr. Kamholz, Tonawanda

18   Coke, Mr. Kamholz was causing the coal tar sludge

19   at Tonawanda Coke to go out and be mixed with the

20   coal in the coal fields.  You told that to

21   Mr. Grossman?

22   A.  Yes.

23   Q.  And did he respond when you told him that?

24   A.  He said he wanted to -- he needed to get more

25   information to figure out if that was, indeed, what

2436

1    was going on.  That's why he was there.

2    Q.  All right.  But what more information -- did he

3    tell you what more information he needed to get?

4    A.  No.  He needed to gather information, is what

5    he --

6    Q.  He didn't tell you what it was?

7    A.  No.

8    Q.  And you didn't ask?

9    A.  No.  I just met him the same day.  He came

10   in -- I hadn't talked to him prior to him coming in

11   to do this inspection.

12   Q.  All right.  All right.  And had not talked to

13   him ahead of time?

14   A.  No.

15   Q.  So your disclosure to him about what you found

16   out from Ms. Webster --

17   A.  Happened on the day of.

18   Q.  The day of?

19   A.  Yes.

20   Q.  Being June 17th, 2009?

21   A.  Correct.

22   Q.  Okay.

23   A.  I'm sure he was informed by his boss who was in

24   contact with my boss.

25   Q.  Who was his boss?

1    A.   Phil Flax.

2    Q.  And you're sure that Grossman already knew?

3    A.  I'm not sure, but I would assume so.

4    Q.  When you told Mr. Grossman what you knew that

5    you had found out from Ms. Webster, did he act

6    surprised, or did he indicate to you he already

7    knew?

8    A.  I don't recall that.

9    Q.  Did you and Mr. Grossman have a discussion --

10    by the way -- oh, let's finish this.  Did you and

11    Mr. Grossman have a discussion before you went out

12    on June 17th of 2009 about whether what was being

13    done was proper or improper?

14    A.  I think we discussed it on the way to the

15    facility.

16    Q.  All right.  And were you both in agreement as

17    to whether it was proper or improper?

18    A.  I don't think he had formulated an opinion yet.

19    Q.  I see.  You've indicated he has or had at the

20    time, probably still does, less experience with

21    RCRA than you?

22    A.  I'm not sure about that.  I'm not certain of

23    that.  But, you know, me being that much older than

24    he is, I would assume that I have a little bit more

25    experience.

1    Q.  Do you know how much experience Mr. Grossman --

2    A.  No.

3    Q.  -- had?

4    A.  I don't know that.

5    Q.  You told us a lot about the inspection.  I'm

6    not going to go back through all of what happened

7    on June the 17th.  But one thing I am interested

8    in, you -- it's clear now you knew that the

9    recycling practice at Tonawanda Coke as it related

10   to the -- what we call the decanter tar sludge

11   involved using a front end loader and taking that

12   tar sludge out and mixing it with the coal in the

13   coal field.  You knew that?

14   A.  I did know that.

15   Q.  And you knew that Mr. Kamholz had indicated to

16   you that there was, what he understood to be K087,

17   inside one or more of these abandoned tanks that he

18   was going to also recycle, fair?

19   A.  Yes.

20   Q.  You knew that?

21   A.  Yes.

22   Q.  All right.  And Mr. Linsin asked you did you

23   caution Mr. Kamholz that it was, at least your

24   view, that that was improper, and you said no, I

25   did not, right?

1    A.   Right.

2    Q.   And what I understand your explanation to be as

3    to why you didn't is because you weren't sure if it

4    was K087?

5    A.   No.  The collective group of the inspectors,

6    including myself, Ellen Banner, and Lenny

7    Grossman -- I was in a supportive role.  Lenny was

8    the lead inspector.  He was the one gathering most

9    of the information during the inspection, and I was

10   there to support him.

11   Q.   All right.  But again, you didn't know until

12   you got there that Mr. Kamholz would tell you that

13   there was what he thought was K087 in these tanks

14   that he intended to have recycled.  You didn't know

15   that before you got there, right?

16   A.   No, we didn't.

17   Q.   So that comes up when you're there.  And my

18   question is, again, then why did you not

19   immediately say whoa, whoa, whoa, if you're going

20   to recycle that the same way you're recycling the

21   decanter tar sludge, don't do it?  Why didn't you

22   tell him that?

23   A.   Because I was not -- I was not the lead

24   inspector.  I was trying to help Lenny with the

25   inspection.  He was gathering information.  He

1   didn't feel as if he had enough information yet.

2   Q.  But you're a DEC hazardous waste inspector.

3   You were at the time, right?

4   A.  Yes.

5   Q.  And you're being told that activities are

6   planned, which in your mined, I thought, would be

7   contrary to the RCRA statute, right?

8   A.  Yes.

9   Q.  And I guess what you're telling us is you

10  exercised your discretion to not do anything in

11  deference to the EPA.  Is that really what you're

12  telling us?

13  A.  It was -- it was in deference to gathering

14  enough information for us to be confident that we

15  were making the right decisions.

16  Q.  Okay.  But when you're -- making what right

17  decision?  What decision was it that you were

18  planning on making?

19  A.  With -- going further with an enforcement

20  action.

21  Q.  Okay.  And at that point -- let me be very

22  pointed about this.  At that point in time, had

23  there been any discussion -- I mean in June

24  of 2009.  Had there been any discussion about the

25  possibility that this might be handled criminally,

1    rather than civilly, to your knowledge?

