VOL. XII

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

      -vs-              10-CR-219S

TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
              Defendants.
-------------------------------------


          Proceedings held before the

     Honorable William M. Skretny, U.S.

     Courthouse, 2 Niagara Circle, Buffalo,

     New York on March 14, 2013.


     APPEARANCES:

     AARON J. MANGO,
     Assistant United States Attorney,
     ROCKY PAIGGIONE, Senior Counsel,
     U.S. Department of Justice,
     Appearing for the United States.

     GREGORY F. LINSIN, ESQ.,
     JEANNE M. GRASSO, ESQ.,
     ARIEL S. GLASNER, ESQ.,
     Appearing for Tonawanda Coke Corporation.

     RODNEY PERSONIUS, ESQ.,
     Appearing for Mark L. Kamholz.

     Also Present:  Lauren DiFillipo, Paralegal
                   Sheila Henderson, Paralegal


     Michelle L. McLaughlin, RPR,
     Official Reporter,
     U.S.D.C. W.D.N.Y.
     (716)332-3560

2478

1                        I N D E X

2            WITNESS                              PAGE

3        PHILIP FLAX
     Direct Examination by Mr. Piaggione          2508
4    Cross-Examination by Mr. Linsin              2581
     Redirect Examination by Mr. Piaggion         2636
5

6

7

8        GOVERNMENT EXHIBITS                      EVD.

9        136.01 through 136.11 and
             2.02.02 through 2.02.27              2492
10                   108                          2534
                     109                          2537
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present in the courtroom.)

2          THE COURT:  Okay.  At least we have the

3  attorneys and parties here.  I know the jury is

4  ready to come in.  But there's probably a

5  preliminary matter or two that we have to address

6  first.

7      Mr. Linsin, do you want to start?

8          MR. LINSIN:  Yes.  Thank you, your Honor.

9  The issue I wanted to raise with the Court, I know

10  at the close of our time here yesterday, we spoke

11  about the issue of the jury charge.  And I know the

12  Court has been working on this.  One of the issues

13  that became clearer to me last evening as I was

14  preparing for the testimony of -- anticipated

15  testimony of Mr. Flax, who will be a government

16  RCRA expert, one of the issues relates to a

17  question that has been posed I think by the

18  parties' submissions on proposed jury instructions

19  concerning Counts 18 and 19.

20      And specifically, your Honor, it is this:

21  That, as the Court may recall, Magistrate Judge

22  Schroeder had denied the defendants' earlier

23  dispositive motions with regard to the RCRA counts.

24  And in his Report and Recommendation and Order, he

25  had concluded that, in part -- he had based his

1    rationale in part on a conclusion that the

2    government, in order to establish those violations,

3    would need to demonstrate and prove an intent to

4    dispose with respect to the two RCRA disposal

5    counts.  Those are now 18 and 19.  At that point it

6    was 18 and 20.

7        We have proposed that in our submission

8    concerning the proposed jury charge -- our

9    document -- I believe it is document 89 that was

10   filed back in mid-December -- proposed that that

11   element be included in the charge with respect to

12   those counts.  And as we -- as Mr. Flax testifies

13   and as we prepare to cross-examine him, it struck

14   me that that will be a critical issue for us and

15   for the jury to consider as they evaluate his

16   testimony.

17       And so I'm raising it now simply to inquire

18   whether the Court has reached even a preliminary

19   judgment about that particular element on those two

20   counts.

21            THE COURT:  With respect to intent to

22   dispose?

23            MR. LINSIN:  Yes, sir.

24            MR. MANGO:  Your Honor, if I can respond

25   to that.  We've laid out the elements in our

1          proposed jury charges, which is document 77, which

2          does cite to a Second Circuit case law, Laughlin.

3          It is very clear in the RCRA statute there is no

4          element that relates to an intent to dispose.

5          The defendants are trying to inject that

6          argument into this case clearly to defeat the RCRA

7          charges, clearly, you know, in the questions that

8          are being asked of the witnesses that it wasn't

9          your intent to dispose of this material; it was

10         your intent to reintroduce it into the coke ovens.

11         Those questions we objected.  The Court let them

12         in.  You know, I guess we'll proceed with those

13         questioning.  But the key is, it is not an element

14         of the RCRA charge.

15         And we don't as well agree with the

16         characterization that Magistrate Judge Schroeder's

17         determination years ago somehow changes the

18         elements of this RCRA charge, you know, this

19         settled Second Circuit case law, or, you know,

20         what -- what elements need to be proved to the

21         jury.  So we are -- we are definitely opposed to

22         any -- any intent to dispose element being added on

23         to the RCRA charges.

24                  THE COURT:  All right.  I'll note the

25         arguments of both parties.  I'll have the charge

2482

1      for you by the end of tomorrow, so you'll have it

2      going into the weekend, and I'll have the verdict

3      form for you as well.  And I'll take another look

4      at the intent element before I give you the

5      proposed charge.

6                MR. LINSIN:  All right.  I would just

7      mention --

8                THE COURT:  Does that work from your

9      standpoint?

10               MR. LINSIN:  Well, we will work with what

11     we have to.  You know, I believe, as I mentioned,

12     it would be helpful to all sides, all parties, to

13     have guidance on that before the jury received the

14     testimony of a RCRA expert who will be testifying

15     about those Counts, and certainly before we

16     cross-examine him on those issues.  I mean, we will

17     proceed as the Court directs.  But it just

18     seemed -- as I was thinking through these issues in

19     preparation for his testimony, it seemed to me to

20     be a fairly critical issue, and that's why I raised

21     it this morning.

22               THE COURT:  When does Flax testify?

23               MR. PIAGGIONE:  He's the next witness.

24               MR. MANGO:  He is the next witness.  I

25     would note that in the elements you gave the jury

1    at the start of the case you covered RCRA, and

2    there was no intent to dispose included, which we

3    believe is the accurate elements.  But I think that

4    basic providing the elements to the jury was

5    sufficient at the time.  I don't think we need to

6    re -- go through it again.

7              THE COURT:  Well, I'll look at it again.

8    You know, if -- well, we'll start with the witness.

9    I can't do anything about that.  I'll just examine

10   it, and if I can -- if I reexamine it and the

11   decision changes, I will let you know.  We'll work

12   on it a little bit this morning.

13             MR. LINSIN:  All right.  Thank you, your

14   Honor.  I would just add on that point, with

15   respect to the decision of Magistrate Judge

16   Schroeder, it appears to us, given his decision on

17   that issue -- or his recommendation on that issue

18   and this Court's adoption of his findings and

19   recommendation that that determination has become

20   law of this case for the purposes of analyzing the

21   elements.  And I understand that the government has

22   cited the Laughlin case.  There are a number of

23   cases, obviously, that we have cited as well on

24   this issue.

25        But with respect to this case and given the

1      unique issues that were raised in the dispositive

2      motions, we believe that that is a -- we have

3      understood it to be a controlling decision from

4      that point forward, and given that those findings

5      have been adopted by this Court, we have presumed

6      that -- and as the Court may remember, immediately

7      following the preliminary general instructions that

8      the Court provided to the jury, I raised this point

9      with the Court on this issue of the intent to

10     dispose, because it has remained an important issue

11     for us.

12              THE COURT:  Yeah.  I don't think Mr. Mango

13     agrees with you.  You wanted to make a comment on

14     that?

15              MR. MANGO:  Yes, your Honor.  It's well

16     settled, the intent element in RCRA is just simply

17     knowingly -- a knowingly intent element.  We do not

18     believe that Magistrate Judge Schroeder was

19     intending to add an element to the RCRA charge.  In

20     fact, there was no trial date set.  The discussion

21     in the pretrial motions was more, could the factual

22     dispute between the parties, which is the facts of

23     this case, allow Judge Schroeder to issue a Report

24     and Recommendation dismissing the indictment.

25     That's what he was focused on.

1        He wasn't focused on what are the elements of

2   RCRA.  He was focused on, can I resolve this

3   factual dispute, and he said, no, I can't.  It

4   needs to go -- it needs to happen in a trial

5   setting.

6            MR. LINSIN:  And in so doing, your Honor,

7   he expressly addressed what the government would

8   need to prove at trial, and I don't have that

9   opinion in front of me.  But that is precisely --

10  Mr. Mango is correct as to the general aspects of

11  what was before the magistrate judge then.  But in

12  his findings he did make specific holdings as to

13  what the government would need to prove in order to

14  establish these charges, and that is what -- what

15  we have been referencing.

16           MR. MANGO:  But, your Honor, we can't have

17  law of the case that is contrary to settled Second

18  Circuit case law, which essentially eviscerates

19  Count 17 and 18 in this case.  It would -- it's --

20  or sorry, 18 and 19.  It would eviscerate those

21  charges.  And it would -- it would not be -- in

22  reading the language that Congress has used in

23  passing RCRA, it would be contrary to that as well,

24  your Honor.

25           THE COURT:  Okay.  Well, let me take a

1    look at it.  But you'll be able to start your

2    witness, and then we'll go from there, and I'll see

3    if I can give you a preliminary call on it.

4              MR. LINSIN:  Thank you, your Honor.

5              MR. MANGO:  Thank you, your Honor.

6              THE COURT:  All right.  Anything,

7    Mr. Personius?

8              MR. PERSONIUS:  Thank you, no, Judge.

9              THE COURT:  Okay.  All right.  We need a

10   few minutes just to gather our materials, and I'll

11   be right back out.

12             (Short recess was taken.)

13             (Jury not present in the courtroom.)

14             THE COURT:  Okay.  Attorneys and parties

15   are back present.  We will summon the jury in just

16   a moment.  Related to the discussion that we had

17   just before we broke a couple minutes ago, I had a

18   chance to review what we did with respect to the

19   preliminary charge, and, Mr. Mango, I think your

20   account is accurate.

21       And in the preliminary charge, as you noted, I

22   did not include the intent element for purposes of

23   the RCRA counts.  Preliminarily I'll give you this

24   indication.  This should be of some guidance to

25   you.  I am going to reaffirm that position that

1    there is not an applicable intent element in the

2    RCRA counts.  I will take another look at it, a

3    hard look at it, but based on the work that we did

4    before, that was my determination.  And I repeat

5    that for purposes of giving you some guidance in

6    terms of your examination of the next government's

7    witness.  If there's any change in that, I will let

8    you know.  But that appears to be the decision that

9    I will apply in finalizing the jury charge as well.

10          MR. LINSIN:  Thank you, your Honor.

11          THE COURT:  Okay.  Okay.  Chris, if you

12    would bring the jury in please.

13          MR. MANGO:  Judge, again, I do have those

14    two stipulations when we begin before Mr. Flax

15    testifies.

16          THE COURT:  Okay.  Is that going to be

17    related to the photos?

18          MR. MANGO:  There are some photos in

19    there, yes.

20          THE COURT:  Okay.  And they will be

21    published as you proceed through?

22          MR. MANGO:  Yes.  Before I start with the

23    stipulation -- actually at Mr. Linsin's suggestion,

24    I'm going to ask that the Court allow the

25    introduction of these photographs without

1    objection, so we can bring them up.

2           THE COURT:  Okay.  That would be great and

3    we can move through it.

4           MR. MANGO:  Great.

5           (Jury seated.)

6           THE COURT:  Good morning.

7           THE JURY:  Good morning.

8           THE COURT:  Good to see you again.  Have a

9    seat, please.  All right.  How's the temperature in

10   that jury room, a little better?  All right.

11   Because I know you have your sweater.  Looks like

12   everyone's added a few layers.  All right.

13      We're back convened in Tonawanda Coke and Mark

14   Kamholz.  The attorneys and parties are back

15   present.  We are ready to start.

16      The government has a next witness.  But before

17   that, there is a stipulation or couple of

18   stipulations that will be presented to you.  And as

19   you know, those are agreements as to what the facts

20   are, and that becomes, then, competent evidence for

21   purposes of your consideration in arriving at, you

22   know, a unanimous verdict resolving all the fact

23   issues on the 19 counts in this indictment.

24      There's another article in the paper today, so

25   stay away from anything having to do with this

1    case.  It usually comes up, as you probably know,

2    or maybe I think because I've told you, in the

3    local news portion of the newspaper.  It's a small

4    article.  Again, we don't want you to look at

5    anything that relates to the evidence that you are

6    hearing in the courtroom, because you are

7    restricted to a consideration of all of that

8    evidence or the lack thereof, not influenced by

9    anything on the outside other than your common

10   sense, your experience, and your intelligence in

11   getting to get this case resolved.  Because as we

12   told you from the outset, important to both sides,

13   otherwise the case wouldn't be here.  And I think

14   you have a feel for the importance of the case

15   based on what you've already heard.

16       We urge you to keep your minds open.  Don't

17   prejudge the case.  Very important, because the

18   defense has an opportunity to put a case on.  It

19   may not, but you have to know where you stand with

20   respect to the evidence before you start getting

21   into a discussion and deliberations and getting

22   those fact issues resolved.  So, keep your minds

23   open.  Please don't prejudge the case.  Stay with

24   us.  You know, sometimes it gets tough to do that,

25   but -- in my humble opinion.  But just keep on

1    working at it.  You'll get it.  And I know you'll

2    get those fact issues resolved for us and return

3    that unanimous verdict.

4        Okay.  I think we're still in the government's

5    case, right?  Government has the burden of proof,

6    and we are going to give you those notebooks today

7    right, Miss Labuzzetta?

8              THE CLERK:  Oh, Judge, sorry.  My note's

9    not big enough.

10             THE COURT:  You never know what she's

11   going to come up when she leaves that room.  All

12   right.  We have a new Pope.  That's a good start

13   for today.  That's one more issue behind us,

14   Mr. Linsin.

15             MR. LINSIN:  It was probably a unanimous

16   vote, your Honor.

17             THE COURT:  We were here last night until

18   about 9:15.  I think we had some high school

19   students that were putting on a trial.  It was

20   pretty cool, and Miss Labuzzetta was here, so she's

21   one step behind her usual quick pace.

22       All right.  And these kids did just amazing

23   work.  Kind of makes us wonder why we went to law

24   school when we see high school students do as well

25   as they did.  Okay.  Serious business, right?

1          Let's see what you can do with the

2     stipulations, Mr. Mango.

3               MR. MANGO:  Thank you, your Honor.

4               THE COURT:  Okay.

5               MR. MANGO:  Your Honor, prior to starting

6     on the stipulations, the government would move into

7     evidence Government Exhibits 136.01 through 136.11.

8     Actually four of those exhibits have already been

9     introduced into evidence.  And then we would move

10    in the totality as well Government's

11    Exhibits 2.02.01 all the way to 2.02.27.  We would

12    move those into evidence as they're photographs of

13    sampling activities that we're going to discuss

14    now.

15              THE COURT:  Okay.  They will be moved into

16    evidence without objection, is that -- that would

17    be the basis of the stipulation?

18              MR. MANGO:  Yes.

19              THE COURT:  Okay.  Mr. Linsin, so agreed

20    and stipulated?

21              MR. LINSIN:  Mr. Mango as accurately

22    recited it, your Honor.  Yes, no objection.

23              THE COURT:  Do you agree with that,

24    Mr. Personius?

25              MR. PERSONIUS:  I do, your Honor.

1          THE COURT:  All right.  Go for it,

2     Mr. Mango.

3               (Government's Exhibits 136.01 through

4               136.11 and 2.02.01 through 2.02.27 were

5               received into evidence.)

6          MR. MANGO:  Thank you, your Honor.

7     Stipulation.  "Testimony of EPA Geologist Robert

8     Morrell.

9          "The United States of America, by and through

10    its attorney, William J. Hochul, Jr., United States

11    Attorney for the Western District of New York and

12    Ignacia S. Moreno, Assistant Attorney General for

13    the United States Department of Justice,

14    Environment and Natural Resources Division, and the

15    undersigned assistant United States attorney and

16    senior trial attorney and the undersigned counsel

17    for defendants Tonawanda Coke Corporation,

18    Tonawanda Coke, and Mark L. Kamholz do hereby

19    stipulate angry as follows:

20         "One, that if called to testify, Robert Morrell

21    would testify that he is a geologist with the

22    United States EPA, EPA Region 2 Monitoring and

23    Assessment Branch located in Edison, New Jersey;

24    that he has been employed with the EPA for the past

25    25 years; and that as part of his duties, he

1    provides inspection and sampling support for the

2    Resource Conservation and Recovery Act, RCRA,

3    program within Region 2 of EPA.

4         "Two, that if called to testify, Robert Morrell

5    would testify that on two occasions in 2009 he took

6    samples from the area in and around the two large

7    deteriorating tanks at Tonawanda Coke that are the

8    subject of Counts 17 and 18 of the indictment, so

9    that the samples could be sent to the EPA Region 2

10   laboratory for analysis for benzene.

11        "Three, that if called to testify, Robert

12   Morrell would testify that on September 10th

13   of 2009 he collected eight representative samples

14   of a material described as sludge from in and

15   around the westernmost deteriorating tank, also

16   known as left burnt tank, that is the subject of

17   Counts 17 and 18 of the indictment; that this

18   sampling was the result of a request from the civil

19   EPA Region 2 RCRA Compliance Branch, and that

20   following the sampling, he delivered the eight

21   samples to the EPA Region 2 laboratory on

22   September 14th of 2009.

23        "Four, that if called to testify, Robert

24   Morrell would testify that the eight samples that

25   he collected were all taken with a separate sterile

1    plastic scoop to prevent cross-contamination

2    between the samples, and that the sample ID and

3    time taken were as follows:  Sample 1, Sample ID,

4    AL05705, 11:30 a.m.;

5        "Sample 2, AL05706, 11:48 a.m.;

6        "Sample 3, AL05707, time collected 12:05 p.m.;

7        "Sample 4, AL05708, 12:10 p.m.;

8        "Sample 5, AL05709, 12:30 p.m;

9        "Sample 6 AL05710, 12:47 p.m.;

10        "Sample 7, AL05711, 1:10 p.m;

11        "And Sample 8, AL05712, 1:28 p.m.

12        "Five, that if called to testify, Robert

13    Morrell would testify that during his sampling

14    activities on September 10th, 2009, photographs

15    were taken that fairly and accurately represent the

16    conditions of the westernmost tank, left burnt

17    tank, and the easternmost tank, right burn tank;

18    that Government Exhibits 136.01 to 136.11 are true

19    and accurate copies of the photographs taken during

20    the sampling activities, and that the government

21    exhibit numbers and description are as follows:"

22        And we're going to pull those up on the screen

23    at this point.

24        "Government Exhibit 136.01, description, view

25    of the collapsed right burnt tank looking

2495

1    northeast;

2         "136.02, view of the collapsed left burn tank

3    looking northwest;

4         "136.03, sample location for left burn tank

5    number one;

6         "136.04, sample location for left burn tank

7    number two;

8         "136.05, sample location for left burn tank

9    number three and left burn tank number four;

10        "136.06, sample location for left burn tank

11   number five.

12        "136.07, sample location for lowest burn tank

13   number six;

14        "136.08, sample location for left burn tank

15   number seven;

16        "136.09, sample location for left burn tank

17   number eight;

18        "136.10, view inside the left burn tank;

19        "And 136.11, view inside the right burn tank."

20        Paragraph 6.  "That if called to testify,

21   Robert Morrell would testify that on

22   December 17th, 2009, he collected 18 representative

23   samples of a material described as sludge from in

24   and around the deteriorating tanks that are the

25   subject of Counts 17 and 18 of the indictment; that

1    this sampling occurred during the execution of a

2    criminal search warrant at Tonawanda Coke; and that

3    following the sampling, he delivered the 18 samples

4    to the EPA Region 2 laboratory on December 18th,

5    2009.

6        "Seven, that if called to testify, Robert

7    Morrell would testify that the 18 samples he

8    collected were all taken with a separate sterile

9    plastic scoop to prevent cross-contamination

10   between the samples and that the sample ID, time

11   taken were as follows:

12       "Sample 1, sample ID AL07170, time collected

13   10:40 a.m.;

14       "Sample 2, AL07171, 10:55 a.m.;

15       "Sample 3, AL07172, 10:56 a.m.;

16       "Sample 4, AL07173, 11:05 a.m.;

17       "Sample 5, AL07174, 11:20 a.m.;

18       "Sample 6, AL07175, 11:35 a.m.;

19       "Sample 7, AL07176, 11:50 a.m.;

20       "Sample 8, AL07177, 12:05 p.m.;

21       "Sample 9, AL07178, 12:15 p.m.;

22       "Sample 10, AL07179, 3:00 p.m.;

23       "Sample 11, AL07180, 3:10 p.m.;

24       "Sample 12, AL07181, 3:15 p.m.;

25       "Sample 13, AL07182, 3:22 p.m.;

1          "Sample 14, AL01783, 3:35 p.m.;

2          "Sample 15, AL07184, 4:15 p.m.;

3          "Sample 16, AL71785, 4:23 p.m.;

4          "Sample 17, AL07186, 4:30 p.m., and

5          "Sample 18, AL07187, 4:40 p.m.

6          "Eight.  If called to testify, Robert Morrell

7    would testify that during his sampling activities

8    on December 17th, 2009, photographs were taken that

9    fairly and accurately represent the conditions of

10   the westernmost tank and the easternmost tank; that

11   Government Exhibits 2.02.01 to 2.02.27 are true and

12   accurate copies of the photographs taken during his

13   sampling activities; and that the Government

14   Exhibit numbers and description are as follows:"

15   We'll pull these up on the screen.

16         "Government Exhibit 2.02.01, photograph taken

17   on December 17th, 2009, facing north, tank on east;

18         "2.02.02, photograph taken on December

19   17, 2009, facing north, tank on east;

20         "2.02.03, photograph taken on December 17th,

21   '09, facing north, tank on west;

22         "2.02.04, photograph taken on

23   December 17th, 2009, facing north, tank on west;

24         "2.02.05, photograph -- photo taken on

25   December 17th, 2009, outside tank to the west;

 1          "2.02.06, photo taken on December 17th, 2009,

 2     tank to the east;

 3          "2.02.07, photo taken on December 17th, 2009,

 4     tank to the west.

 5          "2.02.08, photo taken on December 17th, 2009,

 6     sample 1.

 7          "2.02.09, sample 2 and 3.

 8          "2.02.10, sample 4;

 9          "2.02.11, sample 5;

10          "2.02.12, sample 6;

11          "2.02.13, sample 7;

12          "2.02.14, sample 8;

13          "2.02.15, sample 9;

14          "2.02.16 sample 10;

15          "2.02.17 sample 11;

16          "2.02.18, sample 12;

17          "2.02.19, sample 13;

18          "2.02.20, sample 14;

19          "2.02.20, sample 14".  Thank you, Lauren.

20          "2.02.21, up close of sampled material in

21     sample 14;

22          "2.02.22, sample 15;

23          "2.02.23, sample 15;

24          "2.02.24, sample 16;

25          "2.02.25, sample 16;

1           2.02.26, sample 17;

2           "And 2.02.27, sample 18.

3           "Nine, the government -- that Government

4    Exhibits 136.01 to 136.11 and 2.02.01 to 2.02.27

5    are admissible at trial without further proof or

6    foundation."

7           And this stipulation is dated March 12th of

8    2013.  It's signed by myself, by Mr. Piaggione, by

9    Mr. Linsin, by Miss Grasso, by Mr. Personius, and

10   Mr. Kamholz.

11          And, your Honor, I'd ask that this stipulation

12   be so received.

