VOL. XIII

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

         -vs-                  10-CR-219S
TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
              Defendants.
-------------------------------------

         Proceedings held before the

    Honorable William M. Skretny, U.S.

    Courthouse, 2 Niagara Circle, Buffalo,

    New York on March 15, 2013.


    APPEARANCES:

    AARON J. MANGO,
    Assistant United States Attorney,
    ROCKY PIAGGIONE, Senior Counsel,
    U.S. Department of Justice,
    Appearing for the United States.

    GREGORY F. LINSIN, ESQ.,
    JEANNE M. GRASSO, ESQ.,
    ARIEL S. GLASNER, ESQ.,
    Appearing for Tonawanda Coke Corporation.

    RODNEY PERSONIUS, ESQ.,
    Appearing for Mark L. Kamholz.

    Also Present:  Lauren DiFillipo, Paralegal
                 Sheila Henderson, Paralegal


    Michelle L. McLaughlin, RPR,
    Official Reporter,
    U.S.D.C. W.D.N.Y.
    (716)332-3560

2662

1                  I N D E X

2              WITNESS                          PAGE

3        RONALD SNYDER
    Direct Examination by Mr. Piaggione         2692
4    Cross-Examination by Mr. Personius         2699
    Cross-Examination by Mr. Linsin            2717
5    Redirect Examination by Mr. Piaggione      2722

6        ROBERT O'CONNOR
    Direct Examination by Mr. Mango             2724
7    Cross-Examination by Mr. Linsin            2846
    Cross-Examination by Mr. Personius         2825
8
        DANIEL J. HEUKRATH
9    Direct Examination by Mr. Mango             2874
    Cross-Examination by Mr. Personius         2894
10   Cross-Examination by Mr. Linsin            2911
    Redirect Examination by Mr. Mango           2913
11

12       GOVERNMENT EXHIBITS                    EVD.

13           115.07                            2730
             115.09                            2734
14           115.25                            2737
             115.29                            2738
15           116.01.00                         2740
             116.01.01                         2742
16           116.01.02                         2743
             116.01.03                         2745
17           116.01.04                         2748
             116.01.07                         2751
18           116.01.08                         2755
             116.01.09                         2756
19           115.02.01                         2765
         116.02.02 through 116.02.39           2768
20           116.03                            2769
             116.06                            2772
21           117                               2777
         117.01.01 through 117.01.08           2780
22           117.05                            2782
             117.06.02                         2786
23           117.09                            2787
             117.10                            2789
24           117.11                            2790
             118                               2797
25           118.01                            2799

2663

1                         I N D E X

2        GOVERNMENT EXHIBITS                    EVD.

3            120                                 2804
         400  through  569                       2811
4            21.01                               2814

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury not present in the courtroom.)

2           THE COURT:  Okay.  Miss Labuzetta, do you

3     want to call the case, please?

4           THE CLERK:  Criminal case 10-219S, United

5     States of America versus Tonawanda Coke and Mark

6     Kamholz.

7           THE COURT:  Okay.  The attorneys and

8     parties are assembled.  The jury is here.  We

9     haven't summoned them in yet, but they will be

10    whenever we're ready.

11        There are some preliminary matters I

12    understand?

13          MR. LINSIN:  There are, your Honor.  And

14    it's hard to determine in which order to address

15    them.  But let me begin with this, if I may.

16        I received a call last evening from Thomas

17    Kelly, who is counsel representing Patrick Cahill,

18    one of the witnesses who testified in the case.

19    Mr. Kelly informed me that somehow a reporter had

20    obtained his client's cell phone number, had called

21    Mr. Cahill to ask him about whether or not it was

22    true that he had been demoted at the plant

23    following his testimony.  My understanding is that

24    Mr. Cahill declined to comment to the reporter.

25    But my understanding is also that -- though I have

1    not seen it this morning -- that a story is run,

2    has been run, or will be run today along that line,

3    that somehow my client, in retaliation for

4    Mr. Cahill's testimony, had demoted him after he

5    testified.  And I can't, of course, control the

6    accuracy of media accounts and that's not my

7    objective.

8        But I do want to provide some factual

9    information just to make sure that this issue does

10   not somehow creep into this trial or prevent it

11   being elicited from any witness.  And that

12   information is as follows:  That -- as the Court

13   knows, Mr. Cahill used to work as the foreperson of

14   the by-products department.  Prior to the weekend

15   March 2nd and 3rd Mr. Cahill had been working four

16   to six hours a day in the by-products department

17   because of problems that department was

18   encountering.

19       Over that weekend, the weekend of March 2nd and

20   3rd, the plant experienced two exhauster failures,

21   which created significant risks to the plant and to

22   the safety of the workers.  And part of this was

23   directly attributable to operator error.  Three of

24   the four by-products operators in by-products now

25   are new.

1          Following those failures Mr. Cahill was asked

2     to temporarily supervise directly the by-products

3     department again to help get it back in shape.

4     There was no reduction in pay.  Mr. Cahill is

5     continuing to sign forms and act as plant

6     superintendent.  But I am just concerned about this

7     being -- this kind of misinformation leaking into

8     the trial, and I wanted to do what I could to

9     inform the Court of the actual context so that this

10    could be hopefully prevented from infecting this

11    trial.

12          THE COURT:  All right.  Do you know if the

13    reporter who allegedly made the call was from the

14    Buffalo News?

15          MR. LINSIN:  I do not know the reporter's

16    identity.  I don't know how, as I said, the

17    reporter -- and I didn't inquire, your Honor.  It

18    is my habit, honestly, not to read press accounts

19    during a trial.  It is just not productive for me.

20    So I can't confirm whether the story's run.  I'm

21    telling you the information as I learned it from

22    Mr. Kelly last evening, and I've not done any

23    further inquiry.

24          THE COURT:  All right.  I take it you

25    haven't been contacted or any member of your

1      attorney team?

2            MR. LINSIN:  No, we have not been

3      contacted as far as I know.  The company itself has

4      not been contacted to verify or check the accuracy

5      of this.  But obviously the concerns of something

6      like this -- this kind of sensationalized issue is

7      significant, and I just wanted to bring it to the

8      Court's attention.

9            THE COURT:  Okay.  What I will do is I

10     will monitor what's on line during the course of

11     the day, and if anything shows up, I'll get a

12     printout and let everybody know and we'll figure

13     out if there's anything we have to do.  Certainly

14     an admonition before the jury recesses for the

15     weekend would probably be in order.  We don't have

16     to reference the specifics, but certainly tell them

17     that, you know, every effort should be made in the

18     event that, you know, they -- you know, get the

19     paper or whatever that there might be some articles

20     in there that they should stay away from.  And, you

21     know, we'll massage the language to make it

22     comfortable and not highlight the fact that it

23     might be something along that line.

24           MR. LINSIN:  Right.  It may be helpful,

25     your Honor, without being pointed about it, to

1    simply -- in addition to the cautions the Court has

2    already provided, to simply add, which is true, of

3    course, sometimes news accounts can just get things

4    wrong, and, you know, that would be unfortunate.

5    And so just to -- to make that additional caution

6    might be helpful without referencing Mr. Cahill

7    himself.

8              THE COURT:  Okay.  Yeah.

9              MR. MANGO:  Your Honor, I don't know if

10   the Court needs to go that far.  The government did

11   learn about this yesterday as well from different

12   sources.  And the information the government

13   received is that Mr. Cahill is no longer plant

14   manager.  Someone else is filling in in that

15   capacity.  So at least from what I understand, the

16   information that Mr. Cahill is still signing

17   documents and acting as if he was plant manager,

18   that is not the case.  There is a new person in

19   that position, so -- but I don't think it's

20   necessary to tell the jury sometimes that the press

21   gets it wrong.  Because there's really -- I mean,

22   that's one view of the the facts in this case, and

23   the press has the right to investigate and inquire

24   and write about what they want.

25             THE COURT:  I'll give it some thought, and

1     then I'll be careful about how I admonish the jury.

2     I think you do agree that something is appropriate

3     if there is to be an article in the news media

4     before the jury breaks for the weekend.

5             MR. MANGO:  As you've normally been doing,

6     your Honor, just advising them if there is an

7     article, please don't read it.

8             THE COURT:  Okay.  We'll see what occurs

9     on line today, and then we'll go from there.  Okay.

10            MR. LINSIN:  Thank you, your Honor.

11     Second issue I wanted to bring to the Court's

12     attention is that one of the witnesses I believe

13     the government intends to call today, Mr. Ron

14     Snyder, is one of the witnesses that we had raised

15     concerns about with the Court earlier on for a

16     couple of reasons.

17         First of all, in his -- in the summary provided

18     in his -- in the government's witness list, it was

19     indicated that he was intending or would be

20     proffered to testify about some unnoticed 404(b)

21     evidence, premature green pushes from the ovens.  I

22     understand from counsel for the government they do

23     not intend to get into that with this witness, and

24     confident that they don't, but I wanted to put that

25     on the record.

1          But the broader concern we have about

2     Mr. Snyder, and I wanted to bring it to the Court's

3     attention, is that Mr. Snyder, as I understand it,

4     resigned from the company in September of 2005.

5                    THE COURT:  He was a former plant manager.

6                    MR. LINSIN:  He was the former plant

7     superintendent, yes.  Resigned from the company in

8     September of 2005.  He, based on the materials we

9     have been provided by the government, from 2008

10    forward, he has been speaking to investigators

11    about one issue or another concerning Tonawanda

12    Coke.  Much of the information contained in his

13    3500 material is clearly based on hearsay and

14    nothing but hearsay information.

15         When I compare the time frame for the relevant

16    counts in this indictment, Counts 1, 6, 11, 17, and

17    20, given his resignation in September of 2005,

18    Mr. Snyder would, it appears, have actual direct

19    knowledge about all of one month during the

20    relevant time periods in Counts 1, 6, 11 and 20 --

21    I'm sorry, now 19.

22                    THE COURT:  You mentioned 17 before too.

23                    MR. LINSIN:  17 is the one count that,

24    your Honor, may recall that goes back to '98, so

25    obviously my comments are not directed to that

1    count.  But as to the other counts, 1, 6, 11 and

2    now 19, Mr. Snyder was at the plant for all of one

3    month during the charged period.

4        And so I raise this now in an effort to avoid

5    repeated objections or discussions during the

6    course of his testimony, just to advise the Court

7    that we've seen an awful lot of hearsay information

8    in here.  He has a narrow first-hand knowledge

9    basis of the plant for the charged period of time,

10   and I just wanted to advise the Court before he

11   comes on the stand that this is a significant

12   concern for us.

13              THE COURT:  Okay.  All right.  Snyder is

14   going to be one of your witnesses?

15              MR. PIAGGIONE:  Yes, your Honor.

16              THE COURT:  And your wrap-up witness, is

17   that Conway?

18              MR. PIAGGIONE:  Yes, your Honor.

19              THE COURT:  You have two left?

20              MR. MANGO:  No, your Honor.  We have Mr.

21   Heukrath as well who is going to testify today, and

22   Mr. O'Connor, who is a DEC law enforcement officer

23   who was involved in seizing some documents that

24   we're going to discuss as well.

25              THE COURT:  Okay.  Well --

1          MR. MANGO:  So possibly four witnesses

2     today, and I think we can finish today possibly.

3     Stay true to word.

4          THE COURT:  Mr. Personius?

5          MR. PERSONIUS:  Your Honor, we, with

6     respect to Mr. Conway, literally overnight so that

7     this morning when we got up and got into the

8     office -- when I got in around 7:00, received

9     summary charts for Mr. Conway that we have not seen

10    before.  There may be issues with those that we'll

11    need to address with you.  I need to talk to

12    Mr. Kamholz, Mr. Linsin, and everybody on his team

13    about this.  I just want you to know before we get

14    to that point, if he's going to be the government's

15    last witness, we're definitely going to need an

16    opportunity -- we meaning the defense team -- to

17    consult on this.  There may or may not be an issue

18    there.

19         THE COURT:  There may or may not what be?

20         MR. PERSONIUS:  An issue.  Just so you're

21    aware of it, Judge.

22         THE COURT:  Okay.

23         MR. PERSONIUS:  Judge, if I may, the other

24    point is we've been working hard with Mr. Mango.  I

25    don't mean to leave to Mr. Piaggione out, but we've

1     been working with Mr. Mango on a stipulation that I

2     think ties to the testimony of Mr. O'Connor

3     relating to documents seized from Tonawanda Coke in

4     December of 2009.  There are a handful -- I have

5     three specific issues that I need to discuss with

6     Mr. Mango about that.  I think they're all -- the

7     issues I have I think are resolvable.  I don't know

8     whether Mr. Linsin and Miss Grasso have an issue

9     with the stipulation.  But I want you to know that

10    too.  I think the ones we have we can work out.

11            MR. LINSIN:  My concern about the

12    stipulation -- and we have tried to discuss this

13    with government counsel, your Honor, and we don't

14    seem to be communicating on the same wave length on

15    this issue.  The stipulation itself covers dozens

16    of different documents.  For most of the documents

17    we do not have a genuine issue regarding the

18    foundational question of whether these are business

19    records.  But it gets into -- there are significant

20    questions about the relevance of many of these

21    documents.  And what I am hoping to avoid is the

22    situation where we have a witness on the stand and

23    we are going back and forth and back and forth

24    about the relevancy of dozens of documents, one

25    after the other.  And that -- our discussions have

1    not been productive on that basis.  And we have

2    tried to winnow this down to focus on documents

3    that -- where there isn't an issue with relevancy,

4    but government counsel just doesn't seem prepared

5    to approach it that way.  So, it is a frustrating

6    challenge given that the witness is now about to

7    take the stand, but we have concerns about the

8    manner in which the government seems to intend to

9    proceed.

10            THE COURT:  Well, I mean  --

11            MR. MANGO:  Your Honor, I'm -- we've been

12   attempting for a couple days now to try to reach a

13   stipulation on this.  And I've been open to various

14   alternatives in drafting the stipulation.  It's

15   gone through a couple iterations already.

16       There is some question as to relevance that I

17   understand.  The stipulation reserves the right to

18   object on relevance grounds.  If the Court wants to

19   do -- wants to hear relevance issues ahead of time,

20   I'm willing to do that.  I haven't said I'm opposed

21   to that, that I just need to throw the witness on

22   the stand.  I'm willing to do what the Court wants

23   to do.  There's certain records that were seized

24   during the search warrant that the government

25   believes are clearly relevant to the issues in this

1   case.

2           THE COURT:  What counts?

3           MR. MANGO:  Counts 1 -- some of the

4   records relate to all of the counts.  Some of the

5   records relate to Counts 1 through 5, which are

6   specifically these bleeder charts, which we've been

7   talking about.

8           THE COURT:  Okay.

9           MR. MANGO:  And then there's another stack

10  of bleeder charts there.  There is a folder --

11  there's a folder seized from Defendant Kamholz's

12  office which says on the tab "EPA 114, 9/8/09, "

13  which, if you remember, EPA had sent a request for

14  information letter, a 114 request, and Mr. Kamholz

15  had responded.  We went through those responses.  I

16  don't know if you want me to do this now, your

17  Honor, or at least go through it quicker.  There is

18  a folder --

19          THE COURT:  Give me a bird's-eye on it,

20  please.

21          MR. MANGO:  There is a folder with 114

22  information, handwritten notes of Mr. Kamholz and

23  items in there.  There's a folder seized from

24  Mr. Kamholz's office that has notes and documents

25  regarding the April EPA inspection, specifically

 1    his notes, which I think are relevant, on the

 2    21st of April.  Your Honor, there is a folder that

 3    was seized from Mr. Kamholz's office which says at

 4    the top, "Clean Air Coalition Citizens Enviro

 5    Coalition," which include articles dating back

 6    to 2005 that talk about benzene in the air.

 7             THE COURT:  So you're going to be going

 8    into the contents, assuming that the seized folders

 9    and documents are relevant?

10             MR. MANGO:  Yes, your Honor.

11             THE COURT:  All right.  And through only

12    one witness, is that what we're talking about?

13             MR. MANGO:  Yes, your Honor.  In terms of

14    trying to consolidate and eliminate additional

15    witnesses, I believe there's been at least a

16    partial agreement that we can do this through

17    Mr. O'Connor.  That we don't need to call the

18    witnesses who actually seized these records, and

19    fly them in from around the country, because that

20    would be a waste of resources.

21        Your Honor, there's another document --

22             THE COURT:  O'Connor is a DEC employee,

23    right?

24             MR. MANGO:  Who was present during the

25    search warrant, yes, and is in Buffalo.  The final

1   document which I do believe is the main point of

2   issue with the defense is during the search warrant

3   there was various business plans seized for the

4   Tonawanda Coke Corporation.  This business plan

5   that we intend to put into evidence, it's

6   identified as Government Exhibit 120.  It's for the

7   fiscal year ending June 30th, 2009.  In that

8   business plan there's specific discussion about --

9   in the market analysis under weaknesses,

10  "significant environmental pressures include

11  ongoing compliance with local, state, and federal

12  emissions regulations".  In the section regarding

13  risks, there is a section about environmental risks

14  and number three says "Economic.  Compliance with

15  environmental mandates often involves substantial

16  capital expenditure."

17          THE COURT:  Which is part of what you

18  referenced in your opening statement, the

19  economics.

20          MR. MANGO:  Yes, and was referenced in

21  defense's opening when they said money isn't an

22  issue here.  That's the issues with the records

23  from the search warrant.

24          THE COURT:  All right.  That's essentially

25  it, Mr. Linsin?

1          MR. LINSIN:  It's not about bleeder

2    charts, your Honor, that's for sure.  The business

3    plan that Mr. Mango references, the problem with a

4    document like that, your Honor, is that having a

5    document taken out of context from a company

6    without any foundation as to the purposes for which

7    it was developed, the audience for which it was

8    intended, the comprehensiveness with which it

9    represents the company's position about anything,

10   and then for the government -- without any

11   foundation at all, for the government to then

12   characterize this document as representing the

13   company's overall attitude about any one issue we

14   believe is -- is a distortion, is unfair.  It is

15   leveraging a document that they happen to like and

16   suggesting, ah-ha, this characterizes the company's

17   entire approach to environmental regulation.  And

18   that, your Honor, I believe is putting far too much

19   weight on the fact that a particular document

20   happened to be seized from the company.  Selected

21   documents were taken.  And it is the contextual

22   issue that is lacking here.

23          THE COURT:  Well -- but that -- I mean,

24   that's typical, right?  I mean, that is something

25   that you can question the witness about.  If you

1    choose to put on a defense, you can have

2    information made available on the defense with

3    respect to the -- the plan and provide the context

4    if you choose to do that for that plan document,

5    the notebook document.  I mean, I don't know if

6    it's that unusual.  The document, there's no issue,

7    it was seized, right?  It states what Mr. Mango

8    says it states?

9               MR. LINSIN:  That is correct, your Honor.

10              THE COURT:  Okay.  Well, all right.  Well,

11   it's helpful for me to get the overlay on that.

12              MR. MANGO:  Your Honor, one issue to

13   follow up, just so the Court is aware, one of the

14   defense witnesses, if they choose to put on a case,

15   I believe is the author of these business plans,

16   Mr. Bloom, who would have authored this.  So there

17   is very much a chance for the defense to put this

18   into context if that's what they want to do.

19              MR. LINSIN:  Your Honor, if I may, one of

20   the other folders that Mr. Mango referenced though

21   concerns -- contains news articles and a number of

22   other records that we believe are -- are entirely

23   irrelevant.  And I didn't hear any connection in

24   the comments Mr. Mango made about any relevance of

25   some collection of news articles.

1          There has been great care taken to ensure that

2     news accounts and Clean Air Coalition activities be

3     kept out of this case.  And now the government is

4     seeking to, through a folder it happened to have

5     found, to get all of this in front of the jury.

6     And that, I believe, is clearly improper.

7                MR. MANGO:  Your Honor, the items that we

8     were going to put into evidence, if allowed and

9     permitted by the Court, there are certain news

10    articles in here that do not discuss specific

11    results.  And according with the Court's earlier

12    rulings, we were going to stay consistent with

13    that.  There's one article in particular that just

14    says that there's now an air quality concern in

15    Tonawanda in 2005.  It was a Tonawanda News

16    article.

17         It's very important.  This was in Mr. Kamholz's

18    office in a folder.  And this goes back to

19    Mr. Carlacci's testimony which was allowed to come

20    in, which is why he even went there in '08, because

21    there's this benzene issue.  It goes to knowledge,

22    motive, and intent.  And we'll take very, very

23    great care in making sure that any of the news

24    articles in here that we do offer for evidence do

25    not contain any analytical results.

1          THE COURT:  Is that folder marked Mark

2     Kamholz?

3          MR. MANGO:  It came from his office, and

4     the tab says "Clean Air Coalition, Citizens Enviro

5     Coalition," and that was one of the folders in his

6     office.

7          THE COURT:  Okay.  I mean, your argument

8     is that it's relevant on the issue of knowledge at

9     the very least?

10          MR. MANGO:  Yes, your Honor.

11          THE COURT:  Okay.

12          MR. PERSONIUS:  Judge, if I could be heard

13     on that too, because it affects Mr. Kamholz.

14          THE COURT:  Yes.

15          MR. PERSONIUS:  As Mr. Mango has

16     indicated, we've had not just Mr. Carlacci, we've

17     had several witnesses testify about Mr. Kamholz's

18     being informed about the concerns in that area with

19     benzene emissions, about the visits, or at least

20     two visits the DEC had to speak with Mr. Kamholz

21     about that.  August of 2007 and May of 2008 come to

22     mind.

23        So, this folder on that point is cumulative.

24     You've already got the evidence in.  On the other

25     hand, it runs the risk of prejudice, because you're

1    dealing with news articles, you're dealing with

2    this Clean Air Act Coalition, which Mr. Linsin

3    indicates we've been trying to keep out of the

4    case.

5         I'd like to suggest, Judge, you might get to a

6    balancing issue here, and because you've already

7    got that evidence in, and I don't think that's been

8    contested, that he was informed of that, I think

9    that should clearly be -- be kept out.

10             THE COURT:  Why isn't it cumulative

11   evidence?

12             MR. MANGO:  Yes, your Honor.  Thank you

13   for asking that question.  That's why I was going

14   to stand up.  This is a very different form of this

15   evidence.  Now the evidence that we have is that

16   DEC was concerned and made an approach to Defendant

17   Kamholz to tell him, "Hey, there's benzene in the

18   air.  We're going to be looking at this, you know,

19   what's going on?"

20        It's a very different story when the evidence

21   is coming from his own hand, that he's printed news

22   articles out, or saved these news articles in a

23   folder.  It shows a different level of awareness

24   than just being told by the DEC that there's

25   benzene in the air.  It's his own -- you know, and

1    this is well before DEC even showed up and told him

2    that we were doing this.  This article is

3    from 2005.  There's no testimony that -- that he

4    was told by the DEC starting in 2005 that there was

5    an air quality issue.  It was only in -- I believe

6    it was '08 when the funds were approved for this

7    air monitoring study.

8        So my -- my argument, your Honor, on cumulative

9    is, one, it is not cumulative because it actually

10   moves the time period earlier in terms of

11   knowledge, and it is a very different form of

12   notice and knowledge.

13          THE COURT:  Okay.  Okay.  Now that's

14   helpful.  I don't think we need more discussion.

15   We'll see how it unfolds as we go through the

16   testimony.  Who's going to be your first witness?

17          MR. PIAGGIONE:  It's going to be

18   Mr. Snyder, your Honor.  Ron Snyder.

19          THE COURT:  And he's the former plant

20   manager that we talked about?

21          MR. PIAGGIONE:  That's correct.

22          THE COURT:  So we have a -- I don't know

23   if this was a good start to the day or not, but

24   there's certainly a number of issues that surfaced

25   today.  All right.  We will continue to monitor the

1      online accounts, news accounts, to see if there is

2      anything that is published with respect to the

3      Cahill matter that we talked about earlier.  So,

4      you know, I'll keep you updated on that.

5          Okay.  Well, I think we're probably at the

6      point where we should try to begin, and then we'll

7      see where we wind up it.  It seems like an

8      ambitious day, frankly, to try to get four

9      witnesses in.  But, you know, we'll do what we can.

10             MR. LINSIN:  And, your Honor, I don't mean

11     to prolong this at all, but I do want to echo the

12     concerns that Mr. Personius mentioned about the

13     summary charts.  This is not a matter of ten

14     minutes to review something.  This is -- these are

15     significant issues, and I -- we'll do what we can,

16     but we just literally received them overnight.

17             THE COURT:  All right.  I'm not going to

18     push for you to give time that you're not

19     comfortable with in terms of getting to the

20     testimony.  I'd rather have you secure in your

21     decision on whether or not there's an objection to

22     the summary charts or not.  I mean, that's --

23     that's always a problem.  It's always an issue with

24     summary charts.  And in order to eliminate issues

25     that are almost certain to arise, if you don't have

1    sufficient time to look at them -- I mean, I'll

2    give you whatever time you need.  And we want to

3    make sure there's a fact basis for everything

4    that's contained in whatever the summary

5    accounts -- and I don't know what they are, but --

6    so, you know, we've noted it.  You'll have whatever

7    time you need.  You know, we don't have to --

8    there's not a time urgency, I don't think, with

9    getting everybody on today.  If everybody's

10   comfortable, we'll try it.  But otherwise, you

11   know, if we extend it to Monday, so be it.

12        Okay.  That's pretty much it then.  Nothing

13   else?

14             MR. PIAGGIONE:  No, your Honor.

15             MR. LINSIN:  Thank you very much, your

16   Honor.

17             MR. PERSONIUS:  Judge, the only I thing

18   I'd add is, whether it will be the end of the day

19   today, or whether it will be Monday will depend on

20   where we're at.  But the defense will have a

21   written submission for you on the Rule 29.

22             THE COURT:  Yeah.  We're going to have to

23   discuss that too at the appropriate time.  I want

24   to give you some time -- I think that's what we had

25   talked about -- to argue your motion.  You know, I

1    think you had indicated you were planning something

2    by way of submission in terms of guidance with

3    respect to your positions on the Rule 29,

4    Mr. Personius.  And maybe not from Mr. Linsin, but

5    we'll see.

6           MR. LINSIN:  It will be a joint

7    submission, your Honor.

8           THE COURT:  Oh, okay.

9           MR. PERSONIUS:  In interest of full

10    disclosure, it's thanks to Mr. Glasner.

11           THE COURT:  I noticed a few extra bags

12    under his eyes.  I figured he was probably working

13    on that.

14           THE COURT:  Okay.  All right.  We can talk

15    about a timetable on getting the submission once

16    we -- you're comfortable with giving it to me.  And

17    I don't know if the government's going to have a

18    response in writing, but we'll see.

19           MR. MANGO:  We'll see, your Honor.  We'll

20    try.

21           THE COURT:  It's always a safe statement,

22    right, Mr. Mango, we'll see.  Okay.

23      Mr. Moeller, what do you think?

24           LAW CLERK:  I have no comment.

25           THE COURT:  All right.  Okay.  Chris,

1    let's get the jury in I think.

2        Michelle, you're ready?

3            (Jury seated.)

4            THE COURT:  Good morning.  Have a seat.

5    What's with all this green?

6            THE JURY:  To match your tie.

7            THE COURT:  Thank you.  We just had a

8    little discussion about that earlier.  Good to see

9    everybody.  You can tell we're all ready and about

10   to start for the day.  But I thought I would be

11   remiss -- a couple of -- I thought we'd start a

12   little earlier, but we've been working hard at

13   this, so, I thought it would be appropriate to just

14   go over a couple of things, what's today?

15           A JUROR:  Friday.

16           A JUROR:  Ides of March 15th.

17           THE COURT:  How about the Ides of March?

18           A JUROR:  He said that.

19           THE COURT:  All right.  And, of course, we

20   know for the most part -- and, you know, there is a

21   a few things associated with the Ides that we

22   probably should talk about before we start the

23   trial.

24       Because you know that back in the early Roman

25   days, right, the month of March was the first month

1    of the Roman New Year, and the first full moon of

2    the Roman New Year was Usually what date?

3    March 15th.  All right.  This month of March is an

4    amazing month that we're experiencing together,

5    right?  Okay.

6        So you're going to look up in the sky tonight,

7    right?  You've got a lot of things on your mind,

8    but you're going to check out and see if we have a

9    full moon.  Who was assassinated?

10               A JUROR:  Julius Cesar.

11               THE COURT:  Yeah, there you go.  Not bad.

12   But here's something else.  This month of March is

13   amazing.  Now just think what you're going to be

14   experiencing.  Once in every 823 years the month of

15   March there are -- and I love this statistic, and

16   you can check your calendars -- five Fridays and

17   five Saturdays and five Sundays this year.  All

18   right.  So who thinks they're going to be around in

19   823 years to see the next one?  All right.  So,

20   historic, right?  We've got a lot that we're

21   experiencing together.

22       I have one sad thing to report.  And usually

23   this day is a special day to Mary, because it's --

24   it's her favorite holiday of the year, all right,

25   March 15th because every year the buzzards return

1    to Hinkley, Ohio, all right, en mass.  Thousands

2    buzzards go back to Hinkley, Ohio, on March 15th.

3    It's sort of like Ground Hog Day, only it relates

4    to buzzards.  So she loves to be off on that day.

5    Mary sometimes migrates with the buzzards.  Not

6    always, but when we have trials she has to stay

7    here.

8        But buzzards are her favorite bird, because,

9    you know, she knows that their digestive system

10   kills bacteria, and she thinks that's important.

11   And those buzzards don't carry any diseases

12   whatsoever.  So, there's a lot to be said, I think,

13   about those birds.  And Mary can relate to

14   buzzards.  It's very, very important to her.

15       So, you know, in honor of Mary, we're going to

16   dedicate the day to her holiday.  We're going to

17   try to get a lot accomplished today.  We want to

18   thank you for your attention.  That's our segue

19   into, you know, historically March, in our

20   experience together, very important.  But this

21   case, as you know, is important to both sides.

22       We've got a lot to do today.  You've been

23   terrific, absolutely terrific.  And we've got a

24   number of witnesses we have to get to.  Please keep

25   your minds open.  And you know what your burden is,

1    it's to decide unanimously -- and you're going to

2    be the only ones that know as much about this case

3    anywhere, anytime, anyplace with respect to putting

4    it in the perspective of proof beyond a reasonable

5    doubt.  Did the government meet its burden or not?

6    And you're working with that sacred presumption of

7    innocence that attaches to both defendants in this

8    case.

9        So, we've got a lot to do.  You've been great.

10   We have been moving through this case.  Please

11   don't discuss this case.  Please stay away from any

12   media accounts that in any way relate to the

13   subject matter or this case in particular, because

14   that would be unfair.  Everything you're going to

15   need to apply your common sense, your experience,

16   your intelligence to get to the point where you

17   render that unanimous verdict.  And what does that

18   require?  That requires that you resolve all of the

19   fact issues that are necessary with respect to the

20   19 counts in this particular indictment.  Okay.

21       So are you ready?  Okay.  And this still is the

22   government's case.

23       Mr. Piaggione, I know you're ready, so bring on

24   your first witness for us, please.

25           MR. PIAGGIONE:  Thank you, your Honor.

1    The government would call Ron Snyder, please.

2              THE COURT:  All right.  Mr. Snyder, if you

3    would approach the witness stand, please, and I'll

4    tell you when to stop, and it's right there.  If

5    you would do a little rotation, face the jury,

6    please.

7    R O N A L D   S N Y D E R, having been duly sworn as

8    a witness, testified as follows:

9              THE COURT:  All right.  Good morning, sir.

10             THE WITNESS:  Good morning.

11             THE COURT:  How are you doing?

12             THE WITNESS:  Good.

13             THE COURT:  All right.  Got a couple of

14   preliminary instructions for you.  Just in that

15   exchange it sounds like you're going to carry okay

16   on the microphone.  It's friendly.  You have to

17   just speak at it in a conversational tone, and then

18   it generally works.  I do ask you to face the jury,

19   comfortably, because you are here to testify for

20   their benefit.

21             THE WITNESS:  Right.

22             THE COURT:  Key to this is that you not

23   answer any questions you don't understand.  If you

24   don't understand the question, let the attorneys or

25   me know, if you don't understand.  When you do get

2692

1    a question that you understand and you answer it,

2    please be as concise as you possibly can.  If you

3    can possibly answer it yes or no, if that's what

4    the question calls for, please do that.  Don't

5    volunteer information.

6         If there's an objection, and there are likely

7    to be some, wait until I rule on the objection, and

8    then I'll give you the instruction continue with

9    your answer, wait for another question, or

10   something along those lines for you to follow.

11   Fair enough?

12              THE WITNESS:  Very good.

13              THE COURT:  Okay.  Please, so that we know

14   for sure how you're going to sound over the

15   microphone system, please state your full name and

16   spell your last name, please.

17              THE WITNESS:  Ronald Snyder, S-N-Y-D-E-R.

18              THE COURT:  Okay.  Mr. Piaggione, if you

19   spell your last name and then begin.

20              MR. PIAGGIONE:  P-I-A-G-G-I-O-N-E.  But

21   for today it starts with M-C.

