VOL.XIV

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

        -vs-               10-CR-219S

TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
              Defendants.
-------------------------------------


         Proceedings held before the

    Honorable William M. Skretny, U.S.

    Courthouse, 2 Niagara Circle, Buffalo,

    New York on March 18, 2013.


    APPEARANCES:

    AARON J. MANGO,
    Assistant United States Attorney,
    ROCKY PIAGGIONE, Senior Counsel,
    U.S. Department of Justice,
    Appearing for the United States.

    GREGORY F. LINSIN, ESQ.,
    JEANNE M. GRASSO, ESQ.,
    ARIEL S. GLASNER, ESQ.,
    Appearing for Tonawanda Coke Corporation.

    RODNEY PERSONIUS, ESQ.,
    Appearing for Mark L. Kamholz.

    Also Present:  Lauren DiFillipo, Paralegal
                  Sheila Henderson, Paralegal


    Michelle L. McLaughlin, RPR,
    Official Reporter,
    U.S.D.C. W.D.N.Y.
    (716)332-3560

2924

1                        I N D E X

2              WITNESS                                PAGE

3          JAMES G. STRICKLAND
       Direct Examination by Mr. Mango                2955
4      Cross-Examination by Mr. Linsin                2979
       Cross-Examination by Mr. Personius             3026
5      Redirect Examination by Mr. Mango              3029
       Recross-Examination by Mr. Linsin              3043
6      Further Redirect Examination by Mr. Mango      3046

7          ROBERT CONWAY
       Direct Examination by Mr. Mango                3049
8      Cross-Examination by Mr. Personius             3079
       Redirect Examination by Mr. Mango              3105

9

10

11         GOVERNMENT EXHIBITS                         EVD.

12             200                                     3055
               201                                     3064
13         201 through 211                             3072

14

15         DEFENDANTS' EXHIBITS                        EVD.

16             DDDD.02                                 3001
               DDDD.01                                 3004
17

18

19

20

21

22

23

24

25

 1                (Jury not present in the courtroom.)

 2                THE CLERK:  Criminal case 10-219S, United

 3      States of America versus Tonawanda Coke and Mark

 4      Kamholz.

 5                THE COURT:  Okay.  The attorneys and

 6      parties are back present, and we're about to

 7      resume.  The jury, I understand, is here.

 8          Are there any preliminary issues that have to

 9      be addressed?

10                MR. LINSIN:  Your Honor, I believe there

11      are -- there is at least one and perhaps possibly a

12      second.  The one issue that I think would be very

13      helpful to resolve before we begin -- before we get

14      going, if possible, this is the issue of the

15      summary charts.  As I understand it, the

16      government's next witness will actually be an

17      expert witness on RCRA issues, so perhaps we may

18      not bump into it immediately.  But, as we discussed

19      on Friday, we did order and have received the

20      transcript of the testimony of Mr. Cahill on these

21      issues.

22          For reasons we're prepared to explain when we

23      get to the issue, regrettably we've not been able

24      to come to an agreement with the government even as

25      to the -- the simpler summary chart regarding the

1    by-products logbook itself.

2        So, that would be the one issue, and the second

3    issue, your Honor, that at some point we would like

4    to address with the Court is just witness

5    management, case management for this week in terms

6    of our defense case, and we have some suggestions

7    in that regard as well.

8            THE COURT:  Okay.  All right.  So the

9    arguments are as they were then on Friday with

10   respect to the summary charts?

11           MR. LINSIN:  Well --

12           THE COURT:  There's nothing new, is what

13   we're really saying, based on your examination of

14   the transcripts?

15           MR. LINSIN:  We -- we have looked closely

16   at the transcript, your Honor.  I have copies of

17   the transcript for the Court and for the government

18   if they don't have already it.  We have marked the

19   sections -- every section we could find in

20   Mr. Cahill's testimony where he addressed this

21   issue of the adjustments to the back pressure --

22   I'm sorry -- to the set point for the

23   pressure-relief valve.

24       We have also looked a little more closely at

25   the logbook itself overall, and, candidly, it is

1   that examination that has resulted in our inability

2   to -- to come to some agreement with the government

3   even on that basis.  And we do believe, your Honor,

4   if you will hear us on that, that there are some

5   significant issues there that relate directly to

6   the underlying question of the reliability of this

7   data.

8           THE COURT:  Okay.  Mr. Mango.

9           MR. MANGO:  Yes, your Honor.  I have had

10  an opportunity to review Mr. Cahill's transcript,

11  and I have a much different reading than I

12  believe -- I haven't heard it being articulated

13  yet, but I have a much different reading of what

14  this transcript means.  And in -- my reading of

15  this transcript indicates that during direct

16  examination Mr. Cahill was asked specifically about

17  did you -- this is now I'm reading from page 50.

18  I've tabbed and highlighted a couple of sections as

19  well, so at least I'll give the Court those

20  references.  On page 50 he's asked, "Did you ever

21  give instructions to anyone to raise or lower the

22  bleeder?"

23      "Yes."

24      "Okay.  If you had given that instruction and

25  if someone had, in fact, raised or lowered the

2928

1     bleeder, would you expect to find that notation in

2     the logbooks, the by-products logbooks?"

3          Answer:  "Yes, I would."

4          That's his first day of testimony.  The second

5     day of testimony he resumed on direct, and I asked

6     him very -- I got into questions about that again.

7     And now I'm reading from page 12 of the second day.

8          "Okay.  Who is permitted to adjust the release

9     point for the bleeder?"

10         Answer:  "The BP supervisor and the operators."

11         Question:  "If an adjustment is made, is that

12    noted anywhere?"

13         "Yes."

14         "Okay.  Where is the adjustment noted?"

15         "It would be noted in the BP logbook."

16         I then went on to ask Mr. Cahill on direct

17    about the notations for the April inspection.  I

18    showed him April 14th, April 15th, 16th, and asked

19    him after each of those is there any notation he

20    made a change in the logbook.  And he said, no,

21    because he didn't want anybody to find out.

22         Then I grouped April 17th, the 20th, and the

23    21st all into one question.  He said again there's

24    no notation.  That was the extent of the direct

25    examination on that.

1          Now, during cross, Mr. Cahill was asked a

2     couple of questions about -- about the -- the --

3     this is now I'm reading from page 52 during

4     Mr. Personius's cross.

5          Question:  "Do you agree" -- and this is on to

6     53 -- "Do you agree, Mr. Cahill, that while it

7     might have been the desired practice to put changes

8     in the pressure for the PRV recorder in the" --

9     hyphen hyphen -- "in the by-products logbook, that

10    didn't happen on a regular basis?"

11         Answer:  "No, it didn't happen on a regular

12    basis."

13         Question --

14              THE COURT:  Read that question again,

15    please.

16              MR. MANGO:  I've an interpretation of

17    that.  It's, "Do you agree, Mr. Cahill, that while

18    it might have been the desired practice to put

19    changes in the pressure for the PRV recorder in

20    the" -- hyphen hyphen -- "in the by-products

21    logbook, that that didn't happen on a regular

22    basis?"

23         Answer:  "No, it didn't happen on a regular

24    basis."

25         He's then asked, "It is rare that entries were

1    made in this logbook, isn't it?"

2        And he says:  "No.  Whenever the operators

3    would make an adjustment, they would definitely put

4    it in the logbook."

5        Question:  "They would?"

6        Answer:  "Yes."

7        And then later in the page down at the bottom

8    of 53, Question:  "Right.  But you're saying most

9    of the time it gets changed, the majority of times

10   that pressure got changed it should be in the

11   logbook and will be?"

12       And he says "Yeah."

13       Now, my interpretation, your Honor, is he

14   clarified that.  My understanding is from other

15   witnesses and Mr. Cahill -- I don't think

16   Mr. Cahill got into it directly how often this got

17   changed, but other witnesses have, and said this

18   doesn't get changed all that frequently.  So I

19   think that first question where he answered that, I

20   think he was bringing that -- that practice into

21   play in answering the question.  And then later

22   when he was asked more directed questions, he

23   answers, well, no, it should be in the book.

24       Now, then there is a question by Mr. Personius

25   about whoever makes the change in the recorder is

2931

```
1       expected to walk to this green shack, which is
2       75 feet.  Mr. Cahill says, "Yes, that's what you're
3       supposed to do."
4            And then there was the break.  Mr. Personius
5       was right.  There was a break, and then after the
6       break, after having read that book that he was
7       shown, which included the April inspection, he's
8       asked, "And I think you told us on direct that when
9       you would change the pressure you did not make an
10      entry in the logbook, is that true?"
11           "That's true, yes --"
12           All he said on direct was for the April
13      inspection.  So I think in reading everything into
14      context, we have a much different view of
15      Mr. Cahill's testimony.  And I --
16                THE COURT:  Than Mr. Linsin's view as
17      opposed.
18                MR. MANGO:  Right.
19                THE COURT:  But it's consistent with what
20      you argued on Friday.
21                MR. MANGO:  Yes, your Honor.  In terms of
22      the -- we have made some changes to the by-products
23      operator exhibit, Exhibit 200, based on comments by
24      counsel.  We haven't incorporated wholesale all of
25      their comments, because it would defeat the purpose
```

1    of a concise, consolidated summary exhibit.  But we

2    have added where we can descriptions in the comment

3    section to reflect requests that they have made.

4              THE COURT:  This is Exhibit 200?

5              MR. MANGO:  Exhibit 200, your Honor.  And

6    I think it does -- that's what the testimony is

7    for -- fairly and accurately reflect what is

8    supposed to be reflected in that chart.

9              THE COURT:  Okay.  Thank you, Mr. Mango.

10      Mr. Linsin.

11              MR. LINSIN:  Your Honor, and I would be

12    happy to offer up a copy of the pages I'm

13    referencing if the Court would wish, but part of

14    the problem with Mr. Mango's comments is that the

15    portions of Mr. Cahill's testimony that he read

16    from Mr. Cahill's direct examination do not

17    encompass all of his testimony regarding his

18    setting of this set point for the pressure-relief

19    valve.  And I will give you an example.

20        On page 24 of his testimony, the first day of

21    his testimony, he's asked a question by Mr. Mango:

22    "All right.  As part of your responsibilities as

23    by-products foreman, did you have any

24    responsibilities relating to the operation of this

25    bleeder valve?"

1          "Yes."

2          Question:  "What were your responsibilities?"

3          Answer:  "To maintain the pressure in the

4     plant."

5          Question:  "All right.  What were your

6     responsibilities with respect to this bleeder

7     valve?"

8          Answer:  "Setting it."

9          Question:  "Setting it?"

10         Answer:  "Yes."

11         "Okay" -- this is the question.  "Okay.  So

12    there's a way to set it?"

13         The answer is "Yes," and then the conversation

14    goes on.

15         It is clear from this testimony, your Honor,

16    that Mr. Cahill also testified on direct that part

17    of his responsibilities as BP foreman, in order to

18    coordinate and maintain plant pressure, was to set

19    this valve.  And there is a significant part of

20    this equation, your Honor, that is -- the closest

21    equivalent I can think of is to the dog that didn't

22    bark, that if you look at this back pressure

23    logbook, there are not entries by Mr. Cahill

24    indicating he has changed the set point on this

25    pressure-relief valve.

2934

1           The testimony and Mr. Cahill's -- the passages

2      from his testimony that Mr. Mango was just

3      referencing was, and we believe consistent, that it

4      is the operators that were required to record it

5      when they did so.

6           But we believe that the testimony we just

7      referenced about his ongoing general duties as

8      foreman of the by-products department were to

9      maintain this pressure, and then when you add that

10     to the question and answer regarding whether he

11     ever made an entry in the logbook reflecting a

12     change in the set point, coupled with the absence

13     of any such entries in the logbook, I think

14     demonstrate that it is clear that as foreman of

15     that department he was not recording his actions in

16     the logbook.  He wanted to make certain that the

17     operators were.

18          And that is consistent with the structure of

19     the logbook, that these entries regarding changes

20     in the set point that are in the logbook always

21     have an operator number associated with them.

22     Mr. Cahill is not an operator.  He is the foreman.

23          And so the government is cherry-picking some of

24     this testimony, we believe.  But I think, your

25     Honor, this issue of the other entries that we've

1    been unable to come to some agreement about I also

2    think reflect very significantly on the reliability

3    of this data.  And if I could offer just one

4    example, your Honor.

5        I don't know why the government has not offered

6    a summary chart of April 2009.  As we see the

7    submission they are proposing, there is no summary

8    chart for that month in April.  However, there are,

9    if you look at the logbook, a number of entries in

10   April clearly demonstrating that the set point in

11   that month was changed and that there were

12   adjustments to the bleeder valve because of an

13   operation in pumping down the moat, and yet these

14   are not entries they are prepared to enter into

15   even their summary chart for the logbook.

16       But then when they jump to May and seek to

17   reflect the set point for the pressure-relief valve

18   in their May summary, they go all the way back to

19   March and ignore these entries that are directly in

20   the logbook demonstrating that there had been

21   adjustments up and down in the set point.

22            THE COURT:  In April, you mean?

23            MR. LINSIN:  Yes, sir.  Yes, sir.

24       There are other entries here which demonstrate,

25   again in '09, that the -- the bleeder valve itself

1    appears not to be working.  There's an entry, again

2    one they're not willing to include, that the valve

3    was closed on the bleeder manometer, which is the

4    measuring device for the pressure.  This is --

5    excuse me -- in May, on May the 7th.  And then

6    there's a May 22nd entry indicating bleeder back in

7    service.

8        It appears to be, your Honor, from these

9    entries, that just on the face, that the bleeder

10   valve itself may well have been out of service for

11   a two-week period of time.

12       And we -- all of these entries that we had

13   requested be included in this first summary chart

14   are reflective, we believe, of functions and

15   changes to the set point, sometimes references to

16   changes in set point without any indication as to

17   what the change is.  And the government is

18   unwilling to include it in their first summary

19   chart because -- we suspect because they believe or

20   recognize that it will undermine the reliability

21   they are seeking to achieve by just extracting

22   selected numbers for the second summary chart.

23              THE COURT:  All right.  Why no April?

24              MR. MANGO:  Your Honor, there is a good

25   reason for that, and that's absolutely not the case

1    is that we're trying preserve the integrity of this

2    chart by excluding April.  April was excluded

3    because there's no bleeder circular charts for

4    April except for during the inspection.  And we now

5    know that -- according to testimony, that the

6    bleeder set point was changed.

7              THE COURT:  By Cahill.

8              MR. MANGO:  By Cahill.  And it wasn't

9    recorded anywhere.  So, if we actually included

10   April, we would be making assumptions and

11   including -- and would have summary charts that

12   would be the product of guesswork, because there

13   was no notation as to what it was exactly set to.

14        Now, the other entries that are in April that

15   Mr. Linsin references, there's an April 2nd, an

16   April 4th, and an April 5th, '09.  First off, April

17   is not included, so -- in the bleeder circular

18   charts, so there was really no purpose in including

19   it in the by-products operator summary.

20        But these entries have nothing to do with the

21   bleeder, the bleeder we're talking about.  The fact

22   that it says, "Pumping down moat.  Have bleeder

23   opened a little," that has -- that is totally

24   unrelated to the by-products pressure-relief valve.

25   There is a bleeder that is associated with the --

1    the steam apparatus used to pump down the moat.

2    We've confirmed this with Tonawanda Coke employees.

3    I mean, so there was a reason that Special Agent

4    Conway did not include these on his chart.

5              THE COURT:  This moat isn't the bleeder

6    we're talking about.

7              MR. MANGO:  Right.  And likewise the fact

8    that the bleeder manometer valve gets closed, we've

9    also confirmed that with Tonawanda Coke employees

10   who actually worked on this, that said whenever

11   pressure would really get high, I mean on days it

12   was really going up, the bleeder -- the manometer

13   would get stuck.  It would get basically maxed out

14   and get stuck there.

15             THE COURT:  That's not part of the

16   evidence.

17             MR. MANGO:  Right.  But this is something

18   that went into the creation of this chart.  And

19   so -- in Mr. Conway's creation of the chart.  So

20   the fact that there's this entry that says, well,

21   it could have been out of service, Mr. Conway

22   believes it wasn't out of service, based on his

23   information in creating this summary.

24        So it is a fair representation of what is in

25   the logbook.

 1              THE COURT:  Well, he doesn't believe that

 2      it was out of service, and what's the basis for

 3      that evidentiarywise?

 4              MR. MANGO:  It is based on conversations

 5      he's had with Tonawanda Coke employees in

 6      investigating the entries in the by-products

 7      operator logbook.

 8              THE COURT:  Yeah, but that's outside the

 9      record, right?

10              MR. MANGO:  It is.  It is.  But if it's

11      examined on cross-examination, I mean, he'll be

12      ready to discuss that.  I was not going --

13              THE COURT:  He has a good-faith basis for

14      the exclusion of April.

15              MR. MANGO:  Right.  Right.  So --

16              MR. LINSIN:  Your Honor, the entry

17      Mr. Mango is referring to says, "Bleeder back in

18      service."  This is May 22nd.

19              THE COURT:  22nd?

20              MR. LINSIN:  Yes.  It is not a maybe.  It

21      is not a could-have-been.  And what now -- what

22      Mr. Mango is now suggesting is that his very

23      witness is suggesting that the entries in this

24      logbook they're seeking to summarize are false.

25          And I just find this to be -- if -- if the

1    purpose of this testimony is then to impugn the

2    integrity of the very logbook they're seeking to

3    summarize, I think they are shooting themselves in

4    the foot.

5        I just -- the fundamental point here, your

6    Honor -- and I do believe these issues regarding

7    the other entries in the logbook are significant,

8    but the fundamental point, as we stressed in our

9    discussions on Friday, the man who was the BP

10   foreman testified, and we believe unambiguously,

11   that he changed this set point as part of his

12   general responsibilities as the BP foreman.  That

13   was his direct testimony.

14       And when he was asked on cross, not just about

15   April of '09, about all of his direct, about

16   whether he put entries in the logbook, he said no.

17   And that's exactly where this record is.  And --

18   and the logbook itself corroborates the

19   interpretation that we have of this testimony,

20   because there simply are not -- it's not just April

21   that's missing any entries from Mr. Cahill.  There

22   are none for Mr. Cahill except when he is

23   admonishing, as I referenced to the Court on

24   Friday, he -- there is an entry later in 2009 when

25   he's admonishing the operators not to change it

1    without his direction.

2        And there is another entry, your Honor, I would

3    point out, in July of 2009 where the -- an

4    operator, Operator JC.  We're not certain -- well,

5    we think we know who that is, but essentially is

6    requesting Mr. Cahill in this note to say, please

7    advise us when you change the -- I'm interpreting

8    here -- please advise the operators when you change

9    the set point.  We don't have radios or phones, and

10   you need to tell us.

11       And we believe that further corroborates the --

12   what is the testimony, what is the evidence by the

13   log itself, that Mr. Cahill, as foreman, was not

14   noting his changes in this logbook.

15            MR. MANGO:  Your Honor, the last point on

16   that is, there is an entry on October 1st of 2008

17   by Pat Cahill.  It's not on here because it doesn't

18   relate to a set point.  But it does say, "Cahill

19   working on bleeder, not bleeding correctly."  He

20   puts that in the logbook.

21       There's other entries in here which are

22   recorded on the operator logbook summary.  "Bleeder

23   set at 95 per PC."  So he has the responsibility to

24   make settings in the bleeder.  He tells his

25   operators to do that.  They then put it on here.

1    There's a least two of those on this chart.

2    "Bleeder set at 95 per PC."  That's on the first

3    entry November 3rd of 2006.  Then there's an entry

4    on December 19th of 2007, "Bleeder now at 100 as

5    per PC."

6        There's no discrepancy in what he testified to

7    in this logbook.

8            MR. PERSONIUS:  Judge, those entries that

9    Mr. Mango refers to, I don't interpret those as an

10   indication that it was Mr. Cahill that did that.

11   It simply is saying it was per or as per

12   Mr. Cahill; in other words, in accordance with his

13   direction.

14       I only want to add one point, Judge.  The

15   fairest reading from the government's perspective,

16   the best they can argue from his trial testimony is

17   that what he testified to is that entries would be

18   made in the -- the BP logbook when it was the

19   operator making those changes, but if it was

20   Mr. Cahill doing it, and it was his responsibility

21   to do it, he would not note those entries in the

22   logbook.

23       So all the changes that were made by

24   Mr. Cahill, we don't know about those, and that is

25   corroborated by the entry of July of 2009 where

1   someone is complaining about the fact that

2   Mr. Cahill makes changes and doesn't tell anybody

3   that's he's doing it.

4          THE COURT:  Okay.  Why don't you give me

5   the highlighted portions of your respective

6   transcripts, and I'll take a look at those.  I'll

7   make a decision before we get started.

8       Who is your first witness?

9          MR. MANGO:  James Strickland, your Honor.

10          THE COURT:  Okay.  The charts won't be

11   admitted through him.

12          MR. MANGO:  No, your Honor.

13          THE COURT:  We'll wait for Conway for

14   that?

15          MR. MANGO:  Yes, your Honor.

16          THE COURT:  Okay.

17          MR. MANGO:  Your Honor, there is one other

18   issue.  We'll just give the Court some notice, and

19   it depends on how -- I believe there's going to be

20   a request regarding witness order.  It's come to

21   our attention one of the defense experts, Marcia

22   Williams, her testimony, which was noticed as being

23   substantially similar to what she was going to

24   testify here in this case, in a Southern Union case

25   that was out of Rhode Island, a recent RCRA case,

1    the government moved to preclude her testimony in

2    that case, and the court held a Daubert hearing

3    where she testified, and then ultimately did

4    preclude her testimony at trial.

5         The government intends to file a motion to

6    preclude her testimony on similar grounds.  It

7    was -- the basis of that is that she was providing

8    essentially legal opinions, which would invade on

9    the province of the Court.  We'll reduce that to

10   writing and ensure something gets filed today.

11              THE COURT:  Okay.  Anything, Mr. Linsin?

12              MR. LINSIN:  Well, your Honor, we are

13   proffering Miss Williams to testify precisely as we

14   noticed in our notice.  I don't know why this

15   revelation is coming now this late in the day, and

16   I would simply proffer to the Court that

17   Miss Williams' proposed testimony would be in

18   general character and similar to the other expert

19   witness testimony that has been admitted without

20   objection here in this trial.

21        So, I mean, if the government files something,

22   we will respond, but Miss Williams has been

23   instructed about the limitations given the Court's

24   determination on the two regulatory definitions,

25   and her testimony will -- will closely adhere to

1    that limitation.

2              THE COURT:  Okay.  I'll wait for whatever

3    it is that you file in your response in that

4    regard.

5         Okay.  We'll take a look at this.

6         Okay.  We'll see you as soon as I can get back.

7              MR. LINSIN:  All right.  Thank you, your

8    Honor.

9              (Short recess was taken.)

10             (Jury not present in the courtroom.)

11             MR. LINSIN:  My apology, your Honor.

12             THE COURT:  No problem, Mr. Linsin.  Thank

13   you.

14        Okay.  The attorneys and parties are back

15   present.  And with respect to the summary charts

16   proffered by the government, I reviewed the

17   arguments of counsel, that is the attorneys,

18   concerning the government's proffered summary

19   charts.  I incorporate the discussion we had on

20   this topic on Friday, March 15th, 2013, as well as

21   the discussion this morning.  I have had a chance

22   to adequately review the transcripts of Pat

23   Cahill's testimony that were handed up to me this

24   morning.

25        And based on that review and on my own

1    recollection of the testimony, and giving full

2    consideration to the totality, I am going to permit

3    the government to use its summary charts over the

4    defendants' objections.  I'm satisfied that the

5    government has a good-faith basis for the

6    information contained in the chart and that the

7    trial testimony adequately supports the

8    government's summaries for admissibility purposes.

9         Defendants undoubtedly interpret the trial

10   testimony differently than the government, but I

11   cannot conclude at this time that the government

12   lacks an evidentiary basis for its summary charts.

13   I will therefore permit them.

14        With there being an evidentiary basis for the

15   summary charts, I find that defendants' objections

16   concerning the reliability of the summary charts go

17   to the weight to be afforded the charts rather than

18   to admissibility.  Defendants will have the full

19   opportunity to cross-examine Agent Conway on the

20   methodology and information he employed to create

21   the charts, as well as any relevant information he

22   may have omitted from them.  It will be then for

23   the jury to afford the charts and the information

24   therein whatever weight, if any, it deems

25   warranted.

1          Consequently, the defendants' objections to the

2     government's summary charts are overruled.

3               MR. PERSONIUS:  Your Honor, may I, on

4     behalf of the defense, make a request in that

5     regard, that as part of -- I think really it would

6     be pursuant to -- I don't know if it's Rule 3500 or

7     what it would be, but to the extent that Agent

8     Conway has notes of these interviews that he

9     conducted with Tonawanda Coke employees, may we

10    have a copy of those notes for cross-examination?

11              THE COURT:  Yes.

12        You will make inquiry in terms of what exists

13    in that regard, Mr. Mango?

14              MR. MANGO:  Yes, your Honor.  I know some

15    of the -- the basis will have included a

16    conversation that was had this morning.  So we'll

17    see if we can have that reduced to a note form if

18    there was no notes taken.  I was in one location,

19    Agent Conway was in a different location, and then

20    there was a witness on the phone.  So I'll inquire

21    and make sure that's produced if there is notes.

22              THE COURT:  Okay.  Mr. Linsin?

23              MR. LINSIN:  I know this is not

24    determinative to the Court's ruling.  I'm not

25    asking for any further reconsideration.  I just

1    want the record to be clear on one point with

2    respect to an issue I raised in our discussion on

3    Friday.

4        The Court may recall that I made reference to

5    statements by one of the BP operators, Mr. Jack

6    Bodie.  And I stated which -- what I believe to be

7    true on Friday, that Mr. Bodie had informed the

8    government in its interview reports that he at

9    times -- he was a BP operator -- he at times

10   changed the set point without recording it.  I was

11   mistaken in that representation.  I just want to

12   make it clear.  Mr. Bodie did, in fact, say that,

13   but he said it to us in an interview that we

14   conducted with him.  We reviewed the interview

15   reports that the government had in its possession,

16   and to the extent I was suggesting they had

17   information in their possession that was contrary

18   to the position, I just wanted the record to be

19   clear.  All right.  Thank you, your Honor.

20            THE COURT:  Okay.  The record will so

21   reflect.

22       We're almost ready.  I'd like to have the

23   attorneys come up to the bench for a moment,

24   please.

25            (Side bar discussion held on the record.)

1              THE COURT:  Okay.  Can everybody hear me

2       okay?  I did receive a letter that apparently was

3       sent to defense counsel from James Kennedy, the

4       First Assistant United States Attorney.  And the

5       copy I have references a statement that apparently

6       I made with respect to Assistant U.S. Attorney

7       Mango.  What I want to clarify at this point in

8       time -- and nobody raised this as any type of

9       issue.  One, I have said a number of times that

10      counsel for both sides were doing an excellent job.

11      And, frankly, I have no bias one way or another

12      with respect to this case and the performance

13      and/or conduct of the attorneys.

14          In my view what I did say specifically with

15      respect to Mr. Mango is not accurately reflected in

16      the letter.  My recollection is that I said that

17      his performance was -- well, the letter reads this

18      way.  It reads that he's one of the best attorneys

19      that I have seen in the courtroom.  Whether that's

20      true or not, my recollection is that I said that

21      it's one of the better performances that I've seen

22      from the United States Attorney's Office in a

23      while.  So I qualified it a little bit.  I don't

24      want this to go your head, Mr. Mango.

25              MR. MANGO:  No, it surely is not.

1          THE COURT:  But my comments always with

2    respect to counsel, you all are cooperative.  You

3    are -- I mean, to me, I mean, I can't imagine

4    clients either way having better representation.  I

5    mean that sincerely.

6        And the letter is what it is, but, I mean, I

7    just want you to know that from my standpoint

8    there's no favoritism whatsoever, nothing in my

9    mind that distinguishes one side or the other in

10   terms of how I view this case.  And I consistently

11   maintain I'm simply an umpire and managing the

12   trial as best as I can, and I favor no side over

13   any others.  And if there's anything you want me to

14   do, any further discussions that you want to have,

15   I'll be more than happy to do it.

16          MR. LINSIN:  Your Honor, can I represent

17   to the Court and to the government that we received

18   a copy of this letter on Friday.  We spoke about it

19   among the defense team.  I spoke to Mr. Personius

20   about it as well.  We were in no way troubled by

21   the reported conversation.  We intended -- instead

22   of just responding by email, we intended to draft a

23   letter confirming that view to the First Assistant

24   United States Attorney.  And we will do so.  But I

25   can represent to the Court that we are -- we have

1    no concerns or issue with the conversation either

2    as reported in the letter or as recalled by the

3    Court.  So we appreciate your -- your raising this

4    on the record, but we will confirm in writing what

5    I have just recited orally.

6              THE COURT:  Okay.  Well, I appreciate

7    knowing that.  Well, rather than expound on it,

8    I'll leave it for what it is.  And I guess we're

9    ready to proceed then.

10             MR. LINSIN:  All right.

11             MR. PERSONIUS:  Judge, I just want to add

12   the letter is drafted, and the letter makes it

13   clear this is a non-issue.  It is not a problem.

14             THE COURT:  Okay.  I mean --

15             MR. PERSONIUS:  It's just not.

16             THE COURT:  -- frankly, I guess you learn

17   something all the time.  And, you know, the fact

18   that I say counsel in a case are doing a great job

19   for their clients, you know, I'll have to give that

20   thought down the road a little bit.  But in this

21   case I feel it's appropriate, so -- on both sides.

22   So thank you very much.  I appreciate it.

23             MR. LINSIN:  Thank you, Judge.

24             MR. MANGO:  Thank you, Judge.

25             (End of side bar discussion.)

