VOL. XV

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

            -vs-                          10-CR-219S
TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
                 Defendants.
-------------------------------------


            Proceedings held before the

       Honorable William M. Skretny, U.S.

       Courthouse, 2 Niagara Circle, Buffalo,

       New York on March 20, 2013.


       APPEARANCES:

       AARON J. MANGO,
       Assistant United States Attorney,
       ROCKY PIAGGIONE, Senior Counsel,
       U.S. Department of Justice,
       Appearing for the United States.

       GREGORY F. LINSIN, ESQ.,
       JEANNE M. GRASSO, ESQ.,
       ARIEL S. GLASNER, ESQ.,
       Appearing for Tonawanda Coke Corporation.

       RODNEY PERSONIUS, ESQ.,
       Appearing for Mark L. Kamholz.

       Also Present:  Lauren DiFillipo, Paralegal
                      Sheila Henderson, Paralegal



       Michelle L. McLaughlin, RPR,
       Official Reporter,
       U.S.D.C. W.D.N.Y.
       (716)332-3560

3158

1                    I N D E X

2          WITNESS                                PAGE

3     GARY FOERSCH
   Direct Examination by Mr. Personius        3177
4  Cross-Examination by Mr. Linsin            3270
   Cross-Examination by Mr. Piaggione         3276
5  Redirect Examination by Mr. Personius      3284
   Recross-Examination by Mr. Piaggione       3290
6  Further Redirect Examination by Mr. Personius 3292
   Further Recross-Examination by Mr. Piaggione 3292

7
      KENNETH ENG
8  Direct Examination by Mr. Linsin           3295
   Cross-Examination by Mr. Mango             3323

9

10

11        GOVERNMENT EXHIBITS                   EVD.

12            105.37                           3184
              3521.04                          3223
13            3518.04                          3306

14        DEFENDANTS' EXHIBITS                  EVD.

15            MM                               3206
              HHH                              3252
16

17

18

19

20

21

22

23

24

25

1                    (Jury not present in the courtroom.)

2                THE COURT:  The attorneys and parties are

3    back present on Tonawanda Coke and Mark Kamholz.  I

4    do have a decision to render with respect to the

5    Rule 29 motion.  I'll do that now.  And then I know

6    the government filed something on the expert

7    witness.  I haven't quite finished reviewing that.

8    And I don't know if there's anything that the

9    defense wants to add.  I don't have anything from

10   the government on your expert witness.

11       Did we get --

12               THE CLERK:  It was filed late.

13               THE COURT:  Our computers were down, so we

14   just got them up and running.

15               MR. LINSIN:  We filed something yesterday

16   afternoon, your Honor, in response.

17               THE COURT:  Okay.  Well, let's begin this

18   way.  And this follows the moving for judgment of

19   acquittal that was made on Monday.  And as far as

20   Rule 29 is concerned, that rule provides, in

21   pertinent part, that upon a defendant's motion a

22   court must enter a judgment of acquittal of any

23   offense for which the evidence is insufficient to

24   sustain a conviction.  That's Federal criminal --

25   Rule of Criminal Procedure 29(a).

1       The Second Circuit has held that a defendant

2   challenging the sufficiency of the evidence bears a

3   heavy burden.  See United States versus Walker.

4   That's a Second Circuit 1998 case. [42 F.3d 103,

5   112]

6       If it's okay with the attorneys, I won't read

7   the full cites, but I'll have Michelle put the full

8   cites into the record.  Mr. Linsin, that works?

9               MR. LINSIN:  That's fine.

10              THE COURT:  Mr. Personius?

11              MR. PERSONIUS:  Yes, Judge.

12              THE COURT:  Gentlemen?

13              MR. MANGO:  Absolutely, your Honor.

14              THE COURT:  A district court may enter a

15   judgment of acquittal on the grounds of

16   insufficient evidence only if, quote, after viewing

17   the evidence in the light most favorable to the

18   prosecution and drawing all reasonable inferences

19   in the government's favor, it concludes no rational

20   trier of fact could have found the defendant guilty

21   beyond a reasonable doubt.  United States versus

22   Reyes.  That's a Second Circuit case from 2002.

23   [302 F.3d 48, 52]

24       Now, here we have 19 separate counts.  We're

25   going to talk about Counts 1 through 15 first

1    because they charge defendants with violating the

2    Clean Air Act, specifically 42 U.S.C. Section

3    7413(c)(1).

4         Counts 1 through 5 allege that defendants

5    operated Tonawanda Coke Corporation in violation of

6    its Title V permit by emitting coke oven gas from a

7    pressure relief valve in the by-products

8    department.  Counts 6 through 10 allege that

9    defendants violated Tonawanda Coke's Title V permit

10   by operating the western quench tower, tower one,

11   without a baffle system.

12        Counts 11 through 15 allege that defendants

13   violated Tonawanda Coke's Title V permit by

14   operating the eastern quench tower, tower two,

15   without a baffle system.

16        To satisfy its burden on the Clean Air Act

17   counts, 1 through 15, the government must establish

18   beyond a reasonable doubt each of the following

19   elements of the crime:  First, that the defendant

20   was an owner or operator of a stationary source of

21   air pollutants;

22        Second, that the stationary source of air

23   pollutants was subject to the Title V operating

24   permits program;

25        Third, that during the time periods alleged in

1    the indictment, the defendant operated or caused to

2    be operated an emission source in violation of a

3    Title V operating permit requirement;

4        And fourth, that the defendant acted knowingly.

5        Defendants argue that the government has not

6    presented sufficient evidence on each of these

7    elements from which a rational jury could find the

8    defendants guilty.

9        Excuse me just one second, please.

10       Okay.  As to Counts 1 through 5, defendants

11   seek judgment of acquittal on those counts on the

12   basis that the pressure relief valve or bleeder

13   valve is an emission point, not an emission source.

14   Each of these counts charges that defendants

15   violated Tonawanda Coke's Title V permit by

16   emitting coke oven gas through the pressure relief

17   valve, an unpermitted source.  Defendants argue

18   that based on the testimony at trial, no reasonable

19   juror could find that the pressure relief valve is

20   an emission source.

21       In my view, however, the evidence presented at

22   trial is sufficient to overcome defendants' Rule 29

23   motion.  The government's expert Al Carlacci

24   testified that the terms "emission source" and

25   "point" were synonomous, and he later testified

1    directly that operating the pressure relief valve

2    violated the Title V permit.  From that testimony

3    it is a fair inference that Carlacci viewed the

4    pressure relief valve as an emission source.

5    Another of the government's experts, Larry Sitzman,

6    offered consistent testimony.

7        Moreover, the definition of "emission source"

8    under 6 NYCRR Section 200.1(f) is any, quote,

9    apparatus, contrivance, or machine capable of

10   causing emission of any air contaminant to the

11   outdoor atmosphere, close quote.  The pressure

12   relief valve meets this definition.

13       Finally, I agree with the government's argument

14   that whether the pressure relief valve meets the

15   definition of an emission source is a question of

16   fact that must be resolved by the jury.

17       For these reasons, defendants' motion is denied

18   as to Counts 1 through 5.

19       Counts through 6 through 10.  Defendants seek

20   judgment of acquittal on those counts as well on

21   the basis that the government failed to allege that

22   the defendants violated the baffle exemption

23   granted in 1984 by using the western quench tower

24   greater than 10 percent of the time.  They also

25   argue that the government failed to present

1    evidence that the baffle exemption granted before

2    issuance of the Title V permit ever ceased to be

3    effective.

4        The exemption letter sent to Tonawanda Coke

5    states that the exemption is conditioned on the

6    prohibitive cost of installing baffles, and that

7    the western quench tower was used less than

8    10 percent of the time.  If either of these

9    conditions changed, the letter states that a baffle

10   system may then be required.

11       In my view, dismissal of these counts is not

12   warranted.  The government has charged defendants

13   with violating condition 96 of Tonawanda Coke's

14   Title V permit.  Both Carlacci and Sitzman

15   testified that use of the western quench tower

16   greater than 10 percent of the time constitutes a

17   violation of condition 96.  Thus, there is evidence

18   in the record that would support the jury's

19   verdict.

20       Moreover, I find no support for defendants'

21   argument that the government needed to charge the

22   existence of the exemption in the indictment, an

23   argument for which no legal authority is cited.

24   The existence of an exemption is not an element of

25   the offense.  Additionally, I find no prejudice to

1    defendants by way of the government's presentation

2    of the evidence concerning the exemption, as they

3    have been on sufficient notice of government's

4    theory.

5        Finally, viewing the evidence in the

6    government's favor, I find a fair reading of the

7    1984 exemption letter to be the impetus -- to be

8    that, the impetus was on Tonawanda Coke to notify

9    the New York DEC if any conditions of the exemption

10   were no longer being met, notably increased use of

11   the quench tower -- notably, the increased use of

12   the western quench tower.  Such a reading is

13   consistent with the self-reporting nature of the

14   statutory scheme and the realities of enforcing the

15   environmental laws.  It is unreasonable to expect

16   that New York DEC could effectively monitor the

17   conditions under which the permit was granted and

18   that Tonawanda Coke had no obligation in this

19   regard.

20       Accordingly, defendants' motion for judgment of

21   acquittal on Count 6 through 10 is denied.

22       Counts 11 through 15.  Again, the defendants

23   move for judgment of acquittal on those counts on

24   the general basis that the government has not

25   offered sufficient proof.  Defendants have not,

1    however, identified any deficiencies in the

2    government's proof, and I find that the government

3    has, in fact, offered sufficient evidence from

4    which the jury could find guilt on these counts.

5    Defendants' motion is therefore denied.

6        Count 16 charges the defendants with

7    obstructing justice in violation of 18 U.S.C.

8    Section 1505 during an EPA inspection by

9    instructing an employee to conceal that a pressure

10   relief valve in the by-products department emitted

11   coke oven gas during normal operations.

12       To satisfy its burden on Count 16, the

13   government must establish beyond a reasonable doubt

14   each of the following elements of the crime:

15   First, that on or about the date set forth in the

16   indictment, a proceeding was pending before an

17   agency of the United States;

18       Second, that the defendants knew that a

19   proceeding was pending before an agency of the

20   United States;

21       Third, that the defendants corruptly endeavored

22   to influence, obstruct, or impede the due and

23   proper administration of the law under which the

24   proceeding was being conducted.

25       Defendants argue that the government has not

1    presented sufficient evidence on each of these

2    elements from which a rational jury could find the

3    defendants guilty.  Defendants argue that they are

4    entitled to a judgment of acquittal because there

5    is insufficient proof that a proceeding was pending

6    on the date that Defendant Kamholz instructed Pat

7    Cahill to adjust the pressure relief valve during

8    the EPA inspection.  The proceeding at issue is the

9    EPA inspection which began on April 14th, 2009.

10       The indictment charges that from April 14th,

11   2009, to April 21st, 2009, defendants obstructed

12   justice.  The testimony at trial was that Mark

13   Kamholz gave this direction to Pat Cahill before

14   April 14th, 2009.  There is also evidence that Mark

15   Kamholz received a letter on April 8th, 2009,

16   advising him of the EPA's investigation and

17   inspection.  This letter directed Kamholz to begin

18   collecting records, which he endeavored to do.

19   Kamholz's directive to Pat Cahill came after this

20   letter, but before the actual inspection.

21       The issue then is when the proceeding became

22   pending in pretrial particularization.  The

23   government identified the proceeding as the joint

24   inspection that was conducted from April 14th

25   through 21, 2009.  In my view, the proceeding

1    became pending on April 8th, 2009, when Defendant

2    Kamholz received the EPA's letter directing him to

3    gather documents and prepare for an inspection.

4        Defendants rely on United States versus Smith

5    for the proposition that an imminent or

6    anticipatory theory of a pending proceeding is

7    insufficient under Section 1505.  Smith, however,

8    is distinguishable because there is nothing at all

9    pending in Smith.  At best, Smith simply believed

10   that an investigation was imminent.  Thus, Smith is

11   not instructive, because it was clear that no

12   proceeding was pending.

13       Here I find that Kamholz's receipt of the

14   letter advising him of the upcoming inspection and

15   his need to gather documents in preparation

16   therefore is when the inspection became pending for

17   purposes of Section 1505.  A contrary conclusion

18   would be counter to the intent of the statute, as

19   it would allow a party on notice of a proceeding to

20   obstruct that proceeding right up until the time it

21   began.

22       Under defendants' theory in this case, for

23   example, Kamholz could have obstructed the document

24   gathering phase of the inspection with impunity, so

25   long as he stopped before the inspectors set foot

1    on Tonawanda Coke property to begin the physical

2    inspection.  Such a result is contrary to the

3    intent of the statute, in my view.

4        Defendants' motion for judgment of acquittal on

5    Count 16 is therefore denied.

6        Counts 17 through 19 charge defendants with

7    violating the Resource Conservation and Recovery

8    Act, RCRA, specifically, 42 U.S.C. Section

9    6928(d)(2)(A).

10       Count 17 charges defendants with storing a

11   waste without a permit as required by RCRA.

12   Counts 18 and 19 charge defendants with disposing a

13   waste without a permit as required by RCRA.

14       In order to prove the defendants guilty of

15   violating RCRA as charged in Counts 17, 18, and 19,

16   the government must establish beyond a reasonable

17   doubt each of the following elements of the crime

18   as to each defendant:  First, for Count 17, that

19   the defendant knowingly stored or caused others to

20   store a waste on or about the date set forth in the

21   indictment, and for Counts 18 and 19, that the

22   defendant knowingly disposed of or caused others to

23   dispose of a waste on or about the date set forth

24   in the indictment;

25       Second, that the waste was hazardous as defined

1   by the Resource Conservation and Recovery Act;

2       Third, that the defendant knew that the

3   hazardous waste had the potential to harm others or

4   the environment, in other words, knew that the

5   waste was not a harmless substance like

6   uncontaminated water;

7       And fourth, that the defendant did not have a

8   permit to store, Count 17, or dispose of, Counts 18

9   and 19, the hazardous waste.

10      It appears that defendants move for judgment of

11  acquittal on Counts 17 through 19 on the general

12  basis that the government has not offered

13  sufficient proof on each count.  Defendants have

14  not, however, identified any deficiencies in the

15  government's proof, and I find that the government

16  has, in fact, offered at least sufficient evidence

17  from which the jury could find guilt on these

18  counts.

19      Defendant's motion is therefore denied.  That

20  will be my ruling.

21      Okay.  Is the defense ready with its case?

22          MR. PERSONIUS:  Yes, your Honor.

23          MR. LINSIN:  We are, your Honor.  It would

24  be helpful with respect to how we're going to

25  proceed if the Court is prepared to address the

1    motion to exclude testimony of Miss Williams.  We

2    do anticipate her to be a witness here today.  I

3    mean, not our first witness, but perhaps if the

4    Court has not had a chance to review our response

5    we can defer it, but --

6              THE COURT:  You know, let me take a look

7    at the response.  You know, obviously I looked at

8    the government's submission.  Do you need that

9    decision before --

10             MR. LINSIN:  Not before our first witness.

11             THE COURT:  Because based on what I saw in

12   the government's paper, I expect that I know how

13   I'm going to rule, but I do want to take a look at

14   it.

15             MR. LINSIN:  Of course.

16             THE COURT:  All right.  Okay.  How about

17   if we take 15 minutes, if you don't mind, and I'll

18   have a chance to do a couple of things, and we'll

19   get ready to get started.

20       Chris, if you tell the jury it will be about 15

21   more minutes.

22             COURT SECURITY OFFICER:  Sure.

23             MR. LINSIN:  Thank you, your Honor.

24             (Short recess was taken.)

25             (Jury not present in the courtroom.)

1          MR. PERSONIUS:  Judge, what's going on is

2     the first witness we're going call is Gary Foersch,

3     F-O-E-R-S-C-H.  I was looking at my notebook of

4     prior statements, and I had a document.  I realized

5     it didn't have a sticker on it, so I gave it to

6     Aaron to see if he had it, and he has it here.  We

7     need to have a few copies of it made.  I didn't

8     realize until about three minutes ago.

9          THE COURT:  Okay.

10         MR. MANGO:  I was going to have the agent

11    go downstairs and make a copy.  Miss Labuzzetta has

12    graciously agreed to make some copies.

13         THE COURT:  All right.  Terrific.  That

14    means we can get started, but what I thought I'd do

15    first is just let you know that I've had a chance

16    to review the government's motion to exclude Marcia

17    Williams's testimony, or in the alternative to hold

18    a Daubert hearing.  And then I did look at the

19    defendants' submission, which I had not seen until

20    just a short time ago.

21         And I'm going to deny the government's motion,

22    and also deny a Daubert hearing.  I find that

23    there's no basis for a Daubert hearing based on the

24    arguments of the government -- you know, the way I

25    look at this is there is an acknowledgment from

1    both sides that you're aware of what my earlier

2    pretrial rulings are with respect to testimony

3    concerning the legal conclusions and the like.

4         You know, I -- and the defendants argue and

5    represent that they fully intend to abide by those

6    rulings.  The fact that the submission was not

7    adjusted for the pretrial rulings in light of the

8    representations of the defendants I find does not

9    form a basis to support granting the government's

10   motion.  And, you know, I think the government's

11   argument that it's a waste of time, frankly, only

12   time will tell.

13        So, on that basis, the government's motion,

14   both in the primary request to exclude or to hold a

15   Daubert hearing is denied.

16        Okay.  So that, I think, wraps up all the loose

17   ends, right?  And if we can bring the jury in now

18   please, Chris.

19             COURT SECURITY OFFICER:  Yes, sir.

20             (Jury seated.)

21             THE COURT:  Good morning.  How are you

22   doing, okay?  Sorry for the delay.  My fault for

23   the most part, and we had some business that we had

24   to resolve on this case.  So we're ready to go.

25   Have a seat, and I'll tell you what to look forward

1    to at this point in time.  Hope you enjoyed your

2    day off.  And, you know, I can tell you're all

3    ready, rested, and eager to begin.

4        And, you know, I will reiterate how important

5    this case is, as you know, to both sides.  And, you

6    know, you are a key to the resolve of this case,

7    and the law requires that you resolve the fact

8    issues unanimously as a jury.  You are the judges

9    of the facts.  And you also know, and I've said

10   this how many times already, I don't like to even

11   think about the count, but that burden rests with

12   the government to convince you beyond a reasonable

13   doubt.

14       No burden on the defense, each of the

15   defendants.  They don't have to put on a case, but

16   just so you know, it is their intention to do that

17   now.  But the burden doesn't change and the

18   presumption doesn't leave the defendants because

19   they're putting on a case.  They have a right.

20   They've entered pleas of not guilty to each of the

21   19 counts, and so if they choose, not only to

22   question the government's witnesses, but to put on

23   their own evidence, that's of their volition.  They

24   can do that.  And you assess their witnesses just

25   as you would the defense -- the government's

1    witnesses in this particular case.

2         And whether they put on fewer or more witnesses

3    than the government, that's not really anything

4    that is significant.  You are to view all of the

5    evidence as a totality.  You assess their witnesses

6    just as you did the government's in terms of

7    determining credibility, believability of those

8    witnesses, and, you know, once you do that, then

9    you will be permitted to draw whatever reasonable

10   inferences are fair from the evidence introduced in

11   arriving at your full assessment of all of the

12   evidence, and whether all of that evidence does

13   satisfy the government's proof beyond a reasonable

14   doubt.

15        So with that, I guess the defense is ready with

16   it's first witness, is that correct?

17             MR. PERSONIUS:  Yes, sir.

18             THE COURT:  Mr. Personius, if you will,

19   please.

20             MR. PERSONIUS:  Yes, your Honor.  The

21   defense calls Gary Foersch.

22             THE COURT:  If you stay right there and

23   face the jury, I'll have you sworn in.

24        Miss Labuzzetta, if you would, please.

25   G A R Y   F O E R S C H, having been duly sworn as a

1  witness, testified as follows:

2          THE COURT:  Sometimes I wonder if

3  Miss Labuzzetta is going to be able to bring

4  herself to a full stop before she administers the

5  oath.  I would not like to be the witness if she

6  could not.

7      But if you would have a seat, please.  And

8  we'll have you face the jury.  And some very

9  preliminary instructions, please.  If the questions

10  that will be asked to you, if you do not understand

11  the question, ask that it be repeated.  Try to

12  answer the question succinctly.  Don't volunteer

13  information.  That's usually when things get

14  complicated.  It's really up to the lawyers to draw

15  the information from you, so don't volunteer.  If

16  you can answer a question yes or no, please try to

17  do that as best you can.

18      And if there's an objection, wait until I rule

19  on the objection, and then I will give you

20  instructions on whether, for example, to start the

21  answer again, complete the answer, wait for another

22  question, et cetera.  Do you understand?

23          THE WITNESS:  Yes, I do.

24          THE COURT:  All right.  You have to speak

25  in a conversational tone only.  The microphone's

1    friendly so it should pick you up.  You don't have

2    to be right on top of it.  I think where you're

3    positioned now is good.

4        Please state your full name, spell your last

5    name, please.

6            THE WITNESS:  Gary Foersch, F-O-E-R-S-C-H.

7            THE COURT:  Okay, thank you.

8        Your witness, Mr. Personius.

9            MR. PERSONIUS:  Thank you, your Honor.

10   DIRECT EXAMINATION BY MR. PERSONIUS:

11   Q.  Good morning, Mr. Foersch.

12   A.  Good morning.

13   Q.  I'm Rod Personius.  As you know, I represent

14   Mark Kamholz, who's at the back table.  And it's

15   true that you've been good enough to meet with me

16   on several occasions to talk about your

17   recollection of the events that you're going to

18   testify about here today, is that correct?

19   A.  Yes.

20   Q.  Okay.  And you've also made yourself available

21   to the government to talk to them about your

22   recollection, is that true?

23   A.  Yes.

24   Q.  All right.  And is it correct that you're

25   currently retired?

1    A.   Yes.

2    Q.   Would you please tell the jury about your

3    employment history?

4    A.   I basically did 40 years with the New York DEC,

5    primarily in the Division of Air Resources.   I

6    worked originally in continuous monitoring where

7    there were a number of samplers set up around the

8    state to monitor the air and compare it to the

9    federal air standards.

10        I then transferred into the stack testing

11   division where I, along with some fellow employees,

12   we'd go right out to a facility and basically stick

13   a probe in the stack, and do sampling, and then

14   that would be -- results of that could be compared

15   to the regulations to see if a company was in

16   compliance.

17        After that, I moved into the permitting and

18   inspection section, where I basically remained for

19   the rest of my career, and in that capacity I would

20   write permits and go out and do facility

21   inspections to see if the facility was living up to

22   the conditions of their permits.

23   Q.   Mr. Foersch, when you refer to stack testing,

24   you're talking about waste heat stacks, is that

25   what that was?

1    A.   No.   It would be any type of -- typically back

2    then it was incinerators, boiler stacks.

3    Q.   I see.

4    A.   That type of thing.

5    Q.   So -- but large chimneys?

6    A.   Right.

7    Q.   That's what I meant to say.  And so that it's

8    clear, your 40 years of employment was all with the

9    Department of Environmental Conservation?

10   A.   Correct, and the Division of Air Resources.

11   Q.   Okay.  That was before DEC?

12   A.   No, I'm saying the Division of Air Resources is

13   part of DEC.

