VOL. XVI

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

        -vs-                    10-CR-219S

TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
                 Defendants.
-------------------------------------

          Proceedings held before the

     Honorable William M. Skretny, U.S.

     Courthouse, 2 Niagara Circle, Buffalo,

     New York on March 21, 2013.


     APPEARANCES:

     AARON J. MANGO,
     Assistant United States Attorney,
     ROCKY PIAGGIONE, Senior Counsel,
     U.S. Department of Justice,
     Appearing for the United States.

     GREGORY F. LINSIN, ESQ.,
     JEANNE M. GRASSO, ESQ.,
     ARIEL S. GLASNER, ESQ.,
     Appearing for Tonawanda Coke Corporation.

     RODNEY PERSONIUS, ESQ.,
     Appearing for Mark L. Kamholz.

     Also Present:  Lauren DiFillipo, Paralegal
                     Sheila Henderson, Paralegal


     Michelle L. McLaughlin, RPR,
     Official Reporter,
     U.S.D.C. W.D.N.Y.
     (716)332-3560

3344

1                      I N D E X

2            WITNESS                        PAGE

3      MARCIA WILLIAMS
Direct Examination by Mr. Linsin          3348
4    Cross-Examination by Mr. Personius       3497
     Cross-Examination by Mr. Piaggione       3511

5

6       DEFENDANTS' EXHIBITS

7          OOOO (received demonstratively)      3429

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present in the courtroom.)

2          THE COURT:  We had a minor juror problem,

3     but I guess he was able to overcome the breakdown

4     in his vehicle, so he's here.  Just for the record,

5     the attorneys and parties on Tonawanda Coke are

6     here.

7       Is there anything we have to discuss before we

8     begin?

9          MR. PERSONIUS:  Not with Mr. Kamholz, your

10    Honor.

11         MR. LINSIN:  Not for Tonawanda Coke, your

12    Honor.

13         MR. MANGO:  No, your Honor.  Nothing from

14    the government.

15         THE COURT:  Okay.  Ms. DiFillipo, do you

16    have anything that we need to address?

17         THE PARALEGAL:  No.  Thank you.

18         THE COURT:  Okay.  Okay.  We have to get

19    organized up here, so it look likes we'll start

20    about 9:45 or so.

21         MR. LINSIN:  Thank you, your Honor.

22         MR. MANGO:  Thank you, your Honor.

23         (Short recess was taken.)

24         (Jury seated.)

25         THE COURT:  Notebooks in hands.  Welcome

1    back, ladies and gentlemen.  Please have a seat.

2         Okay.  The attorneys and parties are back

3    present in the case of United States versus

4    Tonawanda Coke Corporation and defendant Mark

5    Kamholz.

6         Good to have our jury back.  We can't do it

7    without you.  You know that.  Please keep your

8    minds open, and don't lose sight of the fact -- and

9    I'm sure you won't -- that this is an important

10   case to both sides.  The government has the burden

11   of proof.  That never changes.  The defense has the

12   opportunity to put on a defense, if they choose to,

13   in light of the presumption of innocence, and they

14   have.  And they're prepared to go forward with, I

15   think, another witness or two today.

16        And, you know, we ask you to keep your minds

17   open and then keep focused on returning a unanimous

18   verdict in this particular case on the 19 counts

19   you will be presented with at the time that you

20   deliberate.  So thank you for your work and your

21   attention, and we're almost at Friday, so bear with

22   us.

23        And, Mr. Linsin, I think the defense has a next

24   witness?

25             MR. LINSIN:  We do, your Honor.  Tonawanda

1    Coke calls Marcia Williams.

2            THE COURT:  Okay.  Okay.  If you would

3    approach the witness stand, but don't enter it, and

4    I'll tell you when to stop, so just keep on going

5    in that direction, and keep on going, going, going.

6    Stop.  Look at the jury.  We'll have you take an

7    oath.

8    M A R C I A   W I L L I A M S, having been duly

9    sworn as a witness, testified as follows:

10           THE COURT:  All right.  Good morning.

11           THE WITNESS:  Good morning.

12           THE COURT:  All right.  Make yourself

13   comfortable.  Make friends with the microphone.

14   We're going to ask you to speak at it and talk in a

15   conversational tone.  You probably have to move up

16   a little bit more than that.

17       But you're here to testify for the benefit of

18   the ladies and gentlemen of the jury.  A couple of

19   very preliminary instructions.  If you don't

20   understand a question, ask the attorney or me, if

21   I'm asking you the question, to clarify.  Be as

22   succinct as you can.  If you can answer yes or no,

23   please try to do that.  Don't volunteer

24   information.  That tends to complicate things if

25   you do.

1          If there's an objection, let me rule on the

2     objection first, then I will give you specific

3     instructions.  For example, I'll tell you to

4     complete an answer, start the answer all over

5     again, wait for another question, et cetera.  Do

6     you understand?

7               THE DEFENDANT:  Yes, I do.

8               THE COURT:  Okay.  I think you'll carry

9     okay.  Please state your full name, spell your last

10    name.

11              THE WITNESS:  Marcia Williams.

12    W-I-L-L-I-A-M-S.

13              THE COURT:  Your witness, Mr. Linsin.

14              MR. LINSIN:  Thank you, your Honor.

15    DIRECT EXAMINATION BY MR. LINSIN:

16    Q.  Miss Williams, good morning.

17    A.  Good morning.

18    Q.  How are you presently employed?

19    A.  I work for Gnarus Advisors as an environmental

20    consultant.

21    Q.  And just for the record would you spell Gnarus?

22    A.  Yes.  It's actually spilled with a G.

23    G-N-A-R-U-S.

24    Q.  And how many years -- how long have you worked

25    as an environmental consultant?

1    A.   I've worked as an environmental consultant for

2    about 22 years, but the last two of them have been

3    with -- with my current firm.

4    Q.   And prior to your working as a consultant, did

5    you have other experience -- work experience in the

6    environmental field?

7    A.   Yes, I have.   I've actually been working in the

8    environmental field for a little over 40 years at

9    this point.

10   Q.   And can you first give us a quick summary of

11   that work experience, and then I'm going ask you to

12   go into a little more detail in areas.

13   A.   Yes.   I started working for the predecessor of

14   the Environmental Protection Agency in the fall of

15   1970, and then I stayed on with the Environmental

16   Protection Agency until 1989.

17           THE COURT:   What was the predecessor of

18   the EPA?

19           THE WITNESS:   It was the National -- the

20   agency I was working for was the National Air

21   Pollution Control Administration, and that was one

22   of the agencies that got pulled into EPA.

23           THE COURT:   Okay.   Thank you.

24   BY MR. LINSIN:

25   Q.   Miss Williams, could I ask you to just turn the

3350

1      mike a little bit toward your face so that -- yeah.

2      I think you'll project a little bit better that

3      way.

4           So you were with EPA for and the predecessor

5      agency for a total of 18 years, is that correct?

6      A.   That's correct.

7      Q.   All right.  Now, before we ask you some more

8      about that experience, could you briefly describe

9      your educational background?

10     A.   Yes.  I have an undergraduate degree in

11     mathematics and physics from Dickinson College, and

12     I did some graduate work at the University of

13     Maryland in physics, and I've taken a lot of short

14     courses in technical environmental areas, like

15     groundwater and certain types of organic chemistry

16     and so on.

17     Q.   And where did you first go to work after

18     finishing college?

19     A.   I actually first went to work at a company

20     called ITT Electrophysics Laboratories, and that

21     company -- I was a mathematician there, and I was

22     developing models of the ionosphere, which the

23     company used for defense communications purposes.

24     Q.   And --

25               THE COURT:  I'm sorry.  You developed

1        models of what?

2                THE WITNESS:  It's of the ionosphere,

3        which is a level of the atmosphere.

4                THE COURT:  Well, how do you know I didn't

5        know what you were talking about?

6                THE WITNESS:  I'm sorry.

7                THE COURT:  All right.  Give us a little

8        bit more on what we're talking about when we talk

9        about the ionosphere.

10               THE WITNESS:  It is a little obtuse, I

11       agree.

12               THE COURT:  So, what is the ionosphere

13       again?

14               THE WITNESS:  It's the level of the

15       atmosphere that a lot of the radio waves and

16       communication waves can bounce off of.

17               THE COURT:  Have I been up there?  Do you

18       know?

19               THE WITNESS:  I doubt it.

20               THE COURT:  Okay.  All right.  Let's go

21       from there.

22               MR. LINSIN:  I have requested

23       Miss Williams to be brief in certain areas of her

24       summary, your Honor --

25               THE COURT:  Well, when we touch upon the

1    ionosphere, I want to make sure we are not skirting

2    something here, Mr. Linsin.

3              MR. LINSIN:  I don't believe RCRA has any

4    jurisdiction up there, your Honor.

5    BY MR. LINSIN:

6    Q.   When did you first become employed with EPA or

7    its predecessor?

8    A.   In September of 1970.

9    Q.   What was your first position with that agency?

10   A.   My first position was as a mathematician in the

11   Office of Research and Development, and at that

12   time I was involved with analyzing air pollution

13   data and health effects for the purpose of trying

14   to establish national ambient air quality

15   standards.

16   Q.   And how long were you with that office?

17   A.   About two years.

18   Q.   And after leaving that office, what was your

19   next position within EPA?

20   A.   My next position was in the Office of Mobile

21   Source Air Pollution Control.  And this is an

22   office that's responsible for developing standards

23   for pretty much any emission source that moves, so

24   cars, trucks, buses, airplanes.  And I was involved

25   with developing emission standards for checking the

1    emissions of automobiles in the field.  And so we

2    were involved with developing the inspection

3    maintenance test that many of us have to do today

4    to get our cars checked; responsible for developing

5    the fuel economy driving cycle, which is what gets

6    used when EPA says the EPA mileage for this car on

7    the city and the highway is whatever it is.  And so

8    those were some of the activities that my office

9    was involved in at the time.

10        During that tenure, I also had an opportunity

11   to serve a four-month special assignment in

12   Congress in the Senate, and that was a period of

13   time when a number of environmental laws were being

14   developed, including the Resource Conservation and

15   Recovery Act.

16            THE COURT:  All right.  When was that

17   yearwise, timewise?

18            THE WITNESS:  It was in 1976.

19            THE COURT:  Thank you.

20   BY MR. LINSIN:

21   Q.  Now, after leaving the Office of Mobile

22   Sources, what was your next position within EPA?

23   A.  My next position was to set up a new office in

24   EPA in the Office of Planning and Evaluation.  It

25   was a set -- a group of statisticians, and the

1    function of the office was to evaluate the major

2    regulations that EPA was putting out, before they

3    were issued, to make sure there was adequate

4    analysis and data to support the regulations that

5    were being issued.

6    Q.  All right.  Now, following your departure from

7    that Office of Planning and Evaluation, you had

8    several positions with the Office of Pesticide

9    Programs and Toxic Substances.  Would you describe

10   those collectively and the work you did in those

11   offices, please.

12   A.  Yes.  The Office of Pesticide Programs was

13   responsible for overseeing the safe use of

14   pesticides in the country, and so I was there for

15   about two years.  I then was in a position in the

16   Office of Toxic Substances, and that office is

17   responsible for ensuring the safe use of all other

18   chemicals other than pesticides.

19       And then I was in a position that oversaw both

20   of those offices and also oversaw the enforcement

21   program that was responsible for ensuring that --

22   that regulated entities were compliant with those

23   programs.

24   Q.  And just so we can orient ourself timewise, the

25   last position you mentioned in oversight of both of

1   those offices, what time period were you there?

2   A.   That was between 1983 and 1985.

3   Q.   And what was your title in your oversight

4   position of those two offices?

5   A.   I was the deputy assistant administrator, which

6   means I was sort of the senior career official that

7   reported to the political appointee who was running

8   that part of the agency.

9   Q.   And after leaving that position as deputy

10  assistant administrator, what was your next

11  position within EPA?

12  A.   My next position was to become the director of

13  the Office of Solid Waste.  And the Office of Solid

14  Waste was about a 250-person office that was

15  responsible for being the national program manager

16  for the Resource Conservation and Recovery Act

17  programs.

18  Q.   I'm sorry.  Am I tracking you correctly that

19  you took on those responsibilities as director of

20  the Office of Solid Waste during 1985?

21  A.   Yes.  It was in early September 1985.

22          THE COURT:  And where is that located?

23          THE WITNESS:  That was in Washington, DC.

24  BY MR. LINSIN:

25  Q.   And would you -- how long did you remain in

1    that position as director of that office?

2    A.  I remained in that position until March of

3    1988.

4    Q.  And would you describe your responsibilities as

5    director of that office, particularly with respect

6    to the RCRA statute and its implementing

7    regulations?

8    A.  At the time I took over this office, Congress

9    had just passed a major set of amendments to the

10   Resource Conservation and Recovery Act, and my

11   office had to issue a lot of new regulations in

12   this window of time.  In fact, we issued 40 either

13   proposed or final rule makings within the window of

14   time that I was there, to implement some of the new

15   requirements of the law.

16       In addition, my office was the national manager

17   for the permitting program for RCRA, and this was a

18   time period when RCRA was first getting started

19   with regard to permits.  We were also responsible

20   for the corrective action program, which involved

21   cleaning up historical releases at sites that had

22   RCRA permits.  And then, finally, my office was

23   responsible for authorizing states to actually

24   implement the RCRA program in lieu of the federal

25   government.

1   Q.   During your 18-year tenure with EPA, did you

2   receive any awards or honors?

3   A.   I did.   I actually received a number of them,

4   and several were ones I was quite proud of,

5   including one I received in 1981, which was given

6   to one person in the federal government, the entire

7   federal government, each year, under the age of 37,

8   for excellence in public administration.   And then

9   when I left the agency, I was given a distinguished

10  career award.

11  Q.   All right.   Now, during your tenure with EPA,

12  did you have contact with the companies and

13  entities which the EPA was regulating?

14  A.   Yes.   Very much.   That was a very important

15  part of the job, because we would have a lot of

16  contact during the time when we were developing new

17  regulations, in the hopes that we could collect all

18  the input that was necessary.   And then we would

19  continue to have a lot of contact after we issued

20  the regulations, because our goal was to try to

21  make sure we could get information out into the

22  world into the field so that --

23            THE COURT:   Could you slow down just a

24  little bit, please?

25            THE WITNESS:   Yes, I'm sorry.

1                  THE COURT:  Thank you.

2                  THE WITNESS:  So that the -- so that the

3      regulated parties would understand the regulations

4      that we had just issued.

5    BY MR. LINSIN:

6    Q.  All right.  Did you also have contact -- in

7      order to perform the responsibilities you've

8      described, did you also have contact with

9      nonregulated parties?

10   A.  Yes, we did.  There was a large group of

11     interested entities in the regulations that EPA was

12     developing, so we had a lot of inputs from

13     environmental groups, from labor groups, from

14     university research people, and consultants.  So it

15     was quite a large group of people that we were

16     interacting with.

17   Q.  Now, during your work with EPA, were you at

18     times involved in directing enforcement activities

19     or oversight of compliance activities?

20   A.  Yes, I was.  I think I mentioned briefly that

21     when I was in the Office of Pesticides and Toxic

22     Substances I actually supervised the headquarter's

23     enforcement office for that program.

24         When I was in the Office of Solid Waste, there

25     were several ways in which I was involved in

1    enforcement.  One, I was involved with developing

2    with our sister office, the enforcement office,

3    individual strategies for each new regulation in

4    terms of how we were going to go about doing

5    enforcement.

6        Secondly, I was involved in the development of

7    the 1988 RCRA inspector manual that was given out

8    as guidance to our regions and to the state

9    inspectors.

10       And then, finally, on an annual basis we would

11   go out to a representative set of the EPA regions

12   and perform oversight functions in terms of how the

13   regions were implementing both the permit program

14   and the enforcement program.

15   Q.  And there is some water there for you there if

16   it would be helpful.  I know it's a lot of talking.

17       Now, what year did you leave EPA?

18   A.  I left EPA in 1988.

19   Q.  All right.  And where were you next employed

20   after leaving that agency?

21   A.  I was employed at Browning-Ferris Industries.

22   It's a large -- at the time it was a large

23   international waste company, managed all different

24   types of wastes.

25   Q.  All right.  And how long were you employed by

3360

```
1     BFI?

2     A.  For about three and a half years.

3             THE COURT:  Was that home office in Texas?

4     Is that where that was?

5             THE WITNESS:  It was in Texas.

6   BY MR. LINSIN:

7     Q.  All right.  And what were your duties and

8     responsibilities during the three years you were

9     with BFI?

10    A.  I had several different -- I wore several

11    different hats during this period of time.  One of

12    them was to be involved and run the federal

13    regulatory affairs program.  I also was the

14    co-chair inside the company for the company's

15    environmental policy committee.  For a period of,

16    maybe like a year, year and a half of that time

17    frame, I was also involved with -- as the

18    vice-president of our hazardous waste subsidiary,

19    in terms of environmental permitting and

20    compliance.

21    Q.  Now, during your employment with BFI, did you

22    continue to have contact and involvement with the

23    U.S. Environmental Protection Agency?

24    A.  Yes, I did, both in the -- in the role of BFI

25    being an interested entity that would comment upon
```

1    new regulations and make sure it understood those

2    regulations so they could apply it within the

3    company, and also sometimes with the regional

4    offices and certainly with the states, because we

5    had facilities located in these many different

6    places, including New York, and we would work with

7    the state agencies.

8    Q.  And after leaving BFI in 1991, where were you

9    next employed?

10   A.  At that point I started my own environmental

11   consulting firm.  It was a small firm.  And I did

12   that for about six years, and then I folded my

13   company into a larger firm.

14   Q.  And since that time, with various companies

15   have you continued to work as an environmental

16   consultant?

17   A.  Yes, I have.

18   Q.  So over these past 12, 13 years, could you

19   please describe for the jury what types of clients

20   you have -- for whom you have consulted and what

21   types of work you have done for them.

22   A.  Consulted for a very large number of both

23   companies big and little as well as governments.

24   I've done work for the U.S. Government, I've done

25   work for the governments, for example, of Canada

 1    and of Mexico.  I've also done work for many

 2    companies in pretty much a whole wide range of

 3    types of companies, auto companies, aerospace

 4    companies, chemical companies, food companies.  And

 5    the work -- my work tends to focus on either

 6    chemical- or waste-related issues.

 7    Q.  Now, during this time as a consultant, have you

 8    ever declined to take on prospective clients in

 9    connection with criminal litigation?

10    A.  Yes, I have.  If I review the facts of the

11    situation and I feel that there's not a way that I

12    could provide reasonable assistance to them, I

13    would decline to take it, and that has happened.

14    Q.  Have you, Miss Williams, ever served on any

15    advisory panels with respect to environmental

16    compliance issues?

17    A.  Yes, I have.  I've served on several

18    subcommittees of the National Academy of Science

19    that have dealt with waste- or chemical-type

20    issues.  I've also served on some subcommittees of

21    the EPA Science Advisory Board.

22    Q.  Have you ever taught any environmental courses?

23    A.  Yes, I have.  I've -- I've taught RCRA courses

24    both inside companies that have come to ask me to

25    teach, and I've also actually taught RCRA

1    commercially, where anybody interested could come

2    take the class.  And I've also taught courses on

3    environmental auditing to companies that want to

4    understand how to do inspections of their own

5    facilities.

6    Q.  Have you ever given testimony before the United

7    States Congress on RCRA-related issues?

8    A.  Yes, I have.  Between 1980 and nineteen --

9    mid-'90s, I would say maybe about a dozen times.

10   Q.  Have you ever written any articles or given

11   speeches on RCRA issues?

12   A.  Yes.  Both.  I've given a large number of

13   speeches, and have written articles, although not

14   probably in the last ten years.

15   Q.  All right.  And, Miss Williams, have you

16   previously testified in court or provided testimony

17   in depositions as an expert witness with respect to

18   RCRA issues?

19   A.  Yes.  About -- probably about 15 times.

20   Q.  Now, one last question on your background and

21   experience.  Is -- is all of your RCRA-related work

22   as a consultant in the context of litigation?

23   A.  No.  In fact, the majority of my work that

24   covers RCRA is actually consulting work, not

25   litigation work.  I often go in because a company

1     wants to have my help in making their compliance

2     program stronger, or to understand how good their

3     compliance program is, or to help them figure out

4     some way to recycle a material within the construct

5     of RCRA.

6              MR. LINSIN:  Your Honor, at this time

7     Defendant Tonawanda Coke proffers Miss Williams as

8     an expert under Rule 702 of the Federal Rules of

9     Evidence, to provide testimony regarding -- and

10    opinions regarding the history and development of

11    the federal RCRA program, the relationship between

12    EPA and state environmental agencies in

13    RCRA-authorized states, the scope and purpose of

14    RCRA compliance inspections, and the interpretation

15    and application of the RCRA regulations with

16    respect to recycling and the RCRA permitting

17    program.

18             THE COURT:  Okay.  Mr. Piaggione?

19             MR. PIAGGIONE:  No objection, your Honor.

20             THE COURT:  All right.  Mr. Personius?

21             MR. PERSONIUS:  No objection.  Thank you,

22    Judge.

23             THE COURT:  Okay.  Then again, ladies and

24    gentlemen, you have tendered to you an expert

25    witness.  You've heard the scope of the expertise

1    described by not only testimony, but summarized by

2    Mr. Linsin in his proffer with respect to this

3    witness.

4        You are to consider the witness's testimony as

5    you would any other witness who testifies, in terms

6    of your assessing believability, credibility, and

7    what weight, if any, to give to her testimony.

8    She's here to assist you in the areas of her

9    particular expertise, which may not be necessarily

10   the information or knowledge that you have that

11   would make it comfortable for you to decide certain

12   aspects of the testimony or the case or the issues.

13       So you may consider her areas of expertise in

14   proceeding to reach your resolve on the fact issues

15   in this particular case.  You decide, though, how

16   much weight, if any, to give to her testimony.

17       Thank you.

18           MR. LINSIN:  Thank you, your Honor.

19   BY MR. LINSIN:

20   Q.  Miss Williams, when did you first become

21   engaged to work in this matter?

22   A.  It was April of 2010.

23   Q.  And since that time, approximately how much

24   time have you spent reviewing information and

25   materials and preparing for your testimony?

1    A.   About 200 hours over that time period.

2    Q.   Would you summarize, please, for the members of

3    the jury the case-specific documents you reviewed

4    during the course of your work on this case?

5    A.   I started out by reviewing the criminal

6    indictment in the case.  I then reviewed a large

7    number of site-specific types of documents,

8    including the inspections that had been performed

9    by the DEC.  I also included -- reviewed various

10   types of correspondence, emails, associated with

11   the site.  And -- and then more recently I made

12   sure I had reviewed all of the documents that the

13   government expert witnesses had cited as their own

14   reliance materials.

15   Q.   And in addition to those materials, did you

16   review any additional documents that you have in

17   your possession at Gnarus Advisors?

18   A.   Yes.  I have a large library of materials

19   relevant to RCRA, and I did review many of those as

20   well.

21   Q.   Did you visit the Tonawanda Coke facility in

22   Tonawanda, New York?

23   A.   I did not visit the facility, but I have had an

24   opportunity to look at a lot of the photographs,

25   including photographs that have been entered as

1   exhibits into this case.

2   Q.  Did you review any statements or testimony of

3   Tonawanda Coke employees and the DEC regulatory

4   personnel?

5   A.  Yes.  I was able to review a number of the

6   interview reports that were prepared by government

7   investigators with regard to the individual

8   Tonawanda Coke Corporation employees.  I was able

9   to review trial testimony of a number of employees

10  that was presented in this case, and I was also

11  able to review trial testimony of Mr. Corbett and

12  of Mr. Flax, and then I was able to be present in

13  court just this past Monday to hear the testimony

14  of Mr. Strickland.

15  Q.  All right.  Now, based upon the work you've

16  just summarized, did you reach any opinions as to

17  whether the RCRA regulations required Tonawanda

18  Coke to obtain RCRA permits for the company's

19  activities with respect to the management of the

20  K087, decanter tank tar sludge, and D018 materials

21  found around the Barrett tanks?

22  A.  Yes, I did.

23  Q.  Now, before I ask you to address the opinions

24  regarding those specific issues, I'm going to ask

25  you a series of questions -- general questions

1    about RCRA and its regulations.  First of all, can

2    you briefly summarize the general purposes of the

3    RCRA statute?

4    A.  Yes.  There are really two very important

5    purposes of this statute.  One is to ensure the

6    safe management of waste, and the second is to

7    encourage resource conservation through proper

8    reuse and recycling.

9    Q.  Now, during the work experience that you

10   summarized, were you involved in developing and

11   applying RCRA regulations with respect to solid

12   waste and recycling activities?

13   A.  Yes, I was.  And in fact, when I became the

14   director of the Office of Solid Waste in 1985, a

15   major new regulation had just recently been issued

16   that dealt specifically with what is a solid waste.

17   And so as soon as I joined that office, we were

18   spending a lot of time developing guidance and

19   making sure people understood those particular new

20   regulations.

21   Q.  Now, under RCRA and its regulations must a

22   material be a solid waste and a hazardous waste in

23   order to be regulated under the RCRA permitting

24   program?

25   A.  Yes.  It needs to be both, because it has to

1    both be a waste as well as being hazardous.

2    Q.  All right.  So, can you briefly describe

3    what -- under the RCRA regulations, what makes a

4    solid waste a hazardous waste?

5    A.  There are really two categories of types of

6    hazardous wastes.  The regulations identify a very

7    long list of very specific types of waste as being

8    hazardous.  And this is just a set of maybe 400

9    different narrative definitions.  So that's one way

10   a waste can be hazardous.

11       The other way a waste can be hazardous is --

12   the regulations identify four characteristics that

13   a waste might possess.  So, for example, a waste

14   might be ignitable.  And the regulations specify

15   test procedures or a very detailed description of

16   what those characteristics are.  So waste could be

17   hazardous because it possesses one of those

18   characteristics.

19            THE COURT:  All right.  I mean, just so I

20   understand, when you talk about the 400 or so,

21   you're talking about listed wastes by name?

22            THE WITNESS:  Yes.

23            THE COURT:  All right.  And then the

24   second category is those waste items that exhibit

25   certain characteristics that might meet the listing

1    of characteristics that would make something

2    hazardous?

3              THE WITNESS:  That's correct.  So

4    there's -- there's -- one of the characteristics is

5    ignitability.  Another one is corrosivity.  Another

6    one is reactive, and the fourth one is called

7    toxicity, and there's multiple ways a waste could

8    be toxic.

9              THE COURT:  All right.  Thank you.

10   BY MR. LINSIN:

11   Q.  So, with respect to this particular case, is

12   there a listed hazardous waste that is relevant to

13   the facts and issues that you've identified in this

14   case?

15   A.  Yes.  The listed waste is the waste called K087

16   that's been involved in the testimony already.

17   Q.  All right.  And is it correct that this listed

18   waste, hazardous waste, is defined in narrative

19   form in the EPA RCRA regulations as decanter tank

20   tar sludge from coking operations?

21   A.  That's correct.

22   Q.  Now, is there also a characteristic hazardous

23   waste that is relevant to the facts and testimony

24   in this case?

25   A.  There is.  There is a waste known as D018, D18.

1    And that is characteristic waste because the level

2    of benzene in that waste, when tested under the

3    prescribed test procedure, exceeds the level that

4    would cause it to be hazardous.

5    Q.   So that would be -- am I correct that that

6    would be a characteristic hazardous waste because

7    of its toxicity for benzene?

8    A.   Yes.   That's correct.

9    Q.   All right.   Now, under the RCRA regulations how

10   do you determine whether or not, first of all, a

11   material is classified as a solid waste for the

12   purposes of the RCRA hazardous waste program?

13   A.   The -- the regulations and the statute,

14   actually, as well, define waste in terms of the

15   concept of discard.   Now, that's a pretty easy

16   concept when you're thinking about I have a coffee

17   cup, I'm done with it, I'm going throw it away.

18   And in a similar way, at an industrial plant if you

19   have a material and you say I don't need any more

20   of this chemical or I don't need this material, I'm

21   going to throw it away, clearly there's discard

22   involved.   It gets more complicated than that when

23   recycling is involved.

24   Q.   All right.   And how do the RCRA regulations

25   address this concept of recycling?

1    A.   The RCRA regulations have tried to divide

2    recycling into two categories.  Let me put it that

3    way.  One category is recycling that looks like

4    normal production operations, and the other

5    category is recycling that looks like waste

6    treatment-type operations.  And the regulations

7    define a number of different types of secondary

8    materials and a number of different ways in which

9    those materials could be recycled, and then decides

10   which of these categories and activities look like

11   production and which of them look like waste

12   treatment or waste activities.  So if the material

13   looks like -- if the material and the activity look

14   like production, the RCRA regulations exclude that

15   from being a solid waste.

16   Q.   And what is the term of art under the RCRA

17   regulations that relates to that situation where

18   the material and the process looks like normal

19   production?

20   A.   That's usually referred to or often referred to

21   as ongoing or continuous production process.

22   Q.   All right.  And you used the term "secondary

23   material."  Would you describe, please, what that

24   means under the RCRA regulations?

25   A.   That's a general term that the regulations use

1    to capture any kind of material that's generated as

2    part of an industrial or commercial process that

3    could be a waste, depending on how that material

4    ends up being recycled.

5    Q.  Now, as you know, decanter tank tar sludge has

6    been a focus of this case, and it is involved in

7    one of the counts in the indictment.  Is decanter

8    tank tar sludge considered a secondary material

9    under the RCRA regulations?

10   A.  Yes, it is.

11   Q.  And is decanter tank tar sludge also a listed

12   hazardous waste?

13   A.  Yes, it is.

14   Q.  Now, under these regulations with respect to

15   K087, how do you determine whether it is a solid

16   waste?

17   A.  Well, the first step then is to go back to the

18   regulations and say is this material discarded

19   during the process of being recycled.  And so

20   that's the question that one needs to grapple with.

21   Is the way in which this material is being

22   recycled -- and in this case at Tonawanda Coke --

23   would that look like a normal production activity

24   or would that look like a waste treatment activity.

25   In one case it would be excluded from the

1    definition of solid waste.  If the decision was it

2    looked like waste treatment -- waste-like activity,

3    then it would be covered by RCRA as a solid waste.

4            THE COURT:  Say that again for me, please.

5    Just repeat that answer.

6    BY MR. LINSIN:

7    Q.  Yeah.  Let me see if I can break this up.  And

8    it is an important issue I'd like to the Court and

9    the jury to be clear on.

10       How -- we have this listed hazardous waste.

11   It's listed in the regs.  It's defined as a

12   hazardous waste.  But how do you properly, under

13   the RCRA regulations, then first determine whether

14   this already listed hazardous waste meets the

15   definition of solid waste?

16   A.  You need to look at whether or not the way in

17   which it's being recycled looks more like a normal

18   production activity or looks like a waste activity.

19   And you do that by looking at the regulations and

20   seeing whether the regulations identify the type of

21   behavior, the type of recycling, as production-like

22   or not.

23           THE COURT:  When you say waste activity,

24   I'm sorry, but --

25           MR. LINSIN:  No, I apologize, your Honor.

1           THE COURT:  Is that the same as relating

2     to recycling activity?  Is waste activity and

3     recycling activity synonomous?

4           THE WITNESS:  No.  Let me try and explain

5     that.  It's very important.

