VOL. XVII

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

        -vs-                 10-CR-219S
TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
                Defendants.
-------------------------------------


          Proceedings held before the

     Honorable William M. Skretny, U.S.

     Courthouse, 2 Niagara Circle, Buffalo,

     New York on March 25, 2013.


     APPEARANCES:

     AARON J. MANGO,
     Assistant United States Attorney,
     ROCKY PIAGGIONE, Senior Counsel,
     U.S. Department of Justice,
     Appearing for the United States.

     GREGORY F. LINSIN, ESQ.,
     JEANNE M. GRASSO, ESQ.,
     ARIEL S. GLASNER, ESQ.,
     Appearing for Tonawanda Coke Corporation.

     RODNEY PERSONIUS, ESQ.,
     Appearing for Mark L. Kamholz.

     Also Present:  Lauren DiFillipo, Paralegal
                  Sheila Henderson, Paralegal



     Michelle L. McLaughlin, RPR,
     Official Reporter,
     U.S.D.C. W.D.N.Y.
     (716)332-3560

3592

1                          I N D E X

2                   WITNESS                          PAGE

3        MICHAEL IANNELLO
     Direct Examination by Mr. Personius           3616
4    Cross-Examination by Mr. Mango                3647
     Redirect Examination by Mr. Personius         3657
5    Recross-Examination by Mr. Mango              3680

6        PHILIP FLAX
     Direct Examination by Mr. Mango               3680
7    Cross-Examination by Mr. Linsin               3701
     Redirect Examination by Mr. Mango             3721

8
     JURY CHARGE CONFERENCE                        3743
9
     JURY CHARGE                                   3756
10

11

12       DEFENDANTS' EXHIBITS                      EVD.

13            SSSS                                 3630
              OOOO                                 3685
14

15       GOVERNMENT EXHIBITS                       EVD.

16            48                                   3641
              212                                  3688
17

18

19

20

21

22

23

24

25

1              (Jury not present in the courtroom.)

2         THE COURT:  If we could get Tonawanda

3    Coke, please.

4       Is there anything preliminary we have to do?

5         MR. MANGO:  May I consult with counsel for

6    one moment before I answer that question?

7         THE COURT:  Yeah.  I'm going to take 15

8    anyway right now.  The jury's not here yet, so

9    that'll -- I'm sorry?

10         MR. LINSIN:  The only issue I was going to

11    raise potentially, Mr. Iannello is our first and

12    last witness this morning.  Before we then rested I

13    wanted to resolve this issue of the chart that we

14    had offered in connection with Miss Williams'

15    testimony.

16       Over the weekend the government provided a

17    chart they expect to utilize with -- I believe

18    with -- in connection with Mr. Flax's rebuttal

19    testimony today.  And I can represent, at least on

20    behalf of Tonawanda Coke, we -- we would not oppose

21    the admission of that chart.  I wasn't sure if the

22    government was intending to offer it, but I thought

23    it might be helpful to clarify that before the

24    Court considered this issue.

25         THE COURT:  Okay.  Do you know -- have you

1     seen it and reviewed it?

2               MR. MANGO:  Oh, yes, Judge.  We've worked

3     on this chart this weekend, and this is the chart

4     we provided to defense for our rebuttal witness.

5               THE COURT:  Well, there's no objection to

6     that chart, right?

7               MR. LINSIN:  Well --

8               THE COURT:  Or is it contingent upon --

9               MR. LINSIN:  -- my hope in making this

10    suggestion was that if the government was not going

11    to oppose ours, then we would not oppose theirs.

12    Yes.  If that seems to be a reasonable quid pro

13    quo.

14              THE COURT:  Well, have you had made any

15    adjustments --

16              MR. LINSIN:  Your Honor, we have.  And I

17    would be happy to offer the adjustments that we

18    have made for the Court's review.  We believe we

19    addressed the issues, at least as we understood

20    them, in connection with comments the Court had

21    made.  I've not shown this revised version to

22    government counsel, but would be happy to do so.

23              THE COURT:  All right.  Why don't you do

24    that.  We'll take 15 minutes, and then the

25    government made a submission yesterday, I think --

1    or, no, that was your submission yesterday with

2    respect to the chart.

3              MR. LINSIN:  We made a submission, your

4    Honor, in connection with the jury charge issues,

5    yes.

6              THE COURT:  Okay.  We'll see you in about

7    15, and then we'll see where the jury is at this

8    point.  Thank you.

9              MR. LINSIN:  Thank you, your Honor.

10              (Short recess was taken.)

11              (Jury not present in the courtroom.)

12              THE COURT:  Okay.  Miss Labuzzetta, if you

13    would call the case, please.

14              THE CLERK:  Criminal case 10-219, United

15    States of America versus Tonawanda Coke and Mark

16    Kamholz.

17              THE COURT:  Okay.  The attorneys and

18    parties are all present, and the jury is here.  I

19    do have to resolve the matter of Ms. Majerowski's

20    availability, and so we'll do that today.

21        As far as the matter of the chart, Mr. Linsin,

22    if you want to bring that up at this point, we'll

23    deal with it.

24              MR. LINSIN:  Thank you, your Honor.

25         Sheila, if you could call up, so the Judge

1      could review it, Defendant's Exhibit OOOO as

2      modified.

3          And if I may, your Honor, explain that

4      consistent with Miss Williams' testimony and more

5      completely consistent with Miss Williams'

6      testimony, we have made the following modifications

7      to the chart that was displayed during her

8      testimony last week.

9          We have added a negative arrow descending from

10     the 261.4(a) exemption box to indicate that if the

11     material or its handling does not meet that

12     exemption, that it is -- the analysis must be

13     returned to the hazardous waste box, the purple

14     box.

15         We have added below that purple box the

16     indication that if, in fact, the material meets one

17     of the definitions of a hazardous waste, then a

18     permit is required for either storage or disposal.

19     We did not include treatment, because that is not

20     one of the alleged violations in the case.

21         And then on the left-hand side of the chart we

22     have added the parenthetical clause below the "not

23     a RCRA waste" box, which states that these are

24     examples of materials, slash, activities that do

25     not meet the definition of solid waste.

1          And we have retained here, your Honor, only

2     those examples that Miss Williams testified as, in

3     her opinion, being relevant to her analysis for the

4     management of the activities in question here.  As

5     the Court may recall, there had been other examples

6     in the original chart, and we thought it would be

7     clearer, more faithful to her testimony, to simply

8     have those listed that were, in fact, referenced by

9     her as examples.

10         So we have modified the chart in a way that we

11    believe more fully comports with and is faithful to

12    her testimony.  As the Court may recall, we -- we

13    moved this exhibit during her testimony, and the

14    Court reserved judgment, as I recall.  We have had

15    discussions with counsel during the break, and

16    unfortunately -- I will let Mr. Mango speak, but my

17    understanding is the government will continue to

18    oppose receipt of this exhibit.

19              THE COURT:  Okay.  And we -- and I was in

20    agreement with this, that this cannot be admitted

21    under 1006.

22         Let me ask you this.  You know -- and why do we

23    have those light rays on the left side of the

24    chart?  Can that be --

25              MR. LINSIN:  Your Honor, my understanding,

1    I believe this is simply the chosen background.  We

2    would be happy, obviously, to make this -- the

3    background completely neutral and consistent.  I'm

4    confident that could be easily resolved, your

5    Honor.  Honestly, I had not even noticed it.  But I

6    believe it's just a template that was selected and

7    was not meant to influence or be anything

8    substantive.

9            THE COURT:  All right.  Because I think it

10   makes it more difficult.  It doesn't come out as

11   pronounced, to read, and I think that's

12   problematic.  It was the same on the other draft.

13   So I'll ask you to take a look at that, if I do

14   admit it, and make it entirely a neutral

15   background.

16           MR. LINSIN:  Okay.

17           THE COURT:  And there will be more

18   definition that way, I think.

19      Mr. Mango, the government objects?

20           MR. MANGO:  Yes, your Honor.  The

21   government does intend, and we've provided now up

22   to the Court -- we can pull it up on the screen, as

23   well, if you would like to see the summary chart

24   the government is going to use during our rebuttal

25   case if Mr. Flax does testify in rebuttal.  I'm

1    assuming that we'll, you know, be able to put him

2    on.

3         But we do oppose that chart, the revised chart,

4    because our summary chart we were not intending to

5    introduce as substantive evidence.  I --

6              THE COURT:  This one that's on the screen

7    now?

8              MR. MANGO:  This one that's on the screen.

9    Consistent with our position with the other chart

10   is I really don't think, your Honor, under 611(a)

11   pedagogical exhibits should be admitted as

12   evidence, especially pedagogical exhibits that

13   really discuss the law, as Miss Williams' chart

14   does, and Mr. Flax's chart.

15       I -- so that's -- that's just the -- one of the

16   reasons we think any revised Williams chart should

17   not be admitted.

18       The other concern I have is this chart is now

19   clearly different than what the jury saw,

20   Miss Williams' chart.  And I do believe that for

21   anything to be admitted into evidence there needs

22   to be live witness testimony to have that evidence

23   introduced substantively.  And my recollection of

24   her testimony does differ.  I remember, going back

25   to her testimony, I believe she said commercial

1    chemical products have no bearing on this case;

2    yet, they're still on this chart.

3              THE COURT:  Miss Henderson, bring yours up

4    again, please.

5        Now, where are you referring, Mr. Mango?

6              MR. MANGO:  In the lower left where it

7    says:  Commercial chemical product return to

8    process.  Substitute direct reuse feedstock

9    substitute for commercial chemical product.

10       Again, it's my recollection that she had said

11   that a CCP, as she used on her original chart,

12   the -- because I do have the original here -- the

13   initials CCP were used.  And I believe she

14   testified that CCP has really no bearing on this

15   case.

16       But I'm just more concerned with, after

17   Mr. Flax's testimony, if -- if, again, he testifies

18   on rebuttal, there's certain issues in this chart

19   that, when you read the regulations, in this white

20   box here this is not what the regulations say.

21   The -- the regulations don't say "used on the land"

22   in that.  The regulations do not say "used as a

23   fuel unless that fuel is non-waste fuel."  That's

24   not what the regulations say.  So, not only do we

25   oppose it on just pure 611 grounds --

1          THE COURT:   What does the regulation say,

2     in your view?

3          MR. MANGO:   Which, your Honor, we have

4     added it to our chart.   But the regulations are

5     very clear that a definition of solid waste is,

6     "used to produce a fuel," not "used as a fuel."

7     That's not what it says.   It says -- I'm reading

8     from 261 -- 40 CFR 261.2(c)(1) -- I'm sorry --

9     (c)(2)(B), which is, solid -- it's not a solid

10    waste if it's used to produce a fuel or otherwise

11    contained in fuels.

12        That's a little different than "used as a fuel

13    unless that fuel is a non-waste fuel."

14          THE COURT:   And what's the "used on land"

15    language that you disagree with?

16          MR. MANGO:   The "used on land" language,

17    according to Mr. -- again, the testimony we're

18    going to highlight, there's really two land

19    questions when you recycle a product and there is

20    an issue with the land.   The first is -- well, this

21    one, I believe she's trying to -- trying to

22    encompass 261.2(c)(1)(B), which says, "used to

23    produce products that are applied to or placed on

24    the land or are otherwise contained in products

25    that are applied to or placed on the land."

1          That's what I believe she's trying to encompass

2     as used on the land.  But this white box completely

3     ignores the portion of the regulation immediately

4     subsequent to -- or preceding that, which says,

5     "The material is a solid waste when it is" -- and

6     this is nowhere in this chart -- "applied to or

7     placed on the land in a manner that constitutes

8     disposal."

9          That's exactly what we have here, based on the

10    Court's definition of disposal, which is totally

11    absent from this white box.  So I think -- I think

12    to introduce this would be -- would do an injustice

13    to what the regulations actually say.

14              THE COURT:  Okay.  Mr. Linsin.

15              MR. LINSIN:  Your Honor, I will go back.

16    Part of the difficulty here, of course, is that

17    counsel in one breath is objecting that this is

18    intended as a recitation of the law, and then is

19    also -- is then objecting that it does not

20    precisely quote the law.

21              THE COURT:  Or the testimony.

22              MR. LINSIN:  Well, your Honor, I disagree

23    on that regard.  I do agree in one respect, that

24    Miss Williams testified that commercial chemical

25    products are not relevant.  I left that sub-bullet

1    in in its entirety.  Counsel is correct that

2    Miss Williams did not reference commercial chemical

3    product in that regard.

4        What -- what I -- what I believe is, in fact,

5    faithful to the discussion and the -- to

6    Miss Williams' testimony is that the discussion

7    in -- in this white box focused on whether or

8    not -- and the whole major heading here is whether

9    or not the material is discarded.  And she offered

10   these as examples of conditions within the

11   regulation defining solid waste that illustrate

12   whether something is discarded.  And used on the

13   land, I believe, is -- is -- and her testimony was

14   relating to products that were applied to or placed

15   on the land.  And that is exactly the language that

16   has been quoted here.

17       I also believe that she spoke at some length

18   about this definition of solid waste focusing on

19   whether or not the material was discarded.  And

20   that, I believe, would constitute this issue --

21   incorporate this issue of applied to or placed on

22   the land in a manner that constitutes disposal.

23   The concept of land disposal, I believe, is

24   captured both in Miss Williams' testimony

25   concerning solid waste, but also then with regard

1    to the exemption itself on the right-hand box.

2        So I -- this was not represented in

3    Miss Williams' testimony as a verbatim recitation

4    of the regulation.  It was offered as a summary of

5    her testimony regarding the elements in the solid

6    waste definition that she deemed relevant.

7        If counsel believes, in the course of

8    Mr. Flax's testimony, that he can poke holes in

9    this or indicate why it is defective, that's one

10   thing.  But I don't believe it is reasonable to say

11   that this is not faithful to Miss Williams'

12   testimony, save for the comment here about

13   commercial chemical product, because she testified

14   repeatedly both on direct and cross that this issue

15   of discard, this issue of whether something was

16   disposed of on the land or elsewhere, was central

17   to the definition and assessment of whether the

18   material was a solid waste.  And I believe that

19   that concept is clearly captured in the bullets

20   that have been included in here.

21       And the point here, your Honor, is, whether

22   counsel believes that this is -- that

23   Miss Williams' opinions are accurate or whether

24   their expert believes they are accurate, that is a

25   matter for the jury to assess.  But Miss Williams

1    testified that this is a chart she prepared, she

2    testified in a manner that is consistent with this

3    chart, and we believe it is reasonable, and we

4    believe the Court has discretion under 611 to

5    permit the admission of exhibits like this when the

6    Court believes they could assist the trier of fact

7    in understanding the testimony.  I believe that's

8    exactly what this chart does.

9          THE COURT:  All right.  Well, what is your

10   position with respect to Mr. Mango's point that

11   bullet point -- open circle in the white box number

12   4, with respect to used as a fuel.  He says it's

13   not accurate with respect to the regulation as well

14   as the testimony, in that it should read something

15   to the extent of to the production of a fuel?

16      I think that was the terminology, Mr. Mango?

17          MR. MANGO:  Yes, your Honor.  The

18   terminology says, "used to produce a fuel or

19   otherwise contained in fuels."  That's the language

20   from the regulations.

21      And before -- again, my only comment, your

22   Honor -- obviously we defer to the Court.  If the

23   Court does introduce this, then clearly we would

24   want to introduce ours, but the government's

25   position is they should just both be as teaching

 1      aids at this point.

 2              THE COURT:  All right.  I want to clarify,

 3      though, and resolve the "used to produce as a

 4      fuel," that language.

 5              MR. LINSIN:  Well, there are a couple of

 6      points, your Honor.  To be -- I do not recall, as I

 7      sit here, precisely what Miss Williams testified,

 8      and so I'm not going to represent to the Court that

 9      I do.  I believe the terminology is -- is -- the

10      distinction in the terminology is not that

11      critical, especially in light of this fact, your

12      Honor.  In the indictment itself the government has

13      described coke as a material -- one moment,

14      please -- and I'm quoting now from paragraph 3 of

15      the indictment -- "Coke is used in the steel mill

16      and foundry industries as an additive in the

17      steel-making process."  An additive, not as a fuel.

18          The government has described coke as a

19      component in the mixture of a material, not as a

20      fuel in the production of material.

21          I do believe that Miss Williams testified about

22      this.  I anticipate, given what counsel has said,

23      Mr. Flax will be testifying about it.  My point is

24      I do not believe that the distinction "used to

25      produce" or "used as" is all that critical to the

1    analysis here.  If -- we'll be happy to check our

2    notes with regard to Miss Williams' testimony on

3    this point.  If her testimony included the wording

4    "to produce," we would, as we've demonstrated, be

5    happy to amend this to make sure it is consistent

6    with her testimony, but I just can't represent to

7    the Court that I have a specific memory on this.

8              THE COURT:  Okay.  You know, I think I had

9    mentioned last week that I thought it was somewhat

10   problematic to proffer this as a summary of the

11   testimony of the witness and -- of Miss Williams.

12   I'm not sure it is that.  I mean, it's -- it comes

13   across by way of that it's captioned as a summary,

14   if you will, of the law, which I think would be

15   problematic, and I'm not sure that -- the

16   caption -- I'm not sure that the caption makes

17   clear what it is, which I think has to be resolved,

18   because I don't want the jury to get the wrong

19   impression.

20        I think in some respects this can be very

21   helpful, but if it reflects the law, I'm not sure

22   it's -- it would be admissible for that purpose.

23   If it's a summary of the testimony, the way it's

24   captioned I'm not sure that it reflects that.  So I

25   think there has to be some modification, and I'm

1    willing to give it another go, because I think it

2    can be helpful, and I would consider admitting it

3    under 611.  But I would admit it -- I will admit

4    the government's.  That's the quid pro quo here.

5         MR. LINSIN:  And, your Honor, as we've

6    indicated, we would not have an objection on that

7    score.  We think -- this is not meant to supplant,

8    as I trust the Court understands, the Court's

9    guidance on the law.  We would be happy to add to

10   the caption, if the Court believes it would be

11   helpful, Miss Williams' opinions regarding what

12   materials are regulated as waste or something to

13   that effect.

14        THE COURT:  I think that has to be done.

15   Because it's technically not a summary of all of

16   her testimony, and I think that's part of the

17   government's objection.  I think that's legitimate.

18   I think it cannot summarize the law as it stands.

19   I think that's a legitimate.  But if it's -- if

20   it's an opinion with respect to the application of

21   the law to the facts, I think the jury needs some

22   guidance.  And I think we sense that from the

23   questions, which I thought were really very good

24   questions under the circumstances.

25        So, you know, with the background

1    modifications, with maybe an effort to see just

2    what was testified to on the fuel open circle

3    point, and a rearticulation of the caption, I will

4    consider admissibility as a constructive aid under

5    611 to the handling of testimony and the

6    understanding of the testimony.  And the quid pro

7    quo with that is that the government's exhibit will

8    similarly be admitted.  Okay?

9           MR. LINSIN:  All right.  We will do so,

10   your Honor.

11          MR. MANGO:  Your Honor, I just intend

12   during Mr. Fax's testimony, obviously as a

13   rebuttal, to reference Defendant's OOOO, and I

14   didn't know if at this point we should be

15   referencing the original Defendant's OOOO during

16   his testimony.  Because I'd like to pull it up on

17   the screen, because he's going to say what he

18   agrees with, what he doesn't agree with, as would

19   be proper with a rebuttal witness.

20          THE COURT:  No.  Put that one aside.  Work

21   with, until we get it resolved, this OOOO.

22          MR. MANGO:  Okay.

23          THE COURT:  This is the one you showed to

24   Flax, but we'll try to get it modified to our

25   satisfaction before Flax becomes the rebuttal

1      witness.  Okay?

2              MR. MANGO:  Yes, your Honor.

3              MR. LINSIN:  All right.  That will -- if

4      we could have over lunch to get that, your Honor

5      because we just don't have the capacity here to

6      make modifications.  Miss Henderson could go back

7      over lunch to do that.  We'll certainly work to

8      accomplish that.

9              THE COURT:  All right.  Now, you have a

10     witness --

11             MR. LINSIN:  Yes.

12             THE COURT:  Is there anything else that

13     we --

14             MR. LINSIN:  One other very brief just

15     logistical matter, your Honor.  Mr. Glasner will be

16     departing town later today, probably sometime after

17     lunch, to return home for the Passover observance.

18     He will be gone the end of the day today, and

19     tomorrow, and returning later on Wednesday.  We

20     would just ask the Court, since I presume it's

21     something the jurors would notice, that Mr. Glasner

22     had a -- is attending to personal matters and will

23     be returning later in the week, something to that

24     effect.  So, thank you, your Honor.

25             THE COURT:  Okay.  No problem.  Okay.

1              MR. MANGO:  I would just propose maybe

2      instead of a lunch -- I don't expect Mr. Iannello's

3      testimony to take that long.  It's possible we

4      could be done by 11:00 o'clock with Mr. Iannello,

5      and maybe it would make sense to then just take an

6      hour break instead of -- you know, send the jury

7      out.  I just propose that just so the Court knows

8      that I don't expect to be long with Mr. Iannello

9      either.

10             THE COURT:  Okay.  Then as far as Mr. Flax

11     is concerned, how long?

12             MR. MANGO:  Not long either, your Honor.

13     A very brief rebuttal witness.  I think 15 minutes

14     on my side, 15, 20 minutes.

15             THE COURT:  Okay.  And then both sides

16     will have rested?

17             MR. MANGO:  Yes.

18             THE COURT:  Okay.  Let's see where we are

19     timewise, and then we'll go from there.  Okay.

20             MR. PERSONIUS:  Judge, with Mr. Iannello,

21     he's the firefighter --

22             THE COURT:  Yes.

23             MR. PERSONIUS:  -- and we've discovered

24     there is a 13-second video of this fire.  We've

25     marked it as a defense exhibit.  We're going to

1    offer that.  I don't think the government is going

2    to oppose that offer.  And I just want you to be

3    aware of that.  We will get it into evidence.

4        My thought is it's almost clearer if you play

5    it in the smaller size that it comes in.  If you

6    blow it up so it fills up the entire screen, it

7    almost gets too blurry so that it's very hard to

8    see.  So if it's smaller so if it takes up a

9    fraction of the screen, it's almost easier to see.

10   I just want you to be aware of that.

11            THE COURT:  All right.  We have two drop

12   screens that go from ceiling to floor in the

13   courtroom, which I've been anxious to use,

14   Mr. Personius.  You're not anxious to try them out,

15   I take it then.

16            MR. PERSONIUS:  Well, if you expanded them

17   to that level, they would be completely useless,

18   Judge.

19            THE COURT:  All right.  Yeah, that's fine.

20            MR. PERSONIUS:  Okay.

21            THE COURT:  That's fine.  I take it

22   there's no objection?

23            MR. MANGO:  Yeah, no objection, your

24   Honor.  In fact, because it's so quick and small,

25   it may make sense to play it a couple of times.

1           MR. PERSONIUS:  And the other thing I

2     intend to do is to stop it a couple of times in the

3     middle of it is helpful too.  It becomes like a

4     still shot.

5           THE COURT:  Okay.  All right.  Let's bring

6     the jury in now, and then after we're done with

7     Mr. Iannello I'll talk with Miss Majerowski, and

8     we'll find out what her situation is and how we

9     handle that.

10        Chris, if you would, please.  Good morning.

11           (Jury seated.)

12           THE COURT:  Good morning.  Welcome back.

13    Good to see everybody.  It wouldn't be a Monday if

14    it weren't our chance to see you again.  So thank

15    you.  Please have a seat.

16        Okay.  We are back on in the case of United

17    States versus Tonawanda Coke Corporation and Mark

18    Kamholz, defendants.  I think we're all

19    knowledgable now in terms of who our jurors are and

20    roll call waived.  And, of course, you know, ladies

21    and gentlemen, that the parties in this case are

22    two defendants, and they're represented by the

23    various attorneys, and I think I'll dispense with

24    the introductions today.  You know the technicians,

25    as well, the paralegals that are doing our work on

1    the monitors for you in terms of the evidence, so I

2    think everybody is ready to go.

3        And we have, of course, Mr. Paul Saffrin, who

4    is the president of Tonawanda Coke, and Mark

5    Kamholz, who's the individual defendant, here as

6    well.

7        So, with that, and again I thank you for your

8    efforts on Thursday, and we ask you to keep your

9    minds open.  Remember the government has the burden

10   of proof beyond a reasonable doubt.  The burden

11   never shifts.  The defense has chosen to put on a

12   case.  We're in that case now.  It doesn't have a

13   burden, though, and both defendants are entitled to

14   the presumption of innocence, which is in place for

15   purposes of this case until and if you decide that

16   the proof has satisfied you beyond a reasonable

17   doubt that either the corporate or the individual

18   defendant or both are guilty as charged on the

19   count that you are considering.  And each count has

20   to be separately considered as to each defendant

21   and as to all of the essential elements of the

22   charge that applies to that particular count.

23       So, with that, I think the defense has another

24   witness.  You're going to call that witness,

25   Mr. Personius?

1           MR. PERSONIUS:  Yes, your Honor.

2           THE COURT:  Okay.

3           MR. PERSONIUS:  Your Honor, we call

4      Michael Iannello.

5           THE COURT:  If you would approach the

6      witness box, sir, I'll tell you when to stop.

7      Right about there is good, and we'll have you turn

8      towards the jury and --

9  M I C H A E L    I A N N E L L O, having been duly

10  sworn as a witness, testified as follows:

11          THE COURT:  Okay.  Mr. Witness, I think

12     you're positioned the right way.  Speak to the

13     jury.  They're here to listen to what you have to

14     say.  Get a little closer to the microphone or

15     bring it towards you.  You don't have to be right

16     on top of it.  All you have to do is speak in a

17     conversational tone.

18         Do your best to answer concisely and directly

19     the question.  Try not to volunteer any

20     information.  That usually complicates things.  If

21     the question calls for a yes or no, please try to

22     answer it in that fashion.  That's helpful.

23         If you don't understand a question, ask the

24     lawyers or me to repeat the question, and I'll

25     direct that that be done, or I will do it myself.

1          If there's an objection, wait until I rule on

2     the objection, and then I will give you

3     instructions on whether to complete your answer,

4     start it again, wait for another question,

5     et cetera.

6          Do you understand?

7               THE DEFENDANT:  I do.

8               THE COURT:  All right.  Sounds like you

9     will carry on the microphone, but state your full

10    name and spell your last name, please.

