VOL. XVIII

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

        -vs-                  10-CR-219S
TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
               Defendants.
-------------------------------------


         Proceedings held before the

    Honorable William M. Skretny, U.S.

    Courthouse, 2 Niagara Circle, Buffalo,

    New York on March 26, 2013.


    APPEARANCES:

    AARON J. MANGO,
    Assistant United States Attorney,
    ROCKY PIAGGIONE, Senior Counsel,
    U.S. Department of Justice,
    Appearing for the United States.

    GREGORY F. LINSIN, ESQ.,
    JEANNE M. GRASSO, ESQ.,
    ARIEL S. GLASNER, ESQ.,
    Appearing for Tonawanda Coke Corporation.

    RODNEY PERSONIUS, ESQ.,
    Appearing for Mark L. Kamholz.

    Also Present:  Lauren DiFillipo, Paralegal
                 Sheila Henderson, Paralegal


    Michelle L. McLaughlin, RPR,
    Official Reporter,
    U.S.D.C. W.D.N.Y.
    (716)332-3560

3799

1                        I N D E X

2                                            PAGE

3      JURY CHARGE CONFERENCE               3800

4      SUMMATIONS

5      Mr. Mango                            3879

6      Mr. Linsin                           3928

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3800

1              (Jury not present in the courtroom.)

2              THE COURT:  Okay.  Colleen, if you would

3      call the case, please, just to get us on track

4      here.

5              THE CLERK:  Criminal case 10-CR-219,

6      United States versus Tonawanda Coke and Mark

7      Kamholz.

8              THE COURT:  Okay.  Let's see.  The

9      attorneys are all here representing the parties in

10     the case, and we thought we'd have a continuation

11     in order to finalize the charge conference and the

12     charges.  We're at the point where we were going to

13     start with charge number 39.  I thought we'd

14     proceed in the same fashion that we did yesterday.

15     I know in the defendants' submission basically the

16     first charge that's addressed is 41.  But does

17     anybody want to bring up anything preliminarily?

18             MR. PERSONIUS:  No, your Honor.

19             MR. MANGO:  No, your Honor.

20             MR. LINSIN:  No, your Honor.

21             THE COURT:  Okay.  All right.  Proposed

22     charge number 39, violations of the Clean Air Act.

23     Hold on one second.

24        Okay.  Hearing nothing, charge number 39 will

25     be accepted.  That runs from pages 54 through 67.

1      Okay.  And then that takes us to charge number

2  40, purpose of the statute.  Hearing nothing,

3  accepted.  That's page 68.

4      Now we go to charge number 41, and that's the

5  elements of the offense.  Mr. Linsin?

6          MR. LINSIN:  Thank you, your Honor.  What

7  we requested in our submission and what we believe

8  is necessary in order to give clear guidance to the

9  jury is that the Court break the Clean Air Act

10  instructions out into three separate instructions

11  to relate to the three groups of counts as we set

12  out in our submission, Counts 1 through 5 to be

13  addressed separately, Counts 6 through 10 to be

14  addressed separately, and then 11 through 15.

15      We believe it important, in part, your Honor,

16  because there are separate elements, in our view,

17  as recited in the indictment, separate conditions

18  in the permit that are referenced and that we

19  believe should be referenced in the instruction.

20      And, as we've indicated, with respect to

21  Counts 6 through 10, for the reasons we set out in

22  our submission, we believe that there should be an

23  additional element added to the list that is

24  currently contained -- list of elements currently

25  contained in draft charge number 41 relating to the

1    proof that there was no valid exemption in effect

2    during the time periods referenced.

3        So we are asking that these be broken out, not

4    in any way to complicate this charge, but to, we

5    believe, provide proper guidance and clarity to the

6    jury about what they must find with respect to each

7    of the three separate Clean Air Act groups of

8    counts.

9            THE COURT:  Okay.  I'm going to start out

10   this way.  It's a little difficult, I mean, not

11   knowing the government's position because I still

12   don't have that from the government.  You know, one

13   thing we do have, I think, is a jury that's

14   engaged.  So, you know, I think that's helpful in

15   terms of the -- what we have to do with the charge,

16   if anything.

17       But, Mr. Mango, what's -- what's your view with

18   respect to the sufficiency of the charge as it now

19   stands?

20           MR. MANGO:  Yes, your Honor.  We do

21   believe it is sufficient, except for one change

22   that would be recommended in the third element,

23   which currently reads that "during the time periods

24   alleged in the indictment the defendant operated or

25   caused to be operated an emission source in

1   violation of the Title V operating permit."  In the

2   government's view, consistent with all 15 counts of

3   the indictment, it actually -- the indictment reads

4   that "the defendant operated or caused to be

5   operated a stationary source in violation of a

6   Title V operating permit requirement."  That, I

7   think, would get over the confusion of the fact

8   that in condition 4 it's actually called an

9   unpermitted emission source, and that in conditions

10   96 and 97, those are the quench towers, and

11   according to Mr. Linsin, those are not emission

12   sources.  We strongly disagree with the fact that

13   Counts 6 through 10 need to have an additional

14   element.

15       We did draft something, your Honor.  It just

16   didn't make it into final version to be ready to be

17   e-filed.  We could do that later this morning if

18   you'd like.  But it's our view that -- that these

19   elements, with just that change, would be

20   sufficient, and I don't think -- based on your

21   comments, your Honor, this jury is going to follow

22   you.  And all 15 counts start out the same way.

23   The Tonawanda Coke Corporation operated a

24   stationary -- or the defendants operated a

25   stationary source in violation of a Title V permit.

1    And there's no reason not to capture all 15 counts

2    in one charge such as this, because all the

3    elements are the same, in the government's view.

4            THE COURT:  Yeah, I'm inclined to go that

5    way.  I don't think there's the necessity for the

6    insertion of an additional element in the second

7    grouping of counts that are proffered by the

8    defendants.

9        But what's your position, Mr. Linsin, with

10   respect to changing the third element from an

11   emission source to a stationary source?

12           MR. LINSIN:  Your Honor, I just, frankly,

13   disagree with counsel's -- the stationary source

14   language is captured in the first element of this

15   instruction, and that is consistent with the

16   introductory language in each of the 15 counts, and

17   that's why we had no objection.

18       When we get down to the particularization of

19   each of the groups, Count 1, for example,

20   references a pressure-relief valve in the

21   by-products department, comma, an unpermitted

22   emission source.  And then when you look to the

23   parallel language in the other groups, it is a

24   quench tower.

25       And so the language about a stationary source,

1    that is a necessary element.  It is captured in the

2    first element, as recited in this draft charge, but

3    what it is that is actually charged as the

4    violation, the particularization for each of these

5    groups, in the language of the indictment in each

6    of the counts speaks of, for Counts 1 through 5, an

7    emission source.  And we believe it is important

8    that the jury be guided and that the -- that the

9    requirement be clear that it be proven that it is

10   an emission source.

11       As the Court will recall, we believe that there

12   is a significant issue here as to whether the

13   pressure-relief valve was, in fact, an emission

14   source under the applicable regulations.  And

15   failing to capture that, glossing it over and

16   repeating language of what is in the first element,

17   I think misleads the jury as to what -- what the

18   required elements are and what the allegations are

19   in these counts.

20            THE COURT:  In Counts 1 through 5?

21            MR. LINSIN:  Counts 1 through 5.  And then

22   in 6 through 10 and, likewise, in 11 through 15,

23   instead of an emission source, it is referenced as

24   a quench tower, operation of a quench tower in

25   violation of a condition of the permit.

1    And we see -- I'm surprised, your Honor, that

2    the -- that the government would -- would oppose a

3    clear statement of what is actually recited in this

4    indictment.  That is what they've charged.  Making

5    it clear that the instructions and the elements

6    track what is alleged in these counts, I think

7    is -- assists the jury, makes sure that the

8    government is held to the proof that they have

9    alleged in these counts, and, honestly, if -- if

10   this current charge is -- were to be read by the

11   jury in parallel with the language that is set out

12   in each of these counts, I think there would be

13   inevitable confusion, and this charge does mislead

14   for that reason.

15       So we think, as I said, at a minimum these

16   groups need to be particularized as to what is

17   the -- either the source or the quench tower that

18   is referenced; and we would also think -- believe,

19   your Honor, that for that very reason it would be

20   important to recite that in Counts 1 through 5 it

21   is alleged that this -- the operation of this

22   emission source was a violation of condition 4 of

23   the permit.  We see --

24            THE COURT:  As opposed to just Title V.

25            MR. LINSIN:  Exactly.  And -- and then, in

1    parallel, for counts for the groups 6 through 10,

2    condition 96; and then 11 through 15, condition 97.

3    That's what is alleged.  And I think it clearly

4    will help the jury in focusing its attention.  It

5    is what is charged, and those charges should be

6    reflected as part of the burden the government has

7    in establishing these alleged violations.

8        I won't belabor the point, your Honor, with

9    regard to this exemption for the second group

10   there, 6 through 10, but I would point out that

11   this is an issue that we addressed during the

12   Rule 29 conference.  It is clearly the theory upon

13   which the government has tried this case, and I

14   think exempting or removing that element which they

15   have assumed as a burden in the course of trying

16   this case, I think leaves the jury without any

17   guidance as to what to do with all of this evidence

18   that's been introduced about the exemption itself,

19   about the percentage of uses of these towers.

20       If I try to put myself in the place of a juror

21   and I look at this charge without any reference to

22   this exemption or its applicability to these

23   allegations for quench tower number 1, I think

24   without a reference to that exemption the jury will

25   be left without any clear guidance about what to do

1    with that evidence.  And the government introduced

2    it for a reason.  They knew it was an issue with

3    regard to these counts, and they now should be held

4    to that by inclusion of that element in these

5    counts.

6              THE COURT:  By reference to the condition?

7              MR. LINSIN:  By reference -- no, your

8    Honor.  By reference -- well, by reference to the

9    condition, but by reference to the exemption that

10   relates to that quench tower.  It's quench tower

11   number 1 in 6 through 10.  That is an exemption

12   they understood applied.  There has been abundant

13   evidence about this issue.  Witnesses have been

14   questioned repeatedly about the initiation of the

15   exemption, about whether it was valid or not, about

16   the percentage of the usage, and whether it had

17   been voided.  And now to leave the jury without any

18   guidance about what to do, what to make of that

19   evidence and how it relates to these counts, I

20   think is -- is failing to hold the government to

21   their required proof, but I also think would just

22   lead to confusion.

23         So I think this is an element, your Honor, that

24   the government has accepted as their burden on

25   Counts 6 through 10, and we believe that should be

1    reflected as a necessary element, given the facts

2    as presented throughout this trial.

3                THE COURT:  But you can certainly argue

4    that point.

5                MR. LINSIN:  Well, your Honor, without

6    clear guidance from the Court -- I can argue all

7    day long.  But if the Court then tells the jury,

8    "Well, but that's not a required element," my

9    arguments go up in smoke.  It should be a required

10   element.  I can make reference to the exemption and

11   whether it was valid, but if the Court does not

12   clearly tell this jury the government's required to

13   prove there was no valid exemption, the jury's

14   going to think of these arguments as nothing but

15   smoke on my part.  And I don't believe that is a

16   fair assessment of how the government has tried

17   this case and -- or a fair assessment of the

18   representations they made during the Rule 29

19   discussion on this issue.

20               MR. MANGO:  Your Honor, these arguments

21   are -- seem to be identical to the Rule 29

22   arguments, that this -- this is not an element of

23   the offense.  The conditions, which are in

24   parentheticals in all of the counts, so the first

25   five and a half lines of each of the counts are

1    identical, that they -- again they -- the

2    defendants knowingly operated a stationary source

3    in violation of its Title V permit requirements by,

4    and then it gives specificity in each of the 15

5    counts.

6        That language is identical, and that is what I

7    believe can be captured in these four elements, and

8    it's -- the fact that they're the owner or operator

9    of the stationary source in the first element, that

10   doesn't capture that they then operated that

11   stationary source in violation of their permit.

12   And --

13           THE COURT:  Do you have any problem with

14   the language referencing the specific condition?

15           MR. MANGO:  Well, your Honor, I don't

16   have -- I believe the government does not have a

17   problem referencing that Counts 1 through 5

18   particularize they violated the permit by emitting

19   coke oven gas from a pressure-release valve in the

20   by-products department, an unpermitted emission

21   source.

22       That parentheses, condition 4, I don't think we

23   need to reference that, because that's -- we get

24   into this tricky area where under the Clean Air Act

25   it's a general-intent statute, and we've got to be

1  careful that we don't add a specific-intent element

2  to it by --

3  THE COURT:  But 4 -- I understand that.

4  I'm sorry to cut you off.  But 4 is what applies

5  there.  In 6 through 10 it's 96.  So doesn't that

6  give direction without really running the risk that

7  you change the elements with respect to intent or

8  knowledge or whatever the case may be?  There's --

9  there's no risk of that, really, is there?

10  MR. MANGO:  Not -- not as proposed by the

11  Court.  I would just be cautious if these are all

12  broken out separately.  I think in this form,

13  covering them all 15 in one and then adding a

14  separate charge that counts -- you know, with

15  particularization, Counts 1 through 5 address a

16  violation of the Title V permit, and then just take

17  the language right out of the indictment, "by

18  emitting coke oven gas from a pressure-release

19  valve in the by-products department, an unpermitted

20  emission source."  And then if you want to add the

21  parenthetical, that's fine.  And then another,

22  Counts 6 through 10 relate to --

23  THE COURT:  Yeah.  Go ahead.

24  MR. MANGO:  -- relate to violations of the

25  Title V permit, and then just follow the language,

1    "by operating the western quench tower," down the

2    line.

3        You could do that all in one instruction, so

4    you don't need -- in the government's view, you

5    don't need to go through each set of these when you

6    can do all 15 in one and then provide, if you want,

7    this specific instruction for each of the counts

8    afterwards.

9            THE COURT:  Put yourself in the jury's

10   position, though.  Don't you think it would be

11   helpful -- because we did talk about grouping of

12   counts throughout the course of the trial -- to

13   have it set out elementally as per each group?  I'm

14   not talking about adding the exemption aspect right

15   now, but just in terms of the clarification with

16   respect to the condition and whether we're talking

17   quench tower 1 or quench tower 2, or --

18       But if you were to look at it, I mean, as the

19   jury, I mean, when you -- you know, I kind of came

20   in liking all 15, but to be covered by this one

21   general instruction, it does make it more

22   manageable in one respect, I mean, in terms of

23   presenting it.  But from the jury's perspective I'm

24   wondering if maybe it would be helpful to break it

25   down with the specific conditions.  It just would

1    help everybody focus a little bit.

2              MR. MANGO:  Your Honor, if I could just

3    have one moment.

4              THE COURT:  Yeah.

5              MR. MANGO:  This is where -- we're

6    comfortable, your Honor, with whatever approach you

7    want to take.  The concern is this knowledge

8    element.  In the Second Circuit case law,

9    specifically in Weintraub, 273 F.3d 139 at 1478,

10   the Court talked about what knowledge is under the

11   Clean Air Act.  And says that knowledge of the

12   facts and attendant circumstances that comprise a

13   violation of the statute, not specific knowledge

14   that one's conduct is illegal.

15       So this gets into -- if -- if the Court is

16   saying that the defendant had to -- I'm just

17   worried about element 3 and element 4 blending

18   together, where the jury will read the knowing --

19   the general intent knowing standard as knowing it

20   was a specific violation of condition 96 or 97.

21             THE COURT:  So we could just work with the

22   third element and set it out in a way that would

23   relate to the three separate groupings, and that

24   would accomplish, I think, what you want, and I

25   think that would minimize the concerns that

1   Mr. Mango has, so that element 3 would be

2   individualized to the groupings.

3            MR. LINSIN:  Your Honor, that's precisely

4   what we were hoping.  Obviously, we still have this

5   issue with the second group, but -- concerning the

6   exemption, but that is what we think would be

7   faithful to what is charged, without in any way

8   suggesting that we intend to argue or suggest that

9   these are specific-intent crimes.  We know better

10   than that, your Honor.

11            MR. PERSONIUS:  Judge, I would like to be

12   heard briefly on the --

13            THE COURT:  Yeah.

14            MR. PERSONIUS:  -- please, to -- when

15   you're ready.

16            THE COURT:  I'm going to confuse myself if

17   I let you speak too early here, Mr. Personius.

18            MR. PERSONIUS:  I'm sorry.

19            MR. LINSIN:  Your Honor, may I just -- I

20   understand that even if the Court does not accept

21   our argument on this language concerning the

22   exemption for the second group, I understand the

23   only issue then would be the -- the change in the

24   third element that we've been discussing.  I just

25   believe it would be very helpful, even if the Court

1    would take the time to reread the first, second,

2    and fourth elements, to explain to the jury:  Look,

3    here's your charge for Counts 1 through 5.  And so

4    they've got a charge to go to as they consider

5    the -- here's your charge for Counts 6 through 10.

6        I see -- you know, the -- the benefit of

7    clarity, I believe, is far outweighed by the

8    minimal repetition that would occur.  And I -- I

9    certainly see no prejudice to the government.  So

10   that is -- that would be our recommendation to the

11   Court, and even if the language of the first,

12   second, and fourth elements didn't otherwise

13   change.

14            THE COURT:  Yeah.  I don't mind doing

15   that, necessarily.  I think I'm going to make the

16   change, and we'll itemize it in terms of element 3.

17            (Discussion off the record.)

18            THE COURT:  Okay.  Yeah, I'm going make

19   the changes.  We just have to figure out how I can

20   comfortably present it.  And I want to -- you know,

21   when I give them the document, I want to have

22   something that they will not be confused by.

23   Because I think, very honestly, it really works to

24   both -- to the advantage of both sides to make this

25   as -- as clear as possible in terms of what we're

1    dealing with elementally.  Because, you know, you

2    always run the risk that the jury could throw up

3    its hands one way or another against either side

4    because they simply don't understand it.  And

5    that's not fair, I don't think.

6        I think we really want to get -- after all the

7    effort that went into this thing -- the jury to

8    really knowledgeably address these elements.  And I

9    know, because I speak to the jury every single

10   case.  I can -- I don't think I have a recollection

11   of one jury that I know of that has told me they

12   haven't gone to the elements discussions in guiding

13   their deliberations.  So I really want to do that.

14       I want to work with Andrew a little bit until

15   we get what we're talking about now committed to

16   paper.  I'll give it to you again.  But, I mean, I

17   will change it, and I will make it more specific.

18            MR. LINSIN:  Well, your Honor, I just -- I

19   think it would be of assistance, we think it is

20   faithful to the points we referenced, but in our

21   submission on pages 2, 3, and 4 we have proposed

22   language for what we believe those third elements

23   should be for each of those groups.

24            THE COURT:  Yeah, I have that right here.

25   Okay.  So I'm looking at it as we speak.  But I

1    still need to determine how I'm going to do this in

2    terms of setting up the instruction for a

3    "threepeat," if you will.  Okay.  So -- but I'll

4    work on that, and I'll give it to you one more

5    time.

6              MR. LINSIN:  All right.

7              THE COURT:  Okay.  Mr. Personius.

8              MR. PERSONIUS:  Thank you, Judge.  Judge,

9    this goes back to the -- the issue that relates

10   to -- I think I've got this right -- Counts 6

11   through 10, which is the first quench tower and the

12   exemption.

13             THE COURT:  Yes.

14             MR. PERSONIUS:  If something isn't put in

15   about the exemption and the jury reads the third

16   element, the risk is that they will say:  Okay,

17   we've got quench tower number 1.  They'll go to --

18   I think it's condition 96.  Condition 96 says you

19   have to have baffles.  They'll say:  If we follow

20   the elements, there were no baffles in that quench

21   tower.

22       If some mention isn't made that there's an

23   exemption that the government has acknowledged from

24   its opening statement that applies here, and the

25   jury literally reads the elements, as Mr. Linsin

1     has indicated, he can talk until the cows come home

2     about the exemption, but if the jury is faithful to

3     the charge, they won't consider the exemption.

4               THE COURT:  You know, I'm not sure -- I'm

5     not sure I agree with that, necessarily.  I want to

6     work it out.

7          But, Mr. Mango.

8               MR. MANGO:  Thank you, your Honor.  The

9     government definitely does not agree with that.

10    There's been more than adequate discussion on the

11    record with evidence, with testimony, of what

12    condition 96 means based on the regulatory history.

13    The jury's got enough to weigh the exemption issue

14    in place here.  And technically it's -- you know,

15    the indictment is what the indictment is.  And

16    condition --

17              THE COURT:  Well, yeah, but the operation

18    in violation of the Title V condition and permit

19    requirements, it's not in violation if there's an

20    exemption that applies, is what you're saying,

21    right?

22              MR. MANGO:  According to the DEC

23    witnesses.  According to the EPA witness who took

24    the stand, Mr. Eng, the defendants' witness, it's

25    the Title V document that controls.  But there has

1    been enough of this discussion.  There's evidence

2    in regarding this exemption.  Your Honor, I believe

3    we're all going to reference it, probably, in our

4    closing argument.

5              MR. LINSIN:  But the point is, your

6    Honor -- and I apologize for interrupting, but the

7    point is, if these instructions stand, however

8    eloquent I am or Mr. Personius is about this

9    exemption, Mr. Mango can state up in rebuttal close

10   and say:  Look at the instructions the judge is

11   going to give you about the elements for these

12   offenses.  There is a not a single word about

13   exemption in there.  There's no requirement that

14   the government prove anything about exemption.

15   Follow the Court's instructions.  Ignore this issue

16   of exemption, and -- and --

17             THE COURT:  Well, he can't argue that.  He

18   cannot argue that.

19             MR. LINSIN:  On this count, with this

20   instruction as it stands, as Mr. Personius just

21   said, that's precisely what he can argue, that the

22   government has no burden under this -- under this

23   proposed charge.  No burden to prove anything with

24   regard to the exemption, because it's not

25   referenced.

1          THE COURT:  But you're saying that the

2    burden switches to you with respect to establishing

3    the applicability of the exemption.

4          MR. LINSIN:  Your Honor, what we -- what

5    we are saying is that -- and the element we have

6    proposed is the government establish there was no

7    valid exemption.  This is the government's burden.

8    The government's own witnesses have testified that

9    they believe this exemption was in effect until

10   November of 2009.  Mr. Foersch testified about

11   that.  The DEC, the agency that regulated this

12   facility for 25 years, has said with its own notice

13   of violation we're only going to order baffles in

14   quench tower number 2, not quench tower number 1.

15   They knew there was an exemption in effect.

16        These are the government's witnesses and the

17   agency that regulated the facility.  And so the

18   government's burden, I believe, and the one they

19   have assumed in the way they've tried their case,

20   is to prove that there is no valid exemption.  And

21   without a reference to that issue in these

22   instructions, the jury will have no way to place or

23   assess or evaluate what all this testimony has been

24   about.

25          THE COURT:  Well, let me hear from you on

3821

1    that, Mr. Mango, because my concern is -- is that

2    by not including it -- and, you know.  I still

3    think that it can be argued and that it's not

4    blowing smoke, as you first referenced it,

5    Mr. Linsin, or who was it, the cows come home?  Is

6    that what you said, Mr. Personius?  I have both of

7    your characterizations.  But, I mean, I think the

8    jury -- the jury has heard a lot about exemptions,

9    and they can come to grips with it.  I haven't

10   settled this yet.  But what -- my fear is this,

11   and, you know, maybe I've got it slotted wrong,

12   because Mr. Linsin didn't pick up on it.  But what

13   I'm afraid of is that there's some shifting of the

14   burden to the defendants, and you don't want that

15   to happen, because that to me is reversible error.

16       So, against that backdrop, I mean, by not

17   proving that no exemption applies, doesn't that

18   shift the burden to some extent to the defense to

19   have to establish that an exception -- an exemption

20   is applicable?  All right.  And that's problematic,

21   perhaps.  I don't know.  You tell me.

22            MR. MANGO:  Yes, your Honor.  First, just

23   so the Court is aware and the parties are aware,

24   Mr. Piaggione is going to be doing the rebuttal.

25   Mr. Linsin mentioned Mr. Mango could get up on.

3822

1    I'm going to be doing the closing.  Mr. Piaggione

2    is going to be rebuttal.

3              THE COURT:  Well, it's one and the same as

4    far as we're concerned.

5              MR. MANGO:  It is true.  Your Honor, I

6    don't think there is any type of shifting of the

7    burden in this case, because the government, one,

8    for the record, is not going to stand up and say

9    that we don't have to -- we don't have to prove

10   anything about an exemption, look at Title V.  That

11   would be contrary to what we said on the record,

12   how the proof came in in evidence.  Now, that

13   testimony, I believe, is what is controlling, that

14   according to the DEC's view, condition 96 had this

15   exemption.  So, of course, we've got to show that

16   they violated the exemption.

17             THE COURT:  Well, what does 96 require?

18             MR. MANGO:  That -- 96 requires that all

19   wet quench towers be operated with a baffle system

20   to effectively reduce particulate emissions.

21             THE COURT:  Does it reference exemption?

22             MR. MANGO:  Condition 96 does not

23   reference the exemption.

24             MR. PERSONIUS:  Why would you have a

25   four-week trial and risk this, and risk that --

1    that -- that there's a conviction on this set of

2    counts and then you go up on an appeal and the

3    Second Circuit says you should have included that,

4    because of the point you're making, Judge, about

5    it's burden shifting.  And that's a good point.

6    But I think if you literally read the charge as

7    it's written out, it's going to create jury

8    confusion.

9            THE COURT:  Well, I mean, you know, almost

10    all the time you ask for extra elements to be

11    inserted, Mr. Personius, because that puts a

12    greater burden on the government than what the law

13    generally requires.  And that's problematic, and I

14    don't want to do that.  I don't want to give them a

15    burden beyond what the law requires.  But, you

16    know, I also have that counterconcern about

17    shifting the burden, to some extent.  And I don't

18    know if -- if -- you know, the jury has heard so

19    much about exemptions.  There's no reference to

20    exemptions in condition 96.  I don't see why it

21    can't be forcefully argued without the jury -- and

22    I won't allow the government to say:  Look, you

23    know, you don't have to consider the element of

24    exemption.

25        That doesn't make -- and that's your fear here,

1    Mr. Linsin.

2          MR. LINSIN:  But, your Honor, let's set

3    aside for a moment that Mr. Piaggione -- no one on

4    the government's team argues that they don't have

5    to prove anything with regard to exemption.  Let's

6    say the jury then walks out into the jury room with

7    this charge, with the charge itself that says

8    nothing about exemptions.  Nothing.  It is silent.

