VOL. XIX

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------
UNITED STATES OF AMERICA

        -vs-               10-CR-219S

TONAWANDA COKE CORPORATION
MARK L. KAMHOLZ,
               Defendants.
-------------------------------------


         Proceedings held before the

     Honorable William M. Skretny, U.S.

     Courthouse, 2 Niagara Circle, Buffalo,

     New York on March 27, 2013.


     APPEARANCES:

     AARON J. MANGO,
     Assistant United States Attorney,
     ROCKY PIAGGIONE, Senior Counsel,
     U.S. Department of Justice,
     Appearing for the United States.

     GREGORY F. LINSIN, ESQ.,
     JEANNE M. GRASSO, ESQ.,
     ARIEL S. GLASNER, ESQ.,
     Appearing for Tonawanda Coke Corporation.

     RODNEY PERSONIUS, ESQ.,
     Appearing for Mark L. Kamholz.

     Also Present:  Lauren DiFillipo, Paralegal
                     Sheila Henderson, Paralegal



     Michelle L. McLaughlin, RPR,
     Official Reporter,
     U.S.D.C. W.D.N.Y.
     (716)332-3560

4000

1                               I N D E X

2                                                       PAGE

3          SUMMATIONS

4    Mr. Personius                                      4034

5    Mr. Piaggione                                      4105

6          JURY CHARGE                                  4165

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Jury not present in the courtroom.)

2          THE COURT:  And I don't mind if there is a

3    little bit of activity going on, as long as it's

4    not too noisy.  But I think the attorneys and

5    parties are back here.

6       You want to call the case, please, Colleen?

7          THE CLERK:  Criminal case number

8    2010-CR-219, United States versus Tonawanda Coke

9    and Mark Kamholz.

10         THE COURT:  Okay.  Good morning to all.

11         MR. LINSIN:  Good morning, your Honor.

12         THE COURT:  All right.  As far as where we

13   left off yesterday, I think as we sent you off into

14   the blue skies, I think, before it got dark last

15   night, we talked a little bit about the verdict

16   form and the charge.  And I had given you the

17   documents relating to the changes that we suggested

18   on a number of the charges and asked to you take a

19   look at it.

20       I don't think, Mr. Moeller, we didn't get

21   anything from anybody yet?

22         LAW CLERK:  Just the definitions from the

23   government.

24         THE COURT:  Okay.  All right.  Do we have

25   anything to discuss as far as the proposed charges

1    are concerned?

2           MR. LINSIN:  Your Honor, I apologize.  I

3    didn't know you were expecting to get something in

4    writing from us on these.  The only points that I

5    would raise were the ones we had mentioned during

6    our brief discussion yesterday, that we thought

7    that the -- there should be a parallel addition to

8    the introductory paragraph for Count 19 parallel to

9    what was added for 17 and 18.

10       And then with respect to draft charge number

11   57, it is our view that there should be two RCRA

12   instructions, one for 17 and then a joint one for

13   18 and 19.  And we believe that the one for 17

14   should break out the two factual findings into two

15   elements, findings that are joined by the

16   underscored "and" in the draft charge.  We believe

17   those are separate factual findings and should be

18   set out as two distinct elements.

19       Other than that, we are comfortable with the

20   modifications that are reflected in these draft

21   charges.

22           THE COURT:  Okay.  And I think, you know,

23   it's -- the timing to talk about this, I think, is

24   good.  I'm not sure the jury is here yet.

25       Mr. Mango, you can live with that, I take it?

1          MR. MANGO:  Yes, your Honor.  With respect

2     to that count, I think we've discussed that in

3     detail already, so we can live with that.  The one

4     thing that I did want to check into -- and there is

5     quite, actually, a complicated regulatory history

6     behind using that word "required."  This is going

7     back to charge -- charge 54, which has all of the

8     RCRA counts in one, which I understand may -- well,

9     that may stay, because it's the indictment and the

10    statute.  That may stay as is.  It was, I believe,

11    57 that may get broken out.

12         But in 54, that term at the end, "Tonawanda

13    Coke Corporation without a required permit," we

14    would ask that "required" be taken out of that and

15    not used.  It's not an element of the crime, that's

16    not what RCRA says, and there is this other

17    complicated regulatory history, which I can go

18    through.  There is a Second Circuit case law

19    discussing whether the EPA has the ability even to

20    require someone to get a permit.  But if there's no

21    objection, I don't think we need to go into that.

22    So I would just ask that "required" be taken out.

23         MR. LINSIN:  Your Honor, I'm not going to

24    belabor this point.  I believe that it would be

25    helpful, but I don't -- if -- I'm comfortable with

```
 1        it reading "without a permit," so I would accede to

 2        that recommendation.

 3                   THE COURT:  Okay.  Thank you.

 4             Mr. Personius, you're on board?

 5                   MR. PERSONIUS:  Yes, Judge.

 6                   THE COURT:  Okay.  Okay.  And then I think

 7        we're good.

 8                   MR. MANGO:  Your Honor, the one thing -- I

 9        don't know if we were going to discuss

10        separately -- move to the special verdict form.

11        The other item that you asked us to look into was

12        whether the entrapment by estoppel defense

13        statement should be in that.  And we're prepared to

14        argue -- we forcefully believe it should not be in

15        the special verdict form.  And if you want to hear

16        our argument, we can present that now, or if that

17        was going to be covered separately.

18                   THE COURT:  No -- the jury's here?

19             Okay.  We still have a little time, so I'll

20        hear you out.  I take it the defense position is

21        that the estoppel by defense addendum should be

22        included on all the charges but for the obstruction

23        of justice?

24                   MR. LINSIN:  It is, your Honor.  We have

25        some recommendations as to how we believe it should
```

1    be incorporated.  We think it is imperative that it

2    be included on each of those counts, and we have

3    some thoughts as to how that can be done without

4    being too cumbersome.

5           THE COURT:  Okay.  Do we have the draft

6    available on that?  Yeah, the draft of the form --

7    of the verdict form with the added language?  No,

8    we didn't do that?  Okay.

9       Okay.  Yeah, we had discussed it.  Yeah, we'll

10   hear you out on that, and I'll hear the government

11   first with its opposition, and then we'll go

12   forward with a decision on it.

13          MR. MANGO:  Thank you, your Honor.  Your

14   Honor, I would note at the outset here that the

15   Second Circuit -- it is well settled in the Second

16   Circuit -- and I've got cases.  The two principle

17   cases that I'll cite -- I have copies for defense

18   and the Court if you want them, or I'll give the

19   cite.  In United States v. Bell, Second Circuit

20   case, 2009, 584 F.3d 478, the court said -- in this

21   case it's a very interesting case, because this was

22   a -- facts involved an execution of a search

23   warrant on a gas station, and a person who was in

24   the back room saw police come in with vests on

25   which said "police," but still was apparently under

1    the mistaken assumption that they weren't police.

2    He pulled a gun out, fired a couple of shots at

3    somebody, one of the police officers; they

4    exchanged fire.  And then he was indicted on

5    assault.  He was indicted on the attempted murder

6    of a federal officer.

7        And at -- at trial the court gave a general

8    verdict form, which, in fact, I think for most of

9    the counts in the indictment, this is a general

10   verdict form.  Because for Count 1 it just says

11   here's the indictment, how do you find, guilty or

12   not guilty.  So I think this is a general verdict

13   form for most of the counts.

14       And that's what happened in this case, in Bell.

15   And then the jury convicted the defendant of most

16   of the counts, not the attempted murder count, and

17   sua sponte, on its own, the district court, similar

18   to what we have here, your Honor, sua sponte raised

19   this issue.  Said, "I think there was error in the

20   trial.  I'm going to grant a new trial."

21       And in part of -- there was two reasons for

22   that.  One, on that there was a flawed definition

23   of "intentional conduct," which doesn't relate, but

24   second, the use of a general verdict form rather

25   than a special form that would have addressed the

1    specific elements of the charged offenses and the

2    burdens of self-defense.  Self-defense is an

3    affirmative defense similar to entrapment by

4    estoppel.

5       And the court goes on, the Second Circuit --

6    the government then appealed, because they believed

7    they had an appropriate conviction.  The Second

8    Circuit weighed this and said, "Nor can we conclude

9    that the use of a general verdict form" -- also not

10   contested by the parties -- "was error of any sort

11   that could serve as the basis for ordering a new

12   trial.  As it happens, there is a historical

13   preference for general verdicts and a traditional

14   distaste for special interrogatories in criminal

15   cases."

16      And it goes on to say, "The district court more

17   than adequately addressed the issue of self-defense

18   and its important [sic] for deliberation in its

19   charge to the jury."

20           THE COURT:  What's the year of that case?

21           MR. MANGO:  2009.

22           THE COURT:  Okay.  I mean, that

23   traditionally has been the Second Circuit's

24   position.  But, as you know, as things evolve with

25   issues in drug cases concerning whether or not

1    there's a controlled substance, whether or not

2    there's a certain threshold quantity that's met or

3    not met, and whether the jury unanimously finds

4    below or beyond -- above a threshold, the verdict

5    forms become a modified general verdict form so

6    that the juries can address that.

7         So while, you know, I understand that that

8    basically states the preference for general

9    verdicts where, you know, there are no other

10   issues, I'll take that into account.  In fact we

11   talked about that last night in terms of the

12   circuit going on record in that regard.

13        But -- yeah, go ahead.

14             MR. MANGO:  A couple more points, your

15   Honor, if I may.  I'm sorry to impose on the Court

16   here.  There is a 2008 Ninth Circuit case, United

17   States versus Ramirez.  That's 537 F.3d 1075.  And

18   in that case the court -- the defendant

19   specifically asked for a special verdict form on

20   the defense of self-defense, and the court refused

21   to give it.  It went on appeal, and the Ninth

22   Circuit said it wasn't error to refuse that.  Now,

23   I know that's the Ninth Circuit.  In this case --

24             THE COURT:  Yeah.  It's not always good

25   law in the Second Circuit, as you know,

1    Mr. Mango -- the Ninth Circuit.  And, in fact, I

2    mean, I learned my lesson, because I had a choice

3    just a couple of weeks ago on a case that hadn't

4    been -- or an issue that hadn't been really decided

5    in the Second Circuit.  There was a Ninth Circuit

6    case and a Sixth Circuit case, and I went with the

7    Ninth Circuit rationale.  Second Circuit thought

8    the Sixth Circuit was a little bit better.  So, you

9    know, I'm going to be a little bit cautious on the

10   Ninth Circuit authority here.

11            MR. MANGO:  I understand, your Honor.

12        But, more seriously, the point is that

13   yesterday the government -- and I don't want to

14   revisit the argument.  It was settled.  We objected

15   to the -- to the instruction of entrapment by

16   estoppel on all counts except for Count 16.  I

17   mean, in the government's view it's not warranted.

18   There's no evidence, just for example, say for

19   Count 17, the storage around the tanks, that

20   somehow that was implicitly authorized.  There's

21   nothing in any of the records that anybody saw

22   these tanks.

23        So that coupled with the decision -- and I'm

24   not going to say it right, but Abcasis, I think

25   it's Abcasis, where the court goes on to say that

1    this -- this defense of entrapment by estoppel

2    is -- is something that -- it should be used with

3    great caution.  Great caution should be exercised

4    when it comes to the application of this defense.

5        And in this case -- and there's other cases,

6    actually a Hawaiian case, that cites Abcasis, which

7    talks about government malfeasance, which is

8    essentially the government's position here, that

9    they just -- they just didn't do the job, if

10   that's -- and that's the theory of entrapment by

11   estoppel -- that that doesn't warrant an entrapment

12   by estoppel defense.

13       So, again, I'm not trying to revisit that.  The

14   Court has ruled; the instruction is ruled.  But

15   when this -- if and when this goes to the Second

16   Circuit, with that language of "great caution

17   should be used when using this defense," and that

18   coupled with the Second Circuit's stated preference

19   that special interrogatories are distasted and

20   should not be used, that put together I think is

21   going to present information to the Second Circuit

22   that -- that putting it directly in the special

23   verdict form went too far.

24       And that is the government's position.  The

25   instruction is very clear.  They're going to have

1    the instruction.  It doesn't need to be in there,

2    because the number of different permutations that

3    we're going to need to figure this out -- are they

4    going to have to figure out the entrapment by

5    estoppel defense first, or are they going to have

6    to go through the elements of the charges, then hit

7    entrapment by estoppel?  Is there going to be

8    language that says, well, if you still find the

9    defendants guilty -- because now, obviously, the

10   government has objected to the use of it.  So I --

11   I could presume maybe that if there was -- let's

12   say, for example, they checked the box we do find

13   the defendants guilty or that they've met all the

14   elements, the government has met all the elements,

15   but we also find that this entrapment by estoppel

16   defense applies, I don't know -- I mean, I'm not an

17   appellate attorney.  I don't know if the government

18   would be able to appeal that and reinstate the --

19   the fact that all the elements were found.  I don't

20   know.

21            THE COURT:  Well, I don't think it's that

22   complicated, frankly, to set it out.  And the

23   Second Circuit in the case you cited didn't say

24   that it was error to have included a separate

25   inquiry of the jury.  It just said that the general

1    verdict was okay.  So -- but it had the caveat that

2    it would be the Second Circuit's position it should

3    be carefully considered.

4         You know, I'll look at the case, because, you

5    know, I don't know.  But just from your account of

6    it, it still looked like there was an open door to

7    having included it.  But --

8              MR. MANGO:  Just one last point.  In Bell,

9    your Honor, there was no special verdict form, so

10   they didn't weigh on whether it was error.  But

11   they did say they weighed on whether -- because the

12   judge sua sponte said, "You know what, I should

13   have put this in the special verdict form."  So, in

14   a sense, they kind of did, because they went on to

15   say the use of a general verdict form was not error

16   of any species --

17             THE COURT:  Right.

18             MR. MANGO:  -- and did not warrant a new

19   trial, and went on to say that these instructions

20   the court gave on self-defense were clear and

21   called attention to the very issue of self-defense.

22        So, in essence, the Second Circuit kind of did

23   say in that case you didn't need it.

24             THE COURT:  Well --

25             MR. MANGO:  Maybe.  Maybe you didn't need

1      it.

2                THE COURT:  The facts are different.  The

3      verdict was already rendered.  You know, a lot of

4      distinctions.  But, I mean, I'll look at it

5      carefully.  I don't know, because I don't know the

6      case, but from hearing your account, I know you can

7      make some distinctions.

8          Mr. Linsin?

9                MR. LINSIN:  Thank you, your Honor.  I

10     don't have the Bell case in front of me.  I do

11     believe, given Mr. Mango's account, that a review

12     of this issue post-verdict when neither party

13     apparently had requested or objected to a special

14     verdict form prior to the matter being submitted to

15     the jury, I think puts us in a very different

16     posture here.  We're obviously having this

17     discussion before the matter is submitted.

18         We are strongly of the view that this would

19     be -- is both required and would be very helpful to

20     the jury for -- candidly, for the very reasons

21     Mr. Mango has just described.  What is the jury to

22     make of this defense and how does it apply?  How

23     should it be considered count by count for the

24     counts that it relates to?

25         So we don't believe that the Bell case, at

1    least from what I understand, would be controlling

2    here.  We believe that without it being cumbersome,

3    and similar in some respects, your Honor, to the

4    manner in which the Court has addressed the need

5    for special findings in Counts 17, 18, and 19 with

6    respect to the penalties provisions of that

7    statute.  Those special findings are built into the

8    form.  As the Court has understood, they are

9    required, based upon the manner in which fines

10   could potentially be calculated.

11        We believe that for each of these counts, with

12   some -- perhaps some supplemental language on the

13   very first page of the verdict form itself, that

14   the form could -- could easily say after the

15   statement of the charge, if the jury unanimously

16   concludes that the government has not proven this

17   charge beyond a reasonable doubt, and then just

18   direct them to what would be perhaps designated as

19   Part C -- to this Part C that would say how do you

20   find on Count 1 as to each defendant, guilty/not

21   guilty.  If the government hasn't proven their

22   case, the jury would be directed to that portion of

23   the form.  If you conclude that the government has

24   proven this charge beyond a reasonable doubt, then

25   direct the jury to what would be Part B, and then

1    ask, has the defendant -- has the defendant proven

2    the defense of entrapment estoppel with respect to

3    this charge by a preponderance of the evidence;

4    yes/no.

5       And then the flow would then direct them to

6    Part C.  And there would need to be, I think, some

7    preliminary guidance as to what a "no" decision

8    would mean in that Part B, but I think this could

9    be -- the jury could be directed to how they should

10   make these assessments pretty simply and without

11   any -- without unnecessarily complicating the form,

12   but providing proper legal guidance to the jury as

13   to just what their decision process should be.

14              THE COURT:  Yeah.  I mean, that's

15   essentially what I think would work.  And I think I

16   know how we would like to see it.  I would

17   circulate it just to have you look at it, because I

18   think we were pretty close last night to getting it

19   clear.

20      But I want to look at Bell.  So I think, you

21   know, I have the parties' positions, and I think

22   that's -- yours included, Mr. Personius?

23              MR. PERSONIUS:  Judge, yeah.  The only

24   thing I would note, Mr. Mango was kind enough to

25   give us a copy of the Bell decision.

1          THE COURT:  Right.

2          MR. PERSONIUS:  If you read further from

3     the portion he quoted, at pages 484 through 485,

4     the Second Circuit notes the charge that was given

5     in Bell.  And also I think Bell is different

6     because the -- I don't know self-defense federally,

7     but from reading this, the defense doesn't have any

8     burden on that to prove it.  It's that the

9     government has to prove beyond a reasonable doubt

10    that there wasn't self-defense.  I think it's

11    different than what we have here.  And I think at

12    484, 485 it makes that clear that there was a

13    different consideration there.

14         THE COURT:  Okay.  All right.  Well, you

15    know, what I'll do is I'll take a few minutes now,

16    and, you know, we'll kind of, from a chambers

17    standpoint, decide how we're going to proceed.  I

18    understand the respective arguments.  And then just

19    in a few minutes we'll have the jury come out.

20         MR. LINSIN:  Your Honor, the only

21    additional point I would ask for the Court's

22    consideration is with respect to Count 17.  And as

23    we had discussed kind of in the abstract yesterday,

24    we do believe with respect to Count 17, and

25    assuming we are adding in this element of finding

1    that there was active management, just a direction

2    that there be a unanimity determination as to what

3    action that -- a -- a confirmation that there has

4    been a unanimous decision as to what action

5    constituted active management.

6            MR. MANGO:  And, your Honor, the

7    government doesn't feel that is necessary.  Again,

8    the point of this verdict form is to keep it

9    simple.  Just listening from Mr. Linsin's

10   description before of this entrapment by estoppel

11   addition and then this addition, this -- this form

12   is not going to be something that's going to be

13   easy for them to work through.  I'd like to see the

14   draft form, obviously, before it goes.  But there's

15   no requirement that they need to be unanimous as to

16   what active management is.

17           THE COURT:  Well, I mean, there are some

18   cases, and I -- I just can't call them to mind

19   right now, that -- where there are several options

20   that the court does require without unanimity with

21   respect to the jury's action on those different

22   options.  But I'm not sure that I recall anything

23   other than a charge to the jury, rather than a

24   statement on the form relative to that.

25         So I want to take a look at it from that

1   standpoint.  I know you want it on the form, if I

2   understand you correctly.  But --

3               MR. LINSIN:  Your Honor, this is the one

4   element in the one count, I believe, where there

5   are a variety of different options as to the

6   particular conduct that could be considered as

7   active management.  So that is why we think it

8   should be particularized on this count.

9       Perhaps a general unanimity instruction would

10  be sufficient, but I think -- I think it is of

11  particular significance for this element on this

12  count just because there has been such a wide

13  variety of evidence as to what does and what

14  doesn't constitute active management, and differing

15  time frames when that conduct occurred.

16              THE COURT:  All right.  Well, I mean,

17  it's -- I mean, frankly, I know where you're coming

18  from.  It's been a little bit troubling to me.  I

19  just -- I'll have to work out how I want to handle

20  it.  Okay?

21              MR. LINSIN:  Thank you, your Honor.

22              THE COURT:  All right.  Thank you for your

23  input.

24      Andrew, is there anything else?

25              LAW CLERK:  No.

1                THE COURT:  Okay.  I'm going to target

2     10:15 to start.  Okay?

3                MR. PERSONIUS:  Judge, if it's helpful,

4     and I hope this isn't a problem, I went through my

5     closing this morning.  I think I told you about a

6     half an hour.  It's at least an hour.

7                THE COURT:  That's okay.

8                MR. PERSONIUS:  I'm sorry.

9                THE COURT:  Whatever the time is, it is.

10      Okay.  I think we ran over a little bit

11    yesterday on approximations, and I just hope that

12    we don't run over the extended approximation, but

13    whatever you have to do, I mean --

14               MR. PERSONIUS:  My prediction right now,

15    your Honor, would be 60 to 70 minutes.

16               THE COURT:  Okay.  All right.  And then

17    you have rebuttal, Mr. Piaggione?

18               MR. PIAGGIONE:  Yes, your Honor.

19               THE COURT:  Okay.

20               MR. PIAGGIONE:  And depending on what I

21    hear, it might affect the length of my rebuttal.

22               THE COURT:  All right.  Well, that's what

23    rebuttal is for, Mr. Piaggione.

24               MR. PIAGGIONE:  Thank you.

25               THE COURT:  Okay.  Thank you.

1          MR. LINSIN:  Thank you, your Honor.

2          (Short recess was taken.)

3          (Jury not present in the courtroom.)

4          THE COURT:  Okay.  Thank you.  Please have

5     a seat.

6        Okay.  We're reassembled, and the attorneys and

7     parties are back present.  Is there some matter

8     relating to the proposed jury verdict form that you

9     want to call to my attention?

10         MR. PERSONIUS:  Yes, Judge.  And thank you

11    for coming out.  I was reading further the Bell

12    decision that the government was kind enough to

13    provide to us, and then I've had a chance to talk

14    to Mr. Linsin about it and, actually, Mr. Mango

15    too.

16        And what the court indicated in -- the trial

17    court indicated in the Bell decision to the jury

18    was, actually, you might want to consider the

19    self-defense issue first.  In other words, don't do

20    that last.  Consider that first.  And it caused me

21    to wonder if here if the jury shouldn't be given

22    the option, in terms of how they address, whether

23    they address the beyond a reasonable doubt for the

24    particular count first or whether they address the

25    defense of entrapment by estoppel first, that they

1    shouldn't be required, necessarily, to reach a

2    guilty verdict on a particular count before they

3    consider the entrapment by estoppel defense.

4         I don't think there's any requirement.

5    Certainly, it wouldn't make sense that they would

6    have to do that.  And that the jury should be

7    informed that there's no particular procedure that

8    they have to follow in considering guilt on the

9    count versus the entrapment by estoppel defense

10   with respect to that count.  And I just wanted to

11   bring that to your attention that that was a

12   thought we had.

13             THE COURT:  Okay.  Do you want to comment?

14             MR. MANGO:  Brief comment, your Honor.  I

15   haven't found any Second Circuit case except for

16   George, which was cited by the defendants in their

17   request for the additional instruction.  This is

18   the George case, 2004 Second Circuit case, in which

19   the district court gave -- this is -- this is the

20   extent of the instruction the district court gave

21   on entrapment by estoppel:  "If you believe that

22   Mr. George was trying to comply with the law by

23   following the instructions of the person to whom he

24   submitted his passport application, and you believe

25   that a reasonable person desirous of obeying the

1   law would have accepted those instructions as

2   accurate, then you may not convict Mr. Gorge based

3   on the fact that the number was not his actual

4   Social Security number."

5       That's it.  That's all we have from guidance

6   from the Second Circuit.  Now, obviously, your

7   instruction goes beyond that.

8           THE COURT:  It's pretty strong and

9   detailed.

10          MR. MANGO:  Yeah.  And I'm concerned that

11  now if we go to the next step and actually tell the

12  jury how they should weigh this, this gets back

13  to -- this is a separate Second Circuit case, which

14  gets back to why the Second Circuit does not like

15  special verdict forms.  This is a 1958 case, United

16  States v. O'Looney, 544 F.2d at 392.  I don't have

17  the first -- first page of it.  But it said the

18  court elaborated on the reasoning and indicated

19  that special verdicts tend to infringe on certain

20  historic functions of the jury, to temper the law

21  with common sense, to decide whether to follow

22  instructions, and to reach a general verdict

23  without enunciating its reasons.

24      That's very important.  So the more we mess

25  with that, the more we're taking away this jury's

1    historic function.  And that's why we would be

2    concerned with actually telling the jury, well, you

3    may want to look at this first and then go through

4    everything else.  And why it shouldn't be in the

5    verdict form.

6            THE COURT:  Well, you know, I wasn't at

7    the Supreme Court arguments yesterday, but they

8    seemed to be concerned about new developments, for

9    example, in relationships.  And, you know, there's

10   been a lot of new developments in the law since

11   1958 and the O'Looney case, you know, which I think

12   we have to be sensitive too.  This is what, only

13   the second criminal Clean Air Act prosecution in

14   history.  Right?  So I think we've got to take that

15   into account, and we've got to look at this

16   carefully.

17       I do agree with you, though, that the charge on

18   the estoppel by entrapment defense is a strong

19   charge, and I think a good charge.  Do we need to

20   adjust the verdict form?  I'm not sure.  We're

21   going look at it carefully.  I'll look at Bell.

22            MR. MANGO:  Thank you.

23            THE COURT:  I think one concern is, and, I

24   mean, is there evidence here that would -- that's

25   been introduced by either side in this case that

1    would apply to all the counts but the -- but for

2    the obstruction of justice charge?  And I want to

3    make sure that there's an argument to be made that

4    there is before we consider that entry on the

5    special verdict form.

6        Mr. Mango?

7             MR. MANGO:  Right.  That's very much why

8    we raised the issue yesterday and again quickly

9    this morning, your Honor.  Because -- because these

10   are issues that are -- if it goes a certain way,

11   may be, you know, under the microscope in the

12   Second Circuit.  And this is an expansion, in the

13   government's view, of the entrapment by estoppel

14   defense.  There's no case law out there, in the

15   Second Circuit, certainly, that says -- and think

16   about it in the environmental context, that the

17   precedence this case is going to set is that in

18   every -- in every environmental case you have --

19   you have a duty on government, either local, state,

20   or federal, to go out and do inspections.  And by

21   the fact that they now missed it over, you know, 20

22   years, 30, however many years you want to talk

23   about, even five years, one year, if it's multiple

24   inspections, this case is now going to stand for

25   the precedence that in any environmental case

1    there's this entrapment by estoppel --

2            THE COURT:  Well, I mean, that's factually

3    distinguishable.  I mean, you have some pretty

4    aggravated circumstances here in terms of a

5    long-standing situation where you don't catch

6    certain violations or, you know, allegedly certain

7    violations, and there was a lot that was going on

8    that was known by the DEC people and that didn't

9    become known to the EPA people, I think is what the

10   defense is going to argue.

11      So I want to balance that.  I've got to take a

12   close look at it.  I don't agree that this

13   necessarily is bad precedent, but I just want to

14   make sure that it's the right thing to do under the

15   circumstances.

16           MR. MANGO:  I'm not saying bad precedent,

17   your Honor.  I'm just going to say it expands the

18   entrapment by estoppel.  But, for example, say in

19   Count 17, the storage count, there's been no

20   evidence that DEC -- and it's the defendants'

21   burden -- that there's been no evidence that in

22   1998 DEC was told about this, the storage of the

23   D018 on the ground.  There's nothing.  There is

24   nothing in the 30 days of trial we have.  And so

25   it's not warranted with that count.

1              THE COURT:  What was the date of that

2      storage?

3              MR. MANGO:  1998 it starts.  That's the

4      day we, which we didn't get into it, that the deer

5      got covered in coke breeze and the -- you know,

6      there's no indication that defendant ever said,

7      hey, we've got these tanks --

8              THE COURT:  But they were on premises

9      after 1998.

10             MR. MANGO:  Not in that area.  There's no

11     evidence they were in that area though.  We've got

12     a 188-acre site.  And they were there in 2009.

13     I'll grant that.  And they saw it in 2009, sure.

14     But starting in 1998, no.

15             THE COURT:  Okay.  Well, I mean, that's

16     part of my concern, so I've got to look at that

17     carefully.

18             MR. LINSIN:  Well, your Honor, as to that

19     particular point, there clearly is evidence that

20     they were on-site repeatedly after 1998.  If, as

21     Mr. Mango says, the evidence isn't there to show

22     that we've established the necessary elements for

23     this defense, then the jury will make quick work of

24     it.  Then that's a simple matter, and there's no

25     prejudice to the government.  But the evidence

1    certainly is there, and I -- that -- that the DEC

2    officials were on this site repeatedly after that

3    date.  Clearly in 19 -- 2009 there were explicit

4    discussions about the materials in this area.

5        And the point I wanted to add to what

6    Mr. Personius raised, and what I was thinking about

7    as he was discussing this Bell matter, is this,

8    your Honor.  None of us, I believe, want to see an

9    unnecessary retrial of this case.  What I became

10   concerned about as I was reflecting on this is,

11   if -- if we have jurors -- if for some reason the

12   jury is not able to reach a unanimous verdict with

13   respect to a given count, they shouldn't be told

14   they have to stop there.  The jury should be able

15   to consider this defense with respect to that

16   count, regardless of whether they have reached a

17   unanimous guilty/not guilty verdict on that count.

18       And that is the point I think is important.  It

19   hadn't been captured as I reflected on this special

20   verdict form, and what I think the Court's

21   instruction should guide them that they are

22   permitted to consider the defense even if they

23   haven't reached an unanimous verdict.  I would hate

24   to see a special verdict form that requires

25   unanimity on a not guilty or guilty and prevents

1    them then from considering the defense, so we wind

2    up with a hung jury that hasn't even considered the

3    defense.  And I think we have to be sensitive to

4    that as we are considering the guidance to give to

5    the jury.

6              THE COURT:  All right.  Well, you know, it

7    seems to me that we really have an engaged jury.

