IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.  10-CR-219-S

TONAWANDA COKE CORPORATION

                       Defendant.

# DECLARATION OF ANTHONY J. VEREL IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR AN IMMEDIATE HEARING

**Anthony J. Verel**, under penalty of perjury and pursuant to 28 U.S.C. § 1746, declares the following to be true and correct:

1. I am the Director for Safety, Security, and Human Resources for Tonawanda Coke Corporation ("TCC"), and I submit this declaration in opposition to the Government's motion for an immediate hearing.

2. I have been asked to give additional information concerning an incident that occurred on the night of September 3, 2018, in which firefighters were called to respond to reports of a structure fire at the Tonawanda Coke facility, 3875 River Road, Tonawanda, New York.

3. The investigation of the event is ongoing, and I provide this declaration based on my personal knowledge and recollection and preliminary investigation, except for those matters stated upon information and belief. For those matters stated upon information and belief, I believe them to be true.

4. At approximately 8:22 p.m. on September 3, 2018, I was informed by plant personnel that a power outage had occurred. At that time, the cause of the outage was unknown.

5. When I was notified of the outage, I immediately notified TCC's field safety supervisor, plant operations superintendent, assistant plant superintendent, chief electrician, environmental supervisor, and others of the outage. A power outage needs to be operationally addressed, but does not present an immediate threat to health or safety.

6. Upon information and belief, as a result of the electrical outage, TCC's exhauster fan would have continued to function for approximately 15-20 minutes. To bring the exhauster fan back online, the plant must transfer to generator power. Transferring to generator power, specifically to power the exhauster, typically takes approximately 20-30 minutes under the circumstances presented on September 3.

7. Upon information and belief, while the exhauster fan is off, exhaust from the coke oven battery cannot be pulled out of the system, and pressure builds within the system. That pressure must be released, but environmental regulations prohibit direct release of the exhaust into the atmosphere. Regulations require that the exhaust be burned, or "flared."

8. Upon information and belief, shortly after learning of the power outage, the plant began controlled flaring of exhaust from the "battery flare." In connection with that flaring process, the operation may have also included flaring from one or more "goosenecks" (curved pipes) that are connected to the gas main. The flaring process would have caused flames to emerge from the top of the battery flare, potentially large enough to be seen in a clear night sky.

9. Upon information and belief, in addition to the battery flare, the plant's "west flare" in the byproducts department operates automatically in a separate location, independently of the battery flare. The west flare is used to control the pressure of fuel gas. It may have also been flaring at the time of the battery flare.

10. Upon information and belief, the battery flare operation was in compliance with environmental regulations, and served to protect against an environmental excursion.

11. Simultaneous operation of the battery flare, the goosenecks, and the west flare could create a perception of a larger "fire" from a distance.

12. At approximately 8:50 p.m., I was notified that first responders were arriving at the plant. Through TCC's structured reporting system, I had not received any notification of any plant emergency. Through the same structured reporting system, I inquired from plant staff whether there were any fire emergencies or other emergencies. Plant staff confirmed that there were no emergencies.

13. At the same time, I was communicating by phone with the responding fire chief for one of the responding fire companies. The fire chief told me that community members had reported multiple structural fires at the plant. I advised him that I had been in direct communication with plant personnel since the power outage, that they were following standard operating procedures, and that there were no other incidents that could have been interpreted as structural fires. In addition, I advised him that there were no other emergencies.

14. In the past, there have been several incidents in which community members mistakenly reported fires at the plant. Those mistaken reports were later determined to

be either false alarms, or fires occurring in other locations not on TCC property. The fire chief acknowledged this when I spoke with him on September 3.

15. TCC has standard operating procedures ("SOPs") for responding to power failures at the plant. The SOPs are in place for the safety of plant employees, as well as the safety of outside emergency personnel.

16. TCC also has a plan for responding to emergencies, including a structure for communication between management staff and third-party emergency personnel. This plan is communicated to employees as part of TCC's general safety training.

17. Part of TCC's general safety training also requires non-essential personnel to proceed to a muster point when emergencies occur, before third-party first responders and vehicles are allowed on site. This is to prevent involvement of non-essential personnel in addressing the emergency, and thereby avoid unnecessary injury to plant personnel.

18. TCC emergency response staff are trained on plant operations and procedures for addressing emergencies. Once TCC personnel can verify that an emergency exists, third-party first responders are allowed on site. Until then, they are asked to stand by and await escort so they can safely navigate through the plant. This also allows plant personnel and third-party first responders to coordinate important information that may be relevant to the safety and health of first responders, and necessary equipment to address the emergency (if one exists). The practice is intended to ensure the safety of TCC employees, as well as third-party first responders. The practice also prevents third-party first responders from hindering TCC's trained response personnel.

19. To my knowledge, other industrial entities in the area, including 3M and PeroxyChem, use similar procedures.

20. During my discussions with the fire chief, I had already confirmed with plant personnel that there was no fire emergency. Accordingly, it was my desire to cooperate with first responders, and assure them that there was no structural fire or other emergency. However, I also wanted to maintain control of the situation to prevent unnecessary risk to TCC employees, or to third-party first responders.

21. As a precaution, I advised the fire chief that I would permit him and his associate into the plant in their fire department SUV, accompanied by an escort to ensure their safety. I also allowed the Town of Tonawanda fire inspector to join the escort in his SUV.

22. TCC's byproducts supervisor told me that he escorted the two SUVs, and waited with them as fire personnel observed the flare operation.

23. I arrived on site at approximately 9:00 p.m. After debriefing with the general foreman in charge of the flaring operation, the electrical supervisor, and the plant engineer, I joined the fire personnel as they observed the flare operation. The fire personnel were allowed to confirm that the flare was a controlled burn.

24. At approximately 9:50 p.m., the fire personnel departed the plant, before the flare operation was complete.

25. To my knowledge, the power outage and necessary flaring operation are not related to any of the opacity measurements that are the subject of the Government's current motion. Upon information and belief, around 1:00 a.m. on September 4, National Grid indicated

they believe the outage may have been caused by a bird strike at the plant's substation. The specific cause of the outage is still under investigation, but I currently have no reason to believe that the outage was caused by TCC's operations.

Dated: September 4, 2018

_____
Anthony J. Verel