2    A.   Not to my knowledge.

3    Q.   All right.  But if you got Mr. Kamholz telling

4    you it's K087, you know what he did with the

5    Tonawanda Coke decanter sludge, how would telling

6    Mr. Kamholz don't do the same thing with the K087

7    or what you think is K087 in that tank, don't do

8    that because I think it's wrong?

9              MR. PIAGGIONE:  Objection.  It's already

10   been asked and answered several times.

11             THE COURT:  Yeah.  Sustained.

12       Next question.

13   BY MR. PERSONIUS:

14   Q.   Did you discuss with Mr. Grossman and

15   Ms. Banner whether or not to make that statement to

16   Mr. Kamholz while you were at the site on

17   June 19th?

18             MR. PIAGGIONE:  Objection again, your

19   Honor.  This also has been asked and answered

20   several times.

21             MR. PERSONIUS:  I don't believe it has,

22   Judge.

23             MR. PIAGGIONE:  He's already testified

24   about discussions with them, about what to say.

25             THE COURT:  Well, I think you should go

2442

1    on, Mr. Personius.

2    BY MR. PERSONIUS:

3    Q.   After you left on June 19th of 2009, did you

4    have further discussions with Mr. Grossman before

5    you went back again in September, on

6    September 10th?

7    A.   I believe we had a telephone conference with my

8    boss and his boss.

9    Q.   Okay.  So that would be Mr. Strickland,

10   Mr. Flax, Mr. Grossman and you?

11   A.   Yes.

12   Q.   Was anybody else part of that call?

13   A.   I can't recall, but I think at least that many

14   people were involved in a telephone conversation.

15   Q.   Was there just one call?

16   A.   I'm not -- I'm not certain.

17   Q.   Okay.  I only ask because I thought on direct

18   you said there was conference calls, more than one.

19   A.   I know there were more than one conference

20   calls, but I don't know the exact time frame of all

21   of them.

22   Q.   The subject matter of the call, at least the

23   one call, was what steps should be taken next?

24   A.   Yes.

25   Q.   And that's when it was decided to go back and

1    get samples?

2    A.   Correct.

3    Q.   Was there discussion during this call about

4    whether what you knew about the Tonawanda Coke

5    recycling of its decanter tar sludge was proper or

6    improper?

7    A.   I believe so.

8    Q.   All right.  Was there a consensus?

9    A.   I don't know if there was a total consensus at

10   that point in time.

11   Q.   All right.  What was the reason that it took

12   three months, about three months, to get out to

13   Tonawanda Coke to get these samples?

14   A.   Well, I wasn't leading that effort, so I don't

15   know what time frames it takes to mobilize sampling

16   teams.

17   Q.   Okay.  During that period of time, was any

18   effort made by you to determine if anything had

19   been done with the material that was inside the

20   abandoned tanks at Tonawanda Coke?

21   A.   By me personally, no.

22   Q.   Do you know if anyone else looked into that?

23   A.   I don't know.

24   Q.   Okay.  And when you went out in September

25   of 2009, samples were taken, right?

2444

1    A.   Yes, samples were taken.

2    Q.   That's when you learned the contents of the --

3    the tank or tanks had been recycled in the same way

4    that the -- had been taken out to the coal?

5    A.   Yes.

6    Q.   Okay.  And I think you told us that the --

7    any -- any view you had or anybody had about the

8    propriety or impropriety of that was not disclosed

9    to Mr. Kamholz because Mr. Grossman told you not

10   to?

11          MR. PIAGGIONE:  Objection.  Again, we've

12   gone over this several times.

13          THE COURT:  Yeah, sustained.

14          MR. PERSONIUS:  I haven't, Judge, but --

15          THE COURT:  Ask the question again.

16          MR. PERSONIUS:  That's okay.  I'll move

17   on.

18          THE COURT:  If you say you haven't, but --

19          MR. PERSONIUS:  I can move on, Judge.

20          THE COURT:  Okay.

21          MR. PERSONIUS:  I don't need to ask again.

22   I don't need to.

23   BY MR. PERSONIUS:

24   Q.   You were interviewed regarding these

25   inspections by telephone in August of 2010.

1        Do you remember that?

2    A.   By telephone August of?

3    Q.   August of 2010.

4    A.   Yes.

5    Q.   It would be about a year later.

6    A.   Okay.

7    Q.   And it involved a phone interview -- let me

8    help you.  Mr. Mango was involved in the call,

9    another EPA attorney named Kevin Cassidy was

10   involved, Terry Mucha, M-U-C-H-A, from DEC was

11   involved, and an EPA agent named Conway was

12   involved.

13   A.   Okay.

14   Q.   Does that --

15   A.   It rings a bell.

16   Q.   -- refresh your recall?

17   A.   Yes.

18   Q.   And you talked about both of these inspections

19   during that call.

20        Do you remember that?

21   A.   Yes, I do.

22            THE COURT:  All right.  Mr. Personius, why

23   don't we take 15 and we'll be back.

24            (Jury excused from the courtroom.)

25            THE COURT:  Okay.  Mr. Corbett, you can

1    step down.  See you in 15 minutes.

2              MR. MANGO:  Yes, your Honor.

3              MR. LINSIN:  Thank you your Honor.

4              (Short recess was taken.)

5              (Jury seated.)