13              THE COURT:  Okay.  It will be received.

14   Is it marked as a Court Exhibit?

15              MR. MANGO:  Yes, your Honor, Court

16   Exhibit 5.

17              THE COURT:  Okay.  It will be received as

18   a Court Exhibit.  The information contained in that

19   stipulation, ladies and gentlemen, is for your

20   consideration.  It is competent evidence.  It is

21   the result of the agreement of the parties.

22          In addition to that, there was some reference

23   to a witness who would be called to testify.  You

24   are to view that part of the stipulation as if that

25   witness were here telling you that information that

1    was contained in the stipulation.  That's competent

2    evidence for your consideration.

3        Okay.  I think we can move forward.  So

4    stipulated, Mr. Linsin?

5            MR. LINSIN:  Yes, your Honor, thank you.

6            THE COURT:  Mr. Personius?

7            MR. PERSONIUS:  Yes, your Honor.

8            THE COURT:  Okay.  And Mr. Mango?

9            MR. MANGO:  Yes, your Honor, thank you.

10           THE COURT:  You're welcome.

11           MR. MANGO:  One more.

12           THE COURT:  One more?

13           MR. MANGO:  One more.

14           THE COURT:  Mr. Mango.  All right.  Go

15   ahead.

16           MR. MANGO:  Thank you.  Your Honor, I'm

17   going to read from what's identified as Court

18   Exhibit 6.  "Stipulation.  "Testimony of EPA

19   Chemist John Lee.

20       "The United States of America, by and through

21   its attorney, William J. Hochul, Jr., United States

22   Attorney for the Western District of New York, and

23   Ignacia S. Moreno, Assistant Attorney General for

24   the United States Department of Justice,

25   Environment and Natural Resources Division, and the

1    undersigned assistant United States attorney, and

2    senior trial attorney, and the undersigned counsel

3    for defendants, Tonawanda Coke Corporation,

4    Tonawanda Coke, and Mark L. Kamholz do hereby

5    stipulate and agree as follows:

6         "One, that if called to testify, John Lee,

7    chemist with the laboratory branch of the United

8    States Environmental Protection Agency, EPA, Region

9    2, Division of Environmental Science and

10   Assessment, located in Edison, New Jersey, Region 2

11   laboratory, would testify that he has been employed

12   as a chemist with EPA since August 1983, and that

13   the Region 2 laboratory is responsible for the

14   chemical, microbiological, and biological testing

15   of pollutants in support of all environmental

16   statutes under the jurisdiction of the EPA,

17   including the Resource Conservation and Recovery

18   Act, RCRA.

19        "Two, that if called to testify, John Lee would

20   testify that eight jars collected by EPA employees

21   from in and around the two large deteriorating

22   tanks at Tonawanda Coke and containing a material

23   described as sludge was delivered to the Region 2

24   laboratory on September 14th, 2009.  And that 18

25   jars collected by EPA employees from in and around

1    the two large deteriorating tanks at Tonawanda

2    Coke, and containing a material described as sludge

3    was delivered to the Region 2 laboratory on

4    December 18th, 2009.

5        "Three, that if called to testify, John Lee

6    would testify that for the samples described in

7    paragraph 2, he performed the toxicity

8    characteristic leaching procedure, TCLP, test

9    method 1311, as required by Title 40, Code of

10   Federal Regulations, Part 261.24 of the RCRA

11   regulations to create leacheates, i.e., extracts

12   which are non-potable water, that he has performed

13   the TCLP procedure over 200 times, and that the

14   TCLP is a procedure designed to simulate the

15   effects of slightly acidic rain water when it comes

16   into contact with material in a landfill and

17   produces a leachate.

18       "Four, that if called to testify, John Lee

19   would testify that for the samples described in

20   paragraph 2, he analyzed representative sub-samples

21   of the TCLP extracts to determine whether and in

22   what concentration volatile organic compounds were

23   present using accredited EPA Method 624 for

24   non-potable samples that is documented in the

25   Region 2 laboratory standard operating procedure,

 1     SOP C-89, Analysis of Volatile Organic Compounds in

 2     Aqueous and Waste Oil/Waste Organic Solvent Samples

 3     by Purge and Trap, GC/MS, and that he has peformed

 4     this analytical method on non-potable samples over

 5     a thousand times.

 6          "Five, that if called to testify, John Lee

 7     would testify that the concentration of benzene, a

 8     volatile organic compound, in the eight samples

 9     delivered to the Region 2 laboratory on

10     September 14, 2009, as measured using gas

11     chromatography/mass spectrometry, GC/MS, in

12     accordance with accredited EPA Method 624 was as

13     follows:

14          "Sample 1, sample ID AL05705, analytical result

15     for benzene, milligrams over liter, 3.9; regulatory

16     level for benzene, milligrams over liter, 0.5;

17          "Two, sample 2, AL05706, result for benzene,

18     1.7;

19          "Sample 3, AL05707, result for benzene 1.4;

20          "Sample 4, AL05708, result for benzene 1.1;

21          "Sample 5, AL05709, result for benzene, 0.64;

22          "Sample 6, AL05710, result for benzene, 2.1;

23          "Sample 7, AL05711, result for benzene, 14;

24          "Sample 8, AL05712, result for benzene 3.0.

25          "Six, that if called to testify, John Lee would

1    testify that the concentration of benzene, a

2    volatile organic compound, in the 18 samples

3    delivered to the Region 2 laboratory on

4    December 18th, 2009, as measured using GC/MS in

5    accordance with accredited Method 624 was as

6    follows:

7        "Sample number, 1, ID, AL07170.  Result for

8    benzene, non detect.  Regulatory level for benzene,

9    0.5;

10        "Sample 2, AL07171, result for benzene, non

11   detect;

12        "Sample 3, AL07172, result for benzene, non

13   detect;

14        "Sample 4, AL07173, result for benzene, 8.5;

15        "Sample 5, AL07174, result for benzene 6.5;

16        "Sample 6, AL07175, result for benzene, 0.81;

17        "Sample 7, AL07176, result for benzene, non

18   detect;

19        "8, AL078177, result for benzene 2.9;

20        "Sample 9, AL07178, result for benzene, non

21   detect;

22        "Sample 10, AL07179, result for benzene 9.8;

23        "Sample 11, AL07180, result for benzene, 3.7;

24        "Sample 12, AL07181, result for benzene 5.8;

25        "Sample 13, AL07182, result for benzene, 3.6;

1              "Sample 14, AL07183, non detect, result for

2      benzene;

3              "Sample 15, AL07184, result for benzene, 3.4;

4              "Sample 16, AL07185, result for benzene, 1.9.

5              "Sample 17, AL07186, result for benzene, 0.80.

6              "Sample 18, AL07187, result for benzene, 2.6.

7              "Seven, that the analytical results contained

8      in paragraph 5 and paragraph 6 are admissible at

9      trial without further proof or foundation."

10             And this is also dated March 12th, 2013.

11     Signed by myself, by Mr. Piaggione, by Mr. Linsin,

12     Miss Grasso, Mr. Personius, and Mr. Kamholz.

13             And, your Honor, I ask that this Court Exhibit

14     number 6 be received into evidence.

15                 THE COURT:  Okay.  And today's March 14th.

16                 MR. MANGO:  It is.

17                 THE COURT:  So that was signed and

18     subscribed two days ago.

19                 MR. MANGO:  That's correct, your Honor.

20                 THE COURT:  Okay.  It will be received as

21     Court Exhibit 6.  The information contained therein

22     so stipulated, Mr. Linsin?

23                 MR. LINSIN:  So stipulated, your Honor.

24                 THE COURT:  Mr. Personius?

25                 MR. PERSONIUS:  Yes, your Honor.

1          THE COURT:  Okay.  And Mr. Mango, correct?

2          MR. MANGO:  Yes, your Honor, so

3     stipulated.

4          THE COURT:  If you would give that to

5     Miss Labuzzetta, please.

6       Ladies and gentlemen, the same instruction,

7     that is all, should you choose to consider it

8     competent evidence to help you and assist you in

9     assessment of whether the government's evidence

10    meets the standard of proof beyond a reasonable

11    doubt.

12      There were witnesses referenced in the

13    stipulation.  They are to be considered as if they

14    were here personally testifying to you for the

15    information that was contained in the stipulation

16    that is competent evidence.  Okay.

17      Now, Mr. Piaggione?

18          MR. PIAGGIONE:  Yes, your Honor.  Our next

19    witness will be Philip Flax, F-L-A-X.

20          THE COURT:  Okay.  Lets find out if it is.

21    Stay right there, please, and I'll have you sworn

22    as a witness.

23  P H I L I P   F L A X, having been duly sworn as a

24    witness, testified as follows:

25          THE COURT:  Okay.  Please be careful.

1     Just take it easy, get a seat, get comfortable.  I

2     think you have the microphone positioned just about

3     right.  And we ask you to respond in the direction

4     of the jury because you're here to testify for

5     their benefit.

6               THE WITNESS:  Yes, your Honor.

7               THE COURT:  Couple of very preliminary

8     questions -- or instructions, I'm sorry.  If you

9     don't understand a question, ask that it be

10    repeated.  Don't try to answer a question you're

11    not sure about.  Be as concise with your answers as

12    you can.  Don't volunteer information.  That's

13    generally what complicates things if we want to

14    move through this expeditiously.  If you can answer

15    a question with a yes or no, and that's what the

16    question calls for, please try to do that.  It's up

17    to the attorneys to draw out the information after

18    that that they want from you.  If there's an

19    objection, and there likely will be some, wait

20    until I rule on the objection, then I will give you

21    instructions, if it's unclear, as to what to do,

22    complete an answer, wait for the next question, or

23    something along those lines.  Do you understand?

24              THE WITNESS:  Yes, sir.  Yes, your Honor.

25              THE COURT:  Okay.  I think you're going to

 1    carry okay.  Speak at the microphone -- it's

 2    friendly -- in a conversational tone.  Tell us what

 3    your full name is and spell your last name, please.

 4         THE WITNESS:  My name is Philip Flax.

 5    Last name is spelled F-L-A-X.

 6         THE COURT:  Okay, great.  Thank you very

 7    much.

 8       Mr. Piaggione your witness.

 9         MR. PIAGGIONE:  Thank you, your Honor.

10    DIRECT EXAMINATION BY MR. PIAGGIONE:

11    Q.  Mr. Flax, what is your educational background?

12    A.  I have a bachelor's degree in geoscience from

13    New Jersey City University, and a master's degree

14    in geology from Queens College at the City

15    University of New York.

16    Q.  And what did you do after you completed

17    graduate school?

18    A.  After I completed graduate school, I was

19    working for the U.S. Army Corps of Engineers in the

20    New York City district.  I worked doing wetlands

21    delineation, support for dredging projects, and I

22    worked on beach erosion control and shore

23    protection projects.

24    Q.  Okay.  After that position, what did you do

25    next?

1    A.   In February of 1989 I was hired by the

2    Environmental Protection Agency as a Corrective

3    Action Project Manager in the RCRA program.

4    Q.   And how long did you stay in that position?

5    A.   I was in that position for approximately two

6    and a half years, a little more than that, from

7    February of 1989 to October of 1991.

8    Q.   And what were your duties in that position?

9    A.   During that time I had several duties.  Primary

10   duty was to oversee remediation of contamination in

11   industrial sites that are regulated by EPA.  The

12   other function was to serve as a RCRA inspector to

13   inspect facilities to determine their compliance

14   with the regulations.

15   Q.   And what did you do after that position?

16   A.   In October of 1991 we had an internal

17   reorganization within EPA.  A new section within

18   the branch I worked was created, and I was made the

19   manager of that section.

20   Q.   And what were your duties then?

21   A.   My duties were oversee a staff of engineers and

22   scientists in performance of compliance and

23   inspections, and outreach to the regulated

24   community, and to basically respond to requests

25   from the communities, to give presentations to help

1    them better understand how facilities within those

2    communities were regulated.

3    Q.   How long did you stay in that position?

4    A.   I was in that position until July of 1996 when

5    we had another internal reorganization.

6    Q.   And what happened then?

7    A.   At that time I was made the RCRA Senior

8    Enforcement Team Leader, and with pretty much the

9    same responsibilities I had previously.

10   Q.   And what were your duties in that position?

11   A.   Oversee a staff of engineers in their

12   performance of compliance evaluations at industrial

13   facilities to determine their compliance with the

14   RCRA regulations.

15   Q.   Okay.  How long did you stay in that position?

16   A.   I stayed in that position until February

17   of 2012.

18   Q.   Okay.  And what happened then?

19   A.   In February of 2012 I was asked by regional

20   management to take a reassignment to a position to

21   oversee RCRA corrective action, remediation being

22   undertaken in the region.

23   Q.   Now you.  While you were employed -- while you

24   are employed with EPA, have you received training

25   regarding those positions that you've described?

1    A.   Yes.   We received a lot of training in the

2    years.   The patent transport of chemicals in the

3    environment, hydrology, remediation techniques,

4    treatment technologies for hazardous waste, RCRA

5    inspector training, basic inspector training,

6    advanced RCRA inspector training, RCRA inspector

7    institute where we obtained a specialist given at

8    our national enforcement investigation center in

9    Denver, Colorado.   And just very, very many courses

10   over the years and specialized units within RCRA

11   such as incinerators, service impoundments.

12           THE COURT:   Mr. Flax, just move the

13   microphone back a little bit.   Thank you.

14   BY MR. PIAGGIONE:

15   Q.   Now, in the course of your duties, did you ever

16   conduct RCRA inspections yourself?

17   A.   Yes, I did.   When I initially came to work I

18   conducted inspections from that time until I became

19   a manager in October '91.   I conducted somewhere

20   between 50 and 60 inspections.

21   Q.   Okay.   What is typically involved in a RCRA

22   inspection for compliance?

23   A.   Well, a thorough inspection will start before

24   the inspector actually goes out to the facility.

25   They'll review previous inspection reports.

1    They'll review whatever information is available

2    regarding that company or companies that operate in

3    that industrial sector, so they can determine what

4    their industrial processes do and what wastes they

5    may try to produce; previous inspection reports

6    from state and EAP.  They would look at their past

7    compliance history to get a sense of what they

8    might find when they go out there.  And if that

9    facility is subject to RCRA permitting, they would

10   review that permit because that is what is

11   enforceable under RCRA.  And all this, of course,

12   is contingent on the inspector having enough time

13   to do all that.

14   Q.  Okay.  And did your inspections involve making

15   a hazardous waste determination?

16   A.  Yes, they did.

17   Q.  And what does that involve?

18   A.  Number one, it's incumbent upon a generator of

19   hazardous waste -- and a generator of hazardous

20   waste under RCRA is one who produces hazardous

21   waste.

22   Q.  Excuse me, just answer my question please.  Did

23   you make determinations regarding hazardous waste?

24   A.  Yes, I did.

25   Q.  Okay.  Can you tell us what does that involve

1   as a RCRA inspector?

2   A.   First it involves determining whether or not

3   the waste is specifically excluded or exempted by

4   regulation.   Then you go to regulations and you

5   determine whether that waste is listed.   In the

6   regulations there are numerous wastes that, when

7   they are always produced, no matter what the

8   concentrations of contaminants in those wastes,

9   those wastes are hazardous under RCRA.

10      In the absence of a waste being listed, then

11   you can determine by testing whether a waste is

12   hazardous.   And there are four ways, we call them

13   characteristic wastes.   The first characteristic

14   waste is one that we call an ignitable waste.   An

15   ignitable waste is one that has a flash point of

16   140 degrees Fahrenheit or less.

17      The second is a corrosive hazardous waste.

18   These are generally strong acids and bases.   These

19   are materials that have a pH of 2 or less or

20   greater than 12.5.

21      The third is a reactive hazardous waste.

22   Reactive hazardous waste are those that react

23   violently in water or air, are readily explosive,

24   or generally produce large amounts of sulfide or

25   cyanide gases.

1          And the fourth type of waste is a toxicity

2     characteristic waste.  Toxicity characteristic

3     wastes are 40 compounds.  If any one of them in a

4     material exceeds a stipulated regulatory standard

5     in the regulation, then that material is a

6     hazardous waste.  This includes things such as

7     benzene.  Things such as trichloroethylene and

8     tetrachlorethylene, otherwise known as dry cleaning

9     fluids, strong solvents, pesticides such as

10    chlordane and lindane.

11               THE COURT:  Slow down just a little bit,

12    please.

13               THE WITNESS:  Sorry, your Honor.  And

14    metals such as lead, arsenic, cadmium, chromium.

15    BY MR. PIAGGIONE:

16    Q.   Okay.  What else have you spent your

17    professional time on?

18    A.   Excuse me?

19    Q.   Have you participated as an EPA faculty

20    member --

21    A.   Yes.

22    Q.   -- for RCRA training?

23    A.   Yes.  Yes, I have.  I've given courses in both

24    basic inspector training and RCRA inspector

25    training.

1    Q.   And can you tell us what courses -- how many

2    inspectors have you trained by teaching these

3    courses?

4    A.   A couple hundred.

5    Q.   Okay.  And have you ever testified in court as

6    a RCRA expert before?

7    A.   Yes, I have.  I've testified twice in court.

8    First in the Northern District of New York in the

9    case of M & M Enterprises and Mahendra Patel and

10   in 2003 in the District of Puerto Rico in the case

11   of J and G Corporation.

12   Q.   Okay.  And in the course of your duties as a

13   RCRA supervisor, how many RCRA inspections have you

14   reviewed to determine compliance with RCRA and RCRA

15   permits?

16   A.   More than 500.

17   Q.   And as part of your duties, have you been

18   involved in compliance and enforcement of RCRA

19   regulations regarding the recycling of hazardous

20   waste?

21   A.   Yes, I have.

22   Q.   And as part of your duties, have you written

23   regulatory interpretations for industry?

24   A.   Yes, I have.

25   Q.   What about EPA practices and policies?

1    A.   I've reviewed EPA practices and policies quite

2    often to determine what the agency's intent for

3    regulations when there is any ambiguity.

4    Q.   As part of your experience in training as a

5    manager, do you provide guidance to federal EPA

6    RCRA inspectors regarding EPA practices and

7    policies?

8    A.   On a routine basis.

9    Q.   And as part of your duties, have you had to

10   review laboratory analysis of samples and compare

11   them to the RCRA definition of hazardous waste to

12   determine if RCRA applies?

13   A.   Yes, I have.

14   Q.   And how many times have you done that?

15   A.   Over a hundred times.

16        MR. PIAGGIONE:  At this point, your Honor,

17   based on Mr. Flax's experience in the field of RCRA

18   for the past 24 years, his education, his

19   continuing education in the field of RCRA, and his

20   knowledge of the RCRA statute, and its implementing

21   regulations and definitions, I offer Mr. Flax as an

22   expert witness in the field of RCRA, its

23   implementing regulations, definitions, and

24   permitting program and EPA practices and guidances

25   regarding the implementation of RCRA.

1          THE COURT:  Okay.  Any objection,

2     Mr. Linsin?

3          MR. LINSIN:  No objection, your Honor.

4     Thank you.

5          THE COURT:  Mr. Personius?

6          MR. PERSONIUS:  No, your Honor.

7          THE COURT:  Okay.  So, ladies and

8     gentlemen, Mr. Flax will be tendered to you as an

9     expert.  Now remember, you judge his credibility

10    the same way you do every other witness, those same

11    factors apply.

12        It's agreed that he has a special expertise in

13    RCRA and the application of the RCRA statute.  And

14    you heard his background and training.  That can

15    assist you in assessing the value and weight, if

16    any, that you choose to give to his testimony.  But

17    again, he's no different from any other witness

18    other than his expertise will be utilizable in

19    explaining and presenting to you the evidence in

20    this case.

21        Okay.  Mr. Piaggione, you may proceed.

22          MR. PIAGGIONE:  Thank you, your Honor.

23    BY MR. PIAGGIONE:

24    Q.  What activities does RCRA address?

25    A.  RCRA addresses the cradle-to-grave management

2518

1      of hazardous waste.

2      Q.   Can you explain what cradle-to-grave means?

3      A.   Cradle-to-grave means from the point that a

4      waste is first produced or generated, right through

5      you until its final deposition in disposal.

6      Q.   Based upon your training and experience, how

7      does the EPA ensure compliance with RCRA?

8      A.   We do that several ways.  We issue information

9      requests to facilities, where we ask detailed

10     questions about their practices.  We perform

11     compliance inspections.  And we issue permits to

12     facilities that require them, and we enforce those

13     permits.

14     Q.   If you could just try to slow down a little

15     bit.

16     A.   Certainly.  Sorry.

17     Q.   That's okay.  Does the EPA require RCRA permits

18     for all activities?

19     A.   No, it does not.

20     Q.   What activities does RCRA permits -- what

21     activities require RCRA permits?

22     A.   RCRA permits are required for certain storage,

23     treatment, and disposal activities.

24     Q.   Okay.  Does the state government have RCRA

25     programs as well?

1    A.   Yes.

2    Q.   Okay.  Can you explain how the state RCRA

3    programs fit into the federal regulatory programs?

4    A.   We have a work sharing relationship.  Like the

5    state of New York, it has an authorized program.

6    That means that the state of New York has

7    demonstrated to us -- this happened many years

8    ago -- that they have regulations that are at least

9    equivalent to the federal regulations, and that

10   they have personnel sufficient to implement the

11   program.

12        What we do, we develop annual work plans that

13   are cooperative agreements between us and the

14   state, and divides up the different types of

15   permits we'll issue, the corrective action

16   facilities that would be overseen, and the

17   different facilities that would be inspected by the

18   state and by EPA.  We have a cooperative work

19   sharing relationship.

20   Q.   And as part of your duties, have you provided

21   oversight of state RCRA programs?

22   A.   Yes, I have.

23   Q.   Which states?

24   A.   State of New York, State of New Jersey, and the

25   Commonwealth of Puerto Rico.

2520

1    Q.   How does New York State Department of

2    Environmental Conservation and federal EPA work

3    together regarding permitting and inspections?

4    A.   We have constant meetings where we develop work

5    plans to discuss progress in implementing those

6    work plans and divide up the work.

7    Q.   And was that true between the periods of 2005

8    and 2009?

9    A.   Yes, it was.

10   Q.   As part of your duties, did you provide

11   guidance to the EPA inspectors you supervised?

12   A.   Routinely.

13   Q.   Okay.  And as part of your duties, did you

14   provide oversight of the state programs?

15   A.   Yes.

16   Q.   And how did you do that?

17   A.   Several times a year we would go up to Albany,

18   and we would review the files of New York State to

19   ensure the inspections they were conducting were

20   proper; that if violations were found, that they

21   were properly documented; and that timely and

22   appropriate enforcement action was being taken when

23   that was necessary.

24   Q.   Now, when you said you provide guidance to the

25   EPA inspectors you supervise, that does not include

1    New York State inspectors, is that right?

2    A.   That is correct.

3    Q.   Now, does your guidance to the EPA inspectors

4    include what they should do if they suspect a

5    violation of RCRA?

6    A.   Yes, it does.

7    Q.   And what is the guidance you provide?

8    A.   EPA inspectors are instructed not to inform the

9    facility during an inspection that violations have

10   occurred.  And it's done for several reasons.

11   Number one, quite often an inspector does not get a

12   chance to review whether there are more significant

13   violation of the facility.

14         THE COURT:  Stop right there.  This goes

15   beyond the scope of that question.  So break it

16   down a little bit.

17         MR. PIAGGIONE:  Okay.  Sorry, your Honor.

18   BY MR. PIAGGIONE:

19   Q.   With respect to when an EPA inspector suspects

20   a violation of RCRA, do you give them guidance as

21   what to do at the conclusion of that inspection?

22   A.   Yes.  To inform the supervisors that they

23   believe there's a violation.