22              THE COURT:  Go ahead, please.

23   DIRECT EXAMINATION BY MR. PIAGGIONE:

24   Q.  Mr. Snyder, was there a time that you were

25   employed by the Tonawanda Coke Corporation?

2693

1    A.   Yes.

2    Q.   And when was that?

3    A.   I started 1978 and worked till 1980.  I left in

4    1980, came back in 1983, and worked till the fall

5    of 2005.

6    Q.   Okay.  And can you tell the jury what were your

7    duties after you returned from that one absence?

8    A.   I came back in 1983 as a door machine operator

9    on the ovens.  I did that for two years.  And in

10   1985 I was made a general foreman on the battery.

11   I did that job for five years.  1990 I was made a

12   coal handling supervisor, held that position for 13

13   years, and then I was made plant superintendent

14   in 2003, and held that position until the fall

15   of 2005.

16   Q.   Okay.  Now, in the course of your duties as a

17   coal handling --

18   A.   Coal handling supervisor.

19   Q.   -- supervisor, right, did you work in the coal

20   fields?

21   A.   Yes.

22   Q.   And when you were working at Tonawanda Coke --

23   were you working at Tonawanda Coke when the pad was

24   installed in the coal fields?

25   A.   Yes.

1    Q.  Do you know approximately when that pad was

2    installed?

3    A.  1995.

4         MR. PIAGGIONE:  Okay.  Your Honor, I'd

5    like to use Government's Exhibit 3.02, which is in

6    evidence.

7         THE COURT:  Okay.

8         THE WITNESS:  That is it.

9    BY MR. PIAGGIONE:

10   Q.  Okay.

11   A.  That is the concrete pad.

12   Q.  Okay.  Wait for a question, please.

13   A.  Yes, sir.  I'm sorry.

14   Q.  Can you recognize that photograph?

15   A.  Yes.

16   Q.  Okay.  And what is that?

17   A.  That is the concrete pad and the ramp leading

18   to the pug mill.

19   Q.  Okay.  And the pug mill -- can you just touch

20   the screen where the pug mill is located?

21   A.  Right here.

22   Q.  Okay.  And do you know when that machine was

23   installed?

24   A.  It was approximately two years after the

25   concrete pad was finished.

1    Q.   Okay.  And in the course of your duties as a

2    coal field operator, coal --

3    A.   Coal handling supervisor.

4    Q.   Correct.  In the course of your duties there,

5    did you ever operate that machine?

6    A.   Yes, I did.

7    Q.   Okay.  Approximately what time frame was it

8    that you operated that machine?

9    A.   After it was installed, over the course of the

10   next two or three years at various times we ran

11   that.

12   Q.   Okay.  And can you describe what that machine

13   did exactly?

14   A.   Well, in theory we were going to mix up

15   product, coal and tar slurry, tar sludge, and it

16   was going to be placed in the hopper.  It would go

17   down the hopper on to a conveyor belt, and at the

18   end of the conveyor belt was a series of cutting

19   blades or mixing blades that would blend this

20   together and drop it down on a conveyor belt.

21   Q.   Okay.  So this machine would basically prepare

22   the coal tar sludge for introduction into the --

23   into the ovens?

24   A.   Yes.

25   Q.   Okay.  And did that process involve the coal

1    tar sludge hitting the ground at all?

2    A.   Yes.  At times if the machine malfunctioned,

3    there were problems with it, there was spillage.

4    Q.   But when it was operating properly, did

5    materials hit the ground?

6    A.   Yes.

7    Q.   Okay.  How did it hit the ground then?

8    A.   There was leakage through the conveyor belts,

9    and if the conveyor belt that it was feeding

10   stopped and the pug mill kept running, then you got

11   a big pile, and there was always spillage.

12   Q.   Okay.  And do you know how long that machine

13   attempted to continue to operate?

14   A.   I ran it with other laborers and other

15   personnel for -- over the various times for two or

16   three years, and then finally we just stopped using

17   it.  It wasn't working.

18   Q.   Okay.  Now, in the course of your duties

19   in 2005 as a plant superintendent, was it?

20   A.   Yes.

21   Q.   Were you in the coal fields at that time?

22   A.   Yes.

23   Q.   Okay.  And were you ever there in the coal

24   fields when it rained?

25   A.   Yes.

1    Q.   Okay.  What did you observe when it rained in

2    the coal fields, if anything?

3    A.   Well, the way the coal field is set up, there's

4    a conveyor belt that runs down the center of the

5    entire coal field.  That's the highest part of the

6    elevation of the field.  And then on each side of

7    the conveyor belt, the coal field slants and drops

8    off and slopes off.  And when it rained or we had

9    heavy snow melt, the water would run off to the

10   sides of the coal field and go into ditches.

11   Q.   Okay.  And what would happen -- you said there

12   were ditches.  Were those ditches there by accident

13   or by design?

14   A.   They were -- they were -- we put them in.  I

15   mean, we had to get rid of the water in the coal

16   field.  The field would become unmanageable because

17   of the amount of water.  The ground would turn into

18   a very big, heavy slurry.  So to make the field

19   manageable for vehicles and such to drive through,

20   we had to get rid of the water.

21   Q.   Where would the water go?

22   A.   There was a ditch on each side of the coal

23   field.  The water in it would run typically from

24   east to west towards the west end of the plant.

25   The two ditches eventually came together, went

2698

1    underneath a roadway.  From there I have no idea

2    where it went.

3    Q.  Okay.  Now, did these ditches ever become

4    blocked in any way?

5    A.  Yes.  There was so much slurry from the coal

6    fines that the water would stop running.  And also

7    there was pipes underneath.  We had 12- or 15-inch

8    pipes that we ran underneath the access roads to

9    the coal field to allow the water to drain and

10   continue towards the west end of the plant.

11   Q.  Okay.  Now, can you describe the water that you

12   saw in the ditches?

13   A.  Well, it was -- it was always black.  The water

14   was always black from -- from the rain or the snow

15   melt from running through the coal, and there was

16   also obvious petroleum deposits, rainbow colored,

17   bluish color tint to it.

18   Q.  Okay.  Now, can you please describe the

19   circumstances under which you left employment with

20   Tonawanda Coke?

21   A.  In August or September I was called to the

22   front office and told I was being demoted and sent

23   back to the coal handling department, and that

24   would happen the very next day.

25   Q.  Okay.  And as a result of that you resigned?

1    A.   Yes.   Not at that moment.   I made up a

2    two-week -- letter of resignation, and gave

3    two-week notice, and after that I was gone.

4    Q.   And are you bitter about that -- circumstances

5    under which you left?

6    A.   I am.   I mean, at the time I was 48 years old

7    and I had 24 years invested, and to not be given a

8    specific reason for the demotion, to me, was very

9    troubling.

10   Q.   But does that affect your testimony today?

11   A.   Not at all.

12        MR. PIAGGIONE:   I have no further

13   questions, your Honor.

14        THE COURT:   Okay, Mr. Piaggione, thank

15   you.

16        MR. PERSONIUS:   Your Honor, if it's okay

17   with you, may I go first?

18        THE COURT:   Certainly.

19        MR. PERSONIUS:   Thank you, Judge.

20   CROSS-EXAMINATION BY MR. PERSONIUS:

21   Q.   Good morning, Mr. Snyder.

22   A.   Good morning.

23   Q.   My name is Rod Personius, and I represent Mark

24   Kamholz.   You know who Mark is, right?

25   A.   Yes.

1    Q.   Okay.   During -- if I understand correctly,

2    after you left Tonawanda Coke -- and, again, what

3    year was that?

4    A.   2005.

5    Q.   All right.   There came a time several years

6    later where you engaged in conversations with

7    different DEC personnel?

8    A.   Yes.

9    Q.   And that led to conversations also with

10   personnel from the EPA?

11   A.   Yes.

12   Q.   And the U.S. Attorney's office?

13   A.   Yes.

14   Q.   Okay.   And in preparing to testify here today,

15   have you reviewed any -- any documents?

16   A.   Yes.

17   Q.   Okay.   What -- what did you review, please?

18   A.   I've seen pictures, and I've seen transcripts

19   of other people's accounts of things that were

20   going on at Tonawanda Coke.

21   Q.   These transcripts that you saw, are you talking

22   about grand jury transcripts?

23   A.   No.

24   Q.   Okay.   What were these -- when you say

25   "transcripts," can you be a little more specific

1   what you're referring to?

2   A.   They were summaries of reports that -- I don't

3   know where they came from.  Rocky had given me a

4   copy along with Aaron, and they were just what

5   other people have stated about things that have

6   happened.

7   Q.   Okay.  And so in testifying here, you had the

8   benefit -- would these be agent reports of

9   interview, would that be a way to describe those,

10   that summarized an interview of an employee?

11   A.   I can't tell you exactly.  I don't know.

12   Q.   All right.  Do you remember the -- the

13   employees whose interviews you reviewed?

14   A.   No, I don't.

15   Q.   You don't remember the names of any of them?

16   A.   No, I don't.

17   Q.   Do you remember how many of these summaries you

18   reviewed?

19   A.   I believe there was two sets of documents on

20   each page.  There was probably, two, three pages

21   for each document.

22   Q.   I see.  Okay.  And how many -- roughly how many

23   of these documents then were there, these two- or

24   three-page documents?

25   A.   Just two.

2702

1    Q.   Just two?

2    A.   Yes.

3    Q.   Okay.  Did they summarize the statements given

4    by a variety, then, of different witnesses?

5    A.   Yeah, there was several different people

6    mentioned in the -- in the accounts.

7    Q.   All right.  And that was given to you to help

8    prepare you to testify here?

9    A.   I don't know why it was given to me.  I may

10   have asked for some specific information.  I don't

11   know why.

12   Q.   Okay.  But before you came to testify, you

13   reviewed these summaries?

14   A.   Yes.

15   Q.   All right.  And in addition to that, did you

16   review any agent reports of interviews of you?

17   A.   No.

18   Q.   Just these reports of the interviews of other

19   people?

20   A.   Right.

21        MR. PERSONIUS:  Your Honor, I don't think

22   we've seen that, and at some point I think we

23   should probably have a chance to look at that.

24        THE COURT:  Okay.  Do you want to proceed

25   now, or do you want to find out what there was from

1    Mr. Mango or Mr. Piaggione?

2              MR. PERSONIUS:  I'll do it any way you

3    want to.  If you want me to continue for now, I

4    can.

5              THE COURT:  Yeah.  I think you should, and

6    then when you're at a point where you want to

7    break, we'll have you, out of the presence of the

8    jury, just kind of work it out with government

9    attorneys.

10             MR. PIAGGIONE:  Your Honor, we only showed

11   Mr. Snyder his own statements.

12             THE COURT:  All right.  Why don't you talk

13   with the government attorneys now, okay?

14             (Discussion off the record.)

15             MR. PERSONIUS:  I think I can deal with

16   it, Judge.

17             THE COURT:  All right, good.  Thank you.

18             MR. PERSONIUS:  Thank you, Rocky.

19   BY MR. PERSONIUS:

20   Q.  For identification -- what we're going to try

21   to do is show you what we understand you looked at

22   and have you look at it, Mr. Snyder, and let us

23   know if this is what you reviewed.

24   A.  Okay.

25   Q.  This is for identification.  Lauren, would you

2704

1    please put up so that Mr. Snyder can look at

2    Government Exhibit 3561.01.

3        Do you see on your screen, Mr. Snyder, that you

4    have a document, in the upper right has a yellow

5    sticker that says 3561.01?

6    A.  Yes, I do.

7    Q.  All right.  Lauren, could you make the content

8    a little bigger?  Thank you.

9        Just take a quick look at that, Mr. Snyder.

10   Let us know if this is one of the statements you

11   looked at.

12   A.  Yes, it is.

13   Q.  Okay.  And there is another page to it, just so

14   you know.  It's a two-page document.  So you've

15   reviewed this document, right?

16   A.  Yes, I did.

17   Q.  And do you see that this is identified as a

18   report of an interview of you on November 9

19   of 2009?

20   A.  That's correct.

21   Q.  All right.  And this is one of the documents

22   that you reviewed?

23   A.  Yes.

24   Q.  All right.  And did you satisfy yourself when

25   you reviewed it as to the accuracy of what was

1    reported in this document?

2    A.   Yes.

3    Q.   And did you satisfy yourself it was accurate?

4    A.   Yes.

5    Q.   Okay.  Thank you.  Again for identification,

6    Lauren, could you please put up for Mr. Snyder to

7    review exhibit -- Government Exhibit 3561.02.

8    Again, that's for identification.

9        And again, Mr. Snyder, in the upper right you

10   see the yellow sticker, sir?

11   A.   Yes.

12   Q.   And it says 3561.02?

13   A.   Yes.

14   Q.   Lauren, could you make that bigger?  Thank you.

15       Just take a quick look at that, Mr. Snyder.

16   There is a second page to that one also.

17       Would you show him the second page too, please,

18   Lauren?

19       Is this document familiar to you, Mr. Snyder?

20   A.   Yes, it is.

21   Q.   Okay.  Is this another document you reviewed

22   before testifying?

23   A.   Yes.

24   Q.   All right.  So it's identified -- this

25   indicates it's an interview report from

1    March 22, 2010, and it was an interview of you?

2    A.  Yes.

3    Q.  All right.  And again, did you review the

4    document and satisfy yourself that what was

5    reported in this document was accurate as to what

6    you had told the investigators?

7    A.  Yes.

8    Q.  Would you put up, Lauren, for identification,

9    please, Government Exhibit 3561.03?

10       And again, Mr. Snyder, in the upper right do

11   you see the yellow sticker that says 3561.03?

12   A.  Yes, I do.

13   Q.  We're going make it a little bigger for you.

14   Just take a quick look at this document, please.

15       This is several pages and, Lauren, if you can

16   show Mr. Snyder all pages, please.

17   A.  Can I read it?

18   Q.  Yes, I'm sorry.  You want to see the first page

19   again?

20   A.  Yeah, I'd like to read it.

21   Q.  Okay.  Sorry.

22   A.  Okay.

23   Q.  Would you like to see the rest of the exhibit?

24   A.  Yes, I would.

25   Q.  Second page please, Lauren.

1          Lauren will make it a little bigger for you,

2     Mr. Snyder.

3     A.   Okay.

4     Q.   Was that the last page?

5     A.   Yes.

6     Q.   Do you remember this document?

7              THE COURT:  This is the last page here?

8              MR. PERSONIUS:  Yes.  Thank you, Judge.

9              THE WITNESS:  Very good.

10    BY MR. PERSONIUS:

11    Q.   Okay.  It's a three-page document?

12    A.   Yes.

13    Q.   Okay.  And is this familiar to you?

14    A.   Yes.

15    Q.   Did you review this document also before coming

16    here to testify?

17    A.   I don't know if I reviewed it before coming

18    here, but I have seen it before.

19    Q.   All right.  Just so we briefly identified it,

20    this is not a report.  This is two different

21    emails?

22    A.   Yes.

23    Q.   And one -- if I understand it correctly, one

24    was prepared by you?

25    A.   Yes.

1    Q.   Okay.  All right.  And then just for

2    identification again, Lauren, please put up

3    Government Exhibit 3561.04.

4        Do you see the sticker in the upper right,

5    Mr. Snyder?

6    A.   Yes, I do.

7    Q.   It indicates this is Exhibit 3561.04?

8    A.   Yes.

9    Q.   Would you make it larger, please, Lauren?

10       And again, just if you take a look at that,

11   Mr. Snyder, and satisfy yourself as to whether

12   you're familiar with it.

13   A.   I have not seen this before.

14   Q.   Okay.  Just so we've, in a sense, identified

15   what this exhibit is, it's handwritten notes,

16   right?

17   A.   Yes.

18   Q.   You did not see this?

19   A.   No.

20   Q.   All right.  So --

21             THE COURT:  Is there another page?

22             MR. PERSONIUS:  Yes, there is, Judge.

23             THE COURT:  Show that one as well.

24   BY MR. PERSONIUS:

25   Q.   Okay.  That's page two you're looking at now,

1    right?

2    A.   I can't read it, it's too small.

3    Q.   We'll make it bigger.

4         Mr. Snyder, have you seen this before?

5    A.   I have not seen this before.

6    Q.   Could you go just to the third page, Lauren,

7    please?

8         All we're asking, Mr. Snyder, is to let us know

9    if you've seen this before.  You don't need to

10   review it if you haven't seen it.  Probably best if

11   you don't review it if you haven't seen it.

12        Have you seen this page before?

13   A.   I have not seen this before.

14   Q.   All right.  Very good.  So from what I

15   understand then, the first two exhibits you were

16   shown, which were 3561.01 and 3561.02, which are

17   two typed agent reports, those you've seen before?

18   A.   Yes.

19   Q.   And these other two documents you have not?

20   A.   No.  I have not seen the other documents.

21   Q.   And to try to clear up what got us to this

22   point, the two documents you've told us you've seen

23   before, are those the documents you reviewed before

24   testifying?

25   A.   Yes.

2710

1 Q. Did you review anything else?

2 A. No.

3 Q. Okay.  Thank you.  On direct examination do you

4 recall you gave some testimony about a machine that

5 you called a pug mill?

6 A. Yes.

7 Q. It was shown in the photograph with the -- with

8 the pad?

9 A. Yes.

10 Q. All right.  And you described how that

11 operated, that device?

12 A. Yes.

13 Q. And it didn't sound like it operated all that

14 great --

15 A. It did not.

16 Q. -- was that true?  And it was used off and on

17 for about three years?

18 A. Yes.

19 Q. Would it be fair to say it was used a lot less

20 often than more often?

21 A. Yes.

22 Q. Okay.  Used infrequently?

23 A. Yes.

24 Q. Okay.  Thank you.  You started at Tonawanda

25 Coke, I think you said, in 1978?

1     A.   Yes, to my knowledge.

2     Q.   And am I -- so that you were at Tonawanda

3     Coke -- with that little exception that you told us

4     about, you were there for how many years at

5     Tonawanda Coke?

6     A.   Close to 24 years.

7     Q.   All right.  And do you remember when you were

8     interviewed by the agents telling them that you

9     remembered that there's a pressure relief valve in

10    the by-products area?

11    A.   Yes.

12    Q.   And do you remember telling the agents that, to

13    your understanding or based on your observation,

14    that had been there over 30 years?

15    A.   To the best of my knowledge, it was there the

16    whole time I was there.

17    Q.   The whole time you were there.

18    A.   So 30 years would be an exaggeration, yes.

19    Q.   But at least when you started back in '78 it

20    was there?

21    A.   As far as I remember, it was there.

22    Q.   Okay.  You've testified about the concrete pad,

23    you saw a picture of it?

24    A.   Yes.

25    Q.   And am I correct in understanding that what

1     that pad was principally used for was to store

2     incoming or what I might call off-site coal tar

3     sludge coming from Bethlehem Steel or Indianapolis

4     Coke?

5     A.   We didn't have specific knowledge where the

6     product was coming from, but, yes, it was trucked

7     in.

8     Q.   Okay.  And stored on that pad?

9     A.   Yes.

10    Q.   Now, I noticed -- and I don't know that you

11    reviewed this document, but in one of the first

12    times that you spoke with the DEC, which I think

13    would have been in 2008, there was a reference to a

14    gentleman named Paul Borcynski?

15    A.   Yes.

16    Q.   B-O-R-C-Y-N-S-K --

17    A.   I.

18    Q.   -- I?

19    A.   That's correct.

20    Q.   And who is Paul Borcynski?

21    A.   He's one of the members of the coal handling

22    staff.

23    Q.   Okay.  And do you remember mentioning his name

24    to the DEC?

25    A.   I do not.

1    Q.  All right.  And how long has Mr. Borcynski

2    worked at Tonawanda Coke?

3    A.  Since 1978.

4    Q.  And always in coal handling?

5    A.  Yes.

6    Q.  So as a coal handler, what would have been his

7    duties?

8    A.  He ran the car dumper which takes railroad cars

9    and turns them upside down and sends coal into the

10   building, and he also monitors conveyor belts that

11   process coal.

12   Q.  All right.  Now, you were at -- I don't know

13   that you were -- were you at Tonawanda Coke

14   in 2008?

15   A.  No.

16   Q.  You weren't there then.  Okay.

17       Something else that you mentioned I noticed in

18   one of the -- either the reports or the notes, is

19   an organization called -- I call it the

20   A-triple-C-I?

21   A.  Yes.

22   Q.  What does that stand for?

23   A.  I believe it stands for American Coal, Coke,

24   and Chemical Institute.

25   Q.  All right.  And do you know what the ACCCI is?

1    A.   No, I don't.

2    Q.   Do you remember mentioning that to the agents?

3    A.   Yes.

4    Q.   Okay.  And you said they had a --

5              MR. PIAGGIONE:  Your Honor, I'm going to

6    object to this line of questioning.  I'm not quite

7    sure if this has anything to do with the direct

8    testimony.

9              THE COURT:  Yeah.  You're going to connect

10   this up, I take it?

11             MR. PERSONIUS:  It will connect up with a

12   later testimony.  It won't be connected up with

13   this witness, but it will be connected up with

14   later testimony that will be presented, Judge, not

15   with this witness.

16             THE COURT:  All right.

17             MR. PERSONIUS:  But it will be connected

18   up.

19             THE COURT:  Okay.  I'll allow it.

20             MR. PERSONIUS:  Thank you, Judge.  It will

21   be brief, Judge.

22   BY MR. PERSONIUS:

23   Q.   You had mentioned to one of the government

24   people that you talked to that ACCCI had an

25   excellent Web site on coke.

1    Do you remember that?

2    A.   Yes.

3    Q.   But you don't know what the ACCCI is?

4    A.   I don't know what they specifically do.  I

5    understand it's some type of organization, most

6    likely to promote the coal and coke industry.

7    Q.   A national organization?

8    A.   I believe it is.

9    Q.   Okay.  Thank you.

10   While you were working at Tonawanda Coke, you

11   from time to time would have occasion to see the

12   quench towers?

13   A.   Every day.

14   Q.   And --

15        MR. PIAGGIONE:  Again, your Honor, I'm

16   going to object.  This is going beyond the direct.

17        THE COURT:  No.  His employment has been

18   opened up.  Overruled.

19   BY MR. PERSONIUS:

20   Q.   And you were aware that the quench towers did

21   not have baffles?

22   A.   Yes.

23   Q.   All right.  And do you know based on your

24   observations while you worked at Tonawanda Coke for

25   the period you did that from time to time DEC

1    inspectors would come to the plant?

2    A.  Yes.

3    Q.  All right.  And would you see those inspectors

4    at the plant?

5    A.  Typically, I wouldn't see them.  The majority

6    of my time was either on top of the coke ovens or

7    the very top of the coal handling building, so I

8    would not be aware of any specific inspections or

9    anything going on.

10   Q.  Did you ever observe any of the inspectors in

11   the area of the quenching tower?

12          MR. PIAGGIONE:  Objection, your Honor.

13   Again, he said he was not aware of where they were.

14          THE COURT:  No.  He said he was aware that

15   they came from time to time.

16          MR. PIAGGIONE:  Now, he's asking him

17   specifically did he see them someplace.  He's

18   already answered that question.

19          THE COURT:  Okay.  I'll permit it.

20   Overruled.

21   BY MR. PERSONIUS:

22   Q.  It's just the one question.

23       Did you ever observe any of the DEC inspectors

24   in the area of either quench tower?

25   A.  No.

1          MR. PERSONIUS:  Your Honor, may I have a

2      minute, please?

3              THE COURT:  Certainly.

4          MR. PERSONIUS:  Your Honor, thank you.

5      Those are all the questions we have.

6          Thank you, Mr. Snyder.

7              THE WITNESS:  You're welcome.

8              THE COURT:  Okay, Mr. Personius.

9      Mr. Linsin.

10             MR. LINSIN:  Thank you, your Honor.

11     CROSS-EXAMINATION BY MR. LINSIN:

12     Q.  Good morning, Mr. Snyder.

13     A.  Good morning.

14     Q.  I don't believe we've met before.  My name is

15     Greg Linsin.  I represent Tonawanda Coke.

16     A.  Good morning.

17     Q.  Mr. Snyder, you -- is it accurate to say that

18     even though you didn't interact with these DEC

19     regulators when they came out to the plant, you

20     knew some of them by name?

21     A.  No, not -- not when I was employed there.  I

22     never knew anyone by name.

23     Q.  Did you know Mr. Larry Sitzman?

24     A.  No.

25     Q.  Did you ever form any opinions about whether or

1    not the DEC inspectors had actually just overlooked

2    conditions at the plant that you thought to be

3    problematic?

4              MR. PIAGGIONE:  Objection, your Honor.  I

5    don't see the relevance of this testimony.  He's

6    already indicated he didn't know them, and it's way

7    beyond anything we discussed in direct.

8              THE COURT:  Okay.  Mr. Linsin.

9              MR. LINSIN:  Do you recall --

10             THE COURT:  No.  Is this beyond the scope

11   or is it relevant?

12             MR. LINSIN:  I do believe it to be

13   relevant, your Honor, to observations that I

14   understand this witness made while he was employed

15   at Tonawanda Coke and statements he has

16   subsequently made to a private investigator

17   regarding those observations.

18             THE COURT:  So it goes to knowledge to

19   some extent of the witness with respect to what

20   he's already testified to?

21             MR. LINSIN:  Exactly.  Knowledge regarding

22   these DEC inspectors about which there's already

23   been testimony, yes.

24             THE COURT:  Mr. Piaggione?

25             MR. PIAGGIONE:  Yes, your Honor.  He's

1    only testified about what happened in the coal

2    field and with the pad.  He's not testified about

3    anything to do with DEC inspectors dealing with

4    clean air.

5            THE COURT:  Well, you talked about the

6    quench towers too, I think.

7            MR. PIAGGIONE:  Only on cross, your Honor,

8    when you permitted that to be raised.

9            THE COURT:  That opens it up for purposes

10   of additional examination.  So I'll overrule the

11   objection, and he may inquire, and I'll listen to

12   any subsequent objections.

13   BY MR. LINSIN:

14   Q.  Do you recall being interviewed by a private

15   investigator, Mr. Tom Thurston?

16   A.  Yes.

17   Q.  Do you remember talking to Mr. Thurston --

18           MR. PIAGGIONE:  Objection, your Honor,

19   again.  We don't have these reports.  We don't know

20   what he's talking about, and he's asking him about

21   documents which we haven't seen.  He's not

22   indicated any problem with his memory.  This is

23   some sort of out-of-court statement that I don't

24   know what he's talking about.

25           THE COURT:  Mr. Linsin, what are you

1    seeking to do here with --

2         MR. LINSIN:  I'm going -- I intend to ask

3    questions, your Honor, whether this witness

4    expressed certain opinions during those interviews,

5    two separate interviews, regarding these DEC

6    inspectors --

7         THE COURT:  It may go to interest in the

8    outcome of the case, bias, prejudice, and the like?

9         MR. LINSIN:  Exactly.

10        MR. PIAGGIONE:  We're entitled to that

11   report then, your Honor, if they're going to ask

12   him questions about that --

13        THE COURT:  On what basis?

14        MR. PIAGGIONE:  That investigator, first

15   of all, is listed as one of their witnesses.  If

16   he's produced a report, we're entitled to see it.

17   He's going to ask him questions about that report

18   which we have never seen.

19        MR. LINSIN:  I'm simply asking this

20   witness if it is true or not whether he made

21   certain statements, and I certainly have a

22   good-faith basis for asking those questions, your

23   Honor.  I would be happy to share that basis with

24   the Court.  There is no requirement under the rules

25   that I'm aware of that these reports be shared with

1    the government.

2              THE COURT:  As long as your questions are

3    based on a good-faith basis, and, secondly, do not

4    contain information that factually is not accurate.

5    So, I'll permit it, and then we'll go from there.

6              MR. LINSIN:  Thank you, your Honor.

7    BY MR. LINSIN:

8    Q.  Let's back up a little bit then, Mr. Snyder.

9    Do you recall talking to Mr. Tom Thurston on two

10   occasions, one in August of 2010 and one in

11   September of 2010?

12   A.  Yes.

13   Q.  And do you recall talking to Mr. Thurston about

14   your observations and your opinions about the DEC

15   inspectors that came to inspect the Tonawanda Coke

16   facility?

17   A.  Yes.

18   Q.  And do you recall telling Mr. Thurston that it

19   was your observations that DEC inspectors had

20   regularly overlooked conditions that you believed

21   to be problematic?

22              MR. PIAGGIONE:  Objection again, your

23   Honor.  He's asking for his opinion as to

24   observations that were not relevant to what he was

25   testifying about in this case.

1           THE COURT:  No.  Overruled.  You may

2      answer.

3      BY MR. LINSIN:

4      Q.  Do you recall telling Mr. Thurston that?

5      A.  We talked about it, yes.

6      Q.  And did you tell Mr. Thurston that you believed

7      that, in fact, DEC had just dropped the ball in its

8      regulatory oversight of Tonawanda Coke?

9      A.  Yes, I think that's true.

10          MR. LINSIN:  I have nothing further, your

11     Honor.  Thank you.

12          THE COURT:  Okay.  Mr. Piaggione?

13     REDIRECT EXAMINATION BY MR. PIAGGIONE:

14     Q.  During your course of employment at Tonawanda

15     Coke, were you ever working -- did you ever work in

16     the by-products area?

17     A.  Yes.

18     Q.  Okay.  And did you see the bleeder valve go

19     off?

20     A.  Yes.

21     Q.  Okay.  How often did you see it go off?

22     A.  Every 20 minutes.

23     Q.  Okay.  Was that true in 2005?

24     A.  Yes.

25     Q.  Okay.  Was it a practice to place the sludge

1    from the coal tar box on to the pad?

2    A.  Yes.

3            MR. PIAGGIONE:  Okay.  No further

4    questions.

5            THE COURT:  Okay.  Mr. Personius,

6    anything?

7            MR. PERSONIUS:  Thank you, no, Judge.

8            THE COURT:  All right.  Okay.  With that,

9    Mr. Snyder, you are excused.  Thank you very much.

10           THE WITNESS:  Thank you.

11           MR. MANGO:  Your Honor, the government

12   would call Robert O'Connor.

13           THE COURT:  Mr. Witness, if you would come

14   forward, please, and approach the witness box and

15   then we'll have you sworn.  Okay.  If you'd stop

16   right about there and then rotate and face the

17   jury.

18   R O B E R T   O' C O N N O R, having been duly sworn

19   as a witness, testified as follows:

20           THE COURT:  Okay.  Get comfortable in the

21   chair, and I'm going to be asking you to speak at

22   the microphone, because it is friendly.  It will

23   pick you up if you speak in a conversational tone.

24   Angle towards the jury just a little bit because

25   you are here to testify for their benefit.

1            If you don't understand a question, ask that it

2       be repeated, whether it's by the attorneys or me.

3       Try to answer concisely.  If you can do it with a

4       yes or no and the question calls for that, please

5       do that.  When you volunteer information, that's

6       sometimes becomes problematic.

7            If there's an objection, wait until I rule on

8       the objection, and then I will give you

9       instructions either to complete an answer, start

10      the answer all over again or wait for another

11      question.  Instructions like that.

12           Do you understand?

13                 THE WITNESS:  I do, your Honor.

14                 THE COURT:  Okay.  I think if you --

15      sounds like you're going to carry pretty well.  So

16      state your full name, spell your last name, please.

17                 THE WITNESS:  My name is Robert O'Connor.

18      The last name is spelled O, apostrophe, capital

19      C-O-N-N-O-R.

20                 THE COURT:  Okay.  Thank you very much.

21           Mr. Mango.

22                 MR. MANGO:  Thank you, your Honor.

23      DIRECT EXAMINATION BY MR. MANGO:

24      Q.  Good morning, Mr. O'Connor.

25      A.  Good morning.

1    Q.   How are you?

2    A.   I'm fine.   Thank you.

3    Q.   Mr. O'Connor, are you currently employed?

4    A.   I am.

5    Q.   Can you tell the jury how you're employed?

6    A.   I'm employed with the New York State Department

7    of Environmental Conservation.

8    Q.   And that goes by DEC, is that right?

9    A.   That's right.

10   Q.   All right.   What is your current job title with

11   DEC?

12   A.   I'm an environmental conservation investigator

13   with DEC.

14   Q.   And where -- where is that position located?

15   A.   The position is located in our Buffalo office.

16   It's a regional office, Region 9.   It covers six

17   counties in Western New York.

18   Q.   How long have you been an environmental

19   conservation investigator?

20   A.   I've been with the department as a police

21   officer for 24 years and as an investigator for the

22   last eight.

23   Q.   Okay.   As an investigator, are you -- when you

24   perform your duties, are you in a uniform or are

25   you in plain clothes?

1    A.   I'm in plain clothes.

2    Q.   All right.  And can you tell the jury what --

3    as an environmental conservation investigator, what

4    your duties are?

5    A.   My duties are to investigate allegations of

6    environmental law, particularly -- all law really

7    in New York State but focusing on environmental

8    law.