1          THE COURT:  Okay.  Chris, I think we're

2     ready if the jury would like to come out.  Please

3     give them that invitation, please.

4          COURT SECURITY OFFICER:  Okay.

5          (Jury seated.)

6          THE COURT:  Actually, we couldn't find the

7     notebooks, and that's why we're late.  No, that's

8     not why.

9      Okay.  Welcome back.  I hope everybody had a

10    good weekend, a nice weekend.  We're happy to have

11    you back.  Thank you.  Sorry for the delay.  I know

12    we had you come in a little bit later, and things

13    took a little bit longer, and we had some issues

14    that we had to resolve here.  So I think we're

15    ready to go.  We'll distribute the notebooks now.

16      Please keep in mind that we urge you to keep

17    your minds open until all of the evidence is in,

18    respecting the fact that the burden of proof is on

19    the government beyond a reasonable doubt and that

20    the defendants are presumed innocent in this case.

21      So please have a seat.  Thank you.

22      Okay.  We have, I think, everybody assembled,

23    and, of course, I think by now you know everybody.

24    This is United States versus Tonawanda Coke

25    Corporation and the defendant Mark Kamholz, who's

1    at the table with defense lawyer Rod Personius.

2    And Gregory Linsin and Jeanne Grasso and Ariel

3    Glasner represent the Tonawanda Coke Corporation.

4    And they are here along with Sheila Henderson, who

5    is the paralegal that does a lot of the technology

6    work for the defense and for the government.

7    Robert Conway is the agent who's at the far table

8    with Lauren DiFillipo, the paralegal.  And the

9    attorneys you've come to know, too, are Aaron Mango

10   and Rocky Piaggione.  And I think the only person I

11   missed was Paul Saffrin, who is the president of

12   Tonawanda Coke.  So that gives you the full

13   landscape once again.

14       It's good to have you back.  It's nice to start

15   a Monday seeing our jury.  And we hope the

16   government can proceed with its case.

17       Mr. Mango, are you ready with your next

18   witness?

19           MR. MANGO:  We are, your Honor.  Thank

20   you.  The government would call James Strickland.

21           THE COURT:  If you would approach the

22   witness stand, please, and I'll tell you when to

23   stop, and it should be right there, and then we'll

24   ask -- yeah.  Terrific.  Face the jury.  That's a

25   good thing.

2954

1    J A M E S   G.   S T R I C K L A N D, having been

2    duly sworn as a witness, testified as follows:

3              THE COURT:  Okay.  Mr. Witness, still good

4    morning.  Good morning.

5              THE WITNESS:  Good morning, your Honor.

6              THE COURT:  A couple of preliminary

7    instructions.  It is important that you keep in

8    mind you're testifying for the benefit of the

9    ladies and gentlemen of the jury.  And we ask you

10   to try to be concise with your answers.  Speak at a

11   conversational tone.  The microphone is friendly,

12   so it should pick you up if you speak at it.  You

13   have to get a little bit closer than you are right

14   now or bring it towards you.

15       If you don't understand a question, please

16   don't answer it.  Just ask the lawyers or me to

17   repeat the question until we get it clear.  If you

18   can answer it in a yes or no fashion, that usually

19   helps, because whenever you volunteer information

20   that complicates things, usually.  Sometimes -- and

21   then more often than not the lawyers will follow up

22   with proper questions to get the information that

23   they need from you.

24       If there's an objection, wait until I rule on

25   the objection, and then I'll give you instructions

1    on whether to complete an answer, start your answer

2    again, wait for another question, or instructions

3    like that.

4         Do you understand?

5              THE WITNESS:  I do.

6              THE COURT:  Okay.  I think you're going to

7    carry okay, but for us state your full name, spell

8    your last name, please.

9              THE WITNESS:  My name is James G.

10   Strickland.  Last name is spelled

11   S-T-R-I-C-K-L-A-N-D.

12             THE COURT:  Okay.  Mr. Mango, your

13   witness.

14             MR. MANGO:  Thank you, your Honor.

15   DIRECT EXAMINATION BY MR. MANGO:

16   Q.  Good morning, Mr. Strickland.  How are you?

17   A.  Good morning.  Very well.

18   Q.  Are you currently employed?

19   A.  Yes, I am.

20   Q.  Can you tell the jury, please, who you're

21   employed by?

22   A.  I'm employed by the New York State Department

23   or Environmental Conservation, Region 9 office in

24   Buffalo.

25   Q.  And what is your current position with the

1    Region 9 office in Buffalo?

2    A.   Currently I am the regional engineer in the

3    Region 9 office.

4    Q.   And can you tell the jury what the regional

5    engineer does?

6    A.   As regional engineer I oversee all of our

7    environmental quality programs, which include our

8    air program, water program, solid waste program,

9    hazardous waste program, and environmental

10   remediation program.

11   Q.   Okay.  So you oversee all of those different

12   programs?

13   A.   Yes.

14   Q.   Which would include the hazardous waste program

15   you mentioned?

16   A.   Yes.

17   Q.   And even the air program?

18   A.   Yes.

19   Q.   All right.  How long have you been the regional

20   engineer?

21   A.   About two and a half years.

22   Q.   Mr. Strickland, who do you report to, if

23   anybody, in Region 9?

24   A.   I report to the regional director.

25   Q.   Okay.  So can you tell the jury how long in

1    total you've been employed with the DEC?

2    A.   I've been with the DEC approximately 30 years.

3    Q.   And I'd like you to tell the jury what other

4    positions you've held with the DEC and

5    approximately how long you held those positions.

6    A.   Prior to being the regional engineer, I was the

7    regional hazardous materials engineer for

8    approximately 16 years.  Prior to that I worked in

9    our Region 4 office in Schenectady for about a year

10   as a solid waste engineer.  And for approximately

11   the 12 years prior to that I worked in our

12   wastewater treatment construction grants program as

13   an engineer.

14   Q.   And so you mentioned as the Region 9 hazardous

15   material engineer you served in that role from 1994

16   to 2010, is that correct?

17   A.   That's correct.

18   Q.   All right.  That's the 16 years you mentioned?

19   A.   Yes.

20   Q.   And what were your duties, if you could tell

21   the jury, as the hazardous materials engineer?

22   A.   It was -- I managed the hazardous waste

23   program, which involved regulation of generators of

24   hazardous waste, also the permitted treatment,

25   storage, and disposal facilities.

1    Q.   Okay.  Did those duties include oversight of

2    any personnel?

3    A.   Yes.  I had a staff of approximately nine

4    people.

5    Q.   Okay.  And that staff was composed of what type

6    of employees?

7    A.   Engineers, geologists, chemists, and program

8    specialists.

9    Q.   Okay.  In your role as hazardous materials

10   engineer did you ever communicate or discuss issues

11   with the Environmental Protection Agency?

12   A.   Yes.  It would be relatively common to do that.

13   Q.   So you mentioned some of your duties.  Did your

14   duties involve the oversight and issuance of RCRA

15   permits?  I'm going to say RCRA.  Do you know what

16   that term is?

17   A.   RCRA stands for the Resource Conservation and

18   Recovery Act, which is a federal law which was

19   enacted in 1976.

20       And, yes, I was involved with the issuance of

21   permits.

22   Q.   Okay.  And those issuance were for the

23   treatment, storage, and disposal of hazardous

24   waste?

25   A.   That is correct.

1    Q.   And is there something known as a TSDF permit?

2    A.   Yes.   A treatment, storage, and disposal

3    facility permit.

4    Q.   Okay.   So we may use that term, TSDF.   And so

5    that's -- that is a known term to you?

6    A.   Correct.

7    Q.   All right.   When a facility wants to apply for

8    a TSDF permit, what is typically the first step in

9    that process?

10   A.   Typically we would have a pre-application

11   conference with the applicant, and that would

12   involve individuals from the hazardous waste

13   program and generally someone from our permit

14   administration program.

15   Q.   Okay.   So that would be a conference before the

16   actual application is submitted?

17   A.   That is correct.

18   Q.   And where would that conference occur?

19   A.   Typically that would be at our DEC office in

20   Buffalo.

21   Q.   Okay.   And so there's -- are there things

22   discussed during this pre-application conference?

23   A.   Yes.   We attempt to get, you know, some general

24   facility information, what hazardous waste

25   management activities the applicant is considering

1    to undertake at their facility.

2    Q.   Okay.   Is that an important part of the

3    process, to have this conference to try to

4    understand what is -- the application is going to

5    be based on?

6    A.   Yes, it is.   It's important for us and also the

7    applicant.

8    Q.   Now, that's the pre-application conference.   Is

9    there an actual permit application --

10   A.   Yes, there is.

11   Q.   -- that gets used?   And can you describe what

12   goes into the RCRA permit application?

13   A.   There is essentially two parts to it.   A Part

14   A, which has general facility information.   It will

15   have estimated quantities of hazardous waste which

16   they want to manage, the methods under which they

17   want to manage the hazardous waste, i.e.,

18   treatment, storage in tanks, storage in containers.

19       And then there's actually a Part B application,

20   which has more details about the individual units

21   that they wish to operate at the facility.   It will

22   have information about contingency planning,

23   preparedness and prevention activities, how often

24   they would need to inspect the facility to ensure

25   that the hazardous waste is being managed

1    appropriately.

2    Q.  All right.  So -- so, assuming the application

3    gets submitted with all that information you just

4    discussed, Mr. Strickland, what, if anything,

5    happens after the application is submitted?

6    A.  The application is submitted to us.  We would

7    review the application.  Typically there -- we

8    would generate some comments related to that, that

9    review.  We would relay those back to the

10   applicant, and they would revise the application in

11   accordance with the comments, or meet with us and

12   discuss the comments to make sure that they

13   understood exactly what we were asking for.

14   Q.  Okay.  So there's this -- is there this

15   opportunity given to the applicant to respond to

16   any comments that DEC may have?

17   A.  Yes.

18   Q.  And is it a sort of a back-and-forth process?

19   A.  Yes.  It can go back and forth a couple of

20   times.

21   Q.  Okay.  Now, does DEC -- once the back-and-forth

22   between DEC and the facility is concluded, is there

23   any type of draft permit that is issued?

24   A.  Yes.  Once we're satisfied with the

25   application, we actually draft the permits and

1    place the appropriate conditions in the permit.

2    Q.  All right.  And what happens after the draft

3    permit gets issued?

4    A.  Well, once we've developed a draft permit, we

5    issue what's known as a notice of complete

6    application, which starts a public comment period.

7    And for a hazardous waste permit that's a 45-day

8    comment period.

9    Q.  So what happens if there are comments by the

10   public or some other party?

11   A.  We review the comments.  If there seems to be

12   something that needs to be modified within the

13   permit based on those comments, we would do that.

14   Q.  Okay.  So changes could be made after the draft

15   is issued?

16   A.  That is correct.

17   Q.  Is there a process by which DEC documents the

18   comments and responses?

19   A.  Yeah.  We develop what is called a

20   responsiveness summary, which will list all of the

21   comments and the action that we took in regard to

22   those comments.

23   Q.  Okay.  And if there are differences -- are

24   there sometimes differences between the DEC and the

25   facility at this stage of the process?

1    A.   Yes, there can be.  There can be -- we could go

2    to what's termed an adjudicatory hearing, which is

3    a hearing before an administrative law judge, to

4    resolve issues that the two parties cannot come to

5    agreement on.

6    Q.   How often does that happen?

7    A.   It's relatively rare.

8    Q.   All right.  So, after that process happens,

9    does a permit get issued?

10   A.   Once -- yes, once we're through that process,

11   the permit would be issued by our regional permit

12   administrator.

13   Q.   Okay.  So that's an office in the DEC?

14   A.   Yes.

15   Q.   So --

16   A.   It's in the regional office.

17   Q.   The DEC would issue the permit?

18   A.   That is correct.

19   Q.   So, when a permit, a treatment storage disposal

20   facility, this TSDF permit is issued, how long of a

21   time period are those valid for?

22   A.   They're either five-year terms or ten-year

23   terms.

24   Q.   Can you tell the jury how many TSDF new and

25   renewal permits are handled by Region 9 in a given

1    year?

2    A.   Usually one.

3    Q.   And so between 1994 and 2010 at the time you

4    were the hazardous materials engineer, how many --

5    how many of those permits issued one a year would

6    you have reviewed?

7    A.   Sixteen or so.

8    Q.   Okay.  One per year?

9    A.   About one a year.

10   Q.   Would you have reviewed all of the RCRA permits

11   during your time?

12   A.   Yes.

13   Q.   Okay.  And again, during your tenure as

14   hazardous materials engineer -- I'm sorry.  I asked

15   you that question.  It's fair to say you reviewed

16   them all during your tenure?

17   A.   Yes.

18   Q.   All right.  Now, you just described for us,

19   Mr. Strickland, the process by which a facility

20   would apply to DEC to get a permit, is that right?

21   A.   That's correct.

22   Q.   All right.  Would it be possible for a facility

23   to, in essence, bypass DEC and go directly to the

24   EPA?

25   A.   If they did, the EPA would refer that back to

1    us, because we -- the New York State is authorized

2    to administer the hazardous waste program in New

3    York State.

4    Q.   Okay.  So DEC would be involved in the process

5    of issuing any permit under RCRA in New York State?

6    A.   Yes, we would.

7    Q.   Okay.  Let me ask you, as part of your duties

8    when you were hazardous materials engineer, did you

9    get involved in issuing any type of written

10   regulatory interpretation and/or guidance to the

11   RCRA permit holders?

12   A.   Yes.  To permittees and just the regulated

13   community.

14   Q.   Okay.  How would that come about?

15   A.   Generally there would be -- you know, a permit

16   holder would not fully understand the requirements

17   in the regulations, or a generator would have

18   trouble understanding requirements in our

19   regulations.

20   Q.   And it would fall on your shoulders to provide

21   interpretation and guidance on that?

22   A.   Yes.

23          MR. LINSIN:  Objection, your Honor, to

24   this line of questioning on grounds of relevance.

25          THE COURT:  Mr. Mango.

1            MR. MANGO:  Your Honor, I'm just

2      attempting to establish the expert qualifications

3      for this witness.  I don't plan to go any further

4      on these questions.

5            THE COURT:  Okay.  Let's move on then,

6      please.

7            MR. MANGO:  Yes, your Honor.

8      BY MR. MANGO:

9      Q.  Mr. Strickland as part of your duties when you

10     were hazardous materials engineer, were you

11     responsible for keeping RCRA inspectors who worked

12     for you in your region current with all new

13     practices and/or guidance documents?

14     A.  Yes, I was.

15     Q.  And can you tell the jury what your educational

16     background is?

17     A.  I have a Bachelor of Science degree in

18     mechanical engineering.

19     Q.  And do you hold any type of professional

20     license?

21     A.  Yes.  I'm a professional engineer licensed in

22     New York State.

23     Q.  And how about any membership in any

24     organization -- professional organizations?

25     A.  I'm a board member of the Air and Waste

1       Management Association, Niagara Frontier Section.

2       Q.   Okay.  As a board member, what are your duties

3       as a board member?

4       A.   As a board member we set up the -- what we call

5       the program for the year, which is a series of

6       dinner meetings where we have professionals in the

7       air and waste management business give

8       presentations to our membership.

9       Q.   Okay.  And you're involved in setting those up?

10      A.   Yes.  And we also give out scholarships for

11      college students.

12      Q.   Okay.  Have you received any type of training

13      with DEC regarding RCRA?

14      A.   Yes.  I've attended approximately 14 RCRA

15      inspector training courses, and I've taken various

16      courses on hazardous waste management and

17      environmental remediation.

18      Q.   Okay.  Now, we've been talking this term RCRA,

19      Resource Conservation and Recovery Act.  Are you

20      familiar with that act?

21      A.   Yes, I am.

22      Q.   How are you familiar with RCRA?

23      A.   RCRA -- New York State has its waste

24      regulations as stringent as the federal EPA

25      regulations, and it's through the exercise and use

1    of those regulations that I'm familiar.  Also

2    through the permitting process.

3    Q.   Okay.  And as your role as hazardous material

4    engineer, is that right?

5    A.   Yes.

6    Q.   All right.  Are you familiar with the

7    implementing regulations under RCRA?

8    A.   The New York State regulations, yes.

9    Q.   Yes.  Are you familiar with the permitting

10   scheme under RCRA?

11   A.   Yes.

12   Q.   Do you know if DEC -- you mentioned this -- is

13   authorized to implement RCRA in New York State?

14   A.   Yes, the DEC is.

15   Q.   Okay.  So are you familiar with -- now, let me

16   ask you -- Title 6 of the New York Code Rules and

17   Regulations, NCYCRR Parts 370 to 376?

18   A.   Yes.

19   Q.   Okay.  Just briefly, if you can tell the jury,

20   what are those parts?

21   A.   Part 370 is general information and definitions

22   related to our hazardous waste management program.

23   Part 371 is the identification and listing of

24   hazardous waste.  Part 372 is regulations related

25   to generators and transporters of hazardous waste.

1   Part 374 contains regulations for specific types of

2   hazardous wastes.  Part 375 is actually not in the

3   hazardous waste program, and Part 376 is the land

4   disposal restrictions.

5   Q.  All right.  And so in your career at DEC,

6   approximately how many years have you been involved

7   in RCRA compliance issues and RCRA inspection

8   issues?

9   A.  Sixteen years.

10             MR. MANGO:  Your Honor, at this point,

11   based on Mr. Strickland's experience in the field

12   of RCRA for the past 16 years, his education, his

13   continuing education in the field of RCRA, his

14   knowledge of the RCRA statute, its implementing

15   regulations and its definitions, and in particular

16   his understanding of the New York scheme that

17   allows a facility to obtain a permit and get a

18   permit, I offer Mr. Strickland as an expert in the

19   field of permitting under RCRA and the regulations

20   and definitions relating to the permitting program

21   under RCRA.

22             THE COURT:  From the standpoint of New

23   York State?

24             MR. MANGO:  Yes, your Honor.

25             THE COURT:  Any comments, Mr. Linsin?

1           MR. LINSIN:  We have no objection to

2     receiving Mr. Strickland's testimony on that basis,

3     your Honor.

4           THE COURT:  All right.  And Mr. Personius?

5           MR. PERSONIUS:  No objection, your Honor.

6           THE COURT:  Okay.  As tendered, the

7     witness will be presented to the jury for purposes

8     of permitting and the process involving permitting

9     as it relates to RCRA and the State of New York and

10    its applicable regulations.

11        Now, ladies and gentlemen, keep in mind that

12    Mr. Strickland is being tendered as an expert

13    witness, meaning that he has by training,

14    background, and experience, and education an

15    expertise that may be helpful to you in

16    understanding the issues that will be presented

17    through testimony.

18        You are to evaluate and assess his credibility

19    the same like you do with any and all of the other

20    witnesses that have testified in this trial.  He

21    gets no special treatment by virtue of the fact

22    that he is an expert, but you may consider those

23    areas of his testimony based on his expertise to

24    help you where you may not have the type of

25    background and ability to work through the

2971

1    permitting aspect of this case without his

2    testimony.

3         So, with that, Mr. Mango, you may proceed.

4              MR. MANGO:  Thank you, your Honor.

5    BY MR. MANGO:

6    Q.  Mr. Strickland, are you familiar with the term

7    "interim status" under RCRA?

8    A.  Yes, I am.

9    Q.  Can you tell the jury what that means, interim

10   status?

11   A.  Interim status was -- came into being because

12   in 1980 the federal government promulgated their

13   first set of RCRA regulations, so there were

14   facilities which were undertaking activities prior

15   to 1980, which after 1980 possibly could have

16   needed a permit.  So they would have been

17   immediately thrown into a -- in a noncompliance

18   mode.  So interim status was developed to allow

19   those facilities to keep operating after 1980,

20   doing what they were doing until they could be

21   evaluated to determine whether they did need a RCRA

22   permit or not.

23   Q.  Okay.  Mr. Strickland, are you familiar with a

24   company known as the Tonawanda Coke Corporation?

25   A.  Yes, I am.

1    Q.  And did you have an opportunity to review the

2    DEC RCRA file on the Tonawanda Coke Corporation?

3    A.  Yes, I did.

4    Q.  And based on that review, did the Tonawanda

5    Coke Corporation have any type of interim status

6    between the period of 1998 and 2009?

7    A.  No.

8    Q.  And did you review the DEC regulatory

9    inspections?

10           MR. LINSIN:  Your Honor, I apologize for

11   interrupting.  Could I just get the years that that

12   last question was framed?

13           THE COURT:  1998 through 2009?

14           MR. MANGO:  Yes.

15           MR. LINSIN:  Thank you.

16   BY MR. MANGO:

17   Q.  And, in fact, I'll even broaden it.  Do you

18   know if before 1998 Tonawanda Coke had any type of

19   interim status ever?

20   A.  No.

21           THE COURT:  You don't know, or they did

22   not?

23           THE WITNESS:  They did not.

24           THE COURT:  Thank you.

25   BY MR. MANGO:

1    Q.   And, Mr. Strickland, did you review the DEC

2    regulatory -- the DEC regulatory inspections at the

3    Tonawanda Coke Corporation prior to 2009?

4    A.   Yes, I did.

5    Q.   And if you can tell the jury, which inspections

6    did you specifically review?

7    A.   I looked at -- the first inspection was in

8    1989, the second inspection was 1997, the third

9    inspection was in 2007, and the fourth was --

10   excuse me.  I said '97.  2001.  And the fourth was

11   in 2007.

12   Q.   Okay.

13             THE COURT:   Okay.  Give us those again,

14   because I'm not sure I understood.  1989.

15             THE WITNESS:   1989, 1997, 2001, and 2007.

16   BY MR. MANGO:

17   Q.   Okay.  So you've reviewed those inspection

18   reports from the DEC file?

19   A.   Yes.

20   Q.   Are you familiar with the terms "large-quantity

21   generator" and "small-quantity generator"?

22   A.   Yes, I am.

23   Q.   Okay.  From those four inspection reports,

24   those years, do the inspection reports identify

25   Tonawanda Coke as one or the other of these, large

1   or small?

2   A.   They identify Tonawanda Coke as a

3   small-quantity generator.

4   Q.   Okay.  And in your experience as head of the --

5   as engineer of the hazardous materials division,

6   how do inspectors obtain information to complete a

7   small-quantity generator inspection report?

8   A.   They obtain the information via conversations

9   with the operator; they obtain information via

10  their observations of the activities at the

11  facility.

12  Q.   Okay.  Could it be one or the other?

13  A.   It would generally be both.

14  Q.   Okay.  Now, did you see any mention of the --

15  of a term, let me tell you, "K087" in the

16  inspection reports?

17  A.   Yes, I did.

18  Q.   Do you know what K087 is?

19  A.   Yes, I do.

20  Q.   So prior to June of 2009 was there any

21  indication in those reports as to how the K087

22  waste was being recycled at the Tonawanda Coke

23  Corporation?

24  A.   The one report indicated that the K087 was

25  being mixed with pulverized coal and recycled back

1   into the coke ovens.

2           THE COURT:  What do you understand K087 to

3   be?

4           THE WITNESS:  K087 is hazardous waste from

5   a specific source in the by-products process.  It's

6   tar decanter sludge.

7   BY MR. MANGO:

8   Q.  You mentioned in one of the reports there was a

9   mention of the K087 was mixed with pulverized coal

10  and then recycled to the coke ovens?

11  A.  Yes.

12  Q.  In any of the reports did it say where the K087

13  was being mixed with the coal?

14  A.  No, it was not identified.

15  Q.  The inspection reports that you just went

16  through, these four inspection reports prior to

17  June of 2009, did the Tonawanda Coke Corporation

18  indicate whether or not it was storing any

19  hazardous waste longer than 90 days at the

20  facility?

21  A.  No, it did not.

22          MR. LINSIN:  Your Honor --

23          THE COURT:  Yes?

24          MR. LINSIN:  Never mind.  I'll cover it on

25  cross.  Thank you.

1             THE COURT:  Okay.

2             MR. LINSIN:  I apologize.

3    BY MR. MANGO:

4    Q.  Mr. Strickland, did you review the indictment

5    in this case?

6    A.  Yes, I did.

7    Q.  Okay.  Are you familiar with the conduct

8    alleged in Counts 17, 18 and 19 of the indictment?

9    A.  Yes, I am.

10   Q.  Okay.  What is your understanding of the

11   conduct alleged to have occurred in Count 17?

12   A.  Count 17 was the storage of characteristic

13   hazardous waste.  It was characteristic for benzene

14   on the ground, and that storage occurred from -- it

15   was alleged to have occurred from 1998 till 2009.

16   Q.  Okay.  All right.  Can you tell the jury

17   whether Tonawanda Coke had a RCRA permit issued by

18   DEC or EPA to engage in this conduct?

19   A.  No, they did not.

20   Q.  Based on your experience as head of the Region

21   9 RCRA program, would DEC have issued a permit for

22   this conduct?

23   A.  For that type of storage, no.

24   Q.  Okay.  Tell the jury why.

25   A.  Because it was stored on the ground, there were

1     no engineering controls related to the storage of

2     that material.

3     Q.   Okay.  What is your understanding, if you can

4     tell the jury, of Count 18 of the indictment?

5     A.   Count 18 involves the same characteristic

6     hazardous waste for benzene, which was removed from

7     one of the tanks which were cut down on the

8     property, and that material was then taken to the

9     coalfields and applied to the coal.

10    Q.   Okay.  Mr. Strickland, do you know if the

11    Tonawanda Coke Corporation had a RCRA permit issued

12    by DEC or EPA to engage in this conduct alleged in

13    Count 18?

14    A.   No, they did not.

15    Q.   And based on your experience as head of the

16    Region 9 RCRA program, would DEC have issued a

17    permit for this type of conduct?

18    A.   No, we would not.

19    Q.   Okay.  Why?

20    A.   Just because the method in which the material

21    was managed leaves the possibility that it could

22    come in contact with the ground and constitute

23    disposal.

24    Q.   Okay.  Mr. Strickland, what is your

25    understanding of the conduct alleged to have

1    occurred in Count 19 of the indictment?

2    A.   Count 19 would have involved the K087 waste,

3    which was once again applied to the coal in the

4    coalfield.

5    Q.   Okay.  Did the Tonawanda Coke Corporation have

6    a RCRA permit issued by DEC or EPA to engage in

7    this conduct?

8    A.   No, they did not.

9    Q.   And again, based on your experience as head of

10   the Region 9 RCRA program, would DEC have issued a

11   permit for this type of conduct?

12   A.   No.

13   Q.   And why?

14   A.   For the same reason, that the hazardous

15   constituents from the waste could come in contact

16   with the ground in an uncontrolled fashion.

17   Q.   All right.  In fact, for any period of time --

18   or for the period of time between 1998 and 2009 did

19   the Tonawanda Coke Corporation have any type of

20   RCRA permit issued by DEC or EPA to handle any type

21   of hazardous waste?

22   A.   No, they did not.

23             MR. MANGO:  Thank you, your Honor.

24   Nothing further for this witness.

25             THE COURT:  Okay.  Thank you, Mr. Mango.

1       Mr. Linsin.

2               MR. LINSIN:  May I proceed, your Honor?

3               THE COURT:  You may.  Thank you.

4   CROSS-EXAMINATION BY MR. LINSIN:

5   Q.  Good morning, Mr. Strickland.

6   A.  Good morning.

7   Q.  I don't believe we've met before.  My name is

8   Greg Linsin.  I represent the Tonawanda Coke

9   Corporation.

10      Did you ever visit the Tonawanda Coke facility,

11  sir?

12  A.  Yes, I've been there twice.

13  Q.  All right.  And before we go there, can you

14  tell me, please, what materials other than the DEC

15  file that you've testified about -- what materials

16  did you review in connection with your preparations

17  for your testimony here today?

18  A.  I've reviewed various emails that were between

19  various state employees, DEC employees, and EPA

20  employees.

21  Q.  In what time frame, sir?

22  A.  Those would be probably in the 2009 time frame

23  and probably some after that.

24  Q.  All right.  Anything else?

25  A.  I've looked at the RCRA file.  I've looked at

1    the charges --

2    Q.  And you're referencing -- I'm sorry.  I didn't

3    mean to interrupt.  Your reference -- when you talk

4    about the RCRA file, you're talking about the DEC's

5    RCRA file?

6    A.  Yes.

7    Q.  All right.  Please go ahead.

8    A.  I looked at the indictment, with the charges.

9    Q.  Are you familiar with the factual stipulations

10   that have been entered into the record in this case

11   regarding the materials that were maintained in

12   these two tanks that you just testified about?

13   A.  Yes, I am.

14   Q.  You've read those?

15   A.  Yes.

16   Q.  Have you reviewed the testimony of any of the

17   witnesses who have testified in this trial

18   regarding the management of the K087 or the D018

19   materials on the Tonawanda Coke facility?

20   A.  No, I have not.

21   Q.  You had a direct involvement in this DEC's

22   oversight of Tonawanda Coke back at least beginning

23   with your taking on the duties as the regional

24   hazardous waste engineer in 1994, is that correct?

25   A.  That would be correct.

2981

1    Q.   And scrolling forward for a moment to 2009, you

2    were Tom Corbett's supervisor, is that correct?

3    A.   Yes, I was.

4    Q.   And were you familiar with the fact that

5    Mr. Corbett went out, along with a Mr. Lenny

6    Grossman and an Ellen Banner, in June of 2009 and

7    inspected the Tonawanda Coke facility for RCRA

8    compliance purposes?

9    A.   Yes, I was aware that he went out with Len

10   Grossman.  The other individual I don't know.

11   Q.   Now, you testified a moment ago that you

12   actually visited the Tonawanda Coke facility on a

13   couple of occasions.

14   A.   Yes.

15   Q.   What was the first date that you personally

16   visited this facility?

17   A.   It was April of 2010.

18   Q.   Do you recall -- have you reviewed the summary

19   of your proposed testimony that was submitted in

20   connection with the government's pretrial

21   submissions in this case?