14   Q.   So you were always --

15   A.   I was always in -- I always worked in the air

16   pollution as opposed to water or solid waste, et

17   cetera.

18   Q.   Okay.  I have to get the question out so that

19   Michelle can get my question and then you give your

20   answer, please.

21   A.   Oh, sorry.

22   Q.   No, please, it happens.

23        THE COURT:  It takes a while to get a

24   rhythm.  So just wait for the question then answer,

25   and it moves on rather smoothly.  Go ahead, please.

3180

1    Q.  We will take our time and we'll do fine.

2        Did you have a particular position that you

3    held with DEC once you started doing the permitting

4    and the inspections?  Did you have a title?

5    A.  Yes, Principle Environmental Engineering

6    Technician.

7    Q.  All right.  And are there -- were there other

8    people that you worked with in the DEC office that

9    did the same work that you did, these air

10   inspections?

11   A.  Yes.

12   Q.  Okay.  And there's been some people who have

13   testified in this case.  One was Larry Sitzman.

14   Did you work in that section when Mr. Sitzman was

15   there?

16   A.  Yes, I did.

17   Q.  Okay.  And the name has come up, Cheryl

18   Webster.  Are you familiar with her?

19   A.  Yes.

20   Q.  Did you work with her for a period of time?

21   A.  Yes.

22   Q.  Okay.  Someone who hasn't testified but the

23   name has come up is Henry Sandonato.  Do you know

24   who he is?

25   A.  He was at one time the Regional Air Pollution

1    Control Engineer.  He would have been my --

2    basically the boss of the Division of Air at the

3    time.

4    Q.  I see.  Okay.  And for what period of time was

5    Mr. Sandonato the boss of that section?

6    A.  Well, I can't give specific dates.  I believe

7    he retired or left our office in the early 2000s.

8    Q.  All right.  And was he replaced by someone --

9    did someone take over that supervisory position?

10   A.  Yes.

11   Q.  Who was that?

12   A.  Larry Sitzman.

13   Q.  All right.  Did Mr. Sitzman remain in that

14   capacity until you retired?

15   A.  Yes.

16   Q.  I don't know if you told us, when did you

17   retire?

18   A.  In November of 2009.

19   Q.  And if my math is correct, does that mean you

20   started in '69?

21   A.  In 1969, correct.

22   Q.  Okay.  Now, as part of your duties with

23   Tonawanda -- or with DEC -- I'm giving away my

24   question -- with DEC as a technician, did you work

25   out at Tonawanda Coke?

3182

1   A.   Yes.

2   Q.   During what period of time were you assigned to

3   do work with Tonawanda Coke?

4   A.   It would have been from the early 1980s right

5   on through my retirement.

6   Q.   So for about 30 years?

7   A.   About 30 years.

8   Q.   All right.  And would that include going out to

9   the -- to the site?

10  A.   Yes, it would.

11  Q.   Would you tell the jury where Tonawanda Coke is

12  located please?

13  A.   It's on River Road in Tonawanda.

14  Q.   All right.  Near the Grand Island Bridge, up in

15  that area?

16  A.   Correct.

17  Q.   How frequently would you go out to Tonawanda

18  Coke?

19  A.   Typically once a year.

20  Q.   Could we have -- this is for identification.

21      Lauren, could you please put up for

22  identification Government Exhibit 105.37?

23      The way this works, Mr. Foersch, is you will

24  see that exhibit on that screen that you're looking

25  at.  Do you see it says 105.37 on the yellow

1    sticker?

2    A.   Yes.

3    Q.   Okay.  That's how we try to handle exhibits.

4    This is more efficient that way.  What you see on

5    the screen, do you recognize what's shown in that

6    exhibit?

7    A.   Yes, sir.  That appears to be an aerial

8    photograph of Tonawanda Coke.

9    Q.   Okay.  And based on your 30-or-so-year

10   experience working out at Tonawanda Coke, do you --

11   do you see that as being a fair representation of

12   the different parts of the plant, in other words

13   where the office area is, where the coal fields

14   are, where the by-products area is, where the

15   battery is, is that all shown in that photograph?

16   A.   Yes, I believe it's remained pretty much

17   constant over the years.

18   Q.   Does the photograph also show River Road and

19   the entrance up to Tonawanda Coke?

20   A.   Yes, it does.

21   Q.   Okay.

22            MR. PERSONIUS:  Your Honor, I offer this

23   exhibit.

24            MR. PIAGGIONE:  Your Honor, we have no --

25   government has no objection except to provide the

1    information that this photograph was taken in April

2    of 2009.  That was what was stipulated to

3    previously.

4              THE COURT:  All right.  So stipulated --

5              MR. PERSONIUS:  Sure.

6              THE COURT:  -- no objection.

7              MR. LINSIN:  No objection, your Honor.

8    Thank you.

9              THE COURT:  Okay.  105.37 will be

10   received.

11             MR. PERSONIUS:  Thank you, Judge.

12             (Government's Exhibit 105.37 was received

13             into evidence.)

14             MR. PERSONIUS:  May we publish to the jury

15   please?

16             THE COURT:  Yes.

17   BY MR. PERSONIUS:

18   Q.  All right.  Now the jury can see it, so I'm

19   going to ask you some questions about the picture.

20   Remember I asked you if it showed River Road?

21   A.  Yes.

22   Q.  Okay.  You have the ability by tapping the

23   screen to make either a little red box or an arrow.

24   So if you try by tapping the screen show the jury

25   where River Road is, please.

3185

1    A.   All right.

2    Q.   You're a square guy, not an arrow.

3         Do you see the entrance off of River Road to

4    Tonawanda Coke?

5    A.   Yes.

6    Q.   Okay.  Would you show the jury where that is

7    again?  Do another tap.  Very good.

8         And so you come up that roadway, and that takes

9    you into the plant area?

10   A.   Yes.

11   Q.   All right.  There's been some testimony about a

12   gate that you have to go through.  Do you see

13   that -- well, first of all, do you remember there

14   is a gate you have to go through?

15   A.   Yes.

16   Q.   And a guard shack or guard house?

17   A.   It wasn't always there.  But, yes, in recent

18   years.

19   Q.   Okay.  Can you show the jury, please, with

20   another tap where that is?

21   A.   It's pretty close to where the last one is, but

22   I'll try again.

23   Q.   Okay.  Now, what's in that location, is that

24   like what you see at a railroad track, a bar that

25   goes up and down?

3186

1   A.   Yes, it is.

2   Q.   And as you drive in toward the facility, is

3   there another cycloned fence type gate that slides

4   when you enter the facility, do you remember that?

5   A.   That I don't remember.

6   Q.   Okay.  Do you remember where the -- where the

7   guard house is?

8   A.   Yes.

9   Q.   Okay.  Can you show the jury where that is?

10   A.   Okay.

11   Q.   Now, when you would go to the facility, would

12   you have contact with Mr. Kamholz?

13   A.   Yes, I would.

14   Q.   Okay.  And you mentioned you went there about

15   once a year, that is to Tonawanda Coke?

16   A.   Yes.

17   Q.   Okay.  What was the reason you had that contact

18   with Mr. Kamholz?

19   A.   You mean as far as making a yearly inspection?

20   Q.   Well, why would it be Mr. Kamholz that you

21   would have the contact with?

22   A.   He was the designate -- my designated contact

23   person.

24   Q.   And did you know him to be the environmental

25   manager, or whatever his title is, the

3187

1    environmental person for Tonawanda Coke?

2    A.   Yes.

3    Q.   And would you go to his office from time to

4    time to meet with him?

5    A.   Yes.

6    Q.   Okay.  I'm going take off what you've put on

7    there.  And this time can you identify on this

8    exhibit where Mr. Kamholz's office is, please?

9        All right.  There's a series of buildings over

10   in the upper left-hand corner of the photograph?

11   A.   Right.

12   Q.   And that's -- his office is part of that group

13   of buildings?

14   A.   Yes.

15   Q.   Okay.  And now when you would go to do your

16   inspection at Tonawanda Coke and you wanted to see

17   Mr. Kamholz, did you park your car near the guard

18   house and walk around, or how did you get from the

19   guard house to Mr. Kamholz's office?

20   A.   Well, couple of different scenarios.  One would

21   be prior to the gate being out front, I would have

22   to drive up to the guard house, announce who I was,

23   and ask to see Mr. Kamholz.

24   Q.   Okay.

25   A.   Sometimes he would come up to the guard house

3188

1    to get me.  If I -- they'd ask you do you know

2    where his office is, which I would reply yes.  They

3    would say well, you can proceed back to his office

4    then.  And I would drive back there.

5    Q.  You would drive back there?

6    A.  Yes.

7    Q.  There is like a road that goes back there?

8    A.  Yes.

9    Q.  If Mr. Kamholz came to greet you, would he come

10   in a vehicle, or would he walk over to greet you?

11   A.  He would drive.

12   Q.  All right.  Now, when you would go out to

13   Tonawanda Coke, would you from time to time go to

14   the by-products area?

15   A.  Yes, I would.

16   Q.  All right.  Do you see where the by-products

17   area is on the -- on the photograph?

18   A.  Yes.

19   Q.  Could you do another tap, please, to show the

20   jury?

21       All right.  And that's more on the right-hand

22   middle side of the picture?

23   A.  Yes.

24   Q.  Where you put that, that's where the

25   by-products area is?

1    A.    Not in its entirety.    There is a little more in

2    another area.

3    Q.    Okay.    Maybe just to clear that up, where's the

4    rest of by-products please?

5         I see.    The second -- the higher of the two red

6    blocks you put on, what's in that area?

7    A.    The light oil.

8    Q.    I see.    We've heard about that.    Now, how would

9    you get from Mr. Kamholz's office over to

10   by-products?

11   A.    Can I draw a line on this or --

12   Q.    Go ahead.

13   A.    I would drive my vehicle.

14   Q.    You wouldn't walk from his office over there?

15   A.    Sometimes we would drive from his office to

16   another parking lot, and then walk into the

17   facility.

18   Q.    Okay.    Did you ever walk from his office all

19   the way over to by-products?

20   A.    No.

21   Q.    You would take a vehicle?

22   A.    Yes.

23   Q.    Okay.    Now, when you would do inspections at

24   Tonawanda Coke, is by-products one of the areas

25   that you would look at?

1   A.   Yes.

2   Q.   All right.  Would you also -- part of what you

3   would inspect, would that be the boiler house?

4   A.   Yes.

5   Q.   Can you show the jury where the boiler house is

6   on there, please?

7        All right.  And it looks like there is a tall

8   stack -- at least one tall stack there?

9   A.   Yeah, there's actually I believe three.  Two

10  tall and a shorter one.

11  Q.   All right.  And would you also do inspecting at

12  the -- whether it's called the battery or the

13  ovens?

14  A.   Yes.

15  Q.   Could you please show the jury where that's

16  located on here?

17       Thank you.  Now, in addition to talking to

18  Mr. Kamholz at his office, looking at by-products,

19  looking at the boiler house area, and looking at

20  the oven or battery, was there any other parts of

21  the Tonawanda Coke operation that you would

22  inspect?

23  A.   On a rare occasion also would maybe take a look

24  at the coal piles as far as fugitive emissions,

25  what we call fugitive emissions would go.

1   Q.   For both the benefit of the jury and me, what's

2   a fugitive emission?

3   A.   Basically an emission that is vented to the

4   atmosphere that gets there other than going through

5   a stack.

6       So basically if you have a roadway or pile of,

7   in this case, ground up coal, and the wind blows

8   across it, the emissions off of the -- you know,

9   that you would see off of that would be deemed to

10   be fugitive emissions.

11   Q.   All right.   How frequently would you go out to

12   the coal fields?

13   A.   Very infrequent.

14   Q.   Meaning -- you're there once a year.   Maybe --

15   or how many times total did you go out to the coal

16   fields while inspecting at Tonawanda Coke?

17   A.   Three.

18   Q.   Three times total?

19   A.   Yeah.

20   Q.   All right.   When you went out there, did you

21   make any observations about what activity was

22   occurring?

23   A.   Yes.

24   Q.   All right.   And what -- what observations

25   generally did you make?

1    A.   Well, you would observe truck traffic, and just

2    try to evaluate when the wind was blowing if there

3    was any noticeable amount of dust coming off the

4    piles.

5    Q.   Okay.  Did you ever -- do you know what coal

6    tar sludge is?

7    A.   Yes.

8    Q.   If you don't, just say no.  Don't say you do if

9    you don't.  Do you know what it is?

10   A.   It's -- well, I'm going to say no then.

11   Q.   Did you ever see front end loaders out in the

12   coal field area?

13   A.   Yes.

14   Q.   Okay.  Did you ever observe what they were

15   doing out there?

16   A.   Most of the time just moving -- the coal piles,

17   as I understand it contain -- there's actually many

18   different types of coal.

19             MR. PIAGGIONE:  I'm going to object, your

20   Honor.  This witness is not someone who's an expert

21   in RCRA, has any background in the mixture of coal.

22             THE COURT:  Well, the witness is

23   telling -- his last testimony I'll allow it to go

24   that far.  I mean, it doesn't call for any

25   expertise, and you can cross-examine on that.  But

3193

1    his understanding is the front loaders were moving

2    coal.

3              MR. PERSONIUS:  I think that's what we

4    were getting at.

5    BY MR. PERSONIUS:

6    Q.  Let me ask a leading question.  Did you see the

7    front end loaders moving coal?

8    A.  Yes.

9    Q.  Okay.  Thank you.  We can move on.  Can you put

10   your finger again please where the coal fields are,

11   Mr. Foersch?

12   A.  I'll put a few.  Basically in this area.  I got

13   an arrow for some reason.

14   Q.  You're getting better.  All right.  That's

15   great.

16        What is the -- if you know, do you have any

17   idea what the -- what the acreage is for -- that's

18   occupied by Tonawanda Coke is?

19   A.  I believe in the 150 acre area.  I don't know

20   exactly.

21   Q.  All right.  And just -- I don't know if we

22   can -- if you can -- and maybe you can't.  On this

23   overhead -- well, let's do this.  I'm going to take

24   your things off.

25        And, Lauren, if you could, please, could you

1    make that part bigger please, Lauren?   Thank you.

2        What I wanted to ask, Mr. Foersch -- and I

3    think this will work -- do you know what a

4    quenching tower or quenching station is?

5    A.   Yes.

6    Q.   Do you draw a distinction between a tower or a

7    station?

8    A.   Not really.

9    Q.   Okay.  Is it okay to use either term?

10   A.   Yes.

11   Q.   Okay.  Now -- and which do you prefer, tower or

12   station?

13   A.   Quench tower I prefer.

14   Q.   Are you familiar with the quenching towers at

15   Tonawanda Coke?

16   A.   Yes.

17   Q.   Okay.  Can you look on this exhibit, Government

18   Exhibit 105.37, are you able, again with your

19   finger, to show the jury where the quench towers

20   are located?

21       You've put two red squares on the picture,

22   right?

23   A.   Yes.

24   Q.   The one at the top of the page, what direction

25   is that, do you know?

3195

1    A.   That is to the west side of the plant.

2    Q.   Okay.  And was that tower sometimes referred to

3    as the west quench tower?

4    A.   Yes.  Or tower number 1 --

5    Q.   Okay.

6    A.   -- I believe.

7    Q.   All right.  And where you put the other square,

8    is that roughly where the other quench tower is?

9    A.   Yes.

10   Q.   And that would be to the east?

11   A.   The east.

12   Q.   And did you know that by another designation

13   other than the east quench tower?

14   A.   That would be tower number 2.

15   Q.   Okay.  All right.  Thank you very much.

16       Now, do you remember -- and I suppose we can

17   take that down.  I think we're done with it,

18   Lauren.

19       Do you remember when the first time was,

20   Mr. Foersch, that you went out to Tonawanda Coke?

21   A.   It would -- the very first time would have been

22   when I was with the stack testing unit.  And it

23   would have been in the mid to late '70s.

24   Q.   Are you familiar with when Tonawanda Coke

25   became Tonawanda Coke?

1    A.   Not the exact date, no.

2    Q.   Okay.  Do you know that it was sometime in the

3    '70s?

4    A.   Yes.

5    Q.   Were you out at the site before the site was

6    taken over by the Tonawanda Coke?

7    A.   I don't recall.

8    Q.   Now, you've told us that you would go out to do

9    your inspections at Tonawanda Coke once a year?

10   A.   Yes.

11   Q.   And what was the reason you went once a year?

12   A.   Basically to, you know, at the request of my

13   supervisors to do a visible emissions inspection of

14   the coke oven battery.  Tonawanda was considered a

15   major source, and we were required to inspect major

16   sources once per year.

17   Q.   We've had this described before, but it's been

18   a while.  Could you give the jury a lay definition

19   of what a major source is?  Or can't you?

20   A.   I'd have to quote some numbers, and I can't --

21   I've kind of forgot them.

22   Q.   But is it based on the quantity of emissions,

23   is that what determines it?

24   A.   Typically, yes.  And in a layman's term, the

25   more emissions you had, or if they were hazardous

1   above certain levels, you were deemed a major

2   source.

3   Q.  All right.  Now you mentioned to us in terms of

4   these inspections that you would do on a yearly

5   basis that you were sent out there to check out the

6   ovens?

7   A.  Yes.

8   Q.  Okay.  Can you tell the jury a little bit about

9   what you would do, please, when you would go out to

10  Tonawanda Coke?

11  A.  Well, basically, we would have to go top-side

12  on the ovens and inspect for the number of leaks

13  that they possibly had on charging holes, off-take

14  piping.  We would watch some charging occur.  We

15  would look for door leaks on both sides of the

16  battery.  And we would observe pushing, and that's

17  pretty much what we did at the battery.

18  Q.  Okay.  And as you watched the charging and the

19  pushing, was there something you were looking for?

20  A.  Depending on if it was a lid or an off-take or

21  a door, there was different allowables as far as

22  how much smoke and how long they could emit smoke

23  from them.  And in some cases on pushing we would

24  observe and document the opacity of the smoke.

25  Q.  And again, the opacity means what?

1    A.   It's basically how much the smoke obscures

2    light.  So if you have no smoke present, you have

3    zero percent opacity.  And if you have something

4    that's pitch black that you can't see through, then

5    it's considered a hundred percent opacity.

6    Q.   To be able -- you would do readings of the

7    smoke?

8    A.   Yes.

9    Q.   With the naked eye?

10   A.   Naked eye, yes.

11   Q.   You didn't have any device you used?

12   A.   No.

13   Q.   Did you have some type of training that you

14   received that enabled you to be able to --

15   A.   Yes.

16   Q.   -- to qualify to do that?

17   A.   Yes, I'm sorry.

18   Q.   Would you tell the jury just briefly what that

19   training was?

20   A.   Basically on an annual basis, and certain

21   sources required that we be tested bi-annually.

22   Tonawanda Coke was one of them.  We would basically

23   go out, and they had a smoke generator which could

24   emit varying opacities from zero to a hundred

25   percent.  And it had an optical eye on it that

1    would read the opacity.  And we would have to be

2    able to read the opacity, and our results were

3    compared with the optical eye.  And you basically

4    had to be able to read within a certain standard.

5    Q.  And how frequently did you have -- was that

6    like a test you had to take?

7    A.  Yes.

8    Q.  How frequently did you have to do that?

9    A.  Twice a year.

10   Q.  Twice a year.  Okay.

11   A.  Yes.

12   Q.  Now, you mentioned that, as part of your

13   inspections, you would also go to -- I think you

14   said by-products and the boiler area --

15   A.  Yes.

16   Q.  -- is that true?  And every year when you would

17   go out, would you go to the ovens, to the boiler,

18   and to by-products?  Did it work that way?

19   A.  In the early years it was primarily the ovens

20   and the boiler house.  The by-products when I first

21   started did not have permits.

22   Q.  Okay.  So each year when you went out, as you

23   say, in the early years, then would you go to both

24   the ovens and also to the boiler house?

25   A.  Yes.  Yes.

1   Q.  All right.  And then there came a time when you

2   also included the -- the by-products area in your

3   inspections?

4   A.  Right.

5   Q.  And once that -- we'll get to when that was in

6   a minute.  Once that happened, each time you went

7   out would you go to all three areas?

8   A.  Not necessarily.

9   Q.  All right.  We should probably explore that a

10  little bit.  How did you decide when you went out

11  to do an inspection where you would spend your

12  time?

13  A.  It was primarily devoted to the battery itself,

14  because that's where most of the emissions were

15  coming from at the time.

16  Q.  Okay.  And did that -- that focus on the

17  battery, was that a decision you made, or was that

18  a decision someone else made for you?

19  A.  Typically it was my supervisor would tell me to

20  go out and do a Method 9 as they called it,

21  inspection of the battery.

22  Q.  And again, this had to do with taking these

23  opacity --

24  A.  Method 9 is a specific method that spells out

25  the requirements for performing a visible emissions

1    inspection.

2    Q.  All right.  And this focus on the -- if I can

3    call it that, a focus during your inspections on

4    the oven or battery area, did that continue

5    throughout the 30 years that you would go out to

6    Tonawanda Coke?

7    A.  Yes.

8    Q.  All right.  And would there be some times then

9    that you would go out that you wouldn't spend any

10   time, for example, in the boiler area?

11   A.  On a rare occasion, yes.

12   Q.  All right.  And how about the -- once you

13   started inspecting the by-products area, would

14   there be years that you wouldn't check the

15   by-products area at all?

16   A.  By that time probably not.  It would be most

17   ever time.

18   Q.  You would go to by-products?

19   A.  Yes.

20   Q.  And when was it that part of your inspection

21   duties began to include the by-products area, when

22   did that happen?

23   A.  The permitting of the by-products area started

24   in I believe 1984.

25   Q.  Okay.  I think you had told us you started

1    going out to Tonawanda Coke around 1980 or so?

2    A.   Probably in '81.

3    Q.   Okay.  All right.  Thank you.  When you would

4    go out and do these annual inspections, was there a

5    period of time that you would spend at the

6    facility?  You know -- you know, you don't know.

7    Minutes, hours, each time you went?

8    A.   Well, I'd usually allotted pretty much a day

9    for the inspection.

10   Q.   So about eight hours?

11   A.   No.  I'm allowing -- probably about five.

12   Q.   Okay.  All right.

13        Could we have put up on the screen, please

14   Lauren, this is in evidence, Government

15   Exhibit 19.01.

16        Do you see this Exhibit 19.01 on your screen?

17   A.   Yes.

18   Q.   I guess let's do this so it's a little easier

19   to read.  Could we have that bigger please, Lauren?

20        Okay.  It's easier to read, right?

21   A.   Yes.

22   Q.   Okay.  And this is a letter dated March 13 of

23   1981, right?

24   A.   Yes.

25   Q.   And have you seen -- it's from Mr. Kamholz,

1    right?

2    A.   Yes.

3    Q.   To a Robert Armbrust, A-R-M-B-R-U-S-T?

4    A.   Correct.

5    Q.   At Region 9?

6    A.   Right.

7    Q.   Here in Buffalo?

8    A.   Yes.

9    Q.   Okay.  Who at the time was Robert Armbrust, if

10   you remember?

11   A.   He would have been, again, the Regional Air

12   Pollution Control Engineer at the time.

13   Q.   Okay.  Would that make him the head of the air

14   section?