6         RCRA regulates the treatment, storage, and

7     disposal of solid waste that are also hazardous

8     waste.  RCRA does not actually regulate the

9     recycling process itself.  So the first step, you

10    look at the recycling process, you look at the

11    regulations, and the regulations look at the type

12    of material.  In this case it's K087, listed

13    secondary material.  And you look at how that's

14    being recycled.  And in this case it was being

15    recycled on the coal piles in the coalfield to be

16    put back into the coke ovens to be reused.  And I

17    look at that combination, and the regulations

18    address the question of whether that's a

19    production-type material that's excluded from the

20    definition of solid waste versus a -- an activity

21    that's covered by the definition of solid waste

22    because it looks like RCRA storage, treatment, or

23    disposal.

24  BY MR. LINSIN:

25    Q.  Let me try it this way, if I can.  Within this

1   definition of solid waste -- and is it fair to say

2   it's a fairly complicated definition?

3   A.  Yes, it is.

4   Q.  All right.  Within this definition of solid

5   waste, this first stop, if you will, in

6   understanding how RCRA applies, are there certain

7   categories of recycling activities that, if they

8   bear these indications of treatment, storage, or

9   disposal that you just referenced, that that

10  regulatory definition for solid waste says, huh, if

11  you're engaged in recycling that looks like this,

12  then we're going to treat the material as a solid

13  waste, is that correct?

14  A.  That is correct.

15  Q.  All right.  But again, according to that

16  definition, if the recycling activity doesn't meet

17  those indicia --

18           MR. PIAGGIONE:  Objection, your Honor.

19  This is going on again with the leading, a

20  narrative.  Let the witness testify to these things

21  if that's the case.

22           THE COURT:  No.  The witness has to

23  understand the question, and the question, I think,

24  is a fair question if you'd let it get completed.

25  Overruled.  You may continue.

1              MR. LINSIN:  Thank you, your Honor.

2              MR. PIAGGIONE:  I would just point out,

3      your Honor, that she testified just a moment ago

4      that she said RCRA does not regulate recycling, and

5      now he's asking her how RCRA regulates recycling.

6              THE COURT:  And what's your point here?

7              MR. PIAGGIONE:  It's already been asked

8      and answered that it doesn't, according to her.

9              THE COURT:  No.  Overruled.

10              MR. LINSIN:  Thank you, your Honor.

11     BY MR. LINSIN:

12     Q.  Let's -- let me try this again, Miss Williams.

13     Within the definition of solid waste, are there

14     sections that address this concept of recycling?

15     A.  Yes.

16     Q.  And within the definition of solid waste, do

17     the regulations determine, based on those

18     components of the definition, that some recycling

19     activities are going to be treated as solid waste?

20     A.  Yes.

21     Q.  All right.  And what are the factors in that

22     definition of solid waste that determine if some of

23     those recycling activities are actually going to be

24     treated as a solid waste under the definition?

25     Would you explain that to the members of the jury?

1    A.   The regulations identify the types of materials

2    and the types of recycling that qualify as solid

3    waste.   Likewise, they identify the types of

4    materials and the types of activities that don't

5    classify as solid waste.   So you have to look at

6    the material and the way in which it's being

7    recycled, and the regulations will answer the

8    question of whether that's a waste -- a solid waste

9    or whether that's not a solid waste.

10   Q.   So, under the regulations, under this

11   definition of solid waste and the other RCRA

12   regulations, if recycling is accomplished as a part

13   of a continuous production process, is it covered

14   within the definition of solid waste?

15   A.   No, it's not.   This is one of the examples of

16   the ways in which the regulations exclude materials

17   from being a solid waste.   If the material is in a

18   continuous production process, it is not a solid

19   waste under RCRA.

20        In fact, if the material is -- comes out of a

21   production process and gets reinserted directly

22   into a different production process, that's another

23   way that a material would be considered excluded

24   from RCRA, not a solid waste.

25             THE COURT:   Yeah, but it has to be both a

1       solid waste and hazardous to be covered by RCRA,

2       according to your testimony.

3               THE WITNESS:  That's correct.

4    BY MR. LINSIN:

5    Q.  Now, what if K087 -- well, I think we've

6       already covered this now.

7           Do the RCRA regulations, if a material had --

8       meets this definition of solid waste, and also then

9       is determined to be -- well, are there other

10      exemptions that have been added to the overall RCRA

11      program that exclude materials that are deemed to

12      be solid waste from the permitting requirements?

13   A.  Yes.  Again, if -- when you start, there's a

14      set of materials that never enter the system as a

15      solid waste.  There's a set that do.  Within that

16      set of materials that classify as a solid waste,

17      the regulations have added additional exclusions,

18      and those additional exemptions or exclusions have

19      been developed and added to the regulations as new

20      information is collected that suggest that there's

21      other ways that some of these materials can be

22      recycled that really don't have any elements of

23      discard involved with them.  So these exemptions

24      were developed to further exclude material that

25      didn't really have discard associated with them.

1    Q.   All right.  Now I'll see if I can ask this

2    question clearly enough.  Is it possible that under

3    the regulatory structure you're describing -- is it

4    possible that a material can be classified as

5    outside the definition of solid waste, in the

6    continuous production process you were just

7    describing for recycling, but also covered by a

8    specific RCRA exemption that has now been added to

9    this definition of solid waste?

10   A.   The answer to that question is yes.  And let me

11   explain why that happens.  When a new exemption

12   gets added into the definition of solid waste

13   regulations, it's usually more targeted than these

14   general  -- these general exclusions that might say

15   any continuous production process is not covered as

16   a solid waste under RCRA.  It's not industry

17   specific; it's just a general exclusion.

18        When a new exclusion is added, it's typically

19   very specific to a type of waste or a type of

20   industry.  And that exclusion is usually added

21   because it allows some activities that were

22   previously covered to now be excluded.  But it's

23   often frequently the case that some of the

24   activities that are capable of being covered under

25   this new exclusion were already excluded because

1    they didn't meet the basic regulatory definition of

2    a solid waste.

3        So there's usually some new material that gets

4    out with the new exclusion, but some of the

5    material could already have been excluded because

6    it didn't meet the basic factual definition of

7    discard.

8            THE COURT:  All right.  Let me just ask

9    you this.  And it's in light of Mr. Linsin's

10   question.  He referenced -- and maybe I have this

11   wrong, but a listing of waste substances that are

12   not waste.  I mean, the breakdown is -- includes

13   listed substances that are waste materials, right?

14   Are waste substances.  They're listed.

15           THE WITNESS:  Yes.

16           THE COURT:  All right.  Now, your question

17   said outside the listed substances.  Is there a

18   list of substances that are not listed that are set

19   forth?  Do you understand the question?

20           THE WITNESS:  Maybe.  Let me try and see

21   if I could explain a little bit more about

22   secondary materials.  I think it might help.

23           THE COURT:  All right.  Because as I

24   understood the question, you referenced outside the

25   list of substances that --

1          MR. LINSIN:  Well, I had intended to

2     say -- I perhaps said list, but what I was talking

3     about -- and let me restate the question.  Is it

4     possible that a particular material can be

5     classified as outside the definition of solid waste

6     but also covered by one these exemptions that has

7     been developed?  So outside the definition of solid

8     waste, but also then addressed in a new exemption?

9     And, your Honor, if I may go one question further,

10    it may help clarify this.

11          THE COURT:  Okay.

12    BY MR. LINSIN:

13    Q.   In this case is there one of these particular

14    exemptions to the definition of solid waste that

15    relates to K087?

16    A.   In -- yes.  In 1992 the regulations -- the

17    federal regulations were modified to add a specific

18    exemption that addressed K087 under certain

19    conditions.

20    Q.   And what are those conditions?  Let's put that

21    on the table.

22    A.   Those conditions involved the fact that the

23    material would have to be managed without any land

24    disposal involved prior to the time that it -- that

25    it was introduced into the recycling process.

1    Q.   But to see if I understand your testimony, are

2    you also saying that even though this exemption

3    regarding K087 material was enacted in 1992, is it

4    also your testimony that if -- even without that

5    exemption, if this same material, K087, decanter

6    tank tar sludge, was being managed as a part of --

7    and recycled as a part of a continuous production

8    process, that that would never have fit within the

9    definition of solid waste to begin with?

10   A.   That is correct.

11   Q.   And you referenced a moment ago that it's

12   important to understand -- in order to understand

13   your response, to understand this concept of a

14   secondary material.  Would you explain that.

15   A.   Well, in the definition of solid waste, certain

16   types of secondary materials are exempt from the

17   definition of solid waste.  And one of those would

18   be materials like a K087 material, which is

19   considered a by-product of the manufacturing

20   process.  That type of a secondary material is

21   exempt from the definition of solid waste when it

22   is reinserted back into the production process.

23        So one doesn't need to get to the special

24   exemption in the case where you're directly

25   reinserting it back into the production process.

1    If, instead of that, you are perhaps first

2    reclaiming it, you are doing something else to it

3    before you reinserted it, then that would be, in

4    fact, covered as a solid waste.

5        So it depends not only on the fact that it's

6    K087, but what type of recycling were you doing

7    with it.  The definition of solid waste excludes it

8    if you weren't, for example, reclaiming it first.

9    When EPA added the new definition -- new exclusion

10   in 1992, it said as long as you follow the

11   regulation that we lay out with this exclusion,

12   now, if you wanted to, you could reclaim it first.

13   So it gave some additional relief, if you want to

14   say, that the original regulation didn't provide.

15   Q.  But that '92 exemption was premised on, as you

16   testified, there being no intervening land

17   disposal, correct?

18   A.  That's correct.

19   Q.  All right.  Now, we will get to that concept in

20   a little bit.  In nineteen ninety -- I'm sorry --

21   in 2008 were there new exemptions added to this

22   RCRA definition of solid waste?

23   A.  Yes.  There were a couple of quite broad new

24   exemptions that addressed on-site recycling at any

25   type of a facility.  And one of the interesting

1    things or useful things about these regulations is

2    that they introduced the terminology of something

3    called a land-based production unit.  And what

4    these regulations clarified is that a land-based

5    production unit, you can -- it's allowable to

6    recycle in a land-based production unit even if

7    there's a preclusion from land disposal as part of

8    that exclusion.

9    Q.  And can you give the jury some examples of what

10   would qualify under this new exemption, this 2008

11   exemption, as a land-based production unit?  Any

12   industries that utilize these land-based production

13   units on a regular basis?

14   A.  The mineral -- the mineral processing industry

15   uses these quite frequently.  So let me give you a

16   very specific example.  In gold and in copper

17   processing it's very common to actually process the

18   feedstock in a land-based unit, and secondary

19   material, acid, is utilized on these heap leach

20   piles, essentially.  And that occurs on the ground.

21   But that is a production process.  So that would be

22   an example of a land-based production unit.

23   Q.  And a land-based production unit that is not

24   considered land disposal under the regulations, is

25   that correct?

1    A.   That is correct.

2    Q.   Does the recycling process itself require a

3    RCRA permit?

4    A.   No.   The recycling process itself does not

5    require a RCRA permit.   If the material is

6    stored -- if the material is a solid waste and a

7    hazardous waste and it's stored before it starts to

8    be recycled, then it would require a RCRA permit.

9    Q.   A RCRA storage permit, correct?

10   A.   A RCRA storage permit, or a RCRA treatment

11   permit if it was treated first.   But once it enters

12   the recycling process itself, that's considered

13   normal production, and it doesn't require a RCRA

14   permit.

15   Q.   Now, do the RCRA regulations govern the

16   recycling process if it involves the placement of

17   secondary material directly on the ground during

18   recycling?

19   A.   No.   Again, if there was material placed

20   directly on the ground prior to the start of

21   recycling, that would require a permit.   But if the

22   material enters the recycling process and the

23   recycling process is legitimate recycling and it's

24   taking place on the ground, there's not a

25   requirement to have a permit.

1            THE COURT:  If it's legitimately what?

2            THE WITNESS:  If it's legitimate

3    recycling.

4   BY MR. LINSIN:

5   Q.  And would you expand on that.  Is this concept

6   of legitimate recycling meaningful in interpreting

7   these RCRA regulations you're testifying about?

8   A.  It is.  There have been many characteristics

9   that have been developed that describe what

10  constitutes legitimate recycling.  And essentially

11  what -- what gets looked at is how much does this

12  recycling look like -- how much does the material

13  that you're recycling and the way in which you're

14  recycling it look like an analogous raw material or

15  an analogous product.  Is there a guaranteed market

16  for this activity, material that you're developing

17  through the recycling process?  Are you storing the

18  material and managing it similarly to the way you

19  would manage raw materials, normal feedstocks?  So

20  there are -- those are some of the things that get

21  looked at to determine whether the recycling is

22  legitimate recycling.

23  Q.  Okay.  All right.  Now, if there are accidental

24  releases or spills from a legitimate recycling

25  process, would that material being recycled --

3388

1     would that make the material being recycled a solid

2     and potentially a hazardous waste?

3     A.   In my experience, that would be extremely

4     unusual.   I can't really think of a situation in my

5     experience where that happens.   Any more than in a

6     normal production process, if you go to almost any

7     kind of a big plant, there can be spills, there can

8     leaks, inadvertent activities.

9         Those have to be addressed, cleaned up

10    potentially, so that often happens through the

11    Clean Air Act, through the Clean Water Act, and

12    sometimes if there's been a big release and it

13    hasn't been properly cleaned up, it can be required

14    to be cleaned up using various remedial-type

15    environmental authorities.   But it doesn't turn the

16    production process into a RCRA waste activity.

17        And recycling would be a similar situation.

18    Once the material enters recycling, it's considered

19    to be in a production-like phase, and a leak or a

20    spill would be addressed through another mechanism,

21    not through a RCRA permit.

22    Q.   All right.   Now, you've testified that

23    recycling in the manner in which you've described

24    does not require a RCRA permit.   My question now

25    is:   What types of activities do require a RCRA

1    permit?

2    A.  Well, if you have both a solid waste and a

3    hazardous waste and you want to store that

4    material, you want to treat that material, or you

5    want to dispose of that material, you would need to

6    get a RCRA permit for those activities.  And that

7    would include if you had a solid waste and

8    hazardous waste and you wanted to store or treat it

9    prior to the time you started to recycle it.

10   Q.  All right.  Now, what are the land disposal

11   regulations under RCRA?

12   A.  The land disposal regulations were some very

13   important --

14        MR. PIAGGIONE:  Objection, your Honor.  I

15   believe now we're going into the land disposal,

16   which I believe we're not permitted to talk about,

17   pursuant to your order.

18      The Court has already defined that term.

19        THE COURT:  I think you better come up

20   here.  I'm not sure what you're referring to.

21        (Side bar discussion held on the record.)

22        MR. PIAGGIONE:  Your Honor, you issued an

23   order which defined land disposal.  We were

24   precluded, our experts, from getting into

25   discussing the meaning of land disposal, the

1    regulations regarding land disposal, or any

2    policies addressing that.  This -- now is being

3    asked about the regulations regarding land

4    disposal, which you specifically told us we were

5    prohibited from bringing up when our experts

6    testified.  And in fact, when we attempted to

7    mention the registry regarding land disposal,

8    defense claimed that it was excluded by your order.

9    Now defense is asking this witness the same thing,

10   the same issue about describing what land disposal

11   is by -- through their regulations or policies,

12   which you have already indicated you've decided

13   there is a definition of and we're not supposed to

14   be having our experts speak about.

15            THE COURT:  Mr. Linsin.

16            MR. LINSIN:  Your Honor, the question I've

17   asked does not in any way go to any policies or

18   guidance documents or federal register notices.

19   The question I'm asking and the answer I'm

20   anticipating relate to a set of RCRA regulations

21   that were enacted in 1988 regarding land disposal

22   issues.  It is -- these are important, your Honor,

23   in a number of regards, not because I'm going to

24   get into any of these regulations in any way that

25   contradicts or is different from the Court's

1    definition of this term.  The witness fully

2    understands those limitations.

3         These are regulations that were enacted the

4    year before DEC's first RCRA compliance inspection

5    at this facility, and having those as a backdrop to

6    understand the significance of that first DEC RCRA

7    compliance inspection we believe is an important

8    aspect of interpreting and helping the jury to

9    understand just what issues were in play at the

10   time of this 1989 inspection.

11        So my question about these regulations is not

12   in any way designed to controvert or dispute the

13   controlling definition of land disposal.  It is

14   simply to put -- clarify for the jury that there

15   were these new set of regulations enacted in 1988,

16   and it is relevant to their assessment of the

17   significance of this DEC RCRA compliance

18   inspection.  That is why I have asked this and why

19   we believe it relevant.

20             THE COURT:  So where are you going with

21   the follow-up questions to the issue of the

22   amendments that relate to land disposal?

23             MR. LINSIN:  The only place I'm going at

24   this point, your Honor, is were there regulations

25   enacted, what do they relate to.  They related to

1    restrictions on land disposal of, at that time,

2    waste material.  And that's it.

3           THE COURT:  No follow-up questioning on

4    that?

5           MR. LINSIN:  No, not at all.

6           MR. PIAGGIONE:  Your Honor, first of all,

7    the RCRA inspection was a small-quantity exemption

8    inspection.  Had nothing to do with land disposal

9    or the issuance of land disposal regulations, and

10   there's no indication that there is.  There is no

11   indication that there was.  They didn't -- in fact,

12   they went through looking at containers, what

13   was -- if you looked at the checklist, it had a lot

14   of things covered by it, not land disposal

15   specifically.

16       So the idea that this inspection was generated

17   by a land disposal regulation that was passed in

18   1988 is totally unsupported by anything that's in

19   evidence.  If you look at the inspection itself, it

20   covers a myriad of things, nothing to do with land

21   disposal.

22       Second of all, he is now attempting to put some

23   sort of context for land disposal beyond the

24   definition, of trying to explain away, in effect,

25   what land disposal means by introducing these other

1    regulations.  If that's the case, then, your Honor,

2    we should be allowed to put on an expert to explain

3    what, in fact, land disposal means.  If they're

4    going to give some sort of other context to it,

5    then that's going beyond the scope of what you've

6    ordered in this case, and it -- it goes to the

7    heart of the very fact that we have not put our

8    experts on to talk about the fact that land

9    disposal is -- how it's used in terms of recycling.

10            THE COURT:  Well, as I understand where

11    we're going, the land disposal definition is what

12    I'm presenting to the jury.  All we're establishing

13    is that there are amendments that were enacted with

14    respect to land disposal.  Period.  No follow-up.

15            MR. PIAGGIONE:  But if he's going to

16    explain what those regulations are, then he's

17    putting some sort of spin or --

18            MR. LINSIN:  I did not --

19            MR. PIAGGIONE:  If he's going to ask what

20    it says in those regulations --

21            MR. LINSIN:  That is not what I intend to

22    ask.  Merely that they generally address

23    restrictions on land disposal.  That's it.  I'm not

24    getting into the substance of those.  I'm not

25    citing them at all.  But these were significant

1     regulations, and we believe it is relevant for the

2     jury to understand this in assessing what this DEC

3     inspector did in 1989.

4              THE COURT:  Let me ask you this.  What

5     does the jury gain by that information if there's

6     no follow-up to what the amendments were and how

7     they relate, if at all, to the issue of waste

8     disposal, which you can't get into?

9              MR. LINSIN:  It is in this way, your

10    Honor.  The 1989 inspection occurred before the

11    enactment of this 261.4A10, this exemption that

12    specifically related to recycling of K087 without

13    plant disposal.  The point is that even though that

14    particular exemption was enacted at a later point

15    in time, when the regulator went out there to

16    assess this recycling activity, there were in fact

17    other regulations that related to -- in the same

18    way, if you will, related to restrictions on land

19    disposal --

20             THE COURT:  In the amendments?

21             MR. LINSIN:  The 1988 amendments, yes.

22    And so the point is, even though 261.4A10 was later

23    enacted, this issue of restrictions on land

24    disposal for the purposes of RCRA were still in

25    play and were an issue that would have been

1    considered by a RCRA regulator when they are first

2    inspecting a facility and assessing whether -- this

3    is a first visit -- whether this facility is in

4    fact a large-quantity generator or small-quantity

5    generator.

6         We believe it is relevant for that purpose even

7    without -- and I have no intention whatsoever of

8    getting through the details of what those

9    regulations require, restricted, and in no way

10   conflicting with the Court's definition of that

11   term.  This is simply background information to

12   understand the context of ensuing regulatory

13   contact with this facility.

14        THE COURT:  Yeah, but if the jury doesn't

15   hear evidence with respect to what those amendments

16   in point of fact are, you're asking them to infer

17   something from the fact that there are these

18   amendments, without any information from which they

19   can intelligently draw a reasonable inference.

20        MR. LINSIN:  Your Honor, the jury can be

21   instructed, and we have no problem at all with the

22   jury being instructed that they should presume that

23   the definition of land disposal with respect to

24   these regulations is precisely the same as the

25   Court's definition of land disposal.  We are not --

1    the term is a term that is used in a number of

2    places in the regulations.  The fact that it has

3    been now defined by the Court for the purposes of

4    this case doesn't mean we shouldn't be able to make

5    reference to other places in the regulations where

6    that term is utilized.

7             THE COURT:  But those terms don't change

8    the fact of what the definition of waste disposal

9    is, right?

10            MR. LINSIN:  The Court's definition of

11   land disposal can readily be used by the jury, and

12   we have no objection to its use here with respect

13   to understanding how land disposal should be used

14   in reference to these land disposal regulations

15   enacted four years prior to 261.4A10.

16            MR. PIAGGIONE:  Your Honor, first of all,

17   the understanding that -- or rather the proposal

18   that this is going to be used as motivation for the

19   RCRA inspector is something that is not in

20   evidence, and, in fact, the supervisor of the

21   inspector was on the stand and did not indicate

22   that this was the motivation for having this

23   inspection conducted.  That's to begin with.

24       Second of all, the issue about introducing

25   these definitions clearly is an attempt to imply an

1   inference or a context to the definition of land

2   disposal that the jury is going to have to

3   basically -- or given an inference that the land

4   disposal definition should not be applied here

5   because of some sort of other context, in which

6   case then the issue about guidance through the

7   regulatory interpretations by the policies by the

8   agency, which clearly indicate how land disposal

9   should be used, are being excluded by this

10  inference of some other definitions out there about

11  land disposal, and the context of that not being

12  applied here is being introduced.  It's going to

13  mislead the jury, to begin with, and confuse the

14  jury.

15          THE COURT:  Are you --

16          MR. MANGO:  And it's irrelevant.

17          THE COURT:  Are you looking to use the

18  amendments as, arguably, the impetus for the

19  activities of the additional inspections of the

20  plant?

21          MR. LINSIN:  Your Honor, I wouldn't

22  describe it as the impetus.  What my point is and

23  what this witness will testify to when we get to

24  this topic, is that --

25          THE COURT:  Okay.  I'm sorry.  Let's do

1    that.  Okay?

2              (End of side bar.)

3              THE COURT:  If you twist my arm we'll give

4    you a break.  What do you think?  You want 15

5    minutes?  Okay.  And then we can -- might be a

6    little bit longer until I get this resolved.  Okay?

7         So don't discuss the case.  We'll see you

8    roughly 15-plus minutes, okay?  Thank you.

9              (The jury excused from the courtroom.)

10             THE COURT:  Okay.  Probably what I think

11   we should do is, Miss Williams, have you step out.

12   Okay.  You can take a break as well.

13             (Witness left the courtroom.)

14             THE COURT:  Please have a seat.  I'm

15   sorry.

16        Okay.  You were going to say -- I think we were

17   at the point of whether the amendments were the

18   impetus for the subsequent inspection that took

19   place at TCC.

20             MR. LINSIN:  Yes, your Honor.  In order to

21   assess what these RCRA compliance inspections

22   meant, what they -- what their significance should

23   be for the jury to interpret them, we think it's

24   reasonable for the jury to understand what the

25   background was before the inspections were

1    conducted.  That's why we have asked questions of

2    witnesses about this being the very first RCRA

3    inspection of this facility.  That's why we have

4    introduced evidence that the facility noticed EPA

5    that it was a generator of K087.  That -- and

6    therefore, having a -- it is reasonable for the

7    jury -- and we think it would be unfair for the

8    jury and a distortion for the jury not to

9    understand that the year prior to this inspection

10   occurring there were land disposal restrictions

11   enacted by EPA, so that it is reasonable for a jury

12   to understand that among the things this inspector

13   would have in his mind when he visits the facility

14   is ensuring that the facility is in compliance with

15   the regulations that were then in effect.

16        THE COURT:  So the amendments you

17   characterize as amendments that imposed further

18   restrictions.

19        MR. LINSIN:  That's exactly correct.  On

20   land disposal.  And, your Honor, this is not in any

21   way meant, as counsel suggested when we were

22   speaking at the bench, as some end run around or

23   some alternative interpretation of this term.  It

24   is simply a recognition of the fact, your Honor.

25        The Court has defined land disposal, and we

1    respect it, and we'll abide by it.  But land

2    disposal -- 261.4A10 is not the only place where

3    this term appears in the RCRA regulations.  The

4    concept of land disposal and restrictions against

5    land disposal were not first introduced when that

6    exemption was adopted in 1992.  This land disposal

7    limitation was in play before then.

8         And simply permitting the jury to have an

9    understanding of that context, applying, as I said

10   previously, precisely the same definition which we

11   recognize and understand that the Court has defined

12   for this case, it is simply an appropriate context

13   for the jury to understand in assessing the meaning

14   of this first RCRA compliance inspection.

15        THE COURT:  Well, you know, given what

16   you've just stated, are you in any way prejudiced

17   if the jury is not aware of the fact that there

18   were certain amendments that you say restricted

19   land disposal, if they don't know what those

20   amendments are?

21        MR. LINSIN:  Your Honor, if they don't

22   know that those amendments existed, if they don't

23   know that the year before this first DEC RCRA

24   inspection these amendments were on the books, yes,

25   we do believe we are prejudiced, and we believe it

1    would impair the jury from understanding one of the

2    factors that should be considered in assessing the

3    significance of this RCRA compliance inspection and

4    its conclusions.

5              THE COURT:  Okay.  Mr. Piaggione.

6              MR. PIAGGIONE:  Again, your Honor, again

7    the supervisor for the inspectors was on the stand.

8    He did not indicate that this new legislation that

9    he claims motivated this inspection was the reason

10   why they went there.

11       In addition, we had the inspectors who did take

12   the stand who said that was not one of the

13   motivations for them to do an inspection there.  It

14   is unfair --

15             THE COURT:  Who said that?

16             MR. PIAGGIONE:  Mr. Corbett, your Honor.

17   He testified that he went there.  He did not

18   indicate he was going there to see -- this first --

19   his two inspections prior to June of 2009, he

20   indicated he went there as part of his

21   inspection -- inspection responsibilities, not

22   related to anything to do with land disposal, with

23   regard to the recycling of any waste.  He went

24   there as part of the routine of a small-quantity

25   generator inspection.

1          THE COURT:  Yeah, but he didn't say he was

2    not aware of the amendments.

3          MR. PIAGGIONE:  But he would always have

4    to be aware of the amendments, your Honor.  That's

5    not the motivation for doing the inspection, which

6    is what the implication he's trying to claim is.

7          THE COURT:  I don't think so.  I don't

8    think you're saying that that was -- and he said

9    outright that's not what he's going to argue, that

10   that was the motivation.  I mean, it is the

11   information that the inspectors had when they

12   conducted the investigation, and it -- it does tend

13   to relate to what they would be looking for with

14   respect to how land disposal is defined.

15         MR. LINSIN:  Your Honor --

16         MR. PIAGGIONE:  However, your Honor --

17         THE COURT:  Wait.  No.  Hold on.  Correct?

18         MR. LINSIN:  We agree entirely.  The

19   government has chosen not to -- to call Mr. Fisher.

20   We are aware of that, and we are not -- but it is

21   now the jury's duty to assess and evaluate the

22   significance of this -- the RCRA compliance

23   inspections, especially in light of what we

24   anticipate will be the Court's instruction

25   regarding entrapment by estoppel in this case.

1           And we believe in order to make that evaluation

2      it is fair, reasonable, and not in any way contrary

3      to the guidance the Court has issued, for the jury

4      to have an understanding of what the regulatory

5      compliance requirements were when this RCRA

6      inspector first visited the facility in 1989.

7           We are not disputing Mr. Corbett's testimony.

8      We have our own issues about his visit to the

9      facility, and we will address those separately.

10     But especially given this 1989 inspection, your

11     Honor, which was prior to the enactment of

12     261.4A10, prior to the construction of a concrete

13     pad, we believe it's important for the jury to

14     recognize that land disposal -- there was a major

15     set of regulations that was adopted nationally, and

16     it would have been -- we believe it's reasonable

17     for the jury to infer -- would have been one of the

18     factors on this regulator's mind when he's going

19     for the very first RCRA compliance inspection.

20          MR. PIAGGIONE:  Again, your Honor, if I

21     could be heard.  The indictment starts in 1989

22     [sic].  That's when the RCRA charge starts.  It

23     seems to me, first of all, that it's irrelevant

24     whether or not what happened in 1989, the

25     inspection, has to do with 1998 forward.  That's

1    one thing, that this is totally irrelevant to that

2    issue.

3        Second of all, again, there's been no

4    indication from his supervisor, who was there in

5    1989, that motivation for any type of inspection

6    like this was because of these regulations.  And I

7    believe what happens then is the jury gets this

8    basically unfair inference that there's some sort

9    of qualification to what the land disposal

10   definition is.

11           THE COURT:  Well, it relates to land

12   disposal, so no matter how you look at it, whatever

13   the amendments are, they modify land disposal.  You

14   know, whether -- you know, it's not going to affect

15   the definition that I give.

16           MR. PIAGGIONE:  But if that's the case,

17   your Honor, are we permitted then to bring in

18   information as to other contexts for which the use

19   of land disposal is?  Are we allowed to then to

20   refer to the policies in which it puts the context

21   of land in, the guidance?  Those are the things you

22   specifically told us we could not do.

23           THE COURT:  No.  We're not talking about

24   that.  All right.  I'll tell you what.  Just hang

25   in for like five minutes.

1          Andrew, can I see you for a second?  And then

2     we'll take a break and give Michelle a break.  But

3     just wait for a minute.

4               (Judge left the bench.)

5               THE COURT:  Okay.  Please have a seat.

6     All right.  I'm trying to get a context for this,

7     because clearly it's established, Mr. Linsin, that

8     you're not going to do follow-up with respect to

9     what specifically those amendments consisted of.

10    Fair statement?

11              MR. LINSIN:  Fair statement, your Honor.

12              THE COURT:  All right.  Now, what I'm

13    trying to do -- did I cut you off?  Go ahead.

14              MR. LINSIN:  No.  I was really just going

15    to reiterate a general statement that they existed

16    and placed restrictions for the management of the

17    waste on land.  That -- that is what I'm

18    anticipating the witness will say in response to

19    the last question, to which there was an objection.

20              THE COURT:  All right.  And, you know, I'm

21    still struggling with the issue of how that's

22    really relevant without having the specifics of

23    what those amendments were other than that they

24    were restrictive amendments.  Now, let me just

25    carry that through, and then I'll let you say what

1    you want.

2         But is -- is the relevance tied into the fact

3    that there's fluidity to RCRA from the standpoint

4    of compliance by Tonawanda Coke in terms of

5    adjusting to what has to be done to comply with

6    RCRA, because RCRA's a changing law?  Is that what

7    we're talking about?

8              MR. LINSIN:  No.  Your Honor, the

9    relevance here for this particular question and a

10   couple of subsequent questions really more relates

11   to this witness's opinions regarding the

12   significance of the findings that were made by

13   these DEC regulators during the course of their

14   inspection reports.  She has reviewed those

15   reports.  She has opinions to render regarding what

16   those reports mean, what the significance of those

17   findings would reasonably have been.

18             THE COURT:  Because of the amendments?

19             MR. LINSIN:  In part because of the -- one

20   of the factors, one of the backdrops to this first

21   '89 inspection were these land disposal

22   restrictions, a significant set of RCRA limiting

23   regulations relating to land disposal the year

24   before the inspection occurred.