11              THE WITNESS:  Michael Iannello.  Last name

12    is I-A-N-N-E-L-L-O.

13              THE COURT:  Okay.  Thank you,

14    Mr. Iannello.

15         Your witness, Mr. Personius.

16              MR. PERSONIUS:  Thank you, your Honor.

17    DIRECT EXAMINATION BY MR. PERSONIUS:

18    Q.  Good morning, Mr. Iannello.

19    A.  How are you, sir?

20    Q.  I'm very good.  Thank you.  We've met before,

21    obviously.

22    A.  That's correct.

23    Q.  And you've also had an opportunity to meet with

24    the government regarding your testimony, correct?

25    A.  Yes, I have.

1    Q.   You've made yourself equally available to both

2    parties?

3    A.   That's correct also.

4    Q.   Now, you are a member of the Elwood Fire

5    Company?

6    A.   Yes.   The Elwood Volunteer Fire Company.

7    Q.   Okay.   And how long have you been a member of

8    that fire company?

9    A.   I'm in my 15th year.

10   Q.   Was there a time when you were the chief for

11   the fire company?

12   A.   Yes.

13   Q.   When was that, please?

14   A.   I served as chief in '09 and 2010, and years

15   prior to that I was an assistant chief for six

16   years.

17   Q.   And do you recall responding to a fire at the

18   Tonawanda Coke Company in July of 2008?

19   A.   I do.

20   Q.   Now, the Elwood Fire Company, does that have

21   some jurisdiction over the area where Tonawanda

22   Coke is located?

23   A.   Two months out of the year we cover and we take

24   jurisdiction over what we call our District 1

25   commercial.   July and January are Elwood's months.

1    Q.  All right.  So that during those two months, if

2    there was an event that occurred, for example, at

3    Tonawanda Coke, Elwood would be the primary

4    responding company?

5    A.  That's correct.

6    Q.  And then there are other companies that cover

7    that area during the other months of the year?

8    A.  Yes.

9    Q.  And this fire that you responded to at

10   Tonawanda Coke, do you remember when in 2008 that

11   was?

12   A.  The date is July 8th.

13   Q.  Of 2008?

14   A.  2008.

15   Q.  All right.  Now, do you remember how you first

16   discovered that there was a fire at Tonawanda Coke?

17   A.  Yes, I do.

18   Q.  Would you tell the jury how that happened,

19   please?

20   A.   I was heading to a meeting in the town of

21   Tonawanda, traveling down Sheridan Drive, and I

22   noticed heavy black smoke from what at that time I

23   thought could have been, you know, River Road.   I

24   was at the corner of Military and Sheridan, and I

25   radioed to my office, the dispatch office, asking

1    them if there was any incident that we needed to be

2    made aware of.

3    Q.   And from making that contact did you determine

4    whether or not Elwood had been notified?

5    A.   Not at that contact, no.

6    Q.   All right.  What did you do at that point then?

7    A.   I informed them that I would be traveling

8    towards the area where the black smoke was and I

9    would report back to them.

10   Q.   So what direction did you travel in then?

11   A.   I continued west on Sheridan Drive.

12   Q.   And were you able to track where the smoke was

13   coming from as you traveled?

14   A.   Yes.

15   Q.   And when you -- did you go to the end of

16   Sheridan?

17   A.   I made my way over from -- Sheridan turns into

18   Grand Island Boulevard, and then I turned onto

19   Kenmore Avenue, and then I proceeded down Sawyer

20   Avenue to reach River Road.

21   Q.   Okay.  And when you got to River Road had you

22   heard back yet from the fire company?

23   A.   I did not.

24   Q.   All right.  When you got River Road, what

25   direction did you proceed in?

1    A.   I determined that the fire -- the smoke was

2    coming from Tonawanda Coke on River Road, and I

3    proceeded to head in that direction and make my way

4    up into Tonawanda Coke's driveway.

5    Q.   And you could see, as you headed up the

6    driveway, the smoke on the Tonawanda Coke property?

7    A.   That's correct.

8    Q.   Could we, Lauren, please, put on the screen --

9    this is in evidence -- Government's Exhibit 105.37.

10        Do you see a photograph on the screen,

11   Mr. Iannello?

12   A.   Yes, sir.

13   Q.   And you and I have reviewed this before?

14   A.   That's correct.

15   Q.   Do you recognize what's depicted in this

16   photograph?

17   A.   Yes, I do.

18   Q.   Would you please tell the jury what you

19   recognize?

20   A.   I recognize that -- the access road from River

21   Road into the plant, and I recognize the facility

22   through other pictures that I've seen and being

23   on-site.

24            THE COURT:  If you'll tap the access road,

25   please.

1   BY MR. PERSONIUS:

2   Q.  You can tap the screen, and you'll either get a

3   square or an arrow.  Okay.

4   A.  That's the access road to the facility.

5   Q.  And just so it's clear to the jury, too, could

6   you please tap where River Road is?

7        Thank you.  That's good.

8        So you proceeded up that access road?

9   A.  That's correct.

10  Q.  And what happened when you got -- was there a

11  guardhouse you came to?

12  A.  Yeah.  I was stopped at the guardhouse once I

13  got all the way up the access road into the

14  facility.

15  Q.  All right.  And what happened at that point?

16  A.  I had asked the guard if there was an incident

17  that we needed to be notified of, if something was,

18  you know, out of control.

19           THE COURT:  All right.  Where is the

20  guardhouse?

21       Thank you.

22  BY MR. PERSONIUS:

23  Q.  And did you get a response to that inquiry?

24  A.  She wasn't -- it was a female guard.  She was

25  not aware that there was any incident that needed

1 any more attention than what was going on.

2 Q. So what did you do at that point?

3 A. I suggested to her that in my opinion there was

4 something more to what was going on on the facility

5 than what she was notified of or hadn't been

6 informed of at that time.  So I radioed to my

7 dispatch and told them that I thought we had an

8 incident that needed attention by the fire service.

9 Q. All right.  And what -- at that point what did

10 you do after you made that radio call?

11 A. At that point they notified me back that

12 somebody from the facility had called, and that at

13 that moment -- we're notified to respond to fire

14 calls by a series of tones that go out over our

15 fire radios, and at that moment they had set the

16 tones off and dispatched the rest of the fire

17 service that would respond to that particular call.

18 Q. Did you then proceed onto the Tonawanda Coke

19 property?

20 A. I did.

21 Q. All right.  And can you show us on this screen

22 what direction you went in, please?

23 A. I proceeded down a road that looks like it

24 appears to go through the middle of the facility,

25 which would be this road here.

1    Q.   Okay.

2    A.   And I made my way towards the -- towards the

3    incident.

4    Q.   And by "the incident," you mean the smoke?  Is

5    that what you were looking --

6    A.   Yeah, where the fire was and the smoke was

7    being derived from.

8    Q.   All right.  We're going to go to another

9    photograph, and I want to draw your attention to

10   that long white building that part of my arrow is

11   on.

12   A.   I see it.

13   Q.   If you could, note where that is, and we'll see

14   if that's in the next photo that we put up.

15       Could you take this one down, please, Lauren,

16   and put up Government Exhibit in evidence 105.40.

17       Okay.  In this photograph, Mr. Iannello, do you

18   see that long white building I put the arrow on in

19   the last photo?

20   A.   I do.

21   Q.   And does that help you determine where the

22   smoke was coming from?

23   A.   That's correct.

24   Q.   Okay.  Could you show the jury with another tap

25   where you determined the smoke was coming from?

3624

1    A.   Up a little higher.

2    Q.   All right.

3    A.   A little bit -- it's not working on my screen.

4    Can you clear that?

5    Q.   Want to try again?

6    A.   Let's try that.   That's better.

7    Q.   Okay.   Thank you.   And did you proceed with

8    your vehicle in that direction?

9    A.   That's correct.

10   Q.   Are you able to tell us or show us on this

11   photograph, Exhibit 105.40, where you proceeded to?

12   A.   The second one that I highlighted there is more

13   accurate.

14   Q.   All right.   Thank you.   Now, as you went into

15   the Tonawanda Coke property and arrived at the

16   location you've noted on this photograph, did you

17   come into contact with anyone at Tonawanda Coke

18   that you spoke to about the fire?

19   A.   Yes, I did.

20   Q.   Who was that please?

21   A.   Kevin Walsh.

22   Q.   And do you know Kevin Walsh?

23   A.   I know Kevin outside of Tonawanda Coke through

24   the fire service.   He's a past chief of the Kenmore

25   Volunteer Fire Department.

1    Q.  Did you have a conversation with Mr. Walsh

2    about this fire?

3    A.  I did.

4    Q.  Would you share that with the jury, please?

5    A.  Basically, as I got out of my vehicle, I asked

6    Kevin what was going on, and he said we had an

7    incident here that got out of control, that plant

8    personnel could not handle.  And he had called --

9    he was the one that called dispatch and called the

10   fire department to have us respond.

11       And I asked him a few questions about what was

12   going on, how the fire started, and I was informed

13   that it was ignited by some work that was being

14   done around the area of the point of the fire.

15   Q.  Did Mr. Walsh describe for you what that work

16   was that was being done?

17   A.  He may have at the time.  I know welding had

18   something to do with it, but I couldn't say

19   specifically what they were doing.

20   Q.  All right.  Now, when you got to the point near

21   the fire where you've shown us that you stopped,

22   can you just tell us in your own words what you

23   observed?

24   A.  Basically, it was an exterior fire that, from

25   my standpoint of being a fire chief, I would say

1    was a small building and some ground, grass, that

2    had been burning around this -- what we've been

3    calling a shack, that looked liked it had been

4    abandoned.

5    Q.  All right.  Lauren, would you take this picture

6    down, please, and put up in evidence Government

7    Exhibit 125.01.

8        We have another photograph on the screen,

9    Mr. Iannello.  Do you recognize what's shown in

10   this picture?

11   A.  Yes, I do.

12   Q.  Would you tell the jury what you recognize,

13   please?

14   A.  The brick building with the wood -- wood-type

15   structure roof and the wood frames was where the

16   fire -- the center of the fire was when I pulled up

17   to the scene.  And grass -- I'm sorry -- grass and

18   grounds around it were also burning.

19   Q.  Can you -- so the jury -- I think it's obvious,

20   but could you tap the building you're referring to?

21       All right.  And there's a tank behind the

22   building?

23   A.  That's correct.

24   Q.  Do you see that?  It's yellowish in color?

25   A.  I do see it.

3627

1    Q.   All right.   And can you show the jury, if you

2    can on this picture, if this is fair, where the --

3    what the scope of this fire was?   Is that -- can

4    you show that on this photograph?

5    A.   Will this allow me to circle?

6    Q.   Yes.   Absolutely.

7    A.   I'd say it was contained to this area right

8    here, and there was -- behind this building in this

9    area there was some ground clutter that was

10   burning.   You know, maybe grass or any rubbish that

11   might have been there, wood particles, or maybe

12   some scrap from something.

13   Q.   We haven't covered this.   I don't know how

14   important it is.   What time of day was it when you

15   got there?

16   A.   I'm just trying to think, that my appointment

17   where I was headed -- I want to say it was -- I'm

18   going to guess it was in the morning between 10:00

19   and noon.   That's the best of my knowledge, without

20   looking at any records, when the incident occurred.

21   Q.   You've shown us on this exhibit that's on the

22   screen, 125.01, with two different circles the area

23   where you -- you observed the fire when you arrived

24   there, is that correct?

25   A.   That's correct.

1    Q.   Now, how long were you at the -- at the scene?

2    A.   From the time we were asked to respond and the

3    time we cleaned up, it was approximately three

4    hours.

5    Q.   Okay.  Did other fire companies also come to

6    the scene?

7    A.   Yeah.  My understanding is that six fire

8    companies responded and seven pieces of fire

9    apparatus, trucks, equipment, responded.

10   Q.   One of those six would have been Elwood?

11   A.   That's correct.

12   Q.   Now, as you've shown the scope of the fire when

13   you got there, in Exhibit 125.01, during the period

14   of time you were there did the scope of the fire

15   expand?

16   A.   Not to my knowledge.  It was pretty contained

17   to that area.

18   Q.   All right.  Now, I'm going to put -- I'll try

19   to do this.  Do you see where I put an arrow on the

20   right-hand side?

21   A.   I do.

22   Q.   And was the fire ever in that area?

23   A.   Not that I know of.  No, not to my knowledge.

24   Q.   Okay.  During your preparation to testify here,

25   were you provided with a -- a videotape?

1     A.   Not --

2     Q.   A film or something of the fire?

3     A.   No.  Nothing other than what was emailed to me

4     about something -- that 13-second video that you

5     mentioned.  It was not a tape.

6     Q.   That's why I fumbled when I said it.  What

7     would you call it?

8     A.   A digital video clip from an email.

9     Q.   Did you view a digital video clip of the fire?

10    A.   Yes, I did.

11    Q.   All right.  And was that a fair and accurate

12    depiction of at least part of the fire, that's

13    shown on that clip?

14    A.   I would say yes, it is.  It's my -- most --

15    that would compare to my recollection of the

16    incident.

17              MR. PERSONIUS:  Your Honor, we've marked

18    that as Defense Exhibit for identification SSSS.

19    I'm happy to go through a foundation if necessary.

20              MR. MANGO:  We have no objection, your

21    Honor.

22              MR. PERSONIUS:  So, your Honor, what I

23    would propose, if we could then, that I'll ask

24    Sheila, please, once you confirm it's in evidence,

25    to put that up on the screen.  Is that okay, Judge,

1    if we do that?

2              THE COURT:  Yes.  SSSS received in

3    evidence, may be published, no objection.  We're

4    going to drop the lighting down a little bit.

5              MR. PERSONIUS:  Thank you, Judge.

6              THE COURT:  If you would, please.

7              (Defendants' Exhibit SSSS was received

8              into evidence.)

9              MR. PERSONIUS:  Members of the jury, if

10   you look behind you, I think those wooden slats

11   are --

12             MR. MANGO:  No, there is a shade that's

13   going to come behind it.

14             THE COURT:  Okay.  You've been here now

15   for 12 hours.

16             MR. PERSONIUS:  Your Honor, does Mary have

17   any popcorn?

18        Your Honor, as I mentioned -- and we can do it

19   both ways.  I -- from my looking at this, I think

20   even though this is small, it's clearer like this

21   than if we fill the whole screen.  We can do it

22   both ways if you'd like us to.

23             THE COURT:  No, let's try it this way.

24             MR. PERSONIUS:  Try it this way?  Okay.

25

1    BY MR. PERSONIUS:

2    Q.   And before we do it, if I could, do you see

3    the -- the start of this video clip on the screen?

4    A.   Yes.

5    Q.   Okay.  And can you just, for the jury, point

6    to -- do you recognize anything on the screen right

7    now?

8    A.   Yes.

9    Q.   Tell the jury what you recognize, please.

10   A.   I recognize the -- the shed, the shack

11   building, and the tank behind the building that --

12   where the center of the fire was.  The center of

13   origin.

14   Q.   Can you tap the screen where you see the

15   building?  I don't know if it'll work, but -- thank

16   you.  And then where you see the tank.

17       That's great.  Thank you.  I'm going to take

18   that off.  And what we're going to do, with the

19   Court's permission, Mr. Iannello, we're going to

20   play it through once, and then we'll go back and

21   maybe stop it a couple of times.

22   A.   Okay.

23           MR. PERSONIUS:  Okay.  Could you please

24   play it, Sheila.

25           (The above-referenced video clip was

1            played for the jury.)

2            THE COURT:  Okay.  Enlarge it and play it

3    once.  Okay.

4  BY MR. PERSONIUS:

5  Q.  Great.  Just so it's on the record, we just

6    finished playing it the first time?

7  A.  Understood.

8  Q.  Now we're going to play it again, filling up

9    the whole screen, and see how it looks.

10            (The above-referenced video clip was

11            played for the jury.)

12            MR. PERSONIUS:  Judge, do you have a

13    judgment on which one is better?

14            THE COURT:  No.  You can work with either

15    one.

16            MR. PERSONIUS:  Yeah.  I didn't think the

17    big one was that bad.

18            THE COURT:  No.  It came across, I think,

19    reasonably well this time, so --

20            MR. PERSONIUS:  I didn't think it was bad,

21    so maybe we'll try it with the big one.

22            THE COURT:  Please.

23  BY MR. PERSONIUS:

24  Q.  Now, the entire duration of that is about 13

25    seconds, that clip?

1    A.   That's correct.

2    Q.   Okay.  Could we get it back up again, Sheila,

3    without playing it, please?

4         All right.  Now, you've already shown us from

5    the smaller size where the tank is and where this

6    building is that you saw that was burning.  The

7    smoke, there's some black smoke?

8    A.   Yes.

9    Q.   And from being present at the fire, did you

10   determine what the source of that black smoke was?

11   A.   At the time I -- I assumed that the shack that

12   was burning, it was the roofing material that was

13   on the -- that made up the roof of that shack, and

14   any wood that was involved in the fire.

15   Q.   All right.  And have you since learned, from

16   talking to the government and talking to us, that

17   on the surface surrounding this tank -- on the

18   ground surrounding this tank there was some coal

19   tar?

20   A.   That was mentioned to me, but at the time I

21   didn't know if there was anything like that

22   involved in the fire.

23   Q.   Sheila, could we play this to -- and stop it,

24   please, at five seconds?

25              (The above-referenced video clip was

1                    played for the jury.)

2     BY MR. PERSONIUS:

3     Q.   Now, what we see is we see the black smoke and

4     some of this tank behind the smoke, correct?

5     A.   That's correct.

6     Q.   Where I put the arrow to the left of it, do you

7     see some white smoke coming out of the top of the

8     tank?

9     A.   Yes.

10    Q.   And are you able to tell the jury why there was

11    white smoke coming out of the top of the tank?

12    A.   My estimate would be that it was caused by

13    whatever was heating up inside the tank and it was

14    venting out.   That's probably a vent to the top of

15    that tank.   And whatever was burning around it

16    could have possibly gotten in some of the access

17    points, so it was maybe a residual smoke from the

18    fire.

19    Q.   Do you know whether or not the fire actually

20    traveled to the inside of this large tank?

21    A.   I do not.

22    Q.   Could we continue, Sheila, and stop, please, at

23    about 12 seconds?

24                    (The above-referenced video clip was

25                    played for the jury.)

1    BY MR. PERSONIUS:

2    Q.   Okay.  We've stopped this clip now at 12

3    seconds.  And I'm going take this arrow off that's

4    on there.  And again, where I put the one arrow,

5    could you tell the jury what that shows?

6    A.   That looks to be the front of the shack and

7    flames inside the door of the shack.

8    Q.   Okay.  And I'm going to put another arrow over

9    and to the right of that.  Do you see where that

10   other arrow is?

11   A.   Yes.

12   Q.   And was there fire over in that area?

13   A.   No flames in that area.  No fire.

14   Q.   All right.  And are you able on this screen to

15   again show the jury where, during the period of

16   time you were present, that the fire was focused?

17   A.   I stood about 30 to 40 feet away from the shack

18   in this area here, but a little further back.  Not

19   quite that close to the scene.

20   Q.   And can you draw a circle around where the

21   fire -- where the fire was, please?

22        In that area?

23   A.   Yes.  Up into that area.

24   Q.   All right.  Now, one other question while we've

25   got it stopped here.  And we can go back to a still

1    photo.  But do you see this kind of white --

2    whitish rectangular item on the right side of the

3    screen where I put another arrow?

4    A.   Yes.

5    Q.   And do you know what that is?

6    A.   After looking at pictures after, it's a -- it's

7    a disabled railcar, tanker car for a train.

8    Q.   Do you recall whether or not that tanker car

9    was present when you were present for the fire?

10   A.   In honesty, I do not recall that being there.

11   Q.   All right.  Thank you.

12       I think we can take that down now, Sheila.

13   Thank you.  Could -- Lauren, could you please put

14   on the screen in evidence Government

15   Exhibit 125.03.

16       Do you see the photograph on the screen that

17   has the sticker 125.03, Mr. Iannello?

18   A.   I do.

19   Q.   Do you recognize what's shown in this picture?

20   A.   I do.

21   Q.   Now, can you tell the jury what -- what that is

22   on the right-hand side of the screen?

23   A.   That is the shack that was the center of the

24   fire.

25   Q.   Okay.  Lauren, could you please put up

1    Government Exhibit 125.04, which is also in

2    evidence?

3         Do you recognize what's shown in this

4    photograph, Mr. Iannello?

5    A.   I do.

6    Q.   All right.  Do you remember I asked you at the

7    end of the video clip about the white object that

8    you could see?

9    A.   Yes.

10   Q.   The white rectangular object?

11   A.   Yes.  Yes.

12   Q.   Okay.  And do you see that in this photograph?

13   A.   Are you referring to the -- the front --

14   Q.   That object.

15   A.   Oh, okay.  Because there was a -- object was

16   the building in the previous -- I do see that, yes.

17   Q.   And is it your testimony you don't recall that

18   partially demolished tank being in that position

19   when you were in the fire?

20   A.   That's correct.  From my standpoint, it wasn't

21   in my -- my view.

22   Q.   All right.  Lauren, would you please put up --

23   again, this is in evidence -- Government

24   Exhibit 3.04.

25        Now, do you recognize, Mr. Iannello, what's

1    depicted in this photograph?

2    A.   I recognize it from the photos I was shown by

3    both parties.

4    Q.   Okay.  Did you see what's depicted in this

5    photograph when you were at the fire scene?

6    A.   I did not.

7    Q.   And was any of the fire -- to your knowledge,

8    based on your observations, did any of the fire

9    involve this part of the property?

10   A.   No, it did not.

11   Q.   Okay.  You can take that down, Lauren, please.

12        When the steps were being taken to put out the

13   fire, was -- do you know, was any water sprayed

14   inside the tank?

15   A.   From my original report it did say that we had

16   stuck a hose line into an access panel inside the

17   tank.

18   Q.   Do you know why that was done?

19   A.   I would say it was probably done for cooling

20   purposes, just to kind of get a different angle at

21   the fire.  You know, if there was anything in there

22   that could have been ignited, more of a cooldown.

23   Q.   All right.  During the period of time that you

24   were -- you were at the fire, did you see any

25   substances coming out of that large tank?

1    A.   No, I did not.

2    Q.   And once the fire apparatus was in place to put

3    out the fire, how long did it take to actually put

4    out the fire?

5    A.   I think the extinguishing was done probably in

6    20 to 25, 30 minutes, and then the rest was what we

7    call overhaul.  It would be maybe cooling down.

8    That's probably at the time we stuck the nozzle

9    inside the tank, cooling down the grounds after the

10   incident and just turning things over.  That would

11   be considered overhaul.  That probably took another

12   half hour to 40 minutes.

13   Q.   Now, the term "hazmat," does that have meaning

14   to you as a fireman?

15   A.   I know what it means, yes.

16   Q.   Would you tell the jury what your understanding

17   is of that term?

18   A.   A hazmat situation would be an incident

19   involving hazardous materials that would be suited

20   for a different type of response.

21   Q.   Had you received any information, as you came

22   to the scene and while you were present at the

23   scene, that this was a hazmat circumstance?

24   A.   I got no information, and I had no concern at

25   that point that it was a hazmat situation.

3640

1   Q.  And based on your experience at the scene in

2   putting out this fire, would it have made a

3   difference to you to have known that this may have

4   been a hazmat circumstance?

5   A.  In my opinion, no.

6   Q.  Now, at the conclusion of the work you did that

7   day, unexpected, did you then prepare some type of

8   report of this incident?

9   A.  Every incident that we respond to has a report

10   attached to it for our fire company records.

11   Q.  Okay.  And was one prepared for this incident?

12   A.  Yes.  Yes, we did.

13   Q.  You've looked at it?

14   A.  Yes, I have.

15   Q.  For identification, Lauren, could we please put

16   on the screen Government Exhibit 48, please?

17      Do you see on the screen a document that has in

18   the lower right a yellow sticker that says 48 on

19   it?

20   A.  Yes.

21   Q.  Do you recognize what this is?

22   A.  Yeah.  That's my Elwood Volunteer Fire

23   Company's fire report.

24   Q.  Related to the Tonawanda Coke fire?

25   A.  That's correct.

1    Q.   From July 8 of 2008?

2    A.   Yes.

3              MR. PERSONIUS:  Your Honor, we offer it.

4              MR. MANGO:  No objection, your Honor.

5              THE COURT:  All right.  48 received, no

6    objection.  May be published.

7              MR. PERSONIUS:  Thank you, Judge.

8              MR. MANGO:  It is multiple pages, your

9    Honor, just so the Court's aware of that.

10             THE COURT:  Thank you.

11             MR. PERSONIUS:  Thank you, Aaron.

12             (Government's Exhibit 48 was received into

13             evidence.)

14   BY MR. PERSONIUS:

15   Q.   The first page of this exhibit, Mr. Iannello --

16   why don't we do this.  It will be a little easier

17   to read.

18        Lauren, could you make the upper half larger,

19   please?  Thank you, Lauren.

20        Do you see at the top, Mr. Iannello, there's a

21   reference to your fire company?

22   A.   Yes, I do.

23   Q.   And to the date?

24   A.   That's correct.

25   Q.   All right.  Now, it also, in the area I'm going

1    to point to, in that area it talks about dates and

2    times?

3    A.   Yes.

4    Q.   That gives us the date again of July 8, 2008,

5    right?

6    A.   Yes, it does.

7    Q.   And it gives times ranging from 1114 to 1416.

8    A.   That's correct.

9    Q.   Would you tell the jury what those times

10   indicate?

11   A.   The 1114 is military time when the initial

12   signal went out to call for fire service.

13   Q.   And then the 1416 time?

14   A.   That would be the time that the last piece of

15   apparatus called into service, and that's recorded

16   at the Town of Tonawanda dispatch.

17   Q.   Now, let me get rid of that.  And do you see

18   where I put another arrow.  It's in box C.  It

19   refers to incident type?

20   A.   Yes, I do.

21   Q.   And there is an entry there?

22   A.   Yes.

23   Q.   That says, "Outside rubbish fire, other"?

24   A.   Yes.

25   Q.   Did you select that as the description of this

3643

1    fire?

2    A.   Yes, I did.

3    Q.   And can you tell the jury why you described it

4    in that fashion?