9    And the jury's going to be sitting there, "What the

10    heck was all that testimony about?  How do we

11    apply -- how does that evidence of an exemption and

12    whether it's valid or not or what the percentage --

13    how does that relate to these charges?"

14          THE COURT:  Well, they're going to say,

15    "We just heard Mr. Linsin and Mr. Personius argue

16    that they qualified for an exemption, therefore

17    they didn't violate the Title V permit

18    requirements."

19          MR. LINSIN:  But, your Honor, you have the

20    final word.  They are going to be told:  These are

21    the elements the government needs to prove and only

22    these elements.

23       And if the Court doesn't give some guidance on

24    how that proof relates to these five counts, I

25    think, first of all, the -- the government's burden

1    that they have assumed in the way they've tried

2    this case will not be accurately reflected in the

3    charge, and the jury will be free to navigate the

4    assessment of the evidence on these five counts

5    without any reference or consideration to

6    exemption.

7             THE COURT:  Well, let me ask you this.  I

8    mean, the defense is always in a position to

9    defend.  That sounds redundant; right?  And in

10   order to defend there has to be a theory of

11   defense.  The theory of defense in this case is --

12   at least with respect to 6 through 10, is that

13   there was no violation of the Title V permits

14   because there was an exemption that applied here.

15            MR. LINSIN:  But, your Honor --

16            THE COURT:  That's like an affirmative

17   defense in a civil case, isn't it?

18            MR. LINSIN:  Your Honor, the truth of the

19   matter is, if the jury in this case goes no further

20   than the literal language of the Title V permit as

21   Mr. Mango has just said, they will not need to make

22   any question or issue or make any finding --

23   factual finding about an exemption.  The Title V

24   permit says nothing about this exemption.

25            THE COURT:  What about a separate charge

1    that qualifying as an exemption is a defense to

2    charges 6 through 10?

3              MR. LINSIN:  Your Honor, because we don't

4    believe that this is a situation where the

5    defendants have the obligation to establish an

6    affirmative defense.  We believe that the

7    government's own witnesses have testified they

8    believed there was an exemption that was in effect.

9    Their own evidence has shown that.  And what we're

10   saying is the way they have tried the case, the way

11   the evidence has come in, makes it clear that if

12   there was going to be a violation for these baffles

13   in quench tower number 1, they have to prove beyond

14   a reasonable doubt that there was no exemption that

15   applied.

16             THE COURT:  All right.  All right.  I'm

17   going -- I'll consider the argument.  I don't think

18   I'm persuaded, but I'll -- I'll give it some more

19   thought, because, just as you did there, I don't

20   see why you can't argue that to the jury without

21   confusing the jury.  You know, it's a pretty sharp

22   jury.

23             MR. LINSIN:  Well, your Honor, as I said,

24   we can make the argument, but if the jury is

25   sitting in the jury room with the Court's charge in

1    front of it and it is silent on exemptions, those

2    arguments will have no place in the jury's

3    assessment of whether or not the government's met

4    its burden.  None.  I think it is -- it is -- I

5    believe the Court must give guidance to the jury on

6    what it is to do with these evidence -- this

7    evidence and how it relates to whether there was a

8    violation of the law.

9            THE COURT:  All right.  You know, I'm -- I

10   don't know if I want to include it as another

11   element.  That's what I need to work out.  I don't

12   disagree that some guidance may be warranted here.

13   Okay.  But I just don't know if it -- if it

14   involves including it as a distinct element when

15   technically the charge on these violations don't.

16   So I don't know where the place is for it yet,

17   but -- but I think some guidance is probably a good

18   idea, and I just don't exactly know where.

19           MR. LINSIN:  Well, I would only point out,

20   your Honor, we do not believe -- we strenuously do

21   not believe that the guidance should place that

22   burden on our shoulders.

23           THE COURT:  Well, what about something, if

24   you believe that an exemption applies with respect

25   to 6 through 10?

1           MR. MANGO:  And that the defendants

2      qualified for that exemption.

3           THE COURT:  Then you should acquit.

4           MR. MANGO:  Even something -- I agree.  I

5      don't like appending it as an element.  And in the

6      language that's included here, this is -- this

7      would be even more confusing, that fourth that

8      there was no valid exemption for the baffles

9      requirement in effect.  That's -- that's not how

10     the testimony has come out.  But I agree that

11     guidance would be -- would be acceptable with the

12     government in this case if it were something that

13     established and captured the testimony here at

14     trial.

15          THE COURT:  If you find that the

16     exemption -- was it the 1994 exemption?

17          MR. MANGO:  '84.

18          THE COURT:  -- to the west quench tower.

19     Right?

20          MR. LINSIN:  '84.

21          THE COURT:  1984.  Okay.  Exemption to the

22     west quench tower.  If you find that, that it

23     applied, you should vote to acquit.

24          MR. LINSIN:  Well, that -- that is an

25     articulation of an affirmative defense, your Honor,

1    and we believe it problematic.  We believe it

2    absolves the government of a burden they should

3    have of proof beyond a reasonable doubt.

4              THE COURT:  But does it?  Because what

5    that does is it doesn't place the burden on either

6    side.  It leaves it up to the jury to determine.

7              MR. LINSIN:  By what standard, your Honor?

8    By beyond a reasonable doubt?  That's -- that's

9    just the point if we do not include it as an

10   element.  And that is why we're here.  That is the

11   burden the government assumes by walking in this

12   courtroom with a criminal charge, and they should

13   not -- with these five counts -- we have attempted,

14   your Honor, to be fair and narrow in our proposals

15   here, but we are -- we don't find a formula that

16   properly captures this issue of the exemption for 6

17   through 10 without requiring it as an element of

18   the charges for those five counts.

19             THE COURT:  Yeah, I mean, it does -- it

20   does cause -- there is cause for concern, I think,

21   in terms of by what standard does the jury make the

22   finding if it's not included as an essential

23   element of the government.  I mean, from the

24   standpoint of does it have to be addressed in a

25   special verdict form, maybe it would have to be, if

1   we're dealing with setting it out in the language

2   of "if you find," because they could find, I

3   suppose, less than by a burden of beyond a

4   reasonable doubt.  But then, again, it's not an

5   essential element, at least the way it's structured

6   here.

7       So I still don't know if that requires the

8   government to prove that no exemption applies.  Let

9   me try to work something up.  I'll go back to the

10  boards, and we'll talk about some guidance on that

11  exemption.  I think that's -- I think we should do

12  something.  I just don't know how we're going do it

13  yet.  So let me work on it.  Okay?  We're making

14  some progress in that regard.  I think by your own

15  admission, Mr. Mango, something has to be done.  I

16  just --

17          MR. PERSONIUS:  Judge, could I -- I make

18  one suggestion, please?

19          THE COURT:  Yeah.

20          MR. PERSONIUS:  It doesn't add an element.

21  If the third element for those five counts, 6

22  through 10, were to read:  Third, that during the

23  time periods alleged in the indictment the

24  defendant operated or caused to be operated an

25  emission source -- or whatever language gets used

1     there -- comma -- not subject to --

2          MR. LINSIN:  Quench tower.

3          MR. PERSONIUS:  Quench tower.  But comma,

4     not subject to exemption, comma, in violation of a

5     Title V operating permit.

6        It doesn't add an element, but it makes it

7     clear that the exemption has to be considered.

8          THE COURT:  That might do it.

9          MR. MANGO:  That might.

10          THE COURT:  All right.  I don't want to

11     give you a lot of credit for that, Mr. Personius,

12     but I -- I think that might be helpful.

13          MR. PERSONIUS:  I've got to wiggle out of

14     the "cows come home" point I made.

15          THE COURT:  I know.  Yeah, let me think

16     about that.  That might work it.  That might work.

17     All right.

18          MR. MANGO:  Yeah.

19          THE COURT:  Okay.  All right.  Andrew,

20     we'll note it.

21          LAW CLERK:  I got it.

22          THE COURT:  Okay.  Yeah, I'm comfortable

23     with that.  Okay.

24        That was 41; right?

25          MR. MANGO:  Yes, your Honor.

1          MR. LINSIN:  Yes, your Honor.

2          THE COURT:  Okay.  I mean, that

3     encompassed a lot, so, okay.  We've got a little

4     bit of work to do on that, but I think that was

5     very helpful.  Thank you.

6        Charge number 2, owner/operator.

7          MR. LINSIN:  42, your Honor?

8          THE COURT:  Yes, 42.  Hearing none,

9     acceptable.

10        43, stationary source and major source.

11    Hearing nothing, acceptable.

12        44, Title V operating permit program.  Hearing

13    nothing, accepted.

14        46, Element 4, definition of "knowingly."

15          MR. LINSIN:  I'm sorry.  You missed 45.

16          THE COURT:  Okay.  New York State

17    regulation.  Thank you.

18          MR. MANGO:  Your Honor, I would suggest at

19    this point -- since this has now and is a factual

20    issue that seems to be in dispute, I would suggest

21    the adding after -- as part of this instruction,

22    adding four definitions that come right out of the

23    New York Codes, Rules and Regulations, which are

24    emission source, construction, modification, and

25    process.  Because process is actually used in the

1    definition of modification.

2        I think that would -- that would help the jury

3    in tackling the factual issue with whether the

4    bleeder pressure-release valve is an emission

5    source.

6            THE COURT:  Mr. Linsin?

7            MR. LINSIN:  Which definitions?  I'm

8    sorry.  I didn't have my pen in my hand.

9            MR. MANGO:  Yeah, I can give actual

10   citations too.

11           THE COURT:  Just tell us the --

12           MR. LINSIN:  Source point --

13           MR. MANGO:  Yes.

14           MR. LINSIN:  -- modification and process?

15           MR. MANGO:  Yes.  Emission source.  But

16   under the regulations, emission source is actually

17   defined as air contamination source or emission

18   source.  So if you look up just emission source

19   you're not going to find it.  You're going to start

20   with air contamination source or emission source.

21   We could probably leave out the air contamination

22   source part.  But that comes out of Part 200.

23       And in Part 201 there is the additional

24   language regarding construction.

25           MR. LINSIN:  Can I just ask what -- what

1    version of these definitions you're referencing?

2    What -- what year?

3             MR. MANGO:  My understanding is that the

4    current version, these -- these principles, these

5    four terms, have not been changed since 2005.

6             MR. LINSIN:  But we're talking about a

7    permit that was issued in 2002.  I think my view is

8    that we would either have to go with the versions

9    that -- as they existed in 2002 or separate

10   versions for the different years in the five years

11   of the indictment.  If the -- if you're going to

12   include a definition, it has to be the definition

13   that is applicable to the time period in question.

14            MR. MANGO:  In the indictment, which is

15   2005 to 2009, that would be the government's

16   position.  And these definitions are consistent

17   during that time period.

18            THE COURT:  All right.  Well, list the

19   four.  Then you have to get definitions, make

20   certain that they apply, and the same ones apply

21   between 2002 and 2005.  If they're different, we'll

22   use the two different ones.

23            MR. MANGO:  Your Honor --

24            THE COURT:  If it doesn't become

25   overwhelmingly confusing.

1          MR. MANGO:  Right.  I think, again, the

2     time period would be 2005 to 2009.  That's what's

3     charged in the indictment, the time period.  I know

4     there was a reference that the Title V permit was

5     issued in 2002, but it's -- that's a living

6     document, and if there was a change, say in 2003

7     or 2004, in 2005 when the indictment is charged the

8     definition in effect should apply to what's charged

9     that year.  But the terms are emission source,

10    construction, modification, and process.  And I

11    could --

12         MR. LINSIN:  Oh.  Well, then, your Honor,

13    emission point also must be included.  There was a

14    significant amount of testimony and questions of

15    the witnesses regarding an emission point, and the

16    distinction between source and point was a subject

17    of quite a bit of examination of the government's

18    witnesses.

19       I thought you had included point initially.

20    But point, we believe, would definitely need to be

21    added.  Your Honor, let me think and take a look at

22    the applicability issue.  Counsel may have a point

23    that we need not go back to 2002 if -- if --

24         THE COURT:  If the permit process is a

25    living process.

1           MR. LINSIN:  Exactly.  Right.  But one

2    point I would make, your Honor, also, on this

3    instruction is I think it would be helpful to

4    include an introductory sentence or two indicating

5    that this is -- this instruction is related to and

6    particularized as to Counts 1 through 5 of the

7    indictment.  This doesn't really relate

8    meaningfully to 6 through 15.

9           MR. MANGO:  That's fair.

10           THE COURT:  Fair enough.

11           MR. LINSIN:  And Counts 1 through 5 and

12    condition 4 of the permit.

13           THE COURT:  Okay.

14           MR. LINSIN:  All right.

15           THE COURT:  Yes.  Okay.  But the

16    definitions -- I mean, assuming you get a chance to

17    look at those -- were we to include them, would

18    also include emission point?

19           MR. LINSIN:  Yes, I believe that would be

20    fair.

21           MR. MANGO:  I'll include the language

22    in -- I presume I'll email this to chambers and

23    counsel.  Condition 4 says nothing about emission

24    point.  That's -- that could be argued.  There was

25    testimony what an emission point means.

1          THE COURT:  There's so much that involved

2     that.  I'll include the point.  Send that out.

3          MR. MANGO:  All right.

4          MR. LINSIN:  Okay.  Thank you, your Honor.

5          THE COURT:  So that would be five

6     definition statements.

7          MR. MANGO:  Yes.

8          THE COURT:  Okay.  All right.  Where are

9     we by your count?

10          MR. LINSIN:  46, your Honor.

11          THE COURT:  Knowingly?

12          MR. LINSIN:  Yes.

13          THE COURT:  Anything on that?

14          MR. LINSIN:  Your Honor, I --

15     substantively, no.  But just on page 75 of the

16     draft instruction, the first partial paragraph

17     there, I was not sure why that final sentence was

18     here in this discussion of knowingly.

19          THE COURT:  You mean, "Then you must find

20     this emission was unpermitted and was in violation

21     of the Title V permit"?

22          MR. LINSIN:  Right.  I just -- I wasn't

23     sure if that was an artifact of or -- but -- well,

24     no.  Actually, I withdraw my comment, actually.

25     Now when I look at the paragraph as a whole, I

1    think it is appropriate.  It is a clarification.

2    And my only other point, your Honor, would be that

3    if we -- depending on how the Court resolves the

4    issue of -- well, no.  I actually don't think it

5    would require modification of the discussion for 6

6    through 10 here.  I think this -- this should --

7    can stay as is, even if the other modification we

8    were discussing is made, because this goes to that

9    intent element, the knowingly standard.  All right.

10             THE COURT:  Okay.  Okay.  Charge 47,

11   estoppel defense.

12             MR. PERSONIUS:  Judge, we did include in

13   our submission a request that there be a brief

14   addition to that charge that is consistent, we

15   think, with Second Circuit precedence as

16   articulated in the two cases, Abcasis and George,

17   that we cite in our submission at page -- page 4.

18   And we've included on page 5 the paragraph, which I

19   think is maybe just two sentences, that we think

20   needs to be added to make it clear.  What we're

21   particularly concerned about, Judge, is that it be

22   made clear to the jury that even if the jury were

23   to conclude that the elements of any given offense

24   had been proven beyond a reasonable doubt, this

25   defense of entrapment by estoppel is still

1    available to the defendants.  And that's what the

2    Second Circuit has specifically articulated in

3    Abcasis and in George.  And the charge as written

4    does not -- does not state that -- that clear to

5    the jury.

6         So the concern is, as written, the jury could

7    look at this charge, and one of the jurors might

8    say, "Well, we're satisfied that each element of a

9    particular count has been proven beyond a

10   reasonable doubt, and therefore we convict," and

11   that wouldn't be correct.

12             THE COURT:  All right.  I understand what

13   you're saying, but where does your proposed

14   language come from?  Is that something that you

15   crafted?

16             MR. PERSONIUS:  Well, it's taking -- it's

17   taking literally the language from George, I think,

18   Judge, with maybe one change.  If you compare the

19   proposal we have with the George quote, which is on

20   the bottom of page 4, and the proposal's on the top

21   of page 5, they're almost identical.  I can't tell

22   you immediately what the change is, Judge, but it

23   was simply a change made to make the charge

24   consistent with -- with our case.

25             THE COURT:  All right.

1          MR. PERSONIUS:  If you look at George, it

2    really comes right from that, with, I think, maybe

3    one word being changed.

4          THE COURT:  Let me -- I mean, I think

5    that's right.  So I'll just take a look at it and

6    make sure.

7          MR. PERSONIUS:  I'm sorry I can't tell you

8    right now what the change is.

9          MR. MANGO:  I see the change, your Honor.

10   It's the last -- in George, on -- in the block

11   quote on defense's submission, page 4, it says "in

12   reasonable reliance on a government," then says

13   "official's statement."

14         MR. PERSONIUS:  Right.

15         MR. MANGO:  In the block quote it says,

16   "committed in reasonable reliance on the conduct of

17   the government would violate due process or

18   fundamental fairness."  It does change coverage,

19   and --

20         MR. PERSONIUS:  But you recognize

21   otherwise on your charge, Judge, that the reliance

22   can be based not only on the statement but also

23   conduct.  So I mean, it could say a government

24   official's statement or conduct, and then it would

25   be consistent with the rest of the charge.

1           That probably would be the best way to do it, I

2      think, and I should have done it that way.

3                THE COURT:  I think -- I think that would

4      be all right.  The government's -- reliance on the

5      government's statement.

6                MR. PERSONIUS:  The government official's.

7                THE COURT:  Official's statement or

8      conduct.

9                MR. PERSONIUS:  Right.  I should have done

10     it that way.  I think Aaron's right.

11               MR. MANGO:  Your Honor, putting that

12     aside, we do have a question as to what counts

13     entrapment by estoppel is that now the judge of the

14     law finds this applies to.  Because we haven't

15     addressed that.  In this charge it doesn't say you

16     should only factor this into, say, the RCRA counts

17     or, you know, the one -- one of the quench tower

18     counts or -- and I think we need to do that,

19     because we -- the government has a strong view that

20     this does not apply, entrapment by estoppel.  If it

21     applies at all, it applies to Count 18 of the

22     indictment, which is -- we heard testimony that

23     there was potentially knowledge by the EPA that

24     they were going to remove the material from inside

25     the tank and place it on the coalfield.

1    The defense, in the government's view, hasn't

2    met its burden with respect to anything else.  And

3    I think maybe we should need to, you know, work

4    that out here.

5         MR. LINSIN:  Your Honor, as I read draft

6    charge number 47, the Court has stated at the end

7    of the very first paragraph that this -- this

8    defense relates to counts 1 through 15.  And then

9    later in the draft charge the Court clarifies that

10   it also relates to counts 17, 18, and 19.  The one

11   count excepted, and we're not disputing this, would

12   be Count 16, the obstruction count.

13        MR. MANGO:  And it's the government's

14   view, your Honor, that the entrapment by estoppel

15   defense -- I mean, we have got now a witness who

16   testified, Gary Foersch, who said he didn't give

17   them authorization to operate the east quench tower

18   number 2 without baffles.  In fact -- in fact, he

19   said, "You got to fix this."  So, entrapment by

20   estoppel, they haven't met their burden on that.

21        Quench tower number 1, that's the exemption

22   issue.  That doesn't apply to entrapment.

23        THE COURT:  That's what you argue, right?

24   I mean --

25        MR. PERSONIUS:  Judge, what the case law

1    says -- we talked about this in the pretrial

2    motion.  What the case law says is there has to be

3    a basis in the evidence for the defense to be given

4    to the jury.  Questions regarding credibility are

5    something that the jury should assess.

6            THE COURT:  Yeah.

7            MR. LINSIN:  That's where I think we are.

8            THE COURT:  Okay.  Yeah, I'll leave it

9    stand.  I don't think it needs to be further

10   identified in terms of its applicability.  It's

11   really a matter for argument based on the testimony

12   that the jury has heard.

13       Okay.  Preponderance of the evidence.  Okay.

14   Hearing nothing, that's accepted.  That's number

15   48.

16       49, obstruction of justice.  Hearing nothing,

17   accepted.

18       50, purpose of the statute.  Hearing nothing,

19   accepted.

20       51, elements of the offense.  Hearing nothing,

21   accepted.

22       I think we go down to 58 before we have any

23   other discussions.

24            MR. PERSONIUS:  Yes, Judge.  If you want

25   me to put it on the record, this primarily relates

3844

1    to Mr. Kamholz, and we think the charge the Court

2    has proposed is appropriate.

3              THE COURT:  Okay.  Right up to 58 and then

4    elements of the offense we're okay?

5              MR. PERSONIUS:  I've got it in my version

6    that goes to 54, and then I think 55 goes to the

7    RCRA.

8              THE COURT:  Yeah, but -- I'm just talking

9    about no objections through 58.

10             MR. LINSIN:  Your Honor, I have one

11   comment on charge -- proposed charge number 55.  It

12   is minor, but in the introductory language to each

13   count, I would request -- in looking at Count 17 as

14   the first example, on the third line, I believe it

15   should read, "deteriorating tanks at the Tonawanda

16   Coke Corporation without a required permit," comma,

17   so the words "without a required permit" we would

18   ask be added in that location, and then a parallel

19   amendment to each of the introductory paragraphs

20   on -- with respect to Counts 18 and 19.

21             MR. MANGO:  Your Honor, that's what -- the

22   indictment does include "without a permit."  It's

23   the introductory language.  I think he's trying to,

24   you know, focus the jury and capture it.  If it

25   gets expanded too much, you lose the point of an

1     introductory paragraph.  But we defer to the Court.

2              THE COURT:  All right.

3              LAW CLERK:  Can you say it one more time?

4              THE COURT:  I'm sorry.

5              LAW CLERK:  Could you say it one more

6     time?

7              MR. LINSIN:  Sure.  What I'm requesting --

8     I'll say it with respect to Count 17.  The third

9     line on page 87.

10             THE COURT:  Beginning with "deteriorating

11    tanks."

12             MR. LINSIN:  "Deteriorating tanks at the

13    Tonawanda Coke Corporation without a required

14    permit," comma.  So the words "without a required

15    permit" would be added before the comma and after

16    the word "Corporation."

17             THE COURT:  So "without a required

18    permit," period.

19             LAW CLERK:  Right.

20             MR. LINSIN:  Well --

21             THE COURT:  And then Count 17 reads --

22             MR. LINSIN:  I'm sorry.  It was a period.

23    Yes.  I'm sorry.  I thought it was a comma.  Then

24    period.  Yes.

25             THE COURT:  Okay.  Okay.  All right.  So

1    through 57, with that comment addressing 55, there

2    are no objections.

3            MR. LINSIN:  No objections.

4            THE COURT:  All those will be accepted.

5       We get to charge number 58, elements of the

6    offense.

7            MR. LINSIN:  Right.  Your Honor, we

8    believe that it is an accurate statement of the law

9    with respect to Count 17 -- well, as a general

10   matter, I'll state it, that with respect to the

11   RCRA counts, we believe that the Count 17

12   instruction should be a standalone instruction, and

13   then 18 and 19, both of which are disposal counts,

14   could, I believe, be addressed in tandem.

15      But we believe that, given that the material --

16   and there's a stipulation to this effect -- that

17   the material that is the subject of Count 17 had

18   been abandoned by a prior owner, and given what we

19   believe to be the uncontradicted evidence in the

20   case that without active management that material

21   was not subject to RCRA regulation, we believe the

22   government should be required, as the first element

23   here, to establish that the defendants actively

24   managed a waste that is subject to Count 17

25   after -- and we have proposed, your Honor, the date

1     of December 25th, 1990, which was actually the date

2     D018 wastes were defined as characteristic

3     hazardous wastes under the RCRA regulation.

4          It does not do violence in any way to the

5     government's proof.  Their proof and theory of the

6     case is that active management occurred consequent

7     to that date.  But we believe that's faithful to

8     the regulations.  But we -- we believe, your Honor,

9     that without requiring that this be an element, the

10    jury again will have no way to assess the

11    significance or importance of whether this material

12    was actively managed or not.

13         And we also believe, your Honor, that there

14    needs to be a unanimity guidance with respect to

15    this element so that the jurors are told that --

16    and the special verdict form would then reflect

17    that they are unanimous as to what action they find

18    constitutes active management for this material.

19              THE COURT:  Okay.  Well, let's deal with

20    the inclusion of the December 25th, 1990, date.

21              MR. MANGO:  Your Honor, my concern is that

22    the stipulation does not -- does not capture what

23    Mr. Linsin is telling the Court.  The stipulation

24    says that some of the material that had been in the

25    two tanks had spread on the ground in the vicinity

1    of the two tanks.  It doesn't say all of the

2    material on the ground were there prior to 1978.

3    That's not what the stipulation says.

4        And there's testimony that some of the material

5    flowed out of the tanks after 1990.  So we get too

6    far into -- if I can finish here, there's clear

7    pictures which show that material had flowed out of

8    the tanks.  There's testimony that material had

9    flowed out of the tanks.  And I believe the way the

10   testimony has come out is that material that has

11   flowed out of the tanks subsequently after the

12   enactment of RCRA, you don't need to actively

13   manage.  That is subject to RCRA regulation, and

14   you would need a permit.

15       So by appending this active management element,

16   it would -- it would cause a problem, in that it

17   would confuse the jury as to, well, what material

18   was there before 1990, what material may have come

19   out after 1990.  That's --

20            MR. LINSIN:  Well, your Honor, if that is

21   the government's theory, then this -- then the

22   instruction needs to be differentiated as to which

23   material is in issue and when the conduct occurred

24   that brought it within RCRA regulation.  The charge

25   would need to be -- to provide clear guidance to

1    capture the points Mr. Mango has just made.

2        If they're not told somehow as to how this

3    material was under RCRA regulation or became

4    subject to RCRA regulation, the count is deficient,

5    and the government would avoid establishing

6    elements that are necessary to prove the charge.

7            THE COURT:  Now, you're talking both with

8    respect to the date from which prospectively

9    there's a requirement for active management,

10   meaning December of 1990?