8    And I can't imagine a case where the jury would be

9    any more engaged than this jury appears to be,

10   okay, from my observations.  And the crux of the

11   questions that have been asked, essentially, is

12   give us a little assistance, give us a little help.

13   And I don't think, frankly, the Second Circuit can

14   be critical of attempts to do that.  But we have to

15   be right.

16       Like, for example, what you were just referring

17   to, Mr. Mango.  I'm not sure being on-site is

18   sufficient for purposes of the entrapment defense

19   without there being disclosure associated with

20   that.  So, you know, I'm not sure it would be

21   proper to include a reference to the entrapment

22   defense if there is an absence of evidence with

23   respect to disclosure.

24             MR. LINSIN:  But, your Honor, the count

25   runs for an extended number of years.

1          THE COURT:  Yeah.

2          MR. LINSIN:  And disclosure during any

3    portion of that count, I believe, would -- would

4    trigger the applicability of the defense.  It is

5    not -- it is not required that -- you know, this

6    isn't a year-by-year count as some of these other

7    counts are.  This is '98 to 2009.  And our point is

8    that this -- that we have multiple visits on-site

9    during that period of time, and then we have an

10   explicit discussion and engagement of the

11   regulators down by those tanks in 2009 as to what's

12   going to be done with this material.  And so we

13   certainly have notice during the time period that

14   is alleged in the count.

15      And so we think that that satisfies the

16   requirements -- the threshold requirements of at

17   least raising the defense and then leaving it to

18   the jury to make a factual determination as to

19   whether we satisfied the elements.

20          THE COURT:  And maybe it does.  But that's

21   certainly at the tail end of the ten-year period,

22   if you will.

23          MR. LINSIN:  Well, the specific visit to

24   the tanks is, your Honor.  The other visits to the

25   site come, as the Court will recall, at a number of

1     different intervals.

2           THE COURT:  But that's what I -- I don't

3     think that's enough.  Site visits, absent presence

4     at the tanks, big distinction, in my mind, at

5     least, at this point.  I mean, I --

6           MR. LINSIN:  Well, your Honor, it is a

7     distinction, but the truth is, the evidence before

8     the jury is that we have RCRA compliance inspectors

9     at the facility for multiple hours on a number of

10    different occasions.  And I think -- I don't think

11    it's fair to the jury to just cut off what may be

12    reasonable inferences from that information derived

13    from the inspection reports and the understanding

14    as to what these RCRA inspectors are charged with

15    doing when they go out to these facilities.  There

16    may well be reasonable inferences that can be drawn

17    from that direct evidence.

18          MR. MANGO:  Real brief, your Honor?

19          THE COURT:  Just give me one second so I

20    can try to straighten this out.

21        Yeah, but interjecting reasonable inferences

22    upon inferences to get to the kind of defense

23    that's being urged or argued here, I mean, frankly,

24    is a cause for concern for me.  I mean, because

25    there is no direct evidence.  And maybe the DEC

1      people should have been out there, you know,

2      looking at, you know, the different areas that we

3      have no evidence about.  But -- but we don't have

4      any evidence that they were there.  And to say that

5      that's sufficient to trigger a consideration of the

6      entrapment defense, I'm not yet convinced.

7            Let me hear what you have to say.

8                  MR. MANGO:  Your Honor, it was picking up

9      on that point, that this -- this is such a serious

10     defense.  It's -- the impact of it is so

11     monumental.  I mean, it's discussed in the Second

12     Circuit case law that it can't be based on

13     reasonable inferences.  It's got to be based on

14     that disclosure at the time or before of the

15     authorization by the government.  It's very clear.

16     You've spelled it out very clearly in your

17     instruction.  You can't -- you can't have

18     inferences as part of this.  And I think that is

19     captured in the language that the Second Circuit

20     uses as to how sparingly this defense should be

21     used and such.

22                 THE COURT:  Yeah.  But my concern, too,

23     is, this is a very unique type of case.  These kind

24     of administrative criminal prosecutions are

25     different, and we have to consider that.  I mean,

1      it's not an attempt murder case.  It's just not.

2      All right.  And that's why this kind of precedent

3      can be positive precedent, but I'm not even worried

4      about the precedential part of it.  I want it to be

5      right so this jury does what's right for both sides

6      of this case.  And that's why there's so much at

7      stake here, okay.

8          But I appreciate the input, and we'll work it

9      out.

10         Okay.  Andrew, is there anything else that we

11     should touch base with?

12             LAW CLERK:  No, Judge.

13             THE COURT:  All right.  Okay.  I think

14     we'll leave it at that.  I think we're ready to

15     start with the jury, if you would, Chris, please.

16     Thank you.

17             (Jury seated.)

18             THE COURT:  Good morning.  Have a seat

19     please.  What did I tell you, we would start

20     promptly at 10:30.  I said not a minute later,

21     maybe two minutes.  Right, didn't I tell you that?

22     Okay.

23         All right.  Good to see you.  And I hope you're

24     ready.  We have two more closing arguments, okay?

25     And we're going start with Mr. Personius.

1          And the attorneys and parties are back,

2     present.  As you know, you can use the notebooks,

3     but very important that you focus on the fact that

4     whatever you put down now is not evidence.  That's

5     just simply a guide, if you choose to use the books

6     at all, and make sure that's clear in your notes.

7          Again, please don't prejudge the case.  You

8     still have more to hear.  You still have to get --

9     and all the attorneys have referenced what I'm

10    going to be giving you in my charge, so we're going

11    to take some time and we're going to work through

12    that.  And then you have to go about applying that

13    law, working through the counts, following the form

14    that I give you with respect to how you consider

15    the evidence in light of the count.  I'll be

16    telling you different things as I define terms for

17    you a little bit later, and I'll tell you more

18    about the charge at that time too.

19         But you look ready.  I mean, I haven't seen you

20    look this ready in I don't know how long.  So thank

21    you for your attention.  You know, you've been

22    really terrific, and, you know, yesterday was a

23    relatively long day in terms of taking in

24    everything that the attorneys had for you

25    yesterday.  But again, we thank you for your

1     engagement.  You've been terrific.  Please bear us.

2     We've got two more arguments.

3         The attorneys and parties are back, present.

4     You are here, roll call waived.  And I think we're

5     now, Mr. Personius, waiting for your closing

6     argument.

7              MR. PERSONIUS:  Thank you, Judge.  May it

8     please the Court --

9              THE COURT:  Yes, you may proceed.

10             MR. PERSONIUS:  -- Mr. Mango,

11    Mr. Piaggione, Mr. Linsin, Miss Grasso, good

12    morning members of the jury.

13        Over the next -- it will be about an hour or

14    so, two TV shows, that I'm going talk to you.  And

15    I want to you talk to you about four things.  You

16    want to hear about the obstruction count, I know

17    you do, so that's the first thing I'm going to talk

18    to you about.  There's been an effort, in my

19    judgment, through this case by the government to,

20    for lack of a better term, throw dirt on Mark

21    Kamholz.  I've identified a dozen instances where

22    that attempt was made.  I feel obliged to address

23    each of those, because I think it's important in

24    terms of what you think about Mr. Kamholz as you go

25    to deliberate.  I think it's also important in

4035

1      terms of assessing the quality of the evidence that

2      the government has given to you and the arguments

3      that the government is making about that evidence.

4          Because as the Judge has told you repeatedly

5      and you know this, this is a very, very important

6      matter.  This isn't some law school hypothetical

7      where you can pick and choose what you want from

8      the evidence and ignore the rest of it.  You've got

9      to look at the whole body of the evidence, and as

10     the Judge says, apply your common sense and your

11     experience and your intelligence to that evidence.

12         The third point that I'm going to address with

13     you is this entrapment by estoppel defense, because

14     it says an awful lot about the way we approach --

15     Mr. Linsin and I and Miss Grasso, how we approached

16     this case has a lot to do with that defense.  I

17     want to make absolutely certain you understand what

18     that theory is.

19         The last thing I'm going to do is to go through

20     just a few examples of the evidence that the

21     government has presented, and the point being that

22     you've been told by the Judge what reasonable doubt

23     means.  And in essence what it means is it has to

24     be of such quality -- the evidence has to be of

25     such quality that you wouldn't hesitate to rely

1    upon that evidence in an important matter.  In

2    simple terms, that's what it is.  And my point is

3    with the evidence you're getting from the

4    government you most surely in an important matter

5    would hesitate to act.

6        So let's get to the obstruction, and then we'll

7    move through these other points, and then I'll sit

8    down.  But I'm not going to be as brief as I was

9    during my opening.

10       Okay.  If anybody ever came to any of us and

11   they were upset about something that somebody had

12   said, you would never ever, ever, ever, even in

13   some casual setting, you would never make a

14   judgment on that person or what that person

15   intended without asking questions.  And the kind of

16   questions you would ask is well, when the person

17   made that comment, what were the surrounding

18   circumstances?  What had you been talking about

19   before that?  What did you talk about after that?

20   And if it had to do with some action you took based

21   on what that person said, you'd want to know what

22   happened after that.

23       You'll remember that when I was questioning

24   Mr. Cahill, who is the critical witness, of course,

25   on this, that in a fashion I asked him do you agree

1      that actions speak louder than words.  And in

2      considering the obstruction count, the point I'm

3      getting to is you cannot take in isolation whether

4      it's six words or nine words or whatever it is that

5      Mr. Kamholz said to Mr. Cahill back on what we

6      understand was April 10th, 2009, in the by-products

7      area and ignore everything else that surrounds

8      that.

9          You have to consider the entire context of what

10     was said, and you have to go back, I want to

11     suggest historically, to get an understanding of

12     what Mr. Kamholz's understanding was at the time he

13     walked through the by-products area back in April

14     of 2009.

15         Now, you've heard from the evidence that

16     Mr. Kamholz has been working at Tonawanda Coke for

17     about 30 years, and for that whole period of time

18     he's been the environmental compliance officer.

19     We've heard from the evidence that -- and you can

20     see it in the overhead photograph -- it's a big

21     place.  It's about 150 or more acres.  It's a large

22     facility.  It occupies a lot of land.  You saw from

23     the photographs where his office is, Kamholz's

24     office is, versus where the main part of the

25     operation is.

1      It's a distance, and what you heard from Mr.

2   Foersch is if -- you heard this from Mr. Carlacci

3   too, if you're in the office area, you don't walk

4   over to that other part of the plant.  You drive

5   over there.  And this isn't to suggest that

6   Mr. Kamholz wasn't in and around the plant.

7   Obviously he was.  But one of the questions is with

8   what frequency?

9      And if you'll recall, at least what I recall

10  from the evidence is that what Mr. Cahill testified

11  to is that during the 15 or so years that he worked

12  in the by-products area, both as an operator and a

13  foreman, he would see Mr. Kamholz in the

14  by-products area.  At one point he said --

15  initially he said once a month.  Then he said once

16  every three months to take a test.  That's what

17  Mr. Cahill testified to.

18      So just because -- this is one of the dangers

19  in a trial like this is that you take 30 years of a

20  person's work experience, 30 years of activity at a

21  coking plant, and you compress that into four

22  weeks.  And in that four weeks you talk about

23  isolated components of that facility's operation,

24  this pressure relief valve, the two quench towers,

25  and whether or not they had baffles, and they did

1    not have baffles.  We know that.  This coal tar

2    sludge from the openings, the decanter tar sludge,

3    what happened with that, and then these two

4    abandoned tanks.

5         We've taken four or five components of this

6    huge operation, we focused on those over the four

7    weeks, and do not slip, do not slip into thinking

8    well that's all Mark Kamholz had to worry about day

9    in and day out.  Recall that this plant has to run

10   24 hours a day, seven days a week, 12 months a

11   year, 365.  It's running all the time.  If you

12   don't do that, apparently these ovens fall apart.

13   So it's running all the time.

14        Mark Kamholz doesn't work 24 hours a day or

15   seven days a week or anything like that.  He's a

16   regular shift employee who works an eight-hour day,

17   five days a week.  But guess what?  The

18   environmental issues at Tonawanda Coke don't just

19   arise when he's working.  They arise all day long.

20   And he's there for just a fraction of the time to

21   deal with all of these issues, and not just with

22   what's going on with the quench towers, or what's

23   going on with the PRV, or what's going on in the

24   by-products area.

25        So what he knows about any particular operation

1    you cannot assume he knew anything and everything

2    that was going on in by-products, especially when

3    you know from Mr. Cahill, what I recall, is that he

4    would only come -- Mr. Kamholz would only come to

5    by-products once every one or once every three

6    months.

7        So, in addition to that, this is a coke plant.

8    It's an old coke plant.  We've seen pictures.  It's

9    close to a hundred years old.  This thing has been

10   around.  And being a coke plant -- Mr. Sitzman made

11   a comment.  He said it has coke smells.  He's been

12   around coke plants.  He knows what a coke plant is.

13   It's not a place that you want to take your kids to

14   play.  It's a coke plant.

15       And the nature of the operation is that it's

16   going to have issues.  It's going to have a lot

17   more issues than some other type of manufacturing

18   operation is.  By definition, it's going to have

19   issues.  And who is in charge of dealing with all

20   of those issues?  It's Mr. Kamholz.

21       So, it's against that backdrop that I ask you

22   to consider this obstruction charge.  And then in

23   addition to that, recall that Mr. Foersch, whom we

24   called as a witness because we felt it was

25   important.  Who was the 30-year face of the

1    Department of Environmental Conservation at

2    Tonawanda Coke?  It was Gary Foersch.  Who called

3    him to testify?  The defense called Mr. Foersch to

4    testify.  That in itself speaks volumes about the

5    government's case.

6        But what you heard from Mr. Foersch was that

7    his focus while working at Tonawanda Coke was on

8    the ovens.  The ovens is where you get all these

9    emissions.  They're coming out the doors and the

10   lids.  That's where the real concern is.  It would

11   make sense, and I think the evidence would support

12   the fact that that's where Mr. Kamholz's principle

13   concern would be also.

14       So, in any event, the reason I point all that

15   out is it would be unfair to Mr. Kamholz, it would

16   be inconsistent with the evidence to assume that he

17   knew anything and everything about the whole plant

18   and what was going on, much less anything and

19   everything about what was going on in by-products.

20       So he gets a letter from Miss Hamre,

21   April 8th I think it was, that said -- maybe a

22   phone call too -- says we're coming out to do an

23   inspection.  And we're concerned about emissions,

24   so we're going to focus on the by-products area.

25   He gathers some documents together that she's asked

1    for, and he does what I think you would expect he

2    would do, which is he goes to the by-products area

3    and he tells Mr. Cahill, who is the foreman of the

4    by-products area, who's been working there for 15

5    years, had been the foreman for six -- I don't

6    know, six or seven years at that point in time.

7    And he says we're going to have an inspection.

8    Some people from the EPA are coming in, and let's

9    take a look at the by-products area.

10        Now, let me step back for a minute too because

11    this was suggested.  It was suggested that

12    Mr. Kamholz somehow had a concern about emissions

13    because there had been this visit a year earlier.

14    There was a visit May 28th of 2008.  Mr. Carlacci

15    came with Mr. Sitzman and Miss Webster, and

16    Mr. Foersch was there too.  And it was a visit, not

17    an inspection, and they talked about emissions and

18    the concerns that they had.  And I think there's

19    some suggestion that Mr. Kamholz had in the back of

20    his mind that he was worried about emissions and

21    the fact that the DEC was looking at the emissions.

22        Well, Mr. Kamholz knew from back in August

23    of 2007 that there were emission concerns at

24    Tonawanda Coke.  There had been an inspection back

25    in August of 2007 by Mr. Sitzman and Miss Webster

1   and Mr. Foersch that dealt with emissions.  And

2   there's no evidence whatsoever in the record that

3   Mr. Kamholz did anything untoward after learning

4   about that.  And in fact, when this group came back

5   along with Mr. Carlacci on May 28th of 2008, they

6   told him at that time we have continuous

7   monitoring, continuous monitoring going on at

8   Tonawanda Coke.

9       So Mr. Kamholz knew that a year before this

10  April 2009 inspection that DEC was continuously

11  monitoring Tonawanda Coke for its emissions.  And

12  is there any evidence he did anything untoward in

13  those next 11 months?  No, there isn't.  So that

14  has nothing to do with Mr. Kamholz going to look at

15  by-products and talking to Mr. Cahill on what I

16  believe it's been testified was probably that

17  preceding Friday, which would have been April 10th

18  of 2009.

19      And when he went there, he didn't focus on this

20  pressure relief valve.  He went there to talk to

21  him about a variety of different concerns that he

22  had, and Mr. Cahill testified about those.  He was

23  concerned about the moat and the condition of the

24  moat.

25      And you remember from the testimony of Miss

1    Hamre -- I think you saw pictures -- that moat was

2    not in very good shape.  It had objects sitting in

3    it.  I think there were pallets sitting in the moat

4    and that type of thing.  He told Mr. Cahill to

5    clean it up.  If he did, he didn't do a very good

6    job because those items were still there during the

7    inspection.

8        He talked to him about the drip legs, and he

9    said those valves can't be open.  Those valves have

10   to be closed, which was the proper way that the

11   valves should be handled.  He talked to him about

12   some stray pumps that were lying around in the

13   by-products area.  He said clean those up, Pat.

14       And he also talked to him about the AC

15   building, and the condition of the AC building.

16   And during the course of that walk-through that

17   valve went off.  And Mr. Kamholz said something

18   about the valve and something about the valve going

19   off during the inspection.  What exactly he said we

20   don't know for sure.  Mr. Cahill on the witness

21   stand was quite confident as to what he had said.

22   "We can't have that going off while they're here."

23       What he testified to in the grand jury was not

24   the same.  He testified four different ways about

25   what was said by Mr. Kamholz during this

1   walk-through.  But if we get hung up and we focus

2   too much on what Mr. Kamholz said, and we don't

3   look at what happened after that, we're missing the

4   forest through the trees, because you've got to

5   look at what happens after that.

6        And what do we know from the testimony happened

7   after that regarding Mr. Kamholz and Mr. Cahill?

8   And what's the answer to that question?  Zero.

9   Nothing.  No further discussion for the rest of

10  history about the pressure relief valve.  That's

11  what Mr. Cahill's testimony was.

12       I went through it with him in great detail.

13  First question, after you had that conversation and

14  before the inspection which started the following

15  Tuesday, whenever the meeting was.  Cahill says it

16  was Friday.  Say it was Friday, Saturday, Sunday,

17  Monday Mr. Kamholz come and talk to you about that

18  valve?  No.  There was no discussion at all.

19       The inspection starts.  Mr. Kamholz come to you

20  and say did you do anything to take care of that

21  valve so it doesn't come up?  Nope.  Never

22  discussed.  Never discussed again.  Mr. Cahill

23  says, well, I would raise it up in the morning and

24  I lowered that set point down at night.  And did

25  Mr. Kamholz have any idea at all that you did that?

1    No.  He doesn't record it in the log book.  Does
2    Mr. Kamholz know you didn't record it in the log
3    book?  No.
4        Then on that Friday, April the 17th, lo and
5    behold, if it hadn't gone off before then, and it's
6    not clear whether it had or had not, as much as it
7    was supposed to be going off, I don't know.  That
8    Friday it goes off and if gets noticed.  Any
9    discussion at all with Mr. Kamholz after that?
10   Pat, you didn't do a very good job.  Pat, what did
11   you do?  Pat, look what you've caused.  It is not
12   discussed again.
13       After that you continue, Mr. Cahill, to work at
14   Tonawanda Coke.  What was your relationship with
15   Mr. Kamholz?  We had a good relationship.  Did it
16   change at all after that inspection?  Did it change
17   at all after the PRV was discovered?  No.  No.  We
18   continued to have a good relationship.  Mr. Cahill,
19   you became the superintendent or the plant manager,
20   whatever it's called, plant -- the head for the
21   whole deal.  And from time to time Mr. Kamholz
22   would prepare forms for you to complete.  Yeah.
23   Did you have any hesitation to complete those forms
24   based on this prior incident or anything else?  No.
25   No.  I have no hesitation at all.  You relied on

1    Mark and had confidence in him?  Yes, I did.  Yes,

2    I did.

3        On the day that the valve goes off, which was

4    that Friday April the 17th, what happens?  The

5    valve goes off, one of the inspectors -- we don't

6    know who it was -- one of the inspectors notices

7    it, and he says, "What was that"?  And

8    Mr. Kamholz's response was either steam or is it

9    steam?  And then the inspector -- one of the

10   inspectors said, "What is it?"  Mr. Kamholz,

11   immediately without missing a beat said, "It's a

12   pressure relief valve."  The next question was,

13   "Well, how long has it been here?"  Mr. Kamholz

14   says, "I don't know.  Pat, how long has it been

15   here?"  And Pat says, "I don't know."

16       You sat through this trial.  Does anybody know

17   how long that valve has been there?  Was Mr.

18   Kamholz lying when he said he thought it was steam?

19   You remember the testimony of Mr. Cahill when he

20   testified in the grand jury, not here.  When he

21   testified in the grand jury, prior sworn statement.

22   You can weigh that in deciding what the truth is.

23       In the grand jury Mr. Cahill testified when

24   that thing went off I didn't know whether it was

25   steam or coke oven gas, that's what he said in the

1    grand jury.  Here he said he was shocked because

2    Mr. Kamholz thought it might be steam.  It's not

3    what he said in the grand jury.  Why the change?  I

4    don't know.  But that was his grand jury testimony.

5         Could you put up Government Exhibit 50, Lauren?

6    I hope that's right.

7         This is the picture that shows something coming

8    out of that pressure relief valve.  Mr. Cahill was

9    asked about that during his trial testimony.  And

10   he was asked -- I think it was by Mr. Mango --

11   "What is that coming out of that -- out of that

12   valve?"  His answer, "I don't know."  He didn't say

13   it was coke oven gas.  Even in the picture,

14   Government Exhibit 50, which shows something coming

15   out of the valve, Mr. Cahill's trial testimony was

16   "I don't know", and it was truthful, because you

17   don't know.  It didn't always emit coke oven gas.

18   It had a steam line on it and sometimes it emitted

19   steam.

20        So for Mr. Kamholz in response to the question

21   "What was that?" to say, "Steam" or "Is it steam?"

22   was an entirely, entirely truthful response.  His

23   immediate response when asked, "What is it?" to

24   say, "It's the pressure relief valve" was an

25   entirely truthful response.  His response to the

1    question, "How long has it been here?"  To say, "I

2    don't know," Pat, you're the foreman for

3    by-products.  You've been here for 15 straight

4    years -- he didn't say that, but as you know, Pat,

5    I only come here once every month or three months.

6    How long has it been here, Pat?  Was there

7    something wrong with him asking Cahill to give his

8    response on that, and then what happened?

9        Mr. Cahill took a couple of the inspectors to

10   the little green shack where this set recorder is,

11   and provided them with truthful information on how

12   the shack operates.  There's no suggestion that

13   anything Mr. Cahill said was wrong or inaccurate.

14   There is no suggestion Mr. Kamholz exercised any

15   control over what Mr. Cahill said.

16       Then the following Monday, which would be April

17   the 20th, and the following Tuesday, which would be

18   April the 21st, there were additional questions

19   asked of Mr. Kamholz and Mr. Cahill regarding the

20   pressure relief valve.  Truthful responses were

21   provided to those questions.  There is no

22   suggestion Mark Kamholz exercised any improper

23   control over the information provided by Mr. Cahill

24   or that the information provided by Mr. Kamholz was

25   anything other than truthful.

1          So where is the obstruction?  If you look at

2     entire context of this circumstance, where is

3     the -- where is the wrongdoing?  What was done here

4     that was that was wrong?  So then the question is,

5     well, why would you refer questions about

6     by-products to Mr. Cahill?  Why wouldn't you answer

7     those yourself?  Why wouldn't you refer questions

8     about by-products to Mr. Cahill?  He's the one that

9     works there.  He's the one that's in day in and day

10    out.  He's the one that's been there for 15 years.

11         Other questions regarding by-products were

12    referred to Mr. Cahill during the inspection.  Was

13    there something wrong with that?  If you remember

14    the evidence, Mr. Cahill remembered that he was

15    asked about the moat, the tar precipitator pump,

16    the light oil system, the drip legs, and the

17    ammonia stripper among other questions that he

18    answered during the inspection.

19         It was in Martha Hamre's log, this daily log

20    that she kept, about her references to ask Pat, or

21    talked to -- to the foreman of by-products.  So,

22    having him answer questions about the PRV, there

23    was nothing wronging with that.  Mr. Cahill

24    testified he wasn't happy about that.  He felt as

25    though he had been put on the spot, and just to

4051

1    bring this back, the Batman objection by Mr. Mango,

2    and we got a laugh out of that, but the question

3    had been asked was with great power comes great

4    responsibility.  And the point of me asking that

5    was not to -- not to get a laugh out of the jury,

6    but the point is -- the point is this, if you're

7    going to be the foreman of a department, if you're

8    going to take the extra money you get to be the

9    foreman, if you're going to enjoy the extra

10   benefits when you are the boss of a department,

11   you're going to get upset during an important

12   inspection when you're asked to answer questions

13   about how that department operates?  It just

14   doesn't make sense, and it certainly isn't fair to

15   put some responsibility on Mr. Kamholz because

16   Mr. Cahill didn't like being put on the spot.

17       And what do we know about Mr. Cahill?  What we

18   know about him is that, as I told you, Tonawanda

19   Coke is a community just like any other community,

20   just like you are a community.  And we all react

21   differently to different situations.

22       There was a time many years ago when I started

23   doing this where I hated doing what I'm doing right

24   now, standing up like this, I was sweating bullets

25   and my knees were knocking.  I wasn't comfortable

1    doing it at all.  I've been doing it a long time.

2    It's okay.  I don't mind doing it.  We all have

3    things we like to do and we don't like to do.  And

4    Mr. Cahill said he doesn't like to be the center of

5    attention.  That's okay.  That's understandable.

6    He said that.  He doesn't like being put on the

7    spot.  You could tell I think when he was on the

8    witness stand, he wasn't comfortable.  Remember

9    when he was asked to look for some circular charts

10   and Martha Hamre noticed he was nervous?  That's

11   his personality.

12       But to infer from that because he didn't like

13   being asked questions about his department, that

14   that means this man is a criminal or engaged in

15   obstructive behavior, it just doesn't follow.  And

16   there is a couple upside down perversions about

17   this whole thing that I don't know what weight they

18   should carry in your deliberations.  But it's

19   turning the world on its ear, which is a lot of

20   that in this case.

21       But what is the principle complaint about what

22   happened?  The allegation is I guess that

23   Mr. Kamholz said whatever he said on April the

24   10th, and that caused Mr. Cahill to raise the set

25   point on the PRV.  After the EPA and the DEC find

1    out about the PRV, what do they tell Mr. Cahill and

2    Mr. Kamholz to do?  Turn up the set point on the

3    PRV.

4        And what else seems unusual about this and

5    doesn't really make a lot of sense, what's the

6    other complaint?  The other complaint is apparently

7    that it was -- it was significant that Mr. Cahill

8    when he would do what he did, on his own, wouldn't

9    record it in this by-product operators log book.

10   That he was doing what he did, and he claimed the

11   reason was because he didn't want anybody to know

12   what he was doing.

13       Well, we know from the evidence both from his

14   testimony and from these by-product operator log

15   books and the testimony of Mr. Conway, Mr. Cahill

16   never ever put any of his change in the set point

17   entries in the log book.  There are none.  So, is

18   there a reasonable doubt?  Is there more than a

19   reasonable doubt?  Would you hesitate to act on

20   this evidence in a matter of importance?  I don't

21   think there's any question but that you would.

22       Now, the government, and they're certainly

23   entitled to do this, but what they do is they try

24   to -- to dirty up Mark Kamholz.  This obstruction

25   allegation, I can tell from how you reacted to when

1    this evidence comes in, I can tell how you reacted

2    when Mr. Linsin closed yesterday and said, "I'm

3    going to have Mr. Personius talk about that", that

4    you were looking to me because you wanted to hear

5    about this.  I understand this is important to you,

6    and it well should be.  It's also important to Mark

7    Kamholz, and it's important to his family how this

8    case gets decided.  And the government, quite

9    rightly, says if we can throw some dirt on Kamholz,

10   it's going to help.  You know, we got to try to do

11   that, so that's what they tried to do in this case.

12       He's been referred to as being manipulative and

13   deceitful.  That's how he's been described by the

14   government.  Again, lets put this in context.

15   We're going to part two of my four-part

16   presentation.  So you're through the first quarter.

17       Remember what you've heard from the evidence,

18   the government went to Tonawanda Coke on

19   December 17th, 2009.  And Mr. O'Connor, who

20   testified -- he's in the front row there -- he was

21   there.  They took a bunch of the agents out there.

22   They conducted what's called a federal raid.  The

23   whole point of doing that is to catch the target

24   off guard, to get the smoking-gun evidence that

25   shows the criminality.  They're a lot of work.  So

1    the reason you do that, rather than issue a

2    subpoena is -- it's like a Pearl Harbor surprise

3    attack type move.  Get it before they could get rid

4    of it or change it.

5        They were there for 12 hours.  That's a long

6    time.  There were a lot of agents there.  They

7    seized 36 large boxes of documents.  Thirty-six

8    boxes of documents.  And what do we have in this

9    case is the evidence that they got out of that

10   seizure.  What's been offered in evidence here

11   that's the smoking gun evidence, the evidence that

12   Mark Kamholz is a monster?  Some of his handwritten

13   notes from the inspection where he says something

14   about got Pat Cahill on April 20th to talk about

15   the PRV.  That's bad?  You got the foreman of

16   by-products to talk to the inspectors about the

17   PRV.  That's incriminating?

18       The draft of his response to the request for

19   information letter that Mr. Kamholz submitted to

20   the EAP in October of 2009, there's something wrong

21   with that draft?  There is a crossed-out word in

22   there.  Mr. Mango has invited you to speculate on

23   what that crossed out word is.  I mean, where are

24   we going with this case?  Where's the smoking gun

25   that came out of the 12 hours and the 36 boxes of

1       evidence that was seized?  So keep that in mind.