6              THE COURT:  Okay.  Okay.  Please have a

7    seat.  Ladies and gentlemen, please have a seat.

8        Okay.  The attorneys and parties are back,

9    present.  And our jury is here with questions

10   unrelated to the case, but I think we'll start.

11   Roll call waived.

12       Mr. Personius, you have one more area of

13   inquiry you would like to pursue with Mr. Corbett.

14   We're going to let you do that now on

15   cross-examination and work through it.

16       Chris, get your answers ready for the jurors

17   for later on.

18              COURT SECURITY OFFICER:  Yes, sir.

19              THE COURT:  All right, Mr. Personius.

20   BY MR. PERSONIUS:

21   Q.  Mr. Corbett, when we broke I had asked if you

22   recalled an interview that you had with certain

23   government representatives in August of 2010.

24   A.  I do recall having that interview.

25   Q.  All right.  And this is the only other topic I

1   want to cover with you.  Do you remember that a

2   week later you went to Robert O'Connor who is an

3   investigator with -- with the DEC?

4   A.   Yes.

5   Q.   Okay.  And you discussed a discrete portion of

6   this interaction with Tonawanda Coke with

7   Investigator O'Connor, right?  Do you remember what

8   you told him?

9   A.   I don't.  No, not exactly.

10  Q.   Why don't we do this.  For identification,

11  Lauren, would you please put Government

12  Exhibit 3509.11 on the screen again for

13  identification.

14       Do you see this exhibit on the screen,

15  Mr. Corbett?

16  A.   Yes, I do.

17  Q.   Have you seen this document before?

18  A.   Yes, I have.

19  Q.   Okay.  Do you want to take a minute and read

20  it, please and -- to yourself.  And let us know

21  when you're done.  Are you finished reading it?

22  A.   Yes, I am.

23  Q.   Would you take it down, please, Lauren.

24       Does that refresh your recollection about the

25  discussion you had with Mr. O'Connor?

2448

1   A.   Yes, it does.

2   Q.   And to be clear, Mr. O'Connor is a DEC

3   investigator?

4   A.   That's correct.

5   Q.   He had not been part of this discussion a week

6   earlier, correct?

7   A.   No.

8   Q.   Okay.  What was your reason for going to see

9   Mr. O'Connor?

10  A.   Just to clarify a point about me not discussing

11  a violation with K087 mixing on the ground with Mr.

12  Kamholz.

13  Q.   And why did you choose to talk to Mr. O'Connor

14  about that?  Was there a particular reason why you

15  went to him?

16  A.   Well, I just -- because I don't think it was --

17  it was in the record that -- that I had -- I had

18  maybe a little bit of a difference of opinion as to

19  how to approach the subject.

20  Q.   The difference of opinion being that your view

21  was Mr. Kamholz should have been informed of the

22  violation?

23  A.   Well, it was my typical practice to do that --

24  Q.   Okay.

25  A.   -- at the exit interviews for inspections.

1    Q.   Okay.   Thank you.

2              MR. PERSONIUS:   Your Honor, may I have

3    just a minute?

4              THE COURT:   Certainty.

5              MR. PERSONIUS:   Kept my word, right?

6         Nothing further, Judge.

7              THE COURT:   Okay, Mr. Personius.

8              MR. PERSONIUS:   Thank you, Mr. Corbett.

9              MR. PIAGGIONE:   May I redirect, your

10   Honor.

11             THE COURT:   I'm sorry, Mr. Piaggione?

12             MR. PIAGGIONE:   May I redirect, your

13   Honor?

14             THE COURT:   Yes.   Yes.   Thank you.   Sorry.

15   REDIRECT EXAMINATION BY MR. PIAGGIONE:

16   Q.   Mr. Corbett, good afternoon.

17   A.   Good afternoon.

18   Q.   Based upon your experience working with other

19   RCRA inspectors, are some more cautious than

20   others?

21   A.   Yes, indeed.

22   Q.   Do some require samples to be taken and

23   analyzed before they determine if something is a

24   hazardous waste?

25   A.   Yes.

1    Q.   Okay.  And are you aware that the EPA instructs

2    its RCRA inspectors not to determine a violation

3    until it's reviewed by its management?

4    A.   I'm not familiar with EPA protocol.

5    Q.   But you know of other New York State RCRA

6    inspectors who would require sampling be taken

7    before they determine a hazardous waste is the

8    material they're looking at?

9    A.   Yes.

10            MR. PERSONIUS:  Judge, I object.

11            THE COURT:  I'm sorry?

12            MR. PERSONIUS:  It's out.  Never mind.

13            THE COURT:  Okay.

14   BY MR. PIAGGIONE:

15   Q.   And as a result of your conversations with

16   Mr. Grossman after the June 17th inspection, did

17   you, in fact, return to take samples of the

18   material in the tanks and around the tanks?

19   A.   Yes.  Yes, we did.

20   Q.   I want to go over to Exhibit -- Government

21   Exhibit 3.04, which is already in evidence.

22        Mr. Corbett, in looking at that photo, do you

23   see evidence of current releases?

24   A.   Yes, I do.

25   Q.   Okay.  Would the fact that you had known there

2451

1   were historical releases change your conclusion

2   that there was a violation of RCRA occurring?