24   Q.   Okay.  Say that again.

25   A.   To inform their supervisors that they believe

1    there is a violation.

2    Q.   Okay.  Are they instructed to inform the

3    company?

4    A.   No.

5    Q.   Okay.  And when they inform their supervisors,

6    you're referring to the RCRA supervisors in the

7    EPA, is that correct?

8    A.   Correct.

9    Q.   Okay.  And at that time what is -- why is that

10   required?

11   A.   Number one, I would want to review their

12   inspection reports to ensure that their

13   observations and the facts gathered during the

14   inspection truly supports the violations that they

15   believe have occurred.

16   Q.   Okay.  And does the EPA RCRA program have a

17   procedure when a violation of RCRA is suspected?

18   A.   Generally what we would do when a violation --

19   Q.   Could you just answer that yes or no?

20   A.   I'm sorry, yes.

21   Q.   And what is that procedure?

22   A.   We will issue an information request letter

23   under RCRA.

24   Q.   What else do they do?  What else would you do?

25   A.   I would review all the inspection reports to

1    ensure that they support the contention that there

2    are violations.

3    Q.   Would you require them to take samples?

4    A.   On occasion, yes.

5    Q.   And based upon your position and your knowledge

6    of the EPA RCRA practices, is there a process that

7    EPA follows to determine if a RCRA violation has

8    occurred?

9    A.   We would take the information that the

10   inspector has gathered during the inspection

11   report, the information that we get from the

12   response to the information request, we would

13   review the regulations, because -- to ensure that

14   there were no specific exemptions or exclusions

15   carved out in the regulations that we may not be

16   aware of that may negate the potential violation.

17   Q.   Okay.  And is that reviewed -- that

18   determination -- do you make that determination?

19   A.   Yes.

20   Q.   Okay.  And is that determination reviewed by

21   anyone else?

22   A.   Generally reviewed by the branch chief, but

23   it's generally reviewed just before we issue an

24   enforcement action.

25   Q.   Does counsel get involved in that decision?

2524

1    A.   Yes, they do.

2    Q.   How do they get involved?

3    A.   They review the inspection reports.  They

4    review the responses to the information request

5    letter, and they review our enforcement actions.

6    Q.   Okay.  Does the EPA have a name for a company

7    that produces hazardous wastes?

8    A.   Yes.  We call them generators.

9    Q.   And do -- and does RCRA regulations define what

10   a generator must do?

11   A.   Well, yes, it does.  They define specifically

12   what generators of different categories must do.

13   There are three categories of generators.

14   Q.   Does RCRA define what a hazardous waste is?

15   A.   Yes, it does.

16   Q.   How does a generator determine if it produces a

17   hazardous waste?

18   A.   It's the generator's responsibility, and they

19   must be familiar with the regulations to determine

20   whether or not they generate a hazardous waste.

21   Because, as we said before, there are listed

22   hazardous wastes in the regulations that are always

23   hazardous, no matter what the concentrations of

24   different contaminants are.  Then they got to

25   determine if their waste is characteristic or if

 1    it's subject to an exclusion.

 2    Q.  Okay.  Now you mentioned --

 3         MR. LINSIN:  I'm sorry, your Honor.  I

 4    didn't hear that final -- the end of that last

 5    response.

 6         THE COURT:  Subject to an exclusion.

 7         THE WITNESS:  Subject to an exclusion.

 8         MR. LINSIN:  Thank you.

 9    BY MR. PIAGGIONE:

10    Q.  And what is a characteristic hazardous waste

11    again?

12    A.  Characteristic waste is one that either fails

13    for ignitability, corrosivity, reactivity, or is

14    one of the 40 constituents that makes it toxicity

15    characteristic.

16    Q.  Okay.  In the RCRA regulations, does it

17    describe what a material must be subject to

18    regarding toxicity?  What test should be --

19    A.  Yes.  There's a test called the toxicity

20    characteristic leaching procedure.  And this test

21    basically simulates what the concentration of a

22    waste would be in the leachate.  The leachate is an

23    extract once precipitation works its way down

24    through a landfill.

25    Q.  Are you familiar with the regulatory levels for

1    toxicity characteristic constituents?

2    A.   Some more than others.   There are 40 of them.

3    Q.   Is benzene on that list?

4    A.   Yes, it is.

5    Q.   And what is the RCRA regulatory standard for

6    benzene?

7    A.   The RCRA regulatory standard for benzene is 0.5

8    milligrams her liter.

9                MR. PIAGGIONE:   Your Honor, I would like

10   to show this witness Court Exhibit number 6.   May I

11   approach?

12               THE COURT:   You may.

13               MR. PIAGGIONE:   Let me know when you're

14   finished looking at that.

15               MR. PERSONIUS:   Your Honor, I'm sorry for

16   being confused.   What is the witness looking at?

17               THE COURT:   That's the stipulation.

18               MR. PERSONIUS:   Oh, okay.

19               THE COURT:   Court Exhibit 6.

20               MR. PERSONIUS:   Okay.

21               THE COURT:   That's the second stipulation

22   that was presented by Mr. Mango.

23               MR. PERSONIUS:   Thank you, Judge.

24               THE COURT:   You're welcome.

25               MR. PIAGGIONE:   Thank you for clarifying,

1     your Honor.

2              THE WITNESS:  I've looked at it.

3     BY MR. PIAGGIONE:

4     Q.  Okay.  And reviewing the results -- the

5     laboratory results of the samples taken in

6     September of '09, of 2009, how many sample results

7     are there?

8     A.  There are eight sample results.

9     Q.  And in your opinion as an expert on RCRA

10    definitions, how many of them indicate they fall --

11    or rather they exceed the regulatory level for

12    benzene?

13    A.  All eight of them do.

14    Q.  So they would indicate they were

15    characteristically hazardous for toxicity?

16    A.  That's correct.

17    Q.  Okay.  And are there laboratory results for

18    samples taken in December of 2009?

19    A.  Yes, there are.

20    Q.  And how many sample results are there?

21    A.  There are 18 samples.

22    Q.  And in your opinion as an expert on RCRA

23    definitions, how many of them indicate that they

24    exceed the regulatory level for benzene?

25    A.  Twelve out of the 18.

1    Q.   All right.  And those 12 samples then would

2    indicate that they are hazardous for the toxicity

3    characteristic for benzene?

4    A.   That's correct.

5    Q.   Okay.  Now, getting back to the generator, you

6    mentioned an EPA ID number?

7    A.   That's correct.

8    Q.   All right.  What is that?

9    A.   All generators of hazardous waste are required

10   to obtain an EPA ID number.  It's a 12-digit ID

11   number, and it basically identifies them as a

12   generator of hazardous waste.  And the only legal

13   way that that generator of hazardous waste can

14   offer that waste to a transporter to be transported

15   to a final disposal facility is by the use of that

16   ID number.  Authorized transporters in disposal

17   facilities will not accept wastes from a generator

18   that does not have an EPA ID number.

19   Q.   The EPA ID number for the generator, is that a

20   permit of some sort?

21   A.   No, it is not.

22            THE COURT:  Mr. Flax, push that microphone

23   back, please.

24            THE WITNESS:  Sorry, your Honor.

25            THE COURT:  It's okay.  You wind up a

1    little bit too close to it and we get some

2    feedback.  Thank you.

3         Go ahead, Mr. Piaggione.

4              MR. PIAGGIONE:  Thank you, your Honor.

5         How does a generator determine if their waste

6    is hazardous?

7              THE WITNESS:  As I said before --

8              MR. LINSIN:  Objection.  Your Honor, the

9    witness did testify to the four separate steps on

10   this.

11             THE COURT:  Yeah.  Objection sustained.

12   BY MR. PIAGGIONE:

13   Q.  No problem.  Are there different levels of EPA

14   oversight for generators?

15   A.  Yes, there are.

16   Q.  What are they?

17   A.  We give most scrutiny to large quantity

18   generators of hazardous waste.  Large quantity

19   generators of hazardous waste are those that

20   generate greater than 1,000 kilograms or 2200

21   pounds of regulated hazardous waste in a calendar

22   month.  We give them the most scrutiny.  The

23   thought is that the more waste that's generated,

24   the more potential there is for mismanagement.

25   Q.  Based upon your experience and knowledge of EPA

1    RCRA practices, are you aware if RCRA associates

2    certain types of waste with a coke producing

3    process?

4    A.   Yes.

5    Q.   What are they?

6    A.   There is K087.  K0141 through 148.  There are

7    wastes associated with coal tar management.  K087

8    is decanter sludge, tar tank decanter sludge from

9    coking operations.

10   Q.   And does the EPA have a regulatory practice to

11   encourage recycling of hazardous waste?

12   A.   Yes.  There are many exclusions and

13   opportunities in the regulations that encourage

14   recycling.  There are offices in EPA whose sole

15   purpose is to reach out to industry -- reach out to

16   industry to search for opportunities for recycling

17   or for underused opportunities for recycling.

18   Q.   Okay.  Are there certain conditions required

19   for recycling?

20   A.   There are many conditions placed on recycling

21   throughout the regulations.

22   Q.   Okay.  What are the conditions -- some of the

23   conditions for recycling?

24   A.   That there be no land disposal, that it be done

25   within a closed-loop recycling system where there's

1    no opportunity for materials to be released to the

2    environment, that there be no sham recycling done.

3    That means you recycle a material that contains

4    other toxic materials, that shouldn't be, you know,

5    contained in it.  There's many of them.

6    Q.  Okay.  Does RCRA allow the recycling of

7    hazardous waste associated with coking operations?

8    A.  Yes, it does.

9    Q.  And are there any conditions placed on

10   recycling of coke waste under RCRA?

11   A.  Yes.  The regulations specify that the coke

12   waste generated within the coking industry can be

13   recycled on the condition that there be no land

14   disposal involved from the point of generation to

15   the point where the material is reintroduced into

16   the process.

17   Q.  All right.  Is K087 one of those wastes that

18   can recycle?

19   A.  Yes, it is.

20   Q.  Describe for the jury the conditions a facility

21   has to meet to recycle K087 waste under RCRA.

22   A.  The facility has to ensure that there is no

23   land disposal.  Facilities I am familiar with use

24   either a concrete pad with a steel top, 18-inch

25   thick concrete pad with a steel top in a totally

1    enclosed unit.  Another facility I'm familiar with

2    uses a --

3             MR. LINSIN:  Objection, relevance.

4             THE COURT:  Well, this still relates to

5    K087, is that what you're saying?

6             MR. PIAGGIONE:  Yes, your Honor.

7             THE COURT:  Okay.  Overruled.  I'll permit

8    it.

9             THE WITNESS:  Another facility that I have

10   some familiarity with liquefies the coke.

11            MR. PERSONIUS:  Your Honor, pardon me for

12   interrupting.  It's not responsive to the question,

13   that's the problem.

14            THE COURT:  Well, it didn't appear to be

15   at that point.  We're talking about waste -- or

16   land disposal units, right?

17            MR. PIAGGIONE:  No, your Honor.  I asked

18   him some of the conditions -- what are some of

19   the -- excuse me.  What are some of the

20   practices --

21            MR. PERSONIUS:  No, it wasn't practices.

22   It was conditions.  That's the problem.

23            MR. PIAGGIONE:  Okay.  I'll ask that

24   question then, your Honor, if there's a problem

25   with that.

1          THE COURT:  Well, we need the question

2     clear so we know what the witness is supposed to

3     answer, please.

4     BY MR. PIAGGIONE:

5     Q.  What are some of the practices within the

6     coking industry to comply with the conditions

7     placed on recycling of coke waste under RCRA?

8     A.  Mixture on an 18-inch concrete pad with a steel

9     cap, totally enclosed so that there is no release

10    to the environment.  Or liquefaction of the coal

11    tar material in tanks, and then introduction to the

12    coal conveyor belt leading into the coke ovens by

13    spraying it on the coal.  All of this is to ensure

14    there is no releases into the environment.

15    Q.  Okay.  Now, with respect to this particular

16    case, have you had an opportunity to review the EPA

17    file and portions of the DEC file related to the

18    Tonawanda Coke company?

19    A.  Yes, I have.

20    Q.  And as part of that -- that development of that

21    case, were you involved in any way?

22    A.  Yes, I was.

23    Q.  And what was your involvement?

24    A.  I reviewed all the inspection reports.  I

25    reviewed and authorized the information request

1    letter that we sent.  I helped in the development

2    of the enforcement action and in the settlement

3    agreement.

4    Q.  Okay.  With respect to the letter you sent, I

5    would ask that exhibit -- Government

6    Exhibit 108-0001 be called up for identification

7    purposes.

8        Do you recognize that?

9    A.  Yes, I do.

10            MR. PIAGGIONE:  Okay.  Absent any

11   objection, I would ask that this be introduced in

12   evidence as Government's Exhibit 108.

13            MR. LINSIN:  May we just scroll through

14   the pages of the exhibit, please?

15       No objection, your Honor.

16            MR. PERSONIUS:  No objection, your Honor.

17            THE COURT:  Okay.  No objection, one point

18   zero --

19            MR. PIAGGIONE:  108.  Your Honor.

20            THE COURT:  Okay.  108 received, no

21   objection.  May be published.

22            (Government's Exhibit 108 was received

23            into evidence.)

24   BY MR. PIAGGIONE:

25   Q.  Okay.  And I would ask you to explain what that

1   is.

2   A.   That's a RCRA 3007 -- Section 3007 information

3   request letter.  Section 3007 of RCRA provides us

4   with our information gathering authority.  That's

5   also the authority under which we conduct

6   inspections.  We routinely send these letters out

7   following compliance inspections to substantiate

8   the observations and facts gathered by the

9   inspector during the inspection.

10  Q.   And what is the date of that letter?

11  A.   Dated October 30th, 2009.

12  Q.   Okay.  And can we go to the last page of that

13  letter, please?  Yes.  Whose signature is that?

14  A.   That is my signature.

15  Q.   Okay.  It's under the name George Meyer.

16  A.   Yes.  George Meyer is our branch chief.  I

17  routinely sign correspondence in his absence.

18          MR. PERSONIUS:  Excuse me, your Honor.

19  This was referred to as the last page of the

20  exhibit and --

21          MR. PIAGGIONE:  Last page of the letter,

22  excuse me, I said.

23          MR. PERSONIUS:  It's page 02, just so it's

24  clear.

25          THE COURT:  The record will so reflect.

1            MR. PERSONIUS:  Thank you, Judge.

2    BY MR. PIAGGIONE:

3    Q.  Okay.  So you signed that letter?

4    A.  Yes, I did.

5    Q.  Okay.  And typically how long does it take to

6    get a response for such a request?

7    A.  Generally if we're not looking for an enormous

8    amount of information, we'll give a respondent 30

9    days to answer our letter.

10   Q.  Did you give 30 days to respond to this letter?

11   A.  Yes, we did.

12   Q.  And subsequently did you receive a letter back

13   from Tonawanda Coke Corporation?

14   A.  Yes, we did.

15   Q.  Okay.  We'd ask that Government marked for

16   identification purposes 109 be put up for the

17   witness.

18       Can you take a look at that please, sir?  Do

19   you recognize that?

20   A.  Yes, I do.

21            MR. PIAGGIONE:  Okay.  Absent an

22   objection -- we will scroll through it, and absent

23   an objection, we'd ask that it be introduced as

24   Government's Exhibit 109.

25            THE COURT:  Okay.  Start the scrolling,

 1     please.

 2              MR. LINSIN:  No objection, your Honor.

 3              MR. PERSONIUS:  Your Honor, with the

 4     observation that the attachment is not included, we

 5     have no objection.

 6              THE COURT:  The attachment referred to in

 7     the letter?

 8              MR. PERSONIUS:  Yes.

 9              THE COURT:  All right.  The record will so

10     reflect.  And we will receive 109, no objection.

11     And it may be published.

12              (Government's Exhibit 109 was received

13               into evidence.)

14              MR. PIAGGIONE:  Thank you, your Honor.

15     BY MR. PIAGGIONE:

16     Q.  I wonder if I could have a split screen between

17     108 and 109, and if we could go to 108-002 I

18     believe.  No, 4, excuse me.  Okay.  And I wonder if

19     we can focus in on this part here.

20         Now, for clarification, are you the supervisor

21     of Leonard Grossman?

22     A.  Yes, I was.

23     Q.  Okay.  And were you the supervisor during this

24     period of time?

25     A.  Yes.

2538

1    Q.   Okay.   Were you in continued supervision of him

2    during the time he did inspections at Tonawanda

3    Coke?

4    A.   Yes.

5    Q.   Okay.   Were you actively supervising him during

6    the periods of his inspection during Tonawanda

7    Coke?

8    A.   Sometimes, yes.   And sometimes I was engaged in

9    other matters.

10   Q.   Who supervised him when you were not?

11   A.   The branch chief, George Meyer.

12   Q.   And with respect to this letter, this was sent

13   after you received the information from

14   Mr. Grossman as to his observations at Tonawanda

15   Coke?

16            MR. LINSIN:   Objection, leading.

17            THE COURT:   Reput the question, please.

18   BY MR. PIAGGIONE:

19   Q.   Okay.   Did you speak to Mr. Grossman regarding

20   his observations at Tonawanda Coke?

21   A.   Yes.

22   Q.   And as a result of -- as a result of --

23            MR. LINSIN:   Can we have a time frame,

24   your Honor, please?

25   BY MR. PIAGGIONE:

1   Q.   Yes.  Did you speak to Mr. Grossman after his

2   inspections at Tonawanda Coke in September of 2009?

3   A.   Yes.

4   Q.   Okay.  And as a result of those conversations,

5   did you determine that this letter should be

6   issued?

7   A.   Yes, we did.

8   Q.   Okay.  All right.  And the part on the left of

9   108, Exhibit 108-0004, can you tell us what you're

10  asking for in that question?

11  A.   We wanted to confirm statements that had been

12  made to Mr. Grossman during the inspection that

13  coal tar waste was being mixed directly on the

14  ground with coal prior to introduction into the

15  coke ovens.

16  Q.   Okay.  I'm going to go to 109, and I wonder if

17  I could get this -- can we blow it up a little bit?

18  Can we magnify that, please, Miss DiFillipo?

19      This is technology beyond my understanding,

20  your Honor.

21              THE COURT:   That top portion is from the

22  October 30th, 2009, letter.

23              MR. PIAGGIONE:   Okay.  Can you read that

24  response, please?

25              THE WITNESS:   Certainly.

1          THE COURT:  This is the response to the

2     letter, is that correct?

3          MR. PIAGGIONE:  This is the response to

4     the question raised above as to how they recycle

5     their hazardous K087 waste.

6          THE COURT:  That was by virtue of the

7     December letter of Tonawanda Coke?

8          MR. PIAGGIONE:  That's correct, your

9     Honor.

10          THE WITNESS:  "Tonawanda Coke Corporation

11     operates one self-cleaning tar decanter.  The

12     material that is automatically removed from the tar

13     decanter, tar decanter sludge, is periodically

14     taken by front end loader from the tar decanter to

15     a raw material coal pile.  Here the sludge is

16     rolled into the pile for use as feedstock to the

17     coal preparation building, and on to the coke oven

18     battery.  At no time does the tar sludge contact

19     the ground.  Also there is no ground disposal of

20     any tar sludge.  The coal piles individually and

21     the coal storage area collectively sit upon several

22     feet of coal above the approximately 40 feet thick

23     layer of native impermeable clay.

24     BY MR. PIAGGIONE:

25     Q.  Okay.  Based upon your experience, knowledge of

1    RCRA, EAP practices, and your educational

2    background as a geologist, is the response "at no

3    time does the tar sludge contact the ground" an

4    accurate description?

5    A.   No, it is not.

6    Q.   Why is that?

7    A.   Because the facility, by not using an

8    impermeable surface such as a concrete pad, has no

9    way of containing the material or knowing whether

10   or not it's reaching the grounds.

11   Q.   All right.  Does it matter if the ground has

12   coal on it?

13   A.   No, it doesn't.  That's the ground surface.

14   Q.   Okay.  Does it matter if there's clay -- how do

15   they describe it?  A thick layer of native

16   impermeable clay?

17   A.   It really doesn't, because although the clay

18   may impede the downward infiltration of the

19   contaminants, the contaminants through runoff

20   precipitation, there's no controlling it.  It just

21   runs laterally, and the contaminants can migrate

22   wherever they want.

23   Q.   Okay.  Take that off the screen,

24   Miss DiFilippo.

25             THE COURT:  Why don't we take 15?

1          MR. PIAGGIONE:  All right.  Thank you.

2               (Jury excused from the courtroom.)

3          THE COURT:  Okay.  We'll start again at

4     11:45.

5          MR. LINSIN:  Thank you.

6          THE COURT:  Thank you.

7          MR. MANGO:  Yes, your Honor.

8               (Short recess was taken.)

9               (Jury seated.)

10         THE COURT:  Welcome back, please have a

11    seat.  Okay.  Attorneys and parties are back

12    present.  The jury is here, roll call waived.

13         Mr. Flax, if you can resume the stand, sir.

14    You remain under oath.

15         And, Mr. Piaggione, you may resume questioning.

16         MR. PIAGGIONE:  Thank you.

17         THE COURT:  Direct examination.

18    BY MR. PIAGGIONE:

19    Q.  Mr. Flax, just please -- please try to slow

20    down a little.

21    A.  Yes, I will.  I'm sorry.

22    Q.  All right.  Can we have Exhibit 109 brought up

23    again, please?  And can we turn to .0004?  Thank

24    you.

25         And who signed that response?

1    A.   Mr. Kamholz did.

2    Q.   Can we go back to the first page again, please?

3    And can we can go back again to this section?  All

4    right.

5         With respect to that response, what is your

6    understanding of the ground?

7    A.   The ground is simply the surface of the earth

8    on which you walk.

9    Q.   All right.  And if -- if -- if it's mixed with

10   coal, is it still the ground?

11   A.   It's the ground, yes.

12   Q.   If it's mixed with a clay, is it still the

13   ground?

14   A.   Yes, it is.

15   Q.   Okay.  So where does the ground start?

16   A.   Ground starts at the point where you walk.

17   Q.   Okay.  If it was rocks on the ground, would

18   that make it not the ground?

19   A.   No, it would not.

20   Q.   Okay.  Now, this response, is that -- based

21   upon your experience and your knowledge of RCRA,

22   would the Tonawanda Coke Corporation's response

23   depicted in this exhibit void the RCRA exclusion

24   for recycling?

25              MR. LINSIN:  Objection.  There are a

1        number of exclusions for recycling.  I'm not quite

2        certain which one counsel is referring to.  Can we

3        be clear?

4                    MR. PIAGGIONE:  Sure.

5                    THE COURT:  If you can refine it, please.

6                    MR. PIAGGIONE:  Yes, your Honor.

7            Based upon your experience and knowledge of

8        RCRA, would the mixing of -- as described in this

9        response, void the RCRA exclusion for -- for

10       recycling for -- because of land disposal?

11                   THE WITNESS:  Yes.

12                   MR. PERSONIUS:  Object to be that.

13                   THE COURT:  Yeah, sustained.  Bad

14       question.

15                   MR. PIAGGIONE:  Okay.

16                   THE COURT:  That's not a legal ground, but

17       give it another try.

18                   MR. PIAGGIONE:  Okay.  Based upon your

19       experience and knowledge, would the mixing -- this

20       response indicate that Tonawanda Coke is entitled

21       to the exclusion for mixing -- for recycling,

22       excuse me -- entitled to the exclusion for

23       recycling under RCRA?