9    Q.   Okay.  So you investigate environmental crimes?

10   A.   That's correct.

11   Q.   And in your job do you work with any non-DEC

12   law enforcement officials to investigate

13   environmental crime?

14   A.   Yes, I do.

15   Q.   Okay.  Who do you work with?

16   A.   Several other agencies, but one of them would

17   be the Environmental Protection Agency's Criminal

18   Investigation Division.

19   Q.   Did there come a time, Mr. O'Connor, that you

20   became involved in a criminal investigation of the

21   Tonawanda Coke Corporation?

22   A.   Yes, there did.

23   Q.   And when did that criminal investigation begin?

24   A.   It began in October of 2009.

25   Q.   Okay.  How did the criminal investigation

1    begin?

2    A.   It began with a newspaper article in the

3    Buffalo News.  It was a Sunday article.  It was a

4    feature article.  It was a front page article.

5    Relating to the air study that had been going on in

6    that area and some other issues with air pollution

7    in the town of Tonawanda area.

8    Q.   Okay.  And as a result of that newspaper

9    article, what -- what happened then?

10   A.   Well, after that article appeared, there was a

11   meeting with representatives from my department,

12   representatives from the Environmental Protection

13   Agency's Criminal Investigate Division, and the

14   U.S. Attorney's office.

15   Q.   All right.  Was there any involvement by civil

16   EPA or civil DEC in initiating that -- that initial

17   meeting?

18   A.   No, there wasn't.

19   Q.   And how about in initiating the criminal case

20   in general, was there any involvement by the civil

21   regulators?

22   A.   No.

23   Q.   Okay.  What was -- after this meeting, what was

24   the next step in the criminal investigation?

25   A.   Well, after that meeting, the next step was to

1    gather information, to talk to witnesses, to review

2    files, that kind of thing.

3    Q.   Okay.  During the -- then the course of the

4    criminal investigation preceded from that point on?

5    A.   It did.

6    Q.   All right.  During the criminal investigation,

7    do you know if the details of the criminal

8    investigation were shared with civil EPA or civil

9    DEC officials?

10          MR. PERSONIUS:  Excuse me.  I'm sorry.

11   This witness can testify as to what he knows.

12          THE COURT:  And that's the question I

13   think and it calls for a yes or no.  No?

14          MR. LINSIN:  Your Honor, the question was

15   much broader as I heard it.  It was does he know

16   whether anyone -- it was open-ended.  Does he know

17   whether information was shared.  I think he's

18   competent to testify whether he shared information.

19          THE COURT:  Well, reput the question.  I

20   mean, I think it's okay the way it was, but put it

21   anyway --

22          MR. MANGO:  Yes, your Honor.

23          THE COURT:  -- again.

24   BY MR. MANGO:

25   Q.   Mr. O'Connor, during your involvement in the

 1    criminal case, did you share any details with your

 2    civil counterparts at DEC?

 3    A.  No, I did not.

 4    Q.  Did you share any information with the civil

 5    regulators at EPA?

 6    A.  No.

 7    Q.  Okay.  Do you know -- just a yes-or-no answer.

 8    Do you know if any other members of the criminal

 9    investigative team shared any details of the

10    criminal investigation with those individuals?

11    A.  I don't know that for a fact.  I don't know

12    that they did or didn't.

13    Q.  Okay.  Let's talk.

14        Do you recall what, if anything, happened on

15    December 17th of 2009?

16    A.  I do.  I recall that on that date there was a

17    search warrant executed at the Tonawanda Coke

18    Corporation.

19    Q.  All right.  And that search warrant, were you a

20    part of that search warrant?

21    A.  I was.

22    Q.  Okay.  And was criminal -- or the EPA CID,

23    which meant criminal investigation division,

24    involved?

25    A.  They were primarily involved.

1    Q.  Are you aware of whether photographs were taken

2    during the search warrant?

3    A.  Yes, I am.  There were many photographs taken

4    that day.

5    Q.  Okay.  I'd like to show you just a couple at

6    this point.

7        Your Honor, I'd like to pull up for

8    identification purposes Government Exhibit 115.07,

9    and absent an objection, I would offer this into

10   evidence.

11              MR. LINSIN:  No objection, your Honor.

12              THE COURT:  Okay.

13              MR. PERSONIUS:  No objection, Judge.

14              THE COURT:  All right.  115.07 received,

15   no objection, and may be published.

16              (Government Exhibit 115.07 was received

17              into evidence.)

18              MR. MANGO:  Thank you, your Honor.

19   BY MR. MANGO:

20   Q.  Mr. O'Connor, do you see what is on your

21   screen?

22   A.  I do.

23   Q.  What is that depicted?

24   A.  That's a picture of the eastern quench tower at

25   Tonawanda Coke which is also known as tower number

1    2.

2    Q.  Okay.  And this was taken during the search

3    warrant?

4    A.  It was.

5    Q.  All right.  Let me show you, for identification

6    purposes, Government's Exhibit 115.09.

7              THE COURT:  Let me ask you this:  Was

8    there a photograph that you took from somewhere?

9    Is this the photograph you took, or did you take

10   this photograph with the camera?

11             THE WITNESS:  I did not take this

12   particular photograph, your Honor.

13             THE COURT:  So that was somewhere and you

14   took the photograph itself, right?

15             THE WITNESS:  No, I didn't take the photo.

16   I'm aware that it was taken there by another

17   person.

18             THE COURT:  All right.  Did this exist

19   when you executed the search warrant, this photo?

20             THE WITNESS:  This was the condition of

21   the -- that's what it looked like.

22             THE COURT:  Okay.  Thank you.

23        Yes, Mr. Linsin?

24             MR. LINSIN:  Just if I could make sure I

25   understand.  This is a photograph taken by the

```
 1      agents during the execution of the search warrant.
 2      Do I --
 3               THE COURT:  From someplace.
 4               MR. LINSIN:  Yes.
 5               THE COURT:  Is that right?
 6               THE WITNESS:  Yes.
 7               THE COURT:  Okay.  Thank you.
 8               MR. MANGO:  Yes, your Honor.  I think the
 9      question -- I'll clarify.
10    BY MR. MANGO:
11    Q.  This photograph was taken during the execution
12      of the search warrant at the Tonawanda Coke
13      Corporation?
14    A.  Yes, it was.
15    Q.  Okay.  And this fairly and accurately depicts
16      the quench tower number 2?
17    A.  Yes, it does.
18               THE COURT:  All right.  I'm still a little
19      bit confused.  Was there somebody with a camera
20      that took this?  Or was this an existing photograph
21      that was seized pursuant to the search warrant?
22               THE WITNESS:  This was not seized during
23      the search warrant.  This photograph was taken
24      during the execution of the search warrant.
25               THE COURT:  Okay.  Thank you.  By some
```

1    agent that accompanied you?

2              THE WITNESS:  That agent accompanied me

3    during the day on the warrant, but I wasn't

4    physically present when the photo was taken.

5              THE COURT:  Okay.

6              MR. PERSONIUS:  I think it -- just the

7    last step in this, Judge.  I think it should -- it

8    should be established that at some point that day

9    Mr. O'Connor saw this quench tower.  I think.

10             THE COURT:  All right.  Thank you.

11   Mr. Mango.

12             MR. MANGO:  Yes, your Honor.

13   BY MR. MANGO:

14   Q.  Mr. O'Connor, did you see quench tower number 2

15   on that day?

16   A.  I did.

17   Q.  Okay.  And does this picture accurately depict

18   quench tower number 2 that you saw?

19   A.  That's the way it looked that day.

20   Q.  All right.

21             THE COURT:  All right.  Do you want this

22   published?  It's received.  No objection?

23             MR. LINSIN:  No objection.

24             MR. PERSONIUS:  No objection, your Honor.

25   BY MR. MANGO:

1    Q.  Oh, if we can actually go back.  Okay.  115.07

2    is now up on the screen and, again, tell the jury

3    what they're looking at here.

4    A.  That's the eastern quench tower or quench tower

5    number 2 in the Tonawanda Coke Corporation.

6    Q.  Okay.  Are you, Mr. O'Connor --

7         We can take that down.  Thank you, Lauren.

8         Let me ask you:  Are you familiar with whether

9    that quench tower had a baffle system in place

10   during the execution of the search warrant?

11   A.  On the day I was there, there were baffles in

12   that quench tower.

13   Q.  Okay.  Did you make an observation of that?

14   A.  Yes, I did.

15   Q.  Okay.  I'd like to show you, for identification

16   purposes, Government Exhibit 115.09.

17        And absent an objection, offer this into

18   evidence, your Honor.

19             MR. LINSIN:  No objection, your Honor.

20             MR. PERSONIUS:  No objection, your Honor.

21             THE COURT:  Okay.  115.09 received, no

22   objection, and may be published.

23             MR. MANGO:  Yes, your Honor.  Thank you.

24             (Government Exhibit 115.09 was received

25             into evidence.)

1    BY MR. MANGO:

2    Q.   Mr. O'Connor, can you tell the jury what we're

3    looking at in 115.09?

4    A.   This is a photograph that depicts the baffles

5    in the second quench tower, quench tower number 2,

6    from inside the tower looking upward.

7    Q.   And this is -- fairly and accurately represents

8    what you saw inside the quench tower?

9    A.   That's correct.

10             THE COURT:   All right.   Tap the photograph

11   where you say there are baffles depicted.   With

12   authority.   That's one baffle?

13             THE WITNESS:   I'm sorry, your Honor.   I

14   didn't understand your question.

15             THE COURT:   Yeah.   Tap the screen where

16   you say there are baffles depicted.

17             THE WITNESS:   There are several of them.

18   It's not just one --

19             THE COURT:   Okay.   Outline it, if you

20   want.   Okay.

21   BY MR. MANGO:

22   Q.   Mr. O'Connor, are baffles composed of -- do you

23   know what baffles are?

24   A.   Yes.

25   Q.   And what are they?

1    A.   In this case they're basically wooden boards

2    that are inserted on an angle.

3    Q.   Okay.  So these -- these boards we see here,

4    going that way, are those the baffles you're

5    referring to?

6    A.   Those are some of them, yes.

7    Q.   Okay.

8         MR. MANGO:  I'd like to show you for

9    identification purposes, your Honor, Government

10   Exhibit 115.25, and absent an objection, offer this

11   into evidence.

12        Well, maybe actually if I can -- I'd like to

13   ask a couple questions first, your Honor.

14        THE COURT:  Sure.

15   BY MR. MANGO:

16   Q.   Mr. O'Connor, do you know if there's a second

17   quench tower at the Tonawanda Coke plant?

18   A.   There are two quench towers there.

19   Q.   Did you make any observations as to the other

20   quench -- we were talking about quench tower number

21   2.  Let's talk about quench tower -- what's the

22   other one called?

23   A.   The other one is quench tower number 1 or the

24   western quench tower.

25   Q.   Did you make any observations of that quench

1    tower?

2    A.   I did.

3    Q.   And did you observe any baffles inside of that

4    quench tower?

5    A.   On that day, the day I was there, I did not

6    observe any baffles in quench tower number 1.

7              MR. MANGO:   At this point now, your Honor,

8    I'd like to show the witness, for identification

9    purposes, Government Exhibit 115.25 and absent an

10   objection, offer that into evidence.

11             MR. LINSIN:   No objection, Judge.

12             MR. PERSONIUS:   No objection, your Honor.

13             THE COURT:   Okay.   Then 115.25 received,

14   no objection, and may be published.

15             (Government Exhibit 115.25 was received

16             into evidence.)

17   BY MR. MANGO:

18   Q.   Mr. O'Connor, can you tell the jury what

19   they're looking at in Government Exhibit 115.25?

20   A.   This is a picture of the western quench tower

21   from inside the tower looking up.   And it depicts

22   an area at the top of the quench tower where there

23   are no baffles.

24   Q.   All right.   And let's -- if we can pull up for

25   identification purposes Government Exhibit 115.29.

2738

1     And absent an objection, offer that into evidence.

2              MR. LINSIN:  No objection, Judge.

3              MR. PERSONIUS:  No objection, your Honor.

4              THE COURT:  Okay.  115.29 received, no

5     objection, and may be published.

6              (Government Exhibit 115.29 was received

7              into evidence.)

8              MR. MANGO:  Thank you, your Honor.

9     BY MR. MANGO:

10    Q.  Mr. O'Connor, during the search warrant, did

11    you make or observe what was known as a concrete

12    pad at Tonawanda Coke?

13    A.  Yes, I did.

14    Q.  Now, with respect to what is on our screen

15    here, Government Exhibit 115.29, can you tell the

16    jury what they're looking at?

17    A.  That depicts what was known as the coal tar pad

18    in the coal field at the plant.

19             THE COURT:  All right.  Tap the screen in

20    terms of where it is or outline it, please.  Thank

21    you.

22    BY MR. MANGO:

23    Q.  Okay.  Lauren, we can take that down.  Thank

24    you.

25         Mr. O'Connor, I want to talk -- are you aware

1    of whether any documents were seized from the

2    Tonawanda Coke Corporation during the execution of

3    the search warrant?

4    A.   I am aware there were many documents seized.

5    Q.   Okay.  I'd like to show you some of those

6    documents at this point.  Okay.  All right.

7        I'd like to -- if we could pull up for

8    identification purposes Government

9    Exhibit 116.01.00.

10       All right.  Do you see that on your screen,

11   Mr. O'Connor?

12   A.   Yes, I do.

13   Q.   And could you -- do you identify -- do you know

14   what this is?

15   A.   That's a folder that was obtained from

16   Defendant Kamholz's office during the course of the

17   search warrant.

18   Q.   Okay.  And do you know if there was anything

19   inside of that folder that -- have you reviewed the

20   contents of that folder?

21   A.   I have reviewed the contents.  There were

22   documents in that folder.

23   Q.   Okay.  And just -- without going into any other

24   detail, do you see the label of the tab for the

25   folder?

1    A.   I do.

2    Q.   Okay.

3         Your Honor, at this point I would offer

4    Government Exhibit 116.01.00 into evidence.

5              MR. PERSONIUS:  It's one exhibit, right?

6              MR. MANGO:  Yes, at this point.

7              THE COURT:  All right.  Any objection?

8    Any objection?

9              MR. LINSIN:  Just one moment --

10             THE COURT:  I'm sorry.

11             MR. LINSIN:  -- your Honor.  No objection,

12   your Honor.

13             MR. PERSONIUS:  No objection, your Honor.

14             THE COURT:  Okay.  116.01.00, no

15   objection.  May be received and published.

16             (Government Exhibit 116.01.00 was received

17             into evidence.)

18             MR. MANGO:  Thank you, your Honor.

19   BY MR. MANGO:

20   Q.   Mr. O'Connor, I'm going to show you what's on

21   the screen here.  If you could tell the jury -- we

22   can actually just focus in on this section here.

23   Is this the folder that you mentioned?

24   A.   Yes.

25   Q.   You mentioned this was a folder.  And the tab

1    of that folder, what does it say?

2    A.   It says EPA 114.

3    Q.   And is there a date there?

4    A.   There is.  September 8th, 2009.

5    Q.   Okay.  And you mentioned that there was some

6    documents that were inside this folder that you've

7    reviewed?

8    A.   Yes.

9              MR. MANGO:  I'd like to pull up

10   Government's Exhibit 116.01.01 for identification

11   purposes, your Honor.  And absent an objection, I

12   would offer this into evidence.

13             MR. LINSIN:  Could we just clarify, your

14   Honor, if the witness recognizes this as a document

15   that came from the folder we just saw?

16             THE COURT:  Yes.  Okay.  Mr. O'Connor, do

17   you recognize that particular document?

18             THE WITNESS:  I do.  I've reviewed it.

19             THE COURT:  Okay.

20   BY MR. MANGO:

21   Q.   And did it come from inside of that folder that

22   was seized from Defendant Kamholz's office?

23   A.   Yes, it did.

24             MR. LINSIN:  No objection, your Honor.

25             MR. PERSONIUS:  No objection, your Honor.

1          THE COURT:  Okay.  Then 116.01.01

2     received, no objection, and may be published.

3               (Government Exhibit 116.01.01 was received

4               into evidence.)

5               MR. MANGO:  Thank you, your Honor.

6     BY MR. MANGO:

7     Q.  Mr. O'Connor, can you tell the jury what we're

8     looking at here in this exhibit?  It's two pages

9     and we can go to the next page if you need to

10    but --

11    A.  It's a shipping document.  It's a UPS or United

12    Parcel Service shipping document.  It indicates

13    that the remittance name is Mark Kamholz, Tonawanda

14    Coke Corporation, and the address.  And that it was

15    sent to Mr. Kenneth Eng at the U.S. EPA Air

16    Compliance Branch in New York.

17    Q.  Okay.  And there's a shipper's signature down

18    here.  What is the date of that shipper's

19    signature?

20    A.  The signature indicates it was signed on -- or

21    the spot next to the signature indicates that it

22    was signed on October 7th of 2009.

23    Q.  Okay.  And there is a weight up at the top.

24         What does that weight indicate?

25    A.  It indicates that it was a 30-pound box that

1    was shipped.

2    Q.  All right.  I'd like to pull up now Government

3    Exhibit 116.01.02 for identification purposes and

4    ask you if you recognize this document as a

5    document -- I'll just ask you:  Do you recognize

6    this document?

7    A.  I do.

8    Q.  Do you know where this document came from?

9    A.  That also came from the folder you showed me.

10          MR. MANGO:  Your Honor, I'd offer

11   Government Exhibit 116.01.02 into evidence as well.

12          MR. LINSIN:  No objection, your Honor.

13          MR. PERSONIUS:  No objection, Judge.

14          THE COURT:  How do you know those came

15   from the folder?

16          THE WITNESS:  I reviewed the evidence that

17   was seized during the search warrant and I looked

18   in that folder.

19          THE COURT:  Okay.  Thank you.  116.01.02

20   received, no objection, and may be published.

21          (Government Exhibit 116.01.02 was received

22          into evidence.)

23          MR. MANGO:  Thank you, your Honor.

24   BY MR. MANGO:

25   Q.  Mr. O'Connor, this is another UPS shipping

1    label?

2    A.   Yes.

3    Q.   Or receipt?  Okay.  Indicates another 30-pound

4    box as well, is that right?

5    A.   It does indicate that it was a 30-pound box,

6    yes.

7    Q.   Okay.  So from this -- from this it would

8    indicate that two 30-pound boxes were sent to the

9    EPA?

10   A.   That's what it indicates.

11   Q.   All right.  Let's go to Government's

12   Exhibit 116.01.03 for identification purposes, your

13   Honor.

14       Mr. O'Connor, do you recognize this document on

15   your screen?

16   A.   I do.

17   Q.   Do you know where this document came from?

18   A.   It came from the folder that we talked about

19   earlier marked 116.

20          MR. MANGO:  Okay.  Your Honor, I'd offer

21   Government's Exhibit 116.01.03 into evidence.

22          MR. LINSIN:  No objection, Judge.

23          MR. PERSONIUS:  Just want to confirm,

24   Judge.  Are there more pages to this or just this

25   one page?

2745

1          MR. MANGO:  There are, your Honor.

2          THE COURT:  There are more pages?

3          MR. MANGO:  Yes.  We can scroll through

4     all of the pages.

5          THE COURT:  Please.

6          MR. MANGO:  It's ten pages, your Honor.

7          MR. PERSONIUS:  No objection, your Honor.

8     Thank you.

9          THE COURT:  Okay.  116.01.03 received, no

10    objection, and may be published.

11          (Government Exhibit 116.01.03 was received

12          into evidence.)

13          MR. MANGO:  Thank you, your Honor.

14    BY MR. MANGO:

15    Q.  If we can zoom in on this portion here.

16        Mr. O'Connor, can you tell the jury what this

17    document now in evidence, 116.03 -- point 01, I'm

18    sorry.  116.01.03, is?

19    A.  Yes.  It looks like it's a cover letter from

20    Tonawanda Coke Corporation signed by Defendant

21    Kamholz to Mr. Kenneth Eng who is the chief of the

22    Air Compliance Branch of the EPA for Region 2 in

23    New York.

24    Q.  Okay.  And it indicates that this is in

25    response to a Section 114 letter?

1   A.   It does indicate that, yes.

2   Q.   All right.  If we can go to the next page.

3           THE COURT:  What's a 114 letter, do you

4   know?

5           THE WITNESS:  Are you asking me, your

6   Honor?  It's a response to -- it's a section of law

7   that requests the -- certain questions of the

8   corporation and the corporation was responding to

9   that request.

10          THE COURT:  Okay.  Thank you.

11  BY MR. MANGO:

12  Q.   Page 2 of this exhibit is certification of a

13  response, is that correct?

14  A.   Yes, it is.  It's a certification of response.

15  Q.   All right.  If we can go to page 3, this begins

16  the -- the actual response section of Mr. Kamholz's

17  letter, is that right?

18  A.   Yes, it does.

19  Q.   I'd like to show you at this point Government

20  Exhibit 116.01.04 for identification purposes, and

21  ask you -- Mr. O'Connor, this is a multiple-page

22  document.  We can scroll through the pages.

23      Do you recognize this document?

24  A.   I do recognize it.

25  Q.   And how do you recognize this document?

1    A.   I recognize it from my document review of the

2    material that was seized at the search warrant.

3    Q.   Okay.  Do you know where this document came

4    from?

5    A.   It came from Defendant Kamholz's office.

6    Q.   Okay.  In any particular folder?

7    A.   The folder 116.

8    Q.   Okay.  So the folder we've been talking about?

9    A.   Yes.

10           MR. MANGO:  Your Honor, at this point the

11   government would offer Government Exhibit 116.01.04

12   into evidence.

13           THE COURT:  Does it consist of three

14   pages?

15           MR. MANGO:  No.

16           THE COURT:  How many pages, four?

17           MR. MANGO:  There's multiple pages, your

18   Honor.

19           THE COURT:  Let's go through it and

20   identify the number of pages, please.

21           MR. MANGO:  Your Honor, I believe that is

22   the last page.  It's 22 pages in length.

23           THE COURT:  Okay.

24           MR. LINSIN:  No objection, your Honor.

25           MR. PERSONIUS:  No objection, your Honor.

1          THE COURT:  Okay.  116.01.04 received, no

2     objection.  May be published.

3               (Government Exhibit 116.01.04 was received

4               into evidence.)

5          MR. MANGO:  Thank you, your Honor.

6     BY MR. MANGO:

7     Q.  Mr. O'Connor, can you tell the jury what this

8     document now in evidence is?  We can zoom in if we

9     need to.

10    A.  It's a letter from the EPA to Defendant Kamholz

11    notifying him of his responsibilities to respond

12    under certain sections of the law.

13    Q.  Is this the 114 letter that EPA sent --

14    A.  Yes.

15    Q.  -- to Defendant Kamholz?  Okay.

16         And if we can scroll through the pages, please.

17    If we can keep going.  And now we get into the

18    questions that are being asked.  If we could stop

19    right there on page 19.

20         Do you see handwriting on this document?

21    A.  Yes, I do.

22    Q.  Okay.  Do you know whose handwriting this is?

23    A.  I don't.

24    Q.  Okay.

25              MR. PERSONIUS:  Judge, we'll stipulate

1    it's Mr. Kamholz, if it's helpful.

2                MR. MANGO:  Yes.

3                THE COURT:  Okay.  Mr. Linsin?

4                MR. LINSIN:  No objection, your Honor.

5                THE COURT:  Okay.  So stipulated.  The

6    three entries, the handwritten entries are those,

7    by stipulation, of defendant Mark Kamholz.

8                MR. MANGO:  Your Honor, and there is other

9    handwriting on this document.  I would ask the same

10   questions if we could scroll to the next page.

11               THE COURT:  Same stipulation?

12               MR. PERSONIUS:  Yes, your Honor.

13               MR. MANGO:  And the next page.

14               THE COURT:  Same?

15               MR. PERSONIUS:  Yes, Judge.

16               MR. MANGO:  And the next page.

17               MR. PERSONIUS:  And the page now we're on

18   is 22 and that is Mr. Kamholz.

19               THE COURT:  Okay.  Thank you.

20               MR. MANGO:  Excellent.

21               THE COURT:  The record will so reflect.

22               MR. LINSIN:  And we would join in that

23   stipulation.

24               THE COURT:  Okay.  Thank you.

25               MR. MANGO:  Your Honor, at this point I'd

1      like to show the witness Government

2      Exhibit 116.01.07 for identification purposes.

3          Mr. O'Connor, do you see that document on your

4      screen?

5                  THE WITNESS:  Yes, I do.

6      BY MR. MANGO:

7      Q.  Do you know where this document came from?

8      A.  That's another document that was in the folder

9      marked 116.

10     Q.  Okay.

11                 MR. MANGO:  And that at this point, your

12     Honor, the government would offer Government's

13     Exhibit 116.01.07 into evidence.

14                 MR. LINSIN:  Are there more -- is there

15     more than one page to this document?

16                 MR. MANGO:  Yes, your Honor.  There's --

17     this is a number of pages, as well.  It goes for

18     ten pages.

19                 THE COURT:  All right.  Well, let's scroll

20     through it to get to page 10.  No 11?

21                 MR. MANGO:  I believe ten pages, your

22     Honor.  Yes.

23                 THE COURT:  Okay.  Just checking your

24     math.

25                 MR. MANGO:  Thank you.

1          THE COURT:  Okay.  So no objection?

2          MR. LINSIN:  No objection, your Honor.

3          MR. PERSONIUS:  No objection, and we'll

4     stipulate again, Judge, it's Mr. Kamholz's

5     handwriting.

6          THE COURT:  Okay.

7          MR. LINSIN:  We will join in that

8     stipulation.

9          THE COURT:  Okay.  Stipulation joined.

10    Government as well?

11         MR. MANGO:  Yes, your Honor.  We would ask

12    for that.

13         THE COURT:  Okay.  Then 116.01.07, no

14    objection by stipulation, received, and it can be

15    published.

16         (Government Exhibit 116.01.07 was received

17          into evidence.)

18         MR. MANGO:  Thank you, your Honor.

19    BY MR. MANGO:

20    Q.  Mr. O'Connor, can you tell the jury what this

21    appears to be -- this exhibit appears to be?

22    A.  They appear to be handwritten notes that were

23    generated in responding to the 114 request.

24    Q.  Okay.  Are you aware of whether in that 114

25    request from EPA there was any -- any request for

 1    information relating to a pressure relief valve or

 2    bleeder valve at Tonawanda Coke?

 3    A.   In general terms, I think there is a request

 4    for all emission sources.

 5    Q.   Okay.  Well, let's go -- if we could go to

 6    page 6 of this document, please.  Let's focus on

 7    that.

 8         Do you see entry number 20 there, pressure

 9    release valve?

10    A.   Yes, I do.

11    Q.   And what I want you to do -- and your Honor, I

12    may ask to approach the witness because the

13    handwritten pages of this are going to be easier to

14    read.

15         Do you see this -- there is a part here that's

16    struck -- I'm going ask you to read, Mr. O'Connor,

17    for the jury, this entry under E.  And there is a

18    part that's crossed out here.  It maybe easier for

19    you to read the original handwritten version.

20         Your Honor, may I approach the witness?

21              THE COURT:  Yes.

22    BY MR. MANGO:

23    Q.   Mr. O'Connor, take your time.  I would like you

24    to read for the jury the entry on E there.

25    A.   Twenty marked E, reads as follows:  "The PRV

1    opens very rarely.  Again, the objective is to" --

2    I'm not sure what that next word is.

3              MR. PERSONIUS:  Judge, we'll stipulate

4    it's conserve.

5              THE COURT:  Okay.  "Conserve COG"?

6              MR. PERSONIUS:  Yes, Judge.  Which is coke

7    oven gas.

8              THE COURT:  Well, keep that paragraph

9    enlarged.  Can you highlight it?  Thank you.

10   BY MR. MANGO:

11   Q.  Okay.  Conserve.

12   A.  "To conserve COG for boiler and battery use."

13             MR. LINSIN:  Well, your Honor, if we could

14   also note that there is a word that appears to have

15   been crossed out after the letters COG.

16             THE COURT:  Okay.  Can you read that word

17   that's crossed out?

18             THE WITNESS:  It looks like it might be

19   "not" crossed out, but I really can't tell.

20             THE COURT:  Okay.

21   BY MR. MANGO:

22   Q.  Okay.  Keep going.

23   A.  Okay.  So again, "the objective is to conserve

24   COG for boiler and battery use.  Should" -- and

25   then there's another crossed out word -- "the valve

1    open, it would only be for five" -- correction --

2    "it would only be for 10 to 15 seconds, SEC

3    period."  Then there are some cross outs.

4              MR. PERSONIUS:  Well, there is one cross

5    out.

6              THE WITNESS:  Okay.  "In this open

7    position, the PRV would" -- cross out -- "emit COG

8    at a rate of" -- and then there's no number there.

9    Then after that, there is pounds, abbreviation for

10   pounds, LBS slash HR.  So it would emit COG at a

11   rate of an empty space pounds per hour.

12      The next sentence reads:  "The PRV valve" --

13   and there's two words crossed out -- "hasn't opened

14   in months."

15 BY MR. MANGO:

16   Q.  Okay.  I want you to focus on in the

17   handwritten version that cross out that I've just

18   circled and look -- just take a moment, read the

19   handwritten version, and see if you can make out

20   what that word that was crossed out is.  Can you do

21   it?

22   A.  I can't make that out.

23   Q.  Okay.  Let's -- let's go on.

24      I'd like to show you now Government

25   Exhibit 116.01.08 marked for identification

1    purposes.

2        Do you see that up on your screen,

3    Mr. O'Connor?

4    A.  Yes, I do.

5    Q.  Okay.  Where did this document come from?

6    A.  That came from folder 116.

7            MR. MANGO:  Your Honor, at this point the

8    government would offer Government's

9    Exhibit 116.01.08 into evidence.

10           MR. LINSIN:  No objection, your Honor.

11           MR. PERSONIUS:  No objection, your Honor.

12   We would be willing to stipulate that this

13   handwriting is Chuck Lauricella, who is an engineer

14   at Tonawanda Coke, if that's helpful.

15           THE COURT:  Government stipulate?

16           MR. MANGO:  Yes, your Honor.

17           MR. LINSIN:  We would join, your Honor.

18           THE COURT:  Okay.  Stipulation received

19   with respect to Lauricella handwriting.  116.01.08

20   received, no objection, may be published.

21           MR. MANGO:  Thank you, your Honor.

22

23           (Government Exhibit 116.01.08 was received

24            into evidence.)

25           THE COURT:  You're welcome.

1    BY MR. MANGO:

2    Q.   Mr. O'Connor, do you see this document on your

3    screen?

4    A.   I do.

5    Q.   What is -- it mentions coke oven gas flow at

6    the top?

7    A.   It does.

8    Q.   Under calculated flow, what is listed for

9    pounds per hour?

10   A.   It says 7,135 -- 7,135 pounds over hours.

11   Pounds per hour.

12   Q.   And finally from this folder I'd like to show

13   you Government Exhibit 116.01.09 for identification

14   purposes.  Do you recognize this document?

15   A.   I do.

16   Q.   Do you know where this document came from?

17   A.   That came from the folder marked 116.

18   Q.   Okay.

19           MR. MANGO:  Your Honor, I would offer

20   Government Exhibit 116.01.09 into evidence.

21           MR. LINSIN:  No objection, Judge.

22           MR. PERSONIUS:  No objection, your Honor.

23           THE COURT:  Okay.  116.01.09 received, no

24   objection, and may be published.

25               (Government Exhibit 116.01.09 was received

1           into evidence.)

2           MR. MANGO:  Thank you, your Honor.

3    BY MR. MANGO:

4    Q.  Mr. O'Connor, can you tell the jury what we're

5    looking at here?

6    A.  This is an envelope that was addressed to

7    Mr. Mark Kamholz, manager, environmental control at

8    the Tonawanda Coke Corporation.  It indicates that

9    it was sent by Harish Patel from the U.S.

10   Environmental Protection Agency, Region 2

11   headquarters on Broadway in New York.

12   Q.  Okay.  Now, in your review of the -- of the

13   records that were seized from Mr. Kamholz's office,

14   did you review records that were seized in

15   proximity to this folder?

16   A.  Yes, I did.

17           MR. LINSIN:  Your Honor, could we perhaps

18   establish if this witness was personally involved

19   in this search of this office?  I still don't have

20   that clear and if we're going to be getting into

21   those kinds of issues, I think it would be very

22   helpful to know.

23           THE COURT:  Yeah.  Let's start with that

24   and I think we need to take a break.  So let's find

25   out the role here and the personal involvement,

1    please.

2              MR. MANGO:  Yes.

3    BY MR. MANGO:

4    Q.  Mr. O'Connor, did you -- were you involved in

5    personally searching Mr. Kamholz's office during

6    the search warrant?

7    A.  No, I was not.

8    Q.  Okay.  Did you -- during the search warrant,

9    did there come a time when you were in

10   Mr. Kamholz's office?

11   A.  Yes, there was.

12   Q.  Okay.  And based upon your review of the logs

13   of the search warrant-seized materials, are you

14   familiar with what materials came out of

15   Mr. Kamholz's office?

16   A.  Yes, I am.

17             THE COURT:  Mr. Linsin.

18             MR. LINSIN:  No dispute to those issues,

19   your Honor, but when we get into details about

20   proximity of one document as to another, I still

21   haven't heard a foundation on that kind of issue.