22   A.   Yes, I have.

23   Q.   Was that submission accurate as far as it

24   related to your proposed testimony?

25   A.   I think there were some inaccuracies.  I don't

1    recall.

2    Q.  Do you recall that in that submission there was

3    an indication that you had visited the Tonawanda

4    Coke facility shortly after the April 2009 air

5    inspection?

6    A.  That is incorrect.

7    Q.  Did you point that fact out to the prosecutors

8    before you -- when you reviewed this?

9    A.  I believe I did, but I think I saw that after

10   it was submitted.

11   Q.  All right.  So the first time -- that

12   submission aside, then the first time you actually

13   visited the facility was in 2010, is that correct?

14   A.  That is correct.

15   Q.  All right.  Now, you testified that you

16   reviewed in preparation for your testimony several

17   of the DEC inspection reports that were -- the RCRA

18   compliance reports that were completed by people

19   under your supervision, correct?

20   A.  That is correct.

21   Q.  And if I heard you correctly, it was the '89

22   inspection report, '97 inspection report, 2001,

23   and 2007, is that correct?

24   A.  That is correct.

25   Q.  Are you aware of any other inspection reports

1    that have been completed by DEC with respect to

2    RCRA compliance for the Tonawanda Coke facility?

3    A.   No, I am not.

4    Q.   Are you aware that -- that EPA completed a

5    report of the June 17th, 2009, inspection at the

6    facility?

7    A.   Yes.

8    Q.   Have you reviewed that?

9    A.   I have not seen that.

10   Q.   Not at any point?

11   A.   I don't think it was ever submitted to me.

12   Q.   And you did not request to review it, is that

13   your testimony?

14   A.   I did not request.

15   Q.   And are you aware that there was also a report

16   prepared for -- in connection with the sampling

17   visit to the facility in September of 2009?

18   A.   I am aware that there was a report.

19   Q.   Did you review that report?

20   A.   No.

21   Q.   You did not request it?

22   A.   No.

23   Q.   In addition to the DEC inspection reports, were

24   you aware -- are you aware that the Tonawanda Coke

25   facility back in 1986 and again in 1988 submitted a

1   RCRA hazardous waste notification in '86?  Have you

2   reviewed that document?

3   A.  No, I have not.

4   Q.  Are you aware, sir, that in 1986 the Tonawanda

5   Coke facility advised EPA that it was a generator

6   of K087 waste and that it was recycling that waste

7   on-site?

8   A.  No, I am not.

9   Q.  Did you review the 1988 submission by Tonawanda

10  Coke, part of a biannual submission -- reporting

11  submission, in which two years later Tonawanda Coke

12  advised EPA that it was generating K087 waste and

13  recycling that waste on-site?  Are you aware of

14  that submission?

15  A.  No, I am not.

16  Q.  Isn't it common, Mr. Strickland, for DEC and

17  EPA to share information that either agency may

18  receive about hazardous waste generators?

19  A.  It is common, but there are instances where we

20  don't have certain notifications.

21  Q.  Let's go back to the 1980s, and I understand

22  from your testimony you were not in a position

23  dealing with hazardous waste in the '80s, is that

24  correct?

25  A.  That's correct.

1    Q.  Well, let me ask you a couple of questions.  Is

2    it fair to say, based on what you've now learned

3    about hazardous waste, that during the 1980s there

4    was a significant amount of activity regarding the

5    development of the national regulations for the

6    RCRA program?

7    A.  Yes.

8    Q.  And as you testified a moment ago, Part B

9    interim status was implemented to accommodate

10   facilities that -- while they were applying for a

11   RCRA permit, correct?

12   A.  That is correct.

13   Q.  And there were some fundamental definitions

14   that were developed during that 1980s period

15   regarding what was going to be considered a solid

16   waste, correct?

17   A.  Correct.

18   Q.  And as a matter of fact, there were also some

19   very significant regulations developed and

20   promulgated in the late 1980s regarding the land

21   disposal regulations and what was going to be

22   permitted to be disposed of on the land, is that

23   correct?

24   A.  That is correct.

25   Q.  All right.  So, now, I asked those background

1    questions because I want to confirm my

2    understanding that based on your review of DEC's

3    files, this 1989 inspection report was DEC's first

4    contact, for RCRA compliance purposes, with the

5    Tonawanda Coke facility, is that correct?

6    A.   It's the first that's evidenced in our file.

7    Q.   All right.  And so when -- do you know who

8    conducted that RCRA compliance inspection?

9    A.   That was Ray Fisher.

10   Q.   All right.  Do you know Mr. Fisher?

11   A.   Yes, I do.

12   Q.   Have you spoken to him about what he did during

13   the course of that inspection?

14   A.   No, I have not.

15   Q.   When Mr. Fisher -- were you aware that when

16   Mr. Fisher went out to inspect the Tonawanda Coke

17   facility in 1989, that the Tonawanda Coke already

18   had an EPA generator number, ID number?

19   A.   Yes, because it's displayed on the inspection

20   report.

21   Q.   Okay.  That indicates to you, does it not, that

22   even if you may not have reviewed it before, that

23   previous to the '89 inspection Tonawanda Coke had

24   in effect raised its hand in the 1980s and

25   submitted this report to EPA saying, hey, we're

1   generating K087, correct?

2   A.   If it was listed on their notification, yes.

3   Q.   And as a matter of fact, that was then

4   repeated -- or this biannual submission in '88

5   repeated the very same notification, is that

6   correct?

7   A.   If it was listed, that would be correct.

8   Q.   So your DEC RCRA compliance inspector is aware

9   in 1989 that this facility has self-notified that

10  it is a generator of K087, because it has an EPA

11  generator ID number.  It is DEC's very first

12  contact with this facility since the enactment of

13  RCRA, correct?

14  A.   Correct.

15  Q.   It is DEC's first contact with this facility

16  after this fundamental definition of solid waste

17  has been put in place, correct?

18  A.   That is correct.

19  Q.   Ands it is also DEC's first contact with this

20  facility, that has told DEC it's generating K087,

21  since the enactment of the land disposal

22  regulations, correct?

23  A.   That is correct.

24            MR. LINSIN:  May I please have Defendant's

25  Exhibit B, which is in evidence.  B as in boy.  I'm

1    sorry.

2    BY MR. LINSIN:

3    Q.   Now, this is the first page of the exhibit,

4    Mr. Strickland.  I'm going to ask that we scroll

5    through.  I apologize in advance.  A couple of

6    these pages are out of order.  And this first page,

7    as you can see, is actually a cover memorandum that

8    wasn't related to the inspection report.  But have

9    you seen this first page of Defendant's Exhibit B

10   before?

11   A.   Yes, I have.

12   Q.   All right.  Could we please go to the next

13   page?

14       Have you seen this letter that was sent to

15   Tonawanda Coke following the inspection in 1989?

16   A.   Yes, I have.

17   Q.   And then you recognize this as the first page

18   of the actual inspection, RCRA compliance

19   inspection form?

20   A.   Yes, it is.

21   Q.   All right.  Now, can we please go to -- well,

22   here is the table of contents for the entire

23   inspection report form.  The next page is actually

24   out of sequence, and so we will skip over this page

25   and come back to it in a moment.

1        But do you recognize this as the first

2    substantive page of the findings of the report?

3    This would be Roman numeral I-1.

4    A.   Yes.

5    Q.   All right.  And if we could go to -- the

6    indication here midway down the page -- and if we

7    can enlarge just this portion, please.

8        Indication here again, the K087 decanter tank

9    tar sludge from coking operations.  That is the

10   listed waste that is being generated on-site,

11   correct?

12   A.   That is correct.

13   Q.   All right.  And if we could then go to Roman

14   I-2.  And can you enlarge this portion of the page,

15   please.

16       There is a section of the form that says, "If

17   the facility is a treatment, storage, or disposal

18   facility, have they," and then there is a series of

19   questions, correct?

20   A.   This is correct.

21   Q.   And Mr. Fisher wrote in the words "not

22   applicable," correct?

23   A.   Correct.

24   Q.   And submitted a Part A application, that's N/A,

25   correct?

1   A.   Uh-huh.

2   Q.   And a Part A application is a RCRA permit

3   application, correct?

4   A.   It is the first part of the RCRA permit

5   application.

6   Q.   And so Mr. Fisher, based on these findings, has

7   determined that the RCRA permit application is not

8   applicable to this facility, correct?

9   A.   That is correct.  It has not been submitted.

10   Q.   And if we could go to Roman I-4, please.

11       And you see here, beginning on this page, this

12   is the -- the general heading before we enlarge

13   this is Status Identification.  That is the number

14   2 at the top, correct?

15   A.   Correct.

16   Q.   And then here we have treatment, storage, or

17   disposal facility status, correct?

18   A.   Correct.

19   Q.   And the question here in number 1 under C is,

20   "Is hazardous waste generated and stored on-site?

21   If so," and then a series of questions, each of

22   which Mr. Fisher has said no to, correct?

23   A.   That is correct.

24   Q.   So he made a determination in 1989 that

25   hazardous waste was not generated and stored on the

1    site, correct?

2    A.   This indicates that hazardous waste -- has

3    hazardous waste been stored on-site longer than 90

4    days?  He answered no to that.

5    Q.   All right.  And is that one of the permit

6    conditions?

7    A.   If they were -- if they stored hazardous waste

8    on-site for longer than 90 days, they would be

9    required to have a permit, if they were a

10   large-quantity generator.

11   Q.   All right.  Now, could we back out of this

12   again so we can get the larger page, and move then

13   to Roman numeral I-5.  And again, to the -- well,

14   actually, as long as we're going to do this, let's

15   bring it all the way down here.

16       So this is a follow-on from the previous page,

17   correct?

18   A.   Correct.

19   Q.   And Mr. Fisher has concluded that there's no

20   hazardous waste received from off-site, correct?

21   A.   Correct.

22   Q.   No hazardous waste being treated on-site,

23   correct?

24   A.   That is correct.

25   Q.   And no hazardous waste is disposed of on-site,

1    correct?

2    A.   That is correct.

3    Q.   And again, in the margin to the left-hand side

4    he has written, "All K087 sludges are recycled into

5    the process," right?

6    A.   That is correct.

7    Q.   And you testified on direct examination that

8    the -- it is your understanding that a RCRA

9    compliance inspector, in conducting a RCRA

10   compliance inspection, would generally speak both

11   with the operator of the facility and then observe

12   the activities that were in question, correct?

13   A.   That is correct.

14   Q.   And if we could go back to -- I'm sorry --

15   Roman numeral I-3, please.  Which is -- yes.  Yes.

16   Thank you.

17        Are you familiar with this page?

18   A.   Yes, I am.

19   Q.   And you've read this page?

20   A.   Yes, I have.

21   Q.   And so you're aware that in the handwritten

22   text here Mr. Fisher describes in some detail what

23   happens to the K087 material at Tonawanda Coke,

24   correct?

25   A.   Yes, he does.

1    Q.   He even had to go outside of the margins,

2    because there weren't enough line space to contain

3    the information he wanted to record, correct?

4    A.   That is correct.  Ray liked to do that.

5    Q.   And Ray Fisher determined, based on DEC's very

6    first RCRA compliance inspection of this facility,

7    that this facility didn't have and didn't need a

8    permit, correct?

9    A.   That is correct.

10   Q.   And is there any place at all in the remainder

11   of the DEC's regulatory files from 1989 forward to

12   2009, anything in any of those files that indicate

13   a determination by DEC that Tonawanda Coke needed a

14   RCRA permit for the activities it was conducting?

15   A.   No, there is not.

16   Q.   And that's a 20-year period, correct?

17   A.   Correct.

18        MR. LINSIN:  Your Honor, I have a little

19   bit more.  Would this perhaps be a convenient time

20   for a break?

21        THE COURT:  A break?

22        MR. LINSIN:  Yes.

23        THE COURT:  I know it's been somewhat

24   short for all of you, ladies and gentlemen, but

25   you've been here since the time that I asked you

1   to, and I thank you for that.  We've been pretty

2   busy, and so we need to take a break.  We'll see

3   you back here -- we'll get started by 2:15, but if

4   you can get here at 2 o'clock or so, we'll try to

5   be available then.  Okay?

6        Thank you very much.  Please keep your minds

7   open, and we will get started as soon as we can.

8   Enjoy the day.

9             (Jury excused from the courtroom ).

10             THE COURT:  Okay.  Mr. Strickland, you can

11   step down.  Thank you.

12        Anything else?

13             MR. LINSIN:  No.

14             THE COURT:  Okay.  Thank you.  We'll see

15   you at -- try to be here about 2 o'clock.  We will

16   be starting between 2:00 and 2:15, I think.  Thank

17   you.

18             (Lunch recess was taken.)

19             (Jury not present in the courtroom.)

20             MR. LINSIN:  Your Honor, just very briefly

21   on the scheduling issue that I had mentioned today,

22   because I think it may relate to our timing and

23   perhaps the Court's instruction to the jury as they

24   depart.  Based on my estimate of finishing cross

25   and what we expect Mr. Conway's testimony to be, it

2995

1        seems fairly clear to us that the government will

2        be resting some time this afternoon.

3                    THE COURT:  Okay.

4                    MR. LINSIN:  As we've already advised

5        government counsel, we believe we will be calling

6        five witnesses in our defense case, four relatively

7        short witnesses and, presuming the Court allows,

8        our RCRA expert to testify on RCRA issues.

9            For scheduling purposes during the week, we

10       know the Court is off on Friday, and what we were

11       going to request of the Court for timing purposes

12       is that you permit us to begin our defense case on

13       Wednesday morning and getting all of that testimony

14       then in Wednesday morning and Thursday.  We have

15       two witnesses on that list of five who, because we

16       have advanced our schedule, are not able to be into

17       town until Thursday.  And so our belief is that if

18       we start on Wednesday we will certainly conclude

19       some time on Thursday.

20           And I just wanted to raise it, because if it

21       made sense to the Court, it might be that then that

22       we could obviate the need for the jurors to come in

23       for three partial days, and it would just make the

24       flow a whole lot easier.

25                   THE COURT:  So we'd have them come in on

1    Wednesday and Thursday?

2           MR. LINSIN:  That would be our request,

3    your Honor, yes.

4           MR. PERSONIUS:  Judge, just a point of

5    clarification.  My understanding is we have one

6    witness coming from out of town.  We have another

7    witness who's from Buffalo, but he's self-employed,

8    and it is far better for him if he could testify

9    Thursday than Tuesday or Wednesday.  It's not a big

10   deal, but --

11          THE COURT:  No.  Understood.  Thank you.

12      Mr. Mango.

13          MR. MANGO:  Your Honor, whatever the Court

14   would desire to do, we're comfortable with.

15          THE COURT:  Okay.  All right.  Well, we'll

16   try to put that schedule in place.  I don't see why

17   that would not work.  Let's see how we do today,

18   and if we can wrap up the witness testimony, that

19   would be a good thing.

20      Okay.  Chris, if you'd bring the jury in

21   please.

22          MR. PERSONIUS:  Judge, as Chris is doing

23   that, the other request -- we've talked to the

24   government about it -- at a point you think

25   appropriate in Mr. Conway's testimony, if you could

1     please consider giving the jury an instruction on

2     summary charts and the fact that they're not

3     evidence.

4             THE COURT:  Okay.  Certainly.

5             MR. PERSONIUS:  Thank you, Judge.

6             MR. MANGO:  I believe they are evidence,

7     but they should be also -- well --

8             MR. PERSONIUS:  Whatever the instruction

9     is.

10            MR. MANGO:  Maybe we need to look at the

11    instruction.  I'll look at the instruction.

12            THE COURT:  Okay.  All right.  You're

13    introducing them as demonstrative evidence.

14            MR. MANGO:  Yes.

15            THE COURT:  But summary.

16            MR. MANGO:  Right.  To aid the jury.  Yes,

17    that's correct.  So -- but they do get to go back

18    with the jury during deliberation, but --

19            (Jury seated.)

20            THE COURT:  Okay.  Welcome back.  Please

21    have a seat.

22        Okay.  The attorneys and parties are back

23    present, and the jury is here, roll call waived.

24    Mr. James Strickland is on cross-examination.  He

25    remains under oath.

1          Mr. Linsin, your witness.

2               MR. LINSIN:  Thank you, your Honor.

3     BY MR. LINSIN:

4     Q.  Good afternoon, Mr. Strickland.

5     A.  Good afternoon.

6               MR. LINSIN:  Miss Henderson, may I please

7     have Defendant's Exhibit B again, already in

8     evidence.  And could we please go to what is the

9     third page of this document.  Third page of the

10    exhibit.  Fourth page.  I'm sorry.  Back, back.

11    One more.  Thank you.  Right there.

12    BY MR. LINSIN:

13    Q.  Could we enlarge -- you recognize this, sir, as

14    the inspection form -- DEC's first inspection form

15    for the Tonawanda Coke facility, correct?

16    A.  Yes, I do.

17    Q.  All right.  Could we enlarge that portion.

18         You testified a little bit earlier that you

19    understood that Tonawanda Coke had made a

20    submission to EPA regarding its generator status

21    prior to this 1989 inspection, because at the time

22    of the '89 inspection the facility had an EPA

23    generator ID number, correct?

24    A.  That is correct.

25    Q.  And is this the number, handwritten in here

2999

1    that has been enlarged?

2    A.  Yes, it is.

3    Q.  All right.  And just for the record, does it

4    read NYD088413877?

5    A.  Yes, it does.

6    Q.  All right.  And if I may please have for

7    identification -- if we take this down --

8    Defendant's Exhibit DDDD.02.

9              THE CLERK:  Is it in evidence?

10             MR. LINSIN:  I'm sorry?

11             THE CLERK:  Is it in evidence?

12             MR. LINSIN:  No.  For identification.

13             MR. MANGO:  Your Honor, I'd object at this

14   point.  I believe we covered this during the

15   earlier portions of his cross-examination.  He was

16   asked specifically about a 1989 -- or '86 and 1988

17   notice to EPA, and the witness said he was not

18   aware of it and did not know of it.  Now we're

19   actually showing what appears to be that document

20   to the witness.  I would object on that grounds.

21             MR. LINSIN:  Your Honor, if I may ask a

22   couple of additional questions to clarify where I'm

23   going on this.

24             THE COURT:  Certainly.

25   BY MR. LINSIN:

3000

1   Q.   All right.   Do you recognize this form, sir?

2   A.   Yes.   It looks like the hazardous waste

3   notification form.

4   Q.   All right.   And if we could please scroll to

5   the third page of this exhibit.   I'm going to ask

6   you, please, to enlarge this -- well, actually, let

7   me come back here.   Enlarge that section of the

8   exhibit, please.

9        Do you recognize -- well, back out again,

10  please.

11       Do you recognize what this acknowledgment form

12  is?

13  A.   Yes.   It looks like the acknowledgment of

14  notification of hazardous waste activity.

15  Q.   From EPA, correct?

16  A.   From EPA.

17  Q.   And now if we can enlarge this portion of

18  page 3 of the exhibit.

19       At the top left-hand corner of this enlarged

20  portion of page 3 of the exhibit, do you recognize

21  an ID number?

22  A.   Yes, I do.

23  Q.   And do you recognize that as the same EPA

24  generator ID number that appeared on the

25  inspection -- the DEC inspection form for the 1989

1    inspection?

2    A.   Yes, that's the same number.

3              MR. LINSIN:  Your Honor, I would move

4    Government's [sic] Exhibit DDDD.02 into evidence.

5              MR. MANGO:  Your Honor, I would still

6    object here.  There's been no foundation that he

7    has any knowledge.  That the fact that the number

8    is the same doesn't establish a foundation for this

9    document, which is clearly an EPA document, through

10   this witness.

11             THE COURT:  Okay.  Mr. Linsin?

12   BY MR. LINSIN:

13   Q.   Are generator ID numbers assigned by EPA unique

14   identification numbers for a given facility?

15   A.   Yes, they are.

16             THE COURT:  All right.  Over objection,

17   I'll permit it.  It will be admitted.

18             (Defendants Exhibit DDDD.02 was received

19             into evidence.)

20             MR. LINSIN:  If we can go to the first

21   page of this exhibit, please.  Yes.

22        Please, may it be published?

23             THE COURT:  Yes.

24   BY MR. LINSIN:

25   Q.   And if we can enlarge the framed portion of the

1    document.

2        Do you see this, sir?  Do you recognize this as

3    an EPA hazardous waste activity notification form

4    from Tonawanda Coke Corporation?

5    A.   Yes.  That's what the document says.

6    Q.   And the installation contact being identified

7    as Mark Kamholz, manager -- environmental manager,

8    correct?

9    A.   That's correct.

10   Q.   And if we could enlarge this portion of the

11   document, please.  I'm sorry.  Let's go all the way

12   across so we get the whole -- that whole portion of

13   the -- please go back, Sheila.  And -- yeah.  All

14   the way across.

15       Okay.  When -- in the section marked mode of

16   transportation, do you see the box "other" checked?

17   A.   Yes, it's checked.

18   Q.   And with the explanation adjacent to it, when

19   it says specify, none, material is recycled

20   on-site, correct?

21   A.   That's correct.

22   Q.   All right.  May we go to page 2, please, of

23   this exhibit.  And do you recognize this topic --

24   this page, generally, as the place where the

25   generator identifies the hazardous waste that is

1    being generated on-site?

2    A.   Yes, that's correct.

3    Q.   And perhaps you can read it in the smaller,

4    but, Sheila, would you enlarge that portion.

5    Include the heading of that section, please.   So

6    from here across.

7         Okay.   So this is the section of the form where

8    Mark Kamholz on behalf of Tonawanda Coke

9    Corporation in this notification form is notifying

10   EPA that the facility is generating K087 waste,

11   correct?

12   A.   That is correct.

13   Q.   All right.   And lastly on this page, please,

14   down at the bottom, if you enlarge that portion.

15        You see the signature of Mark Kamholz, manager

16   environmental control, dated February 13th, 1986,

17   correct?

18   A.   Yes, it does state Mark Kamholz.

19   Q.   All right.   May I now please have -- let's come

20   out of this -- Defendant's Exhibit DDDD -- for

21   identification, DDDD01.01.

22        Do you recognize this form, sir?

23   A.   Yes.   It's Form IC, EPA form.

24   Q.   Regarding a hazardous waste report, correct?

25             MR. MANGO:   Your Honor, we're not going to

3004

1          object.   If the foundation is the same as what it

2          was before, we won't object to the admission of

3          this document into evidence.

4                    MR. LINSIN:   On that basis, your Honor, I

5          would now move Defendant's DDDD01.01 into evidence.

6                    THE COURT:   You're saying .01, but -- oh,

7          are you taking that from the Bates number?

8                    MR. LINSIN:   Yes, your Honor.   The exhibit

9          number.

10                   THE COURT:   The exhibit number, I think is

11         DDDD.01?

12                   MR. LINSIN:   Yes.

13                   THE COURT:   That's the sticker number.

14         Okay.   That will be received, no objection.

15                   (Defendant's Exhibit DDDD.01 was received

16                   into evidence.)

17         BY MR. LINSIN:

18         Q.   And why does a generator submit a form like

19         this, sir?

20         A.   The generator would submit this form to

21         identify the types of waste and quantities that

22         they generate.

23         Q.   All right.   Can we go to page 2 of this

24         exhibit, please.   And first, if we could, in the

25         comment section, could we enlarge that section.

1        And do you see, sir, in the comment section of

2   this form, that Mr. Kamholz on behalf of Tonawanda

3   Coke is notifying EPA that the K087 which is

4   generated on-site is -- fits within the exemption

5   under 261.4C?

6   A.   Yes.  That is what it states.

7   Q.   And it states after recycling there is no waste

8   material of any kind to be disposed of in any

9   manner, correct?

10  A.   That's correct.

11  Q.   Now, can we back out of this page, please, the

12  enlargement, and stay on this page.  Could you

13  please enlarge this top box.

14       Are you familiar with coke production

15  facilities, generally, sir?

16  A.   To a minor extent.  I have no detailed

17  knowledge.

18  Q.   Do you have any idea of how much K087 even a

19  medium-size coke production facility would generate

20  in a month?

21  A.   I think I've seen in an inspection report that

22  it's about a ton.  Could be a ton a month.

23  Q.   So, 2,000 pounds or above, is that correct?

24  A.   Correct.

25  Q.   All right.  And do you see indicated on this

3006

1    form, completed by Mr. Kamholz on behalf of

2    Tonawanda Coke, that he is actually reporting in

3    1988 -- reporting that the facility is generating

4    more than a thousand kilograms, more than a ton, in

5    one month?

6    A.   That is correct.

7    Q.   All right.  Okay.  If we could come out of this

8    now.

9         And we can call it back up if you want, but

10   isn't it true that in each of the DEC inspection

11   reports that you testified about on direct

12   examination, that the DEC RCRA compliance

13   inspectors determined that Tonawanda Coke was, in

14   fact, a small-quantity generator?  Isn't that true?

15   A.   That is correct.

16   Q.   Doesn't that reinforce the recognition that

17   these DEC inspectors understood that the K087 that

18   was generated at that facility was exempt from RCRA

19   regulation?

20   A.   That is correct.

21   Q.   Are you familiar with the term, as it relates

22   to RCRA, sir, the continuous production process?

23   A.   I'm not familiar with that term.

24   Q.   You've not understood that as a concept that

25   was important in the development of RCRA

1    regulations during the 1980s?

2    A.   I'm not aware.

3    Q.   All right.  The process of recycling under RCRA

4    does not require a permit, correct?

5    A.   That is correct.

6    Q.   Now, you testified on cross-examination before

7    lunch that the first time you went to this

8    facility, the Tonawanda Coke facility, was in 2010,

9    correct?

10   A.   That's correct.

11   Q.   All right.  But, prior to 2010, in 2009 you had

12   a conversation with Cheryl Webster of DEC regarding

13   this facility, didn't you?

14   A.   Yes, I did.

15   Q.   And you had a conversation with her -- she is

16   with the -- pardon me.  She's with the air office

17   of DEC, correct?

18   A.   That's correct.

19   Q.   But she had been with the hazardous waste

20   section of DEC, correct?

21   A.   No.  She was with the solid waste.

22   Q.   With the solid waste section before moving to

23   air enforcement, right.

24   A.   Correct.

25   Q.   And she had a conversation with you following

1    her April 2009 inspection at the Tonawanda Coke

2    facility, didn't she?

3    A.   Correct.

4    Q.   And do you recall what the subject matter of

5    that telephone conversation was?

6    A.   That was a conversation related to whether K087

7    could be recycled.

8    Q.   And do you recall approximately what date that

9    was?

10   A.   Not exactly.

11   Q.   Would June 1st of 2009 fit with your

12   recollection?

13   A.   It's possible.

14   Q.   All right.  And do you recall telling

15   Miss Webster -- do you know why she called you?  Do

16   you recall why she was seeking input from you about

17   this issue?

18   A.   I believe she was trying to determine whether

19   that was a legitimate way to recycle K087 in

20   accordance with the RCRA regulation.

21   Q.   Whether what was a legitimate way to recycle

22   K087?

23   A.   Whether placing it back into the coke ovens.

24   Q.   Placing it back into the coke ovens?

25   A.   Right.

1    Q.   I see.  Did she tell you how the recycling was

2    being done?

3              MR. MANGO:  Objection, your Honor.  This

4    is getting into hearsay conversations.  I let it go

5    a little bit, but now asking particularly did she

6    tell you this, that is hearsay, your Honor, in the

7    government's view.

8              MR. LINSIN:  That question, your Honor, is

9    not seeking a statement for the truth of the

10   matter.  It is a predicate question to what this

11   witness told Miss Webster.

12             THE COURT:  All right.  To that extent

13   I'll permit it.  Overrule the objection.

14   BY MR. LINSIN:

15   Q.   Do you recall what Miss Webster told you about

16   how K087 was being recycled at Tonawanda Coke?

17   A.   I believe we went back and forth a couple of

18   times on this, and it came down to a question of

19   whether they were using the concrete pad to mix the

20   K087 with the coal.  And as I recall, it was

21   somewhat confusing, but then ultimately I believe

22   we determined that the facility was mixing the K087

23   on the coal in the coalfield and not using the pad.

24   Q.   All right.  We'll get to the June 17th

25   inspection in just a minute.  But going back to

1    your conversation with Miss Webster on June the 1st

2    of 2009, do you recall telling her, first of all,

3    that coal tar sludge is excluded as solid waste

4    under RCRA?

5    A.  As long as it is managed within the confines of

6    the exclusion.

7    Q.  Do you recall telling Miss Webster that it may

8    be appropriate to say that the waste codes, that is

9    the waste codes that relate to K087, apply once it

10   is managed?  If it is removed from the old storage

11   area, it cannot be stored in any way that would

12   constitute land disposal.  Do you recall telling

13   Miss Webster that?

14   A.  That would sound correct.

15   Q.  All right.  So it can't be stored in a way that

16   constitutes land disposal, correct?

17   A.  Correct.

18   Q.  And "stored" is a term of art under RCRA,

19   correct?

20   A.  Yes.

21   Q.  And what is your understanding of what that

22   means under RCRA, to store a solid or hazardous

23   waste?

24   A.  Storage would be that the -- the waste is in a

25   tank or container awaiting recycling or disposal.

1          MR. LINSIN:  May I have just a moment,

2     your Honor?

3   BY MR. LINSIN:

4     Q.  Does it fit with your memory, sir, that

5     "storage" under RCRA is defined as follows, to

6     mean:  "The holding of a hazardous waste for a

7     temporary period, at the end of which the hazardous

8     waste is either treated, disposed, or stored

9     elsewhere."

10         Does that fit with your understanding?

11    A.  Yes.

12    Q.  All right.  And you told Miss Webster on

13    June 1st of 2009 that these regs would apply if

14    this material was being stored in a way that

15    constituted land disposal, is that correct?