15   A.   Head of the Division of Air, yes.

16   Q.   Would that be before Mr. Sandonato took that

17   position?

18   A.   Yes, it would.

19   Q.   Okay.  Have you seen this letter before?

20   A.   I think so.

21   Q.   You've seen it maybe in the file?

22   A.   Yes.

23   Q.   I think there's a -- Lauren, if you could

24   please go to page 03.

25        Now page 03 is on -- has a heading on it of

1    Tonawanda Coke Corporation, is that correct?

2    A.   Correct.

3    Q.   Do you recognize what is shown in this exhibit?

4    A.   It's what we would call a basic flow diagram.

5    Q.   Do you remember having seen this before?

6    A.   I believe I've seen this particular piece of

7    paper, yes.

8    Q.   All right.  And now, do you know what the

9    reason was for this diagram being submitted to the

10   DEC by Tonawanda Coke?

11   A.   If it was submitted in '81?

12   Q.   Yes.

13   A.   Not exactly.  I'm not exactly sure.

14   Q.   Would it be fair to describe this as a

15   primitive flow diagram?

16   A.   Yes.

17            MR. PIAGGIONE:  Objection, your Honor.  He

18   already testified he was not aware of what this

19   was.

20            THE COURT:  I think you're going to move

21   on from here.

22            MR. PERSONIUS:  Yes.  Just to get across

23   the point, if it's appropriate, Judge, that this a

24   pretty rudimentary diagram.

25            THE WITNESS:  Yes, it is.

1          MR. PERSONIUS:  Okay.

2          THE COURT:  I'll let it stand.  Thank you.

3          MR. PERSONIUS:  Thank you, Judge.

4    BY MR. PERSONIUS:

5    Q.  Lauren, would you please put defense -- this is

6    for identification, Defense Exhibit MM on the

7    screen?

8         Mr. Foersch, do you see that there's now a

9    document that's Defense Exhibit MM.  It's for

10   identification.  Do you see that sticker on it?

11   A.  Yes.

12   Q.  Is this document familiar to you?

13   A.  Yes, it is.

14   Q.  Okay.  And it was actually prepared by you?

15   A.  Yes.

16   Q.  It relates to Tonawanda Coke?

17   A.  Correct.

18   Q.  And the date of it, can you read the date?

19   A.  May 6th, 1981.

20   Q.  Okay.  Would this have been at a time when you

21   were doing inspections at Tonawanda Coke?

22   A.  Yes.

23   Q.  Okay.

24          MR. PERSONIUS:  Your Honor, we offer this.

25          MR. PIAGGIONE:  No objection, your Honor.

1           THE COURT:  Okay.  MM -- let's see,

2    Mr. Linsin, no objection?

3             MR. LINSIN:  No objection, your Honor.

4             THE COURT:  Received, no objection.  It

5    may be published.

6             (Defendants' Exhibit MM was received into

7             evidence.)

8             MR. PERSONIUS:  Thank you, Judge.

9    BY MR. PERSONIUS:

10   Q.  All right.  Now, could we make that part

11   bigger, Lauren?  Thank you.

12       What we have on the screen is part of this

13   Defendants' Exhibit MM in evidence blown up, is

14   that correct, Mr. Foersch?

15   A.  Yes.

16   Q.  All right.  And it indicates up at the top

17   that -- the first sentence is that on May 5, 1981,

18   a Mr. Stanton and you documented visible emissions

19   at the subject facility?

20   A.  Correct.

21   Q.  All right.  Who was Mr. Stanton?

22   A.  He was my supervisor at the time.

23   Q.  And can you just tell the jury generally what

24   the purpose of this memo was?

25   A.  Basically to determine compliance with our regs

1    at the time.

2    Q.  And regs related to?

3    A.  The amount of smoke and the opacity of the

4    smoke coming from the oven.

5    Q.  From the oven?

6    A.  Yes.

7    Q.  And would it be fair to describe this as

8    documenting an oven inspection?

9    A.  Yes, at the time.

10   Q.  That was conducted on May 5 of 1981?

11   A.  Yes.

12   Q.  Lauren, would you please put Government Exhibit

13   in evidence 19.02 on the screen?

14       We now have Exhibit 19.02 on the screen,

15   Mr. Foersch?

16   A.  Yes.

17   Q.  Is this -- is this a letter?

18   A.  Yes.

19   Q.  Okay.  Is this familiar to you?

20   A.  Yes, it is.

21   Q.  All right.  Please make that bigger, Lauren.

22       Now, if you recall, this was a Tonawanda Coke

23   letter to Stanley Gubner, G-U-B-N-E-R?

24   A.  Gubner.

25   Q.  I'm sorry, Gubner.  Who was Mr. Gubner?

1    A.   He would have been the RAPCE that replaced

2    Robert Armbrust.

3    Q.   I see.

4    A.   When I say RAPCE, Regional Air Pollution

5    Control Engineer.

6    Q.   It went from Armbrust to Gubner --

7    A.   To Gubner, Sandonato to Sitzman.

8    Q.   Okay.  Thank you.  Now, this -- in this letter

9    it's dated September 19 of 1983?

10   A.   Yes.

11   Q.   All right.  The first paragraph indicates

12   certain applications, sir, are being forwarded,

13   right?

14   A.   Yes.

15   Q.   And then the rest of the letter, do you see in

16   the second paragraph, second line there's a

17   reference to QUEN1?

18   A.   Yes.

19   Q.   And do you remember this letter being sent in?

20   A.   No.

21   Q.   Do you know that in and around 1983, 1984, DEC

22   granted permission to Tonawanda Coke to operate the

23   number 1 quench tower without baffles?

24   A.   No.

25   Q.   You're not familiar with that?

1    A.   No.

2    Q.   Okay.  Did you ever -- while you were working

3    for DEC, did you ever have knowledge that Tonawanda

4    Coke had a formal exemption from the DEC from

5    having baffles in quench tower number 1?

6              MR. PIAGGIONE:  Objection, your Honor.

7    It's already been asked and answered I believe.

8              THE COURT:  It's a different question.

9    Overruled.  You may answer.

10             THE WITNESS:  Could you repeat the

11   question?

12   BY MR. PERSONIUS:

13   Q.   Yes.  While you were working at the DEC, did it

14   ever come to your attention that DEC had given

15   Tonawanda Coke an exemption from the baffles

16   requirement for tower number 1?

17   A.   Yes, they did.

18   Q.   Okay.  And do you remember when Tonawanda Coke

19   received that exemption?

20   A.   The exemption I'm thinking of was later on,

21   maybe late '80s.

22   Q.   All right.  This -- this letter, just if you

23   would, just take a minute, please, and read it to

24   yourself.  And my question is going to be, after

25   you've taken a look at it, whether it's familiar to

3210

1    you.  If it's not, we'll move on.  If it is, I want

2    to ask you a few questions.

3              MR. PIAGGIONE:  Again, objection, your

4    Honor.  He already said he does not recognize this

5    letter.  Twice he answered it.

6              MR. PERSONIUS:  I'm asking to read it to

7    himself to see if it's familiar to him.

8              THE COURT:  I'll permit it.

9              MR. PERSONIUS:  Thank you.  When you

10   finish this page, let us know, Mr. Foersch, because

11   there is a second page also.

12             THE WITNESS:  Okay.

13   BY MR. PERSONIUS:

14   Q.  Could we go to the second page, Lauren?

15       Please read he that to yourself also,

16   Mr. Foersch.

17       Are you finished reading it?

18   A.  Yes.

19   Q.  Having read it, does that help you remember

20   having seen this letter before?

21   A.  Not really.  I was aware of an exemption but --

22             THE COURT:  Let's move on, Mr. Personius.

23             MR. PERSONIUS:  We will, Judge.

24   BY MR. PERSONIUS:

25   Q.  Would you please, Lauren, put on the screen

1    Government Exhibit 19.17 which is in evidence?

2        Do you see on the screen this exhibit,

3    Mr. Foersch?

4    A.   Yes.

5    Q.   All right.  Please make that part bigger,

6    Lauren.

7        Just take, if you would, a quick look at this

8    letter and let us know if this letter is familiar

9    to you, Mr. Foersch.

10   A.   Yes, this one is.

11   Q.   This one is?

12   A.   Yes.

13   Q.   This one is dated March 14 of 1984?

14   A.   Yes.

15   Q.   You were copied on this letter?

16   A.   Yes.

17   Q.   All right.  And what was the -- if you recall,

18   what was the purpose of this letter?

19   A.   As I recall it, it was a request to use quench

20   tower number 1 on a limited basis, because they had

21   to perform maintenance or other work on the quench

22   tower number 2.  And they had to keep the process

23   running, and also I believe they had to use it

24   occasionally in the winter to keep it from freezing

25   up.

3212

1  Q.  And by "it" you mean quench tower number 1?

2  A.  Quench tower number 1.

3  Q.  All right.  How long did this exemption

4  continue, do you remember?

5  A.  I was under the intention -- or impression it

6  continued through my employment.

7  Q.  So through --

8  A.  Through 2000 -- through November of 2009 when I

9  left, I was under the impression it was still in

10  effect.

11  Q.  Okay.  You're aware that there came a point in

12  time when Tonawanda Coke was issued a Title V

13  permit?

14  A.  Yes.

15  Q.  Do you remember when that was?

16  A.  It would have been the early 2000s.

17  Q.  All right.  And are you aware that that Title V

18  permit had reference in it to each of the two

19  Tonawanda Coke quench towers?

20  A.  Yes, I am.

21  Q.  All right.  And do you remember what was

22  provided for in that Title V permit regarding tower

23  number 1?

24  A.  Could you be a little more specific?

25  Q.  Yes, I can.  Did the permit, the Title V

1    permit, with respect to tower number 1, address

2    whether or not baffles were required in that tower?

3    A.   Yes, it did.

4    Q.   And do you remember what it said?

5    A.   It required baffles.

6    Q.   Okay.  But your understanding was that this

7    exemption took precedence over that condition of

8    the permit?

9    A.   Yes, that was my -- yes.

10   Q.   Did you ever discuss that understanding that

11   you had with anyone at DEC?

12   A.   With DEC you say?

13   Q.   Yes.

14   A.   In what time period are we talking or --

15   Q.   During between -- well, I guess between when

16   the permit became effective and the time you

17   retired.

18   A.   No.  No.

19   Q.   Okay.  All right.  Now, in this letter --

20   again, this is Government Exhibit 19.17.  Can -- I

21   know what we do.

22       Lauren, can you highlight that sentence,

23   please?  It starts right there.

24       This sentence that's on the screen right now,

25   it starts with "since the dimensions", do you see

 1    that?

 2    A.   Yes.

 3    Q.   And it says -- as it continues it says, "The

 4    dimensions of the quench tower would require a

 5    significant amount of expense for very little

 6    reduction in particulate control."  It goes on to

 7    say the exemption is granted, right?

 8    A.   Yes.

 9    Q.   Do you know what that phrase means, "very

10    little reduction in particulate control"?

11    A.   Yes.

12    Q.   Would you tell the jury what your understanding

13    is as to the intent of that phrase?

14    A.   Well, it would obviously be -- you know, quench

15    towers are quite large in cross-sectional area, and

16    to install a number of baffles as was required in

17    our regulation would have obviously cost the firm a

18    certain amount of money.  And it was felt that

19    baffle systems are very low in efficiency.  In

20    other words, they collect certain sized particles

21    pretty good and then everything else goes right

22    through them.  So the department felt that given

23    the cost of the baffle system and the very little

24    difference in emissions that would be made, that it

25    would grant the exemption.

1    Q.  Were you part of that discussion that led to

2    this determination that the exemption would be

3    granted?

4    A.  No, I was not.

5    Q.  You got to wait for me.

6    A.  Sorry.

7    Q.  It's all right.  Could we have the full exhibit

8    again please, Lauren.  19.17.  All right.  I think

9    that's it.  Could we go please, Lauren, to

10    Exhibit -- Government Exhibit in evidence 19.03.

11        We're going to make this bigger because this is

12    hard to see.  Do you recognize this --

13    A.  Yes.

14    Q.  -- exhibit.  Just in this size can you tell the

15    jury what it is?  We can make it a little bigger if

16    you need to in certain areas.

17    A.  That is one of our original, what we call the

18    operating certificates or an Air 100.  It's

19    basically the permit that the department issued to

20    a company giving them -- granting them permission

21    to operate a particular emission point or emission

22    source.

23    Q.  Okay.  Lauren, could you please make that upper

24    part bigger?  That helps a lot.  Thank you.  Okay.

25        Now that it's bigger, can you tell which

3216

1    facility at Tonawanda Coke this permit related to?

2    A.   Quench tower number 1.

3    Q.   Could you point to the jury where you see that,

4    please?

5    A.   Okay.

6    Q.   And there's some language where it says

7    "describe the process or unit", do you see that?

8    A.   Yes.

9    Q.   Would you read that for the jury, please?

10   A.   "Incandescent foundry coke is transported in a

11   standard gauge railcar into a tower.  Approximately

12   a four-minute period in each cycle.  This unit has

13   a large stack area, 1,017 square feet, therefore,

14   the upward velocity is lower and less apt to

15   entrain particulates in the steam plume."

16   Q.   And guess what I'm going to have you do?  First

17   of all, where it talks about "the unit has a large

18   stack area", do you know what that means?

19   A.   Yes.

20   Q.   Would you tell the jury what that means,

21   please?

22   A.   It's -- well it's the cross-sectional area of

23   the tower.

24   Q.   And by cross --

25   A.   The width in feet and/or inches and the length

1   in feet and/or inches.

2   Q.   This would be the opening of the tower?

3   A.   It would be the opening of the tower, yes.

4   Q.   Okay.  And then it goes on to say that "The

5   upper velocity is lower and less apt to entrain

6   particulates in the steam plume."  Do you see that

7   phrase?

8   A.   Yes.

9   Q.   Do you understand what that means?

10  A.   Yes.

11  Q.   Would you explain that to the jury, please?

12  A.   Basically, what we're dealing with in a quench

13  tower, you have to take the incandescent coke and

14  rapidly cool it, otherwise it can basically -- it's

15  carbon and it becomes consumed.  So you have to

16  quench it very quick.  When you dump large

17  quantities of water on this railcar full of hot

18  incandescent coke, you get an immediate large --

19  generation of a large amount of steam, and the

20  velocity of the steam rising upward would pull

21  particulates off the coke and emit them to the air.

22      So what this is saying is by having a large

23  cross-sectional area as opposed to a narrow area,

24  the velocity is less, and, therefore, the

25  entrainment of particulate is less.  So you don't

1    have the particulate matter being transferred into

2    the air.

3    Q.   And that word "entrainment" that you used, what

4    does that mean, "entrainment of particulate"?

5         In the phrase says "less apt to entrain

6    particulates."  I'm just wondering what does the

7    word "entrain" mean.

8    A.   Basically you have the air movement caused by

9    the rapid formation of the steam, it's basically

10   wind if you want to call it that, grabbing the

11   particulate and pulling it upward.

12   Q.   Okay.  Would you make the exhibit larger again

13   please, Lauren?  And could you just make the bottom

14   part bigger, please?

15        Now, you see on here, Mr. Kamholz signed this?

16   A.   Yes.

17   Q.   And your name is on here also?

18   A.   Yes.

19   Q.   Okay.  And would you just read the special

20   conditions for the jury please down at the bottom,

21   this area here?

22   A.   "This emission point shall be maintained as a

23   standby unit.  Use is limited to less than

24   10 percent of total quenches.  The installation of

25   baffles is not required due to unreasonable cost

1    and physical impairments."

2    Q.  Now, did you write that, or did somebody else

3    write that clause in there?

4    A.  That is my handwriting.

5    Q.  All right.  And when you -- when you wrote this

6    and you talked about it's limited to less than

7    10 percent of the total quenches, total quenches

8    measured over what period of time?

9    A.  There was -- I would say on an annual basis.

10   Q.  Okay.

11   A.  Because typically we looked at emissions based

12   on an annual basis.

13   Q.  All right.  And how is that -- if you know, how

14   was it to be determined what the usage was?

15   A.  We would -- I guess I didn't have a way to

16   check that.  We would rely on Mr. Kamholz or who's

17   ever in charge of that at Tonawanda Coke to keep

18   below that limit.

19   Q.  I see.  And was he ever -- was it -- was it

20   the -- in your view, at least was it the facility's

21   obligation to let DEC know what the usage was?

22   A.  Yes, it would have been.

23   Q.  All right.  Did you ever inform Mr. Kamholz

24   that that was a facility obligation?

25   A.  He would have received a copy of this permit,

1    so via -- via his copy of this permit, he would

2    have been informed of that requirement.

3    Q.  So your view was, simply by the language here,

4    that that would put him and Tonawanda Coke on

5    notice that it was their obligation to let DEC know

6    if the usage exceeded 10 percent?

7    A.  Yes.

8    Q.  To be clear, you never told him that was his

9    obligation?

10            MR. PIAGGIONE:  Objection, your Honor.

11   Asked and answered.  I'll permit it.  It is.  But

12   I'll permit it.  What was your answer?

13            THE WITNESS:  Repeat that, please.

14   BY MR. PERSONIUS:

15   Q.  To be clear, you never told him that other than

16   what you put in the permit?

17   A.  No.  I don't think so.

18   Q.  All right.  Could we go, Lauren, please to

19   Government Exhibit 19.04 in evidence.

20       Do you recognize -- we can make it bigger if we

21   need to.  Do you recognize what this is,

22   Mr. Foersch?

23   A.  Yes, basically a newer rendition of the

24   previous form.

25   Q.  Okay.  Well, we're going make part of it a

1    little bigger.  The top part, Lauren, could you

2    please make that bigger?

3        Are you able to tell, Mr. Foersch, from making

4    the top half of this bigger, what quench tower this

5    relates to?

6    A.   It appears to be quench tower number 2.

7    Q.   That would be the other one?

8    A.   Yes.

9    Q.   Could you make the -- thank you, Lauren.  And

10   could you make the bottom part bigger?  Thank you.

11       And again this is -- this is signed by you?

12   A.   Well, showing that I did the inspection yes.

13   Q.   All right.  And was this permit that you issued

14   for the quench tower number 2?

15   A.   Yes.

16   Q.   All right.  And at the time this was issued, if

17   you can -- can you read that?  It's very hard to

18   read.  Can you read that sentence that I just put

19   the bracket in front of?

20   A.   It says this quench tower does have an approved

21   baffle system.

22   Q.   Okay.  And the date of this document is what,

23   please?  Do you remember?  Or can you tell?

24   A.   It was issued in March of 1984.

25   Q.   All right.  And as of -- as of that date, do

1    you know if there were baffles in quench tower

2    number 2?

3    A.   Yes.

4    Q.   Were there?

5    A.   Yes.

6    Q.   Okay.  You can take that down, Lauren, please.

7    Would you go please to Government Exhibit 3521.04

8    for identification?

9         Do you recognize this exhibit, Mr. Foersch?

10   A.   Yes, I do.

11   Q.   All right.  And was this -- is this a copy of a

12   letter you sent to Tonawanda Coke?

13   A.   Yes.

14   Q.   And the date was when?

15   A.   October 22nd, 1984.

16   Q.   All right.  And did it relate to a planned EPA

17   inspection at Tonawanda Coke?

18   A.   Yes.

19            MR. PERSONIUS:  Okay.  Your Honor, I offer

20   it.

21            MR. PIAGGIONE:  No objection, your Honor.

22            THE COURT:  Mr. Linsin?

23            MR. LINSIN:  No objection, your Honor.

24            THE COURT:  Okay.  3521.04 received into

25   evidence, no objection.  And may be published.

1           (Government's-Exhibit 3521.04 was received

2           into evidence.)

3           MR. PERSONIUS:   Thank you, Judge.

4    BY MR. PERSONIUS:

5    Q.  Just to make it easier to read, Mr. Foersch,

6    would you -- Lauren, would you make that bigger,

7    please?

8         Now, in this letter in the first paragraph you

9    talk about an inspection planned for November 14,

10   1984?

11   A.  Yes.

12   Q.  And you refer to the EPA coming to the

13   facility?

14   A.  Yes.

15   Q.  Do you know if the EPA had come to Tonawanda

16   Coke before this date?

17   A.  I don't know for sure.

18   Q.  All right.  Did -- was there an inspection at

19   Tonawanda Coke on November 14 of 1984, do you know?

20   A.  I believe so.

21   Q.  All right.  Did you participate in it?

22   A.  Yes.

23   Q.  All right.  Do you remember anything about that

24   inspection?

25   A.  No.

1    Q.   Nothing?

2    A.   No.

3    Q.   Okay.  Lauren, could we please go to Government

4    Exhibit 19.05 in evidence?  Thank you, Lauren.

5         Mr. Foersch, do you see a letter on the screen?

6    A.   Yes.

7    Q.   And do you recognize this letter?

8    A.   Yes, I do.

9    Q.   All right.  Again we will I try to move through

10   these.  Could you make that bigger, please, Lauren?

11        This letter's dated November 21, 1984, right?

12   A.   Yes.

13   Q.   And did you remember from the last letter that

14   the EPA inspection was going to be on November 14

15   of 1984?

16   A.   Yes.

17   Q.   This letter refers back to that inspection, is

18   that true?

19   A.   Yes.

20   Q.   All right.  And in this letter did you make a

21   request to Mr. Kamholz that something be provided?

22   A.   Yes, I did.

23   Q.   And what was it you asked for?

24   A.   Basically the department was updating its air

25   emission inventory.  And you have to remember that

1    our operating permit system was basically evolving

2    at that time.  We only had the battery and the

3    boiler house and the two quench stacks listed as

4    emission points.  And it had come to our attention

5    that the by-products area most likely included a

6    number of emission sources that would require

7    permits.

8    Q.  Okay.  So this was a request?

9    A.  This was a request, yes.

10   Q.  All right.  Lauren, could we go to Government

11   Exhibit 19.07 in evidence, please?

12       Do you recognize this exhibit, Mr. Foersch?

13   A.  Yes, I do.

14   Q.  All right.  Thank you, Lauren.

15       This is a letter that you sent to Mr. Kamholz

16   dated March 5th of 1985?

17   A.  Correct.

18   Q.  So it's about four months after -- four or five

19   months after the last letter?

20   A.  Yes.

21   Q.  And it indicates that you got a process diagram

22   from Tonawanda Coke?

23   A.  Yes.

24   Q.  And what was the purpose of this letter?

25   A.  To follow up on the inspection that was

1    performed, and to identify the emission points that

2    we felt would be required under the current

3    regulations to obtain permits.

4    Q.  All right.  Do you see that -- well, I put it

5    back.  Do you see the word "exempt" is handwritten

6    in?

7    A.  Yes, I do.

8    Q.  Whose handwriting is that?

9    A.  That was mine.

10   Q.  What was your intent in putting the word

11   "exempt" there?

12   A.  Basically we originally identified a vent on

13   WO, which stands for wash oil still.  After my

14   review of our regulations, I felt that there was an

15   exemption that might apply based on the type of

16   liquid that was stored in that tank.  And as I

17   recall it, I asked Mark for additional information

18   regarding the vapor pressure of the wash oil that

19   was in the tank.  And it was such that we would

20   be -- it was -- the material in the tank didn't

21   volatilize, didn't evaporate readily, and therefore

22   very little would be emitted to the atmosphere, and

23   basically there was an exemption granted based on

24   the typical low emissions that you would expect.