25        The -- but also, your Honor, I think it is

1    understandable -- it's reasonable for the jury to

2    understand that -- that as early as '88 there was

3    continuity in this concept of land disposal in

4    different places in the regulations.  The '92

5    adoption of 261.4A10 wasn't this -- the first time

6    this issue of land disposal or prohibitions against

7    land disposal related to RCRA.

8              THE COURT:  Well, there was consistency,

9    arguably, okay.  That's a fair argument, I suppose.

10   But then that consistency being interrupted by the

11   amendments, is that where we are going?

12             MR. LINSIN:  No.  No, your Honor.  Our

13   position is there was never land disposal in the

14   re-treatment and reuse of this material.  Never

15   was.  And the point is, in drawing this concept

16   back, the explicit prohibition regarding land

17   disposal back to at least 1988 is that it predated

18   the very beginning of the regulatory oversight of

19   this facility by DEC.

20       And we think that's a fair factor for the jury

21   to understand, in general senses -- in a general

22   sense, with respect to interpreting what this

23   regulatory oversight meant, what it related to.

24             THE COURT:  Let me ask you this.  Let

25   me -- you know, in general terms, in general

1    oversight, you know, all of that still factors into

2    the opinion that you're going to ask your witness

3    to render.  But my question is, what happens if the

4    jurors ask the question, "What did those amendments

5    consist of?"  Then what do we do?

6              MR. LINSIN:  Your Honor, I would be happy

7    to instruct the witness -- I have not expressly

8    instructed her in this way, but I will do so, that

9    anything she might say in response to a question

10    like that would have to presume that the

11    limitations related were -- were defined as the

12    Court has defined land disposal with respect to

13    this particular case, and not go into any great

14    detail otherwise.  That these were a set of

15    regulations that prevented the land disposal -- the

16    management of wastes on the land.

17        And I will tell you, your Honor, these are

18    regulations that were in development during the

19    time this witness was the head of the Office of

20    Solid Waste.  I mean, this is a -- something she

21    does have knowledge about.  It is -- she

22    understands entirely that we're working within

23    the -- this framework, but we -- we do not -- we

24    would not invite, we are not intending to get into

25    any detail at all about these regulations and

1    precisely what they related to.  It is simply that

2    this issue of land disposal is -- is a -- a factor

3    for the regulatory oversight for this facility, and

4    it's reasonable for the jury to understand that.

5                THE COURT:  Yeah, but what's a little bit

6    troubling to me is that on your description of what

7    her knowledge is, I mean, it's not only with

8    respect to the amendments, but it's the development

9    of the amendments prior to their enactment that she

10   would be basing her opinion on with respect to the

11   conclusions of the investigators.

12               MR. LINSIN:  Your Honor, the opinion she's

13   based -- the basis upon which her opinion is

14   rendered is simply a recognition that these land

15   disposal restrictions had been promulgated.  And

16   that is it.  The land disposal restrictions, your

17   Honor, have the -- with respect to the activities

18   at Tonawanda Coke, have the precise same

19   limitations as 261.4A10 do.  And she's not going to

20   render any different opinion about that.  The land

21   disposal restrictions were not industry specific.

22               THE COURT:  So there's no difference

23   between those amendments and 261.410?

24               MR. LINSIN:  With respect to land

25   disposal, yes.

3410

1           THE COURT:  In terms of the restrictions.

2           MR. LINSIN:  That's correct.

3           THE COURT:  So, whether they existed or

4     not makes no difference, because 261.410 --

5           MR. LINSIN:  Well, your Honor, I beg to

6     differ.  I think it does.

7           THE COURT:  I'm not telling you.  It was

8     actually a question.

9           MR. LINSIN:  With respect to understanding

10    the context of this 1989 inspection, your Honor, we

11    think it does make a difference, because --

12          THE COURT:  But she has to have -- I'm

13    sorry.  She has to have knowledge of what those

14    amendments consisted of, what they were, in order

15    for her to consider them in whatever opinion you're

16    going to ask her to render, right?

17          MR. LINSIN:  But, your Honor, it is -- it

18    is the knowledge she has of any of the RCRA

19    regulations that she has already testified about.

20    And her testimony will simply be that these

21    restrictions prohibited generators from managing

22    the solid or hazardous waste on the ground until

23    they met certain treatment standards.  That is her

24    only -- that is the only point of this, but a

25    recognition that -- here is the dilemma we are

1    facing, your Honor.

2              THE COURT:  All right.  And this is

3    against the backdrop of the definition of land

4    disposal?

5              MR. LINSIN:  All of this is strictly

6    within those confines.  But imagine a situation

7    where we -- we believe it's reasonable, and we

8    believe it will be reasonable for the jury to infer

9    that this very first RCRA inspection by DEC

10   evaluated this activity.  Obviously, that is a

11   point of discussion here.

12             THE COURT:  This activity meaning --

13             MR. LINSIN:  Meaning the recycling of the

14   K087 at the facility at a time before there was any

15   concrete pad.  If we are not able to provide this

16   backdrop regarding what the DEC regulators were

17   reasonably looking at, we will have the testimony

18   then that 261.4A10 that specifically addressed this

19   K087 and wove in this exemption with the exception

20   of land disposal, that first RCRA inspector

21   couldn't have even been thinking about this issue

22   of land disposal, because 261.4A10 was not even

23   enacted until 1992, three years after the

24   inspection.

25        But the reality is that these regulations were

1        on the books, these more general regulations

2        prohibiting the precise same activity that we're

3        talking about in detail in 261.410A.

4                THE COURT:  So 261.4A10 were enacted after

5        the amendments to RCRA, the general amendments that

6        you're talking about?

7                MR. LINSIN:  Yes.  261.4A10 was enacted in

8        1992.  If she has not already -- there has already

9        been testimony to that effect, and that is the

10       reality.  So they were enacted three years prior to

11       this RCRA inspection that I've been referencing in

12       '89.  But the land disposal restrictions, which

13       conveyed the same limitations, generally, for

14       industry, were enacted the year before the '89

15       inspection.

16               THE COURT:  Well, okay.  Is that relevant

17       to your client in any way?

18               MR. LINSIN:  Well, your Honor, we believe

19       it is important -- for my client's purposes it is

20       relevant to understand what the jury should take

21       away from the findings of this first RCRA

22       inspection and, therefore, what my client should

23       understand and rely upon, given this first RCRA

24       inspection in '89.

25               THE COURT:  Okay.  And the specific

1    findings?

2          MR. LINSIN:  That there was no disposal

3    occurring, there was no treatment occurring, and no

4    disposal, treatment, or storage of this waste.  All

5    of those findings we've walked through in detail

6    with several witnesses.  The inspection report is

7    in the record.

8        And without understanding what this regulator

9    was reasonably looking for with regard to the

10   disposal issue, and that being the backdrop of

11   these land disposal restrictions, my client is

12   prejudiced in not being able to clarify to the jury

13   that this was one of the factors that would have

14   influenced those findings.  The same prohibition

15   against land disposals that is then embodied in

16   261.4A10 three years later.

17         THE COURT:  Okay.  All right.

18         MR. MANGO:  Judge, if I can, I'm about to

19   jump out of my skin.  I'm sorry.

20       The land disposal that's part of 261.4A10 is

21   very different than the land disposal we're talking

22   about in these 1988 amendments.  The 1988

23   amendments dealt with, as Mr. Linsin just said,

24   managing hazardous wastes to a treatment standard

25   so that it can be applied to the ground and left

3414

1    there.  And left there.  That's her understanding

2    of what she's going to talk about these 1988

3    amendments.

4              THE COURT:  Well, she already made

5    reference to that, didn't she, in her testimony?

6              MR. MANGO:  Not -- not with -- not with

7    specific specificity to these 1988 amendments.  The

8    problem is 261.4A10, the exclusion for K087 waste

9    that talks about land disposal, it's in a different

10   context.  And it's the 1992 regulation that comes

11   out that gives context to the definition the Court

12   has now included, which says you can't put it on

13   the land.  That's very different than the 1988

14   amendments, which say, well, you can put it on the

15   land if you treat it to a certain level.

16        That's -- that's where he's trying to go with

17   this, with all due respect.  That's -- so it is

18   going to create some confusion, and it is still

19   going to create confusion in the jurors' minds

20   and --

21             THE COURT:  It is confusing, though, isn't

22   it?  Doesn't this help rather than confuse?

23             MR. MANGO:  The government disagrees that

24   it helps.  But if -- if it is inquired to, at some

25   point the government's going to need to then add

3415

1     the context for what land disposal actually means

2     according to the Court's definition, which is

3     something totally different than the 1988

4     amendments.

5          THE COURT:  But my definition is not going

6     to change any.  That's the law of the case.  So you

7     can argue from that.  Right?

8          MR. MANGO:  That's correct, your Honor.

9     The 1992 amendments is what gives really the

10    creation of your -- of your definition, not these

11    more general 1988 amendments.

12         THE COURT:  But they're consistent, are

13    they not?  I mean -- and that's part of the

14    argument, that we're talking about consistency

15    here, getting -- I'm sorry.  Go ahead.

16         MR. MANGO:  I'm sorry.  I cut you off.

17         THE COURT:  No, no.  No.

18         MR. MANGO:  Well, the 1988 amendments deal

19    with treatment of the material and then leaving it

20    on the ground.  Leaving it there.  In the -- in the

21    true sense of abandoning it on the ground.  You

22    have to --

23         THE COURT:  But it had to be part of the

24    process, right?  I mean, you couldn't leave it

25    there and store it there.  It had to be part of

1       that recycling process.

2              MR. MANGO:  No.  In the 1988 amendments,

3       it is if you treat a material to a certain -- like

4       if you reduce the toxicity level of it to an

5       additional -- or to a lower amount, then you can

6       dispose of it on the land.  You can put it on the

7       land, bury it over, leave it there.

8              THE COURT:  Well, let me ask you, are we

9       talking disposal --

10             MR. LINSIN:  Your Honor, Count 19 charges

11      my client with disposal of K087.  But my intention

12      and my limited intention, as I've explained to the

13      Court several times, in referencing --

14             THE COURT:  Well, you know, I'm a little

15      bit on the thick side.

16             MR. LINSIN:  No.  I'm trying, actually, to

17      explain it to Mr. Mango.

18             THE COURT:  I get the drift of what you're

19      saying, but -- yeah, go ahead.

20             MR. LINSIN:  You know, this is not being

21      brought up somehow to argue and it is not our

22      position in any way that Tonawanda Coke disposed of

23      this material and left it on the ground.  That is

24      not our point at all.  And the point of the 1988

25      general amendments was that there can be no land

1    disposal unless some of these treatment issues were

2    addressed.  And it is the land -- the prohibition

3    against land disposal of hazardous waste that is

4    the continuing thread between the 1988 amendments,

5    the land disposal restrictions, and this embodiment

6    of the prohibition against land disposal in the '92

7    amendment -- '92 regulation.

8            MR. MANGO:  But that's very different than

9    the Court's now definition and what the 1992

10   amendments say, which say absolutely no land

11   disposal regardless of how you treat it.  K087

12   waste cannot go on the ground.  So this is going to

13   confuse the issue, because these 1988 amendments

14   talk about, well, it can go on the ground if you

15   treat it to a certain thing.  It's like talking

16   about apples and oranges here, your Honor.

17           THE COURT:  All right.  Let's take a break

18   for 15 minutes, and we'll start again at about 10

19   of 12:00.

20           (Short recess was taken.)

21           (Jury not present in the courtroom.)

22           THE COURT:  Okay.  The attorneys and

23   parties are back present.  I've reviewed the

24   arguments of the attorneys concerning the relevancy

25   of the 1988 amendments to RCRA that we had

1    discussed before the break, and the defendants have

2    expressed that the changes to RCRA in and around

3    the 1989 inspection at the Tonawanda Coke Company,

4    specifically the 1988 amendments and the 1992

5    regulations, are relevant to witness Marcia

6    Williams's opinions concerning the significance of

7    the New York DEC regulators' findings as set forth

8    in their report from the 1989 inspection.

9        Williams's opinion is allegedly based in part,

10   or at least will be, on her recognition that the

11   1989 restrictions had been promulgated on the

12   disposal of waste on land.

13       Having reviewed these arguments, I find that

14   this evidence is relevant in the sense that it goes

15   to the bases of Williams's opinions, but I further

16   find that the probative value of this evidence is

17   substantially outweighed by the danger of confusing

18   or misleading the jury.

19       In particular, the risk is present because the

20   jury will not be presented with a full context or

21   explanation of the specific RCRA amendments and the

22   changes at issue.  Moreover, there is the risk that

23   the witness, even if instructed, could sua sponte

24   testify substantively about the regulations or that

25   her testimony will cause the jurors to question the

1    substance of the regulations.

2         In my view, this evidence is not required for

3    the jury to understand the basis of Williams's

4    opinions, and I find no prejudice to defendants of

5    substance in excluding this line of questioning

6    under Rule 403.  That is my ruling.

7         Before we begin, Chris, could I see you just

8    for a minute?

9              COURT SECURITY OFFICER:  Yes, sir.

10             THE COURT:  Okay.  I have one other

11   matter.  I'd like the attorneys to approach the

12   bench.

13             (Side bar discussion held on the record.)

14             THE COURT:  Okay.  I did receive what I

15   would describe as a communication from the jury,

16   and the way it materialized, as the jury left for

17   the break and entered into the deliberation room,

18   they expressed to the court security officer that

19   they had difficulty in understanding the testimony

20   of the expert witness, and could he ask me, the

21   judge, to see if the testimony from the witness

22   could be dumbed down a bit.

23        So I offer that to you, as the communication.

24   My sense is they should be, in the normal course --

25   and I don't -- I'm just going to offer to you what

1    I think, and then you can comment.  I'm reluctant

2    to make that an issue as far as the jury is

3    concerned and its relationship with the court

4    security officer, because he does follow my

5    instructions to the letter in not having

6    communications with the jury.  That was a blurt-out

7    reaction of the jury.

8        And what I don't want to do is create a divide

9    between the CSO and the jurors.  I think that

10   relationship is important, especially in a case

11   like this.  So what I propose is that we do not

12   much of anything, other than when we do recess for

13   the -- for the morning, afternoon, that I just tell

14   them again, please -- not make an issue of it -- do

15   not discuss the case.  Do not communicate with

16   anybody.  Just the same, in essence, litany that I

17   normally give to the jurors, and then go on.

18           MR. LINSIN:  We would have no objection to

19   that, your Honor.

20           MR. PIAGGIONE:  No objection.

21           MR. LINSIN:  And I would only indicate

22   that even our assessment of how this testimony had

23   gone so far, my intention with the witness right

24   now is to use actually a graphic she had prepared

25   to illustrate some of this.  I will not be,

1   obviously, making reference to this, but in --

2   hopefully in clarifying some of these concepts with

3   the graphic, that might help the jury, and then we

4   will just move on.

5            THE COURT:  Okay.  I mean, each side has

6   to determine how they want to handle subsequent

7   testimony.  In my judgment, if there are objections

8   that something was asked and answered, that's

9   legitimate in going forward.  If your

10  clarifications are the result of the exhibits that

11  you intend to introduce and have the witness

12  testify from, that works.

13           MR. LINSIN:  It is simply an exhibit that

14  summarizes all of this testimony about solid waste,

15  the -- and the reasons things might not meet that

16  definition, and then what happens if it does.

17           THE COURT:  Okay.

18           MR. LINSIN:  It is a summary chart, which

19  we've already provided to the government.

20           MR. MANGO:  Which we may want to just

21  discuss now.

22           MR. LINSIN:  Go ahead.

23           MR. MANGO:  Your Honor, we have no

24  objection to the use of these charts as pedagogical

25  exhibits for the witness's -- for the witness and

1    for the jury's benefit, but I think under

2    Rule 611(a) they really are just pedagogical -- I'm

3    having trouble with that one -- exhibits and not to

4    be admitted into evidence.  I think a number of

5    circuits have said that the better practice for

6    these type of exhibits is you can use them, but

7    because they, in essence, summarize the law, of

8    what the law is under RCRA, which will be in your

9    jury instructions, that they should not be -- and

10   we didn't get a chance to discuss this, so I don't

11   know if counsel is planning to introduce these as

12   substantive evidence in the case, but I would just

13   note our position at this point, your Honor.

14            MR. LINSIN:  Well, our view is, your

15   Honor, that the exhibit is intended to summarize

16   her testimony.  We think it would be of assistance

17   to the jury to be able to make reference to it.  We

18   would move it, and if counsel wishes to object,

19   obviously the Court can make a judgment after

20   seeing it.  But it is no more an expression of the

21   law than the testimony of the government's

22   witnesses on the law on this point, so I --

23            THE COURT:  I'll have to wait and see.  If

24   you were finished.  I didn't mean to cut you off.

25            MR. LINSIN:  Okay.

1          THE COURT:  I'll wait and see.  I

2     understand the respective positions, and we'll

3     proceed on that basis.  Okay.

4        I'm just wondering if that makes more sense to

5     break for lunch.

6          MR. LINSIN:  I'm certainly not going to be

7     done in a half hour, so that would be fine and

8     might be easier from a sense of continuity.

9          THE COURT:  Okay.  Now, how does that

10    affect your witness that you have?

11         MR. PERSONIUS:  The fireman?

12         THE COURT:  Yeah.

13         MR. PERSONIUS:  He was going to come,

14    Judge, at 1:45.  He -- he has somewhere he has to

15    be by 5 o'clock.  I could have him come later in

16    the afternoon.

17       I know it's not a fair question, Rocky, but do

18    you have any sense how long your cross will be?

19         MR. PIAGGIONE:  I don't think it's going

20    to be that long, but if you want to put him on out

21    of order, maybe?

22         MR. MANGO:  I don't know if that would

23    make sense, with the confusion the jury already

24    has, to --

25         THE COURT:  Wait.  Michelle's transcribing

3424

1    your dialogue there, and you're talking over each

2    other.

3              MR. PIAGGIONE:  I'm sorry.

4              THE COURT:  You know, if you put that

5    witness on, the expert will have to come back

6    probably on Monday.

7              MR. PERSONIUS:  Right.  And that won't

8    work, because she is from California.

9         This witness, Judge, from our initial meeting

10   with him, the fireman, I had understood was leaving

11   for Florida this weekend.  When I talked to him

12   about his availability, he said he's not available

13   tomorrow, which is fine.  My understanding is he

14   would be available Monday if we needed -- if we

15   needed him on Monday.  We would love to get

16   everything wrapped up today, but I think that's an

17   option.  And I can check over the break.  I'll call

18   him back.

19             THE COURT:  All right.  Yeah, check on

20   that, because, I mean, that would obviate the

21   problem, I think.

22             MR. PERSONIUS:  Yes.  And I think it is

23   better.  There might be something to what Aaron

24   says about completing this testimony.  I think

25   you're probably right.

1          MR. MANGO:  It makes sense.

2          THE COURT:  Okay.  Does that work for

3    everybody?

4          MR. PIAGGIONE:  Yes, your Honor.  I was

5    just making a suggestion to accommodate.

6          THE COURT:  No, that's fine.

7          MR. PERSONIUS:  It was understood that

8    way.

9          THE COURT:  Okay.  Want to start at 1:45?

10   That way it helps a little bit to try to get the

11   witness wrapped up by today.

12         MR. PERSONIUS:  Okay.

13         MR. PIAGGIONE:  Thank you, your Honor.

14         MR. LINSIN:  Thank you, Judge.

15         (End of side bar discussion.)

16         THE COURT:  Okay.  You have my decision

17   with respect to the line of questioning that we've

18   discussed as far as the expert witness is

19   concerned.  I think we've also addressed to some

20   extent the order of witnesses that still need to be

21   called.  I think to be most efficient and allow

22   time to contact one of your witnesses,

23   Mr. Personius, and to get everything ready for

24   efficient resumption of testimony, we'll let the

25   jury go now until 1:45 and start promptly,

1    hopefully, at that time with Miss Williams's

2    continued testimony on direct examination.

3        Does that meet with the defense approval,

4    Mr. Linsin?

5                MR. LINSIN:  It is acceptable to us, your

6    Honor.

7                THE COURT:  All right.  Mr. Personius?

8                MR. PERSONIUS:  Yes.  Thank you, your

9    Honor.

10               THE COURT:  And from the government's

11   standpoint?

12               MR. MANGO:  Yes, your Honor.

13               THE COURT:  Okay.  Chris, if you would

14   bring the jury in, please.

15               (Jury seated.)

16               THE COURT:  Okay.  Based on my objective

17   observations, it seems to me that you're desperate

18   to take an early lunch break, with the

19   understanding that you show back here at 1:45 for

20   resumption of testimony in the case.  That will

21   enable us to get everything in order.  We've been

22   working through some matters, and we'd like to

23   resume examination of Miss Williams.  So I hope you

24   don't mind if we break a little bit earlier for

25   lunch.

1          Please keep in mind the fact that this is an

2     important case.  Don't prejudge it.  Keep your

3     minds open.  Don't discuss the case.  Don't do any

4     independent investigation or communication.  You've

5     been terrific.  So if you get an early lunch,

6     that's a bonus.  We'll have you back here, though,

7     at what time?

8               THE JURY:  1:45.

9               THE COURT:  Okay.  Thank you very much.

10              (Jury excused from the courtroom.)

11              THE COURT:  Okay.  We'll try to start at

12    1:45 then.  Thank you.

13              MR. LINSIN:  Thank you, your Honor.

14              (Lunch recess was taken.)

15              (Jury seated.)

16              THE COURT:  Welcome back.  Please have a

17    seat.  Okay.  The attorneys and parties are back

18    present.  The jury is here, roll call waived.  We

19    hope you had a good lunch.  Our witness, Marcia

20    Williams, is back on the stand.  She remains on

21    direct examination.  I guess, Mr. Linsin, you're

22    going to resume.

23              MR. LINSIN:  Yes.

24              THE COURT:  And, Miss Williams, you remain

25    under oath.

3428

1      BY MR. LINSIN:

2      Q.  Good afternoon, Miss Williams.

3      A.  Good afternoon.

4      Q.  Miss Williams, in preparation for your

5      testimony here today, did you prepare a chart that

6      summarizes the testimony you've provided regarding

7      the RCRA solid waste definition and the various

8      exclusions and exemptions from that?

9      A.  Yes, I did.

10     Q.  Miss Henderson, could I please have Defendants'

11     Exhibit OOOO for identification.

12          And do you see on your screen there,

13     Miss Williams, the document that in the lower

14     right-hand corner is marked as Defendants' Exhibit

15     OOOO?

16     A.  Yes, I do.

17     Q.  And did you prepare this diagram?

18     A.  I did.

19     Q.  All right.  And does it fairly summarize the

20     testimony I just referenced regarding the RCRA

21     solid waste definition and the exclusions and

22     exemptions?

23     A.  Yes.

24               MR. LINSIN:  All right.  Your Honor, at

25     this time I would ask that Defendants' Exhibit OOOO

1    be published for the purposes of illustrating the

2    witness's testimony, but also published -- received

3    substantively into evidence for that reason, as

4    well.

5              MR. PIAGGIONE:  Again, your Honor, I

6    believe we discussed this before.  There is a

7    limited use for that purpose only as an aid at this

8    point in the court, but not as an exhibit.  We

9    believe under 611 this is an indication of the law

10   without any reference to citations and not to be an

11   exhibit introduced into evidence.

12             THE COURT:  All right.  I'll receive it at

13   this time demonstratively subject to renewed

14   request to have it admitted into evidence pursuant

15   to 1002, I think.  And the objection will be noted.

16   It may be published though.

17             MR. LINSIN:  All right.  May we publish it

18   then at this time?

19             (Defendants' Exhibit OOOO received

20             demonstratively.)

21   BY MR. LINSIN:

22   Q.  Miss Williams, would you, first of all, explain

23   to the members of the jury what is depicted in this

24   center white box on this chart that you prepared.

25   A.  The center white box is a summary of the

1   definition of solid waste regulations.  And it has

2   included in it the types of things that the

3   regulations suggest look like discard.  And so just

4   to pick one example, if you look under the heading

5   that says "Recycled in certain ways based on the

6   type of material," you can see, and I'll just make

7   the very first example there.

8           THE COURT:  Okay.  Put a dot.  Tap it with

9   your finger with some authority.

10          THE WITNESS:  I sort of got it.  So it

11  says, "Listed by-products/sludges when reclaimed."

12  So that's an example of the type of secondary

13  material, a listed by-product or sludge, that if it

14  was recycled by being reclaimed, the regulations

15  say that encompasses discard.

16  BY MR. LINSIN:

17  Q.  And would be treated as a solid waste under the

18  RCRA regulations, is that correct?

19  A.  Yes, it would.

20  Q.  All right.  Now, if, after looking at all these

21  factors in the solid waste definition -- if all of

22  the answers to those questions in that central box

23  are in the negative, no, would you please describe

24  then what is depicted on the left-hand side of the

25  diagram?

1    A.   The left-hand side of the diagram, where it

2    says "Not a solid waste," are examples of the types

3    of materials and recycling that would not be

4    considered a solid waste under RCRA.  So, for

5    example -- if I can get up there -- continuous

6    production process, which is one I talked about

7    this morning, is an example of a type of recycling

8    that would not be considered a solid waste under

9    RCRA.

10   Q.   All right.  Now -- and you have listed other

11   examples here as well, is that correct?

12   A.   I have.  I have.

13   Q.   Now, if, in reviewing this central definition

14   of solid waste, it is determined that the material

15   fits one of these definitions of solid waste, so

16   you have an affirmative answer, would you describe

17   what that means with respect to the boxes that are

18   on the right-hand side of this diagram.

19   A.   So what it means is if you get any -- a yes to

20   any of the answers in the central box, you come

21   over into this gold-colored box on the right-hand

22   side which says -- that means the material is a

23   solid waste under RCRA.  And then --

24   Q.   And if we stay with the gold-colored box, would

25   you describe then what is depicted up here in this

3432

1    longer rectangular box marked 261.4(a)?

2    A.   If the starting point is that it is a solid

3    waste under RCRA -- I think I mentioned this

4    morning there can still be some additional

5    exemptions from the definition of a solid waste.

6    And so if it's a solid waste, in other words, it

7    comes off to the right-hand side of the box, you

8    then check the whole list of exemptions to see if

9    perhaps one of those apply.  And if one of those

10   apply, again this arrow brings you back over to the

11   fact that it's not a solid waste.

12   Q.   It's not a solid waste and thus not a RCRA

13   waste under the regulations, is that correct?

14   A.   That's correct.  It's not a RCRA waste.

15   Q.   All right.  Now, if -- we will speak in a

16   moment about a particular one of these exemptions

17   as you testified earlier that relates to K087.  But

18   just to complete this chart, if you've determined

19   the waste is a solid waste and it doesn't meet one

20   of these exemptions, what is the purple-colored box

21   intended to reference here?

22   A.   The purple box captures all of the different

23   solid wastes that also meet the definition of a

24   hazardous waste.  And so those materials are both

25   solid wastes and hazardous wastes, and if they're

3433

1    treated, stored, or disposed of, would require a

2    RCRA permit.

3    Q.  And so even though -- as you testified earlier,

4    even though we have in this case a material that

5    is -- is in the regulations as a listed hazardous

6    waste, this K087, and it's in the regs listed that

7    way, is it your testimony that in order to

8    understand whether or not the RCRA permitting

9    requirements apply to that material, you have to go

10   through the analysis you've just summarized here?

11   A.  That's correct.  You have to determine whether

12   it's also a solid waste.

13   Q.  All right.

14           THE COURT:  Why don't you put it in the

15   center box and trace it through.

16   BY MR. LINSIN:

17   Q.  Okay.  Let us -- if you would, take -- presume

18   we have K087 material and -- and -- which is a

19   listed RCRA hazardous waste, correct?

20           THE COURT:  That's your coal tar sludge,

21   right?

22           MR. LINSIN:  I'm sorry, your Honor?

23           THE COURT:  Coal tar sludge?

24   BY MR. LINSIN:

25   Q.  The coal tar sludge from a coking operation.

1    Now, assuming you have that material, please

2    explain to the jury, with reference to the center

3    box, how do you decide whether that coal tar sludge

4    that's sitting in a tar box at the facility,

5    whether it's governed by the RCRA regulation -- the

6    permitting regulations?

7    A.   Okay.  Well, I have to look and see -- I have

8    to know what I'm going to do with that K087.  So

9    I -- in this particular case, the K087 is removed

10   from the tar box, and it's taken over to the coal

11   piles.  It's put on the coal piles and mixed with

12   the coal pile.  And then it's put back into the

13   coke ovens for the manufacture of coke.  So I have

14   to know all those things before I start to go

15   through this center box.  So I go through the box

16   and I ask first of all --

17   Q.   Tap the box where you're talking about.

18   A.   I first ask is that material being abandoned,

19   meaning thrown away.  So the answer to that would

20   be no, because it's being recycled by being mixed

21   on the coal piles and put back into the coke oven.

22   Sorry.

23   Q.   That's all right.

24   A.   Well, anyway, I go down to speculatively

25   accumulated, and what that means is I collect it

1    for a very long time.  I might intend to recycle it

2    but I haven't recycled it.  I'm storing it and

3    there's some very specific definitions in the

4    regulations as to how long I store it before it

5    gets to be considered speculatively accumulated,

6    but it's a long time.  It's over a year.  So, in

7    the case that we just described, the K087 wouldn't

8    meet that criteria either.

9        And then I look at this whole set of recycling

10   descriptions that are in the regulations, and I see

11   if it meets any of these.  So the first thing I'm

12   looking at is, is it a listed by-product or a

13   listed sludge that's being reclaimed?  Now, K087 is

14   a listed by-product.  In fact, it is a listed

15   by-product.  That's the way it would classify under

16   the regulations.  So it meets the first part of

17   that line.  But the question is, is it being

18   reclaimed?  What reclaimed means is that you're

19   having to first do something with the waste to

20   either remove what's valuable from the waste so you

21   can throw some part of it away, or you remove the

22   part that you want to throw away, so what you have

23   left is good.

24       And in our case there's no reclamation going on

25   in the case of the material, because all the

1     material together is being removed from the tar box

2     and taken over to the coal piles to mix.

3     Q.   What about the next item then --

4     A.   The spent materials is the next item.  This is

5     not -- K087 is not a spent material.  A spent

6     material would be something, let's say, like a

7     solvent that you used it, you're finished using it,

8     and so you're done using it.  But the K087 doesn't

9     fit that.

10    Q.   The next one?

11    A.   The next one is used on the land.  What that

12    means is the actual use of the material is placed

13    on the land.  So the best example I could give you

14    of that is a fertilizer.  Many times people take a

15    waste and they say well, I can recycle it, but I'm

16    going to recycle it as at fertilizer.  That's use

17    on the land.

18    Q.   Okay.  And the last one?

19    A.   The last one is used to make a fuel -- used to

20    make a fuel or used as a fuel.  And the only caveat

21    to that is that it's okay to use it as a fuel to

22    make a fuel if, in fact, that's its normal way it

23    would be used.  And so the K087 doesn't meet that

24    either.

25    Q.   All right.  And in saying that, you understand

3437

1    that the K087 is recycled with the coal and put

2    back into the ovens, correct?

3    A.   Yes.

4    Q.   All right.

5    A.   It is mixed with the normal ordinary feedstock,

6    which is the coal, and then it's put back into the

7    ovens.

8    Q.   But it is not burned in the oven as a fuel, is

9    that your point?

10   A.   It's not burned in the oven as a fuel.  And it

11   is used to make coke.  And coke actually can be

12   used as both a fuel and not an important carbon

13   source in the manufacture of steel.