5    A.   This particular piece of reporting software is

6    a very -- a large, layered piece of software, and

7    there's not many categories to select of what

8    the -- what the incident was.  Our fire company

9    uses this piece just more as a tracking of our

10   personnel, and it's very general when it comes to

11   putting information in from an incident, per se,

12   like this one here.  So you get to this section --

13   after you fill out the address and the location,

14   you get to Section C, and it limits you to what to

15   select to continue on with the reporting process.

16   So outside rubbish fire was the closest selection I

17   could have made to move forward with completing the

18   rest of the document.

19   Q.   Okay.  Thank you.  Could you make it large,

20   this page large again, please, Lauren.

21        The only other thing on this page I want to

22   note, Mr. Iannello -- we're going to make a section

23   of the first page larger.  Do you see the box that

24   says "Completed modules"?

25   A.   Yes, I do.

3644

1    Q.   And there's a reference to a Hazmat 7?

2    A.   Yes.

3    Q.   That has not been completed on this form?

4    A.   That's correct.

5    Q.   Okay.  And what is that box used for?

6    A.   If you select in the upper area C -- if you

7    select a category that has a hazmat incident as

8    being the cause, then the software will direct you

9    to questions regarding those items.  So because we

10   selected that it was an exterior structure -- or

11   exterior rubbish fire, it avoids those hazmat

12   questions, because it doesn't pertain to the

13   incident.

14   Q.   All right.  And I asked you this at the outset.

15   I'm going to ask you one more time just because you

16   may have found out something once you got there.

17   Did you ever determine what the actual cause or

18   starting point of this fire was?

19   A.   Other than it being caused by a spark from --

20   from some sort of torch or welding that was being

21   performed.

22   Q.   Okay.  Thank you.  Could you make this page

23   larger again, please, Lauren.  And just for

24   completeness, would you go to the second page of

25   the exhibit, please.

3645

1        And is it correct that the only entries on the

2    second page are way up at the top and then way down

3    at the bottom?

4    A.   That's correct.

5    Q.   And as far as there's no substantive

6    information on the second page?

7    A.   That's correct.

8    Q.   Would you go to the third page, please, Lauren.

9        And on the third page would it be correct that

10   the only entries are way at the top?

11   A.   That's correct.

12   Q.   And there's no substantive information on the

13   third page either?

14   A.   There is something in Section D.

15   Q.   D?

16   A.   Yes.

17   Q.   This area here?

18   A.   Yes.

19   Q.   Okay.  Could you make that bigger, Lauren,

20   please.

21       Okay.  And tell us, please, what -- what the

22   entry is there.

23   A.   This area gets filled out as a summary of what

24   was put into the report from the upper pages.  And

25   again it's very, very general due to the fact that

1    these are predetermined terms and they fall into
2    place when you make selections from the original
3    Category C.
4    Q.  All right.  And did you check the box for Item
5    Number 3?
6    A.  Yes, I did.
7    Q.  Okay.  And that 3 says, "Item first ignited,"
8    and then it says "Flammable liquid gas in from
9    final container."  And then a box is checked that
10   says, "Check if spread was confined to the object
11   of origin."
12   A.  That's correct.
13   Q.  What was your reason for checking that box?
14   A.  That box was checked because there was no
15   spread.  It was contained to the area that we were
16   fighting, was my definition of that.
17   Q.  And that's the area you previously described
18   for us?
19   A.  That's correct.
20   Q.  You can take that down please, Lauren.
21           MR. PERSONIUS:  May I have a minute,
22   please, Judge?
23           THE COURT:  Certainly.
24           MR. PERSONIUS:  Your Honor, those are all
25   the questions we have.

1          Thank you, Mr. Iannello.

2               THE WITNESS:  You're welcome.

3               THE COURT:  Okay.  I may have missed this,

4     but, Mr. Iannello, did you take that video that you

5     testified about, or was that taken by somebody

6     else?

7               THE WITNESS:  No, sir, I did not take that

8     video.  I could give you an idea of where it did

9     originate from.

10              THE COURT:  Okay.  Just my question was,

11    you did not take it, right?

12              THE WITNESS:  I did not.

13              THE COURT:  Okay.  Thank you.

14         Mr. Linsin, any questions?

15              MR. LINSIN:  No questions.  Thank you,

16    your Honor.

17              THE COURT:  Okay.  You're welcome.

18         Mr. Mango.

19              MR. MANGO:  Thank you, your Honor.

20    CROSS-EXAMINATION BY MR. MANGO:

21    Q.   Good morning, Mr. Iannello.

22    A.   Good morning.

23    Q.   How are you?

24    A.   Very good.  Thank you.

25    Q.   We've -- we have met on a couple occasions, is

1    that correct?

2    A.   Yes, sir.

3    Q.   And again, my name is Aaron Mango.   I'm an

4    assistant United States attorney.

5         And what I'd like to talk about is, obviously,

6    the fire incident that you responded to, okay,

7    Mr. Iannello?

8    A.   Sure.

9    Q.   When you arrived at the guard shack at the

10   Tonawanda Coke Corporation, is it fair to say that

11   the guard initially did not want to let you in?

12   A.   That's correct.

13   Q.   And when you arrived, while you were at the

14   guard shack and then as you proceeded into the

15   site, what you observed was dark, black smoke

16   billowing into the air, is that right?

17   A.   Yes, I did.

18   Q.   And when you arrived on scene, is it fair to

19   say that you observed some Tonawanda Coke employees

20   trying to take some corrective action to put that

21   fire out?

22   A.   I can't say what their actions were, but there

23   were employees when I reached the scene.

24   Q.   And at some point you had a conversation with

25   Mr. Walsh, I think you mentioned?

1    A.   That's correct.

2    Q.   And he's employed at the Tonawanda Coke

3    Corporation, are you aware of that?

4    A.   I am.

5    Q.   As a purchasing manager?

6    A.   I don't know what his role was, but if that's

7    what you say.

8    Q.   Okay.  And is it fair to say that he told you

9    that the tanks were empty?

10   A.   Yes.

11   Q.   That the tank -- I should say the tank that

12   you've now looked at the pictures of, that tank was

13   empty.

14   A.   That's correct.

15   Q.   And then after you arrived on scene, other fire

16   personnel arrived on scene?

17   A.   Yes.

18   Q.   And it included six -- well, five other fire

19   departments other than yours and seven fire trucks

20   or fire equipment --

21   A.   That's correct.

22   Q.   -- in total.

23        All right.  Lauren, if we could pull up

24   Government Exhibit 125.02, please?

25            THE CLERK:   Is it in evidence?

3650

1           MR. MANGO:  Yes, in evidence.

2    BY MR. MANGO:

3    Q.   Mr. Iannello, do you see this on your screen?

4    A.   Yes.

5    Q.   I don't think you were shown this exact

6    photograph during your direct testimony, but is it

7    fair to say that this tank in the middle of the

8    screen, this is the tank that you were fighting the

9    fire, that was the focus of your firefighting

10   activities?

11   A.   Yes.

12   Q.   All right.

13   A.   That's correct.

14   Q.   And do you see something poking out in the

15   left-hand side there?  See where I put the arrow?

16   A.   Yes.

17   Q.   It looks almost like a tank?  Did you make any

18   observations as to the tank in the background there

19   on the left?

20   A.   Other than the pictures that I've seen, I had

21   no involvement or knowledge of that tank.

22   Q.   Okay.  And I want it to be very clear for

23   today's purposes, Mr. Iannello.  I know you've met

24   with me several times --

25   A.   Yes.

1    Q.   -- along with the special agent.  And you've

2    met with defense a couple of times, and we've all

3    probably showed you a number of photographs.  So I

4    want your recollection today to be focused on what

5    you actually remember back in July of 2008.

6         So back -- sitting here today, do you recall in

7    July of 2008 any fire or activity relating to that

8    tank in the background on the left?

9    A.   I don't recall any activity of that tank being

10   involved in our incident.

11   Q.   Okay.  I'd like to pull up Government

12   Exhibit 125.04 in evidence.

13        And, Mr. Iannello, you were shown this

14   photograph.  And there's some area back here where

15   I put the arrow.  Do you see that?

16   A.   Yes.

17   Q.   Okay.  And is it fair to say that you did not

18   make any observations in the area where I put the

19   arrow?

20   A.   That's correct.

21   Q.   And would it also be fair to say that you don't

22   know whether Tonawanda Coke employees had actually

23   put out a fire in this area before you arrived?

24   A.   That's correct.  I have no knowledge.

25   Q.   Okay.  Now, looking at that scene, I'd like to

1    pull up -- you were shown Government

2    Exhibit 105.40, which is in evidence.

3        I'd like to pull that up, please, Lauren.

4        Now, you see the arrow.  You put some dots on

5    the screen.  I want to tell you, Mr. Iannello, this

6    is a photograph that the parties have now

7    stipulated was taken on April 21st of 2007.  So

8    this would be well over a year before you

9    responded.

10   A.   Okay.  Thank you.

11   Q.   Okay.  So could you say whether or not -- see

12   that tank I've just put the box around -- whether

13   it was in that condition when you arrived or not?

14   A.   I do not recall the conditions beyond that

15   point.  I cannot answer that.

16   Q.   Okay.  And if we can now go back to Government

17   Exhibit 125.04 in evidence, which we just looked

18   at.  Do you see that area back there where I put

19   the arrow?  And again you testified you did not

20   make any observations in that area?

21   A.   That's correct.

22   Q.   Okay.  And during your testimony, Mr. Iannello,

23   I think you said you did not -- for this tank here

24   where I just put the arrow, you did not observe any

25   material flow out of the tank, is that correct?

3653

1   A.   That's correct.

2   Q.   All right.  And so your observations of

3   material flowing would be limited to this tank on

4   the left where I put the arrow, is that correct?

5   A.   Yes.

6   Q.   I believe you testified that you were standing

7   about 30 to 40 feet away?

8   A.   Correct.

9   Q.   So that you were a safe distance from the fire?

10       Bless you.

11       So you were a safe distance from the fire?

12  A.   Correct.

13  Q.   Okay.  And if we could pull up Government

14  Exhibit 125.03 in evidence, please.

15       Mr. Iannello, do you remember seeing this

16  during your direct testimony?

17  A.   Yes.

18  Q.   Okay.  Would it be fair to say that when you

19  were on scene there was water used to put this fire

20  out?

21  A.   That's correct.

22  Q.   All right.  And the water that was being

23  sprayed onto that tank was also being sprayed on

24  the ground.  You mentioned there was some fire on

25  the ground?

3654

1    A.   That's correct.

2    Q.   Okay.  So -- so water from a fire hose was

3    being shot onto the ground in this area?

4    A.   That's correct.

5    Q.   And when you were on scene, do you recall

6    seeing the water create any type of pond or -- let

7    me leave it at that.  Do you recall any type of

8    pond being created?

9    A.   There were areas around the base of the large

10   tank that had water in it.

11   Q.   Okay.  So, if there was water on the ground and

12   material was leaking out of the tank from the base

13   of the tank actually below the waterline, you would

14   not have been able to see that, is that right?

15   A.   That's correct.

16   Q.   Now, you were asked a little bit about you got

17   no information that there was any type of hazardous

18   concern on-site here?

19   A.   That's correct.

20   Q.   Okay.  If the material that -- well, let's --

21   let's actually -- I'd like to show that video

22   again, your Honor, if we can go to SSSS, please,

23   Sheila.  And I'd like to -- if you can just enlarge

24   it half of the screen, just drag it from here.  I

25   was able to do it.  I don't know.  If you just try

1    to drag from here and pull it that way.  Yes.

2    Thank you.  That's perfect.

3         Okay.  So I'd like to try a third option, your

4    Honor, about halfway in between, if we can run it.

5              (The above-referenced video clip was

6              played for the jury.)

7    BY MR. MANGO:

8    Q.  All right.  Thank you.

9         So, Mr. Iannello, you were able to observe that

10   video on the screen?

11   A.  Yes.

12   Q.  If we could just go to the -- just the start,

13   and not play it, Sheila.  Okay.

14        And I believe it was your testimony that there

15   was some firefighting activities occurring in this

16   area behind the tank, is that right?

17   A.  No, sir.  In that diagram where I put the two

18   circles I was more -- I was considering this area

19   here behind the shed.

20   Q.  Okay.  All right.  But it's fair to say that

21   you see black smoke all around this tank, is that

22   right?

23   A.  In this picture there's black smoke there, yes.

24   Correct.

25   Q.  Okay.  So would it be fair to say that maybe

1    there was not an actual flame, but something was

2    burning to cause this black smoke in and around

3    this tank back here, is that right?

4    A.   My observation of this would be that the fire

5    and the smoke was being pushed against the tank and

6    it was finding a path around it.  I would have no

7    knowledge if there was anything burning where

8    you've highlighted there, by the way I'm reading

9    the smoke.

10   Q.   Okay.  But -- and it's your testimony, though,

11   that you were standing about 30 to 40 feet in this

12   direction here?

13   A.   Yes, correct.  Right in that direction.

14   Q.   Okay.  Now, you talked about you were not aware

15   of whether the ground or the tanks or anything

16   contained any type of hazardous material, is that

17   right?

18   A.   That's correct.

19   Q.   Now, if you had known that the ground in this

20   area contained toxic levels of benzene, would that

21   have been something you would have wanted to know?

22   A.   Yes.

23           MR. MANGO:  Thank you, your Honor.

24   Nothing else.

25           THE COURT:  Okay.  Miss DiFilippo, you

1    have this up, right?  No?  Miss Henderson?

2        All right.  Play it from the beginning on.  I'm

3    just looking at the jurors, and it looked like they

4    wanted to go through it one more time.  Start it

5    again, please.  Thank you.

6              (The above-referenced video clip was

7              played for the jury.)

8              THE COURT:  Okay.  Thank you.  Any

9    redirect, Mr. Personius?

10             MR. PERSONIUS:  One question, Judge.

11   REDIRECT EXAMINATION BY MR. PERSONIUS:

12   Q.  Mr. Iannello, based on being present at the

13   scene, based on seeing this video from the scene

14   again several times today, is there any question in

15   your mind as to where this fire was localized?

16   A.  No.  I'm pretty sure.

17             MR. PERSONIUS:  No further questions,

18   Judge.

19             MR. MANGO:  One brief follow-up, your

20   Honor.

21   RECROSS EXAMINATION BY MR. MANGO:

22   Q.  Mr. Iannello, you never had a chance to go back

23   to the Tonawanda Coke?

24   A.  That's correct.  I have not been on the

25   facility since the fire.

1    Q.  So if the fire had been in other areas, you

2    couldn't make that call, sitting here today?

3    A.  No.

4    Q.  Okay.  Thank you.

5              MR. MANGO:  Nothing else, your Honor.

6              THE COURT:  Okay.  Mr. Linsin, anything?

7              MR. LINSIN:  Nothing.  Thank you, your

8    Honor.

9              THE COURT:  Okay.  Mr. Iannello, you are

10   excused.  Thank you.

11             THE WITNESS:  Thank you.

12             THE COURT:  Okay.  From the defense

13   standpoint, anything additional?

14             MR. LINSIN:  Save for the one issue

15   regarding that one chart, your Honor, Tonawanda

16   Coke does not have any additional witnesses to

17   present.

18             THE COURT:  Okay.  The defense then for

19   Tonawanda Coke rests subject to the resolve of the

20   exhibits?

21             MR. LINSIN:  That is correct, your Honor.

22             THE COURT:  Yes.  Thank you.

23   Mr. Personius.

24             MR. PERSONIUS:  Your Honor, the defense as

25   to Mark Kamholz rests.

1          THE COURT:  Okay.  Ladies and gentlemen,

2     we're going to take a 15-minute break.  I'll bring

3     you back out here, and I'll give you the plan for

4     the day.  Okay?  Thank you very much.  Keep your

5     minds open, please.  The case is not concluded yet.

6          (Jury excused from the courtroom.)

7          THE COURT:  All right.  That's a little

8     fiat lux, right?  I mean, for a little Latin flavor

9     to what we're doing?

10    Okay.  I did speak with Miss Majerowski, I

11    think, in your observation, and the note that reads

12    Thursday, March 26th, was meant to read Tuesday,

13    March 26th, which is tomorrow.  And she is willing

14    to come back, depending on our schedule, after the

15    doctor's visit and the sonogram and a few other

16    things that have to take place.  So we're probably

17    talking about midday, you know, noonish.

18    So I'm just going to put that out there now,

19    and we can talk about it later so we can get

20    everything together.

21    Okay.  Government has a rebuttal case?

22         MR. MANGO:  Yes, your Honor.  The

23    government asks permission to call Mr. Flax in

24    rebuttal.  There were some issues that the

25    government believes is necessary to present a

3660

1    rebuttal case on, that occurred during the

2    testimony of Miss Williams in defense, and it will

3    be brief.  We would ask permission to call --

4    recall Mr. Flax to the witness stand.

5            THE COURT:  Okay.  And on the

6    representation that it relates to matters that are

7    directly connected to Miss Williams's expert

8    testimony, I will permit the rebuttal case.  If it

9    doesn't relate to that, I'll entertain a motion to

10   strike.

11     But then there's time that was requested by the

12   defense with respect to Miss Williams's exhibit.

13           MR. LINSIN:  Yes, your Honor.  We -- we

14   will need some period of time to be able to run

15   back to the hotel and get these adjustments made in

16   this chart consistent with our discussion

17   previously today.

18           THE COURT:  Well, what if we broke until

19   1:00 o'clock and then we put the government on.

20   I'll make this the jury's lunch break.  And then

21   we'll go for as long as it takes, and then we'll

22   figure out what to do with the rest of the day and

23   tomorrow.

24     I'm somewhat inclined to do this.  The charge

25   is long.  We've got a few things to resolve.  I'm

1    not overwhelmed by what I think timewise it's going

2    to take, because most of it seems to be breakdown

3    in terms of the counts of the indictment and some

4    add-ons.  It's kind of a yea or a nay on what's

5    added or not.  I don't think that will take

6    forever.

7        But the stock charge itself, that portion that

8    doesn't relate to the specifics of the counts and

9    the elemental aspects of it, I'm wondering if

10   you -- I'd like to break it up into the stock

11   portion of the charge and then the substantive --

12   what I'll call the substantive portion of the

13   charge.  Because otherwise, to read it, it would

14   take a day, basically.

15       I wouldn't -- I mean, I would consider reading

16   the stock portion today, recessing -- this is after

17   the government's case -- for the morning tomorrow,

18   complete the substantive reading tomorrow

19   afternoon, and then have closing arguments and

20   deliberations start on Wednesday.  Or, you know,

21   depending on how long it takes, I don't mind

22   starting the closing arguments tomorrow afternoon

23   if you're ready.

24           MR. LINSIN:  Your Honor, this is not

25   something I've discussed with Mr. Personius.  The

1       Court's proposal takes me a little by surprise.

2       But my experience has been that the summations,

3       closing arguments, are given prior to the Court's

4       charge to the jury.  That would be my preference if

5       the Court is amenable to that procedure.

6           I don't know what the Court's normal practice

7       is.  I'm cognizant of the difficulty in terms of

8       scheduling all of this, but we believe, especially

9       in a case like this where -- where there are some

10      significant legal issues that are unusual and that

11      we believe are important for the Court to -- for

12      the jurors to have in mind, that that clarification

13      be provided following summations rather than prior

14      to summations.

15              THE COURT:  Well, I do it both ways, and a

16      lot of times it's -- frankly, it's scheduling

17      driven.  And, you know, usually the charge that

18      relates to the substantive portion of the charge,

19      when I talk to the jury I'll -- you know, I tell

20      them that is the law that's going to apply.  If you

21      hear anything different from the attorneys, you go

22      with what I give you, what you've heard, that kind

23      of thing.  But, I mean, it works both ways.

24          If we were to follow your recommendation, what

25      we're really talking about, then, is closing

1    arguments, and the way we do it here is the

2    government proceeds first, followed by the

3    defendant, and then time to reserve for rebuttal.

4        Is the government ready to argue today?

5            MR. MANGO:  No, your Honor.

6            MR. LINSIN:  Your Honor, we had

7    anticipated -- perhaps it was -- we had anticipated

8    that -- that we would have a charge conference on a

9    number of these issues, we were expecting, at some

10   point this afternoon.  I understand they are not

11   overwhelming, but the points that we had raised in

12   our submission yesterday we believe are very

13   important both to the charge itself and then to

14   shaping the arguments based on what we know the

15   charge is going to be.  So clarification on those

16   issues would be important to us before being

17   prepared to -- to sum up.

18           MR. MANGO:  Your Honor, just if I can

19   clarify my earlier -- preparation is a relative

20   term.  I could, obviously, give a closing argument

21   if necessary today, you Honor.  But in light of the

22   amount of preparation I'd like to do, I would ask

23   that -- and I actually think the Court's

24   recommendation makes sense in this case, so that

25   there's no lost time.  And I would -- I would

1    presume that the Court is planning to give the jury

2    a copy of the charge?  Is that --

3            THE COURT:  I do at the end of the case,

4    but I don't tell them that until after the

5    completed charge, because I really want them to

6    focus on what I have to say.

7            MR. MANGO:  Right.  But I think that

8    would -- that would clarify or assist in resolving

9    if there were any legal issues or clarification

10   that needed to happen based on the -- the closings

11   by the attorneys.  The jury would then have that as

12   a resource.

13      But I do agree that it would make sense in this

14   case to close and then let the jury start

15   deliberating, which -- which would best happen on

16   Wednesday.

17           THE COURT:  Well, let me suggest something

18   else.  Let me still suggest opening with the -- or

19   this afternoon, perhaps, delivering the stock

20   portion of the charge, I mean, that's going to take

21   a little bit of time as well.  Have our charge

22   conference tomorrow morning when we're down, work

23   through everything, and then I can work on the

24   final part of the substantive charge following the

25   charge conference, and then we could have closing

1    arguments start in the afternoon tomorrow.

2              MR. PERSONIUS:  And then, your Honor, do

3    the substantive part of the charge on Wednesday?

4              THE COURT:  After the closing arguments.

5              MR. PERSONIUS:  For whatever value it has,

6    I strongly prefer that as much of the charge as you

7    think is appropriate follow closing argument rather

8    than precede it.

9              THE COURT:  Mr. Linsin.

10             MR. LINSIN:  That is my preference.  And

11   the only request I would make, your Honor -- I'm

12   not quite sure where the dividing line is for the

13   Court on the stock charge.  I did have, in going

14   through this, a couple of comments I don't believe

15   in any way controversial or time-consuming, but I'd

16   just like the chance to review my notes, which I

17   have with me here, if we were going to proceed with

18   the stock charge this afternoon, just so that I

19   could confirm that there's nothing I didn't want to

20   raise in that regard.

21             THE COURT:  Well, yeah.  There will be

22   time for that.  All right.

23             MR. LINSIN:  Okay.

24             THE COURT:  And, no, I didn't mean to

25   preclude any discussion, but, basically, I would

3666

1    give the jury the first 53 pages as it's now

2    proposed, and that would be up to the discussion of

3    the Clean Air Act.  That is where I consider the

4    charge to turn from stock to substantive.

5              MR. LINSIN:  Okay.

6              MR. MANGO:  Yes, your Honor.

7         We would just ask that if we do closings in the

8    afternoon, that all the closings happen in one

9    afternoon and not, you know, be broken up into --

10   into the day.  I'm just concerned that we give our

11   closing and then they have the evening to weigh our

12   closing and then -- you know, based on time

13   constraints.  So that would be my concern, if we're

14   going to do closing in an afternoon, we do -- you

15   know, if we need limited breaks.  Obviously, I see

16   Michelle's face.  I would just want all the

17   closings to occur in one period of time.

18             THE COURT:  If we went over to the next

19   day for rebuttal, you wouldn't be opposed to that.

20             MR. MANGO:  Well -- well, your Honor, I

21   would actually prefer it happen all in one day,

22   actually.

23             THE COURT:  All right.  How -- you've --

24   probably you're semi-ready to argue.  But

25   approximately how long?

1           MR. MANGO:  I'm putting it at about an

2     hour, your Honor.

3           THE COURT:  All right.  Okay.  Mr. Linsin,

4     do you have an idea?

5           MR. LINSIN:  Yes.  I feel I need to limit

6     myself to 45 minutes, your Honor, and I think I can

7     do that.

8           THE COURT:  Okay.  And Mr. Personius?

9           MR. PERSONIUS:  My hope is, Judge, about a

10    half an hour.

11          THE COURT:  All right.  I don't see any

12    problem then, if we start at, say, noon, all right.

13    Because I'll tell the jury to become -- to come

14    here fortified, so -- which means they can intake

15    lunch before they get here.  We'll start somewhere

16    around noonish.  That will give everybody time to

17    adequately argue their respective cases, we'll have

18    times for breaks, and then, depending on what time

19    it is, we can either complete or start the

20    substantive charge or start on Wednesday with

21    the -- what I call the substantive charge,

22    beginning with the Clean Air Act and whatever we

23    decide after tomorrow's charge conference.  And

24    then we'd start the deliberations on Wednesday.

25         And I take a little bit of time.  You know,

1     I -- right now, the charge, as you know, is a

2     little over 115 pages or so.  But I will -- bless

3     you -- I will walk the jury through the Clean Air

4     Act and the elements, and then we try to take a

5     couple of breaks, and I just don't want them to

6     become in their own minds overwhelmed by

7     everything.

8         I mean, you'll see a sigh of relief -- I'm sure

9     you all experience this -- when I tell them they

10    get the charge in written form.  But, you know,

11    I'll work with them as if they're going to get it

12    only orally, and until that time when we break the

13    news that they get the written version.

14        If I see that they're really panicking or at

15    least I sense that, I may tell them, "I'll give you

16    the written charge, but just stay focused with what

17    I'm doing."  We'll see how that works.  Okay?

18        That's my intention.  If you have any problem

19    with that, let me know, and I'll reconsider.  But

20    that's basically the way I like to proceed.

21            MR. LINSIN:  We agree that makes perfect

22    sense, your Honor.

23            THE COURT:  Okay.

24            MR. PERSONIUS:  We're comfortable with

25    that, Judge.  Thank you.

1          MR. MANGO:   Likewise with the government.

2          THE COURT:   Okay.  We ate up about ten

3    minutes, so let's have the jury come back about

4    1:15 then, and then we'll start with the

5    government's case, and then I'll tell the jury that

6    I will be giving them a part of -- of the

7    instruction this afternoon.  And then we'll break.