11           MR. LINSIN:  No.  I didn't hear Mr. Mango

12   to be debating the date for that.  What I

13   understood Mr. Mango to be saying is that with

14   respect to the material that may have leaked out of

15   this tank at some point.  What I understand

16   Mr. Mango to be saying is, I presume, based on the

17   testimony of Mr. Flax, that because that material

18   had previously been in a tank, it is Mr. Flax's

19   view that that was stored in the tank and thus

20   always subject to RCRA regulation from the date of

21   enactment of RCRA.  That's if I understood

22   Mr. Mango's point.  And then became subject to a

23   RCRA storage permit requirement once it flowed out

24   onto the ground.

25       But that is differentiated from the material

1    that is on the ground initially and over which some

2    breeze had been spread.  And that active management

3    concept comes into play with respect to the

4    spreading of that breeze.

5        So, you know, to capture fairly the complexity

6    of the point that Mr. Mango is making here, the

7    jury needs to be given some guidance about how it

8    should assess the material that was once in the

9    tank and may have flowed out, and what law applies

10   to it, and then how the concept of active

11   management must be fit into the jury's assessment

12   of the regulatory status of material on the ground.

13            THE COURT:  That's what Flax said, that

14   stored material was always subject to RCRA.

15            MR. LINSIN:  That was his testimony, your

16   Honor.  Miss Williams testified, as the Court may

17   recall, in a very different way.

18       But my point here is, clearly stating what the

19   law is -- and, you know, there is dispute on this

20   issue, and providing guidance to the -- to the jury

21   is what this charge is intended to do, and I

22   thought the fairest way, being faithful to the

23   general theory that the government had, was to make

24   it clear that the government had to establish there

25   was active management of the material on the

1    ground.

2        If the government is now saying they want to

3    also go with a theory that this material in the

4    tank was subject to RCRA, that raises a new set of

5    issues, but it doesn't negate the point I'm making

6    regarding how active management needs to be

7    considered with respect to the materials on the

8    ground.

9            THE COURT:  This is Count 17?

10           MR. LINSIN:  Yes, your Honor.  Just as to

11   Count 17, the count which relates to storage of the

12   material on the ground without a permit.

13           MR. MANGO:  Your Honor, if I could have

14   one moment, I want to consult with Miss Dubriel,

15   the EPA attorney.

16           THE COURT:  Yeah.

17           MR. LINSIN:  Could we perhaps take a --

18           THE COURT:  Want to take a 15-minute

19   break?  I'll tell you, you know, this is okay, and

20   I know you're going to -- you know, we're planned

21   to start at 12:00 o'clock or so.  We'll watch that

22   a little bit.  But, you know, we've got a little

23   time to work out the charge.  I mean, we're not

24   going to have it by the time you finish your

25   argument.  We're going to be working it through.  I

1   mean, you basically know where we're coming from so

2   far, so we just have to -- you won't have it on

3   paper before you argue.

4         MR. LINSIN:  As long as we have it clearly

5   articulated, your Honor, especially as to the --

6   the -- well, the points we focused on in our

7   discussion, that would be helpful.

8         THE COURT:  Yeah.  And I think -- at least

9   I'm clear in terms of where we decided we should go

10  with everything up to this point in time.  So this

11  is a fresh start area right here.  Let's take at

12  least 15, and then I want to give you some time

13  before we get --

14        MR. PERSONIUS:  I was going to say, Judge,

15  I maybe mistakenly thought there would be at least

16  an hour between when we would finish this and when

17  we would close and --

18        THE COURT:  We don't have too much more

19  after this, right?

20        MR. PERSONIUS:  I just wanted to express

21  that.

22        MR. LINSIN:  I believe that's correct,

23  your Honor.

24        MR. MANGO:  I would agree if -- if I do

25  have to go back to the office, which I'd like to do

1    to email the definitions for these five regulatory

2    definitions, I would probably ask for something on

3    the order of an hour once we conclude here and

4    close, if that's possible.

5             THE COURT:  Well, do you need that right

6    now?  I mean, to get those definitions?  Are you

7    going to reference those?

8             MR. LINSIN:  I have them, your Honor.

9             THE COURT:  Okay.  All right.  Okay, yeah.

10   I mean, we can do that.  We'll take an hour. Let's

11   take 15 now.

12            MR. LINSIN:  Thank you, Judge.

13            THE COURT:  Thank you.

14            (Short recess was taken.)

15            THE COURT:  Okay.  And the attorneys are

16   back convened in U.S.A. versus Tonawanda Coke and

17   Mark Kamholz.

18       This last discussion that we started to have, I

19   think, as it related to Count 17, it seemed like --

20   I mean, frankly, I wasn't following it very well.

21   But is that something that the two of you,

22   Mr. Linsin and Mr. Mango, could work out, I mean,

23   on this date, or do we have to get it resolved this

24   way?

25            MR. LINSIN:  We actually did have some

1    conversations after the break, your Honor.  I'm not

2    quite sure where Mr. Mango is on this.  I believe

3    it would be unnecessarily complicated to get into

4    this storage issue and the tank material.  The

5    concept, I think, that Mr. Mango was referencing,

6    this issue of the material leaking out of the tank,

7    it could actually be considered within this

8    definition of active management, because active

9    management includes the addition of a hazardous

10   waste to preexisting wastes.

11       So I don't know Mr. Mango's position on that.

12   Our basic point, your Honor, hoping we don't

13   complicate this issue with the concept of storage

14   in the -- of the material in the tank, because,

15   honestly, I don't know how the Court can resolve

16   that as a legal issue, given this record and the

17   fact that it is coming up at this late hour.  And

18   there is conflicting testimony about the legal

19   status of this material inside the tank.

20       But our basic point is that, at least with

21   respect to active management, we believe it is a

22   factual issue, a factual issue that the jury must

23   find in order to conclude that a violation

24   occurred.  The stipulation of the parties was that

25   the material inside the tank and on the ground

1   outside the tank had been abandoned by a prior

2   owner.  And there is the pretrial submissions on

3   this issue, and the testimony, I think, has been

4   consistent that abandoned material does not become

5   subject to RCRA regulation unless there has been

6   active management.  And holding the government to

7   that proof as an element of this offense I think is

8   imperative.

9           THE COURT:  I think that's right.  I mean,

10   that's the testimony, that unless active management

11   is factored in, abandoned waste is not subject to

12   RCRA.

13           MR. MANGO:  That's correct, your Honor.  I

14   think we -- we are in agreement on that.  The --

15   what the government, now that I've had a chance to

16   counsel, is strongly opposed to any inclusion in a

17   special verdict form in terms of what activity the

18   jury needs to find unanimously constituted active

19   management.

20       The term is going to be defined by the Court,

21   and the facts have been examined during -- during

22   testimony, and they have that.  They don't need a

23   special verdict form on that issue.

24           THE COURT:  Yeah, let me hold you right

25   there.  I don't think you're asking for that, are

1    you?

2              MR. LINSIN:  Well, your Honor, I'm not

3    asking in the special verdict form that the jurors

4    detail what activity they find to have been active

5    management.  That's not our request.  But because

6    there -- there have been -- there is testimony

7    about a number of activities which potentially

8    could constitute active management, we do believe

9    it's -- it is required that the jury be instructed

10   that they agree unanimously on which activity

11   constituted active management.

12        Because, in the absence of that, your Honor,

13   you could have six jurors concluding that the

14   leakage from the tank is active management, six

15   jurors concluding that spreading of coke breeze is

16   active management.  And that is not permissible.

17   So it is not a request that the jurors specify,

18   yes, we believe spreading of coke breeze, but just

19   a special verdict form saying that we have found

20   unanimously that -- that there was active

21   management with respect to a given activity.  That

22   I think is important because of the range of

23   testimony about the interaction with this material.

24              THE COURT:  Mr. Mango?

25              MR. MANGO:  Yes, your Honor.  The -- the

1    issue with active management comes up -- obviously,

2    you've heard the testimony.  Material is on the

3    ground prior to the enactment of RCRA; RCRA gets

4    enacted; if they left it alone they're fine.  But

5    if they actively manage it, then -- then that --

6    that's the requirement for regulation under RCRA.

7    And that is captured in the count of the indict --

8    or the element of the charge which talks about in

9    Count 17 the fact that they did not have a permit

10   to store this material on the ground.  That -- that

11   is -- that, in essence, captures this active

12   management.

13       So I think we're maybe talking about two

14   different things.  I guess I'm not really focused

15   on what specifically is being requested to be

16   changed in the elements of the offense charge.

17            MR. LINSIN:  Well, and -- I'm sorry,

18   Mr. Mango -- on page 6 of our submission we have

19   proposed that a first element be included with

20   respect to the instruction for Count 17 to the

21   effect that, first, the defendant actively managed

22   a waste that is the subject of Count 17 after

23   December 25th, 1990.  We believe that should be the

24   threshold, the first element, for this charge for

25   Count 17.

1          And, as we go on to say, we believe there

2     should be a corresponding finding in the special

3     verdict form -- I think this is addressed in

4     footnote 4 on page 6 -- that they be instructed

5     they must unanimously agree as to what, if any,

6     activity constituted the active management that is

7     the subject of the count.  And then a special

8     finding in the verdict form that they -- they so

9     found unanimously.

10          THE COURT:  That there was active

11     management but without specificity.

12          MR. LINSIN:  Exactly.  That they -- that

13     they found unanimously as to what, if any, activity

14     constituted active management.  Not that they all

15     separately agree that different things constituted

16     active management.  That finding, your Honor, we

17     believe has to be unanimous under Apprendi.

18          MR. MANGO:  Your Honor, my -- my concern

19     right now is on this fifth element on page 6 of the

20     defendants' submission, which says that RCRA permit

21     was required --

22          MR. LINSIN:  We haven't -- we haven't

23     gotten to that point, your Honor.  We do believe,

24     and we've set this out on pages 6 and 7 of our

25     submission -- we do believe that it is appropriate

1   to include the requirement that a RCRA permit was

2   required to store this hazardous waste, and then

3   that there was no RCRA permit issued to Tonawanda

4   for that activity.

5          MR. MANGO:  They're reading that

6   backwards, though, your Honor.  The statutory

7   elements under the case law is that they stored

8   without a permit.  That's it.  Period.  We

9   shouldn't try to reshuffle these elements -- or

10  this language -- to fit that they had -- they had

11  to get a permit to store this material.

12         THE COURT:  We're saying the same thing,

13  aren't we?

14         MR. MANGO:  Yeah, it is, but the case

15  law -- the Second Circuit case law is clear it's

16  storage without a permit.  That's what the

17  government needs to prove.

18         THE COURT:  All right.  And I -- that's --

19  I don't see why that doesn't work.

20         MR. LINSIN:  Your Honor, we believe this

21  is a clearer statement.  I'm not going to belabor

22  the point.  We think -- I don't think the

23  government disputes the concept here --

24         THE COURT:  I don't think they do either.

25         MR. LINSIN:  -- that a RCRA permit is

1    required and that no permit was obtained.  And I

2    see no harm at all, no additional burden, in just

3    making that clear.  But our larger point on this

4    Count 17, your Honor, relates to this additional

5    element concerning active management.

6              THE COURT:  Yeah.  And I don't think

7    Mr. Mango has a problem with that, so I'm inclined

8    to include that, that there is the active

9    management waste requirement.  But I'll leave the

10   language with respect to the RCRA permit the way it

11   is.

12             MR. MANGO:  Yes, your Honor.  You do have

13   it in your fourth element there that the defendant

14   did not have a permit to store or dispose for

15   Count 18, but really stored.  And that's what the

16   case law says.

17             THE COURT:  Okay.  All right.

18             MR. MANGO:  Thank you.

19             THE COURT:  Andrew, we're okay with that?

20             LAW CLERK:  Uh-huh.

21             THE COURT:  Okay.  Let's move on then.

22             MR. LINSIN:  Your Honor, on -- given our

23   last discussion, I -- I question now -- well, I

24   guess the government would still want this.  But

25   with respect to draft charge 59, I would request

1    that in the last sentence the two words be added.

2    The sentence currently reads, "Wastes that have

3    already been disposed of cannot be considered to be

4    in storage."  I would just request that it state,

5    "Wastes that have already been disposed of or

6    abandoned cannot be considered to be in storage."

7              MR. MANGO:  No, your Honor.  That would be

8    attempting to add, in our mind, your Honor, a

9    little bit -- a defense into that sentence,

10   because, you know, this then touches back into the

11   active management area that if it's -- even if it's

12   abandoned, but they actively manage it, then it's

13   considered storage.  So the language, in the

14   government's view, is fine as it is.  And it

15   does -- that -- the first part of that language

16   comes right out of RCRA.

17             MR. LINSIN:  Your Honor, I don't believe

18   the government disputes the -- the accuracy of the

19   addition I'm proposing.  It is simply a

20   clarification for terms that have been used

21   essentially interchangeably in this trial.

22   Disposed of or abandoned cannot be considered to be

23   in storage.  If those materials are thereafter

24   actively managed, then -- then they are subject to

25   RCRA requirements.  So it fits precisely with our

1    previous discussion on active management.

2          MR. MANGO:  Your Honor, I disagree.  I

3    think this would change your definition of -- would

4    modify the discussion previously about active

5    management, and, in fact, obviously there has been

6    some agreement that the material on the ground had

7    been abandoned, but we're not -- we are saying very

8    much so that because it was actively managed it was

9    stored.  So that would -- that would create

10   confusion and inject a defense that:  Well, wait a

11   second, the government agrees it was abandoned.

12   The judge is going to tell you wastes that have

13   been disposed of or abandoned can't be considered

14   to in be in storage.  So how can we be in violation

15   of Count 17?  Everybody agrees it was abandoned.

16       That's -- that's not what the testimony of

17   Mr. Flax was.  There may be a dispute on that, but

18   if there's a dispute it shouldn't be included in

19   the definition of storage.

20         MR. LINSIN:  Perhaps a way to address

21   counsel's concern would simply be to say, "Wastes

22   that have already been disposed of or abandoned

23   cannot considered to be in storage unless they are

24   first actively managed."

25         MR. MANGO:  That's -- that's also -- that

1        would -- that would negate the testimony of

2        Mr. Flax, who said the material in the tanks that

3        we agree was abandoned, in his view, was considered

4        storage.  So, again, I don't think any change in

5        this is necessary at this point.  We're trying to

6        keep this clean for the jury.  This is clean.

7                MR. LINSIN:  Well, my concerns now are

8        heightened, because it now appears that the

9        government will be arguing an additional theory

10       here that I thought we had escaped in our

11       discussion in the last draft charge, and that is

12       that the jury can convict based on the testimony of

13       Mr. Flax that this material inside the tanks was in

14       storage as of the date of the RCRA -- the enactment

15       of the RCRA statute.  The Court has made no finding

16       about that as the controlling law in this case.

17       There is conflicting opinion testimony about that

18       issue, and I don't believe counsel should be

19       permitted to argue that as a legal theory for

20       liability on Count 17.

21               MR. MANGO:  We're not planning to, your

22       Honor.  We just don't want to add a confusion that

23       we don't need here.

24               THE COURT:  Well, how is it confusing to

25       say, "disposed of or abandoned unless it's actively

3864

1      managed"?

2                 MR. LINSIN:  "Cannot be considered to be

3      in storage unless it is first actively managed."

4      It clearly synchs up with the discussion on active

5      management.

6                 MR. MANGO:  That's not what Mr. Flax said.

7                 THE COURT:  Well, it doesn't matter what

8      he says.  Right?

9                 MR. LINSIN:  Exactly.

10                MR. MANGO:  I know, but the Court would

11     then be giving a statement to the jury that

12     Mr. Flax was either wrong or his testimony was

13     irrelevant or --

14                THE COURT:  Well, you can still argue

15     that, right?

16                MR. MANGO:  Your Honor, the definition, as

17     well -- I believe, the definition of solid waste

18     does state that it can be discarded by being stored

19     in lieu of incineration and disposal.  And I'd like

20     to check the language in RCRA that -- that storage

21     comes from, because I think it -- I'm kind of at a

22     loss here.  I don't know why we're trying to modify

23     something that really has no bearing on the issues

24     in the case here.

25                MR. LINSIN:  Your Honor, my proposal, I

1    think, is an effort to help clarify this concept

2    and to help explain to the jury how they should

3    consider this definition in conjunction with the

4    concept of active management.  I don't believe

5    there is any -- I don't hear any real dispute about

6    the accuracy of what we propose.  And I don't see

7    it as -- as confusing issues.  I see it as helping

8    to clarify this instruction for the jury.

9            MR. MANGO:  But -- but it would be, your

10   Honor.  These are questions the jury had -- that

11   the jury included in their questions, so this is

12   something that's very much in their minds.  So by

13   including this language, "Wastes that have already

14   been disposed of or abandoned," that's -- that's

15   not what the RCRA definition of storage says.  It

16   simply says, "Wastes that have already been

17   disposed of cannot be considered to be in storage."

18      And there has been differing testimony as to

19   what the material -- and I guess the nature of the

20   material inside the tanks.  And I think if -- if

21   this change is included, then the defense in that

22   definition is -- is essentially allowing the Court

23   to -- to strike down Mr. -- a portion of Mr. Flax's

24   testimony.

25           THE COURT:  Well, is that an addition to

1    the definition in RCRA of storage?

2              MR. LINSIN:  Your Honor, I don't have my

3    regulation book here.  I don't -- I don't know off

4    the top of my head, your Honor.  I can't represent

5    to the Court.  I did not understand this to be a --

6    the last sentence, anyhow, to be a quotation from

7    the RCRA definition.  If that is counsel's

8    representation, then, yes, I would be proposing a

9    clarifying addition to the definition, that -- that

10   I think is helpful.

11             THE COURT:  All right.  If RCRA says what

12   it says here, I'm going to go with that, and I'll

13   deny the request to augment.  Okay.  Let's move on.

14      If it's -- if it doesn't say what this says it

15   purports to say, then -- then I think that gives us

16   wiggle room to clarify.

17             MR. LINSIN:  And, your Honor, just to be

18   clear, if this is a complete quote for the

19   statutory, I guess, not regulatory definition of

20   storage, then -- well, I'll withdraw my

21   objection -- or my request.

22             THE COURT:  Okay.  Okay.  All right.

23      Disposal, 60.  Okay.  Hearing nothing,

24   accepted.

25      61, solid waste.  Hearing nothing, accepted.

1          62 --

2              MR. MANGO:  Your Honor, with 61, now that

3     there has been discussion of solid waste and the

4     government has put in our proposed summary chart,

5     Government Exhibit 212, that -- there's certain

6     language that was focused on in that chart that

7     maybe we want to focus on solely in this

8     instruction.  I leave it at the Court's discretion

9     on that.  But there was really two key elements in

10    solid waste that apply under the recycling

11    provision, whether it is being used to produce a

12    fuel, which is not included here, or used -- used

13    or applied to the land in a manner constituting

14    disposal.

15       I think -- I think that would make sense to

16    maybe expand this a little bit now that we've got

17    the testimony of both Miss Williams and Mr. Flax.

18             MR. LINSIN:  Well, now -- now I'm

19    confused.  Is this -- is what is proposed in charge

20    61, is that a -- is that a quotation from the

21    statutory definition of solid waste?

22             THE COURT:  That comes off of the chart,

23    right?  That language that you were referring to?

24             MR. MANGO:  Well, that's what I would

25    propose come into here.  I think this is -- this is

1    a modification of that, but I would just, I guess,

2    ask that -- that we be truer to what is on

3    Government's Exhibit 212 and -- and which models

4    the regulations, which is the exact language out of

5    the regulations.

6              THE COURT:  Well --

7              MR. LINSIN:  My question went to whether

8    we're now switching back and forth when it suits

9    our purpose between a statutory definition and a

10   regulatory definition.

11             THE COURT:  And that's where I was going

12   to go with that question.  Is this a regulatory or

13   statutory definition?  And then you're asking what

14   you just said you didn't want to do in the prior

15   discussions.  So if this is what the regulatory or

16   statutory definition is, we'll leave it alone.

17             MR. MANGO:  I think it's a little of both,

18   your Honor.  I think there's a statutory portion in

19   here and a regulatory portion.

20             THE COURT:  Well, that's good enough, I

21   think, then.  We'll just leave it that way.

22             MR. MANGO:  Yes, your Honor.

23             THE COURT:  Thank you.  62 is K087.

24             MR. LINSIN:  And, your Honor, we had in

25   this regard made a request that is contained in our

1    pages 7, 8.

2              THE COURT:  That's with respect to intent

3    element?

4              MR. LINSIN:  That is correct, your Honor.

5    And we believe that was the basis -- the expressed

6    basis of Magistrate Judge Schroeder's ruling in

7    the -- with respect to the dispositive motions on

8    these counts, expressly contained in his report,

9    recommendation, and order, which was adopted by

10   this Court.  Magistrate Schroeder clarified that

11   the government would need to prove an intent to

12   dispose of this material, with respect to the

13   disposal counts, and that would go to 18 and now

14   19.

15      We believe that the law-of-the-case doctrine

16   and the holding of Magistrate Judge Schroeder's

17   report, recommendation, and order, which has been

18   adopted by this Court, now requires the government

19   to prove that element with respect to the two

20   disposal counts.

21             THE COURT:  Yeah, but we talked about that

22   in the context of the decision he rendered and not

23   for purposes of the proof element at trial, as I

24   recall it.  Because it had that limited

25   applicability.  It was with respect to the

1    decision.

2        Mr. Mango?

3            MR. MANGO:  Yes, your Honor.  I have that

4    decision.  We did discuss this.  It's my

5    recollection -- well, I have it here -- that at

6    page 17 Judge Schroeder specifically said,

7    "Notably, the defendants' argument turns on a

8    determination of the defendants' intent."  So he

9    acknowledged that it was the defendants' argument

10   that there's this intent element.

11       But in no way is he trying to bind your Honor

12   in making, you know, a determination on what the

13   elements of RCRA are.

14           MR. LINSIN:  Your Honor --

15           THE COURT:  It's been your consistent

16   position that there is no intent element that needs

17   to be proven by the government with respect to

18   satisfying Count 19.

19           MR. MANGO:  Correct, your Honor, other

20   than just the general "knowingly" intent, not an

21   intent to dispose, which is requested.

22           MR. LINSIN:  Well, your Honor, I would

23   point out that on the very next page of Magistrate

24   Judge Schroeder's ruling he stated, "In addition to

25   the issue of whether the defendant intended to

1    dispose of material" -- in addition to that issue.

2    "There also remains" --

3             THE COURT:  He says "issue," right?  He

4    doesn't say "element."

5             MR. LINSIN:  Yes.  Yes.  "There also

6    remains the issue of whether the conduct of the

7    defendant and its employees in mixing this material

8    constituted land disposal."

9        These are issues in the trial, issues that

10   Magistrate Judge Schroeder clearly said would be

11   reserved for findings.  "As discussed above, there

12   are a myriad of factual issues, including the

13   penultimate issue of the defendants' intent, which

14   all must be resolved by the jury."

15       And the fact is, your Honor, by making those

16   findings and ruling as he did on these motions with

17   that recognition in mind that these were factual

18   issues for the jury to resolve, without presenting

19   that issue for the jury to resolve, we are negating

20   what we see is the clear holding of this ruling by

21   Magistrate Judge Schroeder.

22            THE COURT:  I don't really agree with that

23   position.  Mr. Mango, do you take issue?

24            MR. MANGO:  Yes, your Honor.  We've

25   expressed our position.

1          THE COURT:  Okay.  And I don't view it as

2     law of the case, so I will deny that request for

3     the addition of the intent element.

4          Okay.  All right.  Proposed charge 63,

5     hazardous waste.  Hearing nothing, accepted.

6          64, knowledge.  Hearing nothing, accepted.

7          65, permit requirement.  Hearing nothing,

8     accepted.

9          Entrapment by estoppel defense.  Okay.  We

10    talked about that previously, but with respect to

11    this placement, hearing nothing, accepted.

12         67, aiding and abetting.  Hearing nothing,

13    accepted.

14         Venue, various states, et cetera.  Hearing

15    nothing, accepted.

16         So that will take us through 77.

17         Okay.  Thank you.  Appreciate it.  Very

18    helpful, very constructive, I think.

19         Chris, is the jury here?

20              COURT SECURITY OFFICER:  I know they are,

21    but I haven't checked on them personally.

22              THE COURT:  Okay.

23              MR. LINSIN:  45 minutes?

24              THE COURT:  1:00 o'clock or 12:45?

25              MR. LINSIN:  I would ask 1:00 o'clock.

1           THE COURT:  All right.  Chris, tell them

2     that we will start at 1:00 o'clock with closing

3     arguments.

4        Does that work for everybody?

5           MR. LINSIN:  Just for guidance, your

6     Honor, does the Court intend after the government's

7     opening closing to take a break, or are we just to

8     proceed forward from there?

9           THE COURT:  No, we'll take a break,

10    because that's an hour anyway.  All right.  So

11    we'll take a little break, and then we'll go with

12    the defense argument and we'll break, and we'll do

13    the rebuttal and we'll break.  And the way it's

14    shaping up right now, we're probably looking at

15    completion of the charge tomorrow.

16           MR. LINSIN:  All right.  Thank you very

17    much, your Honor.

18           MR. PERSONIUS:  Thank you, Judge.

19           THE COURT:  All right.  If anybody is here

20    for the starting of the trial, that will not get

21    started until 1:00 o'clock, just so you know.

22    Okay.  We're just a tad behind, but we need that

23    time to get everything taken care of so we can have

24    an effective oral argument.

25        Okay.  Mr. Moeller, is there anything?

 1             LAW CLERK:  No, Judge.

 2             THE COURT:  Okay.  Thank you very much.

 3             (Lunch recess was taken.)

 4             (Jury not present in the courtroom.)

 5             THE CLERK:  Criminal case number

 6   10-CR-219, United States versus Tonawanda Coke and

 7   Mark Kamholz.

 8             THE COURT:  Okay.  For the record the

 9   attorneys and parties are back present.  The jury

10   is assembled.  We will bring them in shortly.  I

11   just want to make sure that the rules are clear.

12   The government will commence the closing arguments,

13   followed by Mr. Linsin and Mr. Personius, and then

14   there will be the opportunity for a rebuttal

15   argument by Mr. Piaggione.

16      Is that the understanding of counsel?

17             MR. MANGO:  Yes, your Honor.

18             MR. LINSIN:  Yes, your Honor.

19             THE COURT:  Okay.  And we will break after

20   each argument for a short period of time.  Are

21   there any preliminary matters?