2            The criminal investigation then went on for

3       about ten months.  We know it started in October

4       of 2009.  We know the indictment was returned in

5       July of 2009, so that's about ten months.  And we

6       know that during that period of time Mr. Conway was

7       working on it, Mr. O'Connor was working on it, and

8       a whole bunch of other agents and investigators

9       were working on it too.  We know they had the

10      benefit of the grand jury.  We know witnesses

11      testified in the grand jury.  It's a big deal.

12      It's a lot of power.  You can subpoena somebody.

13      You can force them to come in, you can put them

14      under oath in front of a grand jury and ask them

15      all the questions you want about the case.  And the

16      government, we know from the evidence, we know they

17      took full advantage of that.  They had an unbridled

18      opportunity, unbridled opportunity to get all the

19      evidence they wanted on Tonawanda Coke and on Mark

20      Kamholz.

21           They put Mr. Kamholz and his conduct under a

22      30-year microscope over that ten-month period.  And

23      what do we have that shows that he's this deceitful

24      person, this monster that Mr. Kamholz [sic] has

25      characterized him as being?  I want to, if I can,

1    I'm going to go through that with you in a minute.

2        What we know from the trial evidence is that

3    there's a gentleman that worked in by-products back

4    in the '90s.  His name is Keith Hutchinson.  You

5    can look up there and see him.  I don't think

6    you'll remember him.  He was pretty quick, but what

7    he said about Mark Kamholz was not insignificant.

8    And the only reason we were able to get this out is

9    he happened to say it to the investigator, so we

10   knew about it.

11       He described Mark Kamholz as being a straight

12   shooter.  He described Mark Kamholz as being very

13   strict on environmental compliance.  That's what

14   Mr. Hutchinson said about Mark.  Now getting into

15   this a little later.

16       Contrast that, if you will, with -- remember

17   Mr. Carlacci?  He was the first witness.  He was up

18   here for three days when we thought this was going

19   to be a six-month trial.  It took us three days to

20   get through the first witness.  We speeded it up

21   after that fortunately for all of us.

22       Mr. Carlacci, if you recall, at the tail end of

23   his direct testimony -- he was put on as an expert.

24   But by the end of it he was an advocate.  He was an

25   advocate to paint Mark Kamholz as a bad person.

1     Remember he talked about the May 28, 2008,

2     inspection, and he accused Mr. Kamholz of having a

3     mask.  And he put the mask on over his face when he

4     walked through by-products.  And he accused

5     Mr. Kamholz of being uncooperative, uncooperative

6     during that visit.

7          Well, we were able to put into evidence his

8     notes.  What was it, three lines at the top, three

9     lines at the bottom, notes that he had from what he

10    described at that visit.  And nothing in there,

11    nothing in there about any of this.  And there are

12    other people that were present for that visit too,

13    Cheryl Webster, Larry Sitzman, and Mr. Foersch was

14    there too.  Nothing, nothing about any improper

15    behavior at this visit from Mr. Foersch.  In fact,

16    he said, no, I didn't notice anything at all.  I

17    didn't notice anything at all -- anything different

18    about Mark during that visit.  No, it was typical

19    Mark.

20         And then as far as the mask was concerned,

21    Mr. Foersch, said, Mark -- that wasn't uncommon for

22    Mark to have a mask around his neck.  When you go

23    to the battery, you have to wear a mask.  It

24    doesn't matter who you are.  If you're Mark Kamholz

25    or you're Donald Crane or you're Mr. Saffrin, you

1  wear a mask in the battery area, not for gas

2  emissions, but for particulate emissions.  And

3  that's what Mr. Foersch said.

4      So, for the first of these instances of

5  misconduct that we have, that's -- that's what you

6  have in the evidence.  You have Mr. Carlacci, the

7  expert, being the advocate, not supported by his

8  notes versus the other evidence in the case, which

9  demonstrates that what Mr. Carlacci was saying did

10 happen did not happen.  Mark was not uncooperative

11 during that inspection.  And as Mr. Carlacci

12 suggested, he wanted him -- if you remember, he

13 wanted him to be the plant manager.  We had to

14 correct that on cross and say he's not the plant

15 manager.  He's the environmental compliance officer

16 for the company.  And the mask, I think it's clear,

17 Mark would have a mask around his neck because of

18 the battery, and it had nothing to do with the

19 by-products area.  That's one of these 12 instances

20 where Mark has been painted as a bad person.

21     A lot has been said about the letter that was

22 sent to Mr. Kamholz in September of 2009 by

23 Mr. Patel.  Remember that when they had the

24 inspection in April, you had Miss Hamre and another

25 gentlemen from Denver, the NEIC.  You had from

1    Region 2 in New York City Mr. Patel and two other

2    gentlemen, and you had some folks there from the

3    DEC.  And Mr. Patel testified that the EPA decided

4    after the inspection they would send a couple of

5    these request letters.  They're called 114 letters

6    asking for information to -- to Mr. Kamholz.  They

7    sent one in July and they sent this other one in

8    September.  And the one that's really been the

9    focal point in terms of Mark being a bad person was

10   the one that was sent in September.

11       Again, you have to put in perspective what

12   Mr. Patel knew and what Mark knew when that letter

13   was sent and when the response was received.  And

14   what do we know about Mr. Patel?  He was present

15   for the first week, but because of funding, he was

16   not present for the second week.  He left on that

17   Friday, along with the other two gentlemen who came

18   with him and went back to New York City.  When was

19   the information provided about the pressure relief

20   valve?  The next Monday and Tuesday, the 20th and

21   21st, when Mr. Patel and the other two, who wrote

22   this letter from Region 2 when they weren't there.

23   They were gone.

24       And -- pardon me -- what was talked about

25   during -- on the 20th and 291st?  There was talk on

1    both dates about the pressure relief valve and how

2    it worked and all the details of it, and so on, and

3    so forth.  So, when Mr. Kamholz gets the letter in

4    September, he's got it in his head that DEC and EPA

5    know about the history of the pressure relief valve

6    because it's been discussed.  Mr. Patel and the

7    other two gentlemen with him who wrote the letter,

8    they don't know that, because they weren't there.

9        So the letter gets written to Mr. Kamholz.  And

10   one of the questions -- and I think the only one

11   that we really have to focus on is question 20F,

12   but before we get to that, remember also that on

13   his direct examination what Mr. Patel suggested to

14   you was that the whole letter as is related to the

15   PRV was misleading because he was seeking five

16   years of information.

17       And when I asked him on cross, your testimony

18   was you expected to get five years of historical

19   information on the PRV, what did you base that on?

20   And if you recall -- if I recall his testimony he

21   said, well, it's in the instructions.  So we went

22   to the instruction sheet and he looked through it

23   and he looked up and he said it's not there.  And

24   it wasn't there.  And what you have to do with that

25   letter -- I don't think I'm going to take the time

1    to put it up.  But I encourage you, if this is a

2    matter of concern to you, I encourage each of you

3    to go look at that letter.  It's Government

4    Exhibit 126.  The way the letter is set out is if

5    Mr. Patel wanted information going back five years,

6    he asked for it.  And there's a specific example.

7    There's two examples where he asked for

8    five-year-old information.  He would say I want

9    information going back five years.  He didn't say

10   that with the pressure relief valve.

11       Where he does say it is there's a question

12   about benzene service, and it's question number 16,

13   and you're not going to remember this, but you're

14   hopefully going to remember that Personius told me

15   this, 16, Sweet 16, look at number 16, that's where

16   Mr. Patel specifically asked for information going

17   back five years.

18       If you look at the questions related to the

19   pressure relief valve, which are questions at 20,

20   and 20F comes the closest, but if you look at those

21   questions, they don't go back five years, and

22   Mr. Kamholz at the time he fills this out, he has

23   in his head I've already told them back on

24   April 20, 21st about the PRV.  They're looking for

25   what the current information is, not the historical

4063

1    information.

2         Question 20F is the difficult one, because if

3    you look at the question, it's split.  It asks for

4    current information and old records depending on

5    what the answer is.  But in terms of the

6    information request, it's current.  You only

7    provide records if the current information requires

8    you to look back the five years.

9         In addition to that, we know from the evidence

10   that Mr. Kamholz included a cover letter, and I

11   asked Mr. Patel about that.  Did you read the cover

12   letter?  Yes, I did.  What did the cover letter

13   say?  If you have any questions at all about my

14   responses, call me.  So I asked Mr. Patel, did you

15   pick up the phone and call Mr. Kamholz if you were

16   unsatisfied or dissatisfied with what he said about

17   anything including the PRV?  And his answer was no.

18   I don't know even -- I guess I must have asked him

19   this, why not?  And he said because I talked to my

20   supervisor, and he said I can't call him.  And the

21   reason he couldn't call him was because the

22   criminal investigation was pending.  I mean, is

23   that fair?  I mean, you answer questions in good

24   faith.  The person who writes the question from the

25   EPA wants to ask a question about it, and he's told

1      by his supervisor, no, you can't call him because

2      there is a criminal investigation pending.  Is that

3      fair?  Does that make him a deceitful person?  Look

4      at the letter if it's of concern to you.

5           You can kind of get a sense when you're sitting

6      over there when things resonated.  Cahill resonated

7      with you, and when Patel testified about this I

8      think it resonated with you.  We'll meet it head

9      on, and I'll look every one of you in the eye and

10     neither one of these is a concern.  You'll have to

11     remember the Cahill testimony and take into

12     consideration everything that I've told you about

13     the circumstances, and you'll make that decision.

14     On the letter, you can go look at it.  And I invite

15     you to do that, because it's very clear when

16     Mr. Patel wanted old information and when he did

17     not.

18          Miss Hamre, something else that came up

19     yesterday in Mr. Mango's closing.  This is number

20     three, three out of 12.  We're getting there.  She

21     testified that oh, by the way, during the opening

22     day of the inspection on April the 14th, that

23     Tuesday, Mr. Kamholz said there was no pressure

24     relief valve anywhere in the facility.  Wow.  But

25     on cross-examination by Mr. Linsin it became clear

1      that if you looked at her notes in context that

2      what she was talking about was the battery flare

3      when she wrote that note.  It didn't have to do

4      with the whole facility, much less with the

5      by-products area.

6          And would Mr. Kamholz say that anyway when he

7      made prior disclosure to the DEC that talked about

8      pressure relief valves?  This isn't the only

9      pressure relief valve at Tonawanda Coke.  There is

10     a number of pressure relief valves there.  And this

11     is probably the most important point on the fact

12     that she is mistaken in her recall.  There were

13     other people present for that initial session.

14     There were people present who testified here in the

15     court that were present.  I think Mr. Sitzman was

16     there.  I think Mr. Patel was there.  And do you

17     think that if they understood that Mr. Kamholz had

18     made that representation, that the government

19     wouldn't have asked them about that during their

20     testimony?  Do you think if others who were present

21     who weren't called remember or understood that

22     that's what Mr. Kamholz had said that they wouldn't

23     have been called as witnesses here?  Of course,

24     they would have.

25         And the fact of the matter is it didn't happen.

4066

1    And do you think that if it was understood that

2    Mr. Kamholz on April 14th had said there's no

3    pressure relief valve on the coke oven gas line,

4    which is what she suggested by her testimony and

5    what the government argued in their closing, do you

6    think for a minute that when that valve got

7    discovered that that wouldn't have been brought up,

8    that that wouldn't have been in somebody's notes

9    again, that that wouldn't have been a topic of

10   discussion?  He said that on a Tuesday, and they

11   find out on a Friday, and nobody talks about it?

12   It just doesn't comport with what the Judge told

13   you to use which is your common sense and your

14   intelligence and your experience.  Things don't

15   happen that way.  So her testimony on that she was

16   mistaken.

17       Mr. Foersch testified, not on my examination

18   but on Mr. Piaggione's cross-examination, that

19   after he -- the last time he looked in quench tower

20   number 2 and saw that either there were no baffles

21   or that it was in disrepair, that he never went

22   back there.  There's no question about that.  But

23   he claimed in response to a question by

24   Mr. Piaggione that a year later he asked Mark

25   Kamholz, "Did you put those baffles in quench tower

4067

1    number 2"?  And he testified under oath that

2    Mr. Kamholz said, "Oh, yeah, I put them in there."

3    And I suggest to you that that conversation did not

4    happen.  And this would be the fourth badge of

5    fraud, if you will, that the government relies

6    upon.

7        If you'll remember Mr. Foersch had been

8    interviewed right after Mark was arrested.  Mark

9    was arrested on December 23rd of 2009, two days

10   before Christmas.

11           MR. MANGO:  Your Honor, I have to object

12   to that.  There's no evidence in the record about

13   an arrest on a specific date.

14           THE COURT:  Okay.  The jury heard the

15   evidence, and we'll leave it go at that.

16           MR. PERSONIUS:  In early January of 2010,

17   if you recall from the evidence, we sent a private

18   investigator, a retired FBI agent to go talk to

19   Mr. Foersch.  Talked to him twice.  Those two

20   interviews were separated by ten days.  During the

21   intervening ten days Mr. Foersch had the

22   opportunity to talk with a DEC attorney.

23       During the first interview Mr. Foersch

24   indicated to Mr. Thurston that he was fully aware

25   that there were not baffles in either quench tower.

1    Mr. Foersch made no mention of Mr. Kamholz ever

2    telling him that he had put baffles in quench tower

3    number 2.

4        Mr. Thurston came back.  He gave Mr. Foersch --

5    the second time he came back after Mr. Foersch had

6    talked to this DEC attorney, and he said, I want

7    you to review my report, and I want you to make any

8    changes to the report that you'd like to.

9    Mr. Foersch read it.  The only change he made was

10   to say, well, I want you to take out the word

11   "fully" in front of the "aware", and the word

12   "aware" was in front of "aware there was no baffles

13   in both quench towers", so Mr. Thurston crossed out

14   the word "fully".  It was the only change he asked

15   to be made to the report.  He didn't say anything

16   at that interview about Mr. Kamholz having told him

17   he put baffles in quench tower number 2.

18       Mr. Foersch then testified in the grand jury

19   during 2010.  I can't remember if it was March or

20   July, sometime in 2010, a little later in the year.

21   And he was extensively questioned by the government

22   about his interaction with Mr. Kamholz and these

23   baffles.  And Mr. Foersch testified about looking

24   at the tower and seeing that it was -- in the grand

25   jury said it was in disrepair.  This was the last

4069

1    time he looked.

2        And he was asked in the grand jury -- you

3    remember he was impeached on this.  Impeached means

4    you read somebody's prior statement and try to

5    demonstrate that it's inconsistent with what he's

6    testifying to at trial, which, by the way, is a

7    very important piece of evidence, as the Judge has

8    told you, to weigh in assessing the credibility of

9    a witness.

10       Back in the grand jury when Mr. Foersch

11   testified about looking in this tower and it was in

12   disrepair.  He was asked did you do any follow up?

13   And his answer was no.  A few questions later he

14   was asked did you ever talk to Mr. Kamholz again

15   about it?  Specific question, perfect opportunity

16   to say yeah, a year later, a year later I went back

17   and asked him, and he told me they weren't there.

18   He said I don't recall talking to Mr. Kamholz.

19       Somehow between 2010 and the time he sits in a

20   public courtroom Mr. Foersch's memory changes.  And

21   I don't mean to criticize him for what he did.  He

22   was put in a very, very bad spot.  He's the one who

23   was this 30-year face of the DEC.  He's in a bad

24   spot.  He's sitting in a courtroom, not as many

25   people as there are here now, but he was put in a

4070

1   bad spot.  But if you recall his testimony, he was

2   pretty much at ease when he started.  And as we got

3   closer and closer, as the years passed and we got

4   to those letters from December of '96 and January

5   of '97, if you recall, his comfort level in the

6   witness box changed, and he became less and less

7   comfortable.  And it's understandable that he would

8   because he's in a bad way.

9       But what I suggest to you is that his recall

10  that he testified to here that the government wants

11  you to rely on as good evidence, that you wouldn't

12  hesitate to act upon is not good evidence.  And

13  he's misremembering what happened, and he's doing

14  it because he was put in a bad spot, and he was

15  embarrassed.  You recall, I came back on at that

16  point, redirect or whatever it was, and I asked

17  him, and I said in your heart of hearts isn't it

18  true you knew there were no baffles in there?  And

19  he had that pained look on his face.  He became

20  very uncomfortable, and I hated to do it to him,

21  but he said yeah, yeah, I knew they weren't there.

22      And on the last point on this, do you think for

23  a minute if the government really believes that

24  that happened, do you think for a minute if they

25  had a witness who had directly lied to a DEC

1    officer and said he put baffles in there when he

2    didn't, do you think for a minute that they

3    wouldn't have called him as their witness?  Of

4    course, they would have.  But they didn't.  We had

5    to call him.  So my point is that didn't happen.

6        It was suggested in opening and it was carried

7    forth in the government's closing that there was an

8    effort, and apparently the claim involves

9    Mr. Kamholz, this is number five, to delay these

10   inspectors when they came to Tonawanda Coke.  And

11   this was part of this scheme of deception.  There

12   is the guard house, and they would have to wait

13   there before they could come into the plant.  And

14   Mr. Kamholz or somebody else would some out and

15   greet the inspectors.

16       Mr. Kibler, who is the gentleman who was

17   involved in those 303 -- the daily 303 inspections,

18   the oven batteries, he was asked about that.  He

19   said, no, no, that didn't happen.  There's no

20   delay.  No, I came in, I went over, I changed, and

21   I went out, and I did my inspection.

22       There was an attempt with the volunteer fireman

23   yesterday, two days ago -- I'm losing track of my

24   days -- two days ago, the volunteer fireman,

25   Mr. Ianello, there was an attempt to suggest with

1    him that when he came to the facility looking for

2    the fire and the guard didn't immediately let him

3    drive through, that that somehow was a

4    manifestation of this same type of improper

5    conduct.

6        Sometimes you take reality and you stretch it

7    too far, hesitate to act in the most important of

8    your own affairs.  But more to the point, during

9    the cross-examination of Mr. Foersch, Mr. Piaggione

10   asked him, well -- because he could because it was

11   cross -- isn't it true that every time you came out

12   there Mr. Kamholz knew exactly what you were going

13   to do?  And my recall of Mr. Foersch's response,

14   no, that's not true.  He had no idea what I was

15   going to do when I came out there.  There is no

16   evidence in the record that supports that

17   allegation by the government that they continue to

18   argue in their closing.

19       Number six, reference was made to a conference

20   that Mr. Heukrath testified about, and he was one

21   of the later witnesses in the case.  You'll

22   remember Mr. Heukrath, he gave the longest

23   description of his employment history in the

24   history of mankind.  He went on for a couple of

25   pages of the transcript describing his past

1    history.  He's an earnest man, and he's very

2    precise, and certainly came across as a credible

3    witness.

4         But, in any event, he testified about

5    conversation he had with Mr. Kamholz in the fall

6    of 2009.  And it had to do with benzene emissions,

7    and he recalled that Mr. Kamholz responded, well,

8    there's no restriction on the amount of benzene

9    emissions, and that's how it was left on direct,

10   that's how it was left during the government's

11   closing.

12        On cross-examination I went up and I said, do

13   you remember what the context -- do you remember

14   what the context of the conversation was, and

15   Mr. Heukrath fortunately did.  And he said, yeah, I

16   remember I was talking to him about quench towers

17   in the AC building.  He wasn't talking about waste

18   heat stacks or pressure relief valves or anything

19   else.  But you need to know that to be able to put

20   that comment in meaning, or is it better to just

21   say that Mr. Kamholz said to Mr. Heukrath that

22   there's no restrictions on benzene emissions?

23        Well, again, you got to know the context.  You

24   got to look at the circumstances when the comment

25   was made and what the conversation was that took

4074

1     place at that time.

2          Number seven, and this was mentioned again in

3     closing, that back in the '90s both Mr. Brossack

4     and Mr. Priamo -- Anthony Brossack worked in the

5     battery area.  He was like the third witness.  And

6     Mr. Priamo was the gentleman with the nice

7     mustache.  But in any event, they both remembered

8     that back in the '90s they talked to Mr. Kamholz on

9     an occasion when the pressure relief valve released

10    and asked him if it was okay, and he said it was.

11    And that makes him deceitful or manipulative?  Or

12    is that simply Mr. Kamholz's expressing his good

13    faith belief that as far as he knew it was okay,

14    that the way the valve was being used that that's

15    okay?  Is that some indication he's a bad person?

16         Number eight, and again it came up in closing,

17    and this ran through the trial and I'm not sure

18    where it goes or what it means.  But Mr. Brossack

19    remembered that back in the '90s Mr. Kamholz on one

20    occasion after something had happened, Mr. Brossack

21    was on the radio and referred to a quench tower --

22    or quench station as a quench tower, and that this

23    difference between a tower and a station was

24    somehow important and somehow shows that he's less

25    than honest.

1           And witness after witness was asked, and they

2      said it doesn't -- it has no meaning.  It doesn't

3      matter.  It doesn't mean anything.  But to the

4      government it apparently means something.  And

5      beyond that, not that it matters, but Mr. Patel

6      remembered that -- the gentleman from New York

7      City -- he remembered that there was a MACT, they

8      call it a MACT standard -- that specifically talked

9      about the difference -- if it matters between a

10     tower and a station.  I don't think it does matter,

11     but the government chooses to continue to bring it

12     up.  It doesn't mean Mark Kamholz can't be trusted

13     or that he was stacking the deck against the DEC.

14          This was mentioned once, and it hasn't come up,

15     but I'm telling you everything I could figure out

16     that was an attempt to try to tar Mark Kamholz's

17     image.  You've heard a lot about the emission study

18     from July of 2003, and it's mostly about the -- the

19     table in it that has the information about the PRV

20     on the coke oven gas line.  You've heard a lot

21     about that.

22          Well, there's another page in that exhibit,

23     again it's Government Exhibit 131, and at page 2-10

24     there is a discussion of the quenching system at

25     Tonawanda Coke.  And what it says in there is that

1    there is a single quench tower at Tonawanda Coke

2    and it has baffles.  And if you recall, this is why

3    it stands out in my mind, when that was read Judge

4    Skretny stopped and said, did you say quench tower

5    as opposed to towers?  And the witness or the

6    person questioning, somebody said yes.  And the

7    point is that's wrong.  It's incorrect.

8        And what I want to suggest to you is so what?

9    Mr. Kamholz didn't write it.  He submitted it, but

10   he didn't write that.  The fact that it refers to a

11   tower is an indication that the author did not have

12   good information on what that meant, but beyond

13   that, remember what that study was.  And this helps

14   explain why Mr. Kamholz would have missed it.  If

15   and when, you got to assume he looked at it, but

16   why he would have missed it.

17       This study had to do with -- some of you know

18   more about this than I do -- HAPS emissions.  And

19   it had to do with leaks.  What relevance would what

20   was going on in the quench tower have to do with

21   that anyway?  And I only mention that because it

22   helps explain why Mr. Kamholz would have missed

23   that.  I don't know if it's going to come up on

24   rebuttal.  Again, it's there.  I want to try to

25   identify everything I can for you and explain to

1    you why what the government is trying to do here,

2    it just doesn't wash.  And the other point about it

3    is that reference is completely immaterial to the

4    purpose -- to the purpose of the study.

5         There was a lot made of the annual and

6    semi-annual certifications that would be prepared

7    by Mr. Kamholz, and starts at Government

8    Exhibit 31, prepared by Mr. Kamholz, and then

9    signed by the plant manager.  And we had a couple

10   witnesses talk about how they didn't like having to

11   sign those.

12        And again, if that concerns you, if you take a

13   look at the forms, what you'll see is they are

14   clearly set up so that a person who knows about

15   what's being reported fills it out and signs it.

16   And Mark Kamholz signed every one of those and

17   somebody who is a responsible party, i.e. the plant

18   manager, is expected to also sign them.  There's

19   nothing improper or sinister about those forms or

20   the fact that they're signed by both Mr. Kamholz

21   and the plant manager.

22        Something that hasn't been mentioned since it

23   was brought out, but it came out in Mr. Brossack's

24   testimony is you've heard about what's called the

25   beehive.  The beehive is when the exhauster shuts

1    down.  When the exhauster shuts down, you're not

2    sucking the gas out of the battery.  The exhauster

3    pulls the gas towards the exhauster, and when it

4    goes to the other side, it pushes it away.  So it's

5    like a vacuum cleaner sucking it up and pushing it

6    out the other side.  If the exhauster dies, there's

7    nothing that pulls that coke oven gas out of the

8    battery.

9        So, what you have to do at that point is that's

10   when you have to light this flare.  It's a rare

11   occurrence.  It doesn't happen often at all.  But

12   the government asked Mr. Brossack about beehiving,

13   and Mr. Brossack recalled a conversation that he

14   had with Mr. Kamholz where Mr. Brossack had had an

15   experience where the exhauster was shut down for

16   about 45 minutes, and Mr. Kamholz made some

17   comment.  It wasn't clear what he said, but

18   something about ten minutes, that beehives don't

19   last more than ten minutes.  It's not clear what he

20   said.

21       I'm not sure why it was brought up, but what

22   came out of all of that was it lasts -- if there is

23   a beehive, what do you do with it?  We put it in

24   the general foreman's report.  What happens with

25   the general foreman's report?  Do the inspectors

1    look at that?  And the answer was no.  So, I don't

2    know what the purpose -- maybe we'll find out on

3    rebuttal why that's important.  But I don't know

4    what the point is.  I don't know why it was brought

5    up, and I don't know what it means.

6         And again, Mr. Brossack and Mr. Priamo each

7    have been there over 30 years.  Each of them said

8    that there's been less than 30 -- less than 15 of

9    these incidents, so it happens about once every two

10   years.  It's a very, very rare event that the

11   beehive occurs.  That's 11.

12        Now, number 12.  And on this one, government,

13   you got Mr. Kamholz.  The battery flare.  He

14   shouldn't have let that happen.  We admit that.  We

15   fess up to that one.  That battery flare should

16   have had the -- the automatic igniter, the pilot to

17   do it.  It should have and it didn't.  It started

18   in '94, lasted until 2008, about 14, 15 years.

19   Granted that ties in with these beehives.  So

20   during that period of time it would have been used

21   about seven or eight times, but it should have the

22   pilot hooked up to it, and it didn't.

23        And it was suggested in the government's

24   closing that that was Mr. Kamholz's decision to

25   shut the natural gas off.  My recall is I

4080

1    specifically asked Mr. Brossack -- the way I said

2    it was you don't mean to suggest to this jury that

3    it was Mr. Kamholz's decision to turn off the

4    natural gas, and he said oh, no, no.  No, I don't

5    mean to suggest that.  Mr. Kamholz was the

6    messenger.  He's the one that said it's shut off

7    because natural gas was expensive.  The government

8    recalled the testimony differently, and I think

9    they're incorrect, because I remember asking the

10   question.  It wasn't Mark Kamholz's decision.  But

11   should he have not allowed that to happen?

12   Absolutely.

13       And in the letter, this letter that came out in

14   September of 2009.  It gets answered by him in

15   October of 2009 from Mr. Patel, that has a question

16   in it that asked about the -- about this flare.

17   And that's the other example where there is a

18   question that asks for information and documents

19   going back five years.  And that's question number

20   33, and it's in Exhibit 126.  And the way

21   Mr. Kamholz answers that question is -- he doesn't

22   lie, but he simply says there are no documents.  He

23   just doesn't answer the question about whether or

24   not it hadn't operated in the past five years, and

25   he should have.

1        So, one instance.  Thirty years, 12-hour

2    search, ten-month investigation, full power of the

3    grand jury, complete federal investigation, and one

4    instance where Mr. Kamholz is subject to criticism.

5        We're going talk about the entrapment by

6    estoppel now.  It's very, very important to us that

7    you give consideration to this defense in this

8    case, and it explains why we took the time we did

9    with these different DEC witnesses to talk about

10   what their relationship was with Mr. Kamholz and

11   with Tonawanda Coke.  And what I suggest to you

12   that we drew out of that evidence is that, number

13   one, the relationship that Tonawanda Coke had from

14   1980 or so, however far you want to go back,

15   until 2009, until April of 2009, it was with the

16   DEC.  It wasn't with the EPA.  EPA had come out

17   there twice to do inspections, and Mr. Foersch

18   couldn't remember anything about them.  One around

19   1990, another around 2000.  That's the only time

20   they had been there.

21       Then, as the way Mr. Linsin described it,

22   there's a new sheriff in town.  They come in in

23   April of 2009, they do this inspection, and then

24   there's a tsunami change in what the regulatory

25   attitude is.  And it's our position that that just

1      isn't fair.  It isn't fair to prosecute a company

2      or an individual for what they've been doing for 30

3      years that they thought was okay because another

4      agency, the feds, decide to come in and read the

5      rules differently.

6          And provided the elements are met, and we

7      embrace those elements that have to be met,

8      provided those are met, you have the authority, the

9      power -- what is it, where there's great power,

10     there's great responsibility.  You have the power

11     to decide this case based on that defense.  We have

12     the burden -- it's not beyond a reasonable doubt,

13     but we have to show that it's more likely than not

14     that this circumstance prevailed.

15         One of the reasons we called Gary Foersch as a

16     witness when the government didn't was because it

17     was a great way to try to describe to you what that

18     relationship was between Mr. Kamholz, Tonawanda

19     Coke, and the DEC.  And I suggest to you that what

20     you found from his testimony is that it was a good,

21     positive, productive relationship, that they got

22     the work done, that Mr. Kamholz wasn't in his

23     pocket, that there was no fix.  It was outgoing,

24     honest relationship over those 30 years.

25         Not everything was documented.  Some of

4083

1    Mr. Foersch's reports leave something to be

2    desired, but the work was done.  The focus was put

3    where it should be.  It was put on the battery,

4    because that's where the problems are, and things

5    were taken care of.  If there was a question or a

6    concern, you call, and it would get taken care of.