3   A.  No, it would not change my opinion.

4   Q.  Okay.  Now, I want to go to what's marked for

5   identification purposes only, Defendant's Exhibit

6   K, please.

7       Do you recall this document, sir?

8   A.  Yes, I do.

9   Q.  Okay.  Is that your inspection report for the

10  September 6th, '07, inspection?

11  A.  Yes, it is.

12  Q.  Have you reviewed that inspection form

13  recently?

14  A.  Yes, I have.

15  Q.  Okay.  Was there any reference to K087 in that

16  document?

17  A.  I don't believe there was.

18  Q.  Okay.  In fact, you were not there on

19  September 6th, '07, to do a full small quantity

20  generator inspection, were you?

21  A.  No, I was not.

22  Q.  You were there to respond to a complaint of

23  some sort, is that correct?

24  A.  Yes, I was there on a specific mission.

25  Q.  Okay.  And in the course of your conversation

1    with Mr. Kamholz, he gave you information, however,

2    that they were recycling their hazardous wastes, is

3    that correct?

4    A.   Yes.

5    Q.   And so your conclusion that Tonawanda Coke

6    Corporation was in compliance with RCRA regarding

7    its recycling of its hazardous wastes was based

8    upon what?

9    A.   Was based upon statements from Mr. Kamholz.

10   Q.   Okay.  And did not involve any sort of

11   observations on your part?

12   A.   No, it did not.

13   Q.   All right.  Is that unusual for -- in a small

14   quantity generator inspection to rely upon the

15   generator's information?

16   A.   No, it's -- it's normal course of business.

17   Q.   Okay.  And did you go through a checklist with

18   Mr. Kamholz?

19   A.   Yes, I did.

20   Q.   Okay.  And did he say specifically where the

21   K087 waste was being mixed?

22           MR. LINSIN:  Objection.  Asked and

23   answered.

24           THE COURT:  Well, calls for a yes or no.

25   Let's -- I'll let it go and move right through it.

1        What was your answer?  No?

2             THE WITNESS:  I did not answer yet.  What

3    was the question again?

4    BY MR. PIAGGIONE:

5    Q.  Did Mr. Kamholz specifically designate the

6    location where the K087 was being mixed?

7    A.  No, he did not.

8    Q.  And if he had told you where that location was,

9    would that have changed your conclusion?

10   A.  Yes, it would.

11   Q.  Incidentally, did Mr. Kamholz indicate how much

12   decanter tar sludge was being generated at the tar

13   box?

14   A.  That inspection, I don't think we got into the

15   particulars.

16   Q.  Okay.  Subsequently, in the June inspection,

17   June of '09 inspection, did you have a conversation

18   with him regarding the amount of tar sludge being

19   generated by the decanter?

20   A.  Lenny Grossman was asking all the questions,

21   but those were definitely pertinent questions that

22   were asked.

23             MR. PERSONIUS:  Your Honor, I object to

24   this.  It goes way beyond the cross.

25             THE COURT:  In terms of the quantity?

 1          MR. PERSONIUS:   Quantity of Tonawanda Coke

 2    decanter sludge was not covered on cross at all.

 3          MR. PIAGGIONE:   There was a discussion

 4    about small quantity generators, and that's based

 5    upon quantity.

 6          THE COURT:  No.  Sustained.

 7    BY MR. PIAGGIONE:

 8    Q.  Based upon your conversations with Mr. Kamholz

 9    during the June '09 inspection, did you determine

10    if Tonawanda Coke was a small quantity generator or

11    a large quantity generator?

12          MR. PERSONIUS:  Again, Judge, same

13    objection.

14          MR. LINSIN:  Objection.

15          THE COURT:  Yeah, sustained.

16    BY MR. PIAGGIONE:

17    Q.  You testified on cross that you went on the

18    June '09 inspection for a three- or four-hour

19    meeting at Mr. Kamholz's office.  During that

20    meeting, did Mr. Kamholz indicate the K087 was

21    being recycled?

22    A.  Yes, he did.

23    Q.  Did he indicate at the office meeting the

24    location where that K087 was being recycled?

25          MR. LINSIN:  Your Honor, again, I object.

1      This witness has answered this question at least a

2      couple times.

3                  THE COURT:  I think that's right.  I mean,

4      is this new?

5                  MR. PIAGGIONE:  Yes, your Honor.  They did

6      not discuss the issue of -- at this meeting.  They

7      only discussed it once they got out of the meeting.

8      That was the only thing that was brought up on

9      cross.

10                 MR. PERSONIUS:  I object on relevance,

11     Judge.

12                 MR. PIAGGIONE:  They talked about when he

13     was advised about the recycling of the hazardous

14     waste.

15                 THE COURT:  Okay.  Ask a question, please.

16                 MR. PIAGGIONE:  Okay.  At the meeting in

17     the office with Mr. Kamholz --

18                 THE COURT:  What date?

19                 MR. PIAGGIONE:  -- in June of '09, during

20     the June of '09 inspection, did he indicate the

21     location where the K087 waste was being recycled?

22                 THE COURT:  Calls for a yes or no.

23                 THE WITNESS:  No.

24                 MR. PIAGGIONE:  Could we have Defendant's

25     Exhibit DDDD, four Ds, already in evidence.

1           THE COURT:  There's 4D.01 and 4D.02.

2           MR. PIAGGIONE:  It's 01.  Thank you.

3           THE COURT:  I'm not sure that's in

4    evidence, though.  It's not.