24                   MR. LINSIN:  Your Honor, same objection.

25                   THE COURT:  Yeah, sustained.

 1          MR. PIAGGIONE:  One moment, your Honor?

 2          THE COURT:  Yes.

 3     BY MR. PIAGGIONE:

 4     Q.  Based upon this response, would the mixing of

 5     K087 waste on the coal piles as depicted here fit

 6     within the description of the exclusion for

 7     recycling under RCRA?

 8     A.  No, I believe it is contrary to the description

 9     in the exclusion.

10     Q.  Okay.  Now, based upon your experience and

11     knowledge of RCRA, if tar sludge was in a tank when

12     RCRA took effect --

13          THE COURT:  Redo it again.

14     BY MR. PIAGGIONE:

15     Q.  Okay.  Based upon your experience and knowledge

16     of RCRA, if tar sludge was in a tank when RCRA took

17     effect, could EPA require a permit for it?

18     A.  Yes, it could.

19     Q.  Under what conditions?

20          MR. LINSIN:  Objection.  Relevance.

21          THE COURT:  Relevance?

22          MR. PIAGGIONE:  Your, Honor there is tar

23     sludge that was placed in a tank before RCRA took

24     effect in this case.  I'm asking him could that be

25     subject to regulation by RCRA.

1          MR. LINSIN:  There's no charge in this

2     count that relates to a permit.

3          THE COURT:  There isn't.

4          MR. PIAGGIONE:  I will show the connection

5     in a moment, your Honor, if I could.

6          THE COURT:  All right.  I mean, if you

7     connect it up, I'll give you one or two questions

8     in that regard.  But there are no charges with

9     respect to the tar sludge in the tank.

10          MR. PIAGGIONE:  Actually, if you look at

11     the charges, your Honor, there is charges that --

12     we'll get to that.  I believe there is charges

13     regarding the release of that tar sludge, your

14     Honor.

15          THE COURT:  That's the overrun.  That's a

16     different issue.

17          MR. PIAGGIONE:  Okay.

18          THE COURT:  Mr. Linsin, go ahead.

19          MR. LINSIN:  Well, I would like to be

20     heard on that issue precisely if -- if this is

21     where -- if that is where this is going.  Because I

22     see no -- no charge in 17, 18 or 19 that relates to

23     a release from any of the tanks.

24          THE COURT:  All right.  I mean, what was

25     in the tank, there is testimony that that's from a

1   prior owner as well.

2          MR. LINSIN:  And a stipulation, that is

3   correct.  And my objection, your Honor, really

4   relates to focusing this testimony on the charges

5   that are actually charged in this indictment, not

6   what may have otherwise been a RCRA violation.

7          THE COURT:  Okay.  It's not necessary, as

8   I see it, for background to the charged violation.

9   You tell me -- yes, go ahead.

10         MR. PIAGGIONE:  May I have a -- this

11  involves active management, your Honor.  And it

12  goes to that point.  Perhaps if we had a side bar

13  we can discuss that, considering that there is a

14  restriction on discussing what active management

15  actually is.

16         THE COURT:  Go ahead.

17         MR. PIAGGIONE:  Your Honor, if you recall,

18  you have provided a definition of active

19  management, and this goes to that issue, and

20  therefore I want to -- without discussing it in

21  front of the jury, thus violating your order, I ask

22  for a side bar.

23         THE COURT:  One second, please.

24         MR. PIAGGIONE:  I can try a hypothetical,

25  your Honor, perhaps --

1           THE COURT:  Do we have an active

2     management here, Mr. Linsin, because --I mean, it

3     is -- active management is regulated if it's after

4     November of 1990, right?

5           MR. LINSIN:  The time period in -- with

6     respect to Count 17 begins in 1998.  Time period

7     with respect to Count 18 begins in 2009.

8           THE COURT:  Okay.  But the definition

9     relates to active management post-November 1980,

10    which would be subject to RCRA regulation.

11          MR. LINSIN:  Correct.  And if we

12    approached this questioning through the lens of the

13    actual charge, that is where -- what I was trying

14    to avoid, your Honor, was a hypothetical discussion

15    about permitting requirements concerning materials

16    that have no relation to this.

17      If we could perhaps approach the issue

18    through -- through what is actually charged in

19    Count 17 -- and obviously, yes, we agree active

20    management is an issue.  But for clarity and for

21    relevance purposes, I would request that we

22    approach it through the actual charge that is

23    before the jury.

24          THE COURT:  Okay.  Let's try to do it that

25    way, Mr. Piaggione.  And you have the definition of

1      active management.  We have the charges in the time

2      frame that are stated by the charges, and you have

3      to work with that, and then I'll entertain any

4      objections, if there are any, to the manner in

5      which you approach it.

6                  MR. PIAGGIONE:  Okay.  Thank you, your

7      Honor.

8      BY MR. PIAGGIONE:

9      Q.  If material stored in the tank from at least

10     May of 1998 to 2009, if this material was --

11     exhibited the characteristic for benzene, and it

12     was released from that tank and sat on the ground

13     for about a year before removal, would RCRA apply?

14     A.  Yes, it would.

15     Q.  Why?

16     A.  Facilities are required to maintain themselves

17     in order to prevent accidental, sudden, or

18     non-sudden releases of hazardous wastes or

19     hazardous constituents.  It's obvious by this

20     occurrence that that was not done.

21         Also the material staying on the ground for a

22     year, there's some reasonable expectation that when

23     a release of hazardous waste occurs at a facility,

24     that the facility will take some very, very -- if

25     not immediate, very, very soon action to clean that

1    up and to remedy any harm that that might have

2    caused.

3        That was not done in this case.  So I would say

4    that I would bring a charge against this facility

5    if I was to do this under my civil authority for --

6             MR. LINSIN:  Objection, your Honor.

7             THE COURT:  We have a narrative response

8    to a direct question.

9             MR. PIAGGIONE:  Just try to limit your

10   response, please.

11            THE COURT:  Is that your objection or --

12            MR. LINSIN:  Yes, it is narrative.  And

13   also opinions as to what might constitute a civil

14   offense is irrelevant as well.

15            THE COURT:  Okay.  And there's references

16   to this case, without specifics in that regard, so

17   it's difficult to determine the bases you're

18   referring to without better questions.  Or at least

19   incremental questions.

20   BY MR. PIAGGIONE:

21   Q.  Just try to respond to my questions, please.

22   A.  Okay.

23   Q.  All right.  If a material was released from a

24   tank which had been in the tank from at least May

25   of 1998 to about December 17th, 2009, if that

1    material was -- had the characteristic of benzene,

2    and it was leaked on to the ground and left there

3    for about a year before removal, how would RCRA

4    apply?

5              MR. PERSONIUS:  Your Honor, that's just

6    the question we had.

7              THE COURT:  I think it's slightly

8    different actually I think.  Your first question

9    was would RCRA apply.  Now it's how would RCRA

10   apply.  Did you want to make it that way?  Is that

11   your question?

12             MR. PIAGGIONE:  Yes.

13             MR. PERSONIUS:  I guess you're going to

14   have to overrule my objection, Judge.  I think it's

15   the same question.

16             THE COURT:  Is your answer any different?

17             THE WITNESS:  No, my answer wouldn't be

18   any different.

19             THE COURT:  Okay.  So I'll sustain the

20   objection.

21             MR. PERSONIUS:  Thank you, Judge.

22             MR. PIAGGIONE:  All right.  If there was

23   material on the ground for at least -- if there was

24   from at least May of 1998 to about

25   December 17, 2009, and there was a subsequent

1      additional release from a tank into that same area

2      where this material was on the ground, would RCRA

3      apply to that?

4              MR. LINSIN:  Objection, relevance.

5              THE COURT:  In the form of the question

6      you're talking subsequent to what?  What period?

7      That last 2009 date that you gave?

8              MR. PIAGGIONE:  I said from -- if the

9      material -- yes, your Honor.  The material --

10             THE COURT:  So it would be 2009 forward.

11     From November of 2009 forward, is that the

12     subsequent --

13             MR. PIAGGIONE:  No, your Honor.  I'll

14     rephrase the question.

15             THE COURT:  Okay.  To the form of the

16     question, I'll sustain the objection.  It may be my

17     inability to follow it.  Maybe it's clear to

18     everybody else, but restate it.

19             MR. PIAGGIONE:  Okay.  If there was

20     material on the ground from at least May of 1998 to

21     about December 17th, 2009, and it was -- material

22     was leaked from a tank nearby which had also the

23     characteristic of benzene in 2008, would RCRA apply

24     to that material on the ground which -- as a result

25     of that release?

1           MR. PERSONIUS:  Your Honor, I hate do it,

2    but I object.

3           THE COURT:  Yeah, sustained.

4           MR. LINSIN:  I do as well.

5           THE COURT:  Take a minute.  Sit down,

6    craft the question, okay?  Please.

7           MR. PIAGGIONE:  Okay.  Let's try to walk

8    through this again.  Let me provide you with a

9    hypothetical.  Let's say in 1998 coal tar material,

10   which was toxic for benzene, was placed on the

11   ground and had been on the ground before May of

12   1998.  And coke breeze --

13          THE COURT:  Wait.  Start it again.

14   BY MR. PIAGGIONE:

15   Q.  Okay.  If coal tar was on the ground in 1998

16   and coke breeze was placed on the coal tar after

17   that time, would RCRA apply?

18   A.  Yes.

19   Q.  How would it apply?

20   A.  I believe the addition of the coal breeze to

21   the -- coke breeze to the coal tar on the ground

22   would be treatment, because it changes the physical

23   nature of the material under RCRA.

24   Q.  Okay.  If coal tar was on the ground from at

25   least May of 1998, which is toxic for benzene, and

2554

1    coal tar from a tank was permitted to be mixed with

2    it, would RCRA apply?

3            MR. PERSONIUS:  Your Honor, I object on

4    relevancy grounds.  There may be a 404(b) issue

5    too.  I don't know where this is going, but both of

6    those are grounds for objection.

7            THE COURT:  Well, I don't know where it's

8    going exactly either.  I'll give you a little time

9    to work with it.  I don't know if it is a 404(b),

10   unless you're more specific in that regard.

11           MR. LINSIN:  Well, that is part of the

12   problem, your Honor.  We seem to be combining many

13   issues in each of these questions, and it's very

14   difficult to track them out.

15           MR. PERSONIUS:  And, Judge, I know you

16   don't want to excuse the jury, but I'm concerned

17   about where this is headed.  And I'm not even sure

18   doing it -- and I don't like side bars.  I don't

19   like asking the jury to leave, but I'm getting

20   concerned about where this is headed.

21           THE COURT:  Okay.  Well, he's probably

22   right.  I don't like to get rid of you, but I think

23   this time we better do it for a little while.  Let

24   me get this sorted out, and we'll bring you back as

25   soon as we can.

1          If you don't hear from me in a reasonable

2     period of time, you can beat feet out of here and

3     we'll track you down, okay?

4               (Jury excused from the courtroom.)

5               MR. LINSIN:  If we're going to be

6     discussing these issues, I would request the

7     witness be excused, please.

8               THE COURT:  Mr. Flax, if you can step out

9     to the lobby, please.

10              THE WITNESS:  Thank you, your Honor.

11              THE COURT:  Thank you.

12              (Witness excused from the courtroom.)

13              THE COURT:  Okay.  I guess I'll let you

14     take the lead, Mr. Personius.  Are we running the

15     risk of flying in the face of the ruling that

16     relates to those 13 categories?

17              MR. PERSONIUS:  I think it's even worse

18     than that.  I don't think it was in that list.

19     What I'm hearing is -- I think where this is

20     headed, Judge, is that you have the coal tar around

21     the two abandoned tanks.

22              THE COURT:  Right.

23              MR. PERSONIUS:  There has been some

24     testimony that could -- I don't think it

25     necessarily does -- could support an argument that

2556

1    around the time the fire occurred that there was

2    some leakage from the inside of the tank on to that

3    existing coal tar base.  Whether that occurred or

4    not, there is no charge in this case regarding a

5    violation of RCRA based on that incident, nor did

6    we get notice in the government's 404(b) disclosure

7    that they intended to get into whether or not that

8    event, if it occurred, would constitute a RCRA

9    violation.  That's where I think we're headed.  And

10    I don't think we should be there.

11            THE COURT:  All right.  Is that where we

12    are going?

13            MR. PIAGGIONE:  No, your Honor.  What we

14    are trying to explain is the issue for whether or

15    not this material on the ground is subject to RCRA

16    is if it was actively managed.  One of the factors

17    for active management is additions to that

18    material.  And this release was an addition to that

19    material, hence it falls within the definition of

20    active management.

21        I didn't want to argue that in front of the

22    Court -- in front of the jury because you had ruled

23    we were not supposed to explain that in front of

24    the jury.  Your Honor, it's my understanding that

25    the --

1        THE COURT:  Does that -- does that make

2   sense to you?

3        MR. PERSONIUS:  I had understood, and I

4   look Mr. Linsin, because he clearly knows more

5   about this -- the technical environmental arguments

6   than I do, Judge.  I understood the active

7   management argument in this case was based upon the

8   spreading of coke breeze on the coal tar around

9   these abandoned tanks, which occurred back around

10  1998.

11       MR. MANGO:  And then the excavation of the

12  material, your Honor, if I can add in.  And then

13  the excavation of the material.

14       THE COURT:  Help me out here, Mr. Mango.

15  Give me a capsule on it.

16       MR. MANGO:  Yes, your Honor.  I think what

17  Mr. Piaggione here is attempting to set up is in

18  Count 18 we have material -- now from testimony

19  where there was material on the ground.

20       THE COURT:  That's the coal tar sludge.

21       MR. MANGO:  Coal tar sludge, and then

22  there was a fire which affected the area.  And

23  according to some testimony, additional material

24  ran out on to the ground around the area.

25       THE COURT:  All right.  In the direction

1    of the piled coal tar sludge that existed from

2    1998.

3              MR. MANGO:  Correct, your Honor.  So

4    Count 18 then captures the excavation of that

5    material for the period of time between June of '09

6    and September of '09.  The excavation of the

7    material in and around the tanks.  And then the

8    placement of that material on to the coal piles.

9         So I think what Mr. Piaggione here is trying to

10   set up is just to get us to that count.  In terms

11   of --

12             THE COURT:  And by adding that runoff

13   material to what was stationary, that constitutes,

14   from your standpoint, active management that

15   relates to Count 19.

16             MR. PIAGGIONE:  Count 17.

17             THE COURT:  Or seventeen.

18             MR. MANGO:  Seventeen and 18.  Seventeen,

19   your Honor, also charges for the time period

20   between May of '98 up until the time of the

21   criminal search warrant, December 17th, '09, which

22   would capture the fire event as one of the -- one

23   of the arguments that the government is claiming

24   contributed to the active management of the area.

25        It's not simply, in the government's view, the

1    placement of the coal breeze on top of the surface

2    that gives us Count 17 here.  It's the fact that

3    they ripped these tanks out of the ground and

4    disturbed the area and then let a fire occur to

5    further disturb the area, and then more stuff came

6    out on to the ground.

7                THE COURT:  And they moved that, and that

8    becomes part of the active management, and they

9    added that to the stationary pile --

10               MR. MANGO:  Yes, your Honor.

11               THE COURT:  -- that was in existence at

12   the time, which makes it, at least under your

13   theory, a violation of RCRA.

14               MR. MANGO:  Yes, your Honor.

15               MR. LINSIN:  Your Honor, may I go back to

16   one of the original points I was trying to make

17   here?

18               MR. PIAGGIONE:  Your Honor, if I could,

19   it's my understanding the defense experts are in

20   the courtroom.  Could they be excluded as well?

21      Is that what I understand from Mr. Mango, is

22   the expert witnesses from defense --

23               MR. LINSIN:  I don't believe our experts

24   are within 3,000 miles of this courthouse at this

25   point.

1          MR. PIAGGIONE:  Then withdrawn, your

2     Honor.

3          MR. LINSIN:  The concern I have with the

4     way counsel is structuring the questions is this,

5     your Honor.  He is focusing his questions on this

6     process of release from the tanks, and then posing

7     a question would that be covered by RCRA.  And my

8     concern is that the implication in the way this

9     questioning is going is that, see, this release is

10    a violation of RCRA.  And that is not the argument

11    we just heard.  It is not the rationale for which

12    this opinion is being offered.  And what I had

13    asked initially was that the questions be framed in

14    terms of and focused on what the allegations are,

15    and then ask questions about active management, and

16    would this event constitute active management in

17    your opinion.  My concern is that we're throwing

18    off these terms, and would this be covered by RCRA.

19    It is just -- I think it runs the risk of

20    misapprehension on the jury's part that there are

21    multiple serial violations of RCRA that are not

22    charged in the indictment, and that is my concern.

23        We have disagreements, obviously, on the

24    premise regarding active management.  But it is --

25    it was the structure of the questioning that I was

1    concerned about.

2              THE COURT:  Yeah, for example, the release

3    itself is -- in and of itself is not a violation of

4    RCRA necessarily.

5              MR. LINSIN:  It is certainly not charged

6    in this indictment, yes.

7              MR. MANGO:  Your Honor, if we could have

8    five minutes, we'll refine some questions.  I can

9    get them very focused, and -- the questions very

10   focused on the issues at hand, and if we could have

11   five minutes?

12             THE COURT:  Well, can we -- can we call

13   the matter of active management to the attention

14   the jury without that being unfairly prejudicial?

15             MR. LINSIN:  I'm not sure what the

16   Court's -- call the matter of active management?

17   I'm not sure what you're proposing, your Honor.

18             MR. MANGO:  Your Honor, my understanding

19   of your ruling is -- and I've got it here -- we

20   can't discuss what the definition -- through our

21   collective government or defense witnesses, we

22   can't have them offer opinions as to what active

23   management means.

24        But I think what the -- where the Court is

25   going is we need to at least have the witness say

1    why this would be covered under RCRA, and I think

2    it would be appropriate to say this would

3    constitute active --

4              THE COURT:  Management.

5              MR. MANGO:  Right.

6              MR. LINSIN:  Well, I agree with the latter

7    proposition.  I disagree -- as I read the Court's

8    opinion regarding these definitions, it was a

9    matter of not inviting the witnesses to opine about

10   different definitions or different theories.  I

11   would presume that these expert witnesses would

12   need to make reference to the definitions that the

13   Court has provided, yes.

14             MR. MANGO:  Yes.

15             THE COURT:  And you can do it that way.

16   Try to set it up that way.  That makes it more

17   understandable, because these terms now will become

18   familiar to the jury, and we can --

19             MR. LINSIN:  And as long as it is tied to

20   the counts, that -- that is my concern, that the

21   jury not be -- that it not be implied in front of

22   the jury that there are just these serial RCRA

23   violations and without -- you know, with the

24   prejudice that that would result in.

25             THE COURT:  I think that's a legitimate

1    concern.  Because if every reference that you make

2    to some activity you have the witness testify that

3    that's a RCRA violation, when it doesn't

4    necessarily constitute what's charged, that can be

5    problematic.  Because that's almost like a

6    propensity-type of argument I think.  So you've got

7    to be careful of that.

8            MR. PIAGGIONE:  Yes, your Honor.  The

9    question was how does RCRA apply, not whether it

10   was a violation.  I just point that out.  If we can

11   use "active management", the word "active

12   management", that's fine.  I was trying to avoid

13   that issue, so we did not violate the Court's

14   order.

15           THE COURT:  Okay.  We all know what your

16   questions were, so just get to staging it as part

17   of active management, and then we'll go from there,

18   but as it relates to the, Count 17, et cetera.

19           MR. MANGO:  Absolutely.

20           MR. PERSONIUS:  Judge, I don't mean to

21   prolong this.  Can I make one other point because

22   it might tie into a hypothetical.

23           THE COURT:  Yes.

24           MR. PERSONIUS:  I think it was Mr. Mango

25   when he was explaining the evidence indicated that

1    there's been evidence that the excavation activity

2    at these tanks included the material outside the

3    tanks.  And I haven't -- that's not my -- if

4    there's going to be a hypothetical about removal of

5    material, the only testimony I've heard is removal

6    of material from inside, not outside the tanks.

7    And maybe I missed the testimony.

8            MR. LINSIN:  That is what my notes reflect

9    as well, your Honor.

10           MR. PERSONIUS:  I don't want a

11   hypothetical based on outside.

12           THE COURT:  I don't think he is.  You're

13   talking about the inside materials.

14           MR. MANGO:  Yes.  I may have misspoke.

15           MR. PERSONIUS:  Just wanted to make sure.

16   Thank you for doing this, Judge.  Thank you.

17           THE COURT:  As you know, I try to do as

18   much in front of the jury as we can, because it

19   keeps them engaged for one thing.

20           MR. PERSONIUS:  Right.

21           THE COURT:  As long as they understand

22   what we're doing is not in any way evidence from

23   their standpoint.  And, you know, but a point like

24   that is well taken.  Thank you.

25           MR. PERSONIUS:  Thank you, Judge.

1          THE COURT:  Five, sure.

2          (Short recess was taken.)

3          (Jury seated.)

4          THE COURT:  I must admit we did get a

5    little worried.  We thought we might have to track

6    you down a little bit.  I'm glad to see that

7    everybody's back.  Please have a seat.

8      Mr. Flax remains on the stand.  He remains

9    under oath.  Thank you for bearing with us.  We're

10   going to be -- this is part of our physical fitness

11   aspect of the case.  We'll be moving you back and

12   forth a little bit.  We won't go much longer, and

13   we'll break for the regular time.  And we should be

14   in a better position to move through everything

15   okay?

16     Thank you.  The attorneys and parties are back

17   present.  You, of course, are all here, roll call

18   waived, and it's always nice to see.

19     We're going to give Mr. Piaggione the podium

20   again and see what he does.

21          MR. PIAGGIONE:  Thank you, your Honor.

22   BY MR. PIAGGIONE:

23   Q.  Now, I you want to ask you a hypothetical.  If

24   material was placed on the ground prior to 1978, is

25   that subject to RCRA?

2566

1    A.   Not if it was not actively managed after 1981

2    when RCRA was implemented.

3    Q.   Okay.  What you would call --

4             MR. LINSIN:  Your Honor, I apologize.

5    Could we get clarification about what material this

6    hypothetical relates to?

7             THE COURT:  Yes.

8    BY MR. PIAGGIONE:

9    Q.   Okay.  If coal tar was placed on the ground

10   prior to 1978, is that subject to RCRA?

11   A.   Not if it was not actively managed after the

12   implementation date of RCRA in 1980.

13   Q.   What would you call that -- that area which

14   contained this coal tar?

15   A.   We call pits -- pits, service impoundments.

16   landfills, we call them land disposal units.

17   Q.   Okay.  Now, if the same land disposal unit was

18   in 1978 subject to coke breeze being spread on the

19   top of it, subject to 1998, would RCRA apply?

20   A.   Yes, it would.

21   Q.   Why?

22   A.   Because that material in that pit had been

23   actively managed.

24   Q.   Okay.  Now, if this material in this land

25   disposal unit we've just described was moved and

1    consolidated after 1998, would RCRA apply?

2            MR. PERSONIUS:  Your Honor, I object to

3    that.  There's no foundation for that hypothetical.

4            THE COURT:  I think to the form of the

5    question -- I think it's improper in that form.

6    Objection sustained.

7            MR. PIAGGIONE:  If -- may I try again,

8    your Honor?

9       If the coal tar in the land disposal unit was

10   consolidated, would that constitute -- would RCRA

11   apply?

12           MR. LINSIN:  Objection, lack of

13   foundation.