22             THE COURT:  All right.  I think that's a

23   legitimate matter for inquiry.  If you'll note

24   that, it may save some time if you establish that

25   in your questioning.

1          MR. MANGO:  Yes.

2          THE COURT:  And then we'll go from there.

3    Okay.  I think we need to take 15 minutes.  We'll

4    start at 11:30 actually.  Stay right there until

5    the jury leaves.  Thanks.

6          (Jury excused from the courtroom.)

7          THE COURT:  Thank you.  Okay.  We'll see

8    you at 11:30.

9          MR. MANGO:  Yes, your Honor.

10          (Short recess was taken.)

11          MR. MANGO:  Judge, if we could have a

12    moment, I think Mr. Personius is looking through

13    one of these original folders.  Your Honor, if we

14    could have a just a few more minutes.

15          THE COURT:  Absolutely.

16          MR. PERSONIUS:  Thank you, Judge.  I'll be

17    very quick.

18          MR. MANGO:  I think we're all set, your

19    Honor.

20          MR. PERSONIUS:  Thank you, Judge.

21          THE COURT:  You're welcome.

22          (Jury seated.)

23          THE COURT:  Welcome back.  Please have a

24    seat.  Okay.  The attorneys and parties are back

25    present.  The jury is here, roll call waived.

1     Mr. Robert O'Connor is on the stand.  He remains

2     under oath.  This still is direct examination by

3     the government.

4         Mr. Mango, you're the government so you may go

5     forward.

6              MR. MANGO:  Thank you, your Honor.

7     BY MR. MANGO:

8     Q.  Mr. O'Connor, where we left off there was a

9     little bit of a discussion.  We've now gone through

10    the contents of a folder that is in evidence as

11    116.01.00.  Was that right?

12    A.  Yes.

13    Q.  Okay.  Now, did you have a chance to review the

14    materials that were seized from Mr. Kamholz's

15    office?

16    A.  I did.

17    Q.  Okay.  And during your review, did you locate

18    in the -- let me ask it a different away.  When you

19    reviewed those records, did you do those in

20    Mr. Kamholz's office or at some other location?

21    A.  At a later time at the U.S. Attorney's office.

22    Q.  That's where the records have been stored, is

23    that right?

24    A.  Yes.

25    Q.  Okay.  And when you reviewed the records, do

1    you know whether or not they were in substantially
2    the same order in which they were seized?
3    A.  Yes.
4    Q.  Okay.  And did you have a chance to review
5    records that were found just after where the folder
6    we just went through was seized?
7    A.  Yes.
8         MR. LINSIN:  Your Honor, first of all, I
9    object to the leading, and, second of all, I'm not
10   even clear where we are right now.  But the basic
11   objection is leading.
12        THE COURT:  Yeah.  It was, and that was
13   not a good question.  But kind of set it up so that
14   we know clearly what this witness observed and
15   we'll go from there, please.
16        MR. MANGO:  Yes, your Honor.
17   BY MR. MANGO:
18   Q.  If we could just start with an exhibit,
19   actually.  Let me show you, Mr. O'Connor,
20   Government Exhibit 116.02.01 marked for
21   identification purposes.
22        Do you see that document on your screen?
23   A.  I do.
24   Q.  Okay.  Are you familiar with that document?
25   A.  I am.

2762

1    Q.   How are you familiar with that document?

2    A.   I reviewed it, along with other documents that

3    were seized during the search warrant.

4    Q.   Okay.  And where did this document that you're

5    looking at come from?

6    A.   This document came from Defendant Kamholz's

7    office.

8                MR. MANGO:  Your Honor, at this point the

9    government would offer Government Exhibit 116.02.01

10   into evidence.

11               MR. LINSIN:  Well, your Honor, how many

12   pages do we have for this exhibit, please?

13               THE COURT:  Certainly.

14               MR. MANGO:  This is a one-page exhibit,

15   your Honor.  I am intending, and if defense counsel

16   so chooses, there are other government exhibits

17   that are identical to these, which range from

18   Government Exhibit 116.02.01, all the way up to

19   Government Exhibit 116.02.39, and they're all of

20   similar character.

21               THE COURT:  They're all the bleeder

22   charts?

23               MR. MANGO:  Yes, your Honor.

24               THE COURT:  Should we work with all of

25   them or just this one?

2763

1          MR. LINSIN:  I would recommend, unless

2     there's some other reason counsel wishes to work

3     through them one at a time.  When I saw the

4     pagination on this exhibit, I assumed that there

5     were multiple pages for the same exhibit and --

6          THE COURT:  Well, okay.  Why don't we --

7     why don't we take them all, 116.02.1 through 116.02

8     point --

9          MR. LINSIN:  They're all .01, your Honor,

10     it's just --

11          THE COURT:  No.  .02 and then it goes from

12     .01 through .30, is that right?

13          MR. MANGO:  39.

14          THE COURT:  39.  Did you follow that?

15          MR. LINSIN:  I think what we have is

16     Exhibit Number 116.02.01.

17          THE COURT:  Right.

18          MR. LINSIN:  They're all 01, and yet the

19     page numbers after the 01 are 1 through 39, is that

20     correct?

21          MR. MANGO:  No, your Honor.  This --

22     there's only one page of this exhibit on the screen

23     right now.  This -0001, that is it.  There's no

24     dash zero zero zero --

25          MR. LINSIN:  I stand corrected, your

2764

1       Honor.  Okay.

2                   THE COURT:  Okay.  So it's actually

3       116.02.01, right?  That's the one-page document.

4                   MR. MANGO:  That's it.

5                   THE COURT:  Let's get that one in first.

6       Okay?

7                   MR. MANGO:  Yes.

8                   THE COURT:  All right.  And then all the

9       others are individually from 02.02 all the way

10      through .39.

11                  MR. MANGO:  Yes.

12                  THE COURT:  All right.

13                  MR. LINSIN:  I apologize for the

14      confusion.  Yes, that is correct, your Honor.

15                  THE COURT:  So no objection,

16      Mr. Personius, through .39?

17                  MR. PERSONIUS:  I was just going to --

18      next time we have a trial together, could we add

19      another decimal point to these?

20                  THE COURT:  I know.  I know.  We don't

21      have enough of those.

22          As you know, ladies and gentlemen, decimals are

23      our favorites.  All right.

24          And so, Mr. Piaggione, you must have marked

25      these exhibits, right?

1          MR. PIAGGIONE:  I seem to take the blame

2     for a lot of things, your Honor.

3          THE COURT:  And not without deserving it,

4     Mr. Piaggione.

5          MR. PIAGGIONE:  I appreciate that, your

6     Honor.

7          MR. MANGO:  He had nothing to do with it,

8     your Honor, in fairness.

9          MR. PERSONIUS:  No objection, Judge.

10         THE COURT:  All right.  All right.  So

11    we're going to move, with no objection from

12    anybody, 116.02.01 which is on the screen now for

13    Mr. O'Connor to have identified.  It will be

14    received without objection.  And you want to

15    publish that one.  And then the next step will be

16    to get everything else in.  Fair enough?

17         MR. MANGO:  Yes, your Honor.

18         THE COURT:  Okay.  Let's do that.

19         MR. MANGO:  Thank you.  Your Honor, yes,

20    it is published.

21         (Government Exhibit 116.02.01 was received

22         into evidence.)

23   BY MR. MANGO:

24   Q.  If we could focus just on that so you could

25    give the jury the date on this chart, please,

1    Mr. O'Connor, that is now in evidence.

2    A.   The date on the chart is September 8th, 2009.

3    Q.   All right.  And again, you mentioned that this

4    was seized from Defendant Kamholz's office?

5    A.   It was.

6    Q.   All right.  And were there other records

7    similar to this -- these circular charts that were

8    seized from Defendant Kamholz's office?

9    A.   Yes.

10   Q.   Have you reviewed those records?

11   A.   Yes.

12             MR. MANGO:  Your Honor, at this point,

13   absent an objection, I would offer the remaining

14   bleeder circular charts into evidence, which would

15   be 116.02.02 to .39.

16             THE COURT:  Okay.  I think we handled all

17   the decimals in that one, Mr. Personius.  Any

18   objections?

19             MR. PERSONIUS:  No.  But I think it would

20   be helpful just to know the date range, please, if

21   that's not too much.

22             MR. MANGO:  Your Honor, for Government

23   Exhibit 116.02.02, it's September 7th, 2009.

24             MR. PERSONIUS:  I don't know need to every

25   date, just the range.

1          MR. MANGO:  Right.  It goes backwards.  At

2     .39 is August 1st of 2009.

3          THE COURT:  Why do we move backwards,

4     Mr. Mango?

5          MR. MANGO:  These -- your Honor --

6          MR. PIAGGIONE:  Your Honor, I'll take the

7     blame for that.

8          MR. MANGO:  These were exactly as they

9     were seized in the order they were, and I didn't

10    want to shuffle them around unnecessarily.

11         THE COURT:  Actually, that was a

12    rhetorical question.  I didn't really need an

13    answer.

14       Okay.  We'll receive -- and, of course, ladies

15    and gentlemen, all of this is very serious, and

16    sometimes we lighten it up just so that we keep

17    everybody involved.  And so I will receive -- and I

18    think everybody's on board.

19         MR. PERSONIUS:  Yes.

20         THE COURT:  -- all of these -- we'll call

21    them circular bleeder chart documents ranging from

22    116.02.02, that date being December of 2009, right?

23         MR. MANGO:  They were seized December

24    of 2009.  There's another date in that description

25    which would range, again, from September of '09 to

1    August of '09.

2              THE COURT:  And that will be inclusive of

3    116.02.39.  All will be received without objection,

4    and if counsel for the government chooses, he may

5    publish those documents, as well.

6              MR. MANGO:  Yes.

7              THE COURT:  Okay.

8              (Government's Exhibit 116.02.02 through

9              116.02.39 were received into evidence.)

10             MR. MANGO:  We could publish -- I'd like

11   to publish just the first five of them, your Honor,

12   to give a representative sample.  So if we can now

13   publish 116.02.02, please; 116.02.03, 116.02.04,

14   and 116.02.05.

15   BY MR. MANGO:

16   Q.  So, Mr. O'Connor, have you seen those five

17   representative examples that were put up on the

18   screen?

19   A.  Yes, I have.

20   Q.  Those were the circular bleeder chart documents

21   that were seized from Defendant Kamholz's office?

22   A.  Yes.

23   Q.  Okay.  I'd like to now show you Government

24   Exhibit, for identification, 116.03.  This is a

25   one-page document.  Ask you to take a look at it.

1          Do you know where this -- or are you familiar

2    with this document?

3    A.   I am.

4    Q.   And where did this document come from?

5    A.   It was seized from Defendant Kamholz's office

6    during the search warrant.

7    Q.   All right.

8               MR. MANGO:  Your Honor, I would ask that

9    Government Exhibit 116.03 be offered into evidence.

10              MR. LINSIN:  No objection, your Honor.

11              MR. PERSONIUS:  No objection, Judge.  And

12   we'll stipulate the handwriting at the top, the

13   "ATT 4a" is Mr. Kamholz's handwriting.

14              THE WITNESS:  Okay.  So stipulated,

15   Mr. Mango?

16              MR. MANGO:  Yes, your Honor.

17              THE COURT:  Mr. Linsin.

18              MR. LINSIN:  Yes, your Honor.

19              THE COURT:  Okay.  Thank you.

20        By stipulation, the handwriting is identified

21   as Defendant Kamholz's handwriting.  The exhibit

22   itself will be received without objection and may

23   be published if you choose to do that, Mr. Mango.

24              (Government Exhibit 116.03 was received

25              into evidence.)

1          MR. MANGO:  Yes, your Honor, I'd ask to

2     publish that.  If we can zoom in.

3          Mr. O'Connor, do you see that handwriting up

4     there, the "ATT 4a?"

5          THE WITNESS:  Yes, I do.

6     BY MR. MANGO:

7     Q.   That is now the subject of the stipulation.

8          So this is a letter that was seized from

9     Defendant Kamholz's office?

10    A.   Yes, it is.

11    Q.   Okay.  Do you know if that ATT 4a relates to

12    the 114 letter that we have already gone through?

13         If you need to see that 114 letter, I can show

14    it to you if you want.

15    A.   Would you show it to me, please.

16    Q.   Yes, your Honor -- or yes, Mr. --

17    A.   I got promoted.  That's pretty good.

18    Q.   If we could pull up Government

19    Exhibit 116.01.03, your Honor, in evidence.  And go

20    to the third page of that document.  Well, first,

21    let's start at the first page.

22         Mr. O'Connor, do you recognize this that you've

23    already identified as the response letter to the

24    114 to the EPA?

25    A.   I do recognize it as that.

1   Q.   Okay.  If we can back out of that now, and

2   please go to the third page of this document.

3        And do you see under number 4 which describes a

4   March 17, 2009, venting?  Right here.

5   A.   I see that.

6   Q.   Okay.  Underneath there is an A and it says

7   Attachment 4a?

8   A.   I see that.

9   Q.   Now, if we could go back to Government Exhibit

10  116.03 now in evidence.  That ATT 4a was an

11  attachment to the 114 letter?

12  A.   It indicates that.

13  Q.   Okay.  I'd like to at this point, your Honor,

14  go to Government's Exhibit 116.06 for

15  identification purposes.

16       Mr. O'Connor, do you see Government

17  Exhibit 116.06 on the screen?

18  A.   Yes, I do.

19  Q.   And are you familiar with that document?

20  A.   I am.

21  Q.   Where did this document come from?

22  A.   That was seized from Defendant Kamholz's

23  office.

24            MR. MANGO:  All right.  Your Honor, the

25  government would move Government Exhibit 116.06

1    into evidence.

2              THE COURT:  Okay.

3              MR. LINSIN:  No objection, your Honor.

4              MR. PERSONIUS:  No objection, your Honor.

5    Again, we will stipulate the "ATT 32a" is

6    Mr. Kamholz's handwriting, Judge.

7              THE COURT:  Okay.  So stipulated,

8    Mr. Mango?

9              MR. MANGO:  Yes, your Honor.

10             THE COURT:  Mr. Linsin?

11             MR. LINSIN:  Yes, your Honor.

12             THE COURT:  Okay.  The entry handwriting

13   is stipulated as that of Defendant Kamholz.

14        116.06 received, no objection, and may be

15   published.

16             (Government Exhibit 116.06 was received

17             into evidence.)

18   BY MR. MANGO:

19   Q.  Mr. O'Connor, do you see this document on your

20   screen now?

21   A.  Yes, I do.

22   Q.  Okay.  It's a multiple-page document.  On the

23   first, though -- and you see that which is now the

24   subject of a stipulation, "ATT 32A," which is the

25   handwriting of Defendant Kamholz?

1    A.   Yes.

2    Q.   Okay.  Does this -- does this indicate that

3    this was also part of the 114 attachments?

4    A.   It indicates that.

5    Q.   Okay.  All right.  And if you could just read

6    the letter, is there a reference to an installation

7    of a flare device in this letter?

8    A.   That is the reference in the letter.

9    Q.   Okay.  If we could scroll through so the jury

10   can see the rest of the pages that are -- accompany

11   this exhibit.

12        THE COURT:  Would you go back to 7,

13   please?  The stipulation applies to the

14   handwriting?

15        MR. PERSONIUS:  Apparently not, Judge.

16        THE COURT:  Okay.

17        MR. PERSONIUS:  Thank you for asking.

18        THE COURT:  Okay.  Thank you.

19   BY MR. MANGO:

20   Q.   Thank you, your Honor.

21        I would like to now switch gears, Mr. O'Connor,

22   and show you a different item.

23        If we could pull up Government Exhibit 117 for

24   identification purposes.

25        Do you see Government Exhibit 117 on your

1     screen?

2     A.   I do.

3     Q.   And what is Government Exhibit 117?

4     A.   It's a folder.

5     Q.   And do you know where this -- was there

6     anything inside of this folder, if you know?

7     A.   Yes.   There were documents inside that folder.

8     Q.   Do you know where this folder was seized?   Let

9     me -- do you know where this folder came from?

10    A.   This folder came from Defendant Kamholz's

11    office.

12    Q.   Okay.   When?

13    A.   During the search warrant on December 17th,

14    2009.

15    Q.   Okay.   And you're familiar with this folder and

16    its contents?

17    A.   I am.

18    Q.   Did you review the material?

19    A.   I did.

20           MR. MANGO:   Your Honor, the government

21    would offer Government Exhibit 117 into evidence.

22           THE COURT:   Just the folder itself, not

23    the contents?

24           MR. MANGO:   At this point I think we're

25    going to need to move through the contents.

1          THE COURT:  Okay.

2          MR. LINSIN:  Minor clarification, your

3    Honor.  Was this something the witness also

4    reviewed in the U.S. Attorney's office as opposed

5    at the facility on December 17th?

6          THE COURT:  Okay.  Fair enough.  Let's

7    find out.  Ask the question, please.

8          MR. MANGO:  Yes, your Honor.

9      Mr. O'Connor, did you review -- did your

10   familiarity with this folder come from your time at

11   the search warrant or your review of records at a

12   later time?

13         THE WITNESS:  It came from my review of

14   records at a later time at the U.S. Attorney's

15   office.

16   BY MR. MANGO:

17   Q.  Excellent.  And again, that was a review of the

18   records that were seized during the search warrant?

19   A.  Yes, that's correct.

20         MR. LINSIN:  No objection to admission,

21   your Honor.

22         MR. PERSONIUS:  No objection, Judge.

23   There is some handwriting on the label.  We'll

24   stipulate that's Mr. Kamholz's handwriting.

25         THE COURT:  Okay.  With that stipulation,

1    that's entered into by you, I take it, Mr. Mango?

2            MR. MANGO:  Yes, your Honor.  There's

3    actually some business cards that were stapled on

4    the inside and there is some handwriting on one of

5    them.  I believe that stipulation may apply to

6    the -- one of the business cards that has some

7    handwriting on --

8            THE COURT:  It does.

9            MR. PERSONIUS:  If we could see it,

10   please, Judge, on the screen.

11           THE COURT:  Sure.

12           MR. MANGO:  Go to the next page.

13           MR. PERSONIUS:  We stipulate, Judge,

14   that's Mr. Kamholz's, the "See Martha's card."

15           THE COURT:  Yes.  Okay.  So stipulated and

16   Mr. Linsin --

17           MR. LINSIN:  Yes.

18           THE COURT:  -- you're onboard with that?

19           MR. LINSIN:  We join in the stipulation.

20           THE COURT:  Okay.  Then with that

21   stipulation, 117, the folder and stapled cards on

22   the interior are admitted without objection, and

23   may be published if you choose to do that or move

24   on.

25           MR. MANGO:  Yes.

1              (Government Exhibit 117 was received into

2              evidence.)

3              MR. MANGO:  Your Honor, I would ask to

4      publish for the jury's benefit here.

5          Mr. O'Connor, if you could tell the jury what

6      is the label on this folder?

7              THE WITNESS:  The label says EPA and

8      inspection, in an abbreviated form.  And a date --

9      I don't know if you can blow that up.  4/14.

10     BY MR. MANGO:

11     Q.  Okay.  And if we could go to the second page of

12     this document.

13         Do you see -- what was contained on the second

14     page of this document?

15     A.  Six business cards are stapled inside the

16     folder.

17     Q.  And you see here is the subject of another

18     stipulation of Defendant Kamholz's handwriting?

19     A.  Yes, I see that.

20     Q.  Okay.  I'd like to now go to some of the

21     contents of this folder.  I'd like to show you the

22     first one, again.  We'll have a series of these,

23     but,, let's start with Government's

24     Exhibit 117.01.01 for identification purposes.

25         Mr. O'Connor, are you familiar with this

1  document that's on the screen?

2  A.  I am.

3  Q.  Okay.  And where did this document come from?

4  A.  From a folder -- the folder you just showed me,

5  117.

6  Q.  Okay.

7  A.  From Defendant Kamholz's office.

8  Q.  And you recognize what this is depicting on the

9  screen, is that fair to say?

10 A.  Yes.

11 Q.  All right.

12        MR. MANGO:  Your Honor, the government

13 would offer Government's Exhibit 117.01.01, and

14 there is nine -- I'm sorry -- eight additional of

15 these records that I would offer into evidence

16 extending through .08, if there's no objection.

17        MR. PERSONIUS:  Could we get a date range

18 please, Judge?

19        THE COURT:  Yes.

20        MR. MANGO:  Your Honor, these are -- as

21 you -- as you referred to them --

22        MR. PERSONIUS:  Maybe start with the

23 oldest date and come to the --

24        MR. MANGO:  Circular bleeder chart

25 documents, I want to use the Court's term, for

1    April 20th, 2009, is the first exhibit.  That is

2    the date latest in time, and the earliest in time

3    is 4/12 of 2009.  And that would be Government

4    Exhibit 117.01.08.

5            MR. PERSONIUS:  4/12 to 4/19?

6            MR. MANGO:  4/12 to 4/20.

7            MR. PERSONIUS:  4/20, thank you.

8            MR. MANGO:  But, your Honor, there are --

9    there is a few that were missing and are not part

10   of this series.

11           THE COURT:  Okay.  But in any event, from

12   117.01.01 to 117.01.08, is this first offer?

13           MR. MANGO:  Yes, your Honor.

14           THE COURT:  Okay.  Okay.  They all are --

15   or at least appear to be bleeder chart documents,

16   circular.

17           MR. MANGO:  Yes.

18           MR. LINSIN:  And all from folder 117, is

19   that correct?

20           THE COURT:  Yes.

21           MR. LINSIN:  Yes.  No objection, your

22   Honor.

23           MR. PERSONIUS:  No objection, Judge.

24           THE COURT:  Okay.  No objection, all are

25   received, and selectively or in totality, they may

1    be displayed or published.

2            (Government Exhibits 117.01.01 through

3            117.01.08 were received into evidence.)

4            MR. MANGO:  Yes, your Honor.  I would ask

5    to just publish the first five representative

6    charts here, as well.

7    BY MR. MANGO:

8    Q.   This is -- Mr. O'Connor, do you see on your

9    screen 117.01.01?

10   A.   Yes, I do.

11   Q.   Bleeder chart for 4/20 of '09?

12   A.   I can't see the date on -- yes, 4/20/09.

13   Q.   And if we could go to 117.01.02.  And again, we

14   can zoom in on the date.

15       Is that a bleeder chart for April 19th of 2009?

16   A.   Yes, it is.

17   Q.   If we can go to 117.01.03.

18       What is this document?

19   A.   That's a circular bleeder chart for 4/18/09.

20   Q.   Okay.  117.01.04.

21       Do you recognize this as a bleeder chart for

22   April 17th of 2009?

23   A.   Yes, I do.

24   Q.   And finally 117.01.05.

25       Do you recognize this as a bleeder chart for

1    April 16th of 2009?

2    A.   Yes, I do.

3    Q.   Okay.

4         MR. MANGO:   I'd like at this point to pull

5    up for identification purposes Government

6    Exhibit 117.05 for identification purposes.

7         Your Honor, this is a multiple-page document.

8    It may make sense to scroll through for the -- so

9    the witness can see this, the whole page.

10        THE COURT:   How many pages?

11        MR. MANGO:   Your Honor, I believe it's

12   just two pages.

13        THE COURT:   Okay.   You've had a chance to

14   look at both of those, Mr. O'Connor?

15        THE WITNESS:   Yes, your Honor.

16        THE COURT:   Thank you.   Okay.   Go ahead.

17   BY MR. MANGO:

18   Q.   Do you see this document on your screen?

19   A.   I do.

20   Q.   Where -- are you familiar with this document?

21   A.   I am.

22   Q.   Where did this document come from?

23   A.   It came from folder -- the folder that's marked

24   117 which came from Defendant Kamholz's office.

25   Q.   Okay.

1          MR. MANGO:  Your Honor, the government

2    would offer Government Exhibit 117.05 into

3    evidence.

4          MR. LINSIN:  No objection, Judge.

5          MR. PERSONIUS:  No objection, your Honor.

6    We will stipulate it is Mr. Kamholz's handwriting

7    on both pages.

8          THE COURT:  Okay.  Stipulation entered,

9    Mr. Mango?

10         MR. MANGO:  Yes, your Honor.

11         THE COURT:  Mr. Linsin?

12         MR. LINSIN:  We join in the stipulation.

13         THE COURT:  Okay.  Writing stipulated.  No

14    objection to the Exhibit 117.05, received, and may

15    be published.

16         MR. MANGO:  Thank you, your Honor.

17         (Government Exhibit 117.05 was received

18         into evidence.)

19    BY MR. MANGO:

20    Q.  Mr. O'Connor, I'd ask you to take a look at

21    this document that's now up on your screen.  Let's

22    just focus on this top portion here.

23         What is this that we appear to be looking at?

24    A.  They appear to be handwritten notes from the

25    inspection in April of 2009.

1    Q.   Okay.  I'd like you to just take a look at this

2    section here, and if you can read it for the jury,

3    please.

4    A.   It says A.M. review of power outage.

5    Q.   I'm sorry.  Just -- you can even just start

6    with those two lines.

7    A.   The highlighted section says, "Got Pat to talk

8    about" -- I might be able to see if you could

9    remove the highlight maybe.  There is one word

10   I'm -- there is a word there that I really can't

11   make out.  But what I can make out is:  "I got Pat

12   to talk about" -- then I can't read it --

13   "bleeder."

14   BY MR. MANGO:

15   Q.   Okay.  That's okay.  I don't want you to --

16             THE COURT:  Well, can you read the last

17   portion or not?

18             THE WITNESS:  I can read a couple of the

19   words in the last portion.

20             THE COURT:  Yeah.  Finish it off to the

21   extent that you can read it, please.

22             THE WITNESS:  I can read the word "about."

23   And then I think the word "week of."  Those are the

24   words I can make out in the second portion.

25             THE COURT:  Okay.  Let's stop there.  This

1     page was dated April 21st, I think, right?

2               MR. MANGO:  Yes, your Honor.

3               THE COURT:  Okay.  Of '09.

4               MR. MANGO:  Yes, your Honor.

5     BY MR. MANGO:

6     Q.  Okay.  At this point I'd like to pull up for

7     identification purposes Government

8     Exhibit 117.06.01.

9         Which, Mr. Conway, do you see that on your

10    screen now?  Mr. Conway.  I'm sorry, Mr. O'Connor.

11    A.  Yes.  I do see that on my screen.

12              THE COURT:  We respond to any name, it

13    doesn't matter.

14              MR. MANGO:  I know.

15    BY MR. MANGO:

16    Q.  I'm sorry.  Mr. O'Connor, do you see that on

17    your screen?

18    A.  Yes, I do.

19    Q.  Okay.  What is that document that you -- or

20    where did this document come from that's on your

21    screen?

22    A.  That document came from the folder marked 117

23    that came from Defendant Kamholz's office during

24    the search warrant.

25    Q.  Okay.  And do you know -- let me also show you

1    117.06.02 which is marked separately, but also has

2    a notation up at the top.

3        Do you know if these two pages, the two

4    exhibits that I've now just showed you, relate to

5    each other?

6    A.  They appear to be pages 1 and 2 of the notes.

7    Q.  And this exhibit that I'm showing you,

8    117.06.02, where did this document come from?

9    A.  That also came from the folder marked 117 taken

10   during the search warrant from Defendant Kamholz's

11   office.

12   Q.  Okay.  Thank you.

13           MR. MANGO:  Your Honor, I would offer both

14   of these exhibits into evidence, 117.06.01 and 02.

15           MR. LINSIN:  No objection, your Honor.

16           MR. PERSONIUS:  No objection, your Honor.

17   We stipulate that the handwriting is Mr. Kamholz's.

18           THE COURT:  So stipulated, Mr. Mango?

19           MR. MANGO:  Yes, your Honor.

20           THE COURT:  And Mr. Linsin?

21           MR. LINSIN:  So stipulated.

22           THE COURT:  Okay.  Handwriting stipulated;

23   that is, that it is the handwriting of Defendant

24   Mark Kamholz.  117.06.01 and .02 both received

25   without objection and may be published.

2786

1                    (Government Exhibit 117.06.01 and

2                    117.06.02 were received into evidence.)

3                    MR. MANGO:   Thank you, your Honor.

4    BY MR. MANGO:

5    Q.   If we could go back to the first page and just

6    publish the first page for the jury so they can see

7    this.

8         Mr. O'Connor, these are the -- do you recognize

9    these as what appear to be notes?

10   A.   Yes.

11   Q.   Okay.  And there is a date up at the top, is

12   that right?

13   A.   Yes.  The date is 4/20/09.

14   Q.   All right.  And if we could just go to the

15   second page, just so the jury can see this.

16        Again, a 4/20 at the top?

17   A.   Yes.

18   Q.   I'd like to now go for identification purposes

19   to Government Exhibit 117.09 for identification

20   purposes.

21        Do you see that document on your screen,

22   Mr. O'Connor?

23   A.   Yes.

24   Q.   And do you know where this document came from?

25   A.   Also came from folder 117.

1    Q.  All right.  Which was seized during the search

2    warrant from Defendant Kamholz's office?

3    A.  Yes.

4              MR. MANGO:  Your Honor, I would offer

5    Government Exhibit 117.09 into evidence.

6              MR. LINSIN:  No objection, your Honor.

7              MR. PERSONIUS:  No objection, Judge.  We

8    stipulate it's Mr. Kamholz's handwriting again.

9              THE COURT:  Okay.  So stipulated,

10   Mr. Mango?

11             MR. MANGO:  Yes.

12             THE COURT:  Mr. Linsin?

13             MR. LINSIN:  So stipulated.

14             THE COURT:  Okay.  Handwriting stipulated

15   as that of defendant Mark Kamholz.  The

16   Exhibit 117.09 received, no objection, and may be

17   published.

18             MR. MANGO:  Thank you, your Honor.

19             (Government Exhibit 117.09 was received

20             into evidence.)

21   BY MR. MANGO:

22   Q.  Mr. O'Connor, do you see this document here on

23   your screen?

24   A.  Yes.

25   Q.  Okay.  Keep this document in mind.  We're going

1      to look at another document in a moment, and I want

2      you to just keep this in your mind.

3          If we can now go to Government Exhibit 117.10

4      for identification purposes.

5          Do you see this document on your screen,

6      Mr. O'Connor?

7      A.   Yes.

8      Q.   And where did this document come from?

9      A.   That document came from folder 117, which was

10     seized during the search warrant from Defendant

11     Kamholz's office.

12     Q.   Okay.  Thank you.

13             MR. MANGO:  Your Honor, the government

14     would offer 117.10 into evidence at this point.

15             MR. LINSIN:  No objection.

16             MR. PERSONIUS:  No objection.  We can only

17     stipulate here, Judge, that the "Mark Kamholz"

18     entry  is Mr. Kamholz's handwriting.

19             THE COURT:  That stipulation is acceptable

20     to the government?

21             MR. MANGO:  Yes, your Honor.

22             THE COURT:  Okay.  And Mr. Linsin, as

23     well?

24             MR. LINSIN:  Yes, your Honor.

25             THE COURT:  Just the Kamholz name is

1    identified and stipulated to as that of defendant

2    Mark Kamholz's writing.  But with respect to the

3    entire exhibit, 117.10 is received, no objection,

4    and may be published.

5              (Government Exhibit 117.10 was received

6              into evidence.)

7              MR. MANGO:  Thank you, your Honor.

8    BY MR. MANGO:

9    Q.  Mr. O'Connor, do you see what's on your screen?

10   A.  Yes, I do.

11   Q.  Is it labeled at the top "opening conference"?

12   A.  Yes, it is.

13   Q.  All right.  Your Honor, at this point I would

14   like to pull up Government Exhibit 117.11 for

15   identification purposes.

16        Mr. O'Connor, do you see that document on your

17   screen?

18   A.  Yes, I do.

19   Q.  And what is -- where did this document come

20   from?

21   A.  That document came from folder 117 which was

22   seized during the search warrant, and it came from

23   Defendant Kamholz's office.

24              MR. MANGO:  Your Honor, the government

25   would move Government Exhibit 117.11 into evidence

1    which is, in reality, the same copy that I believe

2    Government Exhibit 26, if my memory serves -- or

3    29.  If I could have a moment.

4        Twenty-nine.  Yes, your Honor.  I would move

5    Government Exhibit 117.11 into evidence.

6              MR. LINSIN:  No objection.

7              MR. PERSONIUS:  No objection, your Honor.

8              THE COURT:  Okay.  And that document is

9    the TCC organizational chart.  117.11 will be

10   received, no objection.

11             MR. MANGO:  Thank you, your Honor.

12             (Government Exhibit 117.11 was received

13             into evidence.)

14             THE COURT:  You're welcome.

15             MR. MANGO:  I'd ask that it be published.

16       And Mr. O'Connor, do you see the document here

17   on your screen?

18             THE WITNESS:  Yes, I do.

19   BY MR. MANGO:

20   Q.  And this is the Tonawanda Coke organizational

21   chart according to the title at the top?