16         MR. MANGO:  Your Honor, He was not certain

17    of the date.  It seems a little unclear with the

18    question.  That's Mr. Linsin's question, so, his

19    testimony was --

20         THE COURT:  Fair enough.  Let's get it --

21         MR. LINSIN:  All right.

22  BY MR. LINSIN:

23    Q.  I understand, sir -- and I don't mean to pin

24    you down to a date you're not certain about, but in

25    this conversation you've been testifying about with

1    Miss Webster in June of 2009, do you recall telling

2    her during that conversation that the regs would

3    apply to this material if it was being stored in

4    any way which would constitute land disposal?

5    A.   I believe so.

6    Q.   All right.  Now, did you talk to Mr. Corbett?

7    He was -- you were Mr. Corbett's supervisor,

8    correct?

9    A.   That's correct.

10   Q.   Back in June of 2009, right?

11   A.   That's correct.

12   Q.   Did you talk to him about the plans for this

13   joint RCRA compliance inspection that occurred on

14   June the 17th of 2009 at Tonawanda Coke?

15   A.   Yes, I did.

16   Q.   Did you give him any instructions about what he

17   should be doing, what he should be looking for,

18   guidance as to how he should conduct this RCRA

19   compliance inspection?

20   A.   Yes.  In general terms, I indicated that, you

21   know, it's a joint inspection with EPA.  EPA would

22   be the lead agency on the inspection, and that

23   there was a question as to -- there was a previous

24   question as to whether K087 was being recycled on

25   the concrete pad or not.

1    Q.  All right.  And so you specifically asked --

2    instructed him to determine how K087 was being

3    recycled at the Tonawanda Coke facility?

4    A.  That's correct.

5    Q.  And did you receive a report from Mr. Corbett

6    following his inspection?

7    A.  A verbal report.

8    Q.  Is it unusual that a DEC inspector would

9    accomplish a RCRA compliance inspection and not

10   submit a written report of that inspection?

11   A.  In the instance where the EPA is the lead, we

12   would defer to them to generate the report.

13   Q.  What did Mr. Corbett tell you about what he

14   learned at that facility during the

15   June 17th, 2009, inspection?

16   A.  I believe he indicated that there was an issue

17   with the -- or was probably an issue with the

18   manner in which the K087 was being managed.  And I

19   believe there was another issue related to the

20   disposal of lab chemicals.

21   Q.  All right.  Now, let's see if we can be clear

22   about this.  When you're talking about the K087 in

23   the answer you just gave, are you talking about the

24   material that was being generated as a part of the

25   continuous production process at the facility, or

1    are you talking about material that was found in

2    these old storage tanks?

3    A.   No, that was material that came from the

4    production process.

5    Q.   Okay.  And so you instructed him to find out

6    how they were doing this recycling?

7    A.   That's correct.

8    Q.   And what did Mr. Corbett report to you orally

9    after he inspected the facility?

10   A.   I believe he indicated that Mr. Kamholz told

11   him that they were not using the pad to recycle the

12   K087.

13   Q.   And how shortly after that inspection did

14   Mr. Corbett report this to you?

15   A.   I believe it was a matter of days.

16   Q.   And so did you immediately notify the company

17   that they were required to have a permit for this

18   activity that your inspector had identified as

19   ongoing at the facility?

20   A.   No, I did not.

21   Q.   And as a matter of fact -- well, I don't

22   know -- are you familiar with a 7003 order?

23   A.   Seven -- Section 7003 order?

24   Q.   Section 7003 order.

25   A.   No.

1    Q.   Under -- under -- it's an EPA authority under

2    RCRA.  Are you familiar with that?

3    A.   Not exactly, no.

4    Q.   Does New York State under its regulations have

5    the ability -- short of a compliance action or

6    enforcement action, does New York State under its

7    own RCRA regulations have the ability to direct a

8    generator to mitigate or suspend an action that

9    they believe to be constituting a significant and

10   imminent hazard to the environment?

11   A.   Based on a RCRA inspection, we would typically

12   advise them, before we left, that we think --

13   either that we know that there is a compliance

14   problem or there's possibly a compliance problem.

15   Q.   And that would be as a matter of your normal,

16   your standard inspection protocol, correct?

17   A.   Yes, for New York State.

18   Q.   And -- but my question really went to a

19   different authority.  Does New York State under its

20   regulations have the authority, short of an

21   enforcement action, to direct a generator or

22   handler to take certain actions to mitigate what

23   the inspector identified as a risk to the

24   environment?

25   A.   Not that I'm aware of.  I've only ever seen it

3016

1    done in the context of an enforcement action.

2    Q.  All right.  You're familiar with the concept of

3    raw material under RCRA?

4    A.  A raw material?

5    Q.  Yes.

6    A.  Yes.

7    Q.  All right.  And would you agree with me that

8    for a coke manufacturer raw -- that coal is a raw

9    material for that production process?

10   A.  Yes, it is.

11   Q.  And raw material is not regulated under RCRA,

12   correct?

13   A.  No, it is not.

14   Q.  It is not regulated under RCRA even if that raw

15   material sits out in the rain or snow or sleet,

16   correct?

17   A.  That is correct.

18   Q.  Are you aware of the composition of the

19   coalfield at the Tonawanda Coke facility?

20   A.  No, I'm not.

21   Q.  Do you know how deep the coal itself is

22   underneath the coal piles in that coalfield?

23   A.  No, I do not.

24   Q.  Would that affect your views about the

25   recycling process that was ongoing at Tonawanda

1    Coke -- let me rephrase the question, please.

2        Would it affect your view regarding the

3    recycling process at Tonawanda Coke if you

4    understood that the coal in this coalfield was

5    anywhere between 2 and 4 feet deep underneath the

6    coal piles themselves?

7    A.   No, it would not.

8    Q.   All right.  Are you familiar with the concept

9    of a land-based production unit?

10   A.   A land-based production unit or disposal?

11   Q.   No, a land-based production unit.

12   A.   No.

13   Q.   Are you familiar with the revisions, the EPA

14   revisions, to the definition of solid waste that

15   came out in 2008?

16   A.   Not off the top of my head.

17   Q.   Do you recognize -- does it help refresh your

18   memory that in those revisions EPA addressed the

19   issue of manufacturers --

20            MR. MANGO:  Objection, your Honor.  It

21   seems like we're getting into EPA policy, guidance,

22   recommendations.  That was kept out for a reason.

23   The Court is going to give very explicit

24   definitions of what solid waste is, hazardous

25   waste, storage disposal, land disposal.  This

1    doesn't seem relevant at this point, your Honor.

2              THE COURT:  Is that where you're going,

3    Mr. Linsin?

4              MR. LINSIN:  Your Honor, I'm asking

5    regarding this concept of a land-based production

6    unit and how EPA has applied that concept to other

7    industries that produce products on the ground,

8    such as the mining industry, which I believe is

9    directly relevant to this witness -- foundation

10   upon which this witness's opinions are based.

11             MR. MANGO:  Which my understanding, my

12   notes, your Honor, is that he's unfamiliar with the

13   term "land-based production unit."  So --

14             THE COURT:  I think that's right.  I think

15   that was your testimony.  Is that right?

16             THE WITNESS:  That is correct, your Honor.

17             THE COURT:  Okay.  Then I'll sustain the

18   objection.

19   BY MR. LINSIN:

20   Q.  Do you know when -- are you aware that there

21   was a concrete pad, a walled concrete pad, in the

22   coalfield at the Tonawanda Coke facility?

23   A.  Yes, I am.

24   Q.  Do you know when that concrete pad was

25   constructed?

1    A.   I believe it was designed and constructed in

2    1994.

3    Q.   And that would be five years after DEC's first

4    inspection, first RCRA compliance inspection, of

5    this facility, correct?

6    A.   That's correct.

7    Q.   You testified a little bit earlier on

8    cross-examination that you were aware of the

9    factual stipulation regarding the materials in

10   these two old storage tanks, correct?

11   A.   That's correct.

12   Q.   And do you recognize that on the basis of that

13   stipulation there's an agreement that the materials

14   inside -- that had been inside those tanks had been

15   abandoned by a prior owner of the facility?

16   A.   Yes, that's correct.

17   Q.   And are you also aware that some of the

18   material that had been inside those tanks had

19   actually spread out onto the ground in the area of

20   the tanks?

21   A.   Yes, that's correct.

22   Q.   Now, do you have an opinion about the

23   application of RCRA to those previously abandoned

24   wastes from a prior owner?

25   A.   I'm not following the question.

1    Q.   When Tonawanda Coke acquired the facility in

2    1978, did RCRA apply to those previously abandoned

3    wastes?

4    A.   In 1978?

5    Q.   Yes, sir.

6    A.   RCRA did not exist at the time.

7    Q.   All right.  Did it apply once RCRA was enacted?

8    A.   Yes, it would.

9    Q.   And what is your analysis of RCRA that would

10   apply RCRA to those previously abandoned wastes?

11   A.   Because once RCRA came into being, they would

12   have qualified as wastes, so that once 1980 passed,

13   that those -- the waste codes would apply to that

14   waste if it was managed in any way.

15   Q.   Oh.  So RCRA would apply to those previously

16   abandoned wastes if and only if those previously

17   abandoned wastes were actively managed, is that

18   correct?

19   A.   That's correct.

20   Q.   And do you have any understanding of the facts

21   in this case that indicate that Tonawanda Coke had

22   actively managed that material?

23   A.   I believe they spilled some during the

24   demolition of the tanks.

25   Q.   You believe?

1    A.   I believe so.

2    Q.   When did that occur?

3    A.   I believe it was in -- somewhere around the

4    2008 time frame.

5    Q.   So, according to your analysis, if I understand

6    you correctly, RCRA wouldn't have applied to that

7    material inside the tanks until it had been spilled

8    when the tanks were dismantled, is that correct?

9    A.   That's correct.

10   Q.   All right.  So RCRA wouldn't have applied

11   before then?

12   A.   No.

13   Q.   Okay.  Now, I'd like to ask you this

14   hypothetical question, if I may, Mr. Strickland:

15   If a coke manufacturer notified EPA in 1986 that it

16   was generating K087 waste, and then again informed

17   EPA two years later that it was generating more

18   than a thousand kilograms of K087 every month, and

19   then the DEC RCRA compliance inspectors inspected

20   that facility at least four separate times over a

21   20-year period and each time confirmed that that

22   facility was a small-quantity generator, never told

23   that facility that it needed to apply for a RCRA

24   permit or change its recycling practices, wouldn't

25   it be reasonable for that facility to conclude that

1       the regulatory agency had approved of the recycling

2       practice that had been ongoing from 1986 until the

3       end of that period of inspection?

4              MR. MANGO:  Your Honor, I hate to object.

5       It was a long question.  But I didn't quite follow

6       it, and asking him whether it would be reasonable

7       for a regulated industry to believe something, I

8       don't think we have that foundation here for this

9       witness to say what a facility -- what would be

10      reasonable for a facility to believe.  That's

11      almost the ultimate question at issue here, and I

12      don't think it's an appropriate question.

13             THE COURT:  All right.  Do you remember

14      the question?

15             THE WITNESS:  Not exactly.

16             THE COURT:  All right.  Which is

17      problematic, but is that calling for the ultimate

18      conclusion here?

19             MR. LINSIN:  Your Honor, I'm asking --

20      given the oversight responsibilities that this

21      witness has had and the direct responsibilities

22      that he's had with respect to the RCRA compliance

23      inspectors that engaged with this facility, I'm

24      asking whether or not, given that regulatory

25      framework, it is reasonable for the facility to

1    understand that these practices were being approved

2    of.  I recognize that it is a -- he has been

3    offered as an expert to render opinions in this

4    area regarding requirements for permitting or not.

5    I realize it touches on areas that will be ultimate

6    issues, but I don't believe -- I believe it is a

7    reasonable question.

8              THE COURT:  Yeah, I think it's a

9    reasonable question, but I don't think it's

10   permissible in the way that it was presented,

11   because you are asking for a conclusion with

12   respect to what the provider was -- whether it

13   would be reasonable for it to conclude or not.  And

14   I think, in that fashion, based on the facts, it's

15   an impermissible question, so I'll sustain the

16   objection.

17             MR. LINSIN:  All right.  Let me change the

18   hypothetical, if I may, then, just slightly.

19   BY MR. LINSIN:

20   Q.  I'll try to go back through this.  I apologize

21   for the length of the question, but if it's not

22   clear at the end of this effort, please just let me

23   know.

24       Let me ask it this way:  Isn't it reasonable --

25   looking back over the regulatory oversight that DEC

1    exercised over the Tonawanda Coke facility, isn't

2    it reasonable to recognize that your agency and the

3    inspectors you supervised, time and again, on at

4    least four separate occasions, concluded that there

5    was no need for this facility to have a RCRA permit

6    for the recycling activities in which they were

7    engaged?  Isn't that a reasonable conclusion?

8    A.  That would be based on the inspectors'

9    observations of the activities.  They -- it's quite

10   possible that they may have gone to the facility

11   and not seen the recycling process and exactly how

12   it was done, so they may not have understood fully

13   where the material was being mixed with the coal.

14   Q.  For that possibility to have been true, your

15   RCRA compliance inspectors on four separate

16   occasions over 20 years would have had to ignore

17   what you described as the general practice for an

18   inspector to both speak with the operator and view

19   the operation of the activities, correct?

20           MR. MANGO:  I'm going object.

21           THE COURT:  I'll permit that question.

22   Overruled.  You may answer if you understand it.

23           THE WITNESS:  Could you repeat the

24   question, please?

25   BY MR. LINSIN:

1    Q.  Sure.  You said it's possible that these RCRA

2    inspectors that you supervised -- it's possible

3    they may not have viewed the recycling activity.

4    Is that how I understood your previous question?

5    A.  That's correct.

6    Q.  And my question now is:  In order for that

7    possibility to be true, your RCRA compliance

8    inspectors or the RCRA compliance inspectors from

9    your office, some of whom you directly supervised

10   during this interval, they would have had to have

11   ignored what you described as the general practice

12   for RCRA compliance inspectors, when they conduct a

13   RCRA compliance inspection, to both speak to the

14   operator and observe the activities in question,

15   isn't that true?

16   A.  The inspections end up becoming a snapshot of

17   what's happening at the facility at the time of the

18   inspection.  It's quite possible that certain

19   activities are not occurring at any facility when

20   the inspectors go there.  And they could say, fine,

21   you know, I don't see any problems, but the next

22   day, you know, there could be compliance issues.

23   So I guess they would have to see the activity or

24   be informed of the activity.

25   Q.  In order for a RCRA compliance inspector to

1    determine that the facility does not need a permit,

2    that it is, in fact, properly operating as a

3    small-quantity generator, that RCRA compliance

4    inspector has to satisfy him or herself that the

5    recycling activities are being done appropriately,

6    correct?

7    A.   Only if they were aware of how they were -- if

8    the activity was occurring while they were there or

9    they were informed by the operator --

10   Q.   Mr. Strickland --

11   A.   -- that there is or is not a problem.

12   Q.   Isn't it their job to understand what those

13   recycling activities are?

14   A.   Yes, they should.

15              MR. LINSIN:  I have nothing further, your

16   Honor.  Thank you.

17              THE COURT:  Okay, Mr. Linsin.  Thank you.

18              MR. PERSONIUS:  May I, Judge?

19              THE COURT:  Certainly.

20              MR. PERSONIUS:  May I start?

21              THE COURT:  Yes, you may.

22   CROSS-EXAMINATION BY MR. PERSONIUS:

23   Q.   Good afternoon, Mr.  Strickland.

24   A.   Good afternoon.

25   Q.   My name is Rod Personius, and I represent Mark

Case 1:10-cr-00219-WMS-HKS   Document 329   Filed 10/10/14   Page 105 of 235

3027

1    Kamholz.

2        Following up on Mr. Linsin's question about the

3    inspectors being at Tonawanda Coke, it's true, is

4    it not, that those inspectors had the absolute

5    authority to require Mr. Kamholz or whomever they

6    dealt with to show them exactly how the recycling

7    activity was taking place?

8    A.  Yes, they could.

9    Q.  They could.  If -- they had the complete

10   authority to -- if they didn't see it, they had the

11   complete authority to ask to see it, right?

12   A.  They could have asked.

13   Q.  You testified about information you received

14   regarding recycling activities at Tonawanda Coke

15   from Cheryl Webster.

16   A.  Yes.

17   Q.  We don't know the exact date, but I think you

18   agreed it was in and around June of 2009?

19   A.  That would seem correct.

20   Q.  Okay.  And it was based on information that

21   Miss Webster had obtained during an earlier air

22   inspection as Tonawanda Coke?

23   A.  Correct.

24   Q.  And is it correct in understanding that the

25   source of the information that she provided to you

1    was Mr. Kamholz?

2    A.   I believe some of it was from Mr. Kamholz.

3    Q.   During the air inspection?

4    A.   Right.

5    Q.   All right.  And the information you got from

6    Mr. Corbett following the inspection that took

7    place in June of 2009 at Tonawanda Coke, again the

8    source of that information was Mr. Kamholz?

9    A.   Regarding the K087, yes.

10   Q.   Okay.  And there was a later either inspection

11   or sampling activity that occurred at Tonawanda

12   Coke in September?

13   A.   That's correct.

14   Q.   Of 2009?

15   A.   Right.

16   Q.   Okay.  And additional information about those

17   recycling activities was learned at that time by

18   Mr. Corbett?

19   A.   I believe it was the same information.

20   Q.   Okay.  And -- and the source again of that

21   information was Mr. Kamholz?

22   A.   That's correct.

23            MR. PERSONIUS:  Okay.  May I have a

24   minute, Judge?

25            THE COURT:  Sure.

1          MR. PERSONIUS:  Your Honor, that's all we

2     have.

3          Thank you, Mr. Strickland.

4              THE WITNESS:  You're welcome.

5              THE COURT:  Mr. Mango?

6              MR. MANGO:  Your Honor, thank you.

7     REDIRECT EXAMINATION BY MR. MANGO:

8     Q.   Good afternoon, Mr. Strickland.

9     A.   Good afternoon.

10    Q.   You were asked on cross-examination about an

11    EPA notice, I believe, back in 1986, those 1986

12    notifications and a later notification regarding

13    notifying the EPA as to certain hazardous waste

14    activities that were occurring.

15    A.   That's correct.

16    Q.   All right.  In fact, does RCRA require

17    facilities to identify if they are generating

18    hazardous wastes?

19    A.   Yes, it does.

20    Q.   And does RCRA also require that a facility go

21    out and obtain this generator ID number that we've

22    been talking about?

23    A.   Yes, it does.

24              MR. MANGO:  Okay.  I'd like pull up, your

25    Honor, in evidence, Sheila, please, Defendant's

1    Exhibit B.  If we could scroll through the pages

2    until we hit I-2 at the bottom.  Yes.  Right there.

3    Thank you.

4  BY MR. MANGO:

5    Q.  Mr. Strickland, do you see this document on

6    your screen?

7    A.  Yes, I do.

8    Q.  Okay.  And this information is now zoomed up.

9    There was this question in D as to if the facility

10   is a treatment, storage, or disposal facility, and

11   if they have, and it's checked all not applicable,

12   is that correct?

13   A.  That's correct.

14   Q.  Who would have given Mr. Fisher this

15   information to put not applicable here?

16   A.  That quite possibly could be the facility.

17           MR. LINSIN:  Objection to possibilities,

18   your Honor.

19           THE COURT:  Yeah.  Sustained.

20           MR. LINSIN:  I would move the answer be

21   struck.

22           THE COURT:  Okay.  And I'll grant that

23   motion to strike the answer.  It should not be

24   considered, ladies and gentlemen, as any evidence

25   for your consideration purposes.

1    BY MR. MANGO:

2    Q.  Let's start again.  Mr. Strickland, are you

3    familiar with Mr. Fisher's work?

4    A.  Yes, I am.

5    Q.  During -- and is that fair to say that during

6    the time you supervised him you reviewed a number

7    of his inspection reports?

8    A.  I would normally only review an inspection

9    report if there was a serious violation and it was

10   going to proceed to formal enforcement.  Typically

11   the inspection reports would be -- I would assign

12   another inspector to review the inspection reports

13   generated by any of the inspectors.  They -- that

14   report would then go to our Albany office and would

15   be reviewed by another individual in the RCRA

16   inspection program.

17   Q.  Okay.  But is it fair to say that in the course

18   of your duties you've reviewed some of Mr. Fisher's

19   work?

20   A.  Yes.

21   Q.  And are you familiar with whether he was an

22   avid note taker or not an avid note taker?

23   A.  He was known to be a very avid note taker.

24   Q.  Okay.  So, if, for example, Mr. Fisher had

25   actually seen the process of recycling K087 --

1          MR. LINSIN:  Objection to hypotheticals.

2     The witness has already said he did not speak to

3     Mr. Fisher about this inspection report.

4          MR. MANGO:  Your Honor, I'm not asking him

5     about whether he spoke to him.  I'm asking about in

6     his experience of reviewing his work.  That is the

7     basis of the question.

8          MR. PERSONIUS:  But you're -- if I may add

9     something, Judge.  The witness has testified that

10    as a rule he did not review Mr. Fisher's inspection

11    reports.  There's no foundation.

12         THE COURT:  Yeah, unless there was a

13    compliance issue.  I'll sustain the objection.

14         MR. MANGO:  Okay.

15 BY MR. MANGO:

16    Q.  Well, did there come a time when you did review

17    Mr. Fisher's work?

18    A.  Yes, I have looked at his inspection reports.

19    Q.  Okay.  And -- and you mentioned -- I believe on

20    cross you were asked whether it was their job to

21    understand the recycling process that was happening

22    at the facilities they inspected.  Do you remember

23    that?

24    A.  Yes.

25    Q.  Okay.  And in part in answering that question,

1    I believe you said part of understanding -- part of

2    their understanding of this recycling process is

3    relying on facility representatives to give them

4    that information.

5    A.  That's correct.

6    Q.  Is that right?

7    A.  That's correct.

8    Q.  And the other basis would be to actually see

9    the process.

10   A.  That is correct.

11   Q.  Based on your review of Mr. Fisher's notes and

12   inspection report, do you believe Mr. Fisher saw

13   the process?

14            MR. LINSIN:  Objection.

15            THE COURT:  Sustained.

16   BY MR. MANGO:

17   Q.  Let me ask you this:  If Mr. Fisher would have

18   seen the recycling process, would he have described

19   that in his inspection report?

20            MR. LINSIN:  Objection, your Honor.

21            THE COURT:  Sustained.

22   BY MR. MANGO:

23   Q.  Okay.  If we can back out of this, please,

24   Sheila.  If we could go to page I-4.  Thank you.

25        Okay.  Mr. Strickland, do you see this section

1    on your screen here?

2    A.   Yes, I do.

3    Q.   Treatment, storage, or disposal facility

4    status.  Is hazardous waste generated and stored

5    on-site, is that right?

6    A.   Correct.

7    Q.   Okay.  There's specific answers in here.  No,

8    no, and no, for A, B, and C.  Is that right?

9    A.   That's correct.

10   Q.   Based on your understanding of inspections at

11   small-quantity generators, how did this information

12   arrive on this form?

13           THE COURT:  If you know.

14           THE WITNESS:  It would probably be --

15           MR. PERSONIUS:  Objection to probably,

16   your Honor.  Sorry to interrupt.

17           THE COURT:  Sustained.

18   BY MR. MANGO:

19   Q.   Let me ask you.  Do you know?  Without saying

20   probably, do you know?

21   A.   No, I don't.

22   Q.   Let me ask you this:  During an inspection, if

23   hazardous waste was being stored on-site for longer

24   than 90 days, is that something, in your

25   experience, that -- as head of the RCRA section

1    from 1994 to 2010, is that something you would

2    expect a facility manager to bring to the

3    inspector's attention?

4    A.  Yes.

5    Q.  Okay.  Now, you were asked about the previous

6    EPA notification and the fact that it was checked

7    that they were generating more than 1,000 --

8    1,000 pounds, I believe.

9    A.  I believe it was 1,000 kilos.

10   Q.  1,000 kilos of waste, is that right?

11   A.  That's correct.

12   Q.  And you were asked that if there is an

13   exemption, that material is not considered a

14   hazardous waste for, say, K087, is that right?

15   A.  Correct.  It would be excluded.

16   Q.  Okay.  But to obtain that exemption,

17   specifically for K087, what needs to be done?

18   A.  I'm not following the question.

19   Q.  How does a facility have to handle their K087

20   waste to be entitled to that exemption?

21        MR. LINSIN:  Your Honor, may I, please?

22   The -- I'm not clear, first of all, what exemption

23   we're talking about, and some of the exemptions

24   change dramatically during the time frame that

25   these questions range over.  So I just ask for a

1   time frame and specifically identify what exemption

2   or exclusion the question relates to.

3                MR. MANGO:  I will, your Honor.

4                THE COURT:  Okay.  Mr. Mango.

5   BY MR. MANGO:

6   Q.  Let's go at it this way, Mr. Strickland.  You

7   testified that in 1994 you believe this concrete

8   pad was installed?

9   A.  That's correct.

10   Q.  Are you familiar or do you know if anything

11   happened in 1992 relating to K087 waste?

12   A.  There was -- essentially, the exclusion came

13   into being for the K087 recycling, and there was

14   some guidance from EPA related to how facilities

15   could manage the K087 and several other K08's from

16   the coke by-products process and avoid the issue of

17   land disposal.

18   Q.  Okay.  So in 1992 this guidance comes out, and

19   is it fair to say it said the material --

20                MR. LINSIN:  Objection.

21                THE COURT:  I'm sorry.  Go ahead.

22                MR. LINSIN:  Objection, your Honor.  If we

23   are going down the guidance, this directly relates

24   to the Court's pretrial order with respect to land

25   disposal.

1          THE COURT:  Mr. Mango, try again.

2          MR. MANGO:  Yes, your Honor.  Your Honor,

3     I was trying to set the stage for the question

4     before.

5     BY MR. MANGO:

6     Q.  Let's start in 1994.  There was an objection

7     regarding a time frame to a question.  In 1994 if a

8     company says that they have an exemption for K087

9     waste, what do they need to do to maintain that

10    exemption?

11    A.  Essentially, they have to recycle the K087 back

12    into the coke -- coking process, without having

13    land-disposed of the waste at any time from the

14    point of generation to the point of recycling.

15    Q.  Okay.  Now, you talked about -- during direct

16    testimony and briefly on cross-examination, about

17    storage and disposal, and it's your understanding

18    that Count 19 relates to the placement of K087

19    waste on coal piles on the ground, is that right?

20    A.  That's correct.

21    Q.  Okay.  And you were asked specifically about a

22    definition of "storage."  I want to ask you about a

23    definition of "disposal."  Is it your understanding

24    that under the regulations in RCRA disposal means

25    the abandonment, discharge, deposit, injection,

1    dumping, spilling, leaking, or placing any solid

2    waste, including hazardous waste, into or onto any

3    lands or waters?  Is that your understanding of

4    disposal?

5    A.   That's correct.

6    Q.   So would your -- would the placement of K087

7    waste onto coal situated on the ground constitute

8    disposal under that definition?

9    A.   Yes, it would.

10   Q.   Let me ask you this:  If a raw material such as

11   coal is situated on the ground -- which you said is

12   not regulated under RCRA, right?

13   A.   That's correct.

14   Q.   Okay.  But that raw material is mixed in with

15   some hazardous waste and then is put on the ground,

16   is that raw material and hazardous waste mixture

17   regulated under RCRA?

18   A.   Yes.  It would be a hazardous waste.

19   Q.   All right.  Let me ask you this:  You were

20   asked about the June of 2009 inspection and some

21   information that you learned from Mr. Corbett?

22   A.   Yes.

23   Q.   Okay.  Why did you not tell the Tonawanda Coke

24   Corporation that they were in violation of RCRA or

25   believed to be in violation of RCRA relating to

1   their handling of K087 waste after that inspection?

2   A.   Because we were not the lead in the inspection.

3   Q.   Okay.  I'd like to pull up Defendant's DDDD.01

4   please, Sheila.

5       Now, remember that conversation we just had

6   about disposal, Mr. Strickland?

7   A.   Yes.

8   Q.   Okay.  I'd like to go to the second page of

9   this document.  This is in evidence, yes.

10  Actually, if we could go to the first page.  I'd

11  just like to get a date.

12      This is the 1988 notice.  You see that at the

13  bottom, Mr. Strickland?

14  A.   Yes, I do.

15  Q.   Okay.  So let's go to the next page, please.

16  If we could zoom in this bottom part.

17      You remember being asked about the comments on

18  this 1988 notice?

19  A.   Yes, I do.

20  Q.   Okay.  In reading this, "After recycling, there

21  is no waste material of any kind to be disposed of

22  in any manner."  See that word "disposed"?

23  A.   Yes.

24  Q.   Okay.  We just talked about that.  By reading

25  this, would you -- would it be fair to believe that

1   Tonawanda Coke is telling EPA we're taking K087

2   waste and we are putting it on coal on the ground?

3   A.   It does indicate disposal -- or it does have

4   the word "disposed" on there.

5   Q.   But it says "no waste material of any kind to

6   be disposed."  Is that right?

7   A.   That is correct.

8   Q.   Okay.  So is it fair to say that EPA was not

9   told in this that they're taking the K087 waste and

10  putting it on coal on the ground?

11  A.   I would believe that to be correct.

12          MR. MANGO:  Your Honor, if I could have

13  one moment, please.

14          THE COURT:  Yes.

15  BY MR. MANGO:

16  Q.   Mr. Strickland -- we can take that down.  Thank

17  you, Sheila.

18      When a RCRA inspector conducts a small-quantity

19  generator inspection, is there any type of

20  checklist of questions that is brought to the

21  facility at that time?