25   Q.  Okay.  As of 1985 were there, under the state

1    rules, exemptions for certain types of emission

2    points?

3    A.  Yes, there were.

4    Q.  Okay.  And to the extent that emission points

5    were exempt, was it understood they would not have

6    to appear on the flow diagrams that were submitted

7    to you?

8    A.  They wouldn't have to, no, I guess not.

9    Q.  Could we go, Lauren, please, to Defense Exhibit

10   QQQ.01, which is in evidence?

11       There's a photograph on the screen,

12   Mr. Foersch.  Do you see that?

13   A.  Yes.

14   Q.  And it's identified as Defendants' Exhibit

15   QQQ.01?

16   A.  Yes.

17   Q.  All right.  Do you recognize what's shown in

18   that photograph?

19   A.  It appears to be some piping in the by-products

20   area.  And the large building in the background is

21   the coal handling building.

22   Q.  Okay.  I'm going to try not to do it backwards.

23   I put an arrow next to a pipe that's standing up?

24   A.  Yes.

25   Q.  Okay.  And do you know what that is?

3228

1    A.   No.

2    Q.   All right.  Do you remember on how many

3    occasions you inspected the by-products area at

4    Tonawanda Coke?

5    A.   Rough estimate, 15 times.

6    Q.   All right.  And it may have -- did it vary from

7    time to time how much time you spent in

8    by-products?  How much of your --

9    A.   Yes.

10   Q.   -- five hours you'd spend there?

11   A.   Yes.

12   Q.   Okay.  Do you remember what the -- what the

13   longest period of time was you spent in by-products

14   on those 15 occasions?

15   A.   No.

16   Q.   All right.  Can you give us any sense at all --

17   without guessing, any sense of how long you would

18   spend inspecting by-products when you looked at it?

19   A.   Two hours.

20   Q.   Two hours.  All right.  And as you were

21   inspecting by-products, is one of the things you

22   were doing to look for emission points?

23   A.   Yes.

24   Q.   Okay.  And this -- where I've put this arrow,

25   is it your testimony that you never noticed that --

1    that pipe?

2    A.  Yes.

3    Q.  Okay.  Can we agree that appears to be an

4    emission point?

5            MR. PIAGGIONE:  Objection, your Honor.

6    Now he's leading.

7            MR. PERSONIUS:  And it is.

8            THE COURT:  I'll allow the question.  You

9    may answer if you can.

10           THE WITNESS:  Yes.

11   BY MR. PERSONIUS:

12   Q.  Okay.  Thank you.  Now, as we continue from the

13   mid '80s into the mid '90s, would it be fair to say

14   that you would have been going back to Tonawanda

15   Coke at least on an annual basis?

16   A.  Yes.

17   Q.  And spending five hours or so at the facility?

18   A.  Yes.

19   Q.  And during that period of time from 1985 to

20   1995, would you have gone to by-products -- you can

21   take that down, Lauren.

22       -- would you have gone to the by-products area

23   every time or just periodically?

24           MR. PIAGGIONE:  Objection again, your

25   Honor.  This had been asked and answered.

1           THE COURT:  I'll permit it.  Overruled.

2           THE WITNESS:  Periodically.

3    BY MR. PERSONIUS:

4    Q.   Okay.  What would determine whether you went to

5    by-products during a given inspection?

6    A.   There was no set criteria.  My annual

7    inspection typically keyed on the emissions off the

8    battery.  And I imagine time permitting, I'd spend

9    as much time in the by-products area as I could.

10   Q.   Okay.  But, again, during that time period your

11   main focus was on the battery?

12   A.   Yes, was still on the battery.

13   Q.   During that whole period, was that your

14   decision or was that guidance you got from your

15   supervisor?

16   A.   That was typically directed to go out and do a

17   visible emissions inspection on the battery.

18   Q.   It came from your supervisor?

19   A.   Yes.

20   Q.   All right.  Could we go, please, to, Lauren, to

21   Government Exhibit in evidence 3521.10?

22        Do you see on the screen a memorandum,

23   Mr. Foersch?

24   A.   Yes.

25   Q.   Do you recognize it?

1    A.   Yes.

2    Q.   Are you the author of it?

3    A.   Yes.

4    Q.   Okay.   Please make it bigger, Lauren.

5         The date of this memorandum is October 18,

6    1994?

7    A.   Correct.

8    Q.   And you did a memo to a Michael Podd, P-O-D-D,

9    correct?

10   A.   Yes.

11   Q.   All right.   And who was Mr. Podd at the time?

12   A.   He would have been employed in the hazardous

13   waste remediation section.

14   Q.   All right.   Do you remember what the reason was

15   you sent this memorandum to him?

16   A.   Not exactly, no.

17   Q.   All right.   There is a -- would you highlight

18   that sentence please, Lauren?

19        Would you read that sentence please,

20   Mr. Foersch?

21   A.   "The firm historically has been in compliance

22   with our regulations with only an occasional upset

23   or malfunction causing any problem."

24   Q.   Those were your words?

25   A.   Yes.

3232

1    Q.  And at the time you wrote those on October 18

2    of 1994, to your knowledge was that accurate?

3    A.  Yes.

4    Q.  Can we go please, Lauren, to Government

5    Exhibit 19.11.1 in evidence?

6        Do you recognize this exhibit, Mr. Foersch?

7    A.  Yes.

8    Q.  Okay.  This letter was addressed to you --

9    A.  Yes.

10   Q.  -- from Mr. Kamholz?

11   A.  Yes.

12   Q.  Okay.  We're going to make it a little bigger

13   so it's easier to read.  I think that's good

14   enough, thank you.

15       All right.  Now, the "regarding" on this is

16   number 2 quench tower?

17   A.  Yes.

18   Q.  That was the tower to the east?

19   A.  Yes, it was.

20   Q.  And do you remember receiving this letter?

21   A.  Yes.

22   Q.  And do you have a recollection of what

23   Mr. Kamholz was asking for in the letter?

24   A.  Yes.

25   Q.  And what was that?

1    A.  Basically the tower at that time was quite

2    tall, looks like about 70 feet, and he was asking

3    if he could lower the height of the -- basically

4    remove the upper portion of the tower and leave

5    just the remaining lower portion in place.

6    Q.  All right.  I'm not -- I'd like to make that

7    paragraph bigger, please, Lauren.  It's the third

8    paragraph.

9        I'm not going to ask you to read this out loud,

10   Mr. Foersch, but you've read this -- this paragraph

11   before, right?

12   A.  Yes.

13   Q.  Okay.  You're familiar with the argument that's

14   being set forth in this paragraph?

15   A.  Yes.

16   Q.  Would you explain what your understanding is of

17   that argument to the jury please?

18   A.  It's basically a repeat of the argument that

19   was made for quench tower number 1, as far as being

20   low to the ground and wide that there would be less

21   entrainment and carry-out of any particulate into

22   the air.

23   Q.  When you say "low to the ground", what is your

24   reference point?  What being low to the ground?

25   A.  Well, I'm -- it says it would only be 40 feet

1    high as opposed to it started at 70.

2    Q.  Almost cutting it in half?

3    A.  Yes.

4    Q.  All right.  And after you received this letter,

5    what did you do with it?

6    A.  I would have discussed it with my supervisors.

7    Q.  At the time who was that please?  This is 1996

8    if that helps.

9    A.  Probably Henry Sandonato -- Stanley Gubner or

10   Henry Sandonato, one or the other.

11   Q.  All right.  Do you see -- put the whole letter

12   up again, please.  And then, Lauren, make that part

13   there bigger, please.  It's the handwritten part of

14   the letter.

15       There's handwriting there, do you see it?

16   A.  Yes.

17   Q.  And whose handwriting is that?

18   A.  That would be mine.

19   Q.  All right.  And it refers to "discussed with HS

20   1/6/97", is that what it says?

21   A.  That appears what I read too, yes.

22   Q.  And HS would have been whom, please?

23   A.  Henry Sandonato.

24   Q.  And do you remember the substance of your

25   conversation about this letter with Mr. Sandonato?

1    A.   Not the specifics, no.   But it would have been

2    in regards to the arguments that Tonawanda Coke had

3    made relative to the environmental impact of, you

4    know, lowering the stack and stuff.

5    Q.   Okay.   All right.   This -- this concept of a

6    lowered stack and less of the particulates coming

7    out because you've got less velocity in the steam,

8    am I describing it correctly, is that the point?

9             MR. PIAGGIONE:   Again, it's leading, your

10   Honor.   Objection.

11            THE COURT:   All right.   It's out there.

12   Why don't you ask him a question again, please.

13   BY MR. PERSONIUS:

14   Q.   Okay.   I'm trying to simplify the point.   Is

15   the point that if the tower is shorter, you're

16   going to have less steam velocity, and therefore

17   it's going to pull fewer of the particulates into

18   the atmosphere?

19   A.   Yes.

20   Q.   That's the argument?

21   A.   Yes, that would be part of it.

22   Q.   And did you discuss that argument with

23   Mr. Sandonato?

24   A.   Yes.

25   Q.   All right.   And did he indicate to you whether

1    he agreed or disagreed with that argument?

2    A.   I believe he agreed.

3    Q.   Okay.  And did you have a point of view on that

4    argument as to whether or not it had validity?

5    A.   Yes.

6    Q.   What was your viewpoint?

7              MR. PIAGGIONE:  Objection, your Honor.  I

8    believe that's irrelevant at this point.

9              THE COURT:  I'm sorry, say that again.

10             MR. PIAGGIONE:  It's irrelevant.  He's

11   already indicated that they had agreed in this

12   letter that they were going to permit this.

13             MR. PERSONIUS:  This is about the -- not

14   whether they agreed to the reduction, your Honor.

15   It's the argument that was being made about

16   velocity and pulling out the particulates.

17             MR. PIAGGIONE:  Again, it's irrelevant,

18   your Honor.

19             THE COURT:  What's the relevancy?

20             MR. PERSONIUS:  I'll ask it a different

21   way.

22   BY MR. PERSONIUS:

23   Q.   Did you discuss your reaction to this argument

24   with Mr. Kamholz?

25   A.   Repeat that.

3237

1    Q.   Were there times when you talked to Mr. Kamholz

2    about this argument that he made regarding the

3    height of the towers and the velocity of the steam?

4    A.   Yes, there were.

5    Q.   And did you share with him what your view was

6    regarding this argument?

7    A.   Yes, I did.

8    Q.   Okay.  And what was the view you shared with

9    Mr. Kamholz?

10   A.   I basically agreed in principle with his

11   arguments.

12   Q.   Okay.  Did you communicate that to Mr. Kamholz

13   that you agreed?

14   A.   Yes, I did.

15   Q.   Okay.  On one occasion or more than one

16   occasion?

17   A.   I believe this discussion came up more than

18   once.  So I would say on more than one occasion.

19   Q.   All right.  Do you remember what period of

20   time?

21   A.   Probably throughout the time that I did

22   inspections there.

23   Q.   Okay.  At Tonawanda Coke?

24   A.   Yes.

25   Q.   Okay.

1     A.   I mean, it was probably brought up a few

2     different times.

3     Q.   All right.  And did you discuss the argument

4     with Mr. Sandonato on just this one occasion or

5     other occasions also?

6     A.   Probably just the once.

7     Q.   All right.  Did you communicate to Mr. Kamholz

8     what Mr. Sandonato's perspective was on this --

9     this argument?

10     A.   No.

11     Q.   Okay.  Now, could we go please, Lauren, to

12     Government Exhibit in evidence 19.12?

13        Do you recognize this exhibit, Mr. Foersch?

14     A.   Yes.

15     Q.   Okay.  And this is your letter response to

16     Mr. Kamholz?

17     A.   Yes.

18     Q.   All right.  Please make that part bigger,

19     Lauren.

20        That's the body of the letter, Mr. Foersch,

21     correct?

22     A.   Yes.

23     Q.   And you indicate you're answering Mr. Kamholz's

24     letter, right?  In the first paragraph?

25     A.   Yes.

1    Q.  And this concerns the reduction in the height

2    of tower number 2?

3    A.  Yes.

4    Q.  Okay.  And do you indicate in the letter that

5    the reduction in the height is being approved?

6    A.  Yes.

7    Q.  Okay.  Then there's a paragraph that I put a

8    red bracket around.  Would you read that to the

9    jury, please?

10   A.  It should also be noted that Part 214.5(a)

11   requires that all wet quench towers be equipped

12   with a baffle system.

13   Q.  Now, was there a reason that you put that

14   paragraph in this letter?

15   A.  Yes.

16   Q.  All right.  And tell the jury, please, if you

17   would, what that reason was.

18   A.  I seem to recall it being twofold, just, again,

19   to notify him or make him aware obviously that the

20   baffles were required.  And at the time I wrote

21   this letter to Mark, I wasn't sure if the baffles

22   were located in the top part of the quench tower or

23   if they were located in the bottom part.  So I was

24   afraid he might say, oh, you said I could take the

25   top of the tower off, that's where the baffles are,

1    they're not there anymore.  And I wanted to make it

2    clear that the department still expected to see

3    baffles in place.

4    Q.  Now, after you sent this lower to Mr. Kamholz,

5    did you have one or more later conversations with

6    him about your letter?  And specifically about this

7    paragraph?

8    A.  Probably.

9    Q.  All right.  That's not a very confident answer.

10   Is the probably more than a guess?

11   A.  Yes.

12   Q.  All right.  Do you have a recollection of

13   whether this paragraph was discussed with

14   Mr. Kamholz once or more than once?

15   A.  I know the argument had been made on a couple

16   of occasions anyways relative to the inefficiencies

17   of baffles, and that it wasn't maybe cost effective

18   or something to that effect.

19   Q.  All right.  And when Mr. Kamholz made those --

20   those points in his discussions with you, did you

21   respond?

22   A.  Yes.

23   Q.  Okay.  Do you remember what your response was?

24   A.  As I said earlier, I typically agreed with him

25   relative to, you know, the baffle -- you know, the

1    efficiencies of the baffle.

2    Q.  Now, after this letter was sent -- it's

3    government -- I keep saying this letter.  It's

4    Government Exhibit 19.12, which was sent on

5    January 6th of 1997 -- did you specifically talk

6    about, with Mr. Kamholz at any time, about this

7    sentence or paragraph you had put in this letter?

8    A.  No, I don't.

9    Q.  You don't recall a specific reference to this

10   letter?

11   A.  Talking about, no.

12   Q.  All right.  But these discussions about the

13   relative merits of baffles continued?

14           MR. PIAGGIONE:  Objection, your Honor,

15   this has already been asked and answered.

16           THE COURT:  We're working through this

17   though, so overruled.

18       You may answer that question and then move on,

19   Mr. Personius.

20           MR. PERSONIUS:  I will, Judge.

21   BY MR. PERSONIUS:

22   Q.  Did the discussions about the relative merits

23   of baffles with Mr. Kamholz continue after this

24   letter --

25   A.  Yes.

3242

1    Q.   -- was sent.  In this letter in January of 1997

2    did you -- you continued to do inspections at

3    Tonawanda Coke?

4    A.   Yes, I did.

5    Q.   And they continued to be on an annual basis?

6    A.   Yes.

7    Q.   Okay.  After this letter of January of 1997, as

8    part of your inspections at Tonawanda Coke, do you

9    have a recollection if you ever checked inside of

10   quench tower number 2?

11   A.   Could you restate that?

12   Q.   Yes.  I'm sorry.  This letter that we've been

13   referring to from January of 1997, after that

14   letter had been sent to Mr. Kamholz, start it this

15   way, you continued to do your annual inspections,

16   correct?

17   A.   Correct.

18   Q.   And as part of those inspections, do you

19   remember if you ever went to quench tower number 2

20   to check to see if there were baffles in there?

21   A.   Yes, I did.

22   Q.   All right.  Do you remember when you did that?

23   A.   No.

24   Q.   All right.  How many times did you do it after

25   that?

3243

1    A.   I believe once.

2    Q.   Do you remember when that was?

3    A.   I can only approximate it.

4         MR. PIAGGIONE:  Objection.  He's already

5    asked and answered that he did not know the date.

6         THE COURT:  Overruled.  You may answer.

7         THE WITNESS:  Probably 2005, in that area.

8         MR. PIAGGIONE:  Object again, your Honor.

9    He said he's guessing.

10        THE COURT:  You may cross-examine.

11   Overruled.

12   BY MR. PERSONIUS:

13   Q.   All right.  I want to be clear, I don't want a

14   guess from you.  If what you're giving is a guess,

15   tell us, because we don't want a guess.

16        Do you have a recollection when it was?

17   A.   No, I do not.

18   Q.   All right.  But you recall one time after this

19   letter was sent you checked inside tower number 2?

20   A.   Yes.

21   Q.   And your purpose in looking inside the tower

22   was what?

23   A.   To determine compliance with our Part 214

24   regulation.

25   Q.   Okay.  And what specifically of that regulation

1    were you looking for?

2    A.   To basically see if the baffles were in place.

3    Q.   Do you remember what you saw when you looked?

4    A.   No, I don't --

5    Q.   Okay.

6    A.   -- exactly.  I recall either -- I know it was a

7    violation, I recall that.  But whether or not there

8    was some baffles still remaining in place, or

9    whether they were all removed, that part of it I

10   don't remember.

11   Q.   When you say "there was a violation", did you

12   mean a violation of the baffles requirement?

13   A.   Yes, I do.

14   Q.   Okay.  And was Mr. Kamholz with you on this

15   occasion when you looked in the quench tower?

16   A.   Yes, he was.

17   Q.   All right.  Did you have a conversation with

18   him?

19   A.   I recall reminding him again of the requirement

20   in Part 214 that baffles be in place.

21   Q.   Okay.  Did he respond?

22   A.   No.  I don't --

23   Q.   And did you ever check again to see if the

24   baffles had been -- had been put in there?

25   A.   No, I did not.

1   Q.   All right.  Was there a -- was there a reason

2   you didn't go back and check again -- check again

3   in tower number 2 to see if baffles were in place?

4   A.   Yes.  Yes.

5   Q.   Okay.  Can you tell the jury what the reason

6   was, please?

7   A.   Based on my past dealings with Mr. Kamholz, if

8   I typically needed something done or looked at, or

9   there was a report of excessive smoke from the

10  facility, I'd call up Mr. Kamholz and ask him to

11  look into it and take care of it, and it typically

12  was always done to my satisfaction.  And I made the

13  assumption he'd do the same thing with the baffles.

14  Q.   All right.  These conversations you'd had with

15  him about the relative merits of the baffle system,

16  did you continue -- I think you said you continued

17  to have those conversations with him throughout the

18  period you did your inspections, correct?

19  A.   Correct.

20  Q.   And should we understand those conversations

21  continued after this occasion that you've testified

22  that you looked and saw either no baffles or a

23  violation in tower number 2?

24  A.   No, I don't believe we discussed it after that.

25  Q.   Now, do you remember, Mr. Foersch, that

3246

1    Mr. Kamholz was arrested in late December of 2009?

2    A.   Yes.

3    Q.   And you learned about that somehow?  That he

4    had been arrested.

5    A.   Yes.

6    Q.   And do you remember that a private investigator

7    named Tom Thurston came to talk to you on two

8    occasions in January --

9    A.   Yes, I do.

10   Q.   -- of 2010?

11   A.   Yes, I do.

12   Q.   Okay.  And he prepared a report each time,

13   correct?

14   A.   Yes.

15   Q.   You've seen those reports?

16   A.   Yes.

17   Q.   Right.  And do you agree that in both of those

18   reports you told Mr. Thurston that you were aware

19   that there were no baffles?

20        MR. PIAGGIONE:  Objection, your Honor.

21   This is not a statement in evidence, and it's also

22   leading.

23        THE COURT:  Overruled.

24        MR. PIAGGIONE:  And it's not proper on

25   direct.

1           THE COURT:  You may answer -- or ask the

2     question.

3     BY MR. PERSONIUS:

4     Q.  I'll ask it again.  You've reviewed Mr.

5     Thurston's two reports, right?

6     A.  Yes.

7     Q.  I've given them to you, right?

8     A.  Yes.

9     Q.  And actually when Mr. Thurston came to see you

10    the second time, he brought with him his report

11    from the first time he came to see you, right?

12    A.  Yes, he did.

13    Q.  Okay.  And he allowed you to read it, right?

14    A.  Yes.

15    Q.  And he allowed you to make changes to it,

16    right?  Do you remember that?

17    A.  He asked me to sign it.

18    Q.  And he also said I you want you to read this

19    and before you sign it, I you want you to make --

20           MR. PIAGGIONE:  Objection, your Honor.

21    This is leading and this is direct.

22           THE COURT:  Overruled.  You may answer.

23    Did he say that or not?

24    BY MR. PERSONIUS:

25    Q.  Do you remember the second time Mr. Thurston

1    gave you his first report and said I'd like you to

2    read this?

3    A.   Yes.

4    Q.   And he said if you want to make any changes to

5    it, please do so?

6    A.   Yes.

7    Q.   And included in that first report was an

8    indication that you were fully aware that neither

9    tower number 1 nor tower number 2 had baffles in

10   them, correct?  Do you remember his report said

11   that?

12   A.   His report said that, yes, it did.

13   Q.   And what you asked him to do was to take out

14   the word "fully"?

15            MR. PIAGGIONE:  Objection, your Honor.

16            THE COURT:  Overruled.

17   BY MR. PERSONIUS:

18   Q.   Is that true?

19   A.   Yes, I did.

20   Q.   Okay.  And once he took out "fully", he asked

21   you to sign the document, right?

22   A.   Yes.

23   Q.   And you declined to sign or initial the first

24   report, right?

25   A.   Yes.

1    Q.   Okay.  And the reason for that was that in

2    between the first visit by Mr. Thurston and the

3    second visit by Mr. Thurston, you had talked to a

4    DEC attorney --

5              MR. PIAGGIONE:  Objection, your Honor.

6    This is continually leading, talking now about

7    hearsay with a --

8              THE COURT:  It is leading at this point.

9    So, sustained.

10   BY MR. PERSONIUS:

11   Q.   Between the first Thurston visit and the second

12   Thurston visit had you spoken to someone about the

13   first visit?

14   A.   Yes.

15   Q.   Okay.  Who was that?

16   A.   I would have spoken to DEC attorneys.

17   Q.   All right.  And do you remember who that was?

18   A.   Yes.

19   Q.   Who was it?

20   A.   Theresa.

21   Q.   Theresa's last name is?

22   A.   Mucha.

23   Q.   Okay.  M-U-C-H-A?

24   A.   Yes.

25   Q.   And so when Mr. Thurston came the second time,

3250

1    and he had you read the report from the first

2    interview?

3    A.   Yes.

4    Q.   Okay.  And you told him to take out the word

5    "fully", right?

6    A.   Yes.

7    Q.   And the reason that you wouldn't then initial

8    or sign the report was because you had talked to

9    Miss Mucha?

10   A.   No.  I did it on my own accord.

11   Q.   All right.  But the -- other than have him take

12   out the word "fully" in front of "aware", that's --

13   you agreed to his first report?

14          MR. PIAGGIONE:  Objection again, asked and

15   answered.