14   Q.   All right.

15   A.   But in this case, there's already been a

16   determination in the regulations that coke is not a

17   waste-derived fuel.

18   Q.   All right.  And the last item then working

19   through our K087, what does this stored for

20   abandonment mean?

21   A.   Stored for abandonment means that you decided

22   to store it, but your long-term plan for what to do

23   with it is you're going dispose of it.

24   Q.   All right.  So we will come back to these in --

25   in reference to the particular issues regarding

3438

1    Count 19 in this case, which relates to the K087.

2    And we may come back and make reference to this

3    chart as we do so.

4        And I will actually wait until later to move it

5    substantively.  Did the Court have additional

6    questions?

7              THE COURT:  Well, are you going to take

8    it -- where does it go, right or left, from the

9    center box?

10             MR. LINSIN:  All right.

11   BY MR. LINSIN:

12   Q.  In this -- in this summary you've just provided

13   with the K087, if I understood your testimony, your

14   testimony was that based on the facts you

15   understood in this case, the K087, even though it's

16   listed as a hazardous waste, doesn't meet any of

17   these definitions of the solid waste that you

18   summarized, is that correct?

19   A.  That is correct.

20   Q.  And so show the jury, please, based on your

21   review of the regs, where that material, the K087,

22   fits, given the activity that you understand went

23   on at Tonawanda Coke.

24   A.  It's my view that it fits right in that

25   continuous production process line on the left-hand

3439

1    side.

2    Q.  All right.  So this second bullet here on the

3    left, is that correct?

4    A.  Yes.  And I think it also fits equally well --

5    I'm not good at this, obviously.  I was trying to

6    hit this first one.

7    Q.  Are you indicating the --

8    A.  It's directly reused as a feedstock.  It's

9    directly reused as a feedstock.

10   Q.  And so am I understanding correctly that your

11   view is that it -- the material as handled by

12   Tonawanda Coke, this K087, doesn't fit -- you don't

13   get a yes answer to any of these solid waste

14   questions, and it also fits into these categories

15   you've identified as continuous production process

16   and reuse as a feedstock, as -- and so, therefore,

17   is not treated was a solid waste under RCRA?

18   A.  Yes, that's my opinion.

19   Q.  All right.  Now, as long as we're here, let me

20   ask you -- even though that is your opinion, let me

21   ask you to presume for one moment that the K087 at

22   Tonawanda Coke was considered a solid waste for the

23   purposes of this chart.  So it gets you over here

24   then to the yes side of this equation.  Would you

25   walk the jury through how this 240 -- I'm sorry --

1    261.4(a) exemption would relate to the handling of

2    K087.

3    A.   Okay.  So, now, if we make that assumption

4    we're in this gold box over here, and it's a solid

5    waste.  So we look up here at 261.4(a)(10), which

6    is a particular exemption that was put in for the

7    coke manufacturing industry.  And we look to see

8    whether the conditions of that particular exemption

9    are met.  And the key provision is that there could

10   be no land disposal associated with the management

11   of the K087 from the point in time that it leaves

12   the tar box until the point in time that it enters

13   the recycling process.

14   Q.   All right.  And based on your review of the

15   information and testimony in this case, do you have

16   an opinion as to whether or not the K087 that was

17   generated at Tonawanda Coke and handled in the way

18   you described satisfies this exemption that you

19   just identified?

20            MR. PIAGGIONE:  Objection, your Honor.

21   Again, if he's going to testify about land

22   disposal, her definition of land disposal has

23   already been defined by the Court.

24            THE COURT:  No.  I'm going to overrule

25   that objection.  You may answer that.  Can you

1    answer it, first?

2              THE WITNESS:  Yes.

3    BY MR. LINSIN:

4    Q.  All right.  Would you please explain what your

5    opinion is?

6    A.  It's my opinion that the material entered the

7    recycling process at the time it was mixed with the

8    coal on the coal piles in the coalfield.  And

9    that's when the recycling started.  And so it was

10   not -- it was not land disposed.  It met the terms

11   of the exemption.

12   Q.  All right.  Now, we will come back to this with

13   respect to Count 19 in specific, but --

14             THE COURT:  All right.  Let me -- let me

15   just interrupt, one more question.  Okay?

16             MR. LINSIN:  Sure.

17             THE COURT:  Go back to the gold box.  It

18   says "RCRA solid waste."  Well, you follow the line

19   that went up to the exemption.  How do you get into

20   the purple box?

21             THE WITNESS:  I get into the purple box if

22   there are no exemptions that would cover that

23   particular type of material in recycling.  So in

24   our case we -- in our case, let's say we went up to

25   the -- I guess we could draw another line here.  It

1    would be maybe clearer.  So if we go up to the

2    261.4(a)(10) box and we say, well, there is an

3    exemption here, but we don't meet the conditions of

4    that exemption, then there would be another line

5    that would bring it down to the purple box.

6              THE COURT:  Okay.  So that was my

7    question.  I mean, you didn't have a line getting

8    anything into the purple box, but if you don't meet

9    one of the exemptions in the gold box above, you

10   have to drop down to the purple box, is that right?

11             THE WITNESS:  That's correct.  Assuming

12   you first get over to the gold box, try to meet the

13   exemption, don't meet the exemption, then you drop

14   it down to the purple box.

15             THE COURT:  And you only go from the

16   exemption gold box back to the blue box if an

17   exemption is met?

18             THE WITNESS:  That's correct.  But you

19   never even get to the right-hand side of the chart

20   at all if you don't -- you know, if you don't -- if

21   you don't have discard the way it's described in

22   the center box, you never get to the right-hand

23   side of the box.

24             THE COURT:  Okay.  But you assumed that

25   you were able to get to the gold box in order to

1    explain the analysis that you just did.

2              THE WITNESS:  Yes, I did.

3              THE COURT:  All right.  But your view is

4    you don't go in the right direction, you go to the

5    "no" direction because it's not a waste.

6              THE WITNESS:  That's correct.

7              MR. LINSIN:  All right.  Now --

8              MR. PERSONIUS:  Excuse me, your Honor.  I

9    know this is out of line, but I'm going to mention

10   it as long as we're on the box right now.  If you

11   go where the blue box is where it's a not a solid

12   waste, and the witness testified that there were

13   two of those bullet points below that that would

14   apply here, it's not at all clear to me what those

15   are or why they would apply.  I could ask it

16   myself, but I thought for continuity maybe we could

17   explain that now?

18             THE COURT:  Okay.  Yeah.  Let's do that.

19   Thank you.

20             MR. LINSIN:  Okay.  I thought we had

21   covered this previously, but thank you,

22   Mr. Personius.

23             MR. PERSONIUS:  We may have.

24   BY MR. LINSIN:

25   Q.  On -- on this point, Miss Williams, would

1    you -- and tap the screen again gently on the

2    bullets you're talking about.  Based on your

3    understanding of the processes that Tonawanda Coke

4    engaged in in the management of this K087, which of

5    those bullets on the left-hand side persuade you

6    that this material fits within this

7    not-a-RCRA-waste category?

8    A.   Well, again, I think there are really two

9    separate ones, the one that we just talked about,

10   which was continuous production process, but in

11   addition, I think it also meets the criteria for

12   direct reuse as a feedstock, meaning it's -- you're

13   taking this material and you're directly using it

14   in the process to manufacture another product, the

15   coke.

16   Q.   And when you say a continuous production

17   process, are you indicating that it is a continuous

18   production process that is not interrupted by land

19   disposal?

20   A.   It's not interrupted by land disposal; it's not

21   interrupted by storage, other than the type of

22   storage that would normally occur with your virgin

23   feedstock, the regular feedstock that you would

24   usually have.

25   Q.   And as long as we are here, RCRA has a set of

1    permitting requirements for the treatment, storage,

2    and disposal of hazardous waste, correct?

3    A.   Yes.

4    Q.   And tell the jury, please, when do those RCRA

5    permitting requirements come into effect with

6    respect to this particular chart?

7    A.   The permitting requirements come into effect if

8    you're over in the purple box.  So if you're in the

9    purple box and you have something that's a solid

10   waste and it's a hazardous waste, and you're either

11   going to treat it, you're going store it, or you're

12   going to dispose of it, then you would need a

13   permit.  But if you're going to recycle it, you

14   would only need a permit for any storage that you

15   were doing or disposal you were doing before the

16   start of the recycling process.  You would not need

17   a permit for the recycling process itself.

18   Q.   All right.  If we could take this down, please.

19       Let me ask you -- shift gears for just a minute

20   and ask you a couple of questions about how the

21   RCRA regulations at the time they were first

22   enacted back in the 1980s -- how those regulations

23   apply to waste materials that had been abandoned

24   prior to the time that RCRA was enacted.

25   A.   If a material was abandoned before the RCRA

1    regulations came into place, then when the RCRA

2    regulations came into place that material was not

3    regulated under RCRA unless the material was

4    actively managed after the date that the

5    regulations came into effect.

6    Q.   Okay.  So if a previous owner of a facility had

7    already discarded material before the effective

8    date of the RCRA regulations, was that material

9    subject to RCRA regulations immediately for

10   treatment, storage, or disposal, once those RCRA

11   regulations came into effect?

12   A.   No.  Not unless there was some intervening

13   action of active management after the effective

14   date of the regulations.

15   Q.   Now, let me add an additional question on to

16   that hypothetical, please.  So if a previous owner

17   had abandoned waste on a site, and a -- prior to

18   the enactment of RCRA, would that -- would a

19   subsequent owner of that site have any

20   responsibility for that abandoned material under

21   RCRA or any other environmental legislation even if

22   they hadn't actively managed the material?

23   A.   They wouldn't have any responsibility to permit

24   that abandoned material.  It is certainly possible

25   that if there were an unacceptable risk from that

1    material, there are other authorities, other parts

2    of both RCRA and other environmental laws, that

3    could make that entity address the risk associated

4    with it.  But it wouldn't be RCRA permitting.

5    Q.  All right.  And that risk might involve cleanup

6    or other remediation, is that correct?

7    A.  That's correct.

8    Q.  But those authorities and those requirements

9    are separate and entirely distinct from the RCRA

10   permit requirements, is that correct?

11   A.  That is correct.

12   Q.  All right.  Now, before we turn to the

13   indictment itself, I would like to ask you a few

14   questions regarding your review of the New York

15   State Department of Environmental Conservation RCRA

16   regulatory files concerning Tonawanda Coke.  You

17   testified previously that you have reviewed those

18   files, and my preliminary question is:  Do you

19   remember how many times between 1989 and 2009

20   Tonawanda Coke was inspected by the DEC RCRA

21   compliance inspectors?

22   A.  Well, I think it was at least four.  There was

23   an inspection in '89, and one in '90, and one in

24   2001, and I think one in 2007.  I recall those.

25   Q.  And did I hear you say 1989 as well?

1    A.   '89 was the first one, yeah.

2    Q.   And have you developed any opinions regarding

3    the conclusions that are contained in those RCRA

4    compliance inspection reports?

5    A.   Yes.  Are you asking all of the set of reports?

6    Q.   Well, I'm asking you, first of all, have you

7    developed opinions about the conclusions that are

8    in them.  All right?

9    A.   Yes, I have.

10   Q.   All right.

11        THE COURT:  Can you reput that?  I'm not

12   exactly sure what your question is.

13   BY MR. LINSIN:

14   Q.   Okay.  Well, did you reach any opinions

15   regarding DEC's evaluation of Tonawanda Coke's

16   recycling of the K087 during those inspections

17   between 1989 and 2009?

18   A.   Yes.

19   Q.   All right.  What are those opinions?

20        MR. PIAGGIONE:  Objection, your Honor.

21   It's offering opinions about what they say?  What

22   is the basis for that, your Honor?

23        THE COURT:  Well, it's hard to decipher.

24   I mean, is this in the aggregate from all four

25   inspections, and are the conclusions the same so

1    they can be addressed as one?

2              MR. LINSIN:  I'm happy to go through them

3    one by one, your Honor.  We can begin with the

4    1989.  Let me do it that way if it would be

5    helpful.  I believe the answers will be the same,

6    but I will proceed in that manner.

7              MR. PIAGGIONE:  I would also object that

8    this is now asking her to make a decision as to the

9    ultimate issue here, your Honor, whether or not

10   this was legitimate recycling that was approved and

11   accepted.  In other words, that there was no

12   disposal.

13             THE COURT:  Well, I don't fully understand

14   that objection.  Let's get a question, and when we

15   get to what troubles you, object, and then I'll try

16   to deal with it then.

17             MR. PIAGGIONE:  Thank you, your Honor.

18   BY MR. LINSIN:

19   Q.  Let's focus, please, Miss Williams on your

20   review of that first RCRA inspection in 1989.  You

21   read that inspection report, is that correct?

22   A.  Yes, I did.

23   Q.  And you have an understanding of what the prior

24   submissions that Tonawanda Coke had made to EPA, is

25   that correct?

1    A.  Yes, I do.

2    Q.  All right.  Now, based on your understanding of

3    the RCRA regulations in 1989 and your review of

4    this DEC inspection report, do you have an opinion

5    as to the conclusions that DEC reached regarding

6    the handling of K087 by Tonawanda Coke in 1989?

7    A.  Yes.

8    Q.  All right.  And would you please explain to the

9    members of the jury what those opinions are

10   regarding your review of the report, given the

11   regulatory context in 1989.

12          MR. PIAGGIONE:  Objection, your Honor.

13   It's going to the ultimate issue here.  She is

14   being asked to decide whether or not the defendants

15   broke the law or not as charged in this case.

16          THE COURT:  All right.  We're talking

17   about 1989.  We're talking about determinations

18   that were made by the inspectors following their

19   inspection.

20          MR. LINSIN:  And that's all we are --

21   that's all the question calls for, your Honor.

22          THE COURT:  Without being any more

23   specific.

24          MR. LINSIN:  No.  Conclusions regarding

25   Tonawanda Coke's recycling of the K087 in 1989.

1          THE COURT:  Well, I think it has to be

2     articulated that way.  I mean, because she has to

3     address a particular determination rather than be

4     given carte blanche -- I mean, there's a lot of

5     determinations that were made, I think, in those

6     inspections, right?

7          MR. LINSIN:  Your Honor, I intend -- I'm

8     happy to ask the question about recycling.  I

9     believe that was my first question.  I was then

10    going to ask about the small-quantity generator

11    determination.

12         THE COURT:  Okay.

13         MR. LINSIN:  Those are the two issues I

14    wanted to focus on in that inspection report.

15         THE COURT:  All right.  And I think that

16    makes a difference in terms of the objection.  So I

17    think I'll sustain your original one, but I'll

18    permit individualized questions on both points that

19    you had just referenced.

20         MR. LINSIN:  All right.

21    BY MR. LINSIN:

22    Q.  Focusing on your review of the 1989 DEC

23    inspection, RCRA compliance inspection report, what

24    were your opinions with regard to the conclusions

25    that DEC reached concerning Tonawanda Coke's

1    recycling of the K087?

2    A.   It's my opinion that for the inspectors to have

3    concluded in the 1989 inspection that this facility

4    did not need a treatment, storage, or disposal

5    permit, in order to do that, the DEC inspector

6    would have had to come to the conclusion that --

7             MR. PIAGGIONE:   Objection, your Honor.

8    Now it's speculative.   He would have had come to

9    the conclusion.

10            THE COURT:   No.   I think it might be

11   helpful if you had the witness identify what the

12   conclusion of the inspector was and then what her

13   conclusion is, and explain how she came to that

14   conclusion that's different from the other, if it

15   is different.

16            MR. LINSIN:   Okay.

17   BY MR. LINSIN:

18   Q.   As a threshold matter, after you reviewed the

19   1989 inspection report, did you -- did that report

20   indicate in any way that Tonawanda Coke required a

21   RCRA permit?

22   A.   No.   I mean, this inspection explicitly said

23   the activities at Tonawanda Coke did not require a

24   RCRA treatment, storage, or disposal permit.

25   Q.   Now, given that conclusion, do you have an

1     opinion about what that conclusion about the

2     absence of a need for permit -- what that says

3     about the assessment of the recycling process that

4     was ongoing at Tonawanda Coke?

5              MR. PIAGGIONE:  Objection, your Honor.

6     Now he's asking for a conclusion on that conclusion

7     of the inspector.

8              THE COURT:  Well, I think he's asking for

9     this witness's opinion with respect to the factors

10    that were considered in arriving at the inspector's

11    opinion or the report's conclusion.  I'll permit

12    that.  I think that's okay.  Overruled.

13    BY MR. LINSIN:

14    Q.  Would you like me to restate the question, or

15    do you still have it?  I'm happy to restate.

16    A.  Why don't you restate it so I make sure I

17    answer the correct question.

18    Q.  Okay.  You testified a moment ago that you read

19    in this inspection report and the inspector

20    concluded that Tonawanda Coke did not need a RCRA

21    permit for the treatment, storage, or disposal of

22    hazardous waste, correct?

23    A.  Yes.

24    Q.  Now, given those findings in that report, what

25    are your opinions about what that inspector

1    concluded concerning the recycling activity that

2    was -- of the K087 that was ongoing at Tonawanda

3    Coke?

4    A.  It's my opinion that the -- that the

5    inspector's determination, which is consistent with

6    my opinion, is -- concluded that the recycling --

7    that when the coal tar sludge was taken to the pile

8    to be mixed and entered into the coke ovens, that

9    the inspector concluded that it didn't need a

10   permit because it was in the process of being

11   recycled.  It was not a solid waste.  It was part

12   of a continuous manufacturing operation.

13              THE COURT:  All right.  Before you go on,

14   from your review of the report, was there

15   information in that report from the inspector that

16   stated that information?

17              THE WITNESS:  Well, I have to piece

18   together the information that is in the report.

19              THE COURT:  Okay.  But my question was

20   that supports that determination, was there

21   specific information in the report that was

22   identical to what you just stated needed to be the

23   case?

24              THE WITNESS:  I believe there is.

25              MR. PIAGGIONE:  Objection, your Honor.  It

1    is not.  There is no mention of coal pile in that

2    report.  The words "coal pile" do not appear in

3    that inspection report.

4            THE COURT:  Okay.  But the issue is the

5    recycling, correct?

6            MR. PIAGGIONE:  Correct.

7            MR. LINSIN:  The issue is the recycling.

8    And, your Honor, counsel is perfectly free to test

9    the witness's conclusion on cross-examination.  And

10   I -- the exhibit is in evidence.  We can call it

11   back up if need be.  I was trying to get past this

12   as a threshold matter, as not to dwell on it.

13           THE COURT:  Right.  And the rule with

14   respect to experts is that the expert doesn't have

15   to provide all the underlying data in rendering the

16   opinion, and you can examine with respect to that.

17   But, to give some credit to Mr. Piaggione, I think

18   that was a follow-up to the way that I queried this

19   witness, so I don't think that was out of line

20   necessarily.  But I'll allow you to proceed, with

21   the understanding of how I think permissible

22   cross-examination can be conducted from the manner

23   in which Mr. Linsin is eliciting the opinion of

24   this witness.  If it gets out of line, I'll

25   entertain an additional objection, but I think

1    right now we're okay.  A question, I guess, is

2    really what we need.

3              MR. LINSIN:  All right.

4    BY MR. LINSIN:

5    Q.  In your review of this 1989 inspection report,

6    did you also see any determination in that report

7    as to whether at that time Tonawanda Coke was

8    properly classified as a small-quantity generator

9    under RCRA?

10   A.  Yes.  The report stated that the facility was a

11   small-quantity generator.

12   Q.  Now, do you know, based on the other consulting

13   work you've done and based on your review of

14   documents in this particular case, what the average

15   monthly production of K087 decanter tank tar sludge

16   at a coking facility is?

17   A.  It's a very large generated waste stream.  And

18   in the documents that Tonawanda Coke did submit in

19   1988, which I believe was entered into evidence

20   when I saw it on Monday, it stated -- they stated

21   that they were generating at least 1,000 kilograms

22   per month of the decanter tar tank sludge.  I

23   think, in my experience, based on coke plants -- a

24   typical coke plant would generate far more than a

25   thousand kilograms a month.

1    Q.   So your review of the EPA notification

2    indicated that Tonawanda Coke in 1988 had

3    designated itself, at least preliminarily, as a

4    large-quantity generator, correct?

5    A.   Yes.

6    Q.   All right.  But you testified a moment ago that

7    in the 1989 inspection the DEC RCRA inspector

8    concluded that Tonawanda Coke was a small-quantity

9    generator, correct?

10   A.   Yes.

11   Q.   Now, what does that fact tell you about the DEC

12   RCRA regulator's conclusions with respect to

13   Tonawanda Coke's management of K087 in 1989 -- I'm

14   sorry -- K087 in 1989?

15   A.   The inspector would have had to have concluded

16   that that material was not being stored, treated,

17   or disposed of prior to recycling, because if it

18   were, it would have to have been counted in terms

19   of how much waste was being generated.  So it

20   couldn't have been possible for the facility to

21   have been a small-quantity generator if that

22   material was being -- was classified as a solid

23   waste and a hazardous waste and was being either

24   stored, treated, or disposed of.

25   Q.   And does that conclusion -- what effect does

1   that conclusion regarding the small-quantity

2   generator have with respect to the opinion you

3   testified to a moment ago regarding the recycling

4   operations at the facility?

5   A.  It supports my opinion that the recycling

6   operations at this facility, when reviewed by the

7   inspector, were found to be not a solid waste,

8   outside the need to have a RCRA permit.

9   Q.  All right.  Let's move to Count 19 of the

10  indictment, regarding K087.  What is your

11  understanding of the violation that is alleged in

12  Count 19 of the indictment?

13  A.  It's my understanding that the indictment

14  charges that Tonawanda Coke, between 2005 and 2009,

15  disposed of K087 waste on the tar field without

16  having a RCRA disposal permit.

17  Q.  Now, you referenced it before, given the way

18  your testimony has developed, but so we have it all

19  here in one place, based on your review of the

20  documents and your review of testimony, what was

21  your understanding -- what is your understanding of

22  how Tonawanda Coke was managing its K087 waste

23  during that 2005-to-2009 time period?

24  A.  It's my understanding that the material was

25  taken from the tar box in a front-end loader and it

1      was generally taken to the coal piles in the

2      coalfield.  Now, there were times when it may have

3      been put on a pad, but that pad didn't even exist

4      until the 1994 time frame.  So -- but between 2005

5      and 2009, it's my understanding that most of the

6      time it was taken directly to the coalfield, mixed

7      with the coal, and then taken from -- the mixture

8      was taken and placed into the -- into the coke

9      ovens for the manufacture of coke.

10     Q.  Now, have you reviewed the testimony of Philip

11     Flax that was given during this trial, and were you

12     present in the courtroom this past Monday when

13     Mr. Jim Strickland testified?

14     A.  Yes.

15     Q.  Do you recall their opinions that in order to

16     be exempt from the RCRA permitting requirements the

17     recycling of the K087 material had to meet the

18     requirements of this 261.4(a)(10) exemption that

19     you've testified about?

20     A.  Yes, I recall that.

21     Q.  Do you agree with those opinions?

22     A.  No, I do not.

23     Q.  Why not?

24     A.  Well, if we go back to the 1989 inspection,

25     just for -- it's very important in this regard --

 1    there was no 261.4(a)(10) exemption in effect at

 2    the time of the 1989 inspection.  And yet the DEC

 3    inspector correctly, I believe, found that that

 4    recycling did not require a RCRA treatment,

 5    storage, or disposal permit.  And that's because,

 6    it's my view, that that recycling was not a solid

 7    waste.  The material was not a solid waste when

 8    recycled in that manner.

 9    Q.  All right.  Now, we touched on this before --

10          THE COURT:  When you say "in that manner,"

11    you're talking about the placement on the coal

12    piles?

13          THE WITNESS:  Yes.

14          THE COURT:  For reuse.

15          THE WITNESS:  For reuse.

16    BY MR. LINSIN:

17    Q.  Let's assume for a moment, as we did briefly

18    when we were looking at your chart, but let's

19    assume for a moment that this K087 material that

20    was generated at Tonawanda Coke met this definition

21    somehow of the solid waste in the center box of the

22    chart that you testified about.  Do you have an

23    opinion as to whether the recycling of that K087

24    that was performed by Tonawanda Coke in the manner

25    you just described still met the specific

1    conditions of that exemption, this 261.4(a)(10)?

2    A.   Yes, I do have an opinion on that.

3    Q.   And in developing that opinion, have you taken

4    into account the definition of land disposal that

5    is applicable to this case?

6    A.   Yes.

7    Q.   All right.  Now, would you -- what is your

8    opinion, first of all, whether it met that

9    exemption?

10   A.   It's my opinion that it did meet the exemption.

11   Q.   And would you please explain to the members of

12   the jury why you believe the K087 met the

13   requirements of that exemption, given the

14   definition of land disposal that applies in this

15   case.

16   A.   Well, I think there are actually two reasons,

17   but one reason is the placement of the K087 on the

18   coal pile for the purpose of mixing was -- it's

19   really one reason.  Let me combine it into one

20   reason.  The placement of the K087 on the coal pile

21   for the purpose of mixing was really the first step

22   of the recycling process.  At that point the

23   material was blended with the feedstock, it was

24   really no different than the feedstock, and the

25   recycling process had already started.

3462

1    Q.  And do you believe that that recycling process

2    that you've described, on the coal piles in the

3    coalfield, constituted land disposal?

4    A.  No, I don't believe it constituted land

5    disposal, because you're talking about something

6    that's on a raw material feedstock pile.  It's like

7    a land-based production unit.  So it's a big pile

8    on top of 2 to 4 feet of packed coal.  So I don't

9    believe it meets the definition of land disposal.

10   But I also believe that it already entered the

11   recycling process at the point in time that it was

12   placed on the piles for the purpose of mixing.

13   That was the start of recycling.

14   Q.  Let me ask you, if you can, Miss Williams, can

15   you give some hypothetical examples, perhaps

16   unrelated to this case, but hypothetical examples

17   of what you believe would have constituted the land

18   disposal of K087.

19            THE COURT:  Okay.  Hold the question.

20   Yes?  I'm sorry?

21            MR. LINSIN:  She needs her inhaler.

22            THE COURT:  Oh, I'm sorry.  Okay.  Do you

23   need a break?  No?

24            A JUROR:  I need my inhaler.

25            THE COURT:  Chris, keep the door open,

3463

1    please, so we --

2        Are you okay?  Okay.  All right.  Let's reput

3    the question and start there.

4            MR. LINSIN:  Yes.

5        Can you, Miss Williams, give some examples,

6    hypothetical examples, of the kinds of activities

7    concerning management of K087 waste that you think

8    would have constituted land disposal if they had

9    been engaged in?

10           MR. PIAGGIONE:  Again, objection, your

11   Honor.  Now we're getting into what is land

12   disposal.  Examples of what is land disposal.

13           THE COURT:  No, I don't think that's --

14   that's not what you're asking.

15           MR. LINSIN:  No, your Honor.

16           THE COURT:  Okay.  All right.  Just to

17   clarify for you, reput the question, because we're

18   talking about the individual activities -- well,

19   you're saying that hypothetically could constitute

20   land disposal.

21           MR. LINSIN:  Could constitute land

22   disposal, given the definition of land disposal

23   that is applicable in this case.

24           MR. PIAGGIONE:  Your Honor, by giving

25   those examples, she is going to redefine the

3464

1    definition of land disposal.

2          THE COURT:  I don't think so.  All right.

3    I'm going to overrule your objection.  You may --

4    can you answer that question?

5          THE WITNESS:  I think so.  I mean, I was

6    just going to give some examples of what is clearly

7    land disposal.

8          THE COURT:  Well, if you think so, then I

9    can't allow it.  So you have to put a question that

10    the witness knows she can answer.

11   BY MR. LINSIN:

12   Q.  Are you able -- are you able, given the

13    definition of land disposal that applies in this

14    case --

15          THE COURT:  And you know what that

16    definition, is I take it?

17          THE WITNESS:  I do.

18   BY MR. LINSIN:

19   Q.  Okay.  Working with that definition and only

20    that definition, can you provide the jury some

21    examples of activity that, in your opinion, would

22    have constituted land disposal if they had been

23    engaged in?

24   A.  One example that I can think of is if a bunch

25    of K087 was taken out to a part of the plant, not

3465

1    on the coal piles, and just dumped there to be

2    abandoned.

3         Another example might be if a big pile of K087

4    was taken out to -- not on the coal piles, to

5    another part of the plant on the ground and piled

6    up in a big waste pile with the idea that it would

7    eventually be recycled, but it might be sometime in

8    the future.  Years, two years, but eventually.  So

9    those are two examples.

10   Q.  All right.  Now, in preparing for your

11   testimony, Miss Williams, did you review the

12   testimony that was provided in this trial from

13   certain witnesses that on a limited number of

14   occasions some of the K087 material from the

15   Tonawanda Coke operation was mixed with the coal on

16   the coal piles and then remained in that location

17   for a couple of weeks or even a month before it was

18   then charged back into the ovens?

19   A.  I did see that testimony.

20   Q.  And does that testimony change your opinion as

21   to whether Tonawanda Coke was, between 2005 and

22   2009, legitimately recycling the K087 material

23   without intervening land disposal?

24   A.  It does not change my opinion.

25   Q.  And would you please explain why it doesn't.

1    A.   Because, again, once the K087 is mixed with the

2    coal, that material is now a feedstock.   And like

3    any feedstock, you know, you have a normal

4    production rate where material is fed into a

5    process, but there are times when, for many

6    different reasons, the production rate may change,

7    the feedstock may sit there longer than normal, but

8    routinely, in the testimony I read, it was

9    typically fed in within 24 hours.   The fact that on

10   occasion it could have sat there longer is no

11   different than what would happen in any kind of a

12   production process.

13   Q.   Now, with respect to recycling activities

14   generally, do the RCRA regulations require that

15   there be a roof over the recycling or mixing

16   process that is ongoing?

17   A.   No.   There's no such requirement in the

18   regulations.

19   Q.   And do the RCRA regulations require that

20   recycling activities be performed on a concrete pad

21   or a impermeable surface?

22   A.   No, there's also no requirement for that.   I

23   think I gave some examples of land-based production

24   units that are recycling that are occurring

25   directly on the ground.

3467

1    Q.   All right.  Now, turning to Count 17 --

2              THE COURT:  For example, again, was that

3    the mixing with --

4              THE WITNESS:  The example I had given

5    earlier was the example of the heap leach piles for

6    copper and gold, where the acid is poured onto the

7    mineral-processing materials to leach out the gold

8    and the copper.

9              THE COURT:  On the land itself?

10             THE WITNESS:  That happens on the land,

11   yes.

12   BY MR. LINSIN:

13   Q.   And without a concrete pad?

14   A.   Without a concrete pad.

15   Q.   All right.  And that is, under the RCRA

16   regulations, an understood and acceptable recycling

17   process, is that correct?

18   A.   Yes.  I mean, there are other recycling

19   processes, as well, that occur on the land once the

20   recycling is started.

21   Q.   All right.  Let's turn, if we can, to Count 17

22   of the indictment.  Have you reviewed Count 17 in

23   the indictment?

24   A.   Yes, I have.

25   Q.   And what is your understanding about what is

3468

1    charged in Count 17?

2    A.   It's my understanding that in Count 17

3    Tonawanda Coke was charged with storing hazardous

4    waste on the ground between -- D018 hazardous waste

5    on the ground between 1998 and 2009 without

6    obtaining a RCRA storage permit.

7    Q.   And remind the jurors again, please, what is

8    D018.

9    A.   D018 is a waste that is hazardous because it

10   has higher benzene levels than what the standard

11   is.