8    It shouldn't -- they should probably get an early

9    break today.  And then we'll start as we discussed

10   tomorrow morning.  Okay.

11         MR. PERSONIUS:   Judge, if we could,

12   please, factor in to what you're planning for today

13   an opportunity, which I think will be brief, to

14   raise just a couple of issues with you about your

15   standard charge.  They're not controversial, but I

16   think it will be quick.

17         THE COURT:   Okay.  No, that's fine.  And

18   if we get them here at 1:15, we'll begin with the

19   government's redirect case, we will finish that up,

20   we'll break, we'll talk about whatever you think is

21   appropriate as far as the standard or stock charge,

22   and then we'll go from there.

23         MR. PERSONIUS:   Thank you.

24         THE COURT:   Okay.  I'm going call the jury

25   back now, and we'll give them the break, and I'll

1      explain to them what they face for the day.  And

2      I'm going to mention tomorrow, too, because they

3      should know that tomorrow they won't start until

4      noon, or hopefully as close to noon as we can get

5      Miss Majerowski back.

6                (Jury seated.)

7                THE COURT:  Okay.  Welcome back, and I'm

8      going give you what we usually call the home

9      stretch lecture.  So have a seat.

10         Okay.  Jury is back, roll call waived.  The

11     attorneys and parties are back present.

12         Here's where we are, ladies and gentlemen.

13     We're going to send you out for an early lunch, and

14     we're going to try to resume about 1:15, okay.  At

15     that time -- as you know, the defense has rested

16     its case.  They do not intend to call any

17     additional witnesses or produce any additional

18     evidence.  The government gets the opportunity to

19     call a rebuttal witness.  They have one witness

20     that I understand is reasonably short.  That will

21     take place this afternoon on your return from

22     lunch.

23         After that we're going to take a break, and

24     when we resume I will start what we call the

25     preliminary instruction to you with respect to the

1    deliberation charge, which will include some

2    general instructions and definitions and the like,

3    and then eventually we get to giving you the

4    specifics on the law and the definitions to be

5    applied.

6        Some of the terms that we talk about, like

7    burden of proof and presumption of innocence and

8    proof beyond a reasonable doubt, I'll talk about

9    those with you this afternoon.  I'm going to break

10   it up a little bit, because there's a fairly

11   lengthy charge or instruction in the law that comes

12   with the case and which I need to give you before

13   you can actually begin your deliberations.  So you

14   get that.

15       Tomorrow we will resume at approximately

16   12:00 o'clock.  And in part -- I think you probably

17   know Miss Majerowski has a doctor's appointment,

18   and when she gets back we're going to start.  And

19   at noon or thereabouts we will have the closing

20   arguments.  And you will hear from the attorneys.

21   They will give you their closing arguments.  We

22   hope to complete all three of them in -- tomorrow

23   afternoon.

24       There then remains a part of the instruction in

25   the law that I still have to give to you, and I

1    will complete that with you.  And once that's

2    complete, then you will begin your deliberations,

3    and we'll get you all set up for that.

4        So that's what you have to look forward to, you

5    know, so we're talking Wednesday morning by the

6    time we either start deliberations or complete the

7    charge on the law to you.  Okay.  You'll be down

8    tomorrow morning, and then, you know, the real

9    business begins where we get down to deciding this

10   case with a unanimous verdict on the 19 counts of

11   this indictment.

12       So we're almost there, but we've got to keep

13   your minds open.  No discussion, no research, no

14   anything.  And then you come back, and once you

15   start your deliberations, you know, that's when you

16   will be asked to designate or elect your foreperson

17   if you choose to do it that way.  And that person

18   will preside over your deliberations, and I'll give

19   you the instructions on how to conduct those in

20   summary fashion, but it's basically what, common

21   sense, experience intelligence.

22       You'll get the exhibits.  You'll have those to

23   review.  And we'll do whatever we can to assist you

24   so that you can get to that unanimous verdict in

25   this case, because, obviously, nobody knows this

1    case like all of you. And you've been terrific in

2    that regard.

3         You'll get to see us here for the duration of

4    whatever time it takes, although Mr. Glasner, Ariel

5    Glasner, who's here, and you know who he is, he's

6    sitting up against the wall, he has a personal

7    matter that he will be attending to for a few days,

8    so he will not be here, but I think everybody else

9    will.

10        And that's where we're at. So, you know, we're

11   relying on you to resolve the case as you stated at

12   the time that we started that you would make your

13   very best effort to do that unanimously in this

14   case.

15        So that we can get everything together and get

16   ready, you get an early lunch. We'll see you back

17   here at what time? Did I cover everything or --

18   yes? Okay. Okay. So we will see you at 1:15, and

19   have a good lunch. Beautiful day. And be anxious

20   to get back here. Thank you.

21             (Jury excused from the courtroom.)

22             THE COURT: Okay. 1:15.

23             MR. LINSIN: Thank you, your Honor.

24             MR. MANGO: Yes, your Honor.

25             (Lunch recess was taken.)

1          (Jury not present in the courtroom.)

2          THE COURT:  Okay.  The attorneys and

3    parties are back present.  The jury is back.  We're

4    ready to call them in.  But how are we doing in

5    terms of the exhibit?  Mr. Linsin.

6          MR. LINSIN:  Your Honor, we have revised

7    the exhibit in accordance with a -- the discussion

8    this morning, but also in accordance with a draft

9    transcript of Miss Williams' testimony regarding

10   this fuel issue.  That entry now regarding fuel

11   reads as follows:  "Used to make a fuel or used as

12   a fuel unless that fuel is a nonwaste fuel."

13      And we believe that -- it's not literally --

14   some of it is verbatim, some of it is -- is a

15   condensing of several different answers, but we

16   believe that accomplishes the objective.  We've

17   made it a neutral background, and the heading now

18   reads "Marcia Williams' opinions regarding what

19   materials are regulated as waste under RCRA in this

20   case."

21          THE COURT:  Okay.  Let me -- can I take a

22   look at it?  Miss Henderson, would you publish

23   that, please?

24      Okay.  Mr. Mango.

25          MR. MANGO:  Your Honor, my concern -- and

1      I defer to the Court, obviously, but my concern is

2      now we're making substantive changes into the white

3      box, when -- I mean, the whole -- part of the

4      rebuttal case is to -- was to point out that there

5      was some clear errors in the white box.  You know,

6      not necessarily the testimony, but the white box.

7      So now we've got an exhibit that is in a much

8      different form than what the jury saw it

9      originally.

10         I mean, obviously, that is consistent with what

11     she testified though.  I have reviewed this partial

12     transcript.  So, you know, I just point it out that

13     it seems like now the jury is going to get this

14     version of this chart that they're not going to be

15     familiar with.  I mean, we'll still be prepared.

16     We still have enough on rebuttal to talk about.

17     That's the only point I make.

18             THE COURT:  Okay.  All right.  What I will

19     do -- and I do think it's clearly helpful.  I don't

20     think that the jury will be misled by the

21     fine-tuning of this particular exhibit.  And I am

22     going to permit it under 611.

23         I guess -- is that over objection?

24             MR. MANGO:  No, your Honor.

25             THE COURT:  Okay.  All right.  And

1    correspondingly, then, the government's exhibit --

2    do you have a number for it?

3              MR. MANGO:  Yes, your Honor.  212.  And at

4    the lunch break I added a sharper version of that,

5    and I gave it to Miss Labuzzetta, which is right

6    there.  So --

7              THE COURT:  Okay.  And you agree,

8    Mr. Linsin, that it's a sharper version of 212?

9              MR. LINSIN:  It is a sharper version.  The

10   only point I made, it is a -- I understand there

11   may be space issues, but for purposes of

12   clarification with the jury, I understand Mr. Flax

13   would be testifying about this, but much as we have

14   designated our exhibit as reflecting Marcia

15   Williams' opinions, I think it would be helpful if

16   this exhibit somewhere indicated that these reflect

17   Mr. Flax's opinions.  That was the only request I

18   had made of the government, and I believe it's

19   reasonably parallel.

20             THE COURT:  Can you do that?

21             MR. MANGO:  Your Honor, I think it's going

22   to be obviously clear from the testimony that this

23   is -- these are his opinions.  I just hesitate,

24   one, based on space, and, two, it took some working

25   to try to get it into the sharper format, to be

1    ready to present here this afternoon.

2        Maybe we can just see how the testimony comes

3    in and see if it is very clear, based on the

4    testimony, that these are his opinions as to, you

5    know, the RCRA issues in play in this case.  I

6    think the testimony then would stand for itself.

7              THE COURT:  Okay.  I mean, I'll let you

8    work with it.  If we can entitle it his opinions

9    before the exhibit goes to the jury, I think that

10   would be acceptable.  Mr. Linsin?

11             MR. LINSIN:  That fine, your Honor.  No

12   problem.

13             MR. PERSONIUS:  And, your Honor, I think

14   what could be done, if it can't be done -- we're so

15   used to doing things these days with computers and

16   things -- somebody with good penmanship, in the

17   white at the top could simply handwrite in there

18   with a Magic marker that is Mr. Flax's opinion.

19             THE COURT:  Or, you know, we could -- we

20   could put a -- a label on it.  But we'll give that

21   some thought.  But, you know, it does limp a little

22   bit just because it doesn't have some title

23   designation to it.  So -- but 212 will be received

24   into evidence.  There's no objection, I understand.

25             MR. LINSIN:  No objection, your Honor.

1           THE COURT:  Okay.  I mean, it is -- I hope

2       it is clarifying or helpful.  There is a lot on

3       there, but it is sharp, so we'll leave it at that.

4       And as I mentioned, I will receive OOOO into

5       evidence, and there's no objection.

6           So, okay.  Substantial progress.  I think we

7       can then call the jury back and start with your

8       rebuttal case witness.

9           MR. MANGO:  Yes, your Honor.

10          THE COURT:  Okay.  Please, Chris.

11          MR. LINSIN:  Thank you.

12          (Jury seated.)

13          THE COURT:  Welcome back, ladies and

14      gentlemen.  Please have a seat.

15          Okay.  I think against the backdrop of the

16      explanation that I gave you before you broke for

17      the early lunch, thank you very much for coming

18      back here timely.  We are ready to proceed.  The

19      attorneys and parties are back present.  You are

20      here, of course, roll call waived.

21          The defense case is finished.  They believe

22      that you have everything you need now to decide the

23      case for the defendants.  The government believes

24      that it has given you sufficient proof beyond a

25      reasonable doubt to establish their case against

 1    the defendants, but the government does in this

 2    scenario get the opportunity to present a rebuttal

 3    case, so to speak, if it complies with the rules,

 4    and I found that it did.  So there is one more

 5    witness, not a -- we think, not a long witness.

 6    And the government is ready to do that.

 7        Once that is complete, then I'll give you

 8    further instructions on how we're going to go

 9    forward.

10        Mr. Mango, you have another witness?

11            MR. MANGO:  Yes, your Honor.  In rebuttal

12    the government would call Phil Flax.

13            THE COURT:  Okay.  Now, you have heard

14    from Mr. Flax before, but in this scenario he

15    amounts to witness number 30 by my count, so --

16        All right.  We're going to have you stand right

17    about there, Mr. Flax.  Thank you.

18    P H I L I P   F L A X, having been duly sworn as a

19    witness, testified as follows:

20            THE COURT:  Okay.  I think you know the

21    drill, but, again, you now are under oath.  You've

22    testified before.  You have been here in the

23    courtroom.  I'm going to ask you now to state your

24    full name, spell your last name, please.

25            THE WITNESS:  My name is Philip Flax,

1      F-L-A-X.

2                  THE COURT:  Okay.  Mr. Mango, your

3      witness.

4                  MR. MANGO:  Thank you, your Honor.

5      DIRECT EXAMINATION BY MR. MANGO:

6      Q.   Good afternoon, Mr. Flax.

7      A.   Good afternoon, sir.

8                  MR. MANGO:  Your Honor, based on

9      Mr. Flax's earlier testimony in this trial

10     regarding his background, his education, his

11     knowledge of RCRA and its implementing regulations,

12     I ask that Mr. Flax continue to be viewed as an

13     expert in that area, and I again offer him to the

14     Court as an expert in a way to streamline this

15     rebuttal case.

16                 THE COURT:  All right.  And his testimony

17     really is going to be directed, as I understand it,

18     to the testimony of the defense expert, Marcia

19     Williams.

20                 MR. MANGO:  That's correct, your Honor.

21                 THE COURT:  Okay.  Unless there's an

22     objection, I'm going to proffer Mr. Flax once again

23     as the government's expert as articulated, but

24     primarily in RCRA.

25                 MR. LINSIN:  No objection, your Honor.

1           MR. PERSONIUS:  No objection.  Thank you,

2     Judge.

3           THE COURT:  Okay.  Ladies and gentlemen,

4     remember that -- and you've heard and seen Mr. Flax

5     before -- expert witnesses -- and you will have an

6     opportunity to ask questions if you will -- or

7     choose to, because he is being entered as an

8     expert.  You assess his believability, his

9     credibility, just as you would any other witness on

10    the same criteria factors.  But keep in mind he has

11    a special knowledge and expertise based on study,

12    experience, work history and the like, in

13    particularly the RCRA statute.  So -- and

14    procedures.

15        Go ahead, Mr. Mango.

16          MR. MANGO:  Thank you, your Honor.

17    BY MR. MANGO:

18    Q.  Mr. Flax, did you have an opportunity to listen

19    to the testimony of Miss Williams?

20    A.  Yes, I did.

21    Q.  And were there any parts of that testimony that

22    you agreed with?

23    A.  Some.

24    Q.  Okay.  Were there any parts of that testimony

25    you that you did not agree with?

1    A.   Yes, there were.

2    Q.   Okay.  I'd like to start with some items you

3    may have agreed with.  Did you hear her testimony

4    regarding spills and leakage?

5    A.   Yes, I did.

6    Q.   All right.  Was there any portion of that

7    testimony that you agreed with?

8    A.   Yes, there was.

9    Q.   Okay.  Tell the jury what that was.

10   A.   I agreed that inadvertent spills and leakage

11   were those spills that were done by personnel,

12   accidental spills when they were taking every

13   precaution to try to prevent those spills, and

14   those types of spills are immediately cleaned up

15   and any residual contamination is removed.

16   Q.   All right.  Are you familiar with Tonawanda

17   Coke's practice of placing K087 waste onto the coal

18   piles on the ground?

19   A.   Yes, I am.

20   Q.   All right.  And as a result of that practice,

21   would you characterize any releases containing K087

22   waste as an inadvertent activity?

23   A.   No, I would not.

24   Q.   Okay.  Tell the jury why.

25   A.   I wouldn't because I believe that, in my

1    opinion, the practice of taking K087 tar sludge and

2    placing it on coal in the coal piles on the grounds

3    was a deliberate action that allowed for the

4    uncontained, uncontrolled, and unremediated release

5    of contamination to the environment.

6    Q.   All right.  Mr. Flax, did you hear

7    Miss Williams's testimony regarding the purposes of

8    RCRA?

9    A.   Yes, I did.

10   Q.   All right.  And what is your understanding of

11   the purposes of RCRA?

12   A.   The purpose of RCRA are twofold.  The first is

13   to protect human health in the environment through

14   the proper management of hazardous waste.  And the

15   second is resource recovery and conservation; in

16   other words, reuse, recycling, and the reduction of

17   wastes.

18   Q.   All right.  Can you tell the jury whether any

19   of those -- if one of those purposes takes

20   precedence over the other?

21   A.   Yes, of course.  The protection of human health

22   in the environment takes precedence over everything

23   else.  All other considerations are secondary.

24   Q.   All right.  During Miss Williams's testimony

25   did you have an opportunity to observe the chart

1    she used during her testimony, which is Defendant's

2    OOOO?

3    A.  Yes, I did.

4    Q.  And have you had a chance to review Defendant's

5    OOOO before now testifying here today?

6    A.  Yes, I did.

7         MR. MANGO:  Your Honor, I'd like to pull

8    up Defendant's OOOO at this point.

9         THE COURT:  Okay.  Mr. Mango, go ahead,

10   please.  There's no objection?  Yes.

11        MR. LINSIN:  No objection, your Honor.

12   And is this an appropriate time to resolve its

13   admission, the matter I had understood, at least on

14   the record last week, was still open?

15        MR. MANGO:  No objection now, your Honor.

16   I understand the Court is inclined to admit this

17   into evidence, and we have no objection.

18        THE COURT:  All right.  It is now received

19   into evidence, and it may be considered by you,

20   ladies and gentlemen.  It has been designated the

21   summary chart, if you will, of the opinions of the

22   defense expert, Marcia Williams, with respect to,

23   as designated, waste under RCRA in this case.  So,

24   you know, you are to view it as that, for purposes

25   of assisting you in understanding the evidence

1    that's relevant to the RCRA counts in the

2    indictment no this case.  So this is now an exhibit

3    received into evidence, and it may be published for

4    your review.

5              (Defendants' Exhibit OOOO was received

6              into evidence.)

7              MR. MANGO:  Thank you, your Honor.

8    BY MR. MANGO:

9    Q.  Mr. Flax, do you see that Defendant's OOOO on

10   the screen?

11   A.  Yes, I do.

12   Q.  All right.  How would you characterize -- do

13   you see the white box in the middle of the exhibit?

14   A.  Yes, sir.

15   Q.  How would you characterize the information

16   contained in this white box?

17   A.  Well, it's incomplete in some respects, and

18   it's missing at least one critical factor that, in

19   my opinion, needs to be taken into account when you

20   consider whether material recycled is a solid

21   waste.

22   Q.  Okay.  I want you to tell the jury -- this

23   critical factor you believe is missing here, why

24   don't you tell the jury a little bit more about

25   that.

1    A.   The section of the regulations for recycling

2    materials that states, "Materials are solid waste

3    when recycled when they are applied to or placed on

4    the land -- on the land in a manner that

5    constitutes disposal."  And that is entirely

6    missing from the white box in this figure.

7              THE COURT:   Where should that go, in your

8    opinion?

9              THE WITNESS:   That should go right on top

10   of "used on the land," sir.

11             THE COURT:   Thank you.

12   BY MR. MANGO:

13   Q.   Okay.  So that is -- that is missing in this

14   white box?

15   A.   Yes, it is.

16   Q.   Now, in a manner -- I think you mentioned,

17   "applied to or placed on the land in a manner

18   constituting disposal."

19   A.   That's correct.

20   Q.   In your understanding of disposal under RCRA,

21   can you tell the jury what that is?

22   A.   Disposal under RCRA is the placement of solid

23   waste, hazardous waste, or hazardous materials onto

24   or into the land in a manner that allows the

25   release of that solid waste, hazardous waste, or

1     hazardous constituents, which are basically the

2     chemicals that make something hazardous, into the

3     environment.

4     Q.  Okay.  So for disposal purposes, is that the

5     key, that the material may enter the environment?

6     A.  Correct.

7     Q.  Okay.  Now, in light of -- I think you also

8     mentioned that you believe this was incomplete.  In

9     light of your belief that Defendant's OOOO is

10    incomplete, did you prepare any charts of your own

11    for use today?

12    A.  Yes, I did.

13    Q.  All right.  And what type of chart -- if you

14    could tell the jury, what type of chart did you

15    prepare?

16    A.  I prepared a chart that, in my opinion, tries

17    to demonstrate the steps one would take to

18    determine whether something is a solid and a

19    hazardous waste.  I've limited the information to

20    the things that I believe are applicable to the

21    situation at Tonawanda Coke, and then I've made

22    three little decision trees to try and show how

23    that information is applicable to the RCRA counts

24    that are contained in the criminal indictments.

25              MR. MANGO:  All right.  At this point,

1   your Honor, I'd like to show the witness Government

2   Exhibit 212.  And based on our earlier conversation

3   and understanding the Court's ruling, I would move

4   this into evidence.

5           THE COURT:  Yeah.  There's no objection,

6   is my understanding.  It will bear with it probably

7   a descriptive title when you next see this

8   particular exhibit, ladies and gentlemen.  But it

9   will be received.  No objection, Mr. Linsin?

10          MR. LINSIN:  No objection, your Honor.

11          THE COURT:  All right.  Mr. Personius?

12          MR. PERSONIUS:  No objection, Judge.

13          THE COURT:  Okay.  And it may be

14   published.  And the RCRA counts in this indictment

15   are 17, 18 and 19.

16          MR. MANGO:  Yes, your Honor.

17          THE COURT:  Okay.

18          (Government's Exhibit 212 was received

19          into evidence.)

20          MR. MANGO:  Yes, it is published.  Great.

21   BY MR. MANGO:

22   Q.  Mr. Flax, do you see this document, now

23   Government Exhibit 212 in evidence, on your screen?

24   A.  Yes, I do.

25   Q.  Okay.  Why did you create this chart?

1    A.   I created this chart to try to explain to the

2    jury in as simple a way I could how you determine

3    whether materials from Tonawanda Coke are solid

4    waste and how that relates to the counts in the

5    indictment.

6    Q.   Okay.  Is it your belief that this chart will

7    aid the jury in understanding the RCRA concepts

8    relating to Counts 17, 18 and 19?

9    A.   I certainly hope so.

10   Q.   All right.  Now, let's start with the box in

11   the upper left, which says "Definition of solid

12   waste, number 1."  Can you describe for the jury,

13   using reference to that box -- and if you need to

14   touch the screen, please do so, add dots.  Describe

15   for the jury how a material becomes a solid waste.

16   A.   According to what I have in this box, materials

17   become a solid waste when they are discarded by

18   being either abandoned or recycled in certain ways.

19   Q.   All right.  And abandoned -- you have two

20   bullet points underneath abandoned?

21   A.   Yes.

22   Q.   Could you talk about that briefly?

23   A.   Well, abandoned by being disposed or by being

24   accumulated, stored, or treated in lieu of or -- in

25   lieu of being abandoned.

1    Q.   Okay.  Now, "Recycled in certain ways based on

2    the type of material."  You have three bullet

3    points there?

4    A.   Yes.

5    Q.   Can you talk a little bit more about the bullet

6    points you included under this recycling part?

7    A.   Right.  Well, the first is "Applied to or

8    placed on the land in a manner that constitutes

9    disposal."  That's what we just talked about when

10   things are applied to the land in a manner so that

11   contamination can enter the environment.

12       The second, I put that down just to show,

13   because when I was listening to Miss Williams's

14   testimony, she gave an example of something that's

15   used to -- used on the land.  I think what she

16   meant to say was used to produce a product that is

17   used on the land, if I'm not incorrect, because she

18   used the example of a fertilizer.  And this is the

19   section of the regulation that applies to that.

20       The other, "Used to produce a fuel," using that

21   because I believe that is -- directly pertains to

22   the situation at Tonawanda Coke.

23   Q.   All right.  And we'll talk about that in a

24   minute in more detail.

25       Now, you've -- just if you could just briefly

1    walk the jury through the other two boxes on the

2    right-hand top part of this page.

3    A.   Sure.  Box number 2 contains the exclusion from

4    being a solid waste that is specific to wastes from

5    the coking processes.  There are about 25 of these

6    specific exclusions in the regulations.  This is

7    the only one that applies to waste products from

8    coking operations.

9    Q.   And then underneath it there's a box number 3.

10   What is that?

11   A.   Right.  After you determine if something is a

12   solid waste, then you have to determine whether

13   it's a hazardous waste.  And, of course, you do it

14   in two ways, and I condensed this, because they

15   could be separate.  You do it first by trying to

16   identify it as a listed waste.  And listed waste,

17   as I know you've heard a hundred times, are those

18   things that are specifically identified in the

19   regulations.  They each have numbers associated

20   with them.  Or you determine if that waste exhibits

21   a characteristic, like ignitability, corrosivity,

22   reactivity or, in this case, toxicity.

23   Q.   All right.  And just describe in general terms

24   the bottom half of this exhibit, what -- what that

25   contains.

1    A.   Well, I produced the decision tree that --

2    where you'd follow along to see if something was a

3    solid waste and then a hazardous waste and then

4    subject to regulation, trying to make it as simple

5    to possible.  It's a way to use the information in

6    the three upper boxes to make a decision about the

7    nature of the material and the RCRA requirements

8    involved.

9    Q.   Okay.  All right.  Let's start with Count 17

10   here.  What is your understanding of Count 17 of

11   the indictment?

12   A.   My understanding of Count 17 is that it alleges

13   storage of hazardous waste on the ground in the

14   area around the two Barrett tanks.  Storage without

15   a permit.

16   Q.   All right.  And now you've got your decision

17   tree here.  Why don't we walk through that, if we

18   could.

19   A.   Sure.  The first box you look at is, "Is the

20   material on the ground a solid waste?"  So you go

21   to box number 1, and there is a stipulation that

22   the Court and -- all the parties and the Court have

23   agreed, that that material was abandoned.  So you

24   go no further.  Since that material was abandoned,

25   you follow the yes arrow down, because now you know

1     it is a solid waste, and you look and you try to

2     determine is it a hazardous waste.

3     Q.  And take the jury through the next step of your

4     decision tree.

5     A.  In determining whether or not the material is a

6     hazardous waste, I reviewed analytical data from

7     September and December of 2009 that was taken of

8     this material, and I found that the samples

9     indicated that this material was a toxic hazardous

10    waste because it exceeded the regulatory level for

11    benzene.  So, yes, it is a hazardous waste.

12        The next step is to determine if the material

13    was actively managed.  In 1998 Tonawanda Coke

14    applied coke breeze to these piles around the

15    Barrett tanks.  In my mind, that was enough to make

16    this material actively managed.  Therefore, what's

17    happening is you have a hazardous waste in an area

18    that's being actively managed.  That activity

19    requires a RCRA storage permit, and Tonawanda Coke

20    did not have one.

21    Q.  Okay.  All right.  Let's go through Count 18.

22    What is your understanding of Count 18 of the

23    indictment?

24    A.  Count 18 involves the removal of waste from the

25    Barrett tanks and its mixing -- dumping and mixing

1    with coal on the ground.  And the allegation is

2    that that activity required a RCRA disposal permit.

3    Q.  All right.  So let's walk through the decision

4    tree you created for that.

5    A.  Well, the first thing you do is you try to --

6    you go to box number 1, and you see and try to

7    decide if this material is a solid waste.  And you

8    look and you see that, first of all, the material

9    is not abandoned, because it's being recycled.  And

10   then you look in "recycled in certain ways," and

11   you see if something applies to that.  And, in my

12   opinion, two things do apply, but the most -- the

13   first one, "applied to or placed on the land in a

14   manner that constitutes disposal," in my opinion,

15   that applies to this material.  But also the third

16   one, it was used to produce a fuel.  So there's two

17   criteria there to indicate to me that this material

18   is a solid waste.