22             MR. MANGO:  No, your Honor.

23             MR. LINSIN:  No, your Honor.

24             MR. PERSONIUS:  No, your Honor.  Thank

25   you.

1          THE COURT:  Okay.  I think we therefore

2     are ready.

3          Chris, if you would bring the jury in please.

4               (Jury seated.)

5          THE COURT:  Good afternoon.  Please have a

6     seat.  Okay.  Are you looking for something?

7               A JUROR:  It was glasses.  My eyeglasses.

8          THE COURT:  You have them or you don't?

9               A JUROR:  This is a second pair.

10         THE COURT:  Okay.  You probably won't need

11    the glasses to hear the attorneys is my view.

12         But welcome back, again, ladies and gentlemen.

13    And thank you for assembling promptly.  We have

14    been working through matters, and we are ready now

15    for closing arguments.  And soon you will be

16    wearing the mantle of the judges of the facts.  And

17    I ask you though to, once again, reserve judgment,

18    keep your minds open, keep focused on how important

19    this case is to both sides.

20         You are the determiner of the facts.  Nobody

21    has more information about this case than all of

22    you do as a result of the presentation of the

23    evidence in this case, which consists of the

24    answers to the questions by the witnesses, the

25    exhibits that have been received into evidence, and

1    the stipulations that have been entered between and

2    among the attorneys in this case.  You know this is

3    an important matter and case to both sides.  If you

4    keep your minds open, that's my instruction to you,

5    and you will start for the first time really

6    discussing the case when you enter your

7    deliberations.  And that's when I ask you, once

8    again, to respect each other's views, to focus on

9    the application of common sense, experience, and

10   intelligence.  You know how many times I've

11   mentioned that to you right from the outset in this

12   case.  But that's what it takes.  It's not

13   overwhelming.

14        You yet have to receive from me the completed

15   instructions in the law which you are to accept

16   without questioning the wisdom of the law.  And

17   I've been working very hard with the lawyers, and

18   they're making every effort to make certain that

19   the law that I present to you is not only correct,

20   but will be of assistance to you in determining

21   whether the government has satisfied its burden of

22   proof on each essential element of the 19 crimes

23   charged in this indictment.

24        As you know, the burden of proof never shifts,

25   and each defendant is afforded the presumption of

1      innocence.  And you are to consider each defendant

2      separately on each count of the indictment, and you

3      are to consider each defendant on your analysis

4      individually each count, each defendant, of the

5      essential elements and whether all of them for each

6      count, each defendant has been proven beyond a

7      reasonable doubt.

8          A lot has gone on in this case.  You've heard a

9      lot of testimony from witnesses.  Thirty by our

10     count.  And I suspect that your eyes have been

11     opened more than once, and you've learned a great

12     deal, but all of that now has to be like every life

13     experience, applied to the practicalities of the

14     task ahead, and that is for you to decide this case

15     unanimously by verdict on each of the particular

16     counts in this particular indictment.

17         So soon you're going to be undertaking that

18     duty that you affirmatively by oath represented

19     that you were willing to do in an important matter

20     in our justice system, and that's deciding this

21     particular case.

22         What happens next are three closing arguments,

23     if you will.  And the procedure is very much like

24     when we started this case.  The government has the

25     opportunity to open with its closing argument

1   first, and that's because it technically brought

2   this case against the two defendants that you have

3   come to know as Tonawanda Coke Corporation and Mark

4   Kamholz.

5       We will take a break, brief, after the

6   government's closing argument.  Then we will resume

7   with the two defense closing arguments.  They will

8   be separated by a break, a short break.  I think

9   the order will be Mr. Linsin, then followed by

10  Mr. Personius.  And then if everything comports

11  with the rules, the government will have the

12  opportunity to make what's called a rebuttal

13  argument.  And that would be -- I think the initial

14  argument will be by Mr. Mango, and then

15  Mr. Piaggione will wrap up the rebuttal argument

16  for the government.

17      So that's what you have to look forward to.

18  I'm confident that we can accomplish that this

19  afternoon.  Once that is done, then I will give you

20  the balance of the law that you need to apply to

21  decide this case.  So, you know, I know you

22  comprehend and understand how this all works now,

23  and you in a sense have become experts in the trial

24  process, and that's a good and positive thing.

25      You've heard me emphasize time and time again

1    only the evidence or the lack of evidence decides

2    the case.  Now you also heard me say that the

3    closing arguments will be very different from the

4    opening statements.  And they will be designed to

5    persuade you -- that's the attorney function in

6    every case -- persuade you from the evidence or the

7    lack of evidence whether the government has

8    satisfied its burden beyond a reasonable doubt.

9    But here's the caveat, and you know what I'm

10   getting to.  What the lawyers say and have said

11   throughout out the trial, what?  None of that is

12   evidence.  The evidence was produced by the

13   witnesses, the exhibits, and the stipulations.

14        You have your notebooks.  You can take notes if

15   you choose to, but if you do, it's with the

16   expressed understanding that it's a guide.  It's

17   not evidence for you to consider when you enter

18   your deliberations.

19        Okay.  Are you ready?  All right.

20        That being the case, Mr. Mango, I believe you

21   are ready to start.  And you may sum for purposes

22   of this case.

23              MR. MANGO:  Thank you, your Honor.

24              THE COURT:  You're welcome.

25              MR. MANGO:  May I proceed?

1          THE COURT:  You may.

2          MR. MANGO:  To comply or to deceive, that

3    is the question.  Now that question which I've

4    borrowed from Shakespeare in a modified form really

5    sums up the issues in this case.  On several

6    occasions defendant Tonawanda Coke Corporation and

7    its manager of environmental control, defendant

8    Mark Kamholz, faced that simple question and had to

9    decide whether they were going to comply with

10   environmental laws designed to protect the very air

11   we breathe and the ground we walk on from dangerous

12   toxic and hazardous pollutants, or whether they

13   were going to engage in deception to avoid

14   compliance to save a buck.  And as the evidence has

15   established during the course of this trial, time

16   and again the defendants chose to deceive, not

17   comply, all in an attempt to put profit ahead of

18   all else.

19      Now, before we start getting into the counts of

20   the indictment, I'd like to just give you one

21   example of what I'm talking about.  You've heard a

22   lot of testimony in this case, and you heard

23   testimony regarding something called a battery

24   flare stack.  I want to start there, because that

25   puts, in the government's view, everything into

1      perspective.

2           You heard that this is a device used during

3      times of emergency to vent the battery, to vent

4      this coke oven gas, which contains benzene,

5      naphthalene, sulphur, to vent it so the battery

6      doesn't explode.

7           And as I go through my closing you're going see

8      a number of slides here.

9           This is the battery flare stack as testified

10     to.  Now to really put this into context and how

11     this relates to this case, there's some

12     correspondence that you all saw.  In 1993, October,

13     Defendant Kamholz sends a letter to the EPA, 1993,

14     and he says, I'm aware there's this new law.  I've

15     got to have a -- Tonawanda Coke has to have a

16     battery flare stack on the system and, in fact,

17     we've got to install it by March 31st of 1994.

18          He proposes some alternative option of using

19     some collection of stand pipes to manually open the

20     devices during an emergency.  And he sends this

21     into the EPA requesting an exemption from this rule

22     that says you have to have a battery flare stack.

23          EPA responds back.  December 30th of 1993,

24     couple months goes by.  They in essence say we've

25     evaluated your request.  It's denied.  We don't

1    believe that it would adequately destroy the amount

2    of coke oven gas going into the atmosphere.  Coke

3    oven gas going into the atmosphere.

4        On the third page of that document, EPA

5    specifically tells him -- this is in the conclusory

6    paragraph here.  "A manually operated system would

7    not be as reliable as a flare system for these

8    brief venting episodes.  An automatic system is

9    much faster than using battery workers to vent the

10   battery."

11       We're going to go through a lot of language

12   that the government believes is very clear in this

13   case and clear in the requirements it imposed on

14   Defendant Kamholz and Defendant Tonawanda Coke

15   Corporation.

16       Now, in light of that language, we've heard

17   testimony from Anthony Brossack, from Gerry Priamo

18   about this battery flare stack.  You may have been

19   wondering at the time, how does this relate, why

20   are we even talking about this?  The Judge read me

21   the indictment before we started -- or the counts

22   of the indictment.  It relates because within at

23   most a year, because those witnesses said it was

24   '94, '95 that the pilot light went out, that the

25   automatic system that was in place was not in

1    place.

2         So within a year Defendant Kamholz removes that

3    natural gas and those witnesses told you why.

4    Because he said it was too expensive.  Natural gas

5    is too expensive, and in response the witnesses say

6    well, how are we supposed to light this?  What are

7    we supposed to do?  And that man's response was

8    grab one of those brooms you use to brush the

9    battery top, light it on fire, throw it up, ignite

10   the battery flare stack.  It's exactly what EPA

11   said don't do.  Exactly.  Do not -- use an

12   automatic system.  A manual system doesn't work.

13   And you're not approved to use it.  That's, in the

14   government's view, uncontradicted testimony from

15   the witnesses who took the stand.  All for money

16   because natural gas was too expensive.

17        Now, you've heard the Judge talk obviously with

18   instructions yesterday and this morning, that

19   whatever I say here today is not evidence.

20   Whatever Mr. Linsin, whatever Mr. Personius says,

21   that's not evidence.  You've got the evidence.

22   We're just trying to put a spin on the evidence.

23   Okay.  You've got it.  And likewise aside from the

24   closings, the openings that you heard, those aren't

25   evidence.

1          But it's my practice I like to take notes

2     during opening.  I like to see what the defense

3     counsel is going to say or what they believe

4     they're going to show in their case.

5          And again my recollection is not determinate --

6     determines your recollection.  It's what you recall

7     during openings that matters.  But I recall

8     Mr. Linsin saying something to the effect of money

9     is no issue.  This is a corporation.  You're going

10     hear the baffles cost $125,000 to install, which

11     you did.  You heard that stipulation.  Baffles in

12     each tower cost $125,000.  That's a lot of money.

13     But he said money's no issue.

14          But I submit, ladies and gentlemen, what the

15     evidence does show in this case is that money was

16     an issue.  Money drove the corporation and

17     Defendant Kamholz into this deception.  And you've

18     now got in evidence this Government Exhibit 120,

19     which is the business plan for the fiscal year

20     ending 2009.

21          And what better document than a confidential

22     and proprietary document of the own corporation?

23     Confidential and proprietary.  This is for us only,

24     except when EPA criminal agents go in and take it.

25     And they did.  And on page 16 under weaknesses,

1    significant environmental pressures include ongoing

2    compliance with local, state, and federal emissions

3    regulations.  Eighteen, under risks, environmental

4    risks.  Economic, compliance with environmental

5    mandates often involves substantial expenditures.

6    This is their own document.  They wrote this

7    document.  Money is an issue.  It's clearly an

8    issue.  You wouldn't put it in a business document

9    if money is of no concern to compliance.

10        Let's switch gears now, talk about the Clean

11    Air Act and the Resource Conservation and Recovery

12    Act.  We spent a good three days in the beginning

13    with the testimony of Mr. Carlacci going through

14    the Clean Air Act, going through the self-reporting

15    nature of the Clean Air Act, going through the

16    requirements that are on corporations like the

17    Tonawanda Coke Corporation, going through the

18    requirements that are on the point of contact,

19    Mr. Kamholz.  And I submit as we go through these

20    accounts, ladies and gentlemen, the evidence is

21    consistent with the defendants' attempts to deceive

22    inspectors and manipulate the regulatory scheme.

23    Manipulate it for their own benefit.

24        You're going to hear some common terms when

25    Chief Judge Skretny gives you the instructions

1    about the Clean Air Act.  You're going hear about

2    what it means to be an owner or operator, a

3    required element in the Clean Air Act charges.  The

4    defendants need to be owners or operators of a

5    stationary source of air pollution.

6         An owner or operator just simply means,

7    obviously, someone who owns the company, which the

8    corporation does.  But in the case of Defendant

9    Kamholz it includes anyone who controls or

10   supervises the stationary source.

11        There's now, as the Judge mentioned, 30

12   witnesses who've testified, a number of which

13   talked about Defendant Kamholz's responsibilities

14   at the corporation.  You've got a number of

15   documents where he signed -- he signed his name --

16   we're going to go through one in a minute -- where

17   he certifies that everything is true, accurate, and

18   complete.  He is the one who is supervising, who's

19   in control of this stationary source.

20        I want to start my discussion of the counts

21   with Count 6 through 10 of the indictment.  And if

22   you remember, that -- those counts of the

23   indictment relate to quench tower number 1, that's

24   the west quench tower, deals with condition 96 in

25   the Title V permit.  And the time period in play is

1    July 29th of 2005, which, when you get the

2    indictment -- it's not evidence -- but look at it.

3    That's exactly five years to the day before the

4    indictment is returned, to December 31st of 2009.

5    And December 31st of 2009 we know from a letter in

6    evidence, Government Exhibit 19.16, that baffles

7    were reinstalled in this quench tower number 1 in

8    January.  That brings us all the way through

9    December.

10        And you saw a picture of the quench tower,

11   number one tower, which was taken during the

12   execution of the criminal search warrant.  And

13   it's -- it's the government's position that there

14   really is no dispute that this quench tower did not

15   have baffles going back at least since 1983, 1984.

16   And obviously you've heard about that.  We'll talk

17   about that in a minute.

18        You saw from the inside on that day, on

19   December 1st, 2009, during the search warrant,

20   there were no baffles in the quench tower.  Again,

21   it's the government's position we're not here to

22   talk about whether there were or were not baffles

23   in the quench tower.

24        But we are here to talk about the defendants'

25   deception towards the regulatory agencies involved,

1   which begins for this count on September 19th of

2   1983, where he says, and he gives the principle

3   reason for why he's asking not to have baffles in

4   that quench tower, cost too much.

5       So, a month ago when you heard it, money is not

6   an issue, and in 1983 money was an issue.  The

7   physical size of the exit would require very

8   significant sums of capital to produce the

9   60 percent control.

10      The next page, he ends the letter by saying he

11  believes that quench tower number 1, the lack of

12  baffles, is de minimus.  We're going to talk about

13  de minimus.  It's a word now when we fast forward

14  into 2009 that comes back into play.

15      So, you've learned DEC granted that exemption

16  March 14th, 1984.  This is Government

17  Exhibit 19.17.  They specifically say, "Please note

18  the condition on the operating certificate that

19  limit the use of the quench tower to less than

20  10 percent of the time."  You have that, that Air

21  100.  I'm not going to go through it.  I would be

22  here for hours if I tried to go through everything.

23  But you have that Air 100.  You're going to see it

24  in the deliberating room, and on the bottom it will

25  say not to be used more than 10 percent -- or ten

1    percent or more of the time.

2        Now fast forward to 1997, December of 1997.

3    Again, based on what you heard from Mr. Carlacci

4    and Mr. Sitzman, this whole new regulatory world

5    goes into play, that's Title V.  That's the Clean

6    Air Act.  In December of 1997 Defendant Kamholz is

7    responsible for applying for the Title V permit.

8    And no doubt -- no doubt Defendant Kamholz included

9    in his application the request to continue this

10   exemption.  And now you've seen that the draft

11   permit got issued.  The exemption wasn't in it.

12   Tonawanda Coke, Defendant Kamholz commented on that

13   draft permit.  No mention of quench tower number 1.

14       Likewise in 2006 there is a renewal application

15   submitted.  That's Government Exhibit 18.06.

16   There's nothing in that regarding the exemption.

17   And the issue in play in Count 6 to 10 really is

18   that exemption.  Because you heard DEC witnesses

19   Mr. Sitzman, Mr. Carlacci, say that our view of

20   condition 96 of the Title V permit would

21   incorporate this exemption.

22       So your duty is to think about well, did they

23   use this tower 10 percent or more of the time

24   during the relevant period, 2005 to 2009?  And

25   you've heard from a number of witnesses now on that

1    point that during the relevant time, those

2    witnesses who did work at Tonawanda Coke said that

3    both towers were used in an alternating fashion.

4        If you remember the testimony of Frank

5    Gonzalez, the battery foreman or battery

6    supervisor, he testified.  Even under his math with

7    eight oven pushes in a shift, the west tower is

8    used one to two times.  Even one time out of eight

9    pushes that's more than 10 percent of the time.

10        You heard the testimony of Sean Hoffmann and

11   Dan Heukrath.  I'm not going to pretend that didn't

12   happen, where they testified that there was a

13   period of time that the west quench tower was

14   closed off, it was out of service.  And you heard

15   from other witnesses about the length of that time.

16   And I submit to you the testimony was somewhere

17   between six months to two years.

18        But the indictment charges five years, five

19   counts, five years.  And, in fact, it's my

20   recollection that both Mr. Heukrath and

21   Mr. Hoffmann said that sometime in 2008 the west

22   tower came back online.  And from that point on it

23   was used in an alternating fashion.  In fact,

24   Mr. Hoffmann said that the east tower, which we'll

25   talk about in a second, that was down.  He gave

1    dates, again in my recollection -- it's your

2    recollection that controls of the testimony --

3    January to May of 2008.  The east tower was down

4    completely.  Quench tower number 1 used all the

5    time.  They got to quench the coke.  They got to go

6    somewhere.  They got to pour water on it.

7        Let's move to the east tower, number 2 tower.

8    That relates to Counts 11 through 15 of the

9    indictment.  And those charge the defendants with

10   using that tower.  That tower had no exemption.

11   That tower had to have baffles a hundred percent of

12   the time.  All the time.

13       When that tower from 2005 you look, the charge

14   starts July 29th, 2005, five years prior to the day

15   of the indictment, up until November 15th of 2009.

16   If you remember there's now an exhibit in evidence,

17   that's Exhibit 19.15, where Tonawanda Coke sends in

18   a letter, and says we've reinstalled baffles in

19   this tower.

20       You saw a photograph of this tower.  Again,

21   taken during the criminal search warrant.  And as

22   you know, the story begins in 1996.  Because in

23   1996 that is when Defendant Kamholz, again, began

24   his scheme to deceive the regulatory agency.

25   Because in that letter he talks about how he wants

1    to lower the height of the tower.  That's it.  We

2    anticipate operating number 2 quench station in its

3    modified form, and request your concurrence to this

4    modification.  The word "baffles" doesn't appear

5    anywhere in this letter.  It's no where.

6        So in response -- again, you've seen this.

7    Government Exhibit 19.12 -- DEC sends a letter

8    back.  It's very clear.  It should be noted that

9    Part 214.5(a) -- that's the New York Codes Rules

10   and Regulations, which you've heard of -- says

11   explicitly all wet quench towers have to have

12   baffles.  We're reminding you of that.  That's it.

13       So at that point, ladies and gentlemen, that

14   point in time, 1996, '97, they had a choice, to

15   comply with the law or to deceive.  And from what

16   we've heard, we know the choice was to deceive.

17       And I say defendants at this point.  I just

18   want to briefly touch on this.  You've heard this.

19   You've heard this from the Judge yesterday about

20   responsible corporate officer, that based on his

21   duties he was the person that was the responsible

22   person for this facility.  It's similar to this

23   owner-operator definition.

24       You also heard about the definition of

25   corporate responsibility.  That corporations are --

1   can be liable for the actions of their employees.

2   And that's how we have both Defendant Kamholz and

3   the corporation involved in this case.

4        And, again, with this tower, my notes suggest

5   that it was mentioned during opening by Mr. Linsin,

6   I suggest there's really no dispute whether this

7   tower had baffles or not.  I believe there's no

8   dispute it did not have baffles.  My notes say that

9   Mr. Linsin mentioned that during opening.  And

10  you've now heard the testimony from a number of

11  witnesses.  There were never baffles in this tower

12  after '96, '97 time period.  Mr. Priamo mentioned

13  that.

14       I don't want to go through the testimony about

15  baffles in or out.  What I want to focus on is Gary

16  Foersch, the defense witness.  The person called by

17  the defense in their case.

18       My notes, again, suggest that Mr. Linsin said

19  something to the effect of you're going hear from a

20  DEC inspector, and I would presume that's

21  Mr. Foersch, who was out there from 1996 to 2009,

22  knew there were no baffles in quench tower number

23  2, knew it was a violation, but never wrote up the

24  corporation, never said anything.

25       Okay.  Now you've heard his testimony.  That's

1    not what he said.  He didn't say that at all.  He

2    stated that he brought the lack of baffles or

3    missing baffles, he couldn't remember, he brought

4    that up during one of his inspections because one

5    time he decided to go into this dangerous place as

6    he testified to, where there's electric rails,

7    where there is water pouring out possibility.  You

8    climb down a little slope, he looked in, and he

9    said there's problem there.

10       Defendant Kamholz, you know, Part 214.5

11   remember that?  That requires baffles.  Okay.

12   There was nothing at that point.

13       Mr. Foersch testified Mr. Kamholz didn't say

14   well, you know, the upward velocity.  Don't

15   really -- this tower, should ignore, you know,

16   baffles.  There was none of that.  It was just an

17   acknowledgment.  Yup, okay.

18       So again, I'm trying to focus on all these

19   choices, these times when that decision to comply

20   or deceive came up.  Here's another chance.  He had

21   the choice.  He could have complied.  He could have

22   put the baffles in the tower, but he chose to

23   deceive.  And then you also heard testimony from

24   Mr. Foersch that not only did he raise that the

25   year later when he went back during his full

1    compliance inspection, he didn't look in the tower,

2    but as he's walking out, finished with his

3    inspection, he says something to the effect, hey,

4    did you put baffles in that tower?  And again there

5    was that choice, that chance.  Come clean.

6         Defendant Kamholz could have said well, you

7    know what, it's too cost prohibitive, we haven't

8    had a chance to do it yet.  He could have said

9    that.  Mr. Foersch, said yes, we put them in.  Yes,

10   he made that choice.  He chose to deceive.  He

11   chose in this case to roll the dice, to roll the

12   dice that DEC was never going to go back there and

13   look.

14        You may hear an argument, I expect you'll hear

15   an argument that well, Mr. Foersch, he didn't

16   really believe Defendant Kamholz at that time.  Who

17   cares?  What does that matter?  Everything that was

18   communicated, the statements or conduct which

19   you're going hear about -- I'm using these terms

20   deliberately -- because you're going to hear about

21   this term entrapment by estoppel.  I have it under

22   something else I want to talk about.

23        These statements or conduct that is sent over

24   to the defendants is you got to have baffles, and

25   did you put them in.  That's it.  It wasn't hey, I

1    really don't believe you, but it's okay.  That

2    didn't happen.  So the fact that Mr. Foersch either

3    didn't follow up or didn't believe Defendant

4    Kamholz, it's irrelevant.  It doesn't matter.

5        Now, there's an interesting thing that happened

6    in April of 2009.  And we're going to talk about

7    that as well.  That's that EPA -- joint EPA/DEC

8    inspection.  And we'll get there, we'll talk about

9    why this inspection comes up.  But at that point

10   quench tower number 2 becomes an issue.  You heard

11   it from Mr. Sitzman.

12       He finds out there's no baffles in the tower.

13   He talks to Defendant Kamholz.  He says, hey,

14   what's going on?  You're supposed to have baffles.

15   Remember those letters?  Yeah, I remember those

16   letters.  Did he say, well, Gary told me I could?

17   No.  No, he didn't say anything.  He didn't say

18   anything.  Think about that.

19       I mean, my own daughter does it to me and my

20   wife.  If I tell her something but my wife tells

21   her something else, well daddy told me I could do

22   it.  I got that this weekend actually.  That's

23   ingrained in us since we're little.  If somebody

24   tells you it's okay to do something, and then

25   somebody else comes along and says why did you do

1    this?  It's common sense.  You're expected to use

2    your common sense.

3        Similar to the April of 2009 inspection and any

4    lack of response by Defendant Kamholz.  We have

5    this letter in evidence, Government Exhibit 126,

6    which is the request for information sent by the

7    EPA following this inspection.  Significant

8    document which we'll talk about in another context.

9    And says, you know, Defendant Kamholz, we really

10   need some more information about your facility.

11   They send it to him, the owner-operator.  They

12   specifically ask about baffles.

13       It doesn't get any clearer than 8(a).  State

14   whether the quench towers have any baffles.  If

15   your answer is no, explain why not.  Another

16   chance.  Another chance for him to say -- to make

17   that choice, that compliance choice.  But instead

18   he chose to deceive.  He had the chance again to

19   say, you know what, Gary told me I could do it.  He

20   didn't do that.  Here's the letter that he sent

21   back.

22       In the section -- this is the certification I

23   wanted to talk about.  In the letter he sends back

24   he says I believe that the submitted information is

25   true, accurate, and complete, and that all

1    documents submitted with this response are complete

2    and authentic unless otherwise indicated.

3        He's on the hook.  It goes on to say there's

4    significant penalties, including imprisonment.  He

5    knows what he's doing.  And he says the quench

6    towers are not baffled.  They're not traditional

7    quench towers.  They're short.  The upward

8    velocity, we've heard that.  And we heard about

9    foundry coke.  This is the chance to say Gary told

10   me I could do it.  He doesn't do that.  And the

11   reason is because it never happened.

12       Gary never said, Gary Foersch I'm talking

13   about, never said you can operate without baffles

14   in that tower.  You heard his testimony.

15       Okay.  Let's move on to the bleeder valve.

16   These are Counts 1 through 5 of the indictment.

17   And those counts charge the defendants with

18   operating an unpermitted emission source in

19   violation of their Title V permit.  That's

20   condition four.  We went through it, again, three

21   days of testimony with Mr. Carlacci, I think two

22   days of testimony with Mr. Sitzman.  I think you've

23   got it.  I think you know what we're talking about.

24       And we've also heard this called the bleeder

25   valve, the pressure release valve.  It's in

1     by-products.  And a period of time, again

2     July 29th, 2005, five years from the time of

3     indictment, up to December 30th of 2009.  Because

4     we know or you've heard from the testimony of

5     Mr. Cahill that that bleeder was taken out of

6     service in March of 2010.  So it's -- so the charge

7     brings it all the way up to the end of December.

8     And you've seen a number of photographs depicting

9     this bleeder.

10         I want to focus on this one, Government

11    Exhibit 50, which you heard testimony of.  You saw

12    people point it out, there it is.  Does it appear

13    to be releasing?  That's your call.  I don't know

14    if there was testimony or not on whether it was

15    releasing, but you could look at that.  You could

16    use your common sense.