7         Remember Mr. Sitzman testified, yeah, I

8    remember that.  He remembered a time that he wanted

9    to come out, there is some complaint about these

10   emissions.  He said I want to go out and I wanted

11   to check the emissions in the battery.  He called

12   Mark, and Mark said, yeah, come on out.  So he came

13   out at eleven at night.  Was Mark there?  Yes, he

14   was.  And until two in the morning he checked the

15   emissions.  And Mark was there with him.  Stayed

16   the whole time.

17        He mentioned another example where the

18   Tonawanda Coke, on its own, because there was some

19   complaint about these emissions it raised its waste

20   heat stack by 30 or 40 feet to try to help address

21   that issue.  That's the kind of relationship that

22   it was.  They weren't going to get hung up on

23   formalities.  They were going to get the job done

24   and the job did get done.

25        Now, I want to take that, and I want to apply

1    step-by-step with you how we think this entrapment

2    by estoppel defense applies to one of the set of

3    the charges.  I'm not going to go through all of

4    them, because we will be here two or three hours.

5    I won't get your attention for that long. I want to

6    do it with one, and then I'll briefly touch on the

7    others.

8        I want to talk about quench tower number 2,

9    because that was the main issue really with Mr.

10   Foersch.  And you recall that Mr. Foersch candidly

11   and honestly admitted that he would have

12   discussions with Mark Kamholz about quench tower

13   number 2, and about this idea of the steam and if

14   you reduce the size of the tower, Mr. Linsin said

15   this is simple physics.  No physics is simple.  But

16   you reduce the size of the tower, as the steam goes

17   up, it doesn't go up as fast, so you're not pulling

18   those particulates up.  And therefore the purpose

19   of the baffles is either limited or not existence.

20       And Mr. Foersch said yeah, we had those

21   discussions, and I agreed with Mark about that.

22   And he went on to say I talked to Henry Sandonato,

23   my supervisor, about it, and he agreed too, that

24   the baffles really weren't efficient.  And I told

25   Mark that I didn't think that they were.

1          And he testified -- we ultimately got out of

2     him, as he had told Mr. Thurston, and as he

3     testified in the grand jury, he knew there were no

4     baffles in that quench tower number 2, he being

5     Mr. Foersch, he knew it.  And when he was asked in

6     the grand jury -- and we brought this out on his

7     examination, when he was asked in the grand jury

8     well, you knew it, but why didn't you do something

9     about it, his response was, it was one of those

10    discretionary things.  It was one of those

11    discretionary things.

12         That's what this case is about.  It was 30

13    years, and that's what it was.  And then April

14    of 2009 it all changes.  And the question is, is

15    that fair?

16         Now, as far as the permit application was

17    concerned that Mr. Kamholz put in which reinforces

18    this, the government questioned this and tried to

19    suggest it was improper.  But if you recall, when

20    the permit application was put in for the quench

21    towers, for quench tower number 1, which is the

22    east one that had the exemption, Mr. Kamholz in the

23    application cited the Air 100 permit.  He put the

24    word in "exemption" I think.

25         For quench tower number 2, what Mr. Kamholz did

1    is he cited those two letters, the '96 and '97

2    letter, which kind of scratch your head and say why

3    would you cite the '97 letter that says you have to

4    have baffles?  It's because it was known that even

5    though that was in the letter, that wasn't the

6    understanding.  Why else would he cite that?  And

7    what he also cited which is important is he cited

8    to the regulations.  It's 6 New York Code Rules and

9    Regulation, NYCRR. You don't need to do know all

10   that.  It's Part 214.

11        If you recall, there is a subdivision of Part

12   214 that says there is exemptions.  And that's the

13   one that Mr. Kamholz cited.  He cited 214.10, which

14   is the exemption section.  He specifically told the

15   DEC and whoever was reviewing this what his

16   understanding was.

17        And then what happened?  The permit comes out

18   and guess what?  Condition 96 for tower number 1

19   says you got to have baffles.  And condition 97

20   comes out for tower number 2 and that says you have

21   to have baffles.  And you heard the government

22   argue that means you've got a problem with number

23   2.  We're going to let you off on number 1, but not

24   on number 2.

25        But that's not even totally true, because Mr.

1   Eng testified that as far as the EPA was concerned,

2   it didn't matter for quench tower number 1 that you

3   had the exemption.  The permit overrode that

4   exemption.  That isn't the position the

5   government's taking here, but that was the attitude

6   of the EPA.  And again, is that fair?  Is that the

7   way our government should work?

8       So what we have happening at trial now is the

9   following.  The government is willing to concede,

10  as I think they must, that the exemption applies to

11  tower number 1, this Air 100 from 1984, whenever it

12  was.  They conceded that.  And their point there is

13  how often the quench tower was used.  I'll get to

14  that in a minute.  For quench tower number 2 the

15  government is saying no, no, no, doesn't matter

16  what relationship you have with Mr. Foersch.  It

17  doesn't matter that you put that exemption section

18  in your permit application, doesn't matter.  You're

19  guilty of five separate felonies for not having

20  baffles in there, even though the DEC

21  representative knew about that.

22      So to apply this entrapment by estoppel defense

23  to quench tower number 2 the first question is was

24  there a disclosure of the condition or activity to

25  the governmental entity?  And here there clearly

1    was.  Mr. Foersch has acknowledged I knew there

2    were no baffles in quench tower number 2.  So there

3    was a disclosure.  He knew about it, no question.

4         And then number two, did Tonawanda Coke and

5    Mr. Kamholz rely upon the authority of whoever it

6    was that they were dealing with?  Of course,

7    Mr. Kamholz did.  He put it right in the permit

8    that he did.  He cited those two letters, which

9    makes no sense, in the exemption section, and said

10   we don't need them for here.

11        Is there something inequitable about the

12   government now enforcing condition 97?  Well, of

13   course there is.  And does the evidence tell you

14   that even though condition 97 which said baffles in

15   question number 2, which was in effect from 2002 to

16   the present, that Mr. Foersch never enforced that.

17   Is there a certain unfairness there to now say

18   you're guilty of five felonies?  We think so, and

19   that's why that that defense -- this is a textbook

20   case for this defense.  And you don't get many of

21   them.  But this is the one.  And you have the power

22   to apply it to these facts.

23        Beyond everything else, proof -- if you ever

24   get to this point of saying we're convinced on

25   whatever count that guilt has been proven for every

4089

1        element for that count, presumption is gone,

2        guilty.  Even if you got to that point, you have

3        the authority to apply this defense, that's how

4        powerful it is.  And it's a once-in-a-million

5        opportunity that you have.  But it applies, it

6        applies in this case.

7            Now, I'm not going to go through the other

8        counts in detail, but I'm going to quickly suggest

9        to you why we think -- why we think it applies.  To

10       the pressure relief valve, was there a disclosure?

11       Yes, there was.  Of course there was.  It was

12       disclosed in the emission study table back in July

13       of 2003.  It was open and obvious.  As Mr. Linsin

14       asked one of the witnesses, was a shroud put over

15       it?  Of course not.  It was out in the open.  Even

16       Mr. Foersch, when he saw a picture of it said,

17       yeah, that sure looks like an emission point to me.

18       It was there.  It was easily to be seen.  It was

19       disclosed.

20           There were these full compliance evaluations

21       that you heard about.  And the testimony is that a

22       full compliance evaluation is supposed to be done

23       every year.  Every year.  And it's supposed to

24       identify, not only the permitted emission points,

25       but also the unpermitted emission points.  And

1    there's one of those completed every year.  Every

2    year that said that Tonawanda Coke was in

3    compliance.  And now to say five felonies for that,

4    is that fair?

5        Quench tower number 1, I'm not going to take

6    time on that.  That comes down to whether you think

7    that there was evidence that you wouldn't hesitate

8    on that shows that that exemption doesn't apply.

9    In other words, that number 1 was being used more

10   than 10 percent of the time.  I'll touch on that in

11   just a minute.  The evidence isn't there to support

12   not applying that exemption.  But even on that one,

13   what you have that suggests this unfairness is the

14   Eng email from December 30th of 2009, the Eng email

15   where he knows from Mr. Sitzman that this exemption

16   has existed at that point for 25 years, and he

17   represents the EPA and says it doesn't matter to

18   me.  They missed it.  He sends the email that says

19   DEC missed it, and Tonawanda Coke didn't notice it,

20   or something, not knowing about the relationship

21   that existed between Mr. Foersch and Mr. Kamholz.

22   And he says so we're going to site them for a

23   violation for that.  Is that fair?  Is that how we

24   want our government to act?

25       And then Counts 17 and 18, and this applies

1   more to 18.  Eighteen is the count that has to do

2   with taking the substance out of that tank with an

3   excavator, putting it in a front end loader, and

4   taking it over and putting it into the coal piles.

5   And remember that in June of 2009 Mr. Corbett was

6   told about that by Mr. Kamholz, told about that by

7   Mr. Kamholz.  And the fellow from the EPA,

8   Mr. Grossman, said don't tell Kamholz we have

9   concerns.  We want to do some sampling before we do

10  anything.

11      In the intervening three months what

12  Mr. Kamholz told them they were going to do was

13  done.  It was taken over and put in the coal pile.

14  Exactly what Mr. Kamholz said they were going to do

15  is done.  And they come back in September '09, and

16  lo and behold, it's been done.

17      So now that's another felony count, because EPA

18  said, no, don't tell Kamholz not to do that.  Don't

19  tell him not to do that, get a felony out of that.

20  Is that fair?  Is that the way we want our

21  government to act?

22      It bothered Mr. Corbett so much, if you'll

23  recall, he went to Mr. O'Connor after he had been

24  interviewed by the government and said, you know,

25  this is bothering me.  I've got to let you know.  I

4092

1    would have told him about this, but Mr. Grossman

2    told me not to.  It's pretty sad.

3         And then for Count 19, the tar decanter sludge.

4    That's the stuff that they put in the front end

5    loaders and take it out to the coal pile.  And

6    there what you have, you have the inspection

7    reports, the one from Mr. Fisher goes back to '89,

8    and they move forward.  You have the disclosure.

9    You certainly have in -- before that you have the

10   EPA reports.  But the key there is the 1989

11   inspection report, Defendants' Exhibit B.

12        And then you've got the later inspection

13   reports too, but that's not all you have.  You have

14   Mr. Strickland's testimony, because what the

15   government kept trying to get these witness to say

16   is nobody went out and checked.  And Mr. Strickland

17   said, no, it doesn't work that way.  It's not just

18   based on conversation.  These reports are based on

19   conversation and observation.

20        Where is Mr. Fisher?  If it's otherwise,

21   where's Mr. Fisher?  Where is he?  Did you see him

22   take the stand?  And who is it, who is it that

23   tells the DEC and EPA in April of 2000, who

24   volunteers that this is what they're doing?  Mark

25   Kamholz during the air inspection has a

1    conversation with Cheryl Webster from the DEC, who

2    also wasn't called to testify by the government,

3    and tells her, oh, yeah, this is what we do.  We've

4    been doing this for a long time.

5        She gets ahold of her supervisor, Sitzman.

6    Sitzman gets ahold of I think it's Strickland.

7    Strickland gets ahold of Corbett, that's how this

8    whole thing starts, because he tells Cheryl Webster

9    about it.  And then when Mr. Corbett comes out in

10   June of '09, along with Mr. Grossman, and they talk

11   to Mark about it, he openly discloses this is a

12   routine practice.  We've been doing this for a

13   long, long time.  Disclosure, candor, openness, or

14   deception?

15       And every one of these conditions as soon as

16   Tonawanda Coke was told by the EPA you can't mix it

17   on the coal piles, you got to put baffles in, and

18   even with a PRV they weren't told anything.  They

19   did it totally on their own.  The PRV, set point

20   gets raised, and then it's blanked off by Tonawanda

21   Coke.  Baffles are put in in both quench towers

22   within months, and immediately after the search

23   warrant Tonawanda Coke starts using the pad.  As

24   soon as they are told this is how we want you to do

25   it, that's what Tonawanda Coke does.

1          The problem is for the 30 years before that

2     that's not what DEC told them.  And that's why we

3     have this defense, that's why I say this is a

4     textbook case.  Textbook case where that defense

5     applies.

6          Just something brief.  Mr. Linsin asked me to

7     mention this.  I stay away from these RCRA counts

8     like it's the flu, because I don't understand it.

9     But he wanted me to make the point.  When you're

10    considering the RCRA counts, please don't make

11    judgments on how this was done and say well, maybe

12    this should have been done a different way.  Accept

13    how it was done and assess whether or not that

14    violates RCRA.  Maybe there was a better way that

15    you could have taken -- scooped the material out of

16    the abandoned tanks.  But that's not for you to

17    decide.  It's the way they did it, and you gauge

18    whether there is a violation or not on that -- on

19    that evidence.

20         I started out by talking about -- I can't

21    remember his name now -- Paul Harvey.  And first

22    words I said to you were don't let the facts get in

23    the way of a good story.  And I think that's --

24    that's what the case has been about.  I want to

25    give you a few examples of what I'm talking about

1    and suggest to you that it carries over to all the

2    proof in this case.

3        Let's talk for a minute -- these are brief,

4    except for the last one.  But let's talk for a

5    minute about the -- sorry.  Judge, I'm sorry --

6    about the quench towers.  And the issue here is

7    quench tower number 1 and whether the exemption

8    applies.  Was quench tower number 1 used more than

9    10 percent of the time?  We have two witnesses who

10   worked on the battery, worked on the battery for

11   years and years and years, Mr. Brossack and

12   Mr. Priamo, who said no.  Quench tower 1 was -- it

13   was a backup.  It wasn't used more than 10 percent

14   of the time.  It was quench number 2 that we used.

15   In other words, the exemption applies.

16       And why is that important?  Well, they work in

17   the battery.  They work right where the quench

18   tower is used day-in and day-out.  What does the

19   government want you to rely on?  What do they want

20   you to rely on to find the exemption doesn't apply?

21   Do you remember Mr. Hoffmann?  If I remember

22   Mr. Hoffmann he's the gentleman that was fired and

23   he doesn't know why he was fired, and from time to

24   time he would drive a pickup truck around in the

25   coal fields.  And he said that he would stand out

1      in the coal fields and pay attention to which

2      quench tower was being used, and he would see the

3      smoke, and he'd watch the smoke blow with the wind.

4          Come on.  Do you want -- you're going to -- in

5      a matter of importance to you you're going rely on

6      that kind of evidence as opposed to what

7      Mr. Brossack and Mr. Priamo say?  I don't think so.

8      And that's just one idea of what I'm talking about.

9          Graphic example is the fire, the July 8, 2008,

10     fire.  And the first -- my impression of that,

11     until we talked to Mr. Ianello and saw his video

12     clip was that this was an inferno, that this was a

13     huge fire that consumed two of the large tanks or

14     area of the tanks.  It was a big, big fire.

15         And you had Mr. Dahl come in.  And Mr. Dahl had

16     testified in the grand jury that he saw a little

17     tar seeping out of one of the tanks during the

18     fire.  And he got on the stand here and testified

19     that he saw -- I don't know how many front end

20     loaders come flowing out of those tanks, and he

21     said it was 10 or 20 tons, 10 or 20 tons flowed out

22     of there.

23         We called Mr. Ianello, someone the government

24     had talked to.  We put Mr. Ianello on the stand,

25     the fire chief.  He brought the video clip with

1    him.  And we found out this was not an inferno.

2    His testimony was he didn't see any -- anything

3    coming out of the tanks at all.  And if you want to

4    consider the government's suggestion, well, it was

5    coming out underneath the water, I guess you can,

6    but is that speculation?  And are you supposed to

7    rely on speculation?  I don't think so.

8        And he played that video clip and we played it

9    over and over, and it became clear there was a lot

10   of smoke.  And we've heard the expression, my

11   grandmother used to say -- she'd laugh and say

12   where there's smoke there's fire.  I never really

13   knew what that meant.  What I understand that to

14   mean that isn't true that where there's smoke

15   there's fire.  And there was a lot of smoke.  There

16   was a lot of black smoke, but there wasn't much

17   fire.

18       What you heard from Mr. Ianello was that this

19   fire was limited to about one-quarter or one-third

20   of one tank in the southwest corner of the tank.

21   There was that building, that's where the fire was.

22   That's what the video clip showed.

23       On cross-examination the government played that

24   video clip for Mr. Ianello and said, do you see

25   this area over here, you're saying the fire wasn't

4098

1    over here, and there was that other area where a

2    tank had been torn down, that either Mr. Dahl or

3    Mr. Hoffman, one of the government's witnesses

4    said, yeah, the fire was over there.  Mr. Ianello

5    said clearly the fire wasn't over there, no where

6    near there.

7        And the government asked Mr. Ianello is it

8    possible that the Tonawanda employees put that out

9    before you got there?  That's not the kind of

10   evidence when we're talking about what's at stake

11   here that you should be relying on.  And then

12   played the clip again and based on how the smoke

13   was traveling tried to suggest that that meant the

14   fire was over there, because the smoke was blowing

15   in a northerly direction.  That's not good

16   evidence.

17       This is a serious case, and you got to make a

18   determination that overcomes the presumption of

19   innocence and finds guilt beyond a reasonable

20   doubt, and it can't be based on that type of --

21   that type of testimony.

22       The last thing that I want to cover, and I'm

23   going to shorten this up, which should make you

24   happy, because I would love to put this out there,

25   but there's not time.  I want to talk about the

1          government's summary chart.  I'm going to try to do

2          it without putting it up there.

3               Remember Mr. Conway testified about this?  You

4          have the orange chart and then you have the green

5          chart for the months.  And those charts, there

6          is -- there's nothing about those charts that you

7          can rely on.  But the government wants you to rely

8          on those.  And hopefully you can remember this from

9          my examination.  But I feel like I've taken too

10         long.

11              Government Exhibit 200 is the orange chart, and

12         that purports to have in it Mr. Conway's review of

13         every single one of the by-product operator log

14         books.  And every time the set point changed, he

15         put it in there.  And recall that based on that he

16         then look's at the circular charts, and every time

17         he sees a spike above what he decided that set

18         point was, he's going to call that a release, and

19         he's going to prepare this chart, and it's going to

20         show that this PRV was releasing about twice an

21         hour.  That's what he claims -- the government

22         claims the chart shows.

23              And what we attempted to show on cross were any

24         number of things why this was really bad, bad

25         information.  And the first is if you go back and

1   you look at the orange chart, there are 2 instances

2   on the chart, one is for August 29th of 2007 and

3   October 7 of 2007, where the entry for August

4   29th will show one set point, and when you look at

5   the very next entry that they've shown, it clearly

6   indicates between the first and the second entry

7   there's been a change, and it's not reflected

8   anywhere.  And that happens twice on the charts

9   between August 29th of '07 and October 7 of '07.

10  And it happens again between September 30 of '08

11  and March 2nd of '09.

12       Remember with Mr. Conway when I asked him about

13  the first one, his response was, well, that doesn't

14  matter because that's not part of my charts,

15  because his charts only went through '09.  Well,

16  guess what?  As I just indicated, the second time

17  it happens it does affect his charts, and it

18  affects the entries for January and February.  They

19  are clearly wrong, because he has missed the fact

20  that at some point between September 30th of '08

21  and March 2nd of '09 there was a change in the set

22  point.  We don't know when it was.  Was it

23  March 1st of '09?  Was it October 1st of '08?  We

24  don't know.  But you got that chart in evidence and

25  you're supposed to rely upon that to determine if

1    the company and Mr. Kamholz are guilty.  You can't

2    use that chart for anything except as an indication

3    of the quality of the evidence -- or lack of

4    quality of the evidence that's been presented to

5    you.

6         You were told that Mr. Conway skips April

7    of 2009 because that's an unreliable month.

8    Apparently because the inspection happened and

9    Mr. Cahill says he raised and dropped the set

10   point, so they skip April of 2009.  So what do they

11   do for May of 2009?  He uses a setting from March

12   of 2009, even though he's admitted that -- that you

13   can't rely on April.  We know there were changes in

14   April.  But he takes a setting in March and uses

15   that in May.  So May is not -- is not reliable.

16        You know that it was never calibrated.  You

17   know that he relied on testimony outside the

18   courtroom that we don't know about.  You know that

19   there were other changes that were shown in the log

20   book that he just ignored because there wasn't a

21   number.  It wasn't convenient to use those, because

22   there that was an indication the set point changed,

23   but since you didn't know what the number was, he

24   ignored it and just didn't use it.  And yet you'll

25   get this chart.

1          You know from Mr. Sitzman that he determined --

2     Mr. Sitzman determined that that PRV was not

3     releasing as of the fall of '09.  But look at

4     Mr. Conway's chart, and he's got it releasing every

5     half hour.

6          And this is the most troubling part of all.

7     There is a Government Exhibit -- this is the one I

8     want to put up please, Government Exhibit 88-0122.

9     This is from -- well, let's just make this part

10    bigger please.

11         This is very important.  July 30th, 2009.  And

12    the entry right there, the note.  We do have radios

13    and a phone.  If Mr. Cahill makes an adjustment on

14    anything, I believe it would be appropriate to

15    inform operators.

16         That doesn't appear in Mr. Conway's chart.

17    It's smack dab in the middle of the summer of 2009.

18    It's important for a couple reasons.  Number one,

19    it shows that Mr. Cahill was making changes and not

20    putting them in the book.  It also shows he was

21    making changes in the summer of '09 that aren't

22    reflected anywhere, and the government just ignores

23    that when it makes this chart to argue to you that

24    these releases continued every half an hour through

25    all of 2009.

1          How can you do that?  How can you do that and

2     expect you as a jury to rely on that evidence as

3     proof of anything?  It just -- it defies logic.

4     And is it fair to do that?

5          And then Mr. Cratsley -- you're not going to

6     remember this -- on top of that, Mr. Cratsley, who

7     is one of the by-products operators -- you can take

8     that down -- he testified too that as of the time

9     of the search warrant the setting was at 160.  160.

10    There's nothing close to that in Mr. Conway's

11    chart.  And the other thing that Mr. Conway

12    acknowledged is he reviewed every single one of

13    these log books, and indeed Mr. Cahill never put

14    his entries in the log book.

15         I'm done.  I'm not going to do any fancy wrap

16    up.  I'm not even going to thank you for listening.

17    I'm not even going to do that.  The one thing I'm

18    going to say, I am going to say Mark didn't

19    testify.  My decision.  You've heard enough.  You

20    don't need testimony from him.  There is reasonable

21    doubt on every one of these charges.  We've

22    established entrapment by estoppel defense by a

23    preponderance, and I will say thank you for your

24    attention today, for the entire trial, for your

25    questions.  Never had an experience like this

1    before.  Thank you very much.

2              THE COURT:  What are you thinking?  Ready

3    for a break?  How about if we take 15, okay, and

4    then we will have the rebuttal argument, and then

5    we'll break for lunch.  Does that work for

6    everybody?  You've been terrific.  Thank you.

7              (Jury excused from the courtroom.)

8              THE COURT:  Okay.  We will see you in 15

9    minutes.

10             MR. LINSIN:  Thank you, Judge.

11             (Short recess was taken.)

12             (Jury seated.)

13             THE COURT:  Welcome back.  Please have a

14   seat.  Okay.  The attorneys and parties are back,

15   present.  Our jury is back, roll call waived.  This

16   will be, ladies and gentlemen, the last of the

17   arguments.  And if you recall, whatever the

18   attorneys say and I say that's not evidence.

19   Please don't lose sight of that.  And please don't

20   make up your mind on this case until you commence

21   your deliberations, and then you will have

22   everything you need at that point in time.

23      The gentleman sitting on the edge of his seat

24   there ready to get up, Mr. Piaggione, is ready with

25   I think his rebuttal argument.  Mr. Piaggione.

1          MR. PIAGGIONE:   Thank you, your Honor.

2    May I proceed then?

3          THE COURT:   You may proceed, yes.

4          MR. PIAGGIONE:   Thank you.  Mr. Personius,

5    Mr. Linsin, Miss Grasso, ladies and gentlemen of

6    the jury, I've been sitting here waiting for about

7    five weeks to speak to you, and I'm just hoping

8    that you're not too tired to listen at this point.

9       I would first of all thank you again for your

10   service.  I know some of you did not want to be

11   here.  But you did make the effort and you did show

12   up, and you did make -- came every day and showed

13   attention, and I applaud you for that, and thank

14   you for that.

15      But I'm going to ask you for your patience and

16   attention just a little longer.  This is the

17   government's opportunity to respond to those last

18   three hours of arguments you heard from the

19   defendants.  And throughout this whole proceeding,

20   the Court has told you use your common sense in

21   evaluating these facts.  Use your common sense, and

22   the government wants you to follow that advice

23   because if you do, you will look right through the

24   defendants' arguments and realize that they're --

25   they don't hold -- they don't hold up.

1        I'm going to first try and address Mr. Linsin's

2   arguments, and then I want to clear up some of the

3   confusion Mr. Personius apparently expressed in his

4   argument.  The thing to remember though is don't

5   let the defendants' arguments make you think

6   there's some sort of alternative reality in this

7   courtroom.

8        You know, use your common sense.  If two plus

9   two equals four outside this courtroom, it equals

10  four inside this courtroom.  And this concept that

11  the defense has put forth of a perspective of 20 to

12  30 years of environmental compliance, when you look

13  at it through common sense, you realize it's 20 to

14  30 years of environmental deception.

15       Defendants argue that, first of all, if you

16  remember that the cost of compliance was minimal.

17  I wonder if I can have 15.02.003, Miss DiFillipo.

18       Do you recall this place looked like during the

19  April 2009 inspection?  This is a tank in

20  operation.

21       Can I have 15.02.015 please, Miss DiFillipo?

22       This is where this machinery was spewing oil,

23  so to prevent people being sprayed by it, they put

24  a rag over it.  Does this look like a company who

25  invested in its operations?  And if the costs of

1   compliance was minimal, then why ask for an

2   exemption for the west tower to begin with?  Why

3   not just put the baffles in in 1984 and use it

4   whenever you wanted to?

5       Why resist putting in an automatic flare on the

6   battery when the regulation was passed?  If you

7   remember, they tried to say we don't need one, and

8   then the EPA had to come back and said, no, you

9   have to put one in.  Why not replace the baffles in

10  the east quench tower in 1997?  If it didn't cost

11  them anything, why not just do it?  And why not get

12  a permit and a flare on the bleeder valve in the

13  by-products area?

14      The government submits you might consider

15  because the defendants did not want to spend a dime

16  more than they had to on environmental compliance.

17      And I don't want you to get confused with the

18  defendants' claims of estoppel by entrapment.

19  Estoppel by entrapment defense requires the

20  defendant to reasonably disclose its conduct before

21  or at the time it claims the government authorized

22  it.  Okay.  And they had to rely upon that

23  authorization to commit this conduct.  In other

24  words, if the defendants committed an illegal act,

25  then went back and disclosed it to the government,

4108

1   that is not estoppel.  They have to seek that

2   approval before or at the time they commit this

3   illegal act, and that's important to understand.

4   That the government has to be aware of what is

5   going on and then authorize it.  It's not if the

6   government conducts an inspection and doesn't

7   detect a violation.  That's not estoppel.

8       Now, let's consider defendants' arguments as

9   they look -- if you look at them through just plain

10  common sense, okay?  First of all, Counts 1 through

11  5 there is this claim that this was open and

12  obvious.  First of all, if you recall, the DEC was

13  there less than twice a year.  They were there to

14  do inspections which were focused on the battery,

15  not on the by-products area.  These annual

16  inspections, as the inspectors indicated, the one

17  inspector indicated didn't physically check every

18  condition.  What they did is they relied upon the

19  defendants to be in compliance on those conditions

20  they didn't check.

21      And as it was testified to, Mr. Kamholz knew

22  where the inspector went.  When he accompanied the

23  inspector, he could see where he went.  So he knew

24  what the pattern was.  And if you remember,

25  Mr. Foersch said he was in the by-products area 15

1    times in 25 years.  Fifteen times.  So, he did not

2    notice the bleeder valve.

3        If you recall, he didn't have to walk past the

4    bleeder valve either.  On direct testimony

5    Mr. Foersch indicated he was driven to the

6    by-products area by Mr. Kamholz.  So he was there

7    15 times.

8        Now, you recall Mr. Kibler.  He said he was

9    there a thousand times.  That was his testimony, a

10   thousand times.  He came -- his testimony also said

11   he came within 10 feet of the by-products area.  He

12   was there a thousand times and never noticed the

13   bleeder valve.

14       So I submit to you it's not so open and obvious

15   as the defendants are claiming it is.  Common sense

16   tells you the government doesn't even have to make

17   this argument really, if you think about it.  The

18   Clean Air Act requires that the defendant get a

19   permit for its emission sources, including that

20   bleeder valve.  It's the law.  And it's not

21   conditioned upon only if the DEC finds it.  They

22   have that obligation to put it on their permit.

23       Let me give you a common day analogy to this.

24   If you drive in Buffalo, you have to get a driver's

25   license.  That's the law.  It's incumbent upon you

1    to take that test and get the license and pay a

2    fee.  Okay.  Suppose someone here in Buffalo

3    decides he's not going to get a driver's license.

4    And he drives around Buffalo for 20 years.

5         Now there are some days when you drive around

6    Buffalo that idea might not be so farfetched.  But

7    the fact of the matter is one day this driver gets

8    stopped by the police, and he gets arrested for

9    driving without a license.  Now is it a defense for

10   that driver to say I've been driving around Buffalo

11   for 20 years openly and honestly, obviously.  I

12   drove past the police station every day.  I drove

13   past police cars every day.  I even stopped and

14   talked to the police.  One time I got a parking

15   ticket, and I went into the police station and paid

16   it.  They asked me for ID.  I said I don't have a

17   driver's license, will this due, and they accepted

18   that and they never arrested me.  I've been misled

19   by the police into believing I could drive without

20   a license.  Does that make sense to you?  Just

21   everyday common sense?

22        Using your common sense with the facts in this

23   case, you can see that.  Did the defendants rely on

24   the conduct of the DEC to commit this violation of

25   operating this bleeder valve, or did the defendants

1    commit this violation relying on not getting caught

2    by the DEC?  That's the difference.  Did they rely

3    on something the DEC did, or rather that they

4    figured out the DEC was not going to do?  They were

5    not going to find this bleeder valve.  And if it's

6    the latter, it's not estoppel.