5           MR. PERSONIUS:  I don't think it is,

6    Judge.  Is 02 in evidence?

7           THE COURT:  No, it's not in evidence.

8           MR. PIAGGIONE:  One moment, your Honor.

9    Excuse me, your Honor.  Could I bring it up for

10   identification purposes?

11          THE COURT:  Yes.

12   BY MR. PIAGGIONE:

13   Q.  Were you shown that on cross-examination?

14   A.  Yes, I was.

15   Q.  Okay.  Is that a permit?

16          MR. LINSIN:  Your Honor, the witness

17   testified on cross he didn't recognize this

18   document, hadn't seen this document.

19          THE COURT:  That's right.

20          MR. LINSIN:  I object to further questions

21   as to the nature of what this document is.

22          THE COURT:  Yes, sustained.

23   BY MR. PIAGGIONE:

24   Q.  Okay.  Mr. Corbett, does RCRA require every

25   generator to determine if its waste is hazardous or

1    not?

2    A.   Yes.

3    Q.   Okay.  And does the DEC rely on the generator

4    to identify which wastes are hazardous and which

5    are not?

6    A.   Yes.

7    Q.   If someone was going to claim an exemption to

8    that definition, does DEC rely upon their initial

9    representations as to whether or not the exclusion

10   applies?

11   A.   Yes.

12   Q.   And based on your review of the DEC file, prior

13   to June 17th, 2009, was DEC aware that the K087

14   waste was mixed in coal piles on the ground?

15   A.   No.

16          MR. PIAGGIONE:  No further questions, your

17   Honor.

18          THE COURT:  All right, Mr. Piaggione.

19   Thank you.

20      Mr. Linsin.

21   RECROSS-EXAMINATION BY MR. LINSIN:

22   Q.   Mr. Corbett, you were asked on redirect

23   examination if some RCRA inspectors are more

24   cautious than others, correct?

25   A.   Yes.

1    Q.   And some RCRA inspectors require samples before

2    they make a final judgment about regulatory status,

3    correct?

4    A.   Correct.

5    Q.   Now, on cross-examination earlier today you

6    testified about the distinction between

7    characteristic hazardous waste and listed hazardous

8    waste, correct?

9    A.   Correct.

10   Q.   And you testified that K087 waste is a listed

11   hazardous waste, correct?

12   A.   Correct.

13   Q.   There's no need to do any sampling or analysis

14   of K087, is there?

15   A.   In my previous testimony I stated that it was

16   our concern that there might be a hazardous waste

17   mixture in those tanks.

18   Q.   You're talking now about the material in the

19   tanks, correct?

20   A.   In the Barrett tanks, yes.

21   Q.   Right.  But with respect to the K087 material

22   that was generated on site, the process waste, if

23   you will, there was no need to do any testing or

24   analysis of that material to determine whether it

25   was covered by the RCRA regulation, was there?

1    A.   There was no need to test that waste.

2    Q.   The regulations define it as a hazardous waste

3    because of how it is generated, correct?

4    A.   Correct.

5    Q.   And that is precisely what Mr. Kamholz told EPA

6    in 1998, correct?

7    A.   Told EPA in 1998?

8    Q.   Didn't you testify on cross-examination

9    earlier, sir, that Mr. Kamholz filed a notice with

10   EPA that Tonawanda Coke generated K087 waste on

11   site?

12   A.   Yes.  We talked about that earlier.

13   Q.   All right.  So in 1998 Mr. Kamholz told EPA and

14   received an ID number because he informed them that

15   the facility generated K087 waste, correct?

16            MR. PIAGGIONE:  Objection, your Honor.  I

17   was not permitted to talk at all about that same

18   document just now on redirect.  Now he's bringing

19   it up and asking questions about the same document.

20            MR. LINSIN:  Talking about the witness'

21   testimony, not any document.

22            THE COURT:  We're still on the issue of

23   whether K087 is listed or not.

24   BY MR. LINSIN:

25   Q.   Well, there's no doubt in your mind, right --

2460

1    A.   There's no doubt in my mind.

2    Q.   -- K087 is a listed hazardous waste, correct?

3    A.   That is correct.

4    Q.   And it's the characteristic hazardous waste

5    that require sampling and analysis to determine

6    whether or not the material exceeds certain

7    regulatory parameters, right?

8    A.   That's correct.

9    Q.   All right.  And it's your testimony here today,

10   sir, if I heard your last response on redirect

11   examination, that despite the RCRA compliance

12   inspection that was completed by Raymond Fisher on

13   February 17th, 1989, and despite the RCRA

14   compliance inspection that was completed by Bob

15   Wozniak on January the 7th, 1997, and despite the

16   RCRA compliance inspection that was completed at

17   Tonawanda Coke on February 29th, 2001, and despite

18   your RCRA compliance inspection conducted on

19   September 6th of 2007, despite those four RCRA

20   compliance inspections, your testimony here today

21   is that neither you nor anyone else in the Bureau

22   of Hazardous Waste Operations understood how this

23   recycling was occurring at Tonawanda Coke.  Is that

24   your testimony, sir?

25   A.   Yes, it is.

1          MR. LINSIN:  I have nothing further, your

2     Honor.  Thank you.

3          THE COURT:  Thank you, Mr. Linsin.

4        Mr. Personius?

5          MR. PERSONIUS:  I'm fine, Judge.  Thank

6     you.