14           MR. PIAGGIONE:  If --

15           THE COURT:  No.

16           MR. PIAGGIONE:  I'm sorry.  Your Honor,

17   there is testimony that this material was moved.

18           THE COURT:  Okay.  Try it one more time.

19           MR. PIAGGIONE:  Okay.  Now, if this

20   material that I referred to before in the land

21   disposal unit --

22           THE COURT:  "Material" meaning?

23           MR. PIAGGIONE:  The coal tar sludge --

24   excuse me.  The coal tar on the ground in the land

25   disposal unit was moved after 1998, would RCRA

2568

1     apply?

2            MR. LINSIN:  Your Honor, I'm going to

3     object on this basis.  Now these questions appear

4     to be related to the material that was on the

5     ground.  The hypotheticals are premised on the

6     material being coal tar sludge.  The allegations in

7     Count 17 and 18 do not allege coal tar sludge being

8     either in the tanks or on the ground.  This --

9     this -- these hypotheticals, this line of

10    hypotheticals has nothing to do with the

11    allegations that exist in Count 17 and 18.

12            THE COURT:  All right.  You know, I'm not

13    sure when you talk about the material being coal

14    tar sludge, if it's with or without the coke dust

15    that was mixed.  I mean, I think --

16            MR. LINSIN:  But, your Honor, the

17    allegation in 17 and 18 relates to D018, which is

18    not coal tar sludge.  It is a different waste under

19    the regulations.  We are off in a territory that is

20    not alleged in 17 or 18.

21            MR. PIAGGIONE:  Your Honor, I can modify

22    the hypothetical.

23            THE COURT:  Well, that's correct, right?

24            MR. PIAGGIONE:  Yes.  I can modify the

25    hypothetical.

 1          THE COURT:  Okay.  We'll see everybody at

 2   2:00 o'clock.  Take a break.

 3          (Jury excused from the courtroom.)

 4          THE COURT:  Okay.  Mr. Flax, you can step

 5   down.  Thank you.

 6      All right.  Either you get the act together on

 7   the questioning --

 8          MR. PIAGGIONE:  We will, your Honor.

 9          THE COURT:  -- hypothetical or factual.

10   If there is further objections along this line,

11   I'll just sustain every single objection, and you

12   won't get a second opportunity.  I think that's

13   only fair at this point.  So, either you get it

14   right this time or it will not get in.  Okay?

15          MR. PIAGGIONE:  Yes, your Honor.

16          MR. MANGO:  Yes, your Honor, absolutely.

17          MR. PERSONIUS:  Your Honor, I'm sorry

18   to --

19          THE COURT:  No, it's okay.

20          MR. PERSONIUS:  -- to do this too.

21          THE COURT:  It's all right.

22          MR. PERSONIUS:  I preface this by saying

23   I'm not an environmental lawyer.  I'm leaving this

24   part of the case to Mr. Linsin.  But my very

25   fundamental understanding of these charges is it's

1    not being alleged that any movement of this, what I

2    think is called coal tar that's outside the tank,

3    that the movement of that is a RCRA violation.

4          THE COURT:  It's the adding on that was

5    testified to as being the active management.

6          MR. PERSONIUS:  Adding on.  We've had a

7    hypothetical about movement, and there was some

8    testimony that when the coke breeze was added, it

9    made the coal tar move.  But that I don't believe

10   is the basis for the counts in the indictment.  I

11   could be wrong, Judge.  I'm just telling what I

12   think.

13         MR. LINSIN:  Well, your Honor, I also

14   objected to -- there was a hypothetical about

15   consolidation of a land disposal unit.  Counsel

16   should know these are terms of art in environmental

17   regulation, and it has nothing to do with these

18   charges.

19         THE COURT:  Well, I think that was a

20   throw-in, frankly.  Because I think it destroyed

21   the hypothetical.  It didn't make sense to me, but

22   again, Mr. Personius, I hear what you're saying.

23      Go ahead, Mr. Linsin.

24         MR. LINSIN:  No, no.  I was just wanting

25   to clarify that it was movement, then it was

1    consolidation, and it's just -- these terms mean

2    things under the regulations.

3         MR. MANGO:  Your Honor, we will clarify,

4    but there is an issue with the movement of this

5    material.  When the coke breeze was added on top,

6    there was testimony that the coal tar migrated and

7    moved and consolidated.  And that under -- under

8    your Honor's definition and according to --

9         Mr. Flax, you want to go outside for a second?

10             (Witness left the courtroom.)

11        MR. MANGO:  Your Honor, I believe under

12   Mr. Flax's interpretation of RCRA that the adding

13   of the coke breeze, which caused the movement of

14   the coal tar, constitutes active management.

15        THE COURT:  But that's not migration.

16        MR. PIAGGIONE:  That's disturbing.

17        MR. MANGO:  That is disturbing the

18   material by causing it to move.  But we will again

19   have just a very few limited focused hypotheticals

20   when we come back.

21        THE COURT:  Okay.  The focus of the

22   hypotheticals will not be coal tar sludge.

23        MR. MANGO:  No, that, I believe was a --

24   was an accident.  It will be coal tar that exhibits

25   the toxicity characteristic for benzene.  That's

1    how it's going to be described.

2              MR. LINSIN:  It is material that exhibits

3    the toxicity for benzene.  That is what is alleged

4    in 17 and 18, and that is D018.

5              MR. MANGO:  We'll use that term.

6              THE COURT:  It says the waste exhibiting.

7              MR. LINSIN:  Exactly.  That's fine.

8              MR. PIAGGIONE:  We'll use that in our

9    hypothetical.

10             MR. MANGO:  Yes, your Honor.  We were just

11   trying to incorporate some of the testimony that

12   called this material coal tar.  But we'll call it

13   the waste exhibiting the toxicity characteristic

14   for benzene.  I think to be consistent and fair to

15   the language in the indictment, we will keep our

16   hypothetical limited to that language.

17             THE COURT:  I think you have to do that,

18   because the substance then would not be what you've

19   charged in the indictment as I see it.

20             MR. MANGO:  Yes.  Absolutely.

21             THE COURT:  All right.

22             MR. LINSIN:  Thank you, your Honor.

23             MR. PERSONIUS:  Thank you, Judge.

24             (Lunch recess was taken.)

25             (Jury not present in the courtroom.)

 1          THE COURT:  Okay.  Thank you.  Please have

 2     a seat.  Chris, please.

 3        Mr. Flax, want to resume the stand, please?

 4             (Jury seated.)

 5          THE COURT:  You know there's only limited

 6     frivolity allowed during this trial.  Good to see

 7     you back.  Please have a seat.

 8        Okay.  The attorneys and parties are back

 9     present.  Mr. Philip Flax is back on the stand.  He

10     remains under oath.  It's still the government's

11     direct examination.

12        Mr. Flax, as you know, has been tendered as an

13     expert witness.  And, Mr. Piaggione, you may resume

14     questioning.

15          MR. PIAGGIONE:  Thank you, your Honor.

16   BY MR. PIAGGIONE:

17   Q.  Mr. Flax, I would like to try again to give you

18     a couple of hypotheticals.  First, assume for a

19     moment that in 1978 a waste exhibiting the toxicity

20     characteristic for benzene, a hazardous waste under

21     RCRA, was present on the ground adjacent to two

22     large tanks.  Would the fact that the hazardous

23     waste is on the ground make it subject to RCRA?

24   A.  No.  If it was placed there prior to RCRA's

25     implementation date, as long as it was not actively

1    managed, it would not be subject to regulation.

2    Q.   Now, are you familiar with what coke breeze is?

3    A.   My understanding is that coke breeze are fine

4    particles of coke.

5              THE COURT:  All right.  Is that a yes or

6    no?

7              THE WITNESS:  Yes.

8              THE COURT:  Thank you.

9              THE WITNESS:  Sorry, your Honor.

10   BY MR. PIAGGIONE:

11   Q.   What is coke breeze?

12   A.   Coke breeze is fine particles of coke.

13   Q.   With the information I already provided you,

14   again, the waste exhibiting the toxicity

15   characteristic for benzene, a hazardous waste under

16   RCRA, was present on the ground adjacent to two

17   large tanks since 1978, and now in 1998 coke breeze

18   was placed on the surface of the hazardous waste,

19   would those facts subject the hazardous waste to

20   RCRA regulation?

21   A.   Yes, they would.

22   Q.   Can you explain why for the jury?

23   A.   The application of the coke breeze to the

24   previously deposited hazardous waste significantly

25   disrupted or disturbed that waste, and therefore

1    the waste was actively managed, which now makes it

2    subject to regulation.

3    Q.   With the information that I already provided

4    you, assume that if the placement of the coke

5    breeze on to the surface of the hazardous waste

6    with heavy equipment caused the hazardous waste to

7    move toward the two large tanks, would those facts

8    subject the hazardous waste to RCRA regulation?

9    A.   Yes.

10   Q.   Can you explain why to the jury?

11   A.   Once again, the movement of this waste caused

12   by the heavy equipment is disturbing and disrupting

13   it.   That is active management and subjects that

14   waste to regulation.

15   Q.   Okay.   With the information I already provided

16   you, assume that in 2008 additional coke breeze was

17   placed on the surface of the hazardous waste.

18   Would those facts subject the hazardous waste to

19   RCRA regulation?

20   A.   Once again, significant --

21   Q.   Is that yes or no?

22   A.   Yes.

23   Q.   Okay.   Can you explain why for the jury?

24   A.   The application of the coke breeze disturbs or

25   disrupts the waste, therefore it's being actively

1   managed, therefore it's subject to regulation.

2   Q.  Now, with the information I already provided

3   you, assume that in 2008 additional waste

4   exhibiting the toxicity characteristic for benzene,

5   a hazardous waste under RCRA, flowed on top of the

6   hazardous waste that was on the ground around the

7   two large tanks.  Would those facts subject the

8   hazardous waste now on the ground to RCRA

9   regulation?

10  A.  Yes.

11  Q.  Can you explain why for the jury?

12  A.  Inaction to quickly address that release and

13  clean it up constitutes storage under RCRA.

14           MR. LINSIN:  I apologize, but could I ask

15  the witness to repeat that question [sic]?  I could

16  not -- either it was not responsive or I didn't

17  understand what was said.

18           THE COURT:  Okay.  I mean, the answer --

19  well, okay.

20      I'll let you answer the question.  Can you put

21  that answer again, please?

22           THE WITNESS:  Sure.  The failure to timely

23  address that release of hazardous waste and clean

24  it up, and leave it on the ground for an extended

25  period of time constitutes storage under RCRA.

1    BY MR. PIAGGIONE:

2    Q.   Would it constitute active management?

3    A.   Storage by definition is active management.

4    Q.   Okay.  Are you familiar with the concept of

5    active management?

6    A.   Yes.

7    Q.   Okay.  Are you familiar with the definition of

8    active management as defined by this Court as

9    physically disturbing accumulated waste within a

10   management unit, or disposing of additional

11   hazardous waste in existing units containing

12   previously disposed wastes.  In other words, it

13   means taking some action to disturb or disrupt

14   contained hazardous waste or adding hazardous waste

15   to previously contained materials.  If active

16   management occurs after November 19th, 1980, it is

17   subject to regulation under RCRA.

18   A.   Yes, I am.

19   Q.   Did you -- did your opinion incorporate that

20   definition?

21   A.   Yes, I did.

22   Q.   Okay.  Now, let me ask you another

23   hypothetical.  Assume that a waste exhibiting the

24   toxicity characteristic for benzene, a hazardous

25   waste under RCRA, was removed from its location and

1    placed into coal piles on the ground, would that --

2    would those facts subject the hazardous waste to

3    RCRA regulation?

4    A.   Yes.

5    Q.   Why?

6    A.   The failure to use an impervious barrier that

7    prevents the uncontrolled release of the coke waste

8    when it's applied to coal subjects the facility the

9    loss of the exception in the regulations for that

10   particular waste, so that waste now becomes

11   regulated.

12           THE COURT:  All right.  Give me that

13   answer again, please.

14           THE WITNESS:  Sure.  The failure of the

15   facility to use an impermeable barrier while they

16   mix the coal tar waste with the coal -- the coking

17   waste with the coal and not controlling releases

18   causes the loss of the exception in the regulations

19   for the recycling of that material.

20       Basically what has happened, the regulations

21   allow this exception that if you take that waste

22   from the point of generation until it's recycled in

23   the coke ovens and there was no land disposal, you

24   maintain that exception.  The material is not

25   regulated.  But once you take that material without

1   using an impermeable barrier to contain and control

2   this waste material when you apply it to the coal,

3   you lose that exception.  The material becomes

4   regulated.

5   BY MR. PIAGGIONE:

6   Q.  Okay.  I had asked you a question about waste

7   exhibiting the toxicity characteristic for benzene,

8   a hazardous waste under RCRA.  Not coal tar, not

9   coal tar sludge.

10  A.  I'm sorry.

11  Q.  So let me ask you that again.  Assume that a

12  waste exhibiting the toxicity characteristic for

13  benzene, a hazardous waste under RCRA, was removed

14  from its location and placed into coal piles on the

15  ground, would those facts subject the hazardous

16  waste to RCRA regulation?

17  A.  Yes.

18  Q.  Why?

19  A.  Because failure to use an impermeable barrier

20  when mixing this toxicity characteristic hazardous

21  waste with coal causes the loss of the exception in

22  the regulations which allows this recycling to

23  occur, and that is because there can be no land

24  disposal between the point of generation of that

25  waste and its introduction back into the coke --

1    the coking process.

2    Q.   Would it make any difference if the coal with

3    the hazardous waste -- that the hazardous waste was

4    put in, was ultimately placed into a coke oven?

5    A.   Could you repeat that?

6    Q.   Would it make any difference if the coal the

7    hazardous waste was put in was ultimately placed

8    into a coke oven?

9    A.   No.  The problem is that there was land

10   disposal between the point of generation and the

11   time that the material was introduced into the

12   coking process.  It's that critical time period

13   where the problem occurred.

14   Q.   Okay.  Now point of clarification.  Going back

15   to the 18 samples taken in December of 2009, do you

16   recall that?

17   A.   Yes.

18   Q.   All right.  Do you know at all if -- how many

19   of those samples were taken outside of the two

20   tanks?

21   A.   I believe there were four samples.  There were

22   four samples taken.  Numbers 15, 16, 17 and 18 were

23   taken outside the tanks.

24   Q.   All right.  And how many of those exceed the

25   regulatory level for benzene?

1     A.  All four of them did.

2              MR. PIAGGIONE:  Okay.  I have no further

3     questions of this witness.

4              THE COURT:  Okay, Mr. Piaggione.

5         Mr. Linsin.

6              MR. LINSIN:  May I proceed, your Honor?

7              THE COURT:  Yes.

8     CROSS-EXAMINATION BY MR. LINSIN:

9     Q.  Good afternoon, Mr. Flax.

10    A.  Good afternoon, sir.

11    Q.  My name is Greg Linsin.  I represent the

12    Tonawanda Coke Corporation.  I'd like to ask you a

13    few preliminary questions about your preparation to

14    testify here in this trial today.

15        You testified on direct examination I believe

16    that you reviewed the EPA file regarding this

17    matter, is that correct?

18    A.  Yes.

19    Q.  Could you describe, please, for the members of

20    the jury what -- what was in that EPA file about

21    this case?

22    A.  There were inspection reports.

23    Q.  Can you be specific about which inspections?

24    A.  Sure.  In the EPA file there were inspection

25    reports from June of 2009 and September of 2009

1    that were performed by one of my staff members,

2    Lenny Grossman.  There was also a sampling

3    report -- two sampling reports from September 2009

4    and December 2009 when -- when samples were taken

5    and analytical results obtained --

6             THE COURT:  Slow down a little bit.

7             THE WITNESS:  Sorry.  Sorry, your Honor.

8    Where samples were taken around the two tanks.

9    BY MR. LINSIN:

10   Q.  You testified -- I'm sorry, that

11   Mr. Grossman -- you were supervising Mr. Grossman

12   back in 2009, correct?

13   A.  Yes, I was.

14   Q.  And you testified, if I heard you correctly,

15   that he prepared an investigative report after his

16   visit to the facility in June of 2009, right?

17   A.  Correct.

18   Q.  And you reviewed that report, right?

19   A.  Yes, I did.

20   Q.  Did I also hear you to say that he prepared an

21   investigative report following his visit to the

22   facility in September of 2009?

23   A.  That's correct.

24   Q.  All right.  And do you know where that report

25   is now?

1    A.   It should be in the files.

2    Q.   In whose files?

3    A.   I'm sure it's in EPA's files.

4    Q.   Do you know when that document was prepared?

5    A.   Generally it had to be shortly after he

6    performed the inspection.

7    Q.   All right.  And then a report following the

8    sampling inspection -- what was the third report

9    you referenced?

10   A.   There was a December -- well, there was a

11   September sampling report, and also a December

12   sampling report.

13   Q.   And the December sampling report was actually a

14   sampling report conducted in connection with the

15   execution of a federal criminal search warrant,

16   correct?

17   A.   Correct.

18   Q.   All right.  And I also believe I heard you to

19   testify that you reviewed portions of the

20   investigative file -- I'm sorry, the regulatory

21   file from the Department of Environmental

22   Conservation for the State of New York, correct?

23   A.   That is correct.

24   Q.   Would you explain what portions of that file

25   you reviewed?

1    A.   I just -- I looked at the three old inspection

2    reports.

3    Q.   Which ones?

4    A.   They dated back several years.  I can't tell

5    exactly which ones.  They were done by three

6    different inspectors.  Actually two different

7    inspectors.

8    Q.   Do you remember their names?

9    A.   Sure.  One was Tom Corbett.  The other name

10   I -- and I looked at two of Tom Corbett's

11   inspection reports.  The other one the name escapes

12   me right now.

13   Q.   Do you know what year it was from?

14   A.   They were between I think 2006 and 2009 I

15   believe.

16   Q.   Did you review any RCRA compliance inspection

17   reports conducted by Bureau of Hazardous Waste

18   Operations for DEC prior to 2006?

19   A.   I don't believe I did, but I might have,

20   because I'm not sure of the dates on the reports

21   that I looked at.

22   Q.   Isn't it important -- I thought I heard you

23   testify that it is important before conducting an

24   inspection or developing opinions about a

25   compliance situation with regard to a waste

1    generator, that you understand the compliance

2    history and regulatory history of that facility,

3    isn't that correct?

4    A.  Yes, it is.

5    Q.  Did you review all of the RCRA compliance

6    inspection reports for this facility, sir?

7    A.  No, I didn't.

8    Q.  Did you review any of the statements --

9    investigative statements taken with respect to the

10   employees of the Tonawanda Coke Corporation?

11   A.  No, I did not.

12   Q.  Did you review any of the grand jury testimony

13   of the -- of those employees?

14   A.  No, I did.

15   Q.  Have you reviewed any of the trial testimony of

16   the Tonawanda Coke employees who testified in this

17   trial about the activities related to the

18   management of K087 at Tonawanda Coke?

19   A.  No, I have not.

20   Q.  Did you review any of the trial testimony of

21   the Tonawanda Coke employees regarding the

22   management of the materials in the Barrett tanks?

23   A.  No, sir.

24   Q.  Did you review any photographs from the

25   facility?

2586

1    A.   Yes, I have.

2    Q.   Which ones?

3    A.   I reviewed photographs that were taken during

4    the sampling inspections and the compliance

5    inspections.

6    Q.   And these would be the two sampling inspections

7    in 2009?

8    A.   Yes.

9    Q.   And which compliance inspection?

10   A.   I believe the second inspection that -- no, it

11   may just be from the sampling inspections.

12   Q.   September '09 and --

13   A.   And December.

14   Q.   Okay.  Did you talk at all with the DEC RCRA

15   compliance inspectors who had visited this facility

16   prior to 2009?

17   A.   Prior to 2009?

18   Q.   Yes.

19   A.   About this facility?

20   Q.   Yes, sir.

21   A.   No.

22   Q.   Subsequent to 2009 did you talk to any of those

23   individuals?

24   A.   Yes.  I communicated with Tom Corbett.

25   Q.   Did you speak with Mr. Fisher?

1   A.   No.

2   Q.   Did you speak with Mr. Wozniak?

3   A.   No.

4   Q.   Do you know -- do you know when the first RCRA

5   compliance inspection regarding this facility was

6   conducted by DEC?

7   A.   No, I do not.

8   Q.   Are you aware, Mr. Flax, that there is a charge

9   in this indictment regarding allegations concerning

10  the illegal storage -- the unpermitted storage of

11  hazardous waste at Tonawanda Coke?

12  A.   Yes, I am.

13  Q.   Do you know what time period that charge

14  relates to?

15  A.   It relates to the time period following the

16  release of the hazardous waste from the tank on to

17  the ground surface.

18  Q.   And when do you understand -- is that what you

19  understand the charge to include?

20  A.   I believe it occurred between -- that storage

21  occurred between 2008 and 2009.

22  Q.   And so your understanding is that it relates to

23  the release of material from one of the tanks, is

24  that correct?

25  A.   Yes.

1    Q.   And what material is alleged to have been

2    illegally stored, do you know?

3    A.   Hazardous waste with characteristic D018 for

4    benzene.

5    Q.   From what location?

6    A.   From one of the Barrett tanks I believe they

7    call it.

8    Q.   So it's your understanding that the storage

9    count relates to the material inside the Barrett

10   tanks?

11   A.   Not inside.  The material that was released

12   onto the ground and left there for a year.

13   Q.   I see.  Let me make sure I understand what

14   you're saying.  Your understanding is that the

15   storage count in this case relates to the material

16   that was released from one of the Barrett tanks and

17   then left on the ground, is that correct?

18           MR. PIAGGIONE:  Objection, your Honor.

19   I'm not sure I understand the relevance of what he

20   understands were the legal charges in this

21   particular case.

22           THE COURT:  Well, how is that relevant?

23           MR. LINSIN:  I understand -- your Honor, I

24   think it goes to the heart of relevance.

25   Understanding -- for a witness to express -- an

1    expert witness to express an opinion about factual

2    circumstances, it is critical that that witness

3    understand what those factual circumstances are.

4           THE COURT:  I think that's right as far as

5    the expert witness testimony is concerned.  There

6    is a difference between a nonexpert and expert for

7    purposes of this line of questioning.

8           MR. PIAGGIONE:  However, your Honor, we

9    did give him hypotheticals that were not exactly

10   what was charged, and his testimony was --

11          THE COURT:  Well then, I shouldn't have

12   allowed it probably.  Right?

13          MR. PIAGGIONE:  Excuse me.  I stand

14   corrected.  We gave it in reference to the facts in

15   the case, however we didn't reference it to the

16   counts in the case.

17          THE COURT:  Okay.  I don't think that -- I

18   mean certainly you had opened the door by doing it

19   that way.  And I'll permit this examination.

20   Overruled.

21          MR. LINSIN:  Thank you, your Honor.

22   BY MR. LINSIN:

23   Q.  Now, the questions I was asking, Mr. Flax, were

24   related to the one storage charge in this

25   indictment.  And if I understand your testimony

1    correctly, it's your understanding that that one

2    storage charge relates to material that was

3    released from one of these Barrett tanks and then

4    left on the ground without being cleaned up, is

5    that correct?

6    A.   Correct.

7    Q.   And that the opinions you've expressed today

8    relate to your view about those factual

9    circumstances, is that correct?

10   A.   Yes.

11   Q.   Now, there are two RCRA disposal counts,

12   unpermitted disposal counts, is that your

13   understanding?

14   A.   I'm certain of one RCRA disposal count that

15   involves the mixing of the waste from the tanks

16   with the coal on the grounds.