22   A.  Yes.

23   Q.  I'd like to move now, your Honor, to Government

24   Exhibit 117.12 for identification purposes.

25             THE COURT:  That was already received.

1          MR. MANGO:  Yes, I just -- into evidence.

2     If we could just publish it at this point.  I just

3     want to ask a follow-up question to make it clear

4     where this document came from.

5    BY MR. MANGO:

6     Q.  Mr. O'Connor, do you see this document on your

7     screen which has previously been admitted into

8     evidence?

9     A.  I do see it on the screen.

10    Q.  Where -- where did this document come from?

11    A.  This document came from the folder marked 117

12    which was seized during the search warrant and came

13    from Defendant Kamholz's office.

14    Q.  Okay.  And let's just focus on this top portion

15    here.  And with particular attention to part one,

16    "please have these documents available," and there

17    is a one, a two, a three.

18         Do you see that?

19    A.  Yes, I do.

20    Q.  Okay.  A, B, C, D, E subparts there.

21    A.  I see A, B, C, D and E subparts for number one,

22    yes.

23    Q.  Okay.  We can actually come out of this -- your

24    Honor, there is some handwriting on the second page

25    of this document which at the time it was

1    introduced was unknown.  I believe there may be a

2    stipulation.

3              MR. PERSONIUS:  Your Honor, we'll

4    stipulate that's Mr. Kamholz's handwriting and then

5    there were check marks on the first page that

6    Mr. Kamholz put there, if that's important.

7              THE COURT:  Okay.  So stipulated,

8    Mr. Linsin?

9              MR. LINSIN:  Yes.  We join in that, your

10   Honor.

11             THE COURT:  Are you joining, as well?

12             MR. MANGO:  Yes, your Honor.

13             THE COURT:  Okay.  Stipulation establishes

14   the check marks and the handwriting as that of

15   defendant Mark Kamholz.

16             MR. MANGO:  Thank you.  If we could go

17   back to the first page.  So that part one with the

18   number 1 and then the A through E subparts, keep

19   that in mind.  And let's go back now --

20             THE COURT:  Wait, wait.  Put those up

21   first.

22   BY MR. MANGO:

23   Q.  Yes.  Mr. O'Connor, have you had a chance to

24   look at that?

25   A.  Yes.

1    Q.  Okay.  Let's go back now, if we could, in

2    evidence Government Exhibit 117.09.  And you

3    mentioned this came from the same folder as the

4    other Exhibit 117.12.

5        Does this appear to have any relation to

6    Government Exhibit 117.12?

7    A.  It does appear to correspond to that.

8            THE COURT:  All right.  Could you split

9    screen this?

10           MR. MANGO:  We could, yes, your Honor.

11   Let's do 117.09 on the left and 117.12 on the

12   right.

13   BY MR. MANGO:

14   Q.  Mr. O'Connor, you believe there is some

15   correlation between these two exhibits?

16   A.  Yes, I do.

17           THE COURT:  Just leave them there for a

18   minute.

19           MR. MANGO:  Yes; which are both admitted.

20           THE COURT:  Yes.

21           MR. MANGO:  Finally, from this folder, I'd

22   like to go to Government Exhibit 117.13 for

23   identification purposes.

24           THE COURT:  That's also received into

25   evidence.

1          MR. MANGO:  And received into evidence.

2     Thank you, your Honor.  And I'd ask that that be

3     published for the jury.

4     BY MR. MANGO:

5     Q.  And just for clarification purposes to this

6     already admitted exhibit, Mr. O'Connor, do you know

7     where this Exhibit 117.13 came from?

8     A.  Yes, I do.  It came from a folder which is

9     marked 117.  The folder was seized during the

10    search warrant at Tonawanda Coke from Defendant

11    Kamholz's office.

12    Q.  All right.  I'd now like to move for -- are you

13    aware whether any --

14         We can take that down, Lauren.  Thank you.

15         Are you aware of any other folders that were

16    seized from Defendant Kamholz's office?

17    A.  Yes, I am.

18    Q.  Okay.  I'd like to pull up for identification

19    purposes, your Honor, Government Exhibit 118.

20          THE COURT:  Okay.

21    BY MR. MANGO:

22    Q.  Mr. O'Connor, do you see this on your screen

23    here?

24    A.  Yes, I do.

25    Q.  And were there any items inside of -- well, let

1    me ask you first:  What do you see on your screen?

2    What is this?

3    A.  It's a copy of a folder, and there is a title

4    on the tab of the folder.

5    Q.  Okay.

6    A.  If you could --

7            MR. PERSONIUS:  Your Honor, this gets into

8    an area that we object to.

9            THE COURT:  We talked about this earlier.

10            MR. PERSONIUS:  Yes.  Yes.

11            MR. LINSIN:  We object on relevance

12    grounds, your Honor, and 403 grounds, as well.

13            THE COURT:  Okay.  I think the discussion

14    we had on the record supports the respective

15    positions.  I'm going to overrule the objection.

16    I'll allow you to proceed.

17            MR. MANGO:  Thank you, your Honor.

18    BY MR. MANGO:

19    Q.  At this point, do you recognize this -- let's

20    just back up for a moment.  Do you recognize this

21    folder -- or what this is?  I'm sorry.  I think you

22    mentioned it's a copy of a folder.

23    A.  I do recognize it.

24            THE COURT:  All right.  And this related

25    to the enhanced knowledge issue?

1          MR. MANGO:  Yes, your Honor.

2          THE COURT:  Okay.

3          MR. MANGO:  And there's only one item from

4     inside this folder that we'll be going into.

5        Mr. O'Connor, what -- where did this folder

6     come from?

7          THE WITNESS:  This came from Defendant

8     Kamholz's office.

9     BY MR. MANGO:

10    Q.  Were there any items inside of this folder that

11    you reviewed?

12    A.  Yes, there were.

13    Q.  And again, did you make this review at the time

14    of the search warrant or during your subsequent

15    review at the U.S. Attorney's office?

16    A.  I made the review during a subsequent time at

17    the U.S. Attorney's office.

18    Q.  Okay.

19        Your Honor, the government would move

20    Government Exhibit 118, just the folder at this

21    point, into evidence.

22          MR. LINSIN:  I believe our objection has

23    been overruled, your Honor.

24          THE COURT:  Yes.

25          MR. PERSONIUS:  Yes, but we have to

1    object.

2              THE COURT:  All right.  118 received, over

3    objection, and may be published if you choose to do

4    that.

5              MR. MANGO:  Yes, please, your Honor.

6              (Government Exhibit 118 was received into

7              evidence.)

8    BY MR. MANGO:

9    Q.  Okay.  Mr. O'Connor, do you see this document

10   that's now on your screen?

11   A.  Yes, I do.

12   Q.  Okay.  Can you read the tab that is on this

13   folder for the jury, please?

14   A.  It says "Clean Air Coalition," and underneath

15   that it says "citizens enviro" and then a word that

16   looks like it could be coalition.

17             THE COURT:  Ms. DiFillipo, would you

18   enlarge that -- okay.  Thank you.

19   BY MR. MANGO:

20   Q.  Okay.  Do you know if there were any documents

21   inside of this folder?

22   A.  Yes.  I do know that were there were several.

23   Q.  Just with a generality of what was in this

24   folder, can you tell the jury, please?

25   A.  There were several newspaper articles, and some

1   notices of meetings.

2   Q.  Okay.  I'd like to show you one of those

3   newspaper articles.

4       If we could go for identification purposes to

5   Government Exhibit 118.01, and ask you if you

6   recognize this?

7   A.  Yes, I do recognize it.

8   Q.  Okay.  And where did this item that you see on

9   your screen come from?

10  A.  It came from inside that folder marked 118.

11          MR. MANGO:  All right.  Your Honor, the

12  government would move Government Exhibit 118.01

13  into evidence.

14          THE COURT:  As a document included in the

15  file?

16          MR. MANGO:  Yes, your Honor.  I believe

17  that was his testimony.  It is two pages.  If we

18  want to go to the second page, as well.

19          THE COURT:  Please.

20          MR. MANGO:  And absent an objection, which

21  I understand there is, but I would move this into

22  evidence, your Honor.

23          MR. LINSIN:  I would renew my objection,

24  your Honor.

25          THE COURT:  Okay.  Mr. Personius.

1           MR. PERSONIUS:  Yes, Judge, I renew the

2     objection.  I note the date and even the content --

3     I'm just not -- I just think for a variety of

4     reasons it's objectionable.

5           THE COURT:  Okay.  And we did have some

6     discussion on this.  I think the reasons were amply

7     stated against admissibility.  I think for purposes

8     of this document being included in the particular

9     file that was seized, the government's position is

10    supportive of that.  I will, over objection,

11    receive this particular document as one of the

12    documents contained in the file.

13          (Government Exhibit 118.01 was received

14          into evidence.)

15          MR. MANGO:  Thank you, your Honor.  I

16    would ask that it be published.

17          THE COURT:  And it's over objection.  Yes.

18    BY MR. MANGO:

19    Q.  Mr. O'Connor, do you see the document now on

20    your screen?

21    A.  Yes, I do.

22    Q.  Let's just focus on this section here.

23        Are you familiar with what the Tonawanda News

24    is?

25    A.  I am.

1    Q.   What is it?

2    A.   It's a newspaper.

3    Q.   Okay.  Is there a date on this?

4    A.   There is a date on this document.

5    Q.   Okay.  And what does this -- what does this

6    document -- is there a title for this document?

7    A.   Well, there's an -- it's a computer-generated

8    story or -- well, it appears to be taken from the

9    Internet.

10   Q.   Okay.

11   A.   And the title of the page is Tonawanda News and

12   then there is a title of the story below that.

13   Q.   Okay.  And if we can zoom out of this, please.

14   And if we could just --

15        THE COURT:  Well, the date is March 2nd,

16   2005, right?

17        MR. MANGO:  Yes, your Honor.

18     If we could just focus on these two paragraphs

19   at the bottom.

20        MR. LINSIN:  Your Honor, if we may, could

21   we go back to the top just so the record is clear?

22        THE COURT:  Yes.

23        MR. LINSIN:  If we'd enlarge the area

24   below the headline, I believe the date of

25   publication appears to be February 25th, 2005.

1              MR. MANGO:  That would appear to be

2     correct, your Honor.

3              THE COURT:  Okay.  And the March 2, 2005,

4     date relates to site updates, at least by whatever

5     terminology that establishes --

6              MR. LINSIN:  Yeah.

7              THE COURT:  Okay.  The record will so

8     reflect.

9              MR. MANGO:  If we could focus on the last

10    two paragraphs.

11        Take a look at that.  Do you see the name

12    Tonawanda Coke anywhere in these two paragraphs?

13             THE WITNESS:  Yeah, I do.

14             MR. MANGO:  Okay.  All right.

15             THE COURT:  All right.  And that

16    information, ladies and gentlemen, is not offered

17    to establish anything other than the article states

18    this information in it and the article was

19    contained in the file.  And as such, it could

20    comprise notice of at least what the article's

21    contents are in this particular piece from the

22    Tonawanda Press.

23        Okay.  You may proceed.

24             MR. MANGO:  Thank you, your Honor.

25    BY MR. MANGO:

1   Q.   I'd like to --

2        We can take that down now, Lauren, thank you.

3        Mr. O'Connor, do you know if -- we went through

4   records now that were seized from Defendant

5   Kamholz's office, is that right?

6   A.   Yes.

7   Q.   Okay.  Do you know if other records were seized

8   during the course of the search warrant from other

9   locations at the Tonawanda Coke Corporation?

10  A.   Yes.  I do know that there were records taken

11  from other locations that day.

12  Q.   Okay.  At this point, your Honor, I would ask

13  to pull up Government Exhibit 120 for

14  identification purposes.

15       Mr. O'Connor, do you see that document on your

16  screen?

17  A.   I do.

18  Q.   And are you familiar with this document?

19  A.   I am.

20  Q.   Okay.  Where did this document come from?

21  A.   It came from an office in the administration

22  building at Tonawanda Coke Corporation.

23  Q.   Okay.

24  A.   That office was on the second floor.

25  Q.   Okay.  And have you reviewed this document?

1    A.  Yes, I have.

2              MR. MANGO:  Your Honor, for reasons we

3    discussed earlier -- and I can go into more detail

4    if necessary -- the government would move

5    Government Exhibit 120 into evidence.

6              THE COURT:  Same objection, Mr. Linsin?

7              MR. LINSIN:  Same objections, relevance

8    and 403.

9              THE COURT:  Are those two objections or

10   one?

11             MR. LINSIN:  Actually, it's two.  They

12   would stand alone -- either would stand alone.  We

13   believe it to be irrelevant and even if that was

14   determined against us, we believe it to be

15   inadmissible under 403, as well.

16             THE COURT:  Okay.  Thank you.

17   Mr. Personius.

18             MR. PERSONIUS:  I'll join in the

19   objection, Judge.

20             THE COURT:  Okay.  All right.  I think in

21   keeping with my understanding as the arguments were

22   expressed, I will overrule those objections, and

23   permit you to proceed and receive 120.  And again,

24   it will be subject to cross-examination, if you

25   will, if I can express it that way, although we're

1    talking about an exhibit as such, but, in any

2    event, 120 received.

3              (Government Exhibit 120 was received into

4              evidence.)

5              THE COURT:  Over objection.

6              MR. MANGO:  Thank you, your Honor.

7    BY MR. MANGO:

8    Q.  Mr. O'Connor --

9         I'd ask that it be published for the jury.

10        Mr. O'Connor, do you see what is on your screen

11   now?

12   A.  Yes, I do.

13   Q.  What is this document?

14   A.  That's a copy of the cover of a binder.

15   Q.  Okay.  And the binder was seized during -- or

16   where did the binder come from?

17   A.  The binder came from an office in the

18   administrate building at Tonawanda Coke on the

19   second floor.

20   Q.  During the execution of your search warrant?

21   A.  Yes.

22   Q.  Okay.  And this is a -- mentions a business

23   plan.  Is there a fiscal year period that is given?

24   A.  Yes, there is.  It says it's the business plan

25   for the fiscal year ended June 30th, 2009.

1    Q.   Okay.  Now, have you reviewed this document?

2    A.   Yes, I have.

3    Q.   All right.  Are there any references in this

4    document to environmental compliance?

5    A.   Yes, there are.

6    Q.   Okay.

7         I'd like to move, your Honor, to page 16 of

8    this exhibit.

9         Do you see -- what is the title at the top of

10   page 16?

11   A.   The top of the page says "Market Analysis."

12   Q.   Okay.  And I'd like to focus on the bottom part

13   here.

14        What is the -- the heading for this bottom

15   part?

16   A.   The heading of this section, the bottom part

17   says "weaknesses."

18   Q.   If you could read for the jury that last two

19   lines.

20   A.   The last two lines read, "Significant

21   environmental pressures include ongoing compliance

22   with local, state, and federal emissions

23   regulations."

24   Q.   Okay.  Do you know, Mr. O'Connor, if there was

25   any other reference to environmental risks in this

1    document?

2    A.   Yes.   I do know that there were references to

3    environmental risks in this document.

4    Q.   Okay.  I'd like to go to page 18 of this

5    document.  And do you see -- if we could just focus

6    on that.

7        What's the heading for this section that we've

8    now enlarged?

9    A.   The heading that shows up on this section is

10   "Risks."

11   Q.   Okay.  And do you see a subheading here titled

12   "Environmental Risks"?

13   A.   Yes, I do.

14   Q.   Okay.  If you could please read sub 1 and sub 3

15   for the jury.

16   A.   Sub 1 reads: "Regulatory.  The laws that may

17   impact our product are primarily environmental.

18   Tonawanda Coke Corporation will stay abreast of

19   legal issues facing our industry through trade

20   associations."

21   Q.   And number 3, please?

22   A.   Number 3 reads:  "Economic.  Compliance with

23   environmental mandates often involves substantial

24   capital expenditures."

25   Q.   Mr. O'Connor, do you know -- during your review

1    of records seized during the search warrant, did

2    you come upon any other business plans for the

3    Tonawanda Coke Corporation?

4    A.  Yes, I did.

5    Q.  Okay.  What -- did those have years associated

6    with them?

7    A.  Yes, they did.

8    Q.  And what were those years?

9    A.  They were for years ending 2005, 2007,

10   and 2008.

11   Q.  In addition to this 2009 one we just read?

12   A.  In addition to this 2009 business plan.

13   Q.  That language that I just had you read that was

14   on page 16 and on page 18, was there language --

15           MR. LINSIN:  Objection.  Objection.  He's

16   asking a witness to testify about documents that

17   are not even in evidence.

18           THE COURT:  True.  Sustained.

19           MR. MANGO:  Your Honor, at this point I'd

20   like to pull up -- let me --

21       We can take this down.  Thank you, Lauren.

22       Mr. O'Connor, we went through some of these

23   circular bleeder charts, is that right?

24           THE WITNESS:  Yes, that's correct.  We

25   did.

1   BY MR. MANGO:

2   Q.  Okay.  Now, during your review of the materials

3   seized during the execution of the search warrant,

4   do you know if any additional -- other than what we

5   looked at, any additional bleeder charts were

6   seized?

7   A.  Yes.  I do know that additional bleeder charts

8   were seized.

9   Q.  Okay.

10          MR. MANGO:  Your Honor, at this point I'd

11   like to pull up Government Exhibit 400, no decimal

12   point.

13          THE COURT:  You saw the light, Mr. Mango.

14          MR. MANGO:  For identification.  I did.

15   Took a little while.  We got to 400.  But I did.

16   This is for identification purposes.

17      Mr. O'Connor, do you see this document that is

18   on your screen?

19          THE WITNESS:  Yes, I do.

20   BY MR. MANGO:

21   Q.  And what do you recognize this document as?

22   A.  I recognize it as a circular bleeder chart.

23   Q.  Okay.  Where did this come from?

24   A.  This bleeder chart came from Pat Cahill's

25   office at Tonawanda Coke Corporation during the

1    execution of the search warrant.

2    Q.  Okay.

3          MR. LINSIN:  Your Honor, could we just

4    have some basis for that testimony?  I don't quite

5    understand --

6          THE COURT:  Let's do it now.

7          MR. MANGO:  Yes, your Honor.

8          THE COURT:  Please.

9    BY MR. MANGO:

10    Q.  Mr. O'Connor, did you review, as part of your

11    review at the U.S. Attorney's office where certain

12    records came from that were seized during the

13    search warrant?

14    A.  Yes, I did.

15    Q.  Okay.  And is that how you're able to -- how

16    are you able to say that this came from

17    Mr. Cahill's office?

18    A.  Through my review and, in this case, I happened

19    to be the one that seized this set of charts.

20    Q.  Okay.

21          MR. MANGO:  All right.  Your Honor, the

22    government would move Government Exhibit 400 into

23    evidence which is a bleeder chart for December 9th

24    of 2009.  And there's a number of them, your Honor.

25    And if there is no objection, I would move

1    consistently from Government Exhibit 400 all the

2    way up to Government Exhibit 569 into evidence.

3            MR. LINSIN:  All of the same foundation we

4    just heard, all seized from Mr. Cahill's office by

5    this witness?

6            THE COURT:  Mr. O'Connor, is that true?

7            THE WITNESS:  Yes, that's true.

8            THE COURT:  Okay.

9            MR. LINSIN:  No objection, your Honor.

10           THE COURT:  All right.  Mr. Personius?

11           MR. PERSONIUS:  Could we have a time frame

12   again, please, Judge?

13           MR. MANGO:  Yes.  The first chart, your

14   Honor, is dated December 9th, 2009, that's

15   Government Exhibit 400.  And the last chart is

16   dated May 15th of 2009, and that's Government

17   Exhibit 569.  And they range in between that time

18   period.

19           MR. PERSONIUS:  No objection, Judge.

20           THE COURT:  Okay.

21           MR. PERSONIUS:  Thank you.

22           THE COURT:  All right.  Exhibit --

23   Government Exhibit 400 through Government

24   Exhibit 569, all bleeder chart documents, received

25   into evidence without objection.

1          Do you wish to publish any?

2                (Government Exhibits 400 through 569 were

3                received into evidence.)

4                THE COURT:  You have 400 on the screen

5     right now.

6                MR. MANGO:  Not at this point.  I'd just

7     ask to publish Government Exhibit 400 as a

8     representative example.

9     BY MR. MANGO:

10    Q.   Mr. O'Connor, do you see that on your screen?

11    A.   Yes, I do.

12    Q.   For the jury's benefit, if we just can blow up

13    this central portion.

14         What is the date listed there?

15    A.   The date is 12/9/09.

16    Q.   Okay.  Thank you.  Okay.

17                THE COURT:  Actually, that's the latest

18    dated circular chart document, right, the bleeder

19    chart document?

20                MR. MANGO:  Yes, your Honor.

21                THE COURT:  Okay.

22                MR. MANGO:  May have not fully learned all

23    the lessons yet but, yes.  It does go backwards in

24    time.

25                THE COURT:  Okay.  Okay.  I won't say

1    anything more, Mr. Mango.

2              MR. MANGO:  I have one more set, your

3    Honor.  If we could pull up Government Exhibit

4    21.01 for identification purposes.

5         And, Mr. O'Connor, ask you to take a look at

6    that.  Do you see that on your screen?

7              THE WITNESS:  Yes, I do.

8    BY MR. MANGO:

9    Q.  Okay.  What is this document you see on your

10   screen?

11   A.  It's a circular bleeder chart.

12   Q.  Where did this bleeder chart come from?

13   A.  I'm not sure if this particular one was part of

14   that set or not, but it came from the search

15   warrant.

16   Q.  Okay.  You're familiar that this came from the

17   search warrant?

18   A.  Yes.

19   Q.  All right.

20             MR. MANGO:  Your Honor, the government

21   would offer Government Exhibit 21.01 into evidence.

22             THE COURT:  You want to expound on that a

23   little bit I think, right?

24             MR. LINSIN:  It would be helpful.

25             THE COURT:  Give us in terms of more

1    information relative to your role in the seizure of

2    this particular exhibit.

3              THE WITNESS:  Well, my role was that I was

4    present there, but that I reviewed these documents

5    back at the U.S. Attorney's office at a subsequent

6    time to the search warrant.

7              THE COURT:  Okay.  And the date of the

8    seizure?

9              THE WITNESS:  The date of the seizure was

10   December 17, 2009, your Honor.

11             MR. LINSIN:  Your Honor, is there any

12   marking on this document that -- that helps the

13   witness understand that it was, in fact, one of the

14   these myriad of charts seized or from where it was

15   seized?  Folder or not.  Anything.

16             THE COURT:  Is there like that,

17   Mr. O'Connor?

18        Why don't you take the center disc and blow

19   that up for a minute.  All right.

20        Anything there or anywhere on that particular

21   copy of the exhibit that identifies it to a

22   particular location on a particular date or

23   whatever?

24             THE WITNESS:  What I can say is that it's

25   a bleeder chart and I know that it was seized at

1   the warrant -- during the warrant, but this

2   particular one, I'm not sure what location it was

3   taken from.

4           THE COURT:  Okay.  But it looks like

5   1/1/09.  Is that the right date?

6           THE WITNESS:  That's the date on the

7   chart.  That's not the date of the seizure.

8           THE COURT:  Okay.  So, your testimony is

9   that you know this to have been seized pursuant to

10  the search warrant from an earlier review of this

11  particular exhibit at the U.S. Attorney's office?

12          THE WITNESS:  Yes, your Honor.

13          THE COURT:  It goes to weight, I think.

14          MR. LINSIN:  No objection, your Honor.

15          THE COURT:  All right.  Mr. Personius?

16          MR. PERSONIUS:  No objection, Judge.

17          MR. MANGO:  Yes, your Honor.  Thank you.

18  I would move this into evidence and ask at least

19  this one be published for the jury.

20          THE COURT:  Okay.

21          (Government Exhibit 21.01 was received

22          into evidence.)

23          MR. MANGO:  And there is another series of

24  exhibits, your Honor, and I believe the same

25  foundational questions would apply to the

1    Exhibit 21 series which are Government

2    Exhibit 21.02 up to 21.72, which start in January

3    of 2009 and range to March 15th of 2009.  And I

4    would move all of those documents into evidence,

5    your Honor.

6              THE COURT:  You had 21.61 already

7    received, though.  So --

8         Right?

9              MR. MANGO:  Yes, your Honor.  Yes.  You're

10   right.  So absent 21.61, I would move the package

11   of 21.02 to 21.72 into evidence.

12             MR. LINSIN:  Your Honor, 21 -- the date of

13   21.02, please?  I just -- I heard January of '09.

14   I don't know what date it is.

15             MR. MANGO:  It starts at January 2nd of

16   2009.

17             MR. LINSIN:  Okay.  All right.

18        No objection, your Honor.

19             MR. PERSONIUS:  No objection, your Honor.

20             THE COURT:  Okay.  21.02 excluding 21.61

21   through and inclusive 21.72, received, no

22   objection.  Subject to the same foundational

23   questions and answers, and you may selectively --

24   well, you've already displayed 21.01.  So I don't

25   know if you want -- and that's on the screen right

1    now.  It's been published.  Is there anything else

2    you want to do?

3              MR. MANGO:  Not with this series of

4    exhibits, your Honor.

5              (Government's Exhibit 21.02 through 21.60

6              and 21.62 through 21.72 were received into

7              evidence.)

8              THE COURT:  Okay.

9              MR. MANGO:  Thank you.  If I can have a

10   moment.

11             THE COURT:  Sure.

12             MR. MANGO:  Your Honor, the government has

13   no further questions for Mr. O'Connor at this

14   point.

15             THE COURT:  Okay.  We probably should

16   break at this point.

17      Mr. O'Connor, we'll call you back, though,

18   after the jury comes back from lunch.  We'll --

19   please, ladies and gentlemen, don't discuss the

20   case.  Keep your minds open.  Keep in mind that the

21   government has to prove its case beyond a

22   reasonable doubt.  The best advice I can give you

23   is enjoy that lunch today.  All right.  And we

24   we'll see you back here at what time?

25   2:00 o'clock.  Thank you very much.

1              (Jury excused from the courtroom.)

2              THE COURT:  Okay.  You can step down you,

3     Mr. O'Connor.  Thank you.

4          All right.  We'll see everybody at 2:00.

5              MR. LINSIN:  Thank you, your Honor.

6              MR. MANGO:  Thank you, Judge.

7              (Lunch recess was taken.)

8              (Jury not present in the courtroom.)

9              THE COURT:  Okay.  We're back on in

10    Tonawanda Coke and Mark Kamholz, defendants.

11         Is there an issue that we need to work out?

12             MR. LINSIN:  We thought it might be

13    helpful to address the Court on this issue that we

14    had spoken about briefly this morning before

15    testimony began, and that is these two summary

16    charts that the government has prepared.

17             THE COURT:  Yes.

18             MR. LINSIN:  We have had a chance to

19    review them, and I just wanted to give -- I don't

20    know if it'll literally come up this afternoon, but

21    I wanted to at least give the Court a sense of what

22    we're looking at here.

23         There are two summary charts.  One of them is

24    an abstract of entries that are contained in the

25    by-products operators' log which is in evidence.

1    We've spoken to counsel for the government.  Our

2    sense is that there are some errors in the chart as

3    developed.  Some of the entries, we believe, are

4    incomplete and should be augmented so that they are

5    complete.  I don't see a problem working our way

6    through to an accurate summary abstract of the

7    entries in the BP log that reflect adjustments in

8    the set point for the -- for the pressure relief

9    valve.  So I think we can get to where the

10   government wants to get with regard to that first

11   summary chart.

12        We have very profound concerns, however, about

13   the second summary chart which purports to be a

14   calculation based upon the entries in the operator

15   logbook and a comparison of the circular charts for

16   the intervening periods of time.  And the spikes

17   reflected in those circular charts that go above a

18   given set point purports to be a calculation of the

19   number of releases throughout that time period.

20             THE COURT:  Not tonnage but the number?

21             MR. LINSIN:  The number of releases.

22             THE COURT:  Okay.

23             MR. LINSIN:  But here's the concern, your

24   Honor, and why we believe that the way this is done

25   and what it purports to represent is -- is a

1    significant distortion of the evidence in this case

2    already.  As the Court may recall, Pat Cahill, who

3    was the BP operator, testified that he would make

4    changes in the set point for this pressure relief

5    valve and not record it.  As the BP foreman, not

6    record it.

7                 THE COURT:  He said he never recorded

8    anything.

9                 MR. LINSIN:  Exactly.  And one of the

10   premises of this summary chart is that -- that the

11   set point remains the same from one entry to the

12   next.  So all the calculations are based on that

13   presumption.  There may be three months intervening

14   between the entries, and the calculations are

15   assuming that the number is the same.  So there's

16   Cahill's testimony that he never recorded anything

17   in the BP log.

18       If you look at the logbook itself, your Honor,

19   there are entries in here that were recorded by the

20   operators that demonstrate on their face that not

21   all the entries are recorded.  And, for example,

22   there is an entry in August 29th of 2007 which

23   indicates the set point was 80.  The very next

24   entry which is October 7th, a little over a month

25   later, it states that the set point was lowered to

1    90.   And so it's obvious that there had been one

2    more changes in between this intervening time.   And

3    again, the government's calculations in its chart

4    presume that the set point has remained identical.

5        There is another point, your Honor, that I

6    will -- because what it compares the circular

7    charts to is the set point in the last entry in the

8    operators' log.

9            THE COURT:   But I think Cahill always said

10    he raised the point, didn't he?   I'm not sure he

11    ever said he lowered it.   I don't remember that.   I

12    don't know if that makes a difference for purposes

13    of where you're going.

14            MR. LINSIN:   There's testimony from

15    Mr. Cahill, as I recall, that certainly during --

16    there was testimony about raising and lowering

17    during the April '09 inspection.   All right.

18    That's one issue.   But he also testified, as we

19    recall, that he changed and adjusted this set point

20    at other times.   And never -- as the foreman, never

21    recorded it in there.

22        There is another entry here, your Honor, by Pat

23    Cahill admonishing the operators not to change the

24    set point without his express direction.   Again,

25    the logbook itself reflecting that there is a

1    problem that the set point is getting changed

2    without being recorded.

3        And perhaps -- well, additionally important,

4    your Honor, even though it hasn't been the subject

5    of active testimony, the government had on its

6    witness list a former BP operator, James Bodie.  I

7    forget his first name.  James Bodie.  He has

8    testified -- he has stated to the government in a

9    number of interviews, the government is aware of

10   this, that even as a BP operator, it was his

11   practice to change this set point without recording

12   it in this logbook.  And so what we're dealing

13   with -- and the record here demonstrates that the

14   logbook says what it says and we're prepared to

15   agree to, you know, a summary chart reflecting

16   that.  But then extrapolating from that those

17   statements into a statement that -- into a summary

18   chart that purports to reduce this to a calculation

19   of exact number of releases in a given time period,

20   I think distorts the evidence that has already been

21   introduced in the case, and provides a very, very

22   misleading picture of this issue.  The jury is free

23   to make its own comparisons.  They will have these

24   circular charts and all the testimony.  But we

25   believe this is a distortion and not faithful to

1    the evidence that it purports to summarize.  So we

2    have a very significant concern about this summary

3    chart for those reasons.

4            THE COURT:  But the summary chart, as far

5    as it goes in terms of what it reflects from the

6    records, it's accurate as to the set points.  The

7    only difference that -- not difference, but the

8    point of contention here is that you feel that the

9    set points that are reflected are not wholly

10   accurate because there may well be additional ones

11   that are not recorded?

12           MR. LINSIN:  That's right.  And the

13   summary chart -- if this was a summary chart, your

14   Honor, of -- regarding activities on the day of the

15   entry in -- in the BP logbook, there might be a

16   quibble about it, but it's not that significant.

17   There could be a gap of 30 or 45 or 60 days.  This

18   summary chart is presuming that the set point has

19   remained the same for that entire period, and that

20   conflicts with the evidence.

21           THE COURT:  Well, isn't that for you to

22   point out?

23           MR. LINSIN:  Your Honor, I think a summary

24   chart should only be admissible if it fairly

25   reflects what the evidence is, as a threshold

1    matter.  I don't think this goes to weight.  I

2    believe that this presumes a normalcy and a

3    predictability in what that set point was.  And I

4    don't think we should be put in the position of

5    having to -- of permitting the government to

6    introduce a demonstrably unreliable summary and

7    then having to point out that unreliability.  I

8    think -- under 1006, I do not believe that summary

9    charts should be admitted if it is obvious on the

10   record that is not faithful to the underlying

11   evidence.

12        THE COURT:  Okay.  All right.  I certainly

13   understand the argument.

14     Mr. Mango.

15        MR. MANGO:  Yes, your Honor.

16        THE COURT:  I mean, I think that's right.

17   When you're talking about a summary chart, it has

18   to be based on the evidence.  And you have both

19   documentary and testimonial evidence here.  So how

20   is that summary chart faithful to the evidence

21   presented?

22        MR. MANGO:  Yes, your Honor.  The -- the

23   set of summary charts -- they're really a set of

24   summary charts, the green ones versus the orange

25   one, the first one Mr. Linsin was referring to.