22  A.   Typically they would bring the RCRA inspection

23  form.

24  Q.   Those documents we were looking at?

25  A.   Correct.

1    Q.  And does the RCRA inspector then ask the

2    questions on that form to the facility

3    representative?

4    A.  Yes.  Any of the sections that would be

5    applicable.

6    Q.  And does the RCRA inspector then use the

7    answers from the facility representative to fill in

8    the answers on that inspection form?

9    A.  Yes, in addition to their observations.

10   Q.  Is there any indication in Mr. Fisher's report

11   that he observed where the recycling was happening?

12   A.  I see no indication.

13   Q.  Based on your experience, Mr. Strickland, of

14   managing the RCRA program from 1984 to 2010 and

15   reviewing inspection reports, is it usual for the

16   answers to the questions of a small-quantity

17   generator inspection to be based solely upon

18   information supplied by the facility?

19           MR. LINSIN:  Objection.  Asked and

20   answered.

21           MR. MANGO:  Your Honor, this is a little

22   different, and this is my last question to the

23   witness.

24           THE COURT:  All right.  Why don't you --

25   that's your objection?  Asked and answered?

1          MR. LINSIN:  Yes, it is.

2          THE COURT:  All right.

3          MR. PERSONIUS:  I object also, Judge.  I

4      think it's leading, on top of it.

5          THE COURT:  No.  But reask the question

6      again, please.

7          MR. MANGO:  Yes, your Honor.

8  BY MR. MANGO:

9  Q.  Mr. Strickland, based on your experience of

10     running the RCRA Region 9 office from 1994 to 2010,

11     reviewing inspection reports, your understanding of

12     what goes into a small-quantity generator

13     inspection, is it usual for the answers of the

14     questions of a small-quantity generator inspection

15     to be based solely on information supplied by the

16     facility?

17  A.  Solely, no.

18  Q.  Okay.  Does that -- did that happen any time

19     that you were aware of?

20         MR. LINSIN:  Objection, your Honor.

21         THE COURT:  If what happens?

22         MR. MANGO:  Were there instances where the

23     small-quantity generator inspection report was

24     based solely on information provided by the

25     facility representative if the actual process was

1    not occurring at the time the facility or the

2    inspector was there?

3              THE COURT:  All right.  There is an

4    objection.  I'll sustain the objection.

5              MR. LINSIN:  Thank you.

6              MR. MANGO:  Nothing further, your Honor.

7              THE COURT:  Okay, Mr. Mango.

8              MR. MANGO:  Thank you.

9              THE COURT:  Sure.

10             MR. LINSIN:  Just very briefly, please,

11   your Honor.

12             THE COURT:  Okay.

13   RECROSS EXAMINATION BY MR. LINSIN:

14   Q.  May I please have Defendant's DDDD.01 in

15   evidence.  And going to page 2 of this exhibit,

16   please.

17       Mr. Strickland, if I heard you correctly, you

18   testified that when a DEC RCRA compliance inspector

19   goes to a facility, especially for the first time,

20   they would typically bring with them the EPA form

21   which had resulted in the generator ID number.  Is

22   that what you testified to?

23   A.  No.  I think I testified to the fact that they

24   would normally bring the -- an inspection report,

25   our DEC inspection report.

1    Q.   I'm sorry.  The RCRA inspection form.  You

2    don't mean the EPA RCRA inspection form, is that

3    what you're saying?

4    A.   No, it would be the New York State.

5    Q.   But the -- you see in here -- we went through

6    it again -- that the facility had reported in 1998,

7    the year before your inspection, the first DEC

8    inspection, that it was generating more than a

9    thousand kilos per month, correct?

10   A.   Yes.  That's how it's marked.

11   Q.   Lets bring this down, please.

12        And based on your review of the DEC file, your

13   inspectors confirmed on four separate occasions

14   from '89 to 2009 that this facility qualified as a

15   small-quantity generator, correct?

16   A.   That's correct.

17   Q.   And what's the number to qualify, the weight

18   number, volume number of hazardous material

19   generated for a small-quantity generator?

20   A.   A small-quantity generator generates between a

21   hundred and a thousand kilos in any one month

22   during the calendar year.

23   Q.   And so you -- you testified a moment ago that

24   it was your understanding that a -- even a

25   moderate-size coke manufacturer is going to

1    generate approximately a ton of K087 per month,

2    correct?

3    A.  Yes, I did.

4    Q.  And that would greatly exceed the limitations

5    for a small-quantity generator, correct?

6    A.  A thousand kilos would be 2,200 pounds,

7    roughly.

8    Q.  All right.  So your inspectors had to determine

9    that something else was being done with this K087

10   material, correct?

11   A.  Yes.  They noted that this was being recycled

12   in accordance with the exclusion.

13   Q.  And there is a reason, isn't there,

14   Mr. Strickland, why RCRA compliance inspections are

15   conducted on-site?  Isn't there?

16   A.  Yes, there is.

17   Q.  If -- especially for an initial RCRA compliance

18   inspection, isn't it critical for the RCRA

19   compliance inspector to determine whether or not

20   this is a large-quantity generator or a

21   small-quantity generator?

22   A.  Yes.

23   Q.  And if it were otherwise, somebody could just

24   call the facility and go through a checklist and

25   say, hey, they told us this is what they're doing,

1    and that's good enough for us.  Right?

2    A.  Right.  But we would not do that.

3    Q.  No, you wouldn't, because it's important for

4    your inspectors to get out on-site, correct?

5    A.  That is correct.

6    Q.  And review site-specific information about how

7    that facility is managing and handling their

8    hazardous waste, correct?

9    A.  That is the intent of the inspection.

10   Q.  And that's their job, right?

11   A.  Correct.

12   Q.  And that's the training you talked about having

13   received yourself, correct?

14   A.  Correct.

15         MR. LINSIN:  I have nothing further, your

16   Honor.  Thank you.

17         MR. PERSONIUS:  Your Honor, I have nothing

18   further.

19         THE COURT:  All right, Mr. Personius.

20   Thank you.

21         MR. MANGO:  One question, your Honor,

22   based or that line of -- last line of questioning.

23   FURTHER REDIRECT EXAMINATION BY MR. MANGO:

24   Q.  Mr. Strickland, is it unusual that an inspector

25   not observe the recycling process during a

1        small-quantity generator inspection?

2        A.   Excuse me?

3        Q.   Is it unusual that an inspector not observe the

4        recycling process during a small-quantity generator

5        inspection?

6        A.   If the process is not going on while they're

7        there, yes, they would not observe it.

8                   MR. MANGO:  Thank you.  Nothing else, your

9        Honor.

10                  MR. LINSIN:  Nothing, your Honor.  Thank

11       you.

12                  MR. MANGO:  I guess, subject to any

13       questions of the jury, your Honor, we have nothing

14       else.

15                  THE COURT:  Yes.  Ask the jury if there

16       are any questions that you have on your written

17       forms, if you would raise your hands, we can pick

18       those up if there are any.

19           Okay.  It does not appear that there are.

20           Mr. Strickland, you are excused.  Thank you

21       very much.

22                  THE WITNESS:  Thank you, your Honor.

23                  MR. MANGO:  Your Honor, the government

24       would call Robert Conway.

25                  THE COURT:  Okay.  Mr. Conway, I think you

1   know the drill, so stay right there.  We'll have

2   you sworn.

3   R O B E R T   C O N W A Y, having been duly sworn as

4   a witness, testified as follows:

5              THE COURT:  Okay.  Good afternoon,

6   Mr. Conway.

7              THE WITNESS:  Good afternoon, your Honor.

8              THE COURT:  You know the instructions.  Be

9   as responsive as you can.  If you don't understand

10  a question, let the attorney or myself know,

11  whoever the questioner is.  If you can answer a

12  question yes or no, please try to do it that way.

13  Don't volunteer information.

14     If there's an objection, let me rule on the

15  objection, then I will give you further

16  instructions.  Okay?

17             THE WITNESS:  Okay.

18             THE COURT:  All right.  I think you're

19  going to carry okay, but state your full name,

20  spell your last name, please.

21             THE WITNESS:  My name is Robert Conway.

22  C-O-N-W-A-Y.

23             THE COURT:  Okay.  Thank you.  Your

24  witness, Mr. Mango.

25             MR. MANGO:  Thank you, your Honor.

```
1    DIRECT EXAMINATION BY MR. MANGO:

2    Q.   Good afternoon, Mr. Conway.

3    A.   Good afternoon, Mr. Mango.

4    Q.   We've talked about this a couple of times, but

5    if you could tell the jury, are you currently

6    employed?

7    A.   Yes, I am.  I'm employed as a special agent

8    with the United States Environmental Protection

9    Agency's Criminal Investigation Division, and I'm

10   stationed out of Syracuse, New York.

11   Q.   Okay.  And how long have you been a special

12   agent with EPA?

13   A.   I've been a special agent with the EPA CID for

14   about three and a half years.

15   Q.   Okay.  And that's -- CID is the Criminal

16   Investigation Division?

17   A.   Correct.

18   Q.   All right.  Can you tell the jury what your

19   duties are as a special agent with EPA CID?

20   A.   My duties as a special agent are to investigate

21   complaints of potential criminal activity related

22   to the Environmental Protection Agency's laws and

23   regulations, particularly the Clean Air Act, the

24   Clean Water Act, the Resource Conservation and

25   Recovery Act, which is the hazardous waste laws,
```

1    and there's some other -- other specialized laws as

2    well.  But the three major ones are the Clean Air

3    Act, Clean Water Act, and RCRA.

4    Q.  Prior to your start with EPA CID, did you hold

5    any other type of federal law enforcement

6    positions?

7    A.  Yes, I did.  I had worked for 15 --

8    approximately 15 years as a seasonal and a

9    permanent law enforcement park ranger for the

10   National Park Service.

11   Q.  Okay.  Now, I'd like to ask you a question.

12   Have you been present, Mr. -- or Special Agent

13   Conway, during the testimony of all the witnesses

14   in this trial?

15   A.  Yes, I have.

16   Q.  And have you been present during the

17   introduction of all exhibits into evidence in this

18   trial?

19   A.  Yes, I have.

20   Q.  And based on those exhibits that have been

21   introduced, have you conducted any type of review

22   of those exhibits?

23   A.  Yes, I have.

24   Q.  Okay.  Can you tell the jury what was the

25   purpose of your review of some of those exhibits?

1    A.   The purpose was to prepare summary charts to

2    assist the jury in understanding some of the

3    lengthy exhibits that have been entered as evidence

4    into the case.

5    Q.   Okay.  And if you could just briefly, in

6    general terms, tell the jury what type of summary

7    charts you have prepared -- have you prepared any

8    summary charts?

9    A.   Yes, I have.

10   Q.   Okay.  Can you tell the jury what type of

11   summary charts you've prepared?

12   A.   I've prepared two summary charts.  The first is

13   a summary of the by-products operator logbooks, and

14   the second summary is a summary of the circular

15   bleeder chart documents that have been discussed at

16   great length in this case.

17   Q.   Okay.  So let's start with the operator --

18   by-products operator logbook.  You mentioned that

19   was one of your summaries that you've made?

20   A.   Correct.

21   Q.   Are you familiar with Exhibits 82 to 89 that

22   have been introduced in this trial?

23   A.   Yes.  They are the by-products operator

24   logbooks, where the by-products operators every two

25   hours go around and do inspections and they note

1   what they did during those -- those rounds around

2   the by-products department.

3   Q.  Okay.  Those Exhibits 82 to 89, did you read

4   all of those exhibits?

5   A.  Yes, I did.

6   Q.  And approximately how many pages are all of

7   those exhibits?

8   A.  I would say approximately over -- well over a

9   thousand pages.

10  Q.  All right.  Do you know what time periods the

11  Government Exhibits 82 to 89 cover?

12  A.  They cover a time period of August 17th, 2006,

13  through December 17th, 2009.

14  Q.  And December 17th, 2009, is there any -- does

15  that date have any meaning to you as part of this

16  case?

17  A.  Yes, it does.  That's the day the criminal

18  search warrant was executed at the Tonawanda Coke

19  Corporation.

20  Q.  Okay.  So you did say you read through those

21  documents.  And what, if anything, did you do when

22  you read through those documents, Exhibits 82 to

23  89?

24  A.  What I was looking for was references to the --

25  the pressure-relief valve or the bleeder valve.

1    Particularly, I was looking for where adjustments

2    to the set release point were noted in those

3    logbooks.  In addition, in the summary chart I

4    noted where there was one incident noted in the

5    logbook of the bleeder valve or the PRV catching on

6    fire via a lightning strike.

7    Q.  Okay.  So you noted that in the log -- or in

8    the summary?

9    A.  Yes.

10            THE COURT:  Ask the question again,

11   please.

12   BY MR. MANGO:

13   Q.  Yes.  So you noted the lightning strike in your

14   summary exhibit?

15   A.  Yes.  That's the only one that will not have a

16   set release change value for the pressure-release

17   valve set point.

18   Q.  Okay.  So I'd like to show you for

19   identification purposes now, your Honor, Government

20   Exhibit 200.  Not in evidence, for identification

21   purposes.

22       Special Agent Conway, do you see Government

23   Exhibit 200 on your screen?

24   A.  Yes, I do.

25   Q.  And if you could tell the jury, what is this

1    document?

2    A.   This is the document -- this is my summary of

3    the -- my review of the by-products operator

4    logbooks.  It notes the date of the entry in the

5    logbook; it notes the set release point for the

6    bleeder valve or the pressure-release valve; it

7    notes the by-products operator logbook date,

8    because each logbook has set dates, a beginning

9    date and an end date.  The next is the government

10   exhibit and the page number that's in reference to

11   the government exhibit that was entered into

12   evidence, and the specific page number within that

13   government exhibit where you can find the

14   reference.  And then the last is any relevant

15   comments related to the entry into the logbook.

16   Q.   All right.  Did you make this document that's

17   on your screen?

18   A.   Yes, I did.

19   Q.   And for the items you just mentioned, the

20   information that it contains -- the date, the

21   bleeder setting, set point, the logbook date range,

22   the government exhibit and page number, and the

23   comments -- does Government Exhibit 200 that you're

24   looking at fairly and accurately summarize that

25   information from the logbooks onto your summary

1    chart here?

2    A.  Yes, it does.

3              MR. MANGO:  Your Honor, based on the

4    testimony of this witness and Federal Rule of

5    Evidence 1006, the government would move Government

6    Exhibit 200 into evidence.

7              THE COURT:  Mr. Personius?

8              MR. PERSONIUS:  We note our prior

9    objection, Judge, and stand by that.

10             THE COURT:  Mr. Linsin as well?

11             MR. LINSIN:  Yes, your Honor, and

12   acknowledge the Court's ruling.

13             THE COURT:  Okay.  Thank you.  And the

14   objections will be overruled.  I will permit it for

15   the reasons previously discussed.

16             (Government's Exhibit 200 was received

17             into evidence.)

18             THE COURT:  You may proceed, Mr. Mango.

19             MR. MANGO:  Thank you, your Honor.  And I

20   would ask that Government Exhibit 200 now be

21   admitted into evidence and published for the jury.

22             THE COURT:  Yes, you may do that.

23   BY MR. MANGO:

24   Q.  All right, Special Agent Conway, can you again

25   now, with respect to what is on our screens,

1    explain for the jury what we're looking at?

2    A.   Yes.  Again, on the left-hand side is the date

3    of the entry in the by-products operator logbook.

4    So, for example, we'll take the first one,

5    November 3rd, 2006.  The bleeder valve set release

6    point was set at 95 centimeters of oil.  It was in

7    the -- found inside the by-products operator

8    logbook with the beginning date of

9    August 17th, 2006, and that logbook ended on

10   January 31st of 2007.  That logbook is entered as

11   Government Exhibit No. 82, and that entry will be

12   found on page 81 of that logbook within the

13   government exhibit.  And the comment says "Bleeder

14   set at 95 per PC," PC being Pat Cahill, the

15   by-products manager or by-products supervisor.

16   Q.   That's who you believe?

17   A.   That who I believe, yes.

18   Q.   Okay.  I would like to go, if we could just --

19   just for example, to show the jury what we're

20   looking at for, say, December 19th, 2007, you have

21   a bleeder setting point there of 100, is that

22   right?

23   A.   That is correct.

24   Q.   And what is the government exhibit and page

25   number that that references?

1   A.   That would be Government Exhibit 85, and that

2   would be page number 5 for that exhibit.

3   Q.   Okay.   If we could actually go, please, Lauren,

4   to Government Exhibit 85, page 5, which is in

5   evidence.   If we could focus on this bottom

6   section.

7        Okay.   So do you see that notation that you've

8   now incorporated into your summary exhibit,

9   Exhibit 200, on the screen here?

10  A.   Yes, I do.

11  Q.   Can you just tap it and show the jury.   Okay.

12  "Bleeder now at 100 as per PC"?

13  A.   Correct.

14  Q.   Okay.   If we could go back to Exhibit 200,

15  please.

16       So I believe your testimony was, every time

17  there was a setting change to the bleeder you noted

18  it in this log?

19  A.   Yes.

20  Q.   Okay.   Except for one?

21  A.   There was one that I -- that I missed.

22  Correct.

23  Q.   Okay.   There's one that did not have a set

24  point change, is that right?

25  A.   Oh, yes.   On 5/31 of '08, the -- that was the

1    incident where the bleeder valve was struck by

2    lightning and caused a fire.  And I included that

3    in there because that has come up in -- many times

4    throughout the course of the investigation as a --

5    you know, a point of remembrance by the witnesses.

6    Q.  Okay.  And apparently an incident that caused a

7    little bit of concern by the operator who put that

8    in there, is that fair to say?

9    A.  That would be fair to say.

10   Q.  All right.  So you've now noted in here all of

11   the changes to the bleeder set point from

12   Government Exhibits 82 through 89, is that correct?

13   A.  That is correct.

14   Q.  All right.  Now, with this still up on the

15   screen, I want you to talk about these other

16   summaries.  You mentioned there was another

17   category of summary documents you made?

18   A.  Correct.

19   Q.  Why don't you tell the jury -- first let me ask

20   you, are you familiar with Government Exhibits

21   21.01 to 21.72, 116.02.01 to 116.02.39, and

22   Exhibits 400 to 569?

23   A.  Yes, I am.

24   Q.  Okay.  What are all of those exhibits that I

25   just gave you the numbers of?

1       A.   Those are the circular bleeder valve charts

2       that were part of my analysis -- or part of my

3       summary.

4       Q.   Okay.  What was the earliest bleeder chart

5       summary in that group?

6       A.   The earliest one is dated January 1st of 2009.

7       Q.   Okay.  In the course of your investigation,

8       were any earlier bleeder charts located?

9       A.   No, there were not.

10      Q.   Okay.  So you couldn't create any type of

11      summaries for 2008, per se?

12      A.   No, I could not.

13      Q.   All right.  So all of those bleeder charts

14      exhibits that I just gave you the exhibit numbers

15      for, did you review all of those exhibits?

16      A.   Yes, I did.

17      Q.   And if you can tell the jury, what, if

18      anything, did you do as you reviewed those

19      exhibits?

20      A.   When I reviewed them I was looking for --

21      obviously it's a circular chart with the -- with

22      pressure notations that go in circles around the

23      chart, and that relates to the plant pressure of

24      the coke oven gas line within the by-products

25      department at the facility.  I took information

1    from my first summary, which is the by-products

2    operator logbook, noted the set release point for

3    the pressure-release valve, and I looked on the

4    circular bleeder chart where the, you know, spikes

5    in the chart were in relation to the set release

6    point, and that's what I performed my summary on.

7    Q.   Okay.  And so did you prepare a type of summary

8    exhibit relating to these bleeder charts?

9    A.   Yes, I did.

10   Q.   Okay.  What did you capture in those summary

11   charts relating to the bleeder circular charts?

12   A.   Basically the number of releases for a 24-hour

13   period for each chart.  And then I summarized

14   those, the releases, on a monthly basis over the

15   period, the course of the calendar year, with one

16   exception.  We did not have bleeder -- circular

17   bleeder valve charts for the month of April, with

18   the exception of the ones during the April 2009 air

19   inspection.

20   Q.   Okay.  And again we went through this with

21   Mr. Cahill on the stand.  Did you find any notation

22   in the by-products logbook for the April -- during

23   the April inspection time period, that noted what

24   it was being set at?

25   A.   No.  There were no notations in the logbook for

1    any adjustments in the release point setting for

2    the bleeder valve during the April 2009 inspection

3    dates.

4    Q.  So why did you exclude April?

5    A.  I excluded April because we -- a definitive set

6    point was never established with my conversations

7    with Mr. Cahill, and so I decided not -- you know,

8    the accuracy would be in question for that, for

9    that week time period, so I chose not to -- to

10   evaluate those bleeder charts.

11   Q.  All right.  So which months did you create

12   summary charts for?

13   A.  Created summary charts for January, February,

14   March, nothing for April, May through December.

15   But with December being a short month, we only

16   had -- the last bleeder valve chart we had,

17   circular chart, was dated December 9th of 2009.

18   Q.  And then the search warrant was executed on

19   December 17th?

20   A.  Correct.

21   Q.  All right.  At this point, Special Agent, I'd

22   like to show you Government Exhibit 201 for

23   identification purposes.  Do you see this document

24   on your screen?

25   A.  Yes, I do.

1   Q.   Just generally, what is this document?

2   A.   Again, this is a summary of the releases for

3   the month of January of 2009 after I evaluated all

4   the pertinent January circular bleeder valve

5   charts.

6   Q.   Did you make this document?

7   A.   Yes, I did.

8   Q.   How did you make this document?

9   A.   Again, I took the set release point from the

10   by-products operator logbook, brought that over

11   into this document, and then I took each bleeder

12   chart and monitored the 24-hour period, any spikes

13   that went above that release point.

14   Q.   Okay.  And what information from the different

15   columns are on this?  What information did you

16   record on this document?

17   A.   I recorded the date of the circular bleeder

18   valve chart, the setting in the by-products

19   operator logbook from the first -- from

20   Exhibit 200, and then again third column is the

21   number of releases that I evaluated on that

22   circular chart in a 24-hour period.  The government

23   exhibit is -- the first government exhibit, number

24   86, is the logbook entry where that set release

25   point was noted, and the page number.  The second

1    government exhibit number is the actual exhibit

2    number for the circular bleeder chart that I

3    evaluated.  And then the column on the right, the

4    comments, is just any -- if there were any issues

5    with the chart or if there was a section missing,

6    you know, I noted it.  I tried to note it in the

7    comment section.

8    Q.   Okay.  So for that information you just

9    described for the jury -- the date, the setting,

10   the number of releases, the government exhibit

11   numbers, and the comments -- does Exhibit 201 here

12   that's on your screen fairly and accurately

13   summarize that information from the January of 2009

14   circular bleeder charts that you reviewed and the

15   by-products operator logbook settings?

16   A.   Yes, it does.

17          MR. MANGO:  Your Honor, pursuant to

18   Federal Rule of Evidence 1006, the government would

19   move Government Exhibit 201 at this point into

20   evidence.

21          MR. LINSIN:  Your Honor, we would renew

22   the objection stated earlier and acknowledge the

23   Court's ruling.

24          MR. PERSONIUS:  I agree, Judge.

25          THE COURT:  Okay.  The objections are

1    overruled for the reasons stated.  Exhibit 201 is

2    received pursuant to Rule 1006.

3              (Government's Exhibit 201 was received

4              into evidence.)

5              MR. MANGO:  Thank you, your Honor.  I

6    would ask that Government Exhibit 201 now be

7    published for the jury.

8              THE COURT:  Yes.

9    BY MR. MANGO:

10   Q.   Okay.  Before we zoom in on any particular date

11   here, Special Agent Conway, can you tell the jury

12   what -- what they're looking at, how this is

13   organized, please?

14   A.   It's organized again by date.  And again the --

15   the next column to the right is the setting for the

16   pressure-release valve, the set point on that

17   particular date.  The next column again is the

18   releases on the bleeder chart that I counted that

19   went up -- that exceeded the setting in the

20   by-products operator logbook.  So any -- for

21   January 1st of 2009, for example, the PRV was set

22   at a release point of 90, so when I evaluated the

23   chart, there were 48 spikes in the chart that went

24   above the pressure setting point on the bleeder

25   chart at the point -- at 90.

1    Q.  All right.  And then there's -- you did that

2    for each day then that you had a bleeder chart in

3    January --

4    A.  Correct.

5    Q.  -- is that correct?

6    A.  Correct.

7    Q.  Okay.  And there's a calculation, it appears,

8    at the bottom?

9    A.  Yes.  At the end, the summary at the bottom is

10   just the number of days that were evaluated, the

11   total number of releases for that time period, and

12   then the average number of days -- or the average

13   number of releases per day over the course of that

14   month time period.

15   Q.  Okay.  All right.  Let's start with -- do you

16   see the entry there for January 1st of 2009?

17   A.  Yes.

18   Q.  Okay.  I'd like to have you, just for an

19   example for that one day, walk the jury through how

20   you analyzed the circular bleeder chart for

21   January 1st of 2009, which you have listed here as

22   Government Exhibit 21.01, is that right?

23   A.  That is correct.

24           MR. MANGO:  All right.  So, at this point,

25   your Honor, I'm going to ask to put the original

1      bleeder circular chart on the Elmo system.

2              THE COURT:  Yes, you may.

3      BY MR. MANGO:

4      Q.  All right, Special Agent Conway, do you see the

5      Exhibit 21.01 on your screen?

6      A.  Yes I do.

7      Q.  All right.  And why don't you walk the jury,

8      please, through -- there is a notation on the

9      left-hand side here which says midnight, is that

10     right?

11     A.  That is correct.

12     Q.  All right.  Walk the jury through how you

13     analyzed this circular bleeder chart for

14     January 1st of 2009, again Government

15     Exhibit 21.01, which is on the screen -- how you

16     analyzed this to create Government Exhibit 201

17     which is now in evidence.

18     A.  Okay.  First of all, you can see the date of

19     January 1st, 2009, there at the center of the chart

20     where there's a hole just below the notation that

21     says bleeder, which tells us it's a bleeder valve

22     chart.  Then you see the concentric rings with

23     readings.  There is a ring for 20, 40, 60, as you

24     go from the center of the chart to my left, or to

25     the left on the chart where I've highlighted them,

1    the 20 and the 40, with a red dot.  As you work

2    out, you see 80 and 100, but there isn't a mark for

3    90, but there's ring between the 80 and the 100

4    mark, and that's the 90 setting for this -- for

5    this bleeder valve circular chart.

6    Q.  If you can put just an arc on the 90 line

7    somewhere?

8    A.  I'm putting it a little bit below.  Actually,

9    it's on the 80, because I know it's a wide line,

10   but it's that next circle to the left of my red

11   line that I just put on the exhibit.  So starting

12   at midnight --

13   Q.  I did that by accident.  I'm sorry.

14   A.  Okay.  It's all right.

15   Q.  Why don't we try that again.  All right.  Go

16   ahead.

17   A.  Okay.  I've established my line.  It's the next

18   line over, which is the 90 setting on this circular

19   bleeder valve chart.  So, beginning at midnight, I

20   would count the number of spikes -- and the spikes

21   are these red lines that you see going vertical.

22   So I would start counting.  So every time that line

23   went above 90, I would count.  So that would be my

24   first count, second, so on and so forth.  I would

25   go around the circular chart completely for a

1     24-hour period and total up the number of spikes

2     that were above the pressure setting of 90.

3     Q.   All right.   And going back to Government

4     Exhibit 201, reading from that, you put 48 releases

5     on that chart?

6     A.   Correct.

7     Q.   And that would reference one release every half

8     hour, approximately?

9     A.   Correct.

10    Q.   Thank you.   If we could actually go back to

11    Government Exhibit 201 at this point?

12        Would it be fair to say, then, for what you

13    just explained you did for January 1st of 2009, you

14    then continued for each of the days in January?

15    A.   That is correct.

16    Q.   This "missing sections" comment here, for

17    1/28/09, can you explain to the jury what that

18    means?

19    A.   The by-products operator has to change these

20    charts, you know, every 24-hour period, and

21    sometimes the -- there would be sections of the

22    chart that would be missing.   There would be a

23    short section where there wouldn't be pen marks.

24    And it could be because they didn't get it changed

25    in time.   It could be the pen ran out of ink.   It

1   could have been a number of different -- but for

2   one reason or another there was a section missing

3   where there were no pen marks on the bleeder valve

4   chart itself.  So I didn't evaluate that.

5   Q.  You didn't assume any type of release or

6   anything during that period of time, would you?

7   A.  No, I did not assume any.

8   Q.  All right.  Okay.  We can take that down now,

9   your Honor.

10      Let me ask you -- the questions are going to be

11   substantially the same.  For February of 2009 did

12   you review the circular bleeder charts, all of the

13   bleeder charts you had for February of 2009?

14   A.  I did.

15   Q.  And based on your review, did you create

16   anything?

17   A.  I created a summary chart of the number of

18   releases for the month of February.

19   Q.  Is it fair to say that your testimony regarding

20   what you did for January of 2009, which is now in

21   evidence, Government Exhibit 201, is substantially

22   the same for what you did for February of 2009?

23   A.  It is.  The same information is recorded, and I

24   evaluated it in the same manner.

25   Q.  All right.  Let me show you for identification

1    purposes Government Exhibit 202.  Do you see that

2    on your screen?

3    A.  Yes, I do.

4    Q.  What is this?

5    A.  It's the summary of -- it's my summary that I

6    did for bleeder releases for February of 2009.

7    Q.  All right.  And with -- similar to the other

8    questions, does the information on here fairly and

9    accurately summarize the information contained in

10   this summary, being the date, the setting of the --

11   from the by-products logbook, the releases, the

12   government exhibit, and the comments?