16          THE COURT:  I'll permit this, and move on.

17          MR. PERSONIUS:  Yes.

18          THE WITNESS:  Yes.

19   BY MR. PERSONIUS:

20   Q.   Okay.  Thank you.  Following 1997 did you

21   continue to do inspections at Tonawanda Coke

22   through your retirement?

23   A.   Yes.

24   Q.   Okay.  And could we have Defense Exhibit HHH

25   for identification put on the screen for

1    identification?

2        Do you recognize this exhibit, Mr. Foersch?

3    A.   Yes.

4    Q.   Okay.  And just generally, what is it, please?

5    A.   It's basically a printout from entries that we

6    would make into our computer system after

7    performing an inspection so that it's logged into

8    the system.

9    Q.   All right.  And this -- this particular

10   inspection was on what date, please?

11   A.   Can I see the rest of the form?

12   Q.   That's all we have for this exhibit.  I put a

13   red line to try to draw your attention to what I

14   understand to have been the date.  Is that helpful

15   or not?

16   A.   The way that form was, as I recall it -- and

17   I've been retired for three and a half years -- the

18   scheduled and achieved date were sometimes

19   questionable.  But I would think that that October

20   of '99 is the correct date.

21   Q.   It's a 1999 inspection?

22   A.   Yes.

23   Q.   Okay.

24           MR. PERSONIUS:  Your Honor, I offer this.

25           MR. PIAGGIONE:  No objection, your Honor.

1          MR. LINSIN:  No objection, your Honor.

2          THE COURT:  Okay.  HHH received, no

3     objection.

4          (Defendants' Exhibit HHH was received into

5          evidence.)

6          THE COURT:  And it may be published if you

7     choose to do that.

8          MR. PERSONIUS:  Thank you, Judge.

9     BY MR. PERSONIUS:

10    Q.  Would you put the whole exhibit up, Lauren,

11    please.  Sheila, I'm sorry.

12        All right.  We have this document that's

13    Defendant's Exhibit HHH in evidence on the screen,

14    Mr. Foersch?

15    A.  Yes.

16    Q.  Okay.  And, Sheila, would you please just make

17    that upper part bigger?  All right.  This is a

18    record you made of a routine inspection you did at

19    Tonawanda Coke sometime in 1999?

20    A.  Yes.

21    Q.  All right.  And was it your practice to prepare

22    a document similar to this each year that you would

23    go to Tonawanda Coke?

24    A.  Yes.

25    Q.  Sometimes with more details than others?

1    A.   Yes.

2    Q.   The use of this, this type of document -- was

3    there a point in time when you started using this

4    format rather than the -- the earlier format which

5    was like a memo of some type?

6    A.   There was, yes, but I couldn't tell you the

7    date.

8    Q.   Can we agree as of 1999 and moving forward that

9    this was the format you used to document your

10   inspections?

11   A.   Yes.

12   Q.   And there should be in the file a document

13   similar to this for each year that you did your

14   inspection?

15   A.   Yes.

16   Q.   Sometimes with more detail than others --

17   A.   Correct.

18   Q.   -- correct. Could we go To Defendants' Exhibit

19   KKK for identification, please?

20             THE COURT:   How much more time do you have

21   on direct, a while?

22             MR. PERSONIUS:   Probably a half hour.

23             THE COURT:   Okay.   We'll break now for

24   lunch, and we'll see you back here at 2:15.   We'll

25   start then, okay?

3254

1          Don't discuss the case, please.  Enjoy the day.

2     A little cool out there, but nice.

3               (Jury excused from the courtroom.)

4               THE COURT:  Mr. Foersch, stay right there

5     until the jury is released, please.

6               THE WITNESS:  Sorry.

7               THE COURT:  Okay.  You may step down.

8     Thank you.  We'll see you at 2:15.

9               (Lunch recess was taken.)

10               (Jury seated.)

11               THE COURT:  Welcome back, ladies and

12     gentlemen.  Please have a seat.

13        Okay.  We have Mr. Gary Foersch back on the

14     stand.  He remains under oath.  This is still

15     direct examination.

16        Mr. Personius -- Mr. Foersch remains under

17     oath -- you may continue.

18               MR. PERSONIUS:  Thank you, Judge.

19               THE COURT:  The attorneys and parties are

20     back present.  The jury is here, roll wall waived.

21     BY MR. PERSONIUS:

22     Q.  Good afternoon, Mr. Foersch.

23     A.  Good afternoon.

24     Q.  Do you remember, Mr. Foersch, that before we

25     broke for the lunch recess, you had been testifying

1    about this last occasion when you looked inside of

2    quench tower number 2?

3    A.   Yes.

4    Q.   Okay.  And that you had indicated in response

5    to my questions you couldn't recall the date when

6    that happened?

7    A.   Yes.

8    Q.   Okay.  Can we agree that it was at some time

9    after the issuance of the Title V permit in 2002?

10   A.   Yes.

11          MR. PIAGGIONE:  Objection, your Honor.

12   He's already indicated he doesn't remember.

13          THE COURT:  He just said yes.  So I'll

14   permit that.

15   BY MR. PERSONIUS:

16   Q.   And do you remember I also asked you why it was

17   after you looked into the tower and saw no baffles

18   that you never looked again?  Do you recall I asked

19   you that?

20   A.   Today?

21   Q.   Yes.

22   A.   Oh, I looked again.

23   Q.   You looked again after the time you looked and

24   saw no baffles?

25   A.   About a year later.  Oh, looked again.  No.

1   Excuse me.  I got that wrong.  No, I never looked

2   again.

3   Q.  Never looked again?

4   A.  Never looked again.

5   Q.  Do I recall correctly that what you told us

6   before the lunch break is that because you were

7   relying on Mr. Kamholz to take care of it?

8   A.  Yes.

9   Q.  Okay.  You testified in the grand jury on

10  July 29th of 2010, do you recall that?

11  A.  Yes.

12  Q.  And when you went into the grand jury, you put

13  your hand up and you took the oath to tell the

14  truth, right?

15  A.  Yes.

16  Q.  Okay.  For identification, Lauren, could we

17  please have Government Exhibit 3521.16 on the

18  screen for identification?

19      And do you see on the screen the exhibit

20  sticker 3521.16, Mr. Foersch?

21  A.  Yes.

22  Q.  And do you recognize this as the first page of

23  your transcript of your grand jury testimony that

24  you provided on July 29, 2010?

25  A.  Yes.

1    Q.   Lauren, I think we want to go, please, in this

2    exhibit to page 24.  Could we try that and see if

3    that gets us where we need to be.  Thank you.  It

4    does.  Could you make the bottom portion larger

5    please, Lauren?

6        Now, on page 24 of your grand jury transcript

7    starting on line 17 you were asked: "And then at

8    annual inspections after that, did you go back to

9    check for the baffles?"  Your answer was:  "No, I

10   did not."  And the question was: "Why did you check

11   for them that day, but not the other inspections

12   you went back for?"  And your answer back in July

13   of 2010 was: "I don't know.  It was just easier to

14   do that day or something.  I don't recall why."

15   Was that your testimony back in July of 2010?

16   A.   Yes, it was.

17   Q.   You can take that down, Lauren.

18       And, Sheila, would you please put up, this is

19   for identification, Defendants' Exhibit KKK.

20       Mr. Foersch, do you see on the screen the first

21   page of an exhibit that's marked Defendants'

22   Exhibit KKK?

23   A.   Yes.

24   Q.   I don't expect you to get much out of that.

25       But could we go to the next page please,

1       Lauren?

2           I just want you to take a look, if you would,

3       at the first couple paragraphs of this exhibit,

4       this second page of this exhibit.  And my question

5       is do you recognize this correspondence?  Please

6       just read it to yourself.

7       A.  Yes.

8       Q.  Okay.  Do you recognize this letter?

9       A.  Yes.

10      Q.  Okay.  And do you recall that the EPA came back

11      to -- you can take it down, Lauren.  Thank you.

12          Do you recall that the EPA came back to inspect

13      Tonawanda Coke in May of 2000?

14      A.  No.

15      Q.  Okay.  Could you put it back up, please?

16      A.  Oh, I got to read it?

17              THE COURT:  There must be some way to

18      avoid that, but I'm not sure how.

19      BY MR. PERSONIUS:

20      Q.  I just want you to read it to yourself and when

21      you're done let me know.

22      A.  I'm sorry, I didn't look at all the dates.  I

23      just generally scanned the letter.

24      Q.  Let us know when you're done reading it.

25      There's a whole system here that you've got to get

1    used to.

2    A.   Okay.

3    Q.   You can take it down, Lauren.   Thank you.

4         Do you recall that the EPA came back to

5    Tonawanda Coke to do an air inspection again in May

6    of 2000?

7    A.   Yes.

8    Q.   Okay.   Did you participate in that inspection?

9    A.   I don't recall if I did or not.

10   Q.   Do you have any -- other than the fact that the

11   inspection took place in May of 2000, do you have

12   any other recollection of the inspection?

13   A.   No.

14   Q.   Sheila, would you please put Defendants'

15   Exhibit F in evidence on the screen?

16        Do you see Defendant's Exhibit F, Mr. Foersch?

17   A.   Yes.

18   Q.   Is it familiar to familiar to you?

19   A.   Yes.

20   Q.   And this is what's called a full compliance

21   evaluation checklist?

22   A.   Correct.

23   Q.   All right.   How frequently -- well, let me ask

24   this before that.   The handwriting that's on the

25   document, not the signature, but the handwriting,

1    do you recognize that handwriting?

2    A.   Yes, I do.

3    Q.   Whose is it, please?

4    A.   It's mine.

5    Q.   All right.   The signature down at the bottom is

6    Mr. Sitzman?

7    A.   Yes, it is.

8    Q.   All right.   Could you make that part bigger

9    please, Lauren -- or Sheila.

10        This full compliance evaluation checklist, how

11   frequently were they completed with respect to

12   Tonawanda Coke?

13   A.   Should have been annually.

14   Q.   There should be one of these done every year?

15   A.   Yes.

16   Q.   And what -- what is the purpose -- if you know,

17   what was the purpose of completing this document

18   each year?

19   A.   Basically a checklist to remind us of things

20   to, you know, observe when we go out there, and to

21   indicate whether or not we could determine

22   compliance with those individual sections that are

23   on there.

24   Q.   All right.   There is like a little paragraph

25   near the top.   Could you make that larger, please,

1    Sheila?  Thank you.

2        The paragraph that's been made larger refers to

3    the full compliance evaluation as a comprehensive

4    evaluation of the compliance status of the

5    facility?

6    A.  Yes.

7    Q.  Okay.  And what -- what was done -- what had to

8    be done before this form was filled out with

9    regards to the inspection that you did, was there

10   anything in particular you had to do before this

11   document could be completed?

12   A.  You had to do an inspection obviously.  But,

13   outside of that, I don't --

14   Q.  Let me ask a further question.  I'm not being

15   clear.  You've told us before that the primary

16   areas of Tonawanda Coke that you would look at

17   would be the ovens, the boiler, boiler area and the

18   by-products area?

19   A.  Yes.

20   Q.  Okay.  And I think you also told us that --

21   that you didn't necessarily inspect each of those

22   three areas every year?

23   A.  Yes.

24   Q.  Okay.  When one of these forms, these full

25   compliance evaluation checklists was completed, did

1    you first have to do an inspection of each of those

2    three areas before this form could be completed?

3    A.   Yes.

4    Q.   So when -- so that would be mean every year

5    then you were inspecting all the areas?

6    A.   As long as all the boxes, the appropriate

7    boxes, are checked.

8    Q.   I see.  Okay.  Can we go back, Sheila, please

9    to the larger exhibit?  And please make that part

10   bigger.  Thank you.

11       Now, on this particular form, Defendant's

12   Exhibit F, do you see that there's boxes in the

13   left column for all except two of the queries?

14   A.   Yes.

15   Q.   And tell the jury, if you would, what does that

16   mean?  The two I guess specifically were the check

17   marks in the third box over, what does that tell

18   us?

19   A.   That it's not applicable.  You're saying where

20   the --

21   Q.   Yes.

22   A.   I can't see the N/A, but third box over is N/A.

23   Q.   Not applicable?

24   A.   Yes.

25   Q.   The reason then that you would have put not

1    applicable for -- for annual compliance

2    certificate, do you know why you put not applicable

3    there?

4    A.  No.

5    Q.  Okay.  And then for source test you put not

6    applicable.  Can you tell us why?

7    A.  That would probably be because there would have

8    been no annual -- some emission points require

9    annual stack testing as part of their compliance

10   determination.  And in this case, source testing

11   wasn't required.

12   Q.  Okay.  Can you tell from this -- the way this

13   full compliance evaluation checklist is completed,

14   which is Defendant's Exhibit F, can you tell us

15   whether there would have been a full inspection of

16   the by-products area?

17   A.  I would say there would have been.

18   Q.  There would have been?

19   A.  Yes.

20   Q.  And you were satisfied then with what you saw?

21   A.  Yes.

22   Q.  Okay.  You can take that down, Sheila, please.

23       Lauren, could you please put Government

24   Exhibit 31 in evidence on the screen?

25       Do you see that Government Exhibit 31 is now on

1    the screen, Mr. Foersch?

2    A.   Yes.

3    Q.   Do you recognize what this document is?

4    A.   Yes, I've seen it before.

5    Q.   Okay.  Can you tell the jury what it is,

6    please?  There's more to the exhibit.  Would it

7    help you to see the rest of it?

8    A.   I don't know that it would help.  I'm not

9    really -- I've seen the form.  I'm not really that

10   familiar with it.

11   Q.   Okay.  All right.

12   A.   I never had to fill one out myself.

13   Q.   All right.  Could we go to, Lauren, this is

14   also in evidence, Government Exhibit 32, please?

15       Okay.  Do you have on your screen Government

16   Exhibit 32, Mr. Foersch?

17   A.   Yes.

18   Q.   Okay.  And I'm not tricking you.  This is

19   slightly different from the one that we just had up

20   there.  But do you recognize what that document is?

21   A.   I've seen them, yes.

22   Q.   Are you familiar with this type of document?

23   A.   Not -- not in any detail, no.

24   Q.   All right.  You can take that down, please,

25   Lauren.

1      And, Sheila, could you please put up in

2  evidence Defendants' Exhibit I?

3      You see Defendant's Exhibit I on your screen,

4  Mr. Foersch?  Down in the lower right-hand --

5  A.  Yes.

6  Q.  We're going make the upper part a little

7  bigger.

8      Do you recognize this is one of your annual

9  inspection reports?

10  A.  Yes.

11  Q.  Okay.  And the date that this inspection was

12  done is what, please?

13  A.  8/23/2007.

14  Q.  Okay.  Could we go to the -- were you part of

15  this inspection, by the way?

16  A.  Yes, I believe I was.

17  Q.  Can we interpret from -- can we interpret from

18  that first page that Mr. Sitzman and Miss Webster

19  also would have been part of it?

20  A.  Yes.

21  Q.  Okay.  Could we go to the second page, please,

22  and just the first -- just make the first paragraph

23  larger?

24      Do you see on the second page of this exhibit,

25  the first paragraph has been made slightly larger?

1    A.   Yes.

2    Q.   Do you see it makes reference to the ongoing

3    Tonawanda Coke benzene study?

4    A.   Yes.

5    Q.   Okay.  And we can go back to it, if you need

6    to.  Do you remember the date of the inspection?

7    Would you like to see the first page again?

8    A.   2007 something.

9    Q.   Okay.  We can go back to the first page,

10   please.  Thank you.

11       Okay.  It was August 23rd of 2007?

12   A.   Yes.

13   Q.   Do you have a recollection that on this date

14   you and Miss Webster and Mr. Sitzman met with

15   Mr. Kamholz to talk about the Tonawanda benzene

16   study?

17   A.   Yes, I believe I do.

18   Q.   Back in 2007?

19   A.   Yes.

20   Q.   Do you remember -- you can take that down,

21   please.

22       Do you remember going back to Tonawanda Coke on

23   May 28th of 2008, not for an inspection, but for a

24   visit with Mr. Carlacci and I think Mr. Sitzman and

25   Miss Webster to talk about the benzene study again?

3267

1    A.  Yes, I think I do, yes.

2    Q.  All right.  And you met for a period of time

3    with Mr. Kamholz in the conference room at

4    Tonawanda Coke, do you recall that?

5    A.  Conference or his office.  One or the other,

6    yes.

7    Q.  It was over in that office complex area you

8    pointed out to us --

9    A.  Yes.

10   Q.  -- at the beginning of your testimony?

11   A.  Yes.

12   Q.  Do you remember how long that total visit

13   lasted?

14   A.  No.

15   Q.  All right.  And was the focal point of the

16   discussion in Mr. Kamholz's office have to do with

17   this emission study?

18   A.  Yes.

19   Q.  Okay.  And then after that do you remember

20   going over to the -- to the by-products area?

21   A.  Yes.

22   Q.  Okay.  To get from the office area over to the

23   by-products area, do you remember how you got

24   there?

25   A.  Not -- no.

1    Q.   Did you walk?  Did you go in a vehicle?

2    A.   I would imagine in a vehicle.

3    Q.   Okay.  Why would you imagine?

4    A.   Because that's what we typically did.

5    Q.   There's some distance between where

6    Mr. Kamholz's office is and the by-products area?

7    A.   Right.

8    Q.   So when you got over to the by-products area,

9    did you then spend some time over there, over in

10   the by-products area that day?

11   A.   Yes.

12   Q.   Yes?

13   A.   Yes.

14   Q.   Okay.  And by then you had been dealing with

15   Mr. Kamholz for almost 30 years?

16   A.   Yes.

17   Q.   Okay.  And did you notice anything about his

18   demeanor that day where he seemed withdrawn or

19   unwilling to share information?

20   A.   No.

21   Q.   All right.  And did you notice if he was using

22   any kind of a mask that day?

23   A.   I don't recall if he had one on or not.  It's

24   not uncommon.

25   Q.   When you say "it's not uncommon", what's not

1    uncommon?

2    A.   For a worker at Tonawanda Coke to have a

3    respirator hanging around their neck.

4    Q.   Including Mr. Kamholz?

5    A.   Yes.

6    Q.   Okay.  And if you know, what is -- what is the

7    reason that the employees would have a mask hanging

8    around their neck?

9    A.   There are certain areas on the battery and

10   maybe confined areas in the plant that you have to

11   go into that OSHA would require that you wear a

12   respirator.

13   Q.   All right.  And did -- those occasions when you

14   saw Mr. Kamholz with a mask or respirator hanging

15   around his neck, did you find that unusual or

16   noteworthy?

17   A.   No.

18           MR. PERSONIUS:  Your Honor, may I have a

19   minute, please?

20           THE COURT:  Certainly.

21           MR. PERSONIUS:  Your Honor, we have no

22   more questions at this time.  Thank you, Mr.

23   Foersch.

24           THE COURT:  Okay, Mr. Personius, thank

25   you.

1          Any questions, Mr. Linsin?

2                MR. LINSIN:  Thank you, your Honor.  May I

3     proceed, Judge?

4                THE COURT:  You may proceed, yes.

5                MR. LINSIN:  Thank you.

6     CROSS-EXAMINATION BY MR. LINSIN:

7     Q.  Good afternoon, Mr. Foersch.

8     A.  Good afternoon.

9     Q.  We've met once before I believe, but my name is

10    Greg Linsin.  I represent Tonawanda Coke.  And I

11    just have a couple of questions for you.

12          You testified that a lot of the time you went

13    out and inspected the Tonawanda Coke facility your

14    attention was focused on the battery of that plant,

15    is that correct?

16    A.  Yes, sir, it was.

17    Q.  Is it accurate that part of the reason your

18    attention was focused on the battery was that the

19    DEC recognizes that the battery at a coke plant is

20    one of the more significant potential sources of

21    emissions?

22    A.  Yes, it is.

23    Q.  And as a matter of fact, you would routinely go

24    around and inspect the battery, the lids, and the

25    off-take pipes, and even the oven doors for leaks,

1    is that correct?

2    A.   Yes.

3    Q.   And is it your understanding also that there

4    came a time when -- when there was actually a daily

5    inspection of those leaks from the battery, is that

6    correct?

7    A.   Yes, there was.

8    Q.   And do you recognize those daily inspections as

9    typically referred to as 303 inspections?

10   A.   Yes, I do.

11   Q.   All right.  And is it accurate both in the

12   inspections you conducted on an annual basis on

13   behalf of DEC and these daily 303 inspections that

14   there is an allowable limit under the inspection

15   protocol, an allowable limit for leaks from the

16   various components I just mentioned, the oven doors

17   and the lids on the battery and the off-take pipes,

18   is that correct?

19   A.   Yes.

20   Q.   All right.  And there's -- so there's a

21   recognition that however careful the facility is

22   being, however carefully the doors are being

23   maintained and the lids are being sealed, there is

24   a recognition that there will be some leaks, and

25   that margin is accounted for in the inspection

3272

1    protocol, is that correct?

2    A.   Yes.

3    Q.   Now, how many ovens again are at the battery,

4    do you recall, at Tonawanda Coke?

5    A.   I believe it's -- in operation last thing I

6    knew I think it was 60.

7    Q.   Sixty separate ovens.  And the leaks that we

8    were just talking about that are observed and

9    recorded, these are leaks from the ovens

10   themselves, correct?

11   A.   Yes.

12   Q.   And so they are leaks while the coke is

13   actually in process, correct?

14   A.   While the coking is going on, yes.

15   Q.   All right.  And so is it accurate to

16   understand, Mr. Foersch, that the leaks we're

17   talking about that are monitored are leaks from the

18   ovens of raw coke oven gas?

19   A.   Yes.

20   Q.   And those leaks, as we've just said, they're

21   monitored, and there's an expectation that the

22   facility will try to do what they can to control

23   it, but those leaks as long as they are within the

24   parameters of the test protocol are entirely

25   lawful, is that correct?

```
 1              MR. PIAGGIONE:  Objection, your Honor,
 2      this is leading.  I let it go for a while, but now
 3      it's a narrative.  Leading.
 4              THE COURT:  All right.  Do you understand
 5      the question?
 6              THE WITNESS:  Yes.
 7              THE COURT:  All right.  I'll allow him to
 8      answer.  Overruled.
 9    BY MR. LINSIN:
10    Q.  If leaks are detected from the ovens during
11      these inspections and they are within the
12      parameters allowed or provided for in the test
13      protocol, those leaks are lawful, is that correct?
14    A.  Yes, they are.
15    Q.  And those are leaks of coke oven gas before it
16      is processed through the by-products area, is that
17      correct?
18    A.  Yes.
19    Q.  Now, you testified on direct that you recall
20      one occasion -- after Tonawanda Coke facility
21      received its Title V permit, you recall one
22      occasion when you actually went over and looked up
23      into quench tower number 2, correct?
24    A.  Yes.
25    Q.  All right.  Now, you were out at the facility,
```

1   as I believe you testified, every year to perform

2   these inspections, correct?

3   A.   Yes.

4   Q.   And is it true that during the five hours or so

5   that you would spend on these inspections, that you

6   would observe quenches being conducted in quench

7   tower number 2?

8   A.   Yes, I would.

9   Q.   And is it also true, Mr. Foersch, that when you

10   would see a quench tower -- I'm sorry, a quench

11   operation being conducted in quench tower number 2,

12   that you would also, even if you were in a

13   different part of the plant, you would also observe

14   certain dust or particles falling down in the area

15   in which you were standing or where you were in

16   your vehicle?