12   Q.   So it would be one of the examples of these

13   characteristic hazardous wastes, correct?

14   A.   Yes.  It's a characteristic hazardous waste.

15   Q.   Now, based on your review of the documents and

16   the testimony and the stipulations that have been

17   entered into during this trial, do you have an

18   understanding as to where the materials that were

19   in these Barrett tanks and on the ground around the

20   Barrett tanks originally came from?

21   A.   Well, I think what -- it originally came from

22   the previous owner, and it had been abandoned by

23   the previous facility owner before Tonawanda Coke

24   purchased the facility.

25   Q.   And before I ask you the next couple of

1    questions, are you aware of the definition for

2    "active management" that is applicable in this

3    case?

4    A.   Yes, I am.

5    Q.   All right.  I want to ask you, based on your

6    experience and training, whether certain particular

7    activities would, in your opinion, constitute

8    active management as defined for the purposes in

9    this case.

10        First of all, can you discuss, in your opinion,

11   whether the spreading of coke breeze over an area

12   that contained previously discarded D018 waste

13   would constitute active management of that

14   previously discarded waste?

15   A.   It's my opinion that it would not constitute

16   active management.

17   Q.   And would you explain that opinion, please?

18   A.   Well, the coke breeze is a product, and it was

19   placed in this area in order to -- to form a harder

20   surface so that it would be easier to access this

21   area.  It's like putting a sidewalk down or a

22   boardwalk down.  It's my view that -- that any

23   physical disturbance of the waste in that process

24   was incidental.  The purpose was to put in a -- you

25   know, a firmer surface.  So it's my opinion that it

1   does not meet the definition of active management.

2   Q.  Now, do you also have an understanding as to

3   what the definition of "treatment" is under the

4   RCRA regulations?

5   A.  Yes, I do.

6   Q.  And would you explain that term to the members

7   of the jury?

8   A.  RCRA has a definition of treatment.  It's sort

9   of a two-part definition.  The first part is, have

10   you physically, chemically, or biologically changed

11   the nature of the waste; and then the second part

12   is, for a series of purposes that are named in the

13   definition, so, for example, to neutralize the

14   waste, to make the waste less hazardous, to make

15   the waste more amenable to recovery.  And there are

16   four or five different reasons.  In order for

17   something to meet the definition of RCRA treatment,

18   it has to meet both parts of those definitions --

19   of the definition.

20   Q.  Now, in your opinion, Miss Williams, would the

21   placement of coke breeze over the previously

22   discarded waste material, this 2D018 on the ground,

23   constitute treatment under the RCRA regulations?

24   A.  It's my view that it does not.

25   Q.  And would you explain the basis for that

1    opinion?

2    A.  Well, I think it -- based on the evidence I

3    reviewed, it's not clear that it changed the

4    physical, chemical, or biological nature of the

5    waste; but even if it did in some way do that, I

6    reviewed carefully all the purposes of the

7    treatment definition, and it wasn't done for any of

8    the purposes that would constitute RCRA treatment.

9    Q.  Are you aware, Miss Williams, of situations

10   where facilities have placed cover material like

11   coke breeze over previously discarded hazardous

12   wastes without it -- without that activity leading

13   to RCRA regulation of that previously discarded

14   waste?

15   A.  Yes.  Actually, it's -- it's quite a common

16   occurrence, in my experience.

17   Q.  And would you give some examples of those

18   situations based on your experience.

19   A.  Based upon my experience, it's often done,

20   particularly at older facilities that have been

21   around for a long time and they have old waste

22   disposal areas on the plant.  Often those are

23   covered, for example, with asphalt to be used as

24   parking lots.  Sometimes they're -- buildings are

25   constructed over these areas.  So it's not -- it's

1      not an uncommon thing.

2      Q.   And the activity you're describing, such as the

3      placement of a parking lot or even a building, is

4      that, in your experience, done even without prior

5      removal of that previously discarded waste?

6      A.   Yes.  In fact, it's usually done without prior

7      removal, and it's seen as a positive thing because

8      you're capping the surface in a way that prevents,

9      for example, rain and precipitation from getting to

10     the waste.

11     Q.   And is that activity permissible and lawful

12     under the RCRA regulations?

13     A.   Yes.

14     Q.   And does that activity in any way subject the

15     previously discarded material to RCRA permitting

16     requirements?

17     A.   Not in my opinion or experience.

18     Q.   All right.  In your review of the material and

19     testimony in this case, did you notice information

20     that some of the material from these Barrett tanks

21     may have been at one point or another released onto

22     the ground during the fire that occurred in 2008 or

23     subsequently during the dismantling of the Barrett

24     tanks themselves?

25     A.   I'm sorry.  Could you just repeat that, the

3473

1    first part of the question?

2    Q.   Sure.   I apologize.   In your review of all the

3    materials in this case and the testimony, did you

4    hear some reference to the possibility that some of

5    this material from the Barrett tanks may have been

6    released during the fire or the subsequent

7    dismantling of the tanks?   Released onto the ground

8    in the area around the tanks.

9    A.   Yes.   I mean, I saw conflicting information on

10   this, because I saw the fire report that suggested

11   there wasn't anything released, but I also saw some

12   testimony that suggested there may have been

13   something that released during the fire.

14        MR. PIAGGIONE:   Objection, your Honor.

15   Again, there's no report in evidence saying

16   anything was released or not.

17        THE COURT:   Well, it can be the basis of

18   her report.   Was it referred to in her report?

19        MR. LINSIN:   It is, your Honor.

20        THE COURT:   All right.   Then you have

21   that, so you can --

22        MR. PIAGGIONE:   We don't have that report.

23        MR. LINSIN:   Your Honor, the DEC oil spill

24   report was referenced in the witness's summary of

25   her materials.   Counsel has a copy of that report.

1    And there is also interview reports from the fire

2    chief, who was present at the scene, and counsel

3    has those interview reports.  They generated them.

4              THE COURT:  Okay.  Record will so reflect.

5    BY MR. LINSIN:

6    Q.  So you -- you saw some information and reviewed

7    some interview reports or saw testimony that there

8    may have been a release of some of the material

9    from inside one of these Barrett tanks, is that

10   correct?

11   A.  I did see some of that testimony.

12   Q.  In your opinion, Miss Williams, if -- assuming

13   for a moment if some of that material had leaked

14   out of the Barrett tank during the fire or at some

15   other point, would that action -- would that

16   leakage have constituted either -- well, we'll take

17   them one at a time.  Would it have constituted

18   active management of that material for RCRA

19   regulation purposes?

20   A.  It's my opinion that it would not meet the

21   definition of active management.  It was a passive

22   event.  I didn't see anybody say that there was

23   someone who took material and put it on the ground

24   or purposefully did that so it was movement of

25   material that had already been abandoned.

1    Q.  And would it have been activity that would have

2    constituted treatment of that material under the

3    RCRA regulations?

4    A.  No.  Really for the same reason.  This is

5    material that was abandoned back pre-1978, and

6    while it might have moved through some mechanism of

7    the fire, for example, that wouldn't meet the

8    definition of RCRA treatment either.

9    Q.  Now -- so, based on all of the documents you

10   reviewed, the testimony you reviewed, and the

11   testimony you just referenced, do you have an

12   opinion as to whether or not the wastes on the

13   ground around these Barrett tanks became subject to

14   the RCRA storage regulations and requirements prior

15   to 2009?

16   A.  I have an opinion, yes.

17   Q.  And would you just -- would you please explain

18   that opinion to the members of the jury.

19   A.  It's my opinion that -- that those materials

20   had been previously abandoned, and I did not see

21   any evidence of active management, so it's my

22   opinion that they do not need a RCRA storage

23   permit.

24   Q.  All right.  Now, did you also review testimony

25   and statements that at some point in 2009 some of

1    the material from inside the tanks and possibly

2    some of the material from outside of the tanks had

3    actually been excavated?

4    A.   Yes, I did.

5    Q.   And do you -- do you have an understanding as

6    to how that was actually accomplished?

7    A.   It's my understanding that an excavator was

8    used to dig out some of this material and it was

9    put into a front-end loader and it was taken again

10   over to the coal piles in the coalfield for the

11   purpose of, again, mixing with the coal so that it

12   could be reinserted into the coke ovens as

13   feedstock.

14   Q.   All right.  Now, in your opinion, did the

15   excavation of some of that material from inside or

16   around these tanks cause the rest of that material

17   that remained in the tank or that remained on the

18   ground to become subject to the RCRA permitting

19   requirements?

20   A.   It's my opinion that -- that it would not.  The

21   answer is no to your question.

22   Q.   And why is that?

23   A.   Because the material that wasn't excavated is

24   still remaining where it was.  Now, the material

25   that was excavated is actively managed.  It's a new

1    point of generation of RCRA waste, and that

2    excavated material needs to follow all of the RCRA

3    requirements from the point it's generated until

4    it's either recycled or disposed of.

5    Q.  All right.  We'll get to that in a moment.  But

6    staying with this Count 17, one last question,

7    please.  Given your answers, then, to the previous

8    questions regarding Count 17, do you have an

9    opinion as to whether or not this D018 material

10   that remained on the ground or in the tanks around

11   the ground required a RCRA storage permit?

12   A.  I do have an opinion.

13   Q.  And would you please state what the opinion is

14   and explain it to the jury.

15   A.  I have an opinion that the material that

16   remained on the ground or remained in the storage

17   tanks does not need a RCRA storage permit, because

18   it had been abandoned and it still was abandoned.

19   It was abandoned prior to the effective date of the

20   regulations covering that material.

21   Q.  All right.  Now I'd like to turn next to

22   Count 18 of the indictment.  And have you reviewed

23   Count 18?

24   A.  Yes.

25   Q.  Would you explain to the jury what your

1       understanding is of the charges in Count 18.

2       A.   Count 18 charged that material that was D018

3       had been excavated from in and around the area of

4       the Barrett tanks and taken to the coalfield for

5       mixture with -- on the coal piles without having a

6       disposal permit.

7       Q.   All right.

8       A.   And I think -- I don't remember if I said the

9       time frame.  The time frame, as I recall, was

10      June 2009 through the end of 2009.

11              THE COURT:  Well, when you say disposal

12      permit, do you mean treat and dispose, or are those

13      two separate permits?

14              THE WITNESS:  I think -- they can be two

15      separate permits, but I think the charge was

16      disposal without having a disposal permit.

17              THE COURT:  Well, I think the charge is to

18      treat and dispose.

19      BY MR. LINSIN:

20      Q.   All right.  Let's factor that into your

21      analysis, that the charge relates to treatment or

22      disposal of these materials that were excavated,

23      this D018.  Now, you testified a moment ago that

24      this material that was excavated in 2009 from in or

25      around the tanks had to meet the recycling

1    requirements of 261.4(a)(10), is that correct?

2    A.   Once the material -- once the material is

3    excavated, it's now a D018 hazardous waste.  So now

4    the question is the same question we asked earlier

5    with the K087, which is:  Based on what you do with

6    it, is it also a solid waste?  So it's really a

7    very similar analysis.

8    Q.   So, first of all, is it a solid waste?

9              THE COURT:  Let's put the chart up.

10   BY MR. LINSIN:

11   Q.   Okay.  Could we have OOOO again, please.

12        And while this is coming back, can you explain,

13   please, what your -- I believe you testified to

14   this a moment ago, but based on your review of the

15   testimony and the materials, what is your

16   understanding of what was actually done with this

17   material once it was excavated from in or around

18   the tanks?

19   A.   It's my understanding, again, that it was taken

20   in a front loader over to the coal piles in the

21   coalfield and mixed with the coal so that it could

22   be again fed back into the coke ovens.

23   Q.   Okay.  So if you wouldn't mind again, with

24   reference to Defendants' Exhibit OOOO, we have with

25   respect to this count, Count 18, D018, a

1   characteristic hazardous waste, correct?

2   A.   Yes.

3   Q.   So it -- at least it is -- based on that

4   characteristic, it is potentially a hazardous waste

5   over in this purple box, correct?

6   A.   Yes.

7   Q.   But it's your testimony, if I understand it

8   correctly, that first you have to go through this

9   process of reviewing the definition of solid waste

10  that is represented in the center white box of this

11  exhibit, is that correct?

12  A.   That's correct.

13  Q.   Would you explain then, please, to the jury how

14  your analysis of whether or not the D018 that was

15  excavated from these tanks in 2009 -- how it should

16  be analyzed with respect to this definition of

17  solid waste in the center white box.

18  A.   Okay.  Well, it's -- it's a little bit

19  different than the analysis for K087, because the

20  D018 material would not be a continuous

21  manufacturing process, as I had discussed earlier,

22  because obviously it had been abandoned.  It been

23  on the ground for quite a while.  So at the point

24  that it's generated, if I look down here and see

25  whether it has any elements of discard, however, I

1    still don't find any of these elements of discard.

2              THE COURT:  Well, you said "look down

3    here."  Where are you talking about?

4              THE WITNESS:  The center of a box of the

5    chart.

6              THE COURT:  Okay.  So you're looking at

7    what section of that?  Abandonment?

8              THE WITNESS:  I'm going down the entire --

9    each of the different items --

10   BY MR. LINSIN:

11   Q.  Let's go one by one.

12   A.  Sure.

13   Q.  Okay.  Do you have any information in what

14   you've seen that this excavated material, first of

15   all, was abandoned?

16   A.  Once it's excavated, no.

17   Q.  Do you have any information, based on review

18   all of the evidence and testimony, that the

19   material was speculatively accumulated as that term

20   is used in RCRA regs?

21   A.  No, there's no evidence to that effect.

22   Q.  Now, do you have any information that indicates

23   to you that the way in which that material was

24   handled, as you've just described, fit within any

25   of these recycling activities that have the

1    characteristic of a waste-like activity?

2    A.   There's no evidence that it was recycled in any

3    of those ways that have elements of discard.

4    Q.   All right.  And was there any information that

5    you have that indicated the D018 material was

6    stored for abandonment?

7    A.   No.

8    Q.   All right.  So, given that all of the answers

9    to those questions are in the negative, can you

10   tell the jury where in this chart -- where you

11   believe that D018 fits on the left-hand side of

12   your chart that you've prepared?

13   A.   Okay.  And I think it fits under the section

14   that says, "Certain secondary materials when

15   legitimately recycled."

16   Q.   And would you tap on that, please.  All right.

17       And would the subpart be there for direct --

18   I'm sorry -- for direct reuse?

19   A.   It would fit under direct reuse.  It actually

20   potentially could also fit under the characteristic

21   by-product or sludge when reclaimed.  It wasn't

22   really being reclaimed, but it was characteristic,

23   and so whether it was reclaimed or put in the

24   process without reclamation, it was exempt.

25   Q.   Let's assume, then, hypothetically that this

1    D018 for some reason actually fit within these --

2    one of these factors for a solid waste in the

3    center box here.  And so let's then move over to

4    the gold box here for the D018 having fit that

5    definition of solid waste.  Okay?

6    A.   Yes.

7    Q.   Presume this for a moment.  In the way in which

8    this material was treated, as you've described, by

9    recycling on the coal piles in the coalfield, did

10   that activity meet one of the exemptions for the

11   definition of solid waste that is represented by

12   this broader rectangular gold box up here?

13   A.   Yes, I believe it did.

14   Q.   And would you explain how -- the basis for that

15   opinion?

16   A.   Again, the exemption, the same one we talked

17   about previously, 261.4(a)(10), allows the material

18   to be recycled as not a solid waste when -- when

19   the recycling occurs without -- when -- I'm

20   sorry -- when, between the point at which the

21   material is removed and generated until the point

22   at which it's recycled, there is no land disposal

23   involved.

24   Q.   So, now, you testified earlier that this

25   exemption, this 261.4(a)(10), applied to K087, the

1    coal tar sludge that is actively generated as a

2    part of the ongoing process.  Does that same

3    exemption from the definition of solid waste also

4    apply to D018, this characteristic hazardous waste

5    that we've been discussing with regard to Count 18?

6    A.   Yes.  The exact same exemption would hold.

7    Q.   Okay.  So, in summary, Miss Williams, in your

8    opinion, did Tonawanda Coke require a RCRA disposal

9    permit in order to recycle the K018 [sic] material

10   on the coal piles, as you described, during the

11   period between 2005 and 2009?

12   A.   On the dates -- I'm sorry.  Are you asking

13   about D018?

14   Q.   No.  I'm going back to K087.

15   A.   K087.  No, it did not.  It did not require a

16   disposal permit for the K087 recycling.

17   Q.   And in your opinion, did Tonawanda Coke require

18   a RCRA storage permit with respect to that material

19   that was on the ground around the tanks between

20   1998 around 2009?

21             MR. PIAGGIONE:  Objection, your Honor.

22   This has already been asked and answered.  So was

23   the previous question.  He has asked these

24   questions.  Now he's repeating them at the end.

25             THE COURT:  No, I don't think so.  You're

1    now on --

2           MR. LINSIN:  Your Honor, I am going

3    back -- I'm -- these are my last three questions to

4    summarize what has been somewhat complex testimony,

5    and I'm trying to tie them directly to the three

6    counts in the indictment.

7           MR. PIAGGIONE:  She has already testified

8    about all three counts, reaching her conclusions on

9    all three counts, and now he's asking her those

10   conclusions again.  That is asked and answered.

11          THE COURT:  All right.  This is the

12   wrap-up?  Are we on K087 or D018?

13          MR. LINSIN:  This was my first question on

14   D018, and I have one remaining question on D018,

15   and that is it.

16          THE COURT:  Okay.

17   BY MR. LINSIN:

18   Q.  All right.  If I may, Miss Williams, may I

19   restate that question.  In your opinion, did

20   Tonawanda Coke require a RCRA storage permit with

21   respect to the previously abandoned material that

22   was on the ground around the two old storage tanks

23   between 1998 and 2009?

24   A.  It's my opinion that they did not require a

25   RCRA storage permit.

3486

1    Q.  And in your opinion, did Tonawanda Coke require

2    a RCRA permit to treat or dispose of the D018

3    material from those old storage tanks during 2009?

4    A.  You're talking about to recycle it on the coal

5    piles?

6    Q.  That's correct.

7    A.  It's my opinion they do not need a RCRA permit,

8    either a treatment or a disposal permit.

9              MR. LINSIN:  I have nothing further.

10   Thank you very much, your Honor.

11             THE COURT:  Okay.  Would you like a break?

12   I mean, you got to clear the head a little bit?

13   But let it sink in.  Don't get rid of it.  Okay.

14   And you're working.  I know it's hard.  I know it's

15   hard.  But you've heard a lot, and, you know,

16   remember how much we've talked about the

17   application of common sense, experience,

18   intelligence.  I mean, you're going to, as the

19   jury, probably have bits and pieces from everybody.

20   Not everybody is going to retain everything.  And

21   then, you know, when you get down to discussing it

22   and resolving the things you don't remember, and

23   you're putting it together with -- or remember

24   well, and you put it together with everybody else's

25   discussion -- and don't forget, you're going to get

1    guidance in this.  You're going to get instructions

2    in the law.  You will be -- I mean, the facts will

3    be highlighted for you so that you know what issues

4    you have to decide in the context of the 19 counts

5    in the indictment.

6        So try not to get overwhelmed by it.  Okay.  It

7    will -- you know, just think about how much you

8    already know.  Okay.  Right?  I mean, who would

9    have thought, right?  I mean you go home and you

10   sing D018, K087, right?  I mean, it's like music to

11   your ears.  So -- all right.  So go take a break

12   for 20 minutes.  We'll see you here --

13            MR. LINSIN:  Your Honor, I don't mean to

14   impose, but may I move OOOO into evidence as a

15   summary on these points?

16            THE COURT:  You can move, I'll resolve it

17   after the --

18            MR. LINSIN:  Okay.  Thanks.

19            (Jury excused from the courtroom.)

20            THE COURT:  Okay.  Miss Williams, you can

21   step down.  Thank you.

22       What are we going to do with your witness --

23   or, please have a seat, everybody.  Thank you.

24            MR. PERSONIUS:  You're talking to me,

25   right, Judge?

1           THE COURT:  Yes.

2           MR. PERSONIUS:  And I appreciate your

3     concern.  I had asked him to be here at 3:30.

4     Unfortunately, I had a couple of questions for this

5     witness, because I'm -- I told you before this

6     isn't my area, and I'm not totally clear on this.

7     So I was going to ask a couple of questions of this

8     witness.  And then Mr. Piaggione has his right, of

9     course, to cross.

10        So I don't know how long he's going to be.

11    This witness said if there was any way at all he

12    can get this done today, he'd like to.  But again,

13    Judge, we do the best we can, and I appreciate your

14    concern.

15          THE COURT:  I mean, realistically, I don't

16    think it's going to happen.

17          MR. PERSONIUS:  Right.

18          THE COURT:  So try to keep that in mind.

19    Okay.

20          MR. PIAGGIONE:  I will have a few

21    questions, your Honor.

22          THE COURT:  You only have a few questions?

23          MR. PIAGGIONE:  No, I do have a few

24    questions.

25          THE COURT:  Okay.  All right.  Then we'll

 1     get to those after Mr. Personius clears things up.

 2              MR. PERSONIUS:  No, I won't clear it up,

 3     but --

 4              THE COURT:  Okay.  Well, and then I'll

 5     rule on the chart.  You know, I'll hear your

 6     position out on that if you want.  Do you still

 7     have an objection to it, just so I know?

 8              MR. PIAGGIONE:  I do, your Honor.

 9              THE COURT:  Okay.  All right.  Okay.

10     We'll see you in about 15 minutes or so.

11              (Short recess was taken.)

12              (Jury not present in the courtroom.)

13              THE COURT:  Before we begin, the

14     government's objection to quadruple zero.

15              MR. LINSIN:  Quadruple O, your Honor, yes.

16     Letters.  We're stuck with letters.  I apologize.

17              THE COURT:  No, no.  That's okay.  Is

18     there an objection?

19              MR. PIAGGIONE:  Yes, your Honor.  Again,

20     that is a repeat of the -- the law, first of all,

21     and I believe it's somewhat inaccurate, which we

22     can point out on cross, and it's meant to be an

23     aid -- I can't pronounce the word --

24              THE COURT:  Demonstrative?

25              MR. PIAGGIONE:  No, not demonstrative.

1    That's the easy one.  Pedagogical exhibit as

2    opposed to a demonstrative.

3              THE COURT:  What's the rule basis of your

4    objection?

5              MR. PIAGGIONE:  611, your Honor.

6              THE COURT:  Pardon me?

7              MR. PIAGGIONE:  611.

8              THE COURT:  Well, that gives me the

9    authority to manage the evidence.

10             MR. PIAGGIONE:  Yes.

11             THE COURT:  And what are you saying?  That

12   it doesn't do that?  Is that what you're saying?

13             MR. PIAGGIONE:  Yes, your Honor.  I'm

14   saying that that particular exhibit doesn't

15   accurately reflect the law, to begin with, which

16   we'll show on cross-examination, so they're

17   submitting something inaccurate.  And all it's

18   supposed to be doing is depicting the law as an aid

19   to the law, which the Court would provide the

20   instructions on.

21             THE COURT:  All right.  Well, I'm not --

22   you know, I'll wait, and maybe after your

23   cross-examination you'll be able to convince me on

24   that, because what it does is establish a path

25   flow, as I see it, for consideration of elemental

1    considerations.  But, Mr. Linsin?

2         MR. LINSIN:  Your Honor, I just -- we're

3    happy to have the Court defer its ruling, but the

4    point is we believe this is -- would be a very

5    helpful exhibit for the jury, not to substitute for

6    the Court's instructions as to the law, but as a

7    summary of this witness's opinions, much as -- this

8    witness's opinions about the applicability of

9    particular regulations.

10        The government's witnesses have -- have offered

11   their opinions in that precise area, and this is

12   simply a reduction, not meant as a substitute for

13   the Court's instructions as to the law, but a way

14   that we believe would be very helpful to the jury

15   to understand her opinions.

16        THE COURT:  All right.  So you're moving

17   it under 1006?  Is that what you're doing?

18        MR. LINSIN:  As a summary, your Honor.  We

19   do -- yes.  We are moving it under 1006.  We

20   understand it is not a summary of voluminous

21   documents per se, but we believe it is an

22   appropriate and fair summary of the witness's

23   opinions in a complex area, and we believe it would

24   be of assistance to the jury in assessing this

25   testimony.

 1              THE COURT:  Well, let me ask you this.  Do

 2       you have any objection if it were to be admitted as

 3       demonstrative evidence and not substantive

 4       evidence?  And the reason why I say that is because

 5       if you look at it, you know, when you talk about

 6       the exemptions it just gives you a reference, a

 7       statutory reference or a regulation reference,

 8       without any specific information, which, you know,

 9       from the standpoint of being the summary of an

10       opinion, I'm not so sure it suffices, because it

11       gives you a point of reference without any

12       information.

13              MR. LINSIN:  Well, your Honor, we do not

14       have an objection if it was admitted as a

15       demonstrative exhibit.  We do believe it would be

16       helpful for the jury to be able to make reference

17       to it as they deliberate.  You know, to be candid,

18       a chart that would contain all of the detail that

19       the Court is referencing, we believe would just be

20       too complex to be helpful, and obviously it is not

21       meant as a precise, detailed recitation of all the

22       testimony, but as a summary that I think would help

23       the jury navigate and assess this testimony.

24              THE COURT:  All right.  Well, I mean, I am

25       troubled by one other thing, and that is the

1    absence of the line from the exemption box down to

2    the purple box.  All right.  So, you know, we will

3    have to deal with that as well.

4         MR. LINSIN:  Your Honor, we have a

5    magician on our team who can make that happen, and

6    we would be more than happy to --

7         THE COURT:  Is that Mr. Glasner?

8         MR. LINSIN:  He has many talents, but

9    Miss Henderson, I think, would be able to help us

10   clarify that, as the witness had done in her

11   testimony at the Court's request.  So --

12        THE COURT:  Well, I am troubled by that.

13   So --

14        MR. LINSIN:  Of course.  And we

15   understand.  That would be a helpful clarification,

16   and we would be happy to make that adjustment.

17        THE COURT:  All right.  Well, I'm going to

18   reserve.  I mean, you know -- you may be surprised

19   by this comment, but, you know, some of this

20   testimony is somewhat complex, and, you know, the

21   jury, I think, is outreaching for some guidance.

22   And I just throw that out there, but I want

23   whatever it is, if there is going to be anything

24   demonstratively or substantively, to accurately

25   reflect the summary of testimony, and as it stands

1    right now without that line, I don't think it does.

2       So, you know, we'll wait to hear from the

3    magician as well, you know, in terms of getting

4    this finally resolved.  And if it is pointed out

5    that this thing doesn't capture the essence of what

6    legal path has to be pursued in order for it to

7    result in a determination of -- of, you know,

8    whether we go left or right, then we'll just have

9    to decide it on that basis.  But that will await

10   cross-examination or clarification from

11   Mr. Personius.  Okay.

12          MR. MANGO:  Your Honor, just if I may,

13   just so the record is clear, because I did look

14   into this prior to the introduction of the summary

15   exhibits through Mr. Conway, Special Agent Conway.

16   It would be improper for this to be admitted under

17   Rule 1006.  1006 is limited to evidence voluminous

18   in nature.  It is -- and there is a commentary to

19   Rule 611(a).  There is commentary that discusses

20   pedagogical exhibits are controlled by Rule 611(a).

21   And there's case law on that as well.

22       There's a case out of the Second Circuit, which

23   the Second Circuit has gone both ways in allowing

24   under 611 pedagogical exhibits to go to the jury or

25   to not go to the jury.  And I want to make that

1    clear that in the government's view it would be

2    error if it was admitted under 1006.  It would not

3    be error if it was admitted under 611(a).

4              THE COURT:  Well, I mean, you never argued

5    1006, so I assume that you were conversant in

6    611(a)(1), I think, is where we really have to go

7    with this, and that's really where I have the

8    broadest discretion.  No, I hear you.  You're

9    basically saying it doesn't fit under 1006.

10             MR. MANGO:  Right.  Right.

11             THE COURT:  You know, and I don't know if

12   Mr. Linsin's really disagreeing that it -- it

13   doesn't capture the summarization of voluminous

14   exhibits and that kind of thing.  So, you know,

15   you're probably right, and I know that you came up

16   with the term pedagogical from somewhere, and

17   probably not from Mr. Piaggione, based on his

18   attempts at pronouncing it earlier.

19             MR. PIAGGIONE:  Confirmed, your Honor.

20             THE COURT:  All right.  So, you know,

21   we'll reserve until we complete cross-examination.

22   But it is utilizable for purposes of both cross,

23   obviously, because you're going to attack the

24   credibility of that, I take it, and then it's

25   necessary for the clarification that Mr. Personius

1     is going to establish.  So we have to move forward,

2     because we are running out of time.  So

3     Mr. Personius, please.

4               MR. PERSONIUS:  Should we call the jury

5     first?

6               THE COURT:  Well, let's try it without a

7     jury and see how it goes.

8         Chris, if you would, please.

9               (Jury seated.)

10              THE COURT:  Okay.  I have a confession,

11    and the lawyers took me to task on this.  I almost

12    forgot that we needed you to go forward.  All

13    right.  So, please don't take that personally.

14    Please have a seat.  Welcome back.

15        I do want to tell you this, though.  We're

16    going to make every effort to complete

17    Miss Williams's testimony, and then we're going

18    give you off tomorrow.  Okay.  And we will resume

19    on Monday.  Okay.  And that way everything gets to

20    gel.  Okay.

21        The attorneys and parties are back present.

22    You are here.  And Mr. Personius has some questions

23    of this witness, so he will be next.  And remember,

24    common sense, experience, intelligence, the

25    application of that to resolving the fact issues in

1     this case.  Okay.  And it's doable.  And it is up

2     to you to resolve them and come back with that

3     unanimous verdict.

4          Okay.  Mr. Personius.

5               MR. PERSONIUS:  Thank you, Judge.

6     CROSS-EXAMINATION BY MR. PERSONIUS:

7     Q.  Good afternoon, Miss Williams.

8     A.  Good afternoon.

9     Q.  Sheila, could we please have Defendants'

10    Exhibit quadruple zero [sic] on the screen?

11         Do you see, Miss Williams, on the screen

12    Defendants' Exhibit quadruple zero?

13    A.  Yes, I do.

14    Q.  You've testified in answer to Mr. Linsin's

15    questions that this is an exhibit that you put

16    together?

17    A.  Yes, I did.

18              THE COURT:  Now, Mr. Personius, I was

19    corrected on this.  Quadruple O.

20              MR. PERSONIUS:  Oh, what did I say?  Zero,

21    too?

22              THE COURT:  Yeah.  I probably led you down

23    that path.  So we're on letters, ladies and

24    gentlemen.  So -- now, they look somewhat alike,

25    but we're going refer to them for the record as O,

1    quadruple O.

2              MR. PERSONIUS:  But there are no decimal

3    points in it.

4              THE COURT:  Not on this one yet.  But give

5    us some time.  We'll probably add a few decimals

6    just to spice things up, ladies and gentlemen.

7    BY MR. PERSONIUS:

8    Q.  I just wanted to try, if I could, for my own

9    edification, to clear up a little bit about your

10   chart.  The white in the middle is -- if I

11   understand it, those are questions you would ask to

12   determine whether or not a particular material is a

13   solid waste?

14   A.  That's correct.

15   Q.  All right.  And if a material is not a solid

16   waste, then you don't get to the hazardous waste

17   issue at all?

18   A.  Well, I think the key aspect is in order to get

19   covered by the RCRA regulations it has to be both a

20   hazardous waste and a solid waste.