19       Then the next step, you look at box number 2,

20   because some solid wastes have specific --

21   waste-specific exclusions.  So if you handle it in

22   a certain way, it comes out of the solid waste

23   field.  The exclusion for coke waste reads, K087 --

24   and it's paraphrased a little bit -- "K087 and D018

25   from coke by-products processes are excluded from

1    the definition of solid waste when recycled to coke

2    ovens."

3         And here's the big point:  "Conditioned on

4    there being no land disposal" -- "no land disposal

5    from the point they are generated to the point they

6    are recycled to the coke ovens."

7         Now, it is my opinion that the mixing of the

8    decanter tank tar sludge and the mixing of the

9    materials taken out of the Barrett tanks on the

10   coal on the ground constituted land disposal, and a

11   definition of which is going to be supplied to you

12   by the Court.

13        That opinion differs very much, and it's the

14   main point -- there is a lot of points where I

15   differ from Miss Williams's testimony.  This is the

16   main point where I differ from Miss Williams.  I

17   believe that this material is subject to full

18   regulation.  Otherwise, why would you need the

19   second part of this regulation that says

20   "conditioned on there be no land disposal from the

21   point it is generated to the point where it's

22   actually introduced back into the coke ovens"?

23   Wouldn't be necessary.

24        I believe the mixing procedure utilized at

25   Tonawanda Coke makes any eligibility for this

1    exclusion null and void.  The material is subject

2    to full regulation.  And being that it is, the next

3    step I take in this little decision tree is to see

4    if it's a hazardous waste.

5         Well, once again, this material, there were

6    samples taken in September and December of 2009,

7    and those samples indicate that it was toxic for

8    benzene.  Therefore, that material is a hazardous

9    waste.

10   Q.  Okay.  And as a result of that, what is your

11   opinion --

12   A.  The land disposal -- the disposal -- excuse

13   me -- the disposal of hazardous waste as alleged in

14   the indictment requires a permit, a permit under

15   RCRA, and Tonawanda Coke Corporation had no such

16   permit.

17             THE COURT:  Are we talking K087?

18             THE WITNESS:  No.  Right now, your Honor,

19   I'm talking D018 that was taken out of the Barrett

20   tanks.

21             THE COURT:  Okay.

22             MR. MANGO:  That's Count 18, your Honor.

23   BY MR. MANGO:

24   Q.  Okay.  Let's talk now about -- let me go back.

25   In that description of your decision tree for

1    Count 18, I'm going to put a little point there.

2    You said "used to produce a fuel."  Is it your

3    opinion that coke is a fuel?

4    A.  It's my opinion, based on everything I've

5    heard, yes.

6    Q.  Okay.  All right.  Can you tell the jury what

7    your understanding of Count 19 is?  Just your

8    understanding.

9    A.  Count 19 alleges legal disposal -- well, excuse

10   me.  It alleges disposal of hazardous waste without

11   a permit as related to the practice at Tonawanda

12   Coke of removing K087 from the tank and applying it

13   with coal on the grounds.

14   Q.  Okay.  This is the K087 waste into the tar box,

15   is that right?

16   A.  Yes.

17   Q.  And brought to the coalfield?

18   A.  Yes.

19   Q.  Okay.  Walk the jury through maybe a similar

20   analysis to the earlier count, but if so, just --

21   you don't need to repeat yourself, but walk the

22   jury through the decision tree for Count 19.

23   A.  Sure.  The first step, once again you go to box

24   number 1, materials not being abandoned, is being

25   recycled in a certain way.  And it is, in my

1    opinion, being used to produce a fuel and applied

2    to or placed on the land.  So, in my opinion, this

3    material is a solid waste.

4        Then you go to box number 2, and the same

5    argument.  This is an exclusion, a specific

6    exclusion for these wastes.  And if this material

7    had not been mixed on the land, it -- it would be

8    eligible for the exclusion.  However, the fact that

9    they did mix this material on the land with the

10   coal makes them ineligible for this exclusion.

11       Therefore, I go to the next box, and I ask

12   myself, is this hazardous waste?  K087 is a

13   hazardous waste, a listed hazardous waste under

14   RCRA.  So, therefore, the disposal of this material

15   requires a permit under RCRA, and Tonawanda Coke

16   had no such permit.

17   Q.  All right.  Thank you, Mr. Flax.  Did you hear

18   Miss Williams's testimony regarding land-based

19   production units?

20   A.  Yes, I did.

21   Q.  All right.  Have you become familiar with what

22   land-based production units are?

23   A.  Well, I did try to make myself familiar with

24   them, because I really had never heard the term

25   before.  So I did a little research, yes.

1    Q.   Have you done a fair amount of research since

2    you've last testified?

3    A.   Yes, I have.

4    Q.   All right.  What is your understanding of what

5    a land-based production unit is?

6    A.   The land-based production units that are

7    recognized by EPA are restricted to the example

8    that Miss Williams gave on the stand, and that is

9    gold heap leaching and copper dump leaching.  And

10   these are production activities that take place

11   right on the land and are limited to the mining

12   industry.  And EPA has elected not to regulate

13   those activities because -- well, they don't occur

14   around here -- because they felt that the state

15   authorities in Nevada, where it does occur, are

16   sufficient to handle any problems that might result

17   from that.  And they also felt that any necessary

18   cleanup or any other means necessary to address any

19   contamination resulting from the operation of these

20   types of units could be performed under either the

21   Clean Water Act or the Safe Drinking Water Act.

22   That's why they elected not to regulate them under

23   RCRA.

24   Q.   Okay.  So it's your testimony land-based

25   production units apply only to something that is

1    physically and actually produced on the land?

2    A.   Yes.   That is the only way to do this very

3    restricted type of operation.

4    Q.   Do you believe that the concept of land-based

5    production units has any relevance to Count 18 or

6    19 of this indictment?

7    A.   None whatsoever, in my opinion.

8    Q.   And tell the jury why.

9    A.   Well, because coke is produced in a coke oven.

10   Q.   Did you hear Miss Williams's testimony

11   regarding a continuous production process?

12   A.   Yes, I did.

13   Q.   And is there any definition of "continuous

14   production process" in the RCRA regulations?

15   A.   No, there is not.

16   Q.   All right.   What is your understanding of what

17   a continuous production process is under RCRA?

18   A.   A continuous production process under RCRA is a

19   situation where you would take the waste from the

20   point where it is generated and immediately, in a

21   safe manner, transport it back to be introduced

22   right into the production process.   No storage, no

23   other activity in between that.   That is my

24   understanding.

25   Q.   And what do you -- or I'm sorry.   Do you

1    believe that the concept of continuous production

2    process has any relevance to Count 18 or Count 19

3    of this indictment?

4    A.   None whatsoever, in my opinion.

5    Q.   Okay.  Tell the jury why.

6    A.   Because the operations conducted at Tonawanda

7    Coke were not continuous in nature.  Material was

8    either taken from -- the K087 was either taken from

9    the tar tank or the material was taken from the

10   Barrett tanks, and it wasn't immediately

11   reintroduced into the coke ovens.  It was mixed

12   with coal on the ground in the coalfields.  There

13   was no way in the world that this is a continuous

14   production process.

15          MR. MANGO:  Thank you, Mr. Flax.

16      Nothing further, your Honor.

17          THE COURT:  Okay, Mr. Mango.  Thank you.

18      Mr. Linsin.

19          MR. LINSIN:  May I proceed, your Honor?

20          THE COURT:  You may proceed.

21   CROSS-EXAMINATION BY MR. LINSIN:

22   Q.   Good afternoon, Mr. Flax.

23   A.   Good afternoon, sir.

24   Q.   We've not spoken since you testified last, is

25   that correct?

1    A.   That is correct.

2    Q.   Mr. Flax, you've changed a number of the

3    opinions you expressed since you last testified

4    here, haven't you?

5    A.   I don't believe that's true, no.

6    Q.   Do you recall when you testified here, if I

7    have it correctly, on Thursday, March the 14th, and

8    you were asked some questions about the K087

9    material, that you testified that because this was

10   a listed hazardous waste under RCRA, there was no

11   need to be concerned at all or to analyze at all

12   whether it was a solid waste?  Do you recall

13   testifying that way?

14   A.   Yeah.

15   Q.   All right.  But now in the decision tree you

16   have provided on this Government Exhibit

17   number 212, you now concede, I guess, that it is

18   important and necessary that you first determine

19   whether that material is a solid waste, is that

20   correct?

21   A.   What I believe is that the uninitiated or the

22   unexperienced need to go through this procedure.

23   Q.   The un -- isn't -- isn't it explicitly required

24   in the regulations -- not just for the uninitiated

25   or the inexperienced, isn't it explicitly required

1    in the regulations, the hazardous waste regulations

2    under RCRA, that you first determine whether the

3    material is a solid waste?

4    A.   That is a procedure that is specified in the

5    regulations.  But when I or one of my inspectors go

6    out to a facility and we inquire of the facility

7    the materials that they generate, or we familiarize

8    ourselves with the types of waste, beforehand, that

9    a facility generates, I think we've got a jump

10   start on how we view the process.

11   Q.   Let me ask the question again.  You may have a

12   jump start, and your experience may well help you

13   in the analysis, but isn't it true that before you

14   reach any decisions about whether material or

15   activity regarding material requires a permit, you

16   must first determine whether it is a solid waste

17   under RCRA?  Isn't that correct?

18   A.   Something has to be a solid waste to be a

19   hazardous waste.  If that's what you mean, yes.

20   Q.   And when you testified here just 11 days ago,

21   you said that you didn't have to be concerned about

22   whether K087 was a solid waste, because it's a

23   listed hazardous waste, and you go straight to that

24   analysis.  Isn't that what you said?

25   A.   That's what I would do, sir, yes.

1    Q.  But you've now modified that so we can

2    incorporate this important decision-making process

3    on your chart, correct?

4    A.  I've modified this chart to try to explain in

5    the most simple way to the jury how you could come

6    about the conclusions that I have come to.

7    Q.  And the way you now have this provided, at

8    least the decisions are consistent with actually

9    what is required under the regulations, correct?

10   A.  These are the decisions I would have come to if

11   I didn't start at the point that you are

12   indicating.

13   Q.  You also testified last time, did you not, that

14   you thought there was one disposal count charged in

15   this case, correct?

16   A.  At the time you were asking me questions about

17   one particular situation, and my testimony at that

18   time was regarding that explicit event.  Yes.

19   Q.  Well, Mr. Flax, didn't you testify that it was

20   your understanding that there was one disposal

21   count charged in this case that related to K087?

22   A.  Yes.  I was not familiar with the indictment.

23   That's correct.

24   Q.  All right.  You have testified, as I heard you,

25   repeatedly, that one of the fundamental differences

1    that you have with Miss Williams's testimony is

2    that you believe that the mixture of this, either

3    the K087 or the D018, on the coal piles, in your

4    testimony, on the ground, constituted land

5    disposal, is that correct?

6    A.   Correct.

7    Q.   Since you last testified, have you done

8    anything to inform yourself about what the material

9    was that was beneath these coal piles out at

10   Tonawanda Coke?

11   A.   I've listened to whatever testimony I sat in

12   the courtroom and heard what individuals had to say

13   about it.  Yes.

14   Q.   Did you hear what Gerry Priamo had to say --

15   not had to say.  Did you hear what Gerry Priamo

16   testified was underneath these coal piles?

17   A.   No.  I was not in the courtroom for that.

18   Q.   Has anyone advised you that Mr. Priamo, who had

19   substantial experience in this coalfield, testified

20   that the coal underneath these coal piles was

21   anywhere from 3 to 6 feet deep?  Did you hear that?

22   A.   I wasn't aware of it, but that's fine.  Okay.

23   Now I am.  Yes.

24   Q.   All right.  And you agree with me, don't you,

25   that coal -- at least for the purposes of coking

3706

1    operations, coal is a raw material, correct?

2    A.   Absolutely.

3    Q.   And raw materials are not regulated under RCRA,

4    correct?

5    A.   That's correct.

6    Q.   All right.  So you testified multiple times

7    that -- in your direct testimony a moment ago, that

8    this mixing operation occurred on coal piles that

9    were on the ground.  That was not correct, was it?

10   A.   That is correct.

11   Q.   Are you disputing Mr. Priamo's testimony about

12   what was beneath these coal piles?

13   A.   No.

14   Q.   But you're equating 3 to 6 feet of coal with

15   the ground.  Is that what I understand?

16   A.   Yes, I am.

17   Q.   All right.  Even though raw material is

18   excluded from RCRA?

19   A.   Yes, I am.

20   Q.   Okay.  You testified that you believe that this

21   recycling procedure, both for the K087 and the

22   D018, constituted land disposal, in your opinion,

23   correct?

24   A.   That is correct.

25   Q.   And you believe that that was true because it

1    allowed for, if I took it down correctly, the

2    uncontained, uncontrolled releases into the

3    environment.  Is that your testimony?

4    A.  Exactly.  Yes.

5    Q.  Are you aware of any sampling that was done in

6    the coalfields at Tonawanda Coke?

7    A.  No, I'm not.

8    Q.  Are you aware of the fact that Tonawanda Coke

9    has a Clean Water Act permit?

10   A.  No, I'm not.

11   Q.  Are you aware of what the testing parameters

12   are on a monthly basis under that facility's Clean

13   Water Act permit?

14   A.  No.

15   Q.  Do you have any information at all to indicate

16   or have you heard any testimony to indicate that

17   there was at any point releases of coal tar sludge

18   or D018 material into the environment?

19   A.  I have heard testimony and I've read testimony

20   that indicated that no preventative precautions

21   were ever taken to prevent that.

22   Q.  Did you ever hear the testimony -- let's start

23   at the beginning of the process, with the material

24   that was taken out of the tar box.  Did you hear

25   the testimony from people who had observed that

1    process, about how long those front-end loaders sat

2    there so that all that material that was outside of

3    the bucket would drip back into the box before the

4    front-end loader traveled to the coalfield?

5    A.   No.  No.  No, I haven't.

6    Q.   Would you believe that would have been

7    important for you to understand?

8    A.   No, I don't.

9    Q.   Would you agree with me that that is a prudent

10   and valuable precaution to take to make sure that

11   none of this material just dribbles onto the

12   ground?

13   A.   Could you explain the process that relates to

14   this again, in terms of the front loader?

15   Q.   Sure.  I'm sorry if I my question wasn't clear.

16   I'm talking about whether you ever heard testimony

17   from anyone or whether anyone ever advised you that

18   when this material was removed from the tar box,

19   scooped out of the tar box, that the front-end

20   loader would actually sit there and idle in front

21   of the tar box so that any of the material that

22   might be on the outside of the bucket would drip

23   back into the tar box before the front-end loader

24   actually moved to travel to the coalfield.

25   A.   Well, that's very nice, but I'm more concerned

1    with what happens when the front-end loader goes to

2    the coalfields and dumps the tar.

3    Q.   We'll get there.  But my question is, first of

4    all, did you hear that testimony?

5    A.   No, I did not.

6    Q.   You were not aware of those facts?

7    A.   No, sir.

8    Q.   All right.  And have you read or seen any

9    descriptions of what actually happened when this

10   material was mixed with the coal on the coal piles?

11   A.   Yes, I have.

12   Q.   Whose testimony have you read?

13   A.   I have -- I don't remember whose, but I did

14   read some short sections that dealt with that.

15   Q.   You don't remember any names?

16   A.   I -- I read several people's testimony.  I

17   could give you the names of the people's testimony

18   I read.  If it's in there, that's where I saw it.

19   Q.   Well, what I'm trying to understand right now,

20   Mr. Flax, is what is the basis, the factual basis,

21   for the opinions you're now offering.  What is your

22   factual basis for your understanding of what

23   actually happened in this recycling process?

24   A.   That there was no preventative measures, no

25   containment or control of this coal tar when it was

1    dumped on and mixed with the coal on the ground.

2    Q.  You mean it was not performed within a box?

3    A.  It was not performed in a manner to prevent the

4    uncontrolled release of contamination.

5    Q.  And my question -- my initial question before

6    we got off on this track was whether you are aware

7    of any testimony anywhere, from any person, that

8    says that any of this material was released into

9    the environment.

10    A.  I believe I saw some testimony from either

11    Mr. Rogers or Mr. Hoffmann that indicated that no

12    preventative controls were put in place and nobody

13    ever told them to avoid doing anything that would

14    cause a release of this material when it was

15    applied to the coal.

16    Q.  Right.  And that's now the second time you've

17    given that answer.  I'm going to repeat my question

18    for the third time.  Are you aware of any evidence,

19    any testimony from any source, that any of this

20    material did enter the environment?

21    A.  You mean from somebody who was standing there

22    watching it?  No, I'm not.

23    Q.  From any source, sir.

24    A.  No.  No.

25    Q.  You offered some testimony on Count 17 today.

1    I want to go back through that briefly, but am I

2    correct that you also now have become more familiar

3    with what the allegations are in Count 17 of the

4    indictment since you last testified?

5    A.   Yes, sir.

6    Q.   And you're aware that in the indictment,

7    anyhow, it's alleged that this storage went back to

8    1998 when coke breeze was first spread on this

9    material, is that correct?

10   A.   That is my understanding, yes.

11   Q.   And it's your opinion that spreading of the

12   coke breeze constituted active management and

13   therefore this material became subject to RCRA, is

14   that correct?

15   A.   That's part of what determined my opinion, yes.

16   Q.   But you also testified that you read the -- or

17   were aware of the stipulation that before Tonawanda

18   Coke took possession of this property that the

19   material in the tanks and on the ground around the

20   tanks had been abandoned by a prior owner, correct?

21   A.   Correct.

22   Q.   So let's just look at your decision tree, as

23   you described, it for Count 17.  You indicate here

24   that the first question you have to ask is whether

25   the material is a solid waste.  Isn't it true that

1    because this material that relates to Count 17 had

2    been abandoned by a prior owner, don't you -- isn't

3    the first question you have to ask whether or not

4    the material was actively managed, in order to

5    determine whether it becomes subject to RCRA?

6    Isn't that your first question?

7    A.   You could back into it that way, yes.

8    Q.   Isn't that the threshold question, Mr. Flax, to

9    determine whether the material becomes subject to

10   RCRA regulation?

11   A.   I believe there is a definition of active

12   management that has been agreed upon, and it's been

13   proffered by this Court.  And I don't believe it

14   says that in the definition, sir.

15   Q.   Well, there is a definition of active

16   management, and we can get to that in a moment.

17   But my question, though, really relates to how that

18   concept of active management relates to waste that

19   had been abandoned before the enactment of RCRA.

20   Are we agreed that material that was abandoned

21   before the enactment of RCRA is not subject to RCRA

22   regulation unless and until it is actively managed?

23   A.   I agree with that, yes.

24   Q.   All right.  So given that there is a

25   stipulation in this case about that material, that

1    it had been abandoned by a prior owner prior to

2    '78, isn't it correct that the first question you

3    have to ask in order to understand whether the

4    material is subject to RCRA regulation -- don't you

5    have to first ask is the material or has it been

6    actively managed?

7    A.  That is what you need to ask to know if a

8    permit was required.  It's not what you have to ask

9    to determine whether the material is a solid or

10   hazardous waste.

11   Q.  So you believe it's subject to RCRA regulation

12   even if it wasn't actively managed?

13   A.  No.  I believe it to be a hazardous waste if it

14   wasn't actively managed, but I believe that it is

15   subject to a permit because it was actively

16   managed.

17   Q.  You heard Miss Williams testify about a wide

18   number of -- of facilities she's familiar with -- a

19   large number of facilities she is familiar with, in

20   which previously abandoned waste has been paved

21   over or parking lots or even buildings put over

22   them.  Did you hear that testimony, sir?

23   A.  Yes, I did.

24   Q.  Are you familiar with those kinds of management

25   of inactive waste storage units?

3714

1  A.  We routinely pave over areas where soil has

2  been contaminated by hazardous waste or hazardous

3  constituents, because there is a structural

4  stability.  So we pave over it because the paving

5  does two things.  It puts a barrier between that

6  contamination and people and the environment, and

7  it also prevents the infiltration of precipitation

8  that can drive that contamination elsewhere.  But I

9  certainly wouldn't want my daughter parking her car

10  in a parking lot that is paved over a sludge

11  impoundment, and I would not want to live in a

12  building that had been built upon a basis of

13  sludge, sir, because I don't believe there's any

14  structural integrity to it.

15  Q.  I'm going to ask you, Mr. Flax, if you could

16  confine your responses to answers that are

17  responsive to my question.

18  A.  I'm sorry.  I just thought I was trying to

19  explain myself.

20  Q.  My question is whether you are familiar with

21  circumstances where, consistent with RCRA

22  regulations, inactive waste management units of

23  material that existed pre-RCRA have been paved over

24  or even had buildings built over them.

25  A.  Yes.  Under the conditions that I just spoke

1    about.

2    Q.  So you are familiar with those?

3    A.  Yes.

4    Q.  All right.  And are you familiar with the

5    testimony that was provided by Mr. Gerry Priamo and

6    others in this case that the purpose of spreading

7    this breeze over the material that's on the ground

8    was to harden the surface?

9    A.  I have not heard Mr. Priamo's testimony, sir.

10   Q.  Would you agree with me that that purpose is

11   consistent with the overpavement that I had just

12   described of these other inactive waste management

13   units?

14   A.  No.

15   Q.  The spreading of the coke breeze on this

16   material that was on the ground, in your

17   understanding of the facts, was that the only

18   activity that, in your opinion, constituted active

19   management of this material?

20   A.  Well, what I read in Mr. Rogers' testimony,

21   sir, and Mr. Hoffmann's, apparently there had been

22   problems walking in the area because of the sludge,

23   and apparently heavy equipment had gotten stuck in

24   the sludge.  So the coke breeze was added, it's my

25   understanding, to that material in order to try to

1    avoid that situation.

2    Q.  To permit heavy equipment to get close to the

3    tanks, is that correct?

4    A.  Yes.

5    Q.  All right.  So, that is the activity that you

6    believe constitutes active management?

7    A.  Yes, because that activity caused the waste in

8    place to be disrupted and disturbed, and it

9    actually caused it to migrate down gradient,

10   according to what I've read, closer to the tanks.

11   And I believe that is consistent with the

12   definition of active management that has been

13   developed by the Court.

14   Q.  Would you agree with me, or does it fit with

15   your understanding that the definition of active

16   management that will govern the decisions in this

17   case reads as follows:  "Physically disturbing

18   accumulated wastes within a management unit or

19   disposing of additional hazardous waste in existing

20   units containing previously disposed wastes,"

21   period.  "In other words, it means taking some

22   action to disturb or disrupt contained hazardous

23   waste or adding hazardous waste to previously

24   contained material."

25       Is that your understanding of the operative

1    definition?

2    A.   Yes, it is.

3    Q.   And so it requires an action taken to disturb

4    or disrupt?

5    A.   Correct.

6    Q.   And it's your view that the spreading of coke

7    breeze on this tar to facilitate the access of

8    heavy equipment to the tanks was an action taken to

9    disturb or disrupt?

10   A.   It was an action taken that did disturb and

11   disrupt the waste in place.

12   Q.   And -- but that isn't what I just read, is it?

13   A.   I don't know if that's exactly what you just

14   read.

15   Q.   All right.  You testified at a couple of

16   points, I presume with regard to Counts 18 -- and

17   it would be applicable to Counts 18 and 19, that

18   you believe that coke is -- qualifies as a fuel

19   under the terms used in the RCRA definition of

20   solid waste, is that correct?

21   A.   That's correct.

22   Q.   All right.  And if I heard you correctly, you

23   said that you believed coke is a fuel, based on

24   everything you've heard?

25   A.   Heard and read, yes.

1   Q.  And what is the basis of that opinion, sir?

2   A.  In part, decisions that have been made

3   interpret -- regulatory interpretations that have

4   been made by EPA in regard to when coke, intended

5   to be recycling, becomes a solid waste.

6   Q.  Isn't it true, Mr. Flax, that EPA expressly has

7   made the determination that coke is not a

8   waste-derived fuel?  Isn't that what EPA decided?

9   A.  That is true.  That has nothing to do with

10  this.

11  Q.  If -- if a material is determined to be a fuel

12  under the solid waste definition, what is the

13  consequence under this regulation?

14  A.  If something is recycled and in doing so is

15  used to produce a fuel, then when it is -- it is --

16  it is -- it is a solid waste.

17  Q.  What is a solid waste?

18  A.  The material used to produce a fuel in this

19  case is the tar sludge.

20  Q.  All right.  Let me ask you if this is not

21  consistent with your understanding of the actual

22  language of the regulation.  And I'm referencing,

23  for the record, 216.2(c)(2)(B).  And these are all

24  materials that are -- that fit within the

25  definition of solid waste under the regulations.

1        "Materials are solid waste when they are used

2   to produce a fuel or are otherwise contained in

3   fuels," parentheses, "in which case the fuel itself

4   remains a solid waste," close parentheses, period.

5   A.   That relates to the part of that that says

6   "contained in fuels," not to the part that says

7   "used to produce fuels."

8   Q.   And what is the factual basis for your

9   understanding that coke is a fuel?

10  A.   Once again, it deals with every regulatory

11  interpretation that any -- any policy or guidance

12  documents that I have ever been associated with at

13  my time in EPA.

14  Q.   And can you point to any RCRA regulation that

15  identifies coke as a fuel?

16  A.   RCRA regulation does not identify raw

17  ingredients, sir.  It doesn't deal with raw

18  ingredients.  I think we covered that.  It deals

19  with wastes.

20  Q.   So RCRA doesn't define coke as a fuel?

21  A.   No.  In the RCRA regulations coke is not

22  defined as a fuel.

23  Q.   But you said, based on everything you've heard,

24  you've concluded coke is a fuel.

25  A.   Yes.  And I said it was based on all the

1     regulatory interpretations, policy, and guidance

2     that I have ever been associated with in all my

3     years at EPA.

4     Q.  Is it fair, Mr. Flax, to summarize your

5     disagreement with Miss Williams as follows:  That

6     you believe -- at least with respect to the D018

7     and K087 material, it's your opinion that the

8     mixing of this material on the coal piles

9     constituted land disposal?