17         A number of witnesses testified on this bleeder

18    valve.  They testified about during reversals gas

19    would back up in the coke oven.  It wouldn't flow

20    to the coke oven.  Pressure in the line would

21    increase.  This device was set to relief that

22    pressure.  You heard about the general set point of

23    the bleeder from 80 to 100.

24         Witness after witness testified we set it at 80

25    to 100, somewhere in that ballpark.  And when the

1    pressure would go above that, a signal would get

2    transmitted to the valve, it would open, coke oven

3    gas would go into the atmosphere.

4        You learned about where the set point was in

5    this green shack just below it, that changes to the

6    set point weren't made that often.  You heard

7    testimony from a number of witnesses on that.  They

8    didn't adjust this that often.  And it would

9    generally release during reversals, and when it

10   would you heard it would go anywhere from five to

11   30 seconds blowing coke oven gas into the

12   atmosphere.  Some times it would be longer.

13       You heard from a witness who was actually

14   working when it caught fire.  You've now had an

15   entry you see in the log book that's included on

16   that summary chart -- we'll get to that in a

17   minute -- that caught on fire in 2008.  And the

18   result of that was a 10-foot high flame, like a

19   blow torch into the air.

20       Now, you also heard testimony from Mr. Heukrath

21   and I believe from Mr. Cahill, it's my

22   recollection, that at some point in the 1980s the

23   bleeder was set there.  It was in a different

24   location.

25       There's really three main elements of these

1   counts that I want to discuss, that the defendants

2   operated this bleeder in violation of a permit

3   condition, and knowingly.  So operation in

4   violation of a permit condition and knowingly.  So

5   at the close of the government's case in chief,

6   that was before the defense started their case, you

7   heard from Special Agent Conway.  He presented this

8   summary chart which included a summary of all the

9   by-products operator log books and the bleeder

10   charts.  And certainly there's no dispute that this

11   chart is only as good as the documents that it

12   relies upon.  And that there's clear discrepancies

13   in the log book.  Bleeder being lowered to 94, with

14   the setting before it it was at 90.

15       But the important -- there's important parts of

16   this log book you have to take away.  That except

17   for the last entry and one entry in February

18   of 2008, it was consistently set at 80 to 100

19   centimeters.  Highest setting ever was recorded on

20   May 22, 2009, which occurred after the April

21   of 2009 inspection.  When we've heard now that

22   defendants were asked to raise this, this chart

23   bears that out.

24       Now, with the discrepancies in this chart, even

25   if we just limit ourselves to those three days that

1    I have bracketed there that we have bleeder charts

2    for, you saw all those circular bleeder charts.

3    Just even focusing on those three days, March 2nd,

4    March 3rd, and May 22nd, well, you saw Government

5    Exhibit 203 in evidence, where on March 2nd of 2009

6    it was set at 94 and based on that bleeder chart,

7    there were 49 releases, just over every half hour.

8         The next day it was raised to 100.  There's

9    actually 51 releases.  If we go to the May 22nd,

10   the next entry, which says raised to 110, there is

11   48 again, consistent with every half hour during

12   reversals.  This evidence coupled with the

13   testimony of the witnesses you've heard, a number

14   of them, this bleeder would release frequently.

15        In fact, you heard from near the end of the

16   government's case Dan Heukrath, who said

17   between 2005 and 2009 he saw this release thousands

18   of times.  Thousands.  So I submit to you that

19   based on that evidence, there's no doubt that the

20   defendants operated this bleeder valve.

21        Now, violation of a condition of the permit.

22   This deals with condition number four.  You're

23   going to hear some terms during the definitions

24   when you're instructed on the law about emission

25   source.  I don't know if you remember that

1    testimony, emission source versus emission point,

2    construction, modification, a process, what all

3    that means.  But what is clear, I would submit

4    based on the testimony, is that you heard this

5    bleeder is an apparatus.  Al Carlacci testified to

6    that.  Larry Sitzman testified to that.  And under

7    the definitions you're going to get from the Judge,

8    an emission source is any apparatus or contrivance

9    or equipment that can cause emissions into the air.

10   That's exactly what we have.  There it is.  There's

11   the apparatus.

12        Now, the last element of these counts I want to

13   talk about is knowingly, because you've got to show

14   that the defendants acted knowingly.  You're going

15   to hear about what knowingly means in the Clean Air

16   Act.  But it doesn't get any more knowingly than if

17   you recall the testimony of Gerry Priamo, who said

18   he had conversation with Defendant Kamholz 15 to 20

19   years ago in the vicinity of this very apparatus,

20   and says hey, Defendant Kamholz, is it legal to

21   bleed gas here like this?  Does it need to be lit?

22   The defendant had a choice.  He chose to deceive

23   his own employees and said it's legal, don't worry

24   about it.

25        Same with Anthony Brossack.  You heard from

1    him.  He had a conversation more regarding the

2    condensate that was coming out of this.  Again, a

3    long time ago.  There was condensate coming out,

4    and he asked, hey, is the bleeder all right to do

5    this?  And Defendant Kamholz's response was yeah,

6    it's supposed to do that.

7         And finally, in terms of knowingly, we've got

8    Pat Cahill's testimony, which I want to hold on and

9    talk about that in a moment.

10        Now, I expect you're going to hear about this

11   entrapment by estoppel defense.  It's really a

12   defense, and it's a defense the defendants have to

13   prove.  They have to prove it.  And you heard some

14   testimony regarding this document, Government

15   Exhibit 131, this HAPS study.  And defendants have

16   challenged some of the government witnesses arguing

17   that the report provided notice to the DEC.  And we

18   saw this chart with the coke oven gas system, a

19   pressure relief valve, listed one, that somehow

20   this was notice.

21        I have no other argument than this is complete

22   nonsense.  You heard about the process to make

23   notice.  It doesn't include a reference which in

24   the footnotes itself identifies this as a leaking

25   valve based on the emission factors that you heard

1     from Mr. Sitzman.  But moreover, does it describe

2     where it is?

3         This coke oven gas system, you've now seen

4     charts, the length of these pipes.  It doesn't say

5     where it is.  Does it say what it looks like?  No.

6     And again, how often it releases?  Well, the

7     footnote says it doesn't release that often.  It's

8     a leaking pipe.  And then on the next page, the

9     very important question, the most important

10    question out of this, how much benzene is coming

11    out of it?  A big zero.

12        So this, ladies and gentlemen, this tells you

13    nothing.  Nothing.  This can't be notice.  If this

14    is notice, think about when you -- it's almost

15    middle of April.  We've got to submit our taxes,

16    got to make an accounting of how much income you've

17    earned, put it on a 1040, send it in to the IRS.

18    You say how much income you've earned.  You're

19    giving them notice of how much tax due and owing

20    you have based on the amount of income you have.

21        Now think about instead, you send -- you

22    electronically file your -- your income statement,

23    your tax return.  You electronically file it.  I

24    expect that's what most of us do now.  But at the

25    same time you write a letter out to the IRS, oh, by

1     the way, dear IRS, I have another job.  You put it

2     in the mail and you send it in.  Would that be

3     notice?

4         What if in that same letter on the most

5     important question it says I earned zero income.

6     Think about it that way.  That letter would be

7     meaningless.  It's nonsense.  That this could be

8     notice to the DEC is nonsense.

9         Proper notice of an emission source is not

10    burying it in some unintelligible chart that you

11    heard testimony of really isn't reliable anyways.

12    This is not notice.

13        Now you've also heard testimony from the

14    defendants that this bleeder was open and obvious.

15    That it wasn't shrouded in a veil I think was --

16    was the -- one of the questions.  No, there was no

17    veil draped around it.

18        So, in essence, what they're telling you, what

19    they're going to imply I expect in closing is that

20    well, although DEC didn't catch us, they should

21    have.  They should have, because we didn't put a

22    veil around this.  We didn't hide it.  We didn't

23    drape a sheet over it every time they showed up.

24        But when you think about that argument, you got

25    to think, is that how the law works?  Think for a

1    moment about a serial bank robber who alludes

2    detection by police on a number of occasions, robs

3    a number of banks, but then finally is caught.  On

4    one of the final attempts he's caught.  And then

5    there's evidence produced during maybe a search of

6    his apartment of these earlier bank robberies.

7    Does the fact that the police missed it somehow

8    absolve that bank robber of those earlier crimes?

9         Think about this.  How about in the Ponzi

10   scheme.  Probably heard Bernie Madoff in the news

11   in the past.  Think about someone is operating a

12   Ponzie scheme, and it goes undetected by the agency

13   that's supposed to detect it, which is the

14   Securities and Exchange Commission.  Even though

15   they should have caught on, the tell-tail signs

16   were there, they should have caught it.  If the SEC

17   later determines that this is truly a Ponzi

18   scheme, does that mean they're precluded from

19   taking any action?  The answer is no.  The law

20   simply does not work that way.

21        This is not monopoly.  There's

22   no-get-out-of-jail-free-because-they-missed-it

23   card.  That doesn't apply.  Even if you want to

24   conclude that DEC missed it, that's fine.  I can't

25   argue with that.  But in the context of this case,

1    and in the entrapment by estoppel defense that the

2    Judge is going to tell you about, you've got to

3    think to yourself it really has no bearing.

4        Because for this entrapment by estoppel defense

5    to apply, which the defendants have to prove,

6    that -- they have to show that the defendants --

7    I'm sorry, that the government caused the

8    defendants to commit the crimes by leading the

9    defendants to reasonably believe they could commit

10   the crimes.  Reasonably believe.  Defendants must

11   show they relied on statements or conduct of the

12   defendant, and, very importantly, and they must

13   show that they reasonably disclosed this conduct at

14   or time [sic] the authorization from the

15   government.  That's a very important statement.

16       You heard this bleeder's been around for years,

17   since the '80s.  That's why I say the 2003 report

18   is nonsense.  Because under an entrapment by

19   estoppel, back in the '80s when they were using it,

20   they've got to give notice then.  They've got to

21   tell the government, hey, we're going to be using

22   this to vent coke oven gas in the atmosphere.  Not

23   decades later.

24       Those are the Clean Air Act charges in the

25   indictment.  And I submit to you that based on the

1    evidence presented, you should find the defendants

2    guilty of all those charges.

3        Now we're not done there.  We've got to talk

4    about the RCRA charges.  And as you heard with the

5    government's last witness, the government attempted

6    to present you and through Mr. Flax his opinion as

7    to the concepts relevant to Counts 17 to 19.  And

8    with Count 17 we're talking about storage, storage

9    of a RCRA hazardous waste.  And I submit to you --

10   again, I'm trying to focus on what the government

11   believes are really the key issues.

12       I submit to you that the only real issue in

13   dispute here with Count 17, which you heard from

14   Miss Williams who testified, Mr. Flax,

15   Mr. Strickland is whether the defendants actively

16   managed this material.  Did they actively manage

17   it?

18       The Judge is going to give you a very

19   straightforward definition of what active

20   management means.  And I expect it's going to

21   include something to the effect of disturbing

22   accumulated waste.  Disturbing.  As you evaluate

23   that language, "disturbing accumulated waste",

24   you've got to think about the tanks and the

25   material around the tanks on the ground.

1          Let's start with the tank to the east.  It's

2     Government's Exhibit 105.40, which has been

3     stipulated, if you remember the stipulation, was

4     taken on April 21st of 2007.  So 2007 there's two

5     tanks standing.

6          Moving into July of 2008 one tank is down.

7     Moving into June of 2009, from the testimony of

8     Mr. Corbett who was there who took this photo,

9     that's the tank.  If you go back where the tip of

10    that arrow is, I don't know if you see the piece of

11    metal sticking up that's almost like a right angle.

12    I submit to you you see it in that photograph too.

13    Then you've got a stipulated photograph from

14    September 10 of 2009.  This is Government

15    Exhibit 136.11.  This is from the sampling event.

16         There can be no doubt, ladies and gentlemen,

17    that what you've seen in these photographs, the

18    ground around these tanks, this tank in particular,

19    has been actively managed.  You've got to think

20    about the testimony you heard.  The witnesses who

21    testified they drove over the material with heavy

22    equipment.  They disturbed it.  It's very simple.

23         RCRA may sound complex, but when you think

24    about the definitions the Judge is going to give

25    you, they disturbed it.  They drove over it.  They

1    poured coke breeze on it.  They dumped more coke

2    breeze on it that caused it to move.  They drove

3    over it with heavy equipment that caused it to

4    move.  Material flowed out of this tank, which,

5    part of the definition you're going to hear about

6    active management is whether additional material

7    comes on top of it.

8        Let's look at the tank on the west, again,

9    stipulated April 21st, 2007.  The time of the fire

10   July of 2008, tank still standing.  Sometime

11   between July of 2008 and June of 2009 when

12   Mr. Corbett's there, this tank comes down.  Then in

13   September when they're doing sampling there,

14   stipulated photo 136.04, sampling of tank on the

15   left.  Tank to the west.  There's no question in

16   these photographs that the defendants actively

17   managed the ground around the tank on the west.

18       You've got evidence which is apparent from

19   these photographs -- you'll have a number of

20   photographs to look at that -- that there's fresh

21   spills.  This material is flowing out.  And you

22   also have evidence now that this was toxic for

23   benzene.  Toxic and remained on the ground.

24       Let's go back to this chart and I'll talk

25   briefly about Counts 18 and 19, that's the disposal

1    of a RCRA hazardous waste.  And both of those, if

2    you really simplify all the testimony, involve

3    mixing somehow with coal on the ground.  Well, I'll

4    talk about ground in a minute.

5         So, that seems to be -- again, I'm trying to

6    I'm trying to clarify this -- seems to be in the

7    government's view the key issue, whether that

8    mixing was appropriate in the coal piles on the

9    ground.

10        So you heard about this ground, defense exam of

11   the government's witnesses as to what does ground

12   mean.  Does the fact that there's coal, years and

13   years of coal accumulated on the ground, does that

14   mean it's not the ground?  No.  You've got to use

15   your common sense.  The fact that there's a layer

16   of coal doesn't mean the coal is not the ground.

17   You heard testimony about the ground is the surface

18   of the earth.

19        You probably walked across some street to get

20   here, probably Delaware, maybe Niagara Square,

21   which I guess would be Delaware, so it's all

22   Delaware, unless you maybe walked across Niagara

23   Street and came on the sidewalk.  At some point you

24   walked across a street today.  And at that point if

25   somebody asked you where you were walking, do you

1    think you have to do mental gymnastics to say well,

2    I'm really walking on blacktop, that's on top of

3    gravel, that's on top of soil, which is on top of

4    the ground.  That makes no sense.  You don't have

5    to do that.  You walked on the ground.  That's

6    where you walked.  The surface of the earth, that's

7    where the coal is.

8        All right.  To come to terms with this mixing

9    on the ground, you've got to listen to the

10   definitions the Judge is going to give you about

11   disposal under RCRA, what it means, disposal.  You

12   heard some testimony from the experts.  And land

13   disposal.  And I submit when you hear those, again,

14   it's not going to be difficult to tackle these

15   issues.  RCRA is not that complicated when you get

16   very clear definitions.  And those definitions are,

17   for both of those, simply if you place something on

18   the land so that it may enter the environment,

19   that's the key word, may enter the environment,

20   that's disposal.  That's land disposal.

21       You don't have to be worried about whether it

22   actually did enter the environment.  It may.  It

23   may enter the environment.  You've heard that

24   there's no -- no way -- there was no containment

25   out in the coal field to stop this K087 waste and

1   this D018 waste from getting flushed out of the

2   coal field.

3        And you heard about a direct surface water

4   connection to the Niagara River.  Runoff, snow melt

5   comes off the coal piles, runs down ditches, heads

6   out to the Niagara River.  It may enter the

7   environment.

8        Now, you heard from a number of witnesses -- I

9   guess maybe part of it was the parties made RCRA a

10  little complicated.  The government called two

11  experts, defense called an expert, we called a

12  rebuttal expert.  But you also heard -- again, this

13  is my notes from opening -- Mr. Linsin talked about

14  this other expert you may hear from, a Steven

15  Johnson, who would talk about RCRA and give you

16  some opinions.  We didn't hear from him.

17       So all you have from the defense is the

18  testimony of Miss Williams, a witness who's never

19  done a RCRA inspection in her life, a witness who's

20  never been to the Tonawanda Coke Corporation, so

21  she's never physically seen the coal field, a

22  witness who, according to my notes during direct,

23  said she spent about 200 hours working on this

24  case.  And on cross-examination with Mr. Piaggione

25  said she billed $475 an hour, which comes out to

1     $95,000 is what her and her firm were paid for what

2     you heard on the stand.  And I submit that that

3     $95,000 opinion is in direct conflict with the

4     definitions the Court's going to give you, that it

5     may enter the environment.

6          And, in fact, let's take a look at after the

7     search warrant gets executed, there was a question

8     I believe what was happening now with the coal

9     field -- with the K087 waste.  Well, that may not

10    have been relevant, but what was relevant was what

11    happened right after the criminal search warrant?

12    On December 17th after having civil regulators come

13    in, look at the material, sample it, then the

14    criminal inspectors come in.

15         The criminal agents execute their search

16    warrant, and then the light goes off.  You know

17    what, we probably shouldn't be putting this on the

18    ground.  There is a policy change.  No more

19    material on the ground.  In fact, you heard I

20    believe from Mr. Dahl that sometimes it went on the

21    pad in the past.  Sometimes it went out to the

22    field.  After December 17th of 2009?  No, they

23    changed.  I'd submit to you because they knew what

24    they were doing was wrong.  They built the pad in

25    1994.  You heard the regulations came into effect

1      in 1992.  Put it all together.  Use your common

2      sense.  I submit to you they knew what they were

3      doing was wrong.

4          Now at this point I'm moving along.  I want to

5      just thank you for your service.  A month ago to

6      the day you were brought into this courtroom,

7      probably never expected to be sitting where you're

8      sitting now.  And I appreciate -- I know on behalf

9      of the government I appreciate your attention, the

10     questions, the way you've approached this case,

11     it's -- it's really a commendable -- the most

12     commendable public service is what you ladies and

13     gentlemen are doing right now.  And I couldn't even

14     fathom being just taken out of my normal day and

15     having to sit in that box for 30 days, and so I

16     thank you.  I thank you for your patience and your

17     time in this case.

18         Now the one thing -- the one count I haven't

19     discussed yet is the obstruction of justice count.

20     And that's the last count we're going talk about

21     here.  That's Count 16.  Because that gets back to

22     this practice, this decision, the choice to comply

23     or deceive.  And that charges Defendant Kamholz

24     with obstruction of justice in the instruction that

25     he gave Mr. Cahill who you heard on the stand prior

1    to the EPA inspection.  And that was if you

2    remember the testimony with reference to the

3    bleeder, they were walking around prior to this

4    inspection, and Defendant Kamholz said -- again,

5    this is my recollection, my notes of what

6    Mr. Cahill said, "Pat, we can't have that going off

7    while they're here."  And he was questioned on

8    cross-examination about whether that was "they're

9    here" or not, and he said, "Yeah, I recall to this

10   day he said, we can't have that going off while

11   they're here."  That's the -- and in response Pat

12   Cahill says, "Okay, I'll take care of it."

13       Now I believe there was questioning of

14   Mr. Cahill about well, you know, Defendant Kamholz

15   never told you hey, every day adjust it up, adjust

16   it down, adjust it up, adjust it down every day, he

17   never told you that, did he?  No.  No.  Again, this

18   is your common sense, ladies and gentlemen, is --

19   when we come into the courthouse we've got to check

20   certain things.  We've got to check our cell

21   phones, electronic devices.  The one thing you're

22   not supposed check is your common sense.

23       In fact, the Judge has already told you you can

24   use your common sense.  You're expected to use your

25   common sense, and at the moment that Mark Kamholz

1    says "Pat, we can't have that going off while

2    they're here", and Pat Cahill says, "Okay, I'll

3    take care of that", you don't need any

4    extraordinary leeps of imagination to know that

5    Mark Kamholz knew what Pat Cahill meant by "Okay,

6    I'll take care of that."

7        This is kind of crude analogy, but think of

8    Rocky and I, we are out on the street, and we're

9    hit men, and Rocky gives me a gun and says, "Hey,

10   go take care of him."  And I say, "Okay, I'll take

11   care of him" and he hands me a gun.  I know what

12   he's telling me to do.  I don't need him to say

13   okay, make sure you're there at night, wait in your

14   car, stay on the street, wait for the person to

15   come out the stairs, follow him to a deserted

16   place, shoot him, then throw away the gun, and then

17   run away.  I don't need that.  Just like Defendant

18   Kamholz didn't need that.  When Pat Cahill said,

19   "Okay, I'll take care of that", everybody knew what

20   was going on.

21       And so this testimony Mr. Cahill said was the

22   Friday before the inspection.  Now, if you remember

23   the testimony, the Tuesday -- April 14th, Tuesday,

24   was the beginning of the inspection, so if you go

25   back, that Friday was April 10th.  April 10th,

1    2009.

2         And you're going to get legal instructions on

3    this count.  And there's really three major

4    elements.  I'm going to step through them all,

5    because I think we need to just discuss briefly the

6    first two, that the first element you're going hear

7    about is was a proceeding pending?  So was there

8    some type of proceeding, some government

9    proceeding, and was it pending at the time Mark

10   Kamholz gave that instruction?  That's a required

11   element.

12        And if you remember the testimony of

13   Miss Hamre, she testified that on April 8th, 2 days

14   before that Friday, she talked to Defendant

15   Kamholz.  She sent him this letter.  She said, hey,

16   we're going to be there.  We're coming.  EPA is

17   coming.  Along with that, she sent a records

18   request.  Said here's some records I want you to

19   start getting ready.  Number 1A process flow

20   diagram.  We'll talk about that in a minute.  These

21   are the records that we're going to need.

22        And at that point on April 8th, ladies and

23   gentlemen, I'd submit to you the proceeding's

24   pending at that point.  Defendant Kamholz knows

25   EPA's coming.  In fact, he's got this now records

1    request.  He's got to start getting it ready.  In

2    fact he does.  You now have notes, Government

3    Exhibit 117.09.  He starts putting together his own

4    notes in terms of the response.  The proceeding was

5    pending on April 8th of 2009 I would submit to you.

6        The second element is that the defendant has to

7    know the proceeding is pending.  That we don't

8    really need to talk about too much.  He got the

9    letter.  He talked to Miss Hamre.

10       The third element is the defendant corruptly

11   endeavored to influence, obstruct, and impede the

12   proper administration of the law.  Corruptly

13   endeavored, it's a weird term.  You're going hear

14   about it from the Judge.  What does "corruptly

15   endeavor" mean?  And I expect you're going hear

16   that corruptly simply means to have an improper

17   motive.  Improper motive, that's it.  So, you've

18   got to focus on that improper motive.

19       And when you examine all of the circumstances

20   surrounding this inspection, which we're going to

21   talk about briefly, when you examine all of that,

22   you'll get -- as Mr. Personius said, you'll get the

23   rest of the story.  You'll get the improper motive.

24   It's clear.  There's no question, I submit to you

25   that Defendant Kamholz acted with an improper

1    motive.

2        First we've got -- prior to -- prior to that

3    instruction, "Hey, Pat we can't let that go off

4    while they're here", prior to that instruction

5    there is a folder that we know now which was seized

6    after the fact, but we know it was in his office.

7    That folder, you'll have it.  You'll have the

8    actual folder with you.  It says Clean Air

9    Coalition on the top.  You saw it.

10        It's got an article in there from 2005.  Talks

11   about benzene into the air.  You heard about a 2008

12   inspection by Mr. Carlacci, again a month ago.  He

13   was looking for sources of benzene.  He's trying to

14   have a dialogue with Defendant Kamholz.  Defendant

15   Kamholz gives him nothing.  And then now, with this

16   letter, April 8th, EPA's coming to town.  He knows

17   EPA hasn't been there in a while.  That's swirling

18   in his mind.  That's prior to his comment.

19        Now, just after the comment in the opening

20   conference Miss Hamre testified that Mark Kamholz

21   specifically said there's no pressure release

22   valves.  We don't have any.  In fact, we're coke

23   oven gas deficient.

24        You heard the testimony.  If they're coke oven

25   gas deficient, this thing wouldn't be going off

1   thousands of times.  He passed out this flow

2   diagram.  He gives this to the regulators.  He has

3   that choice.  He could put on there, hey, we've got

4   this pressure release valve.  He doesn't do that.

5   There's no notice on this.  There's no mention of

6   the pressure release valve.

7        You heard testimony of the inspectors from

8   Miss Hamre, Mr. Patel.  He didn't want to answer

9   any questions about this when it came up during the

10  inspection.  In fact, at one point you heard

11  testimony that he denied knowing how long it had

12  been there.

13       And you heard that he got Pat Cahill to talk

14  about the bleeder.  That's consistent with his own

15  notes which are now in evidence on April 21st, 2009

16  in the a.m.  "Got Pat to talk about plant pressures

17  and bleeder.  Took about one week of charts.  P.M.,

18  gave copies of bleeder charts for those dates.

19  Cheryl arrived."  It's in his own notes.

20       So you've got the testimony of Pat Cahill.

21  You've got, in addition to that, the testimony that

22  he was mad.  He was mad after this because he felt

23  like he was put on the spot.  He felt like

24  Defendant Kamholz knew how long this had been

25  there.  And you heard from Gerry Priamo, you heard

1     from Anthony Brossack.  They corroborate his story.

2     Cahill came to them and was mad.

3          And you also heard testimony that at the

4     closing conference there was some discussion of

5     maybe raising it.  And we've already seen that

6     notation without going back to that by-product

7     summary of log books, that on May 22nd they did

8     raise it.  They only raised it to 110.  Now that's

9     all immediately in -- immediately after this

10    inspection.

11         But we've also got to weigh the comments that

12    Mr. Kamholz gave to the EPA.  And EPA specifically

13    asked about the bleeder and specifically says on

14    Exhibit 126 page 12 and 13, give us all this

15    information about the bleeder.  This is what we

16    want to know.  And with respect to number F and

17    number E -- or E and F, these are very specific

18    questions.  So what you have to do is when you

19    weigh whether he had an improper motive, whether he

20    corruptly endeavored, look at his response.  So he

21    sends it.  This is now Government Exhibit 127.