7         Now, let's look at this, what I would call, a

8    fairy tale about the HAPS report constituting

9    notification to the DEC.  Let's put this report in

10   context of common sense.  The HAP report is about

11   regulations that come out a year after the

12   defendants got their Title V permit.  And it is

13   submitted by the defendants to the DEC, again, in

14   an attempt to exempt Tonawanda Coke from new

15   environmental regulations.  And Mr. Kamholz signed

16   that report saying if you have any questions, ask

17   me about it.  And they submit in that report this

18   infamous table 4.2.

19        Can we have Exhibit 131.4-2, please?  Okay.

20   Thank you.  All right.

21        Now, if you look at this table, there is a

22   pressure relief valve in the coke oven gas system.

23   There's also a valve listed in the coke oven gas

24   system.  In the light oil system there are no

25   pressure relief valves listed.  According to this

1    table, this pressure relief valve is not really

2    emitting anything.  This maybe has a leakage

3    problem, and that's what that little formula

4    indicates .00030.  There's a leak coming there.

5        Certainly there's nothing on this pressure

6    relief valve that indicates it's emitting 137 tons

7    of coke oven gas.  And again there's no separate

8    entry for a pressure relief valve in the light oil

9    system.

10       Miss Henderson, can I have Defendant's Exhibit

11   FFFF please?

12       Now this is defendants' diagram of what the

13   coke oven gas system is.  This is their

14   description, not the government's, okay?  The

15   government agrees this is accurate.  If you notice,

16   part of the coke oven gas system is the light oil

17   scrubber, okay?  Now, defendants try to claim that

18   the light oil scrubber is part of the light oil

19   system, but clearly there's overlap.  It's listed

20   there as part of the coke oven gas system.

21       Now, do you remember Miss Hamre's testimony?  I

22   wonder if I could -- thank you, Miss Henderson.

23       I wonder if I could have Exhibit 15.01.061,

24   please?

25       Now, Miss Hamre said when she was going through

1   the by-products area they found a pressure relief

2   valve.  Right there.  And if you notice, it's not

3   one that actively emits gas.  It waits, if there's

4   a problem, it would open.  The only thing it may

5   have is an issue of leaks.  There is no separate

6   entry again on that table that says there's a

7   pressure relief valve in the light oil system.

8   There's only one pressure relief valve listed

9   between the light oil system and the coke oven gas

10  system.

11      If I can go back to 131.4-2 please.  Okay.

12      Again, if there was -- there is valves -- and

13  valves there.  But there is a separate entry for

14  pressure relief valves.  So between the two systems

15  for this to be accurate, there has to be either a

16  separate entry for a pressure relief valve in the

17  light oil system, or there has to be two pressure

18  relief valves in the coke oven gas system.

19      And if you look at it, which is the -- now we

20  know there is a second pressure relief valve in the

21  coke oven gas system.  It's the bleeder valve.  And

22  if you look at this description, this is not the

23  one that's emitting 173 tons of coke oven gas.  In

24  other words, the one that was left out was the

25  bleeder valve.  The government submits that this

1    HAP report didn't notify anyone about the bleeder.

2    It wasn't even included in the report.  The only

3    pressure relief valve listed here is the one on the

4    light oil scrubber, which by the defendants' own

5    admission, is part of the coke oven gas system.

6        You can consider that this claim now, that the

7    HAP report provided some sort of notification about

8    the bleeder valve is a story made up after the

9    defendants got indicted.  If you look at it, that

10   makes -- doesn't that make common sense to you?  If

11   they wanted to include the bleeder valve, there

12   would have been a second entry.  Or if they wanted

13   to distinguish there would have been one in the

14   light oil system.

15       Now do you recall, while we're on this subject,

16   that Miss Hamre -- take this down.  Do you recall

17   Miss Hamre testified that the defendant told the

18   EPA inspection team there was no pressure relief

19   valves in the coke oven gas system?  And it was not

20   in reference to the battery.  That was her

21   testimony.  Defendants have tried to claim she

22   didn't hear that correctly or she misheard it.  It

23   didn't happen.

24       Well, remember Mr. Linsin's question.  He asked

25   who in their right mind would claim there was no

1      pressure relief valves knowing there was one out

2      there?  Okay.  Well, that would be the one who

3      in 2009 had not included the bleeder valve in the

4      HAP report.  There had been no notification of the

5      bleeder valve to the DEC or the EPA.  And who told

6      Pat Cahill not to have the bleeder valve go off

7      during the inspection?  As far as he knew there was

8      no one in the government who knew about that

9      bleeder valve.

10          And Mr. Linsin's second question referring to

11     his claim that Mr. Foersch's testimony that

12     Defendant Kamholz knew there were baffles in the

13     east quench tower was fabricated.  Remember that

14     one?  He said who in their right mind would tell an

15     inspector there were baffles in the number two

16     quench tower knowing they were not?

17          Can I have Exhibit 131.2-10 please?

18          Well, right there, that would be the same one

19     who would put in a HAP report there were baffles in

20     the tower six years after they were removed.

21     That's in the report.  And the answer to that is

22     the same, it's Mark L. Kamholz.

23          Some other statements I want to clarify the

24     defendant made about these issues was coming out of

25     the bleeder valve was this un -- I think it was

1    called purified gas, uncontradicted that it was

2    purified gas coming out of the bleeder.  Now, it's

3    your recollection, not mine.  But do you recall

4    testimony about the bleeder valve being caught on

5    fire twice?  That in the winter there were

6    emissions, that employees saw crystallized

7    naphthalene in the air from the emissions from the

8    bleeder valve, and that others smelled coke oven

9    gas when it was released, and when the light oil

10   scrubber went out of commission in 2008 meant there

11   was going to be more benzene in the coke oven gas.

12   Does your common sense tell you that sounds like

13   purified gas?

14        Or the defense statement that the bleeder valve

15   was insignificant?  That was Mr. Linsin's words.

16   This bleeder valve was emitting 173 tons of benzene

17   loaded coke oven gas a year.  As presented at

18   trial, that evidence, that amount alone would

19   qualify a facility as a major source.  It is

20   submitted that perhaps the DEC might not find that

21   so insignificant.  Again, if it had been notified.

22        With respect to the defendants'

23   characterizations regarding emission source and

24   emission point, well, if you recall, both

25   Mr. Carlacci and Mr. Sitzman stated that while

1    there was separate definitions in the regulations,

2    that in this case and in many other cases, an

3    emission source and emission point can be part of

4    the same thing.  The valve is the apparatus or the

5    equipment that releases the gas.  And the pipe is

6    the point from which it goes into the environment.

7        They both said that -- that they -- they would

8    have this bleeder valve on permit.  That was

9    uncontradicted.  There wasn't a question of

10   emission source or emission point.  But even that

11   argument, if you look at it from common sense,

12   let's look at it this way.  On top of the battery

13   there is a flare stack.  And when the coke oven gas

14   pressure builds up in the battery, for some reason

15   like the exhauster wasn't working, someone has to

16   go up and turn a valve manually.  That is the

17   emission source, and this battery flare stack lets

18   the gas come out and there is an automatic pilot

19   light that sets it on fire if it's working, so that

20   the escaping coke oven gas isn't emitted into the

21   environment.  Okay.  So there is your emission

22   point and emission source together.

23       The defendants knew this had to be on its

24   permit.  And it had to be flared if it was going to

25   comply with the Clean Air Act.  Now right down the

1    road in the by-products area is this other emission

2    source where, when the coke oven gas builds up, it

3    has an electronic set point that opens the valve,

4    that's your emission source, and it goes up the

5    pipe, that's your emission point.  And that is done

6    every day, daily, when there is a reversal in the

7    ovens.

8         The defendants knew how to include the battery

9    flare stack that was used occasionally in its

10   Title V permit.  Does it make sense the defendants

11   didn't understand that they had to also include the

12   bleeder valve, which was doing basically the same

13   thing every day?  Does that make common sense to

14   you?

15        Let's talk about the east quench tower.  That's

16   Counts 11 through 15.  Now defendants have argued

17   that they were misled by Gary Foersch into

18   believing there were no need to put baffles in that

19   tower.  Now, again, just use your everyday common

20   sense in looking at that.  First, defendants

21   request in this letter that they're going lower

22   the -- lower the tower.  And if you recall,

23   Mr. Foersch wrote back and said in clear

24   instructions, you can lower it, but you have to

25   have baffles in that tower.

1          In fact, he testified on the stand it was for

2     the very reason that he didn't know if the baffles

3     were on the top of the tower or the bottom of the

4     tower that he put that in there to make sure those

5     baffles were there.

6          Now if you recall, Jon Rogers testified that

7     the baffles were removed when the tower was lowered

8     and never replaced.  So the defendants now claim

9     estoppel because Kamholz relied upon what Foersch

10    said.  Well, what part of that letter did Kamholz

11    rely upon to remove the baffles?  Remember estoppel

12    only applies when the reasonable disclosure of the

13    activity before or at the time of the conduct is

14    authorized.

15         So, defendants went out and did this based upon

16    a letter that said you can't do it.  And now

17    they're claiming they have authorization to do it.

18    Does that make common sense to you?

19         Do you recall again that Mr. Foersch stated

20    that the inspector went everywhere -- that

21    Mr. Kamholz went everywhere the inspector did?  He

22    knew that the inspectors rarely checked for baffles

23    in the east quench tower.  Mr. Foersch testified to

24    that.  He said it was a dangerous place to go.  It

25    was out of the way.  They didn't really want to go

1    there.  And the main focus of the inspections every

2    year was on the battery, not on the quench towers.

3         You can consider that the Defendant Kamholz

4    made a calculated decision not to replace the

5    baffles in the east quench tower to save money.

6    And remember at that time, 1997 when this happened,

7    Mr. Kamholz had already gone three years with the

8    illegal removal of that automatic pilot light in

9    the battery flare stack, and the DEC had not

10   discovered it.  It would take another 11 years

11   before DEC discovered that violation.

12        So Defendant Kamholz removed the baffles in

13   contradiction to the DEC letter stated, and before

14   having any conversation with Foersch about it.  You

15   can consider that he made a calculated risk.

16   Basically, he didn't rely upon anything Mr. Foersch

17   said.  He relied upon Mr. Foersch not catching it.

18        With respect to this idea that he put it in his

19   application for Title V, this reference to these

20   letters, well, the letters, all they say is you

21   have to have baffles.  And if the height of the

22   tower isn't sufficient, it's conditioned on you

23   raising it.  So is the reference to a condition of

24   raising the tower, lowering the tower, but there's

25   nothing about baffles in that.

1          I submit to you you may consider that his

2     attempt to refer to that letter was an attempt to

3     sneak past the DEC authorization that he couldn't

4     get if he applied for a modification.  And the

5     testimony is the defendant knew how to apply for a

6     modification of his permit, and he knew it had to

7     be in writing.  Again he didn't rely on

8     authorization from Gary Foersch.  He relied on not

9     getting caught by Gary Foersch.

10         Let's look further at Defendant Kamholz and

11    what he relied upon regarding Mr. Foersch's conduct

12    even after he removed the baffles.  Now again, it's

13    your recollection that counts, not mine.  But do

14    you recall Mr. Foersch's testimony that he had many

15    conversations with defendant regarding

16    inefficiencies of the baffles, and he agreed with

17    the defendants' theory?  However, Mr. Foersch was

18    clear on one point.  He never told the defendant he

19    could operate the east quench tower without

20    baffles.  Yes, I agree with you, Mr. Kamholz, but

21    the regulations say you have to have baffles.  What

22    are we going to do?

23         And in addition, the defendant knew, as

24    Mr. Foersch testified, that Foersch didn't have

25    authority to change the permit.  He didn't have the

1    authority to make modifications to the permit

2    without it being in writing.  The defendant knew

3    the procedure, he knew how to do that.  So is there

4    any basis for Mr. Kamholz to reasonably rely on

5    Gary Foersch, the inspector, modifying his Title V

6    permit orally?  Does that make any common sense to

7    you?

8        You recall the testimony of Mr. Foersch there

9    was sometime post-1997 where he lowers the tower --

10   after the tower was lowered, maybe as late as when

11   the Title V permit was issued.  It's not really

12   clear.  Mr. Foersch went to the east quench tower

13   with Mr. Kamholz.  And they observed -- he doesn't

14   really recall.  He remembers it was a violation.

15   He doesn't remember if it was no baffles or partial

16   baffles.  And what did he say?  What did he do?

17               (Interruption by telephone malfunction in

18               the courtroom.)

19               THE COURT:  Okay.  Lets get back to

20   serious business.

21               MR. PIAGGIONE:  Okay.  With respect to

22   Mr. Kamholz, he's looking up into the tower, and he

23   says to Mr. Foersch -- reverse that.  Mr. Foersch

24   is looking up in the tower and he says to Mr.

25   Kamholz, you've got to put baffles in that tower,

1    okay?  If you recall, Kamholz didn't say in

2    response well, I thought you gave me authority not

3    to put baffles in the tower.  He didn't say

4    anything.

5         You have to draw your own conclusions about Mr.

6    Foersch, whether Mr. Foersch was the type of person

7    who could be easily manipulated or not.  But do you

8    recall Mr. Foersch said he trusted Kamholz.  He

9    trusted him to correct violations when they were

10   pointed out to him.  He relied upon the defendant

11   to put the baffles back into the tower.  And as he

12   testified, he said he didn't follow up right away,

13   because he believed Mr. Kamholz was going to do

14   what he told him to do.

15        However, as Mr. Foersch stated, he felt in his

16   gut that maybe Mr. Kamholz didn't do what he was

17   supposed to do, that he didn't replace the baffles.

18   So the next annual inspection a year later he asked

19   the defendant were there baffles in that tower, and

20   defendant said yes.

21        Now defense now tries to claim that it didn't

22   happen, that he misremembered, that he was making

23   this up.  But one thing he was clear about

24   throughout his testimony, he never told Mr. Kamholz

25   to operate that tower without baffles.

1         And this was a continual theme about

2    misremembering that Mr. Personius put forth.  When

3    Kamholz said something that was incriminating, he

4    claimed it wasn't clear what Mr. Kamholz said.  If

5    someone remembered something that was incriminating

6    about Mr. Kamholz, he said they misunderstood, or

7    it didn't happen.  So Miss Hamre didn't hear

8    Mr. Kamholz say there were no pressure relief

9    valves in the system.  And Mr. Foersch didn't hear

10   the defendant say yes, there were baffles in the

11   tower.  Does that make really a lot of common sense

12   to you?

13        Looking back now, of course, Mr. Foersch was

14   asked on the stand, knowing that he had been misled

15   by Mr. Kamholz, that maybe in his heart of hearts

16   he knew that Kamholz may not have replaced the

17   baffles.  Well, looking back like that, he had to

18   reflect, and he had to admit maybe that was true.

19   But that made no difference, because he never told

20   the defendant that he could do it.  There was

21   nothing for Mr. Kamholz to rely upon.  And he knew

22   that Mr. Foersch did not have the authority to

23   change the permit.

24        And if the -- if Mr. Kamholz was really relying

25   upon those conversations with Foersch, why did the

1    defendant state in the HAP report -- can I have

2    131.2-10 please again?

3         Why does he state again that there are baffles

4    in the tower in the HAP report six years after the

5    baffles were removed?  Why did he put in his

6    application for renewal of his Title V permit

7    in 2006 that there were baffles in the east quench

8    tower?  Was he relying on Mr. Foersch's authority?

9    If he was, why didn't he put it in these documents?

10        Again, it's not because he relied on

11   Mr. Foersch.  He relied on Mr. Foersch not finding

12   out, not getting caught.  The fact that

13   Mr. Foersch, knowing Mr. Kamholz gave him a break

14   and give him a warning, put the baffles in rather

15   than write out a NOV, should be held against

16   Mr. Foersch that somehow now the defendant was

17   relying upon him not to follow-up?  Is that really

18   what this is about?  Is that really relying on Mr.

19   Foersch, or is that relying on Mr. Foersch not

20   finding out?  There's a difference there.

21        He wasn't relying on Mr. Foersch giving him the

22   authority, because if he did he would have

23   represented that.  On more than one occasion that

24   he had, every compliance report, every year that he

25   submitted to the DEC, baffles in the east quench

4126

1    tower.  In the HAP report, baffles in the east

2    quench tower.  In the Title V renewal, baffles in

3    the east quench tower.  Does that sound like he was

4    relying on Mr. Foersch, or was he relying on not

5    getting caught?  Common sense tells you what the

6    answer to that is.

7        Now, also this question about why didn't we

8    call Mr. Foersch, why didn't we call Mr. Fisher,

9    why didn't we call Miss Webster?  Well, the

10   government decides how it can prove its case, and I

11   submit to you the government proved its case by

12   simply showing what are the permit conditions and

13   through the testimony of the employees, what were

14   the conditions at the plant.  That's it.  That's

15   the violation.

16       We don't have to call -- we didn't call

17   Mr. Foersch.  We didn't call any air inspector and

18   we didn't call Mr. Fisher, we called the inspector

19   that was there at the time of the time period from

20   which the indictment was charged.  Okay.  Consider

21   how long this case would have been if we called

22   every inspector that came in that went to Tonawanda

23   Coke Corporation.  We have to make a decision

24   what's going to be efficient, what's going to keep

25   your attention, and that's our decision.

1           Let's -- since I mentioned Mr. Corbett, let's

2    move over to Counts 18 and 19.  Those are the

3    disposal charges.  Now, there is a lot Mr. Linsin

4    said was based upon what Miss Williams told you.  I

5    would ask you to recall my attempts to ask

6    Miss Williams a simple yes or no question and what

7    the answers were like.  Usually 15, 20 minutes

8    later I got to ask my next question.

9           Now, it's your recollection that counts, but

10   remember I asked her your resume indicates that you

11   testified 40 times in the last 25 years, 40

12   times -- over 40 times, excuse me, in the last 25

13   years.  And her response was I haven't bothered to

14   count them.  Okay.

15          Now it's up to you to consider motivations.

16   It's up to you to figure out if she was being

17   evasive when I was trying to ask her questions.

18   But you can consider is Miss Williams a

19   professional witness, paid to provide the answers a

20   company pays her to get?  If they want an opinion,

21   do they pay her to come up with that opinion?  So

22   is it a surprise that Miss Williams' testimony

23   disagreed with every DEC, every EPA expert, even,

24   Mr. Corbett, the RCRA inspector?  Her testimony

25   disagreed with all of them.

1      And then she gives her opinion as to what the

2   RCRA inspectors were doing out at Tonawanda Coke.

3   This is a woman who never conducted a RCRA

4   inspection, never inspected a coke production

5   plant, never saw hazardous waste recycled, never

6   went to Tonawanda Coke Corporation.  And she's

7   going to tell us her opinion as to what the

8   inspectors were doing when they were out there

9   doing a RCRA inspection.  Does that make any common

10  sense to you?

11      But let's compare what the defendants are

12  saying now with what the defense actually did

13  during this time period.  Now, if you recall,

14  defendants seem to always try to say the pad was

15  built for storage.  Really, let's see, and think

16  about that.  You can consider if the defendant

17  built that pad to mix hazardous waste properly and

18  then they choose not to use the pad, are they

19  knowingly violating the law?  Consider that.  And

20  let's look at this.

21      First of all, we know in 1992 the K087

22  recycling laws are passed, the regulations which

23  say you can recycle this, you don't have to pay for

24  disposal of your K087 anymore.  You can recycle it

25  into your coke ovens as long as it isn't land

1      disposed, as long as it doesn't hit the ground.

2          Well, coincidentally Tonawanda Coke in 1994

3      puts in a concrete pad with walls on it that

4      curiously enough looks like a mixing pad where it's

5      legal to recycle your hazardous waste by mixing it

6      on that pad and transferring it over to the ovens

7      without it touching the ground.  All right.

8          Now if you recall Mr. Ohar's testimony, Mr.

9      Ohar was the engineer who was there when the pad

10     was installed.  And what was the first thing they

11     did at that pad?  They held a demonstration mixing

12     K087 waste with coal on the pad.  That's what they

13     did.  They didn't demonstrate storage.  They

14     demonstrated mixing of K087 waste on the pad, and

15     then they took a crane and they put it over on to

16     the belt that goes to the ovens.  And it did not

17     hit the ground.  No land disposal.  A legal form of

18     recycling.  Okay.

19         Is that consistent with putting that pad in

20     just for storage?  Is that consistent with the

21     defendants' argument that mixing of K087 and coal

22     on the coal piles is appropriate?  Now, again, it's

23     your recollection, not mine, but if you recall

24     testimony from Mr. Snyder and Mr. Rogers about the

25     installation of a pug mill.

1          Can we have Exhibit 3.02 please?

2          Do you remember this?  The pug mill is over

3     here.  I'm a little off.  That's a tree.  But close

4     enough to the pug mill.  What was the purpose of

5     the pug mill?  Do you remember?  It was to mix the

6     K087 sludge on the pad and go up that ramp and on

7     to -- if you look behind -- on to that belt back

8     there to the coke ovens.  That was the purpose of

9     that.  Is that consistent with storage?  Is that

10    why the pad was there, for storage?  Why put the

11    pug mill there?

12         Now, can I have 3.03 please?

13         I just want to show you there's the pad with

14    the rain runoff contained on the pad.  That's the

15    purpose of the pad, to prevent lateral distribution

16    of contamination.  And what happens is if you mix

17    the sludge and the coal with that, that all gets

18    thrown back into the coke oven.

19         Now, what Mr. Snyder and Mr. Rogers said was

20    the pug mill didn't work.  It kept breaking down.

21    It spilled things.  So, the defendants had a choice

22    at that point.  And that is the crucial issue here.

23    They had the choice, do they spend more money, more

24    time mixing it on the pad and finding a way to get

25    it to the coke ovens without it hitting the ground,

1    or do they go back to their old ways and put it

2    back on the coal piles, knowing full well that it's

3    going to hit the ground, knowing full well that

4    they have a legal way of doing it on that pad and

5    choosing to go and do it illegally.  And it was

6    just a matter of saving time, saving money.

7        They weren't relying on inspectors to put it on

8    that pile, coal pile.  That had nothing to do with

9    it.  They weren't relying on Miss Williams'

10   concepts of land based units that emerged in 2008.

11   That had nothing do with it.  They weren't relying

12   on this was the first step of recycling, therefore

13   we don't need land disposal.  No.  They had a pad.

14   They knew how to do it.  They chose to do it

15   differently.  They chose to save money, save time,

16   just dump it on the pad.  Just dump it off the pad

17   on the coal piles.  Mix it directly there.

18       And the testimony shows there's no controls

19   when they did that, that the constituents can go

20   anywhere.  And Mr. Snyder and Mr. Heukrath

21   testified that when it rained, whatever was on that

22   coal pile washed down into those ditches and

23   went -- left the coal piles and eventually made its

24   way through ditches down to the Niagara River.

25       Does that sound like land disposal to you,

1   where a constituent may enter the environment?

2   Doesn't even have to "shall enter the environment".

3   May enter the environment.

4       Then this argument about where does the ground

5   start.  Apparently if you went home and sprayed --

6   and put coal on your lawn and you walked on it, you

7   weren't walking on the ground now, you're walking

8   on coal.  Well, if we follow that, if you put grass

9   seed on the ground and you walk on the ground,

10  you're not walking on the ground, you're walking on

11  grass seed.  Does that make any sense to you?

12  Where does the ground start?  According to the

13  defense it's 3 feet below the surface, then

14  mentioned some sort of clay lens that went 50 feet.

15  Does that count or doesn't it count?  Does it go

16  further down?  Are we talking about the ground

17  starting about 53 feet below the surface of the

18  earth?  Does that make any sense to you?  The coal

19  was on the ground, and you're walking on it, that's

20  the ground.  The same way if you're walking on the

21  sand, the sand is the ground.  There's no

22  distinction between them.

23      And really the point is out of all of that, if

24  you put it on the ground in that fashion, if you

25  put it on the pile on a coal field, are you

1    containing it?  Are you preventing the constituents

2    from migrating out into the environment?  And the

3    answer is they didn't.  By doing that, they

4    knowingly disposed of hazardous waste.

5        Now I want to talk about active management kind

6    of quickly.  Trying to make this as quick as I can.

7    With respect to Count 17 there is this testimony

8    from Mrs. Williams regarding the issue of active

9    management.  There is the testimony from Mr. Flax

10   about active management.  It's very simple.  Just

11   listen to the definition of the Judge as to what

12   active management is, okay?  And your recollection

13   counts, not mine.

14       But do you recall testimony of Mr. Rogers?  He

15   stated that when he first got to that area it was

16   spread out over a 200-by-200 foot area, and it was

17   things getting stuck in this.  Okay.  And that over

18   time that material got mixed at least twice with

19   coke breeze and heavy equipment ran over it, and it

20   moved the entire material over to the area between

21   the two tanks, and moved it all the way over there,

22   and now had all this stuff on top of it, and then

23   was accidently set on fire.  And on top of that it

24   was material leaked out into it.

25       Now, I wonder if I could have Exhibit 125.02.

4134

1    Make it 125.01.  There we go.  Okay.

2        So, this is the site before the fire -- or

3    after the fire.  And this is what it looked like

4    then.

5        Can we go to 3.04?  Okay.

6        There's the tank on the right.  And if you can

7    see, it's leaking.  It's coming out.  It's being

8    added to the material.  Oh, by the way -- can we

9    blow up this part right here?  Notice this is the

10   stuff they said well, we're putting this stuff down

11   as road -- as part of the road, that it's

12   impermeable.  It doesn't prevent the spread of

13   anything.  Does that look impermeable to you?

14   There's things growing in it.  The water percolates

15   down, and there's things growing in it.  This is

16   not impervious pad.  This is not coal, coke breeze

17   making it impossible for material to spreed.

18       Can I have Exhibit 136.02?  Okay.

19       So this is the final result of active

20   management or not active management.  You can

21   decide if this material that started out in a

22   200-200-foot area somewhere beyond this photograph

23   and was pushed into this area and mixed and

24   contributed to by the stuff in the tanks.  You can

25   decide that for yourselves.  Was this material --

1    when it was originally placed in that 200-and-

2    200-foot area, was that material disturbed?  You

3    can decide that.  And you don't need any experts to

4    figure that one out.

5        I just want to comment about something.  If you

6    notice, there is a partial wall there left from the

7    storage tank.

8        And can we go back to 125.03 please?  Make that

9    125.02.  Sorry.

10        There are those tanks, the same tanks back

11    here, okay?  And then after the fire if you recall

12    there was testimony that material leaked.

13        Can I put that 125.02 again?  Sorry.

14        After the fire they said they walked around,

15    and if you see, you can see that there's water

16    there, so they really can't tell from that picture

17    if anything leaked or not if it had come out

18    underneath.  And remember those tanks in the back.

19        Now, can I have Exhibit 3.06?

20        Remember this photograph?  Mr. Corbett

21    testified that this material that looked like it

22    was solid was really like quicksand, that the

23    material had leaked out, and it leaked out all the

24    way over to those two tanks in the background.

25        Let's see if I can find -- 125.04 again.  No,

1    I'm sorry.  125.02.  There we go.

2         There are the other two towers.  So that

3    material leaked from behind and out that way.

4              THE COURT:  This is 125.01.

5              MR. PIAGGIONE:  Thank you for that

6    correction, your Honor.  And if I could go to

7    136.06, please.

8         Remember there was a partial wall?  Well,

9    that's where they took the samples of this material

10   as it leaked.  There was a trail that went from

11   there to those two tanks in the back.  It leaked.

12   There's evidence it leaked.

13        Now, lets talk about the west tower, the west

14   quench tower.  Now the defense tries to make this

15   controversy over the west quench tower.  They say

16   that because the EPA and the DEC differed over the

17   baffles in the west tower going forward in November

18   of 2009 forward.

19        Is that another call coming in, your Honor?

20             THE COURT:  It was.  Sorry.

21             MR. PIAGGIONE:  Because the EPA and DEC

22   got into a controversy over how they should have

23   baffles going forward from November 2009, somehow

24   someway that means the defendants can't be

25   prosecuted for not having baffles in the tower

1    before 2009.  Before November of 2009.  In other

2    words, if the defendants used it more than

3    10 percent of the time before 2009, they are

4    innocent, or being dealt with unfairly, because

5    once they found out they were using it, once they

6    found they were using it more ten percent, and once

7    it was determined they needed baffles in that

8    tower, going forward they were innocent for having

9    violated their exemption looking backward.  That

10   makes no sense.

11       The government from its opening statement said

12   if the defendants were using the west quench tower

13   more than 10 percent of the time, it needed

14   baffles.  So what does it matter if after November

15   of 2009, after the period that's charged in the

16   indictment, the EPA and the DEC decide they have to

17   have baffles in the tower?  If they wanted to fight

18   that, they can go and fight that with the EPA and

19   DEC.  It has nothing to do with this case.  It's

20   irrelevant.

21       And with respect to how often it was used, do

22   you remember the testimony of the employees and the

23   ex-employees were, when they were working -- when

24   they first started working there, and it was more

25   than just Mr. Hoffmann, it was Mr. Gonzalez, it was

1    Mr. Kambat, people who said their work depended

2    upon which tower was being used.  They worked on

3    the wharf or they worked on the hot car for a

4    while, the towers were used alternatively.

5    Mr. Heukrath said he started in 1993 said the

6    towers were used alternatively.

7        In fact, in 2008 when the west quench tower

8    comes back online, Mr. Kamholz tells him the west

9    quench tower should be used 10 percent of the time.

10   That's the first time Mr. Heukrath even hears about

11   10 percent of the time.  The first time.

12       So what happened before that?  Think about it.

13   The evidence is people remember -- they didn't sit

14   there and count, this is true.  But that's not how

15   people remember things like this.  They remember

16   them by events.  If I was drawing an analogy, if

17   you went out to eat at a restaurant with your

18   friends, and you came back and you felt that the

19   food was good but it was expensive.  Several years

20   later you remember that the restaurant was

21   expensive.  You're not going to remember what

22   exactly you paid for it, what was your bill.  But

23   you're going to remember it was expensive.