7          THE COURT:  Mr. Piaggione?

8          MR. PIAGGIONE:  Just one question, your

9     Honor.

10    REDIRECT EXAMINATION BY MR. PIAGGIONE:

11    Q.  Mr. Corbett, did you indicate that when you

12    conducted the small quantity generator inspections

13    it was not unusual to rely upon the information

14    provided to you regarding recycling exemptions?

15    A.  That's correct.

16          MR. PIAGGIONE:  No further questions.

17          MR. LINSIN:  Nothing further, your Honor.

18    Thank you.

19          THE COURT:  All right.  Mr. Corbett,

20    you're free to go.  Thank you very much.

21    Appreciate it.

22        We have a short witness?

23          MR. MANGO:  Yes, your Honor.  The

24    government will call John Ohar.

25    J O H N   O H A R, having been duly sworn as a

2462

1    witness, testified as follows:

2             THE COURT:  All right.  Not off to a good

3    start.  Have a seat, please.  Good afternoon.  Some

4    very brief instructions.  I understand that you

5    have a few questions to be asked by Mr. Mango.  If

6    you don't understand a question, please don't

7    answer it.  Just ask the attorney, or if I ask you

8    a question, ask us to repeat the question.  Try to

9    be as concise as you can when you answer.  Don't

10   volunteer information.  If you can answer a

11   question with a yes or no, try to do that.

12       If there's an objection, wait until I rule on

13   the objection, and then I will give you further

14   instructions.  For example, I'll tell you to

15   complete your answer; wait for another question, et

16   cetera, okay?

17       Now, we need to talk to the jury.  That's your

18   testimony.  They have to decide, you know, what to

19   accept or not from your testimony.  They want to

20   observe you.  And you have to speak at the

21   microphone in a conversational tone.  You don't

22   have to be right on top it, but keep your voice up

23   and it will pick you up, okay?

24             THE WITNESS:  Okay.

25             THE COURT:  I think you're going to be all

1    right.  State your full name, spell your last name,

2    please.

3                THE WITNESS:  John Ohar, O-H-A-R.

4                THE COURT:  Your witness, Mr. Mango.

5                MR. MANGO:  Thank you, your Honor.

6    DIRECT EXAMINATION BY MR. MANGO:

7    Q.  Good afternoon, Mr. Ohar.  How are you?

8    A.  Good afternoon.  Fine.

9    Q.  Okay.  Are you currently employed?

10   A.  Yes, I am.

11   Q.  Can you tell the jury where you're employed?

12   A.  I'm employed at Washington Mills in Niagara

13   Falls, part of the old Carborundum plant.

14   Q.  All right.  Mr. Ohar, have you ever been

15   employed at the Tonawanda Coke Corporation?

16   A.  Yes, I was.

17   Q.  Can you tell the jury what time period you were

18   employed there?

19   A.  I was employed at the Tonawanda Coke plant

20   from, I believe it was January of '78 until of July

21   of '99.

22   Q.  And that was -- in '78 is that when Tonawanda

23   Coke came into existence?

24   A.  That's correct.

25   Q.  So you were there at the beginning?

1   A.   I was there at the beginning.

2   Q.   Were you at the site previous to that?

3   A.   I was at the site previous.  I worked there for

4   Allied Chemical when they had the plant from 1968

5   until Tonawanda Coke took it over.

6   Q.   Okay.  Mr. Ohar, what position did you hold

7   from 1978 up until 1999?

8   A.   I worked as a plant engineer.

9   Q.   Okay.  Did that involve getting involved in

10   projects that you were going to be undertaking at

11   the Tonawanda Coke site?

12   A.   Yes, it did.

13   Q.   All right.  I'd like to show you what's in

14   evidence as Government Exhibit 3.01.  It will come

15   up on your careen, Mr. Ohar.  Do you see that on

16   your screen?

17   A.   I do.

18   Q.   Okay.  What is that, if you can tell the jury?

19   A.   That looks like the pad that was built in the

20   coal field to mix the tar sludge on.

21   Q.   Okay.  Was that pad present in 1978?

22   A.   No, it was not.

23   Q.   Do you recall the installation date of that

24   pad?

25   A.   I don't recall the date.  Everything blends

1    together.

2    Q.   Okay.  Does 1994 sound like it could be

3    possible?

4    A.   Could be, yes.

5             MR. PERSONIUS:  Object to what's possible,

6    Judge.

7             THE COURT:  Well, I'm going to let it

8    stand.  If you need to examine, you can.

9    BY MR. MANGO:

10   Q.   Do you recall, Mr. Ohar, the installation of

11   this pad?

12   A.   I do recall it, yes.

13   Q.   Okay.  Tell the jury please who installed the

14   pad.

15   A.   An outside contractor installed the pad.

16   Q.   And following the installation of the pad, did

17   you observe anything happen on this pad?

18   A.   Yes.  The first a batch of coal tar storage was

19   placed on it.  Coal tar sludge, excuse me.  And a

20   contractor that was working for me mixed it up with

21   a small-track vehicle.

22   Q.   So the sludge was on the pad?

23   A.   The sludge was on the pad, yes.

24   Q.   Did you see it get mixed up -- what did it get

25   mixed with?

1  A.  It got mixed up with the coal that they would

2  normally use in the coke oven process.

3  Q.  Okay.  How soon after the pad was installed did

4  you see that mixture happen?

5  A.  I don't remember exactly.  It was long enough

6  for the pad to cure.  Pretty much immediately

7  afterwards.