17   Q.   All right.   Is that the only RCRA disposal

18   count you're aware of, sir?

19   A.   Yes.

20   Q.   All right.   And the opinions you're offering

21   today are limited to that one RCRA disposal count

22   that you just explained?

23   A.   Yes.

24   Q.   And your understanding is that it relates to

25   the removal of some of the material from inside one

1    of the tanks and then the placement of that

2    material on a coal pile, is that correct?

3    A.  It's the placement of material from inside or

4    outside of the tank on to the coal pile on the

5    grounds.

6    Q.  Okay.  And the opinions you're offering here

7    don't relate to any other factual circumstances

8    that occurred at the Tonawanda Coke plant, correct?

9    A.  Correct.  Only to things I've been questioned

10   on.

11   Q.  All right.  Now, you testified on direct, sir,

12   that you have testified twice before as a RCRA

13   expert, correct?

14   A.  Correct.

15   Q.  And in those cases, Mr. Flax, were you

16   testifying as someone who had supervised the

17   original investigation in those cases?

18   A.  No, I was not.

19   Q.  But you are here today, aren't you?

20   A.  Yes.

21   Q.  I want to go back a little bit earlier in 2009

22   if we can for a moment, because at that time you

23   were the senior enforcement team leader for the

24   Region 2's Division of Enforcement and Compliance

25   Assistance, correct?

1    A.   Correct.

2    Q.   That's in the RCRA compliance branch, right?

3    A.   Yes.

4    Q.   And in that capacity as the senior enforcement

5    team leader, were you aware of plans to conduct a

6    joint compliance inspection at the Tonawanda Coke

7    facility back in April of 2009?

8    A.   I became aware of the plans I believe shortly

9    after that.  I don't believe it was as early as

10   April that I was aware of it.

11   Q.   With whom did you -- did you speak with any of

12   the Region 2 personnel who participated in that

13   April 2009 inspection at Tonawanda Coke?

14   A.   No.

15   Q.   Not at any point?

16   A.   I never communicated with any other -- well,

17   inspection personnel except the person who worked

18   for me, Leonard Grossman.

19   Q.   All right.  But I'm talking about -- at this

20   point I'm talking about the air inspectors.

21   A.   No.

22   Q.   All right.  So you didn't speak to Harish

23   Patel?

24   A.   No.

25   Q.   Or Mozey Ghaffari?

1    A.   No.

2    Q.   Or Richard Kan?

3    A.   No, sir.

4    Q.   All right.   When did you first become involved

5    in the plans for Mr. Grossman to conduct or

6    participate in a RCRA compliance inspection at the

7    Tonawanda Coke facility?

8    A.   Shortly before he conducted the inspection.

9    Q.   And what were the circumstances that led to

10   your speaking to Mr. Grossman about his

11   participation in such an inspection?

12   A.   Well, basically we were going through certain

13   activities that he had to perform and obligations

14   he had.   And it came up in discussion that he was

15   going to go up and inspect the Tonawanda Coke

16   facility, so he wouldn't be able to do something

17   else.   That's when it started.

18   Q.   And what were those allegations that

19   Mr. Grossman had?

20   A.   At what time, sir?

21   Q.   Prior to the June 2009 inspection.   I thought I

22   just heard you say that he told you that he was

23   going to go up to investigate certain allegations

24   he had.

25   A.   Not certain allegations, to determine the

1    compliance at the facility.

2    Q.   What prompted him to make the decision that he

3    was going to go to Tonawanda Coke?

4    A.   He was told by our management to go.

5    Q.   And who was that?

6    A.   George Meyer.

7    Q.   And what is his position?

8    A.   He's a branch chief.  He was my supervisor at

9    the time.

10   Q.   And why did Mr. Meyer tell Mr. Grossman to go

11   inspect the Tonawanda Coke facility?

12   A.   I believe as a result of the air inspections,

13   information had come to the region that there could

14   be problems with other environmental laws.  So they

15   made a decision that Leonard would go up and

16   inspect the facility.

17   Q.   And do you know what that information was?

18   A.   No, sir, I do not.

19   Q.   So prior to Mr. Grossman going out to the

20   Tonawanda Coke facility, you didn't have any

21   understanding about what these potential RCRA

22   compliance issues were?

23   A.   No, sir.

24   Q.   Had you received any written reports from

25   anyone?

1    A.   No, before -- when Leonard went out, I hadn't

2    reviewed any DEC reports or anything, no.

3    Q.   You just testified that you spoke to

4    Mr. Grossman about his going out to the Tonawanda

5    Coke facility.  Did you speak with him about his

6    plans to prepare for that inspection?

7    A.   The only thing I told him at the time was that

8    I knew it was a messy operation, because I had a

9    little familiarity with the old Bethlehem Steel

10   coking operation.  So I told him to be prepared for

11   that.

12   Q.   You had a little familiarity with the Bethlehem

13   Steel Corporation?

14   A.   Yes.

15   Q.   What connection does Bethlehem Steel have with

16   Tonawanda Coke?

17   A.   Nothing.

18   Q.   So what do you mean when you say you knew it

19   was a messy operation, what does that mean?

20   A.   In 1989 --

21   Q.   Excuse me -- could I just -- for everyone's

22   sake, I understand you want us to hear your

23   answers.  If you could just stay back a little bit

24   from the microphone.

25   A.   Sure.  I apologize.

1    Q.   It's easier for us to understand you.

2    A.   Sure.   1998 I was the corrective action project

3    manager for the Bethlehem Steel Lackawanna plant.

4    At that time there were very few activities going

5    on --

6              THE COURT:   Slow down a little bit.

7              THE WITNESS:   Sorry, sir.   At that time

8    there were very few activities ongoing.   They were

9    conducting galvanizing operations and specialty

10   metals, and the only other thing they were doing

11   was performing coking operations.   So during my

12   site visits up there, I would go by the coke ovens.

13   I just wanted to let him know it was a little bit

14   of a messy operation, and wear some protective

15   clothing.   And that was the extent of my

16   discussions with him about his planned inspection

17   of Tonawanda Coke prior to him going up there.

18   BY MR. LINSIN:

19   Q.   Okay.   So you advised Mr. Grossman to wear some

20   protective clothing when he visited Tonawanda Coke.

21   A.   Some boots, sure.

22   Q.   Because you had had some experiences with

23   another coking facility?

24   A.   Yes.

25   Q.   All right.   How many coking facilities have you

1    visited in your career, sir?

2    A.   One.

3    Q.   Is that the one you just testified about?

4    A.   Yes, it is.

5    Q.   How many times were you there?

6    A.   Maybe a dozen times.

7    Q.   And for what purpose?

8    A.   Basically to oversee the investigation that was

9    ongoing for environmental contamination.

10   Q.   That is after the facility had closed down?

11   A.   It's after they closed down everything but the

12   three operations I mentioned.

13   Q.   So was that a remediation work, sir?

14   A.   Yes, sir.

15   Q.   So before 2006 you had not been involved in

16   inspecting an active working coking facility,

17   correct?

18   A.   That's correct.

19   Q.   So, getting back to your discussion with

20   Mr. Grossman before he went to this -- went to

21   visit Tonawanda Coke in 2009, did you instruct

22   Mr. Grossman to review the DEC regulatory file for

23   that facility before he inspected the plant?

24   A.   No, I did not.

25   Q.   That was a mistake, wasn't it?

2598

1    A.  I don't know if it was a mistake.

2    Q.  Well, you testified on direct, sir, that you

3    took courses in how to conduct RCRA inspections.

4    A.  Correct.

5    Q.  You have taught others how to conduct RCRA

6    compliance inspections, correct?

7    A.  Correct.

8    Q.  Wasn't it part of the course you took and isn't

9    it part of the course you teach that a RCRA

10   compliance inspector should understand the

11   regulatory background of the facility before he or

12   she goes out to conduct a compliance inspection?

13   A.  Absolutely.

14   Q.  All right.  So I ask my question again.  It was

15   a mistake that you didn't ask Mr. Grossman or

16   direct Mr. Grossman to review the regulatory

17   compliance history of the Tonawanda Coke plant

18   before he went to visit it in June of 2009?

19   A.  No, sir.

20   Q.  Wasn't a mistake?

21   A.  No, sir, because I'm pretty well assured he

22   would have done it without me asking him.

23   Q.  And yet you didn't do it before you came op

24   here to testify, is that correct?

25   A.  Please ask the whole question again.

2599

1    Q.   You have not reviewed the entire regulatory

2    file for the Tonawanda Coke facility from the DEC

3    before you came on here to testify.

4    A.   No, I did not.

5    Q.   How long have you known, sir, that you were

6    going to be called here to testify as an expert

7    witness?

8    A.   About a year, more than a year.

9    Q.   You received, I believe you said, a report from

10   Mr. Grossman following his inspection in June

11   of 2009 at the Tonawanda Coke plant, right?

12   A.   Yes.

13   Q.   Did you speak to Mr. Grossman about the visit

14   as well?

15   A.   Yes, I did.

16   Q.   Did he create any notes during the course of

17   that inspection?

18   A.   Yes, he did.

19   Q.   And did you review those?

20   A.   At the time.  At the time I think I glanced at

21   them, yes.

22   Q.   What did Mr. Grossman tell you about what

23   happened at that inspection?

24   A.   He told me that he and Tom Corbett went to the

25   area of the Barrett tanks and looked over the area

1    where the material had been discharged.  He told me

2    he asked Mr. Kamholz how they mix the waste from

3    the tank with coal to recycle it into the coke

4    ovens.  And he told me what the response was.

5    Q.  All right.  Did he tell you in June -- well,

6    when was this conversation you had with

7    Mr. Grossman?  Was it still in June, or had it

8    moved to July?

9    A.  It could have been June or July.  I don't

10   remember.

11   Q.  Did he tell you that Mr. Kamholz had explained

12   to the inspectors that they were planning, planning

13   to do the removal and mixing that you just

14   testified about?

15   A.  Yes, I believe so.

16   Q.  So you knew this was something that was

17   scheduled to happen, correct?

18   A.  Yes.

19   Q.  Did you have concerns about -- at that point

20   about the correctness or propriety of that activity

21   that you've just described?

22   A.  Not at that point, because we were in the

23   process of gathering information that indicated

24   that there were problems there that we would have

25   to address through some mechanism.

1    Q.  Well, I thought I heard you to just testify

2    that you were told by Mr. Grossman late June

3    of 2009 that the facility was planning on taking

4    material out one of the Barrett tanks and placing

5    it on the coal pile, correct?

6              MR. PIAGGIONE:  Objection, your Honor.

7    This is hearsay.  He's talking about statements

8    that -- he explaining statements made out of court

9    to this witness.

10              THE COURT:  Well, is there an exception?

11              MR. LINSIN:  Your Honor, I'm trying to

12   explore this witness's knowledge and the basis for

13   his opinions.  Experts can consider all kinds of

14   opinions.

15              THE COURT:  And it's -- it's not

16   necessarily offered for the truth of the matter.

17   It can be with respect to state of mind.  It can be

18   an exception in determining the conduct that this

19   witness followed.  So, I think the exceptions

20   overwhelm the objection, so I'll overrule the

21   objection.

22   BY MR. LINSIN:

23   Q.  Let me repeat this if I can.  When you spoke to

24   Mr. Grossman after he had visited the plant in June

25   of 2009, did you understand from him that this

1    facility was planning to remove some of the

2    material from one of those tanks and place it on a

3    coal pile?

4    A.   We briefly discussed that, yes.

5    Q.   All right.  And did he also explain to you that

6    Mr. Kamholz in June of 2009 had described the

7    material in the tanks as being K087?

8    A.   Yes.

9    Q.   So you knew at that point back in June of 2009

10   that material you understood to be K087, that the

11   facility was planning to remove it from one of

12   these tanks and place it on a coal pile, correct?

13   A.   Correct.

14   Q.   And it's your testimony here today that in your

15   opinion that conduct, just that conduct,

16   constitutes a violation of the RCRA regulation?

17   A.   That's correct.

18   Q.   You didn't need anymore information, you didn't

19   need sampling, that conduct that you heard about

20   was going to constitute a RCRA violation?

21   A.   That's correct, yes.

22   Q.   Did you yourself or did you direct Mr. Grossman

23   to call the facility and say, hey, wait a minute,

24   we have concerns about what you've just told us

25   you're planning to do.  Did you make that call?

1    A.   No.

2    Q.   You were involved, you testified, also in the

3    preparation of a request for information that was

4    sent to Tonawanda Coke in I believe October of '09,

5    correct?

6    A.   That's correct.

7    Q.   And then you were also involved in supporting

8    the execution of the search warrant at the facility

9    in December of that year, correct?

10   A.   Well, I had some discussions with people who

11   were involved in this, yes.

12   Q.   You actually requested to support that sampling

13   effort during the search warrant, right?

14   A.   Yes.

15   Q.   So it's accurate to understand, isn't it,

16   Mr. Flax, that you had been involved and invested

17   in this case since at least June of 2009?

18   A.   Yes, sir.

19   Q.   And that the opinions you're offering here

20   today, the expert opinions you're offering are in

21   defense of your actions and the people under your

22   supervision when you served as the senior

23   enforcement team leader, correct?

24   A.   No.  What I'm saying is not in defense of their

25   actions.  What I'm saying is after analyzing the

1     activities that took place at Tonawanda Coke and

2     their relationship to what is allowed in the

3     regulations, those are the opinions that I'm

4     stating.

5     Q.  Let me put it a different way.  The opinions

6     you're offering here, sir, are not opinions

7     regarding the conduct of third parties or other

8     individuals.  You're offering opinions about the

9     decisions that were made both at Tonawanda Coke,

10    but also within your office during the 2009 period,

11    correct?

12    A.  I was part of those decisions, yes.

13    Q.  What is the purpose of an on-site RCRA

14    compliance inspection?

15    A.  To determine the facility's compliance with

16    whatever RCRA regulations they're subject to.

17    Q.  That is true whether an on-site compliance

18    inspection is of a large quantity generator or a

19    small quantity generator, correct?

20    A.  That's correct.

21    Q.  Are you aware that there were RCRA compliance

22    inspections of the Tonawanda Coke facility prior to

23    1990?

24    A.  I haven't seen any reports.

25    Q.  No, but are you aware that the inspections

2605

1    occurred?

2    A.  No, I'm not.

3    Q.  Don't you think that information would be

4    relevant to the development of the opinions you're

5    expressing here today?

6    A.  It's -- it's good to look at for, you know,

7    just review and context.  But, really, when we go

8    do a compliance inspection, what we see is a

9    snapshot at the moment of what's going on.  And

10    what we hear from facility personnel about what

11    they've done in the past and plan to do in the

12    future, that's more of an idea how they maintain

13    compliance.

14    Q.  Isn't it also true, Mr. Flax, that as a matter

15    of fundamental fairness to a regulated facility,

16    that before you go in and begin expressing opinions

17    about the propriety or impropriety of these

18    operations you're inspecting, that you have an

19    understanding of what this facility has been told

20    previously by regulators?

21         MR. PIAGGIONE:  Objection, your Honor.

22    That's a compound question.

23         THE COURT:  I'll permit it.  Do you

24    understand the question?

25         THE WITNESS:  Yes.

1           THE COURT:  All right.  You may answer.

2      Overruled.

3           THE WITNESS:  Could you repeat the

4      question, please?

5      BY MR. LINSIN:

6      Q.  Sure.  Isn't it also a matter of fundamental

7      fairness to the regulated facility before you go in

8      and begin expressing opinions about the propriety

9      or impropriety of ongoing operations for you to

10     understand what that facility has been told about

11     those operations previously by RCRA regulators?

12     A.  I don't know if it's a matter of fairness.

13     Quite often inspectors go to a facility, and if

14     they don't ask all the right questions, they're not

15     given all the right information by facility

16     personnel that would assist them in making the

17     proper judgment about the activities that are

18     ongoing at the facility.  So I find in a number of

19     instances facility personnel aren't told exactly

20     what they should be.

21     Q.  Would you like me to repeat the question I

22     asked you so you could answer it?

23     A.  Yes, please.

24     Q.  Isn't it a matter of fundamental fairness for a

25     RCRA compliance inspector to understand what the

1    regulatory history has been for that facility

2    before he or she goes out to inspect and make

3    judgments on the propriety of ongoing operations?

4    A.   No.

5    Q.   You testified on direct, sir, about this issue

6    of making a hazardous waste determination.  Do you

7    recall that testimony?

8    A.   Yes.

9    Q.   And if I -- if I recorded it correctly, you

10   testified about that process both with respect to a

11   RCRA compliance inspector who is inspecting a

12   facility, but also then as to what a generator's

13   obligations are in determining that facility's

14   hazardous waste, correct?

15   A.   Correct.

16   Q.   Now, unless I missed it, and it's possible, I

17   didn't hear you offer any testimony about making a

18   decision or evaluating whether the material in

19   question was actually a solid waste.

20   A.   Well, for any material to be a hazardous waste,

21   it first has to be a solid waste.

22   Q.   Okay.  I didn't hear any testimony in your

23   direct examination regarding whether a material is

24   a solid waste.  Would you explain, please, what

25   your analysis is of whether or not a material is a

2608

1    solid waste?  How do you go about making that

2    determination?

3    A.   Materials are a solid waste when they are

4    discarded by being abandoned or disposed, or if

5    they're recycled, or if they're inherently

6    waste-like.  Those are the major categories, things

7    that are solid wastes.

8    Q.   Well, not all materials that are recycled are

9    solid wastes, correct?

10   A.   No.  No.  There are -- there are specific

11   exceptions in the regulations for -- for a lot of

12   these materials.

13   Q.   And one of those -- one of those says, and I

14   hate to do this, but with my apologies, I'm going

15   to cite to some or ask you about some of the

16   provisions in the RCRA regulations, all right?

17   A.   Yes, sir.

18   Q.   Before I do, is it fair to say that anyone who

19   practices in the area of RCRA regulation is

20   required, in order to do their jobs, required to

21   make frequent reference to the regulations that EPA

22   has promulgated and that the states have

23   promulgated as -- in support of that legislation.

24   A.   Absolutely.  Nobody can memorize the book.

25   Q.   And as a matter of fact I heard you testify

1    that -- I think I did, that in evaluating

2    compliance issues, you yourself and your colleagues

3    within EPA frequently have to consult with EPA

4    counsel in order to evaluate whether or not the

5    conditions you're reviewing or being asked to pass

6    judgment on are consistent with the regulations or

7    not, correct?

8    A.   That's correct.

9    Q.   Fair to say -- is it fair to say that these

10   regulations are somewhat dense?

11   A.   Somewhat.

12   Q.   And also fair to say -- is it also fair to say

13   that there are a number of terms used in these

14   regulations that are not actually defined in the

15   regulations?

16   A.   That's true.

17   Q.   And one of those terms that is not defined in

18   the RCRA regulations is "land disposal", correct?

19   A.   "Land disposal" is defined in other places.

20   Q.   "Land disposal" is defined where?

21   A.   Defined in guidance, in policy documents that

22   have been issued by EPA.

23   Q.   But I'm talking about in the regulations

24   themselves.

25             MR. PIAGGIONE:   Your Honor, I'm going to

1    object to this line of questioning.  We were told

2    we're not supposed to go into the definition of

3    land disposal, that the Court has provided a

4    definition of land disposal, and therefore that we

5    couldn't get into that.

6              THE COURT:  No, I don't think that's

7    right.  Overruled.  You may proceed.

8    BY MR. LINSIN:

9    Q.  All right.  Mr. Flax, there's not a definition

10   of land disposal that specifically applies to this

11   exclusion you testified on direct examination, is

12   there?  In the regulatory --

13   A.  In the regulations, no, there is not.

14   Q.  And isn't it also true that there is no

15   regulatory definition in the regulations for active

16   management?

17   A.  True.

18   Q.  Now, I know you've expressed some opinions

19   about those terms, and we'll explore those.  But

20   even though there are quite a number of regulations

21   here and quite a number of definitions, those two

22   terms "land disposal" and "active management" are

23   not defined, correct?

24   A.  That's correct.

25   Q.  All right.  Now, we were talking about this

1    issue of solid waste, and what is a threshold

2    requirement to determine whether any material is

3    even governed by RCRA, correct?

4    A.   Correct.

5    Q.   Now, one of the provisions of the solid waste

6    definition provides that materials are not solid

7    wastes when they are recycled, correct?

8    A.   Properly, yes.

9    Q.   And that provision in the regulations says that

10   they can be recycled if they are used or reused as

11   ingredients in an industrial process to make a

12   product, provided the materials are not being

13   reclaimed, correct?

14   A.   Correct.

15   Q.   Or, or, used or reused as an effective

16   substitute for a commercial product, correct?

17   A.   Correct.

18   Q.   Or, return to the original process from which

19   they were generated without first being reclaimed

20   or land disposed, correct?

21   A.   Correct.

22   Q.   All right.  So that's one of the regulatory

23   exceptions -- or several of them, for the

24   definition of solid waste, correct?

25   A.   Correct.

1    Q.  Did you analyze that definition in reaching the

2    opinions you've expressed here today?

3    A.  I looked at that.  But more than that I went to

4    the applicable regulations that deal specifically

5    with coking waste at 261.4.

6    Q.  All right.  But you can't get to 261.4 because

7    that deals with a -- the exceptions for hazardous

8    waste, right?

9    A.  Correct.

10   Q.  You can't get to 261.4 unless you first work

11   your way through 261.2, which was what we were just

12   talking about?

13   A.  That's true, but once again, these K wastes are

14   listed hazardous wastes.  Listed hazardous wastes.

15   I don't have to go through the trail that you're

16   describing to get to a point to know what the

17   requirements are for them to be recycled.  They're

18   listed in the regulations.

19   Q.  All right.  Let me see if I understand that

20   point correctly.  Are you saying, sir, that if you

21   have a listed hazardous waste such as K087, that it

22   is not necessary -- in analyzing compliance with

23   the RCRA regulations, it's not necessary for you to

24   make reference to 261.2?

25   A.  No.

1    Q.  All right.  Just for the record, all of the

2    references -- the regulatory references I'm making

3    are to 40 CFR, Code of Federal Regulations, Section

4    261.2, and 261.4.  Is that what you're referencing,

5    sir?

6    A.  Yes, sir.

7              THE COURT:  Are those current regulations?

8              THE WITNESS:  They are current.

9              THE COURT:  Thank you.

10   BY MR. LINSIN:

11   Q.  When did the regulations regarding -- and see

12   if we can shorthand this a little bit.  The waste

13   materials that exhibit toxicity for benzene, do you

14   understand those to be identified as D018?

15   A.  Yes, sir.

16   Q.  All right.  And do you know when the

17   regulations governing D018 became effective?

18   A.  I believe -- I believe it was September 1990.

19   Q.  Now, let's move to the -- the additional

20   regulatory reference you were making to 261.4,

21   okay?

22   A.  Okay.

23   Q.  And that section overall relates to exceptions,

24   materials that are not solid waste, is that

25   correct?

1    A.   Correct.

2    Q.   And one of those exceptions, and I again

3    apologize, but it is 261.4(a)(10), is that correct?

4    A.   That's correct.  Yes.

5    Q.   And so the testimony you were offering in your

6    direct testimony concerns that exception because it

7    addresses K087 waste, correct?