1           THE COURT:  All right.  The orange one

2    we're not concerned with, right?  You can work that

3    out?

4           MR. MANGO:  Right, but they do relate,

5    your Honor, because this is a document that is used

6    then into the green summary charts which is a

7    summary for the time period that we have circular

8    charts.  We don't have circular charts before '09.

9    So this reference in 2007 that bleeder now at 80,

10   and then two months later, a month and a half later

11   lowered bleeder to 94, that's two years before the

12   time period being referenced in here.

13      My recollection of the testimony is Pat Cahill

14   would note in the log when he made changes but not

15   during the April inspection.  That's when he said,

16   because he didn't want anybody to find out that --

17   what he was doing.

18           THE COURT:  I don't recall, but --

19           MR. MANGO:  And --

20           THE COURT:  Let's assume for the moment he

21   didn't say that.  Then what?  What if he said --

22   which is my recollection, and I'll -- I'll pull it

23   up.  If he said that he never recorded any of his

24   changes, which is what I think he said, then what?

25   Then you're not accurately reflecting the state of

1        the record in the summary.

2                MR. MANGO:  I think, your Honor, when

3        there is a specific entry in a logbook which says

4        bleeder now at 90 -- or lowered bleeder to 94, say,

5        on March 2nd of 2009, and then the next day, raised

6        bleeder to 100.  And then two and a half months

7        later, bleeder back in service, 110.  That is

8        consistent with the evidence.  Because what we --

9        what we heard was that the bleeder setting was

10       typically between 80 and 100.  And so for these

11       periods -- we're talking about just a very small

12       period of time here on this orange chart that

13       relates to the green charts.  And it's -- there has

14       been testimony from Mr. Hutchinson, Mr. Cratsley, I

15       believe Mr. Brossack, that the bleeder rarely got

16       changed.  It would rarely get changed.

17               THE COURT:  But you have testimony that it

18       was changed.

19               MR. MANGO:  Yes, yes.  So there could be

20       periods of months --

21               THE COURT:  What do you do with the one

22       example Mr. Linsin gave you where I think the

23       testimony was or the chart reflects a lowering to a

24       point that was above a certain number?

25               MR. LINSIN:  Higher than the last recorded

1    set point.

2             THE COURT:  Yeah.  How do you reconcile

3    that?

4             MR. MANGO:  That is two years before

5    anything that begins to be recorded on these

6    charts, your Honor.  Clearly, it's -- clearly, it's

7    a discrepancy and that is a subject that could --

8    could be cross-examined of the witness on.  But the

9    evidence is what it is.

10            THE COURT:  Well, not if you don't account

11   for the testimony.  I mean, if you're wrong about

12   what Cahill said, then your chart is not an

13   accurate summary.

14            MR. MANGO:  Well, then what we could do,

15   your Honor, is -- is the only time periods in play

16   from this orange chart, the bleeder is set from

17   90 -- between the period of September of '08 and

18   March of '09 from 90 to 94.  So in that -- all of

19   January, February, and the first day of March, for

20   the purposes of this chart, we've assumed that the

21   bleeder was set at 90.  Then we've got 94, 100, and

22   110.  For purposes of -- if the Court is really

23   concerned and wants to be consistent with the

24   testimony, the testimony --

25            THE COURT:  Well, you should be too,

1    right?

2              MR. MANGO:  Yes.  But I also wanted to

3    stay true to the by-products logbook which, again,

4    there is no real discrepancy in this small little

5    time frame.  The settings in this green summary

6    chart could just be reflected to 100 as an estimate

7    because that was what the general setting was, 80

8    to 100.  So we'll presume it's set at the highest

9    setting in the typical set point unless the

10   by-products logbook conflicts with that, and then

11   we'll use the by-products logbook.

12        There's got to be some way, your Honor, to

13   capture this information.  Otherwise, all of these

14   circular charts that are now in evidences will have

15   no meaning to the jury and there does need to be

16   some type of meaning.  And I think it's a reliable

17   meaning to go based on the testimony here, and then

18   the logbooks of what they indicate the bleeder was

19   set at.  Which -- and give the benefit of the doubt

20   of if it's lower than 100, we'll recalculate and

21   put it at 100.

22             MR. LINSIN:  Your Honor, I'm troubled even

23   by counsel's comments that we're now going to start

24   making estimates and then performing precise

25   arithmetic calculations based on estimates.  The

1    testimony is and has consistently been from a

2    number of witnesses, and the by-products logbook

3    itself reflects that these numbers are not entirely

4    reliable.  And that there was a practice of the

5    operator -- of the foreman himself and of some of

6    the operators to change this set point at times and

7    ways that you are not reflected in the logbook.

8    And the truth is the jury has heard that evidence,

9    they can assess that evidence, and I'm not at all

10   surprised that the government would like to be able

11   to reduce this to some formula and come up with a

12   graph that has the indicia of reliability and

13   predictability, but that very process I believe

14   defies the evidence that has actually been

15   introduced.  And it is that -- and the suggestion

16   that we just come up with some compromise number

17   even worsens the problem.

18          MR. PERSONIUS:  Judge, if it's helpful,

19   from Mr. Kamholz's notes on March 6th, 2013, at the

20   conclusion of my cross, because I remembered asking

21   Mr. Cahill this and, your Honor, it would be right

22   around -- we broke at 11:05, we came back at 11:35.

23   So it would be around 11:35 on March the 6th at the

24   conclusion of my cross, right before Mr. Linsin's

25   cross, I asked Mr. Cahill, "Are you telling us that

1    you didn't record your changes?"

2           THE COURT:  Did not?

3           MR. PERSONIUS:  "Did not."  Because it was

4    news to me, and he said, "That's correct.  I did

5    not."  Because I remember I was surprised by it.

6    We had a break.  I thought about it.  I said, you

7    know, I'm going to ask him to confirm that.

8           THE COURT:  That's my recollection.  I

9    mean, I think it was sort of cause for me, too, to

10   pause at the time he said that.  I don't recall

11   what you recall, Mr. Mango.  And, you know, at

12   first I thought maybe this is a matter of weight.

13   But I think it is right that if your chart, based

14   on the available evidence that was presented either

15   by direct or cross, does not purport to be an

16   accurate summary of that evidence, it's

17   problematic.  It's problematic.

18          MR. MANGO:  I do remember asking

19   questions, your Honor -- and again, sorry I don't

20   have the exact witness and citation -- of is the --

21   is the by-products logbook generally accurate to

22   what the bleeder is set at.  I believe that has

23   come up.

24          THE COURT:  Well, I don't know if anybody

25   disagrees with that.  That may well have been the

1      testimony, but that doesn't account -- I don't

2      think, and this is the point -- for the testimony

3      with respect to those adjustments in the set point

4      that took place and weren't recorded.  That's what

5      we're talking about.

6              MR. LINSIN:  That is true, your Honor.

7      And I must go back to this point.  I'm troubled by

8      the recognition -- the government's recognition

9      that they have in their files interview reports

10     from James Bodie, a by-products operator, who has

11     told them, "yeah, I changed this set point and I

12     didn't record it."  Now, they scratched him off

13     their witness list.  I can't tell you why, but they

14     know what these facts represent.  And it is a

15     distortion of -- of reality here to suggest that

16     somehow because some entries got in this logbook,

17     then we can presume that they remained the same

18     from one date to the next.  And it is -- it is

19     unfair, and I think -- well, I believe the premise

20     of this summary chart is fatally flawed.

21             MR. MANGO:  Your Honor, he was not

22     scratched for any particular reason such as that.

23     He was scratched because the evidence would have

24     been cumulative.  I could check my notes.  And it's

25     my recollection when I recently interviewed

1    Mr. Bodie that he was not prepared to say what --

2    what counsel is suggesting.  Likewise, that's not

3    evidence in the case anyway, so that's really --

4            THE COURT:  No, it's not.  But your

5    concern is to -- from the standpoint of those

6    circular bleeder chart documents, to give them some

7    meaning --

8            MR. MANGO:  Right.

9            THE COURT:  -- through the summary charts,

10   right?

11           MR. MANGO:  Yes.

12           THE COURT:  If you didn't have the chart,

13   what do you do with them?

14           MR. MANGO:  The summary chart?  What do I

15   do with the circular charts now in evidence?

16           THE COURT:  Um-hum.

17           MR. MANGO:  I make reference in closing to

18   them.  I'm at a loss.  I have no use for them at

19   that point, other than to -- to argue hypotheticals

20   when the by-products logbook itself records

21   exactly --

22           MR. PERSONIUS:  It doesn't.

23           THE COURT:  But it doesn't take into

24   account those settings that were made that weren't

25   recorded.  And there could have been numerous

2832

1    settings not only by Cahill but by others, as I

2    recall the testimony.

3              MR. PERSONIUS:   Judge, there is another

4    piece to this, too.   There was -- if you recall

5    from the evidence, there was a response put in by

6    Mr. Kamholz to this 114 letter from the EPA in

7    October of 2009.   And the government's made much of

8    the fact that Mr. Kamholz said in that response

9    that the PRV releases were rare or infrequent.

10         And the point I made was that's as of that

11   time, because then we had the testimony from

12   Mr. Sitzman that the -- there had been a

13   recommendation that the pressure be raised up, and

14   Mr. Sitzman confirmed that his information was that

15   there had not been any releases at that time.

16         With the government's chart, what they're

17   trying to show is there were all these releases

18   through that period of time based upon the logbook,

19   which is not reliable.   So it's not just a question

20   of using the circular charts.   The government wants

21   to try to use this, I believe, to demonstrate, and

22   I think improperly, that when Mr. Kamholz provided

23   his response in October of 2009, he wasn't being

24   truthful, and that's contrary to the evidence.   The

25   evidence supports the fact he was being truthful.

1    So there is that further enormous prejudice that

2    would arise from allowing the government to use

3    this chart, which is not based on the evidence.

4            MR. MANGO:  Your Honor, I've got to

5    disagree with that comment.  The by-products

6    logbook, the last entry of -- for what is in

7    evidence, is on May 22nd where it says "bleeder

8    setting 110."  And previously, a month and a half

9    before it was 100.  That's consistent with

10   Mr. Sitzman's recollection that somehow he learned

11   somebody turned the bleeder up.  But, it was never

12   turned up so that this thing wouldn't release.

13   There's been no evidence of that.  There hasn't.

14           MR. PERSONIUS:  Oh, but there has --

15           THE COURT:  Well, that's the purpose of

16   turning it up, right?  So that there wouldn't be a

17   release.

18           MR. MANGO:  But there's no evidence of

19   that.  Nobody's said, "I turned it up so it

20   wouldn't release based on what the DEC asked me to

21   do."  Nobody said that.

22           MR. LINSIN:  Your Honor, that -- that is

23   just -- the evidence from every regulatory witness

24   that was at the closeout meeting of the April '09

25   inspection confirmed that the plant personnel,

1    Mr. Kamholz, told them that they would look into

2    adjusting this set point so that it would reduce or

3    eliminate the releases.  And then Mr. Sitzman

4    testified that after that inspection, he satisfied

5    himself that that had been done.  That is the

6    evidence.  That's what the government's witnesses

7    testified to.

8            MR. MANGO:  And then a month later, we

9    have -- during that April inspection, your Honor,

10   the government regulator noted the pressure setting

11   was -- release point was 130.  Right?  And a month

12   now later after that inspection, we have a notation

13   in the BP log that it's 110?  It's because the

14   corporation was not willing to turn this up.

15   They -- they were just giving the regulators what

16   they wanted to hear.

17       And the evidence shows from the by-products

18   logbook that it was -- it can't be corroborated,

19   the information that they claim that this was

20   raised so it wouldn't release.  Nobody has said

21   that we ever put it up to 160, 180.  You'll look on

22   these charts.  That's where it would have had to

23   have been for there to be no releases from this

24   bleeder.  And that's just not in evidence.

25           MR. PERSONIUS:  It is in evidence through

1    Mr. Sitzman, Judge.  It is.  And he -- he's the

2    government's witness, and he said that he

3    determined it had not released.  The government had

4    every opportunity during redirect or re-redirect,

5    wherever we were at that point, to clear that up,

6    and they left the record the way it was.  They left

7    it alone.  That's the record.  They may not like

8    it, but that's the record.

9           MR. MANGO:  That's not the record, your

10   Honor.  We did clear it up.  We asked him, "How do

11   you know that?"  He said, "I don't recall."  So the

12   weight of that evidence, in the government's view,

13   is substantially diminished because he couldn't

14   remember if he ever visited and observed this

15   bleeder chart at the raised setting.  He can't

16   recall who he spoke to that said, after the fact,

17   that it was raised.  He never went to the plant and

18   looked to see if it was releasing.  So, the weight

19   of that evidence is minimal, in the government's

20   view, your Honor.

21          THE COURT:  But it does exist, right?  It

22   does exist?

23          MR. MANGO:  It does exist.  But then you

24   have to look one month later, after the April

25   inspection.  There's a notation in the logbook,

1        "bleeder at 110, looking good."

2              MR. LINSIN:  Your Honor, if I may, and I

3        apologize for interrupting.  I believe that this

4        very discussion illustrates the risks that this

5        kind of summary chart poses here.  The jury will be

6        free to evaluate the testimony we have been

7        referencing here.  They will be free to pick these

8        circular charts up -- I have no doubt they will --

9        and see where those markings are and to compare

10       them with the actual evidence that is in trial.

11       And to suggest through admission of what should be

12       a reliable summary document, to suggest that

13       they -- they can shorthand that process and refer

14       to this summary document that has been admitted, I

15       think does a serious disservice to what this jury

16       needs to go through to evaluate all this evidence.

17             THE COURT:  When are we going to get to

18       this testimony in this chart?  Right now?

19             MR. MANGO:  No, your Honor.  I think this

20       is likely going to happen on Monday going at the

21       pace we have.  After the cross of Mr. O'Connor,

22       who's still on the stand, there's still two other

23       witnesses that are still in play today.  And I

24       think that will take the rest of the day, in

25       honesty.  So it looks like our last witness,

1    Mr. Conway, would be on the stand on Monday.

2           THE COURT:  Okay.  Well, that -- that

3    gives me some time I guess.  All right.  I think

4    you've fully aired your arguments.  I understand

5    both positions.  I don't know what the answer is

6    yet.  But --

7           MR. LINSIN:  We will continue to work on

8    this first summary chart.

9           THE COURT:  Do you have an extra copy of

10   each set?  Let me just see if I can -- I'm not sure

11   I fully comprehend the comparison you were trying

12   to make.  If you would please, Mr. Linsin.  If you

13   would give that to Mr. Moeller to your left.  Thank

14   you.

15      Okay.  All right.  Let's have the jury brought

16   in at 2:45.  Okay.

17           MR. MANGO:  Yes, your Honor.

18           (Short recess was taken.)

19           (Jury not present in the courtroom.)

20           THE COURT:  I just want to follow up on

21   our -- I'm trying to look at the example you gave

22   me of the lower bleeder to the 94 set point and

23   that's from 2007.  And I know we talked about that,

24   right?  And the chart is limited to 2009.

25           MR. MANGO:  Yes, your Honor.

1          THE COURT:  Right?  And we don't have any

2    recorded information that reflects the same kind of

3    discrepancy, right?

4          MR. MANGO:  That's correct, your Honor.

5          THE COURT:  All right.  So are there other

6    sheets like this?  Or is this the only one?

7          MR. MANGO:  No, that's the only one.  This

8    is meant to be a chronology of all those different

9    logbooks that went into evidence.

10          THE COURT:  Okay.  So we have testimony,

11    as I remember it, of pattern and practice over the

12    years, I think.  In terms of the setting of the set

13    points or the changing of the set point, whatever

14    you want to call it, right?  What's critical here,

15    I think, is Cahill's testimony when he said that he

16    did not record changes to the -- that were made in

17    connection with the set point.

18      Was his testimony specific as to just the

19    investigation period, or was it the expanded year

20    of 2009, or was it with respect to the pattern and

21    practice over the years?  That's what I want to

22    ferret out now just for discussion purposes.

23      Mr. Linsin.

24          MR. LINSIN:  Your Honor, I did not review

25    my notes of his testimony.  My recollection of what

1      he meant when he testified -- and I will be happy

2      to check our notes on this -- was that he was

3      talking about his standard practice as the

4      by-products foreman.  That the by-products foreman,

5      at least his practice as the by-products foreman,

6      was not to record the changes.  That this was

7      something he instructed the operators to do and

8      that it was sometimes done and sometimes not done.

9                  THE COURT:  Because I'm not so sure my

10     recollection is on all fours with that.  I think

11     it's problematic, because if his recollection --

12     not recollection, maybe -- maybe it's his -- at

13     least if -- if it's my recollection and it's

14     correct and he only talked about that very limited

15     period of time where he didn't record the changes

16     in the set point, that might not really impugn the

17     integrity of what the government's trying to do by

18     this chart.

19                  MR. PERSONIUS:  That's, Judge, where I'd

20     ask you to consider checking the transcript at

21     exactly where I suggest because I have a very

22     distinct recollection of doing that.  And not that

23     you give it a lot of weight, but my client had that

24     in his notes.

25                  THE COURT:  That's what I'm going to need

1    everybody to check out.  Okay.  Because my

2    recollection, frankly, Mr. Personius, is I sort of

3    remember that.  I said that was pause for cause,

4    but the more I think about this, it sort of sticks

5    in my mind that his testimony when he -- we're

6    talking about what he did, it was so rivetting as

7    far as the investigation was concerned and

8    that's -- that's why I think we need to check that

9    through.

10          MR. PERSONIUS:  And that's why I went back

11   and asked him.  Generally what I recall was, and

12   your testimony was it was your practice, is what I

13   recall.  But that was to clear up exactly that

14   because I was a bit surprised by it.  But that's

15   only recall.

16          MR. LINSIN:  Your Honor, one other point

17   and I -- I have our own digest of this logbook but

18   I don't have it in front of me so I can't give a

19   precise date, but it is my recollection that Pat

20   Cahill also in the logbook in the time period that

21   is of interest to us, in 2009, made an entry

22   directing the other operators not to change the set

23   point without his express direction.  That, to me,

24   your Honor -- it may not be as blatant as the

25   example from 2007, but it evidences a concern on

1    the part of the foreman during our time period that

2    this set point was getting changed without his

3    knowledge and without it being recorded.  And I

4    understand it's not as clean but it is, I think,

5    still a significant entry.

6            THE COURT:  All right.  It is -- you know,

7    I don't disagree that it's a significant entry.

8    But it may revert back to the weight to be given to

9    the summary chart depending on how that plays out.

10   I think we need to clarify what's troubling me; and

11   that is, just what did Cahill testify to.  I don't

12   know if there's anybody else significantly that

13   testified to that period in the -- aside from

14   Sitzman.  But -- to the changing of the set point.

15   But I think we clearly have to know what Cahill

16   said with respect to 2009.  And big difference I

17   think if it's limited to 2009 and if it's part of

18   the pattern and practice.  Okay.

19           MR. MANGO:  And I think Mr. Cratsley did

20   talk about changes in 2009.  I'll check our notes,

21   your Honor.  We've got a couple people here taking

22   notes that take it better than me.  I'll check

23   those, and the one notation in the logbook about

24   not changing the bleeder, I believe that happened

25   after the criminal search warrant.  So -- which --

1    which is a time period that obviously has

2    importance just because it's after the federal

3    search warrant.

4             THE COURT:  Okay.  I don't clearly

5    remember.  Someone remembered that statement of

6    Mr. Cahill's, but I just don't know if it was post

7    investigation, so --

8             MR. MANGO:  Yes.

9             THE COURT:  Or search warrant.

10            MR. MANGO:  Yes.  I have it here, your

11   Honor.

12            MR. LINSIN:  Your Honor, Mr. Mango is

13   correct, that particular entry we have as

14   December 24th, 2009.

15            MR. MANGO:  That's correct.  And that --

16   for the record, would note that is also the day

17   after the criminal complaint was executed against

18   Mr. Kamholz but another significant criminal step

19   in the investigation.  So you've got the search

20   warrant on the 17th, and the criminal complaint on

21   the 23rd and then the next day there's the --

22            THE COURT:  The 24th?

23            MR. MANGO:  Yes.

24            THE COURT:  Okay.

25            MR. LINSIN:  Your Honor, last point on

1    this -- and we will obviously check our notes, but

2    Ms. Grasso is also pointing out to me that there --

3    if you look at this logbook beyond just these

4    entries we've been discussing about the specific

5    adjustments to the set point, there are entries in

6    here that are reflective of this -- we believe,

7    this pattern of adjusting -- adjustments in this

8    set point other than what is recorded.  And I'm

9    offering as an example, a July 30th, 2009, entry in

10   here shortly after the PRV was back in service,

11   which says: "Note, we do not have radios at a

12   phone.  If Mr. Cahill makes an adjustment on

13   anything, I believe it would be appropriate to

14   inform the operators."

15       The clear implication here, as we read this

16   entry, is there might be an adjustment made and

17   Mr. Cahill's not writing it down but he needs to

18   inform the operators.  It does go, I think, your

19   Honor, to trying to assess this overall rather than

20   just looking at particular entries on a given day.

21           THE COURT:  I mean, you can reasonably

22   infer what you're arguing.  On the other hand, you

23   can reasonably infer what the government's argument

24   is as well.  I mean, that that particular entry

25   doesn't necessarily establish that there was in

1      point of fact adjustments of the set points.

2      So --

3              MR. LINSIN:  I agree.

4              THE COURT:  But -- all right.  You know,

5      I'll extend to you the charge and the challenge to

6      identify specifically Cahill's testimony before I

7      make a final ruling.  Okay.  And I think if it's

8      limited to the 2009 period, then I'm more inclined

9      to allow it and then consider it a matter of

10     weight.

11             MR. LINSIN:  Your Honor, I don't mean to

12     prolong this at all, but I don't understand that

13     last point.  Are you saying if it was -- if his

14     comments were limited to the period of the

15     inspection during 2009?

16             THE COURT:  Yes.

17             MR. LINSIN:  I see.  All right.

18             THE COURT:  Yes.  That's what -- I didn't

19     say that.  That's what I meant to say.  Yes.

20             MR. PERSONIUS:  And, Judge, are you

21     suggesting that if we can identify where it might

22     be in the transcript, to order that part of the

23     transcript?  We can do that if that's helpful.

24             THE COURT:  Yeah.  I mean, whatever you

25     can do.  I mean, if it's transcript, if it's in

1    your notes or whatever.  I mean, I need to know.  I

2    mean, I'll check my notes.  You know, I haven't

3    done that yet, so I'll go through what I've taken

4    and we'll try to ferret it out.  Okay.

5              MR. PERSONIUS:  If you were Judge Elfvin,

6    you would have every word down.

7              THE COURT:  Don't I wish.  Many a stories

8    we could relate relating to that.  Okay.  That's

9    been helpful to me.  Thank you.  I'll set you to

10   the task and I'll do what I can with what I have.

11   And I'll work with Michelle a little bit too.

12       All right.  Chris, what do you think?  Do you

13   think the jury's going to want come back out?

14              COURT SECURITY OFFICER:  I'm sure.

15              THE COURT:  Okay.  Good.  Thanks.

16              (Jury seated.)

17              THE COURT:  You don't know how glad I am

18   to see you.  Please have a seat.

19       Mr. Collins, you're not catching what everybody

20   else has now, are you?

21       Okay.  Thank you for coming back.  Sorry for

22   the delay.  We actually have been working trying to

23   work things out.  I think we're ready to resume.  I

24   think we are at cross-examination of Mr. O'Connor.

25       The attorneys and parties are back present.

1    Jury's here, roll call waived.

2        Mr. Linsin, your witness, please.

3            MR. LINSIN:  Thank you, your Honor.

4    CROSS-EXAMINATION BY MR. LINSIN:

5    Q.  Good afternoon, Mr. O'Connor.

6    A.  Good afternoon, Mr. Linsin.

7    Q.  You testified on direct examination,

8    Mr. O'Connor, about a number of the documents that

9    were seized during the execution of the criminal

10   search warrant at Tonawanda Coke on December

11   17th, 2009, correct?

12   A.  That's correct.

13   Q.  Do you recall how long that the execution of

14   the search warrant took on that day?

15   A.  I can -- I can give you a fairly good

16   representation.  I think we arrived somewhere

17   around 9:00 o'clock in the morning, about that

18   time.  And it was well after dark when we left.  It

19   was wintertime so it gets dark early.  I think that

20   we probably were gone from there around

21   9:00 o'clock at night, something like that.

22            THE COURT:  A 12-hour day?

23            THE WITNESS:  Approximately at the plant,

24   yes.

25            THE COURT:  Thank you.

1    BY MR. LINSIN:

2    Q.   And can you provide the members of the jury

3    with an estimate of the volume of documents you

4    seized from -- you and your colleagues seized from

5    Tonawanda Coke that day?

6    A.   Yes, I can.   There were approximately 65 boxes

7    worth of the documents, banker-size boxes.

8    Q.   And you were asked some questions about

9    particular folders and particular documents within

10   those folders in your direct examination, right?

11   A.   Yes.

12   Q.   Now, those folders that you testified about

13   held other documents too, didn't they?

14   A.   They did.

15   Q.   And there were many other folders seized during

16   the search warrant, correct?

17   A.   Yes.

18   Q.   May I please have Government's Exhibit 115.09

19   in evidence.   I'm sorry.   115.07 first.

20           THE CLERK:   Is that in evidence?

21           MR. LINSIN:   It is -- I have it as in, I

22   apologize.   Yes.   I believe.

23           THE COURT:   115.07?

24           MR. LINSIN:   115.07.

25           THE CLERK:   Yes, it is.

1          THE COURT:  Okay.  You may publish.  Thank

2     you.

3     BY MR. LINSIN:

4     Q.  All right.  Thank you.

5          I believe you testified, Mr. O'Connor, that

6     this -- you recognize this as a photograph of the

7     east quench tower, number 2 quench tower at the

8     Tonawanda Coke plant, right?

9     A.  I do recognize it as that.

10    Q.  Okay.  And you did not take this particular

11    photograph, but you did go and observe this quench

12    tower during the course of your activities out

13    there on December 17, correct?

14    A.  Yes.

15    Q.  All right.  And do you recall how you entered

16    the quench tower when you inspected it?

17    A.  No, I don't.

18    Q.  Could we go then to the next exhibit,

19    Government 115.09, in evidence.

20         You recall testifying about this photograph

21    during your direct examination, correct?

22    A.  Yes.

23    Q.  And is this substantially what you saw when you

24    looked into quench tower number 2?

25    A.  Yes.

2849

1    Q.   Now, when you went into quench tower number 2,

2    was it obvious to you that these structures up here

3    at the top were in existence?  You could see them

4    easily from the ground?

5    A.   I could.

6    Q.   And these -- all of these are -- are

7    essentially 1-by-6 wooden slats.  Would that be a

8    fair summary?

9    A.   I don't know the measurements of them.  They

10   were slats, yeah.

11   Q.   And the light areas in between those slats is

12   the sky, correct?

13   A.   That's right.

14   Q.   There's nothing up there other than those

15   wooden slats and the structures that support them,

16   correct?

17   A.   Correct.

18            THE COURT:  Okay.  Let me just ask you

19   this.  When you talk wooden slats, are you talking

20   about something similar to what's above the jury

21   box there and the light for outside?

22            THE WITNESS:  Similar.

23            THE COURT:  Okay.

24   BY MR. LINSIN:

25   Q.   Fair to say, they were rough wood rather than

1   finished wood, is that correct?

2   A.   It would be an assumption.

3   Q.   All right.   Let's not assume.   Were you able to

4   just walk into this quench tower when you were

5   there on December 17th?

6   A.   Yes.

7   Q.   And do you know what these -- what these pipes

8   are that run across in this pattern inside the

9   quench tower?

10  A.   I don't know for a fact, but they carry the

11  water to quench the coke.

12  Q.   All right.   With -- now, if we may move,

13  please, to Government Exhibit 115.25.

14       Do you recall testifying that this was how the

15  interior of the west quench tower, quench tower

16  number 1, looked to you?

17  A.   I recall testifying to that and to seeing that.

18  Q.   All right.   And same as with respect to quench

19  tower number 2.   Were you able to simply walk into

20  quench tower number 1 and look up?

21  A.   Yes.

22            THE COURT:   How do you walk into those?

23            THE WITNESS:   Your Honor, there is a set

24  of railroad tracks where the quench car would roll

25  in there.   You can walk along those tracks.

1          THE COURT:  It's not a walkway where you

2     do that, it's the car tracks that you walk on,

3     right?

4          THE WITNESS:  Yes, sir.

5          THE COURT:  Okay.  Thank you.

6     BY MR. LINSIN:

7     Q.  Well, let me go back if I can to just clarify.

8     Do you remember whether the rail tracks ran all the

9     way through quench tower number 2?

10    A.  What I recall is one of the towers had tracks

11    run all the way through and one of them didn't.  I

12    don't remember which was which.

13    Q.  Okay.  Fair enough.

14         May I please have Government Exhibit 120 in

15    evidence.

16         Now, you were asked some questions about a

17    couple of passages in this document, and I want to

18    ask you a couple of preliminary questions and then

19    get to this document in a little more detail.

20         In the course of your duties with the DEC, as

21    an environmental conservation inspector and

22    investigator, have you had occasion to investigate

23    companies for issues related to environmental

24    compliance?

25    A.  I have.

2852

1    Q.  And how many years have you been doing that?

2    A.  I've been a police officer with the department

3    for 24 years.  As a plain-clothes investigator for

4    the last eight.

5    Q.  Okay.  And in the course of your duties, have

6    you had occasion to investigate and learn how

7    companies manage and account for the

8    responsibilities of environmental compliance?

9    A.  In a very general way.

10   Q.  All right.  If we could move, please, to the --

11   first, the second page and then the third page of

12   this document.  Just as a set up.

13       Do you recognize this as the second page of

14   this same business plan, sir?

15   A.  I recognize it as belonging to that and the

16   second page by its number.

17   Q.  All right.  And if -- the table of contents,

18   the next page, please.

19       Now, you've reviewed this entire document or

20   have you reviewed this entire document?

21   A.  I've looked through the document.

22   Q.  All right.  And is this table of contents -- my

23   only question -- I'm not going to quiz you on it,

24   Mr. O'Connor.

25   A.  I'm just trying to be accurate.

1    Q.   I understand and I appreciate that.

2         Is this a fair summary of all of the topics

3    that are covered in this business plan, this table

4    of contents?

5    A.   In order to answer that, I'd like to see the

6    next page but I think yes, it looks like it ends

7    there.  I don't know if there's more --

8    Q.   Could we see the next page, please.

9    A.   I would say yes.

10   Q.   All right.  Okay.  Now, in your experience in

11   investigating other companies with respect to their

12   management of environmental compliance

13   responsibilities, it's accurate to say, isn't it,

14   that companies have to make some accounting of the

15   costs of complying with environmental

16   responsibilities, don't they?

17   A.   Yes.

18   Q.   And those aspects for small companies or for

19   large companies, those aspects of cost components

20   and how you assess and how you weigh those have to

21   be factored into a company's business plan, don't

22   they?

23   A.   I agree.

24   Q.   If we could move, please, to page 16 of this

25   exhibit anyhow.  And just so we can see what --

1    enlarge just the text, please.

2         Do you recognize this as a portion of this

3    business plan that talks about several aspects of

4    the market analysis for the purpose of this

5    business plan, correct?

6    A.   The page is titled market definitions, yes.

7    Q.   Well, enlarge it one more time, please.

8    A.   "Market Analysis."  It wasn't on the previous.

9    Q.   Yes.  And then several subparts in that

10   discussion of the market analysis, correct?

11   A.   Yes.

12   Q.   And then the one section that you were asked

13   about is actually the fourth section in this

14   part -- in this section of the business plan,

15   correct?  There's industry analysis, correct?

16   A.   Yes.

17   Q.   And market segment -- what market segment this

18   company finds itself in and then strengths and then

19   weaknesses, correct?

20   A.   That's right.

21   Q.   And there is a discussion here about -- at the

22   very bottom, if we could highlight the weakness

23   section.  I'm sorry.  Enlarge is what I meant to

24   say, please.  All right.

25        Discussion about several factors that when you

1    talk about overall market analysis are assessments

2    of weaknesses or challenges in that market

3    analysis, correct?

4    A.  Yes.

5    Q.  All right.  And it is true, isn't it, that

6    businesses, especially manufacturing businesses,

7    often encounter pressures and responsibilities for

8    complying with the range of environmental

9    obligations.  Is that a fair statement?

10              MR. MANGO:  Objection, your Honor.  I

11   don't know if there is a foundation for that

12   question, manufacturing companies that -- the

13   earlier questions were not focused on manufacturing

14   companies.  I'm just concerned there is no

15   foundation for -- for these questions.

16              THE COURT:  I mean, we've probably lost

17   the question in the mix, but let's think about it

18   in terms of foundation and reask a question.

19   BY MR. LINSIN:

20   Q.  What types of companies -- pardon me.

21        In your work with DEC, what types of companies

22   have you investigated with respect to environmental

23   compliance?