13   A.  Yes, it is.

14          MR. LINSIN:  Your Honor, I don't mean to

15   interrupt counsel's flow, but if it would help

16   matters along, we would certainly stipulate that

17   Special Agent Conway's responses would be the same

18   to all of this series of exhibits --

19          THE COURT:  February through December?

20          MR. LINSIN:  February through December,

21   and noting our previous objections and

22   acknowledging the Court's rulings.  However counsel

23   wants to do it, but we don't challenge the issues

24   with respect to Special Agent Conway.

25          THE COURT:  Okay.  Same, Mr. Personius?

1          MR. PERSONIUS:  Yes, your Honor.  That

2    would be through, as I understand it, Government

3    Exhibit 211, I think, is December of 2009?

4          THE COURT:  Yes.

5          MR. MANGO:  Yes, your Honor, with that

6    representation on the record, I would move and

7    I'll -- just so the record is clear, Government

8    Exhibit 202, which is for February of 2009 into

9    evidence; Government Exhibit 203, which is for

10   March of 2009; Government Exhibit 204, which is for

11   May of 2009; Government Exhibit 205, which is for

12   June of 2009; Government Exhibit 206, which is for

13   July of 2009; Government Exhibit 207 for August

14   of 2009; Government Exhibit 208 for September

15   of 2009; Government Exhibit 209, which is for

16   October of 2009; Government Exhibit 210, which is

17   for November of 2009; and Government Exhibit 211

18   for December of 2009, all into evidence as

19   summaries of the bleeder charts for those

20   respective months.

21         THE COURT:  Okay.  There's no objection to

22   what you just put on the record.  They will be

23   admitted over objection, however, for the reasons

24   that we discussed previously.  So Exhibits 201

25   through and including Exhibit 211 received into

1    evidence.

2         And, ladies and gentlemen, the government has

3    presented those exhibits in the form of these

4    charts and summaries prepared by Special Agent

5    Robert Conway.  I'm admitting those charts and

6    summaries in place of all of the underlying

7    documents that they represent, so that that really,

8    I think, bottom line, saves time and avoids

9    unnecessary inconvenience.  So from your

10   standpoint, you are to consider those charts and

11   summaries as you would any other evidence.

12             (Government's Exhibits were received into

13             evidence.)

14             MR. MANGO:  Thank you, your Honor.  I'd

15   like to publish Government Exhibit 202 for the jury

16   at this point.

17   BY MR. MANGO:

18   Q.  All right, Special Agent, if we could focus in

19   on this section here.  There's some comments on

20   here that relate to a number 1 with an asterisk.

21   Can you tell the jury what that relates to?

22   A.  Yes.  When I evaluated that circular chart, the

23   plant pressure for the coke oven gas line never

24   went below the set release point on the

25   pressure-release valve for a 24-hour period.  So

1    when I looked at the chart the plant pressure was

2    above -- in that case for February 3rd of 2009, the

3    set release point on the pressure-relief valve was

4    90 centimeters of oil.  Well, the plant pressure

5    for the coke oven gas line was above that 90 the

6    whole 24-hour period.

7    Q.  All right.  And in particular, there were four

8    different days that you noted that, is that right?

9    A.  Correct.

10   Q.  And the last date here is February 8th of 2009?

11   A.  That is correct.

12   Q.  All right.  I'd like to show you -- do you

13   remember reviewing the bleeder circular chart for

14   February 8th of 2009?

15   A.  Yes.

16   Q.  Which you have noted here as Government

17   Exhibit 21.38?

18   A.  Correct.

19           MR. MANGO:  Your Honor, I would like to

20   put this on the Elmo system at this point, please.

21           THE COURT:  Certainly.

22   BY MR. MANGO:

23   Q.  All right, Special Agent, do you see Government

24   Exhibit 21.38 on the Elmo system?

25   A.  Yes, I do.

1    Q.   Okay.  So explain again what was -- based on

2    your understanding of the by-products operator

3    logbook, what was the set point for the bleeder on

4    this day?

5    A.   It was set at 90 centimeters of oil.

6    Q.   Okay.  And so what do you note in terms of the

7    plant pressure in relation to 90 on this chart?

8    A.   The plant pressure remained above 90 throughout

9    the whole 24-hour period on this chart.

10   Q.   Now, let me ask you, in terms of when you were

11   preparing all of these charts, Government

12   Exhibits 201 to 211, that's for the months, if

13   there was a -- a day that the circular chart, say,

14   was admitted into evidence, but you couldn't really

15   read it, how did you factor that into your charts?

16   A.   If I didn't feel like I could evaluate the

17   chart fairly, I excluded it.  There were several

18   with light pen marks.  The pen wasn't keeping an

19   accurate reflection.  Again, I tried to be

20   conservative in how I, you know, handled some of

21   those anomalies.  So I decided not to include those

22   dates into the -- into the summary chart.  So you

23   will find certain months with days missing.

24             MR. MANGO:  All right.  If we could go

25   back, please, your Honor, to Government

1       Exhibit 202.  I'd just like to publish each of

2       these quickly for the jury.

3    BY MR. MANGO:

4       Q.  So this is Government Exhibit 202, Special

5       Agent Conway.  Based on your calculations, what was

6       the average number of releases per day for February

7       of 2009?

8       A.  According to my summary chart, the average

9       releases per day would be 26 for the month of

10      February.

11      Q.  All right.  If we could go to Government

12      Exhibit 203, which is for March of 2009.  Do you

13      see that?

14      A.  Yes, I do.

15      Q.  Okay.  Based on your calculations for March

16      of 2009, what were the average number of releases

17      per day?

18      A.  48.

19      Q.  If we could go to May of 2009, Government

20      Exhibit 204.  Same question.  What was your average

21      number of releases per day calculated at?

22      A.  57.

23      Q.  Okay.  So now here, if we could just note,

24      there seems to be a change from 100 to 110 that

25      occurred on May 22nd of 2009?

1    A.   Correct.

2    Q.   Okay.  So are you saying if we then went to

3    this Exhibit 88-0021, there would be a notation

4    that the bleeder was set -- changed to 110?

5    A.   There wouldn't be a notation on the bleeder

6    chart itself.

7    Q.   Not on the bleed -- I misspoke.  I'm sorry.  In

8    the by-products operator logbook, which 88-021

9    would reference back to.

10   A.   Correct.

11   Q.   Okay.  If we could go to Government Exhibit 205

12   for June of 2009, what was the average number of

13   releases you calculated per day for June?

14   A.   For June it was 50.

15   Q.   Let's go to July of 2009.  Government

16   Exhibit 206.  Same question.

17   A.   That number would be 30.

18   Q.   Let's go to August of 2009, Government

19   Exhibit 207.  What did you calculate for August

20   of 2007?

21   A.   For August it would be 12.

22   Q.   Government Exhibit 208, which is for September

23   of 2009, what was your calculation there?

24   A.   17.

25   Q.   Government Exhibit 209 for October of 2009,

1    what was your calculation there?

2    A.    48.

3    Q.    Government Exhibit 210, which is for November

4    of 2009, what did you calculate as the average

5    number of releases per day for November?

6    A.    57.

7    Q.    And finally, Government Exhibit 211 for

8    December of 2009, what did you calculate the

9    average number of releases per day?

10   A.    48.

11   Q.    Okay.  And this is your last summary chart?

12   A.    Correct.

13   Q.    And there was no -- again, let me just clarify.

14   There was no bleeder charts obtained past

15   December 9th of 2009?

16   A.    There were no bleeder charts beyond that date.

17            MR. MANGO:  Your Honor, may I have one

18   moment, please?

19            THE COURT:  Certainly.

20            MR. MANGO:  Nothing further for Special

21   Agent Conway, your Honor.

22            THE COURT:  Okay.  Do you want to break

23   for a few minutes or --

24            MR. LINSIN:  It's up to you, Judge.

25   Whatever you want to do.

1              THE COURT:  Do you want a break?  Okay.

2    Let's take -- let's resume at 4:15.

3              (Jury excused from the courtroom.)

4              THE COURT:  Okay.  4:20.  That will give

5    Michelle time to run and get back.

6              (Short recess was taken.)

7              THE COURT:  I think we're going to be able

8    to have argument on the Rule 29 today, so you can

9    get some sleep tonight.

10       Okay.  I think your intention was to give me

11   your briefs after argument, or was it your

12   intention to give it to me before?

13             MR. LINSIN:  Your Honor, we have revised

14   this document earlier this morning.  We will be

15   prepared to file it electronically as soon as we

16   get back to our hotel.  We don't have -- we have a

17   hard copy of an earlier version, and so we will

18   have to file electronically once we get back to the

19   hotel.

20             THE COURT:  That's okay then, because

21   otherwise I wouldn't get it until tomorrow anyway.

22             MR. LINSIN:  Exactly.  Right.

23             THE COURT:  You don't mind if I hear you

24   out today?

25             MS. GLASNER:  Not at all.

1            THE COURT:  Mr. Personius?

2            MR. PERSONIUS:  Yes, I'm ready to go,

3    Judge.

4            MR. MANGO:  Yes, we're ready, your Honor.

5            THE COURT:  Okay.  All right.  Chris, if

6    you wouldn't mind bringing the jury in, please.

7        Mr. Conway, you're ready for cross-examination?

8            THE WITNESS:  Yes, I am, your Honor.

9            (Jury seated.)

10           THE COURT:  Welcome back.  Please have a

11   seat.

12       Okay.  All of the attorneys and parties are

13   back present.  Agent Conway is back on the stand.

14   You are here, ladies and gentlemen, roll call

15   waived.  And it looks like Mr. Personius is ready

16   for cross-examination.

17       Agent Conway, you remain under oath.

18   CROSS-EXAMINATION BY MR. PERSONIUS:

19   Q.  Good afternoon, Agent Conway.

20   A.  Good afternoon, Mr. Personius.

21   Q.  With respect to the -- the summaries, the

22   monthly summaries that you prepared, the accuracy

23   of those summaries in calculating monthly releases

24   would be dependent upon the accuracy of the logbook

25   with respect to changes in the set point for the --

1   the PRV recorder.  Do you agree with that?

2   A.   You need to have the -- the set release point

3   document -- documented to accurately assess the

4   bleeder charts.

5   Q.   And to the extent that that -- that logbook,

6   the by-product operators logbook, to the extent

7   that that doesn't record accurately every change in

8   the set point of the recorder for the PRV, your

9   summary is not going to be accurate.  Do you agree?

10  A.   No.  During the course of my investigation, the

11  by-products operators were very definitive in

12  saying that they reflect any adjustments made to

13  the PRV release set point in those logbooks.

14  Q.   And the information you're providing to us now

15  is information you obtained outside the courtroom,

16  sir?

17  A.   It's information during the course of my

18  investigation.

19  Q.   Outside the courtroom?

20  A.   Outside the courtroom.

21  Q.   Not obtained under oath.

22  A.   Not obtained under oath.

23  Q.   You sat here in the courtroom and you've heard

24  the testimony that's been given by the witnesses?

25  A.   Correct.

3081

1    Q.   You've heard Mr. Cahill, the by-products
2    foreman, testify about the by-product operators
3    logbook, do you recall that?
4    A.   I do.
5    Q.   And do you recall that he testified that while
6    it might be ideal to have all the set point changes
7    recorded in the operators logbook, in practice that
8    doesn't happen?
9    A.   I do not remember him stating it that way.   I
10   remember him saying that the by-products operators
11   were pretty -- were diligent in putting in entries.
12   Q.   Were pretty diligent?
13   A.   Were diligent.
14   Q.   Not pretty diligent?
15   A.   Well, diligent.
16   Q.   And as far as Mr. Cahill is concerned, you
17   remember he testified that he too -- and in
18   actuality he's the one that should make the changes
19   to the set point, right?
20   A.   Again, that's not what I remember hearing
21   witnesses testify.   There were other people that
22   have made adjustments or ordered by-products
23   operators to make adjustments to the set release
24   point.
25   Q.   Let's focus on the testimony of Mr. Cahill --

1    A.   Okay.

2    Q.   -- and not other witnesses.

3    A.   Okay.

4    Q.   He was the by-products foreman for the period

5    that's covered by the indictment, true?

6    A.   Correct.

7    Q.   And certainly was the foreman during the 2009

8    period that you purport to summarize in these

9    exhibits, true?

10   A.   Correct.

11   Q.   And do you remember that he testified that one

12   of his duties is to change the set point on the

13   recorder for the PRV?  Do you remember he testified

14   to that?

15   A.   He could adjust it, yes.

16   Q.   Not that he could.  He said that was one of his

17   duties on direct examination.  Do you remember

18   that?

19   A.   I remember it as he sometimes changed it,

20   not -- it wasn't always him.

21   Q.   And did he also testify that when he made the

22   changes he would not record them in the logbook?

23   A.   My recollection of his testimony is he did not

24   change it during the April 2009 inspection.  He was

25   not clear on other -- at other time periods.

1    Q.  Do you remember him testifying that he would

2    make changes and they would not be recorded in that

3    logbook?  Do you remember that?

4    A.  As I said earlier, he stated that he did not

5    make the changes during the April 2009 inspection

6    when he adjusted the set point.

7    Q.  And you don't remember the other testimony.

8    You don't remember him saying that he would make

9    changes, part of his responsibility to do so, and

10   he would not record it in the logbook, you don't

11   recall that?

12   A.  I -- I don't.

13   Q.  All right.  Could we go to -- this is, as I

14   understand it, in evidence, Lauren.  It's

15   Government Exhibit 88, which should be one of these

16   logbooks, Judge, and I have that in evidence.

17       And Government Exhibit 88 is the logbook for

18   5/10/09 to 9/26/09, is that true?

19   A.  Correct.

20   Q.  All right.  Could we go to page 122, please.

21       Do you see that this is one of the pages of

22   this logbook?  It's dated 7/30/09?

23   A.  Correct.  At the top of the page it does say

24   7/30/09.

25   Q.  All right.  And, Lauren, could you make that

1    part higher, please?

2        Do you see the -- the first note in the

3    left-hand margin?

4    A.   Yes, I do.

5    Q.   And do you see what it says after that?  That

6    one of the operators wrote, "We do have radios and

7    a phone.  If Mr. Cahill makes an adjustment on

8    anything, I believe it would be appropriate to

9    inform operators."  Do you see that?

10   A.   Yes, I do.

11   Q.   And do you agree with me that what's being

12   referred to there is adjustments in the set point

13   for this recorder?

14   A.   I don't agree with that, necessarily.

15   Q.   Well, why don't you tell the jury what was

16   being referred to there.

17   A.   I cannot state what -- what the referral is

18   there.  I know there is a lot of charts -- during

19   the course of the search warrant there was a lot of

20   other charts seized during execution of the search

21   warrant, so there's many different things that can

22   be changed systemwise within the by-products

23   department.  There's no specific reference in this

24   note about the bleeder valve adjustment.

25   Q.   And if, indeed, Mr. Cahill testified during his

1    examination that he would make changes and not
2    record it, this entry would be directly consistent
3    with that, wouldn't it?
4    A.   I cannot make that judgment, because I don't
5    know -- you know, I don't have a reference point
6    for what this note is stating.
7    Q.   Could we go, please, Lauren, to Government
8    Exhibit 200, which is in evidence.
9         This is the summary you prepared, Agent Conway,
10   of the by-product operators logbook, correct?
11   A.   Correct.
12   Q.   And you have indicated to the jury that what
13   you set out in this summary is your interpretation
14   of all the entries in the by-product operators
15   logbooks as to changes in the set point for this
16   recorder, is that true?
17   A.   It's not an interpretation.  It's document --
18   it's documented changes of the set release point in
19   the by-products operator logbooks.
20   Q.   And it did not involve any interpretation at
21   all on your part, is that what you're telling the
22   jury?
23   A.   Not -- not to the -- as far as the -- the set
24   point for the pressure-release valve, no.  It was
25   either -- it was in there or it was not in there.

1    Q.   Okay.  If we could, Lauren, please make those

2    entries bigger.

3         You have in your summary an entry for 8/29/07.

4    Do you see that?

5    A.   Correct.

6    Q.   And what the entry indicates is "Bleeder now at

7    80," is that right?

8    A.   Correct.

9    Q.   And the very next entry, which is at 10/7/07,

10   which would be about a month later --

11   A.   Correct.

12   Q.   -- says, "Lowered bleeder to 90 as per

13   D. Heukrath."

14   A.   Correct.

15   Q.   Do you agree there is an inherent inconsistency

16   there?

17   A.   I agree that you can't lower a bleeder valve to

18   90 when the earlier entry states it's 80.

19   Q.   So do you agree that your summary has a

20   demonstration in it that the by-product operators

21   logbook that you relied upon to create your summary

22   is incomplete regarding these set point changes?

23   A.   I will admit that there is a discrepancy in the

24   entries for this time period, but there was no such

25   discrepancy in the time period for which I

1    evaluated -- did my evaluation, my summaries.

2    Q.   And the period that you did your summaries for

3    was from when to when?

4    A.   The period for my summaries was January 1st

5    of 2009 to December 9th of 2009.

6    Q.   Okay.  And could we go for a minute, Lauren,

7    please, to Government Exhibit 201 in evidence.

8        For Government Exhibit 201 in evidence, this is

9    your -- your summary of what you interpreted as

10   releases for January of 2009?

11   A.   Correct.

12   Q.   And you indicate consistently that the setting

13   from the BP logbook was at 90?

14   A.   Correct.

15   Q.   Can we go now to Government Exhibit 200 again,

16   please, Lauren.  This is in evidence.

17       Show the jury, please, where you get the -- the

18   90 reading that you used for January of 2009.

19   A.   The 90 set release point value is based upon

20   the September 30th, 2008, entry in my summary

21   chart.  That's the last entry prior to January 1st

22   of 2009.

23   Q.   All right.  Could you put an arrow there?  Are

24   you able to do that?

25   A.   A dot or --

3088

1    Q.   Whatever you can do.

2    A.   Sure.  It's a little low.

3    Q.   Thank you.  Now, if we take these entries --

4    and make that bigger, please, Lauren.

5        The entry, Agent, that you indicated you relied

6    upon for the first period covered in your summary

7    assumes a set point of 90 based on an entry back on

8    9/30 of '08, is that true?

9    A.   That is correct.

10   Q.   And the comment that you take from the logbook

11   is, "Bleeder now at 90."  Do you see that?

12   A.   Yes, I do.

13   Q.   And if we look at the next entry on 3/2/09, it

14   indicates, "Lowered bleeder to 94."

15   A.   Correct.

16   Q.   Do you see the inconsistency?

17   A.   The bleeder valve was set at 90 in September

18   8th -- or excuse me, September 30th, 2008, and

19   there is an entry that it was lowered to 94 on the

20   2nd of March of 2009.

21   Q.   So you missed at least one change in the set

22   point between September 30th of 2008 and March 2nd

23   of 2009, true?

24   A.   There is -- there is obviously a set point

25   that's not listed in the logbook.

1    Q.   And this time it is covered by your summaries,

2    true?

3    A.   It is.

4    Q.   And that covers not only January of 2009 but

5    also February of 2009, which also relies upon the

6    entry from September 30th of 2008, true?

7    A.   No.

8    Q.   All right.  Well, let's go to Exhibit 202 in

9    evidence, please.

10        Government Exhibit 202 in evidence, in the

11   second column you reflect a set point for 90 for

12   the entire month.

13   A.   Yes.

14   Q.   And what was the source of the set point that

15   you relied upon for your chart?

16   A.   I was still using the September 30th, 2008, set

17   point.

18   Q.   Which is the one that is contradicted by the --

19   the next entry in your own chart, which says that

20   the bleeder was lowered to 94 on March 2nd of 2009,

21   true?

22   A.   There is a discrepancy in the logbook, yes.

23   Q.   And again it covers another month of your

24   summary, true?

25   A.   I cannot -- you know, I cannot state that.

1    Q.   You can't state what, sir?

2    A.   You know, that I don't know what the prior

3    setting was at prior to 3/2/09.

4    Q.   We know, don't we, from the entries that we

5    have, that sometime between September 30th of 2008

6    and March 2nd of 2009 that set point was changed to

7    something, at least once if not more than once, but

8    at least once, to some level that was above 94,

9    correct?

10   A.   It would appear that the set point at some

11   point was above 94 at one point.

12   Q.   Yes.  And at some point before March 2nd

13   of 2009.

14   A.   Not necessarily.

15   Q.   When could it have been, sir, if it wasn't

16   before March 2nd of 2009, when it says, "Lowered

17   bleeder to 94"?

18   A.   Well, the reason I state that is, when I

19   reviewed the logbooks, when they do an adjustment

20   in the set point very close together, there's

21   usually some sort of problem within the facility.

22   So it's possible that they raised the bleeder set

23   point on March 2nd and then lowered it back down.

24   Because there's several notations where there's

25   adjustments in a very short period of time when

1      there's problems in the facility.

2      Q.   Are you telling us, Agent, that in interpreting

3      your summary and deciding what weight to give to

4      it, the jury should take into consideration that

5      you relied upon possibilities?

6      A.   No.  I relied on what the last set point was

7      for the entry, and that's how I did my evaluation.

8      Q.   And didn't pay attention to the inherent

9      inconsistency in what you relied upon versus what

10     the logbook shows?

11     A.   I paid attention to it.  I obviously knew that

12     there were -- noted the -- the -- as you did, that

13     the bleeder valve was lowered to 94 at one point,

14     but I can't interpret -- if I start doing a lot of

15     interpretation, I'm doing things that are outside.

16     I went strictly by what was in the logbook, last

17     entry to the next entry, to keep things consistent.

18     Q.   You testified, sir, about a circular chart from

19     February 8 of 2009 that showed a continuous -- if

20     you will, a continuous peak all the way around the

21     chart, do you remember that?

22     A.   I remember talking about that chart, yes.

23     Q.   Okay.  Lauren, let's try do it with just the --

24     the screen, if we can.  Government Exhibit 21.38 in

25     evidence.  Well, it really isn't as good, is it?

1    First I guess we should get the date of this.

2    Could you make that larger, Lauren?

3        Do you see the date on there, Agent Conway?

4    A.   Yes, I do.

5    Q.   And it's 2/8/09?

6    A.   Yes, it is.

7    Q.   Would you put it back, Lauren, please, and then

8    do what we can, please, to make the chart itself

9    bigger.

10       It's harder to see than on the -- the original,

11   but for purposes of moving this along, do you

12   remember this was the chart where you've testified

13   that the -- what's reflected by the recorder is

14   consistent all the way around and above what you

15   understand the set point was on that date?

16   A.   That is correct.

17   Q.   And is it your conclusion that this means that

18   the -- the release valve was wide open for the

19   entire day?

20   A.   I don't make -- I did not make any conclusion.

21   I'm just noting that the plant pressure, as noted

22   on the circular bleeder chart, consistently stayed

23   above the set point as established -- the last set

24   point as established in the logbook.

25   Q.   So you don't mean to suggest to the jury that

```
 1    that valve was wide open for 24 hours, do you?
 2    A.  That's -- I'm not making that suggestion.  I'm
 3    just saying that the plant pressure was above the
 4    set point.
 5    Q.  And if the plant pressure was above the set
 6    point, aren't you suggesting to the jury, then,
 7    that the valve was open for 24 hours?
 8    A.  It would be a concern.  Certainly, if the set
 9    release point is set at 90 and the plant pressure
10    is 120, you know, there is a likelihood that that
11    pressure-release valve was emitting coke oven gas.
12    But I cannot physically -- you know, I wasn't
13    physically present to observe it.
14    Q.  And you agree the jury shouldn't make its
15    determination based on what you think was a
16    likelihood, correct?
17    A.  I just summarized the data to present to the
18    jury.  That is not a decision I get to make.
19    Q.  As part of your investigation did you determine
20    how much coke oven gas is produced in a day by
21    Tonawanda Coke?
22    A.  I did not.  No.
23    Q.  And did you make a determination of how much
24    coke oven gas would be lost if that valve was
25    actually wide open for 24 hours?
```

1    A.  Based upon some of the investigative data that

2    I looked at, it would be a lot of coke oven gas.

3    Q.  It would be more coke oven gas than Tonawanda

4    Coke would generate in 24 hours, wouldn't it?

5            MR. MANGO:  Objection, your Honor.

6            THE WITNESS:  That, I could not speak to,

7    sir.

8            MR. MANGO:  I'll let the answer stand.

9    BY MR. PERSONIUS:

10   Q.  Now, as part of preparing -- and when did you

11   prepare these -- these summary charts?  When did

12   you do this?

13   A.  I've been working on them for a long time over

14   the last -- over the course of the last month.

15   Q.  All right.  So during the course of the trial?

16   A.  Yes.

17   Q.  And so the jury understands, in preparing these

18   charts, did you rely upon information outside of

19   the testimony that's been presented here at trial?

20   A.  Yes, I did.

21   Q.  All right.  And what was the nature of that

22   outside evidence that you relied upon?

23   A.  Well, when I composed the by-products operator

24   logbook summary, there were notations made in that

25   logbook related to the bleeder valve.  And so as we

1    continued our investigation --

2    Q.   Who's "we"?

3    A.   Myself, I should say.  And my colleague, Bob

4    O'Connor, if we were working in concert when we

5    were interviewing people.  I would ask, you know,

6    the by-products operator who made the log entry if

7    they remembered what -- what the notes meant, so --

8    Q.   Did you make a -- keep notes of those separate

9    conversations you had outside of this courtroom

10   that went into preparing this summary?  Do you have

11   that information somewhere?

12   A.   They would be part of my, you know, interview

13   notes for the by-products operators and, you know,

14   by-products supervisor.

15   Q.   And the individuals that you spoke to that you

16   got this information from, did they all testify in

17   this trial?

18   A.   No, they did not.

19   Q.   So we don't have the benefit of seeing them on

20   the witness stand under oath, true?

21   A.   Correct.

22   Q.   Now, your -- let's go, if we could, please,

23   Lauren, to Government Exhibit 200.

24        And this, according to you, sets out, from your

25   review of these logbooks, all the instances where a

1    record was made of a change in the set point for

2    the recorder, is that true?

3    A.   That was noted in the by-products operator

4    logbook.

5    Q.   All right.  And can we agree, getting back to

6    Mr. Cahill, that none of the entries that you've

7    identified were entries made by Mr. Cahill?

8    A.   I do not recall a specific entry done by

9    Mr. Cahill.  Several have noted per Pat Cahill's

10   instructions, but --

11   Q.   So the jury understands, those entries were not

12   made by Mr. Cahill, were they?

13   A.   They were not.

14   Q.   One was made by Maurice London, and one was

15   made by Jose Ortiz, who are by-products -- or were

16   by-products operators, correct?

17   A.   Correct.

18   Q.   So there's not a single entry in your summary

19   of a set point change made by Mr. Cahill.

20   A.   There was not.

21   Q.   And yet he testified that his job -- one of his

22   job duties was to make changes to the pressure set

23   point, true?

24   A.   He made -- you know, he ordered operators to

25   change the set point.

1    Q.   When was the last time that that recorder was

2    calibrated?

3    A.   To my knowledge through the course of talking,

4    it has never been -- it hasn't been calibrated any

5    time since it's been purchased, that anyone could

6    recall.

7    Q.   Do you agree that would have an effect upon the

8    accuracy of the readings you were getting off the

9    recorder?

10   A.   Again, I cannot make that call.  It has not

11   been calibrated.  I cannot make a determination on

12   the accuracy or inaccuracy of it.

13   Q.   The reason you made the inquiry during your

14   investigation, because it was important to you to

15   know when it had been calibrated, right?

16   A.   It's always good to check and see what kind of

17   maintenance a facility does on their equipment.

18   Q.   Because calibration or a lack of calibration

19   would affect the accuracy of the instrument, true?

20   A.   It could.

21   Q.   Could we go, please, Lauren, to Government

22   Exhibit -- well, we're on 200.

23        Now, you have an entry on 2/23/08, correct?

24   A.   Correct.

25   Q.   And then your next entry is 5/31/08, right?

```
1    A.   It depends on whether you were looking at the

2    2/23/08 90 or the 2/23/08 100 set release point,

3    but following that, yes, there is a May 31st entry.

4    Q.   Thank you.  And nothing in between?

5    A.   Nothing in between.

6    Q.   Lauren, could we please go to Government

7    Exhibit 85?

8         This is one of the logbooks that you reviewed?

9    A.   Yes.

10   Q.   Can we tell what time period this covers or no?

11   Can you tell?

12   A.   Not definitively.  Go to the inside of the

13   first page.  It will give you the start date, at

14   least.

15   Q.   Could we go to the next page, please, Lauren?

16   A.   And one more page.

17   Q.   Now we're on 03?

18   A.   Correct.

19   Q.   Can you read that or no?

20   A.   It looks like it's 12/17/07.

21   Q.   I think that's right.

22        Could we go to page 179 of this exhibit,

23   please.

24        And this is a -- can you read that?  This is --

25   I'm sorry.  Could we go to 170, Lauren.  I'm sorry.
```

3099

1    I misspoke.

2       Can you read what date these entries are?

3    A.   It looks likes it's May 22nd of 2008.

4    Q.   Okay.  And, Lauren, could we please make this

5    part bigger?

6       Do you see there is an entry there that says

7    "note" in the left margin?

8    A.   Yes.

9    Q.   And then it says "PC raised suction"?

10   A.   Correct.

11   Q.   And "Lowered gas bleeder"?

12   A.   Correct.

13   Q.   This would be an entry that would show a change

14   in the set point, true?

15   A.   Possibly.

16   Q.   You don't read the entry "Lowered gas bleeder"

17   to be an indication the set point was changed for

18   the recorder?

19   A.   Unless -- I mean, it could potentially be the

20   bleeder valve.

21   Q.   Can we agree you missed this one in your

22   summary?

23   A.   Again, I didn't miss it, from the standpoint of

24   there is no set value.