17        MR. PIAGGIONE:   Your Honor, objection

18   again.   This is continuing leading questions one

19   after another.   This is not a hostile witness.

20   This is direct testimony.

21        THE COURT:   Well, there's a distinction

22   here.   The witness was called by Mr. Personius, so

23   there is some leeway that I will grant, and in

24   addition to that, I'll allow it for 611(a)

25   purposes.   You may continue.

1          MR. LINSIN:  Thank you.

2     BY MR. LINSIN:

3     Q.  Would you like me to repeat the question?

4     A.  Yes, sir.

5     Q.  My question is simply this:  When you were at

6     the facility and you would see a quenching

7     operation occurring in quench tower number 2, even

8     if you were someplace else in the plant, over on

9     Broadway, or in some other location, if the air

10    pattern was blowing that quenching steam in your

11    direction, you would see or feel particulate matter

12    or ash, if you will, falling down from the steam,

13    is that correct?

14    A.  That is correct.

15    Q.  And isn't it also true, Mr. Foersch, that given

16    what you were seeing and observing during this

17    quenching operation, that you knew -- subsequent to

18    the Title V permit being issued, you knew that

19    there were no baffles in that quench tower, even

20    without having gone over and looked directly up

21    into the tower, isn't that correct?

22    A.  No, it's not.

23    Q.  Is it your testimony, Mr. Foersch, that even if

24    there were quench -- I'm sorry, baffles in a quench

25    tower, you would still see the same ash falling out

1    of the steam plume off of a quench operation?

2    A.   That's been my experience, yes.

3    Q.   And that's because these baffles are just not

4    very efficient, is that correct?

5            MR. PIAGGIONE:   Objection, your Honor.

6            THE COURT:   No, I'll permit the answer.

7    You may answer.

8            THE WITNESS:   That's my belief, yes.

9            MR. LINSIN:   All right.  I have nothing

10   further.  Thank you, your Honor.

11           THE COURT:   Okay, Mr. Linsin, thank you.

12       Okay.  Mr. Piaggione, if you're going to

13   cross-examine you may.

14   CROSS-EXAMINATION BY MR. PIAGGIONE:

15   Q.   Good afternoon, Mr. Foersch.

16   A.   Good afternoon.

17   Q.   Mr. Foersch, what is your educational

18   background?

19   A.   High school diploma.

20   Q.   Okay.  And when you were employed at DEC, were

21   there permit applications for a clean air permit

22   done in writing?

23   A.   Yes, there were.

24   Q.   Okay.  And were the permits issued in writing?

25   A.   Yes, they were.

1  Q.   Okay.  And when you were employed at DEC, did

2  Tonawanda Coke apply for permits in writing?

3  A.   Yes, they did.

4  Q.   And did Tonawanda Coke receive permits in

5  writing from the DEC?

6  A.   Yes, they did.

7  Q.   And when you were employed at DEC, if there was

8  a modification for a clean air permit, was that

9  modification application made in writing?

10  A.   Yes, it was.

11  Q.   And if DEC granted that modification, was that

12  modification granted in writing?

13  A.   Yes, it was.

14  Q.   All right.  And the entire time that you were

15  at DEC, did that procedure of change?

16  A.   No.

17  Q.   Okay.  And did you tell Mark Kamholz at any

18  time that you had the authority to change or modify

19  a condition in the permit?

20  A.   No.  I didn't have that authority.

21  Q.   And based upon your conversations with

22  Mr. Kamholz, did Mr. Kamholz know you did not have

23  that authority?

24       MR. PERSONIUS:  Object, your Honor, as to

25  what Mr. Kamholz knew.

1              THE COURT:  Yeah, sustained.

2      BY MR. PIAGGIONE:

3      Q.  Did you have conversations with Mr. Kamholz as

4      to your -- the limits of your authority?

5      A.  No.

6      Q.  Okay.  Did you have conversations with

7      Mr. Kamholz regarding the effectiveness of baffles?

8      A.  Yes.

9      Q.  Okay.  And you agreed with him you said, is

10     that correct?

11     A.  Yes, I did.

12     Q.  But did you always end that conversation by

13     saying the rules still required baffles?

14     A.  I wouldn't necessarily end it that way, but --

15     Q.  Would you tell him that?

16             MR. PERSONIUS:  Your Honor, he just

17     testified he didn't, so I object.

18             THE COURT:  Yeah, I'm going to overrule

19     the objection.

20         But that question is not a good question, so

21     reput a question, please.

22             MR. PIAGGIONE:  Thank you, your Honor.

23     BY MR. PIAGGIONE:

24     Q.  When you had these conversations with

25     Mr. Kamholz regarding the effectiveness of the

1    baffles, did you say to him you still needed

2    baffles in the tower?

3    A.  Yes, on occasion.

4    Q.  Okay.  Did you ever tell him that he did not

5    need baffles in the tower?

6    A.  Tower 2.

7    Q.  Tower 2, yes.  East quench tower.  Did you ever

8    tell him that he never needed baffles in the east

9    quench tower?

10   A.  No.

11   Q.  Okay.  Now, you had this conversation with him,

12   you said, sometime after 1997.  Where were you in

13   respect to the east quench tower?

14           MR. LINSIN:  Objection, your Honor.  I

15   believe that misstates the testimony.  The

16   testimony, as I recall it, was the conversation

17   occurred after the issuance of the Title V permit,

18   which was in 2000 --

19           MR. PIAGGIONE:  If I recall correctly, I

20   heard both, your Honor.

21           THE COURT:  Let's clarify, please.

22   BY MR. PIAGGIONE:

23   Q.  The conversation you had with Mr. Kamholz in

24   the east quench tower the last time you were at the

25   east quench tower, was that after the letter in

1    1997?

2    A.   Yes.

3    Q.   Okay.  And where were you standing when you had

4    that conversation?

5    A.   It would have been outside the -- let's see,

6    east door on the quench tower.

7    Q.   Okay.  And can you describe what it would be

8    like to enter the quench tower?

9    A.   To get to the quench tower?

10   Q.   To get -- to enter the east quench tower to see

11   the baffles.

12   A.   Well, to approach the quench tower you have to

13   climb down a bit of a pile of coke, and I actually

14   don't go into the oven -- or into the -- into the

15   tower.  You stand at the door and look in.  It's

16   not -- it's an electrically charged area, it's wet,

17   and it's a dangerous place, and you stay as far

18   away as you can to still be able to observe and

19   determine compliance.

20   Q.   Okay.  And did you tell him at that time that

21   the tower needed baffles?

22   A.   I advised him that the regulations required

23   baffles.

24   Q.   And did Mark -- did Mr. Kamholz raise an

25   argument about upward velocity at that time?

1    A.   No.

2    Q.   Okay.  Did he argue about the efficiency of

3    baffles?

4    A.   No.

5    Q.   All right.  He didn't object, is that correct?

6    A.   Yes.

7    Q.   And based upon your conversation and your

8    previous dealings Mr. Kamholz, you expected him to

9    place baffles in the east quench tower?

10   A.   Yes.

11   Q.   Okay.  And the next year did you -- did you

12   conduct the annual compliance inspection for the

13   next year at Tonawanda Coke?

14             THE COURT:  Put that question again,

15   please.

16   BY MR. PIAGGIONE:

17   Q.   Sorry.  After that conversation did you return

18   the next year to conduct an annual compliance

19   evaluation inspection?

20   A.   Yes, I did.

21   Q.   Okay.  And during that inspection, did you ask

22   Mr. Kamholz if he had put baffles in the east

23   quench tower?

24   A.   Yes, I did.

25   Q.   And what did he say?

3282

1    A.   He said yes.

2    Q.   Okay.  And you never checked the east quench

3    tower again, is that correct?

4    A.   No, I did not.

5    Q.   All right.  And you said you inspected the

6    by-products area 15 times.  Is that 15 times

7    since -- from 1984 to 2009?

8    A.   I would say -- yeah, that's a good

9    approximation.

10   Q.   Okay.  So that's approximately 15 times in 25

11   years, is that correct?

12   A.   Yes.

13   Q.   Okay.  Now, with respect to the inspections

14   that you conducted at Tonawanda Coke, when you went

15   there, did Mark Kamholz always escort you around

16   the facility?

17   A.   Yes, he did.

18   Q.   Okay.  And is it fair to say that Mr. Kamholz

19   knew where you went on inspections?

20   A.   Yes, he did.

21   Q.   And did you always follow basically the same

22   routine when you conducted inspections?

23   A.   Pretty much so, yes.

24   Q.   Okay.  And when Title V -- when the Title V

25   permit was issued, did the focus of your inspection

1   change?

2   A.  Yeah, somewhat.

3   Q.  Okay.  Was it spent more on reviewing documents

4   than looking at apparatus?

5   A.  Yes, it was.

6   Q.  Okay.  And then your Title V permit compliance

7   inspections, did that include checking every

8   condition of the permit physically?

9   A.  No.  No, it wouldn't.

10  Q.  Okay.  And yet you would check off that they

11  were in compliance, was that only in respect to

12  what you observed, is that correct?

13  A.  Yes.

14  Q.  Okay.  And is it fair to say you relied upon

15  Tonawanda Coke to be in compliance with the

16  conditions of the Title V permit you did not view

17  during your inspection, is that correct?

18  A.  Yes.

19  Q.  Okay.

20          MR. PIAGGIONE:  Can I have a moment, your

21  Honor?

22          THE COURT:  Yes.

23          MR. PIAGGIONE:  If I may continue for one

24  moment?

25          THE COURT:  Certainly.

1    BY MR. PIAGGIONE:

2    Q.   Thank you.  Mr. Foersch, you said Mr. Kamholz

3    was with you on every inspection, is that correct?

4    A.   Yes.

5    Q.   Okay.  So he would know those conditions that

6    you did not inspect during your -- he would not

7    know which conditions you did not inspect --

8    withdrawn.

9         He would know what conditions in the Title V

10   permit that you did not physically inspect during

11   your inspection, is that correct?

12   A.   I don't think he would have any idea what I was

13   going to do on a particular inspection.

14   Q.   Okay.  Incidentally, were you ever trained to

15   be a RCRA inspector at any time?

16   A.   No.

17   Q.   Thank you.

18           THE COURT:  Anything, Mr. Personius?

19   REDIRECT EXAMINATION BY MR. PERSONIUS:

20   Q.   Mr. Foersch, when you and I were going through

21   your direct testimony this morning, do you remember

22   that I referred to a couple of occasions when you

23   were interviewed by a private investigator named

24   Mr. Thurston?

25           MR. PIAGGIONE:  Objection, your Honor.

1        We're now going beyond the scope of the cross.

2                MR. PERSONIUS:   This was covered by

3        Mr. Linsin, your Honor.

4                THE COURT:   I'm sorry?

5                MR. PERSONIUS:   It was covered by

6        Mr. Linsin.

7                MR. PIAGGIONE:   It's defense, your Honor.

8                THE COURT:   No.   That's -- that's

9        testimony that can be inquired into.   I'll permit

10       it, but you have to reput the question please.

11       BY MR. PERSONIUS:

12       Q.   Do you remember during my questioning of you

13       this morning that we discussed your two contacts

14       with an investigator named Thurston in January

15       of 2010?

16       A.   Yes.

17       Q.   Okay.   And the questions had to do with you

18       acknowledging to Mr. Thurston that you knew there

19       were not baffles in quench tower number 2, do you

20       recall that?

21       A.   The question again, please?

22       Q.   Yes.   Do you remember that the reason I brought

23       up Mr. Thurston was to address your awareness that

24       there were no baffles in quench tower number 2, do

25       you remember that?

1    A.   Yes.

2    Q.   And we went through him showing you the first

3    report the second time he saw you, do you recall

4    that?

5    A.   Yes.

6    Q.   And he gave you an opportunity to change his

7    report remember?  Do you remember that?

8    A.   Yes.

9    Q.   Okay.  And the only change you asked for was

10   the word "fully" be removed from in front of the

11   word "aware", right?

12   A.   Yes.

13   Q.   And am I correct that you agreed that you told

14   Mr. Thurston both -- on both times you saw him in

15   January of 2010 that you were aware there were not

16   baffles in quench tower number 2?

17   A.   But at what time -- I documented there -- well,

18   I didn't document, I observed there not being

19   baffles.

20   Q.   Did you tell Mr. Thurston you were aware that

21   there were no baffles in quench tower number 2?

22   A.   Yes.

23   Q.   And isn't it true, Mr. Foersch, that you knew

24   from the time you last looked in quench tower

25   number 2 until you retired, you knew in your heart

1    of hearts that there were not baffles in that

2    quench tower, isn't that true?

3                MR. PIAGGIONE:  Objection again, your

4    Honor.  This is direct, and this is leading.

5                THE COURT:  Well, let's get an answer and,

6    that's it.  Move on.

7          You may answer.

8                THE WITNESS:  I had a gut feeling that

9    there weren't baffles in there.

10   BY MR. PERSONIUS:

11   Q.  Thank you.  Now, you were asked by

12   Mr. Piaggione on his examination about

13   conversations you had with Mr. Kamholz regarding

14   this issue with the flow of the steam and the

15   particulates and the height of the tower, do you

16   remember that topic?

17   A.  Yes.

18   Q.  Okay.  And he asked you if you told Mr. Kamholz

19   that you still needed baffles, do you recall that?

20   A.  Yes.

21   Q.  And you said occasionally I did, correct?

22   A.  Yes.

23   Q.  And can we infer from that or conclude from

24   that on other occasions when you had the

25   conversation, you did not tell him that baffles

1    were still required, true?

2    A.   Yes.

3    Q.   All right.  Now, you've testified in response

4    to a question by Mr. Piaggione that a year after

5    this last inspection of quench tower number 2 that

6    you had a conversation with Mr. Kamholz?

7    A.   Yes.

8    Q.   And that what you've told the jury is that you

9    actually asked him do you have baffles in that

10   quench tower, is that what you're recalling?

11   A.   Yes, I did.

12   Q.   And you're telling the jury that your

13   recollection is that he said yes, there were

14   baffles in there?

15   A.   Yes.

16   Q.   Could we please put just for identification,

17   Lauren, back on the screen Mr. Foersch's grand jury

18   testimony, which is Government Exhibit 3521.16.

19       And there is your -- the first page of your

20   grand jury testimony, Mr. Foersch, from July

21   29, 2010, is that correct?

22   A.   Yes.

23   Q.   Would you go please, Lauren, to page 23.  Could

24   you make that upper portion larger, please?

25       The question on line 1 was: "And you say you

1    looked in there and you saw some baffles in

2    disrepair." And your answer was: "Correct."  Do you

3    see that?

4    A.  Yes.

5    Q.  Lauren, could you put the full page back up

6    again, please.  And would you make that part bigger

7    please?

8        And then you were asked on line 23, "But you

9    didn't document it?"  And your answer was, "no".

10   And then the question was:  "Did you follow up with

11   him?"  Do you see that?

12   A.  Yes.

13   Q.  Would you go to the next page please, Lauren?

14   We're on page 24.

15       And your answer was:  "No."  And then the

16   question was: "Why not?"  And your answer was:  "I

17   guess one of those discretionary things that you

18   sometimes do."  Is that correct?

19   A.  Yes.

20   Q.  And to be clear, when you testified in the

21   grand jury two and a half years ago, you didn't

22   tell the grand jury about this conversation you're

23   telling us that you had today, is that true?

24   A.  True.

25             MR. PERSONIUS:  All right.  May I have a

1    minute, Judge?

2         Your Honor, we have nothing further.

3         Thank you, Mr. Foersch.

4              THE COURT:  Okay.  Mr. Linsin, anything?

5              MR. LINSIN:  Nothing further, your Honor.

6    Thank you.

7              THE COURT:  Okay.

8              MR. PIAGGIONE:  I have a few more

9    questions, your Honor, if I may.

10             THE COURT:  Okay.

11   RECROSS-EXAMINATION BY MR. PIAGGIONE:

12   Q.  Mr. Foersch, you said based upon your gut

13   feeling in prior cross -- rather redirect

14   examination.  Based upon your gut feeling did you

15   ask Mr. Kamholz were there baffles in the east

16   quench tower, and he said yes, is that correct?

17   A.  Correct.

18   Q.  Okay.  And did you ever tell Mr. Kamholz that

19   baffles were not required in the east quench tower?

20   A.  No.

21   Q.  Okay.  And with respect to the grand jury

22   testimony, did you note that there were

23   inaccuracies in that testimony when you read it?

24   A.  Not -- grand jury or Thurston's?

25   Q.  Withdrawn.  With respect to the grand jury

1    testimony, you said you never followed up.  Yet

2    there is this follow-up that you did on the

3    following year inspection.  That seems to be in

4    conflict.  Can you explain that?

5    A.  Yes, I can.

6    Q.  Would you, please?

7    A.  I was never asked the question in the grand

8    jury if I did any subsequent -- if I did any

9    follow-up on it or whatever.

10    Q.  Well, the question was:  "Did you follow up on

11    it?"  Did you misunderstand the question in the

12    grand jury?

13    A.  I'd like to read it again if I could.

14    Q.  3521.16.0023.  We have to go down one more

15    line.

16          THE COURT:  It's the next page.

17          MR. PIAGGIONE:  It's the next page, I'm

18    sorry.  24.  Okay.  All right.  Could you read that

19    again?

20      Do you want to explain that now?

21          THE WITNESS:  What I was referring to --

22          THE COURT:  Well, no, you can't do to that

23    way.

24  BY MR. PIAGGIONE:

25    Q.  Okay.  Does that refresh your memory at all?

1    A.  Yes, it does.

2    Q.  Do you want to explain why you said you did not

3    follow up in the grand jury?

4    A.  I was referring to in the short-term, like

5    within a month or two, and not that I never

6    inquired about it again.

7              MR. PIAGGIONE:  No further questions, your

8    Honor.

9              THE COURT:  Okay.

10             MR. PERSONIUS:  I'll try not to do this,

11   Judge, but --

12   FURTHER REDIRECT EXAMINATION BY MR. PERSONIUS:

13   Q.  Could we please have for identification,

14   Lauren, the grand jury testimony, Government

15   Exhibit 3521.16?

16        Do you see that on the screen, Mr. Foersch?

17   A.  Yes.

18   Q.  Lauren, could you please go to the page we were

19   on, page 24?  And the portion of this that you were

20   just referring to, Mr. Foersch, is at the top of

21   page 24, is that true?

22   A.  Yes.

23   Q.  Okay.  Would you please make that bigger,

24   Lauren?

25        Now, on that same page, on line 15, you were

1    asked:  "Did you ever ask him if he did?"  And your

2    answer was:  "That I don't remember if I did or

3    not."  Is that what your testimony was two and a

4    half years ago in the grand jury?

5    A.  Yes.

6    Q.  And that was referring to talking to

7    Mr. Kamholz about whether or not he had put baffles

8    in tower number 2, correct?

9    A.  Could I read a little more of it?

10   Q.  Sure.  Would you let Mr. Foersch read page 24,

11   Lauren?

12       Have you had a chance to read page 24?

13   A.  Yes.

14   Q.  Do you agree that's what your response related

15   to?

16   A.  Yes, I do.

17           MR. PERSONIUS:  Nothing further, Judge.

18   You can take that down, Lauren.

19           THE COURT:  Keep it up.  Do you want to

20   refer to it, or are you going somewhere else?

21           MR. PIAGGIONE:  No where else.  I can ask

22   from here.

23   FURTHER RECROSS-EXAMINATION BY MR. PIAGGIONE:

24   Q.  Is it your testimony today that you do remember

25   the conversation?

1      A.   Yes.

2      Q.   Okay.  Thank you.

3               MR. PIAGGIONE:  No further questions.

4               MR. PERSONIUS:  No, Judge.

5               THE COURT:  Thank you.

6          Okay.  Mr. Foersch, I think that concludes your

7      testimony.  You are excused.  Thank you very much.

8          Mr. Linsin.

9               MR. LINSIN:  Thank you, your Honor.

10     Tonawanda Coke calls Mr. Ken Eng.

11              THE COURT:  Good afternoon.  If you would

12     approach the witness stand, sir.  We'll tell you

13     when to stop.  And right there.  Please stop.

14     Don't enter.  Turn towards the jury, please.

15     K E N N E T H    E N G, having been duly sworn as a

16     witness, testified as follows:

17              THE COURT:  Okay.  Be careful when you

18     enter.  Get comfortable.  Good afternoon.

19              THE WITNESS:  Good afternoon.

20              THE COURT:  All right.  I'm going to ask

21     you to speak in the direction of the jury at the

22     microphone.  That's usually pretty friendly, as

23     long as you speak at it in a conversational tone.

24     Keep in mind that you're here to benefit the jury.

25     They want to hear what you have to say.  But make

1   sure you understand the question that is asked.  If

2   you don't, just ask the lawyer or me to repeat it.

3   Be as succinct as can with your answer.  If you can

4   answer it with a yes or no, that helps move things

5   along.

6        If there's an objection, wait until I rule on

7   the objection, and then I'll tell you what to do;

8   either complete your answer, start it again, wait

9   for a next question.  Do you understand those

10  instructions?

11              THE WITNESS:  I do.

12              THE COURT:  Okay.  Don't volunteer

13  anything -- that usually complicates things -- if

14  you can avoid it.  Sounds like you're going to

15  carry okay on that microphone.  State your full

16  name, spell your last name, please.

17              THE WITNESS:  My full name is Kenneth Eng,

18  E-N-G.

19              THE COURT:  Okay, thank you.

20       Your witness, Mr. Linsin.

21              MR. LINSIN:  Thank you, your Honor.

22  DIRECT EXAMINATION BY MR. LINSIN:

23  Q.  Good afternoon, Mr. Eng.

24  A.  Good afternoon.

25  Q.  My name is Greg Linsin.  I represent Tonawanda

1    Coke Corporation.  Would you please tell the

2    members of the jury where you're employed, sir?

3    A.   I'm employed with the United States

4    Environmental Protection Agency in EPA Region 2

5    office in New York City.

6    Q.   And how long have you been with EPA?

7    A.   I've been with EPA for 41 years and a couple

8    months.

9    Q.   And what is your current position with the

10   Environmental Protection Agency?

11   A.   I'm currently the branch chief, the Air

12   Compliance Branch chief.

13   Q.   And is that for Region 2?

14   A.   Yes, that is correct.

15   Q.   And how long have you held that position, sir?

16   A.   From today approximately 25 years.

17   Q.   And would you briefly describe your duties as

18   the branch chief of Region 2's Air Compliance

19   Branch?

20   A.   Yes.  Basically I am the official that is

21   responsible for managing several group of engineers

22   and inspectors as they conduct compliance

23   inspections.  And if compliance is not -- is a

24   noncompliance, then would proceed to take the

25   appropriate enforcement action.

1    Q.   And Region 2 has responsibility for oversight

2    of environmental compliance in New Jersey, New

3    York, and Puerto Rico, is that correct?

4    A.   Yes, including the Virgin Islands.

5    Q.   All right.  Now, I'd like to direct your

6    attention, please, sir, to 2009, and ask whether

7    there came a time that you became aware that a

8    joint EPA/DEC air compliance inspection was going

9    to be conducted at the Tonawanda Coke facility?