21   Q.  All right.

22   A.  And so RCRA -- the regulations are a little

23   circular in the way they look at it, because

24   typically you don't bother to ask the question of

25   do you have a solid waste unless you're starting

3499

1    with something that you already know is probably

2    hazardous.  So I think the simplest way to think

3    about it is for in order to enter into this path

4    where you need to get a potential RCRA permit, it

5    both has to be a solid waste and it has to be a

6    hazardous waste.

7    Q.   Okay.  And so the point of the middle, the

8    white part, is to say let's start with whether it's

9    a solid waste, and if we don't get past that, we

10   don't have to consider whether it's a hazardous

11   waste.

12   A.   That's correct.

13   Q.   And therefore, in your opinion at least, it

14   wouldn't be covered by the RCRA statute?

15   A.   It wouldn't be covered by this set of

16   provisions in the RCRA statute.

17   Q.   Okay.  Now, you talked about -- in your

18   testimony about two different -- I don't know

19   whether to call them substances or what.  One was

20   called K087?

21   A.   Yes.

22   Q.   Okay.  Is K087 -- is that called a waste, or is

23   it just called K087?

24   A.   Well, it's called decanter tank tar sludge.

25   Q.   Okay.

3500

1    A.   So that's -- and if discarded, certainly it's a

2    waste.  If recycled, it might have been a waste and

3    it might not be a waste.

4    Q.   So that's an important distinction to you?

5    A.   Yes.

6    Q.   Okay.  So we have the K087, and that would be

7    the material that was generated by Tonawanda Coke?

8    A.   Yes.

9    Q.   All right.  And was picked up with the front

10   loader and taken out to the coal piles?

11   A.   That's correct.

12   Q.   Now, the other material you talked about was

13   called D018?

14   A.   Yes.

15   Q.   And that was the material that was -- was out

16   at these abandoned tanks?

17   A.   Yes.   That is the material that was found in

18   and around the tanks.

19   Q.   Okay.  When you say "in and around," both

20   inside and outside is both called this D018?

21   A.   Yes.

22   Q.   And again what is D018?

23   A.   D018 is a characteristic hazardous waste that

24   is characteristic because it fails a specified

25   toxicity test for benzene, meaning that when you

1    test under this test procedure it has more benzene

2    than the cutoff level allows.  So it's hazardous

3    because of benzene.

4    Q.  And this D018 that was both inside and outside

5    these abandoned tanks, is it your testimony that if

6    nothing had been done with those at all by

7    Tonawanda Coke after they took over in 1978, that

8    material clearly would not be covered by the RCRA

9    statute?

10   A.  That material would not be covered by the RCRA

11   permitting provisions within the RCRA regulations.

12   There are other parts of RCRA that really aren't at

13   issue in these charges that could still require the

14   facility to perhaps clean that up if it was causing

15   a risk, but it has nothing to do with the RCRA

16   permitting requirements.

17   Q.  Okay.  So if we could go back to your chart

18   that's on your screen, please.  Defendants' Exhibit

19   OOOO.  If you are in the white box, and you've

20   testified if we go back to the K087, that one you

21   of your opinions is that the K087 is not a solid

22   waste, so you went to the left, is that correct?

23   A.  It's not a solid waste when it's being recycled

24   in the manner that we discussed.

25   Q.  And is it your testimony that it has to qualify

1    under one of the boxes that are at the lower left

2    of your chart?

3    A.   No.  That's a -- that's actually a helpful

4    clarification question.  I've listed a number of

5    examples of things that are not solid wastes.

6    There could be other things.  This is not -- there

7    could be other types of materials that are not a

8    solid waste, as well, but I listed a representative

9    set of examples.

10   Q.   Okay.  All right.  But as far as the K087 as it

11   was used here, if I recall, you said it might fit

12   into two of these different bullet points, is that

13   true?

14   A.   Yes, that's what I said.

15   Q.   Okay.  Could you tell us what the first of

16   those two is again, please?

17   A.   Well, I can't --

18   Q.   It's okay.  Is it the one above that?

19   A.   It's the one above that.  Continuous production

20   process.  And there's another exemption, which is

21   the first small sub-bullet, that says "Direct

22   reuse," which means you take the material and you

23   directly use it as a feedstock.

24        The -- the difference between those two is in

25   direct continuous production there is usually not

1    any storage involved at all other than the typical

2    storage that you would have with a normal

3    production process.  In the second one, which is

4    direct reuse, you're still reusing the material

5    without doing any special reclamation to it or

6    doing anything to the waste, but it's possible that

7    you might store it for a period of time before you

8    reuse it.  So those are really -- that's really the

9    difference between those two.

10   Q.  Okay.  And for the indented bullet point, the

11   direct reuse, you've used that term, and it appears

12   in your chart, "feedstock."  Could you clarify what

13   feedstock means?

14   A.  Feedstock would just be a normal raw material

15   that goes into a production process.  So in this

16   case coal would be a feedstock for the

17   manufacturing of coke.

18   Q.  All right.  And in that -- that indented bullet

19   point that you referred to after feedstock, it says

20   "Substitute for CCP."  What is CCP?

21   A.  CCP stands for commercial chemical product, and

22   that's one of the types of secondary materials that

23   the regulations discuss when they're saying what

24   type of recycling and what type of material.

25   Q.  But that's not -- is that a concern in this

3504

1    case at all, that CCP?

2    A.   No.  I didn't rely on that particular

3    provision.

4    Q.   Okay.  All right.  So if we can -- I'm almost

5    done.  If you go back to the white box, and

6    Mr. Linsin asked you some questions where he said

7    assume that with the -- let's start with the

8    K087 -- assume that it is a solid waste, so you

9    can't go to the left and you have to go to the

10   right.  Are you with me?

11   A.   I am.

12   Q.   Okay.  Then you're saying that you would follow

13   the yes down to the yellow box that says "RCRA

14   solid waste"?

15   A.   That's correct.

16   Q.   And then you follow the yellow line up to where

17   it has that 261.4(a) exemption with a question

18   mark?

19   A.   Yes.  And actually that -- there's lots of

20   261.4 exemptions, but there's only one that's

21   really potentially relevant to this particular

22   process, manufacture of coke.

23   Q.   All right.  And that exemption, again, has to

24   do with recycling?

25   A.   Yes.  All of these exemptions -- well, that's

1     not -- let me back up.  Many of these exemptions

2     have to do with recycling, not all.  But the

3     specific one that we've been talking about has to

4     do with recycling.

5     Q.  All right.  And so your testimony is based on

6     the facts as you understand them, that if the K087

7     is determined to be a solid waste, you still don't

8     have to have a RCRA permit, because of a recycling

9     exception?  Is that what you're saying?

10    A.  Well, what I'm saying is if it turned out it

11    was a solid waste, there is a whole set of

12    exemptions that you first again look at before you

13    decide whether or not this is a regulated solid

14    waste and hazardous waste.  And if you're -- what

15    you're doing -- the material you have and what

16    you're doing with it meets the conditions in any

17    one of those exemptions, that's another way under

18    which the material and the activity is considered

19    exempt from RCRA permitting, and so it's another

20    way of getting over -- over here.  But if you check

21    the -- the exemption and you look at the conditions

22    and you look at what you're doing and you say,

23    well, it doesn't meet that, then, as I was asked

24    earlier --

25    Q.  You go back to the --

1   A.   Then you go back to the purple box.

2   Q.   Okay.  All right.  And the re -- is it your

3   second opinion regarding the K087 not being subject

4   to permitting because it fits this recycling

5   exemption?

6   A.   Well, it's my opinion that it both -- it's not

7   a solid waste, because, really, the way I would

8   analyze it, first I'd go to the left of the box, so

9   I never get over to the right.

10   Q.   I understand.

11   A.   But if I were, hypothetically, over on the

12   right, I also believe it would meet the

13   261.4(a)(10) exemption.

14   Q.   All right.  And once you get to there, then the

15   question becomes whether or not there was land

16   disposal?  You still have to satisfy that issue?

17   A.   No.  Well, you have to -- that's one of the

18   things you look at to decide whether or not it does

19   meet the 261.4(a)(10) exemption.  If it meets the

20   exemption, that's the end of the discussion.

21   Q.   But to meet it you'd have --

22   A.   But to meet it you have to look at whether or

23   not there's land disposal involved prior to the

24   start of the recycling process.

25   Q.   And was it your conclusion that based on the

1   facts as you understand them there was no land

2   disposal?

3   A.   That is my opinion.

4   Q.   Can you explain that to the jury, why you

5   conclude there was -- and you may have done this,

6   and I may have missed it, but I didn't really get

7   it.   Why is it your opinion there was not land

8   disposal when that decanter tar sludge was taken in

9   the front loader and mixed in the -- in the coal

10  pile?

11  A.   Because -- because that mixing occurred in the

12  feedstock pile.   It didn't happen on the ground.

13  These coal piles are not the ground.   They're a raw

14  material feedstock pile.   They're a production raw

15  material.   And below them is another 4 feet of coal

16  material.   So I don't believe that that constitutes

17  land disposal under the definition that's been

18  provided for this case.

19      I also believe that at the time you take this

20  material, the K087, and you put it on the coal pile

21  for mixing, you've already started the recycling

22  process.   And once you start the recycling process,

23  the issue of land disposal isn't -- isn't an issue

24  at that point.   The question is between the time

25  that you generate this material, which is when you

1    take it out of the tar box, and when you start the

2    recycling, are you engaging in land disposal.

3    Q.   Okay.  And what about the argument that the

4    coal piles are sitting on the ground?  How do you

5    respond to that?

6    A.   Well, I mean, the fact -- there is a concept in

7    the RCRA regulations of a waste pile.  And a waste

8    pile is when you take waste and you put it directly

9    on the ground, and that would be land disposal.

10   Q.   Okay.

11   A.   But the coal piles are not the ground.  They

12   are a feedstock.  You're mixing it in directly with

13   the feedstock.  It's not on the ground.  That's my

14   interpretation of the definition of land disposal

15   at issue in this case.  And I think I mentioned

16   previously there is this concept of a land-based

17   production unit.

18   Q.   Yes.

19   A.   And I believe the coal piles and the mixing

20   is -- would fit within the concept of a land-based

21   production unit.

22   Q.   I hate to do this, but you mentioned it.  What

23   is a land-based production unit?

24   A.   A land-based production unit is an activity

25   that is production related that could be in contact

1    with the land.

2    Q.  And that's where you gave the example of the --

3    that I didn't understand, but it had something to

4    do with coins and beaches or leachates or

5    something?

6    A.  Oh, it has -- it has to do with -- in the

7    mineral processing industry, when there's secondary

8    materials from the mineral processing, or primary

9    materials, they'll -- they'll use a ground-based

10   type of production, but they'll use a secondary

11   material to help get the copper and the gold out of

12   that material.  But that whole process occurs on

13   the ground.

14   Q.  And in terms of this issue of on the ground,

15   does it -- is it important at all that the -- the

16   coal piles are on a base of several feet of coal

17   themselves?  Does that factor in at all?

18   A.  Well, it further -- it further contributes to

19   my opinion that -- that mixing on the coal piles

20   does not constitute land disposal as it's been

21   defined for the purpose of this matter.

22   Q.  All right.  I have two other questions.  If we

23   then go to the -- the D018, which was the tar that

24   was inside and outside these old tanks, and you've

25   testified about that being excavated and carried

3510

1     over and itself put into the coal piles?

2     A.   Yes.

3     Q.   Okay.  Is that the same analysis as you've just

4     given us for the K087, or is it somehow different?

5     A.   It's a very similar analysis.  The only

6     difference is that when I do my analysis and I go

7     to the left of the chart, I would not call that a

8     continuous production process.  So -- because it's

9     been abandoned for many years.  You now dig it up.

10    You have a new point of generation of waste.  So I

11    would say the reason that that -- or the type of

12    activity that's going on there is direct reuse.

13    You've taken it, you have a new point of

14    generation, you take it over to the coalfield for

15    the purpose of mixing it with the feedstock, so

16    it's a direct reuse.

17    Q.   All right.  Last question.  If you use the

18    white box in the middle and you conclude that the

19    material that you're considering and what the

20    circumstances are is not a solid waste, so you go

21    to the left on your chart, do you still concern

22    yourself at all with whether or not there's land

23    disposal?

24    A.   No, you do not.

25              MR. PERSONIUS:  Okay.  Thank you, Judge.

1          THE COURT:  Okay.  Before we get to

2    Mr. Piaggione, the 261.4(a) exemption, you said

3    there are multiple of those exemptions.

4          THE WITNESS:  Yes.

5          THE COURT:  But only one that applies

6    here, and that's, at least in your opinion, the --

7    the fact that we're dealing with a coke operation?

8          THE WITNESS:  Yes.

9          THE COURT:  Okay.  And then that triggers

10   whether it qualifies for an exemption under the

11   circumstances of the operation and then where it

12   goes, either to a non-RCRA waste or back down to

13   the hazardous waste?

14         THE WITNESS:  That is correct.  I mean,

15   again, in my analysis I don't ever have to get

16   there, but I do believe if you did that analysis,

17   that would also qualify for the exemption.

18         THE COURT:  Okay.  Mr. Piaggione.

19         MR. PIAGGIONE:  Thank you, your Honor.

20   CROSS-EXAMINATION BY MR. PIAGGIONE:

21   Q.  Good afternoon, Miss Williams.

22   A.  Good afternoon.

23   Q.  My name is Rocky Piaggione.  I and my

24   colleague, Mr. Mango, represent the government in

25   this case.

1        Miss Williams, now, you indicated your degree

2    is in math and physics, is that correct?

3    A.   That's correct.

4    Q.   And you left the EPA in -- was it February or

5    March 1988?

6    A.   I think it was the last day of February.

7    Q.   Okay.  And over the last 25 years you've been

8    employed as a consultant for industry, isn't that

9    correct?

10   A.   Well, I think I said I spent three and a half

11   years employed at Browning-Ferris Industries, and

12   since that time I've been a consultant for both

13   governments and for industry.

14   Q.   Well, isn't it fair to say you make a living

15   being paid for your opinion?

16   A.   Well, I think -- I certainly do get paid for

17   the time I expended.  I don't know that I would say

18   I get paid for my opinion.  I'm not sure I

19   understand your question.

20   Q.   Well, do you provide guidance to industry,

21   you've indicated, and to -- in some cases, I guess

22   you said, some local governments?

23   A.   I think I said the Government of the United

24   States.  I think I said the -- I have also provided

25   some consulting to various cities.  I have provided

1    consulting to the governments of Canada and Mexico,

2    and I have also provided consulting to companies.

3    Q.  Well, isn't it true that you said you testified

4    15 times, you said, I believe, in legal

5    proceedings?

6    A.  I said with regard to RCRA, I think I said I

7    testified approximately 15 times.

8    Q.  But isn't it true, based upon your resumé, that

9    you've testified in proceedings over 40 times,

10   isn't that correct?

11   A.  As I recall the way the question was asked to

12   me, it was how many times had I testified

13   specifically with regard to RCRA matters.  I have

14   testified many times with regard to other matters.

15   Q.  And isn't that all regarding your opinion as it

16   was -- as an expert in these proceedings, is that

17   correct?

18   A.  I don't think I understand your question.

19   Q.  Well, are you being paid for your opinion when

20   you appear and testify in these proceedings?

21   A.  I'm being paid -- when I testify at deposition

22   or in court, I'm being paid to take the time to do

23   a thorough analysis of the facts of the situation

24   and reach my own conclusions, and if I'm asked to

25   testify, I present those conclusions.

3514

1    Q.  You've done that at least 40 times, is that

2    correct?

3    A.  I didn't count them up, but I have done them

4    approximately that number of times.

5    Q.  And since 1988, has the EPA hired you to

6    testify for any reason?

7    A.  I don't have any recollection of testifying for

8    the EPA.  I have testified for the Government of

9    Mexico, for example.

10   Q.  Okay.  And fair to say you wouldn't be

11   testifying here today if you agreed with the EPA's

12   position in this case?

13   A.  I think that's a fair statement.  I mean, I

14   wouldn't be in a position to express my opinion

15   today if I wasn't comfortable that my opinions were

16   accurate.

17   Q.  But if you agreed with the EPA, you would not

18   be here today testifying, isn't that correct?

19   A.  Well, I guess that would depend on whether the

20   EPA asked me to appear to testify, but I wouldn't

21   be testifying, I suspect, on behalf of my current

22   client.

23   Q.  And isn't it fair to say you wouldn't be

24   testifying here today if you were not being paid by

25   your client?

3515

1    A.   I normally do try and get paid when I work.   I

2    think most of us try to do that.

3    Q.   And can you tell the jury, are you being paid

4    on an hourly or on a flat-fee rate?

5    A.   My firm -- my firm gets paid on an hourly rate.

6    Q.   And how much is that an hour?

7    A.   It's $475 an hour that gets paid to my firm.

8    Q.   And does that include whether you're sitting in

9    the court listening or testifying?

10   A.   Well, it generally includes any time that I've

11   spent specifically working on the case.

12   Q.   And you've been working on this case since

13   2010, I believe you said?

14   A.   April of 2010.

15   Q.   And yet you've never gone to Tonawanda Coke

16   Corporation, is that correct?

17   A.   I did not -- I did not visit this particular

18   coke facility, no.

19   Q.   So is it fair to say that you never saw the

20   recycling operation as it is alleged in this

21   indictment?

22   A.   By the time I was engaged in this matter, it's

23   my understanding that the recycling operation had

24   been modified.

25   Q.   And how was it modified?

1  A.  It's my understanding that they began to use a

2  concrete pad for the mixing process.

3  Q.  The concrete pad that in your opinion is not

4  necessary, is that correct?

5  A.  It's a concrete -- yes, it's my opinion it's

6  not necessary, to be in compliance with RCRA.

7  Q.  Okay.  And have you been to any other coke

8  plants before -- before testifying here today?

9  A.  I have not visited a coke plant.  I have done

10  work at other coke plants.

11  Q.  And so you've never really saw any coke

12  recycling operations at a coke plant, is that

13  correct?

14  A.  I think that's -- that's -- I haven't visited a

15  facility where I've seen recycling operations, no.

16  Q.  Okay.  So I'd like to talk about your

17  experience at the EPA.  You said you were involved

18  in the Office of Research and Development, is that

19  correct?

20  A.  Yes.

21  Q.  And you were doing statistical analysis and

22  mathematical modeling, is that correct?

23  A.  I think what I said is I was -- I was doing

24  analysis of air pollution and health effects as

25  inputs to setting the National Ambient Air Quality

1   Standards.

2   Q.   That does not involve RCRA, is that correct?

3   A.   That did not involve RCRA.

4   Q.   And then you worked with, from '72 to '78, test

5   procedures to measure emissions from vehicles, if I

6   understand that correctly?

7   A.   Well, I mentioned quite a few things, but I was

8   in that office, yes.

9   Q.   And that didn't involve RCRA, though, did it?

10   A.   No, other than the time I said I mentioned that

11   I was -- had a special assignment on -- in the

12   Senate Public Works Committee, where I was involved

13   with RCRA and several of the other environmental

14   statutes.

15   Q.   And that experience on the Senate lasted three

16   months, I believe it was?

17   A.   Three to four months.  I can't quite remember.

18   Q.   Okay.  And then from there you -- you went over

19   to the office of -- was it asbestos and pesticides?

20   A.   No.  It was the Office of Planning and

21   Evaluation.

22   Q.   And that dealt with asbestos and --

23   A.   No, that dealt -- that dealt with -- I think I

24   had mentioned that I had set up a central

25   statistical aid group for the agency, and that was

1    involved in reviewing the different major

2    regulations that EPA was promulgating, one of which

3    was the original proposed regulations under the --

4    for the RCRA program.

5    Q.   And your job for that was to come up with a

6    statistical examination of the impact of

7    regulations, isn't that correct?

8    A.   No, that's incorrect.

9    Q.   What was it then?

10   A.   It was to determine whether or not EPA had

11   collected adequate information to support the

12   positions that it was taking in those proposed

13   regulations.

14   Q.   So you collected the information to support the

15   regulation, not to write the regulation, is that

16   correct?

17   A.   We reviewed the information that the Office of

18   Solid Waste had put together, to make sure that the

19   requirements that were being put into the

20   regulations -- and this was a proposed

21   regulation -- were supported by the analysis that

22   had been done by that office.

23   Q.   And when you worked with the -- from there you

24   went to the Office of Pesticides, is that correct?

25   A.   That's correct.

3519

1    Q.  And that dealt with the use of pesticides, I

2    believe?

3    A.  Generally.  Again, it had to do with ensuring

4    that pesticides that were in use were safe.

5    Q.  And that had nothing to do with RCRA, however,

6    did it?

7    A.  It did not have anything to do with RCRA,

8    although I was involved with working on pesticide

9    disposal, and that was coordinated with work that

10   was done in the Office of Solid Waste.

11   Q.  And, in fact, when you worked with the Office

12   of Toxic Substances, that had to do with asbestos

13   and PCBs, is that correct?

14   A.  Well, there are about 50,000 different

15   chemicals in commerce, and our office dealt with

16   all of them.  You've mentioned two of them.

17   Q.  Those substances, however, if they're

18   controlled under the Toxic Substance Control Act,

19   they're not controlled under RCRA, isn't that

20   correct?

21   A.  No, that's not correct either.  I mean, parts

22   of the regulation of them, how they're being used,

23   are controlled under the Toxic Substances Control

24   Act, but for most of the chemicals in use in this

25   country, when they get disposed of they get

1    regulated under RCRA.  So it's not an either/or.

2    Q.  But that portion of it, the disposal, was not

3    controlled under the division you were with.

4    A.  Certain types of -- actually, TSCA is a very

5    broad statute, and so it does allow the regulation

6    of disposal, and certain types of disposal were

7    regulated under TSCA, but I think it's outside the

8    relevance of this case.

9    Q.  And when you went to the Solid Waste Program in

10   September of 1985, you stayed there until February

11   of 1988, and that was the work that you

12   specifically dealt with RCRA, isn't that correct?

13   A.  That was full time managing RCRA, yes.

14   Q.  And for those 29 months that you worked at

15   RCRA, how many coke-producing facilities did you

16   inspect?

17   A.  I didn't inspect any coke-producing facilities

18   at that time.

19   Q.  How about in those 29 months how many RCRA

20   inspections did you conduct?

21   A.  I wasn't personally conducting RCRA inspections

22   during that period of time.  My job was to develop

23   the regulations and to issue all the guidance on

24   how to do permitting, and to get the permitting

25   program put into place, and to issue training on

1    the regulations to the regions and states.  And I

2    won't repeat it all, but my job wasn't to do

3    inspections.

4    Q.  And how many --

5    A.  But my job was to develop and provide input

6    into the manual that did explain to inspectors how

7    to inspect.

8              MR. PIAGGIONE:  Your Honor, if the witness

9    could please just answer the question.

10             THE COURT:  She's doing that.

11             MR. PIAGGIONE:  Okay.  How many RCRA

12   inspection reports --

13             MR. LINSIN:  Your Honor --

14             MR. PIAGGIONE:  -- did you personally

15   review?

16             MR. LINSIN:  -- may I interject just a

17   moment, please, and ask that the witness be

18   permitted to repeat the last portion of her

19   response that Mr. Piaggione just spoke over.

20             THE COURT:  Okay.  Do you recall your

21   answer?

22             THE WITNESS:  Yes.  I think I just said I

23   also was involved in developing the 1988 RCRA

24   inspection manual, which was, in fact, provided to

25   the regions and the states for their use as

 1    guidance in performing inspections.

 2              MR. PIAGGIONE:  And as a result of that

 3    manual, they did do RCRA inspections, is that

 4    correct?

 5              THE COURT:  What's your question?

 6    BY MR. PIAGGIONE:

 7    Q.  Withdrawn.

 8        How many RCRA inspection reports did you

 9    personally review while you were at the EPA?

10    A.  I don't think I could give you a specific

11    number.  It's not a large number.  But I think I

12    mentioned that we went out to the regional offices

13    to do oversight of visits, and we probably visited

14    three -- three regions a year, and during those

15    visits we did review certain inspections and we

16    reviewed certain permits.  So some number, not a

17    large number.

18    Q.  And with respect to the regulations for the

19    recycling of K087 waste, the finalization of those

20    regulations did not occur while you were in the

21    office -- in the EPA, isn't that correct?

22    A.  Well, I think it depends upon which set of

23    regulations you're talking about.  The regulations

24    that deal with the definition of solid waste were

25    finalized during my tenure in the office.  The

1    very --

2    Q.  But the regulations for -- I was asking about

3    the regulations for the recycling of K087 waste,

4    specific regulations for K087 waste.  Those were

5    not finalized while you were in the EPA, isn't that

6    correct?

7    A.  If what you're referring to is the regulations

8    under 261.4(a)(10), those regulations were not

9    finalized when I was in the agency, but those are

10   not the only regulations that cover the recycling

11   of K087.

12   Q.  Okay.  I believe we're at a difference of

13   opinion on that point.  However, we'll go forward.

14            MR. LINSIN:  Your Honor --

15            THE COURT:  All right.  Ladies and

16   gentlemen, what the attorney believes in terms of

17   differences of opinion, that's not evidence.

18   That's not for you to consider.

19       You know better than that, Mr. Piaggione.

20            MR. PIAGGIONE:  Yes, your Honor.  I'm

21   sorry.

22   BY MR. PIAGGIONE:

23   Q.  Now, are you familiar with the term "generator"

24   as it's used in RCRA?

25   A.  Yes, I am.

1    Q.  And are you familiar with the responsibilities

2    imposed upon a generator by RCRA?

3    A.  Yes, I am.

4    Q.  And one of those responsibilities is that the

5    generator make a determination if a solid waste is

6    a hazardous waste or not, is that correct?

7    A.  A generator has a responsibility, at the point

8    in which he generates a waste, to determine whether

9    that material is a hazardous waste and also whether

10   it's a solid waste.  So that is a generator

11   responsibility.

12   Q.  Okay.  And you're aware in this case the

13   generator made a determination as to what his

14   waste -- that what his material was, isn't that

15   correct?

16   A.  I'm not sure I understand your question.

17   Q.  Did Tonawanda Coke Corporation, as a generator,

18   identify its waste as K087?

19   A.  Yes, it did -- it did identify that it

20   generated K087.

21   Q.  And by doing so and notifying the EPA, they had

22   told the EPA that K087 is a solid and hazardous

23   waste, isn't that correct?

24   A.  They notified EPA that they were generating

25   that waste.  They aren't -- that's -- that doesn't

1    answer the question of what they're doing with the

2    waste.  So if they were -- I mean, yes, they said,

3    "We're generating K087 waste," but they're not --

4    but that's not the end of the question.  You have

5    to look at what they are doing with it.

6    Q.   Right.  And didn't Tonawanda Coke indicate that

7    what they were doing was recycling that waste?

8    A.   That's correct.  That's what they said.

9    Q.   All right.  And you stated that the first step

10   in the recycling process starts with the mixing of

11   the coal, is that correct?

12   A.   Yes.

13   Q.   Okay.  And you said you read the testimony of

14   Mr. Flax and Mr. Corbett and you heard the

15   testimony of Mr. Strickland, is that correct?

16   A.   Yes, that's correct.

17   Q.   And each of them testified that the mixing of

18   the coal -- mixing of the K087 with the coal on the

19   coal piles was a violation of land disposal, isn't

20   that correct?

21        MR. LINSIN:  Your Honor, I believe it

22   misstates the testimony, and I'm surprised counsel

23   is now beginning to ask questions about this issue

24   to which they objected on direct.

25        MR. PIAGGIONE:  I don't believe it's --

1              THE COURT:  Well, I mean, to the form of

2     the question, I'm going to sustain the objection.

3  BY MR. PIAGGIONE:

4     Q.   Okay.  Mr. Flax, Mr. Corbett, and

5     Mr. Strickland testified that they considered the

6     mixing of the K087 with the coal on the coal pile

7     as voiding the exclusion for recycling under

8     264(a)(10) [sic], isn't that correct?

9     A.   Well, I mean, I -- I mean, I'm not sure that I

10    would characterize what they said exactly the way

11    you are, but it's very clear to me that my opinion

12    is not identical to theirs, if that's the question

13    that you're asking.

14    Q.   Right.  And the EPA -- didn't the EPA state in

15    1992 that the recycling exclusion is conditioned

16    on --

17              MR. LINSIN:  Your Honor --

18              MR. PIAGGIONE:   -- there being no plant

19    disposal?

20              MR. LINSIN:  -- your Honor --

21              THE COURT:  Wait a minute.  Wait a minute.

22    We have an objection, I think.

23              MR. LINSIN:  Yes.  I don't know what

24    counsel is reading from, and statements of policy

25    or interpretation are not appropriate in the form

1      of a question.  EPA stating something, if

2      Mr. Piaggione wishes to inquire about a regulation

3      that was in effect, I will withdraw my objection,

4      but that didn't seem to be where this is going.

5                    THE COURT:  Well, you know, the EPA -- I

6      mean, that can include an awful lot of individuals

7      divisions, and the like, time periods, regulations,

8      documents, et cetera, et cetera.  I think it goes

9      right down to the form of the question, which I

10     will sustain the objection to.

11                   MR. PIAGGIONE:  In 1992, when the EPA

12     promulgated its regulations for the recycling of

13     K087 waste, it stated in a --

14                   MR. LINSIN:  Your Honor --

15                   THE COURT:  Same objection.  Same ruling.

16                   MR. LINSIN:  Same objection.  Yes.

17     BY MR. PIAGGIONE:

18     Q.  Didn't -- doesn't the regulation say that

19     recycling exclusion is conditioned upon there being

20     no land disposal of the residues at any point from

21     residue generation to the coke ovens?  Didn't it?

22     A.  That isn't the exact wording of the exclusion.

23     It says until it's recycled into the coke ovens, I

24     think.  That's -- something like that.  So the

25     question is, you have to look at the question of

1    where recycling starts.

2    Q.  Doesn't it say recycling to -- into the coke

3    ovens?

4              THE COURT:  What are you referring to,

5    please?

6              MR. PIAGGIONE:  I'm referring to, your

7    Honor, 264 --

8              MR. LINSIN:  It's --

9              MR. PIAGGIONE:  -- .4.

10             THE COURT:  261 or 264?

11             MR. PIAGGIONE:  261.4(a)(10).  Sorry, your

12   Honor.

13   BY MR. PIAGGIONE:

14   Q.  Doesn't it say that there be no land disposal

15   of the wastes from the point they are generated to

16   the point they are recycled to coke ovens?

17   A.  Well, it says recycled to the coke ovens.  And

18   the question is what is the point at which that

19   recycling to the coke ovens starts.

20   Q.  And isn't it the opinion of the EPA, as

21   testified to, that --

22             MR. LINSIN:  Your Honor --

23             MR. PIAGGIONE:  -- testified to in this

24   court --

25             MR. LINSIN:  Your Honor, form of the

 1      question, please.

 2                  THE COURT:  Yeah.  The form of the

 3      question, sustained.

 4      BY MR. PIAGGIONE:

 5      Q.  And isn't it -- the testimony in this case

 6      that -- from Mr. Flax, from Mr. Strickland, that

 7      the recycling first step was when it's reinserted

 8      in the coke ovens?

 9      A.  I understand that that was their testimony, and

10      I provided my opinion.  And, I mean, I think that's

11      why we're here.  We have different opinions.

12      Q.  So what you're saying is your opinion is --

13      differs from the testimony of the EPA officials and

14      the DEC officials who testified in this case?

15      A.  I think my opinion does differ from the EPA and

16      the DEC officials.  It's also my opinion, which I

17      didn't hear them express, that this material is not

18      a solid waste.  It goes to the left-hand side of

19      the chart.  You don't even have to ask the question

20      of whether the exemption is applicable, although I

21      believe it is.