10    A.  That's a fair representation, yes.

11    Q.  And you heard Miss Williams testify that for a

12    number of reasons she believed that it didn't

13    constitute land disposal, is that correct?

14    A.  I disagree with her.  Yes.

15    Q.  And we are also in agreement, if I'm correct,

16    that the regulations that talk about this process,

17    both the solid waste definition and this -- the

18    language of this exemption, neither of those

19    specify that the recycling must occur on a specific

20    pad or in a specific container or under specific

21    conditions, is that a fair statement?

22    A.  That is correct.  What the regulation does, it

23    attempts to prevent releases to the environment,

24    yes.

25    Q.  It says that there should not be intervening

1    land disposal, correct?

2    A.   There should be no land disposal.

3    Q.   From the time of generation until it is

4    recycled to the ovens, correct?

5    A.   Correct.

6    Q.   And your interpretation of that limitation is

7    that this recycling process did not comply with

8    that restriction?

9    A.   Correct.

10   Q.   And Miss Williams's view was that it did?

11   A.   Correct.

12           MR. LINSIN:  I have nothing further, your

13   Honor.  Thank you.

14           THE COURT:  Okay, Mr. Linsin.  Thank you.

15       Mr. Personius.

16           MR. PERSONIUS:  I have no questions,

17   Judge.

18           THE COURT:  Okay.

19           MR. MANGO:  I have two, your Honor.

20           THE COURT:  Okay, Mr. Mango.

21           MR. MANGO:  Thank you.

22           THE COURT:  Sure.

23   REDIRECT EXAMINATION BY MR. MANGO:

24   Q.   Mr. Flax, in your position -- again

25   incorporating your earlier testimony -- in your

1   position as head of the RCRA program for Region 2

2   of EPA, would you in any realm of the possibility

3   authorize the paving over of the area around the

4   Barrett tanks and allow the building on top of

5   those areas after pavement is put down?

6   A.   In the condition in which I understood the area

7   was, in no way would I authorize that.

8   Q.   Okay.  Are you aware of any type of guidance

9   letter authored by Miss Williams involving the

10  Toledo Coke Corporation, which determined --

11          MR. LINSIN:  Objection, your Honor.

12          MR. MANGO:  Your Honor, if I can get the

13  whole question out --

14          THE COURT:  No.  Let's hear it over here

15  first.

16          (Side bar discussion held on the record.)

17          MR. MANGO:  Thank you, your Honor.

18  Miss Williams has authored a guidance letter in

19  response to a question that came in from the Toledo

20  Coke Corporation, which says that K087 waste is --

21  the coal tar sludge is used to produce a fuel.

22  That's directly relevant to the question that was

23  brought up on cross-examination.  He's aware of

24  that, and I think it's fair to ask him.  He was

25  questioned as to his knowledge of coke being a fuel

1    and what is used to produce a fuel.

2            THE COURT:  When was this letter, and what

3    did it relate to?  Was it an investigation?  Was it

4    a court proceeding?

5            MR. MANGO:  Your Honor, it was a letter

6    that came to EPA when Miss Williams was head of the

7    Office of Solid Waste, and she responded by giving

8    the opinion of what the Office of Solid Waste is.

9            THE COURT:  When was that?

10           MR. MANGO:  I believe, 1988.

11           MR. LINSIN:  Your Honor, the opinion

12   letters -- and this is as to Miss Williams or

13   anybody else -- issued by EPA are in response to a

14   specific set of circumstances posed by a question.

15   They are fact specific.  They are not viewed by the

16   agency as precedential.  This is three or four

17   steps below a policy statement, and I think it is a

18   distortion and a misuse out of context of documents

19   that counsel knows are sui generis.

20           THE COURT:  Well, I don't know what the

21   context is, which makes it problematic.  I mean,

22   this is a question that better should have been

23   asked to Miss Williams rather than this witness.

24   His knowledge of it, I think, tends to be more

25   confusing, I mean, in the overall picture of

1    things.  I'm going to deny the request to ask that

2    question.

3              MR. LINSIN:  Thank you.

4              MR. MANGO:  Yes, sir.

5              (End of side bar discussion.)

6              THE COURT:  Okay.  Objection sustained.

7    BY MR. MANGO:

8    Q.  Mr. Flax, you testified on cross that in all of

9    the regulatory opinions you've observed you believe

10   coke is a fuel?

11   A.  That's correct.

12             MR. MANGO:  All right.  Thank you, your

13   Honor.  Nothing else.

14             MR. LINSIN:  No further questions, your

15   Honor.  Thank you.

16             MR. PERSONIUS:  Nothing.  Thank you,

17   Judge.

18             THE COURT:  Okay.  Mr. Flax, you are

19   excused.  Thank you very much.

20             MR. MANGO:  Your Honor, I would say

21   subject to any questions by the jury.

22             THE COURT:  Ladies and gentlemen, I feel

23   terrible.  All right.  Are there any questions?

24       Chris, I think we're going to need your

25   assistance on this, please.

1        Okay.  Thank you very much.  This is a record

2    number of, at least, pieces of paper containing

3    questions.

4        Okay.  Let's put you on a little white noise.

5    Let me work this through with the attorneys, and

6    then we'll go forward.

7        You want to take a break?  We'll have you back

8    here in 15 minutes.

9            MR. LINSIN:  Would it be possible to make

10   copies so we can read them?

11           THE COURT:  Yes, absolutely.

12           (Jury excused from the courtroom.)

13           THE COURT:  All right.  Mr. Flax, you can

14   step down.

15           THE WITNESS:  Thank you, your Honor.

16           THE COURT:  Don't leave.

17       We'll have Mr. Flax outside while we discuss

18   and resolve.  But I will make copies of the

19   questions for you.

20           MR. MANGO:  Thank you, your Honor.

21           THE COURT:  You're welcome.  We'll see you

22   in a few minutes.

23           (Short recess was taken.)

24           (Jury not present in the courtroom.)

25           MR. LINSIN:  My apologies, your Honor.

1          THE COURT:  Oh, no, not at all.

2      All right.  Let's try to work through a couple

3  of questions.  I think your staped accumulation

4  starts with Juror number 6's question?

5          MR. MANGO:  Yes, your Honor.

6          THE COURT:  Okay.  And that's

7  Miss Majerowski's question, actually.  And the

8  question is:  "According to RCRA, what would a

9  company have to do if they purchased a facility

10  with abandoned tanks from the previous owners on

11  their land after RCRA was in effect, if they didn't

12  actively manage these abandoned tanks?"

13      Fair question.

14          MR. LINSIN:  No problem with that

15  question, your Honor.

16          THE COURT:  Interesting question.

17          MR. MANGO:  It was.

18          THE COURT:  You agree?

19          MR. MANGO:  Yes.  Fair question, your

20  Honor.  And the second part, "What would RCRA do

21  then if the company did just that?"  I would make

22  sure that gets in there as well.  But, yes, fair

23  question.

24          THE COURT:  Well --

25          MR. LINSIN:  I don't know what the second

1     part means.  That's my problem.

2                THE COURT:  Yeah.

3                MR. LINSIN:  I don't know what the "did

4     just that" means.

5                THE COURT:  I'm not sure "what RCRA would

6     do," either.  I don't know what that means.  What

7     do you think that means?

8                MR. MANGO:  I think it means if they

9     didn't actively manage, that is, I believe, what

10    she's referring to as "did just that," which would

11    be did not actively manage, what would RCRA do.

12    It's really just a -- trying to restate the

13    question.  So, actually, I'm comfortable if you

14    want to leave that part out, your Honor.

15               THE COURT:  Okay.  All right.  Let's --

16    and I will.  I'll delete that, because I don't

17    think I can interpret what that means, and I think

18    we run a risk if we ask her what that means.  And I

19    think the first question is a good question.

20        Okay.  The first question from Steven Bauman,

21    Juror number 7, is at the bottom of the page:  Does

22    the 3.4 feet -- 3 to 4 feet I think it is -- of

23    COD.

24               MR. LINSIN:  Coal.  It looks like cod, but

25    I think it's coal in the coalfield.

1      MR. PERSONIUS:  Oh, yes.  Coal in the

2   coalfield.

3      THE COURT:  Yes.  Okay.  That's probably

4   regulated by the Clean Water Act.  All right.

5      -- of coal in the coalfield make any difference

6   in regards to land disposal or have any effect on

7   runoff because of rain?

8      MR. MANGO:  Fair question.

9      THE COURT:  Okay, Mr. Personius?

10     MR. PERSONIUS:  Yes, I agree, Judge.

11     THE COURT:  Okay.  Okay.  And fair

12  question next, I think:  "Has anyone actually

13  determined the depth of coal by means of a core

14  sample, et cetera?"

15     I'll permit that.

16     MR. MANGO:  I don't think he'll know the

17  answer.

18     THE COURT:  Anybody object to that

19  question?

20     MR. MANGO:  No.

21     MR. LINSIN:  No, your Honor.

22     THE COURT:  Now we go to Mr. Collins's

23  question, I think, which is Juror number 3:  "Do

24  you know if the mixing of K087 is done on a pad or

25  back in the coalfields?"

1          MR. MANGO:  It seems like a strange

2    question, because I think he testified that what

3    his understanding of the -- Count 19 of the

4    indictment would be, which is the mixing of the

5    K087 waste on the coal piles on the ground.  But

6    I'm comfortable with it being asked.  I don't

7    think -- I really don't see the point of it, but --

8          MR. LINSIN:  I agree it is a -- it is

9    difficult to understand the point of it, and this

10   witness, especially in his rebuttal testimony, has

11   testified only about an operation that occurred on

12   the coal piles.

13         THE COURT:  Well, the question -- yeah,

14   the more I think about it, do you know.  I think

15   that's what he wants to know from this witness.  If

16   he knows.  Right?

17         MR. MANGO:  Yeah.  Is that --

18         MR. PERSONIUS:  That could be.

19         MR. LINSIN:  Okay.

20         THE COURT:  I think that's okay.

21         MR. LINSIN:  All right.

22         THE COURT:  I think it's just background.

23         MR. PERSONIUS:  Would it be appropriate,

24   your Honor, to change the "is" to a "was"?

25   Because, I mean, what's being done presently, I

1      mean, literally, what's being done now, it is being

2      done on a pad.  So maybe consider changing that to

3      "was"?

4              THE COURT:  Yeah, I think that's right.  I

5      think that --

6              MR. MANGO:  Well, maybe that was the point

7      of the question, actually.  If we're having trouble

8      interpreting the question, that could very well be

9      what Mr. Collins is trying to get at is what is

10     being done now.

11             THE COURT:  Well, that's not relevant.

12             MR. LINSIN:  That's right.

13             THE COURT:  I'll ask it only as "was," and

14     if it triggers some sort of reaction from him, then

15     we'll hold it at that, and I'll explain to him that

16     phrasing it in any other way would make it

17     irrelevant.

18         All right.  I think this is Mrs. Funderburk's

19     question, number 5:  "Under RCRA, in your opinion,

20     would the runoff of tar sludge and coal from the

21     coal piles into the ditches be considered as

22     hazardous waste?"

23             MR. MANGO:  That's a good question.

24             MR. LINSIN:  No problem with this

25     question, your Honor.  With the intro under RCRA?

1          THE COURT:  Yes.  It will, yes.  Under

2     RCRA.

3          MR. LINSIN:  All right.  Okay.

4          THE COURT:  Okay.  And Miss Russ's

5     question, number 10:  "Coal is a raw material and

6     therefore is unregulated, but when the coal is

7     mixed with K087 or D018, is that mixture an

8     unregulated raw material?  Why or why not?"

9          MR. LINSIN:  Fair question, your Honor.

10          MR. PERSONIUS:  I think that's a great

11     question.

12          MR. MANGO:  Likewise.  It's a good

13     question.

14          THE COURT:  Okay.

15          MR. PERSONIUS:  Got the numbers down too,

16     Judge.  That's scary.

17          THE COURT:  I know.  I know.  It's

18     amazing.  Okay.  All right.  Everybody in

19     agreement?

20          MR. LINSIN:  Yes.

21          MR. PERSONIUS:  Yes.  Thank you, Judge.

22          MR. MANGO:  Yes.

23          THE COURT:  Okay.  Chris, would you ask

24     the jury if they want to come back out?

25          COURT SECURITY OFFICER:  Sure will.

1            THE COURT:  Okay.  Thank you.

2            MR. PERSONIUS:  Judge, do you want to have

3     Mr. Linsin ask these again or not?

4            THE COURT:  No.  Don't ask that question.

5     Okay.

6            (Jury seated.)

7            THE COURT:  You know, ladies and

8     gentlemen, I don't know how you do it.  I have

9     fewer objections to your questions than when the

10    attorneys ask questions.  How can that be?

11       Have a seat, please.

12       Okay.  And for not asking you about your

13    questions, I get put in the penalty box all day

14    tomorrow.  All right.  So, we will begin, and, you

15    know, this is really serious business, and again on

16    behalf of everybody we thank you for all the

17    efforts that you're making to really be engaged in

18    this process, because, you know, very shortly

19    you're going to be in a position where we're going

20    to ask you to return that unanimous verdict.

21       So each of your questions I am going to ask.

22    And thank you for those, and I ask everybody to pay

23    close attention.  And Mr. Flax remains under oath,

24    and these questions will be directed to him in no

25    particular order.  They happened to leave the order

1    that I arranged them, and Miss Labuzzetta

2    photocopied them in another order, so we're going

3    to go with her order, and then I'll pay the price

4    later on for saying that.

5         But we're going start with Miss Majerowski's

6    question, Mr. Flax.  And remember you are under

7    oath, and ask you to be as directly responsive as

8    you can.  Here's your first question:

9         According to RCRA, what would a company have to

10   do if they purchased a facility with abandoned

11   tanks from the previous owners on their land after

12   RCRA was in effect, if they didn't, quote, actively

13   manage, close quote, these abandoned tanks?

14   Question mark.

15        Do you understand the question?

16             THE WITNESS:  Yes, I do, your Honor.

17             THE COURT:  Okay.

18             THE WITNESS:  First let me say that

19   management in tanks is storage and is always

20   considered active management.  It would be the

21   responsibility of the new owners to determine what

22   is in those tanks and to handle that material

23   appropriately.

24        When tanks like these are, you know, on a

25   property and the ownership of the tanks crosses the

1    dates of RCRA implementation, there is still a

2    responsibility.  Responsibility doesn't go away

3    when a facility changes ownership.  There are still

4    those tanks, and the contents in those tanks needs

5    to be addressed.  And if it is regulated under

6    RCRA, it has to be managed.

7         If tanks on a facility that are left there by a

8    previous owner and they're there when a new owner

9    takes possession of the property, if those tanks

10   contained gold or diamonds, there would be no

11   shortage of people taking responsibility for what's

12   in those tanks.

13            THE COURT:  So your answer is that under

14   RCRA the new owners would have to determine what is

15   in those tanks?

16            THE WITNESS:  We would hope that as the

17   facility changed ownership, your Honor, that there

18   would be discussion between the previous owner and

19   the new owner as to what the nature of the material

20   is in the tanks, so it could be handled properly.

21   If that wasn't the case, then it's the

22   responsibility of the new owner of the property to

23   know whether or not they are storing hazardous

24   waste in those tanks.

25            THE COURT:  All right.  Storing hazardous

1   wastes that are solids, and then they would have to

2   actively manage, is that your testimony?

3            THE WITNESS:  Storage -- storage, by

4   definition, your Honor, is active management.

5            THE COURT:  Okay.  That's the answer to

6   your question.  Okay?  Okay.

7            A JUROR:  Thank you.

8            THE COURT:  Okay.  Next question:  Does

9   the 3 to 4 square feet -- and I think, Mr. Bauman,

10  this is your question -- of coal in coalfields make

11  any difference in regards to land disposal or have

12  any effect on runoff because of rain, question

13  mark.

14           THE WITNESS:  It may, because of its

15  configuration on the ground, serve to channel the

16  rain in a certain direction when it hits the coal.

17  But it makes no differentiation in terms of

18  disposal for RCRA, if there was coal on the ground,

19  if RCRA-regulated waste is dumped right on top of

20  that.

21           THE COURT:  Okay.  And that, again, coal

22  is not a raw material?

23           THE WITNESS:  It is a raw material, your

24  Honor.

25           THE COURT:  Okay.

1              THE WITNESS:  When it's being used as a

2     raw material.

3              THE COURT:  It makes no difference?

4              THE WITNESS:  No.

5              THE COURT:  Okay.  That's the answer to

6     one of the questions.  The second question is this:

7     Has -- if you know, and for the relevant years in

8     question, has anyone actually determined the depth

9     of the coal, for example, by means of a core sample

10    or the like?

11             THE WITNESS:  I don't know.  I did hear

12    reference to, you know, between 3 and 6 feet of

13    coal, but I've never seen anything where anyone

14    went out and actually did borings to determine the

15    actual thickness.

16             THE COURT:  Okay.  So you don't know?

17             THE WITNESS:  No, I do not know.

18             THE COURT:  Okay.  All right.

19    Mrs. Funderburk, I think this is your question, and

20    it relates to under RCRA:  In your opinion,

21    Mr. Flax, would the runoff of tar sludge and coal

22    from the coal piles into the ditches be considered

23    hazardous waste?

24             THE WITNESS:  The runoff of the tar sludge

25    would be considered hazardous waste.  The runoff

1    from the coal, no.  That's a raw ingredient.

2            THE COURT:  Okay.  Next question,

3    Mr. Collins, I believe:  Do you know if the mixing

4    of K087 was done on a pad or back in the

5    coalfields?

6            THE WITNESS:  The indications I have from

7    the inspection reports that I've read from my own

8    staff indicates that they were told that the mixing

9    of the tar sludge was done in the coalfields and

10   not on the pad.  I also had some indications that

11   there were times when they infrequently did use the

12   pad, but that most of the time it was done in the

13   coalfields on the ground.

14           A JUROR:  I meant today, like now.

15           THE COURT:  Okay.  What I'm going to do is

16   I'm going to let the question that I asked,

17   anticipating that it was your question, stand.  The

18   question that you want answered is not relevant, so

19   I'm not going to be able to answer that, and it's

20   not a consideration for you as of today.  Okay?

21           A JUROR:  Okay.

22           THE COURT:  Thank you.  Okay.  And then,

23   Miss Russ, we're going to ask your question:  Coal

24   is a raw material and therefore is unregulated, but

25   when the coal is mixed with the K087 or D018 --

1    18 -- is that mixture an unregulated raw material?

2              THE WITNESS:  That's a very good question.

3    The coal is an unregulated raw material.  The tar

4    sludge is a regulated material.  The mixture of the

5    coal tar sludge with the coal does not make the

6    whole mixture a regulated material, but the tar

7    sludge remains a regulated material.

8              THE COURT:  All right.  Let me ask you

9    this.  The question goes on to say then:  Why or

10   why not?

11             THE WITNESS:  Because mixtures of raw

12   ingredients and hazardous waste do not make the

13   whole mixture a hazardous waste.

14             THE COURT:  Okay.  Yes, Mr. Mango?

15             MR. MANGO:  Yes, your Honor.  I have a

16   brief follow-up, if I could, to the first question

17   in light of the answer.  Do you want me to stand

18   here or sit here?

19             THE COURT:  No, you can come to the

20   podium, and then I will open it up to the other

21   attorneys to follow up if they choose to do that.

22        But, again, ladies and gentlemen, those

23   questions and the responses I -- obviously, they're

24   good questions.  I hope the responses have been of

25   assistance to you.  But the procedure is that we

1    will now allow the attorneys to follow up, and then

2    we will bring Mr. Flax's testimony to a closure.

3    Okay.

4        All right, Mr. Mango, please.

5            MR. MANGO:  Thank you very much, your

6    Honor.

7        Mr. Flax, I'd like to just go back to the first

8    question you were asked, where you talked about

9    storage of material in abandoned tanks.  And you

10   constitute that as storage in tanks is by

11   definition active management, is that correct?

12           THE WITNESS:  Correct.

13           MR. MANGO:  Now, can you contrast that to

14   storage of material that is just on the ground?

15           THE WITNESS:  Well, storage -- material

16   that is stored on the grounds -- are you talking

17   about pre-RCRA implementation or post-RCRA

18   implementation?

19           MR. MANGO:  Pre and then post, if you can

20   tell the jury.

21           THE WITNESS:  All right.  Well, previous

22   to the implementation date of RCRA in November

23   1980, material on the ground was not regulated.

24   Material that had previously been disposed,

25   abandoned on the ground, was not regulated.  And

1    the agency made a decision not to regulate that

2    material, when RCRA was implemented, unless it

3    became actively managed.  The idea was, it's there,

4    don't mess around with it.  If you're going to

5    manage it, then we want you to do it under a RCRA

6    permit so that can be done under the right

7    conditions and -- and sufficient agency oversight

8    of your management of that material can be given.

9        So if it was not actively managed after RCRA

10   was implemented, leave it alone.  If you're going

11   to actively manage it, we want to be able to see

12   what you're doing.  So if you did that after RCRA

13   was implemented, you needed a RCRA permit so that

14   we would have that oversight and it would be done

15   properly.

16           MR. MANGO:  Thank you.  And then the

17   question related to materials that remained in

18   tanks, that's different, is that correct?

19           THE WITNESS:  Tanks are storage, and

20   storage by definition is active management.

21           MR. MANGO:  Okay.  Thank you.  That was my

22   only follow-up, your Honor.  Thank you.

23           THE COURT:  Okay, Mr. Mango.  Thank you.

24      Mr. Linsin?

25           MR. LINSIN:  I have nothing further.

1    Thank you, your Honor.

2              THE COURT:  Mr. Personius?

3              MR. PERSONIUS:  No questions, your Honor.

4    Thank you.

5              THE COURT:  Okay.  Mr. Flax, you're

6    excused.  Thank you very much.

7              THE WITNESS:  Thank you, your Honor.

8              THE COURT:  Is that the last government

9    witness?

10             MR. MANGO:  Yes, your Honor.  The

11   government rests.

12             THE COURT:  Okay.  Okay, ladies and

13   gentlemen, both sides have now rested.  And now we

14   have to work out the details of getting you the

15   instructions, settling the exhibits, getting all of

16   that finalized.  Are you holding up okay today?

17   Okay.

18       And then there will be, obviously, closing

19   arguments.  And remember what I've said, that all

20   these discussions that I have with you and the

21   discussions with the lawyers, none of that is

22   evidence.

23       The closing arguments will not be evidence, but

24   it will be, I believe, very different from the

25   opening statements that you have heard, because now

1    you have heard all of the evidence.  You know more

2    about this case than anybody walking the face of

3    the earth.  And the lawyers now put on a different

4    hat, so to speak, and they will in their arguments

5    try to persuade you, from the evidence, as to

6    whether or not there's enough to convince you

7    beyond a reasonable doubt as to satisfying the

8    government's burden in this case or not.

9         And, obviously, if the government doesn't

10   satisfy its burden on any of the counts, you must

11   acquit; and, likewise, convict if the government

12   has convinced you beyond a reasonable doubt.  So

13   that means that you have to apply the law as I give

14   it to you without questioning the wisdom of the

15   law.  And I'll give you a couple of definitions

16   that you've heard about in terms of active

17   management in, terms of -- what's the other?

18             MR. MANGO:  Land disposal.

19             THE COURT:  Yeah, land disposal.  Both of

20   those I will give you, plus a lot of definitions, a

21   lot of information.  So, that's all to come.

22        What I'm going to ask you to do, and I know

23   we're shuttling you in and out, and you know you're

24   not coming back in the morning, so we'll see you

25   tomorrow at noon, but I need to work out a couple

1    of things with the attorneys right now, and I'll

2    have you back in here in, hopefully, 15 or so

3    minutes, and then I'll let you know what is left in

4    store for today.  Okay?

5         All right.  Thank you very much.  We'll see you

6    in about 15 or so.

7              (Jury excused from the courtroom.)

8              THE COURT:  Okay.  Please have a seat.

9    All right.  I'd like to find out -- I know,

10   Mr. Personius, you had mentioned that with respect

11   to the first 38 charges -- and obviously some of

12   these perhaps need to be excluded, but I'll take

13   the comments of the attorneys.  What I'll do is

14   I'll go this way.  Charge number 1, any comment.

15   Otherwise, if I hear none, I'll move to 2 and

16   charge 1 will be accepted.  Does that work for

17   everybody?

18             MR. PERSONIUS:  Yes, Judge.

19             THE COURT:  Okay.  Charge 1, juror

20   attentiveness.  Hearing nothing, charge number 2 --

21   and hearing nothing, it's accepted.

22        Charge number 2, role of the Court.  Hearing

23   nothing, accepted.

24        Charge number 3, role of the Court.  Hearing

25   nothing, accepted.

1        Charge number 4, juror obligations.  Hearing

2    nothing, accepted.

3        Charge number 5, the government as a party.

4    Hearing nothing, accepted.

5        Charge number 6, conduct of counsel.  Hearing

6    nothing, accepted.

7        Charge number 7, common counsel and counsel

8    cooperation.  Hearing nothing, accepted.

9        Charge number 8, jury to consider only these

10   defendants.  Hearing nothing, accepted.

11       Charge number 9, consider each defendant

12   separately.  Hearing nothing, accepted.

13       Charge number 10, multiple counts, multiple

14   defendants.  Hearing nothing, accepted.

15       Charge number 11, improper considerations,

16   race, religion, national origin, sex, or age.

17   Hearing nothing, accepted.

18       Charge number 12, sympathy.  Hearing nothing,

19   accepted.

20       Charge number 13, punishment.  Hearing nothing,

21   accepted.

22       Charge number 14, testimony and exhibits in

23   general.  Hearing nothing, accepted.

24       Charge number 15, stipulations of fact.

25   Hearing nothing, accepted.

1        Charge number 16, judicial notice.

2            MR. LINSIN:  Your Honor, it was just one.

3    I don't believe, based on our recollection, the

4    Court has taken judicial notice of any facts, so we

5    don't see this as necessary.

6            THE COURT:  I can take judicial notice of

7    the fact that we didn't take judicial notice in

8    this case, if that works, just so we keep it in

9    here.  No.  Okay.  No, I agree.  And I think charge

10   number 16 -- I will leave it so we don't throw all

11   the numbers off.  It will be intentionally left

12   blank.  When I give everything to the jury, charge

13   number 16 -- I don't want to renumber everything.