22    This is page 6 and 76 of that response.

23         Now he mentioned first, I've got to note, he

24    mentions he consulted P. Cahill.  If you remember,

25    my recollection is during the cross-examination Pat

1   Cahill said after this, he never spoke to -- never

2   spoke to Defendant Kamholz about the bleeder.  It

3   never came up.  Defendant Kamholz never talked to

4   him, and he never talked to -- vice versa.  And it

5   goes down.  That F, the last word, "de minimus",

6   and he's -- the question is so explicit as to

7   report -- if you've not reported this in the past

8   five years -- let's go back.  "Explain whether

9   you've reported this coke oven gas emissions as

10  deviations to your Title V permit.  If your answer

11  is yes, provide copies for the past five years.  If

12  your answer is no, explain why such emissions are

13  not reported."

14      He says they're not reported because he

15  believes they're de minimus.  You heard the

16  testimony of Harish Patel, who, based on the

17  calculations in here and what he knew of this

18  pressure release valve, in a given year was

19  173 tons of coke oven gas in the atmosphere.

20      You can use your own common sense, is that de

21  minimus?  But you also have his own handwriting

22  this was a deliberate thought out response.  This

23  isn't something he just typed up quick on his

24  computer.  You've got his handwritten notes.  This

25  is Government Exhibit 116.01.07, page 6.  Take a

1    look at this.  You're going to have this original.

2    You can take a look at what's crossed out there.

3         I'd suggest to you -- again, it's my reading --

4    it looks like currently.  He knew how to answer

5    these questions.  He chose to deceive.  He chose

6    the path of deception.

7         Now, you have to evaluate these actions in

8    evaluating this improper motive, this corruptly

9    endeavored into now everything that we now about

10   this case.  Everything.  The battery flare stack we

11   talked about when I started.  In that same

12   response, I'm not going to go through it, it said

13   specifically tell us all the times in the past five

14   years the pilot light's been out.

15        It doesn't get any clearer than that.  He

16   doesn't say.  He doesn't say oh, by the way, you

17   know, we've had a pilot light problem for 15 years.

18   No, he could have.  He could have chose to comply.

19   He chose to deceive.  You've got to look at

20   everything in making that evaluation of whether he

21   had an improper motive.  Think about the comment he

22   made to Dan Heukrath who you heard on the stand

23   who, he was concerned.  He started hearing about

24   benzene in the air, and he says hey, Mark what's up

25   with this benzene?  And his response is well, you

1    know, there's no upper limit on how much benzene we

2    can release into the air.  He's chosen again to

3    deceive his own employees.  How about the comments

4    to Anthony Brossack.  This relates to the quench

5    towers versus quench stations, which you've heard

6    there's no difference.  There is no exemption for a

7    quench station to not have baffles when they were

8    talking about the towers.  Or how about Gerry

9    Priamo when he talked about hey, there's no baffles

10   in here.  Oh, it's okay.

11       You heard about how he escorted the regulators

12   around.  He had the choice.  He knew where they

13   would go, what they would do, and controlled, in

14   essence, what they could see.

15       Now, based on all of that I'd submit to you

16   there's no question that Defendant Kamholz, when he

17   gave that instruction to Pat Cahill, he knew what

18   he was doing, and it was for a specific purpose so

19   that they did not find out about this bleeder.

20       Now in the defendant's opening Mr. Linsin, you

21   heard this term a "stacked regulatory deck".  That

22   struck a nerve with me.  Because now you have the

23   evidence in the case.  Now you have everything

24   presented to you.  Soon you're going to go into the

25   room, and you're going to get carts of exhibits.

1    But what does the evidence show in this case?  Who

2    was the deck stacked against?  1978 they ask for an

3    exemption from pushing controls.  1984 they ask for

4    an exemption from the number one tower.  They don't

5    use it -- they use it less than 10 percent of the

6    time.  1996 they say they're going to modify the

7    height of the tower.

8         I submit to you the deck was stacked.  It was

9    stacked against the government based on the years

10   of deception, the years of noncompliance that the

11   defendants have now put forth, and the government

12   has put forth through evidence submitted to you,

13   and that for the counts in the indictment, Counts 1

14   through 19, they made that simple choice to not

15   comply and to deceive.  That simple question.  And

16   I submit to you based on the body of evidence you

17   now have, there is no doubt that the defendants are

18   guilty as charged to all of the counts of the

19   indictment.

20        Again, thank you for your time.

21             THE COURT:  Okay, Mr. Mango, thank you.

22   We'll take a break now, ladies and gentlemen.

23   We'll resume again at 3:00 o'clock, and you'll hear

24   the closing argument from Mr. Linsin, okay?

25        Don't discuss the case, please.  Please keep

1    your minds open.  Remember that the closing

2    arguments are not evidence, but they're there to

3    persuade you in terms of what the evidence has

4    shown or not with respect to the 19 counts in this

5    indictment.  Okay.  We'll see you in a few minutes.

6    Thank you.

7                (Jury excused from the courtroom.)

8                (Short recess was taken.)

9                (Jury seated.)

10               THE COURT:  Welcome back.  Please have a

11   seat.  Okay.  The attorneys and parties are back

12   present.  You, of course, are here, ladies and

13   gentlemen, roll call waived.  Thank you for paying

14   the attention that you did to Mr. Mango.

15       And as we explained to you, the second closing

16   argument, with the same rules to apply, is going to

17   be given by Greg Linsin, the attorney for Tonawanda

18   Coke Corporation.  Mr. Linsin.

19               MR. LINSIN:  May it please the Court --

20               THE COURT:  Certainly.

21               MR. LINSIN:  -- Mr. Mango, Mr. Piaggione,

22   and Mr. Personius, and ladies and gentlemen of the

23   jury, on behalf of myself and the entire defense

24   team for Tonawanda Coke, but more importantly, on

25   behalf of Mr. Saffrin, the president of Tonawanda

1    Coke and all of the employees of Tonawanda Coke, I

2    want to -- before I begin, I want to thank each of

3    you for your service, your attention, and your

4    patience throughout what has been a lengthy trial,

5    with a lot of dents and complex evidence at times.

6    I ask your indulgence as I take some more of your

7    time to offer our perspective on what we think this

8    evidence has actually shown in this case, and how

9    we think this evidence should be considered by you

10   as you begin your duty as judges of the facts.

11       I'm going to try and address three general

12   topics in my closing summation for you.  First I

13   want to talk a little bit about the concept of

14   perspective.  There has been a lot of detailed

15   testimony and focus on particular phrases and

16   particular documents.  I want to ask you as you

17   weigh this evidence, consider it, to put it in a

18   common sense perspective, to put it in the

19   perspective that is realistic and meaningful if

20   you're really going to assess how you should view

21   and judge and weigh this evidence.

22       Secondly, I am going to address the particular

23   counts in the indictment and where we believe the

24   government's evidence has fallen substantially

25   short of the heavy burden of proof that they bear

1       in this criminal prosecution.

2           And lastly I'm going to address this issue that

3       Mr. Mango referenced briefly and that Chief Judge

4       Skretny will instruct you on at a later time

5       regarding this defense that is called entrapment by

6       estoppel.  It applies to the facts of this case.

7       It is a defense that you may not have heard about

8       before, and I want to talk about it specifically

9       about what the burden is, what the parts of that

10      defense are, and how we think it actually relates

11      to the counts in this indictment.

12          So, you've heard nearly a month now of detailed

13      testimony from 30 witnesses, literally hundreds of

14      different exhibits entered into evidence.  And you

15      soon will have that task of weighing all of that

16      evidence, evaluating it, and reaching your verdicts

17      in this case.

18          But as you begin that task, I want you to

19      consider one question as a threshold matter.

20      Virtually every charge in this indictment relates

21      to a time period 2005 to 2009, essentially a

22      five-year period of time.  But obviously you've

23      heard a lot of testimony, a lot of evidence about

24      decades of prior interaction between this company

25      and Mr. Kamholz and the inspectors and regulators

1     from DEC and in some instances EPA.

2          And you've heard that, ladies and gentlemen,

3     because it is relevant, it is important to your

4     understanding and your evaluation of these actual

5     charges in the counts in the indictment.  You need

6     to look at the actual counts.  But I suggest to you

7     that you also have to weigh the evidence regarding

8     those counts and test that evidence against the

9     background of 30 years essentially of interaction

10    between this company and the environmental

11    regulators, some of whom you've heard testimony

12    from and some of whom you haven't.

13         And as I go through those counts, I will

14    suggest to you how we believe that background

15    course of conduct, those decades of interaction

16    really are relevant and should be considered by you

17    in weighing the charges in this case.

18         Another general perspective issue I think

19    relates to what Mr. Mango has now reaffirmed as the

20    government's core theory of motive in this case,

21    that Tonawanda Coke simply elected to do things

22    that were not compliant with the environmental

23    regulations in order to save money, that they made

24    a choice, business decision, to increase profits

25    rather than protect the environment.

1    But I ask you to take a look at the overall

2    fabric of evidence in this case and ask yourself

3    where is that evidence about the business decisions

4    that Tonawanda Coke actually made?  Mr. Mango

5    offered and made reference in his summation to a

6    business plan, and somehow by selecting the clauses

7    and sentences that he did seem to imply that it was

8    somehow sinister or improper for a company to

9    consider the costs of environmental compliance as

10   it planned for and structured its business

11   activity.

12   I submit to you, ladies and gentlemen, that

13   your own common sense tells you that any company in

14   making plans for how it is going to manage its

15   assets, how it is going to dedicate and appropriate

16   its resources has to do precisely that.  That is

17   what a business does.  And the reality is -- again,

18   you can use your common sense -- it does cost money

19   to comply with environmental regulations.

20   It is not as Mr. Mango suggested that money is

21   no issue.  Money, of course, is an issue.  But what

22   you see in many of the documents -- and a number of

23   them have been entered into evidence.  There's been

24   testimony from witnesses on this point.  The issue

25   of environmental compliance is not whether it's

1      going to cost money or not.  The issue is is the

2      potential environmental benefit that might be

3      realized from a certain expenditure worth that

4      cost?  What is the cost benefit, and how does that

5      factor into whether it should be required under the

6      regulations?

7           And you'll see that theme woven through many of

8      the communications.  The original discussion about

9      the exemption for the baffles talks about both of

10     those points, in the original letter from Tonawanda

11     Coke and in the response from DEC.  This is an

12     obvious and common sense recognition that you have

13     to balance those issues and weigh them in

14     evaluating whether or not costs are warranted.

15          But the other bigger picture here is to take

16     into account that -- and there has not been

17     evidence on these points, but I ask you to use your

18     common sense on this point too, that compliance

19     with the environmental laws, all of the

20     environmental laws that you know this company is

21     subject to, does cost money.  This company had to

22     have expended substantial resources in order to

23     achieve compliance.

24          We're here on specific charges, and in

25     evaluating and weighing the evidence based on the

1    government's theory of motive here, ask yourself,

2    what are the actual costs of compliance for these

3    charges that relate to these activities that relate

4    to the charges in the indictment?

5        There's a stipulation that the baffles in both

6    quench towers, when finally installed, 10 of the 19

7    counts in this indictment, total cost of $125,000.

8    It is real money, as I said in my opening

9    statement, to any one of us.  It is a cost of doing

10   business to a company that is a going concern and

11   recognizes that compliance costs have to be

12   factored into a business plan.  It is not a

13   prohibitive cost.  The cost -- again, no direct

14   testimony on this point.

15       But circumstantially and using your common

16   sense, think about this pressure relief valve about

17   which there's been so much testimony.  I'll address

18   this issue of whether it was in the permit or not

19   or whether it needed to be.  But common sense is

20   going to tell you this is not a big ticket item to

21   fix or to adjust.

22       The costs of compliance was one that the

23   company itself undertook by blanking off this valve

24   in early 2010, and making other accommodations

25   throughout the plant in order to manage the

1    pressure.  This too is not a substantial cost that

2    reasonably and rationally would drive criminal

3    misconduct.

4        Lastly, with regard to the RCRA counts, the

5    management of these hazardous wastes, we know from

6    the testimony that this concrete pad was installed

7    in 1994 out in the coal fields.  The testimony was

8    consistent from a number of witnesses that it was

9    installed because some offsite material was being

10   brought in, could not be recycled right away, and

11   was going to be stored on this concrete pad.  And

12   that's what it was mainly used for.

13       Sometimes the K087 from by-products was moved

14   to the pad before it was mixed.  But the reason for

15   the installation of that pad, the testimony is

16   uncontradicted, was to store and manage this

17   offsite waste.

18       So what would be the cost of compliance to the

19   company for using the pad for mixing of the coal

20   tar sludge from the by-products or for the material

21   from the tank for that matter?  Absolutely zero.

22   The pad was already there.

23       So there is a certain degree of illogic and

24   disconnect in this government's primary theory

25   about why this company engaged in conduct that the

1    government alleges was a violation.  The

2    government's theory in this regard, we submit to

3    you, its overarching theory about this case simply

4    doesn't hold together when the actual costs of what

5    would be the compliance measures are weighed with

6    your own common sense and judgment.  These are not

7    substantial issues.

8        I also ask you as a matter of perspective and

9    judgment as you weigh this evidence to consider

10   what we submit the evidence has shown to be a

11   certain degree of cherry picking and

12   mischaracterization of evidence and integrity of

13   evidence that is questionable and unreliable that

14   has been presented to you by the government.

15       And one example I want to offer -- and I didn't

16   hear Mr. Mango address this in his summation.  But

17   you heard the testimony presented to you by the

18   government of Pete Dolan and Frankie Gonzalez about

19   this practice they sometimes engaged in in lowering

20   the back pressure on the ovens before the 303

21   inspector would come.  And the implication there,

22   and the point that the government was seeking you

23   to take from this was, see, this is a company that

24   is trying to actively deceive the 303 inspectors.

25       But the problem is, and I suggest perhaps the

1    reason Mr. Mango didn't address it in his summation

2    is that that characterization blew up as soon as

3    Mr. Priamo took the stand.  And Dan Heukrath took

4    the stand and said, wait a minute, we heard about

5    these guys that sometimes were tinkering with this

6    back pressure.  That was against the policy that we

7    were trying to instill in the operation of this

8    battery.  We reprimanded them.  Mr. Priamo

9    testified that he even had to put an extra man on

10   Pete Dolan's shift to help him properly perform the

11   sealing and maintenance functions that are required

12   to help him avoid the shortcuts he was taking.

13       And then you may recall, Mr. Priamo testified

14   he even had to take away Mr. Dolan's chess set,

15   because that's what Mr. Dolan was doing on the

16   battery instead of properly performing his

17   maintenance activities.

18       That evidence, I submit to you, is unreliable.

19   It is a mischaracterization.  It is a suggestion

20   that this misconduct by a couple of employees

21   should somehow be imputed to this company and

22   company policy.  But Mr. Priamo, you may remember

23   on cross-examination now, a government witness on

24   cross-examination, made it clear that that -- that

25   the conduct that was referenced by Mr. Dolan and by

1       Mr. Gonzalez was just that, misconduct, and was not

2       to be condoned.

3           There was another thread of evidence elicited

4       from the government's witnesses.  You may recall,

5       and, again, not something Mr. Mango referenced,

6       about this practice of stopping visitors at the

7       guard gate.  And somehow the inference was to

8       detain them or defer them from coming into the

9       plant.  But that also misfired when it became clear

10      from a number of witnesses, and what you can infer

11      from your own common sense, that that practice is

12      standard operating procedure at industrial

13      facilities.  It is a mandatory safety requirement

14      for visiters coming on.  Even when a fire chief

15      comes to a facility, if the guard doesn't

16      understand the reason for that person being there

17      or who they may be, they're not just going to

18      provide free access.  You cannot just permit

19      visitors to stroll around an industrial plant.

20          That evidence too was misapplied,

21      mischaracterized, and I suggest shows you a

22      problem, a fundamental problem with the integrity

23      of the evidence the government has offered.

24          I also ask you to weigh what are certain

25      logical gaps and holes in the government's

1    evidence, and as you assess the credibility of

2    particular witnesses and the overall presentation,

3    ask yourself a couple of these questions, why is

4    it, for example, that it was the defense that had

5    to call Gary Foersch as a witness in this trial?

6    Gary Foersch, who, unquestionably, was the lead

7    principle contact from DEC with Tonawanda Coke for

8    30 years.  We called him.  We called him so you

9    could hear his testimony.  Why is that, ladies and

10   gentlemen?

11       Why is it also that we called Ken Eng, the EPA

12   official from New York?  Why did we have to present

13   that evidence to you?  And we will return to Mr.

14   Eng in a few moments about what we think to be a

15   particularly telling example of EPA's perspective

16   on this case.  I'll come back to that when we

17   discuss the issues of baffles.

18       These are the kinds of things I'm talking about

19   though, ladies and gentlemen, when I ask you to

20   keep all of this evidence in perspective.  You need

21   to drill down, you need to understand the details,

22   but you also need to understand how those details

23   fit with what has been a very long history of

24   interaction by Tonawanda Coke and Mr. Kamholz with

25   the regulators responsible for overseeing

1    environmental compliance.

2        Let me turn to talk about the particular groups

3    of charges, and I am going to talk about them in

4    groups that are contained in the indictment.  But

5    before I do, I need to ask you -- Chief Judge

6    Skretny will instruct you on this, of course.  I

7    know he has mentioned it a number of times

8    throughout the course of the trial.  But there can

9    hardly be any more important point here, and that

10   is as to each and every fact you are asked to

11   consider, your charge, your duty as jurors is to

12   ask yourself whether the government through its

13   evidence from the witness stand has proven that

14   fact beyond a reasonable doubt.  And you will

15   receive an instruction -- you did receive an

16   instruction on what reasonable doubt means.

17       But it is that kind of evidence, ladies and

18   gentlemen, that a reasonable person would not

19   hesitate to rely or act upon in the most important

20   affairs of his or her life.  That is a very high

21   burden.  And we submit to you that the government's

22   proof has fallen far short of that standard in a

23   number of respects that I will be discussing with

24   you.

25       Now I want to turn first to the first group of

1    counts, Counts 1 through 5 of the indictment
2    regarding this pressure relief valve.  And before I
3    get into the elements that I want to ask you to
4    consider particularly there, I want to also ask you
5    to think about the evidence concerning that PRV in
6    some perspective.  There is no doubt and we can
7    clear this out, there is no controversy that this
8    pressure relief valve in the by-products department
9    was not included in Tonawanda Coke's Title V
10   application.  It was not in its Title V permit.
11   But the story about that valve doesn't begin there,
12   as the evidence has shown you.
13       But as you consider that permit, as you think
14   about what the meaning is that that valve is not in
15   that permit, we ask you to take a look at that
16   whole permit, take a look at the level of detail,
17   the volume of information that is contained in the
18   permit application and then reflected in the permit
19   itself.  Ask you if that level of disclosure, that
20   level of detail is consistent with a company that
21   is trying to hide something important.  How does
22   that fit in context?  What does the rest of this
23   permit tell us?  It must tell us something about
24   how significant or insignificant this pressure
25   relief valve actually is.

1          Literally hundreds of vessels, tanks, valves

2     and other components listed in this -- in this

3     permit application and in the permit itself.  Take

4     a look at it in its entirety as you evaluate this

5     evidence of the pressure relief valve.

6          The second point and the government put up a

7     picture -- I'm not going do it.  I think we've all

8     probably seen it enough.  If a company was

9     attempting to hide or conceal or somehow deceive

10    regulators, would they in their right minds have

11    placed a pressure relief valve in what could be no

12    more obvious location in the by-products area than

13    where it was?  The location of that valve itself

14    tells you something.  And clear and obvious I think

15    is a fair description from whatever angle the

16    picture is taken, whether it was on the top of the

17    battery as Mr. Mango's photo was taken, from the

18    ground itself.  The location of this valve tells

19    you something about the intentions of the company

20    that installed it.

21         It also tells you something, and we don't

22    dispute that this 2003 HAPS inventory that

23    Mr. Mango referenced in his summation, that was not

24    a supplement to the permit.  It was not a request

25    to change or amend the permit.  But there is no

1    doubt that that information, that information about

2    the pressure relief valve on the coke oven gas

3    system was explicitly and expressly provided to

4    DEC, the very regulators that issued the permit,

5    and then to EPA.  Clear as day in the document.

6    Nonsense, I think not.

7        What does it tell you about the actual

8    intentions of the person submitting a document like

9    that?  We submit to you that all of this background

10    information that I've just asked you to reflect on

11    demonstrates not that Tonawanda Coke was acting in

12    some way to conceal the presence of this pressure

13    relief valve, but was acting on a belief, rightly

14    or wrongly, but acting on a belief that it was

15    simply not necessary to include this particular

16    valve in its Title V permit.

17        You saw a number of exchanges between the

18    company and the regulators about exemptions and

19    exclusions from permits.  And ask yourself, ladies

20    and gentlemen, whether or not that background

21    context that I've just outlined for you isn't

22    suggestive of just that with regard to this valve.

23        We also ask you to consider this pressure

24    relief valve, not just in the context of the

25    permit, but in the context of the overall

1    activities of this plant.  Where does this valve

2    fit in terms of comparative and relative

3    significance for this coke producing facility?

4        You heard testimony that the battery itself, 60

5    separate ovens, 120 doors with lids throughout the

6    top of the battery emitted raw coke oven gas 24

7    hours a day, seven days a week, 365 days a year.

8    That was understood.  It was recognized by the

9    inspectors.  It was expected that the company would

10   do what it could to minimize those releases,

11   minimize the leaks of raw coke oven gas.  But this

12   was a recognized function of a properly functioning

13   coke oven battery.  That's part of the context of

14   this plant.

15       There was also regular monitoring of the stack

16   emissions from the boiler house and from the waste

17   heat stack.  Tests of actual opacity limits and

18   components from emissions in these stacks, major

19   emissions from these stacks.  How does that compare

20   to the 4-inch pressure relief valve in by-products?

21       Also as you're considering this pressure relief

22   valve you may not -- it may not have registered as

23   the evidence came in, but I ask you to recall and

24   take a look at Government Exhibit 92, which was

25   read -- a portion of which was read into evidence.

1          It was an Air 100 permit issued by DEC in 2000 to

2     Tonawanda Coke, and it related to a proposal to

3     deactivate a piece of equipment in the by-products

4     area, the desulfurizer in the by-products area.

5     And in that document DEC itself took a look at the

6     potential benefits and trade-offs for deactivating

7     this piece of equipment, and described -- and these

8     are its words -- describe the fact that after coke

9     oven gas is passed through the by-products area in

10    this plant, it is purified gas.  Purified.  And the

11    testimony is uncontradicted that this pressure

12    relief valve was downstream of this by-products

13    department.

14         And so, it is simply not logical when you think

15    of it in this context that Tonawanda for some

16    reason would have sought to conceal this

17    comparatively minor emission source from DEC itself

18    when that agency has described it -- the gas that's

19    flowing at that point as purified gas, and you're

20    comparing releases from a 4-inch pipe to the

21    releases that are occurring on a daily and hourly

22    basis from the ovens.

23         Now, I want to comment on one particular point

24    that Mr. Mango also made in this regard about the

25    April '09 inspection, the joint inspection.  And he

1    referenced the testimony from Miss Hamre, as you

2    may recall.  Miss Hamre who had taken some notes at

3    the orientation meeting.  And there was a notation

4    in her notes and you saw -- no, you didn't see it.

5    A notation in her notes that there was no PRV.  And

6    Mr. Mango in his summation suggested to you again

7    that this was a statement from Mark Kamholz at this

8    orientation meeting declaring there's no PRV in

9    this facility.

10        I submit to you that the testimony of

11   Miss Hamre was something quite different.  The

12   testimony of Miss Hamre as you may remember is that

13   when you actually walked through the notes and took

14   comment in her notes in context that she was

15   talking and referencing a discussion about the

16   battery, a location where there was no pressure

17   relief valve.  Who in his or her right mind, when

18   sitting and meeting with a group of EPA and NEIC

19   inspectors, knowing there's this pressure relief

20   valve on the coke oven gas line out in by-products,

21   knowing that seven years -- six years previous

22   you've submitted a statement saying, hey, we have a

23   PRV up here, who in their right mind would sit

24   there and say no, no, there's no PRV anywhere in

25   this plant?  That is a mischaracterization of the

1    testimony.  It is a characterization, I submit to

2    you, that flies in the face of common sense.

3        Now, let me talk about some of the particular

4    elements that the government is required to prove

5    beyond a reasonable doubt for each of these five

6    counts that relate to the PRV, and I'm actually

7    going to be talking about one count -- one of the

8    elements, but a couple of issues with regard to

9    that element.  And as Mr. Mango said, we can talk

10   about these counts in a group, because they're

11   really just broken up by year, '05, '06, '07, '08,

12   '09.  The elements are going to be the same.

13       You may recall that when Mr. Carlacci testified

14   and Mr. Sitzman testified, two of the

15   representatives from DEC's air emissions office, I

16   asked them a number of questions regarding the

17   regulatory definition of an emission source and

18   emission point.  And both of them acknowledged and

19   agreed that those are two different concepts under

20   the regulations.  Both of them agreed that -- and

21   you will be given a definition in the Court's

22   instruction on this point.  An emission source

23   under the definition, it's true it does say machine

24   or apparatus, but it is a machine or apparatus

25   causing an emission.  That's what a source is.

1          An emission point -- and both witnesses agreed

2     on these definitions -- an emission point is a

3     conduit, a chimney, a duct, a vent, a flu, or an

4     opening of any kind through which emissions are

5     released into the atmosphere.

6          The testimony in this case, ladies and

7     gentlemen, is uncontradicted that to the extent

8     anything was released through that pressure relief

9     valve, the cause, the cause of that release was

10    either the mechanism in the ovens themselves that

11    were reversing and causing a backup in the

12    pressure, or the exhausters that were situated in

13    the by-products department which created pressure

14    on that point of the line.  The testimony is

15    uncontradicted that this pressure relief valve was

16    nothing more than a passive conduit, a passive vent

17    through which releases were caused by other

18    components in the facility.

19         This is the literal language of the

20    definitions.  It is a common sense application of

21    those definitions to the terms that are charged in

22    each of these five counts.  If the government

23    hasn't proven beyond a reasonable doubt that the

24    pressure relief valve is an emission source, their

25    proof on these counts, on each of the counts fails.

1          You also may recall in the direct testimony of

2     both Mr. Carlacci and Mr. Sitzman there was

3     testimony from both of those witnesses that, yes,

4     this valve should have been included in the permit.

5     Failure to include this valve in the permit was a

6     violation of condition four of the facility's

7     Title V permit.  That was about as deep as the

8     analysis went on direct examination.