24       Well, the same way all the testimony is

25   consistent, the towers were used alternatively.

1    Not 10 percent of the time, not rarely.

2    Alternatively.  That's how they remember things.

3    You remember by events, impressions you get.  And

4    clearly Mr. Gonzalez was the only one who said --

5    let me say Mr. Heukrath said when Kamholz told him

6    the towers should only be used 10 percent of the

7    time, he also said he wasn't even sure if that

8    instruction was followed thereafter.  That was his

9    testimony.  He did not know.

10        So if you think about Mr. Gonzalez, he was the

11   one who is still on the battery, still working

12   there, 19 years on the battery.  And he said for

13   every eight ovens pushed, there has to be one or

14   two that go to the west quench tower.  And we added

15   it up.  24 pushes that's -- 2.4 is 10 percent.

16   Minimum three went to the west quench tower.  And

17   as high as six went to west quench tower.  That's

18   still more than 10 percent.

19        Now there is this question about when the west

20   quench tower was down, and depending on who you

21   heard, it went from six months to two years.  But

22   that's not five years.  That's five counts here.

23   Mr. Heukrath pinpoints -- he's the only one

24   pinpoints the time that the tower was down to 2008.

25   You can decide based upon that information which

1    counts apply, which counts may not apply.  That's a

2    question of fact for you.  But the simple fact of

3    the matter is six months to two years doesn't equal

4    five years.

5        I want to talk about the obstruction charge

6    before I finish up.  Now, first of all,

7    Mr. Personius again claims it was never clear what

8    Mr. Kamholz said to Mr. Cahill.  But let's look at

9    these arguments in context.  He keeps saying that

10   we should put it in entire context, and I agree we

11   should.

12       First of all, Mr. Kamholz receives a letter

13   from the EPA that there was an inspection coming.

14   He gets the letter, not Mr. Cahill.  Mr. Kamholz is

15   responsible for environmental compliance, not

16   Mr. Cahill.  Mr. Kamholz had the responsibility to

17   get a permit for the bleeder valve, not Mr. Cahill.

18   So when Mr. Kamholz took Cahill through the

19   by-products area looking for violations to clean

20   up -- it wasn't the other way around.  It wasn't

21   Mr. Cahill.  It was Mr. Kamholz pointing out to

22   Cahill you've got to do that, you've got to clean

23   up that.  If Mr. Kamholz didn't think the bleeder

24   valve was an issue, didn't think it was a

25   violation, why say anything?  If he thought that

4141

1    was perfectly all right, that's not like clean up

2    that oil spill.  It's, that's a problem.  Don't

3    have that going off when they're here.

4        Now, Mr. Personius tries to claim well there's

5    four different versions of it.  Don't have that

6    going off when they're here.  Don't have that going

7    off.  Don't go having that go off during the --

8    it's all basically the same thing, isn't it?

9    You're trying to recall verbatim what someone said

10   to you four years ago.

11       And consider Mr. Cahill's stress testifying

12   here at that time.  He's testifying against his

13   life-long employer.  Think about that.  And if he

14   gets something a little off, maybe he would be a

15   little nervous about it.

16       But if Mr. Kamholz didn't think it was a

17   violation, why did he even point it out to

18   Mr. Cahill?  Does that make any sense to you?  Why

19   he would do that, unless he thought it was a

20   problem?  And if Mr. Kamholz didn't think it was a

21   violation, why did he tell Miss Hamre and the other

22   inspectors that there was no bleeder valve in the

23   by-product area?  And my recollection, and yours is

24   the one that counts, Mr. Personius has a different

25   version of this.  Mr. Kamholz told the inspectors

1   when they first saw it going off, you'll have to

2   speak to the by-products manager.  He didn't say

3   that's steam, that's a pressure relief valve.  He

4   didn't say anything like that.

5       Miss Hamre's testimony, if you recall it, was

6   she was looking down, she saw a cloud, they turned

7   around, she pointed it out to Mr. Garing.

8   Mr. Garing asked Mr. Kamholz what is that.  And he

9   says you'll have to talk to the by-products

10  manager.  He didn't say that's steam.  He didn't

11  say that's a pressure relief valve.  He said you

12  have to go talk to Cahill.  Pat Cahill.

13      Now, did he know what it was?  We know from the

14  testimony that he did.  We know that more than one

15  person spoke to him about the bleeder valve over

16  the years.  We also know, although Mr. Cahill

17  doesn't remember him there that often, that

18  Mr. Rogers remembers that he was there frequently

19  in the by-products area.  That was his testimony.

20      There was only one reason why Mr. Kamholz told

21  Cahill that can't happen.  It was to hide it.

22  Don't let it be seen during the inspection.  And

23  when he did that, he obstructed the EPA's

24  inspection attempt to find benzene sources coming

25  from Tonawanda Coke Corporation.  And as Paul

1    Harvey said, that's the rest of that story.

2         Now, there's the testimony that Kamholz said he

3    didn't discuss it afterwards.  And this is

4    something that Mr. Personius put forth as something

5    you should consider, the fact that he never

6    mentioned it again.  Well, you can also consider it

7    that perhaps Mr. Kamholz was now trying to distance

8    himself from Pat Cahill, because Pat Cahill was the

9    by-products manager.  And now we had a violation in

10   the by-products area that the EPA had discovered.

11        Remember Mr. Kamholz's response to the 114

12   questionnaire?  He answered it about the pressure

13   relief valve saying based upon P. Cahill, that's

14   how he prefaced it.  He was putting the blame on

15   Pat Cahill.  Yet he admits -- Mr. Personius admits

16   that Pat Cahill never spoke to Mr. Kamholz about

17   the bleeder valve after it was discovered.  So he

18   wasn't supplying that information in that

19   questionnaire.  Yet Mr. Kamholz put it down,

20   according to -- or by P. Cahill, as if he was

21   relying upon Mr. Cahill for the answers that he put

22   down.  The other part of that is so the DEC's

23   response was turn that pressure up so it doesn't go

24   off.  Let's figure out what we've got here before

25   we do something.

1          And this other argument about Mr. Carlacci,

2     whether or not he had a mask on or not, what

3     Mr. Carlacci remembers is he put the mask to his

4     face when they were going past that area.  That's

5     all he remembers.  He wasn't saying that he was

6     carrying this gas mask around all the time or not.

7     He wasn't passing judgment on that.  It was

8     interesting he brought it along with him since they

9     indicated they weren't going to the battery where

10    you need it.  They were going to go look at the

11    by-products area where supposedly you don't need

12    it.

13         Now, there's some other things that we might

14    mention.  The question about Mr. Kamholz saying

15    about beehives.  What's the importance about

16    beehives?  According to Mr. Personius, Mr. Brossack

17    also doesn't remember what he heard when he said

18    it, that we just had a beehive for 45 minutes, and

19    Mr. Kamholz responded beehives only last ten

20    minutes.  Well, there is a reason for that.

21         If you look at the Title V permit condition 75D

22    it says when there is a beehive, it has to be

23    reported.  You have to tell the DEC or the EPA.  So

24    if they're going to tell the DEC or the EPA they

25    had a 45 minute beehive, that would be a violation.

1          So, yes, Mr. Brossack could not read

2     Mr. Kamholz's mind, but did he have to?  Is that

3     what happens in the real world?  If someone said to

4     you we just had a beehive for 45 minutes, and he

5     says beehives only last ten minutes, what is the

6     message you're getting?  Use your common sense.  He

7     doesn't have to read his mind.  He doesn't have to

8     say to Mr. Kamholz oh, you mean I should only put

9     it in the book at ten minutes, is that what you're

10    saying, Mr. Kamholz?  That's not how it works in

11    the real world.  Everyone is talking in context of

12    their everyday life.  And they're not going to

13    spell out everything that's said.

14         You know a trial is a search for the truth.

15    And it's been that way for over 200 years.  Now you

16    saw all the government witnesses up here.  They

17    were people who were nervous.  Remember Mr. Rogers

18    had broken out in hives.  Mr. Gonzalez when he

19    tried to drink water was like a human quench tower.

20    I mean, you have to consider it took a great deal

21    of courage for them to go forward and speak here.

22         And what did the defense do?  They subjected

23    these witnesses to a barrage of relentless

24    questions, parsing words, tenses, designed to

25    confuse the witness.  Is that really a search for

1    the truth?  And how many of you would have made a

2    mistake if you were subject to that type of

3    cross-examination?

4        You might consider that that was not a search

5    for the truth, but a search to create mistakes that

6    they can now represent to you well, on cross so and

7    so said this, so and so said that.  You heard each

8    witness.  You heard their entire testimony.  You

9    use your common sense, and you won't be fooled.

10       You know, Abraham Lincoln is in the news a lot

11   lately.  There is a movie about him.  Perhaps you

12   saw it.  He had this famous saying, among many,

13   about fooling the people.  And that saying has kind

14   have been narrowed down and changed over time.  It

15   basically comes down to this almost oriental

16   saying.  Fool me once, shame on you.  Fool me

17   twice, shame on me.

18       The defendants managed to fool the DEC and the

19   system designed to protect the environment once.

20   The defendants should not be permitted to fool the

21   system designed to protect the environment again.

22   Accordingly, I ask you to live up to your

23   responsibility as jurors and find the defendants

24   guilty of the 19 counts in this indictment.  Thank

25   you.

1          THE COURT:  Okay, Mr. Piaggione, thank

2     you.

3          Okay, ladies and gentlemen, we're getting

4     closer and closer and closer to what you have to

5     do, and that is resolve the fact issues that you've

6     heard argument about over the course of the last

7     two days.  Before we do that though we think you

8     should be fortified, and so we're going to break

9     for lunch, and we'll have you back here at 2:30

10    we'll start again, but that will be with my

11    instructions on the law to you.  Okay.  No more

12    arguments.

13         Once we complete my instructions to you -- it's

14    going to take some time, so whatever you eat make

15    sure that it's enlightening in terms of your

16    ability to spend some time with me.  Make sure you

17    don't eat too heavy so you start dozing off.  I

18    want you to stay alert as best you can.  Because,

19    you know, and nobody's making light of anything

20    here.  This is very serious business, so -- it is

21    important that you understand my charge as a

22    totality, of the instruction in the law to apply to

23    this case.  Don't really talk about it.  Keep, you

24    know, enjoy the time that you have to get lunch,

25    enjoy lunch, and we'll see you back here at 2:30.

1    Okay.  Thank you very much.  You've been terrific.

2    Appreciate it.

3              (Jury excused from the courtroom.)

4              THE COURT:  Thank you.  See you back here

5    at 2:30.

6              (Lunch recess was taken.)

7              (Jury not present in the courtroom.)

8              THE COURT:  Okay.  The attorneys and the

9    parties are back present.  I am ready to begin.

10   I'll have the jury brought in in short order.  What

11   I -- just for your information, two things.  One, I

12   am going to start with charge number 35, which is

13   the indictment is not evidence.  I may have

14   delivered that charge before, but I think -- I did

15   not?

16             MR. LINSIN:  No.  I thought my

17   recollection, your Honor, is you stopped just

18   before that, because it seemed to be a logical

19   place to begin with before you start reading the

20   charge.

21             THE COURT:  So I will start with that.

22   And for your information, with respect to the

23   special verdict form, in my judgment, I'm going to

24   let the verdict form stand as prepared.  I'm not

25   going to add the special verdict form component to

1    the verdict form itself for a number of reasons,

2    including the fact that I think the charge that I

3    will be giving with respect to entrapment by

4    estoppel is a strong charge.  I think from the

5    jury's standpoint, as engaged as they are, it will

6    not lose its impact by virtue of the strength of

7    the charge.  It's not going to be any more

8    important or less important than anything else in

9    the charge, but I think the jury will get it.

10        I think there are some issues with respect to

11    the extent or the appropriateness of the proof as

12    to each individual count such that including the

13    language on each verdict sheet that applies to each

14    count of the indictment might not be the

15    appropriate way to go.  And, you know, I did raise

16    this matter sua sponte in a sense, although it

17    certainly differs from, you know, the case that I

18    reviewed.  But, I think in the totality, it still

19    winds up as the fairest of approaches is to leave

20    this verdict form as a general verdict form and not

21    a special verdict form, and that will be my

22    decision on that.  So I just wanted you to know

23    before I get into charging the jury.

24            MR. LINSIN:  Your Honor, could I ask about

25    two issues then?  We accept your ruling obviously.

1    But with respect to the unanimity instruction on

2    the issue of active management for Count 17, can I

3    inquire how the Court intends to address that

4    issue?

5              THE COURT:  You mean in terms of asking

6    for a jury response with respect to active

7    management?

8              MR. LINSIN:  A confirmation, your Honor,

9    that the jurors -- it is one thing to provide a

10   general unanimity requiring unanimity on every

11   element and on every count.

12             THE COURT:  Yeah.  I don't believe it's

13   necessary to do anything more than the elemental

14   approach that we're -- for that particular count.

15   And I think there is the prevailing presumption

16   that the jury will follow my instructions with

17   respect to unanimity, so I don't think there's

18   anything more that really has to be done.

19             MR. LINSIN:  The second point I wanted to

20   inquire about, your Honor, in the draft

21   instructions -- draft charges that were circulated,

22   when you again reference the entrapment by estoppel

23   defense toward the end of your charge -- it would

24   be what was originally -- I don't know what the new

25   number is, but originally draft charge 66 there was

1    an indication in that draft charge that it was

2    applicable to Counts 17, 18 and 19.  You referenced

3    the earlier detailed discussion of the defense and

4    simply remind the jury that it applies to these

5    remaining counts.

6        I guess my threshold question there is, does

7    the Court intend to retain that language in what at

8    least was draft charge 66?  As I'm looking at that

9    original draft charge, it is at the end of the

10   second paragraph -- I'm sorry, the third paragraph

11   in that draft charge.

12             THE COURT:  Okay.  The charge that -- I

13   mean, it's still the same.  It's draft -- or it's

14   still 66.  I think it's going to be on page 102 I

15   think when we get this finalized.  But the way I

16   have it prepared is that I will reference that.

17   Initially the instruction related to Counts 1

18   through 15, but I will reference the fact that to

19   be included will be Counts 17 through 19 as well.

20   So that will take care of all of the counts.

21             MR. LINSIN:  All right.  Thank you.

22             THE COURT:  There's more embellishing

23   language that surrounds that, but I've broken it

24   down into two separate sections.

25             MR. LINSIN:  All right.

1          MR. PERSONIUS:  Judge, I don't -- and I'm

2    not complaining.  I just want to make sure I

3    haven't missed something.  I don't have a copy of

4    the current version of what's left of the charge.

5    Are we not supposed to have it?

6          THE COURT:  No, you should have it.

7          MR. LINSIN:  No, I don't have it either.

8          THE COURT:  You don't?  Okay.

9          LAW CLERK:  They don't get it.  I can make

10   copies of it.

11         THE COURT:  It would helpful --

12         MR. LINSIN:  It would be helpful to be

13   able to follow along and make sure, if we're going

14   to ask whether we object or not at the conclusion

15   whether it's faithful to the text we understand.

16         THE COURT:  That's my fault.  We did make

17   changes.

18         LAW CLERK:  Your practice is counsel does

19   not get a copy of the final charge.  I can do it if

20   you want me to do it.

21         THE COURT:  We made the changes though.

22   You have the draft charge, right?

23         MR. LINSIN:  We have the draft charge.

24   The Court had indicated yesterday that things were

25   going to be repaginated.  There were additional

1    charges made.  We got some of the draft charges at

2    the end of the day yesterday, but --

3                THE COURT:  Okay.  Well, yeah, we'll do

4    it.  Let's get it prepared.  It's my fault.

5                MR. PERSONIUS:  That's all right, Judge.

6                THE COURT:  Give my a couple of minutes.

7                MR. PERSONIUS:  Sorry.

8                THE COURT:  Thank you, your Honor.

9                MR. LINSIN:  Thank you, your Honor.

10               THE COURT:  Give me a couple of minutes

11   and we'll get that done.

12               (Short recess was taken.)

13               (Jury not present in the courtroom.)

14               THE COURT:  Okay.  We are reconvened.

15   There is a question with respect to an email

16   exchange?

17               MR. LINSIN:  Your Honor, there is.  And I

18   apologize to the Court for not more thoroughly

19   reviewing this.  Mr. Mango is correct and I now

20   have in front of me a copy of an email that he sent

21   to the Court's law clerk at 6:38 p.m. last evening

22   regarding these definitions.  I erroneously

23   presumed that Mr. Mango, pursuant to our discussion

24   yesterday, would have transmitted to the Court a

25   full text of the definitions that we discussed and

1      agreed upon yesterday.

2          I now realize in reviewing this that he has

3      edited these definitions.  He has left out

4      significant portions that, in his judgment, he

5      deemed irrelevant.  He has adopted another

6      regulation, and I'm not quite certain how.

7          I fault myself, your Honor, for not more

8      carefully looking at this.  But I presumed,

9      mistakenly, that we would be dealing with, and I

10     think we need to be dealing with, an unedited,

11     unmassaged definition straight from the

12     regulations, and that's not what this email

13     transmitted.

14             THE COURT:  And we just took what was

15     given to us and incorporated that into the charge.

16             MR. LINSIN:  So I do apologize for not

17     observing this before, your Honor.  I didn't think

18     it was going to be necessary.

19             MR. MANGO:  Your Honor, if I could

20     respond.  I did put -- I didn't change any of the

21     definitions.  I left out parts that really have no

22     bearing.  For example, in modification this (aq) in

23     6 NYCRR 200.1(aq) Modification is about 10, 12

24     different -- 12 lines.  And I don't think there's

25     any real dispute between the parties that what I've

1    included is the only relevant portion in this case.

2         I could, if you want, I could go back and cut

3    and paste and send the Court the full definitions.

4    You could take a look at them and make that call.

5    I didn't think this was going to be an issue, your

6    Honor.

7         It was not my intention to, you know, try to

8    mislead defense counsel or the Court, and I

9    absolutely did not try to do that.  I tried to keep

10   the definitions in a very simple and clear manner

11   so that you wouldn't have to read 12 lines of

12   irrelevant text for modification.

13        MR. LINSIN:  Your Honor, again, I fault

14   myself for not being clearer on this when I first

15   walked in the courtroom today.  I don't have my

16   file with me that has the actual text of these

17   definitions.  I would -- before I could agree to

18   editing or deleting text that Mr. Mango is

19   representing is irrelevant, I would need, on behalf

20   of my client, to look at the actual text.  I

21   confess I should have done it last evening, and I

22   just did not.  I have a file back in my hotel room,

23   but I don't have it with me.

24        THE COURT:  Okay.

25        MR. LINSIN:  I apologize, your Honor.

1          THE COURT:  Get the full text, please, of

2    the definitions.

3          MR. MANGO:  I'll go email them to the

4    parties right now, your Honor.

5          MR. LINSIN:  Thank you, your Honor.

6          THE COURT:  And then --

7          MR. MANGO:  That should take me 15

8    minutes.

9          THE COURT:  You haven't seen the weather

10   conditions outside?

11         MR. MANGO:  There is a computer on the

12   third floor, so I'm going to go use that.  I have

13   it electronically, and I can submit it.

14         THE COURT:  If would do that, please, that

15   would be helpful, and notify me when you're ready.

16      Chris, if you tell the jury it's going to be a

17   little while yet before we get started, please,

18   with apologies, okay?

19      Okay.

20         MR. MANGO:  Thank you, your Honor.

21         MR. LINSIN:  Thank you your Honor.

22         (Short recess was taken.)

23         (Jury not present in the courtroom.)

24         THE COURT:  Okay.  We are again

25   reassembled.  The attorneys and parties are back

1    present.  Where do we stand as far as definitions

2    are concerned?

3              MR. LINSIN:  Your Honor, again I apologize

4    to the Court for bringing this up at this point,

5    but Mr. Mango has now sent, I believe, to the Court

6    and to the defense the full text of these

7    definitions, which is what we had understood was

8    going to be included and instructed on.  We believe

9    for a number of reasons with respect to each of

10   these definitions -- some of them I should say were

11   complete in Mr. Mango's email, and obviously those

12   I believe should stand.  But for the ones that were

13   not complete, we believe the complete text of the

14   definition as contained in the regulations should

15   be incorporated.

16       I understand that one or two of them are a bit

17   more lengthy, but that is -- we believe there's

18   important language in there.  That's what we had

19   understood was going to be included, and we would

20   ask simply that the full text be included rather

21   than the abbreviated version that was circulated to

22   the Court and to the parties last night.

23             THE COURT:  Okay.  Do you -- have you

24   specifically identified which ones --

25             MR. LINSIN:  Yes.  Let me -- I apologize

1    for scrolling through as I'm talking, your Honor,

2    but the definition of "source" needs to be amended.

3    That is incomplete in the original email.  The

4    definition of "point" we believe was complete as

5    transmitted last evening, and therefore we don't

6    think any change it necessary there.

7              THE COURT:  What I have is "emission

8    point" right, not just "point"?

9              MR. LINSIN:  I'm sorry, "emission point,"

10   yes.

11             THE COURT:  Okay.

12             MR. LINSIN:  And the definition that is

13   contained in the draft charge number 44, which your

14   clerk just passed out, we believe captures the

15   entire language of the regulations, so we are fine

16   with that.  The term "construction", however, is

17   abbreviated in this draft version, and we believe

18   needs to be amended.  The term "modification" is

19   substantially abbreviated, and we believe needs to

20   be amended, and the term "process" is correct and

21   complete.

22             THE COURT:  Okay.  So --

23             MR. LINSIN:  So source, construction, and

24   modification.

25             THE COURT:  Okay.  All right.  So just

4159

1       going back to the email, okay, for a second, where

2       you have Mr. Mango addressing Andrew, the first

3       definition is "emission source".  At the bottom of

4       the email.  Are we together on that?

5            Mr. Linsin, do you have the email?

6                 MR. LINSIN:  The email that was just sent,

7       your Honor, is that the email --

8                 THE COURT:  No, the one from last night.

9                 MR. LINSIN:  The one from last evening.

10                THE COURT:  Yes.

11                MR. LINSIN:  The first definition on that

12      email is "emission source".

13                THE COURT:  Then it has in paren small F.

14                MR. LINSIN:  Yes.

15                THE COURT:  Okay.  Is that the full

16      definition?

17                MR. LINSIN:  That is the full definition,

18      yes.

19                THE COURT:  Okay.  Likewise, for

20      "modification" it's on the next page of the email.

21      There's "modification" that follows in paren aq, do

22      you see that?

23                MR. LINSIN:  We passed over

24      "construction", your Honor.

25                THE COURT:  Well, okay.  "Construction" is

4160

1    nine, paren nine.

2          MR. LINSIN:  Correct.

3          THE COURT:  That's full definition?

4          MR. LINSIN:  That's full definition, yes.

5          THE COURT:  Okay.  And then modification

6    is in paren aq.

7          MR. LINSIN:  Correct.

8          THE COURT:  Full definition all the why

9    through in paren number two?

10         MR. LINSIN:  Yes, your Honor.

11         THE COURT:  Okay.  That's what you want

12   included?

13         MR. LINSIN:  Yes.

14         THE COURT:  Okay.  Well, what I believe I

15   will do is just -- I mean, I'd like to get started,

16   so I'm going to read off of the email.  In the

17   meantime Andrew will be adding those definitions to

18   charge number 44.

19         MR. LINSIN:  All right.  That's fine, your

20   Honor.

21         THE COURT:  And then once he's integrated

22   all of that in, everything else will fall into

23   place.  He'll bring that out for you to follow

24   along.

25         MR. LINSIN:  Thank you very much, your

4161

1        Honor.

2              THE COURT:  Andrew, does that work?

3              LAW CLERK:  Sure.  Can I just ask you a

4        question?

5              (Discussion off the record.)

6              THE COURT:  In the definitions there's --

7        well, let's work with "modification" just for the

8        moment.  When you get to the paren numbers 1 and 2,

9        there's the pursuant to 40 CFR Part 52.21.  Then

10       you drop down to 2, it's 40 CFR Part 52.21.  Do you

11       want that you included in, the "pursuant to"

12       language?  Because -- well, no, not because.

13             MR. LINSIN:  Your Honor, I believe we

14       could safely end that at 1975.

15             THE COURT:  Right.  And then in 2, we

16       could end it after "issued," period, instead of

17       referencing under 40 CFR --

18             MR. LINSIN:  Yes, I believe -- I am

19       comfortable with that too, your Honor.

20             THE COURT:  Okay.  And then I think that's

21       pretty much it.  Okay.

22          Mr. Mango, that works?

23             MR. MANGO:  Yes, your Honor.  Yes,

24       whatever the Court wants to do or defense requests.

25       Again, I was not trying to do anything so --

1          LAW CLERK:  Emission source sub F, the

2     third line has "as defined in Part 203 of this

3     title."  Do you want to end it at contamination?

4          MR. MANGO:  I think it's probably safe to

5     take that out as well.  They've heard it.  But I

6     defer to counsel.

7          MR. LINSIN:  You know, it may be cleaner

8     to simply put a period after the words "cleaning

9     device".  Because I think we would all agree that

10     the exception that is captured in that last clause

11     is not an issue here.

12          MR. MANGO:  That's agreed, your Honor.

13          THE COURT:  That's okay?

14          MR. MANGO:  That's agreed.

15          THE COURT:  Okay.  Andrew, anything else?

16          LAW CLERK:  That's it.  I'll bring out

17     charges 1 through 43, and then I'll bring the rest.

18          THE COURT:  Okay.  You can follow along.

19     It will be a little disjointed, but I think it's --

20     I'm going to take my time.  I'm hoping we can

21     finish up the charge this afternoon.  But, I mean,

22     actually I can only go until about 5:30, so that's

23     why I want to get started.  Okay.

24      All right, Andrew, whatever you have to do.

25          MR. LINSIN:  The last sentence -- I'm

1    sorry, your Honor.  The last sentence though after

2    that part we just redacted from "emission source"

3    the last sentence will be retained in that

4    definition, yes?

5            THE COURT:  Yes, where a process through

6    the end?

7            MR. LINSIN:  Exactly.

8            THE COURT:  Okay.  Yes.

9            MR. LINSIN:  Thank you.

10           THE COURT:  Okay.  The other thing is

11   where we break down the counts in the charge, 1

12   through 5, 6 through 10, and then 11 through 15,

13   and 16, and then 17 through 19 I'm going to just

14   read a summary rather than each individual count

15   and let the jury know that they will be given the

16   indictment so that they can get into the specifics

17   of Count 1, Count 2, et cetera.

18           MR. LINSIN:  We have no problem with that,

19   your Honor.

20           MR. PERSONIUS:  Very acceptable.

21           THE COURT:  By the time -- Mr. Mango?

22           MR. MANGO:  That's fine.

23           THE COURT:  Because by the time we'd get

24   through reading each one of the counts, the jury

25   would be spent I think.  So, I think that's

4164

1    probably a good way of proceeding.  Okay.

2        All right.  Chris, if you would bring the jury

3    out, please?

4            (Jury seated.)

5            THE COURT:  I don't know how much

6    lengthier a lunch break we can give you, but I hope

7    you're ready.  If you would sit down, please.

8    Thank you for coming back.  As you can see, the

9    attorneys and the parties are back present.

10        And, again, I apologize for the delay, but it

11   sometimes take us a little bit of time to get ready

12   for you, and in the end it saves a lot of time.

13   So, you know, I'm going to work with you for the

14   next couple of hours, all right, I think.  And if I

15   can do it a little quicker than that, I hope that

16   will work.  But, you know, only time will tell.

17        And it's important, but remember what I said to

18   you at the outset that no part -- no any one part

19   of the instruction that I give to you is any more

20   or less important than any other part.  So it's the

21   totality of what I will be telling you that

22   comprises the law, the total law, that applies to

23   this case, not any one part.  But we're going to

24   talk in terms of grouping of counts of the

25   indictment.  I think almost everything that you are

1    familiar with -- and a lot of this you will have

2    heard before, but it's our hope that it will

3    register with you in a way that will be

4    constructive and that will be helping you get to

5    resolving the fact issues in this case.

6        I'll proceed much like we did when I gave you

7    the preliminary charge the other day.  To be honest

8    with you, I'm losing track of days.  I don't think

9    it was -- was it yesterday?

10            MR. MANGO:  Two days ago.

11            THE COURT:  Two days ago.  All right.  We

12   already have a dispute.  You have to resolve the

13    fact issue when you did get that charge from me,

14    among others.  Okay.

15       Serious business, right?  I mean, we can't

16   repeat that enough.  So, I've given you the

17   preliminary instructions, and we're now going to

18   turn to the charges and a discussion of those

19   against the two defendants in this case as contained

20   in the indictment.  And just so you know, we're

21   going give you the indictment itself, so you're

22   going to have that document to work with.

23       And I want to remind you in that regard that

24    that document is just a notice document.  It's not

25    evidence, and what it does is describe the charges

1    that are made against the defendants.  And when I

2    say that, what I mean is that it is an accusation

3    that each of the defendants committed what is

4    charged in the 19 counts of that particular

5    indictment.

6         But, as you know -- and you've heard many times

7    you are not to consider it as any evidence

8    whatsoever of the guilt of the defendants in this

9    case.  And in reaching the determination of whether

10   the government has proved the defendants guilty

11   beyond a reasonable doubt, you may consider only

12   the evidence introduced or the lack of evidence.

13        Now let me group those charges for you.

14   Charges are counts, synonomous, right?  One through

15   five of the indictment charge the defendants, both,

16   with violating the Clean Air Act by operating a

17   source of air pollution in violation of a permit

18   issued under Title V of the Clean Air Act by

19   emitting coke oven gas from an unpermitted emission

20   source.  Okay.  Those are the first five counts.

21        Now, when you get to the indictment you'll have

22   each count, and they'll read similarly, but you

23   have to look at it carefully in terms of the

24   content of each count.  So I'm not going to read

25   all five counts at this point.