8  Q.  Okay.  And after -- so you saw this mixture of

9  coal tar sludge and coal happen on the pad?

10 A.  Yes, I did.

11 Q.  What did you see happen after that mixture was

12 made?

13 A.  After it was made, the crane picked it up and

14 transported it into the building for use as a --

15 for the -- part of the mix.

16 Q.  Okay.  So you saw a crane come and scoop it up?

17 A.  Yes.

18 Q.  And where did it -- where did it bring or drop

19 the material?

20 A.  Well, the crane picked it up and dropped it in

21 the hopper that fed on to 7 belt, and it went on to

22 10 belt, 15 belt, and up into the building in the

23 mix mess.

24 Q.  At any time during your observation did you see

25 this tar sludge being mixed make contact with the

1    ground?

2    A.   No.

3    Q.   And do you know why this pad was installed?

4    A.   To prevent the tar sludge from making contact

5    with the ground.

6    Q.   All right.  Do you know if Mark Kamholz was

7    aware of the installation of this pad and the

8    purpose of this pad?

9    A.   I'm sure he was aware of it.

10           MR. PERSONIUS:  Your Honor, I'll object to

11   the response that he's sure.

12           THE COURT:  I'll sustain the objection.

13   Strike the response.

14   BY MR. MANGO:

15   Q.   Did you see him at any time in the vicinity of

16   this pad while mixing was happening on the pad?

17   A.   I don't remember that.

18   Q.   Okay.

19           MR. MANGO:  Nothing else, your Honor.

20   Thank you.

21           THE COURT:  You're welcome, Mr. Mango.

22   Thank you.

23           MR. LINSIN:  Very brief.

24           THE COURT:  Okay.  Mr. Linsin, please.

25   CROSS-EXAMINATION BY MR. LINSIN:

1    Q.   Good afternoon, Mr. Ohar.

2    A.   Good afternoon.

3    Q.   I believe we met once before, but my name is

4    Greg Linsin.  I represent Tonawanda Coke in

5    connection with this proceeding, okay?

6    A.   Okay.

7    Q.   As an engineer with Tonawanda Coke in the 1990s

8    were you involved -- were you involved in the

9    decision to install this concrete pad you just

10   testified about?

11   A.   No, not the decision.  The decision would have

12   been made on a corporate level.  I would have been

13   involved in the implementation of it.

14   Q.   All right.  So other people on the corporate

15   level made a decision to install the pad.  You were

16   involved in implementing its -- or overseeing or

17   monitoring its construction and installation,

18   correct?

19   A.   I was not involved in installing the pad, okay.

20   Q.   Okay.

21   A.   One of the other engineers did that.  I was

22   only involved in mixing the first batch of tar

23   sludge on it.

24   Q.   Okay.  But you testified a moment ago that --

25   Mr. Mango, if I jotted this down correctly, asked

2469

1    you if you knew why the pad had been installed.

2    You testified, if I recall correctly, was to

3    prevent coal tar sludge from making contact with

4    the ground.  Did I hear you correctly?

5    A.  Yes.

6    Q.  But you've just said you weren't involved in

7    the decision to install the pad, correct?

8    A.  No, I was not.

9    Q.  All right.  And let me ask you this:  Do you

10   recall a time just after this pad was corrected --

11   I'm sorry, was constructed when certain quantities

12   of coal tar sludge were actually brought to

13   Tonawanda Coke's facility from other coking

14   operations, first of all, in Detroit from the

15   Allied facility in Detroit, do you recall that,

16   sir?

17   A.  I recall that the coal tar sludge that was on

18   the pad at that time came from somewhere else.

19   Where it came from, I don't remember.

20   Q.  So the coal tar sludge that you just testified

21   about observed it being mixed and then dropped in

22   the hopper, that had come from a different

23   location, is that correct?

24   A.  That's correct.

25   Q.  All right.  And do you recall that after that

2470

```
1    first batch of offsite coal tar sludge, do you
2    recall other shipments of offsite coal tar sludge
3    being brought to Tonawanda Coke and placed on the
4    pad?
5    A.  I have no direct knowledge of that.  After the
6    first batch was mixed, I had no more involvement
7    with it.
8    Q.  Okay.
9    A.  All right?
10   Q.  All right.  But that first batch, as best you
11   recall, was from an offsite location brought there
12   and staged on the concrete pad before it could be
13   mixed, is that correct?
14   A.  That's correct.
15          MR. LINSIN:  I have nothing further.
16   Thank you.
17          THE COURT:  Okay.  Mr. Linsin, thank you.
18          MR. PERSONIUS:  Nothing, your Honor.
19   Thank you.
20          THE COURT:  Mr. Mango?
21          MR. MANGO:  Nothing, your Honor.
22          THE COURT:  All right.  You actually have
23   the record for brevity.  All right.
24   Congratulations.
25          THE WITNESS:  Thank you.
```

1           THE COURT:  Thank you very much, Mr. Ohar.

2     All right.

3           Ladies and gentlemen, I hate to do this, but

4     we're going to send you home.  All right.  Please

5     keep in mind how important this case is to both

6     sides, okay?  You're going to be getting everything

7     you need to work towards that unanimous decision,

8     and -- so you don't have to do anything else in

9     terms of any independent investigation, any social

10    media, any Internet, no newspaper articles.  Don't

11    read anything that has to do with the subject

12    matter of this particular case, and keep your minds

13    open, all right?