8    A.   Correct.

9    Q.   Among others, correct?

10   A.   Yes.

11   Q.   And that provides that wastes from coking

12   operations, including K087, that are hazardous only

13   because they -- I'm sorry.  K087 from coking

14   operations are excluded from the definition of

15   hazardous waste -- I'm sorry, from the definition

16   of solid waste when, subsequent to generation these

17   materials are recycled to coke ovens, to the tar

18   recovery process as feedstock to produce coal tar,

19   or mixed with coal prior to the tar's sale or

20   refining.  That's one part of that provision,

21   correct?

22   A.   Correct.

23   Q.   And then it says, and this is kind of the

24   condition we have been talking about, this

25   exclusion is conditioned on there being no land

1    disposal of the waste from the point they are

2    generated to the point they are recycled to the

3    coke ovens or tar recovery refining process or

4    mixed with coal tar, is that correct?

5    A.  Yes, it is.

6    Q.  Now, I don't mean to simplify the opinion you

7    offered.  But did I have it correct that you

8    believe that the remixing process that was engaged

9    in at Tonawanda Coke constituted land disposal, is

10   that correct?

11   A.  That's correct.

12   Q.  And do you know how long that remixing of coal

13   tar sludge and coal had been going on at Tonawanda

14   Coke?

15   A.  No, I do not.

16   Q.  Doesn't matter to you, correct?

17   A.  No, it did not.  It doesn't matter to me.

18   Q.  Do you know whether it had been going on prior

19   to construction of a concrete pad at that facility?

20   A.  It was my understanding it had been going on

21   for some time.

22   Q.  My question was:  Do you know whether it had

23   been going on prior to the construction of a

24   concrete pad?

25   A.  No, I do not.

2616

1   Q.  Did you know that this facility had been

2   determined to be in compliance with the RCRA

3   regulations by state RCRA inspectors prior to the

4   construction of the concrete pad?

5   A.  I didn't know that was determined prior to the

6   construction, no.

7   Q.  As a matter of fact, the report that

8   Mr. Grossman provided to you following his

9   June 2009 inspection had it wrong in that respect,

10  didn't he?

11  A.  I really can't say.

12  Q.  You don't remember?

13  A.  No, I do not.

14  Q.  Do you remember that that report indicated that

15  the facility used to use the concrete pad in order

16  to mix the K087 with the coal, but now they've

17  stopped doing that and they're mixing it on the

18  coal piles, does that familiar to you?

19  A.  It sounds relatively familiar.  I think I got

20  the impression that sometimes they use it, and

21  sometimes they didn't.

22  Q.  But you didn't understand that the facility had

23  been mixing its K087 waste with the coal in the

24  coal fields for decades before 2009?

25  A.  I knew it had been done since sometime in the

1    past.  I didn't know when that happened relative to

2    the construction of the concrete pad.

3    Q.  Okay.  Your opinion about this issue of land

4    disposal -- when you were asked about your opinion,

5    if I followed you correctly, you were saying

6    that -- you offered some examples of other

7    facilities you had inspected, at least I thought

8    that's what you were saying, that had used a

9    different method for mixing this K087 waste with

10   the coal tar, is that correct?

11   A.  I have spoken to two facilities.  I've never

12   visited them.

13   Q.  All right.  When did you speak to those two

14   facilities?

15   A.  It was some time -- I'd have to say probably

16   maybe a year and a half ago.

17   Q.  Subsequent to 2009?

18   A.  Yes.

19   Q.  If I heard you, you described one facility that

20   you spoke with that mixes -- that conducts this

21   mixing on a concrete pad, an 18-inch concrete pad,

22   correct?

23   A.  Yes.

24   Q.  And another facility that liquefies the coal

25   tar sludge and then dribbles or drips it on to the

1    coal, is that correct?

2    A.   They spray it on the conveyor that carries the

3    coal into the coke ovens, yes.

4    Q.   All right.  And so the coal is on a conveyor

5    belt, and they're spraying this liquefied coal tar

6    sludge on the coal as it's moving on a conveyor

7    belt, right?

8    A.   It's an enclosed area, right.

9    Q.   Well, as that conveyor belt dumps off its load

10   of coal and then moves to return back to the start

11   of the conveyor belt, some of that liquefied coal

12   tar sludge is going to drip, isn't it?

13   A.   I don't know, because I don't have any

14   specifics of the operation, sir.  It was described

15   to me.

16   Q.   Let me ask it this way:  Isn't it true that in

17   all recycling operations under -- that are in

18   compliance with the RCRA regulations, there is a

19   recognition that there may well be incidental

20   spillage or leakage, but that that incidental

21   spillage or leakage is not going to invalidate the

22   recycling process?

23           MR. PIAGGIONE:  Objection again, your

24   Honor.  That's two questions in one.

25           MR. LINSIN:  I'd be happy to ask spillage

1    first and then leakage.  I saw them as synonymous,

2    your Honor, but --

3              THE COURT:  All right.  Break it down.

4    BY MR. LINSIN:

5    Q.  All right.  Isn't it true, sir, that in all

6    recycling operations, EPA -- when evaluating

7    recycling operations, EPA recognizes that there may

8    be incidental spillage without voiding or

9    invalidating the recycling process?

10   A.  There may be some incidental or de minimus

11   spillage in any operation, yes.

12   Q.  And there may be some incidental or de minimus

13   leakage, correct?

14   A.  Possible, yes.

15   Q.  All right.  Without voiding or invalidating the

16   legitimacy of that recycling process, correct?

17   A.  Correct.

18   Q.  Isn't it reasonable and fair when interpreting

19   the RCRA recycling regulations to look to the

20   intent of the people who conducted that recycling

21   operation?

22   A.  I don't understand that question.

23   Q.  Don't you have to look at the big picture?

24   A.  Are you talking specifically about Tonawanda

25   Coke?

1    Q.   No, sir.  I'm asking you generally now in

2    assessing a recycling activity for RCRA compliance.

3    A.   In all recycling activities we expect that the

4    people conducting those facilities will minimize

5    any potential releases to the greatest extent

6    possible.  We're not tolerant of that.  We try to

7    avoid it at all costs, because that's why allow the

8    recycling, because it minimizes handling of

9    hazardous waste and it reduces the waste that has

10   to be handled more and disposed.

11   Q.   And part of the big picture of the RCRA statute

12   itself, isn't it, is to facilitate recycling and

13   reuse of materials when possible?

14   A.   Whenever possible when done properly yes, sir.

15   Q.   Because as a matter of fact, if material such

16   as K087 were not permitted to be recycled back into

17   the coke ovens, those wastes would have to be

18   landfilled and sent to a TSD, a treatment, storage,

19   and disposal facility, correct?

20   A.   That is correct.

21   Q.   And that is not in anyone's interest, correct?

22   A.   Correct.

23   Q.   And that is precisely why the exception at

24   261.4 is in the regulations, correct?

25   A.   Correct.

1   Q.   You were asked some questions about active

2   management, correct?

3   A.   Yes.  Correct.

4   Q.   And if I recall your testimony correctly, it

5   was your opinion that the placement of breeze, coke

6   breeze on D018 material that might be on the ground

7   would constitute active management of that

8   material, is that correct?

9   A.   Yes, sir.

10  Q.   And did you also say it would constitute

11  treatment of that material?

12  A.   I do believe it's treatment, yes.

13  Q.   How do you define treatment under the RCRA

14  regulation?

15  A.   Any process that changes the physical or

16  chemical nature of a material for any purpose.

17  Q.   For any purpose?

18  A.   In this instance, let's say for -- say for more

19  stable storage.

20  Q.   There is a regulatory definition of treatment,

21  correct?

22  A.   Yes, there is.

23  Q.   And it's actually limited very specifically to

24  a number of different purposes, correct?

25  A.   Yes.

1    Q.  All right.  So, that definition of treatment

2    provides that -- it means any method or process

3    designed to change the physical, chemical, or

4    biological character of a hazardous waste, correct?

5    A.  Correct.

6    Q.  So as to number one, neutralize the waste,

7    right?

8    A.  Um-hum.

9    Q.  Or recover energy or material resources from

10   the waste, correct?

11   A.  Correct.

12   Q.  Now, spreading of breeze wouldn't do either of

13   those two, correct?

14   A.  No.

15   Q.  Or to render such waste nonhazardous.  That's

16   not what the purpose of spreading breeze was,

17   correct.

18   A.  Correct.

19   Q.  Or less hazardous, right?

20   A.  Correct.

21   Q.  Or safer to transport, that's not why the

22   breeze was spread, correct?

23   A.  Correct.

24   Q.  To store or dispose of, and did I hear you a

25   moment ago to say you believe that the breeze was

1    spread on top of this material on the ground, the

2    D018, in order to store it?

3    A.   I can't think of any other purpose.

4    Q.   You were asked some questions about material

5    that had existed in land disposal units before the

6    RCRA regulations -- the RCRA statute came into

7    effect and the RCRA regulations came into effect,

8    correct?

9    A.   Correct.

10   Q.   And you referred to those units as land

11   disposal units, right?

12   A.   Correct.

13   Q.   Now, in your experience as a RCRA regulator,

14   isn't it common -- not just sometimes, but

15   common -- for industrial facilities to pave over or

16   cover areas of a plant where waste had been placed

17   prior to the time that waste was regulated?  Isn't

18   that common, sir?

19   A.   I don't know if it's all that common.  But

20   that's usually done after the material is removed

21   and the unit is closed, then usually they pave it

22   over.

23   Q.   But your testimony is that as far as you know,

24   that only happens, this paving over --

25   A.   No.

1    Q.   -- only happens after the material is removed?

2    A.   No.  But I'm not aware of any specific

3    incidents where it's done otherwise.  And I'm not

4    saying it may not have been done.  I'm just not

5    aware.

6    Q.   So you're not aware?

7    A.   Yes.

8    Q.   By the way, are you familiar or do you know

9    personally Marcia Williams?

10   A.   No, but I've heard her name.

11   Q.   Did you know her when she was the head of EPA's

12   Office of Solid Waste in D.C.?

13   A.   Not personally, no.

14   Q.   Do you respect her opinions on these RCRA

15   compliance issues?

16   A.   When she's correct, yes.

17          THE COURT:  That's a pretty good answer in

18   my humble opinion.

19          MR. LINSIN:  I agree.  I agree.

20   BY MR. LINSIN:

21   Q.   Have you -- have the prosecutors shown you the

22   summary that was filed in this case of Miss

23   Williams' opinions on these issues?

24   A.   Yes.

25   Q.   I'm taking it you disagree with those opinions?

1    A.   Some of them, yes.

2    Q.   And if I hear you correctly, you're saying that

3    you're not aware of situations where industrial

4    facilities have paved over land disposal units with

5    the old material still in place?

6    A.   No, I'm not, sir.   I work in RCRA corrective

7    action, and usually what we do is we make sure that

8    those service impoundments -- I'm sorry.   We make

9    sure that those service impoundments or land

10   disposal units are either clean closed or

11   remediated before they're paved over, and then, as

12   you know, deed restrictions are placed on them.

13   Q.   Okay.   Would it change your opinion to know --

14   would it change your opinion regarding the

15   potential assessment of the application of this

16   breeze to this material out at Tonawanda Coke if

17   you knew that this practice had occurred at land

18   disposal units around the country where old

19   materials remained in place, and they had been

20   paved over with storage pads or parking lots, would

21   it change your opinion to know that?

22   A.   If the material at Tonawanda Coke had been

23   paved over, and this was an acceptable and safe

24   practice, then it might have.   But it's my

25   understanding that that's not what was done.

1    Q.   Is it your understanding that the breeze was

2    spread on this material in order to facilitate the

3    movement of heavy equipment without disturbing the

4    material itself?

5    A.   That's not my understanding.

6    Q.   What's your understanding of why the breeze was

7    spread there, sir?

8    A.   Probably to decrease the --

9    Q.   Wait a minute.

10   A.   Okay.

11   Q.   If you have an explicit understanding, I'd like

12   you to tell us that, not a "probably".  But do you

13   have, do you know, and if so my question is going

14   to be where you learned it --

15   A.   Then I don't know why specifically the breeze

16   was applied.

17   Q.   Wouldn't you agree that would be an important

18   piece of information for you to have in order to

19   evaluate whether or not this complied with RCRA

20   regulations or constituted active management?

21   A.   Why someone did it?

22   Q.   Exactly.

23   A.   If -- if someone treats a hazardous waste and

24   that constitutes active management in a unit that

25   otherwise would be exempt from RCRA, and the

1    purpose of that, the whole idea behind leaving

2    these units alone is to not handle that waste and

3    increase the waste management problem, leave it

4    alone, because we have other authorities that can

5    deal with those problems should they arise.  That's

6    why we said leave those alone, and if you don't

7    touch them after November 19th, 1980, you're not

8    subject to regulation.  So it really doesn't matter

9    why they did it.  I need to know the fact that they

10   did do it.

11   Q.  You used a verb at the start of that answer

12   that is kind of a term of art in RCRA, right?  You

13   went back to treat --

14   A.  Yes.

15   Q.  -- correct.  That's a critical term under RCRA,

16   correct?

17   A.  Yes.

18   Q.  And it's that definition we were just talking

19   about, correct?

20   A.  Yes.

21   Q.  And as we work through that definition, if I

22   understood your testimony correctly, the only way

23   that that term fits with the activity of spreading

24   breeze on this material is if it was done to

25   improve the storage of the material, correct?

2628

1   A.   It's not the only one, but --

2   Q.   Well, I'm sorry.   Then I misunderstood your

3   earlier testimony.

4   A.   No, no.   I did say storage, because I can't

5   think of any other reason why they would have done

6   it.

7   Q.   Okay.   But I'm not asking you to imagine.   I'm

8   asking if you know why it was done.

9   A.   No, I do not.

10  Q.   You do not, okay.   You testified that in your

11  view in order to be compliant with this 261.4

12  exception, that the mixing of the coal tar -- the

13  K087 material with the coal, had to be done on, I

14  believe you said, an impervious pad, is that

15  correct?

16  A.   Impermeable surface, yes.

17  Q.   Impermeable surface.

18  A.   Yes.

19  Q.   That term doesn't exist in the regulations

20  anywhere, does it?

21  A.   No.

22  Q.   That is your interpretation of the regulations.

23  A.   There are discussions in the preambles, there's

24  several rules that talk about what an impermeable

25  surface is.

2629

1    Q.  The controlling definition for land disposal

2    that will be applicable to this case does not use

3    the term impermeable surface, does it?

4    A.  No.

5    Q.  So that is your term, correct?

6    A.  Okay.  It's my term, yes.

7    Q.  It might be helpful to use an impermeable

8    surface or impervious surface, but it is not

9    required under the definition of land management

10   that governs this case, correct?

11   A.  It's not defined, but the purpose of the

12   exclusion and the allowance to do this recycling is

13   conditioned on that the material be controlled so

14   that there are no releases.

15   Q.  The condition is based on there being no land

16   disposal, correct?

17   A.  Correct.

18   Q.  All right.  Now, if I heard your testimony

19   correctly, you also believe -- I want to move back,

20   I apologize, move back a moment to this issue of

21   active management.

22        You also testified that your belief was -- your

23   opinion is that if material had leaked out of one

24   of these tanks on to the ground, that that would

25   constitute active management, is that your opinion?

1    Did I get that correctly?

2    A.   No.

3    Q.   Okay.  So that doesn't constitute active

4    management?

5    A.   No.

6    Q.   So is it your opinion that if material leaked

7    out of the tanks at Tonawanda Coke and remained

8    there on the ground for a period of time, that that

9    constituted disposal?

10   A.   It constituted storage.

11   Q.   It constituted storage.

12   A.   Regulated by RCRA, yes.

13   Q.   Why is that?

14   A.   Because facilities are under an obligation to

15   minimize releases to the environment, and when

16   those releases occur, there is some reasonable

17   expectation that they will be addressed in a

18   somewhat rapid manner to be cleaned up.

19   Q.   If the material that was in the tank initially

20   had been in the tank before the enactment of the

21   RCRA regulations, and then it leaked out of the

22   tank, what converts that to a RCRA regulated

23   substance?

24   A.   The material in the tank or outside the tank?

25   Q.   The material that has leaked out of the tank.

1    What converts it to a RCRA-regulated substance?

2              MR. PIAGGIONE:  Objection, your Honor.

3    Can we get a time frame for this?

4              THE COURT:  No, we don't need a time frame

5    right now.

6              THE WITNESS:  The material in that tank?

7    BY MR. LINSIN:

8    Q.   Sir, let me -- I apologize if my question isn't

9    clear.

10        If there was material in the tank that was

11   there before the enactment of the RCRA regulations

12   and then it leaked out of the tank --

13   A.   Right.

14   Q.   My question is, what converts that material

15   that has leaked out into a RCRA-regulated

16   substance?

17   A.   The material in the tank, to begin with, was a

18   RCRA-regulated substance.  So what we had was a

19   discharge, a leaking of what was already a

20   RCRA-regulated substance.

21   Q.   So it's your view, if I hear you correctly,

22   that if there was material in the tank that existed

23   in this tank before the RCRA regulations were

24   enacted --

25   A.   Correct.

1    Q.   -- that all of that material, without anything

2    more, all of that material became subject to RCRA

3    regulation at the time of the enactment of the

4    statute, is that correct?

5    A.   That's correct.  Hazardous waste in a tank at

6    the time of the RCRA statute's implementation is

7    regulated hazardous waste.  The tank is regulated

8    unless it is closed or converted to less than 90

9    days storage.

10   Q.   Okay.  All right.  And so because of that view

11   that all of this material inside the tank was

12   governed by RCRA at the time of its enactment,

13   whether it was actively managed or not, all that

14   material inside the tank was governed by RCRA at

15   the time of enactment, then if some of it leaked

16   out, then that would be storage?  Is that correct?

17   A.   Storage on the ground, yes.

18   Q.   Storage on the ground.

19   A.   Yes.  That is correct.

20   Q.   All right.

21            THE COURT:  All right.  Let's take 15.

22            MR. LINSIN:  Thank you, your Honor.

23            (Jury excused from the courtroom.)

24            THE COURT:  Okay.  Mr. Flax, you can step

25   down.  Thank you.

1          MR. LINSIN:  Thank you.

2          THE COURT:  See in you about 15.

3          (Short recess was taken.)

4          (Jury seated.)

5          THE COURT:  All right.  I like that new

6     energy level.  All right, good to have you back.

7     Please have a seat.  Roll call waived.  The

8     attorneys and parties are back present.

9        Mr. Flax, we're going to have you back on the

10    stand.  You remain under oath.  I think we're still

11    on cross-examination.

12        Okay.  Mr. Linsin.

13          MR. LINSIN:  Thank you, your Honor.  May I

14    proceed?

15          THE COURT:  Certainly.

16  BY MR. LINSIN:

17    Q.  Mr. Flax, I just have a couple of more

18    questions for you, sir.  Are you familiar with the

19    term under RCRA concerning land-based production

20    units?

21    A.  No, I'm not.

22    Q.  Do you know whether the mixing of this K087 and

23    the coal would have been permitted in a land-based

24    production unit under the RCRA regulations?

25          MR. PIAGGIONE:  Objection, your Honor.

1     He's already asked and answered he knows nothing

2     about that subject.

3           THE COURT:  I'll sustain the objection.

4  BY MR. LINSIN:

5  Q.  Do you agree with me that it would be important

6     to your assessment in developing and expressing

7     your opinions in this matter if you knew that there

8     were conditions under which the RCRA regulations

9     permitted the handling and mixing of otherwise

10    hazardous waste in production units that are in the

11    land?

12 A.  I'm not sure I can answer that question.  In

13    regard to this specific case, I am aware of

14    allowances whereby waste generated by this facility

15    are allowed to be recycled.  And it is my belief

16    that all the conditions for that recycling were not

17    met.  But if you're talking about some type of

18    appurtenance that I'm not aware of, I really can't

19    respond.

20 Q.  Okay.  Fair enough.  You testified, if I heard

21    you correctly on direct, that in your judgment and

22    your opinion that the -- the coal field out at the

23    Tonawanda Coke facility was the land or ground, if

24    I heard you correctly, correct?

25 A.  Correct.

1    Q.   Now, would you agree with me that in a coke

2    manufacturing facility that the coal is actually a

3    raw material?

4    A.   Yes, I'd agree with that.

5    Q.   And a raw material has a particular connotation

6    with respect to RCRA regulation and application,

7    correct?

8    A.   Raw materials are basically exempt from RCRA

9    regulation.

10   Q.   All right.  So the coal in the coal field at

11   Tonawanda Coke, because it is a raw material -- or

12   was a raw material, is exempt from RCRA regulation,

13   correct?

14   A.   Correct.

15   Q.   Now, is it fair to say, Mr. Flax, that because

16   there is a parallel enforcement authority between

17   federal regulators and state regulators under RCRA

18   that it is important for those two authorities to

19   carefully coordinate in terms of their application

20   and enforcement of the RCRA statute and its

21   regulations?

22   A.   And we do that to the greatest extent possible,

23   yes.  The answer is yes.

24   Q.   And isn't it important that those RCRA

25   regulations be applied to regulated facilities in a

2636

1   consistent and predictable manner?

2   A.  We try to do that to the greatest extent

3   possible, yes.

4         MR. LINSIN:  Thank you.  No further

5   questions, your Honor.

6         THE COURT:  Okay, Mr. Linsin, thank you.

7      Mr. Personius?

8         MR. PERSONIUS:  I have no questions,

9   Judge.

10        THE COURT:  Okay.  Thank you.

11     All right.  Mr. Piaggione, is there any

12  redirect?

13        MR. PIAGGIONE:  I do have a few.

14        THE COURT:  Okay.

15  REDIRECT EXAMINATION BY MR. PIAGGIONE:

16  Q.  Mr. Flax, were you involved in the drafting of

17  the indictment in this case?

18  A.  No, I was not.

19  Q.  Are you aware that Count 19 of the indictment

20  involves the unpermitted disposal of K087 waste

21  from the by-products department of the Tonawanda

22  Coke by spreading it on to the coal field at the

23  facility?

24  A.  No.

25  Q.  So when you testified that you were testifying

1    about -- your expert opinion was limited to the

2    disposal of hazardous waste, were you talking about

3    your understanding it was only one count in the

4    indictment?

5    A.   That was my understanding, yes.

6    Q.   Okay.  You indicated that -- you said on cross

7    that it was not fair to review all the past RCRA

8    inspections.  Would you want to explain that

9    please?

10   A.   It would be impossible to review every single

11   document that had ever been generated by both the

12   state and the EPA on a facility.  We do whatever we

13   can as time permits to prepare for inspections.

14   Inspectors are taught to prepare to the greatest

15   extent possible, but time doesn't permit in every

16   instance.

17   Q.   Okay.  And with respect to treatment, the

18   definition of treatment, I'd like to read you the

19   entire definition of treatment as defined in RCRA

20   which says, "Any method, technique, or process,

21   including neutralization designed to change the

22   physical, chemical, or biological character or

23   composition of any hazardous waste so as to

24   neutralize such waste, or so as to render such

25   waste nonhazardous, safer for transport, amenable

1  for recovery, amenable for storage, or reduced in

2  volume.  Such term includes any activity or

3  processing designed to change the physical form or

4  chemical composition of hazardous waste so as to

5  render it nonhazardous."

6       Now what portion of that are you referring to

7  when you say mixing with coal breeze constituted

8  treatment?

9  A.  Making it amenable for storage.

10 Q.  Okay.  And what do you mean "by making it

11 amenable for storage"?

12 A.  Easier to store without problems.

13 Q.  Okay.  Now, are you aware of the Federal

14 Register 57 -- Federal Register 27?

15          MR. LINSIN:  Objection, your Honor.

16          THE COURT:  Grounds?

17          MR. LINSIN:  This -- the Court's prior

18 ruling regarding this specific issue concerning

19 reference to Federal Register notices or other

20 publications.  We're dealing with defined terms

21 pursuant to the Court's pretrial ruling.