24   A.  I'm not sure if I understand exactly what you

25   mean when you say "what types of companies."

1    Q.   What -- what did these companies do?  What --

2    did they make products?  Did they -- what kind of

3    companies were they?

4    A.   They would make products, sure.

5    Q.   Manufacture products?

6    A.   Yes.

7    Q.   All right.  So manufacturers, is that some of

8    the companies that you had investigated in the

9    past?

10   A.   Yes.

11   Q.   All right.  And those companies, along with

12   others, but manufacturers in particular have to

13   account for and manage the responsibilities for

14   complying with state and federal environmental

15   responsibilities, correct?

16   A.   It would be an assumption.  I'm not a business

17   person.  I don't know the answer to that but --

18   Q.   Okay.  Let's go, please, to page 18 of the

19   document and highlight the risks section.

20            THE COURT:  Okay.  And again, this is

21   Bates number 18.  It's paginated number 17.

22            MR. LINSIN:  Yes.  Thank you.

23   BY MR. LINSIN:

24   Q.   So still within the market analysis section,

25   there's a discussion here of different aspects of

 1   business risks which are things companies have to

 2   take account of, correct?

 3   A.  Yes.

 4   Q.  All right.  And under -- two items discussed

 5   under business risks and three under different

 6   types of environmental risks, correct?

 7   A.  Yes.

 8   Q.  All right.  And it is true, is it not, that a

 9   manufacturer has to stay abreast of the legal

10   responsibilities for environmental compliance, is

11   that correct?

12           MR. MANGO:  Objection, your Honor.  His

13   earlier answer, I believe, covers this where he

14   said I'm not a business person and it would be an

15   assumption.

16           THE COURT:  I'll permit this, though.

17   Overruled.

18           THE WITNESS:  I don't feel like I know

19   enough about business to adequately answer that.

20   BY MR. LINSIN:

21   Q.  Well, let me ask then the last point here with

22   regard to this final point under environmental

23   risks, economic.

24       Is it your experience, Mr. O'Connor, that in

25   order to comply with environmental

1  responsibilities, companies have to expend capital

2  resources, sometimes significant capital resources

3  in order to achieve that compliance, is that

4  correct?

5  A.  I could agree with that, yes.

6  Q.  All right.

7       MR. LINSIN:  Your Honor, I have nothing

8  further.  Thank you.

9       THE COURT:  Okay.  Mr. Linsin, thank you.

10     Mr. Personius.

11       MR. PERSONIUS:  Yes.

12  CROSS-EXAMINATION BY MR. PERSONIUS:

13  Q.  Good afternoon, Mr. O'Connor.

14  A.  Good afternoon, Mr. Personius.

15  Q.  We've met before, correct?

16  A.  We have.

17  Q.  You had started out testifying, Mr. O'Connor,

18  about how your involvement in this investigation

19  started.  Do you recall that?

20  A.  I do.

21  Q.  Okay.  And as I understood your testimony, it

22  was based upon a news article that you read, is

23  that correct?

24  A.  Yes.

25  Q.  Do you remember when -- when it was that you

1   read this -- this news article?

2   A.   It was in the paper and I read it that same day

3   it was in.  It was October 11th of 2009.

4   Q.   Okay.  And before that time you were -- you

5   were not involved at all in an investigation of --

6   criminal investigation of Tonawanda Coke, is that

7   correct?

8   A.   Yes.

9   Q.   Okay.  I felt like you paused.

10  A.   I did.

11  Q.   Okay.  Had you -- I'm just going to ask it

12  again.

13      Had you had any involvement as a criminal

14  investigator with Tonawanda Coke prior to this date

15  in October of 2009?

16          MR. MANGO:  Your Honor, if we may approach

17  the bench on this.  There may be an issue to

18  discuss.

19          THE COURT:  Okay.

20          (Side bar discussion held on the record.)

21          THE COURT:  Mr. Mango.

22          MR. MANGO:  Yes, your Honor.  This witness

23  is sensitive to this question because there was --

24  obviously, we know there was some PCB issue

25  in 2007.  And then there was some information that

2860

1    came to the department in 2008, as well.  And so --

2              MR. PERSONIUS:  Is that why you think he

3    paused?

4              MR. MANGO:  Yes.  That's definitely why he

5    paused.

6              THE COURT:  What did you just say?  I'm

7    sorry.

8              MR. PERSONIUS:  Do you think that's why he

9    paused?

10              MR. MANGO:  Yes.

11              MR. PERSONIUS:  Okay.  I'll stay away from

12    that.

13              THE COURT:  Okay.  We had talked about the

14    PCB before.

15              MR. MANGO:  Right.  I just want to --

16    good.  Thank you.

17              MR. PERSONIUS:  Thank you, your Honor.

18              (End of sidebar.)

19              THE COURT:  Okay.  Mr. Personius, I think

20    you can resume, please.

21              MR. PERSONIUS:  Thank you, Judge.

22    BY MR. PERSONIUS:

23    Q.  What we've learned in this case is that

24    in October of 2009 you were involved in certain

25    interviews related to Tonawanda Coke.

1    A.   Yes.

2    Q.   Okay.  And we know that, for example, on

3    October 19th of 2009 you were involved in an

4    interview of Larry Sitzman and Cheryl Webster.

5         Do you recall that?

6    A.   I do.

7    Q.   All right.  And can you explain to us how --

8    were you involved in setting up that interview?

9    A.   I was.

10   Q.   Okay.  So after you read this news article, you

11   did something that caused you to decide you should

12   interview Ms. Webster and Mr. Sitzman?

13   A.   There was a discussion with representatives

14   from the Environmental Protection Agency and the

15   U.S. Attorney's office and myself, and that's when

16   we decided to set that meeting up.

17   Q.   After you read the news article, who did you

18   get in touch with then?

19   A.   The U.S. -- the assistant U.S. attorney that's

20   prosecuting the case, Aaron Mango.

21   Q.   Okay.  And as a result of that, a meeting was

22   set up with someone from EPA?

23   A.   Yes.

24   Q.   And that gave rise to the -- these interviews

25   being -- being set up with, for example,

2862

1    Ms. Webster and Mr. Sitzman?

2    A.  Yes.

3    Q.  All right.  Were you the one who set up the

4    interviews with Ms. Webster and Mr. Sitzman?

5    A.  I think I was.  It would make sense that I, you

6    know, phoned them, being that we're in the same

7    agency, and set it up.

8    Q.  Okay.  And before that interview, did you have

9    any knowledge as to what their role had been with

10   Tonawanda Coke over the years?

11   A.  Yes.

12   Q.  Were you aware of this inspection that had

13   taken place at Tonawanda Coke in April of 2009

14   prior to October of 2009?

15   A.  No.

16   Q.  All right.  Did you learn about that inspection

17   through this interview process?

18   A.  I'm going to back up just a little bit.  I

19   don't think I was aware of it before that time.

20   Q.  Okay.  And we know, too, there was an interview

21   of Thomas Corbett from the DEC on October the 21st,

22   which would have been two days later.  Do you

23   recall that?

24   A.  I do recall that.

25   Q.  Did you set that up also?

1    A.   Yes.

2    Q.   Okay.  And I think what -- what you've told us

3    is that as far as you're concerned -- I think I

4    have this correct -- you were not coordinating your

5    investigation with anybody on the civil side of the

6    DEC?

7    A.   That's right.

8    Q.   All right.  Or the civil side of the EPA, for

9    that matter?

10   A.   That's right.

11   Q.   As far as whatever anybody else was doing, you

12   don't have that knowledge?

13   A.   Not the details.

14   Q.   Okay.  All right.  Thank you.

15        Now, if we get back to the execution of the

16   search warrant, that was on December 17th of 2009,

17   is that correct?

18   A.   It was.

19   Q.   Were you the -- the lead agent or investigator

20   on the search warrant?

21   A.   I was not.

22   Q.   Who was?

23   A.   Well, there were several different EPA agents

24   that were involved.  There was an EPA case that we

25   were assisting with.  When I say "we," I mean DEC.

1    Special Agent Jeff Dirks was involved and Special

2    Agent Brian Kelly was involved.  Both are no longer

3    with the agency, but it would have been one of

4    those two would have been the case agent, lead case

5    agent at that time.

6    Q.   And at that time, Mr. Dirks and Mr. Kelly were

7    with the EPA?

8    A.   That's correct.

9    Q.   Was a decision made at some point between

10   mid-October of 2009 and mid-December of 2009 that

11   EPA would take the lead on the criminal

12   investigation?

13   A.   Yes.

14   Q.   Okay.  All right.  And it's customary when you

15   have these types of investigations for DEC to work

16   in cooperation with the EPA?

17   A.   Yes.

18   Q.   All right.  Now, could we please have for

19   identification Defendant's Exhibit SSS put up,

20   Sheila?

21       Do you see on the screen a photograph?

22   A.   I do.

23   Q.   And it says at the lower right, Defendant's

24   Exhibit SSS?

25   A.   Yes.

2865

1   Q.   Okay.  Do you recognize what's shown in that

2   photograph?

3   A.   It's an office at Tonawanda Coke Corporation.

4   Q.   Okay.  But you don't specifically recognize

5   whose office that is?

6   A.   Not from that perspective, I don't.

7   Q.   Okay.  You can take that down, Sheila.

8        Were you in Mr. Kamholz's office during the

9   course of the search?

10  A.   Yes, I was.

11  Q.   Okay.  But do you have a recollection of what

12  his office looked like?

13  A.   I do.

14  Q.   Okay.  Could you describe it for the jury,

15  please?

16  A.   It looked similar to that picture, but I

17  couldn't say that it was for sure.

18  Q.   Okay.  When you walk into his office, he has

19  two desks that butt up against each other?

20  A.   Yes.  There is a couple of different entrances

21  to the office and that's why I wasn't sure.  I

22  recall that being set up that way.

23  Q.   All right.  And would it be fair to say that

24  his office is not a palace?

25  A.   Yes.

1    Q.   Thank you.  You were asked by Mr. Mango about

2    two folders that were taken from Mr. Kamholz's

3    office.  Do you recall that?

4    A.   I think he asked me about more than two

5    folders, but he did ask me about two.

6    Q.   Okay.  Well, let me be specific the ones I want

7    to refer to.

8        Do you remember there was a folder that

9    contained documents from an information request

10   that was made by the EPA in September of 2009?

11   A.   I do recall that.

12   Q.   And there were certain documents from that

13   folder that you looked at and identified and we

14   admitted into evidence, correct?

15   A.   Yes.

16   Q.   Now, can we agree there were a number of

17   additional documents in that folder that you were

18   not called upon to identify?

19   A.   Yes.

20   Q.   And therefore they're not part of the evidence

21   in this case.

22   A.   I know they are not part of the evidence from

23   what was admitted through me.

24   Q.   Okay.  And then another folder that was shown

25   to you that came from Mr. Kamholz's office was from

2867

1    the September -- I'm sorry -- the April 2009

2    inspection by the EPA and DEC at Tonawanda Coke?

3    A.   I'm sorry.  Could you repeat that again?  I

4    lost you.

5    Q.   Do you remember there was another folder that

6    you were shown by Mr. Mango that had documents in

7    it from the April 2009 inspection at Tonawanda

8    Coke?

9    A.   Yes.

10   Q.   And again, can we agree that there were other

11   documents in that folder from that inspection that

12   were not shown to you?

13   A.   Yes.

14   Q.   And that included notes that were taken by

15   Mr. Kamholz?  Or included notes?

16   A.   Yes.

17   Q.   You may not know whose notes they are.

18        Now, you also testified about Mr. Kamholz's

19   response to this request for information by the --

20   the EPA.  Do you recall that?

21   A.   I do.

22   Q.   All right.  And one of the documents that you

23   identified from that request for information folder

24   were -- that was taken from Mr. Kamholz's office

25   were circular charts?

2868

1    A.   Yes.

2    Q.   And do you have a recollection that generally

3    the time period for those circular charts was from

4    August and early September of 2009?

5    A.   I'm not sure -- excuse me.  I'm not sure what

6    the dates on those charts were.

7    Q.   Okay.  Could we -- this is in evidence, Lauren.

8    Please put up Government Exhibit 116.02.01.

9         This is one of the circular charts,

10   Mr. O'Connor?  It's a circular chart?

11   A.   It is, yes.

12   Q.   Lauren, could you make that center part bigger

13   so we can get the date?

14        Do you see the date on there, Mr. O'Connor?

15   A.   I do.

16   Q.   September 8 of '09?

17   A.   It is.

18   Q.   And could we put up, Lauren, in evidence

19   Government Exhibit 116.02.39.

20        Another circular chart, Mr. O'Connor?

21   A.   Yes.

22   Q.   Please make that bigger, Lauren.  Thank you.

23        And the date on that is August 1 of 2009?

24   A.   Yes.

25   Q.   Does that help refresh your recall --

2869

1    A.   It does, yes.

2    Q.   Do you remember that as part of Mr. Kamholz's

3    response to this EPA request for information, he

4    produced circular charts for this time period?

5    A.   That's what that folder indicated, that that

6    was materials sent to the EPA in response, yes.

7    Q.   Yes.  And one of them was to provide copies of

8    circular charts?

9    A.   Yes.

10   Q.   And his response went in -- Mr. Kamholz's

11   response went in in early October of 2009, right?

12   You don't recall that?

13   A.   If I saw the shipping label, I would refresh my

14   memory, but I maybe want to do that.  I don't know.

15   Q.   All right.  I had the letter.  I got to get my

16   notes.  You're right to do that because the date on

17   the letter was wrong.  I don't know if you remember

18   that.

19       Lauren, this is in evidence.  Would you please

20   put up Government Exhibit 116.01.01 and make the

21   label bigger, please.

22       Does that help you recall the date?

23   A.   It does.  The date of the shipment is reflected

24   on that document and it says October 7th, 2009.

25   Q.   2009.  Okay.  Now, you testified also --

2870

1          You can take that down, Lauren.  Thank you.

2          -- that there were other circular charts that

3     were found in Mr. Kamholz's office.  Do you

4     remember that?

5     A.   Other than the two you just showed me?

6     Q.   That set -- there was that set from August 1

7     of 2009 to early September of 2009.  The ones you

8     just testified about, right?

9          Do you remember that?

10    A.   I do.

11    Q.   Okay.  And then there was another small set of

12    circular charts you testified about that were from

13    April of 2009.  Do you recall that?

14    A.   I do.

15    Q.   And that you indicated that those charts had

16    also been found in Mr. Kamholz's office, correct?

17    A.   Yes.

18    Q.   Now, are you aware that as part of the

19    April 2009 inspection that there was a request that

20    certain circular charts from that inspection period

21    be produced by Tonawanda Coke?

22    A.   Not particularly.  I reviewed that letter and

23    those boxes and those documents, but I'm not sure

24    the details of the request.

25          MR. PERSONIUS:  Okay.  Thank you.

1          Your Honor, can I have a minute, please?

2               THE COURT:  Sure.

3               MR. PERSONIUS:  Nothing further, Judge.

4          Thank you, Mr. O'Connor.

5               THE WITNESS:  Thank you, Mr. Personius.

6               THE COURT:  Okay.  Mr. Personius.

7          Mr. Mango, any redirect?

8               MR. MANGO:  No, thank you, your Honor.

9               THE COURT:  Okay.  Mr. O'Connor, you are

10     excused.  Thank you.

11              THE WITNESS:  Thank you, your Honor.

12              MR. MANGO:  Your Honor, the government

13     would call Daniel Heukrath.

14         Your Honor, I'd ask that Mr. O'Connor be

15     allowed to remain in the courtroom now that his

16     testimony is completed.

17              MR. LINSIN:  No objection, your Honor.

18              MR. PERSONIUS:  No objection, Judge.

19              THE COURT:  Okay.  Certainly.

20         We actually need to take a break for a few

21     minutes, ladies and gentlemen.  Okay.  I know you

22     haven't been here that long but as we've been

23     working rather intensely here.

24         So let's take 10 minutes or so and we'll come

25     back.

1                    (Jury excused from the courtroom.)

2                    THE COURT:  Okay.  Break time.

3                    (Short recess was taken.)

4                    THE COURT:  Are we ready to go forward?

5          Chris, please.

6                    (Jury seated.)

7                    THE COURT:  How is the temperature?

8                    THE JURY:  It's cold.

9                    THE COURT:  Okay.  We're looking at the

10    heat regulator.  Thought we had it solved.  I guess

11    not.  So we're going to work on it over the

12    weekend.  We'll get it under control.  Thank you.

13    Please have a seat.

14         Mr. Mango, are you ready?

15                    MR. MANGO:  We're ready, your Honor.

16                    THE COURT:  Let's call your next witness,

17    please.

18                    MR. MANGO:  Yes, your Honor.  Daniel

19    Heukrath.

20                    THE COURT:  Okay.  If you would approach

21    the witness stand, I'll tell you when to stop.

22    Right there.  And face the jury, and I'll have you

23     sworn.

24    D A N I E L   J.   H E U K R A T H, having been duly

25    sworn as a witness, testified as follows:

1          THE COURT:  Okay.  Good afternoon.

2          THE WITNESS:  Hello.

3          THE COURT:  All right.  Just a few

4   preliminary instructions.  And what I will ask you

5   to do is speak at the microphone in the direction

6   of the jury.  You're here to testify for their

7   benefit.  If you speak in a conversational tone,

8   the microphone should pick you up reasonably well.

9          THE WITNESS:  Okay.

10          THE COURT:  If you don't understand a

11   question, ask whoever's asking you the question to

12   repeat it.

13          THE WITNESS:  Okay.

14          THE COURT:  Try to be as succinct with

15   your answers as possible.  If you can answer it

16   with a yes or no, try to do that.  When you start

17   volunteering information, that causes problems

18   generally speaking.

19      If there's an objection, wait until I rule on

20   the objection, then I will give you instructions.

21   I'll tell you complete your answer, start it again,

22   wait for the next question, et cetera.  Okay?

23          THE WITNESS:  Okay.

24          THE COURT:  All right.  I think you're

25   going to carry pretty well.  Just talk at the

1   microphone.  State your name -- full name and spell

2   your last name, please.

3          THE WITNESS:  Daniel J. Heukrath.

4   H-E-U-K-R-A-T-H.

5          THE COURT:  Okay.  Your witness, Mr.

6   Mango.  Thank you.

7          MR. MANGO:  Thank you, your Honor.

8   DIRECT EXAMINATION BY MR. MANGO:

9   Q.  Good afternoon, Mr. Heukrath.  How are you?

10  A.  Good.

11  Q.  Can you tell the jury, are you currently

12  employed?

13  A.  Yes.

14  Q.  And who are you employed with?

15  A.  Tonawanda Coke.

16  Q.  And when did you start working at the Tonawanda

17  Coke facility?

18  A.  When it first started in 1978.

19  Q.  All right.  And were you actually working at

20  the site prior to 1978 --

21  A.  Yes, I was, for Allied Chemical.

22  Q.  Mr. Heukrath, I'm just going to ask you, just

23  wait till I finish asking the question.  It will be

24  easier for Michelle here, the court reporter.

25  A.  Okay.

1    Q.   All right.   What position do you currently hold

2    at Tonawanda Coke?

3    A.   A supervisor in coal handling.

4    Q.   All right.   How long have you been in that

5    position?

6    A.   Since Monday.

7    Q.   Okay.   And where were you before Monday?

8    A.   I was in by-products, supervisor.

9    Q.   And was there any reason given to you for your

10   change from by-products supervisor to coal

11   handling?

12   A.   No.

13   Q.   What are your job duties in coal handling?

14   A.   I have to direct end loaders to pick up coal

15   from the coal field, put it into a hopper, and the

16   coal comes up into the building.   And I position

17   belts in order for this coal to go in certain bins

18   where it's supposed to.   At the same time I have to

19   send the finished coal over into the oven coal bins

20   where it's charged into ovens.

21   Q.   All right.   We will get there.   You're familiar

22   with that position, is that right?

23   A.   Yes.

24   Q.   You've done that in the past?

25   A.   Yes.

1   Q.  Can you tell -- actually, can you tell the jury

2   what other positions you've worked at Tonawanda

3   Coke and the approximate time periods that you

4   worked in those positions?

5   A.  Starting at the beginning I was a pusher

6   operator, hourly pusher operator for about a year.

7   Then I worked as a lab technician for about a year,

8   sampling coal and coke.  After that I went back to

9   the battery as a pusher operator for about a year.

10  After that I was a -- started breaking in as a

11  general foreman on the battery.  And I was a

12  general foreman for most of the '80s and then

13  possibly into the '90s.  At some time during the

14  '80s, from what I recall, I was breaking in as a

15  by-products supervisor.

16      In 1989 I was in Toledo working for the company

17  trying to solve some problems with the Toledo

18  plant.  In 1990 and '91 I was in Detroit, again

19  working on problems with their coke ovens.

20      When I came back, I was working many different

21  jobs.  I was general foreman.  I worked in coke

22  handling.  I worked in coal handling.

23      In about the mid '90s I was asked to work as a

24  work practice plan teacher I guess you would say,

25  to teach work practices and provide procedures for

1    the oven personnel.

2        After that, from what I recall, I was utility

3    supervisor.  I would fill in certain jobs on the

4    battery.  After the year, about 2000 I was the --

5    what would you call it?  Not the plant manager --

6    assistant plant manager.  And during the time from,

7    say, 2000 to 2007 I was assistant plant manager.

8        And I also did work on oven walls for the

9    company in Sloss, Bermingham.  Did a little work in

10   Empire Coke in Tuscaloosa, Alabama.  Did some work

11   in A.K. Steel during this time.  Did some work in

12   South Africa rebuilding oven walls, and did a

13   little work in the Netherlands.

14       And then in 2007 I became the plant manager, in

15   I think it was January.  And then from January

16   through March of 2009 I was the plant manager.

17       After that, they moved me to the personnel

18   as -- human resources as a personnel director and

19   safety director till September of 2009.

20       And then after that I was in coal handling as a

21   coal handling supervisor.  And then after that I

22   think they moved me back to the ovens for a period

23   of time during the summer, controlling the escania

24   valves on the battery.

25       After that, back -- I don't know if it was coal

1    handling or back to the battery.

2    Q.  Okay.

3    A.  In summer of 2011 I was working in Erie Coke,

4    Erie, Pennsylvania building oven walls.  Then I

5    don't know --

6    Q.  That's okay.

7    A.  I worked so many jobs, I can't remember after

8    that.

9    Q.  It's a very thorough recitation.

10   A.  Came back and did something else.

11   Q.  Okay.  So let me ask you about -- you mentioned

12   directly after becoming -- or after being a plant

13   manager until March of 2009, then you went into

14   personnel, was that the HR department?

15   A.  Yes.

16   Q.  Okay.  Were you given a reason as to why you

17   were taken out of the plant manager role?

18   A.  No.

19   Q.  Okay.  How did that transition come up?

20   A.  Mr. Crane just talked to me and said he wanted

21   me to go to the personnel director's job.

22   Q.  Okay.  Was it -- did you have a choice in the

23   matter?

24   A.  No.

25   Q.  Okay.  So is it fair to say that

1    managerial-level employees get moved around at

2    Tonawanda Coke?

3    A.   Yes, they do.

4    Q.   In any of your previous positions that you just

5    went through, Mr. Heukrath, have you received any

6    type of environmental training?

7    A.   No.

8    Q.   Any type of training involving hazardous waste?

9    A.   No.

10   Q.   Okay.  Do you know what the term "K087" means?

11   A.   No.

12   Q.   Are you familiar, Mr. Heukrath, with the

13   process of making coke at Tonawanda Coke?

14   A.   Yes.

15   Q.   All right.  And do you know what the term

16   "reversal" means?

17   A.   Yes, I do.

18   Q.   And can you tell the jury what you understand

19   the term "reversal" means?

20   A.   The reversal system has to do with heating the

21   battery.  And there's flues.  There's 28 flues in

22   each heating wall, and there are 61 heating walls.

23   So you if you multiply 28 times 61, that's the

24   number of flues in the battery.

25        And if you consider the battery flues as a

1    checker board, the black flues would burn for 20

2    minutes, then at the 20-minute mark it would

3    reverse over, and then the red flues would burn.

4    And every 20 minutes this continually goes on day

5    after day, hour after hour, and the gas reverses.

6    It opens and closes the gas valves going to each

7    flue.

8    Q.   Okay.  During a reversal what happens to the

9    flow of coke oven gas to the ovens?

10   A.   It stops periodically as the hydraulic pistons

11   travel back and forth to open and close the valves.

12   Q.   Does that cause any increase in the plant

13   pressure?

14   A.   Yes, it does, because the battery is no longer

15   taking gas at that time.

16   Q.   Okay.  During your time as assistant plant

17   superintendent and plant superintendent, I think

18   you mentioned from 2000 to 2009?

19   A.   Yes.

20   Q.   Was there anything used in the by-products

21   department to relieve pressure in the line?

22   A.   There is a valve or a bleeder inside the

23   by-products area that bleeds the excess gas.

24   Q.   Okay.  What did you call that?  What was that

25   known as?

1    A.   As the bleeder.

2    Q.   Okay.  I'd like to pull up, your Honor,

3    Government Exhibit 15.02.97 in evidence.

4        Mr. Heukrath, do you see that picture on your

5    screen?

6    A.   Yes, I do.

7    Q.   Okay.  What is that picture?

8    A.   That's a picture of the bleeder.

9    Q.   Okay.  During your time as assistant plant

10   superintendent and plant superintendent -- or

11   assistant plant manager, I think you used the term,

12   and plant manager, was this operational?

13   A.   Yes, it was.

14   Q.   Okay.  Did you see it operate?

15   A.   Yes, I did.

16   Q.   Were you familiar with the operation of this

17   bleeder?

18   A.   Yes.

19   Q.   What was the purpose of this bleeder?

20   A.   It was to bleed, like I say, excess gas.

21   Normally we have a certain plant pressure, what

22   they call plant pressure, where we normally keep

23   the gas pressure at, and anything over and above

24   that set point would bleed.

25   Q.   Okay.  If something -- if the plant pressure

2882

1    went above the set point, what would happen?

2              MR. LINSIN:  Objection, asked and

3    answered.

4              THE COURT:  I'll permit it.  Overruled.

5              THE WITNESS:  What would happen?  The

6    valve would open and gas would come out of the

7    pipe.

8    BY MR. MANGO:

9    Q.  Okay.  When you -- when you -- when it would

10   open and you would have gas come out of the pipe,

11   would you be able to hear anything?

12   A.  Yes, if you were close.

13   Q.  Okay.  How about in the wintertime, did you

14   ever see evidence of releases from the bleeder?

15   A.  Yes.

16   Q.  Okay.  What would you see evidence of?

17   A.  Sometimes it would be water droplets.

18   Sometimes it would be naphthalene crystals if it

19   were cold enough.

20   Q.  Okay.  Was there ever a period of time -- now,

21   we're looking at this bleeder on the screen.  Was

22   there ever a period of time that the bleeder was in

23   a different location?

24   A.  Yes, it was.

25   Q.  Okay.  I'd like to pull up Government

1    Exhibit 50, your Honor.

2              THE COURT:   Okay.

3    BY MR. MANGO:

4    Q.   Which is in evidence.   I would like to just

5    zoom in actually there.

6         Okay.   Mr. Heukrath, do you see -- if you use

7    your finger and tap the screen.   From looking at

8    this picture first, can you tap the screen where

9    the bleeder was between 2000 and 2009 that you were

10   just talking about?

11        Or is it still in the same location?

12   A.   Okay.

13   Q.   Now, you mentioned the bleeder used to be in a

14   different location.   Can you tap the screen where

15   the old location of the bleeder was?

16        All right.   When do you recall -- if you can

17   tell the jury, please, when do you recall seeing

18   the bleeder in that old location?

19   A.   From my -- from what I recall, it was in the

20   '80s it was in that position.

21   Q.   Okay.   Why do you remember it was the '80s?

22   Was there anybody in by-products that you recall at

23   the time?

24   A.   I had broken in with Kenny Burmel for a period

25   of six to nine months in the by-products.   And what

2884

1    I recall it was during that time.

2    Q.   Sometimes in the '80s?

3    A.   Yes.

4    Q.   So sometime after the '80s the old bleeder was

5    removed and this new bleeder here was constructed?

6    A.   Yes, it was.

7    Q.   Between the time period of 2005 to 2009, what

8    was the frequency with which the bleeder would

9    release coke oven gas into the atmosphere?

10   A.   It would depend on the set point.

11   Q.   Okay.  And what would happen to increase plant

12   pressure in the line?

13   A.   A reversal would increase the plant pressure, a

14   charge would increase plant pressure.

15   Q.   Did you ever notice releases from the bleeder

16   during periods of reversal?

17   A.   Yes.

18   Q.   Are you familiar with the term "cogeneration"?

19   A.   Yes.

20   Q.   Okay.  How about during periods of

21   cogeneration, would the bleeder still release

22   during reversals?

23   A.   At times, yes.

24   Q.   In your experience did you ever observe the

25   bleeder release for longer than -- I'm sorry.  Let

1    me ask it this way:  How long would the releases

2    relating to the reversals last?

3              THE COURT:  Try that one again, please.

4    BY MR. MANGO:

5    Q.  Yes.  For the releases relating to reversals

6    that you just discussed, how long did they last?

7    A.  Generally about ten seconds.

8    Q.  All right.  And in your experience did you ever

9    observe the bleeder release for longer than ten

10   seconds?

11   A.  It's possible, yes.

12             MR. LINSIN:  Your Honor, I would just

13   object to "it's possible".  If the witness has a

14   recollection, that's fine.  But I don't know if --

15   possibility is not a --

16             THE COURT:  It's probably not responsive

17   in a sense, so sustained.  You can reput a question

18   if you like.

19   BY MR. MANGO:

20   Q.  Do you ever remember any times that the

21   bleeder -- that you made observations that the

22   bleeder released for longer than ten seconds?

23   A.  That I can't recall.

24   Q.  What was the typical set point for the bleeder

25   between the period of 2005 and 2009?

1    A.   Normally around 80 to 100 centimeters.

2    Q.   Are you familiar with how the set point on the

3    bleeder was raised or lowered?

4    A.   Yes, I was.

5    Q.   How often would the bleeder set point be

6    changed in your experience?

7    A.   Very rarely.

8    Q.   And how would -- if you can tell the jury, how

9    would the release point for the bleeder be

10   adjusted?

11   A.   There's chart, and this chart has a knob on it.

12   And the chart has a pen and also a pointer.  You

13   would raise and lower this pointer on this circular

14   chart that goes around.  And it had gradients

15   from -- had numbers on it from maybe zero to 200.

16   And you would set this set point at, say, if you

17   wanted it at 80, you would set it at the 80 mark.

18   Q.   Okay.  And was there anything else -- well,

19   first, was that actual set point recorded on this

20   circular chart?

21   A.   No.

22   Q.   Okay.  Was there anything else that was

23   recorded on the circular chart?

24   A.   The actual plant pressure by the pen would be

25   recorded on the chart.

1    Q.   And what would happen if the pressure in the

2    line went above the set point?

3    A.   It would open the valve, the pneumatic valve,

4    and it would bleed -- the gas would bleed to

5    relieve the excess pressure to get it below the

6    pointer set point.

7    Q.   Okay.  Now let's say in -- let me ask you for

8    the year 2005.  Do you remember seeing the bleeder

9    release?

10   A.   Yes.

11   Q.   Okay.  In the year 2006 do you remember seeing

12   the bleeder release?

13   A.   Yes.

14   Q.   In the year 2007, do you remember seeing the

15   bleeder release?

16   A.   Yes.

17   Q.   In 2008 do you remember the bleeder releasing?

18   A.   Yes.

19   Q.   In 2009 do you remember seeing the bleeder

20   release?

21   A.   Yes.

22   Q.   Okay.  Now we just went through the time period

23   from 2005 to 2009.  Can you tell the jury,

24   Mr. Heukrath, approximately how many times in that

25   time period you saw the bleeder release?

2888

1    A.   Thousands of times.

2    Q.   Was the use of this bleeder reserved for only

3    time of emergency?

4    A.   No.

5    Q.   Okay.  During the period of 2005 -- Lauren, we

6    can take that down.  Thank you.

7         During the period of 2005 to 2009,

8    Mr. Heukrath, were you ever in the coal field?

9    A.   Yes.

10   Q.   All right.  And are you familiar with the

11   drainage in the coal field?

12   A.   Yes, I am.

13   Q.   And during periods of heavy rain or snow melt,

14   have you seen drainage from the coal field in

15   that 2005 to 2009 time period?

16   A.   Yes, I have.

17   Q.   All right.  And can you tell the jury where the

18   drainage goes in the coal field?

19   A.   It goes along side the, what we call Jamoke

20   Road.  There is a ditch, and this ditch -- the rain

21   water would drain into this ditch, go in back of

22   the shower house, and basically head down to the

23   river in the ditch.

24   Q.   The Niagara River?

25   A.   Yes.

1   Q.   Okay.  So during the period of time you were

2   plant manager, is that correct?

3   A.   Yes.

4   Q.   And what were your duties as plant manager if

5   you can tell the jury?