25   Q.   You didn't include it in your summary?

3100

1     A.   I did not include it in my summary, no.

2     Q.   Could we go, please, to -- Lauren, to

3     Exhibit 87.

4          This is another one of these logbooks, Agent

5     Conway?

6     A.   Yes.

7     Q.   Okay.

8     A.   Sorry.

9     Q.   That's okay.  Can you see the date off the --

10    the face page of this?

11    A.   No, you can't.

12    Q.   Okay.  Could we go to the next page, please,

13    Lauren, and then the page after that, please.

14         And this is page 03, Agent Conway?

15    A.   Yes, it is.

16    Q.   Okay.  Can you read the date at the top?

17    A.   Looks like it's December 31st of 2008.

18    Q.   Okay.  And could we go to page 115, please,

19    Lauren.

20         This -- this entry is for what date?

21    A.   March 13th of 2009.

22    Q.   And this would be within the -- the period

23    covered by your summary?

24    A.   Correct.

25    Q.   Okay.  Lauren, please, if you would --

1       Do you see there's a -- a note in the left

2   margin?

3   A.   Yes, I do.

4   Q.   And then the entry reads, "Bleeder manometer

5   blew out 4:00 a.m., steamed out bleeder."  Do you

6   see that?

7   A.   Yes, I do.

8   Q.   And do you know what the bleeder manometer is?

9   A.   It's the device that, again, monitors the

10  pressure.  The kerosene -- the oil centimeters is

11  in kerosene, is contained in that manometer, and

12  it's my understanding if the pressure release --

13  or, excuse me, the plant pressure goes above a

14  certain point, the manometer can misread; it can

15  get stuck.

16  Q.   Okay.  So we have an instance here where in

17  some fashion the manometer was not performing

18  properly.

19  A.   Correct.

20  Q.   And steps were taken to steam out the bleeder?

21  A.   It would appear, yes, to steam out the valve

22  itself.

23  Q.   It specifically says "Steamed out bleeder,"

24  right?

25  A.   Correct.

1    Q.   And we've had testimony about what that

2    involves, right?

3    A.   About equipment being steamed out, correct.

4    Q.   Including the pressure-relief valve, right?

5    A.   In this case, obviously, steamed out the

6    bleeder.

7    Q.   Okay.  And did you take into consideration in

8    preparing your summary that the bleeder manometer

9    had blown out at 4:00 a.m. on March 13th of 2009?

10   A.   We did consider -- consider it, yes.

11   Q.   Did you put it in your summary?

12   A.   I did not put it in my summary.  No, I did not.

13   Q.   You made a judgment that it didn't have to be

14   put in there?

15   A.   Again, there's no set release point in this --

16   in this entry, so I did not include it in my chart.

17   Q.   Could we go, please, Lauren, to page 191 of

18   this exhibit.

19        Can you tell us the date, please?

20   A.   It's May the 6th, 2009.

21   Q.   Okay.  And could you make that part bigger,

22   please, Lauren?

23        And again this is from May 6th of 2009, Agent?

24   A.   Yes, I believe that was the date.

25   Q.   And you see the note in the left margin again?

1    A.   Yes, I do.

2    Q.   And this time it says, "Manometer for bleeder

3    popped blood vessel on reversal on jack.  Closed

4    valve, removed stainless line.  It settled down to

5    zero.  Hooked back up.  Seems to okay now."

6    A.   Yes, I see that.

7    Q.   This would be another instance where there was

8    a malfunction in this -- in this recorder, is that

9    right?

10   A.   In the manometer, yes.

11   Q.   Okay.  You didn't include this in your summary,

12   did you?

13   A.   I did not, no.

14   Q.   You -- again, you made a judgment that this

15   wasn't important?

16   A.   Again, as I stated before, there's no set

17   release value here, so I did not put it in my

18   summary.

19   Q.   And could we, please, Lauren, go to Government

20   Exhibit 88.

21        And this is a logbook that covers a period

22   May 10 to September 26, 2009?

23   A.   Correct.

24   Q.   And this would be within the period of your

25   summaries?

1    A.  Yes, it would be.

2    Q.  Okay.  Lauren, could we please go to page 21?

3        Up at the top, please, Agent, tell the jury

4    what date this is.

5    A.  This is May 22nd of 2009.

6    Q.  Okay.  And, Lauren, could you please make that

7    bigger?

8        Do you see the -- again, Agent Conway, there's

9    a note in the left margin?

10   A.  Yes, I do.

11   Q.  And the entry is, "Bleeder back in service

12   11:00 a.m., 110 cm."  Do you see that?

13   A.  Yes, I do.

14   Q.  Can we agree that that means that there was

15   some period of time -- we don't know exactly how

16   long -- that the bleeder was out of service?

17   A.  There was -- it definitely notes there was a

18   problem with the bleeder, yes, and it was put back

19   in service at 11:00 a.m.

20   Q.  And did you include that in your summary?

21   A.  I included the 110 centimeters, yes, in my

22   summary.

23   Q.  Did you include the fact that the bleeder had

24   been out of service?

25   A.  Again, I have no reference on the time frame of

1    how long the bleeder was out of service.

2    Q.  Let me ask my question again.  Did you include

3    that information in your summary?

4    A.  The note -- the comment, I believe, is in

5    there, but I did not factor that into my summary.

6            MR. PERSONIUS:  Your Honor, may I have a

7    minute, please?

8            THE COURT:  Sure.

9            MR. PERSONIUS:  Thank you.

10       Lauren, you can take that down.  Thank you.

11       Your Honor, we have nothing further.

12            THE COURT:  Okay, Mr. Personius.  Thank

13   you.

14       Mr. Linsin?

15            MR. LINSIN:  No questions, your Honor.

16   Thank you.

17            THE COURT:  Okay.  Mr. Mango?

18            MR. MANGO:  Yes, your Honor, thank you.

19   Brief couple of questions here.

20   REDIRECT EXAMINATION BY MR. MANGO:

21   Q.  Special Agent Conway, good afternoon again.

22   A.  Hello.

23   Q.  Those notations that were brought to your

24   attention, had you seen those before today?

25   A.  Yes.

1   Q.  And you made a judgment call not to include

2   those in your summary, is that right?

3   A.  I did.

4         MR. PERSONIUS:  Your Honor, I object to

5   the leading.

6         THE COURT:  It is leading, yes.

7   BY MR. MANGO:

8   Q.  Okay.  Can you tell the jury whether you

9   included those notations that were brought to your

10  attention -- whether you included those in your

11  summary or not?

12  A.  For the most part I did not include them in my

13  summary, because there was no set release point --

14  change in the set release point value, with the

15  exception of the -- the last entry, which noted a

16  set point of 110 centimeters.

17  Q.  Okay.  And the manometer on the bleeder, if it

18  pops, do you have an understanding of whether the

19  bleeder itself is actually still in operation?

20  A.  According to the -- the information that --

21  that I gathered during the course of my

22  investigation, the bleeder valve is still operable.

23        MR. MANGO:  Okay.  Nothing further, your

24  Honor.  Thank you.

25        THE COURT:  Okay.  Mr. Personius?

1          MR. PERSONIUS:  No, thank you, Judge.

2          THE COURT:  Mr. Linsin?

3          MR. LINSIN:  No, thank you, your Honor.

4          THE COURT:  Okay.  Agent Conway, you are

5     excused.  Thank you.

6          THE WITNESS:  Thank you, your Honor.

7          MR. MANGO:  Your Honor, the government

8     rests.

9          THE COURT:  Subject to settling of the

10    record?

11         MR. MANGO:  Subject to the settling of the

12    record and any obvious rebuttal after -- if

13    necessary.

14         THE COURT:  Okay.  Okay.  Ladies and

15    gentlemen, what you have now is what in the

16    government's view is sufficient to submit to you

17    for your determination in terms of whether it has

18    satisfied to your unanimous satisfaction by a proof

19    standard of beyond a reasonable doubt each

20    essential element of each crime charged in the 19

21    counts, under separate consideration of each

22    defendant respectively.

23       With that, and you know that the burden of

24    proof rests exclusively on the government.  There's

25    no burden on the defense.  The defendants are

1      presumed innocent and continue to be innocent and

2      presumed that way until proven to your satisfaction

3      otherwise beyond a reasonable doubt.  No burden on

4      the defense at all.

5          What we're going to do today is gather up and

6      we're going to let you go for the evening.  We're

7      going to have you come back on Wednesday, okay?

8      And on Wednesday I'll give you a little bit more

9      information in terms of whether or not there will

10     be a defense case.  There's no obligation for there

11     to be one, but, we'll know a little bit more in

12     terms of just timewise what this case will consist

13     of before it will be submitted to you for your

14     consideration and reaching your unanimous verdict

15     in this case.  So you get a day off.  And -- all

16     right.  And we'll see you on what day?

17               THE JURY:  Wednesday.

18               THE COURT:  Okay.  At what time?

19               THE JURY:  9:30.

20               THE COURT:  9:30.  Keep your minds open.

21     Don't prejudge the case.  Remember, this case is

22     going to involve the application of your common

23     sense, your experience, and your intelligence to

24     resolving the fact issues, because you are about to

25     become the judges of the facts in this particular

1    case.

2       Don't go to any social media.  Don't read

3    anything.  Don't investigate anything.  The

4    government says right now you have everything that

5    has been presented to you in the four walls of this

6    particular courtroom which should be sufficient for

7    you to make your decision.

8       There will be closing arguments in this case,

9    as well, where the attorneys will get the

10   opportunity to convince you through their advocacy

11   as to what the evidence has shown or not in this

12   particular case.  So we have some things to look

13   forward to in this case in terms of whether or not

14   there may be a defense case, and certainly the

15   closing arguments in this case.

16      Anything else, Mr. Linsin, at this point?

17           MR. LINSIN:  No, thank you, your Honor.

18           THE COURT:  You're welcome.

19   Mr. Personius?

20           MR. PERSONIUS:  No, your Honor.  Thank

21   you.

22           THE COURT:  Mr. Mango?

23           MR. MANGO:  No, thank you, your Honor.

24           THE COURT:  And Mr. Piaggione?

25           MR. PIAGGIONE:  No, thank you, your Honor.

1          THE COURT:  Okay.  You want to go home?

2     All right.  See you Wednesday.  Thank you very

3     much.

4               (Jury excused from the courtroom.)

5               (Short recess was taken.)

6               (The following argument was electronically

7               recorded.)

8          THE COURT:  Okay.  The attorneys and

9     parties are back present.  And my understanding is

10    there is to be a Rule 29 motion, and Mr. Glasner,

11    you are going to argue the motion for the defendant

12    Corporation Tonawanda Coke?

13         MR. GLASNER:  That's correct.

14         THE COURT:  Please, if you would.

15         MR. GLASNER:  Can I proceed, your Honor?

16         THE COURT:  Certainly.

17         MR. GLASNER:  Good afternoon.  At this

18    time Tonawanda Coke would like to move with respect

19    to all of the counts in the indictment for a

20    judgment of acquittal under Rule 29 of the Federal

21    Rules of Criminal Procedure.  Mr. Personius has

22    informed me that he joins Tonawanda Coke in this

23    motion, and while he will be addressing the Court

24    as well, he joins in the arguments that I'm now

25    about to make.

1          THE COURT:  All right.  Has he heard those

2    arguments?

3          MR. GLASNER:  He has, your Honor.

4          THE COURT:  He has, okay.  Thank you.

5          MR. GLASNER:  With respect to Counts 11

6    through 15 and 17 through 19, your Honor, it is our

7    view that the evidence on the record is such that

8    no reasonable juror could find that the government

9    has proved all of the elements of the offense

10   beyond a reasonable doubt.

11      I'd like to focus my comments, however, on

12   Counts 1 through 5, which relate to the alleged

13   operation of the PRV, and Counts 6 through 10,

14   which relate to the quench tower number 1 at

15   Tonawanda Coke.

16          THE COURT:  Okay.  So 6 through 10, and --

17          MR. GLASNER:  1 through 5.  And I focus my

18   arguments in the submission that would be submitted

19   to the Court after this argument on those counts as

20   well.

21          THE COURT:  Okay.

22          MR. GLASNER:  And the reason why I'm so

23   focused on those specific counts is because, in our

24   view, the testimony on the record with respect to

25   the issues for those categories of the counts is

1    uncontroverted, that is, there's no weighing of

2    witness credibility or balancing of contradictory

3    testimony with respect to the issues that we

4    believe make the government's offer of proof and

5    the allegations in the indictment fatally flawed

6    with respect to Counts 1 through 5 and 6 through

7    10.

8             THE COURT:  All right.  6 through 10 again

9    is the western quench tower number 1 --

10            MR. GLASNER:  That's correct.

11            THE COURT:  -- those charges, right.  And

12   then 1 through 5 is the --

13            MR. GLASNER:  Operation of the pressure

14   relief valve.

15            THE COURT:  Right.  In terms of the COG,

16   the C-O-G.

17            MR. GLASNER:  That's correct, your Honor.

18            THE COURT:  Okay.

19            MR. GLASNER:  So with respect to Counts 1

20   through 5, that is the operation of the pressure

21   relief valve, the allegation in the indictment is

22   that the pressure relief valve -- and I'm

23   paraphrasing here -- is an unpermitted emission

24   source -- it's an unpermitted emission source that

25   was operated in violation of condition four to

1    Tonawanda Coke's Title V operating permit.

2        And the testimony on the record by the

3    government's expert witnesses, that is Mr. Carlacci

4    and Mr. Sitzman, is that under the Title V

5    permit -- under the Title V permit application and

6    the applicable regulations, there's a distinction

7    between an emission source and an emission point.

8    And it is uncontradicted that a pressure relief

9    valve is an emission point, not an emission source.

10       If I could briefly describe the definitions of

11   what an emission point and emission source are

12   according to the testimony.  According to the

13   testimony, in a Title V facility components are

14   categorized as emission units, emission sources,

15   and emission points.  And as Mr. Carlacci's

16   testimony and Mr. Sitzman's testimony indicated, an

17   emission unit under Title V is most easily

18   understood as a collection of emission sources and

19   emission points, such as a boiler house or a coke

20   oven battery.

21       An emission source is a particular industrial

22   operation that produces an air pollutant in the

23   course of its operation, such as a boiler.  And

24   finally, an emission point is an opening in a

25   building such as a duct, a flare, a stack, or a

1    vent through which the air pollutants generated by

2    an emission source are released.

3        Not only is the testimony uncontroverted that a

4    PRV is an emission point and not an emission

5    source, it is also on the record, and it's clear

6    from the Title V operating permit, and specifically

7    from condition four, which is the condition that's

8    alleged in the indictment that Tonawanda Coke is

9    alleged to have violated, condition four expressly

10   refers only to emission sources.  And so, it does

11   not apply to the pressure relief valve.

12            THE COURT:  All right.  Because that's an

13   emission point.

14            MR. GLASNER:  That's an emission point.

15            THE COURT:  And that's -- that's the

16   argument that relates to 1 through 5?

17            MR. GLASNER:  That's correct, your Honor.

18   And just to anticipate an argument that the

19   government might suggest, which is that

20   testimony -- we acknowledge that there is testimony

21   suggesting that activities -- certain activities

22   described under condition four, i.e. the

23   modification of the source applied to the pressure

24   relief valve, but it's our view that we don't even

25   get to that question.  But the threshold

1   determination is whether the PRV is a point or a

2   source.  And in this case it's a point, not a

3   source.

4           THE COURT:  And you're saying it's

5   uncontroverted that it's a point and not a source?

6           MR. GLASNER:  That's correct, your Honor.

7           THE COURT:  And because the indictment

8   charges source, there's no way that the counts can

9   survive irrespective of having to view the evidence

10  in the absolute light most favorable to the

11  nonmoving party here?

12          MR. GLASNER:  That's correct.  And it's

13  not just in the indictment, but it's also in the

14  Title V permit, and specifically in condition four

15  only refers to a source and not to a point.

16          THE COURT:  What say you?

17          MR. MANGO:  Your Honor, may I have a

18  moment?  I believe I have the actual definition of

19  emission source that was referenced in one of the

20  witness folders.

21          THE COURT:  Okay.  Well, then maybe -- you

22  want to continue?  And then I'll let you get that.

23  We'll break for a few minutes.  It might be easier

24  for you that way.

25          You know what you need to do maybe, Mr. Mango,

1   maybe you should focus on the next argument here as

2   well.

3            MR. MANGO:  Yes.

4            THE COURT:  Or have Mr. Piaggione get it,

5   that way we can keep Mr. Glasner on track as well.

6   That probably would be appreciated, I think, right?

7            MR. GLASNER:  I'd be happy to continue.  I

8   would note that I have a transcript of

9   Mr. Carlacci's testimony in which he defines

10  emission point and emission source, and I'd be

11  happy to go through how he defines emission point

12  and emission source, if that would be helpful to

13  the Court.

14           THE COURT:  And that's controlling -- your

15  statement is that the testimony is controlling

16  irrespective of what the regulation or the permit

17  might state or define a PRV to be?

18           MR. GLASNER:  That's correct.

19           THE COURT:  Okay.

20           MR. GLASNER:  So, your Honor, would you

21  like me to go through how Mr. Carlacci defines

22  emission point and emission source?

23           THE COURT:  Well, let's do that.  And I

24  think all your eggs are in that basket, right, so

25  to speak?  I mean, if there's something that

1    controverts that by way of any evidence,

2    practically speaking, that would cloud the matter

3    of whether we have a source or a point or a unit as

4    far as the PRV is concerned, I'd have to view that

5    most favorably to the government in this case.

6         MR. GLASNER:  That's correct.  And, your

7    Honor, to be clear, having closely reviewed

8    Mr. Carlacci's testimony, at the outset of his

9    testimony he indicated that in his view a point and

10   a source can be interchangeable.  However, that

11   statement was clarified on cross, and he -- and he

12   indicated that -- that is -- that definition was

13   the same under the Air 100 permits, which is the

14   regulatory regime that preceded Title V.  Under

15   Title V, title -- the Title V distinguishes between

16   an emission point and an emission source.

17        THE COURT:  Now that's his testimony?

18        MR. GLASNER:  That's his testimony, your

19   Honor.

20        THE COURT:  All right.  Doesn't that

21   create a problem if he said that they're

22   interchangeable terms?

23        MR. GLASNER:  But they were -- he

24   acknowledged that they were interchangeable under

25   the Air 100 permit, which again is the regime

1    preceding Title V.  And he then acknowledged that

2    under Title V, they have different definitions,

3    and, in fact, he stated what those definitions are.

4    And he explained that an emission point is actually

5    the vent or pipe through which emissions are

6    released.  And that the requirements are in the

7    permitting process that the height and location of

8    those emission points be identified in the permit.

9    And an emission source fit with his understanding

10   that the term "source" for the purposes of the New

11   York State permitting requirements, is an apparatus

12   or a machine that is capable of causing emission of

13   an air contaminant to the outdoor atmosphere.

14            THE COURT:  To wit, a boiler.

15            MR. GLASNER:  And that is not a pressure

16   relief valve.

17            THE COURT:  Your example, a boiler.

18            MR. GLASNER:  That's correct.

19            THE COURT:  Okay.  All right.  Let's --

20            MR. MANGO:  Your Honor, if I may just --

21   I'm ready to address that.  We have a 180-degree

22   view of Mr. Carlacci's testimony.  He was clear

23   when he said he considered -- you want me to keep

24   going?

25            THE COURT:  Before you get to that, I mean

1    there's no issue with respect to what Counts 1

2    through 5 charge, because it does reference an

3    unpermitted emission source, does it not?

4              MR. MANGO:  Absolutely.  That's what the

5    Title V permit condition four addresses is an

6    unpermitted emission source.  And Mr. Carlacci, in

7    his testimony, talked about -- is there a question?

8              THE COURT:  Well, there is, but I'm going

9    to let you finish your statement.  Go ahead.  What

10   did Carlacci say?

11             MR. MANGO:  He was asked specifically

12   whether he would view this bleeder, pressure

13   release valve as an emission source.  And it's the

14   government's recollection of his testimony -- I

15   haven't gone through the three days of transcripts

16   which amount to over 300 and plus pages.  I printed

17   them, but I did not go through them -- that the

18   pressure release valve bleeder was an emission

19   source which he did testify consistently with what

20   the definition is, is any apparatus, contrivance,

21   or machine capable of causing emission of an air

22   contaminant to the outdoor atmosphere.

23             THE COURT:  I mean, is that the definition

24   of Section 4, Title V?

25             MR. MANGO:  This would be the controlling

1    definition for condition four of the Title V

2    permit.  And it is very clear --

3                  THE COURT:  Where is that located?  That's

4    not the 100?

5                  MR. MANGO:  This is in the New York Codes

6    Rules and Regulations, Part 200, general

7    provisions, page 1, Section 200.1 is definitions.

8    And there's a definition for 200.1 sub F, which is

9    air contamination source or emission source.

10   That's where the definition comes from for emission

11   source.

12       And Mr. Carlacci was very clear that he viewed

13   the bleeder pressure release valve, as did

14   Mr. Sitzman, as an emission source, which because

15   it was not requested to be included in the Title V

16   permit, it was never brought to the DEC's attention

17   that it should be included in the Title V permit,

18   that it was unpermitted when it was being used.

19                 THE COURT:  As a source and not just a

20   point?

21                 MR. MANGO:  That's correct, your Honor.

22                 THE COURT:  I mean, does that testimony

23   conflict with the definition?

24                 MR. MANGO:  No, your Honor.  I think

25   Mr. Carlacci was very consistent with the

1    definition from -- that I just read from Part 6

2    NYCRR 200.1 sub F.  I believe he actually used the

3    term "apparatus" on the stand.  An apparatus is a

4    valve that opens based on a pressure setting that

5    releases, as the definition is, any air contaminant

6    to the outdoor atmosphere.

7              THE COURT:  Well, Mr. Glasner, do you

8    agree with that, that an apparatus is the

9    equivalent of a point and not a source -- or not

10   a -- yeah, not a source?

11             MR. GLASNER:  Your Honor, if I may, unlike

12   Mr. Mango, I have the testimony of Mr. Carlacci and

13   I actually did review it.  And no where did I see

14   him say that under Title V did -- is the emission

15   source -- sorry, is the pressure relief valve an

16   emission source.  He was, in fact, very clear that

17   under the Air 100 permits a PRV could have been

18   considered an emission source.

19             THE COURT:  What's an apparatus?  Is an

20   apparatus a point, or is it a source?

21             MR. GLASNER:  Your Honor, under Title V an

22   apparatus will not be a point.

23             THE COURT:  It would be a source?

24             MR. GLASNER:  It would be a source.

25             THE COURT:  And you say that given that,

1    there's no distinction between an apparatus and a

2    PRV for purposes of point designation?

3            MR. MANGO:  Yes, your Honor.  I believe

4    that's what controls this analysis here, is that a

5    pressure release valve, bleeder valve used in -- as

6    the testimony we've heard, as an apparatus that

7    releases contaminants to the air constitutes an

8    emission source.  And there's no question when

9    viewed in a light most favorable to the government

10   that a reasonable jury would fail to find in favor

11   of the government.

12           THE COURT:  All right.  So you made your

13   point on that.  But really the distinction now lies

14   basically between whether an apparatus is a source

15   or whether it can be the equivalent -- but you said

16   it's a source under Title V.  It's not a point for

17   purposes of our discussion.

18           MR. GLASNER:  That -- under the definition

19   of Title V as Mr. Carlacci explained, a source can

20   be an apparatus, but that does not extend to a

21   valve or a vent or a duct.

22           THE COURT:  Okay.  Okay.  All right.  And

23   you say Carlacci's testimony is that an apparatus

24   and the PRV is one in the same?

25           MR. MANGO:  Yes, your Honor.  And my

1    recollection of Mr. Sitzman's testimony, which we

2    do not have transcribed yet, was similar in nature

3    that this pressure release valve was an emission

4    source.

5              THE COURT:  Okay.  All right.  Where do

6    you want to go now, Mr. Glasner?  Do you want to go

7    to 6 to 10, or are you going to 17 through 19?

8              MR. GLASNER:  I think, as I already

9    explained, I'm going to focus on 6 through 10 next.

10   So, Counts 6 through 10 allege that Tonawanda Coke

11   operated quench tower number 1, that is the west

12   quench tower, without baffles in violation of the

13   Title V operating permit requirements.  However,

14   neither the indictment nor the government in its

15   case in chief have alleged that the exemption

16   granted to Tonawanda Coke by the DEC in 1984 no

17   longer applies.

18      If you'll permit me for a moment to read from

19   the March 14th, 1984, letter granting the exemption

20   to Tonawanda Coke --

21             THE COURT:  Which was what, six years

22   before --

23             MR. GLASNER:  Six years before 1991 the

24   Clean Air Act was amended, but the testimony is on

25   the record already that the exemption applied at

1    the time that the Title V permit was issued.  And

2    so the government has the burden of proving that at

3    some point the exemption was voided in order for

4    there to have been a violation of the Title V

5    permit, specifically condition 96 the Title V

6    permit.

7              THE COURT:  Do you agree with that,

8    Mr. Mango?

9              MR. MANGO:  Your Honor, we've mentioned to

10   the Court that we have accepted the position that

11   this 10 percent, especially on Mr. Sitzman's

12   testimony, when he said essentially we missed it,

13   that the 10 percent exemption -- or I'm sorry, if

14   the tower was used less than 10 percent of the

15   time, that it was permissible to use it without

16   baffles.  The government has adopted that.  We

17   mentioned that to the Court in this case.

18        So we are taking the stricter approach to show

19   that while it was used 10 percent or more of the

20   time without baffles.  And the government believes

21   that is there is evidence from a number of

22   witnesses to testify that that tower was used

23   10 percent or more of the time.

24        But I don't believe we need to go into the

25   particulars of the letter.  We agree there was an

1    exemption for use of the tower.  If it was less

2    than 10 percent of the time, it did not need

3    baffles.

4            THE COURT:  All right.  And there was

5    evidence that it was used more than 10 percent of

6    the time.

7            MR. GLASNER:  Absolutely, your Honor.  And

8    we believe that the weight of the evidence will

9    show that the frequency of the usage of tower one

10   was -- first of all, that it was out of commission

11   for a period of time up to two years during the

12   relevant time period, and that it was used less

13   than 10 percent of the time when it was in use.

14   But the frequency of the usage of the tower is not

15   the question that I'm getting to or the issue that

16   I'm getting to.

17       The first issue is whether the exemption still

18   applied.  And according to the 1984 letter, the

19   exemption was granted for two reasons, one, because

20   of the significant amount of expense for very

21   little reduction particulate control that

22   installing baffles would have; and two, because of

23   the intermittent use of this emission point.  The

24   letter then goes on to say that conditions on the

25   operating certificate that limit the use of the

1    quench tower to less than 10 percent of the time.

2    If at a future date any of the justifications for

3    this exemption are no longer valid, compliance --

4    excuse me, compliance with 6 NYCRR Part 214.3 may

5    then be required.

6        It's not -- it does not say that it shall be

7    required.  It's not saying that if the cost issue

8    is resolved, or if the frequency of the usage of

9    the baffles changes, then automatically baffles

10   will be required.  It says it may be required.  And

11   there's been no evidence in the government's case

12   in chief that the DEC ever made a determination

13   that the exemption was voided.

14       In fact, it is our view that this is a

15   necessary element that the Court has to prove, and

16   it should have been included in the indictment,

17   because otherwise there's no violation.

18           THE COURT:  There was no exemption

19   viability?

20           MR. GLASNER:  Exactly.

21           MR. MANGO:  Your Honor, the testimony as I

22   recall it from Mr. Carlacci and Mr. Sitzman were

23   both at one point the Regional Air Pollution

24   Control Engineers for all of the New York -- for

25   all of Region 9 of New York State was that this

1    exemption was voided if the tower was used

2    10 percent or more of the time.

3         So, in essence, we have established that

4    through their testimony.  We don't need to have it

5    written in writing that, you know, DEC is now

6    voiding this exemption.

7              THE COURT:  It's virtually voided by

8    operation of law in a sense.

9              MR. MANGO:  Yes, your Honor.

10             THE COURT:  Why not?  I mean, I think that

11   was the testimony, right?

12             MR. GLASNER:  But, your Honor, the --

13   well, the testimony was that the exemption was in

14   place when the Title V permit was issued.

15             THE COURT:  Okay.

16             MR. GLASNER:  And again, there was no

17   determination by the DEC or notification to

18   Tonawanda Coke that the exemption no longer

19   applied.  And it seems to me that this letter,

20   which is in evidence as Exhibit 19.17, is the

21   controlling document which governs how the

22   exemption should have been applied.

23             THE COURT:  Yeah, but the testimony was

24   that with usage above 10 percent, the exemption was

25   voided.

1           MR. GLASNER:  But -- well -- but according

2     to the letter, again that was not -- there has

3     been --

4           THE COURT:  Is that the '84 letter you're

5     referring to?

6           MR. GLASNER:  It is, your Honor.

7           THE COURT:  All right.

8           MR. GLASNER:  There had to have been some

9     kind of notification or determination to Tonawanda

10    Coke, otherwise how else would Tonawanda Coke have

11    been able to -- would have known that there was no

12    longer an exemption that applied?  According to

13    this letter, if Tonawanda Coke operated the towers

14    more than 10 percent, the exemption could very well

15    still have been in place.  So the testimony that

16    the towers were used -- the quench tower one was

17    used more than 10 percent.

18          THE COURT:  And that goes back to your

19    language about the "may" versus the "shall".

20          MR. GLASNER:  That's correct, your Honor.

21          MR. MANGO:  Your Honor, if we want to talk

22    in the abstract, title -- draft Title V permit gets

23    issued.  It has the condition which says

24    100 percent of the time you have to have baffles in

25    this tower.  Tonawanda Coke doesn't comment on

1    that.  The Title V permit gets issued, which says

2    100 percent of the time you have to have baffles in

3    the tower.