10   A.   Okay.  Yes.

11   Q.   All right.  And did you personally participate

12   in that joint inspection of Tonawanda Coke in

13   April?

14   A.   I did not.

15   Q.   All right.  Did other personnel from EPA Region

16   2 participate in that inspection?

17   A.   Yes.

18   Q.   Who from Region 2 participated?

19   A.   Three of my staff, Harish Patel, a senior

20   inspector, Mozey Ghaffari, another senior

21   inspector, and Richard Kan.

22   Q.   All right.  And what is his position?

23   A.   He was a junior inspector.

24   Q.   All right.  Back at that time?

25   A.   Back at that time.

1    Q.  All right.  And did other personnel from EPA's

2    NEIC office in Denver also participate?

3    A.  Yes, they did.

4    Q.  And who were this please?

5    A.  They were Martha Hamre and Ken Garing.

6    Q.  And Hamre is H-A-M-R-E?

7    A.  I believe so, yes.

8    Q.  All right.  Now, following that April 2009 air

9    compliance inspection at Tonawanda Coke, did you

10   receive a report from any of the those five

11   individuals that you just mentioned regarding the

12   results of that inspection?

13   A.  Yes.

14   Q.  All right.  With whom -- how did you receive

15   the report?

16   A.  It was a report from the NEIC center.  They

17   routine -- if we ask them to participate in

18   inspection, they will develop a report detailing

19   the results of the inspections.

20   Q.  And so there came a time when you received a

21   written report from NEIC, is that correct?

22   A.  Yes, that is correct.

23   Q.  Did you also though receive an oral briefing

24   from Miss Hamre and from Mr. Garing?

25   A.  Yes.

1    Q.  All right.  When did that oral briefing occur?

2    A.  I don't know when it did occur.  But it

3    occurred before their written report.

4    Q.  Before any NEIC written report?

5    A.  Before NEIC's written report.

6    Q.  And in the oral briefing that you received from

7    Miss Hamre or Mr. Garing, did either of them say

8    anything to you about a pressure relief valve that

9    was observed at the Tonawanda Coke facility during

10   the inspection?

11   A.  I do not recall discussions concerning that,

12   no.

13   Q.  All right.  Did you have discussions with the

14   three personnel from Region 2, Mr. Patel, Mr.

15   Ghaffari, or Mr. Kan, did you have an oral

16   report -- receive an oral report from them?

17   A.  Yes, I did.

18   Q.  All right.  And do you recall about when that

19   oral report was received?

20   A.  The oral report -- when they come back from the

21   inspection, they generally tell me what they found

22   in general.  And short of that, general highlights

23   of what they found.  We did not talk details.

24   Q.  All right.  In their summary to you --

25   A.  Yes.

1    Q.   -- oral summary to you, of the findings of

2    this -- do you know how many days this air

3    inspection went on?

4    A.   I believe a couple weeks.

5    Q.   All right.  Did any of them mention to you

6    anything about a pressure relief valve that had

7    been observed on the coke oven gas line at

8    Tonawanda Coke?

9    A.   Yes.  Harish Patel did mention a pressure

10   relief valve, but we did not have extensive

11   discussions about it, no.

12   Q.   All right.  Now, do you remember what time

13   in 2009 you received this written report from NEIC?

14   A.   I do not.

15   Q.   Have you become aware -- since 2009 have you

16   become aware that later in 2009 after this joint

17   inspection that the New York State Department of

18   Environmental Conservation office had issued a

19   notice of violation or an NOV to Tonawanda Coke

20   regarding the need to install baffles in one of the

21   quench towers at that facility?

22   A.   Yes.

23   Q.   All right.  Now, during 2009, were you

24   consulted, or, as far as you know, were any of your

25   staff consulted about the plans by DEC to issue

1    this notice of violation?

2    A.   No.

3    Q.   Were you aware that it was going to occur

4    beforehand?

5    A.   I was not aware that it was going to occur

6    beforehand.

7    Q.   But you've subsequently learned that that

8    notice of violation from DEC related to the east or

9    number two quench tower, is that correct?

10   A.   That is correct.

11   Q.   Now, later in 2009, October, November, did you

12   become involved in discussions regarding the

13   issuance of a notice of violation by EPA regarding

14   the baffles in the quench towers at Tonawanda Coke?

15   A.   Yes.

16   Q.   And was a decision made by -- are you aware

17   that a decision was made to issue a notice of

18   violation from EPA to Tonawanda Coke regarding the

19   baffles in both of these quench towers?

20   A.   Yes.

21   Q.   All right.  Do you recall approximately what

22   date that was issued?

23   A.   It was issued December 7th.

24   Q.   Of 2009?

25   A.   2009.

1    Q.   Now, before that notice of violation was

2    issued, had anyone -- I'm sorry, let me go back.

3         That notice of violation from EPA, is it

4    accurate to say that it required Tonawanda Coke to

5    install baffles in both of the two quench towers at

6    the facility?

7    A.   Yes.

8    Q.   All right.  Before EPA issued that NOV, were

9    you aware that years before, 15 years before, DEC

10   had actually issued a written exemption to

11   Tonawanda Coke with respect to the need to have

12   baffles in the west or quench tower number 1?

13   A.   I was not aware.

14   Q.   As far as you know, was anyone on your staff

15   aware of that exemption that had been issued

16   previously by DEC?

17   A.   As far as I know, none of my staff was aware of

18   an exemption.

19   Q.   Did there come a time in -- toward the end of

20   December in 2009 when you were advised by someone

21   from DEC that there was -- had, in fact, been an

22   exemption issued for these baffles in quench tower

23   number 1?

24   A.   Yes.

25   Q.   All right.  How did you learn about that?

1    A.   I learned about that in a call with state air

2    pollution control engineer Larry Sitzman.  We had a

3    conversation in which he told me.

4    Q.   All right.  And do you recall, Mr. Eng, whether

5    you called Mr. Sitzman or whether he called you?

6    A.   I do not.

7    Q.   All right.  As a result of that conversation --

8    well, what did Mr. Sitzman tell you about this

9    issue regarding an exemption?

10          MR. MANGO:  Your Honor, I'm going to

11   object.  That's hearsay.

12          MR. LINSIN:  Your Honor, I'm not offering

13   this for the truth of the matter.  It really goes

14   to the state of mind of the hearer and his

15   subsequent actions in response to this

16   communication with Mr. Sitzman.

17          THE COURT:  Yeah, and it's being offered

18   against the party --

19          MR. LINSIN:  It's a statement of a party

20   opponent.

21          THE COURT:  It's within the scope of the

22   duties of Mr. Sitzman, so it would qualify as an

23   exception to the hearsay rule as I see it.

24       So objection overruled.

25   BY MR. LINSIN:

1    Q.   All right.  Let me ask it again if I may.

2    A.   Please.

3    Q.   You said you had a conversation with

4    Mr. Sitzman toward the end of December 2009?

5    A.   Yes.

6    Q.   You don't recall who called whom.  But during

7    that conversation, what did Mr. Sitzman tell you

8    about this exemption that DEC had issued to

9    Tonawanda Coke for these baffles in quench tower

10   number 1?

11   A.   He told me that the state had issued Tonawanda

12   Coke this exemption to not have to put on baffles

13   provided that the -- they don't use that quench

14   tower for more than 10 percent of the time.

15   Q.   All right.

16           THE COURT:  Mr. Eng, if you could just

17   move the microphone away from you just a little

18   bit, because you're just a little bit to close, and

19   it causes feedback.

20           THE WITNESS:  How's this?

21           MR. LINSIN:  We hear you just fine, but if

22   you get too close, it pops on us.

23   BY MR. LINSIN:

24   Q.   Did you ask Mr. Sitzman to provide you a copy

25   of this letter memorializing this exemption?

1    A.   He offered to provide me a copy of the letter.

2    Q.   All right.  And did you ever receive a copy of

3    the letter from Mr. Sitzman?

4    A.   I did not.

5    Q.   Did you ever follow up and ask him for a copy

6    of that letter?

7    A.   I did not.

8    Q.   Now, as a result of this discussion with

9    Mr. Sitzman, did you have communications with some

10   of your colleagues within Region 2 regarding this

11   NOV that EPA had issued previously in that month?

12   A.   Yes, I did.

13   Q.   All right.  May we have, please, for

14   identification Government's Exhibit 3518.04.

15       I'm going to ask you, first of all, Mr. Eng, if

16   you observe the yellow sticker with the number

17   3518.04?

18   A.   I do, on the top.

19   Q.   If we can go to the second page, please, and

20   then on to the third page.

21       Do you recognize these -- this document?

22   A.   I do.

23   Q.   And what is it, sir?

24   A.   These are emails -- these are emails that

25   relate to the discussion I had with Larry Sitzman,

1    as well as correspondence from myself and Dore and

2    Barbara McGarry.

3    Q.   And when you -- you mentioned someone by the

4    name of Dore?

5    A.   Dore.  She is my immediate supervisor.  She is

6    the director of the Division of Enforcement and

7    Compliance Assistance.

8    Q.   And what is Dore's last name, please?

9    A.   LaPosta.

10   Q.   All right.  And her first name is D-O-R-E, is

11   that correct?

12   A.   Yes.

13           MR. LINSIN:  Your Honor, at this time we

14   would move Government's Exhibit 3518.04 into

15   evidence.

16           MR. MANGO:  No objection, your Honor.

17           THE COURT:  Okay.

18           MR. PERSONIUS:  No objection.  Thank you,

19   Judge.

20           THE COURT:  Okay.  3518.04 received, no

21   objection.  And if you choose, may be published.

22           MR. LINSIN:  Yes, I would ask that it be

23   published, your Honor.

24           (Government's Exhibit 3518.04 was received

25           into evidence.)

1    BY MR. LINSIN:

2    Q.  And we are now on the third page of this

3    exhibit, and is it correct, Mr. Eng, that this

4    third page of the exhibit actually represents the

5    first portion of this email stream?

6    A.  Yes.

7    Q.  All right.  So, if we could highlight the

8    bottom half, first of all.

9        This would be the first communication in this

10   sequence, is that correct?

11   A.  That is correct.

12   Q.  All right.  And can you just identify the

13   people whose names appear here?  Obviously you are

14   the person to whom this last email is addressed,

15   correct?

16   A.  Yes.

17   Q.  And Miss McGarry's position again, please?

18   A.  She is the strategic implementation manager.

19   She was coordinating the Tonawanda Coke --

20   basically the -- the investigation, the enforcement

21   and so forth.

22   Q.  All right.  And who is if you would please,

23   Karl Mangels?

24   A.  Karl Mangels was my section chief at that time.

25   Q.  Richard Kan we have already discussed.

1    A.  Correct.

2    Q.  At the top of the this portion of the page, is

3    it accurate to say Miss McGarry is indicating that

4    there is something that she is going to need today,

5    that is December 30th, 2009, is that correct?

6    A.  Yes.

7    Q.  All right.  Can we back out and then go to the

8    top of the page, please.  If we can, let's try and

9    get the rest of this portion.

10       Now, who is it that authored this portion of

11    this email string, sir?

12    A.  That would be Barbara McGarry.

13    Q.  Was she involved in the investigation herself?

14    A.  She was involved in the coordination of the

15    investigation, not -- not the specific activities.

16    Q.  All right.  And this -- this email that we've

17    highlighted -- I'm sorry, enlarged here is

18    addressed to your immediate supervisor, correct,

19    Miss LaPosta?

20    A.  Correct.

21    Q.  And who is -- who is this CC'd to at the top,

22    this Patrick Durack?

23    A.  He is the deputy director of the division.  He

24    reports to Dore.

25    Q.  And would you explain, please -- you need not

1    read it, but would you explain what Miss McGarry is

2    communicating here to Miss LaPosta?

3    A.   She appears to be telling Miss LaPosta I would

4    be looking into the issue concerning these baffles.

5    Q.   And from the context, is this a communication

6    then, an email, that was written following this

7    conversation you just testified about with

8    Mr. Sitzman?

9    A.   I'm not sure on when she wrote hers.  I don't

10   remember whether she wrote her email before or

11   after I had spoken to Mr. Sitzman.

12   Q.   But we can agree it's on the same date,

13   correct, December 30th?

14   A.   Yes.

15   Q.   2009?

16   A.   Yes.

17   Q.   All right.  And she explains you're looking

18   into this baffle issue, and she's referencing, in

19   the first line here, an order.  Would that be a

20   reference to a possible compliance order that EPA

21   is considering?

22   A.   Yes.

23   Q.   All right.  And at this point now we are --

24   does it fit with your memory, sir, this is about

25   three weeks after EPA has issued its own notice of

1    violation concerning these baffles?

2    A.  Yes.

3    Q.  All right.  And she says in here you're not

4    sure, if I understand -- tell me if I'm wrong in

5    this.  You're not sure that baffles that they put

6    in are okay.  You are checking, is that correct?

7    A.  That is correct.

8    Q.  And so do you recall that at the time of this

9    email exchange, Tonawanda Coke had actually put

10   baffles in quench tower number two, the eastern

11   quench tower?

12   A.  I did not know when they put in the baffles in

13   the east tower.  I didn't -- at that time I did not

14   know.

15   Q.  Well, this sentence does say "the baffles that

16   they put in," so does it help refresh your memory

17   that at least there's some discussion about some

18   baffles that have already been installed?

19   A.  Yes.

20   Q.  Okay.  So you were wanting to evaluate whether

21   those -- the baffles that had been installed --

22   A.  Correct.

23   Q.  -- fit with the requirements, is that correct?

24   A.  Yes.

25   Q.  And then there is a reference here to -- in the

1    first paragraph -- I don't mean to be jumping

2    around -- to "Our folks were not aware they were

3    using second tower to this frequency."  Do you know

4    what that references?

5    A.   I do not.

6    Q.   In your discussion with Mr. Sitzman, as best

7    you recall, did you receive any information from

8    Mr. Sitzman about what percentage of time either of

9    these quench towers was being used?

10   A.   I did not.

11   Q.   All right.  If we can go to then what would be

12   page 2 of the exhibit.  Enlarge the lower portion,

13   please.

14       Now, this is again from Miss McGarry directed

15   to Miss LaPosta, correct?

16   A.   Correct.

17   Q.   And what is she communicating here?

18   A.   She's basically saying that the NOV that we

19   sent addresses both quench towers, and that baffles

20   were needed in both quench towers.  And we cited

21   them for both quench towers for not having baffles.

22   Q.   You had already issued the NOV, correct?

23   A.   That is correct.

24   Q.   All right.  This communication is at 2:45 in

25   the afternoon on December 30th, correct?

1    A.   Yes.

2    Q.   And it indicates that you are going to work on

3    a short note that you can forward to the RA that

4    captures this information, right?

5    A.   That's correct.

6    Q.   And who is the RA?

7    A.   That's the regional administrator, Judith Enck.

8    Q.   Is that the top EPA official within Region 2?

9    A.   Yes.

10   Q.   All right.  If we can go to the top of this

11   page, please.  Yes.

12        Now, did you write this email, Mr. Eng?

13   A.   I did.

14   Q.   And what time of day did you write it on

15   December 30th, 2009?

16   A.   4:08 p.m.

17   Q.   All right.  And to whom is this email

18   addressed?

19   A.   To Dore LaPosta.

20   Q.   Would you please read your email to the members

21   of the jury?

22   A.   Yes.  "Tonawanda Coke has two wet quench towers

23   on the premises, one located east and one located

24   west of the coke oven battery.  During our

25   inspection, our inspectors observed the coke cars

1    going to the east quench tower for quenching.  This

2    is the quench tower that Tonawanda Coke had

3    subsequently equipped with baffles.  Generally

4    these baffles meet the requirements of Part 214."

5    Q.   I don't mean to interrupt you, sir.  I

6    apologize.  But Part 214 references what now?

7    A.   That's the New York Code and Rules and

8    Regulations that relate to the coke ovens.

9    Q.   All right.  So does this indicate you had

10   checked those regulations to see if the baffles

11   that had been installed in quench tower number 2

12   actually satisfy the requirements of the

13   regulations?

14   A.   Yes, I said in general they satisfy.

15   Q.   I'm sorry.  Please, go ahead.

16   A.   "The west quench tower has a history behind it.

17   In speaking to Larry Sitzman of the New York State

18   DEC, he said that the state and Tonawanda Coke had

19   an agreement memorialized in some letter which

20   Larry will send me a copy of that as long as

21   Tonawanda Coke only used this quench tower for

22   backup duty, less than 10 percent of the time, that

23   the state would not require baffles.  Although

24   Tonawanda Coke had in its Title V permit

25   application a request not to have to install

1    baffles for this quench tower, citing this

2    agreement with the state, the current Title V

3    permit, which has since expired and has not as yet

4    been renewed, does not acknowledge this agreement.

5    The state accidently left out this provision, and

6    Tonawanda Coke never caught it.  Therefore, the

7    Title V permit requires baffles on both quench

8    towers."

9    Q.  All right.  Please go ahead.

10   A.  "Our December 7, 2009, NOV cites Tonawanda Coke

11   for operating both wet quench towers without baffle

12   systems.  It reads in pertinent part" --

13   Q.  And now I apologize again for interrupting you,

14   but the quotations in the emails are quotations

15   from the NOV that EPA had issued earlier that

16   month, is that correct?

17   A.  That is correct.

18   Q.  Please go ahead.

19   A.  "From the findings of fact set forth above, EPA

20   finds that respondent operates the wet quench

21   towers of its coke oven battery without baffle

22   systems designed to effectively reduce particulate

23   emissions during quenching in violation of Section

24   214.5(a) of Part 214.  So, the AO -- the AO that we

25   are preparing" --

1    Q.   The AO, is that a reference to this potential

2    administrative order?

3    A.   That is correct.

4    Q.   Okay.  Please go ahead.

5    A.   "The AO that we are preparing will require

6    Tonawanda Coke to install and maintain baffles in

7    the west quench tower, and will require them to

8    maintain the already installed baffles in the east

9    quench tower in good working order. During the

10   upcoming meeting, not scheduled yet, with Tonawanda

11   Coke to discuss this NOV, it is possible that they

12   may bring up the issues of the state agreement not

13   to require baffles in the west quench tower."

14   Q.   So, do I understand correctly, Mr. Eng, that at

15   the time you wrote this email, you had been advised

16   by Mr. Sitzman that an exemption had been granted

17   by the state of New York for -- telling Tonawanda

18   Coke that there is not a need to have baffles in

19   quench tower number 1 as long as it is used for

20   backup service less then 10 percent of the time?

21   A.   Yes.

22   Q.   You were aware that somehow the state of New

23   York had just forgotten about or had missed that

24   exemption when it drafted the facility's Title V

25   permit, correct?

1    A.   That's what he told me, yes.

2    Q.   And you were further aware as of December 30th,

3    2009, that even though the state had missed it, it

4    appears that Tonawanda never caught -- Tonawanda

5    Coke never caught this mistake that was made by

6    DEC, correct?

7    A.   Yes.

8    Q.   And you had no information at this time, if I

9    understand you correctly, that there had been

10   anything improper done by Tonawanda Coke, no

11   information about the percentage of use with regard

12   to this -- the quench tower number 1 in -- in

13   excess of 10 percent, correct?

14   A.   That is correct.

15   Q.   And yet you didn't do anything to correct this

16   NOV that your agency had issued requiring that

17   baffles be installed in quench tower number 1, is

18   that correct?

19   A.   That's correct.  But I would like to explain.

20   Q.   Of course.

21   A.   Okay.  Usually we will issue an NOV, and that

22   NOV puts on notice to the company that we're

23   asserting that there's a violation of a particular

24   provision.  The company has an opportunity to meet

25   with us and tell us why they don't believe they are

1    out of compliance with respect to a certain

2    requirement.  And we will listen.

3        And depending upon the information they provide

4    to us, we can then at that point decide whether to

5    pursue additional enforcement action or essentially

6    to let it go.  So, we don't go back and make

7    corrections to the NOV.  It's just whether we

8    proceed further with an elevated enforcement

9    action.

10   Q.  But in this situation, even though you hadn't

11   yet had feedback from Tonawanda Coke, you've

12   testified that Mr. Sitzman in effect advised you

13   that there was a mistake, both in the Title V

14   permit, and, therefore, in your notice of violation

15   upon which -- which relied -- I'm sorry, which

16   relied on the Title V permit itself.  He's already

17   told you this, correct?

18   A.  Correct.

19   Q.  And yet you still did nothing to correct that

20   notice of violation and were still making plans to

21   proceed with an administrative compliance order,

22   correct?

23   A.  At that point no information was offered that

24   would give us consideration to change that.  We

25   received nothing other than Mr. Sitzman telling us.

1    We never saw the exemption.  We never saw

2    documentation that supported the exemption.

3    Q.  Did you doubt his word, sir?

4    A.  No, but we normally will check to make sure

5    that all the information is in black and white.

6    Q.  And yet you testified a moment ago that you

7    didn't follow-up with Mr. Sitzman to get a copy of

8    this letter he said he would send you.

9    A.  That's correct.

10   Q.  This is a state official telling you that they

11   had granted an exemption for this facility for

12   these baffles, and yet your testimony here is you

13   did not feel that imposed any obligation on you or

14   EPA to modify this compliance order that you had

15   issued, is that your testimony?

16        MR. MANGO:  Your Honor --

17        MR. LINSIN:  I'm sorry, modify the notice

18   of violation that had been issued.

19        MR. MANGO:  Your Honor, objection at this

20   point.  This is a December 30th email.  The

21   indictment in the case, your Honor, proceeds only

22   up -- if I could just have one moment, your Honor.

23     Talking about quench tower number 1 here, your

24   Honor, which would relate -- which would relate to

25   Count 5 of the indictment, which goes up to

1    December 31st of 2009.  So we're right now talking

2    about an email chain one day before the last day

3    charged in the indictment regarding this tower.  At

4    some point this is irrelevant, your Honor.  And

5    we've talked about this now.  And I don't know how

6    long we're going to talk about this, and it stays

7    relevant.

8              THE COURT:  Well, it's relevant on its

9    face by virtue of the date of this particular

10   email.  I'll permit it.

11             MR. LINSIN:  Thank you, your Honor.  I

12   would just point out that these issues, at least in

13   Tonawanda Coke's mind, go not to Count 5, which is

14   one of the counts relating to the PRV, but go to

15   Counts 6 through 10 of this indictment, five

16   separate counts.

17             MR. MANGO:  I misspoke, your Honor.  I

18   meant to say Count 10 instead of Count 5.  You've

19   ruled.

20   BY MR. LINSIN:

21   Q.  So just getting back to your state of mind on

22   December 30th, 2009, even though Mr. Sitzman, who

23   was -- what was his position at the time you had

24   this conversation?

25   A.  I believe he was the regional air pollution

1    control engineer.

2    Q.  For Region 9?

3    A.  For Region 9.

4    Q.  Of DEC, correct?

5    A.  Of DEC.

6    Q.  And even though he had made this representation

7    to you regarding this exemption that his agency had

8    issued, you felt no requirement to modify your NOV

9    or to put the brakes on the plans for an

10   administrative compliance order, is that your

11   testimony?

12   A.  We received nothing from Larry Sitzman that

13   would support that exemption.  We never saw

14   anything from him, and we wouldn't change it unless

15   we did see something.