22      Q.  However, Tonawanda Coke identified itself as

23      producing K087 waste, isn't that correct?

24      A.  Yes, and it also said it recycled the waste,

25      and it also --

1    Q.  So based upon --

2              MR. LINSIN:  Your Honor, please, may the

3    witness be permitted to finish her answer?

4              THE COURT:  Yeah, I think so.  Complete

5    your answer, please, Miss Williams.

6              THE WITNESS:  Just that they also said

7    that they recycled the waste and that -- and that

8    that recycling involved putting it back as a

9    feedstock for coke manufacture.  And that was

10   information that was available to the government,

11   and DEC had that information when they went out to

12   do the 1989 inspection.

13   BY MR. PIAGGIONE:

14   Q.  Miss Williams, the information, as indicated, I

15   believe, indicates -- excuse me.  Withdrawn.

16        Using it as feedstock, where is that in the

17   information that was provided to the DEC?

18   A.  Well, it was information that the 1989

19   inspector determined and wrote on the inspection

20   form.  And I might point out that at the time of

21   the 1989 inspection, when that inspector decided

22   there was no need for a TSD permit, there was no

23   exemption under 261.4(a)(10).  That exemption

24   hadn't been written yet.

25   Q.  Miss Williams, where does it say feedstock in

1    the 1989 inspection?

2    A.   It said it was used as a raw material, is my

3    memory of the way it was described.

4    Q.   And where does it say coal piles in the 1989

5    inspection?

6    A.   It doesn't mention coal piles, but in 1989

7    there was no pad in the facility, there was no

8    exemption in the regulations for 261.4(a)(10), so

9    the analysis the DEC inspector would have had to

10   have done would have been to assume or recognize

11   when he went out to do the inspection and look at

12   where the waste was generated and how it was

13   recycled.  That's what the guidance manual, the '88

14   inspector manual, says.  Look at the waste, K087,

15   from the point that it's generated and watch it

16   through the process.

17           MR. PIAGGIONE:  Your Honor, I'm going to

18   have to ask if the witness would just answer the

19   questions.  She is going on way beyond anything

20   I've asked.

21           THE COURT:  Well, do your best to answer

22   the question as you understand it, please.

23   BY MR. PIAGGIONE:

24   Q.   Miss Williams, when the 1989 inspection

25   occurred, was there any indication that the coal

3532

1    piles were observed, in the inspection report?

2    A.   The inspection report is silent, but it is

3    my --

4              THE COURT:  Okay.  And that's fine.  Go

5    ahead.  Next question, please.

6    BY MR. PIAGGIONE:

7    Q.   And you heard the testimony of Mr. Corbett, did

8    you not?  Or rather you read the testimony of

9    Mr. Corbett, did you not?

10   A.   I did read it.

11   Q.   Okay.  And he said he did not see the process,

12   is that correct?

13   A.   That's my memory.  I believe that's what he

14   said.

15   Q.   And you concluded that all the inspections

16   indicated that the recycling was done on the coal

17   piles, isn't that correct?

18   A.   Would you please repeat the question?

19   Q.   Didn't you say -- specify that your evaluation

20   of all the inspections by the RCRA inspectors in

21   this case concluded that they -- that the coal

22   was -- that the K087 waste was being mixed on the

23   coal piles, isn't that correct?

24   A.   I don't -- I don't believe that's what I said.

25   I said that is what was going on.  I don't think I

1    said that the inspection stated that.

2    Q.  Can you find in any of the inspection reports

3    any evidence that the inspectors observed the

4    mixing of the coal and the K087 waste on the coal

5    piles?

6    A.  The inspections are silent to that issue.  I

7    think what I testified to was that --

8              THE COURT:  Okay.  Let's leave it right

9    there.

10   BY MR. PIAGGIONE:

11   Q.  So you assumed, then, that that is what

12   occurred, isn't that correct?

13   A.  No, I did not assume it.  I used other

14   information that was in the inspection, including

15   the fact that it was a small-quantity generator.

16   Q.  But, Miss Williams, from the beginning the

17   generator indicated that he was deducting his

18   quantity of waste being generated because he

19   claimed he was recycling, isn't that correct?

20             THE COURT:  Try that question again,

21   please.

22             MR. PIAGGIONE:  Okay.  Withdrawn, your

23   Honor.  I'll come back to that in a little while.

24   BY MR. PIAGGIONE:

25   Q.  Miss Williams, with respect to this

1    Exhibit OOOO, you stated that the definition in the

2    middle was based upon 261.2(b), is that correct?

3    A.   I don't think I gave a regulatory citation.   I

4    said it was based upon the definition of solid

5    waste which is found in the regulations in 261.2.

6    Q.   Okay.  And in those regulations under 261.2

7    there are more definitions for if a material is

8    discarded, isn't that correct?

9    A.   There's one or two others that were not really

10   at issue in this case, and so I didn't include them

11   on the chart.  They have nothing to do with the

12   activities that we're talking about here.

13   Q.   Well, isn't one of them, "Used in a manner

14   constituting disposal, or solid wastes when they

15   are applied or placed on the land in a manner that

16   constitutes disposal"?

17   A.   I believe I have that on there, if you would

18   look at my chart.

19   Q.   Which one is that?

20   A.   It says, "Recycled by being used on the land,"

21   and I think I even gave an example of it when I

22   provided my testimony before.

23   Q.   Miss Williams, there is a separate section for

24   used on the land which follows 1(b) -- excuse me.

25   It's 261.2(c)(1)(B), which is, "Used to produce

1    products that are applied or placed on the land or

2    otherwise contained in products that are placed on

3    the land," isn't that correct?

4    A.   I'm well aware of that exemption, and that's

5    what I have summarized on this chart by saying

6    recycled -- that if materials are recycled in

7    certain ways, based on the type of material, they

8    can be considered to have discard and be a solid

9    waste.   And one of the ones I listed was "used on

10   the land."   And I gave an example of it to the

11   jury, which was the fertilizer example I give.

12   Q.   Correct.   But that is not applied or placed on

13   the land in a manner that constitutes disposal, is

14   it?

15   A.   I'm afraid I don't understand your question.   I

16   mean, there's --

17          THE COURT:   Well, let's leave it at that.

18   BY MR. PIAGGIONE:

19   Q.   Okay.   Does the -- does the definition of solid

20   waste include materials which are applied or placed

21   on the land in a manner that constitutes disposal;

22   and, in fact, there is a separate section, is there

23   not, that says, "Used to produce products that are

24   applied to the land," as in used on the land, isn't

25   that correct?

1    A.   There's one section, and that section under

2    261.2(c) discusses that if you're recycling and the

3    nature of the recycling you're doing is to take the

4    material and use it on the land or to make a

5    product with it where the product you're making is

6    then applied to the land, that that would be

7    considered a solid waste.

8         And, number one, I have included it on my

9    chart; and, number two, I don't believe it's

10   relevant to the situation with regard to the K087.

11   Q.   Again, you still leave out the section "applied

12   to or placed on the land in a manner that

13   constitutes disposal."  Do you know the definition

14   of "disposal," Miss Williams?

15             MR. LINSIN:  Your Honor --

16             THE COURT:  Okay.  Let's -- I mean, you

17   ran two questions in there.  I mean, you've asked

18   her, I think, a number of times.  She said it's

19   included on her chart.  She explained it.  You may

20   not have gotten the answer exactly the way you

21   wanted it, but I think you can argue whatever you

22   want.  Let's move on.

23             MR. LINSIN:  Yes.  Thank you, your Honor.

24   BY MR. PIAGGIONE:

25   Q.   So, Miss Williams, looking at that middle box

1    again for abandoned, isn't "abandoned" further

2    defined in Section 261.2?

3    A.  Yes, it is.

4    Q.  Okay.  And isn't abandoned described as --

5    discarded material that is abandoned as being

6    disposed of, isn't that correct?  Abandoned by

7    being disposed?

8    A.  It's a little more complete than that.  It's

9    disposed of or incinerated.  I mean, there's a

10   definition.

11   Q.  Well, the definition is -- isn't it being

12   disposed of; it just simply says materials of solid

13   waste --

14          THE COURT:  What are you referring to

15   right now, please?

16   BY MR. PIAGGIONE:

17   Q.  Okay.  Excuse me.  Doesn't 261.2(b) state:

18   Materials are solid waste if they are abandoned by

19   being, one, disposed of?  Isn't that correct?

20   A.  That's correct, I think.  I gave an example of

21   that.  When you take material out and you put it

22   out in a part of the field and you leave it there

23   to be disposed of, that's an example of what's

24   meant by disposed of.

25   Q.  And it's -- so the waste on the ground that was

1    placed there in 1978 and stayed, was abandoned by

2    its owner, in your opinion that wasn't being

3    disposed of?

4    A.   The waste that was placed on the ground

5    pre-1978 by the previous owner was disposed of by

6    that owner prior to the effective date of the RCRA

7    regulations.

8    Q.   So that would make it a solid waste, however,

9    wouldn't it?

10   A.   No, because RCRA does not cover materials that

11   were already discarded, abandoned at the time the

12   regulations went into effect, unless those

13   materials were later actively managed.

14   Q.   And it's your opinion that -- did you hear the

15   testimony of -- did you read the testimony of the

16   employees who managed some of that material on the

17   ground?

18            MR. LINSIN:  Your Honor, I'm not even sure

19   what the question is.  Form of the question, your

20   Honor.

21            THE COURT:  It's -- on that grounds I'll

22   sustain the objection.

23            MR. PIAGGIONE:  Okay.  Take a different

24   approach, your Honor.

25

1    BY MR. PIAGGIONE:

2    Q.   Under the definition of solid waste, the first

3    step is to determine if a material is discarded,

4    right?

5    A.   Yes, that's accurate.

6    Q.   And the term "discarded" includes any material

7    that is abandoned or recycled, correct?

8    A.   No.   It includes any material that is abandoned

9    or any material that is recycled in certain ways,

10   not any material that's recycled.   Only certain

11   types of recycling and certain types of materials.

12   Q.   Okay.   Let's talk about recycling.   Materials

13   are solid wastes if they are recycled or

14   accumulated -- I'm going to refer you to 261.2(c)

15   again.   "Materials are solid waste -- "materials

16   are solid waste if they are recycled or

17   accumulated, stored, or treated before recycling,

18   as specified in paragraph (c)(1) through (4) of

19   this section."   And that includes, (1)(A), "applied

20   or placed on the land in a manner that constitutes

21   disposal."   Is that correct?

22   A.   Are you asking me are you reading it correctly?

23   I'm not sure I understand your question.

24   Q.   Isn't it true that if you want to -- if you

25   have to make a determination of the type of

1      material that's being recycled, it has to be a

2      material that's a solid waste that has been

3      abandoned by being disposed of or -- or it's

4      accumulated, stored, or treated, but not recycled

5      before, in lieu of being abandoned, materials that

6      are recycled when they are applied or placed to the

7      land that constitutes disposal.  I'm getting

8      confused.

9                  MR. LINSIN:  Objection.

10                 THE COURT:  Sustained.  Withdraw the

11     question and then do what you think you have to do

12     next.

13                 MR. PIAGGIONE:  You're right, your Honor.

14     BY MR. PIAGGIONE:

15     Q.  Doesn't abandoned also indicate -- excuse me.

16     Doesn't abandoned also include by being

17     accumulated, stored, or treated before or in lieu

18     of being abandoned by being disposed of, burned, or

19     incinerated?  Is that correct?

20                 MR. LINSIN:  Objection to form.

21                 THE COURT:  Sustained.

22     BY MR. PIAGGIONE:

23     Q.  Abandoned is defined in 261.2 as being stored

24     in lieu of the disposal, isn't that true?

25     A.  That is accurate.

1    Q.   Okay.  And it's your opinion that material in

2    the tanks, which was from before 1978 and stayed in

3    those tanks until 2009, was not stored in lieu of

4    disposal, is that correct?

5    A.   It's my opinion that the material in those

6    tanks was already abandoned prior to 1978, and I

7    believe there was even a stipulation on that fact.

8    Q.   And weren't you in the EPA when they created

9    the interim status for facilities that were storing

10   hazardous wastes before 1980 and carried them over

11   past the effective date of RCRA?

12   A.   That would have been true if the material was

13   being stored on the land prior to -- or in the

14   tanks prior to the date -- effective date of RCRA.

15   But in this case the material had already been

16   abandoned.  It had been abandoned, discarded,

17   thrown away.  So it couldn't -- it wasn't affected

18   by RCRA when the effective date of RCRA occurred.

19   It had already been thrown away.  It was an

20   inactive waste unit, and RCRA did not regulate

21   inactive waste management units.

22   Q.   Isn't it true, when you were in EPA, that, in

23   fact, materials left in tanks prior to 1980, when

24   RCRA went into effect, became subject to RCRA as

25   under interim status as being stored subject to

1    RCRA?

2    A.  Completely depends on the circumstances of the

3    situation.  It is possible that if there was an

4    intent to use that material it could have been

5    considered storage, in which case it would have

6    been regulated under RCRA after the effective date

7    of the regulations.  But if it was already

8    abandoned because the intent was there was no more

9    use for it, it was just being thrown away, then it

10   was -- the fact that was in a tank is not what's

11   relevant.  The fact that it was abandoned and there

12   was no intent to use it at the time Tonawanda Coke

13   purchased the facility in 1978 meant that it was

14   not brought into RCRA at the time that the RCRA

15   regulations became effective.

16   Q.  You heard the testimony of Mr. Strickland, is

17   that correct?

18   A.  I was in the courtroom, yes.

19   Q.  And you read the testimony of Mr. Flax?

20   A.  I did.

21   Q.  And they testified that the waste in the tanks

22   which carried over from 1978 to 2009 was subject to

23   EPA regulation, isn't that correct?

24   A.  I mean, I don't have their testimony memorized.

25   I mean, they may have said that.  But, I mean, I

1    would also point out, as I have read the criminal

2    indictment in this case, it doesn't deal with

3    storage of material in the tanks.

4    Q.   The question was:  Did you -- did you read and

5    heard their opinions that indicated that this

6    material was subject to RCRA?  Isn't that correct?

7    A.   I read their -- I read their -- I read

8    Mr. Flax's testimony, and I did hear

9    Mr. Strickland, and, frankly, some of it was

10   confusing to me as to what they were postulating

11   for why that material was regulated.  But it wasn't

12   clear to me whether they were saying the material

13   in the tank had always been regulated or -- what I

14   thought Mr. Flax was saying was after there was

15   some release of the some material after the fire,

16   he thought that material was being stored.  But

17   I'm -- you know, I mean, I'm not an expert on what

18   he said.  I have my own opinions as to whether that

19   material was regulated, and I don't believe it is.

20   Q.   Okay.  So your opinion was, again, different

21   from the EPA officials and the DEC officials who

22   testified in this case, isn't that correct?

23   A.   Well, I think I'd be more comfortable answering

24   by saying my opinion is what my opinion is, and

25   I'll leave it to you to decide whether or not my

1    opinion is different from the EPA opinions.

2    Q.  Okay.  With respect to this chart you have for

3    OOOO, K087 waste would not be in the middle part of

4    this, isn't that correct?

5    A.  When you say it's not in the middle part of

6    this --

7    Q.  The white box, which says "Is material

8    discarded," it's not subject to that sort of

9    analysis, isn't that correct?

10   A.  Well, it's my opinion that the K087, when taken

11   to the coal piles in the coalfield for the purpose

12   of mixing -- it's my opinion that you answer no to

13   all these provisions and you end up on the

14   left-hand side of the chart.

15   Q.  Isn't K087 waste a listed waste by the EPA?

16   A.  I feel like we've gone over this.  It's a

17   listed waste if it's -- it's a listed hazardous

18   waste if it's also a solid waste.  And the purpose

19   of going through the items in the middle of this

20   chart is to figure out the answer to the question

21   of whether it's a solid waste.

22   Q.  And isn't the only reason it would not be a

23   solid waste is if it was being legitimately

24   recycled?

25   A.  If it was being legitimately recycled in

1    certain ways that don't include the ways in the

2    center of the chart.

3    Q.  So it would not be in the center of the chart,

4    is that correct?

5    A.  I'm sorry.  I'm pretty confused at this point.

6              MR. LINSIN:  Your Honor, I'm going to

7    object to the form again.  The witness, first of

8    all, I think tried to answer the previous question,

9    and --

10             THE COURT:  Well, as to the form of the

11   question, that objection sustained.

12             MR. LINSIN:  Thank you.

13   BY MR. PIAGGIONE:

14   Q.  K087 waste is a listed hazardous waste, isn't

15   that -- you stated unless it is being legitimately

16   recycled, isn't that correct?

17   A.  K087 -- it's not exactly correct.  K087 is a

18   listed hazardous waste.  It may or may not be a

19   solid waste, depending upon how it's recycled.

20   Q.  And the difference of opinion between how it is

21   recycled -- the difference -- excuse me.

22   Withdrawn.

23       The difference of opinion between the EPA

24   officials and the DEC officials and your opinion is

25   that the recycling occurs when it's placed in the

1    coke ovens, as opposed to your first step, which is

2    mixing on the coal pile, isn't that correct?

3    A.   That is the one of the reasons.  It's also my

4    opinion that placement of the material on the coal

5    piles for mixing is not land disposal under the

6    definition that's being applied in this case.

7    Q.   Okay.  You did not say that the mixing of the

8    coal tar sludge and the coal was the first step of

9    recycling, therefore land disposal is not applied?

10            MR. LINSIN:  Your Honor, the witness has

11   said both things, and so I object to -- this is

12   beginning to feel like badgering.

13            THE COURT:  Well, I think you need to move

14   on here, Mr. Piaggione.

15   BY MR. PIAGGIONE:

16   Q.   The first stop in recycling for the K087 waste,

17   you said -- stated, was when it was mixed on the

18   coal piles, is that correct?

19   A.   It is my opinion that that would be the

20   appropriate way to look at it.  But independently

21   of that, it is also my opinion that mixing going on

22   on the coal piles in the coalfield does not

23   constitute land disposal as that term has been used

24   in this matter.

25   Q.   Again, I only asked you about the first step in

1    recycling, not anything about land disposal.  If

2    you could please answer the question.

3              MR. LINSIN:  I object, your Honor.

4              THE COURT:  Sustained.

5              MR. PIAGGIONE:  With respect to the first

6    step of recycling, the DEC officials testified and

7    the EPA officials testified --

8              MR. LINSIN:  Objection, your Honor.

9              THE COURT:  Let's move on, Mr. Piaggione,

10   please.

11   BY MR. PIAGGIONE:

12   Q.  With respect to the materials that were left on

13   the ground that you said were not actively managed,

14   did you read the testimony of Mr. Rogers, which

15   indicated that the material was moved from where it

16   was located originally over to and closer to the

17   two tanks on the property?

18   A.  I did read that testimony, yes.

19   Q.  And it's your opinion that that was not

20   disturbing the material?

21   A.  It's my -- it's my opinion that there was no

22   action taken that was intended to move that

23   material.  That movement, to the extent it

24   happened, was incidental to putting a cover over

25   that material.  In my opinion, in my experience,

1    that does not qualify as active management.

2    Q.  So you read an intent into an active

3    management?  Is that it?

4    A.  Well, again, I'm going by the definition that

5    was provided for this case, and it talks about

6    taking an action that would result in physical

7    disturbance and -- or adding additional waste, and

8    under my reading of it, I don't believe that's what

9    was happening.  I believe it would be no different

10   than if I were trying to construct, let's say, a

11   road next to an old waste unit, and in my process

12   of constructing a road some of the gravel fell into

13   the old waste unit.  It's incidental disturbance.

14   It has nothing to do with what I was really doing.

15   So that's my opinion on how that definition would

16   be applied.

17   Q.  And Mr. Flax's opinion disagrees with your

18   opinion, is that correct?

19   A.  You know, you're -- I'm finding it difficult to

20   answer your question.  I did read his testimony,

21   but I really don't feel like I'm an expert on his

22   testimony, so I feel like I'd be more comfortable

23   if you would just ask me about my testimony.

24   Q.  Okay.  If Mr. Flax testified that the movement

25   of this material from where it was to closer to the

1    tanks constituted active management, that would be

2    in disagreement with your opinion, isn't that

3    correct?

4    A.   That would be correct.

5    Q.   And if Mr. Strickland testified that the

6    movement of that material that was on the ground

7    over to the storage tanks was active management,

8    that would be in disagreement with your opinion, is

9    that correct?

10   A.   Again, you're talking about the movement that

11   occurred when the coke breeze was put on --

12   Q.   And run over with heavy equipment, yes.

13   A.   Yes.  My opinion would be in disagreement with

14   that opinion.

15   Q.   Okay.  And your -- and if Mr. Flax testified

16   that the mixing of the coal breeze with the coal

17   tar sludge -- excuse me -- mixing of the coal

18   breeze with the material on the ground constituted

19   a change --

20          MR. LINSIN:  Your Honor -- form of the

21   question, your Honor.

22          THE COURT:  Why don't the attorneys join

23   me here.  And, ladies and gentlemen, we'll be right

24   back with you.  Are you doing okay?  Okay.

25          (Side bar discussion held on the record.)

1              THE COURT:  Okay.  You have, I mean, it's

2       form-of-the-question objection, I think.  How much

3       more do you have?  And the reason why I ask is, you

4       know, very honestly -- do you have a lot?

5              MR. PIAGGIONE:  Not a lot, your Honor.  I

6       haven't -- not a lot.  If you want to adjourn for

7       five minutes or so.  I've got about five minutes

8       left.

9              THE COURT:  I may do that, but I'm going

10      to just tell you right now, if it continues this

11      way, I don't think it should go on.  Frankly, the

12      jury is somewhat tuned out.

13             MR. PIAGGIONE:  Yes.

14             THE COURT:  And if there are additional

15      objections along these same lines, I will sustain.

16             MR. LINSIN:  I'm trying to resist, your

17      Honor.  I just -- I feel like we're going over and

18      over the same topics.  The form is not clear in

19      terms of what is even being asked about, and I --

20      the witness has indicated that confusion

21      repeatedly, and I just -- I would ask that we

22      expedite this process rather than drag it out.

23             THE COURT:  Okay.  I'll give you the five

24      minutes.

25             MR. PIAGGIONE:  Thank you, your Honor.

1          THE COURT:  But I expect it to be short

2     and to the point, and then we'll try to wrap up

3     this witness in short order.  Okay?

4          MR. PIAGGIONE:  Okay.

5          THE COURT:  I'm going to give the jury

6     five minutes outside of the courtroom, so they just

7     get --

8          (End of side bar discussion.)

9          THE COURT:  Okay.  We're going to move

10    things along, but we want to give you like a

11    five-minute break so we can get everything

12    assembled here.  We will bring you back, try to

13    finish up Miss Williams, and send you home with a

14    day off as a bonus.

15         THE JURY:  Our questions for the witness?

16         THE COURT:  Yeah, you're going to have the

17    opportunity to do that as well, okay.  I think we

18    need to do that, because you're not going to see

19    Miss Williams again.  Okay?  All right.  Does

20    anybody object to my questions?  All right.  We'll

21    see you in five minutes.

22         (Jury excused from the courtroom.)

23         THE COURT:  You want to take a five- or

24    ten-minute break?

25         (Short recess was taken.)

1          (Jury seated.)

2          THE COURT:  Okay.  Welcome back.  Have a

3     seat, and we'll get started.  The attorneys and

4     parties are back present.

5          Mr. Piaggione, I think you will resume as far

6     as Marcia Williams is concerned.  She remains under

7     oath.  And we'll wrap up.

8          MR. PIAGGIONE:  Thank you, your Honor.

9     BY MR. PIAGGIONE:

10    Q.  Miss Williams, you make a reference to

11    continuous production process?

12    A.  Yes.

13    Q.  Where is that located in the RCRA regulations?

14    A.  Well, it's actually located in 261.6 of the

15    regulations, and that's the section that says that

16    the recycling process itself isn't regulated, and

17    you have to combine that with the fact that the

18    only thing that is regulated is storage before

19    recycling.  So there's no definition in the

20    regulations, but if you look at what's regulated,

21    you'll see that the recycling process itself is

22    exempt from requiring any type of permit.

23    Q.  So that term is not defined in RCRA, is that

24    what you're saying?

25    A.  It's only discussed in preamble language.

1    Q.   Okay.

2               THE COURT:   When you say "term," you're

3    talking about the continuous production process?

4               MR. PIAGGIONE:   Yes, your Honor.

5               THE COURT:   Okay.

6    BY MR. PIAGGIONE:

7    Q.   And with respect to the land-based production

8    units, that refers to something that occurred in

9    2008, is that correct?

10   A.   Well, the terminology was introduced in 2008.

11   The actual concept was -- existed before then, but

12   the -- the new term was included in the regulations

13   in 2008.

14   Q.   Could we have Government's Exhibit 3.04 already

15   in evidence, please?

16       Miss Williams, it's your opinion that this

17   material in the tank depicted in this photo is not

18   being actively managed, is that correct?

19   A.   Yes.   It's my opinion that that is part of a

20   material that was abandoned prior to the effective

21   date of RCRA.

22               MR. PIAGGIONE:   No further questions, your

23   Honor.

24               THE COURT:   Okay, Mr. Piaggione.   Thank

25   you.

1        Any redirect, Mr. Linsin?

2             MR. LINSIN:  I have no redirect questions,

3    your Honor.  Thank you.

4             THE COURT:  Okay.  Mr. Personius?

5             MR. PERSONIUS:  Thank you, no, Judge.

6             THE COURT:  Okay.  All right.  Ladies and

7    gentlemen, if you have any questions that you would

8    like me to consider asking, if you would --

9        Chris, we're going to put you to real use this

10   afternoon.  So let's see if you can collect

11   anybody's questions that want to be submitted to me

12   for consideration, and I'll review them and discuss

13   them with the attorneys.

14       Does anybody mind if I would just run these and

15   have copies made, and then I'll distribute them to

16   the attorneys, and we can work off of the copies,

17   is that okay?

18            MR. LINSIN:  That would be very helpful.

19   Thank you, your Honor.

20            THE COURT:  It should only take a second,

21   if you wouldn't mind, and put them all on one page

22   except this one, because this one has both sides,

23   okay?

24       Mr. Moeller has been looking forward to

25   becoming a courtroom deputy and manager for years

1    now, ladies and gentlemen.  The very first

2    opportunity that he's had.  My problem is he's

3    probably retained an agent, and I'm going to have

4    to negotiate an increase in salary.

5        I hope you don't mind that I did that.  But

6    it's difficult when I have to run the questions by

7    the attorneys and I'm the only one that has a copy,

8    so it makes it a little bit difficult for them to,

9    even without notes, understand what I have to say,

10   and then when I have notes, it's equally as

11   difficult I think.  So, just bear with us, and

12   we'll get through it.  And thank you.

13       It really is important that you make the effort

14   that you're making to stay engaged in this case.

15   Because, you know, there is a lot of effort that's

16   gone into it from your standpoint and everybody's

17   standpoint, and it's the only way we can get to

18   resolve this case.  Because, as I've said to you at

19   the beginning when we were impaneling the jury,

20   that when this is all over with, there will be

21   nobody, frankly, that will have the information

22   that you have to the extent that you will have in

23   trying to resolve all of the issues in this case.

24   And you know it's an important case.  It's a

25   criminal case, and it involves the defendants, who

1    have entered these not guilty pleas all along the

2    line, 1 through 19, and the government who's

3    charged with the responsibility of enforcing the

4    laws of the United States.

5        So, we have to apply the rules.  This is what

6    our system is about, getting individuals like

7    yourselves that are willing to really do the kind

8    of hard work that you're doing right now to get the

9    case resolved by unanimous verdict.  That's really

10   a significant contribution to our system of

11   justice.  So, we are very, very grateful.  And I'm

12   speaking for myself, but I know that that's the

13   sentiment of all of us, because we do take this

14   responsibility and these duties very seriously.

15       From the length of time that it's taken for

16   Mary to get back here, I'm kind of running out of

17   things to say.  There she is.  Okay.  It's a

18   question of respect, ladies and gentlemen.

19       And probably what I'm going to do here is

20   handle the questions randomly, but I'm going to do

21   it in numerical order, so the juror with the lowest

22   number in our grouping, I'll take that question

23   first, and I'll discuss it with the lawyers and

24   we'll move on.

25       I don't know how that boils down to you, Miss

1    Majerowski, but --

2           A JUROR:  It wasn't my question.  It was

3    Dawn.

4           THE COURT:  You're number five, right --

5    no, you're not.  I'm sorry.  Thank you.  Okay.

6    Now, if I could only count, that would make things

7    go better.

8      Okay.  We're going to work with Juror number

9    5's question, and I'm going to ask the attorneys to

10   approach the bench in just a moment.

11     Lets come on up on Juror number 5's question I

12   think.

13           (Side bar discussion held on the record.)

14           THE COURT:  All right.  This is Juror

15   number 5, this Ms. Funderburk's question.  "How can

16   the K087 process be considered recycling if the

17   K087 hit the ground and is not used for a period of

18   time under RCRA."  Okay?

19           MR. MANGO:  Fair.

20           THE COURT:  Okay.  Two, "What happens with

21   natural elements, such as rain or snow, when it

22   hits piles within a period of time and not being

23   used, natural runoff?  How is that considered to be

24   recycling the tar sludge?"

25           MR. LINSIN:  I have no problem with that

1    question either.  I might just suggest remove the

2    term under RCRA to the front of each of the

3    questions rather than having it at the end.  But I

4    have no problem with the substance of the question.

5              THE COURT:  All right.  Same thing, Mr.

6    Piaggione?

7              MR. PIAGGIONE:  No problem, your Honor.

8              THE COURT:  Okay.  I think that's a good

9    suggestion, because all these questions are under

10   RCRA.  And the question is the natural element,

11   rain or snow, when it runs off coal piles into

12   ditches, would this be considered hazardous waste?

13     I think we can ask that question as well, okay?

14             MR. LINSIN:  Okay.

15             THE COURT:  Lets do these and we'll come

16   back.

17             (End of side bar discussion.)

18             THE COURT:  Okay.  Miss Williams, I have

19   three questions for you from one of our jurors.

20   And I'm going to ask all three, okay?  And ask you

21   to, if you understand them, answer them to the best

22   that you can.

23     Under RCRA, how can the K087 process be

24   considered recycling if the K087 hit the ground and

25   is not used for a period of time?

1            THE WITNESS:  Well, I guess the first part

2   of the answer would be when did the K087 -- if the

3   K087 hit the ground, when did it hit the ground?

4   If it hit the ground before you ever started the

5   recycling process, then that would -- that would

6   potentially be disposal if it wasn't cleaned up.

7        If it hit the ground once it entered the

8   recycling process, that would be similar to what

9   would happen at a production facility if you had a

10   drip or a spill.  And I guess it would all depend

11   really on how consequential that was, if it was a

12   very small amount, you know, and it didn't violate

13   any other permits that the facility had.

14   Typically, I mean, small incidental releases do

15   sometimes happen.

16        If a large amount hit the ground even at a

17   production facility, it would need to be cleaned

18   up, and if it wasn't cleaned up, potentially it

19   could be determined to be regulated under RCRA.

20   But I have to say in my experience, I've really

21   never seen that happen at a production facility.

22   And I haven't typically seen it happen in a

23   recycling facility.  So I don't know if that

24   answers it.

25            THE COURT:  That's your best answer to

1    that question.  All right.

2        Under RCRA, what happens with natural elements

3    such as rain or snow when it hits piles within a

4    period of time and not being used, that is, natural

5    runoff.  How is this considered to be recycling the

6    tar sludge?

7            THE WITNESS:  Well, in terms of what gets

8    into the runoff, let's say when it rains, that, of

9    course, is very dependent upon what the material is

10   and whether that material is soluble in water or

11   it's not soluble in water.  And the extent to which

12   it runs off is also very fact specific typically.