14   It gets really cumbersome.  It will be

15   intentionally left blank, okay?

16           MR. LINSIN:  All right.

17           THE COURT:  Charge number 17, charts and

18   summaries.

19           MR. MANGO:  I think everything has been

20   admitted at this point.

21           THE COURT:  Yes.

22           MR. MANGO:  Charts and summaries.

23           THE COURT:  Accepted, having heard

24   nothing.  Okay.

25       Charge number 18.  Yes?

1          LAW CLERK:  Can we go back to 17?

2          THE COURT:  Sure.

3          LAW CLERK:  So do you want to -- if you

4     did instruct the jury, you gave them the other

5     charge on charts admitted.  This one is not

6     admitted as evidence.  So are we going to

7     substitute the charge you already gave, were there

8     some of each, or --

9          MR. MANGO:  That's why I noted it, because

10    it says in parentheses not admitted as evidence,

11    and I think all the charts have been admitted so --

12         LAW CLERK:  Should substitute the other

13    charge for this one in the same spot.

14         MR. MANGO:  I think that would be

15    appropriate.

16         MR. LINSIN:  Which other charge are you

17    referring to?

18         LAW CLERK:  It's not one in the materials.

19    It's the one the Judge gave at the time the chart

20    came in.  You gave a different charge that's not

21    in --

22         THE COURT:  All right.

23         MR. LINSIN:  We would agree with the

24    substance of what's -- we would agree with counsel

25    for the government that that would be appropriate.

1          LAW CLERK:  It was a standard charge.

2          THE COURT:  All right.  Thank you.  Okay.

3     Question -- charge number 18, questions.

4     Hearing nothing, admitted.

5     Charge 19, direct and circumstantial evidence.

6     Hearing nothing, admitted.

7     Okay.  Charge number 20, similar acts.  Hearing

8     nothing, admitted.

9     Charge number 21, inference defined.  Hearing

10    nothing, admitted.

11    Charge number 22, impermissible to infer

12    participation from mere presence.

13         MR. LINSIN:  I defer to Mr. Personius on

14    that, your Honor.  To me it doesn't seem relevant

15    to the facts in this case, but I would defer to

16    Mr. Personius.

17         MR. PERSONIUS:  Your Honor, are we on 22

18    or 23, please?

19         THE COURT:  22.  My own view is it should

20    go in.

21         MR. PERSONIUS:  Yes, I think it should.

22         THE COURT:  And likewise with 23.

23         MR. LINSIN:  All right.  Fine.  No

24    objection, your Honor, certainly.

25         MR. PERSONIUS:  Yes.

1          THE COURT:  Okay.  Both will be given.

2      Number of witnesses and uncontradicted

3   testimony, number 24.  Hearing nothing, admitted.

4      25, witness credibility generally.  Hearing

5   nothing, admitted.

6      Charge number 26, admission of defendant.

7   Hearing nothing, admitted.

8      Charge number 27, law enforcement witness.

9   Hearing nothing, admitted.

10      28, informal immunity of government witness.

11          MR. MANGO:  Your Honor, I thought this

12   would be an issue.  There were a number of

13   witnesses who did have informal immunity, but it

14   was not questioned on cross, we didn't bring it out

15   on direct, and I don't think we need this charge.

16          THE COURT:  All right.  I've got a

17   question mark next to my copy, so I don't know what

18   defense counsel feel.

19          MR. LINSIN:  We don't have a recollection,

20   your Honor, of this being raised with any witness.

21          THE COURT:  No, I don't believe it was.

22          MR. PERSONIUS:  I don't think it was,

23   Judge.  I think Mr. Mango's right.

24          THE COURT:  Okay.  All right.  So then

25   this will similarly be designated as intentionally

1    left blank.

2        Okay.  29, impeachment by prior inconsistent

3    statement.  Hearing nothing, accepted.

4        Charge number 30, interest in the outcome.

5    Hearing nothing, accepted.

6        31, bias and hostility.  Hearing nothing,

7    accepted.

8        Charge number 32, presumption of innocence and

9    burden of proof.  Hearing nothing, accepted.

10       Reasonable doubt, that's charge 33.  Hearing

11   nothing, accepted.

12       Charge number 34A, improper consideration of

13   defendant's right not to testify.  That, I think,

14   would apply only to your client, I think,

15   Mr. Personius.

16            MR. PERSONIUS:  Yes.  We would like that

17   charge.

18            THE COURT:  Okay.  Hearing nothing in

19   opposition, accepted.

20       34B intentionally left blank?

21            MR. PERSONIUS:  Yes.

22            MR. LINSIN:  Yes, that's acceptable, your

23   Honor.

24            THE COURT:  Okay.  Charge number 35,

25   specific investigative techniques not required.

1          MR. PERSONIUS:  I had a question, Judge,

2    on whether that -- I don't see how that was raised

3    as an issue.  I don't see this charge as applying.

4          MR. MANGO:  I agree, your Honor.

5          MR. LINSIN:  I agree as well, your Honor.

6          THE COURT:  Okay.  I mean, that's kind of

7    an odd charge anyway, I mean, generally speaking,

8    because it's confusing, but --

9          MR. PERSONIUS:  That's why the defense

10   sometimes like it, Judge, but I don't think it

11   applies here.

12         THE COURT:  I know, because it does come

13   up in certain types of cases, but I think it's a

14   little difficult in this one, so I will --

15         MR. LINSIN:  Maybe core samples, your

16   Honor.

17         THE COURT:  It's a valiant effort, I

18   think, but -- okay.  You know, it will probably be

19   one of the issues with the jury, right?  Okay.

20   Charge number 35 will be intentionally left blank.

21      36, corporate responsibility.

22         MR. LINSIN:  No objection.

23         THE COURT:  Hearing nothing, accepted.

24      Responsible corporate officer.  Hearing

25   nothing, accepted.

1          And indictment is not evidence.  Hearing

2     nothing, accepted.

3          And then we'll stop there.  Okay?

4          All right.  I'd like to maybe take another ten

5     minutes, and then I'd like to start this portion of

6     the charge, complete it, let the jury go.  I mean,

7     this is probably just short of an hour, probably.

8     And let them go for the day, and then we start

9     tomorrow roughly at 12:00 o'clock or so.

10              MR. LINSIN:  And what is the Court's

11    pleasure with regard to discussion then on -- our

12    discussion regarding the substantive charges?

13    If --

14              THE COURT:  We'll do that tomorrow

15    morning.  We'll have a charge conference.

16              MR. LINSIN:  All right.

17              THE COURT:  Does that work for everybody?

18              MR. MANGO:  Absolutely.

19              THE COURT:  And we'll -- 9:30?  What do we

20    have calendarwise, please?

21          Mary will be leaving us for a few days.

22          It's rehab, but I wasn't supposed to say.

23              MR. PERSONIUS:  She has asked that the

24    fireman who was at Tonawanda Coke tape the

25    summations so she can watch them, Judge.

1          THE COURT:  All right.  How about

2    10:00 o'clock tomorrow?

3          MR. MANGO:  That would be great.

4          THE COURT:  All right.  And then, you

5    know, we'll take a look at what your positions are.

6    We should be able to get everything resolved by

7    noonish.  Actually, you probably want to move it as

8    quickly as we can so you can kind of rest up for

9    summations.

10         MR. LINSIN:  Well, some of the

11   arguments -- it would be helpful to have some

12   period of time between the resolution and perhaps

13   the need to adjust some of how we've addressed this

14   in the closing, in the summation.

15         THE COURT:  Yeah.  Why don't we do this.

16   Why don't we make it 9:30.  I'll try to move the

17   calendar as quickly as I can.  That might give us a

18   little bit of extra time.

19         MR. LINSIN:  Thank you, your Honor.

20         THE COURT:  Okay.  All right.  Let's take

21   ten or so, and then we'll be back out, Chris, and

22   we'll get started.  Okay?

23         (Short recess was taken.)

24         THE COURT:  Are we all set?

25         MR. MANGO:  Yes, your Honor.

1         THE COURT:  Okay.  Chris, if you'd bring
2    the jury in, please.
3              (Jury seated.)
4         THE COURT:  Everybody doing okay?  Welcome
5    back.  Please have a seat.
6       Thank you, Chris.
7              COURT SECURITY OFFICER:  You're welcome,
8    sir.
9         THE COURT:  Okay.  Ladies and gentlemen,
10   here's what is in store for you for this afternoon.
11   And, as you know, my job, kind of as the referee,
12   draws to a close, and then I give you what is the
13   charge or the instruction in the law, and then you
14   are to apply that law without questioning the
15   wisdom of the law.  You've heard me say that
16   before.
17      You've heard me say a lot of things, and it's
18   been repetition by design, so that when I get to
19   giving you the full instruction, most of the terms
20   you will have been familiar with, you would have
21   heard, and they will come together a little bit
22   easier.
23      The one thing I want to stress is this.  I'm
24   going to only give you a part of it this afternoon,
25   all right, and it's the preliminary part.  But keep

1   this in mind, and, you know, if you think about it,

2   because you're going to be asked to apply your

3   common sense, your experience, and your

4   intelligence to everything that you do from this

5   point forward.  And you've got a lot of listening

6   to do, all right, and you should listen intently.

7   I mean, you've been terrific with all the

8   complexities and everything in this particular

9   case.  And now you're going to be hearing from the

10  attorneys starting tomorrow afternoon.

11      What I'd like to do is give you a part of what

12  we call the charge or the instruction.  But using

13  your common sense, just keep in mind that the total

14  charge that I give you is the instruction in the

15  law.  No one part is separate and more important

16  from the totality of the charge.  There's one law,

17  one instruction in the law, that applies.  And it's

18  everything that I'm going to be telling you.

19      It makes sense to me, anyway, to break it down,

20  to give you this preliminary portion of the charge,

21  and we'll address some of the terms that you've

22  been hearing about in terms of burden of proof and

23  definitions of certain terms.  We'll get to all of

24  that and how you proceed, and credibility and the

25  like.  So I'll give you that first, and then we're

1    going to take a break for the afternoon, and you'll

2    come back tomorrow at noon, you'll hear the

3    attorneys argue, and then there is the remaining

4    part of the instruction that I still will have to

5    give you before you start your deliberations.

6        And if there is anything that -- when the

7    arguments come, that appears different from what I

8    tell you today or what I will give you by -- in the

9    charge portion that follows the closing arguments,

10   your instruction will be to rely on what I say, not

11   what the attorneys say.  But you can use,

12   certainly, their argument to guide you in coming to

13   a resolve on the critical issues in this case,

14   because you have to decide those fact issues.

15   That's why you're here.  You're the judges of the

16   facts.

17       So, I am going to start.  I'll work through

18   this.  I'll try to be as deliberate as possible so

19   that you get an understanding of at least the start

20   of this charge, and then we'll work through another

21   time the breakdown of the different counts of the

22   indictments and the elements.  We started with some

23   of that, if you remember, at the very beginning of

24   the case, trying to get you to focus and think in

25   terms of elements which the government has to

1    prove, because they're essential, beyond a

2    reasonable doubt.

3        So, you get these instructions before you

4    actually enter into your final duty, which is to

5    decide the fact issues in this case.  Please pay as

6    close attention to me now as you have throughout

7    the course of the trial.  That's because, you know,

8    frankly, it's not a personal thing with me, but

9    this case is very important to both sides.  And the

10   only way that you can satisfy your duty in the

11   manner in which you have taken the oath to do in

12   this case is to pay strict and close attention to

13   what I say, what the attorneys will argue to you,

14   and to apply the law as I give it to you.

15       I did mention to you at the very start of the

16   trial that your principle function during the

17   taking of testimony would be to listen carefully

18   and observe each witness who testified, and I've

19   told you this many times.  It's been very obvious

20   to me and, I know, to the attorneys as well, that

21   you have faithfully discharged that duty, and you

22   did follow the testimony -- and that's evidenced by

23   the questions you've asked -- with the closest of

24   attention.  So I will proceed and just simply ask

25   you to give me your careful attention with this

1    instruction.

2        You have heard all of the evidence in the case,

3    and you are about to hear the closing arguments of

4    the lawyers for the parties, and you know that's

5    the United States, Tonawanda Coke Corporation, and

6    Mark Kamholz.  My duty at this point is to instruct

7    you as to the law.  It's your duty to accept these

8    instructions of law and apply them to the facts as

9    you determine them, and just as it has been my duty

10   to preside over the trial and decide what testimony

11   and evidence is relevant under the law for your

12   consideration.

13       On the legal matters, you must take the law as

14   I give it to you, and if an attorney says

15   something -- and we just talked about this -- and

16   states a legal principle different from any that I

17   state to you in my instructions, it is my

18   instructions that you must follow.

19       And you should not single out any instruction

20   as alone stating the law, but you should consider

21   my instruction as a whole when you retire to

22   deliberate in the jury room.  It's like when you're

23   working on a project.  The end result of everything

24   you do is the completed item, project, something

25   that, you know, you may have constructed.  That's

3758

1    the end.  That's the totality.  And that's the same

2    with this charge that I'm in the process of giving

3    you.

4        Again, don't be concerned about the wisdom of

5    the rule of law that I state, because regardless of

6    any opinion that you may have as to what the law

7    may be or ought to be, it would in point of fact

8    violate your sworn duty to base a verdict upon any

9    other view of the law than that which I'm going to

10   give you starting now.

11       Your final rule -- role is to pass upon and

12   decide the fact issues.  We've talked about that

13   many times.  You, the members of the jury, are the

14   sole and exclusive judges of the facts.  You pass

15   upon the weight of the evidence, you determine the

16   credibility, the believability of the witnesses,

17   and you resolve such conflicts as there may be in

18   the testimony, and you draw whatever reasonable

19   inferences you decide to draw from the facts as you

20   have determined them.

21       And I will soon give you instructions upon how

22   to pass upon the credibility, and that's the same

23   thing as we talk about when we say the

24   believability of the witnesses.

25       In determining the facts, you must rely upon

1      your own recollection of the evidence.  What the

2      lawyers have said in their opening statements, what

3      they will say in their closing arguments, what has

4      been discussed in the objections or in their

5      questions, is not evidence.

6          In this connection, you should bear in mind

7      that a question put to a witness is never evidence.

8      It is only the answer which is evidence.  Nor is

9      there anything I may have said during the trial or

10     may say during these instructions or the arguments

11     with respect to a fact matter to be taken -- is to

12     be taken in substitution for your own independent

13     recollection.  Simply, common sense, experience,

14     intelligence.  What I say is not evidence.  That's

15     how this works.

16         The evidence in this case before you consists

17     of the answers given by the witnesses to the

18     questions -- but the questions aren't evidence --

19     the testimony of those witnesses as they gave it,

20     as you recall it, remember, respecting each other's

21     input, judgment, and the exhibits that now have

22     been received into evidence.  And you will get all

23     of those.

24         The evidence does not include questions.  Only

25     the answers are evidence.  But you may not consider

1    any answer that I directed you to disregard or that

2    I directed struck from the record.  Do not consider

3    those questions; do not consider those answers.

4    That happened just a few times in this case.

5         You may also consider stipulations, and there

6    were a fair number of those, and it related in

7    large measure to the exhibits that were received

8    into evidence.  And you'll notice that when you get

9    the list of exhibits and the exhibits themselves.

10   But remember I told you that in those instances

11   where witnesses are referenced, you are supposed to

12   view that as the testimony of a witness as if he or

13   she appeared here in court.

14        Since you are the sole and exclusive judges of

15   the facts, I do not mean to indicate any opinion as

16   to the facts or what your verdict should be,

17   personally.  That's your duty.  The rulings I have

18   made during the trial are not any indication of my

19   views of what your decision should be as to whether

20   or not the guilt of the defendants, individually

21   considered, has been proven beyond a reasonable

22   doubt.  Only you can decide that.

23        I also ask you to draw no inference from the

24   fact that upon occasion I asked questions of

25   certain witnesses.  These questions, not as good as

1    yours most of the time, but were only intended for

2    clarification or to expedite matters, and certainly

3    were not intended to suggest any opinions on my

4    part as to the verdict you should render or whether

5    any of the witnesses may have been more credible

6    than any other witness.

7        You are expressly to understand that the court,

8    meaning me, has no opinion as to the verdict you

9    should render in this case.  As to the facts -- I

10   bet you've heard this a few times, right? -- you

11   are the exclusive judges.  You are to perform the

12   duty of finding the facts without bias or prejudice

13   as to any party.  Be fair to both sides.

14       In determining the facts, you are reminded that

15   before each member, each of you, was accepted and

16   sworn to act as a juror, you were asked questions

17   concerning competency, qualifications, fairness,

18   and freedom from prejudice and bias.  And it was on

19   the faith of those answers that each of you was

20   accepted to be jurors by the parties.  Therefore,

21   those answers that you gave are as binding on each

22   of you now as they were then when you were first

23   accepted and should remain so until you are

24   discharged from consideration in this case.

25       You are to perform your duty of finding the

1    facts, importantly, without bias or prejudice to

2    any of the paries.  You are to perform your final

3    duty in an attitude of complete fairness and

4    impartiality.  The case is important to the

5    government -- we've stressed that before -- for the

6    enforcement of criminal laws is a matter of prime

7    concern to the community.  And equally it is

8    important to the defendants -- we've stressed this

9    before -- because they're charged with serious

10   crimes.

11       The fact that the prosecution is brought in the

12   name of the United States of America entitles the

13   government to no greater consideration than that

14   accorded to any other party to a litigation.  By

15   the same token, it is entitled to no less

16   consideration.  We're talking about fairness here.

17   All parties, whether government or individuals,

18   stand as equals at the bar of justice.

19       It is also the duty of the attorney for each

20   side in the case to object when the other side

21   offers testimony.  We've talked about that from the

22   beginning.  And when there's evidence that's being

23   offered, the same duty applies to the attorney, and

24   that should be where the attorney believes that

25   what's being offered is not properly admissible.

1        The attorneys also have the right and duty to

2    ask me to make rulings of law and to request

3    conferences.  We've had a few sidebars, as you

4    know, out of -- out of your hearing, technically.

5    And usually that's so that I can decide the

6    questions of law that are discussed.  And my

7    instruction is that you should not show any

8    prejudice against any attorney or his client

9    because the attorney objected to the admissibility

10   of evidence, or asked for a conference out of your

11   hearing, or asked me for a ruling of the law.

12       As I've already indicated, my rulings on the

13   admissibility of evidence do not indicate any

14   opinion about the weight or effect of the evidence.

15   You are the sole judges of the believability of all

16   witnesses and the weight and the effect of all of

17   the evidence.

18       You have noticed, I'm sure -- and, you know, we

19   had weekly introductions to the attorneys and whom

20   they represent -- that the two defendants, the

21   corporation and Mark Kamholz, are represented by

22   separate attorneys, and the separate attorneys have

23   consulted from time to time with each other and to

24   some extent have divided the work of the trial in

25   an effort, really, to facilitate their presentation

1    and to avoid duplication.

2        The fact that defense counsel have consulted

3    and cooperated with each other in the conduct of

4    their defense is not to be considered by you as

5    having any significance with respect to the issues

6    in this case.  The issue of each defendant's guilt

7    is personal, and you must take -- or make a

8    separate determination as to whether or not each

9    defendant's guilt has been proven -- what? --

10   beyond a reasonable doubt.

11       In making that judgment, you are to disregard

12   entirely the circumstance that the attorneys for

13   the defendants have worked together during the

14   trial.  Indeed, especially in a case of this

15   length, it would be unusual and wasteful of time

16   and effort if the attorneys did not get together,

17   share the burdens of the defense, et cetera.

18       Now, you are about to be asked to decide

19   whether or not the government in this case has

20   proven beyond a reasonable doubt the guilt of each

21   defendant.  You are not being asked whether any

22   other person has been proven guilty.  Your verdict

23   should be based solely upon the evidence or --

24   what? -- the lack of evidence, as to each defendant

25   in accordance with my instructions and without

1    regard to whether the guilt of other people has or

2    has not been proven.

3         The indictment names two defendants who are at

4    trial together, and in reaching a verdict you must

5    bear in mind that the guilt determination is

6    individual.  Your verdict as to each defendant must

7    be determined separately with respect to each

8    defendant solely on the evidence or lack of

9    evidence presented against each defendant without

10   regard to the guilt or innocence of anyone else.

11        In addition, some of the evidence in this case

12   was limited to one defendant, Tonawanda Coke, for

13   example.  Let me emphasize that any evidence

14   admitted solely against one defendant may be

15   considered only against that defendant and may not

16   in any respect enter into your deliberations on any

17   other defendant.  Thus, you must not consider any

18   evidence that I limited to Tonawanda Coke, for

19   example, in any way in your deliberations with

20   respect to defendant Mark Kamholz.  They must each

21   be considered individually and separately.

22        You know the indictment, by now, contains 19

23   counts, right?  And each count charges the

24   defendants with a different separate crime.  There

25   are two defendants on trial before you.  You must,

1    as a matter of law, consider each count of the

2    indictment and each defendant's involvement in that

3    count separately, and you must return a separate

4    verdict on each defendant for each count in which

5    they are charged.  And you'll get a verdict form

6    that will itemize for you each defendant on each

7    count.

8        In reaching your verdict, bear in mind that

9    guilt is personal and individual.  Your verdict of

10   guilty or not guilty must be based solely upon the

11   evidence about each defendant.  The case against

12   each defendant on each count stands or falls upon

13   the proof or lack of proof against that defendant

14   alone, and your verdict as to any defendant on any

15   count should not control your decision as to any

16   other defendant or any other count.  No other

17   considerations are proper.

18       Your verdict must be based solely upon the

19   evidence developed at trial or the lack of

20   evidence, and it would be improper for you to

21   consider in reaching your decision as to whether

22   the government sustained its burden of proof --

23   because that is what you have to determine --

24   whether any personal feelings you may have about

25   the defendant's race, religion, national origin,

1  sex, or age influence you.  All persons are

2  entitled to the presumption of innocence, and the

3  government has the burden of proof, as I will

4  discuss in a moment.

5  It would be equally improper for you to allow

6  any feelings you might have about the nature of the

7  crime charged to interfere with your

8  decision-making process.  And in part that's why we

9  told you stay away from things outside the

10  courtroom.  To repeat:  Your verdict must be based

11  exclusively upon the evidence or the lack of

12  evidence in this case.

13  You've also heard this, and, you know, every

14  juror in every case throughout the country in the

15  federal courts are going to hear these same

16  charges, these same instructions, and that's what

17  makes the system fair, and that's why we try to get

18  it ingrained in you as we go through this process.

19  So under your oath as jurors you're not to be

20  swayed by sympathy.  You are to be guided solely by

21  the evidence in this case, and the crucial,

22  hard-core question that you must ask yourselves as

23  you sift through the evidence is this:  Common

24  sense, experience, intelligence.  Has the

25  government proved its case, that is, the guilt of

1   the defendants, beyond a reasonable doubt?

2        It is for you alone to decide whether the

3   government has proven that the defendants are

4   guilty of the crimes charged solely on the basis of

5   the evidence and subject to the law as I charge

6   you.  It must be clear to you that once you let

7   fear or prejudice or bias or sympathy interfere

8   with your thinking, there is a risk that you will

9   not arrive at a true and just verdict.  And you

10  know what you've invested in this case, and you

11  know what's at stake for the defendants.

12       If you have a reasonable doubt as to either of

13  the defendants' guilt, you should not hesitate for

14  any reason to find a verdict of acquittal for that

15  defendant.  Not guilty.  But on the other hand, if

16  you should find that the government has met its

17  burden of proving either or both of the defendants'

18  guilt -- what? -- beyond a reasonable doubt, you

19  should not hesitate because of sympathy or any

20  other reason to render a verdict of guilty.

21  Fundamental fairness.

22       The question of possible punishment of the

23  defendants should be and is of no concern to you

24  and should not in any sense enter into or influence

25  your deliberations.  The duty of imposing a

1    sentence, if there happens to be a conviction,

2    rests exclusively on me, because I presided over

3    this trial.  Your function is to weigh the evidence

4    in the case and to determine whether or not the

5    defendants are guilty beyond a reasonable doubt

6    solely upon the basis of such evidence.  Under your

7    oaths of jurors -- or as jurors, you cannot allow a

8    consideration of the punishment which may be

9    imposed upon the defendants if they are convicted

10   to influence your verdict in any way or in any

11   sense enter into your deliberations.

12        Now, shortly I will explain to you the elements

13   of the crimes.  I won't do that today.  But I want

14   to discuss with you upon -- or the basis upon which

15   your verdict must rest.  In summary -- you've heard

16   me mention this countless times -- it must be

17   based, your verdict, upon the evidence introduced

18   in this case.

19        The evidence in this case consists of what?

20   The sworn testimony of the witnesses and the

21   exhibits received in evidence and any stipulations

22   that have been received into evidence.  In this

23   case there is no such thing as judicially noticed.

24   I haven't done that in this case.  And that's when

25   I tell you what the evidence is.  Here we've had

1    stipulations.

2         Exhibits which have been marked for

3    identification but not received may not be

4    considered by you as evidence.  Only those exhibits

5    received may be considered as evidence.  You'll get

6    an exhibit list, and it will contain only those

7    exhibits that have been received into evidence, and

8    you'll get the exhibits themselves.  There may be

9    testimony about exhibits that weren't received into

10   evidence.  You can consider that testimony, but you

11   will not get the exhibits, because they haven't

12   been admitted as competent evidence.

13        And, similarly, you are to disregard any

14   testimony when I have ordered it to be stricken.  I

15   did that just a few times in this case.  And as I

16   indicated to you before, only the witnesses'

17   answers are evidence, and you are not to consider a

18   question as evidence.  Similarly, statements made

19   by counsel are not evidence.

20        You should consider the evidence in light of

21   your own common sense and intelligence and

22   experience, and you may draw reasonable inferences

23   from the evidence.

24        Anything you may have seen or heard about this

25   case outside the courthouse is not evidence and

1    must be entirely disregarded.

2        If you remember, a stipulation, that's an

3    agreement among the attorneys and the parties --

4    the corporation and the defendant -- that a certain

5    fact is true.  And when you get a stipulation, you

6    should regard the agreed fact as established as

7    true, and you may choose to give it whatever

8    consideration you feel is appropriate.