9          But you may remember on cross-examination we

10    called up condition four, and we actually asked the

11    witnesses to walk through what condition four

12    actually says.  And, ladies and gentlemen, that's

13    what you need to do too.  Because the indictment

14    charges that the operation of this valve was a

15    violation of that condition.  And if you remember,

16    condition four in the permit says that if, if an

17    emission source was the subject of permitting

18    requirements under the New York regulations at the

19    time of construction or modification, then it

20    needed to be put in the permit.

21         You may remember that neither Mr. Sitzman nor

22    Mr. Carlacci had any idea, had not inquired, had

23    not asked the company when this valve was

24    constructed.  And by the way, is it surprising that

25    when asked at the joint inspection of April of

1    '09 that Mr. Kamholz didn't know when this valve

2    was constructed?  Not a single witness who's

3    testified here knew when that valve was

4    constructed.  But certainly not the government's

5    witnesses who were asked to apply this regulation.

6    They had no idea when it was constructed, either of

7    them.

8        Mr. Carlacci, when I asked him well, so when

9    was this valve modified?  Do you know when it was

10   modified?  He testified he did not know.  And we

11   talked a little bit about the definition of

12   modification.  And I walked him through what's in

13   that language, and the Judge will give you that

14   language as well.

15       But the modification is very -- the definition

16   is very specific.  It means a physical change in

17   the method of operation of an incinerator, that's

18   not this situation, or a stationary combustion

19   installation, that's not a PRV, or a process.  And

20   if you may recall, when I asked Mr. Carlacci

21   whether the PRV was a process, he testified no, it

22   was not a process.

23       Now, Mr. Sitzman did testify that in his

24   opinion it was a process, this valve was a process.

25   And he did testify that any adjustments or changes

1    in the set point would, in his opinion, constitute

2    a modification.  But I ask you to weigh the

3    government's own evidence on this point.  Their two

4    Clean Air Act witnesses are in direct contradiction

5    of one another about the literal terms of this

6    condition that governs these five counts.  And when

7    I asked Mr. Sitzman well, can you show me one other

8    process in this permit that is confined to a single

9    valve?  He was not able to do it.

10       You will have the ability to look at this

11   permit.  You will look at how processes are treated

12   in this permit.  And I ask yourself using your

13   common sense, using your good judgment and

14   intelligence, whether or not the testimony of

15   Mr. Sitzman holds water on this point.  Failing

16   that, the government's evidence here fails as well,

17   and fails fatally for each of these five counts.

18       Let me turn then to the next group of five

19   counts in the indictment, and that would be

20   Counts 6 through 10, and those relate to the

21   absence of baffles in this western quench tower,

22   quench tower number 1.  No debate on this issue.

23   Quench tower number 1 did not have baffles at any

24   period of time relevant to this indictment.  No

25   real debate -- as we submit the evidence shows, no

1    real debate in 1984 DEC granted Tonawanda Coke an

2    exemption and said you don't need baffles in quench

3    tower number 4 [sic], again weighing the cost

4    benefit analysis of the cost of installing baffles

5    versus the potential minor benefit that baffles may

6    achieve.

7        Gary Foersch testified just a few days ago when

8    we called him to testify, that it was his

9    understanding that this exemption for baffles in

10   quench tower number 1 continued until he retired,

11   which was November of 2009.  But it's not just Gary

12   Foersch's testimony.

13       You may remember that in October of 2009 DEC

14   sent out a Notice of Violation, one of these NOV's,

15   about the baffles to Tonawanda Coke.  And that NOV

16   from DEC only talked about the baffles in quench

17   tower number 2, the eastern baffles, and said

18   install baffles in that tower.

19       I submit to you, we submit to you that that NOV

20   from the agency itself signed by Mr. Sitzman

21   recognizes that even as of October of 2009 the

22   agency itself recognized that this exemption still

23   applied to quench tower number 1, even though, as

24   we all know, it had been inadvertently left out of

25   the actual Title V permit.  There would be no other

1    reason for DEC to only require baffles in quench

2    tower number 2, unless they recognize that this

3    exemption was valid and applied, and therefore no

4    baffles were required for that western quench

5    tower.

6        Now Mr. Mango made some reference to the

7    testimony that's been introduced about the

8    percentage of usage for this quench tower number 1

9    and whether somehow the testimony is sufficient to

10   demonstrate that quench tower number 1 was used

11   beyond this 10 percent limit that is built into the

12   exemption.  I ask yourself, first of all, as you

13   think about this evidence, why is it that the

14   government, in producing this evidence to you,

15   relied primarily upon witnesses who had only

16   incidental or occasional contact with these

17   baffles?  Why is it that they have clung to those

18   phrases that these witnesses have given to them,

19   used alternatively?  Why is it that those witnesses

20   do not recall the testimony -- the fact that was

21   established through the testimony of other

22   witnesses that quench tower number 1 during this

23   relevant time period, '05 to '09, was actually out

24   of service completely for years, a period of years?

25        As you consider the evidence that Mr. Mango

1    referenced in his summation, I ask you also to

2    consider the testimony, again elicited on

3    cross-examination, from Mr. Dan Heukrath, who

4    testified directly, yeah, quench tower number 1 was

5    out of service for several years.  It was back in

6    service around 2008, and he specifically remembered

7    then that he was instructed by Mr. Kamholz, hey,

8    we're using this tower again, but remember, we're

9    not using it more than 10 percent of the time.

10        Mr. Priamo also testified that that quench

11   tower number 1 was out of service for several years

12   and was used infrequently even when it was in

13   service.  Mr. Brossack himself said as we recall --

14   and all of this came out on cross-examination of

15   these witnesses -- number 2, the east quench tower,

16   was the one used predominantly.  Number 1 was used

17   only from time to time in the winter to keep the

18   pipes from freezing.

19        Now that is not evidence you heard referenced

20   in Mr. Mango's summation, and I suggest to you that

21   the testimony from those three witnesses alone is

22   sufficient to demonstrate that quench tower number

23   1, first of all, was out of service for years

24   during this relevant time period.  We don't know

25   exactly which ones, but for years.  And when it was

1    being used, it was used sporadically and used

2    infrequently.

3         The weight of the evidence about this usage of

4    quench tower number 1 demonstrates, we submit to

5    you, that its usage was consistent with and

6    compliant with this condition that was placed on

7    the exemption, the exemption that the agency itself

8    knew was in effect when it issued its Notice of

9    Violation in October of 2009, that Mr. Foersch knew

10   was in effect for quench tower number 1 when he

11   retired in November of 2009.

12        There's another significant piece of evidence

13   on this issue that I'm going to ask you to take a

14   look at, and I think this is the only exhibit I'm

15   going to be calling up at this point.  But could we

16   have, please, Government Exhibit 3518.04.  And go

17   to the second page of this document and enlarge the

18   top half please.

19        You may recall that this was an exhibit that

20   was introduced by the defense when we called Mr.

21   Eng to testify in our case.  Mr. Eng was the chief

22   of the air resources office in New York.  He had

23   only incidental contact with the air inspections at

24   this facility, but as of the end of 2009, he

25   testified that he got a call -- DEC had already

1    issued this NOV I was talking about.  And then in

2    December of 2009 EPA issues its own separate Notice

3    of Violation, and it requires baffles in both

4    quench towers.  And so Mr. Sitzman calls Mr. Eng,

5    that's precisely what Mr. Eng said, and Mr. Sitzman

6    said as is recited in here, "The west quench tower

7    has a history behind it.  In speaking to Larry

8    Sitzman of the NYS DEC, he said that the state and

9    TCC had an agreement, parentheses, memorialized in

10   some letter which Larry will send me a copy of,

11   close paren, that as long as TCC only uses this

12   quench tower for backup duty, less than 10 percent

13   of the time, that the state would not require

14   baffles."

15       And then we have what I think is a very telling

16   acknowledgment and a very revealing insight into

17   the judgments made by EPA in 2009 that directly

18   resulted in the charges in this case.

19       Mr. Eng wrote, "Although TCC had in its Title V

20   permit application a request not to have to install

21   baffles for this quench tower, citing this prior

22   agreement with the state, the current Title V

23   permit, paren, which has since expired and has not

24   yet been renewed, does not acknowledge this

25   agreement.  The state accidentally left this

1    provision out and TCC never caught it."

2        Mr. Eng understands there was an exemption.

3    He's been told by DEC.  There is a letter

4    memorializing this.  He recognizes there was a

5    mistake in not incorporating it in the very permit

6    that is the essence of Counts 6 through 10 of this

7    indictment.  And he makes the decision, as

8    reflected in this memo, a decision that I suggest

9    reflects a stacked deck mentality on the part of

10   this agency, an overzealous mentality with respect

11   to enforcement, a mentality that states we need not

12   bother with these details.  I don't need to wait

13   until I get this letter from Sitzman.

14       Do you remember Mr. Eng said I never bothered

15   to follow-up.  I never inquired further.  No need

16   to evaluate fairly whether this exemption the DEC

17   understood still existed was valid and should be

18   honored.  DEC missed it.  Tonawanda didn't catch

19   it.  So the Title V permit on its face requires

20   baffles in quench tower number 1.  Let's let

21   Tonawanda argue itself out of this one if it can.

22       I submit to you that is the mentality that is

23   betrayed by this email.  And it is not a mentality

24   that is consistent with straight dealing and fair

25   dealing.  It is a mentality that relates directly

1    to Counts 6 through 10 of this indictment.  And I

2    submit to you that the overwhelming weight of this

3    evidence shows that there was a valid exemption,

4    that there is no credible evidence that the company

5    somehow exceeded this limitation during a year's

6    period of time, because that's what -- that is the

7    test.  Mr. Sitzman said ten percent of the time

8    over a year's period of time.  And that doesn't

9    mean there couldn't be incidental usages from this

10   week to that that might extend 10 percent on any

11   spot check.

12       But the instructions you will get on these

13   counts will tell you if there was a valid

14   exemption, then the government's proof has failed.

15   And we submit to you that's precisely what the

16   evidence shows you.  That with regard to these five

17   counts of this indictment, the government has

18   proceeded knowing there was an exemption, just as

19   Mr. Eng suggested in his memo he was going to do.

20       At a minimum I suggest to you that the evidence

21   I've just outlined demonstrates there is clearly

22   and inarguably a reasonable doubt as to whether the

23   government has proven these counts.

24       Let me talk next about the next group of quench

25   tower counts, that's Counts 11 through 15, and

1    those are the counts that relate to the eastern

2    quench tower, quench tower number 2.

3        Now, we can clear, I think, some of the brush

4    out of the way on these counts.  There hasn't been

5    any contradiction in the evidence that there is

6    this 1996 letter from DEC that says, hey, look,

7    we're going to prove you're lowering this quench

8    tower number 2, but we remind you you've got to

9    have baffles in that -- in that quench tower.  That

10   letter's there.  We don't dispute it.  We also

11   don't dispute that the Title V permit itself states

12   you have to have baffles in quench tower number 2.

13       But the evidence doesn't really stop there,

14   because what we also have -- and this is part of

15   the context that I've asked you to keep in mind as

16   you weigh that particular evidence with respect to

17   these counts -- you have a context of interaction

18   between Gary Foersch and Mr. Kamholz and Tonawanda

19   for a 13-year period of time.

20       Thirteen years, from '96 when this letter first

21   goes out approving the lowering of the quench

22   tower, till 2009, when the joint inspection occurs,

23   and there is an official recognition that there are

24   no baffles in this quench tower.  What you have and

25   we submit to you it is very revealing, and you and

1    you alone will be the judges of the credibility of

2    Mr. Foersch on this.  But we submit to you that

3    Mr. Foersch's testimony is important and

4    instructive and critical in assessing what that

5    13-year interval is.

6        Mr. Foersch testified that on multiple

7    occasions he and Mr. Kamholz had discussions about

8    whether these baffles were in any way effective or

9    whether they provided even minimal benefit.  And he

10   testified that he repeatedly agreed with

11   Mr. Kamholz that they didn't.  That they were not

12   significant, at least in Gary Foersch's mind.

13       He also agreed, as we recall the testimony,

14   with Mr. Kamholz's point that once you've lowered

15   this quench tower, the upward velocity is lessened,

16   and so the risk of particulate matter spreading

17   beyond the immediate localized area was reduced.

18   That's a matter of simple physics I suggest to you.

19       Mr. Foersch testified that after this permit

20   was issued in 2002, he looked up into the quench

21   tower, he saw there were no baffles up there.  He

22   did say, yeah, I said something to Mark, hey, you

23   got to get baffles installed.  But he also

24   testified that in his heart of hearts, and I think

25   this may have been the most sincere aspect of his

1      testimony.  In his heart of hearts he knew there

2      were no baffles in that quench tower.  I submit to

3      you he knew before he even looked up there.

4          Now, there were seven years between the time

5      that the permits issued and these inspections

6      in 2009.  And we understand, we heard the testimony

7      just as you did, that during this trial for the

8      very first time in all the times Mr. Foersch has

9      been interviewed, and despite the fact that he's

10     testified previously in the grand jury about these

11     issues, for the first time in testimony here he

12     recalled that Mark Kamholz told him oh, yeah, I've

13     installed baffles in that quench tower.

14         I ask you to weigh that testimony carefully.  I

15     ask you to weigh, first of all, whether it even

16     makes sense that Mark Kamholz, knowing that there

17     are no baffles in that quench tower, would tell a

18     regulator yes, there are.  Much like the no PRV in

19     the by-products department when it's sticking right

20     up there.  Why would he say something like that?  I

21     submit to you, ladies and gentlemen, that that

22     piece of testimony from Gary Foersch is nothing but

23     a fig leaf, a fig leaf that permitted him to save

24     some face in what had to have been a very

25     embarrassing and difficult position for him.

1    He knew and the record demonstrates that he

2    interacted with this facility for 13 years after

3    the 1996 letter, and this was a matter that was

4    simply not important to him.  He communicated that

5    to Mr. Kamholz.  At no time in those 13 years did

6    he ever tell Mr. Kamholz in any official way, hey,

7    you got to install baffles in here.

8        And the course of conduct, we submit to you,

9    shows that this agency, DEC through the person of

10   Gary Foersch, knew there were no baffles in that

11   second quench tower and simply accepted it,

12   regardless of what the literal language in Title V

13   permit was.  That's what this evidence shows.

14       He exercised his discretion and the company and

15   Mr. Kamholz reasonably relied on the interaction of

16   the regulator that was assigned to them in

17   interpreting and understanding what were the real

18   requirements of this permit.

19       Now I'll come back to these five counts when we

20   talk about the entrapment by estoppel defense.

21       Let me turn now to the RCRA counts.  And I want

22   to say I'm not going to be specifically addressing

23   in my summation this Count 16, the obstruction of

24   justice count.  Mr. Personius will be talking to

25   you directly about that.  But before I move on to

1    RCRA, I want to say to you it is imperative with

2    that count as well that you take a look at that

3    evidence in context.  Take a look at that evidence,

4    not just the moment that is looked at under a

5    microscope in this exchange between Mr. Cahill and

6    Mark Kamholz.  But look at it in a broader context

7    that we submit to you is important in evaluating

8    what that interaction actually meant and what it

9    didn't mean.

10        The RCRA counts and I'm going to talk about

11    them in somewhat reverse order.  I'm going to talk

12    about Count 19 first, because Count 19, as you may

13    remember, relates to the overall management of this

14    K087 material that was the material generated from

15    the ongoing process.  I'll talk about 17 and 18 in

16    a minute, the material from the tanks.

17        As we -- as you consider these counts, I ask

18    you to look at 20 years of history that Mr. Mango

19    did not say a single word about.  Mr. Mango

20    referenced the testimony of Mr. Flax and

21    Mr. Strickland.  But as you know, the testimony,

22    the evidence about these RCRA issues at Tonawanda

23    goes back to the '80s.  It goes back to the '80s,

24    and in order to understand what actually was meant

25    and what was required and what was understood by

1    Tonawanda in 2009, you've got to go back to the

2    history of the regulatory interaction regarding the

3    very activities that are the subject of these

4    counts.

5        And what that evidence shows, no dispute,

6    uncontradicted evidence that in '86, Tonawanda

7    through the person of Mark Kamholz notified EPA,

8    hey, we generate this K087 here and we recycle it.

9    They repeated that notification two years later in

10   1988.  And they say, yes, we generate more than

11   they even said at that point.  We are a

12   large-quantity generator.  We generate more than a

13   thousand kilograms a month.  But we recycle it.

14       The very next year you have a DEC RCRA

15   compliance inspection, and you may recall seeing

16   the report of that inspection that goes into some

17   detail, handwriting out in the margins and all over

18   the form about this recycling activity.

19       Now, I concede to you that that report doesn't

20   precisely say well, this recycling occurs by the

21   placement of this K087 on top of the coal piles in

22   the coal field.  Those words are not in there.  But

23   as you look at that report, as you evaluate what is

24   being communicated there, recognize that this

25   inspection in '89 is five years before there was

1    any concrete pad at this facility.  It is the very

2    first RCRA compliance inspection this facility has

3    had.  The first inspection.  The facility has an

4    EPA generator ID number.  They've told the

5    authorities we generate K087.  The purpose of this

6    inspector going to the facility is to understand

7    how this facility manages the very waste material

8    they've notified that they generate.

9        The report itself on its face tells us the

10   inspectors stayed at Tonawanda for two hours.  Two

11   hours for this inspection.  And that report

12   concluded, consistent with all of the other RCRA

13   compliance inspection reports, that Tonawanda was

14   recycling this K087 into the ovens.  There was no

15   disposal occurring.  The plant was properly

16   qualified, not as a large-quantity generator, but

17   as a small-quantity generator, because the bulk of

18   this K087 was being recycled, and therefore didn't

19   count in that small quantity, large quantity

20   equation, and that no RCRA permit was required.

21   Those are the findings consistently in the

22   '89 inspection report, the '90 inspection report,

23   the 2001 inspection report, and the 2007 inspection

24   report.

25       This is the backdrop, ladies and gentlemen, to

1    your evaluation of the testimony concerning the

2    experts who were offered in this case on the RCRA

3    compliance issues.  The testimony is uncontradicted

4    throughout these 20 years.  From '89 to 2009

5    Tonawanda recycled the vast majority of this K087

6    in the precise same manner that is at issue in the

7    Count 19 and Count 18 of this indictment.  By

8    scooping it up, placing it on the coal piles,

9    mixing it with the coal and putting it in the

10   ovens.

11       It defies common sense and flies in the face of

12   logic and flies in the face of the overwhelming

13   weight of the evidence to somehow suggest that DEC

14   over these 20 years simply didn't understand how

15   this company was recycling this K087.  That appears

16   to be the posture of the government's approach

17   through this 20 years of regulatory interaction.

18   There was silence in the government's closing

19   summation.  And you can't fairly and reasonably

20   weigh the evidence about these counts without

21   thoroughly and completely understanding and taking

22   into account that 20-year history.

23       The only thing that changed, ladies and

24   gentlemen, in 2009 is that a new sheriff came to

25   Tonawanda Coke in the form of EPA RCRA inspectors.

1   And you may recall the testimony of Mr. Corbett

2   that when these EPA inspectors came into town, they

3   didn't bother to look at this regulatory history.

4   They didn't review the file.  They didn't

5   understand the background or course of interaction

6   between the company and DEC.  They went out to the

7   facility and Mark Kamholz told them in June of 2009

8   what I submit the evidence shows that he had been

9   telling regulators for the 20 years previous.  This

10  is how we were recycling this material.  We know

11  it's why you're here.  This is how we do it.  And

12  he told them the exact same thing in June of 2009.

13  But there were different ears listening, and there

14  were different judgments being made.

15      He even told them in June of 2009, and by the

16  way, this material down in the tank, we intend --

17  we are going to use some of this material to --

18  excavate some of this material and recycle it in

19  the same way.  And not a single person, not one

20  person in that group of RCRA inspectors that

21  visited the facility in June of 2009 said a word.

22  They didn't raise any issues.  They didn't say,

23  hey, wait a minute, you need to do this

24  differently.  They remained silent, and they knew

25  it.  Not only that this is how they had been doing

1      it, but how they were planning to do it.

2           And now Tonawanda and Mark Kamholz with respect

3      to Count 18 stand charged with a crime for doing in

4      Count 18 exactly what they told the RCRA regulators

5      they were going to do, recycling some of that

6      material from the tanks on to the coal piles.

7           Let me talk a little bit about the RCRA experts

8      that you've heard with respect to these counts.  As

9      you know we presented the testimony of Marcia

10     Williams.  I plead guilty, as Mr. Mango has

11     charged, to sparing you the testimony of yet

12     another RCRA witness, expert witness.  We decided

13     not to call Mr. Johnson to testify.

14          But focus, if you will, on Miss Williams, and I

15     ask you as you're thinking about what the testimony

16     was from these witnesses, as the Judge has told

17     you, you are to weigh the testimony of these

18     witnesses just as you would that of any other

19     person.  You weigh to assess their credibility,

20     whether they appear knowledgeable, whether they

21     knew what they were talking about.  And you're to

22     rely on that testimony only if you find it to be

23     credible and reliable.

24          I submit to you that Miss Williams came into

25     this courtroom and testified in a very credible

1    manner.  She was prepared.  She had done her

2    homework.  She had read the indictment and knew

3    what the charges were.  She had read the documents

4    about the case.  She had seen photographs of the

5    facility.  She had read testimony that was

6    introduced in the trial regarding the relevant

7    witnesses.  And I submit to you that she did all of

8    this before rendering any opinions.  And she

9    explained to you her conclusions that I think are

10    very important, and I trust will be valuable to you

11    as you weigh these charges in Counts 17, 18 and 19.

12        She testified that in her opinion this K087 was

13    not even considered a solid waste under the

14    regulatory definitions because it was recycled as a

15    part of a continuous manufacturing process, and

16    also because it was a secondary material from the

17    coke manufacturing process that was legitimately

18    recycled for direct use as a feed stock.

19        But then I asked her, you may remember, all

20    right, well, assume for a moment this did qualify

21    as a solid waste.  Does it satisfy this other

22    exemption that you've heard a lot of testimony

23    about, the regulatory numbers 261.4(a)(10).  And

24    she said in her judgment and in her opinion that

25    the manner in which this material was recycled,

1    both the K087 and the D018 from the tanks did, in

2    fact, satisfy that exemption, that it was the

3    legitimate recycling, and that the mixture of this

4    material on the coal piles in the coal fields did

5    not constitute land disposal as that term will be

6    defined to you by the Court.

7       And she demonstrated an understanding of that

8    definition, and as you read that definition -- I

9    will not recite it to you now.  You are going to be

10   asked to interpret those definitions as well

11   through the filter of your common sense and

12   judgment.  And ask yourselves with respect to the

13   management of this material from the K087 to the

14   D087 [sic] what was really going on at this plant?

15   What were they doing?  Were they land disposing

16   this material?

17      The evidence overall does not suggest that in

18   any way.  And the telling thing I submit, the

19   telling thing about Miss Williams' opinion is that

20   her opinion is entirely consistent with the

21   regulatory opinion that is reflected in the RCRA

22   compliance inspection reports from DEC from 1989

23   all the way up through and including 2007.  That is

24   an important piece of corroboration I suggest to

25   you.

1          Mr. Mango suggested -- I won't go into

2     detail -- that coal is the same as ground.  I think

3     that suggestion defies common sense.  I think it

4     flies in the face of the testimony.  The

5     recognition from every one of the RCRA experts that

6     coal in a coke production facility, coal is raw

7     material.  And the testimony from the witnesses who

8     knew something about it, the testimony was that the

9     coal in this coal field was anywhere between three

10    to six feet deep.  That's not irrelevant.  That's

11    not what ground is.  This is raw material.  And

12    this where this mixture and recycling occurred.

13         Miss Williams understood that.  The DEC RCRA

14    regulators inspected this facility for 20 years,

15    they also understood.

16         Now, that really touches on both 18 and 19

17    because the same principles are involved.  The same

18    charge is involved, disposal of hazardous waste

19    without a permit.  Miss Williams said no permit is

20    required for this legitimate recycling activity.

21    It is accepted from the definition of solid waste

22    for all the reasons I've just gone over.

23         Count 17, the one RCRA storage count relates to

24    this material that's on the ground around the

25    tanks.  And the key element there is this issue of

1    whether that material was actively managed by the

2    defendants.  Because if it was not actively

3    managed, this abandoned material, material

4    abandoned by a prior owner, if it was not actively

5    managed, it is not subject to the RCRA regulations.

6    So that becomes a key issue for you to grapple

7    with.  And you will get a definition there too from

8    the judge.  Ask yourself as you read through that

9    definition and as you apply your common sense to

10   that definition, was it really actively management

11   when they spread some coke breeze on this just to

12   harden the surface as Gerry Priamo testified?  Was

13   it active management when they spread some coke

14   breeze in order to facilitate heavy equipment

15   moving in that area?

16        Or was there, to the extent there may have been

17   some incidental movement of this material, was it

18   just that, incidental to the purpose of what was

19   really going on?  Use your common sense as you

20   evaluate this concept of active management through

21   the filter of the definition the Judge will give

22   you.

23        And by the way, that definition doesn't consist

24   of one word, as Mr. Mango suggested.  It is not

25   just disturb.  Because if you take that to its

1    logical conclusion, somebody walking past a pile of

2    material on the ground and throwing a rock into it

3    would have actively managed that material and

4    subjected it all to RCRA regulation.  That cannot

5    be what the definition means.  Common sense tells

6    us that.

7        In contrast to the testimony of Miss Williams,

8    and the 20-year history of regulatory interaction

9    with DEC regarding the management of RCRA regulated

10   waste, the government offered the testimony of

11   Mr. Strickland, and then the testimony of Mr. Flax,

12   and then the rebuttal testimony of Mr. Flax.

13       Mr. Strickland testified when he got on the

14   stand he had not reviewed the notifications that

15   Tonawanda had submitted to EPA.  He had reviewed

16   the DEC RCRA inspection report, but he hadn't

17   bothered to talk to Mr. Fisher, whom he knew and

18   was the author of that report.  And then he said,

19   and I think this is very telling when you evaluate

20   the weight to give his testimony, and the

21   significance with which he evaluated these prior

22   inspections, he testified as we recall that DEC --

23   the DEC RCRA inspectors may not have understood how

24   the mixing was being done.  May not have

25   understood.