1           What I will do is then go to the next grouping

2      of charges or counts, and that is 6 through 10, and

3      that too charges crimes under the Clean Air Act.

4      And each of the defendants is charged with

5      violating the Clean Air Act by operating a source

6      of air pollution in violation of a permit issued

7      under Title V of the Clean Air Act by operating the

8      western quench towers -- that's quench tower number

9      1 -- without baffles.  And then the indictment will

10     take you through Counts 6 through 10.

11         The next grouping is Counts 11 through 15 also

12     involving the Clean Air Act.  And if you remember,

13     the last three counts deal with the RCRA statute.

14     But 11 through 15 charge the same defendants with

15     violating the Clean Air Act by operating a source

16     of air pollution in violation of a permit issued

17     under Title V of the Clean Air Act by operating the

18     eastern quench tower -- and as you know, the

19     eastern quench tower is number 2, at least that's

20     the proof that has been presented to you -- without

21     baffles.  Okay.  That's Counts 11 through 15.

22         Now, Count 16 is the count that you heard --

23     okay.  We'll get to Count 16 down the road a little

24     bit.  And then, you know, we're going to talk about

25     Counts 17 through 19 as well.  But we're going stay

1     with the Clean Air Act at this point in time.  I

2     think it will make more sense to you before we get

3     to the obstruction of justice count, and then we

4     get to the RCRA count.

5         So let me tell you about the Clean Air Act,

6     and, I mean, just so you know, under the law it's

7     42 United States Code, Section 7413(c)(1).  But the

8     purpose of that statute is this:  The Clean Air Act

9     and the regulations promulgated thereunder is a

10    comprehensive air pollution control statute that

11    reflects the congressional purpose -- the purpose

12    of Congress -- to protect and enhance the quality

13    of the nation's air resources.  And that's the

14    charge of the prosecutors in this office to

15    accomplish the enforcement of the Clean Air Act

16    pursuant to the purpose of the statute.

17        Now, let's talk about elements, because you've

18    been, in a way, trained or at least exposed to the

19    terminology elements of each of the counts in the

20    indictment.  And each has to be satisfied by the

21    government beyond a reasonable doubt.  And if the

22    government fails with respect to any one, you

23    cannot convict.  If it does prove each of those,

24    before we get to discuss any defenses, if the

25    government proves each essential element beyond a

1    reasonable doubt, you must convict.

2         So let's take a look at Counts 1 through 5

3    again in the indictment.  Those are the Clean Air

4    Act counts.  And here's what the essential elements

5    are, and I'm going to go through four with you with

6    respect to Count 5.  First, that the government

7    [sic] was an owner or operator of a stationary

8    source of air pollutants; second, that the

9    stationary source of air pollutants was subject to

10   the Title V operating permits program; third, that

11   during the time periods alleged in the indictment,

12   the defendant operated or caused to be operated a

13   stationary source in violation of a Title V

14   operating permit requirement by emitting --

15   what? -- coke oven gas from a pressure relief valve

16   in the by-products department, an unpermitted

17   emission source, and then which was condition 4 of

18   the Tonawanda Coke Corporation's Title V permit;

19   and fourth, that the defendant acted knowingly.

20        So you're going to have those four elements to

21   look at.  Now, follow along with me.  I'm going to

22   get you -- I mean, you're going to get a copy of

23   this, okay?  Elementally.  So, pay close attention

24   to me.  But we're going to minimize the danger of

25   your getting lost by giving you a copy that will

4170

1    relate to the specific essential elements.  But let

2    it sink it.  Listen.

3        So we've got the fourth element that the

4    defendant acted knowingly.  So those are the four

5    essential elements that the government must prove

6    beyond a reasonable doubt.  That's for Counts 1

7    through 5.

8        Counts 6 through 10, same principle applies.

9    Each essential element must be proved beyond a

10   reasonable doubt, and we're going to go through

11   four again.  First, that the defendant was an owner

12   or operator of a stationary source of air

13   pollutants.  Same, right?  Second, that the

14   stationary source of air pollutants was subject to

15   the Title V operating permits program.  Same,

16   right?  But you have to individually consider each

17   for each count and each group of counts.  Third,

18   that during the time periods alleged in the

19   indictment, the defendant operated or caused to be

20   operated a stationary source in violation of a

21   Title V permit requirement by operating the western

22   quench tower.  And this is where it starts to

23   differ from the other one, because in the first

24   five you're talking about the emitting of coke oven

25   gas.  But here we're talking about operating the

1    western quench tower that was -- according to the

2    indictment -- and you've heard evidence quench

3    tower number 1 -- at the Tonawanda Coke Corporation

4    without -- what? -- and you've heard about this in

5    the evidence -- a baffle system installed in such

6    quench tower -- and the condition that applies

7    there is number 96 -- of the Tonawanda Coke

8    Corporation's Title V permit, and in noncompliance

9    with any applicable exemption.  Okay.  So that's

10   the third element.  And fourth, that the defendant,

11   like with the first five, acted knowingly.

12        So, essentially everything lines up, but you're

13   going to have that third element.  It's going to be

14   a little bit different, because it has to be

15   tailored to Counts 6 through 10.

16        Now, let's find out -- what do you think, how

17   many elements there might be for Counts 11 through

18   15, right?  Now, we had one through four on all the

19   others.  How about if we have one through four on

20   these counts?  And that's the way it works out.

21   But you have to separately consider the groupings.

22   Okay.

23        But, first, that the defendant was an owner or

24   operator of a stationary source of air pollutants;

25   second, that the stationary source of air

1    pollutants was subject to the Title V operating

2    permits program.  Same, all right?  Let's look at

3    that third one again, because the fourth will be

4    the same that the defendant acted knowingly.  The

5    third one with respect to Counts 11 through 15 --

6    and if you remember, we had quench tower 1 in the

7    last five counts.  We have quench tower number 2

8    now in this second grouping in Counts 11 through

9    15.  So that during the time periods alleged in the

10   indictment, the defendant operated or caused to be

11   operated a stationary source in violation of a

12   Title V permit requirement by operating the eastern

13   quench tower, which is number 2 according to the

14   indictment, and you've heard evidence about that,

15   at the Tonawanda Coke Corporation without --

16   what? -- a baffle system installed in such quench

17   tower.  The condition here is not 96, like it was

18   in the prior counts, 6 through 10.  But this is

19   condition number 97 of the Tonawanda Coke

20   Corporation's Title V permit.  And then the

21   knowingly -- committed knowingly requirement.  So

22   there you go.  Okay.

23        If you look at it, common sense, experience,

24   intelligence, right?  Methodically, you just take

25   it, look at it, address it.

1        Okay.  Let's talk about owner or operator and

2    what that term means.  Because remember everybody

3    told you I'm going to be giving you definitions.

4    But when you listen to them, in light of all of the

5    evidence that you've heard, it's really going to

6    gel, okay?  It's going to be jelling', to quote a

7    commercial.

8        And the term "owner or operator" means any

9    person who owns, leases, operates, controls, or

10   supervisors a stationary source.  Okay.  Common

11   sense.  But, again, you have to know the specific

12   definition to make it all feel right and be right.

13   All right.

14       Let's talk about -- you're saying, okay, what

15   does stationary source mean?  Let's talk about

16   that.  That's our next charge.  The term

17   "stationary source" means, generally, any source of

18   air pollution except those emissions resulting

19   directly from an internal combustion engine for

20   transportation purposes or from non-road engines or

21   vehicles.  A major stationary source means any

22   stationary source of air pollutants which directly

23   emits or has the potential to emit 100 tons per

24   year or more of any air pollutant.

25       The term "major source" under the Clean Air Act

1    includes a major stationary source that was just

2    defined.

3         Okay.  Now, a stationary source is subject to

4    the Title V operating permits program if it is --

5    what? -- a major source.  Once subject to the

6    Title V operating permit program, the stationary

7    source must have a permit issued by a permitting

8    authority.  In New York, the permitting authority

9    under the Title V operating permit program is the

10   New York State Department of Environmental

11   Conservation, the DEC, which is authorized by the

12   EPA to carry out the Title V operating permit

13   program.

14        Okay.  When we're talking stationary source, we

15   agree we're talking about the Tonawanda Coke

16   Corporation, right?

17             MR. LINSIN:  We do not dispute that, your

18   Honor.

19             THE COURT:  Yes, it's not disputed, right?

20        Just so you know so I can give you context for

21   that stationary source, all right?  All right.

22   Let's talk about some of the terms that we've just

23   talked about that relate to Counts 1 through 5 of

24   the indictment, and they -- and which involve the

25   pressure relief valve.  Okay.

1          Under Title 6 of the New York Codes, Rules and

2     Regulation Part 201-1.2, if an existing emission

3     source was subject to the permitting requirements

4     of Title 6 Part 201 of the New York Codes, Rules

5     and Regulations at the time of construction or

6     modification, and the owner and/or operator failed

7     to apply for a permit for such emission source,

8     then -- okay, and I'm going to give you some

9     definitions, okay?  And we're going to talk about

10    owner and/or operator.  And that means that the

11    owner and/or operator must apply for a permit for

12    such emission source or register the facility in

13    accordance with the provisions of this part.

14    That's what the owner/operator must apply for under

15    the definitions that are applicable here.

16         The emission source is as follows by way of

17    definition:  Air contamination source or emission

18    source, any apparatus, contrivance, or machine

19    capable of causing emission of any air contaminant

20    to the outdoor atmosphere, including any

21    appertinent exhaust system, air cleaning -- or air

22    cleaning device.  Where a process at an emission

23    unit uses more than one apparatus, contrivance, or

24    machine in combination, the combination may be

25    considered a single emission source.  Okay.  That's

4176

1   what we're talking about when we say emission

2   source.

3       Emission point is defined as any conduit,

4   chimney, duct, vent, flue, stack, or opening of any

5   kind through which air contaminants are emitted to

6   the outdoor atmosphere.  I'm going to give you

7   these definitions too.  But stay with me, please.

8   Okay.

9       Now construction, that's a term that's defined

10  as follows:  The initiation of physical on-the-site

11  construction activities which are of a permanent

12  nature, excluding site clearing and excavation.

13  Such activities include, but are not limited to,

14  installation of building supports and foundations,

15  laying underground pipework, and construction of

16  permanent storage structures.

17      That's one of the terms you will have defined

18  for you should you choose to address it and use it

19  properly.  All right.

20      Now "modification" is another definition that

21  I'm going to give you, and it's a rather lengthy

22  definition, so I ask that you pay as close

23  attention to me as you can in that regard.

24      Modification, any physical change or change in

25  the method of operation of an incinerator,

1    stationary combustion installation, or process

2    which, one, increases the hourly emission rate,

3    emission concentration, or emission capacity of any

4    air contaminant; or two, involves the installation

5    or alteration of any air cleaning installation --

6    air cleaning device or controlled equipment; or

7    three, involves conversion of fuel used in any

8    emission source to a fuel with a higher ash content

9    than the fuel used prior to the change; or four,

10   involves the alteration of any furnace or other

11   physical changes to allow burning of refuse, or

12   refuse-derived fuel with fossil fuel; or five,

13   results in the emission of any air pollutant not

14   previously emitted or authorized under the permit.

15        Routine maintenance, repair, and replacement of

16   original equipment or parts thereof are not

17   considered physical changes.  Any increase or

18   decrease in the hours of operation is not

19   considered a change in the method of operation if

20   the total emissions do not cause air pollution or

21   contravention of any applicable ambient air quality

22   standard, and the hours of operation are not

23   restricted through a condition of a permit or

24   certificate issued for the air contamination

25   source.

1     A physical change or a change in the method of

2     operation shall not include the use of an

3     alternative fuel or raw material which, one, the

4     facility or emission source was capable of

5     accommodating before January 6th, 1975, unless

6     change would be prohibited under any federally

7     enforceable permit condition, which was established

8     after January 6th, 1975; or two, the facility or

9     emission source is approved to use under any permit

10    that is issued.

11    Okay.  That's the definition of modification.

12    I know there is a lot in there.  Okay.  But the

13    term may come up in your discussions, so you look

14    at the definitions, which will be a part of what I

15    give you, okay?

16    Now, "process" is the last definition for now

17    that I'm going to give you as it relates to the New

18    York State regulations.  And process is defined as

19    any activity involving one or more emission sources

20    that emits or has the potential to emit any

21    regulated air pollutant.  Okay.

22    Now, we're going to get down to the fourth

23    element that relates to that grouping of charges

24    and counts that we've talked about up to this point

25    in time.  And I want to give you the definition of

4179

1      "knowingly".  All right.  And an act is done

2      knowingly if the defendants are aware of the nature

3      of their acts and do not act or fail to act through

4      ignorance, mistake, or accident.  You may consider

5      evidence of the defendants' words, acts or

6      omissions, along with all other evidence, in

7      deciding whether the defendants acted knowingly.

8      It is not necessary for the government to prove

9      that the defendants knew that they were acting in

10     violation of the law, or that they knew of any of

11     the regulatory requirements.

12         The crimes we're talking about here are general

13     intent crimes.  That is, the defendants do not need

14     to know that they were violating the specific terms

15     of the permit or the law in order to be guilty of

16     the crime.  You must, however, find that they knew

17     the facts of what they were doing.

18         For Counts 1 through 5, this means that you

19     must find that the defendants knew that coke oven

20     gas was being emitted from the pressure relief

21     valve in the by-product department.  Then you must

22     find this emission was unpermitted and was in

23     violation of the Title V permit.  Counts 1 through

24     5.

25         Count 6 through 10.  This means that you must

1    find that the defendants knew that the western

2    quench tower, tower 1, was being operated without a

3    baffle system installed.  For Counts 11 through 5

4    [sic], to establish that knowledge element, this

5    means that you must find that the defendants knew

6    that the western quench tower, tower number 2 --

7    I'm sorry, that the eastern quench tower, tower

8    number 2, was being operated without a baffle

9    system installed.  Okay.

10        Now, remember, we've gone through the elements

11   for 15 counts.  Right?  Okay.  Now, you've heard

12   the argument about the entrapment by the estoppel

13   defense.  Let me tell you about that now.

14        The entrapment by estoppel defense is available

15   to the defendants who can establish by a different

16   proof standard, a preponderance of the evidence --

17   they have to prove it -- but by a preponderance of

18   the evidence that the government procured their

19   commission of the illegal acts by leading them

20   to -- what? -- reasonably believed that they were

21   authorized to commit them.  It is a defense to the

22   Clean Air Act violations, Counts 1 through 15, that

23   I have just discussed with you.  That's a

24   recognized legal defense.  Okay.

25        The entrapment by estoppel defense does not

1    negate any of the statutory elements of a crime.

2    Rather, the entrapment by estoppel defense

3    recognizes that even though the government may have

4    proved all of the elements of the crime to convict

5    the defendant for the acts committed in reasonable

6    reliance on a government official's statements, or

7    on the conduct of the government would -- what? --

8    have violated due process or, what you heard argue

9    to you, fundamental fairness.   Okay.   That's how

10   that defense comes into play.

11       To establish this defense, the defendants must

12   show that they reasonably relied on the statement

13   or conduct of a government official when they

14   engaged in the conduct with which they are charged.

15   Reliance is reasonable if a person sincerely

16   desirous of obeying the law, would have accepted

17   the statement or conduct of the government official

18   as true and would not have been put on notice to

19   make further inquiries of his or her own.

20       The defendants must also show that they

21   reasonably disclosed the conduct alleged in the

22   indictment to the government before or at the time

23   of authorization.   That is -- here's what you must

24   find as a jury -- a connection between the conduct

25   disclosed by the defendants, and the conduct that

4182

1       the government purportedly authorized.  There has

2       to be that connection.

3           And finally, the government -- the defendants

4       need not establish that the government actually

5       authorized their conduct.  They don't have to show

6       that.  They must only establish -- what? -- seeming

7       authorization.  Seeming authorization.  Actual

8       authorization is not required.

9           But remember this, the defendants have the

10      burden to prove the entrapment by estoppel defense

11      by preponderance of the evidence, which is more

12      than equal evidence.  It's not proof beyond a

13      reasonable doubt.

14          Lets talk about what that preponderance of the

15      evidence really means by way of strict definition.

16          I just told you that the defendants have the

17      burden of proofing the estoppel -- the entrapment

18      by estoppel defense -- by what? -- a preponderance

19      of the evidence standard, right?

20          To prove something by a preponderance of the

21      evidence means to prove only that it is more likely

22      than not true.  It is determined by considering all

23      of the evidence and deciding which evidence is more

24      convincing.

25          In determining whether defendants have proven

1    this defense, you may consider the relevant

2    evidence or the relevant testimony of all of the

3    witnesses, regardless of who may have called them,

4    and all of the relevant exhibits regardless of who

5    may have produced them.  If the evidence appears to

6    be equally balanced, or you cannot say upon which

7    side it weights heavier, you must resolve, on this

8    issue, the question against the defendants.  Okay.

9    Because it's got to be more than equal evidence.

10        However, it is important to remember the fact

11   that the defendants have raised this defense does

12   not relieve the government of the burden of proving

13   all of the elements of the crimes that we just

14   talked about in Counts 1 through 15.  These are

15   things that the government must still prove beyond

16   a reasonable doubt.  In order words, they have to

17   prove all the essential elements beyond a

18   reasonable doubt.  Okay.  That's Counts 1 through

19   15.

20        We'll break it up before we get to those 17 to

21   19 counts, which is the RCRA counts.  Lets talk

22   about obstruction of justice, okay?  And that's the

23   one count that kind of breaks synch here, if you

24   will.  And the defendants have been charged in this

25   Count 16 with obstructing and endeavoring to

1    obstruct the due administration of proceedings

2    pending before the United States Environmental

3    Protection Agency.  Once again, Count 16 will be

4    given to you so that you can read through it.  But,

5    you know, those terms, obstruction of justice, even

6    by their common meaning, defines what Count 16 is.

7    And when you look to Count 16 though you'll get all

8    the specifics in terms of the dates and all of the

9    particular language.  And, you know, the particular

10   statute in this case -- as you recall, I gave you

11   some statutory references earlier on the other

12   counts that had to do with the Clean Air Act.

13        Title 18 is basically the criminal code, and

14   there's a section of that, 1505, which is the

15   obstruction of justice statute.  And the law reads

16   this way:  Whoever corruptly or by threats of

17   force, or by threatening letter of communication

18   influence, obstructs, or impedes, or endeavors to

19   influence, obstruct or impede the due and proper

20   administration of law under which any pending

21   proceeding is being held before any department or

22   agency of the United States, shall be guilty of a

23   crime.

24        And you heard the argument with respect to

25   obstruction of justice.  But that's the technical

1    language of the statute, and I'll give you that

2    too.  So if you want to look at that particular

3    law, you can, and you should if you believe that

4    would be helpful.  Take that Count 16 and look at

5    it, read it through, and you'll get the specifics

6    that you need for purposes of what you have to

7    decide here.

8        Now, the law is designed to prevent any

9    endeavor -- this is charge number 49 -- whether

10   successful or not, which is made for the purpose of

11   corruptly influencing, obstructing or impeding an

12   agency proceeding.  The word "proceeding"

13   encompasses all the steps and stages of the

14   performance by an agency of its governmental

15   functions.  It extends to and includes both

16   investigative as well as administrative functions.

17       The sweep of the statute extends to any corrupt

18   endeavor or effort to obstruct -- what? -- the due

19   administration of the law under which a proceeding

20   is being conducted.

21       All right.  So, now is there a key word in this

22   statute?  Yes, and that's endeavor.  As used in the

23   statute, endeavor means any effort or any act,

24   however contrived, to obstruct or interfere with

25   the proceeding.  It is the endeavor which is the

4186

1    gist of the crime.  Success of the endeavor is not

2    an element of the crime.  The word "corruptly"

3    means having the improper motive or purpose of

4    obstructing the proceeding.

5         Okay.  Let's -- that's, you know, we're really

6    talking the definition, right?  Now we've got to

7    go -- just like we do with those 15 counts, we need

8    to look at these things elementally, right?  Now we

9    have to find out how many essential elements there

10   are that the government must prove beyond a

11   reasonable doubt.  This case three, not four.  But

12   you have to consider each one, right?

13        In order to establish whether the defendants

14   are guilty of the charge in the indictment, the

15   government must prove first, that on or about the

16   date set forth in the indictment a proceeding was

17   pending before an agency of the United States.

18   Proceeding was pending before an agency of the

19   United States.  Second, that the defendants --

20   what? -- knew that a proceeding was pending before

21   an agency of the United States.  And three, that

22   the defendants -- now listen to these words --

23   corruptly endeavored -- remember endeavor --

24   corruptly endeavored to influence, obstruct, or

25   impede the due and proper administration of the law

1    under which the proceeding was being conducted.

2        Okay.  Lets break that down further.  And it's

3    important.  I know this is a lot, okay?  But just

4    stay with me, because we're going to talk about

5    those elements and some of the other terms like

6    what does "proceeding pending" mean, just so that

7    there's -- we kind of minimize the prospects for

8    your making any mistake if you reference what I'm

9    going to be giving you and what I'm trying to kind

10   of drum into you right now.

11       The first element that the government must

12   prove beyond a reasonable doubt is that on or about

13   the date set forth in the indictment a proceeding

14   was pending before an agency of the United States.

15   In that regard you are instructed that the United

16   States Environmental Protection Agency, the EPA, is

17   an agency of the United States, and further that a

18   proceeding includes an inspection by this agency at

19   the Tonawanda Coke Corporation facility.  Okay.

20       Now, the second of the three elements you have

21   to look to to see if the government as proven it

22   beyond a reasonable doubt is that the government

23   must prove beyond a reasonable doubt that the

24   defendants knew that the administrative proceeding

25   was in progress, and you've heard argument about

1    this.  In order to satisfy this element, you need

2    only determine that the defendants knew at or about

3    the date charged that the United States

4    Environmental Protection Agency was conducting an

5    inspection at the Tonawanda Coke Corporation

6    facility.

7        And the third and final element before we get

8    to move on, right, because we have Counts 17, 18,

9    and 19, RCRA counts.  So it's arranged in a way

10   where it's methodical if you break them down and

11   you group them, and then you look at the elements

12   which will correspond if you look at the four

13   essential elements.

14       Now that we're here, we're going to the third

15   and final element of this obstruction count.  The

16   others ones had four.  This has three essential

17   elements.  So the government must prove beyond a

18   reasonable doubt that the defendants did corruptly

19   obstruct or impede, or endeavor to obstruct or

20   impede the proceeding before the Environmental

21   Protection Agency, the EPA.

22       Now, as I explained earlier, the word

23   "corruptly" means simply having the improper motive

24   or purpose of obstructing justice.  So, as I told

25   you, success of the endeavor is not an element of

4189

1    the crime.  All right.  Whether they succeeded

2    that's not an element of the crime.  The term

3    "endeavor" is designed to reach all conduct which

4    is aimed at influencing, intimidating, and impeding

5    the proceedings.  Thus, it is sufficient to satisfy

6    this element if you find that the defendants made

7    any effort or did any act for the purpose of

8    obstructing or impeding the proceeding, right?

9         Common sense, experience, intelligence.  I know

10   there's a lot.  But you break it down, you take

11   these terms, you apply them, you look at the

12   indictment, you call to mind the arguments, not as

13   evidence, then remember the evidence, start

14   plugging it in, discussing it, work through it

15   methodically.  Don't just get overwhelmed by it.  I

16   know you can do it.  Common sense, experience,

17   intelligence.  Come back with the unanimous

18   verdict, okay?  That's the way we do it.  Just take

19   it calmly, listen to each other, respect each

20   other's views and work through it.

21        Okay.  Now, I know you're waiting, because

22   we're going to talk about Count 17, 18 and 19 now.

23   These are the RCRA counts that we built the

24   anticipation up to, right?  But, again, in the

25   indictment no charge is more important than the

1    other, right?  You've got to approach them

2    methodically.  The different one we just got

3    through, that was the obstruction.  Now we're going

4    to be in those RCRA counts.

5        And let's talk about that, because in these

6    counts we're talking about violations, not of the

7    Clean Air Act, not of the Title 18 obstruction of

8    justice statute, but we're talking about the

9    Resource Conservation and Recovery Act, right,

10   RCRA.  And that statutory references this Title 42

11   U.S.C. Section 6928(d)(2)(A).  You probably never

12   knew there was so many numbers and letters and

13   parentheses, right, that's associated with the law,

14   but there are.  And, you know, they're important

15   for charging because, you know, when you get to

16   those right sections and subsections and titles,

17   that's what leads you to the essential elements

18   that are at issue in the case, which the government

19   says it -- and acknowledges it must prove beyond a

20   reasonable doubt.  And the defense is saying, hey,

21   wait a minute, the proof doesn't measure up.  And

22   if we didn't get to the right subsections and

23   sections and titles, you'd be all over the lot.  So

24   this is going to keep you focused.

25       Count 17 of the indictment charges that the

1    defendants -- or charges the defendants with the

2    storage of a hazardous waste on the ground adjacent

3    to the two large deteriorating tanks at the

4    Tonawanda Coke Corporation without a permit.  Okay.

5        Count 18 of the indictment charges the

6    defendants with a disposal of a hazardous waste

7    originating from in and around two large

8    deteriorating tanks at the Tonawanda Coke

9    Corporation without a permit.

10       And Count 19 of the indictment charges the

11   defendants with the disposal of a hazardous waste

12   by spreading the waste on to the coalfield at

13   Tonawanda Coke Corporation without a permit.

14       So you've got to watch the nuances here.  But

15   when you read the text of the charge, the

16   indictment, it will come back.  It will give you

17   the picture that you've heard the argument about,

18   that you've heard all the proof that's been

19   introduced in this -- in this trial.  Okay.

20       I referenced the statute for you that applies

21   to Counts 17, 18, and 19, to read it in text and as

22   it appears in the book, reads this way:  Any person

23   who knowingly treats, stores, or disposes of any

24   hazardous waste identified or listed under this

25   subchapter without a permit under this subchapter

4192

1   violates the law.  Okay.  Basically.

2       Now, let's talk, like we did before, what's the

3   purpose of this law, of RCRA?  All right.  The RCRA

4   law established a system for managing nonhazardous

5   and hazardous solid wastes in an environmentally

6   sound manner.

7       All right.  That's what we're talking about.

8   When we talk about clean air, we talk about RCRA,

9   RCRA's environmental.  You've learned that.  That's

10  what this law is about.

11      And the RCRA law established a system, again,

12  for managing these nonhazardous and hazardous solid

13  wastes in an environmentally sound manner.

14  Specifically, RCRA provides for the management of

15  hazardous wastes from the point of origin to the

16  point of final disposal, and promotes resource

17  conservation, recycling, and waste minimization.

18      RCRA's hazardous waste implementing regulations

19  for K087 first went into effect in November 1980.

20  And regulations covering wastes that were

21  characteristically hazardous for benzene first

22  became effective in September of 1990.

23      So we're talking about, you know, basically a

24  ten-year period of time for those two laws.  Okay.

25      Now, we're going to talk to you about active

1    management.  The attorneys have mentioned, well,

2    look, the judge is going to give you an instruction

3    on what constitutes active management.  That's what

4    I'm going to do now.  And you've heard the proof

5    relative to was something active management or not.

6    That's a fact issue, right?  So you have to decide

7    with respect to the management of waste under RCRA.

8        Now, my instruction to you is here is the

9    definition of active management.  And you're going

10    to get this.  But if you hear it from me, I hope

11    some of it sticks, okay, and then refer to this.

12    You know, be guided by it.  Take your time, work

13    through it.

14        Active management means physically disturbing

15    accumulated waste within a management unit, or

16    disposing of additional hazardous wastes in

17    existing units containing previously disposed

18    wastes.  Okay.  In other words, it means taking

19    some action to disturb or disrupt contained

20    hazardous waste, or adding hazardous waste to

21    previously contained materials.  And if active

22    management occurs after November 19th, 1980, it is

23    subject to regulation under RCRA.  Okay.  Active

24    management.

25        All right.  Let's talk about the elements just

1    like we did with the other 16 counts.  All right.

2    With respect to Count 17, in this case you have

3    five elements that you have to look at.  All right.

4    Five essential elements that the government must

5    prove beyond a reasonable doubt.  First, that the

6    defendant -- and you have two defendants.  You have

7    to analyze both, right, separately -- actively

8    managed a waste after December 25th, 1990.  All

9    right.  Second, that the defendant knowingly stored

10   or caused others to store a waste on or about the

11   dates set forth in the indictment.  So you've got

12   to look at the indictment to get those dates.

13   Third, that the waste was hazardous as defined by

14   RCRA.  Fourth, that the defendant knew that the

15   hazardous waste had the potential to harm others or

16   the environment.  In other words, knew that the

17   waste was not a harmless substance, like, for

18   example, uncontaminated water just as an example.

19   Okay.  And fifth -- this is where we go now to five

20   elements on this thing -- that the defendant did

21   not have a permit to store the hazardous waste.

22        So you can tell you've got some work to do,

23   because you've got to take everything that you

24   learned in this case and relate it to each of the

25   individual elements, because they're all essential.

1          In this case five for these three last counts.

2              Okay.  Well, there will be four in the

3      Counts 18 and 19, five for Count 17.  All right.

4              Let's talk about 18 and 19.  First, that the

5      defendant knowingly disposed or caused others to

6      dispose a waste on or about the date set forth in

7      the indictment.  So you go to the indictment.  You

8      look at it.  What are the dates?  Eighteen and 19.

9      Second, that the waste was hazardous as defined by

10     RCRA.  Third, that the defendant knew that the

11     hazardous waste and the potential to harm others or

12     the environment.  In other words, knew that the

13     waste was not a harmless substance, once again,

14     like uncontaminated water.  And fourth, that the

15     defendant did not have a permit to dispose of the

16     hazardous waste.  All right.

17             Let's talk about the term "storage".  Because

18     under RCRA, it means the containment of -- when we

19     talk about the containment of hazardous waste

20     either on a temporary basis or for a period years.