14          We're still in the government's case.  It has

15    the burden of proof beyond a reasonable doubt.  The

16    presumption of innocence attaches to both

17    defendants in this case.  Okay.  You made it

18    through another day and we're proud of you.  All

19    right.  So, have a safe trip home.

20          We have a new Pope for those of you that are

21    interested.  Jorge Bergoglio from Argentina.

22    Seventy-six years old.  So, you can put that in the

23    mix of everything you're learning.  But it doesn't

24    apply to this case.  Remember my instructions, what

25    I say and what the attorneys say, that's not

2472

1    evidence.  We'll see you tomorrow at what time?

2              THE JURY:  9:30.

3              (Jury excused from the courtroom.)

4              THE COURT:  Thank you, Chris.

5         Okay.  By my count tomorrow is Thursday.  Okay.

6    Are you we still going to wrap up the government's

7    case on Friday?

8              MR. MANGO:  It's possible, your Honor.  We

9    do have one more RCRA expert who is going to take

10   the stand.  Our previous experts have all gone at

11   least a day.  It really depends on

12   cross-examination and direct and how -- how that

13   goes.  But if not Friday, I would expect Monday, at

14   the latest Tuesday.

15             THE COURT:  Okay.  Have you disclosed who

16   your RCRA witness is?

17             MR. MANGO:  Oh, yes.

18             THE COURT:  Okay.  We will --

19             MR. LINSIN:  We'll discuss with counsel,

20   your Honor, yes.

21             THE COURT:  Okay.

22             MR. LINSIN:  Could we just ask in light of

23   that, your Honor, what the Court's intentions might

24   be with regard to Rule 29 discussions at the close

25   of the government's case?  I'm not familiar with

1    the Court's practice, but would there be time set

2    aside?  There are several issues here I believe

3    that may warrant some consideration.  And I'm just

4    curious as to the Court's --

5              THE COURT:  Yeah, I will set aside to hear

6    from counsel on the Rule 29.

7              MR. LINSIN:  All right.

8              THE COURT:  Okay.

9              MR. LINSIN:  Thank you, your Honor.

10             THE COURT:  Okay.  I mean, as far as any

11   submissions are concerned, are there going to be

12   any on Rule 29?

13             MR. LINSIN:  We have evaluated that, your

14   Honor.  At this point I don't believe so.  We may

15   have some case citations that we believe would be

16   relevant.  But, it's not our judgment at this point

17   that it would be worth a full briefing.  We will be

18   happy, if it would be helpful to the Court, to

19   provide the case citations prior to our discussion,

20   if that might help focus attention.  Or we will do

21   whatever the Court -- you know, would be most

22   helpful to the Court.

23             THE COURT:  Okay.  Well, if you have -- if

24   you have case citations, and you believe they are

25   relevant, let me know.

1          MR. LINSIN:  All right.

2          THE COURT:  And I'll try to take a look at

3    them.  You know, if it -- well, you tell me if you

4    feel it's important that I take a look at them,

5    we'll try to do that.

6          MR. LINSIN:  Could I ask one other

7    question, your Honor, just for planning purposes.

8    And that is we have, of course, are attempting to

9    assess what our defense case will look like.  We

10   don't anticipate under any circumstances that it

11   will be a lengthy presentation.  And I'm just

12   curious if the Court can give us any guidance as to

13   when we might see a draft of the potential jury

14   charge.

15         THE COURT:  Okay.  How about if I answer

16   that one for you tomorrow morning?

17         MR. LINSIN:  Thank you, your Honor.  That

18   will be helpful.  Thanks.

19         THE COURT:  Okay.

20         MR. MANGO:  Thank you, your Honor.

21         MR. PERSONIUS:  Judge, you mentioned about

22   a written submission on the Rule 29.  Would it be

23   helpful to you and to Andrew if -- even if it's not

24   a lengthy legal argument, if you had the argument?

25   We can put it in writing for you if it would be

1    helpful.

2             THE COURT:  I mean, if -- I'm going to

3    leave it to you.  I don't want to make that

4    judgment.  I'll look at it if I get it.  You know,

5    so -- you know, I don't expect that it has to be an

6    opus of any kind.  If you feel, as a guide, that

7    could be helpful to me, you know, I think, what you

8    want to argue --

9             MR. LINSIN:  All right.

10            THE COURT:  -- or will by the end of the

11   government's case.  If it's -- if it's formulated

12   in a way where I can get some guidance from it, I'd

13   be happy to review it.  All right?

14            MR. MANGO:  Thank you, your Honor.  Your

15   Honor, we will start with two stipulations in the

16   morning absent any additional ones reached

17   overnight.  So we do have two executed though to go

18   in.

19            THE COURT:  All right.  I anxiously await

20   those stipulations.

21            MR. MANGO:  I'm sure.

22            THE COURT:  Thank you very much.  I

23   appreciate your cooperation.  We'll see you

24   tomorrow at 9:30.

25            MR. MANGO:  Thank you, your Honor.

2476

1          MR. LINSIN:  Thank you, your Honor.

2                *       *       *       *       *       *

1                        CERTIFICATION

2

3           I certify that the foregoing is a

4       Correct transcription of the proceedings

5       Recorded by me in this matter.

6

7

8                         s/Michelle L. McLaughlin
                          Michelle L. McLaughlin, RPR
9                             Official Reporter
                             U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25