22          THE COURT:  What are you going to do with

23 this, Mr. Piaggione?

24          MR. PIAGGIONE:  I'm just pointing out the

25 exclusion, your Honor, for RCRA involving the

1  recycling.  I'm not going into the definition of

2  land disposal, which is what we're precluded from

3  going into.  We're talking about the exclusion

4  itself.  They brought up the purpose of the

5  exclusion, asking about the intent, so this

6  addresses that issue.

7          THE COURT:  Mr. Linsin?

8          MR. LINSIN:  Your Honor, my understanding

9  of the Court's ruling was that this was not going

10 to be gotten into.  If we're going to open this

11 door, there are a lot of things that come flowing

12 in.

13         THE COURT:  All right.  Let me have the

14 attorneys approach, please.

15         (Side bar discussion held on the record.)

16         THE COURT:  All right.  You want to go

17 into the Code of Federal Regulations for the

18 exceptions?

19         MR. PIAGGIONE:  Your Honor --

20         MR. LINSIN:  The question related to a

21 Federal Register notice.  This gets into preamble

22 language -- and I'm looking for portions of the

23 Court's order.

24         THE COURT:  Point that out to me too.  I

25 have it here, but --

1          MR. PIAGGIONE:  If I could, heard, your

2    Honor.

3          THE COURT:  So you want to go into the

4    Federal Register which is what?

5          MR. PIAGGIONE:  It discusses the

6    exclusion.  The recycling exclusion in which it

7    talks about it being not -- being no land disposal,

8    like the rest of it at this point.  And this was

9    already brought out in part before.  Defendants

10   were bringing up the fact that it was an intent to

11   dispose was required, and this goes into that

12   issue.  I'm not going into defining what land

13   disposal is, which is what we are -- which is what

14   the order defines.

15         THE COURT:  All right.  Mr. Linsin?

16         MR. LINSIN:  The section of the Court's

17   order that I was referencing, your Honor, appears

18   in Document 138 at page 18, and it is the end of

19   the Court's discussion regarding environmental

20   laws, regulations, and permit conditions.  And in

21   that concluding paragraph the Court stated that the

22   government's request to preclude defendants from

23   presenting statutes, regulations, policies, and

24   other memoranda concerning disputed issues of law

25   to the jury is granted.

2641

1          The government itself moved to exclude this

2     kind of material.  I expressly avoided using any

3     such materials with this witness given the Court's

4     order.  And now Mr. Piaggione is seeking to do

5     something that is directly contrary to at least my

6     understanding of this direction by the Court.

7               THE COURT:  I mean, does this fall within

8     the disputed issues of law that's referenced in the

9     final part?  Do we have that as --

10              MR. LINSIN:  Your Honor --

11              THE COURT:  -- at issue here?

12              MR. LINSIN:  Of course.  The preamble

13    itself talks about -- this issue of land disposal

14    is interwoven with this 261.4(a)(10).  There is no

15    pulling it apart.  And my point is that if we start

16    getting into this preamble to talk about what land

17    disposal means with respect to this particular

18    exception under the regulations, I don't know why

19    in the world we would -- how we could stop -- how

20    we can close that door.  And I just -- my

21    understanding of this provision of the Court's

22    order was that we were dealing with the text of the

23    regulations.  We're not getting into policies,

24    memorandum, guidance documents.  I thought that was

25    precisely what the Court was seeking to exclude.

1          THE COURT:  What actually is the Federal

2     Register?  Is that the policy statement?  What is

3     that?

4          MR. PIAGGIONE:  It's the -- it is the

5     policy.

6          MR. LINSIN:  Your Honor, yes.

7          MR. PIAGGIONE:  It is the policy.

8          THE COURT:  Then I'm going to preclude it.

9     Objection sustained.

10          (End of side bar discussion.)

11   BY MR. PIAGGIONE:

12   Q.  Just with respect to your conversations or

13   reports from Lenny Grossman regarding the June 2009

14   inspection, did Mr. Grossman in his reports

15   indicate that the defendants told him where the

16   material around the tanks was going to be recycled?

17   A.  He told me in a discussion that they were going

18   to recycle it by mixing it into the coal.

19          MR. PIAGGIONE:  Okay.  I have no further

20   questions.

21          THE COURT:  Okay, Mr. Piaggione.

22          MR. PIAGGIONE:  I'm sorry, I just realized

23   that was a partial answer.

24          THE COURT:  I'm sorry?

25          MR. PIAGGIONE:  May I have one more

1    question?

2              THE COURT:  You're entitled to one change

3    of mind.

4              MR. PIAGGIONE:  Thank you very much.

5              THE COURT:  That's it.

6              MR. PIAGGIONE:  You've been very kind up

7    to now.

8        Did he say where the mixture was going to take

9    place?

10             THE WITNESS:  On the coal piles on the

11   ground.

12             MR. PIAGGIONE:  Okay.  Thank you, your

13   Honor.

14             THE COURT:  You're welcome.

15       Anything, Mr. Linsin?

16             MR. LINSIN:  I have nothing further, your

17   Honor.

18             THE COURT:  Thank you.  Mr. Personius?

19             MR. PERSONIUS:  Thank you for asking,

20   Judge.  No.

21             THE COURT:  Okay.  All right.  Mr. Flax,

22   thank you, sir.  We appreciate it.  Oh, wait a

23   minute.

24             A JUROR:  Am I allowed to --

25             THE COURT:  You certainly are.  Thank you

2644

1     for reminding me.  If there are any written

2     questions from the jurors, please pass those up to

3     me.  Thank you.

4          Okay.  May I see the attorneys, please?

5               (Side bar discussion held on the record.)

6               THE COURT:  I'll make copies, and I'll

7     have you take a look at the question if you need

8     some time to consider it.  But there are

9     clarification questions from juror number 10 and

10    that's Miss Flax -- not Miss Flax, Miss Russ, okay.

11    Here it is.  First question:  "What is the official

12    definition of land storage and land disposal?"

13    Okay.  That's the first part of the question.

14    Question:  "In the recycling process, is it

15    necessary to have a, quote, roof, close quote, over

16    the mixing process?  Also, is it required to have a

17    concrete pad because you are supposed to recycle on

18    an impermeable surface?"

19               MR. PIAGGIONE:  Your Honor, you can answer

20    the land disposal definition by simply reading your

21    definition of the land disposal.

22               MR. LINSIN:  These are questions for the

23    witness.

24               MR. PIAGGIONE:  If you want him to testify

25    what he thinks is land disposal?

1          MR. MANGO:  That's tricky because the

2     Court has obviously defined the term land disposal.

3          MR. LINSIN:  And I believe it is valuable

4     for the jury to understand whether this witness

5     understands what the controlling definition is

6     before he took the stand, not have it read to him.

7          THE COURT:  Well, if that question were

8     modified to what is your understanding of the

9     definition of land storage and land disposal.

10          MR. MANGO:  Okay.

11          MR. LINSIN:  For the purposes of this

12     case.

13          THE COURT:  For the purposes of this case.

14          MR. LINSIN:  Okay.

15          THE COURT:  That would work, and then

16     there would be my instruction that controls in the

17     end, and that would be referenced in our jury

18     charge.  So I think that works.  Okay?

19          MR. PIAGGIONE:  Yes.

20          MR. PERSONIUS:  Yes.

21          THE COURT:  I'm sorry, I didn't mean to

22     ignore you.

23          MR. PERSONIUS:  This is beyond my --

24          THE COURT:  Okay.  Now, in the -- this is

25     the second part.  "In the recycling process is it

1    necessary to have a, in quote, roof, close quote,

2    over the mixing process?"  I think that's a good

3    question personally.

4           MR. LINSIN:  I agree.  I don't disagree.

5           MR. MANGO:  Yeah.  It's fair.

6           THE COURT:  All right.  Next question,

7    "Also, is it required to have a concrete pad

8    because you're supposed to recycle on an

9    impermeable surface?"  Good question I think.

10           MR. LINSIN:  Yes.

11           MR. MANGO:  Yes.

12           THE COURT:  All right.  So let's do those

13    three, and then we'll come back for the other

14    question.  We'll discuss it.  Okay?  Fair enough?

15           MR. LINSIN:  Sure.

16           THE COURT:  Okay.  Let me just do it in

17    segments.  Okay.

18           (End of side bar discussion.)

19           THE COURT:  Okay.  Thank you, ladies and

20    gentlemen.

21      Mr. Flax, I'm going to ask you three questions,

22    okay, and ask you to answer these to the best of

23    your ability.  Okay?

24           THE WITNESS:  Okay.

25           THE COURT:  First question, what is the

```
 1    definition of land storage and land disposal as you

 2    understand them for purposes of this case?  Start

 3    with land storage, please.

 4          THE WITNESS:  There is no definition for

 5    land storage, and there is no definition other than

 6    that defined by the Court for land disposal.

 7      I think this question arises, if I may, your

 8    Honor, from my proposition that the discharge from

 9    the tank --

10          MR. LINSIN:  Your Honor --

11          THE COURT:  You've got to stop there,

12    Mr. Flax.

13          THE WITNESS:  Okay.

14          THE COURT:  Okay.

15          THE WITNESS:  Sorry.

16          THE COURT:  All right.  So your answer is,

17    in short, for both land storage and land disposal

18    is what?  For purposes of this case and your

19    understanding.

20          THE WITNESS:  For purposes of this case

21    the Court has defined land disposal as any

22    placement on or into the ground any release on

23    to -- on to the -- or into the ground basically.

24    There is no definition for land storage in the

25    regulations or that has been defined by the Court.
```

1          THE COURT:  Okay.  And I will give you,

2    ladies and gentlemen, a definition with respect to

3    land disposal.

4       But what is your understanding of land storage?

5    Tell us your understanding of those terms.

6          THE WITNESS:  Land storage simply would be

7    defined as any temporary placement and storage of

8    material on the ground.  As opposed to land

9    disposal, which is a complete abandonment of that

10   material.

11          THE COURT:  Okay.  We're going to stop you

12   right there, and the attorneys may want to

13   follow-up in short order.

14       Your second question is this:  In the recycling

15   process is it necessary to have a, quote, roof

16   unquote, close quote, over the mixing process?

17          THE WITNESS:  It is not necessary, no.

18          THE COURT:  Okay.  If there is a roof,

19   does that trigger a different approach to the

20   analysis that you testified to?

21          THE WITNESS:  I'm not sure of the

22   question, your Honor.

23          THE COURT:  Okay.  It's probably not a

24   good question.  But if a roof is not necessary, but

25   there is a roof, does that affect your approach to

1    compliance with the regulations?

2              THE WITNESS:  A roof over the concrete

3    pad?

4              THE COURT:  Yes.

5              THE WITNESS:  Roof over a concrete pad,

6    although it's not necessary, it's advisable.  The

7    main purposes of the concrete pad is to prevent

8    releases into the environment as long as that

9    concrete pad is sufficient to contain any of those

10   wastes and manage any potential runoff from those

11   wastes.  A roof is not necessary.  However, a roof,

12   of course, would --

13             THE COURT:  Slow down.  Slow down, please.

14             THE WITNESS:  A roof, of course, would

15   prevent precipitation from contacting the waste on

16   the pad and decrease the potential for there to be

17   runoff from that material.

18             THE COURT:  Third question:  Is it

19   required to have a concrete pad because you are

20   supposed to recycle on an impermeable surface?

21             THE WITNESS:  If you could find a good

22   substitute for a sizable concrete pad with sides

23   high enough to contain all the material and manage

24   any potential runoff, that would probably be

25   acceptable.

1              THE COURT:  Okay.  Miss Russ, satisfied

2    with those questions?

3              A JUROR:  Yes.  I only had two questions.

4    That's fine.  You asked three.

5              THE COURT:  Well, actually there are three

6    question marks on this slip of paper you sent to

7    me, so by my count that's three, okay?  Maybe a run

8    on question with two -- okay.  All right.

9         That's the first note.  I want to talk to the

10   attorneys separately on the second note.  Thank you

11   very much.

12             (Side bar discussion held on the record.)

13             THE COURT:  Okay.  "If waste is in storage

14   at a plant and was put there by a past owner, is

15   the current plant owner responsible for that waste?

16   That is, the contents, the removal, the recycling,

17   et cetera?"

18             MR. PIAGGIONE:  Your Honor, just to

19   clarify that question, so this witness would

20   understand it in terms of RCRA, the question is if

21   material was being -- being stored that was -- was

22   present on the property before this property owner

23   took over, is that subject RCRA.  I think that's

24   what he's trying to say there.  I'm not quite clear

25   if it's going to come across to the witness.

1          MR. LINSIN:  I thought I understood the

2     question from the juror -- could I inquire, your

3     Honor, which juror has asked that question?

4          THE COURT:  Yes, it's Mr. McDonnell.  He's

5     number nine.

6          MR. PIAGGIONE:  Can we read the question

7     again, your Honor?

8          THE COURT:  Let me get Mr. Linsin's --

9          MR. LINSIN:  I thought I had understood

10    the question as the Court read it -- maybe a

11    re-reading would help me understand Mr. Piaggione's

12    point, but I don't right now.

13         THE COURT:  It gets a little complicated

14    with the add-on portion I think when he asks about

15    the contents, the removal, and the recycling

16    referring back to the responsibility for the waste.

17    But I'm going to read the full question, all right.

18      "If waste is in storage at a plant that was put

19    there by the past owner" --

20         MR. PIAGGIONE:  Is that the plant or the

21    waste?

22         THE COURT:  It's the waste.

23         MR. PIAGGIONE:  Okay.

24         THE COURT:  So the waste was put there by

25    the past owner -- "is the current plant owner

1  responsible for that waste?"

2         MR. PIAGGIONE:  Under RCRA.

3         THE COURT:  Well, we can talk about that.

4  Then he goes, "For example, the contents, the

5  removal, the recycling."

6         MR. LINSIN:  The one -- I think it may be

7  helpful, your Honor, to -- as to the latter part to

8  clarify is the -- is the owner, current owner

9  responsible under RCRA with respect to storage,

10  treatment, or disposal.

11     The one concern I have about the question is

12  that in the initial clause it uses the word

13  "storage", and that is a term of art under RCRA.

14  And I would just ask that the Court neutralize the

15  question somewhat to just say if there was material

16  present in a tank.

17         MR. PIAGGIONE:  No.  That's going to

18  change the meaning to this witness.  He's looking

19  at it in terms of RCRA.

20         MR. MANGO:  In our jury instructions, your

21  Honor, we have requested the Court give a

22  definition for storage that comes right out of

23  RCRA.  So it's -- and I'm sure this witness knows

24  that definition of storage.  So I think he's going

25  to understand that question much better in terms of

1    what the juror is asking.

2            THE COURT:  Well, if it were to read if

3    waste is in storage as defined under RCRA.

4            MR. LINSIN:  But see, that's the problem,

5    your Honor.  If you're talking about conduct that

6    occurred before RCRA was enacted, which is what I

7    think this question is actually getting to,

8    describing that conduct in terms of a RCRA concept

9    I think is mixing -- well, is confusing the issue

10   rather than clarifying.

11           MR. PIAGGIONE:  I don't think so, your

12   Honor.  What it's pointing out is that when the law

13   takes affect, does prior storage become subject to

14   RCRA?  That's basically what he's saying, so to

15   say -- to define storage as something other than,

16   as you said non-RCRA storage, it gets more

17   confusing.

18           MR. LINSIN:  What may be helpful, your

19   Honor, and I don't have it immediately with me, but

20   I can get it quickly if it might help the Court.

21   There is a stipulation on this very point, a

22   material that had been abandoned in the tanks and

23   around the tanks.

24           MR. PIAGGIONE:  That has nothing to do

25   with this.

1          MR. MANGO:  That's not the question, your

2     Honor.  The question is -- that is being asked

3     about subsequent activities is --

4          (Interruption by the court reporter.)

5          THE COURT:  Okay.  Let Mr. Piaggione give

6     us his view.

7          MR. PIAGGIONE:  Okay.  Your Honor,

8     basically the question is if -- if storage -- that

9     the stipulation does not discuss the issue of

10    storage.  It just simply says the material that's

11    in the tank was placed there by someone else.

12    Doesn't get into whether or not Tonawanda Coke was

13    responsible for storage, and that has nothing to do

14    with this particular question.

15        The question is here, if I understand it

16    correctly, is if this material that was present on

17    site in -- being stored and RCRA comes into effect,

18    does the company have a responsibility under RCRA

19    for that material being stored?  It's much

20    different than the stipulation.

21         THE COURT:  I mean, Mr. Linsin, you

22    mentioned that storage is a term of art.

23         MR. LINSIN:  It is a term of art.

24         THE COURT:  And it is.  And it's included

25    in the question, so we have to presume I think that

1       the juror intended it to be included in the

2       question.

3                   MR. LINSIN:  Your Honor, the troubling

4       aspect of the question is that it uses a RCRA term

5       with respect to conduct that existed before RCRA.

6       It is -- it is, as I understood the question,

7       talking about this material being stored prior to

8       RCRA.  So if material is in storage before RCRA is

9       enacted, then is the owner responsible.  And all

10      I'm asking is that we neutralize, but still retain

11      what I think is the essence of the question, if

12      material is present in a tank prior to enactment of

13      RCRA, is the subsequent owner responsible under

14      RCRA for treatment, storage, or disposal?

15                  THE COURT:  Well, if we crafted it to read

16      if there was waste at a plant -- if there was waste

17      at a plant owned by a past owner -- that's

18      cumbersome.  Under RCRA is the current plant owner

19      responsible for that waste?

20                  MR. LINSIN:  Is the current plant owner

21      responsible under RCRA.

22                  MR. PIAGGIONE:  I don't think that defines

23      what the conduct is, your Honor.  In other words,

24      if there was a waste in a tank prior to RCRA, is

25      the present owner responsible?

1             THE COURT:  The waste, that is the

2      contents, the removal, the recycling, et cetera.

3      So all I did was take the term of art out, right?

4      Which obviates the concern of Mr. Linsin and then

5      applies RCRA to the appropriate period.

6             MR. PIAGGIONE:  Except, your Honor, the

7      purpose of that question is to find out when RCRA

8      takes place.  This prior conduct prior to RCRA

9      becomes subject to -- that's really the purpose of

10     that question.  If you present it that way, this

11     particular witness is not going to understand the

12     presence of waste in general.  He's going to wonder

13     where it is, what it is, you know, what it's been

14     used for.  He'll answer that it depends.  When

15     really the purpose of that is to say if it was

16     being stored in the tank.

17            THE COURT:  Well, I think if I can't get

18     an agreement on it I'm going to tell the juror that

19     because we can't agree on the essence of the

20     question, I'm not going to permit this one to be

21     asked.

22            MR. PIAGGIONE:  Your Honor, I'll accept

23     your -- a question is better than no question if

24     that helps the jurors.  We'll go with whatever your

25     language is.

1          THE COURT:  Okay?

2          MR. PIAGGIONE:  Okay.

3          MR. LINSIN:  Thank you, your Honor.

4          (End of side bar discussion.)

5          THE COURT:  Okay.  I have one other

6   question.  I am going to ask it slightly modified

7   to make it an appropriate question under the rules

8   that all of us have to comply with.

9      So, Mr. Flax, if you would listen carefully,

10  please.  If waste at a plant was put there by a

11  past or prior owner, under RCRA is the current

12  plant owner responsible for that waste, that is,

13  the contents, the removal, the recycling, et

14  cetera?

15          THE WITNESS:  Yes.  It's incumbent on a

16  facility when they purchase property or when the

17  permit's on it, that they know what they're

18  purchasing, so yes.

19          THE COURT:  Okay.  Okay.  Mr. McDonnell,

20  that's the best we can do with your question.

21  Thank you though.  It was -- the essence, is it

22  there?

23          A JUROR:  Yes.

24          THE COURT:  Okay.  Okay.  I'm going to

25  start with defense counsel.  Any questions in

1    follow-up with Mr. Flax?  Mr. Linsin?

2              MR. LINSIN:  No, thank you, your Honor.

3              THE COURT:  Mr. Personius?

4              MR. PERSONIUS:  No, thank you, Judge.

5              THE COURT:  Mr. Piaggione?

6              MR. PIAGGIONE:  No, your Honor.

7              THE COURT:  Okay.  Mr. McDonnell, you

8    stumped the experts.  All right.  Okay.  And, of

9    course, Miss Russ.  Thank you for your questions.

10        Again, you know, it's very heartening to have

11   your efforts and having you engaged in working

12   through all of this evidence in this very, very

13   important case.  We appreciate that.  I mean,

14   it's -- you know, it's difficult, we know, for you

15   to endure what you have to endure to put all of

16   this information together.

17        But again, as we said from the outset, the

18   application of your common sense, your

19   intelligence, your experience, when you get to the

20   deliberations and you're respecting each other's

21   views, it will make it happen.  You'll have

22   everything you need to resolve this case by

23   unanimous verdict.  Thank you very much for your

24   efforts.

25        Mr. Flax, you are excused.

1           THE WITNESS:  Thank you, your Honor.

2           THE COURT:  I appreciate the questions on

3     behalf of all of us.  And what do we have next?

4           MR. MANGO:  Your Honor, we do have a

5     witness that may take a little while.  It may be

6     appropriate --

7           THE COURT:  Is that unusual?

8           MR. MANGO:  Par for course.

9           THE COURT:  How would you like to go home

10    early?  Good deal?  All right.  You've been

11    terrific.  I mean that sincerely.  We look forward

12    to seeing you tomorrow.  What day is tomorrow?

13          THE JURY:  Friday.

14          THE COURT:  All right.  What time are we

15    going to see you?

16          THE JURY:  9:30.

17          THE CLERK:  Judge, wait.  We don't have

18    any calendar tomorrow.

19          THE COURT:  You want to start a little

20    earlier tomorrow?  Be here at 9:00 o'clock.  We'll

21    try to start as promptly around 9, 9:15.  But we'll

22    get started right in that period, okay?  Be safe on

23    the way home and, of course, back here tomorrow.

24    Thanks.

25              (Jury excused from the courtroom.)

2660

1          THE COURT:  Okay.  Thank you very much.

2          MR. PIAGGIONE:  Your Honor, I just have

3   one request.  In light of the questions, would it

4   be appropriate for your Honor to read the

5   definition of storage to the jurors?  There is a

6   definition.

7          MR. LINSIN:  Your Honor, I anticipate,

8   given that there is a storage count in this

9   indictment, that the definition of storage will be

10  included in the Court's charge to the jury.  I see

11  no reason to pull that out at this moment, and --

12         THE COURT:  I can understand the reason

13  you're asking, but I think the -- frankly, the

14  juror was satisfied.  And it really is the juror's

15  question.  Okay.  So on that basis, I'll look to

16  including it in the final charge, but for purposes

17  of this point in the trial, I think not.  Because

18  the question has satisfied the juror.

19         MR. PIAGGIONE:  All right.  Very good,

20  your Honor.

21         THE COURT:  All right.  Thank you

22  everybody.  We'll see you tomorrow at what time?

23         MR. MANGO:  8:45.

24         MR. LINSIN:  Thank you, your Honor.

25         *      *      *      *      *      *

1                         CERTIFICATION

2

3              I certify that the foregoing is a

4        Correct transcription of the proceedings

5        Recorded by me in this matter.

6

7

8                          s/Michelle L. McLaughlin
                           Michelle L. McLaughlin, RPR
9                               Official Reporter
                             U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25