6   A.   Basically to keep the plant running, make sure

7   it ran at a normal operation.

8   Q.   As part of your job duties did you ever

9   interact with a person known as Mark Kamholz?

10  A.   Yes.

11  Q.   Do you see Mr. Kamholz here in court today?

12  A.   Yes, I do.

13        MR. MANGO:  Your Honor, may the record

14  reflect Mr. Kamholz has stood up and the witness

15  has identified him?

16        THE COURT:  The record will reflect the

17  Defendant Mark Kamholz has been identified by

18  Mr. Heukrath.

19  BY MR. MANGO:

20  Q.   What is Defendant Kamholz's position, if you

21  know, between that time period of 2005 to 2009,

22  what was his position at Tonawanda Coke?

23  A.   He was and always has been in charge of the lab

24  and in charge of environmental things.

25  Q.   All right.

1    A.   His exact title I don't know.

2    Q.   And when you were plant manager, who had the

3    final say on environmental matters?

4    A.   Mark did.

5    Q.   In terms of the overall corporation, do you

6    know if Defendant Kamholz had the final say on

7    environmental compliance matters when you were

8    plant manager?

9    A.   Yes, he did.

10   Q.   Were you ever asked to sign any documents by

11   Defendant Kamholz while you were plant manager?

12   A.   Yes, I was.

13   Q.   What type of documents would you be asked to

14   sign?

15   A.   He would bring me a yellow paper or cardboard

16   folder each month and had me sign that.

17   Q.   When he brought you these documents, did you

18   ever ask him any questions about signing them?

19   A.   I think at one time I asked him what they were,

20   but I don't really recall his answer.  I was just

21   told that I had to sign them because I was the

22   plant manager.

23   Q.   Okay.  I'd like to pull up Government

24   Exhibit 35, your Honor, in evidence.

25        Mr. Heukrath, take a look at your screen.  Do

1   you see this document on your screen?

2   A.  Yes, I do.

3   Q.  Okay.  It's multiple pages.  If we can just

4   flip through before I ask you questions.  That's

5   page 2, page 3, page 4, page 5, and page 6.  Did

6   you get to take a look at all those pages?

7   A.  Yes, I did.

8   Q.  All right.  Let's go back to the first page, if

9   we could please, Lauren.

10      Okay.  There's a signature there for

11  responsible official.  Do you recognize that

12  signature?

13  A.  Yes, it's my signature.

14  Q.  Okay.  Do you recall now looking at this

15  document, what it was -- what it is?

16  A.  No, I don't.

17  Q.  Have you ever heard of a Title V permit?

18  A.  No, I have not.

19  Q.  Okay.  Now, I've showed you Government

20  Exhibit 35.  Do you know if you were asked to sign

21  forms similar to Government Exhibit 35 during your

22  time at Tonawanda Coke as plant manager?

23  A.  I don't understand the question.

24  Q.  All right.  I'll -- we'll just go quickly

25  through them.  Government Exhibit 36, your Honor,

2892

1    please in evidence.

2              THE COURT:  Okay.

3    BY MR. MANGO:

4    Q.  Mr. Heukrath, do you see your signature on that

5    page?

6    A.  Yes, I do.

7    Q.  Okay.  And if we flip through the pages, the

8    questions I asked you about Government Exhibit 35,

9    do they apply to Government Exhibit 36?  Do you

10   have any recollection of this documents?

11   A.  No.

12   Q.  Let's look at Government Exhibits 37, please,

13   in evidence.

14       Do you see your signature on this page?

15   A.  Yes, I do.

16   Q.  Okay.  Let's scroll through the pages, please.

17   Okay.

18       Mr. Heukrath, any recollection of this

19   document?

20   A.  No.

21   Q.  And Government Exhibit 38.  Similar form.  Do

22   you see your signature there?

23   A.  Yes, I do.

24   Q.  Do you remember this document?

25   A.  No.

1    Q.   Okay.   Mr. Heukrath, did there come a time when

2    you became concerned about benzene in the air?

3    A.   I had a conversation with Mark soon after these

4    newspaper articles in the Tonawanda News came out.

5    Q.   Okay.   Do you recall when that was?

6    A.   I guess shortly before the warrant,

7    December 17th.   Somewhere in the fall of that year.

8    Q.   Okay.   Can you tell the jury what you talked to

9    Defendant Kamholz about at that time?

10   A.   I asked him about benzene release, where it

11   comes from, how -- what is going on with it.   And

12   he basically said that there were no upper limits

13   for benzene releases put forth by the government.

14   Q.   Okay.   So he told you that there was no upper

15   limits?

16   A.   Right.

17   Q.   Was he referring to the Tonawanda Coke

18   Corporation that Tonawanda --

19   A.   Yes.

20   Q.   Okay.

21          MR. MANGO:   Your Honor, if I may have a

22   moment, please?

23          THE COURT:   Certainly.

24   BY MR. MANGO:

25   Q.   Mr. Heukrath, just one question.   Just to be a

1    clear, that's the criminal search warrant that was

2    executed?

3    A.   Yes.

4    Q.   Just before this you had that conversation?

5    A.   Yes, in the fall.

6              MR. MANGO:   Thank you, your Honor.   No

7    further questions.

8              THE COURT:   Okay, Mr. Mango, thank you.

9              MR. PERSONIUS:   Your Honor, may I go

10   first?

11             THE COURT:   Yes, certainly.

12             MR. PERSONIUS:   Thank you, Judge.

13   CROSS-EXAMINATION BY MR. PERSONIUS:

14   Q.   Good afternoon, Mr. Heukrath.

15   A.   How are you doing?

16   Q.   Good.   We'll try to get you out of here this

17   afternoon.

18   A.   That would be good.

19   Q.   I don't blame you.   I think you've indicated

20   you started at Tonawanda Coke when?

21   A.   In 1978 in February.

22   Q.   And had worked for the prior owner before that?

23   A.   Yes.

24   Q.   How far back was that?

25   A.   1969 I started in the plant.

1    Q.   Okay.  So you've been at that same facility

2    since 1969?

3    A.   Yes.

4    Q.   About 45 years?

5    A.   About.

6    Q.   So -- you don't look old enough to be able to

7    say that.  But there are some tanks -- do you

8    remember some tanks called the Barrett tanks?

9    A.   Yes.

10   Q.   Okay.  And did those tanks exist when the

11   grounds were owned by the prior company, by Allied?

12   A.   Yes, they did.

13   Q.   All right.  And do you know whether or not

14   those tanks were used at all once Tonawanda Coke

15   took over the property?

16   A.   To my recollection they were never used by

17   Tonawanda Coke.

18   Q.   All right.  And were you at Tonawanda Coke in

19   the summer of 2008 when there was a fire near these

20   tanks?

21   A.   Yes, I was.

22   Q.   Did you actually witness the fire?

23   A.   I didn't witness the start, but I got there

24   when it was undergoing, yes.

25   Q.   When it was ongoing?

1    A.   Yes.

2    Q.   Were you involved in trying to put it out?

3    A.   Yes, I was.

4    Q.   All right.  Do you know how it started?

5    A.   I didn't see it start or anything like that,

6    but I had heard --

7    Q.   Well, you probably shouldn't get into what you

8    heard.  You didn't see it start?

9    A.   I didn't see it start, no.

10   Q.   When you got there, there was already a fire?

11   A.   Yes.

12   Q.   Where was the fire when you got there?

13   A.   There was one large tank, and there was a small

14   brick building in front of this tank on the west

15   side of it.  And this fire -- the fire was around

16   this brick building going from the road down to

17   this brick building and in the west side of this

18   tank.

19   Q.   Okay.  Was the fire inside the tank or outside?

20   A.   No, outside.

21   Q.   It was outside?

22   A.   Outside.

23   Q.   And how many tanks were there?

24   A.   There was the large one, and then there was one

25   to the north of it, and then there was some other

1    ones, I don't know how many, maybe two or three, a

2    little bit east of that.

3    Q.   All right.  So there were several tanks there?

4    A.   Yes.

5    Q.   Okay.  And did the fire department eventually

6    have to be called?

7    A.   Yes, it did.

8    Q.   Do you remember how long it took to actually

9    put out the fire?

10   A.   To me it felt like hours.  I'm not really sure

11   exactly how long it did take.  We did try putting

12   it out ourselves.  We have a fire truck.

13   Q.   Once the fire companies got there, do you

14   remember how long it took?

15   A.   Like I say, time-wise with everything going on,

16   I couldn't really put a time on it, no.

17   Q.   And during the period that the fire was ongoing

18   until it got put out, did you remain in the area?

19   A.   Yes, I did.

20   Q.   Did you observe the fire as it related to the

21   tanks that were there?

22   A.   Yes, I did.

23   Q.   And did the tanks have a coal-tar-like material

24   inside them, do you know?

25   A.   That I don't know.

2898

1    Q.  All right.  Did you notice anything seeping out

2    of the tanks during the fire?

3    A.  No.

4    Q.  And were you observing that?  Were you in a

5    position to notice it?

6    A.  I walked around the side of the tank, and there

7    was nothing coming out or leaking out, no.

8    Q.  If there had been tons of tar coming out of

9    those tanks, do you think you would have noticed

10   that?

11   A.  Yes.

12   Q.  You didn't see that?

13   A.  No.

14   Q.  Now, did there come a time where one or more of

15   those tanks were taken down?

16   A.  Yes.

17   Q.  Okay.  Do you remember when that happened?

18   A.  From what I recall it was after the fire.

19   Q.  After the fire?

20   A.  Yes.

21   Q.  Okay.  There are two quench towers at Tonawanda

22   Coke?

23   A.  Yes.

24   Q.  Okay.  And you've talked to the government a

25   number of times about these quench towers, right?

1    A.   I talked to the government?

2    Q.   The investigators when you've been interviewed.

3    A.   Yes.

4    Q.   And you testified in the -- you've testified in

5    the grand jury also?

6    A.   Yes.

7    Q.   A couple of different times?

8    A.   Yes.

9    Q.   And do you have -- from your time at the

10   facility, do you have some knowledge as to the

11   usage, the relative usage of the two quench towers?

12   A.   Somewhat, yes.

13   Q.   Okay.  Let's first orient ourselves.  The

14   jury's heard this by now thousands of times, but

15   there are two tanks, right?

16   A.   Two towers, yes.

17   Q.   Two towers.  And the one to the west is called

18   tower number 1?

19   A.   One.

20   Q.   And the one to the east is --

21   A.   Tower number 2.

22   Q.   Now, in your experience between 2005 and 2009,

23   are you able to tell us what the relative usage of

24   those two quench towers was?

25   A.   Not really, no.

1    Q.   All right.   Do you remember there was a period

2    of time that quench tower number 1 was out of

3    service?

4    A.   Yes, I do.

5    Q.   Okay.   And was that for a period of years?

6    A.   From what I recall it was several years, yes.

7    Q.   And did that overlap into the period '05 to

8    '09?

9    A.   Yes.

10    Q.   Do you remember what years it was?

11    A.   No.

12    Q.   Okay.   Do you remember how many of the years

13    between '05 and '09 that tower number 1 was out of

14    service?

15    A.   From what I said, two years.

16    Q.   Two years.   And what was the reason that tower

17    number 1 was out of service?

18    A.   From what I recall, they had stopped or plugged

19    off the outlet of the sump for that tower so that

20    no water would go down to the river.   None of the

21    quench water would go down to the river.

22    Q.   And tower number 1 sat in that condition, I

23    think we could call it a lengthy period of time?

24    A.   Yes.

25    Q.   And eventually were steps taken to address

2901

1    that -- that tower so it could be used again?

2    A.   Yes.

3    Q.   Okay.  And do you know what the reason was that

4    that was done?

5    A.   We wanted to replace the quench tracks, and in

6    order to do that you would need two towers

7    operational.

8    Q.   Okay.  I think you have to tell the jury,

9    please, what the quench tracks are.

10   A.   The quench tracks go between the towers and I

11   guess in front of the battery.  What we do is we

12   push coke out of the battery into what's called the

13   hot car.  And the hot car is like a train with a

14   wagon on it.  It travels between -- once you catch

15   an oven, you have red hot coke in the hot car, and

16   you take it to either number 1 or number 2 tower to

17   be quenched, so that the hot coke gets quenched.

18   Q.   All right.  And this -- this issue with the

19   tracks, did that relate to both of the towers or

20   one of the towers where the tracks had to be

21   repaired?

22   A.   The whole set of tracks had to be repaired,

23   yes.

24   Q.   Because of that there was somehow a need to fix

25   tower number 1 so it worked again?

2902

1    A.   Yes.

2    Q.   And during -- after tower number 1 was fixed so

3    it was working again, did you then have to fix the

4    tracks in front of tower number 2?

5    A.   Yes, we did.

6    Q.   So you had to use tower number 1?

7    A.   Yes.

8    Q.   Do you remember roughly when this happened?

9    A.   2008.  The year of 2008.

10   Q.   And so should we understand that for at least a

11   period of a couple years before that that tower

12   number 1 was not working?

13   A.   It was not, no.

14   Q.   Okay.  Now, after you had tower number 1

15   working, then tower number 2 started to work again?

16   A.   Number 2 always worked unless we were changing

17   the tracks inside the tower.

18   Q.   I misspoke.  Once the tracks were fixed, did

19   Tonawanda Coke start using tower number 2 again?

20   A.   Yes, they did.

21   Q.   This would be in 2008?

22   A.   Yes.

23   Q.   And at that point then number 1 and number 2

24   were working sometime in 2008?

25   A.   Yes.

1    Q.  All right.  And after that time do you recall

2    how often 2 was used as compared to 1?

3    A.  I would have to say I don't recall.

4    Q.  Okay.  All right.  Do you remember at some

5    point in time that Mr. Kamholz gave you an

6    instruction that tower number 1 should not be used

7    more than 10 percent of the time?

8    A.  Yes, he did.

9    Q.  Do you remember when he told you that?

10   A.  Not positively when.  I think it was some time

11   during the year 2008.

12   Q.  Okay.  And do you know if that instruction was

13   followed after he gave it?

14   A.  I'm not really sure.

15   Q.  Now, as far as the pressure relief valve or the

16   bleeder is concerned, you talked about the changing

17   of the set point?

18   A.  Yes.

19   Q.  Okay.  And that there's -- the jury again has

20   heard about this -- there is a green building or

21   shack that has a little recorder device in it?

22   A.  Yes.

23   Q.  That's where you changed the set point?

24   A.  Yes.

25   Q.  In your experience who -- who is involved in

1    changing that set point for the -- for the pressure

2    relief valve?

3    A.   Normally it would be the by-products supervisor

4    on recommendation of the boiler house operator.

5    Q.   Okay.  Would there be others that would get

6    involved in that decision?

7    A.   The plant manager would have some say in it

8    too.

9    Q.   And there were times when you had some say in

10   that?

11   A.   Yes.

12   Q.   And would there be circumstances that would

13   cause that set point to be changed that you're

14   familiar with?

15   A.   Yes, there was.  If there were problems with

16   the boiler, they may need excess pressure, they may

17   want to raise the set point so that more pressure

18   would go down to the boiler house to burn rather

19   than natural gas.

20   Q.   All right.  And as far as the release of that

21   valve was concerned, were there factors that would

22   affect how often that valve would release?

23   A.   Yes.

24   Q.   In other words, conditions at the plant?

25   A.   Yes.

2905

1    Q.   Weather?   Whether it's summer or winter?

2    A.   Yes.

3    Q.   Would you explain to the jury, if you could,

4    please, what some of those conditions were that

5    would affect how frequently the valve released?

6    A.   Reversals, it's possible for the valve to

7    release more often.   The production rate, if you

8    charged more ovens than at a lower rate, it's

9    possible for this pressure relief valve to go off.

10   Q.   And in turn, if you were at a lower level of

11   production that would affect the pressure in the

12   gas line?

13   A.   Yes.

14   Q.   And could mean that the valve would release

15   less often?

16   A.   Yes.

17   Q.   What other factors?

18   A.   Also cogen, which is an electrical generator we

19   used run by steam.   And the boiler that puts out

20   the steam is run by gas.   And during times of cogen

21   you would need excess steam, which means you need

22   excess gas to run cogen.

23   Q.   Do you remember when the cogen system was in

24   operation at Tonawanda Coke?

25   A.   No, I don't.

1    Q.  All right.  And whatever that period was then,

2    is it your testimony the boiler would need more

3    gas, so the pressure relief valve would release

4    less often?

5    A.  Yes.

6    Q.  Can you think of other -- we talked about the

7    weather.  Is weather somehow a role in how often

8    that valve would release?

9    A.  Normally in the wintertime, again, the

10   wintertime we use steam in the plant to warm

11   things, to keep things warm, so the boiler would

12   put out more steam in the wintertime, so it would

13   need more gas in the wintertime.

14   Q.  And would the pressure in the gas line be

15   effected by the kind of coke that was being

16   produced?

17   A.  Yes, it would.

18   Q.  There's -- the jury I think has heard this.

19   There's two different kinds of coke?

20   A.  Yes.

21   Q.  Would you briefly explain that for the jury?

22   A.  We have foundry coke, which is our major

23   product, and foundry coke is sold by size, the

24   foundry coke.  The larger it is, the more money you

25   would make off a larger-size coke.  And the foundry

1    coke is used in the foundry to actually go to

2    our -- the people we sell the coke to to heat

3    foundries and melt steel to make engine blocks and

4    that type of thing.

5    Q.   All right.  And so that the jury understands

6    this, how does the type of coke that's being

7    produced, how does that affect the pressure in the

8    gas line?

9    A.   The foundry coke doesn't give out as much gas

10   as furnace or industrial coke.  In fact, industrial

11   coke would give out twice -- just about twice the

12   amount of gas that foundry coke would.

13   Q.   And did Tonawanda Coke produce more of the

14   foundry than the furnace coke?

15   A.   No, they produced -- yes, they did, more

16   foundry than furnace, yes.

17   Q.   Do you remember what the relative percentage

18   was?

19   A.   No.

20   Q.   Okay.  And with the foundry coke it would be

21   less pressure in the gas line again?

22   A.   Yes, there would.

23   Q.   That would affect how frequently the valve

24   would release?

25   A.   Yes.

1    Q.   Now, you mentioned that you had a conversation

2    with Mr. Kamholz about the release of benzene after

3    you read something a newspaper article?

4    A.   Yes.

5    Q.   Okay.  And this was sometime around the time of

6    the execution of the search warrant?

7    A.   Yes, I think it was before it.

8    Q.   Right.  And that warrant was executed in

9    December of 2009?

10   A.   Yes.

11   Q.   So would this have been the fall or early

12   winter of 2009?

13   A.   Yes.

14   Q.   And he made -- you remember he made a comment

15   to you that had something to do with the amount of

16   benzene that was released was something that was

17   not controlled?  Or there was no limit on the

18   amount of benzene you released?

19   A.   Yes.

20            THE COURT:  Ask a full question, please.

21   BY MR. PERSONIUS:

22   Q.   Okay.  Do you remember that Mr. Kamholz made a

23   comment about there not being a limit on the amount

24   of benzene that would be released?

25   A.   Yes.

1  Q.  And do you remember more about that

2  conversation?

3  A.  We talked about going to the coalition meeting.

4  There were coalition meetings.  I don't remember

5  when they were, but they were in the paper for the

6  public to attend.  And we talked about going to

7  them.  I was interested in going to them, but I

8  didn't know whether I should or not.

9  Q.  Right.

10  A.  So I did not.

11  Q.  You ended up not going?

12  A.  No.

13  Q.  When you had the conversation about these --

14  the release of benzene, did you talk about

15  particular release points at the facility?

16  A.  I think he was -- from what I recall he was

17  talking about the quench tower.

18  Q.  The quench tower?

19  A.  And nothing else -- and also about the AC

20  building, coming out of the top of the AC building.

21  Q.  What's the AC building?

22  A.  AC building is where they have the weak liquor

23  still that we send the weak liquor through to scrub

24  the ammonia.

25  Q.  All right.  Now, there is -- there's a concrete

1   pad that Tonawanda Coke has out by the coal fields?

2   A.   Yes.

3   Q.   And you have a recollection of what that was

4   used for by Tonawanda Coke before the -- the search

5   warrant in 2009?

6   A.   It was used to store and mix tar.

7   Q.   Okay.  And where did that tar come from that

8   was mixed and stored on there, do you remember?

9   A.   Some of it came from Bethlehem Steel in

10   truckloads where they dumped it on the pad, and it

11   was mixed with coal already from Bethlehem, but we

12   may have mixed more of it.  Sent it through a pug

13   mill, what they call a pug mill, which is just a

14   grinding machine, and sent it up into the coal

15   handling building.

16       And other times the tar would come from the tar

17   box on Broadway.  An end loader would pick it up on

18   Broadway, take it around to the pad where it would

19   be mixed with coal, and sent up to the coal

20   handling.

21   Q.   Now, you were asked by Mr. Mango about some

22   certifications that -- some documents you signed?

23   A.   Yes.

24   Q.   And they were put up on the screen so you could

25   look at those?

1    A.  Yes.

2    Q.  At the time that Mr. Kamholz asked you to sign

3    those documents, were you plant manager?

4    A.  Yes, I was.

5    Q.  Okay.  And you understood as plant manager that

6    you had certain responsibilities?

7    A.  Yes.

8    Q.  Did you understand that the reason you were

9    being asked to sign those was because you were

10    plant manager?

11    A.  Yes.

12          MR. PERSONIUS:  Okay.  Your Honor, may I

13    have a minute, please?

14          THE COURT:  Certainly.

15          MR. PERSONIUS:  Your Honor, we have no

16    further questions.  Thank you, Mr. Heukrath.

17          THE COURT:  Okay, Mr. Personius, thank

18    you.

19      Mr. Linsin.

20          MR. LINSIN:  Thank you.  May I proceed,

21    your Honor?

22          THE COURT:  Certainly.

23    CROSS-EXAMINATION BY MR. LINSIN:

24    Q.  Good afternoon, Mr. Heukrath.

25    A.  Hello.

1    Q.   How are you doing?

2    A.   Good, good.

3    Q.   About to be a little better?  Just a couple

4    questions, please.

5         I tried to jot down all of the various

6    positions you had worked in while you were with

7    Tonawanda Coke.  I think I got most of them, but

8    can you tell us specifically with regard to the

9    by-products department, what period of time did you

10   work directly in the by-products department?  And

11   let me make it hopefully a little easier.

12        Between 2005 and 2009, did you work in the

13   by-products?

14   A.   No, I did not.

15   Q.   All right.

16             MR. LINSIN:  I have nothing further, your

17   Honor.  Thank you.

18             THE COURT:  Mr. Linsin.

19             MR. LINSIN:  I could go on.

20             THE COURT:  I wonder if we should put that

21   to a vote.

22        Anything, Mr. Mango?

23             MR. MANGO:  Yes, your Honor.  Thank you.

24             THE COURT:  That's a tough act to follow.

25   You better be in line here.

1              MR. MANGO:   That was.

2    REDIRECT-EXAMINATION BY MR. MANGO:

3    Q.   Mr. Heukrath, good afternoon again.   During

4    your time as plant -- assistant plant manager and

5    plant manager, were there times that you were in

6    by-products?

7    A.   Yes.

8    Q.   Okay.   I'd like to pull up Government

9    Exhibit 125.04, your Honor.

10        If I could just have a moment I believe that is

11   in evidence.   Yes.   And ask that be published.

12             THE COURT:   Yes, I'm sorry.

13   BY MR. MANGO:

14   Q.   Thank you.   Mr. Heukrath, if you could, you

15   talked about the fire around some Barrett tanks?

16   A.   Yes.

17   Q.   Okay.   During the fire -- could you tap the

18   screen to indicate the tank that you walked around?

19        All right.   Now, do you see this tank in the

20   background back there?

21   A.   Yes.

22   Q.   During the fire did you make any observations

23   about that area in the background that stands out

24   in your mind?

25   A.   No.

1   Q.  I guess the question is, do you remember making

2   any observations about that area?  Did you notice

3   it?

4   A.  No, I didn't.

5          MR. MANGO:  Your Honor, if I may have a

6   moment, please?

7          THE COURT:  Sure.

8          MR. MANGO:  Thank you.

9   BY MR. MANGO:

10  Q.  Mr. Heukrath, when you were asked about a

11  statement being made to you about usage of a quench

12  tower 10 percent of the time --

13  A.  Yes.

14  Q.  -- had you ever heard that prior to what -- you

15  believe that was in 2008?

16  A.  I believe it was in 2008, yes.

17  Q.  Had you ever heard that prior to that time?

18  A.  No.

19  Q.  And during the time of 2005 to 2009 when you

20  would have been assistant plant manager and plant

21  manager, you had opportunity to be in the

22  by-products department?

23  A.  Yes.

24  Q.  And during those years, as we discussed, every

25  year you observed the bleeder go off?

1    A.   Yes.

2    Q.   And regardless of the conditions you went

3    through during cross-examination, summer, winter

4    production rate, cogeneration, kind of coke, it's

5    your testimony here that in that time period you

6    saw the bleeder release thousands of times?

7    A.   Yes.

8              MR. MANGO:   Nothing further, your Honor.

9              THE COURT:   Thank you, Mr. Mango.

10             MR. PERSONIUS:   Your Honor, I have nothing

11   further.

12             THE COURT:   Okay, Mr. Personius.

13             MR. LINSIN:   Nothing further, your Honor.

14   Thank you.

15             THE COURT:   Okay.  All right.

16   Mr. Heukrath, thank you very much.  You're free to

17   go, sir.

18             THE WITNESS:   Thank you.

19             THE COURT:   Okay.  Mr. Mango, what do you

20   have in store for us next?

21             MR. MANGO:   Well, if I could have a

22   moment, your Honor, just to converse -- there is a

23   witness.  I just want to converse and see if you

24   want us to call our next witness.

25             THE COURT:   I do, but on Monday.

1          MR. MANGO:  That would be perfect, your

2     Honor.

3          THE COURT:  Does that work from

4     everybody's standpoint?  How about you, ladies and

5     gentlemen?  Do you think you can handle a Monday

6     witness?  Okay.

7       All right.  So week three comes to an end I

8     guess.  Thank you for your attention.  I know you

9     worked very hard.  We, again, appreciate that.

10       So, we're going start probably about

11     10:00 o'clock on Monday.  So we'll give you some

12     time to recover.  And please keep your minds open.

13     Don't discuss the case.  Don't do anything with

14     respect to tapping into social media and the

15     Internet and the investigations.  Stay away from

16     any subject matter that might relate to this kind

17     of case.  Keep your minds open, please.  And

18     remember that common sense, experience, and

19     intelligence that you would need to apply to

20     resolving the fact issues, you will get them.  And

21     it will be your job to resolve the fact issues and

22     determine whether the government has satisfied its

23     burden beyond a reasonable doubt.  We're not there

24     yet.  We're still in the government's case.  It has

25     the burden of proof.  The defendants are presumed

1    innocent until proven guilty, if that does occur by

2    the proof standard beyond a reasonable doubt.

3    Okay.

4        You've probably heard that a few times, but

5    very important, because this is a very important

6    case.  And, again, we appreciate it very much.  We

7    will see you on Monday.  We hope you have a great

8    weekend.  Be safe.  Be careful.  And we'll see you

9    at what time on Monday?

10                  THE JURY:  10:00 o'clock.

11                  THE COURT:  Okay.  Thank you very much.

12                  (Jury excused from the courtroom.)

13                  THE COURT:  Okay.  We made it.  The

14   messenger cometh.  I have some proposed jury

15   charges for you to take a look at.

16                  MR. MANGO:  Great.

17                  THE COURT:  Thank you for your

18   cooperation.  I guess you're tasked with getting

19   the information.

20                  MR. LINSIN:  We have actually requested

21   the transcript be prepared, your Honor.  I think

22   that would be the easiest way to resolve this, and

23   I know it is a burden.  I apologize for the burden,

24   but we believe it's an important issue.  We've

25   reviewed our notes, but I think the transcript will

1   be the cleanest way to do this.

2            THE COURT:  Okay.

3            MR. PERSONIUS:  And, Judge, what I

4   remember, if you may recall is I took the logbook

5   that Mr. Mango had used, and I asked Mr. Cahill if

6   there was more than that one entry for change in

7   the valve.  You said he can do that during the

8   break.  It was during that break that he looked at

9   that and said there were two entries in there.  It

10  was after that that I asked him that question about

11  not making entries in the book.  That's what I

12  recall.  I thought maybe you would remember that --

13  help you remember that.  We'll get the transcript.

14           THE COURT:  That will help I think.  Okay.

15  Any other issues?

16           MR. MANGO:  No, your Honor.

17           MR. PERSONIUS:  I don't think so, Judge.

18           MR. LINSIN:  No.  No, your Honor, I don't

19  believe so.

20           THE COURT:  Okay.  Mr. Moeller, would you

21  mind distributing that?  And is the proposed

22  verdict form there too?

23           LAW CLERK:  Yes.

24           MR. LINSIN:  I don't mean to stop this

25  process, but just in terms of preparation for next

1    week, obviously we will wait until the government

2    rests before making any submission.  But does the

3    Court have a sense -- assuming they rest sometime

4    Monday morning, what your preferences would be in

5    terms of scheduling, review of those issues.

6    Essentially what I'm trying to grapple with is how

7    we will deal with the 29 issues, but also when we

8    would be beginning to present evidence so we can

9    plan accordingly.

10           THE COURT:  Okay.  Well, if we assume that

11   you finish with the government's last witness and

12   it rests, right?

13           MR. LINSIN:  Is that an accurate --

14           THE COURT:  You have two witnesses or one?

15           MR. MANGO:  We had an additional witness

16   here in the event we needed to fill some time.

17   What we're going to do is we'll talk, your Honor.

18   I expect either one or two, definitely one.  If --

19           MR. PIAGGIONE:  It would not be long.

20           MR. MANGO:  It would not be long, but it

21   would be nice now to talk though and make sure

22   we've covered everything we need to cover.  But we

23   expect one or two Monday morning.

24           THE COURT:  Well, what if we finished up

25   Monday morning, had the arguments on Rule 29, and

1    then started Tuesday morning with the defense case?

2    I mean --

3              MR. LINSIN:  That would be fine.  I

4    believe we'd been prepared then at that time to

5    make the submission at that time.  What I'm trying

6    to assess is how -- we can work with that schedule.

7              THE COURT:  Well, tell me.  I mean, work

8    with me, because we --

9              MR. LINSIN:  I just want to provide the

10   Court -- I want to make sure -- we do believe there

11   are some significant issues here.  We're trying to

12   capture them in this written submission, and I was

13   hoping to ensure the Court had adequate time to

14   review that submission in assessing the ruling.

15   That is really what I'm -- the only reason I'm

16   asking.  So, we'll be prepared to start Tuesday

17   morning.  But that is -- that is the -- that is the

18   issue.  It would have been a little cleaner

19   obviously if the government had rested today, but

20   so be it.

21             THE COURT:  Well, are you telling me that

22   based on your assessment of what you're going to

23   submit and argue that I may need more than an

24   afternoon?

25             MR. LINSIN:  No, your Honor.  We're trying

1   to keep this short.  And all I wanted to make sure

2   of was that the submission plus the argument was

3   something we -- the Court would have adequate time

4   to consider.  The submission I believe is going to

5   be under ten pages.  I don't think that would --

6            THE COURT:  Okay.  Well, I mean, very

7   honestly, let's look at that schedule.  And I mean,

8   if it appears as if I'm going to need more time,

9   I'm going to take it, I mean, whatever it takes to

10  make sure that we're comfortable with getting the

11  Rule 29 resolved.  And, you know, if it means we

12  put off proof, if that's the case, then we will.

13  I'm not going to rush it.  I think you don't want

14  me to.  I can't predict, frankly -- you know,

15  obviously, I mean, if you want me to decide it now

16  without submissions --

17           MR. LINSIN:  I'm not trying to complicate

18  this, your Honor.  I'm happy to proceed on the

19  basis the Court's suggested.

20           THE COURT:  I know.  And, I mean, a lot

21  has obviously gone into this.  I think we can work

22  with that schedule, and if we have to make some

23  adjustments, we will.

24      We need to have a charge conference as well.

25  We're going to talk about that, but I think one

1    step at a time.  And let's do the Rule 29.  Let's

2    make sure that's behind us, and that everybody is

3    comfortable with it, which means I've got to have

4    enough time for it.  But I think I'll be

5    comfortable with it.  And ten pages I know I can

6    get through, all right?  Okay.  Anything?

7         All right.  Last chance.

8              MR. LINSIN:  I'm not touching it, your

9    Honor.

10             THE COURT:  That's the doctrine that

11   applies on Fridays.  Okay.  Thank you very much.

12   And I say this with some reservation, I look

13   forward to seeing you on Monday.

14             MR. LINSIN:  Thank you, your Honor.

15             *      *      *      *      *      *

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3            I certify that the foregoing is a

4       Correct transcription of the proceedings

5       Recorded by me in this matter.

6

7

8                          s/Michelle L. McLaughlin
                           Michelle L. McLaughlin, RPR
9                               Official Reporter
                                U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25