4        The Title V permit gets all the way out

5    to 2007.  Tonawanda Coke applies for a renewal

6    permit.  And so if we want to talk about in

7    abstract what happened, the government would argue

8    that by the very essence of the Title V permit,

9    they were put on notice that they needed to have

10   baffles.

11       Now, we've adopted the position which is

12   reasonable in light of the two head chiefs of the

13   air department who testified that there was this

14   exemption.  So the testimony is controlling that

15   they viewed this exemption voided based on a

16   reasonable interpretation of that letter if the

17   tower was used 10 percent or more of the time.

18             THE COURT:  Baffles may be required.

19             MR. MANGO:  That is correct.

20             THE COURT:  Not shall.  How were they to

21   know?

22             MR. MANGO:  That -- I think you need to

23   then look at the Title V permit, which says they

24   shall be required.  Condition 96, which relates to

25   those towers, says you operate a wet quench tower,

1   baffles shall be required.

2           THE COURT:  Okay.  So you have to leap

3   from the exemption to the Title V language because

4   there's really no intervening process that puts

5   Tonawanda Coke on notice that they have to change

6   from the exemption that they were under the

7   impression they had?

8           MR. MANGO:  That's correct, your Honor.

9   I'd like to actually review -- I believe there was

10  some additional documents that were submitted

11  relating to this.  I know the 1984 letter that was

12  sent was the final indication from the department.

13  But I'd like to just take a moment maybe on a break

14  or at a second just to look at that quickly.  But

15  then we also need to use that with the west quench

16  tower in context of the eastern quench tower, which

17  we do have correspondence between the intervening

18  time period of '84 and the Title V permit, which is

19  another notice which says explicitly a wet --

20  you're reminded, a wet quench tower has to have

21  baffles.

22          THE COURT:  Yeah, but the east quench

23  tower doesn't have any relevance really to what's

24  charged in 6 through 10.

25          MR. MANGO:  Right.

1          THE COURT:  Okay.

2          MR. MANGO:  And I would just note for the

3    record that that 1984 memo or letter puts the onus

4    on Tonawanda Coke Corporation.  They're the ones

5    who need to identify if we're using this tower

6    10 percent or more of the time, then they -- they

7    have a burden.  We've gone through that with two

8    witnesses in terms of the whole permitting

9    structure under the Clean Air Act and Title V.  The

10   burden rests with the facility.

11         THE COURT:  To what, notify?

12         MR. MANGO:  To notify if that condition is

13   not appropriate.

14         MR. GLASNER:  Your Honor, the -- Tonawanda

15   Coke included in its Title V permit application

16   reference to the exemption.  And the issue is not

17   whether Tonawanda Coke notified the DEC of the

18   usage of the baffles -- excuse me, of the quench

19   tower or whether the cost in relation to the value

20   of the baffles had changed.  The issue is that

21   there was never a determination made, and the

22   government hasn't proven it, hasn't alleged it in

23   its indictment, and based on what Mr. Mango is

24   saying now, it sounds like he's constructively

25   amending the indictment to include an allegation

1    that the exemption no longer applied.

2        I mean, that to me is the issue.  No where in

3    this letter does it say that you have to notify us

4    of the -- if the change occurs.  It says if at a

5    future date any of the justifications are no longer

6    valid, compliance with the regulation may then be

7    required.

8            THE COURT:  How does that burden shift to

9    Tonawanda Coke to notify?

10           MR. MANGO:  Your Honor, the permitting

11   scheme is such that the corporation has the burden

12   to notify of a change of use.  The DEC can't be

13   expected to be on site monitoring or with

14   binoculars how frequently this west quench tower is

15   being used.  That's not reasonable.  That is not

16   reasonable under the Clean Air Act as established

17   through the testimony, which facilities have the

18   obligation to notify of modifications of use, if

19   new sources come in online that need a permit.  And

20   it was -- it would be the government's argument

21   that the corporation had that burden, that once

22   10 percent or more usage of that tower occurred,

23   the burden shifted to the -- to the facility.

24           THE COURT:  Yeah, because irrespective of

25   inspections, periodic or otherwise, it would be

1     highly unlikely that that could be determined by

2     the government, whether it's the DEC or EPA or

3     whatever, right?

4              MR. MANGO:  Yes, your Honor.  And as we

5     heard, inspections are really a snapshot of one

6     given time.  And they can't make it an assessment

7     of percentage of use from one inspection.

8              THE COURT:  Okay.  Okay.  Mr. Glasner, I

9     guess we go through 17 through 19, RCRA.

10             MR. GLASNER:  I'm not going to have any

11    elaborate comments on Counts 17 through 19 other

12    than to note that based on the evidence in the

13    record, it's our view that no reasonable juror

14    could -- could find that the government has proven

15    its case beyond a reasonable doubt.

16        I just want to say one thing last thing with

17    respect to Counts 6 through 10.

18             THE COURT:  Sure.

19             MR. GLASNER:  And that is -- I guess two

20    quick points.  One is that the testimony on the

21    record is that it was -- that in order to apply and

22    be granted an exemption, the application had to be

23    made in writing and the granting of the exemption

24    had to be made in writing.

25             THE COURT:  Okay.  And you had to make the

3134

1    application in order to have it granted.

2           MR. GLASNER:  Exactly.  And Tonawanda Coke

3    acted consistent with that.  It submitted a letter

4    requesting an exemption, and that exemption was

5    granted in 1984.  So it did everything that it was

6    supposed to do.

7           THE COURT:  Except that circumstances

8    changed.  It emitted more than 10 percent.

9           MR. GLASNER:  But there's been --

10          THE COURT:  Arguably.

11          MR. GLASNER:  Arguably.  Again, we don't

12   believe that the weight of the evidence --

13          THE COURT:  Or quench.

14          MR. GLASNER:  But there's been no evidence

15   stating that the burden of notification shifted to

16   Tonawanda Coke when -- if things changed.  And

17   there's nothing in the letter that says that.  So,

18   again --

19          THE COURT:  But practically speaking, how

20   would EPA or DEC know if Tonawanda Coke didn't

21   advise them that the circumstances that mandate the

22   installation of baffles have changed?  How would

23   they know that?

24          MR. GLASNER:  Well, your Honor, the DEC

25   was well aware of this exemption.

1          THE COURT:  Yeah, I mean, in '84.

2          MR. GLASNER:  Exactly.  Not only in '84,

3   but pursuant to the Title V permit application.  I

4   mean, Tonawanda Coke stated specifically that it

5   was operating quench tower number one pursuant to

6   that exemption.

7          THE COURT:  But they didn't say that they

8   were operating it more than 10 percent of the time,

9   right?

10          MR. GLASNER:  They did not.  But, the --

11   the exemption letter does not say that Tonawanda

12   Coke needed to notify the DEC of that.  And the DEC

13   had every opportunity as well to determine that

14   through its regular inspections and through its

15   review of the Title V permit application.  And the

16   testimony from the DEC expert witnesses is that

17   after their review of the application, it was a

18   mistake not to include the exemption in the Title V

19   permit.

20          THE COURT:  Well, how do I resolve the

21   issue of who has the burden on this for purposes of

22   Count 6 through 10?

23          MR. GLASNER:  According to this letter,

24   your Honor, it's clear that the burden is on the

25   DEC to -- because it's not compulsory that

1    Tonawanda Coke will have to have baffles in quench

2    tower number one even if -- even if circumstances

3    change.  So, that suggests very clearly that the

4    burden is on the DEC to notify Tonawanda Coke when

5    baffles are required.

6              MR. MANGO:  I disagree, your Honor.

7    Viewed in a light most favorable to the government,

8    the two experts who testified talked about the

9    requirements of a facility under the Clean Air Act.

10   The original letter that was sent in 1983 -- this

11   is Exhibit 19.02 -- Tonawanda Coke states with

12   explicit reference, "Number one quench tower is

13   used as a backup unit, and as such, in service only

14   intermittently, i.e., about 10 percent of the

15   time."  That statement, in conjunction with the

16   1984 letter, memorandum outlining this agreement,

17   in conjunction with the whole regulatory scheme

18   under the Clean Air Act as testified by our two

19   experts and viewed in a light most favorable to the

20   government, I think the burden -- when viewed in

21   those terms, there is -- the viewing of that needs

22   to swing towards the government, your Honor, and

23   the burden would be on the facility.

24             MR. LINSIN:  Your Honor, may I ask leave

25   of Court to supplement the points here on just this

1    one narrow issue?  Setting aside for a moment this

2    issue of the regulatory exemption and its validity

3    and who has the burden, the problem with the

4    government's position as we see it, and their

5    emphasis on this percentage of use and whether it

6    voided an exemption that had been granted, the very

7    articulation of that issue, we submit, makes it

8    clear that the counts in the indictment fail to

9    allege what they are now acknowledging is an

10   essential element of their proof.

11        There is nothing, nothing, not a single word in

12   Counts 6 through 10 that this quench tower number

13   one, the west quench tower, was used more than

14   10 percent of the time.  It is significant, your

15   Honor, that there has been so much testimony about

16   this issue, so much controversy with the witnesses,

17   and not a whisper in the allegations in the

18   indictment in 6 through 10.

19        And we've struggled with this on just how in

20   the world we would fashion a jury charge for 6

21   through 10 given this assumption of burden that

22   Mr. Mango has acknowledged, but without any

23   allegation in this indictment.  And my -- our

24   concern about these five counts is that the

25   government has adjusted its theory on these five

1        violations post-indictment, has recognized oh, wait

2        a minute, we had this earlier exemption, we can

3        prove the tower was used more than 10 percent of

4        the time.  But that was not the allegation or

5        charge presented to and returned by the grand jury.

6            We are living with the four corners of Count 6

7        through 10, and there is nothing in there that says

8        anything about percentage of usage or voiding of an

9        exemption.

10               THE COURT:  And that's what you say is

11       fatal, that there's no reference to a voiding of

12       the exemption, and you can't sustain the counts

13       without addressing that.

14               MR. LINSIN:  Well, we believe that both

15       the issues are, your Honor.  We believe that the

16       absence of this allegation in the counts is fatal.

17       But we also believe that the testimony -- kind of

18       the post-hoc testimony of the witnesses at time of

19       trial essentially saying well, we would have voided

20       this exemption had we known X, Y, or Z, we don't

21       believe that that really relates to the

22       contemporaneous validity of this exemption during

23       the time period of the indictment.

24               THE COURT:  Well, doesn't -- then it

25       fundamentally goes to whether you can consider

1    these cases -- these counts as proper in light of

2    the confusion with respect to the exemption.

3            MR. LINSIN:  Well, your Honor, yes, we

4    believe that both of these issues demonstrate that

5    these counts are fatally flawed.  The failure to

6    allege anything about percentage of usage or

7    anything about the exemption or the voiding of this

8    exemption, coupled with the uncontradicted

9    testimony of the government's witnesses, we think

10   the government essentially has acknowledged, yes,

11   there is an element here that wasn't alleged.

12   We're prepared to prove it, but the problem is they

13   didn't charge it.

14            THE COURT:  Okay.

15            MR. MANGO:  Your Honor, we disagree with

16   that assessment.  That the Counts 6 through 10

17   count -- or charge violations of condition 96 of

18   the Title V permit.  There's been testimony that in

19   view of the regulatory history condition 96

20   included this exemption.

21            THE COURT:  Yeah.  So the charge is that

22   the defendants violated Tonawanda Coke's Title V

23   permit by operating the quench tower without a

24   baffle system.

25            MR. MANGO:  Right, but in parentheses,

1    condition 96 of the Tonawanda Coke Corporation's

2    Title V permit, which would then incorporate this

3    10 percent or more -- voiding of the exemption if

4    it was used 10 percent or more of the time.

5              THE COURT:  Isn't that sufficient notice

6    if that's what it says?  I don't have it here,

7    but --

8              MR. LINSIN:  Your Honor, condition 96 of

9    the Title V permit says nothing about this

10   exemption, not a word, and certainly nothing about

11   10 percent usage.  The conditions of this exemption

12   are contained only in the 1984 letter.  As the --

13   as the government's witnesses have acknowledged,

14   they missed this exemption when the permit and

15   permit condition 96 was drafted and issued.  So,

16   permit condition 96 by its language doesn't

17   incorporate anything about the exemption.

18             THE COURT:  So the whole should-have,

19   could-have, would-have stuff is irrelevant to the

20   prosecution here for purposes of maintaining the

21   viability of Counts 6 through 10.

22             MR. LINSIN:  The government's witnesses

23   have acknowledged that the exemption was still

24   valid at the time the permit was issued.  The

25   government and its witnesses are now contending,

1    kind of after the fact, well, had we known this,

2    that, or the other, we would have voided the

3    exemption, and that may well be the case.  And I

4    understand that gets into a weighing of evidence.

5    But that's not the point here.

6        We live with the counts that are charged -- the

7    language charged in Counts 6 through 10.  There's

8    nothing about this exemption, nothing about

9    percentage of the usage, or the voiding of the

10   exemption.

11            MR. MANGO:  But there is in the testimony

12   of the witnesses, and the government believes

13   that's sufficient, your Honor.

14            THE COURT:  All right.  Well, let me take

15   a look at it in terms of the face of the indictment

16   is what you're looking at -- looking to in terms of

17   how I decide the viability of 6 through 10.

18            MR. LINSIN:  I think the government is

19   bound by that, your Honor.  And, yes, we believe

20   that to be correct.

21            THE COURT:  Okay.  And then I know your

22   argument then on 17 through 19.

23            MR. GLASNER:  Yes.  And I would just add

24   that Mr. Personius now is going to address

25   Count 16, and we join in his argument with respect

1    to Count 16.

2              THE COURT:  I noticed you elbowed

3    Mr. Linsin out there when he was trying to get back

4    to the microphone.

5         Was there something that you wanted to say?

6              MR. LINSIN:  Oh, no.  I overstayed my

7    welcome.

8              THE COURT:  Okay.

9              MR. GLASNER:  Thank you, your Honor.

10             THE COURT:  Okay, Mr. Glasner.  I

11   appreciate it.  Okay.  You've countered all those

12   parts.  You need a little time to look for that one

13   document I think or something, but --

14             MR. MANGO:  I believe we're -- I put our

15   comments on the record, your Honor.  As we get back

16   to and evaluate the submission of the defendants,

17   if there's additional written submission, the

18   government can add to clarify or highlight my

19   arguments, we may do so.

20             THE COURT:  Okay.  Well, then that leaves

21   us with 16, and that's, I think, your argument,

22   Mr. Personius?

23             MR. PERSONIUS:  It is.

24             THE COURT:  Okay.  Now, we're talking

25   obstruction?

1           MR. PERSONIUS:  Yes.  Your Honor, I think

2     it's always good practice if you can with a jury

3     and with the Court to try to summarize up front

4     exactly what the argument is.  And our argument

5     here, Judge, is -- it's a -- it's simple to state,

6     and we think that it's clear under the law, that

7     the section under which Mr. Kamholz is charged,

8     which is 18 U.S.C., Section 1505, which deals with

9     obstruction regarding an agency matter proceeding

10    requires that at the time of the obstructive

11    conduct that the proceeding be pending.  And we, in

12    the submission that's going to be submitted, and

13    that's the language, your Honor, of the count,

14    that's the language of the statute, and that's what

15    the case law holds, and that's the essence of our

16    argument.

17        You know, because you listened so well, you

18    know what the evidence is.  You know that the

19    evidence from Mr. Cahill is that the conversation

20    that he's testified about, that we have to assume

21    for purposes of this argument occurred, what was

22    said was said.  We have to assume for purposes of

23    this argument that a reasonable juror could

24    conclude that Mr. Kamholz, when he made those

25    remarks, had a bad criminal intent, that he

1    intended to obstruct.  But that conversation was on

2    a Friday.  That conversation was on April 14th, at

3    the latest, and the proceeding, the inspection did

4    not start until four days later on April 14th

5    [sic], of 2009.

6        Now, the way the charge is set out in the

7    indictment, Judge, in Count 16 supports that

8    conclusion, because if I may, I'll briefly

9    summarize it.  It says that "Mr. Kamholz did

10   corruptly obstruct" -- and I'm quoting from

11   Count 16 -- "the due and proper administration of

12   the law under which a pending proceeding was being

13   had before the United States Environmental

14   Protection Agency by instructing that Tonawanda

15   Coke employee to conceal, during an EPA inspection,

16   the pressure relief valve was emitting coke oven

17   gas to the atmosphere."  So --

18          THE COURT:  They said in April 2009,

19   right?  Doesn't that read that way?

20          MR. PERSONIUS:  No.  What the allegation

21   says at the beginning, Judge, is that it was from

22   on or about April 14th to April 21st.  And the

23   complained-of conduct, according to the testimony,

24   occurred at the very latest, on April 10th.

25          THE COURT:  It doesn't say directed the

1    employee in April of 2009, that's not there?

2             MR. PERSONIUS:  I see the count.  I'm

3    looking at paragraph 57 of Count 16 as saying that

4    the conduct reportedly occurred between April 14

5    and April 21st.

6             THE COURT:  Yeah.

7             MR. PERSONIUS:  And I don't see the

8    reference.  I don't think it matters, but I don't

9    see any reference in there to during April of 2009.

10   I see it as being specifically those dates.  We had

11   an interest, Judge, during the discovery phase of

12   this proceeding in pinpointing what the proceeding

13   was.  We thought it was clear from the count, but

14   we wanted to make sure, and Mr. Mango was kind

15   enough to provide us with a voluntary

16   particularization letter in which he specifically

17   acknowledged the following.

18       This is part of our submission, Judge, so

19   you'll get a copy of this.  But on April 27th,

20   2011, in a response to this request for voluntary

21   particularization, Mr. Mango confirmed the

22   following:  "We identified the proceeding as the

23   joint inspection by the Environmental Protection

24   Agency and the New York State Department of

25   Environmental Conservation that was conducted from

1    April 14-21, 2009."

2         And, your Honor, the -- this element of a

3    pending proceeding is specifically set forth in

4    Section 1505, which provides, in part, that the

5    proceeding -- it says that "the obstructive conduct

6    must have an effect on the due and proper

7    administration of the law under which any pending"

8    --  and I underscore the word "pending" -- "is" --

9    and I underscore the word is -- "being had before

10   any department or agency of the United States."

11        The cases and specifically U.S. versus

12   Quattrone, which we again cite in our submission,

13   Judge, it's a Second Circuit case, recognized that

14   in making this determination on -- or making a

15   determination on what the elements of a Section

16   1505 charge are, that you can apply cases that are

17   decided under the companion statute, which is

18   Section 1503.

19        1503 is similar to 1505, except 1503 deals with

20   obstruction of judicial proceedings.  But the

21   Quattrone case specifically recognizes, Judge, and

22   it's in footnote 18 of that decision, that the

23   analysis is the same under either statute.

24        The reason that that's important is that here,

25   Judge, there's more jurisprudence on this under

1    1503 than there is under 1505.  And the Second

2    Circuit has held, Judge, in two different cases,

3    and they're cited again in our papers.  One is U.S.

4    versus Capo, C-A-P-O, and then that was reaffirmed

5    in U.S. versus Biaggi, B-I-A-G-G-I, that a

6    proceeding has to be pending at the time of the

7    offensive conduct, or you don't have a violation of

8    this statute.

9        Now, the best case we could find both in terms

10   of a factually analogous circumstance and that has

11   a good discussion of what the law is in this area

12   happens to be a District of Columbia district court

13   case that's called U.S. versus Smith.  And again,

14   we cite that in our submission.

15       What's significant about Smith is, Judge, that

16   in part it cites Capo, the Second Circuit decision,

17   as support for its holding.  And the facts in Smith

18   revealed that there was a police officer.  He was

19   involved in enforcing the drug laws.  And the

20   suspicion of the police department where he worked

21   was that he was shaking down drug dealers, and he

22   would stop the drug dealer, and while he might

23   arrest the drug dealer, he would either steal drugs

24   or money from the drug dealer before processing the

25   suspect, or he'd let the suspect go.  In other

1    words, he was engaging in bad behavior.

2         The police department undertook a sting

3    operation, and as a result of that they

4    successfully caught the officer engaging in this

5    activity.  And one of the charges that they brought

6    against that officer was a violation of Section

7    1503.  In other words, he was obstructing judicial

8    proceedings.

9         The police officer's argument in response

10   was -- his lawyer's argument was, wait a minute,

11   this may be wrongful conduct, but it doesn't

12   violate a Section 1503, because there was no

13   judicial proceeding.  There was no criminal

14   complaint filed at that time.  There was no grand

15   jury investigation pending.  There was no

16   proceeding under the statute pending at the time

17   the officer engaged in the offense or the activity

18   that was charged against him in the indictment.

19        And the District of Columbia district court

20   that considered that case held that that's

21   absolutely true, and that there's no such thing as

22   an immanency theory under Section 1503.

23        And our argument is there isn't under 1505, and

24   while this might be a result that doesn't taste

25   good to the mouth, that is what the law is.  The

1    statute is very clear on it.  We think the cases

2    are very clear on it.  We think it's clear here,

3    Judge, that the proceeding we're dealing with is

4    this inspection that did not start until

5    April 14th, the latest the alleged activity was,

6    was April the 10th.

7         And what also reaffirms, Judge, that this is,

8    if you will, it's a problem with the statute is

9    that Congress later, just to deal with the paper

10   destruction side of this problem, enacted Section

11   1519 of Title 18 in 2002.  In our submission in a

12   footnote we reference the legislative history when

13   Section 1519 was enacted, and there's comments in

14   there by Senator Leahy from Vermont and then

15   Attorney General Chertoff, that specifically note

16   that the reason 1519 was enacted was to address

17   this problem, that under Sections 1503 and 1505 the

18   proceeding had to be -- I think the word used is

19   "under way" at the time the conduct occurred.

20        And as I say, it may be an outcome that, from a

21   practical perspective doesn't make sense, but we

22   interpret the case law, including Second Circuit

23   case law in Capo and Biaggi, and the factual

24   illustration from the Smith case and the District

25   of Columbia district court as supporting this

1    position.

2              THE COURT:  What's the April 10th date

3    that you mentioned?

4              MR. PERSONIUS:  That -- I'm sorry, Judge,

5    I should be clear about that.  That's the date that

6    Mr. Cahill testified that he had the conversation

7    with Mr. Kamholz.  In other words, that was, if you

8    will, that was the offending conduct.  That's when

9    Mr. Kamholz reportedly said when the pressure

10   relief valve went off, "we can't have that going

11   off" -- either "we can't it going off" or "we can't

12   have it going off when they're here."  In other

13   words, that's what the government alleges was the

14   obstruction.  And I'm repeating myself, but it was

15   before the proceeding was pending.

16             THE COURT:  Okay.  Thank you.  Mr. Mango.

17             MR. MANGO:  Yes, your Honor.  Thank you.

18   There are two responses the government has to that

19   argument.  First, if you remember the testimony of

20   Miss Hamre and the testimony of Mr. -- or

21   Investigator O'Connor, there was certain records

22   sent to the Tonawanda Coke Corporation and

23   specifically Defendant Kamholz.  And I hold in my

24   hand Government Exhibit 117.13, which is a letter

25   sent to the Tonawanda Coke Corporation on

1    April 8th, which would have been Wednesday, saying

2    we're going to inspect you.  Get your documents

3    ready.  The proceeding has started on --

4              THE COURT:  Is that Hamre's letter?

5              MR. MANGO:  This was Hamre's letter that

6    she was involved in sending.  So, your Honor, the

7    proceeding was very much under way at the time that

8    Pat Cahill received the instructions "We can't let

9    that go off while they're here."  He said

10   specifically, "while they're here."  So he's

11   referencing this proceeding that is now under way,

12   which is EPA is going to be coming to our plant.

13   Get your records ready.  And so that is in one

14   response.

15       The other response, your Honor, is that the

16   count also charges that Mr. Cahill -- or this

17   conduct was committed not only through 1505, but

18   also through 18 U.S.C. 2, which is aiding and

19   abetting.  So, the argument the government would

20   make is in addition to the argument that the

21   proceeding was really pending and started on

22   April 8th when Mr. Kamholz was emailed the letter

23   on April 8th, according to Miss Hamre, that an

24   inspection was coming up, that in addition to that,

25   based on the aiding and abetting statute,

1    Mr. Kamholz committed this crime through the use of

2    Pat Cahill, which occurred during the inspection.

3         So, the key, your Honor, is there was

4    correspondence with the Tonawanda Coke Corporation

5    prior to.  EPA inspection was underway at that

6    point.  Once you receive a letter from the EPA

7    saying we're coming to inspect your facility and

8    here are the records you should start gathering,

9    that inspection -- that proceeding has started.

10        THE COURT:  Yeah, but Section 2 doesn't

11   wash unless you have a pending proceeding as well,

12   right?

13        MR. MANGO:  Correct, your Honor.  So

14   when -- as charged in the indictment, which is from

15   on or about April 14th to on or about April 21st,

16   the defendant did corruptly influence, obstruct,

17   and impede and endeavor to impede and obstruct, and

18   all that language, that carries over from every day

19   that Pat Cahill went in the morning of and changed

20   the pressure release setting, that's based on the

21   instructions that he was given.

22        THE COURT:  Well, for purposes of this

23   argument, you're saying that the investigation

24   commenced with the issuance of that Hamre letter on

25   April 8th.

1          MR. MANGO:  That is part of the argument,

2     yes, your Honor.  But, in the event the Court does

3     not agree that the investigation commenced on

4     April 8th, which I'll look for case law, and if we

5     can find case law that supports that a letter being

6     sent commences proceeding, I'll inform the Court.

7     But even if not, Judge, the time period of April

8     14th to April 21st is the critical time period.

9     And that is the time period that Pat Cahill, based

10    on his testimony, every day of the inspection,

11    which we know was April 14th to April 21st adjusted

12    the pressure release valve.  And he did that

13    because he had instructions by Defendant Kamholz.

14          THE COURT:  To head off the investigation

15    so to speak.

16          MR. MANGO:  Right.  So in essence, if

17    those instructions were given before the

18    commencement of the proceeding, those instructions

19    carried over into the proceeding when Pat Cahill

20    acted on those instructions.

21          THE COURT:  That's similar to the

22    background with respect to a conspiracy charge.

23          MR. MANGO:  Yes, your Honor.

24          THE COURT:  Okay.

25          MR. PERSONIUS:  That's -- the problem with

1    that argument, Judge, it isn't charged as a

2    conspiracy, which might have been a good idea to do

3    that.  And the indictment specifically says that

4    the operative conduct by Mr. Kamholz was the

5    obstruction.  It doesn't allege that it was any

6    later conduct undertaken by Mr. Cahill.  And the

7    government's voluntary particularization letter

8    again, they specifically indicate the proceeding is

9    not an investigation, and that's key.  It was the

10   inspection, and it was the inspection that occurred

11   between April 14th and April 21st.

12        What the government is arguing here, Judge, is

13   exactly what this statute doesn't permit, which is

14   this -- the concept that's sometimes used, Judge,

15   is called anticipatory obstruction, and that is not

16   permitted under this statute.  And what it's called

17   in the Smith decision is that the government wants

18   to argue an imminency theory.  Well, you know

19   something's about to happen, but under this

20   statute, the proceeding has to pending at the time

21   the offensive behavior takes place.

22             THE COURT:  Yeah, but, really, I think the

23   government's argument is that the investigation

24   technically is pending once notice is given with

25   respect to scheduling.  So that's your cutoff

1    point.  Once notice is issued, you're saying,

2    right, that the investigation is ongoing?

3              MR. MANGO:  Yes, your Honor.

4              MR. PERSONIUS:  And we're saying -- we

5    don't dispute, Judge, that letter was sent.  But

6    what we're saying, Judge, under the case authority

7    for this section, that isn't good enough, because

8    that's this concept of anticipatory obstruction.

9    And again, it's not that there was an

10   investigation.  It was an inspection.  And the

11   government has specifically indicated that

12   inspection did not start until April 14th.

13             THE COURT:  Well, whether it's an

14   inspection or -- or not, or something else, is that

15   sufficient to be a pending proceeding?

16             MR. PERSONIUS:  The inspection qualifies,

17   there's no question.  There's I think a Ninth

18   Circuit called Technique I think is the case.

19   We've looked at it, Judge.  And an inspection is

20   good enough to trigger this statute.  But the

21   inspection didn't start.  It wasn't pending.

22             THE COURT:  Unless the letter scheduling

23   it triggers the pending nature of the proceeding.

24             MR. PERSONIUS:  And we don't think it

25   does, because then we think you're slipping into

1    this anticipatory behavior, which is not allowed

2    under the statute.

3        I know it makes you uncomfortable.  It seems

4    illogical.  But that's how we read the law.

5                THE COURT:  Okay.

6                MR. PERSONIUS:  And it will be in the

7    brief, and we well understand the government may

8    want to respond to that.

9                THE COURT:  Well, you'll have a lot of

10   time this evening to do that, Mr. Mango.

11               MR. MANGO:  All night, your Honor.

12               THE COURT:  Well, you know, whatever you

13   can get to us.  I mean, I'd like to have your input

14   on it.

15               MR. MANGO:  Absolutely.

16               THE COURT:  And we'll try to get it

17   decided tomorrow.

18               MR. PERSONIUS:  Great.

19               THE COURT:  Okay.

20               MR. PERSONIUS:  Thank you, Judge.

21               THE COURT:  Thank you all very much.  I

22   appreciate you staying.

23               MR. LINSIN:  Thank you, your Honor.

24               THE COURT:  You're welcome.

25               *     *     *     *     *     *

1                          CERTIFICATION

2

3          I certify that the foregoing is a

4      correct transcription, to the best of my

5      ability, from the electronic sound recording

6      of the proceedings in this matter.

7

8

9                      s/Michelle L. McLaughlin
                       Michelle L. McLaughlin, RPR
10                         Official Reporter
                       U.S.D.C., W.D.N.Y.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25