16   Q.  And you didn't request anything further from

17   him?

18   A.  We were waiting for whatever information he was

19   going to send.

20   Q.  My question, sir, is you didn't request

21   anything further from him?

22   A.  Yes, I did not request.

23           MR. LINSIN:  I have nothing further, your

24   Honor.  Thank you.

25           THE COURT:  Okay.  Thank you, Mr. Linsin.

1          Mr. Personius, anything?

2              MR. PERSONIUS:  No questions, Judge.

3     Thank you.

4              THE COURT:  Do you have cross?

5              MR. MANGO:  I do, your Honor.

6              THE COURT:  Okay.  Let's take 15 minutes,

7     ladies and gentlemen.  We'll resume again at ten

8     after four.

9              (Jury excused from the courtroom.)

10             THE COURT:  Okay.  Mr. Eng, you can step

11    down right now.  Thank you.  Thank you.  We'll

12    resume again at 4:10.

13             MR. LINSIN:  Thank you.

14             (Short recess was taken.)

15             (Jury not present in the courtroom.)

16             THE COURT:  Do we have a preliminary

17    matter?

18             MR. LINSIN:  It's really a very brief

19    scheduling question, your Honor.  We expect, based

20    on conversation with government counsel, that the

21    cross of this witness and -- the conclusion of this

22    witness will take another 15, 20 minutes or

23    thereabouts.  We have essentially two more

24    witnesses we will be calling, your Honor, Marcia

25    Williams and then Michael Ianello, who will be a

1    very, very brief witness.

2         Our request of the Court would be that we be

3    permitted to start -- Miss Williams will be a

4    somewhat lengthy witness.  Start tomorrow morning

5    with Miss Williams rather than trying to do a piece

6    of her yet tonight and then start up again with her

7    in the morning.  That's the only reason --

8              THE COURT:  Do you anticipate we'll finish

9    both tomorrow?

10             MR. LINSIN:  I fully do.  Yes.

11             THE COURT:  Okay.  Yeah, I don't think

12   there's any problem with that.

13             MR. LINSIN:  Fine.  Thank you.

14             THE COURT:  And then we can talk about

15   what's going to happen next week.

16             MR. LINSIN:  All right.

17             THE COURT:  Okay.  Chris, if you would,

18   please.

19             (Jury seated.)

20             THE COURT:  Take a deep breath, exhale,

21   get ready.  Okay.  Please have a seat.  Good to

22   have you back.  All right.  Our jury is back, roll

23   call waived.

24        Mr. Eng, you're under oath, and the jury knows

25   that.  You are now open technically to what we call

1    cross-examination.

2         So, all the attorneys and parties are back

3    present.  I think Mr. Mango is going to ask you

4    some questions.  And then we'll go from there.

5         Mr. Mango.

6              MR. MANGO:  Thank you, your Honor.

7              THE COURT:  You're welcome.

8    CROSS-EXAMINATION BY MR. MANGO:

9    BY MR. MANGO:

10   Q.  Good afternoon, Mr. Eng.  How are you?

11   A.  Good afternoon.  I'm fine.

12   Q.  Mr. Eng, you mentioned you have 41 years in the

13   EPA, is that correct?

14   A.  Yes, that is correct.

15   Q.  And at the time you started with EPA, is it

16   fair to say that you initially worked in the air

17   program?

18   A.  That is correct.

19   Q.  And then after that you were in the Air

20   Facility Branch doing inspections for a time being?

21   A.  Yes, that is correct.

22   Q.  And then at some point you moved into the

23   Permits Branch?

24   A.  That is correct.

25   Q.  And then from there you went into the RCRA

1    Branch for about one year, is that correct?

2    A.  That is correct.

3    Q.  And then in 1988, you became Air Compliance

4    Branch chief, is that right?

5    A.  That's correct.

6    Q.  And you've served in that role since your

7    presence here today?

8    A.  That is correct.

9    Q.  Okay.  And during your time doing inspections,

10   in your 41 years, had you ever in the past had an

11   opportunity to come to Buffalo?

12   A.  Yes.  That was my region.  Region 9 with the

13   Buffalo region is where I got started doing my

14   inspections.

15   Q.  Okay.  You've done inspections at a site known

16   as Bethlehem Steel, is that right?

17   A.  I did, indeed.

18   Q.  And Donna-Hanna Coke?

19   A.  Yes.

20   Q.  Do you have any fond memories of a blizzard --

21          MR. LINSIN:  Objection, your Honor.

22   Relevance and beyond the scope.

23          MR. MANGO:  Your Honor, this is

24   introductory.  I'm moving on.  I'm not going into

25   those.

1              THE COURT:  How about moving on then.

2              MR. MANGO:  Mr. Eng, do you have any fond

3     memories --

4              THE COURT:  No, without any fond memories.

5     We don't need any fond memories.  Is that relevant?

6              MR. MANGO:  No, your Honor.

7              THE COURT:  Let's move on, please.

8              MR. MANGO:  He was involved in the

9     Blizzard of '77.  I was just going to make a

10    little -- make the jury aware of that, but we can

11    move on.

12             THE COURT:  All right.  Go ahead.  I want

13    to hear about the Blizzard of '77.

14    BY MR. MANGO:

15    Q.  All right.  I'll try again with that.  Do you

16    have any fond memories of the Blizzard of '77?

17    A.  Yes, memories that I'd like to forget.  Yes.  I

18    was caught in the blizzard.  I was conducting an

19    inspection of Bethlehem Steel in Lackawanna.  And

20    all of a sudden there is an squall, and next thing

21    I know, I couldn't see my fingers in front of me.

22    And we said maybe we ought to get to the hotel.

23    Got into our car, started driving to the hotel

24    which was in downtown Buffalo.

25         Well, needless to say it was probably six hours

1   later we couldn't get there.  We got stuck at the

2   auditorium.  We made it to the auditorium where the

3   Buffalo Braves play.  And we literally were on all

4   fours when we got out of the car and had to crawl

5   into the stadium and spend the night there with a

6   million other people.

7       So, like I said, it's a memory I'd like to

8   forget.

9           THE COURT:  You didn't have time to

10  practice your jump shot, right?  Well, it was worth

11  hearing.

12          MR. MANGO:  I thought so, your Honor.

13  That's why I wanted to --

14          MR. LINSIN:  Your Honor, I would withdraw

15  my objection.

16          THE COURT:  All right.  I mean, quite

17  frankly, that blizzard of '77 made Buffalo famous,

18  and people just don't forget snow in Buffalo ever

19  since then, so --

20          MR. MANGO:  And how many people it

21  affected other than Buffaloians as well?

22          THE WITNESS:  And lived through it.

23          THE COURT:  Very true.  Well, good.

24  Finally you did something right, Mr. Mango.

25  BY MR. MANGO:

1    Q.   Mr. Eng, your office is located in New York

2    City, is that correct?

3    A.   That is correct.

4    Q.   All right.  And you've flown here to Buffalo

5    because the defense wanted to call you as a

6    witness?

7    A.   That is correct.

8    Q.   All right.  Let's talk a little bit about -- is

9    it fair to say that in your duties as branch chief

10   you coordinate with the DEC, the New York State DEC

11   on certain activities?

12   A.   Yes, that is correct.

13   Q.   Okay.  Does that coordination include

14   coordinating on enforcement actions?

15   A.   No.

16   Q.   In fact, is it the general practice of EPA and

17   DEC to separately engage in enforcement actions,

18   isn't that right?

19   A.   That is correct.

20   Q.   And is it -- is it possible that DEC could

21   issue a notice of violation that EPA would not be

22   aware of at the time?

23   A.   Yes, it's possible.  And often it does happen.

24              THE COURT:  Wait.  Did you -- that DEC

25   would issue without EPA knowing about it, is that

1    the question?

2              MR. MANGO:  That's the question, your

3    Honor.

4    BY MR. MANGO:

5    Q.  And your answer is it is possible, and it's

6    most of the times?

7    A.  Yes.  It occurs.

8    Q.  All right.  Would DEC ever send a copy of a

9    notice of violation that they issued to the EPA?

10   A.  They do, but not as soon as they issue.

11   It's -- usually they'll save all the enforcement

12   action and send it to us in one cluster.

13   Q.  How often in a year?

14   A.  Usually monthly -- I mean, usually quarterly,

15   every three months.

16   Q.  Usually quarterly.  Say, if a notice of

17   violation is issued in October -- you were asked

18   about one relating to baffles in the east quench

19   tower number 2 at the Tonawanda Coke Corporation

20   issued by DEC, is that right?

21   A.  Yes.

22   Q.  If that was issued in October, the last

23   quarter, when would it be typical to receive that?

24   A.  Usually around January.

25   Q.  Okay.  Okay.  Now, you were asked some

1    questions during your direct examination about the

2    EPA's issuance of a notice of violation dated

3    December 7th of 2009.  You remember those

4    questions?

5    A.  Yes, I do.

6    Q.  And those related to a notice of violation for

7    the Tonawanda Coke Corporation failing to have

8    baffles in either quench tower, west or east?

9    A.  Yes.

10   Q.  All right.  At the time -- and you were

11   involved in the process of issuing that notice of

12   violation, or at least aware of it?

13   A.  Yes, I was aware of it, and I was involved.

14   Q.  All right.  And at the time EPA issued that

15   notice of violation, was EPA aware that DEC had

16   issued their October notice of violation for just

17   one of the quench towers?

18   A.  No.

19   Q.  All right.  In fact, were you involved or aware

20   at all that EPA had issued -- your branch had

21   issued a Section 114 letter to Tonawanda Coke?

22   A.  Yes.

23   Q.  And would it fit with your recollection that

24   the EPA issued that letter on September 1st

25   of 2009?

1   A.   Somewhere around that time, September.

2   Q.   Okay.  And are you aware that question 8 of

3   that Section 114 letter asked specifically for the

4   quench towers at the facility, "A, State whether

5   the quench towers have any baffles.  If your answer

6   is no, explain why not."

7   A.   Yes.

8   Q.   That was one of the questions?

9   A.   That was one of the questions in the 114

10   letter.

11   Q.   And are you aware that in October the Tonawanda

12   Coke Corporation responded to that 114 request for

13   information?

14   A.   Yes.

15   Q.   And in that response when Tonawanda Coke came

16   to the question 8 about baffles, there's no mention

17   of a 1984 exemption for quench tower number 1, is

18   that correct?

19   A.   That is correct.

20   Q.   So these 114 letters, the letter that gets sent

21   by EPA and the response that comes in from the

22   Tonawanda Coke Corporation, did that factor into

23   you and your office's issuance of this notice of

24   violation?

25   A.   Yes, it certainly did.

1   Q.   When was your -- you mentioned on

2   cross-examination -- or direct, I'm sorry, that you

3   were not involved in the April joint EPA/DEC

4   inspection, is that right?

5   A.   That is correct.

6   Q.   And when -- after that time period, when was

7   your first inspection at the Tonawanda Coke

8   Corporation?

9   A.   That was on January 26th and 27th of 2010.

10  Q.   Okay.  Mr. Eng, do you remember being showed

11  and admitted into evidence Government

12  Exhibit 3518.04, this email chain that happened on

13  December 30th?

14  A.   Yes.

15  Q.   All right.  And in that email you reference a

16  conversation you had with Larry Sitzman, is that

17  right?

18  A.   Yes.

19  Q.   And do you know or do you remember if that

20  conversation happened on that day, December 30th?

21  A.   I believe it happened on that day or very close

22  to that day.  I usually write my memos as quickly

23  as I can, to be sure that I have the facts.

24  Q.   And during that conversation did you learn that

25  there was some sort of exemption granted by the DEC

3332

1   regarding this west quench tower?

2   A.   Yes.

3   Q.   And is it fair to say Mr. Sitzman told you it

4   was somewhere in the 1980s?

5   A.   Yes.

6   Q.   Okay.  So going back from 2009, if it was 1984,

7   that would actually be 25 years ago, not 15, right?

8   A.   Yes.

9   Q.   All right.  Is it accurate to say, Mr. Eng,

10  that you did not know about this exemption prior to

11  your conversation with Mr. Sitzman?

12  A.   Yes.

13  Q.   And the purpose of this email was to raise the

14  issue with the Region 2 management and let them

15  know that there had been a prior agreement

16  regarding quench tower number 1 between Tonawanda

17  Coke and New York State, is that right?

18  A.   That is correct.

19  Q.   And prior to your talk with Larry Sitzman, is

20  it fair to say the Air Compliance Branch, Region 2,

21  your department, was unaware of this exemption?

22  A.   That is correct.

23  Q.   But as you indicated in the email, you were

24  aware that Tonawanda Coke's Title V permit required

25  baffles for the west quench tower, isn't that

1    right?

2    A.   That is correct.

3    Q.   Okay.  So, as head of the Air Compliance Branch

4    for Region 2, EPA, what is controlling to you, a

5    1984 exemption granted by the DEC or the Title V

6    permit?

7    A.   The Title V permit.

8    Q.   And in this email which I'm referencing,

9    Government Exhibit 3518.04, you mention, Mr. Eng,

10   in parentheses if I remember, "The state accidently

11   left out this provision and TCC never caught it,"

12   is that right?

13   A.   That is correct.

14   Q.   Who told you that TCC never caught it?

15   A.   Larry Sitzman told me.

16   Q.   Is it possible that --

17          MR. LINSIN:  Objection to possibilities,

18   your Honor.

19          THE COURT:  It's kind of premature.  Let's

20   me see what he's going to ask.

21   BY MR. MANGO:

22   Q.   Mr. Eng, you're aware that the Title V permit

23   required baffles in both towers?

24   A.   I'm aware of it, yes.

25   Q.   Okay.  Is it possible that when the Title V

3334

1    permit was issued, Tonawanda Coke just assumed they

2    didn't get the exemption?

3    A.   That is possible.

4    Q.   Okay.  And are you aware that in a renewal

5    application to the Title V permit sent in by the

6    Tonawanda Coke Corporation in 2006, there was no

7    mention of an exemption for quench tower number 1,

8    is that right?

9    A.   Well, I didn't review the Title -- the renewal

10   Title V permit.

11   Q.   All right.  I'll withdraw if you haven't

12   reviewed that.

13   A.   I don't remember.

14            THE COURT:  Well, the question and answer

15   stay.

16            MR. MANGO:  Yes.

17            THE COURT:  It's part of the record.

18   BY MR. MANGO:

19   Q.   I won't go any further on that then.

20        Mr. Eng, during your -- you were asked about

21   you trying to make determinations as to whether the

22   baffles met the requirements of Part 214 in this

23   email chain?

24   A.   Correct.

25   Q.   All right.  On January 26th of 2010, did you

1    make a determination -- or first, did you see the

2    baffles?

3    A.   I did, indeed.  Yes.

4    Q.   When you were there?

5    A.   Yes, I saw the baffles.

6    Q.   Okay.  When you saw those baffles, were you

7    concerned at all?

8    A.   I -- I saw a lot of daylight.

9    Q.   Okay.  And do you know -- is it fair to say

10   that in a documentation of that inspection, you

11   documented that you saw about 40 percent daylight?

12   A.   Yes.

13   Q.   And when you observed the 40 percent

14   daylight --

15        MR. LINSIN:  Your Honor, I'm going to

16   object to this.  This is going in a direction that

17   there's been a general agreement we're going to

18   stay away from throughout this trial.  And now

19   moved beyond the time period that counsel objected

20   to when I was asking questions and into compliance

21   activities that occurred the next year.

22        MR. MANGO:  I'll tighten up the scope,

23   your Honor.

24        THE COURT:  Well, I think it is

25   problematic.  So rethink where you want to go.  And

1    I'll sustain the objection.

2              MR. MANGO:  Yes.

3    BY MR. MANGO:

4    Q.  Mr. Eng, are you aware of a federal regulation

5    Subpart 5(c) of the NESHAPs, which discusses the

6    amount of coverage necessary for baffles?

7    A.  Yes.

8    Q.  Okay.  But for that --

9              MR. LINSIN:  Your Honor, I am going to

10   object.  This has nothing to do with the charges in

11   this case, and I object as irrelevant on that

12   basis.

13             MR. MANGO:  Your Honor, this -- this

14   Subpart 5 --

15             THE COURT:  Why don't we some up here and

16   we'll talk about it.

17             (Side bar discussion held on the record.)

18             THE COURT:  You have to go here,

19   Mr. Mango.

20             MR. MANGO:  Yes, your Honor.  This 5(c)s

21   of the NESHAPs requires only 5 percent daylight be

22   allowed from the baffles.  But the 5(c)s only

23   applies if the facility is a major for HAP,

24   hazardous air pollutant.  So this puts into context

25   why the hazardous air pollutant emission inventory,

1    which we have heard testimony of from other

2    witnesses, why the Tonawanda Coke Corporation would

3    have an incentive to submit that to EPA, to show

4    that they are not a major for HAP.  I'm not going

5    to go too far with this.

6              THE COURT:  Well, I think it's -- I mean,

7    it's almost a collateral matter.  It's confusing.

8    You tell me what your position is.  Maybe -- maybe

9    you don't object.

10             MR. LINSIN:  No, I do object, your Honor.

11   And honestly I think it is opening doors that I

12   thought all parties and the Court were trying to

13   keep closed here.  This certainly is not charged in

14   this indictment.  It was not -- I would object to

15   this line of questioning.  I don't think it has any

16   relevance in the charges in the case.

17             THE COURT:  I mean, you have inference on

18   inference.  I think it's problematic.  On that

19   basis I'm going to exclude it.  I'll sustain the

20   objection.

21             MR. MANGO:  Okay.

22             MR. LINSIN:  Thank you.

23             (End of side bar discussion.)

24   BY MR. MANGO:

25   Q.  Mr. Eng, is it fair to say that your

1    December 30th, 2009, email was an internal email

2    with your management just to give them a heads up

3    of what you had learned on that day?

4    A.   That is correct.

5              MR. MANGO:  Your Honor, if I can have one

6    moment.

7              THE COURT:  Certainly.

8              MR. MANGO:  Nothing further, your Honor.

9    Thank you.

10             THE COURT:  All right, Mr. Mango, thank

11   you.

12             MR. LINSIN:  I have no further questions,

13   your Honor.

14             THE COURT:  Okay, Mr. Linsin, thank you.

15      Mr. Personius?

16             MR. PERSONIUS:  Thank you, no, your Honor.

17             THE COURT:  Mr. Eng, I don't know how you

18   did it.  They don't have any further questions, so

19   we're going to let you go for the afternoon.  Thank

20   you very much.

21             THE WITNESS:  Thank you.

22             THE COURT:  Okay.  You may leave.  Thank

23   you.

24      All right.  I think, ladies and gentlemen,

25   given the hour, probably the efficiency of our

1    proceedings would be enhanced if we throw you out

2    of here now and have you come back here tomorrow

3    morning.  Does that work for everybody?  Okay.  And

4    we will resume with the defense case.

5         Please don't lose sight of where we're at.

6    This case is important to both sides.  Please don't

7    do anything to prejudge the case.  Don't discuss

8    it.  Don't research it.  Just keep your minds open,

9    because you aren't that far away from getting to

10   the point where you'll be in deliberations, and

11   you'll be asked to resolve the fact issues

12   unanimously, to return the indictment

13   unanimously -- the verdict in this case based on

14   the indictment.

15        So, you know, we've gone a long way.  Please

16   keep engaged.  You've been terrific.  We really

17   appreciate it.  We'll see you tomorrow at the

18   normal hour which is 9:30.  Okay.  Be safe on the

19   way home.  See you back here tomorrow morning.

20             (Jury excused from the courtroom.)

21             THE COURT:  Thank you, Chris.  Good night.

22             COURT SECURITY OFFICER:  Good night.

23             THE COURT:  Okay.  Anything additional?

24             MR. LINSIN:  Your Honor, I just have a

25   question as to the Court's thoughts on a charge

1    conference.  We do expect -- I'm terrible at these

2    estimates, but we do expect that our two witnesses

3    tomorrow will wrap up by -- I would imagine by

4    early afternoon.  And I know the Court is not

5    sitting on Friday.  I'm just trying to get a sense

6    as to if the Court has given any thought to timing

7    and what we should plan for and anticipate.

8         THE COURT:  Well, I mean, does the

9    government contemplate a request for a rebuttal

10   case?

11        MR. MANGO:  It's possible.  I won't say

12   likely at this point, your Honor, but it's

13   possible, depending on how the testimony plays out

14   tomorrow.  We'll obviously be able to give the

15   court information after the conclusion of the

16   defense witnesses tomorrow, if they are concluded

17   tomorrow.

18        THE COURT:  Okay.  Thank you.  Has anybody

19   done work on reviewing the charge?

20        MR. MANGO:  Yes, your Honor.  I've

21   reviewed it in its totality.  I have -- as I put in

22   our response to the Rule 29 motion, the only

23   comment I would have is I think I would ask that

24   some definitions from the New York Codes Rules and

25   Regulations be included.  And I could discuss that

1    at a later date if necessary.

2             THE COURT:  Okay.  I'm just trying to get

3    an idea of how much time --

4             MR. LINSIN:  I can represent -- we could

5    certainly use -- I could use some time to review

6    the charge more thoroughly.  I have reviewed it,

7    but I cannot say in-depth.  We do have some

8    concerns about some of the instructions.  If it is

9    the Court's intention -- that's part of why I was

10   asking if we were going to -- if the Court intended

11   to pursue this tomorrow, obviously we would have

12   our work cut out for us tonight.  But if we're

13   looking at the possibility of a rebuttal case,

14   maybe it's a moot point for --

15            THE COURT:  Well, let's do it this way.

16   Let's say that -- I mean, whichever way the

17   rebuttal case goes, if it -- I mean, if there is no

18   rebuttal case, maybe we can spend a little bit of

19   time on Friday.

20            MR. LINSIN:  I understood the Court was

21   going to be --

22            THE COURT:  I mean, I've got a little bit

23   of time before I have to be there, but -- does that

24   work?

25            (Discussion off the record between the

1          Court and courtroom deputy.)

2          THE COURT:  You can meet with counsel?

3          THE LAW CLERK:  I don't know if counsel is

4 going to be here Friday.

5          MR. LINSIN:  Oh, yes.  We intend to still

6 be in town for sure, and would be happy to make

7 ourselves available at whatever time would be

8 convenient.

9          THE COURT:  Okay.  What I might do, and

10 I'm still working this out with Mr. Moeller.  We

11 might have him do some preliminary charge work with

12 all of you, and I think that might work.  It would

13 give us a little bit -- give me a jump start in

14 terms of what we would have to do yet to get it

15 fine tuned to your respective satisfactions or not,

16 depending.  All right.  So nothing before Friday,

17 let's do it that way, regardless -- irrespective of

18 what you do.

19          MR. MANGO:  Okay.

20          THE COURT:  Okay.  Thank you.

21          MR. LINSIN:  Thank you, your Honor.

22          THE COURT:  See you tomorrow.  We'll try

23 to get started as close to 9:30 as we can.

24          MR. MANGO:  Yes, your Honor.

25        *     *     *     *     *     *

1                           CERTIFICATION

2

3            I certify that the foregoing is a

4       Correct transcription of the proceedings

5       Recorded by me in this matter.

6

7

8                           s/Michelle L. McLaughlin
                            Michelle L. McLaughlin, RPR
9                                Official Reporter
                               U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25