13   I mean, it may percolate down into the coal pile.

14   It may make it down a few feet.  It may make it

15   down further.  So that's all pretty fact specific.

16       If it were a production facility runoff -- let

17   me see if this helps.  If there's no coal tar being

18   mixed in with the coal, the runoff -- obviously it

19   rains and the rain hits the coal and the coal

20   itself could contaminate the runoff as well.

21   That's normally handled under a Clean Water Act

22   permit.

23       So if you have recycling that's like

24   production, the normal way in which that kind of

25   runoff is handled is through a Clean Water Act

1    permit.

2              THE COURT:  As opposed to RCRA?

3              THE WITNESS:  As opposed to RCRA.

4              THE COURT:  Okay.  And under RCRA -- this

5    is the last of three -- is the natural element rain

6    or snow when it runs off the coal piles into

7    ditches, would this be considered a hazardous

8    waste?

9              THE WITNESS:  The answer -- it's a good

10   question.  Again, if it was -- if K087 waste

11   actually mixed with that material, it could be

12   considered a hazardous waste.  But, again, if it --

13   if the K087 had already entered into the recycling

14   process, it wouldn't be K087 at that point.

15       So again it depend -- if -- if when the rain

16   hits it it's a hazardous waste and a solid waste at

17   that point in time, and then the rain hits it and

18   the rain mixes with it so that what's running off

19   is really a combination of both the rain and some

20   of the material in the K087, then it can be a K087

21   waste.

22       But if it's already in the recycling process,

23   then it wouldn't be a solid waste, so it wouldn't

24   be a hazardous waste, and the runoff would not be a

25   K087.  So it's a complicated answer.  But it

1    depends on sort of the exact fact pattern.

2            THE COURT:  Okay.  So it may be a

3    hazardous waste, but not a solid waste, and if it's

4    not a solid waste, then it's not RCRA regulated?

5            THE WITNESS:  Well, if it's -- if it's

6    already in the process of recycling, at that point

7    it would be really -- it wouldn't really be a waste

8    at that point.  There would be runoff, and if you

9    collected that runoff and tested it, you might find

10   that it was hazardous, you might find it isn't.

11           THE COURT:  And we're talking about the

12   runoff.  But is it a solid waste at that point once

13   it's collected off of the recycling process?

14           THE WITNESS:  If it's collected in one

15   place, yes, it could be a solid -- it would be a

16   solid waste, unless you were going to recycle it.

17   The runoff now we're talking about.

18           THE COURT:  Okay.  Those are the answers

19   to three questions.

20      The next would be from Juror number 9.  If you

21   take a look at that and come up here, please.

22           (Side bar discussion held on the record.)

23           THE COURT:  Okay.  As I read this

24   question, the question is intent versus impact.

25   "Is this what determines how RCRA views the active

1    treatment or management of K087?  Does this

2    determine how the treatment is classified?"

3              MR. MANGO:  That is a tricky question,

4    your Honor, because obviously there's the intent in

5    this case is just simply a knowledge element under

6    RCRA.  And we've already obviously handled the

7    issue regarding is there an intent to dispose

8    necessary in RCRA, and your Honor's already ruled

9    that there is not.

10             THE COURT:  But the knowledge element will

11   be made and defined for the jury.

12             MR. MANGO:  Yes.

13             THE COURT:  With respect to the essential

14   elements, so --

15             MR. LINSIN:  Your Honor, my suggestion on

16   this question would be that the first line of the

17   question simply be struck, so that the question

18   would read what determines how RCRA views the

19   active treatment or management of K087.  Does this

20   determine how the treatment is classified?

21             THE COURT:  That does eliminate the entire

22   quandary as far as intent and knowledge and

23   definition so -- well, let's try it.  Let's see if

24   we have an issue with that.

25             MR. MANGO:  Your Honor, one thing I wanted

3564

1    to bring up.  This is off topic, but there was a

2    reference to treat and dispose in one of the counts

3    of the indictment.  We had moved to take that treat

4    language out, so --

5              THE COURT:  Oh, that's right.  I decided

6    that too.

7              MR. MANGO:  You decided it and it was

8    taken out.  I don't know if it --

9              MS. GRASSO:  It was left in in one spot.

10             MR. LINSIN:  It remains unfortunately in

11   the text in one part of the count, the verb or the

12   earlier part of Count 18 is just dispose of, but

13   then it references a -- without a permit to treat

14   or dispose.  So, that's why the witness had focused

15   on the issue of disposal.

16             THE COURT:  Yeah.

17             MR. MANGO:  I think that -- we would have

18   made -- if we didn't, I'll have to look at our

19   motion to strike, but we would have asked -- we

20   would now ask to take that language out too as

21   surplusage.

22             THE COURT:  Okay.  But it was in the

23   indictment.

24             MR. MANGO:  Yeah.

25             THE COURT:  I was looking at it.  But I do

3565

1    remember that.  Okay.  Okay.

2              MR. LINSIN:  All right.

3              THE COURT:  Well, let's do this question.

4              (End of side bar discussion.)

5              THE COURT:  All right, Miss Williams,

6    they're counting on you to answer this now.

7              THE WITNESS:  Okay.  I'll do my best.

8              THE COURT:  Okay.  And I think you can see

9    that the jurors consider this to be very important,

10   so --

11       What determines how RCRA views the active

12   treatment or management of K087?  In other words,

13   does this determine how the treatment is

14   classified, question mark.

15             THE WITNESS:  Let me think about this for

16   a second.  I'm not sure if I totally understand it.

17             THE COURT:  Sure.

18             THE WITNESS:  Could I just -- could you

19   read it for me one more time?

20             THE COURT:  Absolutely.  What determines

21   how RCRA views the active treatment or management

22   of K087?  That is, does this determine how the

23   treatment is classified?

24             THE WITNESS:  I'm a little confused about

25   whether the word treatment is meaning treatment in

1    the RCRA like --

2              THE COURT:  We're going to do it in

3    context of RCRA.

4              THE WITNESS:  So RCRA treatment, the way

5    the word is used in the regulation?

6              THE COURT:  Yes.

7              THE WITNESS:  Okay.  Well, as I explained,

8    RCRA -- there is a definition of RCRA treatment.

9    And if you have a solid waste -- a material that is

10   both a solid waste and a hazardous waste, and if

11   that material is changed either physically,

12   chemically, or biologically for one of those

13   purposes that's in the definition -- so let's just

14   say if it was changed chemically because you want

15   to neutralize it, then that would be a

16   RCRA-regulated activity.  The exact nature of the

17   RCRA regulation might depend on the exact type of

18   treatment and how you were doing it.  I don't know

19   if I've answered the question.

20       But in other words, RCRA treatment, if you take

21   a newly generated waste, and you're going to -- you

22   want to do something with it, you want to treat it,

23   you look to see if it meets both -- if what you're

24   doing to it meets both parts of this definition.

25   And if so, assuming it's both a solid waste and

1    hazardous waste, then it would be regulated in some

2    fashion.  It might need a permit, it might not.  It

3    would depend on exactly what was being done.

4           THE COURT:  Now are you contrasting that

5    with management?

6           THE WITNESS:  Well, active management -- I

7    think there is a definition that has been provided

8    for what's active management.  I was talking about

9    the treatment piece.

10          THE COURT:  Okay.  So the definition of

11   active management is set for purposes of the

12   instruction the jury will get.

13          THE WITNESS:  Yes.

14          THE COURT:  But given that, and without

15   referencing that definition at this point, is there

16   any way that you can contrast the two for purposes

17   of answering this question?

18          THE WITNESS:  Other than to sort of go

19   back to the definition that will be provided, which

20   I don't think I should -- you would want me to do,

21   I think -- I mean, the concept of active management

22   comes into play if something has already been

23   abandoned, and then you actively manage it.  And

24   the concept of active management is you might bring

25   it back into the system in a way that it could be

1    regulated again.

2        If it's already been discarded before the

3    effective date of the regulations, it's not

4    regulated.  If it's actively managed based on the

5    definition that will be in effect for this case,

6    then it could be brought back in and you'd

7    reclassify it at that point and figure out if it

8    was covered by RCRA.

9            THE COURT:  And that's different from

10   active treatment how?

11           THE WITNESS:  Well, the definition of

12   treatment is different from the definition of

13   active management.  So, it's possible that if you

14   were -- let's take an inactive waste unit.  If you

15   are actually doing something in that unit to treat

16   the waste, then it would constitute active

17   management.  I don't know if that helps, but -- so,

18   if you were treating material that had been

19   previously abandoned after the date the regulations

20   took effect, then that -- then that treatment would

21   likely constitute active management.

22           THE COURT:  If you have a follow-up

23   question, I'll allow you to ask it if you write it

24   out, because I see some heads.  We'll work with

25   that.

1          Let me ask the next question, which I think

2     while everybody -- well, we will break.  But I

3     think this is a little less complicated, if you

4     will.

5          I think the question to you is how do you know

6     how deep the coal is under the piles, because you

7     rendered some of your answers and opinions based on

8     how deep you believed that the coal was.  And I

9     think that's what the question is directed to.

10          THE WITNESS:  I saw reference to that in

11     some of the interviews, the Government Exhibits

12     interviews of the Tonawanda Coke employees that

13     discussed the depth of the coal field underneath

14     the piles.

15          THE COURT:  Okay.  All right.  We're going

16     to try to get back to your question through the

17     follow-up questions, and if you have another one --

18     this is on the earlier one, I'll take another look

19     at it, if it's not satisfactory to the jurors.

20          Okay.  This question that comes up next, and I

21     won't call the attorneys up here, because it's the

22     same question essentially but from another one of

23     the jurors.  And "How did you determine the depth

24     of the coal in the coal field at Tonawanda Coke

25     that you mentioned in your testimony?"  And you've

1    answered that for us, right?

2              THE WITNESS:  Yes.

3              THE COURT:  Unless there's an objection or

4    you want a discussion, I'm going to ask the next

5    question on this last sheet.

6              MR. MANGO:  That's fine with the

7    government.

8              MR. PERSONIUS:  Okay with us, Judge.

9              MR. LINSIN:  No objection, your Honor.

10             THE COURT:  Okay.  And this is depth of

11   coal related I think.  "What is the proper depth of

12   coal under RCRA regulation that allows K087 to be

13   considered legitimately recycled in the coal

14   field?"

15             THE WITNESS:  The regulations don't have

16   any specified depth.  I think what the regulations

17   say is if you put it back into the normal

18   production process, and then it would be not a

19   solid waste.  So I think that's the guidance that

20   the regulations can give you.  So if it's being

21   done in a raw material pile, there's no specified

22   thing that -- part of the regulation that says

23   well, that has to be 5 feet above the ground or

24   2 feet.  It just -- the regulations just talk about

25   putting it back with the feedstock.

1           THE COURT:  Okay.  Okay.  Are there any

2     other questions that -- and I'll give you a little

3     bit of time to write them out in follow-up to where

4     we're at at the present time.

5        And, Mr. McDonell, I'm going to be giving some

6     definitions that relate to certain of the

7     elements -- well, the critical elements of the

8     different charges at the end of the case that

9     should be of assistance I think in terms of matters

10    like knowledge and the like, so -- you know, we

11    will try to sort out your question, because I think

12    that's the one that was being discussed answer-wise

13    that some of the jurors were looking a little

14    perplexed.  And we'll try to get that straightened

15    out.  If you need to follow up with us, we will

16    entertain that.  All right.

17       Please, Chris.  Did everybody have enough time

18    to write out -- okay.  It looked like you were

19    performing some magic on it to make sure that it

20    got here.  All right.

21           A JUROR:  Do you understand the question?

22    I'm sorry, I don't mean to be out of line here.  Do

23    you understand my question?

24           THE COURT:  Yeah, I do.  And I'll just

25    read this out, because it kind of comes back to the

1    answer that Miss Williams tried to give you, okay.

2        And I think it's going to be obvious to you,

3    Miss Williams.  And I'm not trying to lead you or

4    anything, but the jury still has some questions

5    with respect to what is treatment and what is

6    active management, okay?

7        And in the context of Mr. McDonell's question

8    that I read earlier which is:  "Under RCRA, what

9    determines how RCRA views the active treatment or

10   management of K087?  Does this determine how the

11   treatment is classified?"  Okay.  So we're talking

12   treatment, management.  The jury is perplexed

13   because the question is:  "Please elaborate in more

14   detail what is treatment, what is active

15   management."  And they're talking about K087.

16            MR. LINSIN:  Your Honor, may I --

17            THE COURT:  You want to come up?

18            MR. LINSIN:  Just very briefly.

19            THE COURT:  Sure.

20            MR. LINSIN:  I just think it may be

21   helpful.

22            THE COURT:  I'm not judging the questions

23   just so you know.  That's why we ask you to do

24   this, because whatever we can do to help you

25   clarify in your minds what you need to deal with,

1    that's what we are I trying to accomplish for you,

2    okay?

3              (Side bar discussion held on the record.)

4              MR. LINSIN:   The reason I asked to

5    approach is this.   The terms "treatment" and

6    "active management" for the purposes of this case

7    relate only to Counts 17 and 18 that deal with D018

8    waste.   The jury's task in evaluating those terms

9    and their meaning don't relate to the facts or

10   circumstances regarding the management of K087.

11   And I think that may be part of the witness's

12   struggle here that the application of those terms,

13   as I understand the government's theory, doesn't

14   relate to how the K087 was handled.   It relates to

15   the management or interaction with the materials in

16   the tanks or on the ground around the tanks, and

17   so -- I was going to say something earlier, but my

18   concern is that asking the witness to again define

19   how those terms relate to the K087 I think may be

20   taking it further away from an understanding of

21   what the issues really are, because those terms

22   have applicability only for 17 and 18, with respect

23   to the D018.

24             THE COURT:   The government disagrees

25   though.

1           MR. MANGO:  Yes.

2           THE COURT:  How so?

3           MR. MANGO:  Your Honor, there is no active

4    management involved in Count 18 of the indictment.

5    That's the scooping out of the material from the

6    tank.  That has nothing to do with active

7    management.

8           MR. LINSIN:  I stand corrected.  And I

9    agree with counsel, your Honor.  You're right.

10   Those terms relate only to Count 17.  Further

11   making my point I think that asking the witness to

12   discuss those terms with regard to K087 is just

13   going to confuse the issue rather than clarify it.

14       And if -- what I would suggest, if the Court is

15   willing, is that the Court give a preliminary

16   guidance to the jury that those terms, for the

17   purposes of resolving the issues in this case,

18   relate to the material referenced in Count 17, and

19   that -- and ask them -- the witness to address

20   those terms as it pertains to the materials charged

21   in Count 17.  And I just think that would help on a

22   number of levels.

23          THE COURT:  Okay.  I think focusing on

24   Count 17 is a big help.

25          MR. MANGO:  Yes.

 1              MR. LINSIN:  Yes.

 2              THE COURT:  Directing the witness to

 3     respond to those terms in the context of 17 should

 4     be a big help.  And then I'll further tell the jury

 5     that they will get further instructions from me.

 6     They're all encompassing.  It should be enough for

 7     them to apply when it comes to considering

 8     Count 17.

 9              MR. LINSIN:  But as you -- as you pose the

10     question -- or prior to your posing the question

11     focused on 17, if perhaps you could explain that

12     you are modifying it based upon what the -- how

13     these terms actually apply to the charges in this

14     case, and so you're asking the witness to address

15     those charges with respect to the material in

16     Count 17.

17              THE COURT:  All right.  Agreed?

18              MR. MANGO:  Agreed.

19              THE COURT:  Okay.

20              (End of side bar discussion.)

21              THE COURT:  Okay.  I'm going to have them

22     come back just for a second.

23              (Side bar discussion held on the record.)

24              THE COURT:  Let me pose something.

25     Mr. Linsin has made the question in scope limited

1      to Count 17.

2                MR. MANGO:  Yes.

3                THE COURT:  My sense is I can ask the

4      question, but you can probably ask the question

5      better than I can.  I propose that Mr. Linsin ask

6      the question, unless the government objects, which

7      would give it its proper focus.  If you need to ask

8      a follow-up question, I'll let the government ask a

9      follow-up question.  Does that work from your

10     standpoint?

11               MR. MANGO:  That's fine.

12               MR. LINSIN:  I have no problem.

13               THE COURT:  I would be more comfortable

14     with that.

15               MR. MANGO:  Just if we can keep it limited

16     to the question and not -- considering where we're

17     at at this point.  That's -- no objection, your

18     Honor.

19               THE COURT:  All right.  I think that makes

20     sense, because I may throw something in there, as I

21     often do, that gets us on another path.  So, we

22     don't have to have another line in the chart.

23               MR. PERSONIUS:  Judge, you don't want me

24     to ask the question?

25               THE COURT:  Absolutely not, Mr. Personius.

1              (End of side bar discussion.)

2              THE COURT:  Okay.  And, you know, if we

3      need to go a little bit further with this we will,

4      but I think -- if I had to write these questions

5      out, they wouldn't be as good as yours probably in

6      all seriousness.  But what I think would be helpful

7      on this particular question and the concern that's

8      expressed is if I let Mr. Linsin ask the question,

9      at my request.  And I'll tell you why.  Because the

10     question is a question limited to Count 17 only.

11     All right.  So that's going to help your focus.

12     And at the end I'm going to give you I think the

13     detailed instructions that will enable you to

14     address any concerns that you may have in the

15     context of the question, because my instructions

16     will be related to Count 17.  So I asked Mr. Linsin

17     if he would ask the question relating to Count 17

18     for your benefit, and then that may help

19     Miss Williams.  And I'm going to give the

20     government the opportunity to ask a follow-up

21     question if they choose to, so that from their

22     respective standpoints, not mine, okay, because I

23     don't have the perspective that they do, nor the

24     experience, nor the intelligence, to get this out

25     the way that you might want it.  So, if that's okay

1   with you, that's the way I'm going to propose to do

2   it.

3       Miss Williams, I think that will, keeping our

4   fingers crossed, make it a more direct way of

5   getting to an answer that will be specific as to

6   Count 17, the only count that's affected by this

7   question.  Okay.

8       Mr. Linsin, if you would please, and you know,

9   to make this more informal, stay down there, if you

10  don't mind, please.

11          MR. LINSIN:  I'm happy to.

12          THE COURT:  And I feel comfortable doing

13  it this way, because it's kind of conference room

14  like discussion, so if you would.

15          MR. LINSIN:  I will try to break this into

16  a couple of parts that are faithful to the intent

17  of this question.

18      Miss Williams, in your review of the issues in

19  this case, have you made reference to your

20  understanding of how RCRA defines treatment and the

21  definition of active management that has been given

22  for the purposes of this case?  Have you made

23  reference to those definitions?

24          THE WITNESS:  Yes, I have.

25          MR. LINSIN:  All right.  And is it

1    accurate to say that your consideration of those

2    terms relate to the substance of Count 17 in the

3    indictment that concerns the alleged unpermitted

4    storage of material around the Barrett tanks?

5              THE WITNESS:  Yes, that's correct.

6              MR. LINSIN:  All right.  Now with that as

7    predicate, would you please explain to the jurors

8    how you apply those terms "treatment" to determine

9    whether that material had been treated as defined

10   under RCRA, and also how you apply the concept of

11   "activity management" as defined for this case to

12   determine whether that material that was on the

13   ground around the tanks had been either treated or

14   actively managed so it would subject it to RCRA

15   regulation?

16             THE COURT:  Do you understand that

17   question?

18             THE WITNESS:  I think I do.  Yes, I

19   believe I understand it.

20             THE COURT:  Okay.  All right.  So please

21   attempt to answer that and then Mr. Mango.

22             THE WITNESS:  Okay.  So in my evaluation

23   of Count 17, this was the material that had been

24   abandoned prior to the effective date of the RCRA

25   regulations.  And I looked at whether or not that

1    material was actively managed, and I concluded that

2    it was not actively managed.

3        And I also looked at the question of whether it

4    was treated.  The reason I looked at the question

5    of whether it was treated was because if it had

6    actually been treated, that could have been a form

7    of active management, so it was really a subset.  I

8    looked at the treatment question, because if it had

9    been treated, it could have been an indication that

10    it was actively managed.

11              MR. LINSIN:  And what was your --

12              THE WITNESS:  It doesn't help?

13              A JUROR:  It doesn't, I'm sorry.

14              THE COURT:  But so far, right --

15              A JUROR:  Your question is posed

16    correctly, but the thing is it's not basically --

17    I'm basically saying okay, there's a mixing of this

18    coal tar sludge with the coke in the piles, okay?

19    Is that mixing of the sludge and the pile, with the

20    mixing, is that a treatment of the mixing, or is it

21    an active management?  Which one is it?  Is it

22    treatment or is it active management?

23              THE WITNESS:  Okay.  This is why I think

24    in the question to me Mr. Linsin distinguished

25    between what was going on with K087 on the coal

1    piles from that -- the Count 17 which only dealt

2    with the material -- the D018 material that was in

3    the tanks and around the tanks.

4         So the issue of active management is only

5    relevant for the Count 17 material, the material

6    that was abandoned prior to the date of RCRA.  And

7    the reason it's a relevant question for that is

8    because even though it was -- this material was

9    disposed of before the effective date of RCRA, and

10   therefore not normally covered by RCRA, if that

11   material was considered to be actively managed,

12   that could bring it back into RCRA regulation.  So

13   that's why -- that's why I was asked a bunch of

14   questions about did I think that particular

15   material, the D018 material, on the ground was

16   actively managed.

17        With regard to the K087 material that was taken

18   from the tar decanter and put on the coal piles,

19   you don't really have -- you don't need to answer

20   the question of whether it was actively managed.

21             THE COURT:  For Count 17.

22             THE WITNESS:  Well, Count 17 doesn't

23   include K087.  So K087 is involved in Count 19.

24   And so for Count 19 that involved the K087, we

25   don't need to answer the question of active

1    management, because we know this material is newly

2    generated.  We know it's being managed, and the

3    question is, is it being managed as a solid waste

4    as well as a hazardous waste, and where does the

5    recycling begin.  So we don't -- for Count 19 that

6    involves K087 we don't need to address the active

7    management issue.

8        But we do need to address it for Count 17,

9    because that material has already been thrown away

10   a very long time ago.  And as a result, it's not

11   covered by RCRA unless you determine that that

12   material has been actively managed in the time

13   frame of the charge.

14           THE COURT:  So in the vernacular, the old

15   stuff needs to be actively managed.  The new stuff

16   doesn't.

17           THE WITNESS:  The new stuff is being

18   actively managed by definition.

19           MR. LINSIN:  Your Honor, may I, with one

20   additional clarification, if I may.  Count 18

21   addresses the material that was excavated from one

22   of the those tanks, and then put back into the coal

23   piles, mixed in the coal piles.  In your opinion,

24   Miss Williams, is the excavation of some of that

25   material active management?

1          THE WITNESS:  Yes, it is.  The material

2     that's being excavated is actively managed.

3          A JUROR:  Thank you.

4          MR. LINSIN:  All right.  Now that -- that

5     active management of the material that's being

6     acted -- of the material that is scooped out of the

7     tanks, does that active management then subject

8     that scooped out material to RCRA regulation?

9          THE WITNESS:  And the answer is it depends

10    on what you're going to do with it.  But in my

11    analysis of what was done here, which is it was

12    scooped out -- it's actively managed, it's scooped

13    out, so now you have to go back and say, this

14    material which would classify as a D018 hazardous

15    waste, given what you're going to do with it, is it

16    also a solid waste?  And so you go back and do that

17    same analysis, which says if I put it on the coal

18    piles and I mix it, is it a solid waste?

19          MR. LINSIN:  And one last point if I may.

20    Once you've scooped out some of that material from

21    the tank, and as you've said, actively managed it,

22    does that active management of the scooped out

23    material change the RCRA status, if you will, of

24    the stuff that's still in the tank?

25          THE WITNESS:  No, it doesn't, because that

1    material hasn't been actively managed yet.

2            THE COURT:  Okay.  Yes, Mr. Mango.

3            MR. MANGO:  That's what I'd like to ask

4    the question about.  Miss Williams, my name is

5    Aaron Mango.  Hello.  It's your testimony, so the

6    jury understands this, that in that tank where the

7    material was scooped out, the process of scooping

8    that material out, and what is left behind is now a

9    fresh surface to be exposed to the rain, to the

10   snow, to the wind, to the elements.  It's your

11   testimony that that fresh surface now, that clean

12   surface of D018 waste is not being actively

13   managed?

14           THE WITNESS:  That's correct.  What's

15   being actively managed is what's scooped out, not

16   what's still left.

17           MR. MANGO:  Okay.

18           THE COURT:  Okay.  Progress?

19           A JUROR:  Yes.  Thank you.

20           THE COURT:  Okay.  All right.  Terrific.

21   Terrific.  Okay.  You know, I wish I could buy you

22   dinner, but it doesn't work that way.

23           A JUROR:  How about some drinks?

24           THE COURT:  Well, I could probably do

25   that -- no.  All right.  We're not going to see you

1    tomorrow, right, so you're going to have a great

2    weekend.  We'll see you, though, at 9:30 on Monday.

3    All right.  Thank you very much.

4        Please don't discuss the case.  Don't do

5    anything to prejudge, because we're going to have

6    more testimony, more witnesses.  All right.  One

7    more witness I think, perhaps, or thereabouts.

8    Okay.  So we'll see you on Monday.  Thank you.

9             (Jury excused from the courtroom.)

10            THE COURT:  All right.  Chris, good work.

11    Thank you, sir.

12        All right, Miss Williams, thanks.

13        That's what happens when you get a highly

14    competent courtroom deputy.  All right.  He tells

15    you, "Look, Judge, you're not capable of asking the

16    right questions.  Defer to counsel."  So thank you,

17    counsel, I appreciate it.  It made him look better

18    and me better.  Thank you very much.

19            MR. LINSIN:  Thank you, your Honor.

20            THE COURT:  Okay.  We'll see you Monday

21    morning, right?

22            MR. MANGO:  Yes, your Honor.

23            MR. PIAGGIONE:  Weren't we supposed to do

24    the --

25            THE COURT:  Yes.

1            MR. MANGO:  Well, it does appear, your

2       Honor -- if I may, it may help planning.  The

3       government does intend to put on a brief rebuttal

4       case based on the testimony of Miss Williams.  We

5       do think there's some inaccuracies in that document

6       that was placed on the screen.  Some clarification

7       needs to be made.  We'll do that briefly Monday

8       morning.

9          And that's -- that's our intention, but I

10      understand there's still a witness who's going to

11      be testifying Monday morning for the defense.

12            THE COURT:  Yeah, we still haven't --

13      okay.  Is it just with respect to the exhibit?

14            MR. MANGO:  No, your Honor.  It's with

15      respect to Miss Williams' entire interpretation of

16      Counts 17, 18, and 19 in this case.

17            THE COURT:  Who's your witness?

18            MR. MANGO:  Mr. Phil Flax.

19            THE COURT:  Okay.  All right.  As far as

20      the exhibit is concerned, let me tell you where I'm

21      at.  I haven't finally decided it.  I think it

22      does -- and I think you're right, Mr. Mango, I have

23      to resolve it under 611(a)(1).

24          But I don't view it as a summary of the expert

25      witness's testimony.  I don't think it qualifies as

1    that.  I think it has some deficiencies, and we're

2    going to have to examine those.  One is the

3    exemption box, because there's only one exemption,

4    as I understand it from the testimony.  There's no

5    line that goes from that exemption box back to the

6    purple box.

7         And then it's a little bit maybe -- I don't

8    want to say intentionally misleading.  I don't want

9    anybody to think that, but in the left side of the

10   chart where the examples are listed, that's exactly

11   what they are.  They're not factors that have to be

12   satisfied in order to not qualify for RCRA.

13   They're examples that the witness took out and put

14   in for purposes of reference to this case.

15        I'm not sure that's really accurate.  I mean,

16   accurate from the standpoint of does it have a

17   relationship to the determination of non-RCRA

18   coverage on the left side of the chart.  So, you

19   know, if we want to talk about that some more, we

20   can, but -- so I think there's some inherent

21   difficulties with the way that chart projects

22   everything.

23        I think it's helpful in large measure, but I

24   don't think it's exactly right yet, and I'll

25   entertain discussion with respect to does it

1    survive on the basis of the explanations that were

2    given to those particular areas of the chart, or

3    can it be utilized in a modified fashion.  You

4    know, I'll look at that as well.

5        But right now I think it's definitely

6    problematic from a 1006 standpoint, and I'll leave

7    that with you.

8              MR. LINSIN:  All right.  We will certainly

9    adjust it, as we have indicated, your Honor, and

10   certainly address this left-hand side.  Happy to

11   put in the term "examples" or whatever.

12       The point of that, though, your Honor, is just

13   the witness, as I understood her testimony, was

14   saying that these types of examples, these

15   activities, are, in fact, ones that all result in

16   negative responses to the solid waste categories

17   that she has gone through.  And so I don't -- I

18   know the Court wasn't saying it was misleading, but

19   I thought it was helpful to illustrate the kinds of

20   activities that, in her opinion, were not deemed to

21   be solid wastes.

22             THE COURT:  Well, I think with her

23   testimony in combine, that might work.  But I think

24   alone the way it is, it almost looks like those are

25   elemental to the determination that there's not

1    RCRA applicability in some fashion.  Do you know

2    what I'm trying to say?

3        Well, look at it.  Because it looks like other

4    than examples.  That's what I'm trying to get at.

5            MR. LINSIN:  That's what I'm saying, your

6    Honor.  I'm happy -- well, we will adjust it in an

7    effort to take into account the Court's concerns.

8            THE COURT:  All right.  And if it needs

9    further clarification, I'll call on Mr. Personius,

10   and we'll go from there.

11           MR. PERSONIUS:  Thank you, Judge.

12           THE COURT:  All right.  Thank you.

13           MR. PERSONIUS:  Judge, are we doing

14   anything with Andrew tomorrow then or no?

15           THE COURT:  To answer your question,

16   nothing tomorrow.  All right.

17           MR. LINSIN:  Nothing tomorrow.

18           THE COURT:  We'll do whatever we need to

19   do, jury charge and everything, on Monday.  I think

20   it's premature to sit down with everything at this

21   point until I know.

22           MR. LINSIN:  Thank you, your Honor.

23           MR. MANGO:  Thank you, your Honor.

24           MR. PERSONIUS:  Do you foresee, then,

25   summing up on Tuesday, Judge, or maybe Wednesday?

3590

1          THE COURT:  What's the date on Tuesday?  I

2    should have given you this note.  No, it's the

3    24th.  Thursday, I think, is the 26th?  Right?

4    Because today's the, what, 21st, right?  Tuesday is

5    the 26th.  Well, I've got to find out, because I

6    have a note from Juror number 6, and that's

7    Miss Majerowski.  "Doctor's appointment on

8    Thursday, March 26th, at 8:30 regarding pregnancy

9    and follow-up at Sisters Hospital.  The duration of

10   that is unknown."

11      Now, I don't know now if she is talking about

12   the 28th or if she is talking about Tuesday the

13   26th.

14          MR. LINSIN:  It could be Thursday and she

15   misstated the date.

16          THE COURT:  Okay.  I mean, if it's

17   Thursday the 28th, then we probably can get to

18   summations on Tuesday.  Okay.  Thank you.

19          MR. MANGO:  Great.

20          *       *       *       *       *       *

1                        CERTIFICATION

2

3            I certify that the foregoing is a

4       Correct transcription of the proceedings

5       Recorded by me in this matter.

6

7

8                         s/Michelle L. McLaughlin
                          Michelle L. McLaughlin, RPR
9                             Official Reporter
                             U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25