9        The government has presented exhibits in the

10   form of charts and summaries, and so has the

11   defendant, and I decided that those charts and

12   summaries will be admitted, and they represent an

13   effort to save time and avoid unnecessary

14   inconvenience and give you guidance with respect to

15   certain opinions that were rendered by the

16   witnesses; or they reference, you know, large

17   quantities of documents and discs and the like that

18   have been introduced to you at trial, and try to

19   make it more understandable and make it more

20   workable for you to consider without having to

21   expend an inordinate amount of time doing that.

22   And you should consider those charts and summaries

23   and the testimony and the underlying documents, to

24   the extent that they have been provided to you, as

25   you would any other evidence in this case.

1          Again, let me emphasize that a lawyer's

2     question is not evidence.  At times a lawyer on

3     cross-examination may have incorporated into a

4     question a statement which assumed certain facts to

5     be true and asked the witness if the statement was

6     true.  If the witness denies the truth of the

7     statement and there is no evidence in the record

8     proving that the assumed fact is true, then you may

9     not consider the fact to be true simply because it

10    was contained in the lawyer's questions.  And

11    lawyers on both sides sometimes do that.  And not

12    intentionally, but you have to apply that rule and

13    just consider the answers of the witnesses as the

14    evidence.

15         And, you know, one of the examples that we give

16    sometimes, and I really don't like this example,

17    but sometimes a lawyer, by way of example, will ask

18    the question of a married witness, "When did you

19    stop beating your spouse?"  Well, you would not be

20    permitted to consider as true the assumed fact that

21    the witness ever beat his or her spouse unless the

22    witness indicated he or she had or unless there is

23    some other evidence in the record that he or she

24    had beaten the spouse.  And that's why the

25    questions are not the evidence but the answers are.

1          There are two types of evidence which you may

2     properly use in deciding whether a defendant is

3     guilty or not.  One type is called direct evidence.

4     Direct evidence is where a witness testifies as to

5     what he or she saw, heard, or observed.  In other

6     words, when a witness testifies about what is known

7     to him or her of his or her own knowledge by virtue

8     of that witness's own senses, what he or she sees,

9     feels, touches or hears, that's what?  Direct

10    evidence, right?  I mean, that's common sense.

11         Circumstantial evidence, a little bit

12    different.  It's what tends to prove a disputed

13    fact by proof of other facts.  And there's a simple

14    example.  I think we talked about it when we were

15    going through jury selection that we use to

16    demonstrate this.  And that's when, for example,

17    you entered the courthouse in the morning, the sun

18    was shining, it was a nice day, and then, you know,

19    after the course of the day and you can't really

20    see outside, somebody comes in walking in with an

21    umbrella dripping wet or snow particles,

22    individuals came in with raincoats, overcoats, and

23    the like, you know that even though you can't look

24    outside the courtroom and you can't see whether

25    weather conditions had changed, rain or snow, you

1    have no direct evidence of what's going on outside,

2    but on the combination of facts which I have just

3    asked you to assume, it would be reasonable and

4    logical for you to conclude that it had been either

5    raining or snowing.

6        I mean, that's the logical way of handling

7    circumstantial evidence.  But it is the equal of

8    direct evidence.  That's all there is.  That's

9    circumstantial evidence.  You infer on the basis of

10   reason and experience and common sense from an

11   established fact the existence or the nonexistence

12   of some other fact.

13       Circumstantial evidence has no less value than

14   direct evidence, for it is a general rule that the

15   law makes no distinction between direct and

16   circumstantial evidence, but simply requires that

17   before convicting a defendant the jury must be

18   satisfied of the defendant's guilt -- what? --

19   beyond a reasonable doubt from all of the evidence

20   in the case.

21       Now, the government in this case has offered

22   certain evidence tending to show that on a

23   different occasion the defendants engaged in

24   conduct similar to the charges in the indictment.

25   In that connection, let me remind you this way,

1    that the defendants are not on trial for committing

2    any acts not alleged in the indictment.  Okay.  And

3    that's why sometimes questions are not relevant,

4    because they pertain to a period of time outside of

5    the indictment, just by way of example.

6        So you may not consider the evidence of the

7    similar act as a substitute for proof that the

8    defendants committed the crimes charged, nor may

9    you consider this evidence as proof that the

10   defendants have a criminal personality or bad

11   character.

12       The evidence of other similar acts was admitted

13   for a much more limited purpose, and you may

14   consider it only for that limited purpose.  If you

15   determine that the defendants committed the acts

16   charged in the indictment and the similar acts as

17   well, then you may, but you need not, draw an

18   inference that in doing the acts charged in the

19   indictment the defendant acted knowingly and

20   intentionally and not because of some mistake,

21   accident, or other innocent reasons.

22       Evidence of similar acts may not be considered

23   by you for any other purpose.  Specifically, you

24   may not use the evidence to conclude that because

25   the defendants committed the other acts they must

1   also have committed the acts charged in the

2   indictment.  You decide the acts charged in the

3   indictment, the crimes that are charged in the

4   indictment.

5       So let's talk a little bit about inference and

6   that term, because it's been mentioned to you, and

7   we talk about it in the context of reasonable

8   inferences.  And you'll probably hear the attorneys

9   ask you or at least comment that -- tomorrow in

10  their closing arguments, that you may reasonably

11  infer such and such.  And when you are asked that,

12  you will be asked to infer on the basis of your

13  reason, experience, and common sense, from one or

14  more established facts, the existence of some other

15  fact.  Not complicated.  Just draw a reasonable

16  inference.

17      That's what inference is.  But what is it not?

18  Okay.  An inference is not a suspicion or a guess.

19  It is a reasoned, logical decision to conclude that

20  a disputed fact exists on the basis of another fact

21  which you know exists.

22      Now, if you think about that, there may be

23  times when a different inference may be drawn from

24  a set of facts, whether proven by direct or

25  circumstantial evidence.  The government may ask

1    you to draw one set of inferences, while the

2    defense may ask you to draw another.

3        It is for you and you alone to decide what

4    inferences you will draw.  That's your job, because

5    that involves being the judges of the facts.  The

6    process of drawing inferences from facts in

7    evidence, again, is not a matter of guesswork or

8    speculation.  You've got to work at it.  You've got

9    to know what that reasonable inference is.

10        An inference is a deduction or a conclusion,

11   which you, the jury, are permitted to draw, but

12   you're not required to draw it, from the facts

13   which have been established by either -- what kind

14   of evidence, because there's two kinds, right? --

15   direct or circumstantial.  And in drawing the

16   inferences, you should exercise your common sense.

17   That's, you know -- and you can do it.  You draw

18   the reasonable inferences.

19        So while you are considering the evidence

20   presented to you, you are permitted to draw from

21   the facts which you find to be proven such

22   reasonable inferences as would be justified in the

23   light of your everyday experience.  I mean, you

24   represent the cross-section of our community.

25        Here again, let me remind you that whether

1  based upon direct or circumstantial evidence or

2  upon -- what? -- the logical, reasonable inferences

3  drawn from such evidence, you must be satisfied of

4  the guilt of a defendant, should you so find,

5  beyond a reasonable doubt, before you may convict.

6      Keep this in mind, too, that you may not infer

7  that the defendant is guilty of participating in

8  criminal conduct merely from the fact that he was

9  present at the time of the crime or at the time the

10  crime was being committed and had knowledge that it

11  was being committed.  That mere presence is not

12  enough.

13      And you may not infer that the defendant was

14  guilty of participating in criminal conduct merely

15  from the fact that he associated with other people

16  who were guilty of wrongdoing.

17      And remember we talked about the number of

18  witnesses, too.  What do -- we have 30 witnesses

19  that have testified.  And the government called

20  more witnesses than the defense, and, you know,

21  it's -- whoever introduces more evidence than the

22  other doesn't mean that you should necessarily find

23  the facts in the favor of the side offering the

24  most witnesses or the most evidence.  By the same

25  token, you do not have to accept the testimony of

1    any witness who has not been contradicted or

2    impeached if you find the witness not to be --

3    what? -- credible.  The witness has to be

4    believable or credible.

5         You also have to decide which witnesses to

6    believe and which facts are true.  To do this, you

7    must look at all the evidence, drawing upon your

8    common sense, your experience, your intelligence.

9    And after examining all the evidence, you may

10   decide that the party calling the most witnesses

11   has not persuaded you, because you do not believe

12   its witnesses or because you do believe the fewer

13   witnesses called by the other side.

14        Keep in mind, ladies and gentlemen, that the

15   burden of proof is where?  It's always on the

16   government, and the defendants are not required to

17   call upon any witnesses or offer any evidence since

18   they are -- what? -- presumed innocent.

19        Now, you have had an opportunity to observe all

20   of the witnesses, and your job is to decide what

21   weight, if any, to give to their testimony, who's

22   believable, to what extent.  In other words, how

23   believable was the witness who was called, in your

24   minds.  You are the sole judges of the credibility

25   of each witness and of the importance of the

1    testimony that you've received from those

2    witnesses.

3        Now, it's probably clear to you by now that you

4    are being called upon to resolve the various

5    factual issues under the indictment.  And you'll,

6    I'm sure, have those identified with specificity

7    tomorrow.  And you're going to hear very different

8    pictures painted by the attorneys in this case,

9    which probably can't be reconciled.  And you're

10   going to have to decide where the truth lies.

11       And an important part of that decision will

12   involve making judgments about the testimony of the

13   witnesses that you have listened to and observed.

14   And in making those judgments, you should carefully

15   scrutinize all of the testimony of each witness,

16   the circumstances under which each witness

17   testified, and any other matter in evidence which

18   may help you to decide the truth and the importance

19   of each witness's testimony.

20       Your decision whether or not to believe a

21   witness may depend on how that witness impressed

22   you.  For example, was the witness candid, frank,

23   and forthright, or did the witness seem as if he or

24   she was hiding something, being evasive, or suspect

25   in some way?  How did the witness testify on direct

1    examination compared with how the witness testified

2    on cross-examination?  Was the witness consistent

3    in his or her testimony, or did he or she

4    contradict himself or herself?  Did the witness

5    appear to know what he or she was talking about,

6    and did the witness strike you as one who was

7    trying to report his or her knowledge accurately?

8        How much each of you concludes to believe a

9    witness may be influenced by the witness's bias.

10   Does the witness have a relationship with the

11   government or a defendant which may affect how she

12   or he testified?  Does the witness have some

13   incentive, loyalty, or motive that may cause him or

14   her to shade the truth?  Or does the witness have

15   some bias, prejudice, or hostility that may have

16   caused the witness, consciously or not, to give you

17   something other than a completely accurate account

18   of the witness's -- of the facts he or she

19   testified to?

20       Now, even if the witness was impartial, you

21   should consider whether the witness had an

22   opportunity to observe the facts he or she

23   testified about.  You know, a lot of these go back

24   a number of years.  And you should also consider

25   the witness's ability to express himself or

1   herself, and I think it's obvious some witnesses do

2   a better job than others.  Ask yourselves whether

3   the witness's recollection of the facts stands up

4   in light of all of the other evidence.

5       In other words, what you must try to do in

6   deciding credibility is to size a person up in

7   light of his or her demeanor, the explanations

8   given, and in light of all the other evidence in

9   the case, just as you would in any important matter

10  where you are trying to decide if a person is

11  truthful, straightforward, and accurate in his or

12  her recollection.  In deciding the question of

13  credibility, remember that you should use your

14  common sense, your experience, your judgment, your

15  intelligence.

16      There has been evidence in this case that the

17  defendant Mark Kamholz made certain statements in

18  which the government claims he admitted certain

19  facts charged in the indictment.  In deciding what

20  weight to give to the defendant's statements, you

21  should first examine with great care whether each

22  statement was made and whether, in fact, it was

23  voluntarily and understandingly made.  I instruct

24  you that you are to give the statements such

25  weight -- and we've talked about this -- as you

1    feel they deserve in light of the evidence.  You

2    determine the weight, how important is what you are

3    considering.  And, you know, you get to that, too,

4    by respecting each other and your opinions, and

5    your discussions will -- you know they should be

6    open.  Just let everybody say their piece and get

7    to where you have to resolve these fact issues, the

8    credibility of the witnesses, whether the

9    sufficiency satisfies the burden of proof beyond a

10   reasonable doubt.

11       You know, you had witnesses of all kinds in

12   here.  Some were federal and state law enforcement

13   officers, EPA, DEC, et cetera, et cetera.  And the

14   fact that any of those witnesses may be employed by

15   the federal or state government as a law

16   enforcement official, that in and of itself does

17   not mean that his or her testimony is necessarily

18   deserving of more or less consideration or greater

19   or lesser weight than that of an ordinary witness.

20       At the same time, it is quite legitimate for

21   the defense to try to attack the credibility of law

22   enforcement witnesses on the grounds that his or

23   her testimony may be colored by a personal or

24   professional interest in the outcome of the case.

25       It is your decision, after reviewing all the

1    evidence, whether to accept the testimony of the

2    law enforcement witnesses and to give that

3    testimony whatever weight, if any, you find it

4    deserves.

5       Okay.  Now, we're still -- credibility, you've

6    heard terms of, you know, contradictions in

7    testimony or statements or impeachment.  And in

8    this case there was evidence that a witness may

9    have made a statement on an earlier occasion, which

10   maybe tomorrow you'll hear the attorneys argue is

11   inconsistent with that witness's trial testimony.

12      Keep this in mind:  Evidence of a prior

13   inconsistent statement, okay, something that was

14   different than what was testified to in trial, is

15   not to be considered by you -- and this is part of

16   that instruction, okay -- as affirmative evidence

17   bearing on the guilt of the defendants.

18      And that sounds a little complicated, but it's

19   not.  What that really means is evidence of prior

20   inconsistent statements was placed before you for

21   the more limited purpose of helping you decide

22   whether to believe -- that is the credibility --

23   the trial testimony of the witness who contradict

24   himself or herself.  If you find that a witness

25   made an earlier statement that conflicts with his

1    or her trial testimony, you may consider that fact

2    in deciding how much of that witness's testimony,

3    if any, to believe.

4        Now, in making that determination, you may

5    consider whether the witness purposely made a false

6    statement or whether it was an innocent mistake;

7    whether the inconsistency concerns an important

8    fact or whether it had to do with a small detail;

9    whether the witness had an explanation for the

10   inconsistency, and whether that explanation

11   appealed to your common sense.  Common sense,

12   right?  I mean, it kind of works into everything.

13       It is exclusively your duty, based upon all the

14   evidence and your own good judgment, to determine

15   whether the prior statement was, in fact,

16   inconsistent and, if so, how much, if any, weight

17   to be given to the inconsistent statement in

18   determining whether to believe all or part of the

19   witness's testimony.

20       Again, in evaluating the believability or the

21   credibility of the witnesses, you should take into

22   account any evidence that the witness who testified

23   may benefit in some way from the outcome of this

24   case.  Such an outcome in the -- or interest in the

25   outcome of the case creates a motive to testify

1    falsely and may sway the witness to testify in a

2    way that advances that witness's own interest.

3        So, therefore, if you find that any witness

4    whose testimony you are considering may have an

5    interest in the outcome of this trial, then you

6    should bear that factor in mind when evaluating the

7    credibility of his or her testimony, and --

8    what? -- you accept it with great care, because

9    there are interests that might come into play.

10       That's not to suggest to you that every witness

11   who has an interest in the outcome of a case will

12   testify falsely.  That's simply not the case.  It

13   is for you to decide to what extent, if at all, the

14   witness's interest has affected or colored his or

15   her testimony.

16       In connection with your evaluation of the

17   believability of the witnesses, you should

18   specifically consider evidence of resentment or

19   anger which some government witnesses may have

20   toward the defendants.  Evidence that a witness is

21   biased, prejudiced, or hostile towards the

22   defendants requires you to view that witness's

23   testimony with caution, to weigh it with care, and

24   subject it to close and searching scrutiny.

25       Now, although the defendants are under

1    indictment, right, you should remember and you must

2    remember that an indictment is only an accusation.

3    It is not by any stretch evidence.

4        The defendants have pleaded not guilty to each

5    count of the indictment, and as a result of their

6    pleas of not guilty, once again, the burden is on

7    the prosecution to prove guilt beyond a reasonable

8    doubt.  You've heard me say this countless times.

9    The burden never shifts to the defendants, for the

10   simple reason that the law never imposes upon the

11   defendant in a criminal case the burden or duty of

12   calling any witness or producing any evidence.  The

13   law presumes a defendant to be innocent of all

14   charges against him, or it, and I therefore

15   instruct you that the defendants are to be presumed

16   by you to be innocent throughout your deliberations

17   until such time, if ever, you as a jury are

18   satisfied that the government has proven either or

19   both defendants guilty beyond a reasonable doubt.

20       Now, the defendants begin the trial with a

21   clean slate.  That presumption of innocence is that

22   clean slate, and it alone is sufficient -- the

23   presumption of innocence is alone sufficient to

24   acquit a defendant, to find him or it not guilty,

25   unless you as jurors are unanimously convinced

1    beyond a reasonable doubt of the defendant's guilt

2    after a careful and impartial consideration of all

3    of the evidence in this case.

4        If the government fails to sustain its

5    burden -- what? -- you must find the defendants not

6    guilty.  The presumption was with the defendants

7    when the trial began, and remains with them even

8    now as I speak to you, and will continue with the

9    defendants into your deliberations unless and until

10   you are convinced that the government has proven

11   their guilt beyond a reasonable doubt.

12       Let's just talk about that, because you've

13   heard me say that so many times.  Beyond a

14   reasonable doubt.  That's what the government must

15   prove.  Okay.  So what is a reasonable doubt?

16   Well, again, using common sense, experience,

17   intelligence, those words virtually define

18   themselves.

19       Beyond a reasonable doubt is a doubt based upon

20   reason and common sense.  Beyond a reasonable

21   doubt.  It is a doubt that a reasonable person has

22   after carefully weighing all of the evidence.  It

23   is a doubt which would cause a reasonable person to

24   hesitate to act in a matter of importance in his or

25   her personal life.  Proof beyond a reasonable doubt

1    must therefore be proof of such a convincing

2    character that a reasonable person would not

3    hesitate to rely and act upon it in the most

4    important of his or her own affairs.

5          Now, again, that's what reasonable doubt is,

6    but it is not a caprice or a whim.  It is not

7    speculation.  It is not suspicion.  It is not an

8    excuse to avoid the performance of an unpleasant

9    duty, and also it is not sympathy.  Right?

10          So you've got the definition.  Beyond a

11    reasonable doubt.

12          In a criminal case the burden is at all times

13    upon the government to prove guilt beyond a

14    reasonable doubt.  The law does not require that

15    the government prove guilt beyond all possible

16    doubt.  That's not the standard.  It's beyond a

17    reasonable doubt.

18          Proof beyond a reasonable doubt is sufficient

19    to convict.  That burden -- you've heard me say

20    this so many times -- never shifts to the

21    defendants, which means that it is always the

22    government's burden to prove each of the essential

23    elements of the crime charged beyond a reasonable

24    doubt.  And, ladies and gentlemen, if after fair

25    and impartial consideration of all the evidence you

 1   have a reasonable doubt, then what's your duty?

 2   Your duty is to acquit.

 3        On the other hand, if after -- and we insist on

 4   this, and you know we're talking about a fair and

 5   impartial consideration of all the evidence, you

 6   are satisfied of the defendants' guilt beyond a

 7   reasonable doubt, what should you do?  You should

 8   vote to convict.

 9        Now, you know that in this case the defendant

10   Mark Kamholz did not testify in this case, and

11   under our constitution, yours and mine, he has no

12   obligation to testify or present any other

13   evidence, because it is the prosecution's burden to

14   prove the defendants guilty beyond a reasonable

15   doubt.  That burden stays with the prosecution,

16   through the entire trial, never shifts.  The

17   defendants are never required to prove that they

18   are innocent.

19        They have both entered not guilty pleas.  You

20   may not attach any significance to the fact that

21   the defendant Mark Kamholz did not testify.  No

22   adverse inference against him may be drawn by you

23   because he did not take the witness stand.  You may

24   not consider this against him in any way in your

25   deliberations in the jury room.

1        Now, I've talked about Mark Kamholz, and the

2   other defendant, as you know, is the Tonawanda Coke

3   Corporation.  And it is a corporation, and under

4   the constitution and laws of this country a

5   corporation is a person under the law and may be

6   found guilty of an offense charged.  Of course, a

7   corporation, again fundamentally, is not a human

8   being, and as such, a corporation acts only through

9   its agents and employees.  That is, by those

10  officers, agents, employees, or other persons

11  authorized or employed to act for it.  The agents

12  of a corporation include its officers, directors,

13  employees, and certain others who are authorized to

14  act for it.

15     A corporate defendant, here Tonawanda Coke, is

16  entitled to the same impartial consideration of the

17  evidence that you must give to a human being

18  defendant such as Mark Kamholz.  A corporation may

19  be found guilty of the offense charged or be found

20  not guilty of this offense charged under the same

21  instructions that apply to a human being defendant.

22  Common sense, right?  Beyond a reasonable doubt.

23     To sustain its burden of proof on any charge as

24  to Tonawanda Coke, the government must prove beyond

25  a reasonable doubt each of the following:

1    First, the offense charged was committed by

2  agents or employees of the Tonawanda Coke

3  Corporation.

4    Second, the acts by the agents or employees

5  were committed within the authority or scope of

6  their employment.

7    And third, in committing the offense, the

8  agents or employees of Tonawanda Coke intended at

9  least in part to benefit the defendant corporation.

10    For an act to be within the authority of an

11  agent or the scope of the employment of an

12  employee, it must deal with a matter that's

13  performance is generally entrusted to the agent or

14  employee by the defendant corporation.

15    It is not necessary that the particular act was

16  itself authorized or directed by Tonawanda Coke.

17  If an agent or an employee was acting within the

18  scope of their authority or employment and at least

19  in part for the benefit of the company, Tonawanda

20  Coke is not relieved of its responsibility because

21  the act was illegal, contrary to its instructions,

22  or against its general policies.  You may, however,

23  consider the existence of Tonawanda Coke's policies

24  and instructions and the diligence of its efforts

25  to enforce them in determining whether the agents

1   or employees were acting with intent to benefit

2   Tonawanda Coke or within the scope of their

3   employment and at least in part for Tonawanda

4   Coke's benefit.

5       Now, a person may be found guilty of a

6   violation of the Clean Air Act or the Resource,

7   Conservation, and Recovery Act, RCRA, as a

8   responsible corporate officer if the government

9   proves beyond a reasonable doubt that, first, the

10  person had actual knowledge of the facts that give

11  rise to the violation; second, that the person had

12  the authority and capacity to prevent the

13  violation; and third, that the person failed to

14  prevent the violation.

15      Okay.  Heard enough?  Okay.  We're going stop

16  there.  Okay.  We're going to talk tomorrow about

17  the indictment that contains the charges against

18  the defendants.  I'll be reminding you that the

19  indictment is not evidence.  It's an accusation.

20  It describes the charges.  It's not to be

21  considered as evidence.

22      So in reaching that determination, you just,

23  from your standpoint, have to resolve whether the

24  defendants' guilt has been established beyond a

25  reasonable doubt, and consider only the evidence or

 1    lack of evidence that has been given to you in this

 2    case.

 3         You know, I think it's enough.  You've got a

 4    lot to absorb.  You've had somewhat of a long day.

 5    But we're going make sure you get rested tomorrow,

 6    and then we'll start at noonish.  And we'll have

 7    the closing arguments tomorrow, and they should

 8    wrap up, and then, you know, I'll go into some more

 9    explicit details with respect to those elements and

10    definitions and each count to be considered

11    separately.

12         And, you know, you have blocks of counts of the

13    indictment that relate to, you know, the Clean Air

14    Act or the RCRA or -- and that kind of thing.  So,

15    you know, we'll get into that tomorrow.  And then

16    you'll start your work, and you'll get these fact

17    issues resolved.  And I'm confident that you'll

18    come through with what you promised, that you would

19    do your very best to reach a unanimous verdict on

20    all the counts in the indictment here, starting

21    probably tomorrow when you get the case for your

22    deliberations.  Okay.

23         Look at this.  You've got 20 minutes, an early

24    quit for the day.  How much better can it get than

25    that?

1          Thank you very much.  Don't discuss the case.

2     Keep your minds open.  Don't do any independent

3     research.

4          From the attorneys' standpoint, did I miss

5     anything that I should be addressing?

6               MR. MANGO:  No, your Honor.

7               MR. LINSIN:  No.  We're satisfied, your

8     Honor.

9               THE COURT:  Okay.

10              MR. PERSONIUS:  No, your Honor.  Thank

11    you.

12              THE COURT:  Okay.  Thank you sincerely.

13    You know, keep all the stuff in your head.  It will

14    all coalesce; it will all work out.  We'll see you

15    tomorrow at what time?

16              THE JURY:  Noon.

17              THE COURT:  12:00 o'clock.  Okay.  And

18    thank you very much.

19              (Jury excused from the courtroom.)

20              THE COURT:  Okay.  Tomorrow at 9:30 we'll

21    have the charge conference.  We'll get that set as

22    quickly as we can, give you time to get geared up.

23              MR. LINSIN:  Okay.

24              THE COURT:  Okay?

25              MR. MANGO:  All right.

1          THE COURT:  And you want to handle -- the

2     attorneys have to sign off on the exhibit list.

3          THE CLERK:  Yeah.  And it will have to be

4     done then after -- unless you're ready to give me

5     the exhibits now, it will have to be done after

6     closings but before the final charge.  Because the

7     exhibits have to be ready to go to the jury as soon

8     as the judge finishes the charge.

9          THE COURT:  Right.  I know the paralegals

10     have been working and are very comfortable with

11     where we're at, but it requires the attorneys to

12     sign off.  And Colleen will take over tomorrow for

13     Mary.  She has been fully advised, and she'll be

14     the one responsible for getting the list, the

15     exhibits, the charge and everything to the jury.

16     But I like to get it as promptly after the finality

17     of the charge to the jury so that they can get

18     right into the deliberations.  Okay?

19          MR. MANGO:  Good.

20          THE COURT:  So review what you have to

21     tonight with your paralegals.  Make sure that you

22     don't have any issues as far as the exhibits.

23        Thank you very much.  We'll see you tomorrow at

24     9:30.

25          MR. LINSIN:  Thank you, your Honor.

3797

1                    *        *        *        *        *        *

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2

3              I certify that the foregoing is a

4        Correct transcription of the proceedings

5        Recorded by me in this matter.

6

7

8                        s/Michelle L. McLaughlin
                         Michelle L. McLaughlin, RPR
9                            Official Reporter
                           U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25