1       That, ladies and gentlemen, is nothing more

2   than a guess.  And it is a guess I suggest to you

3   that flies in the face of the purpose of 20 years

4   of oversight.  And, quite honestly, is an insult to

5   the integrity of the very RCRA regulators that

6   inspected this facility.

7       Now Mr. Flax testified twice.  When he

8   testified initially he testified that he hadn't

9   looked at the DEC inspection reports before 2006.

10  He was not even aware that there had been

11  inspection before 1990.  He hadn't talked to any of

12  the DEC inspectors.  He didn't review the

13  investigative statements or trial testimony or any

14  other statements of witnesses.

15      He also testified in his first attempt at

16  discussing these issues that there was no need to

17  go through this business of solid waste.  The solid

18  waste trail, as he phrased it, because K087 is a

19  listed hazardous waste.  And without going into

20  detail, he reflected I think a tellingly incomplete

21  understanding even of what the charges were in this

22  case.  He thought there was one RCRA disposal

23  count.  He didn't understand the time period of the

24  RCRA storage count.

25      He testified the first time he was here, well,

1   I believe that the application of breeze was active

2   management.  But when I asked him he had no idea

3   why that breeze had even been applied.  He didn't

4   know.  He didn't know what the purpose was.  He

5   didn't know why it had been done.

6       But when he testified in rebuttal there were

7   some pretty significant changes in his testimony.

8   If you look at Government Exhibit 212, which was

9   displayed during the closing argument, all of a

10  sudden now Mr. Flax has a full-blown rationale as

11  to why this material doesn't satisfy the exclusions

12  from the solid waste definition.  He now had read

13  the three counts in the indictment, and he had a

14  thorough rationale as to why K087 and D018 were, in

15  fact, solid waste under that definition.  In fact,

16  he had also determined that coke is a fuel.  But

17  when I asked him, he couldn't cite to anyplace in

18  the regulations where it says that.

19      He said between his last testimony -- between

20  his first testimony and his last he had learned

21  about this concept of land based management units.

22  But he concluded, tellingly, consistent with his

23  earlier testimony, they have nothing to do with

24  this case, and there's reason to consider them.

25  They don't bear any relation to this issue of land

1    disposal or what it actually means under the regs.

2         I submit to you, ladies and gentlemen, that

3    Martha Williams' testimony and her opinions was

4    simply more credible than the opinions of the

5    experts offered by the government.  And again, at a

6    minimum, they are reason to have a -- they are

7    cause to have a reasonable doubt as to whether or

8    not a permit was required for any of the activities

9    described in Counts 17, 18 and 19.

10        I'm going to next and finally turn to this

11   issue of entrapment by estoppel.  Chief Judge

12   Skretny will provide an instruction on this.  As I

13   said a little bit ago, it is probably not a defense

14   that you've heard of before.  But it's been

15   determined that it applies in this case, and it is

16   an important defense.  It has kind of a fancy name,

17   but the fact is that the meaning of this defense,

18   we submit, is very simple and it's very direct.

19   And it is true that it is the burden of the defense

20   to establish this defense.

21        But there's a significant difference that

22   Mr. Mango didn't reference, and that is while the

23   government's burden in proving these charges is by

24   proof beyond a reasonable doubt, to establish this

25   defense, the defendants only need to prove the

1    components I'm about to discuss by a preponderance

2    of the evidence, and that means 51 percent.  That

3    means proof that something is more likely true than

4    not.  And the elements of this defense which you

5    will receive in the instruction are that the

6    government, in this case the DEC and the EPA

7    inspectors, led the defendants to reasonably

8    believe that they were authorized to engage in the

9    conduct that is now the subject of these charges.

10   That the defendants reasonably relied on statements

11   or conduct, and that means actions or failures to

12   act of these government officials.  And the

13   defendants don't have to show that the government

14   actually authorized the conduct, just that the

15   government and its agents seemingly or appeared to

16   authorize the conduct.  And that in one way or

17   another, the defendants reasonably disclosed this

18   conduct to the government before or at the time it

19   was authorized.

20       So how does that defense apply to these

21   charges?  Because there's another part of the

22   instruction, and it is this.  This entrapment by

23   estoppel defense doesn't somehow negate any of the

24   elements of any one of these offenses.  What it

25   does, and the Judge will instruct you.  This

1    applies to Counts 1 through 15 and 17, 18, and 19.

2    What it does is say this defense recognizes that

3    even though the government may have proved all of

4    the elements of a crime or any one of the crimes,

5    to convict the defendant for acts committed in

6    reasonable reliance on the conduct of the

7    government would violate due process and concepts

8    of fundamental fairness.

9        So even if the government has proven any of one

10   of these crimes beyond a reasonable doubt, this is

11   a complete defense and would require you to return

12   a verdict of not guilty if we have established the

13   elements I just outlined by a preponderance of the

14   evidence.

15       With regard to the pressure relief valve,

16   Counts 1 through 5, as I said, this component in

17   the by-products department was open and obvious on

18   this line since at least the 1970s.  The DEC

19   inspectors were at that plant at least -- the air

20   inspectors were at that plant at least once a year.

21   And as you consider that information about the

22   frequency of the visits, take into account also the

23   testimony that the government wants to emphasize

24   about how often this valve released.  How credible

25   is it?  How believable or plausible is it?  If this

1    valve is, in fact, releasing every 30 minutes or

2    nearly every 30 minutes, how plausible is it that

3    in all these years no DEC inspector ever happened

4    to see this thing?

5         In addition, Tonawanda expressly and explicitly

6    notified DEC and EPA that this pressure relief

7    valve was there in 2003 in that HAPS inventory

8    report.  Told them it existed.  Told them it was on

9    the coke oven gas line.  And then -- and we think

10   this is very telling evidence.  The testimony about

11   the April 2009 inspection, this air inspection

12   where there is quite a bit of discussion about this

13   pressure relief valve where the existence of the

14   valve is confirmed, where there is discussion with

15   Mr. Kamholz and Mr. Cahill and the regulators about

16   how the valve operates, about the fact that it

17   releases when the ovens reverse, the ovens cause

18   the release.  That the pressure is monitored in

19   this green shack and here are the pressure charts.

20   It was known to everyone at that point that this

21   device, this component, this valve was not in the

22   facility's Title V permit.  That was their

23   testimony, uncontradicted testimony.

24        And following this week-long inspection from

25   air inspectors from both DEC and EPA the company

3980

1     was not told, hey, you've got to blank off this

2     valve.  You've got to file an amendment to your

3     permit.  You have to do something to somehow amend

4     your submissions to the agency.  All they were told

5     was, listen, see what you can do to elevate the

6     pressure -- the set point for the valve, or

7     otherwise lower the system pressure in the coke

8     oven gas line.  That was all that was requested of

9     them by this whole panel of regulatory inspectors,

10    and that is exactly what they did.

11         If you were asked to do that based on that

12    information by an official, isn't it reasonable for

13    you to rely on the indication through that conduct

14    and those statements that this is permissible as

15    long as you make the adjustments that I'm asking

16    you to do.  And the evidence isn't in conflict

17    about this.  That evidence is uncontradicted.

18         We submit that this evidence establishes not

19    just by a preponderance, but very persuasively all

20    the evidence I've just outlined.  That Tonawanda

21    had reasonably disclosed the existence of this

22    valve before 2009.  That DEC and EPA had at least

23    seemingly authorized the PRV through their words,

24    their actions, and their inactions over many years.

25    And it was reasonable for Tonawanda and Mark

1    Kamholz to rely on that interaction, those

2    reactions from the regulators.

3         And finally, the last point of this defense is

4    that to convict Tonawanda for acts committed in

5    reasonable reliance on this conduct by the

6    government's representatives would, in fact,

7    violate fundamental concepts of fairness and due

8    process.  I won't go through all of the details,

9    but the same principles, ladies and gentlemen,

10   apply to the consideration for the requirement for

11   baffles in quench tower number 1.  That's the

12   quench tower that had this exemption.  How more

13   forceful could it be that the regulatory agency

14   that has had intimate contact with this company for

15   decades has told the company you have an exemption

16   for baffles, and so the company doesn't put baffles

17   in.  And now they stand before you charged with

18   five felony counts.  That's not fair.  It's an

19   unfairness that is reflected in the email I showed

20   you from Mr. Eng, and it is an unfairness that

21   infects this indictment.

22        With respect to your consideration of quench

23   tower number 2 and the baffles in quench tower

24   number 2, the focus of your consideration there

25   really turns on your assessment of the company's

1    interaction with Gary Foersch over the years that

2    this was an issue, from '96 all the way through

3    2009.  Thirteen years.  Ask yourself what was it

4    that Gary Foersch really communicated by his words,

5    by his conduct, his actions, and his inaction?

6    What did he communicate over those 13 years?  And

7    we submit to you that the evidence is clear that he

8    communicated baffles in quench tower number 2 are

9    just not important to me.  I'm not going to push

10   the issue.  I know it's in the permit.  We all know

11   it's in the permit.  But I'm not going to push

12   this, and I'm not going to make an issue.  And

13   Tonawanda and Mr. Kamholz relied on that

14   interaction in believing reasonably that that was

15   the judgment of the DEC inspector that was sent to

16   them to oversee compliance with this permit.

17       The same issue on this defense applies to each

18   of the RCRA counts as well, 17, 18 and 19.  What

19   was reasonable for Tonawanda to understand from

20   this 20 years of interaction with the DEC RCRA

21   regulators?  The only reasonable conclusion we

22   submit to you is Tonawanda reasonably understood --

23   first of all, they reasonably disclosed what they

24   were doing.  They raised their hand and said we've

25   got this material, we're recycling it.  They stood

1    for inspections at least four times in that 20

2    years, and were told again and again and again and

3    again you don't need a permit.  Your recycling

4    activity is sufficient.  You're a small-quantity

5    generator and there are no violations.

6        But the new sheriff in 2009 said differently.

7    EPA assesses this conduct, largely ignores this

8    regulatory history, and determines with this

9    stacked deck approach to enforcement that the

10   concept that is reflected in this indictment that

11   these were, in fact, criminal violations.

12       But ask yourself these questions, ladies and

13   gentlemen, not just with respect to the RCRA

14   counts, but all the counts in this indictment.  If

15   those were in fact criminal violations, why hadn't

16   DEC on its own previously concluded that these were

17   serious violations that warranted enforcement

18   action?  What had changed in 2009?  The activities

19   didn't change.  The activities didn't change at

20   all.

21       What changed is we have a new agency coming in

22   that's going to apply its own judgment and its own

23   gloss and without proper and fair consideration for

24   decades of regulatory interaction, make enforcement

25   decisions that have resulted directly in the

1    charges before you in this indictment.  I ask you

2    to remember as you think about these counts and

3    this defense, this defense is an absolute defense,

4    if we've shown it to you by a preponderance, an

5    absolute defense to Counts 1 through 15 and 17, 18

6    and 19.

7         Now, I will sit down in a moment, but you're

8    going to be asked to -- probably sometime

9    tomorrow -- retire, consider and weigh this

10   evidence and to ultimately reach unanimous

11   verdicts.  And as you do that, as you reflect on

12   this duty and your discharge of this duty, I ask

13   you to keep in mind that our word verdict comes

14   from an old Latin word, veredictum, which means to

15   speak the truth.  We submit to you that the

16   evidence in this case shows that the truth is the

17   government has failed to meet its burden of proof

18   beyond a reasonable doubt as to each of the counts

19   I have referenced.  The truth is that the conduct

20   that is the subject of this indictment was known to

21   and at least tacitly, if not explicitly authorized

22   by DEC for years.  And applying this law to the

23   facts and using your common sense and your

24   fundamental sense of fairness, we ask you to return

25   not guilty verdicts as to each count in this

1    indictment as to Tonawanda Coke.  I thank you very

2    much for your attention.

3              THE COURT:  Okay, Mr. Linsin, thank you.

4    How's the jury doing, ladies and gentlemen?  Doing

5    okay?  Okay.  Lets take 15 minutes, and we'll bring

6    you back in a little bit.  Thank you.

7              (Jury excused from the courtroom.)

8              THE COURT:  Okay.  Please have a seat.  If

9    we go until 15 minutes it's 5:00 o'clock, then

10   we're are running a little bit behind.  I'm sorry?

11             MR. PIAGGIONE:  I was going to make a

12   suggestion.  Mr. Mango suggested I not make a

13   suggestion.

14             THE COURT:  Okay.  I watched the jury.  I

15   mean, there was a little bit of a grumble about

16   coming back in 15.  Do you want to go forward,

17   Mr. Personius, you're next, or should we start

18   tomorrow morning?  It's -- either way is okay with

19   me.

20             MR. PERSONIUS:  I'm prepared to go

21   forward, Judge, but I'm concerned that it is

22   4:40 or 4:45, whatever time it is, and I certainly

23   don't want to have a situation, if we can avoid it,

24   where I went and the government would do the

25   rebuttal in the morning.  I don't think that

1     would --

2            THE COURT:  We wouldn't do that.  But I'm

3     concerned about oversaturation, frankly.  I mean,

4     the arguments were a little bit longer than I

5     expected, and we did get that hour late start.  I

6     mean, this would have been 4:00 o'clock instead of

7     5:00 o'clock.  That would have been a different

8     story.

9        You know, the more I look at the charge that I

10    have to give tomorrow -- and thank you for putting

11    so much of the burden on me to instruct all these

12    definitions -- but, you know, be that as it may,

13    right?  It has to be.  And I think our discussions

14    were very productive.  You know, Michelle is kind

15    of tired.  And I do want to get some deliberation

16    in.

17       But I think what I'll do is I'll call the jury

18    back out, and I'll suggest to them that we're

19    willing to go if they want us to go.  But, we can

20    come back, given the length of the arguments,

21    tomorrow morning and still have a productive day.

22    Does that work from everybody's standpoint?

23            MR. MANGO:  Yes, your Honor.

24            MR. PERSONIUS:  If the jury were to say,

25    Judge, we would like to go today, I think we'd go

3987

1    with their desire, as long as Michelle is able to

2    continue.

3            THE COURT:  You think they'll want to go

4    today?  I mean, continue on today, is that what

5    you're saying?

6            MR. PERSONIUS:  What I was saying was I

7    think we leave it up to the jury.  The only other

8    consideration I suggest we weigh is Michelle, and

9    if Michelle feels good about moving forward too.

10           THE COURT:  Michelle is a marathoner, and

11   so this is good prep for that.  And I'm not

12   disrespectful of her time.  And I don't mean to --

13   to sound like I am.  All right.  Let's -- I'll kind

14   of suggest to the jury that I think we should break

15   unless there's vehement objection.  And then we'll

16   start tomorrow with the final closing argument and

17   the rebuttal.  Then it will give us a chance to

18   better fine tune the charge.

19       Okay.  If you're not adverse to that, I think

20   we'll give that a try, and we'll have the jury back

21   in in five minutes or so.  All right.  And then

22   we'll try to work it that way.

23           MR. PIAGGIONE:  Thank you, your Honor.

24           THE COURT:  All right.  Thank you.

25           (Short recess was taken.)

1           THE COURT:  Okay.  The attorneys and the

2     parties are back assembled.  I think I'm going to

3     amend what I left you with.  I don't think I'm

4     going to give the jury the option of staying.  I'm

5     just going to send them home.  And then I'm going

6     to discuss with you -- if you can stay for a little

7     bit.  One, I think we need to talk about the

8     verdict form.  Because I think in light of the

9     parties' positions with respect to the

10    applicability of the entrapment defense by estoppel

11    we may have to include a reference to that on our

12    jury form on the respective counts.  And so I want

13    to talk to you about that and any other

14    modifications, because, frankly, nobody has said

15    anything about the jury form.

16        We don't have the definitions yet.  I do have

17    some amendments to the proposed charge, but I need

18    a little bit of time just to finalize my

19    discussions with Andrew.  And then I'd come out and

20    give you what we have up to this point in time.

21    And then we can talk about it tomorrow maybe a

22    little bit more productively and efficiently.  I'd

23    like to do that.  And I'd feel more comfortable,

24    rather than rush through with a super-saturated

25    jury, not having enough time to feel totally

1    comfortable with the amendments to the charge, and

2    then again not doing anything with the verdict

3    form.  Okay.

4         So, I need you to, if you will, have somebody

5    stay around for maybe an additional 15 or 20

6    minutes just so I can finish up part of what we

7    didn't have time to discuss.  Is that okay with

8    everybody?

9              MR. PIAGGIONE:  Yes, your Honor.

10              MR. LINSIN:  That's fine, your Honor.

11              MR. PERSONIUS:  Yes, your Honor.

12              THE COURT:  All right.  Chris, if you

13    bring the jury in.

14              (Jury entered the courtroom.)

15              THE COURT:  Please don't sit down.  Okay.

16    I think you've sat enough for the day.  There was a

17    lot of information that was presented to you in the

18    closing arguments.  What I'm going to do is adjourn

19    you for the day, and we would start tomorrow at the

20    regular time.  And, I mean, very honestly, I need a

21    little bit of time to work with the attorneys.

22    We've got some issues that will put us in a better

23    stead to get the case to you as soon as the

24    arguments are complete.  I'm going to have to --

25    you heard what I'm going to have to do, which is to

1    present you with a lot of definitions, a lot of

2    information.  I want to make sure that I get it

3    right from your standpoint, and it's going to be

4    lengthy.  So I want you as fresh as you are every

5    day at the start of the day.  Okay.  And I don't

6    want you weighed down because, you know, this -- I

7    think you'll find when it's all over and with the

8    charge, it's not going to be burdensome, but it's

9    going to be a lot of work and tedious to go through

10   everything and put it into the right perspective so

11   that you can do your job and get that unanimous

12   verdict back on the counts that are in the

13   indictment.  And, you know, we all have to do our

14   jobs as best we can to make that happen.

15        So, if you don't mind, even if you do mind,

16   we're going to send you home.  I say that with some

17   degree of apology if you were counting on staying.

18   I guess I must be in another world sometimes.

19        But we'll see you back here -- I've got a

20   little bit of a lengthier calendar tomorrow, but

21   I'd like you here at 9:30, and it might be a little

22   bit later when we start, quarter to ten, in that

23   vicinity.  That's what I'll be shooting for, maybe

24   ten, but not later than that, okay?  If you don't

25   mind, I'd be happy to see you around 9:30 if I can

1    do it.  If not, it's going to be a little bit

2    later.

3        Be safe on the way home.  Don't mess up.  Don't

4    get into any trouble.  Come back safe with an open

5    mind.  You're about to start that deliberation, and

6    we've come a long way together.  We'll see you

7    tomorrow at what time?

8            THE JURY:  9:30.

9            THE COURT:  And if it's not exactly 9:30,

10   about what time?

11           THE JURY:  10:00 o'clock.

12           THE COURT:  Okay.  So long.  Thank you

13   very much.  Appreciate it.

14           (Jury excused from the courtroom.)

15           THE COURT:  Okay.  So, I do want you to

16   take a look at the verdict form, and what I'm

17   suggesting is that we'll probably have added on to

18   each one of the counts except 16 the language to

19   the effect that if you are unanimous in your

20   verdict with respect to satisfying the elements of

21   the charge beyond a reasonable doubt, you know, the

22   next question would be, you know, how do you find

23   with respect to whether or not the defendants have

24   established by a preponderance of the evidence the

25   estoppel by entrapment defense.

1          And if you are contrary to that, which I see

2     the government's taking issue with that, I want

3     some specific authority from you in that regard.

4     And if there's any supporting authority from the

5     defense, please, you know, anything along those

6     lines, that would be helpful.  But I think we might

7     have to go that route.  But I'd like some hard

8     authority if it's there.  Unless you disagree.

9          MR. LINSIN:  No, no.  Your Honor, in

10    truth, we had not focused -- I had not focused on

11    the verdict form.  I agree with the Court's initial

12    instincts.  We will look for some authority.  Are

13    you suggesting we bring this back to you tomorrow

14    if we can find it, or are we going forward tonight

15    to talk about the verdict form?

16          THE COURT:  No, we're not going to talk

17    about it tonight.  We're going to talk tomorrow.

18    What I need is -- I don't have all of the, I don't

19    think, fully completed the redrafting of the

20    different parts of the indictment that we talked

21    about earlier, because we don't have the

22    definitions and things.

23          MR. MANGO:  I'm going to send those.

24          THE COURT:  Send those over to us.  But

25    what we do have I need a few more minutes to go

1        over, and then I'll give you the redraft.  And

2        we're going to eliminate all of those intentionally

3        left blank areas of the charge.  I think it will

4        look better.  We'll repaginate and we'll make the

5        adjustments on the table of contents as well.  So

6        we'll do all of that.  That's going to take us a

7        little bit of time.  So if you could hang in there,

8        say, until 5:30, I think I can have this all fully

9        reviewed to my satisfaction, and then I'll get it

10       to you, and you can work on it overnight, and we'll

11       talk tomorrow.  Fair enough?

12               MR. LINSIN:  Yes.

13               MR. MANGO:  Thank you, your Honor.

14               (Short recess was taken.)

15               THE COURT:  Okay.  Let me just -- well,

16       the attorneys are present.  And what I've

17       distributed is our revised proposed charges.  And I

18       just want to reference for you where we made the

19       changes.  And I still have not resolved a couple of

20       points, and I really want your input on it.  We

21       won't do that today.  I prefer to have it tomorrow

22       when you get a chance to think about it.

23           But if you look at the first three charges, 38,

24       39 and 40, those are the elements of the offense.

25       And those are for the broken down groups of counts,

1    I just want to direct your attention to the third

2    element in the charge for charge number 38 and the

3    third element in charge number 40.  All right.  The

4    third element basically has added the verbiage or

5    the words from the indictment so that it's

6    consistent.  Okay.

7        Now, I'd like you to take a look at charge

8    number 39.  And I'm not sure that I'm comfortable

9    with the third element, and I'm cautious about not

10   adding an additional element to the government's

11   proof.  And if you look at the final line in the

12   third paragraph, I'm not convinced that that is

13   articulated just exactly right or that it should be

14   placed there.  It may be okay.  But I want to hear

15   from you on that.

16       The other thought I had in that regard is to

17   place the wording, if it works, the "in

18   noncompliance with any applicable exemption"

19   language after the word "defendant" in the second

20   line of that paragraph.  I almost think it's better

21   there, but it's a little bit of a distance from the

22   baffle system.  So, see what you think.  And I

23   think we have to maybe discuss that a little bit,

24   okay?

25       In charge number 46, the second paragraph was

1     added.

2          In charge number 54 you look at the

3     introductory paragraph to Count 17, there's

4     language there that references "without a required

5     permit."  The same is true for 18.  But I'm not

6     sure about 19.  I didn't include it.  I don't know

7     if it should be, and that's what I want to really

8     get your input on.  And I don't know the answer to

9     it.  So I want you to give some thought to that or

10    maybe you know right now whether it should be

11    included, the language without --

12              MR. LINSIN:  Well, your Honor, I can defer

13    my comments to the morning.  But the requirement

14    for a permit is applicable to Count 19 as well as

15    Count 18.  They are both disposal counts.  They're

16    both disposal without a permit.  And so my request

17    initially was to -- all three of these RCRA counts

18    are premised on the absence of a required permit.

19    And so I thought a parallel amendment would be

20    appropriate for each of these introductory

21    paragraphs.

22              THE COURT:  Okay.  I wasn't really sure.

23    So, I'm open to that.  I will consider it as

24    something I will include unless the government

25    convinces me otherwise tomorrow.  So that all three

1    would be identical in terms of the introductory

2    paragraph referencing without a required permit.

3              MR. MANGO:  Your Honor, the only word I'm

4    looking at is the "required."  I don't know if

5    that's necessary.  So I'll be prepared to discuss

6    that in the morning.  If -- you know, rather it

7    would just say without a permit.  I'll discuss that

8    tomorrow.

9              THE COURT:  Okay.  Okay.  And then charge

10   number 57, the first element has the language with

11   respect to the actively managed.  It's in the first

12   couple of lines of the paragraph beginning "first"

13   for Count 17.  Okay.  That's -- that's where we're

14   at.

15       And then we need your definitions, and then I

16   think that gives us everything we need, right?  But

17   we've got to work on the verdict form as well.

18             MR. LINSIN:  May I make a preliminary

19   comment on 57, your Honor?

20             THE COURT:  Sure.

21             MR. LINSIN:  My concern with this

22   formulation is at least as to Count 17 that we are

23   folding into one element -- we're folding two

24   elements into one.  And it becomes very tricky then

25   when you make, you know, findings, whether we've

1    got unanimity on one or both and it's -- if the

2    concept is valid that these are both required

3    factual elements of the government's burden, I

4    believe it should be broken out into two separate

5    elements.

6              THE COURT:  All right.  We'll put that out

7    there for discussion.  And maybe some wisdom will

8    be bestowed upon the prosecution to understand why

9    that's so important to the defense here without the

10   fact that -- you know, with the hopes that it won't

11   be prejudicial to your case from the standpoint of

12   the way you look at it.

13      Okay.  That's, I think, our best effort at this

14   point, and then we'll see how the timing goes

15   tomorrow.  I don't want to keep the jury waiting

16   very long tomorrow.  I don't think they expect to

17   start at 9:30, I mean the way things have been

18   going.  And 10:00 o'clock, we can massage that a

19   little bit.  But, hopefully there won't be too much

20   that we need to address tomorrow.

21      All right.  It would help maybe if you

22   talked -- you know, if you could come to an

23   agreement on this, it would save us a lot of time.

24              MR. LINSIN:  All right.

25              THE COURT:  Thank you.  Appreciate it.

3998

1           MR. MANGO:  9:30, your Honor, for us?

2           THE COURT:  Yeah.  I mean, if you're going

3     talk in the morning, you might want to get here

4     earlier.  9:30 is the absolute earliest I'll be

5     ready, and I really don't think -- I think there's

6     two or three sentences that I have to get in, so,

7     but they're not -- well, every sentence is a major

8     sentence, but they're not as big as some of the

9     cases are.

10          MR. MANGO:  Thank you, your Honor.

11          MR. LINSIN:  Thank you, your Honor.

12          *      *      *      *      *      *

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           CERTIFICATION

2

3              I certify that the foregoing is a

4        Correct transcription of the proceedings

5        Recorded by me in this matter.

6

7

8                           s/Michelle L. McLaughlin
                            Michelle L. McLaughlin, RPR
9                                Official Reporter
                              U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25