21     Now we're talking about storage.  The term

22     "storage" is defined under RCRA as the containment

23     of hazardous waste either on a temporary basis or

24     for a period of years in such manner as not to

25     constitute disposal of such hazardous waste.  Waste

1    that have already been disposed of cannot be

2    considered to be in storage.

3         The term "disposal" then is defined under RCRA

4    as the discharge, deposit, injection, dumping,

5    spilling, leaking, or placing of any solid waste or

6    hazardous waste into or on any land or water so

7    that such solid waste or hazardous waste or any

8    constituent thereof may enter the environment or be

9    permitted into the air or discharged into any

10   waters, including ground waters.

11        Now, the government has to prove that the

12   materials referenced in the indictment were

13   hazardous waste.  But before you may conclude that

14   the materials were hazardous wastes, the government

15   must prove to your satisfaction that the materials

16   were solid waste.

17        So the first issue when you approach this to

18   get it into manageable order, the first issue for

19   you to decide is whether the materials were solid

20   wastes.  And a solid waste is defined as garbage,

21   refuse, or any other discarded material included

22   solid, liquid, or semi-solid material resulting

23   from industrial or commercial operations.  A

24   material is considered discarded if it falls into

25   any of the following four categories.

1      You've heard these terms for the most part

2   before in the evidence.  It is abandoned by being

3   disposed of it; it is accumulated, stored, or

4   treated before or in lieu of being disposed of;

5   third, it is recycled by being reclaimed, burned

6   for energy, recovery, or used in a manner

7   constituting disposal; or four, it is accumulated,

8   stored, or treated before it is recycled by being

9   reclaimed, burned for energy recovery, or used in a

10  manner constituting disposal.

11      Okay.  You know, I know, again, it's a lot.

12  But, you know, these terms -- I suspect they're

13  really beginning to stick, right?  And when you use

14  the text here to guide you, all right, and, you

15  know, you'll eliminate any doubts in terms of the

16  strict definition of the terms, and then you just

17  have to apply it to what you all collectively know

18  the evidence to be in this case so you can resolve

19  those fact issues.  That's how you have to prove

20  it.

21      It's not going to be an all -- undoable.  It's

22  doable because -- but you need to take the time,

23  put in the effort.  Because like anything

24  worthwhile, you really have to make application to

25  get it done and get it done unanimously.  Okay.

1          MR. LINSIN:  May we approach just for a

2    brief --

3          THE COURT:  Yes. certainly.

4          (Side bar discussion held on the record.)

5          MR. LINSIN:  I apologize, your Honor.  I

6    thought we had addressed this.  I was -- I wanted

7    to raise a point regarding the next charge.

8          THE COURT:  K087 charge?

9          MR. LINSIN:  It's 62, yes.

10         THE COURT:  Okay.

11         MR. LINSIN:  This exception that is

12   discussed in this charge relates both to K087 and

13   the D018 material.  That exemption applies to both,

14   and I thought it was something -- I apologize, I

15   thought it was something we had discussed.  And I

16   was just concerned to raise this with the Court

17   before reading this.  It appears to focus it only

18   on Count 19.  It really, in our view and I believe

19   the government agrees, applies to both counts, 18

20   and 19.  The same language, but applies to both

21   counts.

22         THE COURT:  I know we talked about that,

23   and I didn't catch that.  But if I just reference

24   this for purposes both Counts 18 and 19, and then

25   I'll make a change in the charge.

1          MR. LINSIN:  And to the extent you are

2     referencing the type of waste, if you could

3     reference the D018 as well as the K087.  Thank you,

4     your Honor.

5          THE COURT:  Okay.  Okay.  No problem with

6     that?

7          MR. MANGO:  No, your Honor.  The D018 has

8     to be that type of waste from the coking process,

9     and I don't think there's any dispute that that

10     D018 is from a coking process.  Obviously there is

11     a lot of ways something can become toxic for

12     benzene.  But I think we all agree this is a D018

13     from a coke process, since it's been a coke plant

14     for about a hundred years.

15          THE COURT:  Okay.  I'll kind of present it

16     that way.  All right.  Thank you.

17          (End of side bar discussion.)

18          THE COURT:  How are you doing so far?

19          A JUROR:  Great.

20          THE COURT:  All right.  Good.  And, you

21     know, we really do appreciate it.  I know I watch

22     you, sometimes even through the corner of my eye

23     just to make sure we keep you in line.  But I know

24     sometimes you want to say, boy, can I deal with all

25     of that?  And, you know, I guess if I were in your

4200

1    shoes I'd feel the same way.  But, you know, the

2    more I talk about it, the more we go through this,

3    it really is doable.  And you have to commit

4    yourself to what you took the oath to do, and that

5    is to really gather yourselves up and make that --

6    that exceptional effort to get a handle on

7    something.  When you started out just 30 days

8    ago -- I mean, it seems like we've known each other

9    for our entire lives, right?  And it's like you

10   kind of pray for a split in the family, I guess, so

11   you don't get to see anybody the next day.

12        But, you know, and as I started out with you, I

13   mean, I didn't know what the evidence was.  But,

14   you know, K087, D018, I mean, those are household

15   terms now, right, that you shouldn't have been

16   discussing with anybody, but I know in your mind

17   they're there, right?  And you'll never forget

18   those numbers.  And, frankly, if the Lotto didn't

19   turn out the way it was, I think those are key

20   numbers.  And you might want to keep that in mind

21   for when you continue to play.

22        But getting back to this, let me talk to you in

23   terms of those numbers and Counts 18 and 19, okay?

24   And those are the last two counts.  And this

25   charge, this instruction, references both K087 and

4201

1    DO18.

2        And for purposes of both Counts 18 and 19, the

3    waste alleged to have been disposed of in those

4    counts is identified in the indictment as decanter

5    tank tar sludge from coking operations, that's what

6    we're talking about, K087.  And DO18 is waste from

7    the coking process.  Did we need to further

8    identify it?

9            MR. MANGO:  Just that have the toxicity

10   characteristic for benzene.

11           MR. LINSIN:  Yes, I agree, your Honor.

12           THE COURT:  Okay.  So K087, D018 -- I'll

13   just write -- okay.  So, under RCRA, both K087 and

14   D018 are excluded from the definitions of solid

15   waste if the K087 and D018 waste are recycled to

16   the coke ovens.  However, the exclusion is

17   conditioned on there being no land disposal of

18   either of the wastes from the point they are

19   generated to the point where they are recycled to

20   coke ovens.

21       The term "land disposal" means the discharge,

22   deposit, injection, dumping, spilling, leaking, or

23   placing of any solid waste or hazardous waste into

24   or on any land so that such solid waste or

25   hazardous waste or any constituent thereof may

1    enter the environment or be emitted into the air or

2    discharged into any waters, including groundwaters.

3        If you find that there has not been land

4    disposal of the K087 or K019 [sic] then the

5    exclusion applies, and you cannot consider either

6    as a solid waste.  But if you find that there has

7    been land disposal of one or both, then the

8    exclusion does not apply, and you must consider the

9    K087, D018 as a solid waste.  Yes?  Okay.

10       Lets define hazardous waste lest there be

11   confusion.  The term "hazardous waste" as used in

12   RCRA means a solid waste -- all right -- that has

13   been identified or listed as hazardous by the EPA

14   and New York State.  A solid waste is a hazardous

15   waste if it is either a characteristic hazardous

16   waste or a listed hazardous waste under EPA and New

17   York regulations.  And you've heard that

18   terminology before, right?  You never knew that

19   you'd hear that thing so many times.  But you have.

20       Characteristic hazardous wastes are wastes that

21   are hazardous because they exhibit one or more of

22   the hazardous characteristics identified in the

23   regulations such as toxicity.  Toxic hazardous

24   wastes are wastes containing levels of certain

25   contaminants such as benzene.  If the contaminants

1    are present in excess of the limits listed when

2    tested using appropriate test measures, the waste

3    is regulated as a toxic hazardous waste.   The EPA

4    and New York State have set the regulatory limit

5    for benzene at 0.5 milligrams per liter.

6        Now, with respect to these charges, the

7    government must prove that the defendants acted

8    knowingly.   An act is done knowingly if the

9    defendants realized what they were doing and did

10   not act through ignorance, mistake, or accident.

11   This is going to sound familiar to you.

12       You may consider evidence of the defendant's

13   acts and words along with all of the other evidence

14   in deciding whether the defendants acted knowingly.

15   It is not necessary for the government to prove

16   that the defendants knew that a particular act or

17   failure to act was a violation of the law.   In

18   other words, the government does not have to show

19   that the defendants knew that the materials were

20   designated as a hazardous waste under a particular

21   statute or regulation.

22       Although the government does not need to prove

23   that the defendants knew that the materials were

24   hazardous wastes, the government must prove that

25   the defendants knew that the materials had the

substantial potential to be harmful to others or the environment.

Now, in order to treat, store, or dispose of a hazardous waste under RCRA, the defendants must have either received a permit from EPA or New York State allowing such treatment, storage, or disposal of the waste, or have been granted interim status.

In order to qualify for interim status, the defendants must have notified EPA or New York State that they operated a hazardous waste treatment storage or disposal facility and filed an application for a hazardous waste treatment storage or facility permit. All right.

Go to that, take a look at it, just to make sure that you know we're talking about these RCRA counts now.

Now, the entrapment by estoppel defense applies here as well. Okay. To refresh your recollection -- we talked about it in the context of what charges? 1 through 15, right? Now we're dealing with 17, 18 and 19.

To refresh your recollection, the entrapment by estoppel defense is available to defendants who can establish by a preponderance of the evidence -- remember that -- that the government procured their

4205

1    commission of the illegal acts by leading them to

2    reasonably believe that they were authorized to

3    commit them.  The defendants have the burden of

4    proving the entrapment by estoppel defense by a

5    preponderance of the evidence, and that means that

6    it is more likely than not true.

7        Okay.  So, we're talking about Counts 1 through

8    15, 17 through 19.  Entrapment by estoppel defense

9    may apply, but the defendants have to prove it by a

10   preponderance of the evidence.  And that defense

11   applies equally to all of those counts.

12       Now, there's what's called an aiding and

13   abetting statute, and that's Section 2.  And that

14   will appear -- you'll see that number, Title 18

15   Section 2 appear in the indictment.  And that

16   statute will follow some of the other reference to

17   in violation of such-and-such a title and section,

18   and then will be followed by Title 18, Section 2.

19       And that statute provides that (A) whoever

20   commits an offense against the United States, or

21   aids, abets, counsels, commands, induces, or

22   precures its commission is punishable as a

23   principal; and (B) whoever fully causes an act to

24   be done, which, if directly performed by him or

25   another, would be an offense against the United

1    States, is punishable as a principal.

2        What that means is under the aiding and

3    abetting statute it is not necessary for the

4    government to show that a defendant physically

5    committed the crime with which the defendant is

6    charged in order for the government to sustain its

7    burden of proof.  A defendant who aids or abets

8    another to commit an offense is just as guilty of

9    the offense as he committed -- as if he committed

10   it himself.

11       So, you may find, for example, defendant Mark

12   Kamholz guilty of the offenses charged if you find

13   beyond a reasonable doubt that the government has

14   proven that another person actually committed the

15   offense with which defendant Kamholz is charged,

16   and that the defendant aided or abetted that person

17   in the commission of the offense.

18       So, I think you can see the first requirement

19   is that you find that another person has committed

20   the crime charged.  Obviously, no one can be

21   convicted of aiding or abetting the criminal acts

22   of another if no crime was committed by the other

23   person in the first place.  But if you do find that

24   a crime was committed, then you must consider

25   whether defendant Kamholz aided or abetted the

4207

1    commission of that crime.  And in order to aid or

2    abet another to commit a crime, it is necessary

3    that the defendant knowingly associate himself in

4    some way with the crime and that he participated in

5    the crime by doing some act to help make the crime

6    succeed.

7        To establish that defendant knowingly

8    associated himself with the crime, the government

9    must establish that the defendant knew that the

10   offenses described in Counts 1 through 19 of the

11   indictment were committed.  To establish that the

12   defendant participated in the commission of the

13   crime, the government must prove that the defendant

14   engaged in some affirmative conduct or overt act

15   for the specific purpose of bringing about the

16   crime.  The mere presence of the defendant where a

17   crime is being committed, even coupled with

18   knowledge by the defendant that a crime is being

19   committed, or merely associating with others who

20   are committing a crime is not sufficient to

21   establish aiding and abetting.

22       One who has no knowledge that a crime is being

23   committed or is about to be committed, but

24   inadvertently does something that aids in the

25   commission of a crime is not an aider and abettor

1    An aider and abettor must know that the crime is

2    being committed and act in a way which is intended

3    to bring about the success of the criminal venture.

4    And to determine whether a defendant aided or

5    abetted the commission of a crime with which he is

6    charged, ask yourself these questions:  Did he

7    participate in the crime charged or something he

8    wished to bring about?  I'll read that again.  Did

9    he participate in the crime charged as something he

10   wished to bring about?  Second, did he knowingly

11   associate himself with the criminal venture?  And

12   third, did he seek by his actions to make the

13   criminal venture succeed?  If he did, then the

14   defendant is an aider and abettor, and therefore

15   guilty of the offense.

16       If, on the other hand though, your answer to

17   any one of these questions is no, then the

18   defendant is not an aider and abettor, and you must

19   find him not guilty as an aider and abettor.

20       There's something called venue, and with

21   respect to the elements that we've already talked

22   about, you must consider whether any act in

23   furtherance of the crimes occurred within the

24   Western District of New York.  But, you're

25   instructed by me that Erie County and the city of

1    Buffalo metropolitan area are within the district

2    17-county territorial area.  So in that regard, the

3    government need not prove that the crime itself was

4    committed in this district or the defendant himself

5    was present here.

6         It is sufficient to satisfy this element if any

7    act in furtherance of the crime occurred within

8    this district.

9         If you find that the government has failed to

10   prove that any act in furtherance of the crime

11   occurred within this district, or if you have a

12   reasonable doubt on this issue, then you must

13   acquit.

14        While we are on the subject of the elements --

15   and remember I told you have to take it, look at

16   each count.  The indictment will have dates in it.

17   And in that regard, it really doesn't matter if the

18   indictment charges that a specific act occurred on

19   or about a certain date and the evidence indicates

20   that, in fact, it was on another date.  The law

21   only requires a substantial similarity between the

22   dates alleged in the indictment and the date

23   established by testimony or exhibits.

24        Okay.  So you got to be close, bottom line.

25   All right.  You're going to get the indictment.

1    You know how to use it.  It's not proof.  And it is

2    your guide for your deliberations and to know

3    whether the government has satisfied its burden of

4    proof beyond a reasonable doubt.

5        Tomorrow you're going to start your

6    deliberations, okay?  I'm going to let you go this

7    afternoon.  Maybe even a little bit earlier than

8    you expected.  But it's a little snowy out there,

9    so we'll give you the opportunity to enjoy those

10   flakes.  And be careful on your way home.  You

11   know, we hope you can get up and running and

12   started promptly.  Is it any difficulty for you

13   getting here by 9:30?  You can do that?  You're

14   used to that.  We'll get you started then.  We'll

15   probably have you report here, and we'll make sure

16   we're altogether and nothing else is interfering

17   with your getting started.  And as soon as you're

18   assembled, if I can get you in earlier -- I don't

19   have a calendar tomorrow, right? -- so we can -- we

20   can start at 9:30.  And as soon as we're ready,

21   we'll get you started with the deliberations.

22       You know, we'll help you in every way we can.

23   We're going to get all the exhibits assembled.

24   You'll get everything.  I'm going to send in the

25   board with the photographs of the witnesses for

1    your guidance.  And you'll have an exhibit list,

2    you'll have the exhibits.  We will ask you to work

3    hard on the testimony.  We don't really have a

4    written record of everything that's done here.

5    We'll help out.  If you need some help, you know,

6    we will ask you to be specific.

7        Our communications will no longer be this way

8    for the most part.  Once you have your foreperson

9    in place, there will be written communications

10   between you and me.  Your foreperson will be

11   required to sign a note, send it to me.  I'll look

12   at the question.  I'll usually respond in writing.

13   That should resolve it.  But if there's more to do,

14   we'll bring you back in here after I discuss

15   matters with the attorneys, and I'll speak to your

16   foreperson.  And he or she will make sure that

17   everything gets properly communicated back and

18   forth.

19       And the reason for that is because you take on

20   a different status when you're in deliberations.  I

21   mean, nobody, nobody can interfere with those

22   deliberations.  Chris will be around, but he

23   obviously is outside the room.  He does not

24   participate.  He will not speak with you.  You just

25   go about doing your business, because it is that

1    sacrosanct, that important.

2        But if there's anything we can help you with,

3    make it a specific as you can.  We will try to find

4    whatever you want.  But we urge you to just take a

5    deep breath when you start out, and then listen to

6    everybody.  If there's an issue, go from one person

7    to another.  Just try to get it resolved, work it

8    through yourself, look at that indictment.  I mean,

9    do you know anybody that could have repeated the

10   same things so many times as I just did with you?

11   Probably not humanly possible.  But you've got the

12   framework.  Now you go right into it, and you start

13   figuring out for yourselves how you want to go

14   about getting all these matters resolved.

15       You know, if we do have communications in the

16   courtroom or by note, don't tell me, if you take a

17   vote, what the votes are.  We're not supposed to

18   know that.  You have to work through that yourself.

19   That's all confidential information.  So you work

20   through it until you get to the point where you can

21   advise me by note, and Chris will carry it to me

22   stating that you have your unanimous verdict on the

23   indictment in this particular case.

24       All right.  Remember your limitations are

25   really just a few, but they're critical, and that

1    is you decide the case on the evidence or the lack

2    of evidence.  You know what the evidence consists

3    of.  You have to hold the government to its burden

4    of proof.  If you find with respect to the defense

5    that's been argued to you, the entrapment by

6    estoppel defense, you have to be satisfied that the

7    defendant has proven that by a preponderance of the

8    evidence.  So you've got to keep all these

9    definitions, concepts, burdens separate.  But

10   remember the defendants are presumed innocent until

11   and if proven guilty to your satisfaction beyond a

12   reasonable doubt.

13       Each of you winds up deciding this case for

14   yourself.  I mean, that's -- that's critical here.

15   And, you know, to do that that involves being

16   willing to share your views, exchange with others,

17   being respectful of each other.  I mean, you spent

18   a lot of time together.  And so far everybody seems

19   to be still healthy and getting along and all that

20   kind of stuff.  So very, very important that you

21   continue in that fashion.

22       Keep in mind that while you decide the case for

23   yourself, you remain entitled to your own opinion.

24   You know, we urge you to exchange your views.

25   That's the purpose of deliberation.  That purpose,

4214

1    discuss and consider the evidence, listen to the

2    arguments of your fellow jurors, present your

3    individual views, consult with one another, and

4    then reach an agreement based solely or wholly on

5    the evidence, if you can do so without violence to

6    your own individual judgment.

7         Each of you must decide the case for yourself,

8    and after consideration with your fellow jurors of

9    the evidence in this case.  But you should not

10   hesitate to change an opinion which, after

11   discussion with your fellow jurors, appears

12   erroneous.

13        However, if after careful consideration of all

14   the evidence and the arguments of your fellow

15   jurors you entertain a conscientious view that

16   differs from the others, you are not to yield your

17   conviction simply because you are outnumbered.  But

18   your final vote must reflect your conscientious

19   conviction as to how the issue should be decided.

20   And again, your verdict, whether guilty or not

21   guilty, should be unanimous.

22        Make sure you stay away from any social media,

23   any publicity, any investigation, anything that is

24   outside of what you've been presented with by way

25   of evidence here in this court.

1            You know, we told you from the beginning

2       everything you will need you will hear, see,

3       observe, be given within the four walls of this

4       courtroom.  And again, it would be a violation of

5       your oath as jurors to allow yourselves to be

6       influenced by anything outside of this courtroom,

7       including publicity.

8            Don't have any discussions, no outside contact.

9       If you want me to be more specific -- I love

10      reading this charge, because I'm not sure I'm

11      conversant in all of these.  But you must not

12      communicate with or provide any information to

13      anyone by any means about this case.  You may not

14      use any electronic device or media such as

15      telephone, cellphone, Smartphone, iPhone,

16      BlackBerry, or computer, the Internet, any Internet

17      service, or any text or instant messaging service,

18      or any Internet chatroom, blog or Web site such as

19      Facebook, Myspace, LinkedIn You Tube or Twitter to

20      communicate to anyone any information about this

21      case or to conduct any research about this case

22      until I accept your verdict.

23           In other words, you cannot talk to anyone on

24      the phone, correspond with anyone or electronically

25      communicate with anyone about this case.  You can

1    only discuss the case in the jury room with your

2    fellow jurors during deliberation.  And I expect

3    that you will inform me as you become aware of

4    another juror's violation of these instructions if

5    that ever happens.

6         You may not use the electronic means to

7    investigate or communicate about the case because

8    it's important that you decide this case based

9    solely on the evidence presented in the courtroom.

10   Information on the Internet or available through

11   social media might be wrong, incomplete, or

12   inaccurate.  You are only permitted to discuss the

13   case with your fellow jurors during deliberations,

14   because they have been here with you, seen and

15   heard the same evidence that you have.

16        In our judicial system it is important that you

17   are not influenced by anything or anyone outside of

18   the courtroom.  Otherwise, your decision may be

19   based on information known only by you and not your

20   fellow jurors or the parties in the case.

21   Ultimately, what's wrong with that?  That would be

22   unfair and possibly adversely impact the judicial

23   process.

24        So you start, get your jury foreperson in

25   place.  And that person will be responsible for

1    deciding how to proceed with your job that lies

2    ahead and for signing all the communications with

3    me if any of those arise before you're ready to

4    return your unanimous verdict.

5        And when you do have a verdict ready, you hand

6    that, the signed note to -- well, the note to the

7    court security officer.

8        Chris, are you going to be here tomorrow?

9            COURT SECURITY OFFICER:  Yes, sir.

10           THE COURT:  And he'll bring the note to

11   me.  And then you'll have the indictment [sic].

12   You'll take it on a count-by-count basis.  You'll

13   date it and sign it as you proceed through each

14   count until you're finished with the full

15   consideration of the evidence.

16       Remember, your answers to all aspects of the

17   consideration of each count of the indictment must

18   be unanimous, and then we'll take the return of the

19   indictment [sic] in the courtroom.  There is a

20   procedure for doing that.  I'll explain how that's

21   done.  But once it's received, it's difficult to

22   undo, and we urge you to make sure that when you do

23   return the verdict through your foreperson, that

24   it's done by your foreperson in full reference of

25   the unanimous view of each of you and the entire

4218

1    jury when it comes to a consideration of each of

2    the counts in the indictment.

3         Okay.  That's it.  But I do need to speak to

4    the attorneys to make sure that I didn't misspeak

5    or didn't leave something out.  Or if there's any

6    problem, I'll get that straightened out.  But,

7    assuming there's no problem, then we'll let you go

8    for the day, and we'll see you here tomorrow.

9         May I have the attorneys come up, please?

10                (Side bar discussion held on the record.)

11                THE COURT:  Mr. Mango, for the government,

12   anything that I need to address?

13                MR. MANGO:  Your Honor, I don't know if

14   you need to read this.  The one thing I saw that

15   was missed, in charge number 36, which is the Clean

16   Air Act counts, the statutory reference was not

17   read.  I know you did read the RCRA statute.  The

18   Clean Air Act statute was not read.  I don't know

19   if you want to go back to it.  We have no

20   preference either way.  I just wanted to bring it

21   to your attention that that wasn't read.

22                THE COURT:  I probably won't do that.  It

23   will appear in the charge.  I've got the numbers

24   there, so I think that will suffice.

25                MR. LINSIN:  We have no concern about

1    that, your Honor.

2        Just very briefly for the record, your Honor, I

3    do want to note our continuing objection to the

4    Court's failure to include the intent to dispose

5    element with regard to Counts 18 and 19.  And as

6    long as we are here on the point, with respect to

7    the special verdict form, our continuing objection

8    to not including the special findings with respect

9    to the defense as to the applicable counts and not

10   including guidance as to the unanimity,

11   particularly as to which action or activity

12   constitutes active management for Count 17.  I've

13   made these points before.  I just wanted to make

14   them for the record.

15        THE COURT:  Understood.  The record will

16   so reflect.

17        MR. PERSONIUS:  Your Honor, we join in

18   Mr. Linsin's objections.

19        The additional two comments that I have, I

20   think it goes without saying, on page 90 what goes

21   to the jury will need to be -- very end of that

22   will need to be corrected.

23        Mine's different, Judge.  My page 90 is -- it's

24   what Andrew provided us with.  It would be part --

25   the end of charge 54 where you read the RCRA

4220

1    statute.  There's just some --

2              MR. LINSIN:  The Court read it

3    differently.

4              THE COURT:  I read it differently?

5              MR. LINSIN:  You read it would be a

6    violation as I recall, and I think that would be an

7    appropriate amendment or revision rather than shall

8    be punished.

9              MR. MANGO:  Well, maybe shall be a crime,

10   leave it at that, instead of a violation.

11             THE COURT:  You want me to change -- read

12   that again or just --

13             MR. PERSONIUS:  No, I don't think it's --

14   no, just what goes to the jury, please.

15        And then, your Honor, the only other -- we

16   talked about just to make sure that with the 82,

17   however we handle it with the D018 --

18             THE COURT:  Yes.

19             MR. PERSONIUS:  -- to make that change.

20             THE COURT:  Yes.  Okay.  I can take care

21   of that.  That's it?

22             MR. PERSONIUS:  Yes, Judge.

23             MR. LINSIN:  That's it.

24             THE COURT:  Okay.  Thank you very much.

25             MR. PERSONIUS:  Thank you, Judge.

1                    (End of side bar discussion.)

2          THE COURT:  Okay.  We're pretty close.

3    I'll just tell you what happened.  I was overruled.

4    I wanted to reread all of the instructions, and the

5    attorneys overruled me.  They thought you might

6    appreciate going home tonight instead.  So being

7    overruled, we're going to let you do that.  Get a

8    good night sleep.  Be safe going home.  Be safe

9    coming back.  Don't do anything to disturb the

10   impartiality, the openmindedness, the real

11   dedication and engagement that you put into this

12   case, and we look forward to getting you started no

13   later than 9:30 tomorrow morning, okay?  All right.

14      Thank you very, very much.  We'll see what

15   time?

16          THE JURY:  9:30.

17          THE COURT:  Okay.  Didn't want to let that

18   go for the last night.  We'll see everybody here

19   tomorrow.  Yes?

20          A JUROR:  Do the alternates have to come

21   back?

22          THE COURT:  They do have to come back in

23   case somebody else doesn't.  That's an added part

24   of the insurance policy.  Guys, just hang in there,

25   and I know you've been engaged as well.  Okay.

4222

1    Thank you very much.  We'll see you tomorrow.  Be

2    good.

3              (Jury excused from the courtroom.)

4              THE COURT:  Thank you.  You're free to go.

5    But there might be a few things we want to talk

6    about?

7              MR. LINSIN:  There is --

8              THE COURT:  Have a seat.

9              MR. LINSIN:  There's really only one

10   question, just very quickly, your Honor.  For our

11   planning purposes once the jury retires to

12   deliberate tomorrow, is it the Court's practice to

13   permit us to be on 15- or 20-minute call?  How does

14   that Court wish to plan for that?  We just need to

15   make arrangements.

16             THE COURT:  Yeah.  I mean, what I prefer

17   is that you're as close in proximity to the

18   courthouse -- I mean, if it's 15 minutes or

19   whatever, that's fine.  You probably want to go

20   back to the hotel.

21             MR. LINSIN:  We're just at the Hyatt.  It

22   should not --

23             THE COURT:  That works fine.

24             MR. LINSIN:  Fine.

25             THE COURT:  But we need contact numbers,

4223

1    your cellphone numbers.  Anybody wants to stay

2    closer by, that's fine.  There's no telling how

3    this is going to go.  But by the time we get

4    everybody reassembled, 15 or 20 minutes is okay.

5              MR. LINSIN:  Okay.  Thank you.

6              THE COURT:  Anything else?

7              MR. MANGO:  We'll likely be on the third

8    floor, but I'll leave some numbers to make sure.

9              THE COURT:  Okay.

10             MR. PERSONIUS:  Your Honor, would you like

11   us to be here before 9:30 tomorrow or at 9:30?

12             THE COURT:  You know, I'd like you to be

13   here a few minutes before just in case there's

14   anything that we need to discuss.  You never know,

15   something may happen or I might get a note or

16   something.  Having you here a little bit early

17   would be helpful.  And then, you know, I think it's

18   a good thing for the jury to see you all here.  All

19   right.  And then I'll send them back to start

20   deliberations.  Except you for, Mr. Mango, you can

21   stay home if you -- no, just kidding.  So does that

22   work for everybody?

23             MR. PERSONIUS:  Yes, Judge, is 9:15 early

24   enough, or do you want us here at 9:00?

25             THE COURT:  No.  No.  9:15 is plenty

4224

1    early, Mr. Personius.  And, you know, I'm confident

2    that we'll do our best to make sure that everything

3    is in order.  Colleen will be working with the

4    paralegals because the attorneys have to -- is that

5    already done?

6              THE CLERK:  They already signed off.

7              THE COURT:  That's great work.  We will

8    get everything ready.  We'll have it available for

9    the jury.  The board with the photographs will go

10   in, and I think, you know, we can't really do

11   anything more than that.  You've given it your best

12   efforts.  We'll see what happens tomorrow.

13             MR. LINSIN:  Thank you, your Honor.

14             MR. MANGO:  Thank you very much.

15             THE COURT:  Andrew, was there anything

16   else?

17             LAW CLERK:  No, Judge.

18             *      *      *      *      *      *

19

20

21

22

23

24

25

1                        CERTIFICATION

2

3          I certify that the foregoing is a

4     Correct transcription of the proceedings

5     Recorded by me in this matter.

6

7

8                        s/Michelle L. McLaughlin
                         Michelle L. McLaughlin, RPR
9                             Official Reporter
                            U.S.D.C., W.D.N.Y.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25